**22-cv-01237-RGA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Boy Scouts of America and Delaware BSA, LLC,[1] <br><br>    Debtors | Chapter 11 <br><br> Case No. 20-10343 (LSS) <br><br> Jointly Administered |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, <br><br>        Appellants. <br><br>     v. <br><br> Boy Scouts of America and Delaware BSA, LLC, <br><br>        Appellees | <br><br> Case No. 22-cv-01237-RGA <br><br><br> Jointly Consolidated[2] <br><br><br> On appeal from confirmation of Debtors' Plan of Reorganization |

### <u>BRIEF OF APPELLANTS LUJAN CLAIMANTS</u>

| | |
|---|---|
| LOIZIDES, P.A. <br> Christopher D. Loizides (No. 3968) <br> 1225 North King Street, Suite 800 <br> Wilmington, DE 19801 <br> Phone: 302.654.0248 <br> Email: loizides@loizides.com | LUJAN & WOLFF LLP <br> Delia Lujan Wolff (admitted Pro Hac Vice) <br> Suite 300, DNA Bldg. <br> 238 Archbishop Flores St. <br> Hagatna, Guam 96910 <br> Phone: (671) 477-8064/5 <br> Facsimile: (671) 477-5297 <br> Email:  dslwolff@lawguam.com |

*Attorneys for Appellants the Lujan Claimants*

Dated: November 7, 2022

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243,22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252,22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237.  The Lujan Claimants' appeal is docketed at 22-cv-01258.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | STATEMENT OF JURISDICTION | 2 |
| III. | STATEMENT OF ISSUES AND STANDARD OF REVIEW | 2 |
| IV. | STATEMENT OF THE CASE | 3 |
| V. | SUMMARY OF ARGUMENT | 5 |
| VI. | ARGUMENT | 6 |

**A.  The Bankruptcy Court Erred in Confirming the Plan with Nonconsensual Third-Party Releases and Injunctions** — 6

    1. Debtors Failed to Prove Subject Matter Jurisdiction Exists over Survivors' Claims against Nondebtors. — 6

    2. Even if Subject Matter Jurisdiction Exists, the Bankruptcy Code Does Not Authorize Nondebtor Releases — 16

    3. Assuming Statutory Authority Exists, the Releases and Injunctions Fail under Hallmarks of Sister Circuits and Master Mortgage — 23

        a. Hallmarks from Sister Circuits — 23

        b. Master Mortgage — 28

**B.  The Bankruptcy Court Erred in Confirming a Plan with the Insurance Settlements and which Invalidates, Impairs, and Supersedes Lujan Claimants' Direct Action Rights** — 34

    1. The Confirmed Plan invalidates, impairs, and supersedes direct action rights in violation of the McCarran-Ferguson Act — 34

    2. The proceeds of liability insurance policies are not property of the Bankruptcy Estate and cannot be released or enjoined — 48

    3. The Hartford and Century and Chubb Companies insurance settlements for policy buybacks free and clear of others' interests in the policies are for payment grossly below policy limits and should have been denied — 51

    4. The Plan impermissibly modifies Lujan Claimants' rights — 52

    5. The Plan fails to adequately protect and compensate direct action claimants for their interests in insurance policies — 56

    6. The Court lacks jurisdiction over the 1976 and 1977 Hartford Policies for coverage of child sexual abuse claims, since BSA

previously released its rights to such coverage ............ 60

7. The sale and settlement of nondebtors' separate insurance policies should have been denied ............ 61

8. The insurance settlements fail the Martin standard ............ 62

C. **The Bankruptcy Court Erred in Confirming a Plan that Violates the Automatic Stay Imposed in the Archbishop of Agana's Bankruptcy Case** ............ 64

D. **The Bankruptcy Court Erred in Confirming a Plan that Fails the Best Interest of Creditors Test** ............ 66

E. **The Plan Fails to Properly Classify the Claims of Lujan Claimants** ............ 71

F. **The Plan Treats Survivors, Including Lujan Claimants, Unequally** ............ 72

G. **The Bankruptcy Court Erred in Granting Debtors' Motion to Amend and Supplement and Confirming the Plan which Materially Differs from the Solicited Plan** ............ 74

VIII. **JOINDER** ............ 79

IX. **CONCLUSION** ............ 79

# <u>TABLE OF AUTHORITIES</u>

## Cases

*ACandS, Inc. v. Travelers Casualty & Surety Co.*,
  435 F.3d 252 (3d Cir. 2006) ................................................................... 48,65
*Am. Bankers Ins. Co. of Fla. v. Inman*,
  436 F.3d 490 (5th Cir. 2006) ...................................................................43
*AOV Indus., Inc.*,
  792 F.2d 1140 (D.C. Cir. 1986)................................................................23
*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) ...................................................................................37
*Baumgarten v. U.S.*,
  322 U.S. 665 (1944) .................................................................................3
*Billing v. Ravin, Greenberg & Zackin, P.A.*,
  22 F.3d 1242 (3d Cir. 1996) ....................................................................22
*Block v. Potter*,
  631 F.2d 233 (3d Cir. 1980) .....................................................................3
*Bouie v. JDV Freight Transport, LLC*,
  No. 20-211-JWD-EWD, 2021 WL 3744188 (M.D. La. Aug. 24, 2021) ............48
*Celotex Corp. v. Edwards*,
  514 U.S. 300 (1995) .................................................................................8
*Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C.*,
  173 Wis.2d 665 (1993) .............................................................................54
*Del. v. Van Arsdall*,
  475 U.S. 673 (1986) .................................................................................6
*Estate of Lellock v. The Prudential Ins. Co. of Am.*,
  811 F.2d 186 (3d Cir. 1987) ....................................................................48
*Evans v. TIN, Inc.*,
  Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-
  2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18,
  11-3050, 2012 WL 2343162, at *10 (E.D. La. June 20, 2012)................. 43,44,46
*First Fidelity Bank v. McAteer*,
  985 F.2d 114 (3d Cir. 1993) ................................................................ 48,51
*Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Atkins*,
  926 S.W. 2d 287 (Tex. 1996) ................................................................ 14,21
*Green v. Welsh*,
  956 F.2d 30 (2d Cir. 1992) ......................................................................51
*Hannie v. Wall*,
  569 So. 2d 1044 (La. Ct. App. 1990) ........................................................57
*Hayes v. New Orleans Archdiocesan Cemeteries*,
  805 So.2d 320 (La. Ct. App. 2001) ..........................................................57
*Highmark Inc. v. UPMC Health Plan, Inc.*,
  276 F.3d 160 (3d Cir. 2001).....................................................................45
*Houston v. Edgeworth (In re Edgeworth)*,
  993 F.2d 51 (5th Cir. 1993) .....................................................................49
*Humana, Inc. v. Forsyth*,
  525 U.S. 299 (1999) .................................................................................44
*Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau*,
  97 Wis.2d 435 (1980) ..............................................................................57
*In re Advanced Cellular Systems*,
  235 B.R. 713 (1999) ................................................................................37
*In re Aegean Marine Petroleum Network, Inc.*,

599 B.R. 717 (Bankr. S.D.N.Y. 2019) ..................................................................61
*In re Amwest Ins. Group*,
  285 B.R. 447 (Bankr. C.D. Cal. 2002) ..............................................................36
*In re Archbishop of Agana*,
  Bankruptcy Case No. 19-00010 (D. Guam) .........................................................9
*In re Archbishop of St. Paul & Minneapolis*,
  579 B.R. 188 (Bankr. D. Minn. 2017).................................................................53
*In re Billing*,
  150 B.R. 563 (D.N.J. 1993) ................................................................................22
*In re Charles Street African Methodist Episcopal Church of Boston*,
  499 B.R. 66 (Bankr. D. Mass. 2013) ..................................................................30
*In re Collins*,
  180 B.R. 447 (E.D. Va. 1995) ............................................................................58
*In re Combustion Engineering, Inc.*,
  391 F.3d 190 (3d Cir. 2005) ........................................................ 6,7,8,11,12,38,
*In re Continental Airlines*,
  203 F.3d 203 (3d. Cir 2000) ...................................................... 16,23,31,38,50
*In re Conseco, Inc.*,
  301 B.R. 525 (Bankr. N.D. Ill. 2003) .................................................................67
*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...............................................................63
*In re Estate of Gardinier*,
  40 N.J. 261 (1963) .............................................................................................55
*In re Federal-Mogul Global, Inc.*,
  No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. 2007) ..................................74
*In re Federal-Mogul Global, Inc.*,
  684 F.3d 355 (3d Cir. 2012) ..............................................................................40
*In re Grabill Corp.*,
  967 F.2d 1152 (7th Cir. 1992) ...........................................................................22
*In re Heron, Burchette, Ruckert & Rothwell*,
  148 B.R. 660 (Bankr. D.D.C. 1992)....................................................................32
*In re Jet Fla. Sys., Inc.*,
  883 F.2d 970 (11th Cir. 1989) ...........................................................................51
*In re Johns–Manville Corp.*,
  517 F. 3d 52 (2d Cir. 2008) ..........................................................................18,
*In re La. World Exposition, Inc.*,
  832 F.2d 1391 (5th Cir. 1987) ...................................................................... 48,49
*In re Lee*,
  25 B.R. 135 (Bankr. E.D. Pa. 1982) ..................................................................58
*In re Martin*,
  91 F.3d 389 (3d Cir. 2002) ................................................................................62
*In re Master Mortgage Investment Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994)..................................................... 28,29,31,
*In re Millennium Lab Holdings, II, LLC*,
  575 B.R. 252 (Bankr. D. Del. 2017)...................................................................29
*In re Mrs. Weinberg's Kosher Foods*,
  278 B.R. 358 (Bankr. S.D.N.Y. 2002) ...............................................................66
*In re New Century TRS Holdings, Inc.*,
  505 B.R. 431 (Bankr. D. Del. 2014).....................................................................7
*In re Nutraquest, Inc.*,
  434 F.3d 639 (3d Cir. 2006) ..............................................................................49
*In re Optical Tech., Inc.*,
  216 B.R. 989 (M.D. Fla. 1997).......................................................................66,67
*In re PRS Ins. Group, Inc.*,

iv

294 B.R. 609 (Bankr. D. Del. 2003) .............................................................. 36,37
*In re Purdue Pharma, L.P.,*
21 cv 7532 (CM), 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) ............. 17,39,40
*In re Quigley Co.,*
437 B.R. 102 (Bankr. S.D.N.Y. 2010) .................................................... 34,72,73
*In re Scott,*
607 B.R. 211 (W.D. Pa. 2019) .................................................................................6
*In re Smith Corona Corp.,*
212 B.R. 59 (Bankr. D. Del. 1997)........................................................................78
*In re SportStuff, Inc.,*
430 B.R. 170 (B.A.P. 8th Cir. 2010) ....................................................................53
*In re Wash. Mut., Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011)......................................................................28
*In re W.R. Grace & Co.,*
591 F.3d 164 (3d Cir. 2009) ................................................................... 3,6,8,9,67
*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012) ...................................................................................52
*In re Wool Growers Cent. Storage Co.,*
371 B.R. 768 (Bankr. N.D. Tex. 2007) ........................................................... 32,34
*Infant C. v. Boy Scouts of America, Inc.,*
391 S.E.2d 322 (Va. 1990) ............................................................................ 14,21
*Juarez v. Boy Scouts of America, Inc.,*
81 Cal. App. 4th 377 (2000) .......................................................................... 14,18
*L.P. v. Oubre,*
547 So.2d 1320 (La. Ct. App. 1989) ............................................................. 14,20
*Landry v. Exxon Pipeline Co.,*
260 B.R. 769 (Bankr. M.D. La. 2001)..................................................................49
*Litton v. Ford Motor Co.,*
554 So.2d 99 (La. Ct. App. 1989) ........................................................................57
*Malpeli v. Beneficial Fin. Co. (In re Malpeli),*
7 B.R. 508 (Bankr. N.D. Ill. 1980) .......................................................................56
*Martin v. Kane,*
784 F.2d 1377 (9th Cir. 1986) .............................................................................62
*Martin v. Richards,*
192 Wis.2d 156 (Wis. 1995)................................................................................57
*Matthies v. Positive Safety Mfg. Co.,*
No. 99-0431, 2000 WL 892825 (Wis. Ct. App. July 5, 2000) .............................57
*Mission Prod. Holdings, Inc. v. Tempnology, LLC,*
139 S. Ct. 1652 (2019)........................................................................................53
*N.K. v. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,*
175 Wash. App. 517 (Wash.App. 2013) ........................................................ 14,20
*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.,*
692 F. 3d 283 (3d Cir. 2012)., ..........................................................................6, 7
*Pacor, Inc. v. Higgins,*
743 F.2d 984 (3d Cir. 1984) ...............................................................................8,
*Pepper v. Litton,*
60 S. Ct. 238 (1939)............................................................................................10
*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.),*
327 F.3d 537 (7th Cir. 2003) ...............................................................................57
*Prudential Ins. Co. v. Benjamin,*
328 U.S. 408 (1946) ............................................................................................36
*Rauch v. Am. Fam. Ins. Co.,*

115 Wis.2d 257 (1983) ............................................................................55
*Reis v. OOIDA Risk Retention Group, Inc.,*
303 Ga. 659 (2018)...............................................................................47
*Reyes v. First Net Ins. Co.,*
2009 Guam 17 .......................................................................................57
*Roe No. 1 v. Boy Scouts of America Corp.,*
147 Conn. App. 622 (2014).............................................................. 14,19
*SEC v. Nat'l Securities, Inc.,*
393 U.S. 453 (1969) ......................................................................... 42,46
*Shipman v. Kenosha Unified Sch. Dist.,*
57 Wis.2d 697 (1973) ...........................................................................56
*Society Ins. v. Capitol Indem. Corp.,*
260 Wis.2d 549 (Ct. App. 2003) ...........................................................55
*Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.,*
601 F.3d 329 (5th Cir. 2010) ................................................................43
*Union Labor Life Ins. Co. v. Pireno,*
458 U.S. 119 (1982) ......................................................................... 42,47
*United States v. Del. Dep't of Ins.,*
No. 20-829-MN-CJB, 2021 WL 3012728, (D. Del. July 16, 2021) .............. 36,37
*United States Dep't of Treasury v. Fabe,*
508 U.S. 491 (1993) ..................................................................... 35,42,46
*United States Fidelity & Guaranty Co. v. Bray,*
225 U.S. 205 (1912) ...............................................................................10
*United States v. Security Ind. Bank,*
103 S. Ct. 407 (1982) ............................................................................56
*United States v. South-Eastern Underwriters Ass'n,*
322 U.S. 533 (1944) ..............................................................................35
*Wadsworth v. Allied Professionals Ins. Co.,*
748 F.3d 100 (2d Cir. 2014) .................................................................46
*Welch v. Crown Zellerbach Corp.,*
359 So. 2d 154 (La. 1978).....................................................................57
*Wound Care Centers Inc. v. Catalane,*
Civil No. 10-336, 2011 WL 3476612 (W.D. Pa. Aug. 9, 2011) ........................78
*Zeigler v. Hous. Auth. of New Orleans (Hano),*
192 So.3d 175 (La. Ct. App. 2016) ......................................................48

