22-cv-01237-RGA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Boy Scouts of America and Delaware BSA, LLC,[1] <br><br> Debtors | Chapter 11 <br><br> Case No. 20-10343 (LSS) <br><br> Jointly Administered |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, <br><br> Appellants. <br><br> v. <br><br> Boy Scouts of America and Delaware BSA, LLC, <br><br> Appellees | Case No. 22-cv-01237-RGA <br><br><br> Jointly Consolidated[2] <br><br><br> On appeal from confirmation of Debtors' Plan of Reorganization |

## APPENDIX OF APPELLANTS LUJAN CLAIMANTS

| | |
|---|---|
| LOIZIDES, P.A. <br> Christopher D. Loizides (No. 3968) <br> 1225 North King Street, Suite 800 <br> Wilmington, DE 19801 <br> Phone: 302.654.0248 <br> Email: loizides@loizides.com | LUJAN & WOLFF LLP <br> Delia Lujan Wolff (admitted Pro Hac Vice) <br> Suite 300, DNA Bldg. <br> 238 Archbishop Flores St. <br> Hagatna, Guam 96910 <br> Phone: (671) 477-8064/5 <br> Facsimile: (671) 477-5297 <br> Email:  dslwolff@lawguam.com |

*Attorneys for Appellants the Lujan Claimants*

Dated: November 7, 2022

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243,22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252,22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237.  The Lujan Claimants' appeal is docketed at 22-cv-01258.

## APPENDIX OF APPELLANTS LUJAN CLAIMANTS

Listed below are documents and excerpts of documents cited in Appellants Lujan Claimants' opening brief. In order to avoid needless duplication, Lujan Claimants coordinated with other Appellants, including the Certain Insurers and the D & V Claimants, whose appendices include documents cited by the Lujan Claimants in their opening brief and are not reproduced herein. Lujan Claimants join in and incorporate as if fully set forth herein the Certain Insurers' and the D & V Claimants' appendices to their opening briefs.[4]

## TABLE OF CONTENTS

| Bankr. Dkt. No. | Description | Appendix Initial Page |
|---|---|---|
| \multicolumn | **Documents filed in In re Boy Scouts of America and Delaware BSA, LLC, United States Bankruptcy Court for the District of Delaware, Case No. 20-10343 (LSS)** | |
| 1 | Voluntary Petition for Non-Individuals Filing for Bankruptcy, filed 2/18/2020 | ALW001 |
| 2407 | Transcript of Telephonic Omnibus Hearing (3/17/2021), filed 3/18/2021 [Excerpts] | ALW018 |
| 7924 7924-1 | Verified Statement of Lujan & Wolff LLP Pursuant to Bankruptcy Rule 2019 [Redacted], filed 12/22/2021 [Excerpts] | ALW022 |
| 8708 | Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection filed by Guam Committee, filed 2/7/2022 | ALW029 |
| 9031 | Lujan Claimants' Supplemental Objection to Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LC, and Joinder in Objections of United States Trustee and Guam Committee, filed 2/25/2022 | ALW076 |

[4] Among the documents included in such appendices are those documents that are required to be included in the appendix in Fed. R. Bankr. P. 8018(b)(1).

| 9305<br>9305-1 | Notice of Revised Summary Final Voting Report Date with Respect to Local Councils and Chartered Organizations Named in Abuse Survivor Proofs of Claim, filed 3/11/2022 [Excerpts] | ALW091 |
|---|---|---|
| 9386 | Twelfth Mediator's Report, filed 3/17/2022 | ALW110 |
| 10246 | Lujan Claimants' Objection to Debtors' Motion to Amend and Supplement the findings of Fact and conclusion of Law in the Confirmation pinion Pursuant to Fed. R. Bankr. P. 7052 and Fed. R. CIV. P. 52, filed 8/24/2022 | ALW137 |
| 10327 | Order Releasing Pre-Petition Century/Chubb Claims Pursuant to Century and Club Companies Insurance Settlement Agreement, filed 9/12/2022 | ALW142 |
| 10454 | Notice of Appeal [Lujan Claimants], filed 9/22/2022 [Excerpts] | ALW145 |

| **Hearing Transcripts** | | |
|---|---|---|
| **Bankr. Dkt. No.** | **Description** | **Appendix Initial Page** |
| | Transcript of Hearing (9/1/2022) [Excerpts] | ALW180 |
| | Transcript of Status Conference Hearing (9/7/22) [Excerpts] | ALW197 |

| **Joint Trial Exhibits** | | |
|---|---|---|
| **JTX No.** | **Description** | **Appendix Initial Page** |
| 1-159 | Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform under the Restructuring Support Agreement, and (II) Granting Related Relief, filed 7/1/2021 [D.I. 5466] [Excerpts] | ALW213 |
| 1-296 | Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, filed 9/30/2021 [D.I. 6445] [Excerpts] | ALW217 |
| 1-352 | Exhibit 1:  Hartford Insurance Settlement Agreement, filed 2/15/2022 [D.I. 8816-1] [Excerpts] | ALW220 |

| 1-355 | Notice of Filing of Exhibits I-2, I-3, I-4 and J-2 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization, filed 2/15/2022 [D.I. 8817] [Excerpts] | ALW224 |
|---|---|---|
| 1-363 | Notice of Filing of Exhibits I-2, I-3, I-4 and J-2 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization, filed 2/18/2022 [D.I. 8907] [Excerpts] | ALW228 |
| 379 | Letter from James P. Ruggeri to Jessica C. Lauria et al., dated 2/5/2021 | ALW234 |
| 2646 | Debtors' Responses and Objections to Lujan Claimants' First Set of Requests for Admission to Boys Scouts of America and Delaware BSA, LLC, dated 10/18/2021 | ALW240 |
| 2947 | Sexual Abuse Survivor Proof of Claim [Excerpts] | ALW255 |

| **Deposition Designation** | | |
|---|---|---|
| **Bankr. Dkt. No.** | **Description** | **Appendix Initial Page** |
| | Transcript of the Testimony of Jesse Lopez (12/2/2021) [Excerpts] | ALW262 |

Dated: November 7, 2022.

Respectfully submitted,

*/s/ Christopher D. Loizides*
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

LUJAN & WOLFF LLP

*/s/ Delia Lujan Wolff*
Delia Lujan Wolff (admitted Pro Hac Vice)
Suite 300, DNA Bldg.
238 Archbishop Flores St.

Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

**Fill in this information to identify the case:**

United States Bankruptcy Court for the District of Delaware

Case number (if known): _____   Chapter 11 _____

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy   04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | Delaware BSA, LLC |
| 2. | **All other names debtor used in the last 8 years** | |
| | Include any assumed names, trade names, and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number (EIN)** | 84-2764311 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 1325 West Walnut Hill Lane | |
| Number   Street | Number   Street |
| Irving      TX    75038 | |
| City        State   ZIP Code | City        State    ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Dallas | |
| County | |
| | Number   Street |
| | City        State    ZIP Code |

5. **Debtor's website (URL)**   www.scouting.org

6. **Type of debtor**
   ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
   ☐ Partnership (excluding  LLP)
   ☐ Other. Specify: _____

**ALW001**

Debtor Name <u>Delaware BSA, LLC</u>                    Case number *(if known)* _____

| | |
|---|---|
| **7.** | **Describe debtor's business** |

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. § 101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
☒ None of the above

B. *Check all that apply:*

☒ Tax-exempt entity (as described in 26 U.S.C. § 501)
☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

___8134___

| | |
|---|---|
| **8.** | **Under which chapter of the Bankruptcy Code is the debtor filing?** |

*Check one:*

☐ Chapter 7
☐ Chapter 9
☒ Chapter 11. *Check all that apply:*

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☒ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11 (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

| | |
|---|---|
| **9.** | **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**<br><br>If more than 2 cases, attach a separate list. |

☒ No
☐ Yes.   District _____ When _____ Case number _____
                                      MM / DD / YYYY
           District _____ When _____ Case number _____
                                        MM / DD / YYYY

| | |
|---|---|
| **10.** | **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**<br><br>List all cases. If more than 1, attach a separate list. |

☐ No
☒ Yes.   Debtor _Boy Scouts of America_ _____ Relationship ___Sole Member___
           District ___District of Delaware___ When ___02/18/2020___
                                           MM / DD  /YYYY
           Case number, if known _____

**ALW002**

Debtor **Delaware BSA, LLC**          Case number(*if known*)_____
            Name

| | |
|---|---|
| 11. **Why is the case filed in *this* district?** | *Check all that apply:*<br><br>☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |
| 12. **Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ☒ No<br>☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention? (Check all that apply.)**<br><br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br><br>What is the hazard?_____<br><br>☐ It needs to be physically secured or protected from the weather.<br><br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br><br>☐ Other_____<br><br>**Where is the property?**  _____<br>           Number    Street<br><br>_____<br>_____<br>City           State    ZIP Code<br><br>**Is the property insured?**<br><br>☐ No<br>☐ Yes. Insurance agency_____<br><br>    Contact    _____<br><br>    Phone    _____ |

■ **Consolidated statistical and administrative information**

| | |
|---|---|
| 13. **Debtors' estimation of available funds** | *Check one:*<br>☒ Funds will be available for distribution to unsecured creditors.<br><br>☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors. |

| 14. **Estimated number of creditors** | | |
|---|---|---|
| ☒ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

| 15. **Estimated assets** | | |
|---|---|---|
| ☒ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**ALW003**

Debtor **Delaware BSA, LLC**                Case number(*if known*)_____
_____
Name

| 16. | **Estimated liabilities** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|---|
| | | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | | ☐ $500,001-$1 million | ☒ $100,000,001-$500 million | ☐ More than $50 billion |

███ **Request for Relief, Declaration, and Signatures**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. | **Declaration and signature of authorized representative of debtor** | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|---|

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __02/18/2020__
                MM / DD / YYYY

**x** _____        Steven P. McGowan
Signature of authorized representative of debtor        Printed name

Title Secretary and General Counsel
_____

| 18. | **Signature of attorney** | **x** _____        Date    __02/18/2020__
                                                                MM / DD / YYYY |
|---|---|---|

Signature of attorney for debtor

Derek C. Abbott                                Jessica C.K. Boelter
Printed name

Morris, Nichols, Arsht & Tunnell LLP            Sidley Austin LLP
Firm name

1201 North Market Street                        787 Seventh Avenue
Address

Wilmington, DE 19899                            New York, NY 10019
City/State/ZIP

(302) 351-9314                                  (212) 839-5300
Contact phone

dabbott@mnat.com                                jboelter@sidley.com
Email Address

3376 (DE)                                       5657580 (NY)
Bar number                                      Bar number

**ALW004**

**DELAWARE BSA, LLC**
**MEMBER**

**RESOLUTIONS APPROVING CHAPTER 11 FILING AND RELATED MATTERS**

**February 17, 2020**

**WHEREAS**, the undersigned, representing the sole member (the "**Member**") of Delaware BSA, LLC (the "**Company**"), a non-profit Delaware limited liability company, hereby adopts the following resolutions by written consent in accordance with the Limited Liability Company Agreement of the Company;

**WHEREAS**, the Member of the Company consulted with the senior leadership of the Company and the legal and financial advisors to the Company and has fully considered each of the Company's strategic alternatives; and

**WHEREAS**, the Member of the Company desires to approve the following resolutions.

<u>Commencement of Chapter 11 Case and Filing of Plan of Reorganization</u>

**NOW, THEREFORE, BE IT RESOLVED**, that, in the judgment of the Member of the Company, it is desirable and in the best interests of the Company, its creditors, and other stakeholders, and in furtherance of the Company's mission, that the Company file a petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"); and be it further

**RESOLVED**, that the Member or each duly appointed officer or duly authorized signatory of the Company (each, an "**Authorized Person**" and, collectively, the "**Authorized Persons**") be, and each of them hereby is, authorized and empowered, in the name of the Company, to execute and verify a petition for relief under chapter 11 of the Bankruptcy Code and to cause such petition to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), such petition to be filed at such time as the Authorizing Person executing the petition shall determine and to be in the form approved by the Authorized Person executing such petition, such approval to be conclusively evidenced by the execution, verification, and filing thereof; and be it further

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized and empowered, in the name of the Company, to execute a chapter 11 plan of reorganization (as such plan may be amended, modified or supplemented from time to time, the "**Plan**"), the form of which has been presented to the Member, which has considered and had the opportunity to ask questions of the senior leadership of the Company and the legal and financial advisors to the Company regarding the Plan, and to cause the Plan to be filed in the Bankruptcy Court at such time as the Authorizing Person executing the Plan shall determine; and be it further

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed, in the name of the Company, with full power of delegation, to execute, verify, and cause to be filed all petitions, schedules, statements, lists, motions, applications, pleadings, affidavits, declarations, reports, exhibits, and other papers or documents (and any

**ALW005**

amendments, modifications, and supplements thereto), and to perform such further actions and execute, verify, and cause to be filed such further documentation that such Authorized Person deems necessary, appropriate, or desirable in connection with the Company's chapter 11 case (the "**Chapter 11 Case**") and in accordance with these resolutions; and be it further

## Retention of Advisors

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed to retain and employ, in the name of the Company, subject to Bankruptcy Court approval: (i) the law firm of Sidley Austin LLP, as general bankruptcy counsel; (ii) the law firm of Morris, Nichols, Arsht & Tunnell LLP, as Delaware bankruptcy counsel; (iii) the financial advisory firm of Alvarez & Marsal North America, LLC, as financial advisor; (iv) the legal case administration firm of Omni Agent Solutions, as noticing, claims and solicitation agent; and (v) any other legal counsel, accountants, financial advisors, restructuring advisors, investment bankers, public relations professionals, or other professionals any of the Authorized Persons deems necessary, appropriate, or advisable; each to represent and assist the Company in carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code; and in connection therewith, each of the Authorized Persons be, and hereby is, authorized, empowered, and directed, in the name of the Company, in accordance with the terms and conditions hereof, to execute appropriate retention agreements, pay appropriate retainers, fees, indemnities, and expenses, and to cause to be filed appropriate applications for authority to retain such services in the Chapter 11 Case; and be it further

## General Authorization and Ratification

**RESOLVED**, that each of the Authorized Persons be, and hereby is, authorized, empowered, and directed to take, or cause to be taken, in the name of the Company, any and all further actions (including, without limitation, (i) executing, delivering, certifying, filing and/or recording, and performing any and all documents, agreements, instruments, motions, affidavits, declarations, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and (ii) paying fees and expenses in connection with the transactions contemplated by the foregoing resolutions) and to take any and all steps deemed by any such Authorized Person to be necessary, advisable, or desirable to carry out the purpose and intent of each of the foregoing resolutions, and all actions heretofore taken by any such Authorized Person in furtherance thereof are hereby ratified, confirmed, and approved in all respects; and it is further

**RESOLVED**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company, with the same force and effect as if each such acts, actions, and transactions had been specifically authorized in advance by resolution of the Company or consent of the Member; and it is further

**RESOLVED**, that the omission from these resolutions of any agreement, document, or other arrangement contemplated by any of the agreements, documents, or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any

**ALW006**

of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable, or appropriate to consummate, effectuate, carry out, or further the transactions contemplated by, and the intent and purposes of, the foregoing resolutions.

*[Signature page follows]*

**ALW007**

     **IN WITNESS WHEREOF,** the undersigned has executed this written consent as of the date first written above.

                                        **BOY SCOUTS OF AMERICA**

                                        By:   Steven P. McGowan
                                        Title: Secretary

*Signature Page to Resolutions of the Member of Delaware BSA, LLC*

**ALW008**

| Fill in this information to identify the case: |
|---|
| Debtor name <u>Delaware BSA, LLC</u> |
| United States Bankruptcy Court for the: <u>District of Delaware</u><br>(State) |
| Case number (if known): <u>20-</u> |

Check if this is an
amended filing

The following is a list of the thirty (30) largest known creditors potentially holding unsecured claims against Boy Scouts of America and Delaware BSA, LLC (collectively, the "Debtors") other than holders of abuse claims (the "Consolidated Top 30 List"). Concurrently with the filing of their petitions, the Debtors have filed a motion seeking authority to file this Consolidated Top 30 List, along with a list of the twenty-five (25) law firms representing the largest numbers of holders of abuse claims against the Debtors, in lieu of a list of the twenty (20) largest unsecured creditors for each of Boy Scouts of America and Delaware BSA, LLC.

The Consolidated Top 30 List reflects estimated amounts owed by the Debtors as of the Petition Date. It was produced from the books and records of the Debtors as of the close of business on February 17, 2020. The Consolidated Top 30 List does not include any person or entity who is now, or formerly was, an "insider" of the Debtors as that term is defined in 11 U.S.C. § 101(31). The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date. The Debtors' failure to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtors' right to contest the validity, priority and/or amount of any such claim.

## Official Form 204

# Chapter 11 or Chapter 9 Cases:  List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors, other than holders of abuse claims, holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2]<br>If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Williams, Roy L.<br>Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $2,386,986.12 |
| 2 | Mazzuca, Robert J.<br>Address on File | PHONE: On File | Deferred Compensation/ Restoration Plan | Unliquidated | | | $1,609,662.86 |
| 3 | Brock, C. Wayne<br>Address on File | PHONE: On File<br>EMAIL: On File | Deferred Compensation/ Restoration Plan | Unliquidated | | | $1,140,755.43 |
| 4 | Connelly, Kenneth L.<br>Address on File | PHONE: On File<br>EMAIL: On File | Restoration Plan | Unliquidated | | | $948,559.60 |
| 5 | Hoover Jr., C. Michael<br>Address on File | PHONE: On File<br>EMAIL: On File | Restoration Plan | Unliquidated | | | $915,037.28 |
| 6 | Ross II, David J.<br>Address on File | PHONE: On File<br>EMAIL: On File | Restoration Plan | Unliquidated | | | $904,795.26 |
| 7 | NCS Pearson, Inc.<br>200 Old Tappen Road<br>Old Tappan, NJ 07675 | ATTN: Bjarne Tellmann<br>TITLE: General Counsel and Chief Legal Officer<br>PHONE: 201-236-5416<br>EMAIL: bjarne.tellmann@pearson.com | Trade Payable | | | | $714,588.00 |

---

[1] To protect the identities and/or personal contact information of certain individuals listed hereon, the Debtors have redacted such information from this list. The Debtors are providing an unredacted version of this list to the Court and the Office of the United States Trustee.

[2] Amounts related to Restoration Plan are based on a preliminary actuarial determination.

**ALW009**

| Debtor | Delaware BSA, LLC | Case number *(if known)* |
| | Name | |

| Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|
| 8 Surbaugh, Michael Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $699,388.64 |
| 9 Ratcliffe, Judith Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $594,295.40 |
| 10 Tuggle, Robert Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $589,471.08 |
| 11 American Engineers & Contractors 224 Datura St, Ste 1012 West Palm Beach, FL 33401 | ATTN: Shiv Shahi TITLE: Owner PHONE: 561-666-9327 EMAIL: shiv@aecbuild.com | Trade Payable | | | | $533,950.84 |
| 12 Ohmstede, Roger A. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $512,590.29 |
| 13 Varnell, Thomas Address on File | PHONE: On File EMAIL: On File | Deferred Compensation | | | | $397,582.81 |
| 14 Terry, Anne Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $393,977.68 |
| 15 Lion Brothers Company Inc. 10246 Reisterstown Road Owings Mills, MD 21117 | ATTN: Susan Ganz TITLE: Chief Executive Officer PHONE: 410-363-1000, EXT. 247 EMAIL: sganz@lionbrothers.com | Trade Payable | | | | $355,795.41 |
| 16 Fitzgibbon, Thomas H. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $353,449.14 |
| 17 McChesney, Donald Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $328,739.51 |
| 18 Butler, Gary Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $324,387.52 |
| 19 Travis, Hugh Address on File | PHONE: On File EMAIL: On File | Deferred Compensation | | | | $306,816.71 |
| 20 Farmer, Bradley Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $304,736.45 |
| 21 Stone, Kathy Sue Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $254,068.18 |
| 22 Hunt, Jeffrey Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $237,271.49 |
| 23 Harrington, Thomas Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $228,275.19 |
| 24 Green, John Address on File | PHONE: On File | Restoration Plan | Unliquidated | | | $224,126.37 |
| 25 Quad/Graphics, Inc. N61W23044 Harry's Way Sussex, WI 53089-2827 | ATTN: Joel Quadracci TITLE: Chairman, President & Chief Executive Officer PHONE: 414-566-2200 EMAIL: joel.quadracci@qg.com | Trade Payable | | | | $174,600.00 |
| 26 Blackwell, Raymond L. Address on File | PHONE: On File EMAIL: On File | Restoration Plan | Unliquidated | | | $174,241.06 |

**ALW010**

Debtor    Delaware BSA, LLC _____    Case number (if known) _____
                Name

| Name of creditor and complete mailing address, including zip code[1] | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 27  Doe Claimant 2001 c/o Law Offices of Jeffrey E. Martin, LLC 2340 S. Arlington Hts. Rd., Ste 520 Arlington Hts., IL 60005 | PHONE: 847-956-0000 | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 28  Doe Claimant 2002 Address on File | PHONE: On File | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 29  Lehr, Richard Address on File | PHONE: On File EMAIL: On File | Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 30  Pension Benefit Guaranty Corporation 1200 K Street N.W. Washington, DC 20005 | ATTN: Patricia Kelly TITLE: Chief Financial Officer PHONE: 202-229-3033 EMAIL: kelly.patricia@pbgc.gov | Pension Guaranty | Contingent/ Unliquidated | | | Undetermined |

**ALW011**

<table>
<tr><td colspan="2">Fill in this information to identify the case:</td></tr>
</table>

Fill in this information to identify the case:

Debtor name____Delaware BSA, LLC

United States Bankruptcy Court for the: _____ District of Delaware
(State)

Case number (if known): _____

Check if this is an
amended filing

# Chapter 11 or Chapter 9 Cases:  List of 25 Law Firms With the Largest Number of Representations of Holders of Abuse Claims
12/15

The following is a consolidated alphabetical list of the twenty-five (25) law firms representing the largest numbers of holders of abuse claims against the debtors and debtors in possession (the "**Debtors**"), based on the number of known pending and asserted claims (the "**Top Plaintiffs' Counsel List**").[1]  Concurrently with the filing of their petitions, the Debtors have filed a motion seeking authority to file this Top Plaintiffs' Counsel List and a consolidated list of creditors holding unsecured claims against the Debtors other than holders of abuse claims, in lieu of a list of the twenty (20) largest unsecured creditors that would include individual holders of abuse claims for each of Boy Scouts of America and Delaware BSA, LLC.[2] The Top Plaintiffs' Counsel List does not include any person or entity who is now, or formerly was, an "insider" of the Debtors as that term is defined in 11 U.S.C. § 101(31).  The Top Plaintiffs' Counsel List was prepared with information existing as of February 17, 2020.  The Debtors reserve the right to amend the Top Plaintiffs' Counsel List. The information contained in the Top Plaintiffs' Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtors. Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.  The Debtors' failure to list a claim as contingent, unliquidated or disputed does not constitute a waiver of the Debtors' right to contest the validity, priority and/or amount of any such claim.

| Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1  Andreozzi & Associates, P.C. 111 N. Front Street Harrisburg, Pennsylvania 17101 | ATTN: Nathaniel L. Foote, Esq. PHONE: 717-686-9936 EMAIL: Unknown FAX: 717-525-9143 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 2  AVA Law Group, Inc. 3667 Voltaire Street San Diego , California 92106 | ATTN: Andrew Van Arsdale, Esq. PHONE: 1-866-428-2589 EMAIL: support@ava.law FAX: 619-347-2705 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 3  Bondurant, Mixson & Elmore, LLC One Atlantic Center, 1201 West Peachtree Stree NW, Suite 3900 Atlanta, Georgia 30309 | ATTN: Michael B. Terry PHONE: 404-881-4100 EMAIL: terry@bmelaw.com FAX: 404-881-4111 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 4  Crew Janci LLP 1200 NW Naito Parkway, Suite 500 Portland, Oregon 97209 | ATTN: Stephen Crew PHONE: 503-306-0224 EMAIL: steve@crewjanci.com FAX: 503-467-4940 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

---

[1] Based on pending litigation and claims identified to the Debtors by attorneys representing certain abuse victims.

[2] This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors, other than insiders, who have the 20 largest unsecured creditors against a debtor.

ACTIVE 254241804

**ALW012**

Debtor    Delaware BSA, LLC                                          Case number (if known) _____
          Name

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5 | Dumas Law Group, LLC (a/k/a Dumas & Vaughn Attorneys at Law) 3835 NE Hancock Street, Suite GL-B Portland, Oregon 97212 | ATTN: Gilion Dumas PHONE: 503-616-5007 EMAIL: gilion@dumaslawgroup.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 6 | Eisenberg Rothweiler, Winkler, Eisenberg & Jeck, P.C. 1634 Spruce Street Philadelphia, Pennsylvania 19103 | ATTN: Stewart Eisenberg, Esq. PHONE: 215-398-7544 EMAIL: Unknown FAX: 215-546-0118 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 7 | Green & Gillispie 1 Riverfront Place, Suite 605 North Little Rock, Arkansas 72114 | ATTN: Joshua Gillispie PHONE: 501-244-0700 EMAIL: josh@greenandgillispie.com FAX: 501-244-2020 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 8 | Gregg, Hunt, Ahern & Embry Attorneys at Law One Cranberry Hill, #304 Lexington, Massachusetts 02421 | ATTN: Jonathan Barnes PHONE: 617-494-1920 EMAIL: jbarnes@chelaw.com FAX: 617-494-1921 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 9 | Hurley McKenna & Mertz P.C. 33 N. Dearborn Street, Suite 1430 Chicago, Illinois 60602 | ATTN: Christopher Hurley PHONE: 312-553-4900 EMAIL: churley@hurley-law.com FAX: 312-553-0964 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 10 | Jeff Anderson & Associates, PA 505 Thornall Street, Suite 405 Edison, New Jersey 08837 | ATTN: Jeffrey Anderson PHONE: 909-344-3847 EMAIL: jeff@andersonadvocates.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 11 | Kosnoff Law 1321 Upland Drive PMB 4685 Houston, Texas 77043 | ATTN: Timothy Kosnoff, Esq. PHONE: 206-257-3590 EMAIL: tim@kosnoff.com FAX: 206-837-9690 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 12 | Law Offices of Mitchell Garabedian 100 State Street, 6th Floor Boston, Massachusetts 02109 | ATTN: Mitchell Garabedian PHONE: 617-523-6520 EMAIL: mgarabedian@garabedianlaw.com FAX: 617-523-3687 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 13 | Lindsay Hart, LLP 1300 SW 5th Ave, Suite 3400 Portland, Oregon 97201 | ATTN: James L. Dumas PHONE: 503-226-7677 EMAIL: jdumas@lindsayhart.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 14 | Lujan & Wolff, LLP 238 Archbishop Flores Street, Suite 300, DNA Building Hagatna, Guam 96910 | ATTN: David Lujan PHONE: 671-477-8064 EMAIL: Unknown FAX: 671-477-5297 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

ACTIVE 254241804

**ALW013**

Debtor  Delaware BSA, LLC _____    Case number (if known) _____
Name

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, Trade Payables, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 | Marsh Law Firm 151 East Post Road, Ste. 102 White Plains, New York 10601 | ATTN: James Marsh PHONE: 929-232-3235 EMAIL: jamesmarch@marsh.law FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 16 | Merson Law 150 East 58th St., 34th Floor New York, New York 10155 | ATTN: Jordan Merson PHONE: 212-603-9100 EMAIL: jmerson@mersonlaw.com FAX: 347-441-4171 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 17 | Michael G. Dowd 600 Third Ave., 15th Floor New York, New York 10016 | ATTN: Michael G. Dowd PHONE: 212-751-1640 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 18 | Paul Mones 13101 Washington Blvd. Los Angeles, California 90066 | ATTN: Paul Mones PHONE: 310-400-5960 EMAIL: pamones@comcast.net FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 19 | Penn Law Group 4200 Northside Parkway, NW, Building One, Suite 100 Atlanta, Georgia 30327 | ATTN: Darren Penn PHONE: 404-961-7655 EMAIL: darren@pennlawgroup.com FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 20 | Pfau, Cochran, Vertetis, Amala PLLC 403 Columbia Street, Ste. 500 Seattle, Washington 98104 | ATTN: Michael Pfau PHONE: 206-451-8260 EMAIL: michael@pcvalaw.com FAX: 206-623-3624 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 21 | Rebenack, Aronow, Mascolo, LLP 111 Livingston Avenue New Brunswick , New Jersey 08901 | ATTN: Jay Silvio Mascolo PHONE: 732-247-3600 EMAIL: Jmascolo@ram.law FAX: 732-247-3630 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 22 | Robins Kaplan LLP 399 Park Avenue, Suite 3600 New York, New York 10022 | ATTN: Patrick Stoneking PHONE: 212-980-7400 EMAIL: pstoneking@robinskaplan.com FAX: 212-980-7499 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 23 | Rubenstein & Rynecki 16 Court Street, Ste. 1717 Brooklyn, New York 11241 | ATTN: Sanford Rubenstein PHONE: 718-522-1020 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 24 | Sweeny Reich & Bolz, LLP 1981 Marcus Avenue, Ste. 200 Lake Success, New York 11042 | ATTN: Gerard Sweeney PHONE: 718-459-9000 EMAIL: Unknown FAX: Unknown | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |
| 25 | Thomas Law Office, PLLC 9418 Norton Commons Blvd., Ste. 200 Louisville, Kentucky 40059 | ATTN: Tad Thomas PHONE: 877-736-4963 EMAIL: tad@thomaslawoffices.com FAX: 502-785-7257 | Abuse-Related Litigation | Contingent/ Unliquidated/ Disputed | | | Undetermined |

Official Form 204       Chapter 11 Case: List of 25 Law Firms With the Largest Number of Representations of Holders of Abuse Claims page 3

ALW014

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC, | Case No. 20-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following list identifies all corporations, other than a governmental unit, which directly or indirectly own 10% or more of any class of equity interests in the above-captioned debtor and debtor in possession.

| Direct Owner | Indirect Owners |
|---|---|
| Boy Scouts of America | None |

**ALW015**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC, | Case No. 20-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## LIST OF EQUITY SECURITY HOLDERS

Pursuant to rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, the following is a list of holders of equity securities of the above-captioned debtor and debtor in possession.

| Name and Last Known Address or Place of Business of Holder | Kind of Interest | Percentage of Interest |
|---|---|---|
| Boy Scouts of America | Membership | 100% |

ALW016

| Fill in this information to identify the case and this filing: |
|---|
| Debtor Name  Delaware BSA, LLC |
| United States Bankruptcy Court for the:  ___District of Delaware___ |
| (State) |
| Case number (*if known*):  _____ |

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors
12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)*

☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐ *Schedule H: Codebtors (Official Form 206H)*

☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐ *Amended Schedule* ____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒ Other document that requires a declaration  List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders; Corporate Ownership Statement; List of Equity Security Holders; List of 25 Law Firms with the Largest Number of Representations of Holders of Abuse Claims

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   02/18/2020         x _____
             MM / DD / YYYY          Signature of individual signing on behalf of debtor

                                     Steven P. McGowan
                                     Printed name

                                     Secretary and General Counsel
                                     Position or relationship to debtor

**ALW017**

Case 1:22-cv-01237-RGA   Document 44   Filed 11/07/22   Page 23 of 299 PageID #: 1918
Case 20-10343-LSS   Doc 2407   Filed 03/18/21   Page 47 of 64

47

1  case -- and certainly, I think we will be there by the end of

2  April, that we're going to need the Court to start calling

3  balls and strikes on disputed issues.  And those disputed

4  issues go beyond 2004 requests and 2019 motions.  We have

5  pretty serious issues that we'll need to bring before the

6  Court at the appropriate time on an appropriate briefing

7  schedule.  So, in our view, pushing the disclosure statement

8  hearing off indefinitely or to a date past the 111 days or

9  well into the future is just not right for this particular

10  case.

11        So, again, if the Court is inclined to move that

12  date, we would say only move it by a very little bit because

13  we do believe we need to come in front of the Court,

14  potentially in the near term -- let's see how the mediation

15  goes through the month of March -- to call some balls and

16  strikes for us.

17        THE COURT:  When you say "a little bit," what are

18  you thinking?

19        MS. LAURIA:  You know, I would say two weeks, two

20  to four weeks.  I know we have an omnibus mid-May, I think

21  it's May 15th, if I'm not mistaken, or thereabouts.

22        (Pause in proceedings)

23        THE COURT:  May 19th.

24        Well, thank you for all of the input.  As I said, I

25  have read what's been filed, the flurry of papers noted, the

**ALW018**

Case 1:22-cv-01237-RGA   Document 44   Filed 11/07/22   Page 24 of 299 PageID #: 1919
Case 20-10343-LSS   Doc 2407   Filed 03/18/21   Page 48 of 64

48

1   adversary proceeding that's been filed, obviously the

2   estimation motion.  Sometimes I think I am not the audience

3   for some of these filings because I can read a mediator's

4   report and understand exactly what it meant.  But the -- and I

5   -- so if parties perceive that their filings are helpful for

6   some reason, of course you can file what you want.  But again,

7   I don't always think I'm the intended audience.

8            The concern I have with going forward with the

9   disclosure statement at this point is because I don't see some

10  very necessary information and documents, quite frankly, that

11  I would want to see at a disclosure statement, including the

12  TDPs.  Those who are involved in Imerys with me know that I

13  did not send out that disclosure statement until we had TDPs.

14  They can be negotiated or they can not be negotiated.  But

15  there's -- but I think -- and think this plan has that gap in

16  it, where parties don't know what, in fact, the treatment is

17  going to be.

18           So, for very practical reasons, I think it's

19  difficult, perhaps, to go forward with that hearing in mid-

20  April.  On the other hand, I hesitate to move it because

21  deadlines usually focus people and things get achieved.  What

22  I think, here, perhaps can focus people are the mediation

23  sessions that are to take place later this month.

24           And whether attending in person or attending via

25  Zoom, I expect everybody to be there, who the mediators

**ALW019**

Case 1:22-cv-01237-RGA   Document 44   Filed 11/07/22   Page 25 of 299 PageID #: 1920
Case 20-10343-LSS   Doc 2407   Filed 03/18/21   Page 49 of 64

49

1    request be there.  I don't want to hear that someone decided

2    it was inconvenient or they couldn't show.  We're $100 million

3    into fees in this case, I think that is a staggering number,

4    and progress needs to be made.  Victims need to be compensated

5    appropriately and the Boy Scouts' mission needs to continue.

6    And that's evident from -- everyone that I see here has voiced

7    that view.

8           And I will say that some of the letters that I've

9    received from individual -- individuals who are abuse

10   survivors, or who say they are abuse survivors -- and they get

11   docketed -- also share that view, which I find quite

12   heartening and somewhat amazing sometimes; that those

13   survivors, some of them, are still involved in scouts, their

14   kids are involved in scouts, and they see a role for scouts

15   going forward.  Boy Scouts, I should be specific.

16          So I think that goal needs to be paramount, and I

17   think it affects the mediation.  It affects the timing of

18   disclosure statement and confirmation.  It affects how much

19   this is going to cost.  And quite frankly, every dollar to

20   professional fees is a dollar that comes out of some

21   creditor's pocket.

22          So I'm going to move the disclosure statement

23   hearing to April 29th and 30th.  And I will look for any

24   further mediation reports that the mediators find appropriate

25   to file after further mediation sessions.  And we'll have a

ALW020

50

1   further status report or hearing on April 12th.

2            MR. ABBOTT:  Your Honor, Derek Abbott for the

3   debtors.  I assume we can just work with chambers to tighten

4   up specific timing for that and get notice --

5            THE COURT:  Yeah, I'm looking in the afternoon.

6   And if that doesn't work for parties, generally, we can do it

7   on the 13th.  My thought is to try to get in a status before

8   objections are due to disclosure statement, recognizing that

9   some people may still have to work on it notwithstanding, but

10  people seem to have a jump on it.  And I want it sufficiently

11  after the sessions with the mediator, so that discussions can

12  continue, as they often do after the mediation, and we can see

13  if -- what kind of consensus, if any, is reached on overall

14  issues or discrete issues.  But I'm generally available the

15  afternoon of the 12th and 13th, and I don't have a preference,

16  but that's my thinking.

17           MR. ABBOTT:  (Indiscernible)

18           THE COURT:  Thank you.

19           MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

20  the record.

21           I take it that the objection deadlines will be

22  extended accordingly?

23           THE COURT:  Yes, they need to be extended

24  accordingly.

25           MR. BUCHBINDER:  Thank you, Your Honor.

**ALW021**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

## VERIFIED STATEMENT OF LUJAN & WOLFF LLP
## PURSUANT TO BANKRUPTCY RULE 2019

Pursuant to Federal Rule of Bankruptcy Procedure 2019 ("Rule 2019"), Lujan & Wolff LLP (the "Firm"), who represents the Abuse Survivors listed on **Exhibit A** hereto (collectively, the "Clients"), hereby submits this verified statement (this "Verified Statement") as required under the *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 6438] (the "Solicitation Order") and states as follows:

1.  On February 18, 2020 (the "Petition Date"), Boy Scouts of America ("BSA") and Delaware BSA, LLC (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") for relief under chapter 11 of title 11 of the United States Code. The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**ALW022**

2.      Prior to the filing of this Verified Statement, the Clients listed on **Exhibit A** hereto, retained the Firm to represent their interests in these Chapter 11 Cases after consultation with me or other members of the Firm.

3.      The Clients each hold claims against BSA, certain non-debtor Local Councils, Chartered Organizations, and insurers arising from childhood sexual abuse.  The Clients further have an interest in certain insurance policies, including the proceeds thereof.

4.      In accordance with Bankruptcy Rule 2019, attached hereto as **Exhibit A** is a list of the names and addresses of each Client.  The "nature and amount of all disclosable economic interests" held by each Client are unliquidated abuse claims as set forth in the respective proofs of claim filed by or on behalf of each Client in the Chapter 11 Cases.  The proof of claim number of each Client is set forth on **Exhibit A**.  The information set forth on **Exhibit A** is based upon information the Clients provided to the Firm and is subject to change.

5.      Annexed hereto as **Exhibit B** is an exemplar of the engagement letter (the "Engagement Letter") used by the Firm to engage the Clients.  The Engagement Letter might contain redactions or blanks with respect to pricing, compensation amounts or percentages, and personal identifying information of the Clients.

6.      The undersigned verifies that the foregoing is true and correct to the best of her knowledge.

7.      The information set forth in this Verified Statement is intended only to comply with Bankruptcy Rule 2019 and the Solicitation Order and not for any other purpose.

8.      Nothing contained in this Verified Statement is intended or shall be construed to constitute:  (i) a waiver or release of the rights of the Clients to have any final order entered by, or other exercise of the judicial power of the United States performed by, an Article

2

**ALW023**

III court; (ii) a waiver or release of the rights of the Clients to have any and all final orders in any and all non-core matters entered only after de novo review by a United States District Judge; (iii) consent to the jurisdiction of the Court over any matter; (iv) an election of remedy; (v) a waiver or release of any rights the Clients may have to a jury trial; (vi) a waiver or release of the right to move to withdraw the reference with respect to any matter or proceeding that may be commenced in these Chapter 11 Cases against or otherwise involving the Clients; or (vii) a waiver or release of any other rights, claims, actions, defenses, setoffs, or recoupments to which the Clients are or may be entitled, in law or in equity, under any agreement or otherwise, with all such rights, claims, actions, defenses, setoffs, or recoupments being expressly reserved.

9.      The Clients, through their undersigned counsel, reserve the right to amend or supplement this Verified Statement in accordance with the requirements of Bankruptcy Rule 2019 at any time in the future.

Dated:  December 22, 2021                    /s/ Christopher D. Loizides
Wilmington, Delaware                         Christopher D. Loizides (No. 3968)
                                             LOIZIDES, PA
                                             1225 North King Street, Suite 800
                                             Wilmington, DE 19801
                                             Telephone:     (302) 654-0248
                                             Facsimile:     (302) 654-0728
                                             Email:         loizides@loizides.com

                                             and

                                             LUJAN & WOLFF LLP

                                             /s/ Delia Lujan Wolff
                                             Delia Lujan Wolff
                                             Suite 300, DNA Bldg.
                                             238 Archbishop Flores St.
                                             Hagatna, Guam 96910
                                             Phone: (671) 477-8064/5
                                             Facsimile: (671) 477-5297
                                             Email:  dslwolff@lujanguam.com
                                             *Attorneys for Lujan Claimants*

**ALW024**

**Exhibit A**

**(Abuse Survivor List)**

| Name | Address | Claim No. |
|------|---------|-----------|
| ████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 80328 |
| ████████ | ████████ | 17480 |
| ████████ | ████████ | 2010 |
| ████████ | ████████ | 87715 |
| ████████ | ████████ | 2991 |
| ████████ | ████████ | 38591 |
| ████████ | ████████ | 15139 |
| ████████ | ████████ | 6434 |
| ████████ | ████████ | 67293; 103378 |
| ████████ | ████████ | 79403 |
| ████████ | ████████ | 33028; 96418; 96419 |
| ████████ | ████████ | 3120 |
| ████████ | ████████ | 22872 |
| ████████ | ████████ | 15104 |
| ████████ | ████████ | 2394 |
| ████████ | ████████ | 4858 |
| ████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 40889 |

**ALW025**

| Name | Address | Claim No. |
|---|---|---|
| ███████████ | ████████████████ | 23388 |
| ████████████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 10548 |
| █████████ | ███████████████ | 22874 |
| ██████████ | ████████████████ | 6823 |
| █████████ | ████████████████ | 14187 |
| ████████████ | ████████████████ | 7977 |
| ██████ | ████████████████ | 4855; 4859 |
| ██████████ | ████████████████ | 58370 |
| ███████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 2597 |
| █████████████ | ████████████ | 35352 |
| █████████████ | █████████████ | 73607; 103377 |
| ███████████ | ██████████████ | 4857 |
| █████████ | ███████████████ | 5655 |
| ██████████ | ██████████████ | 3616 |
| ██████████ | ████████████████ | 3051 |
| ██████████ | ███████████████ | 80982 |
| █████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 18860 |
| ███████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 48168 |
| ████████ | ████████████ | 87757 |

ALW026

| Name | Address | Claim No. |
|------|---------|-----------|
| ███████ | ███████ | 7976 |
| ███████ | ███████ | 248 |
| ███████ | ███████ | 25069 |
| ███████ | ███████ | 2840 |
| ███████ | ███████ | 18873 |
| ███████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 1765; 45700; 45702 |
| ███████ | ███████ | 4860 |
| ███████ | ███████ | 35354 |
| ███████ | ███████ | 2403 |
| ███████ | ███████ | 25063 |
| ███████ | ███████ | 1746 |
| ███████ | ███████ | 6824 |
| ███████ | ███████ | 5648 |
| ███████ | ███████ | 1551; 1670 |
| ███████ | ███████ | 3614 |
| ███████ | ███████ | 79769 |
| ███████ | ███████ | 22873 |
| ███████ | ███████ | 73585 |
| ███████ | ███████ | 8037 |
| ███████ | ███████ | 2433 |

ALW027

| Name | Address | Claim No. |
|------|---------|-----------|
| ██████████ | ██████████ | 1677 |
| ██████████ | ██████████ | 11251 |
| ██████████ | ██████████ | 5646 |
| ██████████ | ██████████ | 8038 |
| ██████████ | ██████████ | 58317 |
| ██████████ | ██████████ | 6432 |
| ██████████ | ██████████ | 2885 |
| ██████████ | ██████████ | 2011 |
| ██████████ | ██████████ | 3385 |
| ██████████ | ██████████ | 67267 |
| ██████████ | ██████████ | 40890 |
| ██████████ | ██████████ | 3612; 80655 |
| ██████████ | ██████████ | 3610 |
| ██████████ | ██████████ | 11250 |
| ██████████ | ██████████ | 67286 |
| ██████████ | c/o Lujan & Wolff LLP<br>238 Archbishop Flores St., Ste. 300<br>Hagatna, GU 96910 | 1913 |
| ██████████ | ██████████ | 2003 |
| ██████████ | ██████████ | 1953 |
| ██████████ | ██████████ | 1757 |

**ALW028**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 7832, 8683 |

## LUJAN CLAIMANTS' OBJECTION TO SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, AND JOINDER IN OBJECTION FILED BY GUAM COMMITTEE

COME NOW the Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")[1] and object to confirmation of Debtors Boy Scouts of America and Delaware BSA, LLC's (collectively "Debtors") Second Modified Fifth Amended Chapter 11 Plan of Reorganization. On September 30, 2021, Debtors filed the Solicitation Version of the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 6443), which was sent to creditors for vote. On December 18, 2021, during the voting period and just 10 days before the voting deadline, Debtors filed a Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 7832). Both the Modified and Second Modified Plans are collectively referred to as "the Plan." Lujan Claimants hereby object to confirmation of the Plan and join in and incorporate herein the Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agana (Bankr. D. Guam 19-00010) to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8683).

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

1

**ALW029**

## I. BACKGROUND

Lujan Claimants are all survivors of childhood sexual abuse by the Boy Scouts, who were abused in the United States territory of Guam. Survivors of child sexual abuse in Guam are different from Survivors who were abused in other states or territories. Guam Survivors benefit from an open statute of limitations that does not close (the civil statute of limitations was eliminated the Guam Legislature in 2016) and have statutory direct action rights against insurers without having to sue the insured tortfeasor. Almost all Guam survivors were sexually abused by Father Louis Brouillard, a scoutmaster who was in charge of Guam's swimming merit badge program and who was one of the most prolific child sexual abusers in scouting history. Most Lujan Claimants were abused by Fr. Louis in his capacity as not only a scoutmaster or scout leader, but also in his capacity as a Catholic priest in settings completely unrelated to scouting. Thus, most Lujan Claimants have abuse claims that have nothing to do with Debtors, but which appear threatened by the release in the Plan. The chartered organization implicated in almost all Guam survivors' abuse is the Archbishop of Agana, a debtor in its own pending Chapter 11 bankruptcy action in the District Court of Guam. Further, 70 Lujan Claimants had prepetition lawsuits against the Boy Scouts of America ("BSA") and therefore constitute more than twenty-five percent (25%) of the 275 prepetition lawsuits against Debtors at the time Debtors initiated this consolidated bankruptcy action.

Of the 73 Lujan Claimants who voted, 72 voted to reject the Plan and 1 voted to accept the Plan. Notably, the sole voter who accepted the Plan is not pursuing compensation in the Archbishop of Agana bankruptcy case. Of the 72 Lujan Claimants who voted to reject the Plan, about 70 have asserted scouting-related abuse claims against the Archbishop of Agana, including by filing a proof of claim in the Guam bankruptcy case, and all have claims against the Aloha Council. Further, it is Lujan Claimants' belief that they have most, if not all, asserted claims against certain religious orders,

2

**ALW030**

including the Capuchin Franciscans Province of St. Mary[2], Carmelite entities[3], and School Sisters of Notre Dame entities, none of which are or have ever been chartered organizations, yet are listed by Debtors as Potential Chartered Organizations Protected Parties and Limited Protected Parties. Nearly all Lujan Claimants have also asserted abuse claims against the Archbishop of Agana and the religious orders which are not related to scouting, e.g., abuse at Church or school by Fr. Louis in his priest capacity.

## II. ARGUMENT

After almost two years of litigating this bankruptcy case, at jaw-dropping expense to the estates of nonprofit BSA and virtually asset-less Delaware BSA, LLC, Debtors have solicited for vote a Plan that must be denied confirmation for plain failure to meet the requirements of the Bankruptcy Code, including but not limited to the reasons that follow. Lujan Claimants reserve their right to make additional arguments at the Confirmation Hearing.

### A.    THE PLAN IS UNCONFIRMABLE WITH NONDEBTOR RELEASES.

#### 1.   The Court Lacks Subject Matter Jurisdiction over Survivor Claims against Nondebtors, such as Local Councils, Chartered Organizations, Insurers, and Other Entities.

Federal bankruptcy jurisdiction is set forth in 28 U.S.C. § 1334, which confers upon district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b).  District courts may refer to a bankruptcy court any or all cases under title 11 or all proceedings arising under title 11 or arising in or related to a case under title 11.  28 U.S.C. § 157(a).  "Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits

---

[2] (See Notice of Current & Potential Protected Parties & Limited Protected Parties ("Notice") at 515-16 (identifying corresponding local council as either "Aloha Council, BSA 104" or "Multiple Councils Included in Claim").)
[3] (See, e.g., Notice at 522 (identifying "CARMELITE NUNS" and identifying corresponding local council as either "Aloha Council, BSA 104" or "Multiple Councils Included in Claim").)

**ALW031**

between third parties that conceivably may have an effect on the bankruptcy estate." <u>In re Combustion Eng'g, Inc.</u>, 391 F. 3d 190, 226 (3d Cir. 2005) (citing <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 308 n.5 (1995)).

In <u>Pacor, Inc.</u>, 743 F. 2d 984 (3d Cir. 1984), the Third Circuit "set forth what has become the seminal test for determining 'related to' jurisdiction over third party claims." <u>In re Combustion Eng'g</u>, 391 F. 3d at 226. The Third Circuit stated in <u>Pacor</u>:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

743 F. 2d at 994 (italics in original) (internal citations omitted). While the language of the test appears broad, the facts of the case in <u>Pacor</u> demonstrated a "crucial limit on the legitimate exercise of subject matter jurisdiction." <u>In re W.R. Grace & Co.</u>, 591 F. 3d 164, 171 (3d Cir. 2009).

In <u>Pacor</u>, John and Louise Higgins filed suit in Pennsylvania state court against Pacor, a distributor of chemical supplies, seeking damages caused by Mr. Higgins' work-related exposure to asbestos supplied by Pacor. 743 F. 2d at 986. In response, Pacor filed a third-party complaint impleading the Johns-Manville Corporation, which Pacor claimed was the original manufacturer of the asbestos. <u>Id.</u> Thereafter, Manville filed a Chapter 11 bankruptcy petition. <u>Id.</u> When Pacor tried to remove the Higgins lawsuit to the bankruptcy court where the Manville bankruptcy case was pending, the Third Circuit denied removal, holding that "the primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate, and therefore [cannot establish] 'related to' [jurisdiction over that suit]…." The Third Circuit stated, "At best, [the Higgins-Pacor lawsuit] is a mere precursor to the potential third party claim for indemnification by Pacor against

4

**ALW032**

Manville. Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor."

In this case, the Court lacks subject matter jurisdiction over any claims of Lujan Claimants against the Archbishop of Agana. While many Lujan Claimants filed prepetition civil lawsuits naming BSA and the Archbishop of Agana as codefendants, the plaintiffs' claims against the Archbishop of Agana have long been automatically stayed since January 2019, when the Archbishop of Agana filed its own Chapter 11 bankruptcy petition in the District Court of Guam. That case is In re Archbishop of Agana, Bankruptcy Case No. 19-00010 (D. Guam). The Guam federal court is under the appellate jurisdiction of the Ninth Circuit Court of Appeals, which has ruled that, while a discharge under Chapter 11 releases the debtor from personal liability for any debts, 11 U.S.C. 524(a), bankruptcy courts cannot release third parties of liability since, pursuant to 11 U.S.C. § 524(e), the "'discharge of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.'" In re Lowenschuss, 67 F. 3d 1394, 1401 (9th Cir. 1995) (quoting 11 U.S.C. § 524(e)). The Ninth Circuit has repeatedly held that section 524(e) precludes bankruptcy courts from discharging the liabilities of nondebtors. Id. at 1401-02 (citing, e.g., Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F. 2d 621, 626 (9th Cir. 1989); Underhill v. Royal, 769 F. 2d 1426, 1432 (9th Cir. 1985); Comm'l Wholesalers, Inc. v. Investors Comm'l Corp., 172 F. 2d 800, 801 (9th Cir. 1949)); see also In re Claar Cellars LLC, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021) (stating that "section 524(e) 'prevents a reorganization plan from inappropriately circumscribing a creditor's claims against a debtor's co-debtor or guarantors over the discharged debt. Put differently, section 524(e) precludes a co-obligor of a bankrupt debtor from piggybacking on rights the debtor enjoys under the Bankruptcy Code, including the right to discharge or restructure indebtedness. If a co-obligor seeks a discharge or to restructure its liability on a jointly liable claim, section 524(e) effectively requires the co-obligor to commence its own bankruptcy

**ALW033**

case."). Accordingly, the Guam bankruptcy court's future discharge of the Archbishop of Agana's debt to certain Lujan Claimants shall have no effect on the liability of BSA on that debt and therefore shall have no effect on Lujan Claimants' claims against the BSA.

There is also no subject matter jurisdiction over Lujan Claimants' claims against the Boy Scouts of America Aloha Council ("the Aloha Council"). Again, while certain Lujan Claimants filed prepetition lawsuits naming BSA and the Aloha Council as co-defendants, the Aloha Council has never made any claim against the BSA for contribution or indemnification in connection with Lujan Claimants' claims. Similarly, the Court lacks subject matter jurisdiction over certain Lujan Claimants' claims against religious orders, including but not limited to claims against Capuchin Franciscan entities, Carmelite entities, and School Sisters of Notre Dame entities. Like the Aloha Council, none of the religious orders have ever filed any contribution or indemnification claim against the BSA relating to Lujan Claimants' claims.

As for the Lujan Claimants who have filed no civil lawsuits against a chartered organization, religious order, and/or local council, the Court lacks subject matter jurisdiction over these Lujan Claimants' claims against chartered organizations, religious orders, and the Aloha Council. Without any lawsuit against these nondebtors, it is obvious that any resolution of Lujan Claimants' claims against these nondebtors would be a mere precursor to a separate lawsuit against the BSA for any contribution or indemnification claims. Thus, the resolution of Lujan Claimants' claims against chartered organizations, religious orders, or the Aloha Council, either without a lawsuit or as part of a future lawsuit, would have no effect on Debtors' bankruptcy estate.

Regarding insurers, none of Lujan Claimants have filed a lawsuit against insurers seeking payment under BSA insurance policies. Under Guam law, Lujan Claimants each have a statutory right of direct action against such insurers, but no lawsuit has been yet brought against BSA insurers. Likewise, no lawsuits have been brought against the separate insurers of any local council, chartered

6

ALW034

organization, or religious order.  Without any lawsuit against insurers, any resolution of Lujan

Claimants' claims against an insurer (especially separate insurers of local councils, chartered

organizations, or religious orders) would be a mere precursor to a separate lawsuit for

indemnification or contribution against the BSA or its insurers.

Thus, the Court lacks subject matter jurisdiction over Lujan Claimants' claims against

nondebtors and the Plan cannot be confirmed with the nonconsensual release of Lujan Claimants'

claims against nondebtors.

### 2. Even if Subject Matter Jurisdiction Exists, the Bankruptcy Code Does Not Authorize Nondebtor Releases.

Assuming that subject matter jurisdiction exists over Lujan Claimants' claims against

nondebtors, the Bankruptcy Code provides no authority for the release of these claims.  The claims

are specifically against local councils, chartered organizations, religious orders, and insurers.

The Third Circuit recognizes that "[s]ection 524(e) of the Bankruptcy Code makes clear that

the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their

liabilities." In re Continental Airlines, 203 F. 3d 203, 211 (3d Cir. 2000).  Nowhere in the Bankruptcy

Code is there express statutory authority to enjoin a third-party's claim against a nondebtor outside

the context of asbestos.  Id.  In fact, only one section of the Bankruptcy Code expressly allows a

bankruptcy court to enjoin third-party claims against nondebtors without the consent of those third

parties, and that is 11 U.S.C. § 524(g), which authorizes such an injunction only in cases involving

injuries arising from the manufacture and sale of asbestos.  In re Purdue Pharma, L.P., 21 cv 7532

(CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021).

The statutory language and history of section 524(g) reveal that "Congress believed that

Section 524(g) created an exception to what would otherwise be the applicable rule of law." In re

Purdue Pharma, 2021 WL 5979108, at *49.  Section 524(g)(4)(A)(ii) states: "*Notwithstanding the*

*provisions of section 524(e)*, such an injunction may bar any action directed against a third party who

7

**ALW035**

is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii) (italics added).  Section 524(e) states: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).  The word "notwithstanding" in section 524(g) suggests that the injunction authorized by that section would be barred by section 524(e), if not for Congress' enactment of section 524(g).    In re Purdue Pharma, 2021 WL 5979108, at *49.  "Plainly, Congress made a decision to limit the scope of the experimenting [with nondebtor releases and injunctions] that was 'reportedly' to be happening (and that was in fact happening) in other [non-asbestos] industries.  And it left to itself, not the courts, the task of determining whether and how to extend a rule permitting non-debtor releases 'notwithstanding the provisions of section 524(e)' into other areas."  Id. at *51.  Yet, since 1994, Congress has made no such extensions of the trust/injunction mechanism to non-asbestos bankruptcies.  Id.

In Purdue Pharma, 2021 WL 5979108, at *70, the district court vacated confirmation of the plan of reorganization, holding that there is no authority under the Bankruptcy Code to permit the nonconsensual release of third party claims against nondebtors that are direct claims based on the individual liability of the nondebtors and which do not derive from the liability of the debtor.  The Purdue court defined "direct claims" as "claims that are not derivative of [the debtor's] liability, but are based on the [nondebtor's] own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than [the debtor].  'Direct' claims are based upon a 'particularized' injury to a third party that can be directly traced to a non-debtor's conduct."  Id. at *48.  In contrast, "derivative claims" are "claims that would render the [nondebtors] liable because of [the debtor's] actions (which conduct may or may not have been committed because of the

8

**ALW036**

[nondebtors]). 'Derivative' claims are those that seek to recover from the estate indirectly' on the

basis of [the debtor's] conduct,' as opposed to the non-debtor's own conduct." <u>Id.</u> (quoting <u>In re</u>

<u>Johns-Manville Corp.</u>, 517 F. 3d 52, 62 (2d Cir. 2008).

Here, the Court lacks jurisdiction over Survivors' direct claims against nondebtors, such as

local councils, chartered organizations, and other entities such as religious orders that are being swept

up in this case even though they are neither a local council nor chartered organization. Survivors'

claims against these nondebtors are based on the independent liability of these nondebtors and are

not dependent on a finding of either Debtor's liability. In other words, a Survivor can succeed in

proving a local council's or chartered organization's liability based on the tortious conduct of such

local council or chartered organization. For instance, a court may find a local council or chartered

organization liable for child sexual abuse, and, at the same time, find that the BSA is not liable for

the same child sexual abuse.

In <u>Juarez v. Boy Scouts of America, Inc.</u>, an action alleging child sexual abuse, the court

described the tortious liability of a defendant:

> A tort ... involves a violation of a legal duty, imposed by statute, contract or
> otherwise, owed by the defendant to the person injured. Without such duty, an injury
> is "damnum absque injuria"—injury without wrong. Thus, in order to prove facts
> sufficient to support a finding of negligence, a plaintiff must show that defendant had
> a duty to use due care, that he breached that duty, and that the breach was the
> proximate or legal cause of the resulting injury. ....
> ... [Courts have adopted a] multi-element duty assessment in determining
> whether a particular defendant owed a tort duty to a given plaintiff. These factors
> include: (1) the foreseeability of harm to the injured party; (2) the degree of certainty
> that the injured party suffered harm; (3) the closeness of the connection between the
> defendant's conduct and the injury suffered; (4) the moral blame attached to the
> defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the
> burden to the defendant; and (7) the consequences to the community of imposing a
> duty to exercise care, with resulting potential liability.

81 Cal. App. 4th 377, 401 (2000) (citations omitted). The particular defendant's above-described

duty and liability is not dependent on anyone else's misconduct, negligence, or other liability. In

fact, the court held that the pretrial record did not conclusively eliminate the possibility of the BSA's

9

**ALW037**

liability, but it did show that there were no triable issues of fact with respect to the Church's liability stemming from the Scouts' use of Church property to hold troop meetings. Id. at 413. The court further held that the plaintiff failed to proffer material facts to support his claim against the Church alleging premises liability, as the plaintiff failed to claim that there were facts that put or should have put the Church on notice of the molestation, nor did the plaintiff claim the Church could have taken effective steps to prevent the sexual molestation. Id.

In Roe No. 1 v. Boy Scouts of America Corp., the plaintiff sued the BSA and local council for child sexual abuse he suffered by his stepfather who was also the assistant scoutmaster for his troop. 147 Conn. App. 622, 631 (2014). The appellate court affirmed the trial court's grant of a summary judgment motion in favor of the BSA and local council, finding no genuine issue of material fact since the plaintiff failed to present evidence to counter the defendants' evidence that, under the organizational structure of the Boy Scouts, the local chartered organization is responsible for the selection and supervision of troop leaders. Id. at 642. The court reached this conclusion based on its finding that the BSA and local council were not in control of the situation and that it was the local chartered organization that was responsible for selecting and supervising its adult volunteers. Id. at 644.

In L.P. v. Oubre, the court held that the plaintiffs, parents of a child sexually abused in scouting, adequately pleaded a cause of action for negligence against the BSA and local council. 547 So.2d 1320, 1323-24 (La. Ct. App. 1989). The court found that the plaintiffs adequately pleaded a duty owed by the BSA and local council, alleging that, under the auspices of the BSA, the local council undertook to promote, administer, and supervise the boy scout program in their community; that the local council know or should have known that the scoutmaster had sexually molested troop members; that the defendants failed to investigate the scoutmaster's background, failed to supervise

**ALW038**

him and the scouts themselves and failed to inform the parents of the scoutmaster's sexual abuse of troop members. Id. at 1323-24.

In N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wash. App. 517, 530 (2013), the court held that for the plaintiff, a former scout, to show that the church had a duty, based on a special relationship, to protect him from sexual molestation, he did not need to prove that the church had prior specific knowledge that the scout leader posed a threat. After considering allegations that the church selected the scoutmasters and adult volunteers for the troop, the church chapel was the registered meeting place for the troop, the church actively encouraged children of the congregation to participate in scouting and it paid for the boys' participation in the troop, the church held out the abusive scoutmaster as a youth leader who could be safely trusted with children, the church owned a scouting cabin where the boys participated in meetings and scouting activities away from the custody and protection of their parents, the scoutmaster sometimes took the plaintiff to the cabin outside of meeting times and molested him there, and the scoutmaster also molested the plaintiff after scout meetings, the court found that the church had a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm. Id. at 532-33.  In contrast, the court found that the BSA and local council did not have a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm.  Id. at 534-35.

As the above sampling of cases demonstrate, a nondebtor's liability is based on its own conduct and relationship with the child.  The liabilities of a local council, chartered organization, or other entities such as religious orders do not derive from or depend upon the liability of the BSA. As Survivors' claims against these non-directors are based on nondebtors' direct, individual liability and are not derivative of the BSA's liability, the Court lacks jurisdiction to release Survivors' direct claims against these nondebtors.  Accordingly, the Plan must be denied confirmation.

**ALW039**

### 3. Assuming the Bankruptcy Code Authorizes Nondebtor Releases, the Releases in the Plan Fail under Third Circuit Precedent and Master Mortgage.

In the Third Circuit, bankruptcy courts look to several factors in determining whether to grant a nonconsensual release and permanent injunction of a third party's claim against a nondebtor. In re Continental Airlines, 203 F. 3d at 217 n.17. Although the Third Circuit declined to establish its own rule regarding the conditions under which nondebtor releases and permanent injunctions are appropriate or permissible, the Third Circuit has considered the propriety of nondebtor releases under tests established by sister Circuits that authorize such releases and injunctions, and has rejected such releases and injunctions as failing to meet the hallmarks of permissible nonconsenual releases— fairness, necessity to the reorganization, and specific factual findings to support these conclusions, id. at 214—and reasonable consideration given in exchange for the release and permanent injunction, id. at 215.

Regarding fairness, a plan provision is unfair if it releases the liabilities of nondebtors without providing additional compensation to a creditor being forced to release claims against nondebtors. In re Continental Airlines, 203 F. 3d at 213 (citing AOV Indus., Inc., 792 F. 2d 1140, 1154 (D.C. Cir. 1986)). Here, the Plan is unfair to Survivors who are being forced to give up claims against local councils, chartered organizations, and other entities while receiving little to nothing in exchange. Although the 251 local councils may contribute funds to the Settlement Trust, there is no allocation of specific local council funds to Survivors who have claims against such local council; instead, the funds from all local councils are simply provided to the Settlement Trust for general payment of unknown debts (Trust expenses, compensation to Survivors?). For example, the Aloha Council may contribute approximately $1.3 million to the Settlement Trust, yet none of that money is being allocated to the almost 200 Survivors (including Lujan Claimants) who have claims against the Aloha Council. Even if the $1.3 million was allocated only to Survivors with claims against the Aloha Council, the average payout to the Survivor is less than $7,000, which is a pittance for

12

**ALW040**

compensating the horrific claims at issue in this case, i.e., child sexual abuse.  As for chartered organizations and other entities such as religious orders, except for The Church of Jesus Christ ("the TCJC") and potentially the United Methodist Church, these nondebtors are paying absolutely nothing in exchange for release of liabilities for post-1975 claims, claims insured by Settling Insurance Companies, and pre-1976 claims to the extent that such releases are supported by additional compensation from BSA and/or the local councils.  The release of these nondebtors without their payment of compensation is undoubtedly unfair to Survivors who have claims against these nondebtors, including Lujan Claimants.  Assuming that a chartered organization or other entity agrees in the future to provide a substantial contribution of their funds in exchange for releases and permanent injunctions, the nonconsensual releases and injunctions will still be unfair as, except in the case of the TCJC, these funds will go toward the general pot in the Settlement Trust and are not reserved to compensate only Survivors who have claims against these nondebtors, resulting in these Survivors receiving little to nothing in exchange for the release of their claims.  As for insurers, the release and permanent injunction of claims to collect from non-settling insurers, including direct action claims (such as Lujan Claimants' direct action claims), are obviously unfair as these insurers are providing no compensation whatsoever and may never provide compensation in the future, despite the best efforts of the Settlement Trustee to pursue payment owed under insurance policies issued by non-settling insurers.  Even with settling insurers, such as Century and Chubb and Hartford, the releases are unfair as the implicated coverage limits and liabilities greatly exceed the actual settlement amounts contributed by these settling insurers.  Given the fact that the primary insurance policies of Century and Hartford were mostly non-aggregate and mostly covered $500,000 per occurrence for each policy year, and that these same settling insurers provided non-aggregate excess insurance coverage of up to $2 million per occurrence, Debtors will be unable to prove the fairness of a Century and Chubb release in exchange for their mere payment of $800 million, and Debtors

13

**ALW041**

will be unable to prove the fairness of a Hartford release in exchange for mere payment of $787 million. The payments by local councils and settling insurers are also unreasonable given their liability exposure, the substantial assets of nondebtors where the assets are disclosed, and Debtors' failure to disclose the assets of nondebtors such as settling insurers. Debtors will fail to meet their burden of demonstrating fairness and reasonable consideration.

Additionally, the release and permanent injunction of Survivors' claims against nondebtors are certainly unnecessary to the success of Debtors' reorganization. Debtors have admitted multiple times, even in testimony before this Court, that the BSA Toggle Plan is feasible. Debtors proposed the Toggle Plan, which releases no nondebtors (and certainly not local councils, chartered organizations, insurers, and religious orders) and permanently enjoins no claims against nondebtors, in their Second Amended, Third Amended, and Fourth Amended Plans. (D.I. 2592, 5368, 5484, respectively.) Notably, nondebtors, including but not limited to chartered organizations, have previously expressed their attraction to a plan that would preserve third party claims against nondebtors. (See, e.g., TCJC's Objection to Second Amended Plan (D.I. 3263) at 11-12 (stating that, unlike Global Resolution Plan, hypothetical chapter 7 liquidation would not enjoin chartered organization from pursuing valuable insurance rights in BSA insurance policies)[4]; Joinders of Roman Catholic Archbishop of Los Angeles and its Related BSA-Chartered Organizations and Roman Catholic Diocese of Brooklyn, New York to TCJC Objection to Disclosure Statement (D.I. 4092, 6044).) As the Guam Committee has argued, Debtors' successful reorganization does not depend on Lujan Claimants losing their right to be compensated in debtor Archbishop of Agana's bankruptcy case, including from the Archbishop's personal assets and separate insurance, especially as this treatment was not automatic or granted to debtor chartered organizations or objecting chartered

---

[4] In light of their settlement with Debtors, the TCJC later withdrew its objection and supplemental objection to the amended disclosure statement. (D.I. 6233.)

ALW042

organizations in the original Modified Fifth Amended Plan, which is the only Solicitation Version disclosed to Survivors for vote.   As Debtors admittedly can successfully reorganize without nonconsensual releases and permanent injunctions of third party claims against nondebtors, confirmation of the Plan with nonconsensual nondebtor releases and injunctions must be denied.

Although the Third Circuit has not explicitly adopted factors set forth in In re Master Mortgage Investment Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994), courts in the Third Circuit have considered Master Mortgage factors in determining whether to grant nonconsensual releases and permanent injunctions of third party claims against nondebtors.  See, e.g., In re Wash. Mut., Inc., 442 B.R. 314, 349 (Bankr. D. Del. 2011); In re Indianapolis Downs, LLC, 486 B.R. 286, 303 (Bankr. D. Del. 2013); In re Millennium Lab Holdings, II, LLC, 575 B.R. 252, 272 (Bankr. D. Del. 2017). The factors are:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
> (2) The non-debtor has contributed substantial assets to the reorganization.
> (3) The injunction is essential to reorganization.  Without the it [sic], there is little likelihood of success.
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes has "overwhelmingly" voted to accept the proposed plan treatment.
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

In re Master Mortgage, 168 B.R. at 935.  Here, the Master Mortgage factors do not support release and injunction of Survivors' claims against local councils, chartered organizations, insurers, and religious orders.

There is no identity of interest between Debtors and local councils, chartered organizations, insurers, and religious orders.  BSA admits that BSA, local councils, and chartered organizations are "three entirely separate legal entities" who, although having a common goal of youth character development as expressed in the Scouting Program, have no control over the other.  (Notice of Filing

15

**ALW043**

of Ex. A to Objection to Adequacy of Debtors' Disclosure Statement (Decl. of National E. Marshall) (D.I. 3949-1) at 5 (describing relationship between BSA, local councils, and chartered organization).) Each local council is separately incorporated nonprofit organization which raises and disburses its own funds and has its own board of directors. (Id.) BSA itself claims that it is chartered organizations, and not BSA and local councils, who directly administer the Scouting Program at the troop level and who own and operate the troops or units. (Id. at 5-6.) Further, Debtors have not disclosed an indemnity relationship with the Aloha Council or any of the chartered organizations or religious orders. As for insurers, a direct action against insurers will not deplete BSA's estate, but in fact does the opposite by compensating Survivors with insurance proceeds, thereby preserving estate assets. Accordingly, this factor weighs against nondebtor releases and injunctions.

In the Plan, none of the nondebtors are contributing substantial assets to compensate Survivors. The local councils collectively are failing to contribute more than $1 billion in unrestricted net assets to compensate Survivors, (Amended Disclosure Statement (D.I. 6445) at 431), despite the filing of over 82,000 proofs of claim for child sexual abuse, Debtors' estimated range of total value of abuse claims at $2.4 billion to $7.1 billion, (id. at 34), the Future Claimants' Representative's forecast of future claims liability of approximately $5 billion, (id. at 95), and the Settlement Trust's compensation of not only Direct Abuse Claims for which a proof of claim was timely filed in this case but also Direct Abuse Claims against local councils for which no proof of claim was timely filed, (Plan Ex. A (TDP at 5) (D.I. 7832) at 149). The TCC's analysis (based only on 41,750 proofs of claim that identified a local council) shows that current total direct abuse claims against local councils are valued between approximately $7 billion to $41 billion and that the local councils are contributing only 4.56% to 24.47% of their unrestricted net assets to pay Survivors. (Amended Disclosure Statement (D.I. 6445) at 431.) Specifically, the TCC found that the Aloha Council has direct abuse claim liability (based on 175 unique proofs of claim, 75 of which are Lujan

16

**ALW044**

Claimants') between $69,713,750 and $314,910,450, yet is only contributing $1,338,358, or between 1.9% to 8.57% of its unrestricted net assets. (Id. at 427.) Again, except for the TCJC and potentially the United Methodist Church, none of the chartered organizations are contributing any of their assets to compensate Survivors for the release of Survivors' claims against them. In exchange for debtor Archbishop of Agana's release of post-1975 liability and apparent release of pre-1976 liability, the Archbishop is paying nothing, even though most Lujan Claimants are creditors in the Archbishop's bankruptcy case, the Archbishop has personal assets valued at tens of millions of dollars, the Archbishop has its own insurance policies, and none of these assets are being contributed to the BSA Settlement Trust to pay Survivors with claims against the Archbishop. Lujan Claimants should not be restricted from recovering in the Guam bankruptcy case, especially since they clearly are not receiving something of "indubitably equivalent value" to replace their released claims against the Archbishop. In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a nondebtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor"). Like almost all chartered organizations, no religious order is paying a penny in exchange for release of Survivor claims against them. Debtors have failed to provide any information justifying release of these entities, such as a supposed status as chartered organizations, and have failed to provide any information regarding religious orders' assets to demonstrate a substantial contribution by any of them. As concerns Lujan Claimants with claims against the Catholic Church, the chartered organization was the Archbishop of Agana, and not religious orders such as the Capuchin Franciscans, Carmelites, or School Sisters of Notre Dame. Similarly, Debtors have failed to disclose any information on insurers' assets to prove a substantial contribution justifying release and permanent injunction of claims, including direct action claims not only against settling insurers but also non-settling insurers who may never contribute to the

17

**ALW045**

Settlement Trust.  Given the billions in dollars of insurers' exposure and liability, especially since the insurance policies provided non-aggregate limits until the mid-1980s, Debtors will be unable to show a substantial contribution by the insurers.  As Lujan Claimants are not being adequately protected or compensated for release and injunction of their direct action claims against insurers, they clearly are not receiving anything of indubitably equal value to replace their direct action rights. This factor weighs heavily against release and injunction of third party claims against nondebtors.

As explained earlier, the nonconsensual release and permanent injunction of third party claims against nondebtors are not necessary to Debtors' successful reorganization, as Debtors continue to maintain that the BSA Toggle Plan, containing no third party releases or injunctions, is a feasible plan for their reorganization.  This factor strongly supports rejection of release and injunction of third party claims against nondebtors.

The fourth factor—creditor approval of the release and permanent injunction—is "the single most important factor."  In re Master Mortgage, 168 B.R. at 938.  The Third Circuit has identified as a "key consideration[]" "whether affected parties overwhelmingly have agreed to accept the proposed treatment."  In re Continental Airlines, 203 F. 3d at 217 n.17 (listing Master Mortgage factors).  In chapter 11 non-asbestos cases where third party releases have been approved, courts have interpreted overwhelming creditor support to mean that at least 90% of affected voting creditors accept the plan.  See In re Wool Growers Cent. Storage Co., 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) ("Most courts have held that factor four [of the Master Mortgage factors] is satisfied when over ninety percent of the impacted creditors approve the plan."); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 674 (Bankr. D.D.C. 1992) (citing to overwhelming support of plan with releases as indicative of "good faith"; "Of the 64 creditors voting—other than partners of the debtor—62 voted for the plan or roughly 97%.").  Here, the Final Voting Report reveals that only **73.57%** of voting Survivors (i.e., Class 8 Direct Abuse Clams holders) voted to accept the Plan, thus

18

**ALW046**

showing that, overall, Debtors **LOST THE VOTE** of Survivors.  (Decl. of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding Solicitation of Votes & Final Tabulation of Ballots Cast (D.I. 8345) Ex. A at 2.)  Debtors similarly lost the vote of Class 9 Indirect Abuse Claims holders, of whom only 69.57% of voters voted to accept the plan.  (Id.)  When viewing the voting outcome in greater detail, it will undoubtedly show that many affected creditors losing claims against specific local councils, chartered organizations, insurers, and other entities like religious orders, voted to reject the Plan, thereby showing a failure by Debtors to obtain the overwhelming support of affected creditors for Plan releases against these specific nondebtors.  For instance, Lujan Claimants have no doubt that, of the 82,000+ Survivors who have filed proofs of claim here, they are the vast majority of Survivors in this case who have claims against the Archbishop of Agana and religious orders such as the Capuchin Franciscans, Carmelites, and School Sisters of Notre Dame in Guam.  In fact, of the nearly 200 Survivors who have asserted claims against the Aloha Council, Lujan Claimants constitute more than 37% of such Survivors.  As 73 of the 75 Lujan Claimants voted, and all but one of the 73 voted to reject the Plan, it is clear that, as affected creditors with claims against these nondebtors, Debtors lost the vote to support release and injunction of claims against the Archbishop of Agana, the religious orders, *and* the Aloha Council, meaning they failed to obtain at least 90% voter acceptance of the treatment in the Plan.  Debtors should be required to file or present publicly a breakdown of the vote by claims against local councils, chartered organizations, insurers, and other entities such as religious orders, which will reveal the extent of the lost vote by affected creditors. Having failed to win overwhelming support from affected creditors, this most important factor of the Master Mortgage factors mandates rejection of the Plan's nonconsensual release and permanent injunction of third party claims against nondebtors.

The fifth factor—payment of all or substantially all of the claims—is also not met by the Plan, as Debtors estimate that, if Direct Abuse Claims are valued at $7.1 billion, Survivors will

**ALW047**

recover payment of 10 to 21% on their claims, plus additionally insurance rights that hypothetically are expected to yield up to 100% recovery. (Amended Disclosure Statement (D.I. 6445) at 29.) Debtors also estimate that, if Direct Abuse Claims are valued at the very low end at $2.4 billion, Survivors will recover payment of 31 to 63% on their claims, plus additional insurance rights that hypothetically are expected to yield up to 100% recovery. (Id.) Lujan Claimants dispute Debtors' grossly low estimated value of Direct Abuse Claims. Even if Debtors' valuation is correct, the Plan still fails to provide for payment of all or substantially all of Survivors' claims. See In re Wool Growers, 371 B.R. at 778 (finding the fifth factor, full or almost full payment of the affected claims, not satisfied where affected creditors will recover, at best, 60 to 70% of their claims). This is especially true as to Lujan Claimants who will lose their ability to pursue claims against the Aloha Council, Aloha Council's separate insurers, the Archbishop of Agana and its separate insurers, and BSA insurers. The factor strongly disfavors nonconsensual release and injunction of third party claims against nondebtors.

       As the Master Mortgage factors weigh heavily against approval of nonconsensual releases of third party claims against nondebtors, the Plan must be denied confirmation.

**B.     THE PLAN FAILS THE BEST INTEREST OF CREDITORS TEST.**

       Pursuant to the best interest of creditors test set forth in section 1129(a)(7), a Chapter 11 plan cannot be confirmed unless the plan provides each dissenting, impaired creditor at least as much as the creditor would be paid if the debtor liquidated under Chapter 7. In a Chapter 7 liquidation, nondebtor releases are not permitted. See, e.g., In re Mrs. Weinberg's Kosher Foods, 278 B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (holding in this chapter 7 case that bankruptcy courts may not use a channeling injunction to enjoin a creditor from prosecuting direct claims against a nondebtor); In re Optical Tech., Inc., 216 B.R. 989, 990-94 (M.D. Fla. 1997) (adopting Master Mortgage but striking the actual releases contained in the debtors' liquidating plan because "where ... a plan of

20

**ALW048**

reorganization provides for the total liquidation of the debtor, the factors of Master Mortgage cannot be met").

A plan of reorganization is unconfirmable for violating the best interests of creditors test, where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan. In re Conseco, Inc., 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).

Here, the Plan fails the best interest of creditors test because the Plan releases Survivors' claims against and enjoins them from suing nondebtors and requires that, in order to receive a distribution under the Plan, the Survivor must sign a release of all Protected Parties (such as local councils, contributing chartered organizations, and settling insurers) and chartered organizations. (Plan (D.I. 7832) Ex. A at 8-9, 12, 21-22.)  As Survivors can only receive payment under the Plan if they sign a release of their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these nondebtors, which they would still be able to retain in a chapter 7 liquidation.  Furthermore, the Insurance Entity Injunction prohibits Survivors from recovering payment under insurance policies issued by Non-Settling Insurers, thereby precluding Lujan Claimants from exercising their statutory rights to file direct actions against these Non-Settling Insurers.  Since, in a Chapter 7 liquidation, Survivors would be able to pursue their claims against local councils, chartered organizations, and settling and non-settling insurers of such nondebtors, the Plan clearly fails to pay Lujan Claimants at least as much as they would be paid if Debtors liquidated under Chapter 7.

Perhaps most sinister is that the Plan precludes Lujan Claimants, who are also creditors in the ongoing bankruptcy case of the Archbishop of Agana, from recovering compensation through the Archbishop of Agana bankruptcy case, despite the fact that they have proofs of claim in that Guam bankruptcy case filed since 2019, several months *before* Debtors filed this consolidated

ALW049

action. These Lujan Claimants, at least 70 in number, appear to be enjoined in the Plan from seeking compensation from debtor charted organizations (who are treated as opt-out chartered organizations), as the Plan's Channeling Injunction provision states that "the sole recourse of any holder of an Opt-Out Abuse Claim against an Opt Out Chartered Organization on account of such Opt-Out Abuse Claim shall be to and against the Settlement Trust ... and such holder shall have no right whatsoever at any time to assert such Opt-Out Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Charted Organization." (Plan Art. X.F.1.) The Plan further provides a reservation: "Notwithstanding anything to the contrary in this Article X.F, the Channeling Injunction shall not enjoin: ... the rights of holders of Abuse Claims that are not Opt-Out Abuse Claims to assert such Abuse Claims against any Opt-Out Chartered Organization (unless such Opt-Out Chartered Organization becomes a Protected Party under Article IV.1)[.]" (Plan Art. X.F.3.) This appears to mean that the channeling injunction enjoins Lujan Claimants from asserting against debtor Archbishop of Agana claims for abuse that occurred post-1975, even though they already have timely filed proofs of claim which are subject to disposition, including allowance or disallowance, before Chief Judge Frances Tydingco-Gatewood[5] of the District Court of Guam. Similarly, the Plan's Insurance Entity Provision prohibits Survivors with claims of abuse post-1975 from pursuing compensation from insurance, except the Injunction shall not enjoin "the rights of any Person to assert or prosecute (i) an Abuse Claim against an Opt-Out Chartered Organization to the extent that such Claim is not under an insurance policy issued by a Settling Insurance Company ...." (Plan Art. X.H.2, 3.d.) It is unclear whether the Insurance Entity Injunction prohibits Survivors from seeking insurance compensation from post-1975 BSA insurance or from a Settling Insurance Company, but a reasonable interpretation is that

---

[5] Chief Judge Tydingco-Gatewood is only one of two judges out of 94 chief judges in the United States who must also sit as Chief Bankruptcy Judge.  See https://www.gud.uscourts.gov/attorneys/hon-frances-tydingco-gatewood-chief-judge.

22

**ALW050**

the Injunction enjoins Lujan Claimants from seeking compensation from post-1975 BSA insurance, or from a Settling Insurance Company.  In effect, the Plan appears to give debtor chartered organizations, including debtor Archbishop of Agana, Limited Protected Party status (i.e., immunity from post-1975 abuse claims), even though they have "opted out" by objecting, as the Archbishop of Agana has done here.  Incredibly, the Plan also appears to release the Archbishop of pre-1976 liability.  (Guam Committee Objection (D.I. 8683) at 14 n. 37 (citing Plan Art. X.J.3).  This is entirely unfair as Lujan Claimants have pursued their abuse claims by filing civil lawsuits against the Archbishop since as early as 2017 and then by filing proofs of claim in the Archbishop's bankruptcy case.  Further, this is unfair treatment of Lujan Claimants, as the Archbishop of Agana has its own personal assets, its own non-BSA insurance, and its separate rights to post-1975 BSA insurance as an additional insured.  Not only is this treatment unfair, but it is also clearly unnecessary to Debtors' successful reorganization, as the Solicitation Version of the Plan did not grant Limited Protected Party status, much less pre-1976 release of liability, to an objecting debtor chartered organization, thereby allowing Lujan Claimants to pursue claims against the objecting Archbishop of Agana for post-1975 and pre-1976 abuse.  This change in the treatment of Lujan Claimants occurred merely 10 days before the voting deadline, with the filing of the Second Modified Fifth Amended Chapter 11 Plan, as to which Debtors gave no additional disclosure to creditors, even though the Second Modified Plan provided vastly worse treatment for Survivors with post-1975 abuse claims against debtor chartered organizations.  In a Chapter 7 liquidation, Lujan Claimants with timely filed proofs of claim in the Archbishop of Agana bankruptcy case would not be restricted from receiving compensation from the Guam bankruptcy case; they would maintain their claims to be paid from the Archbishop's personal assets and they would be able to pursue compensation from the Archbishop's non-BSA insurance, as well BSA insurance based on the Archbishop's status as an additional insured.

ALW051

As the Plan releases Lujan Claimants' claims against nondebtors, without Lujan Claimants' consent, and requires such release in order for them to be paid at all (including from BSA's personal assets), the Plan fails to meet the best interests of creditors test as to Lujan Claimants and must be denied confirmation.

## C. THE PLAN IMPERMISSIBLY VIOLATES LUJAN CLAIMANTS' DIRECT ACTION RIGHTS AGAINST INSURERS AND TREATS LUJAN CLAIMANTS UNEQUALLY.

Under Guam law, 22 GCA § 18305, Lujan Claimants have a right of direct action against insurers of persons or entities liable for personal injury, including BSA, local councils, and chartered organizations. Yet, the Plan disregards Lujan Claimants' statutory right to directly sue insurers of liable persons or entities. If confirmed, the Plan wrongly enjoins Lujan Claimants from suing both settling and non-settling insurers and fails to adequately protect and compensate Lujan Claimants. Further, the Plan treats Lujan Claimants unequally compared to survivors of abuse who lack prejudgment direct action rights against insurers.

### 1. Pursuant to the McCarran-Ferguson Act, Lujan Claimants Have the Power to Exercise Direct Action Rights against Insurers, as Guam's Direct Action Statute Reverse Preempts Bankruptcy Code Provisions that Do Not Specifically Relate to the Business of Insurance and that Operate to Invalidate, Impair, or Supersede the Right of Direct Action under Guam Law.

In 1945, Congress passed the McCarran-Ferguson Act "to restore the supremacy of the States in the realm of insurance regulation." United States Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993). This federal statute was enacted in response to the United States Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944), which held that an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws. Id. at 499. The holding in South-Eastern Underwriters was widely viewed as a threat to state power to tax and regulate the insurance industry. Id. at 499-500. To allay these fears, Congress moved quickly to enact the McCarran-

24

**ALW052**

Ferguson Act which "makes its mission very clear: 'Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.'" Id. at 500 (quoting 15 U.S.C. § 1011). A year after passage of the Act, the Supreme Court observed of the federal statute: "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.'" Id. at 500 (quoting Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429 (1946)). Congress achieved this purpose, first, "'by removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation,'" and, second, "'by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.'" Id. (quoting Prudential Ins., 328 U.S. at 429-30).

Section 2(b) of the McCarran Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). As used in the Act, the term "State" includes the several States, Alaska, Hawaii, Puerto Rico, **Guam**, and the District of Columbia. 15 U.S.C. § 1015. A federal statute is reverse preempted under the Act if (1) the federal statute does not specifically relate to the business of insurance, (2) the state statute was enacted for the purpose of regulating the business of insurance, and (3) the federal statute would invalidate, impair, or supersede the state statute. In re PRS Ins. Group, Inc., 294 B.R. 609, 612 (Bankr. D. Del. 2003) (citing, e.g., In re Amwest Ins. Group, 285 B.R. 447, 451 (Bankr. C.D. Cal. 2002)). To the extent that the Plan prohibits Lujan Claimants from directly suing

25

**ALW053**

insurers of the BSA, local councils, chartered organizations, or any entity against whom Lujan Claimants or any of them have a claim, the Plan violates the McCarran-Ferguson Act.

The first factor is met in this case, as "there is no question that the Bankruptcy Code does not specifically relate to the business of insurance." In re Advanced Cellular Systems, 235 B.R. 713, 719 (1999). The Supreme Court has explained that "[m]any federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 42 (1996). In fact, the Bankruptcy Code expressly states that a domestic insurance company is not eligible for relief as a debtor. PRS Ins. Group, 294 B.R. at 612 (citing 11 U.S.C. § 109(b)(2)). In PRS Ins. Group, the Delaware Bankruptcy Court concluded that "the Bankruptcy Code does not specifically relate to the business of insurance." Id.

Review of the specific Plan provisions supports the conclusion that the Bankruptcy Code provisions cited by Debtors do not specifically relate to the business of insurance. The Plan provides that, pursuant to section 1123(b) of the Bankruptcy Code, holders of Abuse Claims shall discharge and release all claims against Protected Parties, including settling insurers of Debtors, and the property of Protected Property, including the insurers of local councils (as all local councils are Protected Parties), regardless of whether the local council-only insurer is a settling or non-settling insurer.[6] (Plan Art. X.J.3.) The Plan further provides for an Insurance Entity Injunction to be issued,

---

[6] The Plan states:
As of the Effective Date ..., pursuant to section 1123(b) of the Bankruptcy Code, ... all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respectively property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims ....

(Plan Art. X.J.3.)

ALW054

pursuant to the equitable jurisdiction and power of the Bankruptcy Court and District Court under section 105(a) of the Bankruptcy Code, to facilitate the Insurance Assignment, protect the Settlement Trust, and preserve Settlement Trust Assets.  (Plan Art. X.H.1.)  The Insurance Entity Injunction in the Plan enjoins holders of Abuse Claims from pursuing claims, including but not limited to commencing an action, against any Insurance Company.[7]  (Plan Art. X.H.2.)  The Plan further provides for a channeling injunction, pursuant to the exercise of jurisdiction and power of the Bankruptcy Code and District Court under section 105(a) of the Bankruptcy Code, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claim Settlement, the Insurance Settlements, and the TCJC Settlement, and to supplement, where necessary, the injunctive effect of the Discharge.  (Plan Art. X.F.1.)  The Channeling Injunction provides that the sole recourse of any holder of an Abuse Claim against a Protected Party, Limited Protected Party (on account of a Post-1975 Chartered Organization Abuse Claim or where the Abuse Claim is covered by a policy issued by a Settling Insurance Company), or Opt-Out Chartered Organization, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party, Limited Protected Party, Opt-Out Chartered Organization or any property or interest of any such Protected Party, Limited Protected Party, or Opt-Out Chartered

---

[7] The Insurance Entity Injunction provision in the Plan states:
Subject to the terms of Article X.E and Article X.F, except for Opt-Out Chartered Organizations with respect to Non-Settling Insurance Companies and Participating Chartered Organizations with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action ....

(Plan Art. X.H.2.)

27

**ALW055**

Organization. (Plan Art. X.F.1.) Further, the Plan states that all Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements. (Plan Art. X.F.2.) Notwithstanding anything to the contrary in Article X.F, the Channeling Injunction shall not enjoin the rights of holders of Abuse Claims to assert such an Abuse Claim against the Settlement Trust in accordance with the Trust Distribution Procedures, a Limited Protected Party to the extent such Abuse Claims arose prior to January 1, 1976, and are not covered by any insurance policy issued by a Settling Insurance Company, an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company, or an Opt-Out Chartered Organization unless it becomes a Protected Party. (Plan Art. X.F.3.)

As discussed above, the Plan cites sections 105(a) and 1123(b) of the Bankruptcy Code as providing authority to prohibit survivors' direct action rights against insurers. However, neither section 105(a) nor section 1123(b) specifically relate to the business of insurance.

Section 105(a) of the Bankruptcy Code provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Debtors cite the equitable jurisdiction and power of the Bankruptcy Court and District Court under section 105(a) as authorizing the Insurance Entity Injunction and Channeling Injunction, which both prohibit creditors from bringing actions or claims against insurers of Protected Parties, including BSA, all local councils, and certain chartered organizations. However, the Third Circuit held in In re Combustion Eng'g, Inc., that section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and

28

**ALW056**

vacated the channeling injunction. 391 F. 3d 190, 238 (3d Cir. 2004).  In In re Continental Airlines, the Third Circuit rejected as extra-statutory the provision in a plan of reorganization that released claims against former and current directors of debtor Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here." 203 F. 3d 203, 211 (3d Cir. 2000).  That one instance is asbestos cases.  In fact, as noted earlier, the Third Circuit has never identified any section of the Bankruptcy Code that authorizes nondebtor releases in non-asbestos cases.  Since, by its terms, section 105(a) clearly does not specifically relate to the business of insurance, the Third Circuit has held that section 105(a) does not allow for the creation of substantive rights not otherwise available under the Bankruptcy Code, and the Third Circuit has acknowledged that the Bankruptcy Code only explicitly authorizes the release and permanent injunction of claims against nondebtors only in asbestos cases, the only reasonable conclusion is that section 105(a) is not a federal statute that specifically relates to the business of insurance, including allowing the release and permanent injunction of claims against insurers in non-asbestos cases.

Turning to section 1123(b), that statute provides:

(b) Subject to subsection (a) of this section, a plan may—
    (1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
    (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
    (3) provide for—
        (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
        (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
    (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

29

**ALW057**

> (5) modify the rights of holders of secured claims, other than a claim secured
> by a security interest in real property that is the debtor's principal residence,
> or of holders of unsecured claims, or leave unaffected the rights of holders of
> any class of claims; and
> (6) include any other appropriate provision not inconsistent with the
> applicable provisions of this title.

11 U.S.C. § 1123(b).  Like section 105(a), the language of section 1123(b) contains no express

reference to insurance, including any provision allowing a release and permanent injunction of claims

against insurers.  Section 1123(b) simply lays out in detail what a plan of reorganization may contain.

In re Purdue Pharma, 2021 WL 5979108, at *62.  Similar to section 105(a), section 1123(b) is not a

statute that specifically relates to the business of insurance.

　　　While Debtors rely only upon sections 105(a) and 1123(b) as authority for the release and

permanent injunction of claims against insurers, the Future Claimants' Representative ("FCR") and

Coalition of Abused Scouts for Justice ("the Coalition") have cited as authority for such release and

injunction section 1123(a)(5) of the Bankruptcy Code.  (Joint Reply of FCR & Coalition in Support

of Debtors' Disclosure Statement [D.I. 6246] at 26.)  Section 1123(a)(5) provides:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
> …
> 　　(5) provide adequate means for the plan's implementation, such as—
> 　　　　(A) retention by the debtor of all or any part of the property of the
> 　　　　estate;
> 　　　　(B) transfer of all or any part of the property of the estate to one or
> 　　　　more entities, whether organized before or after the confirmation of
> 　　　　such plan;
> 　　　　(C) merger or consolidation of the debtor with one or more persons;
> 　　　　(D) sale of all or any part of the property of the estate, either subject to
> 　　　　or free of any lien, or the distribution of all or any part of the property
> 　　　　of the estate among those having an interest in such property of the
> 　　　　estate;
> 　　　　(E) satisfaction or modification of any lien;
> 　　　　(F) cancellation or modification of any indenture or similar instrument;
> 　　　　(G) curing or waiving of any default;
> 　　　　(H) extension of a maturity date or a change in an interest rate or other
> 　　　　term of outstanding securities;
> 　　　　(I) amendment of the debtor's charter; or
> 　　　　(J) issuance of securities of the debtor, or of any entity referred to in
> 　　　　subparagraph (B) or (C) of this paragraph, for cash, for property, for

30

**ALW058**

> existing securities, or in exchange for claims or interests, or for any
> other appropriate purpose ....

11 U.S.C. § 1123(a)(5).  Section 1123(a) "contains a laundry list of things that a plan can include in

order to make sure that resources are available to implement the plan – any of which can be ordered

by a bankruptcy court."  In re Purdue Pharma, 2021 WL ___ at *63.  However, as plainly seen from

the language, insurance is nowhere mentioned in the statute.  "Injunctions against the prosecution of

third-party claims against non-debtors [including insurers], and the release of such claims, are

nowhere to be found on that list."  Id. at *64.  Section 1123(a)(5) does not by itself confer any

substantive right.  Id.  Nor does it confer any special power on a bankruptcy court.  Id.  "Finally, and

most important, Section 1123(a)(5) does not authorize a court to give its imprimatur to something

the Bankruptcy Code does not otherwise authorize, simply because doing so would secure funding

for a plan.  Nothing in Section 1123(a)(5) suggests that the debtor has the right to secure sufficient

funds for implementation by any means necessary."  Id.

  Admittedly, in In re Federal-Mogul Global Inc., 684 F. 3d 355, 369 (3d Cir. 2012), the Third

Circuit held that section 1123(a) preempts state law.  In that case, the issue was whether a debtor

could transfer its insurance rights to a section 524(g) asbestos trust notwithstanding the policies' anti-

assignment provisions.  Id. at 366.  In holding that section 1123(a) permitted the debtor to transfer

its insurance rights to the asbestos trust, the Court did not consider the McCarran-Ferguson Act and

whether section 1123(a) is a federal statute that specifically relates to the business of insurance.

Instead, the Court recognized that section 1123(a) "by its express terms does not displace other

portions of the Bankruptcy Code."  Id. at 371.  Only in considering section 1123(a) in conjunction

with section 524(g), which permits injunctions of claims against insurers in asbestos cases, did the

Court reach its conclusion regarding preemption.  As there is no statutory authority in the Bankruptcy

Code allowing the release and permanent injunction of third party claims against insurers outside the

**ALW059**

asbestos context, section 1123(a) standing alone cannot be construed as specifically relating to the business of insurance.

Clearly, Congress knows how to craft legislation that specifically references insurance, as it did in enacting section 524(g), which provides that, notwithstanding the provisions of section 524(e), the bankruptcy court may order an injunction barring claims against third parties that arise by reason of "the third party's provision of insurance to the debtor or a related party."  11 U.S.C. 524(g). Congress has never enacted a bankruptcy statute similar to section 524(g), permitting an injunction of claims against insurers in non-asbestos bankruptcy cases.  Rather, except as stated in section 524(g), the rule governing all non-asbestos bankruptcy cases (such as Debtors' case), is section 524(e) which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt."  Therefore, considering 1123(a) in a non-bankruptcy case subject to the rule in section 524(e), these Bankruptcy Code provisions cannot be construed as specifically relating to the business of insurance.

Regarding the second factor, the Supreme Court has stated that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance."  United States Dep't of Treasury v. Fabe, 508 U.S. 491, 505 (1993) (quoting Black's Law Dictionary 1236, 1286 (6th ed. 1990), and holding that an Ohio statute reverse preempted the federal statute under the McCarran-Ferguson Act to the extent that it protected policyholders).  "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly are laws regulating the 'business of insurance.'"  SEC v. Nat'l Securities, Inc., 393 U.S. 453, 460 (1969).  In Fabe, the Court. 508 U.S. at 493.  The Supreme Court has identified three criteria to determine whether a state law regulates the business of insurance:  (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship

32

**ALW060**

between the insurer and the insured"; and (3) "whether the practice is limited to entities within the insurance industry." <u>Union Labor Life Ins. Co. v. Pireno</u>, 458 U.S. 119, 129 (1982). Although none of the <u>Pireno</u> factors are necessarily determinative, an examination of the factors may lead to a finding that state law regulates the business of insurance. <u>Am. Bankers Ins. Co. of Fla. v. Inman</u>, 436 F. 3d 490, 493 (5th Cir. 2006).

In <u>Evans v. TIN, Inc.</u>, Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162, at *10 (E.D. La. June 20, 2012), the Eastern District of Louisiana court held that the Louisiana Direct Action Statute ("LDAS") is a statute that was enacted for the purpose of regulating the business of insurance:

> First, the LDAS regulates risk by subjecting all policy disputes regarding [insurance] coverage to the possibility of a jury trial. Second, the LDAS forms an integral part of the insurer-insured relationship because it controls how disputes regarding [insurance] coverage will be resolved. Finally, the LDAS only applies with respect to claims asserted under polic[ies] or contract[s] of liability insurance and it is, therefore, limited to entities within the insurance industry.

<u>Id.</u> (internal quotations omitted). The Fifth Circuit has also recognized that "Louisiana's direct action statute is arguably a state law regulating insurance, [and that] the McCarran Ferguson Act may allow it to trump federal law ...."

Guam's Direct Action Statute, found at 22 GCA § 18305, is virtually identical to the LDAS[8], stating:

> On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct

---

[8] The LDAS provides in part:
> The injured person or his survivors or heirs ..., at their option, shall have a right of direct action against the insurer within the terms and limits of the policy ... This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana ....

<u>Evans</u>, 2012 WL 2343162, at *6 (quoting La. Rev. Stat. Ann. § 22:1269).

33

**ALW061**

action, provided that the cause of action arose in Guam.  Such action may be brought
against the insurer alone, or against both the insured and insurer.

22 GCA § 18305.  Like the LDAS, Guam's Direct Action Statute regulates risk by subjecting all

policy disputes regarding insurance coverage to the possibility of a jury trial, Guam's Direct Action

Statute forms an integral part of the insurer-insured relationship because it controls how disputes

regarding insurance will be resolved, and Guam's Direct Action Statute only applies with respect to

claims asserted under policies or contracts of liability insurance and it is, therefore, limited to entities

within the insurance industry.  Thus, the second factor is met.

As for the third factor, the Supreme Court has defined the terms "invalidate," "impair," and

"supersede."  Humana, Inc. v. Forsyth, 525 U.S. 299, 311 (1999).  "The term 'invalidate' ordinarily

means 'to render ineffective, generally without providing a replacement rule or law.' … And the

term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a

substitute rule.'"  Id.  Here, Debtors are applying sections 105(a) and 1123(b) to prohibit survivors

and anyone else from directly suing insurers of Debtors, local councils, chartered organizations, and

any other entity that receives a form of protected party status.  Permitting this application of the

Bankruptcy Code will surely invalidate, impair, and/or supersede Guam's Direct Action Statute as it

is applied to survivors of child sexual abuse in Guam.  If Debtors are granted their requested

injunction, then survivors, including Lujan Claimants, will be prevented from enjoying the direct

action rights granted them by the Guam Legislature, which Congress has charged with regulating the

business of insurance.  They will no longer be allowed to sue insurers for the abuse they suffered,

even though there is coverage to pay for their abuse.  The third factor is undisputedly met.

As the Plan runs afoul of the McCarran-Ferguson Act, which requires that Guam's Direct

Action Statute reverse preempt conflicting Bankruptcy Code provisions that do not specifically relate

to insurance and thus preserves Lujan Claimants' right to directly sue insurers, the Plan must be

denied confirmation.

34

**ALW062**

2. **Even if the McCarran-Ferguson Act Does Not Apply, the Sale or Transfer of Insurance Policies of Nonprofit Boy Scouts of America Remain Subject to and Cannot Impair Guam's Direct Action Statute.**

Although the Plan identifies settlements with insurers without actually providing written settlement agreements, the Plan clearly includes settlements with insurers for the sale of BSA's rights to insurance policies pursuant to section 363 of the Bankruptcy Code.  However, under 11 U.S.C. § 363(d)(1), a sale of property in the case of a nonprofit debtor, such as the BSA, must comply with applicable nonbankruptcy law.

The leading treatise on insurance law explains why the extinguishment of Lujan Claimants' direct action rights as part of insurance policy buybacks cannot be approved by this Court:

> A completed surrender and cancellation of an insurance policy terminates the contract, and the parties are relieved from any liability that might otherwise accrue under the policy, though not from liability already accrued.
> … Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested. …
> A mutual rescission of a liability policy by the insurer and the named insured does not abrogate the accrued rights of the omnibus insureds without their consent. …
> A provision in a liability policy giving the injured person a right of action over against the insurer cannot be cancelled by the insurer, even with the consent of the insured, after the injured person's identity has been established.

*Couch on Ins.* § 31:49 (3d ed. 2020).

The insurer and insured cannot agree to modify the rights of the injured person against the insurer, including by cancelling the provision in the contract giving the injured person a right of action against the insurer, because the terms of Guam's Direct Action Statute are deemed to be part of every liability insurance policy governed by Guam law whether or not the parties expressly agree to its terms. Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C., 173 Wis. 2d 665, 676 (1993) (interpreting Wisconsin direct action statute similar to Guam's).  An insurer and insured may not rescind a liability policy after a known loss.  Society Ins. v. Capitol Indem. Corp., 260 Wis. 2d 549, 555-56 (Ct. App. 2003); In re Estate of Gardinier, 40 N.J. 261 (1963); Rauch v.

**ALW063**

Am. Fam. Ins. Co., 115 Wis. 2d 257, 267 (1983) ("[U]pon the happening of an accident, the injured party acquires an interest in the policy that cannot be foreclosed by litigation or agreement between the insurer and insured alone.").

The buyback of an insurance policy after an accident is a prohibited rescission or cancellation of the policy. M. Quinn, The Insurance Buyback, 28 Ins. Litig. Rptr. 661, 666 (No. 18 2006) (insurance buyback not typical purchase of insurance policy but more like a rescission or cancellation of policy). The buyback of insurance policies is not saved by section 363 because the Bankruptcy Code cannot preempt Guam's direct action insurance laws. It is not saved by section 1123(a)(5), which authorizes a "sale" that might not otherwise be permitted under applicable bankruptcy law, because Guam law is not anti-sale; it is anti-rescission. Any modification of policy terms among Debtors and insurers cannot rescind the policies or eliminate Lujan Claimants' and other direct action Survivors' statutorily fixed rights.

Further, the Court cannot approve sale of the insurance policies free and clear of Survivors' interests under section 363(f), as none of the subsections of section 363(f) can be satisfied. Subsection (f)(1) does not apply because applicable nonbankruptcy law does not permit the sale of the policies free and clear of Lujan Claimants' direct action rights. Subsection (f)(2) cannot be satisfied because Lujan Claimants absolutely do not consent to the insurance policy buybacks and Debtors have not and cannot offer any evidence of Lujan Claimants' consent. Subsection (f)(3) is irrelevant because Lujan Claimants' direct action rights, while similar to liens, are not technically liens. Subsection (f)(4) is not met as Lujan Claimants' direct action rights are established by Guam's Direct Action Statute and the rights established by that statute are not in dispute. Subsection (f)(5) cannot be satisfied as the Plan provides no money satisfaction to Lujan Claimants for the extinguishment of their direct action interests in the policies. Further, the policies applicable to Lujan

**ALW064**

Claimants have no aggregate limits and, based on the present funding in the Plan, including insurance settlements, the Plan cannot provide Lujan Claimants full payment of their claims.

Additionally, the requirements of section 1123(a)(5)(D) of the Bankruptcy Code are not met. Section 1123(a)(5)(D) requires that a plan provide adequate means for its implementation, including a sale of estate property. This clause prohibits the violation of Guam law barring insurance policy buybacks for at least for reasons. First, the sale would frustrate Guam's Direct Action Statute, which preempts section 1123 under the McCarran-Ferguson Act. Second, Guam law prohibiting the post-occurrence modification of an injured person's rights is not anti-sale; it is anti-rescission. Third, section 1123(a)(5)(D), which was enacted in 1980, cannot apply to pre-enactment claims because retroactive application violates Lujan Claimants' Fifth Amendment property rights. More than 70 Lujan Claimants have direct action claims that accrued prior to 1980, when section 1123(a) was amended to add the phrase, "[n]otwithstanding any otherwise applicable nonbankruptcy law." Shipman v. Kenosha Unified School Dist., 57 Wis. 2d 697, 704-05 (1973). The application of this phrase retroactively to preempt Guam's Direct Action Statute abrogates Lujan Claimants' "substantive" causes of action against settling insurers in violation of Lujan Claimants' Fifth Amendment due process rights. United States v. Security Ind. Bank, 103 S. Ct. 407, 413-14 (1982); Malpeli v. Beneficial Fin. Co. (In re Malpeli), 7 B.R. 508, 511 (Bankr. N.D. Ill. 1980). Fourth, the Court cannot approve the insurance buyback settlements under section 1123(a)(5)(D) because its free and clear provision is limited to sales free of "liens." 11 U.S.C. § 1123(a)(5)(D). Lujan Claimants' interests in the insurance policies, while similar to liens, are not technically liens as they do not secure payment of a debt.

### 3. The Plan Fails to Adequately Protect and Compensate Direct Action Claimants for Their Interests in Insurance Policies.

Assuming the insurance policy buybacks are lawful sales under section 363(f), the Plan must provide Lujan Claimants with adequate protection and compensation for their interests in the

**ALW065**

insurance policies.  11 U.S.C. § 363(e).  The word "interest," as used in section 363(f), is to be interpreted broadly.  Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.), 327 F. 3d 537, 545 (7th Cir. 2003)).  Lujan Claimants have an interest in BSA's (and other tortfeasors') insurance policies since they have prejudgment direct action rights against insurers under Guam law.  Prejudgment direct action claimants, like Lujan Claimants, are third party beneficiaries to insurance policies, Litton v. Ford Motor Co., 554 So. 2d 99, 103 (La. Ct. App. 1989) ("Under the well-established jurisprudence, the general public as a class is also a third party beneficiary of liability insurance coverage."), with rights in the policies that vest "at the time of the tort," Hayes v. New Orleans Archdiocesan Cemeteries, 805 So. 2d 320, 323 (La. Ct. App. 2001) ("The Direct Action Statute vests the injured party with rights at the time of the tort to institute an action directly against the insurer within the terms and limits of the policy.").[9]  An accrued cause of action, such as for negligence, is a vested property interest entitled to due process protection that accrues on the date of the plaintiff's injury.  Matthies v. Positive Safety Mfg. Co., No. 99-0431, 2000 WL 892825, at *3 (Wis. Ct. App. July 5, 2000) (citing Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau, 97 Wis. 2d 435, 442, 445 (1980), and Martin v. Richards, 192 Wis. 2d 156, 206 (Wis. 1995)).

If the debtor's property is subject to an interest of another party, the debtor must provide adequate protection to the creditor.  In re Lee, 25 B.R. 135, 139 (Bankr. E.D. Pa. 1982).  The interest of the creditor must be adequately protected before the bankruptcy court will order turnover of these funds to the debtor.  Id.  The debtor bears the burden of proving the existence of adequate protection for the creditor's interest.  Id.  The court has the authority to condition or prohibit any sale of property as is necessary to provide adequate protection to the secured creditor's interest.  In re Collins, 180

---

[9] In cases brought under Guam's Direct Action Statute, the Supreme Court of Guam has relied upon Louisiana court decisions in cases brought under its similar LDAS.  See, e.g., Reyes v. First Net Ins. Co., 2009 Guam 17 ¶ 29 (citing Welch v. Crown Zellerbach Corp., 359 So. 2d 154, 156 (La. 1978), and Hannie v. Wall, 569 So. 2d 1044, 1050 (La. Ct. App. 1990

ALW066

B.R. 447, 452 (E.D. Va. 1995). The commonly accepted method for adequately protected a secured creditor when a sale is authorized under section 363(f) is to order the liens or interest to attach to the proceeds of the sale. Id.

In this case, the Plan provides Lujan Claimants with zero compensation or protection for their interests in the insurance policies. There is no attempt in the Plan to compensate or protect Lujan Claimants for the loss of statutory rights granted by the Legislature of Guam to directly sue insurers for payment of their abuse claims. Despite their status as prejudgment direct action Survivors with interests in insurance policies, the Plan treats Lujan Claimants the same as all other Survivors who lack prejudgment direct action rights, as all insurance proceeds will be paid to all Survivors with allowed claims. Since the insurance proceeds will be shared among all Survivors, regardless of whether they have direct action rights, then, at the very least, prejudgment direct action Survivors, including Lujan Claimants, should be granted a priority right to proceeds of insurance policy buybacks. A priority right to the insurance proceeds is consistent with Guam's Direct Action Statute, as the Guam Legislature, in enacting its direct action statute, prioritized the ability of injured persons to recover payment from insurers by allowing them to directly sue insurers. As the Plan fails to provide Lujan Claimants with adequate protection and compensation for the loss of their direct action rights against insurers, as part of insurance policy buybacks, the insurance settlements (and any future insurance settlements between presently non-settling insurers with Debtors or the Settlement Trust) must be denied approval and the Plan must be denied confirmation.

###### 4.    The Plan Treats Lujan Claimants Unequally, Compared to Survivors who Lack Prejudgment Direct Action Rights.

Under section 1123(a)(4) of the Bankruptcy Code, "a plan shall— ... provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Here, Lujan Claimants are not being provided equal treatment compared to Survivors

39

**ALW067**

who lack direct action rights.  Lujan Claimants are being forcibly deprived of their direct action rights without any compensation or protection.  Yet, Survivors without direct action rights give up no such rights and then are treated the same as Lujan Claimants under the Plan.  As Lujan Claimants are being forced to give up more rights in exchange for the same treatment as Survivors who lack such rights, the Plan treats them unequally and it must be denied confirmation.

**D.    THE PLAN VIOLATES THE AUTOMATIC STAY IN THE ARCHBISHOP OF AGANA BANKRUPTCY CASE AND WRONGLY DIVESTS THE ARCHBISHOP OF ITS INTEREST IN BSA INSURANCE POLICIES.**

As argued by the Guam Committee, the Plan violates the automatic stay provided for by 11 U.S.C. § 362 in the Archbishop of Agana bankruptcy case by disposing of estate property including debtor Archbishop's rights and interest as an additional insured to BSA insurance policies.  The automatic stay protecting the Archbishop's estate property went into effect on January 16, 2019, when the Archbishop filed for bankruptcy.  The Archbishop's rights and interest in BSA insurance policies are part of the Archbishop's bankruptcy estate pursuant to 28 U.S.C. § 541, subject to the exclusive jurisdiction of the District Court of Guam, 28 U.S.C. § 1134.  As the Plan sells the Archbishop's interest in BSA insurance policies, including the Century and Hartford insurers' policies, and enjoins the Archbishop from making claims against BSA insurers, all without the consent of the Archbishop or the approval of the Guam bankruptcy judge, the Plan obviously violates the automatic stay since the sales and injunction are acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The Plan cannot be confirmed when it violates the automatic stay of another bankruptcy action.

Even if the Archbishop of Agana were not in bankruptcy, the Plan is unconfirmable since it involves the wrongful exercise of jurisdiction over nondebtors' interests in BSA insurance policies.  A bankruptcy court lacks jurisdiction over property rights outside of the estate, and therefore lacks

40

**ALW068**

jurisdiction over a nondebtor's rights to insurance proceeds.  The filing for bankruptcy does not endow a debtor with greater property rights than it would have had outside of bankruptcy.  Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1663 (2019).  In relation to insurance, where there are multiple insured parties under a policy, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest."  In re Archdiocese of St. Paul & Minneapolis, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); see also In re Sportstuff, Inc., 430 B.R. 170, 178 n.15 (8th Cir. 2010) ("While the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights.").  Thus, the Court has jurisdiction only over Debtors' rights to the insurance policies, and not over nondebtors' rights to the insurance policies, including additional insureds such as the Archbishop of Agana.  Lacking jurisdiction over nondebtors' interests in BSA insurance policies, the Court cannot sell the policies free and clear of the coinsureds' interests, including the Archbishop of Agana's interests, and cannot enjoin the coinsureds from exercising their rights as to the policies.

E.  **THE COURT LACKS JURISDICTION TO APPROVE THE SALE AND SETTLEMENT OF 1976 AND 1977 HARTFORD POLICIES, AS BSA PREVIOUSLY RELEASED ITS RIGHTS TO THESE POLICIES.**

Hartford has asserted before this Court that "Hartford A&I primary policies no. 10CA-43349E, for policy period January 1, 1976 to January 1, 1977, and no. 10CA43359E, for policy period January 1, 1977 to January 1, 1978, were released by BSA pursuant to a confidential settlement agreement."  Hartford Accident & Indemnity Co. v. Boy Scouts of America, Case No. 20-50601-LSS, Compl. ¶ 90 (Bankr. D. Del. May 15, 2020).  As BSA released these policies, and so is not entitled to coverage for sexual abuse claims, these policies (including any proceeds to cover sexual abuse claims) cannot be part of the bankruptcy estate in this case since BSA has no legal or equitable interests in these policies.  11 U.S.C. § 541.  The same is true as to any other policies

41

**ALW069**

released by BSA or limited as to coverage.    Accordingly, the Court lacks jurisdiction over these policies and cannot approve sales free and clear of others' interests (including local councils, chartered organizations including the Archbishop of Agana, and direct action Survivors including Lujan Claimants) in these policies.

**F.   THE PLAN IS NOT MADE IN GOOD FAITH AS BSA "GAMED THE SYSTEM" BY ESTABLISHING DELAWARE BSA, LLC, IN ORDER TO ALLOW BSA TO FILE FOR BANKRUPTCY WITHIN THE THIRD CIRCUIT INSTEAD OF THE FIFTH CIRCUIT.**

Under 11 U.S.C. § 1129(a)(3), a plan of reorganization may only be confirmed if the court finds that plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). In determining a debtor's good faith, a court should consider the following factors: "'(1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [exhibited] a fundamental fairness in dealing with the creditors.'" In re W.R. Grace & Co., 475 B.R. 34, 87-88 (Bankr. D. Del. 2012) (quoting Genesis Health Ventures, Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001).

Regarding the first factor, the Supreme Court has identified two purposes of Chapter 11 as: "(1) preserving going concerns; and (2) maximizing property available to satisfy creditors." In re W.R. Grace, 475 B.R. at 88 (citing Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999). Here, Delaware BSA, LLC was never a going concern and it will not be a going concern after confirmation of the Plan; it will be dissolved on the Effective Date. (Plan Art. V.F.) Delaware BSA, LLC, was incorporated under the laws of Delaware on July 11, 2019, only 7 months before Debtors filed for bankruptcy in Delaware. (Am. Disclosure Statement (D.I. 6445) at 49.)  As it will dissolve on the Effective Date, the Plan is not made for the purpose of preserving Delaware BSA, LLC, as a going concern, which it never was. As discussed at length earlier, Debtors have failed to maximize property available to satisfy Survivors, as Debtors entered

42

**ALW070**

into low policy buyback agreements with insurers and low settlements with local councils, and seek to release and enjoin Survivors' claims against nondebtors without Survivors' consent. This factor supports a finding of lack of good faith.

The second factor requires that the plan be proposed with honesty and good intentions, and that it have a "'reasonable hope of success.'" In re W.R. Grace, 475 B.R. at 88 (quoting In re Sun Country Dev., Inc., 764 F. 2d 406, 408 (5th Cir. 1985)). In determining whether a plan was proposed for honest and good reasons, courts routinely look to whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists. Id. In the case, Debtors have willfully abused the judicial process by violating the automatic stay protecting the bankruptcy estate of debtor Archbishop of Agana. Despite their awareness of the Guam bankruptcy case and that the Archbishop's interest in BSA insurance policies are part of the Archbishop's bankruptcy estate, Debtors persisted in preparing multiple plans (including the current Plan) which disposed of the Archbishop's interests in the policies. Further, Debtors filed the Plan just 10 days before the voting deadline, and failed to make further disclosures to Survivors of the material changes contained in the Plan. Debtors failed to disclose to Lujan Claimants that their rights to recover in the Guam bankruptcy case for scouting-related abuse were largely being extinguished by the Plan. Debtors' dishonesty and bad intentions demonstrate their bad faith in proposing the Plan.

As for the third factor, courts should consider if the debtor exhibited a fundamental fairness when dealing with its creditors. In re W.R. Grace, 475 B.R. at 89. This factor is satisfied when the plan treats all parties fairly and ensures that its confirmation comports with due process. Id. Debtors' Plan fails to treat all parties fairly, as it treats Lujan Claimants, who have and would lose under the Plan direct action rights to sue insurers, the same as other Survivors who lack such statutory rights, and fails to adequately compensate or protect Lujan Claimants for their interests in BSA insurance

43

**ALW071**

policies. Debtors have also exhibited a fundamental unfairness when dealing with creditors, particularly Survivors. Debtors "gamed the system" by creating Delaware BSA, LLC, in order to allow BSA to file for bankruptcy in the Third Circuit pursuant to 28 U.S.C. § 1408(2), and to avoid having to file for bankruptcy within the Fifth Circuit, which does not permit nonconsensual releases and permanent injunctions of third party claims against nondebtors, see In re Pac. Lumber Co., 584 F. 3d 229, 252 (5th Cir. 2009). In doing so, Debtors relentlessly seek to deprive Survivors of their direct claims against nondebtors, which would not be permitted by a bankruptcy court in the Fifth Circuit. As Debtors are doing everything they can to leave no liable-for-child-sexual-abuse nondebtor behind, they have been fundamentally unfair to Survivors who would have been able to continue pursuing direct claims against at least local councils and chartered organizations if this case had been rightfully filed in the Fifth Circuit. This factor supports a finding of bad faith by Debtors.

As Debtors proposed this Plan without good faith, the Plan must not be confirmed.

## G.     THE PLAN FAILS TO PROPERLY CLASSIFY THE CLAIMS OF LUJAN CLAIMANTS.

Pursuant to section 1122 of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Here, the Plan places prejudgment direct action Survivors, including Lujan Claimants, within the same class as Survivors who lack the statutory right to sue insurers without first obtaining a judgment and without having to name the insured. These direct action claimants are not substantially similar to other Survivors who have no interests in insurance policies, and therefore are not entitled to adequate protection or compensation from sales of insurance policies. In addition to having direct action rights, Lujan Survivors have an open civil statute of limitations to bring suit for child sexual abuse. They should be separately classified, as the Bankruptcy Code requires their different treatment.

44

**ALW072**

**H.     EVEN IF LUJAN CLAIMANTS' CLAIMS ARE PROPERLY CLASSIFIED, THE PLAN TREATS SURVIVORS UNEQUALLY COMPARED TO OTHER CLASSES OF UNSECURED CREDITORS.**

"The Code does not require that all creditor classes be treated equally, only that there be a reasonable basis for any differentiation." In re Purdue Pharma, 2021 WL 5979108, at *71 (citing Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship), 21 F. 3d 477, 482-83 (2d Cir. 1994)). Here, the unsecured creditor classes are not being treated equally under the Plan. Class 6 General Unsecured Creditors have an estimated percentage recovery of 75 to 95%. (Am. Disclosure Statement at 27.) Class 7 Non-Abuse Litigation Claims are estimated to recover 100% of the value of their claims. (Id. at 28.) Class 8 Direct Abuse Claims have an estimated percentage recovery of 10 to 21% if the claims' total value (including future, unknown claims) is $7.1 billion, and an estimated percentage recovery of 31 to 63% if the claims value totals $2.4 billion. (Id.) Only Class 9 Indirect Abuse Claims might fare worse than Survivors, as their estimated recovery percentage is "Unknown." (Id. at 30.) There is no reasonable basis to give significantly worse treatment to Survivors, compared to General Unsecured Creditors and Non-Abuse Litigation Claims. The horrors of child sexual abuse and its lingering effects cannot be overstated. There is no reason that Non-Abuse Litigation Claims should have first dibs on BSA insurance proceeds, and then, where there is a shortfall, be guaranteed a cash payment of the lesser of the remaining unsatisfied portion of the claim and $50,000. (Id. at 28-29.) The Plan puts Survivors of child sexual abuse at the back of the line without reasonable justification. The Plan should not be confirmed.

//

//

//

//

//

45

**ALW073**

## III. CONCLUSION

Based on the foregoing, the Plan must be denied confirmation for multiple failures to comply

with the Bankruptcy Code.

Dated: February 7, 2022.                      Respectfully submitted,

                                              /s/ Christopher D. Loizides
                                              Christopher D. Loizides (No. 3968)
                                              LOIZIDES, P.A.
                                              1225 North King Street, Suite 800
                                              Wilmington, DE 19801
                                              Phone: 302.654.0248
                                              Email: Loizides@loizides.com

                                              and

                                              LUJAN & WOLFF LLP

                                              /s/ Delia Lujan Wolff
                                              Delia Lujan Wolff
                                              Suite 300, DNA Bldg.
                                              238 Archbishop Flores St.
                                              Hagatna, Guam 96910
                                              Phone: (671) 477-8064/5
                                              Facsimile: (671) 477-5297
                                              Email: dslwolff@lawguam.com
                                              *Attorneys for Lujan Claimants*

46

**ALW074**

# APPENDIX A

The foregoing Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection Filed by Guam Committee was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Lujan & Wolff LLP. The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim, including amendments thereto.

| | | | | |
|---|---|---|---|---|
| 248 | 2991 | 6824 | 25063 | 79403 |
| 1551 | 3051 | 7976 | 25069 | 79769 |
| 1670 | 3120 | 7977 | 33028 | 80328 |
| 1677 | 3385 | 8037 | 35352 | 80655 |
| 1746 | 3610 | 8038 | 35354 | 80982 |
| 1757 | 3612 | 10548 | 38591 | 87715 |
| 1765 | 3614 | 11250 | 40889 | 87757 |
| 1913 | 3616 | 11251 | 40890 | 96418 |
| 1953 | 4855 | 14187 | 45700 | 96419 |
| 2003 | 4857 | 15104 | 45702 | 103377 |
| 2010 | 4859 | 15139 | 48168 | 103378 |
| 2011 | 5646 | 17480 | 58317 | 4858 |
| 2394 | 5646 | 18860 | 58370 | 4860 |
| 2403 | 5648 | 18873 | 67267 | |
| 2433 | 5655 | 22872 | 67286 | |
| 2597 | 6432 | 22873 | 67293 | |
| 2840 | 6434 | 22874 | 73585 | |
| 2885 | 6823 | 23388 | 73607 | |

47

ALW075

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 7832, 8683, 8708, 8710, 8813, 9023** |

### LUJAN CLAIMANTS' SUPPLEMENTAL OBJECTION TO THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, AND JOINDER IN OBJECTIONS OF UNITED STATES TRUSTEE AND GUAM COMMITTEE

COME NOW the Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")[1] and object to confirmation of Debtors Boy Scouts of America and Delaware BSA, LLC's (collectively "Debtors") Third Modified Fifth Amended Chapter 11 Plan of Reorganization. On September 30, 2021, Debtors filed the Solicitation Version of the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 6443), which was sent to creditors for vote. On December 18, 2021, during the voting period and just 10 days before the voting deadline, Debtors filed a Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 7832) ("Second Modified Plan"). On February 7, 2022, Lujan Claimants filed Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection Filed by Guam Committee (D.I. 8708) ("Lujan Claimants' Objection" or "Objection"). On February 15, 2022, Debtors filed a Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8813) ("the Plan"). Lujan Claimants hereby object to confirmation of the Plan and incorporate herein their previous

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

1

**ALW076**

Objection. Further, Lujan Claimants hereby join in the United States Trustee's Objection to Confirmation of the Second Modified Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8710) and the Supplemental Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agana (Bankr. D. Guam 19-00010) to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 9023).

## I. BACKGROUND

Debtors Boy Scouts of America ("BSA") and Delaware BSA, LLC ("Delaware BSA") filed for bankruptcy on February 18, 2020, in response to a deluge of child sexual abuse lawsuits initiated against BSA after the reopening of various state and territorial civil statutes of limitations, including in Guam. On the Petition Date, BSA faced 275 lawsuits, 70 of which were filed by Lujan Claimants. As a result of the bankruptcy filing, Lujan Claimants have been automatically stayed and enjoined from pursuing their claims against BSA and the Boy Scouts of America Aloha Council ("the Aloha Council") in the civil courts of Guam.

Lujan Claimants are 75 Survivors who were abused, molested and raped as children in Guam, during the period from 1955 to 1981. They deserve justice not only from BSA but also from other entities responsible for the loss of their innocence, like the Aloha Council, Archbishop of Agana, and insurers against whom Lujan Claimants have a statutory right of direct action.

For the past two years, Lujan Claimants have been patient. Some have died. While they have come forward in their lawsuits and the bankruptcy cases, many have continued to closely guard this terrible secret that they have held onto for decades. Broken, they are searching for healing and fair treatment. This latest Plan by Debtors will give them neither.

## II. ARGUMENT

Like the Second Modified Plan, Debtors' newly modified Plan must be denied confirmation

2

**ALW077**

for continued failure to meet the requirements of the Bankruptcy Code and other applicable law, including but not limited to the reasons that follow.  Lujan Claimants reserve their right to make additional arguments at the Confirmation Hearing.

**A.      THE PLAN TAKES AWAY LUJAN CLAIMANTS' RIGHTS TO RECOVER AGAINST DEBTOR ARCHBISHOP OF AGANA WITHOUT AUTHORITY AND WITHOUT ANY CONTRIBUTION.**

One of the most head-scratching features of the Plan is that it provides unwarranted and unrequested benefits to a chartered organization that opts out of Limited Protected Party status. Under the Plan, Archbishop of Agana, a debtor in its own pending chapter 11 bankruptcy case in Guam, will benefit from a post-1975 release (due to the Hartford and Century and Chubb settlements) of at least all scouting-related liability, even though it is a debtor that has not given written notice that it wishes to make the Participating Chartered Organization Insurance Assignment and even though it has filed an Objection to the Plan (D.I. 8687).  (Plan Art. V.G.1.e.)  This benefit will be given even though none of debtor Archbishop of Agana's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  (Plan Art. I.A.196.)

Essentially, the Plan tries to block Lujan Claimants who were first abused in 1976 or later from receiving compensation through the bankruptcy case of debtor Archbishop of Agana, where they have timely filed proofs of claim against the Archbishop for its own direct liability for child sexual abuse.  The Archbishop of Agana is not only an additional insured under BSA insurance policies, but it has its own assets worth at least tens of millions of dollars.  See, e.g., In re Archbishop of Agana, Bankr. Case No. 19-00010 (Second Amended Schedule A/B & Statement of Financial Affairs [D.I. 684]; Amended Schedule A/B, G, H, Statement of Financial Affairs [D.I. 148]; Ch. 11 Voluntary Petition [D.I. 1]) (D. Guam).  At this time, there are two competing plans of reorganization

**ALW078**

scheduled for a hearing on the disclosure statements. The Archbishop of Agana clearly has its own assets to pay for its own liability to Lujan Claimants and appears willing and able to do so.

As argued in the earlier Objection, there is no jurisdiction or statutory authority to release Lujan Claimants' claims against the Archbishop of Agana. Even if there were, the release and channeling injunction are not justified as no contribution whatsoever is being made to Lujan Claimants through Debtors' bankruptcy case herein. Assuming a substantial contribution is made, Lujan Claimants, as the vast majority of affected creditors[2], have overwhelmingly voted to reject the Plan and therefore the release of the Archbishop from liability. Without authority, contribution, or overwhelming support of the affected creditors, the Plan cannot be confirmed if it would release debtor Archbishop of Agana of liability and enjoin Lujan Claimants from pursuing payment including through the Archbishop's own bankruptcy case.

Additionally, the District Court of Guam has exclusive jurisdiction to determine whether to permit Lujan Claimants to recover against debtor Archbishop of Agana. "Among the granted powers [to bankruptcy courts] are the allowance and disallowance of claims; the collection and distribution of the estates of the bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the [Bankruptcy Act]. In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts." Pepper v. Litton, 60 S. Ct. 238, 244 (1939) (citing United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 217 (1912)). However, "'[i]n other matters arising in or related to title 11 cases, unless the Code provides otherwise, state courts have concurrent jurisdiction ....'" In re Mystic Tank Lines Corp.,

---

[2] Out of approximately 76 Survivors who have identified the Archbishop of Agana as the chartered organization in their proofs of claim, about 73 of them are Lujan Claimants. (See Local Council/Chartered Organization Final Voting Report Date posted on Omni Agent website (Feb. 21, 2022).)

**ALW079**

544 F. 3d 524, 529 (3d Cir. 2008) (quoting <u>Sanders v. City of Brady (In re Brady Mun. Gas Corp.)</u>, 936 F. 2d 212, 218 (5th Cir. 1991)).

As the Archbishop of Agana filed for bankruptcy in the District Court of Guam, that federal court has exclusive jurisdiction over the allowance and disallowance of Survivors' claims against the Archbishop of Agana. The District Court of Guam also has exclusive jurisdiction over the collection and distribution of debtor Archbishop of Agana's estate and the determination of controversies in relation thereto.

Here, Debtors' Plan, if confirmed, wrests from the District Court of Guam control over Lujan Claimants' scouting-related abuse claims against debtor Archbishop of Agana, releases such claims (at least for post-1975 abuse), and channels them to the Settlement Trust. This is all despite the District Court of Guam having exclusive jurisdiction over allowance and disallowance of Lujan Claimants' scouting-related abuse claims against the Archbishop filed in that Court, the collection and distribution of the Archbishop's estate, and the determination of controversies related thereto. Despite the overreaching release and channeling injunction provisions of the Plan, there is no concurrent jurisdiction here, as the Court is not a state court. Debtors have cited no authority that allows this Court to effectively disallow Lujan Claimants' scouting-related abuse claims against debtor Archbishop of Agana. No plan should be confirmed which prevents Survivors from recovering against a debtor chartered organization in its own bankruptcy case, especially when the debtor chartered organization filed for bankruptcy more than one year before Debtors filed for bankruptcy herein. To confirm such a plan would also lead to an inequitable outcome since Lujan Claimants would be denied recovery from the Archbishop not because a state court with concurrent jurisdiction ruled against Lujan Claimants on the merits of their abuse claims against the Archbishop but simply because Debtors wish to proceed with low-dollar insurance policy buybacks free and clear of the Archbishop's interests as an additional insured. This does not provide a sufficient basis for

5

ALW080

encroachment upon the District Court of Guam's exclusive jurisdiction over Lujan Claimants' filed claims against debtor Archbishop of Agana.  The Plan must be denied confirmation.

**B.    THE RECENTLY RELEASED BREAKDOWN OF THE SURVIVOR VOTE SHOWS THE TRUE EXTENT THAT DEBTORS LOST THE VOTE TO PERMIT RELEASES OF LOCAL COUNCILS, CHARTERED ORGANIZATIONS, AND OTHER ENTITIES.**

On February 21, 2022, Debtors released for the first time the breakdown of the Survivor vote showing the vote of each voting Survivor and the local councils, chartered organizations, and other entities against whom Survivors are asserting claims.  (See Local Council/Chartered Organization Final Voting Report Date posted on Omni Agent website (Feb. 21, 2022).)  Further, Debtors have committed to file herein by February 25, 2022, a summary of the breakdown by local council and chartered organization.  Debtors have also committed to filing an updated breakdown and summary based on the results of the limited extended voting deadline.

The breakdown shows that well over 93% of voting Survivors who have claims against the Archbishop of Agana voted to Reject the Plan; at least 70, or more than 95%, of the Reject votes were made by Lujan Claimants.  The chart reveals also that 197 Survivors asserted claims against the Aloha Council and of that 197, 118 voted to Reject, 63 voted to Accept, 9 Abstained, and 7 ballots were Invalid.  Thus, of the voting Survivors with claims against the Aloha Council, 65.2% voted to Reject the Plan (118/181) and 34.8% voted to Accept the Plan (63/181).  Out of the 118 Survivors who voted to Reject the Plan, 72 are Lujan Claimants and, thus, Lujan Claimants constitute 40 out of the 65.2% Reject vote.  Thus, affected creditors voted compellingly to Reject the release of claims against the Archbishop of Agana and the Aloha Council.

Although the breakdown data will undoubtedly change, given the limited extended voting deadline to vote on the newly modified Plan, the breakdown will reveal the true extent of affected creditor support and non-support for nondebtor releases.  The breakdown will reveal whether Survivors affected by the release of particular local councils, chartered organizations, and other

6

**ALW081**

entities voted to Accept the Plan in an overwhelming show of support for the Plan, *i.e.,* over 90% of impacted creditors who voted, voted to approve the Plan.  Lacking overwhelming support of affected creditors to approve the Plan's release of each local council, chartered organization, and other entity, the Plan should not be confirmed to release such nondebtors of child sexual abuse liability.

## C.   THE INDEPENDENT REVIEW OPTION IMPERMISSIBLY GRANTS DIRECT ACTION RIGHTS AND PRIORITY RIGHTS TO INSURANCE PROCEEDS.

The newly modified Plan provides a new mechanism for payment of an allowed direct abuse claim, called the Independent Review Option.  (Plan Ex. A Art. XIII.)  This Option is available to Survivors who pay the Settlement Trust at least $10,000 for review of their claim.  Survivors who opt for this process may receive awards of more than 5 times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix.  If a claim is valued at over $1 million, the first $1 million will be paid from the General Trust and amounts over $1 million will generally be paid from the Excess Award Fund, which is funded by proceeds of non-settling excess insurance and certain chartered organizations' separate insurance policies.  Survivors entitled to Excess Award Shares will receive 100% of the amounts awarded that are applicable to the expenses incurred by the Survivor in pursuing this Option or that are awarded for any bad faith claim, 100% of the amounts awarded from any policy of a Responsible Insurer that does not have applicable aggregate limits, and/or up to 80% of amounts collected in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits.  The Excess Award Fund shall be used to pay the Excess Award Shares and, once the Excess Award Shares are paid in full, the remaining funds in the Excess Award Fund shall become General Trust funds available to pay all allowed Survivor claims.  Further, if a Neutral's Settlement Recommendation determines that a chartered organization not protected by the Channeling Injunction is responsible for all or a portion of liability for Direct Abuse Claim assigned to the Settlement Trust, the Survivor may then bring an action in any court of competent

ALW082

jurisdiction against the chartered organization and its insurers to recover the allocated portion of liability and any additional damages.

In a nutshell, the Independent Review Option provides Survivors whose claims are valued at over $1 million a priority right to at least proceeds of non-settling excess insurance and certain chartered organizations' separate insurance policies. And the Option provides Survivors a right of direct action against insurers of chartered organizations. Yet, the Plan does not require that Survivors who choose to undergo the Independent Review Option have direct action rights against insurers or even that they have claims which implicate non-settling excess insurance or certain chartered organizations' separate insurance policies.

At the same time, the Plan continues to release Lujan Claimants' direct action claims against insurers (of Debtors, local councils, chartered organizations) without their consent; the Plan continues to channel Lujan Claimants' direct action claims to the Settlement Trust; the Plan continues to enjoin Lujan Claimants from directly suing insurers; and the Plan continues to sell insurance policies free and clear of Lujan Claimants' interests without providing them adequate protection and compensation.

As argued in Lujan Claimants' earlier filed Objection, Lujan Claimants, as Survivors with prejudgment direct action rights under Guam law, 22 GCA § 18305, have an interest in BSA's (and other tortfeasors') insurance policies. Prejudgment direct action claimants, like Lujan Claimants, are third party beneficiaries to insurance policies, Litton v. Ford Motor Co., 554 So. 2d 99, 103 (La. Ct. App. 1989), with rights in the policies that vest "at the time of the tort," Hayes v. New Orleans Archdiocesan Cemeteries, 805 So. 2d 320, 323 (La. Ct. App. 2001). An accrued cause of action, such as for negligence, is a vested property interest entitled to due process protection that accrues on the date of the plaintiff's injury. Matthies v. Positive Safety Mfg. Co., No. 99-0431, 2000 WL 892825, at *3 (Wis. Ct. App. July 5, 2000) (citing Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau,

8

ALW083

97 Wis. 2d 435, 442, 445 (1980), and Martin v. Richards, 192 Wis. 2d 156, 206 (Wis. 1995)). The debtor must provide adequate protection to a creditor who has an interest in the debtor's property. In re Lee, 25 B.R. 135, 139 (Bankr. E.D. Pa. 1982).

However, absent policy language or a statutory provision to the contrary, a tort claimant generally possesses no interest in a tortfeasor's insurance policy and so may not sue the insurer directly to recover under the policies. See 1 ROWLAND H. LONG, THE LAW OF LIABILITY INSURANCE § 1.06[3][a], at 1-34.2 (2007) ("The modern rule is that, in the absence of a contractual or statutory provision allowing a direct action, the claimant has no right to a direct action."); 46A C.J.S. Insurance § 1942 (2007) ("As a general rule, in the absence of policy or statutory provisions to the contrary, one who suffers an injury which comes within the provisions of a liability insurance policy is not in privity of contract with the insurance company, and cannot reach the proceeds of the policy for the payment of his or her claim by an action directly against the insurance company."); 22 ERIC MILLS HOMES, HOLMES' APPLEMAN ON INSURANCE 2d § 142.1[B][1], at 480 (2003) (stating that, where there is no direct action statute, the claimant is not a third party beneficiary under the insurance policy). Thus, to the extent that Survivors who choose the Independent Review Option are not prejudgment direct action claimants, they lack the right to directly sue insurers for compensation and they lack an interest in the insurance policies that would require their adequate protection or compensation including through receiving a priority right to insurance proceeds. As the Independent Review Option improperly grants these rights, the Plan is not confirmable with this Option.

Although the Independent Review Option wrongly grants direct action and priority rights in contravention of the law, this Option proves that granting particular Survivors a priority right to insurance proceeds and continued right of direct action against insurers is not offensive to a plan of reorganization of Debtors. Lujan Claimants have previously argued that they should retain their direct action rights against insurers, maintain their interests in the insurance policies, or be adequately

ALW084

protected and compensated for sales of insurance policies by having at least a priority right to insurance proceeds. As Debtors admit that this can be done for particular Survivors, Lujan Claimants and other prejudgment direct action Survivors should be granted this relief, and without having to pay $10,000 or $20,000 or any other amount.

**D.    THE INSURANCE SETTLEMENT AGREEMENTS SHOULD BE DENIED APPROVAL.**

The Plan now reveals the written settlement agreements with insurers and that they involve sales free and clear of interests in the policies and proceeds of the policies. However, these agreements must be denied approval for reasons including but not limited to the following.

> **1.  The Proceeds of Liability Insurance Policies Are Not Property of the Bankruptcy Estate and Cannot Be Released or Enjoined.**

The bankruptcy estate only includes property to which the debtor would have had a right if the debtor were solvent. First Fidelity Bank v. McAteer, 985 F. 2d 114, 116 (3d Cir. 1993) (citing In re La. World Exposition, Inc., 832 F. 2d 1391, 1401 (5th Cir. 1987)). Insurance policies are considered part of the property of a bankruptcy estate. ACandS, Inc. v. Travelers Casualty & Surety Co., 435 F. 3d 252, 260 (3d Cir. 2006) (citing Estate of Lellock v. The Prudential Ins. Co. of Am., 811 F. 2d 186, 189 (3d Cir. 1987)). The debtor's right to its insurance proceeds is property of the estate, except where the debtor does not own the insurance proceeds but just owns the policy. In re Nutraquest, Inc., 434 F. 3d 639, 647 n.4 (3d Cir. 2006). For example, when the debtor corporation's liability policy insured only the corporation's directors and officers (and would only pay them), the liability proceeds were not property of the bankruptcy estate. Id. (citing In re La. World Exposition, 832 F. 2d at 1399-401). "The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim." Houston v. Edgeworth (In re Edgeworth), 993 F. 2d 51, 55-56 (5th Cir. 1993). The debtor has no cognizable claim to liability insurance proceeds paid by an insurer

10

**ALW085**

on account of a covered claim.  Landry v. Exxon Pipeline Co., 260 B.R. 769, 786 (Bankr. M.D. La. 2001).

Here, while the bankruptcy estate includes BSA's interest in BSA insurance policies, the bankruptcy estate does not include the proceeds of BSA liability insurance policies since those proceeds are payable not to BSA but to injured persons, including Survivors of child sexual abuse. Not being part of the bankruptcy estate, the disposition of the liability insurance proceeds cannot be allowed free and clear of Lujan Claimants' interests under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code.  Instead, Lujan Claimants' interests in the insurance proceeds and direct action rights against insurers cannot be released pursuant to 11 U.S.C. § 524(e).

Even if third party releases are permitted here, the release of Lujan Claimants' claims against insurers to recover payment of proceeds must satisfy the requirements for third party releases: fairness, necessity to the reorganization, specific factual findings to support these conclusions, and reasonable consideration given in exchange for the release and permanent injunction.  In re Continental Airlines, 203 F. 3d 203, 214-15 (3d Cir. 2000).  As argued in Lujan Claimants' previous Objection, neither these factors nor the Master Mortgage factors are satisfied to allow release of claims against insurers.  These releases are certainly not necessary to Debtors' successful reorganization since Debtors admit that they can successfully reorganize under a BSA Toggle Plan which includes no insurance policy buybacks or insurer releases.  They certainly are not necessary as Debtors have proposed other plans which do not include a Century and Chubb settlement agreement or even a Hartford settlement agreement.  There is simply no need for Debtors to sell their policies back to insurers, especially for insultingly low dollars.  The releases should be denied.

//

//

//

11

**ALW086**

2. **The Hartford and Century and Chubb Companies Insurance Settlements for Insurance Policy Buybacks Free and Clear of Others' Interests in the Policies Are for Payment Grossly Below Policy Limits and Should Be Denied.**

The Bankruptcy Code's protection of the debtor from liability does not affect the liability of the debtor's insurers. First Fidelity Bank, 985 F. 2d at 114. Courts, relying on 11 U.S.C. § 524(e), have permitted claimants to proceed with tort claims against the debtor for the purpose of collecting from the debtor's liability insurer. Id. (citing Green v. Welsh, 956 F. 2d 30 (2d Cir. 1992); In re Jet Fla. Sys., Inc., 883 F. 2d 970 (11th Cir. 1989)). Thus, the creditor remains free to recover the full amount of the original obligation from any nondebtor party including an insurer. Id.

The general rule is that, when an insurer pays proceeds of the insurance to the person who is the proper recipient under the policy, such payment is a discharge of the liability of the insurer where the entire amount due is paid. 46A C.J.S. Insurance § 1986 (2007). Where only a partial payment of the proceeds is made to the person designated by the policy, the insurer is discharged from liability to the extent of the amount paid. Id.

It cannot be disputed by Debtors that neither settlement involves payment up to the limits of these mostly nonaggregate policies, which include yearly primary insurance policies with $500,000 per occurrence limits and yearly excess insurance of up to $2 million per occurrence. Without full payment, Survivors are free to recover the remaining payment owed under the policies from the insurers. Since the insurance settlement agreements seek the total release of Hartford and Century of all liability under the policies without payment of the entire amount due, they must be denied approval.

3. **The Sale and Settlement of Nondebtors' Separate Insurance Policies Must Be Denied.**

A bankruptcy court lacks authority to dispose of property of a nondebtor. In re Aegean Marine Petroleum Network, Inc., 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019). Despite this, both the Hartford and Century settlements attempt to release the insurers of their obligation to provide

12

**ALW087**

coverage to local councils and chartered organizations under their own separate non-BSA insurance policies and the 1976 and 1977 Hartford insurance policies which were released by BSA. The releases are a shocking overreach supported by no provisions of the Bankruptcy Code or other law. Like liability insurance proceeds, non-BSA insurance policies and released BSA insurance policies are not property of the bankruptcy estate and therefore may not be disposed of free and clear under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code.

The sale and settlement of chartered organizations' separate Hartford insurance policies are additionally problematic for the reason that, under the previous Plan, the Hartford settlement agreement did not include release of Hartford Protected Parties from liability, loss, or expense with respect to any Claim by any Chartered Organization arising out of or relating to coverage for Abuse Claims under any Hartford Policy or policy issued by any Hartford Protected Party. (See Notice of Filing of Exs. I-1 & J-1 [D.I. 8816] Ex. A at VI.D.) Further, the earlier Hartford settlement agreement did not include release of Direct Action Claims, such as Lujan Claimants' direct action claims. (Id. Ex. A at I.A.72.) Although Hartford is receiving additional consideration, it continues to pay the same, unchanged purchase price of $787 million, thus demonstrating the unfairness and unsound business judgment of Debtors in entering the deal. The sales of these non-BSA policies must not be permitted.

E.  **DEBTORS' BAD FAITH IN PROPOSING THE PLAN IS NOT NEGATED BY THEIR 11TH HOUR RESCUE OF DELAWARE BSA FROM DISSOLUTION.**

Only eight (8) calendar days after Lujan Claimants' objection to the Plan based on lack of good faith, Debtors filed a Plan that breathes new life into debtor Delaware BSA. However, this new revival of Delaware BSA does not fix the problem. While it will now continue in existence past the Effective Date, Delaware BSA is still not a going concern as it has had no revenues or full-time employees, (Delaware BSA's Monthly Operating Report [D.I. 8694]), and its sole asset is a single bank account at JP Morgan that had only $9,690.60, as reflected in the Schedules, (Schedules of

13

**ALW088**

Assets & Liabilities for Delaware BSA, LLC [D.I. 377]).  Incorporated just 7 months before Debtors filed for bankruptcy, Delaware BSA was unmistakably born for no discernible business purpose, as Debtors planned its dissolution over and over again.[3]  The abrupt change in course to continue its existence does not moot Lujan Claimants' objection to the Plan for lack of good faith.  It does not change the reality that Delaware BSA was formed to provide venue outside of the Fifth Circuit and it does not do anything as a business.

## III. CONCLUSION

Based on the foregoing, the Plan must be denied confirmation for multiple failures to comply with the Bankruptcy Code and other applicable law.

Dated: February 25, 2022.                    Respectfully submitted,

                                             /s/ Christopher D. Loizides
                                             Christopher D. Loizides (No. 3968)
                                             Loizides, PA
                                             1225 North King Street, Suite 800
                                             Wilmington, DE 19801
                                             Phone: 302.654.0248
                                             Email: Loizides@loizides.com

                                             and

                                             LUJAN & WOLFF LLP

                                             /s/ Delia Lujan Wolff
                                             Delia Lujan Wolff
                                             Suite 300, DNA Bldg.
                                             238 Archbishop Flores St.
                                             Hagatna, Guam 96910
                                             Phone: (671) 477-8064/5
                                             Facsimile: (671) 477-5297
                                             Email: dslwolff@lawguam.com
                                             *Attorneys for Lujan Claimants*

---

[3] (See Amended Ch. 11 Plan of Reorganization [D.I. 2293] Art. V.F. (Dissolution of Delaware BSA); Second Amended Ch. 11 Plan of Reorganization [D.I. 2592] Art. V.F. (Dissolution of Delaware BSA); Third Amended Ch. 11 Plan of Reorganization [D.I. 5368] Art. V.F. (Dissolution of Delaware BSA); Fourth Amended Ch. 11 Plan of Reorganization [D.I. 5484] Art. V.F. (Dissolution of Delaware BSA); Fifth Amended Ch. 11 Plan of Reorganization [D.I. 6212] Art. V.F. (Dissolution of Delaware BSA); Modified Fifth Amended Ch. 11 Plan of Reorganization (Solicitation Version) [D.I. 6443] Art. V.F. (Dissolution of Delaware BSA); Second Modified Fifth Amended Ch. 11 Plan of Reorganization [D.I. 7832] Art. V.F. (Dissolution of Delaware BSA).)

**ALW089**

# APPENDIX A

The foregoing Lujan Claimants' Supplemental Objection to Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objections of United States Trustee and Guam Committee was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Lujan & Wolff LLP.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim, including amendments thereto.

| | | | | |
|---|---|---|---|---|
| 248 | 2991 | 6824 | 25063 | 79403 |
| 1551 | 3051 | 7976 | 25069 | 79769 |
| 1670 | 3120 | 7977 | 33028 | 80328 |
| 1677 | 3385 | 8037 | 35352 | 80655 |
| 1746 | 3610 | 8038 | 35354 | 80982 |
| 1757 | 3612 | 10548 | 38591 | 87715 |
| 1765 | 3614 | 11250 | 40889 | 87757 |
| 1913 | 3616 | 11251 | 40890 | 96418 |
| 1953 | 4855 | 14187 | 45700 | 96419 |
| 2003 | 4857 | 15104 | 45702 | 103377 |
| 2010 | 4859 | 15139 | 48168 | 103378 |
| 2011 | 5646 | 17480 | 58317 | 4858 |
| 2394 | 5646 | 18860 | 58370 | 4860 |
| 2403 | 5648 | 18873 | 67267 | |
| 2433 | 5655 | 22872 | 67286 | |
| 2597 | 6432 | 22873 | 67293 | |
| 2840 | 6434 | 22874 | 73585 | |
| 2885 | 6823 | 23388 | 73607 | |

15

ALW090

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| UNKNOWN/MISSING | 15,388 | 2,138 | 17,526 | 87.8% |
| ABRAHAM LINCOLN | 41 | 3 | 44 | 93.2% |
| ALABAMA-FLORIDA | 44 | 3 | 47 | 93.6% |
| ALAMO AREA | 183 | 27 | 210 | 87.1% |
| ALLEGHENY HIGHLANDS | 41 | 9 | 50 | 82.0% |
| ALOHA | 78 | 71 | 149 | 52.3% |
| ANDREW JACKSON | 132 | 14 | 146 | 90.4% |
| ANTHONY WAYNE AREA | 57 | 14 | 71 | 80.3% |
| ARBUCKLE AREA | 21 | 2 | 23 | 91.3% |
| ATLANTA AREA | 295 | 41 | 336 | 87.8% |
| BADEN POWELL | 70 | 15 | 85 | 82.4% |
| BALTIMORE AREA | 313 | 47 | 360 | 86.9% |
| BAY AREA | 70 | 4 | 74 | 94.6% |
| BAY-LAKES | 116 | 15 | 131 | 88.6% |
| BLACK HILLS AREA | 27 | 1 | 28 | 96.4% |
| BLACK SWAMP AREA | 54 | 9 | 63 | 85.7% |
| BLACK WARRIOR | 38 | 6 | 44 | 86.4% |
| BLACKHAWK AREA | 107 | 14 | 121 | 88.4% |
| BLUE GRASS | 120 | 26 | 146 | 82.2% |
| BLUE MOUNTAIN | 45 | 6 | 51 | 88.2% |
| BLUE RIDGE | 92 | 17 | 109 | 84.4% |
| BLUE RIDGE MOUNTAINS | 74 | 6 | 80 | 92.5% |
| BUCKEYE | 119 | 22 | 141 | 84.4% |
| BUCKSKIN | 184 | 23 | 207 | 88.9% |
| BUCKTAIL | 14 | 3 | 17 | 82.4% |
| BUFFALO TRACE | 62 | 9 | 71 | 87.3% |
| BUFFALO TRAIL | 64 | 8 | 72 | 88.9% |
| CADDO AREA | 36 | 11 | 47 | 76.6% |
| CALCASIEU | 54 | 6 | 60 | 90.0% |
| CALIFORNIA INLAND EMPIRE | 295 | 50 | 345 | 85.5% |
| CAPE COD & ISLANDS | 27 | 6 | 33 | 81.8% |
| CAPE FEAR | 62 | 9 | 71 | 87.3% |
| CAPITOL AREA | 87 | 14 | 101 | 86.1% |
| CASCADE PACIFIC | 358 | 85 | 443 | 80.8% |
| CATALINA | 142 | 23 | 165 | 86.1% |
| CENTRAL ESCARPMENT | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA | 221 | 33 | 254 | 87.0% |
| CENTRAL GEORGIA | 61 | 9 | 70 | 87.1% |
| CENTRAL MINNESOTA | 21 | 2 | 23 | 91.3% |
| CENTRAL NEW JERSEY | 19 | 7 | 26 | 73.1% |
| CENTRAL NORTH CAROLINA | 46 | 12 | 58 | 79.3% |
| CHATTAHOOCHEE | 74 | 12 | 86 | 86.0% |
| CHEROKEE AREA 469 | 19 | 1 | 20 | 95.0% |
| CHEROKEE AREA 556 | 68 | 8 | 76 | 89.5% |
| CHESTER COUNTY | 35 | 5 | 40 | 87.5% |
| CHICKASAW | 227 | 29 | 256 | 88.7% |
| CHIEF CORNPLANTER | 4 | 1 | 5 | 80.0% |
| CHIEF SEATTLE | 205 | 50 | 255 | 80.4% |
| CHIPPEWA VALLEY | 36 | 10 | 46 | 78.3% |
| CHOCTAW AREA | 26 | 3 | 29 | 89.7% |
| CIMARRON | 35 | 3 | 38 | 92.1% |
| CIRCLE TEN | 362 | 52 | 414 | 87.4% |
| COASTAL CAROLINA | 105 | 15 | 120 | 87.5% |
| COASTAL GEORGIA | 79 | 9 | 88 | 89.8% |
| COLONIAL VIRGINIA | 63 | 16 | 79 | 79.7% |
| COLUMBIA-MONTOUR | 6 | | 6 | 100.0% |
| CONNECTICUT RIVERS | 203 | 40 | 243 | 83.5% |
| CONNECTICUT YANKEE | 156 | 38 | 194 | 80.4% |
| CONQUISTADOR | 31 | 7 | 38 | 81.6% |
| CORNHUSKER | 36 | 4 | 40 | 90.0% |
| CORONADO AREA | 47 | 2 | 49 | 95.9% |
| CRADLE OF LIBERTY | 384 | 54 | 438 | 87.7% |
| CRATER LAKE COUNCIL | 81 | 12 | 93 | 87.1% |
| CROSSROADS OF AMERICA | 279 | 53 | 332 | 84.0% |
| CROSSROADS OF THE WEST | 432 | 63 | 495 | 87.3% |
| DAN BEARD | 241 | 32 | 273 | 88.3% |
| DANIEL BOONE | 49 | 2 | 51 | 96.1% |
| DANIEL WEBSTER | 125 | 21 | 146 | 85.6% |
| DE SOTO AREA | 19 | 3 | 22 | 86.4% |

ALW091

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| DEL-MAR-VA | 81 | 20 | 101 | 80.2% |
| DENVER AREA | 235 | 42 | 277 | 84.8% |
| DIRECT SERVICE | 7 | 4 | 11 | 63.6% |
| EAST CAROLINA | 115 | 16 | 131 | 87.8% |
| EAST TEXAS AREA | 78 | 17 | 95 | 82.1% |
| ERIE SHORES | 111 | 16 | 127 | 87.4% |
| EVANGELINE AREA | 52 | 9 | 61 | 85.2% |
| FAR EAST | 35 | 8 | 43 | 81.4% |
| FIVE RIVERS | 51 | 10 | 61 | 83.6% |
| FLINT RIVER | 46 | 4 | 50 | 92.0% |
| FRENCH CREEK | 74 | 12 | 86 | 86.0% |
| GAMEHAVEN | 38 | 12 | 50 | 76.0% |
| GARDEN STATE | 168 | 24 | 192 | 87.5% |
| GATEWAY AREA | 22 | 5 | 27 | 81.5% |
| GEORGIA-CAROLINA | 53 | 9 | 62 | 85.5% |
| GLACIER'S EDGE | 75 | 10 | 85 | 88.2% |
| GOLDEN EMPIRE | 298 | 40 | 338 | 88.2% |
| GOLDEN GATE AREA | 467 | 79 | 546 | 85.5% |
| GOLDEN SPREAD | 86 | 17 | 103 | 83.5% |
| GRAND CANYON | 346 | 57 | 403 | 85.9% |
| GRAND COLUMBIA | 55 | 18 | 73 | 75.3% |
| GRAND TETON | 58 | 8 | 66 | 87.9% |
| GREAT ALASKA | 61 | 10 | 71 | 85.9% |
| GREAT RIVERS | 41 | 15 | 56 | 73.2% |
| GREAT SMOKY MOUNTAIN | 111 | 10 | 121 | 91.7% |
| GREAT SOUTHWEST | 170 | 28 | 198 | 85.9% |
| GREAT TRAIL | 163 | 29 | 192 | 84.9% |
| GREATER ALABAMA | 284 | 34 | 318 | 89.3% |
| GREATER LOS ANGELES | 788 | 158 | 946 | 83.3% |
| GREATER NEW YORK | 1,034 | 201 | 1,235 | 83.7% |
| GREATER NIAGARA FRONTIER | 144 | 56 | 200 | 72.0% |
| GREATER ST. LOUIS AREA | 605 | 76 | 681 | 88.8% |
| GREATER TAMPA BAY AREA | 306 | 56 | 362 | 84.5% |
| GREATER TORONTO | 1 | | 1 | 100.0% |
| GREATER WYOMING | 22 | 1 | 23 | 95.7% |
| GREATER YOSEMITE | 134 | 23 | 157 | 85.4% |
| GREEN MOUNTAIN | 62 | 18 | 80 | 77.5% |
| GREENWICH | 3 | | 3 | 100.0% |
| GULF COAST | 135 | 16 | 151 | 89.4% |
| GULF STREAM | 114 | 24 | 138 | 82.6% |
| HAWK MOUNTAIN | 46 | 11 | 57 | 80.7% |
| HAWKEYE AREA | 37 | 9 | 46 | 80.4% |
| HEART OF AMERICA | 426 | 67 | 493 | 86.4% |
| HEART OF NEW ENGLAND | 119 | 25 | 144 | 82.6% |
| HEART OF VIRGINIA | 105 | 18 | 123 | 85.4% |
| HOOSIER TRAILS | 58 | 5 | 63 | 92.1% |
| HOUSATONIC | 6 | 1 | 7 | 85.7% |
| HUDSON VALLEY | 85 | 17 | 102 | 83.3% |
| ILLOWA | 72 | 14 | 86 | 83.7% |
| INDIAN NATIONS | 145 | 16 | 161 | 90.1% |
| INDIAN WATERS | 77 | 17 | 94 | 81.9% |
| INLAND NORTHWEST | 116 | 28 | 144 | 80.6% |
| IROQUOIS TRAIL | 23 | 10 | 33 | 69.7% |
| ISTROUMA AREA | 81 | 19 | 100 | 81.0% |
| JAYHAWK AREA | 31 | | 31 | 100.0% |
| JERSEY SHORE | 69 | 12 | 81 | 85.2% |
| JUNIATA VALLEY | 17 | 2 | 19 | 89.5% |
| KATAHDIN AREA | 32 | 8 | 40 | 80.0% |
| LAKE ERIE | 326 | 32 | 358 | 91.1% |
| LAS VEGAS AREA | 127 | 15 | 142 | 89.4% |
| LASALLE | 80 | 8 | 88 | 90.9% |
| LAST FRONTIER | 199 | 36 | 235 | 84.7% |
| LAUREL HIGHLANDS | 252 | 46 | 298 | 84.6% |
| LEATHERSTOCKING | 60 | 11 | 71 | 84.5% |
| LINCOLN HERITAGE | 255 | 48 | 303 | 84.2% |
| LONG BEACH AREA | 100 | 25 | 125 | 80.0% |
| LONGHORN | 274 | 47 | 321 | 85.4% |
| LONGHOUSE | 118 | 29 | 147 | 80.3% |
| LONGS PEAK COUNCIL | 87 | 13 | 100 | 87.0% |

**ALW092**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. #275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| LOS PADRES | 48 | 21 | 69 | 69.6% |
| LOUISIANA PURCHASE | 69 | 14 | 83 | 83.1% |
| MARIN | 29 | 2 | 31 | 93.5% |
| MASON-DIXON | 19 | 9 | 28 | 67.9% |
| MAYFLOWER | 146 | 38 | 184 | 79.3% |
| MECKLENBURG COUNTY | 64 | 8 | 72 | 88.9% |
| MIAMI VALLEY | 100 | 11 | 111 | 90.1% |
| MICHIGAN CROSSROADS | 1,130 | 149 | 1,279 | 88.4% |
| MID-AMERICA | 169 | 27 | 196 | 86.2% |
| MIDDLE TENNESSEE | 174 | 22 | 196 | 88.8% |
| MID-IOWA | 97 | 21 | 118 | 82.2% |
| MIDNIGHT SUN | 16 | 4 | 20 | 80.0% |
| MINSI TRAILS | 71 | 10 | 81 | 87.7% |
| MISSISSIPPI VALLEY | 24 | 5 | 29 | 82.8% |
| MOBILE AREA | 89 | 6 | 95 | 93.7% |
| MONMOUTH | 65 | 16 | 81 | 80.2% |
| MONTANA | 85 | 26 | 111 | 76.6% |
| MORAINE TRAILS | 32 | 9 | 41 | 78.0% |
| MOUNT BAKER | 89 | 17 | 106 | 84.0% |
| MOUNTAIN WEST | 89 | 33 | 122 | 73.0% |
| MOUNTAINEER AREA | 29 | 5 | 34 | 85.3% |
| MUSKINGUM VALLEY | 23 | 8 | 31 | 74.2% |
| NARRAGANSETT | 254 | 52 | 306 | 83.0% |
| NATIONAL CAPITAL AREA | 384 | 79 | 463 | 82.9% |
| NEVADA AREA | 84 | 8 | 92 | 91.3% |
| NEW BIRTH OF FREEDOM | 131 | 13 | 144 | 91.0% |
| NORTH FLORIDA | 205 | 26 | 231 | 88.7% |
| NORTHEAST GEORGIA | 72 | 16 | 88 | 81.8% |
| NORTHEAST ILLINOIS | 71 | 17 | 88 | 80.7% |
| NORTHEAST IOWA COUNCIL | 19 | 3 | 22 | 86.4% |
| NORTHEASTERN PENNSYLVANIA | 44 | 7 | 51 | 86.3% |
| NORTHERN LIGHTS | 72 | 17 | 89 | 80.9% |
| NORTHERN NEW JERSEY | 339 | 70 | 409 | 82.9% |
| NORTHERN STAR | 221 | 42 | 263 | 84.0% |
| NORTHWEST GEORGIA | 31 | 3 | 34 | 91.2% |
| NORTHWEST TEXAS | 52 | 7 | 59 | 88.1% |
| NORWELA | 69 | 7 | 76 | 90.8% |
| OCCONEECHEE | 133 | 21 | 154 | 86.4% |
| OHIO RIVER VALLEY | 36 | 4 | 40 | 90.0% |
| OLD HICKORY | 79 | 20 | 99 | 79.8% |
| OLD NORTH STATE | 111 | 21 | 132 | 84.1% |
| ORANGE COUNTY | 262 | 59 | 321 | 81.6% |
| OREGON TRAIL | 111 | 13 | 124 | 89.5% |
| OVERLAND TRAILS | 38 | 7 | 45 | 84.4% |
| OZARK TRAILS | 108 | 17 | 125 | 86.4% |
| PACIFIC HARBORS | 155 | 25 | 180 | 86.1% |
| PACIFIC SKYLINE | 74 | 12 | 86 | 86.0% |
| PALMETTO | 60 | 4 | 64 | 93.8% |
| PATHWAY TO ADVENTURE | 957 | 144 | 1,101 | 86.9% |
| PATRIOTS' PATH | 148 | 39 | 187 | 79.1% |
| PEE DEE AREA | 56 | 8 | 64 | 87.5% |
| PENNSYLVANIA DUTCH | 46 | 9 | 55 | 83.6% |
| PIEDMONT 042 | 5 | | 5 | 100.0% |
| PIEDMONT 420 | 96 | 10 | 106 | 90.6% |
| PIKES PEAK | 59 | 12 | 71 | 83.1% |
| PINE BURR AREA | 102 | 19 | 121 | 84.3% |
| PINE TREE | 128 | 19 | 147 | 87.1% |
| PONY EXPRESS | 34 | 7 | 41 | 82.9% |
| POTAWATOMI AREA | 20 | 3 | 23 | 87.0% |
| PRAIRIELANDS | 49 | 12 | 61 | 80.3% |
| PUERTO RICO | 49 | 10 | 59 | 83.1% |
| PUSHMATAHA AREA | 36 | 9 | 45 | 80.0% |
| QUAPAW AREA | 235 | 43 | 278 | 84.5% |
| QUIVIRA | 176 | 31 | 207 | 85.0% |
| RAINBOW | 63 | 6 | 69 | 91.3% |
| REDWOOD EMPIRE | 39 | 11 | 50 | 78.0% |
| RIO GRANDE | 61 | 10 | 71 | 85.9% |
| RIP VAN WINKLE | 17 | 4 | 21 | 81.0% |
| ROCKY MOUNTAIN | 51 | 12 | 63 | 81.0% |

ALW093

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council**[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| SAGAMORE | 71 | 10 | 81 | 87.7% |
| SAM HOUSTON AREA | 541 | 64 | 605 | 89.4% |
| SAMOSET COUNCIL | 20 | 7 | 27 | 74.1% |
| SAN DIEGO - IMPERIAL COUNCIL | 298 | 49 | 347 | 85.9% |
| SANTA FE TRAIL | 14 | 1 | 15 | 93.3% |
| SENECA WATERWAYS | 156 | 29 | 185 | 84.3% |
| SEQUOIA | 139 | 39 | 178 | 78.1% |
| SEQUOYAH | 40 | 13 | 53 | 75.5% |
| SHENANDOAH AREA | 17 | 3 | 20 | 85.0% |
| SILICON VALLEY MONTEREY BAY | 186 | 43 | 229 | 81.2% |
| SIMON KENTON | 231 | 40 | 271 | 85.2% |
| SIOUX | 31 | 5 | 36 | 86.1% |
| SOUTH FLORIDA COUNCIL | 355 | 61 | 416 | 85.3% |
| SOUTH GEORGIA | 51 | 5 | 56 | 91.1% |
| SOUTH PLAINS | 55 | 9 | 64 | 85.9% |
| SOUTH TEXAS | 83 | 10 | 93 | 89.2% |
| SOUTHEAST LOUISIANA | 217 | 41 | 258 | 84.1% |
| SOUTHERN SIERRA | 97 | 13 | 110 | 88.2% |
| SOUTHWEST FLORIDA | 75 | 18 | 93 | 80.6% |
| SPIRIT OF ADVENTURE | 430 | 121 | 551 | 78.0% |
| SUFFOLK COUNTY | 126 | 24 | 150 | 84.0% |
| SUSQUEHANNA | 28 | 4 | 32 | 87.5% |
| SUWANNEE RIVER AREA | 35 | 4 | 39 | 89.7% |
| TECUMSEH | 48 | 13 | 61 | 78.7% |
| TEXAS SOUTHWEST | 41 | 1 | 42 | 97.6% |
| TEXAS TRAILS | 48 | 6 | 54 | 88.9% |
| THEODORE ROOSEVELT | 133 | 27 | 160 | 83.1% |
| THREE FIRES | 105 | 23 | 128 | 82.0% |
| THREE HARBORS | 161 | 28 | 189 | 85.2% |
| THREE RIVERS | 85 | 15 | 100 | 85.0% |
| TIDEWATER | 145 | 25 | 170 | 85.3% |
| TRANSATLANTIC | 115 | 29 | 144 | 79.9% |
| TUKABATCHEE AREA | 84 | 9 | 93 | 90.3% |
| TUSCARORA | 27 | 3 | 30 | 90.0% |
| TWIN RIVERS | 153 | 23 | 176 | 86.9% |
| TWIN VALLEY | 29 | 7 | 36 | 80.6% |
| | | | | |
| VENTURA COUNTY | 56 | 16 | 72 | 77.8% |
| VERDUGO HILLS | 46 | 8 | 54 | 85.2% |
| VIRGINIA HEADWATERS | 27 | 4 | 31 | 87.1% |
| VOYAGEURS AREA | 24 | 8 | 32 | 75.0% |
| W.D. BOYCE | 93 | 17 | 110 | 84.5% |
| WASHINGTON CROSSING | 47 | 12 | 59 | 79.7% |
| WEST TENNESSEE AREA | 39 | 6 | 45 | 86.7% |
| WESTARK AREA | 72 | 10 | 82 | 87.8% |
| WESTCHESTER-PUTNAM | 117 | 51 | 168 | 69.6% |
| WESTERN LOS ANGELES COUNTY | 162 | 43 | 205 | 79.0% |
| WESTERN MASSACHUSETTS | 117 | 37 | 154 | 76.0% |
| WESTMORELAND-FAYETTE | 37 | 12 | 49 | 75.5% |
| WINNEBAGO | 43 | 10 | 53 | 81.1% |
| YOCONA AREA | 41 | 1 | 42 | 97.6% |
| YUCCA | 114 | 21 | 135 | 84.4% |
| ABRAHAM LINCOLN; BAY-LAKES; GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | | 1 | 100.0% |
| ABRAHAM LINCOLN; DAN BEARD | 1 | | 1 | 100.0% |
| ABRAHAM LINCOLN; GREATER ST. LOUIS AREA | 2 | | 2 | 100.0% |
| ABRAHAM LINCOLN; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| ABRAHAM LINCOLN; RAINBOW | 1 | | 1 | 100.0% |
| ABRAHAM LINCOLN; W.D. BOYCE | 1 | 1 | 2 | 50.0% |
| ALABAMA-FLORIDA; GREATER ALABAMA | 3 | | 3 | 100.0% |
| ALABAMA-FLORIDA; GULF COAST | 1 | | 1 | 100.0% |
| ALABAMA-FLORIDA; TRANSATLANTIC | 1 | | 1 | 100.0% |
| ALABAMA-FLORIDA; TUKABATCHEE AREA | 1 | | 1 | 100.0% |
| ALAMO AREA; BAY AREA; CIRCLE TEN; LONGHORN | 1 | | 1 | 100.0% |
| ALAMO AREA; CAPITOL AREA | 2 | 1 | 3 | 66.7% |
| ALAMO AREA; GREATER NEW YORK | 1 | | 1 | 100.0% |
| ALAMO AREA; RIO GRANDE | 1 | | 1 | 100.0% |
| ALAMO AREA; SAM HOUSTON AREA | 13 | | 13 | 100.0% |
| ALAMO AREA; SIMON KENTON | 1 | | 1 | 100.0% |

**ALW094**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council**[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| ALAMO AREA; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| ALAMO AREA; SOUTH TEXAS | 1 | | 1 | 100.0% |
| ALAMO AREA; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| ALAMO AREA; TEXAS SOUTHWEST | 2 | | 2 | 100.0% |
| ALLEGHENY HIGHLANDS; BALTIMORE AREA | 2 | | 2 | 100.0% |
| ALLEGHENY HIGHLANDS; BLACK SWAMP AREA | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; BUCKSKIN | 2 | | 2 | 100.0% |
| ALLEGHENY HIGHLANDS; BUCKTAIL | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; CHICKASAW | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; GREAT TRAIL | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; LAUREL HIGHLANDS | 1 | 1 | 2 | 50.0% |
| ALLEGHENY HIGHLANDS; LEATHERSTOCKING | 1 | | 1 | 100.0% |
| ALLEGHENY HIGHLANDS; SENECA WATERWAYS | 2 | 3 | 5 | 40.0% |
| ALOHA; CROSSROADS OF THE WEST | | 1 | 1 | 0.0% |
| ALOHA; DIRECT SERVICE | | 28 | 28 | 0.0% |
| ALOHA; FAR EAST | 1 | | 1 | 100.0% |
| ALOHA; GOLDEN GATE AREA | 1 | | 1 | 100.0% |
| ALOHA; MICHIGAN CROSSROADS; NORTHEAST ILLINOIS; THREE HARBORS | 1 | | 1 | 100.0% |
| ALOHA; WESTERN LOS ANGELES COUNTY | | 1 | 1 | 0.0% |
| ANDREW JACKSON; CHICKASAW | 2 | | 2 | 100.0% |
| ANDREW JACKSON; GREATER LOS ANGELES | 1 | | 1 | 100.0% |
| ANDREW JACKSON; ISTROUMA AREA | 1 | | 1 | 100.0% |
| ANDREW JACKSON; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| ANDREW JACKSON; PINE BURR AREA | 2 | 1 | 3 | 66.7% |
| ANDREW JACKSON; PUSHMATAHA AREA | 4 | | 4 | 100.0% |
| ANTHONY WAYNE AREA; CROSSROADS OF AMERICA | 1 | | 1 | 100.0% |
| ANTHONY WAYNE AREA; ERIE SHORES | 1 | | 1 | 100.0% |
| ANTHONY WAYNE AREA; LASALLE | 1 | | 1 | 100.0% |
| ANTHONY WAYNE AREA; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| ANTHONY WAYNE AREA; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| ANTHONY WAYNE AREA; SAGAMORE | 1 | | 1 | 100.0% |
| ARBUCKLE AREA; LAST FRONTIER | 2 | | 2 | 100.0% |
| ATLANTA AREA; BLUE GRASS | 1 | | 1 | 100.0% |
| ATLANTA AREA; CENTRAL GEORGIA | 2 | | 2 | 100.0% |
| ATLANTA AREA; CENTRAL GEORGIA; JERSEY SHORE; TRANSATLANTIC | 1 | | 1 | 100.0% |
| ATLANTA AREA; CHATTAHOOCHEE | 2 | 1 | 3 | 66.7% |
| ATLANTA AREA; COASTAL GEORGIA | 2 | 2 | 4 | 50.0% |
| ATLANTA AREA; DAN BEARD; GULF COAST; NORTH FLORIDA | | 1 | 1 | 0.0% |
| ATLANTA AREA; FLINT RIVER | 3 | 1 | 4 | 75.0% |
| ATLANTA AREA; GREAT SOUTHWEST | | 1 | 1 | 0.0% |
| ATLANTA AREA; GREAT TRAIL | | 1 | 1 | 0.0% |
| ATLANTA AREA; GREATER ALABAMA | 1 | | 1 | 100.0% |
| ATLANTA AREA; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| ATLANTA AREA; JERSEY SHORE | 2 | | 2 | 100.0% |
| ATLANTA AREA; LAKE ERIE | 1 | | 1 | 100.0% |
| ATLANTA AREA; NEVADA AREA | 1 | | 1 | 100.0% |
| ATLANTA AREA; NORTH FLORIDA | 1 | | 1 | 100.0% |
| ATLANTA AREA; NORTHEAST GEORGIA | 9 | 2 | 11 | 81.8% |
| ATLANTA AREA; NORTHWEST GEORGIA | 2 | | 2 | 100.0% |
| ATLANTA AREA; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| ATLANTA AREA; SOUTH GEORGIA | 1 | | 1 | 100.0% |
| ATLANTA AREA; SUWANNEE RIVER AREA | 1 | | 1 | 100.0% |
| ATLANTA AREA; TUKABATCHEE AREA | 1 | | 1 | 100.0% |
| BADEN POWELL; CRADLE OF LIBERTY | 2 | | 2 | 100.0% |
| BADEN POWELL; CRADLE OF LIBERTY; CROSSROADS OF AMERICA | | 1 | 1 | 0.0% |
| BADEN POWELL; DEL-MAR-VA | 1 | | 1 | 100.0% |
| BADEN POWELL; GREATER NEW YORK | 1 | | 1 | 100.0% |
| BADEN POWELL; GREATER NEW YORK; PATRIOTS' PATH | 1 | | 1 | 100.0% |
| BADEN POWELL; JUNIATA VALLEY | 1 | 1 | 2 | 50.0% |
| BADEN POWELL; LAST FRONTIER | | 1 | 1 | 0.0% |
| BADEN POWELL; LAUREL HIGHLANDS | 1 | | 1 | 100.0% |
| BADEN POWELL; LONGHOUSE; THREE FIRES | 1 | | 1 | 100.0% |
| BADEN POWELL; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| BADEN POWELL; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| BADEN POWELL; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| BADEN POWELL; SUSQUEHANNA | 2 | | 2 | 100.0% |
| BADEN POWELL; TUSCARORA | 3 | | 3 | 100.0% |
| BADEN POWELL; TWIN RIVERS | 1 | 1 | 2 | 50.0% |

**ALW095**

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council**[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| BALTIMORE AREA; CHESTER COUNTY | 1 | | 1 | 100.0% |
| BALTIMORE AREA; DEL-MAR-VA | 6 | 1 | 7 | 85.7% |
| BALTIMORE AREA; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| BALTIMORE AREA; LINCOLN HERITAGE | 1 | | 1 | 100.0% |
| BALTIMORE AREA; MASON-DIXON | 1 | | 1 | 100.0% |
| BALTIMORE AREA; NATIONAL CAPITAL AREA | 11 | 5 | 16 | 68.8% |
| BALTIMORE AREA; NATIONAL CAPITAL AREA; PATRIOTS' PATH | | 1 | 1 | 0.0% |
| BAY AREA; SAM HOUSTON AREA | 2 | 1 | 3 | 66.7% |
| BAY-LAKES; CASCADE PACIFIC | | 1 | 1 | 0.0% |
| BAY-LAKES; GATEWAY AREA; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| BAY-LAKES; GLACIER'S EDGE | 2 | | 2 | 100.0% |
| BAY-LAKES; MICHIGAN CROSSROADS | 6 | 2 | 8 | 75.0% |
| BAY-LAKES; NORTHEAST ILLINOIS | 1 | | 1 | 100.0% |
| BAY-LAKES; NORTHERN STAR | 1 | | 1 | 100.0% |
| BAY-LAKES; OREGON TRAIL | 1 | | 1 | 100.0% |
| BAY-LAKES; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| BAY-LAKES; PATHWAY TO ADVENTURE | 3 | 2 | 5 | 60.0% |
| BAY-LAKES; POTAWATOMI AREA | 1 | | 1 | 100.0% |
| BAY-LAKES; REDWOOD EMPIRE | 1 | | 1 | 100.0% |
| BAY-LAKES; SAMOSET COUNCIL | 1 | | 1 | 100.0% |
| BAY-LAKES; THREE FIRES | 1 | | 1 | 100.0% |
| BAY-LAKES; THREE HARBORS | 1 | | 1 | 100.0% |
| BAY-LAKES; TWIN RIVERS | 1 | | 1 | 100.0% |
| BLACK HILLS AREA; GREATER ALABAMA | 1 | | 1 | 100.0% |
| BLACK HILLS AREA; MONTANA | 1 | | 1 | 100.0% |
| BLACK HILLS AREA; SIOUX | 1 | | 1 | 100.0% |
| BLACK SWAMP AREA; BUCKEYE | 2 | | 2 | 100.0% |
| BLACK SWAMP AREA; ERIE SHORES | 2 | | 2 | 100.0% |
| BLACK SWAMP AREA; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| BLACK SWAMP AREA; SIMON KENTON | 2 | | 2 | 100.0% |
| BLACK SWAMP AREA; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| BLACK WARRIOR; GREATER ALABAMA | 5 | 1 | 6 | 83.3% |
| BLACK WARRIOR; TUKABATCHEE AREA | 1 | | 1 | 100.0% |
| BLACKHAWK AREA; BUCKEYE | 1 | | 1 | 100.0% |
| BLACKHAWK AREA; CONNECTICUT RIVERS; CONNECTICUT YANKEE | 1 | | 1 | 100.0% |
| BLACKHAWK AREA; CROSSROADS OF AMERICA | 1 | | 1 | 100.0% |
| BLACKHAWK AREA; NORTHEAST ILLINOIS | 1 | 1 | 2 | 50.0% |
| BLACKHAWK AREA; PATHWAY TO ADVENTURE | | 1 | 1 | 0.0% |
| BLACKHAWK AREA; RAINBOW | 3 | | 3 | 100.0% |
| BLACKHAWK AREA; THREE FIRES | 1 | | 1 | 100.0% |
| BLACKHAWK AREA; THREE RIVERS | 1 | | 1 | 100.0% |
| BLUE GRASS; DAN BEARD | 1 | | 1 | 100.0% |
| BLUE GRASS; LAUREL HIGHLANDS | 2 | | 2 | 100.0% |
| BLUE GRASS; LINCOLN HERITAGE | 4 | 1 | 5 | 80.0% |
| BLUE GRASS; SEQUOYAH | 3 | | 3 | 100.0% |
| BLUE GRASS; SIMON KENTON | 1 | 1 | 2 | 50.0% |
| BLUE MOUNTAIN; CASCADE PACIFIC | 2 | | 2 | 100.0% |
| BLUE MOUNTAIN; INLAND NORTHWEST | 1 | 1 | 2 | 50.0% |
| BLUE MOUNTAIN; PATRIOTS' PATH | | 1 | 1 | 0.0% |
| BLUE RIDGE MOUNTAINS; CROSSROADS OF AMERICA | 1 | | 1 | 100.0% |
| BLUE RIDGE MOUNTAINS; HEART OF VIRGINIA | 2 | | 2 | 100.0% |
| BLUE RIDGE MOUNTAINS; SHENANDOAH AREA | 1 | | 1 | 100.0% |
| BLUE RIDGE MOUNTAINS; TIDEWATER | 4 | | 4 | 100.0% |
| BLUE RIDGE; BLUE RIDGE MOUNTAINS | 1 | | 1 | 100.0% |
| BLUE RIDGE; CENTRAL FLORIDA; DANIEL BOONE; PIEDMONT 420 | 1 | | 1 | 100.0% |
| BLUE RIDGE; CHICKASAW | 1 | | 1 | 100.0% |
| BLUE RIDGE; CIMARRON | 1 | | 1 | 100.0% |
| BLUE RIDGE; DANIEL BOONE | 1 | | 1 | 100.0% |
| BLUE RIDGE; EAST CAROLINA | 1 | | 1 | 100.0% |
| BLUE RIDGE; INDIAN WATERS | 1 | | 1 | 100.0% |
| BLUE RIDGE; PALMETTO | 1 | 1 | 2 | 50.0% |
| BUCKEYE; GREAT TRAIL | 3 | 1 | 4 | 75.0% |
| BUCKEYE; GREAT TRAIL; LAKE ERIE | 1 | 1 | 2 | 50.0% |
| BUCKEYE; GREEN MOUNTAIN | | 1 | 1 | 0.0% |
| BUCKEYE; HEART OF AMERICA | 1 | | 1 | 100.0% |
| BUCKEYE; LAKE ERIE | 13 | 1 | 14 | 92.9% |
| BUCKEYE; LAKE ERIE; MAYFLOWER; NARRAGANSETT | 1 | | 1 | 100.0% |
| BUCKEYE; SIMON KENTON | 2 | | 2 | 100.0% |
| BUCKEYE; TUSCARORA | 1 | | 1 | 100.0% |

**ALW096**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| BUCKSKIN; COASTAL GEORGIA | | 1 | 1 | 0.0% |
| BUCKSKIN; DAN BEARD | 1 | | 1 | 100.0% |
| BUCKSKIN; GREATER ALABAMA | | 1 | 1 | 0.0% |
| BUCKSKIN; HAWK MOUNTAIN | 1 | | 1 | 100.0% |
| BUCKSKIN; MECKLENBURG COUNTY | 1 | | 1 | 100.0% |
| BUCKSKIN; MOUNTAINEER AREA | 2 | 2 | 4 | 50.0% |
| BUCKSKIN; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| BUCKSKIN; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| BUCKSKIN; SIMON KENTON | 2 | | 2 | 100.0% |
| BUCKTAIL; EAST TEXAS AREA; NORWELA | 1 | | 1 | 100.0% |
| BUCKTAIL; LAUREL HIGHLANDS | | 1 | 1 | 0.0% |
| BUFFALO TRACE; BUFFALO TRAIL | 1 | | 1 | 100.0% |
| BUFFALO TRACE; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| BUFFALO TRACE; LINCOLN HERITAGE | 2 | | 2 | 100.0% |
| BUFFALO TRACE; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| BUFFALO TRACE; SAGAMORE | 1 | | 1 | 100.0% |
| BUFFALO TRAIL; DIRECT SERVICE | 1 | | 1 | 100.0% |
| BUFFALO TRAIL; LONGHORN | 1 | | 1 | 100.0% |
| BUFFALO TRAIL; SOUTH PLAINS | 1 | | 1 | 100.0% |
| BUFFALO TRAIL; TEXAS TRAILS | 1 | 1 | 2 | 50.0% |
| CADDO AREA; CHICKASAW; DE SOTO AREA; QUAPAW AREA; WESTARK AREA | 1 | | 1 | 100.0% |
| CADDO AREA; CIRCLE TEN | 1 | | 1 | 100.0% |
| CADDO AREA; CIRCLE TEN; EAST TEXAS AREA; RIO GRANDE | 1 | | 1 | 100.0% |
| CADDO AREA; EAST TEXAS AREA | 1 | | 1 | 100.0% |
| CADDO AREA; NORWELA | | 1 | 1 | 0.0% |
| CADDO AREA; QUAPAW AREA | 2 | | 2 | 100.0% |
| CALCASIEU; EVANGELINE AREA | 1 | | 1 | 100.0% |
| CALCASIEU; INDIAN NATIONS | 1 | | 1 | 100.0% |
| CALCASIEU; LOUISIANA PURCHASE | 3 | | 3 | 100.0% |
| CALCASIEU; NORWELA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; CATALINA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; CENTRAL FLORIDA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; CROSSROADS OF THE WEST | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; DANIEL WEBSTER | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; DENVER AREA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; GOLDEN EMPIRE | 2 | | 2 | 100.0% |
| CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES | 25 | 7 | 32 | 78.1% |
| CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; ORANGE COUNTY | | 1 | 1 | 0.0% |
| CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; LAS VEGAS AREA | | 1 | 1 | 0.0% |
| CALIFORNIA INLAND EMPIRE; LONG BEACH AREA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; LONG BEACH AREA; ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL; VENTURA COUNTY; VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | | 1 | 1 | 0.0% |
| CALIFORNIA INLAND EMPIRE; LONGS PEAK COUNCIL | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; ORANGE COUNTY | 2 | | 2 | 100.0% |
| CALIFORNIA INLAND EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 2 | | 2 | 100.0% |
| CALIFORNIA INLAND EMPIRE; SOUTHERN SIERRA | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; TEXAS SOUTHWEST | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; VENTURA COUNTY | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; VERDUGO HILLS | 1 | | 1 | 100.0% |
| CALIFORNIA INLAND EMPIRE; WESTERN LOS ANGELES COUNTY | 3 | | 3 | 100.0% |
| CALIFORNIA INLAND EMPIRE; YUCCA | | 1 | 1 | 0.0% |
| CAPE COD & ISLANDS; FAR EAST | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; GREATER NEW YORK | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; HEART OF NEW ENGLAND | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; HEART OF NEW ENGLAND; MAYFLOWER | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; MAYFLOWER; NARRAGANSETT | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; NARRAGANSETT | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| CAPE COD & ISLANDS; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| CAPE FEAR; CENTRAL NORTH CAROLINA; EAST CAROLINA | 1 | | 1 | 100.0% |
| CAPE FEAR; DEL-MAR-VA | 3 | | 3 | 100.0% |
| CAPE FEAR; EAST CAROLINA | 1 | | 1 | 100.0% |
| CAPE FEAR; MECKLENBURG COUNTY | 1 | | 1 | 100.0% |
| CAPE FEAR; OCCONEECHEE | 1 | | 1 | 100.0% |
| CAPE FEAR; OLD HICKORY | 1 | | 1 | 100.0% |
| CAPE FEAR; PIEDMONT 420 | 1 | | 1 | 100.0% |
| CAPITOL AREA; CIRCLE TEN; LONGHORN | | 1 | 1 | 0.0% |
| CAPITOL AREA; LONGHORN | 1 | | 1 | 100.0% |

ALW097

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| CAPITOL AREA; NATIONAL CAPITAL AREA | 2 | | 2 | 100.0% |
| CAPITOL AREA; SAM HOUSTON AREA | 3 | 1 | 4 | 75.0% |
| CAPITOL AREA; TEXAS TRAILS | 1 | | 1 | 100.0% |
| CAPITOL AREA; THREE RIVERS | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; CRATER LAKE COUNCIL | 2 | | 2 | 100.0% |
| CASCADE PACIFIC; GOLDEN EMPIRE | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; GREATER LOS ANGELES | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; GREATER NEW YORK | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; MID-AMERICA | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; MOUNT BAKER | 1 | 1 | 2 | 50.0% |
| CASCADE PACIFIC; MOUNT BAKER; PACIFIC HARBORS | | 1 | 1 | 0.0% |
| CASCADE PACIFIC; OREGON TRAIL | 1 | | 1 | 100.0% |
| CASCADE PACIFIC; PACIFIC HARBORS | | 1 | 1 | 0.0% |
| CASCADE PACIFIC; PINE TREE | 3 | 1 | 4 | 75.0% |
| CASCADE PACIFIC; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| CATALINA; GRAND CANYON | 5 | 1 | 6 | 83.3% |
| CATALINA; GREATER LOS ANGELES | 1 | | 1 | 100.0% |
| CATALINA; HEART OF AMERICA | | 1 | 1 | 0.0% |
| CATALINA; LAS VEGAS AREA | 1 | | 1 | 100.0% |
| CATALINA; LONGS PEAK COUNCIL | 1 | | 1 | 100.0% |
| CATALINA; ORANGE COUNTY | 1 | | 1 | 100.0% |
| CATALINA; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; GREATER NEW YORK | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; GREATER TAMPA BAY AREA | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; GREATER TAMPA BAY AREA; NORTH FLORIDA | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; GULF STREAM | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; NORTH FLORIDA | 4 | 1 | 5 | 80.0% |
| CENTRAL FLORIDA; NORTH FLORIDA; PIEDMONT 420 | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; ORANGE COUNTY | 2 | | 2 | 100.0% |
| CENTRAL FLORIDA; SIMON KENTON | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| CENTRAL FLORIDA; SOUTHWEST FLORIDA | 1 | | 1 | 100.0% |
| CENTRAL GEORGIA; COASTAL GEORGIA | 2 | | 2 | 100.0% |
| CENTRAL GEORGIA; SOUTH GEORGIA | 2 | | 2 | 100.0% |
| CENTRAL MINNESOTA; GAMEHAVEN; NORTHERN STAR | 1 | | 1 | 100.0% |
| CENTRAL MINNESOTA; GREATER NEW YORK; NORTHERN STAR | | 1 | 1 | 0.0% |
| CENTRAL MINNESOTA; NORTHERN LIGHTS | 1 | | 1 | 100.0% |
| CENTRAL MINNESOTA; NORTHERN STAR | 5 | 2 | 7 | 71.4% |
| CENTRAL MINNESOTA; VOYAGEURS AREA | 3 | | 3 | 100.0% |
| CENTRAL NEW JERSEY; MINSI TRAILS | 2 | | 2 | 100.0% |
| CENTRAL NEW JERSEY; MONMOUTH | 10 | 1 | 11 | 90.9% |
| CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| CENTRAL NEW JERSEY; PATRIOTS' PATH | 20 | 5 | 25 | 80.0% |
| CENTRAL NEW JERSEY; WASHINGTON CROSSING | 36 | 7 | 43 | 83.7% |
| CENTRAL NORTH CAROLINA; MECKLENBURG COUNTY | 3 | | 3 | 100.0% |
| CENTRAL NORTH CAROLINA; OCCONEECHEE | | 3 | 3 | 0.0% |
| CENTRAL NORTH CAROLINA; OLD NORTH STATE | 1 | | 1 | 100.0% |
| CENTRAL NORTH CAROLINA; PIEDMONT 420 | 1 | | 1 | 100.0% |
| CHATTAHOOCHEE; COASTAL GEORGIA | | 1 | 1 | 0.0% |
| CHATTAHOOCHEE; FLINT RIVER | 1 | 1 | 2 | 50.0% |
| CHATTAHOOCHEE; GREATER ALABAMA | 1 | 1 | 2 | 50.0% |
| CHATTAHOOCHEE; NORTHEAST GEORGIA | 1 | | 1 | 100.0% |
| CHEROKEE AREA 469; CIMARRON | 1 | | 1 | 100.0% |
| CHEROKEE AREA 469; INDIAN NATIONS | 1 | | 1 | 100.0% |
| CHEROKEE AREA 469; QUAPAW AREA | 4 | | 4 | 100.0% |
| CHEROKEE AREA 556; GREAT RIVERS | 1 | | 1 | 100.0% |
| CHEROKEE AREA 556; GREAT SMOKY MOUNTAIN | 1 | | 1 | 100.0% |
| CHEROKEE AREA 556; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| CHEROKEE AREA 556; NORTH FLORIDA | 1 | | 1 | 100.0% |
| CHEROKEE AREA 556; NORTHWEST GEORGIA | 1 | 1 | 2 | 50.0% |
| CHEROKEE AREA 556; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| CHESTER COUNTY; CRADLE OF LIBERTY | 2 | 1 | 3 | 66.7% |
| CHESTER COUNTY; CRADLE OF LIBERTY; WESTCHESTER-PUTNAM | | 1 | 1 | 0.0% |
| CHESTER COUNTY; DEL-MAR-VA | 1 | | 1 | 100.0% |
| CHESTER COUNTY; MINSI TRAILS; NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH; WASHINGTON CROSSING | | 1 | 1 | 0.0% |
| CHESTER COUNTY; WESTCHESTER-PUTNAM | 4 | | 4 | 100.0% |
| CHICKASAW; GREATER ALABAMA | | 1 | 1 | 0.0% |
| CHICKASAW; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |

**ALW098**

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| CHICKASAW; PINE BURR AREA; PUSHMATAHA AREA; YOCONA AREA | 1 | | 1 | 100.0% |
| CHICKASAW; YOCONA AREA | 1 | | 1 | 100.0% |
| CHIEF CORNPLANTER; GREAT TRAIL | 1 | | 1 | 100.0% |
| CHIEF SEATTLE; CROSSROADS OF THE WEST | 1 | | 1 | 100.0% |
| CHIEF SEATTLE; GRAND COLUMBIA; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| CHIEF SEATTLE; INLAND NORTHWEST | 1 | | 1 | 100.0% |
| CHIEF SEATTLE; MOUNT BAKER | 3 | 1 | 4 | 75.0% |
| CHIEF SEATTLE; OREGON TRAIL | 1 | | 1 | 100.0% |
| CHIEF SEATTLE; PACIFIC HARBORS | 9 | 2 | 11 | 81.8% |
| CHIEF SEATTLE; SILICON VALLEY MONTEREY BAY | 1 | | 1 | 100.0% |
| CHIPPEWA VALLEY; MID-AMERICA; NORTHERN STAR | | 1 | 1 | 0.0% |
| CHIPPEWA VALLEY; NORTHERN STAR | 14 | 2 | 16 | 87.5% |
| CHIPPEWA VALLEY; VOYAGEURS AREA | 1 | | 1 | 100.0% |
| CHOCTAW AREA; PINE BURR AREA | | 1 | 1 | 0.0% |
| CIMARRON; INDIAN NATIONS | 1 | | 1 | 100.0% |
| CIMARRON; QUIVIRA | 1 | | 1 | 100.0% |
| CIMARRON; SOUTH PLAINS | 1 | | 1 | 100.0% |
| CIMARRON; TWIN RIVERS | 1 | | 1 | 100.0% |
| CIRCLE TEN; EAST TEXAS AREA; LONGHORN | 1 | | 1 | 100.0% |
| CIRCLE TEN; GREAT TRAIL | 1 | | 1 | 100.0% |
| CIRCLE TEN; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| CIRCLE TEN; LONGHORN | 21 | | 21 | 100.0% |
| CIRCLE TEN; NARRAGANSETT | 1 | | 1 | 100.0% |
| CIRCLE TEN; SAM HOUSTON AREA | 4 | | 4 | 100.0% |
| CIRCLE TEN; THREE RIVERS | 1 | | 1 | 100.0% |
| CIRCLE TEN; VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 2 | | 2 | 100.0% |
| CIRCLE TEN; WESTERN LOS ANGELES COUNTY | 13 | 1 | 14 | 92.9% |
| COASTAL CAROLINA; ERIE SHORES | 1 | | 1 | 100.0% |
| COASTAL CAROLINA; GOLDEN SPREAD | 1 | | 1 | 100.0% |
| COASTAL CAROLINA; PALMETTO | 1 | | 1 | 100.0% |
| COASTAL CAROLINA; PEE DEE AREA | 2 | | 2 | 100.0% |
| COASTAL CAROLINA; PIEDMONT 420 | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; GREATER TAMPA BAY AREA | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; MIDDLE TENNESSEE | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; NORTH FLORIDA | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; NORTHEAST GEORGIA | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; SHENANDOAH AREA | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; SOUTH GEORGIA | 1 | | 1 | 100.0% |
| COASTAL GEORGIA; TUSCARORA | 1 | | 1 | 100.0% |
| COLONIAL VIRGINIA; ERIE SHORES | 1 | | 1 | 100.0% |
| COLONIAL VIRGINIA; HEART OF VIRGINIA | | 1 | 1 | 0.0% |
| COLONIAL VIRGINIA; HEART OF VIRGINIA; TIDEWATER | 1 | | 1 | 100.0% |
| COLONIAL VIRGINIA; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| COLONIAL VIRGINIA; PINE BURR AREA | | 1 | 1 | 0.0% |
| COLONIAL VIRGINIA; TIDEWATER | 15 | 5 | 20 | 75.0% |
| COLUMBIA-MONTOUR; LEATHERSTOCKING | 1 | | 1 | 100.0% |
| COLUMBIA-MONTOUR; LINCOLN HERITAGE | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; CONNECTICUT YANKEE | 15 | 5 | 20 | 75.0% |
| CONNECTICUT RIVERS; DANIEL WEBSTER | | 1 | 1 | 0.0% |
| CONNECTICUT RIVERS; DANIEL WEBSTER; NARRAGANSETT | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; HEART OF NEW ENGLAND | 3 | | 3 | 100.0% |
| CONNECTICUT RIVERS; HOUSATONIC | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; HUDSON VALLEY | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; MAYFLOWER; WESTCHESTER-PUTNAM | | 1 | 1 | 0.0% |
| CONNECTICUT RIVERS; MONMOUTH | | 1 | 1 | 0.0% |
| CONNECTICUT RIVERS; NARRAGANSETT | 2 | | 2 | 100.0% |
| CONNECTICUT RIVERS; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; SEQUOYAH | | 1 | 1 | 0.0% |
| CONNECTICUT RIVERS; SUFFOLK COUNTY | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; THEODORE ROOSEVELT | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| CONNECTICUT RIVERS; WESTCHESTER-PUTNAM | | 1 | 1 | 0.0% |
| CONNECTICUT RIVERS; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| CONNECTICUT YANKEE; GREENWICH | 7 | 1 | 8 | 87.5% |
| CONNECTICUT YANKEE; HOUSATONIC | 1 | | 1 | 100.0% |
| CONNECTICUT YANKEE; HUDSON VALLEY | 1 | | 1 | 100.0% |
| CONNECTICUT YANKEE; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| CONNECTICUT YANKEE; SUWANNEE RIVER AREA | 1 | | 1 | 100.0% |

**ALW099**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| CONQUISTADOR; CROSSROADS OF THE WEST | 1 | | 1 | 100.0% |
| CONQUISTADOR; FAR EAST; YUCCA | 1 | | 1 | 100.0% |
| CONQUISTADOR; GREAT SOUTHWEST | 3 | | 3 | 100.0% |
| CORNHUSKER; GREATER YOSEMITE | 1 | | 1 | 100.0% |
| CORNHUSKER; QUIVIRA | 1 | | 1 | 100.0% |
| CORONADO AREA; GREAT SOUTHWEST | 1 | | 1 | 100.0% |
| CORONADO AREA; GREATER NEW YORK | 1 | | 1 | 100.0% |
| CORONADO AREA; JAYHAWK AREA | 2 | 1 | 3 | 66.7% |
| CRADLE OF LIBERTY; CROSSROADS OF AMERICA; MINSI TRAILS | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; FRENCH CREEK | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; GREAT SOUTHWEST | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | | 1 | 1 | 0.0% |
| CRADLE OF LIBERTY; JERSEY SHORE | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; JUNIATA VALLEY | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; LAUREL HIGHLANDS | 1 | 1 | 2 | 50.0% |
| CRADLE OF LIBERTY; MINSI TRAILS | 3 | | 3 | 100.0% |
| CRADLE OF LIBERTY; MINSI TRAILS; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; NEW BIRTH OF FREEDOM | | 1 | 1 | 0.0% |
| CRADLE OF LIBERTY; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| CRADLE OF LIBERTY; SUSQUEHANNA | 2 | | 2 | 100.0% |
| CRADLE OF LIBERTY; WASHINGTON CROSSING | 4 | | 4 | 100.0% |
| CRATER LAKE COUNCIL; LOS PADRES | 7 | 2 | 9 | 77.8% |
| CRATER LAKE COUNCIL; OREGON TRAIL | 1 | | 1 | 100.0% |
| CRATER LAKE COUNCIL; REDWOOD EMPIRE | 4 | 1 | 5 | 80.0% |
| CRATER LAKE COUNCIL; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; CROSSROADS OF THE WEST | 3 | 1 | 4 | 75.0% |
| CROSSROADS OF AMERICA; DAN BEARD | | 1 | 1 | 0.0% |
| CROSSROADS OF AMERICA; DAN BEARD; HOOSIER TRAILS | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; DEL-MAR-VA | 10 | 4 | 14 | 71.4% |
| CROSSROADS OF AMERICA; DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; GARDEN STATE | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; HOOSIER TRAILS | 7 | 5 | 12 | 58.3% |
| CROSSROADS OF AMERICA; MIAMI VALLEY | 1 | 1 | 2 | 50.0% |
| CROSSROADS OF AMERICA; MICHIGAN CROSSROADS | 1 | 1 | 2 | 50.0% |
| CROSSROADS OF AMERICA; MINSI TRAILS | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| CROSSROADS OF AMERICA; SAGAMORE | 7 | | 7 | 100.0% |
| CROSSROADS OF AMERICA; SIMON KENTON | | 1 | 1 | 0.0% |
| CROSSROADS OF AMERICA; TUKABATCHEE AREA | 1 | | 1 | 100.0% |
| CROSSROADS OF THE WEST; GRAND TETON | 2 | 1 | 3 | 66.7% |
| CROSSROADS OF THE WEST; GREATER WYOMING; NORTHEAST ILLINOIS | 1 | | 1 | 100.0% |
| CROSSROADS OF THE WEST; INLAND NORTHWEST | 1 | | 1 | 100.0% |
| CROSSROADS OF THE WEST; LAS VEGAS AREA | 2 | | 2 | 100.0% |
| CROSSROADS OF THE WEST; LINCOLN HERITAGE | 1 | | 1 | 100.0% |
| CROSSROADS OF THE WEST; MIDDLE TENNESSEE | 1 | | 1 | 100.0% |
| CROSSROADS OF THE WEST; MOUNTAIN WEST | 2 | | 2 | 100.0% |
| CROSSROADS OF THE WEST; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| DAN BEARD; GREAT RIVERS; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| DAN BEARD; LAST FRONTIER | 1 | | 1 | 100.0% |
| DAN BEARD; LINCOLN HERITAGE | 1 | | 1 | 100.0% |
| DAN BEARD; MIAMI VALLEY | 3 | | 3 | 100.0% |
| DAN BEARD; QUAPAW AREA | 1 | | 1 | 100.0% |
| DAN BEARD; SIMON KENTON | 2 | | 2 | 100.0% |
| DANIEL BOONE; EAST CAROLINA | 1 | | 1 | 100.0% |
| DANIEL BOONE; MECKLENBURG COUNTY | 2 | | 2 | 100.0% |
| DANIEL BOONE; MOBILE AREA | | 1 | 1 | 0.0% |
| DANIEL BOONE; PEE DEE AREA | 1 | | 1 | 100.0% |
| DANIEL BOONE; PIEDMONT 420 | 2 | 1 | 3 | 66.7% |
| DANIEL BOONE; TIDEWATER | 1 | | 1 | 100.0% |
| DANIEL WEBSTER; GREATER ST. LOUIS AREA | 1 | 1 | 2 | 50.0% |
| DANIEL WEBSTER; GREEN MOUNTAIN | 2 | | 2 | 100.0% |
| DANIEL WEBSTER; HEART OF NEW ENGLAND | 4 | 1 | 5 | 80.0% |
| DANIEL WEBSTER; MAYFLOWER | 2 | | 2 | 100.0% |
| DANIEL WEBSTER; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| DANIEL WEBSTER; NARRAGANSETT | | 1 | 1 | 0.0% |
| DANIEL WEBSTER; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| DANIEL WEBSTER; SPIRIT OF ADVENTURE | 11 | 5 | 16 | 68.8% |
| DANIEL WEBSTER; TIDEWATER | 1 | | 1 | 100.0% |

ALW100

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| DE SOTO AREA; WESTARK AREA | | 1 | 1 | 0.0% |
| DEL-MAR-VA; GARDEN STATE | 1 | | 1 | 100.0% |
| DEL-MAR-VA; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| DEL-MAR-VA; WESTERN MASSACHUSETTS | | 1 | 1 | 0.0% |
| DENVER AREA; GREAT SOUTHWEST | | 2 | 2 | 0.0% |
| DENVER AREA; GREATER ALABAMA | | 1 | 1 | 0.0% |
| DENVER AREA; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| DENVER AREA; HEART OF AMERICA | 1 | | 1 | 100.0% |
| DENVER AREA; INDIAN NATIONS | 1 | | 1 | 100.0% |
| DENVER AREA; INLAND NORTHWEST | 1 | | 1 | 100.0% |
| DENVER AREA; LONGS PEAK COUNCIL | 2 | | 2 | 100.0% |
| DENVER AREA; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| DENVER AREA; PIKES PEAK | 3 | | 3 | 100.0% |
| DENVER AREA; SIMON KENTON | 1 | | 1 | 100.0% |
| DENVER AREA; THREE FIRES | 1 | | 1 | 100.0% |
| DIRECT SERVICE; GREATER ST. LOUIS AREA | 1 | | 1 | 100.0% |
| DIRECT SERVICE; GULF COAST | 1 | | 1 | 100.0% |
| DIRECT SERVICE; NATIONAL CAPITAL AREA | 2 | | 2 | 100.0% |
| EAST CAROLINA; FAR EAST | | 1 | 1 | 0.0% |
| EAST CAROLINA; GRAND CANYON | 1 | | 1 | 100.0% |
| EAST CAROLINA; INDIAN WATERS | 1 | | 1 | 100.0% |
| EAST CAROLINA; MECKLENBURG COUNTY | 2 | | 2 | 100.0% |
| EAST CAROLINA; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| EAST CAROLINA; NORTH FLORIDA | 1 | | 1 | 100.0% |
| EAST CAROLINA; OCCONEECHEE | | 2 | 2 | 0.0% |
| EAST CAROLINA; OLD NORTH STATE | | 1 | 1 | 0.0% |
| EAST CAROLINA; TIDEWATER | 1 | | 1 | 100.0% |
| EAST CAROLINA; TUSCARORA | 1 | | 1 | 100.0% |
| EAST CAROLINA; TWIN RIVERS | | 1 | 1 | 0.0% |
| EAST TEXAS AREA; LAS VEGAS AREA; NEVADA AREA | | 1 | 1 | 0.0% |
| EAST TEXAS AREA; LONGHORN | 1 | | 1 | 100.0% |
| EAST TEXAS AREA; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| EAST TEXAS AREA; THREE RIVERS | 1 | | 1 | 100.0% |
| ERIE SHORES; GREAT TRAIL | 1 | | 1 | 100.0% |
| ERIE SHORES; LAKE ERIE | 6 | | 6 | 100.0% |
| ERIE SHORES; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| EVANGELINE AREA; GREATER ST. LOUIS AREA; SOUTHEAST LOUISIANA | 1 | | 1 | 100.0% |
| EVANGELINE AREA; ISTROUMA AREA | 1 | | 1 | 100.0% |
| EVANGELINE AREA; LOUISIANA PURCHASE | 1 | | 1 | 100.0% |
| EVANGELINE AREA; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| EVANGELINE AREA; SOUTHEAST LOUISIANA | 2 | | 2 | 100.0% |
| FIVE RIVERS; GREATER NEW YORK | 1 | | 1 | 100.0% |
| FIVE RIVERS; IROQUOIS TRAIL; SENECA WATERWAYS | | 4 | 4 | 0.0% |
| FIVE RIVERS; LAUREL HIGHLANDS | 1 | | 1 | 100.0% |
| FIVE RIVERS; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| FIVE RIVERS; NORTHEASTERN PENNSYLVANIA | 1 | | 1 | 100.0% |
| FIVE RIVERS; OHIO RIVER VALLEY | 1 | | 1 | 100.0% |
| FIVE RIVERS; PENNSYLVANIA DUTCH | 1 | | 1 | 100.0% |
| FIVE RIVERS; SENECA WATERWAYS | 2 | 2 | 4 | 50.0% |
| FRENCH CREEK; GREATER NIAGARA FRONTIER | 1 | | 1 | 100.0% |
| FRENCH CREEK; LAUREL HIGHLANDS | 2 | | 2 | 100.0% |
| FRENCH CREEK; MID-AMERICA | | 1 | 1 | 0.0% |
| GAMEHAVEN; GOLDEN EMPIRE; GOLDEN GATE AREA; MARIN; PACIFIC SKYLINE | | 1 | 1 | 0.0% |
| GAMEHAVEN; LONGHOUSE | 1 | | 1 | 100.0% |
| GAMEHAVEN; NORTHERN STAR | 1 | | 1 | 100.0% |
| GAMEHAVEN; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| GAMEHAVEN; TWIN VALLEY | 1 | | 1 | 100.0% |
| GARDEN STATE; JERSEY SHORE | 5 | 1 | 6 | 83.3% |
| GARDEN STATE; JERSEY SHORE; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| GARDEN STATE; MONMOUTH | 1 | | 1 | 100.0% |
| GARDEN STATE; MORAINE TRAILS | 1 | | 1 | 100.0% |
| GARDEN STATE; NORTHERN NEW JERSEY | 3 | | 3 | 100.0% |
| GARDEN STATE; THEODORE ROOSEVELT | | 1 | 1 | 0.0% |
| GARDEN STATE; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| GATEWAY AREA; GLACIER'S EDGE; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| GATEWAY AREA; GREATER NEW YORK | 1 | | 1 | 100.0% |
| GEORGIA-CAROLINA; INDIAN WATERS | | 1 | 1 | 0.0% |
| GEORGIA-CAROLINA; MECKLENBURG COUNTY | 1 | | 1 | 100.0% |
| GEORGIA-CAROLINA; NARRAGANSETT | | 1 | 1 | 0.0% |

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| GEORGIA-CAROLINA; PALMETTO | 1 | | 1 | 100.0% |
| GEORGIA-CAROLINA; TIDEWATER; VIRGINIA HEADWATERS | 1 | | 1 | 100.0% |
| GLACIER'S EDGE; SAMOSET COUNCIL | 1 | | 1 | 100.0% |
| GLACIER'S EDGE; SIOUX | 1 | | 1 | 100.0% |
| GLACIER'S EDGE; THREE HARBORS | 1 | | 1 | 100.0% |
| GLACIER'S EDGE; W.D. BOYCE | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; GOLDEN GATE AREA | 18 | 3 | 21 | 85.7% |
| GOLDEN EMPIRE; GOLDEN GATE AREA; GREATER YOSEMITE | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; GOLDEN GATE AREA; GREATER YOSEMITE; MARIN; PACIFIC SKYLINE; PIEDMONT 042; REDWOOD EMPIRE; SEQUOIA; SILICON VALLEY MONTEREY BAY | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; GOLDEN GATE AREA; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; GOLDEN GATE AREA; PACIFIC SKYLINE | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; GOLDEN GATE AREA; REDWOOD EMPIRE | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; GREATER LOS ANGELES | 3 | 1 | 4 | 75.0% |
| GOLDEN EMPIRE; GREATER YOSEMITE | 7 | 2 | 9 | 77.8% |
| GOLDEN EMPIRE; GREATER YOSEMITE; PACIFIC SKYLINE; PIEDMONT 042; REDWOOD EMPIRE; SEQUOIA; SILICON VALLEY MONTEREY BAY | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; GREATER YOSEMITE; REDWOOD EMPIRE; SILICON VALLEY MONTEREY BAY | | 2 | 2 | 0.0% |
| GOLDEN EMPIRE; INLAND NORTHWEST | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; LAS VEGAS AREA | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; MARIN; REDWOOD EMPIRE | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; MORAINE TRAILS | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; NARRAGANSETT | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; NEVADA AREA | 3 | 3 | 6 | 50.0% |
| GOLDEN EMPIRE; NORTHERN STAR | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; OREGON TRAIL | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; PACIFIC SKYLINE | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; SEQUOIA | 2 | | 2 | 100.0% |
| GOLDEN EMPIRE; SEQUOIA; SOUTHERN SIERRA | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; SILICON VALLEY MONTEREY BAY | 1 | 2 | 3 | 33.3% |
| GOLDEN EMPIRE; SOUTHWEST FLORIDA | | 1 | 1 | 0.0% |
| GOLDEN EMPIRE; VENTURA COUNTY | 1 | | 1 | 100.0% |
| GOLDEN EMPIRE; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; GREATER LOS ANGELES | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; GREATER LOS ANGELES; GREATER YOSEMITE | | 1 | 1 | 0.0% |
| GOLDEN GATE AREA; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; GREATER YOSEMITE | 10 | 3 | 13 | 76.9% |
| GOLDEN GATE AREA; GREATER YOSEMITE; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; GREEN MOUNTAIN | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; INLAND NORTHWEST | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; MARIN | 2 | | 2 | 100.0% |
| GOLDEN GATE AREA; MARIN; SILICON VALLEY MONTEREY BAY | | 1 | 1 | 0.0% |
| GOLDEN GATE AREA; NEVADA AREA | 4 | | 4 | 100.0% |
| GOLDEN GATE AREA; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; ORANGE COUNTY; SILICON VALLEY MONTEREY BAY | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; PACIFIC SKYLINE | 6 | 4 | 10 | 60.0% |
| GOLDEN GATE AREA; PATRIOTS' PATH | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; PIEDMONT 042 | 2 | | 2 | 100.0% |
| GOLDEN GATE AREA; REDWOOD EMPIRE | 4 | 3 | 7 | 57.1% |
| GOLDEN GATE AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; SEQUOIA | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; SILICON VALLEY MONTEREY BAY | 3 | | 3 | 100.0% |
| GOLDEN GATE AREA; SOUTHERN SIERRA | 1 | | 1 | 100.0% |
| GOLDEN GATE AREA; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| GOLDEN SPREAD; GREAT SOUTHWEST | 1 | | 1 | 100.0% |
| GOLDEN SPREAD; ISTROUMA AREA | 1 | | 1 | 100.0% |
| GOLDEN SPREAD; LAST FRONTIER | | 2 | 2 | 0.0% |
| GOLDEN SPREAD; SAM HOUSTON AREA | | 1 | 1 | 0.0% |
| GOLDEN SPREAD; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| GRAND CANYON; GREAT SOUTHWEST | 2 | | 2 | 100.0% |
| GRAND CANYON; GREATER LOS ANGELES | 1 | | 1 | 100.0% |
| GRAND CANYON; LONGHORN | 1 | | 1 | 100.0% |
| GRAND CANYON; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| GRAND COLUMBIA; INLAND NORTHWEST | 1 | 2 | 3 | 33.3% |
| GRAND COLUMBIA; MOUNT BAKER | 2 | | 2 | 100.0% |
| GRAND COLUMBIA; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| GRAND COLUMBIA; PIKES PEAK | 1 | | 1 | 100.0% |
| GRAND TETON; MONTANA | 1 | | 1 | 100.0% |

**ALW102**

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9276) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| GRAND TETON; MOUNTAIN WEST | 2 | 1 | 3 | 66.7% |
| GRAND TETON; ORANGE COUNTY | 1 | | 1 | 100.0% |
| GREAT ALASKA; MIDNIGHT SUN | 3 | | 3 | 100.0% |
| GREAT ALASKA; MIDNIGHT SUN; NORTHERN LIGHTS | 1 | | 1 | 100.0% |
| GREAT RIVERS; GREATER ST. LOUIS AREA | 5 | | 5 | 100.0% |
| GREAT RIVERS; HEART OF AMERICA | 3 | | 3 | 100.0% |
| GREAT RIVERS; OZARK TRAILS | 2 | | 2 | 100.0% |
| GREAT RIVERS; PONY EXPRESS | 2 | | 2 | 100.0% |
| GREAT RIVERS; PUSHMATAHA AREA | 1 | | 1 | 100.0% |
| GREAT SMOKY MOUNTAIN; INDIAN WATERS | 1 | | 1 | 100.0% |
| GREAT SMOKY MOUNTAIN; LAKE ERIE | 1 | | 1 | 100.0% |
| GREAT SMOKY MOUNTAIN; MIDDLE TENNESSEE | 1 | | 1 | 100.0% |
| GREAT SMOKY MOUNTAIN; PALMETTO | 1 | | 1 | 100.0% |
| GREAT SMOKY MOUNTAIN; SAMOSET COUNCIL | 1 | | 1 | 100.0% |
| GREAT SOUTHWEST; LOS PADRES | 1 | | 1 | 100.0% |
| GREAT SOUTHWEST; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| GREAT SOUTHWEST; NORTHERN STAR | 1 | | 1 | 100.0% |
| GREAT SOUTHWEST; OLD HICKORY; SEQUOYAH | 1 | | 1 | 100.0% |
| GREAT SOUTHWEST; SAM HOUSTON AREA | 4 | 1 | 5 | 80.0% |
| GREAT SOUTHWEST; SEQUOYAH | 1 | | 1 | 100.0% |
| GREAT TRAIL; LAKE ERIE | 6 | 3 | 9 | 66.7% |
| GREAT TRAIL; LAKE ERIE; THREE FIRES; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| GREAT TRAIL; LAKE ERIE; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| GREAT TRAIL; MONMOUTH; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| GREAT TRAIL; NORTHERN NEW JERSEY | 15 | 2 | 17 | 88.2% |
| GREAT TRAIL; SIMON KENTON | 1 | | 1 | 100.0% |
| GREAT TRAIL; THREE FIRES | 1 | | 1 | 100.0% |
| GREAT TRAIL; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| GREATER ALABAMA; GULF COAST | | 1 | 1 | 0.0% |
| GREATER ALABAMA; MOBILE AREA | 10 | 5 | 15 | 66.7% |
| GREATER ALABAMA; MOBILE AREA; PUSHMATAHA AREA | 1 | | 1 | 100.0% |
| GREATER ALABAMA; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| GREATER ALABAMA; NORTH FLORIDA | 1 | | 1 | 100.0% |
| GREATER ALABAMA; SEQUOIA | 1 | | 1 | 100.0% |
| GREATER ALABAMA; SOUTH GEORGIA | 1 | | 1 | 100.0% |
| GREATER ALABAMA; TUKABATCHEE AREA | 7 | 3 | 10 | 70.0% |
| GREATER ALABAMA; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; GREATER TAMPA BAY AREA | | 1 | 1 | 0.0% |
| GREATER LOS ANGELES; GREATER YOSEMITE | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; LAKE ERIE | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; LONG BEACH AREA | 7 | 3 | 10 | 70.0% |
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL; VERDUGO HILLS | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 2 | | 2 | 100.0% |
| GREATER LOS ANGELES; LOS PADRES | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; MONTANA | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; ORANGE COUNTY | 17 | 2 | 19 | 89.5% |
| GREATER LOS ANGELES; PACIFIC SKYLINE | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; PATHWAY TO ADVENTURE | 2 | | 2 | 100.0% |
| GREATER LOS ANGELES; PATRIOTS' PATH | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; SIOUX | 1 | | 1 | 100.0% |
| GREATER LOS ANGELES; VERDUGO HILLS | 3 | 1 | 4 | 75.0% |
| GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 22 | 3 | 25 | 88.0% |
| GREATER NEW YORK; GREATER NIAGARA FRONTIER | 2 | 1 | 3 | 66.7% |
| GREATER NEW YORK; HUDSON VALLEY | 7 | 3 | 10 | 70.0% |
| GREATER NEW YORK; INLAND NORTHWEST | 1 | | 1 | 100.0% |
| GREATER NEW YORK; IROQUOIS TRAIL | 1 | | 1 | 100.0% |
| GREATER NEW YORK; JERSEY SHORE | 1 | | 1 | 100.0% |
| GREATER NEW YORK; LAKE ERIE | | 1 | 1 | 0.0% |
| GREATER NEW YORK; LEATHERSTOCKING | 1 | | 1 | 100.0% |
| GREATER NEW YORK; MAYFLOWER; TWIN RIVERS; WESTCHESTER-PUTNAM | | 1 | 1 | 0.0% |
| GREATER NEW YORK; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| GREATER NEW YORK; MONTANA | | 1 | 1 | 0.0% |
| GREATER NEW YORK; NEW BIRTH OF FREEDOM | 1 | | 1 | 100.0% |
| GREATER NEW YORK; NORTHERN NEW JERSEY | 11 | 4 | 15 | 73.3% |
| GREATER NEW YORK; NORTHERN STAR | | 1 | 1 | 0.0% |

**ALW103**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| GREATER NEW YORK; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| GREATER NEW YORK; RIP VAN WINKLE | 1 | | 1 | 100.0% |
| GREATER NEW YORK; SENECA WATERWAYS | 2 | | 2 | 100.0% |
| GREATER NEW YORK; SUFFOLK COUNTY | 3 | | 3 | 100.0% |
| GREATER NEW YORK; THEODORE ROOSEVELT | 14 | 1 | 15 | 93.3% |
| GREATER NEW YORK; WESTCHESTER-PUTNAM | 1 | 1 | 2 | 50.0% |
| GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 16 | 1 | 17 | 94.1% |
| GREATER NIAGARA FRONTIER; LONGHOUSE | 1 | | 1 | 100.0% |
| GREATER NIAGARA FRONTIER; NORTHERN LIGHTS | | 1 | 1 | 0.0% |
| GREATER NIAGARA FRONTIER; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; HEART OF AMERICA | 4 | | 4 | 100.0% |
| GREATER ST. LOUIS AREA; ILLOWA | 2 | | 2 | 100.0% |
| GREATER ST. LOUIS AREA; LINCOLN HERITAGE | | 1 | 1 | 0.0% |
| GREATER ST. LOUIS AREA; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; MISSISSIPPI VALLEY | 3 | | 3 | 100.0% |
| GREATER ST. LOUIS AREA; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; NORTHEAST ILLINOIS | 3 | | 3 | 100.0% |
| GREATER ST. LOUIS AREA; OZARK TRAILS | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; PRAIRIELANDS | 2 | 1 | 3 | 66.7% |
| GREATER ST. LOUIS AREA; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; THREE FIRES | 1 | | 1 | 100.0% |
| GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; GREEN MOUNTAIN | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; GULF COAST | 4 | | 4 | 100.0% |
| GREATER TAMPA BAY AREA; GULF COAST; LONGHORN | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; GULF STREAM | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; LEATHERSTOCKING | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; SOUTH FLORIDA COUNCIL | 3 | 1 | 4 | 75.0% |
| GREATER TAMPA BAY AREA; SUWANNEE RIVER AREA | 1 | | 1 | 100.0% |
| GREATER TAMPA BAY AREA; TWIN RIVERS | | 1 | 1 | 0.0% |
| GREATER WYOMING; LONGS PEAK COUNCIL | 1 | | 1 | 100.0% |
| GREATER WYOMING; OZARK TRAILS | | 1 | 1 | 0.0% |
| GREATER YOSEMITE; SEQUOIA | 2 | | 2 | 100.0% |
| GREATER YOSEMITE; SILICON VALLEY MONTEREY BAY | 4 | | 4 | 100.0% |
| GREATER YOSEMITE; SOUTHERN SIERRA | 2 | | 2 | 100.0% |
| GREEN MOUNTAIN; HEART OF NEW ENGLAND | 1 | | 1 | 100.0% |
| GREEN MOUNTAIN; NARRAGANSETT | 1 | | 1 | 100.0% |
| GREEN MOUNTAIN; NORTHERN NEW JERSEY | 1 | | 1 | 100.0% |
| GREEN MOUNTAIN; TWIN RIVERS | 1 | | 1 | 100.0% |
| GREEN MOUNTAIN; WESTERN MASSACHUSETTS | 2 | | 2 | 100.0% |
| GULF COAST; LAST FRONTIER | 1 | | 1 | 100.0% |
| GULF COAST; LONGHORN | 1 | | 1 | 100.0% |
| GULF COAST; NORTH FLORIDA | 1 | | 1 | 100.0% |
| GULF COAST; SOUTH TEXAS | 7 | 2 | 9 | 77.8% |
| GULF COAST; SOUTH TEXAS; YUCCA | 1 | | 1 | 100.0% |
| GULF STREAM; MECKLENBURG COUNTY | 1 | | 1 | 100.0% |
| GULF STREAM; MOUNTAINEER AREA | 1 | | 1 | 100.0% |
| GULF STREAM; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| GULF STREAM; SOUTH FLORIDA COUNCIL | 2 | 2 | 4 | 50.0% |
| HAWK MOUNTAIN; MASON-DIXON | 2 | | 2 | 100.0% |
| HAWK MOUNTAIN; MINSI TRAILS | | 1 | 1 | 0.0% |
| HAWK MOUNTAIN; NEW BIRTH OF FREEDOM | 1 | | 1 | 100.0% |
| HAWK MOUNTAIN; PENNSYLVANIA DUTCH | 1 | | 1 | 100.0% |
| HAWK MOUNTAIN; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| HAWKEYE AREA; MID-AMERICA | 1 | | 1 | 100.0% |
| HAWKEYE AREA; WINNEBAGO | 1 | | 1 | 100.0% |
| HEART OF AMERICA; JAYHAWK AREA | 1 | 1 | 2 | 50.0% |
| HEART OF AMERICA; LAUREL HIGHLANDS | 1 | | 1 | 100.0% |
| HEART OF AMERICA; MID-AMERICA | 2 | 2 | 4 | 50.0% |
| HEART OF AMERICA; ORANGE COUNTY | 1 | | 1 | 100.0% |
| HEART OF AMERICA; OREGON TRAIL | | 1 | 1 | 0.0% |
| HEART OF AMERICA; OZARK TRAILS | 3 | | 3 | 100.0% |
| HEART OF AMERICA; PATRIOTS' PATH; WINNEBAGO | 1 | | 1 | 100.0% |
| HEART OF AMERICA; PONY EXPRESS | 1 | | 1 | 100.0% |
| HEART OF AMERICA; QUIVIRA | 1 | 2 | 3 | 33.3% |
| HEART OF AMERICA; RIO GRANDE | 1 | | 1 | 100.0% |
| HEART OF AMERICA; SOUTH TEXAS | 1 | | 1 | 100.0% |
| HEART OF AMERICA; TWIN RIVERS | 2 | | 2 | 100.0% |
| HEART OF AMERICA; TWIN VALLEY | 1 | | 1 | 100.0% |

ALW104

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| HEART OF NEW ENGLAND; HUDSON VALLEY | 3 | 1 | 4 | 75.0% |
| HEART OF NEW ENGLAND; MAYFLOWER | 4 | 1 | 5 | 80.0% |
| HEART OF NEW ENGLAND; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| HEART OF NEW ENGLAND; NARRAGANSETT | | 1 | 1 | 0.0% |
| HEART OF NEW ENGLAND; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| HEART OF NEW ENGLAND; TRANSATLANTIC | 1 | | 1 | 100.0% |
| HEART OF NEW ENGLAND; TWIN RIVERS | 1 | | 1 | 100.0% |
| HEART OF NEW ENGLAND; WESTCHESTER-PUTNAM | 3 | | 3 | 100.0% |
| HEART OF NEW ENGLAND; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| HEART OF VIRGINIA; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| HEART OF VIRGINIA; PIKES PEAK | 1 | | 1 | 100.0% |
| HEART OF VIRGINIA; TIDEWATER | 4 | 2 | 6 | 66.7% |
| HOOSIER TRAILS; MUSKINGUM VALLEY | 2 | | 2 | 100.0% |
| HOOSIER TRAILS; QUAPAW AREA | 1 | | 1 | 100.0% |
| HUDSON VALLEY; NEW BIRTH OF FREEDOM | 1 | | 1 | 100.0% |
| HUDSON VALLEY; NEW BIRTH OF FREEDOM; SUSQUEHANNA | 1 | | 1 | 100.0% |
| HUDSON VALLEY; NORTHERN NEW JERSEY | | 1 | 1 | 0.0% |
| HUDSON VALLEY; THEODORE ROOSEVELT | 1 | | 1 | 100.0% |
| HUDSON VALLEY; WESTCHESTER-PUTNAM | 2 | | 2 | 100.0% |
| ILLOWA; MID-AMERICA | 1 | | 1 | 100.0% |
| ILLOWA; MISSISSIPPI VALLEY | 1 | 1 | 2 | 50.0% |
| ILLOWA; NORTHEAST ILLINOIS | | 1 | 1 | 0.0% |
| ILLOWA; NORTHEAST IOWA COUNCIL | | 1 | 1 | 0.0% |
| ILLOWA; PRAIRIELANDS | 1 | 1 | 2 | 50.0% |
| ILLOWA; THREE FIRES | 1 | | 1 | 100.0% |
| INDIAN NATIONS; LAST FRONTIER | 2 | | 2 | 100.0% |
| INDIAN NATIONS; SAGAMORE | 1 | | 1 | 100.0% |
| INDIAN WATERS; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| INDIAN WATERS; PALMETTO | 1 | | 1 | 100.0% |
| INDIAN WATERS; PEE DEE AREA | 1 | | 1 | 100.0% |
| INDIAN WATERS; PIKES PEAK | 1 | | 1 | 100.0% |
| INDIAN WATERS; TIDEWATER | 1 | | 1 | 100.0% |
| INLAND NORTHWEST; MONTANA | 2 | | 2 | 100.0% |
| INLAND NORTHWEST; MOUNTAIN WEST | | 1 | 1 | 0.0% |
| INLAND NORTHWEST; NORTHERN STAR | 1 | | 1 | 100.0% |
| INLAND NORTHWEST; OREGON TRAIL | 1 | | 1 | 100.0% |
| INLAND NORTHWEST; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| INLAND NORTHWEST; POTAWATOMI AREA | 1 | | 1 | 100.0% |
| IROQUOIS TRAIL; LEATHERSTOCKING | 8 | | 8 | 100.0% |
| IROQUOIS TRAIL; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| IROQUOIS TRAIL; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| IROQUOIS TRAIL; SOUTHEAST LOUISIANA | 1 | | 1 | 100.0% |
| ISTROUMA AREA; LOUISIANA PURCHASE | 3 | 1 | 4 | 75.0% |
| ISTROUMA AREA; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| ISTROUMA AREA; NORWELA | 2 | | 2 | 100.0% |
| ISTROUMA AREA; SOUTHEAST LOUISIANA | 4 | | 4 | 100.0% |
| JAYHAWK AREA; MID-IOWA | 1 | | 1 | 100.0% |
| JAYHAWK AREA; QUIVIRA | 1 | | 1 | 100.0% |
| JERSEY SHORE; MINSI TRAILS | 1 | | 1 | 100.0% |
| JERSEY SHORE; MONMOUTH | 1 | | 1 | 100.0% |
| JERSEY SHORE; PATRIOTS' PATH | 1 | | 1 | 100.0% |
| JERSEY SHORE; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| JUNIATA VALLEY; LAUREL HIGHLANDS | 7 | | 7 | 100.0% |
| KATAHDIN AREA; PINE TREE | 4 | 1 | 5 | 80.0% |
| LAKE ERIE; LAUREL HIGHLANDS | 1 | | 1 | 100.0% |
| LAKE ERIE; MIAMI VALLEY | 1 | | 1 | 100.0% |
| LAKE ERIE; NORTHEAST ILLINOIS | 1 | | 1 | 100.0% |
| LAKE ERIE; SIMON KENTON | 2 | | 2 | 100.0% |
| LAKE ERIE; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| LAS VEGAS AREA; MOUNTAIN WEST; NEVADA AREA | 1 | | 1 | 100.0% |
| LAS VEGAS AREA; NEVADA AREA | 9 | | 9 | 100.0% |
| LAS VEGAS AREA; PIKES PEAK | 1 | | 1 | 100.0% |
| LAS VEGAS AREA; SUFFOLK COUNTY | 1 | | 1 | 100.0% |
| LASALLE; MIAMI VALLEY | 1 | | 1 | 100.0% |
| LASALLE; MICHIGAN CROSSROADS | 1 | | 1 | 100.0% |
| LASALLE; NARRAGANSETT | 1 | | 1 | 100.0% |
| LASALLE; OREGON TRAIL | 1 | | 1 | 100.0% |
| LASALLE; PATHWAY TO ADVENTURE | 6 | 1 | 7 | 85.7% |
| LASALLE; SAGAMORE | 1 | | 1 | 100.0% |

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council**[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| LAST FRONTIER; LONG BEACH AREA | 1 | | 1 | 100.0% |
| LAST FRONTIER; SAGAMORE | 1 | | 1 | 100.0% |
| LAUREL HIGHLANDS; LINCOLN HERITAGE | 1 | | 1 | 100.0% |
| LAUREL HIGHLANDS; MORAINE TRAILS | 3 | 1 | 4 | 75.0% |
| LAUREL HIGHLANDS; MORAINE TRAILS; WESTMORELAND-FAYETTE | 1 | | 1 | 100.0% |
| LAUREL HIGHLANDS; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| LAUREL HIGHLANDS; OHIO RIVER VALLEY | | 1 | 1 | 0.0% |
| LAUREL HIGHLANDS; SUSQUEHANNA | 2 | | 2 | 100.0% |
| LAUREL HIGHLANDS; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| LAUREL HIGHLANDS; WESTMORELAND-FAYETTE | 3 | | 3 | 100.0% |
| LEATHERSTOCKING; LINCOLN HERITAGE | | 1 | 1 | 0.0% |
| LEATHERSTOCKING; LONGHOUSE | 3 | | 3 | 100.0% |
| LEATHERSTOCKING; NARRAGANSETT | 1 | | 1 | 100.0% |
| LEATHERSTOCKING; RIP VAN WINKLE; TWIN RIVERS | 1 | | 1 | 100.0% |
| LEATHERSTOCKING; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| LEATHERSTOCKING; TWIN RIVERS | 1 | | 1 | 100.0% |
| LEATHERSTOCKING; WESTCHESTER-PUTNAM | 1 | | 1 | 100.0% |
| LINCOLN HERITAGE; SAGAMORE | 1 | | 1 | 100.0% |
| LONG BEACH AREA; LOS PADRES; ORANGE COUNTY; VENTURA COUNTY; VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | | 1 | 1 | 0.0% |
| LONG BEACH AREA; ORANGE COUNTY | 5 | 1 | 6 | 83.3% |
| LONG BEACH AREA; OVERLAND TRAILS | 1 | | 1 | 100.0% |
| LONG BEACH AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| LONG BEACH AREA; SILICON VALLEY MONTEREY BAY | 4 | | 4 | 100.0% |
| LONG BEACH AREA; VERDUGO HILLS | 1 | 1 | 2 | 50.0% |
| LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| LONGHORN; LOUISIANA PURCHASE | | 1 | 1 | 0.0% |
| LONGHORN; NORTHWEST TEXAS | 1 | 1 | 2 | 50.0% |
| LONGHORN; PACIFIC HARBORS | 2 | | 2 | 100.0% |
| LONGHORN; SAM HOUSTON AREA | 5 | | 5 | 100.0% |
| LONGHORN; SOUTH TEXAS; TEXAS SOUTHWEST | 1 | | 1 | 100.0% |
| LONGHORN; TEXAS TRAILS | 3 | | 3 | 100.0% |
| LONGHORN; TEXAS TRAILS; THREE RIVERS | 1 | | 1 | 100.0% |
| LONGHORN; TRANSATLANTIC | 1 | | 1 | 100.0% |
| LONGHOUSE; PATRIOTS' PATH | 1 | | 1 | 100.0% |
| LONGHOUSE; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| LONGHOUSE; TWIN RIVERS | 1 | | 1 | 100.0% |
| LONGS PEAK COUNCIL; NORTHEAST ILLINOIS | 1 | | 1 | 100.0% |
| LONGS PEAK COUNCIL; PIKES PEAK | 1 | | 1 | 100.0% |
| LONGS PEAK COUNCIL; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| LOS PADRES; SEQUOIA | 1 | | 1 | 100.0% |
| LOS PADRES; SILICON VALLEY MONTEREY BAY | 2 | | 2 | 100.0% |
| LOS PADRES; SOUTHERN SIERRA | 2 | | 2 | 100.0% |
| LOS PADRES; WESTERN LOS ANGELES COUNTY | 1 | 1 | 2 | 50.0% |
| MARIN; PACIFIC SKYLINE | 2 | | 2 | 100.0% |
| MARIN; SAN DIEGO - IMPERIAL COUNCIL | 1 | | 1 | 100.0% |
| MASON-DIXON; PEE DEE AREA | 1 | | 1 | 100.0% |
| MAYFLOWER; NARRAGANSETT | 3 | 4 | 7 | 42.9% |
| MAYFLOWER; QUAPAW AREA | | 1 | 1 | 0.0% |
| MAYFLOWER; SPIRIT OF ADVENTURE | 11 | 2 | 13 | 84.6% |
| MAYFLOWER; TRANSATLANTIC | | 2 | 2 | 0.0% |
| MAYFLOWER; WESTCHESTER-PUTNAM | 3 | | 3 | 100.0% |
| MECKLENBURG COUNTY; NATIONAL CAPITAL AREA | 2 | | 2 | 100.0% |
| MECKLENBURG COUNTY; OCCONEECHEE | 2 | | 2 | 100.0% |
| MECKLENBURG COUNTY; OLD HICKORY | 1 | | 1 | 100.0% |
| MECKLENBURG COUNTY; OLD NORTH STATE | 1 | | 1 | 100.0% |
| MECKLENBURG COUNTY; PALMETTO | 2 | | 2 | 100.0% |
| MECKLENBURG COUNTY; PIEDMONT 420 | 4 | 2 | 6 | 66.7% |
| MIAMI VALLEY; MICHIGAN CROSSROADS; TECUMSEH | 1 | | 1 | 100.0% |
| MIAMI VALLEY; SIMON KENTON | 2 | | 2 | 100.0% |
| MIAMI VALLEY; TECUMSEH | 5 | 1 | 6 | 83.3% |
| MICHIGAN CROSSROADS; MID-AMERICA | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; NARRAGANSETT | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; NORTHEAST ILLINOIS | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; NORTHERN LIGHTS | | 1 | 1 | 0.0% |
| MICHIGAN CROSSROADS; ORANGE COUNTY | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; OVERLAND TRAILS | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; PACIFIC HARBORS | 1 | | 1 | 100.0% |

**ALW106**

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| MICHIGAN CROSSROADS; PATHWAY TO ADVENTURE | 6 | | 6 | 100.0% |
| MICHIGAN CROSSROADS; PINE BURR AREA | | 1 | 1 | 0.0% |
| MICHIGAN CROSSROADS; QUAPAW AREA | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; RIO GRANDE | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; THREE FIRES | 1 | | 1 | 100.0% |
| MICHIGAN CROSSROADS; WESTCHESTER-PUTNAM | 1 | | 1 | 100.0% |
| MID-AMERICA; MID-IOWA | 2 | 1 | 3 | 66.7% |
| MID-AMERICA; NATIONAL CAPITAL AREA | 2 | | 2 | 100.0% |
| MID-AMERICA; NORTHERN STAR | 2 | | 2 | 100.0% |
| MID-AMERICA; OLD NORTH STATE | 1 | | 1 | 100.0% |
| MID-AMERICA; OVERLAND TRAILS | 3 | | 3 | 100.0% |
| MID-AMERICA; SIOUX | 1 | | 1 | 100.0% |
| MIDDLE TENNESSEE; NATIONAL CAPITAL AREA | 1 | | 1 | 100.0% |
| MIDDLE TENNESSEE; QUAPAW AREA | 1 | | 1 | 100.0% |
| MIDDLE TENNESSEE; WEST TENNESSEE AREA | 2 | | 2 | 100.0% |
| MID-IOWA; MISSISSIPPI VALLEY | 1 | | 1 | 100.0% |
| MID-IOWA; NORTHEAST IOWA COUNCIL | 1 | | 1 | 100.0% |
| MID-IOWA; TWIN RIVERS | 1 | | 1 | 100.0% |
| MID-IOWA; W.D. BOYCE | 1 | | 1 | 100.0% |
| MIDNIGHT SUN; OREGON TRAIL | 1 | | 1 | 100.0% |
| MINSI TRAILS; MORAINE TRAILS | 1 | | 1 | 100.0% |
| MINSI TRAILS; NEW BIRTH OF FREEDOM | 1 | | 1 | 100.0% |
| MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 1 | 1 | 2 | 50.0% |
| MINSI TRAILS; NORTHERN NEW JERSEY | 4 | | 4 | 100.0% |
| MINSI TRAILS; PATRIOTS' PATH | 2 | | 2 | 100.0% |
| MINSI TRAILS; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| MISSISSIPPI VALLEY; NORTHERN STAR | | 1 | 1 | 0.0% |
| MISSISSIPPI VALLEY; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 4 | 1 | 5 | 80.0% |
| MISSISSIPPI VALLEY; THREE FIRES | 1 | | 1 | 100.0% |
| MONMOUTH; NORTHERN NEW JERSEY | 2 | | 2 | 100.0% |
| MONMOUTH; PATRIOTS' PATH | 2 | | 2 | 100.0% |
| MONMOUTH; PIKES PEAK | 1 | | 1 | 100.0% |
| MONTANA; NORTHERN LIGHTS | 1 | | 1 | 100.0% |
| MOUNTAIN WEST; NEVADA AREA | 1 | | 1 | 100.0% |
| MOUNTAINEER AREA; SIMON KENTON | 1 | | 1 | 100.0% |
| MUSKINGUM VALLEY; SIMON KENTON | 1 | | 1 | 100.0% |
| MUSKINGUM VALLEY; SPIRIT OF ADVENTURE | | 1 | 1 | 0.0% |
| NARRAGANSETT; NATIONAL CAPITAL AREA | | 1 | 1 | 0.0% |
| NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| NARRAGANSETT; SUFFOLK COUNTY | 2 | | 2 | 100.0% |
| NARRAGANSETT; THEODORE ROOSEVELT | 1 | | 1 | 100.0% |
| NARRAGANSETT; WESTERN MASSACHUSETTS | | 1 | 1 | 0.0% |
| NATIONAL CAPITAL AREA; ORANGE COUNTY | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; PACIFIC HARBORS | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; RIP VAN WINKLE | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; SHENANDOAH AREA | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; SOUTH FLORIDA COUNCIL | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; SOUTH PLAINS | 1 | | 1 | 100.0% |
| NATIONAL CAPITAL AREA; TIDEWATER | 2 | | 2 | 100.0% |
| NATIONAL CAPITAL AREA; VIRGINIA HEADWATERS | 2 | | 2 | 100.0% |
| NATIONAL CAPITAL AREA; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| NEVADA AREA; OVERLAND TRAILS | 1 | | 1 | 100.0% |
| NEVADA AREA; OZARK TRAILS | 1 | | 1 | 100.0% |
| NEVADA AREA; PACIFIC SKYLINE | 3 | | 3 | 100.0% |
| NEVADA AREA; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| NEVADA AREA; SEQUOIA; SILICON VALLEY MONTEREY BAY | 1 | | 1 | 100.0% |
| NEVADA AREA; SPIRIT OF ADVENTURE | | 1 | 1 | 0.0% |
| NEW BIRTH OF FREEDOM; NORTHEASTERN PENNSYLVANIA | 1 | | 1 | 100.0% |
| NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH | 3 | | 3 | 100.0% |
| NEW BIRTH OF FREEDOM; SUSQUEHANNA | 2 | | 2 | 100.0% |
| NEW BIRTH OF FREEDOM; TECUMSEH | 1 | | 1 | 100.0% |
| NEW BIRTH OF FREEDOM; TRANSATLANTIC | | 1 | 1 | 0.0% |
| NEW BIRTH OF FREEDOM; WASHINGTON CROSSING | 1 | | 1 | 100.0% |
| NORTH FLORIDA; SOUTH FLORIDA COUNCIL | 2 | | 2 | 100.0% |
| NORTH FLORIDA; SOUTHWEST FLORIDA | | 1 | 1 | 0.0% |
| NORTH FLORIDA; SUWANNEE RIVER AREA | 3 | 3 | 6 | 50.0% |
| NORTH FLORIDA; THREE FIRES | 1 | | 1 | 100.0% |

**ALW107**

THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council**[1]

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| NORTHEAST GEORGIA; NORTHWEST GEORGIA | 3 | | 3 | 100.0% |
| NORTHEAST ILLINOIS; PATHWAY TO ADVENTURE | 10 | 6 | 16 | 62.5% |
| NORTHEAST ILLINOIS; POTAWATOMI AREA | 1 | 1 | 2 | 50.0% |
| NORTHEAST ILLINOIS; RAINBOW; THREE FIRES | 1 | | 1 | 100.0% |
| NORTHEAST ILLINOIS; SAMOSET COUNCIL | 1 | 2 | 3 | 33.3% |
| NORTHEAST ILLINOIS; THREE FIRES | 2 | 1 | 3 | 66.7% |
| NORTHEAST ILLINOIS; W.D. BOYCE | 1 | | 1 | 100.0% |
| NORTHEAST IOWA COUNCIL; WINNEBAGO | 2 | | 2 | 100.0% |
| NORTHEASTERN PENNSYLVANIA; SUSQUEHANNA | 1 | | 1 | 100.0% |
| NORTHERN LIGHTS; NORTHERN STAR | 19 | 3 | 22 | 86.4% |
| NORTHERN NEW JERSEY; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; PATRIOTS' PATH | 41 | 4 | 45 | 91.1% |
| NORTHERN NEW JERSEY; PINE BURR AREA | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; QUIVIRA | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; SOUTHWEST FLORIDA | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| NORTHERN NEW JERSEY; WASHINGTON CROSSING | 2 | 1 | 3 | 66.7% |
| NORTHERN STAR; PIKES PEAK | | 1 | 1 | 0.0% |
| NORTHERN STAR; PRAIRIELANDS | 1 | | 1 | 100.0% |
| NORTHERN STAR; TWIN VALLEY | 1 | 1 | 2 | 50.0% |
| NORTHERN STAR; VOYAGEURS AREA | 6 | 1 | 7 | 85.7% |
| NORTHWEST GEORGIA; OCCONEECHEE | 1 | | 1 | 100.0% |
| NORTHWEST TEXAS; SAM HOUSTON AREA | 1 | | 1 | 100.0% |
| OCCONEECHEE; OLD HICKORY | 2 | | 2 | 100.0% |
| OCCONEECHEE; OLD NORTH STATE | 1 | | 1 | 100.0% |
| OCCONEECHEE; TRANSATLANTIC | 1 | | 1 | 100.0% |
| OCCONEECHEE; TUSCARORA | 1 | | 1 | 100.0% |
| OHIO RIVER VALLEY; PATHWAY TO ADVENTURE | 1 | | 1 | 100.0% |
| OLD HICKORY; OLD NORTH STATE | 3 | 1 | 4 | 75.0% |
| OLD HICKORY; PIEDMONT 420 | 1 | 1 | 2 | 50.0% |
| OLD NORTH STATE; PIEDMONT 420 | 2 | | 2 | 100.0% |
| OLD NORTH STATE; WESTERN MASSACHUSETTS | | 1 | 1 | 0.0% |
| ORANGE COUNTY; PACIFIC SKYLINE | 1 | | 1 | 100.0% |
| ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL | 1 | 2 | 3 | 33.3% |
| ORANGE COUNTY; VENTURA COUNTY | 1 | | 1 | 100.0% |
| ORANGE COUNTY; WESTERN LOS ANGELES COUNTY | 2 | | 2 | 100.0% |
| OREGON TRAIL; OVERLAND TRAILS | 1 | | 1 | 100.0% |
| OREGON TRAIL; QUIVIRA | | 1 | 1 | 0.0% |
| OREGON TRAIL; SHENANDOAH AREA | 1 | | 1 | 100.0% |
| OZARK TRAILS; QUIVIRA | 2 | | 2 | 100.0% |
| OZARK TRAILS; THREE FIRES | 1 | | 1 | 100.0% |
| PACIFIC HARBORS; TRANSATLANTIC | 2 | | 2 | 100.0% |
| PACIFIC HARBORS; WESTERN MASSACHUSETTS | 1 | | 1 | 100.0% |
| PACIFIC SKYLINE; REDWOOD EMPIRE | 2 | | 2 | 100.0% |
| PACIFIC SKYLINE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 1 | | 1 | 100.0% |
| PACIFIC SKYLINE; SILICON VALLEY MONTEREY BAY | 9 | 1 | 10 | 90.0% |
| PALMETTO; PIEDMONT 420 | 2 | | 2 | 100.0% |
| PATHWAY TO ADVENTURE; PRAIRIELANDS | 1 | | 1 | 100.0% |
| PATHWAY TO ADVENTURE; RAINBOW | 5 | | 5 | 100.0% |
| PATHWAY TO ADVENTURE; SAGAMORE | 1 | | 1 | 100.0% |
| PATHWAY TO ADVENTURE; SAMOSET COUNCIL | 1 | | 1 | 100.0% |
| PATHWAY TO ADVENTURE; THREE FIRES | 5 | 1 | 6 | 83.3% |
| PATHWAY TO ADVENTURE; THREE HARBORS | 2 | | 2 | 100.0% |
| PATRIOTS' PATH; VIRGINIA HEADWATERS | 1 | | 1 | 100.0% |
| PATRIOTS' PATH; WINNEBAGO | | 1 | 1 | 0.0% |
| PIEDMONT 420; SENECA WATERWAYS | 1 | | 1 | 100.0% |
| PONY EXPRESS; QUIVIRA | 1 | | 1 | 100.0% |
| POTAWATOMI AREA; THREE HARBORS | 2 | | 2 | 100.0% |
| PRAIRIELANDS; THREE FIRES | 1 | | 1 | 100.0% |
| PRAIRIELANDS; W.D. BOYCE | | 1 | 1 | 0.0% |
| QUAPAW AREA; SEQUOYAH | 1 | | 1 | 100.0% |
| QUAPAW AREA; WESTARK AREA | 1 | | 1 | 100.0% |
| QUIVIRA; SANTA FE TRAIL | 1 | | 1 | 100.0% |
| QUIVIRA; TEXAS TRAILS | 1 | | 1 | 100.0% |
| RAINBOW; SAGAMORE | 1 | | 1 | 100.0% |
| RAINBOW; THREE FIRES | 2 | | 2 | 100.0% |
| RIO GRANDE; SOUTH TEXAS | 1 | | 1 | 100.0% |
| RIO GRANDE; TEXAS SOUTHWEST | 1 | | 1 | 100.0% |

ALW108

**THE DEBTORS NOTE THAT CLASS 8 HAS VOTED TO ACCEPT THE PLAN. THE DEBTORS DO NOT BELIEVE THIS INFORMATION HAS ANY LEGAL RELEVANCE.**

**Distribution of Supplemental Final Voting Report (D.I. 9275) Class 8 Direct Abuse Claim Results by Local Council[1]**

[1] Vote counts and acceptance rates are based on voting report data as of 3/10/2022.

[2] Local Council is based on manually-reviewed proof of claim data received as of 7/2/2021. For each voting claim, the identified Local Council is based on the information reported in the proofs of claim and is not necessarily the correct Local Council. The identified Local Councils have not been verified and therefore should not be considered final.

| Local Council(s)[2] | Accept | Reject | Total | Acceptance Rate |
|---|---|---|---|---|
| SAGAMORE; SPIRIT OF ADVENTURE | 1 | | 1 | 100.0% |
| SAGAMORE; THREE FIRES | 1 | | 1 | 100.0% |
| SAM HOUSTON AREA; SOUTH TEXAS | 1 | | 1 | 100.0% |
| SAM HOUSTON AREA; TEXAS SOUTHWEST | 1 | | 1 | 100.0% |
| SAM HOUSTON AREA; THREE RIVERS | 6 | | 6 | 100.0% |
| SAM HOUSTON AREA; TIDEWATER | 1 | | 1 | 100.0% |
| SAM HOUSTON AREA; VOYAGEURS AREA | 1 | | 1 | 100.0% |
| SAM HOUSTON AREA; YUCCA | 1 | | 1 | 100.0% |
| SAN DIEGO - IMPERIAL COUNCIL; SEQUOIA | 1 | | 1 | 100.0% |
| SANTA FE TRAIL; SOUTHEAST LOUISIANA | 1 | | 1 | 100.0% |
| SENECA WATERWAYS; THEODORE ROOSEVELT | 1 | | 1 | 100.0% |
| SENECA WATERWAYS; TWIN RIVERS | 2 | | 2 | 100.0% |
| SENECA WATERWAYS; WESTMORELAND-FAYETTE | 1 | | 1 | 100.0% |
| SEQUOIA; SEQUOYAH | 2 | | 2 | 100.0% |
| SEQUOIA; SOUTHERN SIERRA | 1 | | 1 | 100.0% |
| SEQUOIA; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| SHENANDOAH AREA; TIDEWATER | 1 | | 1 | 100.0% |
| SILICON VALLEY MONTEREY BAY; TWIN RIVERS | 2 | | 2 | 100.0% |
| SILICON VALLEY MONTEREY BAY; WESTERN LOS ANGELES COUNTY | 1 | | 1 | 100.0% |
| SIMON KENTON; TECUMSEH | 1 | | 1 | 100.0% |
| SOUTH FLORIDA COUNCIL; SOUTH GEORGIA | 1 | | 1 | 100.0% |
| SOUTH FLORIDA COUNCIL; SOUTHWEST FLORIDA | 1 | | 1 | 100.0% |
| SOUTH GEORGIA; SUWANNEE RIVER AREA | 2 | | 2 | 100.0% |
| SOUTH PLAINS; TEXAS SOUTHWEST | 1 | | 1 | 100.0% |
| SOUTHEAST LOUISIANA; WEST TENNESSEE AREA | 1 | | 1 | 100.0% |
| SOUTHERN SIERRA; VENTURA COUNTY | 1 | | 1 | 100.0% |
| SOUTHERN SIERRA; VERDUGO HILLS | | 1 | 1 | 0.0% |
| SOUTHERN SIERRA; WESTERN LOS ANGELES COUNTY | 4 | 3 | 7 | 57.1% |
| SPIRIT OF ADVENTURE; TWIN RIVERS | 1 | | 1 | 100.0% |
| SPIRIT OF ADVENTURE; YOCONA AREA | 1 | | 1 | 100.0% |
| SUFFOLK COUNTY; THEODORE ROOSEVELT | 10 | 3 | 13 | 76.9% |
| SUFFOLK COUNTY; TWIN RIVERS | | 1 | 1 | 0.0% |
| THREE FIRES; TWIN RIVERS | 1 | | 1 | 100.0% |
| THREE HARBORS; YUCCA | 1 | | 1 | 100.0% |
| TUKABATCHEE AREA; WESTMORELAND-FAYETTE | 1 | | 1 | 100.0% |
| VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 2 | | 2 | 100.0% |
| VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 2 | 2 | 4 | 50.0% |
| WEST TENNESSEE AREA; YOCONA AREA | 1 | | 1 | 100.0% |
| **Total** | **33,075** | **5,935** | **39,010** | **84.8%** |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### TWELFTH MEDIATOR'S REPORT

The Court appointed Timothy V.P. Gallagher to serve as the Mediator in the above-captioned cases under the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief*, dated June 9, 2020 [D.I. 812] (the "Mediation Order").[2]

With the assistance of the Mediator, on March 17, 2022, the Debtors, the Roman Catholic Ad Hoc Committee (the "RCAHC") and its individual members, the Tort Claimants' Committee, the Future Claimants' Representative, the Coalition of Abused Scouts for Justice, the Ad Hoc Committee of Local Councils, and Settling Insurance Companies (collectively, the "Parties") reached a settlement, a copy of which is attached hereto as **Exhibit A** (the "RCAHC Term Sheet").[3] The terms of the RCAHC Term Sheet will be appended to and incorporated by reference in the Plan or the Confirmation Order.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Mediation Order, the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (the "Plan") or the RCAHC Term Sheet (as defined below), as applicable.

[3] The summary provided in this report is for illustrative purposes only. In the event of any inconsistency between this summary and the RCAHC Term Sheet, the terms of the RCAHC Term Sheet shall control. The Parties reserve the right to make further nonmaterial changes and corrections to the form of RCAHC Term Sheet attached hereto.

**ALW110**

The Mediator appreciates the diligence of all of the Parties in negotiating the settlement terms. The Mediator expresses no view on the merits of the settlement terms or the confirmability of any plan, matters properly reserved for the Court.

This report is submitted with the consent of the Parties.

*[Remainder of Page Intentionally Left Blank]*

**ALW111**

Dated:  March 17, 2022                    */s/ Timothy V.P. Gallagher*
                                                 Timothy V.P. Gallagher, Mediator

**ALW112**

**EXHIBIT A**

ALW113

**EXECUTION VERSION**

### RCAHC SETTLEMENT

This agreement (the "Term Sheet") dated March 17, 2022 represents the settlement agreement between and among the Roman Catholic Ad Hoc Committee (the "RCAHC"),  and each of its individual members, including all members set forth in the third amended verified Rule 2019 statement filed by the RCAHC [D.I.  8740] and attached hereto as Schedule 1, Boy Scouts of America and Delaware BSA, LLC, as debtors and debtors in possession (collectively, the "BSA" or the "Debtors"), the Ad Hoc Committee of Local Councils (the "AHCLC"), the Coalition of Abused Scouts for Justice, solely and only in its capacity as an ad hoc committee (the "Coalition"),[1] the Future Claimants' Representative (the "FCR"), and the Tort Claimants' Committee (the "TCC", and, collectively with the Settling Insurance Companies, the Debtors, the AHCLC, and the Coalition, the "Parties").[2]  This Term Sheet will be appended to and incorporated by reference to the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. 8813] (as amended to include this Term Sheet, as may be further amended, modified, or supplemented from time to time, the "Plan") or the order confirming such Plan.[3]

The term "Roman Catholic Entities" means each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting activities in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, regardless of whether any of the foregoing entities is or was a Chartered Organization at any time or whether such facilities were owned or leased by any of such entities or a third party; (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC. However, no Perpetrator is or shall be a Roman Catholic Entity.

WHEREAS, the RCAHC has asserted certain objections to confirmation and testimony and exhibits relating thereto (the "Objections");

WHEREAS, the Parties wish to resolve disputes concerning such Objections;

WHEREAS, as provided herein and subject to the terms of the settlement, subject to the clarification of terms described below, the RCAHC will withdraw its Objections and support confirmation of the Plan;

1.     This Term Sheet shall be binding on the Parties when each of the Parties has executed this Term Sheet, except as provided in Footnote 6 hereof with respect to members of the

---

[1]  For the avoidance of doubt, no holders of Direct Abuse Claims are or shall be deemed Parties to this Term Sheet or the Agreement.

[2]  Notwithstanding anything to the contrary in this Term Sheet, the obligations and undertakings of the AHCLC in connection with this Term Sheet or the Agreement shall be no greater than the AHCLC's parallel obligations and undertakings under Section III of the Restructuring Support Agreement (including the "No Liability" subsection thereof) filed at Dkt. 5466-2.

[3]  Capitalized terms not defined in this Term Sheet shall have the meanings ascribed to such terms in the Plan, as applicable or modified to be consistent with this Term Sheet.

1

**ALW114**

**EXECUTION VERSION**

RCAHC that are debtors in their own bankruptcy cases (each a "Debtor RCAHC Member").

2.    The Plan and/or the Confirmation Order shall be amended to provide that Roman Catholic Entities other than those that have specifically opted out of such treatment (and do not withdraw such opt-out) shall be treated as Participating Chartered Organizations, provided that the RCAHC withdraws its Objections and the parishes and related entities of the Archdiocese of New York withdraw their independent joinder.[4] The Plan and/or Confirmation Order shall also be amended to incorporate the following definition of Roman Catholic Entities:

> "'Roman Catholic Entities' shall mean each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting activities in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, regardless of whether any of the foregoing entities is or was a Chartered Organization at any time or whether such facilities were owned or leased by any of such entities or a third party; (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC. However, no Perpetrator is or shall be a Roman Catholic Entity."[5]

3.    Upon execution of this Term Sheet, the RCAHC and each of its members shall:

    a)    support confirmation of the Plan, the releases, injunctions and assignments contained therein and the Insurance Settlements;[6]

    b)    withdraw all discovery served in connection with the Plan, as applicable;

    c)    withdraw all objections to any declarations filed in connection with confirmation of the Plan, including with respect to the objection to the Declaration of Mr. Brian Whittman [D.I. 9310].

    d)    withdraw all objections to confirmation of the Plan and the approval of the Plan Documents, including the making of all findings of fact and conclusions of law therein; and

---

[4] For the avoidance of doubt and regardless of anything in this Term Sheet, prompt withdrawal of any objection to the Plan by any Debtor RCAHC Member or any other Chartered Organization in bankruptcy does not require such entities to seek authorization from any other court.

[5] The foregoing provision is included for the avoidance of doubt. The channeling injunction and releases provided to the Participating Chartered Organizations not affiliated with the Roman Catholic Church (including other faith-based institutions) and their related entities are consistent with the foregoing scope.

[6] Debtor RCAHC Members may submit opt-in elections, subject to bankruptcy court approval, to the extent required by the Bankruptcy Code. Furthermore, except as provided herein, any affirmative obligations of Debtor RCAHC Members arising under this Term Sheet remain subject to bankruptcy court approval in their own bankruptcy cases solely to the extent required by the Bankruptcy Code.

**ALW115**

**EXECUTION VERSION**

      e)   withdraw any expert reports submitted in the Chapter 11 Cases.

4.                         So long as the Roman Catholic Entities are included as Participating Chartered Organizations and receive the benefits of the injunctions and releases for such parties under the Plan, the RCAHC will work in good faith with the Debtors to encourage and recommend to non-RCAHC member Roman Catholic Entities that they should (1) withdraw any opt-out election and (2) withdraw any objection or response to the confirmation of the Plan (excluding any joinders in support of confirmation of the Plan), and otherwise not object to the confirmation of the Plan and the approval of the Plan Documents. The RCAHC shall work in good faith with the Debtors to encourage any such parties that have objected to the Plan or otherwise opted out of the protections afforded them in the Plan as Participating Chartered Organizations to promptly withdraw any objections to the Plan or Plan Documents and withdraw their opt-out elections; provided, however, that with respect to the Roman Catholic Entities that are in bankruptcy and must opt in in order to be afforded such protections, the RCAHC shall work in good faith with the Debtors to encourage such Roman Catholic Entities to promptly submit opt-in elections, subject to bankruptcy court approval, if required by the Bankruptcy Code, and thereafter seek bankruptcy court approval within their own bankruptcy cases regarding the opt-in to the extent required by the Bankruptcy Code;[7] provided further however, to the extent such objection or opt-out is not withdrawn (or in the case of Roman Catholic Entities in bankruptcy, such election to opt-in is not provided), such Entity shall receive the treatment under the Plan for Opt-Out Chartered Organizations.

5.       The members of the RCAHC shall work with the BSA and the Local Councils to improve and support Scouting, at least through the year 2036. The RCAHC and its members agree to recommend to the U.S. Council of Bishops that they encourage all Roman Catholic Entities to work with the BSA and the Local Councils to improve Scouting and grow Scouting, at least through the year 2036. The support provided by the Roman Catholic Entities may, but is not required to, include engaging with the BSA and Local Councils to (a) recommend that Catholic dioceses support Scouting as part of their youth ministry; (b) cooperate with Local Councils in establishing new units; (c) continue to support existing units; (d) allow local parishes to promote and encourage participation Scouting; and (e) continue to support religious awards in Scouting program.

6.       The RCAHC shall cooperate and support the BSA's Youth Protections efforts, including, but not limited to, designating a member to serve on the Youth Protection Committee and facilitating cooperation by the Roman Catholic Entities with the enhanced Youth Protection protocols included in the Plan.

7.       The Document Appendix shall be amended to provide at the end of Section 9 as follows:

---

[7] Any Roman Catholic Entity that is a debtor in bankruptcy has until thirty (30) days following entry of the order confirming the Plan to seek bankruptcy court approval within their own bankruptcy cases regarding opting-in to the extent such approval is required by the Bankruptcy Code.

**ALW116**

**EXECUTION VERSION**

> *"Solely with respect to the RCAHC, its members and Roman Catholic Entities, the Settlement Trustee and holders of Direct Abuse Claimants may issue subpoenas hereunder under the authority of FRBP 2004 solely for the purpose of pursuing Direct Abuse Claims filed with the Trust (whether pursuant to the general procedures in Article V or VII or the Independent Review Option in Article XIII); provided that, the holder of a Direct Abuse Claim shall obtain the written approval of the Settlement Trustee that the proposed discovery is for the purpose of administering Direct Abuse Claims in the Trust before issuing a subpoena; and provided further, that nothing herein shall prejudice the rights of the holder of a Direct Abuse Claim to seek any discovery by lawful means (including filing a motion for an order under FRBP 2004) if the Settlement Trustee does not grant the requested approval."*

8.    The following language will be added to Article X.F.3 of the Plan or the Confirmation Order:

> *"The protections provided under this Article X.F.3 shall apply, including without limitation, to all insureds and co-insureds covered under insurance policies that are sold back to the Settling Insurance Companies pursuant to the terms of the Plan or an Insurance Settlement Agreement."*

9.    A three member "Chartered Organization Advisory Group" consisting of representatives of Participating or Contributing Chartered Organizations shall be formed to advise the Settlement Trustee, Former Judge Houser, about Chartered Organizations' concerns as to any future insurance settlements and other issues.  The Chartered Organization Advisory Group may also advise the Settlement Trustee regarding coordination of claims information and settlement negotiations with Chartered Organizations. The group shall be entirely advisory in nature, shall have no fiduciary duties, and shall not have the authority to bind or control the Settlement Trustee, any Chartered Organization or other party.  A representative of the RCAHC shall be a member of this advisory group.

10.    The following language will be added to section X.G.1.e of the Plan or the Confirmation Order:

> *"For the avoidance of doubt, and consistent with section X.G.1.c of the Plan, Participating Chartered Organizations and Contributing Chartered Organizations retain the right to seek coverage from the Settling Insurance Companies under policies issued directly to such Chartered Organizations for defense costs incurred in connection with the enforcement of the injunction with respect to an Abuse Claim until the time the Abuse Claim is determined to be an Abuse Claim by a court."*

11.    The Settlement Trust will maintain the data room of policy documentation and the Excel spreadsheets that identify the historic Boy Scouts and Local Council insurance policies for five (5) years after the Effective Date of the Plan.  Access to this information will be

**ALW117**

**EXECUTION VERSION**

provided to Chartered Organizations and plaintiffs' counsel who want to determine if the injunction or releases bar suit from being filed.

12.     The Local Councils will use reasonable best efforts to search for insurance policies and evidence of insurance policies on request of a Chartered Organization that has been named or may be named in a claim or lawsuit.

13.     On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse the RCAHC amounts they have paid to its counsel, ArentFox Schiff LLP and Potter Anderson & Corroon LLP (the "RCAHC Professionals") for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the RCAHC Professionals (the "RCAHC Restructuring Expenses"); provided, however, that, without limiting the foregoing, the RCAHC Restructuring Expenses shall be in an aggregate amount not to exceed $1,500,000, any award of such fees shall be payable by Reorganized BSA over the course of the twenty four (24) month period following the Effective Date of the Plan in four equal installments with the first installment due six (6) months following the Effective Date of the Plan. Notwithstanding anything to the contrary in the Plan, the RCAHC Restructuring Expenses shall be subject to the terms of Article II.A.2 of the Plan, with the following modifications: (x) RCAHC Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are RCAHC Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of RCAHC Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner.

The Parties shall not object to the granting of a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, for the reimbursement and/or payment of the RCAHC Restructuring Expenses.

14.     Notwithstanding anything else in this Term Sheet to the contrary, no term or condition of this Term Sheet shall require the BSA, the FCR, or the TCC to take or refrain from taking any action that it determines would be inconsistent with its fiduciary duties.

15.     Parties shall cooperate with each other to coordinate on timing and substance of public statements of settlement, including press releases, court filings and in-court statements.

16.     The persons signing this Term Sheet on behalf of the RCAHC represent that they have authority to enter into this Term Sheet on behalf of the RCAHC.

17.     This Term Sheet may be executed in one or more counter parts that, when exchanged and complied by email or other means shall constitute one single, effective summary of the Parties' agreements.

**ALW118**

**EXECUTION VERSION**

18.   This Term Sheet shall be governed by Delaware law.

        IN WITNESS WHEREOF, the Parties have duly executed this Term Sheet as of the last date indicated below.

6

**ALW119**

**EXECUTION VERSION**

**BSA (as defined)**                    **Roman Catholic Ad Hoc Committee**

By:    _/s/ Roger C. Mosby_____    By:    _____

Name:  Roger C. Mosby_____    Name:  _____

Title:  President and CEO_____    Title:  _____

Date:   March 17, 2022_____    Date:   _____

**ALW120**

**EXECUTION VERSION**

**BSA (as defined)**                    **Roman Catholic Ad Hoc Committee**

By: _____        By: _Rodny W Oligmull_

Name: _____        Name: _RODNEY W. OLIGMUELLER_

Title: _____       Title: _COMMITTEE CHAIRMAN_

Date: _____        Date: _3/17/2022_

**ALW121**

**EXECUTION VERSION**

**Century Indemnity Company**

By: _____

Name: Robert Omrod

Title: President

Date: 3/16/22

**Westchester Fire Insurance Company & Federal Insurance Company**

By: _____

Name: Christopher Celentano

Title: SVP Coverage & Complex Claims

Date: 3/16/2022

**ALW122**

**EXECUTION VERSION**

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**OFFICIAL COMMITTEE TORT CLAIMANTS**

The TCC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**ALW123**

**EXECUTION VERSION**

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**OFFICIAL COMMITTEE TORT CLAIMANTS**

The TCC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: *John P Humphrey Jr*

Dated: 3/17/22

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**ALW124**

**EXECUTION VERSION**

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**OFFICIAL COMMITTEE TORT CLAIMANTS**

The TCC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: *Eric Goodman*

Dated: 3-17-2022

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**ALW125**

**EXECUTION VERSION**

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**OFFICIAL COMMITTEE TORT CLAIMANTS**

The TCC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _____

Dated: _____

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the RCAHC Settlement.

By: _Richard H. Mason_

Dated: _March 17, 2022_

**ALW126**

**EXECUTION VERSION**

# RCAHC MEMBERS

IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

**Catholic Mutual Relief Society of America**

By:  /s/  *Rody W Oligmueller*

Name:  RODNEY W. OLIGMUELLER

Title:  AVP SPECIALTY CLAIMS

Date:  3/17/2022

**Roman Catholic Diocese of Sioux City**

By:  /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Joliet**

By:  /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Omaha**

By:  /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Winona-Rochester**

By:  /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Archdiocese of Washington, D.C.**

By:  /s/ _____

Name: _____

Title: _____

Date: _____

**ALW127**

EXECUTION VERSION

## RCAHC MEMBERS

IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

**Catholic Mutual Relief Society of America**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Sioux City**

By: /s/ _Royce Ranniger_____

Name: _Royce Ranniger_____

Title: _Asst. Secretary_____

Date: _3 - 16 - 2022_____

**Roman Catholic Diocese of Joliet**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Omaha**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Winona-Rochester**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Archdiocese of Washington, D.C.**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**ALW128**

**EXECUTION VERSION**

## RCAHC MEMBERS

IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

**Catholic Mutual Relief Society of America**

By: _/s/_

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Sioux City**

By: _/s/_

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Joliet**

By: _/s/_ D— Schoed

Name: _Brian Schroeder_

Title: _CFO_

Date: _3/16/22_

**Roman Catholic Diocese of Omaha**

By: _/s/_

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Winona-Rochester**

By: _/s/_

Name: _____

Title: _____

Date: _____

**Roman Catholic Archdiocese of Washington, D.C.**

By: _/s/_

Name: _____

Title: _____

Date: _____

**ALW129**

**EXECUTION VERSION**

## RCAHC MEMBERS

IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

| **Catholic Mutual Relief Society of America** | **Roman Catholic Diocese of Sioux City** |
|---|---|
| By: _/s/_ | By: _/s/_ |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

| **Roman Catholic Diocese of Joliet** | **Roman Catholic Diocese of Omaha** |
|---|---|
| By: _/s/_ | By: _(signature)_ |
| Name: | Name: _James J Stolze_ |
| Title: | Title: _CFO_ |
| Date: | Date: _3/16/22_ |

| **Roman Catholic Diocese of Winona-Rochester** | **Roman Catholic Archdiocese of Washington, D.C.** |
|---|---|
| By: _/s/_ | By: _/s/_ |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

**ALW130**

**EXECUTION VERSION**

## RCAHC MEMBERS

IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

**Catholic Mutual Relief Society of America**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Sioux City**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Joliet**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Omaha**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Winona-Rochester**

By: _/s/ Andrew D. Brannon_

Name: _Andrew D. Brannon_

Title: _COO/CFO_

Date: _3/16/2022_

**Roman Catholic Archdiocese of Washington, D.C.**

By: _/s/_____

Name: _____

Title: _____

Date: _____

**ALW131**

**EXECUTION VERSION**

## RCAHC MEMBERS

      IN WITNESS WHEREOF, the RCAHC Member have duly executed this Term Sheet individually on their own behalf and as RCAHC members as of the last date indicated below.

**Catholic Mutual Relief Society of America**

By:    /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Sioux City**

By:    /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Joliet**

By:    /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Omaha**

By:    /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Diocese of Winona-Rochester**

By:    /s/ _____

Name: _____

Title: _____

Date: _____

**Roman Catholic Archdiocese of Washington, D.C.**

By:    /s/ _____

Name: _Christopher Anzidei_

Title: _General Counsel_

Date: _March 16, 2022_

**ALW132**

EXECUTION VERSION

**Roman Catholic Archdiocese of New York**

By:     /s/

Name:   Frank Nepolitano

Title:  Chief Administrative Officer

Date:   3/16/22

**Roman Catholic Archdiocese of Chicago**

By:     /s/

Name:   _____

Title:  _____

Date:   _____

**Roman Catholic Diocese of Syracuse**

By:     /s/

Name:   _____

Title:  _____

Date:   _____

**Roman Catholic Diocese of Rochester, New York**

By:     /s/

Name:   _____

Title:  _____

Date:   _____

**Roman Catholic Diocese of Buffalo**

By:     /s/

Name:   _____

Title:  _____

Date:   _____

**ALW133**

**EXECUTION VERSION**

| | |
|---|---|
| **Roman Catholic Archdiocese of New York** | **Roman Catholic Archdiocese of Chicago** |
| By: _/s/_____ | By: _/s/_ James C. Geoly |
| Name: _____ | Name: James C. Geoly |
| Title: _____ | Title: General Counsel |
| Date: _____ | Date: 3/16/2022 |
| **Roman Catholic Diocese of Syracuse** | **Roman Catholic Diocese of Rochester, New York** |
| By: _/s/_____ | By: _/s/_____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |
| **Roman Catholic Diocese of Buffalo** | |
| By: _/s/_____ | |
| Name: _____ | |
| Title: _____ | |
| Date: _____ | |

**ALW134**

**EXECUTION VERSION**

**Roman Catholic Archdiocese of New York**

By:     /s/ _____

Name:  _____

Title:  _____

Date:  _____

**Roman Catholic Archdiocese of Chicago**

By:     /s/ _____

Name:  _____

Title:  _____

Date:  _____

**Roman Catholic Diocese of Syracuse**

By:     /s/ _____

Name:  _____

Title:  _____

Date:  _____

**Roman Catholic Diocese of Rochester, New York**

By:     /s/ _____

Name:  _____

Title:  _____

Date:  _____

**Roman Catholic Diocese of Buffalo**

By:     /s/ _A. Regina Murphy, SSMN_

Name:  Sr. Regina Murphy, SSMN

Title:  Chancellor

Date:  March 17, 2022

**ALW135**

**EXECUTION VERSION**

## Schedule 1

| Committee Member | Address | Affiliation |
|---|---|---|
| Rodney W. Oligmueller | 10843 Old Mill Rd<br>Omaha, NE 68154-2600 | Catholic Mutual Relief Society of America |
| Royce Ranniger | 1821 Jackson Street<br>Sioux City, IA 51105 | Roman Catholic Diocese of Sioux City |
| Brian Schroeder | 16555 Weber Road<br>Crest Hill, IL 60403 | Roman Catholic Diocese of Joliet |
| James J. Stolze | 2222 N. 111th Street<br>Omaha, NE 68164 | Roman Catholic Diocese of Omaha |
| Andrew D. Brannon | 55 W. Sanborn St.<br>Winona, MN 55987 | Roman Catholic Diocese of Winona-Rochester |
| Chris Anzidei | P.O. Box 29260<br>Washington, D.C. 20017-0260 | Roman Catholic Archdiocese of Washington, D.C. |
| Frank Napolitano | 1011 First Ave.<br>New York, NY 10022 | Roman Catholic Archdiocese of New York |
| James C. Geoly | 835 N. Rush St.<br>Chicago, IL 60611 | Roman Catholic Archdiocese of Chicago |
| Stephen A. Breen | 240 East Onondaga Street<br>Syracuse, NY 13202 | Roman Catholic Diocese of Syracuse |
| Lisa M. Passero | 1150 Buffalo Road<br>Rochester, NY 14624 | Roman Catholic Diocese of Rochester, New York |
| Sr. Regina Murphy | 795 Main Street<br>Buffalo, NY 14203 | Roman Catholic Diocese of Buffalo |

**ALW136**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 10188** |

## LUJAN CLAIMANTS' OBJECTION TO DEBTORS' MOTION TO AMEND AND SUPPLEMENT THE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN THE CONFIRMATION OPINION PURSUANT TO FED. R. BANKR. P. 7052 AND FED. R. CIV. P. 52

COME NOW the Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")[1]

and object to Debtors' Motion to Amend and Supplement the Findings of Fact and Conclusions of

Law in the Confirmation Opinion pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52 (D.I.

10188), which was filed by Debtors Boy Scouts of America and Delaware BSA, LLC's (collectively

"Debtors") on August 12, 2022.

By their motion, Debtors seek to amend and supplement the Court's Opinion (D.I. 10136)

which rejected material aspects of Debtors' Third Modified Fifth Amended Chapter 11 Plan of

Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8813), and seek an order

of the Court confirming a materially modified plan of reorganization.   As the Court's Opinion did

not confirm Debtors' Plan or dismiss this consolidated action, the Opinion is not a final order or

judgment for purposes of appeal. WCI Steel, Inc. v. Wilmington Trust Co., 338 B.R. 1, 9 (N.D. Ohio

2005) (citing, e.g., Lievsay v. W. Fin. Sav. Bank (In re Lievsay), 118 F. 3d 661, 662 (9th Cir. 1997)

(finding a bankruptcy court's decision denying confirmation of a Chapter 11 plan was interlocutory)).

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

1

**ALW137**

"'So long as the bankruptcy proceeding itself has not been terminated, the debtor, unsuccessful with one reorganization plan, may always propose another plan for the bankruptcy court to review for confirmation.'" Id. (quoting Simons v. Fed. Deposit Ins. Corp. (In re Simons), 908 F. 2d 643, 645 (10th Cir. 1990)). " 'Under these circumstances, the parties' rights have not been finally determined and the process of plan confirmation is continuing.'" Id. (quoting Rady v. Robert Bros., No. 1:02-CV-1284-LJM-WTL, 2003 WL 211806094, at *1 (S.D. Ind. Apr. 23, 2003)). The Court, in its Opinion, emphasized that its Opinion was interlocutory and non-final. (Opinion at 269 ("Debtors have decisions to make regarding the Plan and need sufficient time to determine how to proceed. At their convenience, counsel to Debtors may reach out to chambers to schedule a status conference.").) Thus, there is no judgment to amend.

Acknowledging that the Court, in its Opinion, did not confirm the Plan or finally dispose of this consolidated case, Debtors request in their motion that the Court issue Supplemental Findings of Fact and Conclusions of Law Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, (Mot. Ex. A), pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. However, neither Rule 7052 nor Rule 52 permit confirmation of an alternative plan of reorganization, especially one that is materially different[2] from the rejected Plan. Debtors should not be permitted to bypass requirements for plan confirmation, including but not limited to Bankruptcy Rule 2002(b), which requires at least 28 days' notice to parties in interest for filing objections to confirmation of a chapter 11 plan.

Even if Debtors' motion is properly brought under Rules 7052 and 52, Debtors have failed to argue or show manifest injustice without amendment or supplement of the Opinion or any newly

---

[2] Debtors propose that the Court confirm a materially different plan that, among other things, does not include the $250 million settlement with The Church of Jesus Christ and that does not include insurance policy buybacks free and clear of all interests.

2

**ALW138**

discovered evidence justifying amendment or supplement.  <u>Wound Care Centers Inc. v. Catalane</u>, Civil No. 10-336, 2011 WL 3476612, at *3 (W.D. Pa. Aug. 9, 2011); <u>In re Smith Corona Corp.</u>, 212 B.R. 59, 60 (Bankr. D. Del. 1997).  Accordingly, their motion should be denied.

The motion must also be denied as Debtors incorrectly claim that all objections have been resolved by the Court.  In the Opinion, the Court did not address or dispose of certain objections made by Lujan Claimants, including, but not limited to, objections relating to the the release and channeling injunction under the Plan of Lujan Claimants' claims against non-settling insurers, the 1976 and 1977 Hartford insurance policies as to coverage for sexual abuse claims not being a part of the bankruptcy estate, the unequal and unfair treatment of abuse claimants regarding release of some survivors' post-1975 claims against chartered organization while other survivors retain their pre-1976 claims against chartered organizations, and the Plan failing to provide for future claimants' representatives to represent unknown claims against released nondebtors.  As Debtors' motion is premised upon the alleged resolution of all objections, and the Opinion did not fully resolve all objections, Debtors' motion must be denied.

Like the D & V Claimants in their Response to the motion, Lujan Claimants continue to object to confirmation of the Plan and incorporate their objections as if set forth fully herein, and waive none of their objections.  Lujan Claimants reserve all rights, including but not limited to the right to appeal confirmation of the Plan,

Dated: August 24, 2022.                    Respectfully submitted,

/s/ Christopher D. Loizides
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

3

**ALW139**

LUJAN & WOLFF LLP

/s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email: dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

4

ALW140

# APPENDIX A

The foregoing Lujan Claimants' Objection to Debtors' Motion to Amend and Supplement the Findings of Fact and Conclusions of Law in the Confirmation Opinion pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52 was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Lujan & Wolff LLP. The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim, including amendments thereto.

| | | | | |
|---|---|---|---|---|
| 248 | 2991 | 6824 | 25063 | 79403 |
| 1551 | 3051 | 7976 | 25069 | 79769 |
| 1670 | 3120 | 7977 | 33028 | 80328 |
| 1677 | 3385 | 8037 | 35352 | 80655 |
| 1746 | 3610 | 8038 | 35354 | 80982 |
| 1757 | 3612 | 10548 | 38591 | 87715 |
| 1765 | 3614 | 11250 | 40889 | 87757 |
| 1913 | 3616 | 11251 | 40890 | 96418 |
| 1953 | 4855 | 14187 | 45700 | 96419 |
| 2003 | 4857 | 15104 | 45702 | 103377 |
| 2010 | 4859 | 15139 | 48168 | 103378 |
| 2011 | 5646 | 17480 | 58317 | 4858 |
| 2394 | 5646 | 18860 | 58370 | 4860 |
| 2403 | 5648 | 18873 | 67267 | |
| 2433 | 5655 | 22872 | 67286 | |
| 2597 | 6432 | 22873 | 67293 | |
| 2840 | 6434 | 22874 | 73585 | |
| 2885 | 6823 | 23388 | 73607 | |

5

**ALW141**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 9696, 10136, 10310 |

### ORDER RELEASING PRE-PETITION CENTURY/CHUBB CLAIMS PURSUANT TO CENTURY AND CHUBB COMPANIES INSURANCE SETTLEMENT AGREEMENT

Upon consideration of the confirmation of the Plan, which includes the request of approval of the Century and Chubb Companies Insurance Settlement Agreement, attached as Exhibit I-2 to the Plan, under which Debtors request entry of a separate order (this "Order") authorizing the resolution of the Pre-Petition Century/Chubb Claims[2] and the Court's Opinion, dated July 29, 2022 (the "Confirmation Opinion"), and this Court having jurisdiction to consider the request in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors having consented to entry of a final order by this Court under Article III of the United States Constitution; and the Court having found that venue of this proceeding and the request in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that good and adequate cause exists; and the Court having determined that no other or further notice need be given,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein are defined in the Century and Chubb Companies Insurance Settlement Agreement.

**ALW142**

**IT IS HEREBY FOUND:**

A.    <u>The Pre-Petition Century/Chubb Claims</u>.  The Debtors currently assert certain Claims and Causes of Action against Century and the Chubb Companies for payment of defense and indemnity costs allegedly owed as of the Petition Date as further described and defined in the Century and Chubb Companies Insurance Settlement Agreement (the "<u>Pre-Petition Century/Chubb Claims</u>").  The Debtors and their estates have agreed to irrevocably settle and release these causes of action and claims in exchange for the $50,000,000 Initial Payment provided under the Century and Chubb Companies Insurance Settlement Agreement.

B.    <u>The Settlement of the Pre-Petition Century/Chubb Claims Was Approved Under Rule 9019</u>.  The settlement and release of the Pre-Petition Century/Chubb Claims was approved as set forth in the Confirmation Opinion after consideration of the evidence, and this component of the Century and Chubb Companies Insurance Settlement Agreement satisfies the standard for approval set forth in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996), and represents a fair and equitable resolution of these claims.

C.    <u>No Objection</u>.  No objection was filed to this component of the Century and Chubb Companies Insurance Settlement Agreement and the entry of this Order.

For all of the foregoing and the reasons set forth in the Confirmation Opinion and the Confirmation Order,

**IT IS HEREBY ORDERED THAT:**

1.    The resolution of the Pre-Petition Century/Chubb Claims, pursuant to the Century and Chubb Companies Insurance Settlement Agreement is approved.

2.    Upon release of the Initial Payment by the Century and Chubb Companies to the Settlement Trust, the Debtors and their estates shall irrevocably release the Century and Chubb

**ALW143**

Companies from the Pre-Petition Century/Chubb Claims as provided and described in the Century and Chubb Companies Insurance Settlement Agreement (the "Pre-Petition Century/Chubb Claims Release").

3.      The resolution of the Pre-Petition Century/Chubb Claims, including the Pre-Petition Century/Chubb Claims Release, shall survive independently and remain in full force and effect in the case of a Reversal or modification affecting the Confirmation Order.

4.      Nothing in this Order is intended or shall be construed to limit the generality and scope of the releases or injunctions provided in the Confirmation Opinion, the Confirmation Order the Plan, or the Century and Chubb Companies Insurance Settlement Agreement, including with respect to the Pre-Petition Century/Chubb Claims.

5.      The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

6.      This Order is immediately effective and enforceable.

7.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.


**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

Dated: _September 12, 2022_
         **Wilmington, Delaware**

3

**ALW144**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket No. 10136, 10316, 10327** |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that the Tort Claimants represented by Lujan & Wolff LLP[2]
submit this Notice of Appeal in conformity with Bankruptcy Form B417A.

**Part 1: Identify the appellant(s)**

1. Names of Appellants:  Tort Claimants represented by Lujan & Wolff LLP ("the Lujan Claimants") (see footnote 2 and Appendix A attached hereto).

2. Position of Appellants in the bankruptcy case:   Creditors.

**Part 2:  Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (D.I. 10316) (the "Confirmation Order"), accompanying *Opinion* (D.I. 10136) (the "Opinion"), *Order Releasing Pre-Petition Century/Chubb Claims Pursuant to Century and Chubb Companies Insurance Settlement Agreement* (D.I. 10327) (the "Chubb Order"), and all other subsumed judgments, orders, and decrees brought up for review in the appeal.

   A copy of the Confirmation Order is attached hereto as **Exhibit A**, a copy of the Opinion is attached hereto as **Exhibit B**, and a copy of the Chubb Order is attached hereto

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

1

**ALW145**

as **Exhibit C**.

2.  State the date on which the judgment, order, or decree was entered:

   The Confirmation Order was entered on September 8, 2022, and the Opinion was entered on July 29, 2022.  The Chubb Order was entered on September 12, 2022.

**Part 3: Identify the other parties to the appeal**

   The other parties to the Confirmation Order, and the names, addresses, and telephone numbers

of their attorneys, are as follows:

| | |
|---|---|
| Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")<br><br>**Appellants** | **LOIZIDES, P.A.**<br>Christopher D. Loizides (No. 3968)<br>1225 North King Street, Suite 800<br>Wilmington, DE 19801<br>Telephone:  (302) 654-0248<br>Email:  Loizides@loizides.com<br><br>-and-<br><br>**LUJAN & WOLFF LLP**<br>Delia Lujan Wolff<br>Suite 300, DNA Bldg.<br>238 Archbishop Flores St.<br>Hagåtña, Guam 96910<br>Telephone:  (671) 477-8064/5<br>Email:  dslwolff@lawguam.com |
| Boy Scouts of America<br><br>and<br><br>Delaware BSA, LLC<br><br>**Debtors-Appellees** | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>Derek C. Abbott<br>Andrew R. Remming<br>Paige N. Topper<br>Tori L. Remington<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone: (302) 351-9314 / (302) 658-9200<br>Email:  dabbott@morrisnichols.com<br>aremming@morrisnichols.com<br>ptopper@morrisnichols.com<br>tremington@morrisnichols.com<br><br>– and – |

**ALW146**

| | |
|---|---|
| | **WHITE & CASE LLP**<br>Jessica C. Lauria<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone:  (212) 819-8200<br>Email:  jessica.lauria@whitecase.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Michael C. Andolina<br>Matthew E. Linder<br>Laura E. Baccash<br>Blair M. Warner<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone:  (312) 881-5400<br>Email:  mandolina@whitecase.com<br>mlinder@whitecase.com<br>laura.baccash@whitecase.com<br>blair.warner@whitecase.com |
| Tort Claimants' Committee | **PACHULSKI STANG ZIEHL & JONES LLP**<br>Richard M. Pachulski<br>Alan J. Kornfeld<br>Debra I. Grassgreen<br>Iain A.W. Nasatir<br>James E. O'Neill<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Email: rpachulski@pszjlaw.com<br>akornfeld@pszjlaw.com<br>dgrassgreen@pszjlaw.com<br>inasatir@pszjlaw.com<br>joneill@pszjlaw.com |
| Coalition of Abused Scouts for Justice | **MONZACK MERSKY AND BROWDER, P.A**<br>Rachel B. Mersky<br>1201 North Orange Street, Suite 400<br>Wilmington, Delaware 19801<br>Telephone:  (302) 656-8162<br>Email: rmersky@monlaw.com<br><br>–and– |

3

**ALW147**

|  | **BROWN RUDNICK LLP**<br>David J. Molton<br>Eric R. Goodman<br>Seven Times Square<br>New York, NY 10036<br>Telephone:  (212) 209-4800<br>Email:  dmolton@brownrudnick.com<br>egoodman@brownrudnick.com<br><br>–and–<br><br>**BROWN RUDNICK LLP**<br>Sunni P. Beville<br>Tristan G. Axelrod<br>One Financial Center<br>Boston, MA 02111<br>Telephone:  (617) 856-8200<br>Email:  sbeville@brownrudnick.com<br>taxelrod@brownrudnick.com |
| Future Claimants'<br>Representative | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Robert S. Brady<br>Edwin J. Harron<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone:  (302) 571-6600<br>Email:  rbrady@ycst.com<br>eharron@ycst.com<br><br>-and-<br><br>**GILBERT LLP**<br>Kami E. Quinn<br>Emily P. Grim<br>Kyle Dechant<br>700 Pennsylvania Ave., SE<br>Suite 400<br>Washington, DC 20003<br>Telephone:  (202) 772-2200<br>Email:  quinnk@gilbertlegal.com<br>grime@gilbertlegal.com<br>dechantk@gilbertlegal.com |

**ALW148**

| The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC | **BIELLI & KLAUDER, LLC**<br>David M. Klauder<br>1204 N. King Street<br>Wilmington, DE 19801<br>Telephone:  (302) 803-4600<br>Email:  dklauder@bk-legal.com<br>-and-<br><br>**KTBS LAW LLP**<br>Thomas E. Patterson<br>Daniel J. Bussel<br>Robert J. Pfister<br>Sasha M. Gurvitz<br>1801 Century Park East, Twenty-Sixth Floor<br>Los Angeles, California 90067<br>Telephone: (310) 407-4000<br>Email:  tpatterson@ktbslaw.com<br>dbussel@ktbslaw.com<br>rpfister@ktbslaw.com<br>sgurvitz@ktbslaw.com |
|---|---|
| Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company | **BAYARD, P.A.**<br>Erin R. Fay<br>Gregory J. Flasser<br>600 North King Street, Suite 400<br>Wilmington, DE 19801<br>Telephone:  (302) 655-5000<br>Email:  efay@bayardlaw.com<br>gflasser@bayardlaw.com<br><br>-and-<br><br>**RUGGERI PARKS WEINBERG LLP**<br>James P. Ruggeri<br>Joshua D. Weinberg<br>Annette P. Rolain<br>1875 K Street, N.W., Suite 600<br>Washington, D.C. 20006<br>Telephone:  (202) 984-1400 / (202) 469-7767<br>Email:  jruggeri@ruggerilaw.com<br>jweinberg@ruggerilaw.com<br><br>-and- |

**ALW149**

| | |
|---|---|
| | **WILMER CUTLER PICKERING HALE AND DORR LLP**<br>Philip D. Anker<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: (212) 230-8890<br>Email: philip.anker@wilmerhale.com<br><br>-and-<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>Danielle Spinelli<br>Joel Millar<br>1875 Pennsylvania Avenue N.W.<br>Washington, D.C. 20006<br>Telephone: (202) 663-6000<br>Email: danielle.spinelli@wilmerhale.com<br>joel.millar@wilmerhale.com |
| Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, and Chubb Companies | **STAMOULIS & WEINBLATT LLC**<br>Stamatios Stamoulis<br>800 N. West Street<br>Third Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 999-1540<br>Email: stamoulis@swdelaw.com<br><br>-and-<br><br>**O'MELVENY & MYERS LLP**<br>Tancred Schiavoni<br>Times Square Tower<br>7 Times Square<br>New York, New York 10036-6537<br>Telephone: (212) 326-2000<br>Email: tschiavoni@omm.com<br><br>-and-<br><br>**O'MELVENY & MYERS LLP**<br>Steve Warren<br>400 South Hope Street<br>Los Angeles, California 90071<br>Telephone: (213) 430-6000<br>Email: swarren@omm.com<br><br>-and- |

**ALW150**

| | **SIMPSON THACHER & BARTLETT LLP**<br>Mary Beth Forshaw<br>David Elbaum<br>425 Lexington Avenue<br>New York, NY 10017<br>Telephone: (212) 455-2000<br>Email: mforshaw@stblaw.com<br>david.elbaum@stblaw.com |
|---|---|
| American Zurich<br>Insurance Company,<br>American Guarantee<br>Insurance Company,<br>and Steadfast<br>Insurance Company | **TYBOUT, REDFEARN & PELL**<br>Robert D. Cecil, Jr.<br>501 Carr Road, Suite 300<br>Wilmington, Delaware 19899<br>Telephone: (302) 658-6901<br>Email: rcecil@trplaw.com<br><br>-and-<br><br>**CROWELL & MORING LLP**<br>Mark D. Plevin<br>Kevin D. Cacabelos<br>Three Embarcadero Center, 26th Floor<br>San Francisco, California 94111<br>Telephone: (415) 986-2800<br>Email: mplevin@crowell.com<br>kcacabelos@crowell.com<br><br>-and-<br><br>**CROWELL & MORING LLP**<br>Tacie H. Yoon<br>Rachel A. Jankowski<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>Telephone: (202) 624-2500<br>Email: tyoon@crowell.com<br>rjankowski@crowell.com |
| Clarendon National<br>Insurance Company,<br>as successor in<br>interest by merger to<br>Clarendon America<br>Insurance Company;<br>River Thames<br>Insurance Company<br>Limited, as successor<br>in interest to Union | **BALLARD SPAHR LLP**<br>Matthew G. Summers<br>Chantelle D. McClamb<br>919 N. Market Street, 11th Floor<br>Wilmington, Delaware 19801-3034<br>Telephone: (302) 252-4428<br>Email: summersm@ballardspahr.com<br>mcclambc@ballardspahr.com<br><br>-and- |

7

**ALW151**

| America Insurance Company; and Zurich American Insurance Company, as successor to Maryland Casualty Company, Zurich Insurance Company, and American General Fire & Casualty Company | **STEPTOE & JOHNSON LLP**<br>Harry Lee<br>John O'Connor<br>1330 Connecticut Avenue NW<br>Washington, DC 20036<br>Telephone: (202) 429-8078<br>Email: hlee@steptoe.com<br>joconnor@steptoe.com |
|---|---|
| Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | **HOGAN McDANIEL**<br>Daniel K. Hogan<br>1311 Delaware Avenue<br>Wilmington, DE 19806<br>Telephone: (302) 656-7540<br>Email: dan@dkhogan.com |
| Official Committee of Unsecured Creditors | **REED SMITH LLP**<br>Kurt F. Gwynne<br>Mark W. Eckard<br>1201 Market Street, Suite 1500<br>Wilmington, DE 19801<br>Telephone: (302) 778-7500<br>Email: kgwynne@reedsmith.com<br>meckard@reedsmith.com<br><br>-and-<br><br>**KRAMER LEVIN NAFTALIS & FRANKEL LLP**<br>Thomas Moers Mayer<br>Rachael Ringer<br>Natan M. Hamerman<br>Jennifer R. Sharret<br>Megan M. Wasson<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 715-9100<br>Email: tmayer@kramerlevin.com<br>rringer@kramerlevin.com<br>nhamerman@kramerlevin.com<br>jsharret@kramerlevin.com<br>mwasson@kramerlevin.com |

**ALW152**

| | |
|---|---|
| JPMorgan Chase Bank, National Association | **WOMBLE BOND DICKINSON (US) LLP**<br>Matthew P. Ward<br>Morgan L. Patterson<br>1313 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone:  (302) 252-4320<br>Email:  matthew.ward@wbd-us.com<br>morgan.patterson@wbd-us.com<br><br>-and-<br><br>**NORTON ROSE FULBRIGHT US LLP**<br>Kristian W. Gluck<br>Richard S. Krumholz<br>John Hammond Heath<br>Sarah Brown Cornelia<br>2200 Ross Avenue, Suite 3600<br>Dallas, Texas 75201<br>Telephone: (214) 855-8000<br>Email: kristian.gluck@nortonrosefulbright.com<br>richard.krumholz@nortonrosefulbright.com<br>john.heath@nortonrosefulbright.com<br>sarah.cornelia@nortonrosefulbright.com |
| Ad Hoc Committee of Local Councils of the Boy Scouts of America | **DLA PIPER, LLP (US)**<br>R. Craig Martin<br>1201 North Market Street, Suite 2100<br>Wilmington, Delaware 19801-1147<br>Telephone:  (302) 468-5655<br>Email:  craig.martin@dlapiper.com<br><br>-and-<br><br>**WACHTELL, LIPTON, ROSEN & KATZ**<br>Richard G. Mason<br>Douglas K. Mayer<br>Joseph C. Celentino<br>Mitchell S. Levy<br>51 West 52nd Street<br>New York, New York 10019<br>Telephone: (212) 403-1000<br>Email: RGMason@wlrk.com<br>DKMayer@wlrk.com<br>JCCelentino@wlrk.com<br>MSLevy@wlrk.com |

**ALW153**

| Roman Catholic Ad Hoc Committee | **POTTER ANDERSON & CORROON LLP**<br>Jeremy W. Ryan<br>Aaron H. Stulman<br>Elizabeth R. Schlecker<br>1313 N. Market Street, 6th Floor<br>Wilmington, DE 19801-6108<br>Telephone: (302) 984-6000<br>Email: jryan@potteranderson.com<br>astultman@potteranderson.com<br>eschlecker@potteranderson.com<br><br>-and-<br><br>**ARENTFOX SCHIFF LLP**<br>Everett Cygal<br>David Spector<br>J. Mark Fisher<br>Neil Lloyd<br>Daniel Schufreider<br>Jin Yan<br>233 South Wacker Drive, Suite 7100<br>Chicago, IL 60606<br>Telephone: (312) 258-5500<br>Email: everett.cygal@afslaw.com<br>david.spector@afslaw.com<br>mark.fisher@afslaw.com<br>neil.lloyd@afslaw.com<br>daniel.schufreider@afslaw.com<br>jin.yan@afslaw.com |
|---|---|
| Roman Catholic Diocese of Paterson | **PORZIO, BROMBERG & NEWMAN, P.C.**<br>Cheryl A. Santaniello<br>300 Delaware Avenue, Suite 1220<br>Wilmington, DE 19801<br>Telephone: (302) 526-1235<br>Email: casantaniello@pbnlaw.com<br><br>-and-<br><br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>Warren J. Martin, Jr.<br>John S. Mairo<br>Rachel A. Parisi<br>100 Southgate Parkway<br>P.O. Box. 1997<br>Morristown, New Jersey 07962<br>Telephone: (973) 538-4006 |

**ALW154**

| | Email:  wjmartin@pbnlaw.com<br>jsmairo@pbnlaw.com<br>raparisi@pbnlaw.com |
|---|---|
| United Methodist Ad Hoc Committee | **MACAULEY LLC**<br>Thomas G. Macauley<br>300 Delaware Ave., Suite 1018<br>Wilmington, DE 19801<br>Telephone:  (302) 656-0100<br><br>-and-<br><br>**BRADLEY ARANT BOULT CUMMINGS LLP**<br>Edwin G. Rice<br>100 N. Tampa Street, Suite 2200<br>Tampa, FL 33602<br>Telephone:  (813) 559-5500<br>Email:  erice@bradley.com<br>ddecker@bradley.com<br>ebrusa@bradley.com |
| The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole | **RICHARDS, LAYTON & FINGER, P.A.**<br>Michael J. Merchant<br>Brett M. Haywood<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone:  (302) 651-7700<br>Email:  merchant@rlf.com<br>haywood@rlf.com<br><br>-and-<br><br>**LATHAM & WATKINS LLP**<br>Jeffrey E. Bjork<br>Deniz A. Irgi<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071-1560<br>Telephone:  (213) 485-1234<br>Email:  jeff.bjork@lw.com<br>deniz.irgi@lw.com<br><br>-and- |

**ALW155**

| | **LATHAM & WATKINS LLP**<br>Adam J. Goldberg<br>Robert J. Malionek<br>Madeleine C. Parish<br>Benjamin A. Dozier<br>1271 Avenue of the Americas<br>New York, NY 10020-1401<br>Telephone: (212) 906-1200<br>Email: adam.goldberg@lw.com<br>　　　robert.malionek@lw.com<br>　　　madeleine.parish@lw.com<br>　　　benjamin.butzin-dozier@lw.com |
|---|---|
| Dumas &Vaughn<br>Claimants a/k/a<br>D & V Claimaints | **BIELLI & KLAUDER, LLC**<br>David M. Klauder<br>1204 N. King Street<br>Wilmington, DE 19801<br>Telephone: (302) 803-4600<br>Email: dklauder@bk-legal.com<br><br>-and-<br><br>**DUMAS & VAUGHN, LLC**<br>Gilion C. Dumas<br>Ashley L. Vaughn<br>3835 NE Hancock St., Ste. GL-B<br>Portland, OR 97212<br>Telephone: (503) 616-5007<br>Email: gilion@dumasandvaughn.com<br>ashley@dumasandvaughn.com |
| Archbishop of<br>Agaña, a<br>Corporation Sole | **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Charles J. Brown, III<br>1201 N. Orange Street, 3rd Floor<br>Wilmington, DE 19801<br>Telephone: (302) 425-5813<br>Email: cbrown@gsbblaw.com |
| The Official<br>Committee of<br>Unsecured Creditors<br>appointed in *In re:<br>Archbishop of Agaña,<br>a Corporation Sole*<br>(Bankr. D. Guam 19-<br>00010) (the "Guam<br>Committee") | **HILLER LAW, LLC**<br>Adam Hiller<br>300 Delaware Avenue, Suite 210, #227<br>Wilmington, Delaware 19801<br>Telephone: (302) 442-7677<br>Email: ahiller@adamhillerlaw.com<br><br>-and- |

12

**ALW156**

| | **STINSON LLP**<br>Robert T. Kugler<br>Edwin H. Caldie<br>50 South Sixth Street, Suite 2600<br>Minneapolis, MN 55402<br>Telephone: (612) 335-1500<br>Email: robert.kugler@stinson.com<br>ed.caldie@stinson.com<br><br>-and-<br><br>**STINSON LLP**<br>Christina D. Arnone<br>1201 Walnut, Suite 2900<br>Kansas City, MO 64106<br>Telephone: (816) 842-8600<br>Email: christina.arnone@stinson.com |
|---|---|
| National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, and The Insurance Company of the State of Pennsylvania (the "AIG Companies") | **FINEMAN KREKSTEIN & HARRIS PC**<br>Deirdre M. Richards<br>1300 N. King Street<br>Wilmington, DE 19801<br>Telephone: (302) 538-8331<br>Email: drichards@finemanlawfirm.com<br><br>-and-<br><br>**GIBSON, DUNN & CRUTCHER LLP**<br>Michael A. Rosenthal<br>Mitchell A. Karlan<br>James Hallowell<br>Keith R. Martorana<br>200 Park Avenue<br>New York, New York 10166<br>Telephone: (212) 351-4000<br>Email: mrosenthal@gibsondunn.com<br>mkarlan@gibsondunn.com<br>jhallowell@gibsondunn.com<br>kmartorana@gibsondunn.com<br><br>-and- |

**ALW157**

| | |
|---|---|
| | **GIBSON, DUNN & CRUTCHER LLP**<br>Richard J. Doren<br>Blaine H. Evanson<br>333 South Grand Avenue<br>Los Angeles, California 90071<br>Telephone:  (213) 229-7038<br>Email:  rdoren@gibsondunn.com<br>bevanson@gibsondunn.com<br><br>-and-<br><br>**FORAN GLENNON PALANDECH PONZI & RUDLOFF P.C.**<br>Susan N.K. Gummow<br>222 N. LaSalle St., Suite 1400<br>Chicago, Illinois 60601<br>Telephone:  (312) 863-5000<br>Email:  sgummow@fgppr.com |
| The Continental Insurance Company and Columbia Casualty Company | **GOLDSTEIN & MCCLINTOCK LLLP**<br>Maria Aprile Sawczuk<br>501 Silverside Road<br>Wilmington, DE 19809<br>Telephone:  (302) 444-6710<br>Email:  marias@goldmclaw.com<br><br>-and-<br><br>**LOEB & LOEB LLP**<br>Laura McNally<br>Emily Stone<br>321 N. Clark Street, Suite 2300<br>Chicago, IL 60654<br>Telephone:  (312) 464-3155<br>Email:  lmcnally@loeb.com<br>estone@loeb.com<br><br>-and-<br><br>**DAVID CHRISTIAN ATTORNEYS LLC**<br>David Christian<br>105 W. Madison St., Suite 1400<br>Chicago, IL 60602<br>Telephone:  (312) 282-5282<br>Email:  dchristian@dca.law |

**ALW158**

| Allianz Global Risks US Insurance Company | **TROUTMAN PEPPER HAMILTON SANDERS LLP**<br>David M. Fournier<br>Marcy J. McLaughlin Smith<br>Hercules Plaza<br>1313 Market Street<br>Suite 5100<br>P.O. Box 1709<br>Wilmington, DE 19899-1709<br>Telephone: (404) 885-3000<br>Email: david.fournier@troutman.com<br>marcy.smith@troutman.com<br><br>-and-<br><br>**PARKER, HUDSON, RAINER & DOBBS**<br>Harris B. Winsberg<br>303 Peachtree Street NE<br>Suite 3600<br>Atlanta, GA 30308<br>Telephone: (404) 420-4313<br>Email: hwinsberg@phrd.com<br><br>-and-<br><br>**McDERMOTT WILL & EMERY LLP**<br>Margaret H. Warner<br>Ryan S. Smethurst<br>Alex M. Spisak<br>The McDermott Building<br>500 North Capitol Street, NW<br>Washington, DC 20001-1531<br>Telephone: (202) 756-8228<br>Email: mwarner@mwe.com<br>rsmethurst@mwe.com<br>aspisak@mwe.com |
|---|---|

15

**ALW159**

| National Surety Corporation and Interstate Fire & Casualty Company | **TROUTMAN PEPPER HAMILTON SANDERS LLP**<br>David M. Fournier<br>Marcy J. McLaughlin Smith<br>Hercules Plaza, Suite 5100<br>1313 Market Street<br>P.O. Box 1709<br>Wilmington, DE 19899-1709<br>Telephone:  (302) 777-6500<br>Email:  david.fournier@troutman.com<br>marcy.smith@troutman.com<br><br>-and-<br><br>**PARKER, HUDSON, RAINER & DOBBS**<br>Harris B. Winsberg<br>303 Peachtree Street NE<br>Suite 3600<br>Atlanta, GA 30308<br>Telephone:  (404) 420-4313<br>Email:  hwinsberg@phrd.com<br><br>-and-<br><br>**BRADLEY RILEY JACOBS PC**<br>Todd C. Jacobs<br>John E. Bucheit<br>Paul J. Esker<br>500 West Madison Street<br>Suite 1000<br>Chicago, IL 60661<br>Telephone:  (312) 281-0295<br>Email:  TJacobs@bradleyriley.com<br>jbucheit@bradleyriley.com<br>pesker@bradleyriley.com |
|---|---|

**ALW160**

| | |
|---|---|
| Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation | **SEITZ, VAN OGTROP & GREEN, P.A**<br>R. Karl Hill<br>222 Delaware Avenue<br>Suite 1500<br>Wilmington, Delaware 19801<br>Telephone:  (302) 888-0600<br>Email:  khill@svglaw.com<br><br>-and-<br><br>**CHOATE, HALL & STEWART, LLP**<br>Douglas R. Gooding<br>Jonathan D. Marshall<br>Two International Place<br>Boston, MA 02110<br>Telephone:  (617) 248-5000<br>Email:  dgooding@choate.com<br>jmarshall@choate.com<br><br>-and-<br><br>**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO PC**<br>Kim V. Marrkand<br>Laura Bange Stephens<br>One Financial Center<br>Boston, MA 02111<br>Telephone:  (617) 542-6000<br>Email:  kmarrkand@mintz.com<br>lbstephens@mintz.com |

**ALW161**

| Argonaut Insurance Company and Colony Insurance Company | **POST & SCHELL, P.C.**<br>Paul Logan<br>300 Delaware Avenue, Suite 1380<br>Wilmington, DE  19801<br>Telephone:  (302) 251-8856<br>Email:  plogan@postschell.com<br><br>-and-<br><br>**POST & SCHELL, P.C.**<br>John C. Sullivan<br>Kathleen K. Kerns<br>Four Penn Center – 13th Floor<br>1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103<br>Telephone:  (215) 587-1000<br>Email: jsullivan@postschell.com<br>kkerns@postschell.com<br><br>-and-<br><br>**IFRAH PLLC**<br>George R. Calhoun<br>1717 Pennsylvania Ave., N.W., Suite 650<br>Washington, DC  20006<br>Telephone:  (202) 840-8758<br>Email:  george@ifrahlaw.com |

**ALW162**

| General Star Indemnity Company | **SMITH, KATZENSTEIN & JENKINS LLP**<br>Kathleen M. Miller<br>1000 West Street, Suite 501<br>P.O. Box 410<br>Wilmington, DE 19899<br>Telephone: (302) 652-8400<br>Email: kmiller@skjlaw.com<br><br>-and-<br><br>**WILEY REIN LLP**<br>Mary E. Borja<br>Gary P. Seligman<br>Ashley L. Criss<br>2050 M Street NW<br>Washington, DC 20036<br>Telephone: (202) 719-7000<br>Email: mborja@wiley.law<br>gseligman@wiley.law<br>acriss@wiley.law |
| --- | --- |

**ALW163**

| | |
|---|---|
| Great American Assurance Company f/k/a Agricultural Insurance Company, Great American E&S Insurance Company f/k/a Agricultural Excess and Surplus Insurance Company, and Great American E&S Insurance Company | **BODELL BOVÉ, LLC**<br>Bruce W. McCullough<br>1225 N. King Street, Suite 1000<br>P.O. Box 397<br>Wilmington, DE 19899-0397<br>Telephone:  (302) 655-6749<br>Email:  bmccullough@bodellbove.com<br><br>-and-<br><br>**CLYDE & CO US LLP**<br>Bruce D. Celebrezze<br>150 California Street, 15th Floor<br>San Francisco, California 94111<br>Telephone: (415) 365-9800<br>Email:  bruce.celebrezze@clydeco.us<br><br>Konrad R. Krebs<br>340 Mt. Kemble Avenue, Suite 300<br>Morristown, NJ 07960<br>Telephone:  (973) 210-6700<br>Email:  konrad.krebs@clydeco.us<br><br>-and-<br><br>**DAVID CHRISTIAN ATTORNEYS LLC**<br>David Christian<br>105 W. Madison Street, Suite 1400<br>Chicago, IL 60602<br>Telephone:  (312) 282-5282<br>Email:  dchristian@dca.law |

**ALW164**

| Arch Insurance Company | **SMITH, KATZENSTEIN & JENKINS LLP**<br>Kathleen M. Miller<br>1000 North West Street, Suite 1501<br>P.O. Box 410<br>Wilmington, DE 19899 (courier 19801)<br>Telephone: (302) 652-8400<br>Email: kmiller@skjlaw.com<br><br>-and-<br><br>**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**<br>Ronald P. Schiller<br>Matthew A. Hamermesh<br>Sharon F. McKee<br>Elizabeth C. Dolce<br>One Logan Square, 27th Floor<br>Philadelphia, PA 19103<br>Telephone: (215) 568-6200<br>Email: rschiller@hangley.com<br>mhamermesh@hangley.com<br>smckee@hangley.com<br>edolce@hangley.com |
|---|---|
| Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company | **SMITH, KATZENSTEIN & JENKINS LLP**<br>Kathleen M. Miller<br>1000 West Street, Suite 1501<br>P.O. Box 410<br>Wilmington, DE  19899 [Courier 19801]<br>Telephone: (302) 652-8400<br>Email: kmiller@skjlaw.com<br><br>-and-<br><br>**MOUND COTTON WOLLAN & GREENGRASS LLP**<br>Lloyd A. Gura<br>Pamela J. Minetto<br>One New York Plaza 44th Floor<br>New York, NY 10004<br>Telephone: (212) 804-4282<br>Email: lgura@moundcotton.com<br>pminetto@moundcotton.com |

**ALW165**

| Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company | **REGER RIZZO & DARNALL LLP**<br>Louis J. Rizzo, Jr.<br>1521 Concord Pike, Suite 305<br>Brandywine Plaza West<br>Wilmington, Delaware 19803<br>Telephone:  (302) 477-7100<br>Email:  lrizzo@regerlaw.com |
|---|---|
| Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company | **DILWORTH PAXSON LLP**<br>Thaddeus J. Weaver<br>704 King Street, Suite 500<br>P.O. Box 1031<br>Wilmington, DE 19899-1031<br>Telephone:  (302) 571-8867<br>Email:  tweaver@dilworthlaw.com<br><br>-and-<br><br>**DILWORTH PAXSON LLP**<br>William E. McGrath, Jr.<br>2 Research Way, Suite 103<br>Princeton, NJ  08540<br>Telephone:  (609) 924-6000<br>Email:  wmcgrath@dilworthlaw.com |

**ALW166**

| Arrowood Indemnity Company | **JOYCE, LLC**<br>Michael J. Joyce<br>1225 King Street, Suite 800<br>Wilmington, DE 19801<br>Telephone:  (302) 388-1944<br>mjoyce@mjlawoffices.com<br><br>-and-<br><br>**COUGHLIN MIDLIGE & GARLAND, LLP**<br>Kevin Coughlin<br>Lorraine Armenti<br>Michael Hrinewski<br>350 Mount Kemble Ave., PO Box 1917<br>Morristown, NJ 07962<br>Telephone:  (973) 267-0058<br>Email:  larmenti@cmg.law<br>mhrinewski@cmg.law<br><br>-and-<br><br>**CARRUTHERS & ROTH, P.A.**<br>Britton C. Lewis<br>235 N. Edgeworth St., P.O. Box 540<br>Greensboro, NC 27401<br>Telephone:  (336) 478-1146<br>Email:  bcl@crlaw.com |
| Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company | **COZEN O'CONNOR**<br>Marla S. Benedek<br>1201 N. Market Street, Suite 1001<br>Wilmington, DE 19801<br>Telephone:  (302) 295-2024<br>Email:  mbenedek@cozen.com |

**ALW167**

| Gemini Insurance Company | **WERB & SULLIVAN**<br>Brian A. Sullivan<br>LEGAL ARTS BUILDING<br>1225 N. King Street<br>Suite 600<br>Wilmington, Delaware  19801<br>Telephone:  (302) 652-1100<br>Email:  bsullivan@werbsullivan.com<br><br>-and-<br><br>**GIEGER LABORDE & LAPEROUOSE, LLC**<br>John E.W. Baay II<br>701 Poydras Street<br>Suite 4800<br>New Orleans, LA 70139<br>Telephone:  (504) 561-0400<br>Email:  jbaay@glllaw.com<br><br>-and-<br><br>**KIERNAN TREBACH LLP**<br>William H. White Jr.<br>1233 20th Street, NW<br>8th Floor<br>Washington, DC 20036<br>Telephone:  (202) 712-7000<br>Email:  wwhite@kiernantrebach.com |
|---|---|

**ALW168**

| Old Republic Insurance Company | **MORRIS JAMES LLP**<br>Stephen M. Miller<br>Carl N. Kunz, III<br>Sarah M. Ennis<br>500 Delaware Avenue, Suite 1500<br>Wilmington, Delaware 19801<br>Telephone: (302) 888-6800<br>Email: smiller@morrisjames.com<br>ckunz@morrisjames.com<br>sennis@morrisjames.com<br><br>-and-<br><br>**FOX SWIBEL LEVIN & CARROLL LLP**<br>Margaret M. Anderson<br>Ryan T. Schultz<br>Adam A. Hachikian<br>Kenneth M. Thomas<br>200 W. Madison Street, Suite 3000<br>Chicago, Illinois 60606<br>Telephone: (312) 224-1200<br>Email: panderson@foxswibel.com<br>rschultz@foxswibel.com<br>ahachikian@foxswibel.com<br>kthomas@foxswibel.com |
|---|---|
| Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and Evanston Insurance Company | **GREENBERG TRAURIG, LLP**<br>Dennis A. Meloro<br>1007 North Orange Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 661-7395<br>Email: melorod@gtlaw.com<br><br>-and-<br><br>**BROWNSTEIN HYATT FARBER SCHRECK, LLP**<br>Michael J. Pankow<br>410 17th Street, Suite 2200<br>Denver, Colorado 80202<br>Telephone: (303) 223-1100<br>Email: mpankow@bhfs.com |

**ALW169**

| | |
|---|---|
| Girl Scouts of the United States of America | **DORSEY & WHITNEY (DELAWARE) LLP**<br>Eric Lopez Schnabel<br>Alessandra Glorioso<br>300 Delaware Avenue, Suite 1010<br>Wilmington, Delaware 19801<br>Telephone:  (302) 425-7171<br>Email:  schnabel.eric@dorsey.com<br>glorioso.alessandra@dorsey.com<br><br>-and-<br><br>**DORSEY & WHITNEY LLP**<br>Bruce R. Ewing<br>Eric Lopez Schnabel<br>51 West 52nd Street<br>New York, New York 10019<br>Telephone:  (212) 415-9200<br>Email:  ewing.bruce@dorsey.com<br>schnabel.eric@dorsey.com |
| Eric Pai, Administrator of the Estate of Jarred Pai, a minor | **SULLIVAN HAZELTINE ALLINSON LLC**<br>William D. Sullivan<br>William A. Hazeltine<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Telephone:  (302) 428-8191<br>Email:  bsullivan@sha-llc.com<br>whazeltine@sha-llc.com |

**ALW170**

| The County of Denton, Texas, The County of Williamson, Texas, The County of Anderson, Texas, The County of Henderson, Texas, Midland Central Appraisal District, Texas, The County of Milam, Texas, Terry County Appraisal District, Texas ("Texas Taxing Authorities") | **McCREARY, VESELKA, BRAGG & ALLEN, P.C.**<br>Tara LeDay<br>P. O. Box 1269<br>Round Rock, TX 78680-1269<br>Telephone: (512) 323-3200<br>Email: tleday@mvbalaw.com |
|---|---|

27

ALW171

| Oracle America, Inc. | **MARGOLIS EDELSTEIN**<br>James E. Huggett<br>300 Delaware Avenue, Suite 800<br>Wilmington, Delaware 19801<br>Telephone: (302) 888-1112<br>Email: jhuggett@margolisedelstein.com<br><br>-and-<br><br>**DOSHI LEGAL GROUP, P.C.**<br>Amish R. Doshi<br>1979 Marcus Avenue, Suite 210E<br>Lake Success, NY 11042<br>Telephone: (516) 622-2335<br>Email: amish@doshilegal.com<br><br>-and-<br><br>**BUCHALTER, A PROFESSIONAL CORPORATION**<br>Shawn M. Christianson<br>425 Market St., Suite 2900<br>San Francisco, CA 94105<br>Tel: (415) 227-0900<br><br>-and-<br><br>**ORACLE AMERICA, INC.**<br>Peggy Bruggman<br>Alice Miller<br>500 Oracle Parkway<br>Redwood City, California 94065<br>Telephone: (650) 506-5200 |
| Everest National Insurance Company | **CARLTON FIELDS, P.A.**<br>Nader A. Amer<br>2 MiamiCentral<br>700 NW 1st Avenue, Suite 1200<br>Miami, Florida 33136-4118<br>Telephone: (305) 539-7205<br>Email: namer@carltonfields.com |

**ALW172**

| AT&T Corp. | **MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**<br>David P. Primack<br>300 Delaware Avenue, Suite 1014<br>Wilmington, Delaware 19801<br>Telephone:  (302) 300-4515<br>Email:  dprimack@mdmc-law.com<br><br>-and-<br><br>**ARNOLD & PORTER KAYE SCHOLER LLP**<br>Brian J. Lohan<br>70 West Madison Street<br>Chicago, Illinois 60602<br>Telephone:  (312) 583-2300<br>Email:  brian.lohan@arnoldporter.com |
| --- | --- |

**ALW173**

| Norwich Roman Catholic Diocesan Corporation | **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Charles J. Brown, III<br>1201 N. Orange Street, 3rd Floor<br>Wilmington, DE 19801<br>Telephone:  (302) 425-5813<br>Email:  cbrown@gsbblaw.com<br><br>-and-<br><br>**ICE MILLER LLP**<br>Louis T. DeLucia<br>Alyson M. Fiedler<br>1500 Broadway, Suite 2900<br>New York, New York 10036<br>Telephone:  (212) 835-6312<br>Email:  Louis.DeLucia@icemiller.com<br>Alyson.Fiedler@icemiller.com |
|---|---|
| Archdiocese of New York Parishes and Related Entities | **ARCHER & GREINER, P.C.**<br>Alan M. Root<br>300 Delaware Avenue, Ste. 1100<br>Wilmington, DE 19801<br>Telephone:  (302) 356-6623<br>Email:  aroot@archerlaw.com<br><br>-and-<br><br>**ARCHER & GREINER, P.C.**<br>Gerard DiConza<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Telephone:  (212) 682-4940<br>Email:  gdiconza@archerlaw.com |

**ALW174**

| LSR Claimants | **KLEIN LLC**<br>Julia B. Klein<br>225 West 14th Street, Suite 100<br>Wilmington, Delaware 19801<br>Telephone: (302) 438-0456<br>Email: klein@kleinllc.com<br><br>-and-<br><br>**LINDER, SATTLER & ROGWOSKY, LLP**<br>Erica B. Sattler<br>270 North Ave. Suite 202<br>New Rochelle, New York 10801<br>Telephone: (914) 915-8566<br>Email: lsrlawny@gmail.com |
| Zuckerman Claimants | **ZUCKERMAN SPAEDER LLP**<br>Carl S. Kravitz<br>Andrew N. Goldfarb<br>Nicholas M. DiCarlo<br>1800 M Street, NW, Suite 1800<br>Washington, DC 20036<br>Telephone: (202) 778-1800<br>Email: ckravitz@zuckerman.com<br>agoldfarb@zuckerman.com<br>ndicarlo@zuckerman.com |
| Zuckerman Spaeder LLP | **LANDIS RATH & COBB LLP**<br>Adam G. Landis<br>Matthew B. McGuire<br>919 Market Street, Suite 1800<br>P.O. Box 2087<br>Wilmington, DE 19899<br>Telephone: (302) 467-4410<br>Email: landis@lrclaw.com<br>mcguire@lrclaw.com |
| Parker Waichman LLP, on behalf of its Rejecting PW Abuse Survivor Clients | **BURR & FORMAN LLP**<br>J. Cory Falgowski<br>1201 N. Market Street, Suite 1407<br>Wilmington, Delaware 19801<br>Telephone: (302) 830-2312<br>Email: jfalgowski@burr.com<br><br>-and- |

31

**ALW175**

| | **PARKER WAICHMAN LLP**<br>Melanie H. Muhlstock<br>6 Harbor Park Drive<br>Port Washington, NY 11050<br>Telephone:  (516) 466-6500<br>Email:  mmuhlstock@yourlawyer.com |
|---|---|

ALW176

| William L. McCalister, Jr. | **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Ronald S. Gellert<br>1201 North Orange Street, 3rd Floor<br>Wilmington, DE 19801<br>Telephone: (302) 425-5806<br>Email: rgellert@gsbblaw.com<br><br>-and-<br><br>**GUNN, LEE & CAVE, P.C.**<br>Ted D. Lee<br>8023 Vantage Drive, Suite 1500<br>San Antonio, TX 78230<br>Telephone: (210) 886-9500<br>Email: tlee@gunn-lee.com |
|---|---|
| I. G. | **GELLERT SCALI BUSENKELL & BROWN LLC**<br>Ronald S. Gellert<br>1201 North Orange Street, 3rd Floor<br>Wilmington, DE 19801<br>Telephone: (302) 425-5806<br>Email: rgellert@gsbblaw.com |
| Jane Doe | **CHIPMAN BROWN CICERO & COLE, LLP**<br>Mark L. Desgrosseilliers<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, Delaware 19801<br>Telephone: (302) 295-0191<br>Email: desgross@chipmanbrown.com<br><br>-and-<br><br>**ROBINSON MAHONEY PLLC**<br>Cindy L. Robinson<br>Doug Mahoney<br>1210 Post Road<br>Fairfield, Connecticut 06824<br>Telephone: (203) 692-2186<br>Email: crobinson@robinsonmahoney.com<br>dmahoney@robinsonmahoney.com |
| Brown & Bigelow, Inc. | **(Pro Se)**<br>Brown & Bigelow, Inc.<br>1400 Corporate Center Curve, Suite100<br>Eagan, Minnesota 55121 |

**ALW177**

| United States Trustee | **ANDREW R. VARA, UNITED STATES TRUSTEE FOR REGIONS 3 AND 9**<br>Timothy J. Fox, Jr.<br>Trial Attorney<br>Office of the United States Trustee<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, DE 19801<br>Telephone: (302) 573-6491<br>Email: Timothy.Fox@usdoj.gov |
| --- | --- |

\*Additional interested parties include pro se individuals filing documents at D.I. 7663-7664 (W.D.), 7920-7921 (B.C.), 8374-8375 (D.W.), 8657-8658 (M.C.), 8734-8735 (G.M.), 8762 and 8764 (F.S.), 8972-8973 (G.M.), 9007-9008 (L.W.), 9291-9292 (D.W.), and 9516 and 9518 (Claimant 39), from which names and addresses have been redacted. Names and addresses are available to the Debtors and their Claims and Noticing Agent, Omni Agent Solutions.

**Part 4: Optional election to have appeal heard by District Court:**

   N/A

**Part 5: Sign Below:**

Dated: September 22, 2022.               Respectfully submitted,

                              /s/ *Christopher D. Loizides*
                              Christopher D. Loizides (No. 3968)
                              LOIZIDES, P.A.
                              1225 North King Street, Suite 800
                              Wilmington, DE 19801
                              Phone: 302.654.0248
                              Email: Loizides@loizides.com

                              and

                              LUJAN & WOLFF LLP

                              /s/ *Delia Lujan Wolff*
                              Delia Lujan Wolff
                              Suite 300, DNA Bldg.
                              238 Archbishop Flores St.
                              Hagatna, Guam 96910
                              Phone: (671) 477-8064/5
                              Facsimile: (671) 477-5297
                              Email: dslwolff@lawguam.com

                              *Attorneys for Lujan Claimants*

ALW178

# APPENDIX A

The foregoing Notice of Appeal was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Lujan & Wolff LLP.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim, including amendments thereto.

| | | | | |
|---|---|---|---|---|
| 248 | 2991 | 6824 | 25063 | 79403 |
| 1551 | 3051 | 7976 | 25069 | 79769 |
| 1670 | 3120 | 7977 | 33028 | 80328 |
| 1677 | 3385 | 8037 | 35352 | 80655 |
| 1746 | 3610 | 8038 | 35354 | 80982 |
| 1757 | 3612 | 10548 | 38591 | 87715 |
| 1765 | 3614 | 11250 | 40889 | 87757 |
| 1913 | 3616 | 11251 | 40890 | 96418 |
| 1953 | 4855 | 14187 | 45700 | 96419 |
| 2003 | 4857 | 15104 | 45702 | 103377 |
| 2010 | 4859 | 15139 | 48168 | 103378 |
| 2011 | 5646 | 17480 | 58317 | 4858 |
| 2394 | 5646 | 18860 | 58370 | 4860 |
| 2403 | 5648 | 18873 | 67267 | |
| 2433 | 5655 | 22872 | 67286 | |
| 2597 | 6432 | 22873 | 67293 | |
| 2840 | 6434 | 22874 | 73585 | |
| 2885 | 6823 | 23388 | 73607 | |

**ALW179**

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                       .    Chapter 11
 3   IN RE:                            .
                                       .    Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND         .
     DELAWARE BSA, LLC,                 .
 5                                     .
                                       .    Courtroom No. 2
 6                                     .    824 North Market Street
                                       .    Wilmington, Delaware 19801
 7
                           Debtors.    .    September 1, 2022
 8   . . . . . . . . . . . . . . . .    .    11:00 A.M.

 9                       TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:            Derek Abbott, Esquire
                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                              1201 North Market Street, 16th Floor
                                Wilmington, Delaware 19899
14
                                Jessica Lauria, Esquire
15                              Glenn Kurtz, Esquire
                                WHITE & CASE LLP
16                              1221 Avenue of the Americas
                                New York, New York 10020
17

18

19   Audio Operator:           Brandon J. McCarthy

20   Transcription Company:     Reliable
                                1007 N. Orange Street
21                              Wilmington, Delaware 19801
                                (302)654-8080
22                              Email: gmatthews@reliable-co.com

23
     Proceedings recorded by electronic sound recording; transcript
24   produced by transcription service.

25
```

**ALW180**

1 | order as opposed to whatever motion they're going to file to

2 | seek approval?

3 |     MS. BACCASH:   This is just saying that we are

4 | agreeing that they can file a motion and that the fees will be

5 | not -- cannot exceed $1.5 million that we would have to pay

6 | over.   This is part of the termsheet that we entered into with

7 | them, part of the consensual deal that we had with them where

8 | they got rid of their objections.

9 |     THE COURT:   Okay.

10 |     MS. BACCASH:   It is subject to a motion, obviously,

11 | made clear here in the first part of it.

12 |     THE COURT:   I don't think it's necessary, but as

13 | long as it's clear that I'm not approving anything.

14 |     MS. BACCASH:   Yes.

15 |     MS. LUJAN-WOLFF:   Your Honor, if I may, this is

16 | Delia Lujan Wolff.

17 |     THE COURT:   You're camera is not on, Ms. Wolff.

18 | Thank you.

19 |     MS. LUJAN-WOLFF:   I'm sorry.   I just want to raise

20 | this just so it's not construed as waived.   So this issue with

21 | the Roman Catholic Ad Hoc Committee, the termsheet that they

22 | entered filed March 18th.   I mean the way that I read the

23 | opinion this was not -- that was not a part of the Court's

24 | opinion and so as part of our objection, Your Honor, and I

25 | just wanted to note that this process of invoking Rule 7502

**ALW181**

1   and 52 to approve something that goes beyond what the Court

2   had actually ordered, clarifying what the Court had actually

3   ordered or correcting what the Court ordered is improper

4   procedurally.

5            So I just wanted to note that, Your Honor.  I can

6   save that argument for later, but the way that I read the

7   opinion the Court did not actually approve the agreement

8   between the debtors and the Roman Catholic Ad Hoc Committee

9   to, basically, increase the number of entities, non-debtors,

10  that would receive non-consensual releases under the plan.

11           So I just wanted to note that.  Thank you.

12           THE COURT:  Okay.  Thank you.

13           Paragraph 10, rejection damages claims.  You need

14  to bring any objection to late filed claims as an objection to

15  late filed claims.  I don't do that in confirmation orders.

16           The next comment I have is on Paragraph 19.  Does

17  anybody have anything prior that?

18       (No verbal response)

19           THE COURT:  I'm sorry, its Paragraph 18 now, the

20  last sentence "The settlement trustee may request an expedited

21  determination of taxes under 505(b)."  I am not pre-blessing

22  her ability to use 505(b).  I just ruled in GUE that a

23  liquidating trustee in a confirmed Chapter 11 plan could not

24  use 505(b).  So she can argue it again and convince me I'm

25  wrong, but I am not pre-blessing that.

**ALW182**

1   we are off to, you know, creating more problems then going

2   forward.

3            THE COURT:  Okay.  Well, here's what we'll do.

4   I'll keep it in because nobody objected to it and -- but I

5   certainly think that somebody could challenge that provision

6   because, again, I can't confer jurisdiction on myself that I

7   don't have.  So I have jurisdiction; if I can confer on myself

8   exclusive jurisdiction, I can do that, but I don't know if I

9   can do it or not.  But I'll keep it in and we'll have another

10  interesting jurisdictional argument someday.

11           MS. LUJAN WOLFF:  Your Honor, if I may?

12           THE COURT:  Ms. Lujan?

13           MS. LUJAN WOLFF:  I'm sorry.  I'll wait for Mr.

14  Schiavoni to finish.

15           THE COURT:  Ms. Lujan.

16           MS. LUJAN WOLFF:  Oh, thank you.  Yes, Your Honor.

17  As Your Honor knows, my clients are -- many of them are

18  creditors in the Archbishop of Agana bankruptcy case and Your

19  Honor did state in her opinion that it is the bankruptcy court

20  in Guam that has authority over the church's interest in

21  insurance policies, and to the extent that the -- and I

22  believe that the -- then what follows is that the Court has

23  jurisdiction, continues to have jurisdiction over the church's

24  interest in those policies.  So I think that, to the extent

25  that this provision, paragraph 74, conflicts with the opinion,

**ALW183**

1   I do object to that, Your Honor, and I do think that -- I do

2   think that it's more prudent to delete "exclusive" and perhaps

3   just keep the jurisdiction, Your Honor, because, as Your Honor

4   stated, other courts do interpret bankruptcy orders, including

5   the Fuller Austin court, which was, I believe, a California

6   State Court decision.

7         And so it's -- anyway, we do object to that, Your

8   Honor.  Thank you.

9         MR. SCHIAVONI:  Your Honor, I would submit that

10   there's a significant difference between interpreting these

11   injunctions and the free-and-clear.  I think Your Honor was

12   very clear in her decision about the free-and-clear, that the

13   court in Agana would have the ability to deal with that issue.

14   But this issue about how the injunctions apply, if you cede --

15   if you cede that to Guam to decide those issues, to decide,

16   basically, how to apply your injunctions -- which, to be

17   clear, the District Court in Guam, the judge did make

18   statements along the lines that he wanted to honor your

19   decisions, so perhaps there isn't a risk of that occur -- I

20   don't have that transcript to hand to you, but we will -- but

21   to cede core parts of your jurisdiction over essential

22   elements of the plan to Guam or another court, you know, it

23   sets us on a collision course on how to deal with this going

24   forward.

25         THE COURT:  Well, I'm not ceding my jurisdiction to

1   anybody, and I'm sure that the Guam court said they would

2   honor my decision, as I'm not going to step on the Guam

3   court's jurisdiction.

4          So -- and I don't think that, even with that word

5   in there, it could possibly mean that the Guam court cannot

6   decide the issues that are in front of the Guam court.  He

7   didn't have to come to me to ask me what I meant by something.

8   And I don't think that my retaining exclusive jurisdiction

9   could possibly dictate that I could decide something that's

10  happening in the Guam court, I just couldn't.

11         So I'll keep it in there because -- and, Ms. Lujan,

12  feel free to get the transcript -- there's no way that this --

13  that the Guam court can't decide whatever issues are happening

14  in front of the Guam court.

15         MR. SCHIAVONI:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17         Okay, we've done the flip through the order.  Let

18  me ask this:  is there any insurance issue that we have not

19  addressed through the order?

20         MR. GOODING:  Your Honor, Douglas Gooding.  There

21  is one issue relating -- two issues relating to indirect abuse

22  claims.

23         THE COURT:  Come to the podium, please, Mr.

24  Gooding.

25         MR. GOODING:  Good afternoon, Your Honor --

**ALW185**

1          MR. ABBOTT:  Thank you, Your Honor.

2          THE COURT:  Thank you.  And I'll hand this back,

3    please.  Thank you.

4          Okay, so that brings us to Ms. Wolff -- or Ms.

5    Lujan.  And I keep calling you different things and I

6    apologize.

7          MS. LUJAN WOLFF:  They're all good, Your Honor.

8          Your Honor, I just want to go briefly.  The debtors

9    are, again, they're trying to really get confirmed a plan that

10   is not what creditors voted on.

11         Throughout the Court's opinion, the Court referred

12   to the plan as Document 8813, and that was the plan filed

13   February 15.  And so, under the authority that the debtors are

14   citing is Bankruptcy Rule 7052, Federal Rule of Civil

15   Procedure 52, and the purpose of those rules is to correct the

16   Court's findings of fact and legal conclusions where there's

17   clear error, manifest injustice, or newly-discovered evidence.

18         For instance, just as an example, Your Honor, it

19   would be proper under those rules to ask Your Honor to reverse

20   her conclusion -- her findings and conclusions regarding

21   substantial contributions by chartered organizations for the

22   reason that there was no liquidation analysis as to any

23   chartered organization's assets or -- and so there is

24   insufficient evidence to support the nonconsensual release of

25   those entities.  That is a proper use of Rule 7052 and Rule

**ALW186**

1   52.

2          What they're trying to do here is, primarily, to

3   ask the Court to confirm a different plan.  Yes, in some ways,

4   the plan that they're asking to confirm conforms to the

5   Court's opinion that there are other ways that the plan is

6   materially different.  And I did cite the TCJC settlement, the

7   $250 million now being thrown out.

8          In addition, Your Honor, the supplemental findings

9   that they're asking Your Honor to order, they include the --

10  adopting the Roman Catholic Ad Hoc Committee term sheet filed

11  March 18, 2022, which was not, based on my recollection and my

12  review again of the opinion, addressed in the opinion.  And

13  that's important because, Your Honor, this term sheet and this

14  -- the finding, I believe it's paragraph -- it's the

15  supplemental paragraph -- well, it's (q), (q)(1) and (2) of

16  the supplemental findings -- basically, what it states there,

17  Your Honor, is that participating -- the definition of

18  "participating chartered organizations" is now expanded as a

19  result of (q)(1) and (2).

20         And a participating chartered organization, it was

21  defined in Document 8813, the plan that the Court ruled on,

22  and it also continues to be defined in the current version of

23  the plan filed August 29th.  And the way that it's defined,

24  Your Honor, is as each and every civic, faith-based,

25  educational, or business organization, governmental entity or

1   organization, other entity or organization, or group of

2   individual citizens, in each case presently or formerly

3   authorized by the BSA to operate, sponsor, or otherwise

4   support one or more Scouting units.

5           And so for a chartered organization to get the

6   benefit of a participating chartered organization release and

7   channeling injunction, they need to be one of those persons or

8   entities authorized by the BSA to operate, sponsor, or

9   otherwise support Scouting units.

10          And the Roman Catholic entities, under (q)(1), is

11  now -- well, (q)(2) says that Roman Catholic entities are

12  being treated as participating chartered organizations, and

13  Roman Catholic entities has a broader definition than the

14  definition of a contributing chartered organization.  And

15  that's the point, Your Honor, of this -- of (q)(2), it's to

16  broaden the definition of a participating chartered

17  organization, but that these entities that do not fit, you

18  know, otherwise.  And now under a Roman Catholic entities, the

19  definition there, it's pretty broad, Your Honor, and it

20  doesn't require authorization -- it doesn't -- the point of it

21  is to expand the universe of Roman Catholic entities and

22  persons who can benefit from the participating chartered

23  organization release and injunction.

24          And so it does adversely -- it does materially and

25  adversely affect survivors who -- it does affect their

**ALW188**

1    treatment, it does affect -- it would affect their vote

2    because now we have this unknown -- this unknown number of

3    Roman Catholic entities and persons who now get to benefit

4    from this participating chartered organization release and

5    injunction.

6          When Your Honor looked at the substantial

7    contribution of participating chartered organizations, her

8    focus was -- did not include this -- your analysis did not

9    include this expansion of the participating chartered

10   organization term.  And so that is a material change under the

11   plan that they're asking the Court, improperly and not in

12   compliance with the Bankruptcy Rules, to confirm.

13         Another plan modification that we believe is

14   material and that adversely affects survivors is now the plan,

15   this new version of the plan provides that the settlement

16   trustee shall propose unknown procedures to ferret out

17   fraudulent claims.  And then it also notes that people who

18   file fraudulent claims and their lawyers can be subject to

19   civil and criminal penalties.  This is language that was not

20   previously in the plan.  And survivors have a right to have

21   disclosure of what are these fraudulent procedures that can

22   subject people to civil and criminal penalties.

23         I liken this, Your Honor, to the Court's concern

24   that she would not approve a plan that did not disclose the

25   trust distribution procedures because the Court was concerned

**ALW189**

104

1   that survivors need to know how their claims would be
2   evaluated.  And so this new addition of proposed fraudulent
3   procedures that will be proposed at a later time just goes
4   against that and it's additional procedures to evaluate claims
5   that are not disclosed --
6              THE COURT:  Ms. Wolff --
7              MS. LUJAN WOLFF:  -- and which --
8              THE COURT:  -- how does that --
9              MS. LUJAN WOLFF:  Yes, Your Honor.
10             THE COURT:  -- how does that hurt a survivor that
11  somebody who's filing a fraudulent claim gets kicked out of
12  the pool?  Doesn't that benefit, isn't that a benefit to all
13  of your claimants who believe they have valid claims?
14             MS. LUJAN WOLFF:  Yes, Your Honor, I under -- yes,
15  yes.  And it's trust distribution procedures that were
16  originally -- the valuation factors that were previously a
17  part of the TDP, they do the same thing.  The survivors were
18  already, you know, told that they would have their claims
19  allowed or disallowed based on the certain evaluation factors
20  that are a part of the claims allowance process, but this in
21  addition.
22             And so we were told those factors -- what are these
23  fraudulent procedure, you know, evaluation factors that could
24  potentially subject people to criminal and civil penalties?
25  And so that is an additional unknown that should be disclosed

**ALW190**

1   and, to the extent that it affects people who elected to

2   receive the expedited distribution, that would also -- to the

3   extent that that affects it, that also adversely affects not

4   just people who were told that, basically, there was -- if you

5   choose an expedited distribution, it's basically a no-

6   questions-asked as long as you give your name and fill out a

7   form substantially, the proof of claim substantially.

8          And now, if they're subjected to a higher level of

9   review, maybe they wouldn't have chosen only $3500 if they're

10  subjected to greater scrutiny.  Maybe they -- and that's done,

11  people have already -- thousands of people have already

12  elected that expedited distribution and, to the extent that

13  those fraudulent procedures will now be applied to them,

14  that's -- a person probably wouldn't have chosen the expedited

15  distribution had they known that they would have to be

16  involved in a more thorough, invasive review, and they would

17  go for a higher award than the 3500.

18         And so, Your Honor, we believe that the plan is

19  materially different and it does adversely affect survivors of

20  abuse, and so the proper course is to -- is to at least, Your

21  Honor, give us 28 days to respond to this new plan, which, as

22  Your Honor noted earlier, is -- has gone through different

23  versions and is most -- you know, most recently in a version

24  filed August 29, just two days -- two, three days ago.

25         So, Your Honor, also we objected to the motion on

**ALW191**

1    the grounds that not all -- and I know Your Honor stated

2    earlier that all objections are resolved, but we believe that

3    these are objections that should be addressed and resolved,

4    and those include the objections relating to releases and

5    injunctions protecting non-settling insurers.

6           In Your Honor's opinion, Your Honor did a review of

7    the different entities that would benefit from those third

8    party releases and channeling injunctions and not included in

9    that list was the non-settling insurers, and the reason why is

10   because they're contributing zero, they're contributing zilch.

11   And so they're not entitled to a release or an injunction so

12   that people cannot access non-settling insurance proceeds or

13   file claims against them because --

14          THE COURT:  Am I correct that your clients can sue

15   the non-settling insurers?

16          MS. LUJAN WOLFF:  That is our argument, yes, Your

17   Honor, that's part of our objection is that we should be able

18   to directly sue.  The way that this plan is written, there's

19   no exception for direct action claimants as to the insurance

20   entity injunction.  It doesn't exclude that and say that we

21   now can -- we can sue them.  It allows every claim against BSA

22   insurance policies to the trust.

23          THE COURT:  Okay, maybe I'm misremembering, but I

24   thought you were successful in your arguments.  I thought I

25   ruled in favor of you on -- that you have claims against opt-

**ALW192**

1   out chartered and -- well, I guess you're free to sue the opt-

2   out chartered.  And I'll have to take a look at this, but to

3   the extent I didn't rule on it -- well, I think I ruled on all

4   those objections.

5            And where is -- I guess I can look at the section I

6   ruled for you, but I thought you were pretty successful.

7            MS. LUJAN WOLFF:  And, Your Honor, I hope that

8   that's the interpretation, but -- or I hope that that's the

9   outcome, but it's not reflected in the plan, which would allow

10  Lujan claimants to directly sue even BSA insurers, it's not --

11  the plan has not been modified --

12           THE COURT:  It's not the BSA insurers, I think

13  that's different, but -- and, at the very least, the claims

14  against non-settling insurers, aren't they -- there's a

15  preliminary injunction in place, but then after that you can

16  sue them.  Am I right on that?  So it's just a temporal

17  limitation.

18           MS. LUJAN WOLFF:  And, Your Honor, the temporal

19  limitation -- if I could just get clarification -- is as to

20  BSA and local council non-settling insurers?

21           THE COURT:  It's whatever it said.

22           MS. QUINN:  Yeah, that's -- that is -- there is --

23  the insurance entity injunction applies with respect to --

24           THE COURT:  To the non-settling.

25           MS. QUINN:  Yes.

**ALW193**

1          THE COURT:  Yes, but that's temporal in nature.

2    Okay.

3          MS. LUJAN WOLFF:  And, Your Honor, if that's the

4    Court's ruling is that that is only temporal, then once the

5    preliminary injunction is expired that we can sue the non-

6    settling insurers of BSA policies and local council policies,

7    then, you know, we thank Your Honor and withdraw that portion

8    --

9          THE COURT:  Well, I'm not changing anything.  The

10   ruling is what the ruling is and the plan is what the plan is,

11   but I'm not -- I think the creditors of opt-out chartered

12   organizations have a lot more rights to sue various parties

13   and, with respect to the extension of -- well, I guess it's

14   the -- I don't want to get the terms wrong now -- I'm saying

15   too much.

16          I think it's in the plan and I think I've ruled on

17   those issues, so let's just stick with that.

18          MS. LUJAN WOLFF:  And, Your Honor, there are other

19   objections that were raised, including the 1976 and '77

20   Hartford policies, whether they're a part of the bankruptcy

21   estate, as the debtors acknowledge that they released their

22   right to coverage for sexual abuse claims for those policies.

23   And, Your Honor, I'm not going to go through all --

24          THE COURT:  That objection is overruled.  I realize

25   I didn't rule on that, but that's overruled.  And I recall the

1  testimony is that those policies themselves cover other

2  things; they're still property of the estate, they're being

3  sold back.  But you're right --

4           MS. LUJAN WOLFF:  And, Your Honor --

5           THE COURT:  -- I think I failed to rule on that.

6           MS. LUJAN WOLFF:  And, Your Honor, I don't know if

7  you want me to go through the other objections that were not

8  addressed at this time.

9           THE COURT:  No.  I mean, the other objection about

10  future claimants, I don't see how you have standing to raise

11  that, and I'm just looking in your objection.

12           MS. LUJAN WOLFF:  Yeah, the other one noted in the

13  objection, Your Honor, was our objection as to the unequal,

14  unfair treatment of survivors who are all sharing in the same

15  pot of money and, yet, some are losing their -- they're losing

16  their post-1975 chartered organization claims while others who

17  were first abused before 1976 get to retain their claims

18  against chartered organizations.

19           And so what we have here is people who are sharing

20  out of the same pot of money and being treated differently,

21  some are getting to keep their rights while others are losing

22  them, and the plan doesn't even account for that.

23           THE COURT:  Okay.  Thank you.  I don't recall that

24  specifically being raised at the time, but I think I addressed

25  unequal treatment in the opinion and it would apply to this as

**ALW195**

110

1   well.  So I feel like I have ruled on that and it's overruled

2   --

3           MS. LUJAN WOLFF:  I have nothing further.

4           THE COURT:  -- the same logic would apply.

5           MS. LUJAN WOLFF:  Thank you.  I have nothing

6   further.  Thank you, Your Honor.

7           THE COURT:  Thank you very much.

8           Let me hear about this -- the Roman Catholic issue,

9   let me hear about that.

10          MR. GORSICH:  Good afternoon, Your Honor, Ron

11  Gorsich on behalf of the debtor.

12          THE COURT:  Thank you.

13          MR. GORSICH:  The Roman Catholic entry was part of

14  the term sheet with the Roman Catholic as part of the

15  settlement.  Your Honor addressed it on page 72 of your

16  opinion, in which you considered the insertion that was going

17  to be put into the confirmation order and said it's not a 9019

18  settlement agreement, but it certainly is something that will

19  become part of the consideration.  It was filed on March 18th,

20  Docket Number 9390, and it was announced at the hearing.  The

21  text was in that filing and the text provided that it would be

22  included in the confirmation order.

23          So I think this was briefed, discussed, and you

24  considered it and ruled on it.  There's nothing new here.

25          THE COURT:  Okay.  Thank you.

**ALW196**

1

| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| | DISTRICT OF DELAWARE |
| 2 | |
| 3 | IN RE:                          .   Chapter 11 |
| | .   Case No. 20-10343 (LSS) |
| 4 | BOY SCOUTS OF AMERICA AND        . |
| | DELAWARE BSA, LLC,               .   (Jointly Administered) |
| 5 | . |
| | . |
| 6 | .   Courtroom No. 2 |
| | .   824 Market Street |
| 7 | Debtors.           .   Wilmington, Delaware 19801 |
| | . |
| 8 | .   Wednesday, September 7, 2022 |
| | . . . . . . . . . . . . . .   10:00 a.m. |
| 9 | |

10              TRANSCRIPT OF STATUS CONFERENCE HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
11              CHIEF UNITED STATES BANKRUPTCY JUDGE

12

APPEARANCES:

13

For the Debtors:           Derek C. Abbott, Esquire
14                          MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
                           1201 North Market Street
15                          16th Floor
                           Wilmington, Delaware 19899
16
                           Jessica Lauria, Esquire
17                          Glenn Kurtz, Esquire
                           WHITE & CASE, LLP
18                          1221 Avenue of the Americas
                           New York, New York 10020
19

20   Audio Operator:        Brandon J. McCarthy, ECRO

21   Transcription Company: Reliable
                           The Nemours Building
22                          1007 N. Orange Street, Suite 110
                           Wilmington, Delaware 19801
23                          Telephone: (302)654-8080
                           Email: gmatthews@reliable-co.com
24

Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

**ALW197**

1          MS. LUJAN WOLFF:  Hello, Your Honor.  This is Delia

2     Lujan Wolff representing Lujan Claimants.  I am from Lujan &

3     Wolff LLP in Guam.

4          Your Honor, I just want to say I disagree with

5     quite a lot of what Mr. Kurtz said.  And I apologize, I'm --

6     you know, I'm appearing on my cell phone because I am having

7     work internet issues. So please let me know if you're having

8     difficulty hearing me.

9          It's incorrect that I declined to participate in

10    mediation.  I was invited to participate in mediation and I

11    attended, waited in a waiting for a couple of hours, and then

12    was not engaged.  So it was about 3 a.m. in the morning when

13    I signed off.  So during that period, I guess while I was

14    asleep, the debtors reached out through the mediator.  So

15    this was a mediation with Tim Gallagher.

16         Later in the morning I did engage by email with the

17    debtors and Mr. Gallagher.  So I thought that those

18    communications were privileged because they were through Mr.

19    Gallagher.  But anyway, Your Honor, despite that I do want to

20    say that it's not true.

21         Just going back, Your Honor, I did try again to get

22    onto the mediation and I did wait to be let into the -- to be

23    let in, but I was not.  So it's incorrect that I failed to

24    participate or declined to participate. I did try and was

25    unable to.  They reached out thereafter, but I just was not

**ALW198**

13

1  able, at that point, to continue because I had meetings with
2  over 10 clients scheduled for that time.

3        I did indicate prior to that, Your Honor, the
4  objection that I had to this provision.  That did include
5  joining in the objections that were raised by Mr. Caldie
6  representing the Guam committee.  So they were aware of that.

7        Your Honor, the way that I see Paragraph (M) it
8  makes it clear that this is a modification of insurance,
9  settling insurer agreements and the primary objection, Your
10  Honor, was as to Subparagraph (1) which was originally
11  Subparagraph (a).  Now it's Subparagraph (1).  The objection
12  there, that I see, is that this is -- well, first of all,
13  this is the modification of insurance settlement agreement
14  that the Court signaled its approval of previously.

15        So this is, I guess, asking the Court to bless a
16  modification that is not a part of the Court's opinion.  So,
17  on that grounds this is procedurally improper in my view.
18  But, again, it's to modify the settling insurer agreements to
19  include new terms, to include new conditions to a waiver.
20  That is a waiver of a free and clear cell of the abuse
21  insurance policies.

22        Those conditions were not in the settling insurer
23  agreements even though the settling insurer agreements
24  contemplated the debtor chartered organizations opting out
25  and refusing to consent to a sale of their interests in these

**ALW199**

1  policies.  So those agreements already contemplated that.
2  Your Honor looked at this provision in her opinion and stated
3  that, you know, the Court interpreted this as being mindful
4  of the automatic stay in those debtor chartered organizations
5  bankruptcy cases.
6          So the plan proponents or the settling insurers are
7  being mindful of the automatic stay failed to provide these
8  additional conditions to a free and clear sale.  What they
9  did provide, Your Honor, in the settling insurer agreements,
10 if there was not a free and clear sale, what it did provide
11 was that the insurance agreements would not be undone by
12 failure to sell free and clear of these debtor chartered
13 organizations.
14         It made that clear that these agreements would not
15 be undone.  It even said that they would potentially
16 withdrawal the protections of the settling insurer
17 injunctions to benefit these debtor chartered organizations
18 that opted out.  So that is a primary objection that I have
19 which is that this is really modifying those agreements that
20 already contemplated automatic stays.
21         For (M)(1), former (M)(A), this -- I mean this is
22 language that is, I guess, interpreting injunctions and how
23 they would be applied to the Archbishop of Agana the opt-out
24 chartered organization.  I disagree with the interpretation
25 of this provision and how it would apply to a debtor

**ALW200**

1  chartered organization that has protection from the automatic

2  stay, protecting its interests in these insurance policies.

3  It's unnecessary and it doesn't belong here.  I think it's

4  contrary to the opinion.

5          I did have questions that Ms. Lauria, I believe

6  that she may have stated that earlier or it may have been in

7  Chubb's response that they filed today.  And those questions

8  were as to (M)(2) which I feel that it was just, Your Honor,

9  the -- I did have a question just as to the final clause in

10 (M)(2) which started with,

11         "Provided that the foregoing shall not prohibit the

12 settlement trust fund fixing, but not paying the allowed

13 amount of abuse claims in accordance with the TDP, or from

14 paying any portion of any such amount provide that the

15 claimant provides the release required under the plan."

16         I had a question, just because it seemed

17 contradictory to me, to say that the trust would fix, but

18 not, and then it would later pay a portion.  So I just did

19 have that question which I felt was not adequately answered

20 by the plan proponents.  Of course, with more time I am sure

21 that we could have gone to the bottom of it, but that

22 question still remains for me.

23         Overall, Your Honor, again, this is just an attempt

24 to modify insurance -- the settling insurance agreements that

25 the Court signaled (indiscernible) and that already

**ALW201**

16

1    contemplated the circumstance that we're in now which is that

2    the sales would not be free and clear of a debtor chartered

3    organizations interest in these policies.

4            Thank you.

5            THE COURT:  Thank you.

6            Is Mr. Caldie on?

7            MR. CALDIE:  Good morning, Your Honor.  I am.

8            THE COURT:  Good morning.  Do you have anything to

9    add?

10            MR. CALDIE:  Yes, Your Honor.  It can be really

11   brief. I want to emphasize, first of all, thank you to the

12   Court for accommodating us. I understand that this, to use

13   the vernacular of the day, might be triggering to Your Honor

14   and your staff to see us all again.  So I will try to make it

15   painless.

16            The point that Ms. Lujan Wolff made last I want to

17   re-emphasize which is the agreements did contemplate this

18   scenario and now what we're looking at is -- I guess I don't

19   want to mischaracterize it, but it could be an attempt to

20   expand on Your Honor's very detailed, very carefully crafted,

21   thoroughly thought through order.  It also could just be an

22   attempt to interpret it a little bit, but, you know, here was

23   the problem.

24            I will confirm what Mr. Kurtz and, I think, Ms.

25   Lauria also said that the Guam committee's concerns are

**ALW202**

1   injunctions and you did approve the channeling injunction,

2   and so I don't know how it could be disputed that the claims

3   against the settling insurers have been channeled.  The

4   language that's included in (m), "in exchange for an

5   agreement to waive the free-and-clear requirement," it does

6   nothing more than repeat the very language, which is already

7   in the injunction and is to which Your Honor approved and no

8   one has any lingering objections.

9           So, simplistically speaking, this is -- it seems

10   to me, like an effort to re-argue what Your Honor has already

11   found.  I don't see how anyone could argue that the

12   channeling injunction doesn't channel the claims and that the

13   insurance entity injunction doesn't protect the settling

14   insurers from other claims.  And Your Honor specifically

15   identified that the claimants would get the benefit of

16   that -- the Archbishop would get the benefit of that in the

17   buy-back and that there hadn't been any argument on the stay.

18   It's too late to talk about stays.

19           MS. LUJAN WOLFF:  Your Honor, if I may?

20           This is Delia Lujan Wolff.  I'm sorry to just jump

21   in.  It seems like people are just jumping in.  But I just

22   disagreeing with what's being argued by the plan proponents.

23           In Lujan Claimants' objection that was filed

24   February 7, earlier this year, Document A-708, we did object

25   to the stay -- I'm sorry, the sales and the injunctions.  I

**ALW203**

1  will quote a sentence from page 40 of the document and Lujan

2  Claimants stated:

3           "As the plan sells the archbishop's interests in

4  BSA insurance policies, including the Century and Hartford

5  insurance policies, and enjoins the Archbishop from making

6  claims against BSA insurers, all without the consent of the

7  Archbishop or the approval of the Guam bankruptcy judge, the

8  plan obviously violates the automatic stay since the sales

9  and injunction from asked to obtain possession of property of

10  the estate or property from the estate or to exercise control

11  over property of the estate.  The plan cannot be confirmed

12  when it violates the automatic stay of another bankruptcy

13  action."

14           And so it's incorrect that the objection was

15  solely as to the 363 sales.  It also was an objection to the

16  injunctions that would bar the Archbishop from making claims

17  against the insurers, since they have these interests in

18  those settling insurer policies.

19           And so, we did make the objection, not just to the

20  channeling injunction, but also to the insurance entity

21  injunction.  As a matter of fact, my objection, if I recall

22  correctly, did quote language from those injunctions as being

23  the debtors' -- what was -- what the debtor was enjoining and

24  the basis for those injunctions.  It was raised.  It was

25  quoted in my objection, if I recall correctly, and so --

**ALW204**

```
 1              THE COURT:  It wasn't argued that way.  It
 2   certainly wasn't argued that way.
 3              MS. LUJAN WOLFF:  I disagree, Your Honor, but I
 4   apologize --
 5              UNIDENTIFIED:  Your Honor, if I --
 6              MS. LUJAN WOLFF:  If I may continue, Your Honor?
 7              And so, I do want to also quote, Your Honor, if I
 8   may, there is a -- if I can find it -- the Court's opinion
 9   did address -- again, did address the settling insurer
10   policies as to debtor chartered organizations and it did
11   quote from common provisions.
12              Mr. Anker is here -- he can correct me if I'm
13   wrong -- but I believe that these were common provisions to
14   the agreements.  And the Court quoted language -- I'm sorry,
15   I just -- I had it open -- which basically said that the
16   failure to obtain the consent of the debtor chartered
17   organizations would not be a breach of any conditions to the
18   effectiveness of the plan.  And so, again, this is not a
19   condition that -- this was a circumstance contemplated and it
20   was specified that if they (indiscernible) consent to a free-
21   and-clear sale would not prevent a plan from going into
22   effect.  Thank you.
23              THE COURT:  Thank you.
24              I do think that's correct.  I do think that's in
25   my opinion at 159 to 160.  This is not a concession that such
```

**ALW205**

1          THE COURT:  Okay.  I think paragraph one is a

2   paragraph that affects the Archbishop.  The Archbishop isn't

3   here, okay.  The Archbishop didn't appear.  It is -- I'm not

4   sure, again, that the Committee should be raising these

5   issues, as I said in my footnote in my opinion.  I don't

6   understand why the Archbishop isn't here if the Archbishop

7   cares about this paragraph.

8          It is not a paragraph, quite frankly, that the

9   Lujan Claimants, regardless of whether they objected in their

10  objection or not, it's not something they had standing to

11  raise and I think I've got a paragraph on that in my opinion.

12  The Lujan Claimants can raise issues specific to them and I

13  think that's like in paragraph 2, this last "provided,

14  however" provision, that I'll hear some explanation on.

15          But as to paragraph 1, it's with respect to and

16  enjoining the Archbishop.  The Archbishop does not appear

17  and --

18          UNIDENTIFIED:  Your Honor?

19          THE COURT:  -- even the Committee was okay with

20  this paragraph, as I heard it to begin with, but then had a

21  problem with the second part of -- this may be the second

22  part of it.  But that's pulled directly from -- I'm told it's

23  pulled directly from Article 10, so I'm going to -- this

24  paragraph is a paragraph that I will approve.

25          I didn't understand paragraph 4, so I want to make

**ALW206**

1   sure I understand it, if that's -- and then we'll get back to

2   paragraph 2, that last *proviso*, to make sure that we all

3   understand what that one is.  That's how I'm ruling.

4              Paragraph --

5              MS. LUJAN WOLFF:  I'm sorry, Your Honor.  I'm

6   sorry, if I may interrupt, just briefly, just for the record,

7   I think Mr. Caldie, I think, was trying to chime in and to

8   maybe do what I'm about to do, which is to inform the Court

9   that the debtor, the Archbishop of Agana did indicate to the

10  plan proponents that it had an objection to paragraph (m).

11             THE COURT:  Well, then they needed to show up.

12  They needed to show up here and appear and present it and

13  they did not, okay.  They're represented.  They know how to

14  appear.  They did not, okay.

15             Paragraph 2, this "provided" clause, does someone

16  want to explain that?

17             MR. KURTZ:  Your Honor, Glenn Kurtz, again.

18             So, let me start by saying that we did get an

19  email inquiry about this from Ms. Lujan Wolff.  We responded

20  to that on September 5th at 4:30.  We then responded --

21             THE COURT:  Just tell me -- I don't need the

22  history -- just tell me what it means.

23             MR. KURTZ:  So, the claimants were concerned that

24  paragraph 2 somehow would interfere or modify the TDP

25  procedures for adjudicating and paying claims, subject to a

**ALW207**

1    release, and so they asked for a *proviso* that simply said

2    it's not changing the way the TDPs work.  This isn't

3    modifying the TDPs.

4                THE COURT:  So, notwithstanding that there needs

5    to be --

6                MR. KURTZ:  So, a settlement with the Archbishop

7    of Agana will require a release, but that doesn't mean that

8    that's modifying the TDPs, which independently, can move

9    forward on fixing claims and allowing them, subject to

10   releases.  It was a request by the claimants to ensure that

11   there was no modification of those core provisions of the

12   TDP, and all the parties agreed.  There's actually been no

13   objection to this.  I understand some things have gotten

14   raised today, but nobody objected to this until right now.

15               THE COURT:  Okay.  Well, I'm hearing it right now.

16   So, as I understand it, regardless of what happens with the

17   Archbishop, the settlement trustee can fix the allowed amount

18   of abuse claims for Ms. Lujan's clients, for example, and can

19   pay them, as long as those claimants signed the releases that

20   all other claimants have to sign, in order to get a

21   distribution from the trust; is that right?

22               MR. KURTZ:  I think that's right, Your Honor.

23               THE COURT:  That's how I read it.  And I do not

24   see that as a disadvantage at all to the Lujan Claimants, so

25   that's fine.

1          Paragraph 4 is the one -- let me see what I wrote

2   next to it.  I wrote, "What does this mean?"

3          What is paragraph 4 supposed to do?

4          MR. KURTZ:  So, think paragraph 4 -- and there

5   was -- you'll see there was a redline.  There's been a change

6   on it.

7          THE COURT:  Yes.

8          MR. KURTZ:  What it's intended to do is if the

9   Archbishop of Agana or its bankruptcy estate, and it's been

10  changed "shall not have been relieved from the terms of the

11  plan or confirmation without the consent of the settling

12  insurers" so this is a provision that ensures that these --

13  the terms of the plan and the confirmation order and the

14  injunction are still in place.

15         And the reason it was changed from "shall not be"

16  to "have been" was to ensure that this was intended to pick

17  up consent rights to the extent there was a change in the

18  terms and not in any way inhibit a Court from changing the

19  terms on appeal.  And we think that resolves -- that did

20  resolve the objections that people had to this.

21         People were reading it as sort of maybe

22  restricting appellate rights and it was confirmed and all

23  it's doing is preserving consent rights with respect to

24  changes to terms.

25         THE COURT:  Well, this "shall not have been

**ALW209**

43

1   relieved," what does "relieved" mean?  What does -- what
2   does -- I really don't know what this means or what it does
3   that the other paragraphs don't do.
4           MR. KURTZ:  Right.  It's not -- oh, it's not -- I
5   can defer to either Mr. Schiavoni or Mr. Anker on whether
6   it's belt-and-suspenders, but I think "relief from the terms"
7   meant that the Archbishop of Agana is still subject to the
8   terms of the injunctions and the plans.  And if they're not,
9   that we can't do anything to relieve that without their
10  consent.
11          The Court, of course, will do -- any appeal court
12  can do whatever appeal courts want to do.  That's why it went
13  from "have been" to "shall not be."  But the notion here is
14  that we're not going to agree to relieve to take them out of
15  the coverage and the scope of the plan documents without
16  their consent.
17          THE COURT:  Well, that is, actually, Mr. Kurtz,
18  the other thing I wrote down next to this was:  Are they
19  trying to bind the Court?
20          MR. KURTZ:  No.  That's why it moved to "shall not
21  have been" so it couldn't be -- and that was an objection.  I
22  think that was raised by the Committee, the Guam Committee,
23  and that change was made to confirm that was never the intent
24  and we don't think that the language "have been relieved" in
25  any way, shape, or form, now is intended to address any

**ALW210**

1  limitation on what the courts can do.  I think it's just to

2  preserve their consent rights.

3          THE COURT:  Okay.  Well, I --

4          MR. SCHIAVONI:  That's right, Your Honor.  We

5  agree with what Mister -- how Mr. Kurtz characterized it.

6          THE COURT:  You agree that this paragraph 4 is not

7  intended to bind any court?

8          MR. SCHIAVONI:  That's right, Your Honor.

9          THE COURT:  Okay.  That's how I'm reading it,

10 then.

11          Okay.  So, that's the -- that's the insurer

12 issues.  And let me add that I view this as settling the

13 order.  I do not view this as amending the plan.  I know that

14 argument was raised last time, that somehow the 7052 motion

15 is really a motion to amend the plan.  I do not view it that

16 way.  I view it as supplementing findings that need to be

17 made, resolving -- asking me to, in fact, make -- change two

18 of my findings, which I thought were appropriate, the ones

19 that I've agreed to change and in the way I've agreed to

20 change them, and this is simply settling, quite frankly, a

21 quite complicated order after a complicated case and

22 decision.

23          And parties were given every opportunity now to

24 show up and make their arguments and those with standing

25 needed to do it.  So, given the discussion we've had, this is

ALW211

1   how I'm coming down on paragraph (m).  And the paragraphs

2   that concern, really, the deal with the idea that the

3   settlement trustee can't settle matters with the Archbishop

4   without the consent of the insurance companies don't bother

5   me.  I don't see that as a concern at all or quite, for that

6   matter, really, any kind of change that's in way material.

7              Okay.  Let's move on.

8              MR. KURTZ:  Thank you, Your Honor.

9              THE COURT:  Actually, let's take five minutes and

10  then we're going to move on.

11             We're in recess.

12         (Recess taken at 11:17 a.m.)

13         (Proceedings resumed at 11:23 a.m.)

14             THE COURT:  Okay.  We're back on the record.

15  Let's move to the next thing.

16             MS. LAURIA:  Thank you, Your Honor.  This is

17  Jessica Lauria, White & Case, for the debtors.

18             That brings us to the issues, the two issues that

19  I indicated at the outset of the hearing that are remaining

20  with respect to the Certain Insurers.  Again, for the Court's

21  reference, that's Finding I, Subparagraph 2, which is on

22  page 10 of the order, or if folks are looking at the

23  blackline of the PDF, stamped at the top, 11 of 77, and then

24  also paragraph 51, in the decretal paragraph, Subpart (b), on

25  page 64 of the order.

**ALW212**

RSA also provides the Debtors with the support of approximately 60,000 abuse survivors to commence solicitation on a plan.

11. For the avoidance of doubt, the Debtors are not seeking approval of the settlements embodied in the Amended Plan at this time. The key terms and provisions of the Amended Plan proposed under the RSA will include the following:[6]

| Plan Term | Summary |
|---|---|
| **BSA Settlement Trust Contribution** | The BSA Settlement Trust Contribution includes: <br><br> (A) all of the Net Unrestricted Cash and Investments, which are forecasted to total approximately $90 million subject to potential variance depending upon the timing of the Effective Date; <br><br> (B) the BSA Settlement Trust Note in the principal amount of $80 million with a second-lien security interest, subject to the terms set forth in the Term Sheet; <br><br> (C) the Artwork, at a mutually agreed value of $59.0 million; <br><br> (D) the estimated $11.6 million from sale-leaseback of the Warehouse and Distribution Center (or the contribution of such property to the Settlement Trust and sale-leaseback thereof to Reorganized BSA); <br><br> (E) the Oil and Gas Interests at a mutually agreed value of $7.6 million; and <br><br> (F) the $1.962 million of net proceeds from the sale of Scouting University. |
| **Non-Monetary Commitments** | The BSA shall make certain non-monetary commitments, including, without limitation, youth protection measures, reporting, formation of a Child Protection Committee, and information sharing related to Abuse Claims, as set forth in full in the Term Sheet. |
| **Settlement of Restricted and Core Asset Disputes** | The Coalition, TCC and Future Claimants' Representative acknowledge and agree that the BSA Settlement Trust Contribution shall be made in consideration for, among other things, the compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the adversary proceeding (the "Restricted Assets Adversary") filed by the TCC in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS). |
| **Local Council Settlement Contribution** | The Local Council Settlement Contribution shall include: <br><br> (i) at least $300 million of cash to be paid on the Effective Date, <br><br> (ii) Unrestricted properties with a combined Appraised Value of $200 million (the "Property Contribution"), which shall be reduced on a dollar-for-dollar basis by any cash payment amount in excess of the $300 million, *provided that* the methodology and procedures related to property selection and acceptance are provided for as set forth in full in the Term Sheet; and |

---

[6] This summary is qualified in its entirety by reference to the provisions of the RSA. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the RSA, the RSA shall govern.

**ALW213**

| | |
|---|---|
| | (iii)   a $100 million interest-bearing variable-payment obligation note (the "<u>DST Note</u>") issued by a Delaware statutory trust on as soon as practicable after the Effective Date. |
| **Contributing Chartered Organization Settlement Contribution** | The Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.  Such settlements may occur prior to the Effective Date with the consent of all Parties. |
| **Assignment of Claims and Defense / Waiver of Claims** | The Debtors, the Local Councils and any other party that is or becomes a Protected Party shall assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims.  Except for the right to seek reimbursement set forth in the Term Sheet, the Debtors, the Local Councils, and any other party that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date. |
| **Hartford Settlement** | On June 9, 2021, the Coalition, the Future Claimants' Representative, and the TCC sent a joint letter to the Debtors stating that they would not support any plan of reorganization or separate motion/settlement that seeks approval of the Hartford Settlement and requesting that the Debtors not go forward with any such plan of reorganization or motion/settlement.   In connection with this request, the Debtors shall seek a determination of the Bankruptcy Court that the Debtors have no obligations under the Hartford Settlement. |
| **Transfer of Insurance Rights to the Settlement Trust** | Subject to certain conditions in the Term Sheet, on the Effective Date, the Debtors and any Local Council and/or Chartered Organization that is a Protected Party shall delegate to the Settlement Trust exclusive control over, transfer and assign all rights, claims, benefits or causes of action, including the right to receive proceeds held by such party with respect to any insurance policy that provides coverage for Abuse Claims, settlement agreements or coverage in-place agreements, and any receivables due such party from insurance companies arising out of or relating to Abuse Claims. |
| **Reimbursement** | The Indemnification by Settlement Trust provisions set forth in Article IV.I of the June 18 Plan shall be deleted and restated to provide that from and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils  for any documented out-of-pocket, losses, costs, and expenses (including, without limitation, judgments, attorney's fees and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of an Abuse Claim that is channeled to the Settlement Trust if the holder of such Abuse Claim seeks to hold Reorganized BSA or such Local Council liable for such Abuse Claim in violation of the Confirmation Order, as set forth in the Term Sheet. |
| **Channeling Injunction** | The Channeling Injunction set forth in Article X.F of the June 18 Plan shall be modified to permit litigation in the tort system consistent with the terms of the TDP.  After the Effective Date, a party shall not become a Protected Party absent the consent of the Settlement Trustee, the Settlement Trust Advisory Committee, and the Future Claimants' Representative. |
| **TDP Claim Values** | The values of categories of Direct Abuse Claims shall be consistent with and based on available evidence, including the Debtors' historical settlement data and other settlements involving abuse claims (the "<u>TDP Claim Values</u>"), which shall be subject to adjustments as set forth in the TDP. In connection with the confirmation of the Amended Plan, the Debtors shall seek approval of the TDP Claim Values and related procedures (as set forth in the TDP). |
| **Trust Distribution Procedures (TDP)** | The TDP shall be filed with the RSA.  The TDP shall be reasonably acceptable to the Debtors and cannot be modified without the consent of the Coalition, the TCC, and the Future Claimants' Representative, which consent shall not be unreasonably withheld. |
| **Timing** | The Parties shall request that the Bankruptcy Court hear the RSA Motion, the Amended Disclosure Statement, the Case Management Motion, and the Solicitation Procedures at the |

**ALW214**

| | |
|---|---|
| | hearing scheduled for July 20–21, 2021 or as soon thereafter as the Bankruptcy Court may agree. |
| **Coalition Professional and Advisory Fees** | Following the effective date of the RSA, for so long as the RSA remains in full force and effect and subject to the Monthly Fee Cap (as defined below), the Debtors shall pay the reasonable, documented and contractual professional fees and expenses of (i) Brown Rudnick LLP, (ii) Robbins, Russell, Englert, Orseck & Untereiner LLP, (iii) Monzack, Mersky and Browder, P.A., (iv) Province, and (v) Parsons, Farnell & Grein, LLP (the "Coalition Professionals"), on a monthly basis promptly following the Debtors' receipt of a summary of invoices.

For professional fees and expenses incurred from the effective date of the RSA until the Effective Date of the Amended Plan, the Coalition Professionals' fees and expenses shall be limited to $950,000 per month (pro-rated for any partial month) (the "Monthly Fee Cap"), *provided, however*, that any unused portion of the Monthly Fee Cap for any such month may be carried forward or carried back to and utilized in any subsequent or prior monthly period.

Upon the Effective Date, the Debtors shall reimburse State Court Counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for, amounts payable by State Court Counsel but not yet paid to Coalition Professionals for, reasonable, documented and contractual professional and advisory fees and expenses incurred by the Coalition Professionals from July 24, 2020 to and including the Effective Date up to an aggregate amount of $10.5 million (the "Plan Effective Date Cap"), and amounts otherwise payable in excess thereof shall be payable, if at all, by the Settlement Trust after the Effective Date.  For the avoidance of doubt, fees and expenses paid on monthly basis following the effective date of the RSA shall not count against or reduce the Plan Effective Date Cap. |
| **Findings and Orders** | The Amended Plan and Confirmation Order shall contain the following provisions, findings and orders, as applicable in substantially the form set forth below (the "Findings and Orders"):

(A)   the Bankruptcy Court has determined that the Amended Plan, the Plan Documents, and the Confirmation Order shall be binding on all parties in interest;

(B)   the Bankruptcy Court has determined that (i) the procedures included in the TDP pertaining to the allowance of Abuse Claims and (ii) the criteria included in the TDP pertaining to the calculation of the Allowed Claim Amounts, including the TDP's Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors, are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court;

(C)   the Bankruptcy Court has determined that the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party is the allowed value of such Abuse Claim as liquidated in accordance with the TDP and is not (i) the initial or supplemental payment percentages established under the TDP to make distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust;

(D)   the Bankruptcy Code authorizes the Insurance Assignment as provided in the Amended Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court has determined that the Settlement Trust is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights; and

(E)   the Bankruptcy Court has determined that the Plan and the TDP were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code. |
| **Insurance Settlements** | Any settlement with any Insurance Company prior to or in connection with the Amended Plan shall be subject to the approval of the Bankruptcy Court and/or the District Court, and the express written consent of the Coalition, the TCC, and the Future Claimants' Representative. |

**ALW215**

| | |
|---|---|
| | For the avoidance of doubt, the Coalition, the TCC, and the Future Claimants' Representative do not consent to the Hartford Settlement and the Coalition, the TCC, and the Future Claimants' Representative will not support any plan that includes that settlement and its approval. The Amended Plan shall not incorporate any settlement with Hartford unless such settlement is acceptable to the Debtors, the Coalition, the TCC, and the Future Claimants' Representative. Post-Effective Date Settlements making Insurers Protected Parties may be approved on the terms and conditions set forth in the Settlement Trust Agreement. |
| **Turnover of Records/ Transfer of Privileges** | The Parties shall enter into a Document Agreement that provides, among other things, that on or before the Effective Date, the Debtors and any party that is a beneficiary of the Channeling Injunction shall be required to turn over to the Settlement Trust all records and documents in their control pertaining to the Abuse Claims. As to such records, the Settlement Trust shall succeed to and hold all rights related to the Debtors' and the Local Councils' privileges. |
| **Settlement Trustee** | The Settlement Trustee shall be Eric D. Green and will be appointed by the Bankruptcy Court. |
| **Settlement Trust Advisory Committee** | The Settlement Trust Advisory Committee (the "STAC") shall be composed of seven (7) individuals, five (5) of which shall be selected by the Coalition and two (2) of which shall be selected by the TCC. The STAC members shall be reasonably acceptable to the Debtors. The commencement or continuation of a STAC Tort Election Claim (as defined in Article XII.B of the TDP) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved by the Settlement Trustee, the Future Claimants' Representative and the majority of the STAC. <br><br> The refusal of any of the foregoing to (i) authorize the commencement or continuation of a STAC Tort Election Claim or (ii) approve a global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party shall be subject to immediate review under the standard set forth in the Settlement Trust Agreement by the Honorable Diane M. Welsh (Ret.) if three (3) members of the STAC so require. |
| **Future Claimants' Representative** | The initial Future Claimants' Representative to represent the interests of holders of Future Abuse Claims shall be James L. Patton, Jr. |

12.    The RSA contemplates a "Support Period" commencing on the date that the executed RSA is filed with the Court and ending on the earlier of (i) the date on which the RSA is terminated in accordance with its terms and (ii) the Effective Date of the Amended Plan. The Debtors have agreed to use reasonable efforts to propose and pursue the Amended Plan and seek confirmation of the Amended Plan incorporating the terms of the Settlement prior to the termination dates set forth below.

13.    In addition to the Support Period set forth above, the RSA contains the following material terms:

| RSA Term | Summary |
|---|---|
| **Agreements of the Debtors** | Subject to the terms of the RSA, the Debtors agree to certain affirmative covenants related to, among other things, proposal and pursuit of (i) the Amended Plan and Confirmation Order, (ii) the Settlement and all transactions contemplated under the RSA, (iii) the RSA Approval |

**ALW216**

or with respect to each individual Local Council or Chartered Organization. Given the number of entities involved, oftentimes with a combination of Local Councils and Chartered Organizations, many of the potential valuation groupings involve only a single claim or a handful of claims. Moreover, even in the case of Local Council and Chartered Organization combinations involving sufficient numbers of claims, additional information or analysis may be needed to separately identify which portion of the aggregate estimate should be attributed to the BSA and which to the other related organizations.

In addition to Direct Abuse Claims, approximately 14,000 contingent and unliquidated indemnification and contribution Claims have been filed against the Debtors, most of which would be included in the Class of Indirect Abuse Claims. The majority were filed by Chartered Organizations.[85] Among others, TCJC has asserted claims for indemnification and contribution from the BSA relating to the defense and resolution of Abuse Claims that have been and may be asserted against TCJC in the tort system. Pursuant to the terms of the TCJC Settlement, TCJC agreed to waive all claims against, among others, the Debtors and Reorganized BSA.

O.  Future Claimants' Representative's Future Abuse Claims Forecast

Ankura Consulting Group, LLC, consultant to the Future Claimants' Representative ("Ankura"), currently forecasts that the number of compensable Future Abuse Claims that may be asserted against the Settlement Trust is approximately 11,300 or approximately 14% of the total number of Direct Abuse Claims and the amount of the Debtors' liability for such Future Abuse Claims is approximately $5 billion or approximately 21% of the total value of Direct Abuse Claims as calculated by Ankura applying the procedures and criteria set forth in the Trust Distribution Procedures dated July 2, 2021.

The Debtors dispute the Future Claimants' Representative's forecast and believe that the number and value of Future Abuse Claims that will be asserted against the Settlement Trust will be substantially lower for two key reasons: (1) the multi-million dollar advertising campaign that occurred prior to the Bar Date was highly effective in reaching victims who came forward and filed Claims, and (2) the BSA's expert-informed youth protection programs, which are among the most stringent of any youth-serving organization, have been in place during the period correlating to Future Abuse Claims. The Debtors believe that the Bates White estimated range of $2.4 billion to $7.1 billion is a more accurate valuation of all Abuse Claims, including Future Abuse Claims, and is the better basis on which to formulate projected recoveries on account of Abuse Claims.

P.    Assumption and Rejection of Unexpired Leases and Executory Contracts

Since the commencement of these Chapter 11 Cases, the Debtors have strategically reviewed their contractual obligations and sought to weed out contractual agreements that do not provide a significant value to the Debtors' Estates going forward. Consistent with this goal, on March 31, 2020, the Debtors filed a motion seeking entry of an order authorizing the Debtors to reject that certain Personal Services Agreement by and between Pearson Education, Inc.

---

[85]  Certain Chartered Organizations have asserted contractual indemnity rights against the BSA for Scouting-related Abuse Claims. The Debtors dispute the validity of such purported indemnification Claims. While the Debtors do not believe any such valid indemnification Claims exist, any such purported indemnification Claims would be channeled to the Settlement Trust on the Effective Date.

ALW217

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | | |
| 8 | Direct Abuse Claims[40] | Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.<br><br>Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Post-1975 | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery at $7.1 billion: 10 – 21% *plus* additional insurance rights, **expected to yield up to 100% recovery**<br><br>Estimated Percentage Recovery at $2.4 billion: 31 – 63% *plus* additional insurance rights, **expected to yield up to 100% recovery[41]Error! Bookmark not defined.** |

---

[40]  Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

[41]  The following calculation was used to determine the percentage recovery range under the Plan: ($219 million (BSA Settlement Contribution) plus $500 million (Local Counsel Contribution) plus $100 million (DST Note) plus Hartford Settlement Contribution minus the Hartford Administrative Expense Claim ($785 million)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range). The recovery percentages are net of assumed cost to make such contribution to the Settlement Trust. Costs are estimated between 6 and 10% of total assets with costs expected to be at the high end of the range in a smaller trust and at or below the lower end of the range in a larger trust under the Plan. The low end of the recovery range excludes the Hartford Settlement Contribution as some parties may object to the settlement amount and/or how the settlement amount is distributed to holders of Abuse Claims, thereby rendering these amounts unavailable to some or all creditors. The TCJC Settlement Contribution is not reflected in the recovery ranges for Direct Abuse Claims because such contribution by TCJC may not be available to all holders of Direct Abuse Claims under the Trust Distribution Procedures. Abuse Claims that relate to TCJC may have a higher recovery than the ranges set forth above. In addition, the Bates White estimated range of $2.4 billion to $7.1 billion estimates the value of Abuse Claims, which would include Future Abuse Claims, to the extent viable. The Future Claimants' Representative asserts that the forecast of the Future Abuse Claims should be higher than reflected in the Debtors' range. The Debtors do not agree with the forecast of the Future Abuse Claims asserted by the Future Claimants' Representative and believe that the Bates White range is a more accurate range of the value for all Abuse Claims, including Future Abuse Claims. Therefore, the Bates White range provides a better basis on which to formulate projected recoveries on account of Abuse Claims, including Direct Abuse Claims (which include Future Abuse Claims).

ALW218

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 251 | Transatlantic | ZZ | 139 | 1,569,070 | 28,081,700 | 447,138 | 996,036 | 28.50% | 61.57% | 1.59% | 3.44% |
| 252 | Far East | ZZ | 50 | 808,570 | 12,084,200 | 773,955 | 2,886,174 | 95.26% | 356.95% | 6.44% | 23.88% |
| | | | 41,750 | $ 7,646,294,995 | $ 41,069,210,100 | $ 519,586,545 | $ 1,870,754,935 | 6.80% | 24.47% | 1.27% | 4.56% |

**ALW219**

purchase by Hartford in good faith pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable and affording Hartford all protections thereunder, and (iv) the proceeds of such Sale, including the Settlement Amount, will be transferred to the Settlement Trust under the Plan.

       c.      Subject to all of the other terms and conditions of the Plan and this Agreement, including Hartford's payment of the Initial Payment and the Additional Payment, the Hartford Protected Parties are Settling Insurance Companies and Protected Parties entitled to the protection of the Channeling Injunction for all Abuse Claims against any Hartford Protected Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Hartford Protected Party, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurance Company under the Plan as confirmed by the Bankruptcy Court, the Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

       d.      Subject to all of the terms and conditions of the Plan and this Agreement, the Debtors shall irrevocably and unconditionally release and be deemed to release the Hartford Protected Parties from the Prepetition Hartford Claims; the Parties (other than Hartford), the Debtors' Estates, Reorganized BSA, the Settlement Trust, the Local Councils, and the other Protected Parties and Limited Protected Parties shall irrevocably and unconditionally release and be deemed to release the Hartford Protected Parties from all Released Claims; and

ALW220

b.      The Hartford BSA Policy Sale shall be free and clear of all Interests of any additional insured or any other Entity in the Hartford BSA Policies pursuant to section 363(f) and 1141 of the Bankruptcy Code, and the Confirmation Order and Affirmation Order shall so provide.  Hartford shall be designated in the Confirmation Order as a good-faith purchaser of the Hartford BSA Policies, with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.  The proceeds of such Sale, including the Settlement Amount, shall be transferred to the Settlement Trust under the Plan.

c.      Without limiting the foregoing, although the Parties do not believe that the Hartford BSA Policy Sale  free and clear of all Interests of any Entity in such Policies would constitute a violation of the automatic stay of any Chartered Organization that is a debtor in bankruptcy and that asserts an Interest in one or more Hartford BSA Policies, to the extent the Bankruptcy Court (or other court with jurisdiction) determines that the Sale would constitute such a violation, then the Parties shall seek a determination from the Bankruptcy Court (or other court with jurisdiction) that they may proceed with the Sale or relief from such stay to effectuate the Sale.

2.      **Assignment and Sale of Hartford Local Council Policies**

a.      To the extent the Plan, as confirmed, or any Insurance Settlement Agreement approved by the Bankruptcy Court provides that the Local Councils will assign Local Council Insurance Policies issued by any Settling Insurance Company to the Debtors' Estates and that the Debtors and their Estates will sell such Policies to such Settling Insurance Company free and clear of all Interests of any Entity in

29

**ALW221**

such Policies, and to the maximum extent permitted by applicable law, the Local Councils and Hartford consent to the assignment of the Hartford Local Council Policies to the Debtors' Estates, and the Local Councils shall assign the Hartford Local Council Policies to the Debtors' Estates prior to the Plan Effective Date.

b.      To the extent such assignment of the Hartford Local Council Policies occurs, the Debtors and their Estates shall sell the Hartford Local Council Policies, along with the Hartford BSA Policies, to Hartford on the Release Date, in exchange for the Settlement Amount and other consideration provided by Hartford under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code (the **"Hartford Local Council Policy Sale"**).

c.      The Hartford Local Council Policy Sale shall be free and clear of all Interests of any additional insured or any other Entity in the Hartford Local Council Policies pursuant to section 363(f) and 1141 of the Bankruptcy Code, and the Confirmation Order and Affirmation Order shall so provide.  Hartford shall be designated in the Confirmation Order as a good-faith purchaser of the Hartford Local Council Policies, with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.  The proceeds of the Sale, including the Settlement Amount, shall be transferred to the Settlement Trust under the Plan.

d.      Without limiting the foregoing, although the Parties do not believe that the Hartford Local Council Policy Sale free and clear of all Interests of any Entity in such Policies would constitute a violation of the automatic stay of any Chartered Organization that is a debtor in bankruptcy and that asserts an Interest in one or more Hartford Local Council Policies, to the extent the Bankruptcy Court

30

**ALW222**

(or other court with jurisdiction) determines that the Sale would constitute such a violation, then the Parties shall seek a determination from the Bankruptcy Court (or other court with jurisdiction) that they may proceed with the Sale or relief from such stay to effectuate the Sale.

**B.    Releases.**  Upon the Release Date, the Parties shall receive the benefit of the releases of and by the Parties, the Debtors' Estates, Reorganized BSA, the Settlement Trust, the Local Councils, and the other Protected Parties and Limited Protected Parties, as set forth in Section VII below; *provided, however,* that the Hartford Protected Parties shall receive the benefit of the Debtors' release of the Prepetition Hartford Claims when Hartford makes the Initial Payment.

**C.    Local Councils**.  The Debtors and AHCLC shall ensure that, within thirty (30) calendar days of the Execution Date, each current Local Council, including those listed on Exhibit G to the Modified Fifth Amended Plan, becomes a Joining Local Council by executing a joinder to this Agreement in the form attached as Exhibit D.

**D.    Chartered Organizations**.  The Hartford Protected Parties shall be protected under the Plan and Confirmation Order against liability, loss, or expense with respect to any Claim by any Chartered Organization arising out of or relating to coverage for Abuse Claims under any Hartford Policy or any other insurance policy issued or allegedly issued by any Hartford Protected Party to the extent provided under the Plan, whether through the Channeling Injunction, other injunctive protection, assignment of such Claims to the Settlement Trust, releases, and/or any other method in accordance with applicable law and agreed to by the Parties as incorporated into the Plan; *provided, however,* that the rights of any Opt-Out Chartered Organizations provided under insurance policies issued directly to any Opt-Out Chartered Organizations are preserved, and

31

**ALW223**

by the Settling Insurers with respect to Claims or Causes of Action involving Abuse Claims concerning such coverage for Abuse Claims; (II) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Settling Insurers), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or the Settling Insurers; and (III) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (y) file or assert any Claim or Claims against the Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date; and (z) file or assert any rights or interests in any property transferred to the Trust under the Plan, including the proceeds of any settlements paid by an Settling Insurance Company; and (C) the assignment to the Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations. Other than the TCJC and the United Methodist Entities, no Chartered Organization may become a Contributing Chartered Organization without making a contribution in form and substance equivalent to the Participating Chartered Organization Settlement Contribution and agreeing to be bound by the terms and conditions of this Agreement.

11. **Protections Afforded to Insureds and Co-Insureds.** On the Release Date, all Abuse Claims against insureds and co-insureds covered under insurance policies issued by the Settling Insurers shall be channeled and enjoined under the Settling Insurer Policy Injunction and released. Pending the occurrence of the Release Date, all such Abuse Claims shall be enjoined pursuant to the Post-Confirmation Interim Injunction, as provided herein.

12. **Bankrupt Chartered Organizations.** The BSA shall use its best efforts to work with the Roman Catholic Ad Hoc Committee and the Chartered Organizations that are debtors in bankruptcy (the eight bankrupt entities identified on Exhibit K to the Plan, which may be amended to the extent that additional Chartered Organizations file for bankruptcy protection prior to entry of the Confirmation Order, each a "Bankrupt Chartered Organization") to obtain written consent for such Bankrupt Chartered Organizations to consent to the terms of this Agreement. To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, such Bankrupt Chartered Organization shall automatically be deemed to be an Opt-Out Chartered Organization for all purposes hereunder. The Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organization shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan. The Parties consent to the foregoing provisions covering the Settling Insurers to apply to any other Settling Insurance Company. The Settling Insurers reserve all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.

**ALW224**

pursuant to the Participating Chartered Organization Insurance Assignment, the waiver and complete release of (I) each of the Participating Chartered Organization's rights, titles, privileges, interests, claims, demands, or entitlements under the Zurich Insurer Policies and any other insurance policy issued by the Zurich Insurers with respect to Claims or Causes of Action involving Abuse Claims, concerning such coverage for Abuse Claims; (II) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Zurich Insurers), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization, or the Zurich Insurers; and (III) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (y) file or assert any Claim or Claims against the Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date and (z) file or assert any rights or interests in any property transferred to the Trust under the Plan, including the proceeds of any settlements paid by an Settling Insurance Company; and (C) the assignment to the Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations. Other than the TCJC and the United Methodist Entities, no Chartered Organization may become a Contributing Chartered Organization without making a contribution in form and substance equivalent to the Participating Chartered Organization Settlement Contribution and agreeing to be bound by the terms and conditions of this Agreement.

10. **Protections Afforded to Insureds and Co-Insureds.**   On the Release Date, all Abuse Claims against insureds and co-insureds covered under insurance policies issued by the Zurich Insurers or Zurich Affiliated Insurers, including the Zurich Insurer Policies, shall be channeled and enjoined under the Settling Insurer Policy Injunction and released. Pending the occurrence of the Release Date, all such Abuse Claims shall be enjoined pursuant to the Post-Confirmation Interim Injunction, as provided herein.

11. **Bankrupt Chartered Organizations**.   The BSA shall use its best efforts to work with the Roman Catholic Ad Hoc Committee and the Chartered Organizations that are debtors in bankruptcy (the eight bankrupt entities identified on Exhibit K to the Plan, which may be amended to the extent that additional Chartered Organizations file for bankruptcy protection prior to entry of the Confirmation Order, each a "Bankrupt Chartered Organization") to obtain written consent for such Bankrupt Chartered Organization to consent to the terms of this Agreement.   To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, the Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organizations shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan.  The Zurich Insurers reserve all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.

10

**ALW225**

(including with respect to the Clarendon Policies), and (f) the Participating Chartered Organization Insurance Actions. In addition, in order to obtain the benefit of (i) the Settling Insurer Policy Injunction, and (ii) the Full Post-1975 Injunction, Participating Chartered Organizations shall be required to make, or be deemed to make, the following contribution to the Trust ("Participating Chartered Organization Settlement Contribution"): (A) the Participating Chartered Organization Insurance Assignment; (B) to the extent of any rights, claims or interests not assigned to the Trust pursuant to the Participating Chartered Organization Insurance Assignment, the waiver and complete release of (I) each of the Participating Chartered Organization's rights, titles, privileges, interests, claims, demands or entitlements under the Clarendon Policies and any other insurance policy issued or allegedly issued by Clarendon with respect to Claims or Causes of Action involving Abuse Claims concerning such coverage for Abuse Claims; (II) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued or allegedly issued by Clarendon), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or Clarendon; and (III) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (y) file or assert any Claim or Claims against the Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date; and (z) file or assert any rights or interests in any property transferred to the Trust under the Plan, including the proceeds of any settlements paid by an Settling Insurance Company; and (C) the assignment to the Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations. Other than the TCJC and the United Methodist Entities, no Chartered Organization may become a Contributing Chartered Organization without making a contribution in form and substance equivalent to the Participating Chartered Organization Settlement Contribution and agreeing to be bound by the terms and conditions of this Agreement.

10. **Protections Afforded to Insureds and Co-Insureds**. On the Release Date, all Abuse Claims against insureds and co-insureds covered under insurance policies issued by Clarendon shall be channeled and enjoined under the Settling Insurer Policy Injunction and released. Pending the occurrence of the Release Date, all such Abuse Claims shall be enjoined pursuant to the Post-Confirmation Interim Injunction, as provided herein.

11. **Bankrupt Chartered Organizations**. The BSA shall use its best efforts to work with the Roman Catholic ad hoc committee and the Chartered Organizations that are debtors in bankruptcy (the eight bankrupt entities identified on Exhibit K to the Plan, which may be amended to the extent that additional Chartered Organizations file for bankruptcy protection prior to entry of the Confirmation Order, each a "Bankrupt Chartered Organization") to obtain written consent for such Bankrupt Chartered Organization to consent to the terms this Agreement. To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, the Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections

10

Doc # DC/27542496v1

**ALW226**

and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organizations shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan. The Parties consent to the foregoing provisions covering Clarendon to apply to any other Settling Insurance Company. Clarendon reserves all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.

12. **Opt-Out Chartered Organizations**.

a) Opt-Out Chartered Organizations by definition are not Participating Chartered Organizations, Limited Protected Parties or Contributing Chartered Organizations. The term "Opt-Out Chartered Organization," on the one hand, and the terms Participating Chartered Organizations, Limited Protected Parties and Contributing Chartered Organizations, on the other hand, are mutually exclusive.

b) Under the Plan and as a condition to the Plan Effective Date (waiver of which shall require the prior written consent of, among others, Clarendon), any Opt-Out Chartered Organization shall receive the benefit of the Settling Insurer Policy Injunction and the release of all Abuse Claims that are covered under insurance policies issued by Clarendon.

c) For the avoidance of doubt, nothing herein or in the Plan shall require an Opt-Out Chartered Organization to provide an assignment or release with respect to its rights under insurance policies issued directly to such organization, including those set forth in Sections 8 and 9 hereof. The rights of the Opt-Out Chartered Organizations provided under insurance policies issued directly to such organization are preserved. Clarendon reserves all rights and defenses they have under such policies. Clarendon and the Opt-Out Chartered Organizations may enforce and rely upon the channeling and release of Abuse Claims against an Opt-Out Chartered Organization as provided in Section 10 hereof for all purposes. All rights and defenses of Clarendon under insurance policies issued directly to an Opt-Out Chartered Organization are preserved. The foregoing provision will be added to the Plan, including the channeling injunction.

d) If, however, a Chartered Organization that is an Opt-Out Chartered Organization wants to become a Contributing Chartered Organization, (i) a financial contribution must be made by or on behalf of such Opt-Out Chartered Organization, (ii) such Chartered Organization must agree to provide the assignments and releases set forth in Sections 8 and 9, and (iii) if and to the extent required by BSA, such Chartered Organization must agree to cooperate with the Child Protection Committee.

e) By definition, the Clarendon Policies (including those set forth on Exhibits A and B) were issued directly to the BSA and the Local Councils and were not issued directly to the Chartered Organizations.

13. **Post-Confirmation Interim Injunction**. The Plan and Confirmation Order shall provide that all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (the "Post-Confirmation Interim Injunction"), shall remain in full force

11

**ALW227**

*EXECUTION VERSION*

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (this "Agreement") dated February 14, 2022 is entered into between and among Century and the Chubb Companies (both as defined below and collectively, the "Settling Insurers"), Boy Scouts of America and Delaware BSA, LLC, as debtors and debtors in possession (collectively, "BSA" or the "Debtors"), the Ad Hoc Committee of Local Councils (the "AHCLC"), the Coalition of Abused Scouts for Justice, solely and only in its capacity as an ad hoc committee (the "Coalition"),[1] and the Future Claimants' Representative (the "FCR" and, collectively with the Settling Insurers, the Debtors, the AHCLC, and the Coalition, the "Parties").[2]  The attorneys representing holders of Direct Abuse Claims listed on Schedule 1 hereto, which reflects the number of holders of Abuse Claims represented by each firm (the "State Court Counsel") agree to support the terms of and be bound by this Agreement.

WHEREAS, on February 18, 2020, the Debtors commenced proceedings under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, the Settling Insurers have allegedly issued insurance policies covering or allegedly covering Claims and Causes of Action for Abuse involving Scouting that occurred prior to the Petition Date;

WHEREAS, the Parties wish to resolve disputes concerning such policies;

WHEREAS, subject to the terms and conditions set forth herein, the Settling Insurers will pay the Settlement Amount in exchange for the injunctions, releases and other protections described below;

WHEREAS, among other things, the settlement provides for the channeling and release of all Abuse Claims against the Settling Insurers (and against their insureds under policies issued by the Settling Insurers that may cover such Claims) in exchange for the Settlement Payment;

WHEREAS, on December 12, 2021 (the "Term Sheet Effective Date"), the Parties executed a term sheet in the form attached hereto as Exhibit C (the "Term Sheet"), setting forth the basic terms of their settlement; and

WHEREAS, on December 18, 2021, the Debtors filed their Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. 7832] (as it may subsequently be amended from time to time, the "Plan" or "Amended Plan"), as amended to reflect the terms of the Term Sheet.

Capitalized terms not defined in this Agreement shall have the definitions ascribed to such terms in the Plan, which shall be consistent with the terms of this Agreement.

---

[1]  For the avoidance of doubt, no holders of Direct Abuse Claims are or shall be deemed Parties to this Agreement.

[2]  Notwithstanding anything to the contrary in this Agreement, the obligations and undertakings of the AHCLC in connection with this Agreement shall be no greater than the AHCLC's parallel obligations and undertakings under Section III of the Restructuring Support Agreement (including the "No Liability" subsection thereof) filed at Dkt. 5466-2.

**ALW228**

Amount (the "Initial Payment") shall be released from the Escrow Account to the Trust. The remaining $750,000,000 balance of the Settlement Amount (the "Additional Payment") and the Net Income shall remain in the Escrow Account until the Confirmation Order shall become a Final Order (as defined in the Plan), and the other conditions precedent to the occurrence of the Release Date have occurred, on which date the Additional Payment, plus any Net Income, shall be released from the Escrow Account to the Trust; *provided, however,* that, at their election and in their sole discretion as long as the conditions to the Initial Payment Date remain satisfied (or have been waived pursuant to a writing signed by each Party), the Settling Insurers may authorize the release of all or a portion of the Additional Payment (and any Net Income) from the Escrow Account to the Trust at any time before the Confirmation Order becomes a Final Order. The Release Date shall not occur until the Additional Payment and the Net Income have been released to the Trust.

c)  The Trust will have investment discretion with respect to the Escrowed Payments and the Net Income while they are in the Escrow Account, subject to the Parties' agreement on investment guidelines to be provided in writing to the Escrow Agent under which the Escrowed Payments may be invested by the Trust; *provided, however*, that the Trust will bear all risks associated with any such investment of the Escrowed Payments and that no loss or failure to achieve desired investment returns on the Escrowed Payments while they are in the Escrow Account shall require the Settling Insurers to increase the Settlement Amount they are paying or have paid (or increase the amount of BSA's contribution to the Trust); *provided further, however*, that the Debtors, Reorganized BSA, the Local Councils and Chartered Organizations shall have no liability or obligations to the Settling Insurers or the Trust, the Trust shall have no liability or obligations to the Settling Insurers, and the Settling Insurers shall have no liability or obligations to the Trust (or any other Party), whatsoever for any loss or failure to achieve desired investment returns on the Escrowed Payments while they are in the Escrow Account.

d)  Notwithstanding anything to the contrary herein, the Escrowed Payments and any amounts in the Escrow Account, including the Net Income, shall be promptly (and no later than seven (7) Business Days after the date of such written demand, unless otherwise agreed to by the Parties) released to the Settling Insurers upon their written demand if any of the following occur:  (i) the District Court does not enter the Affirmation Order within 360 days after the entry of the Confirmation Order by the Bankruptcy Court or the District Court declines to enter the Affirmation Order (whether or not such denial constitutes a reversal or remand); (ii) the Plan is at any time withdrawn; (iii) the Plan otherwise ceases to conform to the Term Sheet or this Agreement; (iv) there is a Reversal; (v) the Chapter 11 Cases have been converted or dismissed, (vi) the Parties agree to such release in writing; or (vii) an order of the Bankruptcy Court or District Court so provides.

5.  **Protections to be Afforded to the Settling Insurers**.

a)  Effective as of the Release Date, the Settling Insurers will be designated as Protected Parties for all purposes under the Plan and granted all associated releases, injunctions (including the Settling Insurer Policy Injunction), and protections. As set forth herein, the Settling Insurers shall be granted such releases, injunctions, and protections as are

**ALW229**

necessary to deliver finality with respect to all known and unknown insurance policies they issued to BSA and Local Councils covering or potentially covering Claims or Causes of Action related to, arising from or in connection with Abuse Claims, which policies and claim years shall include those identified on Exhibits A and B hereto for all purposes with respect to any and all policy and claim years whether before or after 1976, all such known and unknown policies subject only to the limitations stated in this Section 5 (as applicable to Post-Petition Policies and Non-Abuse Insurance Policies) and Section 6 (with respect to Westchester) (collectively the "Settling Insurers' Policies"), and any other known or unknown insurance policy issued by any of the Settling Insurers covering Claims or Causes of Action for Abuse Claims with respect to such coverage for Abuse Claims; any actions, settlements entered into, omissions or positions taken in connection with any Abuse Claims and/or the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date related to any Abuse Claims and/or policy issued by any of the Settling Insurers concerning the Debtors or Scouting, including the Settling Insurers' performance of their obligations thereunder whether for defense, settlement of claims or otherwise. Notwithstanding anything to the contrary herein, the BSA, Local Councils, Participating Chartered Organizations and Contributing Chartered Organizations are not releasing or enjoining any rights under (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies), other than the right to seek coverage for and/or to pursue any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise, and (ii) Post-Petition Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

b)   To preserve and promote the settlements contemplated by and provided herein and in the Plan, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in Article X of the Plan, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, (i) the sole recourse of any holder of an Abuse Claim against a Settling Insurer on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Settling Insurer or any property or interest in property of any Settling Insurer, (ii) the sole recourse of any holder of a Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against any Limited

**ALW230**

by the Settling Insurers with respect to Claims or Causes of Action involving Abuse Claims concerning such coverage for Abuse Claims; (II) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Settling Insurers), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or the Settling Insurers; and (III) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (y) file or assert any Claim or Claims against the Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date; and (z) file or assert any rights or interests in any property transferred to the Trust under the Plan, including the proceeds of any settlements paid by an Settling Insurance Company; and (C) the assignment to the Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations. Other than the TCJC and the United Methodist Entities, no Chartered Organization may become a Contributing Chartered Organization without making a contribution in form and substance equivalent to the Participating Chartered Organization Settlement Contribution and agreeing to be bound by the terms and conditions of this Agreement.

11. **Protections Afforded to Insureds and Co-Insureds**.  On the Release Date, all Abuse Claims against insureds and co-insureds covered under insurance policies issued by the Settling Insurers shall be channeled and enjoined under the Settling Insurer Policy Injunction and released.  Pending the occurrence of the Release Date, all such Abuse Claims shall be enjoined pursuant to the Post-Confirmation Interim Injunction, as provided herein.

12. **Bankrupt Chartered Organizations**.  The BSA shall use its best efforts to work with the Roman Catholic Ad Hoc Committee and the Chartered Organizations that are debtors in bankruptcy (the eight bankrupt entities identified on Exhibit K to the Plan, which may be amended to the extent that additional Chartered Organizations file for bankruptcy protection prior to entry of the Confirmation Order, each a "<u>Bankrupt Chartered Organization</u>") to obtain written consent for such Bankrupt Chartered Organizations to consent to the terms of this Agreement.  To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, such Bankrupt Chartered Organization shall automatically be deemed to be an Opt-Out Chartered Organization for all purposes hereunder.  The Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organization shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan. The Parties consent to the foregoing provisions covering the Settling Insurers to apply to any other Settling Insurance Company.  The Settling Insurers reserve all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.

**ALW231**

"**Bankrupt Chartered Organization**" has the meaning ascribed to it in section 12 of this Agreement.

"**Bankruptcy Code**" has the meaning ascribed to it in the Amended Plan.

"**Bankruptcy Court**" has the meaning ascribed to it in the Amended Plan.

"**Bankruptcy Rules**" has the meaning ascribed to it in the Amended Plan.

"**BSA**" has the meaning ascribed to it in the opening section of this Agreement.

"**BSA Insurance Policies**" has the meaning ascribed to it in the Amended Plan and shall include the BSA Settling Insurers' Policies.

"**BSA Settling Insurers' Policies**" has the meaning ascribed to it in section 6 of this Agreement.

"**Causes of Action**" has the meaning ascribed to it in the Amended Plan.

"**Century**" means: (a) Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; (b) Century Indemnity Company as successor to CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; (c) Insurance Company of North America; and (d) and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such; provided that the term "Century" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Post-Petition Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

"**Channeling Injunction**" has the meaning ascribed to it in section 5(c) of this Agreement.

"**Chapter 11 Cases**" has the meaning ascribed to it in the Amended Plan.

**ALW232**

"**Chartered Organizations**" has the meaning ascribed to it in the Amended Plan.

"**Child Protection Committee**" has the meaning ascribed to it in the Amended Plan.

"**Chubb Companies**" means: (a) Westchester Fire Insurance Company; (b) Westchester Surplus Lines Insurance Company; (c) Industrial Insurance Company of Hawaii; (d) Chubb Custom Insurance Company; (e) Federal Insurance Company; (f) Pacific Indemnity Company; (g) Texas Pacific Indemnity Company; (h) U.S. Fire Insurance Company, to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (i) International Insurance Company to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (j) Industrial Indemnity Company; (k) Pacific Employers Insurance Company; (l) The North River Insurance Company, but only to the extent policies were assumed by or novated to Westchester Fire Insurance Company prior to the Effective Date; (m) Aetna Insurance Company; (n) American Foreign Insurance Association; (o) Chubb Atlantic Indemnity Ltd.; (p) INA Insurance Company of Illinois; and (q) each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such provided that the term "Chubb" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies), except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Post-Petition Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, settlements entered into, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Plan Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

"**Claim**" has the meaning ascribed to it in the Amended Plan.

"**Coalition**" has the meaning ascribed to it in the opening section of this Agreement.

"**Confirmation**" has the meaning ascribed to it in the Amended Plan.

"**Confirmation Date**" has the meaning ascribed to it in the Amended Plan.

"**Confirmation Hearing**" has the meaning ascribed to it in the Amended Plan.

**ALW233**



**SHIPMAN &**
**GOODWIN** LLP®
COUNSELORS AT LAW

James P. Ruggeri
Phone: 202-469-7752
Fax: 202-469-7751
jruggeri@goodwin.com

February 5, 2021

**VIA ELECTRONIC MAIL**

Jessica C. Lauria, Esq.
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020

Ernest Martin Jr., Esq.
Haynes & Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219

Michael C. Andolina, Esq.
White & Case LLP
111 South Wacker Drive
Chicago, IL 60606-4302

Adrian C. Azer, Esq.
Haynes & Boone, LLP
800 17th Street NW, Suite 500
Washington, D.C. 20006

Re:   *In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343
(Bankr. D. Del.)

Dear Jessica, Mike, Ernest and Adrian:

As you know, this firm represents Hartford Accident and Indemnity Company, First State
Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance
Company (collectively, "Hartford") in connection with the above-captioned bankruptcy case.
We write to express our continued concern with Boy Scouts of America's ("BSA") continued
acquiescence in the Official Committee of Tort Claimants' ("TCC") and the Coalition of Abused
Scouts for Justice's ("Coalition") efforts to permanently shield the abuse claims from even basic
scrutiny, to remind BSA of its contractual obligations to Hartford to cooperate in defending the
abuse claims (particularly in view of the patent evidence that many pending abuse claims may be
fraudulent), and to offer an alternative proposal to resolve the abuse claims in a manner which
both preserves legitimate claims and respects BSA's contractual relationship with Hartford.

On May 6, 2020, we reminded BSA of its contractual duties to Hartford, including its
duty to cooperate and duty to obtain Hartford's consent to settlements for which it intends to
seek coverage from Hartford. *See* May 6, 2020 Ruggeri Letter to Messrs. Martin and Azer. In
particular, Hartford expressed the concern that, by providing certain pre-petition claimants with a
valuation matrix, BSA was creating an artificially high floor that would prejudice future
negotiations. The settlement "proposals" that we have seen since that time from the TCC and the
Coalition bear out those concerns. The matrix that BSA provided to the pre-petition committee

JTX-379

**ALW234**
HFBKPLAN017410

Highly Confidential - Subject to Protective Order

Jessica C. Lauria, Esq.
Michael C. Andolina, Esq.
Ernest Martin Jr., Esq.
Adrian C. Azer, Esq.
February 5, 2021
Page 2

did not advance the prospects for settlement; it has only set a floor for BSA to bid against itself in setting claim values.

Unfortunately, it appears to us that BSA remains headed down a path that denies Hartford its contractual and legal rights and that will unquestionably make a resolution of these Chapter 11 cases harder, not easier. On June, 9, 2020, the Bankruptcy Court entered its mediation order, referring to mediation, "all matters that may be the subject of a motion seeking approval by the Court or solicitation procedures and/or forms of ballots, a disclosure statement, or confirmation of a chapter 11 plan." Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief at 2 (June 9, 2020) [D.I. No. 812] ("Mediation Order"). Since then, Hartford has cooperated with BSA to enable BSA to emerge from bankruptcy while respecting Hartford's contractual rights and obligations. These efforts have included mediation discussions about Hartford's participation in a global or down-payment resolution of BSA's underlying abuse liabilities and Hartford's fair share.

As Hartford has made clear, particularly in light of the unprecedented explosion of claims—from only 275 lawsuits on the petition date to now close to 100,000 proofs of claim—and, in your words, the "silly" settlement demands of the TCC and Coalition, Hartford needs information to evaluate the bona fides of the asserted claims. On December 28, 2020, Hartford informed BSA that it intended to seek discovery from a sample of claimants and asked BSA to join in those efforts. BSA declined. On January 20, 2021, Hartford shared the draft motion to compel it intended to file and once again asked BSA to join. BSA said no.

Rather than cooperating with its insurer to investigate the abuse claims, BSA appears committed to moving forward with a proposed disclosure statement and plan that we are concerned will cede absolute control of the resolution of the abuse claims to the claimants and their attorneys, which will only continue to set claimants' expectations unreasonably high and jeopardize BSA's bankruptcy process. On December 31, 2020, BSA shared its draft Amended Chapter 11 Plan; today, BSA told us that it intends to file its Amended Plan and Disclosure Statement by the end of February. As of the date of this letter, Hartford has seen no draft Disclosure Statement and the draft Amended Plan it has seen is a shell with none of the critical exhibits (including the trust distribution procedures ("TDPs")) attached. On January 28, 2021, BSA told us that it also intends to include in its Disclosure Statement its estimation of abuse liabilities, though to date it has shared no claim values that it will use to drive that estimation.

We have urged BSA to forego any estimation of liabilities or potential claim values because any such analysis would be based on no real investigation of the abuse claims aside from information in proofs of claims, which BSA knows from information it has received independent of Hartford's investigation are riddled with fraud. So far, BSA has said no—it will disclose its claim valuations and estimation of liabilities by the end of February. As Hartford has warned, doing so will have the effect of slowing down, not speeding up, BSA's emergence from bankruptcy, and it will hurt, not help, settlement discussions.

Jessica C. Lauria, Esq.
Michael C. Andolina, Esq.
Ernest Martin Jr., Esq.
Adrian C. Azer, Esq.
February 5, 2021
Page 3

On January 28, 2021, we asked BSA about TDPs, including who is drafting the TDPs the Debtors intend to file. You said the claimants, which surprised and concerned Hartford. We asked again on February 2, and this time you said "everyone" is drafting TDPs, including BSA. Again, this surprised and concerned us because it is a fundamental requirement of the Hartford policies that Hartford and BSA cooperate to defend and resolve the claims.

Hartford urges BSA to reconsider its strategy. A rushed filing of a plan and TDPs would violate the mediation order, which again provides that the mediating parties are expected, if not ordered, to mediate "all matters that may be the subject of a motion seeking approval by the Court or solicitation procedures and/or forms of ballots, a disclosure statement, or confirmation of a chapter 11 plan." Mediation Order at 2. We have not mediated any of this. Nor have we mediated TDPs.

Not only is BSA ordered to mediate these issues per the mediation order, but BSA is contractually obligated to cooperate with Hartford in making settlements that Hartford will be asked to cover. This includes the drafting of TDPs, which—if drafted by or negotiated with the Claimants—would represent a settlement to adjudicate liabilities that Hartford in turn will be asked to cover. A debtor that negotiates a global settlement with claimants without the consent of insurers may lose the right to coverage for the global settlement. That is what happened to Congoleum, which negotiated, prepetition, a Claimant Agreement without the insurers that it intended to force on the insurers through the bankruptcy. The insurers objected to that settlement, and the court in the insurance coverage action after lengthy and expensive litigation agreed with the insurers.

The decision by BSA to file a plan—even one that the parties expect to amend—is undoubtedly viewed as an offer of terms to the abuse claimants. *See, e.g., In re Accuride Corp.*, 439 B.R. 364, 367 (Bankr. D. Del. 2010) ("the Plan constitutes an enforceable contract between the parties"); 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor . . .and any creditor"). To the extent that BSA allows the abuse claimants to control the resolution of their own abuse claims or proposes a plan containing terms that otherwise impermissibly prejudice Hartford's rights with respect to the abuse claims, BSA's actions are a breach its policy obligations. Various provisions of the draft plan that BSA apparently intends to file already impermissibly prejudice Hartford's rights, including:

- The Plan improperly deprives Hartford of its contractual right to defend and/or resolve abuse claims that are to be tendered to it. *See* Plan § IV.C.; § VI.O; § IX.D.

- The Plan improperly deprives Hartford of its contractual right to defend and contest the abuse claims in the bankruptcy case, including filing claim objections pursuant to § 502 of the bankruptcy code. *See* Plan § IX.A-C.

- The Plan improperly seeks a ruling, binding on BSA, that the "Plan Documents," including any TDPs, are a good faith settlement of the abuse claims, entered into

Highly Confidential - Subject to Protective Order

Jessica C. Lauria, Esq.
Michael C. Andolina, Esq.
Ernest Martin Jr., Esq.
Adrian C. Azer, Esq.
February 5, 2021
Page 4

without Hartford's consent. *See* Plan § VI.S.1. This includes seeking a finding that the Plan constitutes a "fair, equitable, reasonable" settlement of the abuse claims. *See id.* § VI.S.2. Such a finding is the antithesis of "insurance neutrality."

- The Plan would require BSA (and other entities) to share with the trust protected information including the Volunteer Screening Database, without imposing any requirements or limitations regarding its use and/or dissemination. This is particularly egregious where thousands of abuse claimants have not identified an alleged perpetrator in any meaningful way. *See* Plan § IV.M.

- The Plan would expunge all abuse claims from the claims register, potentially making it impossible for anyone responding to or defending the claims at a later date from determining whether inconsistent or incorrect factual allegations have been made. *See* Plan § IV.R.

- The Plan purports to provide local councils, certain contributing charter organizations and other non-debtors with a channeling injunction that would effectively discharge those entities from their own liability for the abuse claims. Even if such a channeling injunction would be appropriate as to any claims (and that is highly dubious because the liabilities appear to be direct, not derivative of the Debtors' liability), this injunction improperly purports to enjoin claims Hartford may have for subrogation or contribution against these non-debtor entities. *See* Plan § XI.F.1.

- The Plan potentially purports to enjoin Hartford from seeking contribution from settling insurers, if any are identified under the Plan. *See* Plan § XI.H.2.

Hartford similarly has concerns that any TDPs that are circulated as part of a draft plan will similarly pay claims that are fraudulent, not supported by sufficient evidence, or otherwise invalid. The proposed "term sheet" that the Coalition—which you previously indicated would bear responsibility for drafting the TDPs—heighten Hartford's concern that the TDPs will compromise Hartford's contractual rights and represent an unreasonable settlement of the abuse claims. Among other things:

- The TDPs must confirm that Hartford has a right under its primary policies to defend any suit against the insured seeking damages on account of potentially covered bodily injury, and Hartford has the right to settle any such claim or suit as Hartford deems appropriate. If BSA enters a settlement with the claimants, by TDPs or otherwise, that takes away Hartford's right to defend and settle claims, BSA is in breach of its obligations to Hartford. Simply put, the TDPs must allow Hartford and any other applicable insurer to assume the defense of any claim, in which case that claim must be resolved in the tort system, not through the TDPs.

**ALW237**
HFBKPLAN017413

Jessica C. Lauria, Esq.
Michael C. Andolina, Esq.
Ernest Martin Jr., Esq.
Adrian C. Azer, Esq.
February 5, 2021
Page 5

- The TDPs (and supporting trust documents) must provide that the trust may not admit liability or relinquish liability defenses for any claim that is to be tendered to any insurer, or for which any insurer has agreed to provide a defense.

- The TDPs must require that the trust will maintain and respect the confidentiality and/or privilege of any documentation provided by the Debtors, the reorganized debtor, local councils and charter organizations that relates to the defense of abuse claims.

- Neither the TDPs nor the Plan should contain any statement that claim values or a claims matrix represents the reasonable or settled value for such claims.  Such a statement would be prejudicial to BSA and its insurers, and would breach Hartford's contractual rights.

- The TDPs should not identify claim values at all; the TDPs here can and should assign value for allowed claims resolved by the trust on a non-monetary "points" system similar to that used in other abuse cases.  Here, where the claimant pool is largely known, and the assets to be contributed to the trust are set forth in the Plan, there is more than sufficient information to permit holders of allowed claims to reasonably assess their likely recovery.

- For those claims that no insurer agrees to defend, the TDPs must contain procedures to screen out and disallow time-barred claims.

- The TDPs must contain procedures to screen out and disallow unsupported or otherwise invalid claims.

- The TDPs also must contain procedures to ensure that all claims are supported by evidence that would, at a minimum, be sufficient to withstand a motion for summary judgment.

- The TDPs must contain procedures permitting the claim reviewer (or other individual appointed to evaluate claims) to request additional information or evidence as a pre-requisite to extending an offer to settle a claim.

- The TDPs must require, as a condition to payment, that the claimant sign a release of his/her abuse claims in favor of BSA, the reorganized debtor, the local councils, participating charter organizations and their respective insurers.

- The TDPs and supporting trust documents must provide for supervision of the claim review process by an independent trustee not selected or controlled by the abuse claimants, and the trust agreements must provide for adequate audit procedures to ensure that claim reviews are conducted fairly and rigorously.

**ALW238**
HFBKPLAN017414

Jessica C. Lauria, Esq.
Michael C. Andolina, Esq.
Ernest Martin Jr., Esq.
Adrian C. Azer, Esq.
February 5, 2021
Page 6

      To try to prevent a fight over TDPs and breach (which may relieve Hartford of coverage obligations for the abuse claims that it otherwise may have), Hartford again reaches out to BSA to try to work toward a mutually acceptable landing on appropriate TPDs. Toward that end, we attach to this letter TDPs that we believe could be used to frame our discussions over TDPs. While we are open to having these discussions outside the auspices of mediation, Hartford believes it would make sense to include the mediators in our discussions, which in our view is contemplated, if not required, by the mediation order. The mediators may be able to broker a landing on TDPs. Hartford is prepared to assist further in that process by working with other insurers in the mediation toward a common document that would have shared support.

      We look forward to hearing from you.

                Sincerely yours,

                James P. Ruggeri

Highly Confidential - Subject to Protective Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### DEBTORS' RESPONSES AND OBJECTIONS TO LUJAN CLAIMANTS' FIRST SET OF REQUESTS FOR ADMISSION TO
### BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure ("Federal Rules"), as made applicable by Rules 7026, 7036 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the Local Rules of the United States District Court for the District of Delaware ("Local Rules"), and the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules" and together with the Federal Rules, the Bankruptcy Rules and the Local Rules, the "Rules"), Boy Scouts of America ("BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), by and through their undersigned counsel, hereby respond and object, without prejudice and while reserving all rights, to the *First Set of Requests for Admission* served on the Debtors on October 8, 2021 by Lujan & Wolff LLP ("Lujan") in connection with the *Debtors' Motion for Entry of An Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, Authorizing The Debtors to*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

JTX-2646

LW340

*Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Dkt No. 5466] (the "<u>Requests for Admission</u>"),[2] as follows:

<u>**GENERAL RESPONSES AND OBJECTIONS**</u>

The following **general objections** ("<u>General Objections</u>") apply to each Definition, Instruction, and Request for Admission, and shall have the same force and effect as if fully set forth in the response to each individual Request for Admission.  To the extent that the Debtors respond to a Request for Admission, the Debtors reserve all objections as to relevance, materiality, competence, confidentiality, propriety, privilege, and admissibility, as well as to any and all other objections on any ground that would require or permit the exclusion of the response, or any portion of the response, if the response were offered into evidence.  The Debtors object as follows:

1.      The Debtors object to the Requests for Admission to the extent that they purport to impose obligations that are broader than, or inconsistent with, those required or authorized by the Rules, or other applicable laws, rules, court orders or regulations.

2.      The Debtors object to the Requests for Admission to the extent that they purport to require the Debtors to conduct anything beyond a reasonable and diligent search for readily accessible information.

3.      The Debtors object to the Requests for Admission to the extent they purport to call for a legal conclusion or an admission regarding an ultimate issue to be tried.

4.      The Debtors object to the Requests for Admission to the extent that they seek disclosure of documents or information protected from disclosure by the attorney-client privilege, the work-product doctrine, the mediation privilege, the common interest or joint defense privilege,

---

[2]  Capitalized terms used but not defined herein shall have the meanings set forth in the Requests for Admission.

2

**ALW241**

or any other protection, privilege or immunity against disclosure (collectively, "<u>Privileged</u> <u>Materials</u>"). By responding and objecting to the Requests for Admission, the Debtors do not waive or intend to waive their attorney-client privilege, joint or common interest privilege, mediation privilege or any other applicable privilege, doctrine or immunity protecting their Privileged Materials from disclosure. Accordingly, any response or objection inconsistent with the foregoing is wholly inadvertent and shall not constitute a waiver of any such privilege, doctrine or immunity.

5.      The Debtors object to the Requests for Admission to the extent they violate Delaware Local Bankruptcy Rule 9019-5(d)(i), which provides that "no person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation," and the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "<u>Mediation Order</u>"), which incorporates that rule. *See* Mediation Order ¶ 7. Local Rule 9019-5(d)(i) also provides that "the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." Del. Bankr. L.R. 9019-5(d)(i). The Debtors will not include such information in their responses.

6.      The Debtors object to the Requests for Admission to the extent that they are overbroad, unduly burdensome, vague, cumulative, duplicative, confusing, ambiguous, unlimited in time or seek information that is outside the scope of discovery permitted by the Rules or any other applicable rules or court orders.

7.      The Debtors object to the Requests for Admission to the extent that they seek information concerning matters that are not relevant to the claims or defenses of any party or are disproportionate to the needs of the case.

3

CONFIDENTIAL – Subject to Protective Order

**ALW242**

8.     The Debtors object to the terms or phrases used in the Requests for Admission to the extent that those terms and phrases are vague or ambiguous or beyond their customary meanings.  The Debtors have done their best to understand the terms in the Requests for Admission as used in context, but the Debtors make their responses and objections based on their understanding of such terms and they reserve the right to amend the responses and objections herein if Hartford asserts meanings of such terms that are different from those employed by the Debtors in making their responses and objections.

9.     The Debtors object to the Requests for Admission to the extent that they contain any factual or legal misrepresentation.

10.     No specific objection to any Requests for Admission is to be construed as a waiver of any general objection applicable to that Request for Admission.

11.     The Debtors' failure to object to the Requests for Admission on a particular ground shall not be construed as a waiver of their right to object on that ground or any additional ground at any time.

12.     Nothing in these Responses and Objections shall be construed as an admission by the Debtors concerning the admissibility or relevance of any topic referenced in the Requests for Admission, or an admission of the truth or accuracy of any characterization or assertion contained in the Requests for Admission.

13.     The Debtors' Responses and Objections to the Requests for Admission are made to the best of their present knowledge, information and belief.  The objections are made without prejudice to the assertion of additional objections and responses by the Debtors at a later date.  The Debtors reserve the right to supplement and amend any or all of its responses and objections to the

4

CONFIDENTIAL – Subject to Protective Order

**ALW243**

Requests for Admission, pursuant to Bankruptcy Rule 7026, Federal Rule 26(e), any other applicable Rule and any order of this Court.

**OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

1.      The Debtors object to the definition of "you" and "your" as vague and ambiguous, overly broad, unduly burdensome and not proportional to the needs of the case, and to the extent that it seeks to impose discovery obligations that are broader than, or inconsistent with, the Debtors' obligations under the Rules.  The Requests for Admission were addressed to, and served on, the Debtors, and to the extent the Debtors disclose any information, they will disclose only information that is within the possession, custody or control of the Debtors, and not of any other person or entity.

2.      The Debtors object to Instruction Nos. 1, 2, 3,  and 7 to the extent that they seek to impose on the Debtors discovery obligations that are broader than, or inconsistent with, the Debtors' obligations under the Rules,

3.      The Debtors object to the Requests for Admission as overly broad and unduly burdensome because the Requests for Admission are not limited to any time period.  The Debtors will provide responses with regard to the time period from four years prior to the date hereof.

**RESPONSES AND OBJECTIONS**

**REQUEST NO. 1:**

Admit that the Archbishop of Agana (formerly known as the Bishop of Agana) is an additional insured of BSA insurance policies beginning in 1976 and to the present.

**RESPONSE TO REQUEST NO. 1**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous,

5

**ALW244**

including because the term "BSA insurance policies" is not defined.  The Debtors further object to this request because it seeks a legal conclusion.

Subject to and without waiving their general and specific objections, the Debtors admit that it is the Debtors' position that the Archbishop of Agana is an additional insured under the BSA's general liability insurance policies incepting after January 1, 1976 and to the Petition Date.

**REQUEST NO. 2:**

Admit that BSA insurance policies provide coverage for abuse claims arising from child sexual abuse in Guam during the period from 1955 to 1982.

**RESPONSE TO REQUEST NO. 2:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous, including because the terms "BSA insurance policies" and "provide coverage" are not defined. The Debtors further object to this request because it calls for a legal conclusion.

Subject to and without waiving their general and specific objections, the Debtors admit that it is the Debtors' position that BSA's general liability insurance policies cover BSA for abuse claims arising from child sexual abuse in Guam during the period from 1955 to 1982.

**REQUEST NO. 3:**

Admit that BSA released Hartford from covering sexual abuse claims against the BSA for the 1976 and 1977 Hartford policies.

**RESPONSE TO REQUEST NO. 3:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous,

6

CONFIDENTIAL – Subject to Protective Order

**ALW245**

including because the term "released" is not defined.  The Debtors further object to this request because it calls for a legal conclusion.

Subject to and without waiving their general and specific objections, the Debtors admit that BSA entered into a settlement agreement that released BSA's rights to coverage for sexual abuse claims under the 1976 Hartford Policy and the 1977 Hartford Policy.

**REQUEST NO. 4:**

Admit that the Debtors' bankruptcy estate does not include any insurance proceeds for sexual abuse claims covered by the 1976 Hartford policy.

**RESPONSE TO REQUEST NO. 4**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous, including because the term "insurance proceeds" is not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 5:**

Admit that the Debtors' bankruptcy estate does not include any insurance proceeds for sexual abuse claims covered by the 1977 Hartford policy.

**RESPONSE TO REQUEST NO. 5**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous, including because the term "insurance proceeds" is not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

CONFIDENTIAL – Subject to Protective Order

**ALW246**

**REQUEST NO. 6:**

Admit that, except for certain child sexual abuse claims, any claims against BSA which may be covered by the 1976 Hartford policy are time-barred by the civil statute of limitations.

**RESPONSE TO REQUEST NO. 6:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request because it calls for a legal conclusion.  The Debtors further object to this request because it poses an incomplete hypothetical and calls for speculation.  The Debtors further object to this request as overly broad, vague, and ambiguous, including because the term "except for certain child sexual abuse claims" is not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 7:**

Admit that, except for certain child sexual abuse claims, any claims against BSA which may be covered by the 1977 Hartford policy are time-barred by the civil statute of limitations.

**RESPONSE TO REQUEST NO. 7:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request because it calls for a legal conclusion.  The Debtors further object to this request because it poses an incomplete hypothetical and calls for speculation.  The Debtors further object to this request as overly broad, vague, and ambiguous, including because the term "except for certain child sexual abuse claims" direct action claimants," is not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

8

CONFIDENTIAL – Subject to Protective Order

**ALW247**

**REQUEST NO. 8:**

Admit that direct action claimants have an interest in BSA insurance policies.

**RESPONSE TO REQUEST NO. 8:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. Debtors object to this request because it calls for a legal conclusion. The Debtors further object to this request as overly broad, vague, and ambiguous, including because the terms "direct action claimants," "interest," and "BSA insurance policies" are not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 9:**

Admit that holders of Abuse Claims who lack direct action rights to sue BSA insurers, do not have an interest in BSA insurance policies.

**RESPONSE TO REQUEST NO. 9:**

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. The Debtors object to this request because it calls for a legal conclusion. The Debtors further object to this request as overly broad, vague, and ambiguous, including because the terms "direct action rights," "interest," and "BSA insurance policies" are not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 10:**

Admit that the Plan provides no compensation to direct action claimants for the sale, extinguishment, or disposition of their direct action rights.

9

CONFIDENTIAL – Subject to Protective Order

**ALW248**

**RESPONSE TO REQUEST NO. 10**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request  as overly broad, vague, and ambiguous, including because the terms "compensation," "direct action claimants," "direct action rights," "sale," "extinguishment," and "disposition" are not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 11:**

Admit that the Plan provides no protection to direct action claimants for the sale, extinguishment, or disposition of their direct action rights.

**RESPONSE TO REQUEST NO. 11**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request because it calls for a legal conclusion.  The Debtors further object to this request as overly broad, vague, and ambiguous, including because the terms "protection," "direct action claimants, " "direct action rights," "sale," "extinguishment," and "disposition" are not defined.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 12:**

Admit that the Plan treats direct action claimants with child sexual abuse claims the same way as holders of child sexual abuse claims who lack direct action rights to sue BSA insurers.

10

**ALW249**

**RESPONSE TO REQUEST NO. 12**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. The Debtors object to this request because it calls for a legal conclusion. The Debtors further object to this request as overly broad, vague, and ambiguous, including because the terms "same way," "direct action claimants," and "direct action rights" are not defined.

Subject to and without waiving their general and specific objections, the Debtors admit that all Direct Abuse Claims are treated as part of Class 8 under the plan.

**REQUEST NO. 13:**

Admit that no direct action claimants have consented to the Debtors' $787 million settlement agreement with Hartford.

**RESPONSE TO REQUEST NO. 13**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. The Debtors object to this request because it calls for a legal conclusion. The Debtors further object to this request as overly broad, vague, and ambiguous, including because the terms "direct action claimants" and "consented" are not defined. The Debtors further object to this request to the extent that it requires the Debtors to speculate and calls for information outside the scope of the personal knowledge of the Debtors.

Subject to and without waiving their general and specific objections, the Debtors deny this request.

**REQUEST NO. 14:**

Admit that any claims against the Aloha Council arising from child sexual abuse in Hawaii and whose holders failed to file suit against the Aloha Council by April 24, 2020, are time-barred under Hawaii's civil statute of limitations.

11

CONFIDENTIAL – Subject to Protective Order

**ALW250**

**RESPONSE TO REQUEST NO. 14**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous, including because the terms "arising from" and "time-barred" are not defined.  The Debtors further object to this request because it calls for a legal conclusion without establishing an adequate factual basis for a reasonable legal conclusion.

Subject to and without waiving their general and specific objections, the Debtors admit that, in general, a claim against the Aloha Council arising from child sexual abuse in Hawaii where the holder of the claim failed to file suit against the Aloha Council by April 24, 2020 would be outside Hawaii's current civil statute of limitations.

**REQUEST NO. 15:**

Admit that chartered organizations may have their own independent liability for child sexual abuse which is not derivative of BSA's liability.

**RESPONSE TO REQUEST NO. 15**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein.  The Debtors object to this request as overly broad, vague, and ambiguous, including because the terms "their own independent liability," "for child sexual abuse," and "not derivative of BSA's liability" are not defined.  The Debtors further object to this request because it calls for a legal conclusion without establishing an adequate factual basis for a reasonable legal conclusion.

Subject to and without waiving their general and specific objections, the Debtors have an insufficient factual basis for admitting or denying this request, and, to the extent a response is required, deny this request.

CONFIDENTIAL – Subject to Protective Order

**ALW251**

**REQUEST NO. 16:**

Admit that the BSA Toggle Plan, as provided in earlier Plans filed in this consolidated bankruptcy action, is a feasible plan for the Debtors to successfully reorganize under chapter 11.

**RESPONSE TO REQUEST NO. 16**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. The Debtors object to this request as overly broad, vague, and ambiguous, including because the terms "feasible," "successfully," and "Toggle Plan" are not defined. The Debtors further object to this request because it calls for a legal conclusion and to the extent that it seeks information that is not relevant to confirmation of the Debtors' Plan.

**REQUEST NO. 17:**

Admit that you gave no notice to any chartered organization prior to entering the confidential settlement agreement with Hartford in which BSA released Hartford of liability for sexual abuse claims for the 1976 and 1977 Hartford policies.

**RESPONSE TO REQUEST NO. 17**:

The Debtors incorporate their general objections to the Requests for Admission as if fully set forth herein. The Debtors object to this request as overly broad, vague, and ambiguous, including because the term "notice" is not defined. The Debtors further object to this request to the extent it mischaracterizes the settlement agreement between BSA and Hartford relating to coverage for sexual abuse claims for the 1976 Hartford Policy and the 1977 Hartford Policy. The Debtors further object to this request to the extent it assumes that the Debtors had any obligation to notify any Chartered Organizations regarding the confidential settlement agreement with Hartford relating to the 1976 and 1977 Hartford policies.

Subject to and without waiving their general and specific objections, the Debtors do not believe that any Chartered Organizations were notified prior to the settlement agreement with

13

**ALW252**

Hartford relating to the 1976 Hartford Policy and the 1977 Hartford Policy, but state that the Debtors had no obligation to provide such notice.

14

CONFIDENTIAL – Subject to Protective Order

ALW253

Dated: October 18, 2021

/s/ Andrew W. Hammond
**WHITE & CASE LLP**
Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew W. Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
        jessica.lauria@whitecase.com
        ahammond@whitecase.com
        sam.hershey@whitecase.com

**MORRIS, NICHOLS, ARSHT & TUNNELL
LLP**
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

*Attorneys for the Debtors and Debtors in Possession*

15

**ALW254**

> "While in Guam my actions were discussed and confessed to area priests as well as Bishop Apollinaris Baumgartner who had approached me to talk about the situation. I was told to try to do better and say prayers as a penance."

102. Defendants BSA and Aloha Council either had actual knowledge of Brouillard's sexual abuse of numerous other minors whom Brouillard victimized, or could have and should have reasonably foreseen that Brouillard was committing and would commit sexual abuse of other minors. To date, BSA and Aloha Council have acknowledged that Brouillard victimized minor boys while serving as a scoutmaster, as reflected in the excerpts taken from an interview with Jeff Sulzbach, the chief executive officer of the Boy Scouts of America Aloha Council on March 5, 2017, attached hereto as Exhibit "2":

> "Upon learning of the reports, we took immediate action to preclude individual (Brouillard) from any further participation in the scouting program." Though Sulzbach couldn't say when exactly the Boy Scouts became aware of the reports of Brouillard's sexual abuse of children on Guam, he said it was possible that the organization didn't take action against priest until sometime after the 1970s."

103. As a direct and proximate result of the Defendants' above–described conduct, Norman has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; and has incurred and/or will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

104. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling Norman to exemplary and punitive damages.

## IX.
## SIXTH CAUSE OF ACTION

### Negligence
### [Against All Defendants]

105. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106. Defendants had a duty to protect Norman when he was entrusted to Brouillard's care by Norman's parents and/or guardians. Norman's care, welfare, and/or physical custody were temporarily entrusted to Defendants, and Defendants accepted the entrusted care of Norman.  As such, Defendants owed Norman, as a child at the time, a special duty of care, in addition to a duty of ordinary care, and owed Norman the higher duty of care that adults dealing with children owe to protect them from harm.

23

**ALW255**

107. By virtue of his unique authority and position as a Roman Catholic priest and/or a scoutmaster, Brouillard was able to identify vulnerable victims and their families upon which he could perform such sexual abuse; to manipulate his authority to procure compliance with his sexual demands from his victims; to induce the victims to continue to allow the abuse; and to coerce them not to report it to any other persons or authorities. As a priest and/or a scoutmaster, Brouillard had unique access to a position of authority within Roman Catholic families and/or families that were actively involved in activities sponsored by the BSA and its Aloha Council, like the family of Norman. Such access, authority, and reverence were known to the Defendants and encouraged by them.

108. Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. It was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to Norman, the children entrusted to Defendants' care would be vulnerable to sexual abuse by Brouillard.

109. Defendants breached their duty of care to the minor Norman by allowing Brouillard to come into contact with Norman as a child without supervision; by failing to adequately supervise, or negligently retaining Brouillard whom they permitted and enabled to have access to Norman; by failing to properly investigate; by failing to inform or concealing from Norman's parents, guardians, or law enforcement officials that Brouillard was or may have been sexually abusing minors, including at the Convent; by failing to provide a safe environment to Norman; by holding out Brouillard to Norman, Norman's parents or guardians, and to the community of Guam at large, as being in good standing and trustworthy as a person of stature and integrity. Defendants cloaked within the facade of normalcy Brouillard's contact with Norman and/or with other minors who were victims of Brouillard, and deliberately concealed and disguised the sexual abuse committed by Brouillard.

110. As a direct and proximate result of the Defendants' above-described conduct, Norman has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; and has incurred and/or will continue to incur expenses for medical and psychological treatment, therapy and counseling.

24

ALW256

111. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling Norman to exemplary and punitive damages.

## X.
## SEVENTH CAUSE OF ACTION

### Negligent Supervision
### [Against Defendants Agana Archdiocese, Capuchins, Carmelites, BSA, Aloha Council, and DOES 1–45]

112. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113. Defendants Agana Archdiocese, Capuchins, Carmelites, BSA, Aloha Council, and DOES 1-45 (collectively "Defendants" as alleged in this cause of action) had a duty to provide reasonable supervision of both Brouillard and the minor child, Norman; to use reasonable care in investigating Brouillard; and to provide adequate warning to Norman and Norman's family, and to families of other children who were entrusted to Brouillard, of Brouillard's sexually abusive and exploitative propensities and unfitness.

114. Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. Despite such knowledge, Defendants negligently failed to supervise Brouillard in his position of trust and authority as a parish priest and/or scoutmaster, where he was able to commit the wrongful acts against Norman alleged herein. Defendants failed to provide reasonable supervision of Brouillard, failed to use reasonable care in investigating Brouillard, and failed to provide adequate warning to Norman and Norman's family regarding Brouillard's sexually abusive and exploitative propensities and unfitness. Defendants further failed to take reasonable measures to prevent future sexual abuse.

115. As a direct and proximate result of the Defendants' above–described conduct, Norman has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; and has incurred and/or will continue to incur expenses for medical and psychological treatment, therapy and counseling.

116. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling Norman to exemplary and punitive damages.

25

ALW257

**XI.**
**EIGHTH CAUSE OF ACTION**

**Negligent Hiring And Retention**
**[Against Defendants Agana Archdiocese, Capuchins, Carmelites,**
**BSA, Aloha Council, and DOES 1-45]**

117. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118. Defendants Agana Archdiocese, Capuchins, Carmelites, BSA, Aloha Council, and DOES 1-45 (collectively "Defendants" as alleged in this cause of action) had a duty not to hire, retain, or engage in the services of Brouillard in light of his sexually abusive and exploitative propensities.

119. Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. Despite such knowledge and/or an opportunity to learn of Brouillard's misconduct, Defendants negligently hired, retained, or engage in the services of Brouillard in his position of trust and authority as a parish priest and/or a scoutmaster, where he was able to commit the wrongful acts against Norman alleged herein. Defendants failed to properly evaluate Brouillard in advance by failing to conduct necessary screening; failed to properly evaluate Brouillard's conduct and performance as an employee of, or provider of services to Defendants; and failed to exercise the due diligence incumbent upon employers to investigate employee misconduct, or to take appropriate disciplinary action, including immediate termination and reporting and referral of Brouillard's sexual abuse to appropriate authorities. Defendants negligently continued to retain Brouillard in service as a Catholic priest and/or scoutmaster, working or providing services for Defendants, which enabled him to continue engaging in the sexually abusive and predatory behavior described herein.

120. As a direct and proximate result of the Defendants' above–described conduct, Norman has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; and has incurred and/or will continue to incur expenses for medical and psychological treatment, therapy and counseling.

121. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling Norman to exemplary and punitive damages.

26

ALW258

**XII.**
**NINTH CAUSE OF ACTION**

**Breach of Fiduciary Duty And/Or Confidential Relationship**
**[Against All Defendants]**

122. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123. By holding Brouillard out as a qualified priest and a person of stature and integrity within the Catholic Archdiocese, Defendants invited, counseled, encouraged and induced the Catholic community of Guam, including children such as Norman and parents or guardians of children, and particularly parents or guardians of children serving as altar boys and children eligible to serve as altar boys, to have trust and confidence in the Agana Archdiocese, Capuchins, Carmelites, and their priests and to entrust their children to the company of priests and specifically to Brouillard, including allowing their children to be alone with Brouillard without supervision, and to spend nights at a church facility or Convent where Brouillard resided. Through such actions, Defendants collectively created and entered into a fiduciary and/or confidential relationship with its parishioners, including Catholic parents or guardians and their children, and in particular, children who provided services to the Agana Archdiocese, Capuchins, and Carmelites that included serving as altar boys. Accordingly, Defendants collectively created and entered into a fiduciary and/or confidential relationship specifically with the minor child Norman.

124. By holding Brouillard out as a safe, trustworthy, and highly ethical scoutmaster with integrity, Defendants invited, counseled, encouraged and induced the community of Guam, including children such as Norman and parents or guardians of children to join the Boy Scouts; and particularly as to parents or guardians of children who were already paid members of the BSA and Aloha Council, to have trust and confidence in the BSA, Aloha Council, and their Scout leaders, employees, servants, officers, volunteers, and/or agents, and to entrust their children to the company of scoutmasters and specifically to Brouillard, including allowing their children to be alone with Brouillard without supervision, and to camp out over night at BSA and Aloha Council activities. Defendants Agana Archdiocese, Capuchins, Carmelites, BSA, and Aloha Council actively exploited their reputation of the Catholic Church for the purpose of encouraging membership of the Boy Scouts, thereby facilitating the availability of minor boys to pedophilic priests. In this way, Defendants Agana Archdiocese, Capuchins, Carmelites, BSA, and Aloha Council, maintained a symbiotic relationship by which each recruited minors for their sexual pleasures. Through such actions,

27

ALW259

1  Defendants collectively created and entered into a fiduciary and/or confidential relationship with its

2  members, including parents or guardians and their children, and in particular, children who were members of

3  the BSA and Aloha Council.  Accordingly, Defendants collectively created and entered into a fiduciary

4  and/or confidential relationship specifically with the minor child Norman.

5       125. Through such fiduciary and/or confidential relationship, Defendants collectively caused parents

6  or guardians to entrust their children to members of the Agana Archdiocese, Capuchins, and Carmelites

7  serving both in their role as priests and scoutmasters, and specifically entrusted their children to Brouillard,

8  including the parents of Norman, which resulted in Norman serving as an altar boy and  participating

9  activities and spending one or more nights at a church facility or Convent where Brouillard resided and/or

10  joining and becoming a member of the BSA and its Aloha Council and participating in its activities at a

11  church facility or Convent or elsewhere, resulting in the subject acts of sexual abuse described herein.

12       126. Defendants collectively breached their fiduciary and/or confidential relationship with the minor

13  child Norman by violating the trust and confidence placed in them by parishioners and/or members, and

14  specifically by the minor child Norman, and by engaging in the wrongful acts described in this Complaint.

15       127. As a direct and proximate result of the Defendants' above–described conduct, Norman has

16  suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical

17  manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of

18  enjoyment of life; and has incurred and/or will continue to incur expenses for medical and psychological

19  treatment, therapy and counseling.

20       128. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or

21  fraud, entitling Norman to exemplary and punitive damages.

22   

                                          **XIII.**

23                              **TENTH CAUSE OF ACTION**

24                   **Intentional Infliction of Emotional Distress**
         **[Against Defendants Agana Archdiocese, Capuchins, Carmelites,**

25                    **BSA, Aloha Council, and DOES 1–45]**

26       129. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 128 of this Complaint as

27  if fully set forth herein.

28   

                                      28

ALW260

1   130. The acts and conduct of the Agana Archdiocese, Capuchins, Carmelites, BSA, Aloha Council,

2   and DOES 1-45 in providing Brouillard, a known serial sexual predator to children, with direct access to

3   children including Norman, and refusing to report or stop his sexual abuses, were extreme and outrageous.

4   131. By engaging in such acts and conduct, the Agana Archdiocese, Capuchins, Carmelites, BSA,

5   Aloha Council, and DOES 1-45 intended to cause, or had reckless disregard of the probability of causing,

6   Norman to suffer severe emotional distress, including but not limited to great pain of mind and body, shock,

7   physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and

8   loss of enjoyment of life.

9   132. As an actual and proximate result of this extreme and outrageous acts and conduct, Norman was

10  sexually abused and suffered and continues to suffer severe emotional distress.

11  133. As a direct and proximate result of these acts and conduct, Norman suffered general and special

12  damages.

13  134. By engaging in the conduct described herein, the Agana Archdiocese, Capuchins, Carmelites,

14  BSA, Aloha Council, and DOES 1-45 acted with malice, oppression, and/or fraud, entitling Norman to

15  exemplary and punitive damages.

## XIV.
## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Norman J.D. Aguon requests judgment against all Defendants on all counts as

follows:

1.   For all general, special, exemplary and punitive damages, as allowed by law in a sum to be

     proven at trial and in an amount not less than $10,000,000;

2.   For costs and fees incurred herein;

3.   Attorneys' fees, as permitted by law; and

4.   For other such and further relief as the Court may deem just and proper.

//
//
//
//

29

**ALW261**

1          And I'll sometimes refer to the Boy Scouts of

2    America as BSA.

3          Is the Aloha Council a creditor?

4          MR. CELENTINO:  Calls for a legal conclusion.

5    BY MS. WOLFF:

6          Q. Go ahead and answer the question, sir.

7          **A. I think counsel said it calls for a legal**

8    **conclusion.**

9          Q. Yes, sir.  But Joseph is not your lawyer, and

10   no one has instructed you -- no lawyer has instructed

11   you to answer questions.

12         So please answer the question.

13         **A. Can you ask the question again, please?**

14         Q. Let me ask it in a different way.

15         Has the Aloha Council filed a proof of claim

16   in the Boy Scouts of America bankruptcy case?

17         **A. No.  No.**

18         Q. Okay.  And the Boy Scouts also has not filed a

19   proof of claim against the Delaware BSA, LLC, correct?

20         **A. You said "Boy Scouts."**

21         Q. Yes, initially, but there's another debtor,

22   and that's the Delaware BSA, LLC.

23         Has the Aloha Council filed a proof of claim

24   as to that other debtor, which is the Delaware BSA,

25   LLC?

**ALW262**

1       **A. No.**

2       Q. Okay.  Now, at the time that the BSA, the Boy

3  Scouts of America, at the time that the BSA filed for

4  bankruptcy in February of 2020, isn't it true that

5  there were over 70 cases filed in courts, including

6  Guam, at that time?

7       **A. Not that -- not that I'm aware of.**

8       Q. Okay.  But you're aware that plaintiffs have

9  brought lawsuits against the Aloha Council for child

10 sexual abuse in Guam; is that correct?

11      **A. Yes.**

12      Q. Okay.  And there were -- these cases were --

13 at least some of these cases were in existence at the

14 time that the BSA filed for bankruptcy in

15 February 2020, correct?

16      **A. Yes.**

17      Q. And the Aloha Council was, or is, it still is,

18 the Aloha Council is a co-defendant of the BSA in those

19 cases, correct?

20      **A. Yes.**

21      Q. Okay.  And isn't it true that the Aloha

22 Council has also been sued in Hawaii courts?

23      **A. We've been served, but I don't think it**

24 **proceeded beyond that.**

25      Q. You're referring to the Aloha Council being

**ALW263**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1  every other month, if not every month at the start of

2  this year.  But prior to that was probably on a

3  quarterly basis.

4       Q. Okay.  And can you tell me, sir, whether or

5  not the Aloha Council has ever -- has ever undertaken

6  to value, to determine the value of abuse claims

7  asserted against the Aloha Council?

8       **A. No, we have not.**

9       Q. Has the Aloha Council ever been asked to

10 participate in the valuation of abuse claims made

11 against the Aloha Council?

12      **A. No, we have not.**

13      Q. Has the Aloha Council ever been asked to

14 determine what future claims may be asserted against

15 the local council -- I'm sorry, the Aloha Council?

16      **A. No, we have not.**

17      Q. Are you familiar with the Boy Scouts of

18 America's valuation of the abuse claims that have been

19 asserted in the Boy Scouts of America bankruptcy cases?

20      **A. No, I have not.**

21      Q. Are you familiar with the value of the future

22 claims that could be asserted against the Boy Scouts of

23 America in the -- in the -- I'm sorry, let me ask

24 again.

25           Are you -- is the Aloha Council familiar with

**ALW264**

1  the -- the value -- I believe it's about a $5 billion

2  value for -- of the -- determined for future claims

3  that may be asserted against the Boy Scouts of America.

4          Is the council familiar with that?

5          MR. CELENTINO:  Object to form.

6  BY MS. WOLFF:

7      Q. Is the council familiar with that.

8          MR. CELENTINO:  Object to form.

9          MS. WOLFF:  Yes.

10 BY MS. WOLFF:

11     Q. Is the council familiar with that?

12 **A. No.**

13     Q. Has the Aloha Council ever been asked to -- to

14 give -- to estimate how many claims may be asserted

15 against the Aloha Council which would be timely under

16 Guam law?

17         MR. GUBEN:  Just a second.  Of course, he's

18 going to have to interpose an objection based on the

19 law.  I don't think Mr. Lopez knows Guam law, the

20 statute of limitations on that.  That does require a

21 legal conclusion.

22         MS. WOLFF:  Well, let me ask -- I didn't ask

23 what his understanding of Guam law is.

24 BY MS. WOLFF:

25     Q. Has the Aloha Council ever been asked to

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1    estimate how many claims it believes will be filed

2    against it in the future?

3        **A. No.**

4        Q. And, again, I apologize if I've already asked

5    it.  I just don't recollect if I did.  But the Aloha

6    Council has not tried to determine the value of any

7    future claims that would be asserted against it,

8    correct?

9        **A. Yes, that's correct.**

10       Q. And does the Aloha Council primarily

11   communicate with the Ad Hoc Committee of Local Councils

12   with respect to the Boy Scouts of America bankruptcy,

13   or does the Aloha Council also communicate with the BSA

14   or other parties to the bankruptcy case?

15       **A. All our correspondence is directly with and**

16   **within the Ad Hoc Committee.**

17       Q. Thank you, sir.

18           Well, sir, are you -- can you tell me if the

19   Aloha Council has ever voted on whether to make a

20   contribution as part of the Boy Scouts of America

21   bankruptcy case?

22       **A. No, we have not voted.**

23       Q. Can you tell me why there has been no vote to

24   date?

25           MR. GUBEN:  If you can answer that.

**ALW266**

1    of $1.3 million?

2    **A. No.  No.**

3        Q. Thank you.

4            Now, I want to ask, has the Aloha Council

5    talked to any of its partners about channeling

6    injunctions?

7    **A. No.**

8        Q. Has the Aloha Council talked to any of its

9    chartered partners about voluntary releases?

10   **A. No.**

11       Q. Have any chartered partners of the Aloha

12   Council given notice to the Aloha Council that they no

13   longer wish to sponsor Boy Scouts troops?

14           MR. GUBEN:  Objection to that.  What time

15   period are you talking about?

16           MS. WOLFF:  Thank you for that, Mr. Guben.

17   BY MS. WOLFF:

18       Q. Any time from February 2020 to the present.

19   **A. No.**

20       Q. Thank you.

21           Now, sir, we talked about -- you talked about

22   the Aloha Council previously being presented with the

23   figure of $997,000 and then later with the

24   approximately $1.3 million figure.

25           Do you know why the amount went up for the

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1        Q. Are there any restrictions on use?

2        **A. Not so much use, but zoning because of where**

3        **it's located.  It's in a residential neighborhood-type**

4        **of setting.**

5        Q. Okay.  So no use restriction, other than

6        zoning laws, correct?

7        **A. So we could rent it out to a bingo club or a**

8        **knitting club, so not necessarily scouting.  So we**

9        **can't sell alcohol out of that building or anything**

10        **like that.  So there are some restrictions related to**

11        **the use of it, but not as prohibitive as some of the**

12        **ones I mentioned earlier.**

13        Q. Okay.  Are there any other properties that the

14        Aloha Council owns, other than those properties that we

15        just discussed?

16        **A. No, that's it.**

17        Q. Okay.

18        **A. We do lease -- we do lease a property on Guam**

19        **just because it's local to you.  But, yeah, we do lease**

20        **a property on Guam for retail front.**

21        Q. Who owns the property that is leased by Aloha

22        Council?

23        **A. The territory of Guam, I do believe.**

24        Q. Are there any other properties that the Aloha

25        Council has an ownership or a leasehold interest in,

**ALW268**

RE: BOY SCOUTS and DELAWARE BSA LLC

1   other than those that we've discussed?

2       **A. No other properties.**

3       Q. How about in American Samoa?

4       **A. No, no properties there.**

5       Q. No properties leased there either?

6       **A. No, we -- I think we gave up the lease several**

7   **years ago.  I think it's just a fly-in/fly-out type of**

8   **experience for us.**

9       Q. Okay.  When we're looking at this balance

10  sheet that I think I'm still sharing with you -- you

11  can still see that here.

12      **A. Yes.**

13      Q. When we look at the land, buildings, and

14  equipment, this $7.9 million figure here, is it correct

15  that -- that this -- this includes, I guess, the lands

16  that the Aloha Council has an ownership interest in?

17      **A. Yes.  That dollar value is reflective of when**

18  **the property was put on the books and then any**

19  **subsequent depreciation over time.**

20          **So theoretically, that value may not be**

21  **real-time because it was -- in some cases, these**

22  **properties were -- they were not brought online or**

23  **booked at the same time.**

24      Q. Okay.  And how often do these properties get

25  appraised?

ALW269

RE: BOY SCOUTS and DELAWARE BSA LLC

 1        **A. Almost never, unless there's a -- unless**

 2   **there's a pending sale or a loan needs to be taken out**

 3   **on them on the property's collateral, using the**

 4   **property's collateral.**

 5        Q. Can you tell me how many properties the Aloha

 6   Council has sold, to your knowledge?

 7        **A. What timeframe?**

 8        MR. GUBEN:  Yes.

 9        **THE WITNESS:  What timeframe?**

10   BY MS. WOLFF:

11        Q. During the existence, the council's existence,

12   that you're aware of?

13        **A. None that I'm aware of.  So none in the time**

14   **that I've been here.**

15        Q. You just testified earlier that a property

16   could be sold.  So -- and that's when it would be

17   appraised.

18        So you just described a circumstance.  Has

19   that circumstance ever happened?

20        **A. Not to my knowledge, and not in the time that**

21   **I've been here.**

22        Q. Now my question is not limited -- just to be

23   clear, it's not limited to the time that you've been

24   there.  My question is during the time of the Aloha

25   Council's existence, has there been -- have Aloha

**ALW270**

1  equipment value of 7.9 million, does that include any

2  of the properties that Aloha Council is leasing?

3       **A. No, it does not include those properties.  We**

4  **don't book lease properties.  That's not standard**

5  **accounting practice.**

6       Q. Okay.  But it also says buildings and

7  equipment.  So any buildings and equipment coming from

8  leased properties that are part of this $7.9 million

9  dollar figure.

10      **A. No.**

11      Q. And this $7.9 million dollar figure, again

12  you're saying that it's the values at the time that

13  they're booked and then any depreciation since then?

14      **A. Yeah, that's standard accounting practice.**

15  **When you take something into your organization, you**

16  **would book it at the current value.  And then over**

17  **time, if it's property, land, it would -- I'm sorry,**

18  **not land -- buildings would depreciate.  Land probably**

19  **would stay pretty consistent.**

20      Q. And so if a property was appraised, then would

21  the appraised value be indicated in this figure, this

22  land, buildings, and equipment?

23      **A. No.  I do believe, and I've got to consult an**

24  **accountant, but I don't believe you can re -- reassess**

25  **the value on your books based on an appraised value.  I**

**ALW271**

JESSE LOPEZ
Page 80

1    **think when you book it, that's what it stays at.**

2         Q. So just to be clear, because, unfortunately,

3    I'm not an accountant, have no accounting background,

4    this $7.9 million dollar figure does not include any

5    fair market appraisal values of properties, correct?

6         **A. Not on this reporting document because it is a**

7    **balance sheet reflected on book values of the property**

8    **when they were acquired.**

9         Q. Thank you for explaining that.

10        Okay.  So I'm going to show you -- scroll down

11   to page 30 -- 356 of this same document.

12        So this same exhibit, the amended disclosure.

13        Zoom out.  Well, let me just scroll up a bit

14   so you can see what this is.

15        Okay.  Now, sir, this is a -- in the same

16   disclosures, Amended Disclosure Statement, this is --

17   this shows, I guess, the top left corner here it

18   states, on page 356 of the document, it says "Boy

19   Scouts of America" and, you know, "local council

20   property value information, disclosure statement," and

21   then it says a date, September 21, 2021.

22        Do you recall ever being asked to provide

23   property values for Aloha Council's properties for the

24   Boy Scouts bankruptcy?

25        **A. If you look at fair market value source 1.**

**ALW272**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1        Q.  Okay.  So now that we see at least the value

2   for the first -- I'm scrolling to the left.  The first

3   Aloha Council Service Center being around $4 million,

4   does that indicate to you what property is referred to

5   here?

6        **A.  Yes.**

7        Q.  So what property would that be?

8        **A.  That's the Oahu Service Center.**

9        Q.  So we saw that the second Aloha Council

10  Service Center that's identified here, we saw that

11  there's no value provided here, correct?

12       **A.  Yes.**

13       Q.  So do you have -- can you tell me what this

14  refers to, if you're able to?

15       **A.  I did not produce the document, so I have no**

16  **idea.**

17       Q.  Thank you.

18          So were you -- you can't say whether or not

19  that refers to Camp Kilauea, correct?

20       **A.  I don't have enough information.**

21       Q.  Was Camp Kilauea appraised, to your knowledge?

22       **A.  No, not that I'm aware of.  I know I got --**

23  **no, not that I'm aware of.  I don't know why it**

24  **wouldn't, but I can't recall specifically seeing it.**

25       Q.  Okay.

ALW273

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 90

1      **A. Just to your point, Camp Ehrhorn is also not**

2  **on this list either.**

3      Q. Yes.  I see -- I don't see that, that's

4  correct.

5      So this -- the property valuation is missing

6  or it does not identify clearly Camp Ehrhorn and Camp

7  Kilauea; is that correct.

8      **A. And I do believe it represents -- again, I**

9  **didn't prepare the list.  But it also shows Camp**

10  **Maluhia, which I do believe it's a non-owned property**

11  **that we lease.**

12      Q. Okay.  Has the Aloha Council ever, ever

13  used -- I'm sorry.

14      Has the Aloha Council ever considered using

15  any of the council properties as collateral for a loan?

16      **A. No.**

17      Q. Has the Aloha Council ever looked into whether

18  the possibility of -- now -- and it's a little

19  different, very similar.  Has the Aloha Council ever

20  looked into the possibility of using any of the council

21  properties to get a loan?

22      **A. No.**

23      Q. Do any of the restrictions on the counsel

24  properties restrict Aloha Council's ability to use the

25  property as collateral for a loan?

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 91

1        MR. GUBEN:  I object on the grounds that that

2 requires a legal conclusion.  I have not even seen

3 those documents, but I'll allow the deponent to answer

4 this to the best of his knowledge.  But that is a legal

5 conclusion.

6        **THE WITNESS:  It's just based on use of assets**

7 **as collateral.  I would assume you could use it, but,**

8 **again, you'd have to consult the loan officer or a**

9 **banker for that determination because they would know.**

10 BY MS. WOLFF:

11        Q. Thank you, sir.

12        Now, looking at this document, it's the

13 property in Guam that you testified is leased by the

14 Aloha Council.  The property in Guam is not included

15 here, correct, in this property valuation sheet?

16        **A. That's correct.**

17        Q. Has the property in Guam here ever been

18 appraised, to your knowledge?

19        **A. Not that I'm aware of.**

20        **Again, we don't own it, it's a lease.  So we**

21 **couldn't take out a loan on a leased property.**

22        Q. And why do you believe that the property is

23 only being leased?

24        **A. I don't have the deed in my possession.  And**

25 **based on corporate -- corporate knowledge, it was**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 92

```
 1    shared to me that it's a lease agreement with the

 2    Territory of Guam.  So we are -- we are --

 3         Q. Go ahead.

 4         A. Yeah.  It's not on our asset sheet so that

 5    also lends me to believe that it's not an owned

 6    property of the Aloha Council.

 7         Q. Is the Aloha Council the same thing as Boy

 8    Scouts of America, Aloha Council, Chamorro District?

 9         A. No.  Our legal -- our legal entity name is

10    Aloha Council, dash, Boy Scouts of America.

11         Q. Okay.  Have you ever seen a lease agreement

12    with the government of Guam as to the property in Guam?

13         A. No, I have not.

14         Q. Okay.

15         MS. WOLFF:  Why don't we take a -- we've gone

16    on for another hour.  Can we take a 10-minute break and

17    then we will resume.

18         THE VIDEO OPERATOR:  The time is 3:44 p.m.  We

19    are going off the video record.

20              (Recess taken at 3:44 p.m.)

21         THE VIDEO OPERATOR:  The time is 4:01 p.m.  We

22    are now back on the video record.

23    BY MS. WOLFF:

24         Q. Sir, before the break, we were talking about

25    the property in Guam.  To your knowledge, does the Boy
```

**ALW276**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 93

1  Scouts of America have an ownership interest in that

2  property?

RE: BOY SCOUTS and DELAWARE BSA LLC

**3       A. We do not have.**

4            MR. CELENTINO:  Object to form.

5            MR. GUBEN:  Go ahead.

**6            THE WITNESS:  No, we do not have any ownership**

**7  interest in that property.**

8  BY MS. WOLFF:

9       Q. Okay.  Now, you're speaking on behalf of the

10  Aloha Council, but the question that I asked was, does

11  the Boy Scouts of America, the BSA National, do they --

12  to they have an ownership interest in the Guam

13  property?

**14       A. No, they do not.**

15       Q. And what is on the Guam property?

**16       A. Fax machine, copy machine, a desk, a rack to**

**17  hang uniforms on.**

18       Q. Is it -- I'm sorry to interrupt, but there's a

19  building there, correct?

**20       A. It's a -- yeah, it's based in a building.**

**21  It's not the entire building.**

22       Q. Well, what is the rest of the building used

23  for?

**24       A. We don't own it, so I don't know.**

25       Q. So that is not being used as an office?

ALW277

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1         A. Yeah.  So fax machine, copy machine, retail

2   front. RE: BOY SCOUTS and DELAWARE BSA LLC

3         Q. Okay.  So there's a part that's used as a

4   store?

5         A. Not our -- not the part that we lease -- I'm

6   sorry.  Yes, the part that we lease is used as a retail

7   front for selling uniforms and stuff like that.  Yes,

8   I'm sorry.

9         Q. So to your knowledge, is anyone else using

10  that building?

11        A. Not the space that we're leasing.

12        Q. Is there another space that is not being

13  leased by the Aloha Council in that building?

14        A. I do believe we don't -- we don't operate the

15  entire building.

16        Q. Do you know if anyone else uses the other

17  space that is not operated or used by Aloha Council?

18        A. I do not know.

19        Q. Okay.  I'm going to show you another document.

20  I believe this -- we're on Exhibit 4.

21             (Exhibit 4, Grant Deed, marked for

22  identification.)

23  BY MS. WOLFF:

24        Q. Do you see that, sir?     www.reliable-co.com    Reliable Court Reporting

25        A. Yes.

ALW278

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 95

1        Q. So it says here, Government of Guam,

2   Department of Land Management, Land Records Section,

3   and there's an instrument number 286898.

4           Do you see that?

5        **A. Yes.**

6        Q. Type of instrument:  Grant deed.

7           Do you see that?

8        **A. Yes.**

9        Q. Filed for record on 15th Day of December,

10  1977.

11          Do you see that?

12       **A. Yes.**

13       Q. Okay.  I'm just going to scroll down now.  It

14  says here, on the second page of Exhibit 4, Grant Deed.

15  And it says, "This indenture made and entered into in

16  the City of Agana, Territory of Guam, this 7th Day of

17  December 1977 by and between the government of Guam,

18  herein called the government, as party of the first

19  part and Boy Scouts of America Aloha Council

20  Chamorro District, Post Office Box 258, Agana, Guam

21  96160, herein called the grantee as the party of the

22  second part."

23          Do you see that?

24          MR. CELENTINO:  Counsel, are you going to lay

25  some foundation of this document in terms of him

**ALW279**

1           MS. WOLFF:  I hope so, but let's see.

2           **THE WITNESS:  Are you able to say when you**

3   **obtained this document?**

4   BY MS. WOLFF:

5           Q. Excuse me?

6           **A. Are you able to disclose when this document**

7   **was obtained?**

8           MR. GUBEN:  I think Mr. Celentino has asked

9   for her to lay the foundation for this document.  We

10  here never seen this before.

11  BY MS. WOLFF:

12          Q. Well, let's be clear about that.  Let me just

13  make sure because -- have you ever seen this grant

14  deed?

15          **A. I have not.**

16          Q. Okay.  But when it says Lot 5138-New, my

17  question is, is this the Guam property that's being, to

18  your knowledge, leased by the Aloha Council?

19          **A. I don't --**

20          MR. CELENTINO:  He's never seen --

21          **THE WITNESS:  Yeah.  I'm sorry.**

22          MR. CELENTINO:  My objection was going to be

23  he's never seen the document.  He has no way of

24  answering that question.

25  BY MS. WOLFF:

1        **Again, I think to the attorney's point -- and**

2   **I'm not familiar with the lease agreement laws on Guam**

3   **or what document they would use to create a transfer of**

4   **ownership or a lease agreement.  And I'll reiterate**

5   **that what I was told was that we do not own the**

6   **property on Guam, that we lease the property on Guam.**

7        Q. And before we leave this document, I'm just

8   going to show, because I didn't have a chance to point

9   it out earlier.  I just want to go over the second

10  paragraph because you mentioned lease and you said it

11  doesn't show a transfer.

12        It does say, in the second paragraph, that the

13  Government, pursuant to Section 1 of Public Law 14-10

14  and in consideration of a mutual benefits of both

15  parties does hereby -- I always say remise -- release

16  and forever grant to the grantee its successors and

17  assigns forever the tract or parcel of land described

18  as follows to which.

19        And so then it lists the property 513-New, but

20  it does state here, it does hereby grant to the

21  grantee, who is identified as Boy Scouts of America,

22  Aloha Council Chamorro District.

23        So, again, it's another, now that I've read

24  this paragraph, is it still your position that without

25  further investigation, you can't say whether this

ALW281

1   document transfers property to the Aloha Council?

2          MR. CELENTINO:  Counsel, you're arguing with

3   him about a legal interpretation of a document that

4   you've extensively established he doesn't recognize and

5   doesn't have any basis to respond about.

6   BY MS. WOLFF:

7          Q. Go ahead, sir, and answer the question.

8          **A. Yes.  I -- without further investigation and**

9   **further clarity on both Guam law and transfer of**

10  **ownership, I'm not able to answer.**

11         Q. Okay.  Well, now you've seen this deed.  So is

12  the Aloha Council going to investigate whether it owns

13  this property?

14         **A. Definitely.  And it's still my position that**

15  **we don't own the property, that it's a lease, lease**

16  **agreement.**

17         MR. GUBEN:  Counsel, I notice that it says

18  Chamorro District.  I don't know if a Chamorro District

19  is still in existence of the Aloha Council.

20         MS. WOLFF:  Okay.  Well, I request that you

21  not -- not testify for the witness.  That's not a

22  proper objection.

23         MR. GUBEN:  Yes, it is if you're asking him a

24  legal question.  That is not a legal entity anymore.

25         MS. WOLFF:  You have the opportunity to ask

Page 107

1   was not directly involved in the agreement.

2       Q. So the Aloha Council played no role in the

3   negotiations between the Boy Scouts of America and

4   Hartford Insurance; is that correct?

5       A. That's correct.

6       Q. And at any time, was the Aloha Council asked

7   to value its interests in local council insurance

8   policies?

9       A. No, we were not asked.

10      Q. At any time was the Aloha Council asked to

11  value its interest in Boy Scouts of America insurance

12  policies?

13      A. No, we were not.

14      Q. Has the Aloha Council ever undertaken to value

15  its interest in local council insurance policies?

16      A. No, we have not.

17      MR. SCHIAVONI:  I'm sorry, objection to form.

18  Objection to form.

19  BY MS. WOLFF:

20      Q. Has the Aloha Council ever tried to value its

21  interest in Boy Scouts of America insurance policies?

22      MR. SCHIAVONI:  Objection to form.

23      THE WITNESS:  No, we have not.

24  BY MS. WOLFF:

25      Q. Has the Aloha Council ever participated in

ALW283

Page 108

1    negotiations with insurance companies as part of this

2    Boy Scouts of America bankruptcy case?

3         **A. Aloha Council is not engaged.**

4         Q. Has the Aloha Council ever been asked to

5    consent to a settlement with the insurance company as

6    part of the Boy Scouts of America bankruptcy case?

7              MR. SCHIAVONI:  Objection to form.

8              **THE WITNESS:  Not to my knowledge.**

9    BY MS. WOLFF:

10        Q. Has the Boy Scouts -- I'm sorry.

11             Has the Aloha Council ever signed any document

12   joining in a settlement with an insurance company as

13   part of the Boy Scouts of America bankruptcy case?

14        **A. Without having the document in front of me, I**

15   **can't stipulate what it said or did not say.  But there**

16   **was something relating to insurance that was signed off**

17   **by the Aloha Council.**

18        Q. What do you remember of that document?

19        **A. That it involved Hartford, and then a**

20   **compensation or a settlement -- something related to**

21   **insurance coverage.**

22        Q. When did this document get signed by the Aloha

23   Council?

24        **A. For not having the note -- the date in front**

25   **of me, I would say probably six to nine months ago,**

**ALW284**

1   **somewhere in that timeframe.**

2        Q. Okay.

3        **A. It all -- it all kind of blurs.**

4        Q. Are you aware that there were two Hartford

5   settlements in this Boy Scouts of America -- that were

6   reached as part of this Boy Scouts of America

7   bankruptcy case?

8        **A. Just what I saw on TV or read in the paper.**

9        Q. Okay.  Since that time, about -- I think you

10  said about six months ago or so, since that time, has

11  the Aloha Council signed any other document relating to

12  Boy Scouts of America insurance policies?

13       **A. No.**

14       Q. Has the Aloha Council ever communicated with

15  any of its chartered partners regarding their --

16  regarding the chartered partners insurance policies?

17       **A. No.**

18       Q. Has Aloha Council ever communicated with any

19  of its chartered partners regarding the chartered

20  partner's interest in Boy Scouts of America insurance

21  policies?

22       **A. No.**

23            (The court reporter asks for clarification.)

24            MR. SCHIAVONI:  Objection to form.

25  BY MS. WOLFF:

ALW285

1      Q. And your answer is no, sir; is that correct?

2      **A. Correct.  The answer is no.**

3      Q. And when did the Aloha Council search for

4  insurance policies?

5      **A. Starting mid-2020 through probably the first**

6  **part of this year.  So I would say for a duration of**

7  **eight to nine months.**

8      Q. Since does the Aloha Council -- since the

9  Aloha Council was sued in recent years for child sex

10 sexual abuse allegations, has the Aloha Council

11 communicated with insurers regarding the council's

12 defense?

13     MR. CELENTINO:  Object to form.

14     **THE WITNESS:  No communication with insurance**

15 **companies.**

16 BY MS. WOLFF:

17     Q. Okay.  Are you familiar with the chartered

18 organizations in Guam that are partners with the Aloha

19 Council?

20     **A. In what timeframe?**

21     Q. Currently.

22     **A. Yes.**

23     Q. Are the Guam chartered partners a part of the

24 130 chartered partners that you spoke of earlier?

25     **A. Yes.**

**ALW286**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 132

1  America bankruptcy?

2          MR. CELENTINO:  Same objections.

3          **THE WITNESS:  Decline to answer.**

4          MR. GUBEN:  We'll assert the attorney/client

5  on that and the common interest privilege.

6          MS. WOLFF:  Okay.

7  BY MS. WOLFF:

8      Q. Has the Aloha Council hired an attorney

9  regarding its interest in insurance policies?

10     **A. No.**

11     Q. Okay.  So has the Aloha Council contacted any

12  of its insurers regarding its interest in insurance

13  policies that may be transferred to the trust?

14     **A. The Aloha Council has not contacted.**

15          (The court reporter asks for clarification.)

16  BY MS. WOLFF:

17     Q. Has the Aloha Council informed any of its

18  insurers that the Aloha Council may transfer its

19  interest in insurance policies to the settlement trust?

20          MR. GUBEN:  Asked and answered.

21          MR. CELENTINO:  Object to form.

22  BY MS. WOLFF:

23     Q. Go ahead, sir.

24     **A. You're asking have we asked, so no.**

25     Q. The answer is no, correct?  Is that correct?

**ALW287**

1  respect.

2  BY MS. WOLFF:

3      Q. Sir, has the Aloha Council ever signed a

4  common interest agreement with the Ad Hoc Committee of

5  Local Councils?

6      **A. Yes.**

7      Q. When was that document signed?

8      **A. March 2020.**

9          MR. CELENTINO:  We're happy to produce it to

10  you, Ms. Lujan Wolff.

11          MS. WOLFF:  Thank you.

12          MR. GUBEN:  We can provide it immediately.

13  BY MS. WOLFF:

14      Q. So, sir, this 1 million 3 -- you know, 1

15  point -- I'll say approximately $1.3 million dollar

16  contribution that the Aloha Council intends to pay, can

17  you tell me what claims against the Aloha Council that

18  would -- that amount would pay for?

19          MR. CELENTINO:  Object to form.  Calls for a

20  legal conclusion.

21          MR. GUBEN:  Very speculative.  It's a legal

22  conclusion.

23  BY MS. WOLFF:

24      Q. What is your understanding, sir?

25      **A. I don't -- I don't have an understanding.**

**ALW288**

1         Q. And so again, sir, you just -- I think your

2    testimony -- just to be clear, you said that you

3    just -- you don't know, you know, who is going to be

4    paid this $1.3 million contributed by Aloha Council; is

5    that correct?

6              MR. CELENTINO:  Objection.  Misstates

7    testimony.

8    BY MS. WOLFF:

9         Q. Is that correct, sir?

10             And when I say -- I'm not talking about names

11   of people, I'm talking about what kind of people

12   would -- would -- could be compensated from this

13   $1.3 million that the Aloha Council pays to the

14   settlement trust.

15             Do you know?

16        A. No.

17             MR. CELENTINO:  Object to form.  Calls for

18   legal conclusion.

19             THE WITNESS:  No.

20   BY MS. WOLFF:

21        Q. Okay.  Has the Aloha Council ever -- ever

22   tried to determine whether or not people who assert

23   claims against the Aloha Council will be -- will be --

24   will be fully paid in the Boy Scouts of America

25   bankruptcy case if this chapter -- I'm sorry, if this

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1  fifth amended plan is confirmed?  Has the Aloha Council

2  tried to make that determination?

3          MR. SCHIAVONI:  Objection to form.

4          **THE WITNESS:  Our hope is that all victims are**

5  **equitably compensated, all victims.**

6  BY MS. WOLFF:

7      Q. Okay.  So -- but my question, though, is has

8  the Aloha Council tried to evaluate whether or not

9  people who have asserted claims against the Aloha

10  Council in the Boy Scouts bankruptcy case will be --

11  will be fully compensated?

12          MR. SCHIAVONI:  Objection to form.

13          MR. GUBEN:  It's speculative as to even the

14  size of the settlement trust right now.  There's no way

15  for him to answer that question.

16  BY MS. WOLFF:

17      Q. That's my question.  Has the Aloha Council

18  ever tried to make a determination?  It's a yes or no.

19      **A. For the overall case or just the Aloha?**

20      Q. I'm referring to people who assert claims

21  against the Aloha Council -- who have identified the

22  Aloha Council in their proofs of claim in the Boy

23  Scouts's bankruptcy case, has the Aloha Council ever

24  tried to determine, and you know, tried to evaluate

25  whether or not those people will be fully compensated

**ALW290**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

1   if this fifth amended chapter -- I'm sorry, Fifth

2   Amended Chapter 11 Plan of Reorganization gets

3   confirmed?

4   **A. Again, I think based on what you said earlier,**

5   **our contribution doesn't get directly directed to a**

6   **victim.  It's part of an overall compensation trust.**

7   **So, no, based on that.**

8   Q. Okay.  So let me just clarify.  Let me just,

9   you know, make it clear, because in that question, I

10  wasn't limiting it to whether or not the 1.3 million

11  will fully pay off people who have made claims against

12  the Aloha Council.

13  My question is, has the Aloha Council tried to

14  determine whether the money that goes into the

15  settlement trust, you know, will fully compensate

16  people who have filed -- who have made claims against

17  the Aloha Council in the Boy Scouts's bankruptcy case?

18  MR. SCHIAVONI:  Objection to form.

19  **THE WITNESS:  Don't have enough information at**

20  **my disposal to say yes or no.  It depends on the**

21  **overall compensation trust, and the number of**

22  **confirmed -- I'm assuming there's going to be some**

23  **process of affirming abuse claims.**

24  **So I don't have enough -- it's beyond my**

25  **bailiwick to make that judgment call.**

**ALW291**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

RE: BOY SCOUTS and DELAWARE BSA LLC                                       Page 141

1   BY MS. WOLFF:

2        Q. Does the Aloha Council know what -- what

3   this -- what -- does the Aloha Council know how much

4   money will be placed into the settlement trust as part

5   of this Modified Fifth Amended Chapter 11 Plan of

6   Reorganization?

7        **A. No.**

8        Q. Okay.

9        MS. WOLFF:  Okay.  I don't have any other

10  questions.  Thank you.

11       MR. GUBEN:  I have no questions at this time.

12       MR. SCHIAVONI:  I have a couple of questions.

13       MR. SCHIAVONI:  I'm sorry, the witness -- how

14  does the witness pronounce his name, if counsel could

15  tell me?

16       MR. GUBEN:  Jessie Lopez.

17       MR. SCHIAVONI:  Lopez, okay.

18  EXAMINATION

19  BY MR. SCHIAVONI:

20       Q. Mr. Lopez, my name is Tanc Schiavoni.  I

21  represent Century.  Thank you for coming today.

22       Can you tell me, sir, are you the person for

23  the Aloha Council that purchases insurance?

24       MR. CELENTINO:  Object the form.

25       **THE WITNESS:  We -- we don't -- we don't**

**ALW292**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 171

```
1  BY MR. SCHIAVONI:

2       Q. Well, it's just simply the fact.  I'm not

3  asking about legal advice.  It's like did you ever

4  learn that there was something called a trust

5  distribution procedure?  Did you ever learn something

6  that was called a trust distribution procedure?

7            MR. GUBEN:  Same objection.  You can move on.

8            MR. SCHIAVONI:  Actually, you have to direct

9  the witness not to answer.

10           MR. GUBEN:  I did direct him not to answer

11  that question with respect to the trust settlement

12  procedures.

13  BY MR. SCHIAVONI:

14       Q. Mr. Lopez, at any point in time in trying to

15  evaluate what the Aloha Council should pay as its

16  contribution, did the Aloha Council try to run the

17  number of claims it had against itself through the

18  trust distribution procedures to see what they would be

19  valued at?

20           MR. CELENTINO:  Object to form.

21       A. I'm not aware of the process for determining

22  the allocation amount.

23  BY MR. SCHIAVONI:

24       Q. Can you tell us why is it that the Aloha

25  Council didn't spend any time looking into how claims
```

**ALW293**

RE: BOY SCOUTS and DELAWARE BSA LLC

JESSE LOPEZ

Page 172

1  were going to be allowed and valued in the bankruptcy?

2          MR. CELENTINO:  Object to form.

3          **THE WITNESS:  Ask that question again.**

4  BY MR. SCHIAVONI:

5      Q. Sure.  Is it fair to say that once the Aloha

6  Council reached a decision about what it was going to

7  contribute and it capped its liability in the case, it

8  didn't really care how claims would be valued and

9  allowed in the bankruptcy?

10          MR. CELENTINO:  Objection.  Argumentative.

11      **A. Well, I don't think it's Aloha Council's privy**

12  **to evaluate the level of the abuse, and then the other**

13  **thing that's unknown is what is the end number going to**

14  **look like.  And I mentioned earlier the duplicity of**

15  **the 85,000 claims, how many of those are unique and how**

16  **many of those -- so the numerator, the denominator, all**

17  **those are still too fluid to be able to do the process**

18  **you're suggesting.**

19          **So, no, we just don't have enough information**

20  **to be able to come to a legitimate or a plausible**

21  **number.**

22      Q. The Aloha Council come up with its

23  contribution to the settlement trust by evaluating the

24  claims in the same way that the trust distribution

25  procedures would value the claims?

**ALW294**