## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, | Lead Case No. 22-cv-01237-RGA |
| Appellants. | Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; 22-cv-01240-RGA; 22-cv-01241-RGA; 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |
| v. | |
| Boy Scouts of America and Delaware BSA, LLC, *et al.*, | |
| Appellees. | |

## DEBTORS-APPELLEES' CONSOLIDATED ANSWERING BRIEF

(*Counsel Listed on Following Page*)

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
jessica.lauria@whitecase.com
gkurtz@whitecase.com

WHITE & CASE LLP
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
mandolina@whitecase.com
mlinder@whitecase.com
laura.baccash@whitecase.com
blair.warner@whitecase.com

WHITE & CASE LLP
Ronald K. Gorsich
Doah Kim
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:  (213) 620-7700
rgorsich@whitecase.com
doah.kim@whitecase.com

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
dabbott@morrisnichols.com
aremming@morrisnichols.com
ptopper@morrisnichols.com

*Counsel for Debtors-Appellees and Debtors in Possession*

## CORPORATE DISCLOSURE STATEMENT

Boy Scouts of America is a non-profit corporation founded in 1910 and chartered by an act of Congress on June 15, 1916.  Boy Scouts of America has no parent corporation and has issued no stock.  No publicly-held corporation holds any interest in Boy Scouts of America.

Delaware BSA, LLC is a wholly-owned subsidiary of Boy Scouts of America. Delaware BSA, LLC has issued no stock, and no publicly-held corporation holds any interest in Delaware BSA, LLC.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ix

INTRODUCTION ...............................................................................2

JURISDICTIONAL STATEMENT .......................................................6

STANDARD OF REVIEW ..................................................................6

STATEMENT OF THE CASE ..............................................................8

    A.    General Overview Of Confirmed Plan ......................................8

    B.    Brief Background On The BSA And Scouting.........................9

    C.    Prepetition Abuse Claim Litigation .......................................14

    D.    Overview Of Insurance And Coverage Litigation...................16

        1.    Insurance Policies .......................................................16

        2.    Prepetition Insurance Coverage Litigation...................19

    E.    Chapter 11 Cases..................................................................21

        1.    Claims Filed In The Chapter 11 Cases .........................21

        2.    Mediation And The Plan...............................................22

    F.    Confirmation Hearing ...........................................................31

    G.    Confirmation Opinion And Confirmation Order......................32

SUMMARY OF ARGUMENT .............................................................35

ARGUMENT ....................................................................................37

    I.    The Certain Insurers Failed To Prove That The Bankruptcy Court's Good Faith Finding Is Clearly Erroneous............................................................................37

i

**TABLE OF CONTENTS (continued)**

Page

A.   The Bankruptcy Court's Good Faith Finding Is Not Completely Devoid Of Evidence, But Rather Is Supported By Overwhelming Evidence..................................40

B.   The Certain Insurers' Argument That The Bankruptcy Court Did Not Consider The Evidence As A Whole Is Unsupported And Incorrect..............................52

C.   The Certain Insurers' Spin On Fragments Of Evidence Does Not Prove Clear Error Or Even Support Their Requested Finding Of Bad Faith ......................54

    1.   The Certain Insurers' Argument That The Plan Was Not Proposed In Good Faith Because It Inflates Claim Values And Requires The Certain Insurers To Pay Them Is Incorrect And Unsupported By Evidence..................55

        a.   The Plan Does Not Inflate Claims ......................55

        b.   The Plan Does Not Require The Insurers To Pay Awards ........................61

        c.   The Plan Is Not Designed To Leverage The Insurers ............................65

    2.   The Bankruptcy Court Did Not Err In Relying On The Testimony Of A BSA Witness, Nor Was That The Sole Basis For The Bankruptcy Court's Good Faith Finding................68

        a.   The Insurers' Argument That The Survivors Drafted The TDP And Claim Matrix Is Unsupported And Incorrect.................................................69

        b.   The Insurers' Argument That The BSA Did Not Protect Them Is Unsupported And Incorrect..................72

**TABLE OF CONTENTS (continued)**

Page

      c.    The Insurers Introduced No Evidence Of Collusion Or To Support Their Other Accusations Of Bad Faith ..........................77

    1.    The Fact That 82,209 Proofs Of Claim Were Filed In The Chapter 11 Cases Does Not Demonstrate That The Bankruptcy Court Committed Clear Error In Finding That The Plan Was Proposed In Good Faith, Or Support A Contrary Finding ...........................................78

    2.    The Fact That Some Proofs Of Claim Are Missing Information Does Not Demonstrate Or Even Support A Finding Of Bad Faith.....................89

    3.    The Payment Of Claims Subject To A Statute Of Limitations Defense Is Customary And Does Not Show Bad Faith...................90

    4.    The TDP Criteria For Legal Responsibility Do Not Prove, Or Even Support, The Insurers' Allegation Of Bad Faith .................................95

D.    The Certain Insurers' Challenges Based On Terms That Were Not Included In The Confirmed Plan On Appeal Are Meritless ..........................................................97

    1.    The Insurance-Related Provisions Contained In A Prior Plan Are Not Relevant, And Do Not Prove Clear Error.......................................................97

    2.    An Earlier Proposal For A Settlement Trustee Is Irrelevant And Does Not Prove Clear Error Or Support A Finding Of Bad Faith ..............................................................................102

E.    The Fact That The Settlement Trust Does Not Replicate Scorched Earth Litigation Is Not A Ground For Challenging Confirmation....................................104

**TABLE OF CONTENTS (continued)**

Page

F. The Rare Cases Finding Bad Faith That Are Cited By The Insurers Are Inapposite ..............................108

G. The TCC/Abuse Survivor Settlement Does Not Support, Much Less Require, A Finding Of Bad Faith..........................................................................112

II. The Plan Does Not Abrogate The Certain Insurers' Contractual Rights..................................................115

III. The Bankruptcy Court Did Not Err In Approving The Channeling Injunction And Releases Under Third Circuit Law ...............................................................122

A. The Bankruptcy Court Properly Exercised Its Subject Matter Jurisdiction To Approve The Channeling Injunction And Releases......................122

1. The Bankruptcy Court Had "Arising In" And "Arising Under" Jurisdiction To Approve The Channeling Injunction And Releases .......................................................123

2. The Bankruptcy Court Had "Related To" Jurisdiction To Approve The Channeling Injunction And Releases............................126

a. Interconnectedness ...............................129

b. Shared Insurance ................................138

c. Contractual Indemnification................140

d. The BSA's Residual Interest In Local Council Property................................142

B. The Bankruptcy Court Has Statutory Authority To Grant The Channeling Injunction And Releases ...................143

C. The Bankruptcy Court Has Constitutional Authority To Grant The Channeling Injunction And Releases..........................................................150

## TABLE OF CONTENTS (continued)

Page

D.   The Channeling Injunction And Releases Are Appropriate And Supported By Ample Evidence Under The Applicable Legal Standards .................................. 153

1.   The Channeling Injunction And Releases Satisfy The *Continental* Hallmarks ............................. 153

a.   The Channeling Injunction And Releases Are Necessary To The BSA's Reorganization .......................................... 155

b.   The Channeling Injunction And Releases Are Fair ...................................................... 163

c.   The *Master Mortgage* Factors Are Satisfied .............................................................. 171

i.   Identity Of Interest .................................. 173

ii.   Contribution Of Substantial Assets To The Reorganization ................. 174

a.   Settling Insurance Companies ...................................... 175

b.   Local Councils ................................ 176

c.   Chartered Organizations ................ 178

iii.   A Substantial Majority Of The Impacted Creditors Support The Plan. ................................................. 180

iv.   The Plan Provides For The Payment Of All, Or Substantially All, Of The Abuse Claims Affected By The Injunction ................................................. 182

v.   The Injunction Is Essential To Reorganization ......................................... 190

**TABLE OF CONTENTS (continued)**

IV.   The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Abused Its Discretion In Finding That The Insurance Settlements Do Not Satisfy The *Martin* Standard ............................................................................. 192

    A.   The Insurance Settlements Satisfy The *Martin* Standard ................................................................. 193

    B.   The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Determining That Proceeds Of The Abuse Insurance Policies And Contributed Non-Debtor Abuse Insurance Policies Are Property Of The Estate ....................................... 200

        1.   The Proceeds Of BSA Insurance Policies Are Property Of The BSA's Estates ............................. 202

        2.   The Contributed Non-Debtor Insurance Policies Are Property Of The BSA's Estates ............... 206

    C.   The Plan Adequately Protects And Compensates The Lujan Claimants For Their Alleged Interests In The Abuse Insurance Policies That Are The Subject Of The Insurance Settlements .................................... 209

        1.   The Insurance Settlements Do Not Impermissibly Modify The Lujan Claimants' Rights ......................................................... 212

        2.   Guam's Direct Action Statute Does Not Entitle The Lujan Claimants To Additional Adequate Protection ...................................... 213

V.   The Plan, Confirmation Opinion, And Confirmation Order Do Not Improperly Impact The AOA's Interests, If Any, In Abuse Insurance Policies In Violation Of The AOA's Automatic Stay ................................................. 215

**TABLE OF CONTENTS (continued)**

Page

A. No Party With Standing Has Appealed Confirmation As To The Plan's Impact On The AOA's Interests, If Any, In The Abuse Insurance Policies ..................................................................218

B. The Lujan Claimants Lack Independent Standing To Enforce The AOA's Automatic Stay...............................219

C. Confirmation Of The AOA Plan Has Rendered The Automatic Stay Issue Moot .............................................221

D. Even If The Lujan Claimants Had Standing And Their Arguments Were Not Moot, Their Arguments Are Meritless........................................................224

VI. The Bankruptcy Court Correctly Concluded That The McCarran-Ferguson Act Does Not Reverse Preempt The Bankruptcy Code........................................................................227

VII. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Satisfies The Best Interests Test Under Section 1129(a)(7)..................................................................................228

A. The Plan Satisfies The Plain Language Of Section 1129(A)(7) ........................................................231

B. The Lujan Claimants' Claims Are Unliquidated And Too Speculative To Be Included In A Liquidation Analysis................................................234

C. The Plan Satisfies The Best Interests Test Because The Lujan Claimants Are Likely To Be Paid In Full ...........................................................................237

VIII. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Properly Classifies The Claims Of The Lujan Claimants Pursuant To Section 1122(a)............................................................237

**TABLE OF CONTENTS (continued)**

Page

IX. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Provides For The Equal Treatment For Holders Of Direct Abuse Claims In Accordance With Section 1123(A)(4) .................242

X. The Plan Treats Current And Future Holders Of Direct Abuse Claims Fairly And Equitably ..................................................245

XI. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Clearly Erred In Authorizing Certain Modifications To The Plan.......................................................................249

   A. The Lujan Claimants Lack Standing And Their Argument Was Not Preserved .................................................250

   B. Notice Was Extensive ..............................................................252

   C. Modifications Were Not Material or Adverse ........................256

XII. Allianz And Liberty's Arguments With Respect To The Plan's Treatment Of Indirect Abuse Claims And Judgment Reduction Provisions Are Meritless ................................260

   A. Allianz And Liberty Have Failed To Prove That The Bankruptcy Court Erred In Approving The Treatment Of Indirect Abuse Claims......................................260

   B. The Bankruptcy Court Did Not Err In Approving The BSA's Judgment Reduction Language............................267

CONCLUSION .......................................................................................268

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*A.H. Robins Co., Inc. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ...........................................................127, 130, 134

*Ace Pallet Corp. v. Conrail*,
   764 F. App'x 197 (3d Cir. 2019) .......................................................................80

*Behrmann v. Nat'l Heritage Found.*,
   663 F.3d 704 (4th Cir. 2011) ..........................................................................150

*Burtch v. Opus LLC (In re Opus E. LLC)*,
   698 F. App'x 711 (3d Cir. 2017) ..................................................................7, 40

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)..............................................................................122, 126

*CoreStates Bank, N.A. v. United Chem. Techs.*,
   202 B.R. 33 (E.D. Pa. 1996) ............................................................................39

*David v. Weinstein Co. Holdings, LLC*,
   2021 WL 979603 (D. Del. Mar. 16, 2021) .....................................................163

*First Fidelity Bank v. McAteer*,
   985 F.2d 114 (3d Cir. 1993) ...........................................................................203

*Golden Spread Council, Inc. #562 of the BSA v. Akins*,
   926 S.W.2d 287 (Tex. 1995) ..........................................................................136

*Hammerberg v. BSA*,
   No. 2012-0224433 (GJP), 2015 WL 6115412, 2015 Mass. Super.
   LEXIS 94 (Mass. Super. Ct. Aug. 11, 2015)........................................... 136-137

*Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd.*,
   No. CIV. 96-00047, 1997 WL 995625 (D. Guam Aug. 29, 1997) .................211

*Hobbs v. BSA*,
   152 S.W.3d 367 (Mo. Ct. App. 2004) .................................................... 136-137

ix

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5,
2014) ............................................................................................... 123-125, 171

*In re A.H. Robins Co.*,
88 B.R. 742 (E.D. Va. 1988) ............................................................146

*In re ACandS*,
311 B.R. 36 (Bankr. D. Del. 2004)...................................................110

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)..............................................207

*In re Airadigm Commc'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) ...................................................146, 150

*In re Allied Digital Techs., Corp.*,
306 B.R. 505 (Bankr. D. Del. 2004)................................................204

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ......................................... 38, 77, 112-113

*In re Am. Solar King*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)..............................................250

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986)...............................................239, 243

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (Bankr. D. Del. 2006)................................................238

*In re Barrett*,
833 F. App'x 668 (9th Cir. 2020)....................................................220

*In re CBI Holding Co.*,
529 F.3d 432 (2d Cir. 2008) ...........................................................207

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) ......................................................*passim*

*In re Continental Airlines*,
203 F.3d 203 (3d Cir. 2000) ......................................................*passim*

x

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*In re Coram Healthcare Corp.*,
  271 B.R. 228 (Bankr. D. Del. 2001) ................................................................. 111

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................................. 198

*In re Dow Corning*,
  280 F.3d 648 (6th Cir. 2002) ............................................................................ 150

*In re Dow Corning*,
  237 B.R. 380 (Bankr. E.D. Mich. 1999) .......................................................... 233

*In re Dow Corning Corp.*,
  86 F.3d 482 (6th Cir. 1996) .............................................................................. 130

*In re Downey Fin. Corp.*,
  499 B.R. 439 (Bankr. D. Del. 2013) ................................................................. 223

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992) ............................................................................. 149

*In re Drexel Burnham Lambert Grp., Inc.*,
  146 B.R. 92 (S.D.N.Y. 1992) ........................................................................... 264

*In re Edgeworth*,
  993 F.2d 51 (5th Cir. 1993) .............................................................................. 203

*In re Emerge Energy Servs. LP*,
  No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5,
  2019) .................................................................................................................... 43

*In re Exide Holdings, Inc.*,
  No. 20-11157 (RGA), 2021 WL 3145612 (D. Del. July 26, 2021) ............ *passim*

*In re Fairchild Corp.*,
  No. 10–56 (GMS), 2014 WL 7215211 (D. Del. Dec. 17, 2014) ..................... 223

*In re Fed.-Mogul Glob., Inc.*,
  300 F.3d 368 (3d Cir. 2002) ............................................................................. 140

*In re Fed.-Mogul Glob. Inc.*,
  402 B.R. 625 (D. Del. 2009) ................................................................................. 7

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Fed.-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) .................................................76, 89, 110

*In re Fed.-Mogul Glob. Inc.*,
No. 01-10578 (JFK), 2007 WL 4180545, (Bankr. D. Del. Nov. 16,
2007) ...............................................................................................256

*In re Federal-Mogul, Inc.*,
385 B.R. 560 (Bankr. D. Del. 2008) ..................................................110

*In re Fruehauf Trailer Corp.*,
444 F.3d 203 (3d Cir. 2006) ...........................................................7, 40

*In re Glob. Indus. Techs.*,
645 F.3d 201 (3d Cir. 2011) ................................................ 109, 154-155

*In re Grasso*,
490 B.R. 500 (Bankr. E.D. Pa. 2013) ...................................................99

*In re HomeBanc Mortg. Corp.*,
945 F.3d 801 (3d Cir. 2019) ................................................................7

*In re Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) .............................................................149

*In re Lower Bucks Hosp.*,
488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir.
2014) ...............................................................................................140

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022)...........................................*passim*

*In re Maremont Corp.*,
601 B.R. 1 (Bankr. D. Del. 2019)........................................42, 49, 85

*In re Master Mortgage*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ......................................*passim*

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) .............................................................149

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Millennium Lab Holdings II, LLC*,
562 B.R. 614 (Bankr. D. Del. 2016)................................................................122

*In re Millennium Lab Holdings II, LLC*,
591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019) 7, 124-125, 171

*In re NantHealth, Inc. Stockholder Derivative Litig.*,
No. 18-cv-00551-SB, 2021 WL 1909885 (D. Del. May 12, 2021).................215

*In re Nat'l Truck Funding LLC*,
588 B.R. 175 (Bankr. S.D. Miss. 2018)..........................................................250

*In re Nortel Networks, Inc.*,
669 F.3d 128 (3d Cir. 2011) ..................................................................................7

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006) ........................................................................*passim*

*In re Pecan Groves of Ariz.*,
951 F.2d 242 (9th Cir. 1991) ............................................................................220

*In re Piece Goods Shops Co., L.P.*,
188 B.R. 778 (Bankr. M.D.N.C. 1995)...........................................................239

*In re Plant Insulation Co.*,
469 B.R. 843 (Bankr. N.D. Cal. 2012) ...........................................................233

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021), *rev'd on other grounds*, 635
B.R. 26 (S.D.N.Y. 2021)..........................................................................100, 232

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ........................................................................*passim*

*In re Quigley Co.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010).............................................................243

*In re Quigley Co.*,
676 F.3d 45 (2d Cir. 2012) .......................................................... 139-140, 243

*In re Resorts Int'l, Inc.*,
145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................... 240-241

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*In re RTI Holding Co., LLC*,
  No. 20-12456 (JTD), 2021 WL 4994414 (Bankr. D. Del. Oct. 27,
  2021) ......................................................................................................43

*In re Seaside Eng'g & Surveying*,
  780 F.3d 1070 (11th Cir. 2015) ...........................................146, 150

*In re SGL Carbon*,
  200 F.3d 154 (3d Cir. 1999) ....................................................76, 108

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010)..................................................39

*In re Thgh Liquidating LLC*,
  No. 19-2215 (RGA), 2020 WL 5409002 (D. Del. Sept. 9, 2020)
  (Andrews, J.)..............................................................................41, 51

*In re TK Holdings Inc.*,
  No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018)......................181

*In re Tonopah Solar Energy, LLC*,
  No. 11844 (KBO), 2022 WL 982558 (D. Del. Mar. 31, 2022).............38, 51, 53

*In re W.R. Grace & Co.*,
  13 F.4th 279 (3d Cir. 2021) ...........................................................131

*In re W.R. Grace & Co.*,
  446 B.R. 96 (Bankr. D. Del. 2011), *aff'd*, 729 F.3d 311 (3d Cir.
  2013) ........................................................ 104, 263-264, 266

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013)................*passim*

*In re W.R. Grace & Co.*,
  591 F.3d 164 (3d Cir. 2009), *cert. denied*, 562 U.S. 839 (2010) ....................127

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ..........................................................242

*In re W.R. Grace & Co.*,
  900 F.3d 126 (3d Cir. 2018) ..................................................132, 134

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Walker*,
   628 B.R. 9 (Bankr. E.D. Pa. 2021) ....................................................40

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011).......................................154, 242

*In re White*,
   383 B.R. 366 (W.D. Pa. 2008).......................................................222

*In re Woodbridge Grp. of Cos., LLC*,
   617 B.R. 796 (D. Del. 2020)...............................................................7

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007)............................................184

*In re WorldCom, Inc. Sec. Litig.*,
   293 B.R. 308 (S.D.N.Y. 2003) ........................................................131

*Infant C. v. Boy Scouts of Am., Inc.*,
   391 S.E.2d 322 (Va. 1990) ..............................................................137

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993) ............................................................238

*John Roe #1 v. BSA Corp.*,
   84 A.3d 443 (Conn. App. Ct. 2013) ......................................... 136-137

*Juarez v. Boy Scouts of Am., Inc.*,
   81 Cal. App. 4th 377 (2000), *on appeal*, 2004 WL 1211952 (June
   3, 2004) ...........................................................................................137

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990)...................................................................*passim*

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ..............................................................146

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ..............................................................138

*McCartney v. Integra Nat'l Bank North*,
   106 F.3d 506 (3d Cir. 1997) ............................................................129

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*,
No. 17-269 (RGA), 2019 WL 4198194 (D. Del. Sept. 4, 2019) ............ 80-81, 84

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) ......................................................................*passim*

*N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-
Day Saints*,
307 P.3d 730 (2013) .......................................................................................137

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ...................................................................... 65-66

*Pacor Inc. v. Higgins*,
743 F.2d 984 (3d Cir. 1984) ............................................................ 126-127, 142

*Police & Fire Ret. Sys. of the City v. Ambac Fin. Grp., Inc. (In re
Ambac Fin. Grp., Inc.)*,
No. 10-B-15973 SCC, 2011 WL 6844533 (S.D.N.Y. Dec. 29,
2011) ..............................................................................................................199

*Rauso v. Martinez*,
Nos. 20-2927 and 21-1503, 2022 WL 4965388 (3d Cir. Oct. 4,
2022) ..............................................................................................................222

*Rendell v. Rumsfeld*,
484 F.3d 236 (3rd Cir. 2007) ............................................................... 222-223

*Reyes v. United States*,
No. 08-00005, 2010 WL 5707583 (D. Guam Dec. 15, 2010) ................. 210-211

*Sherwin-Williams Co. v. Cty. of Del.*,
968 F.3d 264 (3d Cir. 2020) ................................................................107, 120

*SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*,
388 B.R. 579 (Bankr. D. Del. 2008) ...............................................................138

*Stoe v. Flaherty*,
436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006) ............................124

*Thompson v. TCT Mobile, Inc.*,
No. 19-899-RGA-SRF, 2020 WL 1531333 (D. Del. Mar. 31, 2020) ......196, 244

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Townsend v. Benavente,*
   339 F.2d 421 (9th Cir. 1964) ............................................................210

*Watkins v. Int'l Union, Sec., Police & Fire Prof'ls of Am.,*
   No. 15-444-LPS, 2016 WL 1166323 (D. Del. Mar. 23, 2016) ...............197, 244

<u>Statutes and Other Authorities</u>

11 U.S.C. § 157 ..............................................................................122

11 U.S.C. § 362 .............................................................. 220, 222-223, 225

11 U.S.C. § 1127 .......................................................................... 98-99

11 U.S.C. § 1129 .........................................................................*passim*

36 U.S.C. §§ 30901-08 ................................................................... 9-10

Fed. R. Bankr. P. 8002 ....................................................................217

Fed. R. Bankr. P. 9019 ....................................................................193

Fed. R. Civ. P. 52 ...........................................................................32

Guam Code Ann. § 18305 ................................................................211

H.R. Rep. No. 64-130 (1916) .......................................................... 10-13

McCarran-Ferguson Act, 15 U.S.C. § 1012(b) .....................................227

Appellees Boy Scouts of America and Delaware BSA LLC (together, the "Appellees" or the "BSA")[2] file this consolidated brief in opposition to the above-captioned consolidated appeals (the "Appeals") of the Opinion with respect to confirmation of the Plan [D.I. 1-3] (the "Confirmation Opinion"),[3] the Confirmation Order [D.I. 1-1], and the Pre-Petition Century/Chubb Companies Claims Order [Bankr. D.I. 10327] (each term as defined herein) of the United States Bankruptcy Court for the District of Delaware and in response to each of the briefs (collectively, the "Opening Briefs") filed in support thereof by National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, Travelers Casualty and Surety Company, Inc. *et al.*, Old Republic Insurance Company, General Star Indemnity Company, Indian Harbor Insurance Company, Munich Reinsurance America, Inc., Arch Insurance Company, Great American Assurance Company *et al.*, The Continental Insurance Co., *et al.*, Gemini Insurance Company, Traders and Pacific

---

[2]   References to the "BSA" herein shall be to Boy Scouts of America or to Boy Scouts of America and Delaware BSA, LLC jointly as the debtors and debtors in possession in the underlying chapter 11 cases (the "Chapter 11 Cases"), as the context requires.

[3]   "D.I. __" refers to documents filed in this consolidated appeal docket (Case No. 22-cv-01237 (RGA)).  "Bankr. D.I. ___" refers to documents filed in the main bankruptcy case that is the subject of this appeal (Case No. 20-10343 (LSS)).  "A__" refers to documents in the Notice of Lodging of Multimedia Filing filed by the Certain Insurers [D.I. 47].   "ADV__" refers to documents in the Appendix to the D&V Claimants' Opening Brief [D.I. 46], "ALW" refers to documents in the Appendix to the Lujan Claimants' Opening Brief [D.I. 44], and "SA__" refers to documents included in the Debtors' supplemental appendix to this brief, filed contemporaneously herewith.

Insurance Company *et al.*, Argonaut Insurance Company *et al.*, Arrowood Indemnity Company, Liberty Mutual Insurance Company *et al.* ("Liberty") and Allianz Global Risks US Insurance Company *et al.* ("Allianz") [D.I. 45] (collectively, the "Certain Insurers" or "Insurers"), Liberty and Allianz [D.I. 43], the claimants represented by Dumas & Vaughn, LLC [D.I. 41] (collectively, the "D&V Claimants"), and the claimants represented by Lujan & Wolff LLP [D.I. 40] (collectively, the "Lujan Claimants").

## INTRODUCTION[4]

An "extraordinary case by any measure"—this is the bankruptcy court's characterization of the historic resolution of these chapter 11 cases after presiding over fifty-nine hearings culminating in twenty-two days of confirmation trial. After nearly three years in bankruptcy and thousands of hours of arduous mediated negotiations among more than a dozen stakeholder groups, the BSA is poised to effectuate an overwhelmingly consensual Plan that will create a settlement trust to compensate survivors of sexual abuse—the largest in United States history. This trust, to be administered by the well-respected, former bankruptcy judge Barbara Houser, will equitably compensate survivors with cash and other assets totaling approximately $2.46 billion plus significant unliquidated assets, including valuable

---

[4] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to such terms below.

insurance rights.  The Plan will also allow the BSA, a congressionally chartered non-profit organization that is woven into the fabric of American life, to continue its charitable mission of providing boys and girls with "opportunities to learn self-sufficiency and leadership skills that can contribute to the betterment of society."[5]

The global resolution embodied in the confirmed plan of reorganization is a carefully calibrated compromise among the often competing interests of the BSA, Local Councils and Chartered Organizations that together form an interconnected network united to deliver the mission of Scouting; insurance companies that issued policies to the BSA, Local Councils and Chartered Organizations covering claims for Scouting-related abuse; and abuse survivors.  The Plan resolves a complex array of overlapping liabilities and insurance rights through a series of settlements by channeling Scouting-related abuse claims to the Settlement Trust and by granting corresponding releases of such claims in favor of the BSA, Related Non-Debtor Entities, Local Councils, Chartered Organizations and Settling Insurance Companies. Without each such element of the Plan, there would be no resolution. The parties would face a melt-down of the BSA organization and the Scouting mission and hundreds of Local Council and Chartered Organization bankruptcies, resulting in a race to the courthouse that would jeopardize or eliminate any ability

---

[5]   D.I. 1-3, Introduction at 2.

for abuse survivors, many of whom are aged and in desperate need of funds and closure, to recover anything or achieve the closure they seek.

The only delays in implementing this extraordinary outcome are the instant appeals by two categories of Appellants: (i) a group of insurance companies, which seek to forestall, by any means necessary, their payment obligations under insurance policies covering Scouting-related abuse claims because they say the trust will pay survivors too much, and (ii) a vanishingly small minority of abuse survivors, representing less than 0.2% of the class, who seek to elevate their claims above similarly situated claimants.

The Certain Insurers principally challenge the bankruptcy court's finding of fact that the Plan was proposed in good faith.  The D&V Claimants and Lujan Claimants principally challenge the bankruptcy court's authorization of the channeling injunction and non-consensual third-party releases that are the lynchpin of the Plan.  Neither challenge has merit.

The bankruptcy court's exhaustive and well-reasoned 269-page Confirmation Opinion properly determined that the Plan was proposed in good faith after diligently examining the totality of the circumstances.  Despite an extremely high bar to reverse such a factual finding, the Certain Insurers appeal the bankruptcy court's finding that the Plan was proposed in good faith, primarily asserting that Retired Judge Houser will issue inflated awards that the Insurers will

have to pay, and complaining about the substantial increase of claims that allegedly would never have been filed but for the bankruptcy. The Certain Insurers not only fail to demonstrate that the bankruptcy court's findings of fact are completely devoid of evidence, as required, but fail to introduce any credible evidence to support a contrary finding. The fact that survivors filed claims in the bankruptcy that may otherwise be barred under applicable state law does not demonstrate, much less support, any theory that the BSA proposed the Plan in bad faith. Further, the Settlement Trust has mechanisms for assessing the validity of claims, and the Certain Insurers' rights to raise coverage defenses are fully preserved under the Plan.

The bankruptcy court also properly applied the Third Circuit's standard for approval of the channeling injunction and related third-party releases as set forth in *Continental* to the facts of these chapter 11 cases, many of which were uncontroverted. In particular, the bankruptcy court made specific factual findings, including that it had subject matter jurisdiction over the claims that were the subject to the channeling injunction and releases and that the channeling injunction and releases are fair and necessary to the reorganization.

The order confirming the Plan in these extraordinary cases should be affirmed.

## JURISDICTIONAL STATEMENT

The bankruptcy court had subject matter jurisdiction to enter a final order confirming the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC* [Bankr. D.I. 10296] (the "Plan") and the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Bankr. D.I. 10316] (the "Confirmation Order")[6] pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334.   This Court has jurisdiction to hear the Appeals under 28 U.S.C. § 158(a)(1), which confers jurisdiction to district courts to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.

## STANDARD OF REVIEW

The Appellants challenge various findings and rulings that the bankruptcy court made in connection with its decision to confirm the Appellees' historic plan of reorganization—a decision the bankruptcy court explained in more than 300 pages of opinion and supplemental findings, after hearing fifteen days of testimony and seven days of oral argument.  None amount to reversible error.

---

[6]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Confirmation Order, as applicable.

The bankruptcy court's factual findings are reviewed for clear error. *See In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 570 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019); *In re W.R. Grace & Co.*, 475 B.R. 34, 75 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013). A bankruptcy court's factual findings "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'" *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors*, 323 F.3d 228, 232 (3d Cir. 2003)); *see also Burch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 714 (3d Cir. 2017) ("Clear error occurs only if the court's finding is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." (internal citations omitted)). A bankruptcy court's legal conclusions, including a determination that it has subject matter jurisdiction, are reviewed de novo. *See* In *re Fed.-Mogul Glob. Inc.*, 402 B.R. 625, 630 (D. Del. 2009). Mixed questions of law and fact are reviewed under a mixed standard, affording a clearly erroneous standard to factual findings but exercising plenary review of the bankruptcy court's interpretation and application of those facts to legal precepts. *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810–11 (3d Cir. 2019); *see also In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011); *In re Woodbridge Grp. of Cos., LLC*, 617 B.R. 796, 801 (D. Del. 2020).

7

## STATEMENT OF THE CASE

### A.    General Overview Of Confirmed Plan

The Plan is a tapestry of interconnected and interdependent settlements that will establish the largest sexual abuse compensation fund in the history of the United States.  Critically, the Plan is supported by every estate fiduciary and nearly every organized creditor group.  D.I. 1-3 at 168.  The settlements memorialized in the Plan are the product of nearly two years of intensive mediation and provide at least $2.46 billion in cash and property to a Settlement Trust benefiting abuse survivors, *plus* significant unliquidated assets, including valuable insurance rights.  D.I. 1-3 at 68–69; Bankr. D.I. 9280 ¶¶ 52, 55.

The global resolution of Scouting-related Abuse Claims under the Plan is predicated on these settlements and the related releases and injunctions.  These settlements resolve the overlapping liabilities, insurance rights and obligations of the Protected Parties, Limited Protected Parties, and Opt-Out Chartered Organizations.  If any one of the settlements is eliminated, the totality of the global resolution embodied in the Plan would fall apart, an outcome which would, in turn, threaten the full payment to abuse survivors and the survival of Scouting.  *See, e.g.*, Bankr. D.I. 9280 ¶¶ 107, 120, 135, 155, 170 (testimony that without the settlements, the plan would "not be possible").  This Court's affirmance of the

Confirmation Order is a condition precedent to the Insurance Settlement Agreements and the effectiveness of the Plan as a whole.

The Plan "channels" to the Settlement Trust all Abuse Claims against the BSA, the Related Non-Debtor Entities, the Local Councils, certain Chartered Organizations, and those covered by insurance policies issued by the Settling Insurance Companies and provides for coextensive nonconsensual releases of the channeled Abuse Claims (the "Releases"). The channeled Abuse Claims will be processed, liquidated, and paid by the Settlement Trustee in accordance with the Settlement Trust Agreement and Trust Distribution Procedures (the "TDP"), and were the subject of intensive negotiations by the BSA and various constituencies during the Chapter 11 Cases. *See, e.g.*, D.I. 1-3 at 174–75; D.I. 1-4 Art. III.B.10, III.B.11, VII.A, Ex. A, Art. I.D.14. The Channeling Injunction and Releases are the "cornerstone of the Plan," D.I. 1-3 at 154–55, and are necessary to ensure an equitable process by which abuse survivors' claims will be administered and paid.

## B.    Brief Background On The BSA And Scouting

The BSA was incorporated in the District of Columbia on February 8, 1910, and chartered by an act of Congress as a non-profit corporation under title 36 of the United States Code, which was signed into law by President Woodrow Wilson on June 15, 1916. *See* 36 U.S.C. §§ 30901-08; Bankr. D.I. 4 at 1. The BSA's charitable mission is to prepare young people for life by instilling in them the

9

values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful. *Id.* The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and career-oriented programs in partnership with community organizations. *Id.* Congress recognized the "importance and magnitude" of the BSA's work and observed that the BSA "tends to conserve the moral, intellectual, and physical life of the coming generation." *See* H.R. Rep. No. 64-130, at 245 (1916).

Scouting operates through a network of organizations that share a common charitable mission. *See* Bankr. D.I. 9316 ¶ 10; Bankr. D.I. 9280 ¶ 14. The BSA, in accordance with its congressional charter, develops and disseminates the structure and content of the Scouting program, owns and licenses intellectual property, and establishes merit badge requirements and membership qualifications. The BSA also purchases general liability insurance that is shared among the BSA, Local Councils and Chartered Organizations (since the 1970s) and provides shared technical support, accounting, human resources and other corporate services to the Local Councils. *See* Bankr. D.I. 9280 ¶¶ 15–17; Bankr. D.I. 9316 ¶¶ 10–11. Each of these Local Councils and Chartered Organizations, along with the BSA, form part of an interconnected organizational structure that is crucial to carrying out the BSA's mission. *See* D.I. 1-3 at 120, 155; Bankr. D.I. 9341 at 263:14–264:1.

Most Scouts never interact with the national BSA organization directly. Bankr. D.I. 9316 ¶ 10.   Instead, the tens of thousands of Scouting units nationwide—*e.g.*, "troops," "packs," and "dens"—are organized locally, through "Chartered Organizations," including churches, schools, and civic associations, which are often referred to as Scouting's partners.  *Id.*  These Scouting units and their Chartered Organization partners are, in turn, supported by the Local Councils. *Id*.  The bankruptcy court found that it takes

> all three levels of organization to deliver Scouting—national, which sets policy and provides administrative services, Local Councils, which charter Organizations, recruit Scouts and volunteer leaders and enforce BSA rules and regulations, and Chartered Organizations, which provide facilities and use Scouting to further one of their goals of youth character development, career skill development, community service, patriotism, military and veteran recognition or faith-based youth ministry.

D.I. 1-3 at 133 (finding identity of interest).

Approximately 250 Local Councils in the United States cover geographic areas of varying size, population, and demographics.  Bankr. D.I. 9280 ¶ 14.  Each Local Council is a non-profit organization incorporated under applicable state law. The Local Councils are chartered by the BSA on an annual basis to facilitate the delivery of the Scouting program.  Bankr. D.I. 9280 ¶ 14.  Local Councils are led by paid professional adult leaders with assistance from volunteers and their own boards of directors and senior management.  Bankr. D.I. 9280 ¶ 14; Bankr. D.I. 9316 ¶ 10; ADV719.  Pursuant to the BSA bylaws, the BSA may revoke or refuse

to renew a Local Council charter at any time in its sole discretion and in the best interest of Scouting. Bankr. D.I. 9279 ¶ 14; SA 8 (BSA Bylaws, dated May 2021, Art. VI, Sec. 3, 4); SA 36 (September 2020 Rules and Regulations); *see also, e.g.*, SA 60 (Capital Area Council and North Florida Council Charter Renewals). In such circumstances, the articles of incorporation for the Local Council provide that such council will take the actions necessary to dissolve the entity. *See, e.g.*, SA 64 (Template Articles of Incorporation, Art. II); SA 109 [JTX 7-2].

The BSA relies on Local Councils for services essential to Scouting, including funding local Scouting programs and initiatives, recruiting Scouts and volunteer leaders, Scout and volunteer training, opportunities for rank advancement, local enforcement of the BSA's policies, rules, and regulations, and registration of members and leaders. Bankr. D.I. 9280 ¶ 15. In addition, Local Councils own and operate hundreds of unique camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in the BSA's Scouting programs. *Id.* ¶ 14; Bankr. D.I. 16 ¶ 91.

Through Local Councils, the BSA maintains relationships with local donors and Chartered Organizations, which currently sponsor more than 44,000 local Scouting units throughout the country. Bankr. D.I. 9316 ¶ 11; 9280 ¶ 16. These relationships, vital to the success of Scouting, drive membership and provide essential funding. *Id.* Without a Local Council operating in a particular region, the

BSA would lose access to the resources necessary to operate Scouting units in such region.  *Id.*   Thus, if a Local Council were to dissolve or file for bankruptcy, it would be difficult for the BSA to reestablish the community ties necessary for a successful Scouting program.  *Id*.

The BSA also receives services and support from certain Related Non-Debtor Entities.  Bankr. D.I. 9280 ¶ 18.  These entities include (a) BSA Asset Management, LLC, a Delaware limited liability company that provides the BSA with investment management and advisory services; (b) BSA Commingled Endowment Fund, LP, a Delaware limited partnership through which the BSA's and certain Local Councils' investments are managed by BSA Asset Management, LLC; (c) BSA Endowment Master Trust, a non-profit trust established for investing funds contributed to the BSA Commingled Endowment Fund, LP; (d) National Boy Scouts of America Foundation, a non-profit corporation that partners with Local Councils and other donors by providing support for major-gift fundraising efforts and managing donor-advised funds; (e) Learning for Life, a non-profit corporation that provides important education programs and mentoring to young people for future career opportunities; (f) Arrow WV, Inc., a non-profit corporation that owns, develops, and leases the Summit Bechtel Family National Scout Reserve high adventure base in West Virginia to the BSA; and (g) Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc., non-share capital

corporations formed under the laws of Canada that own and operate the BSA portions of the Northern Tier High Adventure Base located in Canada.  *Id.* ¶¶ 19–24.  There is "no record that any of the Non-Related Debtor Entities is involved in anything other than Scouting."  D.I. 1-3 at 135.

### C.    Prepetition Abuse Claim Litigation

The BSA's bankruptcy proceedings exist because of liabilities related to claims of sexual abuse.  Prior to the Petition Date, the BSA was a defendant in a significant number of abuse-related lawsuits and claims asserted by abuse survivors.  D.I. 1-3 at 7–10, 20; Bankr. D.I. 4 at 3; Bankr. D.I. 16 ¶¶ 7, 52.  Most of these lawsuits also named non-debtor entities as co-defendants, including Local Councils, Chartered Organizations, and certain Related Non-Debtor Entities.  D.I. 1-3 at 19; Bankr. D.I. 9273 ¶¶ 6, 19.  The abuse allegations in these claims and complaints ranged in severity, and plaintiffs generally sought economic and non-economic damages, punitive damages, and non-monetary relief.  D.I. 1-3 at 10.  The vast majority of the Abuse Claims that were settled before the Petition Date involved allegations of abuse that occurred more than thirty years ago.  Bankr. D.I. 9273 ¶ 7.

As a result of a growing trend of changes in state statutes of limitations for claims related to childhood sexual abuse, the number of abuse claims against the BSA sharply increased during the time period immediately preceding the BSA's

Chapter 11 Cases.    D.I. 1-3 at 20; Bankr. D.I. 9280 ¶ 42. Since 2002, approximately seventeen states have enacted legislation allowing victims of sexual abuse to assert claims that previously would have been barred by applicable statutes of limitation.   Bankr. D.I. 4 at 5; Bankr. D.I. 9280 ¶ 42.   This trend accelerated in 2019, when more than a dozen states enacted such legislation. Bankr. D.I. 4 at 5.

Beginning in 2016, the BSA, together with Ogletree Deakins Nash, Smoak & Stewart, P.C. ("Ogletree"), the BSA's national coordinating counsel handling Abuse Claims litigation, worked to resolve Abuse Claims that were either the subject of pre-litigation demands or pending lawsuits.   D.I. 1-3 at 19; Bankr. D.I. 9273 ¶ 10.   The BSA sought to implement a coordinated, uniform approach for investigating, defending, and resolving Abuse Claims and ensuring consistent defense and claim resolution strategies across the country.   Bankr. D.I. 9273 ¶¶ 18–32.   With certain exceptions,[7] the BSA generally administered and defended Abuse Claims on behalf of Local Councils, Related Non-Debtor Entities, and Chartered Organizations, as well as authorizing and paying settlement amounts related to Abuse Claims, such that these entities did not bear the costs of litigation or settlement of Abuse Claims.   D.I. 1-3 at 20; Bankr. D.I. 9273 ¶ 4.

---

[7]   *See* Bankr. D.I. 9354 at 189:13-21, 191:11-192:6 (Griggs) (describing exceptions with respect to the Archbishop of Agaña and Guam and TCJC); Bankr. D.I. 9273 ¶ 4.

The BSA, with the assistance of Ogletree, was able to resolve approximately 250 prepetition Abuse Claims and spent approximately $150 million on these efforts between 2017 and 2019.[8]  D.I. 1-3 at 20; Bankr. D.I. 9273 ¶¶ 6–7.  But with potential claims still mounting toward the end of 2018 and throughout 2019, the BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable and global out-of-court resolution of Abuse Claims.  Bankr. D.I. 16 ¶¶ 8–9.  In late 2019, the BSA participated in a mediation with counsel to certain abuse survivors and some of the BSA's insurers.  D.I. 1-3 at 20; Bankr D.I. 9354 at 109:11-110:17; Bankr. D.I. 16 ¶ 58; Bankr. D.I. 4 at 6.  The mediation was unsuccessful.  D.I. 1-3 at 20; Bankr. D.I. 16 ¶ 58.  So, the writing was on the wall:  given the pace and volume of Abuse Claims, the BSA recognized that case-by-case litigation untenably threatened the ability to provide equitable compensation to all survivors of sexual abuse and the future of Scouting, and that a global resolution outside of bankruptcy was not possible.  *See* D.I. 1-3 at 20; Bankr. D.I. 4 at 6.

### D.     Overview Of Insurance And Coverage Litigation

#### 1.     Insurance Policies

The BSA's insurance program has evolved over the last eighty years, with variations in insurance carriers, covered entities, type and amount of limits, and the

---

[8]   These include Abuse Claims asserted against the BSA, Local Councils, and/or Related Non-Debtor Entities.  D.I. 1-3 at 20; D.I. 9273 ¶ 6.

use of deductibles.  Bankr. D.I. 9398 ¶ 7; SA 3822.  Nearly all years have some available coverage for Abuse Claims, whether through a per-occurrence limit, an aggregate limit, or both.   Bankr. D.I. 9398 ¶¶ 7, 8; Bankr. D.I. 9490 at 12:2-14:12; *see, e.g.*, A14624, SA 2621, SA 2600.

Between at least 1935 and 1982, the BSA purchased primary insurance policies providing coverage for Abuse Claims, with the limits of liability subject to a per-person or per-occurrence limit, but no aggregate limit.[9]  Bankr. D.I. 9398 ¶ 9; *see, e.g.*, SA 2457, SA 2492, SA 2548, SA 3822.   Certain of the older policies during this period are missing or are disputed.  *See, e.g.*, Bankr. D.I. 9398 ¶ 71 (describing Hartford policies for which only secondary evidence exists).

From 1969 to 1982, the BSA purchased excess insurance policies, which are triggered once the primary insurance coverage is exhausted.  Bankr. D.I. 9398 ¶ 10.  Again, most of these excess policies provide per-occurrence coverage with no aggregate limit, meaning that once the primary policy's per-occurrence limit is exhausted, the excess policy attaches to cover any remaining value of the claim. *Id.*  As a result, the policies can repeatedly pay out the per-occurrence limits.  *Id.*

---

[9]   A per-occurrence limit represents how much an insurance policy will pay for any one occurrence whereas an aggregate limit represents the overall amount a policy will pay for all occurrences that take place during the policy period; once the applicable payments made by these policies reach the aggregate limit, the policy will no longer respond to claims.  Bankr. D.I. 9398 ¶ 8.

Beginning in 1983, the BSA insurance policies generally incorporated aggregate limits for Abuse Claims. *Id.* ¶ 11. Because of these aggregate limits, BSA purchased significantly more layers of excess coverage. *Id.* In the post-1982 period alone, approximately $3.6 billion of coverage is potentially available within the policies' aggregate limits (after accounting for prior settlements and exhaustion of coverage). *Id.*

From 1986 through 2018, the BSA purchased primary and first-layer excess policies that have deductibles that match the policies' limits of liability, dollar for dollar. *Id.* ¶ 12; Bankr. D.I. 9490 at 15:8-19; SA 3822. Beginning in 2019 and continuing to the present, the BSA discontinued its practice of procuring policies with matching deductibles. Bankr. D.I. 9398 ¶ 14; SA 3822.

In addition to providing insurance coverage to the BSA, the BSA insurance program also provided insurance coverage to Local Councils beginning in 1971. Bankr. D.I. 9398 ¶ 15. Prior to 1971, Local Councils were not insureds under the BSA insurance program; instead, they independently purchased insurance policies. *Id.* ¶ 16. For a brief period in the 1970s, the BSA offered each Local Council the opportunity to pay a premium to be added as an additional insured (*i.e.*, a party with rights to the insurance coverage) on the BSA's insurance policies. *Id.* ¶ 17. Many Local Councils elected this option; others continued to purchase coverage independently. *Id.* Starting in 1975, all Local Councils became insureds under the

BSA's insurance program, whether as an additional insured (between 1975 and 1977) or as a named insured (between 1978 and the present). *Id.* ¶ 18.

Beginning in 1976, the BSA also amended its policies to provide coverage for Chartered Organizations. *Id.* ¶ 19. Starting in 1978, the BSA specifically included Chartered Organizations as insureds on its insurance policies, albeit with some variation in coverage. *Id.* Some (but not all) Chartered Organizations are also listed as additional insureds on their Local Council's independent insurance policies. Bankr. D.I. 1-3 at 14; Bankr. D.I. 9398 ¶¶ 25–26; Bankr. D.I. 9490 at 22:17-19, 103:22-104:2.

## 2. Prepetition Insurance Coverage Litigation

The BSA was also engaged in extensive insurance coverage litigation arising out of Abuse Claims prior to the filing of the Chapter 11 Cases. D.I. 1-3 at 16; Bankr. D.I. 9398 ¶¶ 68, 82.

The "Illinois Action" commenced in 2017 when National Surety Corporation sued BSA, the Chicago Area Council, and twenty-one other insurance companies (including Allianz, Century and Hartford) in Illinois state court seeking declaratory relief that no coverage existed under certain excess liability policies for lawsuits alleging abuse by repeat abuser Thomas Hacker. D.I. 1-3 at 16; Bankr. D.I. 9398 ¶ 68; SA 478.

Century and certain other defendants asserted counterclaims against the BSA and the Chicago Area Council in the Illinois Action, arguing that two settlements involving abuse by Hacker were not covered on the grounds that they were unreasonable and/or attributable to punitive damages exposure. *See* D.I. 1-3 at 17; SA 3790.

The "Century Texas Action" commenced in 2018 when the BSA and certain Local Councils filed an action in Texas state court to resolve various coverage issues, including how a settlement called the First Encounter Agreement[10] should be applied in allocating the costs of defense and indemnity to Century and other insurers and other disputes over payment. Bankr. D.I. 9398 ¶¶ 82–83; SA 494. As to Century, the Illinois Action and the Century Texas Action have been resolved through the Century and Chubb Companies Insurance Settlement Agreement. D.I. 1-3 at 77–78; Bankr. D.I. 8907-1. The remainder of the Illinois Action and the Century Texas Action are stayed pending the Chapter 11 Cases. Bankr. D.I. 10316 ¶ 54.

The "Hartford Texas Action" also commenced in 2018 when the BSA filed an action in Texas state court, alleging that Hartford had breached the terms of its

---

[10] The First Encounter Agreement was an agreement entered into between the BSA and Century in 1996 in which it was agreed that the date of "occurrence" pertaining to Abuse Claims would be the date of when the first act of abuse took place regardless of whether additional acts of abuse occurred in later policy periods. Bankr. D.I. 9398 ¶ 44.

insurance policies and acted in bad faith for denying coverage of Abuse Claims. Bankr. D.I. 9398 ¶ 68; SA 516.   Hartford responded with counterclaims alleging various coverage defenses including that Abuse Claims arise out of a single occurrence (which would dramatically limit the amount Hartford would owe for Abuse Claims).   Bankr. D.I. 9398 ¶ 68.   Hartford later filed an adversary proceeding against the BSA, certain of the BSA's insurers, and certain Local Councils that raised the same coverage issues.   D.I. 1-3 at 18 n.91; Bankr. D.I. 9398 ¶ 69.   Both the Hartford Texas Action and the adversary proceeding filed by Hartford have been resolved by the Hartford Insurance Settlement Agreement.   *See* Bankr. D.I. 8816-1.

### E.    Chapter 11 Cases

On February 18, 2020 (the "Petition Date"), the BSA filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

#### 1.    Claims Filed In The Chapter 11 Cases

On May 26, 2020, the bankruptcy court entered an order establishing, among other deadlines, November 16, 2020 as the deadline for holders of Abuse Claims and other claims to file claims against the BSA (the "Bar Date Order").[11]   Bankr.

---

[11]   Prior to their settlement with the Debtors, Century and Chubb Companies appealed the Bar Date Order, but such appeal is currently stayed before the Third Circuit pending the finality of the Confirmation Order.   *See Century Indemnity Co., et al, v. Boy Scouts of Am.*, Case No. 20-00774 (D. Del. Mar. 29,

D.I. 695; D.I. 1-3 at 21.  The Bar Date Order also approved procedures for the provision of notice to known and unknown survivors of Scouting-related abuse, and procedures for the confidential submission of Abuse Claims.  Bankr. D.I. 695; D.I. 1-3 at 22.  As of the bar date, approximately 82,200 unique and timely Direct Abuse Claims, 14,000 largely, if not entirely, contingent and unliquidated Indirect Abuse Claims, and 950 non-abuse claims were filed in the Chapter 11 Cases. Bankr. D.I. 6445 Art. V.M.4; SA 3823; *see also* Bankr. D.I. 9317.

### 2.   Mediation And The Plan

From the outset of the Chapter 11 Cases, the Debtors have sought a global resolution that would achieve their dual objectives of (i) providing an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse while preserving trust assets such as insurance policies and (ii) ensuring that the BSA has the ability to continue its vital charitable mission.  Bankr. D.I. 9280 ¶¶ 43–44; Bankr. D.I. 9309 ¶ 7.  To that end, on June 9, 2020, the bankruptcy court appointed three mediators in the Chapter 11 Cases[12] to aid the Debtors in achieving consensus. Bankr. D.I. 812; D.I. 1-3 at 24.  Indeed, for nearly two years, the Debtors engaged in near-continuous mediation with every

---

2021) [D.I. 1, 25, 27]; *see also Century Indemnity Co., et al, v. Boy Scouts of America*, Case No. 21-1792 (3d Cir. Jan. 3, 2022) [D.I. 35].

[12] Of the three mediators originally appointed by the bankruptcy court, only Timothy V.P. Gallagher continues to serve as mediator.

major creditor constituency in the Chapter 11 Cases, including the Certain Insurers. D.I. 1-3 at 24, 30; Bankr. D.I. 9280 ¶ 55; *see also* Bankr. D.I. 2292, 2624, 5219, 5284, 5287, 6210, 7772, 7884, 7928, 8095, 8772, 9386, 10178.

As set forth above, mediation ultimately led to overwhelming support for the Plan by key constituencies, including (i) the representatives of almost all abuse survivors, including the official committee appointed by the United States Trustee to represent abuse survivors (the "Tort Claimants' Committee"), Bankr. D.I. 142, the Future Claimants' Representative, Bankr. D.I. 486, the Coalition (an ad hoc committee representing more than 70,000 abuse survivors), and the Pfau/Zalkin claimants (certain survivors represented by the law firms of Pfau Cochran Vertetis Amala PLLC and Zalkin Law Firm, P.C.), (ii) the Settling Insurance Companies,[13] (iii) the Debtors' prepetition secured lender, JPM (JPMorgan Chase Bank, N.A.), (iv) the official committee for general unsecured creditors (the "Creditors' Committee"), Bankr. D.I. 141, (v) the Ad Hoc Committee (for Local Councils), (vi) and various Chartered Organizations, including TCJC (The Church of Jesus Christ of Latter-day Saints, a long-time Chartered Organization that ended its relationship with the BSA in 2019), the UMAHC (the United Methodist ad hoc committee, representing the United Methodist Entities involved in Scouting), and

---

[13] This includes Century and Chubb Companies, Hartford, Zurich Insurers, Zurich Affiliated Insurers, and Clarendon.

the RCAHC (the Roman Catholic ad hoc committee, representing Roman Catholic Entities involving in Scouting).   D.I. 1-3 at 56.   Moreover, the Archbishop of Agaña (the "AOA") and the official creditors' committee in the AOA's bankruptcy case (the "AOA Committee") have settled with the Debtors and no longer dispute the Confirmation Opinion and Confirmation Order.[14]   *See* Stipulation and Order of Voluntary Dismissal, D.I. 7 (dismissing the AOA's appeal of the Confirmation Opinion and Confirmation Order with prejudice); *see generally* D.I. 1-3 at 54.

The final voting results following solicitation of votes on the Plan demonstrate overwhelming creditor support for the Plan, with all voting classes voting to accept.   *See* Bankr. D.I. 8345, 9275.   With respect to Debtor BSA, 85.72% of holders of Class 8 Direct Abuse Claims and 82.41% of Class 9 Indirect Abuse Claims voted to accept the Plan.   *See* Bankr. D.I. 9275; *see also* D.I. 1-3 at 164 (finding that 85% acceptance by Class 8 constituted overwhelming creditor support for the Plan).[15]

The settlements achieved through mediation and embodied in the Plan resulted in substantial monetary and other valuable contributions to the Settlement

---

[14]  The AOA withdrew its appeal of the Confirmation Order as a result of the AOA Stipulation (defined herein).  The AOA Committee did not appeal any of the decisions below.

[15]  With respect to Delaware BSA, there were no Class 8 Direct Abuse Claims and 81.03% of Class 9 Indirect Abuse Claims voted to accept the Plan.  D.I. 1-3 at 53; Bankr. D.I. 9275.

Trust and non-monetary contributions to the Scouting mission (including an enhanced Youth Protection program), which enabled the bankruptcy court to confirm the Plan. D.I. 1-3 at 140. The Plan and Confirmation Order create the Settlement Trust, which, in addition to being funded with more than $2.46 billion in cash and property and assigned insurance and other rights under policies of the Debtors, Local Councils and certain Chartered Organizations, will also be entitled to pursue additional recoveries against non-settling parties, including many Chartered Organizations and insurance companies for the benefit of abuse survivors. D.I. 1-3 at 68, 70–71; D.I. 1-4 Art. IV.O.

An overview of the core components of the Plan is set forth below.

**Contributions and Settlements**. The BSA's contributions to the Settlement Trust include the following: (i) the BSA's Net Unrestricted Cash and Investments, (ii) the BSA Settlement Trust Note in the principal amount of $80 million, (iii) the Insurance Assignment,[16] (iv) the BSA's right, title, and interest in and to the

---

[16] It is well-established that anti-assignment provisions are pre-empted by the Bankruptcy Code, and unenforceable. *In re Fed.-Mogul*, 684 F.3d 355, 366, 374, 382 (3d Cir. 2012). Thus, the Debtors can, and routinely do, assign their insurance policy interests to a settlement trust. *See, e.g.*, *Combustion Eng'g, Inc.*, 391 F.3d 190, 218 n.27 (3d Cir. 2004) ("The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006); *In re Fed.-Mogul, Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *see also In re Congoleum Corp.*, No. 03-51524 (KCF), 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008)

Artwork, which is deemed to be valued at approximately $59 million, (v) the BSA

Cash Sharing Amount, (vi) the Oil and Gas Interests, valued at approximately $7.6

million, (vii) the BSA's Settlement Trust Causes of Action, and (viii) the

assignment of any Perpetrator Indemnification Claims held by the BSA.  D.I. 1-4

Art I.A.45.

The Local Councils are also providing valuable contributions to the

Settlement Trust, including, in the aggregate: (i) $500 million in cash or real

property, (ii) the DST Note, a non-recourse interest-bearing promissory note in the

principal amount of $100 million, (iii) the Local Council Insurance Rights, and

(iv) material insurance rights in the BSA Insurance Policies.  D.I. 1-4 Art. V.S.1.a.

The Local Councils will also make the Chartered Organization Contribution of

approximately $40 million to obtain certain protections for Participating Chartered

Organizations.  D.I. 1-4 Art. I.A.181.  The Plan provision providing for the Local

Council Settlement Contribution also contains a savings clause that ensures the

benefit of the contribution even if a Local Council is unable to transfer Local

Council Insurance Rights to the Settlement Trust.  In such a scenario, the Plan

provides that:

> …the Local Council shall, at the sole cost and expense of the
> Settlement Trust: (a) take such actions reasonably requested by the

---

("[A] plan of reorganization may assign insurance policies to a personal injury trust.").

26

> Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amount recovered under or on account of any of the Local Council Insurance Rights…

D.I. 1-4 at 81.   The Bankruptcy Court approved the Non-Debtor Policy Assignment, subject to this savings clause, and "to the extent permitted under state law."  D.I. 1-1 ¶ I.2.c.  Accordingly, to the extent the assignment is permissible under state law, the assignment will be effectuated "through an outright assignment," and to the extent the assignment is not permissible, the Plan ensures the benefit of the transfers "through the cooperation mechanism in the savings clause."  D.I. 1-3 at 256.

The Plan also includes valuable Insurance Settlements with Hartford, Century and Chubb Companies, the Zurich Insurers and Zurich Affiliated Insurers, and Clarendon.  In exchange for the benefits of the Channeling Injunction and Releases, the Settling Insurance Companies will make cash contributions of more than $1.6 billion to the Settlement Trust as consideration for the purchase of their respective policies.  The Insurance Settlements also resolve certain other disputes between the parties to the benefit of the BSA's estates and other parties in interest. *See* Bankr. D.I. 6210; Bankr. D.I. 7745; Bankr. D.I. 7929; Bankr. D.I. 8102.

Finally, the Plan includes other settlements with critical constituencies to the BSA, including (a) a settlement with the United Methodist Entities providing, among other things, a $30 million contribution to the Settlement Trust and a

27

partnership to strengthen Youth Protection efforts and Methodist partnerships with Scouting, *see* Bankr. D.I. 7884, 7929, 8907, (b) the JPM / Creditors' Committee Settlement, *see* Bankr. D.I. 2292; D.I. 1-4 Art. V.S.2, and (c) the TCC/Abuse Survivor Settlement, under which the BSA agreed to certain governance changes to the Settlement Trust, the addition of an optional Independent Review Option in the TDP, the Youth Protection Program, and clarifications to certain Plan terms, *see* Bankr. D.I. 8772.

**Youth Protection Measures**.  The BSA is committed to becoming the gold standard in abuse prevention.  The BSA's Youth Protection Program will be strengthened by enhancements set forth in the Plan, which will ensure that abuse survivors play a key role in shaping the BSA's future youth protection efforts. Such enhancements were the result of months of cooperative discussions and mediation sessions including a group of survivors affiliated with the Coalition, who formed what became known as the Survivors Working Group, affiliated with the Coalition, survivors from the Tort Claimants' Committee, representatives from the BSA and Local Councils, and a number of youth protection experts.

As a result of the Youth Protection Program, the BSA will engage in a number of initiatives, including (a) hiring a Youth Protection executive with extensive experience in prevention of childhood abuse, (b) forming a Youth Protection Committee, and (c) conducting an extensive review and update of

existing policies.  *See* D.I. 1-4, Ex. L.  The BSA will also appoint a qualified survivor of abuse in Scouting to the organization's national executive board.  *See* Bankr. D.I. 8647.

**Chartered Organizations**.  As set forth more fully in the Plan, there are three categories of Chartered Organization participation in the Plan that also enable the global resolution of Scouting-related Abuse Claims: (a) Contributing Chartered Organizations;  (b) Participating  Chartered  Organizations;  and  (c) Opt-Out Chartered Organizations.  D.I. 1-3 at 44-45; Bankr. D.I. 9280 ¶ 190.  Contributing Chartered Organizations, which currently includes the United Methodist Entities, are those that make a substantial contribution to the Settlement Trust in an amount deemed sufficiently substantial by the BSA or, after the Plan goes effective, the Settlement Trust, and become a Protected Party with respect to the Channeling Injunction and Releases.  D.I. 1-4 Art. I.A.86.  Participating Chartered Organizations, which is the default under the Plan, receive Limited Protected Party status and more limited protection of the Channeling Injunction and Releases.[17] D.I. 1-3 at 46; D.I. 1-4 Art. I.A.199; Bankr. D.I. 9280 ¶ 191.  Opt-Out Chartered

---

[17] In exchange for various contributions and releases with respect to Abuse Insurance Policies, the assignment of various causes of action against non-settling Insurance Companies, and the monetary contributions made by Local Councils on behalf of Participating Chartered Organizations, all Post-1975 Chartered Organization Abuse Claims and all Pre-1976 Chartered Organization Abuse Claims that are covered under an insurance policy issued by a Settling Insurance Company will be channeled to the Settlement Trust.

Organizations may opt out of participation in the Plan and will remain liable for all Scouting-related Abuse Claims regardless of whether such Abuse Claims arose before or after January 1, 1976, with a limited exception for Abuse Claims covered under an insurance policy issued by a Settling Insurance Company. *See* D.I. 1-3 at 47–48; D.I. 1-4 Art. I.A.196; Bankr. D.I. 9280 ¶ 197; Bankr. D.I. 9395 ¶ 32.

**Channeling Injunction and Releases**.  To facilitate a global resolution of Abuse Claims, the Plan channels to the Settlement Trust all Scouting-related Abuse Claims against the BSA, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives—collectively defined under the Plan "Protected Parties"—and provides for corresponding Releases in favor of such parties.  The Plan also channels to the Settlement Trust and provides for corresponding releases of (a) all Post-1975 Chartered Organization Abuse Claims against Participating Chartered Organizations and their Representatives—collectively defined under the Plan as "Limited Protected Parties,"—and (b) all Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations and their Representatives. D.I. 1-4 Arts. X.F, X.J.3.  The Channeling Injunction, Insurance Entity Injunction, and Releases allow for all of the monetary contributions provided to the Settlement Trust by resolving Abuse Claims against the Protected Parties and Limited

Protected Parties under the Plan.  D.I. 1-3 at 151–55.[18]  This unique structure is *critical* to securing the contributions from the Local Councils, Chartered Organizations, and Settling Insurance Companies, and unlocking the BSA's insurance for the benefit of the Settlement Trust.

### F.    Confirmation Hearing

The BSA's contested confirmation hearing commenced on March 14, 2022 and continued for twenty-two trial days.  *See* D.I. 1-3 at 56.  Fifteen days were devoted to the submission of testimony and evidence, and seven days were devoted to oral arguments.  *Id*.  Every objecting party had ample time to present arguments. *Id*.

The trial record is extensive.  Twenty-six witnesses, eleven of whom were qualified as experts, provided written or live testimony and were subject to cross-examination.  *Id*.  The hearing transcripts for the confirmation hearing total more than 5,000 pages.  *See generally* Bankr. D.I. 9341, 9354, 9389, 9406, 9407, 9408, 9409, 9454, 9455, 9482, 9490, 9497, 9517, 9530, 9544, 9562, 9563, 9564, 9578, 9616, 9638, 9639, 9646, 9648, 9656.  More than one thousand exhibits, totaling tens of thousands of pages, and portions of six recorded depositions were admitted

---

[18]   *See also* Bankr. D.I. 9517 at 79:11-21; Bankr. D.I. 9280 ¶¶ 134, 154, 169, 184; Bankr. D.I. 9395 ¶ 31; Bankr. D.I. 9407 at 187:21-24; Bankr. D.I. 9316 ¶¶ 67–70; Bankr. D.I. 9341 at 50:20–51:7.

into evidence.  D.I. 1-3 at 56.  At the close of the confirmation hearing on April 14, 2022, the bankruptcy court took the matter under advisement.  *Id.* at 56.

The opinions of many of the BSA's expert witnesses were not challenged by competing expert opinions or testimony.  For example, no party produced a witness to contradict the opinions of Dr. Charles Bates (who testified as to the range of aggregate values of Direct Abuse Claims for the purposes of confirmation) or Nancy Gutzler (who testified as to the reasonableness of the insurance settlements, as well as the amount of insurance available from Non-Settling Insurance Companies).

### G.    Confirmation Opinion And Confirmation Order

On July 29, 2022, the bankruptcy court issued the Confirmation Opinion. D.I. 1-3.  The Confirmation Opinion did not confirm or deny confirmation of the Plan, as there were still certain issues to be addressed.  But the Confirmation Opinion approved the key elements of the Plan.

After the bankruptcy court issued the Confirmation Opinion, the BSA, in consultation with the other Plan supporters, modified the Plan and prepared a revised proposed Confirmation Order that conformed to and supplemented the Confirmation Opinion.  To this end, on August 12, 2022, the BSA filed the *Debtors' Motion to Amend and Supplement the Findings of Fact and Conclusions of Law in the Confirmation Opinion Pursuant to Fed. R. Bankr. P. 7052 and Fed.*

*R. Civ. P. 52* [Bankr. D.I. 10188] (the "Rule 7052 Motion"), which requested the bankruptcy court's authorization to amend and supplement the Confirmation Opinion and entry of the proposed Confirmation Order confirming the modified Plan.[19]  During a status conference held on August 18, 2022, the bankruptcy court acknowledged the need for certain findings not discussed in the Confirmation Opinion to be included in the revised Confirmation Order, and encouraged the parties to work together to accomplish this goal.  *See* Bankr. D.I. 10215 at 11:4–12:14.

The court held hearings on September 1 and September 7, 2022.  Bankr. D.I. 10288; Bankr. D.I. 10317.  Before each hearing, the BSA mediated with the Appellants about potential Plan modifications and revisions to the proposed Confirmation Order.  *See* Bankr. D.I. 10288 at 8:2-9:9; Bankr. D.I. 10317 at 4:23-8:20.  At each of the hearings, the bankruptcy court afforded all parties an opportunity to raise issues that they believed were not addressed in the Confirmation Opinion.  Bankr. D.I. 10288 at 11:7–23, 14:21–23; Bankr. D.I. 10317 at 8:21–23.  The Certain Insurers proposed twelve categories of revisions to the proposed Confirmation Order and modified Plan, and the Lujan Claimants

---

[19]  The Rule 7052 Motion also requested an order approving the release of the Pre-Petition Century/Chubb Claims, as required by section 36 of the Century and Chubb Companies Insurance Settlement Agreement, in connection with the confirmation of the Plan.  *See* Bankr. D.I. 8907.

objected to modifications related to the Insurance Settlement Agreements.  Bankr. D.I. 10246, 10247.

At the September 1 hearing, the bankruptcy court reviewed the changes made to the proposed Confirmation Order and the modified Plan that were in dispute.  *See generally* Bankr. D.I. 10288.  The court ruled on certain of these issues and made its own modifications to the proposed Confirmation Order.  *Id.* The court ultimately requested that the parties negotiate certain remaining disputed provisions and submit a revised order.  *Id.* at 112:1–113:10.  The parties met and conferred but were unable to consensually resolve all disputed issues.  *See* Bankr. D.I. 10317 at 4:23–8:20.

At the September 7 hearing, the bankruptcy court ruled on all outstanding issues other than a dispute about the judgment reduction provision contained in the Plan.  *See id.* at 70:11–16.  The court requested that the parties submit competing proposed judgment reduction provisions.  *Id.* at 69:24-70:2.  Thereafter, the bankruptcy court issued a letter ruling largely accepting the provision proposed by the BSA and certain other Plan supporters.  Bankr. D.I. 10304.  The BSA then submitted a revised form of Confirmation Order incorporating such language.  Bankr. D.I. 10310.  The court entered the Confirmation Order on September 8,

2022 (Bankr. D.I. 10316) and the Pre-Petition Century/Chubb Companies Claims Order on September 12, 2022 (Bankr. D.I. 10327).[20]

## SUMMARY OF ARGUMENT[21]

The Certain Insurers did not discharge their burden of proving that the bankruptcy court's factual finding that the Plan was proposed in good faith was "completely devoid" of evidence. To the contrary, the finding is supported by overwhelming evidence. The Certain Insurers' second challenge that the Plan abrogates their contractual rights is demonstrably wrong. To the contrary, the Plan and TDP preserve the policy obligations as they existed prepetition, and the bankruptcy court further confirmed that any defenses of the Certain Insurers are preserved.

For their part, the Lujan and D&V Claimants fail to show that the bankruptcy court erred when approving the Channeling Injunction and Releases, as the bankruptcy court correctly found that it had jurisdiction because (i) the Channeling Injunction and Releases were necessarily "arising in" and "arising under" title 11 in the context of confirmation of the plan of reorganization, and (ii)

---

[20] As the Pre-Petition Century/Chubb Companies Claims Order recognizes, "*[n]o objection was filed* to this component of the Century and Chubb Companies Insurance Settlement Agreement and the entry of this Order." Bankr. D.I. 10327 at 2 (emphasis added).

[21] In addition to the arguments presented herein, the Appellees incorporate by reference, certain arguments set forth in the answering brief of the Future Claimants' Representative, which is filed concurrently herewith.

it had "related to" jurisdiction over the third-party claims. Nor did the bankruptcy court commit clear error in finding that the third-party releases satisfied applicable Third Circuit law.

The Lujan Claimants also challenge the Insurance Settlement Agreements, but fail to demonstrate that the bankruptcy court abused its discretion when determining that the agreements are reasonable and in the best interests of the BSA's estates. The Lujan Claimants also claim that the Plan, Confirmation Opinion, and Confirmation Order violate the automatic stay issued in the AOA's bankruptcy case, but they lack standing to make this argument, and, in any event, the confirmation of the AOA's plan of reorganization has rendered their arguments moot.

The Lujan Claimants' other arguments also fail. The McCarran-Ferguson Act, as a procedural statute, does not reverse or preempt the Bankruptcy Code in any respect. The Lujan Claimants fail to show clear error by the bankruptcy court in determining that the Plan satisfies the best interests test of section 1129(a)(7) of the Bankruptcy Code. The bankruptcy court also correctly found that the Plan properly classifies the Lujan Claimants in accordance with section 1122 of the Bankruptcy Code because their claims are substantially similar to others in the same class, and the Plan provides for the equal treatment of holders of Direct Abuse Claims in compliance with section 1123(a)(4) of the Bankruptcy Code. The

Lujan Claimants also argue that the Debtors violated certain notice requirements, but the Lujan Claimants lack standing to make these meritless arguments and fail to show that the bankruptcy court erred in confirming the plan.

All of the Appellants' remaining arguments on appeal are meritless and/or were not properly preserved for these Appeals.  The D&V Claimants argue that the Plan is not fair and equitable to current and future holders of Direct Abuse Claims, but this argument was waived below and, in any event, the Settlement Trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate remaining current, as well as future claims going forward.  Allianz and Liberty also fail to show that the bankruptcy court erred in approving the judgment reduction provisions in the plan.

## ARGUMENT

The court approved the Plan after nearly two years of mediation that produced overwhelming support from almost all creditor constituencies in the bankruptcy cases.  None of the Appellants' arguments support a challenge to the Plan.

## I.   The Certain Insurers Failed To Prove That The Bankruptcy Court's Good Faith Finding Is Clearly Erroneous

The Certain Insurers raise two challenges under section 1129(a)(3), arguing that the bankruptcy court: (a) erred in finding that the Plan was proposed in good

faith, and (b) confirmed a Plan that abrogates the Certain Insurers' rights under the Abuse Insurance Policies.  *See* D.I. 45 at 59-86.  Both challenges are meritless.

A plan is proposed in good faith when it "fairly achieve[s] a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (citation omitted).  "In its assessment, the [c]ourt should keep[] in mind [that] the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."  *W.R. Grace*, 475 B.R. at 87 (internal quotations and citation omitted) (alterations in original).  "The factors which a court should consider in determining a debtor's good faith include if the plan: (1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [reflects] a fundamental fairness in dealing with the creditors."  *Id.* at 87-88 (citation omitted).  Courts examine the "totality of the circumstances" when analyzing these factors, none of which is dispositive.  *W.R. Grace*, 475 B.R. at 88; *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (stating that the good faith inquiry "'requires an examination of all of the facts and circumstances and depends upon an amalgam of factors, none of which is dispositive'") (internal citation omitted).  "[T]hat there might be another plan, or even a better one, is not grounds to find a lack of good faith."  D.I. 1-3 at 239; *In re Tonopah Solar Energy, LLC*, No. 11844 (KBO), 2022 WL 982558, at *8 (D. Del.

Mar. 31, 2022) (affirming finding of good faith under section 1129(a)(3) "[e]ven assuming a better settlement could be reached"); *In re Spansion, Inc.*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) ("Even assuming the Alternative Rights Offering provides 'a better deal' for some creditors, the Debtors' refusal to accept the proposal does not, on its own, demonstrate 'bad faith.'") (citing *In re Celotex Corp.*, 204 B.R. 586, 611-12 (Bankr. M.D. Fla. 1996)).

"[T]he good faith determination is a factual inquiry" committed to the bankruptcy court's sound discretion as fact finder." *In re Exide Holdings, Inc.*, No. 20-11157 (RGA), 2021 WL 3145612, at *11 (D. Del. July 26, 2021). "It is recognized that [b]ankruptcy courts are in the best position to ascertain the good faith of the parties' proposals." *Id.*; *see also CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 57 (E.D. Pa. 1996) ("The Bankruptcy Judge was in the best position to assess the legitimacy and honesty of each party's proposal as well as the Plan's probability of success. The Court will not disturb findings with regard to those issues in light of the present record."). Consequently, bankruptcy courts have "considerable discretion" in making the "factually specific," "case-by-case" determinations involved in analyzing good faith. *See, e.g.*, *PWS Holding*, 228 F.3d at 242; *see also W.R. Grace*, 475 B.R. at 87. "[D]enial of bankruptcy relief based on a lack of good faith 'should be confined carefully and is generally utilized only

in…egregious cases.'" *In re Walker*, 628 B.R. 9, 17 (Bankr. E.D. Pa. 2021) (quoting

*In re Falch*, 450 B.R. 88, 93 (Bankr. E.D. Pa. 2011)).

A bankruptcy court's factual findings "may only be overturned if they are

'completely devoid of a credible evidentiary basis or bear[] no rational relationship to

the supporting data.'" *Fruehauf Trailer*, 444 F.3d at 210 (quoting *Citicorp Venture

Capital*, 323 F.3d at 232); *Burtch*, 698 F. App'x at 714 ("Clear error occurs only if

the bankruptcy court's finding is 'completely devoid of minimum evidentiary

support displaying some hue of credibility or bears no rational relationship to the

supportive evidentiary data.'" (internal quotations omitted)).

### A. The Bankruptcy Court's Good Faith Finding Is Not Completely Devoid Of Evidence, But Rather Is Supported By Overwhelming Evidence

The Certain Insurers' assertion that the bankruptcy court "never answered the

fundamental question whether the plan as proposed was in good faith" is incorrect.

D.I. 45 at 67.  The bankruptcy court found that the "Plan has been proposed in good

faith" and, as addressed below, did so based on the totality of the circumstances and

an overwhelming volume of evidence that was largely uncontroverted.  *See* D.I. 1-1

¶ II.D.

"The Supreme Court of the United States has specifically identified two

purposes of Chapter 11 as: (1) preserving going concerns; and (2) maximizing

property available to satisfy creditors."  *W.R. Grace*, 475 B.R. at 88 (*citing Bank of*

*Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)); *see also In re Thgh Liquidating LLC*, No. 19-2215 (RGA), 2020 WL 5409002, at *7 (D. Del. Sept. 9, 2020) (Andrews, J.) (One "honest" purpose in developing a plan of reorganization is to "maximiz[e] value for the Debtors, their estates, and their creditors."). The bankruptcy court correctly concluded that the Plan was proposed in good faith because it is consistent with the purposes and objectives of the Bankruptcy Code: "The Plan fosters a result consistent with the Code, is proposed for the purpose of reorganizing and delivers value to creditors." D.I. 1-3 at 239; D.I. 1-1 ¶ II.D.

The evidentiary record established that after filing the Chapter 11 Cases due to the "tremendous financial pressure" imposed by the sharp increase in the number of Abuse Claims, the BSA maintained two consistent objectives: (1) to timely and equitably compensate abuse survivors and (2) to emerge from bankruptcy with the capability to continue to carry out their charitable mission. *See* Bankr. D.I. 9280 ¶ 43 ("[T]he goal for the Debtors, a non-profit organization, has been to (a) provide an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse and (b) ensure that the Reorganized BSA has the ability to continue its vital charitable mission."); *id.* ¶ 55 ("[T]he Plan contains a series of compromises that represent a good faith effort to achieve consensual resolution, maximize recoveries for creditors, resolve Scouting-related Abuse Claims as a

whole, and provide recoveries for abuse survivors through the Settlement Trust."); Bankr. D.I. 9341 at 41:20-25 (Desai) ("[T]he organization, through the efforts of many of the insurers and chartered partners, and our local council partners have been able to forge a pathway…to emerge from this process while achieving the twofold objectives that the Boy Scouts of America set out to do, which were, one, to equitably compensate our victims, two, to allow the mission of Scouting to continue.").   The Insurers did not introduce any evidence refuting the BSA's honest intent to compensate creditors and to reorganize, nor could they do so. Thus, the bankruptcy court correctly credited the unrefuted evidence of the BSA's intention to reorganize through "a global resolution that balanced the competing interests of Chartered Organizations, Insurance Companies, and abuse survivors" and "provided the BSA with the opportunity to survive the Bankruptcy and fulfill its mission of Scouting."  Bankr. D.I. 9279 ¶ 23.

The Certain Insurers did not and cannot dispute that the BSA's plan to compensate survivors and reorganize the BSA is exactly consistent with the purposes and objectives of the Bankruptcy Code.  *See, e.g.*, *In re Maremont Corp.*, 601 B.R. 1, 20—21 (Bankr. D. Del. 2019) (finding that "providing a fair and equitable resolution" of the debtors' asbestos personal injury claims and "maximizing the returns available to creditors and other parties in interest" is a "legitimate purpose" of reorganization).  Consequently, the bankruptcy court did

not err in finding that "the Plan fosters a result consistent with the [Bankruptcy] Code, [and] is proposed for the purpose of reorganizing and delivers value to creditors." *See* D.I. 1-3 at 239; *see also* D.I. 1-1 § II.D.  As the bankruptcy court found, "[m]any survivors have been waiting for thirty, forty or even fifty years to tell their stories and receive a meaningful recovery.  This Plan makes that happen." D.I. 1-3 at 158.  "Overall, I find that the claims being compromised bring significant value to the estate, enabling Debtors to fund the Settlement Trust with substantial insurance proceeds in a timely fashion." *Id.* at 82.

When determining whether a plan is proposed in good faith, courts may "focus[] 'more to the process of plan development than the content of the plan.'" *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019) (quoting *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014)); *see also In re RTI Holding Co., LLC*, No. 20-12456 (JTD), 2021 WL 4994414, at *9 (Bankr. D. Del. Oct. 27, 2021) (quoting *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010)).  In this regard, courts routinely rely on the fact that a plan was formulated based on settlements in mediation in finding good faith.  *See, e.g., Exide Holdings*, 2021 WL 3145612, at *12 ("[T]he plan was premised on the court-appointed mediators' settlement proposal after lengthy arm's length negotiations. The global settlement was overwhelmingly supported by all key stakeholder…and was fully consistent with the

objectives of chapter 11....[T]he plan was proposed in good faith as a way to preserve the proposal made by the mediators."); *In re Peabody Energy Corp.*, 933 F.3d 918, 927 (8th Cir. 2019) ("[The] Debtors proposed their plan in good faith. The record shows that the Debtors mediated with their creditors to resolve a major dispute between those creditors. The Debtors reached a settlement with substantial input from the negotiating parties."); *In re Roman Catholic Archbishop of Portland*, No. 04-37154 (EP), 2007 Bankr. LEXIS 1180, *18–19 (Bankr. D. Or. Apr. 13, 2007) [D.I. 5065] at 13 ("I find that the plan has been proposed in good faith and not by any means forbidden by law. The plan is the result of months of negotiations and mediation, and has the support of the vast majority of the affected parties. There is no argument or evidence of bad faith or that the plan was proposed by means forbidden by law.").

The BSA's bankruptcy was a complicated one, involving tens of thousands of survivors and other creditors on the one hand, and numerous sophisticated insurers on the other. Since the outset of these Chapter 11 Cases, the BSA recognized the need for a court-appointed mediator to assist in navigating the "unique challenges" and "complicated legal and financial issues" and "foster[ing] productive settlement discussions among the relevant stakeholders." Bankr. D.I. 17 ¶ 6. With the tireless help of one or more of the bankruptcy court-appointed mediators, the BSA for almost two years engaged in hard-fought, good-faith, and

complex negotiations with more than twenty-five separate parties. See D.I. 1-3 at 24. Hundreds of formal and informal mediation sessions resulted in the filing of thirteen mediator reports. Bankr D.I. 2292, 2624, 5219, 5284, 5287, 6210, 7745, 7884, 7928, 8095, 8772, 9386, 10177. As discussed above, these mediation sessions produced settlements and resolutions that form the backbone of the Plan and provide at least $2.46 billion in cash and property plus significant unliquidated assets, including valuable insurance rights, to the Settlement Trust for the benefit of holders of Abuse Claims. *See supra* pp. 22-331.

On March 1, 2021, the BSA reached their first significant resolution—the JPM / Creditors' Committee Settlement—the terms of which are memorialized in the *First Mediators' Report* and incorporated into the terms of the Plan. *See* Bankr. D.I. 2292. This settlement provides critically important benefits to the BSA and its estate, including saving the estate millions of dollars of advisor fees. Bankr. D.I. 9280 ¶¶ 57-72.

Approximately one month later, the BSA reached an initial settlement with a major insurer, Hartford, the terms of which are memorialized in the *Second Mediators' Report*. Bankr. D.I. 2624. However, the terms of that settlement with Hartford were not acceptable to some of the survivor constituencies, including the Tort Claimants' Committee, so the BSA engaged in new and lengthy negotiations with Hartford and ultimately reached a new settlement agreement approximately

five months later, the terms of which are memorialized in the *Sixth Mediators'*
*Report* and Exhibit I-1 of the Plan.  See Bankr. D.I. 6210; D.I. 1-4, Ex. I-1.

Three months later, on December 14, 2021, the BSA achieved the Century
and Chubb Companies Insurance Settlement Agreement, the terms of which are
memorialized in the *Seventh Mediators' Report* and Exhibit I-2 of the Plan.  *See*
Bankr. D.I. 7745; D.I. 1-4, Ex. I-2. Within the next three weeks, the BSA reached
settlement agreements with the UMAHC (*see* Bankr. D.I. 7884; D.I. 1-4, Ex. J-2)
and two more of the BSA's insurers, Zurich Insurers/Zurich Affiliated Insurers and
Clarendon.  *See* Bankr. D.I.s 7928, 8095; D.I. 1-4 Ex. I-3, I-4.

On January 18, 2022, the Solicitation Agent filed a voting report showing
that 73.57% of the Class 8 Direct Abuse Claims had voted in favor of the Plan.
Bankr. D.I. 8345.  These initial voting results, however, did not deter the BSA's
efforts to seek a broader base of support for the Plan and mediated resolution of
disputes with certain constituents—including the Tort Claimants' Committee,
which at the time opposed the Plan and had been encouraging its constituents to
reject the Plan. *See* Bankr. D.I.s 7928, 8095; D.I. 1-4 Ex. I-3, I-4.  The BSA and
the Tort Claimants' Committee continued to negotiate, which finally resulted in a
resolution on February 10, 2022, the terms of which were supported by numerous
state court counsel for abuse survivors and ultimately incorporated into the Plan.
Bankr. D.I. 8772.  The TCC/Abuse Survivor Settlement led to an increase from

73.57% to 85.72% in support from survivors. *See* Bankr. D.I. 9275. Approximately one month later, and three days after the commencement of the confirmation hearing, the BSA reached a final, consensual resolution with the RCAHC, which prompted a number of Opt-Out Chartered Organizations to withdraw their elections to opt out of the Plan and instead become Participating Chartered Organizations under the Plan. *See* Bankr. D.I. 9386. The resulting support of the RCAHC and Roman Catholic Entities will support the BSA's second goal of these Chapter 11 Cases—namely, the preservation of Scouting. *See id.* The Certain Insurers and a tiny number of survivors are the only parties that would not settle.

As the bankruptcy court found:

> This is an extraordinary case crying out for extraordinary solutions. Two years of mediation by capable lawyers has yielded a Plan supported by Debtors, JPM, the [Creditors' Committee], the [Tort Claimants' Committee], the [Future Claimants' Representative], the Coalition, the Settling Insurers and 85.72% of Direct Abuse Claimants. The combination of the monetary and non-monetary aspects of the Plan are fair to the holders of Abuse Claims.

D.I. 1-3 at 168. The court also found that they were the result of "hard-fought negotiations with the help of seasoned mediators." *See* D.I. 1-3 at 155.

Good faith is further evidenced by the fact that the BSA then had the mediated arrangement documented by teams of top-tier professionals, including attorneys expert in bankruptcy, sexual abuse claims, mass torts and insurance, and

a team of economists experienced in mass tort settlements and claims adjudication. The bankruptcy court also relied on the fact that the BSA continuously tried to reach consensual resolutions with stakeholders.  D.I. 1-3 at 30-35, 49, 73.  Those tireless mediation efforts demonstrate good faith in seeking to achieve a consensual resolution.

The BSA's internal process further demonstrates its good faith.  The BSA is a charitable organization and operates largely through volunteers, including some of the most accomplished people in the country.  *See* Bankr. D.I. 9279 ¶¶ 6-9; SA 1; SA 5.  Mr. Desai, a volunteer member of the BSA's National Executive Board, the National Executive Committee, and the Bankruptcy Task Force, testified to the nearly 100 board and committee meetings where the numerous resolutions and settlements that culminated in the Plan were carefully reviewed and approved. Bankr. D.I. 9279 ¶¶ 2, 18.

> [D]uring [these] meetings, the NEB, NEC, and BTF reviewed presentations prepared by the Debtors' advisor team describing the various potential terms and provisions of the settlements that now constitute the terms of the Plan and highlighting the advantages and disadvantages of entering into such agreements. The factors considered included the contributions from the BSA and Local Councils to a Settlement Trust for abuse survivors, the parties included in the Plan, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitation, the costs required under the Plan, the conditions applicable to the Settlement Trust and the Trust Distribution Procedures, youth protection issues, trust governance, the alternatives to entering into the Plan, and the risks of achieving a successful confirmation of a plan of

reorganization. The Plan was approved only after careful deliberation of these and other considerations.

*Id.* ¶ 20.

Those experts formulated the terms of the TDP to replicate the BSA's prepetition claim resolutions. *See infra* at pp. 55-57. The BSA further acted in good faith by proposing the highly respected former bankruptcy judge Barbara Houser to administer the Settlement Trust. Bankr. D.I. 9309 ¶¶ 9-10; Bankr. D.I. 9273 ¶¶ 49-50; D.I. 1-3 at 36; D.I. 1-4, Ex. B § 5.1. Establishing a settlement trust designed to provide fair, expedited, and cost-effective compensation to survivors of childhood sexual abuse, funded with the assets available to the BSA, is a paradigm of honesty and good intentions for the bankruptcy cases. *See In re Maremont Corp.*, 601 B.R. at 20-21 (finding that plan "providing a fair and equitable resolution" of the debtors' asbestos personal injury claims and "maximizing the returns available to creditors and other parties in interest" was proposed in good faith).

The Plan's fundamental fairness to creditors is likewise demonstrated by the overwhelming creditors' support. *See* D.I. 1-3 at 164. Every major creditor constituency supports the Plan, including over 85% of survivors, the two statutory committees (the Tort Claimants Committee and the Creditors' Committee), the Coalition, the Future Claimants' Representative, the Local Councils, a number of Chartered Organizations (including the United Methodist Entities and Roman

49

Catholic Entities), and four of the BSA's primary and excess insurers.  *Id*. at 164, 56. As the bankruptcy court stated, "[t]here are 82,209 claimants whose views need to be considered, and as I said previously, in the context of this case, I consider 85% to be overwhelming acceptance." *Id.* at 164.

The bankruptcy court also balanced confirmation of the Plan against the alternative: "[w]ithout this Plan, litigation goes one of two ways…Claimants may race to courthouses across the country suing Local Councils and Chartered Organizations" or they would "recover only the pennies that a BSA-only bankruptcy plan would bring."  D.I. 1-3 at 164-65.  In addition, when parties sought to terminate the BSA's exclusive period to file a plan of reorganization, the bankruptcy court stated that "to solicit a plan that has no abuse survivor support is not an attractive option, but neither is engaging in protracted litigation that has the potential to…end the Boy Scouts as it currently exists."  Bankr. D.I. 4716 at 100:24-101:3.

The Insurers are not creditors.[22]  Rather, the Certain Insurers issued policies to the BSA, which are property of the estate, and also Local Council Policies, which are property of the estate once assigned to the BSA.  D.I. 1-3 at 87 ("The BSA Insurance Policies were purchased by the BSA.   Any Local Council

---

[22]  Some of the Insurers have filed proofs of claim on account of alleged secured and/or unsecured claims. But the Insurers are not raising good faith objections in that capacity and are being paid in full.

Insurance Policies, once assigned to the BSA in connection with the Plan, will be property of the estate."). And one honest purpose in reorganization is to maximize the assets of the estate. *Thgh Liquidating*, 2020 WL 5409002, at *7. Nonetheless, the BSA dealt with all insurers fairly, preserving their policy terms and coverage defenses, which places them in the same position under the Plan that they would be in outside of the Plan, where they will have to pay any claims presented to them only if they are covered by their policies and not otherwise subject to a coverage defense.

*   *   *

In short, the bankruptcy court's finding of good faith is not "completely devoid" of evidence, but rather is supported by essentially all of the evidence. The Certain Insurers ignore virtually all of the record evidence relevant to the issue. Their arguments are instead either wholly unsupported by the evidence, or supported only by evidentiary fragments that are incompetent, unpersuasive, and contrary to the overwhelming weight of evidence. An appeal is not an opportunity to ask for a reassessment of evidence, other than to determine whether the trial court's findings are "completely devoid of an evidentiary basis." *See Tonopah Solar Energy, LLC*, 2022 WL 982558, at *5. But none of these fragments of evidence could even support a finding of bad faith, much less require one.

**B.     The Certain Insurers' Argument That The Bankruptcy Court Did Not Consider The Evidence As A Whole Is Unsupported And Incorrect**

The Certain Insurers' claim that the bankruptcy court "analyzed the record evidence piecemeal, concluding that [the evidence]…did not in isolation demonstrate a lack of good faith" is a fabrication.  D.I. 45 at 67.  The bankruptcy court made no such statement, nor did it give any indication that it was somehow viewing evidence in isolation—and it is not clear how a judge could view six weeks of evidence in isolation.   To the contrary, on the first page of the Confirmation Opinion, the bankruptcy court stated that "[t]hese findings of fact draw on the trial testimony and the admitted exhibits."  D.I. 1-3 at 1 n.1.  In this regard, the bankruptcy court specifically said that it considered the testimony of twenty-six witnesses, including "portions of six video depositions," "over one thousand exhibits," "designated and counter-designated portions of eight depositions," and "six days of oral argument."  D.I. 1-3 at 56.  Indeed, the bankruptcy court analyzed and cited to the record evidence hundreds of times,[23] and explicitly stated that its findings of fact were drawn "on the trial testimony and the admitted exhibits" and made "based on the record," which is the aggregation of all of the evidence

---

[23]  The Confirmation Opinion contains 765 footnotes, a sizeable portion of which cite evidence from the trial record.  The section of the Confirmation Opinion addressing the Debtors' satisfaction of section 1129(a)(3) alone contains approximately fifty citations to the evidentiary record (*i.e.*, references to declarations, submitted evidence and trial testimony).

admitted at trial.   D.I. 1-3 at 1 n.1, 56, 189 n.558.   The totality of evidence considered by the bankruptcy court addressed the Plan negotiations, the fact that the Plan was negotiated in mediation, the terms of the Plan, the TDP, including the Claims Matrix, the professionals that had structured and documented the arrangement, the careful consideration of the BSA's board and committees, the views of representative survivors, and the support of every major constituency in the case.  *See supra* at pp. 22-35.

The bankruptcy court also relied on the fact that the Certain Insurers had introduced no evidence supporting their allegations of bad faith:

> I was underwhelmed with, I don't know if that's the right word, the lack of evidence of bad faith, if you will, on this record.  I heard the testimony and I didn't see anything to support this objection or to support the insurers' position on this….So I am with [the Debtors] on this.

Bankr. D.I. 9616 at 44:18-45:1; *see also id.* at 61:12-62:6 (Court: "*I'm not persuaded* by [the Certain Insurers' argument regarding the bad faith of the proposed trust mechanism] either." (emphasis added)); D.I. 1-3 at 216 ("Based on this record…I cannot find that Debtors…proceeded in bad faith.").   Thus, the bankruptcy court's factual finding is overwhelmingly supported by the totality of the evidence.

The Insurers' argument that the bankruptcy court considered each piece of evidence in isolation is based on the bankruptcy court's finding that "I reject out-

of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation."  D.I. 1-3 at 223; *see also* D.I. 45 at 67.   The use of the word "alone" did not mean that any evidence was viewed in isolation.   Rather, the bankruptcy court used the word "alone" in responding to the Certain Insurers' argument that the explosion of claims "alone" provided grounds for denying confirmation.  *See* D.I. 1-3 at 223 (The Certain Insurers argue "that this 'explosion' of claims alone is grounds to deny confirmation of the Plan.").   Likewise, the Insurers' "see also" cites neither state, nor reflect, that the bankruptcy court somehow viewed each piece of evidence in isolation.  *See* D.I. 45 at 67 (citing D.I. 1-3 at 216, 221-24, 231, and 233-34).

> ### C.   The Certain Insurers' Spin On Fragments Of Evidence Does Not Prove Clear Error Or Even Support Their Requested Finding Of Bad Faith

The Certain Insurers' shotgun approach of making arguments that are unsupported by evidence, and citing fragments of incompetent or unpersuasive evidence, does not even support a finding of bad faith, much less prove clear error. Under any reading, the bankruptcy court's finding of good faith is not "completely devoid" of evidence, but rather is supported by the overwhelming weight of competent evidence.  For sake of completeness, however, the BSA responds below to each of the Certain Insurers' arguments.

1.      **The Certain Insurers' Argument That The Plan Was Not Proposed In Good Faith Because It Inflates Claim Values And Requires The Certain Insurers To Pay Them Is Incorrect And Unsupported By Evidence**

The Certain Insurers' core challenge to the Plan is based on an incorrect argument that Judge Houser will award "inflated claim values" that are "worlds apart from BSA's prepetition claims history[,]" which the Certain Insurers will be required to pay.  D.I. 45 at 2, 5, 60-68, 72-74.  The Certain Insurers introduced no evidence to support those arguments, much less to prove that the bankruptcy court committed clear error in not adopting their incorrect positions as findings of fact.

a.      **The Plan Does Not Inflate Claims**

The evidence is that the Settlement Trust is intended to replicate the BSA's prepetition claim history, not inflate the value of the claims.  Bankr. D.I. 9309 ¶¶ 9-10; Bankr. D.I. 9273 ¶¶ 49-63.  The lead developers and drafters of the TDP and related documents were law firms and an economist firm.  *See generally* Bankr. D.I. 9309; *see also id.* ¶ 12.  One of the lead attorneys was Mr. Azer, and the economist team was led by Dr. Bates.  Mr. Azer and Dr. Bates met repeatedly with Mr. Griggs (the BSA's national coordinating counsel) to understand and document the BSA's prepetition practices and experiences.  Bankr. D.I. 9309 ¶ 4-10; Bankr. D.I. 9273 ¶¶ 49-50.  Mr. Azer testified that he and teams of lawyers drafted the TDP, including criteria for claims and mitigating and aggravating factors, based on the BSA's prepetition practices and experiences.  Bankr. D.I.

9309 ¶¶ 4-10.   Mr. Griggs also testified that the TDP is consistent with the BSA's prepetition practices and experiences, which he in fact determined and supervised. Bankr. D.I. 9273 ¶¶ 9, 52-63.   The Certain Insurers introduced no evidence to refute Mr. Griggs's testimony about prepetition practices and experience, or Mr. Azer's and Mr. Griggs's testimony that the TDP is consistent with those prepetition practices.

The Claims Matrix, the section of the TDP that provides guidance as to valuing claims, was formulated by the economist team, led by Dr. Bates.  Dr. Bates and his team have vast experience in structuring trust distribution procedures in mass tort cases.   Bankr. D.I. 9454 at 95:6-22.   Dr. Bates testified that his assignment was to design the TDP base matrix values and scalars that were based on and consistent with the BSA's historical abuse settlements and litigation outcomes.   Bankr. D.I. 9455 at 31:22-32:7.  He further testified that the TDP base matrix values and scalars were designed to be used by the Settlement Trustee  to emulate the tort system and replicate the values that Abuse Claims would have received had they been litigated outside of the Chapter 11 Cases.  Bankr. D.I. 9454 at 96:14-20.   Dr. Bates testified unequivocally that, in his expert opinion, the combination of base values and scalars set forth in the TDP were consistent with the BSA's historical abuse claim settlement values.  Bankr. D.I. 9454 at 226:1-4.

> The base matrix values and scal[a]rs that are at hand for the trustee to
> be able to valuate the individual claims and assign to them appropriate

values that would be consistent with those claims as if they were filed in the tort system, but perhaps even better than that in that they would be able to be consistently applied and equitably applied across all of the claimants by having the same procedures used for all of them.

Bankr. D.I. 9454 at 98:2-9.

The Certain Insurers complain that the prepetition claim pool is different from the post-petition claim pool, but the TDP specifically accounts for those differences through mitigating and aggravating factors and scalars to ensure that new claims are treated consistently with prior practices. Bankr. D.I. 9454 at 207:15-209:12, 223:11-224:12; Bankr. D.I. 9455 at 33:2-5; *see also* Bankr. D.I. 9406 at 294:10-295:11 (Azer); D.I. 1-4, Ex. A., Art. VIII.C-D.  Dr. Bates testified that because of the differences between the claims pools, the average post-petition claim is estimated to be lower than the average prepetition claim.  Bankr. D.I. 9454 at 164:11-14 ("[T]he average value of the claims in the POC, the abuse claims, will be lower than what we saw historically."); *Id.* at 135:13-15 ("[T]he value of the abuse claims will on average be much lower than the historical claims"); Bankr. D.I. 9455 at 42:16-43:3; Bankr. D.I. 9454 at 209:8-10 ("[M]ost of the claims will, to emulate the tort values, be scaled downward from the base matrix values…by design."); *see also* Bankr. D.I. 9455 at 42:16-43:3.   And the bankruptcy court credited Dr. Bates's unrebutted opinion that the TDP will result in awards at lower average values, not inflated values:

> The result of [Dr. Bates's] thought experiment confirmed his view that the value of a Direct Abuse Claim, on average, will be less than the average value of Historical Abuse Claims although the aggregate of such claims could be significant…Dr. Bates' analysis was thorough and credible based on the data available.   It was also undisputed….Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims.

D.I. 1-3 at 63-65.

The fact that the TDP does not provide for inflated claim values was also confirmed by Michael Burnett of Burnett Risk Control International, LLC, an expert, who opined on the reasonableness of the TDP based on his experience evaluating and assessing sexual abuse claims in litigation for over 26 years.  Bankr. D.I. 9274 ¶ 5.  Mr. Burnett has evaluated and valued thousands abuse claims, including over 500 abuse claims in the last year alone, and testified that the TDP is reasonable.  Bankr. D.I. 9274 ¶ 6; Bankr. D.I. 9389 at 42:1-3 ("[M]y opinion is that the TDP mimic what you might get in the tort system and I believe that the TDPs are reasonable.").

The Certain Insurers introduced no evidence contradicting the testimony of these percipient and expert witnesses, or otherwise to support their argument that future claim values will be inflated.   Indeed, the Insurers mostly embraced Dr. Bates's analysis.   Bankr. D.I. 8819 at 90:2-7 (Certain Insurers' Counsel: "Mr. Kornfeld is right about one thing, the [insurers] do like Dr. Bates' opinion, but he's

wrong about why we like them, we like them because they're the truth."); Bankr.

D.I. 9177-1 ¶ 17 ("Dr. Bates's valuation opinions are reliable and relevant, were

timely and properly disclosed, and should be fully considered by this Court."); *id.*

¶ 31 ("Dr. Bates's opinions with respect to selection bias are supported by

published economic literature, his analysis of the historical tort population

compared to the abuse claims, and his own experience in other mass tort contexts

and should be considered by this Court.").

Importantly, the Insurers retained an economist to try to rebut Dr. Bates, but

did not offer that defective testimony.   D.I. 1-3 at 221 (the "Certain Insurers

retained an expert to opine on the TDP….The Certain Insurers, however, chose not

to use their expert during the confirmation hearing to support their argument that

the TDP produce over-inflated values.").  Accordingly, the bankruptcy court found

the Insurers' position "underwhelm[ing]":

> The Certain Insurers could have chosen to put on their expert to
> challenge the Base Matrix Value or otherwise clear up any confusion,
> but they did not. This appears to be all optics. Any misperception,
> especially when the Certain Insurers chose not to challenge the Base
> Matrix value through their own expert, is not so egregious as to deny
> confirmation.

D.I. 1-3 at 222; Bankr. D.I. 9616 at 44:18-45:1.

Now, lacking any affirmative evidence to support their appeal, the Insurers

assert that the BSA's supporting testimony is not "reality," D.I. 45 at 28, but cite to

evidence that does not even address whether the TDP and Claims Matrix replicate

prepetition practices or will result in inflated claim values, much less that disproves the uncontroverted testimony of four different witnesses that the bankruptcy court found credible.  *See* D.I. 1-3 at 65, 68, 220, 234-35.

The Certain Insurers' speculation about inflated awards also fails to explain why Judge Houser, a highly qualified and well-respected former bankruptcy judge, would set aside her duties and issue inflated awards.  Furthermore, the very existence of a Settlement Trust minimizes the risk of inflated awards because the childhood sexual abuse claims at issue here would otherwise be subject to jury trials, where awards for these emotionally charged claims have been huge.  *See* Bankr. D.I. 9274 ¶ 48 (Burnett) ("In my experience, the detailed, well-founded, defined and extensive criteria of the Matrix and Scaling Factors in Article VIII [of the TDP] would be welcome by both defendants and their insurers.  They provide a tangible and predictable basis for claim valuation in a way that avoids a volatile and emotionally-charged jury trial in the tort system."); *id*. ¶ 54 (Burnett) ("[Settling sexual abuse claims for less than full value amounts] constitutes a leverage against the risk of a court's potential denial of a motion to dismiss or motion for summary judgment, with the potential for the making of 'bad law;' especially since abuse claims are fraught with emotion and often are personally offensive to judges."); *see also* Bankr. D.I. 9273 ¶ 32 (Griggs) ("Settlement provided a more consistent way to value and settle cases.  Generally, we did not

consider a jury trial to be a favorable forum for claims involving allegations of childhood sexual abuse, both with respect to determinations of liability as well as for determinations of damages."); Bankr. D.I. 9354 at 176:8-16 (Griggs) (testifying that the BSA faced a $20 million verdict in a jury trial for a single sexual abuse case in Portland); Bankr. D.I. 9389 at 232:11-233:6 (Burnett) (testifying that the Diocese of Rockville Center in New York faced a combined $11 million verdict in a case involving two teenage victims of sexual abuse, and anecdotally recalling that the Diocese of Burlington in Vermont was subject to "very large verdicts" after losing cases in trial).

### b. The Plan Does Not Require The Insurers To Pay Awards

The Certain Insurers' argument that the Plan requires them to pay future inflated awards—the sole interest they could have in this case—is also incorrect. The bankruptcy court held that Certain Insurers would not be bound by the awards issued by the Settlement Trust: "the allowed amount of a claim does not necessarily correlate to what an insurer is 'obligated to pay' or what 'a loss' is under its insurance policy and 'a finding in the plan' does not equate the two." D.I. 1-3 at 188. Rather, the bankruptcy court held, a future court will determine whether awards are covered by any particular insurance policy to the extent that there is a dispute in the future about that matter:

61

> The Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy *conditions precedent or obligations under such policies* (other than, in the case of the BSA Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each such policy in subsequent litigation.

D.I. 1-1 ¶ II.I.2(e) (emphasis added); *see also* D.I. 1-3 at 187 ("What insurers are obligated to pay under their policies is an insurance coverage issue that is not before the court."); *id*. at 231 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered."); *see also* Bankr. D.I. 9530 at 81:11-19 (Harrington) ("What will be determined in a coverage court…would be whether or not that breach should in fact resolve or allow the parties seeking recovery to get the money from the insurance company despite the breach.").

Moreover, as acknowledged by the bankruptcy court, the Plan explicitly preserves any defenses that the Certain Insurers may have:

> Except for the Insurance Assignment (and subject to paragraph II.I.2 of [the Confirmation] Order), or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by this Court in the Confirmation Order, **nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations,** if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision

> thereof, **shall be determined pursuant to the terms and provisions of the Insurance Policies** and applicable law**.**

D.I. 1-1 ¶ 48 (emphasis added); *see also* Bankr. D.I. 10288 at 27:11- 28:3 (Court: "There are defenses.  We need to make sure those are preserved and it will have the effect that it has.").

These protective insurance provisions are mirrored in the TDP.  Specifically, Article V.C of the TDP provides that nothing in the TDP modifies, supplements, or amends the insurance policies:

> Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order.

D.I. 1-4, Ex. A, Art. V.C.

Further, the BSA consistently testified that they did not intend to bind the Insurers or otherwise prejudice their right to raise coverage defenses, a false premise for the Certain Insurers' appeal:

> Q:    Did the debtors intend for the TDP[] to impair or change in any way the insurers' rights, whatever they might be, under their policies?
>
> A:    Absolutely not.  That's why we were negotiating so hard for Article 5(c) in the language in there.
>
> Q:    Did the debtors intend for the settlement trustee's determinations to be binding on the insurers?

> A:    No…again, we weren't trying to prejudge anyone's rights insurers or otherwise.  That is for a coverage [court]…we did not mean for that to have any effect.
>
> Q:    Did the debtors intend for the settlement trustee's determinations to bind future court in any potential coverage litigation?
>
> A:    No…we did not.

Bankr. D.I. 9406 at 46:5-18 (Azer); *see also id.* at 40:18-42:19; 63:7-20; 149:6-150:8; 291:2-292:11.

Consequently, if the Insurers are correct in their crystal ball argument that awards will be inflated (and they are not), then they will be able to defend against coverage to the same extent they would have been able to defend against coverage for a settlement made without a trust.  Courts have recognized that this is enough to protect insurers.  *See W.R. Grace*, 446 B.R. at 132 ("[T]he mere fact that the Trust pays a claim does not bind the non-settling insurer to bind the Trust.  The insurer retains its right to object to the claim against it if and when the Trust seeks to recover from the insurer.").

What the Insurers are concerned about is not that the bankruptcy court bound them—it indisputably did not—but that a court in the future will find that an award issued through this well-constructed Settlement Trust by a former bankruptcy judge is reasonable.  The bankruptcy court correctly held that whether "an insurance coverage court will find any relevance to ['the award'] is for that

court to consider." D.I. 1-3 at 188. But the fact that awards are likely to be reasonable is not a ground for challenging the Plan and preventing the BSA from compensating survivors of childhood sexual abuse.

The Insurers also argue that the survivors' counsel were seeking "the Holy Grail" of binding Insurers to pay awards, and that plaintiffs' lawyers "will continue to attempt in other mass tort bankruptcies" to bind insurers to trust awards, "unless halted by the courts." D.I. 45 at 65. But the Plan includes no such term, so there is nothing for this Court to halt. Indeed, the BSA never proposed a plan that would bind the Insurers to pay awards (or release them from their obligations). The Certain Insurers cannot eliminate compensation to tens of thousands of abuse survivors so they can fight terms that they speculate might be included in some future plan of reorganization of some other debtor.

### c.    The Plan Is Not Designed To Leverage The Insurers

The Certain Insurers' repeated argument that the Plan is designed to create "hydraulic pressure to settle" is irrelevant and incorrect. It is irrelevant because there is no confirmation objection based on whether a plan creates pressure to settle. The Certain Insurers' reliance on *Newton* is misplaced. D.I. 45 at 6, 64, 88. *Newton* is not a bankruptcy case or a mass tort case, and did not address

confirmation, good faith or settlement, or remotely suggest that leverage to settlement is relevant to any confirmation requirement.[24]

The Certain Insurers' hyperbolic characterization of the Plan as having been designed to point "an 82,000 claim bazooka at Insurers [to] create[] 'hydraulic pressure' to settle that serves no legitimate purpose" is incorrect because it is based on the faulty premise that they are bound by future awards. *See* D.I. 45 at 6. It is also contradicted by the record. There is no evidence that the Plan was intended to leverage the Certain Insurers to settle, and the argument does not even make sense because the Insurers have proven themselves to be utterly immune to efforts to achieve a settlement. As the bankruptcy court found based on an overwhelming volume of evidence, the Plan was designed to serve the legitimate purpose of compensating survivors of childhood abuse in a cost-effective and expedited way,

---

[24] *Newton* addressed a district court's decision to deny class certification and certify an interlocutory appeal. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001). The Third Circuit held that the district court did not abuse its discretion in not certifying a class because common issues did not predominate and the class action vehicle was not superior, among other reasons, where there would be "hydraulic pressure" to settle and "determining actual injury would require hundreds of millions of individual assessments." *Id.* at 192. Even as to class certification, the court rejected the notion that leverage to settle is problematic: "We do not want to be misunderstood as saying that class actions are bad because they place pressure on defendants to settle. That pressure is a reality, but it must be balanced against the undoubted benefits of the class action that have made it an authorized procedure for employment by federal courts." *Id.* at 167 n.8 (quoting *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995)).

and to allow the Reorganized BSA to continue its charitable mission of teaching scouting skills and morals to America's youths. *See supra* pp. 42-43. The notion that the parties formulated a record-breaking trust, funded primarily by insurance companies, not to compensate survivors fairly, but somehow to leverage the remaining Insurers—meaning that insurance companies contributed approximately $1.656 billion not to settle liabilities under their own policies to pay claims of survivors, but rather to leverage the Certain Insurers to add money to the Settlement Trust—is facially absurd. Moreover, the Certain Insurers have no right to prevent the parties from settling, regardless of whether or not they, as the only parties refusing to provide anything to resolve claims, feel leveraged to settle (while not actually settling).

*   *   *

The unrefuted evidence is that the BSA had no "intention of diluting, in any fashion, the contract provisions protecting against an impairment or change in the insurers' rights and policies." Bankr. D.I. 9406 at 292:12-16.

> The Operative TDP were designed by the Debtors to emulate, to the greatest extent practicable, the prepetition practices of the BSA and its insurance companies for investigating, evaluating, valuing, and resolving Direct Abuse Claims, while simultaneously preserving all of the rights of the Non-Settling Insurance Companies to dispute and litigate coverage issues with the Settlement Trust.

Bankr. D.I. 9309 ¶ 5; *see also* Bankr. D.I. 9406 at 292:17-293:11, 293:20.

### 2. The Bankruptcy Court Did Not Err In Relying On The Testimony Of A BSA Witness, Nor Was That The Sole Basis For The Bankruptcy Court's Good Faith Finding

The Insurers' argument that the bankruptcy court determined that the "BSA had not colluded with claimant representatives when drafting Plan provisions on the sole basis that the BSA's counsel [Mr. Azer] testified that he believed he successfully negotiated with claimants to protect Insurers' right" is irrelevant and incorrect.  D.I. 45 at 52.  It is irrelevant because it is not clear error to rely on the unobjected to testimony of a percipient witness.  Thus, the Insurers' argument that the bankruptcy court erred in "rely[ing] on" or "emphasizing" the testimony of a percipient witness about the BSA's work to protect Insurers' rights is puzzling. D.I. 45 at 75.

The Insurers' argument is incorrect because the bankruptcy court did not rely solely on Mr. Azer's testimony, but also relied on the contemporaneous documents introduced as trial exhibits that confirmed his testimony, the fact that the Plan was formulated in a nearly two-year mediation, the terms of the Plan, and the testimony of other percipient witnesses.  *See supra* pp. 31-32, 45-52.  And the bankruptcy court relied on its factual finding that the "Certain Insurers' argument that Debtors colluded with the Coalition, rather than negotiated with the Coalition, is wholly unsupported by the record."  D.I. 1-3 at 217.  Indeed, the accusation was conclusively refuted by the record.  Notably, the Insurers were provided with

access to the mediation documents and the drafting history, so they fully know that their allegations of collusion are baseless.

> **a.    The Insurers' Argument That The Survivors Drafted The TDP And Claim Matrix Is Unsupported And Incorrect**

The Certain Insurers based their accusations of bad faith on their allegation that the BSA had "turned over the pen" on the TDP to the survivors, and never negotiated at all.  Indeed, the Certain Insurers were successful in invading mediation privilege based on those false accusations.  D.I. 1-3 at 213 ("Because of their allegations of bad faith, I permitted insurers to take discovery into the mediation process with respect to the development of the TDP.").  The Certain Insurers also argued that the protections for the Insurers "were nearly always gutted or removed by the claimants' attorneys…[a]nd BSA allowed it to happen." D.I. 45 at 40.  The Certain Insurers' allegations are demonstrably wrong.

Mr. Azer was a lead drafter of the TDP, and he testified that BSA had the pen, not the survivors, and that he never gave up control of the documents to the survivors or anyone else. Bankr. D.I. 9309 ¶ 7; Bankr. D.I. 9406 at 298:11-21 (Azer) (Q: And had the debtors ceded control of the plan process to the coalition, TCC, and FCR? Azer: No, absolutely not…Like I said throughout my testimony, we were playing it straight down the fairway, trying to protect everyone's rights, including insurers' contractual rights.").  Indeed, Mr. Azer testified that the

survivors had no input into the initial draft, and that the BSA rejected the survivor model.  Bankr. D.I. 9309 ¶ 15 ("The Debtors rejected the February Term Sheet and instead filed multiple drafts of the TDP that were directly contrary to the terms required in the February Term Sheet.").   And Mr. Azer's testimony was fully supported by the contemporaneous records.  D.I. 1-3 at 213; Bankr. D.I. 9406 at 37:20-48:14; Bankr. D.I. 9309 ¶¶ 14-23; A11673; A11696; *see also* SA 2146, SA 2176, SA 2196, SA 2197, SA 2246, SA 2267.

Mr. Azer testified, and the bankruptcy court found, that he and other counsel for the BSA drafted the initial TDP based on a model provided by an insurer, then an adversary, not the survivors.  Bankr. D.I. 9406 at 37:20-38:1; D.I. 1-3 at 214. The BSA also relied on other mass tort bankruptcy trust distribution procedures. Bankr. D.I. 9406 at 39:13-24.  With those templates as a starting point, the BSA created trust distribution procedures with the goal of emulating, to the greatest extent practical, the BSA's prepetition practices for resolving sexual abuse claims. Bankr. D.I. 9309 ¶¶ 5, 9, 42-44; Bankr. D.I. 9406 at 73:5-9.  To do so, Mr. Azer consulted with Mr. Griggs who provided the extensive, real-world background that informed (a) the criteria for determining claim validity, and (b) the types of aggravating and mitigating factors considered by the BSA in resolving abuse claims on a prepetition basis.  Bankr. D.I. 9309 ¶¶ 9, 10; Bankr. D.I. 9273 ¶¶ 49-50.  "The Debtors exercised good faith throughout the whole process, taking into

consideration both the interests of the Direct Abuse Claimants and the Non-Settling Insurance Companies.  The BSA never ceded control of the TDP… to any other party (be it a claimant constituency or an insurance company) or colluded with any third party to prejudice the rights of another."  Bankr. D.I. 9309 ¶ 7.  Mr. Azer's testimony was irrefutable, and the Insurers did not even question him at trial about the fact that he had the pen on the TDP, notwithstanding their months' long accusations against him.

The BSA also relied on its expert consultant, Bates White, economists with deep expertise and experience on trust distribution procedures and claim valuation, to identify base claim values, as well as the amount of the scaling and mitigating factors, that would produce results consistent with the BSA's prepetition practices. Bankr. D.I. 9309 ¶ 12; *see supra*, pp. 56-58.  The Bates White team developed the Claims Matrix based on the BSA's data for prepetition claims resolutions and comprehensive statistical modeling and analyses.  Bankr. D.I. 9454 at 201:10-230:5.  "Dr. Charles Bates, chairman of Bates White LLC and Debtors' retained expert was qualified without objection as an expert in claim valuation, mass tort matrixes and trust distribution procedures.  He spent eight hours on the stand." D.I. 1-3 at 58.  "Dr. Bates's analysis was thorough and credible based on data available.  It was also undisputed.  No other expert testified on the aggregate valuation of the Direct Abuse Claims."  *Id.* at 65.  The bankruptcy court found:

Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for the purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims.  Accordingly, I conclude based on the record of evidence presented and the information known to date regarding the Direct Abuse Claims, that the aggregate valuation of the Direct Abuse Claims is most likely between $2.4 billion and $3.6 billion.

*Id.* at 65-66.

> **b.**   **The Insurers' Argument That The BSA Did Not Protect Them Is Unsupported And Incorrect**

The evidence also proves that the BSA did protect the interests of the Insurers, even though the Insurers were not settling.  Bankr. D.I. 9309 ¶ 26; Bankr. D.I. 9406 at 40:18-42:19.  The written contemporaneous record proves that Mr. Azer negotiated against the Coalition, persistently including protections for the Insurers after they had been stricken by the Coalition.  Mr. Azer painstakingly walked the bankruptcy court through multiple versions of negotiated TDP drafts, demonstrating how and where the BSA protected any existing rights of the Insurers.  Bankr. D.I. 9309 ¶¶ 27-41; D.I. 1-3 at 214 ("Counsel for the Certain Insurers walked Mr. Azer through the TDP (and, various redlines) in minute detail by focusing on provisions that were modified or eliminated after negotiations with counsel for the Coalition …Mr. Azer testified that he believes [the language in Article V.C of the TDP] encompasses all of the language that was deleted in the numerous provisions in the TDP and achieves his goal of preserving the Insurers' rights under their contracts." (citations omitted)).

72

The Certain Insurers' argument that the BSA was buying votes from survivors by settling is unsupported by evidence. The fact that the BSA negotiated a settlement with survivors demonstrates good faith, not bad faith. Negotiations for plan support do not prove, or remotely support, bad faith. Debtors negotiate with creditors in every case and need creditors' support for a consensual plan of reorganization. As the bankruptcy court noted, "Debtors are supposed to negotiate plans, as are official committees (*i.e.*, the [Tort Claimants' Committee]). Other constituencies are often involved." D.I. 1-3 at 178. The BSA could not dictate the terms of an agreement with survivors, so the BSA negotiated in mediation with stakeholders who were willing to engage. Bankr. D.I. 9309 ¶ 20. Mr. Azer testified that "[t]he insurers were not willing to engage constructively to seek a mutually agreeable resolution with any sort of creditor support." *Id.* ¶ 47. "They did not provide input into the [TDP]. Instead, so the emails we got back from the insurers, and this is in the record. But the insurers basically refused to provide comments. They threatened us with kind of multi-year litigation if we proceeded." Bankr. D.I. 9406 at 47:11-15.

Despite the Certain Insurers' unwillingness to cooperate, the BSA continued to revise the Plan and the TDP in a manner that would preserve the Certain Insurers' contractual rights. The BSA only included changes proposed by the Coalition to the extent such revisions were consistent with BSA's prepetition

settlement practices, and rejected any proposed revisions that were inconsistent with such practices. Bankr. D.I. 9309 ¶ 11.

> That was actually probably the hardest part of the negotiation and, the most significant part of the negotiation.  So they kind of fell into two buckets. . . . The first bucket dealt with the process of the [TDP], like how the trustee would evaluate claims. . . .   And then there was a second – second line of negotiations relating to what was the no modification of insurance rights, which is now the assignment of insurance rights provision, which is Article [V.C] of the TDP.  We had lots of negotiations around putting in and keeping protective language that made sure that we weren't modifying, amending, or supplementing the insurers' contractual rights.

Bankr. D.I. 9406 at 40:20-42:19 (Azer).   Notably, the BSA never stopped negotiating and working to address concerns expressed by the parties. For example, the BSA made additional revisions to Article V.C to address specific concerns raised by the Insurers with respect to the treatment of self-insured retentions and to provide less favorable treatment for the statute of limitations in Pennsylvania, even though the Insurers provided nothing in return.  Bankr. D.I. 9309 ¶¶ 36-37, 49.

After numerous exchanges of drafts over several months, the parties agreed to plan terms providing that none of the Insurers' rights or obligations were being modified, and preserving any coverage defenses they had.  Bankr. D.I. 9309 ¶¶ 27-41.  The Plan proves that those protections demanded by the BSA, and repeatedly rejected by the Coalition, are included.  *See supra at* pp. 70-73.  There were drafts that repeated the same protection in multiple provisions, but ultimately the

74

protections were consolidated because repetition added nothing and "the broad general protections in Article V.C would be clearer, less ambiguous, and protected the interests of Non-Settling Insurance Companies."

> I actually think it ended up being ambiguous, right.  Using the principle of specific over the general, people thought it was confusing for me to try to identify every provision that applied versus having the general, which was meant to cover all of it. . . .   So the reason we took it out is people were like, 'Well, wait a minute.  If you don't identify in each provision it may apply, how do you know it doesn't apply?  Just have it in a catchall.  . . .  I think people thought it was ultimately ambiguous as to the inclusion and that's why we ultimately conceded to taking it out because we had the general provision.").

Bankr. D.I. 9406 at 149:14-25.   The bankruptcy court correctly found that consolidating the protections into one provision, rather than including them in several provisions, was a matter of drafting convention.   D.I. 1-3 at 216 (concluding that while "[t]he Non-Settling Insurance Companies may have preferred Mr. Azer's belts and suspenders' language," the bankruptcy court would not "weigh into the apparent disagreement on drafting conventions").

The Insurers also argue, without evidence, that the BSA had no interest in the TDP after reaching an agreement on its financial contribution, but the evidence was that BSA had a strong interest because the BSA needed a confirmable plan and needed to protect its insurance assets:

> [W]e knew we had to get a confirmable plan and we needed something that…the Court would approve; And so, therefore, we had a really significant interest…[to play it]…straight down the fairway…We needed to make sure we were taking into consideration

> the interests of claimants, but also making sure that we preserve the rights of our insurers…. That is a significant asset to the estate, and we needed to make sure that we were protecting our insurers' contractual rights.

Bankr. D.I. 9406 at 40:8-17 (Azer); *see* Bankr. D.I. 9309 ¶ 7.  Moreover, arguing that the BSA was not incentivized to protect their interests does nothing to avoid the actual record that the BSA did develop a TDP that emulated its prepetition practices and experience, and did successfully negotiate, against considerable opposition, to not modify any Insurer's policy and to protect any available coverage defenses for the non-settling insurance companies.  Further, the Third Circuit has rejected the argument raised here challenging trust distribution procedures on the ground that the debtor is not incentivized to protect their insurers.  *See Fed.-Mogul*, 684 F.3d at 380 ("[T]he shift in incentives is not unique to [trust distribution procedures in] the asbestos context and occurs in bankruptcy where there is a discharge of liability to the debtor but not that of the insurer.").

The Certain Insurers are also wrong in arguing that whether Mr. Azer "thought he was protecting Insurers' rights while negotiating with the Plaintiffs' lawyers is irrelevant."  D.I. 45 at 76.  While subjective intent may not be "determinative" of the entire analysis (*cf. In re SGL Carbon*, 200 F.3d 154, 165 (3d Cir. 1999))—and it was not determinative for the bankruptcy court—the BSA's intent is certainly relevant to good faith.  *See, e.g.*, *PWS Holding*, 228 F.3d at 24-43 (relying on subjective testimony and rejecting a challenge to good faith).  Indeed,

the Insurers put the BSA's intent to issue, as demonstrated in their very next sentence, where they claim that the "BSA was complicit in the Plan" to prejudice the Insurers, D.I. 45 at 76, which is something that would require the BSA's agreement and, therefore, intent. *Am. Capital Equip.*, 688 F.3d at 158 ("However, we are not convinced the Fifth Plan is collusive because insurers have not pointed to any evidence of an agreement to defraud insurers," and citing authority that collusion is an agreement between two parties to defraud another). Here, the record is that the BSA did negotiate protections for the Insurers, requiring that the Plan preserve the Insurers' coverage defenses, so the BSA's actions and intent both show good faith.

> ### c.    The Insurers Introduced No Evidence Of Collusion Or To Support Their Other Accusations Of Bad Faith

In addition to relying on the volume of evidence that the BSA did not collude with survivors, the bankruptcy court also relied on the fact that the Certain Insurers introduced no evidence to support their assertions, nor could they given the contemporaneous record.   D.I. 1-3 at 219 ("I find no collusion."). The bankruptcy court correctly found that the Certain Insurers' allegations of collusion "wholly unsupported by the record." *Id.* at 217.

> Based on this record, I cannot find that Debtors colluded with the Coalition or other plaintiff representative to intentionally deprive insurers of their rights.  I cannot find that Debtors abdicated their responsibility to negotiate a plan or proceeded in bad faith...The Certain Insurers' arguments that Debtors colluded with the Coalition,

rather than negotiated with the Coalition, is wholly unsupported by the record.

*Id.* at 216-17.

Even after discovery conclusively demonstrated that the Certain Insurers' accusations that the BSA never negotiated the TDP, but just accepted whatever the survivors presented, were wrong, the Insurers continued to make them.  As the bankruptcy court found:

> Because of their allegations of bad faith, I permitted insurers to take discovery into the mediation process with respect to the development of the TDP.  In their confirmation opinion, Certain Insurers represent that "the results of that discovery were damning."  I disagree.  The record developed at trial shows that Mr. Azer, Debtors' insurance counsel, penned the initial draft of the TDP….Thereafter Mr. Azer never gave up the pen.  Mr. Azer testified that Debtors had an interest in the TDP because they needed a confirmable plan and that they spent significant time negotiating protections for the insurers' contractual rights.

D.I. 1-3 at 213-214.

> 1.   **The Fact That 82,209 Proofs Of Claim Were Filed In The Chapter 11 Cases Does Not Demonstrate That The Bankruptcy Court Committed Clear Error In Finding That The Plan Was Proposed In Good Faith, Or Support A Contrary Finding**

The Certain Insurers argue that the bankruptcy court committed clear error in finding that the Plan was proposed in good faith because there was "an explosion of claims" and because (they say) that "tens of thousands" of the claims are "meritless or questionable."  D.I. 45 at 61, 72.  Both assertions are incorrect.

78

The fact that numerous claims were filed against the BSA in the Chapter 11 Cases is irrelevant to a finding of good faith.  The BSA had nothing to do with the filing of claims.  The Insurers cannot impute to the BSA the conduct of the plaintiffs' attorneys in successfully soliciting clients.  The Certain Insurers introduced no evidence that the BSA had anything to do with the filing of claims against it because there is no such evidence.[25]  *See* D.I 1-3 at 224-24.

The Certain Insurers also introduced no evidence that any of the claims were invalid.  The Certain Insurers cite the fact that there were 1,700 abuse claims filed prepetition, and then 82,209 filed post-petition, but the fact a bankruptcy that would result in a discharge of the BSA's liability attracted the attention of the plaintiffs' bar and survivors does not prove that the claims are invalid (or provide any ground to not account for them in a plan of reorganization).  *See* D.I. 45 at 72-73.  The Certain Insurers had access to all 82,209 proofs of claims and did not

---

[25]  Attributing bad faith to the Debtors for this so-called "explosion of claims" is also improper in light of the efforts that the Debtors took to mitigate the potential for fraud.  As noted in the Confirmation Opinion, the Debtors sought to supplement the Bar Date Order to prevent "what Debtors deemed to be false and misleading statements."  D.I. 1-3 at 23; Bankr. D.I. 1145 ¶ 42.  As a result of these efforts, on September 16, 2020, the court entered the Supplemental Bar Date Order prohibiting the plaintiffs' bar from continuing to make statements (i) suggesting that abuse claimants may remain anonymous, (ii) indicating a specific value of any potential compensation trust, and (iii) suggesting that abuse claimants will never have to be deposed, appear in court or otherwise prove their claims." D.I. 1-3 at 23; Bankr. D.I. 1331 ¶ 10.A.  The Debtors have never taken any action to facilitate the payment of false or fraudulent claims, nor were they "at best, willfully blind."  D.I. 45 at 5.

challenge a single one.  The Certain Insurers did introduce evidence about certain group filings at the deadline, but an attorney's effort to preserve claims before they expire does not prove fraud.  *See* Bankr. D.I. 9517 at 221:15-224:21 (explaining that proof of claim forms were submitted, and sometimes signed on behalf of claimants, at or near the bar date "to protect them from a Draconian bar date in a pandemic" and "avoid the Draconian consequences of missing the bar date").

The Insurers' claim that the "claimants' own expert recognized [that] a significant portion [of claims] are likely fraudulent" is incorrect.  D.I. 45 at 2.  The Certain Insurers cite to a statement made by a witness that was not retained or qualified as an expert to evaluate the prevalence of fraud in the claim pool, and did not evaluate the claim pool.  *See* Bankr. D.I. 9517 at 197:17-24 (proffering Dr. Conte as an expert witness to opine on the characteristics of the allegations, survivor profiles, and legal issues presented by the proofs of claim, but not to evaluate the claim pool for instances of fraud).  And the witness simply said during the course of the deposition that his reaction was that, given the number of claims, "a significant portion of that 80,000…are probably not real claims," without defining what would constitute a significant portion or providing any data or analysis to support his personal belief, much less a report.  Bankr. D.I. 9517 at 202:20-22.  Consequently, it is incompetent.  *Ace Pallet Corp. v. Conrail*, 764 F. App'x 197, 198 (3d Cir. 2019) *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No.

17-269 (RGA), 2019 WL 4198194, at *7 (D. Del. Sept. 4, 2019) (excluding opinion that contains "no actual analysis").  In fact, the number of claims does not indicate fraud because the BSA has served more than 130 million Americans since its inception (Bankr. D.I. 16 ¶ 6), but Dr. Conte never analyzed whether the number of claims was unreasonably large given this total population.  Dr. Conte also did not indicate that he was aware that the BSA had served 130 million children (or how that fact might impact his belief), so that 82,209 claims was 0.06% of the population, which is actually lower than the national average.   In contrast, Dr. Bates comprehensively analyzed the difference between pre-petition and post-petition claim numbers, and concluded that the increase of claims post-petition was a result of survivors' privacy concerns and economic considerations of survivors and their attorneys.  Bankr. D.I. 9454 at 142:9-146:8.  That is, survivors who were unwilling to engage in costly and public litigation in the tort system came forward in the bankruptcy proceeding to file claims when presented the opportunity to do so through the confidential proof of claim process.  *Id.*

The Insurers also cite an analysis by the BSA's data management expert that 90% of claimants never reported abuse to Scouting or law enforcement.  D.I. 45 at 22.  The fact that children that were abused decades ago did not report, or frequently even understand, abuse does not remotely support the Insurers' argument that the claims are fraudulent.  The Insurers introduced no evidence

whatsoever that abused children frequently reported abuse decades ago, or that claims involving a survivor that did not report abuse are fraudulent.  The Insurers never even argued at confirmation that the fact that most claimants never reported abuse to Scouting or law enforcement proved that their claims were fraudulent.  *See* Bankr. D.I. 8695; Bankr. D.I. 9033 (Certain Insurers failing to argue in their confirmation objection that a failure to report abuse prior to filing a proof of claim evidenced fraud on behalf of a claimants).  The Insurers also introduce no evidence that the BSA did not pay claims that were not reported.  To the contrary, the evidence is that the BSA did pay claims that had not been reported, and insurers funded those settlements.  *See* Bankr D.I. 9273 ¶¶ 39, 48.

The Certain Insurers are also incorrect that the possibility of invalid claims "was never addressed in this Plan."  D.I. 45 at 72.  To the contrary, the Plan includes numerous provisions for assessing the validity of claims and one of the founding principles of the TDP is the "prevention and detection of any fraud."  D.I. 1-4, Ex. A, Art. I.B.5.  For example, the signature page on the proof of claim form requires a signature under penalty of perjury, and contains a warning of substantial consequences for submitting false claims:

> **"Penalty for presenting fraudulent claim has a fine of up to $500,000 or imprisonment of up to five years or both.  18 U.S.C. §§ 152, 157, 2571."**

**"I have examined the information in the sexual abuse survivor proof of claim and have a reasonable belief that the information is true and correct."**

**"I declare under penalty of perjury that the foregoing statements are true and correct."** (A 11596).

Furthermore, the bankruptcy court directed that the Confirmation Order provide that the Settlement Trustee propose certain procedures,

> to suss out fraudulent claims taking into account factors which she deems appropriate, which she can include a cost/benefit analysis. Those procedures will be presented to the court…In addition to disallowance of a claim, penalties may include seeking the prosecution of the claimant or the claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 and seeking sanctions from the court.

D.I. 1-3 at 211-12.

The TDP was amended to provide that the Settlement Trustee "shall propose procedures to identify fraudulent claims…to the Bankruptcy Court for approval" and "shall work with the Claims Administrators to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions." D.I. 1-4, Ex. A., Art VII.I; *see also* D.I. 1-1 ¶ 19.  The fraud-prevention procedures will, among other things, "permit the Settlement Trustee or Claims Administrators to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or

groups of Trust Claim Submissions, any of which may include Settlement Trustee Interviews." D.I. 1-4, Ex. A, Art. VII.I.  In addition, the Trust Claim Submissions "must be signed under the pains and penalties of perjury and to the extent of applicable law…may subject those responsible to criminal prosecution in the Federal Courts."  *Id.*; *see* D.I. 1-1 ¶ 19 ("In addition to disallowance of a claim, penalties may include seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 and seeking sanctions from the [Bankruptcy] Court.").  A Submitted Abuse Claim will only be deemed to be allowed once it has met the "evidentiary standard set forth in the General Criteria" and "the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent."  D.I. 1-4, Ex. A, Art. VII.C.3.

No settlement trust (or litigation) is immune from efforts by unscrupulous people to commit fraud, but the Plan includes more than adequate procedures for denying any such claims.  And the hypothetical fact that an unscrupulous person might pursue a fraudulent claim—and there is no proof that anyone has done so— does not prove or even remotely support an argument that the BSA acted in bad faith in setting up a comprehensive settlement trust to compensate victims of childhood sexual abuse.  Speculation that potential fraudulent claims will get past

Judge Houser, but would not also have fooled the BSA, unsupported by any evidence, does not demonstrate bad faith.  To the contrary, mass tort settlements administered by trusts like the one at issue here are commonplace. *See Maremont*, 601 B.R. at 20-21; *In re W.R. Grace & Co.*, 446 B.R. 96, 132 (Bankr. D. Del. 2011), ("The Trustees have a fiduciary duty to ensure that only valid claims are paid.  No evidence was proffered to suggest, let alone prove, that Trustee will violate that duty."), *aff'd*, 729 F.3d 311 (3d Cir. 2013).  And contrary to the Certain Insurers' suggestion that litigation would identify invalid claims through discovery, evidence shows that sexual abuse claims are established primarily through the testimony of the survivor, not through recordings or documentary evidence, and the TDP allows Judge Houser to take testimony.  *See* D.I. 1-4, Ex. A, Art. VII.A (allowing the Settlement Trustee to obtain additional evidence from the holder of an Abuse Claim or from other parties pursuant to certain document obligations in order to complete the evaluation of each Abuse Claim).  Moreover, the evidence is that the BSA paid claims prepetition as long as the case appeared credible, especially if the abuse claimant "was willing to accept a settlement offer for an amount less than the cost of defending the case through trial."  Bankr. D.I. 9273 ¶ 39.  And notably, the Certain Insurers seek to defeat the Plan, not to protect against fraudulent claims, because, as the bankruptcy court found, the Certain Insurers never suggested any procedures for protecting against fraudulent claims.

D.I. 1-3 at 211.   Nonetheless, if Judge Houser somehow does not identify fraudulent claims as such, then the Certain Insurers will have their coverage defenses.  *See supra* at pp 62-65.  And again, the Certain Insurers' position is not prejudiced or changed because the BSA could settle fraudulent claims without a trust, subject only to coverage defenses.

The Certain Insurers' argument that the recovery for bona fide claimants will be reduced by invalid claims is again based on their faulty premise that invalid claims will be provided awards.  D.I. 45 at 74.  Additionally, the Certain Insurers have no standing to assert arguments for their adversaries in this case, the survivors, who are represented by opposing counsel and are the very parties that the Insurers seek to harm by eliminating the Settlement Trust set up to compensate them for their injuries.   The survivors overwhelmingly voted for the Plan. Moreover, the Certain Insurers' contention that claims will be diluted ignores the bankruptcy court's factual finding that survivors will likely be paid in full.  *See* D.I. 1-3 at 72.  The Insurers introduced no contrary evidence.  The Insurers' argument about dilution also conflicts with their core argument on appeal that claims will be inflated, not diluted.  Additionally, the Certain Insurers' assertion that "experts on both sides testified" that the Plan victimizes the "people who are really deserving" is wrong.  D.I. 45 at 74.  Dr. Treacy, the Certain Insurers' expert did not testify that the Plan victimizes survivors or that there were fraudulent

claims.  Rather, Dr. Treacy testified that people making fraudulent claims deserve nothing and should not be permitted to dilute the claim pool, but the Plan does not provide for any compensation to fraudulent claims.  Bankr. D.I. 9530 at 186:6-12; *see* D.I. 1-1 ¶ III.19; D.I. 1-4 Ex. A, Arts. VII.C, VII.I.

The Certain Insurers also argue that the BSA did not seek to disallow claims, but cite no authority that a debtor should seek to disallow claims, rather than having claims assessed through the TDP, much less that a decision to do so could constitute bad faith.  The Certain Insurers never before these Appeals even suggested that the BSA should seek to disallow claims.  *See* Bankr. D.I. 8695; Bankr. D.I. 9033 (Certain Insurers failing to argue that the BSA must first attempt to disallow claims before the Plan could be confirmed).  Moreover, it would have made no sense for the BSA to adjudicate 82,209 claims in the disallowance proceeding, so that it could proceed to a trust to adjudicate those same claims, defeating the purpose and the efficiencies of the TDP.  Indeed, despite their insinuations of impropriety, the Certain Insurers never sought to designate votes.  As the bankruptcy court found, the Certain Insurers, however, did not "move to designate any votes as they presaged they might do, nor challenge in any way the vote count." D.I. 1-3 at 210 n.615.

The Certain Insurers also speculate that but for the BSA's bankruptcy proceedings, the "explosion of claims" would not have occurred.  D.I. 45 at 20.

The Certain Insurers do not point to any evidence that supports this conclusion, nor do they account for the fact that the establishment of the Bar Date that required all claimants to assert their claims or forever lose them. As the bankruptcy court found, the "explosion" of claims "could be a consequence of a bankruptcy filing and a bar date and an open statutes of limitations and the advertising that went on." *See* Bankr. D.I. 9638 at 191:10-17.

> A debtor's ability to obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules. The remedy for inappropriate behavior, if any, rests with state supreme courts and/or disciplinary counsel around the country, any appropriate remedy in this court for personal who failed to perform appropriate diligence before signing proofs of claim and appropriate procedures in the TDP to ferret out any fraudulent claims. Denying confirmation, however, is not an appropriate or proportional remedy.

D.I. 1-3 at 224.

In any case, bankruptcy law provides no ground for defeating confirmation based on the volume of claims brought against the BSA, nor do the Certain Insurers' insurance policies contain any limitation based on the volume of claims filed against their insureds, other than aggregate limits, which remain in place. As the bankruptcy court correctly held, "the logical extension of [the Insurers'] argument is that no entity with mass tort liabilities can file a bankruptcy case because claims might increase exponentially." D.I. 1-3 at 224; *see* Bankr. D.I. 9616 at 62:2-6 (finding the argument that the debtors "can't be allowed to file a

bankruptcy because it might generate a whole bunch of claims" unpersuasive); *see In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 380 (rejecting the argument about increasing an insurer's exposure through bankruptcy, holding that exposure to an insurer provides standing to participate in bankruptcy proceedings, "[b]ut granting a private party powerful leverage that may amount to a *de facto* veto over the reorganization proceedings does not seem promising solution to these potential problems.").

Regardless of how many proofs of claims were filed, they had to be addressed by the BSA in the Chapter 11 Cases.  Whether awards will be issued that reach the Certain Insurers, and whether the Certain Insurers will decline to pay those awards, can only be determined in the future.

> **2.    The Fact That Some Proofs Of Claim Are Missing Information Does Not Demonstrate Or Even Support A Finding Of Bad Faith**

The Certain Insurers' contention that certain proofs of claim are missing information is also irrelevant.  The submission of a proof of claim with missing information does not prove fraud.  Indeed, it is commonplace for a survivor to not recall the name of his or her abuser from decades earlier.  Bankr. D.I. 9274 ¶ 33 ("Often a victim, due to age and the passage of time, will not have an initial recollection of their abuser's name, but are able to identify them based on their role in Scouting, or where the scout troop met, or their role in a religious organization,

if any.").  Nonetheless, the TDP requires the provision of information, regardless of whether it is missing from the proof of claim, and claims that do not provide required information will be treated accordingly by Judge Houser and her team. D.I. 1-4, Ex. A, Art. VII.C.4 (providing for disallowance of claim that does not satisfy certain General Criteria); *id.* Art VII.A (providing that a claimant's failure to comply with agreement to produce documents, consent to examinations, and cooperate in a written/oral examination under oath shall be grounds for disallowance or significant reduction of an Abuse Claim).  Allowing survivors to present claims, which then will or will not be awarded compensation depending on their merits, does not support, much less require, finding that the BSA did not propose the Plan in good faith.

### 3.   The Payment Of Claims Subject To A Statute Of Limitations Defense Is Customary And Does Not Show Bad Faith

The Certain Insurers' argument that the bankruptcy court should have found that the Plan was not proposed in good faith because the Settlement Trust will pay claims that are subject to a statute of limitations defense, and therefore is inconsistent with prepetition practices, is unsupported by evidence and incorrect. D.I. 45 at 28, 38.  The Certain Insurers rely on the testimony of one of their witnesses, Ms. Bitar, that a survivor in the tort system "would get nothing" on a time-barred claim, and under the TDP "would get $300,000."  D.I. 45 at 33.  Both

assertions are incorrect, something Ms. Bitar would not have known because she has never represented the BSA, and she has never settled even a single abuse claim. D.I. 9563 at 72:4-73:2.

Claims subject to statute of limitations defenses were paid by the BSA and sometimes its insurers prepetition. The testimony at trial was that States consistently revive abuse claims, and that "courts are reluctant to grant dispositive motions on a statute of limitations basis, particularly for something like childhood sexual abuse. Indeed, many of the states that had potentially applicable statutes of limitations also included exceptions (such as discovery exceptions) that would effectively negate a dispositive motion on a statute of limitations defense." Bankr. D.I. 9273 ¶ 24. Mr. Griggs provided an example of a case where the "BSA believed it had meritorious defenses with respect to certain abuse claims in Idaho based on the statute of limitations. The bankruptcy court, however, essentially articulated a new legal theory based on fraudulent concealment that circumvented the applicable statute of limitations in that case, which prevented the BSA from prevailing on its statute of limitations defense." *Id.* ¶ 25.

Mr. Griggs further testified that the BSA often settled claims with a statute of limitations defenses, even if it was likely to prevail on the defense, and insurers often approved and funded those settlements. *Id.* ¶¶ 22-26. The BSA even paid claims after prevailing on the defense: "[I]n a case filed in Connecticut, the trial

court granted the BSA's motion for summary judgment on the basis that the claim was untimely under a statute of repose.  Notwithstanding that the motion for summary judgment was granted, the BSA ultimately settled that lawsuit with the consent of its insurer rather than face the cost and risk of an appeal."  *Id.* ¶ 26.

Notably, many of the largest settlements paid by the BSA and its insurers arose out of claims where the BSA believed it had a viable statute of limitations defense.  *Id.* ¶ 24.  The BSA's largest settlement, in fact, was subject to a time-bar defense, and the courts rejected it through appeal.  *Id.* ¶ 24 (describing settlement of Hacker claims).  Dr. Bates and his team analyzed the BSA's prepetition claim pool to evaluate the impact of the statute of limitations defense on claim value, and he testified that the BSA's average value in the claim pool was not in fact reduced where there were statute of limitations defenses.  Bankr. D.I. 9454 at 260:5-261:1.  "[I]n fact, if you…go through the claims, evaluate the historical claims based on the statute of limitations discount and do it properly, you wind up finding no difference in the average values in the claim pool."  D.I. 9454 at 263:15-264:4.  Nonetheless, Dr. Bates and his team formulated a Claims Matrix that include different discounts for statute of limitations defenses based on the strength of the relevant State's statute.

The Insurers complain that the defense is a mitigating factor, rather than part of the General Criteria, but Mr. Griggs testified that the availability of a potential

statute of limitations defense was considered a mitigating factor prepetition, not part of the General Criteria that would have to be satisfied for payment.  D.I. 9273 ¶ 24.

> [The BSA sometimes] would use the possibility of a statute of limitation defense as an argument to reduce the value of a settlement in negotiations with counsel for underlying plaintiffs, but not as a complete bar to recovery.  This is because if we presented the statute of limitations defense and lost, the underlying plaintiffs' settlement demand would likely increase to be more similar to a claim that was not subject to any such defense.  For instance, BSA had a statute of limitations defense to Hacker claims, but lost the motion for summary judgment on the defense.  BSA took an appeal, and lost again. Consequently, we did not ultimately achieve any discount for the statute of limitations in settling with the plaintiffs.

*Id*.

The bankruptcy court credited Mr. Griggs' unrefuted evidence:  "During the trial there was much discussion about the statute of limitations defense.  As Mr. Griggs testified, his experience is that even states with closed statutes of limitations, courts are hesitant to dismiss on statute of limitations grounds."  D.I. 1-3 at 191 n.566 (internal citation omitted).

> There is no 'law' that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant whose claim may be time-barred.  Indeed, the uncontroverted testimony of Mr. Griggs is that prepetition BSA was not often successful in asserting statute of limitations defenses even in states where the defense was viable, and that even when BSA prevailed on a statute of limitations defense it still might subsequently settle the claim.

D.I. 1-3 at 233.  Consequently, the bankruptcy court found that it could not find based on the record before it, "that this result means the Plan was not proposed in good faith."  *Id.* at 234.

Mr. Burnett, an expert on sexual abuse claim evaluation,  also testified that, based on his considerable experience, it was reasonable to treat the statute of limitations and the statute of repose as a mitigating factor, rather than a claim validity criteria, given (a) his experience that trial courts are reluctant to grant statute of limitations defenses in sexual abuse claims, (b) that dismissal on the basis of statute of limitations are usually without prejudice, with the bankruptcy court providing a roadmap on how to remedy pleading errors in an amended complaint, (c) complexities concerning reviver windows, and (4) that prevailing on a statute of limitations defense can be a pyrrhic victory where defense costs exceed the value of a claim.  Bankr. D.I. 9274 ¶¶ 54–56.  The bankruptcy court did not commit clear error by not finding bad faith on the basis of the Certain Insurers' unsupported and incorrect assertion that claims subject to statute of limitations defenses would receive nothing outside the Settlement Trust or that the potential availability of the defense should be part of the General Criteria, not the mitigating factors.

The second half of Ms. Bitar's testimony is also incorrect.  Ms. Bitar not only stated incorrectly that a survivor "would get nothing" on a time-barred claim

prepetition, but she also stated incorrectly that the survivor "would get $300,000" in the Settlement Trust.  Bankr. D.I. 9563 at 52:6-8.  Ms. Bitar simply took a Base Value and applied a statute of limitations discount.  Bankr. D.I. 9563 at 50:18-52:8, 122:4-15.  The parties who formulated the TDP testified that claims adjudication does not work the way Ms. Bitar assumed.  Rather, the Settlement Trustee must apply numerous mitigating and aggravating factors to ascertain the value of a claim, and the TDP is not expected to result in any awards at the Base Matrix Value number.  D.I. 1-3 at 221 ("Dr. Bates's testimony was clear: the Base Matrix Values in the TDP are a starting point, not an ending point.  In his words, the Base Matrix Values are not 'magic number[s]'; rather, any number could be used…one would simply have to modify the Scaling Factors appropriately.").

### 4. The TDP Criteria For Legal Responsibility Do Not Prove, Or Even Support, The Insurers' Allegation Of Bad Faith

The Certain Insurers also object that evidence of the "BSA's negligence is not a prerequisite for liability as it would be in the tort system."  D.I. 45 at 28.  Under the TDP, the Settlement Trustee will consider evidence of "legal responsibility," rather than negligence because claims other than negligence had been brought on a prepetition basis.  Consequently, the TDP needed to address the potential liability of a Protected Party for all claims, not merely for negligence claims. Bankr. D.I. 9309 ¶¶ 50-51; Bankr. D.I. 9406 at 217:20-23 (Azer) ("I think we wanted to encompass all the causes of action, right, so we wanted to make sure

we were encompassing everything that could be out there, and this is the reason we used that language.").

The Certain Insurers also argue that the TDP is unfair because it treats negligence as an aggravating factor.  D.I. 45 at 28.  This is incorrect.  The testimony at trial established that "the showing of negligence was subsumed by the General Criteria."  Bankr. D.I. 9309 ¶ 50; *see also* Bankr. D.I. 9273 ¶ 59 ("Based on my work as NCC, if an underlying plaintiff could establish, by a preponderance of the evidence, each of the General Criteria, I would have considered that a claim should be settled because the claimant likely would be able to show negligence by the BSA, Local Council, and/or Chartered Organization.").  Moreover, the evidence is that the General Criteria is consistent with the BSA's prepetition practices.  Specifically, if all of the General Criteria was met prepetition, then the BSA viewed that as a sufficient basis to establish negligence and to pay the claim.  Bankr. D.I. 9273 ¶ 59.  While there is a reference to negligence in the "aggravating factors" of the TDP, the unrebutted testimony is that the BSA meant for this to address the issue of notice, rather than legal liability, which is subsumed by the General Criteria of the TDP.  Bankr. D.I. 9406 at 41:15-22 (Azer) ("[W]e actually had a reference to negligence….[I]f the BSA had notice, then it was meant to allow for an increased dollar value, and I guess the insurers were confused by that.  And so, again, we modified that language to try to make clear our intent in the

aggravating factors."). The testimony further established that treating the degree of notice as an aggravating factor was consistent with the BSA's prepetition practices. D.I. 9273 ¶ 41. In any case, the BSA subsequently revised the TDP after the confirmation hearing to expressly require that "a Protected Party *may be negligent* or may otherwise bear legal responsibility" in the final version of the TDP. D.I. 1-4, Ex. A, Art. VII.C.2(c) (emphasis added). Moreover, Mr. Griggs' testimony established that the BSA's prepetition practices were focused on settlements, not trials, and settlements are not based on proof of negligence, but on the possibility that the survivor may prove negligence at trial. Bankr. D.I. 9273 ¶ 53.

### D. The Certain Insurers' Challenges Based On Terms That Were Not Included In The Confirmed Plan On Appeal Are Meritless

#### 1. The Insurance-Related Provisions Contained In A Prior Plan Are Not Relevant, And Do Not Prove Clear Error

The Certain Insurers next argue that the Plan was proposed in bad faith based on certain insurance related terms that were included in a prior plan, and not in the Plan that was confirmed and is now on appeal. These arguments are frivolous. The section 1129(a) requirements for confirmation of a plan (including good faith) have to be satisfied for the plan under consideration, not for prior versions of the plan. The Certain Insurers cannot establish that the Plan was proposed in bad faith based on terms that were not in fact proposed in this Plan.

The terms that are not included in the confirmed Plan cannot harm, or otherwise impact, the Certain Insurers.

The BSA proposed a plan in February 2022 that included certain insurance-related terms opposed by the Insurers.  *See* Bankr. D.I. 8813 Art. IX.A.3.w-aa. The bankruptcy court declined to approve certain of those terms.  *See* D.I. 1-3 at 171-89.  Section 1127(a) provides a debtor with the right to modify its plan, and then it is that modified plan that needs to satisfy the confirmation requirements, not a prior plan: "The proponent of a plan may modify such plan at any time before confirmation… After the proponent of the plan files a modification of such plan with the court, the plan that is modified becomes the plan."  11 U.S.C. § 1127(a). Altering plan provisions before and after confirmation is consistent with bankruptcy precedent and procedure.

In August 2022, the BSA modified the prior plan to comply with the Confirmation Opinion, listed those changes in a plan addendum, and filed a corresponding proposed order confirming the Plan.  *See* Bankr. D.I. 10188, Exs. A, B, 10190.  The bankruptcy court ultimately confirmed the Plan over the Certain Insurers' objection in September 2022.  D.I. 1-1, 1-4.  The Certain Insurers cannot challenge the Plan based on terms that are not in it, much less demonstrate that the bankruptcy court committed clear error by not making certain factual findings based on terms that the BSA did not propose in the confirmed Plan.

The Insurers try to avoid that fact by pointing out that it was the bankruptcy court that caused the parties to change the terms of the Plan by declining to confirm the prior plan.  D.I. 45 at 69-72.  The fact that plan terms were modified to come into compliance with the bankruptcy court's ruling does not demonstrate or support bad faith.  The Certain Insurers cite no authority whatsoever for their novel and incorrect argument that a plan modified to come into compliance with the Confirmation Opinion is then not proposed in good faith (because it was the bankruptcy court that guided the modification).[26]  Section 1127(a) is not limited to modifications that are made independent of any court ruling.  Indeed, there can be no stronger basis for modifying a plan than to come into compliance with a court order, because there is no option to do otherwise.  Debtors routinely modify plans to come into compliance with court rulings and confirmation of a plan is often contingent on post-confirmation hearing modifications.  *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 910 (Bankr. D. Del. 2022) ("I find the [p]lan satisfies the statutory requirements of the Code, with the one exception noted above.  All objections, including any not specifically addressed in this [o]pinion,

---

[26]  The Certain Insurers cite *In re Grasso*, 490 B.R. 500, 511 (Bankr. E.D. Pa. 2013) for the proposition that the bankruptcy court's reliance on the elimination of the terms that it did not approve "was legally erroneous."  D.I. 45 at 69. First, *Grasso* involved a debtor that violated his fiduciary obligations and diverted estate assets; it did not involve a modified plan that eliminated prior terms or even remotely suggest that a court could consider the terms of a prior plan in assessing whether a debtor proposed a plan in good faith.

other than to the [e]xculpation [p]rovision, are overruled. Debtors should submit a revised form of order."); *In re Purdue Pharma L.P.*, 633 B.R. 53, 115 (Bankr. S.D.N.Y. 2021), *rev'd on other grounds*, 635 B.R. 26 (S.D.N.Y. 2021) ("[A]ssuming that the changes to section 5.8 and 10.07(b) of the plan that I outlined will be made, as well as one other change that I will address in a moment, I will confirm the plan…I will enter an order confirming the plan if it is amended as required hereby, which order can generally be in the form of proposed confirmation order previously circulated to the parties and provided to chambers."); *In re Maremont Corp.*, No. 19-10118 (KJC), May 14, 2019 Hr'g Tr. at 10:1-10 (Bankr. D. Del. May 22, 2019) [D.I. 250] ("I felt the changes were necessary and…assuming that the change to be made and finalized in the language is non-substantive and I have no questions about it, I am indeed content to consider a confirmation order…."); *In re USA Gymnastics*, No. 18-09108 (RLM), Dec. 13, 2021 Hr'g Tr. at 49:4-56:10 (Bankr. S.D. Ind. Dec. 22, 2021) [D.I. 1790] (conditionally approving plan subject to changes contemplated in the confirmation order and plan at the conclusion of the confirmation hearing in which revisions incorporating comments from various parties were made).

In addition to being unsupported and wrong, the Certain Insurers' position suggests absurd results. For instance, if the terms of a prior plan permanently tainted debtors, as the Insurers suggest, then debtors would not be able to

reorganize if courts do not overrule every plan objection (because they could not modify their plans to comply with the bankruptcy court decisions). Bankruptcy is not a one shot process, where debtors get a single opportunity to confirm a plan. The bankruptcy court dedicated over two years to the Chapter 11 Cases, including an extended confirmation hearing, and spent months drafting a 269-page opinion approving certain terms and rejecting others. Any position that the BSA could not then propose a plan in good faith to comply with the bankruptcy court's order is frivolous. Indeed, notwithstanding their argument that terms of a prior plan taint the BSA, the Certain Insurers acknowledge that the BSA was entitled to propose a modified plan: "BSA can easily propose a plan that expressly makes clear that it does not affect any rights and obligations in the operative insurance contracts." D.I. 45 at 88. As the bankruptcy court correctly found, that is what the BSA did.

Additionally, although the terms of the prior Plan are not relevant to the confirmed Plan on appeal, those prior terms were not proposed in bad faith. Rather, those terms were included as part of a compromise with counsel for survivors who were concerned that without such provisions, the Insurers would try to raise improper future legal challenges to the Settlement Trust and the TDP. And the bankruptcy court did not find that those terms were proposed in bad faith, but rather declined to approve them because they were unnecessary to confirmation. D.I. 1-3 at 183-84 ("None of the Coalition's rationales require me to find that the

Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors 'are appropriate and provide for a fair and equitable settlement of Abuse Claims' in order to confirm the Plan. I decline to do so."); *id.* at 184 ("The very fact that the required Finding had to be adjusted in an attempt to conform to the evidence suggests the Finding is unnecessary to confirmation. It also suggests that I should not enter Finding aa, which is imprecise at best."); *id.* at 185 ("Finding w seems innocuous enough at first glance. But, if it is, why is it necessary?"); *id.* at 189 ("I ruled in connection with Finding x that § 1129(a)(3) does not justify a finding that the component parts of the TDP…are appropriate or fair and equitable. Finding z appears to be a back door, or perhaps 'belts and suspenders' way to get to these same findings. I decline to make Finding z.").   Thus, in addition to being irrelevant, there is no basis for requiring a finding that the BSA did not propose the prior plan in good faith by agreeing to terms requested by survivors, whose support was needed for a consensual plan of reorganization, that were subject to court approval.

### 2.   An Earlier Proposal For A Settlement Trustee Is Irrelevant And Does Not Prove Clear Error Or Support A Finding Of Bad Faith

The Certain Insurers' allegation that an earlier proposal to retain Professor Eric Green as the trustee means that the Plan was not proposed in good faith is frivolous.  D.I. 45 at 34-35, 71-72.  The current Plan did not propose Professor

Green, nor did the prior plan, but rather proposed former bankruptcy judge Houser, someone everyone agrees is an "eminently qualified, retired, neutral Federal Judge[]."  Bankr. D.I. 9389 at 50:13-15; D.I. 1-3 at 211 ("[N]o one questions the integrity of the proposed Settlement Trustee.").  As addressed above, a challenge directed to a proposal that was not included in the Plan presented for confirmation, and is not included in the Plan that has been confirmed and is on appeal, is irrelevant.

Additionally, Professor Green was qualified to serve as a trustee.  Professor Green is a leading practitioner and scholar familiar with the dynamics of mass-tort cases, including most recently as the special master and trustee for all Takata airbag personal injury and wrongful death claims.  The Insurers introduced no proof that Professor Green was biased.  The fact that an experienced attorney that has served as a mediator in cases that involved members of the plaintiffs' bar— and, of course, members of the defense bar—does not show bias, much less bad faith.  Indeed, arguing that the BSA engaged in bad faith by initially proposing the appointment of a well-regarded mediator, and then changing the proposal in response to objections by the Insurers, just demonstrates the weakness of this appeal.

**E.      The Fact That The Settlement Trust Does Not Replicate Scorched Earth Litigation Is Not A Ground For Challenging Confirmation**

The Certain Insurers' argument that the Settlement Trust resolution process is different from the tort system is correct. The TDP is designed to replicate tort system resolutions in an expedited and cost-effective fashion, not years' long litigation. Mass tort settlements establishing an adjudication procedure, or trust distribution procedures, instead of litigation, are commonplace. *See, e.g.*, *W.R. Grace*, 446 B.R. 96; *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Jan. 18, 2011) [D.I. 503]. As addressed above, the TDP here was fashioned on other mass tort settlements. *See supra* pp. 70-71; D.I. 1-3 at 214 (crediting Mr. Azer's testimony that the TDP was drafted using precedent from trust distribution procedures in other mass tort cases).

The Insurers' preference for scorched-earth litigation against survivors is not a ground for challenging the Plan. The Insurers have no right to require litigation or to prevent settlement. Bankr. D.I. 9406 at 87:4-89:13. Even the Insurers' expert, Mr. Harrington, conceded that it was not feasible to litigate 82,000 claims. D.I. 1-3 at 229 (citing Bankr. D.I. 9530 at 104:5-6). In any case, the BSA was always free to settle abuse claims, and not litigate, even without the rigor of review by a former bankruptcy court judge and a Claims Matrix developed by experienced economists, as here. The insurance policies do not prevent the BSA from settling unilaterally or through a trust. Bankr. D.I. 9406 at 87:4-89:13. The BSA could at

any time settle claims at the values indicated for the Settlement Trust, or at any other value, on its own, and the Insurers could do nothing to prevent those resolutions.  *Id.*  What the Certain Insurers could do in that circumstance is refuse to pay under their policies to the extent they could establish a coverage defense, and insurers did exactly that prepetition.  Bankr. D.I. 9406 at 64:16-65:7 (Azer).  Thus, the Certain Insurers' insurance expert described the consent rights as "providing that no action lies against the insurer for breach unless…the claimant, insured and insurer have agreed to writing to settle the claim."  D.I. 45 at 16.  The Certain Insurers have that same right to raise that same purported coverage defense for awards under the Settlement Trust because the Plan and the bankruptcy court preserved the Insurers' rights and coverage defenses.  D.I. 1-4, Ex. A, Arts. V.C., X.

Because the BSA was entitled to settle without litigation, subject to any resulting coverage defense, the Certain Insurers' claim that Court dismissed in a footnote two days of testimony about how the TDP differ from the tort system because "insurance neutrality" is merely "a standing concept" is irrelevant.  D.I. 45 at 77.  It is also incorrect.  What the bankruptcy court found in its footnote is that it did not need to determine "whether a claims process in trust distribution procedures are 'like' the tort system, given the acceptance of Class 8."  D.I. 1-3 at 184 n. 547.  Bankruptcy courts need only determine whether treatment under the

plan is fair "with respect to each class or claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  Because Class 8 voted to accept their treatment, a finding on whether such treatment is fair and equitable in accordance with tort system principles is irrelevant.

The Certain Insurers also are wrong that the bankruptcy court "erroneously declined to engage with the [P]lan's real-world impact because the court believed 'insurance neutrality' is merely a 'standing concept.'"  D.I. 45 at 77.  "Insurance neutrality" is a standing doctrine, not a plan requirement.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217 (3d Cir. 2004), as *amended* (Feb. 23, 2005).  As the bankruptcy court correctly noted, there is no confirmation requirement that a Chapter 11 plan be "insurance neutral."  D.I. 1-3 at 216 ("There is nothing that requires Debtors to negotiate a plan that is 'insurance neutral,' which is not a concept in the Bankruptcy Code" (*citing Purdue Pharma*, 633 B.R. at 63 ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect.")).  The Certain Insurers do not cite a single authority to the contrary.  The Insurers cite *Global Industrial* and *Combustion Engineering*, but the bankruptcy court correctly found that neither case held that a plan had to be insurance neutral.  D.I. 1-3 at 250.  Rather, these cases held that the insurers in those cases had standing to raise challenges to the plan.  *Id.* ("[I]f a plan is not 'insurance neutral,' insurance

companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard.").

The bankruptcy court did address the real-life impact of the Plan by preserving the Insurers' defenses and correctly ruling that, to the extent a dispute arises in the future, a court with jurisdiction over the matter will determine the dispute based on the then-existing facts. D.I. 1-3 at 231 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered."). At this point, no awards have been issued, much less presented to any of the Insurers for payment, and no Insurer has disputed any hypothetical award, so no court has jurisdiction to resolve this potential, but currently non-justiciable, dispute. *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 479-80 (1990) (it was not justiciable where it "amounts to a request for advice as to 'what the law would be upon a hypothetical state of facts'" or is predicated on "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) and *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)); *Sherwin-Williams Co. v. Cty. of Del.*, 968 F.3d 264, 272 (3d Cir. 2020) ("A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quoting *Wyatt v. Gov't of the V.I.*, 385 F.3d 801, 806 (3d Cir. 2004)).

**F.**     **The Rare Cases Finding Bad Faith That Are Cited By The Insurers Are Inapposite**

The cases that the Certain Insurers cite for finding bad faith reveal the deficiencies of their appeal.  These cases either do not address good faith or affirm a bankruptcy court's finding of bad faith, the exact opposite of what occurred here.  Moreover, the Insurers do not cite a single case disturbing a bankruptcy court's finding of good faith.  As noted above, it is very difficult to disturb a trial court's findings of fact, and impossible here, where the record evidence overwhelming supports the findings and where the Certain Insurers introduced no evidence to support a bad faith finding.

The Insurers cite *In re SGL Carbon*, which did not address confirmation issues.  200 F.3d 154 (3d Cir. 1999).  Rather, that case dismissed the bankruptcy petition because the debtor was "a financially healthy company" and the "Chapter 11 lacks a valid reorganization purpose…"  *Id.* at 156, 166 (finding courts have "consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11.").

The Insurers cite *Global Industrial*, but that court did not rule on good faith. It merely found that the bankruptcy court erred in holding that the insurers had no standing to object to a plan where their policies were being transferred to a trust, and where the insurers had submitted substantial evidence that 91.5% of the claims

were not legitimate.[27]  *In re Glob. Indus. Techs.*, 645 F.3d 201, 207-08 (3d Cir. 2011).  Further, the bankruptcy court found that there was record evidence that "[the debtor] had sold out [the insurers] by setting up a system in which they would pay for newly ginned-up silica claims in exchange for asbestos claimants casting their votes in favor of the [plan]."  *Id*. at 214.  Indeed, the debtors obtained a list of silica claimants from another company's bankruptcy and then solicited those claims to gain confirmation votes, causing the "explosion of silica claims."  *Id*. Although the bankruptcy court had considered some of the insurers' contentions, the Third Circuit remanded to ensure that the insurers had the opportunity to make a full record: "[w]e accept the logical position that a party, granted standing and a full opportunity to participate, may add something meaningful to the record on which the bankruptcy court is called to make a decision."  *Id.* at 215 n.33.

Here, the bankruptcy court granted standing to the Insurers, and they were full participants at trial, but introduced no evidence of collusion or that any claims were fraudulent, the exact opposite of what happened in *Global Industrial.*

---

[27] The insurers produced evidence showing that the diagnosing physicians had been barred in other mass tort cases for making "questionable to abysmal" diagnoses in a van sitting in parking lots and for claimants that had already been diagnosed with asbestos-disease.  *In re Glob. Indus. Techs.*, 645 F.3d 201, 207 n.16 (3d Cir. 2011).  The Third Circuit noted that having both an asbestos and silicon related disease is so improbable that "[a] golfer is more likely to hit a hole in one than an occupational medicine specialist is to find a single case of silicosis and asbestosis."  *Id.* at 207.

Moreover, on the basis of a full record, the bankruptcy court found that the BSA did not collude with the survivors' counsel. *See supra* pp. 78-79. The Certain Insurers introduced no evidence to the contrary, relying primarily on an argument that the BSA was incentivized to collude (D.I. 45 at 66-67), which is patently insufficient, as *Global Industrial* pointed out, and was specifically rejected by the Third Circuit in *Federal-Mogul*, another case relied on by the Insurers:

> Insurers also allege the trust mechanism might distort ordinary incentives between insurer and insured, encouraging the Debtor to collude with claimants and impose costs on the insurer. But as *Federal-Mogul* points out, this shift in incentives is not unique to the asbestos context and occurs in bankruptcy where there is a discharge of the liability of the debtor but not that of the insurer…. Nor did the Insurers provide any evidence of such collusion in this case. Such bare speculation does not establish an increase in risk.

684 F.3d at 380.

The bankruptcy court *In re ACandS* made a factual finding that the plan was not proposed in good faith because the trust structure was totally unfair to claimants. 311 B.R. 36, 43 (Bankr. D. Del. 2004). The trust structure was dictated by plaintiffs' attorneys that favored their clients over other claimants. *Id.* Specifically, the conflicted controllers provided a different treatment for the exact same claims, so that their clients would be paid in full even if they were merely exposed to asbestos and were not sick, while someone they did not represent, with the most serious disease, mesothelioma, could get nothing: "[I]t is fundamentally unfair that one claimant with non-symptomatic plural plaques would be paid in

full, but while someone with mesothelioma runs a substantial risk of receiving nothing.  Both should be compensated based on the nature of their injuries, not based on the influence and cunning of their lawyers." *Id.* at 40, 43.

The bankruptcy court *In re Coram Healthcare* made a factual finding that the plan was not proposed in good faith because the debtors' CEO and president had an actual conflict of interest when entering into an agreement with the debtors' largest creditor, requiring that he take the creditors' instructions.  271 B.R. 228, 234-35 (Bankr. D. Del. 2001).  His annual fee of $1 million was substantially more than the executive's salary from the debtor, the executive breached his fiduciary duties, and the conflict caused "insidious effects," including the debtors' decision to provide the creditor with $6.3 million interest payment, "with no legal obligation" to do so, harming the debtors' liquidity at a time that they needed cash to achieve "operational advantages, as well as an enhanced negotiating position vis-à-vis to its creditors." *Id.* at 236.  Neither the executive nor the creditor disclosed the arrangement, until it was uncovered in discovery, and the bankruptcy court found the executive's testimony "unconvincing." *Id.* at 239.  The Certain Insurers oddly cite the case as rejecting a "no harm, no foul" approach, but the bankruptcy court did not reject the "no harm, no foul" approach, but rather rejected the application of it in that case because there was harm. *Id.* at 237-38.

The bankruptcy court in *In re American Capital* found that the plan was not proposed in good faith based on a structure that was entirely different from the one here at issue, and in fact was used to distinguish the plan from a trust like the one on appeal.  In *American Capital*, the bankruptcy did not relate to the tort liability, the debtors did not contribute to the fund, but would only take from the fund, the tort claimants were the sole source of funding, the funds were to pay off only creditors and insurers, rather than tort claimants, and there was "inherent conflict of interest" as the plan stripped the insurers of "procedural and substantive rights without the protections of Section 524(g)."  688 F.3d at 159-60.  The Third Circuit held that the "inherent conflict of interest" was "especially concerning" because the debtors were financially incentivized to sabotage their own defense due to a kickback mechanism.  *Id.* at 158-60 ("[The debtor] is required to cooperate in its defense, but will be incentivized to do otherwise.").  In contrast to the debtors in *American Capital*, the BSA has no conflict of interest, has meaningfully contributed to the Settlement Trust, and has not established a surcharge mechanism at the claimants' expense for the BSA's own gain.  In almost every meaningful respect, the Plan serves as a direct foil to the plan in *American Capital*.

### G.   The TCC/Abuse Survivor Settlement Does Not Support, Much Less Require, A Finding Of Bad Faith

The Certain Insurers' argument that the TCC/Abuse Survivor Settlement, that provides an Independent Review Option and uncapped recoveries against non-

settling insurance companies, proves that the bankruptcy court committed clear error in not finding that the Plan was proposed in good faith is baseless. A goal of the TDP was to reflect the BSA's prepetition settlement practices, and the BSA and its insurers sometimes paid sexual abuse claims in excess of the $2.7 million maximum cap applicable to a Trust Claim Submission. Bankr. D.I. 9309 ¶¶ 55-56; Bankr. D.I. 9454 at 237:12-18 (Bates). The Independent Review Option was intended to address the fact that the prior TDP that did not provide a pathway for recoveries in excess of $2.7 million for particularly egregious cases and, therefore, is consistent with the BSA's prepetition practices. Bankr. D.I. 9454 237:12-18 (Bates); *see* Bankr. D.I. 9454 at 98:14-99:1 (Bates) ("[The Independent Review Option] [b]asically remov[es]…a windfall that the excess insurers had obtained in the original draft of the [TDP]."); *id.* at 235:16-23 (Bates) ("The excess insurers…pay more, but…only to the extent that they got a windfall from the original [TDP], which capped itself at 2.7. So, they aren't actually made worse off, relative to what the policies are worth.").

The Certain Insurers are not entitled to capped recoveries. Outside of the Settlement Trust, survivors are able to, and did, pursue claims with uncapped recoveries. Bankr. D.I. 9273 ¶ 63. And prepetition, the BSA paid claims substantially in excess of $2.7 million for egregious cases. Bankr. D.I. 9273 ¶ 63. The Insurers have no right to the windfall of a $2.7 million cap on claims,

something they would not have without the Plan.  Nonetheless, if the awards are unreasonable, and there is no evidence that will ever occur, then the Certain Insurers retain their coverage defenses.

The Certain Insurers also argue that the TCC/Abuse Survivor Settlement required the BSA to "downplay BSA's own expert testimony at trial regarding the likely amount of aggregate liability from the claims."  D.I. 45 at 63.  That is untrue. As the bankruptcy court found, "while the TCC/Abuse Survivor Settlement provided claimants with certain consultation rights with respect to Dr. Bates's testimony, such testimony would be truthful and consistent with [his] own opinions."  D.I. 1-3 at 218 n.642.  Indeed, the Certain Insurers' concern was that Dr. Bates would walk away from his opinion about his range of aggregate claim values, and in particular the most likely range, and he did not do so.  To the contrary, as found by the bankruptcy court, Dr. Bates's testimony was "definitive," "in no way hedged," and the Certain Insurers "did not point to any difference between [Dr. Bates's expert] reports [which were filed prior to the TCC/Abuse Survivor Settlement] and Dr. Bates's testimony."  D.I. 1-3 at 218-219.  The bankruptcy court correctly concluded that the challenges to "good faith" based on this issue were nothing more than "optics." D.I. 1-3 at 222.

## II.    The Plan Does Not Abrogate The Certain Insurers' Contractual Rights

As the bankruptcy court correctly held, "a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied."  D.I. 1-3 at 251 (quoting *In re Am. Home Mortg.*, 402 B.R. 87, 923-93 (Bankr. D. Del. 2009) (emphasis in original).  The bankruptcy court found that Section 363 was satisfied:  "The Plan's transfer of rights under BSA Insurance Policies (the "Debtor Policy Assignment") is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights."   D.I. 1-1 ¶ II.I.2.   The Certain Insurers identify no authority whatsoever that their policies' interests could not be assigned, and such interests are routinely assigned by debtors.

The Certain Insurers do not cite any language in the Plan or the TDP abrogating the BSA's obligations under the insurance policies because there is none.  To the contrary, the TDP is explicit in not modifying the insurance policies and preserving the policy obligations as they existed prepetition:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending or supplementing the terms of any insurance policy or rights and *obligations* under an Insurance Policy assigned to Settlement Trust to the extent such rights and *obligations* or otherwise available under applicable law and subject to the Plan and Confirmation Order.  The rights and *obligations*, if any, of the Non-Settling Insurance Companies relating to the TDP, or any

provision hereof, shall be determined pursuant to the *terms and provisions of the Insurance Policies* and applicable law.

D.I. 1-4, Ex. A, Art. V.C (emphasis added).

The Plan again references preserving those obligations—to the extent they exist—in the assignment provision:

> The Settlement Trust's rights under any insurance policies issued by the Non-Settling Insurance Companies, *including the effect of any failure to satisfy* conditions precedent or *obligations under such policies* (other than, in case of the BSA Insurance Policies, the terms of any policies or provision of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each policy in subsequent litigation.

D.I. 1-1 ¶ II.I.2(e) (emphasis added).

Moreover, the TDP provide:

> The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code.

D.I. 1-4, Ex. A, Art. V.C.

Additionally, the bankruptcy court repeatedly referred to the obligations as part of the policies, not as having been abrogated: "If the *obligations* form the basis for claims, *they* will be treated accordingly. If the *obligations* are conditions precedent, then the Non-Settling Insurance Companies may be able to assert *those conditions* as a defense to performance." D.I. 1-3 at 253 (emphasis added). An

116

"obligation" cannot form the basis of the claim or be a condition precedent if it had been abrogated.

Thus, the "obligations" under the insurance policies were not abrogated. D.I. 1-3 at 255. Instead, what the Certain Insurers seem to argue is that, in the future, Judge Houser will breach the policies by not complying with their conditions. Speculation about a potential alleged future breach of the insurance policies does not constitute abrogation. Thus, the bankruptcy court correctly held that speculation about future breaches does not provide a ground for objecting to the Plan, and then did the opposite of abrogating the BSA's obligations under the insurance policies by holding that if the TDP:

> Creates a defense in subsequent insurance litigation, the Non-Settling Insurance Companies may reap that benefit. But, that is not certain. While there is nothing in the TDP that requires the Settlement Trustee to cooperate with the Non-Settling Insurance Companies under the Claims Matrix process, there is nothing that prohibits the Settlement Trustee from taking any and all action that she believes are appropriate or required to ensure that the Settlement Trust Insurance rights are maximized rather than compromised.

D.I. 1-3 at 216. The bankruptcy court further stated that she would "not anticipate how the Settlement Trustee will perform her duties, but I am confident she will be mindful of the need to maximize the insurance assets."[28] D.I. 1-3 at

---

[28] The Certain Insurers' argument that they are losing the ability to minimize liability by participating in defense is unsupported by evidence. The evidence is that other than Century, Hartford, and "to a lesser degree, AIG…[o]ther insurance companies were largely uninvolved with respect to defense and

230; *see also* D.I. 1-4, Ex. A, Art. X ("The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.").

The Certain Insurers argue that the Plan does not specifically provide for the BSA or the Settlement Trustee to cooperate in the defense of claims or consent to settlements or other resolutions, but there is no requirement for a plan of reorganization to provide those rights to insurers. Moreover, the BSA could always settle claims without the Insurer's consent, and it has done so numerous times in the past, subject to the risk of coverage defense. Bankr. D.I. 9354 at 91:2-8. The Settlement Trust is no different. If the Insurers believe that there is some future breach of their insurance contracts, then they retain the right to raise that

---

settlement of Abuse Claims." Bankr. D.I. 9273 ¶ 33. As the bankruptcy court found, any conclusions from Professor Harrington "about the actual impact of the loss of contractual rights is all in the hypothetical." D.I. 1-3 at 229. Professor Harrington had no knowledge of how insurers actually participate in the defense of any claims. *Id.* at 225. Indeed, as the bankruptcy court also found, "it is evident, notwithstanding the specific and narrow nature of his expertise, Professor Harrington's opinions wander outside his academic expertise into interpretation of the Plan and TDP and speak generally about 'prejudice' to litigation outcomes, an area in which he was not offered and admittedly has no experience." *Id.* at 226. The Insurers also misstate the contracts by saying that they anticipate that claims will be "settled within the context of the court system." Bankr. D.I. 9530 at 23:23-25 (Harrington). There is no language in the contract limiting settlements, and claims are routinely settled without the need for litigation. In any event, the testimony is irrelevant because of the Certain Insurers' rights under the contracts, including its right to claim breach, are fully preserved.

defense to coverage.  Moreover, the Insurers' interest is not actually to defend these claims, but rather to avoid making payments under their policies. Consequently, if the Certain Insurers can establish a coverage defense based on a breach, then the Certain Insurers are benefitted by the breach, not harmed by it.

The Certain Insurers also argue that any future failure to involve them in the defense will result in inflated awards that "would fundamentally alter the economic bargain between the parties."  D.I. 45 at 62.  As addressed above, the Certain Insurers introduced no evidence that future awards would be inflated, and the record evidence is exactly to the contrary.  *See supra* pp. 56-61.  Moreover, the bargain between the parties is set forth in the terms of the insurance policies, and it is for the Certain Insurers to pay covered claims, and to not pay claims that are not covered or are otherwise subject to a coverage defense.  If there is future award that reaches an Insurer, and they dispute their obligation to pay that award, then they will raise their coverage defense, and that defense will be adjudicated on the then-existing facts.  *See supra* pp. 62-65.  But the policies do not allow, and there never was a bargain to allow, the Certain Insurers to prevent the BSA from compensating survivors of childhood abuse or otherwise resolving claims.

The Certain Insurers' back-up argument that the bankruptcy court should have decided the insurance coverage issue is incorrect.  D.I. 45 at 87.  The requirements for confirmation do not include an obligation, or a right, to resolve

coverage disputes, much less with respect to future alleged claims. Indeed, the claim would not even be justiciable because there is no award, much less one presented to any of the Certain Insurers for payment, nor have the Certain Insurers joined issue by disputing any potential, future payment obligation. *See*, *e.g.*, *Lewis*, 494 U.S. at 479-80 (finding a claim was not justiciable where it "amounts to a request for advice as to 'what the law would be upon a hypothetical state of facts'" or is predicated on "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Haworth*, 300 U.S. at 241, and *Thomas*, 473 U.S. at 580-81); *Sherwin-Williams Co.*, 968 F.3d at 272 ("[A] dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quoting *Wyatt*, 385 F.3d at 806). Thus, the bankruptcy court correctly determined not to adjudicate future breaches that had not occurred, and might not occur. D.I. 1-3 at 231 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered"). As even Professor Harrington acknowledged, he does not know "'how anything will come out.'" *Id.* at 321, 256 ("This issue will be resolved by a coverage court in the event of any disputes."); *id.* at 224 ("[W]hile there may be some issues that are global in nature, insurance coverage litigation is often before the coverage court on whether an

insurer must pay a specific settlement entered into by the insured without the insurer's consent.  This would appear to be a fact intensive inquiry.").

Additionally, the Certain Insurers' position is completely inconsistent with the position they took before the bankruptcy court.  Various insurers have repeatedly and loudly argued that their potential liability under their insurance contracts should be decided outside of bankruptcy, by a court with jurisdiction over the coverage disputes.  *See, e.g.*, Bankr. D.I. 4716 at 214:21-25 ("[Y]ou're a bankruptcy judge.  You're not a coverage judge; you're not there to decide coverage issues, you're there to decide bankruptcy issues."); *id.* at 222:8-20 ("I don't have a qualm about Your Honor deciding bankruptcy issues…but Your Honor is not deciding – and this is what [the BSA] want[s] you to do, they want you to decide a coverage issue, an aggregate liability issue that they can then run into coverage court and say, BSA's liability has been found, it's been liquidated, who was the carrier that year? That's what this is all about…It's coverage, not bankruptcy."); *id.* at 223 ("But, again, all we're really looking for is to not have you make findings with respect to coverage issues and not alter the contractual rights."); *see also id.* at 241:18-22, 242:9-17 (explaining that "no coverage issue is going to be adjudicated" and that the bankruptcy court "can't imagine I would decide a coverage issue" in response to repeated concerns from insurers rejecting the bankruptcy court's authority to decide coverage issues).

### III. The Bankruptcy Court Did Not Err In Approving The Channeling Injunction And Releases Under Third Circuit Law

#### A. The Bankruptcy Court Properly Exercised Its Subject Matter Jurisdiction To Approve The Channeling Injunction And Releases

The D&V and Lujan Claimants argue that the bankruptcy court lacked subject matter jurisdiction to confirm the Plan and to approve the Channeling Injunction and Releases therein, challenging both the legal and factual bases for the Confirmation Opinion.  D.I. 40 at 6-16; D.I. 41 at 25-45.  They are incorrect. Under 28 U.S.C. §§ 157 and 1334, Congress vested bankruptcy courts with subject matter jurisdiction over three types of matters: (i) "proceedings arising under title 11," (ii) "proceedings arising in a case under title 11," and (iii) "proceedings related to a case under title 11."  *See* 11 U.S.C. § 157(b); D.I. 1-3 at 117–27; *see also In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016).  The Supreme Court has recognized that "Congress intended to grant comprehensive jurisdiction to the courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate," and the "related to" language must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving property of the debtor or its estate.  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). As the bankruptcy court correctly determined, it had subject matter jurisdiction to confirm the Plan both because (i) the Channeling Injunction and Releases were

"arising in" and "arising under" title 11 in the context of this plan of reorganization, and (ii) it had "related to" jurisdiction over the Abuse Claims that are the subject of the Channeling Injunction and Releases.

### 1. The Bankruptcy Court Had "Arising In" And "Arising Under" Jurisdiction To Approve The Channeling Injunction And Releases

As an initial matter, the bankruptcy court correctly concluded, and no party contested in the confirmation hearing, that the bankruptcy court had "arising under" and "arising in" jurisdiction to confirm the Plan. D.I. 1-3 at 118–19.[29] Now, on appeal, the Lujan Claimants argue that the bankruptcy court erred in exercising "arising in" jurisdiction and that the parties cannot "create" subject-matter jurisdiction on their own by agreement or by structuring a plan in such a way that it depends upon third-party contributions. *See* D.I. 40 at 7 (citing *Combustion Eng'g*, 391 F.3d at 228).[30] This argument overlooks the fundamental premise that the bankruptcy court has subject-matter jurisdiction over any matter "arising in" this "case" or "proceeding," and a confirmation hearing is a

---

[29] "'Arising under' jurisdiction refers to those causes of action specifically created by the bankruptcy statute. 'Arising in' cases involve the administration of the bankruptcy estate." *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *13 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 267 (3d Cir.1991)).

[30] In *Combustion Engineering*, cited by the Lujan Claimants, the Third Circuit focused entirely on "related to" jurisdiction without addressing "arising in" or "arising under" jurisdiction as the bankruptcy court correctly observed. D.I. 1-3 at 119; *see Combustion Eng'g*, 391 F.3d at 227.

proceeding that necessarily "could arise only in the context of a bankruptcy case." D.I. 1-3 at 118–19 (quoting *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014) (citation omitted); *see also Stoe v. Flaherty*, 436 F.3d 209, 218 (3d Cir. 2006), *as amended* (Mar. 17, 2006); *710 Long Ridge*, 2014 WL 886433 at *13. The bankruptcy court relied on sections 105, 1123 and 1129 of the Bankruptcy Code as the statutory bases for approving the Channeling Injunction and Releases. The bankruptcy court therefore had arising in—as well as arising under—jurisdiction to confirm the Plan, including the Channeling Injunction and Releases that form "the cornerstone of the Plan" and an integral part of the settlements memorialized in the Plan. D.I. 1-3 at 154–55.

"Bankruptcy 'arising under' jurisdiction is analogous to 28 U.S.C. § 1331" and exists where "the Bankruptcy Code creates the cause of action or provides the substantive right invoked." *Stoe*, 436 F.3d at 216–217. Here, the Channeling Injunction and Releases were considered in the context of a confirmation hearing, which can only occur with respect to a plan being considered under the relevant provisions of the Bankruptcy Code. *See* D.I. 1-3 at 118.

Third Circuit precedent establishes that bankruptcy courts have statutory jurisdiction to approve third-party releases. In *Millennium Lab Holdings II*, the court of appeals held that "Bankruptcy Court indisputably had 'core' statutory authority to confirm" a plan containing third-party releases because "'[c]ore

proceedings include…confirmations of plans.'"  945 F.3d 126, 137 (3d Cir. 2019)

(28 U.S.C. § 157(b)(2)).  The *Millennium Lab Holdings* court went on to hold that,

because the non-debtor releases were "integral to the restructuring of the debtor-

creditor relationship," the constitutional overlay on bankruptcy court jurisdiction

laid out by the Supreme Court in *Stern v. Marshall* did not change the result.  *Id.* at

138.  As the bankruptcy court concluded, the Channeling Injunction and Releases

here are unquestionably integral to the restructuring of the debtor-creditor

relationship.  *See* D.I. 1-3 at 117–29 (citing *In re Charles St. African Methodist

Episcopal Church of Boston*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013)) (holding

that a plan of reorganization, the "unitary omnibus civil proceeding for the

reorganization or adjustment of all obligations of the debtor and disposition of all

the debtors' assets," was the "quintessential bankruptcy matter" and thus, "arising

under" jurisdiction existed over third party releases," "*even without recourse to its

related-to jurisdiction*." (emphasis added)); *710 Long Ridge*, 2014 WL 886433, at

\*13 ("The bankruptcy court's jurisdiction to adjudicate core proceedings, including

those in the process of plan confirmation, includes granting releases and

injunctions in appropriate circumstances.")).  As a result, the bankruptcy court had

"arising in" and "arising under" jurisdiction to approve them as part of a plan.[31]

---

[31]  The Lujan Claimants argue that the Bankruptcy Court lacked "arising in" and
"arising under" jurisdiction to approve the Channeling Injunction and Releases
because the underlying abuse claims arose prepetition under non-bankruptcy

### 2.    The Bankruptcy Court Had "Related To" Jurisdiction To Approve The Channeling Injunction And Releases

In addition to its "arising in" and "arising under" jurisdiction, the bankruptcy court also correctly determined that it had "related to" jurisdiction—a third independent basis to vest the bankruptcy court with statutory authority to approve the Channeling Injunction and Releases.  D.I. 1-3 at 120.  Courts have "related to" jurisdiction over proceedings, including third-party claims, in circumstances where "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original omitted); *see also Combustion Eng'g*, 391 F.3d at 226 ("suits between third parties that conceivably may have an effect on the bankruptcy estate" are "'related to' a title 11 case"); *accord Celotex*, 514 U.S. at 308 ("We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc.* v. *Higgins*[.]").  An action satisfies the "conceivable effect" test "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor*, 743 F.2d at 994.  The

---

law rather than under the Bankruptcy Code.   D.I. 40 at 7.   But this misapprehends relevant law.  Claims and liabilities addressed by a confirmation hearing *always* arise prior to the filing of a chapter 11 case and under non-bankruptcy law.

"key word [in the *Pacor* test] is 'conceivable.'  Certainty, or even likelihood, is not a requirement." *Marcus Hook*, 943 F.2d at 264 (citation omitted).

Whether a claim is sufficiently "related to" a bankruptcy case to warrant the exercise of subject matter jurisdiction depends on the facts and circumstances of the particular case. *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n.9 (3d Cir. 2009), *cert. denied*, 562 U.S. 839 (2010).  The Third Circuit has held that third-party claims against non-debtors are "related to" a bankruptcy case where the action against the non-debtor "affect[s] the bankruptcy [] without the intervention of yet another lawsuit." *Id.* at 173 (citing *In re Fed.-Mogul Glob. Inc.*, 300 F.3d 368, 382 (3d Cir. 2002); *Combustion Eng'g*, 391 F.3d at 232).  Courts may therefore exercise "related to" jurisdiction over third-party claims where the debtor is the real party defendant or where the claims implicate indemnification obligations owed by, or insurance policies shared with, the debtor. *See, e.g.*, *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1002 (4th Cir. 1986) (finding "related to" jurisdiction based on findings of identity of interest, express indemnification rights, and shared insurance); *see also Combustion Eng'g*, 391 F.3d at 228, 230-31 (noting that corporate affiliation may be sufficient for "related to" jurisdiction "if supported by factual findings demonstrating that a suit against [non-debtors] would deplete the estate or effect its administration" and finding that shared insurance may be sufficient if supported by evidence of automatic liability); *W.R. Grace*, 591

F.3d at 171 (indicating that for a finding of "related to" jurisdiction indemnification rights must accrue upon the filing of the claim without the intervention of another lawsuit).

Here, the bankruptcy court found that the third-party claims subject to the Channeling Injunction and Releases have a "conceivable effect" on the BSA's estates. *See* D.I. 1-3 at 120–25. Specifically, the bankruptcy court found that "related to" jurisdiction exists with respect to the Abuse Claims "for any or all" of several reasons, including: (a) a clear identity of interest based on interconnectedness among the BSA and the other Protected Parties, Limited Protected Parties and Opt-Out Chartered Organizations (collectively, the "Releasees"), which each benefit from the protections afforded by the Channeling Injunction and Releases, *see* D.I. 1-3 at 133–35; Bankr. D.I. 9341 at 263: 14–264:1; (b) shared insurance coverage among the BSA, the Local Councils, and the Chartered Organizations, which, if depleted, would reduce property of the BSA's estates that would otherwise be available for distribution to creditors, *see* D.I. 1-3 at 133–35; Bankr. D.I. 9341 at 263: 14–264:1; (c) contractual indemnification obligations among the BSA, Local Councils and certain of the other Releasees, including Chartered Organizations and the BSA's Representatives, which obligations, when triggered, would deplete property of the estates, *see* D.I. 1-3 at 122-23, 127; and (d) the BSA's residual interest in all of the Local Councils'

property in the event of any such Local Council's dissolution or the revocation of its charter.[32]  D.I. 1-3 at 4 n.25, 120–21.  Each of these reasons are independently sufficient to provide jurisdiction; considered together, the bankruptcy court's exercise of subject-matter jurisdiction was more than well-founded.

### a.    Interconnectedness

"Related to" jurisdiction is appropriately exercised where there is an identity of interest between a non-debtor codefendant and the debtor, such that the debtor is the real party in interest.  *See McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997) (extending the automatic stay to nonbankrupt codefendants where "there is there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a

---

[32] For similar reasons, the bankruptcy court determined (and such determination was uncontested) that it also had "related to" jurisdiction over Abuse Claims asserted against Related Non-Debtor Entities and the Debtors' officers, directors, and other Representatives. D.I. 1-3 at 125–26. There is uncontroverted evidence that there is an identity of interest between the Debtors and (a) Related Non-Debtor Entities because the BSA defended and settled prepetition Abuse Claims on their behalf before the Petition Date, and all of the Related Non-Debtor Entities are additional insureds under the BSA's insurance policies, D.I. 1-3 at 125; D.I. 9273 ¶ 4; 9280 ¶ 203; *see, e.g.* JTX 10-36; JTX 10-37, and (b) their Representatives, many of whom are volunteers, who participated in relevant decision-making and worked tirelessly throughout the Chapter 11 Cases to formulate a plan of reorganization that would provide compensation to survivors, all while continuing to carry out the mission of Scouting. D.I. 1-3 at 125–27; D.I. 9341 at 41:19-24, 22:19025. Further, the BSA's Charter and Bylaws provide the BSA's officers and directors with automatic contractual rights to indemnification. D.I. 1-3 at 126; JTX 234 Art. XIII Sec. 1.

judgment against the third-party defendant will in effect be a judgment or finding against the debtor.") (citing *A.H. Robins*, 788 F.2d at 999); *In re Dow Corning Corp.*, 86 F.3d 482, 493 (6th Cir. 1996) (noting that "[t]he degree of identity between a debtor and nondebtor codefendants" is an important factor and holding that there was "related to" subject matter jurisdiction over claims pending against nondebtor defendants).

Courts have found an identity of interest between a debtor and a non-debtor where third-party claims center on the debtor's product or operations and allege joint responsibility among the debtor and non-debtor defendants. *See, e.g.*, *Dow Corning*, 86 F.3d at 492–94 & n.11 (finding identity of interest where litigation centered on debtor's role as manufacturer and/or supplier and claims demonstrated a relatedness between the parties); *A.H. Robins*, 788 F.2d at 996, 1014 (finding identity of interest with respect to claims arising out of use of single device manufactured by the debtor); *W.R. Grace*, 386 B.R. at 30–32 (finding identity of interest where debtor's conduct and operations were "at the core" of third-party claims against non-debtors); *cf. Combustion Eng'g*, 391 F.3d at 230–31 (distinguishing "single product" case law and declining to exercise "related to" jurisdiction over claims arising out of non-debtors' product line, which products were not manufactured or distributed by the debtor or subject to contractual indemnification obligations of the debtor).  In other words, "the existence of strong

interconnections between the third party and the bankruptcy" commonly serves as the basis for the exercise of "related to" jurisdiction. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003) (collecting cases).

"The proper inquiry," according to the Third Circuit,

> is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it….[T]his approach does not require the reviewing court to decide state-law claims on the merits. It does, however, require it to ascertain what liability under the relevant law demands.

*In re W.R. Grace & Co.*, 13 F.4th 279, 286 (3d Cir. 2021). A claim against a third party may be derivative even if the claim is based on the third party's own misconduct. *See id.* The mere fact that "a third party is alleged to have engaged in some wrongdoing is not enough to render a claim against it independent if its liability depends on the debtor's liability." *Id.*

Here, the main theories of liability against Local Councils and Chartered Organizations are negligence and respondeat superior.[33] *See* D.I. 1-3 at 9-10, 138-

---

[33] It is irrelevant that each Local Council and Chartered Organization is legally separate from the BSA. *See* D.I. 1-2 at 136. Indeed, if they were all the same entity—or if they had all the same duties and liabilities—third-party releases would not be necessary and this entire discussion would be meaningless. *Id.* Moreover, the Lujan Claimants' speculation that survivors hold independent claims against non-debtors is similarly unpersuasive and absent from the record. Critically, the Lujan Claimants filed proofs of claim to assert that the BSA bears responsibility for Scouting-related Abuse, and identifying both Local

140; *see generally* SA 1602, SA 2291, SA 1614, SA 618. The negligence-based Scouting-related Abuse Claims asserted against the Protected Parties, Limited Protected Parties and Opt-Out Chartered Organizations are not, and could never be, "wholly separate from the debtor's liability." *In re W.R. Grace & Co.*, 900 F.3d 126, 137 (3d Cir. 2018); *see also* D.I. 1-3 at 140. Similar to the plaintiffs' claims against the insurer in *W.R. Grace*, the liabilities of these parties in this case "depend[] on the debtor's liability." 900 F.3d at 136; *see also* D.I. 1-3 at 138-40; SA 3697 ¶¶ 6, 14, 39-40, 49; SA 529 ¶¶ 141–42, 147; SA 2357 ¶ 11. The evidence at trial demonstrated that such claims are based upon the Scouting system that the BSA designed and has implemented at a local level by granting charters to Local Councils and Chartered Organizations in accordance with BSA's Rules and Regulations. *See* D.I. 1-3 at 8–10, 138–40. The Local Councils and Chartered Organizations follow the BSA's protocol with respect to volunteers. *See id*. at 4–5. Importantly, a part of that protocol involves the BSA maintaining an ineligible volunteer file. *See id*. at 8; SA 1614, SA 2381, SA 618 ¶ 150. The BSA's youth protection standards and Scouting programming are also key to the plaintiffs' various negligence-based theories of liability. *See id*. at 133–39 nn.451–53; SA 3697 ¶¶ 6, 14, 39-40, 49; SA 529 ¶¶ 141–42, 147; SA 2357 ¶ 11; SA 1602 ¶ 28;

---

Councils and Chartered Organizations for the same liabilities attributable to the BSA. D.I. 1-3 at 134; SA 3697 ¶ 14.

SA 2291 ¶¶ 44–45; SA 1614 ¶¶ 21–23, 27–28, 87–88; SA 618 ¶124.  Indeed, the evidence demonstrated that it is these policies and procedures that guide factfinders to determine whether there was negligence.  *See generally* D.I. 1-3 at 7–10; SA 1614 (referencing the BSA's policies and procedures in a complaint against the BSA); SA 2381 (same); SA 618 (same).  Abuse survivors cannot plead a cause of action under these negligence theories without directly implicating the BSA's asserted wrongdoing.  *See* D.I. 1-3 at 19, 133, 138; Bankr. D.I. 9273 ¶¶ 6, 19 (noting that pending abuse claims generally included BSA as a defendant or co-defendant); *see, e.g.*, SA 2357 ¶ 11.  Nor could the Local Councils or Chartered Organizations properly respond to a case under these negligence theories without implicating the BSA's standards, programing, management and the ineligible volunteer files.  *See* D.I. 1-3 at 7–10, 138–40; Bankr. D.I. 9273 ¶¶ 18–19, 29–30.  Like the programs themselves, the liability in these negligence cases is rooted in a system that was created by, and necessarily implicates at every level, the BSA.  *See* D.I. 1-3 at 8, 138–40; Bankr. D.I. 9273 ¶¶ 6, 18–19; *see, e.g.*, SA 2357 ¶ 11.  This is reflected in the BSA's historic practice of jointly defending and settling abuse claims on behalf of Local Councils and Chartered Organizations.[34]  *See* Bankr. D.I.

---

[34] The Lujan and D&V Claimants' own prepetition complaints rely upon the interconnected relationship that they now attempt to refute.  D.I. 1-3 at 133 (citing complaints asserting that (i) BSA and the Local Councils controlled the selection of Scout leaders; (ii) that BSA conspired with the Local Council and Chartered Organization in carrying out the alleged tortious and unlawful

9273 ¶¶ 4–9, 17–18, 20, 48.  Because the BSA's conduct was always at issue in

Abuse Claims, the BSA was the "real party defendant" in defending Abuse Claims.

*See A.H. Robins*, 788 F.2d at 999; *see also* D.I. 1-3 at 136 (acknowledging BSA's

historical prepetition practices).

The Plan clearly provides that liability that is not connected to the BSA is

***not*** released.  For example, with respect to Mixed Claims (which are claims that

include both Scouting and non-Scouting-related Abuse), only those portions of

Mixed Claims arising from Scouting will be channeled and released.  *See* D.I. 1-4

Arts. I.A.18, I.A.184, I.A.258, I.A.259.  There can therefore be no concern that

there is only an "incidental" relationship connecting the Channeling Injunction and

Releases to the BSA.  *W.R. Grace*, 900 F.3d at 137.

The D&V and Lujan Claimants cannot refute the overwhelming evidence

that demonstrates the interconnectedness of the BSA, Local Councils, and

Chartered Organizations and supports the bankruptcy court's finding of identity of

interest.[35]  *See* D.I. 40 at 14–16;[36] D.I. 41 at 31-33.  The BSA, Local Councils, and

---

conduct; and (iii) asserting that BSA was aware of the abuse, kept that
information secret, and did nothing to change the Scouting program).

[35]  The bankruptcy court also found an identity of interest due to the reciprocal
nature of the leadership of the BSA, Local Councils, and Chartered
Organizations.  *See* D.I. 1-3 at 121.  Specifically, each Chartered Organization
has a seat on the board of its Local Council, and each Local Council has
members on the National Council that elects the National Executive Board of
the BSA.  Bankr. D.I. 9279 ¶ 6; SA 8 Art. VI Sec. 7.

Chartered Organizations clearly have such an identity of interest here, as the bankruptcy court correctly found.  D.I. 1-3 at 120–24, 133–36.[37]

In spite of the overwhelming trial evidence of interconnectedness, the D&V and Lujan Claimants contend in a few instances that that the BSA did not universally settle or defend cases on behalf of the tripartite group.  D.I. 40 at 14–15; D.I. 41 at 33–34.  To support these arguments, the D&V and Lujan Claimants cite nine lawsuits in which plaintiffs alleged abuse for which defendants were liable but that were unrelated to Scouting, which misses the point entirely.  The BSA handled Scouting-related Abuse Claims (and only Scouting-related Abuse Claims) on behalf of the entire tripartite group.[38]  *See* D.I. 1-3 at 19–20; Bankr. D.I.

---

[36] In support of their erroneous position that the BSA and other members of the tripartite group are not interconnected and that the BSA has no control over Local Councils or Chartered Organizations, the D&V Claimants rely on a declaration of a now-former BSA employee, which was filed in a Scouting-related abuse case in Oregon more than twelve years ago.  Adv. D.I. 729; *see also* D.I. 40 at 12.  The declaration is in the record, but has not been admitted for the truth of the matter asserted therein.  Bankr. D.I. 9591 ¶ 3.  In addition to being inadmissible hearsay, the declaration fails to rebut the uncontested evidence presented by the Debtors at confirmation regarding the interconnectedness and control-based relationship among the BSA, Local Councils, and Chartered Organizations.

[37] Bankr. D.I. 9341 at 17:14-18:15, 49:15-19, 49:20-50:1, 50:12-15, 54:22-25, 206:10-21, 263:16-25; Bankr. D.I. 9316 ¶ 11; Bankr. D.I. 9398 ¶¶ 15, 17-18, 25, 28; Bankr. D.I. 9273 ¶¶ 4, 6, 19, 48; Bankr. D.I. 8647, Ex. A-1 at 13; SA 96, SA 1616, SA 1620, SA 2665, SA 2810, SA 68, SA 97, SA 107, SA 374, SA 409, SA 434, SA 68; Bankr. D.I. 9407 at 95:19, 97:5-18.

[38] The Lujan and D&V Claimants' arguments focus on Mixed Claims, rather than Scouting-related Abuse Claims and confuse the two.  *See* D.I. 41 at 33–34; D.I.

9273 ¶¶ 4–6, 9–19, 29.   Claims that alleged abuse outside of the Scouting context,

such as claims asserted against the AOA and TCJC (unrelated to their roles as

Chartered Organizations), were handled differently.   Bankr. D.I. 9273 ¶ 20; *see*

*also* Bankr. D.I. 9354 at 191:11-192:6 (Griggs describing that Guam was an

exception because the perpetrator of abuse, Father Brouillard, encountered

claimants first within the church and then brought such claimants into Scouting);

---

40 at 14–15.   But as noted above, the Plan does not channel any claims that are
unrelated to Scouting, including those portions of a Mixed Claim, unrelated to
Scouting; the Channeling Injunction and Releases are narrowly tailored to relate
solely to Scouting-related Abuse Claims.   D.I. 1-4 Arts. I.A.18, I.A.184,
I.A.258, I.A.259.   For example, in the cases cited by the Lujan and D&V
Claimants, *Hammerberg v. BSA*, the court noted that the sexual advances the
perpetrator made toward the plaintiff "occurred during non-scouting
interactions."   No. 2012-0224433 (GJP), 2015 WL 6115412, at *3 (Mass.
Super. Ct. Aug. 11, 2015).   In *John Roe #1 v. BSA Corp.*, the court noted that it
was significant that the perpetrator was the plaintiff's stepfather and was in a
relationship with the victim's mother prior to their involvement in Scouting,
and that the sexual abuse in question stemmed from non-Scouting camping trips
at sites unaffiliated with the BSA or local council.   84 A.3d 443, 450 (Conn.
App. Ct. 2013).   In *Hobbs v. BSA, Inc.*, the abuse in question occurred during
the 24-hour period before the authorized Scouting event, and the court was
unable to find that the BSA "had anything to do with authorizing or
encouraging [the perpetrator] to pick up [the victim] to take him to the
campout."   152 S.W.3d 367, 371 (Mo. Ct. App. 2004).   In *Golden Spread
Council, Inc. # 562 of the BSA v. Akins*, the court noted that the perpetrator
molested the victim prior to the victim's involvement in the Scouting, and that
the perpetrator "did not molest [the victim] while the two were associated with
Troop 22."   926 S.W.2d 287, 289 (Tex. 1995).   Further, when the perpetrator
was later arrested and convicted of child molestation, "[t]he record did not
reflect whether any offenses for which [the perpetrator] was convicted involved
a boy in the Boy Scouts."   *Id.*   These cases underscore the Plan's proper
differentiation of the Scouting-related portion of an Abuse Claim from the non-
Scouting-related portion of such claim.

Bankr. D.I. 9273 ¶ 4.  Where claims against the BSA were dismissed but claims against other members of the tripartite group were not, the cases were distinguished by unique circumstances,[39] and these instances are not a departure from the Debtors' overall historical practice of jointly defending and settling Abuse Claims on behalf of Local Councils and Chartered Organizations.[40]  *See* D.I. 1-3. at 136; Bankr. D.I. 9273 ¶ 4.

---

[39] *See John Roe #1 v. BSA Corp.*, 84 A.3d 443 (the perpetrator was the plaintiff's stepfather and was in a relationship with the victim's mother prior to their involvement in Scouting); *Hobbs v. BSA*, 152 S.W.3d 367 (the plaintiff did not sue the local troop officers or the chartering and sponsoring organization of the local troop so their liability was not at issue); *N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints,* 307 P.3d 730, 734 (2013) (the perpetrator was accepted as a volunteer by the church, but never officially registered with the BSA, and the record did not contain evidence raising an inference that either the BSA or the Local Council were even aware of the perpetrators existence, let alone his participation in Scouting); *Infant C. v. Boy Scouts of Am., Inc.*, 391 S.E.2d 322 (Va. 1990) (affirming a judgement where the plaintiff concurred in submitting the  issue of agency to the jury, and the jury found in favor of the BSA); *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377 (2000), *on appeal*, 2004 WL 1211952 (June 3, 2004) (the court reversing summary judgement for the BSA and Local Council and remanding the case for further proceedings, but affirming summary judgement in favor of a church which was not a participant in Scouting, and did not control the local Troop, but merely provided the facility that the local Troop used to hold meetings).

[40] At least one example offered by the Lujan and D&V claimants is particularly disingenuous as they point to the fact that a limited set of counts against the BSA were dismissed without mentioning that a number of additional counts against the BSA remained pending—thus demonstrating the interconnected nature of these claims. *See, e.g.*, *Hammerberg v. BSA*, 2015 WL 6115412, at *4 (the court dismissing only a narrow set of claims against the BSA for negligent hiring, but preserving remaining counts for negligent infliction of emotional

### b.    Shared Insurance

The Third Circuit has also recognized that courts have found "related to" jurisdiction over claims against non-debtors based in part on shared insurance policies."[41] *Combustion Eng'g*, 391 F.3d at 226.  A dollar-for-dollar reduction of the debtor's available insurance coverage—property of the estate under section 541 of the Bankruptcy Code—without the need for an intervening action is precisely the type of effect on the estate that can adversely affect a debtor's reorganization and provide the basis for "related to" jurisdiction over a third-party claim.  *See, e.g.*, *SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*, 388 B.R. 579, 584 (Bankr. D. Del. 2008) ("Depletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate."); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92–93 (2d  Cir. 1988)

---

distress, breach of fiduciary duty, and negligence against the BSA before ultimately dismissing all remaining claims against both the BSA and Local Council for the separate reason that they were subject to a charitable immunity statute).

[41]  For more than 45 years, the BSA's insurance program has provided coverage for Abuse Claims to all Local Councils and, by 1978, all Local Councils were added as named insureds under the BSA's insurance policies.  Bankr. D.I. 9316 ¶ 11; Bankr. D.I. 9398 ¶¶ 15, 17; Bankr. D.I. 9398 ¶18; Bankr. D.I. 9490 19:6-7.  Chartered Organizations have been named as additional insureds under both the BSA's policies and the Local Councils' policies for certain periods of time. SA 3824; Bankr. D.I. 9398 ¶ 25; Bankr. D.I. 9490 at 22:12-19; Bankr. D.I. 9398 ¶ 19.  In addition, certain independent policies issued to Local Councils also insured Chartered Organizations. D.I. 1-3 at 122; Bankr. D.I. 9490 at 103:22-104:2; ADV 717.

(noting that where "third  parties [sought] to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct…plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets."); *In re Quigley Co*., 676 F.3d 45, 47 (2d Cir. 2012) ("[W]here litigation of [the suits] against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate  of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").[42]

The insurance coverage that the BSA shares with Local Councils and Chartered Organizations for Abuse Claims is subject to per-occurrence limits and, in certain instances, aggregate policy limits.  The BSA's insurance policies are also generally subject to combined single limits, which caps the amount of insurance available for a single occurrence regardless of the number of insureds.  *See* D.I. 1-3 at 121; *See* D.I. 1-3 at 121; SA 2665, SA 3082, SA 3165, SA 3189, SA 3333, SA 2701, SA 3572, SA 3645, SA 3674.  In other words, as the bankruptcy court

---

[42] The D&V Claimants assert that shared insurance, by itself, is insufficient to confer "related to" jurisdiction.  D.I. 41 at 24, 36–37.  The bankruptcy court relied on several bases to concluding that it had "related to" jurisdiction.  As a result, this Court need not decide whether shared insurance, standing alone, is sufficient to confer jurisdiction, although there is ample evidence in these cases that the complex and competing claims against the BSA's insurance are sufficient to confer subject matter jurisdiction on the bankruptcy court.  D.I. 1-3 at 120–22.

observed, "if an insurer paid out its per occurrence limits to plaintiff A to either a Chartered Organization or Local Council, there would be no insurance remaining to respond to a claim on the policy by BSA for Abuse alleged against it by plaintiff." *Id.* And as the bankruptcy court correctly determined, no second suit is necessary. *Id*. at 123.

### c.   Contractual Indemnification

The Third Circuit also recognizes that indemnification rights of non-debtors against a debtor support "related to" jurisdiction over third-party claims where "the right to indemnification is clearly established and has accrued upon a filing of a civil action." *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014). Such indemnification rights, to give rise to subject matter jurisdiction, cannot be contingent on the factual findings of subsequent litigation. *Id; see also Combustion Eng'g*, 391 F.3d at 231 (indemnification rights are not clearly established or accrued where the lawsuit "would not, itself, result in the indemnification against the debtor"); *In re Fed.-Mogul*, 300 F.3d 368 (same).

The BSA's and Local Councils' indemnification obligations support the bankruptcy court's exercise of "related to" jurisdiction. D.I. 1-3 at 121. Chartered Organizations have asserted contractual claims (as well as common law claims) against both the BSA and Local Councils for indemnification for losses related to

Abuse Claims, including in thousands of proofs of claim filed in the Chapter 11 Cases.  D.I. 1-3 at 121 (citing SA 406 – SA 472).  In recognition of the critical roles that Chartered Organizations and Local Councils play in the delivery of Scouting, the BSA adopted board resolutions in which it agreed to defend and indemnify Chartered Organizations, in addition to maintaining and providing general liability insurance for Chartered Organizations in connection with the delivery of Scouting.  *Id*. at 122; ADV 721.  Further, every year each Local Council signs an Annual Charter Agreement with each Chartered Organization that provides the Chartered Organization with a contractual right of indemnification against the Local Council with respect to any Scouting-related Abuse Claim.  ADV 717.  Since 2014, the Annual Charter Agreements have provided that the "[t]he Local Council agrees to:…[i]ndemnify the Charter Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America."  Bankr. D.I. 9316 ¶ 69.  As noted above, and as the bankruptcy court correctly ruled, Local Councils' indemnification obligations to Chartered Organizations may diminish the BSA's residual interest in Local Council property.[43]  D.I. 1-3 at 121.

---

[43]  The D&V Claimants argue that the Annual Charter Agreements do not actually create indemnity obligations because they did not exist at the time that most Abuse Claims arose.  D.I. 41 at 40, 44.  This, too, is unavailing.  *See* Bankr. D.I. 9316 ¶ 69.  There is no evidence that these agreements do not apply to all applicable claims, whenever arising.

The record demonstrates that the BSA's and Local Councils' contractual indemnification obligations are immediate, clearly established, accrued by the filing of Abuse Claims, and in no way dependent on potential third-party claims. D.I. 1-3 at 123.  As the bankruptcy court recognized, no second lawsuit is necessary to establish the existence of this liability.  *Id*. at 12.

### d.     The BSA's Residual Interest In Local Council Property

Bankruptcy courts indisputably have jurisdiction over property of the debtor. *See* 28 U.S.C. § 1334(e) (granting "exclusive jurisdiction…of property of the estate").  And claims against property of the estate indisputably fall within a bankruptcy court's "related to" jurisdiction.  *See Pacor*, 743 F.2d at 996 n.15 (actions that "sought to affect property of the estate" are within "related to" jurisdiction).  As a further basis for exercising "related to" jurisdiction, the bankruptcy court found that the BSA's residual interest in Local Council property constitutes property of the estate.  D.I. 1-3 at 4, 121.

In particular, the BSA holds a contingent interest in Local Council property that would be triggered by the BSA's termination of a Local Council charter or by the dissolution of a Local Council.  This interest is set forth in the BSA's Bylaws and Rules and Regulations, as well as in the form of Local Council bylaws. D.I. 1-3 at 4, 121; BSA Bylaws Art. VI § 1, cl.2; *see also* JTX 147 Art. X Sec. 2. Although Local Councils are legally separate entities that hold title to property in

142

their own name, such property automatically reverts to the BSA upon the revocation of the Local Council's charter or the Local Council's dissolution. Under the Bankruptcy Code, the BSA's residual interest is indisputably "property of the estate." Accordingly, the bankruptcy court recognized that any Abuse Claim that diminishes the assets of Local Council or triggers the Local Councils' indemnification obligations to Chartered Organizations would also necessarily diminish the assets of the BSA's estates.[44]

### B.   The Bankruptcy Court Has Statutory Authority To Grant The Channeling Injunction And Releases

The D&V and Lujan Claimants have failed to prove that the bankruptcy court erred in exercising its statutory authority to channel and release claims as described in the Plan. *See* D.I. 40 at 22; D.I. 41 at 50. Recognizing that chapter 11 presents many complex issues, Congress enacted several provisions that provide bankruptcy courts the flexibility to accommodate unique, case-specific circumstances. Certain of those provisions include sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code, which the bankruptcy court correctly

---

[44] The D&V Claimants argue that, because the residual interest is subject to all superior interests, including valid claims against a Local Council, it is "impossible" that payment of claims against a Local Council would diminish the BSA's interest. D.I. 41 at 38. But the BSA has a residual interest in *all* Local Council property, and the payment of debts by a Local Council, including on account of Abuse Claims, reduces the value of that residual interest to the detriment of the estate.

relied upon to provide the statutory basis for the nonconsensual third-party releases in the Plan:

- Section 105(a) empowers the court to adopt flexible remedies, consistent with its powers as a court of equity, as "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

- Section 1123(a)(5) requires a plan to provide "adequate means" of implementation "[n]otwithstanding any otherwise applicable nonbankruptcy law" and provides a non-exhaustive list of potential mechanisms.

- Section 1123(b)(6) allows a plan to include "any other appropriate provision not inconsistent with applicable provisions of [the Bankruptcy Code]."

D.I. 1-3 at 128. Additionally, section 1129(a)(1) requires a plan to comply "with the applicable provisions of [the Bankruptcy Code]" and also provides authority to approve third party releases.

When viewed together, these provisions confer what the Supreme Court has described as a bankruptcy court's "residual authority" to formulate plans that enable successful and value-maximizing reorganizations, including relief not specifically authorized elsewhere in the Bankruptcy Code. *See United States v. Energy Res. Co.,* 495 U.S. 545, 549 (1990). In *Energy Resources,* the Supreme Court held that the bankruptcy court had the authority under sections 105(a) and 1123(b)(6), even though the Bankruptcy Code did not explicitly so provide, to reallocate the debtor's tax liabilities "if the bankruptcy court determines that this [reallocation] is necessary to the success of a reorganization plan." *Id.* at 549. In

particular, the Supreme Court held that this residual authority existed to effectuate relief appropriate and "necessary to the success of a reorganization plan." *Id*. at 551; *see also United States* v. *Pepperman*, 976 F.2d 123, 130 (3d Cir. 1992) (noting that "the [Supreme] Court in *Energy Resources* consistently linked its holding with the fact of reorganization and the debtor's need for rehabilitation").

*Energy Resources* shows that sections 105(a) and 1123(b)(6) are sufficiently broad to authorize plan provisions that are both fair and necessary to the reorganization, including third-party releases, so long as such provisions are not inconsistent with the Bankruptcy Code.  Courts and commentators have noted the similarity between the tax allocation orders upheld in *Energy Resources* and non-debtor releases.[45]  And the Third Circuit has read *Energy Resources* to provide that bankruptcy courts have "power to do what is necessary to get the plan confirmed," *In re Kaplan*, 104 F.3d 589, 598 n.19 (3d Cir. 1997), and that "a showing of need for a reorganization or similar purpose" is sufficient grounds for bankruptcy courts

---

[45]  *See, e.g.*, *Wetherbee v. Willow Lane, Inc. (In re Bestway Prods., Inc.)*, 151 B.R. 530, 538 n.27 (Bankr. E.D. Cal. 1993) (noting that the tax allocation order in *Energy Resources* is the "functional equivalent of a discharge for specific debts for someone other than the debtor"); Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 EMORY BANKR. DEV. J. 13, 115 (2006) (noting that both "permit the modification of *non-debtor* obligations" and that "while both tax allocation orders and channeling releases . . . restrict[] the *sources* from which the creditor may recover, neither actually abrogates the creditor's legal *right* to payment") (emphasis added and internal citation omitted).

to craft flexible remedies not explicitly authorized elsewhere in the Bankruptcy Code. *Pepperman*, 976 F.2d at 131.

Based on these provisions, the Third Circuit, courts within the Third Circuit and other courts have repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances. *See, e.g.*, *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214–15 (3d Cir. 2000) (holding that a third-party injunction would be proper under section 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *Glob. Indus.*, 645 F.3d at 206 (explaining that a third-party injunction under section 105(a) requires showing with specificity that an injunction is both necessary to the reorganization and fair) (citing *Cont'l Airlines*, 203 F.3d at 214); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) (The "residual authority" derived from sections 105(a) and 1123(b)(6) "permits the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the Bankruptcy Code."); *In re Seaside Eng'g & Surveying*, 780 F.3d 1070, 1076–79 (11th Cir. 2015) (citing section 105 when approving third party releases); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (citing section 105(a) when affirming order enjoining suits against third parties*; In re A.H. Robins Co.*, 88 B.R. 742, 754 (E.D. Va. 1988) (citing section

105 when approving third party releases); *In re Signal Int'l, Inc.*, No. 15-11498 (MFW) (Bankr. D. Del. Nov. 24, 2015) [D.I. 555] at 11 (finding that the plan provides adequate and proper means for its implementation, including third party releases, thereby satisfying section 1123(a)(5)).

The Lujan and D&V Claimants also argue that the Channeling Injunction and Releases are prohibited under sections 524(e) and 524(g). *See* D.I. 40 at 16; D.I. 41 at 24, 47. But the Third Circuit has rejected the argument that section 524(e) bars nonconsensual third-party releases. *PWS*, 228 F.3d at 247 (determining that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties," but rather "concluded . . . the releases at issue were impermissible because the hallmarks of permissible non-consensual releases . . . [were] absent") (internal quotation marks omitted). Rather, the releases in *Continental* were invalidated because the "[p]laintiffs received no consideration" and there was "nothing in the record" in terms of specific factual findings demonstrating the necessity of the releases. *Cont'l Airlines*, 203 F.3d at 215.

Similarly, section 524(g), which expressly authorizes third-party releases in asbestos cases, does not render such releases impermissible in non-asbestos cases. D.I. 1-3 at 129. In fact, Congress enacted a rule of construction in section 524(g) that contradicts the inference that the Lujan and D&V Claimants ask this Court to

make, legislating that "[n]othing in . . . the amendments made by [§ 524(g)-(h)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Bankruptcy Reform Act, Pub. L. 103-394 § 111(b) (1994); *see also* 140 Cong. Rec. 27,692 (Oct. 4, 1994). Accordingly, section 524(g) expressly provides that it *cannot* be used to prohibit relief otherwise allowed by the Bankruptcy Code. Because the Lujan and D&V Claimants' argument flies in the face of the express legislative history of section 524(g), it should not be credited.[46]

The Court should also reject the D&V and Lujan Claimants' reliance on *In re Purdue Pharma*, 635 B.R. 26 (S.D.N.Y. 2021) for the proposition that the bankruptcy court does not have statutory authority to grant the Channeling Injunction and Releases. First, this Court should disregard the district court's decision in *Purdue*, which is currently on appeal before the Second Circuit, because it misinterprets the Bankruptcy Code and is contrary to controlling Third Circuit law. *See Cont'l Airlines*, 203 F.3d at 214.

---

[46] Moreover, the legislative history of section 524(g), which retroactively approves prior asbestos injunctions, demonstrates that Congress sought to "remov[e] uncertainty over the validity of such injunctions [so that] the value of trust assets available to fund recoveries by victims can increase." 140 Cong. Rec. 27,699 (Oct. 4, 1994). At the time Congress enacted this legislation, it understood that "other debtors in other industries are reportedly beginning to experiment with similar mechanisms," but it did not draft section 524(g) to prohibit third-party releases in the non-asbestos context. *Id.*

As a general matter, the *Purdue* court failed to follow more than three decades of existing Second Circuit precedent, which, like the Third Circuit, holds that bankruptcy courts are authorized to enjoin and release third-party claims against non-debtors where such releases are integral to the debtor's reorganization. *See In re Johns-Manville Corp.*, 843 F.2d 636, 640, 649 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–42 (2d Cir. 2005).

Moreover, the *Purdue* district court's statutory analysis is wrong as a matter of law. Among other things, the court's flawed conclusion that the Bankruptcy Code is "silent" on the subject of a bankruptcy court's authority to channel and release claims disregarded the Supreme Court's decision in *Energy Resources*. In particular, the *Purdue* court ignored, among other things, section 1123(b)(6) of the Bankruptcy Code, which gives a bankruptcy court flexibility and substantive authority to approve provisions in a reorganization plan that are not expressly mentioned in the Bankruptcy Code so long as those provisions are not inconsistent with the Bankruptcy Code. The *Purdue* district court also disregarded the import of section 105(a) of the Bankruptcy Code, which allows the court to fashion relief necessary to effectuate a successful reorganization.

Additionally, the *Purdue* district court relied heavily on section 524(g) and (h), which specifically provide that a bankruptcy court may enjoin actions against a

non-debtor in the asbestos context.  But, as discussed herein, the text of section 524(g) and (h) does not authorize an injunction of third-party claims **only** if the section 524(g) requirements are met.  Finally, the *Purdue* district court seemingly took a view of section 524(e) that is contrary to precedent from this Circuit, as well as the Fourth, Seventh, and Eleventh Circuits, which hold that section 524(e) does not bar any provision in a reorganization plan limiting the liability of third parties.  *See Seaside Eng'g*, 780 F.3d at 1077–78; *Airadigm Commc'ns*, 519 F.3d at 656; *In re Dow Corning*, 280 F.3d 648, 657 (6th Cir. 2002); *PWS*, 228 F.3d at 245; *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 710 (4th Cir. 2011).

## C.    The Bankruptcy Court Has Constitutional Authority To Grant The Channeling Injunction And Releases

The D&V and Lujan Claimants have failed to prove that the bankruptcy court erred in determining that it had constitutional authority to grant the Channeling Injunction and Releases.  D.I. 1-3 at 129.  The Third Circuit held in *Millennium Lab Holdings* that "a bankruptcy court is within constitutional bounds when it resolves a matter that is integral to the restructuring of the debtor-creditor relationship."  945 F.3d at 135; *see also* D.I. 1-3 at 117, 128–29; *see also Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) (observing that matters that are "integral to the restructuring of the debtor-creditor relationship" fall within the bankruptcy court's constitutional powers of adjudication).  In *Millennium Lab Holdings*, the Third Circuit reiterated the lower court's conclusion that a

bankruptcy court is constitutionally authorized to approve a plan containing nonconsensual third-party releases and related injunctions if it concludes that such releases are integral to the success of the plan. *See* 945 F.3d at 137–40.

The bankruptcy court thoroughly and thoughtfully addressed whether the Channeling Injunction and Releases were integral to the success of the Plan. The bankruptcy court determined without Channeling Injunction and Releases "in favor of the Settling Insurers, Non-Debtor Related Entities, Local Councils, Chartered Organizations and their Representatives, the Settling Insurers and Local Councils would not make their monetary contributions to the Settlement Trust." D.I. 1-3 at 154. Similarly, without the Channeling Injunction and Releases the "Participating Chartered Organizations, Related Non-Debtor Entities, and their respective Representatives who are additional insureds would not contribute their insurance rights to the Settlement Trust." *Id.* Moreover, "[i]t is illogical to believe that these settlements could be achieved without releases and this conclusion is supported by the record." *Id.* Finally, without the settlements and the Channeling Injunction and Releases, "these cases would devolve into a morass of coverage litigation, and recoveries to holders of Abuse Claims would be delayed for countless years." D.I. 1-3 at 154–55. For these reasons, the bankruptcy court concluded that the Channeling Injunction and Releases "unlock these monetary contributions" and are "the cornerstone of the Plan." *Id.* Because the bankruptcy court determined that

the Channeling Injunction and Releases were integral to the restructuring, the bankruptcy court had constitutional authority to confirm the Plan. *Id.* This conclusion is well supported by the record, and the D&V and Lujan Claimants have not disputed this holding, much less proved that it was erroneous.

Importantly, the bankruptcy court had authority to enter a final order approving the Plan because it was not asked to adjudicate each of the Abuse Claims. Instead, the Plan provides for the claims to be channeled to the Settlement Trust for evaluation by the Settlement Trustee. Under the TDP, a claimant has the option to elect to seek a *de novo* determination of its Abuse Claims by a court of competent jurisdiction. D.I. 1-4, Ex. A, Art. XII.A. A claimant may also elect the "Independent Review Option" to have a neutral third party make a settlement recommendation to the Settlement Trustee, if dissatisfied with the results of his reconsideration of the Settlement Trustee's determination. *Id.*, Art. XIII. Accordingly, confirmation of the Plan does not effectuate the nonconsensual liquidation of a personal injury claim for purposes of distribution by the bankruptcy court. The Plan therefore complies with 28 U.S.C. § 157, and the bankruptcy court had jurisdiction to enter a final order.

### D.   The Channeling Injunction And Releases Are Appropriate And Supported By Ample Evidence Under The Applicable Legal Standards

The bankruptcy court correctly applied the law in deciding to approve the Channeling Injunction and Releases as fair and necessary to BSA's reorganization, and supported its decision with extensive factual findings.  D.I. 1-3 at 132–56, 163–68.  Because the bankruptcy court correctly applied the law in determining that it had statutory and jurisdictional authority to approve the Channeling Injunction and Releases, the D&V and Lujan Claimants must prove that the bankruptcy court committed clear error in its factual findings supporting the Channeling Injunction and Releases.  D.I. 40 at 23-34; D.I. 41 at 58-79.  The D&V and Lujan Claimants do not come close to carrying this heavy burden.

#### 1.   The Channeling Injunction And Releases Satisfy The *Continental* Hallmarks

As shown above, the *Continental* "hallmarks" of fairness and necessity to the reorganization guide the bankruptcy court's review of third-party releases under Third Circuit law.  *Cont'l Airlines*, 203 F.3d at 212; D.I. 1-3 at 115–16.  Here, after engaging in detailed and thorough factfinding, the bankruptcy court correctly concluded that the Channeling Injunction and Releases satisfy the *Continental* hallmarks.  D.I. 1-3 at 163.  Because the applicable legal standard— the *Continental* hallmarks—is uncontroverted, and whether the bankruptcy court's decision to approve the Channeling Injunction and Releases was appropriate

depends on its analysis of the particular facts of the case, this Court should review the bankruptcy court's decision for clear error. *See Exide Holdings*, 2021 WL 3145612, at *12–14 (stating that "[c]ourts review the approval of releases and injunctions for clear error" and finding that "[t]he Bankruptcy Court used the appropriate standard for determining that the Releases were justified, and the Bankruptcy Court's findings are not clearly erroneous"); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011) ("Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case."); *Cont'l Airlines*, 203 F.3d at 217 (conducting detailed case-specific factual inquiry); *Glob. Indus.*, 645 F.3d at 206 (same).

The D&V and Lujan Claimants argue that the Channeling Injunction and Releases are not necessary because, according to them, the BSA theoretically could have confirmed a "BSA-only" plan of reorganization that does not contain releases in favor of third parties. *See* D.I. 40 at 26; D.I. 41 at 64. They also contend that the Channeling Injunction and Releases were not fair because they were approved without what the D&V and Lujan Claimants believe to be sufficient consideration from the Local Councils and Chartered Organizations. These arguments misconstrue the legal standard articulated in *Continental*.

### a. The Channeling Injunction And Releases Are Necessary To The BSA's Reorganization

Under *Continental*, to approve a nonconsensual third-party release, the bankruptcy court must find that the release is necessary to the debtor's reorganization. 203 F.3d at 214. In *Continental*, the Third Circuit held that the particular third-party releases before it on appeal were not necessary to the reorganization, as there was "nothing in the record to even imply that the success of the…reorganization bore any relationship to the release and…injunction." 203 F.3d at 215. The Third Circuit subsequently clarified in *Global Industrial* that necessity and fairness mean showing that the liability of the third party is "sufficiently onerous to jeopardize the debtors' reorganization" if not channeled to a trust under the debtor's plan of reorganization. 645 F.3d at 206. As courts in the Third Circuit have held, the necessity prong requires demonstration that "the success of the…reorganization [bears] a relationship to the release" of the non-consensual parties, and that the releases have provided "a critical financial contribution" to the plan" in exchange for receiving a release of liability." *Continental*, 203 F.3d at 215.

The D&V and Lujan Claimants misconstrue the necessity prong of the *Continental* standard. They argue that the Channeling Injunction and Releases are unnecessary because the BSA proposed—more than two years prior to the confirmation hearing—the "BSA Toggle Plan," which contained an option for a

potential BSA-only plan. *See* D.I. 40 at 26; D.I. 41 at 65–67. This plan was never solicited, and indeed it was structured as a "cramdown" plan on abuse survivors. *See* Bankr. D.I. 6445 (solicitation version of disclosure statement excludes BSA-only plan). There is ***no*** evidence that such a plan would have been feasible—either for the future of the BSA or survivor recoveries.

This is because, among other things, the success of a plan of reorganization for the BSA depends upon the BSA's future membership revenue, which, in turn, depends on Local Councils and Chartered Organizations resolving their abuse liabilities and continuing to deliver the Scouting program. The bankruptcy court found that "[m]embership drives BSA's finances," which "depends on Local Councils and Chartered Organizations to both maintain and recruit Scouts." *Id.* at 153. According to the bankruptcy court, the "evidence is unrefuted" that, without the Channeling Injunction and Releases for Local Councils and Chartered Organizations, the "BSA is likely to suffer a drop in membership, significantly affecting revenue and putting into serious question BSA's ability to continue as a national organization." *Id.* at 163. Mr. Whittman testified that (i) absent the Channeling Injunction and Releases for Local Councils, there would be "significant" Local Council bankruptcy filings (which the AHCLC's witness, Mr. Sugden, agreed with), and (ii) absent the Channeling Injunction and Releases for Chartered Organizations, there would be a significant impact on membership and

operation.  *Id.* at 153-54; *see also* Bankr. D.I. 9316 ¶ 11, 68; Bankr. D.I. 9407 at

35:15–36:9, 188:6–13; SA 2141.    The Local Councils' contribution to the

Settlement Trust, as well as the contribution of their insurance rights, would not

have been possible without the Channeling Injunction and Releases.  Bankr. D.I.

9316 ¶ 68 ("[I]f Abuse Claims against Local Councils are not channelled to the

Settlement Trust, Local Councils will not make the Local Council Settlement

Contribution.").

For these reasons, the bankruptcy court found that the BSA-only plan was

"not a true resolution and would leave claimants racing to the courthouse, filing

suits across the country, and BSA in shambles."  D.I. 1-3 at 156.  According to the

bankruptcy court, a BSA-only plan would spiral the organization into a "death trap

of litigation with minimal recoveries in sight," and survivors—many of whom

have been waiting decades to receive a meaningful recovery—would miss out on

the recoveries made possible by this Plan.  *Id.* at 158.  The BSA-only plan would,

if consummated, fail to unlock the value from the Abuse Insurance Policies and

provide virtually no recovery to holders of Abuse Claims in comparison to the

Plan, which provides several billion dollars in value to such creditors.  *See id.* at

156–58; Bankr. D.I. 2594 Art. II.A (disclosing that under the BSA-only plan the

recovery for holders of Direct Abuse Claims would be as little as 1% of their

claims); Bankr. D.I. 4108 (same); Bankr. D.I. 4716 at 73:9–14, 80:21–81:16

(counsel for the Tort Claimants' Committee characterizing the BSA Toggle Plan as a "death trap plan").  Unsurprisingly, the BSA-only plan was not supported by any Abuse Claim constituency.  *See* D.I. 1-3 at 157.

In addition to misconstruing the necessity prong of *Continental*, the D&V and Lujan Claimants fail to mention that Mr. Whittman's prior testimony as to the feasibility of the BSA-only plan was given several months before the BSA launched the solicitation of the Plan and therefore did not consider the evolution of the BSA's financial position and prospects of attaining a global resolution.  In prior versions of the disclosure statement filed on May 16, 2021 the BSA provided financial projections for the BSA-only plan.  Bankr. D.I. 4108, Ex. C at 4.  These financial projections assumed an August 31, 2021 emergence.  *See* Bankr. D.I. 4108, Ex. C at 4.  During this time frame, a BSA-only plan was considered to be at least hypothetically feasible.[47]   But circumstances changed.  The BSA unpredictably remains in bankruptcy more than one year later than its then-projected emergence, and its liquidity position has since deteriorated.  *See* Bankr. D.I. 9517 at 66:22–23 ("And, as I've testified to before, the BSA, from a liquidity

---

[47] *See* D.I. 4108 Art. X.A.19 ("[I]f the Plan is confirmed as a BSA Toggle Plan, because the Local Councils and Contributing Chartered Organizations will not be subject to the releases under the Plan, there is incremental economic risk related to the continued reach of Scouting which could lead to lower membership levels and require additional expense reductions versus what are reflected in the projections.").

perspective, is near the end of its rope.").  Thus, although the BSA-only plan was hypothetically feasible at the time of Mr. Whittman's testimony, it was not feasible at the time the final Plan was confirmed.  Even if the D&V and Lujan Claimants' reading of *Continental* was correct (which it is not), the BSA would therefore have satisfied *Continental*'s necessity prong.

Importantly, under the confirmed Plan, the bankruptcy court found after a twenty-two day evidentiary hearing involving twenty-six witnesses and more than 1,000 exhibits, that the Channeling Injunction and Releases were necessary to maximize the value of the estates for the benefit of holders of Abuse Claims.  *See* D.I. 1-3 at 155, 163.  The foundation of the Plan consists of contributions to the Settlement Trust by the Releasees of approximately $2.5 billion in cash and property, as well as other assets the bankruptcy court determined have a value of more than $4 billion.  *Id.* at 163.  Without the Channeling Injunction and Releases, the bankruptcy court found that these contributions would not have been made. *See id.* at 154, 155, 163 (finding that the "Settling Insurers and Local Councils would not make their monetary contributions to the Settlement Trust" and the "Participating Chartered Organizations, Related Non-Debtor Entities and their respective Representatives who are additional insureds would not contribute their insurance rights to the Settlement Trust [without the Channeling Injunction and Releases]…[It] is illogical to believe these settlements could be achieved without

releases and this conclusion is supported by the record"); *see also* Bankr. D.I. 9517 at 79:11–21 (Whittman) ("I believe [the Channeling Injunction and Releases] were necessary in order to maximize the value of the [insurance] policies, I believe they were necessary in order to secure this deal that is a set of interlocking, interrelated deals").

Both the amounts payable under the Insurance Settlement Agreements and the Local Council, Related Non-Debtor Entity and Chartered Organization contributions are essential to the success of the Plan insofar as they provide the overwhelming majority of funding to the Settlement Trust for the benefit of holders of Abuse Claims. The bankruptcy court found that, absent the "global settlements of insurance coverage disputes" with BSA's two primary insurance carriers, Hartford and Century and Chubb Companies, "these cases would devolve into a morass of coverage litigation," and recoveries "would be delayed for countless years." D.I. 1-3 at 155; *see also* Bankr. D.I. 9517 at 66:23–67:2 (Whittman)] ("[A]bsent these insurance settlements…I'm not sure that the BSA would have been able to reorganize."). The Hartford and Century and Chubb Companies settlements also "provided a template" for settlements with Zurich and Clarendon and may serve as the template for future settlements with Non-Settling Insurance Companies after the BSA's emergence from bankruptcy. D.I. 1-3 at 155. The bankruptcy court determined that the "undisputed evidence" showed that

"without the Scouting-Related Releases, the Settling Insurance Companies would not settle their liability." *Id.*; *see also* Bankr. D.I. 9395 ¶ 31. In a world without the Channeling Injunction and Releases, "the insurance proceeds may or may not be available." *See* D.I. 1-3 at 163.

The Lujan Claimants' arguments that the Channeling Injunction and Releases in favor of the Settling Insurance Companies and certain other Releasees are unnecessary are similarly based on a faulty reading of Third Circuit law. According to the Lujan Claimants, the Channeling Injunction and Releases are not necessary because certain earlier versions of the Plan did not provide releases for the AOA, Century and Chubb Companies, Clarendon, Zurich, and Roman Catholic Entities, which are now receiving releases under the confirmed Plan. *See* D.I. 40 at 26. To reiterate, *Continental*'s necessity prong does not require the bankruptcy court to find that only a plan containing third-party releases is feasible.

The Lujan Claimants further argue that there was no evidence and no bankruptcy court determination that the successful reorganization of the BSA requires the release of Roman Catholic Entities and other religious entities. *See* D.I. 40 at 28. This misconstrues the bankruptcy court's findings and misapprehends that under the Plan, the Roman Catholic Entities fall under the umbrella of Participating Chartered Organizations; therefore, all of the bankruptcy court's findings relating to the necessity of releases for Participating Chartered

Organizations indeed include Roman Catholic Entities and any other religious Chartered Organizations that did not become Opt-Out Chartered Organizations with respect to Scouting-related Abuse Claims. *See* D.I. 1-4 Art. V.S.8 ("[A]ll Roman Catholic Entities, other than those that have specifically opted out of such treatment…shall be treated as Participating Chartered Organizations."). Consequently, the Lujan Claimants' argument ignores the evidence establishing that the Channeling Injunction and Releases for Participating Chartered Organizations (which includes Roman Catholic Entities and religious Chartered Organizations) are undeniably necessary and the bankruptcy court did not err in making such finding. *See, e.g.*, Bankr. D.I. 9395 ¶¶ 30–31; Bankr. D.I. 9316 ¶¶ 67–70; Bankr. D.I. 9280 ¶¶ 191–93, 199.

The bankruptcy court determined that the "BSA needs to resolve the Abuse litigation in order to move forward" and that the Plan, supported by the Channeling Injunction and Releases, accomplishes just that. D.I. 1-3 at 163–64. Thus, for the reasons set forth above, the D&V Claimants and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in determining that the Channeling Injunction and Releases were necessary to the BSA's reorganization, as required by *Continental*.

### b.    The Channeling Injunction And Releases Are Fair

In addition to finding that the Channeling Injunction and Releases are necessary to the success of the reorganization, under *Continental*, the bankruptcy court must also find that they are fair.  203 F.3d 214.  Courts in the Third Circuit have interpreted the fairness prong of *Continental* to require that the parties whose claims are being released receive adequate consideration in exchange for such releases.  *See, e.g.*, *Mallinckrodt*, 639 B.R. at 867 (noting that "[t]he [Third Circuit's] review of cases [in *Continental*] indicated that…fairness dictates that 'it is necessary to provide adequate consideration to a claimholder being forced to release claims against non-debtors'" (quoting *Cont'l Airlines*, 203 F.3d at 212–13));  *David v. Weinstein Co. Holdings, LLC*, 2021 WL 979603, at *6 (D. Del. Mar. 16, 2021) ("Part of the inquiry into the fairness of non-consensual third-party releases is determining whether reasonable consideration is given in exchange for the releases.").[48]  This Court has held that the adequacy of consideration given in exchange for releases of claims is reviewed for clear error.  *See Exide Holdings*, 2021 WL 3145612, at *13 ("The mere fact that [a claimant] believes the consideration too low does not meet the exacting standard for reversing the Bankruptcy Court's finding of fact [for] clear error.").

---

[48]  Indeed, the Third Circuit in *Continental* framed the legal question as "whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  203 F.3d at 214 n.11.

In this case, the D&V and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in determining that the Channeling Injunction and Releases are fair to holders of Abuse Claims because "the Plan provides a mechanism for payment of all or substantially all Direct Abuse Claims" and therefore holders of Direct Abuse Claims "are being treated fairly for the releases they are granting." D.I. 1-3 at 164. No party presented evidence at trial to challenge this critical finding, and the D&V and Lujan Claimants cite none on appeal. The D&V and Lujan Claimants now claim that they are being forced to release claims against Local Councils, Chartered Organizations, and Settling Insurance Companies "while receiving little to nothing in exchange." D.I. 40 at 24; *see also* D.I. 41 at 59–64. But the bankruptcy court squarely rejected this assertion based upon the overwhelming unrefuted record before it, finding that the D&V and Lujan Claimants, like other holders of Abuse Claims, can expect to be paid in full. *See* D.I. 1-3 at 164. Because they will receive under the Plan all of the compensation to which they would be entitled in the tort system, the D&V and Lujan Claimants are receiving "adequate consideration" as required by *Continental*. The D&V and Lujan Claimants' unsupported rhetoric cannot overcome the bankruptcy court's fairness determination, as required by *Continental*. *See* D.I. 1-3 at 163–68.

The fairness of the Channeling Injunction and Releases is also evidenced by the fact that the Plan was "overwhelmingly accepted" by holders of Direct Abuse Claims. *See* D.I. 1-3 at 164; *see also* Bankr. D.I. 9280 ¶ 56. The bankruptcy court observed that more than 85% of holders of Direct Abuse Claims voted to accept the Plan, which constitutes "overwhelming acceptance." D.I. 1-3 at 164. The Plan also has the support of JPM, the Creditors' Committee, the Tort Claimants' Committee, the Future Claimants' Representative, the Coalition and the Settling Insurance Companies. *Id.* The bankruptcy court concluded that the settlements are preferable to the alternative after conducting an exhaustive review of, among other things, the fairness of the settlements and the impediments to collection. *Id.* at 164–68. The vast majority of claimants similarly situated to the D&V and Lujan Claimants agreed.

Finally, the transparency and rigor of the process by which Local Councils' contributions to the Settlement Trust were calculated supports the fairness of the releases given in exchange. *See* D.I. 1-3 at 141–44. Each Local Council is contributing a fixed amount of cash and property based on a formula that fairly and equitably allocates the Local Council Settlement Contribution. *See generally* Bankr. D.I. 9316; Bankr. D.I. 9280 ¶¶ 234–35. The formula was developed over many months and accounts for disparities between Local Councils' claims

165

exposure, applicable statutes of limitation, and financial capacity.  *See* Bankr. D.I. 9316 ¶¶ 24–43; Bankr. D.I. 9280 ¶¶ 232–35; D.I. 1-3 at 141–44.

In addition to the likely payment in full of Abuse Claims, the overwhelming acceptance of the Plan by holders of Abuse Claims, and the transparency of the process with respect to Local Councils and Chartered Organizations, the bankruptcy court also found the Channeling Injunction and Releases to be supported by several other factors.  These include: (a) "more timely assessment and payment" of claims, and "more equal treatment across claimants," in comparison with resolution in the tort system, D.I. 1-3 at 164, (b) consistency with the manner in which claimants sued and settled claims with BSA (*i.e.*, as a group),[49] (c) the "multiple options" provided under the TDP to holders of Direct Abuse Claims to pursue litigation in the tort system, *id.* at 165, and (d) survivors' need for global resolution after waiting decades.[50]  *Id.* at 164–68; *see also* Bankr.

---

[49] The bankruptcy court found that the prepetition claimants, "including the D&V and Lujan Claimants, treated BSA, Local Councils and Chartered Organizations as 'one organization,' each liable for the actions of the other and with BSA in ultimate control."  *Id.*  Therefore, the Channeling Injunction and Releases are consistent with the way that claimants sued and settled claims with BSA—as a group—prior to the Petition Date.  *Id.* at 164; Bankr. D.I. 9273 ¶ 48.

[50] The bankruptcy court found that Dr. Kennedy's and Mr. Meidl's testimony in support of the Plan evidence an awareness of their fellow survivors and the need for global resolution.  D.I. 1-3 at 164; Bankr. D.I. 9406 at 10:19–12:5, 14:4–15:20; Bankr. D.I. 9482 at 35:6–36:9.

D.I. 9280 ¶¶ 43–51, 53–56.   All of those findings are supported by competent evidence.

The D&V and Lujan Claimants' additional arguments further demonstrate their misunderstanding of the fairness standard.   For instance, the D&V Claimants argue that the Local Councils' aggregate contribution is unfair by comparing the BSA's versus Local Councils' percentages of "liquid assets" being contributed to the Settlement Trust.   *See* D.I. 41 at 62 ("BSA is paying 67% of its liquid assets to the Settlement Trust…Local Councils are getting releases of all abuse claims in exchange for [contributing] only 30% their liquid assets.").[51]   This argument is a red herring.   The standard articulated in *Continental* is the adequacy of the consideration given to the party whose claims are released, not the cost imposed on the released party.   *See, e.g.*, *Mallinckrodt*, 639 B.R. at 874 (assessing fairness in terms of value provided to claimants in exchange for nonconsensual third party releases).   D&V Claimants argue that without knowing the assets and potential liabilities of each organization receiving a release, it is "impossible" to know if the

---

[51]   Not only are these percentages irrelevant to fairness under *Continental*, they are inaccurate.   The 30% figure does not take into account the DST Note, the BSA Settlement Trust Note, and the significant value of both the Local Council insurance policies and the Local Councils' rights in BSA insurance policies. *See* Bankr. D.I. 9280 ¶¶ 210–19, 225 ("*[W]ithout accounting for the value of Local Council insurance rights*, the Local Council Settlement Contribution represents 30% of the modified unrestricted net assets of the Local Councils." (emphasis added)).

claimants giving the releases are getting fair consideration in return.  *See* D.I. 41 at

61.    The Lujan Claimants likewise complain that "no analysis was done" of

Chartered Organizations' or, excluding Century, Settling Insurance Companies'

assets or liability exposure.  *See* D.I. 40 at 24–25, 31.  But these arguments fail to

account for the significant value of the insurance rights that the Local Councils and

Chartered Organizations are contributing to the Settlement Trust and the non-

monetary aspects of the Plan that the bankruptcy court determined to be fair to

holders of Abuse Claims.[52]    *See* D.I. 1-3 at 168.  Moreover, the D&V and Lujan

---

[52] Participating Chartered Organizations and Opt-Out Chartered Organizations are only receiving limited releases that are coextensive to their insurance contributions.  Therefore, such entities may be exposed to additional liability and may be required to make additional contributions on account of claims that are not covered by a Settling Insurance Company in the future.  For the avoidance of doubt, Participating Chartered Organizations and Opt-Out Chartered Organizations are not receiving the same release that Contributing Chartered Organizations will receive under the Plan.  D.I. 1-3 at 54 n.103, 100-02, 175–78.  The D&V Claimants highlight the treatment of TCJC as a "telling example of the unfairness of the releases," arguing that it is unfair that TCJC, as a Participating Chartered Organization, will receive "the same release and channeling injunction as all other Participating Chartered Organizations."  D.I. 41 at 59–60.  This argument again disregards that the portion of a Mixed Claim unrelated to Scouting is not channeled or released.  Previously, TCJC was designated as a Contributing Chartered Organization based on its proposed agreement to contribute $250 million in cash to the Settlement Trust plus the assignment of its interests in Abuse Insurance Policies in exchange for the benefits of the Channeling Injunction and Releases, whereby TCJC would receive, in exchange for its cash contribution, a full and complete release of all Abuse Claims, without regard to when the claim arose or whether the claim could be considered a Mixed Claim under the Plan.  At the time of confirmation, TCJC sought a broader release with respect to what constituted an Abuse Claim that would be released under the Plan than other Chartered

Claimants have failed to prove that the bankruptcy court clearly erred in determining that the Plan provides for likely payment of Abuse Claims in full, and therefore this inquiry is irrelevant.

The D&V Claimants also argue that the bankruptcy court failed to make certain specific findings of fact that support the Channeling Injunction and Releases. *See* D.I. 41 at 67–68. This is incorrect. Moreover, the D&V Claimants do not cite any cases to support their argument. In *Continental*, the Third Circuit determined that the bankruptcy court "***never*** specifically addressed the release and permanent injunction" of the released claims and found the confirmation order lacked "***any*** findings" that the release was fair and necessary to the reorganization. *See Cont'l Airlines*, 203 F.3d at 214 (emphasis added). This is obviously not the

---

Organizations. The bankruptcy court declined to approve the TCJC Settlement Agreement because the evidence did not support a broader release of Abuse Claims as compared to other Chartered Organizations. D.I. 1-3 at 168–69. As a consequence of this ruling, TCJC is a Participating Chartered Organization under the Plan and will receive the same releases that all Participating Chartered Organizations receive thereunder. The releases for Participating Chartered Organizations do not include the substantial protection TCJC would have been entitled to under the terms of the original TCJC Settlement, for which TCJC was prepared to make a substantial cash contribution. D.I. 1-1 ¶ 20. No party objected to or raised any issue with respect to TCJC's classification as a Participating Chartered Organization under the Plan prior to the bankruptcy court's entry of the Confirmation Order. As with all Participating Chartered Organizations, TCJC's contribution of rights under insurance policies issued by the Settling Insurance Companies, among other things, is essential to the success of the Plan and the satisfaction of all channeled claims in full.

case here, where the bankruptcy court's Confirmation Opinion includes countless specific findings of fact that thoroughly address and support every aspect of the Channeling Injunction and Releases with respect to the *Continental* hallmarks. *See generally* D.I. 1-3. Finally, the D&V Claimants also object to the release of Representatives of Chartered Organizations on fairness grounds. First, the D&V Claimants argue that they did not have sufficient notice of released Representatives, since "while there is a list attached to the Plan of more than 100,000 Chartered Organizations released, the Plan does not identify all the Chartered Organizations" nor the "Representatives" of Local Councils or Chartered Organizations who will be released. *See* D.I. 41 at 67. The bankruptcy court, however, found that a "complete list of Chartered Organizations can be found at Boy Scouts of America Restructuring Website, http://omniagentsolutions.com/bsa/." D.I. 1-3 at 5, 47. The list is free and accessible to the public. Bankr. D.I. 9275 ¶ 7. This website was also listed thirty-three times throughout the solicitation packages, which the BSA, through their Solicitation Agent, served to holders of Direct Abuse Claims. Bankr. D.I. 7999; Bankr. D.I. 8378.

The D&V Claimants also cannot complain that there was a lack of disclosure regarding the "Representatives," which is a defined term in the Plan. D.I. 1-4 Art. I.A.249. That definition provides sufficient details to put claimants

on notice of the Representatives receiving a release.  As noted above, no party disputes that Representatives must be included in the Channeling Injunction and Releases as part of the global resolution under the Plan because certain Representatives are insureds under the BSA Insurance Policies and claims against such Representatives would therefore impact the proceeds of the BSA Insurance Policies absent a release.[53]   Bankr. D.I. 9316 ¶ 68 ("[W]ithout coverage for Representatives, a Local Council will likely face indemnity/contribution claims from such Representatives, rendering a "global resolution" illusory."); *id.* ¶ 70 ("I am confident that without the releases and channeling injunctions contained in the Plan of (a) Local Councils, (b) Local Councils' Representatives, (3) Chartered Organizations, and (4) Chartered Organizations' Representatives, Local Councils will not make the Local Council Settlement Contribution or the Supplemental LC Contribution."); SA 92 (providing requirement to indemnify Representatives).

### c.   The *Master Mortgage* Factors Are Satisfied

Although *Continental* is the law in this Circuit, the factors enumerated in *Master Mortgage* are helpful guideposts for a bankruptcy court's determination whether the *Continental* hallmarks have been met.  *In re Master Mortgage*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994); *see also Millennium*, 591 B.R. at 584; *In*

---

[53]  For the avoidance of doubt, Perpetrators are not receiving releases regardless of a Perpetrator's position or service as a Representative.  D.I. 1-3 at 130; D.I. 1-4 Art. I.A.236.

*re 710 Long Ridge*, 2014 WL 886433, at *14 (noting that "since the Third Circuit did not set out a specific test in *Continental Airlines,* several courts within the Third Circuit have continued to apply a five-factor" derived from *Master Mortgage*); *Mallinckrodt*, 639 B.R. at 875 n.103 (concluding that although it is unnecessary to consider the *Master Mortgage* factors, in any event, the factors are satisfied); *Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*, No. 20-1401 (RGA), 2021 WL 3145612, at *13 (D. Del. July 26, 2021).

The *Master Mortgage* framework requires the bankruptcy court to ask whether (a) there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate, (b) the non-debtor has contributed substantial assets to the reorganization, (c) the injunction is essential to reorganization such that without it, there is little likelihood of success, (d) a substantial majority of the creditors agree to such injunction: specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment, and (e) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction. *Master Mortgage*, 168 B.R. at 935. In this case, the D&V and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in determining that each of these factors, to the

extent relevant as guideposts in the *Continental* analysis, weighs in favor of approving the Channeling Injunction and Releases.

### i.    Identity Of Interest

The D&V Claimants and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in finding "that there is an identity of interest between Debtors and all entities receiving third-party releases."  D.I. 1-3 at 133. As discussed *supra* pp.130-138, the evidentiary record demonstrating the identity of interest among the BSA, Local Councils, Chartered Organizations, Related Non-Debtor Entities, Representatives, and Settling Insurance Companies is clear and extensive.  The bankruptcy court found that there was an "identity of interest" between BSA and the non-debtor protected parties, "such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." D.I. 1-3 at 132.  Specifically, the bankruptcy court found that an identity of interest between the BSA and protected parties was supported by the following: (a) the parties' interconnectedness and interdependence in delivering Scouting and joint responsibility for Scouting-related Abuse Claims, (b) shared insurance, (c) contractual indemnity, and (d) the BSA's residual interest in Local Council property.  Additionally, there is an identity of interest between BSA and the Settling Insurance Companies "because they are the Debtors' insurers." *Id.* at 135 ("[n]o holder" alleges "a separate claim against any Settling Insurer on account of

its own conduct"). This factor weighs in favor of approving the Channeling Injunction and Releases.

### ii. Contribution Of Substantial Assets To The Reorganization

The D&V and Lujan Claimants argue that the "substantial contribution" factor under *Master Mortgage* weighs against the Channeling Injunction and Releases. *See* D.I. 41 at 71; D.I. 40 at 30–31. As discussed in detail herein, the bankruptcy court found that each Releasee was making a substantial contribution in exchange for the benefit of the Channeling Injunction and Releases, "result[ing] in a trust that will pay Direct Abuse Claims in full." D.I. 1-3 at 140-48 (citing *Mallinckrodt*, 639 B.R. at 874 ("Substantial consideration is being given in exchange for the releases in the form of a well-funded trust to which opioid claimants can turn for potential compensation.").[54] And even if the Plan were not

---

[54] The Settlement Trust Assets include, among other things, the following assets and any income, profits and proceeds realized, received or derived from such assets subsequent to the transfer of such assets to the Settlement Trust: (i) the BSA Settlement Trust Contribution, which includes unrestricted cash and investments from the BSA, artwork valued at approximately $59 million, certain real property valued at $11.6 million, oil and gas interests valued at $7.6 million, the BSA Insurance Assignment, and the assignment of certain causes of action on account of Abuse Claims belonging to the BSA; (ii) the Local Council Settlement Contribution, which includes at least $500 million of cash and property, a DST Note in the amount of $100 million, the Local Councils' interest in BSA Insurance Policies, the Local Councils' interest in Local Council Insurance Policies, and the assignment of certain causes of action; (iii) the Chartered Organization Contribution, which includes an additional $15 million cash contribution and up to $25 million added to the DST Note from the

likely to pay holders of Abuse Claims in full (which the bankruptcy court concluded it is), the bankruptcy court correctly noted that a "well-funded trust need not pay claimants in full for the contribution to be substantial" for purposes of the second *Master Mortgage* factor.  D.I. 1-3 at 140 n.455.

### a. Settling Insurance Companies

The Lujan Claimants claim that, with the exception of Century and Chubb Companies, there was no evidence in the record of a Settling Insurance Company's lack of assets or inability to pay.  *See* D.I. 40 at 25.[55]  This argument is irrelevant, as further discussed *infra* pp. 193-201.  The bankruptcy court found that the substantial contribution analysis is the same as the analysis of whether the settlement is fair under the *Martin* test.  D.I. 1-3 at 141.  As established by the

---

Local Councils and a variable annual Settlement Growth Payment from Local Councils and the BSA; (iv) monetary contributions of $30 million from the United Methodist Entities and the contribution of other insurance interests and causes of action; (v) the Participating Chartered Organization Settlement Contribution, which includes such Participating Chartered Organizations' interests in Abuse Insurance policies, the release of claims against the BSA, the Local Councils, any Contributing Chartered Organization, or Settling Insurance Companies; (vi) any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement Agreement, including the $1.656 billion aggregate contribution from Hartford, Century and Chubb Companies, Zurich and Clarendon; and (vii) any rights, claims, or assets of a holder of a Direct Abuse Claim that is assigned to the Settlement Trust pursuant to the terms of the TDP and Settlement Trust Agreement.  D.I. 1-4 Art. I.A.272.

[55] The D&V Claimants do not dispute the bankruptcy court's finding that the Settling Insurance Companies are making a substantial contribution.  *See* D.I. 41 at 71–72.

evidence and testimony of Mr. Desai, Mr. Whittman, Mr. Patton, Dr. Bates, and Ms. Gutzler, the bankruptcy court determined that each settlement with the Settling Insurance Companies was fair and satisfied the *Martin* test in light of the disputed coverage issues, the allocation analysis performed by Ms. Gutzler, and, as to Century and Chubb Companies, the concerns regarding collection in the future. D.I. 1-3 at 141.

### b.  Local Councils

Contrary to the D&V and Lujan Claimants' arguments, the bankruptcy court also found that the "Local Council Contribution is substantial." D.I. 1-3 at 144; *see also* D.I. 41 at 71–72; D.I. 40 at 30. The bankruptcy court credited Mr. Whittman's analysis of the Local Council Settlement Contribution relative to the Local Councils' insurance rights, unrestricted net assets, number of claims, geographic location (for statute of limitations analysis), and ability to contribute. *See* D.I. 1-3 at 144. Mr. Whittman testified that the formula was a fair and reasonable basis for the allocation and indeed maximized the value being contributed to the Settlement Trust. *See id.* No witnesses were presented to contradict Mr. Whittman's testimony. Furthermore, Mr. Whittman's uncontroverted conclusion is that the contribution to the Plan is greater than the result of a liquidation of Local Councils in the aggregate. *Id.*; Bankr. D.I. 9280 ¶¶ 220–35, 268.

The D&V Claimants argue that the bankruptcy court should have focused on the individual amounts that certain Local Councils are contributing relative to their assets or the number of claims against an individual Local Council. *See* D.I. 41 at 71–72. But the bankruptcy court determined that "the Local Council Contribution cannot be viewed in this light" given that it is a collective contribution made by Local Councils for the benefit of all Local Councils and was arrived at after a year of mediation with certain parties in interest, all of whom had an incentive to ensure that the formula maximized recoveries. D.I. 1-3 at 145. Moreover, the only evidence presented at confirmation was that the individual Local Council contributions were based upon a thoughtful and comprehensive formula that took into account Local Councils' claims exposure, applicable statutes of limitation, and financial capacity. *See* Bankr. D.I. 9316 ¶¶ 24–43; Bankr. D.I. 9280 ¶¶ 232–35; D.I. 1-3 at 141–44; Bankr. D.I. 9316 ¶¶ 24–43. The internal allocation amongst the Local Councils was negotiated to ensure global participation by each of the Local Councils, which maximized the value of the Insurance Settlement Agreements. *Id.* Based on the uncontroverted evidence, the bankruptcy court reasoned that nothing in the *Continental* hallmarks precludes collective consideration or prevents one party, in appropriate circumstances, from contributing funds for the benefit of another. *Id.* The D&V Claimants fail to demonstrate any clear error by the bankruptcy court in making this determination.

The Lujan Claimants arbitrarily assert that the Local Councils should be paying "more than $1 billion in unrestricted net assets" without providing any reasoning to support this dollar amount.  *See* D.I. 40 at 30.[56]   There is no evidentiary, legal, or logical basis for this assertion, and in any event, the uncontroverted evidence demonstrates that the value of the Local Council Settlement Contribution exceeded this arbitrary threshold.  Specifically, the Local Councils' Settlement Contribution includes (without taking into account contributions made on behalf of Chartered Organizations), among other things, rights under insurance policies valued between $464 million and $1.13 billion, $500 million in cash and property, and approximately $100 million pursuant to the DST Note.   Therefore, these components of the Local Council Settlement Contribution alone exceed $1 billion.  *See* D.I. 1-3 at 141–45; Bankr. D.I. 9280 ¶¶ 206–19; D.I. 1-4, Ex. F.

### c.   Chartered Organizations

The D&V and Lujan Claimants argue that the Participating Chartered Organizations do not provide anything to the Settlement Trust in exchange for the benefits of the Channeling Injunction and Releases.  *See* D.I. 41 at 72; *see also* D.I.

---

[56]  The D&V Claimants assert that the Local Councils "are providing only 30% of the aggregate value of their unrestricted assets."  *See* D.I. 41 at 71–72.  As explained earlier herein, this 30% figure is not meaningful, accurate, or relevant to the bankruptcy court's finding that the Channeling Injunction and Releases satisfy the *Continental* hallmarks and *Master Mortgage* factors.

40 at 30–31. This position ignores the substantial value the Participating Chartered Organizations are contributing in the form of insurance rights and monetary consideration being paid on their behalf.

The bankruptcy court found that the Participating Chartered Organizations' contributions were "substantial": (a) the Supplemental LC Contribution of $40 million (paid by the Local Councils on the Chartered Organizations' behalf), D.I. 1-3 at 146–47, Bankr. D.I. 9316 ¶¶ 56–58, (b) the funding of 25% of the Settlement Growth Payment (paid by the Local Councils and the BSA on behalf of the Chartered Organizations), D.I. 1-3 at 147, Bankr. D.I. 9316 ¶¶ 56–58, (c) the assignment of the Participating Chartered Organizations' rights under BSA Insurance Policies and Local Council Insurance Policies, which unlocked access to insurance assets with coverage estimated by the bankruptcy court to be between $4.2 and $4.4 billion, D.I. 1-3 at 68–69, 147–48, Bankr. D.I. 9398 ¶ 121, Bankr. D.I. 9490 at 40:13–41:11, (d) the assignment of their own causes of action against Non-Settling Insurance Companies for the period prior to January 1, 1976, D.I. 1-3 at 147, Bankr. D.I. 9280 ¶ 191, and (e) the waiver of their Indirect Abuse Claims, D.I. 1-3 at 147; SA 3823; Bankr. D.I. 9646 at 95:21–24. The bankruptcy court also determined that the Participating Chartered Organizations' contribution (*i.e.*, the waiver and assignment of insurance rights) facilitated the $1.656 billion contribution from the Settling Insurance Companies, enabled the Local Council

contribution, and provided the Settlement Trustee a chance to negotiate in the future with Chartered Organizations for additional contributions in exchange for releases of pre-January 1, 1976 Abuse Claims and to negotiate with Non-Settling Insurance Companies with respect to the estimated $400 million in allocated but unsettled insurance coverage and at least $4.2 to $4.4 billion in unallocated insurance limits. *Id.* at 68–69, 146–48; Bankr. D.I. 9398 ¶ 121; Bankr. D.I. 9490 at 40:13–41:11.

Thus, Appellants have failed to demonstrate clear error by the bankruptcy court in concluding that any Releasee's contribution is substantial, and they have presented no evidence that would refute the bankruptcy court's conclusion.  D.I. 1-3 at 146–48.

### iii.     A Substantial Majority Of The Impacted Creditors Support The Plan.

The D&V and Lujan Claimants argue that the BSA "lost the vote" because fewer than 90% of holders of Direct Abuse Claims voted to accept.  *See* D.I. 40 at 32; D.I. 41 at 73.  There is *no* legal basis for this once-again arbitrary threshold. An overwhelming percentage of holders of Direct Abuse Claims voted to accept the Plan.  The D&V and Lujan Claimants cannot establish that the bankruptcy court clearly erred in finding that the overall acceptance rate of 85.72% for holders of Direct Abuse Claims constitutes a "substantial majority."   D.I. 1-3 at 149; Bankr. D.I. 9275.  Nor can they establish that the bankruptcy court clearly erred in

finding that the overall acceptance rate of 82.41% for holders of Indirect Abuse Claims constitutes a "substantial majority."  D.I. 1-3 at 149.

Third-party releases in this District have been approved with similar acceptance rates.  *See, e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (approving third party releases where 74–78.18% of the affected classes voted to accept the plan); *In re The Weinstein Co. Holdings, LLC*, No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) [D.I. 3203] (approving third party releases where 82.98% of the affected class voted to accept the plan).  The bankruptcy court also noted that the 75% figure in section 524(g) could be used as a proxy, to the extent that there is a floor on what constitutes a "substantial majority."  D.I. 1-3 at 149.

The Lujan Claimants assert that even if the overall acceptance constitutes a substantial majority, the bankruptcy court was required to consider claimant votes in relation to their claims against individual Local Councils or Chartered Organizations.  *See* D.I. 40 at 32.  The bankruptcy court properly rejected this granular analysis because, as the court explained, the Plan was put forth and solicited as a global resolution of Abuse Claims.  D.I. 1-3 at 149.  Moreover, it would have been impracticable to divide holders of more than 82,200 Direct Abuse Claims into additional subclasses based on their potential claims against Local Councils.  The bankruptcy court itself acknowledged that "many holders of Direct

Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim." D.I. 1-3 at 244. Thus, there is no competent evidence supporting any further granularity. The bankruptcy court did not clearly err in concluding this *Master Mortgage* factor supports the Channeling Injunction and Releases.

        **iv.**        **The Plan Provides For The Payment Of All, Or Substantially All, Of The Abuse Claims Affected By The Injunction[57]**

The Lujan and D&V Claimants dispute the bankruptcy court's conclusion that the holders of Abuse Claims will most likely be paid in full or substantially in full under the Plan. They also challenge the credibility of Dr. Bates's testimony on the range of aggregate values of the Direct Abuse Claims. *See* D.I. 40 at 33; D.I. 41 at 75–78. This is a quintessential factual issue that the bankruptcy court resolved in favor of confirmation; there is no basis to reverse, and the Appellants have not provided any evidence to establish clear error by the bankruptcy court.

---

[57] All references to Abuse Claims being "paid in full" or to "payment in full" herein refer to the bankruptcy court's determination, in the context of confirmation, which can be found on pages 70-72 of the Confirmation Opinion. In addition to these determinations, the bankruptcy court entered finding "J" in the Confirmation Order, which provides that "(1) The Court's determination of the likely aggregate valuation of Direct Abuse Claims for purposes of Confirmation does not establish: (a) the actual amount of any individual Direct Abuse Claim; or (b) the actual aggregate amount of Direct Abuse Claims. (2) The allowed amount of Direct Abuse Claims, either individually or in the aggregate, will be determined pursuant to the Trust Distribution Procedures." See D.I. 1-3 at 70–72; D.I. 1-1 ¶ II.J.

The bankruptcy court did not err in finding that the BSA showed, by a preponderance of the evidence, that the Direct Abuse Claims will likely be paid in full.  D.I. 1-3 at 72.  As the only valuation expert, Dr. Bates's analysis was thorough, credible based on the data available," and "undisputed."  *Id.* at 65.  The bankruptcy court found that Dr. Bates "was qualified ***without objection*** as an expert in claim valuation, mass tort matrixes and trust distribution structures."  *Id.* at 58 (emphasis added).  To arrive at the range of aggregate values, Dr. Bates employed a frequency severity model, which the bankruptcy court found "is an accepted valuation methodology within the valuation community" and is the methodology that Dr. Bates employs in each of the many "mass tort case[s] in which he has provided expert testimony."  *Id.* at 58; Bankr. D.I. 9454 at 115:4-116:2.  The D&V Claimants argue that Dr. Bates applied "several of his own arbitrary criteria" in reaching the range of aggregate values.  *See* D.I. 41 at 75.  But as the bankruptcy court pointed out, "none of the objectors challenged his use of the frequency severity model, suggested another analysis or undercut his conclusions." D.I. 1-3 at 65.

Based on the record and assessment of Dr. Bates's credibility, the bankruptcy court found that the best estimate of the aggregate value of the Abuse Claims fell within the lower quartile of Dr. Bates's range of $2.4 billion to $7.1 billion.  *Id.* at 65–66; *see* Bankr. D.I. 9454 at 97:10-23; 190:17-191:6.  Given the

value of the substantial contributions detailed above, the D&V and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in finding that "the Plan provides for payment in full."  D.I. 1-3 at 149–50.[58]

The Lujan Claimants challenge this finding by arguing that "recovery up to 100%" depends on hypothetical future insurance settlements.  *See* D.I. 40 at 34. Not so.  The Bankruptcy Court determined that, under the Plan, the "fully noncontingent funding is $2,484,200,000, which is already within the [$2.4 billion to $3.6 billion] range of Direct Abuse Claims."  D.I. 1-3 at 70.  There is also ample opportunity for the Settlement Trust and, in certain circumstances, individual claimants, to pursue unsettled insurance coverage through negotiated settlements or litigation.[59]  *See supra* p. 25.  The Lujan Claimants' arguments also ignore their opportunity to elect the Independent Review Option.   The purpose of the

---

[58] In support of their argument, the D&V Claimants cite an out-of-circuit decision involving a non-mass tort debtor, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768 (Bankr. N.D. Tex. 2007).  *See* D.I. 41 at 79.  In *Wool Growers*, the bankruptcy court determined that the plan did not provide for payment in full when the evidence established that creditors would recover only sixty to seventy percent of their claim.  *Wool Growers*, 371 at 771, 778.  That case is inapposite.  Here, the bankruptcy court found payment in full based on the uncontroverted, credible evidence.

[59] Indeed, the Independent Review Option provides a pathway for recoveries in excess of the $2.7 million maximum cap applicable to a Trust Claim Submission.  D.I. 1-3 at 41; Bankr. D.I. 9309 ¶ 55; *see* Bankr. D.I. 9454 at 98:14-99:1 ("[The Independent Review Option] [b]asically remov[es]…a windfall that the excess insurers had obtained in the original draft of the TDP.").

Independent Review Option is to replicate the amount a reasonable jury would award for the Direct Abuse Claim and provides claimants that believe they have particularly high-value claims the opportunity to prove such claims and pursue higher recoveries and unsettled insurance coverage. *See* D.I. 1-4 Ex. A, TDP Art. XIII.A.    Moreover, the Lujan Claimants' apparent concern of insufficient additional recoveries from Non-Settling Insurance Companies is belied by the Non-Settling Insurance Companies' instant appeal, where they allege undue "hydraulic pressure" to settle and/or pay. *Compare* D.I. 40 at 34 *with* D.I. 45 at 6. This dynamic demonstrates that neither group of Appellants is correct, and the BSA got it right.

After taking into account the committed, but contingent, funding[60] and the available allocated insurance against Non-Settling Insurance Companies, the bankruptcy court found the funding for the Settlement Trust is "well over" the initial benchmark valuation and "comfortably" within the aggregate range.  D.I. 1-3 at 70-71.  The bankruptcy court also took into account an additional estimated

---

[60] The bankruptcy court's reference to $200 million of committed, but contingent funding inadvertently included an outdated reference to a $100 million fundraising effort from the United Methodist Entities.  The Confirmation Order correctly provides that "[n]otwithstanding the reference to fundraising efforts in subsection (ii) of Section II.C.4 of the Confirmation Opinion, which are no longer part of the United Methodist Settlement Agreement, the United Methodist Settlement Contribution, together with the non-monetary benefits, as set forth in the United Methodist Settlement Agreement, provides a substantial contribution to the Debtors' reorganization." D.I. 1-1 ¶¶ II.O.

$4.2 to $4.4 billion in currently unallocated insurance against Non-Settling Insurance Companies, and unliquidated additional contributions from Chartered Organizations, which provide a total potential recovery of more than $7 billion. D.I. 1-3 at 68–71; Bankr. D.I. 9398 ¶ 121; Bankr. D.I. 9490 at 40:13–41:11.[61] Therefore, the bankruptcy court correctly determined that the BSA has shown that Direct Abuse Claims will likely be paid in full. *Id.* at 71–72. The Lujan Claimants (and D&V Claimants) did not provide any expert or evidence at trial to prove otherwise—and they cannot show clear error on appeal.

The Lujan and D&V Claimants further argue that Dr. Bates contradicted his own prior testimony because he adjusted his aggregate valuation range during the course of the Chapter 11 Cases. *See* D.I. 40 at 32–33; D.I. 41 at 75. These arguments are unavailing and are based on a fundamental misunderstanding of Dr. Bates's testimony. First, Dr. Bates's aggregate valuation range did not change from his initial stated range of $2.4 billion to $7.1 billion. Dr. Bates's ultimate opinion that the range was most likely in the lower quartile of this initial stated

---

[61] The precise timing of a contributing party's payment into the Settlement Trust does not affect the substantial payment in full analysis. Indeed, all recoveries under the TDP are dependent on contributions to the Settlement Trust, which will be contributed at different points in time. *See, e.g.*, D.I. 1-4 Ex. I-1, Hartford Insurance Settlement Agreement §§ IV.B–C (providing for an initial payment date and then later, after certain conditions are met, an additional payment date). The fact that a certain contribution will not be paid to the Settlement Trust immediately upon the Effective Date does not, by itself, equate to non-payment in full.

range was informed by updated information regarding the historical data he relied on to perform his analysis, which led him to conclude that values in the lower quartile of the valuation range were much more likely than the upper quartile. *See* D.I. 1-3 at 61 n.241; Bankr. D.I. 9454 at 186:12–19 ("I still believe that the overall range of 2.4 to 7.1 is a range that is a feasible range…[b]ut the most likely portion of that range is in the lower quartile.").

Specifically, Dr. Bates testified that he found more of the historical high-value resolutions involved repeat abuser claims, which lowered the average for single abuser claims. *See* D.I. 1-3 at 61 n.241; Bankr. D.I. 9454 at 183:5-184:5; 185:9–186:11. Dr. Bates further determined that the majority of pending claims are single abuse claims. Bankr. D.I. 9454 at 48:1–9. The bankruptcy court correctly concluded that Dr. Bates's belief the aggregate range was most likely in the lower quartile was "the result of updated information and not any change in the methodology." D.I. 1-3 at 61 n.241; Bankr. D.I. 9454 at 182:12–186:11. Dr. Bates did not contradict his prior testimony.

Additionally, contrary to the D&V Claimants' argument, Dr. Bates's estimation does not assign "zero value" for any claim with an expected value below $200,000. *See* D.I. 41 at 76. This argument confuses a point that Dr. Bates made during his testimony about why low value claims were not historically pursued in the tort system. *See* Bankr. D.I. 9454 at 146:15–152:20, 156:1–23. Dr.

Bates assigned an estimate of what such claims would be worth if pursued in the tort system even though in the tort system many of such claims would not be pursued, as the expected recovery on such claims were below the threshold of economic viability to plaintiffs' firms working on contingency fees. *See id*. Dr. Bates testified that, in the bankruptcy forum, such claims have value associated with them due to lower economic barriers and thus, claims with an expected value below $200,000 were indeed included in Dr. Bates's estimation. *See id*. at 158:20–159:2. Simply put, that a claim valued below $200,000 may not have had sufficient value to be prosecuted by a contingent counsel in the tort system does not mean that these Abuse Claims do not exist. In fact, Dr. Bates's analysis concluded they likely constitute the majority of claims filed in the Chapter 11 Cases.

The bankruptcy court found that Dr. Bates's valuation range includes his estimate that 400 Future Abuse Claims would be asserted. D.I. 1-3 at 62; Bankr. D.I. 9454 at 198:20–199:19. And the bankruptcy court did not assign any weight to Mr. Patton's testimony regarding the number or value of Future Abuse Claims. D.I. 1-3 at 62 n.246. The court reasoned that Mr. Patton was not offered for the purpose of valuing Direct Abuse Claims; that he is not an expert; and that "there was no support offered for this position." *Id*. Mr. Patton's uncredited testimony

does not negate the bankruptcy court's finding that the Plan likely provides for payment in full.

The D&V Claimants point out that, in the Disclosure Statement, the Tort Claimants' Committee estimated the range of aggregate value of Abuse Claims at $13.5 billion to $73.2 billion. *See* D.I. 41 at 78 (citing Bankr. D.I. 6445). But the Tort Claimants' Committee did not offer any expert witness testimony and the bankruptcy court did not give any evidentiary weight to the Tort Claimants' Committee's estimate provided in the Disclosure Statement. The bankruptcy court's reliance upon Dr. Bates's uncontroverted and well-reasoned expert opinion instead of unsubstantiated statements by non-experts cannot be clearly erroneous, and these arguments must fail.

The D&V Claimants' assertions that the TDP process will inflate the values of claims are similarly based on pure speculation and presupposes the Settlement Trustee will fail to do her job. *See* D.I. 41 at 76-77. There is no evidence in the record to support this argument.

In a last-ditch effort, the D&V Claimants also argue that the bankruptcy court did not address the D&V Claimants' payment-in-full objections to the Plan but rather only focused on the Certain Insurers' objection. *See* D.I. 41 at 79. The D&V Claimants are mistaken. The bankruptcy court addressed all of the

objectors' arguments and specifically mentioned the D&V Claimants' cross-examination of Dr. Bates in its analysis. *See* D.I. 1-3 at 65, 62 n.246, 57-72.

The bankruptcy court, as the finder of fact, concluded that the Plan would likely provide for payment in full of Abuse Claims. The evidence marshalled in support of this conclusion was more than sufficient. The D&V and Lujan Claimants had ample opportunity to challenge this evidence. They did not offer any competent evidence or expert testimony of their own to convince the factfinder otherwise.

### v.      The Injunction Is Essential To Reorganization

As discussed herein, the D&V and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in concluding "the Scouting-Related Releases and the channeling of Abuse Claims to the Settlement Trust are required." *See* D.I. 1-3 at 151. Indeed, the Plan is the only path to providing a substantial recovery for abuse survivors and reorganization of the BSA, and confirmation of the Plan depends upon approval of the Channeling Injunction and Releases. *See supra* pp. 155-63; Bankr. D.I. 9280 ¶¶ 106, 134, 154–55, 170, 184, 192, 238; Bankr. D.I. 9395 ¶ 23; Bankr. D.I. 9482 at 140:9–25; Bankr. D.I. 9517 at 27:10–17, 44:8–12, 47:4–21, 117:15–18. As the bankruptcy court concluded, it is "illogical to believe that these settlements could be achieved without the [Channeling Injunction and Releases] and this conclusion is supported by the record." D.I. 1-3 at 155. The

Channeling Injunction and Releases were the "subject of hard-fought negotiations with the help of seasoned mediators" and amongst parties with opposing interests. D.I. 1-3 at 155-56. The Channeling Injunction and Releases are narrowly tailored to relate solely to Abuse Claims which are defined to mean only those portions of claims for abuse that are related to Scouting. D.I. 1-4 Arts. I.A.18 (defining "Abuse Claim"), I.A.184 (defining "Mixed Claim"), I.A.261 (defining "Scouting"), I.A.262 (defining "Scouting-related").

The D&V and Lujan Claimants have failed to prove that the bankruptcy court clearly erred in concluding that the parties contributing to the Settlement Trust would not have done so without the Channeling Injunction and Releases. D.I. 1-3 at 151-55. Without these settlements, each of the Releasees would be forced to divert the hundreds of millions of dollars in settlement funds into a massive, protracted, complex litigation process to the detriment of abuse survivors, many of whom have waited decades for compensation. D.I. 1-3 at 155. Further, without the Channeling Injunction and Releases, abuse survivors would be forced to individually pursue the settling Local Councils and Chartered Organizations in a race to the courthouse that would ultimately lead to lower recoveries for survivors. D.I. 1-3 at 164. In this scenario, many Local Councils and Chartered Organizations would be forced to file their own bankruptcies in the process, further

delaying and diminishing funds available to compensate abuse survivors. D.I. 1-3 at 153–54; Bankr. D.I. 9407 at 35:15–36:9; Bankr. D.I. 9316 ¶ 11.

The bankruptcy court's finding, based on the overwhelming evidence, that the Channeling Injunction and Releases are the "cornerstone of the Plan" was not clearly erroneous.  D.I. 1-3 at 154-55.   The D&V Claimants and Lujan Claimants identify no clear errors that could undermine the bankruptcy court's conclusion. The bankruptcy court therefore appropriately found that the fifth *Master Mortgage* factor supports the Channeling Injunction and Releases.

## IV.    The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Abused Its Discretion In Finding That The Insurance Settlements Do Not Satisfy The *Martin* Standard

As noted above and set forth in the Confirmation Opinion, the bankruptcy court approved certain Insurance Settlements, which it determined were essential to the reorganization.  The Lujan Claimants challenge certain of those Insurance Settlements, arguing, among other things, that the policy proceeds are not property of the estate and that the bankruptcy court erred in approving the releases of claims against the Settling Insurance Companies. D.I. 40 at 34–62. The bankruptcy court properly rejected all of these arguments in confirming the Plan, and this Court should affirm the bankruptcy court's approval of the settlements.

### A.    The Insurance Settlements Satisfy The *Martin* Standard

The Lujan Claimants challenge the bankruptcy court's finding that the Insurance Settlements satisfy the bankruptcy settlement approval standard.  D.I. 40 at 62–64.  Bankruptcy courts consider the following factors (the "*Martin* factors") when determining whether to approve a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

Under Third Circuit law, a reviewing court examines a bankruptcy court's approval of a settlement "for an abuse of discretion" which is "a deferential standard of review."  *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006).  A reviewing court will "not disturb an exercise of discretion unless there is a definite and firm conviction that the court…committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  *Id.* (quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001)).

Accordingly, to reverse the bankruptcy court's approvals of the Insurance Settlements, this Court must determine that such approvals "rest on a clearly

erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation marks and citation omitted).

The Lujan Claimants do not come close to demonstrating that the bankruptcy court abused its discretion in approving the Insurance Settlements. Nor could they. The court approved the Insurance Settlements based on an extensive evidentiary record that formed the basis for the bankruptcy court's determination that the BSA had satisfied the *Martin* standard. *See* D.I. 1-3 at 75–83. Importantly, the bankruptcy court observed that without the approximately $1.656 billion that the Settling Insurance Companies will contribute to the Settlement Trust, "there is no Plan." D.I. 1-3 at 72–73. And the bankruptcy court found that the Insurance Settlements "resolv[e] complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims." D.I. 1-3 at 76.

Although the Lujan Claimants quibble with the bankruptcy court's assessment of the *Martin* factors, they fail to demonstrate that the bankruptcy court abused its discretion in approving the Insurance Settlements. As the bankruptcy court recognized, a settlement "need not be the best that can be achieved," and a court "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." D.I. 1-3 at 75, 83 (quoting *In re Nutritional Sourcing Corp.*, 398

B.R. 816, 833 (Bankr. D. Del. 2008)).  The Lujan Claimants have failed to prove that the bankruptcy court clearly erred in determining, based on the record before it, that the Insurance Settlements met this evidentiary standard and were each above the lowest point in the range of reasonableness.

As to the individual *Martin* factors, the bankruptcy court analyzed the first and third *Martin* factors[62]—the probability of success and the complexity of the litigation—together and found that they support the approval of the Insurance Settlements.  Specifically, the bankruptcy court determined that insurance coverage litigation (including the Illinois Action, Century Texas Action, and Hartford Texas Action discussed above)—with potentially billions of dollars at stake—would have been complex, costly, risky, and lengthy, with no guarantee of success.  *See* D.I. 1-3 at 72–83.  "In analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits."  *W.R. Grace*, 475 B.R. at 77–78.  Nevertheless, the BSA presented an extensive evidentiary record reflecting the complexity, cost, risk, and delay that would attend the coverage litigation.  *See, e.g.*, Bankr. D.I. 9398 ¶¶ 68–72, 76–77, 83, 87, 91, 95, 100, 104 (testifying about the significant risk that future rulings in favor of Settling

---

[62] The first and third factors are often considered together.  D.I. 1-3 at 75; *see also In re Nutraquest, Inc.*, 434 F.3d at 646 ("The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation.").

Insurance Companies' coverage defenses could substantially reduce available coverage for Abuse Claims and that coverage litigation would be complex and a drain on the Debtors' resources); Bankr. D.I. 9490 at 162:1–169:2 (same); Bankr. D.I. 9280 ¶¶ 104, 132–33, 166–67, 180 (testifying that the settlements "avoid the costs, risks, uncertainty and delay associated with protracted litigation"). The bankruptcy court properly held that this evidence supported approval of the Insurance Settlements, because the "Debtors are resolving complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims." D.I. 1-3 at 82–83.

The Lujan Claimants do not, and cannot, dispute this extensive record, as they did not present any counter-evidence. In their written submissions, the Lujan Claimants did not object to the Insurance Settlements on the grounds that they failed to satisfy the *Martin* standard and only raised this argument for the first time at trial. D.I. 1-3 at 74. This fact alone warrants the rejection of the Lujan Claimants' argument as to the *Martin* standard.[63]   *See, e.g.*, *Thompson v. TCT*

---

[63]   Similarly, the Lujan Claimants' baseless request to reverse or vacate the Pre-Petition Century/Chubb Companies Claims Order should be denied, as they never objected to its entry. *See* Bankr. D.I. 10327 at 2; Bankr. D.I. 10288. To the extent the Lujan Claimants purport to join the D&V Claimants regarding this issue, [D.I. 40 at 79], such joinder is unavailing, as the D&V Claimants have withdrawn the issue on appeal. D.I. 41 at 5 n.6. Even if the Lujan Claimants preserved the issue (which they have not), the Pre-Petition Century/Chubb Companies Claims Order was part of the bargain struck under the Century and Chubb Companies Insurance Settlement and is in exchange for

*Mobile, Inc.*, No. 19-899-RGA-SRF, 2020 WL 1531333, at *7 n.3 (D. Del. Mar. 31, 2020) ("[B]ecause it was not raised in the briefs, the argument is waived."); *Watkins v. Int'l Union, Sec., Police & Fire Prof'ls of Am.*, No. 15-444-LPS, 2016 WL 1166323, at *4 n.4 (D. Del. Mar. 23, 2016) ("Because this argument was made for the first time at the hearing, the Court will not consider it."); *Mallinckrodt*, 639 B.R. at 892 n.178 ("While Sanofi's counsel made additional arguments...during closings at the Confirmation Hearing…these arguments were not included in Sanofi's objections and therefore do not need to be considered.").

Without their own evidence to rely on, the Lujan Claimants assert that the Settling Insurance Companies' coverage defenses are "without merit" and therefore that the bankruptcy court erred in approving the Insurance Settlements. D.I. 40 at 62–64.  But a court's evaluation of the first and third *Martin* factors is not influenced by one party's confidence in its litigation position.  *See Mallinckrodt*, 639 B.R. at 864.  Accordingly, the uncontroverted evidentiary record establishes that notwithstanding the parties' views on the merits, litigation would have been complex, costly, risky, and time-intensive.

The second *Martin* factor—difficulties in collection—is also satisfied or was not at issue.  The bankruptcy court explicitly found that the BSA (and the Future

---

the Century and Chubb Companies' agreement to contribute a portion of the $800 million contribution to the Settlement Trust on the Effective Date.  D.I. 1-4, Ex. I; D.I. 1-3 at 30, 77; Bankr. D.I. 9280 ¶¶ 122–38.

Claimants' Representative) "had significant concerns regarding Century's ability to honor its agreements going forward" based on evidence that "Century is in runoff paying claims."  D.I. 1-3 at 78–79.  This conclusion is amply supported in the record.  Bankr. D.I. 9398 ¶ 86; Bankr D.I. 9280 ¶¶ 129–33 (expressing concern regarding Century's ability to pay any future judgment, considering information "including the fact that Century is in run-off and has a statutory surplus of only $25 million.").

Finally, the bankruptcy court found that the fourth *Martin* factor—the paramount interest of the creditors—was satisfied.[64]   As noted above, the bankruptcy court recognized that, without the Insurance Settlements, "there is no Plan," and the Plan, including the approximately $1.656 billion being contributed to the Settlement Trust by the Settling Insurance Companies under the Insurance Settlements, provides for the likely payment in full of all Abuse Claims, including

---

[64] The Lujan Claimants' reliance on *Ditech* is misplaced.  In that case, the bankruptcy court denied approval of a settlement because the debtor offered *no evidence* that the settlement was fair and equitable with respect to a certain class of creditors.  *In re Ditech Holding Corp.*, 606 B.R. 544, 624–25 (Bankr. S.D.N.Y. 2019).  As noted above, the bankruptcy court's approval of the Insurance Settlement Agreements was supported by a substantial and uncontroverted evidentiary record.

those of the Lujan Claimants.[65]  *See* D.I. 1-3 at 73.  Despite the Lujan Claimants'

assertions otherwise,[66] the bankruptcy court found that:

> [A]ll three groups representing holders of Direct Abuse Claims (*i.e.*,
> the Tort Claimants' Committee, the Coalition and the Future
> Claimants' Representative) now support the Settling Insurer
> Settlements.... Their support satisfies me that Debtors have met their
> burden to show that the Settling Insurer Settlements are in the
> paramount interest of creditors.

D.I. 1-3 at 82.  The bankruptcy court did not err in allowing overwhelming creditor

support to speak for itself.  *See Police & Fire Ret. Sys. of the City v. Ambac Fin.*

*Grp., Inc. (In re Ambac Fin. Grp., Inc.)*, No. 10-B-15973 SCC, 2011 WL 6844533,

at *6 (S.D.N.Y. Dec. 29, 2011) (holding that, because "the unsecured

creditors…are the parties who stand to benefit from any recovery" under the

settlement, "[t]he Bankruptcy Court was therefore justified in placing significant

weight on the Creditors Committee's support for the 9019 Order").

---

[65] The Lujan Claimants further attack the Hartford Insurance Settlement
Agreement and the Century and Chubb Companies Insurance Settlement
Agreement because "neither settlement involves payment up to the limits of
these mostly nonaggregate policies…."  D.I. 40 at 51.  The policy limits are
irrelevant because, as the bankruptcy court determined for the purpose of
confirmation, holders of Direct Abuse Claims are likely to be paid in full by the
Settlement Trust through the TDP – whether through a Trust Claim Submission,
the Independent Review Option, or a TDP Tort Election Claim (each as defined
in the TDP).  D.I. 1-3 at 51.  Because the Lujan Claimants will most likely be
paid in full for their Direct Abuse Claims, they have no basis to challenge the
Insurance Settlements.  There is no requirement that an insurance settlement
must reach a policy limit to be approved, and the Lujan Claimants have not
established a right to payments up to such limits.

[66] *See* D.I. 40 at 63.

The bankruptcy court also rejected the Lujan Claimants' argument that the BSA should have considered the effect of the Insurance Settlements on the particular claims of the Lujan Claimants, noting that "the money coming into the Settlement Trust does not disadvantage the Lujan Claimants more than other creditors." D.I. 1-3 at 83. The court further found that "[g]iven the nature of mass tort litigation, it is impossible to focus on specific creditors when reviewing a resolution of obligations under insurance policies against which coverage can be sought on 82,209 claims." D.I. 1-3 at 83. Thus, the Lujan Claimants have failed to prove that the bankruptcy court clearly erred in determining that the Insurance Settlements were in the paramount interest of the creditors—even if they were opposed by a small minority of creditors. For the foregoing reasons, the Lujan Claimants have failed to prove that the bankruptcy court clearly erred in concluding that the Insurance Settlements satisfied the *Martin* standard.

**B.     The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Determining That Proceeds Of The Abuse Insurance Policies And Contributed Non-Debtor Abuse Insurance Policies Are Property Of The Estate**

In accordance with the Insurance Settlements, the Plan contemplates the sale back to Settling Insurance Companies of certain BSA Insurance Policies and Local Council Insurance Policies. D.I. 1-4 Art. V.S.4; Bankr. D.I. 9316 ¶ 66. Under the Insurance Settlement Agreements and the Plan, the Local Councils will assign their interests in the Local Council Insurance Policies to the BSA, which will, in turn,

sell such policies to the corresponding Settling Insurance Company pursuant to section 363 of the Bankruptcy Code. D.I. 1-4 Art. V.S.4.

No Local Council objected to the sale of the specified Abuse Insurance Policies (which include the Local Council Insurance Policies) free and clear of any interests they may have as an insured under such policies.    D.I. 1-3 at 85. Similarly, no Chartered Organization currently objects to the sale of the Abuse Insurance Policies to the Settling Insurance Companies free and clear of any interests such Chartered Organization may have under such policies.    D.I. 1-3 at 85.    While the AOA previously objected to the sale of any policies under which it might be able to recover, that objection has been resolved by the Confirmation Order which excepts the interest, if any, of the AOA from the sale of Abuse Insurance Policies.    D.I. 1-1 ¶ I.3.    The AOA Committee, like the AOA, is not party to these appeals.

Nonetheless, the Lujan Claimants argue that the bankruptcy court erred in approving the Insurance Settlements because non-debtor Abuse Insurance Policies contributed to the BSA and the proceeds of the BSA Insurance Policies, are not property of the BSA's estates such that the policies may not be sold free and clear of liens, claims and interests under section 363(f) of the Bankruptcy Code.    D.I. 40 at 49-50; 61-62.    As discussed below, the Lujan Claimants arguments fail for several reasons.

### 1. The Proceeds Of BSA Insurance Policies Are Property Of The BSA's Estates

The Lujan Claimants incorrectly argue that "the bankruptcy estate does not include the proceeds of BSA liability insurance policies since injured persons, including Survivors, have a right to receive and keep those proceeds when the insurer pays on the claim."[67]   D.I. 40 at 49.   Even if the Lujan Claimants had a legally cognizable property right in the proceeds of the Abuse Insurance Policies (which they do not), that would not automatically divest the BSA's bankruptcy estate of its entitlement to the proceeds.   As the Third Circuit explained in *In re Nutraquest, Inc.*—a case relied on by the Lujan Claimants—proceeds are not property of the estate if the policy would ***only*** insure and pay out to non-debtors—

---

[67] The Lujan Claimants also argue that the bankruptcy court lacks jurisdiction over the 1976 and 1977 Hartford policies for coverage of child sexual abuse claims, since BSA previously released its rights to such coverage.   D.I. 40 at 61. The scope of those releases remains disputed and Local Councils and Chartered Organizations, which were not parties to the settlement agreement containing the referenced releases, have asserted that their coverage rights under those policies were not impacted by the settlement.   Bankr. D.I. 9398 ¶ 65; Bankr. D.I. 6431 Art. III.F.3.   Moreover, the settlement did not settle claims for possible coverage of claims other than child sexual abuse.   *See* SA 3685.   The bankruptcy court has proper jurisdiction over the 1976 and 1977 Harford policies because the BSA is selling its residual rights for coverage of claims other than child sexual abuse and child sexual abuse claims, if any, as well as the interests of Local Councils and Chartered Organizations which were contributed to the BSA and became part of the BSA estate.   D.I. 1-3 at 87.   To the extent the Lujan Claimants assert that the settlement extinguished all coverage for child sexual abuse under 1976 and 1977 Harford policies, including the interests belonging to the BSA, Local Councils, and Chartered Organizations, they too would have no remaining claim to those policies and their argument would still be meritless.

but this rule is inapplicable where, as here, the debtor is an insured and has a right to the insurance proceeds.[68]  434 F.3d at 647 n.4.  Indeed, as discussed *supra* pp. 19-21, the BSA was in active prepetition coverage litigation with its insurers for the express purpose of seeking to collect proceeds from certain of the Settling Insurance Companies.

In considering how to characterize the proceeds of these insurance policies, the bankruptcy court analogized these policies to cases involving directors, officers, and corporate liability insurance policies, rather than the irrelevant *First Fidelity*[69] framework cited by the Lujan Claimants.  D.I. 1-3 at 90–91 nn.339-40.

---

[68]  Similarly, in *In re Edgeworth*, another case relied upon by the Lujan Claimants, the Fifth Circuit held that proceeds were not part of the debtor's estate because the debtor was not named an intended beneficiary under the policy, so the debtor had no "legally cognizable claim" to the proceeds.  993 F.2d 51, 56 (5th Cir. 1993).  Moreover, as the *W.R. Grace* court explained, the *Edgeworth* court "explicitly recognized that, in general, "'[p]roceeds of…insurance policies, if made payable to the debtor rather than a third party such as a creditor, are part of the estate' [and] noted the common decision of courts in mass tort bankruptcies cases to include insurance proceeds as property of the estate to avoid a 'free-for-all against the insurer.'"  *W.R. Grace*, 475 B.R. at 82 (distinguishing *Edgeworth*).

[69]  As the bankruptcy court correctly determined, the Third Circuit's decision in *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993) is not relevant here.  Among other reasons, unlike in *First Fidelity*, "BSA or the Local Council, as applicable, both own the Abuse Insurance Policies and is the named insured under the policies," the Lujan Claimants are not insured under the policies, "there are numerous coverage disputes," the claims are based on an unknown amount of unliquidated claims, and "[h]ere, there are thousands of Abuse Insurance Policies…[and] the actual allocation is unknown and unknowable

The bankruptcy court highlighted the four rules established by the bankruptcy court in *Allied Digital*:

> (a)   "[w]hen a debtor's liability insurance policy provides direct coverage to the debtor the proceeds are property of the estate, because the proceeds are payable to the debtor."
>
> (b)   "[w]hen the liability insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate."
>
> (c)   "[w]hen there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."
>
> (d)   "[w]hen the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate."

D.I. 1-3 at 90–91 (quoting *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)).  The Lujan Claimants implicitly urge this Court to find that the proceeds of the Abuse Insurance Policies fall into the second bucket without offering any evidence that the BSA does not have direct coverage; any evidence that depletion of insurance proceeds would not harm the estate; or any evidence that indemnification coverage is only hypothetical or speculative.  Without such evidence (which does not exist), the Lujan Claimants also cannot prove that the

---

until not only all of the underlying claims are liquidated, but all of the insurance coverage issues are resolved."  D.I. 1-3 at 88–90.

bankruptcy court erred in determining that the insurance proceeds are property of the BSA's estates.

Indeed, the evidence weighs decidedly in the other direction. As the evidence at trial showed, "[t]he Abuse Insurance Policies provide direct coverage—indemnity, and in many cases, defense—to BSA or the Local Council [which is] not hypothetical or speculative," and considering the "82,209 unique and timely proofs of claim asserting Direct Abuse Claims…against BSA[,]…[d]epletion of the proceeds of these policies would have an adverse effect on the estate." D.I. 1-3 at 91–92.

The Lujan Claimants have failed to prove that they have any right to the proceeds at all. The Lujan Claimants are not named beneficiaries under any of the Abuse Insurance Policies. *See W.R. Grace*, 475 B.R. at 83. The mere fact that the "Lujan Claimants can pursue direct action claims against non-settling insurers" does not equate to a present entitlement to such insurance proceeds. As described in detail below, the Guam direct action statute provides the Lujan Claimants only with a procedural right. It does not afford them a property interest in the proceeds of the Abuse Insurance Policies.[70]

---

[70] *See infra* pp. 202-13.

### 2. The Contributed Non-Debtor Insurance Policies Are Property Of The BSA's Estates

The Lujan Claimants similarly argue that "[l]ike liability insurance proceeds, non-BSA insurance policies and released BSA insurance policies are not property of the bankruptcy estate and therefore may not be disposed of free and clear under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code." D.I. 40 at 61. Even if the Lujan Claimants had standing (they do not),[71] the bankruptcy court had ample authority to confirm the Plan with respect to the sale and settlement of Local Council Insurance Policies. As the bankruptcy court explained, "[a]ny Local Council Insurance Policies, once assigned to BSA in

---

[71] Third Circuit precedent limits bankruptcy appellate standing to "[a]ggrieved persons…whose rights or interests are *directly* affected by an order of the bankruptcy court that 'diminish their property, increase their burdens, or impair their rights.'" *W.R. Grace*, 475 B.R. at 103 (emphasis in original) (quoting *Combustion Eng'g*, 391 F.3d at 214. The Lujan Claimants plainly have no interests or property rights in the contributed insurance policies assigned to the BSA. *See id.* at 81 ("Therefore, given that [objecting party] is not an additional insured under Grace's insurance agreements with CNA, it has no right to complain that its rights are affected by the Settlement Agreement reached between Grace and CNA."); *id.* at 83 ("Given that the [objecting parties] are not named as insureds or intended beneficiaries under any of the Grace-CNA policies and there is no evidence on the record indicating that the policies were purchased for their benefit, the [objecting parties] hold no direct rights to the insurance proceeds."). The bankruptcy court correctly concluded that the Lujan Claimants' position that they had a property interest in the proceeds of Abuse Insurance Policies issued by Hartford and Century (including those issued to non-debtor parties) was "contrary to the evidence," as "the Lujan Claimants have not directed me to any provision of any Abuse Insurance Policy that provides that claimants are insureds" and "[t]he Lujan Claimants' claims against the Aloha Council are…unliquidated personal injury claims." D.I. 1-3 at 89.

connection with the Plan, will be property of the estate." D.I. 1-3 at 87 (citing 11 U.S.C. § 541(a)(7)) (property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case"). Contrary to the Lujan Claimants' argument, which lacks legal support, property assigned to a debtor post-petition unquestionably becomes property of the estate. *See, e.g., In re CBI Holding Co.*, 529 F.3d 432, 459 (2d Cir. 2008) (holding that a creditor's claims that were assigned to debtor properly became property of the estate under section 541(a)(7) and explaining that "[a]llowing a debtor's creditors to assign their claims for the benefit of the debtor's estate permits debtors, creditors, and bankruptcy courts the flexibility in reorganizing or liquidating a debtor's assets necessary to achieve efficient administration of the reorganization").

The sole case the Lujan Claimants cite in support of their argument that non-BSA insurance policies are not property of the estate, *In re Aegean Marine Petroleum Network, Inc.*, is entirely irrelevant to the issue of whether insurance policies are property of the estate. 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019). *Aegean Marine* solely concerned "the involuntary imposition of a third-party release" and only addressed the issue of the bankruptcy court's authority to grant such releases based on evidence that did not meet the standard articulated in the Second Circuit for the inclusion of nonconsensual third-party releases in a plan of reorganization. *Id*. Moreover, the non-BSA insurance policies are being

voluntarily contributed to the BSA and are thus property of the estate, and *Aegean Marine* does not say otherwise.

As the bankruptcy court explained:

No Local Council objects to the buyback of the Abuse Insurance Policies to the Settling Insurers…And, as part of the Local Council Contribution, Local Councils are assigning to BSA any insurance policies they own (i.e. the Local Council Insurance Policies), which are then being sold to the Settling Insurers. The sale free and clear of their interests, therefore, is clearly consensual and thus permissible under § 363(f)(2)….The lack of objection of a Chartered Organization is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2).

D.I. 1-3 at 85. To the extent the Lujan Claimants seek to rehash their arguments related to third party releases, those are separately addressed herein, *see supra* pp. 122-93, but have nothing to do with the bankruptcy court's proper jurisdiction over policies contributed by the Local Councils and Chartered Organizations.

For the same reasons that the Lujan Claimants lack a right to the proceeds of BSA Insurance Policies, the Lujan Claimants failed to prove that they have any right to the proceeds of contributed non-debtor Abuse Insurance Policies. The Lujan Claimants therefore neither have standing to assert this argument nor have they shown the bankruptcy court erred in concluding that the contributed non-BSA insurance policies and their proceeds are property of the Debtors' estates.

### C.  The Plan Adequately Protects And Compensates The Lujan Claimants For Their Alleged Interests In The Abuse Insurance Policies That Are The Subject Of The Insurance Settlements

The Lujan Claimants acknowledge that "the Plan treats [them] the same as all other Survivors," but nonetheless object to the Plan and Insurance Settlements because they do not afford them enhanced recoveries above and beyond those of other holders of Direct Abuse Claims in their class on account of certain procedural rights the Lujan Claimants purport to enjoy.  *See* D.I. 40 at 58.  The Lujan Claimants first assert that the Plan was unconfirmable because it incorporates Insurance Settlements that "impermissibly modify Lujan Claimants' rights to insurance proceeds."  *Id.* at 52.  In the alternative, the Lujan Claimants demand "adequate protection and compensation for their interests in the insurance policies."  *Id.* at 57.  Both objections rest on the mistaken belief that Guam's direct action statute affords the Lujan Claimants a distinct property interest in the proceeds of Abuse Insurance Policies or an enhanced priority over other Abuse Claims against the BSA.[72]  However, as the bankruptcy court explained:

---

[72] The Lujan Claimants further argue that the requirements of section 1123(a)(5)(D), which requires that a plan provide adequate means for its implementation including a sale of estate property, prevent approval of the Insurance Settlements and associated sale of the insurance policies due to Guam's direct action statute.  D.I. 40 at 55.  However, the bankruptcy court approved the sale of the BSA Insurance Policies free and clear of the Lujan Claimants' direct action rights pursuant to section 363.  *See* D.I. 1-1 at 111.  As such, any objection on the basis of section 1123(a)(5)(D) is irrelevant.  The Lujan Claimants' specific arguments are also incomplete and meritless.  The

> [T]he Guam District Court describes the direct action as procedural in
> nature, not substantive….[I]t is a procedural law granting standing to
> sue or, at best, some collection remedy for a creditor of the
> policyholder in the event the creditor can prove the policyholder's
> liability and the policy covers the loss.

D.I. 1-3 at 108–09.

Direct action rights under Guam law simply provide a procedural vehicle for

a plaintiff to directly name the insurance company as a defendant in an underlying

lawsuit against an insured. *See Reyes v. United States*, No. 08-00005, 2010 WL

5207583, at *7 (D. Guam Dec. 15, 2010) (holding that Guam's direct action statute

does not provide a separate cause of action against the insurer). In other words, a

direct action right against an insurance company is wholly derivative of the claim

against the insured. *See Townsend v. Benavente*, 339 F.2d 421, 422 n.3 (9th Cir.

1964) ("Derivative liability of an insurer may be established in the principal action

under Guam's 'direct action' statute."). A direct-action plaintiff is not entitled to

---

argument that the bankruptcy court cannot approve the sale of the insurance
policies because "Guam law prohibiting the post-occurrence modification of an
injured person's rights is not anti-sale; it is anti-rescission" is unsupported by
law or facts. The Lujan Claimants fail to cite an applicable Guam law or case
prohibiting post-occurrence modification of insurance policies in bankruptcy,
and have failed to explain how, if such law existed, it would prohibit the
bankruptcy court from approving what is indeed a sale of insurance policies
pursuant to section 363. The Lujan Claimants have not contested the
bankruptcy court's finding that the Plan provides adequate means for its
implementation, and have not provided law or facts to support their contention
that section 1123(a)(5)(D) prohibits approval of the Insurance Settlements. *See*
D.I. 1-3 at 200.

any *additional* recovery beyond what the plaintiff could have recovered against the insured. *Reyes*, 2010 WL 5707583, at *7.

Indeed, courts have emphasized that Guam's direct action statute does not expand the rights of injured parties beyond the terms of the insurance policy, as "[t]he express language of § 18305[73] limits the 'right of direct action against the insurer *within the terms and limits of the policy*.'" *Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd*., No. CIV. 96-00047, 1997 WL 995625, at *5 (D. Guam Aug. 29, 1997) (emphasis in original) (citing *Capital Ins. & Surety Co. Inc. v. Kelly*, 361 F.2d 567 (9th Cir. 1966) (holding that plaintiff could not prosecute a claim directly against an insurer, notwithstanding Guam's direct action statute, because, under the policy, any claim by an insured must be arbitrated pursuant to the terms of the policy and could not be litigated). Accordingly, the Lujan Claimants' interest in the Abuse Insurance Policies is no greater than that of any other holder of an Abuse Claim.

---

[73] "On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct action, provided that the cause of action arose in Guam. Such action may be brought against the insurer alone, or against both the insured and insurer." 22 Guam Code Ann. § 18305.

### 1.   The Insurance Settlements Do Not Impermissibly Modify The Lujan Claimants' Rights

The record evidence and law are contrary to the Lujan Claimants' assertion that they have a present interest in insurance proceeds distinct from other abuse survivors that cannot be modified by the Plan and Insurance Settlements.  D.I. 40 at 52.  In support of their argument, the Lujan Claimants point to the findings in *In re W.R. Grace & Co.* and the existence of Guam's direct action statute.  475 B.R. at 83 (holding that one way for a claimant to demonstrate a legal right to collection could be "a state statute crafted by the legislature conferring a right upon the parties to pursue a direct action for the proceeds").  However, in *W.R. Grace*, the court explained that "the claiming party must show that it has a right to the insurance proceeds because the insured is in some way liable to the claimant[, such as]…by obtaining a judgment against the tortfeasor.  Absent liability, the claimant has no right to collect the proceeds."  *Id.* at 84 n.40.  The court further explained that "the injured party has no more than an expectation that he/she will be able to collect from the insured prior to obtaining a judgment," and that, particularly in the context of mass tort bankruptcies, this expectation should not preclude approval of a settlement of insurance claims that is in the best interest of personal injury claimants as a whole.  *Id.* at 85 (citing *In re Dow Corning Corp.*, 198 B.R. 214, 242 (Bankr. E.D. Mich. 1996) ("Even more troubling is the situation…where at the time of the proposed settlement there are injured party claimants who are not yet

known.  If each unknown claimant could later sue the insurer and not be estopped by a fully litigated judgment against its insured or by a fair and equitable settlement, there would be no finality to litigation and no realistic likelihood of settlement.")).

As is the case with other abuse survivors, the Lujan Claimants do not have an existing judgment against, or settlement with, the BSA and their claims remain heavily contested.  Similar to the claimants in *W.R. Grace*, the Lujan Claimants have no more than an expectation of recovery, and cannot assert a present right to the proceeds of the BSA Insurance Policies.  *See W.R. Grace*, 475 B.R. at 85. Accordingly, the Plan and Insurance Settlements do not impermissibly modify any right belonging to the Lujan Claimants.

### 2.    Guam's Direct Action Statute Does Not Entitle The Lujan Claimants To Additional Adequate Protection

The Lujan Claimants also assert that Guam's direct action statute entitles them to additional adequate protection.  D.I. 40 at 52.  As the bankruptcy court found, because the direct action statute "does not provide the Lujan Claimants with rights in the Abuse Insurance Policies themselves...no adequate protection is required."  D.I. 1-3 at 112–13.  To the extent the Lujan Claimants' alleged direct action rights did entitle them to adequate protection, the Plan adequately protects and compensates them for their interests.  *See* D.I. 1-3 at 113 ("If [adequate protection] were [required], however, I conclude that the Lujan Claimants are

213

adequately protected.").   Simply put, the bankruptcy court found, by a preponderance of the evidence, that holders of Direct Abuse Claims (including the Lujan Claimants) would most likely be paid in full for their claims. *See id.* at 51, 72. It follows, then, that any direct action rights do not have any additional value. If a tortfeasor's claim is fully paid by the insured (or in this case, by the Settlement Trust created out of the insured's estate), there is no additional recovery against the insurance company. By finding that the Lujan Claimants would most likely be paid in full through the TDP and the Settlement Trust, the bankruptcy court effectively found that the value of any purported direct action rights is zero. Similarly, even if a "priority right" to payment existed (which it does not), because all Direct Abuse Claims will most likely be paid in full, there can be no justification for any such "priority right" to payment.

Again, as noted above in *supra* p. 32, the Lujan Claimants did not call any witnesses to rebut the testimony of Dr. Bates and Ms. Gutzler, upon which the bankruptcy court relied to correctly find that Direct Action Claims will most likely be paid in full. Accordingly, the Plan adequately protects and compensates the Lujan Claimants for any purported interests in the applicable insurance policies.

V.    **The Plan, Confirmation Opinion, And Confirmation Order Do Not Improperly Impact The AOA's Interests, If Any, In Abuse Insurance Policies In Violation Of The AOA's Automatic Stay**

Prior to the filing of the Chapter 11 Cases, the AOA filed its own petition for chapter 11 relief (the "AOA Bankruptcy") in the United States District Court of Guam – Bankruptcy Division (the "Guam Court").[74]   On November 13, 2020, the AOA filed a proof of claim in the BSA bankruptcy proceeding.  *See* SA 473.   In September 2021, after resolution of a dispute between the AOA and the AOA Committee over the AOA Committee's derivative standing to enforce the automatic stay in connection with the AOA's purported rights under BSA Insurance Policies in the AOA Bankruptcy,[75] the AOA took additional actions, including objecting to the Plan, in the BSA's Chapter 11 Cases.  *See, e.g.*, Bankr. D.I. 8687, 9555.   The BSA also filed an objection to confirmation of reorganization solicited in the AOA Bankruptcy (the "AOA Plan") and a proposed settlement in the AOA Bankruptcy in order to defend against the impairment of the BSA's interests with respect to certain of the BSA Insurance Policies.  *See, e.g.*, SA 1682, SA 1819, SA 1837.

---

[74]   *See In re Archbishop of Agaña*, Case No. 19-00010 (Bankr. D. Guam – Bankr. Div.).

[75]   SA 1639 at 19:21-20:16; SA 2140.  This Court may take judicial notice of items on another federal court's docket.  *See In re NantHealth, Inc. Stockholder Derivative Litig.*, No. 18-cv-00551-SB, 2021 WL 1909885, at *1 (D. Del. May 12, 2021).

Following these actions, the parties mediated the conflicts between the BSA Plan and Confirmation Order and the AOA Plan, SA 867, and reached an agreement that resolved their objections to each other's plans of reorganization (the "AOA Stipulation"), and obtained approval of the settlement from both the bankruptcy court and the Guam Court.  Bankr. D.I. 10640; SA 2117.  The AOA Plan was revised to be in accord with and to respect the BSA's Plan, and the two plans of reorganization allow for holders of Abuse Claims, including the Lujan Claimants, to receive distributions from the settlement trusts established in each of the chapter 11 cases simultaneously to the extent applicable.  *See, e.g.*, SA 1869 at 33:10-34:4; SA 1925 § 13.7; D.I. 1-3 at 161.[76]  On October 20, 2022, the Guam Court confirmed the AOA Plan with the support of the BSA.  AOA D.I. 1093.  As noted above, the AOA withdrew its appeal of the Confirmation Order.  Bankr. D.I. 10540.

Despite the settlement and release of all issues with respect to the AOA Bankruptcy and neutrality of the BSA's and AOA's Plans with respect to insurance

---

[76] *See* SA 1925, Fifth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña, No. 19-00010 (D. Guam Sept. 28, 2022) § 13.9 ("Nothing in this Plan…affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant to act in violation of applicable law or affirmatively authorizes such persons to violate … any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder").

interests, the Lujan Claimants contend that the Plan violates the automatic stay in the AOA Bankruptcy.  D.I. 40 at 64-66.  This argument fails as a preliminary matter because the Lujan Claimants lack standing; the AOA—the only party with standing to assert a stay violation—has voluntarily dismissed its appeal of the Confirmation Opinion and the Confirmation Order with prejudice.[77]  *See* Stipulation and Order of Voluntary Dismissal, *Archbishop of Agaña v. Boy Scouts of America*, Docket No. 1:22-cv-01254 [D.I. 7].  In any event, and as further discussed below, these arguments have been rendered moot by the AOA Stipulation.  For these reasons, this Court need not consider the Lujan Claimants' arguments related to the AOA's automatic stay.  Even so, nothing in the Plan, the Confirmation Order, or the Confirmation Opinion violates the AOA's automatic stay.[78]

---

[77]  Neither the AOA, nor any party purportedly acting on behalf of the AOA, may now appeal the Confirmation Opinion or Confirmation Order.  *See* Bankruptcy Rule 8002.

[78]  The injunctions and releases in the Plan do not improperly affect the interests of the AOA in contravention of the automatic stay in the AOA Bankruptcy and are to the AOA's benefit. The Plan specifically provides that Abuse Claims against the AOA covered by Abuse Insurance Policies issued by the Settling Insurance Companies will be channeled to the Settlement Trust and paid pursuant to the TDP. The Settling Insurance Companies provided contributions for such benefits to the AOA, which was an integral and necessary part of the Insurance Settlement Agreements.

**A.     No Party With Standing Has Appealed Confirmation As To The Plan's Impact On The AOA's Interests, If Any, In The Abuse Insurance Policies**

The AOA-related arguments fail first and foremost because the AOA has withdrawn its appeal, and the Lujan Claimants do not have standing to assert this argument on the AOA's behalf.

As noted above, the AOA's dismissal of its appeal was the culmination of rigorous mediation in the AOA Bankruptcy with the Honorable Robert J. Faris. SA 1867.  As a result of court-directed mediation, the AOA, the AOA Committee, and the BSA entered into the AOA Stipulation, which was not opposed by any party, including the Lujan Claimants, and which was approved by the Guam Court and the bankruptcy court.  Bankr. D.I. 10640; SA 2117.

The AOA Stipulation required, among other things, that the AOA (i) amend its plan of reorganization to be consistent with terms agreed to between the AOA and the BSA and (ii) withdraw its appeal of the Confirmation Opinion and Confirmation Order.  Bankr. D.I. 10640 Ex. 1.  The AOA Stipulation resolved all issues between the BSA and AOA bankruptcy estates, as well as the AOA Committee, allowing the respective estates to focus on confirmation and implementation of their respective plans.  SA 2117.

The AOA's withdrawal of its appeal to this Court was an integral and necessary part of the AOA Stipulation.  *Id.*  The Guam Court confirmed the AOA

Plan, which provides for distributions to holders of abuse claims against the AOA, including the Lujan Claimants that filed claims in the AOA Bankruptcy.  SA 2127.

The AOA Stipulation and the withdrawal of the AOA's appeal to this Court is dispositive and should foreclose any attempt by the Lujan Claimants to use the AOA's automatic stay to challenge the bankruptcy court's decisions confirming the Plan.  Moreover, the AOA itself has not sought to enforce its automatic stay against the BSA either in the bankruptcy court or the Guam Court.  Nor has the Guam Court granted any party standing to enforce the stay on the AOA's behalf. SA 1660 at 19:21-20:16.  This Court should not entertain the Lujan Claimants' arguments based on the AOA's automatic stay.

## B. The Lujan Claimants Lack Independent Standing To Enforce The AOA's Automatic Stay

In rejecting similar AOA-focused arguments at confirmation, the bankruptcy court held that "[t]he Lujan Claimants have no standing to raise the rights of the Archbishop."  D.I. 1-3 at 85 n.329; *see also* Bankr. D.I. 9638 at 39:8-13.  The Ninth Circuit, which has jurisdiction over the District Court of Guam where the AOA's bankruptcy was filed,[79] has held that "a creditor has no independent

---

[79]  The AOA's automatic stay originates from the AOA Bankruptcy in the District of Guam, and therefore, Ninth Circuit law applies.  *See De Barros v. From You Flower, LLC*, No. 18-503MSM, 2021 WL 5134361 at *5 (D.R.I. Sept. 22, 2021), *report and recommendation adopted*, 566 F. Supp. 3d 149 (D.R.I. 2021) (applying the law of the district where the bankruptcy discharge was granted); *see also United Consumers Club, Inc. v. Bledsoe*, 441 F. Supp. 2d 967, 986

standing to appeal an adverse decision regarding a violation of the automatic stay."

*In re Pecan Groves of Ariz.*, 951 F.2d 242, 245 (9th Cir. 1991) (rejecting argument

that the purpose of the automatic stay is to protect both the debtor and creditors).

The Ninth Circuit has held that creditors do not have an independent right to

enforce alleged stay violations.  *See In re Barrett*, 833 F. App'x 668, 670 (9th Cir.

2020) ("[I]f the trustee does not seek to enforce the protections of the automatic

stay, then no other party may challenge acts purportedly in violation of the

automatic stay, because 11 U.S.C. § 362 is intended solely to benefit the debtor

estate…[B]ecause the automatic-stay provisions of the Bankruptcy Code are

intended 'solely' for the benefit of the debtor and the debtor's estate, individual

creditors' interests do not fall within the zone of interests protected by the

automatic-stay provisions of the Bankruptcy Code." (quoting *In re Pecan Groves

of Ariz.*, 951 F.2d at 245, and *Sierra Club v. Trump*, 929 F.3d 670, 700 (9th Cir.

2019))).

Here, the AOA has dismissed its appeal, has not sought to enforce its

automatic stay against the BSA in any forum, and is barred under the AOA

Stipulation from joining in the Lujan Claimants' appeal.  Under clear Ninth Circuit

precedent, the Lujan Claimants have no independent standing to enforce the

_____

(N.D. Ind. 2006) (declining to apply authorities "to the extent these cases
conflict with Ninth Circuit law, which governs the [defendants'] bankruptcy,"
including the dischargeability of defendants' debt).

AOA's automatic stay.  Because the Lujan Claimants do not have standing to enforce the automatic stay on behalf of the AOA or in their own right, this Court should not permit the Lujan Claimants to pursue their stay-related arguments.

## C.  Confirmation Of The AOA Plan Has Rendered The Automatic Stay Issue Moot

Even if the Lujan Claimants had standing to raise the argument that confirmation of the Plan violated the AOA's automatic stay (which they do not), the Guam Court's confirmation of the AOA Plan has rendered their arguments moot.  *See* SA 1869 at 33:10-34:4.

As a component of the AOA Stipulation, the BSA, the AOA and the AOA Committee agreed to modify certain provisions of the AOA Plan, including to provide that the AOA Plan would be completely neutral with respect to the Plan (the "Neutrality Provision").  *See* SA 1092 § 13.9 (providing that "[n]othing in [the AOA Plan]…affirmatively authorizes [the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant] to violate or prohibits such persons from violating any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder….").  The AOA Plan, including the Neutrality Provision, was confirmed by the Guam Court, and the Lujan Claimants are not pursuing an appeal of that confirmation order.  No Party has argued in the AOA Bankruptcy that the AOA Plan containing the

Neutrality Provision violated the AOA's automatic stay and importantly, no party has initiated any proceedings against the BSA alleging that the BSA Plan violated the automatic stay in the AOA Bankruptcy. In other words, the Lujan Claimants have waived any right to challenge the Neutrality Provision in the AOA Plan— which moots their automatic stay violation arguments here.

Pursuant to Article III of the Constitution, a federal court may only exercise jurisdiction over a matter if there is a live "case or controversy." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3rd Cir. 2007) (internal citation omitted). A matter is moot if "changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Id.* (quoting *In re Surrick*, 338 F.3d 224, 230 (3d Cir. 2003)). "Moreover, it does not matter when the case becomes moot. The requirement that a case or controversy be 'actual [and] ongoing' extends throughout all stages of federal judicial proceedings, including appellate review." *Id.* at 40–41 (quoting *Khodara Env't, Inc. v. Beckman*, 237 F.3d 186, 193 (3d Cir. 2001)).

The AOA's automatic stay will terminate upon its emergence from bankruptcy. *See* 11 U.S.C. § 362(c)(2) ("[T]he stay of any other act…continues until the earliest of…(C)…the time a discharge is granted or denied."); *Rauso v. Martinez*, Nos. 20-2927 and 21-1503, 2022 WL 4965388, at *3 (3d Cir. Oct. 4, 2022) ("[T]he automatic stay ends when a discharge is granted.); *In re White*, 383

B.R. 366, 368 (W.D. Pa. 2008). The AOA's emergence from bankruptcy and concurrent termination of the automatic stay by operation of law will likely precede this Court's decision in these Appeals. *See In re Fairchild Corp.*, No. 10–56 (GMS), 2014 WL 7215211, at *3 (D. Del. Dec. 17, 2014) ("[A]n appeal from a bankruptcy court's order granting or denying a § 362 lift-stay motion becomes moot when the automatic stay is subsequently lifted by operation of law.").

Even if this Court rules before the effective date of the AOA Plan (which appears highly unlikely), the Neutrality Provision and the prospective discharge of the AOA would still effectively render the Lujan Claimants' arguments moot because this Court's ruling cannot afford the Lujan Claimants the relief they seek. *See*, *e.g.*, *In re Downey Fin. Corp.*, 499 B.R. 439, 471 (Bankr. D. Del. 2013) (denying chapter 7 trustee's stay-violation motion based on non-debtor FDIC's requests that the IRS freeze debtor's tax refund because, "while the violation of the stay arguments are very strong, they are, effectively, moot," as the parties had settled in principle trustee's separate action brought in court of federal claims); *Rendell*, 484 F.3d at 241 (quoting *Khodara*, 237 F.3d at 193) (noting a controversy is rendered moot by subsequent events if a ruling would not "serve [any] purpose today"). Accordingly, the AOA Stipulation and confirmation of the AOA Plan has foreclosed the possibility of affording the Lujan Claimants any meaningful relief,

and the appeal based on the AOA's automatic stay should therefore be denied as moot.

### D. Even If The Lujan Claimants Had Standing And Their Arguments Were Not Moot, Their Arguments Are Meritless

Even if the Lujan Claimants had standing and their arguments had not been rendered moot (as they have been), their arguments fail on the merits because the Plan, the Confirmation Opinion, and the Confirmation Order do not violate the AOA's automatic stay.

On the contrary, the bankruptcy court ensured that the Plan *did not* do so. The bankruptcy court considered arguments about the AOA's automatic stay when the AOA itself raised the issue at confirmation in the context of the Plan's proposed sale of the Abuse Insurance Policies.  The bankruptcy court held that the AOA's stay prevented a sale of such policies free and clear of the AOA's interests, if any, in the BSA Insurance Policies.  *See* D.I. 1-3 at 93–102.  The Plan was subsequently modified to preserve any interests of the AOA in the Abuse Insurance Policies.  *See* Bankr. D.I. 10190, Ex. 1 at 89-90, 114-115.  Having preserved the AOA's interests, if any, the bankruptcy court approved the modified Plan.

At the same time it enforced the AOA's automatic stay with respect to any interests of the AOA's in the Abuse Insurance Policies, the bankruptcy court concluded that the BSA could sell such policies to the applicable Settling

Insurance Companies free and clear of the Lujan Claimants' interests in those same policies. *See* D.I. 1-3 at 110–13. As the bankruptcy court put it, "[b]ecause…I am approving the channeling injunction, the Archbishop will get the benefit of the insurance buyback in any event." *Id.* at 102 n.365. Under the Plan, the AOA will receive the benefit of the Channeling Injunction and Releases as an Opt-Out Chartered Organization. The AOA is not appealing the Confirmation Opinion or Order.

The Lujan Claimants' arguments fail because their own claims against the AOA (or the Settling Insurance Companies) were never protected by the AOA's automatic stay, which, in pertinent part, operates to stay any "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *See* 11 U.S.C. § 362(a)(3). The Lujan Claimants' claims and procedural rights are not property of the AOA's estate.

Instead, the Plan provides that

> [t]he Lujan Claimants…and any other holders of Abuse Claims against the Archbishop are free to immediately pursue their claims against the Archbishop, consistent with the automatic stay in the Archbishop's bankruptcy case, 'to the extent that' the Abuse Claim is not covered by an insurance policy issued by a Settling Insurance Company.

D.I. 1-3 at 160-161. "[T]he Lujan Claimants are not enjoined from pursuing the Archbishop for Abuse Claims, but recoveries may not come from an insurance policy issued by a Settling Insurance Company." *Id.* at 161. This narrow

channeling of Opt-Out Chartered Organization Abuse Claims may affect certain of the Lujan Claimants' claims against the AOA, but clearly not claims that belong to the AOA itself, and thus do not implicate the AOA's automatic stay.

The Lujan Claimants nevertheless suggest that paragraph M.1 of the Confirmation Order impairs the AOA's interests in violation of the automatic stay. *See* D.I. 40 at 65.  It does nothing of the sort.  The Settling Insurance Companies agreed to purchase the Abuse Insurance Policies that they issued free and clear of the interest of any entity, including any additional insureds, pursuant to the terms of the Insurance Settlements, and required entry of a confirmation order approving the sale free and clear of such interests as a condition precedent to confirmation of the Plan.  *See e.g.* Bankr. D.I. 8816-1, II.B.2.  Because the bankruptcy court held that the AOA's automatic stay prevented such sale free and clear of any interests of the AOA, if any, the Plan could not be confirmed if the Settling Insurance Companies agreed to waive this condition precedent.  Paragraph M.1 provides for the voluntary waiver of this condition precedent, subject to the condition that the Settling Insurance Companies will only waive their free and clear sale condition so long as all the related injunctions in the Plan remain in full force and effect.  Given that this was a voluntary waiver by the Settling Insurance Companies of such conditions precedent, there is no basis for asserting that their waiver violated the AOA's automatic stay.

## VI.   The Bankruptcy Court Correctly Concluded That The McCarran-Ferguson Act Does Not Reverse Preempt The Bankruptcy Code

The Lujan Claimants next argue that the Plan impermissibly conflicts with a Guam statute that purportedly provides the Lujan Claimants with direct action rights against the insurance companies.  D.I. 40 at 43–45 (citing 22 Guam Code Annotated § 18305).  The Lujan Claimants incorrectly assert that the McCarran-Ferguson Act (the "MFA"), 15 U.S.C. § 1012(b), provides an exception to federal preemption with respect to laws governing the "business of insurance" and which permits the direct action statute to reverse preempt the Bankruptcy Code.  D.I. 40 at 34–48.  But as the bankruptcy court correctly identified, the Guam direct action statute is only a "procedural statute" that provides tort claimants with a procedural right to bring claims directly against insurers—it is not a "cause of action."  D.I. 1-3 at 109 (quoting *Cruz Reyes v. United States*, No. 08-00005, 2010 WL 5207583, at *7 (D. Guam Dec. 15, 2010)).  The bankruptcy court determined that the goal of the direct action statute was "not policyholder protection" or to "change the payment provisions of the policy or the spread of risk between the insurer and insured."  *Id.*  After a thoughtful analysis of the Third Circuit standard for the application of the MFA, the bankruptcy court correctly concluded that the "Guam direct action statute does not regulate the business of insurance as that term is used in the [MFA, and]…does not prohibit the channeling of the Lujan Claimants' claims to the Settlement Trust thereby effectively extinguishing their procedural

right to sue an insurance company." D.I. 1-3 at 102–10.  On this basis, the Guam

statute and the MFA do not permit the reverse preemption of the Bankruptcy Code

(which notably would have given a small group of claimants an unfair advantage at

the expense of more than 82,000 other abuse survivors).

In further support of this point, the BSA hereby adopts and incorporates by

reference in full the arguments set forth in Article V.E of the Future Claimants'

Representative's and Article I.B.2.b of the Settling Insurance Companies'

answering briefs with respect to this argument.

## VII. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Satisfies The Best Interests Test Under Section 1129(a)(7)

The Lujan Claimants assert that the Plan fails the best interests test of

section 1129(a)(7) because the Lujan Claimants would be able to pursue various

claims and direct action rights against non-debtor Local Councils, Chartered

Organizations, and insurers in a chapter 7 liquidation, which claims and rights are

enjoined under the Plan, and which they assume without evidence would result in

greater recoveries.  *See* D.I. 40 at 66–71.  These arguments fail on multiple

grounds.[80]

---

[80] As set forth in detail herein, the Debtors have amply demonstrated that the Plan satisfies section 1129(a)(7), to the extent it applies.  Even so, the Debtors maintain that as non-profit corporations they need not satisfy the best interests test.  This element of the plan confirmation standard requires courts to compare reorganization recoveries to liquidation recoveries.  A non-profit's chapter 11

Section 1129(a)(7) provides that:

> even if voting results in an accepting class, a plan may not be confirmed unless each holder of a claim has accepted the plan or 'will receive or retain under the plan on account of such claim…value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

D.I. 1-3 at 239 (citing 11 U.S.C. § 1129(a)(7)). To satisfy that requirement, the

BSA prepared a liquidation analysis for the BSA and Related Non-Debtor Entities.

*See* Bankr. D.I. 9280 ¶ 240. This analysis alone demonstrates that the Plan

---

case cannot be involuntarily converted to a chapter 7 liquidation, and the Debtors therefore should not be subject to the same standard as a "moneyed, business, or commercial corporation." *See* 11 U.S.C. § 1112(c). As the Seventh Circuit observed when it declined to enforce the absolute priority rule of section 1129(b)(2) to preclude members of a non-profit cooperative from retaining control of the reorganized debtor "it is small wonder that the rules of Chapter 11 bankruptcy, primarily designed as they are for profit-seeking enterprises, are less than straightforward" when applied to non-profit debtors. *In re Wabash Valley Power Assoc.*, 72 F.3d 1305, 1314 (7th Cir. 1995) (determining that the benefits afforded to members of the debtor by its non-profit operations did not constitute an equity interest cognizable in bankruptcy). Indeed, Congress has codified an alternative formulation of the best interests test in municipal restructuring cases under chapter 9 of the Bankruptcy Code, where liquidation is not a realistic prospect. *See* 11 U.S.C. § 947(b)(7). Courts in chapter 9 cases focus on whether for creditors as a whole the proposed plan provides a better alternative than dismissal and the resulting race to the courthouse. *See In re City of Detroit*, 524 B.R. 147, 213, 216–17 (Bankr. E.D. Mich. 2014), *appeals dismissed*, Nos. 14-CV-14910, 14-cv-14919, 14-CV-14920, 15-CV-10036 (E.D. Mich. Sept. 29, 2015). Here, it is clear that creditors as a whole would fare significantly worse if these cases were dismissed and the more than 82,000 holders of Abuse Claims, bereft of the value-maximizing settlements embodied in the Plan, were forced to pursue their claims in the tort system and enforce any judgment against the Debtors' limited assets.

satisfies section 1129(a)(7); nevertheless, the BSA also prepared a consolidated liquidation analysis of the Local Councils. *Id*. The BSA further adjusted its analysis to account for the impact of a hypothetical liquidation on insurance recoveries. *See id*. ¶ 241. Based on these liquidation analyses, as supported by the uncontroverted expert testimony of Mr. Whittman of Alvarez & Marsal, the BSA's financial advisor, the BSA confirmed—and the bankruptcy court agreed—that each class of creditors receives equal or better treatment under the Plan than under a hypothetical liquidation. *See* D.I. 1-3 at 248; Bankr. D.I. 9280 ¶ 242.

Informed by these liquidation analyses, the bankruptcy court determined, based on uncontroverted testimony, that "each Class of claims is receiving more than it would in a chapter 7 case." D.I. 1-3 at 248. Further, the bankruptcy court "determined based on the record presented that Class 8 holders of Direct Action Claims will be paid in full under the Plan" and thus "the Plan, by definition, meets the best interests test as to claimants in Class 8." *Id.*

The Lujan Claimants offer no evidence or competing liquidation analysis that would support their arguments, asserting instead that certain maximum insurance coverage limits would be available to satisfy their disputed claims without any evidence that this contention is true, much less that it holds true in a liquidation scenario. *Id.* at 69–70. Indeed, no party, including the Lujan

Claimants, offered any evidence to rebut the BSA's liquidation analysis.[81]  *See* D.I. 1-3 at 246 (noting that "[n]o party cross-examined Mr. Whittman on his liquidation analysis or, [except for certain other objections that were not brought on appeal], in any way challenged Mr. Whittman's specific calculations, assumptions or conclusions").  There is therefore no support for the Lujan Claimants' challenges to the bankruptcy court's best-interests determination.

The Lujan Claimants' arguments also fail because (a) the Plan satisfies the plain language of section 1129(a)(7), (b) the Lujan Claimants' claims against Chartered Organizations are too speculative to be included in any liquidation analysis, and (c) the Plan provides for payment in full of Abuse Claims.

## A.    The Plan Satisfies The Plain Language Of Section 1129(A)(7)

The Lujan Claimants argue that the BSA needed to include the value of claims released against third parties under the Plan in their liquidation analysis. Not so.[82]  Section 1129(a)(7) requires only that an impaired creditor "receive or

---

[81]  The Lujan Claimants only list various alleged per occurrence limits under insurance policies for certain years in the 1960s and 1970s.  *See* D.I. 40 at 69–70 (providing alleged per occurrence limits for Norman Aguon and Morgan Paul's claims).  This argument discounts all of the evidence presented favoring settlements with the Settling Insurance Companies and ignores that the amount of insurance coverage is disputed by such parties.  Bankr. D.I. 9398 ¶¶ 104, 133, 167, 181.  There is no evidence that any of the insurance coverage identified by the Lujan Claimants is collectible.  These unsupported arguments should be rejected.

[82]  11 U.S.C. § 1129(a)(7).

retain under the plan **on account of such claim or interest** property of a value, as of the effective date of the plan, that is not less than the amount that such holder would **so receive or retain if the debtor** were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7) (emphasis added).

As the bankruptcy court held, the "plain language" of section 1129(a)(7) does not support the Lujan Claimants' argument because the text focuses only on claims against the debtor. *See* D.I. 1-3 at 247. "[A]s a matter of grammar," the required comparison under section 1129(a)(7) "is between the amount that the objecting creditor would receive under the plan on account of its claim and **what it would 'so' receive—that is, on account of its claim—if the debtor** were liquidated under chapter 7." D.I. 1-3 at 243 (citing *Purdue Pharma*, 633 B.R. at 110) (emphasis added)). The amount that a creditor may receive or retain on account of claims against third parties in a liquidation is therefore irrelevant. That plain-text interpretation correctly "leaves an analysis of third-party releases to the relevant third-party standard" and does not allow a backdoor challenge to such releases under a standard other than *Continental*. D.I. 1-3 at 243.

The bankruptcy court's interpretation of the best interests test is grounded in established precedent. *See, e.g.*, *Purdue Pharma*, 633 B.R. at 110 (holding that the plain language of section 1129(a)(7) does not require that a liquidation analysis include an analysis of a claimant's rights against third parties in a liquidation); *W.R.*

*Grace*, 475 B.R. at 149-50 (concluding that the best interests test considers only the amount that claimants would obtain from the estates in a hypothetical chapter 7 liquidation, not the amount claimants would allegedly recover from the estates' insurers); *In re Plant Insulation Co.*, 469 B.R. 843, 887 (Bankr. N.D. Cal. 2012) (explaining that the "most natural interpretation of section 1129(a)(7) is that it addresses only the amount the dissenting creditor would receive or retain on its claim against the *debtor*" in a hypothetical chapter 7 scenario) (emphasis in original); *In re ARO Liquidation, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. Mar. 28, 2018), Hr'g Tr. at 20:4-10 [D.I. 1752] (following *W.R. Grace* and *Plant Insulation*); *see In re Dow Corning*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (holding that the best-interests test examines only the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan" and observing that courts applying the nearly identical test under chapter 13 "uniformly hold that amounts obtainable from other sources, such as guarantors, are irrelevant" to the inquiry).[83]

---

[83] *But see Ditech Holding*, 606 B.R. at 610-14 (holding that, in the context of a section 363 sale under a plan, certain estimable third party interests must be included in the liquidation analysis) and *In re Quigley Co.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010) (finding that the value of third party derivative claims could be estimated and therefore must be included in the liquidation analysis), distinguished below.

The Lujan Claimants rely on dicta from an out-of-circuit bankruptcy court decision, *In re Conseco*, as their only support for their argument that the Channeling Injunction and Releases violate the best interests test. *See* D.I. 40 at 67. However, the Lujan Claimants misrepresent the findings in that case, which concerned a settlement whereby certain creditors who accepted additional consideration under a plan also agreed to third-party releases. *See* 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003). A group of creditors challenged the releases, but the court found that because the releases were voluntary, they were not "compulsory releases that would require justification by special circumstances." *Id*. at 527. The case thus did not turn on the permissibility of non-consensual releases, much less call into doubt the cases in this circuit finding that "the condition requiring a release in order to receive a distribution does not violate the best interest of creditors test." *In re Wash. Mut., Inc.*, 461 B.R. 200, 251 (Bankr. D. Del. 2011), *unrelated parts vacated*, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

### B. The Lujan Claimants' Claims Are Unliquidated And Too Speculative To Be Included In A Liquidation Analysis

Even if this Court concludes that claims against non-debtors should be considered under section 1129(a)(7) in some circumstances, the Lujan Claimants' alleged claims against certain of the non-debtor entities are speculative, and they have offered no evidence to estimate their claims nor any expert or other testimony

to suggest the insurance coverage they claim exists is valid or collectible. Moreover, it would be impossible to estimate each of the more than 82,000 Abuse Claims individually.  D.I. 1-3 at 244.   It would not be appropriate to include such nonexistent, speculative, and unsupported values in a liquidation analysis.  *See*, *e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 253 (Bankr. S.D.N.Y. 2007) (rejecting as "only speculation" bondholders' unsubstantiated argument that IPO costs, which would only be borne by the estate in a liquidation due to the inapplicability of section 1145 of the Bankruptcy Code to liquidations under chapter 7, would be lower than the amount assumed by the plan proponents).

As the bankruptcy court recognized, in the few cases where a court has included claims against third parties in the best interest test, they have done so when such claims "are neither speculative nor incapable of estimation and exist as of the date of the hypothetical chapter 7 case."  D.I. 1-3 at 243; *see also Ditech Holding*, 606 B.R. at 610-14 (holding that "when weighing [third-party] claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation"); *Quigley*, 437 B.R. at 145 (same).  The bankruptcy court distinguished the Chapter 11 Cases from *Ditech* and *Quigley*, noting that there are "82,209 different claims against tens of thousands of different third-parties such that it would be impossible to value any particular claims."  D.I. 1-3 at 244.   The bankruptcy court also recognized that many claims were substantively deficient which would render

235

meaningful estimation of third party claims impossible since "many holders of Direct Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim." *Id.* In response to the Lujan Claimants' unsupported speculation that their claims are worth substantial amounts, the bankruptcy court acknowledged that, on average, "[each of] the prepetition settlement of claims against BSA for Abuse committed by the same perpetrator, Brouillard…settled for $57,000." *Id.*

It stands to reason that if the Lujan Claimants' claims and potential recoveries in a chapter 7 liquidation were not highly speculative and unliquidated, but instead could be reliably calculated, the Lujan Claimants would have produced some evidence to that effect rebutting the BSA's liquidation analysis. The Lujan Claimants offered none.

Though not required to satisfy section 1129(a)(7), the BSA also performed a consolidated liquidation analysis of all Local Councils and concluded that holders of Abuse Claims were better off under the Plan.[84]  *See* Bankr. D.I. 9280 ¶ 273. While the BSA performed the analysis with respect to the Local Councils, it would be impossible to repeat this exercise for Chartered Organizations on a claim by claim basis, and such an exercise is not required. It is neither appropriate nor

---

[84] Though not applicable, the liquidation analysis clearly shows that the best interests test is met with respect to the Local Councils. *See* Bankr. D.I. 9280 ¶¶ 267–69.

practical to include speculative and unliquidated claims against third parties in a liquidation analysis, and section 1129(a)(7) does not require such an impossible task.

### C. The Plan Satisfies The Best Interests Test Because The Lujan Claimants Are Likely To Be Paid In Full

Regardless of whether claims against third parties are included in the best interests test, the bankruptcy court's determination that the holders of Abuse Claims will likely be paid in full necessarily shows that "the Plan, by definition, meets the best interest test as to claimants in Class 8." D.I. 1-3 at 248 (citing *Quigley*, 437 B.R. at 145).[85]  Because the Lujan Claimants have no basis for reversing this finding, their best interests arguments fail as well. For these reasons, the bankruptcy court's rulings that the best interests test was satisfied should be affirmed.

### VIII. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Properly Classifies The Claims Of The Lujan Claimants Pursuant To Section 1122(a)

Next, with minimal explanation, the Lujan Claimants complain that the Plan violates section 1122 of the Bankruptcy Code because the Lujan Claimants' claims are not "substantially similar" to other Direct Abuse Claims in Class 8 because,

---

[85] As is discussed above, the bankruptcy court held that "[b]ased on the testimony of Dr. Bates and Ms. Gutzler, and the value of the contributions and settlements,"…"if the Plan is confirmed, Direct Abuse Claims will more likely than not be paid in full." D.I. 1-3 at 69.

unlike such other creditors, the Lujan Claimants purport to hold direct action rights against the Insurance Companies.  *See* D.I. 40 at 71–72.  The bankruptcy court rejected this argument, and the Lujan Claimants have provided no evidence of clear error demonstrating why or how this Court should not do the same.

At the outset, this is a purely academic issue.  As discussed, the bankruptcy court found that Abuse Claims would likely be paid in full.  What class the Lujan Claimants are placed in does not matter if they are paid all they could be due.  They are not "parties aggrieved" with appellate standing on this (or any other) issue.

Section 1122(a) provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  A plan proponent has significant flexibility in creating multiple classes under a plan of reorganization so long as a reasonable basis exists and all claims in a particular class are substantially similar.  *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that classification is proper in a cram-down case where each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006) (explaining that section 1122 is satisfied "when a reasonable basis exists for

the structure, and the claims or interests within each particular class are substantially similar"). The bankruptcy court concluded that the Plan comported with section 1122(a), as there was a rational basis for classifying all Direct Abuse Claims together in Class 8. *See* D.I. 1-3 at 190–92.

The Lujan Claimants mistakenly interpret "substantially similar" to require that all claims within a class be identical in all respects. *See* D.I. 40 at 71–72. That is not the law. In evaluating whether claims in the same class are substantially similar for purposes of section 1122(a), the question is "whether the claims in a class have the same or similar legal status in relation to the debtor." *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) (emphasis added) (recognizing that a debtor could appropriately classify all unsecured claims, including "trade, tort, unsecured notes, or deficiency claims of secured debtors," in a single class); *see also In re AOV Indus., Inc.*, 792 F.2d 1140, 1150–51 (D.C. Cir. 1986) (noting that "the focus of the classification is the legal character of the claim as it relates to the *assets of the debtor*") (emphasis in original). The Lujan Claimants' claims share the same legal status in relation to the BSA as all other Direct Abuse Claims under the Plan. All holders of Class 8 claims have unliquidated and unsecured personal injury claims against the BSA and, accordingly, "exhibit a similar effect" on the BSA's estates. *W.R. Grace*, 475 B.R. at 37.

The asserted differences—direct action rights and open statutes of limitations—do not change the character of those claims against the BSA. Indeed, as discussed above, direct action rights are simply a procedural right that do not change the character of the claims. *See* D.I. 1-3 at 191. Similarly, a statute of limitations is a defense, which does not change the character of a personal injury claim. *Id*. It would be impracticable to attempt to determine the relative strengths and weaknesses of 82,209 disputed, unliquidated personal injury claims and attempt to place such substantially similar claims into multiple classes. Nor is such an exercise required. *In re Resorts Int'l, Inc*., 145 B.R. 412, 448 (Bankr. D.N.J. 1990).

Additionally, the BSA is unable to further divide holders of Direct Abuse Claims into additional subclasses based on their potential claims against non-debtor Chartered Organizations or Local Councils. For example, the Lujan Claimants contend, presumably based on their own analysis as there was no competent evidence supporting these assertions admitted at trial, that there are 81 accepting votes out of 182 claimants with claims against the Aloha Council. *See* D.I. 40 at 32. For its part, the BSA's supplemental voting report disclosed that, based only upon a review of the unsubstantiated proofs of claim, 78 of 149 holders of Direct Abuse Claims who identified the Aloha Council in their proof of claim voted to accept the Plan. Bankr. D.I. 9305. The same report also notes that this

count was based only on a tabulation of the Local Councils named in proofs of claim and was not at the time capable of being independently verified. *Id*. Accordingly, not only could these claims mistakenly name the Aloha Council, but there could be numerous claims against the Aloha Council that were unaccounted for in such voting report, as the same voting report disclosed that 17,526 claims did not identify any Local Council. The bankruptcy court acknowledged that "many holders of Direct Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim." D.I. 1-3 at 244. Thus, there is no competent evidence supporting any contention about how a sub-class of claims relating to a certain Local Council voted on the Plan, and it would be impossible to accurately place Direct Abuse Claims against the Aloha Council into a separate class, let alone to attempt to do so for all of the disparate claims against thousands of different Local Councils and Chartered Organizations. Therefore, the bankruptcy court appropriately overruled this objection and concluded that the BSA met their burden with respect to section 1122(a). D.I. 1-3 at 191–92. The Lujan Claimants have presented no competent evidence to support their contention that this conclusion was clearly erroneous and this objection should be overruled.

## IX. The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Erred In Concluding That The Plan Provides For The Equal Treatment For Holders Of Direct Abuse Claims In Accordance With Section 1123(A)(4)

In a familiar refrain, the Lujan Claimants assert that the Plan violates the equal treatment requirement of section 1123(a)(4) because certain survivors are providing greater consideration than other survivors while not being commensurately compensated in return. *See* D.I. 40 at 72–74. Specifically, they assert that (a) survivors that hold direct action rights are entitled to greater consideration in exchange for giving up these rights, and (b) the Plan violates section 1123(a)(4) because some abuse survivors are enjoined from pursuing their claims directly against a Chartered Organization while other claimants retain this right. *See id.* Both arguments fail—what the Lujan Claimants actually seek is preferential treatment for themselves to the detriment of other survivors.

Section 1123(a)(4) requires that a plan shall "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment" for such claim. As the bankruptcy court recognized, in the Third Circuit, this means that "all claimants in a class must have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (internal quotation marks and citations omitted); D.I. 1-3 at 195 n.527 (citing *W.R. Grace*); *see also Wash. Mut.*, 442 B.R. at 356. On this basis, the bankruptcy court concluded that (a) the Lujan Claimants' direct action rights did

242

not warrant separate classification because such rights are procedural in nature, and (b) "equal treatment" does not mean "equality of consideration," rejecting the reasoning of a non-Third Circuit case cited by a different Plan objector in support of this argument.[86]  *See* D.I. 1-3 at 198–200. Moreover, Class 8 Direct Abuse Claims "are all disputed and unliquidated," and "[t]he treatment for each claimant in Class 8 is specified in the TDP, which provide each claimant multiple avenues to liquidate his claim, at the election of the claimant."   D.I. 1-3 at 199. Accordingly, the Lujan Claimants are receiving the same *opportunity* to recover on their claims, consistent with section 1123(a)(4), and their appeal on these grounds should be denied.

The Lujan Claimants do not contend that their opportunity to recover on their claims against the BSA differs in any way from other holders of Direct Abuse Claims; rather, the Lujan Claimants believe that they are providing more consideration than other abuse survivors, in the form of the loss of their direct action rights, without being appropriately compensated in exchange.   As the bankruptcy court observed, the Lujan Claimants' unequal treatment argument is

---

[86] The Lujan Claimants cite *Quigley*, 437 B.R. at 146, an out-of-circuit bankruptcy court opinion, in support of the principle that "each class member must pay the same consideration in exchange for its distribution."   D.I. 40 at 72.  *Quigley* relied on *In re AOV Indus., Inc.* to reach this conclusion, which the bankruptcy court appropriately rejected as non-binding and expressly limited to the facts of the case, in addition to being an unworkable construct for a case with more than 82,000 timely-filed Direct Abuse Claims in a single class.  *See* D.I. 1-3 at 200.

"really just the flip side of the Lujan Claimants' § 1122(a) argument," in which they seek separate classification and enhanced treatment under the Plan on account of their direct action rights.  D.I. 1-3 at 198.  As further addressed herein, the bankruptcy court was correct to conclude that the Lujan Claimants' direct action rights do not warrant separate classification because they are procedural in nature and do not entitle the Lujan Claimants to a separate cause of action.  *Id.* at 191, 198.

The Lujan Claimants also argue for the first time that because only some holders of Direct Abuse Claims are deemed under the Plan to release the Chartered Organizations that are co-liable for their claims, this constitutes unequal treatment in contravention of section 1123(a)(4).  *See* D.I. 40 at 73.  Initially, the Lujan Claimants solely relied on their direct action rights for this objection.  *See* Bankr. D.I. 8708 § II.C.4.  The Lujan Claimants now argue this new position on appeal.[87] Courts hold that an argument not raised in a trial court brief is waived and should not be considered.  *See, e.g.*, *Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.  By failing to

---

[87] The bankruptcy court considered the Lujan Claimants' and Claimant I.G.'s equal treatment objections (*see* Bankr. D.I. 8692 ¶ 5) separately, noting that "[i]n a one-paragraph objection [based on section 1123(a)(4)], the Lujan Claimants once again rely on their direct action rights."  D.I. 1-3 at 198.  This anonymous individual claimant has not filed an appeal to this Court.

raise this issue in their objections before the bankruptcy court, the Lujan Claimants have failed to preserve this argument in these Appeals.

Even if the Lujan Claimants had preserved this argument, they fail to specify whether they are among the group of creditors that is supposedly being treated unequally in being enjoined from pursuing the Chartered Organizations that are co-liable for their claims.  Indeed, the Lujan Claimants are not part of this group, because their claims against the AOA, which is an Opt-Out Chartered Organization, are uniquely preserved.[88]  *See* D.I. 1-3 at 162.  Because of this, the Lujan Claimants do not have standing to make this argument.  In reality, this argument is premised on the Lujan Claimants' baseless efforts to recover more than the likely payment in full and attempt to place themselves in a position they believe will put them above other similarly situated claimants, and should be rejected accordingly.

## X.    The Plan Treats Current And Future Holders Of Direct Abuse Claims Fairly And Equitably

The D&V Claimants argue that the treatment of current Direct Abuse Claims is not fair and equitable as compared to Future Abuse Claims because a holder of a Future Abuse Claim (*i.e.*, a person whose Abuse Claim arose prior to the Petition

---

[88]  Regardless, the judgment reduction provision set forth in Article X.N of the Plan moots any argument with respect to unequal treatment of survivors that may have claims against a Chartered Organization that are not channeled, as it expressly contemplates this situation and instructs a court to set off or credit a judgment in this circumstance.  D.I. 1-4 § X.N.

Date, but is currently unaware of such claim as a result of "repressed memory" to the extent such concept is recognized by the highest appellate court of the applicable state or territory or someone under 18 years of age) was not required to file a proof of claim by the Bar Date.  D.I. 41 at 80–81.

This argument fails at the outset because the D&V Claimants did not raise this issue in their objections to confirmation of the Plan and have thus not preserved it for appeal.  *See* Bankr. D.I. 8744; Bankr. D.I. 9017.  Unpreserved arguments are waived and should not be considered.  *See, e.g.*, *Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.  Additionally, as with other arguments raised by the D&V Claimants, this argument is purely theoretical in light of the bankruptcy court's finding that Abuse Claims (which includes current Direct Abuse and Future Abuse Claims) will be paid in full.  The D&V Claimants, therefore are not "parties aggrieved" with appellate standing on this issue.  Either of these grounds is sufficient to overrule this argument on its own.

Even if this issue were properly before the Court, the D&V Claimants cite no authority whatsoever supporting this contention.  There is none.  Rather, the reverse is true and incorporating this fair and equitable treatment of Future Abuse Claims into the Plan was necessitated by due process concerns.  The creation of a trust to compensate these claimants and the appointment of a legal representative

to act as a fiduciary for their interests in the bankruptcy case has been endorsed by numerous courts in mass tort chapter 11 cases as an appropriate mechanism for a debtor to both comply with the requirements of due process and obtain a discharge from this type of claim.  *See*, *e.g.*, *Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*, 239 B.R. 564, 568-69 (N.D. Cal. 1999) ("[T]he claimants' interests had already been represented in the bankruptcy proceedings through the creation of the trust funds and the appointment of class representatives.  Had this not been the case, it is doubtful that plaintiffs' claims could properly be deemed to have been discharged in bankruptcy.") (citing *In re A.H. Robins*, 88 B.R. 742, 743 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *In re Johns-Manville Corp.*, 36 B.R. 743, 745–46 (Bankr. S.D.N.Y. 1984)).

The channeling of Future Abuse Claims to the Settlement Trust preserves the due process rights of these claimants, following the mechanisms sanctioned by courts in other mass tort bankruptcy cases, while also permitting the BSA to obtain the channeling and discharge injunction and fresh start to which they are entitled. Moreover, it is common practice in mass tort bankruptcies to classify current and future claimants in the same class and to provide future claimants with additional time to file their as-yet unmanifested claims.[89]  Providing holders of Future Abuse

---

[89] *See, e.g.*, *In re DBMP LLC*, No. 20-30080 (JCW) (Bankr. W.D.N.C. June 7, 2022) [D.I. 1461] at *3 (providing in claims bar date order that current holders of asbestos-related mesothelioma claims were subject to the claims bar date

Claims with additional time to assert their claims because, by definition, as "futures" they were unable to assert their claims by the Bar Date comports with principles of fairness, due process, and common sense.  In any event, all such claimants receive the same treatment, as required by section 1123(a)(4).[90]

Moreover, the D&V Claimants' suggestion that holders of Direct Abuse Claims will have to wait "80 to 90 years" for Future Abuse Claims to be filed such that they can receive compensation from the Settlement Trust is speculative hyperbole, which the Court should reject.  *See* D.I. 41 at 80-82.  First, the only competent testimony on this subject is that there are likely only 400 Future Abuse Claims.  D.I. 1-3 at 62; Bankr. D.I. 9454 at 198:20–199:19.  The addition of 400 Future Abuse Claims to the already over 82,200 current Direct Abuse Claims (0.5%) cannot possibly be material, much less the catastrophic inequity that the D&V Claimants would have this Court believe.

---

while future claimants were not subject to the claims bar date); *In re USA Gymnastics*, No. 18-09108 (RLM) (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776] at *21, 26–27 (confirming plan under which sexual abuse claimants that qualified as "Future Claimants" were not subject to the claims bar date); *In re Emons Indus. Inc.*, 220 B.R. 182, 186, 191-92 (Bankr. S.D.N.Y. 1998) (confirming plan where "subsequent" personal injury claimants, who were unknown to debtor at the time the bar date was fixed, were not subject to the bar date, and were appropriately classified in the same class as current claimants).

[90] For the same reason, any suggestion that the Bar Date—which applied only to current Direct Abuse Claims and provided an exception for Future Abuse Claims—creates different treatment fails.  The time to object to, challenge, or appeal the Bar Date Order has long since passed.  *See* Bankr. D.I. 695.

Second, as evidenced by the TDP, the Settlement Trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate remaining current, as well as future, claims going forward. Distributions from the Settlement Trust to current Direct Abuse Claims will not be delayed because of Future Abuse Claims. Instead, the Settlement Trustee may make distributions to holders of current or future Direct Abuse Claims when those claims are allowed under the procedures set forth in the TDP. *See, e.g.*, D.I. 1-4, Ex. A, Art. IX (providing process for payment upon final determination of an Allowed Abuse Claim); D.I. 1-4, Ex. B Art. 4 (same). Accordingly, the D&V Claimants' argument that the Plan is not fair and equitable to holders of current Direct Abuse Claims is unfounded and should be overruled.

## XI.   The Lujan Claimants Have Failed To Prove That The Bankruptcy Court Clearly Erred In Authorizing Certain Modifications To The Plan

In a last-ditch effort to derail the Plan, the Lujan Claimants make several Plan modification-related arguments, asserting that (a) the BSA's Rule 7052 Motion impermissibly bypassed Plan-related notice requirements, (b) the Plan was materially and adversely modified without proper notice after confirmation, and (c) the BSA did not satisfy the correct standard required for a Rule 7052 Motion. D.I. 40 at 74–78. The bankruptcy court overruled these objections prior to

249

confirming the Plan. The Lujan Claimants have failed to demonstrate that such conclusions were clearly erroneous and therefore this Court should do the same.

### A. The Lujan Claimants Lack Standing And Their Argument Was Not Preserved

As an initial matter, the Lujan Claimants lack standing to challenge any Plan modifications because they voted to reject the Plan. Plan modifications are immaterial unless they materially "affect[] a creditor or interest holder who accepted the plan." *In re Am. Solar King*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988). Creditors that reject a plan "lack[] standing to object to the plan's modification." *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 179 (Bankr. S.D. Miss. 2018). The Lujan Claimants were among the most active participants and most vocal objectors in the Chapter 11 Cases, and virtually all of them voted to reject the Plan (as noted in Lujan Claimants' brief). *See* D.I. 40 at 4 (citing Bankr. D.I. 8708). It is not only contrary to the law, but also defies logic to accept the premise that further disclosure and solicitation would have affected such Lujan Claimants' votes. The Lujan Claimants' arguments should be dismissed on this basis alone.

To the extent that the Lujan Claimants have standing, they first argue that the modifications were not permitted under Bankruptcy Rule 7052 as a "vehicle" to confirm an "alternative plan of reorganization" and that the BSA improperly bypassed notice requirements for such modifications. D.I. 40 at 74; *see also id.* at

78.   Contrary to the Lujan Claimants' assertions, the BSA timely submitted the Rule 7052 Motion in an abundance of caution to supplement, or, in certain instances, amend, particular findings of fact and conclusions of law in the Confirmation Opinion.   Pursuant to the Rule 7052 Motion, the BSA requested amendment of findings related to: (1) the UMAHC's contributions, (2) the settlement with the law firm of Pachulski Stang Ziehl & Jones LLP, and (3) exculpation provisions in the Plan.[91]   *See* Bankr. D.I. 10188 at 11–16.

The Lujan Claimants did not object to the amendment of any of these specific findings, only the process by which the BSA proposed the amendments. Because the Lujan Claimants did not include written objections to the specific findings in their Rule 7052 objection, they have not preserved this argument on appeal.   *See, e.g.*, *Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.   Even if the Lujan Claimants had preserved these arguments, they are unavailing.

---

[91] The Lujan Claimants' argument—that the BSA did not satisfy the standard for approval of the Rule 7052 Motion—is also meritless.   The Lujan Claimants posit that the BSA was required to "show manifest injustice without amendment or supplement of the Opinion or any newly discovered evidence justifying amendment or supplement."   *See* D.I. 40 at 78.   However, the bankruptcy court expected the BSA to draft a supplemental order that worked in tandem with the Confirmation Opinion.   *See* Bankr. D.I. 10215 at 11:13–22.   The BSA's limited corrections to findings were to clearly avoid mistakes that would have resulted in manifest injustice for the BSA and their plan supporters in the event such errors had not been corrected.   *See* Bankr. D.I. 10188 at 11–16.

### B.    Notice Was Extensive

In seeking amendment of these limited findings, the BSA did not "bypass requirements for plan confirmation" in violation of the twenty-eight-day notice requirement of Bankruptcy Rule 2002(b).  *See* D.I. 40 at 74.  As detailed above, the confirmation hearing began on March 14, 2022 and lasted twenty-two trial days over a six week period, during which the bankruptcy court addressed objections from numerous parties including the Lujan Claimants.  *See* D.I. 1-3 at 53.  The BSA provided extensive notice of the confirmation hearing in compliance with the Bankruptcy Code and Bankruptcy Rules.[92]

Indeed, the bankruptcy court expressly found in the Confirmation Order that notice was adequate:

> All necessary service and notice with respect to confirmation of the Plan, including all releases and injunctions thereunder, on all known and unknown creditors and other parties in interest was adequate and sufficient under the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is necessary or shall be required.

D.I. 1-1 ¶ II.B.

The Lujan Claimants also had ample time to consider these discrete modifications, file objections, and participate in the hearing on the Rule 7052 Motion.  The Confirmation Opinion was issued on July 29, 2022.  D.I. 1-3 at 269.

---

[92]  *See, e.g.*, Bankr. D.I. 7761; Bankr. D.I. 7999; Bankr. D.I. 8056; Bankr. D.I. 8378; Bankr. D.I. 8886; Bankr. D.I. 8921; Bankr. D.I. 9074; Bankr. D.I. 9213.

The Rule 7052 Motion was required to be filed within fourteen days of the bankruptcy court's issuance of the Confirmation Opinion and was timely filed on August 12, 2022.  Bankr. D.I. 10188.  On August 15, the bankruptcy court established an appropriate objection deadline of August 24 and a hearing date of September 1 for the Rule 7052 Motion.  *See* Bankr. D.I.  10195.  The Lujan Claimants thus had nearly one month following entry of the Confirmation Opinion and two weeks from the filing of the Rule 7052 Motion to object and had at least seventeen days prior to the hearing on the Rule 7052 Motion to consider the BSA's proposed Confirmation Order.  Moreover, the Lujan Claimants did in fact object to the Rule 7052 Motion and actually participate at the September 1 hearing.  *See* Bankr. D.I.  10246; Bankr. D.I. 10288 at 52:25–56:11, 79:11–80:8, 100:7–110:6.

Next, the Lujan Claimants assert that the BSA materially and adversely modified the Plan without proper notice after confirmation to incorporate modifications that (a) resolved the RCAHC's objections to the Plan and (b) implemented a fraud-prevention provision in the Confirmation Order as required by the Confirmation Opinion.  *See* D.I. 40 at 74–78.  At the outset, the Lujan Claimants misstate the facts and timing of the settlement that resolved the RCAHC's Plan objections.  The Lujan Claimants assert that "the Plan now includes third-party releases and injunctions of Survivors' claims which were not in the earlier plan, namely, the releases and injunctions in favor of Roman Catholic

Entities," citing this language as set forth in the Confirmation Order. *See* D.I. 40 at

74–75. But the resolution of the RCAHC's Plan objections was disclosed in a term

sheet filed with a mediator's report on March 17, 2022 and announced at the

beginning of the confirmation hearing with the exact language that the Lujan

Claimants argue was added after confirmation. *See* Bankr. D.I. 9386; Bankr. D.I.

9387; Bankr. D.I. 9406 at 8:1–10:21. The mediator's report and term sheet were

also served on parties in interest, including the Lujan Claimants. *See* Bankr. D.I.

9387; Bankr. D.I. 9442; Bankr. D.I. 9498. That notice clearly stated that the terms

of the settlement would be included in the Plan in exchange for resolution of the

RCAHC's Plan objections, and the terms were subsequently incorporated into the

modified version of the Plan. *See* Bankr. D.I. 9696; Bankr. D.I. 9697. The Lujan

Claimants actively participated in the confirmation hearing and had twenty-eight

days from the disclosure of the RCAHC Plan objection resolution to the end of the

confirmation hearing to raise this issue. The Lujan Claimants chose not to do so.

The settlement with the RCAHC provided for certain clarifications, which

were incorporated directly into the Plan. No party objected to any element of the

RCAHC resolution at any time through completion of the confirmation hearing or

even at any time prior to the issuance of the Confirmation Opinion. The RCAHC

settlement was served on, among others, the Bankruptcy Rule 2002 list parties,

parties that had filed a notice of appearance or requested notice, *pro se* parties, all

parties entitled to vote on the Plan or their counsel, and Chartered Organizations. *See* Bankr. D.I. 9498.

The Lujan Claimants' purported objection was first raised well past any conceivable deadline to do so. In fact, they never filed any pleading of any kind with the bankruptcy court challenging the RCAHC settlement. They did not raise an objection at any time prior to the end of the confirmation hearing or even the prior to the filing of the Confirmation Opinion. This silence continued all the way through their final substantive pleading in the bankruptcy court prior to their appeal. After issuing the Confirmation Opinion, the bankruptcy court held multiple hearings on the form of Confirmation Order and the BSA's Rule 7052 Motion. Consistent with the Lujan Claimants' lack of objection to the RCAHC resolution through issuance of the opinion, the Lujan Claimants' objection to the Rule 7052 Motion filed on August 24, 2022 fails to even mention the RCAHC settlement. *See* Bankr. D.I 10246. Only at one of the subsequent hearings on the form of the Confirmation Order did the Lujan Claimants purport to orally challenge the RCAHC settlement and the resulting clarifications of the Plan. As the bankruptcy court ruled, that was far too late:

> I am not going to change anything with respect to the Roman Catholic resolution. It was filed...during confirmation, but which extended way beyond the filing of this particular resolution and any objections should have been raised at that point in time. There was plenty of time to do it....I think it was fairly covered...by the opinion and,

again, if there was a specific issue, it should have been raised
specifically.

Bankr. D.I. 10288 at 111:1–17.  The Lujan Claimants have provided no evidence

to support that such finding was clearly erroneous and this Court should affirm.

### C.  Modifications Were Not Material or Adverse

The Lujan Claimants' objections should also be overruled on the merits

because the modification did not impact them and, in any event, were not material

or adverse.  The Bankruptcy Code permits modifications of a plan "at any time"

prior to confirmation.   11 U.S.C. § 1127(a).   The Bankruptcy Code further

provides that all voting creditors who previously accepted a plan will be deemed to

have accepted the modified plan.  *Id.*  Bankruptcy Rule 3019(a) specifies that post-

solicitation plan modifications do not require resolicitation if the modifications do

not adversely change the treatment of parties who previously voted for the plan.

As such, courts have found that only "material" and "adverse" modifications

require resolicitation.  *See In re Fed.-Mogul Glob. Inc.*, No. 01-10578 (JFK), 2007

WL 4180545, at *39 (Bankr. D. Del. Nov. 16, 2007); *In re Century Glove, Inc.*,

No. 90-400 (SLR), 1993 WL 239489, at *3 (D. Del. Feb. 10, 1993).

Plan modifications are immaterial unless they materially "affect[] a creditor

or interest holder who accepted the plan that such entity, if it knew of the

modification, would be likely to reconsider its acceptance." *Am. Solar King*, 90

B.R. at 824 (citing 8 Collier on Bankruptcy ¶ 3019.03 (15th ed. 1987); *see also In*

*re New Power Co.*, 438 F.3d 1113, 1117–18 (11th Cir. 2006) (explaining that a party's "vote for or against a plan" may be applied "to a modified plan unless the modification materially and adversely changes" the party's treatment). Further, as addressed elsewhere herein, there can be no material and adverse change when holders of Direct Abuse Claims are likely to be paid in full under the Plan, both before and after modifications are made to the Plan. *See* D.I. 1-3 at 69.

The Lujan Claimants take specific issue with the definition of "Roman Catholic Entities" in the resolution with the RCAHC, asserting that the modified definition "expands" the number of parties being released under the Plan and captures entities that may not share insurance with the BSA and may not be Chartered Organizations. D.I. 40 at 75–76. The Lujan Claimants add that these entities were not adequately disclosed in connection with soliciting votes on the Plan. *Id.* at 76. This argument is mistaken and a red herring. The RCAHC resolution did nothing more than clarify that the listed entities were recognized by the BSA.

Moreover, only "Abuse Claims" are being released under the Plan. Abuse Claims, by definition, are claims against, among others, Limited Protected Parties such as the Roman Catholic Entities that "alleged ***Scouting-related Abuse*** that occurred prior to the Petition Date." *See* D.I. 1-4 Art. I.A.18 (emphasis added). If the Lujan Claimants have claims against religious orders that are not related to

Scouting, those are not released under the Plan. If such claims are Scouting-related, then they relate to claims against the BSA and its insurance and are properly treated under the Plan. The bankruptcy court noted this point in the Confirmation Opinion: "Of course, the [AOA] will have to defend non-Abuse Claims (*i.e.*, abuse claims unrelated to Scouting) but those claims are not covered by the BSA Insurance Policies." D.I. 1-3 at 97 n.354. Thus, the RCAHC settlement creates no risk that the injunctions will spill past their intended effect and the bankruptcy court's jurisdiction.

The Lujan Claimants also assert that a fraud-prevention provision added to conform with the Confirmation Opinion materially and adversely affects the Lujan Claimants such that resolicitation is required. *See* D.I. 40 at 76–78. On its face this argument is absurd and implies that the Lujan Claimants' claims would be negatively impacted by a process designed to identify and address fraudulent claims.

The TDP is not designed to pay fraudulent claims; rather, the detection of fraudulent claims is also part of the review process. *See generally* D.I. 1-4, Ex. A. Nevertheless, in response to parties' concerns that such provisions were not expressly set forth in the TDP, the bankruptcy court ordered that: "If the Plan is confirmed, the Confirmation Order will provide that the Settlement Trustee will propose procedures to suss out fraudulent claims taking into account factors she

258

deems appropriate, which can include a cost/benefit analysis. Those procedures will be presented to the Court." D.I. 1-3 at 211–12. Accordingly, the BSA included the following provision in the Confirmation Order, which was served upon the Lujan Claimants and others and approved by the bankruptcy court:

> Consistent with the Confirmation Opinion, by one-hundred twenty (120) days after the Effective Date, the Settlement Trustee shall propose procedures to the Court to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis). These procedures shall be presented to the Court for approval, after notice and, if necessary, a hearing, and the STAC and the Future Claimants' Representative shall have no consent rights or veto rights with respect to the proposed procedures. In addition to disallowance of a claim, penalties may include seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 and seeking sanctions from the Court.

D.I. 1-1 ¶ 19. As with the Lujan Claimants' other arguments, the bankruptcy court appropriately rejected the Lujan Claimants' objection related to Plan modifications. At the September 1 hearing, the bankruptcy court exposed the absurdity of this objection in a question to counsel: "[H]ow does [a procedure to prevent fraudulent claims being paid by the Settlement Trust] hurt a survivor that somebody who's filing a fraudulent claim gets kicked out of the pool? Doesn't that benefit…all of your claimants who believe they have valid claims?" Bankr. D.I. 10288 at 104:10–13. This Court should ask the same.

All of the Plan modifications made before and after the Confirmation Opinion were adequately disclosed and are not material and adverse modifications

requiring further disclosure or resolicitation. These objections should be overruled.

**XII. Allianz And Liberty's Arguments With Respect To The Plan's Treatment Of Indirect Abuse Claims And Judgment Reduction Provisions Are Meritless**

Two non-settling insurance companies—Allianz and Liberty—have filed a separate brief challenging the bankruptcy court's rulings on the treatment of Indirect Abuse Claims and the judgment reduction provisions set forth in the TDP and Confirmation Order. *See* D.I. 43 at 14–41. The court's rulings with respect to these Plan provisions were correct and should stand for the reasons that follow.

**A. Allianz And Liberty Have Failed To Prove That The Bankruptcy Court Erred In Approving The Treatment Of Indirect Abuse Claims**

Under the Plan, Indirect Abuse Claims are claims for contribution, indemnity, reimbursement, or subrogation with respect to Abuse Claims asserted by Local Councils, Chartered Organizations, and Insurance Companies that are being channeled to the Settlement Trust for liquidation in accordance with the TDP. *See* D.I. 1-4, Art. III.B.11. Article IV.B of the TDP sets forth specific requirements for Indirect Abuse Claims to be eligible for compensation from the Settlement Trust. D.I. 1-4, Ex. A Art. IV.B. Among other things, an indirect abuse claimant (1) must have a valid Indirect Abuse Claim, (2) "that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including

260

subsection (e) thereof, (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law," and (3) must establish that (a) such claimant has paid in full the underlying liability for a Direct Abuse Claim for which the claimant seeks payment, (b) such claimant has released the Settlement Trust and Protected Parties from liability for the Direct Abuse Claim, and (c) the Indirect Abuse Claim is not subject to a valid defense.  D.I. 1-4, Ex. A Art. IV. B.  There is nothing improper about the way the Plan and TDP address these claims.

Indeed, the bankruptcy court ruled *in favor* of the objectors on certain objections related to Indirect Abuse Claims, including the right to judicial review. The TDP was revised to incorporate those rulings in the confirmed Plan.  *See* D.I. 1-4 Ex. A.  Allianz and Liberty misconstrue those changes and the bankruptcy court's rulings to rehash their list of complaints.  As an initial matter, the bankruptcy court clearly ruled on all objections to Article IV.B of the TDP in the Confirmation Opinion: "With respect to Article IV.B, I make the following rulings…."  *See* D.I. 1-3 at 258.  Allianz and Liberty make much of the bankruptcy court's alleged lack of understanding of the difference between claim treatment

and claim allowance, but the bankruptcy court understood those concepts very well:

> ***The allowance of a claim is distinct from treatment of a claim*** and the class vote does not bind a dissenting creditor with respect to whether its claim is allowed.  Whether this is a due process concept or simply the application of § 502 of the Code, I agree with objectors that they are entitled to judicial review of their claims once the Settlement Trustee has made her determinations.[93]

*Id.* (footnote omitted and emphasis added).   The specific challenges raised by Allianz and Liberty are just as misguided.

First, Allianz and Liberty assert that Article IV.B of the TDP violates section 502 by "shift[ing] the burden" of objecting to an Indirect Abuse Claim from the Settlement Trustee to the holder of such claim, who must "affirmatively prove the validity of its claim." D.I. 43 at 16–17.  But that is neither correct nor problematic.

As is commonplace in mass tort bankruptcy cases, the TDP set forth procedures for the allowance and distribution of both Direct and Indirect Abuse Claims that have been channeled to the Settlement Trust.  In *W.R. Grace*, similar trust distribution procedures provided that indirect trust claims had to meet comparable requirements (including establishing that the indirect claimant had fixed, liquidated, and paid the trust's liability to a direct trust claimant in full and

---

[93] The court also expressly referenced the parties' post-confirmation hearing submissions regarding Article IV.B of the TDP in connection with making its rulings on Article IV.B.  *See* D.I. 1-3 at 256–57 n.742.

executed a release in favor of the trust, among other things) in order to become a "presumptively valid" claim that would be paid by the trust. *See W.R. Grace*, 446 B.R. at 116 & n.30; *see also*, *e.g.*, *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (Bankr. D.N.J. Sept. 7, 2018) [D.I. 729] (same); *In re Metex Mfg. Corp.*, No. 12-14554 (CGM) (Bankr. S.D.N.Y. Dec. 23, 2013) [D.I. 364] (same); *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Jan. 18, 2011) [D.I. 503] (same). That is all that is happening here.

Objectors in *W.R. Grace* made similar arguments about disparate treatment (as Allianz and Liberty do here), arguing that the trust distribution procedures imposed impermissible restrictions and requirements on indirect claims that were not imposed on direct claims. *W.R. Grace*, 446 B.R. at 119. The bankruptcy court overruled these objections, "find[ing] that the plain language of the TDP shows that the 'additional requirements' are in place so that an Indirect PI Trust Claimant has a procedural mechanism to present its claims." *Id.* at 120. Such is the case here. What Allianz and Liberty characterize as "burden shifting" and the "construct[ion] [of] obstacles" is no more than the establishment of "procedural mechanisms" for holders of Indirect Abuse Claims to establish and present their claims to the Settlement Trustee at the appropriate time.

Second, as it stands now, Allianz and Liberty have each filed Indirect Abuse Claims that are contingent and unliquidated. *See* SA 378, SA 388, SA 391.

Allianz and Liberty conveniently ignore that outside of the settlement-trust context, these claims would be subject to disallowance under section 502(e).  Section 502(e) provides that notwithstanding section 502(a), a party may object, and the court may disallow, a claim (1) for reimbursement or contribution, (2) for which the entity asserting the claim is "liable with the debtor" on or has secured the claim of a creditor, and (3) that is contingent at the time of its allowance or disallowance.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 92, 95 (S.D.N.Y. 1992).

The imposition of procedural mechanisms in Article IV.B of the TDP, such as the requirement that the holder of an Indirect Abuse Claim have a claim "that is not subject to disallowance under section 502, including subsection (e) thereof," simply places Allianz and Liberty on the same footing as to the status and reconciliation of their claims outside of the process set forth in the TDP.  As recognized by the court in *W.R. Grace*, the BSA is simply changing the procedural mechanisms for resolving these claims—it are not substantively deviating from the Bankruptcy Code's claims resolution requirements.  *W.R. Grace*, 446 B.R. at 119-20.

Under any claim reconciliation procedures, therefore, Allianz and Liberty's claims are not currently eligible for compensation from the Settlement Trust, and raising section 502 arguments with respect to these proofs of claim is premature.

Allianz and Liberty appear to recognize this, noting that they "intend to assert claims in the future to the extent payments are made in respect of Direct Abuse Claims." D.I. 43 at 1. There is no violation of section 502(a) with respect to Allianz and Liberty's existing claims (let alone liquidated claims that *may* be asserted in the future), and the "burden will shift" to the Settlement Trustee to object to such claims once they are in fact asserted in accordance with the TDP.[94]

Third, Allianz and Liberty complain that the bankruptcy court's judicial-review ruling—an issue they won—"does not…remedy the deficiencies inherent in the Claims Allowance Provision" because such review must be up front rather than after the Settlement Trustee has made her determination. D.I. 43 at 18. The bankruptcy court correctly dismissed this argument, ruling that

> [w]hile neither insurer cited a case for the proposition that their claims cannot be reviewed in the first instance by the Settlement Trustee, I agree that a claimant who objects to the delegation of its claim to a settlement trust must have the right to judicial review of the outcome of the trust process.

D.I. 1-3 at 258.

---

[94] The bankruptcy court also recognized that the "burden shifting" argument was premature at the September 1, 2022 hearing: "I think the indirect abuse claimants are entitled to a review in front of me and they can argue whatever they want to argue with respect to burden shifting at that point in time and who has the burden when they're in front of me, if that's where they want to be." Bankr. D.I. 10288 at 89:16-20.

Allianz and Liberty repeat the same argument here, again without citing case law.  The result should be the same.  Judicial review subsequent to the Settlement Trustee's decision on an Indirect Abuse Claim follows the trust distribution procedures approved in other mass tort cases.  *See, e.g.*, *W.R. Grace*, 446 B.R. at 116 n.30 (approving trust distribution procedures providing that if a dispute between the trust and the indirect claimant as to payment of a claim was not resolved by the procedures set forth therein, the indirect claimant may litigate the dispute in the tort system); *In re Paddock Enters., LLC*, No. 20-10028 (LSS) (Bankr. D. Del. May 26, 2022) [D.I. 1406] (trust distribution procedures providing for indirect claim disputes to be resolved by ADR procedures followed by litigation in the tort system); *In re Sepco Corp.*, No. 16-50058 (AMK) (Bankr. N.D. Ohio Mar. 24, 2020) [D.I. 732] (same); *In re Maremont Corp.*, No. 19-10118 (LSS) (Bankr. D. Del. May 17, 2019) [D.I. 241] (same); *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (Bankr. D.N.J. Sept. 7, 2018) [D.I. 729] (same); *In re Geo. V. Hamilton, Inc.*, No. 15-23704 (GLT) (Bankr. W.D. Pa. Jan. 11, 2018) [D.I. 1605] (same); *In re Metex Mfg. Corp.*, No. 12-14554 (CGM) (Bankr. S.D.N.Y. Dec. 23, 2013) [D.I. 364] (same); *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Jan. 18, 2011) [D.I. 503] (same).  The bankruptcy court correctly rejected this, and this Court should follow suit.

Fourth, Allianz and Liberty complain that the bankruptcy court incorrectly ruled with respect to Indirect Abuse Claims because it did not recognize the distinction between claims allowance and claims treatment. However, the bankruptcy court noted that "[t]he allowance of a claim is distinct from treatment of a claim and the class vote does not bind a dissenting creditor with respect to whether its claim is allowed." D.I. 1-3 at 258. Allianz and Liberty ignore this acknowledgment and conveniently focus instead on another statement from the bankruptcy court. D.I. 43 at 24. In any event, Allianz and Liberty were not "foreclosed from arguing that the *allowance* provisions for Indirect Abuse Claims [were] improper"—they simply lost.[95]

## B. The Bankruptcy Court Did Not Err In Approving The BSA's Judgment Reduction Language

Allianz and Liberty complain about the bankruptcy court's ruling with respect to the judgment reduction provisions set forth in the TDP and Confirmation Order, in which the bankruptcy court largely approved the BSA's judgment reduction language. *See* D.I. 43 at 25–41; Bankr. D.I. 10304. Contrary to their complaints, and for the reasons set forth more fully in [Article IV.C.3] of the Future Claimants' Representative's answering brief, the judgment reduction provisions (1) fairly compensate Allianz and Liberty for their contingent and

---

[95] Allianz and Liberty made this argument in their Plan objections, *see* Bankr. D.I. 8763, 8778, at confirmation, and in Liberty's post-confirmation submission to the bankruptcy court. *See* Bankr. D.I. 9689.

speculative contribution claims, and (2) the finality requirement set forth therein—which is mutual based upon the bankruptcy court's ruling—was appropriate and is not prejudicial to the insurers.   The BSA hereby adopts and incorporates by reference in full the arguments set forth in Article V.C.2 of the Future Claimants' Representative's answering brief with respect to this argument.

## CONCLUSION

For all of the foregoing reasons, the Confirmation Opinion, the Confirmation Order, and the Pre-Petition Century/Chubb Companies Claims Order should be affirmed in all respects.

Dated:  December 7, 2022
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:    dabbott@morrisnichols.com
            aremming@ morrisnichols.com
            ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**

Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:    jessica.lauria@whitecase.com
            gkurtz@whitecase.com

– and –

**WHITE & CASE LLP**

Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:    mandolina@whitecase.com
            mlinder@whitecase.com
            laura.baccash@whitecase.com
            blair.warner@whitecase.com

*Attorneys for the Debtors-Appellees and Debtors in Possession, Boy Scouts of America and Delaware BSA LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this brief complies with the type-volume limitation pursuant to this Court's *Order Granting Motion on Stipulation Regarding Appeals from Order Confirming Plan of Reorganization of Boy Scouts of America and Delaware BSA, LLC* [D.I. 22] (the "Order").

1.      Pursuant to the Order, the BSA has up to 71,500 words in response to the Certain Insurers' principal brief (19,500), Liberty and Allianz' supplemental brief (13,000), Lujan Claimants' principal brief (19,500), and D&V Claimants' principal brief (19,500).  Order ¶ 9(c).]

2.      Exclusive of the exempted portions of the brief specified in Fed. R. Bankr. P. 8015(g), the brief contains 68,060 words.

3.      The brief has been prepared using Microsoft Word in 14-point Times New Roman font.  The undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated:  December 7, 2022


*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)