# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Boy Scouts of America and Delaware BSA, LLC, <br>          Debtors. | Chapter 11 <br><br> Bankruptcy Case No. 20-10343-LSS (Jointly Administered) |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, <br>          Appellants. <br><br> v. <br><br> Boy Scouts of America and Delaware BSA, LLC, *et al.*, <br>          Appellees. | Lead Case No. 22-cv-01237-RGA <br><br> Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; 22-cv-01240-RGA; 22-cv-01241-RGA; 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |

## ANSWERING BRIEF OF AD HOC COMMITTEE OF LOCAL COUNCILS

WACHTELL, LIPTON, ROSEN & KATZ
Richard G. Mason (admitted *pro hac vice*)
Douglas K. Mayer (admitted *pro hac vice*)
Joseph C. Celentino (admitted *pro hac vice*)
Mitchell S. Levy (admitted *pro hac vice*)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
RGMason@wlrk.com
DKMayer@wlrk.com
JCCelentino@wlrk.com
MSLevy@wlrk.com

DLA PIPER, LLP (US)
R. Craig Martin (No. 5032)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5655
craig.martin@dlapiper.com

*Attorneys for Appellee Ad Hoc Committee of Local Councils of the Boy Scouts of America*

# **DISCLOSURE STATEMENT**[*]

      The Ad Hoc Committee of Local Councils of the Boy Scouts of America (the "Ad Hoc Committee") is an unincorporated association that comprises eight "Local Councils," independent nonprofit corporations that partner with the Boy Scouts of America to deliver the Scouting mission locally.  The Ad Hoc Committee's members are the Andrew Jackson Council (Jackson, MS), the Atlanta Area Council (Atlanta, GA), the Crossroads of America Council (Indianapolis, IN), the Denver Area Council (Denver, CO), the Grand Canyon Area Council (Phoenix, AZ), the Greater New York Councils (New York, NY), the Mid-America Council (Omaha, NE), and the Minsi Trails Council (Allentown, PA) (each, a "Committee Member").  Each Committee Member is a nonprofit corporation.  Neither the Ad Hoc Committee nor any Committee Member has issued stock.  Neither the Ad Hoc Committee nor any Committee Member has a parent corporation.  No publicly held company holds any interest in the Ad Hoc Committee or in any Committee Member.

---

[*]    The Ad Hoc Committee does not believe that it is required to provide a Corporate Disclosure Statement under Federal Rule of Civil Procedure 26.1(a), as it is not a "nongovernmental corporate party."  For full transparency, however, the Ad Hoc Committee makes the disclosures set forth in this paragraph.

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................1

I.  The Channeling Injunction and Releases are essential to
    BSA's reorganization. .................................................................................3

II. Local Councils are prepared to fund the Settlement Trust, facilitating
    payments to abuse survivors promptly upon the Effective Date. ...................7

## TABLE OF AUTHORITIES

**Page(s)**

Statutes

36 U.S.C. § 30902 ..........................................................................................................................7

## PRELIMINARY STATEMENT[1]

The confirmed plan of reorganization on review before the Court will create the largest compensation fund in United States history dedicated to survivors of sexual abuse — nearly $2,500,000,000 in upfront funding, and with the potential to grow by billions more.  It will compensate and bring closure to tens of thousands of individuals — many in their 80s or older — who have endured decades of waiting.  It will also establish a framework for bringing finality not only for BSA, but for the allied charitable organizations dedicated to furthering the mission of Scouting — Local Councils and Chartered Organizations — as well as their insurers, in exchange for their funding the settlement.  And it will ensure that BSA emerges from bankruptcy a leader in youth safety, and can continue to provide its life-changing Scouting programs to the youth who rely on them.  It is no understatement to say that the BSA Plan will improve millions of lives.

The linchpin of all of this is a Channeling Injunction, centralizing resolution of Scouting-related Abuse Claims through the Settlement Trust, and Releases protecting certain non-debtors, without which billions of dollars of Trust funding would evaporate and the Boy Scouts of America — a 112-year-old American institution — would cease to exist.

