# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC, | Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | |
| | Lead Case No. 22-cv-01237-RGA |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, | Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; 22-cv-01240-RGA; 22-cv-01241-RGA; 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |
| Appellants. | |
| v. | |
| Boy Scouts of America and Delaware BSA, LLC, *et al.*, | |
| Appellees. | |

## APPENDIX TO ANSWERING BRIEF OF
## AD HOC COMMITTEE OF LOCAL COUNCILS

## **Exhibit Index**

| Exhibit | Appendix Page Numbers |
|---|---|
| Declaration of William S. Sugden [Bankr. D.I. 9316], filed 3/14/2022 | A0001-A0045 |
| Declaration of Brian Whittman [Bankr. D.I. 9280], filed 3/11/2022 | A0046-A0174 |

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF WILLIAM S. SUGDEN IN SUPPORT OF CONFIRMATION OF THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

I, William S. Sugden, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare that the following is true and correct to the best of my knowledge and belief:

1.     I submit this declaration ("**_Declaration_**") in support of the _Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC_ [D.I. 8813] (the "**_Plan_**"), and in conjunction with _Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections_ [D.I. 9114] and the _Statement of the Ad Hoc Committee of Local Councils in Support of Confirmation of the BSA's Plan of Reorganization_ [D.I. 9098] (the "**_Statement_**").[2]

2.     This Declaration sets forth my testimony regarding certain topics related to the work of the Ad Hoc Committee of Local Councils (the "**_Ad Hoc Committee_**") in connection with

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]     All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the Statement or in the Plan.

these chapter 11 cases, including in particular:

a.   The relationship between Local Councils and the Boy Scouts of America national organization (the "***National BSA***");

b.   The formation and operations of the Ad Hoc Committee;

c.   The objectives of the Ad Hoc Committee and its role in connection with these bankruptcy proceedings;

d.   The Ad Hoc Committee's role in negotiating the Local Council Settlement Contribution, including its interactions with Local Councils and the development of the Ad Hoc Committee's "Formula," which is used to allocate the direct financial contribution component of the Local Council Settlement Contribution among Local Councils;

e.   The Ad Hoc Committee's role in negotiating the interrelated settlements under the Plan with the key constituencies in the chapter 11 cases, including:  (a) the Settling Insurance Companies, (b) the United Methodist Entities, (c) TCJC, and (d) the Tort Claimants' Committee, FCR, the Coalition of Abused Scouts for Justice (the "***Coalition***") and a supermajority of state court counsel representing holders of Abuse Claims;

f.   The results of the Ad Hoc Committee's efforts to solicit contributions from each Local Council to fund the Local Council Settlement Contribution;

g.   The Plan's proposed releases of Local Councils, Chartered Organizations, and their Representatives; and

h.   The Ad Hoc Committee's role in helping National BSA to evolve its youth protection

A0002

measures, as incorporated in the Plan.

3.      Unless stated otherwise, my statements in this Declaration are based upon my personal knowledge and my review of relevant documents.  If requested, I am able to testify competently live to the facts set forth in this Declaration. The following exhibits, which I reference in the paragraphs below, are made part of my Declaration:

| JTX#[3] | Description | Bates Beginning # |
|---|---|---|
| 7-3 | Atlanta Area Council 2020 Charter Renewal [6.7.6.31_092 Atlanta Area SR A9 2020 LCCR.pdf] | N.A. |
| 1799 | December 15, 2021 AHCLC Formula Summary (Insurers TX[4] # 249 – Sugden Deposition Exhibit 23) | BSA_AHCLC_00058868 |
| 1800 | February 11, 2021 AHCLC Formula Summary (Insurers TX # 249 – Sugden Deposition Exhibit 24) | BSA_AHCLC_00058923 |
| 475 | May 6, 2021 AHCLC Formula Summary | BSA_AHCLC_00058882 |
| 554 | June 18, 2021 AHCLC Formula Summary | BSA_AHCLC_00058890 |
| 1473 | June 2021 AHCLC Formula Spreadsheet | BSA_AHCLC_00058866 |
| 264 | Form of Annual Unit Charter Agreement – 2020 Printing | BSA-RSA_00001256 |
| 358 | Form of Annual Charter Agreement – January 2021 | BSA-PLAN_02887493 |
| 1442 | Form of Annual Charter Agreement – January 2021 Update | BSA-PLAN_02887493 |

## Personal Background

4.      I am a Partner at Alston & Bird LLP in the Financial Restructuring & Reorganization Group.  I joined Alston & Bird LLP in the Atlanta Office as an associate in 2003

---

[3]      Joint Trial Exhibit List.  I understand that the Joint Trial Exhibit List was delivered to the Court by the Debtors.

[4]      Notice of Filing of Certain Insurers' Exhibit List in Connection with Confirmation Hearing [D.I. 9199].

and have remained at the firm since.  Before joining Alston & Bird LLP, I received my J.D. and

M.B.A. degrees from Vanderbilt University, and a B.A. from Kenyon College.  I am a member

in good standing of the State Bar of Georgia.

5.       In my practice at Alston & Bird LLP, I regularly represent parties in connection

with bankruptcy proceedings.  My prior in-court bankruptcy representations include debtors,

bankruptcy trustees, creditors' committees and other fiduciaries, and creditors and indenture

trustees.  I also have substantial experience advising parties on insolvency-related issues in out-

of-court settings.  I am a member of the Bankruptcy Section of the Atlanta Bar Association, and

am a member of the Boards of Directors of the American Bankruptcy Institute and the

Association of Insolvency and Restructuring Advisors.

6.       I am the lead attorney for Alston & Bird LLP's *pro bono* representation of the

Atlanta Area Council in connection with these chapter 11 cases.  I have represented the Atlanta

Area Council since November 2019.  The Atlanta Area Council is a member of the Ad Hoc

Committee, which is a party to these chapter 11 cases, and I have represented the Atlanta Area

Council in connection with its participation on the Ad Hoc Committee since December 2019.

7.       Through my representation of the Atlanta Area Council, I have been involved in

substantially all of the business of the Ad Hoc Committee.  In that role, I have personally

attended virtually all Ad Hoc Committee meetings on behalf of the Atlanta Area Council.

Further, I have attended nearly all mediation sessions that the Ad Hoc Committee has

participated in during these cases, including numerous in-person sessions in New York, Chicago,

and Los Angeles from Spring 2021 through January 2022, as well as a virtual mediation session

that occurred in Miami in the Spring of 2021 and the dozens of virtual mediation sessions that

A0004

have occurred from Winter 2021 to March 2020.  I describe the business of the Ad Hoc Committee in more detail below.

8.      Additionally, I am the father to two children who are involved in Scouting.  My 13-year old is a Boy Scout, and my 9-year old is a Cub Scout.

9.      I was deposed in connection with these chapter 11 cases on November 30, 2021 as the designated Rule 30(b)(6) witness of the Ad Hoc Committee.

**<u>Local Councils' Relationship to National BSA</u>**

10.      Scouting operates through a network of independent organizations that share a common charitable mission.  National BSA, following its Congressional charter, designs and maintains aspects of the Scouting program — setting the structure and content of the Scouting programs, owning and licensing BSA's intellectual property, setting merit badge requirements and membership qualifications, purchasing general liability insurance, and providing shared technical support, accounting, and other corporate services.  But many Scouts never interact with National BSA directly.  Instead, the tens of thousands of Scouting units nationwide — *e.g.*, "troops," "packs," and "dens" — are organized locally, through "Chartered Organizations" such as churches, schools, and civic associations, which are often colloquially referred to as Scouting's "partners."  Those Scouting units and their Chartered Organization partners are, in turn, supported by approximately 250 "Local Councils."  Local Councils receive charters from National BSA,[5] but are independent non-profit legal entities — incorporated under the laws of

---

[5]      A sample charter renewal from the Atlanta Area Council may be found in JTX# 7-3 [6.7.6.31_092 Atlanta Area SR A9 2020 LCCR.pdf].

A0005

their respective jurisdictions — with their own articles of incorporation, bylaws, boards, officers, and employees.

11.     Although legally separate, Local Councils and National BSA are closely interconnected.  Local Councils rely on National BSA to provide shared insurance, certain employee benefits, and other services.  National BSA relies on Local Councils for the bulk of its direct funding (via Scouts' membership fees and the sale of Scouting merchandise).  Local Councils also maintain relationships with both local Chartered Organizations and local donors.  These relationships are vital to the success of Scouting, as they drive membership and provide essential funding.  Without a Local Council operating in a particular geographic region, National BSA would lose access to the resources necessary to operate Scouting units there.  Thus, if a Local Council were to dissolve or file for bankruptcy, it would be difficult for National BSA to reestablish the community ties necessary for a successful Scouting program.

### The Ad Hoc Committee's Formation and Operation

12.     The Ad Hoc Committee was formed by its Chair, Richard G. Mason, who was at the time the volunteer President of the Greater New York Councils, so that Local Councils would have a voice in connection with these bankruptcy proceedings.[6]  I understand that Mr. Mason was first approached by representatives of National BSA about the prospect of forming an ad hoc committee of Local Councils in late 2019.[7]

---

[6]     I understand that Mr. Mason's term as volunteer President of the Greater New York Councils has ended and he is now the volunteer Chair Emeritus.  I understand that Mr. Mason is an Eagle Scout, a partner in the law firm of Wachtell, Lipton, Rosen & Katz and Chair of the firm's Restructuring & Finance Department.

[7]     While representatives of National BSA initially suggested to Mr. Mason the idea of forming the Ad Hoc Committee, to the best of my knowledge, National BSA has never been involved in the affairs of the Ad Hoc Committee other than as expressly described in this Declaration.

A0006

13.     Eight Local Councils were asked to and ultimately did join the Ad Hoc Committee:  Andrew Jackson Council (Jackson, Mississippi), Atlanta Area Council (Atlanta, Georgia), Crossroads of America Council (Indianapolis, Indiana), Denver Area Council (Denver, Colorado), Grand Canyon Council (Phoenix, Arizona), Greater New York Councils (New York, New York), Mid-America Council (Omaha, Nebraska), and Minsi Trails Council (Allentown, Pennsylvania).  Those eight Local Councils form a broadly representative group of the approximately 250 Local Councils located throughout the United States in terms of geography, size, and potential exposure to Abuse Claims.  All eight of those Local Councils have remained members of the Ad Hoc Committee throughout these chapter 11 cases and through the date of this Declaration.

14.     Since its formation, the Ad Hoc Committee has conducted regular Zoom meetings (typically on a weekly basis) to discuss the status of the bankruptcy proceedings and the Ad Hoc Committee's efforts in connection with these proceedings.  I have personally attended almost all of those meetings.  The Ad Hoc Committee does not have formal bylaws, and instead generally operates through discussion and consensus.

15.     Although the Ad Hoc Committee is composed of only eight Local Councils, it aims to provide a voice for all Local Councils in connection with these proceedings.  To that end, the Ad Hoc Committee has executed joint defense agreements with all Local Councils, memorializing its common legal interests with them; maintains an email address through which Local Councils can communicate with the Ad Hoc Committee; has regularly solicited telephone calls and virtual meetings with representatives from various Local Councils; and has generally made itself available to answer questions.  In addition, the Ad Hoc Committee has, from January 2020 through February 2022, convened many virtual meetings open to all Local

A0007

Councils[8] to explain the status of these proceedings and solicit input (as I more fully describe below).

## The Ad Hoc Committee's Role in the Settlement Process and Development of the Formula

16.     The Ad Hoc Committee filed a notice of appearance in these cases on March 3, 2020.  *See Notice of Appearance* [D.I. 135].[9]  It retained Wachtell, Lipton, Rosen & Katz and DLA Piper, LLP (US), both on a *pro bono* basis, as its legal counsel in connection with these proceedings.

17.     The Ad Hoc Committee became a mediation party pursuant to this Court's Order on June 9, 2020.  *See Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812].  It has participated in numerous mediation sessions since that date, and has sent representatives (frequently including myself) to attend substantially all mediation sessions, either in person or through Zoom.

18.     Through the mediation process, the Ad Hoc Committee has engaged extensively with the other mediation parties about a potential global settlement.  Local Councils have a vital interest in the outcome of these cases, given their shared mission with National BSA, and the Ad Hoc Committee has engaged on numerous issues related to the bankruptcy proceedings and the Plan.

---

[8]      Such meetings were only open to Local Councils that have signed the Joint Defense Agreement. However, I understand that all Local Councils had signed the Joint Defense Agreement shortly after the Petition Date; thus, all Local Councils were invited to nearly all of the meetings.

[9]      The Ad Hoc Committee has also filed a *Verified Statement* consistent with Bankruptcy Rule 2019 [D.I. 8893].

A0008

19.     A central focus for the Ad Hoc Committee has been the Local Council Settlement Contribution under the Plan.

20.     The Ad Hoc Committee played a unique role in negotiating the Local Council Settlement Contribution.  It interacted with both the individual Local Councils and the other mediation parties, enabling it to collect and consolidate input from both sources.  This included engaging with the other mediation parties to determine a form and amount of contribution that would garner support for a global settlement from key parties, in particular from abuse survivors and their representatives.  It also involved, simultaneously, engaging with all Local Councils and soliciting their input to assess the form and amount of a financial contribution that could be achieved.  Because of its dual-facing role, the Ad Hoc Committee was uniquely well-situated to negotiate a global resolution of these chapter 11 cases involving Local Councils.

A.      *Principles for Negotiation of the Local Council Settlement Contribution*

21.     Before turning to the systematic "Formula" that the Ad Hoc Committee developed in negotiating the Local Council Settlement Contribution, I will enumerate some basic principles that animated the Ad Hoc Committee's approach.  The amount of the Local Council Settlement Contribution needed to be broadly acceptable to the mediation parties, and in particular to the major claimant representatives.  By the same token, the Local Council Settlement Contribution needed to be financially achievable for the hundreds of Local Councils (numbering 253 as of the Petition Date).

22.     Each Local Council is an independent entity with its own board of directors and management.  Most are represented by their own legal counsel.  All have rights to shared insurance that must be settled as part of any global resolution.  And each Local Council is differently situated in terms of its financial position, the number and type of Abuse Claims it

may face in the tort system, and the statutes of limitation (among other things) that would apply to such Abuse Claims.

23.       As a result, the Ad Hoc Committee recognized that neither exclusively focusing on Local Councils that faced significant "in-statute" tort exposure, nor a series of one-off negotiations regarding each Local Council's potential contribution, offered any reasonable prospect of timely reaching a global settlement.  Focusing on more exposed Local Councils alone would not generate sufficient financial contributions to gain the support of the claimant representatives.  And no series of individual negotiations with some 250 Local Councils could be concluded on the timeframe within which the bankruptcy needed to proceed (if it would be achievable at all).

24.       Given these realities, limitations, and obstacles, the Ad Hoc Committee determined that the most appropriate way to approach the Local Council Settlement Contribution was through the development of a systematic formula (the "*Formula*") that would require each Local Council to contribute based on factors that, in the view of the Ad Hoc Committee, were relevant to equitably and appropriately divide the Local Council Settlement Contribution among Local Councils.  The development of the Formula involved thousands of hours of dialogue within the Ad Hoc Committee and with Local Councils to craft a mechanism that fairly allocates the Local Council Settlement Contribution and ensures the unanimous participation of Local Councils necessary to facilitate the contribution of Local Council insurance rights under the Plan.

25.       Through the development and use of the Formula, the Ad Hoc Committee sought to accomplish two goals in tandem.  *First*, the Formula was intended to allocate the total amount of the Local Council Settlement Contribution among Local Councils, rendering a contribution amount agreed upon with claimant representatives at least potentially achievable.  *Second*, the

A0010

Formula helped the Ad Hoc Committee assess the economic feasibility of different contribution levels for Local Councils, enabling it to communicate and negotiate with other mediation parties, including claimant representatives, about Local Councils' potential contributions to the Settlement Trust.

26.    The Ad Hoc Committee began development of the Formula in October 2020. From the outset, there were several key considerations that guided development of the Formula:

a.    *The Formula Needed to Garner the Maximum Possible Support for a Global Resolution among the Mediation Parties*:  At the time that the Ad Hoc Committee began developing the Formula, it was apparent that a significant direct financial contribution from Local Councils, in addition to contribution of their insurance rights, would be required to obtain the necessary voting support for a global resolution plan. The Formula needed to facilitate that support.

b.    *The Formula Needed to Generate a Substantial Contribution*:  Relatedly, in order to achieve survivor support and Court approval, the Formula needed to generate a substantial contribution from Local Councils.

c.    *The Formula Needed to Result in an Allocation that Had Unanimous (or Near-Unanimous) Support Among Local Councils*:  The Ad Hoc Committee believed that unanimous (or near-unanimous) Local Council support was needed for a global resolution because:

i.    All Local Councils are co-insureds under nearly all general commercial liability insurance policies purchased by the Debtors over the past 45 years; it was therefore essential that each Local Council agree to contribute its

insurance rights under the policies so that National BSA or the Settlement
Trust could negotiate settlement agreements effectively with insurers
regarding these policies.

ii.   Without a global resolution, the Ad Hoc Committee anticipated that the
Pension Benefit Guaranty Corporation (the "***PBGC***") might assert that all
Local Councils are jointly and severally liable for obligations under the
Pension Plan sponsored by the Debtors (the "***Pension***").  Accordingly, any
material non-participation by Local Councils that prevented global resolution
could pose risks to all Local Councils related to potential termination of the
Pension.

iii.  Much of National BSA's revenues come from Local Councils.  Non-
participation by even a few Local Councils, and the associated risk that those
Local Councils would later become economically unviable as a result of state
tort litigation, would increase the economic pressure on the Reorganized BSA
and remaining Local Councils, threatening their own financial viability.

iv.   Local Councils collectively share a common charitable mission with the
Debtors: supporting the Scouting movement.  A resolution that does not
preserve the national character of Scouting is likely to be viewed as a failure
by both Local Councils and their donors, potentially reducing membership
and donor participation in the future.

v.    Non-participation by even a few Local Councils could have a cascading effect
where other Local Councils would "opt out" from a global settlement and
instead elect to defend Abuse Claims in the tort system using shared

A0012

insurance.  This is especially so because most Local Councils are located in jurisdictions that have not enacted a "revival window" for lapsed statutes of limitation (and, indeed, many Local Councils are located in jurisdictions where the state constitution — and caselaw interpreting the state constitution — would prevent revival of time-barred claims even if a revival window was passed by the legislature).  Additionally, those Local Councils do not have the experience (and may never have the experience) of defending Abuse Claims in the tort system.  If Local Councils perceived that the Formula caused their requested contribution to be substantially more than the likely costs of their litigating in the tort system, there was a risk that a number of Local Councils might "opt-out," preventing a feasible global settlement.

B.      *Specifics and Evolution of the Formula*

27.      In the following paragraphs, I describe the material pieces and evolution over time of the Formula developed by the Ad Hoc Committee.  As set forth in further detail below, this was an iterative process that took place over many months, while the Ad Hoc Committee was simultaneously negotiating with claimant representatives and soliciting feedback from Local Councils.  Although the Formula contains significant detail, in this Declaration, I aim to lay out the key features of each iteration for the Court.[10]  The Court may find it helpful to review JTX# 554 [BSA_AHCLC_00058890], which contains the "final iteration" of the Formula.

---

[10]      I understand that the Ad Hoc Committee has produced both (1) decks describing each iteration of the Formula discussed below in detail and (2) self-contained Excel spreadsheets showing all relevant data and calculations underlying each iteration of the Formula discussed herein for which the Ad Hoc Committee has such a spreadsheet.

-13-

(Otherwise, JTX# 1799 [BSA_AHCLC_00058868], JTX # 1800 [BSA_AHCLC_00058923], JTX# 475 [BSA_AHCLC_00058882], and JTX# 554 [BSA_AHCLC_00058890] — as noted in the footnotes — each contain the then-current status of the Formula at the dates outlined below.)[11]

     *a.     First Formula Iteration — December 2020*

28.     The Ad Hoc Committee presented the framework for the first iteration of the Formula to Local Councils on December 15, 2020.[12]  At the time, the Formula operated as follows:

a.     The Formula identified a target contribution level, which was to be negotiated with the claimant representatives (the "***Aggregate Target Contribution***").  The Aggregate Target Contribution represents the total contribution that would be provided by all Local Councils collectively.

b.     The Aggregate Target Contribution was then used to calculate a baseline contribution amount (the "***Average Local Council Contribution***"), which was the amount that each Local Council would pay if the Aggregate Target Contribution was allocated equally among each Local Council.

c.     The Formula then placed each Local Council into a different quintile for each of three factors, which factors the Ad Hoc Committee believed were key in assessing each Local Council's appropriate share of the Aggregate Target Contribution based both

---

[11]     I personally helped to prepare all of the documents cited in this paragraph.

[12]     I understand that the deck describing the Formula as of December 15, 2020 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058868 (JTX# 1799).

A0014

on a Local Council's potential exposure to Abuse Claims and its ability to pay.  Those

three factors were:

    i.    *Financial Factor*:  A factor that reflected each Local Council's total net assets

        (without regard to donor restrictions), as reported on each Local Council's

        books through accounting software used by National BSA.[13]

    ii.    *Claims Factor*:  A factor that reflected the raw number of claims filed in the

        chapter 11 cases that identified a Local Council, using data provided by Bates

        White.

    iii.    *SoL Factor*:  A factor that reflected how defendant- or plaintiff-friendly the

        statute of limitations was for Abuse Claims in the jurisdiction most relevant to

        each Local Council, based on the Ad Hoc Committee's analysis of each

        state's statute of limitations.

d.    The Formula then adjusted the Average Local Council Contribution for each Local

    Council according to the three aforementioned factors:

    i.    Each Local Council was placed into a quintile (*i.e.*, one of five groups) with

        respect to each of the Financial and Claims Factors.  For example, a Local

        Council with total net assets in the top 80% (or above) of all Local Councils

        would be placed in the top quintile for the Financial Factor, while a Local

        Council with total net assets in the bottom 20% (or below) of all Local

---

[13]    All Local Council financial information used in the Formula was and is available to all parties in interest via National BSA's data room.

A0015

Councils would be placed in the bottom quintile. Local Councils were also placed into one of five divisions with respect to their SoL Factors.

ii.    A multiplier, ranging between 0.5x and 1.5x, was ascribed to each quintile. A council's potential contribution amount (the "*Adjusted Contribution*") was determined by multiplying each of its three multipliers by the Average Local Council Contribution. For example, a Local Council that was in the highest quintile among Local Councils for the Financial Factor would have a multiplier of 1.5x based on that factor, whereas a Local Council in the lowest quintile would have a multiplier of 0.5x. A Local Council in the highest quintile for all three factors would have a total multiplier of 3.375x (1.5x * 1.5x * 1.5x), whereas one in the lowest quintile for all three factors would have a total multiplier of 0.125x (0.5x * 0.5x * 0.5x).

e.    The Ad Hoc Committee further determined that these three factors would typically yield a fair contribution for most Local Councils. Sometimes, however, it was possible that the Formula might yield an Adjusted Contribution Amount that, based on the circumstances of the particular Local Council, would be inequitable or otherwise unlikely to gain acceptance from the Local Council. As a result, the Formula contained certain "*Guardrails*," which were created with three principal goals in mind:

i.    to ensure that no Local Council was asked to pay more than nonbankruptcy law would permit (*i.e.*, that no Local Council would be asked to use restricted assets to make its contribution);

    ii.    to ensure that no Local Council was asked to pay so much as to leave it financially unviable and unable to fulfill its Scouting mission; and

    iii.    to ensure that no Local Council was asked to pay an amount disproportionate to its Abuse Claim exposure based on the number of Abuse Claims filed in the chapter 11 cases that identify that Local Council.

f.    The Guardrails used to achieve those goals in this iteration of the Formula were:

    i.    ***TUNA Guardrail***: A Guardrail that limits a Local Council's contribution to a defined maximum percentage of its Total Unrestricted Net Assets ("***TUNA***").

        1.    Because Local Councils are non-profit organizations, a significant portion of their assets comes from donations or gifts that are donor-restricted under applicable nonbankruptcy law. Accordingly, many assets held by Local Councils are either donor- or deed-restricted. These assets are not legally available for use in any settlement.

        2.    Recognizing that these assets are not legally available to contribute as part of a settlement (or in state tort litigation) and that no Local Council would be able to make a contribution prohibited by law, the Ad Hoc Committee limited each Local Council's contribution to no more than 100% of its TUNA.

        3.    The TUNA Guardrail remained unchanged through the "final" iteration of the Formula.

A0017

ii.  ***TNA Guardrail***:  A Guardrail that limited a Local Council's contribution to a defined maximum percentage of its Total Net Assets ("***TNA***") without regard to whether those assets were restricted or unrestricted.

iii.  ***Liquidity Guardrail***:  A Guardrail that limited a Local Council's contribution to a defined maximum percentage of its total liquidity (defined as the sum of its cash plus short-term and long-term investments) without regard to whether those assets were restricted or unrestricted.

    1.  To remain financially viable following the contribution of their assets to the Settlement Trust, Local Councils need to retain sufficient total and liquid assets (restricted or unrestricted) to continue operating.

    2.  Accordingly, the Ad Hoc Committee limited each Local Council's contribution to no more than 30% of such Local Council's total net assets and no more than 30% of its total liquidity, in both cases without regard to whether such assets were restricted or not.

    3.  The TNA Guardrail remained the same through the "final" iteration of the Formula.  As I discuss below, the Liquidity Guardrail was further adjusted in later iterations of the Formula.

iv.  ***Cost Per Claim Guardrail***:  A Guardrail that limited a Local Council's contribution so that its requested contribution amount on a per-claim basis would not be more than a defined multiple of the contribution amount per claim paid on average by all Local Councils.

A0018

1.  It would be inequitable to ask Local Councils facing very few claims to make contributions that were disproportionate to the contributions that other Local Councils were making to the Settlement Trust on a per-claim basis.

2.  If a Local Council was asked to make such a disproportionate contribution, the Ad Hoc Committee believed that there was a likelihood that such Local Council would "opt-out" of a global resolution and instead choose to litigate or settle Abuse Claims individually outside of these proceedings.

3.  Accordingly, this Guardrail established that no Local Council would be asked to contribute more than five times as much on a per-claim basis as the average per-claim amount contributed by all Local Councils.

g.  Each Local Council's contribution under the first iteration of the Formula was determined by taking either its Adjusted Contribution amount or a lower amount established by the Guardrails, if and as applicable.

    *b.    Second Formula Iteration — February 2021*

29.    Following the presentation of the first iteration of the Formula, the Ad Hoc Committee received extensive feedback from Local Councils regarding their views of the strengths and weaknesses of the Formula and whether they would contribute under such a mechanism.  During this period alone, the Ad Hoc Committee spoke directly with most Local Councils about the Formula.  The Ad Hoc Committee also continued to engage with other

-19-

mediation parties regarding the amount of the Local Council Settlement Contribution that would be required for a global settlement.

30.      From these feedback sessions with both Local Councils and other mediation parties, the Ad Hoc Committee adjusted the Formula, and presented a second iteration to Local Councils on February 11, 2021.[14]  The most important of those changes were:

a.   The Formula used updated data from Bates White regarding the number of claims filed against each Local Council.  The Ad Hoc Committee continued to refresh this data in creating each subsequent iteration of the Formula.

b.   The Ad Hoc Committee adjusted the Formula's treatment of the Claims and Financial Factors in two ways:

i.      Rather than grouping Local Councils into quintiles for each factor, it grouped them into deciles.  In other words, Local Councils were assigned one of ten multipliers for each factor, rather than one of five multipliers.

ii.     The multiplier range was adjusted.  Instead of using multipliers ranging between 0.5x and 1.5x, the Formula used multipliers between 0.5x and 1.75x.

c.   The Ad Hoc Committee modified the SoL Factor to better reflect historical versions of statutes of limitation that would apply to historical Abuse Claims.  Application of the SoL Factor to each Local Council was also adjusted so as to be more closely tied to the jurisdictions in which particular Abuse Claims allegedly arose — Local

---

[14]      I understand that the deck describing the Formula as of February 11, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058923 (JTX# 1800) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058865.

A0020

Councils received a "weighted" SoL Factor reflecting the blend of jurisdictions in which Abuse Claims against a particular Local Council allegedly arose.

d.   The Ad Hoc Committee added a ***Maximum Payment Guardrail***, limiting the highest total amount that any Local Council could pay under the Formula.  This was intended to avoid any Local Council being asked to contribute an amount so high that it would be rational for that Local Council to file its own bankruptcy case rather than contribute under the Formula.  The amount of the maximum payment guardrail was initially set at $5,000,000.  (As I explain further below, under the "final" iteration of the Formula, some Local Councils are asked to contribute as much as $10,000,000.)

   *c.    Further Mediation and the National BSA Formula — March 2021*

31.    Over subsequent weeks, the Ad Hoc Committee communicated with all Local Councils about the contribution they would need to make under the second iteration of the Formula.  At this time, the Formula was targeted to achieve a Local Council Settlement Contribution of $300 million, which was the amount identified in the *Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2293] (filed March 1, 2021).  Based on these extensive interactions, the Ad Hoc Committee determined that Local Councils would collectively be willing and able to contribute this amount as part of a global resolution, with approximately 95% of Local Councils indicating their willingness to make the requested contribution amount at that time in an aggregate amount slightly exceeding $300 million.

32.    The Ad Hoc Committee continued to participate in mediation efforts, including with the claimant representatives involved in these chapter 11 cases.  As indicated in both public filings and open court at that time, the claimant representatives in these cases made clear that

A0021

they were unwilling to support a plan that included a $300 million Local Council Settlement

Contribution and a greater amount would be required.

33.     On March 9, 2021, National BSA solicited Local Council participation under a

formula designed by National BSA (the "***National BSA Formula***").  I understand that the

National BSA Formula utilized concepts from the Ad Hoc Committee Formula — *e.g.*, a claims

factor, a financial factor, and a SoL factor — but it applied those concepts differently and

omitted several key guardrails that were present in the Ad Hoc Committee's Formula.  The

National BSA Formula was set at a level intended to generate $600 million in aggregate Local

Council contributions and it was expected under the National BSA Formula that all Local

Council contributions would be required to be made in cash.

34.     Local Councils widely rejected the National BSA Formula.  In feedback provided

to the Ad Hoc Committee, different Local Councils identified different reasons for not

supporting the National BSA Formula.  For some, it yielded a required contribution that would

have left them with inadequate resources to fund their Scouting program going forward.  For

others, they would not be able to make their contribution all in cash as was contemplated under

the National BSA Formula.  For yet others, such as the Local Council that I represent, while they

would have been able to meet the contribution requested under the National BSA Formula

(indeed, the current contribution request of my Local Council under the Ad Hoc Committee's

Formula is slightly higher than the amount set forth in the National BSA Formula), they

nonetheless did not support the National BSA Formula because they recognized that many other

Local Councils would not be able to meet their requested contribution and thus anticipated that

the ultimate contribution expected of them under the National BSA Formula might be

significantly higher.  In other words, even for those Local Councils that might be able and

willing to meet the contributions expected of them under the National BSA Formula, they still viewed the National BSA Formula not to be viable given their perception of the likely inability of other Local Councils to meet their expected contributions.

> d.    *Third Formula Iteration — May 2021*

35.    On April 13, 2021, National BSA filed the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] (the "**Second Amended Plan**"), which provided for a total Local Council Settlement Contribution of $425 million.

36.    Based on the feedback that the Ad Hoc Committee received from Local Councils (both as to the second iteration of the Formula and the National BSA Formula), as well as from continued interactions with the mediation parties, the Ad Hoc Committee continued to make adjustments to the Formula.  On May 6, 2021, the Ad Hoc Committee presented a third iteration of the Formula to Local Councils.[15]  This iteration of the Formula was intended to facilitate meeting the $425 million Local Council Settlement Contribution described in the Second Amended Plan, and involved a series of changes, including:

a.    Increasing the top end of the multiplier range for the Claims Factor, which had previously been 1.75x, to 2.5x.  This multiplier range remained unchanged in the "final" iteration of the Formula.

b.    Increasing the defined maximum percentage of total liquidity that certain Local Councils could be asked to contribute for Local Councils that met certain Claims,

---

[15]    I understand that the deck detailing the Formula as of May 6, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058882 (JTX# 475) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058867.

A0023

Financial and SoL thresholds.  As I have described above, in prior iterations of the Formula there had been a Liquidity Guardrail that limited any Local Council's contribution to no more than 30% of its total liquidity.  In the third iteration of the Formula, this was adjusted for certain Local Councils.  Specifically, if a Local Council had more than $6,000,000 in total unrestricted net assets, its Liquidity Guardrail would be increased by 5%.  Additionally, if a Local Council was identified in more than 100 Abuse Claims, its Liquidity Guardrail would increase by 5%. Finally, if a Local Council was located in a jurisdiction that had an open statute of limitations "revival window," its Liquidity Guardrail would increase by 5%.  These increases were cumulative:  thus, a Local Council with more than $6,000,000 in total unrestricted net assets, more than 100 claims, and that was located in a "window state," under the third iteration of the Formula would have a Liquidity Guardrail of 45% (30% + 5% + 5% + 5%) — *i.e.*, for such a Local Council the Liquidity Guardrail would only apply if its Adjusted Contribution would exceed 45% of its total liquidity.

c.   Increasing the Maximum Contribution Guardrail amount from $5,000,000 to $6,000,000.  (As I describe below, the "final" iteration of the Formula requested that certain Local Councils make contributions of up to $10,000,000.)

d.   Introducing a new Guardrail, the "***National BSA Formula Guardrail***," which provided that no Local Council would be asked to contribute more than the *greater* of:  (1) its contribution amount under the National BSA Formula and (2) its contribution amount under the second iteration of the Ad Hoc Committee Formula (*i.e.*, the version that was presented to Local Councils on February 11, 2021).

-24-

     i.    As I describe above, the National BSA Formula did not garner sufficient support among Local Councils for various reasons.  However, the changes to create the third iteration of the Formula might have resulted in a situation where certain Local Councils would be asked to pay more under the third iteration of the Formula (which sought to raise $425 million) than they were asked to pay under the National BSA Formula (which sought to raise $600 million).

    ii.    The Ad Hoc Committee believed that if it asked any Local Council to pay more under the third iteration of the Formula than it had been asked to pay under the National BSA Formula, there was a risk that the particular Local Council would not participate, and would instead urge the Ad Hoc Committee to adopt the National BSA Formula instead.  As I have described above, the Ad Hoc Committee did not believe that the National BSA Formula presented a viable allocation of the Local Council Settlement Contribution and, if such a path was pursued, it would lead to a failure of the global settlement efforts. As such, the Ad Hoc Committee believed that the National BSA Formula Guardrail was a critical component to maintain the unanimous or near-unanimous support necessary from Local Councils.

37.    Based on its continuing interactions with Local Councils regarding the Formula, the Ad Hoc Committee gained confidence that it could garner support for contributions at this level, as it indicated to the Court at that time.[16]  Notably, its ability to garner this support was

---

[16]    May 21, 2021 Hearing Tr. [D.I. 4716].

A0025

predicated on the ability of Local Councils to make their contribution partially in the form of cash and partially in the form of real property, as certain Local Councils would not have sufficient liquid assets to make these contributions unless they could make their contributions partially in the form of real property.

38.     However, as indicated in both papers filed and statements made on the record around this time, claimant representatives continued to oppose a Local Council Settlement Contribution of $425 million, indicating that a still-larger Local Council Settlement Contribution was required if a global settlement was to be achieved.

e.      *Final Formula Iteration – June 2021*

39.     Because the third iteration of the Formula already pushed a substantial number of Local Councils to the edge of economic viability, it was necessary to develop a new mechanism to enable a settlement amount above $425 million and allocate that additional amount among Local Councils.  The Ad Hoc Committee developed two mechanisms to "bridge the gap" between the $425 million contemplated in the Second Amended Chapter 11 Plan and a $500 million contribution target, which was an amount the Ad Hoc Committee believed would either be acceptable to the claimant representatives or mean that no global resolution was possible because Local Councils would not be able to fund higher amounts.  These "***Bridge-the-Gap Mechanisms***" were:[17]

a.  ***Bridge-the-Gap Mechanism #1***:  The Ad Hoc Committee sought to determine which
    Local Councils had significant potential exposure to Abuse Claims and could

---

[17]     I understand that the deck describing the Formula as of June 18, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058890 (JTX# 554) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058866 (JTX# 1473).

