# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, | Lead Case No. 22-cv-01237-RGA |
| Appellants. | Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; |
| v. | 22-cv-01240-RGA; 22-cv-01241-RGA; |
| Boy Scouts of America and Delaware BSA, LLC, *et al.*, | 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; |
| Appellees. | 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |

## DEBTORS-APPELLEES' APPENDIX TO CONSOLIDATED ANSWERING BRIEF: VOLUME 6 (SA 1361 THROUGH SA 2112)

Dated: December 7, 2022

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
jessica.lauria@whitecase.com
gkurtz@whitecase.com

WHITE & CASE LLP
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
mandolina@whitecase.com
mlinder@whitecase.com
laura.baccash@whitecase.com
blair.warner@whitecase.com

WHITE & CASE LLP
Ronald K. Gorsich
Doah Kim
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:  (213) 620-7700
rgorsich@whitecase.com
doah.kim@whitecase.com

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
dabbott@morrisnichols.com
aremming@morrisnichols.com
ptopper@morrisnichols.com

*Counsel for Debtors-Appellees and Debtors in Possession*

2

## INDEX OF SUPPLEMENTAL DOCUMENTS

| BSA Records | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| List of Current Members of the NEB (Exhibit B to Desai Declaration) | 1-191 | SA 0001 – SA 0004 |
| List of Current Members of the NEC (Exhibit E to Desai Declaration) | 1-192 | SA 0005 – SA 0007 |
| BSA Charter and Bylaws (as amended through May 2021) | 468 | SA 0008 – SA 0035 |
| Rules and Regulations of the Boy Scouts of America (September 2020) | 291 | SA 0036 – SA 0059 |
| Local Council Charter Renewals (Excerpt) | 7-3 | SA 0060 – SA 0063 |
| 2010 Articles of Incorporation Template (Mobile Area Council Articles of Incorporation, Art. II. Duration) | 187 | SA 0064 – SA 0067 |
| Form of Annual Unit Charter Agreement (2020) | 264 | SA 0068 – SA 0069 |
| BSA Bylaws (June 1, 2019) | 234 | SA 0070 – SA 0095 |
| Local Council Charter Renewal for Greenwich NR A2 (January 15, 2020) | 2976 | SA 0096 |
| Troop Roster for Troop 172 (Patriots Path Council) (Redacted) | 17 | SA 0097 – SA 0106 |
| Troop Roster for Sanford Troop 37 (Abraham Lincoln Council) (Redacted) | 23 | SA 0107 – SA 0108 |

| | | |
|---|---|---|
| Examples and Templates of Local Council Articles & Bylaws | 7-2 | SA 0109 – SA 0373 |
| Troop Roster for Pack C-3210 (Cape Fear Council) (Redacted) | 43 | SA 0374 – SA 0377 |

| Proofs of Claim | Appendix Page Nos. |
|---|---|
| Proof of Claim No. 8174 | SA 0378 – SA 0387 |
| Proof of Claim No. 639 | SA 0388 – SA 0390 |
| Proof of Claim No. 4971 | SA 0391 – SA 0405 |
| Proof of Claim No. 9558 | SA 0406 – SA 0408 |
| Proof of Claim No. 9430 | SA 0409 – SA 0412 |
| Proof of Claim No. 9511 | SA 0413 – SA 0416 |
| Proof of Claim No. 12203 | SA 0417 – SA 0424 |
| Proof of Claim No. 5113 | SA 0425 – SA 0428 |
| Proof of Claim No. 10390 | SA 0429 – SA 0433 |
| Proof of Claim No. 12530 | SA 0434 – SA 0449 |
| Proof of Claim No. 1248 | SA 0450 – SA 0452 |
| Proof of Claim No. 9123 | SA 0453 – SA 0462 |
| Proof of Claim No. 7826 | SA 0463 – SA 0466 |

| | |
|---|---|
| Proof of Claim No. 343-13 | SA 0467 – SA 0469 |
| Proof of Claim No. 343-26 | SA 0470 – SA 0472 |
| Proof of Claim No. 6346 | SA 0473 – SA 0477 |

| State and Federal Litigation Documents | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Illinois Complaint filed by National Surety | 162 | SA 0478 – SA 0493 |
| Texas Complaint against Century, National Surety and Allianz | 185 | SA 0494 – SA 0515 |
| Texas Complaint against Hartford | 181 | SA 0516 – SA 0528 |
| Third Amended Complaint: *John Does I-XIX v. Boy Scouts of America, Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.* (District Court for the District of Idaho, No. 1:13-cv-00275-BLW) | 2912 | SA 0529 – SA 0587 |
| Trial by Jury Demand: *Plaintiffs v. Boy Scouts of America Corporation, Mobile Area Council Boy Scouts of America, et al.* (Circuit Court of Mobile County, Alabama, No. CV-2016) | 2920 | SA 0588 – SA 0617 |
| Notice of Removal: *A.A. v. the Boy Scouts of America, North Florida Council, Inc., Boy Scouts of America, et al.* (District Court for the Middle of District of Florida Ocala Division) | 2921 | SA 0618 – SA 1601 |
| Verified Complaint for Damages and Equitable Relief: *Plaintiff v. Roman Catholic Archbishop, et al.* (Superior Court of Guam, No. CV 0207-17) | 2910 | SA 1602 – SA 1613 |
| Complaint: *John Doe v. Boy Scouts of America; and Central Minnesota Council, Boy Scouts of America* (State of Minnesota County of Stearns, District Court, Seventh Judicial District, No. []) | 2913 | SA 1614 – SA 1638 |

| Documents filed in *In re Archbishop of Agana* ("AOA"), Case No. 19-00010 (Bankr. D. Guam) | AOA Docket No. | Appendix Page Nos. |
|---|---|---|
| Motion for Derivative Standing to Enforce the Automatic Stay and Take Other Actions | 616 | SA 1639 – SA 1659 |

| | | |
|---|---|---|
| Transcript of Hearing Held September 10, 2021 | 693 | SA 1660 – SA 1681 |
| Third Amended Chapter 11 Plan | 920 | SA 1682 – SA 1818 |
| BSA's Objection and Reservation of Rights to Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agana | 948 | SA 1819 – SA 1836 |
| BSA's Objection to and Reservation of Rights to Debtors Motion Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order (1) Approving Settlement Agreement Among the Archdiocese, the AOA Entities, the Official Committee of Unsecured Creditors, and AIG Insurers Entities, (2) Approving the Archdioceses Sale of the Policies Issued to the Debtor Back to AIG Insurers Entities Free and Clear of Claims and Interests, and (3) Enjoining Assertion Of Claims Against AIG Insurers Entities | 989 | SA 1837 – SA 1866 |
| Order Granting 218 Stipulated Motion for Order Directing Mediation and Appointing the Honorable Robert J. Faris to Serve as Mediator | 227 | SA 1867 – SA 1868 |
| Transcript of Hearing Held October 4, 2022 | 1092 | SA 1869 – SA 1924 |
| Fifth Amended Chapter 11 Plan | 1044 | SA 1925 – SA 2116 |
| Order Approving Stipulation By and Between Debtor, Official Committee of Unsecured Creditors and Boy Scouts of America Regarding the BSA Plan Objection and Claim Objection | 1048 | SA 2117 – SA 2126 |
| Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization | 1093 | SA 2127 – SA 2139 |
| Minute Entry Regarding September 10 Hearing | 690 | SA 2140 |

| Other Exhibits Admitted at Trial | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Email from Jeff Hunt to Wendy Kurten, et al. | 725 | SA 2141 – SA 2145 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures | 502 | SA 2146 – SA 2175 |

6

| | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Attachment to email: Claims Allowance Procedures | 527 | SA 2176 – SA 2195 |
| Email from Debtors regarding BSA - Preliminary Comments on Draft CAP sent to Coalition, FCR, and Mediator | 529 | SA 2196 |
| Attachment to email: BSA Redline of Claims Allowance Procedures (comparing June 8, 2021 version to June 6, 2021 version) | 533 | SA 2197 – SA 2245 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures (comparing version 3 and version 4) | 537 | SA 2246 – SA 2466 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures (comparing version 3 and version 1) | 539 | SA 2267 – SA 2290 |
| Plaintiff John Doe 4's First Amended Complaint: *John Doe 4 v. Boy Scouts of America, Chicago Area Council, et al.* (Circuit Court of Cook County, Illinois, No. 2018 L 211) | 2911 | SA 2291 – SA 2356 |
| Complaint Fraud and Constructive Fraud: *John Doe XX, et al. v. Boy Scouts of America, Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.* (District Court for the District of Idaho) | 2914 | SA 2357 – SA 2380 |
| Redacted Second Revised Complaint: *John Doe #1, et al. v. Boy Scouts of America Corporation, Fairfield County Council of the Boy Scouts of America, et al.* (Superior Court, Connecticut, J.D. of Stamford/Norwalk at Stamford, No. FST-cv-15-5015023-S) | 2916 | SA 2381 – SA 2456 |

| Insurance Policies | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Hartford Pine Tree Council Casualty Insurance Policy No. 04C157992 | 1154 | SA 2457 – SA 2491 |
| Hartford Fire Insurance Co. Policy No. 12CCP500098 | 1155 | SA 2492 – SA 2547 |
| INA Policy No. 15-12-11 | 4000-1 | SA 2548 – SA 2599 |
| Allianz 1980 Umbrella Policy No. UMB 599346 | 10-1 | SA 2600 – SA 2620 |

| | | |
|---|---|---|
| Old Republic Insurance Company Commercial Excess Liability Insurance Policy for period of March 1, 2017 to March 1, 2018 | 10-7 | SA 2621 – SA 2664 |
| INA Policy No. 70-64-52 | 4000-2 | SA 2665 – SA 2700 |
| Hartford Insurance Policy | 4000-10 | SA 2701 – SA 3081 |
| INA Policy No. 07-54-09-4 | 4000-4 | SA 3082 – SA 3164 |
| INA Policy No. 4-84-03 | 4000-6 | SA 3165 – SA 3188 |
| Hartford Insurance Policy No. 10 C A43303 | 4000-8 | SA 3189 – SA 3332 |
| Hartford Insurance Policy | 4000-9 | SA 3333 – SA 3571 |
| Hartford Insurance Policy No. CBP 109170 | 4000-11 | SA 3572 – SA 3644 |
| Hartford Insurance Policy No. 54 C 990478 | 4000-12 | SA 3645 – SA 3673 |
| Hartford Insurance Policy No. 32 HU 380257 | 4000-13 | SA 3674 – SA 3684 |

| Appendix Documents Filed Under Seal | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Initial Hartford Settlement Agreement | 1481 | SA 3685 – SA 3696 |
| Proof of Claim No. 87715 | N/A | SA 3697 – SA 3789 |

| Illinois Century Answer | 202 | SA 3790 – SA 3821 |
| --- | --- | --- |

| Multimedia Documents to be Lodged with the Court[2] | Joint Trial Exhibit No. | Appendix Page Nos. |
| --- | --- | --- |
| BSA and Local Council Insurance Policies | 10 | SA 3822 |
| All Proofs of Claim | 14 | SA 3823 |
| Settled and Unsettled Local Council Policy Information (Excel Format) | 2961 | SA 3824 |

---

[2]    The following documents cannot be filed on the Court's docket due to their size or file format. The Appellees will make these documents available to the Court and the parties.  For purposes of citing these documents in the Debtors-Appellees' Consolidated Answering Brief, the Appellees have assigned these documents appendix page numbers in accordance with the "SA___" convention.

agency. *Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 467–68 (Fla. 2005).

Vicarious liability may not be imposed on a principal unless the agent was acting within the scope of the agency when the wrong was committed. *See Special Olympics Florida, Inc. v. Showalter*, 6 So. 3d 662, 665-666 (Fla. 5th DCA 2009). An agent's criminal acts, including sexual assaults and batteries, fall outside the scope of the agency as a matter of law. *Id.* (Special Olympics not vicariously liable for sexual molestation committed by volunteer); s*ee also Goss v. Human Services Associates, Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012) (granting motion to dismiss vicarious liability claims based on counselor's sexual assault of minor child at residential facility because the assault was not committed for any therapeutic purpose and it was not aided by the agency relationship); *Elders v. United Methodist Church*, 793 So. 2d 1038, 1041 (Fla. 3d DCA 2001) (church defendants were not vicariously liable for pastor's sexual abuse of counselee because as "a matter of common sense, having sexual relations with a counselee is not part of the job responsibilities of a minister."); *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 355 (Fla. 3d DCA 2001) (even though the pastor may have been counseling the minor, the assault was an independent, self-serving act for which the church could was not vicariously liable); *Mason v. Fla. Sheriffs' Self-Ins. Fund,* 699 So. 2d 268 (Fla. 5th DCA 1997) (officer's sexual assault not within course and scope even though the officer was on duty, in uniform, and serving warrant on the woman he raped); *Agriturf Mgmt., Inc. v. Rose*, 656 So.2d 954, 955 (Fla. 2d DCA 1995) (company president's sexual fondling of six-year old child not within the course and scope even though the touching occurred on the business's property during a time when the perpetrator was cleaning up, putting away equipment, and closing out the day's business).

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza • Suite 900 • Miami, FL 33131 • Phone 305.377.0700 • Fax 305.377.3001 • www.cspalaw.com

Highly Confidential

Vicarious liability cannot be imposed on Defendants because Fout's alleged sexual assaults were outside the scope of any alleged agency relationship he may have had with Defendants. Similarly, vicarious liability cannot be imposed based on the alleged actions of Fout's father because they were not committed within the scope of his volunteer position as scoutmaster. The sexual misconduct took place at his private home during Plaintiff's visits or sleepovers, which were ***admittedly*** against Scouting rules. (Second Amend. Compl. ¶¶ 103-14). Additionally, a parent does not have any duty to control the conduct of an emancipated adult child living in the parent's home. *See Knight v. Merhige*, 133 So. 3d 1140 (Fla. 4th DCA 2014); *see also Carney v. Gambel*, 751 So. 2d 653, 654 (Fla. 4th DCA 1999).

Based on the foregoing, Counts VII-X should dismissed.

### V.   Even if a "special relationship" existed, Defendants owed Plaintiff no legal duty because *all* abuse allegations—save one camping allegation—happened outside of Scouting activity.

Assuming arguendo that a special relationship did exist, BSA and Council owed Plaintiff no legal duty of protection against sexual abuse that occurred—as Plaintiff concedes—unrelated to Scouting activity. (Second Amend. Compl. ¶¶ 103-14). Indeed, *all* allegations of abuse throughout the Second Amended Complaint, except for a singular camping incident, occurred "at George Fout's home after scouting events." (Second Amend. Compl. ¶ 111). As a matter of law, BSA and Council are not liable for Fout's criminal acts outside of BSA events, activities, and premises. *See, e.g., KM ex rel D.M.,* 895 So. 2d at 1114.

Taking the allegations of the Second Amended Complaint as true, Defendants owed Plaintiff no legal duty of protection grounded in a special relationship because the alleged sexual abuse was unrelated to Scouting activity. *See Archbishop Coleman F. Carroll High School, Inc. v. Maynoldi,* 30 So. 3d 533 (Fla. 3d DCA 2010) (holding that school owed no duty to student

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza • Suite 900 • Miami, FL 33131 • Phone 305.377.0700 • Fax 305.377.3001 • www.cspalaw.com

Highly Confidential

BSA-PLAN_01423108

**SA 1362**

injured in car accident after consuming alcohol at private graduation party because accident took place off-campus after non-school sponsored event).  While George Fout may have had access to Plaintiff because of his position as an unpaid BSA volunteer, every sexual abuse allegation raised here—with one, undated exception—occurred in the confines of George Fout's personal residence.  George Fout's alleged, self-serving abuse of his neighbor (Plaintiff) does not trigger a legal duty by BSA or Council.  *See Iglesia Cristiana La Casa Del Senor, Inc.*, 783 So. 2d at 358. In *Iglesia Cristiana La Casa Del Senor, Inc.*, the Third District explained why the abusive pastor's conduct was insufficient to impute liability to the church:

> While Pacheco may have had access to L.M. because of his position as the Church pastor, whom L.M. and her family had become friends with over time, he was not engaging in authorized acts or serving the interests of the Church during the time he tried to seduce her or on the day he raped her. The sexual assault was an independent, self-serving act by Pacheco; an act that he knew was wrong to commit and that the Church would surely have tried to prevent had it known of his plans.

> *Id.*

Accordingly, BSA and Council owed no legal duty to Plaintiff for the alleged conduct that the Second Amended Complaint concedes primarily occurred unrelated to Scouting activities. *See Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) ("[I]f the agent cannot be held liable, neither can the principal, because there is nothing to impute.").

Based on the foregoing, the negligence, breach of fiduciary duty, and vicarious liability claims should be dismissed.

### VI.   Plaintiff's new allegation of fraud and misrepresentation must be dismissed as time barred and for failure to state a cause of action.

Plaintiff's Second Amended Complaint raises a new claim for "Fraud, Misrepresentation and Fraudulent Concealment" under a single count.   (Second Amend. Compl. ¶¶ 265-94).

Highly Confidential

Specifically, Plaintiff alleges that "BSA fraudulently concealed from Congress, scouts . . . A.A. and his guardian" that "pedophiles had been infiltrating BSA in large numbers for many years." (Second Amend. Compl. ¶¶ 272-74).

Under Florida law, fraudulent misrepresentation and negligent misrepresentation involve different elements, particularly with respect to justifiable reliance. "There are four elements necessary to establish fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st DCA 2011). Justifiable reliance is not a necessary element of fraudulent misrepresentation. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). Because justifiable reliance is not an element of fraudulent misrepresentation, "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had [the recipient] made an investigation, unless [the recipient] knows the representation to be false or its falsity is obvious." *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336 (Fla. 1997).

In contrast, a claim for negligent misrepresentation under Florida law requires a showing that the recipient of the information justifiably relied on the erroneous information. *Specialty Marine & Indus. Supplies, Inc.*, 66 So. 3d at 310. Moreover, the elements necessary for fraudulent concealment claim are: (1) a party concealed or failed to disclose a material fact; (2) the party knew or should have known the material fact should be disclosed; (3) the party knew their concealment of or failure to disclose the material fact would induce the plaintiff to act; (4) the party had a duty to disclose the material fact; and (5) the plaintiffs detrimentally relied on the misinformation. *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza • Suite 900 • Miami, FL 33131 • Phone 305.377.0700 • Fax 305.377.3001 • www.cspalaw.com

Highly Confidential

Here, the Second Amended Complaint does not make clear what cause of action plaintiff specifically seeks to pursue under Count XI.  Without a more particularized pleading, BSA and Council cannot construct a cogent defense to Count XI.  Further, BSA was under no duty to disclose to Plaintiff unproven allegations of abuse, and Plaintiff does articulate any such obligation in the Second Amended Complaint.  Nor can Plaintiff argue that such allegations were fraudulently concealed, as they have included a detailed history of such allegations throughout the Second Amended Complaint.

Moreover, Plaintiff's ambiguous fraud claim is barred by the applicable four-year statute of limitations under section 95.11(3).  *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003) ("Florida Statutes section 95.11(3) provides a statute limitation period of four years for actions founded on fraud, negligent misrepresentation, or breach of fiduciary duty.").  Plaintiff cites various settlements between BSA and non-parties between 1987 and 2005 as the basis for its fraudulent concealment and/or misrepresentation allegations.  (*See* Second Amend. Compl. ¶ 276).  In fraud cases, however, the statute of limitations begins running either at the time that plaintiff learned of the fraud or when the plaintiff reasonably should have learned about the facts supporting the fraud claim.  *Moneyhun v. Vital Indus., Inc.*, 611 So. 2d 1316, 1322 (Fla. 1st DCA 1993).

Here, Plaintiff cites various examples of unproven, abuse-related settlements dating back to 1987.  A settlement is no admission of liability.  And, Plaintiff cannot claim that this information was not readily discoverable.  The Second Amended Complaint itself alleges that the information has been known for decades.  Accordingly, Plaintiff's claim is barred by the applicable four-year statute of limitations.

Highly Confidential

## VII.    Conclusion

Based on the foregoing reasons, BSA and Council respectfully request that the Second

Amended Complaint be dismissed with prejudice.


Respectfully submitted by,

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, 9th Floor
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile:  (305) 377-3001

By: /s/Spencer H. Silverglate
        Spencer H. Silverglate
        Florida Bar No. 769223
        ssilverglate@cspalaw.com
        mpedraza@cspalaw.com
        Francisco Ramos, Jr.
        Florida Bar No. 114766
        framos@cspalaw.com
        Shannon P. McKenna
        Florida Bar No. 385158
        smckenna@cspalaw.com
        aford@cspalaw.com

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza • Suite 900 • Miami, FL 33131 • Phone 305.377.0700 • Fax 305.377.3001 • www.cspalaw.com

Highly Confidential                                                                   BSA-PLAN_01423112

**SA 1366**

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct of the foregoing was served through the

Florida E-Portal by e-mail, pursuant to Fla. R. Jud. Admin. 2.516, on this 25th day of October,

2019 to all counsel of record.


CLARKE SILVERGLATE, P.A.

By: /s/Spencer H. Silverglate
Spencer H. Silverglate

Highly Confidential

BSA-PLAN_01423113
**SA 1367**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

      Plaintiff,

CASE NO. 2016-CA-000167

v.

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

      Defendants.

_____/

### AGREED ORDER GRANTING BSA AND COUNCIL'S
### UNOPPOSED MOTION FOR EXTENSION OF TIME
### TO RESPOND TO PLAINTIFF'S SECOND AMENDED COMPLAINT

THIS CAUSE having come before the Court upon Defendants' Unopposed Motion for

Extension of Time to Respond to Plaintiff's Second Amended Complaint dated October 16,

2019, and the Court having reviewed the Unopposed Motion, having been advised of agreement

by and between counsel for parties, and being otherwise duly advise in the premises, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion is GRANTED. Defendants

BSA and North Florida Council shall file their response to Plaintiffs Second Amended

Complaint on or before Friday, October 25, 2019.

Highly Confidential

BSA-PLAN_01423114

SA 1368

DONE AND ORDERED in Chambers in Marion County, Florida this _25 day of October, 2019.

_Edward L. Scott_

EDWARD L. SCOTT
CIRCUIT JUDGE

cc:  Counsel for Plaintiff:
Paul L. SanGiovanni, psangi@forthepeople.com, mtodd@forthepeople.com

Counsel for BSA and North Florida Council:
Spencer H. Silverglate, ssilverglate@cspalaw.com,
mpedraza@cspalaw.com Francisco Ramos, Jr., framos@cspalaw.com,
acastro@cspalaw.com Shannon P. McKenna, smckenna@cspalaw.com,
khickson@cspalaw.com

Counsel for Silver Springs Shores Presbyterian Church, Inc.:
Rachel Garcia, rgarcia@wickersmith.com, ndurham@wickersmith.com

Highly Confidential

BSA-PLAN_01423115

**SA 1369**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT IN
AND FOR MARION COUNTY, FLORIDA

A.A.,

        Plaintiff,

Case No: 2016-CA-0167

vs.

THE BOY SCOUTS OF AMERICA NORTH
FLORIDA COUNCIL, INC., BOY SCOUTS
OF AMERICA, AND SILVER SPRINGS
SHORES PRESBYTERIAN CHURCH, INC.,

        Defendants.

_____/

### ORDER GRANTING BSA AND COUNCIL'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S SECOND AMENDED COMPLAINT

**THIS CAUSE** came before the Court on Defendants, Boy Scouts of America and North Florida Council, Inc.'s Unopposed Motion for Extension of Time to Respond to Plaintiff's Second Amended Complaint, filed on October 16, 2019. The Court considered the Motion, reviewed the court file, and is otherwise duly advised of the premises. Therefore, it is

**ORDERED** as follows:

1.    Defendants' Unopposed Motion for Extension of Time to Respond to Plaintiff's Second Amended Complaint is **GRANTED**.

2.    Defendants shall have **twenty (20) days** from the date of this Order to file a responsive pleading or motion to Plaintiff's Second Amended Complaint.

**IT IS SO ORDERED** in chambers, Marion County Judicial Center, Ocala, Florida, on this 25 day of October 2019.

_Edward L. Scott_
_____
**Edward L. Scott**
Circuit Judge

Page 1 of 2

Highly Confidential

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing has been furnished by the Florida Court's e-filing portal to the following this 25 day of October 2019.

Paul L. SanGiovanni, Esquire
Morgan & Morgan, P.A.
Counsel for Plaintiff

Spencer H. Silverglate, Esquire
Clarke Silverglate, P.A.
Counsel for Defendants/Boy Scouts of America and North Florida Council, Inc.

Richards H. Ford, Esquire
Wicker Smith O'Hara McCoy & Ford, P.A.
Counsel for Defendant/Silver Springs Shores Presbyterian Church, Inc.

_Becky Knipe_
Becky Knipe, Judicial Assistant

Highly Confidential

BSA-PLAN_01423117

**SA 1371**

IN THE CIRCUIT COURT OF THE 5TH JUDICIAL CIRCUIT IN AND FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

      Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL, INC.,
BOY SCOUTS OF AMERICA, AND
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

      Defendants.

_____/

## UNOPPOSED MOTION TO CONSOLIDATE PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND FOR EXTENSION OF TIME TO RESPOND TO DEFENDANTS' MOTIONS

Plaintiff, A.A. ("Plaintiff"), by and through his undersigned counsel and pursuant to Florida Rule of Civil Procedure 1.200(a), requests this Honorable Court for an Order that Plaintiff may consolidate its response to the respective Motions to Dismiss Second Amended Complaint filed by Defendants Silver Springs Shores Presbyterian Church, Boy Scouts of America and North Florida Council, Inc. filed on September 26, 2019 and October 25, 2019 respectively ("Defendants' Motions") and for an extension of time to respond to both motions in a consolidated manner and otherwise states as follows:

1.     Defendants filed their respective Motions to Dismiss on September 26, 2019 and October 25, 2019, the latter response extended pursuant to the Plaintiff's agreement to extensions of time for the Defendants' response.

Highly Confidential

BSA-PLAN_01423118

SA 1372

2.      <u>Request to File Consolidated Response in the Interest of Judicial Economy</u>.  The issues raised by Silver Springs, the North Florida Council and the BSA include several overlapping issues raised by all Defendants.  As with the response to the prior Motions to Dismiss, Plaintiff suggests that judicial economy may be served by filing a single consolidated reply, rather than to repeat issues in two separate responses.

3.      The Court's rules provide that the Plaintiff may respond to the Motions with two (2) separate fifteen (15) page memoranda. Plaintiff proposes responding with one (1) consolidated twenty-five (25) page memorandum.

4.      <u>Request for Extension of Time to File and Serve a Response to Both Motions</u>. The Plaintiff respectfully requests additional time to file and serve the consolidated response described above due to, among other things, the concurrency of several deadlines to which Plaintiff's counsel is responding.

5.      Plaintiff's counsel has discussed the relief requested herein with Defendants' counsel, each of whom has no objection to the relief requested.

6.      The Plaintiff respectfully requests an extension of time to file and serve the consolidated response to both motions to through and including November 22, 2019.

7.      The undersigned certifies that this Motion is made in good faith and not for the purpose of delay.

Highly Confidential

BSA-PLAN_01423119

**SA 1373**

**WHEREFORE,** Plaintiff, A.A., respectfully requests this Court enter an Order granting Plaintiff through and including November 22, 2019 to file and serve a consolidated response not to exceed twenty-five (25) pages to the Defendants' Motions to Dismiss Second Amended Complaint and for such further relief as is just and equitable.

Dated: November 11, 2019.         **MORGAN & MORGAN, P.A.**
                                  **Business Trial Group**

                                  *s/Paul L. SanGiovanni*
                                  **Paul L. SanGiovanni, Attorney at Law**
                                  Florida Bar No. 0513164
                                  20 North Orange Avenue, Suite 1600
                                  Orlando, Florida 32801
                                  Telephone:  (407)418-6041
                                  Facsimile:  (407)245-3394
                                  Primary E-mail:  psangi@forthepeople.com
                                  Secondary E-mail jacquimiller@forthepeople.com
                                  *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the November 11, 2019, I electronically filed the foregoing with the Clerk of the Court by using the Court's E-portal filing system, which will serve a notice of the electronic filing via e-mail to all counsel of record.

                                  *s/Paul L. SanGiovanni*
                                  **Paul L. SanGiovanni, Attorney at Law**

3

IN THE CIRCUIT COURT OF THE
5TH JUDICIAL CIRCUIT IN AND
FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

     Plaintiff,

vs.

THE BOY SCOUTS OF
AMERICA NORTH FLORIDA
COUNCIL, INC., BOY SCOUTS
OF AMERICA, AND SILVER
SPRINGS SHORES
PRESBYTERIAN CHURCH,
INC.,

     Defendants.

_____/

## ORDER ON UNOPPOSED MOTION TO CONSOLIDATE PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND FOR EXTENSION OF TIME TO RESPOND TO DEFENDANTS' MOTIONS

THIS CAUSE having come on before the Court on Plaintiff's Motion to Consolidate Response to Defendants' Motion to Dismiss Second Amended Complaint and for Extension of Time to Respond to Defendants' Motions and the Court having been advised of agreement by and between counsel for parties, it is hereby

1

Highly Confidential

BSA-PLAN_01423121

SA 1375

ORDERED AND ADJUDGED that:

1.      Plaintiff's Motion to file a consolidated response is granted.  The

Plaintiff's consolidated response to the respective Motions to Dismiss shall not

exceed twenty-five (25) pages;

2.      The Plaintiff's shall file the consolidated response on or before

November 22, 2019.

DONE AND ORDERED in Chambers, in Marion County, Florida this _/5_

day of November, 2019.

EDWARD L. SCOTT
JUDGE OF THE CIRCUIT COURT

Copies furnished to:
Paul L. SanGiovanni
Morgan & Morgan, P.A.
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
E-mail:  PSangi@forthepeople.com
**Counsel for Plaintiff**

Spencer H. Silverglate
Francisco Ramos, Jr.
Shannon P. McKenna
Clarke Silverglate, P.A.
799 Brickell Plaza, 9th Floor
Miami, Florida 33131
E-mail: ssilverglate@cspalaw.com
E-mail: framos@cspalaw.com
E-mail: smckenna@cspalaw.com
**Counsel for Defendants, Boy Scouts of America and North Florida Council,
Inc.**

2

Highly Confidential

BSA-PLAN_01423122

**SA 1376**

Raychel Garcia
Wicker Smith O'Hara McCoy & Ford P.A.
390 North Orange Avenue, Suite 1000
Orlando, Florida 32801
E-mail: RGarcia@wickersmith.com
**Counsel for Defendant, Silver Springs Shores Presbyterian Church, Inc.**

3

BSA-PLAN_01423123

**SA 1377**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

      Plaintiff,

v.

CASE NO. 2016-CA-000167

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

      Defendants.

_____/

### BSA AND COUNCIL'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO REPLY TO PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendants, Boy Scouts of America ("BSA") and North Florida Council, Inc. ("Council"), submit this *unopposed* motion for an extension of time for Defendants to file their replies to Plaintiff's Consolidated Response in Opposition to Defendants' Motion to Dismiss Second Amended Complaint due on or before November 22, 2019 (the "Consolidated Motion to Dismiss Response"). In support, BSA and Council state the following:

1.    On September 26, 2019, Defendant Silver Springs Shores Presbyterian Church filed a Motion to Dismiss Plaintiff's Second Amended Complaint. On October 25, 2019, BSA and Council filed its own Motion to Dismiss Plaintiff's Second Amended Complaint.

Highly Confidential

BSA-PLAN_01423124

**SA 1378**

2.      On November 11, 2019, Plaintiff filed an Unopposed Motion to Consolidate Plaintiff's Response to Defendants' Motions to Dismiss Second Amended Complaint and for Extension of Time to Respond to Defendants' Motions (the "Consolidation Motion").  Plaintiff's Consolidation Motion requested an extension of time through Friday, November 22, 2019 to file the Consolidated Motion to Dismiss Response, which BSA and Council did not oppose.

3.      On November 15, 2019, this Court entered an order granting Plaintiff's Consolidation Motion.

4.      Pursuant to this Court's Order Establishing Motion Practice Procedure, replies are required to be filed within five days of receiving the opposing memorandum to which the reply motion is directed.[1]  Accordingly, should Plaintiff file its Consolidated Motion to Dismiss Response on November 22, 2019, BSA and Council's Reply is due the day before Thanksgiving—Wednesday, November 27, 2019.

5.      Based on the procedural deadlines and approaching Thanksgiving holiday, BSA and Council respectfully move the Court to extend the deadline until Friday, December 13, 2019 for Defendants to reply to the Consolidated Motion to Dismiss Response.

6.      This motion is made in good faith and not for purposes of delay.

7.      Plaintiff's counsel does not oppose the requested extension, and no party will be prejudiced by the instant motion.

WHEREFORE, BSA and Council respectfully request entry of the attached Agreed Order granting Defendants the requested extension of time until Friday, December 13, 2019 to reply to Plaintiff's Consolidated Motion to Dismiss Response.

---

[1] Order Establishing Motion Practice Procedure, ¶ 3, available at https://www.circuit5.org/courts-judges/marion-county/judiciary/edward-l-scott/ (January 2019).

Highly Confidential

BSA-PLAN_01423125

**SA 1379**

Respectfully submitted by,

CLARKE SILVERGLATE, P.A.

799 Brickell Plaza, 9th Floor
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile: (305) 377-3001

By: /s/Spencer H. Silverglate
　　　Spencer H. Silverglate
　　　Florida Bar No. 769223
　　　ssilverglate@cspalaw.com
　　　mpedraza@cspalaw.com
　　　Francisco Ramos, Jr.
　　　Florida Bar No. 114766
　　　framos@cspalaw.com
　　　acastro@cspalaw.com
　　　Shannon P. McKenna
　　　Florida Bar No. 385158
　　　smckenna@cspalaw.com
　　　mpedraza@cspalaw.com
　　　*Attorneys for Boy Scouts of America*
　　　*And North Florida Council, Inc.*

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct of the foregoing was served through the

Florida E-Portal by e-mail, pursuant to Fla. R. Jud. Admin. 2.516, on this 18th day of November,

2019 to all counsel of record.

CLARKE SILVERGLATE, P.A.

By: /s/Spencer H. Silverglate
　　　Spencer H. Silverglate

Page **3** of **3**

Highly Confidential

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

      Plaintiff,

v.

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

      Defendants.

CASE NO. 2016-CA-000167

_____/

**AGREED ORDER GRANTING BSA AND COUNCIL'S
UNOPPOSED MOTION FOR EXTENSION OF TIME TO REPLY TO
PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

THIS CAUSE having come before the Court upon BSA and Council's Unopposed
Motion for Extension of Time to Reply to Plaintiff's Consolidated Response in Opposition to
Defendants' Motion to Dismiss Second Amended Complaint due November 22, 2019, and the
Court having reviewed the Unopposed Motion, having been advised of agreement by and
between counsel for parties, and being otherwise duly advise in the premises, it is hereby

ORDERED AND ADJUDGED that BSA and Council's Motion is GRANTED.
Defendants shall file their reply to Plaintiff's Consolidated Response in Opposition to
Defendants' Motion to Dismiss Second Amended Complaint on or before Friday, December 13,
2019.

Page **1** of **2**

BSA-PLAN_01423127

**SA 1381**

DONE AND ORDERED in Chambers in Marion County, Florida this _21_ day of November, 2019.

EDWARD L. SCOTT
CIRCUIT JUDGE

cc:     Counsel for Plaintiff:
        Paul L. SanGiovanni, psangi@forthepeople.com, mtodd@forthepeople.com

        Counsel for BSA and North Florida Council:
        Spencer H. Silverglate, ssilverglate@cspalaw.com,
        mpedraza@cspalaw.com Francisco Ramos, Jr., framos@cspalaw.com,
        acastro@cspalaw.com Shannon P. McKenna, smckenna@cspalaw.com,
        khickson@cspalaw.com

        Counsel for Silver Springs Shores Presbyterian Church, Inc.:
        Rachel Garcia, rgarcia@wickersmith.com, ndurham@wickersmith.com

Highly Confidential

BSA-PLAN_01423128

**SA 1382**

IN THE CIRCUIT COURT OF THE 5TH
JUDICIAL CIRCUIT IN AND FOR MARION
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

       Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL, INC.,
BOY SCOUTS OF AMERICA, AND
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

       Defendants.

_____/

## UNOPPOSED MOTION FOR EXTENSIONS OF TIME
## TO RESPOND TO DEFENDANTS' MOTIONS AND TO FILE REPLIES
## TO THE RESPONSE

Plaintiff, A.A. ("Plaintiff"), by and through his undersigned counsel and pursuant to

Florida Rule of Civil Procedure 1.200(a), requests this Honorable Court for an Order granting the

Plaintiff a one (1) day extension of time to within which to file and serve the consolidated

response through and including November 25, 2019 and requests an extension of time for

Defendants to file and serve their respective reply to the consolidated response to fourteen (14)

days from receipt of Plaintiff's consolidated response and otherwise states as follows:

      1.      On November 15, 2019 and November 21, 2019, respectively, the Court rendered

orders extending the time for the filing of Plaintiff's Consolidated Response to the Defendants'

Motions to Dismiss to November 22, 2019 and Defendants' Reply to December 13, 2019.

BSA-PLAN_01423129

SA 1383

2.      Thereafter, the undersigned counsel received a Subpoena to appear in Court November 21-22, 2019.  The subpoena is attached as **Exhibit A**.

3.      The counsel issuing the Subpoena intended for the undersigned counsel's testimony to be completed by the early afternoon of Thursday, November 21, 2019.

4.      Instead, the undersigned counsel waited at the Courthouse and was not called for testimony until 4:00 p.m.  In addition, the undersigned counsel remains under subpoena on Friday, November 22, 2019 for the Respondent's case and the Petitioner's rebuttal and has remained on stand-by throughout the day.

5.      This schedule disruption has impacted Plaintiff's counsel's finalization of the Consolidated Response to the Motion to Dismiss.

6.      Plaintiff requests a one (1) day extension within which to file the Consolidated Response to the Motions to Dismiss to through and including Monday, November 25, 2019.

7.      Plaintiff's counsel has discussed the relief requested herein with Defendants' counsel, each of whom has no objection to the relief requested, contingent upon the Defendants having fourteen (14) days from the receipt of the Consolidated Response to file their respective reply.

8.      The undersigned certifies that this Motion is made in good faith and not for the purpose of delay.

**WHEREFORE,** Plaintiff, A.A., respectfully requests this Court enter an Order granting the Plaintiff an extension of time to within which to file and serve the consolidated response through and including November 25, 2019 and requests an extension of time for Defendants to file and serve their respective reply to the consolidated response to fourteen (14) days from receipt of Plaintiff's consolidated response and for such further relief as is just and equitable.

2

Highly Confidential

Dated: November 22, 2019.        **MORGAN & MORGAN, P.A.**
                                 **Business Trial Group**

                                 *s/Paul L. SanGiovanni*
                                 **Paul L. SanGiovanni, Attorney at Law**
                                 Florida Bar No. 0513164
                                 20 North Orange Avenue, Suite 1600
                                 Orlando, Florida 32801
                                 Telephone:  (407)418-6041
                                 Facsimile:   (407)245-3394
                                 Primary E-mail:  psangi@forthepeople.com
                                 Secondary E-mail jacquimiller@forthepeople.com
                                 *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the November 22, 2019, I electronically filed the foregoing

with the Clerk of the Court by using the Court's E-portal filing system, which will serve a notice

of the electronic filing via e-mail to all counsel of record.

                                 *s/Paul L. SanGiovanni*
                                 **Paul L. SanGiovanni, Attorney at Law**

Highly Confidential

BSA-PLAN_01423131

**SA 1385**

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT,
IN AND FOR ORANGE COUNTY, FLORIDA**

**IN RE: THE MARRIAGE OF**

**CAESAR MARITATI**

      **Petitioner,**                   **CASE NO.: 2014-DR-2133**

**v.**

**FRANCIS COPPOLA**

      **Respondent.**

_____/

**<u>SUBPOENA FOR TRIAL</u>**

THE STATE OF FLORIDA

TO:    Paul SanGiovanni
       VIA EMAIL ONLY – psangi@forthepeople.com

      YOU ARE COMMANDED to appear before the Honorable Alan S. Apte, Judge of the Court, at the **Orange County Courthouse, 425 N. Orange Avenue, Courtroom 10-C, Orlando, Florida 32801** to testify at trial in this action.

      **IF YOU FAIL TO APPEAR AS DIRECTED, YOU MAY BE IN CONTEMPT OF COURT.  PLEASE GOVERN YOURSELF ACCORDINGLY.**

      The two (2) day time certain trial is scheduled for **Thursday, November 21, 2019 and Friday, November 22, 2019.  Trial will begin each day at 9:00 a.m. and is expected to go until 5:00 p.m. each day.**  You are on call for your appearance on these dates.  Unless otherwise directed by the undersigned attorney, you must appear for both days of trial, beginning at 9:00 a.m., and must plan to be in the courthouse and available for the duration of the day.

---

*Exhibit "A" to Motion for Extension of Time*

---

Highly Confidential
BSA-PLAN_01423132
SA 1386

2014-DR-2133
Maritati v. Coppola
Subpoena for Trial
Page 2 of 2

You are subpoenaed to appear by the undersigned and unless excused from this subpoena

by these attorneys or the Court, you shall respond to this Subpoena as directed.


DATED on November 13, 2019.



/s/Ashley Filimon, Esq.
ASHLEY FILIMON, ESQUIRE
FOR THE COURT


ASHLEY FILIMON, ESQUIRE
ASHLEY FILIMON, P.A.
Florida Bar No. 0095954
1420 E. Concord Street
Orlando, Florida 32803
407-801-5022
Attorney for the Petitioner
afilimon@legalperson.com


**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Court Administration at 425 N. Orange Ave., Room 2130, Orlando, Florida 32801, Telephone: (407) 836-2303 at least 7 days before your scheduled court appearance or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

Highly Confidential

IN THE CIRCUIT COURT OF THE 5TH
JUDICIAL CIRCUIT IN AND FOR MARION
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO. 2016-CA-000167

A.A.,

       Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL, INC.,
BOY SCOUTS OF AMERICA, AND
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

       Defendants.

_____/

### PLAINTIFF'S RESPONSE AND INCORPORATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT AND, IN THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND SECOND AMENDED COMPLAINT

Plaintiff, A.A. ("Plaintiff"), files this Response and Incorporated Memorandum of Law in

Opposition to the Motions to Dismiss the Second Amended Complaint served by Defendants,

THE BOY SCOUTS OF AMERICA, (hereinafter referred to as the "BSA"), the NORTH

FLORIDA COUNCIL, INC., BOY SCOUTS OF AMERICA, (hereinafter referred to as the

"NORTH FLORIDA COUNCIL"), and the SILVER SPRINGS SHORES PRESBYTERIAN

CHURCH, INC., (hereinafter referred to as the "SILVER SPRINGS SHORES").  BSA, NORTH

FLORIDA COUNCIL and SILVER SPRINGS SHORES herein shall be collectively referred to

as "Defendants".

### INTRODUCTION AND SUMMARY OF ARGUMENT

This action arises out the sexual abuse which George Fout, the Assistant Scoutmaster of

the BSA inflicted upon the Plaintiff, A.A., a minor, over the course of more than eight (8) years.

This abuse was known, or should have been known by the Defendants and BSA's Scoutmaster,

Highly Confidential

BSA-PLAN_01423134
SA 1388

Steve Fout, an agent of the Defendant.   The abuse included the mental grooming, mental manipulation and physical abuse itself suffered by the Plaintiff.

> Liability of the Defendants through the Knowledge of their Agent. Steve Fout, was at all times an *agent of the Defendants*. Without limitation, he was a Scoutmaster for the Defendants and *was held out by the organizations as the leader of the Plaintiff's troop*, responsible for the troop's compliance with the Defendant's policies.   (¶ 44 – 64).   In addition, other adults in the troop were agents of the Defendants.

The abuse alleged in the Second Amended Complaint occurred in Steve Fout's home, under circumstance in which Steve Fout, as an agent of the Defendants, knew or should have known that the abuse was occurring and that his adult son was sexually abusing scouts, including the Plaintiff. *See*, for example, ¶ 95 (a – i).

Florida law is clear that notice to this agent constitutes constructive notice to the Defendants.   This notice is alleged throughout the Second Amended Complaint.   *See*, for example ¶ 94, 99 and 149.   Allegations that the Defendants had this constructive knowledge and failed to act, state a cause of negligence action under Florida law for subsequent incidents of abuse.

> Liability of the Defendants through a "special relationship" with the Plaintiff.   *In addition to and separate from* liability which arises out of the *knowledge of the abuse by Steve Fout, the agent of the Defendants*, the Plaintiff also alleges *a secondary and alternate ground that there is a "special relationship"* between the Plaintiff and the Defendants which give rise to liability for their failure to control the acts of George Fout, the perpetrator .

Generally, plaintiffs rely on liability through a special relationship, to establish an obligation to "prevent misconduct" or "fail to control" conduct of a third party, when there is no notice, actual or constructive, to the Defendant of the third parties' continuing actions.   This is not the primary allegation in this case.

<div align="center">2</div>

Highly Confidential

In this case, liability through a special relationship is pleaded as an additional and alternative theory, because, *in this case there is constructive notice to an agent of the Defendants of the third party's continuing sexual abuse*.

The Defendants strategically attempt to argue the Court away from the primary ground of liability – that their agent is actually aware of the abuse and that he permits the abuse to continue,   Instead, the Defendants focus the Court upon the more challenging pleading requirements of a "special relationship."  Nevertheless, the Plaintiff has also asserted allegations which establish this alternate ground for liability.

The defenses raised by the Defendants are generally inappropriate to dismiss a case at the pleading stage.  The grounds more appropriate for argument at the Summary Judgment, if at all, particularly in the fact intensive arena of minor sexual abuse.  The Defendants' Motions to Dismiss should be denied.

Alternatively, the Plaintiff requests leave to amend the Second Amended Complaint to address pleading issues which the Court may identify as a result of the Motions to Dismiss.  The allegations of the Second Amended Complaint have been subject to just one (1) hearing and one (1) review and pronouncement by the Court.  In the Second Amended Complaint, the Plaintiff addressed each pleading issue identified by the Court.  If the Court identifies additional pleading issues in the Second Amended Complaint, or if the Court determines that those issues were not sufficiently addressed by the Plaintiff or identifies additional pleading issues, Florida Law is clear that the Plaintiff has a right to subsequent opportunities to cure the issues identified and amend his pleading.

Highly Confidential

BSA-PLAN_01423136

**SA 1390**

**THE SECOND AMENDED COMPLAINT ADDRESSES THE HOLDING OF THE ORDER UPON THE MOTIONS TO DISMISS THE AMENDED COMPLAINT**

On July 24, 2019, the Court rendered an Amended Order upon the Motions to Dismiss the First Amended Complaint. In general, the Second Amended Complaint[1] substantially supplemented the allegations of the First Amended Complaint.

Specifically, the Second Amended Complaint sounds in ten (10) Counts as follow:

- Negligence Counts:

    - Count I        Negligence against Silver Springs Shores

    - Count III       Negligence of North Florida Council

    - Count V        Negligence of BSA

- Breach of Fiduciary Duty Counts:

    - Count II        Breach of Fiduciary Duty of Silver Springs Shores

    - Count IV       Breach of Fiduciary Duty of North Florida Council

    - Count VI       Breach of Fiduciary Duty of BSA

- Vicarious Liability Counts:

    - Count VII       Vicarious Liability of Silver Springs, North Florida Council and BSA for Sexual Battery by George Fout [The Perpetrator of the sexual abuse against the Plaintiff]

    - Count VIII      Vicarious Liability of Silver Springs, North Florida Council and BSA for Negligence and Breach of Fiduciary Duty by Steve Fout [Scoutmaster]

    - Count IX       Vicarious Liability of North Florida Council and BSA for Negligence and Breach of Fiduciary Duty of Silver Springs Shores

    - Count X        Vicarious Liability of BSA for Negligence and Breach of Fiduciary Duty of North Florida Council and Silver Springs Shores

- Count XI        Fraud, Misrepresentation and Fraudulent Concealment.

---

[1] A redline document showing the revisions made to the Second Amended Complaint from the First Amended Complaint is attached as Exhibit "A".

4

An index to the general areas of the allegations in the Second Amended Complaint are as follows, each establishing sufficient grounds for each counts asserted by the Plaintiff:

- The Parties. (¶ 6 – 20).  Specific allegations of the Defendants' control within the hierarchical system of the BSA and the agency of Steve Fout, Scoutmaster.

- The Hierarchy of the BSA and Its Control over its Agent Scouting Organizations, (¶ 21 – 42).  Additional allegations of the Defendants' control within the hierarchical system of the BSA and the agency of Steve Fout, Scoutmaster, including, without limitation, the allegation that, "unless approved by the BSA, no adult scout leader may serve in a local troop or counsel", ¶ 26.

- The Defendants' Special Relationship with the Plaintiff. (P 43 [a – e]).  A new allegation specifically asserting the grounds upon which the special relationship between the Plaintiff and the Defendants arose.

- The Defendants' Special Relationship with, and Constructive Control of, Steve Fout, Scoutmaster, and his Agency for them.  (¶ 44 – 64).  Allegations, many new, specifically outlining the grounds upon which Steve Fout is an agent for the Defendants.

- The Defendants' Special Relationship with, and Constructive Control of George Fout, the perpetrator, and his Agency for them.  (P 65 – 80).  Allegations, many new, specifically outlining the grounds upon which Steve Fout is an agent for the Defendants.

- George Fout's Grooming and Preparation of the Plaintiff and Three (3) Other Scouts from Troop 448 for Abuse (P 81 – 93).

- George Fout's Abuse of the Plaintiff was Foreseeable and Immanent.  (P 94 – 99).

- The Defendants had Construction Control of the Premises upon which George Fount's Behavior Provided Notice of the Impending Abuse. (P 11 – 102).

    Each of these three sections include allegations, most new, asserting that the grooming of the Plaintiff, itself a form or emotional and mental abuse, and clear notice of impending sexual abuse occurred on the premises of the Defendants and in the presence of adult agents for the Defendants.

- George Fout's Abuse of the Plaintiff. (¶ 103 – 115).  Allegations detailing the grooming and extent of the Plaintiff's abuse and injury at the hands of George Fout in the presence of Steve Fout, agent of the Defendants, including that the abuse constituted violations of Section 794.011, F.S.

- BSA's History of Pedophilia. (¶ 119 – 140).

5

Highly Confidential

- <u>Negligence of the BSA Defendants</u>.  (¶ 141 – 147).  Allegations outlining the grounds for the BSA's alternate theory of negligence for its failure to train its adult volunteers and implement and enforce policies to prevent abuse.

- <u>Negligence of the BSA Defendants – Failure to Protect the Plaintiff</u>.  (¶ 148 – 150).  Allegations asserting the BSA's liability under theories of:

  a)   Notice of the specific abuse upon the Plaintiff (¶ 149),

  b)   Special relationship between the Plaintiff and the Defendants (¶ 148) and

  c)   Foreseeability arising from the BSA's history of pedophilia (¶ 150).

By these allegations, Plaintiff has asserted multiple grounds for a finding of liability against the Defendants for ordinary negligence, negligence arising out of a special relationship, negligence for failure to properly train adult troop leaders and negligence for failure to implement and enforce reasonable policies.  Any one of these, and certainly all in combination provide grounds for liability against the Defendants and require an answer.

In the Second Amended Complaint, the Plaintiff specifically addressed the grounds upon which the Court granted the Defendant's Motions to Dismiss, without limitation:

- As to Silver Springs, the Court held that the First Amended Complaint did not sufficiently allege a special relationship, because the incidents did not occur on the Defendant's premises.

  In response, the Plaintiff has asserted additional and more specific grounds for the theory of a special relationship, specifically supplementing the allegations at ¶ 43 (a – e) and other allegations throughout the Second Amended Complaint.  *See*, for example ¶ 170, repeated for each Defendant in each negligence count.

  To the extent that the Court requires that injury or notice on the premises is required for liability , the Plaintiff has added specific allegations that the

6

BSA-PLAN_01423139

SA 1393

grooming of the Plaintiff, which is, in itself abuse, an indicia of physical abuse and, were the adult leaders properly trained, notice that sexual abuse is immanent, occurred on the premises of the Defendants. *See*, for example, ¶, 95 (including 95[d]), 174, 190, 203, 219.

- As to Silver Springs, the Court found that the First Amended Complaint did not sufficiently allege that both George Fout or Steve Fout are actual or apparent agents of the Defendant, and the factual grounds therefore, including,

    In response, the Plaintiff added multiple allegations asserting the actual and apparent authority and agency of both George Fout and Steve Fout, including, without limitation, ¶ 57 – 64, and specifically:

    > 61.    At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

    > 62    "At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants"

    In addition, the Plaintiff has supplemented the grounds for the Defendants' ordinary negligence, *which does not require a special relationship* including, without limitation, negligence for mental and emotional injury arising from grooming for abuse, as a precursor to the abuse itself, negligence for failure to properly train adult troop leaders and negligence for failure to implement and enforce reasonable policies. ¶ 141 – 175.

7

BSA-PLAN_01423140

SA 1394

- As to the BSA and the North Florida Council, the Court found that the First Amended Complaint *did* sufficiently allege a special relationship because there is an allegation that the incident occurred on BSA property. The Plaintiff has maintained this allegation. ¶ 95, 100.

- As to both Defendants, the Court held that, as drafted, the Counts alleged were time barred, though the Court noted that assertion of statute of limitations is an affirmative defense which should not be considered on a motion to dismiss.

  In response, the Plaintiff has eliminated dates throughout the Second Amended Complaint. The reasoning and the response therefor is more specifically described below. However, on the current Second Amended Complaint, there are no grounds for dismissing the counts on the statute of limitations.

  Alternatively, as more particularly stated below, the Plaintiff requests leave to amend the Complaint to anticipate the affirmative defense, though it is the preferred law in the Florida that the Plaintiff not be required to anticipate the same in the Complaint.

The Plaintiff respectfully requests that the Court deny the Motions to Dismiss. The Second Amended Complaint addresses each deficiency identified by the Court in the First Amended Complaint, includes sufficient allegations to put the Defendants on notice of the claims against them, satisfies the essential elements for each claim and provides sufficient grounds for the causes of action to proceed to discovery.

Alternatively, the Plaintiff asserts that these cause of action are legally challenging and fact specific, that the Plaintiff's claim have been subject to only one (1) review by the Court and requests leave to amend its complaint.

8

BSA-PLAN_01423141

SA 1395

## THE MOTIONS TO DISMISS

The matters raised by the Defendants are not matters to be addressed at the pleading stage in this case. If one common theme can be gleaned from each of the cases cited, it is that the law in the area of duty, breach, limitations and the other defenses raised by the Defendants are highly fact specific and subject to, among other things, detailed factual development and credibility, far beyond what is required in an initial pleading.  This is *particularly* true in the area of whether there is a *special relationship* between the Plaintiff and the Defendants, a central issue identified by the Defendants in their motion.

Indeed, most of the cases cited by the Defendants in support of their arguments are appeals from summary judgment or verdicts in the trial court.

At this stage, the Plaintiff respectfully requests the Court deny the Motions to Dismiss and permit the development of the facts essential to a legal determination.

Alternatively, as stated, the Plaintiff respectfully requests that the Court grant the Plaintiff leave to further amend the Second Amended Complaint to address the issues raised by the Defendants and to incorporate particular issues which may be identified by the Court during Oral Argument.

### Standard of Review for a Motion to Dismiss

In evaluating a motion to dismiss, the trial court determines whether a claim states a cause of action upon which relief can be granted based upon the factual allegations contained within the four corners of the complaint, drawing all inferences in favor of the pleader, and accepting all material allegations as true. *See, Sobi v. Fairfield Resorts, Inc.*, 846 So.2d 1204, 1204 (Fla. 5th DCA 2003); *Davis By & Through Davis v. Bell*, 705 So. 2d 108, 109 (Fla. 2d DCA 1998). Importantly, "a complaint which states a cause of action on <u>any</u> ground should not be dismissed for failure to state a cause of action." *Nicholson v. Kellin*, 481 So.2d 931, 936 (Fla. 5th DCA 1985) (emphasis in original).

9

BSA-PLAN_01423142

**SA 1396**

In this case, drawing all inferences in favor of the Plaintiff, the Plaintiff has stated causes of action against each Defendant.  The Defendants should be required to answer the Second Amended Complaint and the matter should advance.

## ARGUMENT

The consolidated arguments of the Defendants generally address the issue of whether the Second Amended Complaint sufficiently alleges a "duty" upon which liability may be asserted; with other ancillary issues also addressed.[2]

### THE DUTY OF THE DEFENDANTS TOWARD THEIR SCOUTS

In summary, the Defendants argue that there is not alleged in the Second Amended Complaint that the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES have any duties toward individual scouts, including any general or fiduciary duty to warn or protect them from serial sexual abuse by one of its Assistant Scoutmasters when those activities occur under the roof of the Scoutmaster or during scouting activities.[3]

At first blush, that is a remarkable argument to be made by an national youth organization which specifically undertakes as its purpose "to provide, <u>through chartered organizations</u>, a program for boys, young men, and young women designed to encourage them to be faithful in their religious duties, build desirable qualities of character, train and involve them in the responsibilities of participating citizenship, and develop in them personal fitness" and

---

[2] Many of the arguments asserted by the Defendants are arguments asserted in the prior Motion to Dismiss the First Amended Complaint.  Rather than restate most of the applicable law, the Plaintiff herein incorporates his Response and in Opposition to the Motion to Dismiss the First Amended Complaint filed March 1, 2019, including the legal authorities cited therein; primarily addressing in this brief that the allegations of the Second Amended Complaint state the required causes of action supported by that law.

[3] Throughout its brief, the BSA erroneously argues that are no allegations in the Second Amended Complaint that the inappropriate activities of George Fout occurred during scouting activities.  That is not correct.  The Second Amended Complaint clearly references that A.A. would leave scouting activities with the Fouts, against Boy Scout regulations.  *See*, for example ¶ 95 (e).  In addition, the Second Amended Complaint alleges George Fout groomed A.A. for the sexual abuse during scouting activities.  *See*, for example, ¶ 101 – 102.

10

Highly Confidential

BSA-PLAN_01423143

**SA 1397**

represents that "all programs will be directed toward helping to develop the full potential of each member." The Purpose of the BSA. www.scouting.org/commissioners/bsa-mission/ (October 8, 2018).

Moreover, on its face, as a matter of law, the Defendants' Motions are not consistent with the law or with the allegations of the Second Amended Complaint.

### The Defendants have a general duty to act with reasonable care.
### The Defendants had constructive knowledge of George Fout's abuse of the Plaintiff

The Florida Supreme Court has spoken on issues of general duty toward others, when an organization has undertaken an obligation or action. Liability on these grounds *does not require* a finding of a special relationship, or that the incident occurred on the premises of the Defendant. Ordinary negligence against the defendants simply requires and allegation of the elements of negligence.

For example, in *Nova Southeastern University vs. Gross*, 758 So 2d 86 (Fla., 2000), a university student was injured during an off-campus, school related activity. She was assigned to an internship in a dangerous location and was sexually assaulted at the location. There, as here, the University attempted to use the argument that the absence of a "special relationship" between the adult student and the University was a shield from liability for its neglect. The Supreme Court rejected the defense. Finding that a "special relationship" existed in that case, the Court went further holding that "fundamental principles of tort law" would *also* support liability in that case. Quoting *Union Park Chappel vs. Hutt*, 670 So 2d. 64 (Fla, 1996), the Court stated:

> It is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care. *See Slemp v. City of North Miami,* 545 So.2d 256 (Fla.1989) (holding that even if city had no general duty to protect property owners from flooding due to natural causes, once city has undertaken to provide such protection, it assumes the responsibility to do so with reasonable care); *Banfield v. Addington,* 104 Fla. 661, 667, 140 So. 893, 896 (1932) (holding that one who undertakes to act is under an implied legal duty to act with reasonable care to ensure that the person or property of others will not be injured as a result of the undertaking); *Kowkabany v. Home Depot, Inc.,* 606 So.2d 716, 721 (Fla.

11

BSA-PLAN_01423144

SA 1398

1st DCA 1992) (holding that by undertaking to safely load landscaping timbers into vehicle, defendant owed duty of reasonable care to bicyclist who was struck by timbers protruding from vehicle window); *Garrison Retirement Home v. Hancock,* 484 So.2d 1257, 1262 (Fla. 4th DCA 1985) (holding that retirement home that assumed and undertook care and supervision of retirement home resident owed duty to third party to exercise reasonable care in supervision of resident's activities). As this Court recognized over sixty years ago in *Banfield v. Addington,* "[i]n every situation where a man undertakes to act, ... he is under an implied legal obligation or duty to act with reasonable care, to the end that the person or property of others may not be injured."

*Id.; see also Pate v. Threlkel,* 661 So.2d 278, 280 (Fla.1995)("A duty is thus established when the acts of a defendant in a particular case create a foreseeable zone of risk."). We find this fundamental principle of tort law is equally applicable in this case. There is no reason why a university may act without regard to the consequences of its actions while every other legal entity is charged with acting as a reasonably prudent person would in like or similar circumstances.

*Nova* at 89.  See also, *Shurben vs. Dollar Rent-A-Car,* 676 So 2d 467 (Fla. 3rd DCA, 1996).

Similarly, as here, *without the finding of any "special relationship"*, the BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES and Steve Fout, as their agent, each undertook to conduct a scouting program and solicited youth to participate.

The Second Amended Complaint alleges that the BSA cannot operate its scouting program (and specifically Troop 448) without the consent and cooperation of the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.   (¶¶ 22–30, 35–36).   Simply put, having undertaken to act, each Defendant individually, and collectively as agents for the other, had a duty to act as a reasonably prudent person would act in like or similar circumstances.

Clearly, the Second Amended Complaint alleges that each Defendant failed to so act. Repeated throughout the Second Amended Complaint are the allegations, revised for each respective Defendant[4], and Steve Fout, that:

---

[4] These allegations relate to the Negligence Count against Silver Springs.  They are repeated for each negligence count against each separate Defendant.

12

BSA-PLAN_01423145

SA 1399

152.   Defendant, SILVER SPRINGS SHORES undertook to promote and provide a scouting program for children and minor boys.

153.   Having undertaken this activity, SILVER SPRINGS SHORES had duty to act with reasonable care and to take precautions so that persons may not be injured.

. . . .

158.   George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES. Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 – 93

159.   The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

160.   SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

161.   George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

. . . . .

163.   Defendant SILVER SPRINGS SHORES breached the duty it owed the A.A., by acts or omissions which included, without limitation:

   a)   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in ¶¶ 103 - 115.

   b)   Allowing George Fout to have unsupervised contact with the Plaintiff during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse the Plaintiff

   c)   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

The Second Amended Complaint includes further allegations that the Defendants, through their agents, acted unreasonably. The Second Amended Complaint specifically and

13

consistently allege that Defendants and their agents had actual or constructive notice of the grooming of the Plaintiff by George Fout on SILVER SPRINGS SHORES premises at events sanctioned and managed by BSA and NORTH FLORIDA COUNCIL, thus making the Plaintiff's sexual abuse not only foreseeable, but likely.  (¶¶ 94–95, 173, 189, and 218).

Due to this grooming and its accompanying injuries, the Second Amended Complaint alleges the Defendants did not act reasonably and this failure directly resulted in the Plaintiff being sexually battered.  (¶¶ 164–165, 193–194, 206–207).

The Second Amended Complaint further alleges that Steve Fout, as the Scoutmaster of Boy Scout Troop 448, was acting as an agent for the Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of the BSA. (¶239).  As Scoutmaster, he and other adult leaders of Troop 448 knew or should have known of that George Fout was grooming the Plaintiff for sexual abuse and that abuse of the Plaintiff was foreseeable, impending and ongoing.  (¶¶ 88–93).  The Second Amended Complaint alleges that Steve Fout allowed the abuse to continue nevertheless.

*Even without the "special" or "fiduciary" relationship discussed*, below, this knowledge of a known danger creates in the principals the duty to protect the youth and liability in the principals for the failure to do so.  The Motions to dismiss these counts should be denied and the matter should proceed to a jury's determination of the scope of the agency, degree of knowledge of the agent and the breach of the principals' related duties.  To the extent that this Court would be inclined to dismiss the current Second Amended Complaint, the Plaintiff respectfully requests leave to amend the Second Amended Complaint.

### Special Relationship
### The Sexual Abuse of George Fout was known to agents of the Defendants

In addition, the Second Amended Complaint details the "special relationship" between the Defendants and the abuser George Fout (¶¶s 65–80), Troop 448's Scoutmaster and the

Highly Confidential

BSA-PLAN_01423147

**SA 1401**

abuser's father Steve Fout (¶¶s 44–64), and the victim the Plaintiff (¶43(a-e)).  When there is such a special relationship, the institution not only has a duty to warn and protect against known dangers, but also has a duty to warn and protect against reasonably foreseeable dangers.

That there can be such a relationship between an institutional party and an individual member is well recognized.  See, *Nova*, supra, *Gross vs. Family Service Agency, Inc*. 716 So 2d 337 (Fla 4th DCA, 1998).  A review of the case law results in the conclusion that each case is particularly fact specific.  In fact, *there are no cases directly on point in the state of Florida*, other than to generally state the principal that under certain "special relationships" the liability asserted by the Plaintiff, in this case can be imposed on institutional parties, such as the Defendants.

The Second Amended Complaint includes several well recognized bases for the formation of the special relationship, including, that the abuse and grooming for abuse occurred while Plaintiff was in the care and custody of Defendants (¶¶s 90, 95(d)), that the Defendants were substituting for Plaintiff's parents (¶ 43(e)), and George and Steve Fout were acting as agents of the Defendants (¶¶s 62–64, 78–80).

Further, institutional organizations, such as churches, are routinely held to have a "special relationship" toward minors who are sexually abused.  For example, in *C.J.C vs Corporation of the Catholic Bishop of Yakima*, 985 P.2d 262, (Wash. 1999), en banc, the Supreme Court of Washington considered the claims of sexual abuse victims molested as children by a deacon. The claims were dismissed on summary judgment.  On appeal, the Supreme Court reversed and remanded the case, finding that there existed disputed issues of fact whether a "special relationship" existed between the Catholic Church, as an institutional entity, and the children, even though the acts of the Deacon were criminal and even though they occurred off of church property.

<div align="center">15</div>

BSA-PLAN_01423148

**SA 1402**

The extended opinion of the Court, held "*we simply do not agree with the Church that its duty to take protective action was arbitrarily relieved at the church door*" *Id*. at 726.

In general, the Second Amended Complaint alleges that in light of the history of pedophilia in the Boy Scouts, the risk of sexual abuse of its scouts was particularly great. (¶¶ 28 – 33). Furthermore, George Fout's grooming of the Plaintiff *while in the custody of the Defendants and other adult leaders, including his father,* further demonstrates the heightened level of risk of sexual abuse. (¶¶ 90, 95(d)). As a result, the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES had a duty to warn and protect scouts in its care from sexual abuse by Scoutmasters and other volunteers including Assistant Scoutmasters.

Notably, *C.J.C* supports the Plaintiff's position that the *occurrence of the sexual abuse off premises of scouting activities is irrelevant to the existence of the duty.* Notably, the Second Amended Complaint specifically alleges that the grooming of the Plaintiff and at least one instance of abuse occurred *on the premises* of SILVER SPRINGS SHORES and during a BSA, NORTH FLORIDA COUNCIL scouting activity. (¶¶95(a-e)).

In this case, specifically, Steve Fout, as a Scoutmaster and agent of the Defendants knew or should have known that his Assistant Scoutmaster was sexually abusing his scouts and should have taken action to prevent George Fout's exposure to his scouts, to the Plaintiff and to further abuse. Furthermore, due to their positions within the BSA hierarchy and the Plaintiff's continuous grooming for sexual abuse by George Fout on SILVER SPRINGS SHORE's premises during BSA and NORTH COUNCIL sanctioned events, they should have known the Plaintiff was in danger and taken action to prevent the Plaintiff from further abuse. (¶¶100–102). Instead, Steve Fout and the Defendants allowed it to continue.

In light of the highly fact specific nature of a finding of a "special relationship", it is also notable to consider the procedural posture of the cases cited by the Defendants. In addition to each being factually distinguishable from the instant case, particularly with respect to Steve

16

Highly Confidential

Fout's involvement, in most of the cases substantively relied upon by Defendants, the Plaintiff was provided with the opportunity to factually discover, develop and establish its allegations, either in opposition to a motion for summary judgment or to a jury.

- *Archbishop Coleman F. Carroll High School Inc. v. Maynoldi*, 30 So. 3d 533 (Fla. 2d DCA 2010)-Appeal from a *jury verdict* against school and diocese;

- *Roe v. Boy Scouts of America Corp.* 2012 WL 3933184- Appeal from a motion for *summary judgment*;

- *Special Olympics Florida, Inc. v. Showalter*, 6 So.3d 662 (Fla. 5th DCA 2009)- Appeal from a *jury verdict*;

- *Goss v. Human Services Associates, Inc.*, 79 So.3d 127 (Fla. 5th DCA 2012)- Appeal form a *summary judgment*;

- *Iglesia Cristina La Casa Del Senor, Inc. v. L.M.*, 783 So.2d 353 (Fla. 3d DCA 2001)- Appeal from a *jury verdict*;

- *Concepcion v. Archdiocese of Miami By and Through McCarthy*, 693 So.2d 1103 (Fla. 3d DCA 1997)- Appeal from a *summary judgment*.

In summary, the Plaintiff has sufficiently alleged the necessary elements to assert a duty of general negligence and a duty arising out of a "special relationship", such as would impose liability upon the Defendant for a breach of ordinary care, or a duty to protect or warn.  The Motions to Dismiss on these grounds should be denied.  To the extent that this Court would be inclined to dismiss the current Second Amended Complaint, the Plaintiff respectfully requests leave to amend the Second Amended Complaint.

## Fiduciary Duty
### The Sexual Abuse of George Fout was known to an agent of the Defendants

Similar to a "special relationship", a fiduciary duty extends "to every possible case in which there is confidence reposed on one side and the resulting superiority and influence on the other. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.  (citations omitted)." *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 421 (1927).  An implied fiduciary relationship will lie when

17

there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party. *Id.* at 934.   *Masztal vs. City of Miami*, 971 So 2d 803 (Fla 3rd DCA, 2007).

On point in Florida is the case of *Doe v. Evans*, 814 So.2d 370 (Fla. 2002). Cited by Defendants, in *Doe* the Florida Supreme Court found liability based on an implied fiduciary relationship that arose between a priest providing martial counseling and his counselee. The *Doe* Court "stressed that the liability in this case rests on the assertion of an abuse of a marital counseling relationship through an inappropriate sexual relationship." *Id* at 375.

Specifically, the Second Amended Complaint alleges the Defendants accepted the trust and confidence of the Plaintiff and developed a duty to protect the Plaintiff from foreseeable harm through their respective positions within the Boy Scout hierarchy. (¶ 43(a–e)). It was through these relationships that Plaintiff would leave Boy Scout Troop meetings and activities with George Fout in order for Fout to continue with his abuse upon Plaintiff.

In summary, the Plaintiff has sufficiently alleged the necessary elements to assert a fiduciary duty against the Defendants, such as would impose liability upon the Defendant for a breach of ordinary care, or a duty to protect or warn.  The Motions to Dismiss on these grounds should be denied.  To the extent that this Court would be inclined to dismiss the current Second Amended Complaint, the Plaintiff respectfully requests leave to amend the Second Amended Complaint.

<div align="center">

**Vicarious Liability of Agents and Volunteers**
**The Sexual Abuse of George Fout was known to an agent of the Defendants**

</div>

Vicarious liability is founded upon imputed liability for the defendant for another party's tortious acts. *Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So.2d 459, 467 (Fla. 2005). Liability is imputed when (1) an agency relationship exists between the defendant and the party who acted wrongfully and (2) the wrongful actions by the third party fall within the scope

<div align="center">18</div>

of agency. Generally, sexual assault and batteries by employees are held to be outside the scope of an employee's employment, and therefore insufficient to impose vicarious liability on the employer. *See Nazareth v. Herndon Ambulance Serv., Inc.,* 467 So.2d 1076, 1078 (Fla. 5th DCA 1985). However, an exception exists where the tortfeasor was assisted in accomplishing the tort by virtue of the relationship. *See id.*; compare *Hennagan v. Dep't of High Saf. & Motor Veh.*, 467 So.2d 748 (Fla. 1st DCA 1985), with *Argriturf Mgmt., Inc. v. Roe*, 656 So.2d 954 (Fla. 2d DCA 1995).

In *Hennagan*, the court was asked to determine whether the allegations in the First Amended Complaint were sufficient to survive a motion to dismiss. 467 So.2d at 749. The court found that the allegations were sufficient because it could not be said, as a matter of law, that the allegations did not support a finding that the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship he had with his employer.

As alleged in the Second Amended Complaint, at all relevant times, the abuser George Fout, as Assistant Scoutmaster, was acting as agent for Defendants by implementing and maintaining a scouting program at the local level with the consent an oversight of Defendants. (¶¶ 68–73, 76). The Second Amended Complaint alleges SILVER SPRINGS SHORES, as the chartering organization for the Plaintiff's Troop, is an agent of BSA. (¶35–36). It is also alleged that NORTH FLORIDA COUNCIL is an agent of the BSA due to its operation of the Plaintiff's specific Troop and the fact that NORTH FLORIDA COUNCIL cannot operate the Plaintiff's troop without the consent of the BSA. (¶¶41–42). Therefore, it was George Fout's position as an agent within the BSA hierarchy which allowed George Fout to groom the Plaintiff for sexual abuse and then subsequently achieve his objective. (¶¶ 85, 90, 92).

The Second Amended Complaint states a cause of action upon which relief can be granted and the Defendant's motion to dismiss should be denied. To the extent that this Court

19

BSA-PLAN_01423152
SA 1406

would be inclined to dismiss the current Second Amended Complaint, the Plaintiff respectfully requests leave to amend the Second Amended Complaint.

## OTHER ISSUES RAISED IN THE MOTION TO DISMISS

### The Statute of Limitations

Defendants raise the argument in the Motion to Dismiss that the Second Amended Complaint is barred by the applicable four year statute of limitations.  When reviewing a motion to dismiss, the court is limited to the four corners of the complaint.  *See Cazares v. Church of Scientology, of California, Inc.,*444 So.2d 442 (Fla. 5th DCA 1983).  The statute of limitations is an affirmative defense.  Florida law is clear that an affirmative defense may not be considered on a motion to dismiss unless the affirmative defense is established on the face of the Complaint. *Frank v. Campbell Prop. Mgmt., Inc.*, 351 So.2d 364 (Fla. 4th DCA 1977) (citation omitted); *see also* Fla. R. Civ. P. 1.110 (d).  A Plaintiff is not required to anticipate and plead against affirmative defenses in the Complaint.  *See Williams vs. City of Jacksonville*, 191 So 3d 925 (Fla 1st DCA, 2016).  If there is additional information required to support a fatal defense, the recourse would be a motion for summary judgment or trial. *Minor v. Brunetti*, 43 So.3d 178, 179 (Fla. 3d DCA 2010)(holding that the "issue would be better addressed on a summary judgment motion or at trial, not on a motion to dismiss," where the trial court went beyond the four corners of the First Amended Complaint in granting a motion to dismiss).

In this Second Amended Complaint, the Plaintiff has not included dates to upon which the incidents occurred.  There is nothing on the face of the Second Amended Complaint which would establish a statute of limitations defense for the Defendants.

The removal of dates was intentional, to focus the issues on the Motion to Dismiss exclusively to the issues of duty and negligence arising out of common duty or a special relationship, which were the subject to the Court's Order and to eliminate from the consideration

Highly Confidential

BSA-PLAN_01423153

SA 1407

the issue of the statute of limitations, which Florida law expressly provides is not appropriate for consideration at this stage.

SILVER SPRINGS SHORES argues this approach and process, itself, renders the Second Amended Complaint subject to dismissal, because of the absence of dates. SILVER SPRINGS SHORES does not cite any case law to support its proposition. Notably the Plaintiff's research has found no case requiring that dates be included in the complaint, and certain cases which suggest they are not required.

In the Second Amended Complaint, the relevant relationships of the parties, including the Defendants, George Fout and Steve Fout are specifically tied to the duration and time of the agency and the abuse. See, ¶¶ 2, 12, 14, 16, 42, 43, 44, 51, 53, 56, 61, 62, 64, 65, 66, 69, 72, 77, 78, 80 87, 95. These allegations are sufficient to test the legal sufficiency of the counts in the Second Amended Complaint and survive a Motion to Dismiss.

Relative to answering the Complaint, the Defendants may simply answer that they are "without knowledge" if the absence of a date prevents an admission or denial[5]. The specific dates can be vetted through discovery.

The BSA argues in their Motion to Dismiss that Plaintiff's fraud count must be dismissed due to statute of limitations, again there is nothing on the face of the Second Amended Complaint to warrant dismissal. The Second Amended Complaint alleges there was a plan of action to cover up incidents of sexual abuse of minors (¶¶288(a-c)), that the Plaintiff would not have joined the BSA if he would have known of the concealed abuse (¶290), and that this fraud was a direct and proximate cause of George Fout's sexual abuse of the Plaintiff (¶294). Simply

---

[5] In truth, it is unlikely that the Defendants are "without knowledge" of the relevant dates, inasmuch as George Fout was convicted of multiple counts of molestation upon at least three (3) additional scouts in Troup 448 and was the focus of high profile national news coverage, all associated with his position as an assistant troop leader of the Defendants.

21

put, there is nothing to establish a statute of limitations defense on the face of the Second Amended Complaint.

The inclusion of dates is not required to survive a Motion to Dismiss.  Instead, the Defendants are raising the issue as a pretense to raise the statute of limitations as an affirmative defense on a Motion to Dismiss.  Florida Law is clear that this is not permissible and reversible error, particularly in the area of sexual abuse cases.  See, *Abrose vs. Catholic Social Services, Inc*. 736 So 2d 146 (Fla 5th DCA, 1999) ("Only under extraordinary circumstances where the facts in the complaint, taken as true, conclusively show that the action is barred by the statute of limitations, should a motion to dismiss on this ground be granted"), *Doe No. 3 vs. Nur-Ul-Islam Academy, Inc*. 217 So, 3d. (Fla 4th DCA, 2017) (re: statute of limitations in an abuse case "The facts giving rise to a motion to dismiss must be found within the four corners of the complaint, and therefore, if there is additional information required to support a fatal defense, the recourse would be a motion for summary judgment or trial").  *See also, Chakra 5, Inc. vs. City of Miami Beach*, 254, So. 3d, 1056 (Fla. 3rd DCA, 2018), *Exposito vs. Public Health Trust of Miami-Dade County*, 141 So 663 (Fla. 3rd DCA, 2014).

Based upon the factual allegations contained within the four corners of the Second Amended Complaint, the Second Amended Complaint is not subject to dismissal on the ground of the statute of limitation. If the Court is inclined to grant the motion on this ground, the Plaintiff further asserts its motion to amend to incorporate specific dates as required, as they are available.

## Plaintiff Properly Alleges A Claim For Fraud, Fraudulent Concealment, Fraudulent Misrepresentation

The Second Amended Complaint clearly alleges both fraudulent misrepresentation and fraudulent concealment.  Fraudulent misrepresentation requires: (1) a false statement concerning a material fact (¶¶140,274, 281, 288–290); (2) the representor's knowledge that the

22

representation is false (¶¶125,131. 271–272); (3) an intention that the representation induce another to act on it (¶¶285, 288; and (4) consequent injury by the party acting in reliance on the representation (¶290–292).  *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st DCA 2011).  The elements of fraudulent concealment are: (1) a party concealed or failed to disclose a material fact (¶¶140,274, 288–290); (2) the party knew or should have known the material fact should be disclosed (¶125, 271–272); (3) the party knew their concealment of or failure to disclose the material fact would induce the plaintiff to act (¶¶284–285); (4) the party had a duty to disclose the material fact (¶¶268–270, 273) ; and (5) the plaintiff detrimentally relied on the misinformation (¶290–292).  *Hess v. Philip Morris USA., Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

Defendants BSA and NORTH FLORIDA COUNCIL argue Count XI of the Second Amended Complaint does not clarify whether the Plaintiff is alleging fraudulent or negligent misrepresentation and as such cannot respond to the count.  Here, Plaintiff has alleged the elements of fraudulent misrepresentation (discussed above), but also specifically alleges the Plaintiff "reasonably relied upon the BSA's representations that it presented a moral and safe place for boys." (¶280).  *Specialty Marine & Indus. Supplies, Inc.*, 66 So. 3d at 310.  Therefore, the Plaintiff has properly alleged both fraudulent and negligent misrepresentation and does not inhibit Defendants from constructing a "cogent defense to Count XI" as alleged by Defendants.[6]

To the extent that this Court would be inclined to dismiss Count XI of the Second Amended Complaint, the Plaintiff respectfully requests leave to amend the Second Amended Complaint, particularly as this is the Plaintiff's first pleading of this Count.

---

[6] Interestingly, though arguing that the allegations of the instant Complaint cannot be answered, Defendant BSA has filed an answer to a very similar count in Pennsylvania, upon which Count XI of the Second Amended Complaint was based.  *See S.D. v. Boy Scouts of America, et al*, Doc. # 190800135 , Ct. Com. Pl.  If this count can be answered in Pennsylvania, it can be answered in Florida.

23

BSA-PLAN_01423156

SA 1410

## DEFENDANTS ARE VICARIOUSLY LIABLE FOR GEORGE FOUT'S SEXUAL BATTERY

Defendants BSA and NORTH FLORIDA COUNCIL allege in their Motion to Dismiss that Defendants are not vicariously liable for the sexual battery committed by George Fout because the Second Amended Complaint "fails to assert any allegation of sexual battery in connection with Scouting activity to withstand a motion to dismiss."

This is incorrect, as the Second Amended Complaint specifically alleges that the Plaintiff was groomed for sexual abuse while on SILVER SPRINGS SHORES' premises during events sanctioned and managed by the BSA and NORTH FLORIDA COUNCIL. (¶95). This grooming then directly led to the inevitable abuse by George Fout that undoubtedly constituted sexual battery. *See* Fla. Stat. § 794.011(1)(h); (¶107).

## ALTERNATIVE MOTION TO AMEND THE SECOND AMENDED COMPLAINT

As stated, the Plaintiff's Second Amended Complaint, including its specific assertions and inferences, states a cause of action against the Defendants and requires an Answer. The Defendants are on notice of the basis of their duties, the nature of the breaches of that duty and the injuries sustained. The issues raised in their respective motions are collectively and individually highly fact specific, particularly in the area of minor abuse by Hierarchal organizations, and must be resolved on their developed facts using the appropriate procedure vehicles available, including summary judgment or jury deliberation.

The Defendants assert that the Motion to Dismiss should be granted with Prejudice. There is no ground for such a strict remedy at this juncture. The allegations of the Second Amended Complaint have been subject to just *one (1) hearing* and just *one (1) review and pronouncement by the Court*. In the Second Amended Complaint, the Plaintiff addressed each pleading issue identified by the Court. If the Court identifies additional pleading issues in the Second Amended Complaint, or if the Court determines that those issues were not sufficiently

24

BSA-PLAN_01423157
SA 1411

addressed by the Plaintiff or identifies additional pleading issues, Florida Law is clear that the Plaintiff has a right to subsequent opportunities to cure the issues identified and amend his pleading

     To the extent this Court is inclined to dismiss any of the Plaintiff's claims, the Plaintiff requests that it be without prejudice to allow for leave to amend under Florida Rule of Civil Procedure 1.190(e). It is well established that a court's finding that a complaint fails to state a cause of action, by itself, is not a sufficient ground on which to base an order of dismissal with prejudice. *Bouldin v. Okaloosa County*, 580 So. 2d 205, 207 (Fla. 1st DCA 1991). Instead, dismissal with prejudice should only be imposed when it conclusively appears from the face of the complaint that there is no possible way to amend to state a cause of action, or when the privilege to amend has been abused. *Obenschain v. Williams*, 750 So. 2d 771, 773 (Fla. 1st DCA 2000); *Crown v. Chase Home Fin.*, 41 So. 3d 978, 980 (Fla. 5th DCA 2010) ("all doubts should be resolved in favor of allowing the amendment and refusal to do so generally constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile") (internal citations omitted); *Pangea Produce Distributors, Inc. v. Franco's produce, Inc.* 275 So. 3d 240 (Fla. 4th DCA 2019) (not allowing leave to file a *third amended complaint* was an abuse of discretion.).

     The Plaintiff has stated viable claims against the Defendants and the Motions should be denied. However, in the alternative, the Plaintiff requests leave to amend in order to allege additional facts or a different legal theory of relief. *Id.* Clearly, the gravity of the abuse and the injury suffered by the Plaintiff, alone suggest that the Plaintiff be granted exceptional degree of leave to assert his causes of action and to seek relief.

Highly Confidential

BSA-PLAN_01423158

**SA 1412**

## REQUEST FOR ORAL ARGUMENT

Pursuant to this Court's Motion Practice Procedure, Plaintiff respectfully request oral argument on this Motion to Dismiss. The estimated time required for argument is 1 hour.

Dated: November 25, 2019        **MORGAN & MORGAN, P.A.**
**Business Trial Group**

*/s/Paul L. SanGiovanni*
Paul L. SanGiovanni, Esq.
FBN 0513164
20 N. Orange Avenue, Suite 1500
Orlando, FL 32801
Telephone:     (407)418-6041
Facsimile:      (407)245-3394
Primary email: PSangi@ForThePeople.com
Secondary email: MTodd@ForThePeople.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 25, 2019, I electronically filed the foregoing with the Clerk of the Courts by using the Florida Courts eFiling Portal which will send electronic notification to all counsel of record.

*/s/ Paul L. SanGiovanni*
Paul L. SanGiovanni

Highly Confidential

BSA-PLAN_01423159

**SA 1413**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

      Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL,
INC., BOY SCOUTS OF
AMERICA, AND SILVER
SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff, A.A, by and through his undersigned counsel, files this Complaint against Defendants, THE BOY SCOUTS OF AMERICA, a foreign corporation authorized to do business in Florida (hereinafter referred to as the "BSA"), the NORTH FLORIDA COUNCIL, INC., BOY SCOUTS OF AMERICA, a corporation authorized to do business in Florida (hereinafter referred to as the "NORTH FLORIDA COUNCIL"), and the SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC., a corporation authorized to do business in Florida (hereinafter referred to as the "SILVER SPRINGS SHORES") and for good cause, states:

### INTRODUCTION

1.     **General Statement of Claims:** This Complaint is based on the childhood sexual abuse of Plaintiff, A.A. caused by the negligent, willful, wanton, reckless and tortious acts and omissions of BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES,

---

**Exhibit "A" to Response to Motion to Dismiss
Second Amended Complaint**

---

BSA-PLAN_01423160
SA 1414

Scoutmaster Steve Fout and other agents of the BSA, and George Fout, formerly an Assistant Scoutmaster.

1.        At all relevant times, George Fout was the agent of Defendant BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.  These ~claims ~relate ~to ~acts ~of sexual

2.         battery as described in Section 794.011, Florida Statutes suffered by the Plaintiff, A.A., while he was a participant in the programs operated by the Defendants. A.A. was the victim of these acts, and each of them occurred prior to the age of sixteen (16)..

2.3.        As more particularly described herein, the Plaintiff suffered the sexual battery described herein as a result of the neglect of the BSA and its, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES and their respective agents to, among other things, exercise due care in the administration, management and operation of its scouting program, their breach of their fiduciary duties and their vicarious liability for the acts of their agents.

3.4.    **Jurisdiction and Venue**:     This ~is ~an ~action ~for ~damages ~that exceed Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorneys' fees.

 Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorneys' fees.

4.5.        Venue is proper in Marion County, Florida because the events giving rise to this action occurred in Marion County, Florida. .

5.        **The ~Parties**:    A.A. ~is ~currently ~an ~adult ~residing ~in ~Marion ~County,

6.         Florida. The actions described herein occurred when A.A. was under sixteen (16) years of age. The initials "A.A." are used to protect the identity of Plaintiff from public disclosure. The identity and further relevant details shall be disclosed to the Defendants off record and confidentially.

6.7.        At all relevant times, A.A. resided in Marion County, Florida.

2

BSA-PLAN_01423161

SA 1415

8.      A.A. was a member of the Boy Scouts of America Troup 448.

9.      Plaintiff met his abuser, George Fout, due to George Fout's role as the Assistant Scoutmaster of Troup 448.

10.      SILVER SPRINGS SHORES was the chartering organization for Troop 448, or such other Boy Scout Troop as A.A. was a member (herein collectively referred to as "Troop 448").

11.      The BSA is a foreign corporation authorized to do business in the state of Florida.

7.——At all relevant times, BSA controlled or had the right to control -the NORTH

12.      FLORIDA COUNCIL'sCOUNCIL and the sponsoring organizations, which implemented BSA's scouting program, including, without limitation, SILVER SPRINGS SHORES.

13.      The NORTH FLORIDA COUNCIL is a corporation authorized to do business in the State of Florida and is located in Duval County, Florida.

14.      At all relevant times, the NORTH FLORIDA COUNCIL was an agent of BSA, subject to BSA's control or right to control.

8.15.      As Defendant BSA's agent, the NORTH FLORIDA COUNCIL controlled or had the right to control local troops directly, or through their sponsoring organizations, including, without limitation, SILVER SPRINGS SHORES.

9.16.      SILVER SPRINGS SHORES is a corporation authorized to do business in the State of Florida and is located in Marion County, Florida. At all relevant times, the SILVER SPRINGS SHORES was an agent of BSA and the COUNCIL, subject to BSA'stheir control or

3

BSA-PLAN_01423162

SA 1416

right to control. ~~As Defendant BSA's agent, the SILVER SPRINGS SHORES controlled or had the right to control local troops directly, or through their sponsoring organizations.~~

17.    ~~Upon information~~ As Defendant BSA and ~~belief~~ NORTH FLORIDA COUNCIL' agent, SILVER SPRINGS SHORES ~~was~~ controlled or had the ~~chartering organization for Troop 448, or such other Troop as A.A. was a member (herein~~ right to control the programs and troops that it sponsored, including its Scoutmaster and Assistant Scoutmasters.

~~10.~~18.   The BSA, NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES will be collectively referred to ~~as "Troop 448").~~ herein as the Boy Scout Defendants.  When so used, the term references each in their respective individual capacities.

19.    Steve Fout was the Scoutmaster and leader of Troop 448.

~~11.~~20.   George Fout was Steve's son and was an Assistant Scoutmaster of Troop 448.

~~12.    Steve Fout, George Fout's father, was the Scoutmaster of Troop 448.~~

### STATEMENT OF FACTS

~~Scouting is a Hierarchical System~~

### The BSA

~~13.~~21.  The BSA is a large youth-serving organization. ~~who~~ which promotes, markets, and encourages parents to enroll their children in the BSA. Enrollment in the BSA requires parents to entrust their children's health and safety to the BSA and requires children to engage in activities that expose them to adults and others. Much of the BSA's activities include over-night outings, camping trips, and trips away from parents.

~~BSA~~

### The Hierarchy of the BSA and the BSA's Control Over Its Agent Scouting Organizations

4

BSA-PLAN_01423163

SA 1417

22.    The BSA has ~~established~~ ~~its~~ presence ~~through~~ ~~the~~ use ~~of~~ ~~a~~ ~~hierarchical~~ system, ~~whereby~~ ~~local~~ ~~COUNCILS~~Councils and chartering organizations implement and maintain the BSA's program at a local level under the BSA's guidance and control.

23.    Organizationally, the BSA is separately incorporated from local councils, but the BSA and the BSA's local councils comprise a tightly integrated, hierarchal organizational structure under the BSA's control at the top.

~~14.~~24. The BSA issues the Boy Scouts of America name, emblems, badges, markings, and youth programs to the ~~COUNCILS~~Councils and chartering organizations. The BSA requires the local ~~COUNCIL~~Council and troops within a local ~~COUNCIL~~Council to strictly adhere to the BSA's organizational charter and standards of leadership.

~~15.    A local scouting troop cannot exist without the support of a chartering organization that has received a charter from BSA authorizing the chartering organization to implement and run BSA's scouting program.~~

25.    For example, all members of scout troops chartered through a local council must be registered and pay dues to the BSA. The BSA oversees and controls all professional staffing of local councils. Local councils may not employ any professional scouts who are not drawn from a BSA approved candidate list that the BSA compiled and maintained. Local councils are not permitted to use any programs or materials that the BSA has not supplied or approved.

26.    Unless the BSA has selected and approved them, no adult scout leader, whether paid or volunteer, may serve in a local troop or council.

27.    The BSA asserts First Amendment associational rights to exclude Scoutmasters and volunteers who do not share their values or beliefs and anyone else it chooses from participating in scouting.  Indeed the BSA has *successfully* asserted these associational rights in

trial, appellate and over their volunteer and are judicially estopped from asserting that they do not have control or a special relationship with their Scoutmasters and volunteers. *See*, for example, *Boy Scouts of American vs. Dale*, 530 U.S. 640 (2004).  The BSA is similarly judicially estopped from arguing that these Scoutleaders and volunteers are not their agents.

28.    The BSA provides a wide variety of management services to locals councils and troops, including insurance and risk management, marketing, education, training, scout camps, facilities, media relations, and human resources. Duplicate personnel files on local council employees are maintained at the local council and at the BSA's national headquarters.

16.29. The BSA creates the bylaws, rules and regulations that every chartering organization must adhere to in implementing and running the BSA's scouting program. Significantly, the BSA's bylaws obligate a chartering organization to provide adequate facilities, supervision, and leadership for the troop in exchange for the granting of a charter to run a local scouting troop.

30.    A local scouting troop cannot exist without the support of a chartering organization that has received a charter from the BSA authorizing the chartering organization to implement and run the BSA's scouting program.

17.31.  Under the BSA bylaws, each chartering organization is required to select at least three people over the age of 21 to serve as the Troop Committee. The Troop Committee then selects the Troop Scoutmaster. The BSA must approve scout leaders, whether paid or volunteer, to serve in a local troop or council.

18.32.  Together, the Troop Committee and the Scoutmaster are responsible for the general program and supervision of the troop.

6

Highly Confidential

BSA-PLAN_01423165

**SA 1419**

19.33.  Further, each chartering organization is required to appoint a representative other than the Scoutmaster or Assistant Scoutmaster to serve as its institutional representative on the local COUNCIL Council.

20.34.  A chartering organization must reapply to the BSA every year for a renewed charter in order to continue to operate a local troop.  The BSA may revoke a chartering organization's charter at any time should the chartering organization be found to deviate from the BSA's charter and bylaws.

21.35.  This chartering system reveals the BSA's consent to allow local chartering organizations to operate the scouting program on its behalf and the chartering organizations' consent to operate the local troops subject to the BSA's control or right to control.  Accordingly, the chartering organizations, such as SILVER SPRINGS SHORES, are the agents of the BSA.

22.36.  The BSA uses a similar structure in relation to its local COUNCIL's.Councils, such as the NORTH FLORIDA COUNCIL. The BSA issues a charter to an approved local COUNCIL Council authorizing the local COUNCIL Council to administer the scouting program to the local scout troops within the region on behalf of the BSA.

23.37.  The local COUNCIL'sCouncils are subject to the same bylaws, rules and regulations as the chartering organizations. If a local COUNCIL Council deviates from the rules and regulations established by the BSA, then the local COUNCIL Council may have its charter revoked.

24.38.  All local COUNCIL'sCouncils must apply to the BSA for renewal of their charters annually.

25.39.  It is the duty of the local COUNCIL Council to promote, support, and maintain the BSA scouting regime amongst all local troops within the local COUNCIL'sCouncils area.

7

BSA-PLAN_01423166

SA 1420

26.40. The chartering system shows the BSA's consent to allow local COUNCIL's Councils to operate the scouting program on its behalf within a specific geographic region, and the local COUNCIL's Councils consent to operate the scouting program subject to the BSA's control or right to control. Thus, the local COUNCIL's Councils are agents of the BSA.

27.41. The BSA cannot operate its scouting program without the consent and cooperation of the local COUNCIL's Councils and chartering organizations. Conversely, the chartering organizations and local COUNCIL's Councils cannot operate and supervise local scouting troops without the consent of the BSA.

42. At all relevant times, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER SPRINGS SHORES were serving as Defendant the BSA's agents by implementing and maintaining the BSA's scouting program on a local level.

## The BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with A.A.

43. The Boy Scout Defendants have a special relationship with A.A., for reasons which included, without limitation, the following:

   a. A.A. and his family imposed confidence in The Boy Scout Defendants through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that Defendants promote through involvement with the BSA, and ultimately would be safe from harm in doing so;

   b. It is through A.A.'s involvement with The Boy Scout Defendants, and George Fout's relationship with The Boy Scout Defendants that A.A. was abused by George Fout;

   c. The Boy Scout Defendants had a direct and special relationship with scouts who participated in its programs. A.A. was a child at the time of the abuse. The abuse began and often occurred when A.A. was placed in the care and custody of Defendants The Boy Scout Defendants, with the resulting loss of control to protect himself;

8

BSA-PLAN_01423167

SA 1421

    d.     A.A. was a child at the time of the abuse. He was raped and molested at locations and under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardian for their ordinary source of protection or were otherwise relying entirely on the Boy Scout Defendants and their agents, including Scoutmaster Steve Fout, for his protection, and

    e.     The Boy Scout Defendants, were substituting for A.A.'s parents during the relevant times.

**BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with, and Constructive Control over Scoutmaster Steve Fout, and his Agency for them.**

44.    At all relevant times, A.A. was enrolled in the Boy Scouts of America scouting program.

45.    At all relevant times, A.A. was a member of Boy Scouts of America Troop 448 in Ocala, Florida. Troop 448 was chartered by Defendant SILVER SPRINGS SHORES.

46.    Troop 448 was under the jurisdiction of Defendant NORTH FLORIDA COUNCIL.

47.    Each of SILVER SPRINGS SHORES and the NORTH FLORIDA COUNCIL were under the ultimate control and authority of the BSA.

48.    But for the BSA's consent, neither SILVER SPRINGS SHORES, nor the NORTH FLORIDA COUNCIL would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

49.    As the chartering organization of Troop 448, Defendant SILVER SPRINGS SHORES was responsible for providing adequate facilities, supervision, and leadership for the troop, subject to the approval of the Council and the BSA and consistent with their direction and policies.

9

Highly Confidential

BSA-PLAN_01423168

**SA 1422**

50.     The troop meetings were held in facilities owned or operated by Defendant SILVER SPRINGS SHORES.  Certain activities were held in facilities owned or operated by the Council and the BSA.

51.     At all times material hereto, the Boy Scout Defendants installed Steve Fout as the Scoutmaster (a/k/a Troop Leader) for Troop 448.

52.     As the Scoutmaster of Troop 448, Steve Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

53.     At all times relevant, Steve Fout was subject to the approval, direction, control and authority of the Boy Scout Defendants.

54.     Steve Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

55.     In fact, Steve Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

56.     Steve Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, the Boy Scout Defendants had the control or the ability to control, Steve Fout's display of his BSA badge and insignia and other indicia and brands of the BSA.

Highly Confidential

BSA-PLAN_01423169

SA 1423

57.     But for the Boy Scout Defendants' consent, neither Steve Fout would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

58.     The subject authorization was designed to instill, and did instill, trust and confidence in Steve Fout by the parents, guardians and scouts and further served to promote the BSA brand.

59.     But for Steve Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

60.     A.A. and his guardians each perceived Steve Fout to be a representative of the BSA, the Council and Silver Springs Shores and to be a person whom they could entrust with A.A.

61.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

62.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

63.     Steve Fout had actual or apparent authority to act on behalf of the BSA, the Council and Silver Springs Shores, and each of them.

64.     As a result there was, at all relevant times, a special relationship and agency between Steve Fout and Boy Scout Defendants.

11

BSA-PLAN_01423170

SA 1424

## BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES
### Special Relationship with, and Constructive Control over perpetrator and assistant Scoutmaster, George Fout, and his Agency for them.

65.    At all times material hereto, the Boy Scout Defendants installed George Fout, as an Assistant Scoutmaster (a/k/a Assistant Troop Leader) for Troop 448.  George Fout was Steve Fout's son.

66.    At all times material hereto, Assistant Scoutmaster George Fout was under the direct supervision of Scoutmaster Steve Fout.

67.    As the Assistant Scoutmaster of Troop 448, George Fout assisted Steve Fout in his activities.

68.    As the Assistant Scoutmaster of Troop 448, George Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

69.    At all times relevant, George Fout was subject to the approval, direction, control and authority of The Boy Scout Defendants.

70.    George Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

71.    In fact, George Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

12

Highly Confidential

72.     George Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, Boy Scout Defendants had the control or the ability to control, George Fout's display of his the BSA badge and insignia and other indicia and brands of the BSA.

73.     But for the Boy Scout Defendants consent, George Fout would not have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

74.     The subject authorization was designed to instill, and did instill, trust and confidence in George Fout by the parents, guardians and scouts and further served to promote the BSA brand.

75.     But for George Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

76.     A.A. and his guardians each perceived George Fout to be a representative of the Boy Scout Defendants and to be a person whom they could entrust with A.A.

77.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

78.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

13

Highly Confidential

BSA-PLAN_01423172

SA 1426

79.     George Fout had actual or apparent authority to act on behalf of the Boy Scout Defendants, and each of them.

80.     As a result there was, at all relevant times, a special relationship and agency between George Fout and The Boy Scout Defendants.

**George Fout's Grooming and Preparation of A.A. and
Three (3) Other Scouts from Troop 448 for Abuse.**

81.     Perpetrators of sexual abuse against children often "groom" the victim for the abuse.  This grooming is a process of mental, emotional, psychological and physical manipulation by which the perpetrator prepares a child, significant others, and the environment for the abuse of the child.  Specific goals include gaining access to the child, gaining the child's compliance, and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

82.     The grooming process consists of a series of stages.  These include the stages of selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch.

83.     As to the first stage, when selecting a victim, offenders often target children based on family situations, such as those living in single family households as often in these cases children may have less adult supervision or the custodial parent may rely upon others to help with childcare responsibilities.

84.     This pattern of grooming and its specific stages are discernable to supervising adults, including Scoutmasters, particularly if they are properly trained to recognize the behavior.

14

Highly Confidential

BSA-PLAN_01423173

**SA 1427**

This "grooming" results in its own resulting psychological and emotional abuse and damage, separate from the impending physical sexual abuse.

85.     George Fout engaged in exactly these stages of grooming A.A. prior to and during his abuse of A.A.  George Fout often showered Plaintiff with special attention and otherwise engaged in the grooming process described.

86.     A.A. met the profile of a particularly vulnerable child, as he was being raised by a single non-parent adult with no strong male role model.

87.     At the time that George Fout grooming A.A., he was simultaneously grooming at least three (3) other child scouts in Troop 448 for sexual abuse, for a total of four (4) scouts in a single troop undergoing grooming for impending sexual abuse.

88.     As a result of George Fout's grooming of A.A., it was foreseeable that George Fout would ultimately consummate the grooming in its goal of sexual abuse.

89.     Indeed, ultimately, George Fout's grooming of each of these four (4) scouts did result in them suffering his continuous and ongoing sexual abuse.

90.     This grooming frequently occurred on the premises of SILVER SPRINGS SHORES and during events sponsored by the BSA.

91.     Upon information and belief, Troop 448 Scoutmasters knew or should have known that George Fout was grooming A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

92.     In addition, it is a reasonable inference that, while George Fout was grooming four (4) scouts under their care, adult supervisors of Troop 448, including Steve Fout, observed actions and behavior by George Fout by which they knew or should have known that George

15

BSA-PLAN_01423174

SA 1428

Fout was grooming the scouts, including A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

93.     Further, if the Boy Scout Defendants had properly trained adult leaders and Scoutmasters to identify grooming behavior, they would have identified George Fout as being actively engaged in grooming four (4) child scouts in their troop and would have been trained to warn A.A. and his parents of the impending abuse and prevent the abuse and the resulting injuries and damage.

**George Fout's Abuse of A.A. was Foreseeable and Immanent.**

94.     George Fout's sexual abuse of A.A. was foreseeable, as the Boy Scout Defendants each had actual and constructive notice of George Fout's grooming of A.A., and actual and constructive notice of the impending and immanent and actual abuse of A.A. and the abuse, in fact, of A.A.

95.     This notice included, without limitation:

a.     That George Fout would engage in a pattern of grooming of A.A. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

b.     That George Fout would engage in a pattern of grooming of three (3) other scouts. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

c.     Upon information and belief and upon reasonable inference, the adult troop leaders should have known that George Fout engaging in grooming of four (4) minor scouts in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

d.     On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on the BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER

16

Highly Confidential

BSA-PLAN_01423175

**SA 1429**

SPRINGS SHORES, providing notice to The Boy Scout Defendants of grooming, sexual abuse, and the ongoing process of grooming, including that George Fout's propensity to engage in sexual abuse is foreseeable and immanent;

e.      At times, A.A. would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy;

f.      Adult scout leaders of Troop 448 knew or should have known that A.A. and other scouts of Troop 448 would visit the home of George Fout and would often spend the night in the bedroom of George Fout, in violation of BSA policy;

g.      Steve Fout, as agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES was personally present over the course of many years as George Fout, his adult son, took four (4) minor child scouts to his room, each on a series of separate occasions, for hours of "game play" and overnight sleep-overs behind closed doors;

h.      Steve Fout should have known or was willfully ignorant of the fact that his son was abusing minor children under his roof;

i.      Steve Fout, as a troop leader and an agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES knew, should have known or was willfully ignorant that George Fout was actively abusing or posed a threat of sexual abuse to minor scouts under his care.

96.      During all relevant times hereto, George Fout was conducting himself in such a manner and fashion that the Boy Scout Defendants knew or should have known that George Fout had a propensity to commit and engage in sexual misconduct.

97.      If the Boy Scout Defendants had properly and adequately supervised the conduct and the activities of George Fout, they would have known or should have known of the misconduct of George Fout, so as to prevent the sexual abuse and infliction of emotional distress on A.A.

98.      Had the Boy Scout Defendants not acted in such a careless, negligent, and/or reckless manner, they would have known and/or should have known of the conduct of George

17

BSA-PLAN_01423176

SA 1430

Fout, as described herein, and of his propensity to engage in such activities, such that the Boy Scout Defendants could and/or should have prevented the sexual abuse and the infliction of physical and emotional distress on A.A.

99.    As agents for the Boy Scout Defendants, actual or constructive knowledge to Steve Fout and to adult troop leaders that George Fout posed a risk to the scouts and had a propensity to engage in the grooming and sexual abuse is imputed to the BSA, the NORTH FLORIDA COUNSEL, jointly and severally.

### The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES Had Constructive Control of the Premises upon which George Fout's Behavior Provided Notice of the Impending Abuse.

100.    On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at the BSA administrated event on the BSA property.

101.    George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the Boy Scout Defendants.

102.    Similarly, on multiple and continuing occasions, notice of George Fout's propensity to commit abuse, including without limitation, his grooming of A.A. and at least four (4) other scouts occurred on property owned and controlled by Boy Scout Defendants and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

### George Fout's Abuse of A.A.

103.    A.A. was introduced to his abuser, George Fout through his membership in the BSA Troop 448.

18

BSA-PLAN_01423177

SA 1431

104.    At all times material hereto, George Fout was an adult.  At all times material hereto, A.A. was a minor.

105.    At all times relevant hereto, for the purpose of furthering his duties as an Assistant Scoutmaster, George Fout sought and gained the then minor A.A.'s trust, friendship, admiration and obedience. As a result, A.A. was conditioned to comply with George Fout's direction and to look to him as an authority figure.

106.    At all relevant times hereto, using the power, authority and trust of his position as an Assistant Scoutmaster, and availing himself of the Boy Scout Defendants' representations to parents and scouts that tire BSA was a moral and safe place for young boys, George Fout groomed, enticed, induced, directed, coerced and forced A.A. to engage in deviant sexual acts with him.

107.    As the foreseeable extension of the grooming process, George Fout committed a sexual abuse, sexual touching, penetration, oral and anal sodomy and other acts of sexual battery constituting violations of Section 794.011, Florida Statutes, upon A.A.

108.    Eventually, George Fout escalated the frequency of the sexual battery to the point where he was sexually abusing A.A. approximately once a month.

109.    At all times relevant hereto, George Fout utilized physical, emotional and spiritual force and persuasion to impose his moral will upon the then minor A.A. in order to commit grievous, unspeakable acts of sexual abuse upon the person of then minor A.A. all of which acts constitute flagrant abuse of the symbolism, power and authority of his position as an Assistant Scoutmaster.

Highly Confidential

BSA-PLAN_01423178

SA 1432

110.   The grooming and other notice of George Fout's propensity for abuse would frequently occur on the premises of SILVER SPRINGS SHORES and during sanctioned the BSA events on the BSA property.

111.   The sexual battery would often take place at George Fout's home after scouting events, in which he resided with Steve Fout, his father and the Scoutmaster of Troop 448. Steve Fout was often present in the home during George Fout's sexual battery of A.A.

112.   At times, A.A. would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy.

113.   As the sexual battery would continue, without limitation, A.A. would spend the night at the home of Scoutmaster Steve Fout.  This is a clear violation of the BSA policy. During those occasions, A.A. would be abused by Assistant Scoutmaster George Fout. Steve Fout was often in the home often when the incidents of sexual battery occurred.

114.   The  At no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure the non-sleepover between volunteer leaders and youth in the BSA's policy was being implemented and followed by their scoutmasters or scout leaders, and at no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure that no one-on-one contact between volunteer leaders and youth were being followed according to the BSA's polices.

115.   A.A. was repeatedly abused under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardians for their ordinary source of protection or was otherwise relying entirely on The Boy Scout Defendants, and its agents for his protection.

Highly Confidential

BSA-PLAN_01423179

SA 1433

**The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES**
**Had Actual or Constructive Control of the Premises upon which**
**Sexual Abuse and related Grooming was committed.**

116.   On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at a the BSA administrated event on the BSA property.

117.   George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

118.   Similarly, on multiple and continuing occasions, notice of George Fout`s propensity to commit abuse, including without limitation, his grooming of A.A. and at least three (3) other scouts occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

**The BSA's History of Pedophilia ~~in Scouting~~**

~~28.~~119.The BSA has known for decades of the high degree of risk that adult Scoutmasters and volunteers may sexually abuse minor scout members.

~~29.~~120.Since the early 1900s, the BSA has maintained a system of "Ineligible Volunteer Files" to track incidents wherein adult Scoutmasters sexually abused scouts. The Ineligible Volunteer Files contain internal memoranda demonstrating the BSA's awareness of the ongoing pedophilia within the BSA, and demonstrated concerns about pedophiles within the BSA harming their reputation and economic interests.

21

30.121. These Ineligible Volunteer Files demonstrate the BSA's vulnerabilities when it comes to pedophilia within the BSA and includes pedophiles' techniques used to enter scouting, their techniques for grooming victims and more.

31.122. In approximately 1972, the BSA implemented a system requiring local COUNCIL's Council's scouting executives to complete and send in a form with any available supporting information about known or alleged sexual abuse committed by adult Scoutmasters in the executives' jurisdiction. Upon receipt of this information from the local COUNCIL, Council, the BSA created an Ineligible Volunteer File for the abuser and added it to the BSA's database.

32.123. By 1977, the BSA was advising all sponsoring organizations to maintain "two deep leadership" for all scouting activities, wherein two adult Scoutmasters were required to be present at all times. Ostensibly, this precaution was implemented to help prevent sexual abuse in scouting.

33.124. Despite the BSA's extensive and long-standing knowledge of the high degree of risk of pedophilia in scouting, the BSA did not implement a sexual abuse-prevention education program until approximately 1988. This program, the Youth Protection Program, was the BSA's first effort to educate scouts and their family members about the risk of sexual abuse in scouting, a risk that continues today.

34.125. The BSA has overwhelming evidence that scouting has particular characteristics that make the organization vulnerable to pedophiles, including but limited to:

     a.     Joining the BSA provides pedophiles access to boys alone and away from their families in secluded settings like camp-outs and overnight hikes;

     b.     The BSA repeatedly encourages young boys to strictly obey their scout leaders and masters, allowing pedophiles to groom their victims;

22

BSA-PLAN_01423181

SA 1435

        c.      <u>The</u> BSA encourages overnight stays, camping trips and other activities for scouts and scout leaders and masters to be alone together~~.~~:

**~~George Fout's Sexual Battery of A.A.~~**

~~35.~~ ~~A.A. is an adult male. At all relevant times, A.A. was a minor residing in Marion County, Florida and was under the age of sixteen (16).~~

~~36.1.~~ ~~At all relevant times, A.A. was enrolled in the Boy Scouts of America scouting program.~~

~~37.~~ ~~At all relevant times, A.A. was a member of Boy Scouts of America Troop 448 in Ocala, Florida. Troop 448 was chartered by Defendant SILVER SPRINGS SHORES.~~

~~38.~~ ~~As the chartering organization of Troop 448, Defendant SILVER SPRINGS SHORES was responsible for providing adequate facilities, supervision, and leadership for the troop.~~

~~39.~~ ~~The troop meetings were held in facilities owned or operated by Defendant SILVER SPRINGS SHORES.~~

~~40.~~ ~~At all times material hereto, Steve Fout was installed as the Scoutmaster (a/k/a Troop Leader) for Troop 448.~~

~~41.~~ ~~At all times material hereto, Steve Foot's son, George Fout, was an Assistant Scoutmaster (a/k/a Assistant Troop Leader) for Troop 448.~~

~~42.1.~~ ~~Troop 448 was under the jurisdiction of Defendant NORTH FLORIDA COUNCIL.~~

~~43.~~ ~~As the Scoutmaster of Troop 448, Steve Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.~~

~~44.~~ ~~As the Assistant Scoutmaster of Troop 448, George Fout assisted Steve Fout in~~

23

BSA-PLAN_01423182
**SA 1436**

these activities.

45.1.   At all times material hereto, Assistant Scoutmaster George Fout was under the direct supervision of Scoutmaster Steve Fout.

46.   In or about 2004, A.A. became a member of Troop 448.  It was through his membership in Troop 448 that Plaintiff was introduced to his abuser, George Fout.

47.   George Fout often showered Plaintiff with special attention.

48.   George Fout groomed Plaintiff for sexual abuse by gaining Plaintiff's trust and admiration.

49.   In or about 2004, when A.A. was eight (8) years old, George Fout began to commit sexually battery upon A.A.

50.   Specifically, George Fout committed oral and anal sodomy and other acts of sexual battery constituting violations of Section 794.011, Florida Statutes upon A.A.

51.   On or about July 2009, A.A. was attending a scouting event sponsored by BSA, administrated by the BSA and on the BSA property. During that campout week, George Fout approached A.A. in his bedroom. During this encounter George Fout touched A.A.'s penis. This was soon after George Fout's abuse had escalated to include penetration.

52.   Each of these acts occurred prior to the Plaintiff's sixteenth (16th) birthday.

53.1.   Eventually, George Fout escalated the frequency of the sexual battery to the point where he was sexually abusing Plaintiff approximately once a month.

54.   The sexual battery would often take place at George Fout's home after scouting events, in which he resided with Steve Fout, his father and the Scoutmaster of Troop 448. Steve Fout was often present in the home during George Fout's sexual battery of A.A.

55.   At times, A.A. would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's

24

residence in violation of BSA policy.

56.1.    As the sexual battery would continue, without limitation, A.A. would spend the night at the home of Scoutmaster Steve Fout.  This is a clear violation of BSA policy.  During those occasions, A.A. would be abused by Assistant Scoutmaster George Fout. Steve Fout was often in the home often when the incidents of sexual battery occurred.

57.    At no time did BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure the non-sleepover between volunteer leaders and youth in BSA's policy was being implemented and followed by their scoutmasters or scout leaders, and at no time did BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure that no one-on-one contact between volunteer leaders and youth were being followed according to BSA's polices.

58.    A.A. was repeatedly abused under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardians for their ordinary source of protection or was otherwise relying entirely on BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, and its agents for his protection.

59.    A.A. and his family imposed confidence in BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that Defendants promote through involvement with BSA, and ultimately would be safe from harm in doing so.

60.    It is through A.A.'s involvement with BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, and George Fout's relationship with BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES that A.A. was abused by George Fout.

Highly Confidential

BSA-PLAN_01423184

SA 1438

~~BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES had a direct and special relationship with scouts who participated in its programs. A.A. was a child at the time of the abuse.~~ The abuse began and often occurred when A.A. was placed in the care and custody of ~~Defendants BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, with the resulting loss of control to protect himself.~~

d.     Scouting provides opportunities for a pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him;

e.     A pedophile scout leader can, depending on the pedophile's preferred victim age, volunteer for and be sure to have access only to boys of a certain age;

f.     The BSA conditions boys to the concept of strict obedience to the scout leader and a bonding mechanism that pedophiles crave;

g.     The BSA promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a pedophile's efforts to keep his victims silent and compliant;

h.     The BSA conducted no criminal background checks on its volunteers;

i.     The BSA did not prohibit adults from sleeping in tents with boys overnight;

j.     The BSA did not prohibit adult leaders from spending time alone with individual scouts; i. The BSA did not prohibit adult scout leaders from having contact with scouts outside of authorized scouting activities;

k.     For decades, the BSA re-admitted pedophiles it had previously removed for child abuse after a period of the BSA "probation," thereby exposing unsuspecting children to sexual abuse;

l.     The BSA had a practice of not reporting scout abuse incidents to law enforcement;

m.     The BSA had a pattern of reaching an accommodation with a pedophile, in which the pedophile would resign from scouting and the BSA would agree not to report the child sexual abuse to civil authorities;

~~61.~~ The BSA refused requests to share its list of known abusers with other youth organizations, knowing that pedophiles it had ejected often joined other youth-

~~62.    BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES had a~~

~~direct and special relationship with adult scout leaders and masters they utilized to work with~~

26

BSA-PLAN_01423185

SA 1439

~~children, including A.A., whose family entrusted him to Defendants care.~~

~~63.     Defendants BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS~~
~~SHORES, were substituting for A.A.'s parents during the relevant times.~~

~~64.     At all relevant times, George Fout and Steve Fout were acting as the agents of~~
~~Defendant BSA, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER~~
~~SPRINGS SHORES by leading Boy Scouts of America Troop 448.~~

> n.     ~~At all relevant times, Defendant NORTH FLORIDA COUNCIL and/or~~
> ~~Defendant SILVER SPRINGS SHORES were~~ serving as Defendant
> organizations;

> o.     The BSA refused to produce its I.V. files to its review board and scout
> safety consultants, who were endeavoring to develop and implement
> meaningful safeguards and barriers to pedophile infiltration;

> p.     The BSA refused to fingerprint, photograph or perform background
> checks on its adult volunteers, allowing removed pedophiles using an alias
> to sneak back in to scouting through another troop;

> q.     The BSA refused to utilize widely accepted organizational best practices
> that would establish reasonable barriers to intrusion by pedophiles;

> r.     The BSA refused to educate local councils, staff, and troop leaders
> regarding the true risks posed by pedophiles to scouts; and

> s.     The BSA refused to effectively monitor local councils and troops to
> ensure that appropriate safeguards were being used in the selection and
> retention of adult scout leaders.

126.     The BSA's internal records, known as the "Ineligible Volunteer" files (hereinafter
"the I.V. files"), are a unique repository of documents the BSA secretly began amassing shortly
after the BSA's founding in 1910.

127.     The I.V. files reveal that the BSA, far from being safe and wholesome, has long
attracted and been a sanctuary for pedophiles.

27

BSA-PLAN_01423186

SA 1440

128.   The I.V. files contain internal memoranda demonstrating the BSA's ~~agents by implementing~~awareness and concern about the threat that pedophiles in the BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community.

129.   The IV Files contain internal memoranda demonstrating BSA's awareness and concern about the threat that pedophiles in BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community. See Exhibit "A" (The Ernst Memorandum evidencing the BSA and the local council's ongoing conspiracy to suppress from the public its certain knowledge of its pedophile infiltration problem), BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that have successfully infiltrated scouting. The I.V. files highlight BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles' patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

130.   The BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that had successfully infiltrated scouting. The I.V. files highlight the BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

131.   The overwhelming evidence the I.V. files present shows that for a century the BSA has known of the BSA's distinctive characteristics that render scouts particularly prone to pedophiles' abuse.

Highly Confidential

BSA-PLAN_01423187

**SA 1441**

132.   By 1935, the BSA had accumulated approximately 2,000 files on pedophiles that had successfully infiltrated or attempted to infiltrate its program.

133.   In the 1970s, the BSA recognized the potential liabilities represented by possessing and maintaining the I.V. files. By 2005, the BSA's secret cache of files on pedophiles exceeded 20,000.

134.   Over the course of two years in the early 1970s, three the BSA executives reviewed and permanently destroyed thousands of I.V. files

135.   The BSA executives kept no retention logs showing which or how many of the files the BSA destroyed. The BSA made no contemporaneous record of its criteria in determining which files to destroy and which to save.

136.   Approximately 6,000 files survived the BSA's file-purge and are in the BSA's possession. Approximately 1900 of those files are now in the public domain.

137.   The files demonstrate that the BSA opened a new I.V. file on a pedophile every other day for fifty years.

138.   The I.V. files demonstrate that the BSA had overwhelming evidence (1) that scouting attracts pedophiles at an alarming rate and (2) of scouting's distinctive characteristics that make it attractive to pedophiles:

139.   Between 1987 and 2005, the BSA settled sixty-one lawsuits in which the BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders. Since 1987, the BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by the BSA to prevent the abuse's facts and circumstances from becoming public.

Highly Confidential

BSA-PLAN_01423188

SA 1442

65.140.As between the Boy Scout Defendants and A.A., the Boy Scout Defendants had superior knowledge of the risk of sexual abuse to A.A. by participating in the BSA program on a local level, yet failed to warn or otherwise advise A.A. or his guardians of their superior knowledge.

## CAUSES OF ACTION

### Negligence of The Boy Scout Defendants – Failure of Policy and Training.

141.    BSA and its agents knew from long experience based on information contained in its Ineligible Volunteer Files that pedophiles had for nearly a century been exploiting vulnerabilities within it organization to gain access to and sexually abuse boys.

142.    BSA and its agents had certain knowledge that pedophiles like George Fout could exploit BSA's vulnerabilities. BSA knew that failure to adopt and implement certain policies and practices to protect scouts would cause scouts, including A.A., to be at heightened risk of pedophilic grooming and sexual abuse.

143.    The BSA's failure to adopt and effectively implement policies and practices to protect scouts in its custody and control included, without limitation:

144.    Permitting fathers to act as Scoutmasters, in a supervisory position over their adult sons, as Assistant Scoutmasters, effectively eliminating certain protections afforded by a two-deep policy;

145.    Failing to educate scouts and other adult scout leaders about the grooming behaviors they knew that pedophile scout leaders engaged so that that scouts could recognize, resist, and report the inappropriate behaviors;

146.    Failing to monitor or evaluate scout staff to prevent them from using its program and facilities to gain access, groom, and sexually abuse scouts;

30

147.   Further, to the extent that the BSA undertook to adopt any such policies, they were insufficient for the foreseeable risk presented and were not properly implemented or enforced.

**Negligence of The Boy Scout Defendants – Failure to Protect A.A. from foreseeable abuse by George Fout.**

148.   The Boy Scout Defendants, each having a special relationship with A.A. and over Steve Fout and George Fout.

149.   The actual or constructive knowledge that The Boy Scout Defendants and Steve Fout possessed of George Fout's grooming of A.A. and other scouts in Troop 448 rendered the abuse of A.A. not only foreseeable, but highly likely.

150.   In addition, the access that George Fout had to vulnerable children like A.A., the potential to take advantage of the special relationship with potential victims and the failures of BSA policy which George Fout used to gain access to, groom, and to sexually abuse A.A., were precisely the same foreseeable vulnerabilities that BSA had documented in tens of thousands of ineligible volunteer files it had been keeping for nearly a century.

**ACTIONS AGAINST SILVER SPRINGS SHORES**

**Count I: Negligence of Defendant SILVER SPRINGS SHORES**

66.151.  Plaintiff incorporates Paragraphs 1 through 64150 above as fully set forth under this count and further alleges as follows:

152.   Defendant, SILVER SPRINGS SHORES undertook to promote and provide a scouting program for children and minor boys.

31

Highly Confidential

BSA-PLAN_01423190

**SA 1444**

67.153. Having undertaken this activity, SILVER SPRINGS SHORES had ~~a special relationship with~~duty to act with reasonable care and to take precautions so that persons may not be injured.

~~A.A. because among other things, A.A. was a child at the time of the abuse, the abuse began and often occurred when A.A. was placed in the care and custody of Defendant SILVER SPRINGS SHORES, with the resulting loss of control to protect himself, and Defendant SILVER SPRINGS SHORES was substituting for A.A.'s parents during the relevant times.~~

154.    In addition, Defendant SILVER SPRINGS SHORES had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

68.155. This special relationship between Defendant SILVER SPRINGS SHORES and A.A. gave rise to a right of protection for A.A.

69.156. Based on the special protective relationship with A.A., Defendant SILVER SPRINGS SHORES had a duty to protect A.A. from reasonably foreseeable harm.

157.    In addition, Defendant, SILVER SPRINGS SHORES had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

158.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

159.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

32

Highly Confidential

160.     SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

161.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

162.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

70.163.  Defendant SILVER SPRINGS SHORES breached the duty it owed A.A., by acts or omissions which included, without limitation:

aa.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. ~~may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant SILVER SPRINGS SHORES knew or should have known that proper precautions and procedures were not followed. These included, without limitation that Defendant SILVER SPRINGS SHORES knew or should have known of the special relationship between the Fouts and A.A. and that A.A.  would leave the meetings held on its premises with  Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy~~would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

bb.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

cc.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

33

     d.    Failing to advise or warn A.A. or his guardian of the history of pedophilia in the BSA and to affirmatively educate A.A. and guardian to identify and avoid abuse.

     e.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

~~71.~~164.  As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes. ~~A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).~~

165.  Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

~~72.~~166.  As a result of ~~this~~the grooming of George Fout and as a result of the related sexual battery, perpetrated on A.A. by George Fout, A.A. has suffered ~~at the time of the abuse and continuing up~~ and continues to ~~the present day~~suffer permanent, progressive and disabling emotional, psychological ~~and~~ physiological ~~damages and~~ bodily ~~injuries, and~~ he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, ~~pre-judgment and~~ post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

<div align="center">34</div>

BSA-PLAN_01423193

SA 1447

### Count II: ~~Negligence~~Breach of Fiduciary Duty of Defendant ~~NORTH FLORIDA COUNCIL~~SILVER SPRINGS SHORES

~~73.~~167.  Plaintiff incorporates Paragraphs 1 through ~~64~~150 above as fully set forth under this count and further alleges as follows:

168.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and SILVER SPRINGS SHORES, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in SILVER SPRINGS SHORES and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

169.    As a result, SILVER SPRINGS SHORES owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

~~74.~~170. In addition, Defendant ~~NORTH FLORIDA COUNCIL~~, SILVER SPRINGS SHORES had a special relationship ~~with~~ George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

171.    ~~A.A. because among other things, A.A. was a child at the time of the abuse, the abuse began and often occurred when A.A. was placed in~~ George Fout engaged in a process of grooming of A.A. and three other scouts under the care ~~and custody of~~ of SILVER SPRINGS SHORES. Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

172.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

Highly Confidential                                                                      BSA-PLAN_01423194

**SA 1448**

173.    SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

174.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

175.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

176.    Defendant ~~NORTH FLORIDA COUNCIL, with~~ SILVER SPRINGS SHORES breached the ~~resulting loss of control~~ fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

   a.    Failing to protect ~~himself~~ A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

   b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

   c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

   d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

36

Highly Confidential

BSA-PLAN_01423195

SA 1449

177.    As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

178.    Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

179.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## ACTIONS AGAINST NORTH FLORIDA COUNCIL

### Count III: Negligence of Defendant NORTH FLORIDA COUNCIL

180.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

37

181.   Defendant, NORTH FLORIDA COUNCIL ~~was substituting for A.A.'s parents during the relevant times~~ undertook to promote and provide a scouting program for children and minor boys

182.   Having undertaken this activity, NORTH FLORIDA COUNCIL had duty to act with reasonable care and to take precautions so that persons may not be injured.

183.   In addition, Defendant NORTH FLORIDA COUNCIL had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

~~75.~~184.  This special relationship between Defendant NORTH FLORIDA COUNCIL and A.A. gave rise to a right of protection for A.A.

~~76.~~185.  Based on the special protective relationship with A.A., Defendant NORTH FLORIDA COUNCIL had a duty to protect A.A. from reasonably foreseeable harm.

186.   In addition, Defendant, NORTH FLORIDA COUNCIL had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

187.   George Fout engaged in a process of grooming of A.A. and three other scouts under the care of NORTH FLORIDA COUNCIL.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

188.   The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

Highly Confidential

BSA-PLAN_01423197

SA 1451

189.    NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

190.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

191.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by The Boy Scout Defendants.

77.192. Defendant, NORTH FLORIDA COUNCIL breached the duty it owed A.A., by acts or omissions which included, without limitation:

a)a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm ~~that~~ A.A. ~~may~~would be sexually abused by ~~his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant NORTH FLORIDA COUNCIL knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant NORTH FLORIDA COUNCIL knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy~~George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b)b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c)c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters ~~and~~ otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

39

BSA-PLAN_01423198

SA 1452

     d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

193.    As a direct and proximate cause of Defendant, NORTH FLORIDA COUNCIL's negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

78.194. Further, as a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' negligent acts and omissions, A.A. was the victim of ~~these acts, and each of them, prior to the age of sixteen (16).~~a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

79.195. As a result of ~~this~~the grooming of George Fout and as a result of the related sexual battery~~,~~ perpetrated on A.A. by George Fout, A.A. has suffered ~~at the time of the abuse and continuing up to the present day~~and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, ~~pre-judgment and~~ post-judgment interest, and such other and further relief as this Court -deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

~~A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.~~

Highly Confidential

BSA-PLAN_01423199

SA 1453

**Count III – NegligenceIV: Breach of Fiduciary Duty of Defendant BSANORTH FLORIDA COUNCIL**

80.196.  Plaintiff incorporates Paragraphs 1 through 64150 above as fully set forth under this count and further alleges as follows:

197.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and NORTH FLORIDA COUNCIL, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

198.    As a result, NORTH FLORIDA COUNCIL owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

199.    In addition, Defendant BSA, NORTH FLORIDA COUNCIL had a special relationship with A.A. because among other things, A.A. was a child at the time of the abuse, the abuse began and often occurred when A.A. was placed in George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

200.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care and custody of Defendant BSA, with of NORTH FLORIDA COUNCIL. Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

201.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

41

BSA-PLAN_01423200

SA 1454

202.    NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the ~~resulting loss of control to protect himself, and~~ behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

203.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

204.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

205.    Defendant NORTH FLORIDA COUNCIL breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

    a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

    b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

    c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters ~~BSA was substituting~~and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

    d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

Highly Confidential

BSA-PLAN_01423201

SA 1455

206.     As a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL'

breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts

constituting violations of Section 794.011, Florida Statutes.

207.     Further, as a direct and proximate cause of Defendant NORTH FLORIDA

COUNCIL' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional,

psychological and physical manipulation generally described as grooming and more particularly

described in Paragraphs 81 - 93.

208.     As a result of the grooming of George Fout and as a result of the related sexual

battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer

permanent, progressive and disabling emotional, psychological and physiological damages and

bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and

physical distress, all in an amount to be proven at trial.

~~81.~~     WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH

FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, post-judgment

interest, and such other and further relief as this Court deems just and proper. A.A. reserves the

right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of

all issues so triable. ~~parents during the relevant times.~~

### ACTIONS AGAINST BSA

### Count V: Negligence of Defendant BSA

209.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this

count and further alleges as follows:

210.     Defendant, BSA undertook to promote and provide a scouting program for

children and minor boys.

43

BSA-PLAN_01423202

SA 1456

211.    Having undertaken this activity, BSA had duty to act with reasonable care and to take precautions so that persons may not be injured.

212.    Defendant BSA had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

82.213.This special relationship between Defendant BSA and A.A. gave rise to a right of protection for A.A.

83.214. Based on the special protective relationship with A.A., Defendant BSA had a duty to protect A.A. from reasonably foreseeable harm.

215.    In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

216.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

217.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

218.    BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

219.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

Highly Confidential

BSA-PLAN_01423203

SA 1457

220.   In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

84.221.  Defendant BSA breached the duty it owed A.A., by acts or omissions which included, without limitation:

a)a.   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm ~~that A.A. may~~would be sexually abused by ~~his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant BSA knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant BSA knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster~~ George Fout ~~to spend time at the Fout's residence.~~, and other negligence more particularly described in ~~violation of Boy Scout policy~~Paragraphs 103 - 115.

b.   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters

~~b)a.   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.~~

~~c)c.   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters~~ and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d.   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

Highly Confidential

BSA-PLAN_01423204

SA 1458

85.222. As a direct and proximate cause of Defendant ~~BSA's~~BSA' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes. ~~A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).~~

223.    Further, as a direct and proximate cause of Defendant BSA' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

86.224. As a result of ~~this~~the grooming of George Fout and as a result of the related sexual battery, perpetrated on A.A. by George Fout, A.A. has suffered ~~at the time of the abuse and continuing up to the present day~~and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, ~~pre-judgment and post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.~~

**Count IV: Breach of Fiduciary Duty of Defendant SILVER SPRINGS SHORES**

87.    ~~Plaintiff incorporates Paragraphs 1 through 64 above as fully set forth under this count and further alleges as follows:~~

88.    ~~At all relevant times, A.A. was a minor for whom Defendant SILVER SPRINGS SHORES was entrusted with caring.~~

46

BSA-PLAN_01423205

SA 1459

89. ~~Upon information and belief, Defendant SILVER SPRINGS SHORES had a special relationship with A.A. because among other things, Defendant SILVER SPRINGS SHORES took charge of and/or exercised control over A.A, and A.A. and his family imposed confidence in SILVER SPRINGS SHORES through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that SILVER SPRINGS SHORES promotes through involvement with BSA, and ultimately would be safe from harm in doing so.~~

90. ~~As a result of this relationship, at all relevant times, Defendant SILVER SPRINGS SHORES had a fiduciary duty toward A.A. that included the obligation to protect him from sexual battery and sexual predators.~~

91. ~~Defendant SILVER SPRINGS SHORES breached its fiduciary duty to protect A.A. by, among other things,~~

a) ~~Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant SILVER SPRINGS SHORES knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant SILVER SPRINGS SHORES knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.~~

~~b)~~a) ~~Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.~~

~~c)~~a) ~~Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.~~

47

92.     As a direct and proximate cause of Defendant SILVER SPRINGS SHORES'

breach of its fiduciary duty, A.A. was the victim of acts of sexual battery

constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts,

and each of them, prior to the age of sixteen (16).

93.     As a result of this sexual battery, A.A. suffered at the time of the abuse and

continuing up to the present day permanent, progressive and disabling emotional,

psychological and physiological damages and bodily injuries, and he continues to experience

mental anguish, humiliation, and emotional and physical distress, all in an amount to be

proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s
compensatory damages, plus costs of suit, pre-judgment and post-judgment interest, and such other
and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to
assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count V: Breach of Fiduciary Duty of Defendant NORTH FLORIDA COUNCIL**

94.     Plaintiff incorporates Paragraphs 1 through 64 above as fully set forth under

this count and further alleges as follows:

95.     At all relevant times, A.A. was a minor for whom Defendant NORTH

FLORIDA COUNCIL was entrusted with caring.

96.     Upon information and belief, Defendant NORTH FLORIDA COUNCIL had a

special relationship with A.A. because among other things, Defendant NORTH FLORIDA

COUNCIL took control of and/or exercised control over A.A., and A.A. and his family

imposed confidence in NORTH FLORIDA COUNCIL through A.A.'s participation in Boy

Scouts of America Troop 448 that A.A. would, among other things,

learn the values and characteristics that NORTH FLORIDA COUNCIL promotes through

involvement with BSA, and ultimately would be safe from harm in doing so.

48

97. ~~As a result of this relationship, at all relevant times, Defendant NORTH FLORIDA COUNCIL had a fiduciary duty toward A.A. that included the obligation to protect him from sexual battery and sexual predators.~~

98. ~~Defendant NORTH FLORIDA COUNCIL breached its fiduciary duty to protect A.A. by, among other things,~~

> ~~a)~~ ~~a.~~ ~~Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant NORTH FLORIDA COUNCIL knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant NORTH FLORIDA COUNCIL knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.~~

> ~~b)~~ ~~a.~~ ~~Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.~~

> ~~c)~~ ~~Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.~~

99. ~~As a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL's breach of its fiduciary duty, A.A. was the victim of acts of sexual battery constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).~~

100. ~~As a result of this sexual battery, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to~~

Highly Confidential

BSA-PLAN_01423208

SA 1462

~~experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.~~

~~WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, pre-judgment and post-judgment interest, and such other and further relief as this Court deems just and proper.~~ A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### **Count VI: Breach of Fiduciary Duty of Defendant BSA**

~~101.~~225.      Plaintiff incorporates Paragraphs 1 through ~~64~~150 above as fully set forth under this count and further alleges as follows:

~~102.   At all relevant times, A.A. was a minor for whom Defendant BSA was entrusted with caring.~~

~~103.   Upon information and belief, Defendant BSA had a special relationship with A.A. because among other things, Defendant BSA took charge of and/or exercised control over A.A., and A.A. and his family imposed confidence in BSA through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that BSA promotes through involvement with BSA, and ultimately would be safe from harm in doing so.~~

~~104.   As a result of this relationship, at all relevant times, Defendant BSA had a fiduciary duty toward A.A. that included the obligation to protect him from sexual battery and sexual predators.~~

50

Highly Confidential

BSA-PLAN_01423209

**SA 1463**

226.     As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and BSA, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in BSA and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

227.     As a result, BSA owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

228.     In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

229.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

230.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

231.     BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

232.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

233.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

51

BSA-PLAN_01423210

SA 1464

105.234.      Defendant BSA breached its~~the~~ fiduciary duty ~~to protect A.A. by, among other things,~~it owed A.A., by acts or omissions which included, without limitation:

a)~~a.~~      Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm ~~that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant BSA knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant BSA knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy~~that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b.      Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c.      Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d.      Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

235.      As a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

236.      Further, as a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

Highly Confidential

BSA-PLAN_01423211

SA 1465

237.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## VICARIOUS LIABILITY COUNTS

### Count VII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Sexual Battery by George Fout

238.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

239.    At all relevant times, George Fout, as Assistant Scoutmaster, was acting as agent for the Boy Scout Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

240.    Accordingly, the Boy Scout Defendants are vicariously liable for the acts and omissions and breaches of fiduciary duties of George Fout.

241.    George Fout's acts and omissions and breaches of fiduciary duties include, without limitation, committing acts of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93 and performing sexual battery upon A.A.

Highly Confidential

BSA-PLAN_01423212

SA 1466

242.     As a result of acts, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial, for which such damages, the Boy Scout Defendants are vicariously liable.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count VIII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Negligence and Breach of Fiduciary Duty of Steve Fout

243.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

244.     At all relevant times, Steve Fout, as Scoutmaster, was acting as agent for Defendants the Boy Scout Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

245.     Accordingly, Boy Scout Defendants are vicariously liable for the acts and omissions and breaches of fiduciary duties of Steve Fout.

246.     Steve Fout's acts and omissions and breaches of fiduciary duties include, without limitation,

54

a)   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b)   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c)   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters ‑and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d)   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

e)   Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

106.247.   As a direct and proximate cause of Defendant BSA's Steve Fout's negligent acts and omissions and breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).

248.   Further, as a direct and proximate cause of Defendant Steve Fout's negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

107.249.   As a result of this the grooming of George Fout and as a result of the related sexual battery, perpetrated on A.A. by George Fout, A.A. has suffered at the time of the abuse and continuing up and continues to the present day suffer permanent, progressive and

55

disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant ~~BSA~~SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, ~~pre judgment and~~ post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count IX: Vicarious Liability of Defendants NORTH FLORIDA COUNCIL and BSA for the Negligence and Breach of Fiduciary Duty of SILVER SPRINGS SHORES

### ~~Count VII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Sexual Battery by George Fout~~

250.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

251.    At all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendants NORTH FLORIDA COUNCIL and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

252.    Accordingly, Defendants NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of SILVER SPRINGS SHORES.

253.    SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

~~108.~~    Failing to protect A.A. ~~64 above as fully set forth under this count and further~~

56

Highly Confidential

alleges as follows:

109.   At all relevant times, George Fout, as Assistant Scoutmaster, was acting as agent for Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL   and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

110.   Accordingly, Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of George Fout.

111.   George Fout's acts and omissions and breaches of fiduciary duties include from reasonably foreseeable harm, including, without limitation, committing acts of sexual battery upon A.A. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).

112.   As a result of this sexual battery, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial, for which such damages, SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA are vicariously liable.

113.   WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, pre-judgment and post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right  to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

57

### ~~Count VIII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA~~ for the Negligence and Breach of Fiduciary Duty of Steve Fout

~~114.   Plaintiff incorporates Paragraphs 1 through 64 above as fully set forth under this count and further alleges as follows:~~

~~115.   At all relevant times, Steve Fout, as Scoutmaster, was acting as agent for Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.~~

~~116.~~1.   ~~Accordingly, Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of Steve Fout.~~

~~117.~~1.   ~~Steve Fout's acts and omissions and breaches of fiduciary duties include, without limitation,~~

a)f)   ~~Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may~~ the reasonably foreseeable harm that A.A. would be sexually abused by ~~his son and Assistant Scoutmaster if proper precautions were not followed. Steve Fout knew that proper precautions and procedures were not followed. These included, without limitation, that Steve Fout knew or should have known of the special relationship between George Fout and A.A. and that A.A. would leave the meetings held on its premises~~George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

~~to spend the evening at the Fout's residence, in violation of Boy Scout policy.~~

b)g)   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at ~~his~~the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

58

e)h)   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards -of care.

i)   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

j)   Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

118.254.   As a result of this negligencedirect and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).

255.   As a Further, as a direct and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

256.   As a result of the grooming of George Fout and as a result of thisthe related sexual battery, perpetrated on A.A. by George Fout, A.A. has suffered at the time of the abuse and continuing upcontinues to the present daysuffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-

59

Highly Confidential

judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count X: Vicarious Liability of Defendant BSA for the Negligence and Breach of Fiduciary Duty of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES**

257.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

258.    At all relevant times, NORTH FLORIDA COUNCIL was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

259.    ~~, for which such damages~~In addition, at all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

260.    Accordingly, Defendant BSA is vicariously liable for the acts and omissions and breaches of fiduciary duties of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

261.    NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

k)    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

l)    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

60

m)    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters ;and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

n)    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

o)    Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

119.262.    As a direct and proximate cause of **NORTH FLORIDA** COUNCIL and BSA are vicariously liable.COUNSEL's and SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

263.    WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants Further, as a direct and proximate cause of NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

264.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

Highly Confidential

BSA-PLAN_01423220
**SA 1474**

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

<p style="text-align:center"><s>pre-judgment and</s></p>

### Count XI Fraud, Misrepresentation and Fraudulent Concealment

265.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

266.    Congress founded BSA in the United States in 1910.

267.    Throughout its history, the BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed then- trust in the BSA.

268.    Since 1910, hundreds of millions of parents have entrusted their sons to BSA's care, guidance and instruction. Since its inception, BSA aggressively marketed the wholesomeness and safety of its programs to the American Public.

269.    The BSA engages in affirmative commercial efforts which sophisticatedly use powerful American symbols and modern advertising techniques to sell a national belief that the BSA could best mold the proper expression of American boyhood.

270.    The BSA promotes itself as a vehicle for boys to be instructed in good citizenship patriotism, and efficient social organization. Its brand consistently promotes an image of providing a safe environment in which they can develop "patriotism, self-reliance and kindred virtues." For example, a copy of "BSA Mission" is attached as Exhibit "B".

Highly Confidential

BSA-PLAN_01423221

**SA 1475**

271.   Paradoxically, the BSA promotes the wholesomeness of its program while knowing that since the 1940s, it has been secretly removing Scoutmasters for child sexual abuse at an alarming rate, which in the 1970s reached an average of one every three days. Its own records demonstrate that it has long known that scouting attracts pedophiles in large numbers and that scouts, far from being safe, are at the heightened risk of sexual abuse by child molesters

272.   The BSA fraudulently concealed from Congress, scouts, their parents and the American taxpayer BSA's certain knowledge that pedophiles had been infiltrating BSA in large numbers for many years, as more particularly described in Paragraphs 119 - 140

273.   The BSA, pursuant to its Congressional Charter in 1916, later codified by 36 U.S.C. Chapter 309 is required to file an annual report to Congress.

274.   The BSA fraudulently concealed the said information from A.A and his guardian. BSA also misrepresented to scouts, their parents and the American taxpayer that the scouts were safe in scouting programs when, in fact, scouts were at an unreasonably heightened risk of sexual abuse by adult scout leaders, BSA made said misrepresentations to A.A and his guardian.

275.   BSA's internal records known as the "Ineligible Volunteer" files (hereinafter referred to as "The IV Files") are a unique repository of documents BSA secretly began amassing shortly after its founding in 1910.

276.   Between 1987 and 2005, BSA settled sixty-one lawsuits in which BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders.

277.   Since 1987, BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by BSA to prevent the facts and circumstances of the abuse from becoming public.

Highly Confidential

BSA-PLAN_01423222

SA 1476

278.    BSA continues to make false and misleading public statements regarding the risks of sexual abuse in scouting; continues to minimize and downplay the harm of sexual abuse to children in scouting; fails to reach out to provide support and assistance to boys it knows were sexually abused by adult scout leaders; and continues to deny the truth about its historical knowledge of the nature and extent of sexual abuse of scouts by adult scout leaders.

279.    BSA failed to establish reasonable safeguards to prevent pedophiles from entering its programs.

280.    A.A. and his guardians trusted the BSA and reasonably relied upon the BSA's representations that it presented a moral and safe place for boys.

281.    BSA deliberately withheld information from Congress in its annual report from scouts and their parents, including A.A and his guardian.

282.    It withheld information about the true nature and extent of pedophilia in scouting; the warning signs of abuse in scouting, of which BSA was aware; and the methods pedophiles had been using to gain access to scouts, to groom them for abuse, and to keep them silent. BSA's timely communication of this information would have enabled scouts, including A.A., to protect himself from sexual abuse by pedophiles in scouting. It would have enabled Congress to perform its constitutional oversight function over a congressionally-chartered, tax-payer funded and tax-exempt youth organization which brings unscreened, unvetted adults into contact with tens of millions of children annually.

283.    BSA had a financial incentive to withhold facts and information about predatory and pedophilic Scoutmasters and/or Assistant Scoutmasters.

284.    Since 1910, BSA has derived millions of dollars per year licensing the rights to its name, emblems, scouting paraphernalia, and BSA-branded merchandise to affiliated scouting

64

BSA-PLAN_01423223

SA 1477

organizations throughout the United States and abroad (See 36 U.S.C. § 30905). BSA has realized income from these federally-protected assets by marketing them to parents and their children, including A.A.

285.   BSA's marketing includes encouraging parents to enroll their children in BSA. Enrollment secures parents' and children's commitment to follow a system that encourages parents to entrust their children's health and safety to BSA. This entrustment empowers BSA to secure each child's oath to uphold the "Scout Law," to adopt the "Scout" identity, and to adhere to a system that requires children to engage in activities that expose them to adults and others. This system includes overnight outings, camping events, and trips away from parents. The system is reward based, obligating the child to purchase emblems, badges, and other Scouting paraphernalia, which in turn creates profit for the federally charted organization.

286.   In addition to being federally created, federally chartered, and endowed by Congress with exclusive economic rights, BSA is funded by the federal government, private donations, membership dues, corporate sponsors, and special events

287.   BSA is the 18th largest nonprofit in the United States, with income exceeding $780 million dollars a year.

288.   Upon information and belief, the Boy Scout Defendants engaged in a plan of action to cover up incidents of the sexual abuse of minors by Scoutmasters and Assistant Scoutmasters and prevent disclosure, prosecution and civil litigation including, but not limited to:

     a.    Failure to report incidents of abuse to law enforcement or child protection agencies;

     b.    Concealment of abuse they had substantiated and failure to seek out and redress the injuries its Scoutmasters and leaders had caused; and

Highly Confidential

BSA-PLAN_01423224

SA 1478

    c.    Failure to advise local scouting agencies of the rampant problem of sexual abuse of scouts by Scoutmasters and leaders and that BSA's system of "Ineligible Volunteer Files" was ineffective at curbing the problem.

289.   Based on these actions, the Boy Scout Defendants engaged in fraudulent concealment and are estopped from asserting the defense of statute of limitations and/or laches.

290.   A.A. alleges that had the BSA notified A.A., his guardian, civil authorities, or the scouting public of the pervasiveness of sexual abuse by the BSA's adult scout leaders, A.A. would either not have joined the BSA or not been allowed by his guardian to join the BSA.

291.   Alternately, if the BSA had educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, that he would have taken steps to protect himself from the grooming and sexual abuse to which his adult scout leader subjected him.

292.   BSA had notified or educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, he would not have, and would not have been permitted continuous sleep-overs at the home of Steve Fout in the bedroom of George Fout.

293.   The above described conduct of the Boy Scout Defendants was willful and outrageous, was committed in reckless disregard of the probability of causing A.A.'s severe emotional distress, mental anguish, humiliation, and psychological, spiritual, and physical injury and illness of A.A.

294.   Additionally, in doing the acts as described herein, the Boy Scout Defendants were guilty of fraud, oppression, or malice.  As a direct and proximate result of the practice of deceit, deception, concealment and fraud by the Boy Scout Defendants and George Fout, A.A. was victimized by George Fout and sustained the profound injuries, losses and damages as set forth therein

Highly Confidential

BSA-PLAN_01423225

SA 1479

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

Count IX: Vicarious Liability of Defendants NORTH FLORIDA COUNCIL and BSA for
the Negligence and Breach of Fiduciary Duty of
SILVER SPRINGS SHORES

120.1.  Plaintiff incorporates Paragraphs 1 through 64 above as fully set forth under this count and further alleges as follows:

121.1.  At all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendants NORTH FLORIDA COUNCIL and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

122.1.  Accordingly, Defendants NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of SILVER SPRINGS SHORES.

123.1.  SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

a)    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant SILVER SPRINGS SHORES knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant SILVER SPRINGS SHORES knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.

67

BSA-PLAN_01423226
SA 1480

b)a.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c)    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters  and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

124.    As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligence and breach of its fiduciary duty, A.A. was the victim of acts of sexual battery constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).

125.    As a result of this sexual battery, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial for which NORTH FLORIDA COUNCIL and BSA are vicariously liable.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, pre-judgment and post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count X: Vicarious Liability of Defendant BSA for the Negligence and Breach of Fiduciary Duty of NORTH FLORIDA COUNCIL**

126.1.    Plaintiff incorporates Paragraphs 1 through 64 above as fully set forth under this count and further alleges as follows:

68

127.1.   At all relevant times, NORTH FLORIDA COUNCIL, was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

128.   Accordingly, Defendant BSA is vicariously liable for the acts and omissions and breaches of fiduciary duties of NORTH FLORIDA COUNCIL.

129.   NORTH FLORIDA COUNCIL acts and omissions and breaches of fiduciary duties include, without limitation,

> a)   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant NORTH FLORIDA COUNCIL knew or should have known that proper precautions and procedures were not followed. These included, without limitation, that Defendant NORTH FLORIDA COUNCIL knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.

> b)a.   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

> c)   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

130.   As a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL's negligence and breach of its fiduciary duty, A.A. was the victim of acts of sexual battery constituting violations of Section 794.011, Florida Statutes. A.A. was the victim of these acts, and each of them, prior to the age of sixteen (16).

131.   As a result of this sexual battery, A.A. suffered at the time of the abuse and

Highly Confidential

BSA-PLAN_01423228

SA 1482

~~continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial for which BSA is vicariously liable.~~

~~WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, pre-judgment and post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.~~

Dated: November 25, 2019.

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

*-s/Paul L. SanGiovanni*
**Paul L. SanGiovanni, Attorney at Law**
Florida Bar No. 0513164
**Cari Whitmire, Attorney at Law**
Florida Bar Number 1015584
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407)418-6041
Facsimile: (407)245-3394
Primary E-mail: PSangi@forthepeople.com
Primary E-mail: CWhitmire@forthepeople.com
Secondary E-mail: MTodd@forthepeople.com
*Attorneys for Plaintiff*

70

Highly Confidential

IN THE CIRCUIT COURT OF THE
5TH JUDICIAL CIRCUIT IN AND
FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

      Plaintiff,

vs.

THE BOY SCOUTS OF
AMERICA NORTH FLORIDA
COUNCIL, INC., BOY SCOUTS
OF AMERICA, AND SILVER
SPRINGS SHORES
PRESBYTERIAN CHURCH,
INC.,

      Defendants.

_____/

### ORDER ON UNOPPOSED MOTION FOR EXTENSIONS OF TIME TO RESPOND TO DEFENDANTS' MOTIONS AND TO FILE REPLIES TO THE RESPONSE

THIS CAUSE having come on before the Court on Plaintiff's Motion for

Extension of Time to Respond to Defendants' Motions and for Defendants to File

Replies to the Response and the Court having been advised of agreement by and

between counsel for parties, it is hereby

Highly Confidential

BSA-PLAN_01423230

SA 1484

ORDERED AND ADJUDGED that:

1.      The time within which the Plaintiff shall file and serve a consolidated response to the Defendants' Motions to Dismiss is extended to through and including November 25, 2019, and

2.      The Defendants shall file and serve their respective replies to the consolidated to extend to and including fourteen (14) days from the receipt of Plaintiff's consolidated response.

DONE AND ORDERED in Chambers, in Marion County, Florida this ____ 24 day of November, 2019.

EDWARD L. SCOTT
JUDGE OF THE CIRCUIT COURT

Copies furnished to:
Paul L. SanGiovanni
Morgan & Morgan, P.A.
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
E-mail:  PSangi@forthepeople.com
**Counsel for Plaintiff**

Spencer H. Silverglate
Francisco Ramos, Jr.
Shannon P. McKenna
Clarke Silverglate, P.A.
799 Brickell Plaza, 9th Floor
Miami, Florida 33131
E-mail: ssilverglate@cspalaw.com
E-mail: framos@cspalaw.com
E-mail: smckenna@cspalaw.com
**Counsel for Defendants, Boy Scouts of America and North Florida Council, Inc.**

2

Highly Confidential

Raychel Garcia
Wicker Smith O'Hara McCoy & Ford P.A.
390 North Orange Avenue, Suite 1000
Orlando, Florida 32801
E-mail: RGarcia@wickersmith.com
**Counsel for Defendant, Silver Springs Shores Presbyterian Church, Inc.**

3

BSA-PLAN_01423232

**SA 1486**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

       Plaintiff,

v.

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

       Defendants.

CASE NO. 2016-CA-000167

_____/

### BSA AND COUNCIL'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO REPLY TO PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendants, Boy Scouts of America ("BSA") and North Florida Council, Inc. ("Council") (collectively, "Defendants"), submit this *unopposed* motion for an extension of time to file their reply to Plaintiff's Response and Incorporated Memorandum of Law in Opposition to Defendant's Motion to Dismiss Second Amended Complaint and, in the Alternative, Motion for Leave to Amend Second Amended Complaint filed on November 25, 2019 (the "Consolidated Motion to Dismiss Response").  In support, Defendants state the following:

1. On November 18, 2019, Defendants filed an unopposed motion for extension of time until Friday, December 13, 2019 to reply to Plaintiff's Consolidated Motion to Dismiss Response.  This Court granted Defendants' extension request on November 21, 2019.

Page **1** of **3**

BSA-PLAN_01423233

**SA 1487**

2.      On Friday, November 22, 2019, Plaintiff filed an Unopposed Motion for Extensions of Time to Respond to Defendants' Motions and to File Replies to the Response, seeking a one-day extension until Monday, November 25, 2019 to file the Consolidated Motion to Dismiss Response.

3.      Defendants did not oppose Plaintiff's extension request, so long as Defendants received a reciprocal one-day extension.  Thus, Defendants' intended to request an extension until Monday, December 16, 2019 to file their reply to Plaintiff's Consolidated Motion to Dismiss Response.

4.      However, there was a miscommunication with Plaintiff's counsel regarding the reciprocal extension.  The motion mistakenly requested that Defendants have fourteen days from receipt of the Consolidated Motion to Dismiss Response to file their reply instead of a reciprocal one-day extension from Friday, December 13, 2019 to Monday, December 16, 2019.

5.      Based on the foregoing and approaching Thanksgiving holiday, Defendants respectfully move the Court to extend the deadline for Defendants to reply to the Consolidated Motion to Dismiss Response to Monday, December 16, 2019.

6.      This motion is made in good faith and not for purposes of delay.

7.      Plaintiff's counsel does not oppose the requested extension, and no party will be prejudiced by the instant motion.

WHEREFORE, Defendants respectfully request entry of the attached Agreed Order granting them the requested extension of time until Monday, December 16, 2019 to reply to Plaintiff's Consolidated Motion to Dismiss Response.

Highly Confidential

BSA-PLAN_01423234

**SA 1488**

Respectfully submitted by,

CLARKE SILVERGLATE, P.A.

799 Brickell Plaza, 9th Floor
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile:  (305) 377-3001

By: /s/Spencer H. Silverglate
      Spencer H. Silverglate
      Florida Bar No. 769223
      ssilverglate@cspalaw.com
      mpedraza@cspalaw.com
      Francisco Ramos, Jr.
      Florida Bar No. 114766
      framos@cspalaw.com
      acastro@cspalaw.com
      Shannon P. McKenna
      Florida Bar No. 385158
      smckenna@cspalaw.com
      mpedraza@cspalaw.com
      *Attorneys for Boy Scouts of America*
      *And North Florida Council, Inc.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct of the foregoing was served through the Florida E-Portal by e-mail, pursuant to Fla. R. Jud. Admin. 2.516, on this 27th day of November, 2019 to all counsel of record.

CLARKE SILVERGLATE, P.A.

By: /s/Spencer H. Silverglate
      Spencer H. Silverglate

Page 3 of 3

Highly Confidential

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

       Plaintiff,

v.

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

       Defendants.

CASE NO. 2016-CA-000167

_____/

**AGREED ORDER GRANTING BSA AND COUNCIL'S
UNOPPOSED MOTION FOR EXTENSION OF TIME TO REPLY TO
PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

THIS CAUSE having come before the Court upon Defendants' Unopposed Motion for

Extension of Time to Reply to Plaintiff's Consolidated Response in Opposition to Defendants'

Motion to Dismiss Second Amended Complaint filed on November 25, 2019, and the Court

having reviewed the Unopposed Motion, having been advised of agreement by and between

counsel for parties, and being otherwise duly advise in the premises, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion is GRANTED.  Defendants

BSA and North Florida Council shall file their reply to Plaintiff's Consolidated Response in

Highly Confidential

BSA-PLAN_01423236
**SA 1490**

Opposition to Defendants' Motion to Dismiss   Second Amended Complaint on or before

Monday, December 16, 2019.

DONE AND ORDERED in Chambers in Marion County, Florida this _____ day of

November, 2019.

_____

EDWARD L. SCOTT
CIRCUIT JUDGE


cc:     Counsel for Plaintiff:
        Paul L. SanGiovanni, psangi@forthepeople.com, mtodd@forthepeople.com

        Counsel for BSA and North Florida Council:
        Spencer H. Silverglate, ssilverglate@cspalaw.com, mpedraza@cspalaw.com
        Francisco Ramos, Jr., framos@cspalaw.com, acastro@cspalaw.com
        Shannon P. McKenna, smckenna@cspalaw.com, khickson@cspalaw.com

        Counsel for Silver Springs Shores Presbyterian Church, Inc.:
        Rachel Garcia, rgarcia@wickersmith.com, ndurham@wickersmith.com

Highly Confidential                                                                 BSA-PLAN_01423237

**SA 1491**

81910-5

<div align="center">

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT IN AND FOR
MARION COUNTY, FLORIDA

</div>

| | |
|---|---|
| A.A., | CIRCUIT CIVIL DIVISION |
|     Plaintiff, | CASE NO. 2016-CA-000167 |
| vs. | |

THE BOY SCOUTS OF AMERICA, a
corporation authorized to do business in
Florida, the NORTH FLORIDA
COUNCIL, INC., BOY SCOUTS OF
AMERICA, a corporation authorized to
do business in Florida, and SILVER
SPRINGS SHORES PRESBYTERIAN
CHURCH, INC, a corporation
authorized to do business in Florida,

    Defendant.

_____/

**<div align="center">DEFENDANT'S, SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC.,
REPLY TO PLAINTIFF'S RESPONSE AND INCORPORATED MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND
AMENDED COMPLAINT</div>**

Defendant, SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC. ("Silver Springs"), by and through the undersigned counsel and pursuant to the applicable Florida Rules of Civil Procedure, hereby files this Reply to Plaintiff's Response in Opposition to Defendants' Motions to Dismiss Plaintiff's Amended Complaint, and in support thereof states as follows:

    1.    On March 9, 2016, Plaintiff filed his original Complaint in this matter.

    2.    Soon after, this Defendant indicated intention to file a Motion to Dismiss Plaintiff's Original Complaint. However, this Defendant agreed with Plaintiff to withhold filing its Motion to Dismiss in exchange for Plaintiff counsel's agreement to amend the original complaint.

Highly Confidential

CASE NO. 2016-CA-000167

3.      As such, on December 14, 2018, Plaintiff filed an Amended Complaint.

4.      On August 20, 2018, this Defendant filed its Motion to Dismiss and Motion to Strike Prejudgment Interest.

5.      On July 24, 2019, this honorable court granted this Defendant's Motion to Dismiss Plaintiff's Amended Complaint without prejudice.

6.      On August 30, 2019, Plaintiff filed a Second Amended Complaint.

7.      Plaintiff asserts a negligence action arising out of the alleged sexual battery of A.A. by George Fout at various unknown times in the private bedroom of George Fout. ***See Plaintiff's Second Amended Complaint at Paragraph 107, a copy of which is attached hereto as Exhibit A***.

8.      Plaintiff claims that this Defendant was negligent for failing to prevent A.A. from participating in sleepovers with BSA volunteers.

9.      Plaintiff goes on to allege that Defendant breached its duties to A.A., to whom the Second Amended Complaint alleges Defendant had a special relationship. Plaintiff also alleges that Defendant is vicariously liable for the actions of George Fout and Steve Fout.

10.     On September 26, 2019, Silver Springs filed a Motion to Dismiss all counts of Plaintiff's Second Amended Complaint on the following grounds:

a.      Counts I and II should be dismissed because Plaintiff has failed to sufficiently allege a special relationship existed between this Defendant and A.A.

b.      Alleging a "special relationship" between this Defendant and A.A. is a legal conclusion, which is not supported by any of the facts alleged by Plaintiff. Moreover, Plaintiff fails to allege that a special relationship existed at the time of

- 2 -

BSA-PLAN_01423239

**SA 1493**

CASE NO. 2016-CA-000167

the sexual abuse as Plaintiff does not provide any dates to indicate when the abuse occurred.

c.   Plaintiff fails to satisfy Florida's pleading requirements.

d.   Counts VII and VIII of Plaintiff's Amended Complaint should be dismissed because Plaintiff has not alleged any facts that establish vicarious liability on Silver Springs for the actions of either George Fout or Steve Fout.

e.   Defendant moves to dismiss Count XI because it fails Florida's Pleading requirements pursuant to Florida Rule of Civil Procedure 1.120.

f.   Plaintiff's claims against this Defendant are time-barred by the statute of limitations.

g.   Plaintiff improperly commingles counts and defendants. On October 8, 2018, Plaintiff filed a Response and Incorporated Memorandum of the Law in Opposition to Defendant's Motion to Dismiss (hereinafter referred to as the "Response").

11.   As provided in Silver Springs' Motion to Dismiss, there are no allegations in Plaintiff's Amended Complaint that the alleged abuse took place on this Defendant's premises, nor are there any allegations that the abuse took place during an event associated with this Defendant.

12.   In Plaintiff's Response, Plaintiff states that the Second Amended Complaint asserts more specific grounds for its theory of a special relationship and that injury occurred on Silver Springs' premises. *See* **Plaintiff's Response at pages 6-7, a copy of which is attached as Exhibit B**.

- 3 -

Highly Confidential

CASE NO. 2016-CA-000167

13.     However, Plaintiff has cited to no facts to support his contention that Silver Springs owed a special duty to A.A. Plaintiff maintains the position that Silver Springs controlled or had the right to control local troops directly, or through its sponsoring organizations. However, Plaintiff's Second Amended Complaint is deficient of any dates to establish when or how a special relationship arose. **See Exhibit A, and Exhibit B at pages 6-7**.

14.     Florida courts have made it clear that litigants must state their pleadings with sufficient particularity for a defense to be prepared.   Plaintiff has failed to provide facts to support the contention that Silver Springs owed a special duty to A.A. based on a special relationship and, as such, has failed to state their pleading with sufficient particularity.

15.     In Plaintiff's Response, Plaintiff cites to *Nova Southeastern University vs. Gross* to demonstrate that a special relationship between an institutional party and an individual member is well recognized. *Nova Southeastern University vs. Gross,* 758 So. 2d 86 (Fla. 2000)*; also see* Pl.'s Resp. pp. 15. Yet, in *Nova*, the university student was injured during a school related activity that was assigned to her by the university. Therefore, the facts in *Nova* that led to a finding of a special relationship are entirely different from the facts in the present matter. Here, the extent of Silver Springs' involvement with A.A. and Troop 448 was limited to providing A.A. and the rest of Troop 448 with a facility to be used for troop meetings, Silver Springs did not assign A.A. to any Troop or troop activity.

16.     Plaintiff also cites to *C.J.C. v. Corp. of Catholic Bishop of Yakima* and states that churches are routinely held to have a "special relationship" toward minors who are sexually abused. *C.J.C. v. Corp. of Catholic Bishop of Yakima,* 985 P.2d 262 (Wash. 1999); Pl.'s Resp. pp. 15. Although the Court in *C.J.C.* did find a "special relationship" between the church and the

- 4 -

Highly Confidential

BSA-PLAN_01423241
**SA 1495**

CASE NO. 2016-CA-000167

children, the facts in *C.J.C* are significantly different that those alleged in the Complaint. In *C.J.C.*, the abuser was a deacon of the church. As a prominent member of the church, the Court stated a jury could reasonably find his position in the Church was a causal factor in the resulting harm. *Id.* Here, the Fouts were not leaders, employees, or even individuals holding positions in Silver Springs Shores Presbyterian Church, nor is this alleged in the Complaint. Their presence at the church was solely due to their position as scoutmaster and assistant scoutmaster, respectively. Therefore, Plaintiff's argument that merely because Silver Springs is a church, they hold a special relationship with all children who are present on the church premises, even for reasons completely unrelated to the church itself, is unsound.

17.     In Plaintiff's Second Amended Complaint and Plaintiff's Response, Plaintiff alleges that Silver Springs is vicariously liable for the sexual battery by George Fout and the breach of fiduciary duty of Steve Fout, respectively. Plaintiff alleges that, at all relevant times, George Fout and Steve Fout were acting as agents on behalf of Silver Springs. *See* Pl.'s Second Amended Compl. ¶¶ 62-64; 78-80; Pl.'s Resp. pp. 15. This Defendant, Silver Springs, is an entity that is separate and distinct from Defendant, BSA, and as such, Plaintiff's allegations should have been directed at each Defendant individually. Irrespective of this inaccuracy, Plaintiff's Second Amended Complaint and Response fails to allege any facts to establish an agency relationship between this specific Defendant, Silver Springs, and the Fouts. The Fouts were not members, employees, or even volunteers at the church. The Fouts were not acting on the church's behalf nor was the church authorized to accept or control any of their actions, as required to establish agency. Therefore, Silver Springs is not vicariously liable for the Fouts' actions.

- 5 -

CASE NO. 2016-CA-000167

18.     Additionally, the court in *Folwell v. Bernard By and Through Bernard*, 477 So.2d 1060, 1062 (Fla. 2d DCA 1985) discussed agency. (The Court concluded that "where vicarious liability is sought to be imposed upon one of two ostensibly interrelated entities through the ordinary principles of agency, the imposition of such liability is unwarranted in the absence of evidence revealing that one entity, the purported principal, dominates and controls the other.").

19.     The essential elements to establish actual agency are: (1) acknowledgement by the principal that the agent will act for him; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent. *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842 (Fla. 2003).

20.     Plaintiff's Second Amended Complaint is deficient with regard to this argument as it does not allege any ultimate facts showing that a principal (someone in a supervisory role at Silver Springs) acknowledged that either George Fout or Steve Fout would act for Silver Springs; how and when either of the Fouts accepted that undertaking; nor the ways in which Silver Springs controlled the Fouts actions. As such, Plaintiff has again failed to allege specific facts which indicate the presence of an agency relationship.

21.     At the very least, Plaintiff has failed to allege facts sufficient to hold this specific Defendant, Silver Springs, liable under the theory of vicarious liability.

22.     As in *Folwell*, even if this Court chooses to acknowledge any alleged agreement, whether memorialized or not, between the Defendants, Plaintiff has not alleged any facts sufficient to show that Silver Springs exercised any degree of control over the Boy Scouts of America ("BSA"), let alone domination of the BSA as a subordinate entity.

- 6 -

Highly Confidential

CASE NO. 2016-CA-000167

23.     The evidence and allegations are thus, susceptible of only one interpretation, that no agency relationship was created between Silver Springs and BSA. Dismissal of Plaintiff's Second Amended Complaint is therefore, warranted.

24.     Overall, both Plaintiff's Second Amended Complaint and Plaintiff's Response fail to address each Defendant's respective duties, relationships and wrongdoings individually. Instead, Plaintiff joins all three Defendant's into one consolidated party and makes arguments against other Defendants in their Response filed in Opposition to Silver Springs' Motion. For instance, in the Response, Plaintiff refers to arguments made by Boy Scouts of America, a different Defendant, and quotes the purpose of Boy Scouts of America to refute those arguments, even though such arguments are irrelevant in Plaintiff's claims against this specific Defendant, Silver Springs.

25.     Moreover, Plaintiff's Second Amended Complaint improperly comingles counts and defendants.  Florida Rule of Civil Procedure 1.110(f) states that each claim "shall be stated in a separate count." *See also K.R. Exchange Services, Inc. v. Fuerst, Humphrey, Ittleman, PL*, 48 So.3d 889 (Fla. 3d DCA 1020) ("A party should plead each distinct claim in a separate count rather than plead the various claims against all of the defendants together."); *Pratus v. City of Naples* 807 So.2d 795 (Fla. 2d DCA 2002) ("...each claim should be plead in a separate count instead of lumping all defendants together.")

26.     Throughout numerous counts, Plaintiff impermissibly pleads counts that lump multiple Defendants together in one count as opposed to correctly pleading each count against each Defendant separately. Notably, Counts VII, VIII, and XI comingle multiple Defendants into the same count making it indiscernible which paragraphs contained in each count apply to Silver

- 7 -

BSA-PLAN_01423244

SA 1498

CASE NO. 2016-CA-000167

Springs. As such, Plaintiff's Second Amended Complaint fails Florida's pleading requirements and should be dismissed in its entirety.

27.     To the extent that Silver Springs is being sued vicariously for the acts of George or Steve Fout, which is unclear from the four corners of Plaintiff's Second Amended Complaint, then Plaintiff's Second Amended Complaint should also be dismissed because claims for vicarious liability must be specifically plead as separate and distinct counts.  *Goldschmidt v. Holman*, 571 So.2d 433 (Fla. 1990).

28.     Finally, Plaintiff's claims are barred by the statute of limitations. Plaintiff's Second Amended Complaint was filed with this Court on August 30, 2019. All claims against Silver Springs are founded on negligence and the statute of limitations for negligence actions is 4 years.  Fla. Stat. § 95.11. Plaintiff alleges that sexual abuse occurred in 2012, but fails to provide specific dates or instances of the alleged abuse in neither Plaintiff's Complaint nor Plaintiff's Response.

29.     Plaintiff's response states that this Defendant improperly moves to dismiss due to Plaintiff omitting dates of the subject abuse. See Pl's Resp. at pp. 21. Additionally, Plaintiff states that the omission of dates was intentional and not required for purposes of surviving a motion to dismiss. *Id*.

30.     Plaintiff cites to *Doe No. 3 vs. Nur-Ul-Islam Academy, Inc*. 217 So.3d 85 (Fla. 4th DCA 2017) in opposition to this Defendant's motion to dismiss based on statute of limitation grounds. The *Doe* court stated that a former student's complaint against a mosque, alleging that she, while a minor, was sexually abused at private school operated by the mosque, did not, within its four corners, demonstrate that the action was barred by statute of limitations, and thus

- 8 -

CASE NO. 2016-CA-000167

complaint was not subject to dismissal with prejudice on such grounds. There, the Plaintiff's complaint alleged that the student's parents were prevented from knowing of student's reports of abuse, and the complaint did not include the former student's birthdate or age, such that it could not be determined when she reached the age of majority.

31.     The instant case is distinguishable from *Doe* in that the Plaintiff in *Doe* was abused on school property, and thus prevented the Plaintiff's parents from learning of the abuse for purposes of triggering the statute of limitations. In the instant case, Plaintiff alleges in Paragraph 111 that "the sexual battery would often take place at George Fout's home after scouting events." The *Doe* court based its decision to reverse the trial court's dismissal of the complaint on grounds that Plaintiff's parents were prevented from learning of the abuse.

32.     Here, because the subject abuse occurred outside of scouting activities, off scout grounds, and outside of scout hours, Plaintiff's parents should have become aware of the subject abuse making *Doe* inapplicable to the instant case. Further, in regards to this Defendant, none of the abuse alleged in the Complaint occurred on its premises.

33.     Plaintiffs have attempted to avoid the statute of limitation by arguing delayed discovery and fraudulent concealment by Defendants. However, these arguments fail. The delayed discovery doctrine does not apply to negligence causes of action arising out of sexual abuse. *Cisko v. Diocese of Steubenville*, 123 So.3d 83 (Fla. 3d DCA 2013. Additionally, concealment of knowledge of other instances of alleged abuse does not avoid the statute of limitations in negligence claims arising from sexual abuse. *Rubio v. Archdiocese of Miami, Inc.*, 114 So.3d 279 (Fla. 3d DCA 2013); *John Doe No. 23 v. Archdiocese of Miami, Inc.*

- 9 -

Highly Confidential

CASE NO. 2016-CA-000167

34.     Normally, a claim for injuries based on another party's negligent conduct must be filed within four years of the incident under the applicable statute of limitations. *Rubio v. Archdiocese of Miami, Inc.,* 114 So. 3d 279, 281 (Fla. 3d DCA 2013). In more than ten years since enacting section 95.11(7), the legislature has not extended the limitations period to causes of action other than intentional torts. *Cisko v. Diocese of Steubenville*, 123 So. 3d 83, 85 (Fla. 3d DCA 2013). Plaintiff's claims against Silver Springs are all premised on negligence and there are no allegations of Silver Springs committing any intentional torts. The running of the statute of limitations is an absolute defense in a negligence case such as this. *Rubio,* 114 So. 3d 279. In *Rubio*, the defendant church's Motion to Dismiss was granted, despite allegations that it knew that one of its priests was molesting the plaintiff, because there were no allegations that the church caused the plaintiff to wait to file suit. *Id.* As such, Plaintiff's claims related to any abuse that occurred prior to January 27, 2012 are time-barred by the four-year statute of limitations and should be dismissed with prejudice.

35.     Plaintiff's response does not even address this Defendant's arguments with respect to Section 95.11(9) Fla. Stat. In sum, this Defendant contends that Section 95.11(9) is inapplicable as to all Counts against this Defendant. Specifically, Section 95.11(9) states, "an action related to an act constituting a violation of section 794.011 involving a victim who was under the age of 16 at the time of the act may be commenced at any time. This subsection applies to any such action other than one which would have been time barred on or before July 1, 2010." Here, Plaintiff does not allege anywhere in the Second Amended Complaint that Silver Springs "committed an act constituting a violation of section 794.011." Further, it is impossible for an organization to commit an act of sexual abuse thereby making section 95.11(9) inapplicable to

- 10 -

BSA-PLAN_01423247

SA 1501

CASE NO. 2016-CA-000167

Silver Springs. Consequently, the claims against Silver Springs are not "related to an act constituting a violation of Section 794.011." *See* Fla. Stat. § 95.11(9). Plaintiff must comply with the 4-year statute of limitations for any and all claims set forth against Silver Springs.

WHEREFORE, Defendant, SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC., respectfully requests that this Court enter an Order dismissing all allegations contained in the Plaintiff's Amended Complaint against it, for the reasons set forth herein.

WE HEREBY CERTIFY that a copy hereof has been electronically served via Florida ePortal to: Paul L. SanGiovanni, Esquire, psangi@forthepeople.com, mtodd@forthepeople.com; Spencer H. Silverglate, Esquire, ssilverglate@cspalaw.com; mpedraza@cspalaw.com; Francisco Ramos, Jr., Esquire, framos@cspalaw.com; Shannon P. McKenna, Esquire, smckenna@cspalaw.com; on this 4th day of December 2019.

/s/ Raychel A. Garcia
Raychel A. Garcia, Esquire
Florida Bar No. 091096
WICKER SMITH O'HARA MCCOY & FORD, P.A.
Attorneys for Silver Springs Shores Presbyterian
Church, Inc.
390 N. Orange Ave., Suite 1000
Orlando, FL 32801
Phone: (407) 843-3939
Fax: (407) 649-8118
ORLcrtpleadings@wickersmith.com

- 11 -

Highly Confidential

Filing # 95073805 E-Filed 08/30/2019 06:55:17 PM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

        Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL,
INC., BOY SCOUTS OF
AMERICA, AND SILVER
SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

        Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff, A.A, by and through his undersigned counsel, files this Complaint against Defendants, THE BOY SCOUTS OF AMERICA, a foreign corporation authorized to do business in Florida (hereinafter referred to as the "BSA"), the NORTH FLORIDA COUNCIL, INC., BOY SCOUTS OF AMERICA, a corporation authorized to do business in Florida (hereinafter referred to as the "NORTH FLORIDA COUNCIL"), and the SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC., a corporation authorized to do business in Florida (hereinafter referred to as the "SILVER SPRINGS SHORES") and for good cause, states:

### INTRODUCTION

1.    **General Statement of Claims:**  This Complaint is based on the childhood sexual abuse of Plaintiff, A.A. caused by the negligent, willful, wanton, reckless and tortious acts and omissions of BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES, Scoutmaster Steve Fout and other agents of the BSA, and George Fout, formerly an Assistant Scoutmaster.

Exhibit A

BSA-PLAN_01423249

SA 1503

2.      At all relevant times, George Fout was the agent of Defendant BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.  These claims relate to acts of sexual battery as described in Section 794.011, Florida Statutes suffered by the Plaintiff, A.A., while he was a participant in the programs operated by the Defendants, and each of them.

3.      As more particularly described herein, the Plaintiff suffered the sexual battery described herein as a result of the neglect of the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES and their respective agents to, among other things, exercise due care in the administration, management and operation of its scouting program, their breach of their fiduciary duties and their vicarious liability for the acts of their agents.

4.      **Jurisdiction and Venue**:      This is an action for damages that exceed Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorneys' fees.

5.      Venue is proper in Marion County, Florida because the events giving rise to this action occurred in Marion County, Florida. .

6.      **The Parties**:   A.A. is currently an adult residing in Marion County, Florida. The initials "A.A." are used to protect the identity of Plaintiff from public disclosure. The identity and further relevant details shall be disclosed to the Defendants off record and confidentially.

7.      At all relevant times, A.A. resided in Marion County, Florida.

8.      A.A. was a member of the Boy Scouts of America Troup 448.

9.      Plaintiff met his abuser, George Fout, due to George Fout's role as the Assistant Scoutmaster of Troup 448.

2

Highly Confidential

BSA-PLAN_01423250

**SA 1504**

10.     SILVER SPRINGS SHORES was the chartering organization for Troop 448, or such other Boy Scout Troop as A.A. was a member (herein collectively referred to as "Troop 448").

11.     The BSA is a foreign corporation authorized to do business in the state of Florida.

12.     At all relevant times, BSA controlled or had the right to control the NORTH FLORIDA COUNCIL and the sponsoring organizations, which implemented BSA's scouting program, including, without limitation, SILVER SPRINGS SHORES.

13.     The NORTH FLORIDA COUNCIL is a corporation authorized to do business in the State of Florida and is located in Duval County, Florida.

14.     At all relevant times, the NORTH FLORIDA COUNCIL was an agent of BSA, subject to BSA's control or right to control.

15.     As Defendant BSA's agent, the NORTH FLORIDA COUNCIL controlled or had the right to control local troops directly, or through their sponsoring organizations, including, without limitation, SILVER SPRINGS SHORES.

16.     SILVER SPRINGS SHORES is a corporation authorized to do business in the State of Florida and is located in Marion County, Florida. At all relevant times, SILVER SPRINGS SHORES was an agent of BSA and the COUNCIL, subject to their control or right to control.

17.     As Defendant BSA and NORTH FLORIDA COUNCIL' agent, SILVER SPRINGS SHORES controlled or had the right to control the programs and troops that it sponsored, including its Scoutmaster and Assistant Scoutmasters.

3

18.     The BSA, NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES will be collectively referred to herein as the Boy Scout Defendants.  When so used, the term references each in their respective individual capacities.

19.     Steve Fout was the Scoutmaster and leader of Troop 448.

20.     George Fout was Steve's son and was an Assistant Scoutmaster of Troop 448.

### The BSA

21.     The BSA is a large youth-serving organization which promotes, markets, and encourages parents to enroll their children in the BSA. Enrollment in the BSA requires parents to entrust their children's health and safety to the BSA and requires children to engage in activities that expose them to adults and others. Much of the BSA's activities include over-night outings, camping trips, and trips away from parents.

### The Hierarchy of the BSA and the BSA's Control Over Its Agent Scouting Organizations

22.     The BSA has established its presence through the use of a hierarchical system, whereby local Councils and chartering organizations implement and maintain the BSA's program at a local level under the BSA's guidance and control.

23.     Organizationally, the BSA is separately incorporated from local councils, but the BSA and the BSA's local councils comprise a tightly integrated, hierarchal organizational structure under the BSA's control at the top.

24.     The BSA issues the Boy Scouts of America name, emblems, badges, markings, and youth programs to the Councils and chartering organizations. The BSA requires the local

4

Highly Confidential

BSA-PLAN_01423252

SA 1506

Council and troops within a local Council to strictly adhere to the BSA's organizational charter and standards of leadership.

25.     For example, all members of scout troops chartered through a local council must be registered and pay dues to the BSA. The BSA oversees and controls all professional staffing of local councils. Local councils may not employ any professional scouts who are not drawn from a BSA approved candidate list that the BSA compiled and maintained. Local councils are not permitted to use any programs or materials that the BSA has not supplied or approved.

26.     Unless the BSA has selected and approved them, no adult scout leader, whether paid or volunteer, may serve in a local troop or council.

27.     The BSA asserts First Amendment associational rights to exclude Scoutmasters and volunteers who do not share their values or beliefs and anyone else it chooses from participating in scouting.  Indeed the BSA has *successfully* asserted these associational rights in trial, appellate and over their volunteer and are judicially estopped from asserting that they do not have control or a special relationship with their Scoutmasters and volunteers. *See*, for example, *Boy Scouts of American vs. Dale*, 530 U.S. 640 (2004).  The BSA is similarly judicially estopped from arguing that these Scoutleaders and volunteers are not their agents.

28.     The BSA provides a wide variety of management services to locals councils and troops, including insurance and risk management, marketing, education, training, scout camps, facilities, media relations, and human resources. Duplicate personnel files on local council employees are maintained at the local council and at the BSA's national headquarters.

29.     The BSA creates the bylaws, rules and regulations that every chartering organization must adhere to in implementing and running the BSA's scouting program. Significantly, the BSA's bylaws obligate a chartering organization to provide adequate facilities,

Highly Confidential

BSA-PLAN_01423253

SA 1507

supervision, and leadership for the troop in exchange for the granting of a charter to run a local scouting troop.

30.     A local scouting troop cannot exist without the support of a chartering organization that has received a charter from the BSA authorizing the chartering organization to implement and run the BSA's scouting program.

31.     Under the BSA bylaws, each chartering organization is required to select at least three people over the age of 21 to serve as the Troop Committee. The Troop Committee then selects the Troop Scoutmaster. The BSA must approve scout leaders, whether paid or volunteer, to serve in a local troop or council.

32.     Together, the Troop Committee and the Scoutmaster are responsible for the general program and supervision of the troop.

33.     Further, each chartering organization is required to appoint a representative other than the Scoutmaster or Assistant Scoutmaster to serve as its institutional representative on the local Council.

34.     A chartering organization must reapply to the BSA every year for a renewed charter in order to continue to operate a local troop. The BSA may revoke a chartering organization's charter at any time should the chartering organization be found to deviate from the BSA's charter and bylaws.

35.     This chartering system reveals the BSA's consent to allow local chartering organizations to operate the scouting program on its behalf and the chartering organizations' consent to operate the local troops subject to the BSA's control or right to control. Accordingly, the chartering organizations, such as SILVER SPRINGS SHORES, are the agents of the BSA.

6

BSA-PLAN_01423254

SA 1508

36.     The BSA uses a similar structure in relation to its local Councils, such as the NORTH FLORIDA COUNCIL. The BSA issues a charter to an approved local Council authorizing the local Council to administer the scouting program to the local scout troops within the region on behalf of the BSA.

37.     The local Councils are subject to the same bylaws, rules and regulations as the chartering organizations. If a local Council deviates from the rules and regulations established by the BSA, then the local Council may have its charter revoked.

38.     All local Councils must apply to the BSA for renewal of their charters annually.

39.     It is the duty of the local Council to promote, support, and maintain the BSA scouting regime amongst all local troops within the local Councils area.

40.     The chartering system shows the BSA's consent to allow local Councils to operate the scouting program on its behalf within a specific geographic region, and the local Councils consent to operate the scouting program subject to the BSA's control or right to control. Thus, the local Councils are agents of the BSA.

41.     The BSA cannot operate its scouting program without the consent and cooperation of the local Councils and chartering organizations.   Conversely, the chartering organizations and local Councils cannot operate and supervise local scouting troops without the consent of the BSA.

42.     At all relevant times, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER SPRINGS SHORES were serving as Defendant the BSA's agents by implementing and maintaining the BSA's scouting program on a local level.

7

BSA-PLAN_01423255

SA 1509

### The BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with A.A.

43.     The Boy Scout Defendants have a special relationship with A.A., for reasons which included, without limitation, the following:

a.     A.A. and his family imposed confidence in The Boy Scout Defendants through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that Defendants promote through involvement with the BSA, and ultimately would be safe from harm in doing so;

b.     It is through A.A.'s involvement with The Boy Scout Defendants, and George Fout's relationship with The Boy Scout Defendants that A.A. was abused by George Fout;

c.     The Boy Scout Defendants had a direct and special relationship with scouts who participated in its programs. A.A. was a child at the time of the abuse. The abuse began and often occurred when A.A. was placed in the care and custody of Defendants The Boy Scout Defendants, with the resulting loss of control to protect himself;

d.     A.A. was a child at the time of the abuse. He was raped and molested at locations and under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardian for their ordinary source of protection or were otherwise relying entirely on the Boy Scout Defendants and their agents, including Scoutmaster Steve Fout, for his protection, and

e.     The Boy Scout Defendants, were substituting for A.A.'s parents during the relevant times.

### BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with, and Constructive Control over Scoutmaster Steve Fout, and his Agency for them.

44.     At all relevant times, A.A. was enrolled in the Boy Scouts of America scouting program.

45.     At all relevant times, A.A. was a member of Boy Scouts of America Troop 448 in Ocala, Florida. Troop 448 was chartered by Defendant SILVER SPRINGS SHORES,

8

Highly Confidential

BSA-PLAN_01423256

SA 1510

46.     Troop 448 was under the jurisdiction of Defendant NORTH FLORIDA COUNCIL.

47.     Each of SILVER SPRINGS SHORES and the NORTH FLORIDA COUNCIL were under the ultimate control and authority of the BSA.

48.     But for the BSA's consent, neither SILVER SPRINGS SHORES, nor the NORTH FLORIDA COUNCIL would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

49.     As the chartering organization of Troop 448, Defendant SILVER SPRINGS SHORES was responsible for providing adequate facilities, supervision, and leadership for the troop, subject to the approval of the Council and the BSA and consistent with their direction and policies.

50.     The troop meetings were held in facilities owned or operated by Defendant SILVER SPRINGS SHORES.  Certain activities were held in facilities owned or operated by the Council and the BSA.

51.     At all times material hereto, the Boy Scout Defendants installed Steve Fout as the Scoutmaster (a/k/a Troop Leader) for Troop 448.

52.     As the Scoutmaster of Troop 448, Steve Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

53.     At all times relevant, Steve Fout was subject to the approval, direction, control and authority of the Boy Scout Defendants.

9

54.     Steve Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

55.     In fact, Steve Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

56.     Steve Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, the Boy Scout Defendants had the control or the ability to control, Steve Fout's display of his the BSA badge and insignia and other indicia and brands of the BSA.

57.     But for the Boy Scout Defendants' consent, neither Steve Fout would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

58.     The subject authorization was designed to instill, and did instill, trust and confidence in Steve Fout by the parents, guardians and scouts and further served to promote the BSA brand.

59.     But for Steve Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

60.     A.A. and his guardians each perceived Steve Fout to be a representative of the BSA, the Council and Silver Springs Shores and to be a person whom they could entrust with A.A.

10

61.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

62.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

63.     Steve Fout had actual or apparent authority to act on behalf of the BSA, the Council and Silver Springs Shores, and each of them.

64.     As a result there was, at all relevant times, a special relationship and agency between Steve Fout and Boy Scout Defendants.

### BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with, and Constructive Control over perpetrator and assistant Scoutmaster, George Fout, and his Agency for them.

65.     At all times material hereto, the Boy Scout Defendants installed George Fout, as an Assistant Scoutmaster (a/k/a Assistant Troop Leader) for Troop 448.  George Fout was Steve Fout's son.

66.     At all times material hereto, Assistant Scoutmaster George Fout was under the direct supervision of Scoutmaster Steve Fout.

67.     As the Assistant Scoutmaster of Troop 448, George Fout assisted Steve Fout in his activities.

68.     As the Assistant Scoutmaster of Troop 448, George Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members

11

Highly Confidential

BSA-PLAN_01423259

SA 1513

to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

69.    At all times relevant, George Fout was subject to the approval, direction, control and authority of The Boy Scout Defendants.

70.    George Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

71.    In fact, George Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

72.    George Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, Boy Scout Defendants had the control or the ability to control, George Fout's display of his the BSA badge and insignia and other indicia and brands of the BSA.

73.    But for the Boy Scout Defendants consent, George Fout would not have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

74.    The subject authorization was designed to instill, and did instill, trust and confidence in George Fout by the parents, guardians and scouts and further served to promote the BSA brand.

Highly Confidential

BSA-PLAN_01423260

SA 1514

75.     But for George Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

76.     A.A. and his guardians each perceived George Fout to be a representative of the Boy Scout Defendants and to be a person whom they could entrust with A.A.

77.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

78.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

79.     George Fout had actual or apparent authority to act on behalf of the Boy Scout Defendants, and each of them.

80.     As a result there was, at all relevant times, a special relationship and agency between George Fout and The Boy Scout Defendants.

Highly Confidential

BSA-PLAN_01423261

SA 1515

## George Fout's Grooming and Preparation of A.A. and
## Three (3) Other Scouts from Troop 448 for Abuse.

81.     Perpetrators of sexual abuse against children often "groom" the victim for the abuse.   This grooming is a process of mental, emotional, psychological and physical manipulation by which the perpetrator prepares a child, significant others, and the environment for the abuse of the child.   Specific goals include gaining access to the child, gaining the child's compliance, and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

82.     The grooming process consists of a series of stages.   These include the stages of selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch.

83.     As to the first stage, when selecting a victim, offenders often target children based on family situations, such as those living in single family households as often in these cases children may have less adult supervision or the custodial parent may rely upon others to help with childcare responsibilities.

84.     This pattern of grooming and its specific stages are discernable to supervising adults, including Scoutmasters, particularly if they are properly trained to recognize the behavior. This "grooming" results in its own resulting psychological and emotional abuse and damage, separate from the impending physical sexual abuse.

85.     George Fout engaged in exactly these stages of grooming A.A. prior to and during his abuse of A.A.   George Fout often showered Plaintiff with special attention and otherwise engaged in the grooming process described.

14

BSA-PLAN_01423262

SA 1516

86.     A.A. met the profile of a particularly vulnerable child, as he was being raised by a single non-parent adult with no strong male role model.

87.     At the time that George Fout grooming A.A., he was simultaneously grooming at least three (3) other child scouts in Troop 448 for sexual abuse, for a total of four (4) scouts in a single troop undergoing grooming for impending sexual abuse.

88.     As a result of George Fout's grooming of A.A., it was foreseeable that George Fout would ultimately consummate the grooming in its goal of sexual abuse.

89.     Indeed, ultimately, George Fout's grooming of each of these four (4) scouts did result in them suffering his continuous and ongoing sexual abuse.

90.     This grooming frequently occurred on the premises of SILVER SPRINGS SHORES and during events sponsored by the BSA.

91.     Upon information and belief, Troop 448 Scoutmasters knew or should have known that George Fout was grooming A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

92.     In addition, it is a reasonable inference that, while George Fout was grooming four (4) scouts under their care, adult supervisors of Troop 448, including Steve Fout, observed actions and behavior by George Fout by which they knew or should have known that George Fout was grooming the scouts, including A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

93.     Further, if the Boy Scout Defendants had properly trained adult leaders and Scoutmasters to identify grooming behavior, they would have identified George Fout as being actively engaged in grooming four (4) child scouts in their troop and would have been trained to

15

BSA-PLAN_01423263

SA 1517

warn A.A. and his parents of the impending abuse and prevent the abuse and the resulting injuries and damage.

### George Fout's Abuse of A.A. was Foreseeable and Immanent.

94.     George Fout's sexual abuse of A.A. was foreseeable, as the Boy Scout Defendants each had actual and constructive notice of George Fout's grooming of A.A., and actual and constructive notice of the impending and immanent and actual abuse of A.A. and the abuse, in fact, of A.A.

95.     This notice included, without limitation:

    a.     That George Fout would engage in a pattern of grooming of A.A. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

    b.     That George Fout would engage in a pattern of grooming of three (3) other scouts. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

    c.     Upon information and belief and upon reasonable inference, the adult troop leaders should have known that George Fout engaging in grooming of four (4) minor scouts in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

    d.     On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on the BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, providing notice to The Boy Scout Defendants of grooming, sexual abuse, and the ongoing process of grooming, including that George Fout's propensity to engage in sexual abuse is foreseeable and immanent;

    e.     At times, A.A, would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy;

Highly Confidential

BSA-PLAN_01423264

SA 1518

f.   Adult scout leaders of Troop 448 knew or should have known that A.A. and other scouts of Troop 448 would visit the home of George Fout and would often spend the night in the bedroom of George Fout, in violation of BSA policy;

g.   Steve Fout, as agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES was personally present over the course of many years as George Fout, his adult son, took four (4) minor child scouts to his room, each on a series of separate occasions, for hours of "game play" and overnight sleep-overs behind closed doors;

h.   Steve Fout should have known or was willfully ignorant of the fact that his son was abusing minor children under his roof;

i.   Steve Fout, as a troop leader and an agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES knew, should have known or was willfully ignorant that George Fout was actively abusing or posed a threat of sexual abuse to minor scouts under his care.

96.   During all relevant times hereto, George Fout was conducting himself in such a manner and fashion that the Boy Scout Defendants knew or should have known that George Fout had a propensity to commit and engage in sexual misconduct.

97.   If the Boy Scout Defendants had properly and adequately supervised the conduct and the activities of George Fout, they would have known or should have known of the misconduct of George Fout, so as to prevent the sexual abuse and infliction of emotional distress on A.A.

98.   Had the Boy Scout Defendants not acted in such a careless, negligent, and/or reckless manner, they would have known and/or should have known of the conduct of George Fout, as described herein, and of his propensity to engage in such activities, such that the Boy Scout Defendants could and/or should have prevented the sexual abuse and the infliction of physical and emotional distress on A.A.

99.   As agents for the Boy Scout Defendants, actual or constructive knowledge to Steve Fout and to adult troop leaders that George Fout posed a risk to the scouts and had a

17

Highly Confidential

propensity to engage in the grooming and sexual abuse is imputed to the BSA, the NORTH FLORIDA COUNSEL, jointly and severally.

### The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES Had Constructive Control of the Premises upon which George Fout's Behavior Provided Notice of the Impending Abuse.

100.   On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at the BSA administrated event on the BSA property.

101.   George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the Boy Scout Defendants.

102.   Similarly, on multiple and continuing occasions, notice of George Fout's propensity to commit abuse, including without limitation, his grooming of A.A. and at least four (4) other scouts occurred on property owned and controlled by Boy Scout Defendants and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

### George Fout's Abuse of A.A.

103.   A.A. was introduced to his abuser, George Fout through his membership in the BSA Troop 448.

104.   At all times material hereto, George Fout was an adult.  At all times material hereto, A.A. was a minor.

105.   At all times relevant hereto, for the purpose of furthering his duties as an Assistant Scoutmaster, George Fout sought and gained the then minor A.A.'s trust, friendship, admiration and obedience. As a result, A.A. was conditioned to comply with George Fout's direction and to look to him as an authority figure.

18

BSA-PLAN_01423266

SA 1520

106.    At all relevant times hereto, using the power, authority and trust of his position as an Assistant Scoutmaster, and availing himself of the Boy Scout Defendants' representations to parents and scouts that tire BSA was a moral and safe place for young boys, George Fout groomed, enticed, induced, directed, coerced and forced A.A. to engage in deviant sexual acts with him.

107.    As the foreseeable extension of the grooming process, George Fout committed a sexual abuse, sexual touching, penetration, oral and anal sodomy and other acts of sexual battery constituting violations of Section 794.011, Florida Statutes, upon A.A.

108.    Eventually, George Fout escalated the frequency of the sexual battery to the point where he was sexually abusing A.A. approximately once a month.

109.    At all times relevant hereto, George Fout utilized physical, emotional and spiritual force and persuasion to impose his moral will upon the then minor A.A. in order to commit grievous, unspeakable acts of sexual abuse upon the person of then minor A.A. all of which acts constitute flagrant abuse of the symbolism, power and authority of his position as an Assistant Scoutmaster.

110.    The grooming and other notice of George Fout's propensity for abuse would frequently occur on the premises of SILVER SPRINGS SHORES and during sanctioned the BSA events on the BSA property.

111.    The sexual battery would often take place at George Fout's home after scouting events, in which he resided with Steve Fout, his father and the Scoutmaster of Troop 448. Steve Fout was often present in the home during George Fout's sexual battery of A.A.

19

BSA-PLAN_01423267

SA 1521

112.    At times, A.A. would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy.

113.    As the sexual battery would continue, without limitation, A.A. would spend the night at the home of Scoutmaster Steve Fout.  This is a clear violation of the BSA policy. During those occasions, A.A. would be abused by Assistant Scoutmaster George Fout. Steve Fout was often in the home often when the incidents of sexual battery occurred.

114.    At no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure the non-sleepover between volunteer leaders and youth in the BSA's policy was being implemented and followed by their scoutmasters or scout leaders, and at no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure that no one-on-one contact between volunteer leaders and youth were being followed according to the BSA's polices.

115.    A.A. was repeatedly abused under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardians for their ordinary source of protection or was otherwise relying entirely on The Boy Scout Defendants, and its agents for his protection.

### The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES Had Actual or Constructive Control of the Premises upon which Sexual Abuse and related Grooming was committed.

116.    On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at a the BSA administrated event on the BSA property.

117.    George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and

Highly Confidential

BSA-PLAN_01423268

SA 1522

Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

118.    Similarly, on multiple and continuing occasions, notice of George Fout's propensity to commit abuse, including without limitation, his grooming of A.A. and at least three (3) other scouts occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

### The BSA's History of Pedophilia

119.    The BSA has known for decades of the high degree of risk that adult Scoutmasters and volunteers may sexually abuse minor scout members.

120.    Since the early 1900s, the BSA has maintained a system of "Ineligible Volunteer Files" to track incidents wherein adult Scoutmasters sexually abused scouts. The Ineligible Volunteer Files contain internal memoranda demonstrating the BSA's awareness of the ongoing pedophilia within the BSA, and demonstrated concerns about pedophiles within the BSA harming their reputation and economic interests.

121.    These Ineligible Volunteer Files demonstrate the BSA's vulnerabilities when it comes to pedophilia within the BSA and includes pedophiles' techniques used to enter scouting, their techniques for grooming victims and more.

122.    In approximately 1972, the BSA implemented a system requiring local Council's scouting executives to complete and send in a form with any available supporting information about known or alleged sexual abuse committed by adult Scoutmasters in the executives' jurisdiction. Upon receipt of this information from the local Council, the BSA created an Ineligible Volunteer File for the abuser and added it to the BSA's database.

21

BSA-PLAN_01423269

SA 1523

123.   By 1977, the BSA was advising all sponsoring organizations to maintain "two deep leadership" for all scouting activities, wherein two adult Scoutmasters were required to be present at all times. Ostensibly, this precaution was implemented to help prevent sexual abuse in scouting.

124.   Despite the BSA's extensive and long-standing knowledge of the high degree of risk of pedophilia in scouting, the BSA did not implement a sexual abuse-prevention education program until approximately 1988. This program, the Youth Protection Program, was the BSA's first effort to educate scouts and their family members about the risk of sexual abuse in scouting, a risk that continues today.

125.   The BSA has overwhelming evidence that scouting has particular characteristics that make the organization vulnerable to pedophiles, including but limited to:

  a.   Joining the BSA provides pedophiles access to boys alone and away from their families in secluded settings like camp-outs and overnight hikes;

  b.   The BSA repeatedly encourages young boys to strictly obey their scout leaders and masters, allowing pedophiles to groom their victims;

  c.   The BSA encourages overnight stays, camping trips and other activities for scouts and scout leaders and masters to be alone together;

  d.   Scouting provides opportunities for a pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him;

  e.   A pedophile scout leader can, depending on the pedophile's preferred victim age, volunteer for and be sure to have access only to boys of a certain age;

  f.   The BSA conditions boys to the concept of strict obedience to the scout leader and a bonding mechanism that pedophiles crave;

  g.   The BSA promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a pedophile's efforts to keep his victims silent and compliant;

22

Highly Confidential

h.      The BSA conducted no criminal background checks on its volunteers;

i.      The BSA did not prohibit adults from sleeping in tents with boys overnight;

j.      The BSA did not prohibit adult leaders from spending time alone with individual scouts; i. The BSA did not prohibit adult scout leaders from having contact with scouts outside of authorized scouting activities;

k.      For decades, the BSA re-admitted pedophiles it had previously removed for child abuse after a period of the BSA "probation," thereby exposing unsuspecting children to sexual abuse;

l.      The BSA had a practice of not reporting scout abuse incidents to law enforcement;

m.      The BSA had a pattern of reaching an accommodation with a pedophile, in which the pedophile would resign from scouting and the BSA would agree not to report the child sexual abuse to civil authorities;

n.      The BSA refused requests to share its list of known abusers with other youth organizations, knowing that pedophiles it had ejected often joined other youth-serving organizations;

o.      The BSA refused to produce its I.V. files to its review board and scout safety consultants, who were endeavoring to develop and implement meaningful safeguards and barriers to pedophile infiltration;

p.      The BSA refused to fingerprint, photograph or perform background checks on its adult volunteers, allowing removed pedophiles using an alias to sneak back in to scouting through another troop;

q.      The BSA refused to utilize widely accepted organizational best practices that would establish reasonable barriers to intrusion by pedophiles;

r.      The BSA refused to educate local councils, staff, and troop leaders regarding the true risks posed by pedophiles to scouts; and

s.      The BSA refused to effectively monitor local councils and troops to ensure that appropriate safeguards were being used in the selection and retention of adult scout leaders.

Highly Confidential                                                    BSA-PLAN_01423271

**SA 1525**

126.    The BSA's internal records, known as the "Ineligible Volunteer" files (hereinafter "the I.V. files"), are a unique repository of documents the BSA secretly began amassing shortly after the BSA's founding in 1910.

127.    The I.V. files reveal that the BSA, far from being safe and wholesome, has long attracted and been a sanctuary for pedophiles.

128.    The I.V. files contain internal memoranda demonstrating the BSA's awareness and concern about the threat that pedophiles in the BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community.

129.    The IV Files contain internal memoranda demonstrating BSA's awareness and concern about the threat that pedophiles in BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community. See Exhibit "A" (The Ernst Memorandum evidencing the BSA and the local council's ongoing conspiracy to suppress from the public its certain knowledge of its pedophile infiltration problem), BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that have successfully infiltrated scouting. The I.V. files highlight BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles' patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

130.    The BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that had successfully infiltrated scouting. The I.V. files highlight the BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles

24

Highly Confidential

patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

131.   The overwhelming evidence the I.V. files present shows that for a century the BSA has known of the BSA's distinctive characteristics that render scouts particularly prone to pedophiles' abuse.

132.   By 1935, the BSA had accumulated approximately 2,000 files on pedophiles that had successfully infiltrated or attempted to infiltrate its program.

133.   In the 1970s, the BSA recognized the potential liabilities represented by possessing and maintaining the I.V. files. By 2005, the BSA's secret cache of files on pedophiles exceeded 20,000.

134.   Over the course of two years in the early 1970s, three the BSA executives reviewed and permanently destroyed thousands of I.V. files

135.   The BSA executives kept no retention logs showing which or how many of the files the BSA destroyed. The BSA made no contemporaneous record of its criteria in determining which files to destroy and which to save.

136.   Approximately 6,000 files survived the BSA's file-purge and are in the BSA's possession. Approximately 1900 of those files are now in the public domain.

137.   The files demonstrate that the BSA opened a new I.V. file on a pedophile every other day for fifty years.

138.   The I.V. files demonstrate that the BSA had overwhelming evidence (1) that scouting attracts pedophiles at an alarming rate and (2) of scouting's distinctive characteristics that make it attractive to pedophiles:

25

BSA-PLAN_01423273

SA 1527

139.    Between 1987 and 2005, the BSA settled sixty-one lawsuits in which the BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders. Since 1987, the BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by the BSA to prevent the abuse's facts and circumstances from becoming public.

140.    As between the Boy Scout Defendants and A.A., the Boy Scout Defendants had superior knowledge of the risk of sexual abuse to A.A. by participating in the BSA program, yet failed to warn or otherwise advise A.A. or his guardians of their superior knowledge.

### Negligence of The Boy Scout Defendants – Failure of Policy and Training.

141.    BSA and its agents knew from long experience based on information contained in its Ineligible Volunteer Files that pedophiles had for nearly a century been exploiting vulnerabilities within it organization to gain access to and sexually abuse boys.

142.    BSA and its agents had certain knowledge that pedophiles like George Fout could exploit BSA's vulnerabilities. BSA knew that failure to adopt and implement certain policies and practices to protect scouts would cause scouts, including A.A, to be at heightened risk of pedophilic grooming and sexual abuse.

143.    The BSA's failure to adopt and effectively implement policies and practices to protect scouts in its custody and control included, without limitation:

144.    Permitting fathers to act as Scoutmasters, in a supervisory position over their adult sons, as Assistant Scoutmasters, effectively eliminating certain protections afforded by a two-deep policy;

26

BSA-PLAN_01423274

SA 1528

145.    Failing to educate scouts and other adult scout leaders about the grooming behaviors they knew that pedophile scout leaders engaged so that that scouts could recognize, resist, and report the inappropriate behaviors;

146.    Failing to monitor or evaluate scout staff to prevent them from using its program and facilities to gain access, groom, and sexually abuse scouts;

147.    Further, to the extent that the BSA undertook to adopt any such policies, they were insufficient for the foreseeable risk presented and were not properly implemented or enforced.

### Negligence of The Boy Scout Defendants – Failure to Protect A.A. from foreseeable abuse by George Fout.

148.    The Boy Scout Defendants, each having a special relationship with A.A. and over Steve Fout and George Fout.

149.    The actual or constructive knowledge that The Boy Scout Defendants and Steve Fout possessed of George Fout's grooming of A.A. and other scouts in Troop 448 rendered the abuse of A.A. not only foreseeable, but highly likely.

150.    In addition, the access that George Fout had to vulnerable children like A.A., the potential to take advantage of the special relationship with potential victims and the failures of BSA policy which George Fout used to gain access to, groom, and to sexually abuse A.A., were precisely the same foreseeable vulnerabilities that BSA had documented in tens of thousands of ineligible volunteer files it had been keeping for nearly a century.

Highly Confidential

BSA-PLAN_01423275

SA 1529

## ACTIONS AGAINST SILVER SPRINGS SHORES

### Count I: Negligence of Defendant SILVER SPRINGS SHORES

151.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

152.    Defendant, SILVER SPRINGS SHORES undertook to promote and provide a scouting program for children and minor boys.

153.    Having undertaken this activity, SILVER SPRINGS SHORES had duty to act with reasonable care and to take precautions so that persons may not be injured.

154.    In addition, Defendant SILVER SPRINGS SHORES had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

155.    This special relationship between Defendant SILVER SPRINGS SHORES and A.A. gave rise to a right of protection for A.A.

156.    Based on the special protective relationship with A.A., Defendant SILVER SPRINGS SHORES had a duty to protect A.A. from reasonably foreseeable harm.

157.    In addition, Defendant, SILVER SPRINGS SHORES had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

158.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

Highly Confidential

BSA-PLAN_01423276

**SA 1530**

159.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

160.     SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

161.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

162.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

163.     Defendant SILVER SPRINGS SHORES breached the duty it owed A.A., by acts or omissions which included, without limitation:

    a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

    b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

    c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

29

BSA-PLAN_01423277

SA 1531

d.   Failing to advise or warn A.A. or his guardian of the history of pedophilia in the BSA and to affirmatively educate A.A. and guardian to identify and avoid abuse.

e.   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

164.   As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

165.   Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

166.   As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

Highly Confidential

BSA-PLAN_01423278

SA 1532

## Count II: Breach of Fiduciary Duty of Defendant SILVER SPRINGS SHORES

167.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

168.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and SILVER SPRINGS SHORES, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in SILVER SPRINGS SHORES and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

169.    As a result, SILVER SPRINGS SHORES owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

170.    In addition, Defendant, SILVER SPRINGS SHORES had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

171.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

172.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

173.    SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

31

BSA-PLAN_01423279
SA 1533

174.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

175.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

176.    Defendant SILVER SPRINGS SHORES breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

    a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

    b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

    c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

    d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

177.    As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

178.    Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional,

32

psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

179.     As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

<u>ACTIONS AGAINST NORTH FLORIDA COUNCIL</u>

<u>Count III: Negligence of Defendant NORTH FLORIDA COUNCIL</u>

180.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

181.     Defendant, NORTH FLORIDA COUNCIL undertook to promote and provide a scouting program for children and minor boys

182.     Having undertaken this activity, NORTH FLORIDA COUNCIL had duty to act with reasonable care and to take precautions so that persons may not be injured.

183.     In addition, Defendant NORTH FLORIDA COUNCIL had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

33

Highly Confidential

BSA-PLAN_01423281

SA 1535

184.    This special relationship between Defendant NORTH FLORIDA COUNCIL and A.A. gave rise to a right of protection for A.A.

185.    Based on the special protective relationship with A.A., Defendant NORTH FLORIDA COUNCIL had a duty to protect A.A. from reasonably foreseeable harm.

186.    In addition, Defendant, NORTH FLORIDA COUNCIL had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

187.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of NORTH FLORIDA COUNCIL.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

188.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

189.    NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

190.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

191.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by The Boy Scout Defendants.

34

Highly Confidential

BSA-PLAN_01423282

SA 1536

192.     Defendant, NORTH FLORIDA COUNCIL breached the duty it owed A.A., by acts or omissions which included, without limitation:

a.   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b.   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c.   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d.   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

193.     As a direct and proximate cause of Defendant, NORTH FLORIDA COUNCIL's negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

194.     Further, as a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

195.     As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and

35

BSA-PLAN_01423283

SA 1537

bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count IV: Breach of Fiduciary Duty of Defendant NORTH FLORIDA COUNCIL

196.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

197.     As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and NORTH FLORIDA COUNCIL, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

198.     As a result, NORTH FLORIDA COUNCIL owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

199.     In addition, Defendant, NORTH FLORIDA COUNCIL had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

200.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of NORTH FLORIDA COUNCIL.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

Highly Confidential

BSA-PLAN_01423284

SA 1538

201.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

202.    NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

203.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

204.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

205.    Defendant NORTH FLORIDA COUNCIL breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

    a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

    b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

    c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

37

     d.     Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

206.    As a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

207.    Further, as a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

208.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### ACTIONS AGAINST BSA

### Count V: Negligence of Defendant BSA

209.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

Highly Confidential

BSA-PLAN_01423286

SA 1540

210.   Defendant, BSA undertook to promote and provide a scouting program for children and minor boys.

211.   Having undertaken this activity, BSA had duty to act with reasonable care and to take precautions so that persons may not be injured.

212.   Defendant BSA had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

213.   This special relationship between Defendant BSA and A.A. gave rise to a right of protection for A.A.

214.   Based on the special protective relationship with A.A., Defendant BSA had a duty to protect A.A. from reasonably foreseeable harm.

215.   In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

216.   George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

217.   The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

218.   BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

39

Highly Confidential

219.    George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

220.    In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

221.    Defendant BSA breached the duty it owed A.A., by acts or omissions which included, without limitation:

> a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.
>
> b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.
>
> c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.
>
> d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

222.    As a direct and proximate cause of Defendant BSA' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

223.    Further, as a direct and proximate cause of Defendant BSA' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical

Highly Confidential

BSA-PLAN_01423288

SA 1542

manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

224.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## Count VI: Breach of Fiduciary Duty of Defendant BSA

225.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

226.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and BSA, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in BSA and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

227.    As a result, BSA owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

228.    In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

41

BSA-PLAN_01423289

SA 1543

229.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

230.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

231.     BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

232.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

233.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

234.     Defendant BSA breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise

42

Highly Confidential

BSA-PLAN_01423290

SA 1544

conduct the activities of the Troop pursuant to the required and due standards of care.

d.   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

235.   As a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

236.   Further, as a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

237.   As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

43

Highly Confidential

BSA-PLAN_01423291

SA 1545

## VICARIOUS LIABILITY COUNTS

### Count VII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Sexual Battery by George Fout

238.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

239.    At all relevant times, George Fout, as Assistant Scoutmaster, was acting as agent for the Boy Scout Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

240.    Accordingly, the Boy Scout Defendants are vicariously liable for the acts and omissions and breaches of fiduciary duties of George Fout.

241.    George Fout's acts and omissions and breaches of fiduciary duties include, without limitation, committing acts of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93 and performing sexual battery upon A.A.

242.    As a result of acts, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial, for which such damages, the Boy Scout Defendants are vicariously liable.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court

Highly Confidential

BSA-PLAN_01423292

SA 1546

deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count VIII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Negligence and Breach of Fiduciary Duty of Steve Fout

243.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

244.    At all relevant times, Steve Fout, as Scoutmaster, was acting as agent for Defendants the Boy Scout Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

245.    Accordingly, Boy Scout Defendants are vicariously liable for the acts and omissions and breaches of fiduciary duties of Steve Fout.

246.    Steve Fout's acts and omissions and breaches of fiduciary duties include, without limitation,

a)    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b)    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c)    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d)    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

45

BSA-PLAN_01423293

SA 1547

e)      Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

247.    As a direct and proximate cause of Steve Fout's negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

248.    Further, as a direct and proximate cause of Defendant Steve Fout's negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

249.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count IX: Vicarious Liability of Defendants NORTH FLORIDA COUNCIL and BSA for the Negligence and Breach of Fiduciary Duty of SILVER SPRINGS SHORES**

250.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

46

Highly Confidential

BSA-PLAN_01423294

SA 1548

251.    At all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendants NORTH FLORIDA COUNCIL and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

252.    Accordingly, Defendants NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of SILVER SPRINGS SHORES.

253.    SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

f)      Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

g)      Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

h)      Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

i)      Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

j)      Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

254.    As a direct and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

47

BSA-PLAN_01423295

SA 1549

255.    Further, as a direct and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

256.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count X: Vicarious Liability of Defendant BSA for the Negligence and Breach of Fiduciary Duty of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES**

257.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

258.    At all relevant times, NORTH FLORIDA COUNCIL was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

259.    In addition, at all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

48

Highly Confidential

BSA-PLAN_01423296

SA 1550

260.     Accordingly, Defendant BSA is vicariously liable for the acts and omissions and breaches of fiduciary duties of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

261.     NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

k)     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

l)     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

m)     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

n)     Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

o)     Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

262.     As a direct and proximate cause of NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

263.     Further, as a direct and proximate cause of NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES negligent acts and omissions and breach of fiduciary duty,

49

BSA-PLAN_01423297

SA 1551

A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

264.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count XI Fraud, Misrepresentation and Fraudulent Concealment

265.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

266.    Congress founded BSA in the United States in 1910.

267.    Throughout its history, the BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed then- trust in the BSA.

268.    Since 1910, hundreds of millions of parents have entrusted their sons to BSA's care, guidance and instruction. Since its inception, BSA aggressively marketed the wholesomeness and safety of its programs to the American Public.

50

BSA-PLAN_01423298

SA 1552

269.    The BSA engages in affirmative commercial efforts which sophisticatedly use powerful American symbols and modern advertising techniques to sell a national belief that the BSA could best mold the proper expression of American boyhood.

270.    The BSA promotes itself as a vehicle for boys to be instructed in good citizenship patriotism, and efficient social organization. Its brand consistently promotes an image of providing a safe environment in which they can develop "patriotism, self-reliance and kindred virtues." For example, a copy of "BSA Mission" is attached as Exhibit "B".

271.    Paradoxically, the BSA promotes the wholesomeness of its program while knowing that since the 1940s, it has been secretly removing Scoutmasters for child sexual abuse at an alarming rate, which in the 1970s reached an average of one every three days. Its own records demonstrate that it has long known that scouting attracts pedophiles in large numbers and that scouts, far from being safe, are at the heightened risk of sexual abuse by child molesters

272.    The BSA fraudulently concealed from Congress, scouts, their parents and the American taxpayer BSA's certain knowledge that pedophiles had been infiltrating BSA in large numbers for many years, as more particularly described in Paragraphs 119 - 140

273.    The BSA, pursuant to its Congressional Charter in 1916, later codified by 36 U.S.C. Chapter 309 is required to file an annual report to Congress.

274.    The BSA fraudulently concealed the said information from A.A and his guardian. BSA also misrepresented to scouts, their parents and the American taxpayer that the scouts were safe in scouting programs when, in fact, scouts were at an unreasonably heightened risk of sexual abuse by adult scout leaders, BSA made said misrepresentations to A.A and his guardian.

51

BSA-PLAN_01423299

SA 1553

275.   BSA's internal records known as the "Ineligible Volunteer" files (hereinafter referred to as "The IV Files") are a unique repository of documents BSA secretly began amassing shortly after its founding in 1910.

276.   Between 1987 and 2005, BSA settled sixty-one lawsuits in which BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders.

277.   Since 1987, BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by BSA to prevent the facts and circumstances of the abuse from becoming public.

278.   BSA continues to make false and misleading public statements regarding the risks of sexual abuse in scouting; continues to minimize and downplay the harm of sexual abuse to children in scouting; fails to reach out to provide support and assistance to boys it knows were sexually abused by adult scout leaders; and continues to deny the truth about its historical knowledge of the nature and extent of sexual abuse of scouts by adult scout leaders.

279.   BSA failed to establish reasonable safeguards to prevent pedophiles from entering its programs.

280.   A.A. and his guardians trusted the BSA and reasonably relied upon the BSA's representations that it presented a moral and safe place for boys.

281.   BSA deliberately withheld information from Congress in its annual report from scouts and their parents, including A.A and his guardian.

282.   It withheld information about the true nature and extent of pedophilia in scouting; the warning signs of abuse in scouting, of which BSA was aware; and the methods pedophiles had been using to gain access to scouts, to groom them for abuse, and to keep them silent. BSA's

52

BSA-PLAN_01423300

SA 1554

timely communication of this information would have enabled scouts, including A.A., to protect himself from sexual abuse by pedophiles in scouting. It would have enabled Congress to perform its constitutional oversight function over a congressionally-chartered, tax-payer funded and tax-exempt youth organization which brings unscreened, unvetted adults into contact with tens of millions of children annually.

283.    BSA had a financial incentive to withhold facts and information about predatory and pedophilic Scoutmasters and/or Assistant Scoutmasters.

284.    Since 1910, BSA has derived millions of dollars per year licensing the rights to its name, emblems, scouting paraphernalia, and BSA-branded merchandise to affiliated scouting organizations throughout the United States and abroad (See 36 U.S.C, § 30905). BSA has realized income from these federally-protected assets by marketing them to parents and their children, including A.A.

285.    BSA's marketing includes encouraging parents to enroll their children in BSA. Enrollment secures parents' and children's commitment to follow a system that encourages parents to entrust their children's health and safety to BSA. This entrustment empowers BSA to secure each child's oath to uphold the "Scout Law," to adopt the "Scout" identity, and to adhere to a system that requires children to engage in activities that expose them to adults and others. This system includes overnight outings, camping events, and trips away from parents. The system is reward based, obligating the child to purchase emblems, badges, and other Scouting paraphernalia, which in turn creates profit for the federally charted organization.

286.    In addition to being federally created, federally chartered, and endowed by Congress with exclusive economic rights, BSA is funded by the federal government, private donations, membership dues, corporate sponsors, and special events

<div align="center">53</div>

Highly Confidential

287.   BSA is the 18th largest nonprofit in the United States, with income exceeding $780 million dollars a year.

288.   Upon information and belief, the Boy Scout Defendants engaged in a plan of action to cover up incidents of the sexual abuse of minors by Scoutmasters and Assistant Scoutmasters and prevent disclosure, prosecution and civil litigation including, but not limited to:

    a.   Failure to report incidents of abuse to law enforcement or child protection agencies;

    b.   Concealment of abuse they had substantiated and failure to seek out and redress the injuries its Scoutmasters and leaders had caused; and

    c.   Failure to advise local scouting agencies of the rampant problem of sexual abuse of scouts by Scoutmasters and leaders and that BSA's system of "Ineligible Volunteer Files" was ineffective at curbing the problem.

289.   Based on these actions, the Boy Scout Defendants engaged in fraudulent concealment and are estopped from asserting the defense of statute of limitations and/or laches.

290.   A.A. alleges that had the BSA notified A.A., his guardian, civil authorities, or the scouting public of the pervasiveness of sexual abuse by the BSA's adult scout leaders, A.A. would either not have joined the BSA or not been allowed by his guardian to join the BSA.

291.   Alternately, if the BSA had educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, that he would have taken steps to protect himself from the grooming and sexual abuse to which his adult scout leader subjected him.

292.   BSA had notified or educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, he would not have, and would not have been permitted continuous sleep-overs at the home of Steve Fout in the bedroom of George Fout.

Highly Confidential

BSA-PLAN_01423302

SA 1556

293.    The above described conduct of the Boy Scout Defendants was willful and outrageous, was committed in reckless disregard of the probability of causing A.A.'s severe emotional distress, mental anguish, humiliation, and psychological, spiritual, and physical injury and illness of A.A.

294.    Additionally, in doing the acts as described herein, the Boy Scout Defendants were guilty of fraud, oppression, or malice.  As a direct and proximate result of the practice of deceit, deception, concealment and fraud by the Boy Scout Defendants and George Fout, A.A. was victimized by George Fout and sustained the profound injuries, losses and damages as set forth therein

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

Dated: August 30, 2019.

MORGAN & MORGAN, P.A.
Business Trial Group

*s/Paul L. SanGiovanni*
Paul L. SanGiovanni, Attorney at Law
Florida Bar No. 0513164
Cari Whitmire, Attorney at Law
Florida Bar Number 1015584
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone:  (407)418-6041
Facsimile:  (407)245-3394
Primary E-mail:  PSangi@forthepeople.com
Primary E-mail:  CWhitmire@forthepeople.com
Secondary E-mail: MTodd@forthepeople.com

55

Highly Confidential

BSA-PLAN_01423303

SA 1557

1972



**BOY SCOUTS OF AMERICA**
North Brunswick · New Jersey 08902 · 201 249-6000

INTRAORGANIZATION COMMUNICATION

December 4, 1972

PERSONAL AND CONFIDENTIAL

TO ALL SCOUT EXECUTIVES:

SUBJECT:  Maintaining Standards of Leadership

The attached information on Maintaining the Standards of Leadership of the
Boy Scouts of America has been carefully developed as a guideline for
Scout Executives.

This is the first time such information has been printed, and because of
the misunderstandings which could develop if it were widely distributed,
we suggest that after you have read it, you file it with other policy
statements without making photocopies or sharing it beyond the top
management of your council.

If you have any questions, please do not hesitate to write or call us.

Sincerely,

Paul I. Ernst, Executive
Registration and Subscription

cm
cc:  Regional Directors
     Management Staff
Attachment

BSA 02205

**Exhibit "A" to Second Amended Complaint**

e ID: 190800135

MAINTAINING STANDARDS OF LEADERSHIP

Since its inception, the BSA has maintained its right to set standards of
leadership in the areas of age, citizenship, sex, education, morals and
emotional stability. This position is set forth in the Bylaws:

> Article II, Section 2, Clause 3 "No person shall be approved
> as a leader unless, in the judgment of Boy Scouts of America,
> he possesses the moral, educational, and emotional qualities
> deemed necessary for leadership and satisfies such other
> leadership qualifications as it may from time to time require."

> Other supporting Articles are listed in Appendex A.

The local council and the National Council must approve all applications
(Bylaws Article XVIII, Section I, Clause 3).

These standards were developed solely to protect the youth of America and
their enforcement in no way infringes on the rights of any individuals, nor
is refusal of registration to be construed as persecution or defamation of
character. All leaders register for a limited term (usually one year) and
reregistration at the end of that period is also subject to approval
(Bylaws, Article XV, Section 4).

When a registered leader commits an act or conducts himself in a manner that
would seem to cause him to be unfit as a leader or an associate of boys, the
Scout Executive should take the following steps:

1) Inform the Registration and Subscription Executive at the
   National Office of the general nature of the allegations.

2) Secure hard evidence about the situation (signed statements by
   principals, police reports, court records, newspaper clippings,
   etc.).

3) Submit evidence and the confidential record sheet to Registration
   and Subscription.

4) Upon notification from Registration, write a letter to the
   individual (Appendix B) and hand deliver it along with a volunteer.

5) After the letter has been read, verbally tell the person the reasons
   for refusal to register. Make no accusations -- say we have
   evidence to convince us that your --(financial affairs)  (moral life)
   (lack of leadership ability) do not meet the standards for leadership
   in the BSA. Indicate that the BSA is not sharing this information
   with anyone and only wish him to stop all Scouting activity.

   After this visit, write down the main parts of the conversation,
   who was present and the date, and mail this to Registration and
   Subscription.

BSA 02206

Case ID: 190800135

Highly Confidential

--2--

6)  If the individual persists, the following review steps are
    to be taken as required:

    A)  Initial Step  --  The president of the local council will
        appoint three volunteers to act as a committee to review
        the case.

    B)  (If Step A does not resolve matter)  --  The Regional
        President will appoint a review committee if the person
        is not satisfied with the council's decision.

    C)  (If Step B does not resolve matter)  --  The President of
        the BSA will appoint a review committee if the individual
        is not satisfied with the Region's decision.

When a Scout Executive receives a confidential inquiry from Registration and
Subscription about a person attempting to register, he should take the
following steps:

    1)  Secure as rapidly as possible the necessary answers on the
        questionnaire and return to Registration and Subscription.

    2)  If it is not the same person, the registration certificate will
        be sent to the council.

    3)  If it is the same person, Registration and Subscription will write
        to the Scout Executive, indicating that the BSA is unwilling to
        register that person because information we have indicates that
        he fails to meet our standards of leadership.  If the individual
        questions the statement the Scout Executive may ask him if he
        has ever been in Scouting  in the past and been refused membership.

        If the answer is yes, the Scout Executive may say the reasons
        remain the same.

        If the answer is no, and the individual insists there has been a
        mistake, the Scout Executive should instruct him to send a complete
        statement covering his adult years, including address and dates
        lived there, occupations and dates, and names of spouse and children
        to the Registration and Subscription Executive.

In certain cases, an individual who failed to meet the standards of leadership
in the past wishes to register and the circumstances are changed sufficiently
that the BSA is willing to accept the registration on a trial basis.  The Scout
Executive will be notified in this situation, and requested to keep a close
watch on the individual for one year and then give a brief report to
Registration and Subscription.

All cases are reviewed periodically in reference to the seriousness of the
offense and the passage of time, and when the standards of leadership seem
to be satisfactorily met, cases are cancelled.

BSA 02207

Case ID: 190800135

Highly Confidential

BSA-PLAN_01423306

SA 1560

-3-

Many times an individual comes to a council seeking registration with the BSA and something unusual causes concern that further checking should be done before registration is completed.

When you find yourself in this situation, we ask that you write or phone directly to Registration and Subscription, asking that we check for any information that might be on file concerning the individual in question. This will immediately help you in your relationships with the individual and give you information as to whether registration should be completed before you do a lot of unnecessary work and make any commitments which could prove embarrassing.

dw-11/15/72

BSA 02208

Case ID: 190800135

Highly Confidential

BSA-PLAN_01423307

SA 1561

-4-

Appendix A

Article III, Section 2, Clause 1
Article X, Section 5, Clause 1
Article XII, Section 2
Article XII, Section 3
Article XII, Section 4
Article XV, Section 2, Clause 2, 3, 4, 6, 7
Article XVI, Section 6, Clause 4
Article XVIII, Section 2, Clause 1
Article XVIII, Section 3, Clause 2
Article XVIII, Section 4, Clause 1 - 7
Article XVIII, Section 5, Clause 1 - 2
Article XVIII, Section 7, Clause 1 - 2
Article XVIII, Section 9, 10, 11, 12

dw-11/27/72

BSA 02209

Case ID: 190800135

Highly Confidential

BSA-PLAN_01423308

SA 1562

-5-

Appendix - B

Dear

After a review of your past history with the Boy Scouts, it has been decided not to accept your registration. Registration with the Boy Scouts of America is not automatically granted to everyone. It is a privilege and we reserve the right to refuse registration whenever there is any reason for concern related to the person's association with members or leaders of the Boy Scouts of America.

We, therefore, at this time desire to have you sever your relationship with the Boy Scouts of America. We are making no accusations and will not release this information to anyone, so our action in no way will affect your standing in the community.

Very truly yours,

Scout Executive

dw

BSA 02210

Case ID: 190800135

Highly Confidential

BSA-PLAN_01423309

SA 1563

# The BSA Mission

## MISSION STATEMENT AND PURPOSE

*The mission of the Boy Scouts of America is to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law.*

## SCOUT OATH

*On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight.*

## SCOUT LAW

*A Scout is*

- Trustworthy
- Loyal
- Helpful
- Friendly
- Courteous
- Kind
- Obedient
- Cheerful
- Thrifty
- Brave
- Clean
- Reverent

## Purpose of the BSA

The purpose of this corporation shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.

—Federal Charter, sec. 3.

One of the goals of the Boy Scouts of America is to provide, through chartered organizations, a program for boys, young men, and young women designed to encourage them to be faithful in their religious duties, build desirable qualities of character, train and involve them in the responsibilities of participating citizenship, and develop in them personal fitness.

> *Exhibit "B to Second Amended Complaint*

BSA-PLAN_01423310

SA 1564

Special emphasis will be placed in assisting the home, religious groups, and schools in achieving success in the development of abiding values in the lives of young people.

All programs will be directed toward helping to develop the full potential of each member.

## The Council's Purpose

The purpose of the council is to guide and support its districts for the achievement of the movement's purpose. (A successful district meets Quality District requirements.) The end result of effective district support is continued growth in membership, with those members receiving a quality program.

## The Function of the Districts

All districts are responsible for carrying out functions in four areas:

1. Membership
2. Finance
3. Program
4. Camp promotion
5. Training
6. Activities and civic service
7. Advancement and recognition
8. Unit service (commissioner service)

The order in which the functions are listed is not meant to suggest the order of their importance, but the natural interrelationship and flow of the functions. The movement cannot achieve its purpose without first organizing units and enrolling members. The district cannot support its units without the funds to do it. Unit programs are supported by the district through its program functions and unit service. All four functions are equally important and necessary. If one suffers from lack of attention, all the work of the district suffers.

The functions of the district include

- Extending opportunities for youth to join a pack, troop, team, or crew
- Helping existing units provide a quality program for their youth
- Marshaling the resources of the territory in terms of volunteers and money

Its specific duties are selling the use of Scouting and providing the essential services. The district committee sells the use of the program to community organizations and helps to organize new units. It provides those things essential to successful Scouting that the chartered organization cannot easily provide, including

- Guidance in the selection of unit leadership
- Training for unit personnel in the techniques of good program
- Interunit activities that stimulate good unit program through participation and competition
- Promotion of the BSA camping and outdoor program
- Promotion of the BSA advancement program by providing merit badge counselors and coaching unit committees on advancement procedures
- Giving guidance to units through effective commissioner service

The district serves as a vehicle by which Scouting services and programs are carried to the chartered organization and units. It serves as a sounding board for chartered organization and unit needs and thus enables the consideration of those needs as the council program is planned. It also participates in determining the council budget and fund-raising for the financing of its program.

Highly Confidential

IN THE CIRCUIT COURT OF THE 5TH
JUDICIAL CIRCUIT IN AND FOR MARION
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO. 2016-CA-000167

A.A.,

     Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL, INC.,
BOY SCOUTS OF AMERICA, AND
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

     Defendants.

_____/

### PLAINTIFF'S RESPONSE AND INCORPORATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND INITIAL COMPLAINT

Plaintiff, A.A. ("Plaintiff"), files this Response and Incorporated Memorandum of Law in Opposition to the Motions to Dismiss served by Defendants, BOY SCOUTS OF AMERICA, NORTH FLORIDA COUNCIL, INC. and SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC.

### INTRODUCTION

#### The Complaint

On January 27, 2016, the Plaintiff, A.A., filed his initial Complaint against THE BOY SCOUTS OF AMERICA, (hereinafter referred to as the "BSA"), the NORTH FLORIDA COUNCIL, INC., BOY SCOUTS OF AMERICA, (hereinafter referred to as the "NORTH FLORIDA COUNCIL"), and the SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC., (hereinafter referred to as the "SILVER SPRINGS SHORES"). BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES herein shall be collectively referred to as "Defendants".

Exhibit B

BSA-PLAN_01423313

The preliminary allegations of the Complaint summarized the complex Hierarchical organization of the BSA, including how the BSA performs it mission through Councils (like the NORTH FLORIDA COUNCIL) and through Troops administrated by a chartering organization (like SILVER SPRINGS SHORES).   See, Paragraphs 13 – 26 of the Complaint (hereinafter referred to as "¶").

The Hierarchical organization of the BSA is complex and fact specific.  The allegations in the Complaint were intended to summarize the relationship of the parties for the purposes of notice pleading.

Among other allegations, the Complaint includes the following allegations (emphasis added):

> 20.   This chartering system reveals BSA's consent to allow local chartering organizations to operate the scouting program on its behalf and the chartering organizations' consent to operate the local troops subject to BSA's control or right to control.   <u>Accordingly, the chartering organizations are the agents of BSA</u>.

> . . . . .

> 24.   Here too, the chartering system shows BSA's consent to allow local COUNCIL's to operate the scouting program on its behalf within a specific geographic region, and the local COUNCIL's consent to operate the scouting program subject to BSA's control or right to control.   <u>Thus, the local COUNCIL's are agents of BSA</u>.

> 25.   <u>BSA cannot operate its scouting program without the consent and cooperation of the local COUNCIL's and chartering organizations. Conversely, the chartering organizations and local COUNCIL's cannot operate and supervise local scouting troops without the consent of BSA</u>.

> . . . . . .

> 55.   At all relevant times, George Fout [the Scoutmaster for A.A.'s troop in whose home much of the abuse occurred] and Steve Fout [the assistant Scoutmaster and son of George Fout] <u>were acting as the agents of Defendant BSA, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER SPRINGS SHORES by leading Boy Scouts of America Troop 448</u>.

2

Highly Confidential

BSA-PLAN_01423314

SA 1568

If required, the Plaintiff is able to supplement the allegations to provide additional information regarding the organization of the BSA and the respective agency relationships among the Defendants and the troop leadership, including Steve Fout, A.A.'s Scoutmaster and father of George Fout, the perpetrator of the sexual abuse and the Assistant Scoutmaster.

As to the specific, and unique, facts in this case, the Complaint alleges that Steve Fout, was the Scoutmaster of A.A.'s Scout Troup 448.  ¶12.  George Fout, Steve's son, was the Assistant Scoutmaster of the same Troop. ¶11.  At all material times, George Fout, the son, was under the direct supervision of Steve Fout, the father.  ¶42.  The Complaint asserts that George Fout often showered Plaintiff with special attention and groomed Plaintiff for sexual abuse by gaining A.A's trust and admiration.  ¶¶s 44 and 45.  The Complaint alleges that A.A. would leave the meetings "held on its premises" with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.[1] The Complaint alleges that the BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, knew or should have known that A.A. was spending time at the Fout's residence.  Id. The Complaint alleges that A.A. would "spend the night" at the Fout's home. ¶ 52.

Moreover, particularly unique to this case, the Complaint alleges that Steve Fout, the father, and the Scoutmaster for the BSA, knew or should have known that his son, the Assistant Scoutmaster, was abusing scouts under Steve Fout's own roof.  ¶104 - 106.  In the case of A.A., in particular, the Complaint asserts that this abuse, under Steve Fout's roof continued for eight (8) years. ¶¶ 46 – 50.

---

[1] Though not specifically alleged, it is a reasonable inference that these activities occurred during Scout meetings on the property of Scouting activities.

Highly Confidential

BSA-PLAN_01423315

SA 1569

In addition, the Complaint summarized the history of pedophilia in scouting and in the BSA specifically (¶¶s 27 – 30) to generally describe the degree of notice that the BSA has of the substantial risk that the mission presents to youth, particularly at risk youth, and the consequent duties, including special and fiduciary duties arising therefrom to protect the children in their care.

Without limitation, the Complaint includes the allegation that "BSA has known for decades of the high degree of risk that adult Scoutmasters and volunteers may sexually abuse minor scout members." ¶ 26.

Having alleged agency among the Defendants, and notice to the principal and agents of the risk of exposure to pedophilia to youth in scouting, the Complaint alleges that the failure of the BSA and its agents to properly manage the risk, and otherwise protect the Plaintiff from the risk resulted in sexual abuse of the Plaintiff and resulting damages.

Specifically, the Complaint sounds in ten (10) Counts as follow:

Negligence Counts:

| | |
|---|---|
| Count I. | Negligence against Silver Springs Shores |
| Count II | Negligence of North Florida Council |
| Count III | Negligence of BSA |

Breach of Fiduciary Duty Counts:

| | |
|---|---|
| Count IV | Breach of Fiduciary Duty of Silver Springs Shores |
| Count V. | Breach of Fiduciary Duty of North Florida Council |
| Count VI | Breach of Fiduciary Duty of BSA |

4

BSA-PLAN_01423316

SA 1570

Vicarious Liability Counts:

| | |
|---|---|
| Count VII | Vicarious Liability of Silver Springs, North Florida Council and BSA for Sexual Batter by George Fout [The Perpetrator if the sexual abuse against A.A.] |
| Count VIII | Vicarious Liability of Silver Springs, North Florida Council and BSA for Negligence and Breach of Fiduciary Duty by Steve Fout [Scoutmaster] |
| Count IX | Vicarious Liability of North Florida Council and BSA for Negligence and Breach of Fiduciary Duty of Silver Springs Shores |
| Count X | Vicarious Liability of BSA for Negligence and Breach of Fiduciary Duty of North Florida Council |

### Summary of the Litigation

Subsequent to the filing of the Complaint, the parties stipulated to stay the case for 90 days on February 28, 2018, with a subsequent order rendered thereupon on March 12, 2018.  The intent of the stay was to provide the parties with the opportunity to participate in confidential pre-litigation discovery and mediation.  Pursuant to the stipulation, the Plaintiff provided the Defendants with the confidential pre-suit discovery requests.  However, due to difficulties in securing documents from third parties and the Plaintiff's counsel's participation in a substantial trial, the statement of the Plaintiff and the mediation could not be scheduled within the 90 days.

In addition, the BSA and NORTH FLORIDA COUNCIL substituted counsel on July 2, 2018.

At the conclusion of the 90 day stay, the Defendants' filed their respective Motions to Dismiss on August 2, 2018 and August 20, 2018.  Although the motions were directed to the initial Complaint, all Defendants have moved to have the Complaint dismissed "with prejudice."

Highly Confidential

Defendants have advised the Plaintiff that they are no longer agreeable to participating in pre-litigation mediation at this time.[2]

Relative to the Complaint, additional details of the relationship among the BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES and the Scoutmasters and troop leaders which were not incorporated into the Complaint are available which may supplement the current allegations of the Complaint.  In addition, supplemental information supporting these details has been identified.  Further, since the time of the filing of the Complaint, additional facts pertaining to the abuse have been identified.  These include, without limitation:

- The perpetrator, George Fout, was convicted for the abuse of at least three (3) other scouts.  Each of these scouts was in the same troop as A.A.  Each scout was groomed by George Fout for abuse in this troop and each scout was abused, in fact, by George Fout.  George Fout's relationship with A.A. and these scouts, including his behavior during scouting activities at Silver Springs and during other scouting activities, had qualities which should have put Scoutmasters and other agents and representatives of the Defendants on notice that these scouts were being groomed for abuse by Fout, or were being abused in fact.  The Scoutmasters were either negligently trained to observe these relationships, or were negligent in observing the relationship and taking action to protect the youth.

- Incidents of abuse, of notice of a relationship which was abusive occurred between George Fout and A.A., during scouting events.

  These are in addition to the allegation currently in the Complaint that "the Defendants knew or should have known of the special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on [Silver Springs] premises with Scoutmasters Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of Boy Scout Policy."  ¶¶s 61(a), 67(a), 73(a), 80(a), 87(a), 94(a), 106(a), 112(a), and 117(a).  Without limitation, these include abuse during a scouting campout in July of 2009, when A.A. was 13.  George Fout came into A.A.'s room at the campout and touched his genitals through his pants.  This was soon after Fout's abuse had escalated to include penetration.

---

[2] The Plaintiff has contemporaneously moved the Court to order mediation as was contemplated at the time of the Stipulation.  Among other things, mediation provides the possibility that substantial judicial resources, the finances of the parties and the emotional toll on the victim of the sexual assault may be spared.

Highly Confidential

- For the purposes of confidentiality, A.A.'s date of birth has been disclosed privately to the Defendants, but is not included in the public record.  For the purpose of this response, the Plaintiff asserts that A.A. turned 16 years old after January 27, 2012.  As such, all instances of abuse which occurred prior to January 27, 2012 would have occurred while A.A. was under 16 years old.  Any instance of abuse which occurred after January 27, 2012, would have occurred within four (4) years of the filing of the litigation.[3]

- Prejudgment interest does not appear to be applicable in this matter and to that extent, an Amended Complaint would eliminate that element of the prayer for relief.

The Plaintiff has incorporated sufficient facts and grounds in the Complaint to require an answer from the Defendants.  However, if required by the Court, the Plaintiff is able to supplement the allegations to provide additional information to supplement the Complaint.

The Plaintiff respectfully requests that the Court deny motions to dismiss.  The Complaint includes sufficient allegations to put the Defendants on notice of the claims against them, satisfies the essential elements for each claim and provides sufficient grounds for the causes of action to proceed to discovery.

In the interest of judicial economy and by agreement of the party and agreed motion, A.A., files this consolidated response to the motions, inasmuch of many of the grounds for the Defendants' motions overlap.

The matters raised by the Defendants are not matters to be addressed at the pleading stage.  Indeed, most of the cases cited by the Defendants in support of their arguments are appeals from summary judgment or verdicts in the trial court.

---

[3] Even then, as asserted below, a motion to dismiss in not the appropriate vehicle to assert or determine the statute of limitations, particularly in the complex and factually intensive area of sexual abuse.  By way of full disclosure, upon additional information one of the incidents of abuse may have occurred subsequent to A.A.'s sixteenth (16) birthday.  However, as noted, the incident would have occurred within four (4) years of the filing of this action.

7

Highly Confidential

Alternatively, A.A. respectfully requests that the Court grant the Plaintiff leave to amend the initial Complaint to address the issues raised by the Defendants and to incorporate additional allegations identified subsequent to the filing of the initial Complaint.

### Standard of Review for a Motion to Dismiss

In evaluating a motion to dismiss, the trial court determines whether a claim states a cause of action upon which relief can be granted based upon the factual allegations contained within the four corners of the Complaint, drawing all inferences in favor of the pleader, and accepting all material allegations as true. *See, Sobi v. Fairfield Resorts, Inc.*, 846 So.2d 1204, 1204 (Fla. 5th DCA 2003); *Davis By & Through Davis v. Bell*, 705 So. 2d 108, 109 (Fla. 2d DCA 1998). Importantly, "a Complaint which states a cause of action on any ground should not be dismissed for failure to state a cause of action." *Nicholson v. Kellin*, 481 So.2d 931, 936 (Fla. 5th DCA 1985) (emphasis in original).

Stated differently, a Complaint should not be dismissed "unless the movant can establish beyond any doubt that the claimant could prove no set of facts whatsoever in support of his claim." *Morris v. Fla. Power & Light Co.*, 753 So.2d 153, 154 (Fla. 4th DCA 2000).

In this case, drawing all inferences in favor of the A.A., the Plaintiff has stated causes of action against each Defendant.  The Defendants should be required to answer the Complaint and the matter should advance.

Highly Confidential

BSA-PLAN_01423320

SA 1574

## ARGUMENT

The consolidated arguments of the Defendants generally address the issue of whether the Complaint sufficiently alleges a "duty" upon which liability may be asserted; with other ancillary issues also addressed.

### THE DUTY OF THE DEFENDANTS TOWARD THEIR SCOUTS

In summary, the Defendants argue that there is not alleged in the Complaint, and cannot be alleged between these parties, that the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES have any duties toward individual scouts, including any general or fiduciary duty to warn or protect them from serial sexual abuse by one of its Assistant Scoutmasters when those activities occur under the roof of the Scoutmaster or during scouting activities.[4]

At first blush, that is a remarkable argument to be made by an national youth organization which specifically undertakes as its purpose "to provide, through chartered organizations, a program for boys, young men, and young women designed to encourage them to be faithful in their religious duties, build desirable qualities of character, train and involve them in the responsibilities of participating citizenship, and develop in them personal fitness" and represents that "all programs will be directed toward helping to develop the full potential of each member." The Purpose of the BSA. www.scouting.org/commissioners/bsa-mission/ (October 8, 2018).

---

[4] Throughout its brief, the BSA erroneously argues that are no allegations in the Complaint that the inappropriate activities of George Fout occurred during scouting activities. That is not correct. The Complaint clearly references that A.A. would leave scouting activities with the Fouts, against Boy Scout regulations. In addition, it can be inferred through the Complaint that Fout identified and groomed A.A. for the sexual abuse during scouting activities. Further, the Complaint alleges that the abuse occurred under circumstances by which the Scoutmaster, not the perpetrator, was aware of the abuse occurring under his own roof. In addition, as referenced above, A.A. is able to allege that abusive activities occurred during a scouting camp out.

Highly Confidential

BSA-PLAN_01423321

SA 1575

Moreover, on its face, as a matter of law, it is not consistent with the law or with the allegations of the Complaint.

### The Defendants had a general duty to act with reasonable care.
### The Defendants had constructive knowledge of George Fout's abuse of A.A.

The Florida Supreme Court has spoken on issues of general duty toward others, when an organization has undertaken an obligation or action.

Specifically, in *Nova Southeastern University vs. Gross*, 758 So 2d 86 (Fla., 2000), a university student was injured during an off-campus, school related activity.  She was assigned to an internship in a dangerous location and was sexually assaulted at the location.

There, as here, the University attempted to use the argument that the absence of a "special relationship" between the adult student and the University was a shield from liability for its neglect.

The Supreme Court rejected the defense.  Finding that a "special relationship" existed in that case, the Court went further holding that "fundamental principles of tort law" would also support liability in that case.  Quoting *Union Park Chappel vs. Hutt*, 670 So 2d. 64 (Fla, 1996), the Court stated:

> It is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care. *See Slemp v. City of North Miami,* 545 So.2d 256 (Fla.1989) (holding that even if city had no general duty to protect property owners from flooding due to natural causes, once city has undertaken to provide such protection, it assumes the responsibility to do so with reasonable care); *Banfield v. Addington,* 104 Fla. 661, 667, 140 So. 893, 896 (1932) (holding that one who undertakes to act is under an implied legal duty to act with reasonable care to ensure that the person or property of others will not be injured as a result of the undertaking); *Kowkabany v. Home Depot, Inc.,* 606 So.2d 716, 721 (Fla. 1st DCA 1992) (holding that by undertaking to safely load landscaping timbers into vehicle, defendant owed duty of reasonable care to bicyclist who was struck by timbers protruding from vehicle window); *Garrison Retirement Home v. Hancock,* 484 So.2d 1257, 1262 (Fla. 4th DCA 1985) (holding that

10

BSA-PLAN_01423322

SA 1576

retirement home that assumed and undertook care and supervision of retirement home resident owed duty to third party to exercise reasonable care in supervision of resident's activities). As this Court recognized over sixty years ago in *Banfield v. Addington,* "[i]n every situation where a man undertakes to act, ... he is under an implied legal obligation or duty to act with reasonable care, to the end that the person or property of others may not be injured."

*Id.; see also Pate v. Threlkel,* 661 So.2d 278, 280 (Fla.1995)("A duty is thus established when the acts of a defendant in a particular case create a foreseeable zone of risk."). We find this fundamental principle of tort law is equally applicable in this case. There is no reason why a university may act without regard to the consequences of its actions while every other legal entity is charged with acting as a reasonably prudent person would in like or similar circumstances.

*Nova* at 89.  See also, *Shurben vs. Dollar Rent-A-Car,* 676 So 467 (Fla. 3ʳᵈ DCA, 1996).

Similarly, as here, without the finding of any "special relationship", the BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES and Steve Fout, as their agent, each undertook to conduct a scouting program and solicited youth to participate.  Simply put, having undertaken to act, each Defendant individually, and collectively as agents for the other, had a duty to act as a reasonably prudent person would act in like or similar circumstances.

Clearly, the Complaint alleges that each Defendant failed to so act.  Repeated throughout the Complaint are the allegations at Paragraph 61, revised for each respective Defendant, and Steve Fout, that:

61   Defendant SILVER SPRINGS SHORES breached the duty it owed A.A., by acts or omissions which included, without limitation:

a)   Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. may be sexually abused by his Assistant Scoutmaster if proper precautions were not followed. Upon information and belief, Defendant SILVER SPRINGS SHORES knew or should have known that proper precautions and procedures were not followed. These included, without limitation that Defendant SILVER SPRINGS SHORES knew or should have known of the

11

BSA-PLAN_01423323

SA 1577

special relationship between the Fouts and A.A. and that A.A. would leave the meetings held on its premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.

b)   Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c)   Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

The Complaint further includes allegations that the Defendants, through their agents acted unreasonably. The Complaint alleges that Steve Fout, the Scoutmaster of Boy Scout Troop 448, was an agent of SILVER SPRINGS SHORES, which is an agent of NORTH FLORIDA COUNCIL and the BSA. ¶55. The Complaint alleges that Steve Fout, as the Scoutmaster of Boy Scout Troop 448, knew or should have known of the abuse of a scout in his Boy Scout Troop. ¶106(a). The Complaint alleges that Steve Fout allowed the abuse to continue nevertheless.

Even without the "special" or "fiduciary" relationship discussed, below, this knowledge of a known danger creates in the principals the duty to protect the youth and liability in the principals for the failure to do so.

This duty, alleged together with breach, causation and damages support each negligence claim against the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES as alleged in Counts I, II and III. The Motions to dismiss these counts should be denied and the matter should proceed to a jury's determination of the scope of the agency, degree of knowledge of the agent and the breach of the principals' related duties.

12

BSA-PLAN_01423324

SA 1578

### Special Relationship
### The Sexual Abuse of George Fout was known to an agent of the Defendants

In addition, the Complaint alleges a "special relationship" between the Defendants, and each of them and A.A.  ¶ 58 (SILVER SPRINGS), 65 (NORTH FLORIDA COUNCIL) and 71 (BSA)  When there is such a "special relationship", the institution not only has a duty to warn and protect against known dangers, but also has a duty to warn and protect against reasonably foreseeable dangers.

That there can be such a relationship between and institutional party and an individual member is well recognized.  See, *Nova*, supra, *Gross vs. Family Service Agency, Inc*. 716 So 2d 337 (Fla 4th DCA, 1998)

A review of the cases results in the conclusion that each case is particularly fact specific. There are no cases directly on point in the state of Florida, other than to generally state the principal that under certain "special relationships" the liability asserted by A.A., in this case can be imposed on institutional parties, such as the Defendants.

The Complaint includes several well recognized bases for the formation of the special relationship, including, that the abuse occurred while Plaintiff was in the care and custody of Defendants. (Comp. ¶ 53) and that the Defendants were substituting for Plaintiff's parents and George and Steve Fout were acting as agents of Defendants (in loco parentis). (Comp.  ¶¶ 54, 55, 56).

Further, institutional organizations, such as churches, are routinely held to have a "special relationship" toward minors who are sexually abused.  For example, in *C.J.C vs Corporation of the Catholic Bishop of Yakima*, 985 P.2d 262, (Wash. 1999), en banc, the Supreme Court of Washington considered the claims of sexual abuse victims molested as children by a deacon. The claims were dismissed on summary judgment.  On appeal, the Supreme Court reversed and

13

BSA-PLAN_01423325

**SA 1579**

remanded the case, finding that there existed disputed issues of fact whether a "special relationship" existed between the Catholic Church, as an institutional entity, and the children, even though the acts of the Deacon were criminal and even though they occurred off of church property.

The extended opinion of the Court, included the following:

> In particular, we find the conjunction of four factors present in the case before us decisive to finding the existence of a duty is not foreclosed as a matter of law: (1) the special relationship between the Church and deacon Wilson; (2) the special relationship between the Church and the plaintiffs; (3) the alleged knowledge of the risk of harm possessed by the Church; and (4) the alleged causal connection between Wilson's position in the Church and the resulting harm. Under these circumstances, we simply do not agree with the Church that its duty to take protective action was arbitrarily relieved at the church door. Where a protective special relationship exists, a principal is not free to ignore the risk posed by its agents, place such agents into association with vulnerable persons it would otherwise be required to protect, and then escape liability simply because the harm was accomplished off premises or after-hours. Under these facts, the focus is not on where or when the harm occurred, but on whether the Church or its individual officials negligently caused the harm by placing its agent into association with the plaintiffs when the risk was, or should have been, known.
>
> This approach is consistent with our cases recognizing a duty to prevent intentionally inflicted harm where the defendant is in a special relationship with either the tortfeasor or the victim, and where the defendant is or should be aware of the risk. [String citations omitted]
>
> Viewing the facts in the light most favorable to the plaintiffs, a jury could reasonably find Wilson's position in the Church was a causal factor in the resulting harm. Wilson was a prominent member of the Church, placed into positions of trust over children. This position not only brought him into close connection with the children of the congregation, it allegedly inspired confidence to place the plaintiffs into his care. In addition, there is evidence that Wilson baby-sat the victims in order that their father could travel on Church business and that the Church was aware of this arrangement. Given the Church's specific and superior knowledge of the facts, a jury could reasonably find the Church knew or should have known the children of its congregation, and specifically these particular plaintiffs, were exposed to an unreasonable risk of harm at the hands of Wilson.

14

Highly Confidential

BSA-PLAN_01423326

SA 1580

> Our decision not to foreclose the imposition of a duty as a matter of law under these facts is supported by the strong public policy in favor of protecting children against acts of sexual abuse.

*Id.* at 726.

In general, the Complaint alleges generally, and it can be inferred that, in light of the history of pedophilia in the Boy Scouts, the risk of sexual abuse of its scouts was particularly great. ¶¶ 27 – 31. As a result, the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES had a duty to warn and protect scouts in its care from sexual abuse by Scoutmasters and other volunteers including Assistant Scoutmasters.

Notably, this case also dismisses the Defendants' argument that the occurrence of some of the sexual abuse off premises of scouting activities – though under the roof of the Troop Scoutmaster – is relevant to the existence of the duty.

In this case, specifically, Steve Fout, as a Scoutmaster and agent of the Defendants knew or should have known that his Assistant Scoutmaster was sexually abusing his scouts and should have taken action to prevent George Fout's exposure to his scouts, to A.A. and to further abuse. Instead, he allowed it to continue.

In light of the highly fact specific nature of a finding of a "special relationship", it is also notable to consider the procedural posture of the cases cited by the Defendants. Specifically, in addition to each being factually distinguishable from the instant case, particularly with respect to Steve Fout's involvement, in most of the cases substantively relied upon by Defendants in their motions, the Plaintiff was provided with the opportunity to factually discover, develop and establish its allegations, either in opposition to a motion for summary judgment or to a jury.

- *Archbishop Coleman F. Carroll High School Inc. v. Maynoldi*, 30 So. 3d 533 (Fla. 2d DCA 2010)-Appeal from a jury verdict against school and diocese;

15

BSA-PLAN_01423327

SA 1581

- *Roe v. Boy Scouts of America Corp.* 2012 WL 3933184- Appeal from a motion for <u>summary judgment</u>;

- *Special Olympics Florida, Inc. v. Showalter*, 6 So.3d 662 (Fla. 5th DCA 2009)- Appeal from a <u>jury verdict</u>;

- *Goss v. Human Services Associates, Inc.,* 79 So.3d 127 (Fla. 5th DCA 2012)- Appeal form a <u>summary judgment</u>;

- *Iglesia Cristina La Casa Del Senor, Inc. v. L.M.*, 783 So.2d 353 (Fla. 3d DCA 2001)- Appeal from a <u>jury verdict</u>;

- *Conception By and Through Concepcion v. Archdiocese of Miami By and Through McCarthy*, 693 So.2d 1103 (Fla. 3d DCA 1997)- Appeal from a <u>summary judgment</u>;

- *John Doe No. 77 v. Boy Scouts of America, Inc.*, 2015 WL 10000265 (Fla. 13th Cir. Ct. 2015)- Appeal from a <u>summary judgment.</u>

In summary, A.A. has sufficiently alleged the necessary elements to assert a duty of general negligence and a duty arising out of a "special relationship", such as would impose liability upon the Defendant for a breach of ordinary care, or a duty to protect or warn.  The Motions to Dismiss on these grounds should be denied.  To the extent that this Court would be inclined to dismiss the current Complaint, the Plaintiff respectfully requests leave to amend the Complaint.

<div align="center"><b><u>Fiduciary Duty</u></b>
<b><u>The Sexual Abuse of George Fout was known to an agent of the Defendants</u></b></div>

Similar to a "special relationship", a fiduciary duty extends "to every possible case ... in which there is confidence reposed on one side and the resulting superiority and influence on the other. .... The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.  (citations omitted)." *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419, 421 (1927)

<div align="center">16</div>

Said another way, "The law implies a fiduciary relationship "based on the circumstances surrounding [a] transaction and the relationship of the parties." *Maxwell v. First United Bank,* 782 So.2d 931, 933 (Fla. 4th DCA 2001). An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party. *Id.* at 934.   "   *Masztal vs. City of Miami,* 971 So 2d 803 (Fla 3rd DCA, 2007)

On point in Florida is the case of *Doe v. Evans,* 814 So.2d 370 (Fla. 2002). In *Doe,* the Florida Supreme Court found liability based on an implied fiduciary relationship that arose between a priest providing martial counseling and his counselee. The *Doe* Court "stressed that the liability in this case rests on the assertion of an abuse of a marital counseling relationship through an inappropriate sexual relationship." *Id* at 375. Similarly, Fout's sexual misconduct arose out of the relationship between Fout as the Assistant Scoutmaster for Plaintiff's Troop and Fout's involvement with the Defendant's organization.  As alleged in the Complaint, it is through this Assistant Scoutmaster and Boy Scouts Troop Member relationship, that Fout was able to select and groom Plaintiff for sexual abuse and battery. *See* (Complaint ¶¶ 43-46). Through this relationship, Plaintiff would leave Boy Scout Troop meetings and activities with George Fout in order for Fout to continue with his abuse upon Plaintiff.

Simply put, the Plaintiff has alleged specifically this type of relationship between the Defendant, and Steve Fout, and A.A.

Defendants cite to a Connecticut case for their authority to not impose a fiduciary obligation on an institutional defendant. *Roe v. Boy Scouts of Am., Corp.*, 2012 WL 3933184. Not only was *Roe* decided on a motion for summary judgment, not at the motion to dismiss phase, but the facts that allowed for the court to not hold the Boy Scouts of America liable for

17

the sexual abuse and battery that occurred on Boy Scout trips, was the fact that the abuser was the victim's stepfather. This is clearly not the case for Plaintiff. Unlike *Roe*, Plaintiff only knew his abuser because of the Defendants, and had no familial relationship with the abuser.

In summary, A.A. has sufficiently alleged the necessary elements to assert a fiduciary duty against the Defendants and each of them, such as would impose liability upon the Defendant for a breach of ordinary care, or a duty to protect or warn. The Motions to Dismiss on these grounds should be denied. To the extent that this Court would be inclined to dismiss the current Complaint, the Plaintiff respectfully requests leave to amend the Complaint.

### Vicarious Liability of Agents and Volunteers
### The Sexual Abuse of George Fout was known to an agent of the Defendants

Vicarious liability is founded upon imputed liability for the defendant for another party's tortious acts. *Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So.2d 459, 467 (Fla. 2005). Liability is imputed when (1) an agency relationship exists between the defendant and the party who acted wrongfully and (2) the wrongful actions by the third party fall within the scope of agency. Generally, sexual assault and batteries by employees are held to be outside the scope of an employee's employment, and therefore insufficient to impose vicarious liability on the employer. *See Nazareth v. Herndon Ambulance Serv., Inc.,* 467 So.2d 1076, 1078 (Fla. 5th DCA 1985).

However, an exception exists where the tortfeasor was assisted in accomplishing the tort by virtue of the relationship. *See id.*; compare *Hennagan v. Dep't of High Saf. & Motor Veh.*, 467 So.2d 748 (Fla. 1st DCA 1985), with *Argriturf Mgmt., Inc. v. Roe*, 656 So.2d 954 (Fla. 2d DCA 1995). In *Hennagan*, the court was asked to determine whether the allegations in the Complaint were sufficient to survive a motion to dismiss. 467 So.2d at 749. The court found that the allegations in the Complaint were sufficient because it could not be said, as a matter of law,

18

that the allegations did not support a finding that the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship he had with his employer.

As alleged in the Complaint, at all relevant times, George Fout, as Assistant Scoutmaster, was acting as agent for Defendants by implementing and maintain a scouting program at the local level with the consent an oversight of Defendants. (Comp. ¶¶ 98, 104, 110, 116).

Also alleged in the Complaint, at all relevant times, Steve Fout, as Scoutmaster, was acting as agent for Defendants by implementing and maintain a scouting program at the local level with the consent an oversight of Defendants. (Comp. ¶¶ 98, 104, 110, 116).  Steve Fout is alleged to have actual or constructive knowledge of the activities and abuse of George Fout. This knowledge and the liability arising from that knowledge are imputed upon the Defendants in the described Hierarchy.

Based upon the factual allegations contained within the four corners of the Complaint, drawing all inferences in favor of the Plaintiff, and accepting all material allegations as true, the Complaint states a cause of action upon which relief can be granted. Defendant's motion to dismiss should be denied. *See, Sobi v. Fairfield Resorts, Inc.*, 846 So.2d 1204, 1204 (Fla. 5th DCA 2003); *Davis By & Through Davis v. Bell*, 705 So. 2d 108, 109 (Fla. 2d DCA 1998). Defendant's motion to dismiss should be denied.


## OTHER ISSUES RAISED IN THE MOTION TO DISMISS

### The Statute of Limitations

Defendant SILVER SPRINGS SHORES raises the argument in the Motion to Dismiss that the Complaint is barred by the applicable four year statute of limitations.  Plaintiff initially filed his Complaint with this Court on January 27, 2016.  In the Complaint, Plaintiff asserted that

Highly Confidential

BSA-PLAN_01423331

SA 1585

George Fout committed sexual abuse upon Plaintiff beginning in or about 2004 and continued to occur until 2012. (Comp. ¶¶ 46, 50).

The statute of limitations is an affirmative defense.  Florida law is clear that an affirmative defense may not be considered on motion to dismiss a Complaint unless on the face of the Complaint there are allegations which demonstrate the existence of an affirmative defense. *Frank v. Campbell Prop. Mgmt., Inc.*, 351 So.2d 364 (Fla. 4th DCA 1977) (citation omitted); *see also* Fla. R. Civ. P. 1.110 (d).  If there is additional information required to support a fatal defense, the recourse would be a motion for summary judgment or trial. *Minor v. Brunetti*, 43 So.3d 178, 179 (Fla. 3d DCA 2010)(holding that the "issue would be better addressed on a summary judgment motion or at trial, not on a motion to dismiss," where the trial court went beyond the four corners of the Complaint in granting a motion to dismiss).

Indeed, the crux of the SILVER SPRINGS SHORE's argument is that there is NOT enough information in the Complaint to assert the statute of limitations as a conclusive defense. On the basis alone, the ground for dismissal should be denied.

Substantively, the Defendant asserts that the statute of limitations would have commenced to run upon the *first* act of sexual misconduct perpetrated by George Fout.

That is actually the *opposite* of the law in Florida.  George Fout's sexual abuse of A.A. is alleged throughout the Complaint to be continuing, and was continuing in fact.  In a continuing tort, the statute of limitations runs from the time of the *last* tortious act. *DEI Quarry vs. Gateway Estates*, 249 So 3d 1287 (Fla 1st DCA, 2018),  See also, *Clements vs. Sheffield* 626 So 2d 272 (1993).  Also, in applicable is Section 95.11(9), which permits an action involving a minor under the age of 16, to commence the action *at any time*.

SILVER SPRINGS SHORE's motion to dismiss on this ground should be denied.

Highly Confidential                                    BSA-PLAN_01423332

                                                                              **SA 1586**

Based upon the factual allegations contained within the four corners of the Complaint, drawing all inferences in favor of the Plaintiff, and accepting all material allegations as true, the Complaint states a cause of action upon which relief can be granted. Defendant's motion to dismiss should be denied.

### Knowledge of Steve Fout, Scoutmaster and Agent of the Defendants

Throughout the Complaint, Steve Fout, as the assigned Scoutmaster and an agent of the Defendants, is alleged to have knowledge of the sexual abuse of A.A. by his Assistant Scoutmaster.  This fact distinguishes this case from the each of the cases cited by the Defendants.

This notice to Steve Fout, as agent of the Defendants, is notice to the principals, BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

The Complaint alleges that A.A. would leave the meetings "held on its premises" with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence, in violation of Boy Scout policy.  ¶¶ 61(a), 67(a), 73(a), 80(a), 87(a), 94(a), 106(a), 112(a), and 117(a).

The Complaint alleges that A.A. would "spend the night" at the Fout's home. ¶ 52.  The Complaint alleges that Steve Fout, the father, and the Scoutmaster for the BSA, knew or should have known that his son, the Assistant Scoutmaster, was abusing scouts under Steve Fout's own roof. ¶104 - 106.  In the case of A.A., in particular, the Complaint asserts that this abuse, under Steve Fout's roof continued for eight (8) years. ¶¶ 46 – 50.

From these alleged facts, it is an easy inference that the Scoutmaster of the Boy Scouts knows or should know abuse is occurring, or is likely to occur, when his adult son spends the night under his roof behind a closed door in his room with an 8 year old.  When A.A. leaves the Scout meetings with the Fouts; and when the overnight activity continues for eight (8) years, as it

21

BSA-PLAN_01423333

SA 1587

alleged in the Complaint, an inference is hardly required to reach the conclusion that Steve Fout, the father and the Scoutmaster of Troop 448 knew that his Assistant Scoutmaster was abusing the Boy Scout in his care.  It is also an easy inference that other leaders in the Scout Troop knew or should have known of George Fout's abuse.

### The BSA Policy

In addition, the BSA and the NORTH FLORIDA COUNCIL assert that the fact this activity falls outside of the applicable policy is determinative of the case.  In fact, the allegations would allow for an inference and a finding of liability on the grounds that the policy, in its drafting, implementation and application is insufficient for the danger posed.  The existence and breach of the BSA policy is not a ground upon which the Complaint may be dismissed.


## ALTERNATIVE MOTION TO AMEND THE COMPLAINT

To the extent this Court is inclined to dismiss any of A.A.'s claims, the Plaintiff requests that it be without prejudice to allow for leave to amend under Florida Rule of Civil Procedure 1.190(e). It is well established that a court's finding that a Complaint fails to state a cause of action, by itself, is not a sufficient ground on which to base an order of dismissal with prejudice. *Bouldin v. Okaloosa County*, 580 So. 2d 205, 207 (Fla. 1st DCA 1991); *Drakeford v. Barnett Bank of Tampa*, 694 So. 2d 822, 824 (Fla. 2d DCA 1997).  Instead, dismissal with prejudice should only be imposed when it conclusively appears from the face of the Complaint that there is no possible way to amend to state a cause of action, or when the privilege to amend has been abused.  *Obenschain v. Williams*, 750 So. 2d 771, 773 (Fla. 1st DCA 2000).

In other words, a court should not dismiss a Complaint with prejudice if it is actionable on any ground.  *Id*.  Dismissal with prejudice is an abuse of discretion where the party may be

22

BSA-PLAN_01423334

SA 1588

able to allege additional facts to support its causes of action or support another cause of action under a different legal theory. *Id; Fla. Nat'l Org. of Women, Inc. v. State*, 832 So. 2d 911, 915 (Fla. 1st DCA 2002).

A.A has stated viable claims against the Defendants and the Motions should be denied. However, in the alternative, A.A. requests leave to amend in order to allege additional facts or a different legal theory of relief. *Obenschain*, 750 So. 2d at 773.

## REQUEST FOR ORAL ARGUMENT

Pursuant to this Court's Motion Practice Procedure, Plaintiff respectfully request oral argument on this Motion to Dismiss. The estimated time required for argument is 1 hour.

Dated: October 8, 2018                           **MORGAN & MORGAN, P.A.**
                                                 **Business Trial Group**

                                                 */s/Paul L. SanGiovanni*
                                                 Paul L. SanGiovanni, Esq.
                                                 FBN 0513164
                                                 20 N. Orange Avenue, Suite 1500
                                                 Orlando, FL 32801
                                                 Telephone:    (407)418-6041
                                                 Facsimile:    (407)245-3394
                                                 Primary email: PSangi@ForThePeople.com
                                                 Secondary email: MTodd@ForThePeople.com
                                                 *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 8, 2018, I electronically filed the foregoing with the Clerk of the Courts by using the Florida Courts eFiling Portal which will send electronic notification to all counsel of record.

                        */s/ Paul L. SanGiovanni*
                        Paul L. SanGiovanni

Highly Confidential                                    BSA-PLAN_01423335
                                                                      **SA 1589**

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

A.A.,

      Plaintiff,

CASE NO. 2016-CA-000167

v.

THE BOY SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, the
NORTH FLORIDA COUNCIL,
INC., BOYS SCOUTS OF
AMERICA, a corporation authorized
to do business in Florida, and
SILVER SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,
a corporation authorized to do
business in Florida,

      Defendants.

_____/

## BSA AND COUNCIL'S REPLY IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants, The Boy Scouts of America ("BSA") and North Florida Council, Inc. ("Council") (collectively, "BSA Defendants"), reply to Plaintiff's Response and Incorporated Memorandum of Law in Opposition to Defendant's Motion to Dismiss Second Amended Complaint and, in the Alternative, Motion for Leave to Amend Second Amended Complaint ("Response").

### I.    Introduction

Plaintiff asserts that Defendants are liable for volunteer Assistant Scoutmaster George Fout's purported sexual abuse that occurred in the confines of his personal residence, unconnected to Scouting activity. Plaintiff concedes that "[t]he abuse alleged in the Second Amended Complaint occurred in Steve [and George] Fout's home." [Pl.'s Resp. at 2]. As a

Page **1** of **10**

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, Suite 900, Miami, FL 33131  Phone: 305.377.0700  Fax: 305.377.3001  www.cspalaw.com

Highly Confidential

matter of law, Defendants are not responsible for a local volunteer's conduct that is unrelated to Scouting activities.   Because Plaintiff fails to state a viable cause of action against BSA Defendants for negligence (Counts III and V), breach of fiduciary duty (Counts IV and VI), vicarious liability (Counts VII, VIII, IX, and X), or fraud (Count XI), the Second Amended Complaint should be dismissed.

## II.   Discussion

### A.  Negligence Claims (Counts III and V)

The Second Amended Complaint fails to allege facts which, taken as true, establish that Defendants owed a legal duty to prevent George Fout's sexual abuse perpetrated in the confines of his own home and unrelated to Scouting.  "The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may lie."  *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. 1st DCA 2003).[1]

The negligence claims here rest on the allegation that "George Fout's sexual abuse of A.A. was foreseeable, as the Boy Scout Defendants each had actual and constructive notice of . . . the impending and immanent and actual abuse of A.A."  [Second Am. Compl. ¶ 94; *see also* Pl.'s Resp. at 14].  "Duty, however, is not limitless. To impose a duty, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, the defendant's conduct must *create* or *control* the risk before liability may be imposed."  *Demelus v. King Motor Co. of Fort Lauderdale*, 24 So. 3d 759, 761 (Fla. 4th DCA 2009).  Even the most favorable reading of Plaintiff's allegations does not support imposition of a legal duty.

---

[1] Failure to state a legal duty is appropriately addressed on a motion to dismiss.  *See Kaufman v. A-1 Bus Lines, Inc.*, 363 So. 2d 61, 63 (Fla. 3d DCA 1978) (affirming trial court's order dismissing appellant's negligence action because "under the facts alleged, appellee owed no duty to appellant").

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, Suite 900, Miami, FL 33131  Phone: 305.377.0700   Fax: 305.377.3001   www.cspalaw.com

In his Response, Plaintiff maintains that "liability through a special relationship . . . is not the primary allegation in this case." [Pl.'s Resp. at 2]. Instead, according to Plaintiff, "the primary ground of liability" rests on the knowledge possessed by Scoutmaster Steve Fout, whom Plaintiff contends is BSA Defendants' agent. [Pl.'s Resp. at 3]. Plaintiff's explanation for this statement requires the pyramiding of legally flawed inferences.

First, Plaintiff contends that Steve Fout was an agent for Defendants and "knew or should have known" that his son was sexually abusing Plaintiff. [Pl.'s Resp. at 2]. According to Plaintiff, because Steve Fout "knew or should have known" of George Fout's misconduct, Steve Fout had actual notice of the alleged abuse. [*See* Pl.'s Resp. at 2-3]. Plaintiff then concludes that Steve Fout's purported notice of such abuse constitutes constructive notice to Defendants. [*See* Pl.'s Resp. at 2]. Plaintiff posits that Defendants are liable for negligence because they had "constructive knowledge" of George Fout's misconduct and failed to prevent his "foreseeable" sexual abuse. [*See* Pl.'s Resp. at 14]. Plaintiff is mistaken as a matter of law. Whether Counts III and V are framed as claims for general negligence, negligent supervision, or some combination thereof, Defendants had no legal duty to prevent George Fout's surreptitious abuse in his own residence unconnected to Scouting activities.

"Negligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005). A negligent supervision claim requires a plaintiff to allege sufficient facts to demonstrate that "once an employer received active or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate or take corrective action such as

Highly Confidential

BSA-PLAN_01423338
**SA 1592**

discharge or reassignment." *Garcia v. Duffy*, 492 So. 2d 435, 441 (Fla. 2d DCA 1986).  A party has "constructive knowledge of a fact when that party has actual knowledge of facts and circumstances that would lead a reasonable person to inquire and discover the fact in question, or infer its existence." *Dadeland Dodge Inc. v. Am. Vehicle Ins. Co.*, 698 So. 2d 929, 931 (Fla. 3d DCA 1997).

Accordingly, Plaintiff must allege that Defendants had "actual knowledge of the facts and circumstances" surrounding George Fout's misconduct or propensity to commit sexual abuse to impute constructive knowledge. *Id.* at 931.  Plaintiff cannot satisfy this burden.  The Second Amended Complaint bases Steve Fout's actual notice "on a reasonable inference" that he "observed actions and behavior" demonstrating George Fout's abuse or abusive propensity.  [*See* Second Am. Compl. ¶ 92].  This bare notice assertion is insufficient to impute constructive knowledge to Defendants of "facts and circumstances" regarding George Fout's abusive propensity to trigger a cognizable duty.  *See Hammer v. Lee Mem'l Health Sys.*, 218CV347FTM29MRM, 2018 WL 5078909, at *3 (M.D. Fla. Oct. 18, 2018) (dismissing negligence and negligent supervision claims against a hospital based on a male nurse's sexual assault because plaintiff's "bare assertion" that the hospital "knew or should have known" of the nurse's violent history toward women failed to allege constructive knowledge).[2]

---

[2] The Second Amended Complaint contains no allegation that Steve Fout, as an alleged agent for BSA Defendants, ever witnessed George Fout's sexual abuse or any conduct demonstrating his abusive propensity.  Plaintiff makes no factual allegation that Steve Fout ever received notice of George Fout's misconduct or abusive propensity.  Instead, Plaintiff alleges that Steve Fout's actual notice is based on a "reasonable inference" that he would have observed conduct demonstrating George Fout's misconduct because the abuse occurred in their shared residence. [*See* Second Am. Compl. ¶¶ 92, 110-14].  These conclusory allegations are fatally deficient.  *See Willis v. Dade County Sch. Bd.*, 411 So. 2d 245, 246 (Fla. 3d DCA 1982) (to state a negligent retention claim, "a plaintiff must allege facts showing that the employer was put on notice of the harmful propensities of the employee.").

Page **4** of **10**

Highly Confidential

BSA-PLAN_01423339

SA 1593

Moreover, the Second Amended Complaint contains no factual allegation as to how Defendants' conduct created or controlled the risk associated with George Fout's abuse, which, again, occurred in the confines of his personal residence, unconnected to Scouting.  *See Jackson Hewitt, Inc. v. Kaman*, 100 So. 3d 19, 28 (Fla. 2d DCA 2011) ("*As to duty,* the proper inquiry for the reviewing appellate court is whether the defendant's conduct created a foreseeable zone of risk, *not* whether the defendant could foresee the specific injury that actually occurred.") (emphasis in original).

Based on the foregoing, this Court should dismiss Counts III and V because Plaintiff fails to allege any sufficient facts establishing that BSA Defendants owed Plaintiff a duty to prevent George Fout's sexual abuse perpetrated solely in his own residence and unrelated to Scouting.[3]

### B.  Vicarious Liability Claims (Counts VII, VIII, IX, and X)

Plaintiff's vicarious liability claims suffer from the same deficiency as the negligence claims: George Fout's alleged abuse occurred exclusively in the confines of his own residence and unconnected to any Scouting activity.

"Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer.  *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356 (Fla. 3d DCA 2001).  In determining an employer's vicarious liability, an employee's conduct falls within the

---

[3] Plaintiff also proffers the "alternate" theory that the existence of a "'special relationship' between the Plaintiff and the Defendants [ ] give rise to liability for their failure to control the acts of George Fout."  [Pl.'s Resp. at 2].  This argument fails as a matter of law because BSA Defendants had no right or ability to control George Fout outside of Scouting and in his own residence where the alleged abuse exclusively occurred.  *See Garrison Ret. Home Corp. v. Hancock*, 484 So. 2d 1257, 1261 (Fla. 4th DCA 1985) (Under Florida law, a "special relationship must include the right *or the ability* to control another's conduct.").

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, Suite 900, Miami, FL 33131  Phone: 305.377.0700  Fax: 305.377.3001  www.cspalaw.com

Highly Confidential

scope of his employment only if: "(1) the conduct is of the kind the employee is hired to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Sussman v. Florida E. Coast Properties, Inc.*, 557 So. 2d 74, 75–76 (Fla. 3d DCA 1990). Generally, "[s]exual assaults and batteries committed by employees" are held to be outside the scope of an employee's employment and, therefore, insufficient to impose vicarious liability on the employer. *Goss v. Human Services Associates, Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012).

Florida law recognizes an exception to the general rule that sexual assaults and batteries fall outside the scope of employment "where the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship." *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954, 955 (Fla. 2d DCA 1995). The exception does not apply here. Instructive is the Fifth District Court of Appeal's decision in *Special Olympics Florida, Inc. v. Showalter*, 6 So. 3d 662 (Fla. 5th DCA 2009). A volunteer molested two disabled athletes during one of the organization sanctioned events. *Id.* at 663-64. Notably, the organization had actual notice of the volunteer's propensity to commit sexual abuse .*Id.* at 664. The plaintiffs sued in negligence claiming that the organization owed a duty to protect them. *Id.* at 665. As here, they also alleged that the organization was vicariously liable for the volunteer's conduct. *Id.*

Addressing the sexual assault scope-of-employment-exception, the Fifth District explained that "[u]nless it can be established that the abuse occurred in furtherance of the employer's business, this type of conduct is not within the scope of employment." *Id* at 665-66. The Fifth District also reversed the vicarious liability verdict for plaintiffs, holding that the

Highly Confidential

volunteer "was not acting within the scope of his agency at the time of the incidents, notwithstanding the jury's determination to the contrary." *Id.* at 665.[4]

Here, as in *Special Olympics*, George Fout's sexual abuse falls outside the scope of any reasonable volunteer duty.  As Plaintiff concedes, "[t]he abuse alleged in the Second Amended Complaint occurred in Steve [and George] Fout's home."  [Pl.'s Resp. at 2].  George Fout's misconduct, as framed by Plaintiff's pleadings, did not have as its source or purpose any intent to serve Defendants.  Instead, the alleged abuse constitutes an independent, self-serving act committed by George Fout to further his own prurient interests that are inimical to the altruistic objectives promoted by Defendants.  *See Agriturf Mgmt., Inc.*, 656 So. 2d at 955 (finding sexual abuse occurring on Agriturf's property during time employee perpetrator was closing business not within scope of employment because sexual abuse was not in furtherance of employer's business objectives); *see also Iglesia Cristiana*, 783 So. 2d at 356 (holding pastor's criminal conduct was independent, self-serving act and did not occur within course and scope of employment).

Plaintiff misplaces reliance on *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748 (Fla. 1st DCA 1985).  There, an **on-duty** police officer lured a minor into his car and molested her.  *Id.* at 749.  The First District found this allegation sufficient to survive a motion to dismiss because the officer's "acts were initiated in the course and scope of his employment and to serve the interests of the employer," despite ultimately resulting in a criminal offense.  *Id.* at 751.  Here, in contrast, the alleged abuse occurred exclusively in George

---

[4] The Fifth District's refusal to reverse the negligence finding is also notable. The court concluded that the jury could reasonably find the organization had the ability and duty to control the volunteer's conduct based on a "special relationship" because, unlike here, the molestation occurred during a sanctioned event, and the organization was on notice of the volunteer's propensity to commit abuse. *See Special Olympics*, 6 So. 3d at 667.

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, Suite 900, Miami, FL 33131  Phone: 305.377.0700  Fax: 305.377.3001  www.cspalaw.com

Highly Confidential

Fout's home, unconnected to any Scouting activity. *Cf. Mason v. Florida Sheriffs' Self-Ins. Fund*, 699 So. 2d 268, 270 (Fla. 5th DCA 1997) (holding sexual assault by officer not within scope of employment, even though the officer was on duty, in uniform, and serving warrant on woman he raped).

Based on the foregoing, Plaintiff's vicarious liability claims under Counts VII, VIII, IX, and X should be dismissed.[5]

### C.  Fraud Count (XI)

Plaintiff's purported fraudulent concealment and negligent misrepresentation claims, improperly pled under a single count, should be dismissed for lack of specificity required by Florida Rule of Civil Procedure 1.120(b).  *See Robertson v. PHF Life Ins. Co.*, 702 So. 2d 555, 556 (Fla. 1st DCA 1997) (affirming dismissal with prejudice of fraudulent misrepresentation claims because the complaint "fails to specifically identify misrepresentations or omissions of fact, the time, place or manner in which they were made, and how the representations were false or misleading.").   Here, Plaintiff's fraudulent concealment and negligent misrepresentation claims fail as a matter of law because the Complaint fails to identify with specificity the material facts that BSA Defendants falsely represented or failed to disclose.  *See Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st DCA 2011).

---

[5] Plaintiff's claims against BSA Defendants for breach of fiduciary duty under Counts IV and VI fail for the same reasons the vicarious liability claims necessarily fail: George Fout's alleged abuse occurred exclusively outside the scope of any conceivable volunteer responsibility.  Thus, any duty for BSA Defendants to act for Plaintiff's benefit does not extend beyond Scouting activities to the confines of an individual's personal residence.  *See Bldg. Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 41 (Fla. 3d DCA 2008) ("While a contractual relationship between the parties is not required to form a fiduciary relationship, a party must be 'under a **duty** to act for or to give advice for the benefit of another upon matters within the scope of that relation.'") (emphasis in original) (quoting *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)).

Page **8** of 10

Highly Confidential

BSA-PLAN_01423343

SA 1597

The Complaint merely concludes that "BSA fraudulently concealed from Congress, scouts . . . A.A. and his guardian" that "pedophiles had been infiltrating BSA in large numbers for many years." (Second Am. Compl. ¶¶ 272-74).   This conclusion lacks factual support and fails the well-known specificity requirement for pleading fraud. Moreover, no duty exists to disclose **unproven** allegations of abuse.  *See Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172 (Fla. 4th DCA 1994) ("A claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact.").

For these reasons, as well as the more detailed arguments in BSA Defendants' motion to dismiss, the fraud and misrepresentation claims alleged under Count XI should be dismissed.

### III.   Conclusion

Based on the foregoing reasons, BSA and Council respectfully request that the Second Amended Complaint be dismissed with prejudice.

Respectfully submitted by,

CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, 9th Floor
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile:  (305) 377-3001

By: /s/Spencer H. Silverglate
        Spencer H. Silverglate
        Florida Bar No. 769223
        ssilverglate@cspalaw.com
        mpedraza@cspalaw.com
        Francisco Ramos, Jr.
        Florida Bar No. 114766
        framos@cspalaw.com
        acastro@cspalaw.com
        Shannon P. McKenna
        Florida Bar No. 385158
        smckenna@cspalaw.com
        *Attorneys for Boy Scouts of America*
        *And North Florida Council, Inc.*

Highly Confidential

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct of the foregoing was served through the

Florida E-Portal by e-mail, pursuant to Fla. R. Jud. Admin. 2.516, on this 13th day of December,

2019 to all counsel of record.

CLARKE SILVERGLATE, P.A.

By: /s/Spencer H. Silverglate
       Spencer H. Silverglate

Highly Confidential

BSA-PLAN_01423345

**SA 1599**

# EXHIBIT 5

## Civil Cover Sheet

Highly Confidential

JS 44 (Rev. 09/19)                    Case 5:20-cv-00069   Document 1-5   Filed 02/18/20   Page 2 of 2 PageID 984

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| A.A. | The Boy Scouts of America, North Florida Council, et al. |

| (b) County of Residence of First Listed Plaintiff   Marion County, FL | County of Residence of First Listed Defendant   Dallas County, Texas |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Paul L. SanGiovanni, Esq., Morgan & Morgan, P.A., 20 North Orange Avenue, Ste 1600, Orlando, FL 32801, (407) 418-6041 | Spencer H. Silvergate, Esq., Clarke Silvergate, P.A., 799 Brickell Plaza, Ste 900, Miami, FL 33131, (305) 377-0700 |

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question *(U.S. Government Not a Party)*
☐ 2  U.S. Government Defendant
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1452(a)

Brief description of cause:
Removal for "related" Chapter 11 Bankruptcy action in Delaware

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE  Laurie Selber Silverstein | DOCKET NUMBER  20-10342-LSS |
|---|---|---|---|

| DATE  02/18/2020 | SIGNATURE OF ATTORNEY OF RECORD  /s/ Spencer H. Silvergate, Florida Bar No. 769223 |
|---|---|

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

Highly Confidential

BSA-PLAN_01423347

**SA 1601**

FILED
SUPERIOR COURT
OF GUAM

2017 MAR -9 PM 5: 09

CLERK OF COURT

BY: _____

1  **LAW OFFICE OF ANTHONY C. PEREZ**
   Suite 802, DNA Building
2  238 Archbishop Flores Street
   Hagåtña, Guam 96910
3  Telephone No. (671) 475-5055/7
   Facsimile No. (671) 477-5445
4  E-Mail: acp@perezlawguam.com

5  *Attorney for Plaintiff*
   ████████████
6

7                        **IN THE SUPERIOR COURT OF GUAM**

8  ████████████              CIVIL CASE NO. CV 0 2 0 7 - 17

9              Plaintiff,

10      vs.                          **VERIFIED COMPLAINT FOR DAMAGES
                                      AND EQUITABLE RELIEF**
11  ROMAN CATHOLIC ARCHBISHOP OF
    AGANA, a Corporation sole, aka
12  ARCHBISHOP OF AGANA, a Corporation
    Sole, aka BISHOP OF GUAM, a Corporation
13  sole; BOY SCOUTS OF AMERICA; BOY
    SCOUTS OF AMERICA, ALOHA
14  COUNCIL CHAMORRO DISTRICT; and
    JOHN DOES 1 through 20,
15
16              Defendants.

17      Comes now Plaintiff ████████████, by and through his attorney, Anthony

18  C. Perez, Esq., and for a Verified Complaint against the above-named Defendants, hereby affirms

19  and avers as follows:

20

21              **I.      JURISDICTION**

22      1.      This Court has jurisdiction under 7 G.C.A. §3105.

23              **II.     PARTIES**

24      2.      Plaintiff Michael Chargualaf ("Plaintiff"), is a resident of Guam.  Plaintiff is an

25  individual adult male, who brings these claims pursuant to 7 GCA §11301.1 as he was subjected to

26  multiple instances of child sex abuse by Father Louis Brouillard ("Father Brouillard") while an

27

28

**JTX-2910**

C-0023(3048)stb

Highly Confidential

BSA-PLAN_01096356
SA 1602

altar boy and parishioner of the Roman Catholic parish located at San Isidro Church, Malojloj, Guam.  Father Brouillard was the parish priest at San Isidro Church, in addition to being the designated leader and scout master in Malojloj.

3.      Defendant Roman Catholic Archbishop of Agana aka Archbishop of Agana aka Bishop of Guam ("Archdiocese") is, and at all times relevant was a Corporation Sole, organized and existing pursuant to the laws of the Territory of Guam, and the corporate entity under which the Archdiocese of Guam operated.  At all times material hereto, the Archdiocese was designated by the Roman Catholic Church ("the Church") to operate a Catholic archdiocese and/or diocese in Guam, and Archdiocese was acting by and through, had a special relationship with, and had a degree of responsibility or control over, the perpetrators, priests, employees, agents, and/or other persons described herein, including Father Brouillard, whose acts or omissions are alleged herein and are the subject of this Verified Complaint, and therefore, the Archdiocese is liable for said acts and omissions under the doctrine of respondeat superior, vicarious liability, and ostensible agency.

4.      Defendant Boy Scouts of America ("Defendant BSA") is, and at all times relevant was, a Congressionally-chartered corporation existing pursuant to Title 36 of the United States Code, with its principal place of business and its agent for service located at 1325 W. Walnut Hill Lane, Irving, Texas, 75038.  Defendant BSA is the supervising entity over all local divisions of the Boy Scouts, organized into regional "councils" and "districts," which in turn, operate under the authority and supervision of Defendant BSA.

5.      Defendant Boy Scouts of America, Aloha Council Chamorro District ("Defendant BSA Guam") is, and at all times relevant was the local Boy Scouts organization in Guam.  Defendant BSA Guam is a non-profit organization, operating and existing under the laws of the Territory of Guam, and oversees individual Boy Scout troops operating in Guam, including those sponsored by the Church and Archdiocese.  Defendants BSA and BSA Guam, through their agents

_____ v. Archbishop of Agana, Boy Scouts of America, et al.                    Page 2 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

and officials, have control over those activities involving children. Defendants BSA and BSA Guam have the power to appoint, supervise, monitor, restrict and fire each person working with children within the Defendants' Scouting programs.

6. At all times relevant, Father Brouillard was the designated leader and scout master of the Boy Scout troop operating in Malojloj, Guam. Father Brouillard acted with the approval and authority of Defendants BSA and BSA Guam, and at all times relevant was under the supervision of Defendants BSA and BSA Guam.

7. Plaintiff is presently unable to ascertain the identities and capacities of Defendants JOHN DOES 1-20 and, therefore, has named said Doe Defendants fictitiously; said Doe Defendants are in some manner presently unknown to Plaintiff, responsible for the injuries and damages described herein, and/or are related to the named Defendants and are the principals, agents, representatives, subsidiaries, parent companies, employers, employees, partners, limited partners, joint venturers, insurers, and/or independent contractors of the named Defendants, and/or had duties of reasonable care to Plaintiff and the breach of one or more of the foregoing duties caused the injuries and damages described herein. Plaintiff will name said Doe Defendants when their identities and capacities are determined.

## III.   **STATEMENT OF FACTS**

8. Starting in approximately 1975, when Plaintiff was 13 years old, Plaintiff served as an altar boy at the San Isidro Church in Malojloj, Guam. Father Brouillard was the parish priest at San Isidro Church during this time period and resided at the rectory adjacent to San Isidro Church.

9. On Plaintiff's first day as an altar boy, he arrived early before Mass and knocked on the rectory door where Father Brouillard lived. Father Brouillard invited Plaintiff into the room. Father Brouillard was dressed only in a robe that was open, showing Father Brouillard's naked body underneath. Father Brouillard instructed Plaintiff to lie down on the bed, and began to fondle

_____ *v. Archbishop of Agana, Boy Scouts of America, et al.*                    Page 3 of 12
Civil Case No. _____
*Verified Complaint for Damages and Equitable Relief*

Highly Confidential

BSA-PLAN_01096358

SA 1604

Plaintiff's penis while saying "those are the greatest feelings that a man should feel", "don't be afraid, this is Ok", and "doesn't that feel good". Father Brouillard then proceeded to perform oral sex on Plaintiff until Plaintiff ejaculated. During this time, Plaintiff was shaking uncontrollably with fear, but Father Brouillard repeatedly told Plaintiff that "It's okay." He then ordered Plaintiff to fondle Father Brouillard's genitals until Father Brouillard ejaculated.

10. Approximately three months later, in early 1976, Plaintiff arrived early for Mass again. Although he was terrified, he knocked on Father Brouillard's door again, to let him know he was there to begin preparations for Mass as he was an altar boy. However, once again, Father Brouillard ordered Plaintiff to enter the room, disrobe, and lie on the bed. Again, Father Brouillard performed oral sex on Plaintiff until ejaculation and then required Plaintiff to fondle Father Brouillard until ejaculation. When Plaintiff left Father Brouillard's bedroom, he encountered two other altar boys. One of them asked if Father Brouillard was molesting Plaintiff, and when Plaintiff replied, "Yes," the other altar boy confided that he was also being abused.

11. Later that year, Plaintiff joined the Boy Scout troop in Malojloj, sponsored by the Church. Father Brouillard was the scout master. On one occasion, Father Brouillard took Plaintiff and several other boys on a camping trip in Ritidian. During the night, Father Brouillard entered the tent being used by Plaintiff and another boy scout. He ordered Plaintiff and the other boy to remove their underwear and started fondling both of them. Then, Father Brouillard performed oral sex on both of them and told them to ejaculate in his mouth. He then left the tent. The other boys at the camp knew that Father Brouillard had abused Plaintiff and the other scout in the tent and began ridiculing and teasing them, causing Plaintiff severe embarrassment and humiliation.

12. In approximately early 1977, Plaintiff walked to the San Isidro church for confirmation class. Again, Father Brouillard confronted him and ordered him into the room and onto the bed. Father Brouillard proceeded to fondle and perform oral sex on Plaintiff. During this

_____ v. Archbishop of Agana, Boy Scouts of America, et al.          Page 4 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

Highly Confidential

BSA-PLAN_01096359

SA 1605

abusive act, another altar boy knocked on Father Brouillard's door. Father Brouillard opened the door, told the other altar boy to disrobe, and ordered him to lie on the bed next to Plaintiff. Father Brouillard then fondled and performed oral sex on the other altar boy while Plaintiff remained in the bed. When the meal bell rang, Father Brouillard left the room to get his food. Plaintiff told the other altar boy, "We need to get out of here." They both fled.

13.     The last instance of sexual abuse perpetrated by Father Brouillard on Plaintiff occurred in 1977 when Plaintiff reported to the church for altar boy duties prior to mass. Plaintiff knocked on the rectory door to inform Father Brouillard that he was present for the mass, and again, he was ordered onto the bed. Father Brouillard fondled and performed oral sex on Plaintiff. The same altar boy from the previous episode of sexual abuse was brought in by Father Brouillard and ordered to lie on the bed, on either side of him. Father Brouillard then fondled and performed oral sex on Plaintiff and the other altar boy while in same bed and ordered them to fondle Father Brouillard. When Father Brouillard was finished, he instructed Plaintiff to assist him in getting dressed for Mass. Plaintiff and the other altar boy then left the room and encountered a third altar boy, who indicated that he knew that Father Brouillard was sexually abusing them.

14.     Subsequent to this, Plaintiff refused to serve as an altar boy and never returned to the church.

## IV.     FIRST CAUSE OF ACTION:
## NEGLIGENCE AND GROSS NEGLIGENCE AGAINST
## DEFENDANT ARCHDIOCESE

15.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

16.     Father Brouillard has admitted to abusing at least 20 boys or more while he was assigned to the various parishes in Guam. He also has admitted that he contemporaneously

_____ v. Archbishop of Agana, Boy Scouts of America, et al.                    Page 5 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

Highly Confidential                                                      BSA-PLAN_01096360
SA 1606

informed Catholic authorities via confession and also non-confessional discussions that he was sexually abusing children.

17.     The conduct of Father Brouillard described herein constitutes criminal sexual assault under the Guam Code Annotated.

18.     The Archdiocese had a special relationship and custodial relationship with Plaintiff, which relationship gave rise to a duty of care on the part of Archdiocese to (a) warn Plaintiff and Plaintiff's parents of the risk of harm posed by Father Brouillard, and (b) protect Plaintiff from the predations of Father Brouillard.

19.     Despite this actual knowledge of Father Brouillard's heinous and despicable conduct, the Archdiocese, and the Archdiocese' representatives, agents, and employees, failed to notify law enforcement officials of Father Brouillard's abuse of children as required by Guam law including 19 GCA §§13201 et. seq., failed to take any steps to warn its parishioners of the risk of harm to children, failed to adequately supervise and/or prevent Father Brouillard from having contact with children, failed to offer medical treatment, psychological treatment, and/or counseling to Father Brouillard's victims, and failed to laicize/defrock Father Brouillard and expose him as a sexual predator or have him referred to the Vatican for investigation and/or discipline in accordance with Canonical law.

20.     The Archdiocese had a practice and pattern of harboring child abusers and protecting their identities, thereby exposing unwitting parents and their vulnerable children to further harm at the hands of said abusers.  At all times material hereto, Father Brouillard was an agent, employee, authorized representative, and/or was under the responsibility or control of the Archdiocese, while acting under the shield and protection of his clerical agency.  The Archdiocese represented Father Brouillard to be a trusted person that was safe to be around young children, all the while knowing that Father Brouillard was an admitted pedophile and abuser of children.  Rather than taking

▇▇▇▇▇▇▇ v. Archbishop of Agana, Boy Scouts of America, et al.                    Page 6 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

Highly Confidential

BSA-PLAN_01096361

SA 1607

1  reasonable and appropriate steps to protect children, the Archdiocese engaged in a pattern and

2  practice of protecting perpetrators, including Father Brouillard, including at times shuttling the

3  perpetrators to distant and sometimes remote locations, putting children at further risk of harm. The

4  Archdiocese exposed the perpetrator to children, including Plaintiff, to exploitation and sexual

5  abuse.

6      21.     The Archdiocese's conduct constitutes negligence, gross negligence, recklessness,

7  and willful and wanton and/or malicious disregard for the rights and safety of Plaintiff.

8      22.     As a legal and proximate result of the Archdiocese's wrongful conduct, Plaintiff has

9  sustained severe and permanent injuries, and is entitled to compensation for past and future medical

10  and psychological treatment expenses, past and future wage loss, other out-of-pocket expenses,

11  pain and suffering, emotional distress and mental anguish, embarrassment and humiliation, the loss

12  of future enjoyment of life, and other special and general damages allowed by law in amounts to

13  be proven at trial.   In addition, the Archdiocese acted with malice, oppression, and/or fraud,

14  entitling Plaintiff to exemplary and punitive damages.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### V.    SECOND CAUSE OF ACTION
### EQUITABLE RELIEF AGAINST DEFENDANT ARCHDIOCESE

23.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

24.    Plaintiff is entitled to equitable relief from this Court, for non-monetary redress and the protection of Plaintiff and other similarly situated members of the public, as follows:

   a. For a period of not less than ten (10) years from entry of judgment, the Archdiocese post on the home page of their web sites, if any, the names of ALL known members of the Archdiocese who are identified in this Complaint or are otherwise known to the Archdiocese as sexual abusers;

*v. Archbishop of Agana, Boy Scouts of America, et al.*                    Page 7 of 12
Civil Case No. _____
*Verified Complaint for Damages and Equitable Relief*

Highly Confidential                                                          BSA-PLAN_01096362
                                                                            SA 1608

b. That the Archdiocese establish a toll-free phone number and website to which anonymous abuse complaints can be made. If a report of abuse is made formally to anyone in the Archdiocese or through the toll-free number or directly reported to the Archdiocese, that the Archdiocese be required to encourage the victim to report the information to law enforcement and the Archdiocese will also report the information to law enforcement as well;

c. That the Archdiocese adopt a whistle blower policy concerning the method by which a report concerning abuse within the Archdiocese can be made and expressly providing that the Archdiocese will not take any retaliatory actions against persons who report such information in good faith;

d. That the Archbishop or Bishop on Guam will be available upon reasonable notice to have a private conference with any survivor of sexual abuse perpetrated by a priest, educational, religious or other agent of the Archdiocese;

e. Within thirty (30) days after entry of Judgment, the Archdiocese send letters of apology to Plaintiff. Letters of apology will state that Plaintiff was not at fault for the abuse and that the Archdiocese take responsibility for the abuse; and,

f. Any future settlement related to sexual abuse entered into by the Archdiocese shall not contain any Confidentiality provision except at the written request of the settling abuse victim.

## VI.   THIRD CAUSE OF ACTION:
### NEGLIGENCE AND GROSS NEGLIGENCE AGAINST DEFENDANTS BOY SCOUTS OF AMERICA AND BOY SCOUTS OF AMERICA ALOHA COUNCIL CHAMORRO DISTRICT

25.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

26.   Defendant BSA has a long history of employing and protecting pedophiles who used their positions as Scout Masters and other official positions within the BSA organization to gain access to young boys for the purposes of engaging in illegal and abusive sexual activities.

*v. Archbishop of Agana, Boy Scouts of America, et al.*                    Page 8 of 12
Civil Case No. _____
*Verified Complaint for Damages and Equitable Relief*

Highly Confidential                                                                    BSA-PLAN_01096363
SA 1609

27.     Defendants BSA and BSA Guam had duties of care to Plaintiff due to the special relationship and custodial relationship said Defendants had with the individual Boy Scouts.

28.     At the times described herein, Father Brouillard was the Scout Master for the troop of which Plaintiff was a member and was represented by Defendants BSA and BSA Guam to be a person that could be trusted to keep the children safe. To the contrary, however, Defendants BSA and BSA Guam were aware that Father Brouillard frequently took Boy Scouts on camping trips and swimming trips, and forced them to swim in the nude and to participate in sexual activities with Father Brouillard. Defendants BSA and BSA Guam were aware of prior complaints of sexual abuse perpetrated by scout leaders on children in Guam yet failed to contact law enforcement authorities as required by 19 GCA §§13201 et. seq., failed to take any steps to warn parents of the risk of harm to children, failed to adequately supervise and/or prevent Father Brouillard from having contact with children, failed to offer medical treatment, psychological treatment, and/or counseling to Father Brouillard's victims, failed to protect Plaintiff and other children from Father Brouillard's predations, and failed to discipline or terminate Father Brouillard as Scout Master.

29.     Defendants BSA and BSA Guam's conduct constitutes negligence, gross negligence, recklessness, and willful and wanton and/or malicious disregard for the rights and safety of Plaintiff.

30.     As a legal and proximate result of Defendants BSA and BSA Guam's wrongful conduct, Plaintiff has sustained severe and permanent injuries, and is entitled to compensation for past and future medical and psychological treatment expenses, past and future wage loss, other out-of-pocket expenses, pain and suffering, emotional distress and mental anguish, embarrassment and humiliation, the loss of future enjoyment of life, and other special and general damages allowed by law in amounts to be proven at trial. In addition, Defendants BSA and BSA Guam acted with malice, oppression and/or fraud, entitling Plaintiff to exemplary and punitive damages.

_____ v. Archbishop of Agana, Boy Scouts of America, et al.          Page 9 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

Highly Confidential                                                                BSA-PLAN_01096364

SA 1610

## VII.   FOURTH CAUSE OF ACTION:
## EQUITABLE RELIEF AGAINST DEFENDANTS BOY SCOUTS OF AMERICA AND
## BOY SCOUTS OF AMERICA ALOHA COUNCIL CHAMORRO DISTRICT

31.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

32.     Plaintiff is entitled to equitable relief from this Court, for non-monetary redress and the protection of Plaintiff and other similarly situated members of the public, as follows:

    a.  For a period of not less than ten (10) years from entry of judgment, Defendants BSA and BSA Guam post on the home page of their web sites, if any, the names of ALL known members, officials, and/or employees of Defendants BSA and BSA Guam who have complaints, whether formal or informal, relating to allegations of child sexual abuse;

    b.  That Defendants BSA and BSA Guam establish a toll-free phone number and website to which anonymous abuse complaints can be made.  If a report of abuse is made formally to anyone in Defendants BSA and BSA Guam or through the toll-free number or directly reported to Defendants BSA and BSA Guam, that Defendants BSA and BSA Guam be required to encourage the victim to report the information to law enforcement and Defendants BSA and BSA Guam will also report the information to law enforcement as well;

    c.  That Defendants BSA and BSA Guam adopt a whistle blower policy concerning the method by which a report concerning abuse within Defendants BSA and BSA Guam can be made and expressly providing that Defendants BSA and BSA Guam will not take any retaliatory actions against persons who report such information in good faith;

    d.  Within thirty (30) days after entry of Judgment, Defendants BSA and BSA Guam send letters of apology to Plaintiff.  Letters of apology will state that Plaintiff was not at fault for the abuse and that Defendants BSA and BSA Guam take responsibility for the abuse; and,

_____ v. Archbishop of Agana, Boy Scouts of America, et al.                    Page 10 of 12
Civil Case No. _____
Verified Complaint for Damages and Equitable Relief

Highly Confidential

e.  Any future settlement related to sexual abuse entered into by Defendants BSA and BSA Guam shall not contain any Confidentiality provision except at the written request of the settling abuse victim.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants, jointly and severally, as follows:

(A)   For special and general damages in amounts to be proven at trial;

(B)   For an award of exemplary and punitive damages in an amount to be proven at trial;

(C)   For equitable relief as set forth previously;

(D)   For costs of litigation and attorneys fees; and,

(E)   For such additional and further relief deemed just and appropriate under the circumstances.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff MICHAEL CHARGUALAF, through his counsel, Anthony C. Perez, Esq., hereby demands a jury trial of six persons in the above-entitled action. The amount in controversy exceeds Twenty-Five Dollars.

Respectfully submitted this 9th day of March, 2017.


By: _____

**ANTHONY C. PEREZ, ESQ.**
*Attorney for Plaintiff Anthony* ████████

_v. Archbishop of Agana, Boy Scouts of America, et al._                    Page 11 of 12
*Civil Case No. _____*
*Verified Complaint for Damages and Equitable Relief*

Highly Confidential

BSA-PLAN_01096366
SA 1612

<u>**VERIFICATION**</u>

CITY OF HAGATNA        )
GUAM, U.S.A.           )        ss:

████████████████████ declares and attests that he is the PLAINTIFF in the foregoing Verified Complaint; that he has read the Verified Complaint, and knows the contents therein to be true and correct.

I declare under penalty of perjury, this 9th day of March, 2017, that the foregoing is true and correct to the best of my knowledge.

By:   ██████████████████  _____

*Plaintiff*

SUBSCRIBED AND SWORN TO BEFORE me by ████████████████ this 9th day of March, 2017.

_____
NOTARY PUBLIC

SHEERA MARIE BLAS MENDIOLA
NOTARY PUBLIC
In and for Guam, U.S.A.
My Commission Expires: JULY 12, 2018
P.O. Box 8104 Tamuning, Guam 96931

████████ *v. Archbishop of Agana, Boy Scouts of America, et al.*          Page 12 of 12
Civil Case No. _____
*Verified Complaint for Damages and Equitable Relief*

Highly Confidential

STATE OF MINNESOTA                              DISTRICT COURT
COUNTY OF STEARNS                       SEVENTH JUDICIAL DISTRICT
                                              CASE TYPE: CIVIL

_____

John Doe,

              Plaintiff,

       v.                                       **COMPLAINT**
                                          **(JURY TRIAL DEMANDED)**
Boy Scouts of America; and
Central Minnesota Council,
Boy Scouts of America

              Defendants.                Court File No. _____

_____

       Plaintiff, by his attorneys Nichols Kaster, PLLP, brings this action for damages and other

legal and equitable relief from Defendants' violations of state common law, stating the following

as his claims against Defendants.

                                    <u>PARTIES</u>

       1.     Plaintiff John Doe is an adult resident of the State of Minnesota.  At all times

relevant to the tortious and fraudulent conduct alleged herein, Plaintiff was a resident of City of

Nisswa, County of Crow Wing, State of Minnesota and an unemancipated minor.  Plaintiff will

provide his identity to the Defendants under separate cover.  Plaintiff has filed this Complaint

under the pseudonym "John Doe" because he was the victim of sexual abuse as a child and the

disclosure of his identity to the public would result in further emotional injury.

       2.     Defendant Boy Scouts of America ("BSA") is a congressionally-chartered

corporation not registered with the Minnesota Secretary of State, with a principal place of

business and its agent for service located at 1325 W. Walnut Hill Lane, Irving, Texas 75038.

**JTX-2913**

3.      Defendant Central Minnesota Council, Boy Scouts of America, ("Central MN Council") is a Minnesota non-profit corporation, with its principal place of business and agent for service located at 1191 Scout Drive, City of Sartell, County of Stearns, State of Minnesota.

4.      Defendants BSA and Central MN Council (collectively, "Defendants") jointly own and operate programs and activities which invite, encourage membership, and seek out the participation of children (the "Scouting program"). Defendants, through their agents, establish, staff, and control the operation of Boy Scout troops and the Scouting program. Defendants have the power to appoint, retain, supervise, restrict and terminate each agent working with children within Defendants' Boy Scout troops and Scouting program.

<div align="center">

**JURISDICTION AND VENUE**

</div>

5.      This action arises under state common law.

6.      This Court has jurisdiction to hear and adjudicate such claims because Defendants conduct business in the State of Minnesota and took actions in the State of Minnesota that caused harm to Plaintiff, and Defendant Central MN Council operates an office in the State of Minnesota.

7.      Venue is proper in the County of Stearns because Defendants conduct business in Stearns County and Defendant Central MN Council operates an office in Stearns County.

<div align="center">

**FACTUAL ALLEGATIONS**

</div>

**Factual Background**

8.      From approximately 1992 to 1994, Defendants' agent Thomas Erickson ("Erickson") was an adult Boy Scout Leader ("Scout Leader") of Plaintiff's Boy Scout troop, troop number 81, located in Nisswa, Minnesota.

2

BSA-PLAN_01096841

SA 1615

9.     Defendants selected or accepted Erickson as a Scout Leader for Plaintiff's Boy Scout troop. At all times relevant to this Complaint, Erickson was an employee and/or agent of Defendants and under Defendants' control and supervision. In addition, Defendants retained the right to control the means and dictate policies used by Erickson to carry out the duties of Scout Leader.

10.     Plaintiff came to know and trust Erickson when Erickson was Plaintiff's Scout Leader. From approximately 1992 to 1994, Plaintiff participated in Erickson's Boy Scout troop and in Defendants' Scouting program.

11.     From approximately 1992 through 1994, while Plaintiff participated in Defendants' Scouting program, Erickson sexually abused Plaintiff on multiple occasions. Plaintiff was approximately 8 to 10 years old at the time that Erickson sexually abused him. The sexual abuse occurred while Plaintiff participated in Scouting-related meetings, events and outings in and around Nisswa, Minnesota, and while Erickson was acting as a Scout Leader of Plaintiff's Boy Scout troop and within the scope of his agency with Defendants.

12.     Plaintiff's Boy Scout troop generally met for Scouting-related meetings and activities in the Nisswa Elementary School cafeteria and the Nisswa Community Center. Erickson participated in these meetings and activities as a Scout Leader of Plaintiff's Boy Scout troop.

13.     Erickson often hosted Scouting program activities for Plaintiff's Boy Scout troop at his home on Crow Wing County Road 13 in Nisswa, Minnesota for which the scouts would earn merit badges. Among the Scouting program activities hosted by Erickson at his home included building birdhouses and wooden cars for Defendants' annual Pinewood Derby.

Highly Confidential

BSA-PLAN_01096842

SA 1616

14.     On many occasions, prior to and after engaging in the sexual abuse of Plaintiff, Erickson asked Plaintiff to keep the abuse a secret.

15.     On at least one occasion, during one of Defendants' Scouting program activities at Erickson's home, Erickson took Plaintiff away from the other scouts and brought Plaintiff into his bedroom.  There were no other scouts or adults inside Erickson's bedroom.  Erickson showed Plaintiff photographs of other young boys without clothing.  Erickson removed Plaintiff's shirt and took photographs of Plaintiff.  Erickson then proceeded to sexually abuse Plaintiff.  The sexual abuse included fondling and oral intercourse.

16.     As a Scout Leader, Erickson gained the trust and confidence of Plaintiff and his family, and gained the permission and support of Plaintiff and Plaintiff's family to spend substantial periods of time alone with Plaintiff.

17.     On multiple occasions, Erickson would pick Plaintiff up from Nisswa Elementary School after school and sexually abuse Plaintiff inside of his car.  Among other locations, Erickson sexually abused Plaintiff inside of his car while parked behind the Nisswa Cemetery, in the parking lot by the boat landing of Lower Cullen Lake, and near local nature trails.  The sexual abuse occurred more than 10 times and included fondling and oral intercourse.

**Defendants BSA and Central MN Council**

18.     Defendant BSA is a congressionally chartered corporation, codified at 36 U.S.C. § 30901, *et seq.*  Under this Charter, Congress granted Defendant BSA the exclusive right to BSA's emblems, badges, descriptive and designative marks, words and phrases.

19.     Defendant BSA has derived substantial income by marketing its Scouting program, paraphernalia and merchandise to parents and their children, including Plaintiff and his parents.

4

BSA-PLAN_01096843

SA 1617

20.    Defendant BSA is a national organization which develops the Scouting program and policies, as well as adult volunteer leadership training and development.

21.    Defendant BSA implements its Scouting program through local Boy Scouts of America councils, such as Defendant Central MN Council, who are granted a charter which licenses use of the Scouting program, policies, adult volunteer leadership training and development, as well as the BSA name, emblems, badges, markings, paraphernalia and merchandise.

22.    Defendant BSA maintains the standards for the entire organization. Defendant BSA requires local councils and troops to adhere to Scouting guidelines, manuals, policies and procedures that govern the manner in which the Scouting program and activities are to take place.

23.    Defendant BSA's Scouting guidelines, manuals, policies and procedures also provide leadership requirements for Scout Leaders and the manner in which Scout Leaders and other adult volunteers are to perform their tasks and facilitate the activities of the troop.

24.    Defendants work in partnership to appoint and/or accept, and supervise Scout Leaders. BSA has previously stated, "[n]o adult leader can be appointed without approval of the sponsoring institution, the local Council . . . that oversees scouting in the geographical area in question, and Boy Scouts of America." Brief for Petitioner Boy Scouts of America, at *4, *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (No. 99-699).

25.    The ultimate enforcement authority of Defendant BSA's guidelines, policies and procedures is with BSA. Major departures from Defendant BSA's guidelines, policies and procedures by local councils and troops are not permitted.

Highly Confidential

BSA-PLAN_01096844

**SA 1618**

26.     During the time Plaintiff was a scout, the troop of which Plaintiff was a member, Erickson, and Defendant Central MN Council, were all subject to Defendant BSA's authority and control.

**Defendants' Knowledge of Child Sexual Abuse in Defendants' Scouting Program**

27.     Defendants BSA and Central MN Council have known for decades that a significant number of adult Scout Leaders were exploiting their positions as Scout Leaders to sexually abuse children participating in Defendants' Scouting program.

28.     In or around the 1920s, Defendant BSA began to collect and maintain internal "Ineligible Volunteer Files" identifying Scout Leaders whom BSA considered "ineligible" to hold positions as Scout Leader. Amongst these Ineligible Volunteer Files, Defendant BSA collected and maintained files on complaints of child sexual abuse against Defendants' volunteers, a subcategory of files which eventually became known as the "Perversion Files." These files contain documents including biographical information of the accused Scout Leader, witness statements, parent complaints and correspondence.

29.     In the decades that followed, Defendant BSA identified thousands of Scout Leaders believed to have sexually abused children in Defendant BSA's Scouting program. Reports of Scout Leaders engaging in child sexual abuse in Defendant BSA's Scouting program were continuous over time and affected troops throughout the country.

30.     Not all of the Scout Leaders believed to have sexually abused children in Defendant BSA's Scouting program were removed from their positions as Scout Leaders. At some point, prior to 1955, Defendant BSA implemented an internal "probation program," where some Scout Leaders who were believed to have sexually abused scouts, were allowed to continue as Scout Leaders with access to young boys. This program was entirely confidential and scouts

6

BSA-PLAN_01096845

**SA 1619**

and their parents were not informed by Defendants whether a Scout Leader was on "probation" for sexual abuse.

31.     At some point, Defendant BSA became aware that the internal "Probation Program" allowed Scout Leaders accused of child sexual abuse an opportunity to continue to abuse scouts and that in some instances, Scout Leaders previously accused of sexual abuse again engaged in sexual abuse of scouts.   Despite this knowledge, Defendant BSA continued its probation program until in or around the 1980s.

32.     Some adults who were declared "ineligible" to hold positions as Scout Leader due to complaints of child sexual abuse slipped back into Defendant BSA's Scouting program by falsifying personal information, avoiding the registration process, or due to errors on the part of Defendants in the registration process.   For example, in or around 1991, a Scout Leader convicted of abusing a boy in Minnesota returned to his old troop – right after getting out of jail.

33.     Defendant BSA knew or should have known decades prior to Erickson's sexual abuse of Plaintiff, that its Ineligible Volunteer system was ineffective to address the problem of sexual abuse of scouts by Scout Leaders.

34.     Defendant BSA was aware that local councils, including Defendant Central MN Council, as well as staff and Scout Leaders, were at times uninformed about the existence of the Ineligible Volunteer Files, the risk of child sexual abuse posed to scouts, and how to properly respond to allegations of child sexual abuse.   Defendant BSA was also aware that on some occasions, local councils, staff and Scout Leaders, did not respond adequately to allegations of child sexual abuse, resulting in further sexual abuse to scouts.   Defendant BSA did nothing to educate or train local councils, staff or Scout Leaders on identifying, preventing or responding to allegations and incidents of child sexual abuse in Scouting Programs until in or around 1971.

7

BSA-PLAN_01096846

SA 1620

35.     Upon information, prior to Erickson's sexual abuse of Plaintiff, Defendant Central MN Council became aware that Scout Leaders in its local council were accused of engaging in sexual abuse of scouts.  Defendant Central MN Council gained this knowledge through reports of sexual abuse by Scout Leaders operating within the Council's authority.

36.     Defendant BSA's repository of Ineligible Volunteer Files demonstrate that both Defendants were aware, and have been aware for decades, that pedophiles were attracted to Defendant BSA's Scouting program and using the Scouting program to gain access to and accomplish their sexual abuse of children.

37.     Defendant BSA concealed the Perversion Files and the problem of child sexual abuse perpetrated by Scout Leaders from scouts, their parents, and the public.  Defendant BSA concealed its unique knowledge regarding the identities of perpetrators of child sexual abuse, patterns for grooming child victims, the distinctive biographical and behavioral characteristics shared by perpetrators of child sexual abuse, and the characteristics that render certain children particularly prone to sexual abuse.

38.     Defendants' knowledge regarding the danger of sexual abuse of scouts by Scout Leaders included the knowledge of how pedophile Scout Leaders "groomed" child victims to accomplish sexual abuse, including winning the trust of the scout victim, spending time alone with the scout, giving presents to the scout, and making the scout promise to keep a secret.

39.     Defendant BSA maintains the Perversion Files at its principal place of business in Irving, Texas.  Local councils, including Defendant Central MN Council, were instructed and complied with orders by Defendant BSA not to keep Perversion File materials and information at their local offices, but to forward everything to BSA.

8

BSA-PLAN_01096847

SA 1621

40.     Defendant BSA failed to share its Ineligible Volunteer Files with law enforcement and previously had a practice of not reporting child sexual abuse incidents to law enforcement.

41.     Defendant BSA failed to share its Ineligible Volunteer Files with other youth organizations, despite the risk that pedophiles and perpetrators of child sexual abuse that it expelled likely joined other youth organizations as leaders and/or volunteers.

42.     In recent years, thousands of files from the Ineligible Volunteer Files have been released to the public pursuant to court orders in child sexual abuse cases against Defendant BSA or by media organizations.   However, in or around the 1970s, Defendant BSA's executives reviewed and permanently destroyed thousands of records from the Ineligible Volunteer Files. Defendant BSA made no retention log indicating which or how many files were destroyed, and made no contemporaneous record evincing the criteria by which BSA's executives determined which files to destroy and which files to retain.

43.     The collective information released from the surviving Ineligible Volunteer Files establishes that Defendants had knowledge that the Scouting Program was attracting pedophiles as Scout Leaders, that the sexual abuse of children by Scout Leaders was a continuous and systemic problem, and that the Scouting program was uniquely attractive to pedophiles and perpetrators of child sexual abuse due to the following characteristics of Defendant BSA's Scouting program that render scouts particularly susceptible to sexual abuse:

      a.  Defendant BSA failed to effectively monitor local councils and troops to ensure that appropriate safeguards were used in the selection or acceptance, as well as the retention of adult Scout Leaders;

      b.  At the time of Plaintiff's abuse, Defendants conducted no background checks or other identity checks of its Scout Leaders or volunteers, which allowed

Highly Confidential

BSA-PLAN_01096848

**SA 1622**

Leaders to slip back into the Scouting program by falsifying personal information or using an alias;

c.  A pedophile can volunteer for Defendant BSA's Scouting program and have access to only children of a certain age, depending on the pedophile's preferred victim age;

d.  Defendants' Scouting program and activities provide an adult access to children alone and away from their parents in isolated settings;

e.  Defendants' Scouting program and activities provide opportunities to place a pedophile in close proximity to boys when they are particularly vulnerable, including situations where a child must change clothing or attend an overnight trip;

f.  At the time of Plaintiff's abuse, Defendants did not prohibit Scout Leaders from sleeping in tents with scouts overnight;

g.  At the time of Plaintiff's abuse, Defendants did not prohibit adult Scout Leaders from spending time alone with individual scouts;

h.  At the time of Plaintiff's abuse, Defendants did not prohibit adult Scout Leaders from having contact or meeting with scouts outside of authorized Scouting program activities;

i.  Defendant BSA's Scouting program promotes the value of obedience to authority figures and conditions scouts to obey Scout Leaders as trusted authority figures, both of which help enable a pedophile or perpetrator of child sexual abuse to convince his victims to comply with his orders and keep his victims silent;

10

Highly Confidential

BSA-PLAN_01096849

SA 1623

j. Defendant BSA's Scouting program promotes loyalty oaths, ceremonies, and rituals that Defendants knew or should have known could be exploited to enable a perpetrator of child sexual abuse to convince his victims to comply with his orders and keep victims silent; and

k. Defendants' Scouting program and activities provide an opportunity for pedophiles to exploit the trust gained through Defendants' cloak of authority and to groom scouts in order to accomplish sexual abuse inside and outside of the Scouting program;

l. At the time of Plaintiff's abuse, Defendants had a practice of not reporting child sexual abuse of scouts to law enforcement and did not mandate any suspicion of child sexual abuse to be reported to law enforcement;

44.    Despite Defendants' knowledge for decades of the heightened risk of sexual abuse of scouts by Scout Leaders, at no time did Defendants warn scouts, their parents or law enforcement about this known danger or implement reasonable safeguards and child abuse prevention policies.

45.    At the time of Plaintiff's abuse, Defendants failed to have in place sufficient policies and procedures to prevent child sexual abuse, failed to implement reasonable policies and procedures to prevent child sexual abuse, failed to take reasonable measures to make sure that any policies and procedures in place to prevent child sexual abuse were working, failed to investigate risks of child sexual abuse, failed to properly train employees and Scout Leaders to properly identify signs of child sexual abuse by fellow employees and Scout Leaders, and failed to adhere to the applicable standards of care for child safety and child sexual abuse prevention.

11

BSA-PLAN_01096850

SA 1624

46.     Defendants invited the participation of young boys, including Plaintiff, to participate in the Scouting Program and selected or accepted adults to serve as Scout Leaders.

47.     Defendants intentionally concealed the nature and scope of the child sexual abuse in the Scouting program and the danger of such abuse, while representing to the public that their Scouting program and activities were safe and wholesome.

48.     Defendants misrepresented to scouts and their parents that children were reasonably safe in the Scouting program when scouts were at an unreasonably heightened risk of sexual abuse by adult Scout Leaders.

49.     Defendants made false statements and/or representations to the public that the number of pedophiles and incidences of child sexual abuse were comparatively few and that the Scouting program did not attract pedophiles and perpetrators of sexual abuse, both of which Defendants made knowing that the statements and/or representations were false or with reckless disregard for the truth or falsity of those claims.

50.     Defendants' concealed from scouts, scouts' parents, and the public Defendants' knowledge that pedophiles and sexual predators had infiltrated the Scouting program in large numbers for many years, desiring positions around scouts due in part to their sexual interest in children, and had been using the Scouting program to accomplish their sexual abuse of children.

51.     Defendants continue to make false and misleading statements and/or representations regarding the risks of child sexual abuse in the Scouting program and deny the truth about their knowledge of the nature and scope of sexual abuse of scouts by Scout Leaders.

52.     Defendant BSA continues to conceal information about the Ineligible Volunteer Files and the files that have not yet been disclosed to the public. As a result, children remain at risk of sexual abuse in the Scouting program.

Highly Confidential

BSA-PLAN_01096851

SA 1625

53.     Defendants' marketing represents to parents that the Scouting program is safe for children and encourages parents to enroll their children in the Boy Scouts Scouting program. Defendants made such representations to Plaintiff and his parents, and Plaintiff alleges that he and his parents trusted Defendants and reasonably relied upon Defendants' representations.

54.     Through these representations, Defendants secure the trust, confidence, and consent of parents to entrust their children's health and safety to Defendants.

55.     Defendants sought and gained the trust, confidence, and consent of Plaintiff's parents to entrust Plaintiff's health and safety to Defendants and allow Plaintiff to participate in the Scouting program, and engage activities that exposed him to Erickson.

56.     Defendants selected or accepted Erickson as a Scout Leader for Plaintiff's troop and authorized Erickson to perform the duties of a Scout Leader, which included enforcing Defendant BSA's rules governing scouts participation in the Scouting program, as well as the authority and expectation to form close personal relationships with scouts to provide mentoring, counseling, moral guidance, and supervision of boys participating in the Scouting program.

57.     At all times relevant, Erickson was an employee and/or agent of Defendants and under Defendants' control and supervision.  Defendant BSA specifically retained the right to control the means and dictate the policies used by Scout Leaders, including Erickson, to carry out the duties of Scout Leader.

58.     There was a special relationship between Plaintiff and Defendants giving rise to a duty by Defendants to protect Plaintiff from harm, including sexual abuse.  Defendants had a duty to provide a reasonably safe environment for Plaintiff due to establishing, staffing, and operating Plaintiff's troop; encouraging the membership of and accepting Plaintiff into the troop;

13

Highly Confidential

BSA-PLAN_01096852

SA 1626

holding the Scouting program out to be a safe environment for children; and undertaking the custody, supervision and care of the minor Plaintiff.

59.    Erickson's only contact with Plaintiff was through Erickson's leadership and position of authority with Defendants.

60.    Defendants knew that pursuant to his duties as Defendants' Scout Leader, Erickson would be in a position of trust and confidence with the boys in the troop, including Plaintiff.  In his capacity as Defendants' Scout Leader, Erickson sought and gained Plaintiff's trust, confidence, friendship, admiration and obedience.

61.    Defendants held Erickson out to the public, including Plaintiff, as a competent and trustworthy Scout Leader, mentor and authority figure.

62.    As a result of Erickson's authorized position as Scout Leader, Erickson gained the trust and confidence of Plaintiff's family and the permission of Plaintiff's family to allow Plaintiff to spend substantial periods of time alone with Erickson, based upon the trust that was gained through Defendants' representations and the Scouting program.

63.    Erickson also gained Plaintiff's trust through the parents' directive to the minor Plaintiff to respect those with authority within Defendants BSA and Central MN Council, including Erickson.

64.    Trust in those with authority within Defendants BSA and Central MN Council, including Erickson, was promoted, encouraged and reinforced by Defendant BSA's policies which secure each child's oath and commitment to uphold the "Scouts Law," which promotes the obedience of the scout to those in authority, including Scout Leaders. This system is reward-based, incentivizing scouts to earn merit badges and purchase badges and other scouting paraphernalia and merchandise, which results in profit to BSA.

14

BSA-PLAN_01096853

SA 1627

65.     As a result, Plaintiff was conditioned to trust Erickson, obey Erickson's directions, and respect Erickson as an authority figure due to his authorized position as Scout Leader with Defendants.

66.     Erickson supervised Plaintiff during Scouting-related meetings and outings, and exercised authority *in loco parentis* over Plaintiff during Plaintiff's membership in Scouts.

67.     Scouting-related meetings and outings provided Erickson access to Plaintiff alone and away from his parents.  The circumstances of these meetings and outings deprived Plaintiff of ordinary opportunities of self-protection.

68.     Using the authority and trust of his positions with Defendants, and relying upon Defendants' representations to parents that the Boy Scout Scouting Program was safe for boys, Erickson exploited this authority and trust, and induced, directed and coerced Plaintiff into sexual contact with Erickson while Plaintiff was a minor.

69.     Defendants and Defendants' agents negligently permitted Erickson to isolate himself with Plaintiff during Scouting program activities, including on trips and outings to Erickson's home, causing Plaintiff to be injured by sexual abuse.

70.     Defendants and Defendants' agents negligently permitted Erickson to spend substantial periods of time alone with Plaintiff, through the authority and trust Erickson gained from his position as Scout Leader.

71.     Erickson's sexual abuse of Plaintiff was foreseeable to Defendants.

72.     The methods by which Erickson sexually abused Plaintiff were substantially similar to methods known by Defendants to have been used by hundreds, if not thousands, of other Scout Leaders to accomplish sexual abuse of scouts.

15

BSA-PLAN_01096854

SA 1628

73.     As described in detail in the preceding paragraphs, Defendants knew for decades prior to Erickson's sexual abuse of Plaintiff that scouts faced an unreasonably heightened risk of sexual abuse because pedophiles and sexual predators had infiltrated Defendants in large numbers for many years and were using the Scouting program to accomplish their sexual abuse of boys.

74.     As described in detail in the preceding paragraphs, Defendants had knowledge that the Scouting program was attracting pedophiles as Scout Leaders and that the Scouting program was uniquely attractive to pedophiles and perpetrators of child sexual abuse for many of the reasons described above.

75.     Defendants knew or should have known of the danger of sexual abuse of scouts by Scout Leaders before Plaintiff was sexually abused by Erickson.  Despite this knowledge, Defendants ignored the danger and permitted Erickson and other pedophiles in the Scouting program to prey upon children, including Plaintiff, by failing to warn of the danger of sexual abuse by Scout Leaders and failing to implement reasonable safeguards and child abuse prevention policies.

76.     Defendants and Defendants' agents knew or should have known of the specific danger that Erickson presented before Plaintiff was sexually abused.

77.     A criminal complaint was filed against Erickson in 2011.  Several individuals who were interviewed by police stated that Erickson sexually abused them as children during time periods ranging from the 1960s to the early 2000s.  On June 17, 2013, Erickson pled guilty and was convicted of Criminal Sexual Conduct in the Second Degree (victim under age 13) and Criminal Sexual Conduct in the Second Degree, Significant Relationship (multiple acts, victim under age 16).  Erickson is currently incarcerated.

16

Highly Confidential

78.     One victim who provided a statement to the police stated that he met Erickson in or around 1964 in St. Paul, Minnesota, when Erickson was an assistant Boy Scout Leader in the neighborhood, and that Erickson sexually abused him over the course of the next several years.

79.     Erickson, a former fifth grade public school teacher at Onamia Elementary school, was placed on involuntary leave in or around the spring of 1976 for inappropriately disciplining a 10-year-old male student. Several weeks later, the school terminated Erickson's employment.

80.     Despite this knowledge, Defendants ignored the danger presented to children by Erickson and permitted Erickson to become a Scout Leader and sexually abuse Plaintiff.

81.     As a direct and proximate result of Defendants' negligent conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, humiliation, loss of self-esteem, and other psychological injuries. Plaintiff was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life.

82.     Plaintiff has incurred and will continue to incur expenses for medical and psychological treatment, including extensive therapy and counseling.

83.     Plaintiff has incurred and will continue to incur, loss of income and/or loss of earning capacity.

17

BSA-PLAN_01096856

SA 1630

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

84.     By reference hereto, Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

85.     Each Defendant owed Plaintiff a duty to protect Plaintiff based upon a special relationship between Defendants and Plaintiff.

86.     Each Defendant breached the duty to protect Plaintiff.

87.     Each Defendant was aware for decades prior to Erickson's sexual abuse of Plaintiff that scouts faced an unreasonably heightened risk of sexual abuse because of Defendants' knowledge that pedophiles and sexual predators had infiltrated Defendants' Scouting program in large numbers and were using the Scouting program to gain access to and accomplish their sexual abuse of boys.

88.     It was foreseeable to Defendants that scouts were at risk of sexual abuse by Scout Leaders, yet, despite this knowledge, Defendants failed to exercise reasonable care to protect Plaintiff from sexual abuse.  Defendants further failed to prevent the foreseeable misconduct of Erickson from causing harm to scouts, including Plaintiff.

89.     Each Defendant's breach of its duty was the proximate cause of Plaintiff's injuries.

90.     As a direct and proximate result of each Defendant's negligent conduct, Plaintiff has suffered and will continue to suffer the injuries and damages described in this Complaint in an amount in excess of $50,000.

18

## COUNT II

### NEGLIGENT SUPERVISION

91.    By reference hereto, Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

92.    Each Defendant owed Plaintiff a duty to protect Plaintiff based upon a special relationship between the Defendants and Plaintiff.

93.    At all times relevant to this Complaint, Erickson was employed by and/or an agent of Defendants. Erickson was therefore under Defendants' direct supervision, employ and control when he committed the sexual abuse alleged herein.

94.    Erickson sexually abused Plaintiff while acting within the scope of his employment and/or agency with each Defendant, and accomplished the sexual abuse by his employment and/or agency created authority. Erickson's only contact with Plaintiff was through Erickson's leadership and position of authority with Defendants. All of the sexually abusive acts committed by Erickson against Plaintiff were committed using the authority and trust of his position of employment and/or agency with Defendants.

95.    Defendants, by and through their agents, servants, and employees, failed to exercise ordinary care in supervising Erickson in his role as Scout Leader, and Defendants further failed to prevent the foreseeable misconduct of Erickson from causing harm to Plaintiff, when Defendants knew or should have known that Erickson posed a threat of sexual abuse to children and was unfit to serve as a Scout Leader.

96.    As a direct and proximate result of each Defendant's negligent conduct, Plaintiff has suffered and will continue to suffer the injuries and damages described in this Complaint in an amount in excess of $50,000.

Highly Confidential

BSA-PLAN_01096858

SA 1632

## COUNT III

### NEGLIGENT RETENTION

97.     By reference hereto, Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

98.     Each Defendant owed Plaintiff a duty to protect Plaintiff based upon a special relationship between the Defendants and Plaintiff.

99.     Defendants, by and through their agents, servants, and employees, became aware, or should have become aware, of problems indicating that Erickson was an unfit employee and/or agent with dangerous and sexually exploitive and abusive propensities, yet Defendants failed to take action to remedy the problem, failed to investigate, and failed to remove Erickson from working with young boys in the Scouting program.

100.    Despite this information, Defendants negligently retained Erickson and Erickson was able to sexually abuse the minor Plaintiff.

101.    As a direct and proximate result of each Defendant's negligent conduct, Plaintiff has suffered and will continue to suffer the injuries and damages described in this Complaint in an amount in excess of $50,000.

## COUNT IV

### FRAUD

102.    By reference hereto, Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

103.    At all times relevant to this Complaint, Defendants invited the participation of young boys, including Plaintiff, in the Scouting program that they administered and controlled,

20

BSA-PLAN_01096859

SA 1633

represented that the Scouting program was safe and wholesome for children, and encouraged parents to enroll their children in the Scouting program.

104.    This invitation created a special, fiduciary relationship, wherein Plaintiff and his parents relied upon Defendants' representations that the Scouting program was safe for children and relied on Defendants to select or accept safe and trustworthy adults as Scout Leaders.

105.    As explained above, Defendants knew for decades prior to Erickson's sexual abuse of Plaintiff that scouts faced an unreasonably heightened risk of sexual abuse because of Defendants' knowledge that pedophiles had infiltrated Defendants in large numbers for many years and had been discovered to be using the Scouting program to gain access to and accomplish their sexual abuse of boys.  Defendants had knowledge that the Scouting program was attracting pedophiles as Scout Leaders and that the Scouting program was uniquely attractive to pedophiles and perpetrators of child sexual abuse for many of the reasons described above.

106.    Defendants had a duty to disclose known threats to the health and safety of the minors involved in their Scouting program due to holding the Scouting program out to be a safe environment for children and undertaking the custody, supervision and care of the minors.

107.    Defendants' invitation to Plaintiff to participate in their Scouting program upon payment of a fee required Defendants to disclose all matters material to the transaction. Defendants' knowledge regarding the unreasonably heightened risk of sexual abuse of scouts due to the numerous incidences of sexual abuse of scouts by Scout Leaders would have been material to Plaintiff's and his parent's decision to enter into the transaction with Defendants.

108.    In the alternative, Defendants actively concealed their knowledge of the nature and scope of sexual abuse of scouts by Defendants' Scout Leaders.

Highly Confidential

BSA-PLAN_01096860

**SA 1634**

109.    Defendants' knowledge that by participating in Scouts, Plaintiff would be subjected to an unreasonably heightened risk of sexual abuse, due to Defendants' knowledge that pedophile Scout Leaders had been using the Scouting program to gain access to and accomplish their sexual abuse of boys in large numbers for many years, constituted a material fact. Plaintiff and his parents would not have entered into a relationship with Defendants, Erickson, or any other of Defendants' agents had they been aware of this fact.

110.    Defendants failed to disclose, fraudulently misrepresented, and/or actively concealed the dangers of sexual abuse of scouts by Scout Leaders.

111.    Defendants knew that their representations about the safety of scouts in the Scouting program and about the risk of sexual abuse by Scout Leaders involved false representations or Defendants made these representations with reckless disregard for the truth. Defendants made these fraudulent representations with the intent of inducing Plaintiff and his parents, as well as other children, their parents and/or guardians, to rely on Defendants' fraudulent representations and thereby continue to trust and entrust their children with Defendants.

112.    Defendants acquired a substantial economic benefit from the reliance of children, their parents and/or guardians, upon Defendants' fraudulent representations about the safety of scouts in the Scouting program and about the risk of sexual abuse by Scout Leaders.

113.    Plaintiff and his parents reasonably relied on the fraudulent representations by Defendants and reasonably believed that Scouting was safe and did not pose a known danger of sexual abuse to Scouts. Plaintiff's and his parents' reliance on Defendants' fraudulent representations about the safety of scouts in the Scouting program and about the risk of sexual

22

Highly Confidential

BSA-PLAN_01096861

SA 1635

abuse by Scout Leaders resulted in Plaintiff engaging in a relationship of trust with Defendants and their agents, including Erickson.

114.    The reliance of Plaintiff and his parents on Defendants' fraudulent representations was reasonable and justified because they did not know, nor could they reasonably have known, that Defendants were aware of a substantial danger of sexual abuse to scouts by Scout Leaders, based Defendants' knowledge of pedophiles infiltrating Defendants' Scouting program in large numbers and using the Scouting program to gain access to and accomplish their sexual abuse of boys.  Plaintiff and his parents reasonably relied on Defendants' fraudulent representations that the Scouting program was safe for children.

115.    Plaintiff and his parents acted to their detriment in allowing Plaintiff to participate in Scouting based on this reliance.

116.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered and will continue to suffer the injuries and damages described in this Complaint in an amount in excess of $50,000.

23

BSA-PLAN_01096862

SA 1636

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe prays for judgment against Defendants individually, jointly, and severally, as follows:

A. For an order adjudging the practices of Defendants complained of herein to be in violation of the rights guaranteed to Plaintiff under state common law;

B. For compensatory damages, including but not limited to, damages arising from significant pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, humiliation, loss of self-esteem, psychological injuries, expenses for medical and psychological treatment, therapy and counseling, loss of income and/or loss of earning capacity, and other damages in an amount in excess of $50,000;

C. For an award to Plaintiff of his attorney's fees, disbursements, and the costs of this action;

D. For leave to amend to add a claim for an award of punitive damages;

E. For such other and further relief available by statute;

F. For a jury trial on all issues, and;

G. For such further and other relief as the Court deems just and equitable.

Dated: 4/11/16

NICHOLS KASTER, PLLP

*Michelle L. Kornblit*

Steven Andrew Smith #260836
Michelle L. Kornblit #0397778
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Tel: (612) 256-3200
Fax: (612) 338-4878
smith@nka.com
mkornblit@nka.com

ATTORNEYS FOR PLAINTIFF

BSA-PLAN_01096863

SA 1637

## ACKNOWLEDGMENT REQUIRED BY
## MINN. STAT. § 549.211

I hereby acknowledge that, pursuant to Minn. Stat. § 549.211, costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find I acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings, or to harass, or committed a fraud upon, the Court.

_Michelle L. Kornblit_
Michelle L. Kornblit

25

BSA-PLAN_01096864

**SA 1638**

1  Robert T. Kugler (MN #0194116)
   Edwin H. Caldie (MN #0388930)
2  STINSON LLP
   50 S 6th Street, Suite 2600
3  Minneapolis, MN 55402
   Tel: (612) 335- 1500
4  Robert.Kugler@stinson.com
   Ed.Caldie@stinson.com
5  *Counsel for the Official Committee of Unsecured Creditors*
6

7              IN THE DISTRICT COURT OF GUAM
                   TERRITORY OF GUAM
8                   BANKRUPTCY DIVISION

9  In re:                          | Chapter 11 Bankruptcy
10 ARCHBISHOP OF AGAÑA,            | Case No. 19-00010
11 a Corporation Sole,             | **MOTION OF THE OFFICIAL**
12                                 | **COMMITTEE OF UNSECURED**
                Debtor.            | **CREDITORS FOR DERIVATIVE**
13                                 | **STANDING TO ENFORCE THE**
                                   | **AUTOMATIC STAY AND TAKE OTHER**
14                                 | **ACTIONS**
15                                 | **Hearing Date: August 20, 2021 At 9:30 AM**

16        The Official Committee of Unsecured Creditors (the "Committee") moves the Court for an

17 order granting the Committee derivative standing to enforce the automatic stay related to the

18 Debtor's rights under certain insurance policies. The motion is based on the Declaration of Robert

19 T. Kugler and the accompanying memorandum of law, along with the records, files, and

20 proceedings in this case.

21

22 RESPECTFULLY SUBMITTED this 21st day of July 2021.

23

24                          STINSON LLP

25                          /s/   *Edwin H. Caldie*

26

27

28

Motion for Derivative Standing-1

CORE/9990000.2173/168277464.1

**SA 1639**

1    Robert T. Kugler (MN #0194116)
     Edwin H. Caldie (MN #0388930)
2    STINSON LLP
     50 S 6th Street, Suite 2600
3    Minneapolis, MN 55402
     Tel: (612) 335- 1500
4    Robert.Kugler@stinson.com
     Ed.Caldie@stinson.com
5

6    *Counsel for the Official Committee of Unsecured Creditors*

7              IN THE DISTRICT COURT OF GUAM
                 TERRITORY OF GUAM
8                BANKRUPTCY DIVISION

| | |
|---|---|
| In re: | Chapter 11 Bankruptcy |
| ARCHBISHOP OF AGAÑA, | Case No. 19-00010 |
| a Corporation Sole, | **MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR DERIVATIVE STANDING TO ENFORCE THE AUTOMATIC STAY AND TAKE OTHER ACTIONS** |
| Debtor. | |
| | **Hearing Date: August 20, 2021 At 9:30 AM** |

The Official Committee of Unsecured Creditors (the "Committee") by and through its undersigned counsel, submits this memorandum of law in support of its motion for an order granting the Committee derivative standing to enforce the automatic stay related to the Debtor's rights and interests under certain insurance policies (the "Motion").

## **INTRODUCTION**

The Committee requests standing to enforce the automatic stay to protect certain insurance interests held by the Archdiocese. The Archdiocese is an insured party under multiple insurance contracts issued to the Boy Scouts of America (the "BSA Insurance Policies"). The Archdiocese's contract rights in BSA Insurance Policies are likely worth millions of dollars to this estate and its creditors. Currently, parties in the Boy Scouts of America ("BSA") bankruptcy case are pursuing

Motion for Derivative Standing-1
CORE/9990000.2173/168277464.1

SA 1640

settlements that could materially impair or even nullify entirely the Archdiocese's rights and interests under BSA Insurance Policies.

Although the Archdiocese filed a claim in the BSA bankruptcy, the Archdiocese has otherwise ignored these valuable rights. The Archdiocese did not identify its rights under BSA Insurance Policies in its schedules and has not taken clear action to protect its rights under such policies in the BSA bankruptcy case despite the Committee's requests that it do so. As a result, the Committee now seeks standing to secure clarity on two points through an affirmative order of this Court. Specifically, by this Motion, the Committee asks for leave to seek an order (i) identifying the Archdiocese's interest in BSA insurance policies as an asset of the Archdiocese's estate, and (ii) stating explicitly that the automatic stay applies to such estate interests.

The following is a summary of the policies that likely comprise the BSA Insurance Policies:

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| 1/1/1962-1/1/1963 | INA | CGL191986 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1963-1/1/1964 | INA | CGL204680 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1964-1/1/1965 | INA | CGL212922 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1965-1/1/1966 | INA | CGL 232470 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1966-1/1/1967 | INA | CGL 248896 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1967-1/1/1968 | INA | CLP 11200 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1968-1/1/1969 | INA | GLP 151211 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1969-1/1/1970 | INA | GLP 160981 | $500,000 each person; $1,000,000 each occurrence |
| 3/2/1969-1/1/1970 | INA | XBC 43198 | $2,000,000 per occurrence |
| 1/1/1970-1/1/1971 | INA | BLB 51323 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1970-1/1/1971 | INA | XBC 77302 | $2,000,000 per occurrence |

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| 1/1/1971-1/1/1972 | INA | XBC 85370 | $2,000,000 per occurrence |
| 9/21/1971-1/1/1972 | Hartford | 10CA43315 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10CA43303 | $500,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10HUA43302 | - |
| - | Hartford | 10CA43329 | $500,000 each occurrence; $500,000 agg. |
| 1/1/1974-1/1/1975 | Hartford | 10HUA43335 | $2,000,000 per occurrence |
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | National Union | BE1151559 & BE1151554 | $10,000,000 each occurrence |
| 9/17/1976-9/17/1977 | Lloyds' & Companies | 76-10-08-02 | $5,000,000 each occurrence |
| 1/1/1977-1/1/1978 | Hartford | 10CA43359 E | $1,000,000 each occurrence |
| 1/1/1977-1/1/1978 | National Union | BE121P255 & BE1151590 * | $10,000,000 each occurrence |
| 1/1/1977-1/1/1978 | Am RE | M-1027493 | $500,000 each occurrence |
| 1/1/1978-1/1/1979 | INA | GLP706452 | $500,000 per occurrence |
| 1/1/1978-1/1/1979 | National Union | CE1157777 | $500,000 per occurrence |
| 1/1/1978-1/1/1979 | First State | 908854 | $10,000,000 per occurrence |
| 1/1/1979-1/1/1980 | INA | GLP706452 | $500,000 per occurrence |
| 1/1/1979-1/1/1980 | INA | XBC 151748 | $5,000,000 per occurrence |
| 1/1/1979-1/1/1980 | First State | 927616 | $5,000,000 per occurrence |
| 1/1/1980-1/1/1981 | INA | GLP706452 | $5,000,000 each occurrence |
| 1/1/1980-1/1/1981 | Allianz | UMB 599346 | $5,000,000 per occurrence |
| 1/1/1980-1/1/1981 | Aetna | 01XN2438WCA | $10,000,000 per occurrence; $10,000,000 Aggregate |
| 1/1/1981-1/1/1982 | INA | ISC1353 | $500,000 per occurrence |
| 1/1/1981-4/1/1982 | Transit | UMB 964076 | $5,000,000 per occurrence |

Motion for Derivative Standing-3

CORE/9990000.2173/168277464.1

SA 1642

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| **1/1/1981-1/1/1983** | First State and Underwriters | 931255 & 931255A | $10,000,000 per occurrence |
| **1/1/1981-1/1/1983** | First State and Underwriters | 931257 & 931257A | $10,000,000 per occurrence |

The Committee estimates that over seventy (70) still-pending claims filed against the Archdiocese in this chapter 11 case implicate the BSA Insurance Policies. The contractual obligations of the BSA Insurers to the Archdiocese could thus represent a multi-million-dollar recovery for the Archdiocese's estate.

These rights held by the Archdiocese are currently at risk, however. Certain BSA Insurers, in coordination with the BSA, are proposing to sell BSA Insurance Policies back to their issuing insurance companies as part of the BSA's chapter 11 process. If this happens, it would extinguish the Archdiocese's rights under BSA Insurance Policies and prevent any recovery from the BSA's insurers for the Archdiocese or creditors in this case. In other words, if settlements currently contemplated in the BSA bankruptcy case are approved, a significant asset of **this** bankruptcy estate will likely be gone forever, and this estate (and its creditors) will receive little or nothing in exchange.

The Committee has asked the Archdiocese to take action to protect its insurance assets relating to BSA's insurers, but the Archdiocese has refused. The Committee has also asked to see the Archdiocese's analysis demonstrating that such protective action is either not needed or not justified. The Committee's request to see that analysis has gone unanswered and the Archdiocese's oral explanations for its failure to take action have been uncompelling. For this reason, the Committee feels an obligation to take action on its own and, by this Motion, the Committee seeks authority to do so.

CORE/9990000.2173/168277464.1

SA 1643

1

## BACKGROUND

2

Survivors of sexual abuse have filed approximately seventy (70) pending claims in the

3

Archdiocese's bankruptcy case that also implicate the BSA ("BSA Claims").[1] These BSA Claims

4

create liability for both the Archdiocese's insurers and the BSA's insurers. This is so because the

5

Archdiocese is covered by insurance policies issued to the BSA as a sponsor or chartering

6

organization of the BSA on the Island of Guam.[2]

7

8

In 2017, the Archdiocese began submitting Survivor claims to its direct insurers and also

9

to the BSA Insurers.[3] Among the insurers' responding to the Archdiocese's claim tenders, Hartford

10

Accident and Indemnity Company First State Insurance Company, Twin City Fire Insurance

11

Company, and Navigators Specialty Insurance Company (collectively, "Hartford"), acknowledged

12

its obligation to defend the Archdiocese with respect to First State Insurance Company Policy No.

13

927616 (effective 1/1/1979-1/1/1980).[4] Hartford acknowledged that the Named Insured

14

Endorsement in that policy included as Insureds:

15

16
>
> It is agreed that the Named Insured is as follows:
> Boy Scouts of America

17
> National, Regional and All Local Councils

18
> All Scout Officials, Professional and Non-Professional Employees, Sponsors & Charter Organizations, Donors & Volunteer Workers (whether registered or not)

19
> solely with respect to scouting activities and as excess over other valid and collectible insurance, Certificate Holders by specific request, any Leasing Dealer

20
> as respects Automobiles leased by Boy Scouts of America.[5]

21

22

23

-------

24

[1] *See* BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC et al., (Bankr. D. Del. 20-10343), Claim No. 6436 at 8-11 (summarizing claims relevant to the BSA and the BSA Insurance Policies).

25

26
[2] *See, e.g.*, Declaration of Robert T. Kugler ("Kugler Dec.") Ex. C at 2.

[3] E.g., i*d.*

27
[4] Kugler Dec. Ex. D at 2.

28
[5] *Id.*

SA 1644

The Archdiocese has consistently taken the position that it is an insured under that and similar provisions in numerous other BSA Insurance Policies. Further, the Committee has been notified that another of BSA's Insurers (Insurance Company of North America, or "INA") has acknowledged a defense obligation for the Archdiocese for at least some of the claims implicating its coverage period.[6] The 1981 – 1982 INA Primary Policy, for example, states, under the header "PERSONS OR ENTITIES INSURED," that "[t]he unqualified word "Insured" includes: (a) The Named Insured, named in the Declarations of this policy; (b) Scout Officials and employees whether or not registered with the Boy Scouts of America; units and their sponsors (charter organizations), and all volunteers workers . . ."

On February 18, 2020, the BSA filed for relief under chapter 11 of title 11 of the United State Code in the Bankruptcy Court for the District of Delaware (the "BSA Bankruptcy").[7] On November 13, 2020, the Archdiocese filed a proof of claim in the BSA Bankruptcy asserting (i) claims for contribution as to any BSA claims for which the Archdiocese contributes payment in this chapter 11 case, and (ii) claims for coverage as an insured under the BSA Insurance Policies.[8]

On April 16, 2021, the BSA and Hartford filed notice of a Settlement Agreement and Release in the BSA Bankruptcy (the "Hartford Settlement").[9] As part of the Hartford Settlement, the BSA agreed to sell-back to Hartford all insurance policies issued by Hartford to the BSA (the "Hartford Policies").[10] In addition, the Hartford Settlement requires that Hartford be provided with

---

[6] *See, e.g.*, Kugler Dec. ¶ 10.

[7] The BSA cases are jointly administered under case 20-10343 (Bankr. D. Del.).

[8] BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC et al., (Bankr. D. Del. 20-10343), Claim No. 6436.

[9] BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC et al., (Bankr. D. Del. 20-10343), ECF No. 2624.

[10] Specifically, the Hartford Policies are described in the Hartford Settlement as:

the protection of any releases and channeling injunctions provided under the BSA's plan of

reorganization.[11] Both the policy buy-back and the proposed plan releases allow Hartford to escape

its obligations to the Archdiocese as an Insured under the Hartford Policies. The arrangement

channels the Archdiocese's rights under the Hartford Policies to a trust and limits the Archdiocese

recovery to an unspecified allocation[12] of the trust's corpus.

On June 8, 2021, the Committee requested that the Archdiocese provide a written analysis

and response to the Hartford Settlement and the BSA's plan to reorganize.[13] Counsel for the

Archdiocese refused to provide a written response, but instead, on June 8, 2021, scheduled a phone

conference with counsel to the Committee to discuss the Archdiocese's justifications for inaction.[14]

On the call held on June 11, 2021 12:00 PM (Central), the Archdiocese's counsel stated that the

Debtor would be taking no action in the BSA case to preserve the estate's rights under the BSA

---

(i) any and all liability insurance policies, known and unknown, issued or allegedly issued by Hartford to the BSA as the first named insured, including each of the insurance policies identified on Exhibit 1, and (ii) the BSA's Interests in any and all liability insurance policies, known and unknown, issued or allegedly issued by Hartford to any other Person that afford the BSA coverage with respect to Abuse Claims; provided, however, that "Hartford Policies" shall not include (i) any portion of workers' compensation policies with respect to Claims not discharged by the Plan and unrelated to Abuse Claims or (ii) any portion of automobile liability policies with respect to Claims not discharged by the Plan and unrelated to Abuse Claim.

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC et al., (Bankr. D. Del. 20-10343), ECF No. 2624 at 8.

[11] *Id.* at 17.

[12] *See, e.g.,* Objection Of The Tort Claimants' Committee To Debtors' Motion For Entry Of An Order (i Approving The Disclosure Statement And The Form And Manner Of Notice, (ii) Approving Plan Solicitation And Voting Procedures, (iii) Approving Forms Of Ballots, (iv) Approving Form, Manner And Scope Of Confirmation Notices, (v) Establishing Certain Deadlines In Connection With Approval Of The Disclosure Statement And Confirmation Of The Plan, And (vi) Granting Related Relief, Boy Scouts Of America And Delaware BSA, LLC et al., (Bankr. D. Del. 20-10343), ECF No. 3526 at 25-26 (describing inadequacy of disclosure with regard to the Hartford Settlement including the amount and allocation of proceeds).

[13] Declaration of Robert T. Kugler ("Kugler Dec.") at Ex. A.

[14] Declaration of Robert T. Kugler ("Kugler Dec.") at Ex. B.

1  Insurance Policies.[15] The Archdiocese stated that it was satisfied with the releases it would receive

2  under the BSA's plan and settlement proposals and found it a fair trade in return for foregoing its

3  rights under the Hartford Policies.[16] The Archdiocese also noted it would not seek to enforce the

4  automatic stay in this chapter 11 case to protect the Archdiocese's rights as an Insured because it

5  believed the cost of these actions outweighed their benefit to the estate.[17] The Committee cannot

6  sit idly by as the Archdiocese's rights under insurance policies that could yield millions of dollars

7  in recoveries are eliminated, in exchange for releases that do not provide any benefit to the

8  Archdiocese's creditors. The Committee thus respectfully asks the Court to grant the relief sought

9  by this Motion.

10

11  ## REQUEST FOR RELIEF

12       The Committee requests standing and authority to act on behalf of the Archdiocese and its

13  bankruptcy estate to enforce the automatic stay and protect the Archdiocese's rights under the BSA

14  Insurance Policies. At this stage, the Committee believes that it will be sufficient to seek an order

15  from this Court (i) identifying the Archdiocese's interest in BSA Insurance Policies as an asset of

16  the Archdiocese's bankruptcy estate, and (ii) stating affirmatively that the automatic stay applies

17  to such estate assets. To be clear, the Committee does not intend to seek authority to pursue an

18  adversary action to determine coverage under the BSA Insurance Policies or liability of the BSA

19  Insurers for Survivor claims at this time. The Committee merely wishes to preserve the status quo

20  until a confirmable plan is proposed in this case, which plan will address and resolve the

21  Archdiocese's rights under the BSA Insurance Policies.

22

23  ## ARGUMENT

24

25

26  _____

27  [15] *Id.* ¶ 5.

28  [16] *Id.* ¶ 6.

[17] *Id.* ¶ 7.

CORE/9990000.2173/168277464.1

SA 1647

1    "A creditor dissatisfied with the lack of action on the part of the debtor-in-possession may

2    petition the court to compel the debtor-in-possession to act or gain court permission to institute the

3    action itself."[18]

4        Courts consider four factors when deciding to grant a creditor's request to pursue a claim

5    on behalf of the debtor's estate:

6

7        1. Whether a demand has been made upon the statutorily-authorized party to take
            action;

8        2. Whether the demand is declined;

9

10       3. Whether a colorable claim that would benefit the estate if successful exists,
            based on a cost-benefit analysis performed by the court; and

11       4. Whether the inaction is justified in light of the debtor-in-possession's duties in
            a chapter 11 case.[19]

12

13       Central to the Court's inquiry is whether the Committee's request "would forward the

14   reorganization effort, or to the contrary, might be a detriment."[20] The Committee's proposed

15   actions carry a minimal cost, but have the potential to return millions to the estate. For the reasons

16   that follow, the Court should grant the Committee authority to protect the Archdiocese's rights

17   under the BSA Insurance Policies.

18

19

---

20   [18] *In re Spaulding Composites Co., Inc.*, 207 B.R. 899, 903 (B.A.P. 9th Cir. 1997); *see also  In re*

21   *Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986)("[I]f an aggrieved creditor
     believes that the debtor-in-possession has failed to fulfill its duty to prosecute actions, then the

22   creditor must bring this to the attention of the court by an appropriate motion. This promotes the
     fair and orderly administration of the bankruptcy estate by providing judicial supervision over the

23   litigation to be undertaken.").

24   [19] *In re Roman Cath. Bishop of Great Falls, Montana*, 584 B.R. 335, 338–39 (Bankr. D. Mont.
     2018) (citing *In re Yellowstone Mountain Club, LLC*, 2009 WL 982207 *6 (Bankr. D.Mont.

25   2009)); *see also Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988)
     ("While the circumstances under which a creditors' committee may sue are not explicitly spelled

26   out in the Code, the bankruptcy courts have generally required that the claim be colorable, that the
     debtor-in-possession have refused unjustifiably to pursue the claim, and that the committee first

27   receive leave to sue from the bankruptcy court.").

28   [20] *In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986).

Motion for Derivative Standing-9

CORE/9990000.2173/168277464.1

SA 1648

**I. The Committee Demanded the Archdiocese Enforce the Automatic Stay and the Archdiocese Refused.**

The first two factors are clearly satisfied. The Committee requested, in writing on June 8, 2021, that the Archdiocese take action (or explain its inaction) to protect its interest in the BSA Bankruptcy. During the June 10, 2021 meeting of counsel, the Archdiocese's attorneys made clear, by both their refusal to provide a written response and their affirmative verbal statements, that the Archdiocese would not seek to enforce the stay to protect the estate's interest in the BSA Insurance Policies.[21]

**II. The Committee Requests Authority to Pursue Plausible Claims.**

The Committee satisfies the third factor because the proposed actions to define and enforce the automatic stay are "colorable" and will provide value to the estate. A creditor's proposed action is "colorable" if it would survive a motion to dismiss.[22]  Establishing a colorable claim is a low standard that is easily met.[23] To meet this standard, the Committee need only show that, with the alleged facts taken as true, it would have a plausible claim or cause of action.[24]

---

[21] Kugler Dec. ¶¶ 3-7.

[22] *In re Roman Cath. Bishop of Great Falls, Montana*, 584 B.R. 335, 339 (Bankr. D. Mont. 2018) ("[T]he Diocese does not dispute that the Committee's claims challenging the affiliates' interests are indeed colorable, *i.e.*, that they could surely survive a motion to dismiss.").

[23] *See, e.g., Adelphia Comm'ncs Corp. v. Bank of America NA (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (holding that the requisite standard for presenting a "colorable" claim is not a difficult one to meet); *Official Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that only if the claim is "facially defective" should standing be denied).

[24] *E.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (citations omitted).

a) *The Committee has a Colorable Claim that the BSA Insurance Policies Are Property of the Bankruptcy Estate.*

The automatic stay prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[25] It is well-settled law that policies insuring debtor entities constitute property of such debtors' bankruptcy estates.[26] It is also well-settled that an insured may enforce policy provisions made for its benefit.[27]

If this Motion is granted, the Committee will seek orders from the Court confirming that the Archdiocese's rights as an insured under the BSA Insurance Policies are indeed property of **this** estate and protected by the automatic stay. [28] The Committee has stated a colorable basis to pursue such an order. Specifically, the Committee has presented facts demonstrating (i) the existence of BSA Insurance Policies; and (ii) the fact that the Archdiocese is an insured under the BSA Insurance Policies.

The Archdiocese has a distinct and independent legal interest in the BSA Insurance Policies, and the Archdiocese's interest is property of the Archdiocese's bankruptcy estate.[29] Moreover, it is the Committee's understanding that many of the BSA Insurance Policies have no

---

[25] 11 U.S.C. § 362(a)(3).

[26] *In re Spaulding Composites Co., Inc.*, 207 B.R. 899, 906 (B.A.P. 9th Cir. 1997).

[27] *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group*, 76 Cal. App. 3d 1031 (4th Dist. 1978); *see also New Hampshire Ins. Co. v. United States*, 92 F.3d 1193, 1996 WL 436509 at *4 (9th Cir. 1996)(unpublished)("[T]he United States is entitled as an additional insured to enforce the terms of the policy against the insurer as a third party beneficiary even though it was not an actual party to the insurance contract.").

[28] *In re Petters Co., Inc.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009) (recognizing that "any individual insured has a contractually-distinct status that runs directly between itself and the insurer," so that "the right to receive payment on a covered claim [is] the property of that insured itself"); *see also In re Circle K Corp.*, 121 B.R. 257, 261 (Bankr. D. Ariz. 1990)("[A]ctions 'related to' the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as [an] additional [insured] under the policy are to be stayed under section 362(a)(3).").

[29] *In re Petters Co., Inc.*, 419 B.R. at 376.

CORE/9990000.2173/168277464.1

SA 1650

aggregate policy limits and afford significant coverage per occurrence for both BSA and the Archdiocese.

Assuming for purposes of this Motion that all the facts alleged in support of this Motion are true, the Committee has established a colorable claim that the BSA Insurance Policies are property of the estate, and the Court should permit the Committee to pursue actions to confirm the estate's interests.

b) *The Committee has a Colorable Claim that the Hartford Settlement Disposes of Property of the Estate.*

The automatic stay prohibits acts to obtain possession of property interests of the debtor.[30] Courts consistently hold that an attempt by a coinsured to settle or payout proceeds on insurance rights belonging to the estate is a violation of the automatic stay:

> Property of the estate is defined in § 541 as "all legal or equitable interests of the debtor in property (wherever located) as of the commencement of the case." It includes intangible or contingent interests of the debtor as well as intangible property itself. If these insurance proceeds are property of the bankruptcy estates, the litigation and arbitration proceedings, to the extent they seek monetary judgments or reach monetary settlements payable from the proceeds, would be acts to obtain property of the estate.[31]

While this is an unusual case in which the anticipated actions of one bankruptcy debtor (BSA) will impact the estate of another bankruptcy debtor (the Archdiocese), there exists no bankruptcy-to-bankruptcy exception for violations of the automatic stay.[32] Accordingly, the Hartford and other BSA insurers cannot buyback the BSA Insurance Policies or secure a release of its obligations to

---

[30] 11 U.S.C. § 362(a)(3)(2020).

[31] *In re Metro. Mortg. & Sec. Co., Inc.*, 325 B.R. 851, 855 (Bankr. E.D. Wash. 2005).

[32] *Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc.* (*In re Palmdale Hills Prop., LLC*), 654 F.3d 868, 875-6 (9th Cir. 2011) (actions taken by one debtor in its bankruptcy case that affect the rights of another debtor in its bankruptcy case violate the automatic stay in the latter debtor's bankruptcy case).

the Archdiocese without first obtaining leave from *this* Court.[33] The Committee has stated a colorable claim that such settlements would violate the automatic stay and the Court should grant the Committee authority to protect the estate.

    *c)  The Committee has a Reasonable Basis to Believe that the BSA Bankruptcy Case Will Continue to Threaten Property of the Archdiocese's Estate.*

    The BSA has already entered into one settlement, and it is likely to enter into additional settlements and proposals, that divest the Archdiocese of its interests under BSA Insurance Policies as part of the BSA Bankruptcy.[34] Further, the BSA Insurers apparently do not intend to seek leave of this Court before doing so. It is therefore necessary to make clear through an affirmative court order that the Archdiocese's interests in the BSA Insurance Policies constitute property of the Archdiocese's bankruptcy estate and that such interests are thus subject to the automatic stay.

**III.    The Archdiocese's Inaction Is Unreasonable under the Circumstances.**

    The fourth factor requires that the Court analyze the Debtor's refusal to act by weighing the costs of the proposed actions against the benefit to the estate. Analyzing a debtor's refusal to take action with respect to estate assets "focuses on whether a clear benefit to the estate can be identified or whether only insignificant benefits would be realized."[35] A court should not, however, conduct a mini-trial to evaluate a request for derivative standing, but instead weigh the potential

---

[33] *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 979 (Bankr. N.D. Ill. 1991), *aff'd,* 149 B.R. 860 (N.D. Ill. 1992) (denying injunction in favor of insurer that would abridge the rights of non-debtor additional insured to seek coverage from the insurer) ("Additional insureds possess the same rights as the named insureds under an [sic] insurance policies.").

[34] BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC et al., (Bankr. D. Del. 20-10343), Fourth Amended Chapter 11 Plan of Reorganization, Doc 5484 at 101-107 (providing insurance related injunctions).

[35] *In re Foster*, 516 B.R. 537, 542–43 (B.A.P. 8th Cir. 2014), *aff'd,* 602 Fed. Appx. 356 (8th Cir. 2015).

1   costs against the plausible benefits of the action.[36] To justify its requests and overcome the

2   Archdiocese's protests, the Committee must only show that its proposed actions represent a

3   sensible expenditure of the estate's resources.[37] Here, the Committee seeks only to establish, by

4   affirmative Order of this Court, that the Debtor's rights as an Insured under BSA Insurance

5   Contracts are property of this bankruptcy estate and thus subject to the automatic stay imposed by

6   11 U.S.C. § 362.

7

8       A debtor-in-possession owes fiduciary duties to its creditors and must act with diligence to

9   preserve the assets of the bankruptcy estate.[38] The Archdiocese has provided no formal written

10  statement to the Committee to justify its inaction. The statements from Archdiocese's counsel on

11  the issues are not grounded in the applicable facts and relevant law. At the outset of this

12  bankruptcy, the Archdiocese supported the pursuit of its rights under the BSA Insurance Policies,

13  as demonstrated by the Archdiocese's decision to submit claims to the BSA Insurers and as detailed

14  in the coverage correspondence between the Archdiocese's counsel and the BSA Insurers attached

15  to this Motion. The Archdiocese now asserts that actions to protect the Archdiocese's insured

16  interest would cost the estate millions and would be unlikely to produce any different result. To

17  the best of the Committee's understanding, no factual event or substantive change in the Debtor's

18  analysis of the assets at issue has occurred since the outset of the case that accounts for the Debtor's

19  change in position.

20

21      Further, the Committee does not seek authority to obtain coverage declarations or to

22  liquidate claims into judgments. At this time, the Committee seeks authority only to obtain an

23

24  _____

25  [36] *See, e.g., In re Adelphia Comm'ns. Corp.*, 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005).

    [37] *Id.*

26  [38] *In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors

27  bear essentially the same *fiduciary* obligation to creditors and shareholders as would a trustee for
    a debtor out of possession . . . ."). *See generally Commodity Futures Trading Comm'n v. Weintraub*,

28  471 U.S. 343, 355 (1985)("The fiduciary duty of the trustee runs to shareholders as well as to
    creditors.").

Motion for Derivative Standing-14

CORE/9990000.2173/168277464.1

SA 1653

1 order stating that the insurance assets at issue repose in the Debtor's bankruptcy estate and that, as

2 a result, the automatic stay applies to such assets. Stated another way, the Committee seeks only

3 to preserve the status quo, so that any potential coverage litigation or pursuit of insurance proceeds

4 remain available to the estate later in the case.

5       Based on detailed elements of the Debtor's insurance analysis shared with Committee

6 counsel in 2019, as well as oral analysis shared with the Committee by Debtor professionals, the

7 Committee concluded early in this case that the BSA Insurance Policies have a value of millions

8 of dollars to this estate. It will not cost the Committee millions of dollars to secure an order stating

9 that the insurance assets at issue are subject to the automatic stay. The Committee should be

10 permitted to proceed in the limited manner identified in this Motion.

11
                                    **CONCLUSION**

12       The Committee seeks authority to clearly define, protect, and preserve assets of the estate

13 on behalf of its constituency. Such an effort is fundamental to every bankruptcy case and is a

14 cornerstone of the Bankruptcy Code. Although the Archdiocese has filed a claim in the BSA

15 bankruptcy case memorializing its interest in BSA insurance policies, it is unwilling to take

16 additional action to preserve and protect the rights at issue. The Committee asks for standing to

17 defend the rights of the Archdiocese in these insurance policies.  If standing is granted the

18 Committee will seek an order (i) identifying the Archdiocese's interest in BSA Insurance Policies

19 as an asset of the estate, and (ii) stating affirmatively that the automatic stay applies to such estate

20 assets. The Committee's proposed actions are reasonable and necessary under the circumstances

21 and will cost the estate little, particularly compared to the potential value of the estate assets at

22 issue. For these reasons and others set forth above, the Court should grant the Committee derivative

23 standing.

24

25

26

27

28

Motion for Derivative Standing-15

CORE/9990000.2173/168277464.1

1

2

RESPECTFULLY SUBMITTED this 21st day of July 2021.

3

STINSON LLP

4

/s/*Edwin H. Caldie*

5

Edwin H. Caldie

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Derivative Standing-16

CORE/9990000.2173/168277464.1

**SA 1655**

1
2
3
4
5
6

Robert T. Kugler (MN #0194116)
Edwin H. Caldie (MN #0388930)
STINSON LLP
50 S 6th Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335- 1500
Robert.Kugler@stinson.com
Ed.Caldie@stinson.com
*Counsel for the Official Committee of Unsecured Creditors*

7
8

IN THE DISTRICT COURT OF GUAM
TERRITORY OF GUAM
BANKRUPTCY DIVISION

9

In re:

10

ARCHBISHOP OF AGAÑA,

11

a Corporation Sole,

12

Debtor.

13
14

Chapter 11 Bankruptcy

Case No. 19-00010

**ORDER GRANTING MOTION OF THE
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR
DERIVATIVE STANDING TO ENFORCE
THE AUTOMATIC STAY AND TAKE
OTHER ACTIONS**

15
16
17
18

        This matter is before the Court on the motion (the "Motion") of the Official Committee of
Unsecured Creditors (the "Committee") for derivative standing to enforce the automatic stay and
take other actions. Based on the Motion, the files, records, and proceedings in this matter,

19

        **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

20
21
22
23
24

    1.  The Committee has made a demand on the debtor Archbishop of Agana (the "Debtor") to
        take action to enforce the automatic stay imposed by 11 U.S.C. § 362 with respect to the
        debtor's interest in certain insurance policies, insurance proceeds, rights as an insured under
        any insurance policies, and/or any similar insurance interest of the estate.

25
26
27
28

Motion for Derivative Standing-1
CORE/9990000.2173/168277464.1

SA 1656

2.  The Debtor has refused to take action as requested by the Committee.

3.  In its Motion, the Committee has stated and plausibly described the following:

    a.  that certain insurance rights and interests of the Debtor defined in the Motion as the "BSA Insurance Policies" are property of the Debtor's estate;

    b.  that the automatic stay protects the Debtor's rights and interests in the BSA Insurance Policies;

    c.  that there are pending actions outside of this Court that purport to dispose of the Debtor's rights and interests in the BSA Insurance Policies;

    d.  that taking action to protect the Debtor's rights and interests in the BSA Insurance Policies has the potential to achieve a substantial award to the estate;

    e.  that the cost to protect the Debtor's rights and interests in the BSA Insurance Policies is not more than the potential benefits; and

    f.  based on the costs of acting and potential benefits to the estate, the Debtor is not justified in refusing to protect its rights and interests in the BSA Insurance Policies.

4.  There is a sufficient basis in law and fact to grant the Committee standing to act on behalf of the Debtor to protect the estate's insurance rights and interests.

5.  Nothing in this Order is a finding, determination, or conclusion as to the Committee's claims in the Motion, other than that they are plausibly asserted for purposes of the Motion.

6.  Nothing in this Order shall be construed to in any way abridge or determine the rights of any party as to the claims asserted by the Committee in the Motion.

**IT IS HEREBY ORDERED:**

The Committee's Motion is GRANTED as follows.

7.  The Committee is granted standing and authority to act on behalf of the debtor-in-possession to seek an order from this Court stating that (i) the Archdiocese of Agana's interests under insurance policies issued to the Boy Scouts of America constitute an asset

CORE/9990000.2173/168277464.1

**SA 1657**

1    of the Archdiocese of Agana's bankruptcy estate; and (ii) the automatic stay imposed by

2    11 U.S.C. § 362 applies to the Archdiocese of Agana's interests under insurance policies

3    issued to the Boy Scouts of America.

4

5

**SO ORDERED.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Derivative Standing-3

CORE/9990000.2173/168277464.1

SA 1658

CORE/9990000.2173/168277464.1

SA 1659

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

In Re:                    ) Bankruptcy Case No. 19-00010
                          )
ARCHBISHOP OF AGANA,      )
a Corporation Sole,       )
                          )
_____Debtor.___)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
SEPTEMBER 10, 2021; 8:27 A.M.
HAGATNA, GUAM

**Motion Hearing**

(Via VTC)

Proceedings recorded by *mechanical stenography*.

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

SA 1660

APPEARANCES


Appearing on behalf of the U.S. Trustee:


**OFFICE OF THE U.S. TRUSTEE**
**BY: CURTIS CHING, UST**
1132 Bishop Street, Suite 602
First Hawaiian Tower
Honolulu, HI 96813
(808) 522-8150


Appearing on behalf of Debtor:

**ELSAESSER ANDERSON**
**BY: FORD ELSAESSER, JR., ESQ.**
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
(208) 667-2900

**LAW OFFICE OF JOHN C. TERLAJE**
**BY: JOHN C. TERLAJE, ESQ.**
Suite 216, Former Union Bank Building
194 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 477-8894


Appearing on behalf of Boy Scouts of America:

**LAW OFFICE OF CIVILLE & TANG**
**BY: G. PATRICK CIVILLE, ESQ.**
330 Hernan Cortez Avenue, Suite 300
Hagatna, Guam 96910
(671) 472-8868


**LAW OFFICE OF WHITE & CASE**
**BY: ERIN ROSENBERG, ESQ.**
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5357

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910
Case 19-00010   Document 693   Filed 09/10/21   Page 2 of 22

SA 1661

Appearing on behalf of the Committee of Unsecured Creditors:

**LAW OFFICE OF STINSON LLP**
**BY: EDWIN H. CALDIE, ESQ.**
**ANDREW J. GLASNOVICH, ESQ.**
50th South Sixth Street
Suite 2600
Minneapolis, MN 55402
(612)335-1500


Appearing on behalf of Creditor Bank of Guam:

**LAW OFFICE MACDONALD FERNANDEZ**
**BY: IAIN A. MACDONALD, ESQ.**
221 Sansome Street, Third Floor
San Francisco, CA 94104
(415) 362-0449

Appearing on behalf of Continental Insurance Company:

**DAVID CHRISTIAN ATTORNEYS**
**BY: DAVID CHRISTIAN, ESQ.**
105 W. Madison Street
Suite 1400
Chicago, IL 60602


Appearing on behalf of National Union and American Home
Insurance Companies:


**LAW OFFICE OF SQUIRE PATTON BOGGS**
**BY: MARK C. ERRICO, ESQ.**
382 Springfield Avenue, Suite 300
Summit, NJ 07901
(973) 848-5600


Appearing on behalf of the Sisters of Mercy:


**LAW OFFICE OF DUNCAN G. MCCULLY**
**BY: DUNCAN G. MCCULLY, ESQ.**
Ada Cliffline Office Building C
434 W. O'Brien Drive
Suite 201
Hagatna, Guam 96910
(671) 477-7418

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910
Case 19-00010   Document 693   Filed 09/10/21   Page 3 of 22

SA 1662

Appearing on behalf of First Hawaiian Bank:


**BLAIR STERLING JOHNSON MARTINEZ**
**BY: MARTIN DIENHART, ESQ.**
DNA Building, Suite 1008
238 Archbishop FC Flores Street
Hagatna, Guam 96910
(671) 477-7857


Appearing on behalf of numerous plaintiffs:

**THE BERMAN LAW FIRM**
**BY: DARON BERMAN, ESQ.**
111 W. Chalan Santo Papa, Suite 503
Bank of Guam Building
Hagatna, Guam
(671) 477-2778

                 ------------------------------------------------

                              I N D E X


                                                            Page


The Court to issue an order shortly                          21

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

Case 19-00010   Document 693   Filed 09/10/21   Page 4 of 22

SA 1663

```
 1              September 10, 2021; 8:27 a.m.; Hagatna, Guam

 2                              * * *

 3

 4              THE CLERK:  Please come to order.  The District

 5    Court of Guam is now in session.  The Honorable Frances

 6    Tydingco-Gatewood presiding.

 7              Bankruptcy Case No. 19-00010, the Archbishop of

 8    Agana, a Corporation Sole, Most Reverend; Hearing on motion

 9    for derivative standing to enforce the automatic stay and take

10    other actions and the final hearing on motion to approve

11    stipulation.

12              Counsel, please state your appearance starting

13    with the plaintiff.

14              MR. ELSAESSER:  Ford Elsaesser for the

15    archdiocese, Your Honor.

16              THE COURT:  Hold on.  Good morning,

17    Mr. Elsaesser.

18              MR. GLASNOVICH:  Hafa adai, Your Honor, Drew

19    Glasnovich from Stinson here on behalf of the Committee.

20              THE COURT:  Okay, hafa adai, I like that, you

21    know our language here.  Very good.  Okay.

22              MR. MACDONALD:  I better say it too.  Hafa adai,

23    Iain Macdonald representing Bank of Guam.

24              THE COURT:  All right.  Hafa adai, Mr. Macdonald.

25              MR. DIENHART:  Martin Dienhart on behalf of the
```

1    First Hawaiian Bank.

2              THE COURT:  Okay, Marty Dienhart.  Good morning.

3              MR. DIENHART:  Good morning.

4              THE COURT:  Anyone else present?

5              MR. MCCULLY:  Yeah, Duncan McCully for Sisters of

6    Mercy.

7              THE COURT:  Okay, good morning, Mr. McCully.

8              MR. MCCULLY:  Good morning.

9              MR. CHING:  Morning, Your Honor, Curtis Ching for

10   the United States Trustee.

11             THE COURT:  *Hafa adai* and aloha, Mr. Ching.

12   Okay, got that.

13             MS. ROSENBERG:  And, Your Honor, Erin Rosenberg

14   with White & Case for Boy Scouts of America.  Good morning.

15             THE COURT:  Good morning, Ms. Rosenberg.  Okay.

16   All right.  Anyone else?  Do we have everyone?

17             MS. ROSENBERG:  Oh, we have Mr. Civille with me

18   as well.  I think he was on mute.  I apologize.

19             MR. CIVILLE:  Patrick Civille, Your Honor, for

20   the Boy Scouts.

21             THE COURT:  Oh okay, Pat -- Mr. Civille.  Good

22   morning, Mr. Civille.  And was there someone else?

23             MR. CALDIE:  Hi, Your Honor.  I was just going to

24   say hello.  It's Edwin Caldie here for the Committee too, but

25   Mr. Glasnovich will be speaking on our behalf.

```
 1                THE COURT:  Okay, good morning, Mr. Caldie and
 2     Mr. Glasnovich, you're here, right?
 3                MR. GLASNOVICH:  I am, yes.  Thank you, Your
 4     Honor.
 5                THE COURT:  Oh, there you are.  That's right.
 6     Okay.  Already saw that.  All right.  Anyone else?
 7                MR. CHRISTIAN:  Good morning, Your Honor, this is
 8     David Christian and I represent the Continental Insurance
 9     Company.
10                THE COURT:  Okay, good morning, Mr. Christian.
11     Got that.  All right.  Got that.  Anyone else?  Did I miss
12     anyone?  I'm sorry, I'm just kind of getting reacclimated to
13     my courtroom here.  They moved my screen so I'm not used to
14     being on the right side, so let me switch to the right side.
15     Can somebody move it to the left side two weeks -- a week from
16     now, back to where it used to be?  All right.  Thank you.
17                MR. TERLAJE:  John Terlaje for the Archdiocese of
18     Agana, Your Honor.
19                THE COURT:  Okay, Mr. Terlaje.  Good morning.
20                MR. TERLAJE:  Good morning.
21                THE COURT:  Okay, anyone else?
22                MR. BERMAN:  Morning, Your Honor, Daron Berman
23     present.
24                THE COURT:  Okay, Mr. Berman, good morning,
25     Mr. Berman.
```

```
 1              MR. BERMAN:  Good morning, Your Honor.

 2              THE COURT:  Mr. Berman, who do you represent

 3    again?  I'm sorry, can you tell me?  Can you remind me,

 4    please?

 5              MR. BERMAN:  I'm with the Berman law firm.  We

 6    represent numerous plaintiffs, Your Honor.

 7              THE COURT:  Okay, that's right.  Thank you, sir.

 8              MR. ERRICO:  Good morning, Your Honor.  This is

 9    Mark Errico of Squire Patton Boggs on behalf of National Union

10    and American Home Insurance Companies.

11              THE COURT:  This is Mr. Ericco?  Is that what you

12    said?

13              MR. ERRICO:  Yes, Your Honor.

14              THE COURT:  And you're on telephone, right?  Not

15    Zoom appearance; is that correct?

16              MR. ERRICO:  Yes, Your Honor.

17              THE COURT:  Okay, yeah, I'm just double-checking

18    my screen here.  Thank you.  Did I miss anyone else?

19                        (No response.)

20              THE COURT:  Okay, it looks like we're ready to go

21    then.  Thank you everyone.  So we'll go ahead and begin.  The

22    Court does have a joint motion of the debtor and Committee for

23    interim and final orders approving stipulation.  And the Court

24    is also -- sorry, let me just move my -- I actually was going

25    to appear from my chamber but I decided to come out to the
```

1    courtroom.  I'm just a little disorganized.  I don't meant to

2    be.

3              The Court has before it the Boy Scouts of

4    America's limited objection to the joint motion of the debtor

5    and Committee for interim and final orders approving

6    stipulation, etc.  So here we are today.  There is a reply

7    that has been submitted and so the Court does have that.  And

8    let's see --

9              Okay, we'll go ahead and -- give me one second.

10   I just got one more document.  I'm sorry, let me just move it

11   -- hold on a second.  All right.  Let's go ahead and begin

12   then.  I think we should just begin -- well, the Court has

13   before it the stipulation, so the stipulation is before us.

14   The only thing is this Boy Scouts of America supplemental

15   briefing in support of its objection.  So maybe we should just

16   go straight to that, since the stipulation is there and it's

17   just a limited objection.  So we'll go ahead, I'm not sure who

18   wishes to argue for the limited objection on behalf of the Boy

19   Scouts of America?

20             MS. ROSENBERG:  That would be me, Your Honor.

21             THE COURT:  Okay, Ms. Rosenberg.

22             MS. ROSENBERG:  Can you hear me?

23             THE COURT:  Yes, I can hear you.  You may

24   proceed.

25             MS. ROSENBERG:  Thank you, Your Honor, and thank

1    you for your time here.  I have just a few points we would

2    like to make for the record.

3                    THE COURT:  Sure.

4                    MS. ROSENBERG:  Your Honor, the Boy Scouts is

5    here today, as we have been, simply to ensure that our rights

6    remain fully reserved.  Our position is set forth in our

7    papers and I won't repeat all the arguments that we've already

8    made, but what I will say is, with respect to what we -- all

9    the stipulation motion, the Boy Scouts objects to any release

10   beyond the Court authorizing, to the extent necessary, the

11   debtor and the Committee to enter into this agreement between

12   themselves.  There shouldn't be any findings of fact,

13   conclusions of law or other determinations being made here and

14   now with respect to the matters that underlie ultimately the

15   stipulation and the standing motion that it's purporting to

16   resolve.

17                    In other words, Your Honor, the debtor and the

18   Committee, they can agree that they both want to take the

19   position that the debtor has interests in the Boy Scouts

20   insurance policies, which as we said before, are properties of

21   Boy Scouts' estate, subject to the Delaware Court's

22   jurisdiction.  So they can say they want to agree to take that

23   position, but it doesn't make it so.

24                    And although they seem to suggest otherwise in

25   their reply, I just want to make it clear we do object to the

1   motion on this basis.  If that is what the Committee and the

2   debtor are seeking to do, expand their stipulation into

3   conclusive findings on these disputed issues, then they should

4   be clear about it and they need to follow the proper

5   procedures, which this motion, the stipulation motion, it

6   doesn't do.  And by the way, again, this is their motion, they

7   bear the burden on it.  We need the proper procedure and this

8   motion doesn't do it.

9           If on the other hand, Your Honor, that's not what

10  they're trying to do, then likewise, they should just say so.

11  But, ultimately, there is really no reason that this Court

12  can't be clear about the order that it's going to enter.  And

13  Your Honor, this is not, I'm afraid, just a matter of comfort

14  or redundancy, it's an issue of actual confusion over what

15  relief are the movants asking for.  What is it that this Court

16  can and should grant?  Is it relief type A or relief type B?

17  And the Committee itself has recognized and it's drawn this

18  very distinction.  The Committee itself has said in its first

19  reply in the standing motion - and, Your Honor, that's at

20  Docket No. 631, page 11 of 13 - a stipulation or an agreement

21  between two parties, even when Court approved, quote, "is not

22  the same as an order containing legal findings of a Court

23  itself."

24          So again, is it A, an order approving an

25  agreement of the two parties or is it B, an order containing

1   legal findings of a Court itself?  The stipulation motion says

2   it's seeking the former, but if it isn't, now is the time to

3   make that clear.

4           And, Your Honor, again, I'm afraid to say, it's a

5   little ironic for the Committee to suggest that the Court

6   can't do that, that the Court cannot be clear as to its own

7   orders when this whole matter started with the Committee

8   filing the standing motion designed, quote, "to secure clarity

9   through an affirmative order of this Court."

10          Now, the Boy Scouts has proposed some language

11   that we think could address this.  That proposal, which I'll

12   mention, Your Honor, is based off language the Committee

13   itself suggested in connection with the standing motion.  If

14   you just take a look at Docket No. 616 at page 19 of 21, that

15   language from the Committee's language, it works fine.  It

16   doesn't ask this Court to prejudge res judicata or collateral

17   estoppel, both of which are multifactor inquiries.  It merely

18   is asking the Court to make clear this is a stipulation

19   between the parties to it, and again, as the Committee itself

20   has said, a stipulation, even when Court approved, quote, "is

21   not the same as an order containing legal findings of a Court

22   itself."

23          That said, Your Honor, if for some reason the

24   Court has any hesitations about the particular language the

25   Boy Scouts has offered, the parties can discuss, the Court can

 1   fashion different language.  Maybe it looks more like the

 2   first paragraph of the Boy Scouts' proposal, which just says

 3   the Court is not issuing findings of fact or conclusions of

 4   law, maybe it's an order that simply says the stipulation,

 5   subject to the amendments from the U.S. Trustee, the

 6   stipulation is approved as between the debtor and the

 7   Committee.  Maybe there does not need to be a stipulation at

 8   all.  The debtor can withdraw its objection to the standing

 9   motion.  The Court can overrule the Boy Scouts' objection and

10   grant the motion, of which the stipulation is claiming it

11   resolves.

12            One way or another, Your Honor, the Boy Scouts

13   submits that clarity is really necessary and appropriate and

14   that it can and should be provided.

15            And so, ultimately, Your Honor, the takeaway is,

16   as we've stated in our papers, this really serves everyone's

17   interest to provide this clarity now.  Confusion doesn't serve

18   any legitimate purpose and it's not a necessary component to

19   the relief being sought.  And so for those reasons, Your

20   Honor, we would ask that the stipulation motion be denied, to

21   the extent that that's necessary to make it clear that only

22   the narrow relief recognition of the obligation is between the

23   debtor on the one hand and the Committee on the other, only

24   that relief would be granted and the Boy Scouts' rights would

25   remain fully reserved.  Thank you very much, Your Honor, for

1  hearing from us today.  Unless you have any questions, that

2  should conclude my statements.

3          THE COURT:  Well, I think I do.  So I don't know

4  if I was confused.  I thought -- I mean, when I looked at the

5  motion, it was clear to me -- I'm sorry, yeah, when I looked

6  at the joint motion to approve the stipulation, it was clear

7  to me that the stipulation between the debtor and Committee

8  was comprised of things -- three things:

9          Number one, and this is the stipulation, that the

10  debtor has an interest as an insured in the insurer's

11  policies; two, the debtor's interest as an insured in the

12  insurance policies are properties of the debtor's bankruptcy

13  estate; and three, the debtor's interest in the insurance

14  policies are protected by the automatic stay pursuant to 11

15  U.S.C. 362(a).  And so to me, that was just really simple, I

16  didn't take it as anything more than that.  So did you want to

17  comment on that, Ms. Rosenberg?

18          MS. ROSENBERG:  Yes, thank you, Your Honor.  And

19  that's the same interpretation that we had initially.  We did

20  some very close parsing, and if you look at it, there is some

21  slight differences between the interim and the final order and

22  we really can't speculate as to what the movants may rely on,

23  but that's why we T'ed it up in the objection.  And they came

24  back and they said, Oh, no, we won't admit that it's just a

25  stipulation.

1            And so that's really causing us some heartburn,

2     Your Honor, and that's what we would like to clarify here

3     today.

4            THE COURT:  Okay, I guess that's a fair question.

5     All right.  So -- and also too, the Court appreciates the

6     supplemental briefing filed by the Boy Scouts of America.  The

7     Court is obviously allowing you to object because I do find

8     that you are a party in interest under 11 U.S. Code 1109(b).

9     You are a creditor, you have filed a proof of claim.  At the

10    time I made my initial ruling at the prior hearing, I was

11    unaware of the proof of claim filed by Boy Scouts of America.

12            So let me see, who do I have to hear from then on

13    this on the other side?

14            MR. ELSAESSER:  Your Honor, we would defer to

15    Mr. Glasnovich on behalf of the joint stipulation.  I might

16    have some additional comments, but we sort of agreed that he

17    would take the lead in responding to the Boy Scouts'

18    objection.

19            THE COURT:  Sure, Mr. Glasnovich.

20            MR. GLASNOVICH:  *Hafa adai*, Your Honor.  It

21    sounds to me like we're all in agreement that the proposed

22    order before the Court is to approve a stipulation between the

23    debtor and Committee.  There are no findings of fact or

24    conclusions of law in the stipulation and the parties

25    requested the Court enter the order as submitted, we received

1   some comments from the United States Trustee's office and

2   submitted a revised proposed order at Docket 673 and that's

3   the former proposed order we would request that the Court

4   enter.

5          The Committee and the debtor oppose the Boy

6   Scouts' additional language for one primary reason, and that

7   is that we don't know what we don't know.  We're concerned

8   that limiting the scope of the stipulation more so than what

9   the rule and the law already require will have consequences

10  that we can't predict.  And that's why, as we noted in our

11  reply brief, courts generally are dissuaded from

12  predetermining the effect of the order.  So we would ask the

13  Court enter the order as amended and approve the stipulation

14  between the debtor and the Committee.

15          THE COURT:  Does that help you, Counselor?

16          MS. ROSENBERG:  Your Honor, if I'm hearing

17  Counsel correct that they are not seeking to bind the Boy

18  Scouts, they're merely seeking to get approval of the

19  agreement as between the debtor in this case and the Committee

20  without finding other parties, then yes, that's fine.

21          THE COURT:  Okay, Mr. Glasnovich, back to you.

22          MR. GLASNOVICH:  Yeah, and just to clarify,

23  Counsel added some words to my statement.  The stipulation

24  between the debtor and Committee is binding on the estate and

25  it's an order of the Court.  It has the effect that the law

1  gives it, and the Boy Scouts briefed extensively on what they

2  think the effect of a stipulation is.  I can't tell you today

3  what the scenario will be in the future and what that effect

4  will be.  Perhaps they are bound.  I don't know what facts

5  that dispute would be.  But it is -- it's a matter of law.

6  The law determines what the stipulation approved under

7  Rule 9019 is and what effects that it has and that's all that

8  we ask the Court to do is enter an order approving the

9  stipulation pursuant to Bankruptcy Rule 9019.

10            MS. ROSENBERG:  And so, Your Honor, if I may be

11  permitted --

12            THE COURT:  Yes.

13            MS. ROSENBERG:  -- to respond to that?

14            THE COURT:  Yes.

15            MS. ROSENBERG:  We don't think that relief under

16  9019 is necessary, this Court can and approves stipulations

17  regularly without that.  We've offered other alternatives as

18  well, like the debtor withdrawing its objections to the

19  standing motion.  We do think and it's just corroborated by

20  the fact that we can't get a firm commitment from the

21  Committee and the debtor here today on something that Your

22  Honor is not a prediction of the future.  It's Your Honor

23  making clear what you are ordering today.  It's not deciding

24  res judicata or collateral estoppel, which are again,

25  multifactor inquiries for another Court to decide later.  It's

1   just the Court being clear of, look, I'm approving the

2   stipulation between these two parties, this is a distinction,

3   Your Honor, that the Committee itself has made and said is a

4   real difference.  So one way or another, Your Honor, the Boy

5   Scouts needs this clarity to protect its own rights and would

6   respectfully submit that that's what the Court should do.

7         THE COURT:  All right.  Mr. Glasnovich?

8         MR. GLASNOVICH:  Thank you, Your Honor.  I don't

9   think the Committee has anything further.  I defer to the

10  debtor if the debtor has any additional comments.

11        THE COURT:  Okay.

12        MR. ELSAESSER:  Your Honor, just very briefly if

13  we could, if you don't mind.  I just would have a few more

14  point to make.

15        THE COURT:  Sure.  Yes.

16        MR. ELSAESSER:  Your Honor, just to step back for

17  a minute and revisit where we were at the last hearing, when

18  though sorely tempted to hear the rest of your ruling, I, for

19  the first time in my career, interrupted what appeared to be a

20  favorable ruling or ruling in favor to advise you of our

21  agreement.  And that agreement, you know, it just seems to me

22  it goes without saying the order is what it is.

23        First of all, we've already performed under the

24  stipulation.  We agreed in the stipulation that we would --

25  that we would file amended schedules and include the specific

1    policies in those amended schedules and we have done that and

2    that has been filed for the record.

3              I think that trying to -- trying to parse

4    language as to what the impact of the order might be, I think

5    that again, the -- our joint brief cites Justice Ginsburg

6    talking about you can't really judge the fact that the order

7    is the order.  The order is the order.  The impact, whether

8    it's binding, quote, unquote, res judicata or collateral

9    estoppel is for another day.  But I think, it seems to be

10   difficult as to how the Court would take offense that the

11   order as drafted, it's a stipulation that we reached to avoid

12   a dispute that if it had gone on, well, I don't know what the

13   rest of your ruling would have said had you made it, but we

14   made our deal in order to, you know, get back to the business

15   at hand, which I know has been a great frustration to Your

16   Honor as it has been to all of us and certainly all of the

17   abuse survivors, as well as the parishioners and all the

18   members of the Catholic -- the -- Agana is, you know, get --

19   (skipping) get something put together.  We -- on behalf of the

20   debtor, we urge the order that we stipulated to be entered.

21             THE COURT:  Okay, thank you, Mr. Elsaesser.  Well

22   let me just say this, and I guess how Mr. -- how the two of

23   the guys here react will be determinative of a lot of things,

24   I think.  So let me just say, the stipulation is just the

25   stipulation.  The Court is going to order the motion granting

1   the stipulation.  It's not an approved settlement.  It's just

2   a stipulation that I've already gone over the particular three

3   points and I don't see it as the Court making any particular

4   findings of fact or conclusions of law.  I don't.  I -- I

5   don't see it.  You guys aren't asking me to do it and I don't

6   see it as -- this particular stipulation that I'm going to

7   hopefully order today, this morning, if I do.  I don't see it

8   as -- in any way inhibiting the rights of any party that -- to

9   the stipulation or to the Boy Scouts of America as a party in

10  interest.  Would you all agree with that, Mr. Elsaesser and

11  Mr. Glasnovich?

12          MR. ELSAESSER:  I can't -- I cannot disagree with

13  that, Your Honor.

14          THE COURT:  Okay, Mr. Glasnovich?

15          MR. GLASNOVICH:  I think the Committee is --

16  we'll accept the Court's finding.

17          THE COURT:  Right.  And I think that, you know, I

18  mean that's the thing about being lawyers, you know, I mean,

19  if you're a good lawyer, you're going to want to be proactive

20  and make sure that you protect your client's interests in any

21  way that you see fit and you want to be sure that -- well, you

22  just want to be very protective.  Maybe in this case the Boy

23  Scouts of America are getting a little overprotective, but I

24  don't blame them because they got a lot of people on their

25  back.  There are a lot of people wanting to try to get their

```
 1   cases settled with them and -- or making claims against them

 2   for sure.

 3              Okay, so yeah, Ms. Rosenberg, you heard the two

 4   gentlemen, so I think we're clear.

 5              MS. ROSENBERG:  Thank you very much, Your Honor.

 6              THE COURT:  Okay.  So I'm going to -- I'll issue

 7   the order.  And I will consider, is it docket entry -- CMECF

 8   673?  Is that what you said, Mr. Glasnovich?

 9              MR. GLASNOVICH:  Yes, Your Honor.

10              THE COURT:  Okay.  I had prepared my own order

11   but I'll go ahead and I'll look at that and if that's been the

12   -- if that's what the parties want, then the Court will look

13   -- will approve that.  Okay, is there anything else everyone?

14                        (No response.)

15              THE COURT:  No?  Okay.  Well, you all stay safe.

16   Have a nice weekend and good luck.  I hope we're all able to

17   settle soon.  Take care.  That'll be the order of the Court.

18   I'll send this out today.  Thank you.

19                   (Proceedings concluded at 8:52 a.m.)

20                             *  *  *

21

22

23

24

25
```

```
                    CERTIFICATE OF OFFICIAL REPORTER


CITY OF HAGATNA       )
                      )  ss.
TERRITORY OF GUAM     )


        I, Veronica F. Flores, Official Court Reporter for

the United States District Court of Guam, do hereby certify

the foregoing pages, 1 to 21, to be a true and correct

transcript of the proceedings held in the above-entitled

matter to the best of my ability.

        Dated this 10th day of September 2021.


                              /s/Veronica F. Flores
                              Veronica F. Flores
```

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM
## BANKRUPTCY DIVISION

In re:

Archbishop of Agaña, a corporation sole,

          Debtor.

Case No. 19-00010

Chapter 11

---

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ARCHBISHOP OF AGAÑA

---

**ELSAESSER ANDERSON, CHTD.**
Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Tel:   (208) 667-2900
Fax:   (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

**LAW OFFICE OF JOHN C. TERLAJE**
John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

**ATTORNEYS FOR THE ARCHBISHOP OF AGANA**

Dated: July 19, 2022

**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGANA**

Dated: July 19, 2022

THIRD AMENDED JOINT PLAN OF REORGANIZATION

## TABLE OF CONTENTS

THE UNITED STATES DISTRICT COURT ...................................................................1

INTRODUCTION ...........................................................................................................1

ARTICLE I DEFINITIONS AND INTERPRETATION .................................................2
    1.1    DEFINED TERMS ...............................................................................2
    1.2    INTERPRETATION.............................................................................16
    1.3    TIME PERIODS...................................................................................16
    1.4    EXHIBITS AND SCHEDULES...........................................................17

ARTICLE II - TREATMENT OF UNCLASSIFIED CLAIMS......................................17
    2.1    ADMINISTRATIVE CLAIMS ..........................................................17
    2.2    STATUTORY FEES ...........................................................................19
    2.3    PRIORITY TAX CLAIMS ..................................................................19

ARTICLE III CLASSIFICATION OF CLAIMS ...........................................................19
    3.1    SUMMARY ........................................................................................19
    3.2    CLASSIFICATION AND VOTING ...................................................20

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS ...........................................20
    4.1    PRIORITY CLAIMS (CLASS 1)........................................................20
    4.2    GOVERNMENTAL UNIT CLAIMS (CLASS 2) ...............................20
    4.3    TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS
           (CLASS 3) ...........................................................................................21
    4.4    UNKNOWN TORT CLAIMS (CLASS 4)...........................................23
    4.5    GENERAL UNSECURED CLAIMS (CLASS 5)................................24
    4.6    BANK OF GUAM (CLASS 6)............................................................25
    4.7    FIRST HAWAIIAN BANK (CLASS 7) .............................................27
    4.8    BANK OF HAWAII (CLASS 8)........................................................27
    4.9    SMALL BUSINESS ADMINISTRATION (CLASS 9) ......................28
    4.10    ABUSE RELATED CONTINGENT CLAIMS (CLASS 10) ..............29
    4.11    ABUSE RELATED CONTINGENT CLAIMS- UNKNOWN (CLASS 11)........29
    4.12    OTHER ABUSE RELATED CLAIMS-(CLASS 12) .........................29

ARTICLE V MEANS OF IMPLEMENTATION OF THE PLAN...............................30
    5.1    TRUST FORMATION AND FUNDING .............................................30
    5.2    PAYMENT OF PROFESSIONAL FEES ...........................................32
    5.3    PAYMENTS EFFECTIVE UPON TENDER .....................................32

ARTICLE VI TRUST ....................................................................................................32
    6.1    ESTABLISHMENT OF TRUST ........................................................32
    6.2    PURPOSE, FORMATION, AND ASSETS ........................................32
    6.3    ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS
           FROM THE TRUST ...........................................................................33
    6.4    TAX MATTERS..................................................................................33
    6.5    APPOINTMENT OF THE TRUSTEE................................................33

- i -

6.6      RIGHTS AND RESPONSIBILITIES OF TRUSTEE...........................................34
6.7      TRANSFERRED INSURANCE INTERESTS ....................................................35
6.8      SPECIAL DISTRIBUTION CONDITIONS........................................................39
6.9      INVESTMENT POWERS; PERMITTED CASH EXPENDITURES.................39
6.10     REGISTRY OF BENEFICIAL INTERESTS ......................................................40
6.11     NON-TRANSFERABILITY OF INTERESTS ....................................................40
6.12     TERMINATION....................................................................................................40
6.13     IMMUNITY; LIABILITY; INDEMNIFICATION.............................................40
6.14     TREATMENT OF TORT CLAIMS....................................................................41
6.15     CONTROL OF TRUST REAL PROPERTY ASSETS .......................................48
6.16     FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY
         ASSETS ................................................................................................................49

ARTICLE VII SETTLING INSURERS.....................................................................................50
7.1      SETTLING INSURER SETTLEMENT AGREEMENT ....................................50
7.2      FREE AND CLEAR OF INTERESTS OF SETTLING INSURER
         POLICIES ............................................................................................................50
7.3      RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS ...............50
7.4      JUDGMENT REDUCTION.................................................................................51
7.5      FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS.................51
7.6      INDEMNIFICATION OBLIGATIONS...............................................................52
7.7      TIMING ................................................................................................................52
7.8      WAIVER/CONSENT ...........................................................................................52
7.9      DEBTOR WAIVER AND RELEASE OF CLAIMS...........................................53
7.10     SUPPLEMENTAL SETTLING INSURER INJUNCTION ...............................53
7.11     BECOMING A SETTLING INSURER PRIOR TO THE EFFECTIVE
         DATE ...................................................................................................................54

ARTICLE VIII NON-SETTLING INSURERS .........................................................................55
8.1      PRESERVATION OF RIGHTS AND OBLIGATIONS ....................................55
8.2      ESTIMATIONS/ASSESSMENTS ARE NOT BINDING..................................56
8.3      RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS...................57
8.4      THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER RIGHTS ........57
8.5      THE ARCHDIOCESE'S OBLIGATIONS SURVIVE ........................................57
8.6      TRUST POWERS WITH RESPECT TO TORT CLAIMS AND NON-
         SETTLING INSURERS .......................................................................................58

ARTICLE IX INSURANCE POLICIES ....................................................................................58
9.1      CONTINUATION OF INSURANCE POLICIES................................................58

ARTICLE X PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION........................59
10.1     RESERVATION OF RIGHTS TO OBJECT TO NON-TORT CLAIMS ...........59
10.2     OBJECTIONS TO NON-TORT CLAIMS...........................................................59
10.3     DETERMINATION OF CLAIMS ......................................................................59
10.4     NO DISTRIBUTIONS PENDING ALLOWANCE.............................................60
10.5     CLAIM ESTIMATION .......................................................................................60

- ii -

**SA 1684**

ARTICLE XI DISTRIBUTIONS UNDER THE PLAN ...................................................60
    11.1    PAYMENT DATE........................................................................................60
    11.2    UNDELIVERABLE DISTRIBUTIONS ......................................................60
    11.3    SETOFFS ....................................................................................................61
    11.4    NO INTEREST ON CLAIMS .....................................................................61
    11.5    WITHHOLDING TAXES ...........................................................................61

ARTICLE XII EFFECTIVENESS OF THE PLAN.......................................................61
    12.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE ...........................61
    12.2    NOTICE OF EFFECTIVE DATE ..............................................................62
    12.3    EFFECT OF NON-OCCURRENCE OF CONDITIONS.................................62

ARTICLE XIII EFFECTS OF CONFIRMATION .......................................................62
    13.1    DISSOLUTION OF UCC ..........................................................................62
    13.2    DISCHARGE AND INJUNCTION ............................................................62
    13.3    CHANNELING INJUNCTION...................................................................63
    13.4    EXCULPATION; LIMITATION OF LIABILITY .........................................65
    13.5    TIMING .....................................................................................................65
    13.6    NO BAR ON CERTAIN CLAIMS .............................................................65
    13.7    NO BAR ON CLAIMS AGAINST OTHER DEBTORS IN
            BANKRUPTCY. .........................................................................................66

ARTICLE XIV INCORPORATION OF CHILD PROTECTION PROTOCOLS ......................66
    14.1    CHILD PROTECTION PROTOCOLS ........................................................66

ARTICLE XV THE REORGANIZED DEBTOR............................................................66
    15.1    CONTINUED CORPORATE EXISTENCE..................................................66
    15.2    VESTING OF ASSETS ..............................................................................66
    15.3    IDENTITY OF OFFICERS OF REORGANIZED DEBTOR.............................66
    15.4    FURTHER AUTHORIZATION .................................................................66

ARTICLE XVI MISCELLANEOUS PROVISIONS.......................................................67
    16.1    RETENTION OF JURISDICTION .............................................................67
    16.2    ASSUMPTION OF EXECUTORY CONTRACTS..........................................69
    16.3    INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND
            EMPLOYEES ............................................................................................69
    16.4    DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS ..........69
    16.5    RESERVATION OF RIGHTS ....................................................................70
    16.6    NON-APPEALABLE ORDER ...................................................................70
    16.7    AMENDMENTS AND MODIFICATIONS ..................................................70
    16.8    U.S. TRUSTEE REPORTS ........................................................................70
    16.9    NO WAIVER...............................................................................................70
    16.10   TAX EXEMPTION .....................................................................................71
    16.11   NON-SEVERABILITY...............................................................................71
    16.12   REVOCATION...........................................................................................71
    16.13   CONTROLLING DOCUMENTS ................................................................71
    16.14   GOVERNING LAW...................................................................................71

- iii -

16.15   NOTICES...................................................................................................71
16.16   FILING OF ADDITIONAL DOCUMENTS.......................................................72
16.17   POWERS OF OFFICERS...........................................................................72
16.18   DIRECTION TO A PARTY........................................................................72
16.19   SUCCESSORS AND ASSIGNS ..................................................................72
16.20   CERTAIN ACTIONS ...............................................................................72
16.21   FINAL DECREE ....................................................................................72
16.22   PLAN AS SETTLEMENT COMMUNICATION ................................................72
16.23   OTHER RIGHTS....................................................................................73

ARTICLE XVII BANKRUPTCY RULE 9019 REQUEST.......................................................73

ARTICLE XVIII CONFIRMATION REQUEST ....................................................................73

### EXHIBITS AND SCHEDULES

Exhibit A:   Unknown Claims Representative's Report and Recommendations
Exhibit B:   Non-Settling Insurers
Exhibit C:   [RESERVED]
Exhibit D:   Trust Agreement and Trust Distribution Plan
Exhibit E:   Tort Claim Release
Exhibit F:   Unknown Tort Claim Release
Exhibit G:   Real Property Transferred to Trust
Exhibit H:   [RESERVED]
Exhibit I:   Known Archdiocese Entity Insurance Policies
Exhibit J:   Officers and Directors of Reorganized Debtor
Exhibit K:   Child Protection Protocols – **To  Be Supplement**
Exhibit L:   BSA Insurance Policies
Exhibit M:   List of Catholic Entities
Exhibit N:   Settling Insurers
Exhibit O:   Partitioned Real Property
Exhibit P:   Maps of Retained Real Property
Exhibit Q:   Bank of Guam Replacement Properties
Exhibit R:   Form of Scholarship Voucher
Exhibit S:   Form of Cemetery Voucher
Exhibit T:   [RESERVED]

- iv -

## INTRODUCTION

The Archbishop of Agaña, a corporation Sole and the Official Committee of Unsecured Creditors proposes this Joint Chapter 11 Plan of Reorganization (the "Plan") pursuant to the provisions of the Bankruptcy Code.

All creditors are encouraged to consult the disclosure statement for the Chapter 11 Plan of Reorganization (the "Disclosure Statement") before voting to accept or reject this Plan. Among other information, the Disclosure Statement contains discussions of the Archdiocese of Agaña, events prior to and during this Chapter 11 case, and a summary and analysis of the Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

- 1 -

# ARTICLE I
# DEFINITIONS AND INTERPRETATION

**1.1**    **DEFINED TERMS.** For the purposes of the Plan, except as expressly provided,

all capitalized terms not otherwise defined herein have the meanings ascribed to them below:

1.    "Abuse" means (i) any actual or alleged act of sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in 19 Guam Code § 4101(k); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, or intimidation; or (v) child sexual abuse as that term is used in 7 Guam Code § 11301.1.

2.    "Abuse Claim" means a Tort Claim or an Unknown Tort Claim.

3.    "Abuse Claimant" means the holder of a Tort Claim or an Unknown Tort Claim.

4.    "Abuse-Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Tort Claim against a Protected Party.

5.    "Administrative Claim" means a Claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503, 507(a)(2), or 507(b) of the Bankruptcy Code, including any post-petition tax Claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

6.    "Affiliates" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

7.    "Agents" means all past and present employees, officers, directors, agents, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy, Persons bound by

- 2 -

monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in their capacities as such.

8.      "Allowed Professional Claim" means a Professional Claim for which the Bankruptcy Court has entered an Order, which has become a Non-Appealable Order allowing the relevant Fee Application.

9.      "Archdiocese Entity Insurance Policies" mean the insurance policies that are listed on Exhibit I, provided, however, that if a contract, binder, certificate, or policy of insurance identified on Exhibit I was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor, but insures or covers both the Debtor and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is a "Archdiocese Entity Insurance Policy" to the extent it insures or covers the Debtor and any AoA Entity, but not to the extent it insures or covers any other Person.

10.     "AoA Entities" means, in their capacity as such:

(a)     the Archdiocese;

(b)     Archbishop Michael Byrnes;

(c)     All Persons listed on Exhibit M;

(d)     Each of the Affiliates of the Persons identified in the foregoing subsections (a)-(c);

(e)     Each of the successors and assigns of the Persons identified in the foregoing subsections (a)-(d); and,

(f)     Solely to the extent of and in their capacity as such, each of the Agents of the Persons identified in the foregoing subsections (a)-(e).

Notwithstanding the foregoing, an individual who perpetrated, or is alleged to have perpetrated, an act of Abuse that forms the basis for a Tort Claim is not a AoA Entity with respect to that Tort Claim. No religious order, archdiocese or diocese, other than the Archdiocese, is an AoA Entity. The Boy Scouts of America, Aloha Council, and Chamorro District are not AoA Entities.

11.     "AoA Entity Insurer Policy" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Effective Date, and that actually, allegedly, or potentially, insures any AoA Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Tort Claim, provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of an AoA Entity, but insures or covers both an AoA

- 3 -

Entity and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is an "AoA Entity Insurance Policy" to the extent it insures or covers the Debtor or any AoA Entity, but not to the extent it insures or covers any other Person.

12.    "Approval Order" means an order of the Bankruptcy Court approving one or more Insurance Settlement Agreements.

13.    "Archdiocese" and "Archdiocesan" refers to the Archbishop of Agaña, which is the corporation sole formed pursuant to Guam Code 18 § 10101 et seq. that is the public juridic person of the Roman Catholic Archdiocese of Agaña, as now constituted or as it may have been constituted, and the Estate (pursuant to Section 541 of the Bankruptcy Code).

14.    "Assets" of the Archdiocese or the Estate means, collectively, any and all property of the Archdiocese or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including cash (including the residual balance of any reserves established under the Plan, but not the Trust) and Causes of Action.

15.    "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the disclosure statement provided to each holder of a Claim entitled to vote to accept or reject the Plan.

16.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code.

17.    "Bankruptcy Court" means the United States District Court for the District of Guam, Bankruptcy Division.

18.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as currently promulgated.

19.    "BSA Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in the Policies listed on Exhibit L.

20.    "Canon Law" means the Code of Canon Law of the Roman Catholic Church, as codified in 1983 and as may hereafter be amended, and all binding universal and particular laws of the Roman Catholic Church.

21.    "Catholic Entities" means those listed on Exhibit M.

22.    "Cause of Action" or "Causes of Action" means, except as provided otherwise in the Plan, the Confirmation Order, or any document, instrument, release, or other agreement entered into in connection with the Plan, all Claims, actions, causes of action, suits, debts, dues, sums of money,

- 4 -

accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims, and cross claims of the Archdiocese or its Estate, the Committees, or the Trust (as successor to the Archdiocese or its Estate), including an action that is or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any Person based on law or equity (in each case, in respect of a Cause of Action that arose before the Effective Date), including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, any action brought pursuant to Sections 522, 541–45, 547–51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or cross-claim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

23.  "Chancery Real Property" means the Debtor's right, title, and interest in the real property described as Lot 3200B-REM-NEW, Sinajana.

24.  "Channeled Claims" means all (a) Tort Claims, Direct Action Claims, and Indirect Claims, except for any portion of such Claims that is a Non-Settling Insurer Policy Claim; (b) Abuse-Related Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a) – (c) of this sentence; provided, however, that the following are not Channeled Claims: (i) a Claim against an individual who committed the Abuse from which a Tort Claim arises; (ii) a Claim against any religious order, diocese or archdiocese (other than the Archdiocese); (iii) a Claim against the Boy Scouts of America, Aloha Council or Chamorro District; (iv) a Claim against any Insurer arising from or related to any insurance policy that is not a Settling Insurer Policy; (v) Unknown Tort Claims.

25.  "Channeling Injunction" means the injunction imposed pursuant to Section 13.3 of the Plan.

26.  "Child Protection Protocols" means the document entitled "Child Protection Protocols" attached as Exhibit K.

27.  "Claim" means any past, present or (to the extent it arises prior to the Effective Date) future Claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party Claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders,

- 5 -

and any other Claim within the definition of "Claim" in Section 101(5) of the Bankruptcy Code.

28.   "Claims Bar Date" means August 15, 2019.

29.   "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any Agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

30.   "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

31.   "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code which becomes a Non-Appealable Order.

32.   "Contribution Claims" means Abuse-Related Contribution Claims and Non-Abuse Related Contribution Claims. "Contribution Claims" do not include any Claims for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, that the Settling Insurers might have arising from the payment of any Settlement Amount under an Insurance Settlement Agreement.

33.   "Coverage Claims" means all Claims against a Settling Insurer under or relating to the policies issued by such Settling Insurer that are the subject of any Insurance Settlement Agreement or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

34.   "Covered Non-Tort Claim" means any Claim, other than Tort Claims, Unknown Tort Claims, Abuse-Related Contribution Claims, Indirect Claims, or Medicare Claims, for which the Archdiocese or a Catholic Entity or Other Insured Entity would otherwise have coverage under a Settling Insurer Policy but for the sale, transfer, or release by the Debtor, Catholic Entity, or Other Insured Entity of such Settling Insurer Policy in connection with an Insurance Settlement Agreement.

35.   "Debtor" means the Archdiocese.

36.   "Direct Action Claims" means the same as "Tort Claims", except that they are asserted against any Settling Insurer, instead of any Protected Party or the Trust, for the recovery of insurance proceeds.

- 6 -

37.     "Disputed" when used with respect to a Claim against the Archdiocese or property of the Archdiocese, means a Claim: (i) designated as disputed, contingent, or unliquidated in the Debtor's Schedules; (ii) which is the subject of an objection, appeal, or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal, or motion has not been determined by a Non-Appealable Order; or (iii) which during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, is in excess of the amount scheduled as other than disputed, unliquidated, or contingent. The processes for handling "Disputed Claims" do not apply to Class 3 Claims or Class 4 Claims. The process for Class 3 Claims and Class 4 Claims will be addressed in the Trust Agreement. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Reorganized Debtor, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified class of Claims or an unclassified category of Claims (i.e., "Disputed [class designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified class or unclassified category of Claims.

38.     "Distribution Plan Claimants" are Tort Claimants (i) whose Tort Claims do not implicate coverage from any Non-Settling Insurer; (ii) who the Tort Claims Reviewer determines is entitled to receive a distribution pursuant to the Trust Distribution Plan; and (iii) who have released all their Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable.

39.     "Distribution Plan Claims" are Tort Claims asserted by Distribution Plan Claimants.

40.     "District Court" means the United States District Court for the District of Guam.

41.     "Effective Date" means the date upon which the conditions in Article XII of the Plan have been satisfied.

42.     "Estate" means the estate created in this Chapter 11 case pursuant to Section 541 of the Bankruptcy Code.

43.     "Exculpated Parties" means collectively, (i) the Archdiocese, the Estate, and the UCC; (ii) the respective officers, directors, employees, members, attorneys, financial advisors, members of subcommittees of the board of directors, volunteers, and members of consultative bodies and councils formed under Canon Law of the persons identified in the preceding clause including with respect to their service or participation in an outside board on which they serve at the request of the Archdiocese or the Archbishop, in

- 7 -

their capacity as such; (iii) the Settling Insurers with respect to their Settling Insurer Policies; and (iv) professionals of a Person identified in the preceding clause (i) through (iii).

44.    "Extra-Contractual Claims" means any Claim against the Settling Insurers seeking any type of relief in connection with any alleged obligations of the Settling Insurers to the Protected Parties before the Effective Date (including compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs or any other type of relief) alleging any of the following: bad faith; failure to provide insurance coverage under any Settling Insurer Policy; failure or refusal to compromise and settle any Claim insured under any Settling Insurer Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy. The term "Extra-Contractual Claims" includes all Claims relating to the Settling Insurers' (i) handling of any request for insurance coverage for any Claim under the Settling Insurer Policies; (ii) conduct relating to the negotiation of the Insurance Settlement Agreements; and (iii) conduct relating to the settlement of any coverage Claim concerning the Settling Insurer Policies.

45.    "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

46.    "FHP/TakeCare Real Property" means the Debtor's right, title, and interest in the real property described as Lot 1-NEW-Block 2, Tract 259, Tamuning.

47.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

48.    "Indirect Claim" means a Claim against a Protected Party or a Settling Insurer, asserted by any other Person that is not an Insurer for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any Protected Party's actual or alleged liability, for any Claim relating to Abuse that is not a Tort Claim.

49.    "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Non-Settling Insurer or any rights under any Non-Settling Insurer Policies.

CORE/3515288.0002/171049844.30

SA 1694

50. "Insurance Settlement Agreements" means the settlement agreements among the Archdiocese and the other Protected Parties and the Settling Insurers.

51. "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, an AoA Entity Insurer Policy.

52. "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief. For the avoidance of doubt, Interest includes the right of any Person to enforce, under any theory of contract, future interest, or other theory arising in law or equity, regarding a restriction on the use or transfer of any property, real or personal, through a deed, lease, or other conveyance.

49. "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Debtor as contemplated by Section 101(37) of the Bankruptcy Code.

50. "Litigation Claimants" are Tort Claimants who have Tort Claims that are covered, or allegedly covered, under any Non-Settling Insurer Policy.

51. "Litigation Claims" are Tort Claims or Direct Action Claims asserted by Litigation Claimants.

52. "MAO" means Medicare Advantage Organizations under parts C & D of the MMSEA.

53. "Medicare Claims" means any and all Claims by CMS against the Trust, any Settling Insurer, or any Protected Party, under MMSEA and under MSP, that relate to any payments in respect of any Tort Claims, including Claims for reimbursement of payments made to Tort Claimants who recover or receive any distribution from the Trust and Claims by CMS relating to reporting obligations.

54. "Medicare Trust Fund" means a U.S. Treasury-held trust fund account from which Medicare is funded or from which Medicare disbursements are paid, including the Hospital Insurance Trust Fund and the Supplementary Medical Insurance (SMI) Trust Fund.

55. "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSPA.

- 9 -

56.     "MSPA" means 42 U.S.C. § 1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

57.     "Non-Abuse Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer, for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of any Claim against a Protected Party, which is not a Tort Claim.

58.     "Non-Appealable Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and is final and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been timely sought, then no order, judgment, or other decree is a Non-Appealable Order until (a) such appeal, certiorari, review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard, or that granted certiorari, and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Non-Appealable Order."

59.      "Non-Settling Insurer Policy(ies)" means any known or unknown contracts, binders, certificates, or policies of insurance that any Non-Settling Insurer issued, subscribed in any interest in, or has underwritten any risk in, in effect on or before the Effective Date, and that were issued to, allegedly issued to, or for the benefit of, or that otherwise actually, allegedly, or potentially insure, the Archdiocese or any Catholic Entity, or any of their predecessors in interest, successors, or assigns, and that actually, allegedly or could potentially afford coverage with respect to any Tort Claim.

60.     "Non-Settling Insurer Policy Claim" means any Claim for which insurance coverage is provided or allegedly provided by a Non-Settling Insurer Policy.

- 10 -

61.     "Non-Settling Insurer(s)" means any Insurer that is not a Settling Insurer by the Effective Date. The "Non-Settling Insurers" include, but are not limited to, those Persons listed on Exhibit B.

62.     "Other Insured Entity(ies)" means a Person that is not a AoA Entity, but was insured under a Settling Insurer Policy; provided however, that a Person is an "Other Insured Entity" only to the extent it is insured under a Settling Insurer Policy that was issued or allegedly issued to the Archdiocese.

63.     "Other Insurance Policy(ies)" means any insurance policy(ies) that was issued by a Settling Insurer to any Person who is not a Protected Party, but that covers or allegedly covers the Debtor or any AoA Entity for any Tort Claim, Direct Action Claim or Indirect Claim.

64.     "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (i) "person" in Section 101(41) of the Bankruptcy Code; or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

65.     "Petition Date" means January 16, 2019, the date on which the Archdiocese commenced the Chapter 11 case.

66.     "Plan" means this joint Chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

67.     "Plan Proponents" means the Debtor and the UCC.

68.     "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

69.     "Pro Rata" means, with respect to any distribution on account of any allowed Claim in any class, the ratio of the amount of such allowed Claim to the sum of (i) all allowed Claims in such class and (ii) the aggregate maximum of all Claims in such class that are not yet allowed Claims.

70.     "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

71.     "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331, or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 case.

72.     "Proof of Claim" means a proof of Claim filed in the Chapter 11 case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

73.     "Protected Parties" means any of

(a)     the AoA Entities;

(b)     each of the foregoing Persons' respective successors and assigns;

(c)     solely to the extent of and in their capacity as such, each of the foregoing Persons' respective Agents, shareholders, and clergy and other Persons bound by monastic vows, in their capacity as such, of the Persons identified in the foregoing subsections (a)-(b); provided, however, nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Archdiocese, or subject to its control.

An individual who perpetrated an act of abuse that forms the basis of a Tort Claim or an Unknown Tort Claim is not a Protected Party. No religious order, archdiocese, or diocese, other than the Archdiocese, is a Protected Party. The Boy Scouts of America, Aloha Council, and Chamorro District are not Protected Parties.

74.     "Redacted Information" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Tort Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

75.     "Released Claims" means Coverage Claims and Extra-Contractual Claims.

76.     "Reorganization Assets" means, collectively, all Assets of the Debtor and the Estate. For the avoidance of doubt, the Reorganization Assets do not include the Trust Assets.

77.     "Reorganized Debtor" means the Archdiocese, on and after the Effective Date. Unless otherwise expressly stated or the context otherwise requires, references to the "Archdiocese" and the "Reorganized Debtor" throughout various provisions of the Plan are an effort to anticipate whether an event may occur before or after the Effective Date. In this regard, and generally for purposes of the Plan, any written agreement signed after the Petition Date made by the Archdiocese as part of the Plan before the Effective Date

- 12 -

(unless otherwise provided) will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such agreement (including, but not limited to, the provisions of the Plan if confirmed).

78. "SBA/PPP" means Small Business Administration Paycheck Protection Program.

79. "Settling Insurer Policies" means, collectively, all insurance policies that are the subject of the Insurance Settlement Agreements with the Settling Insurers, provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor insures or covers both the Debtor and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is a "Settling Insurer Policy" to the extent it insures or covers the Debtor or an AoA Entity, but not to the extent it insures or covers any other Person.

80. "Settling Insurers" means, solely in connection with insurance under any Settling Insurer Policies, the Persons listed on Exhibit N whose Insurance Settlement Agreements are approved by the Approval Orders and such orders become Non-Appealable Orders Solely in connection with insurance under any Settling Insurer Policies, Settling Insurers also includes each of their past, present, and future parents, subsidiaries, affiliates, divisions, reinsurers, and retrocessionaires, including Persons released pursuant to the Insurance Settlement Agreements; each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies, including the Persons released pursuant to the respective Insurance Settlement Agreements; each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and Claims handling administrators; and each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them, except to the extent, if any, such Person's actual or alleged rights, duties, obligations, or liabilities arise out of or relate to their status as, or conduct, acts or omissions on behalf of, a Non-Settling Insurer. Any Non-Settling Insurer who enters into a final and binding Insurance Settlement Agreement with the Trust after the Effective Date is also a Settling Insurer, except to the extent, if any, such Person's actual or alleged rights, duties, obligations, or liabilities arise out of or relate to their status as, or conduct, acts, or omissions on behalf of, a Non-Settling Insurer.

81. "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan and

- 13 -

filed with the Bankruptcy Court at least fourteen (14) calendar days prior to the confirmation hearing.

82. "Supplemental Settling Insurer Injunction" means the injunction imposed pursuant to Section 7.10 of the Plan.

83. "Tort Claims" means all Claims relating to, in whole or in part, directly or indirectly, Abuse committed by any Person before the Effective Date for which a Protected Party is allegedly responsible, including any such Claim asserted against any Protected Party in connection with this Chapter 11 case and includes the Quintanilla, Concepcion, Sondia and Denton claims from CV0552-16 Superior Court of Guam, filed as Claim Nos. 269, 270, 271 and 272. The term "Tort Claims" does not include Contribution Claims, Medicare Claims, Unknown Tort Claims, or Claims against Persons who are not Protected Parties.

84. "Tort Claimant" means the holder of a Tort Claim.

85. "Tort Claims Reviewer" means the Person, including the designee of such Person, who will assess Class 3 and Class 4 Claims under the Trust Distribution Plan.

86. "Transferred Insurance Interests" means the following rights and interests of the Protected Parties in Non-Settling Insurer Policies in respect of actual or potential coverage for any Class 3 Claim or Class 4 Claim: (1) the proceeds of such Non-Settling Insurer Policies and all claims for such proceeds; and (2) all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim or Class 4 Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages, and attorneys' fees and costs.

87. "Trust" means the trust created for the benefit of certain Tort Claimants in accordance with the Plan and Confirmation Order and the Trust Agreement.

88. "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as it may be amended, together with such additional documents as may be executed in connection with the Trust Agreement.

89. "Trust Assets" means the cash, Transferred Insurance Interests, and other assets and rights to be transferred to the Trust under Article V of the Plan.

90. "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement.

- 14 -

91.     "Trustee" means the Person appointed as Trustee of the Trust in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

92.     "UCC" or "Committee" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 case, as such committee may be constituted from time to time.

93.     "Unimpaired" means, with respect to a class of Claims, that such class is not impaired.

94.     "Unknown Claims Representative" means Judge Michael R. Hogan in accordance with the Bankruptcy Court's order dated May 28, 2021, and any successor or such other person appointed by the Bankruptcy Court or otherwise.

95.     "Unknown Tort Claim" means a Tort Claim relating to Abuse that occurred on or before the Effective Date for which no proof of Claim is filed or deemed filed on or before the Claims Bar Date and one of the following condition applies (a) the Claimant is under eighteen years of age on the Claims Bar Date; or (b) the Claimant neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse on account of one of the following: (i) Claimant's insanity or other mental illness; or (ii) the Claimant was a member of the United States Armed Services deployed in active duty on the Claims Bar Date. For the avoidance of doubt, an Unknown Tort Claim does not include any claim filed after the Claims Bar Date which does not satisfy either (a) or (b) of the proceeding sentence.

96.     "Unknown Tort Claimant" means the holder of an Unknown Tort Claim, the estate of a deceased individual who held an Unknown Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Unknown Tort Claim, as the case may be.

97.     "Unknown Tort Claim Reserve Fund" means the reserve established by the Reorganized Debtor for the benefit of Unknown Tort Claimants in the maximum aggregate amount of $1,500,000.00.

98.     "Unsecured Claims" means Claims which are not secured by any property of the Debtor's Estate and which are not part of any other class defined in this Plan.

99.     "U.S. Trustee" means the Office of the United States Trustee for Region 15, which includes the District of Guam.

- 15 -

**1.2     INTERPRETATION**. For purposes of the Plan:

(a)     any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(b)     the terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

(c)     whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

(d)     the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

(e)     unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules;

(f)     any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(g)     any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

(h)     unless otherwise specified, all references in the Plan to "Articles," "Sections," "Schedules" and "Exhibits" are references to Articles, Sections, Schedules and Exhibits of or to the Plan;

(i)     the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(j)     captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Plan or otherwise affect the interpretation of the Plan; and

(k)     the Plan supersedes all prior drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

**1.3     TIME PERIODS**. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

- 16 -

Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**1.4    EXHIBITS AND SCHEDULES**.

(a)         All Exhibits and Schedules to the Plan (including any Supplemental Plan Documents) (with the Plan, the "Plan Documents") are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

(b)    The Exhibits to the Plan include the following:

| | |
|---|---|
| Exhibit A: | Unknown Claims Representative's Report and Recommendations |
| Exhibit B: | Non-Settling Insurers |
| Exhibit C: | [Reserved] |
| Exhibit D: | Trust Agreement and Trust Distribution Plan |
| Exhibit E: | Tort Claim Release |
| Exhibit F: | Unknown Tort Claim Release |
| Exhibit G: | Real Property Transferred to Trust |
| Exhibit H: | [Reserved] |
| Exhibit I: | Known Archdiocese Entity Insurance Policies |
| Exhibit J: | Officers and Directors of Reorganized Debtor |
| Exhibit K: | Child Protection Protocols [To be supplemented] |
| Exhibit L: | BSA Insurance Policies |
| Exhibit M: | List of Catholic Entities |
| Exhibit N: | Settling Insurers |
| Exhibit O: | Partitioned Real Property |
| Exhibit P: | Maps of Retained Real Property |
| Exhibit Q: | Bank of Guam Replacement Properties |
| Exhibit R: | Form of Scholarship Voucher |
| Exhibit S: | Form of Cemetery Voucher |
| Exhibit T: | [RESERVED] |

## ARTICLE II - TREATMENT OF UNCLASSIFIED CLAIMS

**2.1    ADMINISTRATIVE CLAIMS**. As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims including Professional Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article.

(a)         **Treatment**. Each holder of an allowed Administrative Claim, excluding SBA/PPP claims and Professional Claims, against the Archdiocese shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such Claim. Each holder of an Allowed Professional Claim shall receive, in full satisfaction, settlement, release, and

- 17 -

extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Professional Claim, unless the holder agrees in writing to other treatment of such Claim and subject to the provisions of Section 5.1 of this Plan.

For avoidance of doubt, the SBA/PPP claim of the Chancery will be repaid by its terms. The Parish and School PPP loans roughly total $1,995,088.29. The SBA has forgiven loans in the amount of $905,708.37, leaving loans unforgiven in the amount of $1,084,379.42 relating to eight Parishes and Schools, and two banks; Bank of Guam for seven loans, in the amount of $1,081,791.92, and Coast360 for one loan in the amount of $7,588.00. It is Debtor's intent to term out the unforgiven loans at 1% fixed interest over a five-year term beginning from the Effective Date. The Chancery PPP loans will continue to be paid as scheduled. Debtor will make no claims for forgiveness of any loans not forgiven..

**(b)     Administrative Filing Deadline.**

1. Except as otherwise set forth in this Plan, requests for allowance and payment of Administrative Claims, excluding Professional Claims, must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court (the "Administrative Claims Filing Deadline"). Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such Claims against the Archdiocese, the Reorganized Debtor, any Settling Insurer (to the extent applicable), the Trust, or any of their property. Administrative Claims representing obligations incurred by the Archdiocese after the Effective Date (including, without limitation, Claims for professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. In addition, holders of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

2. All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) calendar days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph shall control

- 18 -

over any contrary deadline set forth in any requests for payment of Administrative Claims.

    **(c)**    **Professional Claim Filing Deadline**. All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) calendar days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

    **2.2**    **STATUTORY FEES**. All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid by the Reorganized Debtor as soon as practicable after the Effective Date. After the Effective Date, the Trust shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed, but in no event shall the payments made to the Trust made pursuant to Article IV, V, or VI by any Person other than the Debtor be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930. The Reorganized Debtor shall file post-Effective Date quarterly reports (if any) in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate. The Reorganized Debtor shall remain responsible for any pre-Effective Date reporting and pre-Effective Date unpaid fees.

    Any cause of action, right to reimbursement for overpayment, or similar interest of the Debtor in amounts paid pursuant to 28 U.S.C. § 1930 shall be transferred to the Trust and the Trust shall be deemed the successor in interest to the Debtor with regard to such causes of action, rights, and interests. The Trust and the Reorganized Debtor shall each be entitled to 50% of the overpayment recovered pursuant to this section

    This Section 2.2 of the Plan is severable and should any portion of this Section 2.2 be stricken, modified, or altered by the Court or the Plan Proponents, the potential for such change has been disclosed to all parties in interest and shall not be deemed to adversely affect any party in interest for the purposes of 11 U.S.C. § 1127 and/or Fed. R. Bankr. P. 3019.

    **2.3**    **PRIORITY TAX CLAIMS**. With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such Claim in cash as soon as practicable after the Effective Date from its ongoing operations, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Archdiocese or Reorganized Debtor, as applicable, in writing, provided such treatment is no less favorable to the Archdiocese than the treatment set forth in clause (i) of this sentence.

<u>**ARTICLE III**</u>
<u>**CLASSIFICATION OF CLAIMS**</u>

    **3.1**    **SUMMARY**. The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of the Plan, and distribution pursuant to the Plan.

- 19 -

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | Tort Claims Other Than Unknown Tort Claims | Impaired | Yes |
| 4 | Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | Secured Claims of Bank of Guam | Impaired | Yes |
| 7 | Secured Claims of First Hawaiian Bank | Impaired | Yes |
| 8 | Secured Claims of the Bank of Hawaii | Unimpaired | No |
| 9 | Small Business Administration | Unimpaired | No |
| 10 | Abuse Related Contingent Claims | Impaired | Deemed to Reject |
| 11 | Abuse Related Contingent Claims - Unknown | Impaired | Deemed to Reject |
| 12 | Other Abuse Related Claims | Unimpaired | No |

### 3.2    CLASSIFICATION AND VOTING.

The Claims against the Debtor shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Article II). Consistent with Section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular class only to the extent the Claim is within the description of the class, and a Claim is classified in a different class to the extent it is within the description of that different class.

<div align="center">

**ARTICLE IV**
**TREATMENT OF CLASSIFIED CLAIMS**

</div>

### 4.1    PRIORITY CLAIMS (CLASS 1).

(a)    **Definition**. A Class 1 Claim means an allowed Claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

(b)    **Treatment.** Unless the holder of an allowed Class 1 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

### 4.2    GOVERNMENTAL UNIT CLAIMS (CLASS 2).

(a)    **Definition.** A "Class 2 Claim" means an allowed Claim of Governmental Units not otherwise included in Article II or Section 4.1 above.

- 20 -

**(b)      Treatment.** Unless the holder of an allowed Class 2 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed Claim (or as soon thereafter as is practicable**).**

## 4.3      TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS (CLASS 3).

**(a)      Definition**. A Class 3 Claim means a Tort Claim other than an Unknown Tort Claim ("Class 3 Claim"). A "Class 3 Claimant" shall mean a holder of a Class 3 Claim.

**(b)      Treatment.** Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 3 Claimants shall be assigned to, assumed, and treated by the Trust as further provided in Article VI, the Trust Agreement, and the Trust Distribution Plan. Class 3 Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan. Class 3 Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 3 Claim pursuant to the factors in the Trust Distribution Plan.

> **Summary**. The Plan creates a Trust to fund payments to Class 3 Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. The Trust shall be funded as provided in Articles IV,V, and VI, including by contributions from the Archdiocese and others and the assignment of the Transferred Insurance Interests. The Trust shall make distributions to the Class 3 Claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which shall represent the sole recovery available to Class 3 Claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 3 Claimants against the Non-Settling Insurers.

> No Class 3 Claimant shall receive any payment on any award unless and until such Class 3 Claimant has executed the Release attached as Exhibit E to this Plan. Each Class 3 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 3 Claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, the Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). The Class 3 Claims will

- 21 -

not be released or enjoined as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, any other Protected Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Any release of Class 3 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Claims for Abuse. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall not be liable for any Protected Party's share of causal liability or fault. In no event may a Class 3 Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall be provided by the Trustee with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and shall not be liable for any Protected Parties' share of liability or fault. The Trust shall be obligated to provide copies of the Class 3 Claimants' releases and certifications to any of the Protected Parties or Settling Insurers upon request provided that such Protected Parties or Settling Insurers have signed a confidentiality agreement encompassing such information.

The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 3 Claims, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of distributions Class 3 Claimants receive, or are entitled to receive, based on the Trust Distribution Plan. For the avoidance of doubt, determinations by the Tort Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of any Protected Party's liability or damages for Class 3 Claims. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 3 Claims. Any such recoveries by the Trust from Non-Settling

- 22 -

Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan. To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the assignment and transfer of the Transferred Insurance Interests to the Trust, results in a forfeiture of coverage, this Plan preserves the Non-Settling Insurers' rights to the extent required under their respective Non-Settling Insurer Policies and applicable law.

(c)     **Stipulated Judgments**. Certain Class 3 Claimants may enter into agreements with the Archdiocese, the Reorganized Debtor, or any other Protected Party for settlement of a Tort Claim consistent with and to the extent authorized by applicable non-bankruptcy law. If a Class 3 Claimant enters into such an agreement with the Archdiocese, the Reorganized Debtor, or any other Protected Party, the Trust will pursue any judgment against the Non-Settling Insurer on behalf of the Class 3 Claimant. Any recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to the Trust Distribution Plan.

**4.4     UNKNOWN TORT CLAIMS (CLASS 4)**.

(a)     **Definition**. A Class 4 Claim means an Unknown Tort Claim ("Class 4 Claim"). A "Class 4 Claimant" shall mean a holder of a Class 4 Claim.

(b)     **Treatment.** The Reorganized Debtor will assume liability for Unknown Tort Claims and establish the Unknown Tort Claim Reserve Fund in the amount estimated at $1,500,000.00 or different amount as determined by the Unknown Claims Representative. Funding shall be made over a five-year period, with a $200,000.00 deposit made upon the Effective Date, the requirement that the fund drop to no less than $200,000.00 for five years with a maximum paid in of $1,500,000.00, or the amount determined by the Unknown Claims Representative. The Unknown Claimants shall be paid lesser of 50% of the amounts determined by the Tort Claimant Reviewer, or $50,000.00. The Reorganized Debtor will make distributions to the Class 4 Claimants, as provided in Trust Distribution Plan, up to the amount of the Unknown Tort Claim Reserve Fund, which fund will represent the sole recovery available to Class 4 Claimants in respect to any obligation owed by the Settling Insurers. Distribution made pursuant to the Trust Distribution Plan, however, does not preclude or affect claims or recoveries by Class 4 Claimants against the Non-Settling Insurers. Class 4 Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 4 Claim pursuant to the factors in the Trust Distribution Plan.

No Class 4 Claimant shall receive any payment on any award unless and until such Class 4 Claimant has executed the Release attached as Exhibit F to this Plan. Each Class 4 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 4 claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all

- 23 -

other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). The Class 4 Claims will not be released or enjoined as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, and such Non-Settling Insurer or are fully adjudicated, resolved and subject to Final Order, but recourse is limited as described above.

The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 4 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 4 Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 4 Claims. Any release of Class 4 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Class 4 Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Claims for Abuse. Nothing in this Article requires any Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or a Settling Insurer and such Claims are reserved. But in no event may a Class 4 Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party.

**4.5      GENERAL UNSECURED CLAIMS (CLASS 5)**.

(a)      **Definition**. A Class 5 Claim means (1) any Claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such Claim timely filed a Claim.

(b)      **Treatment**. Each holder of a Class 5 Claim shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 5 Claim, without interest, on the Effective Date.

CORE/3515288.0002/171049844.30

**4.6     BANK OF GUAM (CLASS 6)**.

(a)     **Class 6 Definition**. A Class 6 Claim means the Claim of Bank of Guam, which is comprised of the Class 6A, 6B Claims, and 6C Claims.

(b)     **Class 6A Definition**. A Class 6A Claim means the secured portion of the claim of the Bank of Guam in the approximate amount of $5,238,040.27 minus payments made since the Petition Date, secured against the Debtor's deposit accounts with the Bank of Guam.

(c)     **Class 6A Treatment**. The Reorganized Debtor shall assume the 6A Claim and all pre-petition date loan documents shall remain in full force and effect, except as modified as follows:

     i.     The deposit accounts securing the Class 6A Claim shall vest in the Reorganized Debtor, but shall no longer secure the Class 6A Claim and the Bank of Guam shall waive any right of set off on those deposit accounts.

     ii.     The Bank of Guam shall receive replacement mortgages on the real property listed on **Exhibit Q** in an amount equal to the Class 6A Claim and the Class 6B Claim.

     iii.     After the Effective Date, the Class 6A Claim will be amortized using a thirty (30) year amortization schedule at 3% fixed interest with a 20 year maturity. The Reorganized Debtor shall make regular monthly payments pursuant to the amortization schedule, with the remaining balance of the Class 6A Claim due and owing on the 20th anniversary of the Effective Date.

     iv.     The Catholic Social Services loans, which are currently guaranteed by Debtor, shall continue to be paid, pursuant to the terms and conditions of the loan documents. The Catholic Social Services loans are fully secured via first mortgages on their respective, non-Debtor owned real properties. Bank of Guam will terminate the Debtor's guarantees on the Effective Date.

     v.     The Bank of Guam has agreed to forbear on collecting any payments from the Archdiocese of Agaña, the Parishes and Schools for a period of six months after the Effective Date of the Plan. For avoidance of a doubt, the loans to Catholic Social Services, Inc., shall be paid as scheduled without forbearance. Upon application, and after showing reasonable cause and necessity, by the Archdiocese, Parishes and Schools on or before the end of the six-month period, the Bank of Guam, at its own discretion, may grant an additional six-month forbearance.

     vi.     The cash collateral lien held by the Bank of Guam via its right of setoff on Bank of Guam accounts in the amount of $4,700,000, or as determined by the Bank of Guam and the Debtor, net of payments made since the case was filed, shall be released in exchange for liens in favor of the Bank of Guam via mortgages on the real property set forth in Exhibit I. The Archdiocese, Parishes and Schools also agree to grant a security interest in Bank of Guam bank account balances that

- 25 -

accrue from and after the closing date. The 3% interest rate may be adjusted every five (5) years to the Bank's reference rate. All terms and conditions of the loan documents remain in full force and effect, except as modified by this Second Amended Plan.

    **(d)**     **Class 6B Definition.** A Class 6B Claim means the unsecured portion of the claim of the Bank of Guam in the approximate amount of $7,087,092.88.

    **(e)**     **Class 6B Treatment.** The Reorganized Debtor shall assume the Class 6B Claim and all pre-petition date loan documents shall remain in full force and effect, except as modified as follows:

        i.       The deposit accounts, if any, securing the Class 6B Claim shall vest in the Reorganized Debtor, but shall no longer secure the Class 6B Claim and the Bank of Guam shall waive any right of set off on those deposit accounts.

        ii.       The Bank of Guam shall receive replacement mortgages on the real property listed on **Exhibit Q** in an amount equal to the Class 6A Claim and the Class 6B Claim.

        iii.       After the Effective Date, the Class 6A Claim will be amortized using a thirty (30) year amortization schedule at 3% fixed interest with a 20 year maturity. The Reorganized Debtor shall make regular monthly payments pursuant to the amortization schedule, with the remaining balance of the Class 6A Claim due and owing on the 20th anniversary of the Effective Date.

        iv.       The Catholic Social Services loans, which are currently guaranteed by Debtor, shall continue to be paid, pursuant to the terms and conditions of the loan documents. The Catholic Social Services loans are fully secured via first mortgages on their respective real properties. Bank of Guam will terminate the Debtor's guarantees on the Effective Date.

        v.       The Bank of Guam has agreed to forbear on collecting any payments from the Archdiocese of Agaña, the Parishes and Schools for a period of six months after the Effective Date of the Plan. For avoidance of a doubt, the loans to Catholic Social Services, Inc., shall be paid as scheduled without forbearance. Upon application, and after showing reasonable cause and necessity, by the Archdiocese, Parishes and Schools on or before the end of the six-month period, the Bank of Guam, at its own discretion, may grant an additional six-month forbearance.

        vi.       The cash collateral lien held by the Bank of Guam via its right of setoff on Bank of Guam accounts in the amount of $4,700,000, or as determined by the Bank of Guam and the Debtor, net of payments made since the case was filed, shall be released in exchange for liens in favor of the Bank of Guam via mortgages on the real property set forth in Exhibit I. The Archdiocese, Parishes and Schools also agree to grant a security interest in Bank of Guam bank account balances that accrue from and after the closing date. The 3% interest rate may be adjusted every five (5) years to the Bank's reference rate. All terms and conditions of the loan

CORE/3515288.0002/171049844.30

documents remain in full force and effect, except as modified by this Second Amended Plan.

(f) **Class 6C Definition.** A Class 6C Claim means the guaranty obligations of the Debtor related to the Catholic Social Service loans with the Bank of Guam.

(g) **Class 6C Treatment.** Bank of Guam will terminate Debtor's guarantees as of the Effective Date.

**4.7    FIRST HAWAIIAN BANK (CLASS 7).**

(a) **Class 7 Definition**. A Class 7 Claim means the secured claims of the First Hawaiian Bank, which are comprised of the Class 7A, Class 7B, and Class 7C.

(b) **Class 7A Definition.** A Class 7A Claim means the Secured Claims of the First Hawaiian Bank in the approximate amount of $4,385,946.41, minus payments made since the Petition Date, secured under that certain negative pledge agreement recorded on ten parcels of real property and under that certain security agreement.

(c) **Class 7A Treatment.** The Class 7A Claim shall retain any payments received during the Chapter 11 case. On the Effective Date Debtor shall commence efforts to sell the FHP/TakeCare Real Property. Once the FHP/TakeCare Real Property has been sold, First Hawaiian Bank will receive payment of $2,000,000.00 if full and final satisfaction of its Class 7A Claim, and the balance of the sales proceeds after payment of $200,000.00 to fund the Unknown Claims, of the FHP/TakeCare real property shall be paid to the Trust.

(d) **Class 7B Definition.** A Class 7B Claim means the Secured Claim of First Hawaiian Bank in the approximate amount of $1,843.40, less payments made since the case was filed, is secured by a 2014 Hyundai Elantra Limited.

(e) **Class 7B Treatment.** The Class 7B claim has been paid in full from the Debtor's cash on hand on the Effective Date. Class 7B claim shall retain any payments received during the Chapter 11 case, but shall receive no additional payments as part of the Plan.

(f) **Class 7C Definition.** A Class 7C Claim means any purported guaranty liability of the Debtor related to the obligations of the Catholic Cemeteries of Guam, Inc. to First Hawaiian Bank.

(g) **Class 7C Treatment.** The Reorganized Debtor shall not assume any liability or obligations related to the Class 7C Claim.

**4.8    BANK OF HAWAII (CLASS 8).**

(a) **Class 8 Definition**. A Class 8 Claim means the secured claim of the Bank of Hawaii in the approximate amount of $222,260.98, minus any payments made since

- 27 -

the Petition Date, which Claim is secured against the Debtor's deposit accounts with the Bank of Hawaii.

      **(b)**    **Class 8 Treatment.** The Class 8 Claim has been paid in full during the pendency of the Chapter 11 case. The Class 8 Claim shall retain any payments received during the Chapter 11 case but shall receive no additional payments as part of the Plan.

**4.9**    **SMALL BUSINESS ADMINISTRATION (CLASS 9)**.

      **(b)**    **Class 9 Definition**. A Class 9 Claim means the Secured Claims of the Small Business Administration for disaster relief loans in the amount of $1,041,740.98 secured by mortgages on the following real property:

| Debtor Prefix | Description of Property | Legal |
|---|---|---|
| CHP2 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3-1, Chalan Pago |
| CHP1 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3NEW-R3, Chalan Pago |
| SIN12 | Saint Jude Thaddeus Catholic Church | Lot 1, Block 17, Tract 232, Sinajana |
| MAN1 & MAN8 | Santa Teresita Catholic Church | Lot 2285-2-3, Mangilao |
| BAR22 | San Vicente School | Lot 2364-1-7-NEW, Barrigada |
| BAR30 | San Vicente School | Lot 2365-1-1, Barrigada |
| BAR28 | San Vicente School | Lot 5437 (Old Bullcart Trail between Lot 2364-1-7 and 2365-1-1), Barrigada |
| BAR25 | San Vicente School | Lot 2265-Rem-8-1, Barrigada |
| BAR24 | San Vicente School | Lot 2265-Rem-8-2, Barrigada |

      **(c)**    **Class 9 Treatment.** The Reorganized Debtor shall assume the Class 9 Claim and all pre-petition date loan documents shall remain in full force and effect and the mortgages securing the Class 9 Claim shall remain and encumber the interest of the Reorganized Debtor to the same extent, validity, and priority as prior to the Petition Date.

**4.10    ABUSE RELATED CONTINGENT CLAIMS (CLASS 10)**.

     **(a)    Class 10 Definition**. Class 10 consists of Abuse Related Contingent Claims. These are Claims by an Entity against the Debtor for contribution, indemnity, or reimbursement arising out of as a result of such Entity's liability for paying or defending against any Tort Claim, including a joint tortfeasor or the like, and includes contingent claims for contribution and indemnification against the Archdiocese by the Boy Scouts of America, School Sisters of Notre Dame, Region of Guam and School Sisters of Notre Dame Central Pacific Province, Inc., and the Parishes and Schools under the Archbishop of Agaña.

     **(b)    Class 10 Treatment.** In accordance with Section 502(e)(1) of the Bankruptcy Code, each Abuse Related Contingent Claim held by any Entity against the Debtor shall be disallowed and will receive no Distribution; notwithstanding any other provision of the Second Amended Plan, any Class 10 Claimant that is or could have been alleged to be a joint tortfeasor with any of the Protected Parties in any action brought by a Tort Claimant shall not be liable for any Protected Party's share of causal liability, fault, or damages, by reallocation or otherwise.

**4.11    ABUSE RELATED CONTINGENT CLAIMS- UNKNOWN (CLASS 11)**.

     **(a)    Class 11 Definition**. Class 11 consists of Abuse Related Contingent Claims. Class 11 Claims are for any Claim for contribution, indemnity, or reimbursement arising out of or relating to the Archdiocese's liability to pay or defend any Class 4 Claim, which are Unknown Tort Claims.

     **(b)    Class 11 Treatment.** In accordance with Section 502 (e)(1) of the Bankruptcy Code, each Abuse Related Contingent Claim held by any Entity against the Debtor that relates to an Unknown Claim shall be disallowed and will receive no Distribution; notwithstanding any other provision of the Second Amended Plan, any Class 11 Claimant that is or could have been alleged to be a joint tortfeasor with any of the Protected Parties in any action brought by a Tort Claimant shall not be liable for any Protected Party's share of causal liability, fault, or damages, by reallocation or otherwise.

**4.12    OTHER ABUSE RELATED CLAIMS-(CLASS 12)**.

     **(a)    Class 12 Definition.** Class 12 consists of non-contingent Claims, which were allowed on or before the Confirmation Date, for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by any Person or Entity against a Protected Party, which claim relates to or arises from Abuse. No Claim allowed after entry of the Confirmation Order shall be a Class 12 Claim, but may still qualify as a Claim in Class 10 or Class 11.

     **(b)    Class 12 Treatment.** The Trust shall pay any allowed Class 12 Claim in full and shall make a dollar-for-dollar reduction to the award(s) of the Class 3 or Class 4 Claimant(s) for which the Class 12 Claim relates.

- 29 -

SA 1715

## ARTICLE V
## MEANS OF IMPLEMENTATION OF THE PLAN

**5.1     TRUST FORMATION AND FUNDING**

    **(a)     Purpose, Formation, and Assets**. The Trust shall be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan. The proposed Trust Agreement and Trust Distribution Plan are attached hereto as <u>Exhibit D</u>.

    **(b)     Funding.**

        1.     **Summary**. This Plan will be funded from the sources and in the manner set forth in this Section.

        2.     **Contributions**. Cash and other assets will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein:

            (i) **Debtor Real Estate**. The Debtor will transfer the parcels of real property with an estimated value of $18,358,034 listed on **Exhibit G** to the Trust, free and clear of all claims, liens, and encumbrances pursuant to 11 U.S.C. § 1123(a)(5)(d);

            (ii) **Debtor Cash Contribution.** The Debtor will transfer $6,609,998.29 to the Trust.

            (iii) **Settling Insurer Contributions**. The Settling Insurers will transfer to the Trust the respective Settlement Amounts set forth in Section 7.11(a) as follows:

                1.     National Union: $18,000,000.00, subject to the terms and conditions of the settlement agreement between the Debtor and National Union as approved by a Final Order.

            (iv) **Unknown Claims.** The Reorganized Debtor will establish the Unknown Tort Claim Reserve Fund in the minimum amount of $200,000.00.

            (v) **Tuition Vouchers.** The Reorganized Debtor will provide the Trust with 150 vouchers for a K-12 Catholic education, which voucher shall cover 100% of the cost of tuition each year for a total of not more than thirteen years at any Catholic school in Guam. The form of "Scholarship Vouchers", including the terms and conditions of use, are set forth in Exhibit R.

            (vi) **Cemetery Vouchers.** The Reorganized Debtor will provide the Trust with 50 vouchers, which voucher shall cover 100% of

- 30 -

a cemetery plot easement at a Catholic cemetery in Guam. The form of "Cemetery Voucher", including the terms and conditions of use, are set forth at Exhibit S.

(vii) **Proceeds of Real Property Sales**. Prior to the Effective Date, the Debtor will market and sell FHP/TakeCare Real Property and Chancery Real Property. The proceeds of the sale will be used as follows (i) to fund the treatment of the Class 7 Claim, (ii) up to $250,000.00 to fund Administrative Claims, (iii) up to $500,000.00 to renovate and outfit the Cathedral for use as the Reorganized Debtor's headquarters and Chancery office and moving expenses (iv) $200,000.00 for the Unknown Claimants funding, and (v) after the payment of the amounts in (i)-(iv) the remaining proceeds will be distributed to the Trust. The sale of the Chancery Real Property shall include six months delayed possession to accommodate the move. The UCC shall have the right to approve the Debtor's real estate agent and the terms and conditions of the sale of the two properties.

3.      **Additional Trust Insurance Assets**: In addition to the funds and real property transferred to the Trust, the Transferred Insurance Interests of the Archdiocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. In addition, the Interests of the other Protected Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. The foregoing assignment and transfer shall not be construed as an assignment and transfer of the Non-Settling Insurer Policies.

4.      **Additional Trust Property Assets**: In addition to the properties transferred to the Trust as listed on Exhibit G, any interest, cause of action, claim, title, or other right of the Archdiocese related to any real property not listed on the Debtor's schedules as of the Confirmation Date will be assigned and transferred to the Trust on the Effective Date. The Debtor does not warrant or represent that any such interest exists. The Trustee shall have full standing, authority, and right to initiate any action necessary to obtain title or any other interest in real property that is owned, held, or possessed by the Debtor on the Confirmation Date, whether or not such right or interest is vested or unvested, contingent, liquidated, or otherwise, if such right, title, and/or interest was not listed on the Debtor's schedules as of the Confirmation Date. The transfer under this subsection of an interest, cause of action, claim, title, or other right shall not be a definitive determination of the existence, validity, or extent of any interest, cause of action, claim, title, or other right of the Archdiocese.

5.      **Vesting.** On the Effective Date, all Trust Assets shall vest in the Trust, and the Archdiocese and other Protected Parties shall be deemed for

- 31 -

all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Protected Party, and Settling Insurers, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Archdiocese, the other Protected Parties and the Settling Insurers shall have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan.

**5.2     PAYMENT OF PROFESSIONAL FEES**. The Reorganized Debtor shall pay all unpaid Allowed Professional Claims accruing through the Effective Date, (i) within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims, or (ii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Professional Claim and the Debtor.

**5.3     PAYMENTS EFFECTIVE UPON TENDER**. Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment is due. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

<u>**ARTICLE VI**</u>
<u>**TRUST**</u>

**6.1     ESTABLISHMENT OF TRUST**. On or before the Confirmation Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 467B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.467B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.467B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

**6.2     PURPOSE, FORMATION, AND ASSETS.** The Trust shall be established for the purposes described in this paragraph. The Trust shall receive the transfer and assignment of assets as provided in Articles IV and V, including the Debtor Cash Contribution, the Debtor Real Estate, and the Transferred Insurance Interests, of which the Trust is, and shall be deemed to be, the sole assignee. The Trust shall make distributions to the Class 3 claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 claimants, but only to the extent that the Archdiocese, the

- 32 -

Reorganized Debtor, or any other Protected Party are not defended or otherwise reimbursed for their defense expenses by any Non-Settling Insurer. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, and any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall fund the costs and expenses in executing these functions, all such functions to be executed in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan, with the aim of preserving, managing, and maximizing Trust Assets to pay Class 3 claimants and with no objective to continue or engage in the conduct of a trade or business. The proposed Trust Agreement and Trust Distribution Plan are attached to this Plan as **Exhibit D**.

**6.3**   **ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST**.

    **(a)**   **General Corpus**. The following distributions and payments will be made from the general corpus of the trust:

       1.   **Distributions.** Distributions on Class 3 Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

       2.   **Tort Claims Reviewer**. The Trustee shall retain the Tort Claims Reviewer. Fees payable to the Tort Claims Reviewer for review of Class 3 Claims and Class 4 Claims shall be paid from the Trust.

       3.   **Trust Administrative Fees**. All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement shall be paid by the Trust, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

       4.   **Indemnity**. The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan shall be made from the corpus of the Trust.

**6.4**   **TAX MATTERS**. The Trust shall not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Guam law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**6.5**   **APPOINTMENT OF THE TRUSTEE**. The initial Trustee has been identified in Exhibit D to this Plan. The Trustee shall commence serving as the Trustee on the Confirmation

Date; provided, however, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Archdiocese and the UCC, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

### 6.6    RIGHTS AND RESPONSIBILITIES OF TRUSTEE.

**(a)**    With respect to the property, rights, interests, and powers conferred on the Trustee under this Plan, the Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including (only to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits) all of the powers like those of a trustee under Sections 108, 704, and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges), but the Trustee is not a trustee under any chapter of the Bankruptcy Code. If there is any inconsistency or ambiguity between the Plan and Confirmation Order, on the one hand, and the Trust Agreement, on the other hand, with respect to the Trustee's authority to act, the provisions of the Plan and Confirmation Order shall control. Among other things, the Trustee: (1) shall liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

**(b)**    Notwithstanding the foregoing, the Archdiocese, the Reorganized Debtor, and the Trust acting for itself and on behalf the Estate, shall be deemed to have waived, effective upon the Effective Date:

> 1.    Any and all Claims under Sections 547, 548, 549, and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Archdiocese in the ordinary course of business prior to the Effective Date; and

> 2.    Any and all Claims and Causes of Action: (i) seeking the substantive consolidation of the Archdiocese and any other Person or an order deeming any such Person and the Archdiocese to be an "alter-ego" of the other or any other similar Claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under Section 544 of the Bankruptcy Code.

- 34 -

**(c)**       The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Trustee in its/his/her official capacity, with respect to its/his/her status, duties, powers, acts, or omissions as Trustee.

**6.7**     **TRANSFERRED INSURANCE INTERESTS**.

**(a)**       **Enforcement of Transferred Insurance Interests Against Non-Settling Insurers.**

1.   As set forth in Article V, the Transferred Insurance Interests are assigned and transferred to the Trust. The Trust shall be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 3 Claim and will be entitled to assert and/or assign to any Tort Claimant all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs. The Trust shall also have the right to pursue judgment against Non-Settling Insurers to determine the amount of coverage available for Protected Parties' liability for Tort Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. The Trust shall be fully authorized to act in its own name, or in the name of any Protected Party, to enforce any right, title, or interest of any Protected Party in the Transferred Insurance Interests. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact that the Archdiocese is in bankruptcy or by any distribution from the Trust to any Tort Claimant. The transfer of the Transferred Insurance Interests shall not affect any Non-Settling Insurer's duty to defend, but to the extent that a failure to defend or a separate agreement between the Archdiocese, the Reorganized Debtor, or any other Protected Party and any Non-Settling Insurer gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds. Any recovery by the Trust on an action against a Non-Settling Insurer for a determination of coverage for Protected Parties' liability for Tort Claims shall become a Trust Asset and shall be distributed as provided in this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust's recourse to the Archdiocese and the other Protected Parties shall be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under this Plan, including any indemnification obligations of the Reorganized Debtor for Covered Non-Tort Claims under section 16.4, or as otherwise provided by the Plan. The Trust shall have no

- 35 -

liability for Covered Non-Tort Claims and holders of Covered Non-Tort Claims shall have no recourse to the Trust with respect to such Claims.

2.  The Trust shall have full access to coverage issued by the Non-Settling Insurers to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Protected Parties prior to the confirmation of the Plan and the transfer of the Transferred Insurance Interests to the Trust, but Plan confirmation shall not relieve the Debtor (or the Trust if applicable) from any obligation under any Non-Settling Insurance Policy. The Non-Settling Insurers shall retain any and all coverage defenses, except any defense regarding or arising from the assignment and transfer of the Transferred Insurance Interests. Notwithstanding the foregoing, confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Archdiocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Protected Party or Settling Insurer under the Plan. The Plan is binding on Non-Settling Insurers as provided under this Section 6.7(a)(2).

The assignment and transfer of the Transferred Insurance Interests to the Trust does not affect the Archdiocese's, the Reorganized Debtor's, other Protected Parties', or any Non-Settling Insurer's right to contest the Archdiocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the assignment and transfer of the Transferred Insurance Interests, the Archdiocese, the Reorganized Debtor, and any other Protected Party shall not be relieved of any obligations or duties under any Non-Settling Insurer Policy (including without limitation any duty to cooperate) and shall continue to honor such duties and obligations as required by such applicable Non-Settling Insurer Policies and applicable law. The transfer and assignment of the Transferred Insurance Interests does not affect any insurers' rights, obligations, or duties under applicable Non-Settling Insurer Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Tort Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Archdiocese, the Reorganized Debtor, or any other Protected Party.

3.  The Bankruptcy Court shall determine at the Confirmation Hearing (i) whether the assignment of the Transferred Insurance Interests provided for in this Section is valid, and (ii) whether such transfer or the discharge and injunctions set forth in Sections 13.2 and 13.3, or any other term of the Plan, void, defeat, or impair the insurance coverage issued by the Non-Settling Insurers. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed assignment and transfer of the Transferred Insurance Interests to the Trust or other terms of the Plan related to

- 36 -

the Non-Settling Insurer Policies by the date set to file such objections, that party in interest shall be deemed to have irrevocably consented to the assignment of Transferred Insurance Interests and other Plan terms related to such Non-Settling Insurer Policies and will be forever barred from asserting that the assignment of the Transferred Insurance Interests or other Plan terms affect the ability of the Trust or Tort Claimants to pursue the Non-Settling Insurers, or any of them, for insurance coverage.

4.  In the event that the Bankruptcy Court enters a Final Order determining that the assignment of the Transferred Insurance Interests is valid and does not defeat or impair coverage under the Non-Settling Insurer Policies, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and other Protected Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Protected Parties shall not be relieved of any obligations the Protected Parties may have under Non-Settling Insurer Policies.

5.  The Reorganized Debtor will cooperate and assist the Trust in enforcing any right or prosecuting any claim based on the Transferred Insurance Interests. This cooperation includes, but is not limited to, providing access to documents and electronic information and providing clergy, employees, agents, and volunteers to testify in depositions and at trial.

**(b)     Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.**

1.  If the Bankruptcy Court does not enter a Final Order approving the assignment and transfer of the Transferred Insurance Interests to the Trust, then the assignment shall not occur and pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is hereby appointed as the representative of the Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's Interests against the Non-Settling Insurers with respect to the Tort Claims. Any recoveries on such Interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trustee as the Archdiocese's and the Estate's representative provided for in this Section 6.7(b)(1) is valid, and does not defeat or impair the insurance coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trustee to pursue Non-Settling Insurers, or any of them, for insurance coverage. In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat

- 37 -

or impair coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, then, following the Effective Date, the Trustee shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and other Protected Parties under Non-Settling Insurer Policies as are necessary to act as the representative of the Archdiocese and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trustee's appointment shall not relieve the Archdiocese, the Reorganized Debtor or the other Protected Parties from any obligation that such entities may have under the Non-Settling Insurer Policies. Nothing contained in this Section 6.7(b)(1) shall affect the rights and remedies of a Person who is not a Protected Party but is an insured or additional insured with the Archdiocese or is asserting rights under a Non-Settling Insurer Policy.

2. In the event that a Final Order is entered holding that: (a) the assignment of the Transferred Insurance Interests, or (b) the appointment of the Trustee as the Archdiocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Archdiocese, the Reorganized Debtor, and each of the Protected Parties will retain their Interests under each Settling Insurer and Non-Settling Insurer Policy.

(i)     At the request of the Trust, the Reorganized Debtor and the other Protected Parties will assert their Interests against a Non-Settling Insurer, including, but not limited to, by filing a lawsuit for recovery of policy proceeds. All recoveries by the Reorganized Debtor and the other Protected Parties will be paid to the Trust. The Reorganized Debtor and the other Protected Parties will select and retain counsel to pursue their Interests against Non-Settling Insurers pursuant to this Section 6.7(b), subject to the Trustee's approval, which approval shall not be unreasonably withheld.

(ii)     The Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Reorganized Debtor and the other Protected Parties in pursuing, pursuant to this Section 6.7(b), its Interests against Non-Settling Insurers.

(iii)     The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section 6.7(b), reimburse the Reorganized Debtor and each of the Protected Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing its Interests against Non-Settling Insurers, but will not compensate the Reorganized Debtor or any other Protected Party for any time any of its employees expend. Upon receipt by the Reorganized Debtor or other Protected Party, all recoveries received by the Reorganized Debtor or other Protected Party from Non-Settling Insurers shall be deemed to be held in trust for the benefit of the Trust and shall be remitted by the Reorganized

- 38 -

Debtor or other Protected Party to the Trust as soon as practicable following the Reorganized Debtor's or other Protected Party's receipt of such recoveries.

**6.8     SPECIAL DISTRIBUTION CONDITIONS**.

**(a)**     With respect to Class 3 Claims only, the Trust shall maintain sufficient funds to pay any potential reimbursements to Medicare and shall complete the following "Medicare Procedures":

> i.     the Trustee shall determine whether each Tort Claimant with a Date of Injury after December 5, 1980 is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Eligible");
>
> ii.     Upon request, the Trust shall provide to a Settling Insurer or the Reorganized Debtor information sufficient to allow them to perform their own SSA queries to the extent they wish to do so;
>
> iii.     in the event that one or more Tort Claimants with Dates of Injury after December 5, 1980 is/are identified as Medicare Eligible, the Trust shall complete a query to the CMS for each such Tort Claimant to determine whether any payment ("Conditional Payment") made pursuant to Section 1395y(b)(2)(B) of the MSPA has been made to or on behalf of that Tort Claimant arising from or relating to treatment for Abuse;
>
> iv.     if any Conditional Payment has been made to or on behalf of that Tort Claimant, the Trustee shall, within the time period called for by the MSPA, reimburse the appropriate Medicare Trust Fund for the appropriate amount, and submit the required information for that Tort Claimant to the appropriate agency of the United States government.

**(b)**     Compliance with the provisions of this Section 6.8 shall be a material obligation of the Trust in favor of the Settling Insurers under any settlement agreements between any of those insurers and Archdiocese, which authorizes funding to the Trust.

**(c)**     With the exception of Unknown Tort Claims, the Trust shall defend, indemnify and hold harmless the Protected Parties and the Settling Insurer Entities from any Medicare Claims, and any Claims related to the Trust's obligations under this Section. The Reorganized Debtor shall defend, indemnify, and hold harmless the Protected Parties and the Settling Insurer Entities from any Claims concerning the Unknown Tort Claims, including Medicare Claims.

**6.9     INVESTMENT POWERS; PERMITTED CASH EXPENDITURES**. All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

- 39 -

**6.10    REGISTRY OF BENEFICIAL INTERESTS**. To evidence the beneficial interest in the Trust of each holder of such an interest, the Trustee shall maintain a registry of beneficiaries.

**6.11    NON-TRANSFERABILITY OF INTERESTS**. Any transfer of an interest in the Trust shall not be effective until and unless the Trustee receives written notice of such transfer.

**6.12    TERMINATION**. The Trust shall terminate after its liquidation, administration, and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement. The Trust shall terminate no later than the sixth (6th) anniversary of the Effective Date.

**6.13    IMMUNITY; LIABILITY; INDEMNIFICATION**.

**(a)**    Neither the Reorganized Debtor or its respective members, designees, or professionals, nor the Trustee or any duly designated agent or representative of the Trustee, nor their respective employees, shall be liable for the acts or omissions of any other member, designee, agent, or representative of such Trustee, except that the Trustee shall be liable for his/her/its specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Trustee may, in connection with the performance of his/her/its functions and in his/her/its sole and absolute discretion, consult with his/her/its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall not be under any obligation to consult with his/her/its attorneys, accountants, financial advisors, or agents, and his/her/its determination not to do so shall not result in the imposition of liability on the Trustee unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, or fraud.

**(b)**    No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant, or other professional retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or this Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for his/her/its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

**(c)**    The Trust shall defend, indemnify, and hold harmless the Trustee, his/her/its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Guam is entitled to indemnify and defend

- 40 -

its directors, trustees, officers, and employees against any and all liabilities, expenses, Claims, damages or losses incurred by them in the performance of their duties hereunder.

1. Additionally, the Reorganized Debtor, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Trust or Trustee or respective agents, with respect to: (i) the Chapter 11 case and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 3 Claims, (iii) the administration of the Trust and the implementation of the Trust Distribution Plan, or (iv) any and all activities in connection with the Trust Agreement, shall be indemnified and defended by the Trust, to the same extent that a corporation or trust organized under the laws of Guam is from time to time entitled to indemnify and defend its own officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor or Reorganized Debtor, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided that, with respect to amounts paid in settlement, the Trust has approved such amounts in advance, such approval not to be unreasonably withheld.

2. Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Trustee, the Debtor, the Reorganized Debtor, and their respective agents in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Trust, shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee, the Debtor, the Reorganized Debtor, and their respective agents, to repay such amount in the event that it shall be determined ultimately by Non-Appealable Order that such Trustee, the Debtor, the Reorganized Debtor, and their respective professionals, officers, and directors is not entitled to be indemnified by the Trust.

**6.14    TREATMENT OF TORT CLAIMS**.

(a)    **TRUST LIABILITY**. On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to section 16.4; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Trust Distribution Plan; and (iii) the right to pursue the Transferred Insurance Interests. Except as otherwise provided herein, the Trust does not assume any liabilities of the Archdiocese or Reorganized Debtor, in whole or in part, in regards to any Tort Claims that are not released, nor the liabilities of the Settling Insurers.

(b)    **ASSESSMENT OF TORT CLAIMS.** Each Tort Claim will be assessed by the Tort Claims Reviewer in accordance with the Trust Distribution Plan to determine

- 41 -

whether the Tort Claimant is entitled to a distribution under the Trust. The Archdiocese or the Reorganized Debtor shall reasonably cooperate with the Tort Claims Reviewer and the Trustee as requested by the Tort Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Trust Distribution Plan, but shall not be required to act in any way that violates any duty to cooperate with a Non-Settling Insurer. Under no circumstance shall the Tort Claims Reviewer's review of a Class 3 Claim, a Class 4 Claim, or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer.

      **(c)**      **Distribution Plan Claimants.** All Tort Claimants (i) whose Claims do not implicate coverage from any Non-Settling Insurer and (ii) who the Tort Claims Reviewer determines to be entitled to a distribution, will be deemed "Distribution Plan Claimants" and will receive a distribution in the amount(s) and at the time(s) determined by the Tort Claims Reviewer pursuant to the Trust Distribution Plan. A Distribution Plan Claimant must execute a release of all of his or her Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable. Any payment on an Abuse Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

      **(d)**      **Litigation Plan Claimants**

    1.    All Tort Claimants whose Claims are covered or are alleged to be covered, under any Non-Settling Insurer Policy will automatically be deemed "Litigation Claimants" under the Plan, and will retain the right to: (i) pursue his or her Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Claim; and (ii) proceed in a Direct Action against any Non-Settling Insurer to the extent allowed by applicable law ("a Litigation Claim"). A Litigation Claimants' recovery on a Litigation Claim is limited as provided herein. The Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person be able to recover any amount from a Settling Insurer in connection with a Litigation Claim.

    2.    Litigation Claimants will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions from the Trust.

    3.    If necessary in the Trustee's discretion, the Trustee may establish a reserve for payment of a claim held by a Litigation Claimant in the amount that would have been awarded to the Litigation Claimant if such Claimant were a Distribution Plan Claimant. The creation and existence of this reserve is not a settlement, release, accord or novation of the Litigation Claims and cannot be used by any third party as a defense to

- 42 -

any alleged joint liability with any Protected Party. For avoidance of doubt, the creation and existence of this reserve does not affect, diminish or impair a Litigation Claimant's rights to collect a judgment against any Non-Settling Insurer or Person that is not a Protected Party, except as expressly provided herein. The Trustee may establish one reserve for all of the Litigation Claims but no Litigation Claimant shall have any interest in any portion of the reserve in excess of the amount determined for that Litigation Claimant under the Trust Distribution Plan, and then only in the event that the Litigation Claimant prevails on his Litigation Claim. Neither the Trust's payment of, or reserving monies on account of, the Tort Claims nor the Tort Claims Reviewer's review of a Claim, shall: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Abuse Claim, either individually or in the aggregate with other Abuse Claims, in any coverage litigation with any Non-Settling Insurers.

(e)     **Legal Effect of Estimation of Claims and Distributions under Trust Distribution Plan.** The Tort Claims Reviewer's determinations are for estimation purposes only and shall not be a finding or fixing of the fact or liability or the amount payable for any Tort Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan. The determination of qualification, estimation of claims, and payment of distributions is not an admission of liability by any Protected Party or the Trust with respect to any Tort Claims and has no res judicata or collateral estoppel effect on any Protected Party, the Trust, or any Non-Settling Insurer. Any payments by the Trust to Tort Claimants in connection with their Tort Claims is not a release of the Debtor nor an accord or novation of the Debtor's liability on account of the Class 3 and Class 4 Claims. The Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Archdiocese's, the Reorganized Debtor's, or any other Protected Party's liability for, or damages with respect to, any Class 3 or Class 4 Claim. The determination of qualification, estimation of claims, and payment of distributions is not a settlement, release, accord, or novation of Class 3 or Class 4 Claims and cannot be used by any third party as a defense to any alleged joint liability. The determination of qualification, estimation of claims, and payment of partial distributions does not impair a Litigation Claimant's rights to obtain a judgment against a Protected Party or any Non-Settling Insurer or other Person, for purposes of establishing the Protected Party's liability on the Tort Claim, but any such judgment awarded to a Litigation Claimant will be reduced by the amount of distributions already paid by the Trust to such Litigation Claimant on his or her Tort Claim(s). Neither the Tort Claims Reviewer's review of a Tort Claim and determination of qualification, nor the Trust's estimation of claims or payment of distributions shall (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages, either individually or in the aggregate, in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of claims and payment of distributions does

- 43 -

not constitute a triggering event for liability under any Non-Settling Insurer Policy nor does it create an admission of the fact of liability or the extent of damages on behalf of the Protected Parties.

      **(f)**      **RELEASE AND DISCHARGE OF TORT CLAIMS.** No Tort Claimant shall receive any payment on any award unless and until such Tort Claimant has executed the Release attached as Exhibit E or Exhibit F to this Plan, as applicable. Each Tort Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and the other Protected Parties that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Tort Claimants specifically reserve, and do not release, any and all claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). Tort Claimants shall not be permitted to recover from the Trust for the liabilities, if any, of any Person that is not a Protected Party. In the event a Tort Claimant recovers from any other Person or any other trust for the liabilities of any Protected Party, the amount of such recovery shall first be deducted from any subsequent distributions from the Trust or any judgment awarded such Tort Claimant for the same liabilities of such Protected Party.

      **(g)**      **LIMIT OF RELEASE FOR NON-SETTLING INSURER POLICIES.** The Tort Claims will not be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Protected Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

      With respect to all other Claims, except as otherwise provided in the Plan, the Debtor's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d). The Tort Claimants' release, in whole or in part, of their Class 3 or Class 4 Claims will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Class 3 and Class 4 Claimants will expressly reserve their rights against other Persons (other than Protected Parties), including joint tortfeasors, who will remain severally liable on any Claims for Abuse. Any Person (other than a Protected Party) that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of causal liability or fault.

      **(h)**      **TRUST RIGHTS AGAINST NON-SETTLING INSURERS.** The Trust retains the right to pursue Non-Settling Insurers for the Archdiocese's, the Reorganized

CORE/3515288.0002/171049844.30

Debtor's, and any other Protected Party's liability to Tort Claimants, including for any distributions made to Litigation Claimants.

    **(i)**    **DISTRIBUTIONS TO TORT CLAIMANTS.** A Distribution Plan Claimant, who the Tort Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan. Any payment on a Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

    **(j)**    **LITIGATION CLAIMS.** In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of any reserve set for that Litigation Claimant's Litigation Claim, plus an additional $1,000.

    1.    In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust for handling pursuant to this Plan. Such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining shall be distributed in a manner consistent with the Trust Distribution Plan.

    **(k)**    Subject to the provisions of Article 6.14(e), the Trust's payment to a Litigation Claimant that has recovered a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds respecting such Class 3 Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

    **(l)**    If a Non-Settling Insurer has refused to defend a Protected Party with respect to any Litigation Claim, the Trust will advance or reimburse the Protected Party for reasonable and necessary attorneys' fees and other expenses incurred in defending the Litigation Claim. If any Non-Settling Insurer has refused to indemnify a Protected Party with respect to any settlement or judgment of a Litigation Claim, the Trust will indemnify the Protected Party for any judgment or settlement incurred by the Protected Party on such Litigation Claim, provided the Trust has consented in advance to any such settlement, such consent not to be withheld unreasonably. If all insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, that Litigation Claimant must sign a covenant not to execute against that Protected Party's

- 45 -

assets (other than Non-Settling Insurer Policies or proceeds or other assigned rights or interests), under which the Litigation Claimant will agree to seek recovery only from Non-Settling Insurers for any judgment the Litigation Claimant obtains against any Protected Party, in exchange for a stipulated judgment and assignment of insurance rights, as authorized by law. If any judgment on any Tort Claim is within the retention of any Non-Settling Insurer Policy, and all insurers have denied indemnity for such judgment, then the Trust will fund the judgment. The Trust's advancement or reimbursement of the Protected Party for such defense costs and/or judgment or settlement payments, and any distributions made by the Trust to the Litigation Claimant and other Class 3 Claimants (or by the Reorganized Debtor to any Claim 4 Claimants), will not affect, diminish or impair the Trust's right to bring any claims against any Non-Settling Insurers for refusing to defend and/or indemnify the Protected Party, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law.

      **(m)**     As of the Effective Date, the Trustee will be deemed to have the right to join or intervene into the Insurance Coverage Adversary Proceeding and to pursue recoveries against any Non-Settling Insurers to the same extent as the Debtor.

      **(n)**     Nothing in the Plan, Confirmation Order or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Tort Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, in connection with a Tort Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

      **(o)**     If the Litigation Claimant fails to prosecute his Litigation Claim to final judgment or settlement of the claim, or a Final Order is entered finding that no Protected Party has liability to such Tort Claimant on account of his Tort Claim, any reserve maintained by the Trust on account of such Tort Claim shall revert to the non-reserved assets of the Trust and the Litigation Claimant shall have no recourse against the Trustee, the Trust, any Protected Party, or any Settling Insurer.

      **(p)**     **OBJECTIONS AND LITIGATION AFTER THE EFFECTIVE DATE.**

1.  Regardless of whether a Class 3 Claimant is a Distribution Plan Claimant or a Litigation Claimant, the Trustee may object to that Class 3 Claimant's Claim. The Trustee's right to object to a Class 3 Claimant's Claim after the Effective Date will not affect or impair any right the Archdiocese, the Reorganized Debtor, other Protected Parties, and/or Non-Settling Insurers may have under the Non-Settling Insurer Policies or applicable law to object to such Class 3 Claims. The Reorganized Debtor may object to any Class 4 Claimant's Claim.

2.  The Protected Parties will comply with all obligations under the Non-Settling Insurer Policies and applicable law. The Trustee, to the extent required by the Non-Settling Insurer Policies implicated by such Tort Claims and applicable law, shall also cooperate with the Non-Settling Insurer in the defense of such

CORE/3515288.0002/171049844.30

judicial proceeding contemplated in Section 6.13(p)(1). In the event of a dispute between a Non-Settling Insurer and the Trustee regarding whether the Trustee must allow such Non-Settling Insurer to control the defense of such Tort Claim, or the extent of anyone's duty to cooperate, such dispute shall be resolved by the court hearing such dispute.

**(q)**     **CLAIM WITHDRAWAL.** A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to Section 13.2 of the Plan, the Channeling Injunction, and the Supplemental Settling Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Tort Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan. Each Protected Party, Non-Settling Insurer, Settling Insurer, and the Trust shall retain any and all defenses that may exist in respect to such Tort Claim.

**(r)**     **ELECTION.** No later than thirty (30) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, the Tort Claimant shall elect in writing one of the following treatment alternatives:

1.  A Tort Claimant may elect to receive a distribution as Distribution Plan Claimant, but must execute the release of all his or her Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable, and waive his right to pursue a direct action under applicable law against any Non-Settling Insurer; or

2.  A Tort Claimant may elect treatment as a Litigation Claimant and will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions from the Trust. Each Litigation Claimant also retains the right to: (i) pursue his or her Tort Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Tort Claim and (ii) proceed in a direct action against any Non-Settling Insurer to the extent allowed by applicable law. A Litigation Claimant's recovery on a Litigation Claim is limited as provided herein. The Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person be able to recover any amount from a Settling Insurer in connection with a Litigation Claim.

**(s)**     **MODIFICATION OF TREATMENT ELECTION.**

1.  If a Tort Claimant does not make one of the elections, the Tort Claimant will be treated as a Distribution Plan Claimant.

- 47 -

2. Upon written notice to the Trustee, subject to the Trustee's sole and absolute discretion, a Tort Claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant. Notwithstanding the foregoing, the Trustee shall consent to a Tort Claimant's rescission if such written notice of rescission is given prior to entry of an order of dismissal or a final judgment on the Litigation Claim in favor of a Protected Party.

3. No later than sixty (60) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, a Tort Claimant may rescind the election to be treated as a Distribution Plan Claimant in favor of being treated as a Litigation Claimant.

**6.15   CONTROL OF TRUST REAL PROPERTY ASSETS.** The Trustee's rights, powers, duties, and obligations provided in the Plan and the Trust Agreement, are subject to the following provisions with regard to any of the Trust's Assets which relate in any way to the Trust's rights, title, or interest in real property (the "Real Property Assets"):

**(a)     PARTITIONING OF CERTAIN PROPERTY.** The Trustee shall, within ninety (90) days after the Effective Date, hire a surveyor and take all steps necessary and prudent to partition the properties listed on **Exhibit O** (the "Partitioned Parcels") as follows:

i.     **RETAINED PARCELS.** The Trustee shall retain the portion of the Partitioned Parcels substantially consistent with the boundaries indicated in blue on the maps included as **Exhibit P** (the "Retained Parcels") for the purpose of liquidating said parcels for the benefit of Class 3 Claimants.

ii.     **PRESERVED PARCELS.** Within thirty (30) days after the Trustee obtains permission from all necessary government authorities to segment the Retained Parcels, the Trustee shall convey to the Reorganized Debtor the portion (the "Debtor Preserved Parcels") of the Partitioned Parcels that are not Retained Parcels.

iii.     **EQUITABLE RIGHTS IN THE PRESERVED PARCELS.** From the Effective Date, until the date the Trustee conveys legal title to the Debtor Preserved Parcels, the Reorganized Debtor shall retain all rights as the sole equitable owner of the Preserved Parcels, including, but not limited to, the right to occupy, use, possess, control, maintain, and exclude others from the same, subject only to the Trustee's rights arising under and related to this Section 6.15(a).

iv.     **RIGHT TO REPURCHASE.** The Reorganized Debtor shall retain a right of first refusal on any real property or interest in real property transferred to the Trust pursuant to this Plan (the "ROFR"). Within three (3) days after listing any Trust real property for sale, the Trustee shall inform the Reorganized Debtor in writing of the publically disclosed terms of the listing. The Trustee shall leave the real property on the market for not less than 30 days. After marketing any trust real

- 48 -

property for sale, the Trustee shall, within three (3) days after the Trustee, in his sole discretion, determines he will no longer accept offers for the real property, inform, in writing, the Reorganized Debtor of the highest and best offer obtained for the real property. The Reorganized debtor shall then have fourteen (14) days to make an offer, in writing, to match the terms of the highest and best offer or provide terms that are, in the Trustee's sole discretion, equivalent to the highest and best offer.

v.     **CLARIFICATION OF REAL PROPERTY ASSETS.** For the avoidance of doubt, the Real Property Assets do not include, and nothing in this Plan will be construed to sell, convey, or transfer, the interests, if any, of the Sisters of Mercy of Americas South Central Community on Guam, Inc. in (A) Lot P19.28B-1New, Ordot-Chalan Pago, or (B) Lot No. 2418A-R3, Tai, Mangilao.

**(b)     TIME LIMITS ON HOLDING REAL PROPERTY.** The Trust shall not hold any Real Property Assets for longer than five (5) years after the Effective Date. Should the Trust continue to hold Real Property Assets for more than five (5) years after the Effective Date, a Trust beneficiary may bring a motion with the Bankruptcy Court to compel the sale of the real property asset(s), and the Bankruptcy Court shall grant such motion, unless:

i.     The real property asset(s) is the subject of an executed purchase agreement with a good faith buyer and the transaction is scheduled to close within 120 days;

ii.     The Trustee has accepted an offer to purchase the real property asset, but the transaction is the subject of pending litigation; or

iii.     The Trustee obtains permission from the Bankruptcy Court to hold the real property asset for more than five years, which permission shall be granted only for cause, including, but not limited to (i) the Trustee demonstrates the value of the real property asset will increase by at least 20% of its current value over a specific amount of time, not to exceed 12 months; (ii) an act of God or other force majeure prevents the sale of the real property asset or substantially diminishes the value of the real property asset; or (iii) a delay in selling the real property asset is otherwise in the best interest of the Trust's beneficiaries.

**6.16     FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY ASSETS**. On the Effective Date of the Plan, the Real Property Assets shall be sold to Trust, pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Archdiocese, the Catholic Entities, and Tort Claimants. The Trust is a good faith purchaser of such assets within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable consideration and the sale complies with the Bankruptcy Code and applicable non-bankruptcy laws. **If the Court determines at the confirmation hearing for this Plan that a person(s) other than the Debtor holds an interest in the Real Property Assets, which interest is subject to a bona fide dispute, such interest will transfer only to the proceeds of any sale by the Trust of the respective Real**

CORE/3515288.0002/171049844.30

**Property Asset(s), and in no event will any person's interest cloud title, affect the Trustee's ability to sell the Real Property Asset(s), or entitle the interested party(ies) to recourse against the Trust in excess of the net-sale proceeds of the respective Real Property Asset(s).**

<div align="center">

**ARTICLE VII**
**SETTLING INSURERS**

</div>

**7.1     SETTLING INSURER SETTLEMENT AGREEMENT**. Any Insurance Settlement Agreements shall automatically be, and hereby are, incorporated by reference and made part of the Plan as if set forth fully herein. Upon (a) the Confirmation Order becoming a Final Order, (b) the conditions precedent in each Insurance Settlement Agreement being satisfied, and (c) subject to any termination provisions in an Insurance Settlement Agreement, the Insurance Settlement Agreements shall become fully binding on the Trust, Protected Parties, the Reorganized Debtor, the Committee, Settling Insurers, the Tort Claimants, parties in interest in the Chapter 11 Case, and any of the foregoing Persons' successors and assigns. The Insurance Settlement Agreements shall survive the confirmation, effectiveness, and consummation of the Plan.

**7.2     FREE AND CLEAR OF INTERESTS OF SETTLING INSURER POLICIES**. To the extent provided in each of the respective Insurance Settlement Agreements, and effective on the later of (i) the Effective Date of the Plan or (ii) the payment by each Settling Insurer of the settlement payment(s) due under such agreement, each and every Settling Insurer Policy issued to the Debtor shall be sold to the issuing Settling Insurer pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Archdiocese, Catholic Entities, and Tort Claimants. As set forth in certain of the Insurance Settlement Agreements and the corresponding Approval Orders, each Settling Insurer that is repurchasing any such Settling Insurer Policy is a good faith purchaser of such insurance policy within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable settlement of the parties' disputes and of their respective rights and obligations relating to each such Settling Insurer Policy and constitutes reasonably equivalent value, the releases in such Insurance Settlement Agreements and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws, and each such Settling Insurer Policy shall be terminated and be of no further force and effect with the issuing Settling Insurer having fully and completely performed any and all obligations under each such Settling Insurer Policy, including any performance owed to the Archdiocese and Catholic Entities, and all limits of liability of each such Settling Insurer Policy shall be exhausted. To avoid all doubt, nothing in this Section 7.2 or elsewhere in the Plan or in any related motion pursuant to Bankruptcy Rule 9019, shall authorize or effect the sale of any interest in a Settling Insurer Policy, which interest reposes in the estate of a person who is a debtor in a proceeding under Title 11 of the United States Code, unless and until the court with jurisdiction over such bankruptcy estate enters an order approving such sale.

**7.3     RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS.** The Confirmation Order shall provide that within ten (10) days after payment of the Insurance Settlement Amounts, the Debtor and the Settling Insurers shall effect dismissal with prejudice of their Claims against each other in anypending adversary proceeding, with each side to bear its own fees and costs. The Archdiocese shall not be required to dismiss any adversary proceeding as against any Non-Settling Insurer. The Settling Insurers will pay to the Trust the sums set forth in

<div align="center">- 50 -</div>

their respective Insurance Settlement Agreements within the time set forth in their respective Insurance Settlement Agreements.

**7.4     JUDGMENT REDUCTION**.

(a)     In any proceeding, suit, or action, , to recover or obtain insurance coverage or proceeds from a Non-Settling Insurer for a Protected Party's liability for any Tort Claim, the following shall apply:

(1)     If a Non-Settling Insurer has asserted, asserts, or could assert, any Contribution Claim against a Settling Insurer, then any judgment or award obtained by any Protected Party, the Trust, or a Tort Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that a court or arbitrator determine such Settling Insurer would have been liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("Reduction Amount"). In any action by a Protected Party, the Trust or a Tort Claimant against a Non-Settling Insurer to obtain insurance coverage or proceeds for a Tort Claim, where the Settling Insurers are not parties, the Non-Settling Insurers' Contribution Claim may be asserted as a defense, and to the extent the Non-Settling Insurers' Contribution Claim against a Settling Insurer is determined to be valid by the court presiding over such action, the liability of the Non-Settling Insurer will be reduced dollar for dollar by the amount so determined. In the event that a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any Settling Insurer will be determined by the court or arbitration proceeding in which such Contribution Claim is filed. To the extent possible, no Settling Insurer will be required to answer or otherwise respond to a complaint alleging a Contribution Claim against such Settling Insurer until such Reduction Amount is determined by such court or arbitrator(s). If, notwithstanding the foregoing, a court refuses to reduce the liability of the Non-Settling Insurer, then once the order establishing the Settling Insurer's liability for the Contribution Claim is a Final Order, the Trust shall promptly indemnify and hold harmless the Settling Insurer for such amount of any such Abuse-Related Contribution Claim.

(b)     Each Settling Insurer agrees that it will not pursue any contribution claim that it might have against any other Insurer (a) whose Contribution Claim against Settling Insurers is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against the Settling Insurers, or any of them. If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against the Settling Insurers, then such released Settling Insurer shall release its Contribution Claims against such releasing Insurer.

To the extent that the Trust indemnifies the Settling Insurers, or if any Insurer asserts a Claim directly against the Trust arising from or concerning the Settling Insurer Policies, any Contribution Claim of the Settling Insurers shall be transferred to the Trust, and the Trust shall be authorized to assert the Contribution Claims of such Settling Insurer against such other Insurer.

**7.5     FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS**. From and after the Effective Date, the Reorganized Debtor and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements,

- 51 -

instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Article without further order of the Bankruptcy Court. The Reorganized Debtor and the Settling Insurers may make technical or immaterial alterations, amendments, modifications, waivers, or supplements to the terms of any Insurance Settlement Agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

**7.6     INDEMNIFICATION OBLIGATIONS**.

From and after the Effective Date, and effective upon the Trust's receipt of the Settlement Amount (as defined in any Insurance Settlement Agreement), the Trust shall defend, indemnify, and hold harmless the Settling Insurers with respect to any and all Channeled Claims. The Reorganized Debtor shall defend, indemnify, and hold harmless the Settling Insurers from and against all other Claims that are subject to any indemnity obligation to the Settling Insurers under any Insurance Settlement Agreement or this Plan.

The indemnification obligations of the Trust to the Settling Insurers includes Claims made by Persons over whom the Trust and/or Reorganized Debtor do not have control. The Settling Insurers shall have the right to defend any Claims identified in this Section 6.6 and shall do so in good faith in the event the Settling Insurer chooses to defend such Claims. The Settling Insurers may undertake the defense of any Claim on receipt of such Claim without affecting such indemnification obligations. The Settling Insurers shall notify the Trust and/or Reorganized Debtor, as applicable, as soon as practicable of any Claims identified in this Section 6.6 and of their choice of preferred counsel. Any obligation of the Trust or Reorganized Debtor, as applicable, to indemnify the Settling Insurer under this Section 6.6 shall not exceed the Settlement Amount set forth in the Settlement Agreement as actually paid by the corresponding Settling Insurer. In defense of any such Claims, the Settling Insurers may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

**7.7     TIMING**

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives the Insurance Settlement Amount in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement.

**7.8     WAIVER/CONSENT**.

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction, and other covenants set forth herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of any Settlement

CORE/3515288.0002/171049844.30

Agreement, and upon receipt by the Trust of the settlement payments required by any Settling Insurers Settlement Agreement, each of the Protected Parties: (1) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims and/or Interests it has or might have now or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to released Tort Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (2) consents to the sale of the Protected Parties' Claims and/or Interests, if any, in the Settling Insurer Policies in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan.

      **(a)**      Nothing in this Section 7.8 shall be construed to bar either (i) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer or (ii) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (i) under an insurance policy other than the Settling Insurer Policies.

      **7.9**      **DEBTOR WAIVER AND RELEASE OF CLAIMS.** In consideration of any payments to be made by the Settling Insurers and other consideration provided by each Settling Insurer, upon payment by the Settling Insurers of their respective settlement amounts under the corresponding Insurance Settlement Agreements, the Archdiocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future (i) under the Settling Insurer Policies issued by the Settling Insurers to the extent those Settling Insurer Policies are bought back under the Settling Insurers Settlement Agreement and this Plan; (ii) against the Settling Insurers with respect to any Tort Claim; and (iii) against the other Protected Parties with respect to any Channeled Claim. For the avoidance of doubt, the Archdiocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future under the Settling Insurer Policies issued by, subscribed to, or underwritten by the Settling Insurers, which are bought back under the terms of the Settling Insurers Settlement Agreement and this Plan.

      **7.10**      **SUPPLEMENTAL SETTLING INSURER INJUNCTION**

      **(a)**      **Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers.** **Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies or Interests in insurance policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code:**

      **Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, or any other Person covered or allegedly covered under the Settling Insurer Policies, that directly or**

- 53 -

indirectly arise from, relate to, or are in connection with (i) any of the Settling Insurer Policies, any Claim that would have been covered under a Settling Insurer Policy but for an Insurance Settlement Agreement, any Tort Claims, Direct Action Claims, Indirect Claims, and Released Claims; (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims; (iii) Extra-Contractual Claims; and (iv) Unknown Tort Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or the Settling Insurer Policies:

1. Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the property of the Settling Insurers;

2. Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;

3. Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the property of the Settling Insurers;

4. Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the property of the Settling Insurers; and

5. Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

For the avoidance of doubt, this Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies but against no other person or thing. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation. For the avoidance of doubt, this Supplemental Settling Insurer Injunction shall not apply to: (i) any Persons who are not Protected Parties but who are insured under any Other Insurance Policies, with respect to coverage under such Other Insurance Policies; (ii) any Claims of any Persons that are covered or alleged to be covered under such Other Insurance Policies, to the extent such Claims are not Tort Claims or Indirect Claims against a Protected Party.

The Supplemental Settling Insurer Injunction will not be for the benefit of Non-Settling Insurers.

The Supplemental Settling Insurer Injunction will be effective with respect to any Settling Insurers Entities as of the date that the Trust receives the Settlement Amount (as defined in any Insurance Settlement Agreement).

## 7.11    BECOMING A SETTLING INSURER PRIOR TO THE EFFECTIVE DATE

(a)    National Union has agreed to contribute $18,000,000.00 to become a Settling Insurer.

- 54 -

(b)      Prior to the Effective Date, a Person may become a Settling Insurer if it (i) is an Insurer or BSA Insurer, (ii) if listed below, it agrees to pay the respective settlement amounts set forth below, or, if not listed below, reaches agreement with the Archdiocese and the UCC on its respective settlement amount; and (iii) obtains approval from the Archdiocese, the UCC, the Bankruptcy Court, and any other court with relevant jurisdiction over any respective Archdiocese Entity Insurance Policy or Other Insurance Policy, on the form of a written settlement agreement:

      (1)      CNA: $9,300,000.00;

      (2)      BSA Insurers, combined contributions total not less than: $55,000,000.00.

(c)      Notwithstanding anything in this Plan to the contrary, no BSA Insurer who becomes a Settling Insurer (whether prior to, as of, or after the Effective Date) is eligible or entitled to purchase an Other Insurance Policy or interest therein as provided under (i) Section 7.2 of this Plan or (ii) any other provision of the Plan or any related motion pursuant to Bankruptcy Rule 9019 which purports to authorize or require a "buyback" or "partial buyback" of such Other Insurance Policy.

(d)      For the avoidance of doubt, and again notwithstanding anything in this Plan to the contrary, neither the Plan Proponents nor the Trustee will enter into any settlement (whether prior to, as of, or after the Effective Date) with a BSA Insurer that would potentially impair the interests of the BSA or any other co-insured party under a BSA insurance policy besides the Debtor, unless they first obtain approval from a court with relevant jurisdiction over such interest, including the U.S. Bankruptcy Court for the District of Delaware.

## ARTICLE VIII
## NON-SETTLING INSURERS

### 8.1    PRESERVATION OF RIGHTS AND OBLIGATIONS.

(a)      In the event: (i) a Tort Claim is pursued in state or federal court by a Tort Claimant against a Protected Party or Non-Settling Insurer, or (ii) the Trust or the Reorganized Debtor asserts an objection to or otherwise seeks a determination of liability as to a Tort Claim, then the Protected Parties, the Trust and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist in respect to such Tort Claim and, except as set forth in Section 6.7(a)(2) and this Section 8.1, all coverage defenses. If a Tort Claimant obtains a judgment, Non-Settling Insurers retain any defenses to such Claim pursuant to the terms of Section 6.7 and Article VIII of the Plan. The rights, duties and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Tort Claims are not impaired, altered, reduced, or diminished by: (a) the discharge in bankruptcy of the Debtor; (b) any distribution to Tort Claimants pursuant to this Plan, the Trust Agreement, and the Trust Distribution Plan; (c) the transfer of the Protected Parties' Transferred Insurance Interests; or (d) protections granted to the

Protected Parties under the Plan. Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage were brought by the Archdiocese, the Reorganized Debtor, or any other Protected Party, except any defense regarding or arising from the assignment and transfer of the Transferred Insurance Interests. Notwithstanding the foregoing, confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Archdiocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Protected Party or Settling Insurer under the Plan. The Plan is binding on Non-Settling Insurers as provided under this Section.

(b)      The rights and obligations of the Archdiocese, the Reorganized Debtor, and other insureds and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law (including without limitation any duty of an insured to cooperate) shall not be affected by the assessment of any Tort Claim, and shall be treated as if the Tort Claim had never been assessed for distribution purposes by the Trust.

(c)      Each Non-Settling Insurer shall be entitled to all rights as are provided under the terms of its Non-Settling Insurer Policies as if the Tort Claim had never been assessed for distribution purposes by the Trust.

(d)      After the Effective Date, upon consent of the Trustee, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves the agreement between the Person, the Reorganized Debtor and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such agreement. Upon the Bankruptcy Court's entry of a Final Order approving such agreement, Exhibit N shall be amended by the Trustee to include such Person. Any such Person shall have all of the rights, remedies and duties of a Settling Insurer notwithstanding that such Person originally may have been a Non-Settling Insurer under any provision of the Plan. Such rights, remedies and duties shall include the terms and conditions of the Channeling Injunction and Supplemental Settling Insurer Injunction. The Bankruptcy Court's retained jurisdiction to approve an agreement under this Article shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**8.2      ESTIMATIONS/ASSESSMENTS ARE NOT BINDING**. Estimations of Class 3 and Class 4 Claims for purposes of voting, and the determination of qualification, assignment of points, and payment of distributions of Tort Claims under the Trust Distribution Plan:

(a)              Shall not (i) constitute an admission of liability by any Person with respect to such Claims; (ii) have any res judicata or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, Protected Parties, Settling Insurers, Non-Settling Insurers, and Claimants in all other contexts or forums;

- 56 -

(b)          Shall be without prejudice to any and all rights of the Trust, the Archdiocese, the Reorganized Debtor, other Protected Parties, the Non-Settling Insurers and Tort Claimants in all other contexts and forums and shall not be deemed to be a determination of liability of the Archdiocese or a determination of whether, or the extent to which, such claim is covered under any Non-Settling Insurer Policy. The fact that a claim has been estimated for distribution purposes has no res judicata or collateral estoppel effect and is not a binding determination on any issue or the creation of a liquidated non-bankruptcy claim. The assessment by the Tort Claims Reviewer under the Trust Distribution Plan shall have no effect upon any "no action" provisions contained in any Non-Settling Insurer Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law. Rather, the liability of the Archdiocese, the Reorganized Debtor, or any other Protected Party and the amount owed by the Archdiocese, the Reorganized Debtor, other Protected Parties, and any Non-Settling Insurer on any Class 3 or Class 4 Claim, shall be determined by: (i) the amount of any court judgment obtained by the Class 3 or Class 4 Claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Archdiocese, the Reorganized Debtor, or any other Protected Party to the Non-Settling Insurer under the respective Non-Settling Insurer Policy or applicable law.

**8.3    RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS.** The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Approval Order approving such Insurance Settlement Agreement, the Plan and the Confirmation Order.

**8.4    THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER RIGHTS.** For the avoidance of doubt, solely with respect to the Non-Settling Insurers, except as set forth in Sections 6.7(a)(2) and 8.1(a) above, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, the Confirmation Order, any order approving a settlement, or any other order, judgment, conclusion of law, finding of fact, determination or statement (written or verbal) of the Bankruptcy Court (or any other Court exercising jurisdiction over this Chapter 11 case) to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer against the Debtor or any other insureds under any Non-Settling Insurer Policies, including any factual or legal defenses to any claim for insurance; (ii) shall affect, impair, or prejudice the rights and defenses of any Protected Party, the Trust, or any other insureds under Non-Settling Insurer Policies in any manner, including any factual or legal defenses to any claim for insurance; (iii) shall constitute a settlement or resolution of any Protected Party's liability to a Tort Claimant; (iv) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurer Policy; or (v) shall otherwise determine the applicability or nonapplicability of any provision of any Non-Settling Insurer Policy and any such rights and obligations shall be determined under the Non-Settling Insurer Policy and applicable law.

**8.5    THE ARCHDIOCESE'S OBLIGATIONS SURVIVE.** Notwithstanding the transfer of the Transferred Insurance Interests to the Trust, the Archdiocese shall not be relieved

- 57 -

of its duties or obligations under any Non-Settling Insurer Policies (except as provided to the contrary in any subsequent Insurance Settlement Agreement), and shall continue to perform such duties as required by such Non-Settling Insurer Policies and applicable law. If the Trust asserts any claim that the Archdiocese has breached such duties or obligations under the Non-Settling Insurer Policies resulting in a loss of coverage, it shall give the Archdiocese notice and an opportunity to cure any alleged breach, and in any event, the Archdiocese shall not be liable for any alleged breach resulting in a loss of coverage except to the extent that (i) the breach relates to post-Effective Date conduct of the Archdiocese, and (ii) the Archdiocese willfully or intentionally fails to comply with its continuing obligations under the Non-Settling Insurer Policies. In addition, any such claim will not be automatically allowed; the Archdiocese will have the right to defend against such claim.

**8.6     TRUST POWERS WITH RESPECT TO TORT CLAIMS AND NON-SETTLING INSURERS**.

**(a)**     A Tort Claimant or the Trust, as applicable, may enter into a settlement of a Tort Claim allowed by applicable non-bankruptcy law, and may enter into an arrangement with Tort Claimant's counsel providing such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer as provided in Section 4.3.

**(b)**     The Trustee may use the Trust Assets to prosecute litigation against the Non-Settling Insurers.

**(c)**     If the Trust successfully resolves an insurance coverage dispute with a Non-Settling Insurer or otherwise receives a recovery of insurance proceeds relating to Tort Claim(s) from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Tort Claims, pursuant to the Trust Distribution Plan. In such event, and on a periodic basis accumulating all such recoveries, the Trust shall make supplemental payments to Tort Claimants in accordance with the Trust Agreement and Trust Distribution Plan.

<u>**ARTICLE IX**</u>
<u>**INSURANCE POLICIES**</u>

**9.1     CONTINUATION OF INSURANCE POLICIES**. Except to the extent any Archdiocese Entity Insurance Policies are bought back as set forth in and pursuant to any Insurance Settlement Agreement or as otherwise provided by the terms of the Plan, all Archdiocese Entity Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Archdiocese Entity Insurance Policy is or was an executory contract of the Archdiocese, or continued in accordance with its terms pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Archdiocese Entity Insurance Policy is not an executory contract of the Archdiocese, such that each of the parties' contractual, legal, and equitable rights under each such Archdiocese Entity Insurance Policy shall remain unaltered. All known Archdiocese Entity Insurance Policies issued and/or effective prior to April 1, 1998 are listed on Exhibit I. To the extent that any or all such Archdiocese Entity Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Archdiocese Entity Insurance

CORE/3515288.0002/171049844.30

Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in this Chapter 11 case. Unless otherwise determined by the Bankruptcy Court pursuant to an order which becomes a Non-Appealable Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Archdiocese existing as of the Effective Date with respect to any Archdiocese Entity Insurance Policy. The Archdiocese reserves the right to seek rejection of any Archdiocese Entity Insurance Policy or other available relief prior to the Effective Date.

<div align="center">

**ARTICLE X**
**PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION**

</div>

**10.1    RESERVATION OF RIGHTS TO OBJECT TO NON-TORT CLAIMS**. Unless a Claim is expressly described as an allowed Claim pursuant to or under the Plan, or otherwise becomes an allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor or the Trustee, as applicable, shall be deemed to have a reservation of any and all rights, Interests, and objections of the Archdiocese, the UCC, or the Estate to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured, or unsecured, including any and all rights, Interests and objections to the validity or amount of any and all alleged Claims, Liens, and Interests, whether under the Bankruptcy Code, other applicable law, or contract. The failure to object to any Claim in this Chapter 11 case shall be without prejudice to the Reorganized Debtor's or the Trustee's, as applicable, right to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

**10.2    OBJECTIONS TO NON-TORT CLAIMS**. Prior to the Effective Date, the Archdiocese shall have the authority to pursue any objection to the allowance of any non-Tort Claim. From and after the Effective Date, the Reorganized Debtor will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to non-Tort Claims (including those Claims that are subject to objection by the Archdiocese as of the Effective Date); provided, however, that nothing in this Section shall affect the right of any party-in-interest (including the Reorganized Debtor and the Trustee) to object to any non-Tort Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to non-Tort Claims will be filed and served not later than thirty (30) days after the later of: (i) the Effective Date, or (ii) the date such Claim is filed. Such deadline or any Bankruptcy Court approved extension thereof, may be extended upon request by the Reorganized Debtor by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan. Notwithstanding the foregoing, there shall be no deadline for the Reorganized Debtor to object to Class 4 or Class 6 Claims.

**10.3    DETERMINATION OF CLAIMS**. From and after the Effective Date, any Claim that is not a Tort Claim, and as to which a Proof of Claim or motion or request for payment was

<div align="center">

- 59 -

</div>

timely filed in this Chapter 11 case, or deemed timely filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Archdiocese, the Reorganized Debtor, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, Interests, or Causes of Action that the Debtor or the Reorganized Debtor may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

**10.4    NO DISTRIBUTIONS PENDING ALLOWANCE**. No payments or distributions will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by an order which has become a Non-Appealable Order, and the Disputed Claim has become an allowed Claim.

**10.5    CLAIM ESTIMATION**. To effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 case, with respect to Disputed Claims, the Archdiocese (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to Section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.

## ARTICLE XI
## DISTRIBUTIONS UNDER THE PLAN

**11.1    PAYMENT DATE**. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a business day, such payment or distribution shall instead be made, without interest, on the immediately following business day.

**11.2    UNDELIVERABLE DISTRIBUTIONS**. If payment or distribution to the holder of an allowed non-Tort Claim under the Plan is returned for lack of a current address for the holder or otherwise, the Reorganized Debtor shall file with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment. All allowed

- 60 -

Claims paid as provided in this Section shall be deemed addressed to the same extent as if payment or distribution had been made to the holder of the allowed Claim with no recourse to the Reorganized Debtor or property of the Reorganized Debtor. If, after the passage of six (6) months, the payment or distribution still cannot be made, the Reorganized Debtor shall make the payment to the Trust. All allowed Claims paid as provided in this Section shall be deemed satisfied and released, with no recourse to the Reorganized Debtor or property of the Reorganized Debtor upon payment to the Trust, to the same extent as if payment or distribution has been made to the holder of the allowed Claim.

**11.3    SETOFFS**. The Reorganized Debtor or the Trustee, as applicable, may, to the extent permitted under applicable law, set off against any allowed Claim and the distributions to be made pursuant to the Plan on account of such allowed Claim, the Claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Trustee, as applicable, may hold against the holder of such allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Trustee, as applicable, of any such Claims, rights, and Causes of Action that the Reorganized Debtor or the Trustee, as applicable, possesses against such holder.

**11.4    NO INTEREST ON CLAIMS**. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between a claimant and the Archdiocese, the Reorganized Debtor, or the Trust, and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and claimants shall not be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order, or Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an allowed Claim.

**11.5    WITHHOLDING TAXES**. The Reorganized Debtor and the Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor and the Trust may require that the holder of an allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

<div align="center">

**ARTICLE XII**
**EFFECTIVENESS OF THE PLAN**

</div>

**12.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**. The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

**(a)    Entry of Confirmation Order**. The Confirmation Order has become a Non-Appealable Order, provided, however, that this condition may be waived if so agreed in writing by the Debtor and the UCC;

<div align="center">

- 61 -

</div>

CORE/3515288.0002/171049844.30

SA 1747

(b)     **Plan Documents.** All Schedules and Exhibits to the Plan shall have been duly completed by the Plan Proponents and filed with the Court and all agreements and releases referred to in the Plan shall have been duly executed by all parties thereto and filed with the Court, in each case in form and substance satisfactory to the Debtor, the Committee, and the Settling Insurers; and

(c)     **The Trust.** The Trust shall have been formed.

(d)     **Funding.** The Debtor shall make the payment to the trust as provided in 5.1(b)(2)(ii).

**12.2    NOTICE OF EFFECTIVE DATE**. The Plan Proponents shall file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**12.3    EFFECT OF NON-OCCURRENCE OF CONDITIONS**. If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the disclosure statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust or the Settling Insurers; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

<div align="center">

**ARTICLE XIII**
**EFFECTS OF CONFIRMATION**

</div>

**13.1    DISSOLUTION OF UCC**. On the Effective Date, the UCC shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

**13.2    DISCHARGE AND INJUNCTION**.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Archdiocese will be discharged from, and its liability will be extinguished completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, based on conduct occurring before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims

<div align="center">

- 62 -

</div>

and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under the Bankruptcy Code Section 501, such Claim is allowed under Bankruptcy Code Section 502, or the holder of such Claim has accepted the Plan.

For clarity, the Debtor is not discharged from Unknown Tort Claims, or Non-Settling Insurer Policy Claims, but recourse with respect to Non-Settling Insurer Policy Claims is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j) above.

Tort Claimants and the Trust shall be permitted to name the Archdiocese in any proceeding to resolve whether the Archdiocese has liability for Tort Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Archdiocese's liability for Tort Claims under Non-Settling Insurer Policies. The limitations otherwise set forth in the Plan on a Tort Claimant's recovery will not in any way limit the Non-Settling Insurers' obligations under the Non-Settling Insurer Policies or the Tort Claimants' and/or Trust's recoveries against the Non-Settling Insurers for the Non-Settling Insurers' conduct in connection with the defense or settlement of a Tort Claim, including on any judgments in excess of the limits of a Non-Settling Insurer Policy.

**13.3   CHANNELING INJUNCTION**. Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.

**(a)      In consideration of the undertakings of the Protected Parties and Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy Code:**

**1.   any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and**

**2.   all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:**

- 63 -

(i)      **commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;**

(ii)      **enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;**

(iii)      **creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;**

(iv)      **asserting, implementing or effectuating any Channeled Claim of any kind against:**

     1.      **any obligation due any of the Protected Parties or Settling Insurers;**

     2.      **any of the Protected Parties or Settling Insurers; or**

     3.      **the property of any of the Protected Parties or Settling Insurers.**

(v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and**

(vi)      **asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers.**

**Notwithstanding anything to the contrary in this Article or the Plan, Tort Claimants and the Trust shall be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or**

- 64 -

settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Sections 6.14(i) and (j).

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section 13.3 shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

The Channeling Injunction will not be for the benefit of Non-Settling Insurers.

The Channeling Injunction will be effective with respect to the Settling Insurers Entities as of the date that the Trust receives the amount(s) set for in Section 7.11.

**13.4    EXCULPATION; LIMITATION OF LIABILITY**. From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and the Archdiocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

**13.5    TIMING**. The injunctions, releases, and discharges (including the Channeling Injunction and Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the other conditions to effectiveness of the Insurance Settlement Agreement are fully met.

**13.6    NO BAR ON CERTAIN CLAIMS**. Notwithstanding the foregoing, nothing in this Plan shall be construed to bar (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing clause under an insurance policy other than the Settling Insurer Policies; or (c) a Tort Claim against a Protected Party that is not released or enjoined under the Plan, to the extent set forth herein.

- 65 -

**13.7**   **NO BAR ON CLAIMS AGAINST OTHER DEBTORS IN BANKRUPTCY.**

Notwithstanding anything in this Plan, including but not limited to the Supplemental Settling Insurer Injunction, the Channeling Injunction, or any Insurer Settlement Agreement, confirmation of this Plan, or approval of any Insurer Settlement Agreement, shall not be construed to bar, channel, discharge, or release: (i) any Claim asserted against a debtor in the BSA Bankruptcy, except to the extent attributable to the Archdiocese or (ii) a Claim for insurance coverage by or on behalf of any other party, besides the Archdiocese, that may be insured under a BSA insurance policy.

## ARTICLE XIV
## INCORPORATION OF CHILD PROTECTION PROTOCOLS

**14.1**   **CHILD PROTECTION PROTOCOLS**. The Child Protection Protocols, which will be supplemented, are incorporated into the Plan.

## ARTICLE XV
## THE REORGANIZED DEBTOR

**15.1**   **CONTINUED CORPORATE EXISTENCE**. The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Guam Code 18 § 10101 et seq. having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state or territorial law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

**15.2**   **VESTING OF ASSETS**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, Claims, and Interests of creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

**15.3**   **IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**. In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on **Exhibit J**.

**15.4**   **FURTHER AUTHORIZATION**. The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

CORE/3515288.0002/171049844.30

SA 1752

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    RETENTION OF JURISDICTION**.

    **(a)**    By the Bankruptcy Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1.  over disputes concerning the ownership of Claims;

2.  over disputes concerning the distribution or retention of assets under the Plan;

3.  over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims;

4.  over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Archdiocese, the Estate, or Trust, or property abandoned or transferred by the Archdiocese, the Estate, or the Trust;

5.  over motions to approve any Insurance Settlement Agreements entered into after the Effective Date by the Trustee;

6.  over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets and including, but not limited to determinations of the extent, validity, and priority of the Trust's interest in any Trust Asset;

7.  the removal of the Trustee and the appointment of a successor Trustee;

8.  over matters relating to the subordination of Claims;

9.  to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10. to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

- 67 -

11. to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to this Plan and any Insurance Settlement Agreement;

12. over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

13. over requests for allowance of payment of Claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

14. over all Fee Applications;

15. over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

16. over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of Claims, including holders of Class 3, Class 4 or Class 4 Claims;

17. over disputes concerning the existence, nature, or scope of the Archdiocese's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

18. to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Archdiocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

19. to enter a Final Decree closing the Chapter 11 case;

20. to enforce all orders previously entered by the Bankruptcy Court; and

21. over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan, including, but not limited to, disputes arising out of or related to the Transferred Insurance Interests or the rights and obligations of the Non-Settling Insurers on and after the Effective Date.

   **(b)**     By the District Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Section 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

- 68 -

CORE/3515288.0002/171049844.30

(c)      Actions to Collect Amounts Owed Pursuant to the Plan. Notwithstanding anything to the contrary in this Section, the Archdiocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to the Plan for any settlements embodied in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with this Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

(d)      Case Closure. The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

**16.2   ASSUMPTION OF EXECUTORY CONTRACTS**. On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court, and except as otherwise provided in the Plan, Confirmation Order, or Insurance Settlement Agreements, each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date with no cure amount due. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**16.3   INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES**. The obligation of the Archdiocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members, or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Archdiocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Guam pertaining to the Archdiocese, will be deemed and treated as executory contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code Section 365 as of the Effective Date, with no cure amount due. Notwithstanding the foregoing, under no circumstances will the Archdiocese, the Trust, or the Reorganized Debtor assume or be responsible for any alleged indemnification of any Person against whom the Archdiocese has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

**16.4   DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS**. After the Effective Date, the Reorganized Debtor will defend and indemnify any Protected Party with respect to any Covered Non-Tort Claim and, if so required by any Insurance Settlement Agreements, will defend and indemnify the Settling Insurers with respect to any Covered Non-Tort Claims. For clarity, effective upon the Trust's receipt of the Settlement Amount (as defined in the Settling Insurers Settlement Agreement), the Reorganized Debtor shall indemnify any Settling Insurers Entities from and against all other Claims (except for Channeled Claims) that are subject to any indemnity obligation to the Settling Insurers under any Insurance Settlement. As to any Claim against the Trust that qualifies as a Covered Non-Tort Claim, the Reorganized Debtor

- 69 -

will also undertake on behalf of the Trust the enforcement of the injunctions set forth in Articles VII and XIII, will defend the Covered Non-Tort Claim, and, if judgment is entered on such Claim, will indemnify the Trust for any liability for such Claim. The Reorganized Debtor may not seek insurance coverage for the Claims defended or indemnified under this Section from the Settling Insurers under any Settling Insurer Policy. Nothing in this provision or any other Plan provision is intended to suggest that any Person is entitled to obtain a judgment on a Covered Non-Tort Claim or Channeled Claim, that such judgment would be covered under any Settling Insurer Policy, or that any Person is entitled to seek coverage for such judgment against any Protected Party or Settling Insurer in violation of the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction, as applicable. For the avoidance of doubt, nothing contained in this Section or the Plan is intended to provide, expand, modify or add coverage for the Archdiocese or any other Protected Party under any Settling Insurer Policy to cover the Archdiocese's indemnification of any Covered Non-Tort Claims.

      **16.5    RESERVATION OF RIGHTS**. In accordance with the provisions of this Plan, the Archdiocese reserves the right to sell property of the Estate or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the confirmation hearing or as soon thereafter as is practicable.

      **16.6    NON-APPEALABLE ORDER**. Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Non-Appealable Order may be jointly waived by the Plan Proponents upon written notice to the Bankruptcy Court provided that Plan Proponents first obtain the consent of all Archdiocesan Settling Insurers.

      **16.7    AMENDMENTS AND MODIFICATIONS**. The Plan Proponents may modify the Plan at any time prior to the confirmation hearing in accordance with Section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may jointly modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding any provision of this Plan to the contrary, the provisions of Article VII and Sections 13.2 through 13.4 are intended to be an integrated set of provisions that implement and supplement the Insurance Settlement Agreements that may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

      **16.8    U.S. TRUSTEE REPORTS**. From the Effective Date until the case is closed, the Reorganized Debtor shall, within thirty (30) days of the end of each fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines. The Reorganized Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

      **16.9    NO WAIVER**. The failure of the Archdiocese to object to any Claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Trustee's right to object to such Claim, in whole or in part.

**16.10   TAX EXEMPTION**. Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**16.11   NON-SEVERABILITY**. Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Plan Proponents.

**16.12   REVOCATION**. The Plan Proponents reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.

**16.13   CONTROLLING DOCUMENTS**. In the event and to the extent that any provision of the Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of the Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of this Plan, this Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

**16.14   GOVERNING LAW**. Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) shall be governed by, and construed and enforced in accordance with, the laws of the Territory of Guam, without giving effect to conflicts of law principles.

**16.15   NOTICES**. Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by: (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Archdiocese or the Reorganized Debtor:

Archbishop Michael Byrnes
207 Archbishop FC Flores Street,
Hagatna, Guam 96910

- 71 -

If to the Trust or the Trustee:

[TBD]

**16.16  FILING OF ADDITIONAL DOCUMENTS**. At any time before substantial consummation, the Archdiocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**16.17  POWERS OF OFFICERS**. The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**16.18  DIRECTION TO A PARTY**. On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**16.19  SUCCESSORS AND ASSIGNS**. The Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**16.20  CERTAIN ACTIONS**. By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Archdiocese under the Plan, including: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Archdiocese or organizational structure of the Archdiocese shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

**16.21  FINAL DECREE**. Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor, Trustee or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 case.

**16.22  PLAN AS SETTLEMENT COMMUNICATION**. The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are Disputed as to validity or amount (including Tort Claims and the Insurance Litigation), except as otherwise provided above. Accordingly, the Plan, the disclosure statement, and any communications regarding the Plan or the disclosure statement are subject in all respects to Federal Rule of

- 72 -

Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Nothing herein or in any confirmed Plan is intended to constitute a compromise of Tort Claims.

**16.23   OTHER RIGHTS**. Except as expressly set forth in this Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Guam law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims.

<div align="center">

**ARTICLE XVII**
**BANKRUPTCY RULE 9019 REQUEST**

</div>

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents request approval of all compromises and settlements included in the Plan. For the avoidance of doubt, the Plan Proponents will file a separate motion with the Court in the event they seek approval of any settlement agreement with a Settling Insurer.

<div align="center">

**ARTICLE XVIII**
**CONFIRMATION REQUEST**

</div>

The Plan Proponents request confirmation of the Plan under Section 1129 of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan. The Plan Proponents request that, notwithstanding Fed. R. Bankr. P. 3020(e), the order confirming the Plan should be effective without stay.

<div align="center">

- 73 -

</div>

[Signature page for Plan of Reorganization]

Respectfully submitted,

**THE ARCHBISHOP OF AGAÑA**

_____

Archbishop of Agana

_/s/ Ford Elsaesser_
ELSAESSER ANDERSON, CHTD.
Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Tel:     (208) 667-2900
Fax:     (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

**ATTORNEYS FOR DEBTOR AND DEBTOR-
IN-POSSESSION**

and

[Signature page for Plan of Reorganization]

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

_____

Leo Tudela
Its: Chairperson

and

*/s/ Robert T. Kugler*
**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGAÑA**

**Exhibit A:**

**Unknown Claims Representative's Report and Recommendations**

**Exhibit B:**
Non-Settling Insurers

1. Insurance Company of North America;
2. Hartford Accident and Indemnity Company;
3. Certain Underwriters at Lloyd's London;
4. American Re Corporation; First State Insurance Company;
5. Travelers Casualty and Surety Company, Inc.;
6. Transit Casualty Insurance Company;
7. Allianz Global Risks US Insurance Company;
8. Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co.;
9. Commercial Ins. Co. of Newark, NJ

This list is non-exhaustive and will be amended or supplemented upon discovery of other Persons who may be Non-Settling Insurers.

| POLICY PERIOD | INSURER | POLICY NO. |
|---|---|---|
| 9/12/50-9/12/51 | Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co. | 41-3621 |
| 4/1/62-4/1/63 (presumed based on secondary evidence) | Commercial Ins. Co. of Newark, NJ | Unknown |
| 4/1/63-4/1/64 (presumed based on secondary evidence) | Commercial Ins. Co. of Newark, NJ | Unknown |
| 4/1/63-4/1/64 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 4/1/64-4/1/65 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 4/1/65-4/1/66 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 1/1/1962-1/1/1963 | INA | CGL191986 |
| 1/1/1963-1/1/1964 | INA | CGL204680 |
| 1/1/1964-1/1/1965 | INA | CGL212922 |
| 1/1/1965-1/1/1966 | INA | CGL 232470 |
| 1/1/1966-1/1/1967 | INA | CGL 248896 |
| 1/1/1967-1/1/1968 | INA | CLP 11200 |
| 1/1/1968-1/1/1969 | INA | GLP 151211 |

| POLICY PERIOD | INSURER | POLICY NO. |
|---|---|---|
| 1/1/1969-1/1/1970 | INA | GLP 160981 |
| 3/2/1969-1/1/1970 | INA | XBC 43198 |
| 1/1/1970-1/1/1971 | INA | BLB 51323 |
| 1/1/1970-1/1/1971 | INA | XBC 77302 |
| 1/1/1971-1/1/1972 | INA | XBC 85370 |
| 9/21/1971-1/1/1972 | Hartford | 10CA43315 |
| 1/1/1972 - 1/1/1974 | Hartford | 10CA43303 |
| 1/1/1972 - 1/1/1974 | Hartford | 10HUA43302 |
| - | Hartford | 10CA43329 |
| 1/1/1974-1/1/1975 | Hartford | 10HUA43335 |
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E |
| 9/17/1976-9/17/1977 | Lloyds' & Companies | 76-10-08-02 |
| 1/1/1977-1/1/1978 | Hartford | 10CA43359 E |
| 1/1/1977-1/1/1978 | Am RE | M-1027493 |
| 1/1/1978-1/1/1979 | INA | GLP706452 |
| 1/1/1978-1/1/1979 | First State | 908854 |
| 1/1/1979-1/1/1980 | INA | GLP706452 |
| 1/1/1979-1/1/1980 | INA | XBC 151748 |
| 1/1/1979-1/1/1980 | First State | 927616 |
| 1/1/1980-1/1/1981 | INA | GLP706452 |
| 1/1/1980-1/1/1981 | Allianz | UMB 599346 |
| 1/1/1980-1/1/1981 | Aetna | 01XN2438WCA |
| 1/1/1981-1/1/1982 | INA | ISC1353 |
| 1/1/1981-4/1/1982 | Transit | UMB 964076 |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931255 & 931255A |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931257 & 931257A |

**Exhibit C:**
[RESERVED]

**Exhibit D:**
Trust Agreement and Trust Distribution Plan

**THE ARCHBISHOP OF AGANA SETTLEMENT TRUST AGREEMENT**

This trust agreement (the "<u>Trust Agreement</u>") is made and entered into by and between the Archbishop of Agana, a Guam corporation sole (the "<u>Reorganized Debtor</u>") and _____ (the "<u>Trustee</u>") pursuant to the Joint Chapter 11 Plan of Reorganization (together with any and all amendments, exhibits, and schedules, the "<u>Plan</u>") filed in the Reorganized Debtor's chapter 11 bankruptcy case, case no. 19-00010 (the "<u>Bankruptcy Case</u>"), before the United States District Court for the District of Guam, Bankruptcy Division (the "<u>Bankruptcy Court</u>"). Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings as ascribed to them in the Plan, Confirmation Order, and Bankruptcy Code.

## <u>RECITALS</u>

A.     On the Petition Date, the debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Reorganized Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.     It is anticipated that in 2022, the Bankruptcy Court will enter an order confirming the Plan (the "<u>Confirmation Order</u>").

C.     The Plan anticipates the existence of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.     Pursuant to the Plan, the Trust is to use the Trust Assets to pay the Class 3 Claims and carry out the purposes of the Plan.

E.     The Trust is established for the benefit of the Beneficiaries of the Trust, as defined in Section 1.6 of this Trust Agreement, and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated under the Internal Revenue Code and codified at 26 C.F.R. §§ 1.468B-1 to -5.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

## <u>DECLARATION OF TRUST</u>

Subject to the occurrence of the Effective Date, the Reorganized Debtor hereby absolutely assigns to the Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Reorganized Debtor in and to the Trust Assets;

TO HAVE AND TO HOLD unto the Trust and its successors in trust and its successors and assigns forever;

IN TRUST NEVERTHELESS upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

PROVIDED, HOWEVER, that upon termination of the Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED that the Trust Assets are to be held and applied by the Trustee upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

## ARTICLE I

## AGREEMENT OF TRUST

1.1     <u>Creation and Name</u>. The Reorganized Debtor hereby creates the Trust known as "The Archdiocese of Agana Settlement Trust," which is the Trust provided for in the Plan. In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

1.2     <u>Purpose</u>. The purpose of the Trust is to assume responsibility for preserving, managing, and distributing Trust Assets to Class 3 Claimants, in accordance with the Trust Agreement and the requirements of the Plan and Confirmation Order, to receive assignment of the Transferred Insurance Interests from the Archdiocese, and to pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

1.3     <u>Transfer of Trust Assets</u>. Pursuant to the Plan and upon the occurrence of the Effective Date, the Reorganized Debtor will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Trust at all times as set forth in the Plan, all of the Reorganized Debtor's rights, titles, and interests in and to the Trust Assets to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan. The Trustee is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Trust.

1.4     <u>Transfer of Confidential Information</u>. The Trustee shall maintain the confidentiality of all documents and follow the confidentiality procedures provided for in the Bankruptcy Court's Order (I) GRANTING EXPEDITED RELIEF; (II) ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM; (III) APPROVING SEXUAL ABUSE PROOF OF CLAIM FORM; (IV) APPROVING FORM AND MANNER OF NOTICE; AND (V) APPROVING CONFIDENTIALITY PROCEDURES [Docket No. 51].

1.5     Irrevocability. The Trust shall be irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor.

1.6     Beneficiaries. The beneficiaries of the Trust are Class 3 Claimants under the Plan whose Claims are allowed by the Tort Claims Reviewer (the "Beneficiaries").

1.7     Acceptance of Assets and Assumption of Liabilities.

1.7.1 In furtherance of the purposes of the Trust, the Trustee hereby accepts the role of trustee of the Trust and accepts the grant, assignment, transfer, conveyance, and delivery of the Trust Assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, and the Confirmation Order.

1.7.2 In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing, and distributing Trust Assets to the Beneficiaries in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order. The Claims of the Beneficiaries will be evaluated by the Tort Claims Reviewer in accordance with the Trust Distribution Plan, attached as Exhibit 2 to this Trust Agreement.

1.7.3 The Trustee shall have all of the rights, powers, and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Trust, and applicable law. The Trustee shall have the authority to bind the Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trustee, and not individually, for all purposes contained in this Trust Agreement.

1.7.4 In furtherance of the purposes of the Trust, the Trustee assumes responsibility for (a) making payments to the Beneficiaries; (b) receiving, collecting, liquidating, maintaining, and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement, the Plan, and the Confirmation Order. The Trust will be administered consistent with the purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Trust Assets or as otherwise provided in the Plan or Confirmation Order.

1.7.5 All Trust expenses and all liabilities of the Trust with respect to the Beneficiaries shall be payable solely by the Trustee out of the Trust Assets.

## ARTICLE II

## <u>CORPUS OF THE TRUST</u>

2.1     <u>Trust Composition</u>. The Trust Assets shall include all property transferred to the Trust pursuant to the Plan, Confirmation Order, and any future orders of the Bankruptcy Court, including without limitation all rights of every kind, nature, and description transferred to the Trust pursuant the Plan.

2.2     <u>Transfer to Trust</u>. After the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Trust Assets shall be transferred to the Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in the Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of, or holders of claims against or Interests in the Reorganized Debtor) in accordance with Sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise provided for in the Plan. The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3     <u>Trustee's Right to and Title and Interest in Trust Assets</u>. Upon the transfer of the Trust Assets, the Trust succeeds to all of the Reorganized Debtor's and the Estate's right to and title and Interest in the Trust Assets, and the Reorganized Debtor and the Estate shall have no further right to, or title or Interest in or with respect to, the Trust Assets or this Trust, except as provided in this Trust Agreement, the Plan, or the Confirmation Order.

2.4     <u>No Tax on Transfers to Trust</u>. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Trust or receipt or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

2.5     <u>Spendthrift Provision</u>. To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

2.6     <u>Trust Corpus</u>. Subject to the terms of the Plan, the entirety of the Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Trust Corpus shall be allocated, administered, and distributed as provided in the Trust Distribution Plan, the Plan, and the Confirmation Order.

# ARTICLE III

## POWERS AND DUTIES OF TRUSTEE

3.1     Trustee's Bond. The Trustee shall not be required to post any bond, surety, or other security for the performance of the Trustee's duties unless otherwise ordered by the Bankruptcy Court and, in the event the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Trust and paid for from the Trust Assets.

3.2     Powers and Duties. The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, and the other provisions in this Trust Agreement, the following powers and duties:

3.2.1     To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, and the Confirmation Order.

3.2.2     To abandon any property which the Trustee determines in the Trustee's reasonable discretion to be of *de minimus* value or of more burden than value to the Trust.

3.2.3     To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate, including without limitation by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

3.2.4     To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan.

3.2.5     To open and maintain bank accounts on behalf of the Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.

3.2.6     To obtain all reasonably necessary insurance coverage with respect to any property that is, or may in the future become, a Trust Asset.

3.2.7     To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs, and expenses of administering the Trust as provided in this Trust Agreement and the Plan. These fees, costs, and expenses include: (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trustee (the "Professionals"), including without limitation the Trustee, the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, (c) the premiums charged by insurers, including without limitation professional liability insurers, (d) reimbursement of any statutory fees and court costs incurred by the Reorganized Debtor (i) in the event the Trustee opposes the closure of the Bankruptcy

Case, from the date of the filing of any such opposition through the closure of the Bankruptcy Case or (ii) should the Trustee reopen the Bankruptcy Case in the future.

3.2.8    In accordance with the evaluation of the Tort Claims Reviewer pursuant to the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan and Plan to Beneficiaries who have provided signed copies of all required releases and forms.

3.2.9    In the Trustee's discretion, to rely on the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the Trust Distribution Plan and assessment of the Class 3 Claims without any verification or confirmation.

3.2.10  In the Trustee's discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust.

3.2.11  To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees from any professional, except (i) the Trustee's primary legal counsel or (ii) special insurance counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court.

3.2.12  Kramer Law LLC shall serve as the Tort Claims Reviewer for the Trustee on the terms approved by the Bankruptcy Court. The Trustee may subsequently remove any Tort Claims Reviewer for cause. For purposes of this Trust Agreement, "cause" shall mean (a) the willful and continued refusal by the Tort Claims Reviewer to perform the Tort Claims Reviewer's duties as set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, (b) gross negligence, gross misconduct, fraud, embezzlement, or theft, (c) a serious breach of fiduciary duty, or (d) other cause as the Trustee shall in good faith determine. In the event the Tort Claims Reviewer resigns, is removed, or is otherwise unable to perform the Tort Claims Reviewer's obligations, the Trustee shall have exclusive authority to appoint a new Tort Claims Reviewer. Nothing contained in this Trust Agreement shall prohibit the Trustee from also serving as the Tort Claims Reviewer if the Trustee determines that serving as both the Trustee and the Tort Claims Reviewer is in the best interest of the Trust and the Beneficiaries.

3.2.13  Frank Pangelinan of Latte Stone Properties shall serve as the real estate advisor for the Trust. The Trustee may subsequently remove the real estate advisor for cause like the "cause" defined in 3.2.12 above.

3.2.14  To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Trust or to maintain and administer the Trust.

3.2.15  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

3.2.16  To amend, modify, or alter the Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries, the Reorganized Debtor, and any or all other parties in interest. For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Trust, as identified in Section 1.2 of this Trust Agreement.

3.2.17  Upon any event terminating the Trust, to defer distribution of Trust Assets for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

3.2.18  To comply with Section 345 of the Bankruptcy Code with regard to the investment of the Trust Assets. The Trustee is relieved of any obligation to diversify.

3.2.19  To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool the accounts, funds, or reserves for investment purposes or require separate bank accounts for the accounts, funds, or reserves.

3.2.20  To be responsible for only the Trust Assets delivered to the Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.2.21  The Trust will assume all duties, obligations, and indemnification responsibilities outlined in the Plan.

3.2.22  To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on the Insurance Litigation.

3.3     Limitations on the Trustee. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

3.3.1   Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

3.3.2   Loan Trust Assets;

3.3.3   Make any transfer or distribution of Trust Assets other than those authorized in this Trust Agreement, the Plan, or the Confirmation Order;

3.3.4   Engage in any trade or business; or

3.3.5    Engage in any investments or activities inconsistent with the treatment of the Trust as a "Designated" or "Qualified Settlement Trust."

## ARTICLE IV

## TERMINATION OF THE TRUST

4.1    Pre-Confirmation Termination. The Trustee shall terminate the Trust if (a) the Effective Date does not occur within one year from the date the Trust Agreement is executed by the Reorganized Debtor and the Trustee or (b) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to confirmation of the Plan (the "Pre-Confirmation Termination"). Upon the Pre-Confirmation Termination of the Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trustee and the Reorganized Debtor both discharged from any and all duties and obligations provided for in this Trust Agreement.

4.2    Post-Confirmation Termination. The Trustee shall terminate the Trust after (a) the Trustee's liquidation, administration, and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and (b) the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan (the "Post-Confirmation Termination"). The Trust shall terminate no later than the fifth anniversary of the Effective Date.

4.3    Post-Confirmation Termination Procedures. After the Post-Confirmation Termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until the Trustee's duties in this Trust Agreement and Plan have been fully performed. The Trustee shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trustee until distribution of all the Trust Assets. For purposes of this provision, the Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $100,000.00. At the Trustee's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Trust Assets or (b) the date until which the Trustee is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice.

4.4    Post-Confirmation Termination Distribution. Upon Post-Confirmation Termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments in the Trust, if any, including any investment earnings to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order.

4.5    Discharge, Exculpation, and Exoneration. Upon Post-Confirmation Termination of the Trust and accomplishment of all activities described in this Article, the Trustee and the Trustee's Professionals shall be discharged and exculpated from liability, and the Trustee's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross

negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or his designated agents or representatives. The Trustee may, at the expense of the Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

## ARTICLE V

## IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUSTEE

5.1     Limitations on Liability. Neither the Trustee nor any of the Trustee's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or the Trustee's designated agents, representatives, or Professionals. The Trustee may, in connection with the performance of the Trustee's functions, and in the Trustee's sole and absolute discretion, consult with the Trustee's Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Trustee's Professionals. Notwithstanding this authority, the Trustee shall be under no obligation to consult with the Trustee's Professionals, and the Trustee's good faith determination not to consult with the Trustee's Professionals shall not result in the imposition of liability on the Trustee, unless the determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2     No Recourse Against the Trustee Personally. No recourse shall be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, or Professional retained by the Trustee in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trustee in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trustee under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets. The Trustee may be held liable for the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability for these grounds is established, recourse may be had directly against the Trustee. The Trust will not be covered by a bond.

5.3     Indemnification. The Trustee, using Trust Assets, shall defend, indemnify, and hold harmless the Trustee, the Trustee's officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the state of Guam is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that

neither the Trustee nor the Trustee's officers, directors, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

# ARTICLE VI

## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS

6.1     <u>Trustee Compensation</u>. The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in Exhibit 1.

6.2     <u>Compensation of the Trustee's Professionals</u>. Any Professional retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered paid by the Trustee from the Trust Assets.

6.3     <u>Reimbursement of Expenses</u>. Any and all reasonably necessary costs and expenses incurred by the Trustee and any Professional retained by the Trustee, in performing their respective duties under this Trust Agreement and the Plan, will be reimbursed by the Trustee from the Trust Assets.

# ARTICLE VII

## SUCCESSOR TRUSTEE

7.1     <u>Vacancy Caused by the Trustee's Resignation or Removal.</u>

7.1.1 The Trustee may resign at any time upon 30-days written notice to be filed with the Bankruptcy Court. The outgoing trustee (the "<u>Outgoing Trustee</u>") shall, within 30 days after the Outgoing Trustee's resignation takes effect, deliver to the successor trustee (the "<u>Successor Trustee</u>") all of the Trust Assets which were in the possession of the Outgoing Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trustee while serving as the Trustee.

7.1.2 Any Tort Claimant may petition the Bankruptcy Court to remove the Trustee.

7.1.3 The Bankruptcy Court may remove a Trustee for cause, which cause shall include, but shall not be limited to, the factors listed in Guam Statute § 501C.076(b). The removal will take effect upon the date the Bankruptcy Court specifies. In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such**.**

7.2     Outgoing Trustee Obligations. In the event of the resignation or the removal of the Trustee, the Outgoing Trustee, in addition to the duties imposed under Sections 7.1.1 or 7.1.2, shall:

7.2.1 Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trustee to effect the resignation or removal of the Outgoing Trustee and the conveyance of the Trust Assets to the Successor Trustee.

7.2.2 Deliver to the Successor Trustee all documents, instruments, records, and other writings relating to the Trust Assets as may be in the possession or under the control of the Outgoing Trustee.

7.2.3 Otherwise assist and cooperate in effecting the assumption of the Outgoing Trustee's obligations and functions by the Successor Trustee.

The Outgoing Trustee hereby irrevocably appoints the Successor Trustee (and any interim trustee) as the Outgoing Trustee's attorney-in-fact and agent with full power of substitution for the Outgoing Trustee and in the Outgoing Trustee's name, place, and stead to do any and all acts that the Outgoing Trustee is obligated to perform under this Trust Agreement. The appointment of the Successor Trustee as the Outgoing Trustee's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trustee. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trustee and the subsequent appointment of the Successor Trustee.

7.3     Appointment of Successor Trustee. Any vacancy in the office of the Trustee shall be filled by the nomination of a majority of the members of the UCC (notwithstanding dissolution of the UCC on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing. If at least three (3) members of the UCC do not participate in the nomination of the Successor Trustee within 10 days after the Outgoing Trustee resigns, is removed, or otherwise becomes unable to serve, the counsel for the majority of Tort Claimants shall designate a successor, subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing.

7.4     Preservation of Record of Changes in Trustees. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## ARTICLE VIII

## TRUSTEE REPORTING AND DISCHARGE

8.1     Annual Accountings. The Trustee shall prepare, at least annually, a written accounting of the administration of the Trust listing the current assets with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting may be filed with the Bankruptcy Court for as long as the Bankruptcy Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the

Beneficiaries upon request. However, the Trustee shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

8.2     Approval of Accountings and Discharge of the Trustee. At any time when the Bankruptcy Case is open, the Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving the accounting, the Trustee shall be discharged from all liability, to the Trust, any Beneficiary, or any Person who has or may have a claim against the Trustee or Trust for acts or omissions in the Trustee's capacity as Trustee with respect any act of gross negligence or intentional wrongdoing related to any assets listed and transactions detailed in the accounting. Any claim of liability arising out of the Trustee's gross negligence or intentional wrongdoing must be raised with the Bankruptcy Court within 30 days after the filing of any accounting.

## ARTICLE IX

## SECTION 468B SETTLEMENT FUND

9.1     Qualification. In accordance with the Plan, the Trustee shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code of 1986 (as amended, the "Tax Code") and the regulations promulgated pursuant the Tax Code (the "Treasury Regulations"). The Reorganized Debtor shall be the "Transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "Administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

9.2     All Events Test and Economic Performance Requirement. It is intended that the transfer of the Trust Assets to the Trust shall satisfy the "All Events Test" and the "Economic Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

9.3     Employer Identification Number. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

9.4     Relation-Back Election. If applicable, the Trustee and the Reorganized Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

9.5     Filing Requirements. The Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Reorganized Debtor shall file an election statement satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and the Treasury Regulations. The election statement shall be included with the Trust's first timely filed trust income tax return. The

Reorganized Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Reorganized Debtor makes a transfer to the Trust.

9.6     Broad Powers of the Trustee. The Trustee is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the Treasury Regulations. Further, the Trustee may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with Article IX of this Trust Agreement, provided such amendment does not create any tax liabilities or administrative responsibilities for the Reorganized Debtor.

<div align="center">

**ARTICLE X**

**BENEFICIARIES**

</div>

10.1 Register. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the (i) names and addresses of the Beneficiaries and the actual distributions made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon the Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by the holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trustee. The Trustee shall be obligated to maintain the confidentiality of all names, addresses, and any and all other personally identifying information of the Beneficiaries provided to the Trustee.

10.2 Rights of Beneficiaries. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of the Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

10.3 Tax Identification Numbers. The Trustee shall require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Trustee shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1 <u>Plan Incorporation</u>. The terms of the Plan and the Confirmation Order are incorporated into and made part of this Trust Agreement as if fully set forth herein. In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

11.2 <u>Notices</u>. All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

If to the Reorganized Debtor:

Archdiocese of Agana
with a copy to:

11.3 <u>Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.4 <u>Reimbursement of Costs</u>. If the Trustee, the Trust or the Reorganized Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement of a provision of this Trust Agreement, the Trustee, the Trust or the Reorganized Debtor, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

11.5 <u>Entirety of Trust Agreement</u>. Except with respect to the Plan and Confirmation Order, this Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement. This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement. It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

11.6 <u>Counterparts</u>. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

11.7 <u>Captions</u>. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

11.8 <u>Representation</u>. It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement. Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America. Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

11.9 <u>Interpretation</u>. This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement. Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party. The parties to this Trust Agreement have used their own judgment in entering into this Agreement.

11.10 <u>Savings Clause</u>. If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

11.11 <u>Applicable Law</u>. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Guam applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

<div align="center">

**[SIGNATURE PAGE TO FOLLOW]**

</div>

IN WITNESS WHEREOF, the Reorganized Debtor and the Trustee execute this Trust Agreement as of the ____ of _____, 2022.

**TRUSTEE:**

By: _____

Title: _____

**ARCHBISHOP OF AGANA**, a Guam religious corporation, as Reorganized Debtor

By: _____

Title: _____

**EXHIBIT 1**

**TRUSTEE COMPENSATION**

Craig Wade- $250.00 per hour

**EXHIBIT 2**

**ARCHBISHOP OF AGAÑA, A CORPORATION SOLE**
**TRUST DISTRIBUTION PLAN**

**ARTICLE I**
**DEFINITIONS**

1.1    **Capitalized Terms**.

Capitalized terms used in this Trust Distribution Plan shall have the meanings given them in the Plan, the Trust Agreement, or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Trust Distribution Plan by reference.

**ARTICLE II**
**RULES OF INTERPRETATION AND GENERAL GUIDELINES**

2.1.    **Purpose**

This Trust Distribution Plan is designed to provide guidance to the Tort Claims Reviewer in determining the amount of each Class 3 Claim and Class 4 Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

2.2.    **General Principles**

As a general principle, this Trust Distribution Plan intends to set out a procedure that provides substantially the same treatment to holders of similar Class 3 Claims and Class 4 Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 3 Claims and Class 4 Claims are intended to reflect the relative values of Class 3 Claims and Class 4 Claims.

2.3.    **Sole and Exclusive Method**

The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 3 Claim or a Class 4 Claim may seek allowance and distribution of such Claim who elect to be treated as a Distribution Plan Claimant. Although the factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

2.4.    **Interpretation**

The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of these Procedures.

### 2.5.    Confidentiality and Privilege

All information that the Tort Claims Reviewer receives from any source about any Class 3 Claim or Class 4 Claim shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Class 3 Claimant or Class 4 Claimant (or such Claimant's counsel of record). All information the Tort Claims Reviewer receives from any Class 3 Claimant or Unknown Tort Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Tort Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

### 2.6.    Tort Claims Reviewer

Kramer Law LLC is the Tort Claims Reviewer. The Tort Claims Reviewer shall conduct a review of each of the Class 3 Claim or Class 4 Claim, according to the guidelines set forth below, shall make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust Agreement.

## ARTICLE III
## PROCEDURE

### 3.1.    Allowance of a Class 3 Claim

A Class 3 Claim shall be allowed if the Tort Claims Reviewer determines the Class 3 Claimant proved his or her claim by a preponderance of the evidence. If necessary, the Tort Claims Reviewer can ask for additional information to make this determination. The Class 3 Claimant may refuse such a request at his or her own risk.

### 3.2.    Claim Amount Determination

If a Class 3 Claim is allowed, the Tort Claims Reviewer shall determine the amount of such Class 3 Claim by assigning such Class 3 Claim a value pursuant to the Evaluation Factors. The Tort Claims Reviewer shall consider all of the facts and evidence presented by the Class 3 Claimant in the Class 3 Claimant's filed proof of claim. Class 3 Claimants may supplement their filed proof of claims to provide additional information to the Tort Claims Reviewer until a plan is confirmed. Class 3 Claimants shall have no later than ten (10) days from the Confirmation Date to provide the Tort Claims Reviewer with any additional information. The Tort Claims Reviewer may consider the credibility of the Class 3 Claimant and the facts alleged in support of the Claim and, in the Tort Claims Reviewer's sole discretion, reduce or deny the Class 3 Claim. After all Class 3 Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall determine the dollar value for each Class 3 Claim based on the Class 3 Claimant's pro rata share of the total points assigned to all Class 3 Claimants and the available funds for distribution after accounting for necessary holdbacks.

### 3.3.    Determinations by the Tort Claims Reviewer

The Tort Claims Reviewer or the Trustee shall notify each Class 3 Claimant or Class 4 Claimant in writing of the expected monetary distribution with respect to the Class 3 Claimant's claim or Class 4 Claimant's claim, which distribution may be greater or smaller than the actual

distribution to be received based on the outcome of any reconsideration claims. The Tort Claims Reviewer's determination shall be final unless the Class 3 Claimant or Class 4 Claimant makes a timely request for the point award to be reconsidered by the Tort Claim Reviewer. The Class 3 Claimant or Class 4 Claimant shall not have a right to any other appeal of the Tort Claim Reviewer's point award. Determinations shall be sent, in the case of a Claimant represented by a lawyer to the Claimant's attorney by email and, in the case of a pro se Claimant, both by email, if one is provided, and by express courier.

### 3.4.      Requests for Reconsideration

The Class 3 Claimant or Class 4 Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claims Reviewer within fourteen days (14) calendar days after the date of mailing of the notice of the preliminary monetary distribution. Each written request must be accompanied by a non-refundable check for the reconsideration fee, $400.00 hundred dollars ($400.00). The Class 3 Claimant or Class 4 Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Class 3 Claimant's or Class 4 Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Tort Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

### 3.5.      Distribution

Once the Tort Claims Reviewer has made all reconsideration determinations, the Trustee shall determine the dollar value of each Survivor's actual distribution based on the Class 3 Claimant's pro rata share of the total final points assigned and the available funds for distribution. The Trustee shall then make payment to Class 3 Claimants in accordance with the Trustee's powers and duties under Section 3.1(h) of the Trust Agreement.

### 3.6.      Deceased Abuse Survivors

The Tort Claims Reviewer shall review the claim of a deceased Class 3 Claimant without regard to the Claimant's death, except that the Tort Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

### 3.7      Determination of Status as Unknown Claim

The Unknown Tort Claim Reprentative shall determine whether a claim qualifies as an Unknown Claim under the Plan. If the Unknown Tort Claim Reprentative determines that a claim qualifies as an Unknown Claim, the Unknown Tort Claim Reprentative shall immediately notify the Debtor for the purposes of funding the Unknown Claim Reserve.

### 3.8 Allowance and Distribution to Unknown Claimants

When an Unknown Claim is received by the Trustee and after it has been qualified by the Unknown Tort Claim Reprentative, the Tort Claims Reviewer shall assign a total point value to

each Unknown Claim pursuant to the factors set forth in Article IV. After the Tort Claims Reviewer assigned points to the Unknown Claim, such Claim is an allowed Claim. Holders of Unknown Tort Claims shall receive a pro rata distribution from the Unknown Claim Reserve established by the Trustee. The distribution to each Unknown Claimant shall be determined by taking the points assigned to each Unknown Tort Claim, divided by the combined total points assigned to all Unknown Tort Claims, multiplied by the amount held in the Unknown Tort Claim Reserve. No Unknown Tort Claimant shall receive more than he or she would have as a Class 3 Claimant. The Trustee shall make an immediate distribution in an amount as determined in the sole discretion of the Unknown Claims Representative to the holders of allowed Unknown Tort Claims immediately upon determination by the Tort Claims Reviewer, with the remaining portion of the Claim paid at the termination of the Unknown Claim Reserve as provided for in the Trust Agreement.

### 3.9 Establishing A Reserve for Litigation Claims

The following procedure is the sole and exclusive method by which any Class 3 Claimant who elects treatment as a Litigation Claimant may seek allowance and distribution of such Litigation Claim. Each Litigation Claimant shall submit to all of the policies and procedures set forth in this Trust Distribution Plan, except as expressly set forth in this Section 3.9. The Trust shall establish a reserve for each Litigation Claim in the amount that would have been allocated to the Claim if the Litigation Claimant had elected treatment as a Distribution Plan Claimant. The Trustee may, in his discretion, and at the same time as the Trustee makes the initial distribution to the Distribution Plan Claimants, make an initial distribution to each Litigation Claimant in an amount based on and not to exceed the reserve set for each Litigation Claim.

a)  In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, then the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of the reserve set for that Litigation Claimant's Litigation Claim plus an additional $1,000.

b)  In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust. Such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining of any such recovery after such reimbursement shall be divided as follows:

1)  If a settlement is obtained with the Debtor, Reorganized Debtor, or Non-Settling Insurer(s) on the Litigation Claim before any judgment was obtained in the Litigation Claim, then the Litigation Claimant is entitled to receive a portion of such settlement up to a maximum amount of the total amount of the reserve set for the Litigation Claim, plus 60% of the total settlement, with the remainder to go to the Trust. The 40% will be payable by the Trust only if the settlement or judgment

is in an amount sufficient to pay the total amount of the reserve set for that Litigation Claimant's Claim, plus the 60%. If a settlement is obtained in an amount less than the reserve amount set for that Litigation Claimant's Claim, then the Litigation Claimant may recover up to the reserve amount from Trust, plus retain the total amount of the settlement.

2) If a judgment is obtained on the Litigation Claim and the resolution with or judgment against the Debtor, Reorganized Debtor, or Non-Settling Insurer is obtained thereafter, then the Litigation Claimant is entitled to receive a portion of such judgment or settlement up to a maximum amount of: the total amount of the reserve set for the Litigation Claim, plus 80% of the total settlement or judgment, with the remainder to go to the Trust. The 20% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the reserve set for that Litigation Claimant's Claim, plus the 80%. If a settlement or judgment is obtained in an amount less than the reserve amount set for that Litigation Claimant's Claim, then the Litigation Claimant may recover up to the reserve amount from Trust, plus retain the total amount of the judgment or settlement.

**3.10 Distribution of Litigation Claim Proceeds.** If any amounts are recovered by the Trust on any Litigation Claim after the distributions to the Litigation Claimant are made pursuant to Section 3.9(b), the Trust shall distribute the proceeds of such Litigation Claim to all Class 3 Claimants pursuant to Section 3.5. The Trust shall calculate each Litigation Claimant's pro rata distribution based on the points assigned for the purpose of establishes the reserve on his or her Litigation Claim.

## ARTICLE IV
## GUIDELINES FOR ALLOCATION FOR ABUSE CLASS 3 CLAIMS

### 4.1.   Evaluation Factors

Each Tort Claim will be evaluated by the Tort Claims Reviewer. Each Claim will be assigned points according to the following system. The total number of points awarded in each section is left to the discretion of the Tort Claims Reviewer.

(a)    **Nature of Abuse & Circumstances**. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive.

(1)    The duration and/or frequency of the abuse;

(2)    Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk;

(3)    Circumstances of abuse:

(i)    grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents,

personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

    (ii)    coercion or threat or use of force or violence, stalking;

    (iii)    relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator;

    (iv)    location of abuse, including but not limited to isolated location, Tort Claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

    (4)    Public Nature of Abuse: Including whether the perpetration of abuse was on more than one survivor at a time and whether the Claimant was the subject of public humiliation during or surrounding the perpetration of the abuse. Examples include: (i) the perpetrator forcing other survivors to watch the perpetration of abuse on a Claimant and (ii) public ridicule from classmates or teachers who observed grooming by the abuser.

    **(b)**    **Impact of the Abuse**. Overall, this category looks to how the abuse impacted the claimant. This includes how the abuse impacted the claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive.

    The Tort Claims Review should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

    (1)    Mental Health Issues: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

    (2)    Physical Health Issues: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

(3)     Spiritual Wellbeing: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

(4)     Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

(5)     Vocational Capacity: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

(6)     Academic Capacity: This includes but is not limited to school behavior problems.

(7)     Legal Difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

(8) Prevention/Knowledge: Was the abuse known about by other members of the establishment?

(9) Loss of Community: This includes, but is not limited to, experiencing public denial of the abuse and shame, shunning, or physical/emotional retaliation from loved ones or friends after disclosing the abuse.

**(c)**    **Claimant Involvement**. The Tort Claims Reviewer shall consider that all Claimants have benefited from the work and cost incurred by those Claimants who have previously asserted claims against the Archdiocese and have participated in the legal and factual development of claims against the Archdiocese.

The Tort Claims Review should consider factors including but not limited to whether the Claimant has filed a lawsuit; whether the Claimant and/or the Claimant's family has been subject to a deposition, mediation or interview; whether the Claimant has participated on the committee representing survivors; and whether the Claimant participated in publicizing the issue of clergy sex abuse which has benefitted all claimants.

<div align="center">

**ARTICLE V**
**<u>BOY SCOUTS OF AMERICA</u>**

</div>

**5.1**    **Allowed Claims from the Boy Scouts of America Bankruptcy Case**

(a) Any assets contributed to the Trust by the Boy Scouts of America and Delaware BSA, LLC and/or the BSA Insurers (the "BSA Contribution") shall only be distributed to Class 3 Claimants pursuant to the terms of this Article V.

(b) If a Class 3 Claimant is also the holder of an allowed claim in the chapter 11 bankruptcy case of the Boy Scouts of America and Delaware BSA, LLC (Bankr. D. Del. 20-10343) (Jointly Administered) (the "BSA Bankruptcy"), such Class 3 Claimant shall be entitled, in addition to the amounts allowed by Articles I-IV, to a pro rata distribution of the BSA Contribution based on the points awarded pursuant to Article IV.

(c) No Class 3 Claimant or Class 4 Claimant may receive a distribution pursuant to Article V unless the Claimant has an allowed claim in the BSA Bankruptcy.

## ARTICLE VI
## ADDITIONAL PROVISIONS

**6.1     Reductions.**

The Tort Claim Reviewer may allow any Class 3 Claim filed after the Bar Date but before the Effective Date in his sole discretion. The points assigned to any Class 3 Claim under this Section 6.1 pursuant to Article IV shall be reduced by 2/3, and in no event shall any Class 3 Claim allowed under this Section 6.1 receive more than $50,000.00.

**6.2     Distribution of Scholarship Voucher and Cemetery Voucher.** The Trustee shall distribute the Scholarship Voucher and Cemetery Voucher to holders of Allowed Class 3 Claims as follows:

a. Prior to making any initial distribution, the Trustee shall send correspondence to the Class 3 Claimants and request that each Class 3 Claimant opt-in to receive a School Voucher, Cemetery Voucher, or both.

b. If the number of opt-in Class 3 Claimants is less than or equal to the number of Scholarship Voucher and/or Cemetery Voucher the Trustee shall, after considering the facts and circumstances of each Class 3 Claimants request, distribute the Scholarship Voucher and/or Cemetery Voucher to the opt-in Class 3 Claimants.

c. If the number of opt-in Class 3 Claimants is greater the number of Scholarship Voucher and/or Cemetery Voucher the Trustee shall award the Scholarship Voucher and/or Cemetery Voucher by random lottery to the respective opt-in Class 3 Claimants. After considering the facts and circumstances of each Class 3 Claimants request, the Trustee shall distribute the Scholarship Voucher and/or Cemetery Voucher to the opt-in Class 3 Claimants awarded a Scholarship Voucher and/or Cemetery Voucher. In no case may a Class 3 Claimant receive both a School Voucher and Cemetery Easement under this provision 6.2(c).

d. After complying with provisions 6.2(a),(b), and (c), if the Trustee is unable to award and distribute all of the Scholarship Voucher and/or Cemetery Voucher, he may, in his discretion award any remaining Scholarship Voucher and/or Cemetery Voucher on a first-come-first-served basis to any Class 3 or Class 4 Claimant, with any then remaining Scholarship Voucher and/or Cemetery Voucher returned to the Reorganized Debtor upon closing of the Trust.

**EXHIBIT E**
**Class 3 Release**
(see below)

```
TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN,
YOU MUST EXECUTE AND DELIVER THIS RELEASE.
```

1.      All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.      In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

       a.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Archdiocese's Chapter 11 case.

       b.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

       c.      Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

       d.      Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

       e.      Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

       f.      With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release,  I covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in

CORE/3515288.0002/171049844.30

connection with the Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) I understand the Plan extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Tort Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s). I intend the foregoing undertakings to comply with the principles set forth in 7 G.C.A. § 24605.

5.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

6.      I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

7.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

8.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10.      I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11.      This Release will bind my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF
TORT CLAIMANT'S ESTATE:


DATED: _____


| | |
|---|---|
| Name of Holder: | _____ |
| Proof of Claim No. (if known): | _____ |
| John/Jane Doe No. (if known): | _____ |
| Signature: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone No. (optional): | _____ |
| E-mail (optional): | _____ |

**EXHIBIT F**

**<u>Unknown Tort Claim Release</u>**

(see attached)

> ### TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.

1.      All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.      In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

a.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Archdiocese's Chapter 11 case.

b.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

c.      Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

d.      Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

e.      Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

f.      With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with the Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to

voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) I understand the Plan extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Tort Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s). I intend the foregoing undertakings to comply with the principles set forth in 7 G.C.A. § 24605.

5.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

6.      I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

7.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

8.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10.     I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11.     This Release will bind my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF TORT CLAIMANT'S ESTATE:

DATED: _____

| | |
|---|---|
| Name of Holder: | _____ |
| Proof of Claim No. (if known): | _____ |
| John/Jane Doe No. (if known): | _____ |
| Signature: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone No. (optional): | _____ |
| E-mail (optional): | _____ |

**Exhibit G:**
**Real Property Transferred to Trust**

| Debtor Prefix | Legal Description |
|---|---|
| AGA13 | Lot 19-R1, Block 26, Agat |
| AGA14 | Lot 8-2, Block 22, Hagatna |
| AGA3 | Lot 1 NEW, Block 9, Agana (Consolidated from Lots 1, 2, 3, 4, 15 and 16) |
| AGA9 | Lot 1341-1-REM-4, Agana |
| AGT1 | Lot 306-4-2NEW, Agat |
| AGT2 | Lot 5, Agat (18% undivided interest) |
| AGT3 | Lots 165 and 168, Agat |
| AHT1 & AHT2 | Lot 19 NEW (Part) NEW-R4, Agana Heights |
| AHT3 | Lot 20 REM-3-2-1, Agana Heights |
| ANG1 | Lot 1341-1-REM-3, Hagåtña |
| ASA1 | Lot 240-10, Asan |
| ASA6 | Lot 214-1REM, Asan |
| ASA7 | Portion of Lot 11, Block 18, Tract 2025, Asan (old D18-23) |
| AST1 | Lot 1NEW, Block 5, Tract 240, Dededo |
| BAR21 | Lot 2346-1, Barrigada |
| BAR25 | Lot 2265-Rem-8-1, Barrigada |
| BAR22, 27 & 28 | Lot 2364-1-7NEW; Lot 2365-1-1; and Lot 5437 |
| BAR35 | Lot 2265-REM-8-4-R1, Barrigada |
| BAR5 | Lot 2264-1-2, Barrigada |
| DED15 | Lot 5019A-3-5, Dededo |
| HAG1 | Lot 1340-3-1, Hagatna |
| HAG2 | Lot 1341-1-1 (REM), Hagatna |
| HAG3 | Lot 81-REM-2, Hagatna |
| HAG4 | Lot 81-REM-3, Hagatna |
| HAG5 | Lot 81-REM-4, Hagatna |
| HAG6 | Lot 81-REM-7, Hagatna |
| HAG7 | Lot 81-REM-R8, Hagatna |
| HAG8 | Lot 81-REM-8, Hagatna |
| INA1 | Lot 190-R9, Inarajan |
| INA5 | Lot 1-R2, Inarajan |
| INA5a | Lot 1-2, Inarajan |
| MAC1 | Lot 10077-1-NEW-5, Machanao |
| MAL1 & MAL2 | Lot 190-2NEW, Malojloj, Inarajan |
| MAL3 | 190-7, Malojloj, Inarajan |
| MAN1 & MAN8 | Lot 2285-2-3, Mangilao |
| MAN3 | Lot 3, Block 3, Tract 139, Mangilao |

| Debtor Prefix | Legal Description |
|---|---|
| MAN6 | Lot 2285A, Mangilao |
| MAN10 | Lot 2418 A-2-R1, Mangilao |
| MER1A&B | Lot 501 (A) and Lot 501 (B), Gugae, Merizo |
| MER2 | Lot 4, Merizo |
| MER3 | Lot 530 Y-Pigua, Merizo |
| MER5 | Lot 54-R1, Merizo |
| MON1 | Lot 100-2, Mongmong |
| ORD2A | Lot 3275-3-4, Ordot |
| ORD3-6 | Lot 1NEW, Tract 122, Ordot |
| PGO10 | Lot 81-REM-1-R/W, Pigo, Agana |
| PGO11 | Lot 81-REM-6-R/W. Pigo, Agana |
| PHI1&2 | |
| PIT1 | Lot 1A, Tract 318, Piti |
| PIT2 | Block 8, Piti |
| SIN13 | Lot 21, Block 17, Tract 232 |
| SIN14 & SIN18 | Lot P19.28B-1New, Ordot-Chalan Pago |
| SIN8 | Lot 1118-R1 |
| STR1 | Lot 4, Block 4, Santa Rita |
| STR2 | Lot 6, Block 2, Santa Rita |
| TAL13 | Portion of Lot No. 11, Tract 2931, Talofofo, an area of 10,000 +/- square meters |
| TAL6-9 | Lots 12, 13, 14 and 15, Block 13, Talofofo |
| TUM1 | Lot 5060-A, Tumon, Dededo |
| TUM2 | Lot 5118-1-1, Tumon |
| YIG3 | Lot 5-1, Block 4, Tract 251, Yigo |
| YIG4 | Lot 7033-A, Yigo |
| YIG5 | Lot 7007-3-R3 New, Yigo |
| YON5 | Lot 91-1A-3-1, Yona |
| YON6 | Lot 173-NEW-NEW-R2, Yona |
| YPN1 | Lot 9-20, Tract 142, Ypan, Talofofo |
| Lot 247-2, Agat | AGT7 |
| Lot 248, Agat | AGT8 |
| Lots 1, 2, 3, and 4, Block 2, Tract 1534, Mangilao | BAR1, BAR2, BAR3, BAR4 |
| Lot 18 & 19, Block 1, Tract 2014, Sinajana | SIN9 & SIN10 |
| Lot 42-3, Umatac | UMA1 |

## Exhibit H:

[Reserved]

**Exhibit I:**
Archdiocese Entity Insurance Policies

| INSURER | POLICY NO. | POLICY PERIOD |
|---|---|---|
| Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co. | 41-3621 | 9/12/50-9/12/51 |
| Commercial Ins. Co. of Newark, NJ | Unknown | 4/1/62-4/1/63 (presumed based on secondary evidence) |
| Commercial Ins. Co. of Newark, NJ | Unknown | 4/1/63-4/1/64 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/63-4/1/64 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/64-4/1/65 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/65-4/1/66 (presumed based on secondary evidence) |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-32493 | 4/1/72-4/1/73 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-32493 | 4/1/73-4/1/74 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-32493 | 4/1/74-4/1/75 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-73721 | 4/1/75-4/1/76 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-73721 | 4/1/76-4/1/77 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-73721 | 4/1/77-4/1/78 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-74445 | 4/1/78-4/1/79 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-74445 | 4/1/79-4/1/80 |

| INSURER | POLICY NO. | POLICY PERIOD |
|---|---|---|
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-74445 | 4/1/80-4/1/81 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-75087 | 4/1/81-4/1/82 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-75087 | 4/1/82-4/1/83 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-75087 | 4/1/83-4/1/84 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-78156 | 4/1/84-4/1/85 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-78156 | 4/1/85-4/1/86 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-78156 | 4/1/86-4/1/87 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214061 | 4/1/87-4/1/88 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214061 | 4/1/88-4/1/89 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214061 | 4/1/89-4/1/90 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214482 | 4/1/90-4/1/91 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214482 | 4/1/91-4/1/92 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-214482 | 4/1/92-4/1/93 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-215417 | 4/1/93-3/31/94 |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-215459 | 4/1/94-3/31/95 (renewal endorsements to April 1, 1997) |
| National Union Fire Ins. Co. of Pittsburgh, PA | 80-216134 | April 1, 1997-April 1, 1998 |

**Exhibit J:**
**Officers and Directors of Reorganized Debtor**

1.  Archbishop Michael J. Byrnes

**Exhibit K:**

**CHILD PROTECTION PROTOCOLS**

[TO BE SUPPLEMENTED]

**Exhibit L:**
**BSA Insurance Policies**

| Policy Dates | Insurer | Policy Number | Limit Description |
| --- | --- | --- | --- |
| 1/1/1962-1/1/1963 | INA | CGL191986 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1963-1/1/1964 | INA | CGL204680 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1964-1/1/1965 | INA | CGL212922 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1965-1/1/1966 | INA | CGL 232470 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1966-1/1/1967 | INA | CGL 248896 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1967-1/1/1968 | INA | CLP 11200 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1968-1/1/1969 | INA | GLP 151211 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1969-1/1/1970 | INA | GLP 160981 | $500,000 each person; $1,000,000 each occurrence |
| 3/2/1969-1/1/1970 | INA | XBC 43198 | $2,000,000 per occurrence |
| 1/1/1970-1/1/1971 | INA | BLB 51323 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1970-1/1/1971 | INA | XBC 77302 | $2,000,000 per occurrence |
| 1/1/1971-1/1/1972 | INA | XBC 85370 | $2,000,000 per occurrence |
| 9/21/1971-1/1/1972 | Hartford | 10CA43315 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10CA43303 | $500,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10HUA43302 | - |
| - | Hartford | 10CA43329 | $500,000 each occurrence; $500,000 agg. |
| 1/1/1974-1/1/1975 | Hartford | 10HUA43335 | $2,000,000 per occurrence |
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | National Union | BE1151559 & BE1151554 | $10,000,000 each occurrence |

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| **9/17/1976-9/17/1977** | Lloyds' & Companies | 76-10-08-02 | $5,000,000 each occurrence |
| **1/1/1977-1/1/1978** | Hartford | 10CA43359 E | $1,000,000 each occurrence |
| **1/1/1977-1/1/1978** | National Union | BE121P255 & BE1151590 * | $10,000,000 each occurrence |
| **1/1/1977-1/1/1978** | Am RE | M-1027493 | $500,000 each occurrence |
| **1/1/1978-1/1/1979** | INA | GLP706452 | $500,000 per occurrence |
| **1/1/1978-1/1/1979** | National Union | CE1157777 | $500,000 per occurrence |
| **1/1/1978-1/1/1979** | First State | 908854 | $10,000,000 per occurrence |
| **1/1/1979-1/1/1980** | INA | GLP706452 | $500,000 per occurrence |
| **1/1/1979-1/1/1980** | INA | XBC 151748 | $5,000,000 per occurrence |
| **1/1/1979-1/1/1980** | First State | 927616 | $5,000,000 per occurrence |
| **1/1/1980-1/1/1981** | INA | GLP706452 | $5,000,000 each occurrence |
| **1/1/1980-1/1/1981** | Allianz | UMB 599346 | $5,000,000 per occurrence |
| **1/1/1980-1/1/1981** | Aetna | 01XN2438WCA | $10,000,000 per occurrence; $10,000,000 Aggregate |
| **1/1/1981-1/1/1982** | INA | ISC1353 | $500,000 per occurrence |
| **1/1/1981-4/1/1982** | Transit | UMB 964076 | $5,000,000 per occurrence |
| **1/1/1981-1/1/1983** | First State and Underwriters | 931255 & 931255A | $10,000,000 per occurrence |
| **1/1/1981-1/1/1983** | First State and Underwriters | 931257 & 931257A | $10,000,000 per occurrence |

The BSA Insurers include, but are not limited to: Insurance Company of North America; Hartford Accident and Indemnity Company; National Union Fire Insurance Company of Pittsburgh, PA; Certain Underwriters at Lloyd's London; American Re Corporation; First State Insurance Company; Travelers Casualty and Surety Company, Inc.; Transit Casualty Insurance Company; Allianz Global Risks US Insurance Company.

## Exhibit M:    List of Catholic Entities

1. The Catholic Cemeteries of Guam, Inc.,
2. Academy of Our Lady of Guam School,
3. Father Duenas Memorial School,
4. Bishop Baumgartner Memorial School,
5. Saint Francis Catholic School,
6. Santa Barbara Catholic School,
7. San Vicente Catholic School,
8. Saint Anthony Catholic School,
9. Our Lady of Lourdes Parish,
10. Santa Bernadita Parish,
11. Santa Barbara Parish,
12. Saint Andrew Kim Parish,
13. Blessed Diego Luis de San Vitores Parish,
14. Saint Anthony and Saint Victor Parish,
15. Saint Francis Parish,
16. San Miguel Parish,
17. San Isidro Parish,
18. Saint Joseph Parish,
19. San Dimas & Our Lady of the Rosary Parish,
20. San Dionisio Parish,
21. Saint Jude Thaddeus Parish,
22. Nuestra Senora de Las Aguas Parish,
23. Immaculate Heart of Mary Parish,
24. Nuestra senora de La Paz Y Buen Viaje Parish,
25. San Juan Bautista Parish,
26. Santa Teresita Parish,
27. San Vicente and San Roque Parish,
28. Dulce Nombre De Maria Cathedral-Basilica,
29. Our Lady of the Blessed Sacrament Parish,
30. Our lady of Purification Parish,
31. Nino Perdido Y Sagrada Familia Parish,
32. Assumption of Our Lady Parish,
33. Our Lady of Guadalupe Parish,
34. Our Lady of Mount Carmel Parish, and
35. Mt. Carmel Catholic School.

**Exhibit N:     Settling Insurers**

1. National Union Fire Insurance Company of Pittsburgh, Pa.;
2. American Home Assurance Company ; and
3. Any Persons added pursuant to Plan Section 8.1(d).

**Exhibit O:**
Partitioned Real Property

| Debtor Prefix | LEGAL DESCRIPTION |
|---|---|
| AGT3 | Lots 165 and 168, Agat |
| AHT1&2 | Lot 19 NEW (Part) NEW-R4, Agana Heights |
| ASA6 | Lot 214-1REM, Asan |
| ASA7 | Lot 11, Block 18, Tract 2025, Asan |
| AST1 | Lot 1NEW, Block 5, Tract 240, Dededo |
| BAR22, 27 &28 | Lot 2364-1-7-NEW, Barrigada; Southeasterly portion of Lot 2364-1, situated between government road and Westerly boundary of Lot 2365, Barrigada; and Lot 5437 (Old Bullcart Trail between Lot 2364-1-7 and 2365-1-1), Barrigada |
| BAR35 | Lot 2265-REM-8-4-R1, Barrigada |
| INA5 | Lot 1-R2, Inarajan |
| MAL1&MAL2 | Lot 190-2NEW, Malojloj, Inarajan |
| MAL3 | 190-7, Malojloj, Inarajan |
| MAN1 &MAN8 | Lot 2285-2-3, Mangilao |
| MER5 | Lot 54-R1, Merizo |
| ORD3-6 | Lot 1NEW, Tract 122, Ordot |
| PIT2 | Block 8, Piti |
| SIN13 | Lot 21, Block 17, Tract 232, Sinajana |
| SIN14&SIN18 | Lot P19.28B-1New, Ordot-Chalan Pago |
| SIN8 | Portion of Lot 1118-R1, Sinajana |
| STR2 | Lot 6, Block 2, Santa Rita |
| TUM2 | Lot 5118-1-1, Tumon |
| YIG5 | Lot 7007-3-R3 New, Yigo |
| YON6 | Lot 173-NEW-NEW-R2, Yona |

**Exhibit P:**

Maps of Retain Real Property

Retained Real Property is shown by blue marks on the following maps:

[filed with the Plan but at a separate docket entry]

CORE/3515288.0002/171049844.30

**Exhibit Q:**
**Bank of Guam Replacement Properties**

| Prefix | Legal | Only Portion Not Contained on Exhibits R/P |
|---|---|---|
| DED19 | Lot 4-NEW, Block 4, Dededo | |
| DED4-11 | Lot 1-New-New, Block 4, Dededo | |
| DED16 | Lot 1-New-New, Block 4, Dededo | |
| DED17 | Lot 1-New-New, Block 4, Dededo | |
| YON6 | Lot 173-NEW-NEW-R2, Yona | x |
| YON7 | Lot 174, Yona | |
| YON8 | Lot 175, Yona | |
| YON9 | Lot 166-Rem-1 | |
| MER5 | Lot 54-R1, Merizo | x |
| SIN2 | Lot 2413-1, Sinajana | |
| SIN3 | Lot 2414-1, Sinajana | |
| SIN14 | Lot P19.28B-1New, Ordot-Chalan Pago | x |
| MAN10 | Lot 2418 A-2-R1, Mangilao | |
| DED12 | Lot 1 New, Block 14, Dededo | |
| DED13 | Lot 7, Block 19, Dededo | |
| SIN19 | Lot 10, Block 5, Tract 232, Sinajana | |
| AGA10 | Lot 2, Block 28, Agana | |
| AGA11 | Lot 2, Block 28, Agana | |
| AGA6 | Lot 1273, Agana | |
| AGA7 | Lot 1275, Agana | |

**Exhibit R:**

**SCHOLARSHIP VOUCHERS**

1. Scholarship Vouchers cover tuition fees only, excluding all other fees, including but not limited to registration fees which will be the responsibility of the award party.

2. All students intending to use a Scholarship Voucher must be otherwise qualified to attend the particular school chosen. Scholarship Vouchers are subject to Admission Requirements, the Parent-Student Handbook, and all other policies implemented by the issuing school as well as policies implemented by the AOA Office of Catholic Education.

3. A specific number of Scholarship Vouchers will be assigned to each catholic school considering the school's viability.

4. Scholarship Vouchers will indicate the school, the grade level (elementary or high school), school year of effectivity and year of expiration.

5. Once the Scholarship Voucher is awarded to a particular student, the Scholarship Voucher is non-transferrable.

6. Scholarship Vouchers are not convertible to cash.

7. Scholarship Vouchers will terminate upon student voluntarily or involuntarily leaving the school of original attendance.

8. Scholarship Vouchers cannot be used at multiple schools.

9. Scholarship Vouchers to be used by family members of an Abuse Claimant who has executed a release.

**ELEMENTARY SCHOLARSHIP VOUCHERS**

1. For a period of ten (10) years, three Scholarship Vouchers per Archdiocesan elementary school will be issued annually that will encompass K to 8th grade.

2. Scholarship Vouchers are valid for up to 9 years from the school year of its effectivity.

3. Using an Elementary Scholarship Voucher prior to its effectivity date to enroll a student not beginning with kindergarten waives the prior year(s) not attended, and can be used only upon the availability of the slot for that higher grade level.

**HIGH SCHOOL SCHOLARSHIP VOUCHERS**

1. For a period of ten (10) years, two Scholarship Vouchers per Archdiocesan high school will be issued annually that will encompass 9th to 12th grade

2. High school Scholarship Vouchers are valid for 4 years from its school year of effectivity.

3. Using a high school Scholarship Voucher prior to its effectivity date to enroll a student not beginning with 9th grade waives the prior year(s) not attended, and can be used only upon the availability of the slot for that higher grade level.

**ARCHDIOCESAN ELEMENTARY SCHOOLS**

Bishop Baumgartner Memorial Catholic School
San Vicente Catholic School
Saint Francis Catholic School
Saint Anthony Catholic School
Santa Barbara Catholic School

**ARCHDIOCESAN HIGH SCHOOL**

Academy of Our Lady of Guam
Father Dueñas Memorial School

Recipient: _____

School: _____

Grade Level: _____

Year Effective: _____

**Exhibit S:**

**CEMETERY VOUCHER**

1. Cemetery Vouchers cover the cost of the cemetery plot easement only, excluding all other fees, including but not limited to pre-need internment merchandise, crypt front, crypt marker, opening closing fee, miscellaneous charges, and caskets, which will be the responsibility of the Awarded Party.
2. The Awarded Party will be required to fill out and execute the Acknowledgement of Understanding, the Pontem Professional CIMS Data Capture Form, and the Contract for Burial Rights, all of which are attached as exhibits to this voucher.
3. Once the Cemetery Easement Voucher is awarded to an Awarded Party, the Cemetery Easement Voucher is non-transferrable.
4. Cemetery Easement Vouchers are not convertible to cash.
5. Cemetery Easement Vouchers to be awarded only to an Abuse Claimant who has executed a release as set forth in the confirmed Plan of Reorganization.

**ARCHDIOCESAN CEMETERIES**

Pigo Catholic Cemetery
Mt. Carmel Catholic Cemetery
Holy Cross Catholic Cemetery


Awarded Party: _____

Cemetery: _____

Year Effective: _____


Approved By: _____

1

2  **G. PATRICK CIVILLE**
   **CIVILLE & TANG, PLLC**
3  330 HERNAN CORTEZ AVENUE, SUITE 200
   HAGÅTÑA, GUAM 96910
4  TELEPHONE: (671) 472-8868/69
   FACSIMILE: (671) 477-2511
   EMAIL: pciville@civilletang.com
5

6  **JESSICA C. LAURIA**
   **WHITE & CASE LLP**
7  1221 AVENUE OF THE AMERICAS
   NEW YORK, NEW YORK 10020
   TELEPHONE: (212) 819-8200
8  FACSIMILE: (212) 354-8113
   EMAIL: jessica.lauria@whitecase.com
9  **-&-**

10 **MATTHEW E. LINDER**
   **ERIN R. ROSENBERG**
11 111 SOUTH WACKER DRIVE, SUITE 5100
   CHICAGO, ILLINOIS 60606-4302
12 TELEPHONE: (312) 881-5400
   FACSIMILE: (312) 881-5450
   EMAIL: matthew.linder@whitecase.com
13       erin.rosenberg@whitecase.com

   *Counsel for Boy Scouts of America*
14

15              **IN THE DISTRICT COURT OF GUAM**
            **TERRITORY OF GUAM - BANKRUPTCY DIVISION**

16 In re:                          | Chapter 11 Bankruptcy

17 ARCHBISHOP OF AGAÑA,            | Case No. 19-00010

18 a Corporation Sole,             | **THE BOY SCOUTS OF AMERICA'S**
                                   | **OBJECTION AND RESERVATION OF**
19              Debtor.            | **RIGHTS TO CONFIRMATION OF THE**
                                   | **THIRD AMENDED JOINT CHAPTER 11**
20                                 | **PLAN OF REORGANIZATION FOR THE**
                                   | **ARCHBISHOP OF AGAÑA**
21                                 | **[DOCKET NO. 920]**

22                                 | **Hr'g Date: October 3, 2022 at 8:30 a.m. (ChST)**

23

24

25

26

27

28

---

- i -

**SA 1819**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   BACKGROUND ............................................................................................. 1

III.  OBJECTION .................................................................................................. 4

    A.   The Plan Impermissibly Conflicts with the Delaware Court's Opinion, Jurisdiction, and Authority............................................................................. 4

    B.   The Plan Impermissibly Seeks to Administer the Proceeds of the BSA Insurance Policies............................................................................................ 6

    C.   The Plan Impermissibly Seeks to Sell "Other Insurance Policies" That Have Already Been Contributed to the BSA Trust Through the Local Council Contribution................................................................................... 8

    D.   The Plan Impermissibly Discriminates Against Certain Unsecured Creditors and Rewrites the Bankruptcy Code's Claims Allowance Procedures. ..................................................................................................... 9

    E.   The Plan Fails the Best Interest of the Creditors Test............................... 10

    F.   The Plan May Not Have Been Proposed in Good Faith. ........................... 11

    G.   Certain Technical Modifications ............................................................... 12

IV.   RESERVATION OF RIGHTS ...................................................................... 13

V.    CONCLUSION............................................................................................. 14

SA 1820

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994)................................................6

*Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) ..........................................................6

*Lee v. Select Portfolio Servicing, Inc. (In re Lee)*, 781 F. App'x 677, 677 (9th Cir. 2019) .............6

*In re Allied Prods. Corp.*, No. 03-1361, 2004 U.S. Dist. LEXIS 5288, at *25–27 (N.D. Ill. Mar. 31, 2004) ..........................................................................................................8

*In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994)....................................10

*In re Hamilton*, 803 F. App'x 123, 126 (9th Cir. 2020) ...............................................................11

## STATUTES

11 U.S.C. § 105..........................................................................................................................8

11 U.S.C. § 363..........................................................................................................................8

11 U.S.C. § 502...................................................................................................................9, 10

11 U.S.C. § 1123........................................................................................................................8

11 U.S.C. § 1129.............................................................................................................. *passim*

<div style="margin-left:3em">

1

2       Boy Scouts of America (the "**BSA**"), by and through undersigned counsel, submits the

3  following objection and reservation of rights (the "**Objection**") to confirmation of the *Third*

4  *Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña* [Docket No. 920]

5  (the "**Plan**").

6  **I.**     **PRELIMINARY STATEMENT**

7       On July 29, 2022, the United States Bankruptcy Court for the District of Delaware (the

8  "**Delaware Court**") issued its *Opinion* [BSA Bankr. Docket No. 10136] (the "**Opinion**")[1] in

9  connection with the BSA's *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with*

10  *Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket

11  No. 9696] (the "**BSA Plan**").  The Opinion spans 281 pages and addresses various issues raised at

12  the confirmation hearing in the BSA Bankruptcy, including objections from the Archbishop of

13  Agaña (the "**Debtor**" or "**AOA**"), its Official Committee of Unsecured Creditors (the

14  "**Committee**," and together with the Debtor, the "**Plan Proponents**"), and the Lujan claimants.  A

15  central component of the Opinion is the Delaware Court's decision to approve the Scouting-related[2]

16  releases and channeling injunctions provided by the BSA Plan, meaning that any claims by or

17  against the AOA that could implicate a BSA Settling Insurer will be channeled to and satisfied

18  exclusively by the BSA Trust.[3]

19       The BSA objects to confirmation of the Plan in this case to the extent that it (i) conflicts

20  with the Opinion, (ii) seeks to improperly exercise control over the proceeds of insurance policies

21  issued to the BSA (the "**BSA Insurance Policies**"), (iii) seeks to authorize the sale of interests in

22  Other Insurance Policies without providing adequate protection to coinsured parties, (iv)

23  impermissibly discriminates against indirect abuse claims, (v) fails the best interest of the creditors

24  test pursuant to section 1129(a)(7) of the Bankruptcy Code, and (vi) may not have been proposed

25  in good faith under section 1129(a)(3) of the Bankruptcy Code.  Without remedying each of these

26  deficiencies, the Plan does not meet the standards for confirmation as required under 11 U.S.C.

27

28

</div>

---

[1] A copy of the Opinion is attached as <u>Exhibit A</u> to the Declaration of P. Civille filed herewith ("**Civille Decl.**").

[2] The terms "Scouting" and "Scouting-related" have the meanings set forth in the BSA Plan.

[3] Capitalized terms used but not yet defined have the meanings later set forth herein. Capitalized terms used but not defined herein have the meanings set forth in the Plan.

- 1 -

§ 1129. BSA objects on this basis and reserves all rights in connection with ongoing discovery and the remainder of the confirmation process. The BSA's objections, in part, may be a result of outdated, confusing, conflicting, or imprecise provisions in the Plan. The BSA will seek clarity on these issues during discovery and would welcome the chance to work with the Debtor on modifications and/or clarifications to the Plan to the extent the BSA's objections may be consensually resolved.

## II.  **BACKGROUND**

Background information regarding the BSA Bankruptcy, as is relevant to this Chapter 11 Case, is set forth in the BSA's prior filings with this Court, including the *Boy Scouts of America's Objection and Reservation of Rights in Response to Motion for an Order (I) Approving the Adequacy of Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving Ballot Forms and Plan Voting Procedures; (IV) Fixing the Voting Deadline; and (V) Approving Procedures for Vote Tabulation* [Docket No. 860] ("**BSA's Disclosure Statement Objection**"). More recently, on July 29, 2022, the Delaware Court issued its Opinion approving the majority of the BSA Plan while outlining certain aspects that would require modification before a confirmation order can be formally entered. The BSA has prepared certain technical modifications consistent with the Delaware Court's Opinion. The Delaware Court has set a status conference in the BSA Bankruptcy for August 18, 2022, and has also set a hearing for September 1, 2022, at which time it will consider the proposed modifications and the BSA's request to issue a confirmation order.

The BSA Plan incorporates a broad resolution of Scouting-related sexual abuse claims against the BSA, its non-debtor local councils (the "**Local Councils**"), and certain chartered organizations that carry out the Scouting mission (the "**Chartered Organizations**"). The BSA Plan establishes a settlement trust (the "**BSA Trust**") funded by the "contributions of over $2.5 billion in cash . . . as well as insurance assets worth up to another $4 billion plus." Opinion at 163. The BSA Plan has garnered the support of every estate fiduciary in the BSA Bankruptcy as well as general support from various parties including groups of plaintiffs' counsel, a committee of Local Councils, multiple insurers, and various Chartered Organizations, notably including a committee

- 2 -

SA 1823

of Roman Catholic entities.  *See* Opinion at 56.

At the heart of the BSA Plan are certain settlements of BSA Insurance Policies issued by BSA Insurers, including settlements (the "**BSA Insurance Settlements**") with Hartford, Century and Chubb Companies, Zurich, and Clarendon (the "**BSA Settling Insurers**") that will "bring an aggregate of $1,656,000,000 to the Settlement Trust from which holders of Abuse Claims will receive distributions."  Opinion at 73.  As the Delaware Court observed: "Without these settlements, there is no [BSA Plan]."  *Id*.  In exchange for the BSA Insurance Settlements, Scouting-related abuse claims against the BSA Settling Insurers and any named or coinsured parties under settled BSA Insurance Policies will be exclusively channeled to, processed, liquidated and paid by, the BSA Trust, <u>including the Scouting-related portion of any Abuse Claims covered by the BSA Settling Insurers asserted by or against the AOA.</u>[4]

As noted above, a number of Chartered Organizations have actively negotiated with the BSA in the BSA Bankruptcy, including as participants in an extensive mediation process, and have come to support the Plan.  In fact, ***every single*** Chartered Organization of the BSA that is a debtor in its own bankruptcy case—other than the Debtor here—has opted to become a Participating Chartered Organization under the BSA Plan.  Where any Chartered Organization, like the Debtor, chose not to participate in the BSA Plan (an "**Opt-Out Chartered Organization**") but could potentially be covered by a BSA Settling Insurer for Scouting-related abuse claims, the BSA Plan channels claims against the Opt-Out Chartered Organization to the extent such claims may be covered by a settled policy.  In this scenario, the Delaware Court has explained: "The Opt-Out Chartered Organizations are not making any of their own contributions to the [BSA] Trust. Rather, the claims are being channeled in order to unlock the Settling Insurer Settlements. In other words, a portion of the Settling Insurers' contribution is made on behalf of the Opt-Out Chartered Organizations."  Opinion at 148.  Critically, where a claim makes allegations of Scouting-related abuse as well as abuse unrelated to Scouting (a "**Mixed Claim**"), the portion of the Mixed Claim unrelated to Scouting, which would include any non-Scouting related claims directly against the

---

[4] The BSA Plan specifically carves out non-Scouting-related abuse claims, including the non-Scouting-related portion of a Mixed Claim.  Those claims remain unaffected under the BSA Plan.

- 3 -

1

2    Debtor, are not released, channeled, or diminished by the BSA Plan.[5]

3          The Plan proposed in this Chapter 11 Case impermissibly conflicts with the Delaware

4    Court's Opinion and otherwise violates the BSA's rights.  These issues must be addressed, and

5    deficiencies must be remedied, before confirmation can occur in this case.

6    **III.    OBJECTION**

7          A.    The Plan Impermissibly Conflicts with the Delaware Court's Opinion,

8                 Jurisdiction, and Authority.

9          After weeks of evidence, live testimony, and legal argument at the BSA confirmation

10   hearing, including hours of testimony, argument, and cross-examination by the Plan Proponents,

11   and months of careful deliberation, the Delaware Court issued its Opinion, including findings of

12   facts and conclusions of law directly related to the BSA Plan, BSA Insurance Policies, and BSA

13   Insurance Settlements.   Specifically, the Delaware Court held that (i) the BSA Insurance

14   Settlements with Hartford, Century, Zurich, and Clarendon, meet the *Martin* Standard for approval

15   (Opinion II.B), (ii) the BSA Insurance Policies may be sold free and clear of direct action rights,

16   including those of the Lujan and other AOA claimants (Opinion II.C.3), (iii) the Scouting-related

17   releases and channeling injunctions meet the *Continental* standard for approval (Opinion II.D.1.e),

18   and (iv) certain remaining objections to confirmation are overruled (Opinion IV, V, VI, and VII).

19   Although the Delaware Court determined that the automatic stay in this case prevents to sale of

20   BSA Insurance Policies free and clear of the Archbishop's interests, absent this Court granting

21   relief from stay to allow the Debtor to opt in and become a Participating Chartered Organization;

22   the Court went on to explain that "[b]ecause . . . I am approving the channeling injunction, the

23   Archbishop will get the benefit of the insurance buyback in any event."  Opinion n. 365.  This

24   means that any Scouting related abuse claims by or against the AOA that could implicate settled

25   BSA Insurance Policies will be exclusively channeled to and satisfied by the BSA Trust, and

26   therefore not susceptible to any separate treatment in this case.  Because of the channeling

27   injunction approved by the Delaware Court, there can be no circumstance where the AOA or its

28   Trust is liable for a Scouting related abuse claim covered by a settled BSA insurance policy, and

---

[5] *Compare* BSA Plan § I.A.18 (defining Abuse Claim), *with id.* § I.A.184 (defining Mixed Claim).

- 4 -

1

2   therefore no circumstance where a claimant in this case can be separately paid by proceeds from a

3   BSA Settling Insurer.  To put a finer point on the issue, the Delaware Court explicitly stated that

4   claimants against the AOA "are not enjoined from pursuing the Archbishop for Abuse Claims, but

5   recoveries may not come from an insurance policy issued by a Settling Insurance Company."

6   Opinion at pg. 161.

7          In light of the Opinion, to the extent the Plan in this case conflicts with the BSA Plan

8   provisions approved by the Delaware Court, the Plan constitutes an impermissible collateral attack

9   on the Opinion and improperly interferes with the Delaware Court's jurisdiction and authority.

10  Among the points of conflict, the Plan purports to entitle the Trust to all policy proceeds due by

11  virtue of a judgment or settlement of a Class 3 Claim, and empowers the Trust to pursue judgment

12  against Non-Settling Insurers, including settling BSA Insurers, to determine the amount of coverage

13  available for Protected Parties' liability for Tort Claims.  *See* Plan 6.7(a).  Additionally, Litigation

14  Claimants who are channeled to the BSA Trust are purportedly empowered to "pursue his or her

15  Claim for its full amount according to proof in order to determine the liability of any Protected

16  Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the

17  Claim."  Plan 6.14(d).  The Trust then purports to retain the right to pursue Non-Settling Insurers

18  for their liability to Tort Claimants, including for any distributions made to Litigation Claimants.

19  Plan 6.14(h).  None of these provisions are permissible to the extent they conflict with the

20  channeling injunction approved in the BSA Bankruptcy or would purport to allow claimants or the

21  Trust to seek to collect upon the proceeds of any BSA Settling Insurance Policy other than through

22  pursuit of their proof of claim as provided for in the BSA Plan and should be revised to be clear

23  that they are not attempting to evade or conflict with the BSA Plan.

24         Similarly, Exhibit D to the Plan (the "**Trust Distribution Plan**") fails to account for the

25  fact that Scouting-related abuse claims covered by any settled BSA Insurance Policy, including the

26  Scouting-related portion of any Mixed Claims, will be exclusively channeled to and compensated

27  by the BSA Trust.  At no point do the Evaluation Factors differentiate between non-Scouting related

28  abuse attributable to the AOA, and Scouting-related abuse channeled to or compensated by the

    BSA Trust.  Similarly the "Reductions" in the Trust Distribution Plan do not consider whether the

- 5 -

claim constitutes a Mixed Claim, or whether any portion of the claim has been channeled to or paid by the BSA Trust.  In fact, the only consideration made regarding the BSA Trust in the Trust Distribution Plan is an attempt to increase distributions to allowed claims in the BSA Bankruptcy on account of Trust assets contributed by the BSA.  To be clear, the BSA has not agreed to any such contributions and will not as this would conflict with the BSA Plan and Delaware Court Opinion.

The Plan and Trust Distribution Plan therefore appear to specifically contemplate that which is barred by the Opinion, namely the pursuit of claims against BSA Settling Insurers outside of the BSA Trust.  Courts have consistently held that res judicata bars a party from bringing a claim if a court of competent jurisdiction has ruled on the merits in a previous action involving the same parties and claims.  *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994); *see also Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (holding that "once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect"); *Lee v. Select Portfolio Servicing, Inc. (In re Lee)*, 781 F. App'x 677, 677 (9th Cir. 2019) (citing *In re Carraher*, 971 F.2d 327, 328 (9th Cir. 1992) and explaining that the bankruptcy court may retain jurisdiction over a related proceeding even after dismissal of the bankruptcy case).  This Court has also put parties in interest on notice of its intent to "to ensure that the Boy Scouts of America settlement matter is also considered by this Court and respected by this Court once the settlement has been finalized."  Hr'g Tr. pg. 42, July 13, 2022.  The Plan Proponents were active participants in the BSA confirmation hearing and are bound by the Opinion of the Delaware Court.[6]

If the Plan Proponents wish to challenge any portion of the Delaware Court's Opinion or subsequent orders, the proper avenue is a direct attack on the Opinion through the appellate process.  The BSA therefore submits that this Court should not approve the Plan unless and until it is modified to comport with the Delaware Court's Opinion and any relevant subsequent orders.

     B.    <u>The Plan Impermissibly Seeks to Administer the Proceeds of the BSA Insurance Policies.</u>

---

[6]  The same holds true for the Lujan claimants, who participated extensively at the confirmation hearing in the BSA Bankruptcy.  *See* BSA's Disclosure Statement Objection at 5 & n.8.

- 6 -

Section 7.11(d) of the Plan provides that "[f]or the avoidance of doubt, and again notwithstanding anything in this Plan to the contrary, neither the Plan Proponents nor the Trustee will enter into any settlement (whether prior to, as of, or after the Effective Date) with a BSA Insurer that would potentially impair the interests of the BSA or any other co-insured party under a BSA insurance policy, *unless they first obtain approval from a court with relevant jurisdiction over such interest, including the U.S. Bankruptcy Court for the District of Delaware.*"[7]  While the first part of Section 7.11(d) may appear at first to protect the BSA and other co-insured parties under a BSA insurance policy, the subsequent, emphasized passage of Section 7.11(d) provides a passageway for the Plan Proponents or the Trustee to attempt to impair the interest of the BSA or any other co-insured party so long as a court of relevant jurisdiction approves the settlement.  There is no reason to give the Plan Proponents or the Trustee a mechanism to impair any interests of the BSA or any other co-insured party under a BSA insurance policy through a settlement with a BSA Insurer, outside of the process allowed under the BSA Plan, under any circumstances.  This is particularly true because the Delaware Court has already found that any unilateral attempts by the Debtor to settle a portion of insurance policies will in fact impair the interests of both the BSA and Local Councils, explicitly stating that, "to the extent the Archbishop is allowed to draw on the proceeds [of insurance] to pay the Archbishop's share of liability for a given claimant, it would diminish proceeds that are available to pay BSA's or the Aloha Council's share of liability on those same claims."  Opinion at 92.

For example, the Plan represents that National Union has agreed to contribute $18,000,000.00 to become a Settling Insurer, but does not disclose whether this contribution includes BSA Insurance Policies issued by National Union or the effect of the settlement on the BSA Insurance Policies.[8]  *See* Plan 7.11(a).  However, given that the Plan Proponents are requesting the approval of the National Union Settlement, Section 7.11(d) does not provide the BSA or other

---

[7] Italics added.

[8] Hours before Plan objections were due, the Plan Proponents filed their motion to approve insurance settlements with AIG Insurers [D.I. 939] (the "**AIG Settlement Motion**").  Because the AIG Settlement Motion was filed the day objections were due, the BSA is unable to respond fully to the Plan inconsistencies and Bankruptcy Code violations therein and thus reserves its rights with respect to the AIG Settlement Motion, any findings of facts or conclusions of law sought by the motion, and any provisions of the Plan it may seek to modify.

co-insureds with any protection concerning any impaired interests arising out of the National Union Settlement.  Rather than provide a carve out that authorizes a court to approve a settlement that impairs the interests of the BSA and other co-insureds under BSA Insurance Policies without compensation,[9] because there is no adequate protection built into the Plan, it should be revised to clearly bar any settlements that impair the interests of BSA and other co-insureds (including through the exhaustion of per-occurrence and/or aggregate policy limits) without their consent.

C.   The Plan Impermissibly Seeks to Sell "Other Insurance Policies" That Have Already Been Contributed to the BSA Trust Through the Local Council Contribution.

In its Opinion, the Delaware Court approved the Local Councils' contributions to the BSA Trust, which include, among other things, their rights in their own insurance policies.  *See* Opinion at 147.  The Plan Proponents now apparently seek authority to sell some portion of those policies free and clear of other interests pursuant to sections 105, 363, and 1123 of the Bankruptcy Code. *See* Plan 7.2.  While section 7.11(c) of the Plan explicitly excludes BSA Insurers from the buyback provisions of section 7.2, this exclusion does not extend to any Local Council policies or proceeds contributed to the BSA Trust pursuant to the BSA Plan.[10]  To the extent that the Plan purports to permit the sale of policies free and clear of any interests transferred to the BSA Trust, including those of the BSA's Local Councils, the BSA objects and submits the Plan must be modified to not conflict with the Delaware Court's Opinion.  Further, the BSA objects to any sale that does not provide adequate protection for co-insured parties.

To the extent the Plan purports to authorize a sale of only the Debtor's interest in an Other Insurance Policy, such relief must be narrowly tailored to preserve any interest in proceeds transferred to the BSA Trust consistent with the Opinion, including preventing any diminution of coverage or available proceeds.

Additionally, Section 363(e) of the Bankruptcy Code requires that the Debtor provide

_____

[9] Permitting the Plan Proponents to impair the BSA and other co-insured interests through a Court-approved settlement is particularly troubling in light of the fact that (1) the Debtor's interests in the settled BSA insurance policies are essentially of no value due to the channeling injunction approved by the Delaware Court in the BSA Bankruptcy, and (2) the Debtors have not established an interest in many of the BSA insurance policies identified in Exhibit L.

[10] To the extent any insurance settlement, including the AIG Settlement Motion, seeks to sell any portion of BSA Insurance Policies, the BSA would object to such sale on the same grounds.

- 8 -

adequate protection in conjunction with a proposed 363 sale. The Debtor cannot simply use or dispose of even some portion of the Other Insurance Policies without adequately protecting third party's interests. *See In re Allied Prods. Corp.*, No. 03-1361, 2004 U.S. Dist. LEXIS 5288, at *25–27 (N.D. Ill. Mar. 31, 2004) (affirming bankruptcy court's denial of debtor's motion to sell insurance policies back to carriers where objecting parties had interests in the policies that were not adequately protected). Accordingly, the Plan Proponents must account for any per-occurrence limits implicated by an insurance settlement and provide adequate protection to a coinsured party whose coverage may be diminished by a 363 sale or expressly provide that no such interests are or can be implicated in any settlements or sales.

D. The Plan Impermissibly Discriminates Against Certain Unsecured Creditors and Rewrites the Bankruptcy Code's Claims Allowance Procedures.

The Plan unfairly discriminates against the BSA's claim in Class 10,[11] which stands to recover no value, while providing holders of Tort Claims in Class 3 and Unknown Tort Claims in Class 4 with up to full recoveries.[12] The Plan provides that claims for contribution, indemnity, or reimbursement in Class 10 are presumptively disallowed pursuant to section 502(e)(1). Section 502 of the Bankruptcy Code provides, among other things, that a claim for reimbursement or contribution of an entity that is co-liable with the debtor may be disallowed when such claim is contingent *at the time* of allowance or disallowance. *See* 11 U.S.C. § 502(e)(1)(B).

The Plan Proponents, however, have not objected to the BSA's claim. Where no party in interest has filed an objection, the Bankruptcy Code creates a presumption that a proof of claim is prima facie evidence of the claim's validity and amount. *See* 11 U.S.C. § 502(a). Seeking to evade the claims allowance process dictated by the Bankruptcy Code, the Plan Proponents attempt to invert the burden and require a claimant seek allowance in addition to their proof of claim (by what mechanism is unclear since the Bankruptcy Code does not provide for a separate determination of allowance before a claim objection). *See* Plan 4.12. To the extent the Plan Proponents believe the BSA's claim, or any other claim should be disallowed, the Bankruptcy Code provides the mechanism for redress. The Plan Proponents can object to the BSA's Claim but may not rewrite

---

[11] Claim No. 210-1.
[12] *See* Plan Art. IV.

- 9 -

1

2   this process to the detriment of creditors for their own convenience.

3          Even if the Plan Proponents were to file an objection and successfully disallow the BSA's

4   claim, the Plan's treatment still violates the Bankruptcy Code's claim allowance process by

5   attempting to bar the application of section 502(j), which provides that "[a] claim that has been

6   allowed or disallowed may be reconsidered for cause."  *See* 11 U.S.C. § 502(j).  Courts have

7   recognized that contingent or unliquidated claims based on contribution, reimbursement or

8   otherwise that might initially be subject to disallowance under section 502(e)(1)(B) may become

9   fixed, allowable, and entitled to distribution from estate assets when they mature.[13]  Despite this,

10  the Plan provides that no indirect claim, <u>even an allowed</u> claim, may receive a distribution if it were

11  allowed after the entry of the Confirmation Order.  *See* Plan 4.12(a).  The Plan cannot discriminate

12  in its treatment of such allowed claims.  The material differences in recovery between allowed

13  claims of equal priority constitutes unfair discrimination pursuant to section 1129(b).  The Debtor

14  cannot justify the disparate treatment afforded to allowed claims of equal priority under the law,

15  particularly where holders of Class 10 and 12 claims would retain their claims for contribution,

16  indemnity, or reimbursement outside of bankruptcy or in a liquidation scenario.  *See In re Tucson*

17  *Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (finding unfair discrimination where

18  Chapter 11 plan purported to pay unsecured classes of the same priority materially different

19  recoveries).

20          E.       The Plan Fails the Best Interest of the Creditors Test.

21          Under the best interest of creditors test set forth in section 1129(a)(7), a Chapter 11 plan

22  cannot be confirmed unless it provides each dissenting, impaired creditor at least as much as the

23  creditor would be paid if the debtor liquidated under Chapter 7.  Here, the Plan Proponents have

24  made no attempt to show that the Plan satisfies the best interest test with respect to the BSA,

25  coinsured parties, or other indirect claimants in classes 10, 11, or 12, nor could they reasonably

26  _____

27  [13] *See, e.g.*, *In re Caribbean Petroleum Corp.*, 566 F. App'x 169, 175 (3d Cir. 2014) (noting that the Bankruptcy Court's
    order expressly provided for the right of a claimant that held "contingent claims" that were disallowed in the early
    stages of a trust's administration of claims under a confirmed plan "to move for reconsideration under 11 U.S.C.

28  § 502(j), thereby preserving further procedural rights for [the claimant] should its claims become ascertainable at some
    point in the future"); *In re Drexel Burnham Lambert Grp. Inc.,* 148 B.R. 982, 991 (Bankr. S.D.N.Y. 1992) (disallowing
    certain contingent claims while noting that claimants' rights to have disallowed claims reconsidered at a later time were
    expressly preserved under section 502(j)).

- 10 -

1
2
3

make such a showing since the proposed Plan is specifically designed to impair the BSA's rights while offering nothing in return.

4

F.      The Plan May Not Have Been Proposed in Good Faith.

5
6

Finally, the Plan cannot be confirmed to the extent it is not "proposed in good faith." 11 U.S.C. § 1129(a)(3).  The Bankruptcy Code does not define "good faith"; instead, it is a flexible

7
8

standard designed to allow the Court to examine whether, considering the totality of the circumstances, the plan and the conduct of the parties proposing it comport with the goals of chapter

9
10

11.  7 Collier on Bankruptcy ¶ 1129.02 (16th 2022); *In re Hamilton*, 803 F. App'x 123, 126 (9th Cir. 2020) (holding that a good-faith determination is based on the totality of the circumstances and

11
12

the purposes of Chapter 11 which are to rehabilitate the debtor and maximize the value of the estate).

13
14

From the outset of the BSA Bankruptcy, the Debtor sought treatment under the BSA Insurance Policies in the Delaware Court.  In fact, when the Debtor opposed the Committee's

15
16

attempts to seek derivative standing, the Debtor described its objection "to any attempt to compromise the additional insured status of the Chartered Organizations, *without a corollary*

17
18

*channeling injunction in its favor* in the BSA bankruptcy" as a sufficient step to preserve its rights under BSA Insurance Policies.  *See Limited Objection to Motion of the Official Committee of*

19
20

*Unsecured Creditors for Derivative Standing to Enforce the Automatic Stay and Take Other Actions* [Docket No. 625] (emphasis added).  Up until just recently, the Debtor was pursuing a plan

21
22

that did not seek to administer BSA Insurance policies or interfere with the Delaware Court's jurisdiction over such policies.  *See First Amended Chapter 11 Plan of Reorganization Proposed*

23
24

*by the Archbishop of Agaña* [Docket No. 715].  But then, the AOA changed course at the 11th hour and succumbed to the Committee's demands to prosecute a Plan squarely at odds with the BSA

25
26

Plan and now, the Delaware Court's Opinion—even though the AOA is now set to receive the very channeling injunction it had asked for.  The Delaware Court specifically noted the oddity of the

27
28

AOA's sudden shift, adding that it was "troubled by the Archbishop's apparent change of position on what is sufficient for its purposes.  In joining the objection filed by the Roman Catholic Committee, the Archbishop 'object[ed] to any attempt to compromise the additional insured status

- 11 -

SA 1832

1

2    of the Chartered Organizations, without a corollary channeling injunction in its favor in the BSA

3    bankruptcy.'  That corollary channeling injunction exists, yet, the Archbishop joined and adopted

4    the Guam Committee's objections during trial.  This change of heart, however, must be sorted by

5    the judge presiding over the Archbishop's bankruptcy case."  Opinion at pg. 96.

6          The reason for this "change of heart" is now subject to ongoing discovery.  The BSA

7    contends that numerous provisions in the Plan, which originated with the Committee's competing

8    plan proposal [Docket No. 719], serve no legitimate restructuring purpose, and that the Debtor may

9    have improperly acquiesced to the Committee's demands in pursuing these provisions to buy peace

10   at the expense of other creditors, the BSA, and the AOA estate.  Such provisions only serve to

11   attempt to convey some benefit to certain Tort Claimants while actually operating to the detriment

12   of the estate as a whole.  In particular, any attempt to administer all BSA Insurance Policies,

13   including policies as to which all claims and interests have been channeled to the BSA Trust, has

14   no legitimate purpose or basis in law.  Further, the Debtor cannot explain how its decision to remain

15   the only Opt-out Chartered Organization in the BSA Plan is consistent with its fiduciary obligations

16   to its creditors and the estate as a whole.  Accordingly, the evidence may show that the Plan is not

17   proposed in good faith and cannot be confirmed in its current form.

18          Because each of these questions are the subject of ongoing discovery, the BSA must object

19   on the grounds that, based upon the information provided to date, the Debtors cannot satisfy the

20   requirements of sections 105, 363, 9019, and 1129 and the Plan as drafted cannot be confirmed.

21   The BSA will further address this argument in particular, as well as any other arguments with

22   disputed factual components, in its pre-trial briefing or at another more appropriate juncture after

23   the completion of discovery consistent with the Court's confirmation scheduling order.

24          G.    Certain Technical Modifications .

25          Finally, the BSA has identified a number of technical inconsistencies and ambiguities in the

26   Plan that likely do not represent material disagreements, but would nonetheless warrant objection

27   if not properly modified before the confirmation hearing.  Because section 6.7(a)(3) of the Plan

28   purports to deem any failure to object  to terms of the Plan "related to the Non-Settling Insurer

     Policies," to be an irrevocable consent to such provisions (which is also improper), the BSA

                                            - 12 -

addresses these inconsistencies in short below.  Additionally, for the sake of clarity, the BSA reserves its rights with respect to all Plan provisions in light of the Plan Proponents recent filing of the AIG Settlement Motion.  For the avoidance of doubt, the BSA does not consent to any transfer or channeling of their interest in any insurance policies pursuant to section 6.7(a)(3) and reserves all rights to the extent that any Plan provision or subsequent modification could be read to non-consensually sell, settle, waive, channel, transfer, administer, or in any way impair the BSA's rights in any insurance policy or the proceeds of such policy.

- While the Supplemental Settling Insurer Injunction in section 7.10 of the Plan appears to attempt to carve out coinsured parties in Other Insurance Policies, it is unclear and although the BSA is willing to work with the Debtor to clarify this provision, it otherwise objects to any attempt to seek findings that would in any way enjoin the BSA from seeking any recoveries against any insurer, including a Settling Insurer, pursuant to the Settling Insurer Injunction.

- While Channeled Claims (as defined in the Plan) do not appear to include coinsured claims against insurers, including Settling Insurers, to the extent there is any ambiguity, the BSA objects to any attempt to  do so or seek findings that would in any way channel any claim belonging to the BSA or the BSA Trust, pursuant to the channeling injunction in section 13.3 of the Plan.

- The BSA Objects to the defined term "Transferred Insurance Interests" to the extent it could be read to include all insurance proceeds, including proceeds belonging to the BSA or BSA Trust.

- The BSA objects to section 4.3(c) to the extent it purports to authorize parties to violate the channeling injunction in the BSA Plan or Opinion.

- The BSA objects to section 6.6(c) to the extent it conflicts with the Delaware Court's jurisdiction over the BSA Plan and BSA Trust.

## IV.   <u>RESERVATION OF RIGHTS</u>

The BSA reserves all rights, including, but not limited to, the rights to object to any modifications or amendments of the Plan, or any exhibits, supplements, motions, proposed orders, proposed findings or conclusions, or other documents related to the Plan.  This includes all rights with respect to any forthcoming 9019 motions contemplated by the Plan.  In response to the Delaware Court's Opinion and subsequent developments, the BSA expects the Plan Proponents may make material post-solicitation modifications to the Plan.  The BSA further specifically reserves its right to object to the adequacy or confirmability of such modifications.

- 13 -

1

2      **V.      <u>CONCLUSION</u>**

3           For all of the foregoing reasons, the BSA submits that the Plan should not be confirmed

4      without material modification by the Plan Proponents and respectfully requests that the Court (i)

5      withhold confirmation pending such material modification, and (ii) grant such other and further

6      relief as the Court deems just and proper.

7

8           RESPECTFULLY SUBMITTED this 17th day of August 2022.

9

10                                        By:      */s/ Erin Rosenberg*_____
                                                   *Counsel for Boy Scouts of America*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

**G. PATRICK CIVILLE**
**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, STE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868/69
FACSIMILE: (671) 477-2511
EMAIL: pciville@civilletang.com

**JESSICA C. LAURIA**
**WHITE & CASE LLP**
1221 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020
TELEPHONE: (212) 819-8200
FACSIMILE: (212) 354-8113
EMAIL: jessica.lauria@whitecase.com

**MATTHEW E. LINDER**
**ERIN R. ROSENBERG**
111 SOUTH WACKER DRIVE, SUITE 5100
CHICAGO, ILLINOIS 60606-4302
TELEPHONE: (312) 881-5400
FACSIMILE: (312) 881-5450
EMAIL: matthew.linder@whitecase.com
            erin.rosenberg@whitecase.com

*Counsel for Boy Scouts of America*

**IN THE DISTRICT COURT OF GUAM**
**TERRITORY OF GUAM - BANKRUPTCY DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Bankruptcy |
| ARCHBISHOP OF AGAÑA, | Case No. 19-00010 |
| a Corporation Sole, | **THE BOY SCOUTS OF AMERICA'S OBJECTION AND RESERVATION OF RIGHTS TO DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a) and 363(f) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER (1) APPROVING SETTLEMENT AGREEMENT AMONG THE ARCHDIOCESE, THE AOA ENTITIES, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND AIG INSURERS ENTITIES, (2) APPROVING THE ARCHDIOCESE'S SALE OF THE POLICIES ISSUED TO THE DEBTOR BACK TO AIG INSURERS ENTITIES FREE AND CLEAR OF CLAIMS AND INTERESTS, AND (3) ENJOINING ASSERTION OF CLAIMS AGAINST AIG INSURERS ENTITIES [DOCKET NO. 939]** |
| Debtor. | |

**Hr'g Date: September 30, 2022 at 8:30 a.m. (ChST)**

- i -

**TABLE OF CONTENTS**

I.      BACKGROUND ........................................................................................................ 1

II.     OBJECTION ............................................................................................................... 5

      A.      The Proposed Order Must be Revised to Clarify the Terms of the AIG
            Draft Settlement. ..................................................................................................... 5

      B.      Bankruptcy Rule 9019 Does Not Provide Authority to Impair the BSA's
            Rights Without Consent. .......................................................................................... 7

      C.      Sections 105(a) and 363(b) and (f) of the Bankruptcy Code Do Not
            Provide Authority to Approve the AIG Draft Settlement as It Relates to
            the BSA Insurance Policies. ................................................................................... 11

      D.      The Debtor has Failed to Meet Its Burden to Establish that the Settlement
            is Fair and Reasonable ......................................................................................... 12

III.    RESERVATION OF RIGHTS ................................................................................. 15

IV.     CONCLUSION........................................................................................................... 15

SA 1838

1
2

**TABLE OF AUTHORITIES**

3

<u>Page(s)</u>

4

**FEDERAL CASES**

5   *In re Oakhurst Lodge, Inc.*,
6       582 B.R. 784 (Bankr. E.D. Cal. 2018) ...........................................................................8

7   *In re OptInRealBig.com, LLC*,
        345 B.R. 277 (Bankr. D. Colo. 2006) ..........................................................................8

8   *In re Pac. Atl. Trading Co.*,
9       33 F.3d 1064 (9th Cir. 1994)........................................................................................8

10  *In re Smart World Techs., LLC*,
11      423 F.3d 166 (2d Cir. 2005).........................................................................................8

12  *In re Wolfberg*,
        255 B.R. 879 (B.A.P. 9th Cir. 2000), *aff'd*, 37 F. App'x 891 (9th Cir. 2002)..........................8

13  *Northview Motors, Inc. v. Chrysler Motors Corp.*,
14      186 F.3d 346 (3d Cir. 1999).........................................................................................8

15  *In re Actrade Fin. Techs., Ltd.*,
        Case No. 02-16212 (ALG), 2009 Bankr. LEXIS 2435 (Bankr. S.D.N.Y. Sept. 3, 2009) ..........9

16  *In re Bondanelli*,
17      No. 2:14-BK-27656-WB, 2020 WL 1304140 (B.A.P. 9th Cir. Mar. 18, 2020) ......................13

18  *In re Fleming Packaging Corp.*,
19      2007 Bankr. LEXIS 4234 (Bankr. C.D. Ill. Dec. 20, 2007)........................................................13

20  *In re Mickey Thompson Ent. Grp., Inc.*,
        292 B.R. 415 (B.A.P. 9th Cir. 2003) ..........................................................................13

21  *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*,
22      841 F.2d 159 (7th Cir. 1987).........................................................................................13

23  *Myers v. Martin (In re Martin)*,
24      91 F.3d 389 (3d Cir. 1996)............................................................................................13

25  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
        390 U.S. 419 (1968)......................................................................................................13

26  *In re HyLoft, Inc.*,
27      451 B.R. 104 ..................................................................................................................14

28

**FEDERAL STATUTES**

11 U.S.C. § 105(a) ............................................................................................7, 11, 12

- iii -

**SA 1839**

1

2   11 U.S.C. § 363(b) ..................................................................................................7, 10, 11, 12

3   11 U.S.C. § 363(f) ...............................................................................................4, 7, 10, 11, 12

4   28 U.S.C. § 2075 .............................................................................................................................7

5   11 U.S.C. § 1129(a)(3) ..................................................................................................................3

6   11 U.S.C. § 1129(a)(7) ..................................................................................................................3

7   Rules Enabling Act ........................................................................................................................9

8
## FEDERAL RULES
9
Fed. R. Bankr. P. 9019 ...................................................................................................... passim

10  Local Rule 6004-1(2) ...................................................................................................................14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SA 1840

The Boy Scouts of America (the "**BSA**"), by and through its undersigned counsel, submits the following Objection (the "**Objection**") to the *Motion Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order (1) Approving Settlement Agreement Among the Archdiocese, the AOA Entities, the Official Committee of Unsecured Creditors and AIG Insurers Entities, (2) Approving the Archdiocese's Sale of the Policies Issued to the Debtor back to AIG Insurers Entities Free and Clear of Claims and Interests, and (3) Enjoining Assertion of Claims Against AIG Insurers Entities* [Docket No. 939] (the "**Motion**") and the *Debtor's Memorandum of Law in Support of Motion Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order (1) Approving Settlement Agreement Among the Archdiocese, the AOA Entities, the Official Committee of Unsecured Creditors, and AIG Insurer Entities, (2) Approving the Archdiocese's Sale of the Policies Issued to the Debtor Back to AIG Insurer Entities Free and Clear of Claims and Interests, and (3) Enjoining Assertion of Claims Against AIG Insurer Entities* [Docket No. 939-1] (the "**Memorandum**").

## I.   BACKGROUND[1]

Substantial background information regarding the BSA's bankruptcy proceeding (the "**BSA Bankruptcy**"), as is relevant to this Chapter 11 Case, is set forth in the BSA's prior filings with this Court, including the *Boy Scouts of America's Objection and Reservation of Rights to Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña* [Docket No. 948] ("**BSA's Plan Objection**").  More recently, on July 29, 2022, the United States Bankruptcy Court for the District of Delaware (the "**Delaware Court**") issued its *Opinion* [BSA Bankr. Docket No. 10136] (the "**Opinion**") in the BSA Bankruptcy in connection with the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications)*

---

[1] Certain of the facts in this section are recounted herein from the Debtors' 9019 Motion and are not an admission of the truth, accuracy, or completeness of such facts and the BSA reserves all of its rights with respect thereto should such representations of the facts prove untrue, inaccurate, or incomplete.

*for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 9696], as modified [BSA Bankr. Docket No. 10296] (the "**BSA Plan**").  On September 8, 2022, the Delaware Court confirmed the BSA Plan, entering the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 10316] (the "**BSA Confirmation Order**").[2]  The Opinion and BSA Confirmation Order address various issues related to the BSA Plan, including objections from the Debtor, the Official Committee of Unsecured Creditors (the "**Committee**," and together with the Debtor, the "**Plan Proponents**"), and the Lujan claimants.  Among other things, a central component of the Opinion and the BSA Confirmation Order and Plan is the treatment of the insurance policies issued to the BSA and its local councils ("**Local Councils**"), (the "**BSA Insurance Policies**"), including the approval of the settlements and sale of certain of the BSA Insurance Policies to Hartford, Century and Chubb Companies, Zurich, and Clarendon (the "**BSA Settling Insurers**") in exchange for settlement amounts transferred to a trust established in the BSA Bankruptcy (the "**BSA Trust**") for the benefit of all abuse claimants.  In addition, the BSA Confirmation Order approves the transfer and assignment of interests in BSA Insurance Policies issued by non-settling insurers to the BSA the Local Councils and certain Chartered Organizations (as defined in the BSA Plan and modified by the Opinion and BSA Confirmation Order).  Among those interests being transferred to the BSA Trust are interests in policies issued by the AIG Insurers to the BSA and the Local Councils, which the Plan Proponents and AIG now seek to partially settle without the BSA's consent, pursuant to the draft settlement agreement attached to the Motion (the "**AIG Draft Settlement**").

On August 17, 2022, the Archbishop of Agaña (the "**Debtor**" or "**AOA**") moved the Court for the entry of an order: (1) approving a settlement set forth in a draft settlement agreement among

---

[2] A copy of the BSA Confirmation Order is attached as Exhibit A to the Declaration of P. Civille filed herewith ("**Civille Decl.**").

- 2 -

the Archdiocese, the AOA Entities, the Committee, and the AIG Insurers Entities (the "**AIG Insurers**"); (2) authorizing the Archdiocese to sell the policies issued directly to the Debtor (the "**Debtor AIG Policies**") to the AIG Insurers, free and clear of claims and interests of any other person or entity; (3) enjoining all claims against the AIG Insurers under the Policies relating to coverage provided to the AOA and the AOA Entities; (4) approving the manner and form of notice of the Motion and the proposed injunction, and (5) granting such other relief as is just and proper. Certain of the policies that are subject to the AIG Draft Settlement (the "**AIG Insurers Policies**") were issued directly to the BSA or its Local Councils for their benefit and may, or may not, provide coverage to the AOA.  Importantly, the BSA is not party to, and does not support, the AIG Draft Settlement.

Among other provisions, the AIG Draft Settlement contemplates that the AIG Insurers will be deemed "Settling Insurers" under the *Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña* [Docket No. 920] (the "**Plan**") and shall be afforded all protections designed thereto, including being granted all associated releases, injunctions (including the Supplemental Settling Insurer Injunction set forth in Section 7.10 of the Plan), and protections from any "Settled Claims." *See* AIG Draft Settlement § 6.  The BSA has objected to confirmation of the Plan on a number of grounds [Docket No. 920] (the "**BSA Confirmation Objection**").

Separate and apart from the AIG Draft Settlement among the Archdiocese, the AOA Entities, the Committee, and the AIG Insurers, the Motion and proposed order attached thereto (the "**Proposed Order**") seek authority to sell certain AIG Insurers Policies pursuant to 11 U.S.C. § 363(f), but "only those policies that were issued to the Debtor." *See* Proposed Order ¶ 2 (emphasis added).  It appears that nothing in the Motion or Proposed Order purports to sell the BSA Insurance Policies, which were issued to the BSA, Local Councils, or any Chartered Organization of the BSA (excluding, to the extent applicable, the Debtor and/or the AOA Entities). This, however, is not

- 3 -

entirely clear in the AIG Draft Settlement and must be clarified in the order before the AIG Draft Settlement can be approved.

Moreover, the BSA takes little comfort in this—as the Debtor admits, the AIG Draft Settlement is not finalized and remains only an agreement in principle.  Mot. at 3 n.1 (noting that the settlement reflects the "agreement reached in principle . . .subject to ongoing review, revisions in all respects, and final approval from the AIG Insurers' management.").  As of the date of this Objection, the Plan Proponents and the AIG Insurers have not filed a final or even an execution version of the settlement agreement, the terms of which may materially deviate from the proposal set forth in the Motion.  The Plan Proponents have also not indicated which issues remain open, when such issues may be resolved, and when they intend to file a final settlement to provide parties sufficient time to review.

The parties' discovery responses provided to date give no further clarity.  While National Union admits that "the National Union Settlement, and $18,000,000 contribution described in Section 7.11 of the Plan, does not and will not authorize or permit the exhaustion or erosion (either now or in the future) of any aggregate or per-occurrence limits on any insurance policies issued to the BSA and/or its Local Councils" (Civille Decl. Exhibit B, RFA No. 2), the Committee states that "after reasonable inquiry the Committee is without sufficient knowledge or information and to respond to [that same request for admission] and so denies same" (Civille Decl. Exhibit C, RFA No. 2).  The Debtor similarly denies that same request for admission (Civille Decl. Exhibit D, RFA No. 2).  Further, the Debtor states in its interrogatory responses that "the Proposed Settlement does not expressly address exhaustion or erosion of any aggregate or per-occurrence limits of any aggregate or per-occurrence limits on any insurance policies issued to the BSA and/or its Local Councils.  Nor does the Debtor otherwise have information relating to the erosion or exhaustion of per occurrence or aggregate limits on such policies."  (Civille Decl. Exhibit G, Interrogatory No.

- 4 -

2).  This causes ambiguity at best and, at worst, concern over whether the Plan Proponents understand the fundamental working mechanisms of the AIG Draft Settlement.

Accordingly, the BSA is not able to fairly evaluate or raise proper objections to the actual settlement terms between the Plan Proponents and the AIG Insurers and has no knowledge of how the terms of an eventual settlement may deviate from the AIG Draft Settlement and therefore both objects on the grounds that no final settlement has been filed with the Court and reserves all rights to raise further objections if and when a final settlement agreement is made available.

## II.   **OBJECTION**

### A.   The Proposed Order Must be Revised to Clarify the Terms of the AIG Draft Settlement.

As described more fully below, the BSA objects to the Motion to the extent the relief sought impermissibly impairs substantive rights that belong to the BSA and/or will be transferred to the BSA Trust pursuant to the BSA Confirmation Order.  Additionally, even if the Plan Proponents did not intend to impair substantive rights belonging to the BSA or the BSA Trust, vague or ambiguously drafted provisions in the Proposed Order and AIG Draft Settlement create material risks to the BSA and the BSA Trust that can only be addressed by clear and unambiguous protective language in this Court's order.

As discussed below, the BSA objects to approval of the Motion on multiple grounds, not the least of which is that the Debtor has not met its burden of proof that this settlement satisfies the applicable standard.  To the extent the Debtor is able to remedy these flaws and the Court is inclined to grant the Motion, the AIG Draft Settlement and order related thereto must be clarified to avoid confusion, improperly impact the BSA's property, and/or collaterally attack the BSA Confirmation Order.  To this end, the BSA has prepared a revised proposed order attached hereto as **Exhibit 1** (the **"Revised Order"**) (shown along with a redline to the proposed order attached to the Motion), which appropriately preserves the BSA's and the BSA Trust's rights against the AIG Insurers.  The

- 5 -

BSA respectfully requests that the Court incorporate these provisions into any order approving the AIG Draft Settlement.  If the representations of the Plan Proponents and the AIG Insurers are accurate, these revisions should not be controversial. Specifically, the BSA's proposed Revised Order provides:

i.   Clarification that nothing in the AIG Draft Settlement, related releases, Plan, Plan confirmation order, or Revised Order shall be construed to release, channel, enjoin, or otherwise impair claims against the AIG Insurers belonging to the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities) or the BSA Trust.

Clarification that, to the extent set forth in a final non-appealable Confirmation Order (as this cannot be done in the context of a settlement agreement only), although the BSA Trust may not assert claims against the AIG Insurers for the Debtor's and/or the AOA Entities' portion of liability, nothing impairs the BSA's property or rights or collaterally attacks the BSA Confirmation Order because no party may seek a Prohibited Recovery against the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), or the BSA Trust on account of the portion of liability attributable to the Debtor and/or the AOA Entities and covered, or allegedly covered, by an AIG Insurers Policy.

   •   This provision is essential to clarify that nothing in the AIG Draft Settlement can be construed to impair the BSA's direct claims against the AIG Insurers and that no party will be permitted to bring claims against the BSA or the BSA Trust for claims that are channeled pursuant to the AIG Draft Settlement and Plan.

ii.  Clarification that nothing in the Revised Order constitutes a determination of the Debtor's and/or the AOA Entities' right to coverage under, or interest in, the AIG Insurers Policies issued to the BSA or Local Councils.

   •   This provision makes clear that the Debtor's interest in the AIG Insurers Policies issued to the BSA or Local Councils, if any, is not before the court and nothing in the Revised Order can be construed to make a final, binding determination of such interest, if any, in those insurance policies.

iii. Clarification that no portion of the Settlement Amount shall be allocated to the AIG Insurers Policies issued to the BSA or Local Councils, nor will anything in the AIG Draft Settlement, related releases, or the Revised Order permit the exhaustion or erosion (either now or in the future) of any aggregate, per-person or per-occurrence limits under the AIG Insurers Policies issued to the BSA or Local Councils.

   •   Although AIG has represented that this an accurate description of the settlement, the AIG Draft Settlement and Proposed Order is not sufficiently clear on this point. Therefore, this provision is necessary to preserve the BSA's (or the BSA Trust's) right to its full insurance coverage and guarantee that the AIG Insurers will not later impair the BSA's (or the BSA Trust's) coverage by exhausting coverage limits in connection with the AIG Draft Settlement.

iv.  Clarification that, in the event of a conflict between the terms of the AIG Draft Settlement and the Revised Order, the terms of the Revised Order shall control.

- 6 -

- This provision ensures that subsequent changes to the AIG Draft Settlement or ambiguous provisions therein will not be construed to impair the BSA's rights as preserved in the Revised Order.

v. Clarification that the Revised Order does not interfere with, or otherwise limit, the Delaware Court's jurisdiction or authority.

- This provision is necessary to respect the Delaware Court's independent jurisdiction and prohibit collateral attacks on jurisdictional and other findings in the BSA Confirmation Order.

vi. Certain necessary conforming revisions.

The BSA asserts that each of the modifications proposed to the Revised Order, as set forth on Exhibit A, is critical to describe the effect of the AIG Draft Settlement on the BSA Insurance Policies issued by AIG Insurers, necessary to preserve the BSA's interests in the BSA Insurance Policies issued by AIG Insurers, and to the extent the Court finds that all requirements are met to approve the AIG Draft Settlement, important in resolving the outstanding objections from the BSA.

B.  <u>Bankruptcy Rule 9019 Does Not Provide Authority to Impair the BSA's Rights Without Consent.</u>

A threshold issue presented by the Motion and the AIG Draft Settlement is the extent to which this Court can grant the relief sought by the Plan Proponents pursuant to Bankruptcy Rule 9019. In the Motion and Memorandum, the Plan Proponents cite Bankruptcy Rule 9019 and sections 105(a), 363(b) and (f) of the Bankruptcy Code as sources of authority to approve the AIG Draft Settlement. First and foremost, Bankruptcy Rule 9019 provides, in pertinent part:

> Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

Accordingly, it appears that the procedural path chosen by the Debtor for the relief being sought is a compromise and settlement under Bankruptcy Rule 9019. Bankruptcy Rule 9019, however, is not an independent source of power for the court to abridge or modify the substantive

- 7 -

rights of parties without their consent.  Notably, the Bankruptcy Rules were promulgated pursuant to 28 U.S.C. § 2075 (the "**Rules Enabling Act**"), which provides: "[t]he Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11" and that "[s]uch rules shall not abridge, enlarge, or modify any substantive right."   Thus, while Bankruptcy Rule 9019 provides a procedural framework for obtaining court approval for a compromise or settlement in a bankruptcy case, Bankruptcy Rule 9019 cannot provide an independent basis for the court to abridge or modify the substantive rights of non-debtor parties without their consent.  *See In re Smart World Techs., LLC*, 423 F.3d 166, 181, n.23 (2d Cir. 2005) (noting that "[r]ules [established by the Supreme Court, such as the rules governing practice and procedure under Title 11,] shall not abridge, enlarge, or modify any substantive right.");  *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 351, n.4 (3d Cir. 1999) (noting that "as a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval of the 'proposed settlement' but ultimately concluding that a specific provision of the Bankruptcy Code was the 'substantive provision requiring court approval'"); *In re Pac. Atl. Trading Co.*, 33 F.3d 1064, 1066 (9th Cir. 1994) (recognizing that "Title 28 U.S.C. § 2075, which implements the Bankruptcy Rules, provides that '[s]uch rules shall not abridge, enlarge or modify any substantive right'");  *In re Oakhurst Lodge, Inc.*, 582 B.R. 784, 797 (Bankr. E.D. Cal. 2018) (explaining that rules of procedure such as "Rule 9019 . . . cannot override a substantive right provided for by the Bankruptcy Code when they conflict."); *In re Wolfberg,* 255 B.R. 879, 883 (B.A.P. 9th Cir. 2000), *aff'd*, 37 F. App'x 891 (9th Cir. 2002) (recognizing that Congress has specifically provided that the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right").

        As a result, Bankruptcy Rule 9019 provides the procedure for a debtor and settling party to do so on a proper showing, but does not provide substantive rights to a debtor—including compromising the rights of non-settling parties.  *See In re OptInRealBig.com, LLC*, 345 B.R. 277,

- 8 -

291 (Bankr. D. Colo. 2006) ("The purpose and effect of seeking court approval of a compromise under Rule 9019 is to *bind the bankruptcy estate* to the terms of any bargain struck by a trustee or debtor-in-possession that affects the bankruptcy estate." (emphasis added)); *In re Actrade Fin. Techs., Ltd.*, Case No. 02-16212 (ALG), 2009 Bankr. LEXIS 2435, at *9 (Bankr. S.D.N.Y. Sept. 3, 2009) (holding that court-approved settlement between a chapter 7 trustee and a debtor was not binding on sureties who were not parties to the settlement).

The typical settlement under Bankruptcy Rule 9019 does not run afoul of the Rules Enabling Act because the settlement is limited to the interests of the debtor and the settling party, both of whom are consenting and are properly before the Court.  An objector to a proposed settlement is often a creditor of the debtor who opposes the settlement as not being in the best interests of the debtor's estate because, among other things, it does not provide enough value on account of compromised claims.

However, the AIG Draft Settlement is entirely different.  The BSA is asserting its objection to the proposed settlement on two grounds: (a) there has been no evidence submitted demonstrating that the AIG Draft Settlement is in the best interest of the Debtor's estate, and (b) the rights and interests of the BSA, a party in interest, may be impermissibly, non-consensually impaired under the terms of the AIG Draft Settlement.  Indeed, the AIG Draft Settlement purports to reach and settle the very rights, claims, and interests *of the BSA* by improperly modifying and abridging those rights, claims, and interests without the BSA's consent and in violation of applicable law.

If approved in its current form, the AIG Draft Settlement and related relief could non-consensually modify and affect rights and claims belonging to the BSA (which will be transferred to the BSA Trust) against the AIG Insurers.  The Proposed Order approves a settlement agreement that neither the BSA nor this Court has seen in final form (Proposed Order ¶ 1) and, acknowledging that the final settlement agreement may incorporate provisions not before the Court, provides that, "[i]n the event of a conflict between the terms of the Settlement Agreement and this Order, <u>the</u>

- 9 -

terms of the Settlement Agreement shall control." *See* Proposed Order ¶ 6 (emphasis added). Accordingly, the substantive rights of the BSA (and the BSA Trust) will be controlled in a potentially materially adverse manner by an agreement to which the BSA is not a party, does not yet exist, and may contain terms not yet drafted or filed that will supersede this Court's order.

Aside from these due process issues presented by the manner in which the AIG Draft Settlement and Proposed Order have been presented to the Court and to parties in interest, the AIG Draft Settlement, in its current form, contains numerous provisions that could create substantive rights for the AIG Insurers or eliminate substantive rights belonging to the BSA and Local Councils without their consent. For example, while it appears as if the AIG Insurers can only allocate the Settlement Amount to the AIG Insurers Policies issued directly to the Debtor and sold pursuant to section 363 of the Bankruptcy Code, the relevant terms remain unnecessarily ambiguous in the AIG Draft Settlement. *See* AIG Draft Settlement § 4(a). The Plan Proponents must clarify and confirm that nothing in the AIG Draft Settlement, the Proposed Order, the Plan, or any other related agreements or orders will permit the depletion of aggregate, per-person, or per-occurrence limits under AIG Insurer Policies issued to the BSA or Local Councils. Any unilateral right to deplete the BSA's policy limits created by the AIG Draft Settlement would violate the automatic stay and improperly take property of the BSA's estate without compensation, adequate protection, or due process, all without oversight or objection, and is wholly inconsistent with the BSA's existing rights and interests in the BSA Insurance Policies issued by the AIG Insurers.

The AIG Draft Settlement also designates the AIG Insurers as settling insurers under the Plan ("**Settling Insurers**") and entitles them to releases, injunctions, and protections (AIG Draft Settlement § 6), and releases claims against the AIG Insurers including claims belonging to "all other persons or entities entitled to assert rights to coverage under any of the AIG Insurers Policies related to Tort Claims or Unknown Tort Claims" (AIG Draft Settlement § 10). While the Plan Proponents and the AIG Insurers may agree to some of these provisions, and agree to seek certain

- 10 -

findings in connection with confirmation of the Plan, Bankruptcy Rule 9019 does not authorize the Plan Proponents to create new substantive rights for the benefit of the AIG Insurers or abridge substantive rights belonging to third-parties such as the BSA, Local Councils, and the BSA Trust. Moreover, the AIG Draft Settlement should not be used as an end run around confirmation of the Plan and approval of, among other things, the releases and injunctions included in the Plan.

Simply put, if the Plan Proponents and the AIG Insurers do not have the power to bind the BSA, Local Councils, and the BSA Trust to the proposed settlement under the AIG Insurers Policies or applicable law, nothing in Bankruptcy Rule 9019 gives the Plan Proponents or this Court the power to do so. The non-debtor party whose rights, claims, and interests are being compromised and settled under Bankruptcy Rule 9019 must be properly before the court *and* must consent to the settlement. Here, the BSA, Local Councils, and the BSA Trust have not consented to the AIG Draft Settlement and nothing in the AIG Insurers Policies or the Bankruptcy Code can compel their consent. Accordingly, the AIG Draft Settlement and Proposed Order, require technical modifications, as set forth above, to make clear that nothing therein modifies or abridges the rights of the BSA, Local Councils, or the BSA Trust.

C.     <u>Sections 105(a) and 363(b) and (f) of the Bankruptcy Code Do Not Provide Authority to Approve the AIG Draft Settlement as It Relates to the BSA Insurance Policies.</u>

In addition to Bankruptcy Rule 9019, the Motion and Memorandum cite sections 105(a) and 363(b) and (f) of the Bankruptcy Code as authority to approve the AIG Draft Settlement. However, the sale of the AIG Insurers Policies pursuant to section 363 includes "only those policies that were <u>issued to the Debtor</u>." Proposed Order ¶ 2 (emphasis added). Additionally, in furtherance of the proposed sale of the AIG Insurers Policies issued to the Debtor (which does not include BSA Insurance Policies), the Plan Proponents request that the Court issue an injunction pursuant to section 105(a), separate from the channeling injunctions contemplated in the Plan and AIG Draft

- 11 -

Settlement, to "implement the Sale of the Policies." Memorandum section III.  Because the BSA

Insurance Policies are excluded from the proposed 363 sale of AIG Insurers Policies, and the related

channeling injunction must be implemented and approved pursuant to the Plan, sections 105(a) and

363(b) and (f) do not provide any authority to approve the AIG Draft Settlement as it relates to the

BSA Insurance Policies.

> D.   <u>The Debtor has Failed to Meet Its Burden to Establish that the Settlement is Fair and Reasonable</u>

Even if the Plan Proponents were to modify the AIG Draft Settlement to preserve all of the

BSA's substantive rights, the Plan Proponents have still not offered any evidence to demonstrate

that the terms of the settlement are fair and reasonable or that the applicable legal standard has been

met—nor can they, since the final terms of the settlement have not been filed or served with proper

notice and time period to review upon any other parties in interest.  While the Debtor cites numerous

cases in the Motion and Memorandum for the proposition that the approval of proposed settlements

need only be reasonable, fair and in the best interests of the estate, it neglects to provide the

fundamental information and evidence necessary for the Court to make such fact-specific

determinations with respect to the AIG Draft Settlement.  Moreover, it is impossible to conclude

that the Debtor entered into such any such settlement in good faith and with sound business

judgment where the Debtor itself appears not to have evaluated a final settlement agreement.  To

be sure, there is no evidence or analysis of what value the Debtor is giving up in exchange for the

$18,000,000 Settlement Amount. Without clear and final terms, there can be no way of knowing

how much abuse claimants are losing as a result of this settlement and whether they are reasonably

compensated for such losses by the Settlement Amount.

The Debtor bears the burden of proof with respect to establishing that the AIG Draft

Settlement is fair and reasonable.  "Although the bankruptcy court has great latitude in authorizing

a compromise, it may only approve a proposal that is fair and equitable to the creditors. . . . And

- 12 -

while a court generally gives deference to a trustee's business judgment in deciding whether to settle a matter, the trustee has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *In re Mickey Thompson Ent. Grp., Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003) (internal citations and quotations omitted). A bankruptcy court "may not simply accept the trustee's word that the settlement is reasonable, nor may [it] merely 'rubber-stamp' the trustee's proposal." *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, (7th Cir. 1987). This Court must exercise its own independent and informed judgment when considering a settlement proposal and, there can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised him or herself of all facts necessary for an intelligent and objective opinion. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 419, 424 (1968) (reversing and remanding approval of a settlement as part of plan where there were no factual findings by the court or facts in the record sufficient to make an informed, independent decision with regard to the compromise); *Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996) (stating that "the bankruptcy court must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate."); *In re Bondanelli*, No. 2:14-BK-27656-WB, 2020 WL 1304140, at *2 (B.A.P. 9th Cir. Mar. 18, 2020) ("[w]hen assessing a compromise, courts appropriately canvass the issues [and must] amply consider[] the various factors that determine[ ] the reasonableness of the compromise"); *In re Fleming Packaging Corp.*, 2007 Bankr. LEXIS 4234 (Bankr. C.D. Ill. Dec. 20, 2007) ("The court may not simply accept the trustee's representation that the settlement is reasonable. Instead, the court must apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment about the settlement.").

The relevant information required for an informed, independent determination of whether a proposed settlement is fair and in the best interests of the estate includes actual facts and not

- 13 -

conclusory statements or allegations proffered by the debtor.  *TMT Trailer*, 390 U.S. at 437 ("To make an informed and independent judgment, however, the court needs facts, not allegations."); *see In re HyLoft, Inc.*, 451 B.R. 104, 110 (Bankr. D. Nev. 2011("[The] Trustees must do more than parrot the standards or announce that they are satisfied. Their burden is to persuad[e] the bankruptcy court that the compromise is fair and equitable and should be approved [and] must present a cogent and detailed factual explanation, discussing how the factors apply to the specific litigation and proposed settlement." (internal citations and quotations omitted)).

The Plan Proponents offer no admissible evidence or facts in the Motion or Memorandum to enable the Court to make such a determination, and do not even offer the terms of a final settlement agreement.  Instead, the Plan Proponents offer only two pages of sweeping assertions that parrot the applicable standard while offering no factual support.  *See* Memorandum § I.A–I.E. At no point do the Plan Proponents provide a baseline analysis of the policies being settled, the claims being released or extinguished, or their methodology for valuing the settled insurance policies relative to such claims.  Importantly, the Debtors failed to submit additional evidence or even a supporting declaration on which the Court could base its findings, despite the clear need to do so.  *See* Fed. R. Bankr. 9019; *see also* Local Rule 6004-1(2).

In particular, whether the settlement is in the best interest of creditors has not been demonstrated.  $18,000,000 *may* be a reasonable settlement if the scope of the releases are clearly limited and the Plan Proponents can offer evidence to support this valuation; however, if the scope of releases remains vague, the Plan Proponents will be unable to clearly demonstrate that the scope of releases are commensurate with an $18,000,000 settlement amount.  Importantly, the Plan Proponents and the Lujan claimants assertion that the AIG Settlement Amount of $18,000,000, which amounts to approximately $69,000 per survivor, is a fair and reasonable exercise of the Debtor's business judgment requires additional factual support the Lujan claimants argued that her claims were worth many multiples of that in prior litigation.  *See* BSA Opinion, p. 245.

- 14 -

Rather than a complete and carefully crafted compromise, the AIG Draft Settlement appears to be unfinished and dangerously vague.  There is no reason for the Plan Proponents to force a hearing on the AIG Draft Settlement when they are simply unprepared.  Because the Plan Proponents cannot meet their burden of proof, or even offer final terms for consideration, the Court should consider this settlement at a later date consistent with the Plan, which contemplates hearing Bankruptcy Rule 9019 motions on or after a confirmation hearing on the Plan.

## III.   RESERVATION OF RIGHTS

The BSA reserves all rights, including, but not limited to, the right to object to any modifications or amendments to the AIG Draft Settlement and to any exhibits, supplements, motions, proposed orders, proposed findings or conclusions, or any other documents related to the AIG Draft Settlement.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should deny the Motion, or in the alternative, the BSA requests the Court continue the hearing to approve the settlement until after the Plan Proponents have filed a final settlement agreement and the BSA has had sufficient time to review and respond.  In either case, to the extent the Court decides to approve the AIG Draft Settlement, the BSA asks that this Court limit any relief consistent with the Revised Order to appropriately preserve the BSA's and BSA Trust's rights.

RESPECTFULLY SUBMITTED this 16th day of September 2022.

By:      */s/ Patrick Civille*_____
         *Counsel for Boy Scouts of America*

- 15 -

# Exhibit 1

(Revised Proposed Order & Redline)

1
2
3

IN THE DISTRICT COURT OF GUAM
TERRITORY OF GUAM
BANKRUPTCY DIVISION

4

In re:

Chapter 11 Bankruptcy

5

ARCHBISHOP OF AGAÑA,

Case No. 19-00010

6

a Corporation Sole,

**[PROPOSED] ORDER (I) APPROVING**

7

Debtor.

**MOTION PURSUANT TO SECTIONS
105(a) and 363(f) OF THE
BANKRUPTCY CODE AND**

8

**BANKRUPTCY RULE 9019 FOR AN
ORDER (1) APPROVING**

9

**SETTLEMENT AGREEMENT
AMONG THE ARCHDIOCESE, THE**

10

**AOA ENTITIES, THE OFFICIAL
COMMITTEE OF UNSECURED**

11

**CREDITORS, AND AIG INSURERS
ENTITIES, (2) APPROVING THE**

12

**ARCHDIOCESE'S SALE OF THE
POLICIES ISSUED TO THE DEBTOR**

13

**BACK TO AIG INSURERS ENTITIES
FREE AND CLEAR OF CLAIMS AND**

14

**INTERESTS, AND (3) ENJOINING
ASSERTION OF CLAIMS AGAINST**

15

**AIG INSURERS ENTITIES**

16
17
18

   This case is before the Court on the Debtor's *Motion Pursuant to Sections 105(a) and*

19

*363(f) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order (1) Approving Settlement*

20

*Agreement Among the Archdiocese, the AOA Entities, the Official Committee of Unsecured*

21

*Creditors, and AIG Insurers Entities, (2) Approving the Archdiocese's Sale of Policies Issued to*

22

*the Debtor Back to AIG Insurers Entities Free and Clear of Claims and Interests, and (3)*

23

*Enjoining Assertion of Claims Against AIG Insurers Entities* [Docket No. 939] (the "**Motion**");

24

notice of the Motion being adequate and no further notice of the Motion being necessary and

25

good cause being found based on the Motion and the entire record before the Court,

26
27

   The Motion is granted as follows;

28

1

1. The Settlement Agreement, as modified and finalized on September [●], 2022,[1] among the Archbishop, the AOA Entities, the Committee, and the AIG Insurers Entities is APPROVED subject to, and as set forth in, this Order.

2. Pursuant to 11 U.S.C. § 363(f), the Archbishop is authorized to sell the AIG Insurers Policies, but only those policies that were issued directly to the Debtor, back to the AIG Insurers Entities, free and clear of claims and interests of any other person or entity.

3. In addition to the sale provided in paragraph 2, the Archbishop is authorized to release its interests, if any, in the AIG Insurers Policies pursuant to the terms of the Settlement Agreement and this Order.  Nothing in the Settlement Agreement, this Order, any related releases or injunctions, the Plan, Confirmation Order, or any other related agreement or order, shall be construed to release, channel, enjoin, or otherwise impair claims against the AIG Insurers Entities belonging to the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), and the BSA Trust,[2] except as provided in the following paragraph of this Order.

4. To the extent approved and set forth in a final non-appealable Confirmation Order, the BSA Trust may not assert claims against the AIG Insurers Entities for the Debtor's and/or the AOA Entities' portion of liability covered or allegedly covered by an AIG Insurers Policy, and in turn, no person may seek a Prohibited Recovery against the BSA, Local

---

[1] Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed in the final Settlement Agreement.

[2] The terms "BSA," "Local Councils," and "Chartered Organization" each have the meanings set forth in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 10316-1], Case No. 20-10343 (LSS) (Bankr. D. Del.) (the "**BSA Plan**"). as modified by the BSA Confirmation Opinion, dated July 29, 2022 [Docket No. 10136] and BSA Confirmation Order, dated August 8, 2022 [Docket No. 10316] issued with respect to the BSA Plan.  The term "**BSA Trust**" means the Settlement Trust as that term is defined in the BSA Plan.

2

SA 1858

Councils, any Chartered Organization (other than the Debtor and/or the AOA Entities), or the BSA Trust on account of such portion of liability.

5. For the avoidance of doubt, nothing in this Order constitutes a determination of the Debtor's and/or the AOA Entities' rights to coverage under (if any), or interest in (if any), AIG Insurers Policies issued to the BSA or Local Councils.

6. Any allocation of the Settlement Amount shall be for the AIG Insurers Entities' internal purposes only and no allocation will be binding on the BSA, Local Councils, the BSA Trust, or any Chartered Organization (other than the Debtor and/or the AOA Entities). For the avoidance of doubt, except for such internal purposes, no portion of the Settlement Amount shall be allocated to AIG Insurers Policies issued to the BSA or Local Councils, nor will anything in the Settlement Agreement, this Order, any related releases or injunctions, the Plan, Confirmation Order, or any other related agreement or order, permit the exhaustion or erosion (either now or in the future) of any aggregate, per-person, or per-occurrence limits under the AIG Insurers Policies issued to the BSA or Local Councils.

7. The AIG Insurers Entities are good faith purchasers entitled to the protections of 11 U.S.C. § 363(m).

8. All claims held by any person against the AIG Insurers Entities under the AIG Insurers Policies are enjoined as set forth in this Order and the Plan.

9. Nothing in this Order or the Settlement Agreement shall override, contravene, modify or limit, or be construed or deemed to override, contravene, modify or limit, the *Opinion* [BSA Bankr. Docket No. 10136] (the "**BSA Confirmation Opinion**"), the BSA Plan, or the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical*

3

SA 1859

*Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 10316] (the "**BSA Confirmation Order**"), including the injunctions and releases provided or approved under the BSA Plan, the BSA Confirmation Opinion or the BSA Confirmation Order (including to the full extent that such injunctions and releases bar any claims or cause of actions against the BSA Settling Insurance Companies or the BSA Opt-Out Chartered Organizations).[3] For the avoidance of doubt, and without limiting the foregoing, the Debtor, the AOA Entities, their creditors or assigns shall not be permitted to take any action with respect to (a) any Abuse Insurance Policy issued by a Settling Insurance Company or (b) any other policy issued by a Settling Insurance Company covering Abuse Claims. This Order and the Settlement Agreement are consistent with and abide by the injunctions in Article X of the BSA Plan and the BSA Confirmation Order (including the Channeling Injunction, the Post-Confirmation Interim Injunction and the Insurance Entity Injunction).

10. In the event of a conflict between the terms of the Settlement Agreement and this Order, the terms of this Order shall control.

11. This Court shall retain exclusive jurisdiction over the interpretation and enforcement of this Order and the Settlement Agreement, provided nothing herein or therein shall interfere with or otherwise limit the jurisdiction or authority of the United States Bankruptcy Court for the District of Delaware.

12. Notwithstanding the provisions of the Federal Rules of Bankruptcy Procedure, including Bankruptcy Rule 6004(h), this Order shall not be stayed and it shall be effective and enforceable immediately upon its entry, and the Debtor is authorized to take all such

---

[3] Capitalized terms used in this paragraph and not otherwise defined herein have the meanings set forth in the BSA Plan.

4

1  actions contemplated by the terms of the Settlement Agreement and this Order and

2  necessary to the Debtor's obligations under the Settlement Agreement immediately upon

3  entry of this Order.

4  DATED:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

SA 1861

~~Ford Elsaesser, ISB #2205~~
~~Bruce A. Anderson, ISB #3392~~
~~ELSAESSER ANDERSON, CHTD.~~
~~320 East Neider Avenue, Suite 102~~
~~Coeur d'Alene, ID  83815~~
~~Telephone      (208) 667-2900~~
~~Facsimile       (208) 667-2150~~
~~ford@eaidaho.com~~
~~brucea@eaidaho.com~~

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE DISTRICT COURT OF GUAM
TERRITORY OF GUAM
BANKRUPTCY DIVISION

| | |
|---|---|
| In re: | Chapter 11 Bankruptcy |
| ARCHBISHOP OF AGAÑA, | Case No. 19-00010 |
| a Corporation Sole, | **[PROPOSED] ORDER (I) APPROVING MOTION PURSUANT TO SECTIONS 105(a) and 363(f) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER (1) APPROVING SETTLEMENT AGREEMENT AMONG THE ARCHDIOCESE, THE AOA ENTITIES, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND AIG INSURERS ENTITIES, (2) APPROVING THE ARCHDIOCESE'S SALE OF THE POLICIES ISSUED TO THE DEBTOR BACK TO AIG INSURERS ENTITIES FREE AND CLEAR OF CLAIMS AND INTERESTS, AND (3) ENJOINING ASSERTION OF CLAIMS AGAINST AIG INSURERS ENTITIES** |
| Debtor. | |

This case is before the ~~court~~*Court* on the Debtor's *Motion* ~~of the Debtor~~*Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019* for an Order~~:~~ *(1)* ~~approving a settlement set forth in a settlement agreement among~~*Approving Settlement Agreement Among* the Archdiocese, the AOA Entities ~~(as defined below)~~, the Official

1

CORE/3515288.0002/176231853.3

SA 1862

1   *Committee of Unsecured Creditors, and AIG Insurers Entities* ~~("AIG Insurers");~~*, (2)*

2   ~~authorizing the Archdiocese to sell the AIG Insurers~~ *Approving the Archdiocese's Sale of*

3   *Policies* ~~issued~~*Issued* *to the Debtor* ~~back~~*Back* *to AIG Insurers* ~~, free and clear of claims and~~

4   ~~interests of any other person or entity; (3) enjoining all claims against AIG Insurers under the~~

5   ~~Policies; (4) approving the manner and form of notice of this Motion and the proposed~~

6   ~~injunction~~ *Entities Free and Clear of Claims and Interests, and (3) Enjoining Assertion of*

7   *Claims Against AIG Insurers Entities* [Docket No. 939] (the "**Motion**"); notice of the

8   ~~motion~~Motion being adequate and no further notice of the Motion being necessary and good

9   cause being found based on the Motion and the entire record before the Court,

10

11          The Motion is granted as follows;

12   1.  The Settlement Agreement, as modified and finalized on September [●], 2022,[1] among

13       the ~~Archdiocese~~Archbishop, the AOA Entities, the Committee, and the AIG ~~Entity~~

14       Insurers Entities is APPROVED subject to, and as set forth in, this Order.

15   2.  Pursuant to 11 U.S.C. § 363(f), the ~~Archdiocese~~Archbishop is authorized to sell the

16       AIG Insurers Policies, but only those policies that were issued directly to the Debtor,

17       back to the AIG Insurers Entities, free and clear of claims and interests of any other

18       person or entity.

19

20   3.  In addition to the sale provided in paragraph 2, the ~~Archdiocese~~Archbishop is

21       authorized to release its interests, if any, in ~~all of~~the AIG Insurers Policies pursuant to

22       the terms of the Settlement Agreement. and this Order.  Nothing in the Settlement

23       Agreement, this Order, any related releases or injunctions, the Plan, Confirmation

24       Order, or any other related agreement or order, shall be construed to release, channel,

25

26   _____

27   [1] Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed in the final
     Settlement Agreement.

28                                              2

CORE/3515288.0002/176231853.3

1  enjoin, or otherwise impair claims against the AIG Insurers Entities belonging to the

2  BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor

3  and/or the AOA Entities), and the BSA Trust,[2] except as provided in the following

4  paragraph of this Order.

5  4.  To the extent approved and set forth in a final non-appealable Confirmation Order, the

6  BSA Trust may not assert claims against the AIG Insurers Entities for the Debtor's

7  and/or the AOA Entities' portion of liability covered or allegedly covered by an AIG

8  Insurers Policy, and in turn, no person may seek a Prohibited Recovery against the

9  BSA, Local Councils, any Chartered Organization (other than the Debtor and/or the

10  AOA Entities), or the BSA Trust on account of such portion of liability.

11

12  5.  For the avoidance of doubt, nothing in this Order constitutes a determination of the

13  Debtor's and/or the AOA Entities' rights to coverage under (if any), or interest in (if

14  any), AIG Insurers Policies issued to the BSA or Local Councils.

15

16  6.  Any allocation of the Settlement Amount shall be for the AIG Insurers Entities' internal

17  purposes only and no allocation will be binding on the BSA, Local Councils, the BSA

18  Trust, or any Chartered Organization (other than the Debtor and/or the AOA Entities).

19  For the avoidance of doubt, except for such internal purposes, no portion of the

20  Settlement Amount shall be allocated to AIG Insurers Policies issued to the BSA or

21  Local Councils, nor will anything in the Settlement Agreement, this Order, any related

22  releases or injunctions, the Plan, Confirmation Order, or any other related agreement or

23

24

25  [2] The terms "BSA," "Local Councils," and "Chartered Organization" each have the meanings set forth in the *Third*

26  *Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 10316-1], Case No. 20-10343 (LSS) (Bankr. D. Del.) (the "**BSA Plan**"). as modified by the BSA Confirmation Opinion, dated July 29, 2022 [Docket No. 10136] and

27  BSA Confirmation Order, dated August 8, 2022 [Docket No. 10316] issued with respect to the BSA Plan.  The term "**BSA Trust**" means the Settlement Trust as that term is defined in the BSA Plan.

28
3

order, permit the exhaustion or erosion (either now or in the future) of any aggregate, per-person, or per-occurrence limits under the AIG Insurers Policies issued to the BSA or Local Councils.

7. 4. The AIG Insurers Entities are good faith purchasers entitled to the protections of 11 U.S.C. § 363(m).

8. 5. All claims held by any person against the AIG Insurers Entities under the AIG Insurers Policies that were issued to the Debtor are enjoined as set forth in this Order and the Plan.

9. Nothing in this Order or the Settlement Agreement shall override, contravene, modify or limit, or be construed or deemed to override, contravene, modify or limit, the *Opinion* [BSA Bankr. Docket No. 10136] (the "**BSA Confirmation Opinion**"), the BSA Plan, or the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. Docket No. 10316] (the "**BSA Confirmation Order**"), including the injunctions and releases provided or approved under the BSA Plan, the BSA Confirmation Opinion or the BSA Confirmation Order (including to the full extent that such injunctions and releases bar any claims or cause of actions against the BSA Settling Insurance Companies or the BSA Opt-Out Chartered Organizations).[3]  For the avoidance of doubt, and without limiting the foregoing, the Debtor, the AOA Entities, their  creditors or assigns shall not be permitted to take any action with respect to (a) any Abuse Insurance Policy issued by a Settling Insurance Company or (b) any other

---

[3] Capitalized terms used in this paragraph and not otherwise defined herein have the meanings set forth in the BSA Plan.

4

CORE/3515288.0002/176231853.3

policy issued by a Settling Insurance Company covering Abuse Claims.  This Order and the Settlement Agreement are consistent with and abide by the injunctions in Article X of the BSA Plan and the BSA Confirmation Order (including the Channeling Injunction, the Post-Confirmation Interim Injunction and the Insurance Entity Injunction).

10. 6. In the event of a conflict between the terms of the Settlement Agreement and this Order, the terms of the Settlement Agreement this Order shall control.

11. 7. This Court shall retain exclusive jurisdiction over the interpretation and enforcement of this Order and the Settlement Agreement, provided nothing herein or therein shall interfere with or otherwise limit the jurisdiction or authority of the United States Bankruptcy Court for the District of Delaware.

12. 8. Notwithstanding the provisions of the Federal Rules of Bankruptcy Procedure, including Bankruptcy Rule 6004(h), this Order shall not be stayed and it shall be effective and enforceable immediately upon its entry, and the Debtor is authorized to take all such actions contemplated by the terms of the Settlement Agreement and this Order and necessary to the Debtor's obligations under the Settlement Agreement immediately upon entry of this Order.

DATED:

5

CORE/3515288.0002/176231853.3

SA 1866

1
2
3
4

**THE DISTRICT COURT OF GUAM**

5
6
7
8
9

In re:

ARCHBISHOP OF AGAÑA,
a Corporation Sole,

　　　　　　　Debtor.

Bankruptcy Case No. 19-00010
Chapter 11

10
11

**ORDER GRANTING MOTION DIRECTING MEDIATION AND APPOINTING THE HONORABLE ROBERT J. FARIS TO SERVE AS MEDIATOR**

12
13
14
15
16

　　　The Court having considered the stipulated motion to appoint a mediator, and it appearing that the relief requested is in the best interest of the Debtor's estate, its creditors, and other parties in interest,

17

**IT IS ORDERED:**

18

　　1.　The motion is **GRANTED**.

19

　　2.　United States Bankruptcy Judge Robert J. Faris is appointed to serve as mediator.

20
21
22
23
24
25
26
27
28

　　3.　The parties to the mediation shall include: (1) the Debtor and its counsel; (2) the Official Committee of Unsecured Creditors and its counsel; (3) counsel for tort claimants, whether now identified or in the future; (4) Non-tort claimant member of the Committee, Bank of Guam and its counsel; (5) subject to Judge Faris' consent, any additional entities or persons choosing to participate in the mediation, (6) Debtor's insurance carriers AIG/National Union, CNA and ACE Group and counsel and (7) any entities or persons that are determined by the Debtor and Committee as necessary to participate, subject to the consent of Judge Faris, (collectively, the "Parties").

-1

SA 1867

4. The mediation proceedings are confidential and the mediator's files and records, with the exceptions of signed, written agreements, are closed to all persons unless the Parties and the mediator mutually agree otherwise. All mediation-related communications, verbal or written, between the Parties or from the Parties to the mediator and any information and evidence presented to the mediator during the proceedings are confidential.

5. The mediation shall be held in Guam, or at such other place as determined by Judge Faris. Judge Faris will establish the schedules and procedures for the mediations sessions. All Parties and their respective counsel must comply with all directions issued by Judge Faris in this case unless otherwise ordered by the court.

6. The mediation shall commence on or before October 30 and 31, 2019 or at any other time as ordered by Judge Faris at the District Court of Guam, U.S. Courthouse, 520 W Soledad Avenue, Hagåtña, 96910, Guam.

7. The mediation shall be conducted by Judge Faris without cost to the estate or any other Party, with the exception of the administrative claims of the Debtor's and the Committee's professionals and reimbursement of out of pocket costs, if any, of the Debtor and the Committee and its members.

8. Any Party intending to terminate their participation in the mediation shall provide ten (10) days written notice to each Party in the mediation and to the mediator.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Aug 28, 2019**

-2

SA 1868

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

IN RE:                     ) Bankruptcy Case No. 19-00010
                           )
ARCHBISHOP OF AGANA,       )
A CORPORATION SOLE,        )
                           )
            Debtor.        )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
OCTOBER 4, 2022; 11:03 A.M.
HAGATNA, GUAM

**Continued Confirmation on Fifth Amended Joint Plan of**          11 03:36AM
**Reorganization**                                                11 03:39AM

APPEARANCES


Appearing on behalf of the U.S. Trustee:

**OFFICE OF THE U.S. TRUSTEE**
**BY: CURTIS CHING, UST (via VTC)**
1132 Bishop Street, Suite 602
First Hawaiian Tower
Honolulu, HI 96813
(808) 522-8150

Appearing on behalf of Debtor:

**ELSAESSER ANDERSON**
**BY: FORD ELSAESSER, JR., ESQ.**
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
(208) 667-2900


**LAW OFFICE OF JOHN C. TERLAJE**
**BY: JOHN C. TERLAJE, ESQ.**
Suite 216, Former Union Bank Building
194 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 477-8894


Appearing on behalf of Boy Scouts of America:

**LAW OFFICE OF CIVILLE & TANG**
**BY: G. PATRICK CIVILLE, ESQ. (Via VTC)**
330 Hernan Cortez Avenue, Suite 300
Hagatna, Guam 96910
(671) 472-8868


**LAW OFFICE OF WHITE & CASE**
**BY: ERIN ROSENBERG, ESQ. (Via VTC)**
**LAURA BACCASH, ESQ.**
**RON GORSICH, ESQ.**
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5357

Appearing on behalf of the Committee of Unsecured Creditors:

**LAW OFFICE OF STINSON LLP**
**BY: EDWIN H. CALDIE, ESQ.**
**ROBERT KUGLER, ESQ.**
**ANDREW J. GLASNOVICH, ESQ. (Via VTC)**
50th South Sixth Street
Suite 2600
Minneapolis, MN 55402
(612)335-1500

Appearing on behalf of Continental Insurance Company:

**DAVID CHRISTIAN ATTORNEYS**
**BY: DAVID CHRISTIAN, ESQ.**
105 W. Madison Street
Suite 1400
Chicago, IL 60602

Appearing on behalf of National Union and American Home
Insurance Companies:

**LAW OFFICE OF SQUIRE PATTON BOGGS**
**BY: MARK C. ERRICO, ESQ., (Via VTC)**
382 Springfield Avenue, Suite 300
Summit, NJ 07901
(973) 848-5600

Appearing on behalf of Bank of Guam:

**LAW OFFICE MACDONALD FERNANDEZ**
**BY: IAIN A. MACDONALD, ESQ. (Via VTC)**
221 Sansome Street, Third Floor
San Francisco, CA 94104
(415) 362-0449

Appearing on behalf of numerous plaintiffs:

**THE BERMAN LAW FIRM**
**BY: MICHAEL BERMAN, ESQ. (Via VTC)**
111 W. Chalan Santo Papa, Suite 503
Bank of Guam Building
Hagatna, Guam
(671) 477-2778

**LAW OFFICES OF DOOLEY ROBERTS & FOWLER**
**BY: KEVIN FOWLER, ESQ. (Via VTC)**
865 South Marine Corps Drive
Suite 201, Orlean Pacific Plaza
Tamuning, Guam 96913
(671) 646-1222


**LAW OFFICES OF PFAU COCHRAN VERTETIS AMALA**
**BY: STEVEN T. REICH, ESQ. (Via VTC)**
403 Columbia Street
Suite 500
Seattle, Washington 98104
(206) 451-8260


Appearing on behalf of certain survivors:

**LAW OFFICE OF LUJAN & WOLFF**
**BY: DELIA LUJAN-WOLFF, ESQ. (Via VTC)**
238 Archbishop Flores Street
DNA Building, Suite 300
Hagatna, Guam 96910
(671) 477-8064


Appearing on behalf of SBA:

**OFFICE OF THE U.S. ATTORNEY**
**BY: JESSICA WESSLING, AUSA (Via VTC)**
108 Hernan Cortez Avenue
Suite 500, Sirena Plaza
Hagatna, Guam 96910
(671) 472-7332


ALSO PRESENT:

Leo Tudela, Committee Chairman

Zita Pangelinan, Pangelinan Family representative (Via VTC)

09 05:43AM
10 38:57AM

I N D E X

<u>Page</u>

Court denied motion by Ms. Wolff for
leave to file additional materials in
support of the objection                      11

Examination of Mr. Leo Tudela              20

Court approves Fifth Amended Plan of
Reorganization                                 34

6

```
 1            October 4, 2022; 11:03 a.m.; Hagatna, Guam
 2                             *  *  *                      10:39AM
 3                                                          10:39AM
 4            THE COURT:  I'm sorry for the delay.  Just --  11:03AM
 5  anyway, I just got locked out from downstairs.  I couldn't get  11:03AM
 6  up here to the courthouse.  So...courtroom.  All right.  So  11:03AM
 7  are we ready to proceed, Counsels?                      11:03AM
 8            MR. CALDIE:  Yes, Your Honor.                 11:03AM
 9            THE COURT:  Okay.  We'll call the case up,    11:03AM
10  please.  And Karen... okay, Carm, you can call the case.  11:03AM
11            THE CLERK:  Good morning, Your Honor.  This is  11:03AM
12  Bankruptcy Case No. 19-00010, In Re:  Archbishop of Agana, a  11:03AM
13  Corporation Sole; Continued confirmation on Fifth Amended  11:03AM
14  Joint Plan of Reorganization.                          11:03AM
15            Counsel, please state your appearances for the  11:03AM
16  Archdiocese.                                            11:03AM
17            MR. ANDERSON:  Bruce Anderson.  Good morning,  11:03AM
18  Your Honor.                                             11:03AM
19            THE COURT:  Good morning.                     11:03AM
20            MR. ELSAESSER:  Good morning, Ford Elsaesser for  11:03AM
21  the Archdiocese.  Mr. Terlaje is in Superior Court and won't  11:03AM
22  be able to join us this morning.                       11:03AM
23            THE COURT:  That's fine.                      11:03AM
24            MR. ELSAESSER:  We also have Father Romeo and  11:03AM
25  Mr. Diaz.  And we also are blessed to be joined by Sister  11:03AM
```

| | | |
|---|---|---|
| 1 | Angela this morning.  And... | 11:04AM |
| 2 | THE COURT:  Okay.  I see her. | 11:04AM |
| 3 | MR. ELSAESSER:  And Ms. Villanueva and Father | 11:04AM |
| 4 | Carl.  And so -- for the Archdiocese. | 11:04AM |
| 5 | THE COURT:  Okay, thank you, Mr. Elsaesser. | 11:04AM |
| 6 | MR. ELSAESSER:  And Mr. Weisenberger, of course. | 11:04AM |
| 7 | THE COURT:  Oh, Mr. Weisenberger.  Okay, good | 11:04AM |
| 8 | morning, everyone. | 11:04AM |
| 9 | MR. CALDIE:  Good morning, Your Honor, Edwin | 11:04AM |
| 10 | Caldie on behalf of the Committee.  I'm also happy to be | 11:04AM |
| 11 | joined this morning by -- with excuse me, lack of sleep, by | 11:04AM |
| 12 | Robert Kugler, my colleague, Andrew Glasnovich, who is joining | 11:04AM |
| 13 | by Zoom.  We also have Mr. Leo Tudela in the Courtroom with | 11:04AM |
| 14 | us. | 11:04AM |
| 15 | And I want to invite, Your Honor, because I | 11:04AM |
| 16 | neglected to do so yesterday, any other Committee members who | 11:04AM |
| 17 | would like to identify themselves.  You don't have to, but if | 11:04AM |
| 18 | you'd like to identify yourselves as being present, we would | 11:04AM |
| 19 | feel honored by your presence, either way.  But if you'd like | 11:04AM |
| 20 | to announce yourself, go ahead. | 11:04AM |
| 21 | MR. MACDONALD:  Yes, Iain Macdonald, representing | 11:04AM |
| 22 | Bank of Guam Committee member. | 11:05AM |
| 23 | THE COURT:  Okay, good morning. | 11:05AM |
| 24 | MR. BERMAN:  Michael Berman, appearing on behalf | 11:05AM |
| 25 | of multiple creditors. | 11:05AM |

| | | |
|---|---|---|
| 1 | THE COURT:  Okay.  *Hafa adai*. | 11:05AM |
| 2 | MR. CIVILLE:  *Buenas* and *hafa adai*, Your Honor, | 11:05AM |
| 3 | Patrick Civille, Erin Rosenberg, Laura Baccash and Ron Gorsich | 11:05AM |
| 4 | for the Boy Scouts of America. | 11:05AM |
| 5 | THE COURT:  *Hafa adai*.  Good morning, Boy Scouts | 11:05AM |
| 6 | of America team. | 11:05AM |
| 7 | MR. CHING:  Morning, Your Honor, Curtis Ching for | 11:05AM |
| 8 | the United States Trustee. | 11:05AM |
| 9 | THE COURT:  Okay, good morning, Mr. Ching. | 11:05AM |
| 10 | MR. FOWLER:  Your Honor, Kevin Fowler and Steve | 11:05AM |
| 11 | Reich for various tort claimant creditors. | 11:05AM |
| 12 | THE COURT:  Good morning Mr. Fowler, Mr. Reich. | 11:05AM |
| 13 | MR. REICH:  Good morning. | 11:05AM |
| 14 | MS. WESSLING:  Good morning Jessica Wessling on | 11:05AM |
| 15 | behalf of Small Business Administration. | 11:05AM |
| 16 | THE COURT:  Okay, good morning, Ms. Wessling. | 11:05AM |
| 17 | Mrs. Wessling. | 11:05AM |
| 18 | MS. PANGELINAN:  Buenas, Your Honor, Zita | 11:05AM |
| 19 | Pangelinan on the estate of Francisco and Engracia Pangelinan. | 11:05AM |
| 20 | THE COURT:  Good morning, Ms. Pangelinan.  I see | 11:05AM |
| 21 | you're able to rearrange your schedule, sorry about that | 11:06AM |
| 22 | inconvenience. | 11:06AM |
| 23 | MR. ERRICO:  Morning, Your Honor, Mark Errico for | 11:06AM |
| 24 | the AIG insurers. | 11:06AM |
| 25 | THE COURT:  Mr. Errico, good morning. | 11:06AM |

| | | |
|---|---|---|
| 1 | MS. WOLFF:  Good morning, Your Honor, Delia Lujan | 11:06AM |
| 2 | Wolff for certain tort claim creditors. | 11:06AM |
| 3 | THE COURT:  Ms. Lujan Wolff, good morning.  Is | 11:06AM |
| 4 | Ms. Mendiola on as well, from the Sgambelluri family?  I see | 11:06AM |
| 5 | she's not, okay. | 11:06AM |
| 6 | MR. CHRISTIAN:  Good morning, Your Honor, David | 11:06AM |
| 7 | Christian on behalf of the Continental Insurance Company. | 11:06AM |
| 8 | THE COURT:  Good morning, Mr. Christian. | 11:06AM |
| 9 | MR. HOGAN:  Morning, Your Honor, Mike Hogan, | 11:06AM |
| 10 | future claims. | 11:06AM |
| 11 | THE COURT:  Good morning, Judge Hogan.  Anyone | 11:06AM |
| 12 | else?  Okay, so a couple things, were parties able to -- were | 11:06AM |
| 13 | the parties able to meet with regard to the issue of the | 11:06AM |
| 14 | language Delia Lujan Wolff was going to submit to Ms. | 11:06AM |
| 15 | Rosenberg and anyone else? | 11:06AM |
| 16 | MS. WOLFF:  Hi, Your Honor.  This is Delia Lujan | 11:07AM |
| 17 | Wolff.  No, we haven't met, yet.  But, Your Honor, I did come | 11:07AM |
| 18 | up with some proposed language that I was just going to send | 11:07AM |
| 19 | over to the debtors, I'm sorry, the Debtor and the Committee, | 11:07AM |
| 20 | just to see if that's acceptable to them first and then I | 11:07AM |
| 21 | would be sending it to Ms. Rosenberg. | 11:07AM |
| 22 | THE COURT:  Okay, why don't you go ahead and do | 11:07AM |
| 23 | that right now then.  Just take a -- just do it and then we'll | 11:07AM |
| 24 | just continue to proceed on. | 11:07AM |
| 25 | MR. CALDIE:  Your Honor, if I may, Edwin Caldie | 11:07AM |

1    for the Committee.                                          11:07AM

2              THE COURT:  Yes.                                  11:07AM

3              MR. CALDIE:  I think it would be -- time is of    11:07AM

4    the essence and you may as well just circulate it to everyone.  11:07AM

5    I think the proponents have no problem with it going to Ms.  11:07AM

6    Rosenberg at the same time it goes to us.                  11:07AM

7              THE COURT:  All right.  Good idea.  So just send  11:07AM

8    it to everyone, including Ms. Rosenberg, Ms. Lujan Wolff.  11:07AM

9              MS. WOLFF:  I will do that, thank you.           11:07AM

10             THE COURT:  Very well.  All right.  So although   11:07AM

11   it's likely that the joinders filed by Mr. Macdonald, on   11:07AM

12   behalf of DM and ECF Nos. 914 and 947 are moot, the Court  11:08AM

13   would like to have it on the record they are, in fact, moot.  11:08AM

14             Mr. Elsaesser, you had indicated that you would  11:08AM

15   reach out to Mr. Macdonald.                                11:08AM

16             MR. ELSAESSER:  I tried to and was unsuccessful,  11:08AM

17   he was off island.  But I will try again.  But I can represent  11:08AM

18   that I'm sure you can consider it deemed withdrawn because, of  11:08AM

19   course, he now has a -- his client now has an allowed claim.  11:08AM

20   So there'd be no reason for him to have any further objection  11:08AM

21   --                                                         11:08AM

22             THE COURT:  I would agree with that, so the Court  11:08AM

23   is going to deem it moot.  Also...                         11:08AM

24             (Pause.)                                         11:08AM

25             THE COURT:  Okay.  Let me just say, there was...  11:08AM

| | |
|---|---|
| 1 | hold on a second.  Just let me double-check something here | 11:09AM |
| 2 | with regard to...all right, so there was a request to allow | 11:09AM |
| 3 | Ms. -- I'm sorry, Ms. Delia Lujan Wolff was asking the Court | 11:09AM |
| 4 | for leave to file late submissions of filings from the Boy | 11:09AM |
| 5 | Scouts of America.  And the Court -- I'm going to deny that | 11:09AM |
| 6 | motion to allow that, the filing of those documents.  Although | 11:09AM |
| 7 | I did read the three exhibits, which I did, even if the Court | 11:09AM |
| 8 | were to grant the motion for leave to file that declaration | 11:09AM |
| 9 | and consider the attached exhibits for purposes of supporting | 11:09AM |
| 10 | Ms. Lujan Wolff's objection, my ruling remains the same as I | 11:09AM |
| 11 | indicated yesterday, that the Court had -- and so the Court | 11:10AM |
| 12 | had overruled her limited objection. | 11:10AM |
| 13 | And the Court reviewed, as I indicated, the | 11:10AM |
| 14 | redline version, ECF 1046-1 and I agreed with the plan | 11:10AM |
| 15 | proponents, that the modifications therein do not endorse the | 11:10AM |
| 16 | Boy Scouts of America plan, do not subordinate the Court to | 11:10AM |
| 17 | the Delaware Court -- does not subordinate this Court to the | 11:10AM |
| 18 | Delaware Court or does not waive the automatic stay in this | 11:10AM |
| 19 | case.  I think, to me, it's clear that the modifications make | 11:10AM |
| 20 | it clear that the plan proponent's position of neutrality is | 11:10AM |
| 21 | contained within that agreement. | 11:10AM |
| 22 | More importantly, as the Court stated yesterday, | 11:10AM |
| 23 | the Fifth Amended Plan does not contain modifications that | 11:10AM |
| 24 | adversely change the treatment of the claim of any creditors | 11:10AM |
| 25 | and, therefore, the objection by Counsel is overruled, as I've | 11:10AM |

| | |
|---|---|
| 1 | indicated. | 11:11AM |
| 2 | Now with regard to the Sgambelluri and Pangelinan | 11:11AM |
| 3 | families, did you have a chance, Mr. Caldie, and anyone else | 11:11AM |
| 4 | who wants to chime in, to review the links that were submitted | 11:11AM |
| 5 | by Zita Pangelinan on behalf her family? | 11:11AM |
| 6 | MR. CALDIE:  We did.  In fact, several members of | 11:11AM |
| 7 | our team reviewed those links, Your Honor. | 11:11AM |
| 8 | THE COURT:  Uh-huh.  Any -- | 11:11AM |
| 9 | MR. CALDIE:  We thought it was a wonderful idea | 11:11AM |
| 10 | and a very interesting idea.  I don't think it's something we | 11:11AM |
| 11 | can incorporate at this late date because to change directions | 11:11AM |
| 12 | in such a fashion would, I think, materially alter the terms | 11:11AM |
| 13 | of the plan, require the submission of a different plan and | 11:11AM |
| 14 | probably require revoting. | 11:11AM |
| 15 | The distributions that are anticipated by | 11:11AM |
| 16 | creditors of the estate are contingent upon the contribution | 11:11AM |
| 17 | of all of the parcels of real property identified in the plan | 11:11AM |
| 18 | into the trust.  And so for us to shift gears and change what | 11:11AM |
| 19 | effectively would be a distribution, a goodwill distribution, | 11:11AM |
| 20 | a nonmonetary distribution, I think would be a material change | 11:11AM |
| 21 | to the plan, Your Honor. | 11:11AM |
| 22 | THE COURT:  All right.  Does anybody wish to | 11:11AM |
| 23 | comment on the YouTube links that were submitted or the links | 11:12AM |
| 24 | submitted by Ms. Pangelinan yesterday? | 11:12AM |
| 25 | (No response.) | 11:12AM |

|   |   |   |
|---|---|---|
| 1 | THE COURT:  Okay, no response.  Ms. Pangelinan, | 11:12AM |
| 2 | do you want to say anything further?  Or add -- | 11:12AM |
| 3 | MS. PANGELINAN:  Yes, I do, Your Honor. | 11:12AM |
| 4 | THE COURT:  Yes, go ahead. | 11:12AM |
| 5 | MS. PANGELINAN:  First of all, I think that in | 11:12AM |
| 6 | terms of what Attorney Caldie stated about making, you know, a | 11:12AM |
| 7 | major change to the plan, I -- I um...wonder how that could | 11:12AM |
| 8 | be, given that these issues are just being brought forth to | 11:12AM |
| 9 | the Court.  And that the -- that there was possibility of you | 11:12AM |
| 10 | ruling, perhaps, in our favor.  And once again, the -- my | 11:12AM |
| 11 | position yesterday was not for the return of the property to | 11:12AM |
| 12 | our family in that the -- it was just to uphold the | 11:12AM |
| 13 | intentions.  Withdrawing that was to stay within the plan and | 11:13AM |
| 14 | to ensure that these -- the land would then be -- still be | 11:13AM |
| 15 | under the Archdiocese, but for the purpose of nonmonetary | 11:13AM |
| 16 | benefits to the survivors. | 11:13AM |
| 17 | And so I can't see how that could be a -- totally | 11:13AM |
| 18 | change the intentions of the plan.  It still will benefit the | 11:13AM |
| 19 | survivors.  And there is also a difference in perhaps the | 11:13AM |
| 20 | definition of "healing" which is the objective of the | 11:13AM |
| 21 | Archdiocese, your objective, Your Honor, in terms of justice | 11:13AM |
| 22 | perhaps.  But definitions of healing, I think, is something | 11:13AM |
| 23 | that this is what -- this is an objective for all and for all | 11:13AM |
| 24 | the survivors. | 11:14AM |
| 25 | So with that, Your Honor, I hope that you | 11:14AM |

| | | |
|---|---|---|
| 1 | consider that as not a major change to the -- as it stays | 11:14AM |
| 2 | within the Archdiocese, but becomes a nonmonetary value to the | 11:14AM |
| 3 | survivors. | 11:14AM |
| 4 | MR. CALDIE:  Thank you, Your Honor. | 11:14AM |
| 5 | THE COURT:  You want to come up to the podium, | 11:14AM |
| 6 | Mr. Caldie? | 11:14AM |
| 7 | MR. CALDIE:  Sure. | 11:14AM |
| 8 | THE COURT:  I think it would be better, everyone | 11:14AM |
| 9 | can see you. | 11:14AM |
| 10 | MR. CALDIE:  If this had been something we had | 11:14AM |
| 11 | disclosed in the disclosure statement that was approved back | 11:14AM |
| 12 | in, I believe, July, there is a possibility, although I'm | 11:14AM |
| 13 | still not certain that it would have been appropriate or | 11:14AM |
| 14 | possible, but there is a possibility that this then could have | 11:14AM |
| 15 | been considered a nonmaterial change because it would have | 11:14AM |
| 16 | been disclosed to creditors as they voted as a possible | 11:14AM |
| 17 | outcome. | 11:14AM |
| 18 | As it stands, the only two possible outcomes | 11:14AM |
| 19 | explained to creditors were either that the properties would | 11:14AM |
| 20 | go into the estate, be liquidated and then the monies would go | 11:14AM |
| 21 | to creditors or that there was a possible dispute, right, over | 11:15AM |
| 22 | those properties.  But we felt very confident that the | 11:15AM |
| 23 | legalities fell in favor of the estate and the trust. | 11:15AM |
| 24 | We're, unfortunately, having these conversations, | 11:15AM |
| 25 | which I applaud as creative and interesting and focused on | 11:15AM |

| | |
|---|---|
| 1 | healing, which is appropriate, but we're having them at a | 11:15AM |
| 2 | very, very late stage.  And I just don't think that we have | 11:15AM |
| 3 | flexibility at this point.  And at this time, Your Honor, I | 11:15AM |
| 4 | think that we are obligated to ask for an order overruling the | 11:15AM |
| 5 | objections and confirming the plan, although we do have one | 11:15AM |
| 6 | more witness. | 11:15AM |
| 7 | THE COURT:  Yeah.  You do.  Let me just go ahead | 11:15AM |
| 8 | and deal with this and I'll let you call Mr. Tudela.  So the | 11:15AM |
| 9 | Court -- Ms. Pangelinan, the Court has -- was in receipt of | 11:15AM |
| 10 | the YouTube links provided by you to one of my Court staff | 11:15AM |
| 11 | yesterday.  And I did, you know, review it.  I actually was | 11:15AM |
| 12 | probably not surprised that it happened in a small | 11:15AM |
| 13 | jurisdiction, like Alaska, in terms of sexual abuse by the | 11:15AM |
| 14 | Catholic priests and so forth. | 11:16AM |
| 15 | Unfortunately, the information that was provided | 11:16AM |
| 16 | in the link does not overcome the law that I am required to | 11:16AM |
| 17 | follow.  I looked, you know, looked at the caselaw and, of | 11:16AM |
| 18 | course, you weren't able to provide caselaw, neither was | 11:16AM |
| 19 | Mr. Caldie.  He would have an obligation to do so if there was | 11:16AM |
| 20 | caselaw that was opposite of what he was arguing, but the | 11:16AM |
| 21 | representation of law that he presented definitely | 11:16AM |
| 22 | demonstrates that there is a strong presumption against | 11:16AM |
| 23 | conditions subsequent. | 11:16AM |
| 24 | And the pertinent deed simply do not contain an | 11:16AM |
| 25 | expressed manifestation of intention by the grantor to impose | 11:16AM |

1  a condition subsequent and retain a right to reclaim the                 11:16AM

2  property.  I mean, if you're just looking at it from the pure           11:16AM

3  legal aspect, which is what we have to do.                             11:16AM

4           So, unfortunately, and I -- I'm sorry to say this            11:16AM

5  because I know, you know, it's clear to me that you want to            11:17AM

6  honor the intention of your family.  And I think even                  11:17AM

7  Mr. Tudela recognizes that.  And you know, that's a problem            11:17AM

8  with this kind of issue, is that it tears apart -- our                 11:17AM

9  community apart; however, Mr. Caldie made a suggestion that            11:17AM

10  once it's put into the trust, maybe something can resolve at          11:17AM

11  that point.  And I think -- so I think that there is still            11:17AM

12  some hope, Ms. Pangelinan, and also for Ms. Mendiola for the          11:17AM

13  Sgambelluri matters.                                                  11:17AM

14           But as I matter of law, the Court must overrule            11:17AM

15  the objections made by the Pangelinan and Sgambelluri family.         11:17AM

16  And so I'm sorry to say that, but I -- you know hopefully             11:17AM

17  you'll continue to work with the -- the survivors' trustee and       11:17AM

18  the others who are -- who may have ability to speak on your           11:17AM

19  behalf or to concur with you.                                         11:18AM

20           So that'll be the Court's order.  So we'll go              11:18AM

21  ahead and call the next witness.                                      11:18AM

22           MR. CALDIE:  Thank you, Your Honor.  If I may             11:18AM

23  preview what we'll do?                                                11:18AM

24           THE COURT:  Yes, that's fine.                             11:18AM

25           MR. CALDIE:  We have very little to cover, I             11:18AM

| | | |
|---|---|---|
| 1 | believe, Your Honor.  And I've conferred with our | 11:18AM |
| 2 | co-proponents and they agree.  So we'd like to call | 11:18AM |
| 3 | Mr. Tudela.  At that point, I would like to make a record of | 11:18AM |
| 4 | the process that we expect to follow with the proposed order | 11:18AM |
| 5 | and the findings Your Honor was referring to earlier, just to | 11:18AM |
| 6 | sort of make sure that everyone is aware of the ground rules | 11:18AM |
| 7 | we'd like to set and timeline we'd like to set on that. | 11:18AM |
| 8 | THE COURT:  Good. | 11:18AM |
| 9 | MR. CALDIE:  And after -- after we ask, if it so | 11:18AM |
| 10 | happens that we are fortunate enough to have the Court confirm | 11:18AM |
| 11 | the plan, I don't want to assume anything, then I also have a | 11:18AM |
| 12 | request from Mr. Tudela to make a statement to the Court, | 11:18AM |
| 13 | should things go well this morning. | 11:18AM |
| 14 | THE COURT:  Okay. | 11:18AM |
| 15 | MR. CALDIE:  And that is all we have on our | 11:18AM |
| 16 | agenda, unless Mr. Elsaesser thinks there is something more? | 11:19AM |
| 17 | MR. ELSAESSER:  I don't believe there is, Your | 11:19AM |
| 18 | Honor.  The one thing I would -- the one thing I would add is | 11:19AM |
| 19 | that just following up on what your ruling is, remind | 11:19AM |
| 20 | everybody that through the Archdiocese, the parishes are going | 11:19AM |
| 21 | to have an opportunity of rights of first refusal on these | 11:19AM |
| 22 | parcels, which I think is what you were referring to, that | 11:19AM |
| 23 | once these properties are in the trustee, it not completely | 11:19AM |
| 24 | over because if they can work with those individual parishes | 11:19AM |
| 25 | and they want to retain that as part of the, you know, part of | 11:19AM |

| | |
|---|---|
| 1 | the parish parcel, they're going to have the opportunity to | 11:19AM |
| 2 | try to do that.  So I just make mention of that, but we don't | 11:19AM |
| 3 | plan to put anything additional on today. | 11:19AM |
| 4 | THE COURT:  And so you're saying that -- so if | 11:19AM |
| 5 | her parish, if the parish from the Pangelinan family and/or | 11:19AM |
| 6 | the Sgambelluri family wishes to engage in the type of path | 11:19AM |
| 7 | that Ms. Zita Pangelinan or Ms. Mendiola are -- well, first, | 11:20AM |
| 8 | let me back up.  As far as Ms. Pangelinan is asking for, they | 11:20AM |
| 9 | can do so? | 11:20AM |
| 10 | MR. ELSAESSER:  Yeah.  They can get it back to | 11:20AM |
| 11 | the church, essentially.  Yes, back to the parish, which will | 11:20AM |
| 12 | be titled in the Archdiocese, but will be back in the fold, so | 11:20AM |
| 13 | to speak. | 11:20AM |
| 14 | THE COURT:  Yeah, so I think maybe if you have a | 11:20AM |
| 15 | chance to speak to Ms. Pangelinan when she comes back, in | 11:20AM |
| 16 | person, that might -- | 11:20AM |
| 17 | MR. ELSAESSER:  I will do that. | 11:20AM |
| 18 | THE COURT:  It's always easier to do that, rather | 11:20AM |
| 19 | than through Zoom since she's off island. | 11:20AM |
| 20 | MR. ELSAESSER:  I'll send both of them a note to | 11:20AM |
| 21 | explain that. | 11:20AM |
| 22 | THE COURT:  Very well.  Thank you.  Did you hear | 11:20AM |
| 23 | that, Ms. Pangelinan? | 11:20AM |
| 24 | MS. PANGELINAN:  Thank you, Your Honor, I did. | 11:20AM |
| 25 | Thank you. | 11:20AM |

| | |
|---|---|
| 1 | THE COURT:  Okay.  It's not all lost, so hang in | 11:20AM |
| 2 | there.  All right.  Go ahead. | 11:20AM |
| 3 | MR. CALDIE:  Thank you, Your Honor. | 11:20AM |
| 4 | MS. PANGELINAN:  I think the issue, Your Honor -- | 11:20AM |
| 5 | yeah.  Thank you, anyway. | 11:20AM |
| 6 | THE COURT:  All right.  Go ahead. | 11:20AM |
| 7 | MR. CALDIE:  Thank you, Your Honor.  The | 11:20AM |
| 8 | proponents call Leo Tudela to testify on -- as the Committee's | 11:21AM |
| 9 | witness. | 11:21AM |
| 10 | THE COURT:  Okay.  Can Steve adjust the Zoom? | 11:21AM |
| 11 | Who's doing that?  Steve?  Can you fix this?  I want to see | 11:21AM |
| 12 | Mr. Tudela closer than the other people.  So I don't know if | 11:21AM |
| 13 | it's you, Carmen or Steve?  Somebody. | 11:21AM |
| 14 | (Pause.) | 11:21AM |
| 15 | THE CLERK:  Sir, please raise your right hand. | 11:21AM |
| 16 | You do solemnly swear that the testimony you are about to give | 11:21AM |
| 17 | in the case before the Court, will be the truth, the whole | 11:21AM |
| 18 | truth and nothing but the truth, so help you God. | 11:21AM |
| 19 | THE WITNESS:  Yes. | 11:22AM |
| 20 | THE CLERK:  Thank you, sir.  Please be seated. | 11:22AM |
| 21 | Sir, please state your full name and spell your name for the | 11:22AM |
| 22 | record. | 11:22AM |
| 23 | THE WITNESS:  Okay, good morning.  My name is Leo | 11:22AM |
| 24 | Borja Tudela.  T-U-D-E-L-A.  Tudela. | 11:22AM |
| 25 | | 11:22AM |

|    |                                                                            |         |
|----|----------------------------------------------------------------------------|---------|
| 1  | DIRECT EXAMINATION                                                          | 11:22AM |
| 2  | BY MR. CALDIE:                                                              | 11:22AM |
| 3  | Q.   Good morning, Mr. Tudela.  Thank you for being here.                   | 11:22AM |
| 4  | MR. CALDIE:  I'm sorry, Your Honor, may I                                   | 11:22AM |
| 5  | proceed?                                                                    | 11:22AM |
| 6  | THE COURT:  Yeah.  You may proceed.  Go ahead.                              | 11:22AM |
| 7  | MR. CALDIE:  Thank you.                                                     | 11:22AM |
| 8  | BY MR. CALDIE: (CONTINUING)                                                 | 11:22AM |
| 9  | Q.   Good morning, Mr. Tudela.  Thank you for being here.                   | 11:22AM |
| 10 | Mr. Tudela, are you the Chair of the Official Committee of                  | 11:22AM |
| 11 | Unsecured Creditors in this bankruptcy case?                                | 11:22AM |
| 12 | A.   Yes, I am; appointed by the judge in Honolulu, Judge                   | 11:22AM |
| 13 | Faris, and of course the local judge.                                       | 11:22AM |
| 14 | Q.   Okay.  Thank you.  And in that role, have you                          | 11:22AM |
| 15 | presided over Committee meetings?                                           | 11:23AM |
| 16 | A.   Yes, sir.  For the last six years.                                     | 11:23AM |
| 17 | Q.   And in those Committee meetings, have you had -- we                    | 11:23AM |
| 18 | don't want to talk about the details because there could be                 | 11:23AM |
| 19 | confidential or privileged, but can you tell us, sir, in those              | 11:23AM |
| 20 | meetings, have you talked about various issues in this case?                | 11:23AM |
| 21 | A.   Many, many issues; some good, some bad; some mixed,                    | 11:23AM |
| 22 | mixed messages.  It's very frustrating, agonizing.  And at                  | 11:23AM |
| 23 | times, we disagree, but at the end of the day, we agree to                  | 11:23AM |
| 24 | what we trying to do for the survivors.  It is very, very                   | 11:23AM |
| 25 | difficult and very hard to be sit[sic] on this Committee.                   | 11:23AM |

| | | |
|---|---|---|
| 1 | There is seven of us, and unfortunately one of the person in | 11:23AM |
| 2 | the Committee, after the first year, he decided not to come | 11:24AM |
| 3 | anymore.  I don't know the personal reason, but during the | 11:24AM |
| 4 | rest of the time, there's only six of us.  And I hope the | 11:24AM |
| 5 | person that never come would hear me, that we love you, and | 11:24AM |
| 6 | please come back. | 11:24AM |
| 7 | Q.   Thank you, Mr. Tudela.  In your meetings with the | 11:24AM |
| 8 | Committee, did you talk about the plan submitted in this case? | 11:24AM |
| 9 | A.   Yes, sir. | 11:24AM |
| 10 | Q.   And did you talk about different ways the creditors | 11:24AM |
| 11 | might be treated? | 11:24AM |
| 12 | A.   Yes, sir. | 11:24AM |
| 13 | Q.   Did you draft protocols for the payment or that got | 11:24AM |
| 14 | -- let me start over.  I'm sorry, Mr. Tudela. | 11:24AM |
| 15 | Did you talk about guidelines for the payment of | 11:24AM |
| 16 | creditor claims in the case? | 11:24AM |
| 17 | A.   Yes, we discuss it with your help, of course with | 11:24AM |
| 18 | your help but, yes, we discuss it. | 11:24AM |
| 19 | Q.   And did you learn a little bit, anyway, about | 11:24AM |
| 20 | bankruptcy law along the way, bankruptcy rules? | 11:24AM |
| 21 | A.   Unfortunately and fortunately, yes.  I heard of | 11:24AM |
| 22 | bankruptcy law, Chapter 11, Chapter 7.  And you know, when I | 11:24AM |
| 23 | got into this position, as requested by Lujan's office and the | 11:25AM |
| 24 | federal judge, I don't know a thing about bankruptcy.  But | 11:25AM |
| 25 | during the process, I took it upon myself to Google everything | 11:25AM |

1    about bankruptcy, so I learned a lot.  Maybe someday I'll take          11:25AM

2    your job.  (Laughing.)  Just joking.                                   11:25AM

3        Q.   Now, that's one more thing for me to worry about.             11:25AM

4    Thank you, Mr. Tudela.                                                 11:25AM

5        A.   No, it's -- one thing about me, when there is an              11:25AM

6    issue that I don't understand, I will search, I will search it        11:25AM

7    and Google it because you got to know the facts.  You cannot          11:25AM

8    just talk story.  You have to have the facts.                         11:25AM

9        Q.   Good.  And so when you reviewed the plan, do you             11:25AM

10   think that the Committee acted in a manner consistent with the        11:25AM

11   Bankruptcy Code to the best of your understanding?                    11:25AM

12       A.   Absolutely.  And you know, we are in the learning           11:25AM

13   process, but after three years we know a lot, yes, absolutely        11:26AM

14   correct.                                                              11:26AM

15       Q.   And to your knowledge, sir, did the plan as has been        11:26AM

16   proposed, were they proposed in good faith?                          11:26AM

17       A.   Yes, sir, good faith, the best we can.                      11:26AM

18       Q.   Were they proposed in any way forbidden by law, to         11:26AM

19   your knowledge?                                                       11:26AM

20       A.   No.                                                          11:26AM

21       Q.   Is the plan perfect, sir?                                   11:26AM

22       A.   Pardon me, sir?                                             11:26AM

23       Q.   Is the plan perfect?                                        11:26AM

24       A.   It's not perfect, but it's a good one.  It's a             11:26AM

25   reasonable one.  To say perfect, I'll be lying to you, but          11:26AM

23

| | |
|---|---|
| 1 | it's a good one.  It's acceptable and doable and it's a | 11:26AM |
| 2 | reasonable one. | 11:26AM |
| 3 | Q.  And is it sort of your position, I'm getting this | 11:26AM |
| 4 | from your declaration so I don't mean to put words in your | 11:26AM |
| 5 | mouth, Mr. Tudela, but is it not perfect because nothing can | 11:26AM |
| 6 | undo what happened to you as a child? | 11:27AM |
| 7 | A.  Correct.  Absolutely.  We never never heal. | 11:27AM |
| 8 | Compensation will help, but with us forever, yes. | 11:27AM |
| 9 | Q.  Do you believe the church made a very good faith | 11:27AM |
| 10 | attempt to settle? | 11:27AM |
| 11 | A.  Yes, sir, at beginning, I'll be honest, Father Romeo | 11:27AM |
| 12 | and Archbishop -- I'll be honest with you, when Archbishop | 11:27AM |
| 13 | Byrnes came up here, I think February, right?  Yeah. | 11:27AM |
| 14 | THE COURT:  I think so. | 11:27AM |
| 15 | THE WITNESS:  Yeah the trial, when he came up, | 11:27AM |
| 16 | "I'm sorry," that's it. | 11:27AM |
| 17 | BY MR. CALDIE: (CONTINUING) | 11:27AM |
| 18 | Q.  That was an important moment to you, sir, to hear the | 11:27AM |
| 19 | apology? | 11:27AM |
| 20 | A.  (Crying.)  I'm sorry. | 11:27AM |
| 21 | Q.  It's okay. | 11:28AM |
| 22 | A.  When the Archbishop said, it really took a toll on | 11:28AM |
| 23 | me.  I'm very grateful for the Archbishop because he came out | 11:28AM |
| 24 | and he said "I'm sorry," and at first, I thought you know, why | 11:28AM |
| 25 | it took so long, but things happen.  And after that, things | 11:28AM |

**SA 1891**

1  start improving, going a positive direction in good faith.                    11:28AM

2         And I must tell you Sister Angela, Sister Angela, you                   11:28AM

3  came forward to me and give me comfort during the trial.  I                   11:28AM

4  appreciate that.  The Catholic Church, Archdiocese of Agana to                11:28AM

5  be honest with you, did delay tactics -- I'll not say tac --                  11:29AM

6  delay program, delay after delay after delay.                                 11:29AM

7         At times, Committee get frustrated; when we request                    11:29AM

8  something, never answer in a timely fashion.  But those things                11:29AM

9  happen.  And you know, let bygones be bygones.  Father Romy                   11:29AM

10 came up, he's a gentleman and a good priest.  Most of the                     11:29AM

11 priest are good priests.  There's a few that evil priests.                    11:29AM

12 It's like a cancer in the side.  Cancer moves slowly.  Before                 11:29AM

13 you know it, you die.  But the church came forward in good                    11:29AM

14 faith after so many years, which I have to say that.  And to                  11:29AM

15 delay, sometimes to deny.  And when the church start fighting                 11:29AM

16 us, I talk to -- the Committee said to me, and I said the same                11:29AM

17 thing, Why did the church abandon us?  Why did the church give                11:29AM

18 us this back and forth, back and forth?  December 16th, 20 --                 11:30AM

19 December 16, 2016 to this day, it's a long period.  I wish the                11:30AM

20 church will come forward the first six out of the year.  We                   11:30AM

21 could have resolved this in two years, if you all sit down.                   11:30AM

22         But at that time, the church, of course, we have a                    11:30AM

23 leader of the church that is not in full cooperation with us.                 11:30AM

24 And we all know who that person is.  Unfortunately, things                    11:30AM

25 happen.  I was involved with the four individuals with that                   11:30AM

| | | |
|---|---|---|
| 1 | person.  I was testified before the Vatican, I think, tribunal | 11:30AM |
| 2 | in Hawaii.  And you know, to be honest with you, this is a | 11:30AM |
| 3 | very hard and difficult on my life.  I came here to be -- to | 11:30AM |
| 4 | go to seminary from Saipan, I was sent by Father Arnold to | 11:31AM |
| 5 | become a missionary, to become a priest.  I could have been | 11:31AM |
| 6 | like Father Romy today, probably become a priest.  I'm sorry, | 11:31AM |
| 7 | Father Romy. | 11:31AM |
| 8 | But unfortunately, this -- I was -- twice, Agana | 11:31AM |
| 9 | Heights Friary and Mangilao.  Twice; not once.  The reason for | 11:31AM |
| 10 | that, I came from Saipan.  I had no money to go to Saipan.  So | 11:31AM |
| 11 | I have no choice.  For eight to ten months, under this person | 11:31AM |
| 12 | named Broulliard, the evil guy.  Should I forgive him?  Maybe | 11:31AM |
| 13 | some day.  I'm a Christian.  I'm a Catholic.  You know, even | 11:31AM |
| 14 | the Lord came down and crucified.  But it takes time. | 11:31AM |
| 15 | Q.   Thank you, Mr. Tudela.  Thank you very much from all | 11:31AM |
| 16 | the -- from the Committee's perspective and from all the | 11:32AM |
| 17 | survivors. | 11:32AM |
| 18 | A.   If I may, can I request who is on the Committee | 11:32AM |
| 19 | they're listening on the Zoom right now?  Are you there, | 11:32AM |
| 20 | Norman?  Norman?  It's okay, Your Honor? | 11:32AM |
| 21 | THE COURT:  Yes, you may.  Go ahead.  Yes. | 11:32AM |
| 22 | THE WITNESS:  Felix, are you there?  Danny? | 11:32AM |
| 23 | Bill?  I know Norman is listening.  Um... Roland?  Of course | 11:32AM |
| 24 | Everett is -- is a no-show for four years, but Everett, are | 11:32AM |
| 25 | you listening?  I want to thank all of you for your sacrifice | 11:32AM |

| | |
|---|---|
| 1 | and heartfelt contribution.  I know we have a difference of | 11:32AM |
| 2 | opinions all the -- sometimes, but at the end of the day, we | 11:32AM |
| 3 | all, you know, agree to what is the best for all of us.  And | 11:32AM |
| 4 | to the rest of the survivors that never came forward, we are | 11:32AM |
| 5 | with you.  And we did the best we can for the interests of the | 11:33AM |
| 6 | survivors.  Some people call it victims.  I got -- a person | 11:33AM |
| 7 | named Roland told me that.  We're not survivors; we're | 11:33AM |
| 8 | victims.  And I believe him. | 11:33AM |
| 9 | But the Committee work so hard.  And, mind you, mind | 11:33AM |
| 10 | you, we didn't get paid for this.  I spent most of my time, | 11:33AM |
| 11 | I'm retired, almost 95% on this case.  Day and night.  Last | 11:33AM |
| 12 | night I got up at 2:30 to write this statement to the Court. | 11:33AM |
| 13 | Many, many nights I could not sleep, but, you know, I'm happy | 11:33AM |
| 14 | that -- glad that this come to hopefully a positive | 11:33AM |
| 15 | conclusion.  Hopefully.  And I might request to the judge | 11:33AM |
| 16 | later on after this -- | 11:33AM |
| 17 | BY MR. CALDIE: (CONTINUING) | 11:33AM |
| 18 | Q.   Great -- | 11:33AM |
| 19 | A.   Any more question? | 11:33AM |
| 20 | Q.   No.  There are no further questions from the plan | 11:33AM |
| 21 | proponents from Mr. Tudela. | 11:34AM |
| 22 | A.   Well, you forgot about the Army. | 11:34AM |
| 23 | Q.   Oh, were you in the Army, sir? | 11:34AM |
| 24 | A.   Yes. | 11:34AM |
| 25 | Q.   I forgot. | 11:34AM |

|  |  |  |
|---|---|---|
| 1 | A.    I want to mention about the Army. | 11:34AM |
| 2 | Q.    Go ahead, sir. | 11:34AM |
| 3 | A.    I graduated in '62 of June while at George | 11:34AM |
| 4 | Washington.  I received selective service for me to be drafted | 11:34AM |
| 5 | 1A.  I said why me?  I'm not an American citizen, I'm from | 11:34AM |
| 6 | Saipan.  I'm an alien, right?  So I went down to the selective | 11:34AM |
| 7 | service.  And they recruited, the Army.  Said we got to take | 11:34AM |
| 8 | you down to the Court, District Court, at that time which is | 11:34AM |
| 9 | down -- down here.  They said, Raise up your right hand.  I | 11:34AM |
| 10 | said, Why, sir?  What happened?  Raise up your right, I know. | 11:34AM |
| 11 | I said, Okay.  I said, I'm not an American citizen.  Said, No | 11:34AM |
| 12 | worry.  We need people, like you, to go to Vietnam.  I said, | 11:34AM |
| 13 | Okay.  I was drafted. | 11:34AM |
| 14 |       At first, I was not happy.  But during the time I | 11:34AM |
| 15 | spent, it was a wonderful years.  I love it.  I'm a patriot. | 11:34AM |
| 16 | And after that, after the Army, I became a U.S. citizen.  Was | 11:35AM |
| 17 | naturalized by federal court in San Francisco.  So I just want | 11:35AM |
| 18 | to -- three years -- six years; three years active, and three | 11:35AM |
| 19 | years Army Reserve.  Thank you. | 11:35AM |
| 20 | Q.    I'm so sorry for forgetting, Mr. Tudela. | 11:35AM |
| 21 | A.    No, it's okay.  It's okay.  I want to say that | 11:35AM |
| 22 | because I didn't -- I was not born a U.S. citizen.  I | 11:35AM |
| 23 | volunteered to be a U.S. citizen, I volunteered to fight for | 11:35AM |
| 24 | this country. | 11:35AM |
| 25 | Q.    Thank you.  Thank you for that.  We have no further | 11:35AM |

| | |
|---|---|
| 1 | questions of Mr. Tudela. | 11:35AM |
| 2 | THE COURT:  Does anybody have any comments or | 11:35AM |
| 3 | questions?  Mr. Elsaesser or anyone? | 11:35AM |
| 4 | MR. ELSAESSER:  No questions, Your Honor. | 11:35AM |
| 5 | THE COURT:  Okay.  Did you want to say anything | 11:35AM |
| 6 | further, Mr. Tudela? | 11:35AM |
| 7 | THE WITNESS:  Can I sit on the table, ma'am? | 11:35AM |
| 8 | THE COURT:  Yes, you may. | 11:35AM |
| 9 | MR. CALDIE:  We had thought maybe we would talk | 11:35AM |
| 10 | about confirmation before the statement, Mr. Tudela?  Right? | 11:35AM |
| 11 | THE WITNESS:  Okay. | 11:35AM |
| 12 | MR. CALDIE:  Okay.  May I do that? | 11:35AM |
| 13 | THE COURT:  Yeah. | 11:35AM |
| 14 | MR. CALDIE:  Thank you, Your Honor.  At this | 11:35AM |
| 15 | point in time, I believe that we have had evidence, | 11:36AM |
| 16 | affirmative evidence on the record, supporting all of the | 11:36AM |
| 17 | elements necessary for confirmation of the plan.  We have also | 11:36AM |
| 18 | addressed all issues relating to objections to the plan.  And | 11:36AM |
| 19 | so I will speak in a moment about the proposed order, business | 11:36AM |
| 20 | and those logistics.  But for now, Your Honor, I would like to | 11:36AM |
| 21 | respectfully urge the Court to confirm the plan, the Fifth | 11:36AM |
| 22 | Amended Plan that's before you. | 11:36AM |
| 23 | MR. CHRISTIAN:  Your Honor, David Christian, on | 11:36AM |
| 24 | behalf of Continental Insurance Company.  As you know, from | 11:36AM |
| 25 | Mr. Caldie's presentation yesterday, part of our agreement is | 11:36AM |

| | | |
|---|---|---|
| 1 | that Continental reserves all of its rights, its objections | 11:36AM |
| 2 | are part of the record.  They will be overruled if Your Honor | 11:36AM |
| 3 | decides to confirm the plan.  As part of the findings of facts | 11:36AM |
| 4 | and conclusions of law that will be proposed to the Court | 11:36AM |
| 5 | along the lines you outlined yesterday, I just wanted to make | 11:36AM |
| 6 | that clear for the record.  I don't have any further argument | 11:36AM |
| 7 | and don't have any evidence to present here today consistent | 11:36AM |
| 8 | with that reservation of rights. | 11:36AM |
| 9 | THE COURT:  Right.  Thank you, Mr. Christian. | 11:36AM |
| 10 | Anyone else want to make any comments before we continue on? | 11:36AM |
| 11 | MR. CHING:  Yes, Your Honor, if I may? | 11:37AM |
| 12 | THE COURT:  Yes, Mr. Curtis Ching.  I think -- I | 11:37AM |
| 13 | recognize your voice, is that right? | 11:37AM |
| 14 | MR. CHING:  Yes.  Thank you.  Just very briefly. | 11:37AM |
| 15 | The U.S. Trustee had raised some objections to the affirmative | 11:37AM |
| 16 | plan regarding grant and vagueness of the exculpation and | 11:37AM |
| 17 | injunction language, as well as the advance release of the | 11:37AM |
| 18 | trustee and post-confirmation trust.  And the plan proponents | 11:37AM |
| 19 | have amended the language on these areas in order to satisfy | 11:37AM |
| 20 | the U.S. Trustees's concerns.  And so we no longer have that | 11:37AM |
| 21 | objection. | 11:37AM |
| 22 | We also have an objection regarding the plan's | 11:37AM |
| 23 | treatment for post-confirmation U.S. Trustee quarterly fees, | 11:37AM |
| 24 | the quarterly fees that will be incurred after the plan is | 11:37AM |
| 25 | confirmed.  The U.S. Trustee and the plan proponents have | 11:37AM |

1    agreed to defer the issue until shortly after plan                    11:38AM

2    confirmation, after the plan confirmation is completed.  And          11:38AM

3    the agreed procedure will involve the U.S. Trustee bringing a         11:38AM

4    contested matter regarding the plan's treatment of                    11:38AM

5    post-confirmation quarterly fees.  I don't believe there are          11:38AM

6    disputed facts on this issue.  And so the Court, we believe,          11:38AM

7    should be able to resolve this as a matter of law.                    11:38AM

8              And so we are reserving our rights on the issue             11:38AM

9    of the quarterly fees and we request that the order confirming        11:38AM

10   the plan simply note that, that the parties have agreed that          11:38AM

11   this issue will be resolved shortly in the future.                    11:38AM

12             MR. CALDIE:  Your Honor, for the record, the                11:38AM

13   proponents believe that both the recitation by Mr. Christian         11:38AM

14   and those by Mr. Ching are accurate from our perspective as          11:38AM

15   well.                                                                 11:39AM

16             THE COURT:  Okay.                                           11:39AM

17             MR. ELSAESSER:  And from the Debtor as well, Your           11:39AM

18   Honor.                                                                11:39AM

19             MS. ROSENBERG:  Your Honor.                                 11:39AM

20             THE COURT:  Yes?  Yes, Ms. Rosenberg.                       11:39AM

21             MS. ROSENBERG:  May I be heard?                             11:39AM

22             THE COURT:  Yes, go ahead.                                  11:39AM

23             MS. ROSENBERG:  Thank you, Your Honor.  Erin                11:39AM

24   Rosenberg of White & Case for Boy Scouts of America.  I just         11:39AM

25   wanted to make a similar reservation as Mr. Christian did and        11:39AM

| | | |
|---|---|---|
| 1 | say a couple related things, including on the topic of the | 11:39AM |
| 2 | proposed order with which U.S. Trustee just raised.  And I | 11:39AM |
| 3 | know Mr. Caldie said he'll have remarks on that shortly. | 11:39AM |
| 4 | Our expectation from the Boy Scouts' perspective, | 11:39AM |
| 5 | Your Honor, is that any proposed order, finding or conclusions | 11:39AM |
| 6 | regarding plan confirmation will conform with and be limited | 11:39AM |
| 7 | to what's set forth in the plan and to the stipulation, which | 11:39AM |
| 8 | Your Honor approved at Docket No. 1048 and will not interject | 11:39AM |
| 9 | any additional issues or in any way undermine that | 11:39AM |
| 10 | stipulation.  You heard that from us yesterday.  I'm just | 11:39AM |
| 11 | reiterating that now before the proceedings close.  We will | 11:39AM |
| 12 | review and comment on any proposed form of order or findings | 11:39AM |
| 13 | or conclusions on that basis. | 11:40AM |
| 14 | And so our expectation is that, again, the | 11:40AM |
| 15 | approved stipulation will be adhered to fully, faithfully and | 11:40AM |
| 16 | unwaveringly.  And we hope that it is where this will land. | 11:40AM |
| 17 | As Ms. Lujan told you earlier, Your Honor, she has not yet | 11:40AM |
| 18 | shared the language she said that she intends to propose.  And | 11:40AM |
| 19 | so our concern as we expressed yesterday, including on timing | 11:40AM |
| 20 | remain, we were prepared on the Boy Scouts' behalf, Your | 11:40AM |
| 21 | Honor, to review that language today, we had some meetings | 11:40AM |
| 22 | arranged, but we have received nothing. | 11:40AM |
| 23 | And I will say at this point, Your Honor, it's | 11:40AM |
| 24 | very late on the mainland and so others on our team and the | 11:40AM |
| 25 | client are unavailable and we'll just need appropriate time to | 11:40AM |

1    review that, assuming Ms. Lujan does send it around promptly.                    11:40AM

2              But our position is that, and we strongly believe                      11:40AM

3    this, and as Your Honor has said and approved that the                           11:40AM

4    language in the Fifth Amended Plan, as mandated by the                           11:40AM

5    stipulation that Your Honor approved, is acceptable and that                      11:40AM

6    no language deviating from that would be appropriate.                            11:41AM

7              So we think, in sum, Your Honor, that it's time                        11:41AM

8    to move on.  We do believe Ms. Lujan's objection is moot based                   11:41AM

9    on Your Honor's ruling on the motion to deemed acceptance.                       11:41AM

10   The plan was overwhelmingly approved.  We know that there is                     11:41AM

11   support for it and that there is support for moving on and                       11:41AM

12   compensating survivors promptly; that that is our shared goal.                   11:41AM

13   We'll be acting accordingly.                                                     11:41AM

14             And with all that said, Your Honor, I'd like to                        11:41AM

15   give anybody else on my team the opportunity to add anything                     11:41AM

16   at this juncture.  I'd like to just give them a moment.                          11:41AM

17             THE COURT:  Okay.  Anyone?                                             11:41AM

18             MS. ROSENBERG:  And...                                                 11:41AM

19             (Pause.)                                                               11:41AM

20             MS. ROSENBERG:  Otherwise, Your Honor, we very                         11:41AM

21   much appreciate your time.                                                       11:41AM

22             THE COURT:  Okay.  Anyone else want to make any                        11:41AM

23   further comments before I -- before Mr. -- before I answer                       11:41AM

24   Mr. Caldie's question and then before he goes on?  Okay.                         11:41AM

25   Since there are no further comments, I will say that with                        11:42AM

```
 1   regard to the additional language that has not been,              11:42AM
 2   unfortunately, for Ms. Lujan Wolff's firm, has not been given     11:42AM
 3   to the Boy Scouts of America, the Court is just not going to      11:42AM
 4   allow it at this time.  It's just too late.  I mean I've given    11:42AM
 5   enough chances and this should have been taken care of before     11:42AM
 6   today.  In fact, there was a delay.  I didn't even start Court    11:42AM
 7   this morning.  I asked you guys from 8:30 to 10:45, yeah, and     11:42AM
 8   because I had to take care of a matter from off island.  But      11:42AM
 9   -- so the Court is not even going to address that issue.  I do    11:42AM
10   agree with Ms. Rosenberg, that is moot.  The Court has already    11:42AM
11   found that the language contained in the Fifth Amended            11:42AM
12   Settlement Agreement is neutral and has been accepted by all      11:42AM
13   interested stakeholders.                                          11:42AM
14           And so the Court will go on and there will be no          11:42AM
15   need to -- even if it's already being passed around, there is     11:42AM
16   no need to respond to it.  We'll just go ahead and move           11:42AM
17   forward.                                                          11:43AM
18           MS. ROSENBERG:  Thank you, Your Honor.                    11:43AM
19           THE COURT:  Thank you.  All right.  So Mr. -- I'm         11:43AM
20   sorry, go ahead, Mr. Caldie.  You asked the Court if I would      11:43AM
21   approve the Fifth Amendment -- Fifth Amended Settlement Plan?     11:43AM
22           MR. CALDIE:  The Fifth Amended Plan of                    11:43AM
23   Reorganization.                                                   11:43AM
24           THE COURT:  Plan of -- Fifth -- okay, not                 11:43AM
25   settlement plan.                                                  11:43AM
```

|    |                                                                                  |         |
|----|----------------------------------------------------------------------------------|---------|
| 1  | MR. CALDIE:  Just to clear the record.                                           | 11:43AM |
| 2  | THE COURT:  Let's clear the record.  All right.                                  | 11:43AM |
| 3  | Fifth Amended Plan of Reorganization, the Court will so                          | 11:43AM |
| 4  | approve.                                                                         | 11:43AM |
| 5  | MR. CALDIE:  Wonderful.  Thank you so much, Your                                 | 11:43AM |
| 6  | Honor.                                                                           | 11:43AM |
| 7  | THE COURT:  Thank you.                                                           | 11:43AM |
| 8  | MR. CALDIE:  This is a huge moment for survivors                                 | 11:43AM |
| 9  | and the church alike.  And I have to say, you can feel the                       | 11:43AM |
| 10 | weight of it in the room.  Thank you very much.                                  | 11:43AM |
| 11 | So logistics, there is an order to worry about.                                  | 11:43AM |
| 12 | Findings of Fact and Conclusions of Law.  We intend to                          | 11:43AM |
| 13 | circulate that very, very soon.  We have a draft prepared                        | 11:43AM |
| 14 | already.  I don't want to speak for Mr. Glasnovich, but my                       | 11:43AM |
| 15 | hope is that Mr. Glasnovich will be able to circulate that                       | 11:43AM |
| 16 | within a few hours of now.  I'm watching Mr. Glasnovich on the                   | 11:43AM |
| 17 | Zoom and he appears to concede, Your Honor.  And so we will do                   | 11:44AM |
| 18 | that.                                                                            | 11:44AM |
| 19 | THE COURT:  On noon today, did you say?                                          | 11:44AM |
| 20 | MR. CALDIE:  We will circulate to all parties who                               | 11:44AM |
| 21 | objected.                                                                        | 11:44AM |
| 22 | THE COURT:  Okay.                                                                | 11:44AM |
| 23 | MR. CALDIE:  Notwithstanding the fact that                                       | 11:44AM |
| 24 | objections have been either overruled or resolved by                             | 11:44AM |
| 25 | settlement, I'm sure that everybody has a copy of that.  We                      | 11:44AM |

| | | |
|---|---|---|
| 1 | will include Bank of Guam, we'll include the SBA, who I know | 11:44AM |
| 2 | is present and anyone else who would like to be included on | 11:44AM |
| 3 | the distribution of that, please e-mail Mr. Glasnovich at | 11:44AM |
| 4 | drew.glasnovich, G-L-A-S-N-O-V-I-C-H, at stinson.com.  That | 11:44AM |
| 5 | e-mail address is all over the docket, too, by the way.  But, | 11:44AM |
| 6 | please, just e-mail Mr. Glasnovich for the request to be on | 11:44AM |
| 7 | the circulation. | 11:44AM |
| 8 | Here is how we would like to proceed with respect | 11:44AM |
| 9 | to getting any needed revisions to that document:  First, we | 11:44AM |
| 10 | urge everyone, although we know that you need to be zealous | 11:45AM |
| 11 | advocates for your client, we all kind of know what the terms | 11:45AM |
| 12 | of the deal were.  They're guided by preliminarily -- or | 11:45AM |
| 13 | primarily by the plan and language in the plan.  Please try to | 11:45AM |
| 14 | follow that language.  Or if there are settlement agreements | 11:45AM |
| 15 | that need to be adhered to for the insurance companies, for | 11:45AM |
| 16 | example, please try to adhere to the documentation already in | 11:45AM |
| 17 | place there, so that there will be no contradictory comments | 11:45AM |
| 18 | and there hopefully will be no battling about what ought to be | 11:45AM |
| 19 | in the order. | 11:45AM |
| 20 | We will circulate that order, Mr. Glasnovich will | 11:45AM |
| 21 | to the distribution group within the next couple of hours. | 11:45AM |
| 22 | People reach out to him and want it later, then they request a | 11:45AM |
| 23 | copy later than that, we'll circulate it to them, too.  We | 11:45AM |
| 24 | will then give everyone who receives it, 48 hours from the | 11:45AM |
| 25 | time that Mr. Glasnovich initially sends it out to get their | 11:45AM |

| | | |
|---|---|---|
| 1 | written proposed changes to us, if any.  We need to adhere to | 11:45AM |
| 2 | that deadline as strictly as possible, which is why I'm | 11:46AM |
| 3 | putting it on the record. | 11:46AM |
| 4 | The reason being, there are a lot of parties in | 11:46AM |
| 5 | interest.  And so when that 48 hours is up, we will confer | 11:46AM |
| 6 | with the Debtor.  We, being the Committee, will confer with | 11:46AM |
| 7 | the Debtor.  The plan proponents will confer.  If we have | 11:46AM |
| 8 | clarifying concerns or if there are ambiguities or there are | 11:46AM |
| 9 | things we think we can resolve with the requesting parties, we | 11:46AM |
| 10 | will do that.  And then we will make determinations on a filed | 11:46AM |
| 11 | version to be submitted to the Court. | 11:46AM |
| 12 | Is that okay with Your Honor? | 11:46AM |
| 13 | THE COURT:  That's fine. | 11:46AM |
| 14 | MR. CALDIE:  Okay.  And at this point, if it's | 11:46AM |
| 15 | okay with Your Honor, I would seek the mic to hear any | 11:46AM |
| 16 | comments from parties in interest on that proposed procedure? | 11:46AM |
| 17 | THE COURT:  That's fine. | 11:46AM |
| 18 | MR. ELSAESSER:  That's fine with the Archdiocese, | 11:46AM |
| 19 | Your Honor. | 11:46AM |
| 20 | MR. CHRISTIAN:  Your Honor, David Christian on | 11:46AM |
| 21 | behalf of Continental Insurance Company.  That's totally fine | 11:46AM |
| 22 | from our perspective.  Happy to review it and respond on the | 11:46AM |
| 23 | schedule that Mr. Caldie described. | 11:46AM |
| 24 | You may recall from yesterday on a parallel | 11:46AM |
| 25 | schedule, we'll be working on settlement documentation.  Not | 11:47AM |

|    |                                                                        |         |
|----|------------------------------------------------------------------------|---------|
| 1  | to overburden Mr. Glasnovich, and Mr. Glasnovich doesn't know          | 11:47AM |
| 2  | this yet, but Mr. Caldie and I agreed before Court that                | 11:47AM |
| 3  | Mr. Glasnovich would be drafting the motion to approve the             | 11:47AM |
| 4  | settlement and a motion to shorten notice.  I will be doing            | 11:47AM |
| 5  | the settlement agreement and I will do that while I'm here on          | 11:47AM |
| 6  | Guam and as I travel back to the mainland of the United                | 11:47AM |
| 7  | States.  And hopefully all our schedules will match up here,          | 11:47AM |
| 8  | towards the end of the week.                                           | 11:47AM |
| 9  | THE COURT:  Okay, very --                                              | 11:47AM |
| 10 | MR. CHRISTIAN:  So that's the plan from my                             | 11:47AM |
| 11 | perspective.                                                           | 11:47AM |
| 12 | THE COURT:  All right.  Thank you, sir.                                | 11:47AM |
| 13 | MR. CALDIE:  I want Mr. Christian to stop                              | 11:47AM |
| 14 | speaking right now before he requests an order from                    | 11:47AM |
| 15 | Mr. Glasnovich to clean his house before he gets home                  | 11:47AM |
| 16 | (laughing.)  That was said in jest.  Others comments?                  | 11:47AM |
| 17 | MS. WOLFF:  Your Honor, this is Delia Lujan                            | 11:47AM |
| 18 | Wolff.  Yes, I'm fine with the procedure outlined by                   | 11:47AM |
| 19 | Mr. Caldie.  Also, Your Honor, I just wanted to comment:  I do         | 11:47AM |
| 20 | actually believe Your Honor that with the Court's ruling, it           | 11:47AM |
| 21 | does moot the additional language, but I did circulate it to           | 11:47AM |
| 22 | Ms. Rosenberg just moments ago, but I did ask her to                   | 11:48AM |
| 23 | disregard, of course, based on the Court's ruling.  Thank you.         | 11:48AM |
| 24 | THE COURT:  Thank you, Ms. Lujan Wolff.  Very                          | 11:48AM |
| 25 | well.  Anyone else want to weigh in on the procedures outlined         | 11:48AM |

1    by proposed procedures outlined by Mr. Caldie?                    11:48AM

2                (Pause.)                                              11:48AM

3                THE COURT:  Okay, I guess not.  All right.  So        11:48AM

4    we'll go ahead and proceed then.                                 11:48AM

5                Mr. Caldie, anything further then, Mr. Caldie.        11:48AM

6                MR. CALDIE:  Just one thing:  We have an             11:48AM

7    unorthodox, but very welcome, request from Mr. Tudela to read    11:48AM

8    a statement to the Court.                                        11:48AM

9                THE COURT:  Sure.  Go ahead.  Yes, Mr. Tudela you    11:48AM

10   may do so and you asked to read a statement from the Counsel     11:48AM

11   table.  You may do so, sir.  You want to read a statement?  Is   11:48AM

12   that the one you wrote last night?                               11:48AM

13               MR. TUDELA:  Um...I have additional statement.       11:48AM

14               THE COURT:  Okay.  Yes, go ahead.  Of course.        11:48AM

15               MR. TUDELA:  Thank you for giving me the time.       11:48AM

16   Today is a day of reckoning and a heartbreaking day today.  We   11:49AM

17   have been waiting for 60 years today, a day of mixed feelings    11:49AM

18   and a day of reckoning.  *Buenas* and *hafa adai para todos*.  To   11:49AM

19   all of you, it is with heavy heart that I stand before -- I      11:49AM

20   sit -- I sat -- sitting -- I sit before you and to all the       11:49AM

21   people of Guam listening to this case.                           11:49AM

22               Forgive me if I get emotional.  I'm sorry, I         11:49AM

23   inherit it from my grandmother.  More than six years ago, we,    11:49AM

24   survivors, began a struggle, journey of painful challenges and   11:49AM

25   agonizing journey.  We, the survivors, came forward and          11:49AM

1   publicly announced of our horrific terrible trauma that          11:50AM

2   shattered our lives forever.  I'm talking about 285             11:50AM

3   individuals that came forward.                                  11:50AM

4          We were young, innocent children devoted to the          11:50AM

5   Catholic church, serving God as altar boys.  We were           11:50AM

6   embarrassed, humiliated, ashamed of what happened to us.  My   11:50AM

7   family, my sons, for a year never talk to me 'cause he has the 11:50AM

8   same name as me.  How could this evil thing happen to us?      11:50AM

9   Why?  Our sorrow that follows us through this long agony        11:51AM

10  journey, why, why, why, why God to us?  (Pause.)  Why the      11:51AM

11  Catholic Church, the Archdiocese of Agana, took a strong stand 11:51AM

12  forward in defending the responsibilities to accept this       11:51AM

13  terrible horrific evil act by a few priests when most of the   11:51AM

14  priests are good priests in the Archdiocese?  I felt like we   11:51AM

15  were abandoned by the church, we all felt we were abandoned by 11:52AM

16  the church.  We could have done this case, finish this case in 11:52AM

17  possibly in two years the most.  But I don't want to use your  11:52AM

18  word that is not accepted to the Court, but somebody drag      11:52AM

19  this, they drag continuous delay after delay, after delay, I   11:52AM

20  get to the point I was frustrated.  At times I want to resign  11:52AM

21  because looks like we get nowhere.  Like the wall is so thick, 11:52AM

22  it cannot penetrate.  But I'm a guy that listens to Winston    11:52AM

23  Churchill; never never give up in times of hard times.         11:52AM

24          With all that's said today, we have met the            11:52AM

25  challenges, the painful frustrating journey and all the        11:52AM

| | | |
|---|---|---|
| 1 | sacrifice that we have endured after so many, many years, over | 11:52AM |
| 2 | six years of painful negotiation.  We are -- however, we are | 11:53AM |
| 3 | very grateful for the affirmative decision and forever | 11:53AM |
| 4 | appreciate all the hard work of our team.  The following | 11:53AM |
| 5 | people have played a major role in helping us achieving the | 11:53AM |
| 6 | positive conclusion in our case for justice. | 11:53AM |
| 7 | If I may, the first people that I want to -- we | 11:53AM |
| 8 | want to thank for me is the office of Lujan of David and Delia | 11:53AM |
| 9 | Lujan office.  The second one is the Stinson group, Robert | 11:53AM |
| 10 | Kugler, Ed Caldie and Drew, I don't know how to pronounce your | 11:53AM |
| 11 | last name, Glasnovich, and the staff.  Mr. Frank Aguon, the | 11:53AM |
| 12 | Chairman of the Committee at that the time in 2016.  He was | 11:53AM |
| 13 | the Chairman of the Committee that I testified before the | 11:53AM |
| 14 | Court.  A very humiliating testifying -- testimony.  I will | 11:54AM |
| 15 | never forget that day.  Mr. Frank Blas, Jr., who introduced | 11:54AM |
| 16 | the bill in the legislature for the Committee to study.  I | 11:54AM |
| 17 | understand during the process many -- some people, not many, | 11:54AM |
| 18 | some people objected to that.  There was even a petition went | 11:54AM |
| 19 | around the island not to approve this, which you know, | 11:54AM |
| 20 | democracy, this is U.S.A., but it really hurts us when we were | 11:54AM |
| 21 | supposed to be the children of God. | 11:54AM |
| 22 | The people of Guam and also the people of Guam | 11:54AM |
| 23 | for the support, especially Mr. David Sablan, Jr., who is the, | 11:54AM |
| 24 | I believe the lead of the Guam Concerned Catholic Association. | 11:54AM |
| 25 | I've met with David Sablan on a couple case and he truly gave | 11:55AM |

1  us his support.  And a gentleman that I don't know what's his

2  name, but in 2016, 2017, he has a pickup truck that goes

3  around the island on his own time, his own gas, with a big

4  flag in the back, said, Silent no more, Silent no more.

5          Our bothers and sisters, who came forward, and to

6  all the survivors who silently support us behind the front.

7  We love you all even though you didn't come forward.  But you

8  have your own personal reason and we respect that and we still

9  love you, to all the survivors.  My understanding is probably

10  2 to 3,000 someplace in Guam.  And we respect your opinion,

11  respect your decision very much.  To Governor Ed -- Eddie

12  Calvo, who signed the law at the last minute 5:00 p.m. on

13  Friday, one of my -- one of the members got a call at 5 or

14  5:00 p.m. to tell us that he signed the law.  Thank you,

15  Governor.

16          To our Committee members:  Roland, Norman, Felix,

17  Bill and Everett, Danny -- and Danny.  Thank you for your

18  sacrifice and help even though we have no pay.

19          To our compassionate and fair judge, Ms.

20  Tydingco-Gatewood, she gave us hope and determination to

21  continue our quest for justice.  *Dangkulu na si yu'us ma'ase*.

22  And Judge Faris from Honolulu and Curtis Ching on the Zoom,

23  thank you for your support and cooperation.  And especially to

24  Judge Faris, you're so patient and very, very cooperative

25  person.  And I thank you for that, sir.  *Mahalo nui*.

11:55AM
11:55AM
11:55AM
11:55AM
11:55AM
11:55AM
11:55AM
11:55AM
11:55AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:56AM
11:57AM
11:57AM
11:57AM
11:57AM
11:57AM

1       This is a very complicated case, negotiating back

2  and forth, wait two hours before the other party come onboard.

3  It's a like forever.  Forgive me if I forget someone in this

4  testimony today.  My apology to you.

5       We are grateful, finally, to reach a settlement

6  after a long period of time.  Like I said earlier, not a

7  perfect one, but a reasonable one and it's acceptable to us.

8  On behalf of the survivors, or the victims as someone said,

9  thank you very much from the bottom...(crying) our hearts.  We

10  will forever appreciate all the hard work and the sweat and

11  tears that follow this long, agony journey.

12       I must mention one more thing before I close, we

13  also have part of the settlement, hopefully the Judge will

14  agree, we call it *Child Protection Protocol*.  We, I, myself,

15  and the Committee members, urge strongly with Mr. Caldie, that

16  we have something in place for future -- present and future

17  protection of all altar boys and altar girls.  And the name is

18  Child Protection Protocol.  We will be discussing more with

19  Delia Lujan.  And hopefully soon, as soon as possible, this

20  Child Protection Protocol is a principle, a guidance,

21  something to protect any altar boys or girls on the island of

22  Guam.

23       If I may use some of the reasons, it's okay?

24  Number one, we will like to have all priests, officials coming

25  to Guam to work for the church of Catholic of Guam to be

11:57AM
11:57AM
11:57AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:58AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
11:59AM
12:00PM

1  vetted, find the records, and -- before they start serving as            12:00PM

2  a priest or church official, that must be done.                          12:00PM

3            Number two, we would like very much not to have               12:00PM

4  any children below 18 to reside in the rectory.  And in                  12:00PM

5  addition, no children should be allowed to ride with priests             12:00PM

6  at nighttime or even daytime.  I was part of that issue --               12:00PM

7  incident in the past.  There should be no children staying at            12:00PM

8  the rectory whatsoever.  That's our request.  And the last one           12:00PM

9  is, if any priest or church official got -- get caught or                12:00PM

10 happen to do something with a young children, they should be             12:01PM

11 reported to the police and they should be -- we also want to             12:01PM

12 have a panel from the church and from the Committee to                   12:01PM

13 investigate, to examine and to request for -- if it's criminal           12:01PM

14 nature, so be it, not -- but we should have a panel from both            12:01PM

15 sides the house, the church, our people and the Committee                12:01PM

16 members.  Together, we will review if any priests or church              12:01PM

17 official is caught doing misconduct for sexual abuse.  There             12:01PM

18 is more and more to this, Your Honor, but that is equally                12:01PM

19 important to the settlement.                                             12:01PM

20            We want to protect future altar boys and girls               12:01PM

21 and any schoolchildren, schoolgirls, schoolboys in the                   12:02PM

22 Catholic church.  It's not acceptable, it's not right to                 12:02PM

23 molest young children.  Thank you.  Oh, I was -- Mr. Caldie              12:02PM

24 excuse me, if I may?                                                     12:02PM

25            THE COURT:  Yes.                                             12:02PM

|   |   |   |
|---|---|---|
| 1 | (Attorney Caldie and witness conferred.) | 12:02PM |
| 2 | MR. TUDELA:  Thank you. | 12:02PM |
| 3 | (Pause.) | 12:02PM |
| 4 | MR. TUDELA:  Please forgive me.  To my family -- | 12:02PM |
| 5 | I did mention my son by the way.  To my family, just ten years | 12:02PM |
| 6 | ago, I told them about myself.  And the first question is why, | 12:02PM |
| 7 | what happened?  I have four kids.  The oldest one is a girl | 12:02PM |
| 8 | and three boys.  And I was supposed to be leaving next week | 12:03PM |
| 9 | because my son is getting promoted to a colonel.  That's why | 12:03PM |
| 10 | I'm glad this is -- so I could take a trip to Hawaii.  My | 12:03PM |
| 11 | oldest son, same name as me, didn't talk to me for a year. | 12:03PM |
| 12 | "Dad, they were thinking it was me, but it's you."  I said, | 12:03PM |
| 13 | I'm sorry about that.  My second son, he's a happy guy.  My | 12:03PM |
| 14 | third son, who's a computer working in the White House, it's | 12:03PM |
| 15 | okay.  My daughter goes...she said, Why the Catholic church do | 12:03PM |
| 16 | that?  I said I don't know.  She also was not happy. | 12:04PM |
| 17 | But as times go along, you know times -- time is | 12:04PM |
| 18 | sometimes good in favor for you, if you leave it alone, so I | 12:04PM |
| 19 | left it alone.  But all my trip coming to Guam for the hearing | 12:04PM |
| 20 | or whatever and I decided to stay in Guam for the last two | 12:04PM |
| 21 | years.  I have a place in Tumon Heights.  So my family now, | 12:04PM |
| 22 | for the last two years, they came forward and they support me. | 12:04PM |
| 23 | Thank you, family.  Thank you, thank you. | 12:04PM |
| 24 | THE COURT:  *Buen probechu*, Mr. Tudela.  And | 12:04PM |
| 25 | congratulations on your son and his promotion to colonel.  Let | 12:04PM |

45

| | | |
|---|---|---|
| 1 | me just say, also on behalf of Judge Faris, he would also say | 12:04PM |
| 2 | you're welcome and also, you all should probably send him a | 12:04PM |
| 3 | happy birthday.  Yesterday was his birthday.  And he called me | 12:05PM |
| 4 | to say, Good luck to you, Frances, today before we started | 12:05PM |
| 5 | yesterday's hearing.  And I'll be able to call him today and | 12:05PM |
| 6 | say well, you know, we started on your birthday and we're | 12:05PM |
| 7 | ending it today, still his birthday. | 12:05PM |
| 8 | MR. TUDELA:  Whose birthday? | 12:05PM |
| 9 | THE COURT:  Judge Faris' birthday. | 12:05PM |
| 10 | MR. TUDELA:  Oh, I will -- he's a lovely person. | 12:05PM |
| 11 | THE COURT:  Well, it's his birthday on Guam | 12:05PM |
| 12 | today, but it was his birthday in Hawaii yesterday. | 12:05PM |
| 13 | MR. TUDELA:  When I go to Hawaii soon, I'll come | 12:05PM |
| 14 | visit him. | 12:05PM |
| 15 | THE COURT:  You know, you should, if you can, you | 12:05PM |
| 16 | should.  He would like that. | 12:05PM |
| 17 | MR. TUDELA:  Yes. | 12:05PM |
| 18 | THE COURT:  So I will say that to you.  And let | 12:05PM |
| 19 | me just end this way, you know, it has been a very emotional | 12:05PM |
| 20 | case, I think, just generally.  Any case dealing with sex | 12:05PM |
| 21 | abuse is probably the most heart-wrenching type of cases and | 12:05PM |
| 22 | even in criminal court.  Of course this is civil court. | 12:05PM |
| 23 | And so I just want to point out a few things to | 12:05PM |
| 24 | you, Mr. Tudela, and the other 285 or so innocent altar boys | 12:06PM |
| 25 | that you spoke of and your Committee members you called by | 12:06PM |

| | |
|---|---|
| 1 | first name, all of you, but most especially you because you | 12:06PM |
| 2 | are the voice, you are their spokesperson, you're the voice of | 12:06PM |
| 3 | the speechless, the voice of the voiceless, and you've come | 12:06PM |
| 4 | forward many times, and most especially in my courtroom where | 12:06PM |
| 5 | I've heard you speak so eloquently and with a lot of heart and | 12:06PM |
| 6 | soul and you're reminding each and every one of us that it all | 12:06PM |
| 7 | goes back to what happened to you 64 years ago, was it about | 12:06PM |
| 8 | 64 years ago, right? | 12:06PM |
| 9 |         MR. TUDELA:  Right.  I forgot something to say, | 12:06PM |
| 10 | you remind me. | 12:06PM |
| 11 |         THE COURT:  Go ahead. | 12:06PM |
| 12 |         MR. TUDELA:  Father Romy and Sister Angela, you | 12:06PM |
| 13 | know, they comfort me.  And one person that really, really | 12:06PM |
| 14 | like my best friend for 30 years, and I'm sorry, Tony, | 12:06PM |
| 15 | Mr. Tony San Nicolas, Anthony Borja San Nicolas, former | 12:07PM |
| 16 | postmaster of Guam for many years.  We appoint him to become | 12:07PM |
| 17 | postmaster and he retired.  He was my best, best friend.  Like | 12:07PM |
| 18 | brother.  More than brother.  And the testimony on 16 of | 12:07PM |
| 19 | September 2016, he was there with me.  And everybody thought | 12:07PM |
| 20 | it was my lawyer because he's sitting next to me and David | 12:07PM |
| 21 | Lujan was right behind me.  He's with me all the time.  Every | 12:07PM |
| 22 | day, we'll meet at 2, 3 o'clock if you don't mind saying this, | 12:07PM |
| 23 | to have coffee, and I'm not advertising McDonald but we have | 12:07PM |
| 24 | coffee at McDonald for the last -- | 12:07PM |
| 25 |         THE COURT:  They have good coffee. | 12:07PM |

| | | |
|---|---|---|
| 1 | MR. TUDELA:  -- many years.  He pass away | 12:07PM |
| 2 | March 2nd, this year.  My beloved departed Tony, you listen to | 12:07PM |
| 3 | me, thank you, sir. | 12:07PM |
| 4 | THE COURT:  Well, that's good.  I'm glad you | 12:08PM |
| 5 | recognize and remembered him.  It's always good to have | 12:08PM |
| 6 | somebody comfort you during these difficult times, especially | 12:08PM |
| 7 | when your situation where your family wasn't, at first, | 12:08PM |
| 8 | probably all onboard because that happens in all -- I would | 12:08PM |
| 9 | say, honestly, most sex abuse cases that happens, having been | 12:08PM |
| 10 | a prosecutor for a long time and then a judge presiding over | 12:08PM |
| 11 | these cases, we see that. | 12:08PM |
| 12 | So your situation was no different.  The big | 12:08PM |
| 13 | difference, though, is when you have a priest that violates | 12:08PM |
| 14 | every core of your being, which is what happened with you, | 12:08PM |
| 15 | Mr. Tudela, and all of the other altar boys and some girls in | 12:08PM |
| 16 | this case.  The Court notes that the wounds that you all have | 12:08PM |
| 17 | suffered, you're going to continue to suffer, unfortunately, | 12:08PM |
| 18 | for many years to come probably till the day you die, but I | 12:08PM |
| 19 | assume I hope it's getting better.  You know, the Court hears | 12:08PM |
| 20 | you.  I think we all hear you when you speak about how wounded | 12:08PM |
| 21 | you are.  Not only spiritually because you indicated that to | 12:09PM |
| 22 | us, you told us about how you left the faith and you left the | 12:09PM |
| 23 | church but you kind of come back to it but also just | 12:09PM |
| 24 | emotionally and physically.  And just for you to come in and | 12:09PM |
| 25 | talk about the abandonment of the church, I think is something | 12:09PM |

| | |
|---|---|
| 1 | that we all feel -- I feel fortunate that, you know, not only | 12:09PM |
| 2 | am I the judge in this case, I think this is probably one of | 12:09PM |
| 3 | the harder cases I've ever presided over in my 30 -- 29, | 12:09PM |
| 4 | 30 years as a judge. | 12:09PM |
| 5 | But I feel fortunate to having -- to being a | 12:09PM |
| 6 | Catholic and to having grown up in our culture and | 12:09PM |
| 7 | understanding many of the things that you said, just even in | 12:09PM |
| 8 | my own career path.  And I -- I -- the Court, you know, thinks | 12:09PM |
| 9 | about what you said with regard to speaking on behalf of all | 12:09PM |
| 10 | of these victims or survivors.  And I think that's been | 12:09PM |
| 11 | extremely important and very pivotal in getting the settlement | 12:10PM |
| 12 | going. | 12:10PM |
| 13 | The one thing I will say is that, once you all | 12:10PM |
| 14 | came out here on Guam, the response by Pope Francis and | 12:10PM |
| 15 | especially his response by appointing Archbishop Michael | 12:10PM |
| 16 | Byrnes was extremely pivotal.  I think that Archbishop Byrnes | 12:10PM |
| 17 | is a special man. | 12:10PM |
| 18 | MR. TUDELA:  Yes. | 12:10PM |
| 19 | THE COURT:  Yeah.  I mean, I'm getting a little | 12:10PM |
| 20 | teary, too. | 12:10PM |
| 21 | MR. TUDELA:  You know, Judge, when he said "I'm | 12:10PM |
| 22 | sorry." | 12:10PM |
| 23 | THE COURT:  Yeah. | 12:10PM |
| 24 | MR. TUDELA:  I decided to go back to church. | 12:10PM |
| 25 | Since that time, forgive me, I went three times.  Last Sunday | 12:10PM |

1    I went to the Cathedral.  I sat in the back row.  And sitting    12:10PM

2    there is like, I guess, like a black shepherd.  In front of me    12:10PM

3    is one of the Committee members and he told me, Thank you, and    12:10PM

4    he's a very prominent person in Guam.    12:11PM

5              THE COURT:  Well, he was -- what is that, I don't    12:11PM

6    know the Bible verse...um...    12:11PM

7              MR. TUDELA:  I went three times already, Your    12:11PM

8    Honor.  Three times after 60 years.    12:11PM

9              THE COURT:  Yeah.  I'm trying to remember the    12:11PM

10   Bible verse I was thinking of.  Anyway it will come to me, but    12:11PM

11   I would say that, yeah, he is special and extraordinary and to    12:11PM

12   come into the Court and say only two words that mattered more    12:11PM

13   to you and everybody that have survived, I think speaks    12:11PM

14   volumes.    12:11PM

15             Anyway, so what the Court notes is that when    12:11PM

16   Archbishop Byrnes said those two words, that was the start of    12:11PM

17   a -- the healing process.  Actually, I think it gave a huge    12:11PM

18   jump start to the healing process.  And of course, it's a long    12:11PM

19   journey that you all have been on for all these years, but    12:11PM

20   it's still ongoing.  And I think -- I kind of wish Archbishop    12:12PM

21   Byrnes was here, I'm sorry that he's not because I would have    12:12PM

22   liked him to be here at the finish line when I'm saying these    12:12PM

23   words, but I hope he's hearing us today wherever he is.  I    12:12PM

24   know he's off island.    12:12PM

25             I will say that the one thing I'm also comforted    12:12PM

1   by is hearing you say not only your best friend, but also          12:12PM

2   Sister Angela, who's here in the Courtroom.  I had a chance to      12:12PM

3   see her recently and here on island.  And so I think it's          12:12PM

4   important that you have these people that have comforted you       12:12PM

5   through these years and through these times.  This is a            12:12PM

6   difficult time.  But really without you -- and I will say          12:12PM

7   you're a hero here.  Without your presence and your constant       12:12PM

8   reminder to everybody that this case is really about these         12:12PM

9   young men, these young boys, who are so innocent and have been     12:12PM

10  violated in the most extreme horrible way, the fact that you       12:13PM

11  always brought us back to that -- those moments, always put        12:13PM

12  everything in perspective.                                         12:13PM

13              The Court notes, also, that there is -- you know       12:13PM

14  just -- this is not just the first case in the Catholic faith      12:13PM

15  nationally or even internationally but in the federal court        12:13PM

16  system, we are obviously one of the smaller diocese and            12:13PM

17  smaller -- you know, smaller religious community, but you          12:13PM

18  know, having grown up a Catholic, I know that our faith has        12:13PM

19  always been very strong here on Guam.  It always -- and it         12:13PM

20  still continues, although there have been people that have         12:13PM

21  left the church.  Many people, including my own family             12:13PM

22  members, who ponder why am I still in the church, listening to     12:13PM

23  this case.  And the church is -- there are some priests, like      12:13PM

24  you said, Mr. Tudela, who are not good priests, but there are      12:14PM

25  many, many, many wonderful priests.  And the Court notes that.     12:14PM

1                The one thing I will close with is that, even              12:14PM

2      though we are here at the finish line, almost at the finish          12:14PM

3      line in terms of, you know, the approval and we've got to get        12:14PM

4      all of the final paperwork complete and signed off on with all       12:14PM

5      these provisos, the fact is that for us to get the insurance         12:14PM

6      companies onboard, to get the Boy Scouts of America onboard, I       12:14PM

7      think is critical, has been critical.  And it goes to show you       12:14PM

8      that even they wanted to come to a final resolution.                 12:14PM

9                And like you said, it may not be perfect, it may           12:14PM

10     not be everything that we want, but you can never get anything       12:14PM

11     -- nobody can ever give you what you need back.  And that's          12:14PM

12     the innocence of what you lost so long ago.  But it is some          12:14PM

13     kind of accounting that is necessary.  The Court knows that          12:14PM

14     there is never -- there has not been a full accounting by the        12:15PM

15     Catholic church here on Guam probably and all over the world         12:15PM

16     and unless and until there is a full accounting of the truth         12:15PM

17     of how many priests or other officials have hurt children,          12:15PM

18     they will never gain their credibility back.  The church will       12:15PM

19     never gain its credibility back unless there is truth in            12:15PM

20     reporting, there is truth in a registry showing the priests         12:15PM

21     are who the priests are, the offenders are.  And like you           12:15PM

22     said, Mr. Tudela, the Child Protection Protocol would be also       12:15PM

23     important in terms of protecting future victims and hopefully       12:15PM

24     not have any.                                                        12:15PM

25                So I just end and, you know, I know this has been        12:15PM

|   |   |   |
|---|---|---|
| 1 | like a piecemeal approach, it seems like it.  It's been a long | 12:15PM |
| 2 | four years since -- six years, six years for you, since the | 12:15PM |
| 3 | bank- -- when was this filed?  Four years ago.  But since the | 12:16PM |
| 4 | case was filed in my Court, it's been a long four years.  But | 12:16PM |
| 5 | it unfortunately has taken that long for everybody to come | 12:16PM |
| 6 | together.  And you also have -- I mean, the fact that you have | 12:16PM |
| 7 | the Boy Scouts of America case ongoing in Delaware and that | 12:16PM |
| 8 | they have come here to work on settlement speaks volumes, too. | 12:16PM |
| 9 | So I want to say that.  I just wasn't sure if everything was | 12:16PM |
| 10 | possible.  I know sometimes I would speak to Judge Faris, of | 12:16PM |
| 11 | course he would never -- he could never tell me what was going | 12:16PM |
| 12 | on with settlement.  But he was always trying to be hopeful | 12:16PM |
| 13 | that he could work with you and I think it was Mr. Christian | 12:16PM |
| 14 | said that it was his proposal that helped seal the deal for | 12:16PM |
| 15 | the Continental Insurance Company, which tells me and shows me | 12:16PM |
| 16 | that, you know, Judge Faris his heart was in it, just as much | 12:16PM |
| 17 | as your heart was in it, Mr. Tudela and all the other lawyers | 12:16PM |
| 18 | and other professionals who have been involved in this case. | 12:16PM |
| 19 | So I just want to say to you, Mr. Tudela, thank you.  And | 12:17PM |
| 20 | *dangkulu na si yu'us ma'ase*.  And you know, keep on doing your | 12:17PM |
| 21 | good work.  I think it's -- | 12:17PM |
| 22 | MR. TUDELA:  *Hagu mas*, senora.  I don't know if | 12:17PM |
| 23 | this is something unusual, but you know I'm 79.  And sooner or | 12:17PM |
| 24 | later, I'll be not able to do things that I want to.  Is it | 12:17PM |
| 25 | possible, I'm just asking, maybe not, take a picture of the | 12:17PM |

|  |  |  |
|---|---|---|
| 1 | group? | 12:17PM |
| 2 | THE COURT:  If there is no objection, that'll be | 12:17PM |
| 3 | fine. | 12:17PM |
| 4 | MR. TUDELA:  It's up to you, sir -- madam. | 12:17PM |
| 5 | THE COURT:  I have no objection.  Do you guys | 12:17PM |
| 6 | have any objection to that?  Nobody has ever asked me to do | 12:17PM |
| 7 | that, but you know what? | 12:17PM |
| 8 | MR. TUDELA:  The whole group. | 12:17PM |
| 9 | THE COURT:  Well, how about your Zoom people?  I | 12:17PM |
| 10 | guess, we'll take those separately.  (Laughing.) | 12:17PM |
| 11 | MR. ELSAESSER:  That's fine, Your Honor.  May I | 12:17PM |
| 12 | just say a couple quick things? | 12:17PM |
| 13 | THE COURT:  Sure, Mr. Elsaesser.  Yes. | 12:17PM |
| 14 | MR. TUDELA:  Thank you so much. | 12:18PM |
| 15 | THE COURT:  Yeah. | 12:18PM |
| 16 | MR. ELSAESSER:  I just want to say on the Child | 12:18PM |
| 17 | Protection Protocols, Mr. Weisenberger here is in Court today | 12:18PM |
| 18 | and he's ready, willing and able to get with Leo and Delia and | 12:18PM |
| 19 | Dr. Rapadas any time, anywhere to -- they have been -- they've | 12:18PM |
| 20 | exchanged information, but I think because of schedules of | 12:18PM |
| 21 | some of the people, they haven't been able to get together. | 12:18PM |
| 22 | But virtually everything that Mr. Tudela said is | 12:18PM |
| 23 | already in the existing protocols that Archdiocese Byrnes made | 12:18PM |
| 24 | sure was in place as soon as he came here and we're just -- | 12:18PM |
| 25 | they're working on the details, it doesn't involve the | 12:18PM |

| | | |
|---|---|---|
| 1 | lawyers, it's -- I mean obviously Mr. Weisenberger is a | 12:18PM |
| 2 | lawyer, but -- and Ms. Wolff is a lawyer, but it's really, | 12:18PM |
| 3 | it's -- they'll get that worked out. | 12:18PM |
| 4 | And I just want to personally thank Your Honor | 12:19PM |
| 5 | through these last almost four years, not quite, but I think | 12:19PM |
| 6 | January 18, 2019, was the filing date.  Thank you for your | 12:19PM |
| 7 | patience and thank you for leading us through this process | 12:19PM |
| 8 | over the last several years.  And I generally can say, you | 12:19PM |
| 9 | know, certainly I won't say I've enjoyed every minute in Court | 12:19PM |
| 10 | during some things that have happened, but I've enjoyed being | 12:19PM |
| 11 | on the island every time.  I've been here now, which is about | 12:19PM |
| 12 | almost 25 days total.  So I -- I'm very appreciative that | 12:19PM |
| 13 | we're at this stage and we'll take the next two months to get | 12:19PM |
| 14 | all the detail work done and get the trustee off and running | 12:19PM |
| 15 | and get the distribution made to the -- yeah, to the | 12:19PM |
| 16 | survivors. | 12:19PM |
| 17 | THE COURT:  Thank you, Mr. Elsaesser. | 12:19PM |
| 18 | MR. ELSAESSER:  So, thank you. | 12:19PM |
| 19 | THE COURT:  And to you, Mr. Elsaesser, and | 12:19PM |
| 20 | everybody, all the lawyers here, have all been very | 12:19PM |
| 21 | professional.  I appreciate that.  So thank you for your time | 12:20PM |
| 22 | and your professionalism and civility. | 12:20PM |
| 23 | And I would say you have no better person to | 12:20PM |
| 24 | choose than John Weisenberger.  He has appeared in my Court | 12:20PM |
| 25 | for many years when I was in the local court.  Should have | 12:20PM |

| | |
|---|---|
| 1 | been a Supreme Court justice.  I always tell him that.  But he | 12:20PM |
| 2 | is truly a fine lawyer for you to have, handling this | 12:20PM |
| 3 | protocol.  So I'm very glad he's onboard with you, | 12:20PM |
| 4 | Mr. Elsaesser.  And the others. | 12:20PM |
| 5 | MR. ELSAESSER:  Thank you. | 12:20PM |
| 6 | THE COURT:  Okay.  Thank you.  All right.  If | 12:20PM |
| 7 | there is nothing further, I think we're all a little calmed | 12:20PM |
| 8 | down now and everything is done, relieved, so we'll -- I guess | 12:20PM |
| 9 | we'll take the photo.  All right.  (Laughing.)  We'll take -- | 12:20PM |
| 10 | we're -- we are in recess and thank you everybody. | 12:20PM |
| 11 | (Proceedings concluded at 12:20 p.m.) | 12:20PM |
| 12 | * * * | |

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA      )
                     )  ss.
TERRITORY OF GUAM    )


        I, Veronica F. Flores, Official Court Reporter for

the United States District Court of Guam, do hereby certify

the foregoing pages, 1 to 55, to be a true and correct

transcript of the proceedings held in the above-entitled

matter, to the best of my ability.

        Dated this 19th day of October 2022.


                        /s/Veronica F. Flores
                        Veronica F. Flores

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM
### BANKRUPTCY DIVISION

In re:

Archbishop of Agaña, a corporation sole,

      Debtor.

Case No. 19-00010

Chapter 11

---

## FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ARCHBISHOP OF AGAÑA

---

**ELSAESSER ANDERSON, CHTD.**
Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Tel:   (208) 667-2900
Fax:   (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

**LAW OFFICE OF JOHN C. TERLAJE**
John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

**ATTORNEYS FOR THE ARCHBISHOP OF AGAÑA**

Dated: September 27, 2022

**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGAÑA**

Dated: September 27, 2022

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARTICLE I DEFINITIONS AND INTERPRETATION...................................2
    1.1    DEFINED TERMS ....................................................................2
    1.2    INTERPRETATION...............................................................18
    1.3    TIME PERIODS .....................................................................19
    1.4    EXHIBITS AND SCHEDULES.............................................19

ARTICLE II - TREATMENT OF UNCLASSIFIED CLAIMS.......................19
    2.1    ADMINISTRATIVE CLAIMS ..............................................19
    2.2    STATUTORY FEES ...............................................................21
    2.3    PRIORITY TAX CLAIMS .....................................................21

ARTICLE III CLASSIFICATION OF CLAIMS ............................................22
    3.1    SUMMARY ............................................................................22
    3.2    CLASSIFICATION AND VOTING .......................................22

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS .............................22
    4.1    PRIORITY CLAIMS (CLASS 1)...........................................22
    4.2    GOVERNMENTAL UNIT CLAIMS (CLASS 2) ...................23
    4.3    TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS
              (CLASS 3) ..............................................................................23
    4.4    UNKNOWN TORT CLAIMS (CLASS 4)...............................26
    4.5    GENERAL UNSECURED CLAIMS (CLASS 5).....................27
    4.6    BANK OF GUAM (CLASS 6)................................................28
    4.7    FIRST HAWAIIAN BANK (CLASS 7) ..................................30
    4.8    BANK OF HAWAII (CLASS 8)..............................................31
    4.9    SMALL BUSINESS ADMINISTRATION (CLASS 9) ...........31
    4.10   ABUSE RELATED CONTINGENT CLAIMS (CLASS 10) ...............32
    4.11   ABUSE RELATED CONTINGENT CLAIMS- UNKNOWN (CLASS 11)........32
    4.12   OTHER ABUSE RELATED CLAIMS-(CLASS 12) .........................32

ARTICLE V MEANS OF IMPLEMENTATION OF THE PLAN....................33
    5.1    TRUST FORMATION AND FUNDING .................................33
    5.2    PAYMENT OF PROFESSIONAL FEES ................................35
    5.3    PAYMENTS EFFECTIVE UPON TENDER ..........................35

ARTICLE VI TRUST.......................................................................................35
    6.1    ESTABLISHMENT OF TRUST..............................................35
    6.2    PURPOSE, FORMATION, AND ASSETS ..............................36
    6.3    ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS
              FROM THE TRUST .................................................................36
    6.4    TAX MATTERS.......................................................................37
    6.5    APPOINTMENT OF THE TRUSTEE .....................................37
    6.6    RIGHTS AND RESPONSIBILITIES OF TRUSTEE................37

CORE/3515288.0002/171049844.43

| | | |
|---|---|---|
| 6.7 | TRANSFERRED INSURANCE INTERESTS | 38 |
| 6.8 | SPECIAL DISTRIBUTION CONDITIONS | 43 |
| 6.9 | INVESTMENT POWERS; PERMITTED CASH EXPENDITURES | 43 |
| 6.10 | REGISTRY OF BENEFICIAL INTERESTS | 43 |
| 6.11 | NON-TRANSFERABILITY OF INTERESTS | 43 |
| 6.12 | TERMINATION | 44 |
| 6.13 | IMMUNITY; LIABILITY; INDEMNIFICATION | 44 |
| 6.14 | TREATMENT OF TORT CLAIMS | 45 |
| 6.15 | CONTROL OF TRUST REAL PROPERTY ASSETS | 53 |
| 6.16 | FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY ASSETS | 55 |

ARTICLE VII SETTLING INSURERS .......................................................................55

| | | |
|---|---|---|
| 7.1 | SETTLING INSURER SETTLEMENT AGREEMENT | 55 |
| 7.2 | FREE AND CLEAR OF INTERESTS OF SETTLING INSURER POLICIES | 55 |
| 7.3 | RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS | 56 |
| 7.4 | JUDGMENT REDUCTION | 56 |
| 7.5 | FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS | 57 |
| 7.6 | INDEMNIFICATION OBLIGATIONS | 57 |
| 7.7 | TIMING | 58 |
| 7.8 | WAIVER/CONSENT | 58 |
| 7.9 | DEBTOR WAIVER AND RELEASE OF CLAIMS. | 59 |
| 7.10 | SUPPLEMENTAL SETTLING INSURER INJUNCTION | 59 |
| 7.11 | BECOMING A SETTLING INSURER PRIOR TO THE EFFECTIVE DATE | 60 |

ARTICLE VIII NON-SETTLING INSURERS ..............................................................61

| | | |
|---|---|---|
| 8.1 | PRESERVATION OF RIGHTS AND OBLIGATIONS | 61 |
| 8.2 | ESTIMATIONS/ASSESSMENTS ARE NOT BINDING | 62 |
| 8.3 | RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS | 63 |
| 8.4 | THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER RIGHTS | 63 |
| 8.5 | THE ARCHDIOCESE'S OBLIGATIONS SURVIVE | 63 |
| 8.6 | TRUST POWERS WITH RESPECT TO TORT CLAIMS AND NON-SETTLING INSURERS | 64 |

ARTICLE IX INSURANCE POLICIES ........................................................................64

| | | |
|---|---|---|
| 9.1 | CONTINUATION OF INSURANCE POLICIES | 64 |

ARTICLE X PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION.......................65

| | | |
|---|---|---|
| 10.1 | RESERVATION OF RIGHTS TO OBJECT TO NON-TORT CLAIMS | 65 |
| 10.2 | OBJECTIONS TO NON-TORT CLAIMS | 65 |
| 10.3 | DETERMINATION OF CLAIMS | 65 |
| 10.4 | NO DISTRIBUTIONS PENDING ALLOWANCE | 66 |
| 10.5 | CLAIM ESTIMATION | 66 |

ARTICLE XI DISTRIBUTIONS UNDER THE PLAN .................................................66

- ii -

| 11.1 | PAYMENT DATE | 66 |
| 11.2 | UNDELIVERABLE DISTRIBUTIONS | 66 |
| 11.3 | SETOFFS | 67 |
| 11.4 | NO INTEREST ON CLAIMS | 67 |
| 11.5 | WITHHOLDING TAXES | 67 |

ARTICLE XII EFFECTIVENESS OF THE PLAN ... 67
| 12.1 | CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE | 67 |
| 12.2 | NOTICE OF EFFECTIVE DATE | 68 |
| 12.3 | EFFECT OF NON-OCCURRENCE OF CONDITIONS | 68 |

ARTICLE XIII EFFECTS OF CONFIRMATION ... 68
| 13.1 | DISSOLUTION OF UCC | 68 |
| 13.2 | DISCHARGE AND INJUNCTION | 69 |
| 13.3 | CHANNELING INJUNCTION | 69 |
| 13.4 | EXCULPATION; LIMITATION OF LIABILITY | 71 |
| 13.5 | TIMING | 72 |
| 13.6 | NO BAR ON CERTAIN CLAIMS | 72 |
| 13.7 | NO BAR ON CLAIMS AGAINST OTHER DEBTORS IN BANKRUPTCY. | 72 |

ARTICLE XIV INCORPORATION OF CHILD PROTECTION PROTOCOLS ... 73
| 14.1 | CHILD PROTECTION PROTOCOLS | 73 |

ARTICLE XV THE REORGANIZED DEBTOR ... 73
| 15.1 | CONTINUED CORPORATE EXISTENCE | 73 |
| 15.2 | VESTING OF ASSETS | 74 |
| 15.3 | IDENTITY OF OFFICERS OF REORGANIZED DEBTOR | 74 |
| 15.4 | FURTHER AUTHORIZATION | 74 |

ARTICLE XVI MISCELLANEOUS PROVISIONS ... 74
| 16.1 | RETENTION OF JURISDICTION | 74 |
| 16.2 | ASSUMPTION OF EXECUTORY CONTRACTS | 77 |
| 16.3 | INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES | 77 |
| 16.4 | DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS | 77 |
| 16.5 | RESERVATION OF RIGHTS | 78 |
| 16.6 | NON-APPEALABLE ORDER | 78 |
| 16.7 | AMENDMENTS AND MODIFICATIONS | 78 |
| 16.8 | U.S. TRUSTEE REPORTS | 78 |
| 16.9 | NO WAIVER | 78 |
| 16.10 | TAX EXEMPTION | 78 |
| 16.11 | NON-SEVERABILITY | 79 |
| 16.12 | REVOCATION | 79 |
| 16.13 | CONTROLLING DOCUMENTS | 79 |
| 16.14 | GOVERNING LAW | 79 |
| 16.15 | NOTICES | 79 |

CORE/3515288.0002/171049844.43

**SA 1928**

16.16  FILING OF ADDITIONAL DOCUMENTS.........................................................79
16.17  POWERS OF OFFICERS ...........................................................................80
16.18  DIRECTION TO A PARTY ........................................................................80
16.19  SUCCESSORS AND ASSIGNS ...................................................................80
16.20  CERTAIN ACTIONS .................................................................................80
16.21  FINAL DECREE .......................................................................................80
16.22  PLAN AS SETTLEMENT COMMUNICATION ............................................80
16.23  OTHER RIGHTS........................................................................................80

ARTICLE XVII BANKRUPTCY RULE 9019 REQUEST.........................................81

ARTICLE XVIII CONFIRMATION REQUEST ........................................................81

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A: | Unknown Claims Representative's Report and Recommendations |
| Exhibit B: | Non-Settling Insurers |
| Exhibit C: | [RESERVED] |
| Exhibit D: | Trust Agreement and Trust Distribution Plan |
| Exhibit E: | Tort Claim Release |
| Exhibit F: | Unknown Tort Claim Release |
| Exhibit G: | Real Property Transferred to Trust |
| Exhibit H: | [RESERVED] |
| Exhibit I: | Known Archdiocese Entity Insurance Policies |
| Exhibit J: | Officers and Directors of Reorganized Debtor |
| Exhibit K: | Child Protection Protocols |
| Exhibit L: | BSA Insurance Policies |
| Exhibit M: | List of Catholic Entities |
| Exhibit N: | Settling Insurers |
| Exhibit O: | Partitioned Real Property |
| Exhibit P: | Maps of Retained Real Property |
| Exhibit Q: | Bank of Guam Replacement Properties |
| Exhibit R: | Form of Scholarship Voucher |
| Exhibit S: | Form of Cemetery Voucher |
| Exhibit T: | [RESERVED] |

CORE/3515288.0002/171049844.43

## INTRODUCTION

The Archbishop of Agaña, a corporation Sole and the Official Committee of Unsecured Creditors propose this Joint Chapter 11 Plan of Reorganization (the "Plan") pursuant to the provisions of the Bankruptcy Code.

All creditors are encouraged to consult the disclosure statement for the Chapter 11 Plan of Reorganization (the "Disclosure Statement") before voting to accept or reject this Plan. Among other information, the Disclosure Statement contains discussions of the Archdiocese of Agaña, events prior to and during this Chapter 11 case, and a summary and analysis of the Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

CORE/3515288.0002/171049844.43

**SA 1930**

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1     **DEFINED TERMS.** For the purposes of the Plan, except as expressly provided,

all capitalized terms not otherwise defined herein have the meanings ascribed to them below:

1.     "Abuse" means (i) any actual or alleged act of sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in 19 Guam Code § 4101(k); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, or intimidation; or (v) child sexual abuse as that term is used in 7 Guam Code § 11301.1.

2.     "Abuse Claim" means a Tort Claim or an Unknown Tort Claim.

3.     "Abuse Claimant" means the holder of a Tort Claim or an Unknown Tort Claim.

4.     "Abuse-Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Tort Claim against a Protected Party.

5.     "Administrative Claim" means a Claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503, 507(a)(2), or 507(b) of the Bankruptcy Code, including any post-petition tax Claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

6.     "Affiliates" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

7.     "Agents" means all past and present employees, officers, directors, agents, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy, Persons bound by

- 2 -

monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in their capacities as such.

8.  "AIG Insurers" shall mean, collectively, National Union Fire Insurance Company of Pittsburgh, Pa., American Home Assurance Company, Lexington Insurance Company, Landmark Insurance Company, and Insurance Company of the State of Pennsylvania.

9.  "AIG Insurers Entities" shall mean the AIG Insurers and their (i) Affiliates; (ii) each of the foregoing Person's Agents or Representatives, in their capacities as such; and (iii) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, officers, directors, stockholders, principals, parents, subsidiaries, attorneys, holding companies, merged companies, related companies, divisions, and acquired companies, claims administrators (including, without limitation, AIG Claims, Inc.) whether known or unknown, administrators, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

10. "AIG Insurers Settlement Agreement" means the Settlement Agreement and Release dated as of September __ 2022 by and between the Official Committee of Unsecured Creditors for the Archbishop of Agaña, the AIG Insurers Entities, the Debtor, and each of the AoA Entities.

11. "Allowed Professional Claim" means a Professional Claim for which the Bankruptcy Court has entered an Order, which has become a Non-Appealable Order allowing the relevant Fee Application.

12. "Archdiocese Entity Insurance Policies" mean the insurance policies that are listed on Exhibit I, provided, however, that if a contract, binder, certificate, or policy of insurance identified on Exhibit I was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor, but insures or covers both the Debtor and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is a "Archdiocese Entity Insurance Policy" to the extent it insures or covers the Debtor and any AoA Entity, but not to the extent it insures or covers any other Person.

13. "AoA Entities" means, in their capacity as such:

    (a)  the Archdiocese;

    (b)  Archbishop Michael Byrnes;

    (c)  All Persons listed on Exhibit M;

    (d)  Each of the Affiliates of the Persons identified in the foregoing subsections (a)-(c);

- 3 -

(e)     Each of the successors and assigns of the Persons identified in the foregoing subsections (a)-(d); and,

(f)     Solely to the extent of and in their capacity as such, each of the Agents of the Persons identified in the foregoing subsections (a)-(e).

(g)     Notwithstanding anything in this definition, none of the following are an AoA Entity: (i) the Holy See, (ii) the Vatican, or (iii) the Supreme Pontiff.

Notwithstanding the foregoing, an individual who perpetrated, or is alleged to have perpetrated, an act of Abuse that forms the basis for a Tort Claim is not a AoA Entity with respect to that Tort Claim. No religious order, archdiocese or diocese, other than the Archdiocese, is an AoA Entity. The Boy Scouts of America, Aloha Council, and Chamorro District are not AoA Entities.

14.     "AoA Entity Insurer Policy" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Effective Date, and that actually, allegedly, or potentially, insures any AoA Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Tort Claim, provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued or subscribed on behalf of an AoA Entity, but insures or covers both an AoA Entity and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is an "AoA Entity Insurance Policy" to the extent it insures or covers the Debtor or any AoA Entity, but not to the extent it insures or covers any other Person.

15.     "Approval Order" means an order of the Bankruptcy Court approving one or more Insurance Settlement Agreements.

16.     "Archdiocese" and "Archdiocesan" refers to the Archbishop of Agaña, which is the corporation sole formed pursuant to Guam Code 18 § 10101 et seq. that is the public juridic person of the Roman Catholic Archdiocese of Agaña, as now constituted or as it may have been constituted, and the Estate (pursuant to Section 541 of the Bankruptcy Code).

17.     "Assets" of the Archdiocese or the Estate means, collectively, any and all property of the Archdiocese or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including cash (including the residual balance of any reserves established under the Plan, but not the Trust) and Causes of Action.

18.     "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the disclosure statement provided to each holder of a Claim entitled to vote to accept or reject the Plan.

- 4 -

19.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code.

20.    "Bankruptcy Court" means the United States District Court for the District of Guam, Bankruptcy Division.

21.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as currently promulgated.

22.    "BSA" means Boy Scouts of America.

23.    "BSA Bankruptcy Case" means the cases filed by BSA and Delaware BSA, LLC under chapter 11 of the Bankruptcy Code, which are jointly administered under Case No. 20-10343 (LSS) (Bankr. D. Del.).

24.    "BSA Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the BSA Bankruptcy Case.

25.    "BSA Confirmation Opinion" means the *Opinion* dated July 29, 2022 issued by the BSA Bankruptcy Court in the BSA Bankruptcy Case, Docket No. 10136, regarding confirmation of the BSA Plan.

26.    "BSA Confirmation Order" means the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* dated September 8, 2022 issued by the BSA Bankruptcy Court in the BSA Bankruptcy Case, Docket No. 10316, confirming the BSA Plan.

27.    "BSA Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in the Policies listed on Exhibit L.

28.    "BSA Non-Settling Insurance Company" means a "Non-Settling Insurance Company" as such term is defined in the BSA Plan

29.    "BSA Opt-Out Chartered Organization" means an "Opt-Out Chartered Organization" as such term is defined in the BSA Plan.

30.    "BSA Plan" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* dated September 6, 2022, as confirmed by, and attached as Exhibit A to, the BSA Confirmation Order in the BSA Bankruptcy Case, Docket No. 10316-1.

- 5 -

31. "BSA Settling Insurance Company" means a "Settling Insurance Company" as such term is defined in the BSA Plan.

32. "Canon Law" means the Code of Canon Law of the Roman Catholic Church, as codified in 1983 and as may hereafter be amended, and all binding universal and particular laws of the Roman Catholic Church.

33. "Catholic Entities" means those listed on Exhibit M.

34. "Cause of Action" or "Causes of Action" means, except as provided otherwise in the Plan, the Confirmation Order, or any document, instrument, release, or other agreement entered into in connection with the Plan, all Claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims, and cross claims of the Archdiocese or its Estate, the Committees, or the Trust (as successor to the Archdiocese or its Estate), including an action that is or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any Person based on law or equity (in each case, in respect of a Cause of Action that arose before the Effective Date), including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, any action brought pursuant to Sections 522, 541–45, 547–51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or cross-claim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

35. "Chancery Real Property" means the Debtor's right, title, and interest in the real property described as Lot 3200B-REM-NEW, Sinajana.

36. "Channeled Claims" means all (a) Tort Claims, Unknown Tort Claims Direct Action Claims, Indirect Claims, and Coverage Claims; (b) Abuse-Related Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a) – (c) of this sentence; provided, however, that the following are not Channeled Claims: (i) a Claim against an individual who committed the Abuse from which a Tort Claim arises; (ii) a Claim against any religious order, diocese or archdiocese (other than the Archdiocese); or (iii) the portion of a Mixed Claim against the Boy Scouts of America, Guam Council, Direct Service Council, Chamorro Council, Aloha Council (including the Chamorro District), or any Local Council.

37. "Channeling Injunction" means the injunction imposed pursuant to Section 13.3 of the Plan.

- 6 -

38.    "Chartered Organizations" means each and every civic, faith based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by BSA to operate, sponsor, or otherwise support one or more scouting units

39.    "Child Protection Protocols" means the document entitled "Child Protection Protocols" attached as Exhibit K.

40.    "Claim" means any past, present or (to the extent it arises prior to the Effective Date) future Claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party Claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any other Claim within the definition of "Claim" in Section 101(5) of the Bankruptcy Code.

41.    "Claims Bar Date" means August 15, 2019.

42.    "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any Agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

43.    "Coinsured Person" means any Person that is not a Protected Party but is or allegedly is insured under an Other Insurance Policy, including insurance policies issued to the BSA, Local Councils, and Chartered Organizations other than the Debtor and/or the AOA Entities.

44.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

45.    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code which becomes a Non-Appealable Order, and which is acceptable to the AIG Insurers in all respects.

46.    "Contribution Claims" means Abuse-Related Contribution Claims and Non-Abuse Related Contribution Claims. "Contribution Claims" do not include any Claims for contribution, indemnity, equitable indemnity,

- 7 -

subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, that the Settling Insurers might have arising from the payment of any Settlement Amount under an Insurance Settlement Agreement.

47. "Coverage Claims" means all Claims against a Settling Insurer under or relating to the policies issued by such Settling Insurer that are the subject of any Insurance Settlement Agreement or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage; provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor insures or covers both the Debtor and any other Person, Claims seeking insurance coverage are only "Coverage Claims" to the extent it insures or covers the Debtor or an AoA Entity, but not to the extent it insures or covers any other Person.

48. "Covered Non-Tort Claim" means any Claim, other than Tort Claims, Unknown Tort Claims, Abuse-Related Contribution Claims, Indirect Claims, or Medicare Claims, for which the Archdiocese or a Catholic Entity or Other Insured Entity would otherwise have coverage under a Settling Insurer Policy but for the sale, transfer, or release by the Debtor, Catholic Entity, or Other Insured Entity of such Settling Insurer Policy in connection with an Insurance Settlement Agreement.

49. "Debtor" means the Archdiocese.

50. "Direct Action Claims" means the same as "Tort Claims", except that they are asserted against any Settling Insurer, instead of any Protected Party or the Trust, for the recovery of insurance proceeds.

51. "Disputed" when used with respect to a Claim against the Archdiocese or property of the Archdiocese, means a Claim: (i) designated as disputed, contingent, or unliquidated in the Debtor's Schedules; (ii) which is the subject of an objection, appeal, or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal, or motion has not been determined by a Non-Appealable Order; or (iii) which during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, is in excess of the amount scheduled as other than disputed, unliquidated, or contingent. The processes for handling "Disputed Claims" do not apply to Class 3 Claims or Class 4 Claims. The process for Class 3 Claims and Class 4 Claims will be addressed in the Trust Agreement. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Reorganized Debtor, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified class of Claims or an unclassified category of Claims (i.e., "Disputed [class

- 8 -

designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified class or unclassified category of Claims.

52.     "Distribution Plan Claimants" are Tort Claimants (i) whose Tort Claims do not implicate coverage from any Non-Settling Insurer; (ii) who the Tort Claims Reviewer determines is entitled to receive a distribution pursuant to the Trust Distribution Plan; and (iii) who have released all their Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable.

53.     "Distribution Plan Claims" are Tort Claims asserted by Distribution Plan Claimants.

54.     "District Court" means the United States District Court for the District of Guam.

55.     "Effective Date" means the date upon which the conditions in Article XII of the Plan have been satisfied.

56.      "Estate" means the estate created in this Chapter 11 case pursuant to Section 541 of the Bankruptcy Code.

57.     "Exculpated Parties" means collectively, (i) the Archdiocese, the Estate, and the UCC; (ii) the respective officers, directors, employees, members, attorneys, financial advisors, members of subcommittees of the board of directors, volunteers, and members of consultative bodies and councils formed under Canon Law of the persons identified in the preceding clause including with respect to their service or participation in an outside board on which they serve at the request of the Archdiocese or the Archbishop, in their capacity as such; (iii) the Settling Insurers (including each of the AIG Insurers Entities) with respect to their Settling Insurer Policies; and (iv) professionals of a Person identified in the preceding clause (i) through (iii).

58.     "Extra-Contractual Claims" means any Claim against the Settling Insurers seeking any type of relief in connection with any alleged obligations of the Settling Insurers to the Protected Parties before the Effective Date (including compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs or any other type of relief) alleging any of the following: bad faith; failure to provide insurance coverage under any Settling Insurer Policy; failure or refusal to compromise and settle any Claim insured under any Settling Insurer Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type for which the Claimant seeks relief other than coverage or benefits under an

- 9 -

insurance policy. The term "Extra-Contractual Claims" includes all Claims belonging to the Protected Parties relating to the Settling Insurers' (i) handling of any request for insurance coverage for any Claim under the Settling Insurer Policies; (ii) conduct relating to the negotiation of the Insurance Settlement Agreements; and (iii) conduct relating to the settlement of any coverage Claim concerning the Settling Insurer Policies; provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor insures or covers both the Debtor and any other Person, Claims are only "Extra-Contractual Claims" to the extent it insures or covers the Debtor or an AoA Entity, but not to the extent it insures or covers any other Person.

59.    "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

60.    "FHP/TakeCare Real Property" means the Debtor's right, title, and interest in the real property described as Lot 1-NEW-Block 2, Tract 259, Tamuning.

61.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

62.    "Indirect Claim" means a Claim against a Protected Party or a Settling Insurer, asserted by any other Person that is not an Insurer for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any Protected Party's actual or alleged liability, for any Claim relating to Abuse that is not a Tort Claim. Class 10 Claims, Class 11 Claims and Class 12 Claims are Indirect Claims.

63.    "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Non-Settling Insurer or any rights under any Non-Settling Insurer Policies.

64.    "Insurance Settlement Agreements" means the settlement agreements among the Archdiocese and the other Protected Parties and the Settling Insurers which shall include the AIG Settlement Agreement.

65.    "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, an AoA Entity Insurer Policy.

66.    "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief. For the avoidance of doubt, Interest includes the right of any Person to enforce,

- 10 -

under any theory of contract, future interest, or other theory arising in law or equity, regarding a restriction on the use or transfer of any property, real or personal, through a deed, lease, or other conveyance.

67.   "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Debtor as contemplated by Section 101(37) of the Bankruptcy Code.

68.   "Litigation Claimants" are Tort Claimants who have Tort Claims that are covered, or allegedly covered, under any Non-Settling Insurer Policy.

69.   "Litigation Claims" are Tort Claims or Direct Action Claims asserted by Litigation Claimants.

70.   "Local Councils" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA; "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council; BSA scouting units (including troops, dens, packs, posts, clubs, crews, ships, tribes, labs, lodges, councils, districts, areas, regions, and territories) associated with any Local Council; and all entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing. For the avoidance of doubt, the Guam Council, the Chamorro Council, and the Aloha Council (including the Chamorro District) are Local Councils.

71.   "MAO" means Medicare Advantage Organizations under parts C & D of the MMSEA.

72.   "Medicare Claims" means any and all Claims by CMS against the Trust, any Settling Insurer, or any Protected Party, under MMSEA and under MSP, that relate to any payments in respect of any Tort Claims, including Claims for reimbursement of payments made to Tort Claimants who recover or receive any distribution from the Trust and Claims by CMS relating to reporting obligations.

73.   "Medicare Trust Fund" means a U.S. Treasury-held trust fund account from which Medicare is funded or from which Medicare disbursements are paid, including the Hospital Insurance Trust Fund and the Supplementary Medical Insurance (SMI) Trust Fund.

74.   "Mixed Claim" means any claim or series of claims held by a claimant that includes both (i) a Tort Claim or Unknown Tort Claim against the Debtor and/or any AoA Entity and (ii) any claim against BSA, any Local Council and/or any of their successors in interest alleging or involving Abuse, including any claim that has been or could have been asserted in connection with the chapter 11 cases of the BSA and Delaware BSA, LLC, as debtors and debtors-in-possession, in the BSA Bankruptcy.

- 11 -

75.     "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSPA.

76.     "MSPA" means 42 U.S.C. § 1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

77.     "Non-Abuse Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer, for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of any Claim against a Protected Party, which is not a Tort Claim.

78.     "Non-Appealable Order" or "Final Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and is final and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been timely sought, then no order, judgment, or other decree is a Non-Appealable Order until (a) such appeal, certiorari, review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard, or that granted certiorari, and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Non-Appealable Order."

79.     "Non-Settling Insurer Policy(ies)" means any known or unknown contracts, binders, certificates, or policies of insurance that any Non-Settling Insurer issued, subscribed in any interest in, or has underwritten any risk in, in effect on or before the Effective Date, and that were issued to, allegedly issued to, or for the benefit of, or that otherwise actually, allegedly, or potentially insure, the Archdiocese or any Catholic Entity, or any of their predecessors in interest, successors, or assigns, and that actually, allegedly or could potentially afford coverage with respect to any Tort Claim.

- 12 -

80.    "Non-Settling Insurer(s)" means any Insurer that is not a Settling Insurer by the Effective Date. The "Non-Settling Insurers" include, but are not limited to, those Persons listed on Exhibit B.

81.    "Other Insured Entity(ies)" means a Person that is not a AoA Entity, but was insured under a Settling Insurer Policy; provided however, that a Person is an "Other Insured Entity" only to the extent it is insured under a Settling Insurer Policy that was issued or allegedly issued to the Archdiocese.

82.    "Other Insurance Policy(ies)" means any insurance policy(ies) that was issued by a Settling Insurer to any Person who is not a Protected Party, but that covers or allegedly covers the Debtor or any AoA Entity for any Tort Claim, Direct Action Claim or Indirect Claim.

83.    "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (i) "person" in Section 101(41) of the Bankruptcy Code; or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

84.    "Petition Date" means January 16, 2019, the date on which the Archdiocese commenced the Chapter 11 case.

85.    "Plan" means this joint Chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

86.    "Plan Proponents" means the Debtor and the UCC.

87.    "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

88.    "Pro Rata" means, with respect to any distribution on account of any allowed Claim in any class, the ratio of the amount of such allowed Claim to the sum of (i) all allowed Claims in such class and (ii) the aggregate maximum of all Claims in such class that are not yet allowed Claims.

89.    "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

- 13 -

90.   "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331, or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 case.

91.   "Proof of Claim" means a proof of Claim filed in the Chapter 11 case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

92.   "Protected Parties" means any of

(a)   the AoA Entities;

(b)   each of the foregoing Persons' respective successors and assigns;

(c)   solely to the extent of and in their capacity as such, each of the foregoing Persons' respective Agents, shareholders, and clergy and other Persons bound by monastic vows, in their capacity as such, of the Persons identified in the foregoing subsections (a)-(b); provided, however, nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Archdiocese, or subject to its control.

An individual who perpetrated an act of abuse that forms the basis of a Tort Claim or an Unknown Tort Claim is not a Protected Party. No religious order, archdiocese, or diocese, other than the Archdiocese, is a Protected Party. The Boy Scouts of America, Aloha Council, and Chamorro District are not Protected Parties.

93.   "Redacted Information" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Tort Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

94.   "Released Claims" means Coverage Claims and Extra-Contractual Claims.

95.   "Reorganization Assets" means, collectively, all Assets of the Debtor and the Estate. For the avoidance of doubt, the Reorganization Assets do not include the Trust Assets.

96.   "Reorganized Debtor" means the Archdiocese, on and after the Effective Date. Unless otherwise expressly stated or the context otherwise requires, references to the "Archdiocese" and the "Reorganized Debtor" throughout various provisions of the Plan are an effort to anticipate whether an event may occur before or after the Effective Date. In this regard, and generally for purposes of the Plan, any written agreement signed after the Petition Date made by the Archdiocese as part of the Plan before the Effective Date

- 14 -

(unless otherwise provided) will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such agreement (including, but not limited to, the provisions of the Plan if confirmed).

97.  "SBA/PPP" means Small Business Administration Paycheck Protection Program.

98.  "Settling Insurer Policies" means, collectively, all insurance policies that are the subject of the Insurance Settlement Agreements with the Settling Insurers, provided, however, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of the Debtor insures or covers both the Debtor and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is a "Settling Insurer Policy" to the extent it insures or covers the Debtor or an AoA Entity, but not to the extent it insures or covers any other Person.

99.  "Settling Insurers" means, (i) the AIG Insurers Entities, and (ii) solely in connection with insurance under any Settling Insurer Policies, the Persons listed on Exhibit N whose Insurance Settlement Agreements are approved by the Approval Orders and such orders become Non-Appealable Orders Solely in connection with insurance under any Settling Insurer Policies, Settling Insurers also includes each of their past, present, and future parents, subsidiaries, affiliates, divisions, reinsurers, and retrocessionaires, including Persons released pursuant to the Insurance Settlement Agreements; each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies, including the Persons released pursuant to the respective Insurance Settlement Agreements; each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and Claims handling administrators; and each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them, except to the extent, if any, such Person's actual or alleged rights, duties, obligations, or liabilities arise out of or relate to their status as, or conduct, acts or omissions on behalf of, a Non-Settling Insurer. Any Non-Settling Insurer who enters into a final and binding Insurance Settlement Agreement with the Trust after the Effective Date is also a Settling Insurer, except to the extent, if any, such Person's actual or alleged rights, duties, obligations, or liabilities arise out of or relate to their status as, or conduct, acts, or omissions on behalf of, a Non-Settling Insurer.

100.  "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan and

- 15 -

filed with the Bankruptcy Court at least fourteen (14) calendar days prior to the confirmation hearing.

101.   "Supplemental Settling Insurer Injunction" means the injunction imposed pursuant to Section 7.10 of the Plan.

102.   "Tort Claims" means all Claims relating to, in whole or in part, directly or indirectly, Abuse committed by any Person before the Effective Date for which a Protected Party is allegedly responsible, including any such Claim asserted against any Protected Party in connection with this Chapter 11 case and includes the Quintanilla, Concepcion, Sondia and Denton claims from CV0552-16 Superior Court of Guam, filed as Claim Nos. 269, 270, 271 and 272. The term "Tort Claims" does not include Contribution Claims, Medicare Claims, Unknown Tort Claims, or Claims against Persons who are not Protected Parties.

103.   "Tort Claimant" means the holder of a Tort Claim.

104.   "Tort Claims Reviewer" means the Person, including the designee of such Person, who will assess Class 3 and Class 4 Claims under the Trust Distribution Plan.

105.   "Transferred Insurance Interests" means the following rights and interests of the Protected Parties, if any, in Non-Settling Insurer Policies in respect of actual or potential coverage for any Class 3 Claim or Class 4 Claim: (1) the proceeds of such Non-Settling Insurer Policies and all claims for such proceeds; and (2) all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim or Class 4 Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages, and attorneys' fees and costs. The "Transferred Insurance Interests" are limited to the extent of any right or interest of the Protected Parties and, nothing in the Plan, Confirmation Order, or any other Plan Documents constitutes a determination of the Protected Parties' rights, if any, to coverage, proceeds from, or interests in, any Non-Settling Insurer Policies.

106.   "Trust" means the trust created for the benefit of certain Tort Claimants in accordance with the Plan and Confirmation Order and the Trust Agreement.

107.   "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as it may be amended, together with such additional documents as may be executed in connection with the Trust Agreement.

- 16 -

108. "Trust Assets" means the cash, Transferred Insurance Interests, and other assets and rights to be transferred to the Trust under Article V of the Plan.

109. "Trust Claim Information" means (A) all information submitted by the claimant to the Trust, (B) the status of the holder's claim, (C) the amount and date of payment of any claim and, (D) in the case of a Mixed Claim, the relative responsibility between BSA and the Local Councils on the one hand and the Debtor and the AoA Entities on the other hand

110. "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement.

111. "Trustee" means the Person appointed as Trustee of the Trust in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

112. "UCC" or "Committee" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 case, as such committee may be constituted from time to time.

113. "Unimpaired" means, with respect to a class of Claims, that such class is not impaired.

114. "Unknown Claims Representative" means Judge Michael R. Hogan in accordance with the Bankruptcy Court's order dated May 28, 2021, and any successor or such other person appointed by the Bankruptcy Court or otherwise.

115. "Unknown Tort Claim" means a Tort Claim relating to Abuse that occurred on or before the Effective Date for which no proof of Claim is filed or deemed filed on or before the Claims Bar Date and one of the following condition applies (a) the Claimant is under eighteen years of age on the Claims Bar Date; or (b) the Claimant neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse on account of one of the following: (i) Claimant's insanity or other mental illness; or (ii) the Claimant was a member of the United States Armed Services deployed in active duty on the Claims Bar Date. For the avoidance of doubt, an Unknown Tort Claim does not include any claim filed after the Claims Bar Date which does not satisfy either (a) or (b) of the proceeding sentence.

116. "Unknown Tort Claimant" means the holder of an Unknown Tort Claim, the estate of a deceased individual who held an Unknown Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Unknown Tort Claim, as the case may be.

- 17 -

117.    "Unknown Tort Claim Reserve Fund" means the reserve established by the Reorganized Debtor for the benefit of Unknown Tort Claimants in the maximum aggregate amount of $1,500,000.00.

118.    "Unsecured Claims" means Claims which are not secured by any property of the Debtor's Estate and which are not part of any other class defined in this Plan.

119.    "U.S. Trustee" means the Office of the United States Trustee for Region 15, which includes the District of Guam.

**1.2    INTERPRETATION**. For purposes of the Plan:

(a)    any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(b)    the terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

(c)    whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

(d)    the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

(e)    unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules;

(f)    any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(g)    any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

(h)    unless otherwise specified, all references in the Plan to "Articles," "Sections," "Schedules" and "Exhibits" are references to Articles, Sections, Schedules and Exhibits of or to the Plan;

(i)    the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(j)    captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Plan or otherwise affect the interpretation of the Plan; and

(k)    the Plan supersedes all prior drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

1.3    **TIME PERIODS**. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

1.4    **EXHIBITS AND SCHEDULES**.

(a)    All Exhibits and Schedules to the Plan (including any Supplemental Plan Documents) (with the Plan, the "Plan Documents") are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

(b)    The Exhibits to the Plan include the following:

| | |
|---|---|
| Exhibit A: | Unknown Claims Representative's Report and Recommendations |
| Exhibit B: | Non-Settling Insurers |
| Exhibit C: | [Reserved] |
| Exhibit D: | Trust Agreement and Trust Distribution Plan |
| Exhibit E: | Tort Claim Release |
| Exhibit F: | Unknown Tort Claim Release |
| Exhibit G: | Real Property Transferred to Trust |
| Exhibit H: | [Reserved] |
| Exhibit I: | Known Archdiocese Entity Insurance Policies |
| Exhibit J: | Officers and Directors of Reorganized Debtor |
| Exhibit K: | Child Protection Protocols |
| Exhibit L: | BSA Insurance Policies |
| Exhibit M: | List of Catholic Entities |
| Exhibit N: | Settling Insurers |
| Exhibit O: | Partitioned Real Property |
| Exhibit P: | Maps of Retained Real Property |
| Exhibit Q: | Bank of Guam Replacement Properties |
| Exhibit R: | Form of Scholarship Voucher |
| Exhibit S: | Form of Cemetery Voucher |
| Exhibit T: | [RESERVED] |

## <u>ARTICLE II - TREATMENT OF UNCLASSIFIED CLAIMS</u>

2.1    **ADMINISTRATIVE CLAIMS**. As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims including Professional Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather,

- 19 -

all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article.

(a)   **Treatment**. Each holder of an allowed Administrative Claim, excluding SBA/PPP claims and Professional Claims, against the Archdiocese shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such Claim. Each holder of an Allowed Professional Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Professional Claim, unless the holder agrees in writing to other treatment of such Claim and subject to the provisions of Section 5.1 of this Plan.

For avoidance of doubt, the SBA/PPP claim of the Chancery will be repaid by its terms. The Parish and School PPP loans roughly total $1,995,088.29. The SBA has forgiven loans in the amount of $905,708.37, leaving loans unforgiven in the amount of $1,084,379.42 relating to eight Parishes and Schools, and two banks; Bank of Guam for seven loans, in the amount of $1,081,791.92, and Coast360 for one loan in the amount of $7,588.00. It is Debtor's intent to term out the unforgiven loans at 1% fixed interest over a five-year term beginning from the Effective Date. The Chancery PPP loans will continue to be paid as scheduled. Debtor will make no claims for forgiveness of any loans not forgiven. The SBA retains the right to audit and process forgiven loans pursuant to federal rules and regulations.

(b)   **Administrative Filing Deadline.**

1.   Except as otherwise set forth in this Plan, requests for allowance and payment of Administrative Claims, excluding Professional Claims, must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court (the "Administrative Claims Filing Deadline"). Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such Claims against the Archdiocese, the Reorganized Debtor, any Settling Insurer (to the extent applicable), the Trust, or any of their property. Administrative Claims representing obligations incurred by the Archdiocese after the Effective Date (including, without limitation, Claims for professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. In addition, holders of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

- 20 -

2. All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) calendar days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph shall control over any contrary deadline set forth in any requests for payment of Administrative Claims.

(c) **Professional Claim Filing Deadline**. All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) calendar days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

**2.2 STATUTORY FEES**. All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid by the Reorganized Debtor as soon as practicable after the Effective Date. After the Effective Date, the Trust shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed, but in no event shall the payments made to the Trust made pursuant to Article IV, V, or VI by any Person other than the Debtor be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930. The Reorganized Debtor shall file post-Effective Date quarterly reports (if any) in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate. The Reorganized Debtor shall remain responsible for any pre-Effective Date reporting and pre-Effective Date unpaid fees.

Any cause of action, right to reimbursement for overpayment, or similar interest of the Debtor in amounts paid pursuant to 28 U.S.C. § 1930 shall be transferred to the Trust and the Trust shall be deemed the successor in interest to the Debtor with regard to such causes of action, rights, and interests. The Trust and the Reorganized Debtor shall each be entitled to 50% of the overpayment recovered pursuant to this section

This Section 2.2 of the Plan is severable and should any portion of this Section 2.2 be stricken, modified, or altered by the Court or the Plan Proponents, the potential for such change has been disclosed to all parties in interest and shall not be deemed to adversely affect any party in interest for the purposes of 11 U.S.C. § 1127 and/or Fed. R. Bankr. P. 3019.

**2.3 PRIORITY TAX CLAIMS**. With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such Claim in cash as soon as practicable after the Effective Date from its ongoing operations, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Archdiocese or

- 21 -

Reorganized Debtor, as applicable, in writing, provided such treatment is no less favorable to the Archdiocese than the treatment set forth in clause (i) of this sentence.

## ARTICLE III
## CLASSIFICATION OF CLAIMS

**3.1** **SUMMARY**. The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of the Plan, and distribution pursuant to the Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | Tort Claims Other Than Unknown Tort Claims | Impaired | Yes |
| 4 | Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | Secured Claims of Bank of Guam | Impaired | Yes |
| 7 | Secured Claims of First Hawaiian Bank | Impaired | Yes |
| 8 | Secured Claims of the Bank of Hawaii | Unimpaired | No |
| 9 | Small Business Administration | Unimpaired | No |
| 10 | Abuse Related Contingent Claims | Impaired | Deemed to Reject |
| 11 | Abuse Related Contingent Claims - Unknown | Impaired | Deemed to Reject |
| 12 | Other Abuse Related Claims | Unimpaired | No |

**3.2** **CLASSIFICATION AND VOTING**.

The Claims against the Debtor shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Article II). Consistent with Section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular class only to the extent the Claim is within the description of the class, and a Claim is classified in a different class to the extent it is within the description of that different class.

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS

**4.1** **PRIORITY CLAIMS (CLASS 1)**.

**(a)** **Definition**. A Class 1 Claim means an allowed Claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

- 22 -

(b)    **Treatment.** Unless the holder of an allowed Class 1 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

**4.2    GOVERNMENTAL UNIT CLAIMS (CLASS 2)**.

(a)    **Definition.** A "Class 2 Claim" means an allowed Claim of Governmental Units not otherwise included in Article II or Section 4.1 above**.**

(b)    **Treatment.** Unless the holder of an allowed Class 2 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

**4.3    TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS (CLASS 3)**.

(a)    **Definition**. A Class 3 Claim means a Tort Claim other than an Unknown Tort Claim ("Class 3 Claim"). A "Class 3 Claimant" shall mean a holder of a Class 3 Claim.

(b)    **Treatment.** Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 3 Claimants shall be assigned to, assumed, and treated by the Trust as further provided in Article VI, the Trust Agreement, and the Trust Distribution Plan. Class 3 Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan. Class 3 Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 3 Claim pursuant to the factors in the Trust Distribution Plan.

> **Summary**. The Plan creates a Trust to fund payments to Class 3 Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. The Trust shall be funded as provided in Articles IV, V, and VI, including by contributions from the Archdiocese, the Settling Insurers, and others and the assignment of the Transferred Insurance Interests. The Trust shall make distributions to the Class 3 Claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which shall represent the sole recovery available to Class 3 Claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 3 Claimants against the Non-Settling Insurers.
>
> No Class 3 Claimant shall receive any payment on any award unless and until such Class 3 Claimant has executed the Release attached as Exhibit E to this Plan. Each Class 3 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the

- 23 -

Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 3 Claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, the Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). Nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such person to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order. The Class 3 Claims will not be released or enjoined under this Plan as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, any other Protected Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Any release of Class 3 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Claims for Abuse. Nothing in the foregoing affirmatively creates a new right or modifies the existing rights, if any, held by any Claimant under otherwise existing under applicable law. Further, nothing in the foregoing authorizes any party to act in a manner inconsistent with applicable law or affirmatively authorizes such person to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall not be liable for any Protected Party's share of causal liability or fault. In no event may a Class 3 Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall be provided by the Trustee with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and shall not be liable for any Protected Parties' share of liability or fault. The Trust shall be obligated to provide copies of the Class 3 Claimants' releases and certifications to any of the Protected Parties or Settling

- 24 -

SA 1953

Insurers upon request provided that such Protected Parties or Settling Insurers have signed a confidentiality agreement encompassing such information.

The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Non-Settling Insurer. For the avoidance of doubt in no event shall a Settling Insurer be required to defend against such Claims or reimburse the defense costs against such Claims. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 Claimants, but only to the extent that such judgments or settlements are not funded by any Non-Settling Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. Nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 3 Claims, except to the extent such Non-Settling Insurer is not liable as provided in operative provisions, if any, of the BSA Plan, the BSA Confirmation Opinion or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of distributions Class 3 Claimants receive, or are entitled to receive, based on the Trust Distribution Plan. For the avoidance of doubt, determinations by the Tort Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of any Protected Party's liability or damages for Class 3 Claims. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 3 Claims, but nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Confirmation Opinion or the BSA Plan, BSA Confirmation Order. Any such recoveries by the Trust from Non-Settling Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan. To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the assignment and transfer of the Transferred Insurance Interests to the Trust, results in a forfeiture of coverage, this Plan preserves the Non-Settling Insurers' rights to the extent required under their respective Non-Settling Insurer Policies and applicable law.

CORE/3515288.0002/171049844.43

**(c)**     **Stipulated Judgments**. Certain Class 3 Claimants may enter into agreements with the Archdiocese, the Reorganized Debtor, or any other Protected Party for settlement of a Tort Claim consistent with and to the extent authorized by law. If a Class 3 Claimant enters into such an agreement with the Archdiocese, the Reorganized Debtor, or any other Protected Party, the Trust will pursue any judgment against the Non-Settling Insurer on behalf of the Class 3 Claimant, but nothing in this Plan affirmatively authorizes a Claimant to violate applicable law or affirmatively authorizes the Trustee to violate or prohibits the Trustee from violating any applicable provision of the BSA Plan, the BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder. Any recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to the Trust Distribution Plan.

**4.4     UNKNOWN TORT CLAIMS (CLASS 4)**.

**(a)**     **Definition**. A Class 4 Claim means an Unknown Tort Claim ("Class 4 Claim"). A "Class 4 Claimant" shall mean a holder of a Class 4 Claim.

**(b)**     **Treatment.** The Trust will assume liability for Unknown Tort Claims, including any liability of any Settling Insurer, and establish the Unknown Tort Claim Reserve Fund in the amount estimated at $1,500,000.00. Notwithstanding the foregoing, the Reorganized Debtor shall be responsible for funding the Unknown Tort Claim Reserve Fund as follows: Funding shall be made over a five-year period, with a $200,000.00 deposit made upon the Effective Date, with the requirement that the fund drop to no less than $200,000.00 for five years with a maximum paid in of $1,500,000.00, or the amount determined by the Unknown Claims Representative. The Unknown Claimants shall initially be paid lesser of 50% of the amounts determined by the Tort Claimant Reviewer, or $50,000.00. The Trust will make distributions to the Class 4 Claimants, as provided in Trust Distribution Plan, up to the amount of the Unknown Tort Claim Reserve Fund, which fund will represent the sole recovery available to Class 4 Claimants in respect to any obligation owed by the Settling Insurers. Distribution made pursuant to the Trust Distribution Plan, however, does not preclude claims or recoveries by Class 4 Claimants against the Non-Settling Insurers. Class 4 Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 4 Claim pursuant to the factors in the Trust Distribution Plan.

No Class 4 Claimant shall receive any payment on any award unless and until such Class 4 Claimant has executed the Release attached as Exhibit F to this Plan. Each Class 4 Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 4 Claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese, Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning

- 26 -

insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Article 6.14(i) and (j). The Class 4 Claims will not be released or enjoined as against the Archdiocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Archdiocese, the Reorganized Debtor, or any other Protected Party (as applicable), and such Non-Settling Insurer or are fully adjudicated, resolved and subject to Final Order, but recourse is limited as described above.

The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 4 Claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Non-Settling Insurer. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 4 Claimants, but only to the extent that such judgments or settlements are not funded by any Non-Settling Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. Nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order.

The Non-Settling Insurers remain fully liable, except to the extent such Non-Settling Insurer is not liable as provided in applicable and operative provisions, if any, of the BSA Plan, the BSA Confirmation Opinion or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder for their obligations related in any way to the Class 4 Claims. Any release of Class 4 Claims, in whole or in part, will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Class 4 Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Claims for Abuse, but nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order. Nothing in this Article requires any Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or a Settling Insurer and such Claims are reserved. But in no event may a Class 4 Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party.

**4.5     GENERAL UNSECURED CLAIMS (CLASS 5).**

    **(a)     Definition**. A Class 5 Claim means (1) any Claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's

- 27 -

schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such Claim timely filed a Claim.

**(b)** **Treatment**. Each holder of a Class 5 Claim shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 5 Claim, without interest, on the Effective Date.

### 4.6 BANK OF GUAM (CLASS 6).

**(a)** **Class 6 Definition**. A Class 6 Claim means the Claim of Bank of Guam, which is comprised of the Class 6A, 6B Claims, and 6C Claims.

**(b)** **Class 6A Definition**. A Class 6A Claim means the secured portion of the claim of the Bank of Guam in the approximate amount of $5,238,040.27 minus payments made since the Petition Date, secured against the Debtor's deposit accounts with the Bank of Guam.

**(c)** **Class 6A Treatment**. The Reorganized Debtor shall assume the 6A Claim and all pre-petition date loan documents shall remain in full force and effect, except as modified as follows:

    i.    The deposit accounts securing the Class 6A Claim shall vest in the Reorganized Debtor, but shall no longer secure the Class 6A Claim and the Bank of Guam shall waive any right of set off on those deposit accounts.

    ii.    The Bank of Guam shall receive replacement mortgages on the real property listed on **Exhibit Q** in an amount equal to the Class 6A Claim and the Class 6B Claim.

    iii.    After the Effective Date, the Class 6A Claim will be amortized using a thirty (30) year amortization schedule at 3% fixed interest with a 20-year maturity. The Reorganized Debtor shall make regular monthly payments pursuant to the amortization schedule, with the remaining balance of the Class 6A Claim due and owing on the 20th anniversary of the Effective Date.

    iv.    The Catholic Social Services loans, which are currently guaranteed by Debtor, shall continue to be paid, pursuant to the terms and conditions of the loan documents. The Catholic Social Services loans are fully secured via first mortgages on their respective, non-Debtor owned real properties. Bank of Guam will terminate the Debtor's guarantees on the Effective Date.

    v.    The Bank of Guam has agreed to forbear on collecting any payments from the Archdiocese of Agaña, the Parishes and Schools for a period of six months after the Effective Date of the Plan. For avoidance of a doubt, the loans to Catholic Social Services, Inc., shall be paid as scheduled without forbearance. Upon application, and after showing reasonable cause and necessity, by the Archdiocese, Parishes and Schools on or before the end of the six-month period, the Bank of Guam, at its own discretion, may grant an additional six-month forbearance.

CORE/3515288.0002/171049844.43

vi.       The cash collateral lien held by the Bank of Guam via its right of setoff on Bank of Guam accounts in the amount of $4,700,000, or as determined by the Bank of Guam and the Debtor, net of payments made since the case was filed, shall be released in exchange for liens in favor of the Bank of Guam via mortgages on the real property set forth in Exhibit Q. The Archdiocese, Parishes and Schools also agree to grant a security interest in Bank of Guam bank account balances that accrue from and after the closing date. The 3% interest rate may be adjusted every five (5) years to the Bank's reference rate. All terms and conditions of the loan documents remain in full force and effect, except as modified by this Second Amended Plan.

**(d)       Class 6B Definition.** A Class 6B Claim means the unsecured portion of the claim of the Bank of Guam in the approximate amount of $7,087,092.88.

**(e)       Class 6B Treatment.** The Reorganized Debtor shall assume the Class 6B Claim and all pre-petition date loan documents shall remain in full force and effect, except as modified as follows:

i.       The deposit accounts, if any, securing the Class 6B Claim shall vest in the Reorganized Debtor, but shall no longer secure the Class 6B Claim and the Bank of Guam shall waive any right of set off on those deposit accounts.

ii.       The Bank of Guam shall receive replacement mortgages on the real property listed on **Exhibit Q** in an amount equal to the Class 6A Claim and the Class 6B Claim.

iii.       After the Effective Date, the Class 6A Claim will be amortized using a thirty (30) year amortization schedule at 3% fixed interest with a 20-year maturity. The Reorganized Debtor shall make regular monthly payments pursuant to the amortization schedule, with the remaining balance of the Class 6A Claim due and owing on the 20th anniversary of the Effective Date.

iv.       The Catholic Social Services loans, which are currently guaranteed by Debtor, shall continue to be paid, pursuant to the terms and conditions of the loan documents. The Catholic Social Services loans are fully secured via first mortgages on their respective real properties. Bank of Guam will terminate the Debtor's guarantees on the Effective Date.

v.       The Bank of Guam has agreed to forbear on collecting any payments from the Archdiocese of Agaña, the Parishes and Schools for a period of six months after the Effective Date of the Plan. For avoidance of a doubt, the loans to Catholic Social Services, Inc., shall be paid as scheduled without forbearance. Upon application, and after showing reasonable cause and necessity, by the Archdiocese, Parishes and Schools on or before the end of the six-month period, the Bank of Guam, at its own discretion, may grant an additional six-month forbearance.

vi.       The cash collateral lien held by the Bank of Guam via its right of setoff on Bank of Guam accounts in the amount of $4,700,000, or as determined by

- 29 -

the Bank of Guam and the Debtor, net of payments made since the case was filed, shall be released in exchange for liens in favor of the Bank of Guam via mortgages on the real property set forth in Exhibit Q. The Archdiocese, Parishes and Schools also agree to grant a security interest in Bank of Guam bank account balances that accrue from and after the closing date. The 3% interest rate may be adjusted every five (5) years to the Bank's reference rate. All terms and conditions of the loan documents remain in full force and effect, except as modified by this Second Amended Plan.

(f)     **Class 6C Definition.** A Class 6C Claim means the guaranty obligations of the Debtor related to the Catholic Social Service loans with the Bank of Guam.

(g)     **Class 6C Treatment.** Bank of Guam will terminate Debtor's guarantees as of the Effective Date.

**4.7     FIRST HAWAIIAN BANK (CLASS 7).**

(a)     **Class 7 Definition**. A Class 7 Claim means the secured claims of the First Hawaiian Bank, which are comprised of the Class 7A, Class 7B, and Class 7C.

(b)     **Class 7A Definition**. A Class 7A Claim means the Secured Claims of the First Hawaiian Bank in the approximate amount of $4,385,946.41, minus payments made since the Petition Date, secured under that certain negative pledge agreement recorded on ten parcels of real property and under that certain security agreement.

(c)     **Class 7A Treatment.** The Class 7A Claim shall retain any payments received during the Chapter 11 case. On the Effective Date Debtor shall commence efforts to sell the FHP/TakeCare Real Property. Once the FHP/TakeCare Real Property has been sold, First Hawaiian Bank will receive payment of $2,000,000.00 if full and final satisfaction of its Class 7A Claim, and the balance of the sales proceeds after payment of $200,000.00 to fund the Unknown Claims, of the FHP/TakeCare real property shall be paid to the Trust.

(d)     **Class 7B Definition.** A Class 7B Claim means the Secured Claim of First Hawaiian Bank in the approximate amount of $1,843.40, less payments made since the case was filed, is secured by a 2014 Hyundai Elantra Limited.

(e)     **Class 7B Treatment.** The Class 7B claim has been paid in full from the Debtor's cash on hand on the Effective Date. Class 7B claim shall retain any payments received during the Chapter 11 case, but shall receive no additional payments as part of the Plan.

(f)     **Class 7C Definition.** A Class 7C Claim means any purported guaranty liability of the Debtor related to the obligations of the Catholic Cemeteries of Guam, Inc. to First Hawaiian Bank.

(g)     **Class 7C Treatment.** The Reorganized Debtor shall not assume any liability or obligations related to the Class 7C Claim.

- 30 -

### 4.8    BANK OF HAWAII (CLASS 8).

(a)    **Class 8 Definition**. A Class 8 Claim means the secured claim of the Bank of Hawaii in the approximate amount of $222,260.98, minus any payments made since the Petition Date, which Claim is secured against the Debtor's deposit accounts with the Bank of Hawaii.

(b)    **Class 8 Treatment.** The Class 8 Claim has been paid in full during the pendency of the Chapter 11 case. The Class 8 Claim shall retain any payments received during the Chapter 11 case but shall receive no additional payments as part of the Plan.

### 4.9    SMALL BUSINESS ADMINISTRATION (CLASS 9).

(b)    **Class 9 Definition**. A Class 9 Claim means the Secured Claims of the Small Business Administration for disaster relief loans in the amount of $1,041,740.98 secured by mortgages on the following real property:

| Debtor Prefix | Description of Property | Legal |
|---|---|---|
| CHP2 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3-1, Chalan Pago |
| CHP1 | Nuestra Senora de la Paz Y Buen Viaje Catholic Church | Lot 3245-3NEW-R3, Chalan Pago |
| SIN12 | Saint Jude Thaddeus Catholic Church | Lot 1, Block 17, Tract 232, Sinajana |
| MAN1 & MAN8 | Santa Teresita Catholic Church | Lot 2285-2-3, Mangilao |
| BAR22 | San Vicente School | Lot 2364-1-7-NEW, Barrigada |
| BAR30 | San Vicente School | Lot 2365-1-1, Barrigada |
| BAR28 | San Vicente School | Lot 5437 (Old Bullcart Trail between Lot 2364-1-7 and 2365-1-1), Barrigada |
| BAR25 | San Vicente School | Lot 2265-Rem-8-1, Barrigada |
| BAR24 | San Vicente School | Lot 2265-Rem-8-2, Barrigada |

- 31 -

(c)     **Class 9 Treatment.** The Reorganized Debtor shall assume the Class 9 Claim and all pre-petition date loan documents shall remain in full force and effect and the mortgages securing the Class 9 Claim shall remain and encumber the interest of the Reorganized Debtor to the same extent, validity, and priority as prior to the Petition Date.

**4.10     ABUSE RELATED CONTINGENT CLAIMS (CLASS 10).**

(a)     **Class 10 Definition**. Class 10 consists of "**Abuse Related Contingent Claims**". These are Claims by an Entity against the Debtor for contribution, indemnity, or reimbursement arising out of as a result of such Entity's liability for paying or defending against any Tort Claim, including a joint tortfeasor or the like, and includes contingent claims for contribution and indemnification against the Archdiocese by the Boy Scouts of America, School Sisters of Notre Dame, Region of Guam and School Sisters of Notre Dame Central Pacific Province, Inc., and the Parishes and Schools under the Archbishop of Agaña, unless any such Claim(s) become(s) a Class 12 Claim(s).

(b)     **Class 10 Treatment.** In accordance with Section 502(e)(1) of the Bankruptcy Code, each Abuse Related Contingent Claim held by any Entity against the Debtor shall be disallowed and will receive no Distribution; notwithstanding any other provision of the Second Amended Plan, any Class 10 Claimant that is or could have been alleged to be a joint tortfeasor with any of the Protected Parties in any action brought by a Tort Claimant shall not be liable for any Protected Party's share of causal liability, fault, or damages, by reallocation or otherwise.

**4.11     ABUSE RELATED CONTINGENT CLAIMS- UNKNOWN (CLASS 11).**

(a)     **Class 11 Definition**. Class 11 consists of "**Abuse Related Contingent Claims-Unknown**." These are Claims are for any Claim for contribution, indemnity, or reimbursement arising out of or relating to the Archdiocese's liability to pay or defend any Class 4 Claim, which are Unknown Tort Claims.

(b)     **Class 11 Treatment.** In accordance with Section 502 (e)(1) of the Bankruptcy Code, each Abuse Related Contingent Claim held by any Entity against the Debtor that relates to an Unknown Tort Claim shall be disallowed and will receive no Distribution; notwithstanding any other provision of the Second Amended Plan, any Class 11 Claimant that is or could have been alleged to be a joint tortfeasor with any of the Protected Parties in any action brought by a Tort Claimant shall not be liable for any Protected Party's share of causal liability, fault, or damages, by reallocation or otherwise.

**4.12     OTHER ABUSE RELATED CLAIMS-(CLASS 12).**

(a)     **Class 12 Definition.** Class 12 consists of allowed, non-contingent Claims for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by any Person or Entity against a Protected Party, which claim relates to or arises from Abuse. For the avoidance of doubt any such claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery that was disallowed as of the Effective Date is not a Class 12 Claim unless and until such Claim is

- 32 -

allowed, after notice and a hearing, pursuant and subject to applicable provisions of the Bankruptcy Code and/or Bankruptcy Rules, including but not limited to Bankruptcy Code Section 502(j).

(b)     **Class 12 Treatment.** The Trust shall pay any allowed Class 12 Claim in full and shall make a dollar-for-dollar reduction to the award(s) of the Class 3 or Class 4 Claimant(s) for which the Class 12 Claim relates.

### ARTICLE V
### MEANS OF IMPLEMENTATION OF THE PLAN

**5.1     TRUST FORMATION AND FUNDING**

(a)     **Purpose, Formation, and Assets**. The Trust shall be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan. The proposed Trust Agreement and Trust Distribution Plan are attached hereto as Exhibit D.

(b)     **Funding.**

1.     **Summary**. This Plan will be funded from the sources and in the manner set forth in this Section.

2.     **Contributions**. Cash and other assets will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein:

(i)     **Debtor Real Estate**. The Debtor will transfer the parcels of real property with an estimated value of $18,358,034 listed on **Exhibit G** to the Trust, free and clear of all claims, liens, and encumbrances pursuant to 11 U.S.C. § 1123(a)(5)(d);

(ii)     **Debtor Cash Contribution.** The Debtor will transfer $6,609,998.29 to the Trust.

(iii)     **Settling Insurer Contributions**. The Settling Insurers will transfer to the Trust the respective Settlement Amounts set forth in Section 7.11(a) as follows:

1.     $18,000,000.00, subject to the terms and conditions of the AIG Insurers Settlement Agreement as approved by a Final Order.

(iv)     **Unknown Claims.** The Reorganized Debtor will establish the Unknown Tort Claim Reserve Fund in the minimum initial amount of $200,000.00.

- 33 -

(v) **Tuition Vouchers.** The Reorganized Debtor will provide the Trust with 150 vouchers for a K-12 Catholic education, which voucher shall cover 100% of the cost of tuition each year for a total of not more than thirteen years at any Catholic school in Guam. The form of "Scholarship Vouchers", including the terms and conditions of use, are set forth in Exhibit R.

(vi) **Cemetery Vouchers.** The Reorganized Debtor will provide the Trust with 50 vouchers, which voucher shall cover 100% of a cemetery plot easement at a Catholic cemetery in Guam. The form of "Cemetery Voucher", including the terms and conditions of use, are set forth at Exhibit S.

(vii) **Proceeds of Real Property Sales**. Prior to the Effective Date, the Debtor will market and sell FHP/TakeCare Real Property and Chancery Real Property. The proceeds of the sale will be used as follows (i) to fund the treatment of the Class 7 Claim, (ii) up to $250,000.00 to fund Administrative Claims, (iii) up to $500,000.00 to renovate and outfit the Cathedral for use as the Reorganized Debtor's headquarters and Chancery office and moving expenses (iv) $200,000.00 for the Unknown Claimants funding, and (v) after the payment of the amounts in (i)-(iv) the remaining proceeds will be distributed to the Trust. The sale of the Chancery Real Property shall include six months delayed possession to accommodate the move. The UCC shall have the right to approve the Debtor's real estate agent and the terms and conditions of the sale of the two properties.

3.      **Additional Trust Insurance Assets**: In addition to the funds and real property transferred to the Trust, the Transferred Insurance Interests of the Archdiocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. In addition, the Interests of the other Protected Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. The foregoing assignment and transfer shall not be construed as an assignment and transfer of the Non-Settling Insurer Policies.

4.      **Additional Trust Property Assets**: In addition to the properties transferred to the Trust as listed on Exhibit G, any interest, cause of action, claim, title, or other right of the Archdiocese related to any real property not listed on the Debtor's schedules as of the Confirmation Date will be assigned and transferred to the Trust on the Effective Date. The Debtor does not warrant or represent that any such interest exists. The Trustee shall have full standing, authority, and right to initiate any action necessary to obtain title or any other interest in real property that is owned, held, or possessed by the Debtor on the Confirmation Date, whether or not such right or

CORE/3515288.0002/171049844.43

interest is vested or unvested, contingent, liquidated, or otherwise, if such right, title, and/or interest was not listed on the Debtor's schedules as of the Confirmation Date. The transfer under this subsection of an interest, cause of action, claim, title, or other right shall not be a definitive determination of the existence, validity, or extent of any interest, cause of action, claim, title, or other right of the Archdiocese.

5.     **Vesting.** On the Effective Date, all Trust Assets shall vest in the Trust, and the Archdiocese and other Protected Parties shall be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Protected Party, and Settling Insurers, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Archdiocese, the other Protected Parties and the Settling Insurers shall have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan.

**5.2     PAYMENT OF PROFESSIONAL FEES**. The Reorganized Debtor shall pay all unpaid Allowed Professional Claims accruing through the Effective Date, (i) within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims, or (ii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Professional Claim and the Debtor.

**5.3     PAYMENTS EFFECTIVE UPON TENDER**. Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment is due. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

## ARTICLE VI
## TRUST

**6.1     ESTABLISHMENT OF TRUST**. On or before the Confirmation Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 467B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.467B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.467B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

- 35 -

**6.2    PURPOSE, FORMATION, AND ASSETS.** The Trust shall be established for the purposes described in this paragraph. The Trust shall receive the transfer and assignment of assets as provided in Articles IV and V, including the Debtor Cash Contribution, the Debtor Real Estate, and the Transferred Insurance Interests, of which the Trust is, and shall be deemed to be, the sole assignee. The Trust shall make distributions to the Class 3 claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests, but nothing in this Plan affirmatively authorizes the Trustee to violate applicable law or affirmatively authorizes or prohibits the Trustee from violating any relevant and operative provision of the BSA Plan, the BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder. The Trust shall fund the defense of the Archdiocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 claimants, but only to the extent that the Archdiocese, the Reorganized Debtor, or any other Protected Party are not defended or otherwise reimbursed for their defense expenses by any Non-Settling Insurer. The Trust shall indemnify the Archdiocese, the Reorganized Debtor, and any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 claimants, but only to the extent that such judgments or settlements are not funded by any Non-Settling Insurer. The Trust shall fund the costs and expenses in executing these functions, all such functions to be executed in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan, with the aim of preserving, managing, and maximizing Trust Assets to pay Class 3 claimants and with no objective to continue or engage in the conduct of a trade or business. The proposed Trust Agreement and Trust Distribution Plan are attached to this Plan as **Exhibit D**.

**6.3    ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST**.

   **(a)    General Corpus**. The following distributions and payments will be made from the general corpus of the trust:

      1.    **Distributions.** Distributions on Class 3 Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

      2.    **Tort Claims Reviewer**. The Trustee shall retain the Tort Claims Reviewer. Fees payable to the Tort Claims Reviewer for review of Class 3 Claims and Class 4 Claims shall be paid from the Trust.

      3.    **Trust Administrative Fees**. All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement shall be paid by the Trust, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

- 36 -

4. **Indemnity**. The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan shall be made from the corpus of the Trust.

**6.4    TAX MATTERS**. The Trust shall not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Guam law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**6.5    APPOINTMENT OF THE TRUSTEE**. The initial Trustee has been identified in <u>Exhibit D</u> to this Plan. The Trustee shall commence serving as the Trustee on the Confirmation Date; provided, however, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Archdiocese and the UCC, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

**6.6    RIGHTS AND RESPONSIBILITIES OF TRUSTEE**.

**(a)**    With respect to the property, rights, interests, and powers conferred on the Trustee under this Plan, the Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including (only to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits) all of the powers like those of a trustee under Sections 108, 704, and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges), but the Trustee is not a trustee under any chapter of the Bankruptcy Code. If there is any inconsistency or ambiguity between the Plan and Confirmation Order, on the one hand, and the Trust Agreement, on the other hand, with respect to the Trustee's authority to act, the provisions of the Plan and Confirmation Order shall control. Among other things, the Trustee: (1) shall liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

**(b)**    Notwithstanding the foregoing, the Archdiocese, the Reorganized Debtor, and the Trust acting for itself and on behalf the Estate, shall be deemed to have waived, effective upon the Effective Date:

- 37 -

1.      Any and all Claims under Sections 547, 548, 549, and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Archdiocese in the ordinary course of business prior to the Effective Date; and

2.      Any and all Claims and Causes of Action: (i) seeking the substantive consolidation of the Archdiocese and any other Person or an order deeming any such Person and the Archdiocese to be an "alter-ego" of the other or any other similar Claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under Section 544 of the Bankruptcy Code.

**(c)**      The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Trustee in its/his/her official capacity, with respect to its/his/her status, duties, powers, acts, or omissions as Trustee.

**6.7      TRANSFERRED INSURANCE INTERESTS**.

**(a)      Enforcement of Transferred Insurance Interests Against Non-Settling Insurers.**

1.      As set forth in Article V, the Transferred Insurance Interests are assigned and transferred to the Trust. The Trust shall be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 3 Claim and will be entitled to assert and/or assign to any Tort Claimant all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs. For the avoidance of doubt, unless provided in the BSA Plan, the BSA Confirmation Opinion, or the BSA Confirmation Order, the Trust is not entitled to policy proceeds owed or paid to the BSA, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), Local Councils, or the BSA Trust, nor is the Trust entitled to any distributions made pursuant the BSA Plan and BSA Confirmation Order, even if the recipient of such distribution is a Tort Claimant in this case. The Trust shall also have the right to pursue judgment against Non-Settling Insurers to determine, to the extent consistent with, if applicable, the BSA Plan, the BSA Confirmation Opinion, and the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder, the amount of coverage available for Protected Parties' liability for

- 38 -

Tort Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. The Trust shall be fully authorized to act in its own name, or in the name of any Protected Party, to enforce any right, title, or interest of any Protected Party in the Transferred Insurance Interests. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact that the Archdiocese is in bankruptcy or by any distribution from the Trust to any Tort Claimant. The transfer of the Transferred Insurance Interests shall not affect any Non-Settling Insurer's duty to defend, but to the extent that a failure to defend or a separate agreement between the Archdiocese, the Reorganized Debtor, or any other Protected Party and any Non-Settling Insurer gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds. Any recovery by the Trust on an action against a Non-Settling Insurer for a determination of coverage for Protected Parties' liability for Tort Claims shall become a Trust Asset and shall be distributed as provided in this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust's recourse to the Archdiocese, the Settling Insurers, and the other Protected Parties shall be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under this Plan, including any indemnification obligations of the Reorganized Debtor for Covered Non-Tort Claims under section 16.4, or as otherwise provided by the Plan. The Trust shall have no liability for Covered Non-Tort Claims and holders of Covered Non-Tort Claims shall have no recourse to the Trust with respect to such Claims.

2. The Trust shall have full access to coverage issued by the Non-Settling Insurers to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Protected Parties prior to the confirmation of the Plan and the transfer of the Transferred Insurance Interests to the Trust, but Plan confirmation shall not relieve the Debtor (or the Trust if applicable) from any obligation under any Non-Settling Insurance Policy. The Non-Settling Insurers shall retain any and all coverage defenses, except any defense regarding or arising from the assignment and transfer of the Transferred Insurance Interests. Notwithstanding the foregoing, confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Archdiocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Protected Party or Settling Insurer under the Plan. The Plan is binding on Non-Settling Insurers as provided under this Section 6.7(a)(2). But nothing in this Section 6.7(a)(2) affirmatively authorizes the Trustee to violate applicable law or affirmatively authorizes the Trustee to violate or prohibits the Trustee from violating any relevant and operative provision of the BSA Plan, the BSA Confirmation Opinion, or the BSA

CORE/3515288.0002/171049844.43

**SA 1968**

Confirmation Order, including any injunctions and releases granted or approved thereunder.

The assignment and transfer of the Transferred Insurance Interests to the Trust does not affect the Archdiocese's, the Reorganized Debtor's, other Protected Parties', or any Non-Settling Insurer's right to contest the Archdiocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the assignment and transfer of the Transferred Insurance Interests, the Archdiocese, the Reorganized Debtor, and any other Protected Party shall not be relieved of any obligations or duties under any Non-Settling Insurer Policy (including without limitation any duty to cooperate) and shall continue to honor such duties and obligations as required by such applicable Non-Settling Insurer Policies and applicable law. The transfer and assignment of the Transferred Insurance Interests does not affect any insurers' rights, obligations, or duties under applicable Non-Settling Insurer Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Tort Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Archdiocese, the Reorganized Debtor, or any other Protected Party.

3.  The Bankruptcy Court shall determine at the Confirmation Hearing whether the assignment of the Transferred Insurance Interests provided for in this Section is valid. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed assignment and transfer of the Transferred Insurance Interests to the Trust or other terms of the Plan related to the Non-Settling Insurer Policies by the date set to file such objections, that party in interest shall be deemed to have irrevocably consented to the assignment of Transferred Insurance Interests and other Plan terms related to such Non-Settling Insurer Policies and will be forever barred from asserting that the assignment of the Transferred Insurance Interests to the Trust was not effective. But nothing in this Section 6.7(a)(3) affirmatively authorizes the Trust to violate applicable law or affirmatively authorizes the Trustee to violate or prohibits the Trustee from violating any relevant and operative provision of the BSA Plan, the BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder

4.  In the event that the Bankruptcy Court enters a Final Order determining that the assignment of the Transferred Insurance Interests is valid, following the Effective Date, the Trust shall assume responsibility for, and be bound by, all obligations of the Archdiocese and other Protected Parties under the Non-Settling Insurer Policies; provided, however, that the Protected Parties shall not be relieved of any obligations the Protected Parties may have under Non-Settling Insurer Policies.

- 40 -

5. The Reorganized Debtor will cooperate and assist the Trust in enforcing any right or prosecuting any claim based on the Transferred Insurance Interests. This cooperation includes, but is not limited to, providing access to documents and electronic information and providing clergy, employees, agents, and volunteers to testify in depositions and at trial.

**(b)** **Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.**

1. If the Bankruptcy Court does not enter a Final Order approving the assignment and transfer of the Transferred Insurance Interests to the Trust, then the assignment shall not occur and pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is hereby appointed as the representative of the Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's Interests against the Non-Settling Insurers with respect to the Tort Claims. Any recoveries on such Interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trustee as the Archdiocese's and the Estate's representative provided for in this Section 6.7(b)(1) is valid, and does not defeat or impair the insurance coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trustee to pursue Non-Settling Insurers, or any of them, for insurance coverage. Nothing in the foregoing sentence shall affirmatively authorize the Trustee to act in a manner inconsistent with applicable law or affirmatively authorize such person to act or prohibit such person from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order. In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, then, following the Effective Date, the Trustee shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and other Protected Parties under Non-Settling Insurer Policies as are necessary to act as the representative of the Archdiocese and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trustee's appointment shall not relieve the Archdiocese, the Reorganized Debtor or the other Protected Parties from any obligation that such entities may have under the Non-Settling Insurer Policies. Nothing contained in this Section 6.7(b)(1) shall affect the rights and remedies of a Person who is not a Protected Party but is an insured or additional insured with the Archdiocese or is asserting rights under a Non-Settling Insurer Policy.

- 41 -

2. In the event that a Final Order is entered holding that: (a) the assignment of the Transferred Insurance Interests, or (b) the appointment of the Trustee as the Archdiocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Archdiocese, the Reorganized Debtor, and each of the Protected Parties will retain their Interests under each Settling Insurer and Non-Settling Insurer Policy.

(i)     At the request of the Trust, the Reorganized Debtor and the other Protected Parties will assert their Interests against a Non-Settling Insurer, including, but not limited to, by filing a lawsuit for recovery of policy proceeds. But nothing in the foregoing affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder. All recoveries by the Reorganized Debtor and the other Protected Parties will be paid to the Trust. The Reorganized Debtor and the other Protected Parties will select and retain counsel to pursue their Interests against Non-Settling Insurers pursuant to this Section 6.7(b), subject to the Trustee's approval, which approval shall not be unreasonably withheld.

(ii)    The Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Reorganized Debtor and the other Protected Parties in pursuing, pursuant to this Section 6.7(b), its Interests against Non-Settling Insurers.

(iii)   The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section 6.7(b), reimburse the Reorganized Debtor and each of the Protected Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing its Interests against Non-Settling Insurers, but will not compensate the Reorganized Debtor or any other Protected Party for any time any of its employees expend. Upon receipt by the Reorganized Debtor or other Protected Party, all recoveries received by the Reorganized Debtor or other Protected Party from Non-Settling Insurers shall be deemed to be held in trust for the benefit of the Trust and shall be remitted by the Reorganized Debtor or other Protected Party to the Trust as soon as practicable following the Reorganized Debtor's or other Protected Party's receipt of such recoveries.

CORE/3515288.0002/171049844.43

### 6.8    SPECIAL DISTRIBUTION CONDITIONS.

(a)    With respect to Class 3 Claims and Class 4 Claims only, the Trust shall maintain sufficient funds to pay any potential reimbursements to Medicare and shall complete the following "Medicare Procedures":

>    i.    the Trustee shall determine whether each Claimant with a Date of Injury after December 5, 1980 is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Eligible");

>    ii.    Upon request, the Trust shall provide to a Settling Insurer or the Reorganized Debtor information sufficient to allow them to perform their own SSA queries to the extent they wish to do so;

>    iii.    in the event that one or more Claimants with Dates of Injury after December 5, 1980 is/are identified as Medicare Eligible, the Trust shall complete a query to the CMS for each such Claimant to determine whether any payment ("Conditional Payment") made pursuant to Section 1395y(b)(2)(B) of the MSPA has been made to or on behalf of that Tort Claimant arising from or relating to treatment for Abuse;

>    iv.    if any Conditional Payment has been made to or on behalf of that Tort Claimant, the Trustee shall, within the time period called for by the MSPA, reimburse the appropriate Medicare Trust Fund for the appropriate amount, and submit the required information for that Tort Claimant to the appropriate agency of the United States government.

(b)    Compliance with the provisions of this Section 6.8 shall be a material obligation of the Trust in favor of the Settling Insurers under any settlement agreements between any of those insurers and Archdiocese, which authorizes funding to the Trust.

(c)    The Trust shall defend, indemnify and hold harmless the Protected Parties and the Settling Insurer Entities from any Medicare Claims, and any Claims related to the Trust's obligations under this Section. The Trust shall use the Unknown Tort Claim Reserve Fund to pay any Claims under this Section related to an Unknown Tort Claim.

### 6.9    INVESTMENT POWERS; PERMITTED CASH EXPENDITURES. All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

### 6.10    REGISTRY OF BENEFICIAL INTERESTS. To evidence the beneficial interest in the Trust of each holder of such an interest, the Trustee shall maintain a registry of beneficiaries.

### 6.11    NON-TRANSFERABILITY OF INTERESTS. Any transfer of an interest in the Trust shall not be effective until and unless the Trustee receives written notice of such transfer.

- 43 -

**6.12   TERMINATION**. The Trust shall terminate after its liquidation, administration, and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement. The Trust shall terminate on the earlier of (a) five years after the Effective Date or (b) the occurrence of each of the following (i) all Trust assets have been administered, and (ii) the Trustee and the Unknown Claim Representative agree that there are no more Unknown Tort Claims to be paid from the Unknown Tort Claim Reserve Fund.

**6.13   IMMUNITY; LIABILITY; INDEMNIFICATION**.

**(a)**   Neither the Reorganized Debtor or its respective members, designees, or professionals, nor the Trustee or any duly designated agent or representative of the Trustee, nor their respective employees, shall be liable for the acts or omissions of any other member, designee, agent, or representative of such Trustee, except that the Trustee shall be liable for his/her/its specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Trustee may, in connection with the performance of his/her/its functions and in his/her/its sole and absolute discretion, consult with his/her/its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall not be under any obligation to consult with his/her/its attorneys, accountants, financial advisors, or agents, and his/her/its determination not to do so shall not result in the imposition of liability on the Trustee unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, or fraud. For the avoidance of doubt, the Trustee shall not be released, exculpated, or discharged under this Section unless and until the Bankruptcy Court has approved, after notice and a hearing, the Trust's final accounting.

**(b)**   Upon the approval by the Bankruptcy Court, after notice and a hearing of a final accounting by the Trustee, no recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant, or other professional retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or this Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for his/her/its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

**(c)**   The Trust shall defend, indemnify, and hold harmless the Trustee, his/her/its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Guam is entitled to indemnify and defend

- 44 -

its directors, trustees, officers, and employees against any and all liabilities, expenses, Claims, damages or losses incurred by them in the performance of their duties hereunder.

1. Additionally, the Reorganized Debtor, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Trust or Trustee or respective agents, with respect to: (i) the Chapter 11 case and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 3 Claims, (iii) the administration of the Trust and the implementation of the Trust Distribution Plan, or (iv) any and all activities in connection with the Trust Agreement, shall be indemnified and defended by the Trust, to the same extent that a corporation or trust organized under the laws of Guam is from time to time entitled to indemnify and defend its own officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor or Reorganized Debtor, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided that, with respect to amounts paid in settlement, the Trust has approved such amounts in advance, such approval not to be unreasonably withheld.

2. Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Trustee, the Debtor, the Reorganized Debtor, and their respective agents in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Trust, shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee, the Debtor, the Reorganized Debtor, and their respective agents, to repay such amount in the event that it shall be determined ultimately by Non-Appealable Order that such Trustee, the Debtor, the Reorganized Debtor, and their respective professionals, officers, and directors is not entitled to be indemnified by the Trust.

**6.14    TREATMENT OF TORT CLAIMS**.

(a)    **TRUST LIABILITY**. On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to section 16.4; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Trust Distribution Plan; and (iii) the right to pursue the Transferred Insurance Interests. Except as otherwise provided herein, the Trust does not assume any liabilities of the Archdiocese or Reorganized Debtor, in whole or in part, in regards to any Tort Claims or Unknown Tort Claims that are not released, nor the liabilities of the Settling Insurers.

(b)    **ASSESSMENT OF TORT CLAIMS.** Each Tort Claim and Unknown Tort Claim will be assessed by the Tort Claims Reviewer in accordance with the Trust

- 45 -

Distribution Plan to determine whether the Tort Claimant is entitled to a distribution under the Trust. The Archdiocese or the Reorganized Debtor shall reasonably cooperate with the Tort Claims Reviewer and the Trustee as requested by the Tort Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Trust Distribution Plan, but shall not be required to act in any way that violates any duty to cooperate with a Non-Settling Insurer. Under no circumstance shall the Tort Claims Reviewer's review of a Class 3 Claim, a Class 4 Claim, or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer, the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), or any trust established pursuant to a confirmed plan of reorganization in the BSA Bankruptcy.

   **(c)**  **Distribution Plan Claimants.** All Tort Claimants and Unknown Tort Claimants (i) whose Claims do not implicate coverage from any Non-Settling Insurer or (ii) who do not elect to be Litigation Claimants, will, if their Claim is allowed, be treated as Distribution Plan Claimants, and will receive a distribution in the amount(s) and at the time(s) determined by the Trustee pursuant to the Trust Distribution Plan. A Distribution Plan Claimant must execute a release of all of his or her Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable. Any payment on an Abuse Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

   **(d)**  **Litigation Plan Claimants**

     1. Any Tort Claimants and Unknown Tort Claimants whose Claims are covered or are alleged to be covered, under any Non-Settling Insurer Policy may elect to be "Litigation Claimants" under the Plan, and will retain the right, if any, to: (i) pursue his or her Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Claim; and (ii) proceed in a Direct Action against any Non-Settling Insurer to the extent allowed by applicable law or, in each case under the foregoing subclauses (i) and (ii), to the extent applicable, the BSA Plan, the BSA Confirmation Opinion, and the BSA Confirmation Order, including any applicable and operative injunctions or releases granted or approved thereunder ("a Litigation Claim"). A Litigation Claimants' recovery on a Litigation Claim is limited as provided herein. The Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person including a Non-Settling Insurer be able to recover any amount from a Settling Insurer in connection with a Litigation Claim.

- 46 -

2. Litigation Claimants will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions from the Trust.

3. If necessary in the Trustee's discretion, the Trustee may establish a reserve for payment of a claim held by a Litigation Claimant in the amount that would have been awarded to the Litigation Claimant if such Claimant were a Distribution Plan Claimant. The creation and existence of this reserve is not a settlement, release, accord or novation of the Litigation Claims and cannot be used by any third party as a defense to any alleged joint liability with any Protected Party. For avoidance of doubt, the creation and existence of this reserve does not affect, diminish or impair a Litigation Claimant's rights to collect a judgment against any Non-Settling Insurer or Person that is not a Protected Party, except as expressly provided herein. The Trustee may establish one reserve for all of the Litigation Claims but no Litigation Claimant shall have any interest in any portion of the reserve in excess of the amount determined for that Litigation Claimant under the Trust Distribution Plan, and then only in the event that the Litigation Claimant prevails on his Litigation Claim. Neither the Trust's payment of, or reserving monies on account of, the Tort Claims nor the Tort Claims Reviewer's review of a Claim, shall: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Abuse Claim, either individually or in the aggregate with other Abuse Claims, in any coverage litigation with any Non-Settling Insurers.

(e) **Legal Effect of Estimation of Claims and Distributions under Trust Distribution Plan.** The Tort Claims Reviewer's determinations are for estimation purposes only and shall not be a finding or fixing of the fact or liability or the amount payable for any Tort Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan. The determination of qualification, estimation of claims, and payment of distributions is not an admission of liability by any Protected Party or the Trust with respect to any Tort Claims and has no res judicata or collateral estoppel effect on any Protected Party, the Trust, the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), any trust established pursuant to a confirmed plan of reorganization in the BSA's bankruptcy proceeding, or any Non-Settling Insurer. Any payments by the Trust to Tort Claimants in connection with their Tort Claims is not a release of the Debtor nor an accord or novation of the Debtor's liability on account of the Class 3 and Class 4 Claims. The Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Archdiocese's, the Reorganized Debtor's, or any other Protected Party's liability for, or damages with respect to, any Class 3 or Class 4 Claim. The determination of qualification, estimation of claims, and payment of distributions is not a settlement, release, accord, or novation of Class 3 or Class 4 Claims and cannot be used by any third party as a defense to any alleged joint liability. The determination of qualification, estimation of claims, and payment of partial distributions does not impair a Litigation

- 47 -

Claimant's rights to obtain a judgment against a Protected Party or any Non-Settling Insurer or other Person, for purposes of establishing the Protected Party's liability on the Tort Claim, but any such judgment awarded to a Litigation Claimant will be resolved as provided in the Trust Distribution Plan. Neither the Tort Claims Reviewer's review of a Tort Claim and determination of qualification, nor the Trust's estimation of claims or payment of distributions shall (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages, either individually or in the aggregate, in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of claims and payment of distributions does not constitute a triggering event for liability under any Non-Settling Insurer Policy nor does it create an admission of the fact of liability or the extent of damages on behalf of the Protected Parties.

      **(f)**      **RELEASE AND DISCHARGE OF TORT CLAIMS.** No Tort Claimant shall receive any payment on any award unless and until such Tort Claimant has executed the Release attached as Exhibit E or Exhibit F to this Plan, as applicable. Each Tort Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Archdiocese, the Reorganized Debtor, and the other Protected Parties that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Tort Claimants specifically reserve, and do not release, any and all claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). Tort Claimants shall not be permitted to recover from the Trust for the liabilities, if any, of any Person that is not a Protected Party. In the event a Tort Claimant recovers from any other Person or any other trust for the liabilities of any Protected Party, the amount of such recovery shall first be deducted from any subsequent distributions from the Trust or any judgment awarded such Tort Claimant for the same liabilities of such Protected Party.

      **(g)**      **LIMIT OF RELEASE FOR NON-SETTLING INSURER POLICIES.** The Tort Claims will not be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Protected Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

      With respect to all other Claims, except as otherwise provided in the Plan, the Debtor's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d). The Tort Claimants' release, in whole or in part, of their Class 3 or Class 4 Claims will be pursuant to the principles set forth in 7 G.C.A. § 24605. The Class 3 and Class 4 Claimants will expressly reserve their rights, subject to applicable law or any

- 48 -

applicable provision of the BSA Plan, the BSA Confirmation Opinion, or the BSA Confirmation Order, including any operative and applicable injunctions and releases granted or approved thereunder against other Persons (other than Protected Parties), including joint tortfeasors, who will remain severally liable on any Claims for Abuse. Any Person (other than a Protected Party) that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of causal liability or fault.

      **(h)**      **TRUST RIGHTS AGAINST NON-SETTLING INSURERS.** The Trust retains the right to pursue Non-Settling Insurers for the Archdiocese's, the Reorganized Debtor's, and any other Protected Party's liability to Tort Claimants, including for any distributions made to Litigation Claimants.  Nothing in the foregoing sentence affirmatively creates a right or authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant, to act in a manner inconsistent with applicable law or affirmatively authorizes such persons to act or prohibits such persons from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder.

      **(i)**      **DISTRIBUTIONS TO TORT CLAIMANTS.** A Distribution Plan Claimant, who the Tort Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan. Any payment on a Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

      **(j)**      **LITIGATION CLAIMS.**

      1.   In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of any reserve set for that Litigation Claimant's Litigation Claim, plus an additional $1,000.

      2.   In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust for handling pursuant to this Plan. Such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were

- 49 -

agreed to in advance by the Trust. Any amount remaining shall be distributed in a manner consistent with the Trust Distribution Plan.

**(k)**     Subject to the provisions of Article 6.14(e), the Trust's payment to a Litigation Claimant that has recovered a judgment or settlement does not affect, diminish or impair the Trust's right, if any, to collect policy proceeds respecting such Class 3 Claim or Class 4 Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

**(l)**     If a Non-Settling Insurer has refused to defend a Protected Party with respect to any Litigation Claim, the Trust will advance or reimburse the Protected Party for reasonable and necessary attorneys' fees and other expenses incurred in defending the Litigation Claim. If any Non-Settling Insurer has refused to indemnify a Protected Party with respect to any settlement or judgment of a Litigation Claim, the Trust will indemnify the Protected Party for any judgment or settlement incurred by the Protected Party on such Litigation Claim, provided the Trust has consented in advance to any such settlement, such consent not to be withheld unreasonably. If all Non-Settling Insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, that Litigation Claimant must sign a covenant not to execute against that Protected Party's assets (other than Non-Settling Insurer Policies or proceeds or other assigned rights or interests), under which the Litigation Claimant will agree to seek recovery only from Non-Settling Insurers for any judgment the Litigation Claimant obtains against any Protected Party, in exchange for a stipulated judgment and assignment of insurance rights, as authorized by law. If any judgment on any Tort Claim is within the retention of any Non-Settling Insurer Policy, and all Non-Settling Insurers have denied indemnity for such judgment, then the Trust will fund the judgment. The Trust's advancement or reimbursement of the Protected Party for such defense costs and/or judgment or settlement payments, and any distributions made by the Trust to the Litigation Claimant and other Class 3 Claimants and/or Class 4 Claimants, will not affect, diminish or impair the Trust's right, if any, to bring any claims against any Non-Settling Insurers for refusing to defend and/or indemnify the Protected Party, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law. Nothing in this Section 6.14(l) affirmatively authorizes the Trust to violate applicable law or affirmatively authorizes the Trust to act or prohibits the Trust from acting in a manner inconsistent with applicable law or affirmatively authorizes the Trust to act or prohibits such person from acting in a manner inconsistent with any relevant and operative provision(s), if any, of the BSA  Plan, BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder.

**(m)**     As of the Effective Date, the Trustee will be deemed to have the right to join or intervene into the Insurance Coverage Adversary Proceeding and to pursue recoveries against any Non-Settling Insurers to the same extent as the Debtor.

**(n)**     Nothing in the Plan, Confirmation Order or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay

- 50 -

any judgment with respect to, any Tort Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, in connection with a Tort Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable law or any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder.

(o)     If the Litigation Claimant fails to prosecute his Litigation Claim to final judgment or settlement of the claim and does not rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant, or a Final Order is entered finding that no Protected Party has liability to such Tort Claimant on account of his Tort Claim, any reserve maintained by the Trust on account of such Tort Claim shall revert to the non-reserved assets of the Trust and the Litigation Claimant shall have no recourse against the Trustee, the Trust, any Protected Party, or any Settling Insurer.

**(p)     OBJECTIONS AND LITIGATION AFTER THE EFFECTIVE DATE.**

1.   Regardless of whether a Class 3 Claimant is a Distribution Plan Claimant or a Litigation Claimant, the Trustee may object to that Class 3 Claimant's Claim. The Trustee's right to object to a Class 3 Claimant's Claim after the Effective Date will not affect or impair any right the Archdiocese, the Reorganized Debtor, other Protected Parties, the Settling Insurers, and/or Non-Settling Insurers may have under the Non-Settling Insurer Policies or applicable law to object to such Class 3 Claims. The Reorganized Debtor may object to any Class 4 Claimant's Claim.

2.   The Protected Parties will comply with all obligations under the Non-Settling Insurer Policies and applicable law. The Trustee, to the extent required by the Non-Settling Insurer Policies implicated by such Tort Claims and applicable law, shall also cooperate with the Non-Settling Insurer in the defense of such judicial proceeding contemplated in Section 6.13(p)(1). In the event of a dispute between a Non-Settling Insurer and the Trustee regarding whether the Trustee must allow such Non-Settling Insurer to control the defense of such Tort Claim, or the extent of anyone's duty to cooperate, such dispute shall be resolved by the court hearing such dispute.

**(q)     CLAIM WITHDRAWAL.** A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to Section 13.2 of the Plan, the Channeling Injunction, and the Supplemental Settling Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Tort Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan. Each Protected Party, Non-Settling

- 51 -

Insurer, Settling Insurer, and the Trust shall retain any and all defenses that may exist in respect to such Tort Claim.

(r)   **ELECTION.** No later than thirty (30) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, the Tort Claimant shall elect in writing one of the following treatment alternatives:

1. A Tort Claimant may elect to receive a distribution as Distribution Plan Claimant, but must execute the release of all his or her Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable, and waive his right to pursue a direct action under applicable law against any Non-Settling Insurer as to the liability of a Protected Party. For the avoidance of doubt, the election to be treated as a Distribution Plan Claimant shall not limit, impair, or otherwise affect a Tort Claimant's rights as a creditor of any Person who is not a Protected Party, including any right to pursue a direct action against any Insurer as to the liability of a Person who is not a Protected Party (including but not limited to the BSA or any Local Council); or

2. A Tort Claimant may elect treatment as a Litigation Claimant and will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions from the Trust. Each Litigation Claimant also retains the right to: (i) pursue his or her Tort Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Tort Claim and (ii) proceed in a direct action against any Non-Settling Insurer to the extent allowed by applicable law. A Litigation Claimant's recovery on a Litigation Claim is limited as provided herein. The Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person be able to recover any amount from a Settling Insurer in connection with a Litigation Claim. Notwithstanding the foregoing, nothing in this subsection shall be construed to limit or impair the right of a Tort Claimant to pursue a Claim that is not a Channeled Claim. Nothing in this Section 6.12(r)(2) authorizes a Claimant to act in violation of applicable law.

(s)   **MODIFICATION OF TREATMENT ELECTION.**

1. If a Tort Claimant does not make one of the elections, the Tort Claimant will be treated as a Distribution Plan Claimant.

2. Upon written notice to the Trustee, subject to the Trustee's sole and absolute discretion, a Tort Claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant. Notwithstanding the foregoing, the Trustee shall consent to a Tort Claimant's rescission if such written notice of rescission is given prior to entry of a non-

- 52 -

appealable (i) order of dismissal or (ii) a final judgment on the Litigation Claim entered in favor of a Protected Party and/or a Non-Settling Insurer.

3.  No later than sixty (60) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, a Tort Claimant may rescind the election to be treated as a Distribution Plan Claimant in favor of being treated as a Litigation Claimant.

**(t)      Trust Claim Submissions.** The Tort Claim Reviewer shall not allow any Tort Claimant or Unknown Tort Claimant unless such Claimant has (i) responded to all questions on the Sexual Abuse Proof of Claim Form, ECF No. 168-1, as approved by the Court ECF No. 168, which questions are applicable to their Claims against any Protected Party and (ii) complied with all requests for information related to his or her Claim made by the Tort Claim Reviewer.

**(u)      Authorization for Release of Information.** Pursuant to the requirements of Paragraph 12 of the *Order Fixing Time for Filing Proofs of Claims; Approving Proof of Claim Forms; Providing for Confidentiality Protocols; and Approving Form and Manner of Notice to the Order* (the "Confidentiality Order"), ECF No. 168, the Trust may (i) disclose to BSA and/or any successor in interest, including any settlement trust established in the BSA bankruptcy (the "BSA Trust") and any Settling Insurer, including the AIG Insurers Entities, the Trust Claim Information and (ii) obtain, pursuant to the terms of any applicable confidentiality procedures or requirements, from any other trust or other entity all information relating to allegations of Abuse submitted by a Tort Claimant or Unknown Tort Claimant. For the avoidance of doubt, the BSA Trust and the Settling Insurers, including the AIG Insurers Entities, are Permitted Parties under the Confidentiality Order.

**(v)      Requirement to Disclose Information.** The Trustee shall be required to disclose (i) all Trust Claim Information to the Settling Insurers, including the AIG Insurers Entities and (ii) any Trust Claim Information relating to Mixed Claims to the BSA Trust.

**6.15      CONTROL OF TRUST REAL PROPERTY ASSETS.** The Trustee's rights, powers, duties, and obligations provided in the Plan and the Trust Agreement, are subject to the following provisions with regard to any of the Trust's Assets which relate in any way to the Trust's rights, title, or interest in real property (the "Real Property Assets"):

**(a)      PARTITIONING OF CERTAIN PROPERTY.** The Trustee shall, within ninety (90) days after the Effective Date, hire a surveyor and take all steps necessary and prudent to partition the properties listed on **Exhibit O** (the "Partitioned Parcels") as follows:

i.      **RETAINED PARCELS.** The Trustee shall retain the portion of the Partitioned Parcels substantially consistent with the boundaries indicated in blue on the maps included as **Exhibit P** (the "Retained Parcels") for the purpose of liquidating said parcels for the benefit of Class 3 Claimants. For the avoidance of doubt, the maps included as Exhibit P, including any boundaries, legal descriptions,

- 53 -

markings, or other notes, are only provided for convenience to illustrate the Plan Proponents' intentions, but are not a determination by the Court regarding any Persons' right, title, or interest in the real property depicted. Nothing in Exhibit P is binding on any Person, except to the extent Exhibit P shall govern the AoA Entities, the Trust, and/or the Reorganized Debtor regarding the partitioning of the Partitioned Parcels.

      ii.      **PRESERVED PARCELS.** Within thirty (30) days after the Trustee obtains permission from all necessary government authorities to segment the Retained Parcels, the Trustee shall convey to the Reorganized Debtor the portion (the "Debtor Preserved Parcels") of the Partitioned Parcels that are not Retained Parcels.

      iii.      **EQUITABLE RIGHTS IN THE PRESERVED PARCELS.** From the Effective Date, until the date the Trustee conveys legal title to the Debtor Preserved Parcels, the Reorganized Debtor shall retain all rights as the sole equitable owner of the Preserved Parcels, including, but not limited to, the right to occupy, use, possess, control, maintain, and exclude others from the same, subject only to the Trustee's rights arising under and related to this Section 6.15(a).

      iv.      **RIGHT TO REPURCHASE.** The Reorganized Debtor shall retain a right of first refusal on any real property or interest in real property transferred to the Trust pursuant to this Plan (the "ROFR"). Within three (3) days after listing any Trust real property for sale, the Trustee shall inform the Reorganized Debtor in writing of the publically disclosed terms of the listing. The Trustee shall leave the real property on the market for not less than 30 days. After marketing any trust real property for sale, the Trustee shall, within three (3) days after the Trustee, in his sole discretion, determines he will no longer accept offers for the real property, inform, in writing, the Reorganized Debtor of the highest and best offer obtained for the real property. The Reorganized debtor shall then have fourteen (14) days to make an offer, in writing, to match the terms of the highest and best offer or provide terms that are, in the Trustee's sole discretion, equivalent to the highest and best offer.

      v.      **CLARIFICATION OF REAL PROPERTY ASSETS.** For the avoidance of doubt, the Real Property Assets do not include, and nothing in this Plan will be construed to sell, convey, or transfer, the interests, if any, of the Sisters of Mercy of Americas South Central Community on Guam, Inc. in (A) Lot P19.28B-1New, Ordot-Chalan Pago, or (B) Lot No. 2418A-R3, Tai, Mangilao.

   **(b)**      **TIME LIMITS ON HOLDING REAL PROPERTY.** The Trust shall not hold any Real Property Assets for longer than three (3) years after the Effective Date. Should the Trust continue to hold Real Property Assets for more than three (3) years after the Effective Date, a Trust beneficiary may bring a motion with the Bankruptcy Court to compel the sale of the real property asset(s), and the Bankruptcy Court shall grant such motion, unless:

i.      The real property asset(s) is the subject of an executed purchase agreement with a good faith buyer and the transaction is scheduled to close within 120 days;

ii.      The Trustee has accepted an offer to purchase the real property asset, but the transaction is the subject of pending litigation; or

iii.      The Trustee obtains permission from the Bankruptcy Court to hold the real property asset for more than three years, which permission shall be granted only for cause, including, but not limited to (i) the Trustee demonstrates the value of the real property asset will increase by at least 20% of its current value over a specific amount of time, not to exceed 12 months; (ii) an act of God or other force majeure prevents the sale of the real property asset or substantially diminishes the value of the real property asset; or (iii) a delay in selling the real property asset is otherwise in the best interest of the Trust's beneficiaries.

**6.16    FREE AND CLEAR OF INTERESTS OF TRUST REAL PROPERTY ASSETS**. On the Effective Date of the Plan, the Real Property Assets shall be sold to Trust, pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Archdiocese, the Catholic Entities, and Tort Claimants. The Trust is a good faith purchaser of such assets within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable consideration and the sale complies with the Bankruptcy Code and applicable non-bankruptcy laws. **If the Court determines at the confirmation hearing for this Plan that a person(s) other than the Debtor holds an interest in the Real Property Assets, which interest is subject to a bona fide dispute, such interest will transfer only to the proceeds of any sale by the Trust of the respective Real Property Asset(s), and in no event will any person's interest cloud title, affect the Trustee's ability to sell the Real Property Asset(s), or entitle the interested party(ies) to recourse against the Trust in excess of the net-sale proceeds of the respective Real Property Asset(s).**

## ARTICLE VII
## SETTLING INSURERS

**7.1    SETTLING INSURER SETTLEMENT AGREEMENT**. Any Insurance Settlement Agreements shall automatically be, and hereby are, incorporated by reference and made part of the Plan as if set forth fully herein. Upon (a) the Confirmation Order becoming a Final Order, (b) the conditions precedent in each Insurance Settlement Agreement being satisfied, and (c) subject to any termination provisions in an Insurance Settlement Agreement, any such approved Insurance Settlement Agreements shall become fully binding on the Trust, Protected Parties, the Reorganized Debtor, the Committee, Settling Insurers, the Tort Claimants, parties in interest in the Chapter 11 Case, and any of the foregoing Persons' successors and assigns. The Insurance Settlement Agreements shall survive the confirmation, effectiveness, and consummation of the Plan.

**7.2    FREE AND CLEAR OF INTERESTS OF SETTLING INSURER POLICIES**. To the extent provided in each of the respective Insurance Settlement Agreements, and effective on the later of (i) the Effective Date of the Plan or (ii) the payment by each Settling Insurer of the

- 55 -

settlement payment(s) due under such agreement, each and every Settling Insurer Policy issued to the Debtor shall be sold to the issuing Settling Insurer pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Archdiocese, Catholic Entities, and Tort Claimants. To the extent set forth in certain of the Insurance Settlement Agreements and the corresponding Approval Orders, each Settling Insurer that is repurchasing any such Settling Insurer Policy is a good faith purchaser of such insurance policy within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable settlement of the parties' disputes and of their respective rights and obligations relating to each such Settling Insurer Policy and constitutes reasonably equivalent value, the releases in such Insurance Settlement Agreements and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws, and each such Settling Insurer Policy shall be terminated and be of no further force and effect with the issuing Settling Insurer having fully and completely performed any and all obligations under each such Settling Insurer Policy, including any performance owed to the Archdiocese and Catholic Entities, and all limits of liability of each such Settling Insurer Policy shall be exhausted. To avoid all doubt, nothing in this Section 7.2 or elsewhere in the Plan or in any related motion pursuant to Bankruptcy Rule 9019, shall authorize or effect the sale of any interest in a Settling Insurer Policy, which interest reposes in the estate of a person who is a debtor in a proceeding under Title 11 of the United States Code, unless and until the court with jurisdiction over such bankruptcy estate enters an order approving such sale.

**7.3     RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS.** The Confirmation Order shall provide that within ten (10) days after payment of the Insurance Settlement Amounts, the Debtor and the Settling Insurer(s) shall effect dismissal with prejudice of their Claims, if any, against each other in any pending adversary proceeding, with each side to bear its own fees and costs. The Archdiocese shall not be required to dismiss any adversary proceeding as against any Non-Settling Insurer. The Settling Insurers will pay to the Trust the sums set forth in their respective Insurance Settlement Agreements within the time set forth in their respective Insurance Settlement Agreements.

**7.4     JUDGMENT REDUCTION**.

**(a)**     In any proceeding, suit, or action, , to recover or obtain insurance coverage or proceeds from a Non-Settling Insurer for a Protected Party's liability for any Tort Claim, the following shall apply:

(1)     If a Non-Settling Insurer has asserted, asserts, or could assert, any Contribution Claim against a Settling Insurer, then any judgment or award obtained by any Protected Party, the Trust, or a Tort Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that a court or arbitrator determine such Settling Insurer would have been liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("Reduction Amount"). In any action by a Protected Party, the Trust or a Tort Claimant against a Non-Settling Insurer to obtain insurance coverage or proceeds for a Tort Claim, where the Settling Insurers are not parties, the Non-Settling Insurers' Contribution Claim may be asserted as a defense, and to the extent the Non-Settling Insurers' Contribution Claim against a Settling Insurer is determined to be valid by the court

- 56 -

**SA 1985**

presiding over such action, the liability of the Non-Settling Insurer will be reduced dollar for dollar by the amount so determined. In the event that a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any Settling Insurer will be determined by the court or arbitration proceeding in which such Contribution Claim is filed. To the extent possible, no Settling Insurer will be required to answer or otherwise respond to a complaint alleging a Contribution Claim against such Settling Insurer until such Reduction Amount is determined by such court or arbitrator(s). If, notwithstanding the foregoing, a court refuses to reduce the liability of the Non-Settling Insurer, then once the order establishing the Settling Insurer's liability for the Contribution Claim is a Final Order, the Trust shall promptly indemnify and hold harmless the Settling Insurer for such amount of any such Abuse-Related Contribution Claim.

**(b)** Each Settling Insurer agrees that it will not pursue any contribution claim that it might have against any other Insurer (a) whose Contribution Claim against Settling Insurers is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against the Settling Insurers, or any of them. If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against the Settling Insurers, then such released Settling Insurer shall release its Contribution Claims against such releasing Insurer.

To the extent that the Trust indemnifies the Settling Insurers, or if any Insurer asserts a Claim directly against the Trust arising from or concerning the Settling Insurer Policies, any Contribution Claim of the Settling Insurers shall be transferred to the Trust, and the Trust shall be authorized to assert the Contribution Claims of such Settling Insurer against such other Insurer.

**7.5    FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS**. From and after the Effective Date, the Reorganized Debtor and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Article without further order of the Bankruptcy Court. The Reorganized Debtor and the Settling Insurers may make technical or immaterial alterations, amendments, modifications, waivers, or supplements to the terms of any Insurance Settlement Agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan; provided however that all amendments to the Plan shall be consistent with the terms of the AIG Insurers Settlement Agreement and Section 13.9 of this Plan.

**7.6    INDEMNIFICATION OBLIGATIONS**.

From and after the Effective Date, and effective upon the Trust's receipt of the Settlement Amount (as defined in any Insurance Settlement Agreement), the Trust shall defend, indemnify, and hold harmless the Settling Insurers with respect to any and all Channeled Claims. The Reorganized Debtor shall defend, indemnify, and hold harmless the Settling Insurers from and

- 57 -

**SA 1986**

against all other Claims that are subject to any indemnity obligation to the Settling Insurers under any Insurance Settlement Agreement or this Plan.

The indemnification obligations of the Trust to the Settling Insurers includes Claims made by Persons over whom the Trust and/or Reorganized Debtor do not have control. The Settling Insurers shall have the right to defend any Claims identified in this Section 7.6 and shall do so in good faith in the event the Settling Insurer chooses to defend such Claims. The Settling Insurers may undertake the defense of any Claim on receipt of such Claim without affecting such indemnification obligations. The Settling Insurers shall notify the Trust and/or Reorganized Debtor, as applicable, as soon as practicable of any Claims identified in this Section 7.6 and of their choice of preferred counsel. Any obligation of the Trust or Reorganized Debtor, as applicable, to indemnify the Settling Insurer under this Section 7.6 shall not exceed the Settlement Amount set forth in the Settlement Agreement as actually paid by the corresponding Settling Insurer. In defense of any such Claims, the Settling Insurers may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

## 7.7    TIMING

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives the Insurance Settlement Amount in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement.

## 7.8    WAIVER/CONSENT.

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction, and other covenants set forth herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of any Settlement Agreement, and upon receipt by the Trust of the settlement payments required by any Settling Insurers Settlement Agreement, each of the Protected Parties: (1) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims and/or Interests it has or might have now or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to released Tort Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (2) consents to the sale of the Protected Parties' Claims and/or Interests, if any, in the Settling Insurer Policies in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan.

(a)    Nothing in this Section 7.8 shall be construed to bar either (i) a Claim based on Abuse against a Person who is not a Protected Party or (ii) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (i) under an insurance policy other than the Settling Insurer Policies.

- 58 -

**7.9**     **DEBTOR WAIVER AND RELEASE OF CLAIMS.** In consideration of any payments to be made by the Settling Insurers and other consideration provided by each Settling Insurer, upon payment by the Settling Insurers of their respective settlement amounts under the corresponding Insurance Settlement Agreements, the Archdiocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future (i) under the Settling Insurer Policies issued by the Settling Insurers to the extent those Settling Insurer Policies are bought back under the Settling Insurers Settlement Agreement and this Plan; (ii) against the Settling Insurers with respect to any Tort Claim, Unknown Tort Claim, or Channeled Claim; and (iii) against the other Protected Parties with respect to any Channeled Claim. For the avoidance of doubt, the Archdiocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future under the Settling Insurer Policies issued by, subscribed to, or underwritten by the Settling Insurers, which are bought back, enjoined, and/or released, under the terms of the Settling Insurers Settlement Agreement and this Plan.

**7.10**     **SUPPLEMENTAL SETTLING INSURER INJUNCTION**

        **(a)     Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies or Interests in insurance policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code:**

        **Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, or any other Person covered or allegedly covered under the Settling Insurer Policies, that directly or indirectly arise from, relate to, or are in connection with (i) any of the Settling Insurer Policies, any Claim that would have been covered under a Settling Insurer Policy but for an Insurance Settlement Agreement, any Tort Claims, Direct Action Claims, Indirect Claims, Coverage Claims, and Released Claims; (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims; (iii) Extra-Contractual Claims; and (iv) Unknown Tort Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or the Settling Insurer Policies:**

        1.  **Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the property of the Settling Insurers;**

        2.  **Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

- 59 -

3. Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the property of the Settling Insurers;

4. Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the property of the Settling Insurers; and

5. Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

For the avoidance of doubt, this Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers as to the Settling Insurer Policies but against no other person or thing. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation. For the avoidance of doubt, this Supplemental Settling Insurer Injunction shall not apply to: (i) any Persons who are not Protected Parties but who are insured under any Other Insurance Policies, with respect to coverage under such Other Insurance Policies; (ii) any Claims of any Persons that are covered or alleged to be covered under such Other Insurance Policies, to the extent such Claims are not Tort Claims or Indirect Claims against a Protected Party.

The Supplemental Settling Insurer Injunction will not be for the benefit of Non-Settling Insurers.

The Supplemental Settling Insurer Injunction will be effective with respect to any Settling Insurers Entities as of the date that the Trust receives the Settlement Amount (as defined in any Insurance Settlement Agreement).

## 7.11   BECOMING A SETTLING INSURER PRIOR TO THE EFFECTIVE DATE

(a)      The AIG Insurers Entities have agreed to contribute $18,000,000.00 to become Settling Insurers pursuant to the AIG Insurers Settlement Agreement.

(b)      Prior to the Effective Date, a Person may become a Settling Insurer if it (i) is an Insurer or BSA Insurer, (ii) if listed below, it agrees to pay the respective settlement amounts set forth below, or, if not listed below, reaches agreement with the Archdiocese and the UCC on its respective settlement amount; and (iii) obtains approval from the Archdiocese, the UCC, the Bankruptcy Court, and any other court with relevant jurisdiction over any respective Archdiocese Entity Insurance Policy or Other Insurance Policy, on the form of a written settlement agreement:

(1)      CNA: $9,300,000.00;

(2)      BSA Insurers, combined contributions total not less than: $55,000,000.00.

(c)      Notwithstanding anything in this Plan to the contrary, no BSA Insurer who becomes a Settling Insurer (whether prior to, as of, or after the Effective Date) is eligible or entitled to purchase an Other Insurance Policy or interest therein as provided under

- 60 -

(i) Section 7.2 of this Plan or (ii) any other provision of the Plan or any related motion pursuant to Bankruptcy Rule 9019 which purports to authorize or require a "buyback" or "partial buyback" of such Other Insurance Policy.

**(d)**     For the avoidance of doubt, and again notwithstanding anything in this Plan to the contrary, neither the Plan Proponents nor the Trustee will enter into any settlement (whether prior to, as of, or after the Effective Date) with a BSA Insurer that would potentially impair the interests of the BSA or any other Coinsured party under a BSA Insurance Policy (besides the Debtor), unless they first obtain approval from a court with relevant jurisdiction over such interest, including the U.S. Bankruptcy Court for the District of Delaware. Notwithstanding anything in this Plan to the contrary, neither the Debtor, Reorganized Debtor, nor the Trust is authorized to enter into any settlement with a BSA Insurer regarding an Other Insurance Policy if such settlement erodes, diminishes, or reduces the insurance policy limits available to pay any Claim asserted against the BSA and/or any of its Coinsured (except the Debtor or any AoA Entity), Local Councils and/or Chartered Organizations (except for the Debtor or any AoA Entity), without the express consent of the BSA and/or any of its Coinsured (except the Debtor or any AoA Entity), Local Councils and/or Chartered Organizations, as applicable.

## ARTICLE VIII
## NON-SETTLING INSURERS

### 8.1     PRESERVATION OF RIGHTS AND OBLIGATIONS.

**(a)**     In the event: (i) a Tort Claim is pursued in state or federal court by a Tort Claimant against a Protected Party or Non-Settling Insurer, or (ii) the Trust or the Reorganized Debtor asserts an objection to or otherwise seeks a determination of liability as to a Tort Claim, then the Protected Parties, the Trust and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist in respect to such Tort Claim and, except as set forth in Section 6.7(a)(2) and this Section 8.1, all coverage defenses. If a Tort Claimant obtains a judgment, Non-Settling Insurers retain any defenses to such Claim pursuant to the terms of Section 6.7 and Article VIII of the Plan. The rights, duties and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Tort Claims are not impaired, altered, reduced, or diminished by: (a) the discharge in bankruptcy of the Debtor; (b) any distribution to Tort Claimants pursuant to this Plan, the Trust Agreement, and the Trust Distribution Plan; (c) the transfer of the Protected Parties' Transferred Insurance Interests; or (d) protections granted to the Protected Parties under the Plan. Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage were brought by the Archdiocese, the Reorganized Debtor, or any other Protected Party, except any defense regarding or arising from the assignment and transfer of the Transferred Insurance Interests. Notwithstanding the foregoing, confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Archdiocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Protected Party or Settling Insurer under the Plan. The Plan is binding on Non-Settling Insurers as provided

- 61 -

under this Section. Nothing in this Section 8.1 affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, or Class 3 Claimant from acting in violation of applicable law.

**(b)** The rights and obligations of the Archdiocese, the Reorganized Debtor, and other insureds and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law (including without limitation any duty of an insured to cooperate) shall not be affected by the assessment of any Tort Claim, and shall be treated as if the Tort Claim had never been assessed for distribution purposes by the Trust.

**(c)** Each Non-Settling Insurer shall be entitled to all rights as are provided under the terms of its Non-Settling Insurer Policies as if the Tort Claim had never been assessed for distribution purposes by the Trust.

**(d)** After the Effective Date, upon consent of the Trustee, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves the agreement between the Person, the Reorganized Debtor and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such agreement. Upon the Bankruptcy Court's entry of a Final Order approving such agreement, Exhibit N shall be amended by the Trustee to include such Person. Any such Person shall have all of the rights, remedies and duties of a Settling Insurer notwithstanding that such Person originally may have been a Non-Settling Insurer under any provision of the Plan. Such rights, remedies and duties shall include the terms and conditions of the Channeling Injunction and Supplemental Settling Insurer Injunction. The Bankruptcy Court's retained jurisdiction to approve an agreement under this Article shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**8.2    ESTIMATIONS/ASSESSMENTS ARE NOT BINDING**. Estimations of Class 3 and Class 4 Claims for purposes of voting, and the determination of qualification, assignment of points, and payment of distributions of Tort Claims under the Trust Distribution Plan:

**(a)** Shall not (i) constitute an admission of liability by any Person with respect to such Claims; (ii) have any res judicata or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, Protected Parties, Settling Insurers, Non-Settling Insurers, and Claimants in all other contexts or forums;

**(b)** Shall be without prejudice to any and all rights of the Trust, the Archdiocese, the Reorganized Debtor, other Protected Parties, the Non-Settling Insurers and Tort Claimants in all other contexts and forums and shall not be deemed to be a determination of liability of the Archdiocese or a determination of whether, or the extent to which, such claim is covered under any Non-Settling Insurer Policy. The fact that a claim has been estimated for distribution purposes has no res judicata or collateral estoppel effect and is not a binding determination on any issue or the creation of a liquidated non-bankruptcy claim. The assessment by the Tort Claims Reviewer under the Trust Distribution Plan shall have no effect upon any "no action" provisions contained in any Non-Settling Insurer

- 62 -

**SA 1991**

Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law. Rather, the liability of the Archdiocese, the Reorganized Debtor, or any other Protected Party and the amount owed by the Archdiocese, the Reorganized Debtor, other Protected Parties, and any Non-Settling Insurer on any Class 3 or Class 4 Claim, shall be determined by: (i) the amount of any court judgment obtained by the Class 3 or Class 4 Claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Archdiocese, the Reorganized Debtor, or any other Protected Party to the Non-Settling Insurer under the respective Non-Settling Insurer Policy or applicable law.

**8.3     RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS.** The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Approval Order approving such Insurance Settlement Agreement, the Plan and the Confirmation Order.

**8.4     THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER RIGHTS**. For the avoidance of doubt, solely with respect to the Non-Settling Insurers, except as set forth in Sections 6.7(a)(2) and 8.1(a) above, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, the Confirmation Order, any order approving a settlement, or any other order, judgment, conclusion of law, finding of fact, determination or statement (written or verbal) of the Bankruptcy Court (or any other Court exercising jurisdiction over this Chapter 11 case) to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses, of any Non-Settling Insurer against the Debtor or any other insureds under any Non-Settling Insurer Policies, including any factual or legal defenses to any claim for insurance; (ii) shall affect, impair, or prejudice the rights and defenses of any Protected Party, the Trust, or any other insureds under Non-Settling Insurer Policies in any manner, including any factual or legal defenses to any claim for insurance; (iii) shall constitute a settlement or resolution of any Protected Party's liability to a Tort Claimant; (iv) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurer Policy; or (v) shall otherwise determine the applicability or nonapplicability of any provision of any Non-Settling Insurer Policy and any such rights and obligations shall be determined under the Non-Settling Insurer Policy and applicable law.

**8.5     THE ARCHDIOCESE'S OBLIGATIONS SURVIVE**. Notwithstanding the transfer of the Transferred Insurance Interests to the Trust, the Archdiocese shall not be relieved of its duties or obligations under any Non-Settling Insurer Policies (except as provided to the contrary in any subsequent Insurance Settlement Agreement), and shall continue to perform such duties as required by such Non-Settling Insurer Policies and applicable law. If the Trust asserts any claim that the Archdiocese has breached such duties or obligations under the Non-Settling Insurer Policies resulting in a loss of coverage, it shall give the Archdiocese notice and an opportunity to cure any alleged breach, and in any event, the Archdiocese shall not be liable for any alleged breach resulting in a loss of coverage except to the extent that (i) the breach relates to post-Effective Date conduct of the Archdiocese, and (ii) the Archdiocese willfully or intentionally fails to comply with its continuing obligations under the Non-Settling Insurer Policies. In addition,

- 63 -

any such claim will not be automatically allowed; the Archdiocese will have the right to defend against such claim.

**8.6     TRUST POWERS WITH RESPECT TO TORT CLAIMS AND NON-SETTLING INSURERS**.

(a)     A Tort Claimant or the Trust, as applicable, may enter into a settlement of a Tort Claim allowed by applicable law, and may enter into an arrangement with Tort Claimant's counsel providing such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer as provided in Section 4.3.

(b)     The Trustee may use the Trust Assets to prosecute litigation against the Non-Settling Insurers.

(c)     If the Trust successfully resolves an insurance coverage dispute with a Non-Settling Insurer or otherwise receives a recovery of insurance proceeds relating to Tort Claim(s) from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Tort Claims, pursuant to the Trust Distribution Plan. In such event, and on a periodic basis accumulating all such recoveries, the Trust shall make supplemental payments to Tort Claimants in accordance with the Trust Agreement and Trust Distribution Plan.

<u>**ARTICLE IX**</u>
<u>**INSURANCE POLICIES**</u>

**9.1     CONTINUATION OF INSURANCE POLICIES**. Except to the extent any Archdiocese Entity Insurance Policies are bought back as set forth in and pursuant to any Insurance Settlement Agreement, including the AIG Insurers Settlement Agreement, or as otherwise provided by the terms of the Plan, all Archdiocese Entity Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Archdiocese Entity Insurance Policy is or was an executory contract of the Archdiocese, or continued in accordance with its terms pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Archdiocese Entity Insurance Policy is not an executory contract of the Archdiocese, such that each of the parties' contractual, legal, and equitable rights under each such Archdiocese Entity Insurance Policy shall remain unaltered. All known Archdiocese Entity Insurance Policies issued and/or effective prior to April 1, 1998 are listed on Exhibit I. To the extent that any or all such Archdiocese Entity Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Archdiocese Entity Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in this Chapter 11 case. Unless otherwise determined by the Bankruptcy Court pursuant to an order which becomes a Non-Appealable Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Archdiocese existing as of the Effective Date with respect to any Archdiocese Entity Insurance Policy. The

- 64 -

Archdiocese reserves the right to seek rejection of any Archdiocese Entity Insurance Policy or other available relief prior to the Effective Date.

<div align="center">

**ARTICLE X**
**PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION**

</div>

**10.1   RESERVATION OF RIGHTS TO OBJECT TO NON-TORT CLAIMS**. Unless a Claim is expressly described as an allowed Claim pursuant to or under the Plan, or otherwise becomes an allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor or the Trustee, as applicable, shall be deemed to have a reservation of any and all rights, Interests, and objections of the Archdiocese, the UCC, or the Estate to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured, or unsecured, including any and all rights, Interests and objections to the validity or amount of any and all alleged Claims, Liens, and Interests, whether under the Bankruptcy Code, other applicable law, or contract. The failure to object to any Claim in this Chapter 11 case shall be without prejudice to the Reorganized Debtor's or the Trustee's, as applicable, right to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

**10.2   OBJECTIONS TO NON-TORT CLAIMS**. Prior to the Effective Date, the Archdiocese shall have the authority to pursue any objection to the allowance of any non-Tort Claim. From and after the Effective Date, the Reorganized Debtor will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to non-Tort Claims (including those Claims that are subject to objection by the Archdiocese as of the Effective Date); provided, however, that nothing in this Section shall affect the right of any party-in-interest (including the Reorganized Debtor and the Trustee) to object to any non-Tort Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to non-Tort Claims will be filed and served not later than thirty (30) days after the later of: (i) the Effective Date, or (ii) the date such Claim is filed. Such deadline or any Bankruptcy Court approved extension thereof, may be extended upon request by the Reorganized Debtor by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan. Notwithstanding the foregoing, there shall be no deadline for the Reorganized Debtor to object to Class 4 or Class 11 Claims (including to the extent a Class 11 Claim becomes a Class 12 Claim).

**10.3   DETERMINATION OF CLAIMS**. From and after the Effective Date, any Claim that is not a Tort Claim, and as to which a Proof of Claim or motion or request for payment was timely filed in this Chapter 11 case, or deemed timely filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable law; or (v) the lack of (a) an objection to such Claim,

<div align="center">- 65 -</div>

(b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Archdiocese, the Reorganized Debtor, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, Interests, or Causes of Action that the Debtor or the Reorganized Debtor may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

10.4   **NO DISTRIBUTIONS PENDING ALLOWANCE**. No payments or distributions will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by an order which has become a Non-Appealable Order, and the Disputed Claim has become an allowed Claim.

10.5   **CLAIM ESTIMATION**. To effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 case, with respect to Disputed Claims, the Archdiocese (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to Section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.

## ARTICLE XI
## DISTRIBUTIONS UNDER THE PLAN

11.1   **PAYMENT DATE**. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a business day, such payment or distribution shall instead be made, without interest, on the immediately following business day.

11.2   **UNDELIVERABLE DISTRIBUTIONS**. If payment or distribution to the holder of an allowed non-Tort Claim under the Plan is returned for lack of a current address for the holder or otherwise, the Reorganized Debtor shall file with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment. All allowed Claims paid as provided in this Section shall be deemed addressed to the same extent as if payment or distribution had been made to the holder of the allowed Claim with no recourse to the Reorganized Debtor or property of the Reorganized Debtor. If, after the passage of six (6) months, the payment or distribution still cannot be made, the Reorganized Debtor shall make the payment to the Trust. All allowed Claims paid as provided in this Section shall be deemed satisfied and released, with no recourse to the Reorganized Debtor or property of the Reorganized Debtor upon

CORE/3515288.0002/171049844.43

SA 1995

payment to the Trust, to the same extent as if payment or distribution has been made to the holder of the allowed Claim.

**11.3    SETOFFS**. The Reorganized Debtor or the Trustee, as applicable, may, to the extent permitted under applicable law, set off against any allowed Claim and the distributions to be made pursuant to the Plan on account of such allowed Claim, the Claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Trustee, as applicable, may hold against the holder of such allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Trustee, as applicable, of any such Claims, rights, and Causes of Action that the Reorganized Debtor or the Trustee, as applicable, possesses against such holder.

**11.4    NO INTEREST ON CLAIMS**. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between a claimant and the Archdiocese, the Reorganized Debtor, or the Trust, and approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and claimants shall not be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order, or Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an allowed Claim.

**11.5    WITHHOLDING TAXES**. The Reorganized Debtor and the Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor and the Trust may require that the holder of an allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

<div align="center">

**ARTICLE XII**
**EFFECTIVENESS OF THE PLAN**

</div>

**12.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**. The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

> **(a)    Entry of Confirmation Order**. The Confirmation Order has become a Non-Appealable Order, provided, however, that this condition may be waived if so agreed in writing by the Debtor, the UCC, and the AIG Insurers Entities;

> **(b)    Plan Documents.** All Schedules and Exhibits to the Plan shall have been duly completed by the Plan Proponents and filed with the Court and all agreements and releases referred to in the Plan shall have been duly executed by all parties thereto and filed with the Court, in each case in form and substance satisfactory to the Debtor, the Committee, and the Settling Insurers;

<div align="center">

- 67 -

</div>

(c) **The Trust.** The Trust shall have been formed;

(d) **Funding.** The Debtor shall make the payment to the trust as provided in 5.1(b)(2)(ii); and

(e) **Approval of AIG Insurers Settlement Agreement.** The AIG Insurers Settlement Agreement, including the sale of the AIG Insurers Policies issued to the Debtor, free and clear of all interests of any person, is approved by the Confirmation Order which shall constitute the Bankruptcy Court's approval of the AIG Insurers Settlement Agreement pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to the AIG Insurers Entities.

(f) **BSA Consultation and Consent**. The BSA shall have consultation rights with respect to the form and substance of the Confirmation Order and any further modifications to the Plan and exhibits thereto, to the extent each of these documents and modifications potentially affect the BSA; provided, however, that the BSA shall have consent rights to any modifications to Section 13.9 of this Plan.

**12.2   NOTICE OF EFFECTIVE DATE**. The Plan Proponents shall file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**12.3   EFFECT OF NON-OCCURRENCE OF CONDITIONS**. If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or disclosure statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust or the Settling Insurers; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

<u>**ARTICLE XIII**</u>
<u>**EFFECTS OF CONFIRMATION**</u>

**13.1   DISSOLUTION OF UCC**. On the Effective Date, the UCC shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

- 68 -

### 13.2    DISCHARGE AND INJUNCTION.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Archdiocese will be discharged from, and its liability will be extinguished completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, based on conduct occurring before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under the Bankruptcy Code Section 501, such Claim is allowed under Bankruptcy Code Section 502, or the holder of such Claim has accepted the Plan. Notwithstanding anything in the foregoing sentence, the injunction provided for in this Section 13.2 shall not discharge or enjoin the Debtor or Reorganized Debtor from any liabilities arising from transactions and events occurring in the ordinary course of the Debtor's business during the pendency of the case arising within the scope of 28 U.S.C. § 959.

For clarity, the Debtor is not discharged from its obligations to fund the Unknown Tort Claim Reserve or from Non-Settling Insurer Policy Claims, but recourse with respect to Non-Settling Insurer Policy Claims is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim or Unknown Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j) above.

Tort Claimants and the Trust shall be permitted to name the Archdiocese in any proceeding to resolve whether the Archdiocese has liability for Tort Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Archdiocese's liability for Tort Claims under Non-Settling Insurer Policies. The limitations otherwise set forth in the Plan on a Tort Claimant's recovery will not in any way limit the Non-Settling Insurers' obligations under the Non-Settling Insurer Policies or the Tort Claimants' and/or Trust's recoveries against the Non-Settling Insurers for the Non-Settling Insurers' conduct in connection with the defense or settlement of a Tort Claim, including on any judgments in excess of the limits of a Non-Settling Insurer Policy.

### 13.3    CHANNELING INJUNCTION. Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.

**(a)    In consideration of the undertakings of the Protected Parties and Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy Code:**

- 69 -

1. any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

2. all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

    (i)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

    (ii)    enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;

    (iii)    creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;

    (iv)    asserting, implementing or effectuating any Channeled Claim of any kind against:

        1.    any obligation due any of the Protected Parties or Settling Insurers;

        2.    any of the Protected Parties or Settling Insurers; or

        3.    the property of any of the Protected Parties or Settling Insurers.

    (v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

    (vi)    asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an

- 70 -

**obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers.**

**Notwithstanding anything to the contrary in this Article or the Plan, Tort Claimants and the Trust shall be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse in the proceeding is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Sections 6.14(i) and (j).**

**The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section 13.3 shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

The Channeling Injunction will not be for the benefit of Non-Settling Insurers or Persons who are not Protected Parties.

The Channeling Injunction will be effective with respect to the Settling Insurers Entities as of the date that the Trust receives the amount(s) set for in Section 7.11.

**13.4    EXCULPATION; LIMITATION OF LIABILITY**. From and after the Effective Date, the Debtor, the Debtor's professionals, the Committee, the Committee's Professionals, and the Estate's officers, directors, and employees acting as fiduciaries in this case "Section 13.4 Exculpated Parties" shall not have nor incur any liability for, and shall be released from, any Claim, Cause of Action or liability to any holder of a Claim, or to any other party in interest, for any act or omission that occurred after the Petition Date through and including the Effective Date during and in connection with the administration of this Chapter 11 case (but not including transactions and event occurring in the ordinary course of the Debtor's business during the pendency of the case) including the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan; provided, however, this Section 13.4 shall not: (1 release or exculpate any Section 13.4 Exculpated Party from liability for any Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Section 13.4 Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction, (2) limit the rights of any holder of a claim or equity interest to enforce rights arising under this Plan, and (3) limit the liability of the Section 13.4 Exculpated Parties and their respective professionals for sanctions under Rule 9011 or any similar rule, statute, or doctrine as determine by Final Order of a court of competent jurisdiction. Provided,

- 71 -

further, that any Section 13.4 Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and the Section 13.4 Exculpated Parties shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and, as applicable, the Channeling Injunction.

13.5    **TIMING**. The injunctions, releases, and discharges (including the Channeling Injunction and Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the other conditions to effectiveness of the Insurance Settlement Agreement are fully met.

13.6    **NO BAR ON CERTAIN CLAIMS**. Notwithstanding the foregoing, nothing in this Plan shall be construed to bar (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing clause under an insurance policy other than the Settling Insurer Policies; or (c) a Tort Claim against a Protected Party that is not released or enjoined under the Plan, to the extent set forth herein. Notwithstanding anything to the contrary herein, nothing in the Plan, other Plan Documents, the Confirmation Order, or in any related motion pursuant to Bankruptcy Rule 9019, shall release, channel, or otherwise impair any claims belonging to the BSA, Local Councils, any Chartered Organization of the BSA (other than the Debtor and/or the AOA Entities), or any trust established pursuant to the BSA Plan, except that the BSA Trust may not assert claims against the AIG Insurers Entities for the Debtor's and/or the AOA Entities' portion of liability covered or allegedly covered by an AIG Insurers Policy.

13.7    **NO BAR ON CLAIMS AGAINST OTHER DEBTORS IN BANKRUPTCY.**

Notwithstanding anything in this Plan, including but not limited to the Supplemental Settling Insurer Injunction, the Channeling Injunction, or any Insurer Settlement Agreement, confirmation of this Plan, or approval of any Insurer Settlement Agreement, shall not be construed to bar, channel, discharge, or release: (i) any Claim asserted against a debtor in the BSA Bankruptcy or any Mixed Claim, except to the extent attributable to the Archdiocese and/or AOA Entities, or (ii) a Claim for insurance coverage by or on behalf of any other party, besides the Archdiocese and/or AOA Entities, that may be insured under a BSA insurance policy.

13.8    **LIMITATION OF RELEASES AND INJUNCTIONS**. Unless specifically stated otherwise, nothing in this Plan, including, but not limited to, the Supplemental Settling Insurer Injunction, the Channeling Injunction, or any Insurer Settlement Agreement, shall be construed or interpreted to release, waive, enjoin, or otherwise limit a Tort Claimant's or an Unknown Tort Claimant's claim(s) against any Person who is not a Protected Party. For the avoidance of doubt, the Channeling Injunction shall not: (i) benefit any Person who is not a Protected Party but who is insured or allegedly insured under any Other Insurance Policies with respect to coverage under such Other Insurance Policies; or (ii) apply to any Claim(s) of any Person that is covered or alleged to be covered under such Other Insurance Policies, to the extent such Claims are not Tort Claims or Indirect Claims against a Protected Party.

- 72 -

**13.9    INTERACTION AMONG THIS PLAN AND THE BSA PLAN, BSA CONFIRMATION OPINION, AND BSA CONFIRMATION ORDER**

Nothing in this Plan, the AIG Settlement Agreement, or otherwise affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant to act in violation of applicable law or affirmatively authorizes such persons to violate or prohibits such persons from violating any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder; provided, however, that no reference in this Plan to the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder, shall limit the rights, if any, of the Trust, Reorganized Debtor, a Class 3 Claimant, and/or a Class 4 Claimant, against a BSA Non-Settling Insurance Company, as those rights are defined by any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, and/or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder.

## ARTICLE XIV
## INCORPORATION OF CHILD PROTECTION PROTOCOLS

**14.1    CHILD PROTECTION PROTOCOLS**. The Child Protection Protocols, which will be supplemented, are incorporated into the Plan.

**14.2    CHILD PROTECTION PROTOCOLS.** Notwithstanding anything else in this Plan to the contrary, the failure to include the Child Protection Protocols as an exhibit to the Plan shall not delay the occurrence of the Effective Date of the Plan; provided, however, that the Trust and the Reorganized Debtor shall be obligated, within 60 days after the Effective Date, to file a finalized version of the Child Protection Protocols, which Child Protection Protocols shall be reasonably equivalent to the proposals, or some combination thereof, included with the Disclosure Statement as Exhibits 2 and 3, made by the Committee and Debtor. Within 30 days after the filing of the agreed version of the Child Protection Protocols and service on all creditors pursuant to Fed. R. Bankr. P. 2002, any party in interest may object to the proposed Child Protection Protocols on the grounds that the proposed Child Protection Protocols are not reasonably equivalent to the proposals, or a combination thereof, included with the Disclosure Statement as Exhibits 2 and 3, made by the Committee and Debtor. If no party in interest objects within 30 days after the filing of the agreed version of the Child Protection Protocols, the proposed version shall become part of this Plan. If, after notice and a hearing, the Court determines the proposed version are not reasonably equivalent to the proposals, or a combination thereof, included with the Disclosure Statement as Exhibits 2 and 3, made by the Committee and Debtor, the Court shall establish a new schedule for the Trust and Reorganized Debtor to make a revised proposal and direct such further procedures as the Court, in its discretion, shall deem just and proper.

## ARTICLE XV
## THE REORGANIZED DEBTOR

**15.1    CONTINUED CORPORATE EXISTENCE**. The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Guam Code 18 § 10101 et seq. having tax-exempt status under 26 U.S.C. § 501(c)(3) under

applicable law and without prejudice to any right to alter or terminate such existence under applicable state or territorial law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

**15.2    VESTING OF ASSETS**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, Claims, and Interests of creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

**15.3    IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**. In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on **Exhibit J**.

**15.4    FURTHER AUTHORIZATION**. The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan, in accordance with applicable law.

**15.5    CONTINUATION OF RETIREE BENEFITS.** On the Effective Date and for the entire duration of the period that the Debtor has obligated itself to provide such benefits, if any, the Reorganized Debtor's obligations to make payment of "Retiree Benefits," as that term is defined in 11 U.S.C. § 1114, shall continue pursuant to the same terms, and at the same level and extent as the Debtor's obligations for such benefits before the Petition Date.

<div align="center">

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

</div>

**16.1    RETENTION OF JURISDICTION**.

**(a)**      By the Bankruptcy Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain, to the fullest extent permitted under the Bankruptcy Code: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or

<div align="center">

- 74 -

</div>

administration of the Plan, and (iv) exclusive jurisdiction over the interpretation and enforcement of the AIG Insurers Settlement Agreement. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1.  over disputes concerning the ownership of Claims;

2.  over disputes concerning the distribution or retention of assets under the Plan;

3.  over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims;

4.  over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Archdiocese, the Estate, or Trust, or property abandoned or transferred by the Archdiocese, the Estate, or the Trust;

5.  over motions to approve any Insurance Settlement Agreements entered into after the Effective Date by the Trustee;

6.  over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets and including, but not limited to determinations of the extent, validity, and priority of the Trust's interest in any Trust Asset;

7.  the removal of the Trustee and the appointment of a successor Trustee;

8.  over matters relating to the subordination of Claims;

9.  to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10. to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

11. to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to this Plan and any Insurance Settlement Agreement;

12. over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

13. over requests for allowance of payment of Claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

- 75 -

14. over all Fee Applications;

15. over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

16. over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of Claims, including holders of Class 3 or Class 4 Claims;

17. over disputes concerning the existence, nature, or scope of the Archdiocese's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

18. to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Archdiocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

19. to enter a Final Decree closing the Chapter 11 case;

20. to enforce all orders previously entered by the Bankruptcy Court; and

21. over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan, including, but not limited to, disputes arising out of or related to the Transferred Insurance Interests or the rights and obligations of the Non-Settling Insurers on and after the Effective Date.

**(b)** By the District Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Section 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

**(c)** Actions to Collect Amounts Owed Pursuant to the Plan. Notwithstanding anything to the contrary in this Section, the Archdiocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to the Plan for any settlements embodied in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with this Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

**(d)** Case Closure. The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

**16.2    ASSUMPTION OF EXECUTORY CONTRACTS**. On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court, and except as otherwise provided in the Plan, Confirmation Order, or Insurance Settlement Agreements, each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date with no cure amount due. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**16.3    INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES**. The obligation of the Archdiocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members, or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Archdiocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Guam pertaining to the Archdiocese, will be deemed and treated as executory contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code Section 365 as of the Effective Date, with no cure amount due. Notwithstanding the foregoing, under no circumstances will the Archdiocese, the Trust, or the Reorganized Debtor assume or be responsible for any alleged indemnification of any Person against whom the Archdiocese has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

**16.4    DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS**. After the Effective Date, the Reorganized Debtor will defend and indemnify any Protected Party with respect to any Covered Non-Tort Claim and, if so required by any Insurance Settlement Agreements, will defend and indemnify the Settling Insurers with respect to any Covered Non-Tort Claims. For clarity, effective upon the Trust's receipt of the Settlement Amount (as defined in the Settling Insurers Settlement Agreement), the Reorganized Debtor shall indemnify any Settling Insurers Entities from and against all other Claims (except for Channeled Claims) that are subject to any indemnity obligation to the Settling Insurers under any Insurance Settlement. As to any Claim against the Trust that qualifies as a Covered Non-Tort Claim, the Reorganized Debtor will also undertake on behalf of the Trust the enforcement of the injunctions set forth in Articles VII and XIII, will defend the Covered Non-Tort Claim, and, if judgment is entered on such Claim, will indemnify the Trust for any liability for such Claim. The Reorganized Debtor may not seek insurance coverage for the Claims defended or indemnified under this Section from the Settling Insurers under any Settling Insurer Policy. Nothing in this provision or any other Plan provision is intended to suggest that any Person is entitled to obtain a judgment on a Covered Non-Tort Claim or Channeled Claim, that such judgment would be covered under any Settling Insurer Policy, or that any Person is entitled to seek coverage for such judgment against any Protected Party or Settling Insurer in violation of the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction, as applicable. For the avoidance of doubt, nothing contained in this Section or the Plan is intended to provide, expand, modify or add coverage for the Archdiocese or any other Protected Party under any Settling Insurer Policy to cover the Archdiocese's indemnification of any Covered Non-Tort Claims.

- 77 -

**16.5    RESERVATION OF RIGHTS**. In accordance with the provisions of this Plan, the Archdiocese reserves the right to sell property of the Estate or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the confirmation hearing or as soon thereafter as is practicable.

**16.6    NON-APPEALABLE ORDER**. Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Non-Appealable Order may be jointly waived by the Plan Proponents upon written notice to the Bankruptcy Court provided that Plan Proponents first obtain the consent of all Settling Insurers.

**16.7    AMENDMENTS AND MODIFICATIONS**. The Plan Proponents may modify the Plan at any time prior to the confirmation hearing in accordance with Section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may jointly modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding any provision of this Plan to the contrary, the provisions of Article VII and Sections 13.2 through 13.4 are intended to be an integrated set of provisions that implement and supplement the Insurance Settlement Agreements that may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

**16.8    U.S. TRUSTEE REPORTS**. From the Effective Date until the case is closed, the Reorganized Debtor shall, within thirty (30) days of the end of each fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines. The Reorganized Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

**16.9    NO WAIVER**. The failure of the Archdiocese to object to any Claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Trustee's right to object to such Claim, in whole or in part.

**16.10    TAX EXEMPTION**. Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

CORE/3515288.0002/171049844.43

**16.11   NON-SEVERABILITY**. Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Plan Proponents.

**16.12   REVOCATION**. The Plan Proponents reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.

**16.13   CONTROLLING DOCUMENTS**. In the event and to the extent that any provision of the Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of the Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of this Plan, this Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

**16.14   GOVERNING LAW**. Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) shall be governed by, and construed and enforced in accordance with, the laws of the Territory of Guam, without giving effect to conflicts of law principles.

**16.15   NOTICES**. Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by: (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

> If to the Archdiocese or the Reorganized Debtor:
>
> > Archbishop Michael Byrnes
> > 207 Archbishop FC Flores Street,
> > Hagatna, Guam 96910
>
> If to the Trust or the Trustee:
>
> Craig Wade
>
> [TBD]

**16.16   FILING OF ADDITIONAL DOCUMENTS**. At any time before substantial consummation, the Archdiocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

- 79 -

**16.17    POWERS OF OFFICERS**. The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**16.18    DIRECTION TO A PARTY**. On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**16.19    SUCCESSORS AND ASSIGNS**. The Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**16.20    CERTAIN ACTIONS**. By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Archdiocese under the Plan, including: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Archdiocese or organizational structure of the Archdiocese shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, without any requirement of further action by the officers of the Archdiocese.

**16.21    FINAL DECREE**. Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor, Trustee or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 case.

**16.22    PLAN AS SETTLEMENT COMMUNICATION**. The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are Disputed as to validity or amount (including Tort Claims, Unknown Tort Claims and the Insurance Litigation), except as otherwise provided above. Accordingly, the Plan, the disclosure statement, and any communications regarding the Plan or the disclosure statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Nothing herein or in any confirmed Plan is intended to constitute a compromise of Tort Claims and unknown Tort Claims.

**16.23    OTHER RIGHTS**. Except as expressly set forth in this Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Guam law, or any other

- 80 -

applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims or Unknown Tort Claims.

## ARTICLE XVII
## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents request approval of all compromises and settlements included in the Plan. For the avoidance of doubt, the Plan Proponents will file a separate motion with the Court in the event they seek approval of any settlement agreement with a Settling Insurer.

## ARTICLE XVIII
## CONFIRMATION REQUEST

The Plan Proponents request confirmation of the Plan under Section 1129 of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan. The Plan Proponents request that, notwithstanding Fed. R. Bankr. P. 3020(e), the order confirming the Plan should be effective without stay.

- 81 -

[Signature page for Plan of Reorganization]

Respectfully submitted,

**THE ARCHBISHOP OF AGAÑA**, a corporation sole

_____

By: Reverend Father Romeo Convocar
Its: Vicar General

_/s/ Ford Elsaesser_
ELSAESSER ANDERSON, CHTD.
Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Tel:    (208) 667-2900
Fax:    (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

**ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION**

and

[Signature page for Plan of Reorganization]

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**


_____

Leo Tudela
Its: Chairperson

and

*/s/ Robert T. Kugler*
**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
FOR THE ARCHBISHOP OF AGAÑA**

**Exhibit A:**

**Unknown Claims Representative's Report and Recommendations**

**Exhibit B:**
Non-Settling Insurers

1. Insurance Company of North America;
2. Hartford Accident and Indemnity Company;
3. Certain Underwriters at Lloyd's London;
4. American Re Corporation; First State Insurance Company;
5. Travelers Casualty and Surety Company, Inc.;
6. Transit Casualty Insurance Company;
7. Allianz Global Risks US Insurance Company;
8. Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co.;
9. Commercial Ins. Co. of Newark, NJ

This list is non-exhaustive and will be amended or supplemented upon discovery of other Persons who may be Non-Settling Insurers.

| POLICY PERIOD | INSURER | POLICY NO. |
|---|---|---|
| 9/12/50-9/12/51 | Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co. | 41-3621 |
| 4/1/62-4/1/63 (presumed based on secondary evidence) | Commercial Ins. Co. of Newark, NJ | Unknown |
| 4/1/63-4/1/64 (presumed based on secondary evidence) | Commercial Ins. Co. of Newark, NJ | Unknown |
| 4/1/63-4/1/64 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 4/1/64-4/1/65 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 4/1/65-4/1/66 (presumed based on secondary evidence) | Unknown | 82-13886 |
| 1/1/1962-1/1/1963 | INA | CGL191986 |
| 1/1/1963-1/1/1964 | INA | CGL204680 |
| 1/1/1964-1/1/1965 | INA | CGL212922 |
| 1/1/1965-1/1/1966 | INA | CGL 232470 |
| 1/1/1966-1/1/1967 | INA | CGL 248896 |
| 1/1/1967-1/1/1968 | INA | CLP 11200 |
| 1/1/1968-1/1/1969 | INA | GLP 151211 |

| POLICY PERIOD | INSURER | POLICY NO. |
|---|---|---|
| 1/1/1969-1/1/1970 | INA | GLP 160981 |
| 3/2/1969-1/1/1970 | INA | XBC 43198 |
| 1/1/1970-1/1/1971 | INA | BLB 51323 |
| 1/1/1970-1/1/1971 | INA | XBC 77302 |
| 1/1/1971-1/1/1972 | INA | XBC 85370 |
| 9/21/1971-1/1/1972 | Hartford | 10CA43315 |
| 1/1/1972 - 1/1/1974 | Hartford | 10CA43303 |
| 1/1/1972 - 1/1/1974 | Hartford | 10HUA43302 |
| - | Hartford | 10CA43329 |
| 1/1/1974-1/1/1975 | Hartford | 10HUA43335 |
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E |
| 9/17/1976-9/17/1977 | Lloyds' & Companies | 76-10-08-02 |
| 1/1/1977-1/1/1978 | Hartford | 10CA43359 E |
| 1/1/1977-1/1/1978 | Am RE | M-1027493 |
| 1/1/1978-1/1/1979 | INA | GLP706452 |
| 1/1/1978-1/1/1979 | First State | 908854 |
| 1/1/1979-1/1/1980 | INA | GLP706452 |
| 1/1/1979-1/1/1980 | INA | XBC 151748 |
| 1/1/1979-1/1/1980 | First State | 927616 |
| 1/1/1980-1/1/1981 | INA | GLP706452 |
| 1/1/1980-1/1/1981 | Allianz | UMB 599346 |
| 1/1/1980-1/1/1981 | Aetna | 01XN2438WCA |
| 1/1/1981-1/1/1982 | INA | ISC1353 |
| 1/1/1981-4/1/1982 | Transit | UMB 964076 |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931255 & 931255A |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931257 & 931257A |

**Exhibit C:**
[RESERVED]

CORE/3515288.0002/171049844.43

**Exhibit D:**
Trust Agreement and Trust Distribution Plan

**THE ARCHBISHOP OF AGAÑA SETTLEMENT TRUST AGREEMENT**

This trust agreement (the "Trust Agreement") is made and entered into by and between the Archbishop of Agaña, a Guam corporation sole (the "Reorganized Debtor") and _____ (the "Trustee") pursuant to the Joint Chapter 11 Plan of Reorganization (together with any and all amendments, exhibits, and schedules, the "Plan") filed in the Reorganized Debtor's chapter 11 bankruptcy case, case no. 19-00010 (the "Bankruptcy Case"), before the United States District Court for the District of Guam, Bankruptcy Division (the "Bankruptcy Court"). Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings as ascribed to them in the Plan, Confirmation Order, and Bankruptcy Code.

**RECITALS**

A.      On the Petition Date, the debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Reorganized Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      It is anticipated that in 2022, the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order").

C.      The Plan anticipates the existence of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.      Pursuant to the Plan, the Trust is to use the Trust Assets to pay the Class 3 Claims and carry out the purposes of the Plan.

E.      The Trust is established for the benefit of the Beneficiaries of the Trust, as defined in Section 1.6 of this Trust Agreement, and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated under the Internal Revenue Code and codified at 26 C.F.R. §§ 1.468B-1 to -5.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

**DECLARATION OF TRUST**

Subject to the occurrence of the Effective Date, the Reorganized Debtor hereby absolutely assigns to the Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Reorganized Debtor in and to the Trust Assets;

TO HAVE AND TO HOLD unto the Trust and its successors in trust and its successors and assigns forever;

IN TRUST NEVERTHELESS upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

PROVIDED, HOWEVER, that upon termination of the Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED that the Trust Assets are to be held and applied by the Trustee upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

## ARTICLE I

## AGREEMENT OF TRUST

1.1    Creation and Name. The Reorganized Debtor hereby creates the Trust known as the "Archdiocese of Agaña Settlement Trust," which is the Trust provided for in the Plan. In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

1.2    Purpose. The purpose of the Trust is to assume responsibility for preserving, managing, and distributing Trust Assets to Class 3 Claimants, in accordance with the Trust Agreement and the requirements of the Plan and Confirmation Order, to receive assignment of the Transferred Insurance Interests from the Archdiocese, and to pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

1.3    Transfer of Trust Assets. Pursuant to the Plan and upon the occurrence of the Effective Date, the Reorganized Debtor will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Trust at all times as set forth in the Plan, all of the Reorganized Debtor's rights, titles, and interests in and to the Trust Assets to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan. The Trustee is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Trust.

1.4    Transfer of Confidential Information. The Trustee shall maintain the confidentiality of all documents and follow the confidentiality procedures provided for in the Bankruptcy Court's Order (I) GRANTING EXPEDITED RELIEF; (II) ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM; (III) APPROVING SEXUAL ABUSE PROOF OF CLAIM FORM; (IV) APPROVING FORM AND MANNER OF NOTICE; AND (V) APPROVING CONFIDENTIALITY PROCEDURES [Docket No. 51].

1.5     Irrevocability. The Trust shall be irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor.

1.6     Beneficiaries. The beneficiaries of the Trust are Class 3 Claimants under the Plan whose Claims are allowed by the Tort Claims Reviewer (the "Beneficiaries").

1.7     Acceptance of Assets and Assumption of Liabilities.

1.7.1 In furtherance of the purposes of the Trust, the Trustee hereby accepts the role of trustee of the Trust and accepts the grant, assignment, transfer, conveyance, and delivery of the Trust Assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, and the Confirmation Order.

1.7.2 In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing, and distributing Trust Assets to the Beneficiaries in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order. The Claims of the Beneficiaries will be evaluated by the Tort Claims Reviewer in accordance with the Trust Distribution Plan, attached as Exhibit 2 to this Trust Agreement.

1.7.3 The Trustee shall have all of the rights, powers, and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Trust, and applicable law. The Trustee shall have the authority to bind the Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trustee, and not individually, for all purposes contained in this Trust Agreement.

1.7.4 In furtherance of the purposes of the Trust, the Trustee assumes responsibility for (a) making payments to the Beneficiaries; (b) receiving, collecting, liquidating, maintaining, and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement, the Plan, and the Confirmation Order. The Trust will be administered consistent with the purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Trust Assets or as otherwise provided in the Plan or Confirmation Order.

1.7.5 All Trust expenses and all liabilities of the Trust with respect to the Beneficiaries shall be payable solely by the Trustee out of the Trust Assets.

## ARTICLE II

## CORPUS OF THE TRUST

2.1     Trust Composition. The Trust Assets shall include all property transferred to the Trust pursuant to the Plan, Confirmation Order, and any future orders of the Bankruptcy Court, including without limitation all rights of every kind, nature, and description transferred to the Trust pursuant the Plan.

2.2     Transfer to Trust. After the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Trust Assets shall be transferred to the Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in the Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of, or holders of claims against or Interests in the Reorganized Debtor) in accordance with Sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise provided for in the Plan. The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3     Trustee's Right to and Title and Interest in Trust Assets. Upon the transfer of the Trust Assets, the Trust succeeds to all of the Reorganized Debtor's and the Estate's right to and title and Interest in the Trust Assets, and the Reorganized Debtor and the Estate shall have no further right to, or title or Interest in or with respect to, the Trust Assets or this Trust, except as provided in this Trust Agreement, the Plan, or the Confirmation Order.

2.4     No Tax on Transfers to Trust. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Trust or receipt or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

2.5     Spendthrift Provision. To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

2.6     Trust Corpus. Subject to the terms of the Plan, the entirety of the Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Trust Corpus shall be allocated, administered, and distributed as provided in the Trust Distribution Plan, the Plan, and the Confirmation Order.

# ARTICLE III

## POWERS AND DUTIES OF TRUSTEE

3.1    <u>Trustee's Bond</u>. The Trustee shall not be required to post any bond, surety, or other security for the performance of the Trustee's duties unless otherwise ordered by the Bankruptcy Court and, in the event the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Trust and paid for from the Trust Assets.

3.2    <u>Powers and Duties</u>. The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, and the other provisions in this Trust Agreement, the following powers and duties:

3.2.1    To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, and the Confirmation Order.

3.2.2    To abandon any property which the Trustee determines in the Trustee's reasonable discretion to be of *de minimus* value or of more burden than value to the Trust.

3.2.3    To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate, including without limitation by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

3.2.4    To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan.

3.2.5    To open and maintain bank accounts on behalf of the Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.

3.2.6    To obtain all reasonably necessary insurance coverage with respect to any property that is, or may in the future become, a Trust Asset.

3.2.7    To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs, and expenses of administering the Trust as provided in this Trust Agreement and the Plan. These fees, costs, and expenses include: (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trustee (the "<u>Professionals</u>"), including without limitation the Trustee, the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, (c) the premiums charged by insurers, including without limitation professional liability insurers, (d) reimbursement of any statutory fees and court costs incurred by the Reorganized Debtor (i) in the event the Trustee opposes the closure of the Bankruptcy

Case, from the date of the filing of any such opposition through the closure of the Bankruptcy Case or (ii) should the Trustee reopen the Bankruptcy Case in the future.

3.2.8   In accordance with the evaluation of the Tort Claims Reviewer pursuant to the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan and Plan to Beneficiaries who have provided signed copies of all required releases and forms.

3.2.9   In the Trustee's discretion, to rely on the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the Trust Distribution Plan and assessment of the Class 3 Claims without any verification or confirmation.

3.2.10  In the Trustee's discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust.

3.2.11  To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees from any professional, except (i) the Trustee's primary legal counsel or (ii) special insurance counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court.

3.2.12  Kramer Law LLC shall serve as the Tort Claims Reviewer for the Trustee on the terms approved by the Bankruptcy Court. The Trustee may subsequently remove any Tort Claims Reviewer for cause. For purposes of this Trust Agreement, "cause" shall mean (a) the willful and continued refusal by the Tort Claims Reviewer to perform the Tort Claims Reviewer's duties as set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, (b) gross negligence, gross misconduct, fraud, embezzlement, or theft, (c) a serious breach of fiduciary duty, or (d) other cause as the Trustee shall in good faith determine. In the event the Tort Claims Reviewer resigns, is removed, or is otherwise unable to perform the Tort Claims Reviewer's obligations, the Trustee shall have exclusive authority to appoint a new Tort Claims Reviewer. Nothing contained in this Trust Agreement shall prohibit the Trustee from also serving as the Tort Claims Reviewer if the Trustee determines that serving as both the Trustee and the Tort Claims Reviewer is in the best interest of the Trust and the Beneficiaries.

3.2.13  Frank Pangelinan of Latte Stone Properties shall serve as the real estate advisor for the Trust. The Trustee may subsequently remove the real estate advisor for cause like the "cause" defined in 3.2.12 above.

3.2.14  To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Trust or to maintain and administer the Trust.

3.2.15  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

3.2.16  To amend, modify, or alter the Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries, the Reorganized Debtor, and any or all other parties in interest. For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Trust, as identified in Section 1.2 of this Trust Agreement.

3.2.17  Upon any event terminating the Trust, to defer distribution of Trust Assets for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

3.2.18  To comply with Section 345 of the Bankruptcy Code with regard to the investment of the Trust Assets. The Trustee is relieved of any obligation to diversify.

3.2.19  To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool the accounts, funds, or reserves for investment purposes or require separate bank accounts for the accounts, funds, or reserves.

3.2.20  To be responsible for only the Trust Assets delivered to the Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.2.21  The Trust will assume all duties, obligations, and indemnification responsibilities outlined in the Plan.

3.2.22  To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on the Insurance Litigation.

3.3    <u>Limitations on the Trustee</u>. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

3.3.1    Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

3.3.2    Loan Trust Assets;

3.3.3    Make any transfer or distribution of Trust Assets other than those authorized in this Trust Agreement, the Plan, or the Confirmation Order;

3.3.4    Engage in any trade or business; or

3.3.5    Engage in any investments or activities inconsistent with the treatment of the Trust as a "Designated" or "Qualified Settlement Trust."

3.4    <u>Requirement to Disclose Trust Claim Information</u>. The Trustee shall be required to disclose (i) all Trust Claim Information to the Settling Insurers, including the AIG Insurers Entities and (ii) any Trust Claim Information relating to Mixed Claims to the BSA Trust.

<div align="center">

**ARTICLE IV**

**<u>TERMINATION OF THE TRUST</u>**

</div>

4.1    <u>Pre-Confirmation Termination.</u> The Trustee shall terminate the Trust if (a) the Effective Date does not occur within one year from the date the Trust Agreement is executed by the Reorganized Debtor and the Trustee or (b) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to confirmation of the Plan (the "<u>Pre-Confirmation Termination</u>"). Upon the Pre-Confirmation Termination of the Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trustee and the Reorganized Debtor both discharged from any and all duties and obligations provided for in this Trust Agreement.

4.2    <u>Post-Confirmation Termination</u>. The Trustee shall terminate the Trust after (a) the Trustee's liquidation, administration, and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and (b) the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan (the "<u>Post-Confirmation Termination</u>"). The Trust shall terminate on the earlier of (a) five years after the Effective Date or (b) the occurrence of each of the following (i) all Trust assets have been administered, and (ii) the Trustee and the Unknown Claim Representative agree that there are no more Unknown Tort Claims to be paid from the Unknown Tort Claim Reserve Fund.

4.3    <u>Post-Confirmation Termination Procedures</u>. After the Post-Confirmation Termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until the Trustee's duties in this Trust Agreement and Plan have been fully performed. The Trustee shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trustee until distribution of all the Trust Assets. For purposes of this provision, the Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than Ten Thousand Dollars ($10,000.00). At the Trustee's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Trust Assets or (b) the date until which the Trustee is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice.

4.4    <u>Post-Confirmation Termination Distribution</u>. Upon Post-Confirmation Termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments in the Trust, if any,

including any investment earnings to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order.

4.5     Discharge, Exculpation, and Exoneration. Upon Post-Confirmation Termination of the Trust and accomplishment of all activities described in this Article, the Trustee and the Trustee's Professionals shall, subject to the requirements for notice and a hearing pursuant to Section 8.2 of this Trust Agreement, be discharged and exculpated from liability, and the Trustee's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or his designated agents or representatives. The Trustee may, at the expense of the Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

## ARTICLE V

## IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUSTEE

5.1     Limitations on Liability. Neither the Trustee nor any of the Trustee's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or the Trustee's designated agents, representatives, or Professionals. The Trustee may, in connection with the performance of the Trustee's functions, and in the Trustee's sole and absolute discretion, consult with the Trustee's Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Trustee's Professionals. Notwithstanding this authority, the Trustee shall be under no obligation to consult with the Trustee's Professionals, and the Trustee's good faith determination not to consult with the Trustee's Professionals shall not result in the imposition of liability on the Trustee, unless the determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2     No Recourse Against the Trustee Personally. No recourse shall be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, or Professional retained by the Trustee in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trustee in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trustee under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets. The Trustee may be held liable for the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability for these grounds is established, recourse may be had directly against the Trustee. The Trust will not be covered by a bond.

5.3     Indemnification. The Trustee, using Trust Assets, shall defend, indemnify, and hold harmless the Trustee, the Trustee's officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the territory of Guam is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that neither the Trustee nor the Trustee's officers, directors, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

# ARTICLE VI

## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS

6.1     Trustee Compensation. The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in Exhibit 1.

6.2     Compensation of the Trustee's Professionals. Any Professional retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered paid by the Trustee from the Trust Assets.

6.3     Reimbursement of Expenses. Any and all reasonably necessary costs and expenses incurred by the Trustee and any Professional retained by the Trustee, in performing their respective duties under this Trust Agreement and the Plan, will be reimbursed by the Trustee from the Trust Assets.

# ARTICLE VII

## SUCCESSOR TRUSTEE

7.1     Vacancy Caused by the Trustee's Resignation or Removal.

7.1.1 The Trustee may resign at any time upon 30-days written notice to be filed with the Bankruptcy Court. The outgoing trustee (the "Outgoing Trustee") shall, within 30 days after the Outgoing Trustee's resignation takes effect, deliver to the successor trustee (the "Successor Trustee") all of the Trust Assets which were in the possession of the Outgoing Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trustee while serving as the Trustee.

7.1.2 Any Tort Claimant may petition the Bankruptcy Court to remove the Trustee.

7.1.3 The Bankruptcy Court may remove a Trustee for cause, which cause shall include, but shall not be limited to, the factors listed in 18 Guam Code Chapter 65. The

removal will take effect upon the date the Bankruptcy Court specifies. In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such**.**

     7.2    <u>Outgoing Trustee Obligations</u>. In the event of the resignation or the removal of the Trustee, the Outgoing Trustee, in addition to the duties imposed under Sections 7.1.1 or 7.1.2, shall:

     7.2.1 Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trustee to effect the resignation or removal of the Outgoing Trustee and the conveyance of the Trust Assets to the Successor Trustee.

     7.2.2 Deliver to the Successor Trustee all documents, instruments, records, and other writings relating to the Trust Assets as may be in the possession or under the control of the Outgoing Trustee.

     7.2.3 Otherwise assist and cooperate in effecting the assumption of the Outgoing Trustee's obligations and functions by the Successor Trustee.

The Outgoing Trustee hereby irrevocably appoints the Successor Trustee (and any interim trustee) as the Outgoing Trustee's attorney-in-fact and agent with full power of substitution for the Outgoing Trustee and in the Outgoing Trustee's name, place, and stead to do any and all acts that the Outgoing Trustee is obligated to perform under this Trust Agreement. The appointment of the Successor Trustee as the Outgoing Trustee's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trustee. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trustee and the subsequent appointment of the Successor Trustee.

     7.3    <u>Appointment of Successor Trustee</u>. Any vacancy in the office of the Trustee shall be filled by the nomination of a majority of the members of the UCC (notwithstanding dissolution of the UCC on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing. If at least three (3) members of the UCC do not participate in the nomination of the Successor Trustee within 10 days after the Outgoing Trustee resigns, is removed, or otherwise becomes unable to serve, the counsel for the majority of Tort Claimants shall designate a successor, subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing.

     7.4    <u>Preservation of Record of Changes in Trustees</u>. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

# ARTICLE VIII

# TRUSTEE REPORTING AND DISCHARGE

8.1     <u>Annual Accountings</u>. The Trustee shall prepare, at least annually, a written accounting of the administration of the Trust listing the current assets with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting may be filed with the Bankruptcy Court for as long as the Bankruptcy Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the Beneficiaries upon request. However, the Trustee shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

8.2     <u>Approval of Accountings and Discharge of the Trustee</u>. After notice and a hearing, notice of which shall be served on the Reorganized Debtor and the Beneficiaries, the Bankruptcy Court may approve the accounting and the Trustee shall be discharged from all liability, to the Trust, any Beneficiary, or any Person who has or may have a claim against the Trustee or Trust for acts or omissions in the Trustee's capacity as Trustee, except with respect to any act of gross negligence or intentional wrongdoing, related to any assets listed and transactions detailed in the accounting.

# ARTICLE IX

# SECTION 468B SETTLEMENT FUND

9.1     <u>Qualification</u>. In accordance with the Plan, the Trustee shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code of 1986 (as amended, the "<u>Tax Code</u>") and the regulations promulgated pursuant the Tax Code (the "<u>Treasury Regulations</u>"). The Reorganized Debtor shall be the "Transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "Administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

9.2     <u>All Events Test and Economic Performance Requirement</u>. It is intended that the transfer of the Trust Assets to the Trust shall satisfy the "All Events Test" and the "Economic Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

9.3     <u>Employer Identification Number</u>. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

9.4     <u>Relation-Back Election</u>. If applicable, the Trustee and the Reorganized Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

9.5     Filing Requirements. The Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Reorganized Debtor shall file an election statement satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and the Treasury Regulations. The election statement shall be included with the Trust's first timely filed trust income tax return. The Reorganized Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Reorganized Debtor makes a transfer to the Trust.

9.6     Broad Powers of the Trustee. The Trustee is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the Treasury Regulations. Further, the Trustee may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with Article IX of this Trust Agreement, provided such amendment does not create any tax liabilities or administrative responsibilities for the Reorganized Debtor.

## ARTICLE X

## BENEFICIARIES

10.1 Register. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the (i) names and addresses of the Beneficiaries and the actual distributions made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon the Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by the holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trustee. The Trustee shall be obligated to maintain the confidentiality of all names, addresses, and any and all other personally identifying information of the Beneficiaries provided to the Trustee.

10.2 Rights of Beneficiaries. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of the Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

10.3 Tax Identification Numbers. The Trustee shall require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The

Trustee shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1 <u>Plan Incorporation</u>. The terms of the Plan and the Confirmation Order are incorporated into and made part of this Trust Agreement as if fully set forth herein. In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

11.2 <u>Notices</u>. All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

If to the Reorganized Debtor:

Archdiocese of Agaña
with a copy to:

11.3 <u>Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.4 <u>Reimbursement of Costs</u>. If the Trustee, the Trust or the Reorganized Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement of a provision of this Trust Agreement, the Trustee, the Trust or the Reorganized Debtor, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

11.5 <u>Entirety of Trust Agreement</u>. Except with respect to the Plan and Confirmation Order, this Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement. This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement. It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or

understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

11.6 <u>Counterparts</u>. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

11.7 <u>Captions</u>. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

11.8 <u>Representation</u>. It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement. Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America. Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

11.9 <u>Interpretation</u>. This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement. Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party. The parties to this Trust Agreement have used their own judgment in entering into this Agreement.

11.10 <u>Savings Clause</u>. If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

11.11 <u>Applicable Law</u>. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the territory of Guam applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Reorganized Debtor and the Trustee execute this Trust Agreement as of the ___ of _____, 2022.

**TRUSTEE:**

_____

By: _____

Title: _____


**ARCHBISHOP OF AGAÑA**, a Guam religious corporation, as Reorganized Debtor

_____

By: _____

Title: _____

# EXHIBIT 1

## TRUSTEE COMPENSATION

Craig Wade- $250.00 per hour

**EXHIBIT 2**

**ARCHBISHOP OF AGAÑA, A CORPORATION SOLE**
**TRUST DISTRIBUTION PLAN**

**ARTICLE I**
**DEFINITIONS**

1.1    **Capitalized Terms**.

Capitalized terms used in this Trust Distribution Plan shall have the meanings given them in the Plan, the Trust Agreement, or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Trust Distribution Plan by reference.

**ARTICLE II**
**RULES OF INTERPRETATION AND GENERAL GUIDELINES**

**2.1.    Purpose**

This Trust Distribution Plan is designed to provide guidance to the Tort Claims Reviewer in determining the amount of each Class 3 Claim and Class 4 Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

**2.2.    General Principles**

As a general principle, this Trust Distribution Plan intends to set out a procedure that provides substantially the same treatment to holders of similar Class 3 Claims and Class 4 Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 3 Claims and Class 4 Claims are intended to reflect the relative values of Class 3 Claims and Class 4 Claims.

**2.3.    Sole and Exclusive Method**

The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 3 Claim or a Class 4 Claim may seek allowance and distribution of such Claim who elect to be treated as a Distribution Plan Claimant. Although the factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

**2.4.    Interpretation**

The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of these Procedures.

### 2.5. Confidentiality and Privilege

All information that the Tort Claims Reviewer receives from any source about any Class 3 Claim or Class 4 Claim shall be held in strict confidence and, except as provided in Article 6.14 of the Plan, shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Class 3 Claimant or Class 4 Claimant (or such Claimant's counsel of record). Except as provided in Article 6.14 of the Plan, all information the Tort Claims Reviewer receives from any Class 3 Claimant or Unknown Tort Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Tort Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

### 2.6. Tort Claims Reviewer

Kramer Law LLC is the Tort Claims Reviewer. The Tort Claims Reviewer shall conduct a review of each of the Class 3 Claim or Class 4 Claim, according to the guidelines set forth below, shall make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust Agreement.

### ARTICLE III
### PROCEDURE

### 3.1. Allowance of a Class 3 Claim

A Class 3 Claim shall be allowed if the Tort Claims Reviewer determines the Class 3 Claimant proved his or her claim by a preponderance of the evidence. If necessary, the Tort Claims Reviewer can ask for additional information to make this determination. The Class 3 Claimant may refuse such a request at his or her own risk, including but not limited to disallowance of his or her Claim.

### 3.2. Claim Amount Determination

If a Class 3 Claim is allowed, the Tort Claims Reviewer shall determine the amount of such Class 3 Claim by assigning such Class 3 Claim a value pursuant to the Evaluation Factors. The Tort Claims Reviewer shall consider all of the facts and evidence presented by the Class 3 Claimant in the Class 3 Claimant's filed proof of claim. Class 3 Claimants may supplement their filed proof of claims to provide additional information to the Tort Claims Reviewer until a plan is confirmed. Class 3 Claimants shall have no later than sixty (60) days from the Confirmation Date to provide the Tort Claims Reviewer with any additional information. The Tort Claims Reviewer may consider the credibility of the Class 3 Claimant and the facts alleged in support of the Claim and, in the Tort Claims Reviewer's sole discretion, reduce or deny the Class 3 Claim. After all Class 3 Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall determine the dollar value for each Class 3 Claim based on the Class 3 Claimant's pro rata share of the total points assigned to all Class 3 Claimants and the available funds for distribution after accounting for necessary holdbacks.

### 3.3.    Determinations by the Tort Claims Reviewer

The Tort Claims Reviewer or the Trustee shall notify each Class 3 Claimant or Class 4 Claimant in writing of the expected monetary distribution with respect to the Class 3 Claimant's claim or Class 4 Claimant's claim, which distribution may be greater or smaller than the actual distribution to be received based on the outcome of any reconsideration claims and the funds ultimately available for distribution. The Tort Claims Reviewer's determination shall be final unless the Class 3 Claimant or Class 4 Claimant makes a timely request for the point award to be reconsidered by the Tort Claims Reviewer. The Class 3 Claimant or Class 4 Claimant shall not have a right to any other appeal of the Tort Claims Reviewer's point award. Determinations shall be sent, in the case of a Claimant represented by a lawyer to the Claimant's attorney by email and, in the case of a pro se Claimant, both by email, if one is provided, and by express courier.

### 3.4.    Requests for Reconsideration

The Class 3 Claimant or Class 4 Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claims Reviewer within fourteen days (14) calendar days after the date of mailing of the notice of the preliminary monetary distribution. Each written request must be accompanied by a non-refundable check for the reconsideration fee, $400.00 hundred dollars ($400.00). The Class 3 Claimant or Class 4 Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Class 3 Claimant's or Class 4 Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Tort Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

### 3.5.    Distribution

Once the Tort Claims Reviewer has made all reconsideration determinations, the Trustee shall determine the dollar value of each Survivor's actual distribution based on the Class 3 Claimant's pro rata share of the total final points assigned and the available funds for distribution. From time to time, the Trustee shall determine the funds that are available for distribution and the funds that are necessary to be held back for the expenses of the Trust. If funds are available for distribution, he Trustee shall then make payment to Class 3 Claimants in accordance with the Trustee's powers and duties under Section 3.2 of the Trust Agreement. The Trustee may make multiple distributions to Claimants throughout the existence of the Trust.

### 3.6.    Deceased Abuse Survivors

The Tort Claims Reviewer shall review the claim of a deceased Class 3 Claimant without regard to the Claimant's death, except that the Tort Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

### 3.7    Determination of Status as Unknown Claim

The Unknown Tort Claim Representative shall determine whether a claim qualifies as an Unknown Claim under the Plan. If the Unknown Tort Claim Representative determines that a claim qualifies as an Unknown Claim, the Unknown Tort Claim Representative shall immediately notify the Debtor for the purposes of funding the Unknown Claim Reserve.

### 3.8 Allowance and Distribution to Unknown Tort Claimants

When an Unknown Tort Claim is received by the Trustee and after it has been qualified by the Unknown Tort Claim Representative, the Tort Claims Reviewer shall assign a total point value to each Unknown Claim pursuant to the factors set forth in Article IV. After the Tort Claims Reviewer assigned points to the Unknown Tort Claim, such Claim is an allowed Claim. Holders of Unknown Tort Claims shall receive a pro rata distribution from the Unknown Claim Reserve Fund established by the Trustee. The distribution to each Unknown Tort Claimant shall be determined by taking the points assigned to each Unknown Tort Claim, divided by the combined total points assigned to all Unknown Tort Claims, multiplied by the amount held in the Unknown Tort Claim Reserve. No Unknown Tort Claimant shall receive more than he or she would have as a Class 3 Claimant. The Trustee shall make an immediate distribution in an amount as determined in the sole discretion of the Unknown Claims Representative to the holders of allowed Unknown Tort Claims immediately upon determination by the Tort Claims Reviewer, with the remaining portion of the Claim paid at the termination of the Unknown Tort Claim Reserve Fund as provided for in the Trust Agreement.

### 3.9 Establishing A Reserve for Litigation Claims

The following procedure is the sole and exclusive method by which any Class 3 Claimant who elects treatment as a Litigation Claimant may seek distribution of such allowed Litigation Claim. Each Litigation Claimant shall submit to all of the policies and procedures set forth in this Trust Distribution Plan, except as expressly set forth in this Section 3.9. The Trust shall establish a reserve for each Litigation Claim in the amount that would have been allocated to the Claim if the Litigation Claimant had elected treatment as a Distribution Plan Claimant. The Trustee may, in his discretion, and at the same time as the Trustee makes the initial distribution to the Distribution Plan Claimants, make an initial distribution to each Litigation Claimant in an amount based on and not to exceed the reserve set for each Litigation Claim.

a) In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, then the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of the reserve set for that Litigation Claimant's Litigation Claim plus an additional $1,000.

b) In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust. Such recovery shall

first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining of any such recovery after such reimbursement shall be divided as follows:

1) If a settlement is obtained with the Debtor, Reorganized Debtor, or Non-Settling Insurer(s) on the Litigation Claim before any judgment was obtained in the Litigation Claim, then the Litigation Claimant is entitled to receive a portion of such settlement up to a maximum amount of the total amount of the reserve set for the Litigation Claim, plus 60% of the total settlement, with the remainder to go to the Trust. The 40% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the total amount of the reserve set for that Litigation Claimant's Claim, plus the 60%. If a settlement is obtained in an amount less than the reserve amount set for that Litigation Claimant's Claim, then the Litigation Claimant shall recover the reserve amount from Trust, plus retain the total amount of the settlement.

2) If a judgment is obtained on the Litigation Claim and the resolution with or judgment against the Debtor, Reorganized Debtor, or Non-Settling Insurer is obtained thereafter, then the Litigation Claimant is entitled to receive a portion of such judgment or settlement up to a maximum amount of: the total amount of the reserve set for the Litigation Claim, plus 80% of the total settlement or judgment, with the remainder to go to the Trust. The 20% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the reserve set for that Litigation Claimant's Claim, plus the 80%. If a settlement or judgment is obtained in an amount less than the reserve amount set for that Litigation Claimant's Claim, then the Litigation Claimant shall recover the reserve amount from Trust, plus retain the total amount of the judgment or settlement.

**3.10 Distribution of Litigation Claim Proceeds.** If any amounts are recovered by the Trust on any Litigation Claim after the distributions to the Litigation Claimant are made pursuant to Section 3.9(b), the Trust shall distribute the proceeds of such Litigation Claim to all Class 3 Claimants pursuant to Section 3.5. The Trust shall calculate each Litigation Claimant's pro rata distribution based on the points assigned for the purpose of establishes the reserve on his or her Litigation Claim.

**3.11 Special Conditions for Allowance**. No Tort Claim or Unknown Tort Claim shall be allowed unless such claimant has (i) fully responded to all questions on the Sexual Abuse Proof of Claim Form, ECF No. 168-1, as approved by the Court ECF No. 168, which questions are applicable to their Claims against any Protected Party and (ii) complied with all requests for information related to his or her Claim made by the Tort Claims Reviewer.

**ARTICLE IV**
**GUIDELINES FOR ALLOCATION FOR ABUSE CLASS 3 CLAIMS**

**4.1.   Evaluation Factors**

Each Tort Claim will be evaluated by the Tort Claims Reviewer. Each Claim will be assigned points according to the following system. The total number of points awarded in each section is left to the discretion of the Tort Claims Reviewer.

      **(a)**    **Nature of Abuse & Circumstances**. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive.

      (1)    The duration and/or frequency of the abuse;

      (2)    Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk;

      (3)    Circumstances of abuse:

      (i)    grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

      (ii)    coercion or threat or use of force or violence, stalking;

      (iii)  relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator;

      (iv)  location of abuse, including but not limited to isolated location, Tort Claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

      (v) Whether the abuse was perpetrated by an Archdiocesan priest in a setting that was not under the control or authority of a religious order.

      (4)    Public Nature of Abuse: Including whether the perpetration of abuse was on more than one survivor at a time and whether the Claimant was the subject of public humiliation during or surrounding the perpetration of the abuse. Examples include: (i) the perpetrator forcing other survivors to watch the perpetration of

abuse on a Claimant and (ii) public ridicule from classmates or teachers who observed grooming by the abuser.

**(b)** **Impact of the Abuse**. Overall, this category looks to how the abuse impacted the claimant. This includes how the abuse impacted the claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive.

The Tort Claims Reviewer should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

(1)     Mental Health Issues: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

(2)     Physical Health Issues: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

(3)     Spiritual Wellbeing: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

(4)     Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

(5)     Vocational Capacity: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

(6)     Academic Capacity: This includes but is not limited to school behavior problems.

(7)     Legal Difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

(8) Prevention/Knowledge: Was the abuse known about by other members of the establishment?

(9) Loss of Community: This includes, but is not limited to, experiencing public denial of the abuse and shame, shunning, or physical/emotional retaliation from loved ones or friends after disclosing the abuse.

**(c)      Claimant Involvement**. The Tort Claims Reviewer shall consider that all Claimants have benefited from the work and cost incurred by those Claimants who have previously asserted claims against the Archdiocese and have participated in the legal and factual development of claims against the Archdiocese.

The Tort Claims Reviewer should consider factors including but not limited to whether the Claimant has filed a lawsuit; whether the Claimant and/or the Claimant's family has been subject to a deposition or given sworn testimony, mediation or interview; whether the Claimant has participated on the Official Committee of Unsecured Creditors; and whether the Claimant participated in publicizing the issue of clergy sex abuse which has benefitted all claimants.

## ARTICLE V
## BOY SCOUTS OF AMERICA

**5.1      Allowed Claims from the Boy Scouts of America Bankruptcy Case**

(a) Any assets contributed to the Trust by the Boy Scouts of America and Delaware BSA, LLC, a Local Council, and/or the BSA Insurers (the "BSA Contribution") shall only be distributed to Class 3 Claimants pursuant to the terms of this Article V.

(b) If a Class 3 Claimant is also the holder of an allowed claim in the chapter 11 bankruptcy case of the Boy Scouts of America and Delaware BSA, LLC (Bankr. D. Del. 20-10343) (Jointly Administered) (the "BSA Bankruptcy"), such Class 3 Claimant shall be entitled, in addition to the amounts allowed by Articles I-IV, to a pro rata distribution of the BSA Contribution based on the points awarded pursuant to Article IV.

(c) No Class 3 Claimant or Class 4 Claimant may receive a distribution pursuant to Article V unless the Claimant has an allowed claim in the BSA Bankruptcy. A Claimant's claim in the BSA Bankruptcy will be considered to be an allowed claim if, at the time of the distribution under this Article, the Claimant's claim has not been disallowed in the BSA Bankruptcy.

## ARTICLE VI
## ADDITIONAL PROVISIONS

**6.1      Reductions.**

The Tort Claims Reviewer may allow any Class 3 Claim filed after the Bar Date but before the Effective Date in his sole discretion. The points assigned to any Class 3 Claim under this

Section 6.1 pursuant to Article IV shall be reduced by 2/3, and in no event shall any Class 3 Claim allowed under this Section 6.1 receive more than $50,000.00.

§       6.2       **Distribution of Scholarship Voucher and Cemetery Voucher.** The Trustee shall distribute the Scholarship Voucher and Cemetery Voucher to holders of Allowed Class 3 Claims as follows:

a. Prior to making any initial distribution, the Trustee shall send correspondence to the Class 3 Claimants and request that each Class 3 Claimant opt-in to receive a Scholarship Voucher, Cemetery Voucher, or both.

b. If the number of opt-in Class 3 Claimants is less than or equal to the number of Scholarship Voucher and/or Cemetery Voucher the Trustee shall, after considering the facts and circumstances of each Class 3 Claimants request, distribute the Scholarship Voucher and/or Cemetery Voucher to the opt-in Class 3 Claimants.

c. If the number of opt-in Class 3 Claimants is greater the number of Scholarship Vouchers and/or Cemetery Vouchers the Trustee shall award the Scholarship Voucher and/or Cemetery Voucher by random lottery to the respective opt-in Class 3 Claimants. After considering the facts and circumstances of each Class 3 Claimant's request, the Trustee shall distribute the Scholarship Voucher and/or Cemetery Voucher to the opt-in Class 3 Claimants awarded a Scholarship Voucher and/or Cemetery Voucher. In no case may a Class 3 Claimant receive both a Scholarship Voucher and Cemetery Voucher under this provision 6.2(c).

d. After complying with provisions 6.2(a),(b), and (c), if the Trustee is unable to award and distribute all of the Scholarship Vouchers and/or Cemetery Vouchers, he may, in his discretion award any remaining Scholarship Voucher and/or Cemetery Voucher on a first-come-first-served basis to any Class 3 or Class 4 Claimant, with any then remaining Scholarship Voucher and/or Cemetery Voucher returned to the Reorganized Debtor upon closing of the Trust.

**EXHIBIT E**
**Class 3 Release**
**(see below)**

> **TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

1.     All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.     In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

a.     Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Archdiocese's Chapter 11 case.

b.     Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

c.     Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

d.     Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

e.     Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

f.     With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, I covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in

connection with the Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) I understand the Plan extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Tort Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s). I intend the foregoing undertakings to comply with the principles set forth in 7 G.C.A. § 24605.

5.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

6.      I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

7.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

8.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10.     I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11.     This Release will bind my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF TORT CLAIMANT'S ESTATE:

DATED: _____

| | |
|---|---|
| Name of Holder: | _____ |
| Proof of Claim No. (if known): | _____ |
| John/Jane Doe No. (if known): | _____ |
| Signature: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone No. (optional): | _____ |
| E-mail (optional): | _____ |

**EXHIBIT F**

**<u>Unknown Tort Claim Release</u>**

(see attached)

> **TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

1.      All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.      In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

a.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Archdiocese's Chapter 11 case.

b.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

c.      Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

d.      Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

e.      Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

f.      With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with the Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to

voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) I understand the Plan extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Tort Claim.

3.　　I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.　　I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s). I intend the foregoing undertakings to comply with the principles set forth in 7 G.C.A. § 24605.

5.　　I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

6.　　I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

7.　　I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

8.　　I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10.      I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11.      This Release will bind my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF
TORT CLAIMANT'S ESTATE:

DATED: _____

|                                          |                                         |
|------------------------------------------|-----------------------------------------|
| Name of Holder:                          | _____  |
| Proof of Claim No. (if known):           | _____  |
| John/Jane Doe No. (if known):            | _____  |
| Signature:                               | _____  |
| Address:                                 | _____  |
|                                          | _____  |
|                                          | _____  |
| Telephone No. (optional):                | _____  |
| E-mail (optional):                       | _____  |

**Exhibit G:**
**Real Property Transferred to Trust**

| Debtor Prefix | Legal Description |
|---|---|
| AGA13 | Lot 19-R1, Block 26, Agat |
| AGA14 | Lot 8-2, Block 22, Hagatna |
| AGA3 | Lot 1 NEW, Block 9, Agaña (Consolidated from Lots 1, 2, 3, 4, 15 and 16) |
| AGA9 | Lot 1341-1-REM-4, Agaña |
| AGT1 | Lot 306-4-2NEW, Agat |
| AGT2 | Lot 5, Agat (18% undivided interest) |
| AGT3 | Lots 165 and 168, Agat |
| AHT1 & AHT2 | Lot 19 NEW (Part) NEW-R4, Agaña Heights |
| AHT3 | Lot 20 REM-3-2-1, Agaña Heights |
| ANG1 | Lot 1341-1-REM-3, Hagåtña |
| ASA1 | Lot 240-10, Asan |
| ASA6 | Lot 214-1REM, Asan |
| ASA7 | Portion of Lot 11, Block 18, Tract 2025, Asan (old D18-23) |
| AST1 | Lot 1NEW, Block 5, Tract 240, Dededo |
| BAR21 | Lot 2346-1, Barrigada |
| BAR25 | Lot 2265-Rem-8-1, Barrigada |
| BAR22, 27 & 28 | Lot 2364-1-7NEW; Lot 2365-1-1; and Lot 5437, Barrigada |
| BAR35 | Lot 2265-REM-8-4-R1, Barrigada |
| BAR5 | Lot 2264-1-2, Barrigada |
| DED15 | Lot 5019A-3-5, Dededo |
| HAG1 | Lot 1340-3-1, Hagatna |
| HAG2 | Lot 1341-1-1 (REM), Hagatna |
| HAG3 | Lot 81-REM-2, Hagatna |
| HAG4 | Lot 81-REM-3, Hagatna |
| HAG5 | Lot 81-REM-4, Hagatna |
| HAG6 | Lot 81-REM-7, Hagatna |
| HAG7 | Lot 81-REM-R8, Hagatna |
| HAG8 | Lot 81-REM-8, Hagatna |
| INA1 | Lot 190-R9, Inarajan |
| INA5 | Lot 1-R2, Inarajan |
| INA5a | Lot 1-2, Inarajan |
| MAC1 | Lot 10077-1-NEW-5, Machanao |
| MAL1 & MAL2 | Lot 190-2NEW, Malojloj, Inarajan |
| MAL3 | 190-7, Malojloj, Inarajan |
| MAN1 & MAN8 | Lot 2285-2-3, Mangilao |
| MAN3 | Lot 3, Block 3, Tract 139, Mangilao |

| Debtor Prefix | Legal Description |
|---|---|
| MAN6 | Lot 2285A, Mangilao |
| MAN10 | Lot 2418 A-2-R1, Mangilao |
| MER1A&B | Lot 501 (A) and Lot 501 (B), Gugae, Merizo |
| MER2 | Lot 4, Merizo |
| MER3 | Lot 530 Y-Pigua, Merizo |
| MER5 | Lot 54-R1, Merizo |
| MON1 | Lot 100-2, Mongmong |
| ORD2A | Lot 3275-3-4, Ordot |
| ORD3-6 | Lot 1NEW, Tract 122, Ordot |
| PGO10 | Lot 81-REM-1-R/W, Pigo, Agaña |
| PGO11 | Lot 81-REM-6-R/W. Pigo, Agaña |
| PHI1&2 | Residential Condominium, 24th Floor, Unit D, Lotus Tower of Oriental Gardens, Cor. Pasong Tamo, Urban Ave. & Tindalo St., Pio del Pilar, Makati City, Philippines; Residential Condominium, 24th Floor, Unit F, Lotus Tower of Oriental Gardens,Cor. Pasong Tamo, Urban Ave. & Tindalo St., Pio del Pilar, Makati City, Philippines |
| PIT1 | Lot 1A, Tract 318, Piti |
| PIT2 | Block 8, Piti |
| SIN13 | Lot 21, Block 17, Tract 232, Sinajana |
| SIN14 & SIN18 | Lot P19.28B-1New, Ordot-Chalan Pago |
| SIN8 | Lot 1118-R1, Sinajana |
| STR1 | Lot 4, Block 4, Santa Rita |
| STR2 | Lot 6, Block 2, Santa Rita |
| TAL13 | Portion of Lot No. 11, Tract 2931, Talofofo, an area of 10,000 +/- square meters |
| TAL6-9 | Lots 12, 13, 14 and 15, Block 13, Talofofo |
| TUM1 | Lot 5060-A, Tumon, Dededo |
| TUM2 | Lot 5118-1-1, Tumon |
| YIG3 | Lot 5-1, Block 4, Tract 251, Yigo |
| YIG4 | Lot 7033-A, Yigo |
| YIG5 | Lot 7007-3-R3 New, Yigo |
| YON5 | Lot 91-1A-3-1, Yona |
| YON6 | Lot 173-NEW-NEW-R2, Yona |
| YPN1 | Lot 9-20, Tract 142, Ypan, Talofofo |
| AGT7 | Lot 247-2, Agat |
| AGT8 | Lot 248, Agat |
| BAR1, BAR2, BAR3, BAR4 | Lots 1, 2, 3, and 4, Block 2, Tract 1534, Mangilao |
| SIN9 & SIN10 | Lot 18 & 19, Block 1, Tract 2014, Sinajana |
| UMA1 | Lot 42-3, Umatac |

**Exhibit H:**

[Reserved]

**Exhibit I:**
Archdiocese Entity Insurance Policies

| INSURER | POLICY NO. | EFFECTIVE DATES |
|---|---|---|
| Fireman's Ins. Co. of Newark, NJ & Commercial Casualty Ins. Co. | 41-3621 | 9/12/50-9/12/51 |
| Commercial Ins. Co. of Newark, NJ | Unknown | 4/1/62-4/1/63 (presumed based on secondary evidence) |
| Commercial Ins. Co. of Newark, NJ | Unknown | 4/1/63-4/1/64 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/63-4/1/64 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/64-4/1/65 (presumed based on secondary evidence) |
| Unknown | 82-13886 | 4/1/65-4/1/66 (presumed based on secondary evidence) |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-32493 | 4/1/72 to 4/1/75 (*unconfirmed*) |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-73721 | 4/1/75 to 4/1/78 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-74445 | 4/1/78 to 4/1/81 (*unconfirmed*) |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-75087 | 4/1/81 to 4/1/84 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-78156 | 4/1/84 to 4/1/87 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-214061 | 4/1/87 to 4/1/90 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-214482 | 4/1/90 to 4/1/93 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-215147 | 4/1/93 to 4/1/94 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-215459 | 4/1/94 to 4/1/97 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-216134 | 4/1/97 to 5/4/98 |

| INSURER | POLICY NO. | EFFECTIVE DATES |
|---|---|---|
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-216266 | 5/4/98 to 4/1/00 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-216632 | Unknown (*unconfirmed*) |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-217121 | Unknown (*unconfirmed*) |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-217266 | 7/1/04 to 7/1/07 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-217760 | 7/1/07 to 7/1/08 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-218169 | 7/1/08 to 7/1/09 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 80-218431 | 7/1/09 to 7/1/10 |

**Exhibit J:**
**Officers and Directors of Reorganized Debtor**

1. Archbishop Michael J. Byrnes
2. Reverend Father Romeo Convocar, Vicar General
3. Josephine Villanueva, as Finance Officer

**Exhibit K:**

**CHILD PROTECTION PROTOCOLS**

[TO BE SUPPLEMENTED]

**Exhibit L:**
**BSA Insurance Policies**

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| 1/1/1962-1/1/1963 | INA | CGL191986 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1963-1/1/1964 | INA | CGL204680 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1964-1/1/1965 | INA | CGL212922 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1965-1/1/1966 | INA | CGL 232470 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1966-1/1/1967 | INA | CGL 248896 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1967-1/1/1968 | INA | CLP 11200 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1968-1/1/1969 | INA | GLP 151211 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1969-1/1/1970 | INA | GLP 160981 | $500,000 each person; $1,000,000 each occurrence |
| 3/2/1969-1/1/1970 | INA | XBC 43198 | $2,000,000 per occurrence |
| 1/1/1970-1/1/1971 | INA | BLB 51323 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1970-1/1/1971 | INA | XBC 77302 | $2,000,000 per occurrence |
| 1/1/1971-1/1/1972 | INA | XBC 85370 | $2,000,000 per occurrence |
| 9/21/1971-1/1/1972 | Hartford | 10CA43315 | $500,000 each person; $1,000,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10CA43303 | $500,000 each occurrence |
| 1/1/1972 - 1/1/1974 | Hartford | 10HUA43302 | - |
| - | Hartford | 10CA43329 | $500,000 each occurrence; $500,000 agg. |
| 1/1/1974-1/1/1975 | Hartford | 10HUA43335 | $2,000,000 per occurrence |
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | National Union | BE1151559 & BE1151554 | $10,000,000 each occurrence |

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| **9/17/1976-9/17/1977** | Lloyds' & Companies | 76-10-08-02 | $5,000,000 each occurrence |
| **1/1/1977-1/1/1978** | Hartford | 10CA43359 E | $1,000,000 each occurrence |
| **1/1/1977-1/1/1978** | National Union | BE121P255 & BE1151590 * | $10,000,000 each occurrence |
| **1/1/1977-1/1/1978** | Am RE | M-1027493 | $500,000 each occurrence |
| **1/1/1978-1/1/1979** | INA | GLP706452 | $500,000 per occurrence |
| **1/1/1978-1/1/1979** | National Union | CE1157777 | $500,000 per occurrence |
| **1/1/1978-1/1/1979** | First State | 908854 | $10,000,000 per occurrence |
| **1/1/1979-1/1/1980** | INA | GLP706452 | $500,000 per occurrence |
| **1/1/1979-1/1/1980** | INA | XBC 151748 | $5,000,000 per occurrence |
| **1/1/1979-1/1/1980** | First State | 927616 | $5,000,000 per occurrence |
| **1/1/1980-1/1/1981** | INA | GLP706452 | $5,000,000 each occurrence |
| **1/1/1980-1/1/1981** | Allianz | UMB 599346 | $5,000,000 per occurrence |
| **1/1/1980-1/1/1981** | Aetna | 01XN2438WCA | $10,000,000 per occurrence; $10,000,000 Aggregate |
| **1/1/1981-1/1/1982** | INA | ISC1353 | $500,000 per occurrence |
| **1/1/1981-4/1/1982** | Transit | UMB 964076 | $5,000,000 per occurrence |
| **1/1/1981-1/1/1983** | First State and Underwriters | 931255 & 931255A | $10,000,000 per occurrence |
| **1/1/1981-1/1/1983** | First State and Underwriters | 931257 & 931257A | $10,000,000 per occurrence |

The BSA Insurers include, but are not limited to: Insurance Company of North America; Hartford Accident and Indemnity Company; National Union Fire Insurance Company of Pittsburgh, PA; Certain Underwriters at Lloyd's London; American Re Corporation; First State Insurance Company; Travelers Casualty and Surety Company, Inc.; Transit Casualty Insurance Company; Allianz Global Risks US Insurance Company.

## **Exhibit M:    List of Catholic Entities**

1. The Catholic Cemeteries of Guam, Inc.,
2. Academy of Our Lady of Guam School,
3. Father Duenas Memorial School,
4. Bishop Baumgartner Memorial School,
5. Saint Francis Catholic School,
6. Santa Barbara Catholic School,
7. San Vicente Catholic School,
8. Saint Anthony Catholic School,
9. Our Lady of Lourdes Parish,
10. Santa Bernadita Parish,
11. Santa Barbara Parish,
12. Saint Andrew Kim Parish,
13. Blessed Diego Luis de San Vitores Parish,
14. Saint Anthony and Saint Victor Parish,
15. Saint Francis Parish,
16. San Miguel Parish,
17. San Isidro Parish,
18. Saint Joseph Parish,
19. San Dimas & Our Lady of the Rosary Parish,
20. San Dionisio Parish,
21. Saint Jude Thaddeus Parish,
22. Nuestra Senora de Las Aguas Parish,
23. Immaculate Heart of Mary Parish,
24. Nuestra senora de La Paz Y Buen Viaje Parish,
25. San Juan Bautista Parish,
26. Santa Teresita Parish,
27. San Vicente and San Roque Parish,
28. Dulce Nombre De Maria Cathedral-Basilica,
29. Our Lady of the Blessed Sacrament Parish,
30. Our lady of Purification Parish,
31. Nino Perdido Y Sagrada Familia Parish,
32. Assumption of Our Lady Parish,
33. Our Lady of Guadalupe Parish,
34. Our Lady of Mount Carmel Parish, and
35. Mt. Carmel Catholic School.

CORE/3515288.0002/171049844.43

SA 2062

**Exhibit N:      Settling Insurers**

1.      National Union Fire Insurance Company of Pittsburgh, Pa.;
2.      American Home Assurance Company;
3.      Lexington Insurance Company;
4.      Landmark Insurance Company;
5.      Insurance Company of the State of Pennsylvania; and
6.      Any Persons added pursuant to Plan Section 8.1(d).

**Exhibit O:**
Partitioned Real Property

| Debtor Prefix | LEGAL DESCRIPTION |
|---|---|
| AGT3 | Lots 165 and 168, Agat |
| AHT1&2 | Lot 19 NEW (Part) NEW-R4, Agaña Heights |
| ASA6 | Lot 214-1REM, Asan |
| ASA7 | Lot 11, Block 18, Tract 2025, Asan |
| AST1 | Lot 1NEW, Block 5, Tract 240, Dededo |
| BAR22, 27 &28 | Lot 2364-1-7-NEW, Barrigada; Southeasterly portion of Lot 2364-1, situated between government road and Westerly boundary of Lot 2365, Barrigada; and Lot 5437 (Old Bullcart Trail between Lot 2364-1-7 and 2365-1-1), Barrigada |
| BAR35 | Lot 2265-REM-8-4-R1, Barrigada |
| INA5 | Lot 1-R2, Inarajan |
| MAL1&MAL2 | Lot 190-2NEW, Malojloj, Inarajan |
| MAL3 | 190-7, Malojloj, Inarajan |
| MAN1 &MAN8 | Lot 2285-2-3, Mangilao |
| MER5 | Lot 54-R1, Merizo |
| ORD3-6 | Lot 1NEW, Tract 122, Ordot |
| PIT2 | Block 8, Piti |
| SIN13 | Lot 21, Block 17, Tract 232, Sinajana |
| SIN14&SIN18 | Lot P19.28B-1New, Ordot-Chalan Pago |
| SIN8 | Portion of Lot 1118-R1, Sinajana |
| STR2 | Lot 6, Block 2, Santa Rita |
| TUM2 | Lot 5118-1-1, Tumon |
| YIG5 | Lot 7007-3-R3 New, Yigo |
| YON6 | Lot 173-NEW-NEW-R2, Yona |

**Exhibit P:**

Maps of Retain Real Property

Retained Real Property is shown by blue marks on the following maps:

[filed with the Plan but at a separate docket entry]

**Exhibit Q:**
**Bank of Guam Replacement Properties**

| Prefix | Legal | Only Portion Not Contained on Exhibits R/P |
|---|---|---|
| DED19 | Lot 4-NEW, Block 4, Dededo | |
| DED4-11 | Lot 1-New-New, Block 4, Dededo | |
| DED16 | Lot 1-New-New, Block 4, Dededo | |
| DED17 | Lot 1-New-New, Block 4, Dededo | |
| YON6 | Lot 173-NEW-NEW-R2, Yona | x |
| YON7 | Lot 174, Yona | |
| YON8 | Lot 175, Yona | |
| YON9 | Lot 166-Rem-1 | |
| MER5 | Lot 54-R1, Merizo | x |
| SIN2 | Lot 2413-1, Sinajana | |
| SIN3 | Lot 2414-1, Sinajana | |
| SIN14 | Lot P19.28B-1New, Ordot-Chalan Pago | x |
| MAN10 | Lot 2418 A-2-R1, Mangilao | |
| DED12 | Lot 1 New, Block 14, Dededo | |
| DED13 | Lot 7, Block 19, Dededo | |
| SIN19 | Lot 10, Block 5, Tract 232, Sinajana | |
| AGA10 | Lot 2, Block 28, Agaña | |
| AGA11 | Lot 2, Block 28, Agaña | |
| AGA6 | Lot 1273, Agaña | |
| AGA7 | Lot 1275, Agaña | |

**Exhibit R:**

**SCHOLARSHIP VOUCHERS**

1. Scholarship Vouchers cover tuition fees only, excluding all other fees, including but not limited to registration fees which will be the responsibility of the award party.

2. All students intending to use a Scholarship Voucher must be otherwise qualified to attend the particular school chosen. Scholarship Vouchers are subject to Admission Requirements, the Parent-Student Handbook, and all other policies implemented by the issuing school as well as policies implemented by the AOA Office of Catholic Education.

3. A specific number of Scholarship Vouchers will be assigned to each catholic school considering the school's viability.

4. Scholarship Vouchers will indicate the school, the grade level (elementary or high school), school year of effectivity and year of expiration.

5. Once the Scholarship Voucher is awarded to a particular student, the Scholarship Voucher is non-transferrable.

6. Scholarship Vouchers are not convertible to cash.

7. Scholarship Vouchers will terminate upon student voluntarily or involuntarily leaving the school of original attendance.

8. Scholarship Vouchers cannot be used at multiple schools.

9. Scholarship Vouchers to be used by family members of an Abuse Claimant who has executed a release.

**ELEMENTARY SCHOLARSHIP VOUCHERS**

1. For a period of ten (10) years, three Scholarship Vouchers per Archdiocesan elementary school will be issued annually that will encompass K to 8th grade.

2. Scholarship Vouchers are valid for up to 9 years from the school year of its effectivity.

3. Using an Elementary Scholarship Voucher prior to its effectivity date to enroll a student not beginning with kindergarten waives the prior year(s) not attended, and can be used only upon the availability of the slot for that higher grade level.

**HIGH SCHOOL SCHOLARSHIP VOUCHERS**

1. For a period of ten (10) years, two Scholarship Vouchers per Archdiocesan high school will be issued annually that will encompass 9th to 12th grade

2. High school Scholarship Vouchers are valid for 4 years from its school year of effectivity.

3. Using a high school Scholarship Voucher prior to its effectivity date to enroll a student not beginning with 9th grade waives the prior year(s) not attended, and can be used only upon the availability of the slot for that higher grade level.

**ARCHDIOCESAN ELEMENTARY SCHOOLS**

Bishop Baumgartner Memorial Catholic School
San Vicente Catholic School
Saint Francis Catholic School
Saint Anthony Catholic School
Santa Barbara Catholic School

**ARCHDIOCESAN HIGH SCHOOL**

Academy of Our Lady of Guam
Father Dueñas Memorial School

Recipient: _____

School: _____

Grade Level: _____

Year Effective: _____

CORE/3515288.0002/171049844.43

**Exhibit S:**

**CEMETERY VOUCHER**

1. Cemetery Vouchers cover the cost of the cemetery plot easement only, excluding all other fees, including but not limited to pre-need internment merchandise, crypt front, crypt marker, opening closing fee, miscellaneous charges, and caskets, which will be the responsibility of the Awarded Party.
2. The Awarded Party will be required to fill out and execute the Acknowledgement of Understanding, the Pontem Professional CIMS Data Capture Form, and the Contract for Burial Rights, all of which are attached as exhibits to this voucher.
3. Once the Cemetery Easement Voucher is awarded to an Awarded Party, the Cemetery Easement Voucher is non-transferrable.
4. Cemetery Easement Vouchers are not convertible to cash.
5. Cemetery Easement Vouchers to be awarded only to an Abuse Claimant who has executed a release as set forth in the confirmed Plan of Reorganization.

**ARCHDIOCESAN CEMETERIES**

Pigo Catholic Cemetery
Mt. Carmel Catholic Cemetery
Holy Cross Catholic Cemetery

Awarded Party:   _____

Cemetery:   _____

Year Effective:   _____

Approved By:   _____

Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID  83815
Tel:    (208) 667-2900
Fax:    (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

*Counsel for Debtor-in-Possession*

## IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM
## BANKRUPTCY DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ARCHBISHOP OF AGAÑA,<br>a Corporation Sole,<br>    Debtor. | Case No. 19-00010 |

## NOTICE OF FILING OF THE UNKNOWN CLAIMS REPRESENTATIVE'S
## REPORT AND RECOMMENDATIONS

The Archbishop of Agaña ("AOA"), a Religious Corporation Sole, Debtor-in-

Possession ("Debtor"), herein by counsel, and as an accommodation to the Unknown Claims

NOTICE OF FILING UNKNOWN CLAIMS
REPRESENTATIVE'S REPORT- 1

SA 2071

Representative, gives notice of filing the attached Unknown Claims Representative's Report and Recommendations.

Dated this 8th day of July, 2022, Pacific Time.

ELSAESSER ANDERSON, CHTD.

*/s/ Bruce A. Anderson*
Ford Elsaesser
Bruce A. Anderson

-and-

THE LAW OFFICE OF JOHN C. TERLAJE

*/s/ John C. Terlaje*
John C. Terlaje

NOTICE OF FILING UNKNOWN CLAIMS
REPRESENTATIVE'S REPORT - 2

SA 2072

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 8, 2022, Pacific Time, in accordance with Fed. R. Civ. P. 5(b)(3), a true copy of the foregoing was served via the Court's CM/ECF notification facilities to those parties who are registered CM/ECF participants in this case, and the U.S. Trustee.

Additionally, by regular first class mail, postage prepaid, the foregoing was served to the parties on the attached MML* and the following non-ECF parties:

Internal Revenue Service
Centralized Insolvency Operation
Post Office Box 7346
Philadelphia, PA 19101-7346

Guam Department of Revenue and
Taxation
Real Estate Tax Department
P.O. Box 23607
Barrigada, Guam 96921

I further certify that on July 8, 2022, Pacific Time, I served the same via first class mail, postage prepaid, on the following non-ECF recipients listed below:

| Catholic Social Services | Catholic Cemeteries of | Catholic Social Services |
|---|---|---|
| 234A U.S. Army Juan C | Guam, Inc. | c/o Arthur Clark |
| Fejeran Street | 850 W. Marine Corps Dr. | 196 Sirena Lane |
| Barrigada, Guam 96913 | Hagatna, Guam 96910 | Tamuning, Guam 96913 |

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 8, 2022, Pacific Time         /s/ Bruce A. Anderson
                                          Bruce A. Anderson

* The attached list will not be mailed out to creditors, but will be on file with the United States Bankruptcy Court. A copy will be provided upon request.

NOTICE OF FILING UNKNOWN CLAIMS
REPRESENTATIVE'S REPORT - 3

SA 2073

**UNITED STATES BANKRUPTCY COURT
FOR THE TERRITORY OF GUAM,
BANKRUPTCY DIVISION**

Case No. 19-00010

In re:

Archdiocese of Agana

Debtor.

**UNKNOWN CLAIMS REPRESENTATIVE'S REPORT AND RECOMMENDATIONS**

Michael R. Hogan, the Unknown Tort Claims Representative ("UCR"), makes the following Report and Recommendations.

I was appointed UCR on February 21, 2020 by the United States District Court for the District of Guam in the above-entitled proceeding (UCR Order, Dkt. 355). This proceeding seeks to reorganize the Archdiocese of Agana under Chapter 11 of the United States Bankruptcy Code. It was filed to resolve approximately 255 child sex abuse claims.

The parties filed the First Amended Join Chapter 11 Plan of Reorganization (the "Plan") (Dkt. 890) on June 29, 2022. The Debtor seeks, in part, to provide a fund to compensate any Future Tort Claimants, as defined in the Plan who may assert sexual abuse claims after confirmation of the Plan, who can satisfy the conditions for compensation under the Plan.

As the representative of the Unknown Tort Claimants, and in accordance with the UCR Order, I have evaluated the likely number of sexual abuse claimants, if any, who might come forward after the Plan is confirmed and the likely value of the unknown claims they may assert

1

SA 2074

against the Debtor. Specifically, in a comprehensive effort to anticipate the number of Unknown Tort Claims (as defined in the Plan) and determine a fair Unknown Tort Claims trust fund, I have, among other things:

1. Reviewed the experiences of other dioceses and other religious orders that have reorganized under Chapter 11 of the Bankruptcy Code in response to large numbers of child sex abuse claims;

2. Reviewed the extensive outreach of plaintiffs' counsel in Guam;

3. Reviewed the comprehensive actual notice and publication efforts concerning possible claims, as proposed by the Debtor and ordered by the District Court;

4. Studied the pattern of claims, the timing of claims in relation to incidents of abuse, and the relative dates of incidents of abuse;

5. Considered the number and pattern of pre-petition claims, the number and pattern of claims filed since the bankruptcy petition was filed, and the number of claims filed since the last date established by the Bankruptcy Court for creditors to file claims;

6. Considered the efforts of the Debtor to encourage potential abuse claimants to file claims;

7. Considered the nature and allegations of the 255 timely claims filed in this proceeding;

8. Considered the 2004 and 2011 reports by the John Jay College of Criminal Justice concerning the sexual abuse of minors; and

2

SA 2075

9. Considered possible affirmative defenses available to the Debtor for unknown claims, which may not be available with regards to timely filed claims in the bankruptcy proceeding.

On May 1, 2019, Judge Tydingco-Gatewood ordered extensive notice of this proceeding to potential tort claimants that timely claims must be filed no later than August 15, 2019 (Dkt. 168). The notice required was extensive and required publication (including personal notice to individuals who had indicated they had claims): by newspaper, both on Guam and in the western United States; in Catholic publications in the Pacific; in parishes; to Guam public officials and "Off Island" groups; by radio, and; by television. Notice was more effective than usual because Guam is an island, and a largely Catholic island at that, and attorneys on the island also spread the word.

Studies conducted by the John Jay College of Criminal Justice in 2004 and 2011 also provide support for the position that most claims against the archdiocese have already been brought. "The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002" ("the 2004 Report") includes the following statistical findings:

1. Over 70% of sexual abuse allegations were made within 30 years after the alleged abuse began.

2. 75% of the events of alleged sexual abuse occurred between 1960 and 1980. [In this proceeding, approximately 90% of alleged abuse occurred between 1960 and 1980.

3. More abuse occurred in the 1970s than any other decade. [Also true in this proceeding.]

4. As estimated from the study data, 2.7% of all priests in religious ministry were accused of alleged sexual abuse.

3

**SA 2076**

5. 89.5% of all alleged abusers were born before 1950.

6. Only 5.5% of all alleged abusers committed their first offense at the age of 60 or older.

7. The average age of a priest at the first allegation of abuse was 39, and the median age was 35.

8. 149 priests with 10+ victims accounted for 26% of all incidents reported in the study. [In this proceeding, five priests with 9+ victims accounted for 80% of all incidents reported. While this is strong evidence of lack of institutional supervision by Archdiocese leadership, all those priests have long ago been permanently removed from ministry or have died. However, it is scandalous that 58% of all the timely-filed claims here named a single priest as the predator. Archdiocese leadership simply had to know, and no intervention was attempted. Perhaps this partially explains the 9 claims charged against the Archbishop himself. The wolves were turned loose with the lambs.]

9. A precipitous decline in incidents of abuse by year of occurrence took place in 1985. [Also true here.]

"The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2010" ("the 2011 Report") contains, among other points, the following relevant findings:

1. Researchers could not point to one single cause, as neither celibacy nor homosexuality were the causes of the abuse. Social and cultural changes in the 1960s and 1970s manifested in increased levels of deviant behavior in the general society as well as among priests.

4

SA 2077

2. The count of incidents per year increased steadily from the mid-1960s through the late-1970s, then declined in the 1980s and continues to remain low.

3. New reports (post-2002) have confirmed initial estimates that the distribution of incidents is stable.

4. At the time of the peak and subsequent decline in sexual abuse incidents, there was a substantial increase in knowledge and understanding in American society about victimization and the harm of child sexual abuse. Changes were made in statutes related to rape and sexual abuse of children and in reporting requirements of child abuse and neglect, an understanding of the cause of sexual offending advanced, and research related to the treatment of sexual abusers was expanded.

As noted, the allegations of initial abuse in this proceeding roughly follow the statistics in the John Jay reports. The allegations of initial abuse here by decade are as follows:

| | | |
|---|---|---|
| 1950s | - | 8 |
| 1960s | - | 52 |
| 1970s | - | 136 |
| 1980s | - | 42 |
| 1990s | - | 12 |
| 2000s | - | 4 |
| 2010s | - | 1 |

To date, 22 alleged additional tort claims have been filed past the court ordered bar date.

5

SA 2078

These claims and any future Tort Claims may be subject to affirmative defenses that are not applicable to claims filed by August 15, 2019, the last date set by the Bankruptcy Court for creditors to file proofs of claim, because of the aggregate nature of resolution of the timely-filed claims. These include the following:

1. Potential liability on the basis of negligence may require proof of foreseeability. The following type of questions could be posed: Would a prudent person see abuse as likely to occur, possibly from a 1960s or 1970s perspective? Would liability be imposed only after a finding of custody or control?

2. Would respondeat superior liability require a finding that abuse has been committed in the course and scope of a special relationship?

3. Would there be joint-and-several liability for acts of persons in other religious orders?

4. Would a finding of Archdiocese control be required for liability of the Archdiocese?

5. Were claimants fully compensated by awards from other religious orders?

6. Does the doctrine of laches limit certain claims?

7. Did claimants mitigate damages?

8. Is some evidence of claims excluded under the First Amendment to the United States Constitution?

9. Is there sufficient admissible evidence to allow the estate of a deceased claimant to pursue a claim on their behalf under Guamanian law?

10. Has a claimant filed a bankruptcy petition in the past, which may result in an abuse claim for damages constituting an asset of the bankruptcy estate?

6

SA 2079

These late-filed claims should receive the same treatment as future claims.

The Chapter 11 sexual abuse cases filed by religious orders responding to large numbers of sexual abuse claims certainly have similarities, but they also have significant differences.

Comparing other religious order cases to the factors involved here indicates that it is likely that some compensable unknown claims will be filed in the future.

The Debtor's counsel estimates that approximately $44 million will be available to holders of tort claims upon the effective date of the Plan.

**Recommendations:**

I make the following recommendations with regard to establishing the future claims trust, the estimate of future claims, and other parameters. I specifically reserve the right to revise these recommendations and to modify them after full review of any changes to the Disclosure Statement and Plan containing the provisions concerning any such future claims trust.

Experience teaches that the settlement value of future claims may be substantially less than earlier-filed claims. However, giving future claimants the benefit of the doubt, and assuming the final count of timely-filed allowable claims herein is 255, and given other factors considered, I recommend the following:

1.      I note the number of claimants who filed proofs of claim in this proceeding after the last date set by the Court to file a proof of claim is approximately ten percent of the number of claimants who filed by the last date set for a timely claim. It is possible that half of those are late claims that may be compensable, which is a rough approximation from other cases.

7

SA 2080

2.      I recommend that the adjudication of these claims be handled in the same manner and means, and by the same adjudicator, as is handling the adjudication of timely-filed claims, assuming that adjudicator is willing and able to serve.

3.      I further recommend that the trust be established and funded in a manner that safeguards the entire balance held in trust, and that the trust be established in a manner that gives the trustee discretion as far as distribution to any claimants determined by the adjudicator to be valid, in such a manner that equitably preserves the balance of the claims for the remainder of the term of the trust.

4.      Based upon my evaluation of previous future claims resolutions in other cases, I recommend that the trust have a termination date of five years from the date of the establishment of the trust, assuming that the trust will be established under the terms of a confirmed Plan of Reorganization, and that the trustee has the discretion concerning the exact termination date of the trust during that five-year period.

5.      The Reorganized Debtor will establish an Unknown Tort Claim Reserve Fund in the amount of $1,500,000. Funding shall be made over a five-year period, with a $200,000 deposit made upon the Effective Date, the requirement being that the fund not drop to less than $200,000 for five years, with a maximum paid in of $1,500,000. The unknown tort claimants shall be paid the lesser of 50% of the amounts determined by the Tort Claim Reviewer or $50,000. The Reorganized Debtor will make distributions to the unknown tort claimants, as provided in the Trust Distribution Plan, up to the amount of the Unknown Tort Claim Reserve Fund, which fund will represent the sole recovery available to unknown tort claimants in respect to any

8

SA 2081

obligation owed by the Settling Insurers. Distribution made pursuant to the Trust Distribution

Plan, however, does not preclude or affect claims or recoveries by unknown tort claimants.

6.      I specifically reserve the right to modify these recommendations based upon

facts and circumstances brought to my attention, including any changes in the Disclosure

Statement and Plan, as well as any information provided by parties in interest in these cases,

including, but not limited to the Debtor, the Official Unsecured Creditors Committee, the

insurance carriers, the U.S. Trustee, or any other party in interest.

Respectfully submitted this _____ day of July, 2022.

MICHAEL R. HOGAN

Label Matrix for local noticing
0993-1
Case 19-00010
District Court of Guam
Hagatna
Thu Apr 21 05:48:11 ChST 2022

Bank Of Guam
C/O Arriola/Cowan & Arriola
P.O. X
Agana, GU 96932-7540

Boy Scouts of America Aloha Council Chamorro
Civille & Tang, PLLC
330 Hernan Cortez Avenue, Suite 200
Hagatna, GU 96910-5081

Numerous Victims of Clergy Abuse (DRF Client
CO Dooley Roberts & Fowler LLP
865 S Marine Corps Dr Ste 201
Tamuning, Gu 96913-3440

U.S. Small Business Administration
2401 Fourth Ave., Ste. 400
Seattle, WA 98121-1430

A.B.L.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

A.C.J.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

A.J.V.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

A.M.
CO Berman OCopnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

A.N.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

American Home Assurance Company
CO Thompson Thompson and Alcantara, P.C.
238 Archbishop Flores Street, Suite 801
Hagatna, GU 96910-5205

Bank of Hawaii
c/o Camacho Calvo Law Group LLC
134 W Soledad Ave, Suite 401
Hagatna, GU 96910-5079

First Hawaiian Bank
c/o Blair Sterling Johnson & Martinez
238 Archbishop Flores St. Ste. 1008
Hagatna, GU 96910-5205

Numerous Victims of Clergy Abuse (Lujan clie
CO Lujan and Wolff, LLP
238 Archbishop Flores Street, Suite 300
DNA Building
Hagatna, GU 96910-5206

Office of the Clerk
520 W. Soledad Ave.
4th Floor, U.S. Courthouse
Hagatna, GU 96910-4916

A.C.D.L.R
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

A.E.P.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

A.L.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

A.M.F.
Law Office of Anthony C. Perez
Anthony C. Perez
Ste 802, 238 Archbishop Flores St
Hagatna, GU 96910-5205

A.P.I.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa
Suite 503
Hagatna, Guam 96910-5176

Archbishop of Agana, a Corporation Sole, Mos
196 Cuesta San Ramon Ste B,
Hagatna, GU 96910-4334

Boy Scouts of America
Civille & Tang, PLLC
330 Hernan Cortez Avenue, Suite 200
Hagatna, GU 96910-5081

National Union Fire Insurance Company of Pit
c/o Thompson Thompson & Alcantara, PC
238 Archbishop Flores St., Ste 801
Hagatna, GU 96910-5205

Sisters of Mercy Entities
co The Law Offices of Duncan G. McCully
139 Murray Boulevard, Suite 200
Hagatna, Gu 96910-5153

A.A.C.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

A.C.F.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

A.J.B.R.JR.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

A.L.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

A.M.S.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

A.P.R.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

SA 2083

A.P.S.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

A.Q.Q.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

A.R.C.M.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

A.S.A.F.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

A.S.V.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

A.T.A.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

A.T.B.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Academy of Our Lady of Guam
233 W Archbishop F Flores Street
Hagatna, Guam 96910-5102

Agafa Gumas
PO Box 11496
Yigo, GU 96929-0496

Anthony Sablan Apuron
c/o Jacqueline T. Terlaje
284 W. Chalan Santo Papa
Hagatna, GU 96910-5154

Assumption of Our Lady
314 Assumption Drive
Piti, GU 96915-5563

B.A.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

B.A.D.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 700
Hagatna, GU 96910-5206

B.B.P.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

B.C.B.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

B.C.J.J.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

B.M.Y.
c/o Berman Law Firm
Michael J. Berman
Suite 503, 111 Chalan Santo Papa
Hagatna, GU 96910-5176

B.Q.V.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

B.T.M.
Lujan and Wolff LLP
Delia L Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

B.T.P.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

B.Y.
c/o Berman Law Firm
111 W Chalan Santo Papa Ste 503
Hagatna, GU 96910-5176

Bank of Guam
P.O. Box BW
Hagatna, GU 96932-7597

Bank of Hawaii
134 West Soledad Avenue
Hagatna, GU 96910-5057

Bishop Baumgartner Memorial School
281 Calle Angel Flores Street
Sinajana, GU 96910-3714

Blessed Diego de San Vitores
884 Pale' San Vitores Road
Tumon, GU 96913-4013

Boy Scouts of America
Attn Legal Department
1325 W. Walnut Hill Lane
Irving, Texas 75038-3096

Boy Scouts of America
PO Box 152079
Irving, TX 75015-2079

Boy Scouts of America Aloha Council
280 N Marine Corps Dr.
Tamuning, GU 96913-4105

C.B.B.C.
co Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

C.M.D.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
238 Archbishop Flores Street
Hagatna, GU 96910-5205

SA 2084

C.M.M.
Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

C.W.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

CathoNet LLC
14 Hampshire Drive
Hudson, NH 03051-4921

Claimant Estate of G.C., et al.
c/o Michael Berman
111 Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

Congregation of Holy Cross
PO BOX 1064
Notre Dame, IN 46556-1064

D.E.Y.C.
c/o Lujan and Wolff LLP
David J Lujan
Ste 300, 238 Archbishop Flores St
Hagatna, GU 96910-5206

D.S.
Michael J. Berman
Berman O'Connor & Mann
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

D.V.
Berman, O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

D.V.S.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

Dulce Nobre de Maria Cathedral
207 Archbishop Flores Street
Hagatna, GU 96910-5102

C.O.
c/o Michael J. Berman
Berman O'Connor & Mann
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

Capuchin Franciscans
Province of St. Mary
30 Gedney Park Drive
White Plains, NY 10605-3534

Claimant B.D., et al.
c/o David Lujan, Lujan and Wolff
238 Archbishop Flores St., #300
Hagatna, GU 96910-5206

Claimant John Doe, et al.
c/o Kevin Fowler
865 S Marine Corps Dr., #201
Barrigada, GU 96913-3440

D.A.N.
CO Lujan and Wolff
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

D.G.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

D.T.S.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores Street
Hagatna, Guam 96910-5205

D.V.C.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

Delia Lujan Wolff
Lujan and Wolff LLP
Suite 300 DNA Building
238 Archbishop Flores Street
Hagatna, Guam 96910-5206

E.B.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

C.P.D.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
DNA Bldg, 238 Archbishop Flores St
Hagatna, GU 96910-5205

Capuchin Franciscans Custody of
Star of the Sea
30 Gedney Park Drive
White Plains, NY 10605-3534

Claimant D.M.
c/o Charles H. McDonald II
238 Archbishop Flores St., Ste 404
Hagatna, GU 96910-5206

Claimant M.B., et al.
c/o Anthony Perez
238 Archbishop Flores Street, #802
Hagatna, GU 96910-5205

D.E.S.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

D.N.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

D.U.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

D.V.R.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

Docomo Pacific
890 S Marine Corps Drive
Tamuning, GU 96913-3458

E.G.W.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

SA 2085

E.J.L.
Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

E.M.M.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

E.M.V.J.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

E.P.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

E.R.C.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

E.T.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

E.T.W.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

E.V.K.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

E.W.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, Guam 96910-5206

Edith Concepcion (Doris)
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

F.A.C. Jr.
Pro Se
P.O. Box 25706
Barrigada, Guam 96921-5706

F.A.D
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

F.F.C.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

F.G.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

F.J.S.
c/o Anthony C. Perez
Law Office of Anthony C. Perez
Ste 802, DNA Bldg, 238 Archbishop Flores
Hagatna, GU 96910-5205

F.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

F.M.S.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

F.P.
CO Berman OConnor and Mann
111 West Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

F.S.B.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

F.S.L.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

F.T.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

F.T.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

Father Duenas Memorial School
PO Box ED
Hagatna, GU 96932-7654

First Hawaiian Bank
Attn: Loan Recovery Dept
PO Box 4070
Honolulu, HI 96812-4070

First Hawaiian Bank
Ed Untalan
400 Route 8, Suite 101
Maite, GU 96910-2026

First Hawaiian Bank
c/o Blair Sterling Johnson & Martinez
238 Archbishop Flores St. Ste. 1008
Hagatna, Guam 96910-5205

G.A.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

G.C.
c/o Berman O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

G.C.G.
CO Law Office of Anthony C. Perez
Suite 802 DNA Bldg
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

G.C.S.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

SA 2086

G.E.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

G.E.A.
CO Law Offices of Anthony C. Perez
238 Archbishop Flores Street, Suite 802
Hagatna, Guam 96910-5205

G.G.E.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
Ste 802, 238 Archbishop Flores St
Hagatna, GU 96910-5205

G.H.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Pap, Ste. 503
Hagatna, GU 96910-5176

G.J.Q.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

G.J.S.M.B.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

G.M.D.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

G.S.M.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

G.T.P.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

G.T.Y.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
Ste 802, 238 Archbishop Flores St
Hagatna, GU 96910-5205

G.W.B.J.
c/o Lujan & Wolff LLP
David J Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

G.Y.Y.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
DNA Bldg, 238 Archbishop Flores St
Hagatna, GU 96910-5205

Guam Capital Investment Corp. Bldg.
414 W. Soledad Ave., Suite 500
Hagatna, GU 96910-5066

Guam Reef Hotel, Inc.
1317 Pale San Vitores Road
Barrigada, GU 96913-4298

Guam Telephone Authority
624 N. Marine Corps Drive
Barrigada, GU 96913-4401

H.A.W.
Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

H.B.B.
Pro Se
P.O. Box 1491
Hagatna, GU 96932-1491

H.J.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

H.J.C.SR.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

H.M.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

I.V.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

Iain A. Macdonald
221 Sansome Street, # 3
San Francisco, CA 94104-2331

Immaculate Heart of Mary
225 Aragon Street
Toto, GU 96910-3000

J.A.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

J.A.B.
c/o Lujan and Wolff LLP
Delia L Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

J.A.B.D.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

J.A.B.P.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.A.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.A.Q.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.A.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

SA 2087

J.B.
c/o Berman O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.B.P.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

J.B.P.
Pro Se
PO Box 313
Hagatna, Guam 96932-0313

J.C.
c/o Berman O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.C.B.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

J.C.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

J.C.G.
c/o Lujan & Wolff LLP
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.C.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.C.N.
c/o Lujan & Wolff LLP
David J Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.C.P.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.C.R.
CO Berman Law Firm
Suite 503, 111 Chalan Santo Papa
Hagatna, GUam 96910-5176

J.C.S.S.
Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.C.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

J.E.S.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.F.G.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.G.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

J.G.F.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.H.C.
CO Lujan and Wolff
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.I.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

J.I.I.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.J.I.C.
c/o Lujan & Wolff LLP
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.J.P.
Pro Se
CO P.O. Box BZ
Hagatna, Guam 96932-7617

J.L.K.
CO Lujan and Wolff LLP
238 Archbishop Flores St., Suite 300
Hagatna, Guam 96910-5206

J.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.M.C.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

J.M.I.Q.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.M.M.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

J.M.M.
c/o Berman Law Firm
Michael J. Berman
Suite 503, 111 Chalan Santo Papa
Hagatna, GU 96910-5176

J.M.Q.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.N.P.D.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
DNA Bldg, 238 Archbishop Flores St
Hagatna, GU 96910-5205

SA 2088

J.P.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.P.G.L.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.P.N.
c/o Lujan & Wolff LLP
David J Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.P.T.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

J.R.
CO Berman Law Firm
111 W. Chalan Santo Papa
Suite 503
Hagatna, Guam 96910-5176

J.R.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.R.
c/o Berman Law Firm
111 W. Chalan Santo Papa
Hagatna, Guam 96910-5169

J.R.A.
Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

J.R.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.R.M.
CO Berman O'Connor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.T.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.T.B.SR.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

J.T.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.T.S.
c/o Lujan & Wolff LLP
Gloria L Rudolph
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

J.V.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

J.V.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

J.W.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

Ju.A.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

K.C.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

K.E.J.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

K.J.B.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

K.L.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

K.S.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

L.B.T.
c/o Lujan & Wolff LLP
David J Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

L.C.P.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

L.J.C.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

L.P.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

LAW OFFICE OF VINCENT LEON GUERRERO
P.O. Box 12457
Tamuning, Guam 96931-2457

Leonilo Alger
231 Hesler Place, Suite 101
Hagatna, GU 96910-5082

Louis Brouillard
c/o Meier, Kennedy and Quinn
445 Minnesota Street, #2200
Saint Paul, MN 55101-2137

M.A.C.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

M.A.C.
P.O. Box 12064
Tamuning, Guam 96931-2064

M.A.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

M.C.M.
CO Roberts Fowler and Visosky LLP
Suite 201/ Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

M.D.
c/o Berman O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

M.D.M.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

M.F.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

M.F.D.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

M.I.Q.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

M.J.B.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

M.J.D.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

M.J.P.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

M.L.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

M.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

M.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

M.P.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

M.Q.G.
CO Lujan and Wolff, LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

M.Q.G.
Dededo Law Office
Mark E. Williams
166 West Marine Corps Dr, Ste 102
Dededo, GU 96929-5911

M.R.W.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

M.S.B.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

M.S.Q.
CO Lujan and Wolff LLP
Suite 238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910

M.T.D.
McDonald Law Office, LLC
Charles H. McDonald II
Ste 404, 238 Archbishop Flores St
Hagatna, GU 96910-5206

M.T.S.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

M.W.M.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

M.W.P.
Lujan and Wolff LLP
Delia Lujan Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

M.W.R.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores Street
Hagatna, Guam 96910-5205

Marist Province Center
NDDU-IBED Lagao Campus
PO Box 42
9500 General Santos City, Philippines

Mark Williams, Esq.
LAW OFFICES OF MARK E. WILLIAMS, P.C.
102 BankPacific Building
166 West Marine Corps Drive
Dededo, Guam 96929-5911

Mary Quinata
Camacho Calvo Law Group, LLC
134 W Soledad Ave., Ste. 401
Hagatna, GU 96910-5079

Mc.F.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

N.A.Q.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
DNA Bldg, 238 Archbishop Flores St
Hagatna, GU 96910-5205

National Union Fire Ins. Co. of Pittsburgh,
c/o Thompson Thompson & Alcantara, PC
238 Archbishop Flores St., Ste. 801
Hagatna, Guam 96910-5205

Nuestra Senora de las Aguas
PO Box 163
Hagatna, GU 96932-0163

Our Lady of Lourdes
153 Chalan Pale Ramon Lagu
Unit A
Yigo, GU 96929-2729

Our Lady of Purification
198 Cuesta San Ramon
Ste B
Hagatna, GU 96910

N.C.A.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

Nino Pardido y Sagrada Familia
PO Box 45
Hagatna, GU 96932-0045

Office of the U.S. Trustee
1132 Bishop St., Suite 602
Honolulu, HI 96813-2830

Our Lady of Mt Carmel School
PO Box 7830
Agat, GU 96928-0830

Our Lady of the Blessed Sacrament
135 Chalan Kapuchino
Agana Heights, GU 96910-6128

N.J.D.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Nuestra Senora De La Paz y Buen
PO Box EC
Hagatna, GU 96932-7565

Our Lady of Guadalupe
PO Box 355
Agat, GU 96928-0355

Our Lady of Mt. Carmel
PO Box 8353
Agat, GU 96928-1353

P.A.
CO Berman, OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, GU 96910-5176

P.A.A.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

P.H.V.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

P.J.D.N.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

P.M.D.
CO Law Office of Anthony C. Perez
Suite 802, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910-5205

P.P.P.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

P.A.V.M.
c/o Lujan & Wolff LLP
David John Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

P.J.B.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

P.J.M.S.
CO Lujan and Wolff LLP
238 Archbishop Flores St., Suite 300
Hagatna, Guam 96910-5206

P.P.
CO Berman OConnor and Mann
111 West Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

P.P.R.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

P.B.M.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

P.J.C.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

P.J.P.D.
c/o Law Office of Anthony C. Perez
Anthony C. Perez
DNA Bldg, 238 Archbishop Flores St
Hagatna, GU 96910-5205

P.P.C.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

P.R.W.
Lujan and Wolff LLP
Delia L Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

SA 2091

P.S.
Michael J. Berman
Berman O'Connor & Mann
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

P.W.G.
Berman O'Connor & Mann
Michael J. Berman
111 N. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

R.A.D.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

R.A.S.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

R.B.C.
c/o Berman O'Connor and Mann
Michael J. Berman
111 N. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

R.C.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

R.C.F.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Hagatna, Guam 96910-5113

R.E.J.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.G.M.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

R.J.S.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 200
Hagatna, GU 96910-5206

P.S.A.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

PBBJR
CO Lujan and Wolff
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

R.A.P.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

R.B.C.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

R.B.D.A.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.C.
c/o Berman O'Connor and Mann
Michael J. Berman
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

R.D.
c/o Roberts Fowler & Visosky LLP
Kevin J. Fowler, Esq.
Ste 201, 865 Marine Corps Dr
Tamuning, Guam 96913-3440

R.F.M.
CO Berman Oconnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

R.I.C.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.J.W.
co Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

P.U.Q.
Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Pacific Solar and Photovoltaics
PO Box 6754
Tamuning, GU 96931-6754

R.A.P.T.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

R.B.C.
c/o Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

R.B.R.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

R.C.B.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

R.D.S.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Hagatna, Guam 96910-5113

R.G.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Pap, Ste. 503
Hagatna, GU 96910-5176

R.J.M.
co Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

R.L.S.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

SA 2092

R.M.C.
Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.M.S.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

R.M.T.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

R.M.V.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.P.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

R.P.C.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

R.P.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.R.C.C.
Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Barrigada, GU 96910-5206

R.R.G.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

R.S.B.
c/o Berman Law Firm
Michael J. Berman
Suite 503, 111 Chalan Santo Papa
Hagatna, GU 96910-5176

R.S.Q.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, GU 96910-5206

R.S.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.T.P.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

R.T.Q.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

R.Y.Y.
c/o Anthony C. Perez
Law Office of Anthony C. Perez
Ste. 802, 238 Archbishop Flores Street
Hagatna, GU 96910-5205

Risk Partner Tools and Mngmt Risk
1876 Utica Square, Third Floor
Tulsa, OK 74114-1424

Roland Sondia
Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Roy Quintanilla
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

S.H.L.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Pap, Ste. 503
Hagatna, GU 96910-5176

S.H.L.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

S.J.J.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

S.P.J.V.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

S.S.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

SBA
2 North 20th Street
Suite 320
Birmingham, AL 35203-4002

Saint Anthony Catholic School
529 Chalan San Antonio
Tamuning, GU 96913-3600

Saint Francis Catholic School
PO Box 21297
Barrigada, Guam 96921-1297

Saint Jude Thaddeus
122 Bien Avenida Avenue
Sinajana, GU 96910-3664

San Dimas and
Our Lady of the Rosary
PO Box 6099
Merizo, GU 96916-0399

San Dionisio
PO Box 6099
Merizo, GU 96916-0399

San Francisco de Asis
1404 N Canton Tasi
Yona, GU 96915-4665

SA 2093

San Isidro
HC 1 Box 17083
Inarajan, GU 96915-7806

San Juan Bautista
PO Box 49
Hagatna, GU 96932-0049

San Miguel
138 San Miguel Street
Talofofo, GU 96915-3644

San Vincente Catholic School
196 Bejong Street
Barrigada, GU 96913-1182

Santa Barbara
330 Iglesia Circle
Dededo, GU 96929-5327

Santa Barbara Catholic School
274 West Santa Barbara Avenue
Suite A
Dededo, GU 96929-5378

Santa Bernadita Church
PO Box 11496
Yigo, GU 96929-0496

Santa Teresita
192 Vietnam Veterans Hwy
Mangilao, GU 96913-6301

School Sisters of Norte Dame
Greensfelder, Bernard Huger
10 S. Broadway, Ste. 2000
Saint Louis, MO 63102-1747

School Sisters of Norte Dame Central
Pacific Province, Inc. (contd.)
c/o Civille & Tang, PLLC
330 Hernan Cortez Ave, Ste 200
Hagatna, GU 96910-5081

School Sisters of Notre Dame-Region of Guam
G. Patrick Civille
c/o Civille & Tang, PLLC
330 Hernan Cortez Ave, Ste 200
Hagatna, GU 96910-5081

Securitech
PO Box 7779
Tamuning, GU 96931-7779

Sisters of Mercy Entities
co The Law Offices of Duncan G. McCully
139 Murray Boulevard, Suite 200
Hagatna, Guam 96910-5153

Sisters of Mercy of NC on Guam
101 Mercy Drive
Belmont, NC 28012-2898

Sisters of Mercy of North Carolina
101 Mercy Drive
Belmont, NC 28012-2898

St. Andrew Kim
PO Box 1555
Hagatna, GU 96932-1555

St. Anthony and St. Victor
PO Box 7707
Tamuning, GU 96931-7707

St. Joseph
PO Box 170022
Inarajan, GU 96917-0022

St. Vincente Ferrer and San Roke
229 San Roque Drive
Barrigada, GU 96913-1131

T.A.C.Sr.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, GU 96910-5206

T.A.D.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Hagatna, Guam 96910-5113

T.D.N.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

T.H.Q.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

T.M.A.
c/o Lujan & Wolff LLP
David J Lujan
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

T.M.E.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

T.O.T.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

T.R.S.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Takecare Insurance Co.
PO Box 6578
Tamuning, GU 96931-6578

U.S. Small Business Administration
c/o Jayson Pang
2401 Fourth Avenue, Suite 400
Seattle, WA 98121-1430

V.C.P.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

V.G.P.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

V.M.
Berman O'Connor & Mann
Michael J. Berman
111 W. Chalan Santo Papa, Ste 503
Hagatna, GU 96910-5176

V.M.C.
Lujan and Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste. 300
Hagatna, GU 96910-5206

V.P.A.
CO Roberts Fowler and Visosky LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913-3440

V.S.F.
Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

V.T.S.N.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

V.U.Q.
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Victim M.Q.G.
c/o Law Offices of Mark Williams, P.C.
PO Box 21298
Barrigada, GU  96921-1298

W.A.B.
CO Lujan and Wolff LLP
238 Archbishop Flores Street, Suite 300
Hagatna, Guam 96910-5206

W.A.P.J.
c/o Lujan & Wolff LLP
Delia L. Wolff
238 Archbishop Flores St., Ste 300
Hagatna, GU 96910-5206

W.C.S.
CO Berman OConnor and Mann
111 W. Chalan Santo Papa, Suite 503
Hagatna, Guam 96910-5176

W.D.S.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

W.G.D.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

W.J.B.
CO Lujan and Wolff LLP
238 Archbishop Flores Street
Suite 300
Hagatna, Guam 96910-5206

W.Y.
Michael J. Berman
Berman O'Connor & Mann
111 W. Chalan Santo Papa, Ste. 503
Hagatna, GU 96910-5176

Walter Denton
c/o Lujan & Wolff LLP
Delia L Wolff
238 Archbishop Flores St, Ste 300
Hagatna, GU 96910-5206

Bruce A. Anderson
Elsaesser Anderson, Chtd.
320 East Neider Avenue
Suite 102
Coeur d Alene, ID 83815-6007

Ford Elsaesser Jr
Elsaesser Anderson, Chtd.
414 Church Street
Suite 201
Sandpoint, ID 83864-0070

Gina Campos
RE/MAX Diamond Realty
238 E. Marine Corps Drive
Suite 202
Hagatna, GU 96910-5194

J. Ford Elsaesser
Elsaesser Anderson, CHTD
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815-6007

John C. Terlaje
Attorney at Law
Suite 216, Former Union Bank Bldg.
194 Hernan Cortes Ave.
Hagatna, GU 96910-5036

Keith Talbot
Patterson Buchanan Fobes & Leitch, Inc.,
1000 Second Avenue
Ste 30th Floor
Seattle, WA 98104-1093

Victim M.Q.G.
c/o Law Office of Mark Williams, P.C.
102 Bank Pacific Bldg.
166 W. Marine Dr.
Dededo, GU 96929-5911

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Blank Rome LLP

(u)Catholic Charities of the Diocese of Agana

(u)Catholic Parishes and Schools

SA 2095

EXHIBIT P TO JOINT PLAN

SA 2096



LOT 1, BLOCK 8, VILLAGE of PITI
Piti Church



LOT P1928B-1NEW & 2418A-R3
Father Duenas Memorial School, Mangilao

**SA 2098**



LOT 1118-R1
Mongmong Church

**SA 2099**



Lot 1 & 21, BLOCK 17, TRACT 232
Sinajana Church



LOT 6, BLOCK 2, VILLAGE of SANTA RITA
Santa Rita Church

Also Lot 4, B4

SA 2101





Cell tower not on property to be included in offer.

LOT 7007-3-R3NEW
Yigo Church



SA 2104



Lot 443 (Lots 165 & 168), Agat
Agat Catholic Cemetery

SA 2105



LOT 19NEW (PART)NEW-R4
Agana Heights Church



Lot 214-1Rem, Maina
Maina Church Social Hall



LOT 11, BLOCK 18, TRACT 2025
Asan Church



LOT 1 NEW, BLOCK 5, TRACT 240
Divine Mercy Chapel, Dededo







Also Lot 190-R9

LOT 190-2NEW
Malojloj Church

Case 09-00000   Document 15042   Filed 05/20/22   Page 17 of 21

**SA 2112**