## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al*., | Lead Case No. 22-cv-01237-RGA |
| Appellants. | Consolidated Case Nos. 22-cv-01238-RGA; |
| v. | 22-cv-01239-RGA; 22-cv-01240-RGA; |
| Boy Scouts of America and Delaware BSA, LLC, *et al.*, | 22-cv-01241-RGA; 22-cv-01242-RGA; |
| Appellees. | 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |

## DEBTORS-APPELLEES' APPENDIX TO CONSOLIDATED ANSWERING BRIEF: VOLUME 7 (SA 2113 THROUGH SA 2476)

Dated: December 7, 2022

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
jessica.lauria@whitecase.com
gkurtz@whitecase.com

WHITE & CASE LLP
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
mandolina@whitecase.com
mlinder@whitecase.com
laura.baccash@whitecase.com
blair.warner@whitecase.com

WHITE & CASE LLP
Ronald K. Gorsich
Doah Kim
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:  (213) 620-7700
rgorsich@whitecase.com
doah.kim@whitecase.com

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
dabbott@morrisnichols.com
aremming@morrisnichols.com
ptopper@morrisnichols.com

*Counsel for Debtors-Appellees and Debtors in Possession*

2

## INDEX OF SUPPLEMENTAL DOCUMENTS

| BSA Records | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| List of Current Members of the NEB (Exhibit B to Desai Declaration) | 1-191 | SA 0001 – SA 0004 |
| List of Current Members of the NEC (Exhibit E to Desai Declaration) | 1-192 | SA 0005 – SA 0007 |
| BSA Charter and Bylaws (as amended through May 2021) | 468 | SA 0008 – SA 0035 |
| Rules and Regulations of the Boy Scouts of America (September 2020) | 291 | SA 0036 – SA 0059 |
| Local Council Charter Renewals (Excerpt) | 7-3 | SA 0060 – SA 0063 |
| 2010 Articles of Incorporation Template (Mobile Area Council Articles of Incorporation, Art. II. Duration) | 187 | SA 0064 – SA 0067 |
| Form of Annual Unit Charter Agreement (2020) | 264 | SA 0068 – SA 0069 |
| BSA Bylaws (June 1, 2019) | 234 | SA 0070 – SA 0095 |
| Local Council Charter Renewal for Greenwich NR A2 (January 15, 2020) | 2976 | SA 0096 |
| Troop Roster for Troop 172 (Patriots Path Council) (Redacted) | 17 | SA 0097 – SA 0106 |
| Troop Roster for Sanford Troop 37 (Abraham Lincoln Council) (Redacted) | 23 | SA 0107 – SA 0108 |

| Examples and Templates of Local Council Articles & Bylaws | 7-2 | SA 0109 – SA 0373 |
| Troop Roster for Pack C-3210 (Cape Fear Council) (Redacted) | 43 | SA 0374 – SA 0377 |

| Proofs of Claim | Appendix Page Nos. |
| --- | --- |
| Proof of Claim No. 8174 | SA 0378 – SA 0387 |
| Proof of Claim No. 639 | SA 0388 – SA 0390 |
| Proof of Claim No. 4971 | SA 0391 – SA 0405 |
| Proof of Claim No. 9558 | SA 0406 – SA 0408 |
| Proof of Claim No. 9430 | SA 0409 – SA 0412 |
| Proof of Claim No. 9511 | SA 0413 – SA 0416 |
| Proof of Claim No. 12203 | SA 0417 – SA 0424 |
| Proof of Claim No. 5113 | SA 0425 – SA 0428 |
| Proof of Claim No. 10390 | SA 0429 – SA 0433 |
| Proof of Claim No. 12530 | SA 0434 – SA 0449 |
| Proof of Claim No. 1248 | SA 0450 – SA 0452 |
| Proof of Claim No. 9123 | SA 0453 – SA 0462 |
| Proof of Claim No. 7826 | SA 0463 – SA 0466 |

| | |
|---|---|
| Proof of Claim No. 343-13 | SA 0467 – SA 0469 |
| Proof of Claim No. 343-26 | SA 0470 – SA 0472 |
| Proof of Claim No. 6346 | SA 0473 – SA 0477 |

| **State and Federal Litigation Documents** | **Joint Trial Exhibit No.** | **Appendix Page Nos.** |
|---|---|---|
| Illinois Complaint filed by National Surety | 162 | SA 0478 – SA 0493 |
| Texas Complaint against Century, National Surety and Allianz | 185 | SA 0494 – SA 0515 |
| Texas Complaint against Hartford | 181 | SA 0516 – SA 0528 |
| Third Amended Complaint: *John Does I-XIX v. Boy Scouts of America, Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.* (District Court for the District of Idaho, No. 1:13-cv-00275-BLW) | 2912 | SA 0529 – SA 0587 |
| Trial by Jury Demand: *Plaintiffs v. Boy Scouts of America Corporation, Mobile Area Council Boy Scouts of America, et al.* (Circuit Court of Mobile County, Alabama, No. CV-2016) | 2920 | SA 0588 – SA 0617 |
| Notice of Removal: *A.A. v. the Boy Scouts of America, North Florida Council, Inc., Boy Scouts of America, et al.* (District Court for the Middle of District of Florida Ocala Division) | 2921 | SA 0618 – SA 1601 |
| Verified Complaint for Damages and Equitable Relief: *Plaintiff v. Roman Catholic Archbishop, et al.* (Superior Court of Guam, No. CV 0207-17) | 2910 | SA 1602 – SA 1613 |
| Complaint: *John Doe v. Boy Scouts of America; and Central Minnesota Council, Boy Scouts of America* (State of Minnesota County of Stearns, District Court, Seventh Judicial District, No. []) | 2913 | SA 1614 – SA 1638 |

| **Documents filed in *In re Archbishop of Agana* ("AOA"), Case No. 19-00010 (Bankr. D. Guam)** | **AOA Docket No.** | **Appendix Page Nos.** |
|---|---|---|
| Motion for Derivative Standing to Enforce the Automatic Stay and Take Other Actions | 616 | SA 1639 – SA 1659 |

| | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Transcript of Hearing Held September 10, 2021 | 693 | SA 1660 – SA 1681 |
| Third Amended Chapter 11 Plan | 920 | SA 1682 – SA 1818 |
| BSA's Objection and Reservation of Rights to Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agana | 948 | SA 1819 – SA 1836 |
| BSA's Objection to and Reservation of Rights to Debtors Motion Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order (1) Approving Settlement Agreement Among the Archdiocese, the AOA Entities, the Official Committee of Unsecured Creditors, and AIG Insurers Entities, (2) Approving the Archdioceses Sale of the Policies Issued to the Debtor Back to AIG Insurers Entities Free and Clear of Claims and Interests, and (3) Enjoining Assertion Of Claims Against AIG Insurers Entities | 989 | SA 1837 – SA 1866 |
| Order Granting 218 Stipulated Motion for Order Directing Mediation and Appointing the Honorable Robert J. Faris to Serve as Mediator | 227 | SA 1867 – SA 1868 |
| Transcript of Hearing Held October 4, 2022 | 1092 | SA 1869 – SA 1924 |
| Fifth Amended Chapter 11 Plan | 1044 | SA 1925 – SA 2116 |
| Order Approving Stipulation By and Between Debtor, Official Committee of Unsecured Creditors and Boy Scouts of America Regarding the BSA Plan Objection and Claim Objection | 1048 | SA 2117 – SA 2126 |
| Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization | 1093 | SA 2127 – SA 2139 |
| Minute Entry Regarding September 10 Hearing | 690 | SA 2140 |

| Other Exhibits Admitted at Trial | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Email from Jeff Hunt to Wendy Kurten, et al. | 725 | SA 2141 – SA 2145 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures | 502 | SA 2146 – SA 2175 |

6

| | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Attachment to email: Claims Allowance Procedures | 527 | SA 2176 – SA 2195 |
| Email from Debtors regarding BSA - Preliminary Comments on Draft CAP sent to Coalition, FCR, and Mediator | 529 | SA 2196 |
| Attachment to email: BSA Redline of Claims Allowance Procedures (comparing June 8, 2021 version to June 6, 2021 version) | 533 | SA 2197 – SA 2245 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures (comparing version 3 and version 4) | 537 | SA 2246 – SA 2466 |
| Attachment to email: Change-Pro Redline of Claims Allowance Procedures (comparing version 3 and version 1) | 539 | SA 2267 – SA 2290 |
| Plaintiff John Doe 4's First Amended Complaint: *John Doe 4 v. Boy Scouts of America, Chicago Area Council, et al.* (Circuit Court of Cook County, Illinois, No. 2018 L 211) | 2911 | SA 2291 – SA 2356 |
| Complaint Fraud and Constructive Fraud: *John Doe XX, et al. v. Boy Scouts of America, Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.* (District Court for the District of Idaho) | 2914 | SA 2357 – SA 2380 |
| Redacted Second Revised Complaint: *John Doe #1, et al. v. Boy Scouts of America Corporation, Fairfield County Council of the Boy Scouts of America, et al.* (Superior Court, Connecticut, J.D. of Stamford/Norwalk at Stamford, No. FST-cv-15-5015023-S) | 2916 | SA 2381 – SA 2456 |

| Insurance Policies | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Hartford Pine Tree Council Casualty Insurance Policy No. 04C157992 | 1154 | SA 2457 – SA 2491 |
| Hartford Fire Insurance Co. Policy No. 12CCP500098 | 1155 | SA 2492 – SA 2547 |
| INA Policy No. 15-12-11 | 4000-1 | SA 2548 – SA 2599 |
| Allianz 1980 Umbrella Policy No. UMB 599346 | 10-1 | SA 2600 – SA 2620 |

| | | |
|---|---|---|
| Old Republic Insurance Company Commercial Excess Liability Insurance Policy for period of March 1, 2017 to March 1, 2018 | 10-7 | SA 2621 – SA 2664 |
| INA Policy No. 70-64-52 | 4000-2 | SA 2665 – SA 2700 |
| Hartford Insurance Policy | 4000-10 | SA 2701 – SA 3081 |
| INA Policy No. 07-54-09-4 | 4000-4 | SA 3082 – SA 3164 |
| INA Policy No. 4-84-03 | 4000-6 | SA 3165 – SA 3188 |
| Hartford Insurance Policy No. 10 C A43303 | 4000-8 | SA 3189 – SA 3332 |
| Hartford Insurance Policy | 4000-9 | SA 3333 – SA 3571 |
| Hartford Insurance Policy No. CBP 109170 | 4000-11 | SA 3572 – SA 3644 |
| Hartford Insurance Policy No. 54 C 990478 | 4000-12 | SA 3645 – SA 3673 |
| Hartford Insurance Policy No. 32 HU 380257 | 4000-13 | SA 3674 – SA 3684 |

| Appendix Documents Filed Under Seal | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| Initial Hartford Settlement Agreement | 1481 | SA 3685 – SA 3696 |
| Proof of Claim No. 87715 | N/A | SA 3697 – SA 3789 |

| Illinois Century Answer | 202 | SA 3790 – SA 3821 |
|---|---|---|

| Multimedia Documents to be Lodged with the Court[2] | Joint Trial Exhibit No. | Appendix Page Nos. |
|---|---|---|
| BSA and Local Council Insurance Policies | 10 | SA 3822 |
| All Proofs of Claim | 14 | SA 3823 |
| Settled and Unsettled Local Council Policy Information (Excel Format) | 2961 | SA 3824 |

---

[2]   The following documents cannot be filed on the Court's docket due to their size or file format. The Appellees will make these documents available to the Court and the parties.  For purposes of citing these documents in the Debtors-Appellees' Consolidated Answering Brief, the Appellees have assigned these documents appendix page numbers in accordance with the "SA___" convention.



SA 2113



**SA 2114**



Lot 1 New, Tract 122, Ordot
Saint Thomas Aquinas Building

SA 2115



PIGO CEMETERY LOTS
Anigua

Case 1:20-mc-00010  Document 5058-2  Filed 03/28/22  Page 211 of 20

Robert T. Kugler, MN #0194116
Edwin H. Caldie, MN #0388930
Andrew J. Glasnovich MN# 0398366
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone      (612) 335-1500
Robert.Kugler@stinson.com
Ed.Caldie@stinson.com

*Counsel for Official Committee of Unsecured Creditors*

<div align="center">

**THE DISTRICT COURT OF GUAM**

</div>

| | |
|---|---|
| In re:<br><br>ARCHBISHOP OF AGAÑA,<br>a Corporation Sole,<br><br>                      Debtor. | Bankruptcy Case No. 19-00010<br>Chapter 11<br><br>**ORDER APPROVING STIPULATION BY AND BETWEEN THE DEBTOR, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND BOY SCOUTS OF AMERICA REGARDING THE BSA PLAN OBJECTION AND CLAIM OBJECTION** |

This court having considered the *Stipulation By and Between the Debtor, Official Committee of Unsecured Creditors and Boy Scouts of America Regarding the BSA Plan Objection and Claim Objection* (the "Stipulation"),[1] a copy of which is attached hereto as Exhibit 1, and upon the record of this case and due deliberation thereon, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      The Stipulation is approved in its entirety.

2.      The Amended BSA Claim shall fully amend the BSA Claim, and the BSA Claim shall be expunged upon entry of a Confirmation Order in this case.

---

[1]   Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Stipulation.

<div align="center">

1

</div>

3.      The Amended BSA Claim shall be (a) classified in Class 12 of the Amended Plan and (b) allowed in the total amount of $1.00 and shall not be subject to any further amendments.

4.      The Committee shall withdraw the Claim Objection Reply and declaration related thereto, both in their entirety and the BSA shall be authorized to file a statement regarding the testimony of Bruce Griggs with respect to the Claim Objection Reply, which shall be reasonably acceptable to the Plan Proponents.

5.      BSA shall seek approval of the provisions of the Stipulation, as it deems necessary, through a 9019 Motion filed in the Delaware Bankruptcy Court.

6.      Upon entry of an order of the Delaware Bankruptcy Court approving the 9019 Motion, the Debtor shall (a) withdraw any pending notice of appeal filed in the BSA's bankruptcy case before the Delaware Bankruptcy Court (Case No. 20-10343 (LSS) (Bankr. D. Del.)) and the Delaware District Court (Case No. 22-01254 (D. Del.) or as may be further assigned and consolidated), (b) take all steps necessary to resolve and close the appeal of the BSA Plan, the BSA Confirmation Order and/or the BSA Confirmation Opinion or any other appeal otherwise by the Debtor related to the BSA's bankruptcy case filed in the Delaware District Court, and (c) forever waive any such right to appeal the BSA Plan, the BSA Confirmation Order and/or the BSA Confirmation Opinion.

7.      The BSA is authorized to appear remotely at the confirmation hearing related to the Amended Plan or any other hearing before this Court by Zoom only.

8.      All pending deadlines concerning confirmation of the Amended Plan, the AIG Settlement Motion, and the Committee's Claim Objection shall be held in abeyance for BSA, *provided*, *however*, that the confirmation hearing will proceed on October 3, 2022.

2

9.     The Debtor, the Committee, and the BSA are authorized to take all actions necessary or desirable to effectuate the relief granted pursuant to, and in accordance with, this Order and the Stipulation.

10.     The terms and conditions of this Order and the Stipulation shall be immediately effective and enforceable upon entry of this Order.

11.     This court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**SO ORDERED**



**/s/ Frances M. Tydingco-Gatewood**
     **Chief Judge**
**Dated: Sep 28, 2022**

3

SA 2119

**EXHIBIT 1**

Robert T. Kugler, MN #0194116
Edwin H. Caldie, MN #0388930
Andrew J. Glasnovich MN# 0398366
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone      (612) 335-1500
Robert.Kugler@stinson.com
Ed.Caldie@stinson.com

*Counsel for Official Committee of Unsecured Creditors*

## IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM – BANKRUPTCY DIVISION

| | |
|---|---|
| In re:<br><br>ARCHBISHOP OF AGAÑA,<br>a Corporation Sole,<br><br>               Debtor. | Chapter 11<br><br>Case No. 19-00010<br><br>**STIPULATION BY AND BETWEEN THE DEBTOR, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND BOY SCOUTS OF AMERICA REGARDING THE BSA PLAN OBJECTION AND CLAIM OBJECTION** |

This stipulation (the "Stipulation") is made and entered into by and between (a) the Archbishop of Agaña, a Corporation sole (the "Debtor" or "AOA"), (b) the Official Committee of Unsecured Creditors (the "Committee," together with the Debtor, the "Plan Proponents"), and (c) the Boy Scouts of America ("BSA," together with the Plan Proponents, the "Parties"), by and through their respective undersigned counsel.

## RECITALS

WHEREAS, on January 16, 2019, the Debtor filed a voluntary petition for relief pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States District Court for the District of Guam – Bankruptcy Division (the "Court").

4

WHEREAS, on August 13, 2019, the BSA filed an initial proof of claim in this case in an unliquidated and contingent amount for among other things, contribution, indemnification, reimbursement, and/or subrogation [Claim No. 210-1] (the "BSA Claim").

WHEREAS, on February 18, 2020, the BSA filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware (the "Delaware Bankruptcy Court").

WHEREAS, after a 22-day confirmation hearing that involved six days of closing arguments, on July 29, 2022, the Delaware Bankruptcy Court entered and docketed its Opinion with respect to confirmation of the BSA plan [BSA Bankr. D.I. 10136] (the "BSA Confirmation Opinion");

WHEREAS, on July 19, 2022, the Debtor filed the *Third Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 920] and the BSA filed an objection and reservation of rights thereto on August 17, 2022 [Docket No. 948] (the "BSA Plan Objection").

WHEREAS, on August 17, 2022, the Debtor filed a motion to approve a settlement agreement among the Plan Proponents, the AoA Entities,[2] and the AIG Insurers [Docket No. 939] (the "AIG Settlement Motion").  The BSA filed an objection and reservation of the rights to the AIG Settlement Motion [Docket No. 989] and the Plan Proponents filed a joint reply [Docket No. 1017] with a revised form of proposed order approving the AIG Settlement Motion attached thereto [Docket No. 1017-1] ("AIG Settlement Order").

WHEREAS, on August 27, 2022, the Committee filed an objection to the BSA Claim [Docket No. 957] (the "Claim Objection") seeking to disallow and expunge the BSA Claim in its entirety.

---

[2]   Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the *Fourth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña*.

WHEREAS, on September 8, 2022, the Delaware Bankruptcy Court docketed and entered its *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. D.I. 10316] (the "BSA Confirmation Order"), confirming the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Bankr. D.I. 10296] (the "BSA Plan");

WHEREAS, on September 18, 2022, the BSA filed its opposition and reservation of rights to the Claim Objection [Docket No. 997]. In support of its opposition, the BSA filed an amended proof of claim [Claim No. 210-2] (the "Amended BSA Claim"), which amended the BSA Claim and asserted, among other things, non-contingent and contingent portions of the claim.

WHEREAS, on September 21, 2022, the Debtor filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña* [Docket No. 1015] (the "Plan").

WHEREAS, on September 23, 2022, the Committee filed a reply to the BSA's response [Docket No. 1025] (the "Claim Objection Reply") and a declaration related thereto [Docket No. 1026]. A hearing on the Claim Objection is scheduled for September 30, 2022.

WHEREAS, in an effort to resolve the BSA's outstanding objections to the AIG Settlement Motion and the Plan and the Committee's Claim Objection to the BSA Claim, the BSA sent the Plan Proponents a letter dated September 23, 2022 and attached thereto a redline of certain Plan modifications proposed by the BSA.

WHEREAS, following the transmittal of the September 23 letter, the Parties have engaged in good faith mediation with Hon. Robert J. Faris to globally resolve and narrow their differences and disputed issues.

WHEREAS, the Parties acknowledge that the terms of this Stipulation is subject to this Court's approval and, to the extent necessary, the approval of the Delaware Bankruptcy Court.

WHEREAS, the Parties desire to memorialize the terms of their agreement in this Stipulation.

NOW, THEREFORE, it is hereby stipulated and agreed to by and between the Parties:

1.      On or before one (1) business day after execution of this Stipulation, the Plan Proponents shall file certain amendments to the Plan (as may be further amended or modified, subject to the consent of the BSA, as set forth herein, the "Amended Plan"), which, among other modifications, (a) incorporates all of the BSA's proposed modifications attached to the September 23 letter and (b) includes a new provision granting BSA consultation rights with respect to the form and substance of the Confirmation Order and any further modifications to the Amended Plan and exhibits thereto, to the extent each of these documents and modifications potentially affect the BSA; *provided*, *however*, that the BSA shall have consent rights to any modifications to section 13.9 of the Amended Plan.

2.      Subject to final review of the execution version of the AIG Insurers Settlement Agreement, the BSA shall inform the Court, at the confirmation hearing or some other hearing before this Court, of its satisfaction with the AIG Settlement Order.

3.      On or before one (1) business day after execution of this Stipulation, the Committee shall submit an agreed order, under certification of counsel, with respect to the Claim Objection. The agreed order shall provide, among other things:

a.  The BSA Claim is amended in full by the Amended BSA Claim and the BSA Claim shall be expunged upon entry of a Confirmation Order in this case;

7

b.  The Amended BSA Claim shall be classified in Class 12 under the Amended Plan and be allowed in the amount of $1.00.  The Amended BSA Claim shall not be subject to any further amendments;

c.  The Committee shall withdraw the Claim Objection Reply and declaration related thereto, both in their entirety;

d.  The terms and conditions of the order resolving the Claim Objection, as set forth herein, shall be subject to approval by the Delaware Bankruptcy Court; and

e.  The BSA shall be permitted to file a statement regarding the testimony of its witness, Bruce Griggs, which shall be reasonably acceptable to the Plan Proponents.

4.  The Amended Plan and/or Confirmation Order shall provide that upon entry of an order of the Delaware Bankruptcy Court approving the 9019 Motion (as defined below), the Debtor shall (a) withdraw any pending notice of appeal filed in the BSA's bankruptcy case before the Delaware Bankruptcy Court (Case No. 20-10343 (LSS) (Bankr. D. Del.)) and the Delaware District Court (Case No. 22-01254 (D. Del.) or as may be further assigned and consolidated), (b) take all steps necessary to resolve and close the appeal of the BSA Plan, the BSA Confirmation Order and/or the BSA Confirmation Opinion or any other appeal otherwise by the Debtor related to the BSA's bankruptcy case filed in the Delaware District Court; and (c) forever waive any such right to appeal the BSA Plan, the BSA Confirmation Order and/or the BSA Confirmation Opinion.

5.  The Plan Proponents shall support the inclusion in the pre-trial order and/or any other request that the BSA may appear remotely at the confirmation hearing related to the Amended Plan or any other hearing before this Court by Zoom only.

6.  The BSA shall seek approval of the provisions of this Stipulation, as it deems necessary, pursuant to Bankruptcy Rule 9019, in the Delaware Bankruptcy Court ("9019 Motion").

Notwithstanding anything to the contrary herein, the terms of this Stipulation are subject to the approval of this Court and the Delaware Bankruptcy Court in all respects.

7.      Notwithstanding anything else in the agreement outlined herein to the contrary, no term or condition of this agreement shall require the Debtor, the Committee, or the BSA to take or refrain from taking any action that it determines would be inconsistent with its respective fiduciary duties.

8.      Subject to the approval of this Stipulation, the BSA will inform and advise the Court of its satisfaction of the Amended Plan at the confirmation hearing.

9.      All pending deadlines concerning confirmation of the Amended Plan, the AIG Settlement Motion, and the Committee's Claim Objection shall be held in abeyance for BSA, with all rights reserved, subject to the Court's approval of this Stipulation.   Notwithstanding the foregoing, the confirmation hearing will proceed on October 3, 2022.

**So Stipulated.**

*[Remainder of Page Intentionally Left Blank]*

DATED: September 27, 2022                    STINSON LLP


By:   /s/ Edwin H. Caldie
        Edwin H. Caldie
        Attorneys for
        OFFICIAL COMMITTEE OF
        UNSECURED CREDITORS



DATED: September 27, 2022                    ELSAESSER ANDERSON, CHTD


By:   /s/ Bruce Anderson
        Bruce Anderson
        Attorneys for
        ARCHBISHOP OF AGAÑA, A
        CORPORATION SOLE



DATED: September 27, 2022                    WHITE & CASE LLP


By:   /s/ Erin Rosenberg
        Erin Rosenberg
        Attorneys for
        BOY SCOUTS OF AMERICA

10

1  Robert T. Kugler (MN #0194116)
   Edwin H. Caldie (MN #0388930)
2  Andrew J. Glasnovich (MN #398366)
   STINSON LLP
3  50 S 6th Street, Suite 2600
   Minneapolis, MN 55402
4  Tel: (612) 335- 1500
   Robert.Kugler@stinson.com
5  Ed.Caldie@stinson.com
   Drew.Glasnovich@stinson.com
6

7  *Counsel for the Official Committee of Unsecured Creditors*

8
                    **THE DISTRICT COURT OF GUAM**
9

10

11 In re:                          Bankruptcy Case No. 19-00010
                                   Chapter 11
12 ARCHBISHOP OF AGAÑA,
                                   **ORDER CONFIRMING THE FIFTH**
13 a Corporation Sole,             **AMENDED JOINT CHAPTER 11 PLAN**
                                   **OF REORGANIZATION FOR THE**
14           Debtor.               **ARCHBISHOP OF AGAÑA**

15

16

17     This case is before the Court on the Fifth Amended Joint Chapter 11 Plan of

18 Reorganization for the Archbishop of Agaña [ECF No. 1044] (the "Plan")[1] proposed by the

19 Debtor and the Official Committee of Unsecured Creditors. Undefined capitalized terms in this

20 order have the meanings set forth in the Plan. The Court conducted the Plan confirmation hearing

21 on October 3 and 4, 2022. Based upon the Plan, the findings and conclusions set forth in the

22 Court's Confirmation Findings and Conclusions [ECF No. 1090] entered concurrently with this

23 order, the findings, conclusions and statements of the Court on the record at the confirmation

24 hearing, and the order approving the AIG Insurers Settlement Agreement, and the order approving

25 the BSA Objection Compromise (as defined below), which are incorporated into this

26 Confirmation Order by reference, the Court further finds and concludes as follows:

27 **IT IS ORDERED:**

28
   ---
   [1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.
   PLAN PROPONENTS' ORDER

1      1.    **CONFIRMATION**. The Plan is confirmed. The Plan satisfies and complies with

2 each of the provisions of 11 U.S.C. § 1129 to the extent applicable to the Plan and this case.

3      2.    **BINDING EFFECT OF THE PLAN**. The terms of the Plan are approved, and

4 effective as of the Effective Date, are binding, including without limitation upon any and all

5 entities acquiring property under the Plan, and all holders of Claims and Interests, any and all

6 non-debtor parties to executory contracts, any and all Tort Claimants, Unknown Tort Claimants,

7 and other creditors, whether or not such creditor has filed a proof of claim, whether or not the

8 Claim of such creditor is impaired under the Plan, and whether or not such creditor has accepted

9 or rejected the Plan. **ALL ENTITIES SHALL ACT OR REFRAIN FROM ACTING AS SET**

10 **FORTH IN THE PLAN.** As set forth in Section 13.9 of the Plan, nothing in the Plan, the AIG

11 Settlement Agreement, or otherwise (and nothing in this order) affirmatively authorizes the Trust,

12 Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant to act in violation

13 of applicable law or affirmatively authorizes such persons to violate or prohibits such persons

14 from violating any relevant and operative provision(s) of the BSA Confirmation Opinion, the

15 BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or

16 approved thereunder; provided, however, that no reference in the Plan (or in this order) to the

17 BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the

18 injunctions and releases provided or approved thereunder, shall limit the rights, if any, of the

19 Trust, Reorganized Debtor, a Class 3 Claimant, and/or a Class 4 Claimant, against a BSA Non-

20 Settling Insurance Company, as those rights are defined by any relevant and operative

21 provision(s) of the BSA Confirmation Opinion, the BSA Plan, and/or the BSA Confirmation

22 Order, including the injunctions and releases provided or approved thereunder.

23      3.    **VESTING OF ESTATE'S ASSETS**. Except as otherwise provided in this order

24 or in the Plan, and as of the Effective Date of the Plan, under 11 U.S.C. §§ 1141(b) and 1141(c),

25 all property of the Debtor's Estate and all property dealt with by the Plan are vested in the Trust

26 or the Reorganized Debtor, or as may otherwise be set forth in the Plan, free and clear of all liens,

27 Interests and Claims against the Debtor. Pursuant to the Plan, and in accordance with Bankruptcy

28

PLAN PROPONENTS' ORDER

CORE/3515288.0002/177438618.4

**SA 2128**

1   Code §§ 105, 363, and 1123, the Debtor is authorized to sell the Real Property Assets identified

2   in **Exhibit A** to this Order, to the Trust, free and clear of all liens, Claims, and Interest, including,

3   but not limited to, any deed language or restrictions that limit the ownership, use, sale, or that

4   otherwise affect the marketability of title, of the Real Property Assets. Pursuant to Plan Section

5   4.9(b),(c), notwithstanding the transfer free and clear to the Trust, the Small Business

6   Administration shall retain its liens, if any, in the Reorganized Debtor's interest in the Preserved

7   Parcels, including, but not limited to, the Preserved Parcels related to MAN1&8 and BAR27.[2]

8   Notwithstanding the transfer free and clear to the Trust, and pursuant to Plan Section 4.9(b),(c),

9   the Debtor shall transfer BAR25 to the Trust subject to the mortgage of the Small Business

10  Administration, instrument number 590157 (the "BAR25 SBA Mortgage"). In the event the Trust

11  sells BAR25 and satisfies, in whole or in part, the BAR25 SBA Mortgage, the Reorganized Debtor

12  shall execute and deliver to the Trust a note in the amount equal to the amount paid by the Trust

13  to satisfy the BAR25 SBA Mortgage (the "BAR25 Replacement Note"). The BAR Replacement

14  Note shall contain substantially the same terms as the note held by the Small Business

15  Administration related to the BAR25 SBA Mortgage. Pursuant to Plan Section 4.6,

16  notwithstanding the transfer free and clear to the Trust, the Reorganized Debtor shall grant the

17  Bank of Guam mortgages on the Reorganized Debtor's interest in the Preserved Parcels related

18  to YON6, MER5, and SIN14.

19          4.      **PRE-EFFECTIVE DATE SALES**. Pursuant to Plan Section 5.1(b)(2)(vii), the

20  Debtor is authorized to take all reasonable and necessary steps to market and sell the

21  FHP/TakeCare Real Property and the Chancery Real Property, including, but not limited to,

22  incurring all reasonable and necessary expenses, not to exceed $500,000.00, to renovate and outfit

23  the Cathedral for use as the Reorganized Debtor's headquarters and Chancery office and moving

24  expenses. With the consent of the Committee, the Debtor is authorized to sell the FHP/TakeCare

25  Real Property and the Chancery Real Property pursuant to Bankruptcy Code Section 363(b)(1),

26  without further order of the Court; provided, however, that any sale of the FHP/TakeCare Real

27

---

28  [2] Plan Section 4.9 identified Debtor Prefix for Lot 2365-1-1, Barrigada, as BAR30. The correct Debtor Prefix for Lot 2365-1-1, Barrigada, is BAR27, as correctly reflected in Plan Ex. G.

PLAN PROPONENTS' ORDER

CORE/3515288.0002/177438618.4

**SA 2129**

1  Property and the Chancery Real Property requiring the protections of Bankruptcy Code Sections

2  363(f) and/or 363(m) shall require approval of the sale by this Court after notice and a hearing.

3  The Debtor is authorized to use the proceeds of any real property sales authorized pursuant to this

4  Paragraph to fund the Plan as provided in Plan Section 5.1. As provided in Plan Section

5  5.1(b)(2)(vii), the Debtor may hire a real estate agent, subject to the approval of the Committee,

6  with such real estate agent's employment and compensation subject to applicable provisions of

7  the Bankruptcy Code, including Section 327, 328, 330, and/or 331.

8      5.    **DISCHARGE**. Except as otherwise expressly provided in the Plan or in this order,

9  on the Effective Date of the Plan, the Debtor is discharged from, and its liability is extinguished

10  completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or

11  unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or

12  unmatured, disputed or undisputed, legal or equitable, known or future, based on conduct

13  occurring before the Confirmation Date, including, without limitation, all interest, if any, on any

14  such Claims and debts, whether such interest accrued before or after the Petition Date, and

15  including all Claims and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h),

16  and 502(i), whether or not a Proof of Claim is filed or is deemed filed under Bankruptcy Code

17  Section 501, such Claim is allowed under Bankruptcy Code Section 502, or the holder of such

18  Claim has accepted the Plan. Notwithstanding anything in the foregoing sentence, the injunction

19  provided for in this section 5 shall not discharge or enjoin the Debtor or Reorganized Debtor from

20  any liabilities arising from transactions and events occurring in the ordinary course of the Debtor's

21  business during the pendency of this case arising within the scope of 28 U.S.C. § 959. For clarity,

22  the Debtor is not discharged from its obligations to fund the Unknown Tort Claim Reserve or

23  from Non-Settling Insurer Policy Claims, but recourse with respect to Non-Settling Insurer Policy

24  Claims is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including

25  extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive

26  damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers

27  because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort

28

1    Claim or Unknown Tort Claim, and any such judgments or awards will be handled in accordance

2    with applicable Sections of the Plan.

3        Tort Claimants and the Trust shall be permitted to name the Debtor in any proceeding to

4    resolve whether the Debtor has liability for Tort Claims or Unknown Tort Claims and the amount

5    of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling

6    Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations

7    of Non-Settling Insurers to defend and pay, the Debtor's liability for Tort Claims or Unknown

8    Tort Claims under Non-Settling Insurer Policies. The limitations otherwise set forth in the Plan

9    on a Tort Claimant or Unknown Tort Claimant's recovery will not in any way limit the Non-

10   Settling Insurers' obligations under the Non-Settling Insurer Policies or the Tort Claimants',

11   Unknown Tort Claimants', and/or Trust's recoveries against the Non-Settling Insurers for the

12   Non-Settling Insurers' conduct in connection with the defense or settlement of a Tort Claim,

13   including on any judgments in excess of the limits of a Non-Settling Insurer Policy.

14       6.    **EXCULPATION AND LIMITATION OF LIABILITY**. The exculpation and

15   limitations of liability provided in the Plan to the Exculpated Parties are valid and incorporated

16   into this Order.

17       7.    **CHANNELING INJUNCTION PREVENTING PROSECUTION OF**

18   **CHANNELED CLAIMS AGAINST PROTECTED PARTIES AND SETTLING**

19   **INSURERS**.

20           **(a)    In consideration of the undertakings of the Protected Parties and**

21   **Settling Insurers under the Plan, their contributions to the Trust, and other**

22   **consideration, and pursuant to their respective settlements with the Debtor and to**

23   **further preserve and promote the agreements between and among the Protected**

24   **Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy**

25   **Code:**

26

27

28

PLAN PROPONENTS' ORDER
CORE/3515288.0002/177438618.4

1. any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

2. all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

    i. commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

    ii. enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;

    iii. creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;

    iv. asserting, implementing or effectuating any Channeled Claim of any kind against:

        1. any obligation due any of the Protected Parties or Settling Insurers;

        2. any of the Protected Parties or Settling Insurers; or

        3. the property of any of the Protected Parties or Settling Insurers.

    v. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

PLAN PROPONENTS' ORDER

CORE/3515288.0002/177438618.4

**SA 2132**

vi.  **asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers.**

**Notwithstanding anything to the contrary in the Plan, Tort Claimants and the Trust shall be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse in the proceeding is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Plan Sections 6.14(i) and (j).**

**The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in Plan Section 13.3 shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

The Channeling Injunction will not be for the benefit of Non-Settling Insurers or Persons who are not Protected Parties.

The Channeling Injunction will be effective with respect to the Settling Insurers Entities as of the date that the Trust receives the amount(s) set for in Plan Section 7.11.

8.      **SUPPLEMENTAL SETTLING INSURER INJUNCTION**.

(a)      **Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies or Interests in insurance policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code:**

**Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, or any other Person covered or allegedly covered under the Settling Insurer Policies, that directly or indirectly arise from, relate to, or are in connection with (i) any of the Settling Insurer Policies, any Claim that would have been covered under a Settling Insurer Policy but for an Insurance Settlement Agreement, any Tort Claims, Direct Action Claims, Indirect Claims, Coverage Claims, and Released Claims; (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims; (iii) Extra-Contractual Claims; and (iv) Unknown Tort Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly**

**or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or the Settling Insurer Policies:**

1. **Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the property of the Settling Insurers;**

2. **Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

3. **Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the property of the Settling Insurers;**

4. **Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the property of the Settling Insurers; and**

5. **Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

For the avoidance of doubt, this Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers as to the Settling Insurer Policies but against no other person or thing. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation. For the avoidance of doubt, this Supplemental Settling Insurer Injunction shall not apply to: (i) any Persons who are not Protected Parties but who are insured under any Other Insurance Policies, with respect to coverage under such Other Insurance Policies; (ii) any Claims of any Persons that are covered or alleged to be covered under such Other Insurance Policies, to the extent such Claims are not Tort Claims or Indirect Claims against a Protected Party.

The Supplemental Settling Insurer Injunction will not be for the benefit of Non-Settling Insurers.

The Supplemental Settling Insurer Injunction will be effective with respect to any Settling Insurers Entities as of the date that the Trust receives the Settlement Amount (as defined in any Insurance Settlement Agreement).

PLAN PROPONENTS' ORDER
CORE/3515288.0002/177438618.4

SA 2135

9.    **INJUNCTIONS ARE PERMANENT; EXISTING INJUNCTIONS AND STAYS REMAIN IN EFFECT UNTIL EFFECTIVE DATE**. On the Effective Date of the Plan, the injunctions provided for in the Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable. All injunctions and stays provided for in the Plan, the injunctive provisions of Bankruptcy Code Sections 524 and 1141, and all injunctions or stays protecting the Protected Parties and Settling Insurers are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.

10.    **LIABILITY OF JOINT TORTFEASORS**. Pursuant to applicable provisions of the Plan, any person or entity that is or was alleged to be a joint tortfeasor with the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim or a Class 4 Claim shall not be liable for any Protected Party's share of causal liability or fault for such Claim.

11.    **PROFESSIONAL FEES AND OTHER ADMINISTRATIVE EXPENSES**. Requests for allowance and payment of Administrative Claims, except for Professional Claims, must be filed and served no later than thirty (30) days after entry of this Order. Requests for allowance and payment of Professional Claims shall be filed and served in accordance with applicable provisions of the Plan.

12.    **APPROVAL OF COMPROMISES RELATED TO THE PLAN**. The Debtor is authorized and permitted to enter into the promises and compromises contained in the Stipulation by and Between the Debtor, Official Committee of Unsecured Creditors and Boy Scouts of America Regarding the BSA Plan Objection and Claim Objection (the "BSA Objection Compromise"). Upon approval of the BSA Objection Compromise by the Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") (or other court of competent jurisdiction), the Debtor shall (a) withdraw any pending notice of appeal filed in the BSA's bankruptcy case before the Delaware Bankruptcy Court (Case No. 20-10343 (LSS) (Bankr. D. Del.)) and the Delaware District Court (Case No. 22-01254 (D. Del.) or as may be further assigned and consolidated, (b) take all steps necessary to resolve and close the appeal of the BSA's Plan,

1   the BSA Confirmation Order and/or the BSA Confirmation Opinion  (as those terms are used in

2   the BSA Objection Compromise) or any other appeal otherwise by the Debtor related to the BSA's

3   bankruptcy case filed in the Delaware District Court; and (c) forever waive any such right to

4   appeal the BSA Plan, the BSA Confirmation Order, and/or the BSA Confirmation Opinion.

5         13.    **FEES PAYABLE UNDER 28 U.S.C. § 1930**. Plan Section 2.2 provides that it is

6   severable and may be modified, stricken, or otherwise altered based on a final determination of

7   the appropriate calculation of fees payable under 28 U.S.C. § 1930. The Plan Proponents and the

8   Office of the United States Trustee have agreed that the Court will determine the appropriate

9   calculation of fees payable under 28 U.S.C. § 1930 through a contested matter to be heard within

10  90 days of entry of this Order. Pursuant to 11 U.S.C. § 1127(b), Section 2.2 of the Plan will be

11  modified to conform with the outcome of the Court's ruling on the calculation of fees payable

12  under 28 U.S.C. § 1930.

13        14.    **MAILING OF NOTICE**. The Debtor and/or Committee shall promptly mail

14  copies of this order as notice of entry of this order and confirmation of the Plan to all creditors

15  and other parties in interest.

16        15.    **WAIVER OF STAY**. The stay imposed by Fed. R. Bankr. P. 3020(e) is waived.

17

18        **SO ORDERED.**

19  

20        **/s/ Frances M. Tydingco-Gatewood**
         **Chief Judge**
         **Dated: Oct 20, 2022**

21

22

23

24

25

26

27

28

PLAN PROPONENTS' ORDER

CORE/3515288.0002/177438618.4

**SA 2137**

EXHIBIT A

| Debtor Prefix | Legal Description |
|---|---|
| AGA13 | Lot 19-R1, Block 26, Agat |
| AGA14 | Lot 8-2, Block 22, Hagatna |
| AGA3 | Lot 1 NEW, Block 9, Agaña (Consolidated from Lots 1, 2, 3, 4, 15 and 16) |
| AGA9 | Lot 1341-1-REM-4, Agaña |
| AGT1 | Lot 306-4-2NEW, Agat |
| AGT2 | Lot 5, Agat (18% undivided interest) |
| AGT3 | Lots 165 and 168, Agat |
| AHT1 & AHT2 | Lot 19 NEW (Part) NEW-R4, Agaña Heights |
| AHT3 | Lot 20 REM-3-2-1, Agaña Heights |
| ANG1 | Lot 1341-1-REM-3, Hagåtña |
| ASA1 | Lot 240-10, Asan |
| ASA6 | Lot 214-1REM, Asan |
| ASA7 | Portion of Lot 11, Block 18, Tract 2025, Asan (old D18-23) |
| AST1 | Lot 1NEW, Block 5, Tract 240, Dededo |
| BAR21 | Lot 2346-1, Barrigada |
| BAR25 | Lot 2265-Rem-8-1, Barrigada |
| BAR22, 27 & 28 | Lot 2364-1-7NEW; Lot 2365-1-1; and Lot 5437, Barrigada |
| BAR35 | Lot 2265-REM-8-4-R1, Barrigada |
| BAR5 | Lot 2264-1-2, Barrigada |
| DED15 | Lot 5019A-3-5, Dededo |
| HAG1 | Lot 1340-3-1, Hagatna |
| HAG2 | Lot 1341-1-1 (REM), Hagatna |
| HAG3 | Lot 81-REM-2, Hagatna |
| HAG4 | Lot 81-REM-3, Hagatna |
| HAG5 | Lot 81-REM-4, Hagatna |
| HAG6 | Lot 81-REM-7, Hagatna |
| HAG7 | Lot 81-REM-R8, Hagatna |
| HAG8 | Lot 81-REM-8, Hagatna |
| INA1 | Lot 190-R9, Inarajan |
| INA5 | Lot 1-R2, Inarajan |
| INA5a | Lot 1-2, Inarajan |
| MAC1 | Lot 10077-1-NEW-5, Machanao |
| MAL1 & MAL2 | Lot 190-2NEW, Malojloj, Inarajan |
| MAL3 | 190-7, Malojloj, Inarajan |
| MAN1 & MAN8 | Lot 2285-2-3, Mangilao |
| MAN3 | Lot 3, Block 3, Tract 139, Mangilao |
| MAN6 | Lot 2285A, Mangilao |
| MAN10 | Lot 2418 A-2-R1, Mangilao |
| MER1A&B | Lot 501 (A) and Lot 501 (B), Gugae, Merizo |

| Debtor Prefix | Legal Description |
|---|---|
| MER2 | Lot 4, Merizo |
| MER3 | Lot 530 Y-Pigua, Merizo |
| MER5 | Lot 54-R1, Merizo |
| MON1 | Lot 100-2, Mongmong |
| ORD2A | Lot 3275-3-4, Ordot |
| ORD3-6 | Lot 1NEW, Tract 122, Ordot |
| PGO10 | Lot 81-REM-1-R/W, PiGo, Agaña |
| PGO11 | Lot 81-REM-6-R/W. PiGo, Agaña |
| PHI1&2 | Residential Condominium, 24th Floor, Unit D, Lotus Tower of Oriental Gardens, Cor. Pasong Tamo, Urban Ave. & Tindalo St., Pio del Pilar, Makati City, Philippines; Residential Condominium, 24th Floor, Unit F, Lotus Tower of Oriental Gardens,Cor. Pasong Tamo, Urban Ave. & Tindalo St., Pio del Pilar, Makati City, Philippines |
| PIT1 | Lot 1A, Tract 318, Piti |
| PIT2 | Block 8, Piti |
| SIN13 | Lot 21, Block 17, Tract 232, Sinajana |
| SIN14 & SIN18 | Lot P19.28B-1New, Ordot-Chalan Pago |
| SIN8 | Lot 1118-R1, Sinajana |
| STR1 | Lot 4, Block 4, Santa Rita |
| STR2 | Lot 6, Block 2, Santa Rita |
| TAL13 | Portion of Lot No. 11, Tract 2931, Talofofo, an area of 10,000 +/- square meters |
| TAL6-9 | Lots 12, 13, 14 and 15, Block 13, Talofofo |
| TUM1 | Lot 5060-A, Tumon, Dededo |
| TUM2 | Lot 5118-1-1, Tumon |
| YIG3 | Lot 5-1, Block 4, Tract 251, Yigo |
| YIG4 | Lot 7033-A, Yigo |
| YIG5 | Lot 7007-3-R3 New, Yigo |
| YON5 | Lot 91-1A-3-1, Yona |
| YON6 | Lot 173-NEW-NEW-R2, Yona |
| YPN1 | Lot 9-20, Tract 142, Ypan, Talofofo |
| AGT7 | Lot 247-2, Agat |
| AGT8 | Lot 248, Agat |
| BAR1, BAR2, BAR3, BAR4 | Lots 1, 2, 3, and 4, Block 2, Tract 1534, Mangilao |
| SIN9 & SIN10 | Lot 18 & 19, Block 1, Tract 2014, Sinajana |
| UMA1 | Lot 42-3, Umatac |

**IN THE DISTRICT COURT OF GUAM**
**TERRITORY OF GUAM**
**BANKRUPTCY MINUTES**
**GENERAL**

CASE NO.: BK-19-00010                          DATE: September 10, 2021
IN RE: Archbishop of Agana, a Corporation Sole, Most Rev. Michael Jude Byrnes, Coadjutor Archbishop of
Agana

HON. FRANCES M. TYDINGCO-GATEWOOD, Chief Judge, Presiding

Law Clerk: Karen Quitlong                          Court Reporter: Veronica Flores
Courtroom Deputy: Virginia T. Kilgore              Hearing Times: 8:28-8:53
CSO: None Present

**APPEARANCES:**

Trustee:
Curtis Ching

Attorney(s) for Debtor(s):                         Others Present:
Ford Elsaesser, Jr for the Archbishop of Agana     Edwin H. Caldie for Committee of Unsecured Creditors
John C. Terlaje for the Archbishop of Agana        Andrew J. Glasnovich for Committee of Unsecured Creditors
                                                   Mark Errico for National Union & American Home Insurance
                                                   Ian Macdonald for Bank of Guam
                                                   Erin Rosenberg for Boy Scouts of America
                                                   Patrick Civille for Boy Scouts of America
                                                   Duncan McCully for Sisters of Mercy
                                                   Martin Deinhart for First Hawaiian Bank
                                                   David Christian for Continental Insurance Company
                                                   Daron Berman for numerous plaintiffs

**PROCEEDINGS: Motion for Derivative Standing to Enforce the Automatic Stay and Take Other Action**
             **Final Hearing on Motion to Approve Stipulation**

- Motion to Approve Stipulation <u>granted</u>.
- Motion for Derivative Standing to Enforce the Automatic Stay and Take Other Actions <u>moot.</u>

NOTES:

SA 2140

**To:** Wendy Kurten[Wendy.Kurten@scouting.org]; Shane Calendine[Shane.Calendine@scouting.org]; John Mosby[John.Mosby@scouting.org]
**From:** jeff.hunt@scouting.org
**Sent:** Mon 8/9/2021 10:09:22 PM
**Subject:** Fwd: Boy Scout Units Chartered by Local United Methodist Churches
**Received:** Mon 8/9/2021 10:09:23 PM
Fyi

Sent from iPhone
Jeff Hunt
Vice President Council Operations
National Service Territories 1-8

Boy Scouts of America
1325 West Walnut Hill Lane
Irving, TX 75015-2079
PO Box 152079-2079
P: 972-580-2092
C: 469-600-6313
F: 469-913-4824
Email: Jeff.hunt@scouting.org

Begin forwarded message:


**From:** Richard Avery <Richard.Avery@scouting.org>
**Date:** August 9, 2021 at 4:19:53 PM CDT
**To:** Jeffrey Hunt <jeff.hunt@scouting.org>, Steve McGowan <Steve.McGowan@scouting.org>
**Subject: Fwd: Boy Scout Units Chartered by Local United Methodist Churches**


Jeff and Steve,

FYI.
Pease forward as needed if you have not seen this letter. Thank you.
Get Outlook for iOS

---

**From:** Michael Jenkins <Michael.Jenkins@scouting.org>
**Sent:** Monday, August 9, 2021 5:12:57 PM
**To:** Richard Avery <Richard.Avery@scouting.org>
**Subject:** FW: Boy Scout Units Chartered by Local United Methodist Churches

Rich,

Have you seen this?

**MICHAEL JENKINS**, Scout Executive
Voyageurs Area Council

O: 218.740.4520   C: 218.464.3000
michael.jenkins@scouting.org

JTX-725

 Prepared. For Life.®

BSA-PLAN_01279330

SA 2141

**From:** Terry TIlton <terrytilton50@gmail.com>
**Sent:** Monday, August 9, 2021 4:01 PM
**To:** Brad Olson <Brad.Olson@scouting.org>; Michael Jenkins <Michael.Jenkins@scouting.org>; Michael Cooper <msjcooper@usfamily.net>
**Subject:** Fwd: Boy Scout Units Chartered by Local United Methodist Churches

Gentlemen;
I am forwarding this information on to you as it has just gone out to all the United Methodist Churches in Minnesota.  It is regrettable and I am not happy with this stance but am powerless to make any changes in this recommendation for the immediate future.

Yours in Scouting,
Terry L. Tilton

---------- Forwarded message ---------
From: **Bishop David Bard** <communications.mnumc@brtapp.com>
Date: Mon, Aug 9, 2021 at 3:49 PM
Subject: Boy Scout Units Chartered by Local United Methodist Churches
To: <terrytilton50@gmail.com>

Dear Minnesota Conference United Methodists:

We write this letter with heavy hearts.

*Personal Background*

Bishop David A. Bard: I am the Bishop of the Conference. As a youth, I was active in Boy Scouts here in Minnesota. I attained the rank of Life Scout before summer jobs and other activities prevented me from continuing with the scouting program. But I have fond memories of campouts, friendships, and learning skills that I still use. I even preached my first sermon on a Boy Scouts camping trip.

Barton L. Seebach: I am the Associate Chancellor of the Conference. Two nephews and a son-in-law are Eagle Scouts. They matured, grew confident, and became the good citizens and community leaders they are, at least partly thanks to scouting. Myself, I left scouting after Webelos, earning no real distinctions. Yet scouting was a foundational experience even for an average scout like me.

*BSA Current Reality*

Unlike our own stories, some boys suffered serious harm related to scouting. The Boy Scouts of America (BSA) is overwhelmed with potential liability exposure from sexual assault allegations nationwide. In response, BSA filed for bankruptcy protection, asking the court to allow BSA to reorganize and to dismiss all sexual abuse claims against BSA not filed in the bankruptcy. Under both plans the BSA has presented to the bankruptcy

BSA-PLAN_01279331

**SA 2142**

court, BSA would leave its Charter Organizations out on a limb. BSA would provide no protection or defense. The Charter Organizations are the local churches, schools, and civic groups that sponsor or host a Scout Troop, Pack, Crew, or other unit. The details of these plans are still playing out. So far, though, the BSA's plans are putting United Methodist churches that are or were involved in scouting at serious risk.

The BSA consistently assured Charter Organizations that they held enough insurance to cover their Chartered Organizations in case scouts were injured. We see now, however, the promise was empty. BSA had too little insurance. Local churches are at risk of having to pay significant sums to compensate victims for damages suffered at the hands of some scout leaders. In addition, the local churches will have to pay to hire attorneys to defend themselves if sued. Lawsuits already have been filed in other states. We must prepare for the same in Minnesota. Our local churches are in this bind because the BSA did not fulfill its promise to provide enough insurance to protect the local churches.

### *Future Relationship with the BSA*

**We recommend our local churches change their relationship with their scouting units.** This recommendation is based on current guidance from The United Methodist Church's General Council on Finance and Administration (GCFA), which is working to represent United Methodist interests in the BSA bankruptcy matter through a committee of annual conference chancellors. Most of those chancellors, themselves, earned distinction as Eagle Scouts. This recommendation, you see, comes from friends of scouting.

**If your local church currently charters a scout unit**, we recommend you **NOT** renew that charter agreement when it is up for renewal or re-chartering this year. Instead, we recommend you choose one of the following options:

1. Tell the local scout council you **will not renew** the chartering agreement but will agree to continue the current agreement until December 31, 2021.
2. Tell the local scout council you **will not renew** the chartering agreement but **will agree to a Facilities Use Agreement**, using a form to be provided by The United Methodist Church, with its unit until December 31, 2021. The new agreement will be more like a lease. It will allow the scout unit to use your space, but the local scout council will be responsible for everything else, including the selection of leaders. GCFA is preparing a model Facilities Use Agreement.

After December 31, 2021, we should be in a better position to assess how best to move forward with the BSA. The bankruptcy court will eventually

BSA-PLAN_01279332

SA 2143

approve a plan for reorganizing the BSA. We hope for a better plan than what BSA has proposed so far. We need a plan that protects your local church.

**If your local church does not currently charter a scout unit**, we recommend you **NOT** consider chartering a unit until the bankruptcy case if finalized and we understand how the United Methodist relationship with the BSA will continue in future.

We understand these suggestions are dramatic. We think them prudent. We want your local churches protected from costly litigation and we want the BSA to honor its commitments.

*Final Thoughts*

We know the value of scouting. It has played a very large role in the mission and ministry of The United Methodist Church for a very long time. The BSA is not proving faithful to The United Methodist Church at this time, leaving us without the protections it promised. We simply cannot continue the relationship with the BSA as we did in the past. We hope to continue our long connection with scouting in a more robust way in the future. Today, though, we need to make some changes to protect our congregations.

May God smile on you,

.

Bishop David A. Bard
Interim Bishop, Minnesota Conference

.

Barton L. Seebach
Associate Chancellor, Minnesota Conference

Forward this email          View in browser

terrytilton50@gmail.com is receiving this email from Bishop David Bard because you have an existing relationship with us. To ensure that you continue to receive emails from us, add communications@minnesotaumc.org to your address book or safe sender list.

To unsubscribe or manage mailings, click here

**Minnesota Annual Conference of the United Methodist Church**
122 W. Franklin Ave., Suite 200, Minneapolis, MN 55404 | 612-230-3334

STOP. THINK. CLICK.

Highly Confidential

BSA-PLAN_01279334

*PRIVILEGED & CONFIDENTIAL*
*ATTORNEY-CLIENT/WORK PRODUCT*
*W&C DRAFT 05/12/2021*

# CLAIMS ALLOWANCE PROCEDURES OF THE
# BOY SCOUTS OF AMERICA SETTLEMENT TRUST FOR THE GLOBAL
# RESOLUTION PLAN

JTX-502

Highly Confidential

BSA-PLAN_00551535

SA 2146

## Table of Contents

Pages

**Article I** Definitions ........................................................................................... 1

    1.1    Capitalized Terms ................................................................... 1

**Article II** Rules of Interpretation and General Guidelines ............................ 1

    2.1    Purpose ................................................................................... 1

    2.2    General Principles ................................................................. 1

    2.3    Sole and Exclusive Method .................................................. 2

    2.4    Interpretation ......................................................................... 2

    2.5    Confidentiality and Privilege ................................................ 2

**Article III** General Trust Procedures ............................................................. 3

    3.1    Expedited Distributions ........................................................ 3

    3.2    Trust Claim Submission ........................................................ 3

    3.3    Cooperation ........................................................................... 4

    3.4    Deceased Abuse Survivor ..................................................... 5

**Article IV** Claims Allowance Procedures ...................................................... 5

    4.1    General ................................................................................... 5

    4.2    Claims Evaluation ................................................................. 5

    4.3    Settlement Trustee Review Procedures .................................. 6

    4.4    Disallowed Claims ................................................................ 8

    4.5    Allowed Abuse Claims ......................................................... 8

    4.6    Treatment of Allowed Abuse Claims .................................... 9

    4.7    Reconsideration of Settlement Trustee's Determination ....... 9

**Article V** Claims Matrix and Points Scaling Factors .................................... 10

    5.1    Points System ........................................................................ 10

    5.2    Claims Matrix ....................................................................... 11

    5.3    Points Scaling Factors ........................................................... 12

    5.4    Allowed Abuse Claim Calculus ............................................ 16

**Article VI** Payment of Settled Claims ........................................................... 16

    6.1    Settled Claim Payments ........................................................ 16

    6.2    Initial Distribution Payment Scaling Factor ......................... 17

5/13/2021 17:42
AMERICAS 107427351 v6 [BSA - Global Plan Claims Allowance
Procedures.DOCX]

BSA-PLAN_00551536
SA 2147

| 6.3 | Payment of Initial Distribution | 17 |
| 6.4 | Subsequent Payments | 18 |
| 6.5 | Release | 19 |

**Article VII** Presentment of Insured Abuse Claims to Non-Settling Insurance Companies for Payment — 20

| 7.1 | Rights of Settlement Trust Against Non-Settling Insurance Companies | 20 |
| 7.2 | Presentment of Insured Abuse Claims | 20 |
| 7.3 | Reimbursement of Insured Abuse Claims | 20 |
| 7.4 | Coverage Disputes | 21 |
| 7.5 | No Direct Action Right | 21 |
| 7.6 | Jurisdiction and Arbitration | 21 |
| 7.7 | Results of Negotiation or Litigation | 21 |

**Article VIII** Indirect Claims — 22

| 8.1 | Indirect Abuse Claims | 22 |
| 8.2 | Offset | 22 |

**Article IX** Tort System Alternative — 23

| 9.1 | Exhaustion of Claims Allowance and Reconsideration Procedures | 23 |
| 9.2 | Tender to Non-Settling Insurance Company | 23 |
| 9.3 | Acceptance of Tender | 23 |
| 9.4 | Limit on Settlement Trust Liability | 23 |
| 9.5 | Parties to Lawsuit | 24 |
| 9.6 | Defenses | 24 |
| 9.7 | Costs | 24 |
| 9.8 | Settlement or Final Judgment | 24 |
| 9.9 | Payment of Judgments by the Settlement Trust | 25 |

**Article X** Miscellaneous Provisions — 25

| 10.1 | Non-Binding Effect of Settlement Trust and/or Litigation Outcome | 25 |
| 10.2 | Amendments | 25 |
| 10.3 | Severability | 26 |
| 10.4 | Governing Law | 26 |

5/12/2021 17:42
AMERICAS 107427351 v6 [BSA - Global Plan Claims Allowance
Procedures.DOCX]

**BOY SCOUTS OF AMERICA ~~SETTLEMENT TRUST~~**
**CLAIMS ALLOWANCE PROCEDURES FOR ~~THE GLOBAL RESOLUTION~~**
**~~PLAN~~ABUSE CLAIMS**

**~~ARTICLE I~~ ARTICLE I**
**PURPOSE AND GENERAL GUIDELINES**

**~~DEFINITIONS~~**

~~1.1 **Capitalized Terms**.  Capitalized terms used in these Claims Allowance Procedures~~

~~shall have the meanings given them in the Plan, the Trust Agreement, or the Bankruptcy Code,~~

~~unless otherwise defined herein, and such definitions are incorporated in the Claims Allowance~~

~~Procedures by reference.~~

**~~ARTICLE II~~**
**~~RULES OF INTERPRETATION AND GENERAL GUIDELINES~~**

**A.**   ~~2.1~~ **Purpose**.  The purpose of the Settlement Trust is to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors pursuant to section 502 of the Bankruptcy Code and against Protected Parties pursuant to applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse ~~Claim~~claim (the "**Allowed Claim Amount**"), and determine payment methodology and direct the payment of all Allowed Abuse Claims.[1]  ~~The purpose of these~~These Claims Allowance Procedures (~~the~~ "**CAP**") ~~is to permit the Settlement Trustee~~have been adopted and approved by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan and the Settlement Trust Agreement.  The Claims Administrator shall implement and administer these CAP in consultation with the Trustee, Claims Processor, Neutrals, and Trust Professionals with the goal of securing the just, speedy, and cost-efficient determination of every Abuse Claim and to provide substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims ~~according to~~in accordance with the procedures set forth herein.  Those entrusted with the consideration and determination of Abuse Claims shall treat all Survivors with abiding respect and shall strive to balance the prudent stewardship of the Settlement Trust with the care in its administration, allocation, and distribution.

---

[1]   ~~For purposes of these Claims Allowance Procedures, the terms "Settlement Trust" and "Settlement Trustee" shall include references to any litigation sub-trust and related litigation sub-trust trustee established pursuant to the Trust Agreement.~~

Highly Confidential                                                                   BSA-PLAN_00551538
**SA 2149**

~~2.2   **General Principles**.   As a general principle, these CAP are intended to set out a claims allowance process that will provide substantially the same treatment to holders of similar Allowed Abuse Claims.  The procedures described herein including, without limitation, the Base Points and Maximum Points (each as defined below) liability values set forth in the Claims Matrix and the discretion given to the Settlement Trustee to determine and to adjust the Allowed Claim Amount assigned to a particular Allowed Abuse Claim through application of the Points Scaling Factors (as defined below) are intended to reflect the relative range of values that Allowed Abuse Claims could achieve in a claims allowance process under section 502 of the Bankruptcy Code.~~

    **B.**    **General Principles**.  To achieve maximum fairness and efficiency, the CAP is founded on the following principles:

        1.    Objective eligibility criteria;

        2.    Clear and reliable proof requirements;

        3.    Administrative transparency;

        4.    Rigorous review process that generates liability values that reflect the values that Allowed Abuse Claims would achieve in a claims allowance process under section 502 of the Bankruptcy Code and applicable law;

        5.    Prevention and detection of fraud;

        6.    Independence of the Trustee, Claims Administrator, Claims Processor, Neutrals, Appeals Officer and Trust Professionals.

    **C.**    **Bankruptcy or Insolvency of the Debtors**.  Due to the bankruptcy or insolvency of the Debtors, the Debtors lacked sufficient assets (excluding insurance) to pay all Abuse Claims in full.  The Settlement Trust assumed the Debtors' legal obligation to pay the Abuse Claims under the Plan.  The amount that Claimants are paid on account of their Allowed Abuse Claim Amounts depends on, among other things, the Settlement Trust's ability to recover from Insurance Companies on account of Insurance Policies, Insurance Actions, Insurance Action Recoveries, Insurance Action Settlement Agreements, and Insurance Coverage assigned to the Settlement Trust.  There is a direct relationship between the Settlement Trust's ability to pay Claimants generally on account of their Allowed Claim Amounts and the Settlement Trust's receipt of payments from Insurance Companies on account of their coverage obligations.  Proceeds recovered from Insurance Companies shall be used to fund distributions to Claimants

5/12/2021 17:42
AMERICAS\ 07427253 v6 |BSA - Global Plan Claims Allowance
Procedure.DOCX]

BSA-PLAN_00551539
**SA 2150**

on account of Allowed Claim Amounts.  The amount of any installment payments, initial payments, or payment percentages established under the CAP or the Settlement Trust Agreement is not, and shall not be interpreted to be, the equivalent of (i) any Claimants' Allowed Claim Amount or (ii) the Debtors' and/or the Protected Parties' legal obligation to pay any Abuse Claims.  The amount that any Survivor is paid on account of his or her Approved Claim Amount is not intended to diminish the injuries suffered by any Survivor because of Sexual Abuse, which injuries shall be acknowledged under these CAP.

2.3 **D.  Sole and Exclusive Method**.  These CAP shall be the sole and exclusive method by which a holder of an Abuse Claim (an "**Abuse Claimant**" or a "**Claimant**") may seek allowance and distribution on such Claim with respect to the Protected Parties and Non-Settling Insurers.

2.4 **Interpretation**.  The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of these CAP.

2.5 **E.  Confidentiality and Privilege**.  All submissions to the Settlement Trust by an Abuse a Claimant shall be treated as made in the course of settlement discussions between the Claimant and the Settlement Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.

Notwithstanding anything in the foregoing to the contrary, with the consent of the Settlement Trust Advisory Committee ("**STAC**"), the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement; *provided, however*, that the Settlement Trust may only disclose such materials in connection with a coverage dispute pursuant to section 7.4 below, or if a Non-Settling Insurance Company defends a reconsideration lawsuit as contemplated in section 9.3 below; *provided, further*, that the Settlement Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents, and materials.  Nothing in these CAP shall be construed to

3
3

Highly Confidential

authorize the Settlement Trustee to waive privilege to disseminate documents to any Abuse Claimant or their respective counsel.

## ~~ARTICLE III~~ ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.** **Incorporation of Plan Definitions**.  Capitalized terms used but not defined in these CAP have the meanings ascribed to them in Settlement Trust Agreement and Article I of the Plan (defined herein).  To the extent that a term is defined in these CAP and the Plan and/or Settlement Trust Agreement, the definition contained in these CAP controls.

**B.** **Definitions**.  The capitalized terms used in these CAP shall have the respective meanings set forth below:

1. "**Abuse Claims**" shall mean Direct Abuse Claims and Indirect Abuse Claims.

2. "**Claimants**" shall mean Direct Abuse Claimants and Indirect Abuse Claimants.

3. "**Direct Abuse Claim**" or "**Sexual Abuse Claim**" shall mean a liquidated or unliquidated Claim asserted by an individual against a Protected Party for Sexual Abuse that occurred prior to the Petition Date.  The term "Sexual Abuse Claim" includes all "Direct Abuse Claims," as such term is defined in the Plan.

4. "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Sexual Abuse Claim.

5. "**Indirect Abuse Claim**" shall mean a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.  ~~For the avoidance of doubt, an~~ Indirect Abuse Claim shall not include any Claim that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of Sexual Abuse.

6. "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

7. "**Sexual Abuse**" shall mean, with respect to a child under the age of eighteen (18) at the time of the sexual abuse, (a) any sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, sexual touching, sexualized interaction, sexual comments about a person's body, or other verbal or nonverbal behaviors that facilitated, contributed to, or led up to abuse, regardless of whether or not such behavior

Highly Confidential

was itself sexual or against the law, and regardless of whether the child thought the behavior was sexual abuse at the time, (b) any behavior between a child and an adult and between a child and another child, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether the child associated the abuse with any physical, psychological, or emotional harm, and (c) any behaviors including penetration or fondling of the child's body, other body-on-body contact, or non-contact, behaviors such as observing or making images of a child's naked body, showing or making pornography, or having children behave in sexual behavior as a group.

8.    "**Sexual Abuse Survivor Proof of Claim**" shall mean a Proof of Claim that asserts a Claim against either of the Debtors for Sexual Abuse filed using the Sexual Abuse Survivor Proof of Claim Form (as such term is defined in the Bar Date Order).

**C.    Interpretation; Application of Definitions and Rules of Construction**.  For purposes of these CAP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these CAP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these CAP may be interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these CAP all without further notice to or action, order, or approval of the Bankruptcy Court or any other person, and such interpretation shall control in all respects; (6) the headings in these CAP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; and (7) in computing any period of time prescribed or allowed by these CAP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE III**
~~**GENERAL TRUST PROCEDURES**~~**CAP ADMINISTRATION**

**A.    Administration**.  Pursuant to the Plan, the Settlement Trust Agreement, the Settlement Trust and these CAP shall be administered by the Trustee in consultation with the STAC, which represents the interests of holders of present Sexual Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Sexual Abuse Claims.  The Claims Administrator shall assist the Trustee in the resolution of Sexual Abuse Claims in accordance with these CAP and provide information necessary for the Trustee to implement these CAP.

**B.    Powers and Obligations**.  The powers and obligations of the Trustee, the Settlement Trust Advisory Committee, the Future Claimants' Representative, the Claims Administrator are set forth in the Settlement Trust Agreement.  The STAC and the Future

5

5/12/2021 17:42
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance Procedure.DOCX]

Highly Confidential

BSA-PLAN_00551542
**SA 2153**

Claimants' Representative shall have no authority to modify, reject, or influence any individual claim determination under these CAP.

**C.**  **Consent Procedures**.  The Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these CAP pursuant to Article [___] below, and on such matters as are otherwise required below and in Article [___] of the Settlement Trust Agreement.

**ARTICLE IV**
**CLAIMANT ELIGIBILITY**

**A.**  **Sexual Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, a Survivor must:  (1) have been a child under the age of eighteen (18) at the time of the Sexual Abuse; (2) have a Sexual Abuse Claim; (3) have timely filed a Sexual Abuse Survivor Proof of Claim or have timely filed a lawsuit against a Protected Party other than the Debtors asserting a Sexual Abuse Claim; and (4) submit supporting documentation and evidence as outlined in Article V.B below.  The Settlement Trust is established to administer Sexual Abuse Claims.  Any Claims unrelated to Sexual Abuse are ineligible for payment by the Settlement Trust and, pursuant to the process described herein, shall be held to be ineligible on a final basis.  All Claimants must have filed a Sexual Abuse Proof of Claim on or before the Bar Date or have timely filed a lawsuit against a Protected Party other than the Debtors asserting a Sexual Abuse Claim.  Sexual Abuse Claims that were not timely filed in the Chapter 11 Cases are ineligible for payment by the Settlement Trust, unless the Claimant (i) has timely filed a lawsuit asserting a Sexual Abuse Claim against a Protected Party other than the Debtors, or (ii) obtains a ruling from the Bankruptcy Court to file a late Sexual Abuse Claim, and within 30 days after the Bankruptcy Court order allowing such late filing (a) files the Sexual Abuse Claim in the Chapter 11 Cases and (b) submits such Sexual Abuse Claim to the Settlement Trust.

**B.**  **Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:  (1) must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order and is not otherwise subject to disallowed under section 502(e) of the Bankruptcy Code or subordination under section 509(c); and (2) establish to the satisfaction of the Settlement Trustee that (a) such Indirect Abuse Claimant has paid in full the liability and obligation of the Settlement Trust to the Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these CAP (and which has not been paid by the Settlement Trust), (b) the Direct Abuse Claimant and the Indirect Abuse Claimant have forever and fully released the Settlement Trust and the Protected Parties from all liability to the Direct Abuse Claimant and the Indirect Abuse Claimant, (c) the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and (d) the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.  In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights related to the Direct Abuse Claimant against the Settlement Trust, including any rights with respect to timing, amount or manner of payment.  In addition, no claim of an Indirect Abuse Claimant may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the

6

8/12/2021 17:43
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance
Procedure.DOCX]

Highly Confidential

BSA-PLAN_00551543

**SA 2154**

Allowed Claim Amount of the related Direct Abuse Claim.  An Indirect Abuse Claim shall be subject to the same payment percentages set forth herein.

**ARTICLE V**
**GENERAL TRUST PROCEDURES**

~~3.1~~ **A.**  **Expedited Distributions**.  As set forth in the Plan and Confirmation Order, a Direct Abuse Claimant who properly completes a non-duplicative proof of claim may elect to resolve his or her Direct Abuse Claim for an Expedited Distribution of $~~1,500~~[●].   The Settlement Trust shall make Expedited Distributions to Direct Abuse Claimants who have properly elected to receive the Expedited Distribution, and who have executed an appropriate release, on or as soon as practicable after the Effective Date.  Direct Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust in order to receive payment of the Expedited Distribution from the Settlement Trust.

A Direct ~~An~~ Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, or any Non-Settling Insurance Company.  ~~An~~A Direct Abuse Claimant who does not properly elect to receive the Expedited Distribution may not later elect to receive the Expedited Distribution.  Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these CAP.

~~3.2~~ **B.**  **Trust Claim ~~Submission~~Submissions**.  Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these CAP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (a) complete under oath a questionnaire to be developed by the Settlement Trustee ~~in consultation with Reorganized BSA~~; (b) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (c) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (d) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each

7
~~7~~

Highly Confidential

BSA-PLAN_00551544
**SA 2155**

a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Cooperation Agreement Obligations (as defined below).

3.3 **C. Cooperation**.  The Settlement Trust shall perform all obligations under the Insurance Policies issued by the Non-Settling Insurance Companies in order to maintain coverage and obtain the benefit of coverage under such policies other than any requirements that would interfere with the allowance and valuation procedures set forth in ~~Article IV and Article V~~Article VI and Article VII of these CAP.  Such obligations shall include any requirement to share documents, witnesses, or other information with the Non-Settling Insurance Companies, to the extent required under the relevant insurance policies, in connection with any coverage litigation pursuant to ~~Article VII~~Article IX and claim litigation pursuant to ~~Article IX~~Article XI of these CAP (the "**Trust Cooperation Obligations**").   In addition, the parties to the Cooperation Agreement shall provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Cooperation Agreement Obligations**" and together with the Trust Cooperation Obligations, the "**Cooperation Obligations**").   Other than their Cooperation Agreement Obligations owed to the Settlement Trust, the Settlement Trust's counterparties to the Cooperation Agreement shall have no obligation to act in any capacity in the claims resolution process under these CAP.

**D.**      **No Modifications to Insurance Policies**.  The Insurance Policies have been assumed and assigned to the Settlement Trust *cum onere*.  Nothing in these CAP shall be interpreted as modifying the terms of any Insurance Policies.

3.4 **E. Deceased Abuse Survivor**.  The Settlement Trustee shall review the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

<div align="center">

~~ARTICLE IV~~ ARTICLE VI
~~CLAIMS ALLOWANCE PROCEDURES~~CLAIMS ALLOWANCE PROCESS

</div>

**A.**     4.1 **General**.  The allowance procedures set forth in this Article ~~IV~~VI will apply to all Submitted Abuse Claims.  The Settlement Trustee must follow the allowance procedures set forth in this Article ~~IV~~VI to establish whether a Submitted Abuse Claim is an Allowed Abuse Claim or is a Disallowed Claim.  The Settlement Trustee will also evaluate all Allowed Abuse Claims under the procedures set forth in ~~Article V~~Article VII to determine a corresponding Proposed Allowed Claim Amount.

**B.**     4.2 **Claims Evaluation**.  The Settlement Trustee shall evaluate each Submitted Trust Claim individually, and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Cooperation Agreement Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will

<div align="center">8</div>

Highly Confidential

either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

**C.** 4.3 **Settlement Trustee Review Procedures**.  The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the Cooperation Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

(i) **1.** **Initial Evaluation Criteria**

. The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

1. (a) there was a material defect in the Abuse Claimant's Proof of Claim or complaint against a Protected Party other than the Debtors (where applicable);

2. (b) such Proof of Claim was timely filed prior to the Bar Date or such complaint was timely filed against a Protected Party other than the Debtors (where applicable);

3. (c) application of relevant statutes of limitation, repose, or other applicable law, should invalidate the Submitted Abuse Claim; or

4. (d) the Submitted Abuse Claim had previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim., *provided, however* that any Submitted Abuse Claim that is disallowed based on the application of a statute of limitations, repose, or other similar time-based defense that becomes the subject of statute of limitations revival legislation may be determined to no longer be a Disallowed Claim and may be evaluated under the General Criteria set forth below.

(ii) **2.** **General Criteria for Evaluating Submitted Abuse Claims**

. To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate whether the Abuse Claimant has provided the following required evidence for such Claim (the "**General Criteria**"):

1. (a) Alleged Abuser Identification.  The Abuse Claimant must either: (a i) identify his or her alleged abuser by the full name or last name, or (b ii) provide additional facts (*e.g.*, a physical description of alleged abuser combined with the name or location of the Abuse

5/12/2021 17:43
AMERICAS :07427251 :v6 :BSA - Global Plan Claims Allowance
Procedure.DOCX]

Highly Confidential                                                                                BSA-PLAN_00551546
**SA 2157**

Claimant's troop) sufficient for the Settlement Trustee to identify the alleged abuser;

2. (b) ~~2.~~ (b) Connection to Scouting. The Abuse Claimant must provide information that: (~~a~~i) he or she was abused by an employee or volunteer of a Protected Party or by a registered Scout, and (~~b~~ii) that such alleged abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

3. (c) ~~3.~~ (c) Location of Abuse. The Abuse Claimant must identify: (~~a~~i) the venue or location of the alleged abuse, and (~~b~~ii) the Scouting activity that he or she was involved in that directly resulted in the alleged abuse; and

4. (d) ~~4.~~ (d) Date and Age. The Abuse Claimant must either: (~~a~~i) identify the date of the alleged abuse and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (~~b~~ii) provide additional facts (*e.g.*, the approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse.

### (iii) 3. Submitted Abuse Claims That Satisfy the General Criteria

. To the extent that a Submitted Abuse Claim meets the evidentiary requirements set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

### (iv) 4. Submitted Abuse Claims That Do Not Satisfy the General Criteria

. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim does not meet all of the evidentiary requirements set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements; *provided*, *however*, that if the Settlement Trustee finds that any of following requirements with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim:

10
~~10~~

Highly Confidential

BSA-PLAN_00551547
**SA 2158**

1. (a)  The Abuse Claimant fails to identify the alleged abuser and/or fails to provide a description of the alleged abuser such that the Settlement Trustee cannot determine whether the alleged abuser was an employee or volunteer of a Protected Party or was a registered Scout, and that the abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

2. (b)  The Abuse Claimant fails to provide the date and/or his or her age at the time of the alleged abuse, and/or sufficient information for the Settlement Trustee to determine the approximate date and/or the Abuse Claimant's age at the time of the alleged abuse; or

3. (c)  The Abuse Claimant fails to identify the alleged acts of abuse.; or

4. (d)  The Abuse Claimant fails to demonstrate that he or she was involved in Scouting.

**D.**   4.4  **Disallowed Claims**.  If the Settlement Trustee finds, pursuant to the procedures set forth in section 4.3Article VI.C above, that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**").  If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article V.

Article VII.   Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in section 4.7Article VI.G below.

**E.**   IV.5  **Allowed Abuse Claims**.  If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the Claims Matrix and Points Scaling Factors described below in Article VArticle VII to determine the proposed Claims Matrix tier and Points Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance, and the Proposed Allowed Claim Amount, and the Initial Settlement Trust Corpus Scaling Factor (as defined below) and any Subsequent Trust Corpus Scaling Factor(s) (to the extent they have been determined) to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in section 4.6Article VI.F below.

**F.**   4.6  **Settled Claim ProcessClaims Determination**.  If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in section 4.7Article VI.G has been exhausted (and no further action has

11
11

Highly Confidential

BSA-PLAN_00551548

SA 2159

been taken by the Abuse Claimant in the tort system pursuant to ~~Article IX~~Article XI below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "~~Settled Claim~~Final Determination"), and the holder of such ~~Settled~~Abuse Claim shall receive payment in accordance with ~~Article VI~~Article VIII, subject to the Abuse Claimant executing the form of release set forth in ~~section 6.5~~Article VIII.D.

**G.**   ~~4.7~~  **Reconsideration of Settlement Trustee's Determination**.   An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**"), within 30 days of receiving a Claim Notice from the Settlement Trust.  Each Reconsideration Request must be accompanied by a check or money order for $500 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.   The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within 30 days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in ~~Article IX~~Article XI below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver ~~a Valid~~an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within 90 days of delivering notice of accepted reconsideration to the Abuse Claimant.   The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its Submitted Abuse Claim in the tort system as described below in ~~Article IX~~Article XI.

**H.**   **Prevention and Detection of Fraud**.  The Claims Administrator shall institute claim auditing procedures and other procedures to detect and prevent the allowance of fraudulent claims.  Responses to questionnaires required by the Settlement Trustee must be signed under

RLF1 3821-1748
AMERICAS 107427251 v6 |BSA - Global Plan Claims Allowance
Procedure.DOCX]

Highly Confidential   BSA-PLAN_00551549
SA 2160

the pains and penalties of perjury.  To the extent of applicable law, the submission of a fraudulent Abuse Claim may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and to the extent of applicable law, may subject those responsible to criminal prosecution in the federal courts.  If the Claims Administrator determines that an Abuse Claim is fraudulent, the Settlement Trustee shall deny the Abuse Claim and so inform the Claimant.  The Claims Administrator shall have the authority to request the Claimant to submit additional records to make a determination of allowance or denial of any Abuse Claim on the basis of fraud.  The Claims Administrator may conduct random audits to verify supporting documentation submitted by randomly selected Abuse Claims and may audit individual Abuse Claims or groups of Abuse Claims.

### ~~ARTICLE V~~ ARTICLE VII
### ~~Claims Matrix and Points Scaling Factors~~

### CLAIMS MATRIX AND SCALING FACTORS

~~5.1  Points System~~**A.**  **Scaling Factors**.  The Settlement Trustee shall utilize the claims matrix (the "**Claims Matrix**") and ~~points~~ scaling factors ("~~**Points**~~ **Scaling Factors**") set forth below in ~~sections 5.2~~Article VII.B and ~~5.3~~VII.C as the basis to determine a Proposed Allowed Claim Amount (*i.e.*, the amount of damages) for each Allowed Abuse Claim.  ~~Points assigned to an Allowed Abuse Claim that make up the Proposed Allowed Claim Amount will be converted to a recovery dollar amount to be determined by an aggregate scaling factor consisting of the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Scaling Factor(s) (each as defined below) (the "**Settlement Trust Corpus Scaling Factor**"), as set forth in Article VI below.  For the avoidance of doubt, the points~~The dollars assigned and agreed to by the Direct Abuse Claimant as the Allowed Abuse Claim Amount for ~~a Settled~~an Abuse Claim shall be deemed to be the BSA's liability for such ~~Claim assuming a Settlement Trust Corpus Scaling Factor of one (1~~Direct Abuse Claim (*i.e.*, the BSA's legal obligation to pay such Direct Abuse Claim), irrespective of how much the holder of such ~~Settled~~Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in ~~Article VI.~~Article VIII.  In no circumstance shall BSA's obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the CAP).

~~5.2~~**B.**  **Claims Matrix**.  The Claims Matrix establishes five tiers of types of abuse, and provides ranges of ~~points~~dollars assignable to an Allowed Abuse Claim in each tier.  The first two columns of the Claims Matrix delineate the five possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse.  The base ~~points~~dollars column for each tier represents the default ~~point~~dollar value for an Allowed Abuse Claim assigned to a given tier, in each case based on BSA's historical abuse settlements and litigation outcomes, prior to application of the ~~Point~~Scaling Factors described in ~~section 5.3~~Article VII.C (the "**Base ~~Points~~Dollars**").  The maximum ~~points~~dollars column for each tier represents maximum ~~point~~dollar values an Allowed Abuse Claim assigned to a given tier can receive based on application of the ~~Point~~Scaling Factors described in ~~section 5.4~~Article VII.D (the "**Maximum ~~Points~~Dollars**").  The ultimate distribution to the holder of an Allowed Abuse Claim may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the Base ~~Points~~Dollars and Maximum

13

5/12/2021 17:42
AMERICAS 107427251 v6 |BSA - Global Plan Claims Allowance
Procedure.DOCX|

Highly Confidential

~~Points~~Dollars values in the Claims Matrix based on the ~~Settlement Trust Corpus Scaling Factor~~payment percentages determined by the Settlement Trustee.[2]  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.

| Tier | Type of Abuse | Base ~~Points~~Dollars | Maximum ~~Points~~Dollars |
|------|---------------|------------------------|---------------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $300,000 | $1,350,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Sexual Abuse-No Touching<br><br>Other Abuse-Not Sexual | $75,000 | $337,500 |

~~5.3  Points~~C.   **Scaling Factors**.  After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the five tiers in the Claims Matrix, the Settlement Trustee will utilize the ~~Points~~Scaling Factors described below to set the ~~points~~dollars attributable to each Allowed Abuse Claim.  The ~~Points~~Scaling Factors are based on evidence submitted to the Bankruptcy Court regarding the BSA's historical abuse settlements ~~and~~, litigation outcomes, and ~~each~~other evidence supporting the Scaling Factors.  Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, as well

---

[2]   ~~The proposed Maximum Points values in the Claims Matrix demonstrates the anticipated maximum dollar distributions for Allowed Abuse Claims in tiers 1–5 when the Settlement Trust Corpus Scaling Factor is one (1).  However, the value of the total Settlement Trust corpus may result in a higher or lower Settlement Trust Corpus Scaling Factor depending on the amounts of recoveries from Non-Settling Insurance Companies and the total points awarded.  The Settlement Trust Corpus Scaling Factor accommodates the potential variances in the Settlement Trust corpus size by scaling the point values assigned to Allowed Abuse Claims based on the size of the Settlement Trust corpus.~~

as materials obtained by the Settlement Trust through the Cooperation Obligations.  These scaling factors can increase or decrease the ~~number of points~~dollars assigned to an Allowed Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one, meaning that in the absence of the application of the scaling factor, the Base ~~Points~~Dollars assigned to a Claim are not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the ~~number of points~~dollars assigned the Allowed Abuse Claim are increased by 50%, the result of multiplying the Base ~~Points~~Dollars of the Allowed Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base ~~Points~~Dollars of the Allowed Abuse Claim.

**Aggravating Factors**:  The Settlement Trustee may assign upward ~~Point~~ Scaling Factors to each Allowed Abuse Claim based on the following categories:

~~(i)~~ (i)    **Nature of Abuse and Circumstances**.  To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward ~~Point~~ Scaling Factor of up to 1.5 to each Allowed Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of abuse during a BSA sponsored event with a single perpetrator held in high regard by the victim and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the Base ~~Points~~Dollars in the Claims Matrix' tiers and would not receive an increase on account of this factor.  By way of example, aggravating factors that can give rise to a higher scaling factor include, but are not limited to, the following factors:

~~1.~~ a.    Unusual duration and/or multiple circumstance of the abuse;

~~2.~~ b.    Repeated targeting and grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Claimant, or use of or exposure to pornography;

~~3. coercion~~c.    Coercion or threat or use of force or violence, stalking; and

~~4. multipled.~~ d.    Multiple perpetrators involved in sexual misconduct.

~~(ii)~~ (ii)    **Abuser Profile**.  To account for the alleged abuser's profile, the Settlement Trustee may assign an upward ~~Point~~ Scaling Factor of up to 2.0 to an Allowed Abuse Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an unknown abuser who is only accused of abuse by one Abuse Claimant.  The hypothetical base case is incorporated into the Base ~~Points~~Dollars in the Claims Matrix' tiers and would not receive an increase on account of this factor.  An upward ~~Point~~ Scaling Factor may be applied for this category as

15
~~15~~

Highly Confidential

follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

1. a.   1.25 if the abuser was accused by at least one (1) other Abuse Claimant;

2. b.   1.5 if the abuser was accused by five (5) or more other Abuse Claimants;

3. c.   2.0 if the abuser was accused by ten (10) or more other Abuse Claimants.

(iii) (iii)   **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Point Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the base points dollars in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

1. a.   Mental Health Issues:  This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

2. b.   Physical Health Issues:  This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

3. c.   Interpersonal Relationships:  This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

4. d.   Vocational Capacity:  This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and

16
16

Highly Confidential

maintaining employment, feelings of unworthiness, or guilt related to financial success.

5. e.   **Academic Capacity**:  This includes but is not limited to school behavior problems.

6. f.   **Legal Difficulties**:  This includes but is not limited to criminal difficulties, bankruptcy, and fraud.

**Potential Mitigating Factors**.  The Settlement Trustee may assign a ~~Point~~ Scaling Factor in the range of 0.1 to 1.0 to each Allowed Abuse Claim to decrease the ~~points~~dollars awarded to such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse that occurred during a BSA sponsored event involving a perpetrator held in high regard and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the base ~~points~~dollars in the Claims Matrix' tiers and would not receive a decrease on account of this factor.  Such factors may include but are not limited to the following:

i. (i)   **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated~~,~~ or mitigated.  For example, the perpetrator may have also maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction of ~~points~~dollars.

ii. (ii)   **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as expected contributions from other, non-Protected Party sources that are related to the abuse.  By way of example, the Settlement Trustee should assign an appropriate ~~Point~~ Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

iii. (iii)   **Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting, the Settlement Trustee shall reduce the ~~points~~dollars assigned to such Claim by assigning a ~~Point~~ Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating knowledge of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.

5/12/2021 17:42
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance
Procedure.DOCX]

Highly Confidential

5.4 **D.  Allowed Abuse Claim Calculus**.  After the Settlement Trustee has assigned an Allowed Abuse Claim to a claim tier and determined the appropriate ~~Point~~ Scaling Factors that apply to the Claim, the total ~~points~~dollars to be assigned to the Allowed Abuse Claim are to be determined as the product of the Base ~~Points~~Dollars of the Claim and the ~~Point~~ Scaling Factors applied to the Claim.  In no event can an Allowed Abuse Claim's ~~point~~dollar value exceed the Maximum ~~Points~~Dollar value for the Claim's assigned tier.

By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim with a Base ~~Point~~Dollar value of $600,000, with a ~~Point~~ Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating ~~point~~ scaling factor of 0.75, and no other ~~Point~~ Scaling Factors, the number of ~~points~~dollars assigned to the Claim (the Proposed Allowed Claim amount) would be $675,000 ~~points~~ calculated as $600,000 x 1.5 x 0.75 = $675,000.  As a further example, if, in addition to the above ~~Point~~ Scaling Factors, the same Allowed Abuse Claim had an additional aggravating ~~Point~~ Scaling Factor of 2.0 on account of the alleged abuser's profile, the ~~points~~dollars assigned to the Allowed Abuse Claim would be twice as much, namely $1,350,000 ($600,000 x 1.5 x .75 x 2.0).

~~ARTICLE VI~~ ARTICLE VIII
**PAYMENT OF SETTLED CLAIMS**

**A.  Payment Upon Final Determination**.  Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section [___] of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VI.F, the Claimant will receive a pro rata share of the Final Determination based on a Payment Percentage described in Article VIII.B and VIII.C.  For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XI.J hereof) shall constitute a Final Determination.

**B.  Initial Payment Percentage**.  After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

~~PAYMENT OF SETTLED CLAIMS~~

~~6.1  Settled Claim Payments.  To determine the distributable dollar value for each Allowed Abuse Claim that becomes a Settled Claim, the Settlement Trustee will multiply the point value of the Allowed Claim Amount for such Settled Claim by the Settlement Trust Corpus~~

18

Highly Confidential

Scaling Factor. After an Allowed Abuse Claim becomes a Settled Claim, as described above in Article IV, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") to the holder of such Settled Claim within 30 days of the Claim becoming a Settled Claim and the Settlement Trust establishing the Initial Settlement Trust Corpus Scaling Factor (as defined below).

6.2 **Initial Distribution Payment Scaling Factor**. After analyzing the Submitted Abuse Claims and determining the number of Allowed Abuse Claims and the likely, aggregate Proposed Allowed Claim Amounts for all Settled Claims and value of the Settlement Trust Assets at that time, the Settlement Trustee and the STAC shall determine, pursuant to the terms and conditions set forth in the Trust Agreement, the appropriate initial Settlement Trust corpus scaling factor (the "**Initial Settlement Trust Corpus Scaling Factor**"). For this purpose, the Settlement Trustee will calculate the Initial Settlement Trust Corpus Scaling Factor as the ratio of the then available Settlement Trust Assets (accounting for future Settlement Trust operating expenses and Submitted Claims litigated in the tort systems pursuant to Article IX) to the total points assigned to all Allowed Abuse Claims (accounting for Future Abuse Claims). By way of example, if the available Settlement Trust Assets are $1.5 billion and the Settlement Trustee calculates the total points assigned to all Allowed Abuse Claims to be 4.5 billion, the Initial Settlement Trust Corpus Scaling Factor would be one third, meaning that the cash payment value of a point for initial payment purposes is $1.00 for every 3 points.

6.3 **Payment of Initial Distribution**. The Settlement Trust will make an Initial Distribution to each holder of a Settled Claim based on the Initial Settlement Trust Corpus Scaling Factor while at the same time maintaining sufficient assets in the Settlement Trust for

5/12/2021 17:48
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance Procedure.DOCX]

BSA-PLAN_00551556
SA 2167

payment of operating expenses, additional Settled Claims and lawsuits against the Settlement Trust.  With respect to Settled Claims that are Insured Abuse Claims (as defined below), the Settlement Trustee shall make such Initial Distribution (and any further distributions) regardless of the status of any litigation seeking indemnity from any Non-Settling Insurance Company.

In the example from section 5.4 of an Allowed Abuse Claim with an Allowed Claim Amount of 1,350,000 points, if the Initial Settlement Trust Corpus Scaling Factor is 1/3, the holder of the Settled Claim will receive $450,000 (1,350,000 x 1/3) as an Initial Distribution.

6.4 **Subsequent Payments**.  As the Settlement Trust obtains additional assets through indemnity payments and recoveries from coverage litigation or settlements with Non-Settling Insurance Companies (or otherwise), or determines that amounts reserved for operating expenses can be reduced, the Settlement Trust's corpus will increase and more funds will become available for distribution to Abuse Claimants on account of Settled Claims.  Consequently, every six (6) months after the payment of the Initial Distribution, the Settlement Trustee shall conduct an evaluation of the total value of the Settlement Trust Assets then available for distribution, and the aggregate points value of Allowed Abuse Claims.   In consultation with the STAC, the Settlement Trustee will then determine when subsequent distributions (each a "**Subsequent Distribution**") should be made to Abuse Claimants on account of Settled Claims and at what additional factor, by updating the Settlement Trust Corpus Scaling Factor (each additional factor, a "**Subsequent Settlement Trust Corpus Scaling Factor**").   Holders of Settled Claims that have not yet received an Initial Distribution prior to the Settlement Trustee's determination to make a Subsequent Distribution shall receive as an Initial Distribution the points value of their

5/12/2021 17:42
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance Procedure.DOCX]

Highly Confidential

BSA-PLAN_00551557

SA 2168

~~Claim multiplied by the Initial Settlement Trust Corpus Scaling Factor plus any Subsequent Settlement Trust Corpus Scaling Factor(s).~~

~~By way of example, if a Settled Claim has an Allowed Claim Amount of 900,000 points, and the Settlement Trust has established an Initial Settlement Trust Corpus Scaling Factor of one third and a Subsequent Settlement Trust Corpus Scaling Factor of one sixth before the Claim becomes a Settled Claim, the Abuse Claimant holding such Claim will receive an initial payment of $450,000, or the sum of the product of 900,000 x 1/3 ($300,000) plus the product of 900,000 x 1/6 ($150,000).   If the sum of the Initial Settlement Trust Corpus Scaling Factor and all Subsequent Settlement Trust Corpus Scaling Factors is one (1), the holder of the Settled Claim will receive $1,350,000 (1,350,000 x 1).   If the Settlement Trust corpus exceeds its expected value, and the sum of the Initial Settlement Trust Corpus Scaling Factor and all Subsequent Settlement Trust Corpus Scaling Factors is 1.5, the holder of the Settled Claim would receive $2,025,000 (1,350,000 x 1.5).~~

**C.     Supplemental Payment Percentage.**  When the Settlement determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement.   Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage.   Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the aggregate of the Initial Payment Percentage and all prior Supplemental Payment Percentages set by the Settlement Trustee.   For the avoidance of doubt, the ~~Allowed Claim Amount~~Final Determination of each ~~Settled~~Abuse Claim shall be deemed to be the BSA's liability (or a Protected Party's liability) for such Abuse Claim ~~assuming a Settlement Trust Corpus Scaling Factor of one (1),~~ irrespective of how much the holder of such ~~Settled~~Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this ~~Article VI~~Article VIII.  For example, BSA's liability for a ~~Settled~~an Abuse Claim with ~~an Allowed Claim Amount of~~Final Determination of $1,350,000 ~~points~~would be $1,350,000, even if the Settlement Trust distributes less or more on account of such ~~Settled~~Abuse Claim to the holder of such Abuse Claim.

BSA-PLAN_00551558
SA 2169

6.5 **D.  Release**.  In order for an Allowed Abuse Claim to become a ~~Settled Claim~~Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA.  Payments made by the Settlement Trust to the holder of a ~~Settled~~Abuse Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Allowed Abuse Claim.

### ~~ARTICLE VII~~ ARTICLE IX
### ~~Presentment of Insured Abuse Claims to Non-Settling Insurance Companies for Payment~~

### PRESENTMENT OF INSURED ABUSE CLAIMS
### TO NON-SETTLING INSURANCE COMPANIES FOR PAYMENT

7.1 **A.  Rights of Settlement Trust Against Non-Settling Insurance Companies**.  Pursuant to the Plan, the Settlement Trust will take assignment of BSA's rights under the Insurance Policies.  For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to ~~Article IV~~Article VI above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**").  The Settlement Trustee may determine that multiple Non-Settled Insurance Companies have responsibility for an Insured Abuse Claim.

7.2 **B.  Presentment of Insured Abuse Claims**.  The Settlement Trustee shall present each Insured Abuse Claim that is an Allowed Abuse Claim, including the Proposed Allowed Claim Amount, to the applicable Non-Settling Insurance Company(ies) for indemnification.  The applicable Non-Settling Insurance Company will have 15 days to review each Insured Abuse Claim presented to it by the Settlement Trust and provide written notice to the Settlement Trust of whether it will indemnify, in whole or in part, the Proposed Allowed Claim Amount of a particular Insured Abuse Claim or decline to indemnify such Insured Abuse Claim (a "**Coverage Determination Notice**").  If the Non-Settling Insurance Company declines to indemnify, the Coverage Determination Notice must provide an explanation of the reason for denial.

7.3 **C.  Reimbursement of Insured Abuse Claims**.  For Insured Abuse Claims that a Non-Settling Insurance Company agrees to indemnify pursuant to a Coverage Determination Notice, the Non-Settling Insurance Company shall indemnify the Settlement Trust for its share of the ~~amount of the~~ Allowed Claim Amount ~~for such Claim, applying an assumed Settlement Trust Corpus Scaling Factor of one (1),~~ within 30 days of ~~such claim~~the Insured Abuse Claim becoming a ~~Settled Claim~~Final Determination.

7.4 **D.  Coverage Disputes**.  For Insured Abuse Claims where a Non-Settling Insurance Company declines to indemnify the Settlement Trust, the Settlement Trust will have the right to pursue the Non-Settling Insurance Company in coverage litigation for the Non-Settling Insurance Company's share of the Allowed Claim Amount for such Claim.  ~~For the avoidance of doubt,~~ Non-Settling Insurance Companies can only deny coverage based on coverage defenses, and not based on challenges to allowance or the Allowed Claim Amount.  The Settlement Trust will have the right to bring such coverage actions in one or more consolidated actions.  For purposes of

5/12/2021 17:42
AMERICAS 107427251 v6 [BSA - Global Plan Claims Allowance Procedure.DOCX]

this section, the dollar value of an Insured Abuse Claim shall be calculated based on ~~an assumed Settlement Trust Corpus Scaling Factor of one (1)~~the Allowed Claim Amount.  The Settlement Trust shall also have the option to negotiate a settlement of coverage issues with each applicable Non-Settling Insurance Company to obtain the benefit of insurance coverage under any Non-Settling Insurance Policy.

~~7.5~~**E.  No Direct Action Right**.   Except as otherwise set forth in the Plan, the Confirmation Order, the Settlement Trust Agreement, or these CAP, Abuse Claimants shall have no rights against the Non-Settling Insurance Companies.

~~7.6~~**F.  Jurisdiction and Arbitration**.  Any coverage action brought by the Settlement Trust against any Non-Settling Insurance Company may be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided*, *however*, that nothing herein waives any right of the Settlement Trust to elect arbitration to the extent the relevant Non-Settling Insurance Policy provides for such.

~~7.7~~**G. Results of Negotiation or Litigation**.   If the Settlement Trustee obtains a settlement or final judgment against a Non-Settling Insurance Company, the proceeds from such judgment settlement will flow into the Settlement Trust corpus.  To the extent a deductible is owed to the Non-Settling Insurance Company in order for the Settlement Trust to obtain the insurance proceeds from a final judgment or settlement, any such deductible shall be submitted to the Settlement Trust as an Indirect Abuse Claim.

<div align="center">

**~~ARTICLE VIII~~ARTICLE X**
**~~INDIRECT CLAIMS~~INDIRECT ABUSE CLAIMS**

</div>

8.1 **Indirect Abuse Claims.**  ~~An Indirect Abuse Claim asserted against the Settlement~~

~~Trust shall be reviewed by the Settlement Trustee and treated as valid and paid by the Settlement~~

~~Trust pursuant to the distribution methodology set forth in these CAP if (a) such Indirect Abuse~~

~~Claim satisfied the requirements of the Bar Date, and is not otherwise disallowed by section~~

~~502(e) of the Bankruptcy Code (subject to the right of the holder of the Indirect Abuse Claim to~~

~~seek reconsideration under section 502(j) of the Bankruptcy Code) or subordinated under section~~

~~509(c) of the Bankruptcy Code, and (b) the holder of the Indirect Abuse Claim establishes to the~~

~~satisfaction of the Settlement Trustee that (i) the holder has paid the liability and obligation of~~

~~the Settlement Trust to the individual claimant to whom the Settlement Trust would otherwise~~

~~have had a liability or obligation under these CAP (and which has not been paid by the~~

5/12/2021 17:42
AMERICAS 107427251 v6 |BSA - Global Plan Claims Allowance
Procedure.DOCX|

Highly Confidential

BSA-PLAN_00551560
**SA 2171**

~~Settlement Trust), (ii) the Settlement Trust and Protected Parties are forever and fully released from all liability related thereto, and (iii) the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law.~~

**A.    Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B hereof.

~~8.2~~ **B.  Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

<div align="center">

~~ARTICLE IX~~ ARTICLE XI
~~TORT SYSTEM ALTERNATIVE~~TORT SYSTEM ALTERNATIVE

</div>

~~9.1~~ **A.  Exhaustion of Claims Allowance and Reconsideration Procedures**.  If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described above in ~~section 4.7~~Article VI.G and the Abuse Claimant disagrees with the Settlement Trustee's final determination regarding allowance or allowed amount of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction.  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered by the Settlement Trust, and recovery, if any, is limited to settlement or judgment from such lawsuit as provided herein.

~~9.2~~ **B.  Tender to Non-Settling Insurance Company**.  If an Abuse Claimant elects to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").  The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit.  The Settlement Trustee shall tender any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available.

~~9.3~~ **C.  Acceptance of Tender**.  A Non-Settling Insurance Company shall have 60 days to determine whether to accept an Insured Lawsuit that is tendered to it.

~~9.4~~ **D.  Limit on Settlement Trust Liability**.  An Abuse Claimant who pursues the Settlement Trust in the tort system shall not be able to receive from the Settlement Trust more than the dollar value of ~~a  Settled~~an Allowed Abuse Claim that is assigned the Maximum ~~Points~~Dollars in the applicable tier set forth in the Claims Matrix ~~assuming a Settlement Trust Corpus Scaling Factor of one (1)~~.  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum damages amount that Abuse Claimant ~~is allowed to sue~~can recover from the Settlement Trust ~~for in the tort system~~ is $2,700,000~~, or 2,700,000 points~~ (the Maximum

<div align="center">

24

</div>

Highly Confidential

BSA-PLAN_00551561

SA 2172

~~Points~~Dollars in tier one) ~~multiplied by an assumed Settlement Trust Corpus Scaling Factor of one (1)~~.

9.5 **E.**   **Parties to Lawsuit**.   Any lawsuit commenced under ~~section 9.1~~Article XI.A of these CAP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.   The potential parties that may be defendants in the lawsuit shall be limited to the Settlement Trust~~; an~~, *provided, however*, that the Abuse Claimant may ~~not sue any of the~~name Protected Parties ~~or~~to the extent necessary to obtain recoveries from Non-Settling Insurance Companies.  In no circumstance shall any Abuse Claimant have recourse against any assets of a Protected Party with respect to the satisfaction of any Abuse Claim, including any Abuse Claim that is liquidate in the tort system.  For the avoidance of doubt, the limit on the Settlement Trust Liability under Article XI.D shall not apply or inure to the benefit of any Non-Settling Insurance Company.

9.6 **G.**   **Defenses**.   All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.   In cases where a Non-Settling Insurance Company has agreed to provide a defense, such Insurance Company retains all liability defenses and may reserve all of its defenses to coverage.

9.7 **H.**   **Costs**.   Each party's costs of litigation shall be borne by that party.   An Abuse Claimant may not seek costs or expenses in the lawsuit filed against the Settlement Trust.

9.8 **I.**   **Settlement or Final Judgment**.   The defending Non-Settling Insurance Company or, if no Insurance Company is defending, the Settlement Trust, is authorized to settle any lawsuit by an Abuse Claimant for an amount it determines appropriate in light of the circumstances of the case, subject to the limitations that the Settlement Trust or defending Non-Settling Insurance Company may not settle any claim for an amount that exceeds the amount that exceeds its potential liability for that Abuse Claim pursuant to ~~section 9.4~~Article XI.D.

9.9 **J.**   **Payment of Judgments by the Settlement Trust**.   If and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these CAP as the Abuse Claimant's ~~Settled  Claim~~Final Determination, and such Allowed Claim Amount shall also constitute the BSA's liability for such Abuse Claim~~, assuming a 1 point to $1 ratio~~.  Within 30 days of executing the release as set forth in ~~section 6.5~~Article XIII.E above, the Abuse Claimant shall receive an Initial Distribution ~~(based on the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Corpus Scaling Factor in effect at such time)~~ from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive any ~~Subsequent Distributions~~subsequent distributions based on any ~~Subsequent Settlement Trust Corpus Scaling Factor(s)~~Supplemental Payment Percentage as determined by the Settlement Trust.  Under no circumstances shall the Settlement Trust pay interest under any statute on any judgments obtained by an Abuse Claimant in the tort system or punitive or exemplary damages.

8/12/2021 17:42
AMERICAS {074271251 v6 {BSA - Global Plan Claims Allowance
Procedure.DOCX}

Highly Confidential

BSA-PLAN_00551562
SA 2173

    **K.**      **Redetermination of Prior Final Determinations**.  To the extent that a Final Judicial Determination of an Abuse Claim implicates a determination of damages under Article VIII for other Abuse Claims which is inconsistent to other Abuse Claims of a similar type to the Abuse Claim subject of a Final Judicial Determination, the Settlement Trustee may, in his sole and absolute discretion, adjust or modify the Claims Matrix and Scaling Factors under Article VIII so that the amount of any prior Final Determinations, solely in an upward manner, is consistent with such Final Judicial Determination.

<div align="center">

~~ARTICLE X~~ ARTICLE XII
~~MISCELLANEOUS PROVISIONS~~ MISCELLANEOUS PROVISIONS

</div>

    ~~10.1~~ **A.** **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these CAP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

    ~~10.2~~ **B.** **Amendments**.  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these CAP, without the written consent of the STAC.  Nothing herein is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to these CAP.

    ~~10.3~~ **C.** **Severability**.  Should any provision contained in these CAP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CAP.  Should any provision contained in these CAP be determined to be inconsistent with or contrary to Debtors' obligations to any Non-Settling Insurance Company providing Insurance Coverage to the Debtors in respect of claims for personal injury for which the Debtors have legal responsibility, the Settlement Trustee, with the consent of the STAC, may amend these CAP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said Non-Settling Insurance Company.

    **D.**      **Offsets**.  The Settlement Trust shall have the right to offset or reduce of the full liquidated value of any Abuse Claim based on any amounts paid or payable to the Claimant on account of such Abuse Claim from any source other than the Settlement Trust.

    ~~10.4~~ **E.** **Governing Law**.  Administration of these CAP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in ~~Article IX~~ Article XI.

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 5/25/2021 11:43:55 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 64077529_1.docx | |
| **Modified filename:** Claims Allowance Procedures 05252021.docx | |
| **Changes:** | |
| Add | 322 |
| Delete | 437 |
| Move From | 10 |
| Move To | 10 |
| Table Insert | 0 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 780 |

BSA-PLAN_00551564

SA 2175

*BR Draft 6/6/2021*
*Mediation Privilege*

**BOY SCOUTS OF AMERICA**
**CLAIMS ALLOWANCE PROCEDURES FOR ABUSE CLAIMS**

**ARTICLE I**
**PURPOSE AND GENERAL GUIDELINES**

    **A.**    **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and other Protected Parties in accordance with section 502 of the Bankruptcy Code and applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below). These Claims Allowance Procedures (the "**CAP**") are adopted pursuant to the Settlement Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These CAP are designed to provide fair, equitable, and substantially similar treatment for all of the applicable Abuse Claims.  These CAP provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these CAP in consultation with the Claims Administrator, Claims Processor, Neutrals, Future Claimants' Representative, Appeals Officer, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining the benefits of any available Insurance Policies.

    **B.**    **General Principles**.   To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these CAP are founded on the following principles:

        1.     objective Claim eligibility criteria;

        2.     clear and reliable proof requirements;

        3.     administrative transparency;

        4.     a rigorous review and evidentiary process that (a) requires an Abuse Claimant to meet allowance standards under applicable law in order to have his or her Abuse Claim allowed as an Allowed Abuse Claim, and (b) permits the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

        5.     prevention and detection of any fraud;

        6.     independence of the Settlement Trust and Settlement Trustee; and

**JTX-527**

[ PAGE   \\* MERGEFORMAT ]

Highly Confidential

*BR Draft 6/6/2021*
*Mediation Privilege*

7.    compliance, as necessary, with the terms of the Insurance Policies and applicable law in order to obtain maximum recoveries by the Settlement Trust for Allowed Abuse Claims that are Insured Abuse Claims.

**C.**    **Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these CAP.  The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights.  The amount of any installment payments, initial payments, or payment percentages established under these CAP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Abuse Claim has against the Debtors, the Protected Parties and/or the Settlement Trust.

**D.**    **Sole and Exclusive Method**.  These CAP and any procedures designated in these CAP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties.

**E.**    **Interpretation**.  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these CAP.

**F.**    **Confidentiality**.  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.**    **Incorporation of Plan Definitions**.  Capitalized terms used but not defined in these CAP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these CAP by reference.  To the extent that a term is defined in these CAP and the Plan and/or the Settlement Trust Agreement, the definition contained in these CAP controls.

**B.**    **Definitions**.  The following terms have the respective meanings set forth below:

[ PAGE   \* MERGEFORMAT ]

1.      "**Abuse Claims**" shall mean Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.      "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.      "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

4.      "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

**C.      Interpretation; Application of Definitions and Rules of Construction**.  For purposes of these CAP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these CAP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these CAP may be interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these CAP without further notice to or action, order, or approval of the Bankruptcy Court or any other person, and such interpretation shall control in all respects; (6) the headings in these CAP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these CAP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; and (8) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

## ARTICLE III
## CAP ADMINISTRATION

**A.      Administration**.  Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these CAP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims.   The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these CAP and provide information necessary for the Settlement Trustee to implement these CAP.

**B.      Powers and Obligations**.  The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrator are set forth in the Settlement Trust Agreement.   The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any individual claim allowance or Allowed Claim Amount determination under these CAP.

[ PAGE   \* MERGEFORMAT ]

BSA-PLAN_00551348
**SA 2178**

      **C.**    **Consent Procedures**.  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these CAP pursuant to Article XII.B below, and on such matters as are otherwise required below and in Article [__] of the Settlement Trust Agreement.  Such consent shall not be unreasonably withheld.

<div align="center">

**ARTICLE IV**
**CLAIMANT ELIGIBILITY**[1]

</div>

      **A.**    **Direct Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

      (1)    have been a child under the age of eighteen (18) at the time of the alleged Abuse;

      (2)    have an Abuse Claim;

      (3)    have timely submitted an Abuse Claim Proof of Claim to the Settlement Trust as provided below; and

      (4)    submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") (which Chapter 11 POCs shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust).  Direct Abuse Claims against Protected Parties other than the Debtors as to which a Direct Abuse Claim is submitted to the Settlement Trust by any applicable deadline that may be set in connection with such entity becoming a Protected Party by the Settlement Trust under Article [__] of the Settlement Trust Agreement.

      **B.**    **Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

      (1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

      (2)    must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subjection (e) thereof, or subordination under section 509(c) (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code); and

      (2)    must establish to the satisfaction of the Settlement Trustee that:

---

[1] **[NTD separate procedures for Non-Abuse Litigation Claims if channeled to Settlement Trust]**.

<div align="center">

[ PAGE   \* MERGEFORMAT ]

</div>

*BR Draft 6/6/2021*
*Mediation Privilege*

(a)    such Indirect Abuse Claimant has paid in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these CAP (and which has not been paid by the Settlement Trust);

(b)    the Indirect Abuse Claimant and the person(s), to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)    the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)    the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability. Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

**C.**    **Future Abuse Claims**. [ADD]

## ARTICLE V
## GENERAL TRUST PROCEDURES

**A.**    **Cooperation**. The Settlement Trustee may require other parties to the Cooperation Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided herein (the "**Cooperation Agreement Obligations**"), and may afford, or require such other parties to the Cooperation Agreement to afford, access for Direct Abuse Claimants to relevant, otherwise discoverable documents to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV or perversion files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these CAP.

**B.**    **Assignment of Insurance Rights**. The BSA insurance rights have been assigned to the Settlement Trust in accordance with the Bankruptcy Code and pursuant to the Confirmation Order, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties.

[ PAGE \* MERGEFORMAT ]

*BR Draft 6/6/2021*
*Mediation Privilege*

    **C.**   **Deceased Abuse Survivor**.  The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these CAP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

## ARTICLE VI
## EXPEDITED DISTRIBUTIONS

    **A.**   **Minimum Payment Criteria**.   A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of [$1,500] (the "**Expedited Distribution**"):  (i) the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim indicated that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse; (ii) the Direct Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification; and (iii) the Settlement Trustee is satisfied based on all available evidence (including the Abuse Claim Proof of Claim, if applicable) that the Abuse was related to BSA-related scouting or a BSA-related scouting event. Direct Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

    **B.**   **Process and Payment of Expedited Distributions**.  Direct Abuse Claimants who have properly elected to receive the Expedited Distribution in accordance with the Plan and Confirmation Order (the "**Expedited Distribution Election**") and who met the criteria set forth in Article VI.A above, shall be entitled to receive their Expedited Payment upon executing an appropriate release.  A Direct Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the Plan and Confirmation Order may not later elect to receive the Expedited Distribution.  A Direct Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, or any Non-Settling Insurance Company.  Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these CAP.

## ARTICLE VII
## CLAIMS ALLOWANCE PROCESS

    **A.**   **Trust Claim Submissions**.   Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these CAP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already

Highly Confidential

received, or that are expected to be received, from BSA or other sources; (iii) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (iv) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Cooperation Agreement Obligations (as defined below).  Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

B.   **Claims Evaluation**.  The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Cooperation Agreement Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

C.   **Settlement Trustee Review Procedures**.  The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the Cooperation Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

1.   **Initial Evaluation Criteria**.  The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

(a)   the Abuse Claimant's Proof of Claim or complaint against a Protected Party other than the Debtors (where applicable) was free from material defects;

(b)   such Proof of Claim was timely filed prior to the Bar Date or such complaint was timely filed against a Protected Party other than the Debtors (where applicable);

(c)   application of relevant statutes of limitation, repose, or other applicable law would permit the Submitted Abuse Claim; or

(d)   the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim, *provided, however* that any Submitted Abuse Claim that is disallowed based on the application of a statute of

[ PAGE   \* MERGEFORMAT ]

*BR Draft 6/6/2021*
*Mediation Privilege*

limitations, repose, or other similar time-based defense that becomes the subject of statute of limitations revival legislation may be determined to no longer be a Disallowed Claim and may be evaluated under the General Criteria set forth below.

2. **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate whether the Abuse Claimant has provided the following required evidence for such Claim (the "**General Criteria**"):

    (a)    Alleged Abuser Identification.  The Abuse Claimant must either: (i) identify his or her alleged abuser by the full name or last name, or (ii) provide additional facts (*e.g.*, a physical description of alleged abuser combined with the name or location of the Abuse Claimant's troop) sufficient for the Settlement Trustee to identify the alleged abuser;

    (b)    Connection to Scouting.  The Abuse Claimant must provide information that: (i) he or she was abused by an employee or volunteer of a Protected Party or by a registered Scout, and (ii) that such alleged abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

    (c)    Location of Abuse.  The Abuse Claimant must identify:  (i) the venue or location of the alleged abuse, and (ii) the Scouting activity that he or she was involved in that directly resulted in the alleged abuse; and

    (d)    Date and Age.  The Abuse Claimant must either:  (i) identify the date of the alleged abuse and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (ii) provide additional facts (*e.g.*, the approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse.

3. **Submitted Abuse Claims That Satisfy the General Criteria**.  To the extent that a Submitted Abuse Claim meets the evidentiary requirements set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

[ PAGE  \* MERGEFORMAT ]

BSA-PLAN_00551353
**SA 2183**

*BR Draft 6/6/2021*
*Mediation Privilege*

4. **Submitted Abuse Claims That Do Not Satisfy the General Criteria**. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim does not meet all of the evidentiary requirements set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements; *provided, however,* that if the Settlement Trustee finds that any of following requirements with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim:

(a) The Abuse Claimant fails to identify the alleged abuser and/or fails to provide a description of the alleged abuser such that the Settlement Trustee cannot determine whether the alleged abuser was an employee or volunteer of a Protected Party or was a registered Scout, and that the abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

(b) The Abuse Claimant fails to provide the date and/or his or her age at the time of the alleged abuse, and/or sufficient information for the Settlement Trustee to determine the approximate date and/or the Abuse Claimant's age at the time of the alleged abuse;

(c) The Abuse Claimant fails to identify the alleged acts of abuse; or

(d) The Abuse Claimant fails to demonstrate that he or she was involved in Scouting.

D. **Disallowed Claims**. If the Settlement Trustee finds, pursuant to the procedures set forth in Article VII.C above, that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**"). If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII. Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

E. **Allowed Abuse Claims**. If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

[ PAGE  \* MERGEFORMAT ]

BSA-PLAN_00551354
**SA 2184**

     **F.**    **Claims Determination**.  If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D.

     **G.**    **Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**").  Each Reconsideration Request must be accompanied by a check or money order for $[●] as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

     If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

     If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

     If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of delivering notice of accepted reconsideration to the Abuse Claimant.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its Submitted Abuse Claim in the tort system as described below in Article XII.

     **H.**    **Prevention and Detection of Fraud**.  The Settlement Trustee shall work with the Claims Administrator to institute auditing and other procedures to detect and prevent the

[ PAGE  \* MERGEFORMAT ]

allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or Claims Auditor to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions.  Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

### [ARTICLE VIII][2]
### CLAIMS MATRIX AND SCALING FACTORS

    **A.**   **Scaling Factors**.  The Settlement Trustee shall utilize the claims matrix (the "**Claims Matrix**") and scaling factors ("**Scaling Factors**") set forth below in Article VIII.B and VIII.C as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim.  The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX.  In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the CAP).

    **B.**   **Claims Matrix**.  The Claims Matrix establishes five tiers of types of abuse, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier, in each case based on BSA's and other putative Protected Parties' historical abuse settlements and litigation outcomes.  The first two columns of the Claims Matrix delineate the five possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse.  The base amount column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier prior to application of the Scaling Factors described in Article VIII.C (the "**Base Amount**").  The maximum amount column for each tier represents maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.D (the "**Maximum Amount**").  The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee.  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.

---

[2] [**Subject to further revisions to address use of average claim values**].

[ PAGE   \* MERGEFORMAT ]

BSA-PLAN_00551356
**SA 2186**

*BR Draft 6/6/2021*
*Mediation Privilege*

| Tier | Type of Abuse | Base Amount | Maximum Amount |
|------|---------------|-------------|----------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $300,000 | $1,350,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Sexual Abuse-No Touching<br><br>Other Abuse-Not Sexual | $75,000 | $337,500 |

**C.** **Scaling Factors**. After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the five tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to set the dollars attributable to each Allowed Abuse Claim. The Scaling Factors are based on evidence submitted to the Bankruptcy Court regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors. Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, as well as materials obtained by the Settlement Trust through the Cooperation Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one, meaning that in the absence of the application of the scaling factor, the Base Amount assigned to a Claim are not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Amount of the Allowed Abuse Claim by 1.5. The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Amount of the Allowed Abuse Claim.

**Aggravating Factors**: The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

[ PAGE   \\* MERGEFORMAT ]

BSA-PLAN_00551357

SA 2187

(i)     **Nature of Abuse and Circumstances**.  To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of abuse during a BSA sponsored event with a single perpetrator held in high regard by the victim and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the Base Amount in the Claims Matrix' tiers and would not receive an increase on account of this factor.  By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

     a.     Unusual duration and/or multiple circumstances of the abuse;

     b.     Repeated targeting and grooming behaviors including special privileges, special activities, and attention, social relationship with parents, personal relationship with the Abuse Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Abuse Claimant, or use of or exposure to pornography;

     c.     Coercion or threat or use of force or violence, stalking; and

     d.     Multiple perpetrators involved in sexual misconduct.

(ii)     **Abuser Profile**.  To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an unknown abuser who is only accused of abuse by one Abuse Claimant.  The hypothetical base case is incorporated into the Base Amount in the Claims Matrix' tiers and would not receive an increase on account of this factor.  An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

     a.     1.25 if the abuser was accused by at least one (1) other Abuse Claimant;

     b.     1.5 if the abuser was accused by five (5) or more other Abuse Claimants;

     c.     2.0 if the abuser was accused by ten (10) or more other Abuse Claimants.

(iii)     **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the Base Amounts in the Claims Matrix' tiers and would not receive an

[ PAGE   \* MERGEFORMAT ]

BSA-PLAN_00551358
**SA 2188**

increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.    <u>Mental Health Issues</u>:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

b.    <u>Physical Health Issues</u>:   This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

c.    <u>Interpersonal Relationships</u>:   This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.    <u>Vocational Capacity</u>:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.    <u>Academic Capacity</u>:  This includes school behavior problems.

f.    <u>Legal Difficulties</u>:  This includes criminal difficulties, bankruptcy, and fraud.

**Potential Mitigating Factors**.  The Settlement Trustee may assign a Scaling Factor in the range of 0.1 to 1.0 to each Allowed Abuse Claim to decrease the Proposed Allowed Claim Amount for such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse that occurred during a BSA sponsored event involving a perpetrator held in high regard and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the Base Amounts in the Claims Matrix tiers and would not receive a decrease on account of this factor.  Such factors may include the following:

(i)    **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated.  For example, the perpetrator may have also maintained a relationship with the Abuse Claimant

[ PAGE   \* MERGEFORMAT ]

BSA-PLAN_00551359
**SA 2189**

through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction of the Proposed Allowed Claim Amount.

(ii)     **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as expected contributions from other, non-Protected Party sources that are related to the abuse.  By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

(iii)    **Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting, the Settlement Trustee shall reduce the Proposed Allowed Claim Amount for such Claim by assigning a Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating that BSA should have known of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.

**D.**     **Allowed Abuse Claim Calculus**.  After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Amount of the Claim and the Scaling Factors applied to the Claim.  In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Amount for the Claim's assigned Claims Matrix tier.  By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Amount of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000.  As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

### ARTICLE IX
### PAYMENT OF SETTLED CLAIMS

**A.**     **Payment Upon Final Determination**.  Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section [__] of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive a pro rata share of the Final Determination based on a Payment

[ PAGE   \* MERGEFORMAT ]

*BR Draft 6/6/2021*
*Mediation Privilege*

Percentage described in Article IX.B and IX.C. For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

**B.    Initial Payment Percentage**. After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

**C.    Supplemental Payment Percentage**. When the Settlement determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the aggregate of the Initial Payment Percentage and all prior Supplemental Payment Percentages set by the Settlement Trustee. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

**D.    Release**. In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA. Payments made by the Settlement Trust to the holder of an Allowed Abuse Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Allowed Abuse Claim.

**ARTICLE X**
**RIGHTS OF SETTLEMENT TRUST**
**AGAINST NON-SETTLING INSURANCE COMPANIES**

Pursuant to the Plan, the Settlement Trust will take assignment of BSA's rights and obligations under the Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may

[ PAGE   \* MERGEFORMAT ]

determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim. The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of the Abuse Claims. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

**A.** **Indirect Abuse Claims**. To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article V.B hereof. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof.

**B.** **Offset**. The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

**A.** **Exhaustion of Claims Allowance and Reconsideration Procedures**. If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described above in Article VII.G and the Abuse Claimant disagrees with the Settlement Trustee's determination regarding allowance or allowed amount of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction (a "**Tort Election Claim**"). An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered by the Settlement Trust, and recovery, if any, shall be limited to settlement or judgment from such lawsuit as provided herein. An Abuse Claimant that asserts a Tort Election Claim may not seek costs or expenses in the lawsuit filed against the Settlement Trust. Each party's costs of litigation shall be borne by that party.

**B.** **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**. The Settlement Trustee, with the approval of the Settlement Trust Advisory Committee and the Future Claimants' Representative, may in his sole and absolute discretion authorize the commencement or continuation of a lawsuit against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**"). STAC Tort Election Claims shall not be required to exhaust any remedies under these CAP before commencing or continuing such lawsuit. No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee, which approval may be withheld for any reason notwithstanding Article II.C.

[ PAGE  \* MERGEFORMAT ]

*BR Draft 6/6/2021*
*Mediation Privilege*

C. **Tender to Non-Settling Insurance Company**.  If a Abuse Claimant elects or is authorized to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").  The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit.  The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

D. **Parties to Lawsuit**.  Any lawsuit commenced under Article XII of these CAP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued.  The Abuse Claimant may name Protected Parties are nominal defendants, *provided, however,* in no circumstance shall any Abuse Claimant have recourse against any assets of a Protected Party with respect to the satisfaction of any Abuse Claim.

E. **Defenses**.  All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.  The defenses available to a Non-Settling Insurance Company that has agreed to provide a defense shall be determined pursuant to the terms of the applicable Insurance Policy and law.

F. **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that*, all amounts of such Allowed Claim Amount in excess of the Maximum Dollars in the application tier set forth in the Claims Matrix (the "**Cap Amount**") shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these CAP (excluding Article XII hereof).  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum payment that Abuse Claimant can recover from the Settlement Trust before all other Direct Abuse Claims are paid in full is $2,700,000 (the Maximum Amount in tier one).  For the avoidance of doubt, the limit on the Settlement Trust Liability under this Article XII.D shall not apply or inure to the benefit of any Non-Settling Insurance Company.

G. **Settlement Trust Liability for STAC Election Claims**.  If the prosecution of STAC Election Tort Claim results in a settlement or judgment less than the Cap Amount, the Abuse Claimant who pursued such STAC Election Tort Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant.  If the prosecution of STAC Election Tort Claim results in a judgment more than the Cap Amount (the

[ PAGE   \* MERGEFORMAT ]

"**Excess Amount**") and the Non-Settling Insurance Company is not a Protected Party, the Abuse Claimant that pursued such STAC Election Tort Claim shall (i) be entitled to an Allowed Abuse Claim against the Settlement Trust for the Cap Amount, less any payments actually received and retained by the Abuse Claimant and (ii) retain [●]% of the Excess Amount and the remaining [●]% shall be paid to the Settlement Trust.  If the prosecution of STAC Election Tort Claim results in a judgment more than the Cap Amount and the Non-Settling Insurance Company has become a Protected Party, the Abuse Claimant that pursued such STAC Election Tort Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that*, all amounts of such Allowed Claim Amount in excess of the sum of (i) the Capped Amount and (ii) [●]% of the Excess Amount shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these CAP (excluding Article XII hereof).

     **H.    Payment of Judgments by the Settlement Trust**.  Subject to Articles XII.F and XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these CAP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the Protected Party's liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth in Article IX.E above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any Supplemental Payment Percentage as determined by the Settlement Trust.

<div align="center">

**ARTICLE XIII**
**MISCELLANEOUS PROVISIONS**

</div>

     **A.    Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these CAP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

     **B.    Amendments**.  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these CAP, without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to preserve the value of assets of the Settlement Trust. Nothing herein is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to these CAP.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend these CAP to provide for materially different treatment for Abuse Claims including the Claims Matrix and Scaling Factors set forth in Article VIII.

     **C.    Severability**.  Should any provision contained in these CAP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CAP.

<div align="center">

[ PAGE   \* MERGEFORMAT ]

</div>

BSA-PLAN_00551364

**SA 2194**

*BR Draft 6/6/2021*
*Mediation Privilege*

   **D.**   **Offsets**.  The Settlement Trust shall have the right to offset or reduce of the Allowed Claim Amount of any Allowed Abuse Claim on a dollar for dollar basis based on any amounts paid or reasonably likely to be paid to the holder of such Claim on account of such Claim from any source other than the Settlement Trust.

   **E.**   **Governing Law**.   Administration of these CAP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII.

[ PAGE  \* MERGEFORMAT ]

Highly Confidential

**To:** Molton, David J.[DMolton@brownrudnick.com]; Goodman, Eric R.[EGoodman@brownrudnick.com]; Quinn, Kami E.[quinnk@gilbertlegal.com]; Brady, Robert[RBRADY@ycst.com]; Harron, Edwin[eharron@ycst.com]

**Cc:** Carey, Kevin[kevin.carey@hoganlovells.com]; Paul Finn[PFinn@commonwealthmediation.com]; Timothy Gallagher[timg@thegallaghergroup.com]; Lauria (Boelter), Jessica[jessica.lauria@whitecase.com]; Andolina, Michael[mandolina@whitecase.com]; O'Neill, Andrew[aoneill@whitecase.com]; Baccash, Laura[laura.baccash@whitecase.com]; Warner, Blair[blair.warner@whitecase.com]; Martin, Ernest[Ernest.Martin@haynesboone.com]; Azer, Adrian[adrian.azer@haynesboone.com]; Whittman, Brian[BWhittman@alvarezandmarsal.com]

**From:** Linder, Matthew

**Sent:** Tue 6/8/2021 6:53:17 PM

**Subject:** BSA - Preliminary Comments on Draft CAP

**Received:** Tue 6/8/2021 6:54:23 PM

**Attachment:** Claims Allowance Procedures 06062021-v3 (BSA Comments 6.8.21).docx

**Attachment:** Comparison of Claims Allowance Procedures 06062021-v3 and Claims Allowance Procedures 06062021-v3 (BSA Comments 6.8.21).pdf

[EXTERNAL EMAIL]

*Mediation Privilege*
*Confidential*

Coalition and FCR teams:

For your eyes only, attached are the BSA's preliminary comments on the draft CAP we received from you yesterday.  These comments are preliminary in nature, have not been reviewed or approved by our client and subject to our continuing review in all respects.  We are sending this to you in the interest of time and to facilitate our continuing mediation discussions.  Please also note, as we have consistently stated, we are prepared to recommend to our client to move forward with the CAP with appropriate concessions.  Previously we discussed that would include a Hartford deal; however, we understand this is not acceptable to you, thus instead we would move forward with the CAP if, in light of the additional cost and risk to the BSA business plan due to the elongated time period in chapter 11, the proposed $80 million BSA note to the Settlement Trust is eliminated.

**Matthew E. Linder** | Counsel
**T** +1 312 881 5421   **M** +1 312 568 9353   **E** mlinder@whitecase.com
White & Case LLP | 111 South Wacker Drive, Suite 5100 | Chicago, IL 60606-4302

**WHITE & CASE**

================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here.

================================================================

JTX-529

BSA-PLAN_00550656
SA 2196

**Mediation and Joint Defense Privileged**
*Subject to Client Review / Comment*
Pachulski Stang Ziehl & Jones LLP
June 7, 2021

**BOY SCOUTS OF AMERICA**
**CLAIMS ALLOWANCE PROCEDURES FOR ABUSE CLAIMS**

**ARTICLE I**
**PURPOSE AND GENERAL GUIDELINES**

**Purpose**

Style Definition: Normal: Font: Times New Roman, 12 pt

Style Definition: Footnote Text: Font: Times New Roman, Space After:  6 pt

Style Definition: List Paragraph: Font: Times New Roman, 12 pt

Style Definition: Footer: Font: Times New Roman, 12 pt

Style Definition: Header: Font: Times New Roman, 12 pt

Formatted: Underline

1

DOCS_LA:338326.1 85353/002

JTX-533

BSA-PLAN_00552173

SA 2197

**Mediation and Joint Defense Privileged**
*Subject to Client Review / Comment*
Pachulski Stang Ziehl & Jones LLP
June 7, 2021

## TABLE OF CONTENTS

**Page**

ARTICLE I PURPOSE AND GENERAL GUIDELINES ............................................................ 1

   A.    Purpose. ............................................................................................................... 1

   B.    General Principles. ............................................................................................... 1

   C.    Payment of Allowed Abuse Claims and Insurance Recoveries. ......................... 2

   D.    Sole and Exclusive Method. ................................................................................ 2

   E.    Interpretation. ....................................................................................................... 2

ARTICLE II DEFINITIONS AND RULES OF INTERPRETATION .................................... 2

   A.    Incorporation of Plan Definitions. ...................................................................... 2

   B.    Definitions. ........................................................................................................... 3

   C.    Interpretation; Application of Definitions and Rules of Construction. .............. 6

ARTICLE III CAP ADMINISTRATION ................................................................................ 7

   A.    Administration. .................................................................................................... 7

   B.    Powers and Obligations. ..................................................................................... 7

   C.    Consent Procedures. ............................................................................................ 7

ARTICLE IV CLAIMANT ELIGIBILITY ............................................................................ 7

   A.    Direct Abuse Claims. ........................................................................................... 7

   B.    Indirect Abuse Claims. ........................................................................................ 8

ARTICLE V GENERAL TRUST PROCEDURES ................................................................ 9

   A.    Recovery Options for Abuse Claimants. ............................................................. 9

   B.    Cooperation. ......................................................................................................... 9

   C.    No Modifications to Insurance Policies. ............................................................. 9

   D.    Deceased Abuse Survivor. .................................................................................. 9

   E.    Statute of Limitations or Repose for Settlement Trust Claims. ......................... 10

ARTICLE VI FIRST-OUT CONVENIENCE PAYMENTS .............................................. 10

   A.    First-Out Convenience Payment Election Timing. ........................................... 10

   B.    Level 1 Convenience Payment. ......................................................................... 10

   C.    Level 2 Convenience Payments. ........................................................................ 11

   D.    Process and Payment of First-Out Convenience Payments. ............................ 12

i

DOCS_LA:338326.1 85353/002

BSA-PLAN_00552174

**SA 2198**

**Mediation and Joint Defense Privileged**
*Subject to Client Review / Comment*
Pachulski Stang Ziehl & Jones LLP
June 7, 2021

ARTICLE VII CLAIMS ALLOWANCE PROCESS ................................................................. 13

    A.    General. ................................................................................................................ 13

    B.    Trust Claim Submissions. ..................................................................................... 13

    C.    Claims Evaluation. ............................................................................................... 15

    D.    Initial Evaluation. ................................................................................................. 15

    E.    Disallowed Claims. .............................................................................................. 16

    F.    Abuse Claims that are Not Disallowed. ............................................................... 18

    G.    Claims Determination. .......................................................................................... 18

    H.    Reconsideration of Settlement Trustee's Determination. ..................................... 18

    I.    Prevention and Detection of Fraud. ..................................................................... 19

ARTICLE VIII EXPEDITED REVIEW AND SUMMARY REVIEW ...................................... 20

    A.    Generally. ............................................................................................................. 20

    B.    Eligibility Criteria and Supplemental Information. .............................................. 20

    C.    Submitted Abuse Claims That Satisfy the General Criteria. ................................. 22

    D.    Submitted Abuse Claims That Do Not Satisfy the General Criteria. .................... 22

    E.    Claims Matrix And Scaling Factors. .................................................................... 22

    F.    Values. ................................................................................................................. 23

    G.    Claims Matrix. ..................................................................................................... 24

    H.    Scaling Factors. ................................................................................................... 25

    I.    Aggravating Factors ............................................................................................ 25

    J.    Potential Mitigating Factors. ............................................................................... 28

    K.    Allowed Abuse Claim Calculus. ......................................................................... 29

ARTICLE IX INDEPENDENT REVIEW PROCESS .............................................................. 29

    A.    In General. ............................................................................................................ 29

    B.    Standard of Review. ............................................................................................. 30

    C.    Valuation Factors to Be Considered in Independent Review Process. .................. 30

    D.    Claims Eligible for Arbitration. ........................................................................... 31

    E.    Establishment of ADR Procedures. ..................................................................... 31

    F.    Fees, Delays and Liquidated Values. ................................................................... 31

    G.    Proposed Claim Amount Rejected. ...................................................................... 32

ARTICLE X PAYMENT OF ALLOWED ABUSE CLAIMS ................................................. 32

DOCS_LA:338326.1 85353/002

ii

BSA-PLAN_00552175

**SA 2199**

**Mediation and Joint Defense Privileged**
*Subject to Client Review / Comment*
Pachulski Stang Ziehl & Jones LLP
June 7, 2021

A.      Percentage Payment. ......................................................................... 32

B.      Source Affected Weighting. ............................................................... 32

C.      Initial Distribution. ........................................................................... 34

D.      Release. .............................................................................................. 34

E.      FIFO Claims Process Queuing and Exigent Health Claims. .............. 34

ARTICLE XI INSURED ABUSE CLAIMS OF NON-SETTLING INSURANCE COMPANIES ....................................................................................................... 35

A.      Rights of Settlement Trust Against Non-Settling Insurance Companies. ..................... 35

B.      Presentment of Insured Abuse Claims. .............................................. 36

C.      No Direct Action Right. ..................................................................... 37

D.      Results of Negotiation or Litigation. .................................................. 37

ARTICLE XII INDIRECT ABUSE CLAIMS .................................................... 37

A.      Indirect Abuse Claims. ...................................................................... 38

B.      Offset. ................................................................................................ 38

ARTICLE XIII TORT SYSTEM ELECTION ..................................................... 38

A.      Exhaustion of Claims Allowance and Reconsideration Procedures; Permissive Suits.. 38

B.      Effect of Tort System Election and Disposition of Proceeds. .............. 38

C.      Tender to Non-Settling Insurance Company ....................................... 36

D.      Settlement Trust Liability. .................................................................. 39

E.      Parties to Lawsuit. ............................................................................. 39

F.      Defenses. ............................................................................................ 40

G.      Settlement or Final Judgment. ........................................................... 40

H.      Payment of Judgments by the Settlement Trust. ................................. 41

I.      Litigation Results and Other Abuse Claims. ....................................... 41

J.      Tolling of Limitations Period. ............................................................ 41

ARTICLE XIV CLAIMS MATERIALS ............................................................. 41

A.      Claims Materials. .............................................................................. 41

B.      Content of Claims Materials. ............................................................. 42

C.      Withdrawal or Deferral of Claims. ..................................................... 42

D.      Fees and Expenses. ............................................................................ 42

E.      Confidentiality of Claimants' Submissions. ....................................... 42

DOCS_LA:338326.1 85353/002

Highly Confidential

**Mediation and Joint Defense Privileged**
*Subject to Client Review / Comment*
Pachulski Stang Ziehl & Jones LLP
June 7, 2021

ARTICLE XV MISCELLANEOUS PROVISIONS ................................................................. 43

    A.    Non-Binding Effect of Settlement Trust and/or Litigation Outcome. ........................... 43

    B.    Amendments..................................................................................... 43

    C.    Severability..................................................................................... 43

    D.    Offsets. ......................................................................................... 43

    E.    Governing Law. ............................................................................. 43

iv

DOCS_LA:338326.1 85353/002

BSA-PLAN_00552177

**SA 2201**

*Mediation Privilege*                                                     *BR Draft 6/6/2021*

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

   **A.   Purpose.**   The ~~purpose of the~~ Settlement Trust ~~is to~~, among other things, is to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and other Protected Parties in accordance with section 502 of the Bankruptcy Code and applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse claim (the "**Allowed Claim Amount**"), determine payment methodology, and direct payment of all Allowed Abuse Claims~~, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below).~~. These Claims Allowance Procedures (the "**CAP**") are adopted pursuant to the Settlement Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").   These CAP ~~are designed to provide fair, equitable, and substantially similar treatment for all of the applicable Abuse Claims.  These CAP~~ provide the means for resolving all Abuse Claims for which the Protected Parties have ~~or are alleged to have~~ legal responsibility as provided in and required by the Plan, the Confirmation Order~~,~~ and the Settlement Trust Agreement.   The Settlement Trustee shall implement and administer these CAP in consultation with the ~~Claims Administrator, Claims Processor, Neutrals,~~ Settlement Trust Advisory Committee ("**STAC**") and Future Claimants' Representative~~, Appeals Officer, and Trust Professionals~~ with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing <u>fair, equitable and</u> substantially similar treatment ~~to holders of similar, legally valid and supported~~<u>for all</u> Allowed Abuse Claims in accordance with the procedures set forth herein, and ~~obtaining~~<u>accessing</u> the ~~benefits of any available~~<u>value in</u> Insurance Policies.

   **B.   General Principles.**   To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these CAP are founded on the following principles:

   1.   objective Claim eligibility criteria;

   2.   clear and reliable proof requirements;

   3.   administrative transparency;

   4.   a rigorous review and evidentiary process that (a) requires an Abuse Claimant to meet allowance standards under applicable law in order to have his or her Abuse Claim allowed as an Allowed Abuse Claim, and (b) permits the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

   5.   prevention and detection of any fraud;

   6.   independence of the Settlement Trust and Settlement Trustee; and

   7.   compliance~~, as necessary,~~ with the terms of the <u>assigned</u> Insurance Policies ~~and applicable law~~ in order to obtain ~~maximum~~<u>full</u> coverage

Highly Confidential                                                 BSA-PLAN_00552178
                                                                          **SA 2202**

*BR Draft 6/6/2021*

*Mediation Privilege*

recoveries by the Settlement Trust for~~on account of~~ Allowed Abuse Claims that are Insured Abuse Claims.

**C.    Payment of Allowed Abuse Claims and Insurance Recoveries.**  Pursuant to the terms of the Plan, the Settlement Trust ~~has assumed~~ shall be assigned the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims. ~~The Settlement Trust Assets, including the proceeds of the assigned insurance rights,~~ Proceeds recovered from Insurance Companies shall be used to fund distributions to Abuse Claimants under these CAP.  The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to ~~liquidate and recover the proceeds of the assigned insurance rights.~~obtain coverage of Allowed Abuse Claims that are Insured Abuse Claims from Non-Settling Insurance Companies.  The amount of any installment payments, initial payments, or payment percentages established under these CAP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the ~~right~~Debtors' and/or the Protected Parties' legal obligation to ~~payment that the holder of an~~pay any Abuse Claim ~~has against the Debtors, the Protected Parties and/or the~~ that is being assigned to the Settlement Trust.

**D.    Sole and Exclusive Method.**  These CAP and any procedures designated in these CAP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to ~~the~~ Protected Parties.

**E.    Interpretation.**  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these CAP.

~~**F.    Confidentiality.**  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement.~~

## ARTICLE II~~ARTICLE II~~
## DEFINITIONS AND RULES OF INTERPRETATION

**A.    ~~A.~~    Incorporation of Plan Definitions.**  Capitalized terms used but not defined in these CAP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement, and such definitions are incorporated in these CAP by reference.  To the extent that a term is defined in these CAP and the Plan and/or the Settlement Trust Agreement, the definition contained in these CAP controls.

2

*BR Draft 6/6/2021*

*Mediation Privilege*

**B.**     **B.**     **Definitions.**[1]  The following terms have the respective meanings set forth below:[2]

1.     "**Abuse Claims**" shall mean Direct Abuse Claims, and Indirect Abuse Claims, and Future Abuse Claims.

2.     "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Claimants and Indirect Abuse Claim, or a Future Claimants.

3.     "**Abuse Types**" shall mean (as specifically defined and described in ARTICLE VIII.E.) the six types of Abuse Claimscheduled in the Claims Matrix.

4.     "**Allocated Share**" shall mean the portion of Non-BSA Sourced Assets allocated to Source Claims as set forth in ARTICLE X.B.

5.     "**Audit Interview**" shall mean an interview of an Abuse Claimant under oath by the Settlement Trust taken as part of an audit undertaken pursuant to ARTICLE VII. I. on the Prevention and Detection of Fraud.

6.     **Average Values** shall mean (as specifically defined and described in ARTICLE VIII.E.) the average values for each tier of Abuse Type based on historical settlements and other evidentiary grounds.

7.     "**Back-End Tort System Election**" has the meaning ascribed in ARTICLE XIII. A. (2).

8.     "**Base Matrix Value**" shall mean the value for each tier of Abuse Type applicable for the base case for such tier (labeled as such in the Claims Matrix and more specifically defined and described in ARTICLE VIII.G.), to be used and that may be identified in connection with the description of the Scaling Factors in ARTICLE VIII.H.

9.     "**Claims Materials**" shall mean suitable and efficient materials for Abuse Claims as described in ARTICLE XIV.A., entitled "Claims Materials."

10.     "**Claims Matrix**" shall mean (as specifically defined and described in ARTICLE VIII.E.) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, Maximum Matrix Value, and Maximum Priority Amount for each tier anticipated to result in the Average Values.

1.     "**Claimant's Jurisdiction**" shall mean the jurisdiction in which the Abuse Claim was filed (if at all) against BSA, applicable Local Councils or applicable Chartered Organizations in the tort system prior to the Petition Date. If the claim was not filed against BSA, applicable Local Councils or applicable Chartered Organizations in the tort system prior to the Petition Date, the Abuse Claimant may elect as the "Claimant's

---

[1] Need to move up to here all the defined terms below.

[2] Need to coordinate these defs with Plan defs to ensure all claims are treated under the plan somewhere.

3

Highly Confidential

Formatted: Left

Formatted: Font: Not Bold, Not Italic

Formatted: Font: Times New Roman Bold, No underline

Formatted: Font: Times New Roman Bold

Formatted: HeadingBody 2, Left, Indent: First line: 0", Space After: 0 pt

Formatted: List, Left, Indent: First line: 0.5", Space After: 0 pt, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Formatted: Underline

Formatted: Underline

Field Code Changed

Formatted: DocID, Left

*Mediation Privilege*

*BR Draft 6/6/2021*

Jurisdiction" either the jurisdiction in which the claimant resides (i) at the time of an incident asserted in the Abuse Claim or (ii) when the claim is filed or deemed filed with the Settlement Trust.

2.10.   "**CPI-W**" shall mean the Consumer Price Index for Urban Wage Earners and Clerical Workers, published by the United States Department of Labor, Bureau of Labor Statistics.

3.11.   "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim..

12.    "**Exigent Health Claim**" shall mean a Direct Abuse Claim that is compensable hereunder for which the Abuse Claimant provides a declaration, under penalty of perjury, from a physician who has examined the Abuse claimant within one hundred twenty days (120) of the date of the declaration, in which the physician states that there is substantial medical doubt that the Abuse Claimant will survive beyond six (6) months from the date of the declaration.

13.    "**Expense Share**" shall mean the pro rata share of the Settlement Trust's expenses to be deducted from a Non-BSA Sourced Payment, for purposes of calculating the disposition of thereof in accordance with ARTICLE X.B., calculated based on the percentage that the then remaining amount of such Non-BSA Sourced Asset represents of total assets in the Settlement Trust at the time of such calculation.

14.    "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Trust.

15.    "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claim Submissions.

16.    "**Final Judicial Determination**" shall mean a final judgment or settlement against the Settlement Trust in the tort system.

17.    "**in the Tort System**" or similar references, as used in these CAP, shall not include claims asserted against a trust established for the benefit of childhood sexual abuse claimants pursuant to the Bankruptcy Code or other applicable law.

18.    "**Initial Distribution**" shall mean the initial distribution by the Settlement Trust in respect of the Allowed Claim Amount of an Abuse Claim after a Final Determination.

19.    "**Initial Tort System Election**" has the meaning ascribed in ARTICLE XIII. A. (4).

20.    "**Insured Abuse Claim**" shall mean a matter related to an Abuse Claim as to which the Trustee determines that a Non-Settling Insurance Company issued coverage that is available to respond.

4

Highly Confidential

*Mediation Privilege*

4.21.    "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

22.    C.    "**Insurer Global Settlement Contribution**" shall mean a settlement contribution from an insurer made in order for it to become a Protected Party under the Channeling Injunction.

23.    "**Insurer Abuse CAP Claim Payment**" shall mean a payment by an insurer other than an Insurer Global Settlement Contribution and other than a Non-BSA Sourced Payment not attributable to a particular Abuse Claim made to the Settlement Trust in respect of an Allowed Claim Amount (that was not determined through a lawsuit after a Tort System Election) of a Protected Party as to an individual Abuse Claim.

24.    "**Insurer Abuse Litigation Claim Payment**" shall mean a payment by an insurer other than an Insurer Global Settlement Contribution and other than a Non-BSA Sourced Payment not attributable to a particular Abuse Claim made to the Settlement Trust in respect of an Allowed Claim Amount (that is determined through a lawsuit after a Tort System Election) of a Protected Party as to an individual Abuse Claim.

25.    "**Matrix Values**" shall mean (as specifically defined and described in ARTICLE VIII.E.) the liquidated values resulting from applying the Scaling Factors to the Base Matrix Values for each tier of Abuse Type.

26.    "**Maximum Matrix Value**" shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in ARTICLE VIII.G.) that represents the maximum Allowed Claim Amount achievable under Summary Review (and twice the amount achievable under Expedited Review) for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in ARTICLE VIII.H.

27.    "**Maximum Priority Amount**" shall mean the value for each tier of Abuse type (labeled as such in the Claims Matrix and more specifically defined and described in ARTICLE VIII.G.) that represents the maximum Allowed Claim Amount (1) entitled to first priority distribution from the Settlement Trust for an Allowed Abuse Claim assigned to a given tier that elects to participate in the Independent Review Process, and (2) to be used in calculating the portion of the Allowed Claim Amounts of certain Abuse Claims that elect and are granted a Tort System Election that will be entitled to first priority distribution from the Settlement Trust.

28.    "**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Settlement Trust, on one hand, and a Protected Party other than BSA, on the other hand, or a recovery by the Settlement Trust by final judgment against a person or entity terminating the liability of such person or entity to the Abuse Claimant.

29.    "**Scaling Factors**" shall mean (as specifically defined and described in ARTICLE VIII.E.) the factors identified below to consider with respect to each Abuse

BSA-PLAN_00552182

SA 2206

*Mediation Privilege*

Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Matrix Value.

30.     "**Source Claims**" shall mean the Allowed Abuse Claims that, absent the Plan's Discharge and Channeling Injunction, could have been satisfied from the person or entity to become a Protected Party in connection with providing Non-BSA Sourced Assets, or from his, her or its assets.

31.     "**Tort System Election**" shall mean the election by an Abuse Claimant to commence or continue a lawsuit in any court of competent jurisdiction in respect of its Abuse Claim against a Protected Party, which action otherwise would be enjoined by the channeling injunction of the Plan.

32.     "**Trustee Interview**" shall mean a written and/or oral examination under oath to which the Abuse Claimant must consent and cooperate as to if requested to do so by the Settlement Trustee on any issues related to his or her Abuse Claim in connection with the Summary Review Process and Independent Review Process.

**C.     Interpretation; Application of Definitions and Rules of Construction.** For purposes of these CAP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these CAP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these CAP may be reasonably interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these CAP without further notice to or action, order, or approval of the Bankruptcy Court or any other person, and such interpretation shall control in all respects other than the STAC; (6) the headings in these CAP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; and (7) in computing any period of time prescribed or allowed by these CAP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; and (8) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

BSA-PLAN_00552183

**SA 2207**

*Mediation Privilege*

## ARTICLE III~~ARTICLE III~~
## CAP ADMINISTRATION

    **A.**    A.    **Administration.**  Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these CAP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims. ~~The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these CAP and provide information necessary for the Settlement Trustee to implement these CAP.~~

    **B.**    B.    **Powers and Obligations.**  The powers and obligations of the Settlement Trustee, the STAC, and the Future Claimants' Representative~~, and the Claims Administrator~~ are set forth in the Settlement Trust Agreement.  The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any individual claim allowance or Allowed Claim Amount determination under these CAP.

    **C.**    C.    **Consent Procedures.**  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these CAP pursuant to ~~Article XII.B~~ARTICLE XV.B below, and on such matters as are otherwise ~~required below and~~specified herein or in ~~Article [___] of~~ the Settlement Trust Agreement.~~ Such consent shall not be unreasonably withheld.~~

## ARTICLE IV~~ARTICLE IV~~
## CLAIMANT ELIGIBILITY[3]

    **A.**    **Direct Abuse Claims.**  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

    (1)    (1)    have been a child under the age of eighteen (18) at the time of the alleged Abuse;

    (2)    (2)    have an Abuse Claim;

    (3)    (3)    have timely submitted an Abuse Claim Proof of Claim to the Settlement Trust as provided below; and

    (4)    (4)    submit supporting documentation and evidence to the Settlement Trust as provided below.

    Direct Abuse Claims that may seek to become eligible for consideration by the Settlement Trust (allowance and payment or disallowance) are only:

    (i)    Direct Abuse Claims for which a Proof of Claim was filed before the Plan's Effective Date in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") *(which Chapter 11 POCs shall, without*

---

[3]  ~~[NTD separate procedures for Non-Abuse Litigation Claims if channeled to Settlement Trust].~~

Highly Confidential

BSA-PLAN_00552184

**SA 2208**

*BR Draft 6/6/2021*

*Mediation Privilege*

*any further action by the Abuse Claimant, be deemed a ~~timely~~ submitted Abuse ~~Proof~~Claim Proofs of Claim to the Settlement Trust).  ~~Direct~~; and*

(ii)   Future Abuse Claims and Abuse Claims against Protected Parties other than the Debtors as to which a ~~Direct Abuse Claim~~claim is submitted to the Settlement Trust by any applicable deadline that may be set in connection with ~~such~~making an entity ~~becoming~~a Protected Party or by the Settlement Trust ~~under Article [  ] of the Settlement Trust Agreement~~(see ARTICLE XIV.).

**B.    Indirect Abuse Claims.**  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(2)    must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subjection (e) thereof, or subordination under section 509(c) (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code); and

(3)    ~~(2)~~ must establish to the satisfaction of the Settlement Trustee that:

(a)    ~~(a)~~ such Indirect Abuse Claimant has paid in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these CAP (and which has not been paid by the Settlement Trust);

(b)    ~~(b)~~ the Indirect Abuse Claimant and the person(s), to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)    ~~(c)~~ the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)    ~~(d)~~ the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the related Direct Abuse Claimant, to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, payment priority, or manner of payment.  In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

8

DOCS_LA:338326.1 85353/002

*Mediation Privilege*                                                                    *BR Draft 6/6/2021*

  C. Future Abuse Claims.  [ADD]

  ARTICLE  VAn Indirect  Abuse  Claimant  that  disputes  the  Settlement  Trust's determination under this section may seek reconsideration thereof by the Settlement Trust upon payment of a $500 fee and submission of additional evidence. If the Settlement Trust declines to reconsider its determination or its further determination remains unsatisfactory to the Abuse Claimant, the Abuse Claimant may move the Bankruptcy Court to apply the provisions of this section to overturn the Settlement Trustee's determination.

<div align="center">

ARTICLE V.
**GENERAL TRUST PROCEDURES**

</div>

  **A.** **Recovery Options for Abuse Claimants.** Each Abuse Claimant may seek recovery  in  respect  of  its  Abuse  Claim  under  the  following  procedures  identified  herein: (1) First-Out Convenience Payments described in ARTICLE VI below; (2) Expedited Review and Summary Review described in ARTICLE VIII below; (3) the Independent Review Process described  in  ARTICLE  IX below;  and  (4)  in  the  tort  system  as  described  in  ARTICLE  XIII below.

  **B.** **Cooperation.** The  Settlement  Trustee  may  require  other  parties  to  the Cooperation Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Cooperation Agreement Obligations**"), and may afford, or require such other parties to the Cooperation Agreement to afford, access for Direct Abuse Claimants to relevant, otherwise discoverable documents to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV or perversion files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust.  The Settlement Trust also may perform any andor all obligations ~~necessary to recover assigned proceeds~~ under the ~~assigned insurance rights~~Insurance Policies issued by the Non-Settling Insurance Companies in connection with ~~the~~its administration of these CAP, including sharing documents, providing access to witnesses, or sharing other information with the Non-Settling Insurance Companies and consulting as to or sharing  with  the  Non-Settling  Insurance  Companies  proposed  or  final  decisions  regarding determinations of Allowed Claim Amounts.

  **C.** ~~Assignment of No Modifications to Insurance Rights.~~**Policies.** The BSA ~~insurance rights~~Insurance Policies have been assigned to the Settlement Trust ~~in accordance with the  Bankruptcy  Code  and  pursuant  to  the  Confirmation  Order~~, and  the  Settlement  Trust  has received ~~an~~ assignment of other rights and obligations under other Insurance Policies from certain Protected Parties., without modification, as provided in the Plan.

  **D.** **Deceased Abuse Survivor.** The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these CAP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

<div align="center">9</div>

Highly Confidential

BSA-PLAN_00552186
**SA 2210**

*BR Draft 6/6/2021*

*Mediation Privilege*

Formatted: Left
Formatted: Font: Not Bold, Not Italic

~~ARTICLE VI~~
~~EXPEDITED DISTRIBUTIONS~~

E.     ~~Minimum~~ Statute of Limitations or Repose for Settlement Trust Claims. The statute of limitations and the choice of law determination applicable to claims against the Settlement Trust shall be determined by reference to the tort system where a claim against the Protected Party was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such a claim could have been timely and properly filed as asserted by the Abuse Claimant.

## ARTICLE VI
### FIRST-OUT CONVENIENCE PAYMENTS

A.     **First-Out Convenience Payment** ~~Criteria.~~**Election Timing.**  To receive a First-Out Convenience Payment (defined below), an Abuse Claimant must make a timely election in the manner designated by the Settlement Trustee as indicated in the Claim Materials (ARTICLE XIV). A Direct Abuse Claimant who does not properly and timely elect to receive a First-Out Convenience Payment may not later elect to receive the First-Out Convenience Payment.

Formatted: Font: Times New Roman Bold

B.     **Level 1 Convenience Payment.**   A Direct Abuse Claimant who meets the ~~following criteria~~ Minimum Criteria (defined below) may elect to resolve his or her Direct Abuse Claim for an expedited distribution of ~~[$1,500] (the "Expedited Distribution"): (i) the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim indicated that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse; (ii) the Direct Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification; and (iii) the Settlement Trustee is satisfied based on all available evidence (including the Abuse Claim Proof of Claim, if applicable) that the Abuse was related to BSA-related scouting or a BSA-related scouting event.~~ $1,500 (the "**Level 1 Convenience Payment**").  The criteria applicable for receiving the Level 1 Convenience Payment (the "**Minimum Criteria**") are:

| Minimum Criteria |
|---|
| 1.  The Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed,  non-duplicative Abuse Claim Proof of Claim indicating that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse.  The timely filing in the Chapter 11 Cases of an Abuse Claim before the Bar Date is deemed a timely submission thereof to the Settlement Trust.  An Abuse Claimant may supplement its Proof of Claim to substantially complete incomplete portions thereof when and as provided by the Settlement Trustee. |

Field Code Changed
Formatted: DocID, Left

10

*Mediation Privilege*                                            *BR Draft 6/6/2021*

Formatted: Left

Formatted: Font: Not Bold, Not Italic

<u>Minimum Criteria</u>

| | |
|---|---|
| 2. | The Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. |

An Abuse Claim that meets the Minimum Criteria will not be subject to disallowance.

    **C.     Level 2 Convenience Payments.**  A Direct Abuse Claimant who meets the Level 2 Criteria (defined below) may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $5,000 (the "**Level 2 Convenience Payment**").  The criteria applicable for receiving the Level 2 Convenience Payment (the "**Level 2 Criteria**") are:

| | |
|---|---|
| | <u>Level 2 Criteria</u> |
| 1. | The Minimum Criteria must be satisfied. |
| 2. | The Abuse Claimant must have included in its Proof of Claim a substantive, credible narrative detailing the incident(s) of Abuse and the impact and damages from the Abuse.<br><br>    An Abuse Claimant may supplement its Proof of Claim to so substantially complete his or her narrative when and as provided by the Settlement Trustee. |
| 3. | The Abuse Claimant must submit evidence reasonably establishing that the Abuse was related to BSA-related scouting or a BSA-related scouting event.  Such evidence may include one or more of the following:<br><br>   a) claimant's name on a roster; or<br><br>   b) a photograph, a membership card, or document that reflects the claimant's participation in BSA-related scouting or a BSA-related scouting event; or<br><br>   c) a sworn statement by a third party witness that the claimant was in BSA-related scouting or attended a BSA-related scouting event where the sexual abuse occurred, and that the third party witness will agree to a deposition if requested by the Settlement Trustee.<br><br>    Alternatively, the Direct Abuse Claimant must provide a credible explanation of why the Claimant does not have such evidence and agree to submit to an interview under oath by the Settlement Trust at its discretion of up to approximately thirty (30) minutes (a "**Substitute Interview**") that credibly evidences such relationship to scouting. |
| 4. | The Abuse Claimant must submit evidence identifying or describing the Scout leader and perpetrator sufficient for the Settlement Trust to identify them.<br><br>If the claimant does not recall the name of the Scout leader or perpetrator, the Abuse Claimant must submit a detailed description of the Scout leader or perpetrator, a substantive explanation of the basis for liability for the claim, and a sworn statement by a third-party witness that supports |

Field Code Changed

Formatted: DocID, Left

11

Highly Confidential

BSA-PLAN_00552188

**SA 2212**

*BR Draft 6/6/2021*

*Mediation Privilege*

| Level 2 Criteria |
|---|
| the basis for liability, offering that the third-party witness will agree to a deposition if requested by the Settlement Trustee sufficient for the Settlement Trustee to use for identification purposes.<br><br>Alternatively, the Direct Abuse Claimant must provide a credible explanation of why the Claimant does not have such evidence and agree to submit to a Substitute Interview that credibly identifies the perpetrator. |
| 5.   The Abuse Claimant must submit credible information or evidence indicating that the Abuse Claim is not a Tier 6 Abuse Type (which Abuse Type is ineligible for Level 2 Convenience Payments). |

A.   Direct Abuse Claimants that elect to receive the Expedited Distribution a Level 1 Convenience Payment or Level 2 Convenience Payment (collectively, the "**First-Out Convenience Payments**") will not have to submit any additional information to the Settlement Trust in order to receive such payment of the Expedited Distribution from the Settlement Trust.other than as needed to meet the Minimum Criteria and/or Level 2 Criteria, as set forth above in this Article.

**D.**     **Process and Payment of Expedited Distributions.**  **First-Out Convenience Payments.**

Direct Abuse Claimants who have properly elected to receive the Expedited Distribution in accordance with the Plan and Confirmation Order (the "Expedited Distribution Election")First-Out Convenience Payments and who met the criteriameet the applicable the Minimum Criteria and/or Level 2 Criteria, as set forth above in this Article VI.A above, shall be entitled to receive their Expedited Payment First-Out Convenience Payments upon executing an appropriate release.  A Direct Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the Plan and Confirmation Order may not later elect to receive the Expedited Distribution.  The Settlement Trustee shall endeavor to distribute the Level 1 Convenience Payment within sixty (60) days following the later of the Plan's Effective Date and the last day to supplement the subject Abuse Claim so as to qualify for a Level 1 Convenience Payment, subject to available funds.  The Settlement Trustee shall endeavor to distribute the Level 2 Convenience Payment promptly following the Settlement Trust's review of such Abuse Claims, subject to available funds.  (If the Settlement Trust determines that an electing Direct Abuse Claimant has failed to qualify to receive a First-Out Convenience Payment, it shall promptly inform the Abuse Claimant of its determination and of his or her further options in attempting to obtain payment under these CAP.)

B.     A Direct Abuse Claimant whothat elects to receive the Expedited Distributionand is determined eligible to receive a First-Out Convenience Payment will receive payment subject to funds availability prior to all other distributions to Abuse Claimants (except as may be expressly indicated herein), but shall not be eligible to receive any further distribution on account of his or her Direct Abuse Claim pursuant to these CAP and shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, or any

12

Highly Confidential

*BR Draft 6/6/2021*

*Mediation Privilege*

Non-Settling Insurance Company.  ~~Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these CAP.~~

## ARTICLE VII~~ARTICLE VII~~
## CLAIMS ALLOWANCE PROCESS

    **A.**    **General.**  The allowance procedures set forth in this ARTICLE VII will apply to all Submitted Abuse Claims to be determined or paid under Expedited Review, Summary Review, Independent Review or the Tort System Election described in ARTICLE XIII.  The Settlement Trustee must follow the allowance procedures set forth in this ARTICLE VII to establish whether a Submitted Abuse Claim is proposed to be an Allowed Abuse Claim or is disallowed (a "**Disallowed Claim**").

    **B.**    **Trust Claim Submissions.**  Each Abuse Claimant that ~~does not make the Expedited Distribution Election and instead elects~~seeks to pursue recovery from the Settlement Trust pursuant to these CAP (other than those who elected and qualified for First-Out Convenience Payments or qualify for an Initial Tort System Election) must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must ~~(i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (iii) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (iv) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.~~satisfy the following criteria (the "**Trust Claim Submission Criteria**"):

| Trust Claim Submission Criteria | |
|---|---|
| 1. | The Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed,  non-duplicative Abuse Claim Proof of Claim indicating that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse. |
| | The timely filing in the Chapter 11 Cases of an Abuse Claim before the Bar Date is deemed a timely submission thereof to the Settlement Trust. |
| | An Abuse Claimant may supplement its Proof of Claim to substantially complete incomplete portions thereof when and as provided by the Settlement Trustee. |
| 2. | The Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. |

DOCS_LA:338326.1 85353/002

Highly Confidential

BSA-PLAN_00552190

**SA 2214**

*BR Draft 6/6/2021*

*Mediation Privilege*

| | **Trust Claim Submission Criteria** |
|---|---|
| 3. | The Abuse Claimant must have included in its Proof of Claim a substantive narrative detailing the incident(s) of Abuse and the impact and damages from the Abuse.<br><br>An Abuse Claimant may supplement its Proof of Claim to so substantially complete his or her narrative when and as provided by the Settlement Trustee. |
| 4. | The Abuse Claimant must submit evidence establishing that the Abuse was related to BSA-related scouting or a BSA-related scouting event.  Such evidence may include one or more of the following:<br><br>　a) claimant's name on a roster; or<br><br>　b) a photograph, a membership card, or document that reflects the claimant's participation in BSA-related scouting or a BSA-related scouting event; or<br><br>　c) a sworn statement by a third party witness that the claimant was in BSA-related scouting or attended a BSA-related scouting event where the sexual abuse occurred, and that the third party witness will agree to a deposition if requested by the Settlement Trustee (or an explanation of why the Claimant does not have such evidence, with an agreement to submit to a Substitute Interview). |
| 5. | The Abuse Claimant must submit evidence identifying or describing the Scout leader and perpetrator sufficient for the Settlement Trust to identify them.<br><br>If the claimant does not recall the name of the Scout leader or perpetrator, the Abuse Claimant must submit a detailed description of the Scout leader or perpetrator, a substantive, explanation of the basis for liability for the claim, and a sworn statement by a third-party witness that supports the basis for liability, offering that the third-party witness will agree to a deposition if requested by the Settlement Trustee sufficient for the Settlement Trustee to use for identification purposes.<br><br>Alternatively, the Direct Abuse Claimant must provide a credible explanation of why the Claimant does not have such evidence and agree to submit to a Substitute Interview that credibly identifies the perpetrator. |
| 6. | The Abuse Claimant has completed under oath a dated and signed questionnaire to be developed by the Settlement Trustee. |
| 7. | The Abuse Claimant either affirms under oath that no settlements, awards or contributions have been received or were agreed to be paid by or on behalf of any Protected Party toward the subject Abuse Claim, or produces all relevant records and documents pertaining to such. |

　　　A.　　To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Cooperation Agreement Obligations (as defined below).  Non-material changes to the

14

Highly Confidential

BSA-PLAN_00552191

**SA 2215**

*BR Draft 6/6/2021*

*Mediation Privilege*

> **Formatted:** Left

> **Formatted:** Font: Not Bold, Not Italic

~~claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.~~

**B. Claims Evaluation.** The Settlement Trustee shall evaluate each Submitted Trust Claim ~~Submission~~ individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed. After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Cooperation Agreement Obligations, and any follow-up materials, interviews or examinations ~~(including, without limitation, any Trustee Interview),~~as may be applicable to the selected review process, the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

> **Formatted:** Font: Times New Roman Bold

> **Formatted:** HeadingBody 2, Left, Space After:  0 pt,  No bullets or numbering

**C.** ~~**Settlement Trustee Review Procedures.**~~**Initial Evaluation.** The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission ~~and/or the Trustee Interview~~ or any other follow-up, and documents obtained through the Cooperation Agreement Obligations, and determine (the "**Initial Evaluation**") whether such Claim is a legally valid Allowed Abuse Claim, based on satisfying the following criteria:

> **Formatted:** HeadingBody 2, Left, Space After:  0 pt,  No bullets or numbering

~~1. **Initial Evaluation Criteria.** The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:~~

~~(a) the Abuse Claimant's Proof of Claim or complaint against a Protected Party other than the Debtors (where applicable) was free from material defects;~~

~~(b) such Proof of Claim was timely filed prior to the Bar Date or such complaint was timely filed against a Protected Party other than the Debtors (where applicable);~~

~~(c) application of relevant statutes of limitation, repose, or other applicable law would permit the Submitted Abuse Claim; or~~

~~(d) the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.~~

~~If any~~

| | **Initial Evaluation Criteria** |
|---|---|
| 1. | The Trust Claim Submission Criteria must be met. |
| 2. | The Submitted Abuse Claim must not have been fully resolved by litigation and/or settlement as against all Protected Parties against which it has been asserted. |

15

> **Field Code Changed**

> **Formatted:** DocID, Left

Highly Confidential

*BR Draft 6/6/2021*

*Mediation Privilege*

> Unless all of these criteria are ~~not~~ met, then the Submitted Abuse Claim shall be a Disallowed Claim, ~~provided, however that any Submitted Abuse Claim that is disallowed based on the application of a statute of limitations, repose, or other similar time-based defense that becomes the subject of statute of limitations revival legislation may be determined to no longer be a~~.

**D.** **Disallowed** ~~Claim and may be evaluated under the General Criteria set forth below~~**Claims.** ~~2.~~ ~~General Criteria for Evaluating Submitted Abuse Claims.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate whether the Abuse Claimant has provided the following required evidence for such Claim (the "**General Criteria**"):~~

~~(a)   Alleged Abuser Identification.  The Abuse Claimant must either: (i) identify his or her alleged abuser by the full name or last name, or (ii) provide additional facts (e.g., a physical description of alleged abuser combined with the name or location of the Abuse Claimant's troop) sufficient for the Settlement Trustee to identify the alleged abuser;~~

~~(b)   Connection to Scouting.  The Abuse Claimant must provide information that: (i) he or she was abused by an employee or volunteer of a Protected Party or by a registered Scout, and (ii) that such alleged abuse occurred during a Scouting activity or directly resulted from a Scouting activity;~~

~~(c)   Location of Abuse.  The Abuse Claimant must identify:  (i) the venue or location of the alleged abuse, and (ii) the Scouting activity that he or she was involved in that directly resulted in the alleged abuse; and~~

~~(d)   Date and Age.  The Abuse Claimant must either:  (i) identify the date of the alleged abuse and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (ii) provide additional facts (e.g., the approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse.~~

~~3.   Submitted Abuse Claims That Satisfy the General Criteria.  To the extent that a Submitted Abuse Claim meets the evidentiary requirements set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are~~

16

Highly Confidential

BSA-PLAN_00552193

**SA 2217**

*Mediation Privilege*

> **Formatted:** Left
> **Formatted:** Font: Not Bold, Not Italic

~~deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.~~

4. ~~**Submitted Abuse Claims That Do Not Satisfy the General Criteria.** If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim does not meet all of the evidentiary requirements set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements; *provided, however,* that if the Settlement Trustee finds that any of following requirements with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim:~~

    (a) ~~The Abuse Claimant fails to identify the alleged abuser and/or fails to provide a description of the alleged abuser such that the Settlement Trustee cannot determine whether the alleged abuser was an employee or volunteer of a Protected Party or was a registered Scout, and that the abuse occurred during a Scouting activity or directly resulted from a Scouting activity;~~

    (b) ~~The Abuse Claimant fails to provide the date and/or his or her age at the time of the alleged abuse, and/or sufficient information for the Settlement Trustee to determine the approximate date and/or the Abuse Claimant's age at the time of the alleged abuse;~~

    (c) ~~The Abuse Claimant fails to identify the alleged acts of abuse; or~~

    (d) ~~The Abuse Claimant fails to demonstrate that he or she was involved in Scouting.~~

~~D.~~ **Disallowed Claims.** If the Settlement Trustee finds, pursuant to the procedures set forth in ~~Article VII.C~~ARTICLE VII.C. above, that a Submitted Abuse Claim is a Disallowed Claim the claimant shall not be entitled to further participate in these CAP or receive any distribution from the Settlement Trust. If the Settlement Trust makes such a determination of disallowance, or if an arbitrator or neutral so determines in undertaking the Independent Review Process described in ARTICLE IX, in both events, the Settlement Trustee shall provide written notice of ~~its~~such determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**"). ~~If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII.~~ For a Disallowed Claim Notice received in connection with the Initial Evaluation, Expedited Review or Summary Review, Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in ~~Article VII.G below.~~ARTICLE VII.H. below. For a Disallowed Claim

> **Formatted:** HeadingBody 2, Left, Space After: 0 pt, No bullets or numbering
>
> **Formatted:** Underline
>
> **Field Code Changed**
> **Formatted:** DocID, Left

17

*BR Draft 6/6/2021*

*Mediation Privilege*

Notice received in connection with the Independent Review Process, the Abuse Claimant shall be entitled to make a Tort System Election under ARTICLE XIII.

 **E. Allowed  Abuse Claims, that are Not Disallowed.**  If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowednot a Disallowed Abuse Claim, based on the SettlementInitial Evaluation, the Settlemen,t Trustee shall utilize the procedures described below in Article VIII to determine the proposed ARTICLE VIII (Expedited Review and Summary Review) or ARTICLE IX (Independent Review Process), at the election of the Abuse Claimant, to determine if the claim will be allowed and its Allowed Claim Amount.  If Expedited Review or Summary Review is selected, the Settlement Trust shall use the Claims Matrix tier and Scaling Factors to determine a proposed Allowed Claim Amount for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and if the Independent Review Process is utilized, the Settlement Trust shall determine the initial Proposed Claim Amount, and the arbitrator or neutral shall determine the further Proposed Claim Amount if the Settlement Trust's is rejected, all subject to the provisions herein as to Insured Abuse Claims.  In either event, the Settlement Trust shall provide written notice of the proposed allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.).

 **F. Claims Determination.**  If the Abuse Claimant receives a Proposed Allowed Claim Amount in an Allowed Claim Notice and accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below),it, the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX,ARTICLE X, subject to the Abuse Claimant executing thea form of release set forth in Article IX.Das provided by the Settlement Trustee in ARTICLE X,0.  A Proposed Allowed Claim Amount also shall constitute a Final Determination if an Abuse Claimant entitled to seek reconsideration thereof under the process set forth below in ARTICLE VII.H. seeks reconsideration and such process has been exhausted, with no further action taken by the Abuse Claimant in the tort system pursuant to ARTICLE XIII below.

 **G. Reconsideration of Settlement Trustee's Determination.**  An  If an Abuse Claimant receives a Claim Notice in connection with the Initial Evaluation, Expedited Review or Summary Review, an Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**").").@  Each Reconsideration Request must be accompanied by a check or money order for $[●]$1,500 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

 If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30forty-five (45) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.

<div align="center">18</div>

Highly Confidential

BSA-PLAN_00552195

**SA 2219**

*BR Draft 6/6/2021*

*Mediation Privilege*

The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in ~~Article XII~~ARTICLE XIII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within ~~30~~forty-five (45) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim— -- including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview— (if applicable to the review process from which reconsideration is sought) -- and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.

If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or ~~that the Claim in question is~~does not ~~deserving of a new~~support changing the Proposed Allowed Claim Amount, the Settlement Trustee's earlier determinations as to allowance ~~determination~~ and/or the Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ~~ninety (90~~one hundred twenty (120) days of ~~delivering~~the Settlement Trust having sent notice ~~of accepted reconsideration to~~that it was reconsidering the Abuse Claimant's ~~Submitted~~ Abuse Claim.   Thereafter, the Abuse Claimant.   ~~The Abuse Claimant~~ shall retain the ability to pursue ~~the Settlement Trust for reconsideration of~~ its ~~Submitted~~ Abuse Claim in the tort system as described below in ~~Article XII.~~ARTICLE XIII.

**H.**      ~~H.~~      **Prevention and Detection of Fraud.**  The Settlement Trustee shall ~~work with~~coordinate in the ~~Claims Administrator to institute~~instituting of auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or ~~Claims Auditor~~other trust personnel to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions.  As part of such audit, any creditor seeking recovery from the Settlement Trust other than by a Level 1 Convenience Payment may be required as a condition of continued eligibility for distribution from the Settlement Trust to submit to an interview under oath by the Settlement Trust (an "**Audit Interview**").  Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

19

Highly Confidential

[Formatted: Left]

[Formatted: Font: Not Bold, Not Italic]

[Formatted: Body Text, Left, Indent: First line: 0", Space After: 0 pt]

[Formatted: Font: Times New Roman Bold]

[Formatted: HeadingBody 2, Left, Indent: First line: 0", Space After: 0 pt]

[Field Code Changed]

[Formatted: DocID, Left]

*Mediation Privilege*

*BR Draft 6/6/2021*

Formatted: Left

Formatted: Font: Not Bold, Not Italic

## [ARTICLE VIII][4]
### ~~CLAIMS MATRIX AND SCALING FACTORS~~

~~A.   **Scaling Factors.**   The Settlement Trustee shall utilize the claims matrix (the "**Claims Matrix**") and scaling factors ("**Scaling Factors**") set forth below in Article VIII.B and VIII.C as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim.   The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX.   In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the CAP).~~

**ARTICLE VIIIB.   ~~Claims Matrix.   The Claims Matrix establishes five tiers of types of abuse~~**

### EXPEDITED REVIEW AND SUMMARY REVIEW

**A.   Generally.**   To potentially receive payment from the Settlement Trust, all Abuse Claimants that do not elect or are determined ineligible to receive a First-Out Convenience Payment and that have not been granted an Initial Tort System Election pursuant to ARTICLE XIII must choose to seek payment under Expedited Review or Summary Review described in ARTICLE VIII or the Independent Review Process described in ARTICLE IX.   For Claimants electing Expedited Review or Summary Review, the Settlement Trust will determine pursuant to this section whether to propose that their claims will be Allowed Abuse Claims (and determine a corresponding Proposed Allowed Claim Amount) or whether their clams are Disallowed Claims.

**B.   Eligibility Criteria and Supplemental Information.**   The criteria for Expedited Review and for Summary Review and the effect of selection of Expedited Review and Summary Review are as follows:

| Expedited Review and Summary Review Eligibility Criteria | | | |
|---|---|---|---|
| | Expedited Review | | Summary Review |
| 1. | The Initial Evaluation Criteria must be met. | 1. | Same. |
| 2. | Location of Abuse.[5]   The Abuse Claimant is to identify the venue or location of the alleged abuse. | 2. | Same. |
| 3. | Date and Age.   The Abuse Claimant is to either:  (i) identify the date of the alleged abuse | 3. | Same. |

---

[4]  ~~[Subject to further revisions to address use of average claim values].~~

[5]  Discuss appropriateness of including these remnant BSA or Coalition criteria (2&3).

Field Code Changed

Formatted: DocID, Left

20

Highly Confidential

*Mediation Privilege*

*BR Draft 6/6/2021*

| Formatted: Left |
| --- |
| Formatted: Font: Not Bold, Not Italic |

| Expedited Review and Summary Review Eligibility Criteria | |
| --- | --- |
| Expedited Review | Summary Review |
| and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (ii) provide additional facts (e.g., the approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the approximate date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse. | |
| 4. No Trustee Interview.  No Trustee Interview / deposition is required, (but if selected for an Audit Interview, the Abuse Claimant will be bumped to Summary Review). | 4. Trustee Interview.  Abuse Claimant must agree to submit to up to a four-hour Trustee Interview / deposition at the discretion of the Settlement Trustee. |
| 5. Award.  50% of Base Matrix Value multiplied by Scaling Factors. | 5. Award.  100% of Base Matrix Value multiplied by Scaling Factors. |

As reflected above, no deposition will be required of the Abuse Claimant selecting Expedited Review, but all Allowed Claim Amounts generated by multiplying the applicable Base Matrix Values by the Scaling Factors under Expedited Review will be reduced by fifty percent (50%).  Claimants electing Expedited Review or Summary Review may provide supplemental information as follows:

| Supplemental Information | |
| --- | --- |
| 1. | Claimant may provide additional evidence regarding liability, such as evidence from a "perversion file" or law enforcement records. |
| 2. | Claimant may provide additional evidence regarding their damages, including medical and counselling records and/or affidavit or unsworn declaration from a family member, significant other, or relative. |
| 3. | An Abuse Claimant may provide evidence as to the inappropriateness of the Scaling Factor for statutes of limitation and repose as to his or her Abuse Claim. |

If an Abuse Claimant that elects Expedited Review is subjected to an Audit Interview pursuant to the section hereof on Prevention and Detection of Fraud (ARTICLE VII.I.), the Settlement Trustee shall be deemed to have converted such Abuse Claim to being subject to

| Field Code Changed |
| --- |
| Formatted: DocID, Left |

21

DOCS_LA:338326.1 85353/002

*BR Draft 6/6/2021*

*Mediation Privilege*

Summary Review and the relevant Allowed Claim Amount shall be commensurate increased to one hundred percent of the result of the Scaling Factors applied to the applicable Base Matrix Value.

**C.    Submitted Abuse Claims That Satisfy the General Criteria.**  To the extent that a Submitted Abuse Claim sufficiently meets the evidentiary requirements set forth in the above applicable eligibility criteria to establish a claim that the Settlement Trustee determines would be potentially allowed in the tort system, and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

**D.    Submitted Abuse Claims That Do Not Satisfy the General Criteria.**  If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim.  Otherwise, although the Settlement Trustee may request further information from an Abuse Claimant necessary to satisfy the General Criteria, nonetheless, if, with the information provided and obtained, the Submitted Abuse Claim does not sufficiently meet the evidentiary standards set forth in the General Criteria to establish a claim that the Settlement Trustee determines would be potentially allowed in the tort system, such Claim, will be, and will be deemed to be, a Disallowed Claim. Upon disallowance, a claimant will be provided a Disallowed Claim Notice as set forth in ARTICLE VII.

**E.    Claims Matrix And Scaling Factors.**  The CAP establishes certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the "**Claims Matrix**") that schedules six types of Abuse (the "**Abuse Types**") and designates for each Abuse Type a Base Matrix Value, Maximum Matrix Value, and Maximum Priority Amount anticipated to result in certain identified average values ("**Average Values**") for each Abuse Type, and certain scaling factors ("**Scaling Factors**") identified below to apply to the Base Matrix Value to determine liquidated values for certain unliquidated Abuse Claims ("**Matrix Values**").  The Abuse Types, Scaling Factors, Matrix Values, Average Values, Base Matrix Values, Maximum Matrix Values, and Maximum Priority Amounts that are set forth in the attached Matrix have all been selected and derived with the intention of achieving a fair allocation of the Trust funds as among Abuse Claimants in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy.  The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors set forth below in ARTICLE VIII.G. and H., as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that elects Expedited Review or Summary Review and shall use the Maximum Priority Amount as a cap or to set a cap on the portion of an Allowed Claim Amount entitled to a first priority in distribution for Abuse Claims from the Settlement Trust for Abuse Claimants that elect the Independent Review Process under ARTICLE IX and certain Abuse Claimants that pursue liquidation of their Abuse Claims through a Tort System Election.  The Proposed Allowed Claim Amount that becomes the Allowed Claim Amount for an Allowed Abuse Claim, after Final Determination through Expedited Review, Summary Review, the Independent Review Process or the tort system shall be or be deemed to be the Protected Parties' liability for

22

Highly Confidential

BSA-PLAN_00552199

**SA 2223**

*Mediation Privilege*

*BR Draft 6/6/2021*

Formatted: Left
Formatted: Font: Not Bold, Not Italic

such Direct Abuse Claim (*i.e.*, the Protected Parties' legal obligation to pay such Direct Abuse Claim).

      **F.**    **Values.** The Average Values identified in the chart below are based upon BSA's claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims. The Base Matrix Values, Maximum Matrix Values and Maximum Priority Amounts set forth below have been established for each of the Abuse Types to be utilized in the Claims Matrix as tools for valuing Claims under Expedited Review and Summary Review and setting a cap on the first priority distribution amount of claims valued under the Independent Review Process and certain claims valued in the tort system. These values all have been established with the expectation that the combination of settlements at the values used for Expedited Review and Summary Review, and those resulting from the Independent Review Process should result in the Average Values set forth below. The Settlement Trust, with the consent of the STAC and the Future Claims Representative, as permitted by the Settlement Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power. In addition, commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-W. The CPI-W adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Average Value Chart | | |
|---|---|---|
| Tier | Type of Abuse | Average Values |
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $2,450,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $1,535,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $721,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $435,500 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Exploitation for child pornography | $175,000 |
| 6 | Sexual Abuse-No Touching | $7,500 |

Field Code Changed
Formatted: DocID, Left

DOCS_LA:338326.1 85353/002

*BR Draft 6/6/2021*

*Mediation Privilege*

G.    **Claims Matrix.**  The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier, in each case based on BSA's and other putative Protected Parties' historical abuse settlements and litigation outcomes..  The first two columns of the Claims Matrix delineate the ~~five~~six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse.  The ~~base  amount~~Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier, in each case based on BSA's historical abuse settlements and litigation outcomes, prior to application of the Scaling Factors described in ~~Article VIII.C~~ARTICLE VIII.H, (the "**Base  Amount**Matrix Value**").**  The maximum ~~amount~~Matrix value column for each tier represents the maximum Allowed Claim Amount achievable under Summary Review for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in ~~Article  VIII.D~~ARTICLE VIII.H, (the "**Maximum  Amount**Matrix Value**").**  The ~~ultimate~~maximum priority amount column for each tier represents the maximum Allowed Claim Amount (1) entitled to first priority distribution~~(s)~~ ~~to~~ from the ~~holder of~~Settlement Trust for an Allowed Abuse Claim assigned to a given tier that ~~has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (~~elects to participate in the ~~case of a smaller-than-expected~~Independent Review Process, and (2) to be used in calculating the portion of the Allowed Claim Amounts of certain Abuse Claims that elect and are granted a Tort System Election that will be entitled to first priority distribution from the Settlement Trust ~~corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee.~~(the "**Maximum Priority Amount").**  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.

| Claims Matrix | | | | |
|---|---|---|---|---|
| Tier | Type of Abuse | Base ~~Amount~~Matrix Value | Maximum ~~Amount~~Matrix Value | Maximum Priority Amount |
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 | $3,240,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $450,000 | $2,025,000 | $2,430,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $300,000 | $1,350,000 | $1,620,000 |

24

Highly Confidential

BSA-PLAN_00552201

**SA 2225**

*BR Draft 6/6/2021*

*Mediation Privilege*

Formatted: Left
Formatted: Font: Not Bold, Not Italic

| Claims Matrix | | | | |
|---|---|---|---|---|
| Tier | Type of Abuse | Base ~~Amount~~Matrix Value | Maximum ~~Amount~~Matrix Value | Maximum Priority Amount |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 | $810,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>~~Sexual Abuse-No Touching~~<br><br>~~Other Abuse-Not Sexual~~Exploitation for child pornography | $~~75~~35,000 | $~~337,500~~175,000 | $210,000 |
| 6 | Sexual Abuse-No Touching | $2,000 | $8,500 | $10,000 |

Formatted: Don't keep with next
Formatted Table
Inserted Cells

**H.** ~~C.~~ **Scaling Factors.** After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the ~~five~~six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to ~~set~~determine the ~~dollars attributable to~~Proposed Allowed Claim Amount for each Allowed Abuse Claim. The Scaling Factors are based on evidence ~~submitted to the Bankruptcy Court~~regarding the BSA's ~~and other putative Protected Parties'~~ historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors. Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust through the Cooperation Agreement Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one. (1), meaning that in the absence of the application of the scaling factor, the Base ~~Amount~~Matrix Value assigned to a Claim ~~are~~is not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base ~~Amount~~Matrix Value of the Allowed Abuse Claim by 1.5. The combined effect of all scaling factors is determined by multiplying the scaling factors together, then multiplying the result by the Base ~~Amount~~Matrix Value of the Allowed Abuse Claim.

**I.** **Aggravating Factors:** The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

Formatted: Font: Times New Roman Bold
Formatted: HeadingBody 2, Left, Indent: First line: 0", Space After: 0 pt
Formatted: Font: Times New Roman Bold
Formatted: Font: Times New Roman Bold
Formatted: Heading 2, Left, Indent: First line: 0", Space After: 0 pt
Formatted: Font: Not Bold
Field Code Changed
Formatted: DocID, Left

25

Highly Confidential

BSA-PLAN_00552202
SA 2226

*Mediation Privilege*

(i)   (i)   **Nature of Abuse and Circumstances**.  To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to [1.5] to each Allowed Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of abuse ~~during a BSA-sponsored event~~ with a single perpetrator ~~held in high regard by~~ with such perpetrator having accessed the victim ~~and in a position of trust within BSA~~ as an employee or volunteer within BSA-sponsored scouting.  The hypothetical base case is incorporated into the Base ~~Amount~~Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor.  By way of example, aggravating factors that can give rise to a higher scaling factor include, but are not limited to, the following factors:

a.   a.   ~~Unusual~~Extended duration and/or ~~multiple circumstances~~frequency of the abuse;

b.   ~~Repeated targeting and grooming behaviors including special privileges, special activities, and attention, social relationship with parents, personal relationship with the Abuse Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Abuse Claimant, or use of or exposure to pornography;~~

b.   ~~c.~~   Exploitation of the Abuse Claimant for child pornography;

c.   Coercion or threat or use of force or violence, stalking; and

d.   d.   Multiple perpetrators involved in sexual misconduct.

(ii)   (ii)   **Abuser Profile**.  To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to [2.0] to an Allowed Abuse Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of ~~an unknown abuser who~~involving a perpetrator as to whom there is ~~only accused of~~no other known allegations of sexual abuse ~~by one Abuse Claimant.~~.  The hypothetical base case is incorporated into the Base ~~Amount~~Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor.  An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

a.   a.   [1.25] if the abuser was accused by at least one (1) other ~~Abuse Claimant~~alleged victim of sexual abuse;

b.   b.   [1.5] if the abuser was accused by five (5) or more other ~~Abuse Claimants~~alleged victim of sexual abuse;

c.   c.   [2.0] if there is evidence of prior notice to the Protected Party (e.g., the inclusion of the perpetrator in the IV files (Volunteer Screening Database)) or if the abuser was accused by ten (10) or more other ~~Abuse Claimants~~alleged victim of sexual abuse.

26

Highly Confidential

BSA-PLAN_00552203

SA 2227

*Mediation Privilege*

(iii)    (iii)    **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to [1.5-].  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the Base AmountsMatrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.    a.    Mental Health Issues:  This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing          .

b.    b.    Physical Health Issues:  This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

c.    c.    Interpersonal Relationships:  This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.    d.    Vocational Capacity:  This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.    e.    Academic Capacity:  This includes but is not limited to school behavior problems.

Highly Confidential

BSA-PLAN_00552204

SA 2228

*Mediation Privilege*

*BR Draft 6/6/2021*

> f.     f.     Legal Difficulties:  This includes ~~but is not limited to~~ criminal difficulties, bankruptcy, and fraud.

**J.     Potential Mitigating Factors.**[6]  The Settlement Trustee may assign a Scaling Factor in the range of 0.0 to 1 ~~to 1.0~~ 0.0 except as specifically provided below to each Allowed Abuse Claim to ~~eliminate or~~ decrease the Proposed Allowed Claim Amount for such Claim. This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse ~~that occurred during a BSA sponsored event involving~~ and a perpetrator ~~held in high regard and in a position of trust within BSA~~that accessed the victim as an employee or volunteer~~.~~ within BSA-sponsored scouting.  The hypothetical base case is incorporated into the Base ~~Amounts~~Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of this factor.  Such factors may include ~~but are not limited to~~ the following:

(i)     (i)     **Absence of Protected Party Relationship or Presence of Another Responsible Party.**  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated.  For example, the perpetrator may have also maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction of the Proposed Allowed Claim Amount.

(ii)     (ii)     **Other Settlements, Awards, Contributions, or Limitations.**  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as expected contributions from other, non-Protected Party sources that are related to the abuse.  By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

(iii)     (iii)     ~~Absence~~**Statutes** of ~~Notice.~~**Limitation or Repose.**  If the evidence provided by the Abuse Claimant ~~does not establish by a preponderance of~~ results in the ~~evidence~~Settlement Trustee concluding that ~~that Protected Party(ies) knew, or had reason to know, that~~subject Abuse Claim could be dismissed or denied in the ~~alleged perpetrator was likely to commit acts~~tort system due to the passage of a statute of ~~Abuse against individuals involved in Scouting~~limitations or due to a statute of repose, the Settlement Trustee shall reduce the Proposed Allowed Claim Amount for such Claim by assigning a Scaling Factor of ~~less than~~between one~~.~~ (1) and two-tenths (0.2) for Expedited Review and Summary Review with the presumptive reduction to be the values set forth in **Exhibit [ ] hereto.**  The Settlement Trustee should weigh the strength of ~~the~~any relevant evidence ~~demonstrating that BSA should have known of the risk of potential~~

---

[6] Need to revise / discuss Mitigating Factors and appropriate scaling for these and Aggravating Factors..

DOCS_LA:338326.1 85353/002

*BR Draft 6/6/2021*

*Mediation Privilege*

abusesubmitted by the perpetratorAbuse Claimant to determine the appropriate factor of mitigation.

**K.    D.    Allowed Abuse Claim Calculus.**  After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base AmountMatrix Value of the Claim and the Scaling Factors applied to the Claim.  In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum AmountMatrix Value for the Claim's assigned Claims Matrix tier.  By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base AmountMatrix Value of $600,000) with a Scaling Factor of [1.5] for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000.  As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of [2.0] on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

## ARTICLE IXARTICLE IX
## INDEPENDENT REVIEW PROCESS

**A.    In General.**  Subject to the provisions set forth below, an Abuse Claimant may elect to have his or her Abuse Claim determined by a neutral for purposes of determining whether the claim would be cognizable and valid in the applicable tort system and its liquidated value in the tort system, without any limitations imposed by the Claims Matrix or Scaling Factors (and, thus, even though it may not meet some of the presumptive criteria set forth above).  Abuse Claimants eligible to elect the Independent Review Process must meet the following criteria:

| | Independent Review Process Eligibility Criteria |
|---|---|
| 1. | The Initial Evaluation Criteria must be met. |
| 2. | The Abuse Claimant executes an agreement to and advances the estimated costs associated with the Independent Review Process up to $50,000 as estimated by the Settlement Trustee.<br><br>Costs include the cost of any deposition and mental health exam, and the valuation by the neutral third party.<br><br>The Abuse Claimant and Settlement Trustee may elect, in lieu of the Abuse Claimant paying such costs, to an alternative arrangement (e.g., that the Abuse Claimant would agree to pay the Settlement Trust from the Abuse Claimant's recovery ten percent (10%) thereof in addition to reimbursing the Settlement Trust from the recovery for the costs it so advanced on the Abuse Claimant's behalf). |

DOCS_LA:338326.1 85353/002

Highly Confidential

BSA-PLAN_00552206

**SA 2230**

*BR Draft 6/6/2021*

*Mediation Privilege*

| Independent Review Process Eligibility Criteria | |
|---|---|
| 3. | The Abuse Claimant must consent to and cooperate in any physical or mental health examinations requested by the Settlement Trustee by healthcare professionals selected by the Settlement Trustee. |
| 4. | The Abuse Claimant must consent to and cooperate in a Trustee Interview. |

Until such time as the Settlement Trust has made an offer on a claim pursuant to the Independent Review Process, the Abuse Claimant may change his or her Independent Review Process election and have the claim liquidated pursuant to Expedited Review or Summary Review. If the conduct for which the Protected Party is alleged to have legal responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada, the liquidated value of such Abuse Claim payable under this CAP shall be initially established only under the Independent Review Process (but in that such process is mandatory, no costs are payable by such claimant).

**B. Standard of Review.** In reviewing Abuse Claims, the Settlement Trust and the neutral shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction (including by reference to appropriate written expert or other evidence from the Claimant's Jurisdiction). The Settlement Trust and neutral shall determine the validity and/or value of such a claim, including whether the claim has been paid, satisfied, settled, released, waived or otherwise discharged. The neutral shall determine the liquidated value of valid Abuse Claims based on historical settlements and verdicts (particularly if available from the Claimant's Jurisdiction), may consider the other valuation factors set forth herein, and may consider any matrices and methodologies developed pursuant to the provisions of this section.

**C. Valuation Factors to Be Considered in Independent Review Process.** The Settlement Trust and neutral shall liquidate the value of each Settlement Trust Claim that undergoes Independent Review Process based on the historic liquidated values of other similarly situated claims in the applicable tort system for the same category of Abuse. The Settlement Trust and neutral shall thus take into consideration all of the factors that affect the severity of damages and values within the applicable tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the criteria established to achieve Base Matrix Value for the Abuse category in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) proximately caused in connection with scouting; (iv) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (v) settlement and verdict histories for the claimant's law firm for similarly situated claims. Where the claimant's law firm submits clear and convincing evidence to the Settlement Trust or, if consistent with the Alternative Dispute Resolution Procedures (defined below), the neutral, and the Settlement Trustee or neutral determine, in their sole discretion, that the claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of Abuse Claims against BSA, their Local Councils or Chartered

DOCS_LA:338326.1 85353/002

Highly Confidential

BSA-PLAN_00552207

**SA 2231**

*BR Draft 6/6/2021*

*Mediation Privilege*

Organizations in the Claimant's Jurisdiction, such as actively participating in court appearances, discovery and trial of the subject cases (evidence will be required of all three phases: prosecution, trial and resolution for each law firm involved; necessary evidence will include evidence of active participation in the cases; and the mere referral of a case, without further involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case), irrespective of whether a second law firm also was involved, the Settlement Trust shall include such cases in the settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction.  If this occurs, the claimant's law firm shall certify, as required by the Settlement Trust or neutral, that it has provided all settlement and verdict history information for Abuse cases against BSA, Local Councils or Chartered Organizations in which claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of the Abuse claims against BSA, Local Councils or Chartered Organizations in the Claimant's Jurisdiction, as described above.

> **D.    Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the Abuse Claimant must first complete the Independent Review Process sufficient to have received an offer from the Settlement Trust thereunder with respect to the disputed issue.  Specifically, a neutral may become involved once the claim has been individually reviewed by the Settlement Trust, and either the Settlement Trust has issued a Disallowed Claim Notice, or has issued an Allowed Claim Notice and the claimant has notified the Settlement Trust of the rejection in writing thereof.

> **E.    Establishment of Alternative Dispute Resolution Procedures.**  The Settlement Trust shall institute non-binding arbitration procedures in accordance with Alternative Dispute Resolution Procedures to be developed with the consent of the STAC and the Futures Representative (as may be modified from time to time) for resolving disputes concerning whether an Abuse Claim meets the requirements of this CAP for purposes of establishing an allowed Abuse Claim and for resolving disputes over the liquidated value of an Abuse Claim (and disputes over the validity of an Indirect Abuse Claim).  In all arbitrations, the arbitrator may take account of the same evidentiary requirements that are set forth in ARTICLE VIII. above but shall consider all evidence presented by the Abuse Claimant and the Settlement Trust, including written expert or other evidence regarding the validity of an Abuse Claim, including evidence regarding whether the claim has been paid, satisfied, settled, released, waived, or otherwise discharged under the law and procedure of the Claimant's Jurisdiction, but only if provided to the Abuse Claimant or his or her counsel at least ten (10) days prior to the arbitration hearing.

> **F.    Fees, Delays and Liquidated Values.**  The Independent Review Process is intended to result in payments equal to the full liquidated value for each claim (which may be zero or any other amount). There is no maximum on the award of the arbitrator.  Amounts of the liquidated value in excess of the Maximum Priority Amount for the applicable category of Abuse (exclusive of any Allocated Share resulting from an Insurer Abuse CAP Claim Payment) shall be subordinated in payment to the aggregate Allowed Claim Amounts of all other Abuse Claims (exclusive of any portion of such claims that represents punitive or exemplary damages).  The timing of the liquidation of Settlement Trust Assets and other uncertainties may result in differing actual payments on the Abuse Claim subject to the Independent Review Process. Because the detailed examination and valuation process pursuant to Independent Review Process requires substantial time and effort, Abuse Claimants electing to undergo the Independent

Highly Confidential

BSA-PLAN_00552208

**SA 2232**

*Mediation Privilege*                                            *BR Draft 6/6/2021*

Review Process (1) will be required to fund the cost of the Independent Review Process as reasonably estimated by the Settlement Trustee up to a maximum amount of $50,000, as described above, and (2) may be paid the liquidated value of their Abuse Claims later than would have been the case had the claimant elected the Expedited Review or Summary Review Process.

     **G.**    **Proposed Claim Amount Rejected.** Claimants who elect the Independent Review Process and then reject their arbitral awards or claim disallowance reflected in the Claim Notice retain the right to make the Tort System Election under ARTICLE XIII.

<div align="center">

ARTICLE X

**PAYMENT OF ~~SETTLED~~ALLOWED ABUSE CLAIMS**

</div>

    **A.**   A.  ~~Payment Upon Final Determination. Only after the Settlement Trustee has established an Initial Payment~~ **Percentage** ~~in accordance with Section [__] of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant~~**Payment.** First-Out Convenience Claims are to ~~Article VII.F, the Claimant will receive a~~be paid as set forth in ARTICLE VI below.  For payment of other claims channeled to the Settlement Trust, the Abuse Claimant ultimately will receive payment of a source-weighted pro rata share of the ~~Final Determination~~Allowed Claim Amount based on a Payment Percentage ~~described in Article IX.B and IX.C.  For the purpose of payment by~~ established under the terms of the Settlement Trust Agreement.  The Payment Percentage shall apply to all claims payable through the Settlement Trust, ~~a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination~~ other than First-Out Convenience Claims, and a different Payment Percentage may be utilized for each silo of funds created by Source Affected Weighting as described below.  The Payment Percentage may be adjusted upwards or downwards from time to time by the Settlement Trust with the consent of the STAC and the Future Claimants' Representative to reflect then-current estimates of the Settlement Trust's assets and the then-estimated value of then-pending and future claims.  If the Payment Percentage is increased over time, Abuse Claimants whose claims were liquidated and paid in prior periods under the CAP shall receive additional payments only as provided in ARTICLE X below.  Because there is uncertainty in the prediction of both the number and severity of existing Direct Abuse Claims, Indirect Abuse Claims, Future Abuse Claims and other claims against Protected Parties that may be channeled to the Settlement Trust, and because the corresponding amount of the Settlement Trust's assets are uncertain, no guarantee can be made of any Payment Percentage as to an Abuse Claim's Allowed Claim Amount.

    **B.**   B.  **Source Affected Weighting.**  Any Non-BSA Sourced Assets shall be weighted to allocate a portion of such assets (the "**Allocated Share**") only among the Allowed Abuse Claims ("**Source Claims**") that could have been satisfied from that source or its assets absent the Plan's Discharge and Channeling Injunction.  From the Non-BSA Sourced Assets remaining after the Expense Share, the Allocated Share shall be determined, which shall consist of the lesser of the amount needed to pay the Allowed Claim Amounts of such Source Claims or the percentages thereof set forth below for each of the following:

<div align="center">32</div>

BSA-PLAN_00552209

**SA 2233**

*Mediation Privilege*                                                                      *BR Draft 6/6/2021*

| | Source Affected Weighting | |
|---|---|---|
| | **Non-BSA Sourced Assets** | **Allocated Share for Source Claims** |
| 1 | Amended Local Council Settlement Contribution: | [80%] |
| 2 | Chartered Organization Settlement Contribution: | [80%] |
| 3 | Insurer Abuse CAP Claim Payment: | [65]% of up to Maximum Priority Amount; [35%] of remainder |
| 4 | Insurer Abuse Litigation Claim Payment: | [90]% of up to Maximum Priority Amount; [50%] of remainder |
| 5 | Insurer Global Settlement Contribution: | [50%] |
| 6 | Other Non-BSA Sourced Assets | [50%] |

        (i)            Any Non-BSA Sourced Assets remaining after the Expense Share and Allocated Share shall be subject to pro rata distribution or reserve for all holders of Abuse Claims based on their actual or estimated Allowed Claim Amounts.

        (ii)            As to the division of the Allocated Share among Abuse Claimants when a particular Insurance Company, Local Council or Chartering Organization contributes cash or property in exchange for a release and/or becoming a Protected Party under the Plan, the Allocated Share will constitute the above-indicated portion of such settlement proceeds, net of the Expenses Share, and such Allocated Share will be shared pro rata (i) as to a Local Council or Chartered Organization, only among those holders of Abuse Claims, for whom such entity has been reasonably determined by the Settlement Trustee to be co-liable or partially liable on such claims absent the Channeling Injunction and (ii) as to a Settling Insurance Company, only among those holders of Abuse Claims determined in good faith by the Settlement Trustee to be covered by any of the Settling Insurance Company's policies.

        (iii)            As to the distribution of the Allocated Share resulting if a particular Insurance Company agrees to pay a Protected Party's liability for the Allowed Claim Amount of an Abuse Claim other than as part of an Insurer Global Settlement Contribution, (x) if the Allowed Claim Amount is a result of a lawsuit following a Tort System Election, the Allocated Share shall constitute [ninety percent (90%)] of such Allowed Claim Amount up to the Maximum Priority Amount and [fifty percent (50%)] of any remainder, which shall be allocated and paid to the subject Abuse Claimant; and (y) if the Allowed Claim Amount is not a result of a lawsuit following a Tort System Election, the Allocated Share shall constitute [sixty-five percent (65%)] of such Allowed Claim Amount up to the Maximum Priority Amount and [thirty-five percent (35%)] of any remainder, which shall be allocated and paid to the subject Abuse Claimant.

        (iv)            As to the division of the Allocated Share among Abuse Claimants if the Settlement Trust recovers by final judgment against an Insurance Company

DOCS_LA:338326.1 85353/002

BSA-PLAN_00552210

**SA 2234**

*BR Draft 6/6/2021*

*Mediation Privilege*

(e.g., in coverage litigation), terminating the liability of such Insurance Company to Abuse Claimant, the Allocated Share will constitute the above-indicated portion of such settlement proceeds for "Other Non-BSA Sourced Assets," net of the Expenses Share, and such Allocated Share will be shared pro rata only among those holders of Abuse Claims determined in good faith by the Settlement Trustee to be covered by any of the Settling Insurance Company's policies.

**C.    Initial    Payment    Percentage.Distribution.**    After ~~the    Claimant    accepts    the Proposed Allowed Claim Amount and~~ there is a Final Determination of ~~the~~an Abuse Claim or there otherwise is an Allowed Claim Amount hereunder for such claim, the Settlement Trust shall pay an ~~initial distribution ("~~Initial Distribution~~")~~ at the next distribution interval based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

~~C.    **Supplemental Payment Percentage.**    When the Settlement determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement.  Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage.    Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the aggregate of the Initial Payment Percentage and all prior Supplemental Payment Percentages set by the Settlement Trustee.  For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX.  For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.~~

**D.    ~~D.    Release.~~**    In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee ~~in consultation with Reorganized BSA~~.    Payments made by the Settlement Trust to the holder of an Allowed Abuse Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Allowed Abuse Claim.

**E.    ARTICLE    X RIGHTSFIFO Claims Process Queuing and Exigent Health Claims.**    The Settlement Trust shall order all Trust Claim Submissions to be reviewed for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to First-Out Convenience Payments or Exigent Claims.  An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date that the specific claim

34

Highly Confidential

*Mediation Privilege*

was filed against a Protected Party in the tort system; (ii) the date prior to the Petition Date that the claim was filed against another defendant in the tort system if at the time the claim was stayed against a Debtor; and (iii) the date of receipt of the Abuse Claimant's Trust Claim Submission. If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants. An Abuse Claimant that elects Expedited or Summary Review on account of an Exigent Health Claim shall be moved to the front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these CAP. Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the Payment Percentages then in effect), within thirty (30) days of executing the release as set forth in ARTICLE X,0. above.

<div align="center">

ARTICLE XI
**INSURED ABUSE CLAIMS** OF ~~SETTLEMENT TRUST AGAINST~~
**NON-SETTLING INSURANCE COMPANIES**

</div>

**A.     Rights of Settlement Trust Against Non-Settling Insurance Companies.** Pursuant to the Plan, the Settlement Trust will take assignment of BSA's rights ~~and obligations~~ under the Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to ~~Article VII above~~ARTICLE VII above or if an Abuse Claimant makes a Tort System Election to address the liability of one or more Protected Parties, the Settlement Trustee ~~will~~may determine, based on the relevant Submitted Abuse Claim, Trust Claim Submission ~~and~~, complaint or any other information ~~submitted in connection with that submission and in~~, interviews or examinations or the materials obtained through the Cooperation Obligations, ~~whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim. The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of the Abuse Claims. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.~~

<div align="center">

~~ARTICLE XI~~
~~**INDIRECT ABUSE CLAIMS**~~

</div>

~~A.     **Indirect Abuse Claims.** To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article V.B Agreement hereof. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof.~~

<div align="center">35</div>

*BR Draft 6/6/2021*

*Mediation Privilege*

**B.**   **Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

### ARTICLE XII
### TORT SYSTEM ALTERNATIVE

**A.**   **Exhaustion of Claims Allowance and Reconsideration Procedures**.  If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described above in Article VII.G and the Abuse Claimant disagrees with the Settlement Trustee's determination regarding allowance or allowed amount of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction (a "**Tort Election Claim**").  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered by the Settlement Trust, and recovery, if any, shall be limited to settlement or judgment from such lawsuit as provided herein.  An Abuse Claimant that asserts a Tort Election Claim may not seek costs or expenses in the lawsuit filed against the Settlement Trust.  Each party's costs of litigation shall be borne by that party.

**B.**   **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**.  The Settlement Trustee, with the approval of the Settlement Trust Advisory Committee and the Future Claimants' Representative, may in his sole and absolute discretion authorize the commencement or continuation of a lawsuit against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**").  STAC Tort Election Claims shall not be required to exhaust any remedies under these CAP before commencing or continuing such lawsuit.  No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee, which approval may be withheld for any reason notwithstanding Article II.C.

**Tender to Non-Settling Insurance Company**.  If a Abuse Claimant elects or is authorized to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").such Abuse Claim.  The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for such an Insured Abuse Claim.

**B.**   **Tender of Matter Under Tort System Election to Non-Settling Insurance Company.**   The Settlement Trustee, as applicable, may tender defense of, and seek indemnification for, an Insured Abuse Claim as to which a Tort System Election is made to any applicable Non-Settling Insurance Companies available to respond to the lawsuit.   The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility for an Insured Lawsuit.  The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.such an Insured Abuse Claim.

DOCS_LA:338326.1 85353/002

Highly Confidential

BSA-PLAN_00552213

**SA 2237**

*BR Draft 6/6/2021*

*Mediation Privilege*

**C.     Presentment of Other Insured Abuse Claims.**  The Settlement Trustee also may present each other Insured Abuse Claim that is an Allowed Abuse Claim, including the Proposed Allowed Claim Amount, to the applicable Non-Settling Insurance Company(ies) for indemnification.  Additionally, prior to offering an initially determined Proposed Allowed Claim Amount in an Allowed Claim Notice, the Settlement Trustee may elect to offer an Abuse Claimant a Proposed Allowed Claim Amount in a lesser amount equal to one or more policy limits as to an Insured Abuse Claim, which offer may be made contingent on receipt by the Settlement Trust of an Insured Abuse CAP Claim Payment within a specified time, and payment to the Abuse Claimant of the Allocated Share resulting from the Insured Abuse CAP Claim Payment within a specified time.  If the applicable Non-Settling Insurance Companies or the Abuse Claimant reject or fail to comply with an accepted policy limits offer, the Settlement Trustee may issue the initially determined Proposed Allowed Claim Amount to the subject Abuse Claimant (which would not include any payment timing conditions).

**D.     No Direct Action Right.**  Except as otherwise set forth in the Plan, the Confirmation Order, the Settlement Trust Agreement, or these CAP (see ARTICLE XIII), Abuse Claimants shall have no rights against the Non-Settling Insurance Companies with respect to Abuse Claims against Protected Parties.  (Nothing herein (or in the Plan) precludes any suit, action, claim, demand or other matter by an Abuse Claimant against a Non-Settling Insurer with respect to claims against persons or entities that are not Protected Parties.)

**E.     Results of Negotiation or Litigation.**

(1)                     For Insured Abuse Claims as to which a Non-Settling Insurance Company declines to defend or indemnify the Settlement Trust, as applicable, the Settlement Trust may pursue or address liability of the Non-Settling Insurance Company in coverage litigation or in any other manner permitted by applicable law.  If it is determined in coverage or other litigation that use of a process hereunder to determine Allowed Claim Amounts deprives the Settlement Trust from recovery for indemnity from a Non-Settling Insurer for an Abuse Claim, or for all Abuse Claims, as to which the Allowed Claim Amount was so determined, the Abuse Claimant and Settlement Trustee may void any such Allowed Claim Amount determinations, treat any payments made as payments on account, and the Abuse Claimant shall be entitled to make the Tort System Election, as provided in ARTICLE XIII.  To the extent a deductible is owed to the Non-Settling Insurance Company in order for the Settlement Trust to obtain the insurance proceeds from a final judgment or settlement, any such deductible shall be submitted to the Settlement Trust as an Indirect Abuse Claim.

(2)                     If the Settlement Trust settles with respect to such action(s), the Non-Settling Insurer may become a Protected Party under the Plan affecting pending litigation as set forth in ARTICLE XIII.  If the Settlement Trust settles or recovers with respect to such action(s), the proceeds from such judgment or settlement will flow into the Settlement Trust corpus and be subject to source affected weighting as set forth in ARTICLE X.B.

**ARTICLE XII**
**INDIRECT ABUSE CLAIMS**

37

Highly Confidential

BSA-PLAN_00552214

**SA 2238**

*BR Draft 6/6/2021*

*Mediation Privilege*

**A.    Indirect Abuse Claims.**   To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy ARTICLE IV.B. hereof. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with ARTICLE X hereof.

**B.    Offset.**   The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust as to (or that reduces under applicable law) the liability of a Protected Party shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as to such Protected Party.

## ARTICLE XIII
## TORT SYSTEM ELECTION

**A.    Exhaustion of Claims Allowance and Reconsideration Procedures; Permissive Suits.**   An Abuse Claimant may make a Tort System Election, including to use the tort system to obtain an Allowed Claim Amount for its Abuse Claim to use for recovery from the Settlement Trust as to the liability of a Protected Party, provided that such election must be made in the manner designated by the Settlement Trustee and shall be available only if:

(1)    The Abuse Claimant has utilized the reconsideration process described above in ARTICLE VII.H. for an Abuse Claim that has gone through Expedited Review or Summary Review, and disagrees with the Settlement Trustee's determination regarding allowance or the Proposed Allowed Claim Amount of the subject Submitted Abuse Claim;

(2)    The Abuse Claim was disallowed or the Abuse Claimant rejects the neutral's or arbitrator's Proposed Allowed Claim Amount resulting from utilizing the Independent Review Process under ARTICLE IX (a Tort System Election under this or the prior subsection is referred to herein as a "**Back-End Tort System Election**")

(3)    The Settlement Trustee and Abuse Claimant agree to void the Allowed Claim Amount determined under the CAP as provided in ARTICLE XI.E.(1); or

(4)    The Settlement Trustee authorizes the commencement or continuation of such lawsuit, and either (a) the lawsuit would be an Insured Abuse Claim or (b) proposed defendants in the lawsuit will be both a Protected Party and a person or entity that is not a Protected Party (a Tort System Election under this subsection is referred to herein as an "**Initial Tort System Election**").[7]

**B.    Effect of Tort System Election and Disposition of Proceeds.**   In any lawsuit under the Tort System Election, the Abuse Claimant may assert its Abuse Claim against [Delaware BSA] and the Settlement Trust as if the Abuse Claimant were asserting such claim against either Debtor or any Protected Party, and the discharge and injunctions in the Plan had not been issued.  The Settlement Trust may control the litigation as to Delaware BSA as well as itself and may assert against the Abuse Claimant any and all claims and defenses of the

---

[7] Lawsuits only against defendants that are not Protected Parties are not channeled to the Settlement Trust.

DOCS_LA:338326.1 85353/002

Highly Confidential

BSA-PLAN_00552215

SA 2239

*Mediation Privilege*

Settlement Trust, as well as any and all claims and defenses that any Debtor or Protected Party could have asserted against the Abuse Claimant with respect to Abuse Claim.

An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered under the CAP, and its recovery from the Settlement Trust, if any, shall be as otherwise provided in this ARTICLE XIII.

Any recoveries from outside the Settlement Trust in respect of a Protected Party's liability in an elective lawsuit under ARTICLE XIII.A.(4) above are payable to the Settlement Trust, leaving the Abuse Claimant to recover its claim for such amount under the terms of ARTICLE XIII.C. hereof, including the provisions therein for Source Affected Weighting.

**C.     Settlement Trust Liability.**  An Abuse Claimant who pursues the Settlement Trust or a Protected Party in the tort system shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant in respect of the Protected Party's liability. The following portion of the amount of an Allowed Claim Amount resulting from such determination in the tort system (exclusive of any Allocated Share resulting from an Insurer Abuse Litigation Claim Payment) shall be subordinated for payment to prior payment of all other Direct Abuse Claims against the Settlement Trust (excluding any portion thereof for punitive or exemplary damages):

(1) for all matters proceeding as a Tort System Election (other than matters proceeding as a Back-End Tort System Election that result in a default judgment), (i) the amount of all costs or expenses incurred in the lawsuit that may be owing by the Settlement Trust; and (ii) without duplication, any amount of the Allowed Claim Amount in excess of the Maximum Priority Amount for the applicable tier set forth in the Claims Matrix;

(2) for matters proceeding as a Back-End Tort System Election that result in a default judgment, the greater of: (i) the amount of the Allowed Claim Amount determined as set forth in subsection (1) of this section; and (ii) the amount of the Allowed Claim Amount in excess of the highest of any Proposed Allowed Claim Amounts received by the subject Abuse Claimant from either the Settlement Trust or from an arbitrator under the Independent Review Process hereof.

**D.     Parties to Lawsuit.**  Any lawsuit commenced under Article XIIARTICLE XIII.A. of these CAP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. ~~The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued.  The Abuse Claimant may name Protected Parties are nominal defendants,~~ *provided, however,* ~~in no circumstance shall any Abuse Claimant have recourse against any assets of a Protected Party with respect to the satisfaction of any Abuse Claim~~The potential parties that may be defendants in the lawsuit shall be the Settlement Trust, [BSA Delaware, Inc.] and any other person or entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law.

39

Highly Confidential

BSA-PLAN_00552216

**SA 2240**

---

Formatted: Left

Formatted: Font: Not Bold, Not Italic

Formatted: Font: Times New Roman Bold

Formatted: HeadingBody 2, Left, Space After:  0 pt,  No bullets or numbering

Field Code Changed

Formatted: DocID, Left

*Mediation Privilege*                                                        *BR Draft 6/6/2021*

E.    **Defenses.**    All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.  ~~The defenses available to a Non-Settling Insurance Company that has agreed to provide a defense shall be determined pursuant to the terms of the applicable Insurance Policy and law.~~

~~F.    **Settlement Trust Liability for Tort Election Claims.**    An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that*, all amounts of such Allowed Claim Amount in excess of the Maximum Dollars in the application tier set forth in the Claims Matrix (the "**Cap Amount**") shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these CAP (excluding Article XII hereof).  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum payment that Abuse Claimant can recover from the Settlement Trust before all other Direct Abuse Claims are paid in full is $2,700,000 (the Maximum Amount in tier one).  For the avoidance of doubt, the limit on the Settlement Trust Liability under this Article XII.D shall not apply or inure to the benefit of any Non-Settling Insurance Company.~~

~~G.    **Settlement Trust Liability for STAC Election Claims.**    If the prosecution of STAC Election Tort Claim results in a settlement or judgment less than the Cap Amount, the Abuse Claimant who pursued such STAC Election Tort Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant.  If the prosecution of STAC Election Tort Claim results in a judgment more than the Cap Amount (the "**Excess Amount**") and the Non-Settling Insurance Company is not a Protected Party, the Abuse Claimant that pursued such STAC Election Tort Claim shall (i) be entitled to an Allowed Abuse Claim against the Settlement Trust for the Cap Amount, less any payments actually received and retained by the Abuse Claimant and (ii) retain [●]% of the Excess Amount and the remaining [●]% shall be paid to the Settlement Trust.  If the prosecution of STAC Election Tort Claim results in a judgment more than the Cap Amount and the Non-Settling Insurance Company has become a Protected Party, the Abuse Claimant that pursued such STAC Election Tort Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that*, all amounts of such Allowed Claim Amount in excess of the sum of (i) the Capped Amount and (ii) [●]% of the Excess Amount shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these CAP (excluding Article XII hereof).~~

F.    **Settlement or Final Judgment.**    If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurer or other person or entity involved in the lawsuit or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant engaged in the lawsuit shall be entitled to proceed with its lawsuit (e.g., if there are persons or entities that are not Protected Parties to collect from).  Such Abuse Claimant also shall be afforded the alternative ability to elect to terminate the lawsuit without prejudice and have its Abuse Claim determined by Expedited Review, Summary Review or the Independent Review Process, in which event, the

40

BSA-PLAN_00552217

SA 2241

*BR Draft 6/6/2021*

*Mediation Privilege*

Abuse Claimant may submit evidence of matters occurring during the lawsuit that shall be taken into account in such processes.  Upon the Abuse Claimant receiving an Allowed Claim Amount under any of such processes, its claim shall be placed at the front of any payment queue.

G. **Payment of Judgments by the Settlement Trust.** Subject to ~~Articles XII.F and XII.G~~ARTICLE XIII.C. hereof, if and when an Abuse Claimant obtains a ~~final judgment or settlement against the Settlement Trust in the tort system (a "Final Judicial Determination")~~, such judgment or settlement amount shall be treated for purposes of distribution under these CAP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the Protected Party's liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth in Article ~~IX.E~~ARTICLE X.0. above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive ~~any  subsequent distributions based on any Supplemental~~with other Abuse Claimants using the applicable Payment Percentage as determined by the Settlement Trust.

H. ~~ARTICLE XIII~~Litigation Results and Other Abuse Claims. To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria used for Expedited Review and Summary Review, the Settlement Trustee, subject to approval of, or notice and opportunity to object to, the Bankruptcy Court or District Court, may modify their application on a go-forward basis for then Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount has been determined.

I. **Tolling of Limitations Period.** The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim against each Protected Party from the earliest of (A) the actual filing of the claim against the Protected Party prior to the Petition Date, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date, and shall continue until one (1) year following release of the Abuse Claim into the tort system hereunder.

## ARTICLE XIV
## CLAIMS MATERIALS

A. **Claims Materials.** The Settlement Trust shall prepare suitable and efficient Claims Materials for all Abuse Claims, including as to applicable elections hereunder to be made with respect to Abuse Claims, and shall provide such Claims Materials upon a written request for such materials to the Settlement Trust.  The claim form for Future Abuse Claims and other claims against Protected Parties channeled to the Settlement Trust to be submitted to the Settlement Trust, and certain other submissions, shall include a certification by the Abuse Claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  The Settlement Trustee shall develop filing procedures and deadlines for claims, related materials, other submissions and elections as to which no specific deadline is set forth elsewhere in these CAP in consultation with the STAC and in so doing, the Settlement Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation

Highly Confidential

BSA-PLAN_00552218

SA 2242

*Mediation Privilege*

over the internet and electronically by disk or CD-rom. The claim form to be used by the Settlement Trust shall be developed by the Settlement Trust and submitted to the STAC and the Futures Representatives for approval; it may be changed by the Settlement Trust with the consent of the STAC and the Futures Representative.

**B.     Content of Claims Materials.**  The Claims Materials shall include a copy of this CAP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  As set forth herein, the claimant shall be required to provide the Settlement Trust with evidence of recovery from other defendants and claims resolution organizations, including such evidence of recovery or other information that such claimant would be required to provide pursuant to the substantive law, rules of procedure or practices in the tort system in the Claimant's Jurisdiction, including pre- and post-verdict rules, so as to enable the Settlement Trust to (1) determine whether the claim would be valid and cognizable in the tort system in the Claimant's Jurisdiction, (2) comply with the provisions hereof, and (3) determine the Settlement Trust's several share of liability for the claimant's unpaid damages.

**C.     Withdrawal or Deferral of Claims.**  An Abuse Claimant can withdraw an Abuse Claim at any time upon written notice to the Settlement Trust.  An Abuse Claimant can also request that the processing of his or her Abuse Claim by the Settlement Trust be deferred for a period not to exceed [30] months.  Except for Abuse Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Settlement Trust's offer is required, or a Settlement Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, initiates reconsideration, nor makes the Tort System Election within six (6) months of the Settlement Trust's written offer of payment or rejection of the claim.  Upon written request and good cause, the Settlement Trust may extend the deferral period for an additional six (6) months.

**D.     Fees and Expenses.**  The Settlement Trustee shall have the discretion to determine, with the consent of the STAC and the Futures Representative, forms and payment processes for fees and expenses required to be paid hereunder.

**E.     Confidentiality of Claimants' Submissions.**  All submissions to the Settlement Trust by a holder of an Abuse Claim and all materials related thereto shall be treated as made in the course of settlement discussions between the holder and the Settlement Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials.  Furthermore, the Settlement Trust shall provide counsel for the holder a copy of any such subpoena promptly upon being served.  The Settlement Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto.  Notwithstanding anything in the foregoing to the contrary, with the consent of the STAC and the Futures Representative, the Settlement Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the Settlement Trust's

42

*Mediation Privilege*

judgment to preserve, litigate, resolve or settle coverage, or to comply with an applicable obligation under an insurance policy, reimbursement agreement, or settlement agreement; provided, however, that the Settlement Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Settlement Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Settlement Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as provided in the agreement.  Nothing in this CAP, the Plan or the Settlement Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in an underlying civil action regarding his or her submission of factual information to the Settlement Trust for the purpose of obtaining compensation from the Settlement Trust.

ARTICLE XV
**MISCELLANEOUS PROVISIONS**

A.      A.      **Non-Binding Effect of Settlement Trust and/or Litigation Outcome.** Notwithstanding any other provision of these CAP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

B.      B.      **Amendments.**   Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these CAP, without the written consent of the STAC ~~and the Future Claimants' Representative~~, as provided in the Settlement Trust Agreement, including amendments to preserve the value of assets of the Settlement Trust.   Nothing herein is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to these CAP.   ~~Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend these CAP to provide for materially different treatment for Abuse Claims including the Claims Matrix and Scaling Factors set forth in Article VIII.~~

C.      C.      **Severability.**   Should any provision contained in these CAP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CAP.

D.      D.      **Offsets.**   The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim ~~on~~as to a ~~dollar for dollar basis~~Protected Party based on any amounts paid or agreed and reasonably likely to be paid to the holder of such Claim as against such Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

E.      E.      **Governing Law.**   Administration of these CAP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in

43

*BR Draft 6/6/2021*

*Mediation Privilege*

the tort system shall be the law of the jurisdiction in which the Abuse Claimant filed or files the lawsuit as described in ~~Article XII.~~

ARTICLE XIII.

**Formatted:** Left

**Formatted:** Font: Not Bold, Not Italic

**Formatted:** HeadingBody 2

**Field Code Changed**

**Formatted:** DocID, Left

Highly Confidential

BSA-PLAN_00552221

**SA 2245**

*BSA Comments 6/8/2021* ~~BSA Comments 6/8/2021~~*BR Draft 6/9/2021*
*Mediation Privilege*

## BOY SCOUTS OF AMERICA

### CLAIMS ALLOWANCE PROCEDURES FOR ABUSE CLAIMS

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

**A.**   **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and other Protected Parties in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below). These Claims Allowance Procedures (the "**CAP**") are adopted pursuant to the Settlement Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These CAP are designed to provide fair, equitable, and substantially similar treatment for all ~~of the applicable~~ Abuse Claims.  These CAP provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these CAP in consultation with the Claims Administrator, Claims Processor, Neutrals, Future Claimants' Representative, Appeals Officer, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of ~~any available Insurance Policies~~the Settlement Trust Assets.

**B.**   **General Principles**.  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these CAP are founded on the following principles:

1.     objective Claim eligibility criteria;

2.     clear and reliable proof requirements;

3.     administrative transparency;

**JTX-537**

4.     a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

5.     prevention and detection of any fraud; and

6.     independence of the Settlement Trust and Settlement Trustee.

1

BSA-PLAN_00552355
**SA 2246**

**C.**      **Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these CAP.  The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights.  The amount of any installment payments, initial payments, or payment percentages established under these CAP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Abuse Claim has against the Debtors, the Protected Parties and/or the Settlement Trust.

**D.**      **Sole and Exclusive Method**.  These CAP and any procedures designated in these CAP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties.

**E.**      **Interpretation**.  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these CAP.

**F.**      **Confidentiality**.  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement.  Nothing in these CAP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents to any Abuse Claimants of their respective counsel, except as provided for in the ~~Cooperation~~Document Agreement.

**ARTICLE II**
**DEFINITIONS AND RULES OF INTERPRETATION**

**A.**      **Incorporation of Plan Definitions**.  Capitalized terms used but not defined in these CAP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these CAP by reference.  To the extent that a term is defined in these CAP and the Plan and/or the Settlement Trust Agreement, the definition contained in these CAP controls.

**B.**      **Definitions**.  The following terms have the respective meanings set forth below:

Highly Confidential

1.     "**Abuse Claims**" shall mean Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.     "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.     "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

4.     "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

**C.     Interpretation; Application of Definitions and Rules of Construction**.  For purposes of these CAP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these CAP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these CAP may be interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these CAP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these CAP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these CAP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; and (8) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

**ARTICLE III**
**CAP ADMINISTRATION**

**A.     Administration**.  Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these CAP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims.  The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these CAP and provide information necessary for the Settlement Trustee to implement these CAP.

**B.     Powers and Obligations**.  The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrator are set forth in the Settlement Trust Agreement.  The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any individual claim allowance or Allowed Claim Amount determination under these CAP.

3

**C.**   **Consent Procedures**.  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these CAP pursuant to Article XII.B below, and on such matters as are otherwise required below and in Article [__] of the Settlement Trust Agreement.  Such consent shall not be unreasonably withheld.

**ARTICLE IV
CLAIMANT ELIGIBILITY**[1]

**A.**   **Direct Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

(1)   have been a child under the age of eighteen (18) at the time of the alleged Abuse;

(2)   have an Abuse Claim;

(3)   have timely submitted an Abuse Claim Proof of Claim to the Settlement Trust as provided below; and

(4)   submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") (which Chapter 11 POCs shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust).

**B.**   **Indirect Abuse Claims**.   To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)   must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(2)   must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subjection (e) thereof, or subordination under section 509(c) (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code); and

(3~~2~~)   must establish to the satisfaction of the Settlement Trustee that:

(a)   such Indirect Abuse Claimant has paid ~~a~~in full ~~the~~ liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these CAP (and which has not been paid by the

---

[1]  **[NTD separate procedures for Non-Abuse Litigation Claims if channeled to Settlement Trust]**.

Settlement Trust)~~, for the avoidance of doubt, this would include but not be limited to claims for the payment of defense costs, deductibles, or indemnification obligations~~;

(b)     the Indirect Abuse Claimant and the person(s), to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)     the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)     the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment.  In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

**C.     Future Abuse Claims**.  [ADD]

**ARTICLE V**
**GENERAL TRUST PROCEDURES**

**A.     ~~Cooperation~~Document Access Agreement**.  The Settlement Trustee may require other parties to the ~~Cooperation~~Document Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided herein (the "~~Cooperation Agreement~~Document Obligations"), and may afford, or require such other parties to the ~~Cooperation~~Document Agreement to afford, access for Direct Abuse Claimants to relevant, otherwise discoverable documents to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV or perversion files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust.  The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these CAP.

**B.     Assignment of Insurance Rights**.  The BSA insurance rights have been assigned to the Settlement Trust in accordance with the Bankruptcy Code and pursuant to the Confirmation Order, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties.  The BSA ~~Insurance Policies~~insurance policy rights and the rights and obligations of certain Protected Parties under

5

the Insurance Policies have been assigned to the Settlement Trust ~~cum onere~~ in accordance with the Bankruptcy Code and pursuant to the Confirmation Order. ~~Nothing in these CAP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or~~The rights and obligations ~~under an Insurance Policy assigned to the Settlement Trust. Furthermore, to the extent that an Insurer has any contractual, legal, or equitable rights related to performance of or the applicability of any specific provision of the CAP, the Non-Settling Insurance Companies contractual, legal, or equitable rights under the applicable~~, if any, of any Non-Settling Insurance Company relating to or arising out of the CAP, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies ~~are expressly preserved and in no way modified, amended, supplemented, or altered~~and applicable law.

      **C.**   **Deceased Abuse Survivor**.  The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these CAP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

<div align="center">

**ARTICLE VI**
**EXPEDITED DISTRIBUTIONS**

</div>

      **A.**   **Minimum Payment Criteria**.  A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of [$1,500] (the "**Expedited Distribution**"):  (i) the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim indicated that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse; and (ii) the Direct Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification.  Direct Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

      **B.**   **Process and Payment of Expedited Distributions**.  Direct Abuse Claimants who have properly elected to receive the Expedited Distribution in accordance with the Plan and Confirmation Order (the "**Expedited Distribution Election**") and who met the criteria set forth in Article VI.A above, shall be entitled to receive their Expedited Payment upon executing an appropriate release.  A Direct Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the Plan and Confirmation Order may not later elect to receive the Expedited Distribution.  A Direct Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, or any Non-Settling Insurance Company.  Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these CAP.

<div align="center">6</div>

## ARTICLE VII
## CLAIMS ALLOWANCE PROCESS

A.    **Trust Claim Submissions**.  Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these CAP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (iii) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (iv) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the ~~Cooperation Agreement~~Document Obligations (as defined below).  Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

B.    **Claims Evaluation**.  The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the ~~Cooperation Agreement~~Document Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

C.    **Settlement Trustee Review Procedures**.  The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the ~~Cooperation~~Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

    1.    **Initial Evaluation Criteria**.  The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

        (a)    the Abuse Claimant's Proof of Claim or complaint against a Protected Party other than the Debtors (where applicable) was free from material defects;

7

(b)     such Proof of Claim was timely filed prior to the Bar Date or such complaint was timely filed against a Protected Party other than the Debtors (where applicable);

(c)     application of relevant statutes of limitation, repose, or other applicable law would permit the Submitted Abuse Claim; or

(d)     the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim, *provided*, *however* that any Submitted Abuse Claim that is disallowed based on the application of a statute of limitations, repose, or other similar time-based defense that becomes the subject of statute of limitations revival legislation may be determined to no longer be a Disallowed Claim and may be evaluated under the General Criteria set forth below.

2.      **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate whether the Abuse Claimant has provided the following required evidence for such Claim (the "**General Criteria**"):

(a)     <u>Alleged Abuse</u>.  [**ADD**].

(a~~b~~)     <u>Alleged Abuser Identification</u>.  The Abuse Claimant must either: (i) identify his or her alleged abuser by the full name or last name, or (ii) provide additional facts (*e.g.*, a physical description of alleged abuser combined with the name or location of the Abuse Claimant's troop) sufficient for the Settlement Trustee to identify the alleged abuser;

(b~~c~~)     <u>Connection to Scouting</u>.  The Abuse Claimant must provide information that: (i) he or she was abused by an employee or volunteer of a Protected Party or by a registered Scout, and (ii) that such alleged abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

(c~~d~~)     <u>Location of Abuse</u>.  The Abuse Claimant must identify:  (i) the venue or location of the alleged abuse, and (ii) the Scouting activity that he or she was involved in that directly resulted in the alleged abuse; and

(d~~e~~)     <u>Date and Age</u>.  The Abuse Claimant must either:  (i) identify the date of the alleged abuse and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (ii) provide additional facts (*e.g.*, the

Highly Confidential

approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse.

3.    <u>**Submitted Abuse Claims That Satisfy the General Criteria**</u>.  To the extent that a Submitted Abuse Claim meets the evidentiary requirements set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4.    <u>**Submitted Abuse Claims That Do Not Satisfy the General Criteria**</u>.  If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim.  To the extent that a Submitted Abuse Claim does not meet all of the evidentiary requirements set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements; *provided*, *however*, that if the Settlement Trustee finds that any of following requirements with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim:

    (a)    The Abuse Claimant fails to identify the alleged abuser and/or fails to provide a description of the alleged abuser such that the Settlement Trustee cannot determine whether the alleged abuser was an employee or volunteer of a Protected Party or was a registered Scout, and that the abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

    (b)    The Abuse Claimant fails to provide the date and/or his or her age at the time of the alleged abuse, and/or sufficient information for the Settlement Trustee to determine the approximate date and/or the Abuse Claimant's age at the time of the alleged abuse;

    (c)    The Abuse Claimant fails to identify the alleged acts of abuse; or

    (d)    The Abuse Claimant fails to demonstrate that he or she was involved in Scouting.

  D.    <u>**Disallowed Claims**</u>.  If the Settlement Trustee finds, pursuant to the procedures set forth in Article VII.C above, that a Submitted Abuse Claim is a Disallowed Claim, the

<div align="center">9</div>

Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**").  If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII.  Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

E.      **Allowed Abuse Claims**.  If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

F.      **Claims Determination**.  If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D.

G.      **Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**").  Each Reconsideration Request must be accompanied by a check or money order for $[●] as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

10

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of delivering notice of accepted reconsideration to the Abuse Claimant.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its Submitted Abuse Claim in the tort system as described below in Article XII.

      **H.**    **Prevention and Detection of Fraud**.  The Settlement Trustee shall work with the Claims Administrator to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or Claims Auditor to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions.  Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

<div align="center">

**[ARTICLE VIII][2]**
**CLAIMS MATRIX AND SCALING FACTORS**

</div>

      **A.**    **Scaling Factors**.  The Settlement Trustee shall utilize the claims matrix (the "**Claims Matrix**") and scaling factors ("**Scaling Factors**") set forth below in Article VIII.B and VIII.C as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim.  The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX.  In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the CAP).

      **B.**    **Claims Matrix**.  The Claims Matrix establishes five tiers of types of abuse, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier, in each case based on BSA's and other putative Protected Parties' historical abuse settlements and litigation outcomes.  The first two columns of the Claims Matrix delineate the

---

[2] **[Subject to further revisions to address use of average claim values]**.

<div align="center">11</div>

five possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse. The base amount column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier prior to application of the Scaling Factors described in Article VIII.C (the "**Base Amount**"). The maximum amount column for each tier represents maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.D (the "**Maximum Amount**"). The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee. If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.

| Tier | Type of Abuse | Base Amount | Maximum Amount |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $300,000 | $1,350,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Sexual Abuse-No Touching<br><br>Other Abuse-Not Sexual | $75,000 | $337,500 |

C. **Scaling Factors**. After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the five tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to set the dollars attributable to each Allowed Abuse Claim. The Scaling Factors are based on evidence submitted to the Bankruptcy Court regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors. Each Allowed Abuse Claim will be evaluated for each

12

factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, as well as materials obtained by the Settlement Trust through the ~~Cooperation~~Document Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one, meaning that in the absence of the application of the scaling factor, the Base Amount assigned to a Claim are not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Amount of the Allowed Abuse Claim by 1.5. The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Amount of the Allowed Abuse Claim.

**Aggravating Factors**: The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

(i) **Nature of Abuse and Circumstances**. To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim. The hypothetical base case scenario for this scaling factor would involve a single incident of abuse during a BSA sponsored event with a single perpetrator held in high regard by the victim and in a position of trust within BSA as an employee or volunteer. The hypothetical base case is incorporated into the Base Amount in the Claims Matrix' tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

    a.    Unusual duration and/or multiple circumstances of the abuse;

    b.    Repeated targeting and grooming behaviors including special privileges, special activities, and attention, social relationship with parents, personal relationship with the Abuse Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Abuse Claimant, or use of or exposure to pornography;

    c.    Coercion or threat or use of force or violence, stalking; and

    d.    Multiple perpetrators involved in sexual misconduct.

(ii) **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario of an unknown abuser who is only accused of abuse by one Abuse Claimant. The hypothetical base case is incorporated into the Base Amount in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be applied for this category as follows (the Settlement

13

BSA-PLAN_00552367
**SA 2258**

Trustee may only apply the scaling factor of the single highest applicable category listed below):

a.      1.25 if the abuser was accused by at least one (1) other Abuse Claimant;

b.      1.5 if the abuser was accused by five (5) or more other Abuse Claimants;

c.      2.0 if the abuser was accused by ten (10) or more other Abuse Claimants.

(iii)   **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the Base Amounts in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.      <u>Mental Health Issues</u>:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

b.      <u>Physical Health Issues</u>:  This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

c.      <u>Interpersonal Relationships</u>:  This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.      <u>Vocational Capacity</u>:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

14

  e. <u>Academic Capacity</u>:  This includes school behavior problems.

  f. <u>Legal Difficulties</u>:  This includes criminal difficulties, bankruptcy, and fraud.

 **Potential Mitigating Factors**.  The Settlement Trustee may assign a Scaling Factor in the range of 0.1 to 1.0 to each Allowed Abuse Claim to decrease the Proposed Allowed Claim Amount for such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse that occurred during a BSA sponsored event involving a perpetrator held in high regard and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the Base Amounts in the Claims Matrix tiers and would not receive a decrease on account of this factor.  Such factors may include the following:

 (i) **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility may be factually or legally attenuated or mitigated.  For example, the perpetrator may have also maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction of the Proposed Allowed Claim Amount.

 (ii) **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as expected contributions from other, non-Protected Party sources that are related to the abuse.  <u>The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system.</u>  By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

 (iii) **Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) [knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting,] the Settlement Trustee shall reduce the Proposed Allowed Claim Amount for such Claim by assigning a Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating that the BSA knew of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.

 **D.** **Allowed Abuse Claim Calculus**.  After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is

<div align="center">15</div>

the product of the Base Amount of the Claim and the Scaling Factors applied to the Claim. In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Amount for the Claim's assigned Claims Matrix tier. By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Amount of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000. As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

## ARTICLE IX
## PAYMENT OF SETTLED CLAIMS

**A.** **Payment Upon Final Determination**. Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section [__] of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive [a pro rata share of the Final Determination based on] a Payment Percentage described in Article IX.B and IX.C. For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

**B.** **Initial Payment Percentage**. After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

**C.** **Supplemental Payment Percentage**. When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the aggregate of the Initial Payment Percentage and all prior Supplemental Payment Percentages set by the Settlement Trustee. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any

16

Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

    **D.**   **Release**.  In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA.  Payments made by the Settlement Trust to the holder of an Allowed Abuse Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Allowed Abuse Claim.

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST
## AGAINST NON-SETTLING INSURANCE COMPANIES

    Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any Protected Parties' (to the extent provided for in the Plan) rights and obligations under the Insurance Policies ~~, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties~~.  For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the ~~Cooperation~~Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**").  The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim.  The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law.  The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of the Abuse Claims.  The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.

    ~~In no event shall an Abuse Claimant have a right to directly pursue claims against Non-Settling Insurance Companies.~~

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

    **A.**   **Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article V.B hereof.  Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof.

17

BSA-PLAN_00552371

**SA 2262**

**B.**   **Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

**A.**   **Exhaustion of Claims Allowance and Reconsideration Procedures**.  If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described above in Article VII.G and the Abuse Claimant disagrees with the Settlement Trustee's determination regarding allowance or allowed amount of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction (a "**Tort Election Claim**").  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered by the Settlement Trust, and recovery, if any, shall be limited to settlement or judgment from such lawsuit as provided herein.  An Abuse Claimant that asserts a Tort Election Claim may not seek costs or expenses in the lawsuit filed against the Settlement Trust.  Each party's costs of litigation shall be borne by that party.

**B.**   **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**.  The Settlement Trustee, with the approval of the Settlement Trust Advisory Committee and the Future Claimants' Representative, may in his sole and absolute discretion authorize the commencement or continuation of a lawsuit by ~~an~~a Direct Abuse Claimant against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**").  STAC Tort Election Claims shall not be required to exhaust any remedies under these CAP before commencing or continuing such lawsuit.  No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee, which approval may be withheld for any reason notwithstanding Article II.C.

**C.**   **Tender to Non-Settling Insurance Company**.  If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the ~~Cooperation~~Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").  The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit.  The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

~~**D. Limit on Settlement Trust Liability**.   An Abuse Claimant who pursues the Settlement Trust in the tort system shall not be able to receive from the Settlement Trust (or any other party) more than a holder of an Allowed Abuse Claim that receives a Final Determination of the Maximum Amount in the applicable tier set forth in the Claims Matrix.  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum Final Judicial~~

18

~~Determination that Abuse Claimant can receive is $2,700,000 (the Maximum Amount in tier one).~~

**D.** ~~E.~~ **Parties to Lawsuit**.  Any lawsuit commenced under Article XII of these CAP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued.  The ~~Settlement Trust shall be the properly named defendant in any such lawsuit.~~Abuse Claimant may name Protected Parties are nominal defendants, *provided*, *however*, in no circumstance shall any Abuse Claimant have recourse against any assets of a Protected Party with respect to the satisfaction of any Abuse Claim.

**E.** ~~F.~~ **Defenses**.  All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.  ~~The defenses available to a~~A Non-Settling Insurance Company that has agreed to provide a defense ~~shall have all the same defenses as the Settlement Trust and/or the Debtors~~may also asset any additional defenses that may be available pursuant to the terms of the applicable Insurance Policy and law.

**F.** **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that*, all amounts of such Allowed Claim Amount in excess of the Maximum Dollars in the application tier set forth in the Claims Matrix (the "**Cap Amount**") shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these CAP (excluding Article XII hereof).  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum payment that Abuse Claimant can recover from the Settlement Trust before all other Direct Abuse Claims are paid in full is $2,700,000 (the Maximum Amount in tier one).  For the avoidance of doubt, the limit on the Settlement Trust Liability under this Article XII.D shall not apply or inure to the benefit of any Non-Settling Insurance Company.

**G.** **Payment of Judgments by the Settlement Trust**.  Subject to Articles XII.F and XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these CAP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the Protected Party's liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth in Article IX.E above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any Supplemental Payment Percentage as determined by the Settlement Trust.

19

BSA-PLAN_00552373
**SA 2264**

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

A.     [**Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these CAP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.]

B.     **Amendments**.  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these CAP, without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to preserve the value of assets of the Settlement Trust. Nothing herein is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to these CAP.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend these CAP to provide for materially different treatment for Abuse Claims including the Claims Matrix and Scaling Factors set forth in Article VIII. Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend the form of release without the consent of Reorganized BSA or remove the requirement of a release in connection with an Expedited Determination [or the chartered partner release contained in the [regular-way process]].

C.     **Severability**.  Should any provision contained in these CAP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CAP.

D.     **Offsets**.  The Settlement Trust shall have the right to offset or reduce of the Allowed Claim Amount of any Allowed Abuse Claim on a dollar for dollar basis based on any amounts paid or reasonably likely to be paid to the holder of such Claim on account of such Claim from any source other than the Settlement Trust.

E.     **Governing Law**.  Administration of these CAP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII.

Highly Confidential

BSA-PLAN_00552374

**SA 2265**

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 6/9/2021 12:44:39 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Claims Allowance Procedures 06062021-v3 (BSA Comments 6.8.21) (002).docx | |
| **Modified filename:** CAP 64085959_4.docx | |
| **Changes:** | |
| Add | 52 |
| Delete | 39 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 99 |

BSA-PLAN_00552375

SA 2266

~~BSA Comments 6/8/2021~~BR Draft 6/10/2021
*Mediation Privilege*

**BOY SCOUTS OF AMERICA**

~~**CLAIMS ALLOWANCE**~~**TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS**

**ARTICLE I**
**PURPOSE AND GENERAL GUIDELINES**

    **A.**    **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and other Protected Parties in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below).  These ~~Claims Allowance~~Trust Distribution Procedures (the "~~**CAP**~~**TDP**") are adopted pursuant to the Settlement Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These ~~CAP~~TDP are designed to provide fair, equitable, and substantially similar treatment for all ~~of the applicable~~ Abuse Claims.  These ~~CAP~~TDP provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these ~~CAP~~TDP in consultation with the Claims Administrator, Claims Processor, Neutrals, Future Claimants' Representative, Appeals Officer, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of ~~any available Insurance Policies~~the Settlement Trust Assets.

    **B.**    **General Principles**.  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these ~~CAP~~TDP are founded on the following principles:

        1.    objective Claim eligibility criteria;

        2.    clear and reliable proof requirements;

        3.    administrative transparency;

        4.    a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

        5.    prevention and detection of any fraud; and

**JTX-539**

1

BSA-PLAN_00551950
**SA 2267**

6.      independence of the Settlement Trust and Settlement Trustee.

**C.      Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these ~~CAP~~TDP.  The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights.  The amount of any installment payments, initial payments, or payment percentages established under these ~~CAP~~TDP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Abuse Claim has against the Debtors, the Protected Parties and/or the Settlement Trust.

**D.      Sole and Exclusive Method**.  These ~~CAP~~TDP and any procedures designated in these ~~CAP~~TDP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties.

**E.      Interpretation**.  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these ~~CAP~~TDP.

**F.      Confidentiality**.  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement.  Nothing in these ~~CAP~~TDP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents to any Abuse Claimants of their respective counsel, except as provided for in the ~~Cooperation~~Document Agreement.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.      Incorporation of Plan Definitions**.  Capitalized terms used but not defined in these ~~CAP~~TDP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these ~~CAP~~TDP by reference.  To the extent that a term is defined in these ~~CAP~~TDP and the Plan and/or the Settlement Trust Agreement, the definition contained in these ~~CAP~~TDP controls.

**B.      Definitions**.  The following terms have the respective meanings set forth below:

2

BSA-PLAN_00551951
**SA 2268**

1.    "**Abuse Claims**" shall mean Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.    "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.    "**Average Values**" shall mean (as specifically defined and described in Article VIII.B the average values for each tier of Abuse Type based on historical settlements and other evidentiary grounds.

4.    "**Base Matrix Value**" shall mean the value for each tier of Abuse Type applicable for the base case for such tier (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C to be used and that may be identified in connection with the description of the Scaling Factors in Article VIII.D.

5.    "**Claims Matrix**" shall mean (as specifically defined and described in Article VIII.C) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, Maximum Matrix Value for each tier anticipated to result in the Average Values.

6.    "**CPI-W**" shall mean the Consumer Price Index for Urban Wage Earners and Clerical Workers, published by the United States Department of Labor, Bureau of Labor Statistics.

7.    ~~3.~~ "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

8.    ~~4.~~ "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

9.    "**Exigent Health Claims**" shall mean a Direct Abuse Claim the holder of which has provided a declaration under penalty of perjury from a physician who as examined the Direct Abuse Claimant within one hundred and twenty (120) days of the declaration in which the physician states that there is substantial medical doubt that the Direct Abuse Claimant will survive beyond six (6) months from the date of the declaration.

10.    "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Settlement Trust.

11.    "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claims Submissions.

12.    "**Matrix Values**" shall mean (as specifically defined and described in Article VIII.C the liquidated values resulting from applying the Scaling Factors to the Base Matrix Values for each tier of Abuse Type.

Highly Confidential

BSA-PLAN_00551952
**SA 2269**

13. "**Maximum Matrix Values**" shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C) that represents the maximum Allowed Claim Amount achievable for an Allowed Abuse Claim assigned to a given tier after applicable of the Scaling Factors described in Article VIII.D.

14. "**Scaling Factors**" shall mean (as specifically defined and described in Article VIII.D) the factors identified below to consider with respect to each Abuse Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Matrix Value.

**C.** **Interpretation; Application of Definitions and Rules of Construction**. For purposes of these ~~CAP~~TDP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these ~~CAP~~TDP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these ~~CAP~~TDP may be interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these ~~CAP~~TDP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these ~~CAP~~TDP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these ~~CAP~~TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; and (8) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

**ARTICLE III**
**~~CAP~~TDP ADMINISTRATION**

**A.** **Administration**. Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these ~~CAP~~TDP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims.  The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these ~~CAP~~TDP and provide information necessary for the Settlement Trustee to implement these ~~CAP~~TDP.

**B.** **Powers and Obligations**. The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrator are set forth in the Settlement Trust Agreement.  The STAC and the Future Claimants' Representative shall

4

have no authority or ability to modify, reject, or influence any individual claim allowance or Allowed Claim Amount determination under these ~~CAP~~TDP.

**C.    Consent Procedures**.  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these ~~CAP~~TDP pursuant to Article XII.B below, and on such matters as are otherwise required below and in Article [——●] of the Settlement Trust Agreement.  Such consent shall not be unreasonably withheld.

**ARTICLE IV**
**CLAIMANT ELIGIBILITY**

**A.    Direct Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

(1)    have been a child under the age of eighteen (18) at the time of the alleged Abuse;

(2)    have an Abuse Claim;

(3)    have timely submitted an Abuse Claim Proof of Claim to the Settlement Trust as provided below; and

(4)    submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") (which Chapter 11 POCs shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust).

**B.    Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(2)    must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subjection (e) thereof, or subordination under section 509(c) (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code); and

(3̶2)    must establish to the satisfaction of the Settlement Trustee that:

(a)    such Indirect Abuse Claimant has paid ~~a~~in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or

5

obligation under these ~~CAP~~TDP (and which has not been paid by the Settlement Trust)~~, for the avoidance of doubt, this would include but not be limited to claims for the payment of defense costs, deductibles, or indemnification obligations~~;

(b)     the Indirect Abuse Claimant and the person(s), to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)     the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)     the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment.  In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

       **C.     Future Abuse Claims**.  ~~[ADD]~~To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

       (1)     have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date; and

       (2)     as of the date immediately preceding the Petition Date, had no attained the eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

## ARTICLE V
## GENERAL TRUST PROCEDURES

       **A.     ~~Cooperation~~Document Access Agreement**.  The Settlement Trustee may require other parties to the ~~Cooperation~~Document Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided herein (the "~~Cooperation~~

6

~~Agreement~~**Document Obligations**"), and may afford, or require such other parties to the ~~Cooperation~~Document Agreement to afford, access for Direct Abuse Claimants to relevant, otherwise discoverable documents to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV or perversion files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust.  The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these ~~CAP~~TDP.

**B.**   **Assignment of Insurance Rights**.  The BSA insurance rights have been assigned to the Settlement Trust in accordance with the Bankruptcy Code and pursuant to the Confirmation Order, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties.  The BSA ~~Insurance Policies~~insurance policy rights and the rights and obligations of certain Protected Parties under the Insurance Policies have been assigned to the Settlement Trust *cum onere* in accordance with the Bankruptcy Code and pursuant to the Confirmation Order.  Nothing in these ~~CAP~~TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust.  Furthermore, to the extent ~~that an Insurer has any contractual, legal, or equitable rights related to performance of or the applicability of any specific provision of the CAP, the~~such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order.  The rights and obligations, if any, of any Non-Settling Insurance ~~Companies contractual, legal, or equitable rights under the applicable~~Company relating to or arising out of the TDP, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies ~~are expressly preserved and in no way modified, amended, supplemented, or altered~~and applicable law.

**C.**   **Deceased Abuse Survivor**.  The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these ~~CAP~~TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

## ARTICLE VI
## EXPEDITED DISTRIBUTIONS

**A.**   **Minimum Payment Criteria**.  A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of [$1,500] (the "**Expedited Distribution**"):  (i) the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim indicated that the claimant was a child under the age of eighteen (18) at the time of the alleged Abuse; and (ii) the Direct Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification.  Direct Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any

7

additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

**B.     Process and Payment of Expedited Distributions**.   Direct Abuse Claimants who have properly elected to receive the Expedited Distribution in accordance with the Plan and Confirmation Order (the "**Expedited Distribution Election**") and who met the criteria set forth in Article VI.A above, shall be entitled to receive their Expedited Payment upon executing an appropriate release. which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations.  A Direct Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the Plan and Confirmation Order may not later elect to receive the Expedited Distribution.   A Direct Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company.   Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these ~~CAP~~TDP.

**ARTICLE VII
CLAIMS ALLOWANCE PROCESS**

**A.     Trust Claim Submissions**.   Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these ~~CAP~~TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").   In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (iii) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (iv) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.   To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the ~~Cooperation Agreement~~Document Obligations (as defined below).  Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

**B.     Claims Evaluation**.   The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the ~~Cooperation Agreement~~Document Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will

Highly Confidential

either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

    **C.**    **Settlement Trustee Review Procedures**.  The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the ~~Cooperation~~Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

    **1.**    **Initial Evaluation Criteria**.  The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

    (a)    the Abuse Claimant's Proof of Claim or complaint against a Protected Party other than the Debtors (where applicable) was free from material defects;

    (b)    such Proof of Claim was timely filed prior to the Bar Date or such complaint was timely filed against a Protected Party other than the Debtors (where applicable);

    (c)    application of relevant statutes of limitation, repose, or other applicable law would permit the Submitted Abuse Claim; or

    (d)    the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim, *provided, however* that any Submitted Abuse Claim that is disallowed based on the application of a statute of limitations, repose, or other similar time-based defense that becomes the subject of statute of limitations revival legislation may be determined to no longer be a Disallowed Claim and may be evaluated under the General Criteria set forth below.

    **2.**    **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate whether the Abuse Claimant has provided the following required evidence for such Claim (the "**General Criteria**"):

    (a)    <u>Alleged Abuse.  The Abuse Claimant must allege that he or she suffered Abuse when he or she was a child under the age of eighteen (18).</u>

    (a<u>b</u>)    Alleged Abuser Identification.  The Abuse Claimant must either: (i) identify his or her alleged abuser by the full name or last name, or (ii) provide additional facts (*e.g.*, a physical description of

9

alleged abuser combined with the name or location of the Abuse Claimant's troop) sufficient for the Settlement Trustee to identify the alleged abuser;

(~~b~~c)  Connection to Scouting.  The Abuse Claimant must provide information that: (i) he or she was abused by an employee or volunteer of a Protected Party or by a registered Scout, and (ii) that such alleged abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

(~~c~~d)  Location of Abuse.  The Abuse Claimant must identify:  (i) the venue or location of the alleged abuse, and (ii) the Scouting activity that he or she was involved in that directly resulted in the alleged abuse; and

(~~d~~e)  Date and Age.  The Abuse Claimant must either:  (i) identify the date of the alleged abuse and/or his or her age at the time of the alleged abuse (which must be 18 years old or younger at the time of alleged abuse), or (ii) provide additional facts (*e.g.*, the approximate date and/or age at the time of alleged abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged abuse and age of the Abuse Claimant at the time of such alleged abuse.

3.  **Submitted Abuse Claims That Satisfy the General Criteria**.  To the extent that a Submitted Abuse Claim meets the evidentiary requirements set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4.  **Submitted Abuse Claims That Do Not Satisfy the General Criteria**.  If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim.  To the extent that a Submitted Abuse Claim does not meet all of the evidentiary requirements set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements; *provided*, *however*, that if the Settlement Trustee finds that any of following requirements with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim:

10

(a) The Abuse Claimant fails to identify the alleged abuser and/or fails to provide a description of the alleged abuser such that the Settlement Trustee cannot determine whether the alleged abuser was an employee or volunteer of a Protected Party or was a registered Scout, and that the abuse occurred during a Scouting activity or directly resulted from a Scouting activity;

(b) The Abuse Claimant fails to provide the date and/or his or her age at the time of the alleged abuse, and/or sufficient information for the Settlement Trustee to determine the approximate date and/or the Abuse Claimant's age at the time of the alleged abuse;

(c) The Abuse Claimant fails to identify the alleged acts of abuse; or

(d) The Abuse Claimant fails to demonstrate that he or she was involved in Scouting.

**D.  Disallowed Claims**.  If the Settlement Trustee finds, pursuant to the procedures set forth in Article VII.C above, that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**").  If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII.  Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

**E.  Allowed Abuse Claims**.  If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

**F.  Claims Determination**.  If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D.

**G.  Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**").  Each Reconsideration Request must be accompanied by a check or money order for $[●] as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in

11

support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of delivering notice of accepted reconsideration to the Abuse Claimant.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its Submitted Abuse Claim in the tort system as described below in Article XII.

**H.**     **Prevention and Detection of Fraud**.  The Settlement Trustee shall work with the Claims Administrator to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or Claims Auditor to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions.  Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

BSA-PLAN_00551961

**SA 2278**

[ARTICLE VIII]
## CLAIMS MATRIX AND SCALING FACTORS

**A.** ~~A.~~ **Claims Matrix and Scaling Factors.** These TDP establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the "**Claims Matrix**") that schedules six types of Abuse (the "**Abuse Types**") and designates for each Abuse Type a Base Matrix Value, Maximum Matrix Value, and amounts anticipated to result in certain identified average values (the "**Average Values**") for each Abuse Type, and certain scaling factors (the "**Scaling Factors**") identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims (the "**Matrix Values**"). The Abuse Types, Scaling Factors, Matrix Values, Average Values, Base Matrix Values, and Maximum Matrix Values that are set forth in the Matrix have all been selected and derived with the intention of achieving a fair and reasonable claim amount in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the ~~claims matrix (the "Claims Matrix")~~ and ~~scaling factors~~Scaling Factors ("**Scaling Factors**") set forth ~~below in Article VIII.B and VIII.C~~ as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX. In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the ~~CAP~~TDP).

**B.** **Average Values.** The Average Values identified in the chart below are based on BSA's claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims. The Base Matrix Values and Maximum Matrix Values set forth below have been established for each type of Abuse Types to be utilized in the Claims Matrix as tools for valuing Abuse Claims. Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-W. The CPI-W adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Average Value |
|------|---------------|---------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $2,450,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $1,535,000 |
| 3 | Masturbation by Adult Perpetrator | $721,000 |

13

| | Oral or Digital Penetration by a Youth Perpetrator | |
|---|---|---|
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $435,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Exploitation for child pornography | $175,000 |
| 6 | Sexual Abuse-No Touching | $7,500 |

**C.** ~~B.~~    **Claims Matrix**.  The Claims Matrix establishes ~~five~~six tiers of ~~types of abuse~~Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier~~, in each case based on BSA's and other putative Protected Parties' historical abuse settlements and litigation outcomes~~.  The first two columns of the Claims Matrix delineate the ~~five~~six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse.  The ~~base amount~~Base Matrix Value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier, in each case based on BSA's and other putative Protected Parties' historical abuse settlements and litigation outcomes, prior to application of the Scaling Factors described in Article VIII.~~C~~D (the "**Base ~~Amount~~Matrix Value**").  The maximum ~~amount~~Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.D (the "**Maximum ~~Amount~~Matrix Value**").  The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee.  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers.

| Tier | Type of Abuse | Base ~~Amount~~ Matrix Value | Maximum ~~Amount~~Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | $600,000 | $2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | $450,000 | $2,025,000 |

14

| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | $300,000 | $1,350,000 |
|---|---|---|---|
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Exploitation for child pornographySexual Abuse-No Touching<br><br>Other Abuse-Not Sexual | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching | $2,000 | $8,500 |

CD.    **Scaling Factors**.  After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the fivesix tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to set the dollars attributable todetermine the Proposed Claim Amount for each Allowed Abuse Claim.  The Scaling Factors are based on evidence submitted to the Bankruptcy Court regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors.  Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust through the CooperationDocument Obligations.  These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base AmountMatrix Value assigned to a Claim areis not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base AmountMatrix Value of the Allowed Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base AmountMatrix Value of the Allowed Abuse Claim.

**Aggravating Factors**:  The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

(i)    (i)    **Nature of Abuse and Circumstances**.  To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim.  The hypothetical base

15

case scenario for this scaling factor would involve a single incident of abuse ~~during a BSA sponsored event~~ with a single perpetrator ~~held in high regard by~~with such perpetrator having accessed the victim ~~and in a position of trust within BSA~~as an employee or volunteer within BSA-sponsored scouting. The hypothetical base case is incorporated into the Base ~~Amount~~Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

a.  ~~a.~~  ~~Unusual~~Extended duration and/or ~~multiple circumstances~~frequency of the abuse;

b.  ~~b.~~  Repeated targeting and grooming behaviors including special privileges, special activities, and attention, social relationship with parents, personal relationship with the Abuse Claimant, opportunity to experience sports or activities, isolation from others, or use of alcohol or illicit drugs by abuser or Abuse Claimant~~, or use of or exposure to pornography~~;

c.  Exploitation of the Abuse Claimant for child pornography;

d.  ~~e.~~  Coercion or threat or use of force or violence, stalking; and

e.  ~~d.~~  Multiple perpetrators involved in sexual misconduct.

(ii)  **Abuser Profile**.  To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim.  This factor is to be evaluated relative to a hypothetical base case scenario ~~of an unknown abuser who is only accused of abuse by one Abuse Claimant~~involving a perpetrator as to whom there is no other known allegations of sexual abuse.  The hypothetical base case is incorporated into the Base ~~Amount~~Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor.  An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

a.  1.25 if the abuser was accused by at least one (1) other ~~Abuse Claimant~~alleged victim of sexual abuse;

b.  1.5 if the abuser was accused by five (5) or more other ~~Abuse Claimants~~alleged victim of sexual abuse;

c.  2.0 if there is evidence of prior notice to the Protected Party (*e.g.*, the inclusion of the perpetrator in the IV files (Volunteer Screening Database)) or if the abuser was accused by ten (10) or more other ~~Abuse Claimants~~alleged victim of sexual abuse.

16

BSA-PLAN_00551965
**SA 2282**

(iii)   **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the Base AmountsMatrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.   Mental Health Issues:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

b.   Physical Health Issues:   This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

c.   Interpersonal Relationships:   This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.   Vocational Capacity:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.   Academic Capacity:  This includes school behavior problems.

f.   Legal Difficulties:  This includes criminal difficulties, bankruptcy, and fraud.

17

**Potential Mitigating Factors**.  The Settlement Trustee may assign a Scaling Factor in the range of 0.1 to 1.0 to each Allowed Abuse Claim to decrease the Proposed Allowed Claim Amount for such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse ~~that occurred during a BSA sponsored event involving~~ aand perpetrator ~~held in high regard and in a position of trust within BSA~~that accessed the victim as an employee or volunteer within BSA-sponsored scouting.  The hypothetical base case is incorporated into the Base ~~Amounts~~Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of this factor.  Such factors may include the following:

(i)       **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated.  For example, the perpetrator may have also maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction of the Proposed Allowed Claim Amount.

(ii)      **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as expected contributions from other, non-Protected Party sources that are related to the abuse.  The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system.  By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

(iii)     ~~**Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting, the Settlement Trustee shall reduce the Proposed Allowed Claim Amount for such Claim by assigning a Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating that the BSA knew of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.~~

**D**E.      **Allowed Abuse Claim Calculus**.  After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base ~~Amount~~Matrix Value of the Claim and the Scaling Factors applied to the Claim.  In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum ~~Amount~~Matrix Value for the Claim's assigned Claims Matrix tier.  By way of example, if an Allowed Abuse Claim is determined by the

18

BSA-PLAN_00551967

**SA 2284**

Settlement Trustee to be a tier 1 claim (Base ~~Amount~~Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000.   As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

### ARTICLE IX
### PAYMENT OF SETTLED CLAIMS

**A.**     ~~A.~~     **Payment Upon Final Determination**.  Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section [ __ ] of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive [a pro rata share of the Final Determination based on] a Payment Percentage described in Article IX.B and IX.C.  For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

**B.**     ~~B.~~     **Initial Payment Percentage**.  After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

**C.**     ~~C.~~     **Supplemental Payment Percentage**.   When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement.  Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage.   Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the aggregate of the Initial Payment Percentage and all prior Supplemental Payment Percentages set by the Settlement Trustee.  For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX.  For example if an Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

19

**D.** ~~D.~~   **Release**.  In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA.  Payments made by the Settlement Trust to the holder of an Allowed Abuse Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Allowed Abuse Claim.

**E.   FIFO Claims Process Queuing and Exigent Health Claims**.  The Settlement Trust shall order all Trust Claims Submissions to be reviewed for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to Expedited Distributions or Exigent Health Claims.  An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the date of receipt of the Abuse Claimant's Trust Claim Submission.  If any Trust Claims Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants.  An Abuse Claimant that elects expedited review on account of Exigent Health Claims shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these TDP.  Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D above.

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST
## AGAINST NON-SETTLING INSURANCE COMPANIES

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any Protected Parties' (to the extent provided for in the Plan) rights and obligations under the Insurance Policies~~, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties~~.  For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the ~~Cooperation~~Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**").  The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim.  The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law.  The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of the Abuse Claims.  The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.

20

~~In no event shall an Abuse Claimant have a right to directly pursue claims against Non-Settling Insurance Companies.~~

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

**A.**   **Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article V.B hereof.  Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof.

**B.**   **Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

**A.**   **Exhaustion of Claims Allowance and Reconsideration Procedures**.  If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described above in Article VII.G and the Abuse Claimant disagrees with the Settlement Trustee's determination regarding allowance or allowed amount of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction (a "**Tort Election Claim**").  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Allowed Claim Amount offered by the Settlement Trust, and recovery, if any, shall be limited to settlement or judgment from such lawsuit as provided herein.  An Abuse Claimant that asserts a Tort Election Claim may not seek costs or expenses in the lawsuit filed against the Settlement Trust.  Each party's costs of litigation shall be borne by that party.

**B.**   **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**.  The Settlement Trustee, with the approval of the Settlement Trust Advisory Committee and the Future Claimants' Representative, may in his sole and absolute discretion authorize the commencement or continuation of a lawsuit by an~~an~~ a Direct Abuse Claimant against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**").  STAC Tort Election Claims shall not be required to exhaust any remedies under these ~~CAP~~TDP before commencing or continuing such lawsuit.  No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee, which approval may be withheld for any reason notwithstanding Article II.C.

**C.**   **Tender to Non-Settling Insurance Company**.  If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the ~~Cooperation~~Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**").  The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have

BSA-PLAN_00551970
**SA 2287**

responsibility to defend an Insured Lawsuit.  The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

**~~D.  Limit on Settlement Trust Liability~~**~~.    An  Abuse  Claimant  who  pursues  the Settlement Trust in the tort system shall not be able to receive from the Settlement Trust (or any other party) more than a holder of an Allowed Abuse Claim that receives a Final Determination of the Maximum Amount in the applicable  tier set forth in the Claims Matrix.  By way of example,  for  an  Abuse  Claimant  asserting  tier  one  abuse,  the  maximum  Final  Judicial Determination  that  Abuse  Claimant  can  receive  is  $2,700,000  (the  Maximum  Amount  in  tier one).~~

**D.**      **~~E.~~ Parties to Lawsuit**.  Any lawsuit commenced under Article XII of these ~~CAP~~TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued.  The ~~Settlement Trust shall be the properly named defendant in any such lawsuit.~~Abuse Claimant may name Protected Parties are nominal defendants, *provided, however,* in no circumstance shall any Abuse Claimant have recourse  against  any  assets  of  a  Protected  Party  with  respect  to  the  satisfaction  of  any  Abuse Claim.

**E.**      **~~F.~~ Defenses**.  All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides ~~at trial.  The defenses available to a~~(which may include any Non-Settling Insurance Company ~~that has agreed to provide a defense shall have all the same defenses as the Settlement Trust and/or the Debtors~~) at trial.

**F.**      **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount against the Settlement Trust equal to the settlement or final judgment obtained in the tort system, less any payments actually received and retained by the Abuse Claimant, *provided that,* all amounts of such Allowed Claim Amount in excess of the Maximum Matrix Value in the application ~~tier set forth in the Claims Matrix~~ shall be subordinate and junior in right to the prior payment in full of all Direct Abuse Claims as liquidated under these TDP (excluding Article XII hereof).  By way of example, for an Abuse  Claimant  asserting  tier  one  abuse,  the  maximum  payment  that  Abuse  Claimant  can recover  from  the  Settlement  Trust  before  all  other  Direct  Abuse  Claims  are  paid  in  full  is $2,700,000 (the Maximum Matrix Value in tier one).  For the avoidance of doubt, the limit on the Settlement Trust Liability under this Article XII.D shall not apply or inure to the benefit of any Non-Settling Insurance Company.

**G.**      **Payment of Judgments by the Settlement Trust**.  Subject to Articles XII.F and XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these ~~CAP~~TDP as the

Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the Protected Party's liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth in Article IX.E above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any Supplemental Payment Percentage as determined by the Settlement Trust.

<div align="center">

**ARTICLE XIII**
**MISCELLANEOUS PROVISIONS**

</div>

**A.** ~~Non-Binding Effect of Settlement Trust and/or Litigation Outcome~~. ~~Notwithstanding any other provision of these CAP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.~~

**A.** ~~B.~~ **Amendments**.  Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these ~~CAP~~TDP, without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to preserve the value of assets of the Settlement Trust.  Nothing herein is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to these ~~CAP~~TDP.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend these ~~CAP~~TDP to provide for materially different treatment for Abuse Claims including the Claims Matrix and Scaling Factors set forth in Article VIII.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC may amend the form of release without the consent of Reorganized BSA or remove the requirement of a release in connection with an Expedited Determination.

**B.** ~~C.~~ **Severability**.  Should any provision contained in these ~~CAP~~TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these ~~CAP~~TDP.

**C.** ~~D.~~ **Offsets**.  The Settlement Trust shall have the right to offset or reduce of the Allowed Claim Amount of any Allowed Abuse Claim on a dollar for dollar basis based on any amounts paid or reasonably likely to be paid to the holder of such Claim on account of such Claim from any source other than the Settlement Trust.

**D.** ~~E.~~ **Governing Law**.  Administration of these ~~CAP~~TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII.

<div align="center">

23

</div>

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 6/10/2021 6:05:21 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Claims Allowance Procedures 06062021-v3 (BSA Comments 6.8.21) (002).docx | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/64089001/1 | |
| **Changes:** | |
| Add | 189 |
| Delete | 153 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 2 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 352 |

BSA-PLAN_00551973

**SA 2290**

COUNTY OF COOK       )
                           ) SS

STATE OF ILLINOIS      )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOHN DOE 4, ) | |
| ) | |
|     Plaintiff, ) | **TRIAL BY JURY** |
| ) | **DEMANDED** |
| v. ) | 2018 L 211 |
| ) | |
| BOY SCOUTS OF AMERICA, a congressionally ) | |
| chartered corporation, authorized to do business in Illinois, ) | |
| CHICAGO AREA COUNCIL, INC. BOY SCOUTS ) | |
| OF AMERICA, and ) | |
| CHICAGO AREA COUNCIL, BOY SCOUTS OF ) | |
| AMERICA, INC., ) | |
| ) | |
|     Defendants. ) | |

**<u>PLAINTIFF JOHN DOE 4'S FIRST AMENDED COMPLAINT</u>**

NOW COMES Plaintiff, JOHN DOE 4, by and through his attorneys in this regard,

Hurley McKenna & Mertz, P.C. and as his First Amended Complaint Against Defendants BOY

SCOUTS OF AMERICA, a congressionally charted corporation, and CHICAGO AREA

COUNCIL, INC. of the BOY SCOUTS OF AMERICA, he states as follows:

<u>**Allegations Specific to Boy Scouts of America**</u>

    1.     The BOY SCOUTS OF AMERICA (hereinafter "BSA") is the largest youth

organization in the United States with approximately five million members.  BSA was chartered

in 1910 by an act of Congress.  An estimated 20% of American boys have had contact with

Scouting either as members or by attending Scout functions.

    2.     Throughout its one hundred and three year history, the BSA has consistently held

itself out to the public as a "moral and safe" environment for boys to participate in healthy

<div align="center">1</div>

JTX-2911

outdoor activities and to be given proper guidance and instruction. Millions of parents and Scouts have placed their trust in the BSA.

3. Paradoxically, the BSA promotes the wholesomeness of its programs while knowing that since the 1920's it has been secretly removing Scoutmasters for child sexual abuse at an alarming rate, which in the 1970's, reached an average of one every three days. Its own records demonstrate that it has long known that "Scouting" attracts pedophiles in large numbers and that Scouts, far from being safe, are at heightened risk of sexual abuse by child molesters.

4. The danger of pedophiles infiltrating Scouting continued through the 1980s and continues today.

5. Defendant, BOY SCOUTS OF AMERICA is a congressionally chartered corporation, authorized to do business in Illinois.

6. Co-Defendant, Chicago Area Council is an Illinois not-for-profit corporation that organizes Scouting events and maintains Scouting troops in Cook County.  The Chicago Area Council headquarters is located in the City of Chicago in Cook County, Illinois.

7. Troops are organized through entities known within BSA as "Chartering Organizations" or "Sponsoring Organizations."  These entities are usually community organizations, schools, or churches that serve as the sponsor for a Troop of Boy Scouts and typically provide space for the Troop to hold its meetings.

8. In this case, St. Louis de Montfort Church served as the "Chartering Organization" for Troop 1600 in Oak Lawn, Illinois.

9. Central to Scouting generally is the exploration of the outdoors, often through camping.

Highly Confidential

BSA-PLAN_01096405

**SA 2292**

10.     Boys participating in Scouting nearly always participate in overnight campouts through the organization often without the presence of their parents.

11.     In fact, Scouting promotes the formation of non-parental adult-child bonds as a way of developing from a boy to a man.

12.     DOE 4 participated in such campouts on a routine basis and, on those occasions, traveled with his Scout leaders to campgrounds without his parents.

13.     Since approximately 1919, BOY SCOUTS OF AMERICA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files (IV Files).

14.     The claimed purpose of the BOY SCOUTS OF AMERICA'S maintenance of the files is to keep sexual predators out of Scouting.

15.     Thomas Hacker was first placed in the IV files in 1970.

### Agency Over Local Councils

16.     BSA divides the United States into geographic territories known as Local Councils.

17.     BSA grants Local Councils charters, which gives each one jurisdiction over a prescribed geographical area.

18.     BSA prescribes each Local Council's geographic area.

19.     BSA requires each Local Council to operate in accordance with BSA Bylaws and the Rules and Regulations of BSA.

20.     Each Local Council operates at the pleasure of BSA and BSA may terminate a Local Councils' charter in any instances where BSA deems such action advisable in the interests of Scouting.

3

BSA-PLAN_01096406

**SA 2293**

21.     Further, BSA may revoke any Local Council's charter if the Local Council does not abide by the Bylaws and Rules and Regulations set forth by BSA.

22.     "Professional Scouters" are individuals employed either by the National Council or by Local Councils throughout the country.

23.     The CEO of each Local Council is known as the Scout Executive.

24.     During the time frame relevant to the Complaint, the Rules and Regulations for the Boy Scouts of America required each Local Council to select its Scout Executive from a list of candidates of commissioned Professional Scouters submitted by the national office of BSA.

25.     The Rules and Regulations required the Local Council scout executive to abide by the policies and procedures of BSA.

26.     Most, if not all professional scouters pay into a pension for Professional Scouters managed and maintained by BSA.

27.     BSA collects those pension payments.

28.     BSA administers the pension and benefits provided by the pension.

29.     Professional scouters also wear a Scout uniform on certain occasions.

30.     The Scouting uniform consists of a shirt with various patches and other insignia.

31.     The Scouting uniform is designed, manufactured, and sold by BSA and worn by professional scouters.

32.     Most, if not all, insignia is trademarked by BSA.

33.     Local Councils use literature created, copyrighted and published by BSA.

34.     The literature is integral in the administration of the Scouting program and includes, but is not limited to the following: a) the Boy Scout Handbook; b) the Scoutmaster Handbook; c) the Patrol Leader Handbook; and d) the Troop Committee Guidebook.

4

35.     Adult volunteers and boys that want to participate in Scouting must register and pay a fee to BSA.

36.     The adult application for adult volunteers is a form created and distributed to Local Councils by BSA.

37.     When a new troop forms within a council, the Troop must fill out a new troop application form.  This form is also created and distributed to Local Councils by BSA.

38.     In the 1980s and during the time frames relevant to this Complaint, when a new troop would form, the troop would submit the following to the Local Council: a) a new troop application; b) applications for each of the boys and the adults; c) fees for each adult and boy participating.

39.     In the 1980s and during the time frames relevant to this Complaint, the Local Council would then type up adult and youth rosters for the troop and then pass the rosters, applications, and fees on to BSA.

40.     Additionally, BSA required each Troop to re-register on an annual basis.

41.     Once again, the Local Council would gather applications and fees for any new volunteers or boys and pass those applications and fees on to BSA.

42.     Local Councils would also gather updated rosters for each Troop and pass those rosters on to BSA.

43.     BSA requires all adults and youth be registered with BSA and all adult and youth registrations are passed on to BSA by Local Councils in accordance with BSA's policies and procedures.

**Agency Over Troops, Committee Members, and Scoutmasters**

5

BSA-PLAN_01096408

**SA 2295**

44.     The Rules and Regulations of the Boy Scouts of America also give BSA the power to grant and revoke the charters of "local units" – Cub Scout packs and Boy Scout troops.

45.     Literature published by BSA dictates to the local units how the Scouting program must be run.

46.     For example, the Official Boy Scout Handbook outlines how boys advance through the Scouting program.

47.     The Handbook sets forth the requirements for obtaining merit badges, obtaining skill awards, and for advancing up the ranks of the program.

48.     The requirements for Eagle Scout are also set forth in the Handbook.

49.     Local Councils are not permitted to alter the advancement requirements set forth in the Boy Scout Handbook.

50.     In order to advance up the ranks of the Scouting, a Scout must abide by the BSA's Scout Law and honor the BSA's Scout Oath.

51.     Both the Scout Law and Scout Oath are either trademarked or copyrighted by BSA.

52.     Local Councils do not have their own Scout Law or Scout Oath: each are tenants of the national organization.

53.     During the timeframe of the abuse at issue in this case, in order to advance up the ranks of Scouting, a Scout must also have Scoutmaster conferences.

54.     BSA described the Scoutmaster conferences in its Scoutmaster Handbook, published during the timeframe of the abuse, as follows: "Counseling can be done anywhere – in camp, in a car, in a place of worship, at home, walking along the street.  What is important is that it be private.  That is, not overheard or interrupted."

6

BSA-PLAN_01096409

SA 2296

55.     The Scoutmaster Handbook also prescribes a number of other duties of the Scoutmaster: discipline, the holding of meetings, the earning of badges, wearing uniforms, camping techniques, safety, etc.

56.     Ultimately it is BSA, not the Local Councils or the Troops, that decides whether a volunteer is fit or unfit for Scouting.

57.     BSA retains the right to revoke any volunteer registration.

58.     BSA retains the right to deny any volunteer registration.

**Boy Scouts of America's Notice of Hacker's Predatory Tendencies.**

59.     On July 7, 1961, authorities in Indianapolis, Indiana arrested Scoutmaster Thomas Hacker for molesting boys during a scout camp out.

60.     After this arrest, Hacker was removed as Scoutmaster of his troop in Indianapolis.

61.     Hacker subsequently joined another troop in Indianapolis.

62.     Hacker was either asked to leave that troop or resigned.

63.     Hacker joined a third troop in Indianapolis in October of 1968.

64.     Between October of 1968 and February 26, 1970, Hacker served as Scoutmaster of his third troop in Indianapolis.

65.     On and prior to February 26, 1970, Thomas Hacker served as a Scoutmaster in a troop affiliated with the Central Indiana Council of the BOY SCOUTS OF AMERICA.

66.     On February 26, 1970, Frank Chase, a Scout Executive with the Central Indiana Council, notified BOY SCOUTS OF AMERICA that local authorities were conducting an investigation into Thomas Hacker.

67.     On February 26, 1970, Frank Chase wrote a letter to Earl Krall of the BOY SCOUTS OF AMERICA.

7

BSA-PLAN_01096410

SA 2297

68.     At the time of the letter, Earl Krall served as Director of Registration and Fulfillment Services of BOY SCOUTS OF AMERICA.

69.     On March 18, 1970, Earl Krall acknowledged receipt of Frank Chase's letter.

70.     On March 18, 1970, Earl Krall stated in response to Mr. Chase's letter that "we have placed this information in our file and have taken steps to have these names deleted from our records."

71.     On March 30, 1970, Indianapolis authorities arrested Hacker and charged him with assault and battery with intent to gratify sexual desires.

72.     The March 30, 1970 arrest led to an investigation in Indianapolis, made part of the public record, in which authorities identified 51 boys that were molested by Hacker.

73.     In the February 26, 1970 letter to Earl Krall, director of Registration & Fulfillment Services with the Boy Scouts of America, Frank Chase stated that Hacker "should not be allowed to register with the Boy Scouts of America at any time or any place."

74.     In its March 18, 1970 response letter, BSA requested the Central Indiana Council fill out and return confidential record sheets that would enable BOY SCOUTS OF AMERICA to identify Mr. Hacker if he attempted to register in the future.

75.     The Central Indiana Council completed a "Confidential Record Sheet" on or about June 8, 1970.

76.     The Central Indiana Council returned the "Confidential Record Sheet" to the BOY SCOUTS OF AMERICA.

77.     The "Confidential Record Sheet" indicates that Mr. Hacker was "arrested for homosexual activity with many boys both in Scouting and through the school in which he was teaching."

8

BSA-PLAN_01096411

SA 2298

78.     On June 8, 1970, Defendant BSA placed Hacker on the ineligible volunteer list for his arrest "for homosexual activity with many boys in Scouting and through the school in which he was teaching."

79.     On June 15, 1970, in a letter to Frank Chase, BSA's Earl Krall acknowledged that he placed Hacker's information in the ineligible volunteer file.

80.     Defendant BSA knew that Hacker was a pedophile and predator that posed a threat to Scouts, as of February 26, 1970.

81.     On October 18, 1971, Hacker was arrested for a third time for sexual misconduct.

82.     On or about October 18, 1971, Hacker was arrested in Cook County for taking indecent liberties with a child.

83.     At the time of his October 18, 1971 arrest, Hacker was volunteering in a troop associated with the Northwest Suburban Council of the Boy Scouts of America.

84.     On October 27, 1971, Arthur Allen, Scout Executive of the Northwest Suburban Council of the Boy Scouts of America, wrote a letter to Paul Ernst of BSA.

85.     At the time the aforementioned letter was written, Paul Ernst was Director of Registration and Membership of the Boy Scouts of America.

86.     Allen's October 27, 1971 letter informed BSA that Hacker had been arrested and that prior to that arrest, Hacker had re-registered with BSA under a different name: Thomas Edwards.

87.     The October 27, 1971 letter clarified for the benefit of BSA that Thomas Hacker and Thomas Edwards were the same person.

9

BSA-PLAN_01096412

SA 2299

88.     Correspondence from Northwest Suburban Council of the Boy Scouts of America to Defendant BSA stated that Mr. Hacker was arrested on charges of taking indecent liberties with a child.

89.     Correspondence from Northwest Suburban Council to BSA included a newspaper clipping that outlined the charges against Thomas Hacker.

90.     The aforementioned correspondence also indicated that the Council learned that Mr. Hacker was previously active in Scouting in Central Indiana.

91.     On November 2, 1971, BSA's Paul Ernst acknowledged receipt of the letter from Northwest Suburban Council of the BOY SCOUTS OF AMERICA and wrote back to the Council.

92.     In his November 2, 1971 letter, BSA's Paul Ernst indicated that "under no circumstances do we want [Mr. Hacker] registered in Scouting."

93.     BSA was, again, warned of the dangers posed to children by Thomas Hacker via the October 27, 1971 letter from the Northwest Suburban Council of the Boy Scouts of America.

94.     In addition to being deemed an "Ineligible Volunteer," Thomas Hacker was also discharged from Chicago Public Schools for molesting children in the late 1970s or early 1980s.

95.     Despite being in the ineligible volunteer files, despite being arrested three times for child molestation, and despite being discharged from Chicago Public Schools for molesting a child, Mr. Hacker became an active adult participant in Boy Scout Troop 1600 in the late 1970s or early 1980s.

96.     In a short time after volunteering for the Chicago Area Council's troop 1600, Hacker began acting as a merit badge counselor and later became the de facto Scoutmaster and committee chairman.

10

BSA-PLAN_01096413

SA 2300

97.     BOY SCOUTS OF AMERICA did not conduct a background check on Mr. Hacker at the time he began volunteering with the Chicago Area Council of the Boy Scouts of America.

98.     BSA did not perform any due diligence in investigating Hacker's references during his registration.

99.     BSA did not request references or gather any information about Hacker's background, criminal history, or qualifications to work with children either before or after he was formally listed as a committee member.

100.    Had BSA conducted any level of due diligence in reviewing Hacker's registration, it would have learned some or all of the following information: a) that Hacker had previously been banned from Scouting for child molestation; b) that Hacker had a criminal background stemming from his sexual abuse of Scouts and other youth; c) that Hacker had been terminated from various jobs for sexually abusing youth in his charge; d) that under no circumstances was Hacker fit to work with children.

101.    By 1984 at the latest, Hacker was registered with the Boy Scouts of America as an adult volunteer.

102.    Through his position as an adult volunteer with the Boy Scouts of America, Mr. Hacker gained access to many young boys and began molesting Scouts.

103.    Hacker met and gained access to Troop 1600 and the Plaintiff through his role as merit badge counselor, committee chairman and de facto Scoutmaster of the Troop.

104.    Hacker was, at various times material hereto, an employee, servant, volunteer, agent and/or apparent agent of Defendant BOY SCOUTS OF AMERICA.

11

105.    Between, at the latest, 1980 and 1988, Hacker routinely and repeatedly molested the Plaintiff and numerous other Scouts during various Scouting events, including campouts, trips, and troop meetings.

106.    In February of 1988, Thomas Hacker was arrested, charged and later convicted of five counts of aggravated criminal sexual assault against three Scouts.

107.    On April 15, 1988, The Illinois Department of Children and Family Services informed the BOY SCOUTS OF AMERICA that at least 34 boys were victims of child abuse at the hands of Thomas Hacker.  BOY SCOUTS OF AMERICA made no effort to locate and identify Hacker's victims.

### BSA's Knowledge of Pedophiles in Scouting

108.    Defendant BSA knew that Scouting was being used and exploited by child molesters to gain access to and gain the trust of Scouts, including Plaintiffs.  Yet, Defendant BSA did nothing to alter its Scouting program to effectively ameliorate the sexual abuse problem or to warn Charter Organizations, Scouts, Scouts' parents, other troop-level leaders or prospective Scouts and their parents prior to or during the timeframe of the Plaintiff's abuse.

109.    Since 1920, Defendant BSA knew that Scouting posed a danger to minor boys because it had actual knowledge that there had been a concrete, longstanding, consistent, and widespread problem of adult Scout leaders sexually abusing minor Scouts.

110.    IV Files that reflect child sexual abuse allegations against adult BSA volunteers are categorized by BSA as "Perversion" files.

111.    On information and belief, the BSA Perversion Files have predominantly constituted a majority or plurality of the total IV Files.

Highly Confidential

112.    Between 1920 and 1935, at least 1,000 child molesters—between 50–60 per year—were discovered and subsequently excluded from Scouting.  At least 1,200 Perversion files were created by BSA between 1965 and 1985.  However, the number of IV Perversion Files currently available significantly underrepresents the actual number of adult BSA volunteers that molested Scouts because Defendant BSA has destroyed IV Files for a variety of reasons, and more significantly because Scouts who have been abused, like many children, do not report the fact that they were sexually abused.

113.    In Illinois alone, BSA placed at least 67 Scout leaders in the Perversion Files between 1965 and 1985. These Scout leaders operated in various councils in Illinois; at least 20 of them were from Chicago.

114.    After 1988, BSA continued to learn of hundreds, if not thousands of instances of pedophiles infiltrating its ranks and abusing Scouts during Scouting events, during Troop meetings, and on campouts.

115.    BSA's post-occurrence files show the danger posed to children by an organization that promotes overnight camping trips without parents as integral to its program while simultaneously knowing child molesters target the program.

116.    Prior to, during, and subsequent to Plaintiffs' abuse, by and through the Perversion Files, Defendant BSA possessed a very detailed  knowledge base concerning the circumstances under which Scouts were sexually abused. The details of the sexual abuse of Scouts contained in the Perversion Files gave the BSA specific information about the ways in which the abuse occurred, how the sexual abuse was accomplished and that previously banned leaders would attempt to get back into Scouting to abuse other Scouts.

117.    Based upon this knowledge prior to and during Plaintiff's abuse, Defendants

13

BSA-PLAN_01096416

SA 2303

knew with certainty that at least some significant number of Scouts – including Scouts such as Plaintiff – would be molested by BSA Scouting volunteers each and every year.

**BSA's Knowledge of Pedophiles Changing Their Names and Regaining Access to Children**

118.   In addition to documenting numerous instances of childhood sexual abuse perpetrated by Scout leaders, the IV Files demonstrate BSA's historic knowledge and notice of pedophiles being barred from Scouting, but later re-entering under another name.

119.   For example, on November 4, 1965, the Clinton Valley Council of BSA, located in Pontiac, Michigan, reported to BSA's national headquarters that David Earl Clark, a volunteer, had been accused of molesting many Scouts within the troop.  BSA apparently placed David Earl Clark in its IV Files.

120.   Thereafter, Clark simply registered with a different last name – as David Johnson – and was able to re-register with the Scouts.

121.   David Earl Clark regained access to Scouting and subsequently molested Scouts, long after he was already a part of the IV files.

122.   BSA knew or should have known of the risk posed by volunteers changing their names on registration applications in order to avoid being detected.

**BSA's Knowledge of Pedophiles Avoiding Registration to Gain Access to Children**

123.   BSA knew or should have known the previously reported pedophiles would attempt to regain membership by avoiding registering with the local council or national organization.

124.   BSA had knowledge prior to Hacker's molestation of the Plaintiffs in the 1980s, that other pedophiles that had been banned from Scouting had successfully re-infiltrated the organization by simply avoiding registration.

14

BSA-PLAN_01096417

SA 2304

**BSA's Knowledge of Pedophiles Re-entering Scouting After Being Reported to BSA**

125.    The IV Files also document multiple instances of child molesters volunteering with Scouting, molesting a child, being reported to BSA, but then re-gaining entry into Scouting.

126.    For example, on June 11, 1971, the Scout Executive of the Boy Scouts of America, Crescent Bay Council, reported to BSA that leader Stephen D. Field should not be permitted to work with children due to his improper behavior with Scouts – behavior which included playing strip poker with boys.

127.    Yet, despite this notice, BSA allowed Stephen D. Field to participate as a volunteer with the Ventura County Council in the 1980s.  Mr. Field was subsequently charged with molesting a scout.

128.    BSA knew or should have known that its IV File system inadequately protected Scouts and that previously known pedophiles routinely re-entered Scouting.

**BSA's Knowledge of *Convicted* Pedophiles Registering with Scouting**

129.    In addition to knowing that pedophiles would either change their names, re-enter Scouting, or avoid registration with Scouting altogether, BSA knew that, historically, convicted pedophiles were able to register with Scouting.

130.    For example, Eugene Fred Burnett, served as Scoutmaster with the Delaware-Maryland-Virginia Council in the 1960s and early 1970s.

131.    Mr. Burnett had previous convictions and arrests for sexual abuse of children in 1957, 1958, 1959, and 1965.

132.    Mr. Burnett and numerous other scout leaders were able to register with BSA despite having past criminal convictions for sexual abuse of minors.

133.    These volunteers were able to register in Scouting because BSA failed to conduct

15

BSA-PLAN_01096418

**SA 2305**

any form of due diligence into their background.

### The IV Files Show BSA Exerted Control Over Which Adults Could Participate as Volunteers

134.   The IV Files further demonstrate BSA's control as principal over Troops and Local Councils because they demonstrate that BSA had the final word on which adults could volunteer.

135.   For example, there are numerous instances of BSA concluding that an adult could not volunteer because that adult had committed an act of sexual molestation upon a boy.

136.   However there are numerous other instances of BSA concluding that an adult could *continue* to volunteer despite that adult exhibiting abhorrent behavior towards children.

137.   For example, there are instances in which conduct such as sleeping in the nude with Cub Scouts and showing Cub Scouts pornography did not warrant excluding an adult from his volunteer position.

138.   Similarly, there are instances of BSA deciding that a particular act of molestation only warranted probation, rather than exclusion.

139.   Determining which acts warranted exclusion as a volunteer, which acts warranted probation, and which acts warranted no discipline at all show that BSA exerted control over the volunteer registration and approval process.

### BSA's Knowledge of Specific Targeting of Scout Troops for the Purpose of Molesting Children

140.   BSA also knew that its organizations, local councils, and most importantly, its troops, were specifically targeted by pedophiles in order to gain access to children.

141.   For example, in 1976, years before Hacker gained access to the Plaintiffs, three men joined the New Orleans Area Council and created a BSA Troop.  The men then routinely

16

BSA-PLAN_01096419

SA 2306

sexually abused the Scouts within the Troop.

142.   On November 24, 1976, the New Orleans local council notified BSA national of the abuse.

143.   BSA's own internal "Ineligible Volunteer Files" records it collected and maintained in secrecy for seventy years, reveal that Scouting is a pedophile "magnet" and that removed pedophiles were often able to re-enter Scouting in other locations. These files were maintained concerning paid Scout executives as well as adult "volunteers" active in Scout troops.

144.   BSA was aware that Scouting attracted pedophiles and that the distinct characteristics of Scouting render Scouts particularly susceptible to pedophiles.

145.   BSA knew or should have known that Scouting attracts pedophiles, in part, because: a) Scouting provides the pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes; b) Scouting provides opportunities for the pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him; c) the pedophile scout leader can, depending on the pedophile's age preference, volunteer for and be sure to have access only to boys of a certain age; d) BSA conditions boys to the concept of strict obedience to the Scout Leader, a bonding mechanism that pedophiles crave; e) BSA promotes the idea of secret ceremonies, rituals and loyalty oaths, all of which help facilitate the pedophile's efforts to keep his victims silent and compliant; f) At the time of the abuse, BSA conducted no due diligence on any of its volunteers.

146.   Despite knowing that: 1) banned members would try and re-register under different names; 2) banned members would attempt to avoid registration; 3) banned members easily re-entered Scouting; 4) convicted pedophiles were able to enter Scouting; and 5) Scouting organizations were specifically targeted by pedophiles, BSA did nothing to protect Scouts

17

BSA-PLAN_01096420

SA 2307

between 1980 and 1988.

## Special Relationship

147.    BSA stands in a special, fiduciary relationship with Scouts, including the Plaintiff and Scouts' families.

148.    BSA promotes itself as a wholesome, moral organization filled with wholesome, moral adult volunteers.

149.    BSA encourages emotionally intimate relationships between its youth and its adult leaders of youth.

150.    Specifically, during the timeframe in which the Plaintiff was molested, BSA encouraged adult leaders to counsel Scouts in private.

151.    BSA required such counseling sessions in order for Scouts to advance in rank.

152.    Scouting literature, promoted, sold, and authored by BSA, encourages Scouts to be loyal to their scout leaders and their Scoutmaster.

153.    BSA likewise encourages Scoutmasters to build "supportive, trusting relationship[s]" with troop members.

154.    The Scout Law required boys to be loyal and obedient to their Troop and its leader.

155.    Hacker used the intimate relationship, encouraged, promoted, and fostered by BSA, to gain the trust of the Plaintiff and molest the Plaintiff.

156.    As an organization promoting private counseling of troops and loyalty to leaders, BSA stood in a special and fiduciary relationship with the Plaintiff.

157.    As an organization that knew boys would be loyal to their leaders, BSA stood in a special and fiduciary relationship with the Plaintiff.

18

BSA-PLAN_01096421

SA 2308

**Facts Relevant to Punitive Damages**

158.     At all times relevant to this Complaint, as detailed above, BSA knew of the serious problem of adult volunteers, leaders, and Scouts sexually abusing minor Scouts.

159.     In the years prior to the abuse of Plaintiff, BSA received thousands of reports around the country of adult leaders sexually abusing minor Scouts.

160.     In response to those reports and complaints, BSA employed a public relations department to handle negative media exposure.

161.     Instead of addressing the problem by informing parents and Scouts of the issue, or by implementing safety programs to prevent abuse, BSA instead concealed the problem by employing a public relations department to combat negative stories about sexual abuse in Scouting.

162.     BSA employed a number of individuals in its public relations department, including Barclay Bollas.

163.     BSA failed to inform its own public relations department, including Bollas, of the seriousness of the problem and, instead, concealed the issue from all but a select few high-ranking employees.

164.     At the time Barclay Bollas worked as head of public relations, he knew very little of the Ineligible Volunteer Files, had never seen a file, and knew nothing about the scope of the files.

165.     Nevertheless, Bollas actively worked to counter negative publicity when reports of sexual abuse of Scouts arose throughout the country.

166.     When negative publicity arose involving the sexual abuse of Scouts, Bollas would author and issue a "News Alert" memorandum that included the following caption:

19

BSA-PLAN_01096422

**SA 2309**

 **NEWS ALERT**

167.    The continued public relations effort to hide the problem of child molestation in Scouting successfully concealed the existence of the problem from parents and Scouts, including Plaintiffs.

168.    By February of 1984, BSA knew or should have known that Thomas Hacker – a dangerous pedophile that had twice been reported to BSA as sexually abusive towards minors – had registered as an adult volunteer with Troop 1600 in Burbank, Illinois.

169.    BSA received a Charter Renewal Overflow page from Boy Scout Troop 1600 by February of 1984.

170.    The Charter Renewal Overflow page received by BSA identified an adult member as "Tom Hacker."

171.    BSA did not cross check the name "Tom Hacker" against its list of ineligible volunteers – a list which contained an ineligible volunteer file for Thomas Hacker.

172.    Paul Ernst, executive of the registration and subscription department of the Boy Scouts of America, was in charge of maintaining the ineligible volunteer files between 1971 and approximately 1993.

173.    During his time as executive of the registration and subscription department of the Boy Scouts of America, Ernst and BSA had a policy to forego checking "multiple registers."

174.    BSA and Ernst maintained this policy despite knowledge that "people did cheat" and register as multiple registers to avoid detection.

175.    BSA claims that it did not check multiple registers because it did not have the

20

BSA-PLAN_01096423

SA 2310

people and resources necessary to check multiple registers.

176.   Upon information and belief, at the time the abuse in this case occurred, BSA had vast resources such that BSA could have devoted sufficient resources to cross-checking adult volunteer names with those names on the list of ineligible volunteers.

177.   Instead of devoting any of its vast resources to cross-checking volunteer registrants with its list of ineligible volunteers, BSA devoted extensive resources to other departments including public relations, marketing, and executive salaries.

178.   Upon information and belief, BSA is a non-profit organization currently holding more than $1 billion in assets.

179.   The aforementioned facts, including BSA's efforts to conceal the nature of the problem through the efforts of its Public Relations department, rise to the level of willful and malicious disregard for the safety of Scouts around the country including Plaintiff.

180.   The aforementioned facts, including BSA's failure to devote resources to addressing the serious problem of childhood sexual abuse of Scouts, constitutes a reckless indifference for the safety of BSA's minor-members.

181.   The above-mentioned facts warrant an award of punitive damages against BSA.

**Allegations Specific to Chicago Area Council**

1.   Co-Defendant BOY SCOUTS OF AMERICA (hereinafter "BSA") is the largest youth organization in the United States with approximately five million members.  BSA was chartered in 1910 by an act of Congress.  An estimated 20% of American boys have had contact with Scouting either as members or by attending Scout functions.

2.   Throughout its one hundred and three year history, the BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy

21

BSA-PLAN_01096424

SA 2311

outdoor activities and to be given proper guidance and instruction. Millions of parents and Scouts have placed their trust in the BSA.

3.      Paradoxically, the BSA promotes the wholesomeness of its programs while knowing that since the 1940's it has been secretly removing Scoutmasters for child sexual abuse at an alarming rate, which in the 1970's, reached an average of one every three days. Its own records demonstrate that it has long known that "Scouting" attracts pedophiles in large numbers and that Scouts, far from being safe, are at heightened risk of sexual abuse by child molesters.

4.      Co-Defendant BSA is a congressionally chartered corporation, authorized to do business in Illinois.

5.      Defendants CHICAGO AREA COUNCIL, INC. BOY SCOUTS OF AMERICA and CHICAGO AREA COUNCIL, BOY SCOUTS OF AMERICA, INC. (hereinafter Chicago Area Council) is an Illinois not-for-profit corporation that organizes Scouting events and maintains Scouting troops in Cook County.  The CHICAGO AREA COUNCIL headquarters was located in the City of Chicago in Cook County, Illinois at the time of the abuse at issue in this case.

6.      Since approximately 1919, BOY SCOUTS OF AMERICA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files (IV Files).

7.      The claimed purpose of the BOY SCOUTS OF AMERICA'S maintenance of the files is to keep sexual predators out of Scouting.

8.      Thomas Hacker was first placed in the IV files in 1970.

22

Highly Confidential

BSA-PLAN_01096425

SA 2312

**BSA Requires Chicago Area Council to Operate in a Defined Region, Hire from BSA-selected staff, and Operate Under BSA's Bylaws, Charter, and Rules and Regulations.**

9.      BSA divides the United States into geographic territories known as Local Councils and the Chicago Area Council is one such council.

10.     BSA grants Local Councils charters each with jurisdiction over a prescribed geographical area.

11.     BSA prescribes each Local Council's geographic area.

12.     At the time of the abuse, BSA prescribed the Chicago Area Council's geographic region.

13.     This BSA-prescribed region generally consisted of Chicago and some of its surrounding suburbs.

14.     At the time of the abuse, from a membership perspective, the Chicago Area Council was the largest Council within BSA.

15.     BSA requires each Local Council, including the Chicago Area Council, to operate in accordance with BSA Bylaws and the Rules and Regulations of BSA.

16.     At the time of the abuse, the Chicago Area Council operated at the pleasure of BSA and, pursuant to its Charters and Bylaws, BSA could have terminated Chicago Area Councils' charter had BSA deemed such action advisable and in the interests of Scouting.

17.     "Professional Scouters" are individuals employed either by the National Council or by Local Councils throughout the country.

18.     The CEO of the Chicago Area Council during the abuse at issue was known as the Scout Executive.

Highly Confidential                                                    BSA-PLAN_01096426

**SA 2313**

19.     During the time frame relevant to the Complaint, the Rules and Regulations for the Boy Scouts of America required the Chicago Area Council to select its Scout Executive from a list of candidates of commissioned professional Scouters submitted by the national office.

20.     The Rules and Regulations required the Chicago Area Council scout executive to abide by the policies and procedures of BSA.

21.     Most, if not all professional scouters from the Chicago Area Council paid into a pension for professional scouters.

22.     BSA collects those pension payments.

23.     BSA administers the pension and benefits provided by the pension.

24.     Professional scouters from the Chicago Area Council also wore a Scout uniform on certain occasions.

25.     The Scouting uniform consists of a shirt with various patches and other insignia.

26.     The Scouting uniform is designed, manufactured (or contracted for manufacture), and sold by BSA and worn by professional scouters.

27.     Most, if not all, insignia is trademarked by BSA.

28.     The Chicago Area Council did not design or manufacture its own uniforms for professional scouters associated with the Chicago Area Council.

29.     The Chicago Area Council did not design or manufacture its own uniforms for Scouts associated with the Chicago Area Council.

30.     The Chicago Area Council used literature created, copyrighted and published by BSA.

Highly Confidential                                                            BSA-PLAN_01096427

**SA 2314**

31.     The literature is integral in the administration of the Scouting program and includes, but is not limited to the following: a) the Boy Scout Handbook; b) the Scoutmaster Handbook; c) the Patrol Leader Handbook; and d) the Troop Committee Guidebook.

32.     At various times, a "Scout Store" has existed on Chicago Area Council property.

33.     The Scout Store, however, is owned and operated by BSA.

34.     The Scout Store is staffed by a BSA employee.

35.     The revenue generated by the Scout Store goes to BSA with a percentage of it being paid back to Chicago Area Council.

36.     Adult volunteers and boys that want to participate in Scouting must register and pay a fee.

37.     The adult application for adult volunteers is a form created and distributed to the Chicago Area Council by BSA.

38.     When a new troop forms within the council, BSA required the Troop to fill out a new troop application form.  This form was also created and distributed to the Chicago Area Council by BSA.

39.     In the 1980s and during the time frames relevant to this Complaint, when a new troop would form within the Chicago Area Council's geographic region, the troop would submit the following to the Chicago Area Council: a) a new troop application; b) applications for each of the boys and the adults; c) fees for each adult and boy participating.

40.     In the 1980s and during the time frames relevant to this Complaint, the Chicago Area Council would then type up adult and youth rosters for the troop and then pass the rosters, applications, and fees on to BSA.

41.     Additionally, BSA required each Troop to re-register on an annual basis.

Highly Confidential

42.     Once again, the Chicago Area Council would gather applications and fees for any new volunteers or boys and pass those applications and fees on to BSA.

43.     The Chicago Area Council would also gather updated rosters for each Troop and pass those rosters on to BSA.

44.     BSA requires all adults and youth be registered and all adult and youth registrations for the Chicago Area Council's geographic region were passed on to BSA by the Chicago Area Council in accordance with BSA's policies and procedures.

**Chicago Area Council's Notice of Hacker's Predatory Tendencies.**

45.     On July 7, 1961, authorities in Indianapolis, Indiana arrested Hacker for molesting boys during a scout camp out.

46.     After this arrest, Hacker was removed as Scoutmaster of his troop in Indianapolis.

47.     Hacker subsequently joined another troop in Indianapolis.

48.     Hacker was either asked to leave that troop or resigned.

49.     Hacker joined a third troop in Indianapolis in October of 1968.

50.     Between October of 1968 and February 26, 1970, Hacker served as Scoutmaster of his third troop in Indianapolis.

51.     On and prior to February 26, 1970, Thomas Hacker served as a Scoutmaster in a troop affiliated with the Central Indiana Council of the BOY SCOUTS OF AMERICA.

52.     On February 26, 1970, Frank Chase, a Scout Executive with the Central Indiana Council, notified BOY SCOUTS OF AMERICA that local authorities were conducting an investigation into Thomas Hacker.

53.     On February 26, 1970, Frank Chase wrote a letter to Earl Krall of the BOY SCOUTS OF AMERICA.

26

BSA-PLAN_01096429

SA 2316

54.     At the time of the letter, Earl Krall served as Director of Registration and Fulfillment Services of BOY SCOUTS OF AMERICA.

55.     On March 18, 1970, Earl Krall acknowledged receipt of Frank Chase's letter.

56.     On March 18, 1970, Earl Krall stated in response to Mr. Chase's letter that "we have placed this information in our file and have taken steps to have these names deleted from our records."

57.     On March 30, 1970, Indianapolis authorities arrested Hacker and charged him with assault and battery with intent to gratify sexual desires.

58.     The March 30, 1970 arrest led to an investigation in Indianapolis, made part of the public record, in which authorities identified 51 boys that were molested by Hacker.

59.     In the February 26, 1970 letter to Earl Krall, director of Registration & Fulfillment Services with the Boy Scouts of America, Frank Chase stated that Hacker "should not be allowed to register with the Boy Scouts of America at any time or any place."

60.     In its March 18, 1970 response letter, BSA requested the Central Indiana Council fill out and return confidential record sheets that would enable BOY SCOUTS OF AMERICA to identify Mr. Hacker if he attempted to register in the future.

61.     The Central Indiana Council completed a "Confidential Record Sheet" on or about June 8, 1970.

62.     The Central Indiana Council returned the "Confidential Record Sheet" to the BOY SCOUTS OF AMERICA.

63.     The "Confidential Record Sheet" indicates that Mr. Hacker was "arrested for homosexual activity with many boys both in Scouting and through the school in which he was teaching."

27

BSA-PLAN_01096430

SA 2317

64.     On June 8, 1970, Defendant BSA placed Hacker on the ineligible volunteer list for his arrest "for homosexual activity with many boys in Scouting and through the school in which he was teaching."

65.     On June 15, 1970, in a letter to Frank Chase, BSA's Earl Krall acknowledged that he placed Hacker's information in the ineligible volunteer file.

66.     BSA knew that Hacker was a pedophile and predator that posed a threat to Scouts, as of February 26, 1970.

67.     On October 18, 1971, Hacker was arrested for a third time for sexual misconduct.

68.     On or about October 18, 1971, Hacker was arrested in Cook County for taking indecent liberties with a child.

69.     At the time of his October 18, 1971 arrest, Hacker was volunteering in a troop associated with the Northwest Suburban Council of the Boy Scouts of America.

70.     On October 27, 1971, Arthur Allen, Scout Executive of the Northwest Suburban Council of the Boy Scouts of America, wrote a letter to BSA's Paul Ernst.

71.     At the time the aforementioned letter was written, Paul Ernst was Director of Registration and Membership of the Boy Scouts of America.

72.     Allen's October 27, 1971 letter informed BOY SCOUTS OF AMERICA that Hacker had been arrested and, at the time of his arrest, had re-registered with the BOY SCOUTS OF AMERICA under a different name: Thomas Edwards.

73.     The October 27, 1971 letter clarified that Thomas Hacker and Thomas Edwards were the same person.

28

BSA-PLAN_01096431

SA 2318

74.     Correspondence from Northwest Suburban Council of the Boy Scouts of America to Boy Scouts of America stated that Mr. Hacker was arrested on charges of taking indecent liberties with a child.

75.     Correspondence from Northwest Suburban Council of the BOY SCOUTS OF AMERICA enclosed a newspaper clipping outlining the charges against Thomas Hacker.

76.     Correspondence also indicated that the Council learned that Mr. Hacker was previously active in Scouting in Central Indiana.

77.     On November 2, 1971, BSA's Paul Ernst acknowledged receipt of the letter from Northwest Suburban Council of the BOY SCOUTS OF AMERICA and wrote back to the Council.

78.     In his November 2, 1971 letter, BSA's Paul Ernst indicated that "under no circumstances do we want [Mr. Hacker] registered in Scouting."

79.     BSA was, again, warned of the dangers posed to children by Thomas Hacker via the October 27, 1971 letter from the Northwest Suburban Council of the Boy Scouts of America.

80.     In addition to being deemed an "Ineligible Volunteer," Thomas Hacker was also discharged from Chicago Public Schools for molesting children in the late 1970s or early 1980s.

81.     At the time of JOHN DOE 4's abuse, the Scout Executive for the Chicago Area Council knew of the existence of the IV Files.

82.     As agents of BSA, Chicago Area Council had actual and constructive notice of sexual abuse perpetrated by Hacker, as described in his IV File.

83.     Despite being in the ineligible volunteer files, despite being arrested three times for child molestation, and despite being discharged from Chicago Public Schools for molesting a

29

BSA-PLAN_01096432

SA 2319

child, Mr. Hacker became active in the CHICAGO AREA COUNCIL beginning in the late 1970s or early 1980s.

84.     In a short time after volunteering for the CHICAGO AREA COUNCIL's troop 1600, Hacker began acting as a merit badge counselor and later became the de facto Scoutmaster and committee chairman.

85.     CHICAGO AREA COUNCIL did not perform any due diligence in investigating Hacker's references, background, criminal history, or qualifications to work with children either before or after he was formally listed as a committee member.

86.     If CHICAGO AREA COUNCIL had conducted a background check when Hacker volunteered in the 1980s, the background check would have confirmed a felony conviction in approximately 1970 on charges involving sexual abuse and/or assault of a child.

87.     By 1984 at the latest, Hacker was registered with the Boy Scouts of America through the CHICAGO AREA COUNCIL.

88.     Through his position with the CHICAGO AREA COUNCIL, Mr. Hacker gained access to many young boys and began molesting children within the Council.

89.     Mr. Hacker met and gained access to all of the Plaintiffs through Hacker's role as merit badge counselor, committee chairman and de facto Scoutmaster with the CHICAGO AREA COUNCIL.

90.     Defendant Hacker was, at various times material hereto, an employee, servant, volunteer, agent and/or apparent agent of Defendant CHICAGO AREA COUNCIL.

91.     Between 1983 and 1986, Hacker routinely and repeatedly molested the Plaintiff during various Scouting events, including campouts, trips, and troop meetings.

Highly Confidential

BSA-PLAN_01096433

SA 2320

92.     At all times relevant to this Complaint, CHICAGO AREA COUNCIL owned a camp located in Twin Lake, Michigan, commonly known as "Camp Owasippe" or the "Owasippe Scout Reservation."

93.     Much of the molestation perpetrated by Hacker occurred at Camp Owasippe.

94.     In February of 1988, Thomas Hacker was arrested, charged and later convicted of five counts of aggravated criminal sexual assault against three Scouts.

95.     On April 15, 1988, The Illinois Department of Children and Family Services informed the BOY SCOUTS OF AMERICA that at least 34 boys were victims of child abuse at the hands of Thomas Hacker.

### Chicago Area Council's Knowledge of Pedophiles in Scouting

96.     Prior to Mr. Hacker's 1988 arrest, BSA and its local councils, including the CHICAGO AREA COUNCIL, knew for decades that sexual predators of boys had infiltrated Scouting.

97.     The CHICAGO AREA COUNCIL knew or should have known the danger that pedophiles presented to boy Scouts and either knew or should have known the danger that Hacker presented, but instead CHICAGO AREA COUNCIL ignored that danger and permitted Hacker and other pedophiles in Scouting to prey upon young boys, including Plaintiff.

98.     The CHICAGO AREA COUNCIL, through its Scout Executive, knew that BOY SCOUTS OF AMERICA maintained files known as the "Ineligible Volunteer Files."

99.     The CHICAGO AREA COUNCIL, through its Scout Executive, likewise knew that BOY SCOUTS OF AMERICA maintained the Ineligible Volunteer Files for the purpose of documenting child-abusers and keeping said abusers out of Scouting.

31

BSA-PLAN_01096434

SA 2321

100.    The CHICAGO AREA COUNCIL, through its Scout Executive, likewise knew that BOY SCOUTS OF AMERICA had a problem preventing pedophiles and predators from infiltrating the ranks of the Scouts.

101.    For those reasons, the CHICAGO AREA COUNCIL knew that any potential employees, volunteers, adult leaders, agents, or Scoutmasters needed to be cross-checked and vetted by either the CHICAGO AREA COUCNIL or the BOY SCOUTS OF AMERICA to determine whether or not they were qualified to work with youth.

102.    BSA's own internal "Ineligible Volunteer Files" records it collected and maintained in secrecy for seventy years, reveal that Scouting is a pedophile "magnet" and that removed pedophiles were often able to re-enter Scouting in other locations. These files were maintained concerning paid executives as well as "volunteers."

103.    CHICAGO AREA COUNCIL was aware that Scouting attracted pedophiles and that the distinct characteristics of Scouting render Scouts particularly susceptible to pedophiles.

104.    Specifically, Ken Walters, who at the time Hacker was arrested was the Director of Finance for the CHICAGO AREA COUNCIL had, prior to Hacker's arrest, dealt with approximately 10 instances of pedophiles entering Scouting and abusing Scouts.

105.    Through Mr. Walters and others, CHICAGO AREA COUNCIL knew of the problem of pedophiles targeting Scout troops for the purpose of abusing Scouts.

106.    BSA's "Ineligible Volunteer Files" contained a file for Mr. Hacker opened in 1970, yet the CHICAGO AREA COUNCIL permitted Mr. Hacker to register as a volunteer and/or employee in the 1980s and, thereafter, participate as an active leader in Scouting.

107.    CHICAGO AREA COUNCIL knew or should have known that Scouting attracts pedophiles, in part, because: a) Scouting provides the pedophile access to boys alone and away

32

BSA-PLAN_01096435

SA 2322

from their parents in secluded settings like camp-outs and overnight hikes; b) Scouting provides

opportunities for the pedophile to seduce a boy by getting him in situations where the boy has to

change clothing or spend the night with him; c) the pedophile scout leader can, depending on the

pedophile's age preference, volunteer for and be sure to have access only to boys of a certain age;

d) CHICAGO AREA COUNCIL and BSA conditions boys to the concept of strict obedience to

the Scout Leader, a bonding mechanism that pedophiles crave; e) CHICAGO AREA COUNCIL

and BSA promote the idea of secret ceremonies, rituals and loyalty oaths, all of which help

facilitate the pedophile's efforts to keep his victims silent and compliant; f) At the time of the

abuse, neither CHICAGO AREA COUNCIL nor BSA conducted any due diligence or inquiry into

Hacker's background.

### Special Relationship Between Chicago Area Council and Plaintiff

108.    CHICAGO AREA COUNCIL stands in a special, fiduciary relationship with

Scouts, including the Plaintiffs.

109.    CHICAGO AREA COUNCIL promotes itself as a wholesome, moral

organization filled with wholesome, moral adult volunteers.

110.    Likewise, CHICAGO AREA COUNCIL promotes the ideals of Scouting.

111.    CHICAGO AREA COUNCIL encourages emotionally intimate relationships

between its youth and its youth leaders.

112.    Specifically, during the time frame in which the Plaintiffs were molested,

CHICAGO AREA COUNCIL encouraged adult leaders to counsel Scouts in private.

113.    CHICAGO AREA COUNCIL required such counseling sessions in order for

Scouts to advance in ranking.

114.    Scouting literature, promoted, sold, and authored by CHICAGO AREA

33

BSA-PLAN_01096436

SA 2323

COUNCIL, encourages Scouts to be loyal to their scout leaders and their Scoutmaster.

115.   CHICAGO AREA COUNCIL likewise encourages Scoutmasters to build "supportive, trusting relationship[s]" with troop members.

116.   Hacker used the intimate relationship, encouraged, promoted, and fostered by CHICAGO AREA COUNCIL, to gain the trust of the Plaintiffs and molest the Plaintiffs.

117.   As an organization promoting counseling of troops and loyalty to leaders, CHICAGO AREA COUNCIL stood in a special and fiduciary relationship with the Plaintiffs.

118.   As an organization that knew boys would be loyal to their leaders, CHICAGO AREA COUNCIL stood in a special and fiduciary relationship with the Plaintiffs.

## COUNT I – JOHN DOE 4 v. BOY SCOUTS OF AMERICA – NEGLIGENCE

1-181.  Plaintiff reasserts and realleges paragraphs 1 through 181 of the section of this First Amended Complaint captioned "Allegations Specific to Boy Scouts of America," as and for Paragraphs 1-181 of Count I of this First Amended Complaint at Law.

182.   BSA's "Ineligible Volunteer Files" contained a file for Mr. Hacker opened in 1970, yet he was able and permitted by BSA to register with the Chicago Area Council in the 1980s and was able to participate in Scouting.

183.   BSA knew or should have known that its "ineligible volunteers" system of keeping track of pedophiles infiltrating its ranks and attempting to eliminate them did not function as it was intended, was flawed, and in many cases ineffective.  Despite that knowledge, BSA did nothing to educate its Scouts and their parents of the ineffectiveness of the screening and tracking system and process.  BSA did nothing to educate or inform Scouts and their parents of the enormity of the pedophile problem, nor did BSA take action to correct its screening and/or education system.

Highly Confidential

BSA-PLAN_01096437

SA 2324

184.    At all times, Hacker was under certain direction, supervision and control of Defendant BSA and was otherwise its employee, servant, volunteer, Scoutmaster, agent and/or apparent agent.

185.    At all times, co-defendant Chicago Area Council was under the direction, supervision, and control of Defendant BSA and was otherwise its servant, agent and/or apparent agent.

186.    At all times, the Charter Organization, Troop Committee and Scoutmasters and Assistant Scoutmasters of Troop 1600 were under the direction, supervision, and control of Defendant BSA and were its servants, agents, and/or apparent agents.

187.    Hacker's work and duties for defendants BSA and Chicago Area Council included duties and activities in Cook County, Illinois.

188.    Prior to 1980, BSA ignored repeated warnings that Hacker was a pedophile.

189.    Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants' representations to parents and Scouts that the BSA was a moral and safe place for boys, Hacker enticed, induced, directed, coerced, and forced JOHN DOE 4 to engage in deviant sexual acts with him between 1983 and 1986.

190.    Hacker physically, mentally, and sexually abused JOHN DOE 4 between 1983 and 1986.

191.    JOHN DOE 4 was a registered scout during the time in which he was abused.

192.    Based upon BSA's knowledge of previous incidents involving pedophiles and its knowledge and information regarding pedophiles within its organization, BSA could reasonably foresee future incidents involving pedophile Scout leaders, volunteers, employees, agents, and/or apparent agents, including Hacker.

35

BSA-PLAN_01096438

SA 2325

193.    Defendant BSA owed a duty to Plaintiff JOHN DOE 4 to prevent known child molesters from serving as Scout leaders with access to children.

194.    Defendant, BSA breached this duty and was negligent in one or more of the following ways:

a.    Allowed Hacker to routinely be alone with Plaintiff JOHN DOE 4 for hours when it was reasonably foreseeable that Thomas Hacker would sexually abuse JOHN DOE 4;

b.    Failed to conduct any due diligence in checking the references of Thomas Hacker or his background when he registered with the Chicago Area Council;

c.    Failed to timely adopt policies and procedures to protect children;

d.    Failed to advise parents of statistical data available to BSA from the Ineligible Volunteer Files;

e.    Failed to advise parents that the Ineligible Volunteer File system of ejection of paid executives and volunteers, as the primary method of protecting Scouts from pedophiles, was ineffective;

f.    Carelessly or negligently maintained, reviewed, and updated the Ineligible Volunteer Files;

g.    Carelessly or negligently warned and/or failed to warn parents of information regarding adult Scoutmasters and their propensity to engage in inappropriate behavior with Scouts;

h.    Carelessly and/or negligently failed to communicate information regarding Scoutmasters, employees, volunteers, agents, and/or apparent agents to its operative branches throughout the United States;

i.    Allowed Hacker to register with the Chicago Area Council despite his history of child abuse and despite previously classifying him as an ineligible volunteer;

j.    Allowed Hacker to continue in his position as merit badge counselor, committee member, committee chairman, and de facto Scoutmaster;

k.    Allowed Hacker to continue as a Scouting volunteer;

l.    Allowed Hacker to volunteer without registering;

36

BSA-PLAN_01096439

SA 2326

m.   Failed to require its local councils to submit names of leaders, volunteers and employees for cross-checking with the Ineligible Volunteer Files;

n.   Upon learning of Thomas Hacker's criminal acts from the Central Indiana Council, failed to obtain sufficient information to properly document Hacker within the Ineligible Volunteer Files and bar him from further activities with Scouting;

o.   Upon learning of Thomas Hacker's criminal acts from the Central Indiana Council, failed to warn other local councils of the danger posed by Thomas Hacker;

p.   Upon learning of Thomas Hacker's criminal acts from the Northwest Suburban Council, failed to obtain sufficient information to properly document Hacker within the Ineligible Volunteer Files and bar him from further activities with Scouting;

q.   Upon learning of Thomas Hacker's criminal acts from the Northwest Suburban Council, failed to warn other local councils of the danger posed by Thomas Hacker;

r.   Failed to properly train local councils and chartering organizations in the vetting and registering of scout leaders;

s.   Failed to inform local councils and chartering organizations of the problem with pedophiles in Scouting;

t.   Hid the problem of pedophiles in Scouting from local councils, parents, Scouts, and other Scouting leaders;

u.   Failed to train troops and sponsoring organizations in the vetting and registering of scout leaders and volunteers;

v.   Failed to require troops and sponsoring organizations to register local leaders;

w.   Failed to inform and warn local councils of the IV Files, the existence of child molesters within the IV Files, and the importance of registering leaders so that they could be cross checked against the IV Files;

x.   Failed to inform and warn sponsoring organizations of the IV Files, the existence of child molesters within the IV Files, and the importance of registering leaders so that they could be cross checked against the IV Files;

y.   Failed to inform and warn Troops, Troop Committees, youth, or parents about the IV Files, the existence of child molesters within the IV Files, and the importance of registering leaders so that they could be cross checked against the IV Files;

37

BSA-PLAN_01096440

SA 2327

z.      Failed to implement procedures to guard against pedophiles changing their names and successfully re-registering in Scouting;

aa.     Failed to regularly, systematically and publicly report child molesters to the police after discovering a scout had been molested and thereby failed to deter future child molesters from targeting Scouts;

bb.     Failed to use past experience and information available to them in the IV files to learn that a large number of children are molested on campouts and thereafter use appropriate care to warn parents and protect Scouts at campouts;

cc.     Failed to use past experience and information available to them in the IV files to learn that a large number of children are molested by adult leaders and specifically Scoutmasters and assistant Scoutmasters and use appropriate care to warn charter organizations and troop committees about the importance of carefully screening adult leaders;

dd.     Failed to take precautions in the screening of adult volunteers when they knew or should have known that child molesters will change or alter their names to gain re-entry into the Scouting program;

ee.     Kept the IV files confidential and failed to share the information contained in those files with charter organizations or troop committees thereby depriving those entities of valuable information that would have assisted them in protecting Scouts;

ff.     Failed to follow the advice of law enforcement and improve their screening process for adult volunteers to ask for and obtain more identifying information from volunteers including but not limited to photos, driver's license numbers, social security numbers and references;

gg.     Repeatedly put known child molesters on probation from the Scouting program rather than reporting them to the police and thereby conveyed the message that Scouting was a safe place to molest children;

hh.     Exerted control over the CAC and the charter organizations and the local troop committees in virtually all aspects of the Scouting program by providing instruction books on virtually everything, but provided no assistance or guidance on the known problem of child molesters targeting Scouts all while being in possession of thousands of secret IV files;

ii.     Failed to collect any detailed information through the adult volunteer application process (including a variety of references, detailed information about past Scouting, employment history, residential history, social security number, driver's license, photographs, etc.) which would send a deterring signal to would-be child molesters that Scouting would conduct due diligence on their past;

BSA-PLAN_01096441

SA 2328

jj.     Failed to collect any detailed information through the adult volunteer application process (including a variety of references, detailed information about past Scouting, employment history, residential history, social security number, driver's license, photographs, etc.) which would send a deterring signal to would-be child molesters that Scouting would conduct due diligence on their past;

kk.     Failed to require Local Council's and/or Troop Committees to confirm that multiple registrants were, in fact, already registered with the BSA;

ll.     Failed to independently confirm that multiple registrants were, in fact, already registered;

mm.     Failed to check "multiple registers" against the IV Files;

nn.     Failed to check "re-registers" against the IV Files;

oo.     Failed to inform local councils and local troops that they should forward the names of "multiple registers" and "re-registers" to BSA for cross-checking against the IV Files;

pp.     Failed to allocate sufficient resources to the Registration Department so that it could check all multiple registers and re-registers;

qq.     Failed to supervise Hacker when Hacker was with children;

rr.     Voluntarily undertook to protect Scouts from child molesters but did so in a negligent fashion;

ss.     Voluntarily undertook to vet and screen volunteers but did so in a negligent fashion;

tt.     Voluntarily undertook to maintain a list of pedophiles and to prevent those pedophiles from re-entering Scouting but did so in a negligent fashion;

uu.     Failed to exercise reasonable care to control Hacker and prevent him from doing harm to JOHN DOE 4;

vv.     Was otherwise careless and/or negligent.

ww.     The BSA could reasonably foresee that one or more of the acts and omissions outlined in subparagraphs "a" through "vv" would lead to the sexual abuse of JOHN DOE 4.

Highly Confidential

BSA-PLAN_01096442

SA 2329

195.    BSA's acts and omissions, outlined in subparagraphs "a" through "tt" proximately caused and enabled Hacker to volunteer with Troop 1600 and molest the Scouts of Troop 1600, including JOHN DOE 4.

196.    As a direct and proximate result of the aforementioned actions by the Defendant, Plaintiff JOHN DOE 4 has suffered permanent injuries of a personal and pecuniary nature, and has been psychologically damaged and continues to be damaged psychologically and to experience mental anguish, humiliation and emotional and physical pain, suffering and distress.

197.    Further, as a result of the aforementioned sexual abuse and breach of trust, Plaintiff JOHN DOE 4 has suffered and will continue to suffer physical and emotional pain and dysfunction, and both economic and non-economic damages in an amount to be proved at trial.

198.    Because this abuse began when Plaintiff JOHN DOE 4 was a minor, Plaintiff JOHN DOE 4 suppressed and/or repressed the memories of this abuse.

199.    It was not until October of 2012 – when the release of Ineligible Volunteer Files became widely publicized – that Plaintiff JOHN DOE 4 discovered his injuries, that they were wrongfully caused by BSA, and became aware of his cause of action against Defendants.

200.    Plaintiff JOHN DOE 4 therefore did not discover that BSA acted negligently until October of 2012.

201.    Likewise, the nature of the injuries – mental and emotional damages caused by sexual abuse at a young age – are such that said injuries are not discovered until later in life.

202.    In this instance, the Plaintiff JOHN DOE 4 did not discover his injuries and that his injuries were wrongfully caused by BSA until October of 2012.

40

BSA-PLAN_01096443

SA 2330

203.   The nature of childhood sexual abuse makes disclosure of abuse less likely and more difficult.  It is an event over which most survivors feel great embarrassment, shame, and guilt.

204.   Feeling responsible for your own abuse is a common reaction of abuse survivors and can serve as a protective factor.  The social and psychological effects themselves carry shame, embarrassment, and often occupy the attention and resources of the survivor.

205.   These serve to prevent disclosure and many function to protect the survivor from full awareness of the impact of the experience of abuse that happened many years previous in their childhood.

206.   Most sexual abuse takes place in the context of an ongoing relationship between victim and offender where many or even most aspects of the relationship are viewed as positive to the victim.

207.   Most, but not all, offenders engage children in a "grooming process" whereby the child is gradually but systematically conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the abuse; and is made to feel a participant in his/her own abuse.

208.   Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections and identify vulnerable children; take efforts to use their authority, position or relationship with adults who would otherwise protect children to lull the adults into believing that their children are safe with the offender; and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

209.   People often blame themselves for their personal problems (e.g. health related risk behaviors such as drinking or risky sexual behaviors) and do not easily make a connection

41

BSA-PLAN_01096444

SA 2331

between a current problem and some event in the past which they have spent years trying to forget.

210.    The characteristics of the childhood sexual abuse, outlined above, delayed Plaintiff JOHN DOE 4 from discovering his cause of action and prevented Plaintiff JOHN DOE 4 from discovering his cause of action until October of 2012.

### BSA Also Fraudulently Concealed the Claims and/or Should be Equitably Estopped from Asserting a Statute of Limitations Defense.

211.    Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants' representations to parents and Scouts that the BSA was a moral and safe place for boys, Hacker enticed, induced, directed, coerced, and forced JOHN DOE 4 to engage in deviant sexual acts with him between 1983 and 1986.

212.    Hacker physically, mentally, and sexually abused JOHN DOE 4 between 1983 and 1986.

213.    After Hacker molested JOHN DOE 4, BSA hid its culpability by both making affirmative misrepresentations through its agents and by remaining purposefully silent.

214.    BSA hid its culpability by allowing its local council – the Chicago Area Council of the Boy Scouts of America – to make statements BSA knew were false.

215.    Because of the special relationship between BSA and the Plaintiff, BSA owed a duty to JOHN DOE 4 to disclose to JOHN DOE 4 the truth about how Hacker was able to re-enter Scouting after having been barred and placed in the IV files repeatedly.

216.    Because of the fiduciary relationship between BSA and JOHN DOE 4, BSA owed a duty to JOHN DOE 4 to disclose to JOHN DOE 4 its longstanding notice of the pedophilia problem in Scouting.

42

BSA-PLAN_01096445

SA 2332

217.   Because of the fiduciary relationship between BSA and JOHN DOE 4, BSA owed a duty to JOHN DOE 4 to disclose the fact that Hacker's information had previously been placed in the IV Files, but that Hacker had made his way back into Scouting.

218.   Because of the fiduciary relationship between BSA and JOHN DOE 4, BSA owed a duty to JOHN DOE 4 to disclose the fact that its IV Files were not sufficient to prevent sexual predators from entering Scouting.

219.   At all times relevant to this Complaint, BSA failed to disclose the truth about Hacker's prior history with the Scouts to JOHN DOE 4 and therefore breached its fiduciary duty to JOHN DOE 4.

220.   At all times relevant to this Complaint, instead of disclosing the truth, BSA hid and covered up its liability by making numerous statements downplaying the problem of child molestation in Scouting.

221.   The BOY SCOUTS OF AMERICA, through its employees, scout executives, scout leaders, agents, officials, attorneys, local council professional scouters, and members of the Registration Department, had actual knowledge that Hacker was a predator and pedophile, beginning in approximately March of 1970, through and including the present.

222.   The BOY SCOUTS OF AMERICA, through its employees, scout executives, scout leaders, agents, officials, attorneys, local council professional scouters and members of the Registration Department, had actual or constructive knowledge that Hacker sexually molested JOHN DOE 4 and other children throughout the 1980s.

223.   The BOY SCOUTS OF AMERICA hid this knowledge from its Scouts and parents of Scouts, including JOHN DOE 4 and his parents, from the time of the assaults up to October of 2012 when a Court required disclosure of the files.

Highly Confidential

BSA-PLAN_01096446

SA 2333

224.     After the BOY SCOUTS OF AMERICA learned that Thomas Hacker molested Chicago Area Council Scouts, the BOY SCOUTS OF AMERICA concealed the fact, in the 1970s, it had previously identified Hacker as child molester and/or abuser but still allowed him to register with the Chicago Area Council.

225.     Ken Walters, a director of finance and support services for Chicago Area Council of the BOY SCOUTS OF AMERICA, actively concealed the fact that Thomas Hacker's name was found within the Ineligible Volunteer Files long before the assaults that began in the early 1980s.

226.     Ken Walters was quoted in the Chicago Tribune as stating that "Obviously he's (referring to Thomas Hacker) not on that system…it would have come up."

227.     BSA stood by silently, never correcting Walters' misrepresentation.

228.     Likewise, Barclay Bollas, a spokesman for the BOY SCOUTS OF AMERICA, actively concealed the fact that Thomas Hacker's name was found within the Ineligible Volunteer Files long before the assaults that began in the early 1980s.

229.     In response to an inquiry after Hacker's arrest, as to whether Thomas Hacker was found within the Ineligible Volunteer Files, Barclay Bollas stated "we consider that list confidential."

230.     BSA internal memorandum within BSA's possession indicated that, at the time of his arrest, Hacker's primary role was that of Scoutmaster.

231.     Yet, immediately after his arrest and after doing no thorough investigation of how Hacker re-entered Scouts or his role with Troop 1600, BSA and the Chicago Area Council represented in public that Hacker "was not a Scoutmaster."

Highly Confidential

232.     In the years following Hacker's arrest, BSA continued to downplay the problem of sexual predators in Scouting.

233.     For example, Lea Sneath, national spokesman for BSA claimed that "until [pedophiles] get caught, there is virtually no way to identify them."

234.     In fact, BSA had already identified Hacker as a pedophile, but let him back into Scouting.

235.     In 1993, again, national spokesman for BSA Blake Lewis claimed that "there were no significant problems inside the Boy Scouts before 1985."

236.     In each of the years between at least 1971 and the date of the filing of this complaint, the BOY SCOUTS OF AMERICA has misrepresented and under-reported the true nature and number of predatory and pedophile scout leaders that have served BOY SCOUTS OF AMERICA and its local councils.

237.     The BOY SCOUTS OF AMERICA has had and presently do have a financial incentive to misrepresent and hide the true nature and scope of this problem of predatory and pedophile leaders, more particularly described below.

238.     For years, BOY SCOUTS OF AMERICA have carefully protected the Ineligible Volunteer Files and repeatedly tried to prevent lawyers representing victims from obtaining and accessing those files.

239.     Defendant BOY SCOUTS OF AMERICA actively misrepresented and concealed the fact that Thomas Hacker was a known pedophile at the time of his registration with the Chicago Area Council.

240.     BSA fraudulently concealed its culpability for the molestation of JOHN DOE 4 by: a. Claiming that Hacker "was not in the files;" b. Engaging in a media campaign to downplay

Highly Confidential

BSA-PLAN_01096448

SA 2335

Hacker's role as Scoutmaster; c. Engaging in a media campaign to downplay the problem of

pedophilia in Scouting; d. Failing to disclose the existence of Hacker's ineligible volunteer file to

the abused children and their parents; e. Failing to disclose to the abused children and their

parents, including JOHN DOE 4 and his parents, the fact that on two prior occasions, BSA had

placed Hacker in the ineligible volunteer files; f. Settling claims of other Scouts for confidential

sums and making said settlements subject to confidentiality provisions; g. Failing to disclose the

magnitude of the pedophile problem in Scouting; h. Failing to disclose to parents the problems of

pedophiles infiltrating Scouting; i. Failing to disclose their negligence to the abused children.

241.    Because of the Defendant's misrepresentation and concealment, JOHN DOE 4 (a)

was unaware of his claim when he turned 18; (b) did not know the BOY SCOUTS OF

AMERICA had done something wrong at any time, and because of the misrepresentation and

concealment of the BOY SCOUTS OF AMERICA, was otherwise not aware of his injuries or

the cause of his injuries.

### Separate Injury Caused by Fraudulent Concealment

242.    In addition to any injuries caused by the childhood sexual abuse, the fraudulent

concealment by the BSA proximately caused separate and distinct injuries to JOHN DOE 4.

243.    By fraudulently concealing its liability, BSA prevented JOHN DOE 4 from

receiving the mental health care he needed in order to recover from the abuse.

244.    By fraudulently concealing its liability, BSA caused further mental injuries or

exacerbated the mental injuries stemming from the childhood sexual abuse.

245.    By fraudulently concealing its liability, BSA caused further emotional damages or

exacerbated the emotional damages that stemmed from the childhood sexual abuse.

246.    By fraudulently concealing its liability, BSA's silence caused JOHN DOE 4 to

Highly Confidential

BSA-PLAN_01096449

SA 2336

withhold disclosing his abuse to friends and family and prevented JOHN DOE 4 from leading a healthy life.

247.    By fraudulently concealing its liability, BSA caused the Plaintiff to shoulder all of the guilt and shame associated with Hacker's molestation.

248.    By fraudulently concealing its liability, BSA increased the risk of harm to JOHN DOE 4 from abuse.

249.    The fraudulent concealment of the BSA caused a lost chance of JOHN DOE 4 to mitigate his damages from abuse.

250.    The fraudulent concealment by BSA caused additional further suffering by JOHN DOE 4.

251.    The fraudulent concealment by BSA prevented JOHN DOE 4 from getting the mental health care required and, in the absence of said care, JOHN DOE 4 engaged in dangerous behaviors.

252.    Had BSA promptly disclosed its liability, rather than covered-up its liability, JOHN DOE 4 would not have suffered problems with shame, depression, inability to have normal relationship and inability to trust.

253.    As more particularly described in Paragraphs 236-240, BOY SCOUTS OF AMERICA misrepresented and concealed material facts about the true nature of predatory and pedophile leaders within the BOY SCOUTS OF AMERICA.

254.    BOY SCOUTS OF AMERICA knew at the time the representations were made, and when the concealment occurred, that they were untrue.

255.    At no time did Plaintiff JOHN DOE 4 know that the representations made by the BOY SCOUTS OF AMERICA were untrue.

47

BSA-PLAN_01096450

256.    The BOY SCOUTS OF AMERICA intended and expected the representation to be acted upon by Plaintiff JOHN DOE 4 and his parents and by other victims of sexual abuse by a scout leader.

257.    BOY SCOUTS OF AMERICA intended Plaintiff JOHN DOE 4 and his parents to act upon the misrepresentation because it had financial incentive to induce Plaintiff and his parents to rely upon the misrepresentation.

258.    Specifically, if the BOY SCOUTS OF AMERICA were to disclose the true extent of predatory pedophile leaders as described above, collected in the Ineligible Volunteer Files, the membership in BOY SCOUTS OF AMERICA would drop substantially and the fees collected from said membership would significantly diminish.

259.    Similarly, given the BOY SCOUTS OF AMERICA specific knowledge that Hacker posed a threat to Scouts but was allowed to participate in Scouting, any disclosure of that information at the time of the 1988 arrest would likely have subjected BOY SCOUTS OF AMERICA to substantial liability.

260.    Accordingly, instead of disclosing said information and knowledge to parents, following Hacker's arrest, BOY SCOUTS OF AMERICA concealed and hid the information and made the misrepresentation outlined above.

261.    Plaintiff JOHN DOE 4 and his parents reasonably relied upon the representations of the BOY SCOUTS OF AMERICA in good faith and to their detriment.

262.    Specifically, before, during and after 1983 and 1986, Plaintiff JOHN DOE 4 and his parents detrimentally relied on the false statements and non-disclosures of the BOY SCOUTS OF AMERICA about predatory and pedophile leaders, including Hacker, serving the BOY SCOUTS OF AMERICA and Chicago Area Council.

48

263.   If the parents of Plaintiff JOHN DOE 4 were informed by Defendant prior to or around 1988 that the BOY SCOUTS OF AMERICA knew or reasonably should have known at that time about pedophile leaders working or volunteering for and/or on behalf of the Defendant, they would not have permitted Plaintiff JOHN DOE 4, their then minor son, to join or participate in the BOY SCOUTS OF AMERICA.

264.   At no time before the disclosure of the Ineligible Volunteer Files in October of 2012, did Plaintiff JOHN DOE 4 know, nor reasonably should have known that he was injured in any way, or that he had been the victim of any wrongful conduct on the part of Defendant BOY SCOUTS OF AMERICA.

265.   Plaintiff JOHN DOE 4 has been prejudiced by his reliance on the representations of the BOY SCOUTS OF AMERICA and fraudulent misrepresentation of the BOY SCOUTS OF AMERICA described above.

266.   As a result, the BOY SCOUTS OF AMERICA should be equitably estopped from asserting any statute of limitation defense.

WHEREFORE, Plaintiff JOHN DOE 4, by and through Plaintiff's attorneys, HURLEY McKENNA & MERTZ prays for compensatory damages against defendant BOY SCOUTS OF AMERICA in a sum in excess of $50,000.00, plus the costs of suit, and all other relief permitted by law.

### COUNT II – JOHN DOE 4 v. BOY SCOUTS OF AMERICA – WILLFUL AND WANTON MISCONDUCT

1-266.   Plaintiff reasserts and realleges paragraphs 1 through 266 of the section of this First Amended Complaint captioned "Allegations Specific to Boy Scouts of America," as and for Paragraphs 1-266 of Count I of this First Amended Complaint at Law.

267.   BSA's conduct, described in paragraphs 1-266 was willful and wanton and that

49

BSA-PLAN_01096452

SA 2339

willful and wanton conduct proximately caused Plaintiff's injury.

268.    The conduct constituted a course of action which showed an utter indifference to or conscious disregard for the safety of Scouts, including JOHN DOE 4.

269.    The conduct described in paragraphs 1-266 caused significant, long-lasting, permanent harm to JOHN DOE 4.

270.    The conduct described in paragraphs 1-266 warrants the award of punitive damages.

WHEREFORE, Plaintiff JOHN DOE 4, by and through Plaintiff's attorneys, HURLEY McKENNA & MERTZ prays for punitive damages against defendant BOY SCOUTS OF AMERICA in a sum in excess of $50,000.00, plus the costs of suit, and all other relief permitted by law.

## COUNT III – JOHN DOE 4 v. CHICAGO AREA COUNCIL - NEGLIGENCE

1-118.  Plaintiff reasserts and realleges paragraphs 1 through 118 of the section of this First Amended Complaint captioned "Allegations Specific to Chicago Area Council," as and for Paragraphs 1-118 of Count III of this First Amended Complaint at Law.

119.    At all times, Hacker was under certain direction, supervision and control of Defendant CHICAGO AREA COUNCIL and was otherwise its employee, servant, volunteer, Scoutmaster, agent and/or apparent agent.

120.    Hacker's work and duties for defendants CHICAGO AREA COUNCIL included duties and activities in Cook County, Illinois.

121.    Prior to 1980 and through 1988, CHICAGO AREA COUNCIL ignored repeated warnings that Hacker was a pedophile.

Highly Confidential

BSA-PLAN_01096453

SA 2340

122.     Using the power, authority, and trust of his positions as a CHICAGO AREA COUNCIL leader and availing himself of Defendants' representations to parents and Scouts that the CHICAGO AREA COUNCIL was a moral and safe place for boys, Hacker enticed, induced, directed, coerced, and forced JOHN DOE 4 to engage in deviant sexual acts with him between 1983 and 1986.

123.     Hacker physically, mentally, and sexually abused JOHN DOE 4 between 1983 and 1986.

124.     JOHN DOE 4 was a registered scout during the time frames of his abuse.

125.     Based upon CHICAGO AREA COUNCIL's knowledge of previous incidents involving pedophiles and its knowledge and information regarding pedophiles within its organization and within Scouting generally, CHICAGO AREA COUNCIL could reasonably foresee future incidents involving pedophile Scout leaders, volunteers, employees, agents, and/or apparent agents, including Hacker.

126.     Defendant CHICAGO AREA COUNCIL owed a duty to Plaintiff JOHN DOE 4 to prevent known child molesters from serving as Scout leaders with access to children.

127.     Defendant, CHICAGO AREA COUNCIL breached that duty and was negligent in one or more of the following ways:

a.     Allowed Hacker to routinely be alone with Plaintiff JOHN DOE 4 for hours when it was reasonably foreseeable that Hacker would molest JOHN DOE 4;

b.     Failed to conduct any inquiry into Hacker's background when he registered as an adult volunteer in Scouting;

c.     Failed to timely adopt policies and procedures to protect children;

d.     Failed to advise parents of statistical data available to CHICAGO AREA COUNCIL from the Ineligible Volunteer Files;

Highly Confidential

BSA-PLAN_01096454

SA 2341

e. Failed to advise parents that the Ineligible Volunteer File system of ejection of paid executives and volunteers, as the primary method of protecting Scouts from pedophiles, was ineffective;

f. Carelessly or negligently warned and/or failed to warn parents of information regarding adult Scoutmasters and their propensity to engage in inappropriate behavior with Scouts;

g. Carelessly and/or negligently failed to communicate information regarding Hacker to BSA's national office;

h. Failed to regularly, systematically and publicly report child molesters to the police after discovering a scout had been molested and thereby failed to deter future child molesters from targeting Scouts;

i. Failed to use past experience and information available to them in the IV files to learn that a large number of children are molested on campouts and thereafter use appropriate care to warn parents and protect Scouts at campouts;

j. Failed to use past experience and information available to them in the IV files to learn that a large number of children are molested by adult leaders and specifically Scoutmasters and assistant Scoutmasters and use appropriate care to warn charter organizations and troop committees about the importance of carefully screening adult leaders;

k. Failed to take precautions in the screening of adult volunteers when they knew or should have known that child molesters will change or alter their names to gain re-entry into the Scouting program;

l. Kept the existence of the IV files confidential and failed to share the information contained in those files with charter organizations or troop committees thereby depriving those entities of valuable information that would have assisted them in protecting Scouts;

m. Failed to follow the advice of law enforcement and improve their screening process for adult volunteers to ask for and obtain more identifying information from volunteers including but not limited to photos, driver's license numbers, social security numbers and references;

n. Allowed Hacker to register with the Chicago Area Council despite his history of child abuse and despite his previously being classified as an ineligible volunteer;

o. Allowed Hacker to continue in his position as merit badge counselor , committee member, committee chairman, and de facto Scoutmaster;

p. Allowed Hacker to continue as a Scouting volunteer;

52

BSA-PLAN_01096455

**SA 2342**

q.      Failed to submit names of leaders, volunteers and employees for cross-checking
        with the Ineligible Volunteer Files;

r.      Failed to properly train local troops and sponsoring organizations in the vetting
        and registering of scout leaders;

s.      Failed to inform local troops and sponsoring organizations of the problem with
        pedophiles in Scouting;

t.      Hid the problem of pedophiles in Scouting from parents, Scouts, and other
        Scouting leaders;

u.      Failed to require troops and sponsoring organizations to register local leaders;

v.      Failed to implement procedures to guard against pedophiles changing their names
        and successfully re-registering in Scouting;

w.      Failed to check "multiple registers" against the IV Files;

x.      Failed to check "re-registers" against the IV Files;

y.      Failed to inform local troops that they should forward the names of "multiple
        registers" and "re-registers" to CHICAGO AREA COUNCIL and/or BSA for
        cross-checking against the IV Files;

z.      Failed to supervise Hacker when Hacker was with children;

aa.     Voluntarily undertook to protect Scouts from child molesters but did so in a
        negligent fashion;

bb.     Voluntarily undertook to vet and screen volunteers but did so in a negligent
        fashion;

cc.     Voluntarily undertook to maintain a list of pedophiles and to prevent those
        pedophiles from re-entering Scouting but did so in a negligent fashion;

dd.     Failed to put in place safeguards to prevent child abuse from occurring at its
        camps, including Camp Owassipe;

ee.     Allowed Hacker to be alone with Plaintiff for hours at Camp Owassipe with no
        further supervision;

ff.     Failed to exercise reasonable care to control Hacker and prevent him from doing
        harm to JOHN DOE 4;

53

gg.    Was otherwise careless and/or negligent;

hh.    Chicago Area Council could reasonably foresee that one or more of the acts and omissions outlined in subparagraphs "a" through "gg" would lead to the sexual abuse of JOHN DOE 4.

128.    As a proximate result of one or more of the acts and omissions described above, Hacker was able to volunteer with Troop 1600 and sexually abuse the boys of Troop 1600, including JOHN DOE 4.

129.    As a direct and proximate result of the aforementioned actions by the Defendant, Plaintiff JOHN DOE 4 has suffered permanent injuries of a personal and pecuniary nature, and have been psychologically damaged and continues to be damaged psychologically and to experience mental anguish, humiliation and emotional and physical pain, suffering and distress.

130.    Further, as a result of the aforementioned sexual abuse and breach of trust, Plaintiff JOHN DOE 4 has suffered and will continue to suffer physical and emotional pain and dysfunction, and both economic and non-economic damages in an amount to be proved at trial.

131.    Because this abuse began when Plaintiff was a minor, Plaintiff has suppressed the memories of this abuse.

132.    It was not until October of 2012 – when the release of Ineligible Volunteer Files became widely publicized – that Plaintiff JOHN DOE 4 discovered his injuries, discovered that they were wrongfully caused, and became aware of his cause of action against Defendants.

133.    Plaintiff JOHN DOE 4 therefore did not discover that Chicago Area Council acted negligently until October of 2012.

134.    Likewise, the nature of the injuries – mental and emotional damages caused by sexual abuse at a young age – is such that said injuries are not discovered until later in life.

Highly Confidential

BSA-PLAN_01096457

SA 2344

135.    In this instance, the Plaintiff JOHN DOE 4 did not discover his injuries until October of 2012.

136.    The nature of childhood sexual abuse makes disclosure of abuse less likely and more difficult.  It is an event over which most survivors feel great embarrassment, shame, and guilt.

137.    Feeling responsible for your own abuse is a common reaction of abuse survivors and can serve as a protective factor.  The social and psychological effects themselves carry shame, embarrassment, and often occupy the attention and resources of the survivor.

138.    These serve to prevent disclosure and many function to protect the survivor from full awareness of the impact of the experience of abuse that happened many years previous in their childhood.

139.    Most sexual abuse takes place in the context of an ongoing relationship between victim and offender where many or even most aspects of the relationship are viewed as positive to the victim.

140.    Most, but not all, offenders engage children in a "grooming process" whereby the child is gradually but systematically conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the abuse; and is made to feel a participant in his/her own abuse.

141.    Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections and identify vulnerable children; take efforts to use their authority, position or relationship with adults who would otherwise protect children to lull the adults into believing that their children are safe with the offender; and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

55

BSA-PLAN_01096458

SA 2345

142.     People often blame themselves for their personal problems (e.g. health related risk behaviors such as drinking or risky sexual behaviors) and do not easily make a connection between a current problem and some event in the past which they have spent years trying to forget.

143.     The characteristics of childhood sexual abuse, outlined above, delayed Plaintiff JOHN DOE 4 from discovering his cause of action until October of 2012.

### Chicago Area Council Also Fraudulently Concealed the Claims and/or Should be Equitably Estopped from Asserting a Statute of Limitations Defense.

144.     Using the power, authority, and trust of his positions as a CHICAGO AREA COUNCIL leader and availing himself of Defendants' representations to parents and Scouts that the BSA and the CHICAGO AREA COUNCIL was a moral and safe place for boys, Hacker enticed, induced, directed, coerced, and forced JOHN DOE 4 to engage in deviant sexual acts with him between 1983 and 1986.

145.     Hacker physically, mentally, and sexually abused JOHN DOE 4 between 1983 and 1986.

146.     After Hacker molested Plaintiff JOHN DOE 4, CHICAGO AREA COUNCIL hid its culpability by both making affirmative misrepresentations and by standing by, purposefully silent.

147.     Because of the special relationship between CHICAGO AREA COUNCIL and the Plaintiff, JOHN DOE 4, CHICAGO AREA COUNCIL owed a duty to Plaintiff JOHN DOE 4 to disclose to Plaintiff JOHN DOE 4 the truth about how Hacker was able to re-enter Scouting after having been barred and placed in the IV files repeatedly.

148.     Because of the fiduciary relationship between CHICAGO AREA COUNCIL and

Highly Confidential

BSA-PLAN_01096459

SA 2346

the Plaintiff JOHN DOE 4, CHICAGO AREA COUNCIL owed a duty to Plaintiff JOHN DOE 4 to disclose to Plaintiff JOHN DOE 4 its longstanding notice of the pedophilia problem in Scouting.

149.    Because of the fiduciary relationship between CHICAGO AREA COUNCIL and the Plaintiff JOHN DOE 4, CHICAGO AREA COUNCIL owed a duty to Plaintiff JOHN DOE 4 to disclose the fact that Hacker had previously been placed in the IV Files, but made his way back into Scouting.

150.    Because of the fiduciary relationship between CHICAGO AREA COUNCIL and the Plaintiff JOHN DOE 4, CHICAGO AREA COUNCIL owed a duty to Plaintiff JOHN DOE 4 to disclose the fact that its IV Files were not sufficient to prevent sexual predators from entering Scouting.

151.    At all times relevant to this Complaint, CHICAGO AREA COUNCIL failed to disclose the truth about Hacker's prior history with the Scouts to Plaintiff JOHN DOE 4 and therefore breached its fiduciary duty to Plaintiff JOHN DOE 4.

152.    At all times relevant to this Complaint, instead of disclosing the truth, CHICAGO AREA COUNCIL hid and covered up its liability by making numerous statements downplaying the problem of child molestation in Scouting.

153.    The CHICAGO AREA COUNCIL, through its employees, scout executives, scout leaders, agents, officials, attorneys, and members of the Registration Department, had actual knowledge that Hacker was a predator and pedophile, beginning in approximately March of 1970, through and including the present.

154.    The CHICAGO AREA COUNCIL, through its employees, scout executives, scout leaders, agents, officials, attorneys, and members of the Registration Department, had

Highly Confidential

BSA-PLAN_01096460

SA 2347

actual or constructive knowledge that Hacker sexually molested Plaintiffs and other children in the mid-1980s.

155.    The CHICAGO AREA COUNCIL hid this knowledge from its Scouts and parents of Scouts, including Plaintiff JOHN DOE 4 and his parents, from the time of the assaults up to and including the present.

156.    After the CHICAGO AREA COUNCIL learned that Thomas Hacker molested its Scouts, the CHICAGO AREA COUNCIL concealed the fact, that in the 1970s, other councils and BSA had previously identified Hacker as child molester and/or abuser.

157.    Ken Walters, a director of finance and support services for CHICAGO AREA COUNCIL, actively concealed the fact that Thomas Hacker's name was found within the Ineligible Volunteer Files long before the assaults that began in the mid-1980s.

158.    Ken Walters was quoted in the Chicago Tribune as stating that "Obviously he's (referring to Thomas Hacker) not on that system…it would have come up."

159.    Co-Defendant BSA stood by silently, never correcting Walters' misrepresentation.

160.    Likewise, Barclay Bollas, a spokesman for the BOY SCOUTS OF AMERICA, actively concealed the fact that Thomas Hacker's name was found within the Ineligible Volunteer Files long before the assaults that began in the mid-1980s.

161.    In response to an inquiry after Hacker's arrest, as to whether Thomas Hacker was found within the Ineligible Volunteer Files, Barclay Bollas stated "we consider that list confidential."

Highly Confidential

BSA-PLAN_01096461

SA 2348

162.    BSA internal memorandum and communications with CHICAGO AREA COUNCIL indicated that, at the time of his arrest, Hacker's primary role was that of Scoutmaster.

163.    Yet, immediately after his arrest and after doing no thorough investigation of how Hacker re-entered Scouts or his role with Troop 1600, BSA and the CHICAGO AREA COUNCIL represented in public that Hacker "was not a Scoutmaster."

164.    In each of the years between at least 1971 and the date of the filing of this complaint, the BOY SCOUTS OF AMERICA and CHICAGO AREA COUNCIL has misrepresented and under-reported the true nature and number of predatory and pedophile scout leaders that have served BOY SCOUTS OF AMERICA and its local councils.

165.    The BOY SCOUTS OF AMERICA and CHICAGO AREA COUNCIL have had and presently do have a financial incentive to misrepresent and hide the true nature and scope of this problem of predatory and pedophile leaders, more particularly described below.

166.    For years, BOY SCOUTS OF AMERICA have carefully protected the Ineligible Volunteer Files and repeatedly tried to prevent lawyers representing victims from obtaining and accessing those files.

167.    Defendant CHICAGO AREA COUNCIL actively misrepresented and concealed the fact that Thomas Hacker was a known pedophile at the time of his registration with the Chicago Area Council.

168.    CHICAGO AREA COUNCIL fraudulently concealed its culpability by: a) Claiming that Hacker "was not in the files;" b) Engaging in a media campaign to downplay Hacker's role as Scoutmaster; c) Engaging in a media campaign to downplay the problem of pedophilia in Scouting; d) Failing to disclose the existence of Hacker's ineligible volunteer file

59

BSA-PLAN_01096462

SA 2349

to the abused children and their parents; e) Failing to disclose to the abused children and their

parents the fact that on two prior occasions, BSA had placed Hacker in the ineligible volunteer

files; f) Settling claims of other Scouts for confidential sums and making said settlements subject

to confidentiality provisions; g) Failing to disclose the magnitude of the pedophile problem in

Scouting; h) Failing to disclose to parents the problems of pedophiles infiltrating Scouting; i)

Failing to disclose their negligence to the abused children.

169.    Because of the Defendant's misrepresentation and concealment, Plaintiff JOHN

DOE 4 (a) was unaware of his claim when he turned 18; (b) did not know the CHICAGO AREA

COUNCIL had done something wrong at any time, and because of the misrepresentation and

concealment of the CHICAGO AREA COUNCIL, was otherwise not aware of his injuries or the

cause of his injuries.

### Separate Injury Caused by Fraudulent Concealment

170.    In addition to any injuries caused by the childhood sexual abuse, the fraudulent

concealment by the CHICAGO AREA COUNCIL proximately caused separate and distinct

injuries to Plaintiff JOHN DOE 4.

171.    By fraudulently concealing its liability, CHICAGO AREA COUNCIL prevented

JOHN DOE 4 from receiving the mental health care he needed in order to recover from the

abuse.

172.    By fraudulently concealing its liability, CHICAGO AREA COUNCIL caused

further mental injuries or exacerbated the mental injuries stemming from the childhood sexual

abuse.

173.    By fraudulently concealing its liability, CHICAGO AREA COUNCIL caused

further emotional damages or exacerbated the emotional damages that stemmed from the

Highly Confidential

BSA-PLAN_01096463

SA 2350

childhood sexual abuse.

174.   By fraudulently concealing its liability, CHICAGO AREA COUNCIL's silence caused JOHN DOE 4 to withhold disclosing his abuse to friends and family and prevented JOHN DOE 4 from leading a healthy life.

175.   By fraudulently concealing its liability, CHICAGO AREA COUNCIL caused the boys, including JOHN DOE 4, to shoulder all of the guilt and shame associated with Hacker's molestation.

176.   By fraudulently concealing its liability CHICAGO AREA COUNCIL increased the risk of harm to each plaintiff, including JOHN DOE 4, from abuse.

177.   The fraudulent concealment of the CHICAGO AREA COUNCIL caused a lost chance of JOHN DOE 4 to mitigate his damages from abuse.

178.   The fraudulent concealment by CHICAGO AREA COUNCIL caused additional further suffering by JOHN DOE 4.

179.   The fraudulent concealment by CHICAGO AREA COUNCIL prevented Plaintiff JOHN DOE 4 from getting the mental health care required and, in the absence of said care, JOHN DOE 4 engaged in dangerous behaviors.

180.   Had CHICAGO AREA COUNCIL promptly disclosed its liability, rather than covered-up its liability, Plaintiff JOHN DOE 4 would not have suffered problems with shame, depression, inability to have normal relationship and inability to trust.

181.   Had CHICAGO AREA COUNCIL promptly disclosed its liability, rather than covered-up its liability, Plaintiff JOHN DOE 4 would not have engaged in dangerous behavior.

182.   As more particularly described in Paragraphs 162 – 168, including subparagraphs (a) – (i) of Paragraph 168, CHICAGO AREA COUNCIL misrepresented and concealed material

61

BSA-PLAN_01096464

SA 2351

facts about the true nature of predatory and pedophile leaders within both BOY SCOUTS OF AMERICA and CHICAGO AREA COUNCIL.

183.    CHICAGO AREA COUNCIL knew at the time the representations were made, and when the concealment occurred, that they were untrue.

184.    At no time did Plaintiff know that the representations made by the CHICAGO AREA COUNCIL were untrue.

185.    CHICAGO AREA COUNCIL intended and expected the representation to be acted upon by Plaintiff and his parents and by other victims of sexual abuse by a scout leader.

186.    CHICAGO AREA COUNCIL intended Plaintiff and his parents to act upon the misrepresentation because it had financial incentive to induce Plaintiff and his parents to rely upon the misrepresentation.

187.    Specifically, if CHICAGO AREA COUNCIL were to disclose the true extent of predatory pedophile leaders as described above, collected in the Ineligible Volunteer Files, the membership in CHICAGO AREA COUNCIL would drop substantially and the fees collected from said membership would significantly diminish.

188.    Similarly, given CHICAGO AREA COUNCIL's specific knowledge that Hacker posed a threat to Scouts but was allowed to participate in Scouting, any disclosure of that information at the time of the 1988 arrest would likely have subjected CHICAGO AREA COUNCIL to substantial liability.

189.    Accordingly, instead of disclosing said information and knowledge to parents, following Hacker's arrest, CHICAGO AREA COUNCIL concealed and hid the information and made the misrepresentations outlined in Paragraphs 162-168.

190.    Plaintiff JOHN DOE 4 and his parents reasonably relied upon the representations

Highly Confidential

BSA-PLAN_01096465

SA 2352

of the CHICAGO AREA COUNCIL in good faith and to their detriment.

191.    Specifically, before, during and after 1983 and 1986, Plaintiff JOHN DOE 4 and his parents detrimentally relied on the false statements and non-disclosures of the CHICAGO AREA COUNCIL about predatory and pedophile leaders, including Hacker, serving the CHICAGO AREA COUNCIL and Boy Scouts of America.

192.    If the parents of JOHN DOE 4, were informed by Defendant prior to or around 1988 that the CHICAGO AREA COUNCIL knew or reasonably should have known at that time about pedophile leaders working or volunteering for and/or on behalf of the Defendant, they would not have permitted Plaintiff, their then minor son, to join or participate in the CHICAGO AREA COUNCIL.

193.    At no time before the disclosure of the Ineligible Volunteer Files in October of 2012, did Plaintiff JOHN DOE 4 know, nor reasonably should have known that he was injured in any way, or that he had been the victim of any wrongful conduct on the part of Defendant CHICAGO AREA COUNCIL.

194.    Plaintiff has been prejudiced by his reliance on the representations of the CHICAGO AREA COUNCIL and fraudulent misrepresentations of the CHICAGO AREA COUNCIL, described above.

195.    As a result, the CHICAGO AREA COUNCIL should be equitably estopped from asserting any statute of limitation defense.

WHEREFORE, Plaintiff JOHN DOE 4 by and through Plaintiff's attorneys, HURLEY McKENNA & MERTZ, pray for damages against Defendant CHICAGO AREA COUNCIL in a sum in excess of $50,000.00, plus the costs of suit, and all other relief permitted by law.

Highly Confidential

BSA-PLAN_01096466

SA 2353

By:  /s/ Evan M. Smola
     Evan M. Smola
     Attorney for Plaintiff

Christopher T. Hurley
Evan M. Smola
HURLEY McKENNA & MERTZ
33 North Dearborn Street, Suite 1430
Chicago, Illinois 60602
(312) 553-4900
(312) 553-0964 - fax
www.hurley-law.com

64

BSA-PLAN_01096467

SA 2354

COUNTY OF COOK      )
                              ) SS

STATE OF ILLINOIS      )

<div align="center">

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

</div>

| | | |
|---|---|---|
| JOHN DOE 4, | ) | **TRIAL BY JURY** |
| | ) | **DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2017 L 7900 |
| | ) | |
| BOY SCOUTS OF AMERICA, a congressionally | ) | |
| chartered corporation, authorized to do business in | ) | |
| Illinois, CHICAGO AREA COUNCIL, INC. BOY | ) | |
| SCOUTS OF AMERICA, and CHICAGO AREA | ) | |
| COUNCIL, BOY SCOUTS OF AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<div align="center">

**VERIFICATION PURSUANT TO SUPREME COURT RULE 222 (b)**

</div>

     Pursuant to Supreme Court Rule 222 (b), and under penalties of perjury, counsel for the

above named Plaintiff certifies that Plaintiff seeks money damages in excess of Fifty Thousand

and 00/100ths Dollars ($50,000.00).

                                    By: /s/ Evan M. Smola
                                         Attorneys for Plaintiff

HURLEY McKENNA & MERTZ, P.C.
Attorneys for Plaintiff
33 N. Dearborn Street
Suite 1430
Chicago, Illinois 60602
Telephone: (312) 553-4900
Atty. No: 41267

<div align="center">65</div>

BSA-PLAN_01096468

**SA 2355**

COUNTY OF COOK       )
                              ) SS

STATE OF ILLINOIS       )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOHN DOE 4,                   ) | |
|                               ) | **TRIAL BY JURY** |
|     Plaintiff,            ) | **DEMANDED** |
|                               ) | |
| v.                             ) | 2018 L 211 |

JOHN DOE 4,  )
                )     **TRIAL BY JURY**
    Plaintiff,  )     **DEMANDED**
                )
v.           )     2018 L 211
                )
BOY SCOUTS OF AMERICA, a congressionally  )
chartered corporation, authorized to do business in Illinois, )
CHICAGO AREA COUNCIL, INC. BOY SCOUTS  )
OF AMERICA, and  )
CHICAGO AREA COUNCIL, BOY SCOUTS OF  )
AMERICA, INC.,  )
                )
    Defendants.  )

### <u>JURY DEMAND</u>

NOW COMES the plaintiff JOHN DOE 4, by and through his attorney in this regard, Hurley McKenna & Mertz, P.C., and demands that this matter be tried before a jury of twelve persons.

                                /s/ Evan M. Smola          
                                One of the Attorneys for Plaintiff

HURLEY McKENNA & MERTZ, P.C.
Attorneys for Plaintiff
33 N. Dearborn Street, 1430
Chicago, Illinois 60602
(312) 553-4900
Atty. No. 41267

66

BSA-PLAN_01096469

**SA 2356**

**CHASAN & WALTON, LLC**
ANDREW M. CHASAN, ISB #2100
E-mail: andrew.chasan@chasanwalton.com
TIMOTHY C. WALTON, ISB #2170
E-mail: timwalton2000@hotmail.com
P.O. Box 1069
Boise, Idaho 83701
Phone: 208-345-3760
Fax: 208-345-0288

**DUMAS LAW GROUP, LLC**
GILION C. DUMAS, ISB #8176
E-mail: gilion@dumaslawgroup.com
3835 NE Hancock St., Ste. GL-B
Portland, OR 97212
Phone: 503-616-5007
Fax: 888-396-3226

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOE XX, JOHN DOE XXI, JOHN DOE XXII, ███████ ███████ and ███████ ███████ | Case No. |
| Plaintiffs, | **COMPLAINT** <br> *Fraud and Constructive Fraud* |
| v. | **Jury trial demanded** |
| BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to do business in Idaho, | |
| Defendants. | |

**JTX-2914**

**Page 1**      **COMPLAINT**

Highly Confidential

Plaintiffs allege:

## IDENTITY OF THE PARTIES

1.

Plaintiffs John Does XX-XXII's true names are not stated in this Complaint in order to protect them from further emotional harm because this Complaint makes allegations involving child sexual abuse.  Their true names will be provided to the Court as may be required by law.

2.

Plaintiff John Doe XX is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant Boy Scouts of America's ("Defendant BSA's") wrongful conduct.  At all times relevant to this Complaint, Plaintiff John Doe XX was a resident of Idaho.  Plaintiff John Doe XX is now a resident of Hawaii.

3.

Plaintiff John Doe XXI is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff John Doe XXI was a resident of Idaho.  Plaintiff John Doe XXI is now a resident of Idaho.

4.

Plaintiff John Doe XXII is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff John Doe XXII was a resident of Idaho.  Plaintiff John Doe XXII is now a resident of Idaho.

/ / /

**Page 2**          **COMPLAINT**

Highly Confidential

5.

Plaintiff ███ ███ is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff ███ ███ was a resident of Idaho.  Plaintiff John ███ ███ is now a resident of Idaho.

6.

Plaintiff ███ ███ is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff ███ ███ was a resident of Idaho.  Plaintiff ███ ███ is now a resident of Massachusetts.

7.

At all times relevant to this Complaint, Defendant BSA was a congressionally chartered foreign corporation incorporated and with its principal place of business in Texas, and operating in Idaho.  At all times relevant to this Complaint, Defendant BSA operated various outdoor, citizenship, service, and character building training programs ("Scouting") for boys in Idaho, including Plaintiffs in this case.

8.

At all times relevant to this Complaint, Defendant Corporation of the Presiding Bishop of the Church of Jesus Christ Of Latter-Day Saints was a foreign religious corporation sole of the Church of Jesus Christ of Latter-Day Saints ("LDS Church") incorporated and with its principal place of business in Utah, and operating in Idaho.

/ / /

/ / /

Page 3          COMPLAINT

BSA-PLAN_01097001

SA 2359

9.

At all times relevant to this Complaint, Defendant Corporation of the President of the Church of Jesus Christ of Latter-Day Saints and Successors was a foreign religious corporation of the LDS Church incorporated and with its principal place of business in Utah, and operating in Idaho.  The Defendant Corporation of the Presiding Bishop and Defendant Corporation of the President will be referred to collectively throughout this Complaint as "LDS Defendants." Defendant BSA and LDS Defendants will be referred to collectively throughout this Complaint as "Defendants."

10.

At all times relevant to this Complaint, Scouting was an integral part of the LDS Defendants' program for raising, teaching, and guiding boys and men within the LDS Church. Scouting was the official program for boys in the LDS Church, and many boys growing up in the LDS Church were required or strongly encouraged to join Scouting.  On information and belief, Scouting was an official part of the Aaronic Priesthood for young men under 21 in the LDS Church.  Men within the LDS Church were also either required or strongly encouraged to be Scout leaders as part of their religious growth and experience in the LDS Church.  Wards were the basic ecclesiastical unit of the LDS Church, and each ward was presided over by a Bishop.  The Bishop had many tasks including, on information and belief, selecting and supervising Scout leaders within the LDS Church.  On information and belief, every ward was supposed to maintain a Scout troop.

11.

At all material times to this Complaint, BSA was a vertically-integrated organization.  The national BSA organization was at the top of the structure.  BSA national established goals,

Page 4          COMPLAINT

BSA-PLAN_01097002

SA 2360

standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local

employees and volunteers to implement its goals, standards, and rules.  The lower levels of BSA

included sponsoring organizations, local councils, troop committees, and troops.  Many troops

were "sponsored" by the LDS Defendants through individual wards in the LDS Church.

Defendant BSA and LDS Defendants jointly agreed to control and operate Cub Scout and Boy

Scout packs, dens, and troops ("troops"), such as those troops Plaintiffs John Does XXI, XXII,

█████ █████ and █████ █████ were members of, in Idaho.  Defendant BSA selected, approved,

and/or retained adult volunteers to lead Scout troops, in positions such as Assistant Scoutmasters

or Scoutmasters ("Scout leaders").  In troops sponsored by LDS Defendants, Defendant BSA and

the LDS Defendants jointly selected, approved, and/or retained adult volunteers to act as Scout

leaders.  Defendant BSA possessed the right of final approval of adult volunteers as Scout leaders,

including adult volunteers that were also members of the LDS Church.  In the course of operating

Scout troops, Defendant BSA also had the right to control the physical details of Scout leaders'

performance of their duties on behalf of Defendant BSA.  In troops sponsored by both

Defendants, both Defendants had the right to control the physical details of Scouts leaders'

performance of their duties.   In performing these duties for Defendant, Scout leaders were acting

in the time and space limits of their agency with Defendants, were motivated at least in part by a

desire to serve Defendants, and these actions were of a type that they were required to do on

behalf of the Defendants.

## AMOUNT IN CONTROVERSY

12.

    The amount in controversy exceeds $75,000 for each Plaintiff, with the exact amounts

to be determined by a jury at trial.


**Page 5          COMPLAINT**

BSA-PLAN_01097003

SA 2361

### ALLEGATIONS SPECIFIC TO JOHN DOE XX

13.

Plaintiff John Doe XX realleges and incorporates by reference paragraphs 1-12.

14.

John Doe XX was born in 1959.

15.

At all times relevant to this Complaint, John Doe XX was a child involved in Scouting, in Scout Troop 156. John Doe XX was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

16.

When John Doe XX was approximately 12 or 13 years old, in or around 1971 or 1972, his Scoutmaster Lawrence Libey ("Libey") began sexually abusing him. Libey's sexual abuse of John Doe XX included fondling, oral sex, sodomy, and other acts of physical, sexual, and emotional abuse. The abuse occurred at Libey's residence when John Doe XX was there to work on merit badges and other Scouting activities, and on Scout camping trips. The abuse occurred dozens of times and lasted approximately two years.

### ALLEGATIONS SPECIFIC TO JOHN DOE XXI

17.

Plaintiff John Doe XXI realleges and incorporates by reference paragraphs 1-16.

18.

John Doe XXI was born in 1963.

/ / /

/ / /

**Page 6**          **COMPLAINT**

Highly Confidential

BSA-PLAN_01097004

SA 2362

19.

At all times relevant to this Complaint, John Doe XXI was a child involved in Scouting, in Scout Troop 20, by the LDS Defendants Boise Fifth Ward.  John Doe XXI was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

20.

One of leaders of Scout Troop 20 was Doug Bowen.  In or around approximately 1974 or 1975, Bowen sexually abused John Doe XXI during a Scout camping event, by kissing and fondling him, engaging in masturbation, and engaging in other acts of sexual and emotional abuse.

21.

As a Scout leader for Troop 20, Bowen abused at least two other Scouts, in addition to John Doe XXII, and attempted to abuse at least one other Scout, in the troop.

**ALLEGATIONS SPECIFIC TO JOHN DOE XXII**

22.

Plaintiff John Doe XXII realleges and incorporates by reference paragraphs 1-21.

23.

John Doe XXII was born in 1963.

24.

At all times relevant to this Complaint, John Doe XXII was a child involved in Scouting, in Scout Troop 20, by the LDS Defendants Boise Fifth Ward.  John Doe XXII was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

/ / /

Page 7          COMPLAINT

Highly Confidential

25.

One of leaders of Scout Troop 20 was Doug Bowen.  In or around approximately 1974 or 1975, Bowen sexually abused John Doe XXII during a Scout camping event, by kissing and fondling him multiple times, and engaging in other acts of sexual and emotional abuse.

26.

As a Scout leader for Troop 20, Bowen abused at least two other Scouts, in addition to John Doe XXI, and attempted to abuse at least one other Scout, in the troop.

**ALLEGATIONS SPECIFIC TO PLAINTIFF** ████ ████



27.

Plaintiff ████ ████ ("████ realleges and incorporates by reference paragraphs 1-26.

28.

████ was born in 1973.

29.

At all times relevant to this Complaint, ████ was a child involved in Cub Scouting, in a den that, on information and belief, was sponsored or operated by the LDS Defendants Caldwell Fourth Ward.  ████ was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

30.

One of leaders of ████ den was James Schmidt.  In or around approximately 1982, Schmidt sexually abused ████ at Schmidt's home by engaging in oral sex.  Schmidt's sexual abuse of ████ also included other acts of physical, sexual, and emotional abuse.

/ / /

/ / /

**Page 8**          **COMPLAINT**

Highly Confidential

31.

As a Scout leader for the Caldwell Fourth Ward, Schmidt abused at least two other Scouts, including Plaintiff ██ ██ during a similar time period.

**ALLEGATIONS SPECIFIC TO PLAINTIFF ██ ██**

32.

Plaintiff ██ ██ (" ██ realleges and incorporates by reference paragraphs 1-31.

33.

██ was born in 1972.

34.

At all times relevant to this Complaint, ██ was a child involved in Cub Scouting, in a den that, on information and belief, was sponsored or operated by the LDS Defendants Caldwell Fourth Ward. ██ was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

35.

One of leaders of ██ den was James Schmidt.  In or around approximately 1982-1983, Schmidt sexually abused ██ on many Scout camping trips, by fondling him while ██ slept in Schmidt's tent.  Schmidt's sexual abuse of ██ also included other acts of physical, sexual, and emotional abuse.  ██ also witnessed Schmidt sexually abuse other Scouts on the same camping trips.

36.

As a Scout leader for the Caldwell Fourth Ward, Schmidt abused at least two other Scouts, including Plaintiff ██ ██ during a similar time period.

/ / /

**Page 9**        **COMPLAINT**

Highly Confidential

### DEFENDANTS' KNOWLEDGE OF SEXUAL ABUSE IN SCOUTING

37.

Plaintiffs reallege and incorporate by reference paragraphs 1-36.

38.

Beginning as early as the 1910s, Defendant BSA regularly received reports and information from its local Councils and agents, of adult Scouting volunteers and professional Scouters sexually abusing Scouts.  Based on these reports, Defendant BSA created a file system then known as the "Red Flag" files — now the "Ineligible Volunteer" files ("IV files") — to attempt to track a variety of transgressions by adult volunteers, including volunteers that sexually abused Scouts.  Defendant BSA categorizes IV files according to the type of transgression committed, labeling IV files that contain allegations of child sexual abuse as "Perversion" files.  By 1972, approximately the year John Doe XX was sexually abused by his Scout leader, Defendant BSA had created thousands of Perversion IV files.  The number of IV Perversion files that still exists significantly underrepresents the actual number of IV Perversion files and of adult Scout leaders that molested Scouts for many reasons, including that Defendant BSA destroyed most of the IV files created before Plaintiffs were abused, and because most children did not report their sexual abuse.

39.

In addition to knowing about the decades of sexual abuse of Scouts by Scout leaders prior to Plaintiffs' abuse, Defendant BSA had specific notice by 1974 that, in Idaho alone, there were at least four Scout leaders who had been accused of sexually abusing Scouts or other youth prior to 1974.  Additional Scout leaders abused additional Scouts prior to 1974, though it is unclear at this time whether Defendant BSA received notice prior to 1974 of the additional abuse

**Page 10**          **COMPLAINT**

allegations.  All of these Scout leaders operated in various local councils operated by Defendant BSA in Idaho.

40.

Prior to Plaintiffs' abuse, LDS Defendants had specific notice by 1974 that, in Idaho, at least two LDS Scout leaders in LDS-sponsored troops had been accused of sexually abusing Scouts prior to 1974.

41.

Prior to Libey abusing John Doe XX, Defendant BSA knew Libey was sexually attracted to boys, was dangerous, and was ineligible to be an adult Scout volunteer.  Libey served as the Assistant Scoutmaster for Troop 156, sponsored by the Lewiston Elks Lodge, in around 1968 or 1969.  Within a month after Libey became the Assistant Scoutmaster, the troop went on a Scout camping trip.  Libey had a minor Scout sleep in his tent with him, alone.  The Scoutmaster of Troop 156 at the time did not approve and confronted Libey.  The Scoutmaster then reported the incident to the Elks Lodge board.  The board chose Libey to lead the troop instead of the Scoutmaster who had reported his concerns.  Shortly thereafter, Libey became the sole Scoutmaster of Troop 156.  As Scoutmaster of Troop 156, Libey repeatedly and severely sexually abused Plaintiff John Doe XX, another Scout between approximately 1968 and 1969, and another Scout between approximately 1972 and 1975.

42.

Both Defendant BSA and LDS Defendants were advised by no later than 1964 that Larren Arnold was a Scout leader sexually abusing boys in Scouting in Idaho.

/ / /

/ / /

**Page 11**        **COMPLAINT**

BSA-PLAN_01097009

SA 2367

43.

Prior to Schmidt abusing Plaintiffs ███ and ███ and no later than 1974, both Defendant BSA and LDS Defendants knew Schmidt was sexually attracted to boys, was dangerous, and was ineligible to be an adult Scout volunteer.

Prior to 1974, a LDS Church member reported to the Stake President of the Nampa Idaho, West Stake at the time, that he had heard reports that Schmidt was acting sexually inappropriately with Scouts at Scout camps.

During the spring and summer of 1977, Schmidt sexually abused at least six Scouts during Scout camping trips at Camp Morrison and/or Camp Tapawingo and other locations.

In June 1979, as documented in the Ineligible Volunteer File that BSA created on Schmidt, two of the Scouts who Schmidt abused during summer 1977, and the mother of one of the Scouts, reported Schmidt's 1977 abuse to the Scout Executive of the Ore-Ida Council, Rex Black.  Scout Executive Black reported these incidents to the national office of BSA.  In the spring or summer of 1979, Schmidt also abused a Scout who was a member of a Scout troop sponsored by the LDS Defendants Nampa Ninth Ward, for which Schmidt was an Assistant Scoutmaster or Scoutmaster.  In July 1979, Scout Executive Black asked Schmidt to stop volunteering at Scout camps, but did not completely bar Schmidt from volunteering or participating in Scouting.

In approximately the late summer or early fall of 1979, several parents of children involved in Scouting in the Nampa Third and Ninth Wards met and discussed Schmidt's abuse of their children.  Parents reported the abuse to the Bishop of the Nampa Ninth Ward and to the Stake President of the Nampa, Idaho West Stake.  The Bishop of the Nampa Third Ward also heard reports that Schmidt was sexually abusing Scouts and reported these allegations to the Stake

**Page 12**     **COMPLAINT**

Highly Confidential

President.  The Stake President asked Schmidt to cease Scouting activities in the wards and in the state.

Later in 1981, the Stake President received a report that Schmidt had sexually abused a child in a troop not sponsored by the LDS Defendants, and he notified Scout Executive Black. Scout Executive Black notified the BSA national office and reported that Schmidt was still an active Scout volunteer in the district.

In 1982, Scout Executive Black advised BSA national that he did not believe Schmidt should be removed from scouting.  BSA national took no steps to ensure that Schmidt was removed.

In 1982, Schmidt went on to volunteer with Troop 228, sponsored by the Caldwell Methodist Church, where he repeatedly abused one Scout and his cousin.  Also beginning in 1982, Schmidt sexually abused Plaintiffs ██ and ██ and at least one other Scout, participating in dens and troops sponsored by the LDS Defendants Caldwell Fourth Ward. Schmidt was also registered as a Scoutmaster for the LDS Defendants Caldwell Fifth Ward and with other Scout troops in the area.

In 1983, Schmidt was arrested for lewd conduct on a camping trip with a Scout from Troop 228.

Defendant BSA finally placed Schmidt in the Ineligible Volunteer files and prohibited from participating in Scouting, on March 17, 1983, after he had abused at least over a dozen Scouts.

/ / /

/ / /

/ / /

**Page 13**        **COMPLAINT**

Highly Confidential                                                        BSA-PLAN_01097011

**SA 2369**

44.

Based on the IV Files, by the time Plaintiffs joined Scouting, Defendant BSA knew that Scouting posed a danger to minor boys because there had been a longstanding, consistent, and widespread problem with adult Scout volunteers sexually abusing Scouts.

45.

Prior to and during Plaintiffs' abuse, on information and belief, LDS Defendants also knew that Scouting posed a danger to minor boys and knew of the risk that Scouts could be sexually abused by Scout leaders, including by LDS Church Scout leaders and in troops sponsored by LDS Defendants.

46.

Prior to Plaintiffs' abuse, Defendants knew that at least some significant number of Scouts such as Plaintiffs would be sexually abused by Scout leaders each and every year if Scouting remained structured as it was.  Defendants knew that child sexual abusers were using Scouting to gain access to and gain the trust of Scouts, including Plaintiffs, in order to abuse them.

**DEFENDANTS' FRAUD**

47.

Plaintiffs reallege and incorporate by reference paragraphs 1-46.

48.

Defendants invited boys, including Plaintiff, to participate in Scouting and enter into a commercial relationship, which included Scouts paying an annual membership fee and other fees, and making required purchases, in exchange for participating in Scouting.  Defendants also created a relationship of trust and confidence with Plaintiffs by inviting them to participate in Scouting and acting *in loco parentis* to Plaintiffs during Scouting activities such as camping and

**Page 14        COMPLAINT**

hiking trips.  Defendants also undertook responsibility for the safety of Scouts such as Plaintiffs

and delegated that responsibility to Scout volunteers acting under Defendants' control.

49.

Prior to and during Plaintiffs' abuse, Defendants actively concealed their knowledge that

abusers had been joining Scouting for decades to gain access to and sexually abuse boys, such as

Plaintiffs.  When Defendant BSA added a volunteer to the IV File list for sexually abusing boys,

Defendant BSA routinely instructed the Scout Executives and other local employees and

volunteers to keep secret the reason the volunteer had been dismissed and the existence of the IV

Perversion file system.  Many times, Defendant BSA then deleted, or instructed local employees

or volunteers to delete, the volunteer's name from unit applications and rosters.  Defendant BSA

also had a policy of limiting the use of the IV File system to a limited number of employees at

the BSA national office and certain local employees and volunteers.  Defendant BSA had no

policies requiring or encouraging its employees to disclose the existence or functioning of the IV

File system to the Scouting community and the general public, thereby limiting the use of the IV

File system to report allegations of wrongdoing by adult Scout volunteers.

50.

Defendants also actively concealed their knowledge that Libey and other Scout leaders in

Idaho, such as Arnold and Schmidt, had been accused of sexually abusing Scouts prior to

Plaintiffs' abuse.

51.

Prior to and during Plaintiffs' abuse, Defendants engaged in a decades-long public

relations campaign to represent to the government, the public, and the Scouting community,

including Plaintiffs and their families, that Scouting was a safe and morally upright program that

**Page 15**         **COMPLAINT**

Highly Confidential

was physically, emotionally, and spiritually beneficial for boys.  Defendants additionally represented that the adult Scout leaders, who were their agents, were appropriate and trustworthy mentors and leaders for young boys.

52.

Prior to and during Plaintiffs' abuse, Defendants conveyed the misrepresentation that adult Scout leaders were appropriate and trustworthy mentors and leaders by selecting, approving, and retaining certain men as adult Scout volunteers.  Defendants further conveyed the misrepresentation that Scouting was a safe and morally upright program for boys by failing to enact or enforce common sense child abuse policies, acknowledge the existence of child sexual abuse in Scouting, or otherwise amend the Scouting program to reduce the prevalence of child sexual abuse in Scouting.

53.

Prior to and during Plaintiffs' abuse, Defendant BSA also conveyed the aforementioned misrepresentations through explicit language, such as in newspaper, magazine, radio, and television advertisements; news articles and other media spots; BSA-published publications; and annual reports to Congress.  As examples, Defendant BSA made specific statements in various editions of the *Boy Scout Handbook* — the handbook that every Scout, including Plaintiffs, uses as a guide to his Scouting experience.  The Scout Oath was and remains: "On my honor I will do my best to do my duty to God and my country and to obey the Scout law; To help other people at all times; To keep myself physically strong, mentally awake, and morally straight."  The Scout law then describes the characteristics a Scout should have: "[a] Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."  This oath is recited by all Scouts, including adult Scout volunteers, at every troop meeting and other

**Page 16**        **COMPLAINT**

Highly Confidential

Scouting events.  These were ideals that both Scouts and Scout leaders were expected to follow.

In the 1965–1972 *Boy Scout Handbook*, the Scoutmaster is referred to as "a wonderful man" who

goes on hikes and goes camping with the Troop, and who "is the friend to whom you can always

turn for advice."  Defendant BSA, *Boy Scout Handbook*, at 94 (7th ed., 3rd printing, 1967).  The

1972-1978 *Boy Scout Handbook*, BSA stated, "[o]ver there watching things is your Scoutmaster.

He's a great guy.  He gives hours of his time to you and the troop.  And do you know why?

Mostly because he knows Scouting is important to his city and nation.  Besides, he is interested in

boys." Defendant BSA, *Boy Scout Handbook*, at 9 (8th ed., 2nd printing, 1973).  This edition also

told Scouts: "Your Scoutmaster is interested in and wants to know about you.  Only then can he

help you to have fun in Scouting. . . . . [Y]our Scoutmaster wants to know you better.  He wants

to see what you have to bring to the troop.  Soon after joining you will have your first personal

growth agreement conference.  Here you and your Scoutmaster will sit down for a talk.  Tell him

about yourself. . . .   Your Scoutmaster will probably ask about the things you like to do. . . .  Your

Scoutmaster will also want to know what things you do well." *Id*. at 82-83.  This partial list of

explicit misrepresentations is not exhaustive.

<div align="center">54.</div>

  LDS Defendants also promoted Scouting as a wholesome, safe, and beneficial program

for boys, by sanctioning Scouting as the official program for boys within the LDS Church.  By

selecting men within the LDS Church to serve as Scout leaders, LDS Defendants represented that

those men were trustworthy and morally upright leaders and mentors.  Young boys that were

members of the LDS Church were required or strongly encouraged to join Scouting as part of

their growth and development within the Church.  For example, in 1978, the president of the LDS

Church said that "This [BSA] is not an optional program...Scouting is no longer on trial.  It is an

**Page 17**   **COMPLAINT**

Highly Confidential

economically, socially, and spiritually sound program." The LDS Church also was the first

chartering organization within BSA.  In 1928, the LDS Church named Scouting as the activity

program for Deacons and teachers (boys ages 12-16 years old) in the LDS Church.  The LDS

Church and BSA continue to be closely integrated organizations — for example, the LDS Church

is the largest sponsor of Boy Scout troops in BSA, BSA has an entire LDS-BSA Relationships

department, and many key leaders within the LDS Church serve on BSA boards and in other

leadership positions in BSA.  This partial list of explicit misrepresentations is not exhaustive.

55.

Prior to and during Plaintiffs' abuse, Defendants also conveyed the aforementioned

misrepresentations through silence because Defendants never made any warnings to the Scouting

community, including Plaintiffs, their parents, and to the general public that adult Scout

volunteers were not always safe and trustworthy, that they might make sexual advances, or that

significant numbers of them had abused boys in the past.  This partial list of omissions is not

exclusive.

56.

Defendants made these misrepresentations with the intent of inducing Plaintiffs (and

other children similarly situated), Plaintiffs' parents (and other parents and guardians similarly

situated), and the public to rely on Defendants' misrepresentations so that they would continue to

trust Scouting and adult Scout volunteers, and continue to participate in Scouting.  Defendants

also made the misrepresentations with the intent of shielding Scouting from scrutiny to ensure

that children continued to join, to benefit Defendants' financial position and reputation.

/ / /

/ / /

**Page 18          COMPLAINT**

Highly Confidential

57.

Defendants knew the representations about Scouting, Scout leaders in general, and Libey, Arnold, and Schmidt, specifically, were false, or made the misrepresentations with reckless disregard for the truth.

58.

Defendants' knowledge of the dangers and prevalence of child sexual abusers in Scouting and specific knowledge of the sexual abuse accusations against Libey, Arnold, and Schmidt constituted a material fact.  Had Plaintiffs and their parents been aware of such dangers, Plaintiffs would not have entered into a relationship, or would not have continued a relationship, with Defendants and Scouting, or would have taken steps to protect themselves from being abused while in Scouting.

59.

Plaintiffs and their parents justifiably and reasonably relied on Defendants' misrepresentations by allowing Plaintiffs to join Scouting, remain in Scouting, and engage in a trust relationship with their Scout leaders Libey, Bowen, and Schmidt.  Their reliance was justified because Plaintiffs and their parents could not conduct an investigation of Defendants' claims that Scout volunteers were safe and trustworthy, given that the records that would disprove the fraud — *e.g.* Defendant BSA's IV files — were not available to the public until decades later; and Plaintiffs and their parents did not know of Defendants' knowledge of their abusers.

60.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiffs

**Page 19**          **COMPLAINT**

Highly Confidential

John Does XXI and XXII, ███ and ███ were seriously injured and damaged. Plaintiffs John Does XXI and XXII, ███ and ███ injuries prevail and will continue to prevail for an indefinite time into the future. It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling. Plaintiffs John Does XXI and XXII, ███ and ███ have incurred and will likely continue to incur damages. These damages include both physical and emotional injury. These damages include general damages and such other damages as are shown by the evidence, to be proved at the time of trial, all to Plaintiffs John Does XXI and XXII, ███ and ███ general damages and such other damages as are shown by the evidence, in an amount now unknown. Their damages include but are not limited to emotional and physical pain and suffering, mental anguish, and disability.

61.

As a direct and proximate result of Defendant BSA's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff John Doe XX was seriously injured and damaged. Plaintiff John Doe XX's injuries prevail and will continue to prevail for an indefinite time into the future. It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling. Plaintiff John Doe XX has incurred and will likely continue to incur damages. These damages include both physical and emotional injury. These damages include general damages and such other damages as are shown by the evidence, to be proved at the time of trial, all to Plaintiff John Doe XX's general damages and such other damages as are shown by the evidence, in an amount now unknown. Their damages include but are not limited to emotional and physical pain and suffering, mental anguish, and disability.

**Page 20**          **COMPLAINT**

Highly Confidential

62.

Within the past three years Plaintiffs discovered and continue to discover that, throughout the time they were involved in the Scouting program and until at least 2010, Defendants perpetrated a fraud related to the dangers of Scout leaders sexually abusing children in the Scouting program.  Prior to each Plaintiff's discovery of Defendants' fraud, each Plaintiff did not know and could not know that Defendants' misrepresentations, or lack thereof, regarding the trustworthiness of Scout leaders and the safety of the Scouting program were false, and that Defendants knew the Scouting program was structured in such a way that sexual abuse of Scouts by Scout leaders was certain to occur to some degree within the Scouting program.

## FIRST CLAIM FOR RELIEF
### *Fraud*

### COUNT I
**Plaintiffs John Does XXI and XXII, ▮▮▮ and ▮▮▮ against all Defendants**



63.

Plaintiffs reallege and incorporate by reference paragraphs 1-62.

64.

As alleged in paragraphs 49, 50, and 56-59, Defendants committed fraud by active concealment.

65.

As alleged in paragraphs 51, 54, and 56-59, Defendants committed fraud by conduct and through explicit language.

/ / /

/ / /

**Page 21**        **COMPLAINT**

BSA-PLAN_01097019

**SA 2377**

66.

As alleged in paragraph 48, Defendants had a duty to disclose their knowledge of the sexual abuse history in Scouting and the risk that Scouts such as Plaintiffs could be sexually abused by their Scout leaders, to Plaintiffs.

67.

As alleged in paragraphs 55-59, Defendants committed fraud through nondisclosure.

68.

As a direct result and consequence of Defendants' fraud, Plaintiffs John Does XXI and XXII, ████ and ████ suffered the injuries and incurred the damages described in paragraph 60.

## COUNT II
### Plaintiff John Doe XX against Defendant BSA

69.

Plaintiff John Doe XX realleges and incorporates by reference paragraphs 1-68.

70.

As alleged in paragraphs 49, 50, and 56-59, Defendant BSA committed fraud by active concealment.

71.

As alleged in paragraphs 51-53, and 56-59, Defendant BSA committed fraud by conduct and through explicit language.

72.

As alleged in paragraph 48, Defendant BSA had a duty to disclose its knowledge of the sexual abuse history in Scouting and the risk that Scouts such as Plaintiffs could be sexually abused by their Scout leaders, to Plaintiff John Doe XX.

/ / /

Page 22          COMPLAINT

BSA-PLAN_01097020

SA 2378

73.

As alleged in paragraphs 55-59, Defendant BSA committed fraud through nondisclosure.

74.

As a direct result and consequence of Defendant BSA's fraud, Plaintiff John Doe XX

suffered the injuries and incurred the damages described in paragraph 61.

## SECOND CLAIM FOR RELIEF
### *Constructive Fraud*

#### COUNT I

**Plaintiffs John Does XXI and XXII,**  **and** ██ ██ **against all Defendants**

75.

Plaintiffs John Does XXI and XXII, ██ and ██ reallege and incorporate by

reference paragraphs 1-73.

76.

As alleged in paragraphs 48, 55, 58, and 59, Defendants committed constructive fraud.

77.

As a direct result and consequence of Defendants' constructive fraud, Plaintiffs John

Does XXI and XXII, ██ and ██ suffered the injuries and incurred the damages described

in paragraph 60.

#### COUNT II
**Plaintiff John Doe XX Against Defendant BSA**

78.

Plaintiff John Doe XX realleges and incorporates by reference paragraphs 1-77.

/ / /

/ / /

**Page 23**          **COMPLAINT**

BSA-PLAN_01097021

SA 2379

79.

As alleged in paragraphs 48, 55, 58, and 59, Defendant BSA committed constructive fraud.

80.

As a direct result and consequence of Defendant BSA's constructive fraud, Plaintiff John

Doe XX suffered the injuries and incurred the damages described in paragraph 61.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.       Non-economic damages and such other damages as are shown by the

evidence by Defendant BSA for each Plaintiff separately, the exact amounts to be

determined by the jury at the time of trial;

2.       Non-economic damages and such other damages as are shown by the

evidence by Defendant LDS Church for each Plaintiff John Doe XXI, John Doe XXII,

████  ████ and ████ ████ separately, the exact amounts to be determined by the jury

at the time of trial;

3.       For Plaintiffs' disbursements and incurred costs;

4.       Attorney fees; and

5.       For any other relief this Court deems just and equitable.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

DATED this 1st day of May, 2017.

/s/ Gilion C. Dumas
Gilion C. Dumas, ISB #8176
**DUMAS LAW GROUP, LLC**

/s/ Andrew M. Chasan
Andrew M. Chasan, ISB #2100
Timothy C. Walton, ISB #2170
**CHASAN & WALTON, LLC**

*Attorneys for Plaintiffs*

**Page 24          COMPLAINT**

Highly Confidential

DOC NO: FST-CV- 15-5015023-S　　　　 : **SUPERIOR COURT**

**JOHN DOE#1;; JOHN DOE#3;**   :
**JOHN DOE#4; JOHN DOE#5; JOHN DOE#6;** :
**JOHN DOE#7; JOHN DOE#8; JOHN DOE#9;** :
**JOHN DOE#10; JOHN DOE#11; JANE DOE #3** :
**ADMINISTRATRIX OF THE ESTATE OF**   :
**JOHN DOE#12; JOHN DOE#13;**    :
**JOHN DOE#14; JOHN DOE#15**     :
**JOHN DOE#16; JOHN DOE#17; JANE DOE#1;**:
**JANE DOE#2**      : **J.D. OF STAMFORD/NORWALK**

**V.**      : **AT STAMFORD**

**BOY SCOUTS OF AMERICA**   :
**CORPORATION; FAIRFIELD COUNTY**  :
**COUNCIL OF BOY SCOUTS OF AMERICA,** :
**INC;CONNECTICUT YANKEE COUNCIL,** :
**INC., BOY SCOUTS OF AMERICA**  : **February 14, 2017**

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

## REDACTED SECOND REVISED COMPLAINT

### SECTION 1 ALLEGATIONS AGAINST BOY SCOUTS OF AMERICA CORPORATION COMMON TO ALL PLAINTIFFS AND ALL COUNTS

1.     BOY SCOUTS OF AMERICA CORPORATION (hereinafter referred to as "BSA") is the largest youth organization in the United States with approximately five million members. BSA was chartered in 1910 by an act of Congress. An estimated 20% of American boys have had contact with scouting either as members or by attending Scout functions.

2.     Throughout its one hundred and three year history, BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed their trust in BSA.

3.     Paradoxically, BSA promotes the wholesomeness of its programs while knowing that since the 1940's it has been secretly removing scoutmasters for child sex abuse at an alarming rate, which in the 1970's, reached an average of one every three days. Its own records

JTX-2916

BSA-PLAN_01097160
SA 2381

demonstrate that it has long known that "Scouting" attracts pedophiles in large numbers and that

scouts, far from being safe, are at a heightened risk of sexual abuse by child molesters.

4.    The Defendant, BOY SCOUTS OF AMERICA CORPORATION, is a

corporation organized and existing under the laws of the State of Connecticut.

5.    The Defendant, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF

AMERICA, INC. is a corporation organized and existing under the laws of the State of

Connecticut.

6.    The Defendant, CONNECTICUT YANKEE COUNCIL INC., BOY SCOUTS

OF AMERICA is a corporation organized and existing under the laws of the State of

Connecticut.

7.    Since approximately 1919, BSA has maintained a group of files known variously

as the red files, perversion files, or ineligible volunteer files.

8.    The claimed purpose of BSA's maintenance of the files is to keep sexual

predators out of Scouting.

**Boy Scouts of America Corporation's knowledge of Pedophiles in Scouting**

9.    BSA knew that Scouting was being used and exploited by child molesters to gain

access to and gain the trust of Scouts including the Plaintiffs. Yet, the Defendant, BSA, did

nothing to alter its Scouting program to effectively ameliorate the sexual abuse problem or to

warn Scouts, Scouts' parents, other troop-level leaders or prospective Scouts and their parents

prior to or during the time of the Plaintiffs' abuse.

10.    Not later than 1965, Defendant BSA knew that Scouting posed a danger to minor

boys because it had actual knowledge that there had been a concrete, longstanding, consistent,

and widespread problem of adult Scout leaders sexually abusing minor Scouts.

-2-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097161
SA 2382

11.     Ineligible volunteer files that reflect child sexual abuse allegations against BSA volunteers are categorized by BSA as "Perversion" files.

12.     On information and belief, the BSA Perversion ineligible volunteer files have predominately constituted a majority or plurality of the total ineligible volunteer files.

13.     Between 1920 and 1935, at least 1,000 child molesters—between 50-60 per year—were discovered and subsequently excluded from scouting. At least 1,200 Perversion files were created by BSA between 1965 and 1985. However, the number of ineligible volunteer perversion files currently available significantly underrepresents the actual number of BSA volunteers that molested Scouts because Defendant BSA has destroyed ineligible volunteer files for a variety of reasons, and, more significantly, because Defendant BSA and its local affiliates systemically exclude such reports knowing that Scouts who have been abused, like many children do not report the fact that they were sexually abused.

14.     In Connecticut alone, at least 26 Scout leaders were placed in BSA's Perversion files between 1960 and 1985. These Scout leaders operated in various councils in Connecticut including the council that is now Fairfield County Council of Boy Scouts of America, Inc. and Connecticut Yankee Council, Inc., Boy Scouts of America.

15.     Prior to and during the pendency of Plaintiffs' abuse, by and through the Perversion files, Defendant BSA possessed a very detailed knowledge base concerning the circumstances under which Scouts were sexually abused. To wit, the details of the sexual abuse of Scouts were contained in the Perversion Files that gave the BSA specific information about the ways in which the abuse occurred, how the sexual abuse was accomplished and that previously banned leaders would attempt to get back into Scouting to abuse other Scouts.

-3 -

TJC-ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

16.     Based upon this knowledge prior to and during Plaintiffs' abuse, Defendants knew with certainty that at least some significant number of Scouts—including Scouts such as the Plaintiffs—would be molested by BSA scouting volunteers each and every year.

17.     BSA knew or should have known that the tortfeasor Donald Dennis, A Scout Master affiliated with Ridgefield Boy Scout Troops 80, 90, and 172, was a serial pedophile and BSA had actual knowledge of the explosion of the pedophiles within scouting during the 1960's and 1970's nationwide.

**Boy Scout of America Corporation's Knowledge of Specific Targeting of Scout Troops for the Purpose of Molesting Children**

18.     BSA also knew that its organizations, local councils, and most importantly, its troops, were specifically targeted by pedophiles in order to gain access to children.

19.     BSA's own internal "Ineligible Volunteer Files" records it collected and maintained in secrecy for seventy years, reveal that Scouting is a pedophile "magnet" and that removed pedophiles were often able to re-enter scouting in other locations. These files were maintained concerning paid executives as well as "volunteers."

20.     BSA was aware that Scouting attracted pedophiles and that the distinct characteristics of scouting render scouts particularly susceptible to pedophiles.

21.     BSA knew or should have known that Scouting attracts pedophiles, in part, because: a) Scouting provides the pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes; b) Scouting provides opportunities for the pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him; c) the pedophile scout leader can, depending on the pedophile's age preference, volunteer for and be sure to have access only to boys of a certain age; d) BSA conditions boys to the concept of strict obedience to the Scout Master, a bonding mechanism that

-4-

TICESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

pedophiles crave; e) BSA promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate the pedophile's efforts to keep his victims silent and compliant; f) At the time of the abuse, BSA conducted no criminal background checks on any of its volunteers.

22.     Despite knowing that scouting organizations were specifically targeted by pedophiles, BSA did nothing to protect scouts between 1965 and 1980.

**Special Relationship**

23.     BSA stands in a special, fiduciary relationship with scouts, including the Plaintiffs.

24.     BSA promotes itself as a wholesome, moral organization filled with wholesome, moral adult volunteers.

25.     BSA encourages emotionally intimate relationships between its youth and its adult youth leaders.

26.     Specifically, during the time frame in which the Plaintiffs were sexually assaulted and/or molested, BSA encouraged adult leaders to counsel scouts in private.

27.     BSA required such counseling sessions in order for scouts to advance in ranking.

28.     Scouting literature, promoted, sold, and authored by BSA, encourages Scouts to be loyal to their scout leaders and their Scoutmaster.

29.     BSA likewise encourages Scoutmasters to build "supportive, trusting relationship[s]" with troop members.

30.     Dennis used the intimate relationship, encouraged promoted, and fostered by BSA to gain the trust of the Plaintiffs and molest the Plaintiffs.

31.     As an organization promoting counseling of troops and loyalty to leaders, BSA stood in a special and fiduciary relationship with the Plaintiffs.

-5 -

TLC-ESQ, psc

Brooke A. Goff, Esq. Juris # 437668

100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

32.    As an organization that knew boys would be loyal to their leaders, BSA stood in a special and fiduciary relationship with the Plaintiffs.

**Punitive Damages**

33.    At all times relevant to this Complaint, as detailed above, BSA knew of the serious problem of adult volunteers, leaders, and scouts sexually abusing minor Scouts.

34.    In the years leading up to the abuse of Plaintiffs, BSA received thousands of reports around the country of adult leaders sexually abusing minor scouts.

35.    Instead of addressing the problem by informing parents and scouts of the issue, or by implementing safety programs to prevent abuse, BSA instead concealed and affirmatively enabled the problem by employing a public relations department to combat negative stories about sexual abuse in Scouting.

36.    The continued public relations effort to hide the problem of child molestation in Scouting successfully concealed the existence of the problem from parents and Scouts, including Plaintiffs.

37.    Upon information and belief, at the time the abuse in this case occurred, BSA had vast resources such that BSA could have devoted sufficient resources to performing adequate background and reference checks on volunteer scout leaders and provide educational material and programs to Scouts like the Plaintiffs and families of said Scouts about sexual misconduct that was going on in the Boy Scouts and preventative measures that could be taken to avoid said misconduct.

38.    Instead of devoting its resources to performing adequate background checks and reference checks on all voluntary Scoutmasters and providing educational material and programs to Scouts like the Plaintiffs and families of said Scouts about sexual misconduct that was going on in the Boy Scouts and preventative measures that could be taken to avoid said misconduct,

-6-

TJC-ESQ_rsc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097165
SA 2386

BSA devoted extensive resources to other departments including public relations, marketing, and executive salaries.

39.     Upon information and belief, BSA is a non-profit organization currently holding more than $1 billion in assets.

40.     At the time of the abuse, BSA had sufficient assets to devote towards performing adequate background checks and reference checks on all voluntary Scoutmasters and providing educational material and programs to Scouts like the Plaintiffs and families of said Scouts about sexual misconduct that was going on in the Boy Scouts and preventative measures that could be taken to avoid said misconduct but instead devoted those assets to Public Relations, Marketing, and executive salaries.

41.     The aforementioned facts, including BSA's efforts to conceal the nature of the problem through the efforts of its Public Relations department, rise to the level of willful and malicious disregard for the safety of Scouts around the country including Plaintiffs.

42.     The aforementioned facts, including BSA's failure to devote resources to addressing the serious problem of childhood sexual abuse of Scouts, constitutes a reckless indifference for the safety of BSA minor-members.

43.     The above-mentioned facts warrant an award of punitive damages against BSA.

44.     BSA had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

45.     BSA withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

-7 -

TIC·ESQ,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097166
SA 2387

46.     In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the BOY SCOUTS OF AMERICA CORPORATION.

**SECTION 2: ALLEGATIONS AGAINST FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. COMMON TO ALL PLAINTIFFS**

1.     Co-Defendant, BOY SCOUTS OF AMERICA CORPORATION (hereinafter referred to as "BSA") is the largest youth organization in the United States with approximately five million members. BSA was chartered in 1910 by an act of Congress. An estimated 20% of American boys have had contact with scouting either as members or by attending Scout functions.

2.     Throughout its one hundred and three year history, BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed their trust in BSA.

3.     Paradoxically, BSA promotes the wholesomeness of its programs while knowing that since he 1940's it has been secretly removing scoutmasters for child sex abuse at an alarming rate, which in the 1970's, reached an average of one every three days. Its own records demonstrate that it has long known that "Scouting" attracts pedophiles in large numbers and that scouts, far from being safe, are at a heightened risk of sexual abuse by child molesters.

4.     The Defendant, BOY SCOUTS OF AMERICA CORPORATION, is a corporation organized and existing under the laws of the State of Connecticut.

5.     The Defendant, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. is a corporation organized and existing under the laws of the State of Connecticut.

-8-

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

6.      The Defendant, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. (hereinafter FCC) is a Connecticut Corporation that organizes scouting events and maintains scouting troops in Fairfield County.

7.      Since approximately 1919, BSA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files.

8.      The claimed purpose of BSA's maintenance of the files is to keep sexual predators out of scouting.

## Fairfield County Council of Boy Scouts of America, Inc., knowledge of Pedophiles in Scouting

9.      FCC knew that Scouting was being used and exploited by child molesters to gain access to and gain the trust of Scouts including the Plaintiffs. Yet, the Defendant, FCC, did nothing to alter its Scouting program to effectively ameliorate the sexual abuse problem or to warn Scouts, Scouts' parents, other troop-level leaders or prospective Scouts and their parents prior to or during the time of the Plaintiffs' abuse.

10.     Defendant FCC knew that Scouting posed a danger to minor boys because it had actual knowledge that there had been a concrete, longstanding, consistent, and widespread problem of adult Scout leaders sexually abusing minor Scouts.

11.     Prior to and during the pendency of Plaintiffs' abuse, by and through the Perversion files, Defendant FCC possessed a very detailed knowledge base concerning the circumstances under which Scouts were sexually abused. To wit, the details of the sexual abuse of Scouts were contained in the Perversion Files that gave the Defendant, FCC specific information about the ways in which the abuse occurred, how the sexual abuse was accomplished and that previously banned leaders would attempt to get back into Scouting to abuse other Scouts.

-9 -

TIC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097168
SA 2389

12.     Based upon this knowledge prior to and during Plaintiff's abuse, the Defendant, FCC knew with certainty that at least some significant number of Scouts—including Scouts such as the Plaintiffs—would be molested by BOY SCOUTS OF AMERICA CORPORATION scouting volunteers each and every year.

**Fairfield County Council Of Boy Scouts of America, Inc. knowledge of Pedophiles in Scouting**

13.     FCC knew for decades that sexual predators of boys had infiltrated scouting.

14.     FCC also knew that its organizations, local councils, and most importantly, its troops, were specifically targeted by pedophiles in order to gain access to children.

15.     BSA knew or should have known that the tortfeasor Donald Dennis, A Scout Master affiliated with Ridgefield Boy Scout Troops 80, 90, and 172, was a serial pedophile and BSA had actual knowledge of the explosion of the pedophiles within scouting during the 1960's and 1970's nationwide.

16.     FCC knew or should have known the danger that pedophiles presented to boy scouts and either knew or should have known the danger that Dennis presented, but instead FCC ignored that danger and permitted Dennis and other pedophiles in scouting to prey upon young boys, including the Plaintiffs.

17.     FCC knew that BOY SCOUTS OF AMERICA CORPORATION maintained files known as the "Ineligible Volunteer Files."

18.     FCC likewise knew that BOY SCOUTS OF AMERICA CORPORATION maintained the Ineligible Volunteer Files for the purpose of documenting child-abusers and keeping said abusers out of Scouting.

19.     FCC likewise knew that BOY SCOUTS OF AMERICA CORPORATION had a problem preventing pedophiles and predators from infiltrating the ranks of Scouts.

-10 -

TIC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

20.     For these reasons, FCC knew that any potential employees, volunteers, adult leaders, agents, or Scoutmasters needed to be cross-checked and vetted by BOY SCOUTS OF AMERICA CORPORATION to determine whether or not they were qualified to work with youth.

21.     BOY SCOUTS OF AMERICAN CORPORATION'S own internal "Ineligible Volunteer Files" records it collected and maintained in secrecy for seventy years, reveal that Scouting is a pedophile "magnet" and that removed pedophiles were often able to re-enter scouting in other locations. These files were maintained concerning paid executives as well as "volunteers."

22.     FCC was aware that Scouting attracted pedophiles and that the distinct characteristics of scouting render scouts particularly susceptible to pedophiles.

23.     FCC knew or should have known that Scouting attracts pedophiles, in part, because: a) Scouting provides the pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes; b) Scouting provides opportunities for the pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him; c) the pedophile scout leader can, depending on the pedophile's age preference, volunteer for and be sure to have access only to boys of a certain age; d) FCC conditions boys to the concept of strict obedience to the Scout Master, a bonding mechanism that pedophiles crave; e) FCC promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate the pedophile's efforts to keep his victims silent and compliant; f) At the time of the abuse, FCC conducted no criminal background checks on any of its volunteers.

24.     Despite knowing that scouting organizations were specifically targeted by pedophiles, FCC did nothing to protect the Boy Scout youth members from pedophiles within the scouting organization.

-11-

TIC·ESQ_psc

Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

25. FCC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

26. FCC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

27. In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the FCC.

**Special Relationship**

28. FCC stands in a special, fiduciary relationship with scouts, including the Plaintiffs.

29. FCC promotes itself as a wholesome, moral organization filled with wholesome, moral adult volunteers.

30. FCC encourages emotionally intimate relationships between its youth and its adult youth leaders.

31. Specifically, during the time frame in which the Plaintiffs were sexually assaulted and/or molested, FCC encouraged adult leaders to counsel scouts in private.

32. FCC required such counseling sessions in order for scouts to advance in ranking.

33. Scouting literature, promoted, sold, and authored by FCC, encourages Scouts to be loyal to their scout leaders and their Scoutmaster.

34. FCC likewise encourages Scoutmasters to build "supportive, trusting relationship[s]" with troop members.

-12-

TTC·ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097171
SA 2392

35. Dennis used the intimate relationship, encouraged promoted, and fostered by FCC to gain the trust of the Plaintiffs and molest the Plaintiffs.

36. As an organization promoting counseling of troops and loyalty to leaders, FCC stood in a special and fiduciary relationship with the Plaintiffs.

37. As an organization that knew boys would be loyal to their leaders, FCC stood in a special and fiduciary relationship with the Plaintiffs.

## SECTION 3: ALLEGATIONS AGAINST CONNECTICUT YANKEE COUNCIL, INC. COMMON TO ALL PLAINTIFFS

1. Co-Defendant, BOY SCOUTS OF AMERICA CORPORATION (hereinafter referred to as "BSA") is the largest youth organization in the United States with approximately five million members. BSA was chartered in 1910 by an act of Congress. An estimated 20% of American boys have had contact with scouting either as members or by attending Scout functions.

2. Throughout its one hundred and three year history, BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed their trust in BSA.

3. Paradoxically, BSA promotes the wholesomeness of its programs while knowing that since he 1940's it has been secretly removing scoutmasters for child sex abuse at an alarming rate, which in the 1970's, reached an average of one every three days. Its own records demonstrate that it has long known that "Scouting" attracts pedophiles in large numbers and that scouts, far from being safe, are at a heightened risk of sexual abuse by child molesters.

4. The Defendant, BOY SCOUTS OF AMERICA CORPORATION, is a corporation organized and existing under the laws of the State of Connecticut.

-13-

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

5.      The Defendant, CONNECTICUT YANKEE COUNCIL INC., BOY SCOUTS OF AMERICA is a corporation organized and existing under the laws of the State of Connecticut.

6.      The Defendant, CONNECTICUT YANKEE COUNCIL INC., BOY SCOUTS OF AMERICA (hereinafter referred to as CYC) is a Connecticut Corporation that organizes scouting events and maintains scouting troops in the State of Connecticut.   CYC is the successor of FCC.

7.      Since approximately 1919, BSA has maintained a group of files known variously as the red files, perversion files, or ineligible volunteer files.

8.      The claimed purpose of BSA's maintenance of the files is to keep sexual predators out of scouting.

**Connecticut Yankee Council, Inc. Boy Scouts of America's knowledge of Pedophiles in Scouting**

9.      CYC knew that Scouting was being used and exploited by child molesters to gain access to and gain the trust of Scouts including the Plaintiffs. Yet, the Defendant, CYC, did nothing to alter its Scouting program to effectively ameliorate the sexual abuse problem or to warn Scouts, Scouts' parents, other troop-level leaders or prospective Scouts and their parents prior to or during the time of the Plaintiffs' abuse.

10.     Defendant CYC knew that Scouting posed a danger to minor boys because it had actual knowledge that there had been a concrete, longstanding, consistent, and widespread problem of adult Scout leaders sexually abusing minor Scouts.

11.     Prior to and during the pendency of Plaintiffs' abuse, by and through the Perversion files, Defendant CYC possessed a very detailed knowledge base concerning the circumstances under which Scouts were sexually abused. To wit, the details of the sexual abuse

-14-

TIC-ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

of Scouts were contained in the Perversion Files that gave the CYC specific information about the ways in which the abuse occurred, how the sexual abuse was accomplished and that previously banned leaders would attempt to get back into Scouting to abuse other Scouts.

12.    Based upon this knowledge prior to and during Plaintiff's abuse, CYC knew with certainty that at least some significant number of Scouts—including Scouts such as the Plaintiffs—would be molested by BOY SCOUTS OF AMERICA CORPORATION scouting volunteers each and every year.

**Connecticut Yankee Council, Inc. Boy Scouts of America's knowledge of Pedophiles in Scouting**

13.    CYC knew for decades that sexual predators of boys had infiltrated scouting.

14.    CYC also knew that its organizations, local councils, and most importantly, its troops, were specifically targeted by pedophiles in order to gain access to children.

15.    BSA knew or should have known that the tortfeasor Donald Dennis, A Scout Master affiliated with Ridgefield Boy Scout Troops 80, 90, and 172, was a serial pedophile and BSA had actual knowledge of the explosion of the pedophiles within scouting during the 1960's and 1970's nationwide.

16.    CYC knew or should have known the danger that pedophiles presented to Boy Scouts and either knew or should have known the danger that Dennis presented, but instead CYC ignored that danger and permitted Dennis and other pedophiles in scouting to prey upon young boys, including the Plaintiffs.

17.    CYC knew that BOY SCOUTS OF AMERICA CORPORATION maintained files known as the "Ineligible Volunteer Files."

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-15-

BSA-PLAN_01097174
SA 2395

18.    CYC likewise knew that Boy Scouts of America maintained the Ineligible Volunteer Files for the purpose of documenting child-abusers and keeping said abusers out of Scouting.

19.    CYC likewise knew that BOY SCOUTS OF AMERICA CORPORATION has a problem preventing pedophiles and predators from infiltrating the ranks of Scouts.

20.    For these reasons, CYC knew that any potential employees, volunteers, adult leaders, agents, or Scoutmasters needed to be cross-checked and vetted by BOY SCOUTS OF AMERICA CORPORATION to determine whether or not they were qualified to work with youth.

21.    BOY SCOUTS OF AMERICA CORPORATION'S own internal "Ineligible Volunteer Files" records it collected and maintained in secrecy for seventy years, reveal that Scouting is a pedophile "magnet" and that removed pedophiles were often able to re-enter scouting in other locations. These files were maintained concerning paid executives as well as "volunteers."

22.    CYC was aware that Scouting attracted pedophiles and that the distinct characteristics of scouting render scouts particularly susceptible to pedophiles.

23.    CYC knew or should have known that Scouting attracts pedophiles, in part, because: a) Scouting provides the pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes; b) Scouting provides opportunities for the pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him; c) the pedophile scout leader can, depending on the pedophile's age preference, volunteer for and be sure to have access only to boys of a certain age; d) CYC conditions boys to the concept of strict obedience to the Scout Master, a bonding mechanism that pedophiles crave; e) CYC promotes the idea of secret ceremonies, rituals, and loyalty oaths, all

-16-

TIC●ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

of which help facilitate the pedophile's efforts to keep his victims silent and compliant; f) At the time of the abuse, CYC conducted no criminal background checks on any of its volunteers.

24.    Despite knowing that scouting organizations were specifically targeted by pedophiles, CYC did nothing to protect the Boy Scout youth members from pedophiles within the scouting organization.

25.    CYC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

26.    CYC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

27.    In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the CYC.

**Special Relationship**

28.    CYC stands in a special, fiduciary relationship with scouts, including the Plaintiffs.

29.    CYC promotes itself as a wholesome, moral organization filled with wholesome, moral adult volunteers.

30.    CYC encourages emotionally intimate relationships between its youth and its adult youth leaders.

31.    Specifically, during the time frame in which the Plaintiffs were sexually assaulted and/or molested, CYC encouraged adult leaders to counsel scouts in private.

32.    CYC required such counseling sessions in order for scouts to advance in ranking.

-17-

TJC•ESQ,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

TIC·ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

33.     Scouting literature, promoted, sold, and authored by CYC, encourages Scouts to be loyal to their scout leaders and their Scoutmaster.

34.     CYC likewise encourages Scoutmasters to build "supportive, trusting relationship[s]" with troop members.

35.     Dennis used the intimate relationship, encouraged promoted, and fostered by CYC to gain the trust of the Plaintiffs and molest the Plaintiffs.

36.     As an organization promoting counseling of troops and loyalty to leaders, CYC stood in a special and fiduciary relationship with the Plaintiffs.

37.     As an organization that knew boys would be loyal to their leaders, CYC stood in a special and fiduciary relationship with the Plaintiffs.

## COUNT 1: JOHN DOE#1 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE

1-46.   Paragraphs 1-46 of Section 1 are hereby fully incorporated and made Paragraphs 1-46 of this Count as if fully set forth herein.

47.     BOY SCOUTS OF AMERICA CORPORATION (hereinafter referred to as "BSA") knew or should have known that its "ineligible volunteers" system of keeping track of pedophiles infiltrating its ranks and attempting to eliminate them did not function as intended, was flawed, and in many cases ineffective. Despite that knowledge, BSA did nothing to educate its Scouts and their parents of the ineffectiveness of the screening and tracking system and process. BSA did nothing to educate or inform Scouts and their parents of the enormity of the pedophile problem, nor did BSA take action to correct its screening and/or education system.

48.     At all times, Dennis was under certain direction, supervision, and control of Defendant BSA and was otherwise its employee, servant, volunteer, Scoutmaster, agent and/or apparent agent.

-18-

BSA-PLAN_01097177
SA 2398

49.     At all times, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. was under the direction, supervision, and control of Defendant BSA and was otherwise its servant, agent and/or apparent agent.

50.     Dennis's work and duties for defendants BSA, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. and CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA included duties and activities in Fairfield County, Connecticut.

51.     Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants BSA, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC., and CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA representations to parents and scouts that the BSA was a moral and safe place for boy's, Dennis enticed, induced, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him between 1967 and 1970.

52.     Dennis physically, mentally, and sexually abused **JOHN DOE#1** between 1967 and 1970.

53.     **JOHN DOE#1** was a registered scout during the time frames of abuse outlined in Paragraphs 51 and 52.

50.     Based upon BSA's knowledge of previous incidents involving pedophiles and its knowledge and information regarding pedophiles within its organization, BSA could reasonably foresee future incidents involving pedophile Scout leaders, volunteers, employees, agents, and/or apparent agents, including Dennis.

51.     Defendant BSA owed a duty to Plaintiff **JOHN DOE#1** to prevent child molesters from serving as Scout leaders with access to children.

-19-

TIC·ESQ.,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097178
SA 2399

52.     Defendant, BSA was negligent in the manner that it screened, supervised, retained as a volunteer, and allowed Dennis to register as an adult volunteer, when BSA knew or should have known that Dennis posed a threat of sexual abuse to children, and was negligent in one or more of the following ways:

a.      Allowed Dennis to routinely be alone with Plaintiff **JOHN DOE#1** for hours;

b.      Failed to conduct a background check on Dennis when he registered with BSA;

c.      Failed to timely adopt policies and procedures to protect children;

d.      Failed to advise parents of statistical data available to BSA from the Ineligible Volunteer Files;

e.      Failed to advise parents that the Ineligible Volunteer File system of ejection of paid executives and volunteers, as the primary method of protecting Scouts from pedophiles, was ineffective;

f.      Carelessly or negligently maintained, reviewed, and updated the Ineligible Volunteer Files;

g.      Carelessly or negligently warned and/or failed to warn parents of information regarding adult Scoutmasters and their propensity to engage in appropriate behavior with Scouts;

h.      Carelessly and/or negligently failed to communicate information regarding Scoutmasters, employees, volunteers, agents, and/or apparent agents to its operative branches throughout the United States;

i.      Failed to properly train local councils in the vetting and registering of scout leaders;

j.      Failed to inform local councils of the problem with pedophiles in Scouting;

k.      Hid the problem of pedophiles in scouting from local councils, parents, scouts, and other scouting leaders;

l.      Failed to train troops and sponsoring organizations in the vetting and registering of Scout leaders;

m.      Failed to require troops and sponsoring organizations to register local leaders;

n.      Failed to inform local councils of the Ineligible Volunteer Files, the existence of child molesters within the Ineligible Volunteer Files, and the importance of

-20-

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

BSA-PLAN_01097179
SA 2400

registering leaders so that they could be cross checked against the Ineligible Volunteer Files;

o.   Failed to inform sponsoring organizations of the Ineligible Volunteer Files, the existence of child molesters within the Ineligible Volunteer Files, and the importance of registering leaders so that they could be cross checked against the Ineligible Volunteer Files;

p.   Failed to supervise Dennis when Dennis was with children;

q.   Failed to educate Scouts and/or parents and families of the problems with pedophiles in scouting;

r.   Failed to create an efficient and effective way to report complaints against Scoutmasters for sexual misconduct;

s.   Failed to implement random checks on Scoutmasters to assure that said Scoutmaster was leading Scouts free from any sexual abuse when they knew or should have known that sexual abuse was occurring on a regular basis between Scoutmasters and Scouts during the 1960's and 1970's; and

t.   Was otherwise careless and/or negligent.

53.   As a direct and proximate result of the aforementioned actions by the Defendant, BSA Plaintiff **JOHN DOE#1** has suffered permanent injuries of a personal and pecuniary nature, and has been psychologically damages and continues to be damages psychologically and to experience mental anguish, humiliation and emotional and physical pain, suffering and distress.

54.   Further, as a result of the aforementioned sexual abuse and breach of trust, Plaintiff **JOHN DOE#1** has suffered and will continue to suffer physical and emotional pain and dysfunction, and both economic and non-economic damages in an amount to be proved at trial.

55.   Further, BSA fraudulently concealed their knowledge as to the existence of pedophiles in Scouting, and the scope of their direct, ongoing involvement in covering up that abuse.

-21-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

BSA-PLAN_01097180

SA 2401

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

56.     If Defendant, BSA and its agents had not misrepresented or concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA CORPORATION, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may be otherwise be held to apply in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

57.     Because of the Defendant's misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the BOY SCOUTS OF AMERICA CORPORATION had done something wrong at any time, and because of the misrepresentation and concealment of the BOY SCOUTS OF AMERICA CORPORATION, was otherwise not aware of his injuries or the cause of his injuries.

**Repressed Memory**

58.     Because this abuse began when Plaintiff **JOHN DOE#1** was a minor, Plaintiff **JOHN DOE#1** has repressed the memories of this abuse.

59.     It was not until October or 2012- when the release of Ineligible Volunteer Files became widely publicized- that Plaintiff **JOHN DOE#1** discovered that he was repressing the memories of abuse, discovered his injuries, and became aware of his cause of action against the Defendants.

60.     Plaintiff **JOHN DOE#1** therefore did not discover that BSA acted negligently until October of 2012.

61.     Likewise, the nature of the injuries, mental and emotional damages caused by the sexual abuse at a young age- are such that the extent said injuries are not discovered until later in life.

-22-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

62.     In this instance, the Plaintiff, **JOHN DOE#1** did not discover the full extent of his injuries until October of 2012.

63.     The nature of childhood sexual abuse makes disclosure of abuse less likely and more difficult. It is an event over which most survivors feel great embarrassment, shame, and guilt.

64.     Feeling responsible for your own abuse is a common reaction of abuse survivors and can serve as a protective factor. The social and psychological effects themselves carry shame, embarrassment, and often occupy the attention and resources of the survivor.

65.     These serve to prevent disclosure and many function to protect the survivor from full awareness of the impact of the experience of abuse that happened many years previous in their childhood.

66.     Most sexual abuse takes place in the context of an ongoing relationship between victim and offender where many or even most aspects of the relationship are viewed as positive to the victim.

67.     Most, but not all, offenders engage children in a "grooming process" whereby the child is gradually but systematically conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the abuse; and is made to feel a participant in his/her own abuse.

68.     Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections and identify vulnerable children; take efforts to use their authority, position or relationship with adults who would otherwise protect children to lull the adults into believing that their children are safe with the offender; and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

-23 -

BSA-PLAN_01097182
SA 2403

69.     People often blame themselves for their personal problems (e.g. health related risk behaviors such as drinking or risky sexual behaviors) and do not easily make a connection between a current problem and some event in the past which they have spent years trying to forget.

70.     The characteristics of the childhood sexual abuse, outlined above, delayed Plaintiff **JOHN DOE#1** from discovering his cause of action and prevented the Plaintiff **JOHN DOE#1** from discovering his cause of action until October of 2012.

71.     BSA had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

72.     BSA withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

73.     In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the BSA.

**Equitable Estoppel**

74.     BOY SCOUTS OF AMERICA CORPORATION misrepresented and concealed material facts about the true nature of predatory and pedophile leaders within the BOY SCOUTS OF AMERICA CORPORATION.

75.     At no time did Plaintiff **JOHN DOE#1** know that representations made by the BOY SCOUTS OF AMERICA CORPORATION were untrue.

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-24-

BSA-PLAN_01097183
SA 2404

76.     The BOY SCOUTS OF AMERICA CORPORATION intended and expected the representation to be acted upon by Plaintiff **JOHN DOE#1** and his parents and by other victims of sexual abuse by a scout leader.

77.     The BOY SCOUTS OF AMERICA CORPORATION intended the Plaintiff **JOHN DOE#1** and his parents to act upon the misrepresentation because it had financial incentive to induce the Plaintiff and his parents to rely upon the misrepresentation.

78.     Specifically, if the BOY SCOUTS OF AMERICA CORPORATION were to disclose the true extent of predatory pedophile leaders as described above, collected in the Ineligible Volunteer Files, the membership in BOY SCOUTS OF AMERICA CORPORATION would drop substantially and the fees collected from said membership would significantly diminish.

79.     Specifically, before, during and after 1967 and 1970, and through and including up to and beyond a period more recently than 2 years prior to the filing of the instant complaint, Plaintiff **JOHN DOE#1** and his parents detrimentally relied on the false statements and non-disclosures of the BOY SCOUTS OF AMERICA CORPORATION about predatory and pedophile leaders, including Dennis, serving in the BOY SCOUTS OF AMERICA CORPORATION, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC., CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA.

80.     If the parents of Plaintiff **JOHN DOE#1** were informed by Defendant BOY SCOUTS OF AMERICA CORPORATION prior to or around 1967 that the BOY SCOUTS OF AMERICA CORPORATION knew or reasonably should have known at that time about pedophile leaders working or volunteering for and/or on behalf of BOY SCOUTS OF AMERICA CORPORATION, they would not have permitted Plaintiff **JOHN DOE#1**, their then minor son, to join or participate in BOY SCOUTS OF AMERICA CORPORATION.

-25 -

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097184
SA 2405

TIC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

81.     At no time before the disclosure of the Ineligible Volunteer Files in October of 2012, did Plaintiff **JOHN DOE#1** know, nor reasonably should have known the extent of his injuries, or that he had been the victim of any wrongful conduct on the part of the Defendant, BOY SCOUTS OF AMERICA CORPORATION.

82.     Plaintiff, **JOHN DOE#1** has been prejudiced by his reliance on the representations of BOY SCOUTS OF AMERICA CORPORATION and fraudulent misrepresentation of the BOY SCOUTS OF AMERICA CORPORATION described above.

83.     As a result, the BOY SCOUTS OF AMERICA CORPORATION should be equitably estopped from asserting any statute of limitation defense.

## COUNT 2: JOHN DOE#1 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

2-84.     Paragraphs 1-83 of Count 1 are hereby fully incorporated and made Paragraphs 1-53 of this Count 2 as if fully set forth herein.

85.     Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants' representations to parents and scouts that the BSA was a moral and safe place for boys, Dennis enticed, induced, directed, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him as set forth above.

86.     Both before and after Dennis molested **JOHN DOE#1**, BSA hid its culpability by both making affirmative misrepresentations and by standing by, purposefully silent.

87.     Because of the special relationship between BSA and the Plaintiff, BSA owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** the truth about how Dennis was able to reenter scouting after having repeatedly engaged in conduct which should have lead to his being barred and placed in the Ineligible Volunteer files.

-26-

BSA-PLAN_01097185

SA 2406

TIC*ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

88.     Because of the fiduciary relationship between BSA and **JOHN DOE#1**, BSA owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** its longstanding notice of the pedophilia problem in scouting.

89.     Because of the fiduciary relationship between BSA and **JOHN DOE#1**, BSA owed a duty to **JOHN DOE#1** to disclose the fact that its Ineligible Volunteer Files were not sufficient to prevent sexual predators from entering scouting, and that indeed that BSA was deliberately misleading as to those files.

90.     At all times relevant to the Complaint, instead of disclosing the truth, BSA hid and covered up its liability by making numerous statements downplaying the problem of child molestation in Scouting, and affirmatively misrepresenting its practices as they related to child protection.

91.     In each of the years between at least 1965 and through within two years of the date of the filing of this complaint and beyond, the BOY SCOUTS OF AMERICA CORPORATION has misrepresented and under-reported the true nature and number of predatory and pedophile scout leaders that have served BOY SCOUTS OF AMERICA CORPORATION and its local councils, and of its knowledge specifically relative to Dennis, and those with whom he acted to effect his abuse of Scouts.

92.     The BOY SCOUTS OF AMERICA CORPORATION has had and presently do have a financial incentive to misrepresent and hide the true nature and scope of this problem of predatory and pedophile scout leaders that, more particularly described below.

93.     For years, BOY SCOUTS OF AMERICA CORPORATION have carefully protected the Ineligible Volunteer Files and repeatedly tried to prevent lawyers representing victims from obtaining and assessing those files, and affirmatively misrepresented the reliability of those files.

-27-

94.     BOY SCOUTS OF AMERICA CORPORATION fraudulently concealed its culpability for the molestation of **JOHN DOE#1** by:

a.      Engaging in a media campaign to downplay the problem of pedophilia in Scouting;

b.      Settling claims of other scouts for confidential sums and making said settlements subject to confidentiality provisions;

c.      Failing to disclose the magnitude of the pedophile problem in scouting, and affirmatively misrepresenting its knowledge regarding the failures of its 'child protection' system generally, and in particular as it relates to plaintiffs' molestation and Dennis' activities in this case;

d.      Failure to disclose to parents the problems of pedophiles infiltrating scouting; and

e.      Failing to disclose their negligence to the abused children.

69.     Because Defendant and its agents misrepresented and concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may otherwise be held to in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

70.     Because of the Defendant, BOY SCOUTS OF AMERICA CORPORATION'S misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the BOY SCOUTS OF AMERICA CORPORATION had done something wrong at any time, and because of the misrepresentation and concealment of the BOY SCOUTS

-28-

Highly Confidential

BSA-PLAN_01097187

**SA 2408**

OF AMERICA CORPORATION, was otherwise not aware of his injuries or the cause of his injuries.

71.     BSA had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

72.     BSA withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

**Separate Injury Caused by Fraud**

73.     In addition to any injuries caused by the childhood sexual abuse, the fraud and fraudulent concealment by the BSA proximately caused the separate and distinct injuries to **JOHN DOE#1**.

74.     By fraudulently concealing its liability, BSA prevented the Plaintiff **JOHN DOE#1** from receiving the mental health care he needed in order to recover from the abuse.

76.     By fraudulently concealing its liability, BSA caused further mental injuries or exacerbated the mental injuries stemming from the childhood sexual abuse.

77.     By fraudulently concealing its liability, BSA caused further emotional damages or exacerbated the emotional damages that stemmed from the childhood sexual abuse.

78.     By fraudulently concealing its liability, BSA's silence caused the Plaintiff **JOHN DOE#1** to withhold disclosing his abuse to friends and family and prevented **JOHN DOE#1** from leading a healthy life.

79.     By fraudulently concealing its liability, BSA caused the Plaintiffs, including **JOHN DOE#1**, to shoulder all of the guilt and shame associated with Dennis's molestation.

-29 -

Highly Confidential

TJC•ESQ psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097188

SA 2409

80.     By fraudulently concealing its liability, BSA increased the risk of harm to **JOHN DOE#1** from abuse.

81.     The fraudulent concealment of the BSA caused a lost chance of **JOHN DOE#1** to mitigate his damages from abuse.

82.     The fraudulent concealment by BSA caused additional further suffering by the Plaintiff **JOHN DOE#1**.

83.     The fraudulent concealment by BSA prevented **JOHN DOE#1** from getting the mental health care required and, in the absence of said care, **JOHN DOE#1** engaged in dangerous behaviors.

84.     Had BSA promptly disclosed its liability, rather than covered-up its liability, **JOHN DOE#1** would not have suffered problems with shame, depression, inability to have a normal relationship and inability to trust.

**COUNT 3: JOHN DOE#1- FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

1-37.   Paragraphs 1-37 of Section 2 are hereby fully incorporated and made Paragraphs 1-37 of this Count 7 as if fully set forth herein.

38.     At all times, Dennis was under certain direction, supervision and control of FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. (hereinafter referred to as FCC), and was otherwise its employee, servant, volunteer, Scoutmaster, agent and/or apparent agent.

39.     Dennis's work and duties for the defendant, FCC, included duties and activities in the State of Connecticut.

40.     Using the power, authority, and trust of his positions as a FCC leader and availing himself of Defendants' representations to parents and scouts that the FCC was a moral and safe

-30 -

Highly Confidential

BSA-PLAN_01097189

SA 2410

TIC•ESQ,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

place for boys, Dennis enticed, induced, directed, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him between 1967 and 1970.

41.    Dennis physically, mentally, and sexually abused **JOHN DOE#1** between 1967 and 1970.

42.    **JOHN DOE#1** was a registered scout during the time frames of abuse outlined in paragraphs 40 and 41.

43.    Based upon FCC's knowledge of previous incidents involving pedophiles and its knowledge and information regarding pedophiles within its organization  and within scouting generally, FCC could reasonably foresee future incidents involving pedophile Scout leaders, volunteers, employees, agents, and/or apparent agents, including Dennis.

44.    Defendant, FCC, owed a duty to Plaintiff **JOHN DOE#1** to prevent known child molesters from serving as Scout leaders with access to children.

45.    Defendant, FCC, was negligent in the manner that it screened, supervised, retained as a volunteer, and allowed Dennis to register as an adult volunteer, when FCC knew or should have known that Dennis posed a threat of sexual abuse to children, and was negligent in one or more of the following ways:

    a.    Allowed Dennis to routinely be alone with Plaintiff **JOHN DOE#1** for hours;

    b.    Failed to conduct as background check on Dennis when he registered with the FCC;

    c.    Failed to timely adopt policies and procedures to protect children;

    d.    Failed to advise parents of statistical data available to FCC from the Ineligible Volunteer Files;

    e.    Failed to advise parents that the Ineligible Volunteer File system of ejection of paid executives and volunteers, as the primary method of protecting Scouts from pedophiles, was ineffective;

-31-

Highly Confidential                                                      BSA-PLAN_01097190

SA 2411

TJC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

f.    Carelessly or negligently warned and/or failed to warn parents of information regarding adult Scoutmasters and their propensity to engage in appropriate behavior with Scouts;

g.    Failed to submit names of leaders, volunteers and employees for cross-checking with the Ineligible Volunteer Files;

h.    Failed to properly train local troops and sponsoring organizations in the vetting and registering of scout leaders;

i.    Failed to inform local troops and sponsoring organizations of the problem with pedophiles in Scouting;

j.    Hid the problem of pedophiles in scouting from parents, scouts, and other scouting leaders;

k.    Failed to require troops and sponsoring organizations to register local leaders;

l.    Failed to supervise Dennis when Dennis was with children;

m.    Failed to educate Scouts and/or parents and families of the problems with pedophiles in scouting;

n.    Failed to create an efficient and effective way to report complaints against Scoutmasters for sexual misconduct;

o.    Failed to implement random checks on Scoutmasters to assure that said Scoutmaster was leading Scouts free from any sexual abuse when they knew or should have known that sexual abuse was occurring on a regular basis between Scoutmasters and Scouts during the 1960's and 1970's;

p.    Failed to put in safeguards to prevent child abuse from occurring at its camps including Camp Mauwehu;

q.    Allowed Dennis to be alone with Plaintiff for hours at Camp Mauwehu with no further supervision; and

r.    Was otherwise careless and/or negligent.

46.    As a direct and proximate result of the aforementioned actions by the Defendant, Plaintiff **JOHN DOE#1** has suffered permanent injuries of a personal and pecuniary nature, and have been psychologically damaged and continues to be damaged psychologically and to experience mental anguish, humiliation and emotional and physical pain, suffering and distress.

-32-

BSA-PLAN_01097191
SA 2412

47.     Further, as a result of the aforementioned sexual abuse and breach of trust, Plaintiff **JOHN DOE#1** has suffered and will continue to suffer physical and emotional pain and dysfunction, and both economic and non-economic damages in an amount to be proved at trial.

48.     Further, FCC fraudulently concealed their knowledge as to the existence of pedophiles in Scouting and the scope of their direct, ongoing involvement in covering up that abuse..

49.     If Defendant, FCC and its agents had not misrepresented or concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA CORPORATION, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may be otherwise be held to apply in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

50.     Because of the Defendant's misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the FCC had done something wrong at any time, and because of the misrepresentation and concealment of FCC, was otherwise not aware of his injuries or the cause of his injuries.

51.     FCC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

52.     FCC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

TIC•ESQ, psc
Brooke A. Goff, Esq, Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-33-

BSA-PLAN_01097192
SA 2413

53.     In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the FCC.

**Repressed Memory**

54.     Because this abuse began when the Plaintiff was a minor, Plaintiff has suppressed the memories of his abuse.

55.     It was not until October of 2012- when the release of Ineligible Volunteer Files became widely publicized- that Plaintiff **JOHN DOE#1** discovered that he was repressing the memories of abuse, discovered the extent of his injuries, and became aware of his cause of action against the Defendant, FCC.

56.     Plaintiff **JOHN DOE#1** therefore did not discover that FCC acted negligently until October of 2012.

57.     Likewise, the nature of the injuries- mental and emotional damages caused by sexual abuse at a young age- is such that said injuries are not discovered until later in life.

58.     In this instance, the Plaintiff **JOHN DOE#1** did not discover his injuries until October of 2012.

59.     The nature of childhood sexual abuse makes disclosure of abuse less likely and more difficult. It is an event over which most survivors feel great embarrassment, shame, and guilt.

60.     Feeling responsible for your own abuse is a common reaction of abuse survivors and can serve as a protective factor. The social and psychological effects themselves carry shame, embarrassment, and often occupy the attention and resources of the survivor.

-34 -

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

BSA-PLAN_01097193
SA 2414

61.    These serve to prevent disclosure and many function to prevent the survivor from full awareness of the impact of the experience of abuse that happened many years previous in their childhood.

62.    Most sexual abuse takes place in the context of an ongoing relationship between victim and offender where many or even most aspects of the relationship are viewed as positive to the victim.

63.    Most, but not all, offenders engage children in a "grooming process" whereby the child is gradually but systematically conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the abuse, and is made to feel a participant in his/her own abuse.

64.    Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections and identify vulnerable children; take efforts to use their authority, position or relationship with adults who would otherwise protect children to lull the adults into believing that their children are safe with the offender, and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

65.    People often blame themselves for their personal problems and do not easily make a connection between a current problem and some event in the past which they have spent years trying to forget.

66.    The characteristics of childhood sexual abuse, outlined above, delayed Plaintiff **JOHN DOE#1** from discovering his cause of action and prevented the Plaintiff **JOHN DOE#1** from discovering his cause of action until October of 2012.

67.    FCC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and

-35-

Highly Confidential

BSA-PLAN_01097194
**SA 2415**

Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

68.     FCC's withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

69.     In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the FCC.

**Equitable Estoppel**

70.     FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. (hereinafter referred to as FCC) misrepresented and concealed material facts about the true nature of predatory and pedophile leaders within both the BOY SCOUTS OF AMERICA CORPORATION and the FCC.

71.     FCC knew at the time the representations were made, and when concealment occurred, that they were untrue.

72.     At no time did Plaintiff know that the representations made by FCC were untrue.

73.     At no time did Plaintiff **JOHN DOE#1** know that representations made by the FCC were untrue.

74.     The FCC intended and expected the representation to be acted upon by Plaintiff **JOHN DOE#1** and his parents and by other victims of sexual abuse by a scout leader.

75.     The FCC intended the Plaintiff **JOHN DOE#1** and his parents to act upon the misrepresentation because it had financial incentive to induce the Plaintiff and his parents to rely upon the misrepresentation.

-36-

TIC-ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097195
SA 2416

76. Specifically, if the FCC were to disclose the true extent of predatory pedophile leaders as described above, collected in the Ineligible Volunteer Files, the membership in FCC would drop substantially and the fees collected from said membership would significantly diminish.

77. Specifically, before, during and after 1967 and 1970, and through and including up to and beyond a period more recently than 2 years prior to the filing of the instant complaint, Plaintiff **JOHN DOE#1** and his parents detrimentally relied on the false statements and non-disclosures of the FCC about predatory and pedophile leaders, including Dennis, serving in the BOY SCOUTS OF AMERICA CORPORATION, FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC., CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA.

78. If the parents of Plaintiff **JOHN DOE#1** were informed by Defendant FCC prior to or around 1967 that the FCC knew or reasonably should have known at that time about pedophile leaders working or volunteering for and/or on behalf of FCC, they would not have permitted Plaintiff **JOHN DOE#1**, their then minor son, to join or participate in FCC.

79. At no time before the disclosure of the Ineligible Volunteer Files in October of 2012, did Plaintiff **JOHN DOE#1** know, nor reasonably should have known the extent of his injuries, or that he had been the victim of any wrongful conduct on the part of the Defendant, FCC.

80. Plaintiff, **JOHN DOE#1** has been prejudiced by his reliance on the representations of FCC and fraudulent misrepresentation of the FCC described above.

81. As a result, the FCC should be equitably estopped from asserting any statute of limitation defense.

-37-

Highly Confidential

BSA-PLAN_01097196

SA 2417

TJC●ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 ● 203.433.5070

## COUNT 4: JOHN DOE#1 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

82.     Paragraphs 1-82 of Count 3 are hereby fully incorporated and made Paragraphs 1-81 of this Count 4 as if fully set forth herein.

85.     Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants' representations to parents and scouts that the BSA was a moral and safe place for boys, Dennis enticed, induced, directed, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him as set forth above.

86.     Both before and after Dennis molested **JOHN DOE#1**, FCC hid its culpability by both making affirmative misrepresentations and by standing by, purposefully silent.

87.     Because of the special relationship between FCC and the Plaintiff, FCC owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** the truth about how Dennis was able to reenter scouting after having repeatedly engaged in conduct which should have lead to his being barred and placed in the Ineligible Volunteer files.

88.     Because of the fiduciary relationship between FCC and **JOHN DOE#1**, FCC owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** its longstanding notice of the pedophilia problem in scouting.

89.     Because of the fiduciary relationship between FCC and **JOHN DOE#1**, FCC owed a duty to **JOHN DOE#1** to disclose the fact that its Ineligible Volunteer Files were not sufficient to prevent sexual predators from entering scouting, and that indeed that FCC was deliberately misleading as to those files.

90.     At all times relevant to the Complaint, instead of disclosing the truth, FCC hid and covered up its liability by making numerous statements downplaying the problem of child

-38-

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097197
SA 2418

TJC•ESQ.,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

molestation in Scouting, and affirmatively misrepresenting its practices as they related to child protection.

91. In each of the years between at least 1965 and through within two years of the date of the filing of this complaint and beyond, the BOY SCOUTS OF AMERICA CORPORATION has misrepresented and under-reported the true nature and number of predatory and pedophile scout leaders that have served BOY SCOUTS OF AMERICA CORPORATION and its local councils, and of its knowledge specifically relative to Dennis, and those with whom he acted to effect his abuse of Scouts.

92. The BOY SCOUTS OF AMERICA CORPORATION has had and presently do have a financial incentive to misrepresent and hide the true nature and scope of this problem of predatory and pedophile scout leaders that, more particularly described below.

93. For years, BOY SCOUTS OF AMERICA CORPORATION have carefully protected the Ineligible Volunteer Files and repeatedly tried to prevent lawyers representing victims from obtaining and assessing those files, and affirmatively misrepresented the reliability of those files.

94. BOY SCOUTS OF AMERICA CORPORATION fraudulently concealed its culpability for the molestation of **JOHN DOE#1** by:

a. Engaging in a media campaign to downplay the problem of pedophilia in Scouting;

b. Settling claims of other scouts for confidential sums and making said settlements subject to confidentiality provisions;

c. Failing to disclose the magnitude of the pedophile problem in scouting, and affirmatively misrepresenting its knowledge regarding the failures of its 'child

protection' system generally, and in particular as it relates to plaintiffs' molestation and Dennis' activities in this case;

d.    Failure to disclose to parents the problems of pedophiles infiltrating scouting; and

e.    Failing to disclose their negligence to the abused children.

69.    Because Defendant and its agents misrepresented and concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may otherwise be held to in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

70.    Because of the Defendant, BOY SCOUTS OF AMERICA CORPORATION'S misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the BOY SCOUTS OF AMERICA CORPORATION had done something wrong at any time, and because of the misrepresentation and concealment of the BOY SCOUTS OF AMERICA CORPORATION, was otherwise not aware of his injuries or the cause of his injuries.

71.    FCC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

72.    FCC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

-40-

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097199
SA 2420

**Separate Injury Caused by Fraud**

73.     In addition to any injuries caused by the childhood sexual abuse, the fraud and fraudulent concealment by the FCC proximately caused the separate and distinct injuries to **JOHN DOE#1**.

74.     By fraudulently concealing its liability, FCC prevented the Plaintiff **JOHN DOE#1** from receiving the mental health care he needed in order to recover from the abuse.

76.     By fraudulently concealing its liability, FCC caused further mental injuries or exacerbated the mental injuries stemming from the childhood sexual abuse.

77.     By fraudulently concealing its liability, FCC caused further emotional damages or exacerbated the emotional damages that stemmed from the childhood sexual abuse.

78.     By fraudulently concealing its liability, FCC's silence caused the Plaintiff **JOHN DOE#1** to withhold disclosing his abuse to friends and family and prevented **JOHN DOE#1** from leading a healthy life.

79.     By fraudulently concealing its liability, FCC caused the Plaintiffs, including **JOHN DOE#1**, to shoulder all of the guilt and shame associated with Dennis's molestation.

80.     By fraudulently concealing its liability, FCC increased the risk of harm to **JOHN DOE#1** from abuse.

81.     The fraudulent concealment of the FCC caused a lost chance of **JOHN DOE#1** to mitigate his damages from abuse.

82.     The fraudulent concealment by FCC caused additional further suffering by the Plaintiff **JOHN DOE#1**.

83.     The fraudulent concealment by FCC prevented **JOHN DOE#1** from getting the mental health care required and, in the absence of said care, **JOHN DOE#1** engaged in dangerous behaviors.

-41-

Highly Confidential

BSA-PLAN_01097200

SA 2421

TIC•ESQ psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

84.    Had FCC promptly disclosed its liability, rather than covered-up its liability, **JOHN DOE#1** would not have suffered problems with shame, depression, inability to have a normal relationship and inability to trust.

## COUNT 5: JOHN DOE#1- CONNECTICUT YANKEE COUNCIL., INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

1-37.    Paragraphs 1-37 of Section 3 are hereby fully incorporated and made Paragraphs 1-37 of this Count 7 as if fully set forth herein.

38.    At all times, Dennis was under certain direction, supervision and control of CONNECTICUT YANKEE COUNCIL OF BOY SCOUTS OF AMERICA, INC. (hereinafter referred to as CYC), and was otherwise its employee, servant, volunteer, Scoutmaster, agent and/or apparent agent.

39.    Dennis's work and duties for the defendant, CYC, included duties and activities in the State of Connecticut.

40.    Using the power, authority, and trust of his positions as a CYC leader and availing himself of Defendants' representations to parents and scouts that the CYC was a moral and safe place for boys, Dennis enticed, induced, directed, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him between 1967 and 1970.

41.    Dennis physically, mentally, and sexually abused **JOHN DOE#1** between 1967 and 1970.

42.    **JOHN DOE#1** was a registered scout during the time frames of abuse outlined in paragraphs 40 and 41.

-42-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097201

SA 2422

43.     Based upon CYC's knowledge of previous incidents involving pedophiles and its knowledge and information regarding pedophiles within its organization  and within scouting generally, CYC could reasonably foresee future incidents involving pedophile Scout leaders, volunteers, employees, agents, and/or apparent agents, including Dennis.

44.     Defendant, CYC, owed a duty to Plaintiff **JOHN DOE#1** to prevent known child molesters from serving as Scout leaders with access to children.

45.     Defendant, CYC, was negligent in the manner that it screened, supervised, retained as a volunteer, and allowed Dennis to register as an adult volunteer, when CYC knew or should have known that Dennis posed a threat of sexual abuse to children, and was negligent in one or more of the following ways:

a.      Allowed Dennis to routinely be alone with Plaintiff **JOHN DOE#1** for hours;

b.      Failed to conduct as background check on Dennis when he registered with the CYC;

c.      Failed to timely adopt policies and procedures to protect children;

d.      Failed to advise parents of statistical data available to CYC from the Ineligible Volunteer Files;

e.      Failed to advise parents that the Ineligible Volunteer File system of ejection of paid executives and volunteers, as the primary method of protecting Scouts from pedophiles, was ineffective;

f.      Carelessly or negligently warned and/or failed to warn parents of information regarding adult Scoutmasters and their propensity to engage in appropriate behavior with Scouts;

g.      Failed to submit names of leaders, volunteers and employees for cross-checking with the Ineligible Volunteer Files;

h.      Failed to properly train local troops and sponsoring organizations in the vetting and registering of scout leaders;

i.      Failed to inform local troops and sponsoring organizations of the problem with pedophiles in Scouting;

-43 -

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

TJC•ESQ psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

j.    Hid the problem of pedophiles in scouting from parents, scouts, and other scouting leaders;

k.    Failed to require troops and sponsoring organizations to register local leaders;

l.    Failed to supervise Dennis when Dennis was with children;

m.    Failed to educate Scouts and/or parents and families of the problems with pedophiles in scouting;

n.    Failed to create an efficient and effective way to report complaints against Scoutmasters for sexual misconduct;

o.    Failed to implement random checks on Scoutmasters to assure that said Scoutmaster was leading Scouts free from any sexual abuse when they knew or should have known that sexual abuse was occurring on a regular basis between Scoutmasters and Scouts during the 1960's and 1970's;

p.    Failed to put in safeguards to prevent child abuse from occurring at its camps including Camp Mauwehu;

q.    Allowed Dennis to be alone with Plaintiff for hours at Camp Mauwehu with no further supervision; and

r.    Was otherwise careless and/or negligent.

46.    As a direct and proximate result of the aforementioned actions by the Defendant, Plaintiff **JOHN DOE#1** has suffered permanent injuries of a personal and pecuniary nature, and have been psychologically damaged and continues to be damaged psychologically and to experience mental anguish, humiliation and emotional and physical pain, suffering and distress.

47.    Further, as a result of the aforementioned sexual abuse and breach of trust, Plaintiff **JOHN DOE#1** has suffered and will continue to suffer physical and emotional pain and dysfunction, and both economic and non-economic damages in an amount to be proved at trial.

48.    Further, CYC fraudulently concealed their knowledge as to the existence of pedophiles in Scouting and the scope of their direct, ongoing involvement in covering up that abuse..

-44 -

BSA-PLAN_01097203
SA 2424

49.     If Defendant, CYC and its agents had not misrepresented or concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA CORPORATION, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may be otherwise be held to apply in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

50.     Because of the Defendant's misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the CYC had done something wrong at any time, and because of the misrepresentation and concealment of CYC, was otherwise not aware of his injuries or the cause of his injuries.

51.     CYC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

52.     CYC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

53.     In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the CYC.

**Repressed Memory**

54.     Because this abuse began when the Plaintiff was a minor, Plaintiff has suppressed the memories of his abuse.

-45-

TIC●ESO_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 ● 203.433.5070

BSA-PLAN_01097204

SA 2425

55.     It was not until October of 2012- when the release of Ineligible Volunteer Files became widely publicized- that Plaintiff **JOHN DOE#1** discovered that he was repressing the memories of abuse, discovered the extent of his injuries, and became aware of his cause of action against the Defendant, CYC.

56.     Plaintiff **JOHN DOE#1** therefore did not discover that CYC acted negligently until October of 2012.

57.     Likewise, the nature of the injuries- mental and emotional damages caused by sexual abuse at a young age- is such that said injuries are not discovered until later in life.

58.     In this instance, the Plaintiff **JOHN DOE#1** did not discover his injuries until October of 2012.

59.     The nature of childhood sexual abuse makes disclosure of abuse less likely and more difficult. It is an event over which most survivors feel great embarrassment, shame, and guilt.

60.     Feeling responsible for your own abuse is a common reaction of abuse survivors and can serve as a protective factor. The social and psychological effects themselves carry shame, embarrassment, and often occupy the attention and resources of the survivor.

61.     These serve to prevent disclosure and many function to prevent the survivor from full awareness of the impact of the experience of abuse that happened many years previous in their childhood.

62.     Most sexual abuse takes place in the context of an ongoing relationship between victim and offender where many or even most aspects of the relationship are viewed as positive to the victim.

-46-

Highly Confidential

63.    Most, but not all, offenders engage children in a "grooming process" whereby the child is gradually but systematically conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the abuse, and is made to feel a participant in his/her own abuse.

64.    Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections and identify vulnerable children; take efforts to use their authority, position or relationship with adults who would otherwise protect children to lull the adults into believing that their children are safe with the offender, and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

65.    People often blame themselves for their personal problems and do not easily make a connection between a current problem and some event in the past which they have spent years trying to forget.

66.    The characteristics of childhood sexual abuse, outlined above, delayed Plaintiff **JOHN DOE#1** from discovering his cause of action and prevented the Plaintiff **JOHN DOE#1** from discovering his cause of action until October of 2012.

67.    CYC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

68.    CYC's withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

69.    In accordance with Connecticut General Statute Section 52-595, the plaintiffs have a valid cause of action against the CYC.

-47-

TIC●ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097206

SA 2427

**Equitable Estoppel**

70.     CONNECTICUT YANKEE COUNCIL OF BOY SCOUTS OF AMERICA, INC. (hereinafter referred to as CYC) misrepresented and concealed material facts about the true nature of predatory and pedophile leaders within both the BOY SCOUTS OF AMERICA CORPORATION and the CYC.

71.     CYC knew at the time the representations were made, and when concealment occurred, that they were untrue.

72.     At no time did Plaintiff know that the representations made by CYC were untrue.

73.     At no time did Plaintiff **JOHN DOE#1** know that representations made by the CYC were untrue.

74.     The CYC intended and expected the representation to be acted upon by Plaintiff **JOHN DOE#1** and his parents and by other victims of sexual abuse by a scout leader.

75.     The CYC intended the Plaintiff **JOHN DOE#1** and his parents to act upon the misrepresentation because it had financial incentive to induce the Plaintiff and his parents to rely upon the misrepresentation.

76.     Specifically, if the CYC were to disclose the true extent of predatory pedophile leaders as described above, collected in the Ineligible Volunteer Files, the membership in CYC would drop substantially and the fees collected from said membership would significantly diminish.

77.     Specifically, before, during and after 1967 and 1970, and through and including up to and beyond a period more recently than 2 years prior to the filing of the instant complaint, Plaintiff **JOHN DOE#1** and his parents detrimentally relied on the false statements and non-disclosures of the CYC about predatory and pedophile leaders, including Dennis, serving in the

-48-

Highly Confidential

TIC•ESQ, psc
Brooke A. Goff, Esq, Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097207
SA 2428

BOY SCOUTS OF AMERICA CORPORATION, CONNECTICUT YANKEE COUNCIL OF BOY SCOUTS OF AMERICA, INC., CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA.

78.     If the parents of Plaintiff **JOHN DOE#1** were informed by Defendant CYC prior to or around 1967 that the CYC knew or reasonably should have known at that time about pedophile leaders working or volunteering for and/or on behalf of CYC, they would not have permitted Plaintiff **JOHN DOE#1**, their then minor son, to join or participate in CYC.

79.     At no time before the disclosure of the Ineligible Volunteer Files in October of 2012, did Plaintiff **JOHN DOE#1** know, nor reasonably should have known the extent of his injuries, or that he had been the victim of any wrongful conduct on the part of the Defendant, CYC.

80.     Plaintiff, **JOHN DOE#1** has been prejudiced by his reliance on the representations of CYC and fraudulent misrepresentation of the CYC described above.

81.     As a result, the CYC should be equitably estopped from asserting any statute of limitation defense.

## COUNT 6: JOHN DOE#1 v. CONNECTICUT YANKEE COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

82.     Paragraphs 1-82 of Count 5 are hereby fully incorporated and made Paragraphs 1-81 of this Count 4 as if fully set forth herein.

85.     Using the power, authority, and trust of his positions as a BSA leader and availing himself of Defendants' representations to parents and scouts that the BSA was a moral and safe place for boys, Dennis enticed, induced, directed, coerced, and forced **JOHN DOE#1** to engage in deviant sexual acts with him as set forth above.

-49-

TJC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

86.    Both before and after Dennis molested **JOHN DOE#1**, CYC hid its culpability by both making affirmative misrepresentations and by standing by, purposefully silent.

87.    Because of the special relationship between CYC and the Plaintiff, CYC owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** the truth about how Dennis was able to reenter scouting after having repeatedly engaged in conduct which should have lead to his being barred and placed in the Ineligible Volunteer files.

88.    Because of the fiduciary relationship between CYC and **JOHN DOE#1**, CYC owed a duty to **JOHN DOE#1** to disclose to **JOHN DOE#1** its longstanding notice of the pedophilia problem in scouting.

89.    Because of the fiduciary relationship between CYC and **JOHN DOE#1**, CYC owed a duty to **JOHN DOE#1** to disclose the fact that its Ineligible Volunteer Files were not sufficient to prevent sexual predators from entering scouting, and that indeed that CYC was deliberately misleading as to those files.

90.    At all times relevant to the Complaint, instead of disclosing the truth, CYC hid and covered up its liability by making numerous statements downplaying the problem of child molestation in Scouting, and affirmatively misrepresenting its practices as they related to child protection.

91.    In each of the years between at least 1965 and through within two years of the date of the filing of this complaint and beyond, the BOY SCOUTS OF AMERICA CORPORATION has misrepresented and under-reported the true nature and number of predatory and pedophile scout leaders that have served BOY SCOUTS OF AMERICA CORPORATION and its local councils, and of its knowledge specifically relative to Dennis, and those with whom he acted to effect his abuse of Scouts.

-50 -

Highly Confidential

92.     The BOY SCOUTS OF AMERICA CORPORATION has had and presently do have a financial incentive to misrepresent and hide the true nature and scope of this problem of predatory and pedophile scout leaders that, more particularly described below.

93.     For years, BOY SCOUTS OF AMERICA CORPORATION have carefully protected the Ineligible Volunteer Files and repeatedly tried to prevent lawyers representing victims from obtaining and assessing those files, and affirmatively misrepresented the reliability of those files.

94.     BOY SCOUTS OF AMERICA CORPORATION fraudulently concealed its culpability for the molestation of **JOHN DOE#1** by:

a.     Engaging in a media campaign to downplay the problem of pedophilia in Scouting;

b.     Settling claims of other scouts for confidential sums and making said settlements subject to confidentiality provisions;

c.     Failing to disclose the magnitude of the pedophile problem in scouting, and affirmatively misrepresenting its knowledge regarding the failures of its 'child protection' system generally, and in particular as it relates to plaintiffs' molestation and Dennis' activities in this case;

d.     Failure to disclose to parents the problems of pedophiles infiltrating scouting; and

e.     Failing to disclose their negligence to the abused children.

69.     Because Defendant and its agents misrepresented and concealed the true nature of predatory and pedophile leaders in BOY SCOUTS OF AMERICA, **JOHN DOE#1** would have discovered earlier, and within the limitation period (whatever that may otherwise be held to in this case); and therefore Plaintiff **JOHN DOE#1** would have filed his cause of action (a) before

-51 -

TUC-ESO_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

BSA-PLAN_01097210
SA 2431

his 18th birthday; and (b) in less than 30 years after his 18th birthday; or (c) earlier than he did and within any applicable Discovery Rule.

70.     Because of the Defendant, BOY SCOUTS OF AMERICA CORPORATION'S misrepresentation and concealment, **JOHN DOE#1** (a) was unaware of his claim when he turned 18; (b) did not know the BOY SCOUTS OF AMERICA CORPORATION had done something wrong at any time, and because of the misrepresentation and concealment of the BOY SCOUTS OF AMERICA CORPORATION, was otherwise not aware of his injuries or the cause of his injuries.

71.     CYC had actual knowledge of pedophiles involvement in the Boy Scouts Organization and intentionally withheld the information from the public and from the Scouts and Parents in effort to obtain a delay on the plaintiff's part in filing a complaint on their cause of action.

72.     CYC withholding the knowledge of the explosion of pedophiles within the Boy Scouts Organization caused Scouts and other individuals like the Plaintiffs to suffer serious injuries as a result of sexual abuse by Scout Masters.

**Separate Injury Caused by Fraud**

73.     In addition to any injuries caused by the childhood sexual abuse, the fraud and fraudulent concealment by the CYC proximately caused the separate and distinct injuries to **JOHN DOE#1.**

74.     By fraudulently concealing its liability, CYC prevented the Plaintiff **JOHN DOE#1** from receiving the mental health care he needed in order to recover from the abuse.

76.     By fraudulently concealing its liability, CYC caused further mental injuries or exacerbated the mental injuries stemming from the childhood sexual abuse.

-52-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

77.     By fraudulently concealing its liability, CYC caused further emotional damages or exacerbated the emotional damages that stemmed from the childhood sexual abuse.

78.     By fraudulently concealing its liability, CYC's silence caused the Plaintiff **JOHN DOE#1** to withhold disclosing his abuse to friends and family and prevented **JOHN DOE#1** from leading a healthy life.

79.     By fraudulently concealing its liability, CYC caused the Plaintiffs, including **JOHN DOE#1**, to shoulder all of the guilt and shame associated with Dennis's molestation.

80.     By fraudulently concealing its liability, CYC increased the risk of harm to **JOHN DOE#1** from abuse.

81.     The fraudulent concealment of the CYC caused a lost chance of **JOHN DOE#1** to mitigate his damages from abuse.

82.     The fraudulent concealment by CYC caused additional further suffering by the Plaintiff **JOHN DOE#1**.

83.     The fraudulent concealment by CYC prevented **JOHN DOE#1** from getting the mental health care required and, in the absence of said care, **JOHN DOE#1** engaged in dangerous behaviors.

84.     Had CYC promptly disclosed its liability, rather than covered-up its liability, **JOHN DOE#1** would not have suffered problems with shame, depression, inability to have a normal relationship and inability to trust.

## COUNT 7: **JOHN DOE#3 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE**

**John Doe 3** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1967 and 1973, during which time he was a registered scout.

-53-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

BSA-PLAN_01097212

**SA 2433**

COUNT 8:JOHN DOE#3 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

## COUNT 9 JOHN DOE#3 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

## COUNT 10: JOHN DOE#3 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

## COUNT 11: JOHN DOE#3 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

## COUNT 12: JOHN DOE#3 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

TJC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-54-

BSA-PLAN_01097213

SA 2434

**COUNT 13: JOHN DOE#4 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE**

**John Doe 4** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1965 and 1970, during which time he was a registered scout.

**COUNT 14: JOHN DOE#4 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 15 JOHN DOE#4 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 16: JOHN DOE#4 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 17: JOHN DOE#4 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 18: JOHN DOE#4 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

-55 -

Highly Confidential

BSA-PLAN_01097214

SA 2435

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

### COUNT 19: JOHN DOE#5 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE

**John Doe 5** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1965 and 1970, during which time he was a registered scout.

### COUNT 20:JOHN DOE#5 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

### COUNT 21 JOHN DOE#5 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

### COUNT 22: JOHN DOE#5 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

### COUNT 23: JOHN DOE#5 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

-56-

Highly Confidential

BSA-PLAN_01097215

SA 2436

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

## COUNT 24: JOHN DOE#5 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

## COUNT 25: **JOHN DOE#6 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**John Doe 6** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1967 and 1972, during which time he was a registered scout.

## COUNT 26:**JOHN DOE#6 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

## COUNT 27 JOHN DOE#6 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

## COUNT 28: JOHN DOE#6 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

-57 -

Highly Confidential

TIC·ESQ,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 29: JOHN DOE#6 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 30: JOHN DOE#6 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

COUNT 31**: JOHN DOE#7 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE**

**John Doe 7** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1967 and 1972, during which time he was a registered scout.

COUNT 32**:JOHN DOE#7 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 33 JOHN DOE#7 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

-58-

TIC•ESO_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 34: JOHN DOE#7 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 35: JOHN DOE#7 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 36: JOHN DOE#7 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

COUNT 37**: JOHN DOE#8 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**John Doe#8** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1967 and 1972, during which time he was a registered scout.

COUNT 38**:JOHN DOE#8 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-59-

BSA-PLAN_01097218

SA 2439

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 39 JOHN DOE#8 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 40: JOHN DOE#8 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 41: JOHN DOE#8 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 42: JOHN DOE#8 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 43: JOHN DOE#9 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE**

-60-

TIC-ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

**JOHN DOE#9** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1971 and 1974, during which time he was a registered scout.

## COUNT 44: JOHN DOE#9 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

## COUNT 45 JOHN DOE#9 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

## COUNT 46: JOHN DOE#9 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

## COUNT 47: JOHN DOE#9 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

## COUNT 48: JOHN DOE#9 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

TJC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-61-

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 49: JOHN DOE#10 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**JOHN DOE#10** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1963 and 1968, during which time he was a registered scout.

**COUNT 50:JOHN DOE#10 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 51 JOHN DOE#10 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 52: JOHN DOE#10 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 53: JOHN DOE#10 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

-62-

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 54: JOHN DOE#10 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 55: JOHN DOE#11 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**JOHN DOE#11** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1967 and 1972, during which time he was a registered scout.

**COUNT 56:JOHN DOE#11 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 57 JOHN DOE#11 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 58: JOHN DOE#11 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

-63-

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

## COUNT 59: JOHN DOE#11 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

## COUNT 60: JOHN DOE#11 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

## COUNT 61: JOHN DOE#12 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE

**JANE DOE#3** is the wife of the decedent, **JOHN DOE#12** and the Administratrix of the Estate of **JOHN DOE#12. JOHN DOE#12** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1966 and 1971, during which time he was a registered scout.

## COUNT 62: JOHN DOE#12 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

## COUNT 63: JOHN DOE#12 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

TIC●ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-64-

BSA-PLAN_01097223
SA 2444

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 64: JOHN DOE#12 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 65: JOHN DOE#12 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 66: JOHN DOE#12 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 67: JOHN DOE#13 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**JOHN DOE#13** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1966 and 1971, during which time he was a registered scout.

**COUNT 68: JOHN DOE#13 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD**

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-65-

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

**COUNT 69: JOHN DOE#13 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 70: JOHN DOE#13 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 71: JOHN DOE#13 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 72: JOHN DOE#13 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 73: JOHN DOE#14 v. BOY SCOUTS OF AMERICA CORPORATION-NEGLIGENCE**

-66-

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

**JOHN DOE#14** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1970 and 1974, during which time he was a registered scout.

## COUNT 74: JOHN DOE#14 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

## COUNT 75: JOHN DOE#14 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

## COUNT 76: JOHN DOE#14 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

## COUNT 77: JOHN DOE#14 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

## COUNT 78: JOHN DOE#14 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

-67-

TJC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

### COUNT 79: JOHN DOE#15 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE

**JOHN DOE#15** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1963 and 1968, during which time he was a registered scout.

### COUNT 80: JOHN DOE#15 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

### COUNT 81: JOHN DOE#15 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

### COUNT 82: JOHN DOE#15 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

### COUNT 83: JOHN DOE#15 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

TJC-ESQ, psc<br>Brooke A. Goff, Esq. Juris # 437668<br>100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-68-

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

### COUNT 84: JOHN DOE#15 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

### COUNT 85: JOHN DOE#16 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE

**JOHN DOE#16** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1971 and 1975, during which time he was a registered scout.

### COUNT 86: JOHN DOE#16 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

### COUNT 87: JOHN DOE#16 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

### COUNT 88: JOHN DOE#16 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

-69-

Highly Confidential

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

### COUNT 89: JOHN DOE#16 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

### COUNT 90: JOHN DOE#16 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

### COUNT 91: JOHN DOE#17 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE

**JOHN DOE#17** adopts the foregoing Count 1 as his second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **this plaintiff** between 1962 and 1967, during which time he was a registered scout.

### COUNT 92: JOHN DOE#17 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

This plaintiff incorporates by reference the dates of his abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as his second revised complaint, against the above named defendant.

### COUNT 93: JOHN DOE#17 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

TIC•ESQ,psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-70-

BSA-PLAN_01097229
SA 2450

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 3 as his second revised complaint against the above named defendant.

**COUNT 94: JOHN DOE#17 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth above, and otherwise adopts the foregoing Count 4 as his second revised complaint, against the above named defendant.

**COUNT 95: JOHN DOE#17 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 5 as his second revised complaint against the above named defendant.

**COUNT 96: JOHN DOE#17 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of his abuse as set forth hereinabove, and adopts the foregoing Count 6 as his second revised complaint against the above named defendant.

**COUNT 97: JANE DOE#1 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE**

**JANE DOE#1** adopts the foregoing Count 1 as her second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **plaintiff**, using her as a part of, and specifically to facilitate his ongoing sexual activity with Scouts between 1965 and 1973, during which time she was a child in the home of Dennis, which conduct was reasonably foreseeable to Defendant, and which they had a duty to plaintiff to prevent given their knowledge of such

-71-

BSA-PLAN_01097230

SA 2451

TJC•ESQ, psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

activities by its Scout Leaders, and that more specifically as to this plaintiff, Defendant negligently

   a.   Allowed Dennis to routinely be alone with Scouts and allow Dennis to take the Scouts to his home where they knew or should have known the Scouts would be abused and therefore put other members of the household at risk of abuse and danger;

   b.   Allowed Dennis to bring home Scouts and have special relationships with said Scouts when they knew or should have known that other members of the household would be effected both sexually and mentally;

   c.   Allowed Dennis to become guardians of boys that were Scouts when they knew or should have known it was inappropriate and would lead to abuse within the home between Dennis and said Scout and therefore put other members of the household in sexual and mental danger; and

## COUNT 98: JANE DOE#1 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

Ther plaintiff incorporates by reference the dates of her abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as her second revised complaint, against the above named defendant.

## COUNT 99: JANE DOE#1 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE

This plaintiff incorporates by reference the dates of her abuse and the nature of the conduct as set forth above, and otherwise adopts the foregoing Count 3 as her second revised complaint against the above named defendant.

## COUNT 100: JANE DOE#1 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD

This plaintiff incorporates by reference the dates of her abuse as set forth above, and otherwise adopts the foregoing Count 4 as her second revised complaint, against the above named defendant.

## COUNT 101: JANE DOE#1 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE

TIC•ESQ.psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-72-

BSA-PLAN_01097231

SA 2452

This plaintiff incorporates by reference the dates of her abuse and the nature of the conduct as set forth hereinabove, and adopts the foregoing Count 5 as her second revised complaint against the above named defendant.

## COUNT 102: JANE DOE#1 - CONNECTICUT YANKEE COUNCIL., INC., BOY SCOUTS OF AMERICA - FRAUD

This plaintiff incorporates by reference the dates of her abuse as set forth hereinabove, and adopts the foregoing Count 6 as her second revised complaint against the above named defendant.

## COUNT 103: JANE DOE#2 v. BOY SCOUTS OF AMERICA CORPORATION- NEGLIGENCE

**JANE DOE#2** adopts the foregoing Count 1 as her second revised complaint, subject to stating that Dennis physically, mentally, and sexually abused **plaintiff**, using her as a part of, and specifically to facilitate his ongoing sexual activity with Scouts between 1963 and 1970, during which time she was a child in the home of Dennis, which conduct was reasonably foreseeable to Defendant, and which they had a duty to plaintiff to prevent given their knowledge of such activities by its Scout Leaders, and that more specifically as to this plaintiff, Defendant negligently

  a.   Allowed Dennis to routinely be alone with Scouts and allow Dennis to take the Scouts to his home where they knew or should have known the Scouts would be abused and therefore put other members of the household at risk of abuse and danger;

  b.   Allowed Dennis to bring home Scouts and have special relationships with said Scouts when they knew or should have known that other members of the household would be effected both sexually and mentally;

  c.   Allowed Dennis to become guardians of boys that were Scouts when they knew or should have known it was inappropriate and would lead to abuse within the home between Dennis and said Scout and therefore put other members of the household in sexual and mental danger; and

## COUNT 104: JANE DOE#2 v. BOY SCOUTS OF AMERICA CORPORATION- FRAUD

-73 -

TJC•ESQ_psc<br>Brooke A. Goff, Esq. Juris # 437668<br>100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

Ther plaintiff incorporates by reference the dates of her abuse as set forth in the immediately proceeding paragraph, and otherwise adopts the foregoing Count 2 as her second revised complaint, against the above named defendant.

**COUNT 105: JANE DOE#2 - FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - NEGLIGENCE**

This plaintiff incorporates by reference the dates of her abuse and the nature of the conduct as set forth above, and otherwise adopts the foregoing Count 3 as her second revised complaint against the above named defendant.

**COUNT 106: JANE DOE#2 v. FAIRFIELD COUNTY COUNCIL OF BOY SCOUTS OF AMERICA, INC. - FRAUD**

This plaintiff incorporates by reference the dates of her abuse as set forth above, and otherwise adopts the foregoing Count 4 as her second revised complaint, against the above named defendant.

**COUNT 107: JANE DOE#2 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - NEGLIGENCE**

This plaintiff incorporates by reference the dates of her abuse and the nature of the conduct as set forth hereinabove, and adopts the foregoing Count 5 as her second revised complaint against the above named defendant.

**COUNT 108: JANE DOE#2 - CONNECTICUT YANKEE COUNCIL, INC., BOY SCOUTS OF AMERICA - FRAUD**

This plaintiff incorporates by reference the dates of her abuse as set forth hereinabove, and adopts the foregoing Count 6 as her second revised complaint against the above named defendant.

TIC•ESQ_psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

-74-

BSA-PLAN_01097233
SA 2454

THE PLAINTIFFS[1],

BY: _____

Brooke A. Goff, Esq.
TJC•ESQ, psc
100 Beard SawMill
Suite 630
Shelton, CT  06484
203.433.5070
Juris # 437668

BY: _____

Timothy J. Conlon, Esq.
TJC•ESQ, psc
The Turks Head Building
76 Westminster St.
Suite 420
Providence, RI 02903

---

[1] Other than Plaintiff John Doe 2

-75-

Highly Confidential

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically delivered on February 14, 2017 to all counsel and self-represented parties of record.

The Reinken Law Firm
1100 Summer Street,
Stamford CT06905

Ryan Ryan Deluca
707 Summer Street
Stamford, CT 06901

Howd & Ludorf
65 Wethersfield Avennue
Hartford, CT 06114

BY: _____

TIC•ESQ. psc
Brooke A. Goff, Esq. Juris # 437668
100 Beard Sawmill Road, Shelton, Connecticut 06484 • 203.433.5070

BSA-PLAN_01097235
SA 2456

DAILY REPORT *for use with* CASUALTY INSURANCE POLICY *Form 8117, and* DECLARATIONS *Page Form AL-51-0*

COMPANY COPY

## THE HARTFORD INSURANCE GROUP

RISK CARD (Not only) INSURER

[ ] Hartford Fire Insurance Co.
[ ] Hartford Accident and Indemnity Co.
[ ] Hartford Casualty Insurance Co.
[ ] New York Underwriters Insurance Co.
[ ] Twin City Fire Insurance Co.

Filing [X] Annual Audit | Monthly | [ ] Participating
[ ] Semi-Annual | Bureau | [ ] Retro
[ ] Quarterly | Loss Control | [ ] Reinsurance

Co. Code **5**

**POLICY NO.   04   C   157992   7   RET. 1-13   SP   YR.**

### DECLARATIONS
Items
Previous Policy No. ~~040154949~~

PINE TREE COUNCIL
BOY SCOUTS OF AMERICA (SEE END #1)
125 AUBURN ST
PORTLAND ME

MB 1-9

1. Named Insured and Address

The named insured is: [ ] Individual  [ ] Joint Venture  [ ] Partnership  [X] Corporation  [ ] Other

2. Policy Period —→ From **01 25 74**5 To **01 25 75**6
12:01 A. M., standard time at the address of the *named insured* as stated herein.

Audit Period: Annual, unless otherwise stated.
[ ] Semi-Annual
[ ] Quarterly
[ ] Monthly

Producer's Name and Address        Agent Code

**THE GHM AGENCY INC        030082**

3. The advance premium for this policy is as stated below. Insurance is afforded by the Coverage Parts forming a part hereof, subject to such limits of liability as are stated therein and subject to all the terms of the policy having reference thereto.

### SUMMARY OF ADVANCE PREMIUMS

| COVERAGE PARTS | | ADVANCE PREMIUM |
|---|---|---|
| Comprehensive General Liability Insurance | $ | ~~1,109.00~~ 1,207.00 |
| Comprehensive Automobile Liability Insurance | $ | ~~188.00~~ 203.00 |
| Automobile Medical Payments Insurance | $ | |
| Uninsured Motorists Insurance | $ | 9.00 |
| Automobile Physical Damage Insurance | $ | ~~72.00~~ 39.00 |
| Premises Medical Payments Insurance | $ | |
| Contractual Liability Insurance | $ | |
| Personal Injury Liability Insurance | $ | ~~72.00~~ 84.00 |
| Garage Insurance | $ | |

Form Numbers of Coverage Parts and endorsements not listed on Coverage Parts forming part of Policy at issue:
A2714-0   L-3505-0
L3020-1 L3503-0 A3007-0 A3009-0 A3010-0 G2240-0B

| TOTAL ADVANCE PREMIUM | ~~1,450.00~~ 1,542.00 |
|---|---|

If Policy Period more than one year: Gross Premium $ _____ Discount $ _____ Net Premium $ _____
Premium is payable: On effective date of Policy $ _____ 1st Anniversary $ _____ 2nd Anniversary $ _____

4. Business of the *named insured* is _____ CAMPS

5. During the past 3 years no Insurer has cancelled insurance, issued to the *named insured,* similar to that afforded hereunder unless otherwise stated herein.

02-06-74 pm/j1c

**JTX-1154**

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

Form AL-51-0 CDR  Printed in U. S. A.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002709
BSA-PLAN_00258162
SA 2457

## COMPREHENSIVE GENERAL LIABILITY INSURANCE—COVERAGE PART

**COMPANY COPY**

| Und. Approved. | Confidential Report | Und. Votes: |
|---|---|---|
| Quality Control | | |

This Coverage Part forms a part of Policy No. 04 C157992 issued by THE HARTFORD INSURANCE GROUP Company designated therein, and takes effect as of the effective date of said policy unless otherwise stated herein.

*(For use only if this Coverage Part is effective after the effective date of the Policy)*
This Coverage Part is effective 01 25 74 (at the hour stated in the policy) and forms a part of the above designated policy issued to

The Company, in consideration of the payment of the premium and subject to all of the provisions of the policy not expressly modified herein, agrees with the *named insured* as follows:

### SCHEDULE

The insurance afforded is only with respect to such of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

| Coverages | Advance Premiums | Limits of Liability |
|---|---|---|
| A — Bodily Injury Liability | $ 865.00    963.00 | $ 300 ,000 each occurrence<br>$ 300 ,000 aggregate |
| B — Property Damage Liability | $ 244.00 | $ 25 ,000 each occurrence<br>$ 25 ,000 aggregate |

| Rating Classifications<br>Entries herein, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Code No. | Premium Bases | Rates B.I. | Rates P.D. | Advance Premiums B.I. | Advance Premiums P.D. |
|---|---|---|---|---|---|---|
| (a) Premises — Operations | | (a) Area (b) Frontage (c) Remuneration (d) Receipts | (a) Per 100 Sq. Ft. of Area (b) Per Linear Foot (c) Per $100 of Remuneration (d) Per $100 of Receipts | | | |
| (b) Escalators | | (e) Landings | (e) Per Landing | | | |
| (c) Independent Contractors | | (f) Cost | (f) Per $100 of Cost | | | |
| (d) Completed Operations | | (g) Receipts | (g) Per $1,000 of Receipts | | | |
| (e) Products | | (h) Sales | (h) Per $1,000 of Sales | | | |
| A) PREMISES BOY OR GIRL SCOUT COUNCILS EXCLUDING CAMPS INCLUDING TROOPS | 86416 | I) EACH I) 16,245 | .0214 .0179 | .0093 | 348.00 291.00 491.00 | 151.00 |
| A) SEE CAMP ENDORSEMENTS L3089-2 | | | | | 448.00 | 68.00 |
| A) INCIDENTAL MALPRACTICE LIABILITY (4 NURSES) | | | | | 32.00 44.00 | |
| ADDITIONAL INSURED (10%) | | | | | 84.00 74.00 | 22.00 |
| E) PRODUCTS E) CAMPS | 70322 | FLAT CHG | | | 8.00 | 3.00 |

Form Numbers of Endorsements forming part of this Coverage Part at issue:
AL-8-OB(2) L3154-0 L3089-2(4)

| | TOTAL ADVANCE PREMIUMS | 963.00 $ 865.00 | $ 244.00 |
|---|---|---|---|

If the Policy Period is more than one year, the Premium is Payable:
On effective date of Policy $          1st Anniversary $          2nd Anniversary $

The conditions and provisions printed on pages CGL-2 and CGL-3 of this form are hereby referred to and made a part hereof.

This Coverage Part shall not be binding unless countersigned by a duly authorized agent of the company and, provided that if this Coverage Part takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this Coverage Part.

Countersigned by

Authorized Agent

Form L-3503-0  CDR   Printed in U.S.A.                    CGL-1

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002710
BSA-PLAN_00258163
SA 2458

## INCIDENTAL MALPRACTICE LIABILITY

Named Insured and Address

This endorsement forms a part of Policy No. 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date 01 25 74 .................................... 12:01 A. M., standard time at the address of the *named insured* as
stated herein.

---

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

### COMPREHENSIVE GENERAL LIABILITY INSURANCE

---

IT IS AGREED THAT:

1. THE DEFINITION OF "BODILY INJURY" IS AMENDED TO INCLUDED INJURY
   ARISING OUT OF THE RENDERING OF OR FAILURE TO RENDER PROFESSIONAL
   SERVICES BY ANY PHYSICIAN DENTIST OR NURSE WHILE EMPLOYED BY
   THE NAMED INSURED TO PROVIDE SUCH SERVICES;

2. EXCLUSION (J) DOES NOT APPLY TO INJURY TO THE EMOTIONS OR
   REPUTATION OF A PERSON ARISING OUT OF THE RENDERING OF SUCH
   SERVICES

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other
than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company;  provided that if this endorsement takes
effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy
by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

Countersigned by.....................................
                                    *Authorized Agent*

The company located these documents in its
business records. At this time, the company
does not certify that these documents constitute
a complete and accurate copy of the policy.

Form AL-8-0 B   Printed in U. S. A.   10-'66   NBCU:

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002711
BSA-PLAN_00258164

**SA 2459**

## SPECIAL ENDORSEMENT #2
## (ADDITIONAL INTERESTS)

Named Insured and Address

This endorsement forms a part of Policy No. **04C157992**
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date    **01 25 74**                12:01 A. M., standard time at the address of the *named insured* as
                                              stated herein.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

### COMPREHENSIVE GENERAL LIABILITY INSURANCE

IN CONSIDERATION OF AN ADDITIONAL PREMIUM OF $~~96~~.00 INCLUDED ($~~74~~.00 BI

AND $22.00 PD) IT IS AGREED THAT THE ADDITIONAL INTERESTS OF EMPLOYEES

AND VOLUNTEERS OF THE INSURED ARE HEREBY ADDED BUT ONLY AS RESPECTS

THEIR DUTIES AS SUCH AND IS FURTHER AGREED THAT SPONSORS OF BOY SCOUTS

ACTIVITIES ARE ADDED BUT ONLY AS RESPECTS THEIR INTERESTS AS SUCH

*(handwritten: 106.00   84.)*

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other
than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company;  provided that if this endorsement takes
effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy
by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

Countersigned by...................................
                                        *Authorized Agent*

The company located these documents in its
business records. At this time, the company
does not certify that these documents constitute
a complete and accurate copy of the policy.

Form AL-8-0 B   Printed in U. S. A.   10-'66   NBCU:

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

# EXCLUSION OF HAZARDS

Named Insured and Address

This endorsement forms a part of Policy No. 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date............01 25 74.........................12:01 A. M., standard time at the address of the *named insured* as
stated herein.

---

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE

---

It is agreed that:

I. The insurance does not apply with respect to such and so many of the hazards described in the Schedule as are designated therein by the word "excluded".

II. The insurance does not apply prior to the date stated in the Schedule as the expiration date of other insurance, with respect to such and so many of the hazards described therein which are designated by an expiration date of other insurance.

III. With respect to such and so many of the hazards described in the Schedule as are designated by a primary insurance date and by limits of liability, the insurance shall, prior to such date, apply only to loss in excess of the applicable limit as stated in such Schedule and then only in the amount by which the applicable limit of liability stated in the declarations exceeds the applicable limit as stated in such Schedule.

## SCHEDULE

| (a) Premises-Operations (Including Independent Contractors Operations) | I. | II. Expiration Date of Other Insurance: |
|---|---|---|
| The ownership, maintenance or use of the premises described herein, including the ways immediately *adjoining*, and all operations necessary or incidental thereto; provided that the hazards described in this paragraph shall not be deemed to include the hazards described in (b) and (c) of this Schedule. | **EXCLUDED** | |
| | III. Primary Insurance Date — Limits of Liability: | $          ,000 each person |
| | | Cov. A — $          ,000 each occurrence |
| | | Cov. B — $          ,000 each occurrence<br>$          ,000 aggregate |
| | Description of Premises: | |

→ 125 AUBURN ST PORTLAND ME

| (b) Elevators (as defined in the policy) | I. | II. Expiration Date of Other Insurance |
|---|---|---|
| The ownership, maintenance or use of *elevators* at the following described premises: | **EXCLUDED** | |
| | III. Primary Insurance Date — Limits of Liability: | $          ,000 each person |
| | | Cov. A — $          ,000 each occurrence |
| | | Cov. B — $          ,000 each occurrence |
| | Description of Premises: | |

→ 125 AUBURN ST PORTLAND ME

| (c) The Completed Operations Hazard and the Products Hazard (both as defined in the policy). | II. Expiration Date of Other Insurance: | |
|---|---|---|
| | III. Primary Insurance Date — Limits of Liability: | $          ,000 each person |
| | Cov. A — $          ,000 each occurrence |
| | | $          ,000 aggregate |
| | Cov. B — $          ,000 each occurrence |
| | | $          ,000 aggregate |

*Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.*

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

Hartford Fire Insurance Company          New York Underwriters Insurance Company
Hartford Accident and Indemnity Company      Twin City Fire Insurance Company
Citizens Insurance Company of New Jersey

The company located these documents in its records as reflecting what appears to constitute a complete and accurate copy of the policy.

Countersigned by ...............................................          *Authorized Agent*

Form L-3154-0   Printed in U. S. A.   2-'67

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002713
BSA-PLAN_00258166
**SA 2461**

**CAMPS**

Named Insured and Address

This endorsement forms a part of Policy No... 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date........ 01 25 74 ........ 12:01 A. M., standard time at the address of the *named insured* as
stated herein.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE

Description of Premises:

CAMP BOMAZEEN

## SCHEDULE

| Classifications | Code No. | Premium Bases (a) Per 100 Camper Days (b) No. of Units | Rates B.I.L. Cov. | Rates P.D.L. Cov. | Advance Premium B.I.L. Cov. | Advance Premium P.D.L. Cov. |
|---|---|---|---|---|---|---|
| Camps — Non Profit | 70321 | A) 7,150 | ~~1.904~~ 2.632 | .209 | ~~136.00~~ 175.00 | 16.00 |
| Camps | 70322 | | | | | |
| | | | | | | |
| Camps — first aid to campers | 80998 | | | | | |
| Saddle Animals | 79434 | | | | | |
| | | | | | | |
| Motorboats | 44598S | B) 1 | ~~6.604~~ 9.906 | 2.907.00 | 10.00 ~~7.00~~ | 3.00 |
| Sailboats | | | | | | |
| Outboard Motors ~~XXXXXXX~~ | 44615S | B) 1 | ~~6.512~~ 8.26 | .870 | ~~7.00~~ 8.00 | 1.00 |
| ~~XXXXXXXXX~~ OVER 25 HP | Total Advance Premium for Watercraft | | | | $ | $ |
| | Total Advance Premium | | | | $ ~~150.00~~ 163.00 | $ 20.00 INCL |

It is agreed that with respect to the operation of any camp on the premises described above or designated in the policy as subject to this endorsement:

1. **FIRST AID**  The insurance does not apply under the "Supplementary Payments" provision to expenses incurred by the *insured* for first aid to any camper unless a premium charge is entered for the Bodily Injury Liability Coverage in the schedule of this endorsement opposite the classification "Camps — first aid to campers".

   If a premium charge is entered therein, the "Supplementary Payments" provision applies to expenses incurred by the *insured* for first aid to campers, other than expenses for services provided by the *insured*, by any employee of the *insured* or by any person or organization under contract to the *insured* to provide such services.

2. **INFIRMARIES, CLINICS, HOSPITALS**  If the camp has an infirmary with facilities for lodging and treatment or a public clinic or hospital, the insurance does not apply to (1) the rendering of or failing to render (a) medical, surgical, dental, X-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith, (b) any service or treatment conducive to health or of a professional nature or (c) any cosmetic or tonsorial service or treatment; (2) the furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or (3) the handling of or performing of autopsies on dead bodies.

3. **SADDLE ANIMALS**  The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's saddle animals* unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement opposite the classification "Saddle Animals".

   If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, the "Persons Insured" provision also includes with respect to such coverage any person or organization legally responsible for the use of the *named insured's saddle animals*, provided the actual use thereof is by the *named insured* or with his permission; but this paragraph does not apply to saddle animals while rented to any person or organization other than a camper.

   As used herein "**named insured's saddle animals**" means saddle animals owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

L-3089-2   Printed in U. S. A.   (ISO: G 410)

The company locates these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

4.  **WATERCRAFT**   The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's watercraft* except canoes and rowboats unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement in the line "Total Advance Premium for Watercraft".

If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, such coverage applies to such *bodily injury* or *property damage* respectively, except while the *named insured's watercraft* is used to carry any person other than a camper for a charge or is rented to any person or organization other than a camper, and the "Persons Insured" provision also includes with respect to such coverage any person or organization using or legally responsible for the use of the *named insured's watercraft*, provided the actual use thereof is by the *named insured* or with his permission.

As used herein **"named insured's watercraft"** means (1) watercraft owned or used by or rented to the *named insured* or rented to others by or through the *named insured* or (2) any other watercraft powered in whole or in part by an outboard motor owned or used by or rented to the *named insured* or rented to others by or through the *named insured.*

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
**INSURANCE GROUP**
HARTFORD. CONNECTICUT

Countersigned by.............................................................................
                                                        *Authorized Agent*

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

L-3089-2

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002715
BSA-PLAN_00258168
SA 2463

## CAMPS

Named Insured and Address

This endorsement forms a part of Policy No. 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date 01 25 74 .........12:01 A. M., standard time at the address of the *named insured* as stated herein.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE

**Description of Premises:**

### VARIOUS LOCATIONS OTHER THAN CAMPS ENUMERATED

### SCHEDULE

| Classifications | Code No. | Premium Bases (a) Per 100 Camper Days (b) No. of Units | Rates B.I.L. Cov. | Rates P.D.L. Cov. | Advance Premium B.I.L. Cov. | Advance Premium P.D.L. Cov. |
|---|---|---|---|---|---|---|
| Camps — Non Profit | 70321 | A) IF ANY | 1.904  2.032 | .209 | | |
| Camps | 70322 | | | | | |
| Camps — first aid to campers | 80998 | | | | | |
| Saddle Animals | 79434 | | 19.05 | | 19.00 | ✓ |
| Motorboats | 44567S | B)    1 | 16.51  | 6.67 | 17.00 | 7.00 |
| Sailboats | | | | | | |
| Outboard Motors not exceeding 10 Horsepower | 44697S | B) IF ANY | 2.667  3.18 | .754 | | |
| Total Advance Premium for Watercraft | | | | | $ | $ ✓ |
| | | | Total Advance Premium | | $ 19.00 | $ |
| | | | | | $ 17.00 | $ 7.00 |

It is agreed that with respect to the operation of any camp on the premises described above or designated in the policy as subject to this endorsement:

1. **FIRST AID** The insurance does not apply under the "Supplementary Payments" provision to expenses incurred by the *insured* for first aid to any camper unless a premium charge is entered for the Bodily Injury Liability Coverage in the schedule of this endorsement opposite the classification "Camps — first aid to campers".
   If a premium charge is entered therein, the "Supplementary Payments" provision applies to expenses incurred by the *insured* for first aid to campers, other than expenses for services provided by the *insured*, by any employee of the *insured* or by any person or organization under contract to the *insured* to provide such services.

2. **INFIRMARIES, CLINICS, HOSPITALS** If the camp has an infirmary with facilities for lodging and treatment or a public clinic or hospital, the insurance does not apply to (1) the rendering of or failing to render (a) medical, surgical, dental, X-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith, (b) any service or treatment conducive to health or of a professional nature or (c) any cosmetic or tonsorial service or treatment; (2) the furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or (3) the handling of or performing of autopsies on dead bodies.

3. **SADDLE ANIMALS** The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's saddle animals* unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement opposite the classification "Saddle Animals".
   If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, the "Persons Insured" provision also includes with respect to such coverage any person or organization legally responsible for the use of the *named insured's saddle animals*, provided the actual use thereof is by the *named insured* or with his permission; but this paragraph does not apply to saddle animals while rented to any person or organization other than a camper.
   As used herein **"named insured's saddle animals"** means saddle animals owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

L-3089-2   Printed in U. S. A.   (ISO: G 410)

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

4. **WATERCRAFT**   The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's watercraft* except canoes and rowboats unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement in the line "Total Advance Premium for Watercraft".

If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, such coverage applies to such *bodily injury* or *property damage* respectively, except while the *named insured's watercraft* is used to carry any person other than a camper for a charge or is rented to any person or organization other than a camper, and the "Persons Insured" provision also includes with respect to such coverage any person or organization using or legally responsible for the use of the *named insured's watercraft*, provided the actual use thereof is by the *named insured* or with his permission.

As used herein **"named insured's watercraft"** means (1) watercraft owned or used by or rented to the *named insured* or rented to others by or through the *named insured* or (2) any other watercraft powered in whole or in part by an outboard motor owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

Countersigned by.............................................................................

*Authorized Agent*

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

L-3089-2                                                          2

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

# CAMPS

Named Insured and Address

This endorsement forms a part of Policy No. 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date 01 25 74                12:01 A. M., standard time at the address of the *named insured* as stated herein.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE

GN

Description of Premises:   CAMP HINDS

## SCHEDULE

OLF

| Classifications | Code No. | Premium Bases (a) Per 100 Camper Days (b) No. of Units | Rates B.I.L. Cov. | Rates P.D.L. Cov. | Advance Premium B.I.L. Cov. | Advance Premium P.D.L. Cov. |
|---|---|---|---|---|---|---|
| Camps — Non Profit | 70321 | A)13,570 | ~~1.904~~ 2.032 | .299 | ~~258.00~~ 276.02 | 31.00 |
| Camps | 70322 | | | | | |
| Camps — first aid to campers | 80998 | | | | | |
| Saddle Animals | 79434 | | | | | |
| Motorboats | 44598S | B) 3 | ~~9.906~~ 6.604 | 2.90 | 30.00 ~~20.00~~ | 9.00 |
| Sailboats | 44697S | B) 1 | ~~2.667~~ 3.18 | .754 | 3.00 | 1.00 |
| (44S07S) Outboard Motors not exceeding 10 Horsepower | | | | | | |
| Total Advance Premium for Watercraft | | | | | $ 309.00 | $ |
| | | Total Advance Premium | | | $281.00 | $ 41.00 |
| | | | | | INCL. | |

It is agreed that with respect to the operation of any camp on the premises described above or designated in the policy as subject to this endorsement:

1. **FIRST AID** The insurance does not apply under the "Supplementary Payments" provision to expenses incurred by the *insured* for first aid to any camper unless a premium charge is entered for the Bodily Injury Liability Coverage in the schedule of this endorsement opposite the classification "Camps — first aid to campers".
   If a premium charge is entered therein, the "Supplementary Payments" provision applies to expenses incurred by the *insured* for first aid to campers, other than expenses for services provided by the *insured*, by any employee of the *insured* or by any person or organization under contract to the *insured* to provide such services.

2. **INFIRMARIES, CLINICS, HOSPITALS** If the camp has an infirmary with facilities for lodging and treatment or a public clinic or hospital, the insurance does not apply to (1) the rendering of or failing to render (a) medical, surgical, dental, X-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith, (b) any service or treatment conducive to health or of a professional nature or (c) any cosmetic or tonsorial service or treatment; (2) the furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or (3) the handling of or performing of autopsies on dead bodies.

3. **SADDLE ANIMALS** The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's saddle animals* unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement opposite the classification "Saddle Animals".
   If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, the "Persons Insured" provision also includes with respect to such coverage any person or organization legally responsible for the use of the *named insured's saddle animals*, provided the actual use thereof is by the *named insured* or with his permission; but this paragraph does not apply to saddle animals while rented to any person or organization other than a camper.
   As used herein "**named insured's saddle animals**" means saddle animals owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

L.-3089-2   Printed in U. S. A.   (ISO: G 410)

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

4.  **WATERCRAFT**   The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's watercraft* except canoes and rowboats unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement in the line "Total Advance Premium for Watercraft".

If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, such coverage applies to such *bodily injury* or *property damage* respectively, except while the *named insured's watercraft* is used to carry any person other than a camper for a charge or is rented to any person or organization other than a camper, and the "Persons Insured" provision also includes with respect to such coverage any person or organization using or legally responsible for the use of the *named insured's watercraft*, provided the actual use thereof is by the *named insured* or with his permission.

As used herein "**named insured's watercraft**" means (1) watercraft owned or used by or rented to the *named insured* or rented to others by or through the *named insured* or (2) any other watercraft powered in whole or in part by an outboard motor owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD. CONNECTICUT

Countersigned by.............................................................................................
                                                                                        *Authorized Agent*

L-3089-2                                                             2

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002719
BSA-PLAN_00258172

SA 2467

# CAMPS

Named Insured and Address

This endorsement forms a part of Policy No..... 04C157992
issued by THE HARTFORD INSURANCE GROUP company desig-
nated therein, and takes effect as of the effective date of said policy
unless another effective date is stated herein.

Effective date....... 01  25  74 ........................12:01 A. M., standard time at the address of the *named insured* as stated herein.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE

Description of Premises:   **CAMP LNUTTER**

## SCHEDULE

| Classifications | Code No. | Premium Bases (a) Per 100 Camper Days (b) No. of Units | Rates | | Advance Premium | |
|---|---|---|---|---|---|---|
| | | | B.I.L. Cov. | P.D.L. Cov. | B.I.L. Cov. | P.D.L. Cov. |
| Camps — Non Profit | 70321 | A)IF ANY | 1.904 | .209 | --- | --- |
| Camps | 70322 | | 2.032 | | | |
| | | | | | | |
| Camps — first aid | | | | | | |
| to campers | 80998 | | | | | |
| Saddle Animals | 79434 | | | | | |
| | | | | | | |
| Motorboats | | | | | | |
| Sailboats | | | | | | |
| Outboard Motors not exceeding 10 Horsepower | | | | | | |
| **Total Advance Premium for Watercraft** | | | | | $ | $ |
| | **Total Advance Premium** | | | | $ --- | $ --- |

It is agreed that with respect to the operation of any camp on the premises described above or designated in the policy as subject to this endorsement:

1. **FIRST AID** The insurance does not apply under the "Supplementary Payments" provision to expenses incurred by the *insured* for first aid to any camper unless a premium charge is entered for the Bodily Injury Liability Coverage in the schedule of this endorsement opposite the classification "Camps — first aid to campers".
   If a premium charge is entered therein, the "Supplementary Payments" provision applies to expenses incurred by the *insured* for first aid to campers, other than expenses for services provided by the *insured*, by any employee of the *insured* or by any person or organization under contract to the *insured* to provide such services.

2. **INFIRMARIES, CLINICS, HOSPITALS** If the camp has an infirmary with facilities for lodging and treatment or a public clinic or hospital, the insurance does not apply to (1) the rendering of or failing to render (a) medical, surgical, dental, X-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith, (b) any service or treatment conducive to health or of a professional nature or (c) any cosmetic or tonsorial service or treatment; (2) the furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or (3) the handling of or performing of autopsies on dead bodies.

3. **SADDLE ANIMALS** The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's saddle animals* unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement opposite the classification "Saddle Animals".
   If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, the "Persons Insured" provision also includes with respect to such coverage any person or organization legally responsible for the use of the *named insured's saddle animals*, provided the actual use thereof is by the *named insured* or with his permission; but this paragraph does not apply to saddle animals while rented to any person or organization other than a camper.
   As used herein "**named insured's saddle animals**" means saddle animals owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

L.-3089-2  Printed in U. S. A.   (ISO: G 410)

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002720
BSA-PLAN_00258173
SA 2468

4. **WATERCRAFT**  The insurance does not apply to *bodily injury* or *property damage* arising out of the use of the *named insured's watercraft* except canoes and rowboats unless a premium charge is entered for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage respectively in the schedule of this endorsement in the line "Total Advance Premium for Watercraft".

If a premium charge is entered therein for the Bodily Injury Liability Coverage or the Property Damage Liability Coverage, such coverage applies to such *bodily injury* or *property damage* respectively, except while the *named insured's watercraft* is used to carry any person other than a camper for a charge or is rented to any person or organization other than a camper, and the "Persons Insured" provision also includes with respect to such coverage any person or organization using or legally responsible for the use of the *named insured's watercraft*, provided the actual use thereof is by the *named insured* or with his permission.

As used herein **"named insured's watercraft"** means (1) watercraft owned or used by or rented to the *named insured* or rented to others by or through the *named insured* or (2) any other watercraft powered in whole or in part by an outboard motor owned or used by or rented to the *named insured* or rented to others by or through the *named insured*.

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

Countersigned by.............................................................

*Authorized Agent*

L-3089-2

2

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002721
BSA-PLAN_00258174

SA 2469

COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE—COVERAGE PART

**COMPANY COPY**

**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

| Und. Approved | Confidential Report | Und. Notes: |
|---|---|---|
| Quality Control | | |

This Coverage Part forms a part of Policy No. ~~04C157992~~ issued by THE HARTFORD INSURANCE GROUP Company designated therein, and takes effect as of the effective date of said policy unless otherwise stated herein.

(For use only if this Coverage Part is effective after the effective date of the Policy)
This Coverage Part is effective 01-25-74 (at the hour stated in the policy) and forms a part of the above designated policy issued to

The Company, in consideration of the payment of the premium and subject to all of the provisions of the policy not expressly modified herein, agrees with the *named insured* as follows:

## SCHEDULE

The insurance afforded is only with respect to such of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

| Coverages. | Advance Premiums | | Limits of Liability | |
|---|---|---|---|---|
| C — Bodily Injury Liability | $ 101.00 ~~85.00~~ | | $ 100 | ,000 each person |
| | | | $ 300 | ,000 each occurrence |
| D — Property Damage Liability | $ ~~103.00~~ 102.00 | | $ 25 | ,000 each occurrence |

### Description of Hazards

**1. Owned Automobiles — Premium Basis — Per Automobile**

| Year Model Trade Name | Body Type - Truck Size (Truck Load, Gallonage, Bus Seating Capacity) | Identification No. (I) Serial No. (S) Motor No. (M) | Town and State in which the automobile will be principally garaged | (a) Purpose of Use Classification | Advance Premiums | |
|---|---|---|---|---|---|---|
| | | | | | Coverage C | Coverage D |
| | | Raymond ~~BELGRADE ME~~ T10 | | | | |
| 1. | 65 Ford trk. #C539T110704 (Raymond, Me. T-10) | | | C Cl.6 | 28.00 | 30.00 |
| 2. | 52 Willys ¾t. Utility trk. #69112 | | | C Cl.6 | 28.00 | 30.00 |
| | ~~SEE SCHEDULE A2714-0 ATTACHED~~ | | | | ~~78.00~~ | ~~102.00~~ |
| 3. | 55 Ford Stake Body #F60D5E46280 | | | C 8CA | 37.00 | 41.00 |

**2. Hired Automobiles — Premium Basis—Cost of Hire**

| Types Hired (b) | Locations where automobiles will be principally used | Purposes of Use (a) | Estimated Cost of Hire | Rates per $100 Cost of Hire | |
|---|---|---|---|---|---|
| | | | | Coverage C | Coverage D |
| PP | BELGRADE ME | P&B | IF ANY | 1,301 ~~1.536~~ | ~~.918~~ .660 |
| C | BELGRADE ME | C | IF ANY | .780 | |

**3. Non-Owned Automobiles — Premium Basis—Class 1 Persons and Class 2 Employees**

Class 1 Persons—Location of Headquarters of Class 1 Persons and Total Number of such persons at each location

| | | Rates Per Person | |
|---|---|---|---|
| | | Coverage C | Coverage D |
| IF ANY BELGRADE ME | | 4.59 | ~~2.70~~ 3.24 |

| Class 2 Employees—Estimated Average Number | Location of Headquarters of Class 2 Employees | Rates Per Employee | |
|---|---|---|---|
| | | Coverage C | Coverage D |
| IF ANY BELGRADE ME | | .26 | .11 |

| | Coverage C | Coverage D |
|---|---|---|
| | 8.00 ~~7.00~~ MP | 1.00MP |

Form Numbers of Endorsements forming part of this Coverage Part at issue:
A-1436-2 A-3114-0

| TOTAL ADVANCE PREMIUMS | $ 101.00 ~~85.00~~ | $ 102.00 ~~103.00~~ |
|---|---|---|

The conditions and provisions printed on page CAL-2 of this form are hereby referred to and made a part hereof.

This Coverage Part shall not be binding unless countersigned by a duly authorized agent of the company provided that if this Coverage Part takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this Coverage Part.

(a) *P & B = Pleasure and Business; C = Commercial*
(b) *PP = Private Passenger Automobile; C = Commercial Automobile*

Form A-3007-0 CDR Printed in U. S. A. 12-72

**CAL-1**

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

does not certify that these documents constitute a complete and accurate copy of the policy.

**Protection Against UNINSURED MOTORISTS INSURANCE—COVERAGE PART**   **COMPANY COPY**


THE HARTFORD
INSURANCE GROUP
HARTFORD, CONNECTICUT

| Und. Approved | Confidential Report | Und. Notes: |
|---|---|---|
| Quality Control | | |

This Coverage Part forms a part of Policy No. **04C157992** ............issued by THE HARTFORD INSURANCE GROUP Company designated therein, and takes effect as of the effective date of said policy unless otherwise stated herein.

*(For use only if this Coverage Part is effective after the effective date of the Policy)*

This Coverage Part is effective ......**01  25 74**.....................(at the hour stated in the policy) and forms a part of the above designated policy issued to...................

The Company, in consideration of the payment of the premium and subject to all of the provisions of the policy not expressly modified herein, agrees with the *named insured* as follows:

## SCHEDULE

The insurance afforded is only with respect to such of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

| Coverage | Advance Premium | Limits of Liability |
|---|---|---|
| U — Uninsured Motorists | $  9.00 | $ **20** ,000 each person<br>$ **40** ,000 each accident |

Designated Insured:

Description of *Insured Highway Vehicles*
(Check appropriate box)

*3 veh. @ 3.00 (ea)*

☒ Any *automobile* owned by the *named insured*   ~~SEE SCHEDULE A2714-0 ATTACHED~~

☐ Any *private passenger automobile* owned by the *named insured*

☐ Any *highway vehicle* to which are attached dealer's license plates issued to the *named insured*

☐ Any *highway vehicle* designated in the schedule of the policy by the letters "UM" and a *highway vehicle* ownership of which is acquired during the policy period by the *named insured* as a replacement therefor

☐ Any *mobile equipment* owned or leased by and registered in the name of the *named insured*

☐ ....................................................................................

**I. COVERAGE U — UNINSURED MOTORISTS**
*(Damages for Bodily Injury)*

The company will pay all sums which the *insured* or his legal representative shall be legally entitled to recover as damages from the owner or operator of an *uninsured highway vehicle* because of *bodily injury* sustained by the *insured*, caused by accident and arising out of the ownership, maintenance or use of such *uninsured highway vehicle*; provided, for the purposes of this coverage, determination as to whether the *insured* or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the *insured* and such representative and the company or, if they fail to agree, by arbitration.

No judgment against any person or organization alleged to be legally responsible for the *bodily injury* shall be conclusive, as between the *insured* and the company, of the issues of liability of such person or organization or of the amount of damages to which the *insured* is legally entitled unless such judgment is entered pursuant to an action prosecuted by the *insured* with the written consent of the company.

**Exclusions**

This insurance does not apply:

(a) to *bodily injury* to an *insured* with respect to which such *insured*, his legal representative or any person entitled to payment under this insurance shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor;

(b) to *bodily injury* to an *insured* while *occupying* a *highway vehicle* (other than an *insured highway vehicle*) owned by the *named insured*, any *designated insured* or any relative resident in the same household as the *named* or *designated insured*, or through being struck by such a vehicle, but this exclusion does not apply to the *named insured* or his relatives while *occupying* or if struck by a *highway vehicle* owned by a *designated insured* or his relatives;

(c) so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law.

**II. PERSONS INSURED**

Each of the following is an *insured* under this insurance to the extent set forth below:

(a) the *named insured* and any *designated insured* and, while residents of the same household, the spouse and relatives of either;

(b) any other person while *occupying* an *insured highway vehicle*; and

(c) any person, with respect to damages he is entitled to recover because of *bodily injury* to which this insurance applies sustained by an *insured* under (a) or (b) above.

The insurance applies separately to each *insured*, except with respect to the limits of the company's liability.

The conditions and provisions printed on pages UM-2 and UM-3 of this form are hereby referred to and made a part hereof.
This Coverage Part shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this Coverage Part takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this Coverage Part.

Hartford hereby represents in its records that these documents constitute a complete and accurate copy of the policy.

Form A-3009-0   CDR   Printed in U. S. A.   12-'72          UM-1

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

# AUTOMOBILE PHYSICAL DAMAGE INSURANCE (Non-Fleet) — COVERAGE PART

**COMPANY COPY**

**THE HARTFORD**
INSURANCE GROUP
HARTFORD CONNECTICUT

| Und. Approved | Confidential Report | Und. Notes: |
|---|---|---|
| Quality Control | | |

This Coverage Part forms a part of Policy No. 04C157992 issued by THE HARTFORD INSURANCE GROUP Company designated therein, and takes effect as of the effective date of said policy unless otherwise stated herein.

*(For use only if this Coverage Part is effective after the effective date of the Policy)*
This Coverage Part is effective 01 25 74 (at the hour stated in the policy) and forms a part of the above designated policy issued to

The Company, in consideration of the payment of the premium and subject to all of the provisions of the policy not expressly modified herein, agrees with the *named insured* as follows:

Items

## SCHEDULE

1. The insurance afforded is only with respect to such of the following coverages, and under each such coverage to such *covered automobiles* described in the Schedule of Covered Automobiles made a part hereof, as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this insurance having reference thereto.

| Coverages | Auto No. | Limit of Liability-each covered automobile | | | Rates | Premiums (each covered automobile) | Premium (each Coverage) |
|---|---|---|---|---|---|---|---|
| | | Amount or "ACV" | Deductible | "S" | | | |
| O. Comprehensive | 1 | ACV | | | | $ 21.00 | 39.00 |
| | 2 | ACV | | | | $ 12.00 | |
| | 3 | ACV | | | | $ 6.00 | $ 72.00 |
| P. Collision | 1 | | | | | $ | |
| | 2 | | | | | $ | |
| | 3 | | | | | $ | $ |
| Q. Fire, Lightning or Transportation | 1 | | | | | $ | |
| | 2 | | | | | $ | |
| | 3 | | | | | $ | $ |
| R. Theft | 1 | | | | | $ | |
| | 2 | | | | | $ | |
| | 3 | | | | | $ | $ |
| S. Windstorm, Hail, Earthquake or Explosion | 1 | | | | | $ | |
| | 2 | | | | | $ | |
| | 3 | | | | | $ | $ |
| T. Combined Additional | 1 | | | | | $ | |
| | 2 | | | | | $ | |
| | 3 | | | | | $ | $ |
| V. Towing (Not available in California) | 1 | —$25 for each disablement— | | | | $ | |
| | 2 | | | | | | |
| | 3 | | | | | | |

Form Numbers of Endorsements forming part of this Coverage Part at issue:

"ACV" means Actual Cash Value
"S" means "as separately stated in the Schedule of Covered Automobiles made a part hereof"

| Premium for Endorsements | |
|---|---|
| TOTAL PREMIUM | 39.00 $ 72.00 |

2. **Schedule of Covered Automobiles** as of effective date of this insurance (including newly acquired vehicles, subject to the provisions of paragraph (b) of the *"covered automobile"* definition)

(a) Description;  (b) Facts Respecting Purchase

| AUTO No. | (a) Year Model Trade Name | Body Type - Capacity (Truck Load, Gallonage, Bus Seating) | Identification No. (I). Serial No. (S). Motor No. (M) | No. of Cyls. Model | Principally garaged in (Town, State) | *Purpose of Use | Classification |
|---|---|---|---|---|---|---|---|
| 1 | 65 Chev. trk. | #C539T110704 | | | T-10 | C | Cl. 6 |
| 2 | 59 Willys Jt. Utility trk. | #6911Z | | | | C | Cl. 6 |
| 3 | 55 Ford Stake Body #F60D5C46280 | | | | | C | 8CA |

| AUTO No. | (b) List Price | Actual Cost | Purchased Mo./Yr. New (N); Used (U) | Rating Symbol | Any loss under Coverages other than Towing is payable as interest may appear to the named insured and the Loss Payee named below: |
|---|---|---|---|---|---|
| 1 | | 3352 | | | |
| 2 | | 2400 | | | |
| 3 | | 1000 | | | |

3. Except with respect to bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance, the *named insured* is the sole owner of every *covered automobile* described, unless otherwise stated herein:

The conditions and provisions printed on pages PHN-2, PHN-3 and PHN-4 of this form are hereby referred to and made a part hereof. This Coverage Part shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this Coverage Part takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this Coverage Part.

*P & B = Pleasure and Business;  C = Commercial

Form A-3010-A   CDR   Printed in U. S. A.   12-72

**PHN-1**

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002724
BSA-PLAN_00258177

SA 2472

**PERSONAL INJURY LIABILITY INSURANCE — COVERAGE PART**                    **COMPANY COPY**

| Recorded | Indexed | Experience Group | Conf. Rep't Ordered | Approved | Notes to Underwriter |
|---|---|---|---|---|---|
| | Noted by Eng. Dept. | Rates Checked | Registered | Basis of Rating | |

This Coverage Part forms a part of Policy No...... 04C157992 ..................issued by THE HARTFORD INSURANCE GROUP
Company designated therein, and takes effect as of the effective date of said policy unless otherwise stated herein.

*(For use only if this Coverage Part is effective after the effective date of the Policy)*
This Coverage Part is effective...........01..25..74.............................(at the hour stated in the policy) and forms a part of the above designated policy issued to.................

The Company, in consideration of the payment of the premium and subject to all of the provisions of the policy not expressly modified herein, agrees with the *named insured* as follows:

## SCHEDULE

The insurance afforded is only with respect to personal injury arising out of an offense included within such of the following groups of offenses as are indicated by specific premium charge or charges.

| Coverage | Limits of Liability |
|---|---|
| PI—Personal Injury Liability | $     each person aggregate |
| | $   300,000 general aggregate |
| | Insured's participation   0   % |

| Groups of Offenses | | Advance Premium |
|---|---|---|
| A. False Arrest, Detention or Imprisonment, or Malicious Prosecution | 5% | $ 36.00 42.00 |
| B. Libel, Slander, Defamation or Violation of Right of Privacy | 2.5% | $ 36.00 21.00 |
| C. Wrongful Entry or Eviction or Other Invasion of Right of Private Occupancy | 2.5% | $ 21.00 |
| Minimum Premium $   22.00 | Total Advance Premium | $ 72.00 84.00 |

| Location and Description of Exposure | Premium Bases | Rates | Premium |
|---|---|---|---|
| 125 AUBURN ST PORTLAND ME AND AFFILIATED CAMPS | 10% 5% OF OLT BASIC PREM | | 72.00 84.00 |

Form Numbers of Endorsements forming part of this Coverage Part at issue:

**If the Policy Period is more than one year, the Premium is Payable:**
On effective date of Policy $ _____ 1st Anniversary _____ 2nd Anniversary $ _____

The conditions and provisions printed on page PI-2 of this form are hereby referred to and made a part hereof.
This Coverage Part shall not be binding unless countersigned by a duly authorized agent of the company, provided that if this Coverage Part takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this Coverage Part.

these documents in its
does not certify that these documents constitute
a complete and accurate copy of the policy.

L35250

Form L-3020-1  CDR  Printed in U. S. A.  3-'67                    PI-1

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

## SPECIAL ENDORSEMENT #1
### (NAMED INSURED)

Named Insured and Address

This endorsement forms a part of Policy No... 04C157992
issued by THE HARTFORD INSURANCE GROUP company
designated therein, and takes effect as of the effective date of said
policy unless another effective date is stated herein.



Effective date ..........01-25-74.......................... Effective hour is the same as stated in the Declarations of the Policy.

IN CONSIDERATION OF THE PREMIUM CHARGED IT IS AGREED THAT THE NAMED
INSURED SHALL READ AS FOLLOWS:

> PINE TREE COUNCIL BOY SCOUTS OF AMERICA AND
> AUXILIARY ORGANIZATION OF THE PINE TREE COUNCIL
> BOY SCOUTS OF AMERICA

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated.

This endorsement shall not be binding unless countersigned by a duly authorized agent of the company; provided that if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.



THE HARTFORD
INSURANCE GROUP
HARTFORD, CONNECTICUT

Countersigned by ........................................ Authorized Agent

Form G-2240-9 B   Printed in U. S. A.   2-'64

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002726
BSA-PLAN_00258179

SA 2474



**CHANGE, ELIMINATION OR ADDITION OF AUTOMOBILE**
**CHANGE OF COVERAGE — AMENDMENT OF DECLARATIONS**

Named Insured and Address

This endorsement forms a part of Policy No. 04C157992
issued by THE HARTFORD INSURANCE GROUP company designated
therein, and takes effect as of the effective date stated herein.

PINE TREE COUNCIL
BOY SCOUTS OF AMERICA (SEE END #1)
125 AUBURN ST
PORTLAND ME

Effective date   06/21/74       12:01 A. M., standard time at the address of the named insured as stated herein.

It is agreed that the policy is amended with respect to such of the following particulars as are indicated by specific entry in connection therewith:

1. Address of named insured to read.............................................................................................................................................

2. A—Automobile Eliminated: The insurance with respect to the automobile designated herein is terminated.   B—Automobile Added: Such insurance as is afforded by the policy applies with respect to the automobile described in this section, subject to all the terms of the policy as amended herein.

| | Year Model | Trade Name | Identification No. (I) Serial No. (S) Motor No. (M) | Class Cas. / FTC | Purchased Mo. / Yr. | New Used | Year Model | Trade Name | Body Type Model | Identification No. (I) Serial No. (S) Motor No. (M) | List Price (L) Actual Cost (A) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ The automobile described in the policy | | | | 8CA | | | 55 | FORD | STAKE BODY | #F60D5E46280 | $1000 |

(a) The automobile will be principally garaged in the town designated in the Declarations of the policy, unless otherwise stated herein:

(b) Loss Payee: Any loss under Comprehensive; Fire, Lightning and Transportation; Theft; Combined Additional Coverage and Collision is payable as interest may appear to the named insured and: (Name and Address)

*Items (c), (d), and (e) not applicable to FAMILY AUTOMOBILE POLICY .*

| Encumbrance | Instalment Payments | | Due Date and Amount of Final Instalment |
|---|---|---|---|
| | No. | Amount of Each | |

(c) The automobile is unencumbered unless otherwise stated herein:

(d) Except with respect to bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance, the named insured is the sole owner of the automobile unless otherwise stated herein:

(e) The purposes for which the automobile is to be used are ☐ "pleasure and business", ☐ "commercial", ☐ other..............
                                                                                                            (describe)

3. The premium for................................................†Coverage(s) and the total premium are amended to read as stated in the schedule.

4. The limits of liability for................................................†Coverage(s) are amended in amounts only to read as stated in the schedule.

5. To include................................................†Coverage(s). Limits of liability to read as stated in the schedule. The insurer with respect to such coverage shall be as designated in the schedule by Co. Code.

6. To eliminate................................................†Coverage(s).

7. The automobile qualifies for Class................................rates with respect to †Coverage(s)...........................and for Class................rates with respect to †Coverage.

*If more than one automobile is insured by the policy and the amendments effected by this endorsement are not to apply to all automobiles insured by the policy such amendments apply only with respect to the following automobile(s):*

SCHEDULE P/R .597

The insurance afforded for the added automobile is only with respect to such and so many of the following coverages, each as defined in the policy, as are indicated by an additional or return premium or the words "no charge" in the Premiums column. The limit of the company's liability against each such coverage shall be as stated herein, subject to all of the terms of the policy having reference thereto:

| Coverages | †Abbreviations | Addl. Premium Dollars / Cents | Return Premium Dollars / Cents | Premiums Dollars / Cents | Co. Code | Limits of Liability |
|---|---|---|---|---|---|---|
| Bodily Injury Liability | BI | 21 / 00 | | 35 / 00 | | $100 ,000 each person  $300 ,000 each accident* |
| Medical Payments | MP | | | | | $ each person |
| Property Damage Liability | PD | 27 / 00 | | 46 / 00 | | $25 ,000 each accident |
| Uninsured Motorists | UM | 2 / 00 | | 3 / 00 | | $20 ,000 each person  $40 ,000 each accident |
| Comprehensive | Comp | 4 / 00 | | 6 / 00 | | $ACV unless otherwise stated |
| Fire, Lightning and Transportation | FLT | | | | | $ ACV unless otherwise stated |
| Theft | T | | | | | $ ACV unless otherwise stated |
| Combined Additional Coverage | CAC | | | | | $ ACV unless otherwise stated |
| Collision | Coll | | | | | ACV less dollars deductible |
| Towing and Labor Costs | T&L | | | | | $ each disablement |
| | Totals | 54 / 00 | | | | ACV means Actual Cash Value |

*If this endorsement is issued to form part of a Family Automobile Policy Form the word "occurrence" is substituted for the word "accident" with respect to Bodily Injury Liability and Property Damage Liability.

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated. This endorsement shall not be binding unless countersigned by a duly authorized agent of the company.

**THE HARTFORD**
INSURANCE GROUP
HARTFORD CONNECTICUT

Countersigned at.................................................

FM/DS  07/09/74
Form A-1648 2nd Rev.  Printed in U.S.A.  2-59

.................................................
Authorized Agent

The company located these documents in its business records. At this time, it does not certify that these documents constitute a THE GEM AGENCY, INC. 080082 policy.



CHANGE, ELIMINATION OR ADDITION OF AUTOMOBILE
CHANGE OF COVERAGE — AMENDMENT OF DECLARATIONS

Named Insured and Address

This endorsement forms a part of Policy No. **04C157992**
issued by THE HARTFORD INSURANCE GROUP company designated
therein, and takes effect as of the effective date stated herein.

PINE TREE COUNCIL
BOY SCOUTS OF AMERICA (SEE END #1)
125 AUBURN ST
PORTLAND ME

Effective date .......... **01/25/74**          12:01 A. M., standard time at the address of the named insured
as stated herein.

It is agreed that the policy is amended with respect to such of the following particulars as are indicated by specific entry in connection therewith:

1. Address of named insured to read ..............................................................................................................

2. **A—Automobile Eliminated:** The insurance with respect to the automobile designated herein is terminated.    **B—Automobile Added:** Such insurance as is afforded by the policy applies with respect to the automobile described in this section, subject to all the terms of the policy as amended herein.

| | Year Model | Trade Name | Identification No. (I) Serial No. (S) Motor No. (M) | Class Cas. | PTC | Purchased Mo. Yr. | New Used | Year Model | Trade Name | Body Type Model | Identification No. (I) Serial No. (S) Motor No. (M) | List Price (L) Actual Cost (A) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ | The automobile described in the policy | | | | | | | | | | | |
| | #1-65 FORD STAKE TRK | | | | | | | | | | | |
| | #3-52 WILLY'S ¼T | | | | | | | | | | | |

(a) The automobile will be principally garaged in the town designated in the Declaration of the policy, unless otherwise stated herein:
(b) Loss Payee: Any loss under Comprehensive; Fire, Lightning and Transportation; Theft; Combined Additional Coverage and Collision is payable as interest may appear, to the named insured and: (Name and Address)
Items (c), (d), and (e) not applicable to FAMILY AUTOMOBILE POLICY
(c) The automobile is unencumbered unless otherwise stated herein:
(d) Except with respect to bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance, the named insured is the sole owner of the automobile unless otherwise stated herein:
(e) The purposes for which the automobile is to be used are ☐ "pleasure and business", ☐ "commercial", ☐ other.................... (describe)

| | Encumbrance | Instalment Payments No. | Amount of Each | Due Date and Amount of Final Instalment |
|---|---|---|---|---|
| | | | | |

3. The premium for ...............................................†Coverage(s) and the total premium are amended to read as stated in the schedule.
4. The limits of liability for ...............................................†Coverage(s) are amended in amounts only to read as stated in the schedule.
5. To include ...............................................†Coverage(s). Limits of liability to read as stated in the schedule. The insurer with respect to such coverage shall be as designated in the schedule by Co. Code.
6. To eliminate ...............................................†Coverage(s).
7. The automobile qualifies for Class ...........rates with respect to †Coverage(s).....................and for Class ..........rates with respect to †Coverage.............

*If more than one automobile is insured by the policy and the amendments effected by this endorsement are not to apply to all automobiles insured by the policy such amendments apply only with respect to the following automobile(s):*

**SCHEDULE**

The insurance afforded for the added automobile is only with respect to such and so many of the following coverages, each as defined in the policy, as are indicated by an additional or return premium or the words "no charge" in the Premiums column. The limit of the company's liability against each such coverage shall be as stated herein, subject to all of the terms of the policy having reference thereto:

| Coverages | †Abbreviations | Addl. Premium Dollars | Cents | Return Premium #1   #3 Dollars | Cents | Premiums #1   #3 Dollars | Cents | Co. Code | Limits of Liability |
|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury Liability | BI | | | 26. | | 26. | | | $100 ,000 each person   $300 ,000 each accident* |
| Medical Payments | MP | | | | | | | | $ each person |
| Property Damage Liability | PD | | | 34. | | 34. | | | $25 ,000 each accident* |
| Uninsured Motorists | UM | | | 3. | | 3. | | | $20 ,000 each person   $40 ,000 each accident* |
| Comprehensive | Comp | | | 12. | 12. | 12. | 12. | | $ACV ACV unless otherwise stated |
| Fire, Lightning and Transportation | FLT | | | | | | | | $ ACV unless otherwise stated |
| Theft | T | | | | | | | | $ ACV unless otherwise stated |
| Combined Additional Coverage | CAC | | | | | | | | $ ACV unless otherwise stated |
| Collision | Coll | | | | | | | | ACV less        dollars deductible |
| Towing and Labor Costs | T&L | | | | | | | | $ each disablement |
| | Totals | | | 87.00 | | | | | ACV means Actual Cash Value |

*If this endorsement is issued to form part of a Family Automobile Policy Form the word "occurrence" is substituted for the word "accident" with respect to Bodily Injury Liability and Property Damage Liability.

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements or declarations of the policy, other than as herein stated. This endorsement shall not be binding unless countersigned by a duly authorized agent of the company.

**THE HARTFORD**
INSURANCE GROUP
HARTFORD, CONNECTICUT

The company located these documents in its business records. At this time, the company does not certify that these documents constitute a complete and accurate copy of the policy.

Countersigned at ..............................................................  ..............................................................
Authorized Agent

Form A-1648 2nd Rev.  Printed in U.S.A.  2-'59

CONFIDENTIAL
Subject to Protective Order – Highly Confidential

HART-BK002728
BSA-PLAN_00258181

**SA 2476**