## Statutes

11 U.S.C. § 105(a) .................................................................. 22,37,38,39.40
11 U.S.C. § 362........................................................................................ 64,66
11 U.S.C. § 363 ............................................................... 49,52,55,56,57,61
11 U.S.C. § 1122(a).......................................................................................71
11 U.S.C. § 1123(a) ............................ 22,40,41,42,49,55,56,61,72,73
11 U.S.C. § 1123(b) ..................................................................... 22,37,39,40
11 U.S.C. § 1129(a)......................................................................................66
11 U.S.C. § 1129(b) ................................................................................ 49,61
11 U.S.C. § 524(e) .................................................................... 16,42,49
11 U.S.C. § 524(g) .................................................................... 17,22,41
11 U.S.C. § 541 ..............................................................................8,60
11 U.S.C. §1334 ............................................................................................2
15 U.S.C. §1012(b)......................................................................................36
15 U.S.C. §1015 ..........................................................................................36

15 U.S.C. §1101 ................................................................................35
28 U.S.C. § 1334 ................................................................................6
28 U.S.C. § 157(a) .............................................................................6
28 U.S.C. § 158(a)(1) .........................................................................2
28 U.S.C. § 541 ................................................................................64
28 U.S.C. § 1134 ..............................................................................64
22 GCA § 18305 ........................................................34,43,44,59,68
La. Rev. Stat. Ann. § 22:1269 ..........................................................44

**Rules**

Federal Rule of Bankruptcy Procedure 7052 .............................. 74,78
Federal Rule of Bankruptcy Procedure 9019 ....................................75
Federal Rule of Civil Procedure 52 ............................................. 74,78

**Treatises**

46A C.J.S. Insurance § 1986 (2007) ..............................................51
*Couch on Ins.* § 31:49 (3d ed. 2020)............................................54

**Other Authority**

Black's Law Dictionary 1236, 1286 (6th ed. 1990) ..............................42

## I.     INTRODUCTION

Debtors Boy Scouts of America ("BSA") and Delaware BSA, LLC (collectively "Debtors") filed for bankruptcy because BSA was sued for child sexual abuse in hundreds of civil lawsuits across the United States, including Guam.  Lujan Claimants are 75 individuals[1] who suffered childhood sexual abuse in Guam in relation to scouting from approximately 1955 to 1981, and who each filed timely sexual abuse proofs of claim in this case.  Almost all Lujan Claimants are survivors of abuse perpetrated by one of the most prolific abusers in scouting history.  In addition to their claims against BSA, each has claims against local councils and chartered organizations, and direct action rights against insurers for their abuse. Some have claims against religious orders who are not chartered organizations. Except for five, all are creditors in the bankruptcy of the Archbishop of Agana ("AOA"), an opt-out chartered organization.  The claims of least two Lujan Claimants do not implicate AOA but other chartered organizations.  All Lujan Claimants have claims against the Boy Scouts of America Aloha Council ("Aloha Council").   More than 25% of the 275 prepetition cases were brought by Lujan Claimants, and are subject to an open civil statute of limitations.  No Lujan Claimant has consented to releasing their claims against nondebtors.  All object to and now appeal Debtors' recently confirmed Plan of Reorganization.

---

[1] ALW022-28.

1

## II.   STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.   The Bankruptcy Court had subject matter jurisdiction over the chapter 11 bankruptcy case of Debtors under 11 U.S.C. § 1334. On September 22, 2022, Lujan Claimants filed a Notice of Appeal, ALW145-79, from the Bankruptcy Court's Confirmation Order filed September 8, 2022, A.282-848, Confirmation Opinion filed July 29, 2022, A.1-281, and Chubb Order filed September 12, 2022, ALW142-44.

## III.   STATEMENT OF ISSUES AND STANDARD OF REVIEW

1. Did the Bankruptcy Court err in confirming the Plan with nonconsensual third-party releases and injunctions?

2. Did the Bankruptcy Court err in confirming the Plan with the insurance settlements and which impairs and impedes Lujan Claimants' direct action rights against insurers?

3. Did the Bankruptcy Court err in confirming the Plan which violates the automatic stay imposed in the Archbishop of Agana's bankruptcy case in Guam?

4. Did the Bankruptcy Court err in confirming the Plan which fails to meet the best interest of creditors test?

5. Did the Bankruptcy Court err in confirming a Plan that improperly classifies

the claims of direct action claimants including Lujan Claimants?

6. Did the Bankruptcy Court err in confirming the Plan which provides unequal treatment?

7. Did the Bankruptcy Court err in granting Debtors' motion to amend and supplement the plan and confirming the Plan which materially and adversely differs from the solicitation plan?

On appeal, district courts review the bankruptcy court's legal determinations de novo, and its factual findings for clear error. In re W.R. Grace & Co., 591 F.3d 164, 170 n.7 (3d Cir. 2009) ("W.R. Grace I"). Whether subject matter jurisdiction exists is a question of law requiring de novo review. Id.

Appellate courts are not bound by a lower court's "conclusions which are but legal inferences from facts." Block v. Potter, 631 F.2d 233, 241 (3d Cir. 1980). "[T]he conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes considerations by (an appellate court)." Id. (quoting Baumgarten v. United States, 322 U.S. 665, 671 (1944)).

## IV.   STATEMENT OF CASE

Debtors filed for chapter 11 bankruptcy on February 18, 2020.  ALW001-017. By the Bar Date, 82,209 unique claims were timely filed by individuals alleging child sexual abuse ("Survivors").  A.30.  After filing a series of plans (some of which

3

provided no releases of local councils, chartered organizations, or insurers), a disclosure statement was approved and votes were solicited on a plan. A.31-32, 163-64. Of the voting Survivors (Class 8 Direct Abuse Claimants), 85.72% voted to accept the solicitation plan. A.59. Of the 75 Lujan Claimants, 72 voted to reject, 1 voted to accept, and 2 did not vote. ALW030. The one accepting Lujan Claimant elected the Expedited Distribution on the ballot, and also has claims against religious orders. Jtx. 2664 (Claim No. 58317). All 73 voters opted out of the plan Article X.J.4 releases. Id. The two non-voters have claims against religious orders. Id. (Claim Nos. 4858, 87757).

Several parties objected to plan confirmation, including all Lujan Claimants. See, e.g., ALW029-90; A.4630-4647, 4985-5088, 5123-54, 5181-86, 5418-88, 5604-69. After the confirmation hearing, the Bankruptcy Court ("the Court") issued an Opinion, which did not confirm the plan. After Debtors filed modified plans and a motion to amend and supplement the Opinion, to which all Lujan Claimants objected, ALW137-41, the Court confirmed the modified Plan on September 8, 2022.

The Plan provides for Survivors and other unsecured creditors to be compensated through a Settlement Trust that would receive noncontingent funding of $2,484,200,000, and contingent funding of another $200,000,000. A.77. All other funding is speculative. A.77-78. In addition to contributions by Debtors,

4

money is being contributed by local councils, the United Methodists, and four settling insurers, pursuant to settlement agreements.   A.70.   The Plan releases entirely these contributing entities—including 250 local councils—from child sexual abuse liability, and releases well over 100,000 non-contributing chartered organizations and an untold number (most likely in the tens of thousands) of religious entities from liability for abuse that first occurred after 1975 and abuse covered by settling insurers policies.

Several parties, including all Lujan Claimants, timely appealed the Confirmation Order and Confirmation Opinion to the District Court of Delaware.

## V.    SUMMARY OF ARGUMENT

Confirmation of the Plan, and any resultant orders such as the Chubb Order to the extent it depends on confirmation, must be reversed.   The Court erred in confirming the Plan because (1) it lacks jurisdiction and authority to grant nonconsensual releases and injunctions of Survivors' claims against nondebtors, (2) the insurance settlements should not have been approved and they violate the McCarran-Ferguson Act and direct action rights, (3) the Plan violates the automatic stay imposed in the AOA bankruptcy, (4) the Plan fails the best interest of creditors test, (5) the Plan improperly classifies direct action claimants, (6) the Plan provides unequal treatment, and (7) the Plan is a material and adverse modification of the solicitation plan.

## VI.   ARGUMENT

The Court erred in confirming Debtors' Plan for several reasons.  As creditors of the bankruptcy estate, Lujan Claimants' interests are directly and pecuniarily affected by the orders confirming the Plan and, therefore, have appellate standing to challenge Plan confirmation and related orders.  In re Combustion Eng'g, Inc., 391 F.3d 190, 223-24 (3d Cir. 2005).

### A. The Bankruptcy Court Erred in Confirming the Plan with Nonconsensual Third-Party Releases and Injunctions.

1. Debtors Failed to Prove Subject Matter Jurisdiction Exists over Survivors' Claims against Nondebtors.

Federal courts have limited jurisdiction, as they exercise only the authority conferred on them by Article III and by congressional enactments pursuant thereto. WR. Grace I, 591 F.3d at 174 (citing Del. v. Van Arsdall, 475 U.S. 673, 692 (1986)). Federal bankruptcy jurisdiction is set forth in 28 U.S.C. § 1334, which provides district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a), (b).  District courts may refer to a bankruptcy court any or all cases under title 11 or all proceedings arising under title 11 or arising in or related to a case under title 11.  28 U.S.C. § 157(a).  Federal courts are presumed to lack jurisdiction without affirmative evidence of this fact.  In re Scott, 607 B.R. 211, 220 (W.D. Pa. 2019) (citing Nuveen

6

Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C., 692 F. 3d 283, 293 (3d Cir. 2012)).  The party asserting that a court has subject matter jurisdiction bears the burden of proving that such jurisdiction exists.  Id.

As Survivors' (including Lujan Claimants') claims are child sexual abuse claims that first arose prepetition (and decades ago for Lujan Claimants), these claims are not cases or proceedings under title 11, or proceedings arising in a case or related to a case under title 11.  These claims, many of which were asserted in civil actions before other courts, are obviously not Title 11 bankruptcy cases or proceedings that exist only because Debtors filed for bankruptcy.

The Court erroneously found subject matter jurisdiction exists because "this is a confirmation hearing" which is "a proceeding that 'by its nature, and not the particular factual circumstance, could arise only in the context of a bankruptcy case.'"  A.125-26 (quoting In re New Century TRS Holdings, Inc., 505 B.R. 431, 441 (Bankr. D. Del. 2014)).  "Bankruptcy jurisdiction exists here, therefore, as this proceeding 'arises in' in this bankruptcy case."  A.126.  The Court erred because parties cannot create subject matter jurisdiction on their own or by agreement even in a plan of reorganization.  Combustion Eng'g, 391 F.3d at 228.  A debtor cannot create subject matter jurisdiction over any nondebtor third-party by structuring a plan in such a way that it depended upon third-party contributions.  Id.  The question then is whether "related to" jurisdiction exists.

7

The Third Circuit has held that bankruptcy courts may have jurisdiction over suits between third parties that conceivably may have an effect on the bankruptcy estate.  Combustion Eng'g, 391 F.3d at 226 (citing Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.5 (1995)).  These suits between third parties may qualify as "proceedings 'related to' a title 11 case."  "Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate."  Id.

In Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984), the Third Circuit "set forth what has become the seminal test for determining 'related to' jurisdiction over third party claims."  Combustion Eng'g, 391 F.3d at 226.  The facts of the case in Pacor demonstrated a "crucial limit on the legitimate exercise of subject matter jurisdiction."  W.R. Grace I, 591 F.3d at 171.  The Third Circuit held that "the primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate, and therefore [cannot establish] 'related to' [jurisdiction over that suit]…."  Id. at 995.  "At best, [the Higgins-Pacor lawsuit] is a mere precursor to the potential third party claim for indemnification by Pacor against Manville.  Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor."  Id.

8

Here, the Court lacks subject matter jurisdiction over Survivors' claims against nondebtors, including Lujan Claimants' claims against nondebtors such as local councils, chartered organizations, other entities such as religious orders, and insurers. The outcome of any prepetition case cannot bind BSA and therefore they cannot determine any rights, liabilities, or course of action of BSA. Those suits, at most, are mere precursors to potential third-party claims for indemnification against BSA. Further, Debtors provided no evidence of any nondebtors making contribution or indemnifications claims against BSA prepetition. Also, common law indemnification claims do not establish a bankruptcy court's subject matter jurisdiction over third-party claims if there would need to be another lawsuit before the third-party claim could have any impact on the bankruptcy proceedings. W.R. Grace I, 591 F.3d at 172.

There is no subject matter jurisdiction over Lujan Claimants' claims against AOA for the additional reason that AOA is a debtor in its own bankruptcy case, In re Archbishop of Agana, Bankruptcy Case No. 19-00010 (D. Guam), and the District Court of Guam has exclusive jurisdiction to determine whether to permit Lujan Claimants to recover against AOA. "Among the granted powers [to bankruptcy courts] are the allowance and disallowance of claims; the collection and distribution of the estates of the bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of

claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the [Bankruptcy Act].  In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts." Pepper v. Litton, 60 S. Ct. 238, 244 (1939) (citing United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 217 (1912)).  Thus, the District Court of Guam has exclusive jurisdiction over the allowance and disallowance of Lujan Claimants' claims against AOA, the collection and distribution of AOA's estate, and the determination of controversies in relation thereto.