---

[1] Capitalized terms not defined herein have the meanings given in the Debtors-Appellees' Consolidated Answering Brief (the "BSA Brief").

As BSA ably argues in its brief, under clear Third Circuit law the Channeling Injunction and Releases fall squarely within the Bankruptcy Court's jurisdiction, are authorized by the Bankruptcy Code, and are appropriate under the facts and circumstances of this extraordinary case. The Ad Hoc Committee joins in the arguments made in the Debtor-Appellees' Consolidated Answering Brief.[2]

Bankruptcy Judge Silverstein's extensive order confirming the plan made exhaustive factual findings — synthesizing evidence and arguments presented at a 22-day confirmation hearing that included testimony from 26 witnesses — and set forth well-reasoned legal conclusions supporting the Channeling Injunction and Releases. Those findings and conclusions should be affirmed. Moreover, since Judge Silverstein confirmed the Plan, Local Councils — the approximately 250 independent charitable organizations that deliver the Scouting program to youth nationwide — have raised the $515 million in cash and property required to fund their collective contribution to the Settlement Trust under the Plan. Upon affirmation, those funds will be transferred to the Settlement Trust so that survivors of abuse can be promptly compensated.

For these reasons, the Ad Hoc Committee respectfully requests that this Court affirm the Confirmation Order.

---

[2] For the avoidance of doubt, the Ad Hoc Committee joins, adopts, and incorporates, as if set forth fully herein, all the statements, arguments, and authorities in the BSA Brief.

I.  **THE CHANNELING INJUNCTION AND RELEASES ARE ESSENTIAL TO BSA'S REORGANIZATION.**

From the beginning of this chapter 11 case, it was apparent that nondebtor releases would be essential for BSA to successfully reorganize. This was driven by three key inescapable features of the Scouting enterprise:

*First*, BSA's "business" is entirely dependent on its third-party partners — Local Councils and Chartered Organizations — to function. Although BSA designs the Scouting program, sets membership standards, purchases group insurance and benefits, and owns camps and "Scouting" intellectual property, delivery of the Scouting program is not handled by BSA. *See* A0005–06 (Bankr. D.I. 9316 ¶ 10). Instead, Local Councils — which operate like franchisees of BSA — organize and administer Scouting units (troops, packs, dens, etc.), recruit members, solicit donations, own and operate hundreds of Scout camps, sell BSA merchandise, and plan Scouting events. *See id*. (Bankr. D.I. 9316 ¶¶ 10–11). Critically, Local Councils collect membership fees and merchandise sales revenues and remit them to BSA. *See* A0006 (Bankr. D.I. 9316. ¶ 11). Local Councils, in turn, partner with Chartered Organizations to sponsor troops, recruit youth members and adult volunteer leaders, provide meeting space, host troop meetings and events, and promote Scouting within their own communities. *See id*. (Bankr. D.I. 9316 ¶ 11). Without Chartered Organization support, BSA and Local Councils lack the manpower to recruit members for the tens of thousands of Scout troops nationwide

and to operate those troops. If the Abuse Claims that prompted BSA's chapter 11 case caused Chartered Organizations to cease their relationship with Scouting, or Local Councils to dissolve, BSA would inexorably fail. *See* A0006, A0041–43 (Bankr. D.I. 9316 ¶¶ 11, 67–70). Addressing that risk was necessary to any successful BSA reorganization. *See* BSA Brief Part III.D.1.b; D.I. 1-3 at 155 ("Given the interconnected nature of the delivery of Scouting, Local Council existence and continued Chartered Organization affiliation is critical to BSA's existence as a national organization.").