A0026

potentially make a larger contribution while remaining financially viable. Based on its review of each Local Council's financial data and available liquid assets, its review of each Local Council's available real property that could be included as part of a contribution, the Abuse Claims potentially identifying that Local Council, and the Ad Hoc Committee's extensive interaction with all Local Councils throughout these proceedings, the Ad Hoc Committee identified approximately 40 Local Councils (generally, larger councils) from which it could solicit additional contributions of between $500,000 and $4,000,000. In general, these Local Councils had a relatively high Financial Factor and/or a relatively high SoL Factor.

b. ***Bridge-the-Gap Mechanism #2***: Bridge-the-Gap Mechanism #1 was insufficient to generate a $500 million Aggregate Target Contribution. As such, the Ad Hoc Committee determined that it was necessary to develop a second mechanism, Bridge-the-Gap Mechanism #2. Unlike all other prior components of the Formula, Bridge-the-Gap Mechanism #2 did not look to a Local Council's potential exposure to Abuse Claims. Instead, it looked only to those Local Councils that (a) were not included in Bridge-the-Gap Mechanism #1 and (b) had so far been asked to contribute less than 85% of their Liquidity Guardrail. These Local Councils were asked to contribute the lesser of 85% of their Liquidity Guardrail or $500,000.[18]

---

[18]     To illustrate, consider a hypothetical Local Council with $5 million in total liquidity whose Liquidity Guardrail was 30%. For that Local Council, the contribution amount would be no more than $1.5 million prior to application of any Bridge-the-Gap Mechanism. However, if the Local Council's requested contribution was less than 85% of its Liquidity Guardrail (*i.e.*, if it had been asked to contribute less than $1.275 million under the third iteration of the Formula), it would be asked to contribute up to 85% of its Liquidity Guardrail, not to exceed $500,000. Thus, for the hypothetical Local Council described in this footnote, if its requested contribution in the third iteration of the Formula was $1 million, it would be asked to contribute $275,000 more through Bridge-the-Gap Mechanism #2. If, alternatively, it has been asked to

A0027

i.   Given how the Formula had been constructed, Bridge-the-Gap

Mechanism #2 disproportionately fell on mid-size Local Councils that

(a) had a greater percentage of liquid assets than the average Local

Council, and (b) had either a relatively lower exposure to Abuse Claims or

had a relatively low SoL Factor.  A total of approximately 90 Local

Councils were requested to make additional contributions under Bridge-

the-Gap Mechanism #2.

ii.   The Ad Hoc Committee viewed Bridge-the-Gap Mechanism #2 to be

particularly risky.  It disproportionately impacted mid-sized Local

Councils with greater-than-average liquidity and less exposure to Abuse

Claims.  However, given the dynamics of the negotiations with the

mediation parties at this time, the Ad Hoc Committee believed it was a

risk that it had to accept if there was to be a global settlement.

40.   The Guardrails that I have described above did not apply to either of the two

Bridge-the-Gap Mechanisms.  If a Bridge-the-Gap Mechanism resulted in a Local Council being

requested to pay more than its cap under any of the Guardrails, those Guardrails did not limit the

amount of the request under the Bridge-the-Gap Mechanism, though the Guardrails still applied

to the "base" contribution requested from the Local Council under the third iteration of the

Formula.[19]

---

contribute $600,000 under the third iteration of the Formula, it would be asked to contribute $500,000 under
Bridge-the-Gap Mechanism #2.

[19]      To illustrate, consider a hypothetical Local Council that was subject to the Maximum Payment
Guardrail under the third iteration of the Formula.  Prior to the application of the Bridge-the-Gap
Mechanisms, that Local Council's contribution would have been $6 million.  If that Local Council was part

A0028

41.     By adding the contribution requests under the two Bridge-the-Gap Mechanisms to the contributions requested in the third iteration of the Formula, the Ad Hoc Committee was able to generate a total Local Council Settlement Contribution of approximately $500 million and allocate that contribution among all Local Councils.

42.     At this point, based on its review of the numbers allocated to Local Councils, the experience of its members in operating Local Councils themselves, and its interactions with Local Councils throughout these chapter 11 cases (particularly in response to contributions requested under the third iteration of the Formula plus the amounts sought under the Bridge-the-Gap Mechanisms), the Ad Hoc Committee concluded it would not be possible to solicit larger direct financial contributions from Local Councils — they simply would not agree to such contributions.  Thus, if $500 million in direct financial contributions was insufficient for the claimant representatives, the Ad Hoc Committee was not prepared to support higher amounts because it did not believe any higher amounts would be achievable.

43.     The deck, which I helped create, explaining the "final iteration" of the Formula to Local Councils is available at BSA_AHCLC_00058890 (JTX# 554).

C.     *The DST Note and the RSA*

44.     The Ad Hoc Committee still sought to reach a global resolution that included sufficient forms of other consideration to garner support from the major plaintiff constituencies in these cases.  In order to reach a Local Council Settlement Contribution amount that would be acceptable to the plaintiff constituencies and finally enable a global resolution, the Ad Hoc

---

of Bridge-the-Gap Mechanism #1, its requested contribution would increase between $500,000 and $4,000,000 without regard to the Maximum Payment Guardrail.  In other words, such a Local Council would have been requested to contribute an aggregate amount of between $6,500,000 and $10,000,000.

A0029

Committee helped develop the Delaware Statutory Trust Note (the "***DST Note***"),[20] which was expected to add an additional $100 million of value to the Settlement Trust.

45.      The DST Note was particularly difficult for the Ad Hoc Committee to support. Shortly before the Petition Date, National BSA (as the sponsor of the Pension) froze the Pension, directly diminishing the retirement benefits of key employees of the Local Councils.  Including the DST Note as part of the Local Council Settlement Contribution significantly reduced the likelihood that the Local Councils would either be able to partially restore those lost retirement benefits or provide similar benefits for future employees, which potentially threatens employee recruiting and retention efforts.

46.      However, the Ad Hoc Committee agreed to support the DST Note as part of the Local Council Settlement Contribution because the Ad Hoc Committee believed that (a) there was no path to achieving significantly greater direct financial contributions from Local Councils, (b) a greater aggregate contribution from Local Councils was essential to reaching a global resolution, and (c) the DST Note contains appropriate protections.

47.      On July 1, 2021, after over a year in mediation, the Ad Hoc Committee entered into a Restructuring Support Agreement (the "***RSA***") with the Debtors and all three plaintiff constituencies that had participated in the mediation to that point:  the TCC, the FCR, and the Coalition.  Included as part of the RSA was an agreement on the Local Council Settlement Contribution, which (at that time) would equal $500 million in direct contributions from Local Councils (which contribution would include not less than $300 million in cash and up to $200 million in real property) plus the $100 million DST Note.

---

[20]      As defined in the Plan Art I.A.114.

A0030

48.     As should be evident from the description that I have provided above, negotiating the Local Council Settlement Contribution in a way that obtained the support of the claimant representatives while also achieving the Ad Hoc Committee's objective of unanimous (or near-unanimous) support among Local Councils has presented unique challenges.  In my nearly nineteen years of legal practice, in which I have negotiated complicated settlements on behalf of hundreds of clients, I can think of no close corollary to the challenges associated with negotiating the Local Council Settlement Contribution.  As I explain further below, subsequent negotiations that have culminated in the settlements now embodied in the Plan were similarly challenging.

49.     The RSA obligated the Ad Hoc Committee to undertake reasonable efforts to persuade Local Councils to make direct contributions that, in the aggregate, amounted to $500 million.

**The Ad Hoc Committee's Efforts to Solicit Local Council Contributions**

50.     Roughly contemporaneously with its entry into the RSA, the Ad Hoc Committee began soliciting letters of intent from all Local Councils for contributions in the amounts indicated by the final iteration of the Formula (including any applicable Bridge-the-Gap Mechanisms).  The Ad Hoc Committee expended tremendous effort persuading Local Councils to make the requested contribution amounts.  In the approximately three-week period during which the Ad Hoc Committee focused its campaign to solicit letters of intent, representatives of the Ad Hoc Committee held hundreds of phone calls with members and representatives of Local Councils and attended dozens of Local Council board meetings.  As a result of these efforts, by the end of July, the Ad Hoc Committee had received letters of intent from the vast majority of Local Councils for the amount of their contributions under the Formula (plus any applicable Bridge-the-Gap amounts) and determined that Local Councils would collectively be willing and

A0031

able to make the $500 million direct financial contribution contemplated under the RSA and to support the DST Note.

51.      In almost all cases, the letter of intent received from a Local Council provided for a contribution in the amount equal to that determined by the final iteration of the Formula (including any applicable Bridge-the-Gap Mechanisms).  The Ad Hoc Committee allowed for deviations from these contribution amounts in two, and only two, circumstances.  *First*, the Ad Hoc Committee allowed for deviations where an error in the Formula resulted in an inappropriate contribution amount.  This occurred where, for example, there was an error in a Local Council's monthly financial statement that resulted in an overstatement of the assets available to a particular Local Council.  *Second*, the Ad Hoc Committee allowed for deviations where a particular Local Council provided evidence that persuaded the Ad Hoc Committee that, notwithstanding the Guardrails built into the Formula, the contribution amount allocated to that Local Council would result in its imminent bankruptcy.  Combined, there were fewer than a dozen instances in which the Ad Hoc Committee approved a deviation from the Formula.

52.      On September 15, 2021, the Debtors filed the *Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6212] ("***Fifth Amended Plan***"), which was the final version of the plan (but for certain modifications) prior to solicitation.  Although this plan, which incorporated additional settlements beyond the Local Council Settlement Contribution, was not supported by the TCC, it retained the same amount and structure for the Local Council Settlement Contribution that existed in the RSA (which the TCC had supported).  The Local Council Settlement Contribution remained the same when the Fifth Amended Plan was sent out for solicitation on September 30, 2021.

53.      By the time the solicitation version of the Disclosure Statement was filed on

A0032

September 30, 2021, the Ad Hoc Committee had received letters of intent from every Local Council reflecting its intent to contribute the amount allocated to it.  I understand that the council-by-council contribution amounts reflected in those letters of intent, including the specific break-down between the cash and real property components were provided in Exhibit C to the Disclosure Statement [D.I. 6445 Ex. C].  As indicated in the Disclosure Statement, at that time, Local Councils had submitted letters of intent that collectively indicated an aggregate cash contribution of $408,391,763 and a real property contribution of $111,196,782, totaling $519,588,545, which slightly exceeded the $500 million contemplated under the RSA.[21]

## The Settlements Under the Plan

54.     Since the filing of the Disclosure Statement, the Ad Hoc Committee has continued to engage with other parties in mediation to resolve open issues that are important to Local Councils' interests.

55.     One of the key issues that the Ad Hoc Committee has focused on is the treatment of Chartered Organizations under the Plan.  Local Councils work directly with local Chartered Organizations to help deliver Scouting in their communities and support BSA's charitable mission.  In most Local Councils, many Scouts are members of troops or units that are directly sponsored by Chartered Organizations.  Chartered Organizations also provide volunteers, facilities, recruiting assistance, and other resources that are vital to National BSA and Local Council operations.  Indeed, Chartered Organizations are sufficiently important to Local

---

[21]     As I explain below, this amount over $500 million was built into the Formula.  The Ad Hoc Committee anticipated that there might be certain circumstances where a Local Council's initial commitment might not ultimately be able to be met, so the Ad Hoc Committee built in some "overage" into the Aggregate Target Contribution amount.

A0033

Councils that the letters of intent submitted by Local Councils included an express contingency requiring that the Plan provide for a satisfactory treatment of Chartered Organizations.[22]  The RSA similarly recognized the need for resolution for Chartered Organizations, obligating the parties to that agreement to work in good faith to agree on such a resolution.[23]

56.     Although certain issues related to Chartered Organizations remained unresolved at the time that the Plan was sent out for solicitation, the parties continued to engage throughout the mediation.  These mediation efforts resulted in several settlement agreements, including the Century and Chubb Settlement Agreement, the United Methodist Ad Hoc Committee Settlement Agreement (which were included in mediator's reports filed on December 14 and December 22, 2021, respectively[24]), and the TCC Settlement Agreement (which was included in a mediator's report filed on February 10, 2022[25]).  These settlement agreements provided substantial protections to all Chartered Organizations (regardless of whether they have agreed to make an independent contribution to the Settlement Trust to become a Contributing Chartered Organization).  To facilitate these settlements for Chartered Organizations, the Ad Hoc Committee agreed to support the payment of three additional forms of consideration to the Settlement Trust (the "***Supplemental LC Contribution***"), each to be funded by Local Councils:

---

[22]     Specifically, the form of letter of intent (which was attached to the Disclosure Statement [D.I. 6445, Ex. B]) was conditioned on:  "Acceptable resolution of insurance and indemnity issues with respect to our chartered partners, to be negotiated, including through the use of a channeling injunction and/or voluntary releases."

[23]     *See Boy Scouts of America Reorganization Term Sheet* [D.I. 5466-2] ("The Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.").

[24]     *See Seventh Mediator's Report* [D.I. 7745] (Dec. 14, 2021); *Eighth Mediator's Report* [D.I. 7929] (Dec. 22, 2021).

[25]     *See Eleventh Mediator's Report* [D.I. 8772] (Feb. 10, 2022).

A0034

a.   ***LC Overage***:  In order to ensure that Local Councils collectively met the $500 million in direct cash/real property contributions under the Local Council Settlement Contribution set forth in the Fifth Amended Plan and to mitigate certain risks that could cause one or more Local Councils to fall short of its individual allocation, particularly related to the valuations of Local Council-owned properties, the Ad Hoc Committee originally designed the Formula to produce aggregate contributions exceeding $500 million (by slightly less than $20 million, leaving approximately a 4% margin).  Under the Fifth Amended Plan, Local Councils were required to contribute $500 million of cash and real property, notwithstanding that the individual allocations summed to a slightly larger number.  As part of the settlements that are now before the Court in the Plan, however, any overage above $500 million ("***LC Overage***") would be contributed to the Settlement Trust.  The Ad Hoc Committee agreed that the LC Overage must be at least $15 million.

b.   ***Increase in the Size of the DST Note***:  The increased, committed amounts to be paid from Local Councils to support the settlements that are currently before the Court as incorporated in the Plan are intended to sum to $40 million.  Up to $19 million of that amount (and not less than $15 million) is intended to be supported by the LC Overage.  Any excess will be covered by an increase in the size of the DST Note.  Thus, if the LC Overage remains $19 million, the DST Note will be increased to $121 million.  If the LC Overage falls to the floor of $515 million, the amount of the DST Note will be increased to $125 million.

A0035

c. ***Settlement Growth Payment***:  In addition to the above, the Ad Hoc Committee also agreed to support the inclusion of the Settlement Growth Payment as part of its efforts to secure the settlement agreements contained in the Plan.  The Settlement Growth Payment is intended to align the interests of National BSA, Local Councils, Chartered Organizations, and the Settlement Trust to grow Scouting in the future.  Such growth, if achieved, will both further bolster the Scouting movement and will simultaneously augment the Settlement Trust for survivors.

The Settlement Growth Payment is a variable payment stream made to the Settlement Trust, in an amount up to $100 million, by National BSA that only commences upon (a) the repayment by National BSA of the BSA Settlement Trust Note, and (b) National BSA's total indebtedness being less than $225 million.  The Settlement Growth Payment is equal to 50% of $72 for each paid youth member above 1.5 million and 50% of $45 for each paid adult volunteer above 500,000.  Essentially, the Settlement Growth Payment will only be made if the Scouting movement increases in size by at least 50% over the coming years and the amount of the payment will be 50% of the current membership dues for any such growth over 50% of the Scouting population.  As set forth above, National BSA is the direct financial beneficiary of such growth and Local Councils are the indirect beneficiaries.  As such, Local Councils have agreed to reimburse National BSA for 25% of any of the Settlement Growth Payments that it actually makes.

A0036

d.     Local Councils believe that growth in Scouting is important for Scouting's future success.  By aligning the interests of National BSA, Local Councils, Chartered Organizations, and the Settlement Trust, the Settlement Growth Payment is a thoughtful way to set Scouting on the path for success in the future.

57.     The Supplemental LC Contribution serves as consideration to facilitate the protections under the Plan for Chartered Organizations that have not yet become Contributing Chartered Organizations, including, among other things, a twelve-month post-Effective Date interim injunction (subject to potential further extensions) that will afford Participating Chartered Organizations an opportunity to assess Abuse Claims that may be pursued against them and assess whether they want to negotiate with the Settlement Trust to become a Contributing Chartered Organization.  The Supplemental LC Contribution is being made on behalf of Chartered Organizations as part of the Chartered Organization Contribution.

58.     The Supplemental LC Contribution that I have described above was agreed by the Ad Hoc Committee prior to January 2022.  However, commencing in early January 2022, the Ad Hoc Committee agreed to participate in a series of intensive mediation sessions with the objective of obtaining support for the Plan from the TCC and other claimant representatives that had not yet agreed to support the Plan.  These additional negotiations led to the settlements embodied in the current version of the Plan.  Based on these negotiations, Participating Chartered Organizations will receive: (a) channeling of all Abuse Claims that arose on and after January 1, 1976 through the Petition Date; (b) channeling of Abuse Claims to the extent they arose before January 1, 1976 if covered by an insurance policy issued by a Settling Insurer; (c) the benefit of any applicable insurance policies to the extent such insurance was not issued by a Settling Insurer; and (d) an extension of the preliminary injunction (staying all Abuse Claims) for not less

A0037

than one year from the Effective Date, which protection was primarily paid for through the Supplemental LC Contribution.

59.     As noted above in Paragraph 55, the letters of intent that Local Councils have submitted were expressly conditioned upon the Plan incorporating an acceptable resolution of Scouting-related Abuse Claims for Chartered Organizations.  The Ad Hoc Committee has solicited feedback from Local Councils regarding the treatment of Chartered Organizations under the current Plan, including through a nationwide Zoom call open to all Local Councils.  To date, *no* Local Council has stated that it views the revised treatment of Chartered Organizations to be unacceptable such that it would not make the contribution set forth in its letter of intent. The Ad Hoc Committee believes that Local Councils will consider the Plan's proposed treatment of Chartered Organizations an "acceptable resolution of insurance and indemnity issues with respect to our chartered partners," as required in the signed letters of intent.

<u>Status of Local Council Commitments to Fund the
Local Council Settlement Contribution</u>

60.     As noted previously, the Ad Hoc Committee has secured letters of intent from every Local Council indicating their intent to contribute cash and real property in the amounts indicated on Exhibit X-1 of the Plan Supplement [D.I. 8815] filed on February 15, 2022.

61.     Accounting for the requirement to fund the LC Overage in the amount of at least $15 million, Local Councils are required to make a direct financial contribution of at least $515 million, in addition to funding obligations related to the DST Note and Settlement Growth Payment.  The Plan provides some flexibility regarding the form of the Local Council Settlement Contribution.  In particular, the Plan allows for that contribution to be partially in the form of cash and partially in the form of real property.  So long as the Local Councils have collectively

A0038

contributed sufficient cash (at least $300 million) and real property (up to $200 million) to the Settlement Trust and so long as the aggregate cash and property contribution is not less than $515 million in the aggregate on the Effective Date, the Local Councils are deemed to have made the requisite contribution.

62.     Since the Ad Hoc Committee first solicited letters of intent from Local Councils, Local Councils have been preparing to make their contributions.  In particular, some Local Councils have sought appraisals of their real property, as contemplated under the Plan.  Although the vast majority of Local Council-owned property had already been appraised by either the TCC or National BSA's appraisers as part of these chapter 11 cases, in certain situations, additional appraisals were required to facilitate a Local Council's contribution of real property to the Settlement Trust.  The Ad Hoc Committee, in conjunction with the Debtors and the Coalition, have worked collaboratively to facilitate these appraisals ("**Qualified On-Site Appraisals**") on the terms set forth in the Plan.  I understand that Local Councils currently anticipate contributing 127 properties, collectively worth an expected value of $103,025,318, to the Settlement Trust, and that approximately 5 appraisals of properties estimated to be worth less than $5 million remain outstanding as of the date hereof.  Based on this progress and its ongoing interactions with Local Councils regarding this process, the Ad Hoc Committee is confident that all necessary appraisals will be completed in advance of the Effective Date of the Plan.

63.     In certain instances, Local Councils have changed the form of their contribution (either switching a portion of their real property contribution to cash or vice-versa), whether in response to the results of the appraisal process or certain real-world events (such as the successful sale of a property that was otherwise designated to be contributed, with the proceeds being contributed instead of the real property itself).  In more limited instances still, the amount

A0039

of the contribution has changed, consuming a small portion of the approximately $19 million contingency indicated in the Disclosure Statement.[26]  I understand that the expected form and amount of contribution from each Local Council, as indicated in each Local Council's most recent letter of intent, was most recently indicated in Exhibit X-1 to the *Fourth Amended Plan Supplement* [D.I. 8815] filed on February 15, 2022.  As set forth in that filing, the aggregate value of the expected individual Local Council contributions was $519,531,478, with a cash contribution of $416,975,066 and a real property contribution of $102,556,412.

64.     For reasons I describe above (including in particular the successful solicitation of letters of intent from every Local Council and the extensive communication with all Local Councils throughout these proceedings), although the Ad Hoc Committee cannot formally bind any Local Council, if the Plan is confirmed in its current form, the Ad Hoc Committee expects that Local Councils will collectively be able to make the required contribution.

65.     In addition to at least $515 million of cash and real property contributions, Local Councils are making indirect contributions to the Settlement Trust through the DST Note.  A Local Council's contributions under the DST Note will be allocated based on the size of that Local Council's employee base, as the DST Note is funded by a percentage of payroll from each Local Council.  Although those amounts have not been individually allocated by Local Council, the amounts are necessarily part of each Local Council's contribution to the Settlement Trust.

66.     Under the Plan, Local Councils will also contribute their rights to the BSA Insurance Policies and the Local Council Insurance Policies.  I understand that, if a Local Council is unable to transfer its rights to any proceeds under the BSA Insurance Policies or the

---

[26]     *See* Disclosure Statement Ex. C at 5 [D.I. 6445].

A0040

Local Council Insurance Policies, it is required to take reasonable steps to pursue those insurance benefits for the benefit of the Settlement Trust and transfer any recoveries to the Settlement Trust.  In either case, the value of a Local Council's interest in the BSA Insurance Policies and the Local Council Insurance Policies will be transferred to the Settlement Trust.

### Releases of Local Councils, Chartered Organizations, and each of their Representatives Are Essential to the Local Council Settlement Contribution

67.     The releases and channeling injunctions contained in the Plan are essential to the settlements embodied in the Plan, including the Local Council Settlement Contribution.  This is true for the releases/channeling injunctions of Abuse Claims against Local Councils and their Representatives, as well as the releases of Abuse Claims against Chartered Organizations and their Representatives to the extent provided in the Plan.

68.     First, if Abuse Claims against Local Councils are not channeled to the Settlement Trust, Local Councils will not make the Local Council Settlement Contribution.  This is made clear in their letters of intent, which are expressly contingent on "[e]ntry of a channeling injunction and releases covering our Local Council (including any predecessors to our Local Council, and any trusts or entities that support Local Council operations), our Local Council's board members, volunteers and employees (other than alleged perpetrators)."[27]  Indeed, it is not reasonable to expect that Local Councils will contribute hundreds of millions of dollars of direct and indirect consideration — in addition to their valuable insurance rights — to the Settlement Trust while still retaining potential liability for Abuse Claims.  The same is true for Abuse Claims against any Representatives of a Local Council — without coverage for these individuals, a Local Council will likely face indemnity/contribution claims from such Representatives, rendering a

---

[27]     Disclosure Statement Ex. B [D.I. 6445].

A0041

"global resolution" illusory.  Local Councils' ability to continue their operations and to support

the Scouting mission depends on complete release of Abuse Claims against them.

69.     Local Councils will also not contribute to the Settlement Trust unless Indirect

Abuse Claims — including indemnity, contribution, and subrogation claims from insurers and

Chartered Organizations — against Local Councils are released and channeled as well.  I

understand that, since 2014, the form of charter agreement that Local Councils have executed

with Chartered Organizations each year contains the following language:  "The Local Council

agrees to: . . . [i]ndemnify the Charter Organization in accordance with the resolutions and

policies of the National Executive Board of the Boy Scouts of America."[28]  Charter

Organizations have asserted, including during these chapter 11 cases, that this provision creates a

contractual indemnity obligation of Local Councils with respect to any Abuse Claims asserted

against a Charter Organization.  Certain insurers have also asserted that they have contingent

Indirect Abuse Claims against Local Councils.  While Local Councils would likely dispute such

claims, the cost and distraction of litigating them would frustrate Local Councils' ability to

operate.  Again, it is not reasonable to expect that Local Councils will make the substantial

financial contribution (including giving up their insurance coverage) contemplated by the Plan

while still retaining potential exposure on indemnity/contribution/subrogation claims brought by

Chartered Organizations or insurers.  Indeed, under the Plan, Local Councils are funding certain

protections for Chartered Organizations — *see* Paragraphs 56 and 57 above.  The Local Council

that I represent — and all other Local Councils that I have interacted with — would not agree to

do so, nor to fund the Local Council Settlement Contribution more generally, if they could still

---

[28]     *E.g.*, JTX # 264 (Form of Annual Unit Charter Agreement – 2020 Printing) [BSA-RSA_00001256];
*JTX* # 358 (Form of Annual Charter Agreement – January 2021) [BSA-PLAN_02887493]; *JTX* # 1442
(Form of Annual Charter Agreement – January 2021 Update) [BSA-PLAN_02887493].

A0042

face such litigation from Chartered Organizations regarding Abuse Claims after the Effective Date.

70.     From my personal interactions with Local Councils, I am confident that without the releases and channeling injunctions contained in the Plan of (a) Local Councils, (b) Local Councils' Representatives, (3) Chartered Organizations, and (4) Chartered Organizations' Representatives, Local Councils will not make the Local Council Settlement Contribution or the Supplemental LC Contribution.

### The Ad Hoc Committee's Support for the Plan's Youth Protection Measures

71.     During the negotiations leading up to the settlements set forth in the most recent version of the Plan, representatives of the Ad Hoc Committee participated in numerous sessions with survivors, including with survivors associated with the Survivor Working Group ("*SWG*"), which was formed by the Coalition.  Local Council representatives, including multiple employees of the Atlanta Area Council, participated.  Those negotiations included multiple mediation sessions with the SWG, as well as numerous sessions with BSA's youth protection employees, and volunteer and executive leadership.  The Ad Hoc Committee was also involved in mediation sessions with TCC members, and reviewed and revised numerous draft proposals of enhanced youth protection measures.  Among other involvement, Local Council representatives shared their own "best practices" for youth protection and described various youth protection initiatives that have already been launched at the Local Council level.

72.     These sessions were constructive, and ultimately resulted in the enhanced youth protection measures contained in the Plan.[29]

---

[29]     *See* Plan Ex. F.

A0043

73.     The Ad Hoc Committee has reviewed these enhanced youth protection measures and the members of the Ad Hoc Committee support them unanimously.  As part of these enhanced youth protections measures, each of the Ad Hoc Committee's eight members have agreed to take steps to identify and appoint at least one otherwise qualified Local Council board member who is a survivor of sexual abuse.  The Ad Hoc Committee has also recommended to all Local Councils that they take this same step with their own Boards.

74.     In addition, under the Plan, Local Councils will continue to be active in future youth protection efforts, including by:

a) participating on the Youth Protection Committee alongside representatives of the BSA, Chartered Organizations, and survivors nominated by the TCC and the SWG;

b) Working with BSA's Youth Protection Executive to implement and monitor Local Council youth protection; and

c) Cooperating with the National BSA on incident reporting and the formation of Unit Leader working groups to regularly identify, discuss, and develop additional ways to protect youth in Scouting.


[Remainder of page intentionally blank]

-44-

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2022

_____

William S. Sugden

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 9114** |

**DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF CONFIRMATION OF
THE THIRD MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY
SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

I, Brian Whittman, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby

declare as follows:

1.      I am a Managing Director in the Commercial Restructuring practice of Alvarez &

Marsal North America, LLC ("A&M"), which serves as restructuring advisor to Boy Scouts of

America (the "BSA") and Delaware BSA, LLC ("Delaware BSA"), the non-profit corporations

that are debtors and debtors in possession in the above-captioned Chapter 11 Cases (together, the

"Debtors").  I am over twenty-one (21) years of age.  I am authorized by the Debtors and fully

competent to make this declaration (this "Declaration") in support of confirmation of the Third

Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA,

LLC, dated February 15, 2022 [D.I. 8813] (as may be amended, modified, or supplemented, and

together with any exhibits and schedules thereto, the "Plan"), attached hereto as Debtors' Ex. JTX

1-353, and in conjunction with *the Debtors' (I) Memorandum of Law in Support of Confirmation*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification
number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing
address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

A0046

*of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "Memorandum"), attached hereto as Debtors' Ex. JTX 2909.[2]

2.    I have bachelor's degrees in Finance and Accountancy from the University of Illinois, am a Certified Public Accountant, and a Certified Insolvency and Restructuring Advisor. I have worked with companies in bankruptcy or undergoing out-of-court restructurings for over twenty-five years, including serving as Chief Financial Officer and Chief Restructuring Officer. This work has included the preparation of financial projections and liquidation analyses, negotiation of complex settlement agreements, negotiation of financing agreements, assessing and pursuing claims in bankruptcy, as well as analyzing assets, liabilities, and wind-down expenses. In addition, I have advised clients in the actual liquidation of a part or all of their business. A copy of my CV is attached hereto as Debtors' Ex. JTX 1034.

3.    A&M was engaged by the BSA through their then-counsel Sidley Austin LLP in October 2018, to assist with financial matters related to the exploration of strategic alternatives. I joined the A&M team working on the BSA matter in August 2019 and shortly thereafter assumed the leadership of the restructuring team. In this capacity, I have familiarized myself with a range of matters concerning the Debtors and these Chapter 11 Cases, including those described herein.

4.    On February 18, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to achieve two key objectives: equitably compensate victims of abuse who were harmed during their time in Scouting and

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan; the Memorandum; the Restructuring Support Agreement, dated July 1, 2021 [D.I. 5466-2] (the "RSA"), attached hereto as Debtors' Ex. JTX 1-159; or the various settlement agreements and term sheets discussed below, as applicable.

continue to carry out Scouting's mission for years to come. I submitted the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 16], attached hereto as Debtors' Ex. JTX 1-4, in support of various first day motions, which provided background on the Debtors' operations, employees, capital structure, and other matters. This declaration also supported the Debtors' Shared Services Motion,[3] detailing, among other things, (a) the Local Council Benefits Programs, which are health and welfare and retirement benefits programs that the BSA offers to eligible, full-time employees of the Local Councils, and (b) the various management, administrative, and support services that the BSA provides to the Local Councils, (the "Local Council Shared Services Arrangements"), which have historically been of an integrated nature to maximize efficiency, rather than requiring performance by each Local Council separately.

5. The retention of A&M by the Debtors was approved by the Bankruptcy Court pursuant to *Order Authorizing the Retention and Employment of Alvarez & Marsal North America, LLC As Financial Advisor for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date* [D.I. 355], attached hereto as Debtors' Ex. JTX 2901.

6. During the period prior to the Petition Date, A&M provided financial advisory services to the BSA regarding a number of financial matters including (a) preparation of financial projections, (b) preparation of cash flow forecasts, (c) preparation of bankruptcy petitions, first day motions and related analysis, (d) analysis of potential contributions to abuse survivors, (e) supporting negotiation and mediation with counsel to various abuse survivors and a proposed future claimant representative, (f) analysis of restructuring alternatives, and (g) other matters in

---

[3] *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations Under Shared Services Arrangements, (II) Authorizing Continued Performance of Obligations Under Shared Services Arrangements, and (III) Granting Related Relief* [D.I. 15], attached hereto as Debtors' Ex. JTX 1854.

A0048

support of the BSA's ultimate chapter 11 filing.  From my work with the BSA since August 2019, I have direct familiarity with and oversaw these activities.

7.     Since the Petition Date, A&M has provided advice to the BSA regarding many of the same issues and additional matters including (a) facilitating the flow of information to various other parties in the chapter 11 process, (b) preparation of bankruptcy reporting requirements including statements of financial affairs, schedules of assets and liabilities, and monthly operating reports, (c) preparation of five-year financial projections, (d) preparation of a liquidation analysis, (e) negotiations of many components of the Debtors' Plan, (f) analysis related to settlements embodied in the Plan, and (g) negotiation of exit financing, among other matters.  As the lead Managing Director, I have supervised the work performed by A&M since the Petition Date.

8.     On June 9, 2020, the Bankruptcy Court appointed three mediators to help resolve disputes as the Debtors worked toward reaching a plan of reorganization that would have the support of sufficient parties to achieve confirmation.[4]  *See Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 812], attached hereto as Debtors' Ex. JTX 1-26.  Since the bar date on November 16, 2020 (the "Bar Date"), the mediation gradually increased in intensity, transitioning from largely virtual to significant in-person sessions starting in March 2021.  Since March 2021, I have participated in hundreds of hours of mediation.  After hard-fought negotiations amongst the parties, the mediation process yielded settlements between the Debtors and JPM, the Creditors' Committee, the Plaintiff Representatives, the TCJC, the UMAHC, Hartford, Century and the Chubb Companies, the Zurich Insurers and the Zurich Affiliated Insurers, Clarendon, the Ad Hoc Committee of Local Councils ("AHCLC")—a group of eight Local Councils which negotiated on

---

[4] As of the date hereof, Mr. Timothy V.P. Gallagher is serving as the sole mediator in these Chapter 11 Cases.

A0049

behalf of the Local Councils—and other parties in interest, all of which have been embodied in the Plan.  I have participated directly in advising and assisting the Debtors in connection with negotiations with the Coalition of Abused Scouts for Justice (the "Coalition"), the Future Claimants' Representative (the "FCR"), and the Tort Claimants' Committee (the "TCC" and, together with the Coalition and the FCR, the "Plaintiff Representatives"), and with other parties in interest in these Chapter 11 Cases.  In particular, I participated directly in advising and assisting the Debtors with the negotiation of the RSA; the Plan, which incorporated the material terms and conditions of the RSA; and related restructuring documents.  I have also been involved with the negotiation of, and participated in advising and assisting the Debtors with evaluating, the JPM / Creditors' Committee Settlement, the Settlement of Restricted and Core Asset Disputes, the Hartford Insurance Settlement, the TCJC Settlement, the Century and Chubb Companies Insurance Settlement, the Methodist Settlement, the Zurich Insurance Settlement, the Clarendon Insurance Settlement, the TCC Settlement, and the Pachulski Settlement (each as defined below).  In each case, I worked closely with the Debtors' management and team and other advisors.  These settlements are incorporated into the Plan.

9.      In connection with my engagement, the Debtors, through their bankruptcy counsel White & Case LLP ("White & Case"), requested that I prepare expert reports in support of the confirmation of the Plan.  I submitted a total of five expert reports.[5]  I submitted my expert report dated December 5, 2021 which was updated and fully restated for subsequent events in my expert report dated December 29, 2021 on the following topics: (1) Feasibility of the Plan; (2) Liquidation

---

[5] Brian Whittman Expert Report, dated December 5, 2021, attached hereto as Debtors' Ex. JTX 1017; Brian Whittman Updated Expert Report, dated December 29, 2021, attached hereto as Debtors' Ex. JTX 1118; Brian Whittman Rebuttal Expert Report, dated January 5, 2022; Brian Whittman Feasibility Rebuttal Expert Report, dated January 12, 2022; and Brian Whittman Supplemental Expert Report, dated March 2, 2022, attached hereto as Debtors' Ex. JTX 1435.

A0050

Analysis & Comparison to Plan Recoveries; (3) Reasonableness of the Local Council Settlement Contribution; (4) Reasonableness of the JPM / Creditors' Committee Settlement; and (5) Reasonableness of the Settlement of the Restricted and Core Asset Disputes. In addition, I submitted two rebuttal expert reports on a subset of these topics, and finally submitted a further update for subsequent events on March 2, 2022.

10. My expert analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision and my reasonable reliance on information provided by the Debtors and other consultants or advisors to the Debtors.

11. Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents. I am not being compensated specifically for this testimony other than through payments received by A&M as a professional retained by the Debtors in these Chapter 11 Cases.

## ORGANIZATION OVERVIEW

12. As the Debtors' restructuring advisor, I am familiar with the mission of the BSA, as well as the organizational and corporate structures of the BSA. The BSA is a non-profit corporation with a mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."[6]

13. The BSA is governed by a national executive board (the "NEB") and a national executive committee (the "NEC"), which are responsible for managing the organization's affairs and electing officers. The NEB is led by the National Chair. The NEC formed a bankruptcy task force (the "BTF") to direct the Debtors' restructuring strategy in connection with these Chapter 11 Cases. Devang Desai, Allison Schuler, Scott Sorrels, Brad Tilden, Dan Ownby, and Roger Mosby

---

[6] BSA, Mission & Vision, https://www.scouting.org/legal/mission/ (accessed Mar. 11, 2022).