Regarding insurers, all but two Lujan Claimants have exercised their direct action rights prepetition in suing doe-insurers seeking payment under BSA insurance policies and policies insuring AOA and Aloha Council, and some sought payment under policies insuring religious orders, but have not yet named such insurers.  Any insurance proceeds recovered through those actions would have no effect on the bankruptcy estate here since the proceeds are not a part of Debtors' bankruptcy estate, as argued later.  If anything, the estate would benefit from Lujan Claimants receiving compensation from insurers, thereby preserving estate assets.

As for the two Lujan Claimants who have filed no civil lawsuits against a chartered organization, religious order, and/or local council, the Court lacks subject matter jurisdiction over these Lujan Claimants' claims against chartered organizations, religious orders, and Aloha Council.  Without any lawsuit against

these nondebtors, it is obvious that any resolution of Lujan Claimants' claims against these nondebtors would be a mere precursor to a separate lawsuit against BSA for any contribution or indemnification claims.

Thus, resolution of Lujan Claimants' claims against chartered organizations, religious orders, or Aloha Council, either without a lawsuit or as part of a future lawsuit, would have no effect on Debtors' bankruptcy estate.

Even if there is jurisdiction over Survivors' derivative claims against nondebtors, there is no "related to" jurisdiction over Survivors' direct claims against nondebtors.  In Combustion Eng'g, the Third Circuit found that there was no "related to" jurisdiction over independent, non-derivative claims against nondebtors Basic and Lummus despite arguments that there was a "unity of interest" between Combustion Engineering, Basic, and Lummus, based in part on "joint operations at single sites leading to the asbestos personal injury at issue," and "extensive financial inter-dependence."  391 F.3d at 230-32.  Unity of exposure created by asbestos contained in a common product was insufficient to give rise to "related to" jurisdiction when the third-party claim would not directly result in liability for the debtor.  Id. at 232.  No "related to" jurisdiction existed where the debtor and third-parties are independent corporate entities, with separate and distinct management and operations, the debtor did not own or control the third-parties, and there was no evidence that a suit against the third-parties would deplete the estate or affect its

11

administration.  Id. at 227-28.  Additionally, there was no "related to" jurisdiction even though there were shared insurance policies and a large majority of Lummus claimants had also asserted claims against Combustion Engineering.  Id. at 230, 232-33.  The Third Circuit noted that courts finding "related to" jurisdiction over claims against nondebtors based in part on shared insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor.  Id. at 232-33.

Here, BSA, local councils, and chartered organizations are "three entirely separate legal entities," "none has control over the other," "each local council raises and disburses its own funds and has its own board of directors," and BSA and local councils "do not administer the Scouting Program directly but rather offer the program to community organizations that wish to use the Scouting Program as a vehicle to reach their own goals and objectives with the youth of that particular community."  ADV729-33.  Debtors failed to prove that BSA has a unity of interest in running houses of worship, providing government services, or accomplishing any of the specific missions of chartered organizations, or even of undisclosed religious entities.  No evidence showed that Survivors' claims against nondebtors result in automatic liability against BSA.  Debtors produced no evidence of prepetition written indemnification agreements.  BSA National Coordinating Counsel Bruce

Griggs testified that he was aware of no written indemnification agreements between BSA and chartered organizations, A.1307, and he oversaw approximately 350 prepetition claims, including Lujan Claimants' lawsuits covering every year from 1955 to 1981, A.1307, 1336-37.  William Sugden, counsel to the Atlanta Area Council and the designated Rule 30(b)(6) witness of the Ad Hoc Committee of Local Councils, A.6197-98, testified that there was no written indemnification agreement between BSA and local councils, A.2106.

The Court erred in concluding that related-to jurisdiction exists to grant releases of local councils and chartered organizations.  A.127-30.  The Court wrongly focused on its conclusion that it takes all three constituencies—BSA, local councils, and chartered organizations—to deliver the Scouting program, that prepetition plaintiffs often treated these entities as jointly responsible for abuse claims, and that each chartered organization has a seat on the local council board and each local council has two or more members on the National Council that elects the National Executive Board.  What matters is whether the third-party claims directly result in liability for Debtors, which they do not.  The focus on BSA's shared insurance with local councils and chartered organizations was also insufficient, since there was no additional evidence of automatic liability against Debtors.  BSA's "residual interest in Local Council property" also is not enough since BSA's interest is only in what remains after payment of valid claims against the local council, and

therefore it has no interest in local council property used to pay claims.  The filing of proofs of claims by chartered organizations, BSA's 2013 resolution, and the 2020 Annual Charter Agreement are also irrelevant since they do not prove Debtors' automatic liability or any contract by Debtors to indemnify.

The Court wrongly disregarded much of BSA's prepetition history, considering only "[t]he more recent history … that BSA defends its Local Councils and Chartered Organizations, settles its cases, and settles for all BSA parties." A.131.  There is a lengthy history of BSA defending itself and not others, leading to differing outcomes for each.  Courts have found BSA to be potentially liable for child sexual abuse but the chartered organization was not found liable.  Juarez v. Boy Scouts of America, Inc., 81 Cal. App. 4th 377 (2000); L.P. v. Oubre, 547 So.2d 1320 (La. Ct. App. 1989).  Courts have also found the chartered organization to be potentially liable for child sexual abuse, while BSA was found not liable.  Roe No. 1 v. Boy Scouts of America Corp., 147 Conn. App. 622 (2014); N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wash. App. 517 (2013).  Similarly, a local council can be held liable for negligence involving child sexual abuse while BSA has been held not liable for the same abuse.  Infant C. v. Boy Scouts of America, Inc., 391 S.E.2d 322 (Va. 1990); Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins, 926 S.W.2d 287 (Tex. 1996).  The Court's understanding of the "most recent history" of scouting defense, which was

a brief period of 3 years 6 months, A.26, is insufficient to establish a unity of interest and also contrary to the evidence as to Lujan Claimants, as Griggs testified that "Guam was an exception" to the typical practice of BSA settling on behalf of BSA, local councils, and chartered organizations.  A.1307.  Griggs further testified that, in the Guam cases including Lujan Claimants' cases, BSA had separate counsel and AOA had its own counsel.  A.1305.

Survivors have direct claims against nondebtors based on the independent liability of these nondebtors and which do not depend on a finding of either Debtor's liability.  As noted above, BSA's prepetition history shows that a court may find a nondebtor such as a local council or chartered organization liable for child sexual abuse, and, at the same time, find that BSA is not liable for the same child sexual abuse.  These tort claims against third-parties are based on the tortious conduct of the third-party and the relationship between the third-party and the child or the perpetrator.  The liabilities of a local council, chartered organization, or other entities such as religious orders do not derive from or depend upon the liability of BSA. Griggs admitted that, in cases where BSA was sued, along with a local council or chartered organization, he would look at whether BSA owed a duty of care to protect the plaintiff when it came to BSA's liability.  A.1303.  For local council liability, he would look at whether the local council owed a duty of care to protect the plaintiff. A.1303-04.  For chartered organization liability, he would look at whether the

chartered organization owed a duty of care to protect the plaintiff.  A.1304.  As Survivors have claims against nondebtors based on nondebtors' direct and individual liability, the Court lacks "related to" jurisdiction to release and permanently enjoin Survivors' direct claims against these nondebtors.

Even Hartford believes that it is "highly dubious" that providing local councils, certain contributing chartered organizations, and other nondebtors with a channeling injunction that would effectively discharge those entities from their own liability for abuse claims would be appropriate "because the liabilities appear to be direct, not derivative of the Debtors' liability."  ALW237.

Thus, there is no subject matter jurisdiction over Survivors' (including Lujan Claimants') claims against nondebtors and the Court erred in confirming the Plan with nonconsensual release and injunction of these claims.

> 2. Even if Subject Matter Jurisdiction Exists, the Bankruptcy Code Does Not Authorize Nondebtor Releases.

The Third Circuit has never answered the question of whether there is statutory authority to grant nonconsensual third-party releases in a non-asbestos bankruptcy case.  Instead, in In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000), the Third Circuit recognized that "[s]ection 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities."  The Third Circuit acknowledged that nowhere in the Code is there express statutory authority to enjoin a third-party's

claim against a nondebtor outside the context of asbestos.  Id.  Only one section of the Code expressly allows a bankruptcy court to enjoin third-party claims against nondebtors without the consent of those third parties, and that is 11 U.S.C. § 524(g), which authorizes such an injunction only in cases involving injuries arising from the manufacture and sale of asbestos, and only if certain requirements are met.  In re Purdue Pharma, L.P., 21 cv 7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021).

"Congress believed that Section 524(g) created an exception to what would otherwise be the applicable rule of law."  Purdue, 2021 WL 5979108, at *49.  In Purdue, 2021 WL 5979108, at *70, the district court vacated confirmation of the plan of reorganization, holding that there is no authority under the Bankruptcy Code to permit the nonconsensual release of third-party claims against nondebtors that are direct claims based on the individual liability of the nondebtors and which do not derive from the debtor's liability.  The Purdue court defined "direct claims" as "claims that are not derivative of [the debtor's] liability, but are based on the [nondebtor's] own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than [the debtor].  'Direct' claims are based upon a 'particularized' injury to a third party that can be directly traced to a non-debtor's conduct."  Id. at *48.  In contrast, "derivative claims" are "claims that would render the [nondebtors] liable because of [the debtor's] actions (which

17

conduct may or may not have been committed because of the [nondebtors]). 'Derivative' claims are those that seek to recover from the estate indirectly' on the basis of [the debtor's] conduct,' as opposed to the non-debtor's own conduct." Id. (quoting In re Johns-Manville Corp., 517 F. 3d 52, 62 (2d Cir. 2008)).

No statute authorizes nonconsensual releases of Survivors' direct claims against nondebtors, such as local councils, chartered organizations, and religious entities such as religious orders.  A Survivor can succeed in proving a local council's or chartered organization's liability based on the tortious conduct of such local council or chartered organization, not depending on any BSA liability.

In Juarez, a child sexual abuse case, the court described the tortious liability of a defendant:

> A tort … involves a violation of a legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such duty, an injury is "damnum absque injuria"—injury without wrong.  Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.  ….
> … [Courts have adopted a] multi-element duty assessment in determining whether a particular defendant owed a tort duty to a given plaintiff.  These factors include:  (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability.

81 Cal. App. 4th at 401 (citations omitted).  The particular defendant's above-described duty and liability is not dependent on anyone else's misconduct, negligence, or other liability.  In fact, the court held that the pretrial record did not conclusively eliminate the possibility of the BSA's liability, but it did show that there were no triable issues of fact with respect to the Church's liability stemming from the Scouts' use of Church property to hold troop meetings.  Id. at 413.  The court further held that the plaintiff failed to proffer material facts to support his claim against the Church alleging premises liability, as the plaintiff failed to claim that there were facts that put or should have put the Church on notice of the molestation, nor did the plaintiff claim the Church could have taken effective steps to prevent the sexual molestation.  Id.

In Roe No. 1, the plaintiff sued BSA and local council for child sexual abuse he suffered by his stepfather who was also the assistant scoutmaster for his troop. 147 Conn. App. at 631.  The appellate court affirmed the trial court's grant of a summary judgment motion in favor of BSA and local council, finding no genuine issue of material fact since the plaintiff failed to present evidence to counter the defendants' evidence that, under the organizational structure of the Boy Scouts, the local chartered organization is responsible for the selection and supervision of troop leaders.  Id. at 642.  The court reached this conclusion based on its finding that BSA and local council were not in control of the situation and that it was the local

19

chartered organization that was responsible for selecting and supervising its adult volunteers.  Id. at 644.

In L.P, the court held that the plaintiffs, parents of a child sexually abused in scouting, adequately pleaded a cause of action for negligence against BSA and local council.  547 So.2d at 1323-24.  The court found that the plaintiffs adequately pleaded a duty owed by BSA and the local council, alleging that, under the auspices of BSA, the local council undertook to promote, administer, and supervise the boy scout program in their community; that the local council know or should have known that the scoutmaster had sexually molested troop members; that the defendants failed to investigate the scoutmaster's background, failed to supervise him and the scouts themselves and failed to inform the parents of the scoutmaster's sexual abuse of troop members.  Id. at 1323-24.

In N.K., 175 Wash. App. at 530, the court held that for the plaintiff, a former scout, to show that the church had a duty, based on a special relationship, to protect him from sexual molestation, he did not need to prove that the church had prior specific knowledge that the scout leader posed a threat.  After considering allegations that the church selected the scoutmasters and adult volunteers for the troop, the church chapel was the registered meeting place for the troop, the church actively encouraged children of the congregation to participate in scouting and it paid for the boys' participation in the troop, the church held out the abusive

scoutmaster as a youth leader who could be safely trusted with children, the church owned a scouting cabin where the boys participated in meetings and scouting activities away from the custody and protection of their parents, the scoutmaster sometimes took the plaintiff to the cabin outside of meeting times and molested him there, and the scoutmaster also molested the plaintiff after scout meetings, the court found that the church had a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm.  Id. at 532-33.  In contrast, the court found that BSA and the local council did not have a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm. Id. at 534-35.

In Infant C., 391 S.E.2d at 322, the court affirmed a jury verdict exonerating BSA of negligence for child sexual abuse since it did not select and/or retain the scoutmaster abuser, while finding the local council liable for negligence.

In Golden Spread Council, 926 S.W.2d at 287, the court reversed the judgment of the appellate court and rendered judgment for BSA based on its finding that BSA could not be liable for the acts of the local council.  The court also affirmed the judgment of the appellate court which found that summary judgment for the local council was improper since the local council had a duty to use reasonable care to prevent child sexual abuse.

21

Thus, a nondebtor's liability is based on its own conduct and relationship with the child, regardless of BSA's liability.  As Survivors have claims against these nondebtors based on their direct, individual liability, the Court lacks statutory authority to release and enjoin Survivors' direct claims without Survivors' consent.