*Second*, BSA has long shared certain contingent liabilities with Local Councils in connection with BSA's defined benefit pension plan. For decades, BSA and Local Councils have contributed to the Boy Scouts of America Retirement Plan, which provides retirement benefits to both BSA and Local Council employees. *See* D.I. 1-3 at 4. Without regular contributions by both BSA and all Local Councils, the Pension Benefit Guaranty Corporation could terminate the pension, and would assert an approximately $1.1 billion statutorily secured claim against BSA and Local Councils jointly and severally — indeed, the PBGC filed a contingent claim for precisely such liability in the BSA bankruptcy case. *See* A0152 (Bankr. D.I. 9280 ¶ 252 n.46). Litigation of Abuse Claims against Local Councils — even if BSA's liability was resolved — would threaten their ability to make the needed pension contributions. And, if the BSA pension plan were terminated, even Local Councils

without significant abuse-related liability would find themselves facing massive claims by the PBGC, potentially forcing them into bankruptcy, and in turn threatening BSA's ability to operate.

*Third*, BSA shares critical insurance assets with Local Councils and Chartered Organizations. Much of BSA's billions of dollars of insurance coverage that could potentially compensate abuse survivors came from policies that name Local Councils, Chartered Organizations, or both, as insureds along with BSA. *See* D.I. 1-3 at 12–13. In other words, Local Councils and Chartered Organizations had as much right to those insurance proceeds as BSA. If the value of these policies — BSA's largest asset by far — was to be unlocked for abuse survivors through insurer settlements, releases of Local Councils and Chartered Organizations were required. *See* A0123-24 (Bankr. D.I. 9280 ¶ 192).

Reaching a resolution that provided nondebtor releases in a manner acceptable to all constituents was an immense challenge. The BSA Plan achieves that result through a series of settlements reached among parties that were — for most of the past three years — diametrically opposed. Those settlements are interlocking: if one is pulled loose, the others fall apart.

The Releases of Local Councils and Chartered Organizations are the glue that holds *all* of these settlements together. *See* D.I. 1-3 at 154–55 ("The Scouting-Related Releases and the Channeling Injunction are the cornerstone of the Plan. . . .

It is illogical to believe that these settlements could be achieved without releases and this conclusion is supported by the record."). Without Releases in their favor, Local Councils would not have agreed to contribute $515 million in cash and property, fund a $125 million note, contribute to the Settlement Growth Payment, and assign their rights under BSA's and their own insurance policies. *See* D.I. 1-3 at 151–54; A0041–42 (Bankr. D.I. 9316 ¶¶ 67–68). Instead, they would have kept those assets in their pockets for their charitable missions locally or their own creditors. Without releases of Local Councils and Chartered Organizations with respect to their insurance policies — as well as releases of the Settling Insurers themselves — the Settling Insurers would not have agreed to contribute $1.656 billion to the Settlement Trust, as they would otherwise face future obligations or litigation under those policies. *See* D.I. 1-3 at 151–52; A0104, 0123–24 (Bankr. D.I. 9280 ¶¶ 136, 192). Without Releases of Chartered Organizations, Local Councils would not have agreed to contribute hundreds of millions of dollars, nor their insurance rights, since Local Councils cannot exist without Chartered Organization partnerships. *See* D.I. 1-3 at 152–53; A0043 (Bankr. D.I. 9316 ¶ 70). And without Releases in their favor, Chartered Organizations would not have agreed to contribute their rights under BSA and Local Council insurance policies, effectively preventing the Settlement Trust from settling those policies in the future. *See* D.I. 1-3 at 154; A0043 (Bankr. D.I. 9316 ¶ 70).

The BSA is not a typical debtor. Instead, it is a Congressionally chartered nonprofit organization, tasked with fulfilling the Scouting mission, which is enshrined in the United States Code:

> to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods . . . in common use by boy scouts . . . .

36 U.S.C. § 30902. The necessity of preserving that mission, while appropriately compensating abuse survivors, drove the creation of this Plan. And it is only through such a plan — containing the Channeling Injunction and the Releases — that both of those goals can be achieved.

## II. LOCAL COUNCILS ARE PREPARED TO FUND THE SETTLEMENT TRUST, FACILITATING PAYMENTS TO ABUSE SURVIVORS PROMPTLY UPON THE EFFECTIVE DATE.