A0051

are the current members of the BTF.  I have frequently interacted with each of these bodies during the course of my engagement with the BSA.

14.      In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program, which are led by paid professional adult leaders with assistance from volunteers and their own independent boards of directors and senior management.  Each Local Council is independently incorporated under the non-profit laws of its respective state and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  There are currently 250[7] Local Councils covering geographic areas of varying size, population, and demographics.  Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner that is consistent with the BSA's mission and with the BSA's Charter, bylaws, rules and regulations, policies, and guidelines, and the BSA and the Local Councils coordinate closely on the day-to-day operation of the mission of Scouting.  Local Councils also are generally responsible for collecting member fees and remitting such funds to the BSA.  These member fees provide a substantial portion of the BSA's annual revenue.

15.      Local Councils own and operate hundreds of unique camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in the BSA's Scouting programs.  Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; Scout and volunteer training; opportunities for rank advancement; local enforcement of the BSA's policies, rules, and regulations; and registration of members and leaders.  In addition,

---

[7] Reflects the number of Local Councils as of March 10, 2022, including a reduction from 251 as a result of the merger of Pikes Peak and Rocky Mountain Councils in August 2021.

A0052

many Local Councils own and operate service centers that provide the local resources necessary for delivery of a successful Scouting program. Local Councils rely upon their own fundraising through donations, product sales, special events, and corporate gifts, as well as programming and other fees, to fund their operations. The BSA provides certain corporate and administrative support to the Local Councils in exchange for shared services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission. This support includes providing human resource programs such as benefits, access to training facilities, marketing services, IT systems, and general liability insurance coverage.

16.     Local Councils also play an important role in the recruitment of Chartered Organizations and oversight of the operation of the Scouting units that those Chartered Organizations create. There are currently more than 44,000 local Scouting units throughout the country sponsored by Chartered Organizations, which are typically local organizations such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens. Some Chartered Organizations are actively involved with the units that they sponsor and encourage Scouting as a means to further their own mission or serve their broader communities. In addition, Chartered Organizations sometimes help support the selection of adult leaders and other scouting volunteers, and provide meeting space to the packs and troops that they sponsor along with storage space, use of equipment, and other monetary and in-kind support. The Local Councils enter into charter agreements with Chartered Organizations on an annual basis. Attached hereto as Debtors' Ex. JTX 358 is a form Annual Unit Charter Agreement.

17.     While Local Councils and Chartered Organizations, and the Scouting units that they sponsor, operationalize the mission of Scouting, the BSA develops and disseminates the structure and content of the Scouting program, and owns and licenses intellectual property, as well as

A0053

operating four high adventure bases ("HABs") which are the pinnacle of the scouting experience. Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

## CORPORATE STRUCTURE

18.     The BSA receives services from certain non-Debtor Affiliates, which are directly or indirectly wholly-owned by, or subject to the control of, the BSA (each, a "Related Non-Debtor Entity").  The Related Non-Debtor Entities provide specialized services under shared services arrangements that facilitate the BSA's national reach, including, among other things, investment and foundation management, management of national programs, lease transactions, and conference and training support functions.

19.     Related Non-Debtor Entity BSA Asset Management, LLC ("BSAAM") is a Delaware limited liability company of which the BSA is the sole member.  BSAAM oversees management of the funds making up the various benefits programs and trusts of the BSA and provides investment management and advisory services to the BSA.  BSAAM manages the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Endowment Fund"), which is a Delaware limited partnership and investment vehicle open only to the BSA, the Local Councils, and their affiliates for investing long-term funds.  BSAAM is the general partner of the Endowment Fund.  The BSA and certain Local Councils are limited partners of the Endowment Fund.  Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Endowment Fund.  In addition to its role as general partner of the Endowment Fund, BSAAM is the settlor of the BSA Endowment Master Trust.

20.     Related Non-Debtor Entity BSA Endowment Master Trust (the "Master Trust"), is a non-profit trust established for the purpose of investing funds contributed to the Endowment

A0054

Fund by the BSA and participating Local Councils. The Master Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible entities that elect to invest their funds in the Master Trust. Global Trust Co. is the trustee of the Master Trust. In addition, the Master Trust is also a limited partner of the Endowment Fund.

21.     The National Boy Scouts of America Foundation (the "Foundation"), a Related Non-Debtor Entity, is a non-profit corporation that was formed in 1997. The Foundation supports the mission of Scouting, and partners with the Local Councils and donors by providing support for major-gift fundraising efforts across the BSA organization. The Foundation also manages the distribution of donor-advised funds such as scholarships, funds for rebuilding camps and high adventure facilities including after the occurrence of natural disasters, and funding for major Scouting events such as the National Jamboree.

22.     Related Non-Debtor Entity Learning for Life is a non-profit corporation tasked with a mission to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances the learning experience and teaches students the skills necessary to succeed both academically and throughout their lives. Learning for Life also administers the Exploring club career education program for young men and women. The Exploring program teaches important life and career skills to young people from all backgrounds through immersive career experiences and mentorship provided by thousands of local, regional and national businesses and organizations, which offer career-specific posts or clubs that help youth pursue their special interests, grow, and develop. The Debtors depend on Learning for Life for these programs.

23.     Arrow WV, Inc. ("Arrow") is a non-profit corporation formed in 2009 to facilitate the acquisition and development of the Summit High Adventure Base in West Virginia

A0055

("Summit").  Arrow owns the real property and improvements that comprise the Summit and leases the Summit to BSA.  Arrow is a guarantor under the Foundation Loan which is being issued by the Foundation to the BSA on the Effective Date and will pledge the Arrow Intercompany Note as security, on a second lien basis, to secure the Foundation Loan.  Attached hereto are the Arrow Collateral Assignment, BSA-PLAN_00373888, Debtors' Ex. JTX 405; Arrow Intercompany Note, BSA-PLAN_00375188, Debtors' Ex. JTX 224; and Arrow Deed of Trust, BSA-PLAN_00069151, Debtors' Ex. JTX 2900.  The Arrow Intercompany Note is a $350 million note from Arrow payable to the BSA.  The Foundation Loan is being used to fund the BSA's operations and various administrative obligations to be paid at emergence.

24.     Related Non-Debtor Entities Atikaki Youth Ventures Inc. ("Atikaki") and Atikokan Youth Ventures Inc. ("Atikokan") are non-share capital corporations formed under the laws of Canada.  Atikaki and Atikokan own the portions of the Northern Tier High Adventure Base ("Northern Tier") located in Canada, and provide certain services to the BSA related to the operation of Northern Tier.  Atikaki maintains the Bissett, Manitoba base for the Northern Tier high adventure facility, which offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park.  Atikokan maintains the Don Rogert Canoe Base for the Northern Tier high adventure facility in Atikokan, Ontario, which offers canoe trips into the Quetico and Crown Lands.

25.     In addition to the BSA, Delaware BSA is the other debtor in these proceedings and is a non-profit limited liability company that was incorporated under the laws of Delaware on July 11, 2019.  The BSA is the sole member of Delaware BSA.  Delaware BSA has pledged substantially all of its assets to secure the obligations of the BSA and Arrow under the 2019 RCF Agreement, the Prepetition Security Agreement (2020), the 2010 Bond Agreement, and the 2012

A0056

Bond Agreement, as defined below. Delaware BSA's principal asset is a depository account located in Delaware, which holds and has held $10,000 or less throughout its existence.

## CAPITAL STRUCTURE

26. As restructuring advisor to the BSA, I am familiar with the prepetition capital structure of the BSA, including its prepetition debt and security documents. The BSA is party to a number of agreements with JPM, the Debtors' senior secured lender. For each of these agreements, BSA is the borrower and JPM is the sole secured lender or holder, as the case may be.

27. On August 11, 2010, the BSA entered into the 2010 Credit Agreement with JPM, pursuant to which JPM made loans and other extensions of credit to the BSA. Arrow is a guarantor under the facility. The 2010 Credit Agreement has been amended seven times, most recently in conjunction with the entry into the 2019 RCF Agreement on March 21, 2019. The 2010 Credit Agreement has two components, a $75,000,000 revolving credit component (the "2010 Revolver") and a $25,000,000 term loan component (the "2010 Term Loan"). The 2010 Credit Agreement also allowed the BSA to request the issuance of letters of credit by JPM (the "2010 Letters of Credit"). The 2010 Revolver was scheduled to mature on March 2, 2020, and the 2010 Term Loan was scheduled to mature on March 2, 2022. Attached hereto is the 2010 Credit Agreement, BSA-PLAN_00374451, Debtors' Ex. JTX 84.

28. As of the Petition Date, pursuant to the 2010 Credit Agreement, the Debtors were indebted to JPM for $25,212,317 in respect of the 2010 Revolver, and $11,250,000 in respect of the 2010 Term Loan. This is reflected in the February 17, 2020 Balance Sheet, BSA-PLAN_00370254, which is attached hereto as Debtors' Ex. JTX 258. As of the Petition Date, the Debtors were also indebted to JPM for $44,299,743 in respect of undrawn 2010 Letters of Credit. This is reflected in the December 31, 2019 Treasury Cash Report, BSA-PLAN_00570696, which

A0057

is attached hereto as Debtors' Ex. JTX 248. At present, the issued but undrawn 2010 Letters of Credit have been reduced to approximately $3.8 million

29.     The Debtors also incurred obligations to JPM under the 2010 Bond Agreement. On November 5, 2010, the BSA and Arrow entered into the 2010 Bond Agreement, pursuant to which the County Commission of Fayette County (West Virginia) (the "Bond Issuer") issued the Series 2010A Bonds and the Series 2010B Bonds, each in the aggregate principal amount of $50,000,000 (collectively, the "Series 2010 Bonds"), the proceeds of which were loaned to the BSA. The loans from the Bond Issuer to the BSA were evidenced by two promissory notes, each executed by the BSA and payable to the order of the Bond Issuer, each in the original principal amount of $50,000,000, and each pledged by the Bond Issuer to JPM to secure the repayment of the Series 2010 Bonds. On November 5, 2015, the BSA repaid the Series 2010A Bonds in full. The 2010B Bonds were scheduled to mature on November 5, 2020. Attached hereto is the 2010 Bond Agreement, BSA-PLAN_00375586, Debtors' Ex. JTX 89.

30.     As of the Petition Date, pursuant to the 2010 Bond Agreement, the Debtors were indebted to JPM for $40,137,274 in respect of the Series 2010B Bonds.

31.     On March 9, 2012, the BSA and Arrow entered into the 2012 Bond Agreement, pursuant to which the Bond Issuer issued the Series 2012 Bonds (the "Series 2012 Bonds") in an aggregate principal amount not to exceed $175,000,000, the proceeds of which were loaned to the BSA. The loans from the Bond Issuer to the BSA were evidenced by a promissory note, executed by the BSA and payable to the order of the Bond Issuer in the principal amount of $175,000,000 and pledged by the Bond Issuer to JPM to secure the repayment of the Series 2012 Bonds. The Series 2012 Bonds were scheduled to mature on March 9, 2022. Attached hereto is the 2012 Bond Agreement, BSA-PLAN_00374668, Debtors' Ex. JTX 106.

A0058

32.     As of the Petition Date, the Debtors were indebted to JPM in the amount of $145,662,101 in respect of the remaining outstanding Series 2012 Bonds.  This is reflected in the February 17, 2020 Balance Sheet, BSA-PLAN_00370254, attached hereto as Ex. JTX 258.

33.     On March 21, 2019, the BSA entered into the 2019 RCF Agreement, with Arrow as a guarantor, pursuant to which JPM agreed to make revolving loans and provide other extensions of credit to the BSA.  The 2019 RCF Agreement is a secured facility with a revolving component (the "2019 Revolver") and a component under which the BSA can request the issuance of letters of credit by JPM, together in a maximum amount not to exceed $71,500,000 (the "2019 Letters of Credit").  The 2019 RCF Agreement was scheduled to mature on March 21, 2020.  Attached hereto is the 2019 RCF Agreement, BSA-PLAN_00374791, Debtors' Ex. JTX 210.

34.     As of the Petition Date, pursuant to the 2019 RCF Agreement, the Debtors were indebted to JPM for $0 in respect of the 2019 Revolver and $61,542,720 in respect of undrawn 2019 Letters of Credit.  This is reflected in the December 31, 2019 Treasury Cash Report, BSA-PLAN_00570696, attached hereto as Ex. JTX 248.  The undrawn 2019 Letters of Credit were required by one of the BSA's insurers in order to secure the BSA's obligations under certain policies.  As of the Petition date, the BSA's obligations under the 2019 Letters of Credit were fully collateralized at 102% of face value by a cash deposit held by JPM, but at present the 2019 Letters of Credit have been drawn down (although the cash collateral has not yet been applied to reduce the loan).

35.     On March 21, 2019, in connection with the 2019 RCF Agreement, the BSA and Arrow also entered into the Prepetition Security Agreement (2019) with JPM.  Pursuant to the Prepetition Security Agreement (2019), the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement

A0059

are secured *pari passu* by the "Collateral", as defined under the Prepetition Security Agreement (2019), pursuant to which the BSA and Arrow granted collateral to JPM, which collateral as of such date included a first-priority lien and security interest in their accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing. Attached hereto is the Prepetition Security Agreement (2019), BSA-PLAN_00375794, Debtors' Ex. JTX 209.

36.     In addition to the Prepetition Security Agreement (2019), the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement are secured *pari passu* by the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, and the Philmont Assignment. Attached hereto are the Florida Sea Base Mortgage, BSA-PLAN_00374990, Debtors' Ex. JTX 214; Florida Sea Base Assignment, BSA-PLAN_00374973, Debtors' Ex. JTX 213; Headquarters Deed of Trust, BSA-PLAN_00375510, Debtors' Ex. JTX 223; Headquarters Assignment, BSA-PLAN_00375192, Debtors' Ex. JTX 217; Northern Tier Mortgage, BSA-PLAN_00375020, Debtors' Ex. JTX 215; Northern Tier Assignment, BSA-PLAN_00375202, Debtors' Ex. JTX 218; Philmont Mortgage, BSA-PLAN_00375050, Ex. JTX 216; and Philmont Assignment, BSA-PLAN_00375215, Debtors' Ex. JTX 219.

37.     Also on March 21, 2019, the BSA executed the Arrow Collateral Assignment, pursuant to which the BSA assigned to JPM, as collateral securing the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond

A0060

Agreement and the 2019 RCF Agreement, its right, title and interest in and to the Arrow Intercompany Note and Arrow Deed of Trust. Attached hereto are the Arrow Collateral Assignment, BSA-PLAN_00373888, Debtors' Ex. JTX 405; Arrow Intercompany Note, BSA-PLAN_00375188, Debtors' Ex. JTX 224; and Arrow Deed of Trust, BSA-PLAN_00069133 at BSA-PLAN_00069151, Debtors' Ex. JTX 81.

38.     On February 3, 2020, in connection with a capital contribution by the BSA to Delaware BSA, the Debtors entered into the Prepetition Security Agreement (2020) with JPM. Pursuant to the Prepetition Security Agreement, Delaware BSA pledged its accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and all proceeds and products of any or all of the foregoing, to JPM as security for the Debtors' prepetition obligations. The Prepetition Security Agreement (2020), BSA-PLAN_00375819, is attached hereto as Debtors' Ex. JTX 257.

39.     Collectively, the Debtors' obligations under the prepetition agreements with JPM discussed above totaled approximately $328,104,155 as of the Petition Date. These outstanding obligations are all secured by the same collateral, which consists of (i) a first-priority lien and security interest in the accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing, of the BSA, Delaware BSA, and Arrow; (ii) a security interest and mortgage in and to (a) the BSA's Headquarters in Texas and (b) certain of the BSA's high adventure facilities,

A0061

including Sea Base in Florida, Philmont in New Mexico, and Northern Tier in Minnesota; and (iii) a collateral assignment of the Arrow Intercompany Note and Arrow Deed of Trust (which grants a security interest and mortgage in and to the Summit in West Virginia).

40. In addition to the secured debt discussed above, the BSA's liabilities also include various unsecured claims, including Abuse Claims (*i.e.*, claims related to alleged Scouting-related Abuse that occurred prior to the Petition Date).

## ASSETS OF THE BSA

41. As restructuring advisor to the BSA, I am familiar with the assets and liabilities of the BSA, including the assets that the BSA regards as being restricted and/or core assets. Under the Plan, the BSA is contributing a number of its assets to the Settlement Trust for the payment of Abuse Claims. The assets that the BSA would retain post-emergence under the Plan, including assets that the BSA regards as being restricted and/or core assets, are reflected in Exhibit E-1 of the Disclosure Statement [D.I. 2294], attached hereto as Debtors' Exhibit JTX 1-34.

## PLAN ECONOMIC FRAMEWORK

42. At the time that the BSA filed for chapter 11 protection, I understand that the BSA was a defendant in approximately 275 lawsuits relating to historical acts of sexual abuse in its Scouting programs in state and federal courts across the United States asserting abuse-related claims against the BSA. Leading up to the filing of the bankruptcy petition, the number of abuse claims had been increasing. I understand the increase coincided with a trend of states' enacting legislation to allow victims of sexual abuse to assert claims that would previously have been barred by applicable statutes of limitations. The increase in the number of abuse claims filed against the BSA placed tremendous financial pressure on the organization. Ultimately, the BSA determined that it could not continue to address abuse litigation in the tort system on a case-by-case basis

17

without jeopardizing its ability to carry out its mission and commenced these chapter 11 proceedings.

43.     From the outset of these proceedings, I understood that the goal for the Debtors, a non-profit organization, has been to (a) provide an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse and (b) ensure that the Reorganized BSA has the ability to continue its vital charitable mission.  As I understood, the Debtors sought to resolve the Abuse Claims related to Scouting through a global resolution with all interested parties, including, among others, the Local Councils and the Chartered Organizations.

44.     Following the Petition Date, the Debtors negotiated with every major creditor constituency in these Chapter 11 Cases to seek a global resolution that would timely and equitably compensate holders of Abuse Claims and enable the Debtors to emerge from bankruptcy with the ability to further the BSA's charitable mission with the support of the Local Councils and Chartered Organizations.  These negotiations led to settlements with all creditor constituencies and these settlements are embodied in the Plan.

45.     I was involved in negotiating a number of provisions of the Plan on behalf of the Debtors and I am familiar with the various economic components thereof.

46.     The Plan provides a framework to maximize distributions to creditors while allowing the BSA to continue to fulfill the mission of Scouting.  The Plan allows for administrative, convenience, and priority expense claims to be paid in full and provides for the assumption of the Pension Plan.  The Plan also provides for full recovery on all JPM related claims by amending and restating JPM's pre-petition secured debt facilities, which include extensions of the maturity dates of the pre-petition facilities ten years post-Effective Date.  In addition, Holders of General Unsecured Claims receive an estimated 75% to 95% recovery through a pro rata share in a $25

18

A0063

million Core Value Cash Pool, payable in four installments over a two-year period after the Effective Date. Holders of Non-Abuse Litigation Claims are estimated a 100% recovery through payment based on available insurance proceeds.

47. Under the Plan, holders of General Unsecured Claims or Non-Abuse Litigation Claims that have an Allowed Claim of $50,000 or less will become Convenience Class Claims, which are paid in full. Holders of General Unsecured Claims or Non-Abuse Litigation Claims that have an Allowed Claim over $50,000 can consent to reduce such Claim to $50,000 or less to become a Convenience Class claimant and have such Claim paid in full.

48. Abuse Claims against the Debtors, Related Non-Debtor Entities, and their Representatives are channeled to the Settlement Trust in exchange for the BSA Settlement Trust Contribution, which includes (among other things) the following:

a. The BSA's Net Unrestricted Cash and Investments (*i.e.*, any excess cash above a threshold which varies by month and after reserving for professional fees and paying administrative and certain other Claims), which shall include the net proceeds of the sale of Scouting University, which equal approximately $1.9 million as well as the net proceeds of the sale of the Warehouse and Distribution Center if it is sold prior to the Effective Date.

b. In addition, if the Warehouse and Distribution Center is sold prior to the Effective Date, the BSA Cash Sharing Amount, if any. If the Effective Date occurs after June 1, 2022, the BSA Cash Sharing Amount shall be an amount equal to 50% of the amount of Unrestricted Cash and Investments to be retained by the BSA in excess of $19 million, capped at $7 million.

A0064

c. If the Warehouse and Distribution Center is not sold prior to the Effective Date, the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to a leaseback agreement with the Settlement Trust.

d. The BSA's right, title, and interest in and to the Artwork listed on Schedule 1 to the Plan which was valued at approximately $59 million (based on a third-party fine arts appraisal prepared by Geolat in 2012).[8]

e. The BSA's interest in the Oil and Gas Interests listed on Schedule 4 to the Plan which were valued at approximately $7.6 million, based on a third-party appraisal prepared in 2020.

f. An $80 million note with a 5.5% interest rate to the Settlement Trust. The BSA Settlement Trust Note is secured by a second lien on cash and certain other current assets of the BSA and has a term of ten years and three months. Annual principal payments begin on the second February 15th following the Effective Date and are a combination of a fixed $4.5 million payment per year plus a variable component based on actual youth membership and HAB attendance each year of the Reorganized BSA, with any balance due at maturity.

g. The BSA and the Related Non-Debtor Entities insurance policies related to Abuse Claims.

h. The Settlement Growth Payment, which is an annual variable payment by Reorganized BSA, commencing the year after the BSA Settlement Trust Note is paid in full and Reorganized BSA's total outstanding debt under the 2010 Bond

---

[8] While the BSA does not own the copyright to all of this artwork, I understand that the Debtors possess title to the artwork. *See* Brown & Bigelow Artwork Agreement, BSA-PLAN_02893153, attached hereto as Debtors' Ex. JTX 36; BSA Artwork Agreement, BSA-PLAN_02893205, attached hereto as Debtors' Ex. JTX 37.

A0065

Documents, 2010 Credit Facility Documents, 2012 Bond Documents, and 2019 RCF Documents or their replacement and the Foundation Loan is less than $225 million in aggregate, based on growth in membership up to the Settlement Growth Payment Cap (*i.e.*, $100 million). Reorganized BSA's obligation to fund the Settlement Growth Payment shall cease upon the earlier of (a) January 1, 2036 or (b) the cumulative payment in Cash in an amount equal to the Settlement Growth Payment Cap. The Local Councils will reimburse Reorganized BSA for 25% of the amount paid to the Settlement Trust pursuant to the Settlement Growth Payment, with the amount to be assessed by Reorganized BSA to the Local Councils based on their share of membership growth. The Settlement Growth Payment will be calculated as (a) 50% of $72 per paid youth member in Scouts BSA or Cubs Scouts at each year-end in excess of 1,500,000 members and (b) 50% of $45 per paid adult volunteer in Scouts BSA or Cubs Scouts at each year-end in excess of 500,000 volunteers.

49. Under the Plan, Abuse Claims against the Local Councils are channeled to the Settlement Trust in exchange for the Local Council Settlement Contribution, which is comprised of the following: (i) at least $300 million of cash; (ii) Unrestricted properties with a combined Appraised Value of $200 million, which shall be reduced on a dollar-for-dollar basis by any cash payment amount in excess the $300 million; (iii) a $100 million interest-bearing variable-payment obligation note (the "<u>DST Note</u>") issued by a Delaware statutory trust;[9] and (iv) their insurance

---

[9] Although the DST Note is in the principal amount of up to $125 million, $25 million of the aggregate $125 million DST Note is being contributed by Local Councils for the benefit of Participating Chartered Organizations.

A0066

rights with respect to any insurance policy which provides or may provide coverage for Abuse Claims.

50.     As consideration for the protections to certain Chartered Organizations, including an extension of the preliminary injunction currently in effect for at least twelve months following the Effective Date, which will afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization, the Local Councils will make an additional payment to the Settlement Trust. Specifically, Local Councils will contribute at least $15 million in additional cash to the Settlement Trust and will increase the DST Note by up to $25 million to a total of $125 million.  To the extent the additional cash payment exceeds $15 million, the DST note will be reduced on a dollar-for-dollar basis.  The Local Councils are also obligated to fund 25% of the Settlement Growth Payment.

51.     In addition to the contributions described above, additional value will be contributed to the Settlement Trust as follows:

     a.  Hartford will contribute $787 million to the Settlement Trust in accordance with the terms of the Hartford Insurance Settlement.  The Hartford Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-356.

     b.  TCJC will contribute $250 million in accordance with the terms of the TCJC Settlement.  The TCJC Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-364.

     c.  Century and the Chubb Companies will contribute $800 million to the Settlement Trust in accordance with the terms of the Century and Chubb Companies

A0067

Insurance Settlement.  The Century and Chubb Companies Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-363.

d.  The United Methodist Entities will contribute $30 million in cash to the Settlement Trust in accordance with the terms of the Methodist Settlement.  The Methodist Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-363.

e.  The Zurich Insurers will contribute $52.5 million to the Settlement Trust in accordance with the Zurich Insurance Settlement.  The Zurich Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-363.

f.  Clarendon will contribute $16.5 million to the Settlement Trust in accordance with the terms of the Clarendon Insurance Settlement.  The Clarendon Settlement Agreement is attached hereto as Debtors' Ex. JTX 1-363.

g.  Participating Chartered Organizations and Contributing Chartered Organizations will contribute their rights in the BSA and Local Council insurance policies with respect to coverage for Scouting-related Abuse Claims.

52.  In addition to the insurance rights discussed above, there is over $2.7 billion of cash and property that is being contributed to the Settlement Trust under the Plan

## THE PLAN HAS BEEN PROPOSED IN GOOD FAITH

53.  As will be described in more detail below, throughout the course of these cases, the Debtors have sought to work with all stakeholders in an attempt to formulate a consensual Plan of reorganization.  These extensive negotiations produced a number of settlements which form the framework of the Plan.  Based on my work on this matter, I believe that the Plan achieves the Debtors' goals of maximizing value for stakeholders while creating a Plan that provides a pathway to a successful reorganization so that the BSA can continue to fulfill the mission of scouting.

A0068

54.     As noted above, the impetus for these Chapter 11 Cases was the burden of Abuse-related litigation filed against the BSA, Local Councils, and/or Chartered Organizations.  The Plan provides a methodology for resolving Scouting-related Abuse Claims against the Debtors as well as the Local Councils and Chartered Organizations that assist the Debtors in carrying out the mission of scouting.  The Plan positions the Debtors to continue operating as a going concern, while avoiding the costs, risks, uncertainty, and delay associated with protracted litigation of Abuse Claims.  The Plan also establishes certain agreed upon, go-forward parameters for the Debtors' operations, including continued youth protection programs, that would help bolster the BSA's charitable mission.

55.     The Plan is the product of two years of arm's-length negotiations and mediation among the Debtors, JPM, the Creditors' Committee, the TCC, the Coalition, the FCR, Insurance Companies, Chartered Organizations, and numerous other stakeholders and creditor constituencies.  These negotiations were challenging, oftentimes contentious, and in some cases, futile and did not yield fruitful settlements.  Nonetheless, the Plan contains a series of compromises that represent a good faith effort to achieve consensual resolution, maximize recoveries for creditors, resolve Scouting-related Abuse Claims as a whole, and provide recoveries for abuse survivors through the Settlement Trust.  In turn, the Plan will allow the Debtors to continue carrying out their charitable mission for many more decades to come.

56.     Third, the majority of the core creditor constituencies and the overwhelming majority of abuse survivors in these Chapter 11 Cases support confirmation of the Plan.  That the Plan has garnered such significant support amongst creditor constituencies supports the conclusion that the Plan exhibits a fundamental fairness in dealing with the creditors.

A0069

## THE JPM / CREDITORS' COMMITTEE SETTLEMENT

57.     Since 2020, I personally participated in hundreds of hours of mediation involving various parties, including, among others, the Plaintiff Representatives, the AHCLC, the Debtors' insurers, JPM, the TCJC, the Roman Catholic Ad Hoc Committee, the United Methodist Ad Hoc Committee, and the Creditors' Committee.

58.     Following the Petition Date, the Creditors' Committee, the TCC, the FCR and all other parties in interest, pursuant to the terms of the Cash Collateral Order [D.I. 433], attached hereto as Debtors' Ex. JTX 1-11, had the opportunity to investigate and seek standing to bring a Challenge Proceeding (as defined in the Cash Collateral Order) against JPM, which could include, among others, a challenge to the collateral securing the Debtors' prepetition credit facilities with JPM.  In connection with the third extension of the Challenge Period (as defined in the Cash Collateral Order) to December 31, 2020 (D.I. 1550), the Creditors' Committee, the TCC, and the FCR raised with JPM and the Debtors certain potential challenges with respect to the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement, including JPM's security interest in the Arrow Intercompany Note, which is secured by a deed of trust on the Summit.  The Challenge Period was subsequently extended by agreement through and including March 12, 2021 (D.I. 1883, 1945, 1989, 2161, 2265).

59.     I participated in discussions between and among the Debtors, JPM, and the Creditors' Committee.  With the active assistance of the Court-appointed Mediators, these parties engaged in lengthy, extensive, good faith and arm's length negotiations.  These parties were represented in these negotiations by experienced counsel and advisors.  As the Debtors' financial adviser, I advised the BTF and the NEC on reaching a resolution regarding these potential challenges, and was present during White & Case's presentation to the BTF on February 3, 2021.

A0070

*See* Chapter 11 Update and Strategy: Presentation to BTF, Feb. 3, 2021, BSA-RSA_00000884, attached hereto as Debtors' Ex. JTX 378.  Additionally, the Debtors, JPM, and the Creditors' Committee, with the active assistance of the Court-appointed Mediators, engaged in extensive negotiations to resolve these potential challenges, including during the Challenge Period.

60.     The settlement between the Debtors, JPM and the Creditors' Committee (the "<u>JPM / Creditors' Committee Settlement</u>") was achieved in the context of mediation and was negotiated at arms-length.  On March 1, 2021, the Debtors filed the First Mediators' Report [D.I. 2292], explaining that the Debtors, JPM, and the Creditors' Committee had entered into the JPM / Creditors' Committee Settlement which was reflected in a term sheet attached to the First Mediators' Report [D.I. 2292-1],  attached hereto as Debtors' Ex. JTX 1-33.  The term sheet provides that (a) all JPM debt is to be extended ten years after the Effective Date, (b) no principal payments under the JPM credit facilities will be payable until two years after the Effective Date, (c) JPM is to have allowed claims in the amount of its outstanding debt plus accrued fees and interest as of the Effective Date (to the extent not paid under the terms of the Cash Collateral Order), (d) JPM will be paid an annual Excess Cash Sweep of 25% of the unrestricted cash and investments above $75 million, if applicable, beginning at two years after the Effective Date, (e) JPM retains all liens on existing collateral per all of its credit facilities, (f) JPM credit facilities are to be guaranteed by Arrow, (g) JPM is to be paid an exit fee of 50bps on outstanding debt at the Effective Date, (h) the Foundation Loan is to be established on the Effective Date in an amount, $42.8 million, equal to the appraised value of the Summit, (i) unrestricted cash and investments above $75 million on the Effective Date will be contributed to the Settlement Trust, (j) there shall be a release of the estates' claims and causes of action against JPM, (k) there shall be a release of preference and other avoidance action claims against non-abuse and convenience claims, (l) a $25

26

A0071

million Core Value Cash Pool is established for unsecured creditors to be paid in four equal semi-annual payments beginning six months after the Effective Date, (m) convenience class claims, which are less than $50,000, are to be paid in full on the Effective Date, (n) a Creditor Representative will be appointed, with fees capped at $100,000, to assist with the reconciliation of Non-Abuse General Unsecured Claims, (o) Non-Abuse Litigation Claims will only recover from the Core Value Cash Pool if all other claims are satisfied in full, (p) the Pension Plan shall continue, and (q) the scope of other releases were to be discussed among the Debtors, JPM, and the Creditors' Committee.[10]

61.     After evaluation the merits of the JPM / Creditors' Committee Settlement, I supported and recommended that the NEC approve the JPM / Creditors' Committee Settlement. For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

62.     As described in Section VII of my Updated Expert Report, the JPM / Creditors' Committee Settlement provides significant value to the BSA, the holders of General Unsecured Claims and the holders of Abuse Claims.  For Reorganized BSA, the maturity dates on each component of the JPM debt are extended to ten years from the Effective Date.  Additionally, JPM also agreed to a 24-month amortization holiday with the amortization deferred until maturity.  This amortization holiday, which defers approximately $28 million in principal payments, provides the Reorganized BSA with the liquidity necessary to pay the $25 million Core Value Cash Pool to the General Unsecured Claims, providing the General Unsecured Claims with an estimated recovery

---

[10] The version of the Plan incorporating the JPM / Creditors' Committee Settlement, filed on March 1, 2021 [D.I. 2292], which is attached hereto as Debtors' Ex. JTX 1-33, included, at the request of JPM, a consensual third-party release, which was set forth in Article X.J.4.

A0072

between 75% to 95%. JPM also agreed to maintain the current low interest rate structure, averaging 2.52% with 71% of the JPM debt being at a fixed rate, which reduces the BSA's risk to interest rate increases, and amend the financial covenants.[11] The maturity extensions and the low interest rates allow the Debtors to make a larger contribution to the Settlement Trust than would otherwise be possible. The below schedule illustrates the current and estimated post-emergence maturity dates and interest rates for the JPM secured debt:

### Chart 1 – JPM Debt Schedule

| ($ in millions) | Balance | | | Maturity | | Interest Rates | |
|---|---|---|---|---|---|---|---|
| Debt Facility | Current [3] | Post-Emergence [1][4] | | Current | Post-Emergence [1] | Current | Post-Emergence [1] |
| 2010 Bonds | $ 40 | $ 40 | | 11/5/2020 | 3/31/2032 | 3.22% | 3.22% |
| 2012 Bonds | 146 | 146 | | 3/9/2022 | 3/31/2032 | 2.92% | 2.92% |
| Term Loan | 11 | 11 | | 3/2/2022 | 3/31/2032 | 1.13% | 1.15% |
| Revolver (2010 Facility) | 25 | 64 | | 3/2/2020 | 3/31/2032 | 3.25% | 1.40% |
| 2019 RCF Facility [2] | 35 | - | | 3/21/2021 | 3/31/2032 | 3.25% | 1.40% |
| **Total** | **$ 257** | **$ 261** | | | **Blended Rate** | **2.97%** | **2.52%** |

Footnotes:

1. Assumes a June 30, 2022 Effective Date and variable interest rates remain at current rates.
2. Assumes substantially all outstanding letters of credit are drawn by the Effective Date and funded debt is repaid through the $63 million of outstanding cash collateral.
3. Reflects funded debt outstanding as of December 29, 2021. Current balance is approximately $324 million, based on subsequent letter of credit draws.
4. Post-emergence funded debt balance is now anticipated to be approximately $640,000 higher due to additional letter of credit draws but is still estimated to be approximately $261 million.

63. The JPM / Creditors' Committee Settlement also permits certain junior debt to be issued and paid ahead of the JPM secured debt, specifically allowing for the $42.8 million Foundation Loan to be established on the Effective Date, virtually all of which is paid through

---

[11] On March 2, 2022, the Debtors filed amended versions of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents to reflect minor modifications to certain liquidity covenant levels following negotiations with JPM due to the delay in the expected Effective Date of the Plan [D.I. 9097], attached hereto as Debtors' Ex. JTX 1-451.

A0073

scheduled amortization before the JPM debt matures. Principal and interest payments begin three months after the Effective Date, or twenty-one months prior to the first required principal payments under the JPM secured debt. The Foundation Loan, which provides the BSA with an amount of cash up to the value of JPM's security interest in the Arrow Intercompany Note ($42.8 million), is critical for the Reorganized BSA to fund its operational needs post emergence. *See* Plan, Ex. E, attached hereto as Debtors' Ex. JTX 1-353.

64.     Additionally, the JPM / Creditors' Committee Settlement resolves all issues and objections that could be asserted by the Creditors' Committee with respect to confirmation of the Plan, as well as lien and collateral challenges and all claims or causes of action that might be brought by or on behalf of the Debtors' Estates. The settlement permits increased distributions to holders of Allowed Convenience Claims, Allowed General Unsecured Claims, Allowed Non-Abuse Litigation Claims and Allowed Abuse Claims.