The Court erred in finding statutory authority to grant nonconsensual releases, as it could not point to a single Code section that explicitly authorizes releases. A.135.  What was more persuasive to the Court was that there was no Code section that prohibits third-party releases.  Id.  However, "unlike Article III courts, bankruptcy courts, as Article I courts, are strictly creatures of statute." In re Billing, 150 B.R. 563, 568 (D.N.J. 1993), rev'd on other grounds in Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242 (3d Cir. 1996).  Bankruptcy courts derive their authority solely from Congress, while district courts are accorded their inherent powers in Article III.  In re Grabill Corp., 967 F.2d 1152, 1156 (7th Cir. 1992).  Code sections 105(a), 1123(a), and 1123(b)(6) confer no authority to grant nonconsensual third-party releases and injunctions.  Neither does section 524(g).

Even if this were an asbestos bankruptcy, nonconsensual third-party releases would not be allowed for failure to meet all section 524(g) requirements.   For instance, Debtors will not continue to fund the Trust and the Trust does not receive a majority of voting rights of either Debtor.  A.2755-58.  Debtors must not receive the benefits of section 524(g) without having met its burdens.

Accordingly, the Court should have denied confirmation of the Plan with nonconsensual third-party releases and injunctions.

3. <u>Assuming Statutory Authority Exists, the Releases and Injunctions Fail under Hallmarks of Sister Circuits and Master Mortgage</u>.

In <u>Continental</u>, the Third Circuit declined to establish its own rule regarding whether nondebtor releases and permanent injunctions are appropriate or permissible.  203 F.3d at 213-14.  The Third Circuit found that the nonconsensual third-party releases in the plan failed to pass the tests established by sister circuits that authorize such releases and injunctions.  <u>Id.</u> at 214.  The Third Circuit described the tests set forth by sister circuits as the hallmarks of permissible nonconsenual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions, <u>id.</u> at 214—and reasonable consideration given in exchange for the release and permanent injunction, <u>id.</u> at 215.  The Third Circuit has never endorsed or adopted these hallmarks of permissible nonconsensual releases but has found that nonconsensual third-party releases before it have failed to pass muster under these hallmarks.

a.  Hallmarks from Sister Circuits

A plan provision is unfair if it releases the liabilities of nondebtors without providing additional compensation to a creditor being forced to release claims against nondebtors.  <u>Continental</u>, 203 F.3d at 213 (citing <u>AOV Indus., Inc.</u>, 792 F.2d 1140, 1154 (D.C. Cir. 1986)).   Here, the Plan is unfair and gives unreasonable

consideration for third-party releases and permanently enjoins Survivors' claims against local councils, chartered organizations, insurers, and other entities like religious orders, without providing additional compensation to Survivors who have claims against them.  Survivors are being forced to give up claims against local councils, chartered organizations, insurers, and other entities while receiving little to nothing in exchange.  Although the 250 local councils may contribute funds to the Settlement Trust, there is no allocation or reserve of specific local council funds to Survivors who have claims against such local council; instead, the funds from all local councils are simply provided to the Settlement Trust for general disposition. For example, Aloha Council may contribute approximately $1.3 million to the Settlement Trust, yet none of that money is being allocated to the almost 200 Survivors (including Lujan Claimants) who have claims against the Aloha Council. Even if the $1.3 million is allocated only to Survivors with claims against Aloha Council, the average payout to the Survivor is less than $7,000, which is a pittance for compensating the horrific claims at issue in this case, i.e., child sexual abuse.  As for chartered organizations, except for United Methodist Entities, they are paying nothing for release of liabilities for post-1975 claims and claims insured by Settling Insurance Companies.  The mere contribution of insurance rights by chartered organizations is unfair since compensation is effectively limited to low insurance dollars, chartered organizations have their own assets to pay compensation, and no

24

analysis was done of their assets or liability exposure. Regarding insurers, any release and injunction of claims to collect from non-settling insurers, including direct action claims (such as Lujan Claimants' direct action claims), are obviously unfair as these insurers are providing no compensation and may never provide compensation in the future, despite the best efforts of the Settlement Trustee. Even with settling insurers, the releases are unfair as the implicated coverage limits and liabilities greatly exceed the actual settlement amounts contributed by these settling insurers, and there was no evidence that any settling insurer is paying up to a policy limit. Except for Century, there was no analysis of the assets or ability to pay of a settling insurer. The release of Roman Catholic Entities and other religious entities is also unfair since there is no evidence that they are paying anything at all in exchange for the release. Debtors failed to meet their burden of demonstrating fairness and reasonable consideration.

The release and permanent injunction of Survivors' claims against nondebtors are undisputedly unnecessary to the success of Debtors' reorganization. Debtors have admitted multiple times that a plan that discharges BSA—and not local councils, chartered organizations, religious entities and orders, or insurers—is feasible. Debtors proposed the BSA Toggle Plan, which releases and permanently enjoins no claims against local councils, chartered organizations, insurers, and religious orders, in their Second Amended and Third Amended Plans, A.2001, and

Fourth Amended Plan (D.I. 5484).  BSA's financial advisor and feasibility expert, Brian Whittman, testified that, as late as December 7, 2021, some form of a BSA-only plan could be feasible.  A.2003.  Devang Desai, of the National Executive Committee and Bankruptcy Task Force, testified that a BSA-only plan remains an option for the BSA—not a preferred or optimal option, but an option nonetheless for BSA to successfully reorganize.  A.1053-55.

Apart from a BSA-only plan, Debtors have also recently proposed plans of reorganization that do not include the nonconsensual release of the AOA, Century and Chubb Companies, Clarendon, Zurich, and Roman Catholic Entities (including the Solicitation Version of the Plan).  A.37, 79.

The evidence showed that release of Survivors' claims against chartered organizations is not necessary to Debtors' reorganization, even though Debtors argued that the local councils' contribution depended on the release of claims against chartered organizations.  In the Restructuring Support Agreement, the local councils committed to contributing to the Settlement Trust $500 million plus a $100 million note, and transfer of their insurance rights.  ALW213-14.  The RSA terms demonstrate that the local councils' locked-in contribution did not depend on the release of chartered organizations of liability.  Id.  The RSA only required, in a section titled "Contributing Chartered Organization Settlement Contribution," that the parties "work in good faith to develop a protocol for addressing participation by

Chartered Organizations in the benefits of the Channeling Injunction.   Such settlements may occur prior to the Effective Date with the consent of all Parties." ALW214.   Clearly, the RSA was concerned only with a protocol for chartered organizations to become Contributing Chartered Organizations through settlements; it did not require, as a condition of the Local Council's Settlement Contribution, that any chartered organization receive limited protected party status by passively "assigning" insurance rights to the Trust.   Sugden testified that the local councils had committed to contributing to the Settlement Trust $500 million plus a transfer of their insurance rights, even though the treatment of the chartered organizations was an open term; Sugden testified that the local councils' contribution was not an open term.   A.2108-2114.   The claim that local councils need the release of chartered organizations is also not credible since chartered organizations are not getting a release for pre-1975 abuse unless the claim against the chartered organization is covered by a settling insurers policy.   Notably, Lopez of Aloha Council testified that Aloha Council had not communicated with any chartered organization about releases or injunctions, and never received notice from any that it no longer wishes to sponsor Boy Scouts troops.   ALW267.   Further, FCR Patton testified that the terms of the Century and Chubb Companies insurance settlement agreement contemplated and included the possibility of bankrupt chartered organizations not receiving the benefits and protections of the agreements, A.2799-2802, showing that

27

reorganization did not require releases and injunctions in favor of AOA especially since it opted out of Plan protections and is providing no compensation to the Trust. This provision also is a term of the Hartford, Clarendon, and Zurich settlements. ALW220-226, 231.

Further, there was no evidence that Chubb issued insurance policies to BSA or any other entity, yet Chubb appears to be getting a release under the Century and Chubb Companies Agreement.  ALW228-30, 232-33.

There was also no evidence and no Court determination that successful reorganization required the release of Roman Catholic Entities and other religious entities, such as religious orders.

As Debtors admittedly can successfully reorganize without nonconsensual releases and permanent injunctions of Survivors' claims against nondebtors, the Court erred in confirming a Plan with nonconsensual nondebtor releases and injunctions.

        b.  Master Mortgage

Although the Third Circuit has not explicitly adopted factors set forth in In re Master Mortgage Investment Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994), courts in the Third Circuit have considered Master Mortgage factors in determining whether to grant nonconsensual releases and permanent injunctions of third-party claims against nondebtors.  See, e.g., In re Wash. Mut., Inc., 442 B.R. 314, 349

(Bankr. D. Del. 2011); <u>In re Millennium Lab Holdings, II, LLC</u>, 575 B.R. 252, 272

(Bankr. D. Del. 2017).  The factors are:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
> (2) The non-debtor has contributed substantial assets to the reorganization.
> (3) The injunction is essential to reorganization.  Without the it [sic], there is little likelihood of success.
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes has "overwhelmingly" voted to accept the proposed plan treatment.
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

<u>Master Mortgage</u>, 168 B.R. at 935.  The Master Mortgage factors are not met here.

For the reasons earlier stated that there is no unity of interest, there is no identity of interest between Debtors and local councils, chartered organizations, insurers, and other entities such as religious orders.  Accordingly, this factor weighs against nondebtor releases and injunctions.

The Court wrongly justified nonconsensual releases based on identity of interest by selectively focusing on allegations in survivor complaints that allege agency relationships between BSA, local councils, and chartered organizations.  First, BSA itself asserts there is no agency relationship.  Second, the Court ignored the claims against BSA in survivor complaints that do not depend on agency relationships.  ALW255-61. Third, at the very least, the Court should have carved

out Survivors' direct claims against nondebtors, as BSA's prepetition litigation history clearly evidences that these nondebtors can have their own direct liability.

In the Plan, no nondebtor is contributing substantial assets to compensate Survivors, who are clearly not receiving something of "indubitably equivalent value" to replace their released and enjoined claims.   In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a nondebtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor"). The local councils collectively are failing to contribute more than $1 billion in unrestricted net assets to compensate Survivors, despite the filing of over 82,000 proofs of claim for child sexual abuse, Debtors' estimated range of total value of abuse claims at $2.4 billion to $7.1 billion, FCR's forecast of future claims liability of $5 billion, ALW217-19, and the Settlement Trust's compensation of not only Direct Abuse Claims for which a proof of claim was timely filed in this case but also Direct Abuse Claims against local councils for which no proof of claim was timely filed, A.508.  Except for the United Methodist Entities, none of the chartered organizations are contributing any of their assets to compensate Survivors for the release of Survivors' claims against them.  No Roman Catholic Entity or religious entity like a religious order is paying a penny in exchange for release of Survivors' claims against them.  Debtors failed

30

to provide any information justifying release of these entities.  Debtors failed to provide any information regarding assets of chartered organizations and religious entities to demonstrate a substantial contribution by any of them.  Similarly, Debtors failed to disclose any information on insurers' assets to prove a substantial contribution justifying release and permanent injunction of claims, including direct action claims not only against settling insurers but also non-settling insurers who may never contribute to the Settlement Trust.  As Lujan Claimants are not being adequately protected or compensated for release and injunction of their direct action claims against insurers, they clearly are not receiving anything of indubitably equal value to replace their direct action rights.  This factor weighs heavily against release and injunction.

As explained earlier, third-party releases and injunctions are not necessary to Debtors' successful reorganization.  This factor strongly supports rejection of release and injunction of third-party claims against nondebtors.

The fourth factor—creditor approval of the release and permanent injunction—is "the single most important factor."  Master Mortgage, 168 B.R. at 938.  The Third Circuit has identified as a "key consideration[]" "whether affected parties overwhelmingly have agreed to accept the proposed treatment."  Continental, 203 F.3d at 217 n.17.  In chapter 11 non-asbestos cases where third party releases have been approved, courts have interpreted overwhelming creditor support to mean

31

that at least 90% of affected voting creditors accept the plan.  <u>In re Wool Growers</u>
<u>Cent. Storage Co.</u>, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007); <u>In re Heron,</u>
<u>Burchette, Ruckert & Rothwell</u>, 148 B.R. 660, 674 (Bankr. D.D.C. 1992).  Here,
only 85.72% of voting Survivors (Class 8 Direct Abuse Clams holders) voted to
accept the Plan, A.59, showing that, overall, Debtors lost the vote of Survivors since
fewer than 90% voted to accept.  Even if the overall voter acceptance by Survivors
was overwhelming, the Court was required to consider the vote by the Survivors
affected by particular third-party releases.  For instance, of the 182 Survivors who
have claims against Aloha Council, 81 voted to accept and 101 voted to reject,
resulting in only 44.5% voter acceptance, ALW091-109, and showing that there was
not overwhelming support for the plan by Survivors who would be affected release
of claims against Aloha Council.  Debtors also lost the vote to support release and
injunction of Lujan Claimants' claims against AOA (1.4% voter acceptance), Jtx.
2664, and religious orders Capuchin Franciscans (2% voter acceptance) and
Carmelites (0% voter acceptance), <u>id.</u>  Having failed to win overwhelming support
from affected creditors, this most important factor of the Master Mortgage factors
required that the Court reject the Plan's nonconsensual release and permanent
injunction of third-party claims against nondebtors.

 The fifth factor—payment of all or substantially all of the claims—is also not
met by the Plan.  Debtors estimate that all Direct Abuse Claims—both current and

future—are valued between $2.4 billion to $7.1 billion.  A.68-69, 71.  Yet, Debtors previously admitted that "the aggregate value of the 82,500 unique Abuse Claims is $2.4-$7.1 billion."  Dr. Bates' valuation is also not reliable since there was no evidence it was not in accordance with the TDP.  Debtors' value range is also contradicted by their own witness, FCR Patton, who testified that he believes there will be 11,040 future claimants, that the value of BSA's liability for future claims that would be allowed under the TDP is $5 billion, that the $5 billion future claims value is 11,000/93,000 of the total value of all allowed claims (which provides a total claims value of over $42 billion).  A.2749-60.  He testified that he never analyzed the liability or non-insurance assets of chartered organizations.  A.2740.  He was only concerned with the payment percentage that would be set aside for future claimants, and no additional money was coming into the Trust and earmarked for future claims.  A.2740-41.  As the current Plan pays less than $2.5 billion, the Plan fails to pay for all or substantially all of the Direct Abuse Claims.