Local Councils have collectively done their part to enable implementation of the Plan. The Plan requires that Local Councils contribute $515 million in cash and property on the Effective Date. *See* D.I. 1-4 § IV.D.1. Collecting this amount from approximately 250 charities — each with its own volunteer Board and officers, operating in over 50 jurisdictions — and with differing claim exposure and financial ability, is no small task. For this reason, the Confirmation Order established a Local Council Escrow Account to collect cash contributions, and the Plan contained a

process for Local Councils to finalize their property contributions before the Effective Date. *See* D.I. 1-1 ¶ 23; D.I. 1-4 § IV.D.2.

*As of today, Local Councils have funded $515.5 million.*[3]  Upon affirmation by this Court, the cash in the Local Council Escrow Account will be transferred to the Settlement Trust. *See* D.I. 1-1 ¶ 23.  And Local Councils will begin the process of monetizing the contributed real properties for the Settlement Trust's benefit.  These immediate payments will allow the Settlement Trust to begin expeditiously its important work reviewing and resolving Scouting-related Abuse Claims and providing appropriate compensation to survivors.

\* \* \*

The BSA Plan achieves a global resolution of one of the most complicated chapter 11 cases ever.  It will provide closure and compensation for survivors of abuse, and finality for the parties contributing billions of dollars toward that resolution.  It will make BSA a safer institution going forward, benefiting millions of Scouts for years to come.

---

[3]  Per the Plan, amounts in excess of the $515 million required cash and property contribution reduce the "DST Note," an additional $125 million note in favor of the Settlement Trust funded by Local Council contributions over time.  *See* D.I. 1-4 § I.A.115.  To the extent that the Local Councils contribute more than $515 million in cash and property on the Effective Date, that amounts to a pre-funding of a portion of the DST Note, putting more money in the Settlement Trust's — and survivors' — hands sooner.

Judge Silverstein said it best: "This is an extraordinary case by any measure." She then went on to write a thorough and well-reasoned 269-page opinion, which she followed with an exhaustive 68-page order with additional findings and conclusions confirming the BSA Plan. That order should be affirmed, and the BSA Plan should be allowed to go effective so that abuse survivors can obtain fair compensation in their lifetimes and Scouting can continue its charitable mission serving youth.

| | |
|---|---|
| Dated: December 7, 2022<br>Wilmington, Delaware | **DLA PIPER, LLP (US)**<br>*/s/ R. Craig Martin* |

R. Craig Martin (No. 5032)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5655
craig.martin@dlapiper.com

– and –

**WACHTELL, LIPTON, ROSEN & KATZ**
Richard G. Mason (admitted *pro hac vice*)
Douglas K. Mayer (admitted *pro hac vice*)
Joseph C. Celentino (admitted *pro hac vice*)
Mitchell S. Levy (admitted *pro hac vice*)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
RGMason@wlrk.com
DKMayer@wlrk.com
JCCelentino@wlrk.com
MSLevy@wlrk.com

*Attorneys for Appellee Ad Hoc Committee of Local Councils of the Boy Scouts of America*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned hereby certifies that this brief complies with the type-volume limitation pursuant to this Court's *Order Granting Motion on Stipulation Regarding Appeals from Order Confirming Plan of Reorganization of Boy Scouts of America and Delaware BSA, LLC* [D.I. 22] (the "Order"):

1. Pursuant to the Order, the Ad Hoc Committee has up to 13,000 words in response to the principal and supplemental briefs filed by the Lujan Claimants, D&V Claimants, Certain Insurers, and Liberty and Allianz. Order ¶ 9(d).

2. Exclusive of the exempted portions of the brief specified in Federal Rule of Bankruptcy Procedure 8015(g), the Ad Hoc Committee's brief contains 1,928 words.

3. The brief has been prepared using Microsoft Word in 14-point Times New Roman font. The undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: December 7, 2022

/s/ R. Craig Martin