65.     In short, the JPM / Creditors' Committee Settlement was negotiated at arms-length between parties with opposing economic interests. This settlement is a good-faith compromise and settlement of complex disputes that avoids the costs, risks, uncertainty and delay associated with protracted litigation between the Creditors' Committee, Debtors and JPM. I believe that, together with the other benefits provided by the settlement, the $25 million being contributed to the Core Value Cash Pool was a reasonable resolution of any lien challenges because it allowed the BSA to resolve issues with one of the statutory committees and, in tandem with the modifications to the JPM credit facilities, was a reasonable financial resolution of the dispute.

66.     The TCC and FCR did not initially support the JPM / Creditors' Committee Settlement and filed a motion seeking standing to bring certain challenges against JPM that had been included in the previously provided draft complaint (the "TCC/FCR Standing Motion"), D.I.

A0074

2364, attached hereto as Debtors' Ex. JTX 1-411.  Both the Debtors (*see* D.I. 2733, which is attached hereto as Debtors' Ex. JTX 1-51) and JPM (*see* D.I. 2732, which is attached hereto as Debtors' Ex. JTX 1-52) opposed the TCC/FCR Standing Motion.

67.     On May 19, 2021, the Court conducted an initial hearing on the TCC/FCR Standing Motion.  At that hearing, the Court ruled that the TCC/FCR Standing Motion would be adjourned to the date and time of the hearing to consider confirmation of the Plan and the TCC/FCR Standing Motion will be considered on such date following the conclusion of the confirmation hearing.  The ruling was reflected in the Court's order dated May 27, 2021 [D.I. 5073], attached hereto as JTX 1-151.

68.     Following the filing of the TCC/FCR Standing Motion, the Debtors, the TCC, the FCR, and the Coalition sought to resolve these disputes in mediation.  The proposed complaint annexed to the standing motion included five counts. Count 1 alleged that the Arrow Intercompany Note is not a legitimate debt of Arrow to the BSA, that it should be recharacterized as an equity or capital contribution, and that JPM has no allowable claim against Arrow and the Summit is free and clear of any lien or security interest.  Counts 2 and 3 focused on the TCC's and FCR's objections to JPM's liens, security interests, and claims on some or all of the Unencumbered Assets.[12]  Count 4 asserted that JPM failed to perfect its asserted liens, claims, and interests in, certain unperfected assets. This count primarily alleged that cash held in deposit accounts that are maintained by banks other than JPM are unperfected and should not be part of JPM's collateral. Count 5 challenged the prepetition obligations, notably the accrued interest, fees and expenses, which were permitted in the Cash Collateral Order, attached hereto as Debtors' Ex. JTX 1-11.

---

[12] Unencumbered Assets were defined in the standing motion as (a) Goods (including Inventory, Equipment and artwork), (b) General Intangibles (including intellectual property and causes of action), (c) Commercial Tort Claims, (d) motor vehicles and watercraft, (e) membership dues payable to or received by BSA; (f) owned real estate (other than the three high adventure sites); (g) leased real estate; (h) Money; and (i) any insurance policies.

A0075

69.     I actively participated in this mediation with the TCC, FCR, the Coalition and JPM. All parties were advised by sophisticated counsel and financial advisors. Ultimately, all parties agreed to the now expired RSA, which included supporting the JPM / Creditors' Committee Settlement and reflected that JPM would permit the issuance and payment of the $80 million BSA Settlement Trust Note. While the Settlement Trust Note matures ninety days after the JPM debt, there is significant scheduled amortization of the Settlement Trust Note throughout the term of the JPM debt. The first principal payment under the BSA Settlement Trust Note, assuming a March 31, 2022 Effective Date, is February 15, 2024, ahead of JPM's first required principal payment on July 1, 2024. These allowances for creation of junior debt that is paid ahead of JPM have directly benefitted the holders of Abuse Claims. Thus, the terms set forth in the RSA effectively resolved the TCC and FCR's lien challenges. Although the RSA has since expired, these terms are incorporated into the Plan, which is supported by the Creditors' Committee, TCC, FCR and Coalition.

70.     In my opinion, the JPM / Creditors' Committee Settlement and the subsequent allowance by JPM of the Settlement Trust Note have provided significant value to the Abuse Claimants both in absolute terms and in comparison to the potential impact of the claims asserted in the TCC/FCR Standing Motion. As noted above, JPM is gaining a limited amount of additional security in that certain assets, primarily inventory, will be added to JPM's collateral package on the Effective Date. The value of JPM's collateral package; however, remains significantly less than that at the Petition Date and as of September 30, 2021. I note this, because, in addition to the benefits of the settlement discussed above, the settlement also includes JPM's agreement not to seek a diminution-in-value claim if the Plan is confirmed. The following schedule illustrates

A0076

JPM's estimated collateral as of the Petition Date, September 30, 2021, and on the Effective Date (assumed March 31, 2022):

### Chart 2 - Estimated JPM Collateral Position

| ($ in millions) | Footnotes | Petition Date 2/18/2020 | Current 9/30/2021 | Assumed Effective Date 3/31/2022 (10) | Variance vs. Petition Date 9/30/2021 | Est. 3/31/22 |
|---|---|---|---|---|---|---|
| **JPM Security Interest** | | | | | | |
| Unrestricted Liquidity (Cash + Investments) | (1) | $ 189 | $ 150 | $ 49 | $ (40) | $ (140) |
| Pledges Receivable (NPV) - Summit | (2) | 30 | 14 | 14 | (16) | (16) |
| Accounts Receivable - Trade & Other | | 13 | 3 | 3 | (9) | (9) |
| Accounts Receivable - Registration Fees | (3) | 39 | 1 | 4 | (38) | (35) |
| _Land & Buildings_ | | | | | | |
| Philmont | (4) | 153 | 153 | 153 | - | - |
| Florida Sea Base | (4) | 29 | 29 | 29 | - | - |
| Northern Tier | (4) | 8 | 8 | 8 | - | - |
| National Headquarters | (4) | 11 | 11 | 11 | - | - |
| Total Land & Buildings | | 200 | 200 | 200 | - | - |
| Vehicles and Boats (NBV) | (5) | 3 | 3 | 3 | 0 | 0 |
| Gross Inventory at High Adventure Bases | (5) | 4 | 4 | 4 | (0) | (0) |
| Arrow Intercompany Note / Summit Value | (6) | 43 | 43 | 43 | - | - |
| Inventory (Supply) | (7) | n/a | n/a | 40 | - | 40 |
| **Total Estimated Value of JPM Security Interest** | | $ 521 | $ 417 | $ 360 | $ (104) | $ (161) |
| Conditional Pledges - Summit (undiscounted) | (8) | 123 | 123 | 123 | 0 | 0 |
| **Total Estimated Value of JPM Security Interest including Cond. Pledges** | | $ 644 | $ 540 | $ 483 | $ (104) | $ (161) |
| **JPM Debt** | | | | | | |
| Funded Debt | (9) | 222 | 257 | 261 | 35 | 39 |
| Undrawn Letters of Credit | (9) | 106 | 71 | 5 | (35) | (101) |
| **Total Debt** | | $ 328 | $ 328 | $ 265 | $ - | $ (63) |
| **JPM Net Security Position - Total Debt including Undrawn LCs** | | | | | | |
| Net Position excluding Conditional Pledges | | $ 193 | $ 89 | $ 95 | $ (104) | $ (98) |
| Net Position including Conditional Pledges | | 316 | 212 | 218 | (104) | (98) |

Footnotes:

1. Petition Date and 9/30/21 amounts reflect current collateral per the Third Amended and Restated Security Agreement. Estimated Effective Date amounts reflect all unrestricted cash and investments including non-Debtor amounts to be part of JPM's collateral package, per the Restated Security Agreement in the Fifth Amended Plan Supplement Notice, dated March 2, 2022 [D.I. 9097], attached hereto as Debtors' Ex. JTX 1-451.

2. The reduction in value is primarily driven by reserves recorded at the end of 2020 for collectability risk on certain pledges.

3. Petition Date amount assumes unpaid registration fees are considered to be accounts receivable. Amount is determined in hindsight based on ultimate collections as it is not known until all membership renewals occur. Estimated 9/30/21 and 3/31/22 amounts reflect unpaid member registration and joining fees based on estimates per the Updated Financial Projections.

4. Reflects amounts based on appraisals for the HABs as of August 2020 and broker opinion of value for HQ. Value is assumed consistent throughout the period as no appraisal is available at the Petition Date or expected emergence date.

5. While the Third Amended and Restated Security Agreement does not include inventory and vehicles generally, the mortgages for Philmont, Florida Sea Base, Northern Tier, and

A0077

National Headquarters include liens for inventory and vehicles on these sites.  Amounts are net book value.

6. Reflects amount based on appraisals / projected sale proceeds per broker opinion of value. While JPM has a lien on the Arrow Note, the intercompany payable is backed by the value of the Summit, which is valued significantly lower. The Arrow intercompany payable was $349 million as of 2/18/20 and $363 million as of 9/30/21.

7. The Restated Security Agreement in the Initial Plan Supplement includes all inventory as JPM's collateral.  Plan Supplement to Modified Fifth Amended Chapter 11 Plan of Reorganization, dated November 30, 2021 [D.I. 7515], attached hereto as Debtors' Ex. JTX 1-303.

8. Conditional pledges related to the Summit are not reflected on the balance sheet as they are not firm commitments.  In addition, many of these are testamentary pledges due on the death of the donor or donor plus spouse and timing of receipt is highly uncertain.

9. Assumes all letters of credit but $5 million are drawn on the Effective Date and partially repaid with the $63 million of cash collateral.

10. A March 31, 2022 Effective Date was assumed for these estimates. As emergence is now estimated to be June 30, 2022, the unrestricted liquidity position as of the Effective Date is estimated to be approximately $20 million lower.  There have been approximately $640,000 of additional letter of credit draws, which will increase the funded debt at emergence and reduce undrawn letters of credit accordingly.

71.     Overall, JPM is providing significant concessions that are, in turn, providing significant direct or indirect benefit to the holders of General Unsecured Claims and Abuse Claims and to the Debtors' Estate.  In my opinion, the JPM / Creditors' Committee Settlement is fair and reasonable to the holders of Abuse Claims, holders of General Unsecured Claims, the Reorganized BSA, and all other parties involved.  Moreover, if the issues resolved by this settlement were instead litigated, I fully expect that JPM would deny and vigorously contest any lien challenge (indeed, JPM has already done that by opposing the TCC/FCR Standing Motion) that could be asserted against JPM pursuant to the terms and conditions of the Cash Collateral Order.  While there is great uncertainty as to whether JPM's liens could be successfully challenged in litigation, any litigation challenging JPM's liens would certainly be expensive, time-consuming, and would require substantial discovery from both JPM and the Debtors.  Indeed, in light of the substantial

A0078

costs and time required to resolve the issues raised in this complicated dispute, it could potentially jeopardize the ability of the BSA to successfully emerge from bankruptcy in a timely fashion, which itself could potentially impede the ability of the BSA to reorganize, jeopardizing recoveries to all creditors. By contrast, the resolution achieved through the JPM / Creditors' Committee Settlement will avoid the costs and uncertainties associated with complex and protracted litigation, and provides substantial value to both the creditors of the Debtors' Estates and the Debtors themselves by preserving the BSA as a going concern and its charitable mission. Further, the resolution achieved through the JPM / Creditors' Committee Settlement will have largely provided what the TCC and FCR sought standing to pursue—namely, increased value for holders of Abuse Claims.

72.    The terms and provisions of the JPM / Creditors' Committee Settlement are incorporated into the Plan.

## THE RESTRUCTURING SUPPORT AGREEMENT

73.    Following the JPM / Creditors' Committee Settlement, in May and June of 2021, the Debtors and certain of their advisors attended eight days of formal in-person mediation sessions with every single official and many of the major creditor constituency in these Chapter 11 Cases, including the TCC, the Coalition, the FCR, the Creditors' Committee, JPM, and the AHCLC, all sophisticated parties. These mediation sessions were held on (i) May 26–27, 2021 in New York, (ii) June 2–3, 2021 in Chicago, and (iii) June 7–10, 2021 in New York. I attended each of these meetings in an attempt to agree upon the terms of a plan of reorganization that would provide for agreed-upon treatment of Abuse Claims that would have the support of a substantial number of Abuse Survivors. The mediation parties were represented by experienced counsel and advisors and engaged in lengthy, extensive, good faith and arm's length negotiations.

A0079

74.     As the Debtors' financial adviser, I participated in negotiations and advised the BTF and NEC regarding the settlement discussions, including during presentations to the BTF by A&M on June 21, 2021, and to the NEC by BSA leadership and A&M on June 22, 2021.  *See* Presentation by AM to BTF (Financial Update Reflecting Third Amended Plan), dated June 21, 2021 BSA-RSA_00000838, attached hereto as Debtors' JTX 557; Presentation by AM to NEC (Local Council Trust Contribution), dated June 22, 2021, BSA-RSA_00001397, attached hereto as Debtors' Ex. JTX 562; Minutes: NEC Special Meeting, dated Jun. 22, 2021, BSA-RSA_00000938, attached hereto as Debtors' Ex. JTX 561.

75.     Ultimately, the negotiations resulted in a proposed resolution with every official and/or major creditor constituency representing abuse survivors in these Chapter 11 Cases.  The material terms of this proposed resolution were set forth in the RSA and the Term Sheet appended thereto.  RSA, dated July 1, 2021 [D.I. 5466-2], attached hereto as Debtors' Ex. JTX 1-159.  The RSA provided for the Plaintiff Representatives' agreement to support an amended plan of reorganization that provided substantial value from the Debtors and the Local Councils.  Under the RSA, the Debtors agreed to make the BSA Settlement Trust Contribution, which, at that time, was comprised of (i) all of the Debtors' Net Unrestricted Cash and Investments; (ii) the BSA Settlement Trust Note, in the principal amount of $80 million; (iii) the BSA's right, title and interest in and to the Artwork, valued at approximately $59 million; (iv) all of the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to the Leaseback Requirement or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value (valued at approximately $11.6 million); (v) the BSA's right, title and interest in and to the Oil and Gas Interests (valued at approximately $7.6 million); (vi) the net proceeds of the sale of Scouting University, which equal approximately $1.9 million; in addition

A0080

to other rights.[13]  In addition, the AHCLC and its members agreed to use reasonable efforts to persuade Local Councils to contribute the following aggregate amounts to the Settlement Trust: (i) at least $300 million of cash; (ii) Unrestricted properties with a combined Appraised Value of $200 million, which shall be reduced on a dollar-for-dollar basis by any cash payment amount in excess of $300 million; (iii) a $100 million interest-bearing variable-payment obligation note (the "DST Note") issued by a Delaware statutory trust; and (iv) their insurance rights with respect to any insurance policy which provides or may provide coverage for Abuse Claims.[14]  Ultimately, each Local Council signed a letter of intent to contribute the settlement amounts allocated thereto under the Local Council Allocation Model.[15]  As noted above, the JPM / Creditors' Committee Settlement was also incorporated into the Plan that the TCC, Coalition, FCR, Creditors' Committee and AHCLC agreed to support in connection with the RSA, along with the Settlement of Restricted and Core Asset Disputes, which is discussed below.

76.     On April 15, 2021, the BSA entered into a Settlement Agreement and Release with Hartford Accident and Indemnity Company and others that was attached to the Second Mediators Report dated April 16, 2021 (D.I. 2624).  The RSA required the Debtors to seek a determination of the Bankruptcy Court that they have no obligations under the Initial Hartford Settlement.[16]

---

[13] RSA, dated July 1, 2021 [D.I. 5466-2, at 2-5], attached hereto as Debtors' Ex. JTX 1-159.

[14] RSA, dated July 1, 2021 [D.I. 5466-2], attached hereto as Debtors' Ex. JTX 1-159.

[15] As of the date of the Disclosure Statement, each Local Council had submitted a non-binding letter of intent reflecting each Local Council's intent to contribute the amounts listed in Exhibit C to the Disclosure Statement. *See* Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, dated September 30, 2021 [D.I. 6445], attached hereto as Debtors' Ex. JTX 1-296, at 6. A form of the non-binding letter of intent is provided in Exhibit B to the Disclosure Statement.

[16] RSA, dated July 1, 2021 [D.I. 5466-2, at 13], attached hereto as Debtors' Ex. JTX 1-159.

A0081

77.     The RSA was negotiated at arms-length between parties with opposing economic interests.  Based on my work on this matter, the Debtors' advisors met many times with the BTF and the NEC to provide legal and financial advice, in addition to providing updates on the negotiations, to evaluate the merits of the RSA.  This information included the June 21, 2021 presentation by A&M to the BTF, and the June 22, 2021 presentation by BSA leadership and A&M to the NEC.  *See* Presentation by AM to BTF (Financial Update Reflecting Third Amended Plan), dated June 21, 2021, BSA-RSA_00000838, attached hereto as Debtors' Ex. JTX 557;  NEC Special Meeting Minutes, dated June 22, 2021, BSA-RSA_00000938,  attached hereto as Debtors' Ex. JTX 561.

78.     I believed that the RSA was in the best interests of the Debtors' estates and their creditors and recommended to the BTF and NEC that the Debtors agree to the terms of the RSA. The RSA provided a framework for achieving the Debtors' goals of equitably compensating abuse survivors and continuing their charitable mission while providing a viable path to confirmation, and represented a reasonable settlement and compromise of the Restricted Asset Litigation, the JPM lien challenges, and the Local Council Settlement Contribution.

79.     On July 1, 2021, the Debtors' moved to approve the RSA.

80.     The Bankruptcy Court granted the motion to approve the RSA in part but declined to make the Debtors' requested determination with respect to the Initial Hartford Settlement.  The RSA expired by its terms on August 27, 2021.  However, the material terms and provisions of the term sheet attached to the RSA—such as contributions by the Debtors and the Local Councils (with some modifications, as discussed below)—are incorporated into the Plan.

## SETTLEMENT OF RESTRICTED AND CORE ASSETS DISPUTE

81. As a non-profit entity, the Debtors believe that certain property listed on the BSA's balance sheet (the "Identified Property") is subject to donor restrictions, held in endowments and/or in a charitable trust, and is legally protected under applicable laws governing charities and other non-profit organizations as assets that are core to the mission of scouting. The Debtors asserted that the Identified Property is not available to satisfy certain Claims against the Debtors. The Debtors prepared a schedule of the property the Debtors intend to retain after the Effective Date that specifically delineates such property as Identified Property or property of the Estate (the "Retained Property List"). The Retained Property List is appended to the Financial Projections attached as Exhibit E-1 of the Disclosure Statement. Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, dated September 30, 201 [D.I. 6445], attached hereto as Debtors' Ex. JTX 1-296.

82. The largest components of the Identified Property are: (a) cash and investments that are subject to donor restrictions and estimated to be approximately $133[17] million as of December 31, 2021 (the "Restricted Cash and Investments") and (b) the HABs. There are a minimal amount of other restricted assets that primarily include pledges receivables. The largest component of the Restricted Cash and Investments (the "CEF Funds") has been held since 2008 in the Endowment Fund. The CEF Funds consist of restricted donations, such as endowments. The BSA and various Local Councils contribute restricted funds to the Limited Partnership as capital contributions and in return receive a *pro rata* share of units in the Limited Partnership ("Partnership Units"). Thus,

---

[17] For ease of reference, the Restricted Cash and Investments are reflected as of December 31, 2021. *See* Exhibit E-1 to the Disclosure Statement, attached as Debtors' JTX Ex. 1-296.

A0083

the BSA owns units in the partnership, not the property owned by the partnership. The Partnership Units are separate, identifiable and have not been commingled.

83.     From the outset of these proceedings, the TCC focused on the restrictions on the Debtors' assets. The TCC argued that the Identified Property may be used to satisfy Abuse Claims against the Debtors and, on January 8, 2021, the TCC filed a complaint commencing an adversary proceeding[18] seeking a determination that the Identified Property is not subject to legal restrictions and should be used to satisfy Abuse Claims (the "Restricted Assets Adversary"). The Restricted Assets Adversary sought declaratory relief that (i) bank account cash is unrestricted property, (ii) the LC Collateral is unrestricted property, (iii) the General Investment Funds are unrestricted property, (iv) the Order of the Arrow Investments are unrestricted property, (v) restrictions on the HABs are avoidable, (vi) the HABs are unrestricted property, (vii) the Donor Restricted Pledges Receivable are unrestricted property, (viii) the Miscellaneous Summit Assets are unrestricted property, (ix) the Gift Annuities and Pooled Income Investments are unrestricted property, and (x) the note receivable from Arrow is unrestricted property. As the HABs and LC Collateral are the subject of JPM's security interests discussed above, which would prevent unsecured creditors from receiving value from the HABs and LC Collateral even if they were found to be unrestricted (or assets that were not core to the mission of the BSA), much of the focus for this dispute has been on the Restricted Cash and Investments. In addition, it is worth noting that the Order of the Arrow Investments that were subject to challenge in the Restricted Asset Adversary were also treated as unrestricted assets.

---

[18] The Complaint commencing the Restricted Assets Adversary is Complaint and Exhibit B listing of Identified Property, dated January 8, 2021, Adv. Pro. No. 21-50032 [Adv. Proc. D.I. 1], attached hereto as Debtors' Ex. JTX 4-1.

A0084

84.     As the Debtors' financial adviser, I advised the NEC and BTF in connection with this dispute.  Additionally, the Debtors, the Coalition, the TCC, and FCR, with the active assistance of Court-appointed Mediators, subsequently engaged in lengthy, extensive, good faith and arm's length negotiations to resolve the dispute.  In connection with the negotiation of the RSA, these sophisticated parties were represented in these negotiations by experienced counsel and advisors. I personally participated in these negotiations.

85.     After months of mediation, the Debtors, the Coalition, the TCC, and FCR ultimately reached a settlement of the Restricted Assets Adversary which was first embodied in the RSA, which expired by its own terms on August 27, 2021, and then incorporated into the Plan, which is now supported by all major claimant constituencies.[19]

86.     As a proposed compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the Restricted Assets Adversary (the "Settlement of Restricted and Core Asset Disputes"), the Debtors agreed, among other things, to reduce the minimum amount of Unrestricted Cash and Investments that the Reorganized BSA will retain on the Effective Date from $75 million to $25 million (subject to potential variance as set forth in Article V.M of the Plan).  The $50 million concession was funded by the Debtors' agreement to use $50 million of Restricted Cash and Investments (out of the approximately $133 million[20] of the Debtors' total restricted cash and investments) in accordance with the underlying donor restrictions during 2022 and 2023, allowing the Debtors to emerge with

---

[19] See RSA, dated July 1, 2021 [D.I. 5466-2, at 8], attached hereto as Debtors' Ex. JTX 1-159.  As a result of reaching a settlement, on July 16, 2021, the Court approved a stipulation with the TCC staying the Restricted Assets Adversary pending the outcome of the confirmation hearing.  See Order Approving Stipulation Staying, dated Jul 16, 2021, Adv. Pro. No. 21-50032 (Bankr. D. Del. 2021 July 16, 2021) [Adv. Pro. D.I. No. 42], attached hereto as Debtors' Ex. JTX 4-3.

[20] See Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, dated September 30, 2021 [D.I. 6445], attached hereto as Debtors' Ex. JTX 1-296, Ex. E-1.

A0085

a lower balance of unrestricted cash and investments. As further consideration in connection with the Settlement of Restricted and Core Asset Disputes, the Debtors have agreed under the Plan to: (i) fund the Core Value Cash Pool, in the amount of $25 million; and (ii) make the BSA Settlement Trust Contribution, including the $80 million Settlement Trust Note.

87. After evaluation the merits of the Settlement of Restricted and Core Asset Disputes, I supported and recommended that the NEC approve the Settlement of Restricted and Core Asset Disputes, and make the BSA Settlement Trust Contribution to resolve the Restricted Asset Adversary. For the reasons discussed below, I believe that the Settlement of Restricted and Core Asset Disputes is in the best interests of the Debtors' estates and their creditors.

88. As described in Section VIII of my Updated Expert Report, in my opinion, the Settlement of Restricted and Core Asset Disputes is fair and reasonable. First, the resolution was achieved in the context of a hard fought negotiation between sophisticated parties with adverse interests who were represented by experienced counsel and financial advisors. In connection with the dispute, the Debtors reviewed and produced significant amounts of information related to the restrictions on the assets, some of which were donated decades ago.

89. Second, the Plan incorporates a settlement of this issue in which the Debtors agreed to use $50 million of Restricted Cash and Investments (out of approximately $133 million of the Debtors' total restricted cash and investments as of December 31, 2021) in accordance with the underlying donor restrictions during 2022 and 2023 allowing the BSA to emerge from bankruptcy with a correspondingly lower balance of unrestricted cash and investments. While the passage of time has eaten into some of the direct benefit of this settlement in terms of cash that will go to the Settlement Trust, this settlement still benefits Abuse Claimants by providing needed liquidity to

the Reorganized BSA to achieve a feasible business plan which requires capital to service the $80 million Settlement Trust Note.[21]

90.     Third, the Debtors believe that the Identified Property is restricted or otherwise unavailable for distribution to creditors of the Debtors' Estate as these assets are core to the estate. There is no guarantee that a litigated result would yield a better result for creditors of the estate. Litigating this dispute would require extensive and burdensome discovery and expert analysis that would consume substantial resources of the estate, including the legal and expert fees of both the TCC and the Debtors, with an uncertain outcome for creditors.  In addition, if this matter were litigated, the time it would take to reach a determination on the issue of the restricted assets could potentially delay the Debtors' ability to emerge from bankruptcy in a timely fashion, threatening the Debtors' ability to reorganize which could also jeopardize the recoveries of creditors.  The settlement incorporated in the Plan avoids the burden and expense of litigation and removes an impediment to the Debtors successful and timely emergence from bankruptcy, while simultaneously providing significant benefits to creditors of the estate.  For the reason identified above, I believe that the settlement of the restricted asset litigation is in the best interests of the Debtors' estate and its creditors.

91.     The terms and provisions of the Settlement of Restricted and Core Asset Disputes are incorporated into the Plan which is now supported by, among others, the TCC.

---

[21] I have reviewed the original donation documents related to a significant portion of the Restricted Cash and Investments to confirm that they contained language from the donor limiting the use of the funds and/or the income derived from the funds. While many of the documents do allow for the donated funds to be used for purposes such as the operations of the BSA, I do not believe the payment of Abuse Claims falls within the donor intent. I have also reviewed the total cash and investment balance of the BSA since 1974 and am able to confirm that, in aggregate, the cash and investment balance of the BSA exceeded the aggregate of net restricted assets as reported in the audited financial statements at each year end. (Note prior to 1974, the audited financial statements do not reflect a breakout of net restricted assets.) The Restricted Cash and Investments have been held in segregated accounts for a number of years and I believe the analysis I did perform appropriately approximates the lowest intermediate balance test courts have looked to when there were questions on the proper segregation of assets.

A0087

## THE HARTFORD INSURANCE SETTLEMENT

92.     During my work on this case, I came to learn that the BSA and the Local Councils historically purchased primary, umbrella, and excess general liability insurance policies from Hartford, and sought defense and indemnity from Hartford under these policies in connection with lawsuits where the underlying plaintiffs alleged that they were sexually abused while participating in BSA programs.  Prior to and continuing during these Chapter 11 Cases, disputes arose as to whether and the extent to which Hartford has coverage obligations for such lawsuits.  Hartford alleged, among other things, that (i) the BSA failed timely to provide notice of certain lawsuits to Hartford; (ii) all abuse claims arise out of a single occurrence, such that Hartford would only need to pay the single per-occurrence limit of each policy; (iii) the BSA has not cooperated in the defense of certain lawsuits and has not sought Hartford's consent to settle certain lawsuits; (iv) the BSA extinguished certain of its coverage through a prepetition settlement; (v) the BSA has no coverage for time-barred claims; and (vi) certain policies are subject to aggregate limits.

93.     Despite the fact that the BSA and Hartford were already litigating these coverage disputes in an action pending in Texas state court, on May 15, 2020, Hartford filed an adversary proceeding[22] seeking a declaratory judgment that would resolve the disputes between the Debtors and Hartford.

94.     I participated in mediation discussions between and among the Debtors, Hartford, the Plaintiff Representatives, and the AHCLC to resolve these disputes.  With the active assistance of the Court-appointed Mediators, these parties engaged in lengthy, extensive, good faith and arm's length negotiations.  These sophisticated parties were represented in these negotiations by

---

[22] *Hartford Accident and Indemnity Company et al. v. Boy Scouts of America et al.*, Adv. Pro. No. 20-50601 (LSS), attached hereto as Debtors' Ex. JTX 3.

A0088

experienced counsel and advisors. As the Debtors' financial adviser, I advised the NEC and the BTF on reaching a resolution regarding these disputes, including during a presentation to the NEC on August 22, 2021, a presentation to the NEC on September 2, 2021, and a presentation to the NEC on September 9, 2021. *See* Chapter 11 Update and Strategy: Presentation to BSA NEC, dated Sept. 2, 2021, BSA-PLAN_01028570, attached hereto as Debtors' Ex. JTX 1920; Chapter 11: Hartford & Other Updates: Presentation to BSA NEC, dated Sept. 9, 2021, BSA-PLAN_01025522, attached hereto as Debtors' Ex. JTX 1921.

95.     The settlement between the Debtors, the AHCLC, the Coalition, the FCR, State Court Counsel, and Hartford (the "Hartford Insurance Settlement") was achieved in the context of mediation and was negotiated at arms-length. On September 14, 2021, the Debtors filed the Sixth Mediators' Report [D.I. 6210], regarding the Hartford Insurance Settlement and attached a term sheet attached as an exhibit thereto. The terms of the Hartford Insurance Settlement were finalized in the Settlement Agreement and Release, dated February 14, 2022 [D.I. 8816-1], attached hereto as Debtors' Ex. JTX 1-356.

96.     The Hartford Insurance Settlement provides for a total contribution of $787 million to the Settlement Trust by Hartford (the "Hartford Insurance Settlement Contribution") in exchange for treatment of Hartford as a Settling Insurance Company under the Plan, including all benefits afforded Protected Parties with respect to the Channeling Injunction that is provided in the Plan. Under the terms of the Hartford Insurance Settlement, on the Effective Date, Hartford will make the Hartford Insurance Settlement Contribution in the following manner: (i) pay $137 million to the Settlement Trust (the "Initial Payment") and (ii) transfer $650 million into an interest-bearing escrow account (the "Additional Payment"), which shall be released to the Settlement Trust on the Release Date (defined in the Hartford Insurance Settlement to mean the

date on which the Confirmation Order shall become final and no longer subject to any further appeal or petition for rehearing or *certiorari*).

97.     Under the terms of the Hartford Insurance Settlement, the Hartford Policies will be sold by the Debtors and their estates to Hartford, free and clear of all interests of the estates and any person or entity other than the estates.

98.     Upon the Release Date, the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling Insurance Companies, the FCR, the Coalition, and the Settlement Trust (the "Releasing Parties") shall release Hartford from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) coverage for Abuse Claims under any other insurance policies issued by Hartford; (3) the types of claims listed in the Insurance Actions definition in the Plan and other Claims related to Hartford's performance of its obligations under any Hartford Policy or other insurance policy that covers Abuse Claims; (4) the Debtors' Chapter 11 Cases and related proceedings; (5) Abuse Claims; (6) any alleged right or interest in any Hartford Policy or any other insurance policy issued by Hartford providing coverage for Abuse Claims; (7) any extra-contractual claims related to actions or omission occurring prior to the Effective Date related to any Abuse Claims or any insurance policy issued by Hartford concerning the Debtors or Scouting, (8) the 2010 BSA-Hartford Settlement Agreement, and (9) the 2011 BSA-Hartford Settlement Agreement; subject to certain limitations. In addition, and simultaneously with Hartford's making the Initial Payment, the Debtors shall release Hartford from any claims that have been or could have been asserted against Hartford for payment of defense and indemnity costs allegedly owed as of the Petition Date.

99.     Under the Plan, Hartford will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set

A0090

forth in Article X.F of the Plan and (b) the Releases and related Injunction set forth in Articles X.J and Article X.L of the Plan, including the Scouting-Related Release set forth in Article X.J.3.

100. In addition, Hartford will be granted a $2 million administrative expense claim.

101. Further, Hartford will have the right to an additional administrative expense claim of $23,610,000 in the event that the Debtors (1) exercise a Fiduciary Out; (2) fail to seek confirmation of the Plan or the entry of the Confirmation Order or Affirmation Order, or to seek to have the Plan Effective Date occur; or (3) fail to take all reasonable actions to defend confirmation of the Plan against any appeals or other challenges. This $23,610,000 administrative expense claim shall be in addition to the $2 million administrative expense claim discussed above.

102. I participated in several meetings with the NEC at which the Hartford Settlement was discussed, including the August 22, 2021, September 2, 2021, and September 9, 2021 NEC meetings. During these meetings, the NEC was provided with financial and legal advice concerning the Hartford Insurance Settlement.

103. After evaluating the merits of the Hartford Insurance Settlement, I supported and recommended that the NEC approve the Hartford Insurance Settlement. For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

104. I believe the Hartford Insurance Settlement, and the amount of the Hartford Insurance Settlement Contribution, was reasonable because it was agreed to in arm's-length negotiations between sophisticated parties with opposing economic interests. Moreover, the Hartford Insurance Settlement increased the amount of the contribution as compared to the Initial Hartford Settlement, and resolved the issues left open with respect to the Initial Hartford Settlement. Further, Hartford had raised coverage defenses in litigation that, if successful, would substantially reduce or even eliminate coverage. The settlement will avoid the costs, risks,

A0091

uncertainty and delay associated with protracted litigation between the Debtors and Hartford, is a good faith compromise of complex insurance disputes, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.

105.    In addition, in considering whether the Hartford Insurance Settlement is reasonable, I considered the fact that the FCR—which represents holders of Future Abuse Claims in these Chapter 11 Cases—and the Coalition—an ad hoc committee of approximately 18,000 abuse survivors, represented by law firms who I understand collectively represents more than 63,000 childhood sexual abuse survivors in these Chapter 11 Cases—supported the settlement. The settlement is also now supported by the TCC. Thus, all major claimant constituencies now support the Plan, which incorporates the Hartford Insurance Settlement.

106.    As noted above, under the settlement, Hartford will receive the benefit of the releases and injunctions provided in the Plan. *See* Settlement Agreement and Release, dated February 14, 2022 Art. VII [D.I. 8816-1], attached hereto as Debtors' Ex. JTX 1-356. I do not believe that Hartford would be willing to agree to the terms set forth in the Hartford Insurance Settlement, including the monetary contribution that would be provided to the Settlement Trust, absent these provisions. Thus, the releases and injunctions that would benefit Hartford are an essential condition of the Debtors (and the Settlement Trust) receiving the substantial benefits of the Hartford Insurance Settlement.

107.    Any claim relating to abuse occurring during scouting activity that is brought against Hartford would necessarily implicate the BSA. Such claims would likely generate negative publicity concerning the BSA, and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims. Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify

A0092

in such proceedings. The BSA's efforts to address negative publicity and discovery obligations associated with Abuse Claims against Hartford would also potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy. In light of these facts, the releases were important from a go-forward business standpoint. In addition, the releases provided to Hartford are essential to obtain the significant contribution Hartford is providing under the Plan. Without these contributions, the plan of reorganization which is supported by all major creditor constituencies would not be possible.

108.     The terms and provisions of the Hartford Insurance Settlement are incorporated into the Plan.

## THE TCJC SETTLEMENT

109.     Historically, the TCJC and the BSA shared a close and long-standing relationship in Scouting. The TCJC was an important Chartered Organization and partner of the BSA until December 31, 2019, when TCJC concluded its 105-year relationship as a Chartered Organization with all Scouting programs around the world, including the BSA. During this time, Scouting was the official TCJC sponsored program for TCJC young men. Given this 105-year relationship and the high level of involvement and participation by TCJC members in Scouting, TCJC may have a higher share of liability for Abuse Claims than other Chartered Organizations.

110.     For at least a part of the time during which TCJC was a Chartered Organization, I understand that the TCJC shared certain co-insurance rights with the BSA. Specifically, I understand that the TCJC shared certain insurance rights under the BSA's Insurance Policies since 1976, and the TCJC asserts that it is a beneficiary of BSA Insurance Policies issued prior to 1976 and of Local Council Insurance Policies. The TCJC has asserted indemnification claims against

A0093

the Debtors for over $62 million plus unliquidated amounts for Abuse Claims that may be asserted against the TCJC. *See* TCJC Proof of Claim No. 1248, dated November 13, 2020, attached to as Debtors' Ex. JTX 14-14; TCJC Proof of Claim No. 12530, dated November 13, 2020, attached hereto as Debtors' Ex. JTX 323.