Debtors have performed no analysis running Survivors' claims through the TDP; Debtors have given no proof at all that Survivors would be paid in full under the TDP.  Likewise, Debtors have provided the Court with no analysis to show that Survivors who choose the Independent Review Option will be paid in full.  The IRO is for claims valued above $1 million.  There is currently no money to fund the IRO. The Excess Award Fund is to be funded from non-settling excess insurers, who may

never pay anything to the Trust, and so the promise of payment from the Excess Award Fund is illusory.  Even if Debtors' valuation is correct, the Plan still fails to provide for payment of all or substantially all of Survivors' claims, especially since recovery up to 100% is dependent on hypothetical future insurance settlements the Settlement Trust may or may never enter with non-settling insurers.  <u>Wool Growers</u>, 371 B.R. at 778 (finding the fifth factor, full or almost full payment of the affected claims, not satisfied where affected creditors will recover, at best, 60 to 70% of their claims); <u>In re Quigley Co.</u>, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (plan was not feasible where funding source was "speculative at best and visionary at worst").  The factor strongly disfavors nonconsensual release and injunction of third-party claims against nondebtors.

As the Master Mortgage factors weigh heavily against approval of nonconsensual releases of third-party claims against nondebtors, the Court erred in confirming the Plan with nonconsensual third-party releases.

**B.    The Bankruptcy Court Erred in Confirming a Plan with the Insurance Settlements and which Invalidates, Impairs, and Supersedes Lujan Claimants' Direct Action Rights.**

1. <u>The Plan invalidates, impairs, and supersedes direct action rights in violation of the McCarran-Ferguson Act</u>.

Under Guam law, 22 GCA § 18305, Lujan Claimants have a right of direct action against insurers of persons or entities liable for personal injury, including BSA, local councils, chartered organizations, and religious orders.  Yet, the Court

confirmed a Plan that disregards Lujan Claimants' statutory right to directly sue insurers of liable persons or entities, in violation of the McCarran-Ferguson Act ("MFA").

In 1945, Congress passed the MFA "to restore the supremacy of the States in the realm of insurance regulation." United States Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993). This federal statute was enacted in response to the United States Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944), which held that an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws. Id. at 499. The holding in South-Eastern Underwriters was widely viewed as a threat to state power to tax and regulate the insurance industry. Id. at 499-500. To allay these fears, Congress moved quickly to enact the MFA which "makes its mission very clear: 'Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.'" Id. at 500 (quoting 15 U.S.C. § 1011). A year after passage of the Act, the Supreme Court observed of the federal statute: "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.'" Id. at 500

35

(quoting <u>Prudential Ins. Co. v. Benjamin</u>, 328 U.S. 408, 429 (1946)).   Congress achieved this purpose, first, "'by removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation,'" and, second, "'by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.'" <u>Id.</u> (quoting <u>Prudential Ins.</u>, 328 U.S. at 429-30).

Section 2(b) of the MFA provides:   "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."   15 U.S.C. § 1012(b).   As used in the Act, the term "State" includes the several States, Alaska, Hawaii, Puerto Rico, **<u>Guam</u>**, and the District of Columbia.   15 U.S.C. § 1015.   A federal statute is reverse preempted under the Act if (1) the federal statute does not specifically relate to the business of insurance, (2) the state statute was enacted for the purpose of regulating the business of insurance, and (3) the federal statute would invalidate, impair, or supersede the state statute.   <u>In re PRS Ins. Group, Inc.</u>, 294 B.R. 609, 612 (Bankr. D. Del. 2003) (citing, e.g., <u>In re Amwest Ins. Group</u>, 285 B.R. 447, 451 (Bankr. C.D. Cal. 2002)).   Federal jurisdiction is barred if all three of these factors are satisfied.   <u>United States v. Del.</u>

36

Dep't of Ins., No. 20-829-MN-CJB, 2021 WL 3012728, at *9 (D. Del. July 16, 2021).   To the extent that the Plan prohibits or impedes Lujan Claimants from directly suing insurers of BSA, local councils, chartered organizations, or any entity against whom Lujan Claimants or any of them have a claim, the Plan violates the MFA and the Court lacked jurisdiction to confirm it.

The first factor is met, as "there is no question that the Bankruptcy Code does not specifically relate to the business of insurance." In re Advanced Cellular Systems, 235 B.R. 713, 719 (1999).   "Many federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 42 (1996).  The Bankruptcy Code expressly states that a domestic insurance company is not eligible for relief as a debtor. PRS Ins. Group, 294 B.R. at 612 (citing 11 U.S.C. § 109(b)(2)).  In PRS Ins. Group, the Delaware Bankruptcy Court concluded that "the Bankruptcy Code does not specifically relate to the business of insurance." Id.

The Plan cites sections 105(a) and 1123(b) of the Bankruptcy Code as providing authority to prohibit survivors' direct action rights against insurers. A.474, 480, 485.  However, neither section specifically relates to the business of insurance.  Debtors cite the equitable jurisdiction and power of the Bankruptcy Court and District Court under 11 U.S.C. § 105(a) as authorizing the Insurance Entity

Injunction and Channeling Injunction, which both prohibit creditors from bringing actions or claims against insurers of Protected Parties, including BSA, all local councils, and certain chartered organizations. However, the Third Circuit held in Combustion Eng'g, Inc., that section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and vacated the channeling injunction. 391 F.3d at 238. In Continental, the Third Circuit rejected as extra-statutory the provision in a plan of reorganization that released claims against former and current directors of debtor Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here." 203 F.3d at 211. That one instance is asbestos cases. As noted earlier, the Third Circuit has never identified any section of the Bankruptcy Code that authorizes nondebtor releases in non-asbestos cases. Since section 105(a) clearly does not specifically relate to the business of insurance, the Third Circuit has held that section 105(a) does not allow for the creation of substantive rights not otherwise available under the Bankruptcy Code, and the Third Circuit has acknowledged that the Code only explicitly authorizes the release and permanent injunction of claims against nondebtors in asbestos cases, the only reasonable conclusion is that section 105(a) is not a federal

38

statute that specifically relates to the business of insurance, including allowing the release and permanent injunction of claims against insurers in non-asbestos cases.

Turning to section 1123(b), that statute provides:

> (b) Subject to subsection (a) of this section, a plan may—
> (1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
> (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
> (3) provide for—
> (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
> (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
> (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;
> (5) modify the rights of holders of secured claims, other than a claim secured by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and
> (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1123(b).  Like section 105(a), the language of section 1123(b) contains no express reference to insurance, including any provision allowing a release and permanent injunction of claims against insurers.  Section 1123(b) simply lays out in detail what a plan of reorganization may contain.  Purdue, 2021 WL 5979108, at *62.  Similar to section 105(a), section 1123(b) is not a statute that specifically relates to the business of insurance.

39

While Debtors rely only upon sections 105(a) and 1123(b) as authority for the release and permanent injunction of claims against insurers, the FCR and Coalition of Abused Scouts for Justice ("the Coalition") have cited as authority for such release and injunction 11 U.S.C. § 1123(a)(5).  Section 1123(a) "contains a laundry list of things that a plan can include in order to make sure that resources are available to implement the plan – any of which can be ordered by a bankruptcy court."  Purdue, 2021 WL 5979108, at *63.  However, insurance is nowhere mentioned in the statute.  "Injunctions against the prosecution of third-party claims against non-debtors [including insurers], and the release of such claims, are nowhere to be found on that list."  Id. at *64.  Section 1123(a)(5) does not by itself confer any substantive right.  Id.  Nor does it confer any special power on a bankruptcy court.  Id.  "Finally, and most important, Section 1123(a)(5) does not authorize a court to give its imprimatur to something the Bankruptcy Code does not otherwise authorize, simply because doing so would secure funding for a plan.  Nothing in Section 1123(a)(5) suggests that the debtor has the right to secure sufficient funds for implementation by any means necessary."  Id.

Admittedly, in In re Fed.-Mogul Glob., Inc., 684 F.3d 355, 369 (3d Cir. 2012), the Third Circuit held that section 1123(a) preempts state law.  In that case, the issue was whether a debtor could transfer its insurance rights to a section 524(g) asbestos trust notwithstanding the policies' anti-assignment provisions.  Id. at 366.  In holding

that section 1123(a) permitted the debtor to transfer its insurance rights to the asbestos trust, the Court did not consider the MFA and whether section 1123(a) is a federal statute that specifically relates to the business of insurance.  Instead, the Court recognized that section 1123(a) "by its express terms does not displace other portions of the Bankruptcy Code."  Id. at 371.  Only in considering section 1123(a) in conjunction with section 524(g), which permits injunctions of claims against insurers in asbestos cases, did the Court reach its conclusion regarding preemption.  As there is no statutory authority in the Bankruptcy Code allowing the release and permanent injunction of third-party claims against insurers outside the asbestos context, section 1123(a) standing alone cannot be construed as specifically relating to the business of insurance.

Congress knows how to craft legislation that specifically references insurance, as it did in enacting section 524(g), which provides that, notwithstanding the provisions of section 524(e), the bankruptcy court may order an injunction barring claims against third parties that arise by reason of "the third party's provision of insurance to the debtor or a related party."  11 U.S.C. § 524(g).  Congress has never enacted a bankruptcy statute similar to section 524(g), permitting an injunction of claims against insurers in non-asbestos bankruptcy cases.  Rather, the rule governing all non-asbestos bankruptcy cases is section 524(e) which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the

41

property of any other entity, for such debt."  Therefore, considering 1123(a) in a non-asbestos case subject to the rule in section 524(e), these Bankruptcy Code provisions cannot be construed as specifically relating to the business of insurance.

Regarding the second factor, the Supreme Court has stated that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505 (quoting Black's Law Dictionary 1236, 1286 (6th ed. 1990), and holding that an Ohio statute reverse preempted the federal statute under the MFA to the extent that it protected policyholders).  "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly are laws regulating the 'business of insurance.'"  SEC v. Nat'l Securities, Inc., 393 U.S. 453, 460 (1969).  The Supreme Court has identified three criteria to determine whether a state law regulates the business of insurance:  (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured"; and (3) "whether the practice is limited to entities within the insurance industry." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982).  Although none of the Pireno factors are necessarily determinative, an examination of the factors may lead to a finding that

state law regulates the business of insurance.  Am. Bankers Ins. Co. of Fla. v. Inman, 436 F.3d 490, 493 (5th Cir. 2006).

In Evans v. TIN, Inc., Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162, at *10 (E.D. La. June 20, 2012), the Eastern District of Louisiana court held that the Louisiana Direct Action Statute ("LDAS") is a statute that was enacted for the purpose of regulating the business of insurance:

> First, the LDAS regulates risk by subjecting all policy disputes regarding [insurance] coverage to the possibility of a jury trial.  Second, the LDAS forms an integral part of the insurer-insured relationship because it controls how disputes regarding [insurance] coverage will be resolved.  Finally, the LDAS only applies with respect to claims asserted under polic[ies] or contract[s] of liability insurance and it is, therefore, limited to entities within the insurance industry.

Id. (internal quotations omitted).  The Fifth Circuit has recognized that "Louisiana's direct action statute is arguably a state law regulating insurance, [and that] the McCarran Ferguson Act may allow it to trump federal law …."  Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd., 601 F.3d 329, 335 n.13 (5th Cir. 2010).

Guam's Direct Action Statute, 22 GCA § 18305, is virtually identical to the LDAS[2], stating:

---

[2] The LDAS provides in part:
> The injured person or his survivors or heirs …, at their option, shall have a right of direct action against the insurer within the terms and

43

> On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct action, provided that the cause of action arose in Guam.  Such action may be brought against the insurer alone, or against both the insured and insurer.

22 GCA § 18305.  Like the LDAS, Guam's Direct Action Statute regulates risk by subjecting all policy disputes regarding insurance coverage to the possibility of a jury trial, Guam's Direct Action Statute forms an integral part of the insurer-insured relationship because it controls how disputes regarding insurance will be resolved, and Guam's Direct Action Statute only applies with respect to claims asserted under policies or contracts of liability insurance and it is, therefore, limited to entities within the insurance industry.  Thus, the second factor is met.

The third factor—whether the federal law invalidates, impairs, or supersedes the state law— is also met.  "The term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law.' … And the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'"  Humana, Inc. v. Forsyth, 525 U.S. 299, 311 (1999).

---

limits of the policy …  This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana ….

Evans, 2012 WL 2343162, at *6 (quoting La. Rev. Stat. Ann. § 22:1269).

A federal law impairs state law if it directly conflicts with state law, applying federal law would frustrate any declared state policy, or applying federal law would interfere with a state's administrative regime.  Highmark Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 167-68 (3d Cir. 2001).  Here, Debtors are applying sections 105(a) and 1123(b), and the Plan provisions, to prohibit survivors and anyone else from directly suing insurers of Debtors, local councils, chartered organizations, and any other entity that receives a form of protected party status.  Permitting this application of the Bankruptcy Code will surely invalidate, impair, and/or supersede Guam's Direct Action Statute as it is applied to survivors of child sexual abuse in Guam.  If Debtors are granted their requested injunction, then survivors, including Lujan Claimants, will be prevented from enjoying the direct action rights granted them by state and territorial legislatures like the Guam Legislature, which Congress has charged with regulating the business of insurance.  They will no longer be allowed to sue insurers for the abuse they suffered, even though there is coverage to pay for their abuse.  The third factor is undisputedly met.

The Court erroneously held that the MFA did not apply for the sole reason that it found that "the Guam direct action statute was not enacted for the purpose of regulating insurance because it is designed to further the interests of injured parties and not policyholders."  A.115.  The Court cited no case law that actually holds that direct action statues do not regulate the business of insurance, but narrowed its focus

on cases that have nothing to do with direct action statutes and that focus on state statutes regarding mergers, SEC, 393 U.S. at 460, and priority of debts, Fabe, 508 U.S. 500 (1993).