111.    I participated in negotiations between and among the Debtors, the TCJC, the Coalition, the FCR, State Court Counsel, the AHCLC, and other mediation parties to resolve among other things, the potential exposure of the TCJC to Abuse Claims.  With the active assistance of the Court-appointed Mediators, these parties engaged in lengthy, extensive, good faith and arm's length negotiations.  These sophisticated parties were represented in these negotiations by experienced counsel and advisors.  As the Debtors' financial adviser, I advised the NEC and the BTF on reaching a resolution with the TCJC and participated in NEC meetings on September 2, 2021 and on September 9, 2021.

112.    The settlement between the Debtors, the TCJC, the Coalition, the FCR, and the AHCLC (the "TCJC Settlement") was negotiated at arms-length.  On September 14, 2021, the Debtors filed the Sixth Mediators' Report , explaining that the Debtors, the TCJC, the Coalition, the FCR, and the AHCLC had entered into the TCJC Settlement which was reflected in a term sheet attached to the Sixth Mediators' Report.  Sixth Mediator's Report, dated September 30, 2021 [D.I. 6210], attached hereto as Debtors' Ex. JTX 1-292.  The terms of the TCJC Settlement were finalized in the TCJC Settlement Agreement and Release, dated February 14, 2022 [D.I.8908-1], attached hereto as Debtors' Ex. JTX 1-364, and are incorporated into the Plan which is also supported by the TCC.

113.    Under the terms of the TCJC Settlement, the TCJC will (i) contribute $250 million to the Settlement Trust and (ii) consent to the waiver, release, and expungement of the TCJC

A0094

Claims and agree not to assert any claim against, among others, the Debtors, Reorganized BSA or the Settlement Trust. The TCJC's contribution will go to pay Abuse Claimants with a claim against TCJC, in addition to a pro rata share of Settlement Trust expenses, unless there are excess funds which will go to other Abuse Claimants. Additionally, on the Effective Date, the TCJC will consent, pursuant to the Plan, to the assignment and transfer by the Debtors, the Local Councils, and any other co-insureds of any and all rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries. *See* TCJC Settlement Agreement and Release, dated February 14, 2022 § II.A [D.I.8908-1], attached hereto as Debtors' JTX Ex. 1-364. The TCJC will further agree to transfer and assign the TCJC Insurance Rights to the Settlement Trust. *See id.* § II.B. In exchange for the TCJC's contributions to the Settlement Trust and other commitments, TCJC will become a Protected Party under the Plan, with all the benefits and protections of the Channeling Injunction, and a Contributing Chartered Organization, with releases from all Abuse Claims. *See id.* § VI.G.

114. Under the terms of the TCJC Settlement, the TCJC's $250 million contribution will be made as follows: (i) on, or as soon as reasonably practicable after, the Effective Date, the TCJC shall deposit $250 million into an escrow account; and (ii) on the date that the Confirmation Order and Affirmation Order become Final Orders, these funds shall be released to the Settlement Trust.

A0095

115.     The TCJC Settlement was negotiated at arms-length between parties with opposing economic interests.  The settlement will avoid the costs, risks, uncertainty and delay associated with protracted litigation, is a good faith compromise of complex disputes between the parties, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.

116.     I was present at meetings where the NEC received legal and financial advice concerning the TCJC Settlement including on September 2, 2021, and on September 9, 2021.  As reflected in White & Case's presentation to the NEC on September 2, 2021, Bates White provided the NEC with an estimation of the value of these claims.  *See* White and Case Chapter 11 Update and Strategy Presentation to BSA National Executive Committee, dated Sept. 2, 2021, BSA-PLAN_01028570, attached hereto as Debtors' Ex. JTX 1920.

117.     After evaluating the merits of the TCJC Settlement, I supported and recommended the NEC approve the TCJC Settlement.  For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

118.     I supported the Debtors' decision to enter into the TCJC Settlement in light of, among other things, the TCJC's potential exposure in connection with Abuse Claims as calculated by Bates White, and the potential defenses that the TCJC may have with respect to such claims. Bates White's analysis reflected in Debtors' Ex. JTX 1920 reflected that the $250 million payment contemplated in the TCJC settlement was reasonable and depending on the value of the Abuse Claims could provide for payment in full under the Plan for Abuse Claims that could be brought against the TCJC.  In addition, I believe the TCJC's $250 million contribution is reasonable because it was agreed to in arm's-length negotiations between sophisticated parties with opposing economic interests. Further, the FCR and the Coalition supported the settlement.  The settlement

A0096

is also now supported by the TCC. Thus, all major claimant constituencies are now supporting the Plan which incorporates the TCJC Settlement.

119.    As noted above, under the settlement, the TCJC will receive the benefit of the releases and injunctions provided in the Plan. *See* TCJC Settlement Agreement and Release, dated Feb. 14, 2022 Art. III.B, Art. IV, Art. VI.G [D.I. 8908-1], attached hereto as Debtors' JTX Ex. 1-364. Based on my involvement in the negotiations, it is my belief that the TCJC would not agree to the terms set forth in the settlement, including the $250 million monetary contribution and the contribution of valuable insurance rights, absent these provisions. Thus, the releases and injunctions that would benefit the TCJC are an essential condition of the Debtors (and their stakeholders) receiving the substantial benefits of the TCJC Settlement.

120.    Any claim relating to abuse occurring during scouting activity that is brought against the TCJC would necessarily implicate the BSA. Such claims would likely generate negative publicity concerning the BSA and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims. Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify in such proceedings. The BSA's efforts to address negative publicity and discovery obligations associated with Abuse Claims against the TCJC would also potentially distract management from their efforts to fulfill the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy. In light of these facts, the releases were important from a go-forward business standpoint. In addition, the releases provided to the TCJC are essential to obtain the significant contributions the TCJC is providing under the Plan. Without these contributions, the plan of reorganization which is supported by all major creditor constituencies would not be possible.

A0097

121.    The terms and provisions of the TCJC Settlement are incorporated into the Plan.

**THE CENTURY AND CHUBB COMPANIES INSURANCE SETTLEMENT**

122.    During my work on these Chapter 11 Cases, I came to learn that the BSA and the Local Councils historically purchased insurance policies from Century and the Chubb Companies, including primary and umbrella policies, and sought defense and indemnity from Century and the Chubb Companies under these policies in connection with lawsuits where the underlying plaintiffs alleged that they were sexually abused while participating in BSA programs. Before and during these Chapter 11 Cases, disputes arose as to whether and the extent to which Century and the Chubb Companies have coverage obligations for such lawsuits. In addition, Century has been an active participant throughout these proceedings, filing numerous objections. *See, e.g.*, Disclosure Statement Objection – Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, dated May 12, 2021 [D.I. 3856], attached hereto as Debtors' Ex. JTX 1-143; Disclosure Statement Objection – Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, dated June 3, 2021 [D.I. 5214], attached hereto as Debtors' Ex. JTX 1-155; Century's Objections to Debtors' Disclosure Statement, dated August 17, 2021 [D.I. 6065], attached hereto as Debtors' Ex. JTX 1-281.

123.    Further, during these Chapter 11 Cases, the Coalition and the FCR raised issues with Century's solvency and ability to pay a significant amount of claims. *See* Objection of the Coalition and the FCR to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof, 2672 D.I.

124.    I participated in mediation between and among the Debtors, Century, the Chubb Companies, the FCR, the Coalition, certain State Court Counsel, and the AHCLC to resolve these

A0098

disputes.  With the active assistance of the Court-appointed Mediators, these parties engaged in lengthy, extensive, good faith and arm's length negotiations.  These sophisticated parties were represented in these negotiations by experienced counsel and advisors.

125.    The settlement between the Debtors, the Future Claimants' Representative, the Coalition, and the AHCLC, Century, and the Chubb Companies (the "Century and Chubb Companies Insurance Settlement") was achieved in the context of mediation and was negotiated at arms-length.  On December 14, 2021, the Debtors filed the Seventh Mediator's Report [D.I. 7745], explaining that the Debtors, Century, the Chubb Companies, the FCR, the Coalition, and the AHCLC had entered into the Century and Chubb Companies Insurance Settlement which was reflected in a term sheet attached to the Seventh Mediator's Report.  The terms of the Century and Chubb Companies Insurance Settlement were finalized in the Settlement Agreement and Release, dated February 14, 2022 [D.I. 8907-1], attached hereto as Debtors' Ex. JTX 1-363 and is incorporated into the Plan.  This settlement is also now supported by the TCC.

126.    The Century and Chubb Companies Insurance Settlement provides for a total contribution of $800 million to the Settlement Trust (the "Century and Chubb Companies Insurance Settlement Contribution") in exchange for treatment of Century and the Chubb Companies as Settling Insurance Companies and Protected Parties under the Plan, including all benefits afford Protected Parties with respect to the Channeling Injunction.  Under the terms of the Century and Chubb Companies Insurance Settlement, Century and the Chubb Companies shall make the Century and Chubb Companies Insurance Settlement Contribution in the following manner: upon the entry of the Confirmation Order by the Bankruptcy Court, Century and/or Chubb shall pay $200 million into an escrow account, with $100 million to be deposited every sixty days thereafter until they have deposited $800 million into the escrow account.  On the Initial Payment

A0099

Date (*i.e.*, the earliest date by which certain conditions are met, including that the Bankruptcy Court has entered the Confirmation Order), $50 million shall be released to the Settlement Trust. The remaining funds shall be disbursed to the Settlement Trust thereafter. The Century and Chubb Companies Policies shall be sold by the Debtors and their Estates to Century and the Chubb Companies free and clear of all interests of any person or entity.

127.    Furthermore, on the Release Date, the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, Limited Protected Parties, other Protected Parties, other Settling Insurance Companies, the FCR, the Coalition, the Settlement Trust, and all such Persons' or Entities' Representatives (the "<u>Releasing Parties</u>") shall release Century and the Chubb Companies from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) any other insurance policy issued by Century and the Chubb Companies covering Claims or Causes of Action for Abuse Claims with respect to such coverage for Abuse Claims; (3) the types of claims listed in the Insurance Actions definition in the Plan and other Claims related to the Century and Chubb Companies Policies and Century's and the Chubb Companies' performance of their obligations thereunder; (4) the Debtors' Chapter 11 Cases and related proceedings; (5) Abuse Claims against the Protected Parties; and (6) any extra-contractual claims related to actions or omissions occurring prior to the Effective Date related to any policy issued by Century and the Chubb Companies concerning the Debtors or Scouting; subject to certain limitations as provided in the Century and Chubb Companies Settlement.

128.    In addition, under the Plan, Century and the Chubb Insurance Companies will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set forth in Article X.F of the Plan and (b) the

A0100

Releases and related Injunction set forth in Articles X.J and Article X.L of the Plan, including the Scouting-Related Release set forth in Article X.J.3.

129.    In connection with my work on this matter, I advised the NEC and the BTF on reaching a resolution regarding these disputes with Century and the Chubb Companies.  I participated in the NEC meeting on November 1, 2021 and the NEC meeting on November 12, 2021.  I also prepared presentations for the NEC on November 21, 2021 and November 22, 2021.  *See* Discussion of Century and Additional Chartered Organization Settlement: NEC Meeting, Nov. 21, 2021, BSA-PLAN_02631397, attached hereto as Debtors' Ex. JTX 973;  Discussion of Century and Additional Chartered Organization Settlement: NEC Meeting, Nov. 22, 2021, BSA-PLAN_02631414], attached hereto as Debtors' Ex. JTX 977.  I was also present at the NEC Meeting on December 12 at which White & Case presented on the Century Settlement. *See* Chapter 11: Century Term Sheet & Other Updates: Presentation to BSA NEC, Dec. 12, 2021, BSA-PLAN_02855027, attached hereto as Debtors' JTX Ex. 1104.

130.    During these meetings, the NEC was presented with information concerning the financial wherewithal of Century in determining the reasonableness of the Century and the Chubb Companies Insurance Settlement, including the fact that Century is in run-off and has a statutory surplus of only $25 million.  *See* KCIC Century Settlement Analysis, Nov. 21, 2021, BSA-PLAN_02631418, attached hereto as Debtor's Ex. JTX 975.

131.    After evaluating the merits of the Century and the Chubb Companies Insurance Settlement, I supported and recommended that the NEC approve the Century and the Chubb Companies Insurance Settlement.  For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

A0101

132.    I believe the Century and the Chubb Companies Insurance Settlement, and the amount of the Century and Companies Insurance Settlement Contribution, was reasonable because it was agreed to in arm's-length negotiations between sophisticated parties with opposing economic interests. In addition, I believe the amount of the Century and the Chubb Companies Insurance Settlement Contribution is reasonable based on the information provided by KCIC. Further, the settlement will avoid the costs, risks, uncertainty and delay associated with protracted litigation between the Debtors and Century and/or the Chubb Companies, is a settlement of complex insurance disputes, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.

133.    Further, I believe that the Century and Chubb Companies Insurance Settlement was reasonable in light of, among other things, (i) the fact that Century and the Chubb Companies have raised defenses that, if successful, would substantially reduce or even eliminate coverage; (ii) coverage litigation would be costly and create significant risk that Century and the Chubb Companies would ultimately pay less than the settlement amount; and (iii) the financial wherewithal of Century, including the fact that Century is in run-off and has a statutory surplus of only $25 million.  Absent the Century and Chubb Insurance Settlement, the Debtors or the Settlement Trust would have been required to litigate and negotiate with Century and Chubb to secure insurance coverage on a case-by-case basis.  Resolving these individual cases would likely have taken many years of negotiation and/or litigation, and required the Debtors to incur significant attorneys' fees, without any guarantee of recovery.  Moreover, even if the Debtors or Settlement Trustee were successful in litigating these matters to conclusion, and secured a judgement greater than $800 million, there is risk that such sums could not be collected in light of Century's present financial condition.  In light of these risks, and the substantial benefit of having secured funds that

A0102

can be readily distributed by the Settlement Trust, I support the Century and the Chubb Companies Insurance Settlement.  Further, in considering whether the Century and the Chubb Companies Insurance Settlement is reasonable, I considered the fact that the FCR and the Coalition supported the settlement.  The settlement is also now supported by the TCC.  Thus, all major claimant constituencies are now supporting the Century and the Chubb Companies Insurance Settlement.

134.    As noted above, under the settlement, the Century and Chubb Companies will receive the benefit of the releases and injunctions provided in the Plan.  *See* Settlement Agreement and Release, dated February 14, 2022 §§ 5, 9 [D.I. 8907-1], attached hereto as Debtors' Ex. JTX 1-363.  I believe that Century and the Chubb Companies would not agree to the terms set forth in the settlement, including the monetary contribution that would be provided to the Settlement Trust, absent these injunctions.  Thus, the injunctions and releases that would benefit Century and Chubb are an essential condition of the Debtors (and the Settlement Trust) receiving the substantial benefits of the Century and Chubb Companies Insurance Settlement.

135.    Any claim relating to abuse occurring during scouting activity that is brought against Century and the Chubb Companies would necessarily implicate the BSA.  Such claims would likely generate negative publicity concerning the BSA and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims.  Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify in such proceedings.  The BSA's efforts to address negative publicity and discovery obligations associated with Abuse Claims against the Century and the Chubb Companies would also potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy.  In light of these facts, the releases were important from a go-forward business standpoint.  In addition, the releases

A0103

provided to Century and the Chubb Companies are essential to obtain the significant contributions these parties are providing under the Plan. Without these contributions, the plan of reorganization which is supported by all major creditor constituencies would not be possible.

136. It should also be noted that the Century and Chubb Companies Insurance Settlement modified the treatment of certain Chartered Organizations under the Plan. Specifically, this settlement provided that all Abuse Claims against a Chartered Organization for which there is insurance issued by a Settling Insurance Company would be channeled to the Settlement Trust. I believe that Century and the Chubb Companies and the other Settling Insurance Companies would not agree to the terms set forth in their respective settlements unless all of these claims were channeled to the Settlement Trust., and that these provisions maximized the contribution provided by Century and the Chubb Companies

137. In addition, the term sheet attached to the Seventh Mediators' Report also contemplated that there would be other changes to the treatment of certain Chartered Organizations—specifically, all Chartered Organizations aside from the TCJC, the United Methodist Entities, the Roman Catholic Entities, and Opt-Out Chartered Organizations—with respect to pre-1976 Abuse Claims for which there was not insurance issued by a Settling Insurance Company. The term sheet contemplated that these claims would be channeled to the Settlement Trust and that, in exchange, the Local Councils would make a contribution to the Settlement Trust on behalf of the Local Councils. This contribution would consist of at least $15 million in additional cash and property and an increase in the DST Note by $25 million to a total of $125 million. This term was modified as part of the TCC Settlement, which is discussed below, and is not part of the final Century and Chubb Companies Insurance Settlement.

A0104

138. The terms and provisions of the Century and Chubb Companies Insurance Settlement are incorporated into the Plan.

## THE METHODIST SETTLEMENT

139. Historically, the United Methodist Entities have been an important group of Chartered Organizations. Following the departure of the TCJC from Scouting, the United Methodist Entities became the largest Chartered Organization group. At present, more than 184,000 BSA youth members are affiliated with United Methodist Entities. Throughout these Chapter 11 Cases, the United Methodist Entities have threatened to disaffiliate with the BSA on the basis that the BSA was not providing them with sufficient protection under the Debtors' plan of reorganization. The Council of Bishops also issued letters to the United Methodist Churches encouraging them, among other things, not to renew their charter agreements. *See, e.g.*, Email from Jeff Hunt to Wendy Kurten *et al.*, dated Aug. 9, 2021, BSA-PLAN_01279330, attached hereto as Debtors' Ex. JTX 725. In addition, on December 2, 2021, the United Methodist Church issued a press release where the UMAHC encouraged individual Methodist churches to vote to reject the BSA's bankruptcy plan. *See* UMC Press Release, *Congregations Encouraged to Vote No on BSA Bankruptcy Plan*, dated Dec. 2, 2021, attached hereto as Debtors' Ex. JTX 1006.

140. During the course of these Chapter 11 Cases, I participated in numerous discussions in mediation between and among the Debtors, the UMAHC, the FCR, the Coalition, and the AHCLC, in an effort to resolve these disputes between the parties. With the active assistance of the Court-appointed Mediator, these parties engaged in lengthy, extensive, good faith and arm's length negotiations. These sophisticated parties were represented in these negotiations by experienced counsel and advisors.

A0105

141.    The settlement between the Debtors, the UMAHC, the FCR, the Coalition, and the AHCLC (the "Methodist Settlement") was achieved in the context of mediation and was negotiated at arms-length.  On December 21, 2021, the Debtors filed the Eighth Mediator's Report [D.I. 7884], which is attached hereto as Debtors' Ex. JTX 1-311, explaining that the Debtors, the UMAHC, the FCR, the Coalition, and the AHCLC had entered into the Methodist Settlement which was reflected in a term sheet attached to the Eighth Mediator's Report.  The terms of the Methodist Settlement, as supplemented in the Addendum to the United Methodist Term Sheet, dated February 14, 2022 [D.I.8907-4], which is attached hereto as Ex. JTX 1-363, are incorporated into the Plan.

142.    The Methodist Settlement requires the UMAHC to recommend to the United Methodist Entities that they collectively contribute $30 million and valuable insurance rights to the Settlement Trust, as well as undertake other commitments.  These other commitments include the UMAHC agreeing to recommend that the General Commission on United Methodist Men continue its ongoing relationship with the BSA, promote scouting, and grow partnerships through scouting ministries at least through the year 2036. Also, the UMAHC recommended to The Council of Bishops that it withdraw its letter encouraging Methodist churches to reject the Plan and will instead encourage all United Methodist Entities to vote to accept the Plan and change any no votes that have already been cast. Additionally, the UMAHC agreed to withdraw the expert report of Melissa Kibler submitted in the Chapter 11 Cases on December 17, 2021 as to the United Methodist Entities.  In addition, "the UMAHC . . . will recommend . . . to the United Methodist Entities that they . . . cooperate with Youth Protections efforts."  D.I. 8907-4 at 3, attached hereto as Debtors' Ex. JTX 1-363.

A0106

143.    The United Methodist Entities will also release any claims or causes of action filed against Settling Insurance Companies for any portion of the United Methodist Settlement Amount to be paid to the Settlement Trust and the Debtors and withdraw all discovery served in connection with the Plan.[23]  In exchange for the United Methodist Entities' contributions to the Settlement Trust and other commitments, the United Methodist Entities will each be a Contributing Chartered Organization and thus Protected Parties under the Plan, and receive all benefits afforded to Protected Parties with respect to the Channeling Injunction, and releases from all Abuse Claims.

144.    The terms of the Methodist Settlement are set forth in Debtors' Ex. JTX 1-311, attached hereto.  To summarize, the United Methodist Entities' $30 million contribution will be made as follows: (i) within 180 days of the Effective Date, the United Methodist Entities shall deposit at least $2 million into an escrow account; (ii) on or before the third anniversary of the Effective Date, the United Methodist Entities shall contribute an additional $25 million into the escrow account; (iii) once a total of $27.5 million has been deposited in the account, and the Confirmation Order has become a Final Order, these funds shall be released to the Settlement Trust; (iv) an additional $2.5 million shall be reserved and not paid into the escrow account, but shall be available to pay for any United Methodist Entity's legal fees, costs, and expenses associated with enforcing and defending the post-confirmation interim injunction and the Channeling Injunction; and (v) on the sixth anniversary of the Effective Date, any amount remaining in the reserve shall be contributed to the Settlement Trust.

---

[23] Some United Methodist entities had asserted (among other things) indemnification claims against the BSA, along with claims arising out of the BSA's alleged obligation to provide Chartered Organizations primary general liability insurance to cover scouting related Abuse Claims. *See e.g.,* First United Methodist Church of Lawrence Proof of Claim No. 9848, attached hereto as Debtors' Ex. JTX 2937.

A0107

145.    In connection with my work on this matter, I advised the NEC and the BTF regarding the Methodist Settlement including in meetings on November 21, 2021, December 12, 2021 and December 20, 2021.  Attached hereto as Debtors' Exs. JTX 973, 1104, and 1113 are A&M's presentation to the NEC on November 21, 2021, and White & Case's presentations to the NEC on December 12, 2021, and December 20, 2021, respectively.

146.    After evaluating the Methodist Settlement, I supported and recommended that the NEC approve the Methodist Settlement.  For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

147.    The Methodist Settlement was negotiated at arms-length between parties with opposing economic interests.  The settlement will avoid the costs, risks, uncertainty and delay associated with protracted litigation, is a good faith compromise of the dispute, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.  In addition, the Methodist Settlement provides significant support for the ongoing mission of Scouting and significantly reduces the risk that Methodist Entities will cease serving as Chartered Organizations. This settlement reduces the risk that the disaffiliation of a large number of Chartered Organizations will negatively impact the Debtors' financial performance.

148.    In addition, the commitment of the United Methodist Entities to support scouting through 2036 was important to maintain the long-term financial stability of the BSA, as it eliminated a risk to the BSA's business plan that would result from the potential disaffiliation from Scouting of the Debtors' largest group of Chartered Organizations, provided a signal of support for the BSA, and would encourage other Chartered Organizations to continue to support the BSA.

149.    I believe it was reasonable for the Debtors' to enter into the Methodist Settlement in light of, among other things, the United Methodist Entities' potential exposure in connection

with Abuse Claims, and the potential defenses that the United Methodist Entities may have with respect to such claims and supported the settlement. Importantly, the United Methodist Entities will not only contribute $30 million and valuable insurance rights to the Settlement Trust, but also continue to support the BSA's mission through at least 2036. The United Methodist Entities commitment to support the BSA through 2036 is important to ensuring a successful reorganization, as the United Methodist Entities constitute the largest group of Chartered Organizations with more than 184,000 BSA youth members affiliated with units chartered by United Methodist Entities. The continued support of the United Methodist Entities eliminates a risk to the Debtors' business plan and increases the likelihood that the Debtors achieve their membership projections (and thus financial projections).

150. In assessing the United Methodist Entities' contribution to the Settlement Trust, I have considered the unique nature of the relationship that the TCJC had with scouting as compared to the United Methodist Entities. As noted above, historically, the TCJC and the BSA shared a close and long-standing relationship in Scouting and the TCJC had been a partner of the BSA until December 31, 2019, when TCJC concluded its 105-year relationship as a Chartered Organization with all Scouting programs around the world, including the BSA. In this respect, the TCJC, unlike the Methodists, required its youth members to participate in scouting and the TCJC operated scouting units as part of their youth ministry. Given the unique relationship between the TCJC and the BSA, and the TCJC's high level of involvement in scouting, it is reasonable to believe that the TCJC would bear a higher share of liability for Abuse Claims than other chartered organizations, such as the Methodists.

151. Moreover, unlike the TCJC, the United Methodist Entities are not highly centralized. The ability to collect against a Methodist Chartered Organization would depend upon

64

the assets of that individual chartered organization. Moreover, I understand that the BSA historically funded the payment of settlement amounts related to Abuse Claims, the United Methodist Entities' $30 million contribution to the Settlement Trust is significant and a departure from the manner in which the BSA has traditionally handled such claims.

152. Further, in considering whether the Methodist Settlement is reasonable, I considered the fact that the FCR and the Coalition supported the settlement. The settlement is also now supported by the TCC. Thus, all major claimant constituencies with an economic interest in maximizing the value of the United Methodist Entities' contribution to the Settlement Trust now support the Plan which incorporates the Methodist Settlement.

153. As noted above, the United Methodist Entities will receive the benefit of the releases and injunctions provided in the Plan. *See* United Methodist Term Sheet [D.I. 7884-1] and Addendum to United Methodist Term Sheet, dated Feb. 14, 2022 § 2 [8907-4], attached hereto as Debtors' Exs. JTX 1-311 and 1-363, respectively. The release that the United Methodist Entities are currently receiving under the Plan[24] for the $30 million payment is incremental to the release that is being offered to Participating Chartered Organizations who are contributing their valuable insurance rights to the Settlement Trust.

154. I do not believe that the UMAHC would agree to the terms set forth in the settlement, including the $30 million monetary contribution, the contribution of valuable insurance rights, and the commitment to continue to support scouting at least through 2036, absent these provisions. Thus, the injunctions and releases that would benefit the United Methodist Entities are an essential condition of the Debtors receiving the substantial benefits of the Methodist Settlement.

---

[24] I note that the scope of the release that is provided to Participating Chartered Organizations under the Plan has been modified from that which was proposed in connection with the Century and the Chubb Companies and Methodist Settlements.

A0110

155.     Any claim relating to abuse occurring during scouting activity that is brought against the United Methodist Entities would necessarily implicate the BSA.  Such claims would likely generate negative publicity concerning the BSA and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims.  Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify in such proceedings.  The BSA's efforts to address negative publicity and discovery obligations associated with Abuse Claims against the United Methodist Entities would potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy.  In light of these facts, the releases were important from a go-forward business standpoint.  In addition, the releases provided to the United Methodist Entities are essential to obtain the significant contributions these parties are providing under the Plan.  Without these contributions, the plan of reorganization which is supported by all major creditor constituencies would not be possible.

156.     I advised the NEC that the releases for the United Methodist Entities were important from a go-forward business standpoint, including because they decrease the risk that the disaffiliation of a large number of Chartered Organizations will negatively impact the Debtors' financial performance

157.     The terms and provisions of the Methodist Settlement are incorporated into the Plan.

## THE ZURICH INSURANCE SETTLEMENT

158.     During my work on this case, I came to learn that the BSA historically purchased excess insurance policies from the Zurich Insurers.  During these Chapter 11 Cases, disputes arose

A0111

as to whether and the extent to which the Zurich Insurers had coverage obligations for Abuse Claims.

159.    I was involved in mediation discussions between and among the Debtors, the Zurich Insurers, the FCR, the Coalition, and the AHCLC to resolve these disputes. With the active assistance of the Court-appointed Mediator, the parties engaged in lengthy, extensive, good faith and arm's length negotiations to resolve these disputes.  These sophisticated parties were represented in these negotiations by experienced counsel and advisors.  As the Debtors' financial adviser, I was also involved in advising and participating in discussions with the NEC and the BTF on reaching a resolution regarding these disputes, including during the NEC meeting on December 20, 2021.

160.    The settlement between the Debtors, the Zurich Insurers, the FCR, the Coalition, and the AHCLC (the "Zurich Insurance Settlement") was achieved in the context of mediation and was negotiated at arms-length.  On December 22, 2021, the Debtors filed the Ninth Mediator's Report [D.I. 7928], attached hereto as Debtors' Ex. JTX 1-312, explaining that the Debtors, the Zurich Insurers and the Zurich Affiliated Insurers, the FCR, the Coalition, and the AHCLC had entered into the Zurich Insurance Settlement which was reflected in a term sheet attached to the Ninth Mediator's Report.  The terms of the Zurich Insurance Settlement were finalized in the Settlement Agreement and Release, dated February 14, 2022 [D.I. 8907-2], which is attached hereto as Debtors' Ex. JTX 1-363.

161.    The Zurich Insurance Settlement provides for a total contribution of $52.5 million to the Settlement Trust by the Zurich Insurers (the "Zurich Insurance Settlement Contribution") in exchange for treatment of the Zurich Insurers and the Zurich Affiliated Insurers as Settling Insurance Companies and Protected Parties under the Plan.  The Zurich Insurers will make the

A0112

Zurich Insurance Settlement Contribution in the following manner: (i) on, or as soon as reasonably practicable after, the Effective Date, the Zurich Insurers shall pay $52.5 million into an escrow account; and (ii) these funds shall remain in the escrow account until the Confirmation Order becomes a Final Order, at which point they shall be released to the Settlement Trust.

162. In addition, on the Effective Date, the Zurich Insurer Policies shall be sold by the Debtors and their Estates to the Zurich Insurers free and clear of all interests of any person or entity.

163. Furthermore, on the Release Date (*i.e.,* the date on which the escrowed funds are released to the Settlement Trust), the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, Limited Protected Parties, other Protected Parties, other Settling Insurance Companies, the FCR, the Coalition, the Settlement Trust, and all such Persons' or Entities' Representatives (the "Releasing Parties") shall release the Zurich Insurers and the Zurich Affiliated Insurers from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) any other insurance policy issued by Zurich Insurers and Zurich Affiliated Insurers covering Claims or Causes of Action for Abuse Claims with respect to such coverage for Abuse Claims; (3) the types of claims listed in the Insurance Actions definition in the Plan and other Claims related to the Zurich Insurers Policies and including the Zurich Insurers' and Zurich Affiliated Insurers' performance of their obligations thereunder; (4) the Debtors' Chapter 11 Cases and related proceedings; (5) all claims alleging Abuse Claims against the Protected Parties; and (6) any extra-contractual claims related to actions or omissions occurring prior to the Effective Date related to any policy issued by the Zurich Insurers and Zurich Affiliated Insurers concerning the Debtors or Scouting; subject to certain limitations.

A0113

164.  In addition, the Zurich Insurers and the Zurich Affiliated Insurers will be Settling Insurance Companies and Protected Parties under the Plan and will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set forth in Article X.F of the Plan and (b) the Releases and related Injunction set forth in Articles X.J and Article X.L of the Plan, including the Scouting-Related Release set forth in Article X.J.3.

165.  I participated in a meeting of the NEC on December 20, 2021 at which the NEC received guidance from White & Case regarding their evaluation of the Zurich Insurance Settlement. In addition, after evaluating the merits of the Zurich Insurance Settlement, I supported and recommended that the NEC approve the Zurich Insurance Settlement.  For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

166.  I believe the Zurich Insurance Settlement, and the amount of the Zurich Insurance Settlement Contribution, was because it was agreed to in arm's-length negotiations between sophisticated parties with opposing economic interests, including the FCR and the Coalition.  The settlement will avoid the costs, risks, uncertainty and delay associated with protracted litigation between the Debtors and the Zurich Insurers and the Zurich Affiliated Insurers, is a settlement of complex insurance disputes, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.

167.  I support the Zurich Insurance Settlement because, among other things, (i) the fact that the Zurich Insurers and the Zurich Affiliated Insurers have raised defenses that, if successful, would substantially reduce or even eliminate coverage; and (ii) coverage litigation would be costly and create significant risk that the Zurich Insurers and the Zurich Affiliated Insurers, if successful, would ultimately pay less than the settlement amount.  Absent the Zurich Insurance Settlement,

A0114

the Debtors or the Settlement Trust would have been required to litigate and negotiate with the Zurich Insurers and the Zurich Affiliated Insurers to secure insurance coverage on a case-by-case basis. Resolving cases on a case-by-case basis would likely have taken many years of negotiation and/or litigation, and required the Debtors (or the Settlement Trust) to incur significant attorneys' fees, without any guarantee of recovery. In light of these risks, and the substantial benefit of having secured funds that can be readily distributed to survivors by the Settlement Trust, in my view the terms of the Zurich Insurance Settlement are reasonable and I support the Zurich Insurance Settlement.

168. Further, in considering whether the Zurich Insurance Settlement is reasonable, I considered the fact that the FCR and the Coalition supported the settlement. The settlement is also now supported by the TCC. Thus, all major claimant constituencies are now supporting the Zurich Insurance Settlement.

169. As noted above, under the settlement, the Zurich Insurers and Zurich Affiliated Insurers will receive the benefit of the releases and injunctions provided in the Plan. *See* Settlement Agreement and Release, dated February 14, 2022 § 4 [D.I. 8907-2], attached hereto as Debtors' Ex. JTX 1-363. The Zurich Insurers would not be willing to agree to the terms set forth in the settlement, including the monetary contribution that would be provided to the Settlement Trust, absent these provisions. Thus, the releases and injunctions that would benefit the Zurich Insurers and the Zurich Affiliated Insurers are an essential condition of the Debtors receiving the substantial benefits of the Zurich Insurance Settlement.

170. Any claim relating to abuse occurring during scouting activity that is brought against the Zurich Insurers and the Zurich Affiliated Insurers would necessarily implicate the BSA. Such claims would likely generate negative publicity concerning the BSA and, at a minimum,

70

require the BSA to expend resources to participate in discovery associated with such claims. Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify in such proceedings. The BSA's efforts to address negative publicity and comply with discovery obligations associated with such abuse claims would also potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy. In light of these facts, the releases were important from a go-forward business standpoint. In addition, the releases provided to the Zurich Insurers and the Zurich Affiliated Insurers are essential to obtain the significant contributions these parties are providing under the Plan. Without such releases, it would not be possible to efficiently maximize the value of such insurance policies. Moreover, the Zurich Insurance Settlement is part of an interconnected set of settlements that culminated with the TCC Settlement, which is the foundation for this Plan which now has the support of every major creditor constituency.

171. The terms and provisions of the Zurich Insurance Settlement are incorporated into the Plan.

## THE CLARENDON INSURANCE SETTLEMENT

172. During my work on this case, I came to learn that the BSA and the Local Councils historically purchased insurance policies from Clarendon. During these Chapter 11 Cases, disputes arose as to Clarendon's potential liability in connection with Abuse Claims.

173. The settlement between the Debtors, Clarendon, the FCR, the Coalition, and the AHCLC (the "Clarendon Insurance Settlement") was achieved in the context of mediation and was negotiated at arms-length. On December 31, 2021, the Debtors filed the Tenth Mediator's Report [D.I. 8095], attached hereto as Debtors' Ex. JTX 1-434, explaining that the Debtors, the FCR, the

A0116

Coalition, and the AHCLC had entered into the Clarendon Insurance Settlement which was reflected in a term sheet attached to the Tenth Mediator's Report. The terms of the Clarendon Insurance Settlement were finalized in the Settlement Agreement and Release, dated February 14, 2022 [D.I. 8907-3], which is attached hereto as Debtors' Ex. JTX 1-363. I summarize the terms of the Clarendon Insurance Settlement below.

174. The Clarendon Insurance Settlement provides for a total contribution of $16.5 million to the Settlement Trust by Clarendon (the "Clarendon Insurance Settlement Contribution") in exchange for treatment of Clarendon as a Settling Insurance Company and Protected Party under the Plan, including all benefits afford Protected Parties with respect to the Channeling Injunction. Pursuant to the Clarendon Insurance Settlement, Clarendon agreed to make the Clarendon Insurance Settlement Contribution in the following manner: on, or as soon as reasonably practicable after, the Effective Date, Clarendon shall (i) pay $2.871 million to the Settlement Trust; and (ii) pay the remainder of the Clarendon Insurance Settlement Contribution into an escrow account, which shall be released to the Settlement Trust on the date that the Confirmation Order becomes a Final Order.

175. In addition, on the Effective Date, the Clarendon Policies shall be sold by the Debtors and their Estates to Clarendon free and clear of all interests of any person or entity.