Instead, courts considering direct action statutes have held that they clearly were enacted to regulate the business of insurance. Similar to Evans, the Second Circuit in Wadsworth v. Allied Professionals Ins. Co. found that New York's direct action statute ("NYDAS"), which requires any insurance policy issued in New York to contain a provision permitting a direct action against a tortfeasor's insurer, was "undoubtedly" a state statute enacted to regulate the business of insurance, under the McCarran-Ferguson Act. 748 F.3d 100, 109 (2d Cir. 2014). The NYDAS authorizes an injured party with an unsatisfied judgment against an insured party to sue the insurer for satisfaction of the judgment in some circumstances. Id. at 108. Application of the statute to insurers would "undoubtedly" regulate insurers by subjecting them to lawsuits filed in New York by claimants who are not parties to insurance contracts. Id. The court noted that the cost of litigation might result in higher attorney fees, costs, and potential recoveries. Id. The court found that NYDAS specifically governed the content of insurance policies, requiring insurers to place in their New York contracts a provision that is not required in other states. Id.

Also, in <u>Reis v. OOIDA Risk Retention Group, Inc.</u>, the Georgia Supreme

Court held that direct actions statutes were laws governing the insurance business.

303 Ga. 659, 665-66 (2018).   There, the court faced the question of whether

provisions in the federal Liability Risk Retention Act of 1986 ("LRRA") preempt

Georgia's motor carrier and insurance carrier direct action statutes, in regard to risk

retention groups.  <u>Id.</u> at 659.  Preemption would occur if the Georgia statutes would

regulate directly or indirectly the operation of the risk retention group as prohibited

by the LRRA.  <u>Id.</u> at 662-63.  The court stated:  "It has been held that whether a

practice is part of 'the business of insurance' can be determined by consideration of

three characteristics:   whether the practice effectively transfers or spreads a

policyholders risk; whether it is an integral part of the contractual relationship

between the insurer and the insured; and whether the practice is limited to entities

within the insurance industry."  <u>Id.</u> (citing <u>Pireno</u>, 458 U.S. at 129).  The court found

that "[t]he direct action statutes would impact operation of the business of insurance

of a risk retention group inasmuch as application of the statutes would result in the

spreading of risk and associated increases in costs due to the additional financial

burden of defending unanticipated lawsuits in which they are directly named as

parties, in affecting the relationship between an insurer and insured by creating

possible conflicts of interests between the insurer and the policyholder, and in

47

limiting their application to insurers of motor carriers.  Therefore, the direct action statutes would regulate the operation of risk retention groups." Id. at 665-666.[3]

As the Plan runs afoul of the MFA, which requires that Guam's Direct Action Statute reverse preempt conflicting Bankruptcy Code provisions that do not specifically relate to insurance and thus preserves Lujan Claimants' right to directly sue insurers, the Court erred in confirming the Plan.

2. The proceeds of liability insurance policies are not property of the Bankruptcy Estate and cannot be released or enjoined.

The bankruptcy estate only includes property to which the debtor would have had a right if the debtor were solvent. First Fidelity Bank v. McAteer, 985 F.2d 114, 116 (3d Cir. 1993) (citing In re La. World Exposition, Inc., 832 F.2d 1391, 1401 (5th Cir. 1987)).  Insurance policies are considered part of the property of a bankruptcy estate. ACandS, Inc. v. Travelers Casualty & Surety Co., 435 F.3d 252, 260 (3d Cir. 2006) (citing Estate of Lellock v. The Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3d Cir. 1987)).  The debtor's right to its insurance proceeds is property of the estate, except where the debtor does not own the insurance proceeds but just owns the

---

[3] Although some Louisiana cases held that the LDAS is not preempted by the LRRA, their conclusion hinged on a narrower reading of the LRRA as allowing preemption of state statutes that regulate the operations of risk retention groups, with "operation" being the key term, meaning that a state may not pass laws that keep risk retention groups from operating as insurance companies. Zeigler v. Hous. Auth. of New Orleans (Hano), 192 So.3d 175, 179-181 (La. Ct. App. 2016); Bouie v. JDV Freight Transport, LLC, No. 20-211-JWD-EWD, 2021 WL 3744188, at *4-6 (M.D. La. Aug. 24, 2021).

policy.  In re Nutraquest, Inc., 434 F.3d 639, 647 n.4 (3d Cir. 2006).  For example, when the debtor corporation's liability policy insured only the corporation's directors and officers (and would only pay them), the liability proceeds were not property of the bankruptcy estate.  Id. (citing La. World Exposition, 832 F. 2d at 1399-401).  "The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim."  Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51, 55-56 (5th Cir. 1993).  The debtor has no cognizable claim to liability insurance proceeds paid by an insurer on account of a covered claim.  Landry v. Exxon Pipeline Co., 260 B.R. 769, 786 (Bankr. M.D. La. 2001).

Here, while the bankruptcy estate includes BSA's interest in BSA insurance policies, the bankruptcy estate does not include the proceeds of BSA liability insurance policies since injured persons, including Survivors, have a right to receive and keep those proceeds when the insurer pays on the claim.  Not being part of the bankruptcy estate, the disposition of the liability insurance proceeds cannot be allowed free and clear of Lujan Claimants' interests under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code.  Instead, Lujan Claimants' interests in the insurance proceeds and direct action rights against insurers cannot be released pursuant to 11 U.S.C. § 524(e).  The Court erred in concluding that the proceeds are a part of the bankruptcy estate since they are

payable to BSA.  There was no evidence to support this, especially since the Court acknowledges that Lujan Claimants can pursue direct action claims against non-settling insurers.  Obviously, any award on a direct action claim would be paid to Lujan Claimants and not BSA.

Even if third party releases are permitted here, the release of Lujan Claimants' claims against insurers to recover payment of proceeds must satisfy the requirements for third party releases:  fairness, necessity to the reorganization, specific factual findings to support these conclusions, and reasonable consideration given in exchange for the release and permanent injunction.  Continental, 203 F.3d at 214-15.  But these requirements are not met.  These releases are certainly not necessary to Debtors' successful reorganization since Debtors admit that they can successfully reorganize under a BSA Toggle Plan which includes no insurance policy buybacks or insurer releases.  They certainly are not necessary as Debtors have proposed other plans which do not include a Century and Chubb settlement agreement or even a Hartford settlement agreement.  There is simply no need for Debtors to sell their policies back to insurers, especially for insultingly low dollars.  The releases should have been denied.

3. <u>The Hartford and Century and Chubb Companies insurance settlements for policy buybacks free and clear of others' interests in the policies are for payment grossly below policy limits and should have been denied.</u>

The Bankruptcy Code's protection of the debtor from liability does not affect the liability of the debtor's insurers. <u>First Fidelity Bank</u>, 985 F.2d at 114. Courts, relying on 11 U.S.C. § 524(e), have permitted claimants to proceed with tort claims against the debtor for the purpose of collecting from the debtor's liability insurer. <u>Id.</u> (citing <u>Green v. Welsh</u>, 956 F.2d 30 (2d Cir. 1992); <u>In re Jet Fla. Sys., Inc.</u>, 883 F.2d 970 (11th Cir. 1989)). Thus, the creditor remains free to recover the full amount of the original obligation from any nondebtor party including an insurer. <u>Id.</u>

The general rule is that, when an insurer pays proceeds of the insurance to the person who is the proper recipient under the policy, such payment is a discharge of the liability of the insurer where the entire amount due is paid. 46A C.J.S. Insurance § 1986 (2007). Where only a partial payment of the proceeds is made to the person designated by the policy, the insurer is discharged from liability to the extent of the amount paid. <u>Id.</u>

It cannot be disputed by Debtors that neither settlement involves payment up to the limits of these mostly nonaggregate policies, which include yearly primary insurance policies with $500,000 per occurrence limits and yearly excess insurance of up to millions per occurrence. Without full payment, Survivors are free to recover the remaining payment owed under the policies from the insurers. Since the

51

insurance settlement agreements seek the total release of Hartford and Century of all liability under the policies without payment of the entire amount due, the Court erred in approving them.

        4.  <u>The Plan impermissibly modifies Lujan Claimants' rights</u>.

The Plan includes settlements with insurers for the sale of BSA's rights to insurance policies pursuant to section 363 of the Bankruptcy Code, and the transfer of insurance rights of Debtors, local councils and chartered organizations, and related injunctions, all of which impermissibly modify Lujan Claimants' rights to insurance proceeds.

In <u>In re W.R. Grace & Co.</u>, the District Court of Delaware held that, in order for Libby Claimants—who were injured creditors not named as insureds or intended beneficiaries under any policies and there was no evidence on the record indicating the policies were purchased for their benefit—to be able to obtain any portion of insurance proceeds, they need to establish that they have a legal right to collection. 475 B.R. 34, 83 (D. Del. 2012). "Such a legal right could be established pursuant to, inter alia: (1) a state statute crafted by the legislature conferring a right upon the parties to pursue a direct action for the proceeds, …." <u>Id.</u> As discussed earlier, Guam's Direct Action Statute gives Lujan Claimants a right of direct action against insurers of BSA, local councils, chartered organizations, and other entities such as

52

religious orders.  Therefore, Lujan Claimants have rights to the insurance proceeds of policies covering their injuries.

A bankruptcy court lacks jurisdiction over property rights outside of the estate, and, accordingly, lacks jurisdiction over a nondebtor's rights to insurance proceeds.  Filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy.  Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1663 (2019).  Regarding insurance, where there are multiple insureds under a policy, "the bankruptcy estate owns only the debtor's interest, and not the co-insured's interest."  In re Archbishop of St. Paul & Minneapolis, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); see also In re SportStuff, Inc., 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) (citing authority that "[w]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights.").  Thus, the Court only has jurisdiction over Debtors' rights to insurance proceeds, and lacks jurisdiction over Lujan Claimants' rights to insurance proceeds of policies that cover BSA and/or other liable insureds, including AOA's interests in policies.

Further, the leading treatise on insurance law explains why the extinguishment or restriction of Lujan Claimants' direct action rights as part of insurance policy buybacks could not have been approved by the Court:

> A completed surrender and cancellation of an insurance policy terminates the contract, and the parties are relieved from any liability that might otherwise accrue under the policy, though not from liability already accrued.
> … Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested. …
> A mutual rescission of a liability policy by the insurer and the named insured does not abrogate the accrued rights of the omnibus insureds without their consent. …
> A provision in a liability policy giving the injured person a right of action over against the insurer cannot be cancelled by the insurer, even with the consent of the insured, after the injured person's identity has been established.

*Couch on Ins.* § 31:49 (3d ed. 2020).

The insurer and insured cannot agree to modify the rights of the injured person against the insurer, including by cancelling the provision in the contract giving the injured person a right of action against the insurer, because the terms of Guam's Direct Action Statute are deemed to be part of every liability insurance policy governed by Guam law whether or not the parties expressly agree to its terms. Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C., 173 Wis.2d 665, 676 (1993) (interpreting Wisconsin direct action statute similar to Guam's). An insurer and insured may not rescind a liability policy after a known loss. Society

54

Ins. v. Capitol Indem. Corp., 260 Wis.2d 549, 555-56 (Ct. App. 2003); In re Estate

of Gardinier, 40 N.J. 261 (1963); Rauch v. Am. Fam. Ins. Co., 115 Wis.2d 257, 267

(1983) ("[U]pon the happening of an accident, the injured party acquires an interest

in the policy that cannot be foreclosed by litigation or agreement between the insurer

and insured alone.").

The buyback of insurance policies is not saved by section 363 because the

Bankruptcy Code cannot preempt Guam's Direct Action Statute.  It is not saved by

section 1123(a)(5), which authorizes a "sale" that might not otherwise be permitted

under applicable bankruptcy law, because Guam law is not anti-sale; it is anti-

rescission.  Any modification of policy terms among Debtors and insurers cannot

rescind the policies or eliminate Lujan Claimants' and other direct action Survivors'

statutorily fixed rights.

The Court erroneously approved the sale of the insurance policies free and

clear of Survivors' interests under section 363(f), since the Plan does not adequately

compensate them for their interests, as discussed below.

Additionally, the requirements of section 1123(a)(5)(D) of the Bankruptcy

Code were not met.  Section 1123(a)(5)(D) requires that a plan provide adequate

means for its implementation, including a sale of estate property.  This clause

prohibits the violation of Guam law barring insurance policy buybacks for at least

four reasons.  First, the sale frustrates Guam's Direct Action Statute, which preempts

section 1123 under the MFA.  Second, Guam law prohibiting the post-occurrence modification of an injured person's rights is not anti-sale; it is anti-rescission.  Third, section 1123(a)(5)(D), which was enacted in 1980, cannot apply to preenactment claims because retroactive application violates Lujan Claimants' Fifth Amendment property rights.  More than 70 Lujan Claimants have direct action claims that accrued prior to 1980, when section 1123(a) was amended to add the phrase, "[n]otwithstanding any otherwise applicable nonbankruptcy law."  Shipman v. Kenosha Unified Sch. Dist., 57 Wis.2d 697, 704-05 (1973).  The application of this phrase retroactively to preempt Guam's Direct Action Statute abrogates Lujan Claimants' "substantive" causes of action against settling insurers in violation of Lujan Claimants' Fifth Amendment due process rights.  United States v. Security Ind. Bank, 103 S. Ct. 407, 413-14 (1982); Malpeli v. Beneficial Fin. Co. (In re Malpeli), 7 B.R. 508, 511 (Bankr. N.D. Ill. 1980).  Fourth, the insurance buyback settlements could not be approved under section 1123(a)(5)(D) because its free and clear provision is limited to sales free of "liens."  11 U.S.C. § 1123(a)(5)(D).  Lujan Claimants' interests in the insurance policies, while similar to liens, are not technically liens as they do not secure payment of a debt.

> 5.  The Plan fails to adequately protect and compensate direct action claimants for their interests in insurance policies.