176. Furthermore, on the Release Date (*i.e,* the date on which the escrowed funds are released to the Settlement Trust), the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, Limited Protected Parties, other Protected Parties, other Settling Insurance Companies, the FCR, the Coalition, the Settlement Trust, and all such Persons' or Entities' Representatives (the "Releasing Parties") shall release Clarendon from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) any other insurance policy issued by Clarendon

A0117

covering Claims or Causes of Action for Abuse Claims with respect to such coverage for Abuse Claims; (3) the types of claims listed in the Insurance Actions definition in the Plan and other Claims related to Clarendon's performance of its obligations thereunder; (4) the Debtors' Chapter 11 Cases and related proceedings; (5) all claims alleging Abuse Claims against the Protected Parties; and (6) any extra-contractual claims related to actions or omissions occurring prior to the Effective Date related to any policy issued by Clarendon concerning the Debtors or Scouting; subject to certain limitations as provided in the Clarendon Insurance Settlement.

177.    In addition, Clarendon will be a Settling Insurance Company and Protected Party under the Plan and will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set forth in Article X.F of the Plan and (b) the Releases and related Injunction set forth in Articles X.J and Article X.L of the Plan, including the Scouting-Related Release set forth in Article X.J.3.

178.    In connection with my work on this matter, I participated in a meeting with the NEC on December 20, 2021 at which White & Case presented information regarding settlement negotiations with Clarendon.

179.    After evaluating the merits of the Clarendon Insurance Settlement, I supported the Clarendon Insurance Settlement.  For the reasons discussed below, I believe that it is in the best interests of the Debtors' estates and their creditors.

180.    The Clarendon Insurance Settlement, and the amount of the Clarendon Insurance Settlement Contribution, was reasonable because it was agreed to in arm's-length negotiations between sophisticated parties with opposing economic interests.  This settlement will avoid the costs, risks, uncertainty and delay associated with protracted litigation between the Debtors and

A0118

Clarendon, is a settlement of complex insurance disputes, and will provide a timely and significant payment to the Settlement Trust on account of Abuse Claims.

181.    I support the Debtors' decision to enter into the Clarendon Insurance Settlement in light of, among other things, the fact that coverage litigation would be costly and create significant risk that Clarendon would ultimately pay less than the settlement amount.  Absent the Clarendon Insurance Settlement, the Debtors or the Settlement Trust would have been required to litigate and negotiate with Clarendon to secure insurance coverage on a case-by-case basis.  Resolving these individual cases would likely have taken many years of negotiation and/or litigation and required the Debtors or the Settlement Trust to incur significant attorneys' fees, without any guarantee of recovery.  In light of these risks, and the substantial benefit of having secured funds that can be readily distributed by the Settlement Trust, I viewed the terms of the Clarendon Insurance Settlement as reasonable.

182.    Further, in considering whether the Clarendon Insurance Settlement is reasonable, it is important to recognize that the FCR and the Coalition supported the settlement.  The settlement is also now supported by the TCC.  Thus, all major claimant constituencies now support the Clarendon Insurance Settlement.

183.    As noted above, under the settlement, Clarendon will receive the benefit of the releases and injunctions provided in the Plan.  *See* Settlement Agreement and Release, dated February 14, 2022 § 4 [D.I. 8907-3], attached hereto as Debtors' Ex. JTX 1-363.  Clarendon would not be willing to agree to the terms set forth in the settlement, including the monetary contribution that would be provided to the Settlement Trust, absent these provisions.  Thus, the releases and injunctions that would benefit Clarendon are an essential condition of the Debtors receiving the substantial benefits of the Clarendon Insurance Settlement.

A0119

184.     Any claim relating to abuse occurring during scouting activity that is brought against Clarendon would necessarily implicate the BSA.  Such claims would likely generate negative publicity concerning the BSA and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims.  Such discovery would likely include producing documents or other information and/or preparing current or former employees to testify in such proceedings.  The BSA's efforts to address negative publicity and discovery obligations associated with Abuse Claims against Clarendon would also potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy.  In light of these facts, the releases provided to Clarendon were important from a go-forward business standpoint.  In addition, the releases provided to Clarendon are essential to obtain the significant contributions that Clarendon is providing under the Plan.  Without such releases, it would not be possible to efficiently maximize the value of such insurance policies.  Moreover, the Clarendon Insurance Settlement is part of an interconnected set of settlements that culminated with the TCC Settlement, which is the foundation for this Plan which now has the support of every major creditor constituency.

185.     The terms and provisions of the Clarendon Insurance Settlement are incorporated into the Plan.

## THE TCC SETTLEMENT

186.     Following the expiration of the RSA on August 27, 2021, the Debtors and the TCC engaged in earnest negotiations over certain disputes including, among other things, the treatment of Chartered Organizations, BSA's contribution to the Settlement Trust, the Local Councils' contribution to the Settlement Trust, and Abuse prevention issues.  Further, the Debtors engaged in joint discussions with the TCC and the Coalition and FCR around both these matters and other

A0120

matters such as governance of the Settlement Trust, the agreements with the Settling Insurance Companies and parameters for future insurance settlements.

187.     As the Debtors' financial adviser, I advised the NEC and the BTF in connection with such disputes, including during the NEC meeting on January 20, 2022 and the BTF meeting on February 6. 2022. I also was also involved in the discussions during White & Case's presentation to the BTF on January 7, 2022, White & Case's presentation to the NEC on January 29, 2022, White & Case's presentation to the NEB on January 31, 2022, and White & Case's presentation to the NEC on February 9, 2022.  *See* Chapter 11 Update, Presentation to NEC. Jan. 29, 2022, BSA-PLAN_02854994, attached hereto as Debtors' Ex. JTX 1229; Chapter 11 Update: Presentation to NEB, Jan. 31, 2022, BSA-PLAN_02854921, attached hereto as Debtors' Ex. JTX 1235; Chapter 11 Update: Presentation to NEC, February 9, 2022, BSA-PLAN_02854935, attached hereto as Debtors' Ex. JTX 1298.  Additionally, the Debtors, the TCC, the FCR, the Coalition, the AHCLC, and the Pfau/Zalkin claimants, with the active assistance of the Court-appointed Mediator, engaged in lengthy, extensive, good faith and arm's length negotiations to resolve these disputes.  These sophisticated parties were represented in these negotiations by experienced counsel and advisors.  I personally participated in many hours of negotiations with the TCC over the course of these Chapter 11 Cases.

188.     Ultimately, the arms-length negotiations that were conducted within the mediation produced a settlement agreement between the Debtors, the TCC, the FCR, the Coalition, the AHCLC, and the Pfau/Zalkin claimants (the "TCC Settlement").  On February 9, 2022, the Debtors filed the Eleventh Mediator's Report [D.I. 8772], attached hereto as Debtors' Ex. JTX 1-350, explaining that the Debtors, the TCC, the FCR, the Coalition, the AHCLC, and the Pfau/Zalkin claimants had entered into the TCC Settlement which was reflected in a term sheet attached to the

Eleventh Mediator's Report [D.I. 8772-1], Debtors' Ex. JTX 1-350.  In exchange for certain agreed upon amendments to the Debtors' plan, the TCC and the State Court Counsel agreed to support the confirmation of the Plan, and to recommend to their clients who voted to reject the Plan that they change their votes to accept the Plan.  Subsequent to the TCC Settlement, on February 15, 2022, the Debtors filed the Plan [D.I. 8813], attached hereto as Debtors' Ex. JTX 1-353, which incorporates the terms of the TCC Settlement, including with respect to the treatment of Chartered Organizations, and the BSA's contribution to the Settlement Trust, among other things.

189.    After evaluating the merits of the TCC Settlement, I supported and recommended that the NEC approve the TCC Settlement.  I believe that it is in the best interests of the Debtors' estates and their creditors.

190.    As per the TCC Settlement, the Plan provides three alternate treatments for Chartered Organizations: (1) Participating Chartered Organization/Limited Protected Party, (2) Contributing Chartered Organization/Protected Party, (3) Opt-Out Chartered Organization. Below I discuss each of these paths.

### Participating Chartered Organization

191.    Unless a Chartered Organization affirmatively chooses to become either an Opt-Out Chartered Organization or a Contributing Chartered Organization, it will become a Participating Chartered Organization and receive certain limited benefits and protections of the Channeling Injunction as a Limited Protected Party. In exchange for (a) all post-1975 Abuse Claims against the Participating Chartered Organizations being channeled to the Settlement Trust and abuse survivors releasing the Participating Chartered Organizations for such claims and (b) all pre-1976 Abuse Claims against Participating Chartered Organizations for which there is insurance issued by a Settling Insurance Company being channeled to the Settlement Trust and abuse

A0122

survivors releasing the Participating Chartered Organizations for such claims, the Participating Chartered Organizations will voluntarily release (a) their rights to any insurance policies issued to the BSA or Local Councils by the Settling Insurance Companies and (b) their rights to coverage for Abuse Claims under any insurance policy issued to the Chartered Organization by a Settling Insurance Company, and the Plan may assign or otherwise provide for the Settlement Trust to sell those policies back to the Settling Insurance Companies.  Participating Chartered Organizations must also assign, among other things, any causes of action against non-settling insurance companies related to Abuse Claims that first occurred on or after January 1, 1976.  Participating Chartered Organizations will retain whatever rights they previously had (to the extent such rights exist) in all pre-1976 BSA and Local Council insurance policies that were not issued by a Settling Insurance Company.  Participating Chartered Organizations will also retain any rights they have under their own insurance policies for claims that are not Abuse Claims or for the non-scouting related portion of a Mixed Claim.

192.    The BSA believes that the insurance rights contributed by the Participating Chartered Organizations would cover Abuse Claims arising post-1975, as the BSA's insurance rights during this period of time covered the Chartered Organizations.  If the Chartered Organizations did not release their rights under these insurance policies, then the insurers would still have coverage obligations with respect to Abuse Claims.  It is unlikely that the Settling Insurance Companies would be willing to resolve coverage obligations in connection with such claims without eliminating their potential exposure, and, even if they would, any such settlement would yield far less consideration for the Settlement Trust for the benefit of the Abuse Claims given the insurers continuing coverage obligations to Chartered Organizations.  Indeed, the agreements with the Settling Insurance Companies demonstrate that the complete resolution of

78

their exposure was a critical component of achieving the over $1.6 billion of insurance settlements to date. Further, the release of Settling Insurance Companies for pre-1976 claims (and the corresponding release of Participating Chartered Organizations) was a critical component of monetizing the value of the BSA and Local Council insurance policies. Thus, the release of Chartered Organizations for Abuse Claims arising post-1975 is essential to effectuate the transfer of insurance rights that would provide the Settlement Trust with the ability to monetize insurance policies and provide a timely payment to survivors.

193.    Lastly, in exchange for the protections of the Channeling Injunction, all Indirect Abuse Claims of Participating Chartered Organizations are voluntarily waived.

## Contributing Chartered Organization

194.    Alternatively, a Chartered Organization could choose to become a Contributing Chartered Organization, and thereby become a Protected Party and receive the full benefits and protections of the Channeling Injunction, in exchange for (i) contributing certain insurance-related rights to the Settlement Trust; and (ii) making a substantial monetary contribution to the Settlement Trust. All Abuse Claims against a Contributing Chartered Organization will be channeled to the Settlement Trust, and the Contributing Chartered Organization will similarly be released from all Abuse Claims. In exchange, Contributing Chartered Organizations will voluntarily release their rights to any insurance policies issued to the BSA or the Local Councils, and the Plan may assign or otherwise provide for the Settlement Trust to access such insurance rights. In addition, Contributing Chartered Organizations will release their rights to any insurance policies issued by Settling Insurance Companies with respect to coverage for Abuse Claims. In exchange for the protections of the Channeling Injunction, all Indirect Abuse Claims of Contributing Chartered Organizations are voluntarily waived.

A0124

195.    As per the TCC Settlement, the Plan recognizes the TCJC and United Methodist Entities will be making a substantial contribution to the Settlement Trust and are thus being treated as Contributing Chartered Organizations. Both of those settlements are discussed above.

196.    The Plan also provides for a pathway for all other Chartered Organizations to negotiate with the BSA and abuse claimant representatives (or the Settlement Trustee after the Effective Date) to make a substantial monetary contribution to the Settlement Trust and become Contributing Chartered Organizations.  Specifically, there shall be an extension of the preliminary injunction currently in effect for twelve months following the Effective Date (and which may be extended even if certain conditions are met) to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization.  The consideration for such extension is an additional $40 million contribution to the Settlement Trust by the Local Councils on behalf of the Chartered Organizations as well as the up to $100 million Settlement Growth Payment. This $40 million contribution is in addition to the $600 million Local Council Contribution discussed above and consists of (i) at least $15 million of cash, which shall be contributed to the Settlement Trust on the Effective Date; and (ii) a $25 million increase in the DST note, which shall be reduced dollar-for-dollar by any cash payment in excess of $15 million.

**Opt-Out Chartered Organization**

197.    Lastly, a Chartered Organization may choose to "opt out," either by objecting to the Plan, or by submitting an opt-out election form.  Opt-Out Chartered Organizations will remain liable for all Abuse Claims regardless of whether such Abuse Claims arose before or after January 1, 1976, with one exception: Abuse Claims against Opt-Out Chartered Organizations will be channeled to the Settlement Trust if a Settling Insurance Company issued a liability policy that

A0125

does not specifically exclude abuse or molestation (i) to the BSA or a Local Council that includes the Opt-Out Chartered Organization, or (ii) directly to the Opt-Out Chartered Organization for the period that a claimant alleges to have been abused. Opt-Out Chartered Organizations will retain rights in BSA and Local Council insurance policies except for any rights in insurance policies issued by any Settling Insurance Company, which policies are being sold back to the Settling Insurance Companies. The Opt-Out Chartered Organizations are being provided with a release to compensate them for releasing rights against policies being sold back to the Settling Insurance Companies. In addition, Opt-Out Chartered Organizations retain their own insurance even if issued by a Settling Insurance Company although the Settling Insurance Company can seek to enforce the Channeling Injunction against any party making a claim against the Chartered Organization for an Abuse Claim.

198.     I worked with my team and the BSA to create a list of potential protected parties under the Plan. That list included, among others, current and former Chartered Organizations that were contained in the Notice of Current and Potential Protected Parties and Limited Protected Parties. See Debtors' Ex. JTX 1607, which is attached hereto. At present, I understand that there are approximately 340 Op-Out Chartered Organizations that opted out of participating under the Plan (not including any Chartered Organizations that objected to the Plan). In comparison with the number of current and former Chartered Organizations that could have opted out and when compared to the percentage of the BSA's membership affiliated with such Chartered Organizations, the Opt-Out Chartered Organizations and membership associated therewith are *de minimis*. Indeed, the vast majority have decided to be Participating Chartered Organizations.

199.     Thus, for all of the Chartered Organizations there is a logical relationship between their contributions to the Settlement Trust and the releases that they are provided under the Plan.

81

Moreover, if the Chartered Organizations do not receive releases, and only the BSA emerges from bankruptcy free of liability for Abuse Claims, the Chartered Organizations would likely face a significant number of lawsuits.

### THE PACHULSKI SETTLEMENT

200.    During my work on this case, I came to learn that Pachulski Stang Ziehl & Jones LLP ("PSZJ") transmitted communications from Mr. Kosnoff to thousands of survivors from the official Tort Claimants' Committee's email address, many of whom were not clients of Mr. Kosnoff.  Estate professionals expended substantial efforts investigating the transmission of these documents to assess whether there was any impropriety.

201.    Instead of continued litigation, the Debtors and the TCC, including PSZJ, reached a settlement resolving these disputes (the "Pachulski Settlement"). Accordingly, the Plan incorporates the compromise and settlement of all claims and disputes the Debtors have, or may have, against the TCC and its Representatives, including PSZJ, regarding these disputes. As part of this settlement, (a) the TCC and its professionals are Exculpated Parties under the Plan and (b) PSZJ will (i) contribute $1.25 million in cash to the Reorganized BSA to be reserved for the BSA's Youth Protection Program and (ii) write-off $750,000 of PSZJ's fees.

202.    I was present when the Pachulski Settlement was discussed with the NEC on February 9, 2022.  In connection with my work on this matter, I understand that the amount of fees incurred by the estate in investigating the transmission of the Kosnoff materials was approximately $1.2 million. Attached hereto as Debtors' Exs. JTX 1109 and 1200 is correspondence (1) from White & Case to Estate Professionals, dated December 16, 2021, BSA-PLAN_02855077; and (2) from White & Case to the TCC, dated January 22, 2022, BSA-PLAN_02855082. In light of the substantial contribution that PSZJ is making, I support the Pachulski Settlement and advised the

A0127

NEC that I supported the Pachulski Settlement because the amount that is being contributed to the estate and its stakeholders is greater than the direct costs of the investigation and thus I believe that this settlement provides reasonable compensation to the BSA and its stakeholders and brings finality with respect to the Debtors and the liabilities related to these Chapter 11 Cases.

## RELEASES FOR RELATED NON-DEBTOR ENTITIES

203.    The Plan also provides for third-party releases for each of the Related Non-Debtor Entities.  All of the Related Non-Debtor Entities are additional insureds under certain of the BSA Insurance Policies and they are contributing their rights under those policies as consideration for these releases.  In addition, some of the Related Non-Debtor Entities are providing additional consideration.  Specifically, the Foundation is providing the Foundation Loan which is a critical component of the Debtors' reorganization and Arrow is continuing to guarantee the JPM facilities and provide the Reorganized Debtors with the use of the Summit.  I believe that each of the Related Non-Debtor Entities are important to the ongoing business of the Reorganized Debtors and the continued mission of Scouting.  Granting releases to these Non-Debtor Entities helps ensure the feasibility of the Plan and provides important protection to the Reorganized Debtors.  Consequently, I believed that the release of Related Non-Debtor Entities rights under the BSA Insurance Policies and the other considerations noted justify the releases of the Related Non-Debtor Entities.

204.    Further, to the extent that any claims relating to abuse in scouting are brought against Related Non-Debtor Entities, such claims would implicate the BSA.  Such claims would likely generate negative publicity concerning the BSA and, at a minimum, require the BSA to expend resources to participate in discovery associated with such claims.  Such discovery would likely include producing documents or other information and/or preparing current or former

A0128

employees to testify in such proceedings. The BSA's efforts to address negative publicity and discovery obligations associated with such claims against the Related Non-Debtor Entities would also potentially distract management from fulfilling the charitable mission of Scouting and divert their attention at a critical time as the Debtors emerge from bankruptcy. In light of these facts, the releases were important from a go-forward business standpoint.

## RELEASES FOR VOLUNTEERS

205.    The Plan also provides for releases for Exculpated Parties. Exculpated Parties include volunteers who have continued to donate their time to the BSA, such as directors, notwithstanding the challenges the BSA currently faces with respect to its restructuring. Volunteers are the lifeline of the BSA. They engage directly with youths, exemplify the BSA's principles, and perform the day-to-day tasks that ensure the BSA can continue to fulfill the mission of scouting. The volunteers were key to the Debtors' ability to support their membership base during these Chapter 11 Cases. In addition, there were some instances in which certain volunteers engaged with vendors, contract counterparties, and other third parties on matters related to these chapter 11 proceedings. The volunteers' contributions continue to allow the BSA to fulfill its mission even during these uncertain times and are essential to the Debtors' ability to emerge from bankruptcy and perform their obligations.

## LOCAL COUNCIL SETTLEMENT CONTRIBUTION AND SUPPLEMENTAL LC CONTRIBUTION

206.    As a part of the Plan, the Local Councils have agreed to contribute, in the aggregate, (a) at least $300 million of cash, (b) unrestricted properties with a combined Appraised Value of $200 million, which shall be reduced on a dollar-for-dollar basis by any cash payment amount in excess of $300 million; (c) the DST Note, a non-recourse interest-bearing promissory note in the

A0129

principal amount of $100 million,[25] and (d) the Local Council Insurance Rights. As of February 15, 2022, the Local Council Settlement Contribution is estimated to consist of approximately $417 million in cash contributions and approximately $83 million in property contributions. In addition to the Local Council Settlement Contribution, Local Councils are contributing an additional $15 million of cash and property as part of the Supplemental LC Contribution on behalf of the Participating Chartered Organizations. *See* Fourth Amended Plan Supplement to Third Modified Fifth Amended Chapter 11 Plan Of Reorganization, Exhibit X-1 [D.I 8815], which is attached hereto as Debtors' Ex. JTX 1-354.

207. As a result of the TCC Settlement, the Local Councils will also make the Chartered Organization Contribution to facilitate the protections being provided to the Participating Chartered Organizations, including with respect to the Post-Confirmation Channeling Injunction. This supplemental contribution includes the Supplemental LC Contribution of $40 million comprised of at least $15 million in cash or property (the "LC Overage") and the DST Note Increase over the prior $100 million amount of between $21 and $25 million, depending on the amount of the LC Overage.

208. The Local Council contribution was the subject of extensive negotiations between the AHCLC, the Coalition, the TCC, and the FCR as well as the BSA. This settlement was initially agreed to by all of the aforementioned parties as part of the now-expired RSA and ultimately incorporated into the Plan. As the Debtors' financial adviser, I advised the BTF and the NEC on reaching a resolution with these parties. This settlement represented a good-faith compromise and settlement of complex disputes that would avoid the costs, risks, uncertainty and delay associated

---

[25] *See* Plan, Art. V.Y; Plan Ex. F. The DST Note is in the principal amount of $125 million but $25 million of the aggregate $125 million DST Note is being contributed by Local Councils for the benefit of Participating Chartered Organizations under the Plan.

A0130

with protracted litigation. Indeed, as discussed below, I believe that the Local Councils are providing a significant financial contribution (including their insurance rights) in exchange for the releases they would receive under the Plan, and that the release of the Local Councils is necessary to allow the Debtors' successfully reorganize and fulfill the mission of Scouting.

209.    In connection with my work for this matter, I prepared an analysis evaluating the reasonableness of the Local Council Settlement Contributions, as described in Section VI of my Updated Expert Report. In doing so, I considered (a) the Local Council insurance contributions, (b) the other non-insurance portions of the Local Council Settlement Trust contributions, including cash, property, and the DST Note, (c) the Local Council Allocation Model, which balances the estimated liability of each council, the impact of different statute of limitations in each state, the financial wherewithal of each council, and the perceptions of each council on their exposure and options related to dealing with Abuse Claims, and (d) the Local Councils' historical sources of income and expenses, including historical operating deficits. I considered whether the Local Councils' Contribution is essential to the two overarching goals of this bankruptcy — compensating survivors fairly and maintaining the mission of Scouting. Based on my analyses, I conclude that the Local Councils are providing a significant financial contribution in exchange for the releases they would receive under the Plan, and that without the release of Local Councils from Abuse Claims, the Debtors' business and ability to successfully emerge from bankruptcy would be jeopardized.

### A. Local Council Insurance

210.    In considering the reasonableness of the Local Council contributions, I have reviewed the contribution of insurance rights, the monetary contribution, and the interdependent relationship between the Debtors and the Local Councils and the potential impact on the Local Councils and the Debtors if releases are not approved.

A0131

211.    The Plan calls for Local Councils to assign insurance rights both in their own Abuse Insurance Policies and the BSA Insurance Policies with Local Councils as named insureds to the Settlement Trust as these policies cover common Claims against both the individual Local Councils and the BSA. These insurance policies have been analyzed by KCIC.

### Chart 3 – KCIC Insurance Analysis

| KCIC Local Council Insurance Policy Analysis | | | | |
|---|---|---|---|---|
| $ in Millions | | | % of Relative Abuse Claim | |
| | Low | High | Low | High |
| Value of Local Council Insurance Policies | $    143 | $    286 | 6.0% | 4.0% |
| Value of BSA Polices where Local Councils are Insureds | 1,286 | 1,686 | 53.6% | 23.7% |
| Value of BSA Polices with No Local Council Insureds | 489 | 511 | 20.4% | 7.2% |
| Total Value of Insurance Policies | $    1,918 | $    2,483 | 79.9% | 35.0% |
| **Abuse Claims Value** | 2,400 | 7,100 | | |

212.    The Local Councils are contributing their own Abuse Insurance Policies to the Settlement Trust, which Ms. Gutzler valued at between $143 million to $286 million based on the estimated $2.4 billion to $7.1 billion Abuse Claims range.

213.    The Local Councils also have rights in certain of the BSA Insurance Policies, which policies are valued at $1.3 billion to $1.7 billion,[26] inclusive of the impact of the Hartford, Century and the Chubb Companies, and Zurich Insurance Settlements.

214.    In my opinion, the amount of credit the Local Councils should be given for contribution of their rights in the BSA Insurance Policies can be estimated as follows.  These policies provide insurance coverage value for between 24% and 54% of the total Abuse Claims based on the high and low range of the Abuse Claims, respectively and thus could be assumed to

---

[26] The value of the BSA's insurance policies, including policies with Local Councils as named insureds, was calculated by KCIC (*see* Expert Report of Nancy Gutzler Dated December 5, 2021 and Supplemental Expert Report of Nancy Gutzler submitted December 29, 2021) based on, among other things, the assumption that the value of Abuse Claims ranges from $2.4 billion to $7.1 billion. The value of insurance is updated to reflect the amounts being contributed to the Settlement Trust by Century, Hartford and Zurich under the Plan.  Following the issuance of my expert report on December 29, 2021, a settlement was reached with Clarendon resulting in an additional $16.5 million of contributions to the Settlement Trust. This settlement has an immaterial impact on the analysis above and does not change my conclusion on the significance of Local Council Insurance contributions.

A0132

cover 24% to 54% of the Local Councils' liability for Abuse Claims. While the Local Councils share of the liability for Abuse Claims has not been determined, some reasonable illustrative shares result in the following:

215. If the Local Councils' share of the Abuse Claim liability is assumed to be 50%, the value of the Local Councils' insurance can be calculated as follows:

**Local Council Insurance Contribution at 50% Share of Liability**

|  | Low | High |
|---|---|---|
| If Council Abuse Liability is 50% | 1,200 | 3,550 |
| Insurance Value (LC policies + coverage for relative % of claim) | 786 | 1,129 |
| Uninsured Portion (Liability less Insurance Value) | 414 | 2,421 |
| Council Contribution | 600 | 600 |
| **% of Council Contribution versus Council Liability** | **145%** | **25%** |

216. As shown above, with 50% of the liability, at the low end of $1.2 billion ($2.4 billion times 50%), the value of insurance is $786 million ($143 million plus 53.6% times $1.2 billion). This would leave $414 million of "uninsured" liability as compared to the $600 million Local Council contribution. This "uninsured" liability increases to $2.4 billion assuming the high end of range of the Abuse Claims is $7.1 billion.

217. If the Local Council's share of the Abuse Claim liability is assumed to be 25%, the value of the Local Councils' insurance can be calculated as follows:

**Local Council Insurance Contribution at 25% Share of Liability**

|  | Low | High |
|---|---|---|
| If Council Liability is 25% | 600 | 1,775 |
| Insurance Value (LC policies + coverage for relative % of claim) | 464 | 707 |
| Uninsured Portion (Liability less Insurance Value) | 136 | 1,068 |
| Council Contribution | 600 | 600 |
| **% of Council Contribution versus Council Liability** | **443%** | **56%** |

218. As shown above, assuming the Local Councils' share is 25% of the liability for Abuse Claims, the "uninsured" liability of the Local Councils is far less than the $600 million

A0133

Local Council contribution at the low range of Abuse Claims and $1.1 billion at the high range. Accordingly, the Local Councils would be paying for their liability in full at the low end of the range and provide substantial coverage (almost 60%) even at the high end of the range.[27]

219.  In addition, the Local Councils' contribution of their rights under the BSA Insurance Policies is also extremely valuable as this contribution allows the Settlement Trust to maximize the value of the policies to the Settlement Trust.  Had the Local Councils not contributed these valuable insurance rights in the aggregate, it would be far more difficult to reach a settlement with the insurers regarding these policies given the exposure that would remain with respect to such policies.  This is demonstrated by the terms of the settlement agreements with each of the Settling Insurance Companies.  Accordingly, the Local Councils have "holdup" value with respect to the value of these policies.  Even though the BSA may have secured such policies, the additional insurance value should be treated as consideration for the Settlement Trust provided by the Local Councils.

### B.  Local Council Settlement Trust Contributions

220.  I evaluated a number of financial metrics to analyze the Local Councils' contribution to the Settlement Trust.

221.  First, I analyzed the Local Councils' asset restrictions.  I studied the Local Council financial statements, in which each Local Council asserted that portions of its net assets are subject to donor restrictions.  *See* Exhibit D-1 to the Disclosure Statement, D.I. 6445, attached hereto as Debtors' Ex. JTX 1-296.  While cash and investment restrictions are reflected on the financial statements, donor restrictions on real property are generally not.  A significant portion of the real

---

[27] I understand that the Debtors' expert, Dr. Bates explained that the value of the Abuse Claims is most likely in the lower quartile of the $2.4 to $7.1 billion range, that is, most likely between $2.4 and $3.6 billion.

A0134

properties owned by the Local Councils are subject to various restrictions on sale and/or reversionary interests related to their original donation to the Local Council

222.    To determine donor restrictions on real property, A&M oversaw a survey of each Local Council where each Local Council was required to provide documentation supporting any asserted restrictions. Once this information was collected and populated to a data room, the BSA's counsel, Steptoe & Johnson LLP, reviewed the donor documents, deeds, and other evidentiary materials related to restricted property assertions to evaluate the restrictions.  *See* BSA – SJ's Review of Local Council Property Restrictions (12.03.2021), BSA-PLAN_01642917, attached hereto as Debtors' Ex. JTX 1015.

223.    Local Councils' net assets per the Local Council financial statements (Exhibit D-1 to the Disclosure Statement) were grossed up to reflect the increase from net book value of real property to fair market value based on third party desktop appraisals and broker opinions of value. A listing of the Local Council properties, the estimated fair market value of the properties, and the restriction status is included in Exhibit D-2 to the Disclosure Statement, D.I. 6445, attached hereto as Debtors' Ex. JTX 1-296.

224.    After analyzing Local Council asset restrictions, I considered how the aggregate contribution of the Local Councils compared to the unrestricted net assets of the Local Councils. In making this comparison, I have replaced the book value of real property with the market value of unrestricted real property based on the appraisals that have been performed in this matter (which increases the unrestricted net assets by $113 million).

### Chart 4 – Local Council Settlement Contribution versus Unrestricted Net Assets

| Local Council Settlement Contribution versus Unrestricted Net Assets | | |
|---|---|---|
| $ in Millions | | Modified Unrestricted Net Assets |
| Modified Local Council Unrestricted Net Assets[28] | $ | 2,003 |
| Settlement Trust Contribution (Cash & Property) | | 500 |
| DST Note[29] | | 100 |
| **Local Council Settlement Contribution** | **$** | **600** |
| *As a % of Local Council Unrestricted Net Assets (modified)* | | *30%* |

225.    As reflected above, without accounting for the value of Local Council insurance rights, the Local Council Settlement Contribution represents 30% of the modified unrestricted net assets of the Local Councils.

226.    I also considered the Local Council Settlement Contribution as compared to the total net assets of the Local Councils, irrespective of restriction status, again adjusted to replace book value of real property with market value based on appraisals.

---

[28] Modified net assets represents the Local Councils' net assets per the Local Council financial statements as of February 2021 (Exhibit D-1 to the Disclosure Statement), grossed up to reflect the increase from net book value of real property to fair market value based on third party desktop appraisals and broker opinions of value. The Modified Net Assets exclude restricted assets totaling $1.67 billion of restricted investments (based on the audited financial statements of the Local Councils) and restricted real property at fair market value.

[29] As noted above, the DST Note has been increased from $100 million to $125 million and the Cash and Property Contribution has been increased to at least $515 million as a result of the TCC Settlement. The Local Councils are contributing $40 million of such amounts on behalf of Participating Chartered Organizations and is thus not accounted for in this analysis.

A0136

## Chart 5 – Local Council Settlement Contribution versus Net Assets

| Local Council Settlement Contribution versus Net Assets | |
|---|---|
| $ in Millions | |
| | **Modified Net Assets** |
| Modified Local Council Net Assets[30] | $       3,670 |
| Settlement Trust Contribution (Cash & Property) | 500 |
| DST Note | 100 |
| **Local Council Settlement Contribution** | **$          600** |
| *As a % of Local Council Net Assets (modified)* | *16%* |

227.    As reflected above, without accounting for the value of the Local Council Insurance Rights being contributed to the Settlement Trust, the Local Council Settlement Contributions represent 16% of the Local Councils' modified net assets.

228.    The aggregate Local Council contribution of $600 million prior to considering insurance represents a significant portion of the assets of the Local Councils, when one considers the total amount of the Local Councils' assets that would be available for distribution.  As discussed above, the insurance rights being contributed by Local Councils to the Settlement Trust substantially increases the amount of the Local Council contribution.

229.    As the Local Councils are independent legal entities, governed by independent boards of directors, it was necessary to obtain the voluntary contribution of each of the 250[31] Local Councils to the Settlement Trust to maximize the value of the Local Councils' insurance

---

[30] Modified net assets represents the Local Councils' net assets per the Local Council financial statements as of February 2021 (Exhibit D-1 to the Disclosure Statement), grossed up to reflect the increase from net book value of real property to fair market value based on third party desktop appraisals and broker opinions of value. The Modified Net Assets include restricted assets totaling $1.67 billion of restricted investments and restricted real property at fair market value

[31] Longs Peak and Greater Wyoming Councils merged in May 2021; however, the councils submitted a single letter of intent reflecting separate contribution numbers for each council. Pikes Peak and Rocky Mountain Councils merged in August 2021, after each had submitted separate letters of intent.  In all, 251 Non-Binding Letters of Intent were received by the Debtors.

A0137

contribution to the Settlement Trust. As such it was important to have each of the Local Councils contribute to the settlement. The ability to get each Local Council to contribute is impacted by (a) the liability profile of each council, particularly as it relates to the statute of limitations and (b) the location relative to that liability profile.

230.    Chart 6 below reflects the contributions[32] (excluding the DST Note) by each council summarized by both its claims decile[33] (*i.e.*, which 10% increment the council falls in for number of Abuse Claims as compared to the other Local Councils) and by the weighted average statute of limitations tier of the claims against each council.[34]  This chart reflects that the contributions made by Local Councils are weighted towards the top (higher number of claims) and to the left (either open states with no statute of limitations or otherwise more favorable statute provisions or likelihood of a window opening).  The distribution of contributions amongst the Local Councils generally indicates that Local Councils with more claims and less protection by statute of limitations are generally contributing more to the Settlement Trust.

---

[32] As of the date of the filing of the Disclosure Statement, all Local Councils submitted letters of intent reflecting each Local Council's intent to contribute the amounts listed in Exhibit C of the Disclosure Statement. A form of a letter of intent is attached as Exhibit B to the Disclosure Statement.  The contributions for each Local Council total approximately $519 million. This amount exceeds the $500 million Local Council Settlement Contribution amount to account for the possibility that certain Local Councils are ultimately unable to meet the contribution amount set out in their letter of intent on the Effective Date, including in the event that certain properties or portions of properties that may be contributed to the Settlement Trust are valued at less than the estimated property value as the result of a Qualified On-Site Appraisal. The total amount and composition of each Local Council's contribution is subject to material change, provided that the value of the Local Councils' contributions of cash and property shall equal $500 million in the aggregate and that the cash portion shall be no less than $300 million in the aggregate.

[33] Claim deciles per Tranche VI Bates White data supplemented with A&M analysis for Claims listing multiple Local Councils. Claims with multiple Local Councils received an additional partial claim.

[34] The statute of limitations tiers are as per Schedule 1 to the Trust Distribution Procedures.