Assuming the insurance policy buybacks are lawful sales under section 363(f), the Court erred in confirming a Plan that fails to provide Lujan Claimants with

adequate protection and compensation for their interests in the insurance policies. 11 U.S.C. § 363(e). The word "interest," as used in section 363(f), is to be interpreted broadly. <u>Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.)</u>, 327 F.3d 537, 545 (7th Cir. 2003)). Lujan Claimants have an interest in BSA's (and other tortfeasors') insurance policies since they have prejudgment direct action rights against insurers under Guam law. Prejudgment direct action claimants, like Lujan Claimants, are third party beneficiaries to insurance policies, <u>Litton v. Ford Motor Co.</u>, 554 So.2d 99, 103 (La. Ct. App. 1989), with rights in the policies that vest "at the time of the tort," <u>Hayes v. New Orleans Archdiocesan Cemeteries</u>, 805 So.2d 320, 323 (La. Ct. App. 2001) ("The Direct Action Statute vests the injured party with rights at the time of the tort to institute an action directly against the insurer within the terms and limits of the policy.").[4] An accrued cause of action, such as for negligence, is a vested property interest entitled to due process protection that accrues on the date of the plaintiff's injury. <u>Matthies v. Positive Safety Mfg. Co.</u>, No. 99-0431, 2000 WL 892825, at *3 (Wis. Ct. App. July 5, 2000) (citing <u>Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau</u>, 97 Wis.2d 435, 442, 445 (1980), and <u>Martin v. Richards</u>, 192 Wis.2d 156, 206 (Wis. 1995)). Lujan

---

[4] In cases brought under Guam's Direct Action Statute, the Supreme Court of Guam has relied upon Louisiana court decisions in cases brought under its similar LDAS. <u>See, e.g.</u>, <u>Reyes v. First Net Ins. Co.</u>, 2009 Guam 17 ¶ 29 (citing <u>Welch v. Crown Zellerbach Corp.</u>, 359 So. 2d 154, 156 (La. 1978), and <u>Hannie v. Wall</u>, 569 So. 2d 1044, 1050 (La. Ct. App. 1990)).

Claimants have a right to the insurance proceeds because the Guam Legislature enacted a statute that confers a right of direct action against insurers.

If the debtor's property is subject to an interest of another party, the debtor must provide adequate protection to the creditor. In re Lee, 25 B.R. 135, 139 (Bankr. E.D. Pa. 1982). The interest of the creditor must be adequately protected before the bankruptcy court will order turnover of these funds to the debtor. Id. The debtor bears the burden of proving the existence of adequate protection for the creditor's interest. Id. The court has the authority to condition or prohibit any sale of property as is necessary to provide adequate protection to the secured creditor's interest. In re Collins, 180 B.R. 447, 452 (E.D. Va. 1995). The commonly accepted method for adequately protected a secured creditor when a sale is authorized under section 363(f) is to order the liens or interest to attach to the proceeds of the sale. Id.

Here, the Plan provides Lujan Claimants no compensation or protection for their interests in the insurance policies. Despite their status as prejudgment direct action Survivors with interests in insurance policies, the Plan treats Lujan Claimants the same as all other Survivors who lack prejudgment direct action rights, as all insurance proceeds will be paid to all Survivors with allowed claims. Since the insurance proceeds will be shared among all Survivors, regardless of whether they have direct action rights, then, at the very least, prejudgment direct action Survivors, including Lujan Claimants, should be granted a priority right to proceeds of

insurance policy buybacks.  A priority right to the insurance proceeds is consistent with Guam's Direct Action Statute, as the Guam Legislature, in enacting its direct action statute, prioritized the ability of injured persons to recover payment from insurers by allowing them to directly sue insurers.  The Court reasoned that Lujan Claimants were not entitled to a priority right to insurance proceeds because Guam's Direct Action Statute was enacted to protect the public at large and other claimants would look to the policy albeit after a judgment.  A.119-20.  This analysis is flawed.  Guam's Direct Action Statute protects only "the injured person or his heirs or representatives…provided that the cause of action arose in Guam," 22 GCA § 18305, and therefore protects those injured in Guam and not the public at large in California, Ohio, or any other state or territory.  Also, it is irrelevant whether other claimants would look to the policies after judgment, as there is no evidence that such other claimants who lack direct action rights have an interest in the policies; what is relevant is that Lujan Claimants have an interest in the polices being sold that is not adequately protected or compensated in the Plan.  The Court also erred in finding adequate protection since the Plan allows Lujan Claimants to process their claims against the Settlement Trust and receive their share of Trust assets including sale proceeds, and that Lujan Claimants may choose the Independent Review Option and seek recoveries from Non-Settling Insurers, or can pursue their claims directly against any Non-Settling Insurance Companies, even outside the Settlement Trust.

59

A.120.   This is not adequate protection or compensation since it pays no compensation to Lujan Claimants for their interests in the policies or, conversely, pays every allowed claimant compensation who has no interest in the policies. Likewise, any payment from Non-Settling Insurers is speculative and not on account of Lujan Claimants' interests in the settling insurer policies.  As the Plan fails to provide Lujan Claimants with adequate protection and compensation for their interests in the policies, the Court erred in confirming the Plan with the insurance settlements and any future insurance settlements between presently non-settling insurers with Debtors or the Settlement Trust.

> 6.   <u>The Court lacks jurisdiction over the 1976 and 1977 Hartford Policies for coverage of child sexual abuse claims, since BSA previously released its rights to such coverage.</u>

"Debtors admit that BSA entered into a settlement agreement that released BSA's rights to coverage for sexual abuse claims under the 1976 Hartford Policy and 1977 Hartford Policy."  ALW245-46.  As BSA released its rights to coverage for sexual abuse claims under these policies, and so is not entitled to coverage for sexual abuse claims, these policies as to and any proceeds for coverage of sexual abuse claims cannot be part of the bankruptcy estate in this case since Debtors have no legal or equitable interests in these policies.  11 U.S.C. § 541.  The same is true as to any other policies released by BSA or limited as to coverage.  Accordingly, the Court lacks jurisdiction over these policies as to and proceeds for coverage of sexual

abuse claims and erred in confirming a Plan which includes sales free and clear of others' interests (including any covered local councils, chartered organizations including the Archbishop of Agana[5], and direct action Survivors including Lujan Claimants) in and injunctions as to these policies.

7. <u>The sale and settlement of nondebtors' separate insurance policies should have been denied</u>.

A bankruptcy court lacks authority to dispose of property of a nondebtor. <u>In re Aegean Marine Petroleum Network, Inc.</u>, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019). Despite this, both the Hartford and Century settlements attempt to release the insurers of their obligation to provide coverage to local councils and chartered organizations under their own separate non-BSA insurance policies and the 1976 and 1977 Hartford insurance policies which were released by BSA. The releases are a shocking overreach supported by no provisions of the Bankruptcy Code or other law. Like liability insurance proceeds, non-BSA insurance policies and released BSA insurance policies are not property of the bankruptcy estate and therefore may not be disposed of free and clear under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code. Lujan Claimants have standing to raise this objection because they have an interest in policies that cover their injuries.

---

[5] It is the undisputed record that "Debtors admit that it is the Debtors' position that the Archbishop of Agana is an additional insured under the BSA's general liability policies incepting after January 1, 1976 and to the Petition Date." ALW244-45.

8. <u>The insurance settlements fail the Martin standard</u>.

A court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise" to determine whether a settlement is fair and equitable. <u>In re Martin</u>, 91 F.3d 389, 393 (3d Cir. 2002). The four criteria a court must consider in striking this balance are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors." <u>Id.</u> The party proposing the settlement bears the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved. <u>Martin v. Kane</u>, 784 F.2d 1377, 1381 (9th Cir. 1986). "An approval of a compromise, absent a sufficient factual foundation which establishes that it is fair and equitable, inherently constitutes an abuse of discretion." <u>Id.</u> at 1383.

Regarding probability of success in litigation, this factor was not met as Debtors admit that the insurers' defenses are "without merit." A.1919-22. While the insurers raised or could have raised defenses, the Court did not address the probability of BSA prevailing over them, including in any bad faith litigation.

As to likely difficulties in collection, there was no evidence that Hartford, Chubb, Chubb Companies, Zurich, and Clarendon are insolvent, or that collection against them would be difficult. The Court found that, as to Century, "unlike the

62

other carriers, there is significant concern about collection.  Century is in runoff with a relatively di [sic] minimis surplus capital."  A.89.  There was no evidence that Debtors considered the financial wherewithal of other insurers who would receive releases.  Further, Debtors admitted awareness that only Century was in runoff and limited to a $25 million surplus, and not Chubb Companies.  A.3423-24.

On complexity of litigation involved, Debtors admit that insurers' coverage arguments are without merit and that the Texas coverage action against Hartford has advanced to a summary judgment motion that is fully briefed.

Regarding paramount interest of creditors, Lujan Claimants were not parties to insurance settlement agreements, and neither was the Tort Claimants' Committee which previously urged Survivors to reject the plan in part because of the low Hartford settlement of $787 million.  There was no analysis of insurers' exposure or liability, or of direct action claims.  A.3400-01.  In In re Ditech Holding Corp., 606 B.R. 544, 625 (Bankr. S.D.N.Y. 2019), debtors failed to meet their burden of proving the settlement was fair and equitable to creditors where the expert did not analyze the creditors' claims or try to place a value on those claims, and was asked to justify a pre-ordained settlement amount.  Testimony showed that expert analysis to demonstrate the reasonableness of the settlements was done after the settlements and no expert reviewed the claims or valued any claims.  A.6082, 6092-93, 6105, 6109; A.72.  Also, there was no evidence that the insurance settlement amounts accounted

for the value of both current, future, and unknown claims (meaning, claims by Survivors who did not file a timely proof of claim and do not qualify as future claimants, yet who are permitted to be compensated under the Plan due to their claims against local councils or chartered organizations).

The Court erred in approving the insurance settlements.

## C.   The Bankruptcy Court Erred in Confirming a Plan that Violates the Automatic Stay Imposed in the Archbishop of Agana's Bankruptcy Case.

The confirmed Plan violates the automatic stay provided for by 11 U.S.C. § 362 in the AOA bankruptcy case through the exercise of control of AOA's estate property including AOA's rights and interest as a coinsured of BSA insurance policies.  The automatic stay protecting AOA's estate property went into effect on January 16, 2019, when AOA filed for bankruptcy.  A.61.  AOA's rights and interest in BSA insurance policies are part of AOA's bankruptcy estate pursuant to 28 U.S.C. § 541, subject to the exclusive jurisdiction of the District Court of Guam, 28 U.S.C. § 1134.  The Court agreed with Lujan Claimants that AOA's interests in the policies are protected by the automatic stay imposed in the Guam bankruptcy, that the automatic stay prevents the Court from approving the sale of the Abuse Insurance Policies free and clear of whatever interests the AOA has, and that permission of the Guam bankruptcy court is required to lift the automatic stay.  A.103-08.  Yet, the Court confirmed a Plan and issued a Confirmation Order which exercises control

over AOA's interest in the policies by enjoining and barring all AOA, its estate, and its creditors (including Lujan Claimants) from asserting any claims or causes of action against the Settling Insurance Companies (and the Hartford Protected Parties) or their respective Representatives based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policies or other insurance policy issued by a Settling Insurance Company covering Abuse Claims[.]" A.293. At the September 7, 2022, hearing, the Court reiterated from her Opinion that "there was a violation of the automatic stay, so I could not permit a sale free and clear of the archbishop's interests." 9/7/22 Hr'g Tr. at 35. As to paragraph M.1. of (at that time, the proposed) Confirmation Order, id. at 10; A.293, the Court acknowledged that "I think paragraph one is a paragraph that affects the Archbishop[] … But as to paragraph 1, it's with respect to enjoining the Archbishop," ALW206. Yet the Court issued the Confirmation Order with this paragraph anyway, since AOA was not present at the hearing. Id. ("The Archbishop isn't here, okay."). The Court also stated that Lujan Claimants lack standing to raise an objection to paragraph M.1. Id. The Court was wrong that AOA needed to be present at the hearing to raise an objection on the basis of the automatic stay since the stay is automatic and does not require any action by AOA to make it apply to a particular proceeding, and AOA could not waive the stay. ACandS, 435 F.3d at 259. The Court also wrongly found Lujan Claimants lack standing to raise an objection, since M.1. enjoins and bars "all

65

Persons" from asserting claims and causes of action against Settling Insurance Companies, Lujan Claimants are creditors of the AOA and its bankruptcy estate and the automatic stay serves the interests of debtors and creditors.  Id.  As direct action claimants, Lujan Claimants have interests in the Settling Insurer Policies.  Clearly, the injunctions violate the automatic stay since they are acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).   The Court erred in ordering confirmation of a Plan that violates the automatic stay of another bankruptcy action.

### D.    The Bankruptcy Court Erred in Confirming a Plan that Fails the Best Interest of Creditors Test.

Under section 1129(a)(7), a Chapter 11 plan cannot be confirmed unless each dissenting creditor "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 … on such date."  11 U.S.C. § 1129(a)(7).  This means that the plan must provide that each dissenting, impaired creditor receive or retain at least as much as the creditor would receive or retain if the debtor liquidated under Chapter 7.    In a Chapter 7 liquidation, nondebtor releases are not permitted.  See In re Mrs. Weinberg's Kosher Foods, 278 B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (holding in this chapter 7 case that bankruptcy courts may not use a channeling injunction to enjoin a creditor from prosecuting direct claims against a nondebtor); In re Optical

66

Tech., Inc., 216 B.R. 989, 990-94 (M.D. Fla. 1997) (adopting Master Mortgage but striking the actual releases contained in the debtors' liquidating plan because "where … a plan of reorganization provides for the total liquidation of the debtor, the factors of Master Mortgage cannot be met").  A plan of reorganization is unconfirmable for violating the best interests of creditors test, where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan.  In re Conseco, Inc., 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).   The plan proponent bears the burden of showing by a preponderance of the evidence that its plan passes the best interest of creditors test.  W.R. Grace, 475 B.R. at 142.

The record shows that the Plan fails the best interest of creditors test because it releases Survivors' claims against and enjoins them from suing nondebtors and requires that, in order to receive a distribution under the Plan, the Survivor must sign a release of all Protected Parties (such as local councils, contributing chartered organizations, and settling insurers) and chartered organizations. A.512, 515, 525. As Survivors can only receive payment under the Plan if they sign a release of their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these nondebtors, which they would still be able to retain in a chapter 7 liquidation.  Furthermore, the Plan prohibits Survivors from recovering payment under insurance policies issued by insurers, thereby

67

precluding Lujan Claimants from exercising their statutory rights to file direct actions against insurers.  Since, in a Chapter 7 liquidation, Survivors would be able to pursue their claims against local councils, chartered organizations, and insurers of such nondebtors and Debtors, the Plan clearly fails to pay Lujan Claimants at least as much as they would be paid if Debtors liquidated under Chapter 7.