A0138

## Chart 6 – Contributions by Claims Decile and Statue of Limitations

| Claims Decile | Net Contribution | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Open | Gray 1 | Gray 2 | Gray 3 | Closed | | |
| 90% - 100% | $ 37,547,107 | $ 29,065,834 | $ 21,340,469 | $ 58,386,502 | $ 8,099,226 | | 154,439,138 |
| 80% - 90% | 45,781,812 | 11,600,316 | 30,296,967 | 22,348,470 | 4,621,048 | | 114,648,614 |
| 70% - 80% | 32,567,645 | 10,659,694 | 10,171,514 | 5,629,446 | 2,637,142 | | 61,665,441 |
| 60% - 70% | 13,544,538 | 6,314,142 | 14,087,193 | 8,825,976 | 447,138 | | 43,218,987 |
| 50% - 60% | 8,872,590 | 14,977,186 | 9,339,956 | 10,845,020 | 867,798 | | 44,902,550 |
| 40% - 50% | 23,873,893 | 1,390,180 | 5,195,738 | 8,341,828 | - | | 38,801,639 |
| 30% - 40% | 3,619,282 | 2,543,176 | 6,206,159 | 6,333,492 | - | | 18,702,108 |
| 20% - 30% | 2,169,625 | 4,795,270 | 4,769,526 | 2,875,206 | 2,254,882 | | 16,864,509 |
| 10% - 20% | 1,133,807 | 4,203,294 | 7,209,185 | 1,355,265 | 1,648,175 | | 15,549,725 |
| 0% - 10% | 1,942,362 | 1,038,378 | 2,159,613 | 3,997,400 | 1,658,080 | | 10,795,833 |
| Total | $ 171,052,662 | $ 86,587,469 | $ 110,776,320 | $ 128,938,606 | $ 22,233,488 | | $ 519,588,545 |
| *% of Total* | *33%* | *17%* | *21%* | *25%* | *4%* | | |

231.    Chart 7 below reflects the modified unrestricted net assets of Local Councils by the same claims decile and statute of limitations tiers. This chart reflects that only 30% of the modified unrestricted net assets of the Local Councils are held by Local Councils in states with "open" statutes of limitations. To the extent that a Local Council is not located in a state with "open" statute of limitations, or in what was classified as a Gray 1 state,[35] I understand that Local Council would likely have stronger statute of limitations defenses to out of time claims.

## Chart 7 – Modified Unrestricted Net Assets by Decile and Statute of Limitations

| Claims Decile | Local Council 2/28/2021 Modified Unrestricted Net Assets | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Open | Gray 1 | Gray 2 | Gray 3 | Closed | | |
| 90% - 100% | $ 107,519,316 | $ 116,736,479 | $ 61,320,030 | $ 210,485,157 | $ 46,531,498 | | $ 542,592,480 |
| 80% - 90% | 135,559,178 | 41,181,114 | 104,997,024 | 67,452,212 | 18,712,600 | | 367,902,127 |
| 70% - 80% | 101,784,993 | 47,770,136 | 31,222,979 | 23,242,300 | 7,858,924 | | 211,879,331 |
| 60% - 70% | 66,711,178 | 17,812,467 | 52,563,595 | 29,589,371 | 966,036 | | 167,642,648 |
| 50% - 60% | 33,838,997 | 60,129,692 | 38,022,278 | 87,603,735 | 3,750,754 | | 223,345,457 |
| 40% - 50% | 106,377,311 | 3,102,082 | 17,259,254 | 48,387,215 | - | | 175,125,862 |
| 30% - 40% | 16,170,255 | 12,914,901 | 20,413,350 | 28,424,947 | - | | 77,923,453 |
| 20% - 30% | 24,751,127 | 10,871,115 | 25,942,443 | 12,805,807 | 16,421,214 | | 90,791,705 |
| 10% - 20% | 2,048,456 | 12,246,582 | 37,796,375 | 6,144,648 | 8,897,127 | | 67,133,188 |
| 0% - 10% | 13,710,212 | 24,204,261 | 8,826,194 | 20,409,718 | 11,997,672 | | 79,148,056 |
| Total | $ 608,471,021 | $ 346,968,828 | $ 398,363,522 | $ 534,545,109 | $ 115,135,825 | | $ 2,003,484,306 |
| *% of Total* | *30%* | *17%* | *20%* | *27%* | *6%* | | |

---

[35] *See* D.I. 5466-2 at PDF page 117 of 118, attached hereto as Debtors' Ex. JTX 1-159.

A0139

232.    The different circumstances that apply to each Local Council and the need to get 250 Local Councils to voluntarily contribute to the Settlement Trust discussed above led to a process to fairly allocate contributions to a settlement in a manner that maximized the dollars and achieved the participation of all Local Councils.

### C.  Local Council Allocation Model

233.    Based on my work on this matter, I understand that the AHCLC was formed to help coordinate negotiations for over 250 Local Councils in these Chapter 11 Cases and to ensure that the interests of Local Councils had a voice in the bankruptcy proceedings.  The AHCLC is a mediation party and has been involved in extensive negotiations with the Coalition, the TCC, and the FCR, among others, regarding the size and composition of the Local Council contribution to the Settlement Trust.  In order to consensually raise $600 million from over 250 local councils, the AHCLC worked with the Local Councils to balance the estimated liability of each council, the impact of different statute of limitations in each state, the financial wherewithal of each council, and the perceptions of each council on their exposure and options related to dealing with Abuse Claims.  Ultimately the AHCLC developed a model to address these factors (the "Local Council Allocation Model"), attached hereto as Debtors' Ex. JTX 1478.

234.    I reviewed the contributions of individual Local Councils and the Local Council Allocation Model.  In general, I understand that the ultimate goal of this process was to build a formula that enjoyed unanimous or near unanimous support amongst the Local Councils because that was a critical part of the AHCLC's goal of helping to foster a global resolution and confirmation of a plan of reorganization for the BSA.

235.    Additionally, it is critical to Plan recoveries and the Settlement Trust that the Debtors and Local Councils make a complete assignment of insurance rights as part of their contribution to the Settlement Trust.  Such contributions were necessary to maximize recoveries

A0140

under the policies for Abuse Claims.[36]  Further, as shown in Charts 6 and 7 above, the allocation

of the settlement is consistent with factors related to the relative liability and ability to pay of each

Local Council.  Therefore, it is my opinion that the Local Council Allocation Model – which was

used to obtain the buy-in of all Local Councils – provided a fair and reasonable basis for the

allocation of the Local Council Settlement Contribution and allowed the Local Councils to

maximize the value that was being contributed by the Local Councils to the Settlement Trust.

### D.  Operating Deficits

236.     Next, I considered the impact of the Local Councils' operating performance on their

capacity to contribute to the Settlement Trust.  Chart 8 below highlights the aggregate Local

Councils' operating deficits, excluding investment income, over time as well as the Local

Councils' dependency on investment earnings and donations and grants to support operations:

### Chart 8 – Operating Deficits

| Consolidated Local Council Operating Fund Surplus / (Deficit)[37][38] | | | |
|---|---|---|---|
| ($ in millions) | 2018 | 2019 | 2020 |
| Revenue | | | |
| Donations & Grants | $ 253 $ | 212 $ | 184 |
| Camping & Activities | 227 | 226 | 49 |
| Product Sales | 89 | 83 | 30 |
| Investment Income / G&L | 55 | 64 | 68 |
| Special Events | 55 | 55 | 36 |
| Other | 53 | 55 | 74 |
| Total Revenue | 733 | 694 | 440 |
| Expenses | 681 | 676 | 501 |
| **Total Operating Surplus / (Deficit)** | **$ 52 $** | **18 $** | **(61)** |
| *Total Operating Surplus / (Deficit) less Investment Income / G&L* | *$ (3) $* | *(46) $* | *(129)* |

---

[36] The value of the BSA Insurance Policies that include the Local Councils as co-insureds under the policies is between $1.3 billion and $1.7 billion.  The importance of Local Council participation in monetizing these insurance policies is evidenced by the requirement for Local Councils to release their rights contained in the Hartford Insurance Settlement.

[37] Figures presented are based on mathematically summing up the financial statements of each Local Council, some of which are unaudited and preliminary. The information is as reported by each individual Local Council in the financial accounting system maintained by the BSA.

[38] The Local Councils are independent legal entities that are operated by independent boards of directors. The information reflected in the schedule above is aggregated for presentation purposes only.

A0141

237.     Chart 8 reflects that the aggregate Local Council operating deficits have grown substantially from 2018 to 2020 when excluding investment income on endowment investments and despite significant reduction in operating expenses. These results include investment income which, as is typical for not-for-profit organizations with significant endowments, heavily subsidize operations. The $500 million of cash and property contributed to the Settlement Trust will directly impact this aspect of the Local Councils' operations. In addition, over 30% of the Local Councils' total revenues for each period are composed of donations and grants. As the Local Councils rely on donations to meet their operating budgets, to continue operating the Local Councils must be able to continue to raise funds and fulfill the mission of Scouting.  To the extent that donors believed that their donations were going to pay Abuse Claims rather than fund Scouting-related activities, this would likely have a negative impact on the ability of Local Councils to raise funds in the future. Given that the Local Councils operate at a deficit and rely heavily on investment income to fund operations, the Local Councils have a limited ability to raise additional funds beyond the Local Council Settlement Contribution for the purpose of resolving Abuse Claims.

### E.  Local Council Settlement Contribution is Essential to the Plan

238.     I understand that most lawsuits filed prepetition named both the BSA and a Local Council and similarly, as reflected in Ex. F to the Disclosure Statement, the majority of the Proofs of Claim also name a Local Council in addition to the BSA.  If the Local Councils do not receive a release in connection with the Plan, Reorganized BSA would likely be impacted as plaintiffs would continue to pursue claims against Local Councils, which would drain the resources of the Local Councils and distract them from fulfilling their role in Scouting as described above.  In addition, it is likely that a number of Local Councils would file for chapter 11 protection.  The ongoing litigation would also continue to tarnish the BSA's brand image, impairing the BSA's

A0142

ability to raise funds. Such litigation would likely take years to conclude and would result in additional delays in compensating survivors as compared to the global resolution provided by the Plan.

239. In my opinion, the Local Councils are providing a significant financial contribution in exchange for the releases they would receive under the Plan. The release provided to the Local Councils under the Plan will directly impact the Debtors ability to successfully reorganize given the interrelationship between these organizations and will maximize the Settlement Trust's ability to recover proceeds from insurance policies of the Local Councils and the BSA.

## LIQUIDATION ANALYSIS

240. In connection with my work on this matter, I prepared a liquidation analysis of (a) the Debtors and Related Non-Debtor Entities, (b) the Local Councils, and (c) a consolidated liquidation analysis of the Debtors, the Related Non-Debtor Entities, and the Local Councils and compared each to recoveries under the Plan (the "Liquidation Analysis"). In each of these analyses, I conclude that each class of creditors receives equal or better treatment under the Plan than under the Liquidation Analysis.

241. Additionally, I have also prepared adjustments to the Liquidation Analysis to account for (a) the impact of a liquidation on net insurance recoveries as compared to the Plan, and (b) a sensitivity analysis quantifying the impacts to liquidation recoveries assuming the value of the $1.1 billion contingent claim asserted by the Pension Benefit Guarantee Corporation ("PBGC")[39] was reduced to $700 million. Based on my analysis, considering these adjustments, I again conclude that each class of creditors receives equal or better treatment under the Plan than under the Liquidation Analysis.

---

[39] Proof of Claim No. 1162, attached hereto as Debtors' Ex. JTX 14-49.

A0143

242.    Finally, I considered the impact of the delay in the expected timing of emergence and modifications to the Plan from the TCC Settlement on both the recoveries in a liquidation and under the Plan.  Based on my analysis, I reaffirm that each class of creditors receives equal or better treatment under the Plan than under the Liquidation Analysis.

### A.  Liquidation Analysis of the Debtors and Related Non-Debtor Entities

243.    In preparing the Liquidation Analysis, I first prepared an analysis of the Debtors' and Related Non-Debtor Entities' creditor recoveries under the Plan as compared to recoveries under a hypothetical liquidation.  As an initial step, I estimated the recovery on the assets of the Debtors and Related-Non-Debtor Entities[40] in a liquidation to determine the gross liquidation proceeds. These assets are reflected in Chart 9 below.

### Chart 9 - Debtor and Related Non-Debtor Entity Asset Proceeds[41]

| ($ 000s) | | Asset Values | | Recovery (%) | Recovery ($) |
|---|---|---|---|---|---|
| | Book Value at 2/28/2021 | Adjustments to BV | Pro Forma BV/FMV | High | High |
| **Assets** | | | | | |
| Cash and Cash Equivalents (a) | $ 111,518 | $ 56,729 | $ 168,247 | 100% | $ 168,247 |
| Cash and Cash Equivalents: Restricted (b) | 32,627 | (10,128) | 22,499 | 0% | - |
| Investments (a) | 127,462 | (110,632) | 16,830 | 100% | 16,830 |
| Investments:  Restricted (b) | 174,782 | 3,968 | 178,750 | 14% | 25,000 |
| Accounts Receivable (c) | 16,762 | 218 | 16,980 | 35% | 5,899 |
| Investment Income Receivable (d) | 653 | - | 653 | 0% | - |
| Pledges Receivable (e) | 17,207 | - | 17,207 | 0% | - |
| Related Party Receivables (f) | - | - | - | 0% | - |
| Inventory (g) | 56,407 | 16,944 | 73,350 | 10% | 7,164 |
| Prepaid and Deferred Charges (h) | 63,036 | - | 63,036 | 5% | 3,101 |
| Land, Building, and Equipment (Net) (i) | 476,143 | (111,500) | 364,643 | 63% | 230,425 |
| Other (j) | 17,353 | 59,337 | 76,690 | 72% | 55,536 |
| **Total Gross Liquidation Proceeds** | **$1,093,950** | **$ (95,066)** | **$ 998,884** | **51%** | **$ 512,202** |

---

[40] "Related Non-Debtor Entities" means the following non-debtor Affiliates of the Debtors that are directly or indirectly wholly owned by, or subject to the control of, the BSA: Arrow WV, Inc., Atikaki Youth Ventures Inc., Atikokan Youth Ventures Inc., BSA Asset Management, LLC, BSA Endowment Master Trust, Learning for Life, and National Boy Scouts of America Foundation.

[41] For simplicity, this and other charts only reflect the high end of my estimated range of recovery in a liquidation.

A0144

244.     Cash and investment balances within the Liquidation Analysis are based on the financial projections supporting the Disclosure Statement. Further, the Liquidation Analysis uses property values from third party property appraisals or other opinions of value, discounted for a liquidation. The Debtors' remaining assets are based on financial statements as of February 28, 2021, and assumed to approximate balances as of the Conversion Date (December 31, 2021), adjusted for seasonality. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding the value of these assets in a liquidation.

245.     The Liquidation Analysis details the assumptions that affect the calculation of gross liquidation proceeds and they are summarized below.

(a)     Unrestricted Cash and Investments – Unrestricted Cash, Cash equivalents, and Investments of the Debtor and Related Non-Debtor Entities are reflected as of the Conversion Date, and based on the BSA's projections supporting the Disclosure Statement. The Unrestricted Investments exclude non-controlling interest in the BSA Commingled Endowment Fund, LP (i.e., the limited partnership interests owned by the Local Councils). For purposes of the Liquidation Analysis, I estimate a 100% recovery on the unrestricted cash and investments. Additionally, the amount reflects cash held by JPM to secure letters of credit issued for the benefit of Old Republic Insurance ("ORIC"). ORIC is assumed to draw on the letters of credit in full and JPM is assumed to be able to recover against this cash collateral in full.

(b)     Restricted Cash and Investments – Restricted Cash, Cash equivalents, and Investments of the Debtor and Related Non-Debtor Entities are reflected as of the Conversion Date, and based on the BSA's projections supporting the Disclosure Statement. Restricted cash balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds. Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds. It is my understanding that there is the potential for litigation related to asset restrictions in a liquidation, which could result in certain unrestricted investments being determined to be restricted or certain restricted investments being determined to be unrestricted. The Tort Claimants' Committee commenced an adversary proceeding (the "Adversary

A0145

Proceeding") challenging the restrictions on certain of the Debtors' assets.[42] The Liquidation Analysis assumes that $25 million of currently restricted investments could be available to creditors in a liquidation. The Plan includes a proposed means to resolve any and all disputes regarding the Debtors' designation of assets as "restricted" or "core," including the claims asserted in the complaint filed by the Tort Claimants' Committee in the Adversary Proceeding, with the TCC supporting the Plan. To achieve this, the cash to be contributed to the Settlement Trust has been increased by $50 million by lowering the amount of Unrestricted Cash and Investments retained by the Reorganized BSA. After careful evaluation, I believe that the Debtors are able to fund this substantial increase in assets to be contributed because certain restricted investments could be used in a manner consistent with their applicable restrictions on use and disposition to support activities included in the Debtors' financial projections. This would not be the case in a liquidation. I estimate a 100% recovery on unrestricted investments plus the $25 million of restricted investments.

(c)    Accounts Receivable – Accounts receivable are comprised of invoiced and accrued third party receivables, including receivables from the Local Councils, and other non-trade receivables and deposits. Accounts Receivable is presented based on the BSA's most recent financial statements and is assumed to be materially consistent as of the Liquidation Date. Estimated recovery percentages for accounts receivable are between approximately 33% and 35%.

(d)    Investment Income Receivables – Comprised of accrued investment earnings primarily from the BSA's restricted investment holdings. These amounts are based on the BSA's recent financial statements and balances are assumed to be materially consistent with balances as of the liquidation date. Investment income receivables are excluded from the Liquidation Proceeds.

(e)    Pledges Receivable – Pledges receivables reflect unconditional donor pledges at estimated net present collectable value. As the pledges are both donor restricted and highly unlikely to be enforceable in a liquidation they are valued at zero. Additional pledges not reflected on the financial statements are conditional and thus could not be collected in a liquidation.

(f)    Related Party Receivables – Interfund receivables are comprised of amounts due to/from Related Non-Debtor Entities. These amounts are consolidated and eliminated within this Liquidation Analysis. The most significant Related Party Receivable is a note receivable due from Arrow, which is secured by a deed of trust in the Summit high adventure facility,

---

[42] *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC,* Adv. Pro. No. 21-50032 (LSS). I note that this adversary proceeding has been resolved and the TCC is now a party to the Plan.

A0146

Arrow's only substantial asset, and which note is pledged to JPM under the BSA's credit agreements. In lieu of showing a recovery on this line in the schedule, the recovery from the liquidation of the Summit is reflected as part of Land Building & Equipment below. Gross recoveries on this note total $35 million. Proceeds from the intercompany note via the sale of Arrow's assets are assumed to satisfy JPM's Secured Claims.

(g) <u>Inventory</u> - Inventory is primarily comprised of branded and non-branded Boy Scout apparel, High Adventure Base general inventory stock, and other miscellaneous inventory items. Inventory is presented based on the BSA's most recent financial statements. Inventory is assumed to be materially consistent as of liquidation date as in the BSA's current financial statements. Estimated recoveries are based on liquidation assumptions that include only sellable apparel and stock at substantially discounted values. Inventory reserves are not contemplated within this analysis

(h) <u>Pre-paid and Deferred Charges</u> - Primarily comprised of prepaid Insurance Policies, professional fees, and deferred expenses. Prepaids are presented based on the BSA's most recent financial statements. Prepaid insurance recoveries are estimated to be $0 based on a detailed breakdown of 2021-2022 plan year Insurance Policies, assuming no additional prepayments during the liquidation period through June 30, 2022. Prepaid professional fees are assumed to be recovered 100% and applied against administrative professional fee Claims in a liquidation scenario. Deferred charges are recovered at 0% of current financial statement balances.

(i) <u>Land, Buildings and Equipment (net)</u> - Primarily comprised of the BSA's national headquarters, High Adventure Bases, Warehouse and Distribution Center, various furniture and fixtures, and software and computers. Land, building, and equipment balances are presented based on the Debtor and Related Non-Debtor Entities most recent financial statements. Pro forma balances represent the following:

- National HQ, Warehouse and Distribution Center, the High Adventure Bases (Philmont, Sea Base, and Northern Tier), and Summit are presented based on valuations conducted by third party experts during the course of this bankruptcy and reflect estimates of the fair market value of the respective properties. Scouting U is presented based on the proceeds generated from the sale of the property. The BSA also owns a portfolio of Oil and Gas Interests. These rights, and the value of the rights, are not included within the financial statements, however, are included in the pro forma fair market value balance of land, building, and equipment based on a recent third party valuation report.

- The remaining balance of land, building, and equipment which

102

primarily includes furniture, fixtures, capital and project improvements, and software and computers is estimated to be materially consistent to the BSA's most recent financial statements.

- Pro forma balances are presented before depreciation and amortization.

After a review of the assets, I concluded that the forced sale of the Debtors' assets in the compressed timeframe that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value." The liquidation value of land, buildings, and equipment is stratified based on estimated recoveries ranging from 80% to 85% recovery on brokers opinion of value of the national headquarters ($11.6 million) and Warehouse and Distribution Center ($7.3 million), fair market value appraisals of each of the High Adventure Bases (Philmont South Ranch $153 million, Sea Base $29 million, and Northern Tier $8.4 million including the Summit ($42.8 million), and an appraisal of the Oil and Gas Interests ($7.6 million). For the former Scouting U building ($2.0 million), recoveries are presented at 100% of sale price less commissions and other closing costs. Recoveries on remaining assets are expected to be minimal based on the nature of the assets and the circumstances of a chapter 7 liquidation. Total land, building, and equipment recoveries range from 58% to 63% of pro forma values. The appraisals for Philmont, Sea Base, Northern Tier, the Summit and the Gas Interests, BSA-PLAN_00113142 – BSA-PLAN_00113157; BSA-PLAN_00117042 – BSA-PLAN_00121154 are attached here to as Debtors' Exs. JTX 288 and 299.

Certain of the BSA's properties are collateral for JPM's Secured debt. These properties include the national headquarters, Philmont Scout Ranch, and the High Adventure Bases at Sea Base and Northern Tier. I assume that Liquidation proceeds from the sale of these properties will be applied to satisfy JPM's Secured debt first, with any remaining proceeds made available to creditors based on priority. As noted above, the value of the Summit which flows to BSA through a note receivable is also reflected in the value of land, building and equipment and is subject to JPM's security interest.

The sale of certain of the High Adventure Bases and other properties could be disputed by third parties, potentially driving down their value or barring them from sale entirely if determined to be restricted property and non-alienable under applicable law; however, no discount has been applied to account for this potential reduction in value given the JPM lien. Similarly the Debtors' assert that the High Adventure Bases are core to the mission of scouting and as such may not be subject to liquidation or the proceeds may not be available to all creditors.

(j)     <u>Other Assets</u> – Other assets are primarily comprised of miscellaneous equipment located at the Summit property, pooled and gift annuity investments, and off-balance sheet art. Balances are presented based on BSA's most recent financial statements with the exception of the Artwork balances which is reflected at an estimated fair market value of $59 million based primarily on a 2012 appraisal. Recoveries are assumed between 50% and 80% for Artwork given indications that the value of the Artwork would be significantly depressed in a sale over a compressed timeframe as well as the impact of the BSA bankruptcy and Abuse Claims on the value of the Artwork, while the remaining balance of other assets is assumed to recover 100% for pooled and gift annuity investments and between 5% and 25% for Summit assets. Note that it is possible that the beneficiaries of the annuities and pooled investments would try to assert some type of priority to those assets which would reduce the liquidation value. In addition, some of these assets are core to the mission of scouting as such may not be available to all creditors. There is no value attributed to the Debtors' intellectual property given that it derives from a congressional charter that is non-transferable and thus it is unclear if any value could be derived.

246.    As shown in Chart 9 above, I estimate the Total Gross Liquidation Proceeds to be $512 million.

247.    Next, I estimated costs associated with liquidation and wind down of the Debtors and Related Non-Debtor Entities, including chapter 7 Trustee fees, Trustee's and Secured Lender professional fees, claims processing costs and broker fees. These expenses are estimated in Chart 10, below.

**Chart 10 - Debtor and Related Non-Debtor Entity Liquidation and Wind Down Expenses**

| ($ 000s) | Asset Values | | | Recovery (%) | Recovery ($) |
|---|---|---|---|---|---|
| | Book Value at 2/28/2021 | Adjustments to BV | Pro Forma BV / FMV | High | High |
| Total Gross Liquidation Proceeds | $  1,093,950 | $   (95,066) | $   998,884 | 51% | $   512,202 |
| **( - ) Less Cost of Liquidation** | | | | | |
| ( - ) Liquidation Wind-Down Expenses | | | | | $   (17,943) |
| ( - ) Chapter 7 Trustee Fees | | | | | (16,476) |
| ( - ) Trustee's Professional Fees | | | | | (5,570) |
| ( - ) Claims Processing Costs | | | | | (1,000) |
| ( - ) Secured Lender Professional Fees | | | | | (968) |
| ( - ) Broker Fees | | | | | (5,552) |
| Total Liquidation Costs | | | | | $   (47,510) |
| **Total Net Liquidation Proceeds** | | | | | $   464,692 |

A0149

248. As shown in Chart 10 above, I estimate that the net proceeds available for distribution to creditors following the liquidation of the Debtors' and Related Non Debtor Entities ("Total Net Liquidation Proceeds") will be approximately $465 million.[43]

249. After calculating the Total Net Liquidation Proceeds, I next calculate the amount that would be necessary to pay existing secured claims. As reflected below in Chart 11, JPMorgan holds a valid secured claim of $328 million. The estimated high end net liquidation value of the assets that are securing JPMorgan's secured claim is approximately $390 million. As shown in Chart 11 below, after accounting for JPMorgan's $328 million in secured claims, there is an estimated excess of approximately $62 million of Secured Collateral that would be available for distribution to other creditors of the estate.

## Chart 11 – JPMorgan Secured Assets

| JP Morgan Collateral and Estimated Recoveries | | | | |
|---|---|---|---|---|
| ($ in millions) | | | | |
| **JP Morgan Secured Claims Recovery** | | | | |
| Funded Debt | | | | $ 232 |
| Outstanding LCs | | | | 96 |
| **Total Secured Claims** | | | | **$ 328** |
| | Book Value at 2/28/21 | Asset Values Adjustments to FMV | Pro Forma FMV | Recovery ($) High |
| JP Morgan Secured Claims Recovery | | | | |
| National HQ | $ 16 | $ (4) | $ 12 | $ 10 |
| Philmont Scout Ranch | 61 | 92 | 153 | 130 |
| Sea Base | 22 | 7 | 29 | 25 |
| Northern Tier (1) | 10 | (2) | 8 | 6 |
| BSA National Intercompany Note (Arrow) | 358 | (323) | 43 | 35 |
| Unrestricted Cash & Cash Equivalents | 112 | 57 | 168 | 168 |
| Unrestricted Investments | 127 | (111) | 17 | 17 |
| Pledges Receivable | 17 | - | 17 | - |
| Accounts Receivable | 2 | - | 2 | - |
| **Total Secured Claims** | **$ 726** | **$ (285)** | **$ 448** | **$ 390** |
| **Excess / (Shortfall) on Secured Collateral** | | | | **$ 62** |

250. Additionally, the Liquidation Analysis assumes that in the event of a liquidation, a portion of the $1.1 billion PBGC Claim, asserted against Related Non-Debtor Entities, would be

---

[43] Costs related to liquidation are based on assumptions included Exhibit D to the Disclosure Statement, D.I. 6445, attached hereto as Debtors' Ex. JTX 1

A0150

secured by a lien in the amount of 30% of Liquidation Proceeds remaining for all members of the control group combined, after wind down costs and Secured debt, if any. In this respect, the PBGC claim alleges that "[i]f any person liable to PBGC under 29 U.S.C. §1362 fails to pay the liability after demand, a lien arises in favor of PBGC as of the termination date of the Plan. The amount of the lien is limited to 30% of the collective net worth of all the liable parties."[44] The secured portion of the PBGC Termination Claim against the Related Non-Debtor Entities is estimated at $495 million and estimated to recover approximately $6.2 million, as shown in Chart 12 below.

**Chart 12 – Debtor and Related Non-Debtor Entity Claims Recoveries – Secured Claims[45]**

($ 000s)

| | Estimated Claims Pool (High) | Recovery (%) High | Recovery ($) High |
|---|---|---|---|
| **Total Net Liquidation Proceeds** | | | $ 464,692 |
| **Secured Claims** | | | |
| JPMorgan Funded Debt | $ 232,262 | 100% | $ 232,262 |
| JPMorgan Letters of Credit | 95,842 | 100% | 95,842 |
| PBGC Termination Claim | 495,531 | 1% | 6,166 |
| **Total Secured Claims** | **$ 823,635** | **41%** | **$ 334,270** |
| **Proceeds Available After Secured Claims** | | | **$ 130,422** |

251. After reducing the liquidation proceeds to account for JPM's $328 million secured claim and the PBGC's $6.2 million secured claim (shown in Chart 12 above), only $130.4 million remains to be distributed to priority and administrative claims and eventually to general unsecured claims, including Abuse Claims.

---

[44] Proof of Claim No. 1162, attached hereto as Debtors' Ex. JTX 14-49.

[45] Subsequent to the preparation of this analysis, all but approximately $4 million of the letters of credit reflected above have been drawn. As I assume they would be drawn in a liquidation there is no impact on my analysis.

A0151

252.  After taking into account the PBGC Claim,[46] I next subtracted the amount of Administrative Claims, including Employee Related Claims, Professional Fee Claims, and Post-Petition Trade Claims[47] from the remaining $130.4 million in proceeds. The Total Administrative Claims are estimated to be $108 million as reflected in Chart 13 below.  After accounting for the Administrative Claims, there would be $22.5 million available for distribution to General Unsecured Creditors, including Direct Abuse Claimants, among other creditors.

---

[46]  The PBGC filed a proof of claim asserting statutory liability for an "unfunded benefit liability" ("UBL") in the amount of $1.1 billion as of October 2020 for the Boy Scouts of America Retirement Plan for Employees Pension Plan (the "Pension Plan").  The PBGC has asserted that upon termination of the Pension Plan, the BSA and each Local Council shall become "jointly and severally liable to PBGC for the total amount of [the $1.1 billion UBL claim]," and that if any person liable fails to pay the liability after demand, "a lien arises in favor of the PBGC as of the termination of the [Pension Plan]."  *See* Proof of Claim No. 1162 ¶¶ 7-9, attached hereto as Debtors' Ex. JTX 14-49.  The PBGC's assertion of joint and several liability for the UBL claim is consistent with the BSA's decades of financial and tax reporting that the Pension Plan is a "single employer plan" for a controlled group.  The BSA Pension Plan has filed tax returns for decades as a "single employer pension plan" with the BSA and all of its Local Councils defined as a single controlled group of participating employers under common control.  *See* 1999 Form 5300 Line 6 Controlled Group Attachment.  Filings of Actuarial Statements (Schedules B and SB) for Forms 5500 prepared and signed by the BSA's enrolled actuaries also reflect this tax filing status.  *See* BSA 2020 Schedule SB Package.  Form 5300 Line 6 Controlled Group Attachment, BSA-PLAN_0126469, attached hereto as Debtors' Ex. JTX 1152; and the BSA 2020 Schedule SB Package, BSA-PLAN_02625064 – BSA-PLAN_02625092, attached hereto as Debtors' Ex. JTX 1153.

[47]  Administrative Claims are based on assumptions included in Exhibit D to in the Disclosure Statement, attached hereto as Debtors' Ex. JTX 1-34.

A0152

**Chart 13 - Debtor and Related Non-Debtor Entity Claims Recoveries – Administrative and General Unsecured Claims**

| | Estimated Claims Pool (High) | Recovery (%) High | Recovery ($) High |
|---|---|---|---|
| **Proceeds Available After Secured Claims** | | | $ 130,422 |
| | | | |
| **Administrative Other Administrative Claims** | | | |
| Other Administrative Claims | $ 25,610 | 100% | $ 25,610 |
| Employee Related Claims | 19,651 | 100% | 19,651 |
| Professional Fee Claims | 44,653 | 100% | 44,653 |
| Post-Petition Trade Claims | 17,975 | 100% | 17,975 |
| **Total Administrative / Other Administrative Claims** | $ 107,889 | 100% | $ 107,889 |
| | | | |
| **Proceeds Available for General Unsecured Creditors** | | | $ 22,533 |
| | | | |
| **General Unsecured Claims (High)** | | | |
| Trade Payables and Accrued Expenses | $ 5,350 | 0.3% | $ 15 |
| Employee Related Claims | 22,689 | 0.3% | 62 |
| Real Property & Equipment Lease Rejection Damages | 8,000 | 0.3% | 22 |
| Abuse Claims | 7,100,000 | 0.3% | 19,425 |
| PBGC Termination Claim | 1,093,834 | 0.3% | 3,009 |
| **Total General Unsecured Claims (High)** | $ 8,229,873 | 0.3% | $ 22,533 |
| | | | |
| **Proceeds Available After General Unsecured Claims** | | | $ - |

253.     The above chart reflects the $22.5 million available for General Unsecured Creditors is distributed across a population of claims which includes the approximately $1.1 billion PBGC claim against the Debtors and the high end of the range of Abuse Claims of $7.1 billion.[48]

254.     I next prepared a chart comparing the projected creditor recoveries against the Debtor and Related Non-Debtor Entities under the Plan with the projected recoveries against the Debtor and Related Non-Debtor Entities in a liquidation.  This comparison is reflected in Chart 14 below, which is drawn from my Updated Expert Report, and prior to the impact of the delay in emergence and the TCC settlement.

---

[48] The Liquidation Analysis assumes a high Abuse Claim of $7.1 billion, a conservative assumption that results in the highest range of recoveries for Class 8 claims. I understand that Dr. Bates has expressed the view that the high range of the Abuse Claim is more likely to fall in the lower quartile of the $2.4 to $7.1 billion range, with a high range of approximately $3.6 billion. If the Liquidation Analysis was updated to reflect a high range Abuse Claim of $3.6 billion, Class 8 liquidation recoveries would be reduced by approximately $2 million for the Debtors and Related Non-Debtor Entities and approximately $18 million for the consolidated liquidation analysis including Local Councils. This impact would not change my conclusions that creditors, including Class 8 Claims, receive equal or more under the Plan than they would in a hypothetical liquidation.

A0153

## Chart 14 – Debtor and Related Non-Debtor Entity Liquidation Recoveries vs. Plan Recoveries

**High Range Abuse Claim - BSA & Related Non-Debtors versus Plan Recoveries**

| ($ in millions) Claims at High Abuse Range | Plan Estimated Allowed Claims | Plan Recovery (Low Value) $ | % | Liquidation Estimated Claims | Liquidation Analysis (High Values) $ | % | Claims Variance | Liquidation Recovery (Lower)/Higher vs. Plan $ | % |
|---|---|---|---|---|---|---|---|---|---|
| 1 - Other Priority Claims | $ 0.1 | $ 0.1 | 100.0% | $ 0.1 | $ 0.1 | 100.0% | $ - | $ - | 0.0% |
| 2 - Other Secured Claims | N/Q | N/Q | 100.0% | 1,100.0 | 9.2 | 0.8% | N/Q | N/Q | 0.0% |
| 3A - 2010 Credit Facility Claims | 80.8 | 80.8 | 100.0% | 80.8 | 80.8 | 100.0% | - | - | 0.0% |
| 3B - 2019 RCF Claims | 61.5 | 61.5 | 100.0% | 61.5 | 61.5 | 100.0% | - | - | 0.0% |
| 4A - 2010 Bond Claims | 40.1 | 40.1 | 100.0% | 40.1 | 40.1 | 100.0% | - | - | 0.0% |
| 4B - 2012 Bond Claims | 145.7 | 145.7 | 100.0% | 145.7 | 145.7 | 100.0% | - | - | 0.0% |
| 5 - Convenience Claims | 2.9 | 2.9 | 100.0% | N/Q | N/Q | 0.0% | N/Q | N/Q | 0.0% |
| 6 - General Unsecured Claims | 33.5 | 25.1 | 75.0% | 36.0 | 0.1 | 0.3% | (2.5) | (25.0) | -69.4% |
| 7 - Non-Abuse Litigation Claims | N/Q | N/Q | 100.0% | N/Q | N/Q | 100.0% | N/Q | N/Q | 0.0% |
| 8 - Direct Abuse Claims | 7,100.0 | 737.0 | 10.4% | 7,100.0 | 19.4 | 0.3% | - | (717.6) | -10.1% |
| 9 - Indirect Abuse Claims | N/Q | N/Q | 10.4% | N/Q | N/Q | 0.3% | N/Q | N/Q | 0.0% |
| 10 - Interests in Delaware BSA | N/Q | N/Q | 0.0% | N/Q | N/Q | 0.0% | N/Q | N/Q | 0.0% |
| Total | $ 7,464.6 | $1,093.3 | | $ 8,564.2 | $356.9 | | $(2.5) | $(742.6) | |

255.    In sum, Chart 14 demonstrates that each class of claimants fares better under the Plan than they would in a liquidation of the Debtor and Related Non-Debtor Entities.  As it relates to Class 8 and Class 9, the estimated Plan recovery of $737 million, which is net of a high-end estimate of the costs of operating the Settlement Trust of 10% of proceeds, includes both the BSA Settlement Trust Contribution and the Local Council Settlement Trust Contribution, which when compared to the high-end estimate of $7.1 billion in Abuse Claims results in a 10.4% recovery under the Plan vs. 0.3% in a liquidation.  This is prior to considering insurance recoveries, which as discussed below are higher under the Plan than in a liquidation and prior to considering recoveries from Chartered Organizations which are equal or better under the Plan.