The Plan also fails to meet the best interest of creditors test because it releases Lujan Claimants' claims against local councils (such as Aloha Council), who are directly liable for the abuse claims and have their own assets and separate insurance rights and policies to compensate Lujan Claimants.

Additionally, the Plan fails the best interest of creditors test because it releases and enjoins each Lujan Claimant's statutory right of direct action against all insurers who provide general liability insurance coverage to BSA, AOA, and local councils such as Aloha Council.  Guam's Direct Action Statute, 22 GCA § 18305, provides injured persons a right of direct action against the insurer up to the limits of the policy.  Debtors admit in the Plan that the BSA insurance policies from 1955 to 1981 are non-aggregate, meaning that the limits are per-occurrence or per person.  Debtors admit that local councils and chartered organizations, including Aloha Council and AOA, are covered under BSA insurance policies beginning in January 1976 to the Petition Date.

For example, the Court heard from Lujan Claimant Norman Aguon, who claims to have been abused in scouting from 1969 through 1973.  As Guam gives him a direct action right up to the policy limits for each insurance policy implicated by the abuse, Aguon has a direct action claim of $2.5 million per occurrence against Century for 1969.  For 1970, Aguon has a direct action claim of $2.5 million per occurrence against Century for 1970.  For 1971, Aguon has a direct action claim of $2.5 million per occurrence against Century and a direct action claim of $2 million per occurrence against Hartford.  For 1972, Aguon has a direct action claim of $3 million per occurrence against Hartford.  For abuse from 5/1/72 to 5/1/73, Aguon has a direct action claim of $5 million per occurrence against Argonaut. For 1973, Aguon has a direct action claim of $6 million per occurrence against Hartford.  For abuse from 5/1/73 to the end of 1973, Aguon has a direct action claim of $5 million per occurrence against Argonaut.  A.694.

The Court also heard from Lujan Claimant Morgan Paul, who claims to have been abused in scouting from September to October 1976.  Paul has a direct action claim of $500,000 per occurrence against Hartford, a direct action claim of $10 million per occurrence against National Union, a direct action claim of $1 million per occurrence against American Re-Insurance, and a direct action claim of $5 million per occurrence against London Market.  A.695.

69

The Plan also releases and enjoins Lujan Claimants' direct action claims against Aloha Council's separate insurers. A.702. For each year from 1974 through 1979, Aloha Council had non-aggregate primary insurance covering $500,000 per occurrence. For each year of 1976 and 1977, Aloha Council had non-aggregate excess insurance covering $1 million per occurrence. Aloha Council also had additional non-aggregate excess insurance covering $1 million per occurrence for 1976 and covering $500,000 per occurrence for 1977. Thus, Paul also has direct action claims against Aloha Council insurers, specifically against First Insurance Company of Hawaii for $500,000 per occurrence, against National Union for $1 million per occurrence, and against American Re-Insurance for $1 million per occurrence.

Although Century and Hartford are paying a combined $1.587 billion, that provides an average of about $19,300 per Survivor, an absolutely minuscule fraction of the direct action claims Lujan Claimants would retain in a Chapter 7 liquidation. The other insurers covering abuse years against whom Lujan Claimants have rights of direct action are paying absolutely nothing as part of the Plan and may never pay anything despite the best efforts of the Settlement Trustee. The money lost in pursuing Lujan Claimants' claims against third parties would not be significant as Lujan Claimants are paying attorney fees based on a contingency fee basis, and therefore attorney fees are capped at those contingency fee rates.

70

Since the Plan provides payment of approximately $2.5 billion to about $82,200, the average per Survivor is about $30,000, without yet considering Trust expenses, future and unknown claims, expedited distributions, and other factors. This is far less than the non-aggregate insurance per-occurrence amounts, oftentimes in the millions when combining primary and excess policy limits, and Aloha Council assets which would be available to compensate Lujan Claimants in a Chapter 7 case.

As Lujan Claimants' claims will be released against nondebtors without Lujan Claimants' consent and requires such release in order for them to be paid at all (including from BSA's personal assets), and Lujan Claimants would lose millions of dollars in claims against third parties if this Plan is confirmed, and which Lujan Claimants would have retained under a hypothetical Chapter 7 liquidation, the Plan should have been denied confirmation for failure to meet the best interests of creditors test as to Lujan Claimants.

### E.     The Plan Fails to Properly Classify the Claims of Lujan Claimants.

"[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).  Here, the Plan places prejudgment direct action Survivors, including Lujan Claimants, within the same class as Survivors who lack the statutory right to sue insurers without first obtaining a judgment and without having to name the insured.  These direct action claimants are not substantially similar to other

Survivors who have no interests in insurance policies, and therefore are not entitled to adequate protection or compensation from sales of insurance policies.  In addition to having direct action rights, Lujan Survivors have an open civil statute of limitations to bring suit for child sexual abuse.  They should have been separately classified, as the Bankruptcy Code requires their different treatment.

### F.        The Plan Treats Survivors, Including Lujan Claimants, Unequally.

"[A] plan shall— … provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Equal treatment requires that (1) all class members must receive equal value and (2) each class member must pay the same consideration in exchange for its distribution.  In re Quigley Co., 437 B.R. at 146.  Here, Lujan Claimants are not being provided equal treatment compared to Survivors who lack direct action rights.  Lujan Claimants are being forcibly deprived of their direct action rights without any compensation or protection.  Yet, Survivors without direct action rights give up no such rights and then are treated the same as Lujan Claimants under the Plan.  As Lujan Claimants are giving up more rights, and therefore paying more consideration, in exchange for the same treatment as Survivors who lack such rights, the Plan treats them unequally and the Court should have denied confirmation.

Also, the Plan treats Survivors unequally as some Survivors are forced to release and enjoined from pursuing their claims against chartered organizations and related religious entities, while other Survivors retain their claims against such nondebtors, and all Survivors same in the same pot of money (except for contributing chartered organization funds).  In other words, Survivors who lose their claims against chartered organizations and related religious entities are giving up more rights, and therefore paying more consideration, in exchange for their distribution and while not being compensated for the loss of their claims.  The Survivors who are being compelled to surrender their claims include those who were first abused after 1975 and those whose claims are released and enjoined under settling insurer injunctions.

This is similar to the treatment in Quigley, which was found to be unequal, leading in part to denial of plan confirmation.  There, the plan placed Non-Settling Claimants and Settling Claimants in the same class.  The Non-Settling Claimants as a group were being compelled to give up their valuable derivative claims—which the Settling Claimants had already surrendered—to get the same 7.5% distribution.  As the Non-Settling Claimants were being forced to pay greater consideration for their 7.5% distribution than the Settling Claimants, the court found that there was unequal treatment under section 1123(a)(4), and denied confirmation.  Quigley, 437 B.R. at 148.

The Plan provides for unequal treatment and should not have been confirmed.

### G. The Bankruptcy Court Erred in Granting Debtors' Motion to Amend and Supplement and Confirming the Plan which Materially Differs from the Solicited Plan.

Pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52, Debtors moved to amend and supplement the Court's Opinion (D.I. 10136), which rejected material aspects of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8813), and sought an order confirming a materially modified plan of reorganization. (Debtors' Motion to Amend and Supplement the Findings of Fact and Conclusions of Law in the Confirmation Opinion pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52 (D.I. 10188).) But neither Rule 7052 nor Rule 52 permit confirmation of an alternative plan of reorganization. Material and adverse plan modifications require resolicitation. In re Federal-Mogul Global, Inc.. No. 01-10578, 2007 WL 4180545, at *39 (Bankr. D. Del. 2007)). Debtors could not bypass requirements for plan confirmation, including but not limited to Bankruptcy Rule 2002(b), which requires at least 28 days' notice to parties in interest for filing objections to confirmation of a chapter 11 plan.

The Plan is materially and adversely different from the plan solicited and denied confirmation. First, the Plan now includes third-party releases and

74

injunctions of Survivors' claims which were not in the earlier plan, namely, the releases and injunctions in favor of Roman Catholic Entities, which also extend to other chartered organizations (including faith-based institutions) and their related entities.  A.296-97.  "Roman Catholic Entities" means

> each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, **regardless of whether any of the foregoing entities is or was a Chartered Organization at any time** or whether such facilities were owned or leased by any of such entities or third party, (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, and (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC.

A.296.  The Plan now treats these undisclosed entities as Participating Chartered Organizations, A.297, even though they are not chartered organizations.  There was no proof, and the Court made no findings, that any of these new and unknown releasees share insurance with Debtors or a unity of interest, or that any are making contributions to receive the protections under the Plan.  They just were not a part of the equation.   These protections are a result of the settlement between plan proponents and the Roman Catholic Ad Hoc Committee ("RCAHC") which resolved RCAHC's objection to plan confirmation, ALW110-36, but which was never presented or justified by Debtors in any disclosure statement or motion to approve compromise under Bankruptcy Rule 9019, prior to or even after the Court's Opinion.

75

The RCAHC Settlement was simply filed during trial, as part of the Twelfth Mediator's Report.   The Court's Opinion expressly gave no approval of the compromise.   A.79.   Not until after the trial ended were settlement terms incorporated into an amended plan.   Even though the world of releasees expanded by most likely thousands, and which now most likely includes religious orders against whom Lujan Claimants have claims (including the one who voted to accept the plan and the two who did not vote), Debtors failed to adequately disclose these non-chartered organization releasees as protected parties and never solicited votes on a plan with these entities as releasees.   Debtors failed to explain why these entities, including their representatives such as lawyers, should receive protections while making no contribution for their release and injunction of claims.

The Plan is also now materially modified to include an undisclosed and unsolicited "audit program" involving "procedures to … identify fraudulent claims" which the Settlement Trustee must present to the Court for approval after the Effective Date, and which include in addition to disallowance of a claim, penalties such as prosecution of the claimant or claimant's counsel for presenting a fraudulent claim and sanctions from the Court.  A.306-07.  The Court in her Opinion required in a future plan "the implementation of strong fraud prevention measures in connection with review of Direct Abuse Claims."  A.217.  "If the Plan is confirmed, the Confirmation Order will provide that the Settlement Trustee will propose

procedures to suss out fraudulent claims taking into account factors she deems appropriate, which can include a cost/benefit analysis." A.218. The solicited plan lacked these strong fraud prevention measures. While these procedures theoretically benefit meritorious claimants, Debtors still needed to adequately disclose such strong fraud prevention measures to Survivors, such as what responses or lack of responses in a proof of claim will be considered fraudulent. Given the Court's finding that BSA worked so closely with local councils and chartered organizations, will a claim that fails to identify a local council or chartered organization be considered fraudulent? Will a claim be considered fraudulent if a Survivor cannot identify the perpetrator or pinpoint a specific enough abuse date or location? Survivors lack answers to these and other questions about the strong measures. Debtors needed to disclose these procedures just as the Court required Debtors to disclose the Trust Distribution Procedures. ALW018-21 (Court moving the disclosure statement hearing since "I don't see some very necessary information and documents, quite frankly, that I would want to see at a disclosure statement, including the TDPs. Those who are involved in Imerys know that I did not send out that disclosure statement until we had TDPs. … [T]his plan has that gap in it, where parties don't know what, in fact, the treatment is going to be."). Disclosure was especially critical for Survivors to decide whether to elect the Expedited Distribution, where $3,500 total is paid with minimal level of claim review, except

the Survivor must have timely submitted a "substantially completed" proof of claim signed by the claimant under penalty of perjury and must have elected the Expedited Distribution on his ballot. A.44. Without knowledge of the strong fraud prevention procedures, 7381 Survivors, including one Lujan Claimant, made the Expedited Distribution election. Id. Survivors might not have elected to receive only $3,500 if they know their claims would be subject to a more rigorous and invasive review, as minimal review sparing Survivors from reliving the horrors of the abuse would have been seen as a benefit to making the election. As the Plan provides undisclosed adverse treatment, it needed to be resolicited.

Additionally, Rules 7052 and 52 are not a vehicle for rewriting Plan terms including settlement agreements, as Debtors have done in making the condition of free and clear sales of settling insurer policies waivable. A.293.

Even if Debtors' motion was proper under Rules 7052 and 52, Debtors failed to argue or show manifest injustice without amendment or supplement of the Opinion or any newly discovered evidence justifying amendment or supplement. Wound Care Centers Inc. v. Catalane, Civil No. 10-336, 2011 WL 3476612, at *3 (W.D. Pa. Aug. 9, 2011); In re Smith Corona Corp., 212 B.R. 59, 60 (Bankr. D. Del. 1997).

Accordingly, the Court erred in granting the motion and confirming a materially and adversely modified Plan.

## VII. JOINDER

Lujan Claimants join in the brief of the D&V Claimants and incorporate it as if fully stated herein.

## VIII. CONCLUSION

The Bankruptcy Court's Confirmation Order, and the Chubb Order to the extent it depends on the Confirmation Order, must be reversed and vacated due to the Court erroneously confirming the Plan with nonconsensual third-party releases and injunctions, erroneously approving the insurance settlements, erroneously approving a Plan that violates the automatic stay imposed in the AOA bankruptcy, erroneously confirming a Plan that fails the best interest of creditors test, erroneously confirming a Plan that improperly classifies direct action claimants, erroneously confirming a Plan that provides unequal treatment, and erroneously granting the motion to amend and supplement to confirm a Plan that is a material and adverse modification of the solicitation plan.

Dated: November 7, 2022.                Respectfully submitted,

                                        */s/ Christopher D. Loizides*
                                        Christopher D. Loizides (No. 3968)
                                        LOIZIDES, P.A.
                                        1225 North King Street, Suite 800
                                        Wilmington, DE 19801
                                        Phone: 302.654.0248
                                        Email: Loizides@loizides.com

                                        and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

## CERTIFICATE OF COMPLIANCE

The foregoing Brief of Appellants Lujan Claimants complies with D. Del. L.R. 7.1.3(f) and Fed. R. Bankr. P. 8015(a) (7) (B) and (h) as modified by this Court's Order in this case. This Brief has been prepared using Times New Roman 14-point typeface in Microsoft Word. This Brief contains 19,368 words, as calculated by Microsoft Word.

Dated: November 7, 2022.       Respectfully submitted,

*/s/ Christopher D. Loizides*
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: loizides@loizides.com

and

LUJAN & WOLFF LLP

/s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*