256.    The liquidation recovery for Class 8 and 9 further declines from $19.4 million to zero if the Conversion Date is delayed to June 30, 2022 due to a decline in cash and increase in accrued professional fees.  The $737 million Plan contribution would decline to $672 million as a

result of the removal of the Warehouse and Distribution Center and the Scouting University from

the BSA Settlement Trust Contribution, pursuant to the terms of the TCC Term Sheet as now

embodied in the Plan, and from assuming a delay in emergence to June 30, 2022 and the resulting

decline in cash. Further, if the Local Council Settlement Trust Contribution is excluded from the

Liquidation Analysis, the BSA Settlement Trust Contribution is $146.6 million ($132 million net

of the high end estimated trust costs of 10%), still well above the zero in a liquidation.

257. Likewise, given that Class 9 Indirect Abuse Claims would be channeled to the

Settlement Trust under the Plan, there would be substantially more funds available to compensate

Indirect Abuse Claims under the Plan than would otherwise be available in a liquidation of the

Debtors and Related Non-Debtor Entities.

258. I further note that at this time, if the Plan is confirmed, the number of Indirect Abuse

Claims would be limited to Opt-Out Chartered Organizations and potentially certain insurers,

given my understanding that Local Councils, Participating Chartered Organizations and

Contributing Chartered Organizations would all be releasing Indirect Abuse Claims under the Plan.

It is estimated that there are approximately 340 Opt-Out Chartered Organizations (out of more

than more than 100,000 current and former Chartered Organizations) that would have the ability

to assert an Indirect Abuse Claim. Further, to my knowledge, there is no holder of an Indirect

Abuse Claim that has explained how they would fare better in a liquidation than under the Plan.

### B. Liquidation Analysis of the Local Councils

259. Next, I considered a hypothetical aggregate liquidation of all 251[49] Local Councils

in the aggregate, and included those proceeds in my Liquidation Analysis. Similar to my analysis

---

[49] There were 251 local councils when the Local Council Liquidation Analysis was prepared. Due to a recent merger between Pikes Peak and Rocky Mountain Councils there are now 250 local councils. This does not change any of my conclusions in regards to the Local Council Liquidation Analysis.

A0155

of the assets of the Debtors and Non-Debtor Entities, I first calculated the value of assets of the Local Council using assumptions largely consistent with the BSA and Related Non-Debtor Entity liquidation analysis assumptions noted above.  I calculated the Local Councils' assets for purposes of the Local Council liquidation analysis using the unaudited financial statements of Local Councils as of February 28, 2021.[50]  I next calculated the expected costs of liquidating the Local Council Assets. My calculations of the Total Gross Proceeds from liquidating the assets of the Local Councils and the projected costs of liquidation are reflected on Chart 15 below.

### Chart 15 – Local Councils Asset Proceeds

| ($ 000s) | | Asset Values | | | Estimated Recovery (%) | Estimated Recovery ($) |
|---|---|---|---|---|---|---|
| | | Book Value at 2/28/2021 | Adjustments to BV / FMV | Pro Forma BV / FMV | Mid | Mid |
| **Assets** | | | | | | |
| Cash and Cash Equivalents (a) | $ | 310,794 | $ (22,224) | $ 288,570 | 100% | $ 288,570 |
| Cash and Cash Equivalents: Restricted (a) | | - | - | - | 0% | - |
| Investments (b) | | 1,650,838 | (1,081,145) | 569,693 | 100% | 569,693 |
| Investments: Restricted (b) | | - | 1,081,145 | 1,081,145 | 19% | 201,646 |
| Land, Building, and Equipment (Net) (c) | | 1,294,850 | (89,103) | 1,205,747 | 60% | 723,448 |
| Land, Building, and Equipment (Net): Restricted (c) | | - | 585,709 | 585,709 | 0% | - |
| Other (d) | | 280,853 | - | 280,853 | 5% | 14,088 |
| **Total Gross Liquidation Proceeds** | **$** | **3,537,334** | **$ 474,381** | **$ 4,011,716** | **45%** | **$ 1,797,444** |

260.    My analysis in Chart 15 reflects that the estimated proceeds available following a liquidation of the Local Councils would be approximately $1.8 billion.  The Liquidation Analysis details the assumptions that affect the calculation of gross liquidation proceeds for the Local Councils and they are summarized below.

    (a)    <u>Cash and Cash Equivalents</u> – Represents Cash and Cash equivalents of the Local Councils as of February 28, 2021, excluding "custodial cash" that is either (a) cash held on account of registration fees payable to BSA, as that amount is included in BSA's forecasted cash at the Conversion Date or (b) cash held on behalf of units that are legally distinct from the Local Councils. The Debtors estimate a 100% recovery on the February 2021 cash balances which are representative of balances anticipated as of the Conversion Date.

---

[50] My calculations of the Local Council assets are reflected in Exhibit D-1: Individual Local Council Balance Sheet to the Disclosure Statement, [D.I.6445], attached hereto as Ex. JTX 1-296.

A0156

(b)  <u>Investments</u> – Represents investments of the Local Councils as of February 28, 2021, segregated between restricted and unrestricted. Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are generally excluded from the Liquidation Proceeds; however, the Debtors prepared the Local Council liquidation analysis assuming that Local Councils would be able to recover approximately the same share of restricted investments (19%) as the Debtors in their Liquidation Analysis as described above. It is possible that recoveries at the Local Council level would be even less due to the scrutiny of donors and state attorneys' general that would occur in a liquidation. The Debtors estimate a 100% recovery on unrestricted investments and 19% recovery on restricted investments.

(c)  <u>Land, Building, and Equipment (net)</u> – Primarily comprised of Local Councils' camp properties, land, office and store structures and other miscellaneous real property. Book value of land, building, and equipment balances are presented based on Local Council balance sheets as of February 28, 2021 and are not disaggregated based on restricted and unrestricted book value. Pro forma balances represent the following:

- <u>Unrestricted Land, Building, and Equipment</u> – Represents a) real property asserted by Local Councils as unrestricted, plus b) certain real property asserted as restricted by Local Councils that the BSA has determined, based on its legal analysis of the asserted restrictions, is capable of being sold with the proceeds available for distribution to general unsecured creditors of the Local Councils. Pro forma balances of unrestricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).

- <u>Restricted Land Building, and Equipment</u> – Represents real property asserted by Local Councils as restricted such that the restriction would preclude a sale of the property or require reversion of the proceeds based on donor restriction documentation, as validated by BSA's legal analysis. Pro forma balances of restricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).

After reviewing the assets, I estimated that the sale of Local Council assets in the compressed timeframes that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair

A0157

value." Further, I believe a larger discount for the Local Councils than the BSA properties described above is appropriate for a number of reasons. First, the Local Council properties were valued through broker opinions of value, which are inherently more limited and provide less certainty than full appraisals used for the principal Debtor properties. Second, the broker opinions of value also generally did not take into account limitations on use driven, for example, by conservation easements, which would further reduce the value of the properties. Third, I expect that the proceeds derived from the sale of Local Council properties would be suppressed due to the market being saturated with a large number of similar camp properties, which are often located in relatively close proximity to one another. The liquidation value of land, buildings, and equipment is estimated based on recoveries of 60% of unrestricted real property. Restricted real property is excluded from liquidation proceeds.

(d)  Other Assets – Other assets are primarily comprised of miscellaneous inventory, prepaid expenses, contributions and pledges receivable, beneficial interests in trusts, and notes receivable held by the Local Councils. Balances are presented based on Local Council balance sheets as of February 28, 2021. Recoveries of other assets are estimated to be 5% of book value balances as these assets either have little sellable or recoverable value via a chapter 7 liquidation or in some cases are restricted based on donor stipulations.

### Chart 16 – Local Councils Liquidation Costs

| ($ 000s) | Asset Values | | | Estimated Recovery (%) | Estimated Recovery ($) |
|---|---|---|---|---|---|
| | Book Value at 2/28/2021 | Adjustments to BV / FMV | Pro Forma BV / FMV | Mid | Mid |
| **Total Gross Liquidation Proceeds** | $ 3,537,334 | $ 474,381 | $ 4,011,716 | 45% | $ 1,797,444 |
| **( - ) Less Cost of Liquidation** | | | | | |
| ( - ) Liquidation Wind-Down Expenses | | | | | $ (62,911) |
| ( - ) Chapter 7 Trustee Fees | | | | | (53,930) |
| ( - ) Trustee's Professional Fees | | | | | (52,811) |
| ( - ) Claims Processing Costs | | | | | (9,519) |
| ( - ) Broker Fees | | | | | (28,938) |
| **Total Liquidation Costs** | | | | | $ (208,107) |
| **Total Net Liquidation Proceeds** | | | | | $ 1,589,337 |

261.  Based on my analysis and reasonable assumptions, I estimate that the costs associated with liquidating the assets of the 251 Local Councils in 251 separate liquidations would

A0158

be approximately $208 million.[51]   As reflected in Chart 16, these costs include wind down expenses, Trustee fees, Trustee's professional fees, claims processing costs, and broker fees. After accounting for the estimated reasonable costs of liquidation, this would leave approximately $1.6 billion available for distribution to creditors ("<u>Total Net Liquidation Proceeds</u>").

262.     From the Total Net Liquidation Proceeds of $1.6 billion, I next considered how the assets would be allocated amongst the various classes of creditors.  I begin my analysis by first accounting for the amount of outstanding secured debt at the Local Councils.  As reflected on Chart 17, there is an estimated $59 million of secured debt ("<u>Local Council Secured Debt</u>"). I estimated that the secured creditors recover 100% of secured debt at the Local Council level.

### Chart 17 - Local Councils Claims Recoveries – Secured and Administrative Claims

| Total Net Liquidation Proceeds | | | | | $1,589,337 |
|---|---|---|---|---|---|
| | | Estimated | Recovery (%) | | Recovery ($ 000s) |
| | | Claims Pool | Mid | | Mid |
| **Secured Claims** | | | | | |
| Secured Local Council Debt | $ | 59,157 | 100% | $ | 59,054 |
| Priority Claims (PBGC) | | 1,090,825 | 100% | | 1,090,825 |
| **Total Secured Claims** | **$** | **1,149,982** | **100%** | **$** | **1,149,879** |
| Proceeds Available After Secured Claims | | | | $ | 439,458 |
| | | | | | |
| **Administrative / Other Administrative Claims** | | | | | |
| Employee Related Claims | $ | 17,655 | 62% | $ | 10,863 |
| **Total Administrative / Other Administrative Claims** | **$** | **17,655** | **62%** | **$** | **10,863** |
| Proceeds Available After Administrative / Other Administrative Claims | | | | $ | 428,595 |

263.     As noted above, the PBGC has asserted a contingent $1.1 billion claim against the BSA in connection with the BSA's bankruptcy proceeding.  The PBGC alleges that if the claim is not satisfied that a lien would arise in favor of the PBGC as of the termination date of the Plan and that the claim is an administrative expense entitled to priority as a tax incurred by the estate in an

---

[51] Assumptions for liquidation and wind down costs are generally consistent with the BSA and Related Non-Debtor Entity liquidation analysis assumptions.

A0159

amount up to 30% of the controlled group's collective net worth.[52]  I understand that the controlled group includes the Local Councils.  The Liquidation Analysis assumes that a portion of the PBGC Claim, asserted against each individual Local Council, is secured by a lien in the amount of 30% of Liquidation Proceeds remaining for all members of the control group after accounting for wind down costs and secured debt, if any. The Secured PBGC Claim is estimated to be between $466 million and $497 million, asserted against each individual Local Council. The Liquidation Analysis assumes that the PBGC recovers 100% of its $1.1 billion Claim between the Local Councils and proceeds from the Debtor and Related Non-Debtor Entity Liquidation Analysis.  In the event the PBGC was unable to assert a secured claim or its security interest was invalidated, the PBGC would have an unsecured claim against each member of the controlled group in the amount of $1.1 billion and would still receive recoveries on account of such claims.  The PBGC has asserted that such claims are joint and several.[53]  I calculated the proceeds available for distribution after subtracting the $59 million in Secured Local Council Debt and the PBGC Priority Claims, totaling $1.1 billion from the Total Net Liquidation Proceeds, to be $439 million.[54]

264.    Lastly, I subtracted the estimated recoveries of Employee Related Claims, which I estimated to be $10.9 million, from the $439 million of proceeds available after accounting for the Secured Local Council Debt and the PBGC claim.

---

[52] Proof of Claim No. 1162, at ¶¶ 9, 10, attached hereto as Debtors' Ex. JTX 14-49.

[53] Proof of Claim No. 1162, attached hereto as Debtors' Ex. JTX 14-49.

[54] Local Councils are assumed to be part of the controlled group for purposes of the PBGC Claim. This claim is estimated as a joint and several claim against each of the 250 Local Councils, and that such claim would have priority claim status. Because the claim is joint and several, the PBGC Claim at each individual local council is a substantial claim that accounts for most of each council's net liquidation proceeds.

A0160

265.     After making these adjustments, as reflected on Chart 17, an estimated $428.6 million of proceeds remain available for distribution to General Unsecured Claims.

266.     Next, I prepared an analysis of Local Council liquidation recoveries for the General Unsecured Claims, including trade payables and accrued expenses, employee related claims, real property and equipment lease rejection damages, unsecured local council debt, and abuse claims These recoveries are reflected in Chart 18 below.

### Chart 18 – Local Councils Claims Recoveries – General Unsecured Claims

| | Estimated | Recovery (%) | Recovery ($ 000s) |
|---|---|---|---|
| | Claims Pool | Mid | Mid |
| Proceeds Available After Administrative / Other Administrative Claims | | | $    428,595 |
| General Unsecured Claims (High) | | | |
| Trade Payables and Accrued Expenses | $    115,885 | 8% | $      9,171 |
| Employee Related Claims | 8,237 | 8% | 660 |
| Real Property & Equipment Lease Rejection Damages | 93,538 | 13% | 12,101 |
| Unsecured Local Council Debt | 59,157 | 7% | 4,129 |
| Abuse Claims | 7,100,000 | 5% | 389,346 |
| PBGC Termination Claim | - | 0% | - |
| Total General Unsecured Claims | $   7,376,816 | 6% | $    415,408 |
| Residual Scouting Interest | | | $      13,188 |

267.     After accounting for general unsecured claim recoveries, I estimate that the Class 8 Direct Abuse Claims will recover $389.3 million in the event of a liquidation of all 251 Local Councils.

268.     Under the plan, Local Councils are contributing $600 million to the Settlement Trust ($540 million after accounting for high range trust administration costs of 10%, which is approximately $150 million more than the high liquidation recoveries of $389 million). Accordingly, recoveries under the Plan are far superior to those in a hypothetical liquidation, whether compared against a liquidation of only the 251 Local Councils in aggregate, or against a consolidated liquidation of the Debtors, the Related Non-Debtor Entities and the 251 Local Councils. This analysis excludes consideration of the other components of the recoveries

A0161

contemplated in the Plan — insurance proceeds and Chartered Organization Contributions — which I estimate are equal to or greater than they would be in a liquidation.

269. In conducting the liquidation analysis of the Local Councils, I examined the assets and estimated secured claims of each council. By contrast, with respect to Abuse Claims, my analysis allocates those claims at a high level as I understand that the Abuse Claim liability cannot be accurately allocated to over 250 individual Local Councils.

### C. Consolidated Liquidation Analysis of the Debtors, the Related Non-Debtor Entities, and the Local Councils

270. As reflected in my Updated Expert Report, I prepared a consolidated liquidation analysis of the Debtors, the Related Non-Debtor Entities, and the Local Councils, which aggregates the two analyses described above. As reflected in Chart 19 below, based on my analysis of the assets available following the liquidation of the Debtors and Related Non-Debtor Entities and the Local Councils, the Total Net Liquidation Proceeds available for distribution would be $2 billion.

## Chart 19 – Consolidated Liquidation Analysis – Net Liquidation Proceeds

| ($ 000s) | | Asset Values | | Recovery (%) | Recovery ($) |
|---|---|---|---|---|---|
| | Book Value at 2/28/2120 | Adjustments to BV | Pro Forma BV/FMV | High | High |
| **Assets** | | | | | |
| Cash and Cash Equivalents | $   422,312 | $   34,505 | $   456,817 | 100% | $   456,817 |
| Cash and Cash Equivalents:  Restricted | 32,627 | (10,128) | 22,499 | 0% | - |
| Investments | 1,778,300 | (1,191,777) | 586,523 | 100% | 586,523 |
| Investments:  Restricted | 174,782 | 1,085,113 | 1,259,895 | 18% | 226,646 |
| Accounts Receivable | 16,762 | 218 | 16,980 | 35% | 5,899 |
| Investment Income Receivable | 653 | - | 653 | 0% | - |
| Pledges Receivable | 17,207 | - | 17,207 | 0% | - |
| Related Party Receivables | - | - | - | 0% | - |
| Inventory | 56,407 | 16,944 | 73,350 | 10% | 7,164 |
| Prepaid and Deferred Charges | 63,036 | - | 63,036 | 5% | 3,101 |
| Land, Building, and Equipment (Net) | 1,770,993 | (200,604) | 1,570,389 | 61% | 953,872 |
| Land, Building, and Equipment (Net): Restricted | - | 585,709 | 585,709 | 0% | - |
| Other | 298,206 | 59,337 | 357,543 | 19% | 69,624 |
| **Total Gross Liquidation Proceeds** | **$ 4,631,284** | **$   379,316** | **$ 5,010,600** | **46%** | **$ 2,309,646** |
| **( - ) Less Cost of Liquidation** | | | | | |
| ( - ) Liquidation Wind-Down Expenses | | | | | $   (80,854) |
| ( - ) Chapter 7 Trustee Fees | | | | | (70,406) |
| ( - ) Trustee's Professional Fees | | | | | (58,381) |
| ( - ) Claims Processing Costs | | | | | (10,519) |
| ( - ) Secured Lender Professional Fees | | | | | (968) |
| ( - ) Broker Fees | | | | | (34,490) |
| **Total Liquidation Costs** | | | | | **$   (255,617)** |
| **Total Net Liquidation Proceeds** | | | | | **$ 2,054,029** |

271.    I next analyzed the recoveries available in a consolidated liquidation.  This analysis is reflected in Chart 20 below.  Based on my analysis, I estimate that after accounting for secured claims and administrative claims, there would be approximately $451 million remaining to pay general unsecured creditors including Abuse Claims in a consolidated liquidation.

A0163

### Chart 20 – Consolidated Liquidation Analysis – Claims Recoveries

| | Estimated Claims Pool (High) | Recovery (%) High | Recovery ($) High |
|---|---|---|---|
| **Total Net Liquidation Proceeds** | | | **$ 2,054,029** |
| **Secured Claims** | | | |
| JPMorgan Funded Debt | $ 232,262 | 100% | $ 232,262 |
| JPMorgan Letters of Credit | 95,842 | 100% | 95,842 |
| Secured Local Council Debt | 59,157 | 100% | 59,054 |
| PBGC Termination Claim | 1,096,991 | 100% | 1,096,991 |
| **Total Secured Claims** | **$ 1,484,252** | **100%** | **$ 1,484,148** |
| **Proceeds Available After Secured Claims** | | | **$569,880** |
| **Administrative / Other Administrative Claims** | | | |
| Other Administrative Claims | $ 25,610 | 100% | $ 25,610 |
| Employee Related Claims | $ 37,306 | 82% | $ 30,513 |
| Professional Fee Claims | 44,653 | 100% | 44,653 |
| Post-Petition Trade Claims | 17,975 | 100% | 17,975 |
| **Total Administrative / Other Administrative Claims** | **$ 125,544** | **95%** | **$ 118,752** |
| **Proceeds Available for General Unsecured Creditors** | | | **$ 451,128** |
| **General Unsecured Claims (High)** | | | |
| Trade Payables and Accrued Expenses | $ 121,235 | 7.6% | $ 9,196 |
| Employee Related Claims | 30,926 | 2.5% | 764 |
| Real Property & Equipment Lease Rejection Damages | 101,538 | 12.0% | 12,138 |
| Unsecured Local Council Debt | 59,157 | 7.0% | 4,129 |
| Abuse Claims | 7,100,000 | 5.9% | 421,892 |
| PBGC Termination Claim | 3,009 | 100.0% | 3,009 |
| **Total General Unsecured Claims (High)** | **$ 7,415,865** | **6.1%** | **$ 451,128** |
| **Proceeds Available After General Unsecured Claims** | | | **$ -** |

272.    I next compared the amounts that would be available for distribution to Direct Abuse Claimants under the Plan versus in a consolidated liquidation. This is reflected in Chart 21 below.

A0164

## Chart 21 - Consolidated Abuse Recoveries – Liquidation vs. Plan

| | High Range Abuse Claim - Consolidated BSA & Local Councils Recoveries versus Plan Recoveries | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) **Claims at High Abuse Range** | **Plan Estimated Allowed Claims** | **Plan Recovery (Low Value)** | | | **Liquidation Estimated Claims** | **Liquidation Analysis (High Values)** | | **Claims Variance** | **Liquidation Recovery (Lower)/Higher vs. Plan** |
| | | **$** | **%** | | | **$** | **%** | | **$** | **%** |
| 2 - Other Secured Claims | N/Q | N/Q | 100.0% | | 1,100.0 | 1,100.0 | 100.0% | N/Q | N/Q | 0.0% |
| 8 - Direct Abuse Claims | 7,100.0 | 737.0 | 10.4% | | 7,100.0 | 421.9 | 5.9% | - | (315.2) | -4.4% |

273.     As reflected in Chart 21, recoveries for Direct Abuse Claims under the Plan are estimated at $737 million versus an estimated $421.9 million in a consolidated liquidation assuming a high range Abuse Claim of $7.1 billion.[55] Accordingly, Class 8 Direct Abuse Claims recover $315.2 million less in a liquidation than under the Plan. As Indirect Abuse Claims in Class 9 are being treated in a similar fashion, there would also be more funds to satisfy Indirect Abuse Claims in Class 9 under the Plan than in a liquidation.  Assuming an emergence date of June 30, 2022, Abuse Claims would recover $672 million under the Plan while liquidation recoveries would decrease by approximately $19 million to $402.5 million, resulting in Class 8 recoveries being approximately $269.5 million less in a liquidation than under the Plan.

### D.  Modified Liquidation Analysis Recoveries

274.     The Liquidation Analysis above does not account for any recovery from insurance proceeds on the basis that recoveries from such proceeds are assumed to be the same or greater

---

[55] I understand that Dr. Bates opined that it is more likely that the Abuse Claims value will be in the bottom quartile of the $2.4 billion to $7.1 billion ranges or approximately $3.6 billion on the high end. Assuming an Abuse Claim high end value of $3.6 billion would result in a decrease in liquidation recoveries for Abuse Claims (Class 8) of $2 million for the Debtors and Related Non-Debtor Entities and $18 million on a consolidated basis, including Local Council Abuse Claim liquidation recoveries. These reductions in liquidation recoveries do not change my conclusions presented herein.

under the Plan than in a chapter 7 liquidation. The Debtors believe the value of their insurance policies will be maximized under the Plan because the Local Councils are additional or named insureds under many of the policies and the Plan provides releases for the Local Councils in exchange for, among other things, contribution of their insurance rights to the Settlement Trust. This aggregation of insurance rights allows for both the current insurance settlements in the Plan, the Hartford Insurance Settlement, the Century and Chubb Companies Insurance Settlement, the Zurich settlement and the Clarendon settlement, as well as providing the Settlement Trust with the opportunity to maximize the value of future settlements by vesting all of the rights of the BSA, the Local Councils, and the Chartered Organization to the BSA Insurance Policies and the Local Council Insurance Policies issued by Settling Insurers in the Settlement Trust and allowing the Settlement Trust to reach future deals with other insurers, thus making them Settling Insurers and providing them the broad releases contained in the Plan.

275. Since the time that I prepared my initial Liquidation Analysis, I was able to assess the impact of a liquidation on net insurance recoveries as compared to the Plan, based on the insurance valuation performed by KCIC. Based on my analysis, I believe there is a clear benefit to the Plan versus a liquidation as it relates to the Hartford Insurance Settlement, the Century and Chubb Companies Insurance Settlement, the Zurich Settlement Agreement and the Clarendon Settlement because the costs to obtain these settlements have already been incurred, and the funds will be made available to pay holders of Abuse Claims following the Effective Date.[56] Absent the Plan, in a hypothetical liquidation of the BSA and the Local Councils, separate chapter 7 trustees would need to pursue litigation with settling and unsettled insurers to resolve coverage issues. I

---

[56] The timing of the proceeds of the Hartford Insurance Settlement and the Century and Chubb Companies Insurance Settlement Agreement are dependent on any appeals of the confirmation order; however, $137 million and $50 million, respectively, will be contributed to the Settlement Trust on the Effective Date even if appeals are pending.

A0166

understand contingent fees for insurance coverage litigation can range up to 35%; however, I have assumed that in a liquidation, trustees for the 251 Local Councils would retain coverage counsel and pay a 25% contingency fee to recover proceeds from insurers, plus an additional 3% for chapter 7 trustee fees[57] (28% in total). I further understand that the Century policies consist of many independent policies issued to individual local councils making recovery more complicated and costly.[58] There may be additional costs associated with delay although these costs could be potentially offset by pre-judgement interest. For insurance that has not yet been settled, there are nonetheless incremental costs associated with pursuing carriers in separate chapter 7 processes as the individual Local Councils will not have the ability to provide insurers with a broad release as provided under the Plan. I have illustratively shown this incremental cost as 10% (plus 3% trustee fee) of the value of the other insurance policies. Chart 22 below provides a reasonable estimate of the additional costs that would directly reduce net insurance proceeds for Abuse Claims at a low range (reflecting the impact at just the amounts being contributed to the Settlement Trust by Century, Hartford, and Zurich under the Plan)[59] and high range of insurance value based on KCIC's analysis. These estimated costs are based on the assumption that in a liquidation, the Local Councils would incur substantial additional litigation and other costs, as well as the estimated

---

[57] Section 326(a) of the Bankruptcy Code sets forth the applicable statutory compensation for the trustee for the trustee's services in a chapter 7 liquidation.

[58] The value of the BSA Insurance an Local Council Insurance was determined by KCIC (*see* Expert Report of Nancy Gutzler Dated December 5, 2021 and Supplemental Expert Report of Nancy Gutzler dated December 29, 2021) based on, among other key assumptions, the range of value of Abuse Claims being from $2.4 billion to $7.1 billion. The value of insurance is updated to reflect the amounts being contributed to the Settlement Trust by Century, Hartford and Zurich under the Plan.

[59] The same analysis would apply to Clarendon. The Clarendon Term Sheet was later executed on December 30, 2021. See Tenth Mediator's Report [D.I. 8095], attached hereto as Debtors' Ex. JTX 1-434. Accordingly Clarendon is treated as a non-settling insurer in the below analysis. Given the size of the Clarendon settlement the impact is not material.

A0167

impact of the time value of receipt of insurance proceeds in the Plan versus estimates absent a Plan. My estimate of additional litigation and costs absent the Plan are set form in Chart 22 below:

### Chart 22 - Insurance Litigation and Costs Absent the Plan

| Insurance Litigation and Other Costs Absent a Plan | | | |
|---|---|---|---|
| ($ in millions) | Low Range Hartford, Century & Zurich[60, 61] | All Other Insurance[62] | High Range Total |
| **Total Insurance Value Under the Plan** (a) | $ 1,640 | $ 844 | $ 2,483 |
| Estimated Additional Litigation and Other Costs Absent a Plan | | | |
| Additional Litigation Costs | 25% | 10% | |
| US Trustee Fees | 3% | 3% | |
| **Total Estimated Additional Costs Absent a Plan as a % of Proceeds** (b) | **28%** | **13%** | |
| **Total Estimated Additional Costs Absent a Plan** ((a) * (b)) = (c) | $ 459 | $ 110 | $ 569 |
| | | | |
| **Time Value of Insurance Proceeds Under the Plan** | | | |
| Years of Delayed Recoveries | 5 | 1 | |
| Interest Rate | 3% | 3% | |
| Insurance Settlement Contributions (a) | 1,640 | 844 | 2,483 |
| Present Value of Insurance Proceeds Absent a Plan (PV of (a)) = (d) | 1,411 | 819 | 2,230 |
| **Time Value of Insurance Proceeds Absent a Plan** ((a) - (d)) | $ 228 | $ 25 | $ 253 |
| | | | |
| Total Costs Absent a Plan | | | |
| Additional Litigation and Other Costs | 459 | 110 | 569 |
| Time Value of Insurance Proceeds | 228 | 25 | 253 |
| **Total** | $ 687 | $ 135 | $ 822 |
| | | *Mid-point costs* | $ 640 |

---

[60] Hartford will contribute $787 million to the Settlement Trust pursuant to the Hartford Insurance Settlement. Century will contribute $800 million to the Settlement Trust pursuant to the Century and Chubb Companies Insurance Settlement Agreement. Zurich will contribute $52.5 million to the Settlement Trust pursuant to the Zurich Settlement Agreement. These proceeds are available because the Local Councils' assigned rights to the Local Council-specific policies and the BSA policies with Local Councils as named insureds. Absent the Plan, it is expected that substantial litigation and other administrative costs would be incurred to recover the same amount of gross proceeds from Hartford, Century, and Zurich in a liquidation. These costs are set forth above and total approximately $687 million (at the midpoint). For purposes of Chart 23 below, additional costs are set at $640 million, reflecting the mid-point of costs that would be required to obtain the proceeds of the Hartford Insurance Settlement Agreement, Century and Chubb Companies Insurance Settlement Agreement, and Zurich Settlement Agreement and all other insurance in the event of a liquidation absent the Plan.

[61] The above analysis does not include Clarendon as a Settling Insurer. The Clarendon Settlement of $16.5 million would increase the low range of additional costs from $459 million to $464 million and the high range of additional costs from $822 million to $825 million, with a mid-point of $643 million.

[62] While no other settlements with insurers have been reached, all other insurance recoveries are estimated to include the remaining proceeds from insurance rights at the high range of estimated insurance value per KCIC (excluding amounts allocated to insolvents and excluding any unallocated, unsettled coverage), excluding Hartford, Century, and Zurich. Although not yet formalized, any such recoveries would provide significant additional benefit to the Plan recoveries, further increasing the delta between estimated recoveries in a liquidation and recoveries under the Plan. Total additional costs absent the Plan for all other insurance is estimated at $135 million, as reflected in Chart 13.

A0168

276.     For the purposes of modified liquidation analysis recoveries, I estimate that a low range of additional costs to recover insurance proceeds absent the Plan totals $459 million, while the high range of costs to recover all remaining insurance proceeds, including those of Hartford, Century, and Zurich, totals $822 million absent the Plan.

277.     As described above based on an assumed June 30, 2022 emergence date, under the Plan, an estimated $672 million will be distributed on account of Class 8 and Class 9 claims channeled to the Settlement Trust from the BSA Settlement Contribution and the Local Council Settlement Trust Contribution, whereas only $402.5 million would be available for distribution to Class 8 and Class 9 in a hypothetical chapter 7 liquidation of the Debtors, Related Non-Debtor Entities, and the Local Councils, in each case prior to considering contributions from insurance and Chartered Organizations.  This differential of $269.5 million would increase by $459 million to $822 million to account for additional litigation and other costs that would be incurred to recover insurance proceeds absent the Plan.  Thus, in order for holders of all third-party claims to be better off in a hypothetical liquidation scenario, the aggregate recoveries on claims released under the Plan would need to exceed $728.5 million ($269.5 million plus $459 million).  Similarly, with respect to the Local Councils only, under the Plan an estimated $540 million to $600 million will be distributed on account of Class 8 and Class 9 claims channeled to the Settlement Trust.  The value remaining for distribution to Class 8 and Class 9 Claims in a hypothetical chapter 7 liquidation of the Local Councils is, in the best case scenario, $389 million.  Thus, in order for all holders of Class 8 and Class 9 claims to be better off in a hypothetical liquidation scenario, the aggregate recoveries on claims released against the Local Councils under the Plan would need to exceed recoveries under the Plan by $150 million to $210 million.  The gap widens even further if

one accounts for the $459 million to $822 million in additional litigation and other costs that would be incurred to recover insurance proceeds absent the Plan.

278. Additionally, as discussed earlier, although the PBGC estimated their claim at $1.1 billion assuming a termination date of October 1, 2020, the claim is contingent on the termination of the Pension Plan.[63] The Pension Plan will be assumed under the Plan and therefore there will be no PBGC claim if the plan is confirmed. However, in a hypothetical liquidation of the BSA and Local Councils, there is an assumption that the pension plan will be terminated, and the PBGC Claim carries a contingent value that will be calculated as of the date that the pension plan terminates. Further, in a hypothetical liquidation, it is assumed that the PBGC Claim is a joint and several claim against the BSA and each Local Council. This assumption is consistent with the PGBC's proof of claim, which asserts that the BSA and each Local Council shall become "jointly and severally liable to PBGC for the total amount of [the $1.1 billion UBL claim]," and that if any person liable fails to pay the liability after demand, "a lien arises in favor of the PBGC as of the termination of the [Pension Plan]." Proof of Claim No. 1162 ¶¶ 7-19. In addition, this assumption is consistent with the BSA's decades of financial and tax reporting that the Pension Plan is a "single employer plan" for a controlled group. The BSA Pension Plan has filed tax returns for decades as a "single employer pension plan" with the BSA and all of its Local Councils defined as a single controlled group of participating employers under common control. *See* 1999 Form 5300 Line 6 Controlled Group Attachment, BSA-PLAN_0126469, attached hereto as Debtors' Ex. JTX 1152. Filings of Actuarial Statements (Schedules B and SB) for Forms 5500 prepared and signed by the BSA's enrolled actuaries also reflect this tax filing status. *See* BSA 2020 Schedule SB Package,

---

[63] Proof of Claim No. 1162, Debtors' Ex. JTX 14-49.

A0170

BSA-PLAN_02625064 – BSA-PLAN_02625092, attached hereto as Debtors' Ex. JTX 1153. The $1.1 billion claim value is reflected in the recoveries in Charts 12, 13, 18 and 20 above.

279.     Throughout the course of the BSA's bankruptcy, there have been fluctuations in the value of the pension assets and interest rates which impact the ultimate value of the pension liabilities. In the event of a liquidation, there could be a dispute over the value of the PBGC Claim, particularly to the extent that the asset values associated with the Debtors' Pension Plan have increased.  Accordingly, I prepared a sensitivity analysis quantifying the impacts to liquidation recoveries with a PBGC Claim value of $700 million, reflected in Chart 23 below.  In constructing this analysis, I have used the midpoint of the estimated incremental costs that would be incurred to recover insurance proceeds in a liquidation versus the Plan ($640 million).

### Chart 23 – PBGC Claim Valuation Sensitivities

| Sensitivities - PBGC Claim Valuation and Abuse Recoveries | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | Recoveries as Filed | Incremental Insurance Costs in a Liquidation | Impact of PBGC Claim at $700M vs. $1.1B at LCs | Adjusted Liquidation Abuse Recoveries | Plan Recoveries | Adjusted Recoveries O/(U) Plan |
| | (1) | (2) | (3) | (4)= (1)+(2)+(3) | (5) | = (5) - (4) |
| BSA & Related Non-Debtors | 19 | - | 1 | 20 | 737 | 717 |
| Local Councils | 389 | (640) | 360 | 109 | 540 | 431 |
| Consolidating Residual Interest | 13 | - | 15 | 28 | N/Q | N/Q |
| **Total Abuse Recoveries** | **$422** | **($640)** | **$376** | **$158** | **$737** | **$580** |

280.     Based on my sensitivity analysis, if the PBGC Claim were to decrease from $1.1 billion to $700 million in isolation the estimated recovery to Abuse Claims in a liquidation would increase by approximately $376 million.  Thus, even if the PBGC Claim were to decrease, the overall recovery to Abuse Claims under the Plan  ($737 million or $672 million given the impact of delayed emergence noted above) exceeds the recovery in a hypothetical liquidation ($580 million) in the consolidated liquidation analysis of the Debtors, the Related Non-Debtor Entities,

A0171

and the Local Councils by a substantial margin and thus would not change my opinion that the Plan recoveries to holders of Abuse Claims are higher than they would be in a liquidation.

281.    For the reasons set forth above, I conclude that each Class of Creditors will recover more under the Plan than they would in a hypothetical liquidation.

*[Remainder of Page Intentionally Left Blank]*

A0172

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 11th day of  March, 2022

/s/ Brian Whittman
Brian Whittman

A0173

**EXHIBITS REFERENCED HEREIN INTENTIONALLY OMITTED AND WILL BE PROVIDED TO THE PARTICIPATING PARTIES**