# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:  BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 20-10343-LSS <br> Jointly Administered |
| NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, *et al.*, <br><br> Appellants, <br> -v- <br><br> BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, <br><br> Appellees. | <br><br> Case No. 22-cv-01237-RGA <br><br> Jointly consolidated |

## BRIEF OF APPELLEES SETTLING INSURANCE COMPANIES

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email: efay@bayardlaw.com
        gflasser@bayardlaw.com

RUGGERI PARKS WEINBERG LLP
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
1875 K Street, N.W., Suite 600
Washington, D.C.  20006-1251
Tel:  (202) 469-7750
Fax:  (202) 469-7751

WILMER  CUTLER  PICKERING  HALE
AND DORR LLP
Philip D. Anker (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, N.Y.  10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

Joel Millar (admitted *pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company,*
*Twin City Fire Insurance Company, and Navigators Specialty Insurance Company.*

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

TYBOUT, REDFEARN & PELL
Robert D. Cecil, Jr. (No. 5317)
501 Carr Road, Suite 300
Wilmington, Delaware 19899
Phone: (302) 658-6901
Email: rcecil@trplaw.com

CROWELL & MORING LLP
Mark D. Plevin (admitted *pro hac vice*)
Kevin D. Cacabelos (admitted *pro hac vice*)
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone: (415) 986-2800
Email: mplevin@crowell.com,
      kcacabelos@crowell.com

Tacie H. Yoon (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Email: tyoon@crowell.com,
      rjankowski@crowell.com

*Attorneys for American Zurich Insurance Company, American Guarantee Insurance Company, and Steadfast Insurance Company*

BALLARD SPAHR LLP
Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail:     summersm@ballardspahr.com
           mcclambc@ballardspahr.com

STEPTOE & JOHNSON LLP
Harry Lee (admitted *pro hac vice*)
John O'Connor (admitted *pro hac vice*)
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail:     hlee@steptoe.com
          joconnor@steptoe.com

*Attorneys for Clarendon National Insurance Company, as successor in interest by merger to Clarendon America Insurance Company; River Thames Insurance Company Limited (as successor in interest to Unionamerica Insurance Company Limited, on its own behalf and in turn as successor to St. Katherine Insurance Company Limited); and Zurich American Insurance Company, as successor to Maryland Casualty Company, Zurich Insurance Company, and Maryland American General Insurance Company*

STAMOULIS & WEINBLATT LLC
Stamatios Stamoulis
800 N. West Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone: (212) 326-2000

Stephen Warren (*pro hac vice*)
400 South Hope Street
Los Angeles, California 90071
Telephone:  (213) 430-6000

Jonathan D. Hacker (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

STAMOULIS & WEINBLATT LLC            SIMPSON THACHER & BARTLETT LLP
Stamatios Stamoulis                             David Elbaum (*pro hac vice*)
800 N. West Street, Third Floor              425 Lexington Avenue
Wilmington, Delaware 19801                 New York, New York 10017
Telephone: (302) 999-1540                     Telephone: (212) 455-2000

*Counsel for Federal Insurance Company and Westchester Fire Insurance Company*

## <u>CORPORATE DISCLOSURE</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, the Appellees, by their undersigned counsel, state as follows:

The Appellees collectively referred to as "Hartford" in this *Brief of Appellees Settling Insurance Companies* are Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company.  The corporate disclosure statements for the Hartford Appellees are as follows:

*Hartford Accident and Indemnity Company*.  Hartford Accident and Indemnity Company, a Connecticut corporation, is wholly owned by Hartford Fire Insurance Company, a Connecticut corporation.  Hartford Fire Insurance Company is a wholly owned subsidiary of The Hartford Financial Services Group, Inc., a Delaware corporation.  The Hartford Financial Services Group, Inc. is a publicly traded corporation that has no parent corporation.  To the best of our knowledge, no publicly held corporation currently owns 10% or more of its common stock.

*First State Insurance Company*.  First State Insurance Company, a Connecticut corporation, is wholly owned by Heritage Holdings, Inc., a Connecticut corporation.  Heritage Holdings, Inc. is a wholly owned company of The Hartford Financial Services Group, Inc., a Delaware

corporation.  The Hartford Financial Services Group, Inc. is a publicly traded corporation that has no parent corporation.  To the best of our knowledge, no publicly held corporation currently owns 10% or more of its common stock.

*Twin City Fire Insurance Company*.  Twin City Fire Insurance Company, an Indiana corporation, is wholly owned by Hartford Fire Insurance Company, a Connecticut corporation.  Hartford Fire Insurance Company is a wholly owned subsidiary of The Hartford Financial Services Group, Inc., a Delaware corporation.  The Hartford Financial Services Group, Inc. is a publicly traded corporation that has no parent corporation. To the best of our knowledge, no publicly held corporation currently owns 10% or more of its common stock.

*Navigators Specialty Insurance Company*.  Navigators Specialty Insurance Company, a New York corporation, is wholly owned by Navigators Insurance Company, also a New York corporation.  Navigators Insurance Company is wholly owned by The Navigators Group, Inc., a Delaware Corporation.  The Navigators Group, Inc. is a wholly owned subsidiary of The Hartford Financial Services Group, Inc., a Delaware corporation.  The Hartford Financial Services Group, Inc. is a publicly traded corporation that has no parent corporation.  To the best of our

knowledge, no publicly held corporation currently owns 10% or more of its common stock.

The Appellees collectively referred to as "Century" in this *Brief of Appellees Settling Insurance Companies* are Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; Federal Insurance Company; and Westchester Fire Insurance Company.  The corporate disclosure statements for the Century Appellees are as follows:

*Century Indemnity Company*.  Century Indemnity Company is a wholly-owned subsidiary of Brandywine Holdings Corporation. Brandywine Holdings Corporation is a wholly-owned subsidiary of INA Financial Corporation, which is a wholly-owned subsidiary of INA Corporation.  INA Corporation is a wholly-owned subsidiary of Chubb INA Holdings Inc., which is a wholly-owned subsidiary of Chubb Group Holdings Inc.  Chubb Group Holdings Inc. is a wholly-owned subsidiary of Chubb Limited.  Chubb Limited is a publicly held corporation, the shares of which are traded on the New York Stock Exchange.

*Federal Insurance Company*.  Federal Insurance Company is a wholly-owned subsidiary of Chubb INA Holdings Inc.  Chubb INA Holdings Inc. is a wholly-owned subsidiary of Chubb Group Holdings Inc.,

which is a wholly-owned subsidiary of Chubb Limited.  Chubb Limited is a

publicly held corporation, the shares of which are traded on the New York

Stock Exchange.

*Westchester Fire Insurance Company*.  Westchester Fire Insurance

Company is a wholly-owned subsidiary of Chubb US Holdings Inc.  Chubb

US Holdings Inc. is a wholly-owned subsidiary of Chubb Group Holdings

Inc., which is a wholly-owned subsidiary of Chubb Limited.  Chubb Limited

is a publicly held corporation, the shares of which are traded on the New

York Stock Exchange.

The Appellees collectively referred to as "Clarendon" in this *Brief of*

*Appellees Settling Insurance Companies* are Clarendon National Insurance

Company, River Thames Insurance Company Ltd., and Zurich American Insurance

Company.  The corporate disclosure statements for the Clarendon Appellees are as

follows:

*Clarendon National Insurance Company*.  Clarendon National

Insurance Company is a wholly owned subsidiary of Enstar Holdings (US)

LLC.  Enstar Holdings (US) LLC is a wholly owned subsidiary of Enstar

USA, Inc., which is a wholly owned subsidiary of Enstar (US Asia-Pac)

Holdings, Ltd.  Enstar (US Asia-Pac) Holdings, Ltd. is a wholly owned

subsidiary of Kenmare Holdings Ltd., which is a wholly owned subsidiary of

Enstar Group Ltd., the shares of which are publicly traded on the NASDAQ exchange.

*River Thames Insurance Company Ltd.* River Thames Insurance Company Ltd. is a wholly owned subsidiary of Kenmare Holdings Ltd., which is a wholly owned subsidiary of Enstar Group Ltd., the shares of which are publicly traded on the NASDAQ exchange.

*Zurich American Insurance Company*. Zurich American Insurance Company ("ZAIC") is the successor in interest to Zurich Insurance Company, U.S. Branch, and Maryland Insurance Company, formerly known as Maryland American General Insurance Company. ZAIC is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation. Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation. Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation. Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

The Appellees collectively referred to as "Zurich" in this *Brief of Appellees Settling Insurance Companies* are American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Steadfast Insurance

Company.  The corporate disclosure statements for the Zurich Appellees are as follows:

*American Guarantee and Liability Insurance Company*.  American Guarantee and Liability Insurance Company is a wholly owned subsidiary of Zurich American Insurance Company, a New York corporation.  Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation.  Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation.  Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation.  Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

*American Zurich Insurance Company*.  American Zurich Insurance Company is a wholly owned subsidiary of Steadfast Insurance Company, an Illinois corporation.  Steadfast Insurance Company is a wholly owned subsidiary of Zurich American Insurance Company, a New York corporation.  Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation.  Zurich Holding Company of America, Inc. is wholly owned by

Zurich Insurance Company Ltd, a Swiss corporation.  Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation.  Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

*Steadfast Insurance Company*.  Steadfast Insurance Company (hereinafter "Steadfast") is a wholly owned subsidiary of Zurich American Insurance Company, a New York corporation.  Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation.  Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation.  Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation.  Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .....................................................................................................4

I.   The Bankruptcy Court Correctly Held That The Insurance
     Settlements And Insurance Policy Buy Backs Complied
     With The Bankruptcy Code..................................................................4

     A.   The Insurance Settlements Fell Well Within The
          Range Of Reasonableness ........................................................4

     B.   The Bankruptcy Code Authorized BSA's Sale Of
          The Insurance Policies Back To The Settling Insurers
          Free And Clear Of All Interests Of Third Parties In The Policies......10

          1.   The insurance policies and their proceeds are property
               of BSA's estate that can be sold in a free and clear sale ..........10

          2.   The insurance policies can be sold free and clear of
               the Lujan Claimants' direct-action rights .................................13

               a.   The Bankruptcy Code authorizes the
                    "free and clear" sale.......................................................13

               b.   The Guam direct-action statute does not
                    "reverse preempt" the Bankruptcy Code under the
                    McCarran-Ferguson Act .................................................17

          3.   The requirements for a free and clear sale are met
               because any interests of the Lujan Claimants are adequately
               protected.................................................................................22

II.  The Bankruptcy Court Correctly Approved The Plan's Non-Debtor
     Injunction And Release Provisions....................................................24

     A.   The Bankruptcy Court Had Subject-Matter Jurisdiction To
          Confirm The Plan With Non-Debtor Injunctions and Releases..........25

          1.   The court had "arising under" and "arising in" jurisdiction .....25

          2.   The court also had "related to" jurisdiction .............................28

     B.   Under Controlling Third Circuit Law, The Bankruptcy Code
          Provides Substantive Authority For The Bankruptcy Court To
          Approve The Plan's Non-Debtor Injunctions And Releases .............34

C. The Bankruptcy Court Correctly Found That, On The Extraordinary Facts And Circumstances of This Case, The Plan's Non-Debtor Injunctions And Releases Meet The Standard For Approval ...................................................................41

    1. The *Continental* hallmarks of necessity and fairness were met ............................................................................42

    2. The *Master Mortgage* factors further demonstrate that the *Continental* hallmarks were met ..........................................48

    3. The Lujan Claimants' arguments based on the Archbishop of Agaña's bankruptcy stay are baseless.............51

CONCLUSION ........................................................................54

CERTIFICATION OF COMPLIANCE ................................................60

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ....................................................................29, 31

*ACandS, Inc. v. Travelers Cas. & Sur. Co.*,
435 F.3d 252 (3d Cir. 2006) ..........................................................................52

*Archbishop of Agaña v. Boy Scouts of Am.*,
No. 22-cv-01254-RGA (D. Del. Oct. 5, 2022), D.I. 7...................................53

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re*
*Exide Holdings, Inc.)*,
No. 20-1402, 2021 WL 3145612 (D. Del. July 26, 2021)............................46

*Carr v. JP Morgan Chase Bank, N.A. (In re New Century TRS*
*Holdings, Inc.)*,
505 B.R. 431 (Bankr. D. Del. 2014)...............................................................26

*Caruso v. Wooten*,
296 So.3d 1047 (La. 2020) .............................................................................20

*Cruz Reyes v. United States*,
No. 08-00005, 2010 WL 5207583 (D. Guam Dec. 15, 2010)......................20

*Descant v. Adm'rs of Tulane Educ. Fund*,
639 So.2d 246 (La. 1994) ...............................................................................20

*Evans v. TIN, Inc.*,
No. 11-2067, 2012 WL 2343162 (E.D. La. June 20, 2012)...................20, 21

*Factory Mut. Ins. v. Panda Energy Int'l, Inc. (In re Hereford Biofuels*,
*L.P.)*,
466 B.R. 841 (Bankr. N.D. Tex. 2012) .........................................................16

*First Fidelity Bank v. McAteer*,
985 F.2d 114 (3d Cir. 1993) ...........................................................................11

*Gillman v. Continental Airlines (In re Continental  Airlines)*,
203 F.3d 203 (3d Cir. 2000) ................................................................. *passim*

*Hadsell v. Phila. Life Ins. Co. (In re Fuel Oil Supply & Terminaling, Inc.)*,
30 B.R. 360 (Bankr. N.D. Tex. 1983) ...........................................................52

*In re Allied Digit. Techs. Corp.*,
306 B.R. 505 (Bankr. D. Del. 2004).............................................................11

*In re Archbishop of Agaña*,
No. 19-00010 (D. Guam Oct. 20, 2022), D.I. 1093 .....................................53

*In re Archbishop of Agaña*,
No. 19-00010 (D. Guam Sept. 28, 2022), D.I. 1044 ....................................53

*In re Archdiocese of St. Paul & Minneapolis*,
579 B.R. 188 (Bankr. D. Minn. 2017).........................................................16

*In re Charles St. African Methodist Episcopal Church of Bos.*,
499 B.R. 66 (Bankr. D. Mass. 2013) ...........................................................27

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) ...........................................................28, 29, 31

*In re Davis*,
730 F.2d 176 (5th Cir. 1984) .......................................................................29

*In re Dow Corning Corp.*,
198 B.R. 214 (Bankr. E.D. Mich. 1996).................................................15, 16

*In re Global Industrial Technologies, Inc.*,
645 F.3d 201 (3d Cir. 2011) ........................................................................38

*In re Mallinckrodt plc*,
639 B.R. 837 (Bankr. D. Del. 2022)...........................................36, 40, 43, 51

*In re Millennium Lab Holdings II, LLC*,
575 B.R. 252 (Bankr. D. Del. 2017), *aff'd sub nom. Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559 (D. Del. 2018), *aff'd on other grounds*, 945 F.3d 126 (3d Cir. 2019)...........................................27, 38

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019) .......................................................27, 38, 39, 51

*In re Millennium Lab Holdings, II, LLC*,
No. 15-12284 (Bankr. D. Del. Dec. 15, 2015), D.I. 206 ........................38, 50

*In re Nortel Networks, Inc.*,
522 B.R. 491 (Bankr. D. Del. 2014) ............................................................5

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y.), *vacated on other grounds*, 635
B.R. 26 (S.D.N.Y. 2021) ...............................................................................47

*In re Purdue Pharma, L.P.*,
635 B.R. 26 (S.D.N.Y. 2021), *appeal filed*, No. 22-90 (2d Cir.
Jan. 18, 2022).................................................................................. 39-40, 47

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) .......................................................................39

*In re Sunland, Inc.*,
No. 13-13301, 2014 WL 7011747 (Bankr. D.N.M. Dec. 11,
2014) ...........................................................................................................16

*In re Trans World Airlines, Inc.*,
322 F.3d 283 (3d Cir. 2003) .......................................................................16

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), *aff'd in part sub nom. Law
Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune
Media Co.)*, 587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228
(3d Cir. 2020)..............................................................................................46

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988) .......................................................35, 36, 37, 40

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
837 F.2d 89 (2d Cir. 1988) .................................................15, 16, 21, 22, 29

*Marin v. Leslie*,
No. 2:06cv690, 2008 WL 4238961 (W.D. Pa. Sept. 10, 2008),
*aff'd*, 337 F. App'x 217 (3d Cir. 2009) .......................................................52

*Martinez v. OGA Charters, L.L.C. (In re OGA Charters, L.L.C.)*,
901 F.3d 599 (5th Cir. 2018) .......................................................................11

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
    880 F.2d 694 (4th Cir. 1989) ........................................................36

*Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minnesota, LLC)*,
    47 F.4th 193 (3d Cir. 2022) ............................................. 26, 27-28

*Myers v. Martin (In re Martin)*,
    91 F.3d 389  (3d Cir. 1996) ...................................................4, 5, 9

*Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC,*
    591 B.R. 559 (D. Del. 2018)...........................................27, 38, 50

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.)*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010) ...........................................16

*Pepper v. Litton*,
    60 S. Ct. 238 (1939)......................................................................34

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.)*,
    327 F.3d 537 (7th Cir. 2003) .......................................................16

*Reis v. OOIDA Risk Retention Grp., Inc.*,
    303 Ga. 659 (2018).......................................................................21

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992) ...........................................35, 36, 37

*Securities and Exchange Commission v. National Securities, Inc.*,
    393 U.S. 453 (1969).....................................................................19

*Sosebee v. Steadfast Ins. Co.*,
    701 F.3d 1012 (5th Cir. 2012) ....................................................11

*Stinnett v. LaPlante (In re Stinnett)*,
    465 F.3d 309 (7th Cir. 2006) ......................................................12

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006) ....................................25, 26, 33, 34

*Union Labor Life Ins. Co. v. Pireno*,
   458 U.S. 119 (1982)................................................................18

*United Artists Theatre Co. v. Walton*,
   315 F.3d 217 (3d Cir. 2003) ...............................................39, 46

*United States Department of Treasury v. Fabe*,
   508 U.S. 491 (1993)................................................................19

*United States v. Delaware Dep't of Ins.*,
   No. 20-829, 2021 WL 3012728 (D. Del. July 16, 2021), r*eport*
   *and recommendation adopted*, No. 20-829, 2021 WL 4453606
   (D. Del. Sept. 29, 2021), *appeal filed*, No. 21-3008 (3d Cir.
   Nov. 1, 2021) ...................................................................17, 18

*Wadsworth v. Allied Pros. Ins. Co.*,
   748 F.3d 100 (2d Cir. 2014) ................................................21

*Wash. Mut. Sav. Bank v. James (In re Brooks)*,
   79 B.R. 479 (B.A.P. 9th Cir. 1987), *aff'd*, 871 F.2d 89 (9th Cir.
   1989) ...................................................................................52

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006) ...............................................11

*Wong v. PNC Bank, Nat'l Ass'n (In re 69 N. Franklin Tpk., LLC)*,
   No. 16-cv-02254, 2018 WL 4773115 (D.N.J. Oct. 2, 2018).......................52

## STATUTES

11 U.S.C. § 105................................................................15, 28, 38

11 U.S.C. § 361................................................................23

11 U.S.C. § 363................................................................*passim*

11 U.S.C. § 524................................................................36, 39, 40, 50

11 U.S.C. § 541................................................................11, 12, 13

11 U.S.C. § 1129................................................................26

15 U.S.C. § 1012................................................................17

28 U.S.C. § 1331 ...................................................................................25

28 U.S.C. § 1334 ...............................................................25, 26, 28, 34

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 .................41

McCarran-Ferguson Act, 15 U.S.C. §§1011-1015 ..........................13, 17, 18, 19, 21

## OTHER AUTHORITIES

1 *Collier on Bankruptcy* ¶ 3.01 ...................................................................26

3 *Collier on Bankruptcy* ¶ 361.03 ..........................................................22

H.R. Rep. No. 103-835 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340 .................40

## PRELIMINARY STATEMENT

The Court should affirm the bankruptcy court's order confirming the plan of reorganization ("Plan") for the Boy Scouts of America ("BSA") and approving BSA's settlement agreements with Hartford, Century, Zurich and Clarendon (the "Settling Insurers").  Those settlements, incorporated into the Plan, will contribute more than $1.6 billion to the Settlement Trust established under the Plan to compensate individuals who were sexually abused in BSA's historical scouting program.  As Judge Silverstein found after a five-week trial on confirmation of the Plan, the insurance settlements—and the Plan's injunctions protecting the Settling Insurers, Local Councils and Chartered Organizations from further abuse-claims litigation—are the "cornerstone of the Plan."  Those settlements and injunctions are necessary to obtain the critical funding that will make the Plan feasible and allow all valid abuse claims to be paid in full.  They are also necessary to achieve a global resolution of ruinous abuse-claims and insurance-coverage litigation that threaten BSA's continued existence and mission.

The Settling Insurers file this brief to respond to the appeal briefs submitted by two groups of abuse claimants, the Lujan Claimants and the D&V Claimants (collectively, the "Dissenting Claimants").  Those appeals challenge both of these critical features of the Plan—i.e., (i) the insurance settlements and (ii) the Plan's injunctions and releases barring abuse claims against the Settling Insurers, the

various Local Councils and other third parties (the "<u>non-debtor injunctions and releases</u>").  The appeals brought by other insurers who have not settled do not challenge those aspects of the Plan, and the Settling Insurers accordingly will not address those appeals.

The Dissenting Claimants are in a distinct minority.  The 75 Lujan Claimants and the 67 D&V Claimants are the only holders of abuse claims who are appealing the Plan.  More than 82,000 abuse claims were filed in the bankruptcy, and more than 85% of those claimants who voted on the Plan voted to accept it. The Plan also enjoyed the support of both official representatives of abuse claimants—the statutory committee of tort claimants ("<u>TCC</u>") and the court-appointed future claimants' representative ("<u>FCR</u>")—as well as an ad hoc committee, the Coalition of Abused Scouts for Justice ("<u>Coalition</u>"), that represented the interests of more than 60,000 abuse claimants.  If the Dissenting Claimants were to succeed on appeal, they would upend an extraordinarily complicated reorganization plan, which came together only after two years of close supervision by Judge Silverstein and the tireless efforts of court-appointed mediators to reach a global resolution of litigation and disputes among numerous stakeholders with starkly different interests.  That plan will produce the largest compensation fund in any sexual-abuse case in history—$2.5 billion in committed funding (including $787 million under the Hartford settlement agreement and $800

million under the Century settlement agreement) with potential additional recoveries from the remaining insurers. And it will allow the Boy Scouts of America to continue its charitable youth-leadership mission for the hundreds of thousands of boys and girls who participate in its programs.

That the Dissenting Claimants are in a small minority would, of course, not be reason to deny their appeals if their challenges to the Plan were meritorious. But they are not. As Judge Silverstein explained in carefully addressing their objections to the Plan, their positions are not supported by the facts or the law.

As Judge Silverstein found, the insurance settlements contributing more than $1.6 billion to the Settlement Trust are plainly reasonable, particularly given the Settling Insurers' defenses to coverage and the evidence presented at trial of the likely aggregate value of the abuse claims and the allocation of those claims to the Settling Insurers' policies. Furthermore, the Bankruptcy Code authorized the sale of those policies back to the Settling Insurers "free and clear" of any purported direct-action rights of the Dissenting Claimants, whose interests (if any) are adequately protected through recourse to a Settlement Trust that, the bankruptcy court found based on uncontroverted evidence, will likely pay abuse claims *in full*. As for the Plan's non-debtor injunctions and releases, the bankruptcy court had both subject-matter jurisdiction and substantive authority under controlling Third Circuit law to approve those injunctions and releases. And as Judge Silverstein

3

correctly held, based on extensive factual findings, the Plan's non-debtor

injunctions and releases meet the standard for approval of such relief under the

extraordinary facts and circumstances of this case.  The bankruptcy court's order

confirming the Plan should be affirmed.

## ARGUMENT

I.   **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE INSURANCE SETTLEMENTS AND INSURANCE POLICY BUY BACKS COMPLIED WITH THE BANKRUPTCY CODE**

### A.   The Insurance Settlements Fell Well Within The Range Of Reasonableness

The Lujan Claimants' arguments (at 51-52, 62-64) that the bankruptcy court

erred in approving the Insurance Settlement Agreements are without merit.  The

legal standard for approving a settlement in bankruptcy is not demanding, and

Judge Silverstein did not abuse her discretion in approving the Insurance

Settlements as reasonable here.

As the bankruptcy court explained, "[s]ettlements … are favored in

bankruptcy cases," which "seek to foster consensual resolution."  Op. at 74

(A.81)[2]; *see In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  Whether to approve a

settlement is committed to the discretion of the bankruptcy court.  *Id.*  To

determine whether to approve the settlements, Judge Silverstein applied the

---

[2]      Citations to "A.__" are to the Certain Insurers' Appendix.

4

governing standard in this Circuit: "The court should 'assess … the value of the claim … being compromised against the value to the estate of the … compromise.'" Op. at 74 (A.81) (quoting *Martin*, 91 F.3d at 393). The court need not resolve the claims or defenses as if it were adjudicating the underlying dispute on the merits. Rather, the court "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *Id.* at 75 (A.82) (quoting *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014)).

Judge Silverstein did not abuse her discretion in finding, based on the testimony of numerous fact and expert witnesses, that the Insurance Settlement Agreements meet the *Martin* standard. As the court explained, "[t]hrough the Settling Insurer Settlements, Debtors are resolving complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims." Op. at 76 (A.83).

The Lujan Claimants object that the Settling Insurers did not pay the policies' full policy limits. But that would be irrelevant even if it were true; the relevant question under *Martin* is not whether the settlements were the most BSA could have obtained if it had succeeded on every issue in every case, but rather whether BSA's decision to settle was a reasonable compromise considering the claims and defenses at issue. As Judge Silverstein found, it was.

The evidence showed, for example, that BSA might have recovered far less than Hartford's $787 million settlement if Hartford had prevailed on its coverage defenses.  BSA and Hartford had been engaged in coverage litigation for years. Op. at 16-19, 76-77 (A.23-26, A.83-84).  Judge Silverstein found that the "insurance coverage litigation raise[d] complex issues," in which Hartford asserted numerous coverage defenses, including that (i) BSA breached its duty to cooperate with Hartford in defending abuse claims; (ii) the claims were not covered because they involved injury that BSA "expected and intended" (based on BSA's alleged knowledge of abusers in the program); and (iii) all of the abuse constituted one "occurrence," subject to a single policy limit under the policies' terms.  *Id.* at 76 (A.83).  As BSA's insurance-allocation expert, Nancy Gutzler, testified, if Hartford prevailed on such defenses, "it would substantially limit the amount Hartford would be obligated to pay for Direct Abuse Claims."  *Id.*

Judge Silverstein made similar findings with respect to the coverage defenses raised by Century, Zurich and Clarendon.  Op. at 77-81 (A.84-88).  In addition to defenses based on BSA's breach of the cooperation and consent-to-settlement clauses of its policies, Century asserted that coverage for many claims was barred by limitations and that many were inadequately supported.  *Id.* at 77-78 (A.84-85).  Those defenses, like Hartford's, presented serious risks for BSA's coverage claims.  *Id.*

6

Zurich, which issued only excess coverage, also articulated several coverage defenses, including that it has no coverage obligation unless and until self-insured retentions of $1 million are paid. Op. at 79-80 (A.86-87). Based on the uncontroverted testimony of Ms. Gutzler that Zurich's defenses, if successful, would substantially reduce or even eliminate coverage (*id*. at 80 (A.87)), Judge Silverstein found that Zurich's settlement was reasonable "given potential coverage defenses, cost and delay." *Id.* at 82 (A.89).

As for Clarendon, it issued primary policies to certain Local Councils and excess policies to BSA. Op. at 80 (A.87). But the terms of some of the primary policies were supported only by secondary evidence, presenting the risk that a court could find the evidence insufficient to prove the existence or terms of those policies. *Id.* And as to the excess policies, Clarendon stated coverage defenses that presented reasonable concerns as to whether coverage existed, including the matching-deductible aggregate limit issue that may limit coverage and that the Clarendon policies provided no coverage until the $1 million self-insured retentions were paid. *Id.* at 80-81 (A.87-88). Based on those hurdles to coverage, Ms. Gutzler's allocation analysis (which showed that the Clarendon settlement amount exceeded claims allocable to the Clarendon policies), and Dr. Bates' aggregate ranges for direct abuse claims (which were all below the amount of the

Clarendon settlement), Judge Silverstein found that Clarendon's settlement was reasonable.  *Id.* at 81-82 (A.88-89).

The Dissenting Claimants do not challenge any of these findings.  They merely cite BSA's litigation posture in the Plan's disclosure statement that Hartford's coverage defenses were "without merit"—while ignoring BSA's statements in the same document that "continuing to litigate against Hartford would not only drain the Debtors' limited resources" but "also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it would under the Hartford Insurance Settlement Agreement—and some risk that Hartford would pay nothing."[3]  As Judge Silverstein found, crediting the unopposed testimony of BSA's witnesses, BSA made the reasonable business judgment that it should enter into the insurance settlements after considering the risks posed by the insurers' coverage defenses and the cost of continued litigation. Op. at 76 (A.83).

Judge Silverstein also found that the Insurance Settlement Agreements were supported by Ms. Gutzler's insurance-allocation analysis, which Judge Silverstein found to be "methodical," "credible" and "undisputed."  Op. at 68, 81 (A.75, A.88).  For example, Hartford issued policies to BSA (and, in some cases, to Local

---

[3]      *See* Lujan Claimants' Br. at 62; *Amended Disclosure Statement* [D.I. 6445] at 111 (A.10949).

Councils) that covered only claims for injury that took place during certain years, primarily in the 1970s, many of which had per-occurrence limits of $500,000.  The abuse claims, by contrast, alleged abuse occurring over many decades, many alleging damages far in excess of $500,000.  Ms. Gutzler's analysis showed that when the abuse claims were allocated across the thousands of insurance policies issued to BSA and the Local Councils by numerous primary and excess insurers over many decades, Hartford's allocated share of the abuse claims—even before taking into account Hartford's coverage defenses—was between $477 million and $716 million.  In other words, "the Hartford payment [of $787 million] falls above the highest allocation of claims [to Hartford's policies]."  Op. at 81-82 (A.88-89).  Judge Silverstein made similar findings with respect to Century (particularly after considering the collection risks posed by Century's runoff status, *id.* at 78-79, 82 (A.85-86, A.89)), Zurich and Clarendon.  *Id.* at 81-82 (A.88-89).

Finally, Judge Silverstein found that the insurance settlements were also supported by the last *Martin* factor—the paramount interest of creditors.  Op. at 82 (A.89).  The Court explained that "all three groups representing holders of Direct Abuse Claims (the TCC, the Coalition and the FCR) now support the Settling Insurer Settlements," and more than 85% of abuse claimants who voted agreed to accept the Plan and the incorporated insurance settlements.  Op. at 52, 82 (A.59,

A.89).  As that broad support demonstrates, the Insurance Settlement Agreements were plainly reasonable.

## B.  The Bankruptcy Code Authorized BSA's Sale Of The Insurance Policies Back To The Settling Insurers Free And Clear Of All Interests Of Third Parties In The Policies

The Lujan Claimants argue that the bankruptcy court erred in approving the sale of the BSA and Local Council insurance policies (the "Abuse Insurance Policies") back to the Settling Insurers free and clear of any third-party interests in the policies held by the Lujan Claimants.  They assert a right to sue the Settling Insurers under Guam's "direct-action" statute, which gives injured parties standing to sue a tortfeasor's insurer on the tortfeasor's liability insurance policy.  The bankruptcy court correctly held that this argument lacks merit.

### 1.  The insurance policies and their proceeds are property of BSA's estate that can be sold in a free and clear sale

Judge Silverstein approved BSA's sale of the policies under Bankruptcy Code section 363, which authorizes a sale of "property of the estate."  11 U.S.C. §363(b); Op. at 83 (A.90).  Although the Lujan Claimants admit that the insurance policies themselves were property of BSA's estate, they argue (at 48-50, 53) that the *proceeds* of those policies were not property of BSA's estate, but instead payable to injured persons, like the Lujan Claimants.

The bankruptcy court correctly rejected that argument.  As it explained, where the debtor owns a policy that insures the debtor itself, the proceeds are

property of the estate.  Op. at 91 (A.98) ("[w]hen a debtor's liability insurance policy provides direct coverage to the debtor the proceeds are property of the estate" (quoting *In re Allied Digit. Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004))).  The only exception to this rule is if the debtor owns an insurance policy whose proceeds are payable *only* to a third party—like the debtor's lender in *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993) or the debtors' directors and officers in *Allied*, 306 B.R. at 512-513.  Op. at 87-91 (A.94-98).  Simply put, a debtor's "right to its insurance-policy proceeds is property of the estate under 11 U.S.C. § 541(a)" "except[]" "when … the liability policy insured *only* [third parties] (and would pay *only* to them)."  *In re Nutraquest, Inc.*, 434 F.3d 639, 647 n.4 (3d Cir. 2006) (emphasis added).[4]

Applying that rule of law, Judge Silverstein correctly found that "the proceeds of the … Abuse Insurance Policies are property of the estate" that could be sold under section 363 because the "Abuse Insurance Policies provide direct coverage—indemnity, and in many cases, defense—to BSA or the Local Council." Op. at 91 (A.98); *id.* at 88-89 (A.95-96).

---

[4]     The Lujan Claimants cite cases from the Fifth Circuit, but that court agrees that insurance proceeds are estate property in mass-tort cases.  *See In re OGA Charters, L.L.C.*, 901 F.3d 599, 604 (5th Cir. 2018); *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1025 (5th Cir. 2012).

The Lujan Claimants argue next (at 60-61) that two insurance policies issued by Hartford—those for policy years 1976 and 1977—were not property of BSA's estate because BSA released Hartford in a pre-bankruptcy settlement agreement from certain coverage claims under those policies.  That argument, too, fails.  As the uncontroverted evidence at confirmation showed, BSA released Hartford from only some—but not all—claims for coverage under those policies.  *See* JTX-1481 ¶ II.A (releasing Hartford from certain defined "Sexual Abuse Claims," but not from other claims).  Because BSA retained rights under the policies to coverage of non-released claims, the 1976 and 1977 Hartford Policies were property of BSA's estate that could be sold under section 363.  *See* Sept. 1, 2022 Hr'g Tr. [D.I. 10288] at 108:18-109:5 (A.9367-9368); Op. at 87-93 (A.94-100); 11 U.S.C. §541(a)(1) (estate property includes "all legal or equitable interests of the debtor"); *In re Stinnett*, 465 F.3d 309, 312-313 (7th Cir. 2006) ("[I]nsurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for purposes of § 541(a).").

Finally, the Lujan Claimants argue (at 61) that the Local Council policies issued by the Settling Insurers were not property of BSA's estate that could be sold under section 363.  That argument also fails.  The Plan provided for the Local Councils to assign their insurance policies covering abuse claims to BSA's estate. *See* Plan [D.I. 10316-1] art. V.S.4 (A.443).  Estate property includes "[a]ny interest

12

in property that the estate acquires after the commencement of the [bankruptcy]

case." 11 U.S.C. §541(a)(7). Thus, as Judge Silverstein correctly held, "[a]ny

Local Council Insurance Policies, once assigned to BSA in connection with the

Plan, will be property of the estate." Op. at 87 (A.94). Hence, they could be sold

back to the Settling Insurers under section 363.

        2.    The insurance policies can be sold free and clear of the Lujan
              Claimants' direct-action rights

The Lujan Claimants further argue that, even if the Abuse Insurance Policies

and their proceeds were property of BSA's estate that could be sold back to the

Settling Insurers, those policies and proceeds could not be sold "free and clear" of

the Lujan Claimants' direct-action rights under Guam statutory law, which permits

an injured party to sue a tortfeasor's liability insurer for coverage under the policy.

The Lujan Claimants advance two arguments, one under bankruptcy law (Br. at

53), and the other under the McCarran-Ferguson Act (*id.* at 34-48, 54-56). The

bankruptcy court correctly rejected both.

        a.    The Bankruptcy Code authorizes the "free and clear" sale

The Lujan Claimants argue (at 53) that, as a matter of bankruptcy law, their

purported "interests" in the policies as direct-action claimants (or those of any

additional insureds under the policies) are third-party rights that are beyond a

bankruptcy court's jurisdiction or power to impair through a "free and clear" sale.

Judge Silverstein correctly rejected this argument because it is contrary to both the

13

express terms of the Bankruptcy Code and the overwhelming weight of the case
law.

Bankruptcy Code Section 363(f)—the provision authorizing a free and clear
sale—addresses precisely this situation.  It specifies that where both the
bankruptcy estate and an "entity other than the estate" hold an "interest" in
property, the estate may sell the property "free and clear" of that third party's
"interest" where the third party could be legally or equitably "compelled … to
accept a money satisfaction of such interest."  11 U.S.C. §363(f)(5).  As Judge
Silverstein correctly found, section 363(f)(5) applies by its terms because the Lujan
Claimants were seeking to reduce their alleged interests to a money judgment.  Op.
at 112 (A.119).[5]  The Lujan Claimants' contention that bankruptcy courts cannot
affect third parties' interests in estate property flies in the face of the statute's plain
language.

It also flies in the face of well-established case law.  As Judge Silverstein
explained, courts have repeatedly held that a debtor may sell its insurance policies
back to the issuing insurer free and clear of any alleged rights of third parties,
including direct-action claimants or additional insureds.  Op. at 84 (A.91).

---

[5]     As the Settling Insurers argued below, a free and clear sale is also authorized
by §363(f) because the Dissenting Claimants' claimed interests are "in bona fide
dispute," 11 U.S.C. §363(f)(4), and "applicable nonbankruptcy law permits sale of
[the policies] free and clear" of those interests, *id.* §363(f)(1).

The Second Circuit so held in its seminal decision, *In re Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988).  In approving a settlement between Johns-Manville and its insurers that enjoined additional insureds from suing insurers under the policies, the Second Circuit reasoned that Johns-Manville could sell the policies to insurers pursuant to §363(f) free and clear of all "interests" of any "additional insured" under the policies.  *Id.* at 91-94.  Although it acknowledged that the additional insured held direct contractual rights against the insurers, the court concluded that §363(f) authorized a sale of the policies free and clear of the additional insured's "interest" in the policies and that §105(a) authorized an injunction enjoining assertion of that interest against the insurers.  *Id.* at 93-94.  As the court explained, the additional insured's "rights as an insured vendor are completely derivative of [the debtor's] rights as the primary insured."  *Id.* at 92-94.  Here, the Lujan Claimants' rights are even more derivative of BSA's rights because the Lujan Claimants are not even insured parties under the policies; their rights depend *both* on BSA's underlying liability and whatever rights (if any) BSA may have under the policies to coverage for such liability.

The court overseeing another landmark mass-tort bankruptcy case in *Dow Corning* applied that same principle to approve a sale of the debtor's insurance policies free and clear of all "interests" of tort claimants who—like the Lujan Claimants—asserted state-law rights to bring a "direct action" against the debtor's

liability insurer (including under the Louisiana direct-action statute that the Lujan Claimants claim is "virtually identical" to the Guam statute, Br. 43).  *See In re Dow Corning Corp.*, 198 B.R. 214, 233-238, 244-245 & n.20 (Bankr. E.D. Mich. 1996); Op. at 84 (A.91) (discussing *Dow*).  The court so concluded because §363(f) permits estate property to be sold "free and clear of *any interest* in such property," and hence "[n]umerous courts have held that estate property can be sold free and clear of existing claims which are derivative of the debtor's rights in that property," like the claimants' direct-action rights there.  *Dow Corning*, 198 B.R. at 244-245.  Many other cases are in accord.[6]  As Judge Silverstein rightly noted, the small line of out-of-circuit cases the Lujan Claimants cite (at 53) are distinguishable and "not persuasive."  Op. at 93 (A.100).[7]

---

[6]     *See, e.g.*, *In re Hereford Biofuels*, *L.P.*, 466 B.R. 841, 857-859 (Bankr. N.D. Tex. 2012) (sale was free and clear of additional insured's rights); *In re Sunland, Inc.*, 2014 WL 7011747, at *3-4 (Bankr. D.N.M. Dec. 11, 2014) (same); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-290 (3d Cir. 2003) (sale of airline's assets was free and clear of successor-liability claims; construing "interests" broadly to include "obligations that are connected to, or arise from, the property being sold"); *In re Qualitech Steel Corp.*, 327 F.3d 537, 545 (7th Cir. 2003) ("interests" should be given "broad interpretation"; sale of real property was free and clear of tenant's lease).

[7]     *See In re SportStuff, Inc.*, 430 B.R. 170, 174-176, 179-180 (B.A.P. 8th Cir. 2010) (not a §363 free and clear sale; declining to approve settlement enjoining additional insureds from suing settling insurers where additional insureds' interests were not adequately protected and distinguishing *Manville* on that basis); *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R. 188, 202 (Bankr. D. Minn. 2017)

b.   The Guam direct-action statute does not "reverse
preempt" the Bankruptcy Code under the McCarran-
Ferguson Act

The Lujan Claimants also argue (at 34-48, 54-56) that the policies cannot be
sold to the Settling Insurers free and clear of the Lujan Claimants' direct-action
rights because, under the McCarran-Ferguson Act (the "MFA"), 15 U.S.C.
§§1011-1015, the Bankruptcy Code is "reverse preempted" by the law of Guam.
Judge Silverstein explained why that argument lacks merit.  Op. at 102-110
(A.109-117).

The MFA provides that "[n]o Act of Congress shall be construed to
invalidate, impair, or supersede any law enacted by any State for the purpose of
regulating the business of insurance … unless such Act specifically relates to the
business of insurance."  15 U.S.C. §1012(b).  The MFA applies only if three
requirements are met: "(i) the federal law at issue does not specifically relate to the
business of insurance; (ii) the state law regulating the activity was enacted for the
purpose of regulating the business of insurance; and (iii) applying federal law
would invalidate, impair or supersede the state law."  Op. at 103-04 (A.110-111)
(citing *U.S. v. Delaware Dep't of Ins.*, 2021 WL 3012728, at *9 (D. Del. July 16,
2021), *report and recommendation adopted*, 2021 WL 4453606 (D. Del. Sept. 29,

_____

(not a §363 free and clear sale; addressing assignment of insurance policy in
contravention of consent-to-assignment conditions under state law).

17

2021)), *appeal filed*, No. 21-3008 (3d Cir. Nov. 1, 2021)).  As Judge Silverstein explained, the MFA does not apply here because, at a minimum, the second requirement is not met—the Guam direct-action statute was not enacted to regulate the business of insurance.  Op. at 105-110 (A.112-117).

Analyzing that requirement, Judge Silverstein identified three criteria the Supreme Court has established for assessing whether a practice regulated by a state statute concerns the "business of insurance":  "(1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry."  Op. at 105 (A.112) (quoting *Delaware Dep't*, 2021 WL 3012728, at *13 (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982))).

Applying these factors, Judge Silverstein explained that the Guam direct-action statute does not regulate the "business of insurance."  "[P]ermitting an injured party to sue his offender's insurer" (1) "does not transfer or spread the risk between the insurer and the insured"; (2) "is not an integral part of the policy relationship between the insurer and the insured"; and (3) "is not directed at parties in the insurance industry, or even a purchaser of insurance."  Op. at 105-106 (A.112-113).

The bankruptcy court's analysis is correct.  As Judge Silverstein explained, "the Supreme Court has steadily focused on who the state statute is aimed at and what it is meant to protect."  Op. at 106 (A.113).  The Supreme Court has thus held that even where a state statute expressly addresses insurance companies, the statute nonetheless falls outside the MFA if—like the Guam direct-action statute—the relevant provision is aimed not at protecting policyholders but instead at benefiting third parties.  Op. at 106-108 (A.113-115).

For example, in *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453 (1969), the Supreme Court held that a state statute protecting the stockholders of insurance companies in insurance-company mergers did not involve the "business of insurance."  *Id.* at 460.  "It is true that the state statute applies only to insurance companies."  *Id.*  But it "regulate[s] … the relationship between a stockholder and the company," whereas "the statutory term" "business of insurance" focuses "on the relationship between the insurance company and the policyholder."  *Id.*  Likewise, in *United States Department of Treasury v. Fabe*, 508 U.S. 491 (1993), the Court held that a state statute governing the priority of payment in insurance-company liquidations regulated the "business of insurance" only to the extent the statute protected policyholders, but not to the extent it protected employees and general creditors.  *Id.* at 505-506, 508-510.

So, too, here, Judge Silverstein explained that "the Guam direct action statute was not enacted for the purpose of regulating insurance because it is designed to further the interests of injured parties and not policyholders." Op. at 108 (A.115). The statute "is not directed at the relationship between the insured and the insurer and it does not dictate the terms of the insurance policy." *Id.* at 105 (A.112). Rather, as the District Court of Guam has emphasized, it is merely "a procedural law granting standing to sue" to "protect[] ... a stranger to the contract." *Id.* at 105, 109 (A.112, A.116) (citing *Cruz Reyes v. United States*, 2010 WL 5207583, at *7 (D. Guam Dec. 15, 2010)).[8] Because that stranger's rights remain entirely dependent on the insured's rights, which in turn are unaffected by the statute, the statute does not regulate the "business of insurance" and hence does not preempt the Bankruptcy Code's free-and-clear sale provisions.

The Lujan Claimants primarily rely (at 43-44) on an out-of-circuit case, *Evans v. TIN, Inc.*, 2012 WL 2343162 (E.D. La. June 20, 2012), which did not involve the Bankruptcy Code or the Guam direct-action statute, but instead held

---

[8]    The Lujan Claimants rely on Louisiana's direct-action statute but, as Judge Silverstein explained, that statute has little bearing on the application of Guam's statute. Op. at 109-110 (A.116-117). In any event, the same rule applies under Louisiana law. *See Descant v. Adm'rs of Tulane Educ. Fund*, 639 So.2d 246, 249 (La. 1994) ("the direct action statute ... merely grants a procedural right of action against the insurer"); *accord Caruso v. Wooten*, 296 So.3d 1047, 1049 n.2 (La. 2020).

that a Louisiana direct-action statute involved the business of insurance and reverse-preempted the Federal Arbitration Act.  As Judge Silverstein noted, however, that case is distinguishable; the Louisiana statute, unlike the Guam statute, had a broader purpose of requiring that all insurance policies be executed for the benefit of injured persons as well as policyholders.  Op. at 109-110 (A.116-117); *Evans*, 2012 WL 2343162, at *10 & n.20.  And to the extent *Evans*'s cursory discussion, in a single paragraph, could be read to mean that a direct-action statute like Guam's statute necessarily regulates the "business of insurance," it conflicts with the Supreme Court's narrow reading of reverse-preemption under the MFA.[9]

Finally, although Judge Silverstein did not need to reach the question, the MFA's third requirement—that the federal law invalidates the state law—also is not met here.  Nothing in the Plan (or the Bankruptcy Code provisions authorizing the Plan's terms) operates to "invalidate, impair, or supersede" Guam's direct-action statute.  The Plan merely provides that the Abuse Insurance Policies are sold

---

[9]     The Lujan Claimants' other authorities (at 46-47) do not address whether a direct-action statute regulates the "business of insurance" under the MFA.  *See Wadsworth v. Allied Pros. Ins. Co.*, 748 F.3d 100, 108-109 (2d Cir. 2014) (holding federal Liability Risk Retention Act of 1986 preempted state statute); *Reis v. OOIDA Risk Retention Grp., Inc.*, 303 Ga. 659, 664-666 (2018) (same).  The Lujan Claimants are also wrong in contending (at 56) that their due process rights were violated through "retroactive" application of the Bankruptcy Code's free-and-clear sale provisions.  Bankruptcy law has authorized free-and-clear sales since the nineteenth century.  *See Manville*, 837 F.2d at 93.

back to the Settling Insurers free and clear of all interests in the policies, with those interests being channeled to the Settlement Trust, which is funded with the proceeds of the sold policies.  The Plan, in other words, affects the substantive rights of all parties to assert coverage claims under the sold policies; it does not target the specific procedural rights granted under the Guam direct-action statute concerning how those rights might be asserted.

>   3.   The requirements for a free and clear sale are met because any
>        <u>interests of the Lujan Claimants are adequately protected</u>

Finally, the bankruptcy court correctly held that the requirements for a free and clear sale are met because any purported interests of the Lujan Claimants in the policies are adequately protected.  Op. at 111-113 (A.118-120).

The Bankruptcy Code generally requires that a third party receive "adequate protection of [its] interest" in property when that property is sold free and clear of the third party's interest.  11 U.S.C. §363(e).  Where, for example, a lender has a senior lien on property, giving it the right to be paid from the property before any other creditor, the court may give the lender a lien against the proceeds of the sale of the property, which preserves the lender's priority and is thus "adequate protection."  *See Manville*, 837 F.2d at 94.  In other cases, however, no lien or priority may be necessary because the party's interest may be adequately protected by recourse to the debtor's estate.  *See, e.g.,* 3 *Collier on Bankruptcy* ¶361.03[1] (existing value, such as an equity cushion in collateral, may provide adequate

22

protection).  In the end, a party's interest is adequately protected so long as the sale does not result in a decrease in the value of that interest.  *See* 11 U.S.C. §361.

The Lujan Claimants argue (at 58-60) that they are entitled to priority over all other holders of abuse claims in payment from the policy proceeds as adequate protection for their direct-action rights.  They are not.  As Judge Silverstein explained, the Lujan Claimants do not have a lien on the policies; they simply have a procedural right granting them standing to sue the BSA's and Local Councils' insurers.  Op. at 112-113 (A.119-120).  No court has found that BSA or any other insured party is liable to the Lujan Claimants, much less that any Settling Insurer is obligated to cover their claims.  *Id.*  At most, the Lujan Claimants' direct-action rights merely allowed them to sue, just as BSA itself had done (in prepetition coverage litigation) and any other insured or direct-action claimant could have done, before BSA's bankruptcy filing imposed an automatic stay that halted the race of creditors and replaced it with the Bankruptcy Code's regime of equitable distribution.  The Lujan Claimants' direct-action rights do not give them any priority right to payment from the sold insurance policies, and hence they are not entitled to such a priority right against the sale proceeds as adequate protection.

But even assuming the Lujan Claimants had some interest in the sold policies, Judge Silverstein correctly held that they would be adequately protected under the Plan.  As she explained, the Lujan Claimants will be entitled to assert

23

their claims against the Settlement Trust, which is funded with a minimum of $2.5 billion, including $1.6 billion in proceeds from the insurance policy buy-backs. They can pursue compensation from the Trust in amounts up to $2.7 million or pursue even higher recoveries through the Trust's Independent Review Option; they can also bring suits directly against Non-Settling Insurers.  Op. at 36-44, 113 (A.43-51, A.120).  Moreover, as discussed below, Judge Silverstein found that the Plan will likely pay all abuse claims in full, which is all the Lujan Claimants could ever be entitled to receive in any event.  *Id.* at 69-72, 113 (A.76-79, A.120).  The Lujan Claimants' putative interests are accordingly adequately protected, and Judge Silverstein properly approved the free and clear sale.

## II.   THE BANKRUPTCY COURT CORRECTLY APPROVED THE PLAN'S NON-DEBTOR INJUNCTION AND RELEASE PROVISIONS

The Dissenting Claimants argue that the bankruptcy court erred in approving the Plan's injunctions and releases barring them from suing the Settling Insurers, Local Councils and (with some exceptions) Chartered Organizations for abuse claims.[10]  Judge Silverstein properly rejected those arguments.  The bankruptcy

---

[10]    In their appeal notices, the Dissenting Claimants referenced the distinct "Chubb Order" approving the settlement of pre-petition claims between BSA and Century and certain Chubb affiliates.  *See Order Releasing Pre-Petition Century/Chubb Claims* [Bank. Dkt. 10327] (ALW142-144).  (Citations to "ALW." are to the Lujan Claimants Appendix.)  Because they failed to object to the Order when entered, *id.* at 2 (ALW143), their appellate challenges were forfeited, and the D&V Claimants (at 5 n.6) expressly abandon any appeal of the Century/Chubb Order.  The Lujan Claimants also make no substantive argument about the

court had both subject-matter jurisdiction and substantive authority under controlling Third Circuit law to approve the Plan's non-debtor injunctions and releases.  And under the extraordinary facts and circumstances of this case, the injunctions and releases meet the standards for approval of such relief.

## A.    The Bankruptcy Court Had Subject-Matter Jurisdiction To Confirm The Plan With Non-Debtor Injunctions and Releases

The bankruptcy court had subject-matter jurisdiction to confirm the Plan with non-debtor injunctions and releases pursuant to Judicial Code section 1334, which confers jurisdiction over "all civil proceedings" (i) "arising under title 11," (ii) "arising in … cases under title 11," or (iii) "related to cases under title 11."  28 U.S.C. §1334(b).  Jurisdiction existed under all three grounds here.

### 1.    The court had "arising under" and "arising in" jurisdiction

The bankruptcy court had "core" jurisdiction over the proceeding to confirm the Plan because it was a proceeding "arising under" the Bankruptcy Code. "Bankruptcy 'arising under' jurisdiction is analogous to 28 U.S.C. § 1331" and exists where "the Bankruptcy Code creates the cause of action or provides the substantive right invoked."  *Stoe v. Flaherty*, 436 F.3d 209, 216-217 (3d Cir. 2006).  Confirmation of a plan arises under the Bankruptcy Code because it is the

---

Century/Chubb Order; they instead assert only that the Century/Chubb Order should be reversed "to the extent it depends on confirmation."  Br. at 5, 79.  The Century/Chubb Order, however, expressly does *not* depend on plan confirmation. Order at 2 (ALW143).

Code that grants the bankruptcy court authority to confirm a plan that meets the requirements set forth in section 1129 of the Code. *See* 11 U.S.C. §1129(a); 1 *Collier on Bankruptcy* ¶3.01[3][e][i] ("confirmation of a plan" is a proceeding "aris[ing] under title 11"); *cf. In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 198-199 (3d Cir. 2022) (proceeding to enforce confirmed plan fell within "arising under" and/or "arising in" jurisdiction).

The bankruptcy court also had jurisdiction over the proceeding to confirm the Plan because it was a proceeding "arising in" a bankruptcy case—i.e., a proceeding that "by its nature, and not the particular factual circumstance, could arise only in the context of a bankruptcy case." Op. at 118-119 (A.125-126) (quoting *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014)); *Stoe*, 436 F.3d at 218 ("confirmation of plans" comes within "'arising in' jurisdiction"); 1 *Collier on Bankruptcy* ¶3.01[3][e][iv] (same).

Whether the Plan could be approved with a non-debtor injunction or release is a separate question of substantive authority under the Bankruptcy Code, not of subject-matter jurisdiction. Section 1334 gave the bankruptcy court the jurisdiction to determine whether the Plan is lawful and should be confirmed. To determine whether the Plan is lawful, the court had to determine whether the Bankruptcy Code authorizes a plan to include a non-debtor injunction or release and, if so, whether the requirements for approving such a provision were met on

26

the facts of this case.  But those are not jurisdictional questions; they are merits

questions, which the bankruptcy court had the power to determine in the exercise

of its jurisdiction over the plan-confirmation proceeding.  Op. at 119 (A.126); *see*

*In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99

(Bankr. D. Mass. 2013) ("It may or may not be appropriate for a court exercising

bankruptcy jurisdiction to confirm a plan containing a third-party release—and, if

it is appropriate, the manner and degree of relation of the released claim to the case

are certainly factors in the analysis—but the court undoubtedly has jurisdiction to

adjudicate the plan, even without recourse to its related-to jurisdiction."); *In re*

*Millennium Lab Holdings II, LLC*, 575 B.R. 252, 287 n.160 (Bankr. D. Del. 2017),

*aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd on other grounds*, 945 F.3d 126 (3d Cir.

2019).[11]

The Lujan Claimants argue (at 7) that the bankruptcy court lacked "arising

in" jurisdiction to confirm the Plan containing non-debtor releases, citing

*Combustion Engineering*.  But as Judge Silverstein noted, *Combustion Engineering*

did not address "arising in" jurisdiction at all.  Op. at 119 (A.126); *cf. Essar Steel*,

---

[11]     The Third Circuit in *Millennium* did not address subject-matter jurisdiction,
but rather held that an Article I bankruptcy judge may, consistent with Article III
of the Constitution, decide by final order whether to confirm a plan containing a
non-debtor release where the court resolves a matter integral to the debtor-creditor
relationship.  945 F.3d at 137 & n.10.

47 F.4th at 199-200 (distinguishing earlier Third Circuit precedent applying "related to" analysis because "[w]e never addressed whether these proceedings could also qualify as core" matters under "arising under" or "arising in" jurisdiction). Rather, *Combustion Engineering* merely explained that section Bankruptcy Code §105(a) does not itself provide subject-matter jurisdiction, which must exist independently. 391 F.3d 190, 224-225 (3d Cir. 2004). Because Judicial Code §1334 conferred that jurisdiction here, the bankruptcy court had jurisdiction to confirm the Plan with non-debtor injunctions and releases.

### 2.   The court also had "related to" jurisdiction

The court also had "related to" jurisdiction to confirm the Plan and its non-debtor injunctions and releases. A proceeding falls within a bankruptcy court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Combustion Eng'g*, 391 F.3d at 226 (internal quotation marks omitted). If the proceeding "could alter the debtor's rights, liabilities, options, or freedom of action," or "in any way impact[] upon the handling and administration of the bankrupt estate," it comes within the court's "related to" jurisdiction. *Id.*

The Dissenting Claimants do not seriously argue that the bankruptcy court lacked "related to" jurisdiction to approve the Plan's injunctions and releases barring abuse claims as against the Settling Insurers. While the Lujan Claimants

assert that no jurisdiction existed (at 10), that argument rests on their mistaken contention that the policies' proceeds were not estate property, which fails as discussed above.

The Third Circuit and other courts have repeatedly held that "related to" jurisdiction exists over claims against a debtor's insurers or other co-insured parties in precisely this circumstance, where the claims could deplete the estate's insurance. *See Combustion Eng'g*, 391 F.3d at 232-233 ("related to" jurisdiction exists over claims based on "shared insurance" where suits are brought against additional insureds on debtor's insurance policy with only limited funds available, citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir. 1986)); *Manville*, 837 F.2d at 91-93 (bankruptcy jurisdiction existed to grant channeling injunction barring non-debtor co-insured from suing debtor's insurers because the claim "seek[s] to collect out of the proceeds of [the debtor's] insurance policies"); *In re Davis*, 730 F.2d 176, 183-184 (5th Cir. 1984) (bankruptcy jurisdiction existed to enjoin asbestos claimants from bringing direct-action suits against debtor's insurers because the suits "pose a significant threat to the estate").

Having no basis to challenge "related to" jurisdiction as to the Settling Insurers, the Dissenting Claimants instead focus their challenges on the alleged lack of "related to" jurisdiction to channel their claims against the Local Councils and Chartered Organizations to the Trust. Those arguments fare no better. As

with suits against the Settling Insurers, the bankruptcy court had "related to" jurisdiction to approve the Plan's injunctions and releases of abuse claims against the Local Councils and Chartered Organizations because continued litigation of those claims would likewise deplete the estate's insurance assets.

Judge Silverstein made detailed findings of fact in this regard.  She found that "from at least 1976 forward, Debtors provided insurance to both Local Councils and Chartered Organizations."  Op. at 10-16, 121 (A.17-23, A.128). Moreover, BSA's primary policies contain per-occurrence limits of liability that restrict potential recoveries for injuries arising from a single occurrence, regardless of the number of insureds.  *Id.* at 121 (A.128).  As a result, "if an insurer paid out its per occurrence limits to plaintiff A to either a Chartered Organization or Local Council, there would be no insurance remaining to respond to a claim on the policy by BSA for Abuse alleged against it by plaintiff A."  *Id.*  Later policies contained "aggregate limits applicable to all claims," such that, again, "[p]ayment of any claims against any insured counts against the aggregate limits, thereby depleting the insurance policies."  *Id.*  Thus, "any call by Local Councils and Chartered Organizations on BSA's insurance has the potential to diminish property of the estate."  *Id.* at 123 (A.130).  It is settled law that bankruptcy courts have "related to" jurisdiction over such claims against insurance assets.  *See supra* p.29.

The Dissenting Claimants have no meaningful response.  The D&V

Claimants' chief argument (at 36-37) is that the Third Circuit has held that shared

insurance is insufficient, as a matter of law, to give rise to "related to" jurisdiction.

That is wrong.  The Third Circuit recognized in *Combustion Engineering* that

shared insurance *can* provide a basis for exercising "related to" jurisdiction over

claims against non-debtors, citing the Fourth Circuit's decision in *A.H. Robins* and

other decisions "finding 'related to' jurisdiction over claims against non-debtors

based in part on shared insurance policies."  391 F.3d at 232-233.

Indeed, *Combustion Engineering* supports the exercise of "related to"

jurisdiction here.  Although *Combustion Engineering* held that the shared

insurance did not support "related to" jurisdiction in that case, it did so only

because the bankruptcy court failed to make findings of fact that "[t]he shared

insurance has one cap and that all insureds are under the same cap," such that

claims against the co-insured non-debtors would deplete the debtor's insurance.

*Id.* at 233 (noting "we would ordinarily remand on the shared insurance issue" for

further fact finding, but the challenged injunction was legally invalid anyway).

Here, Judge Silverstein made precisely such findings:  that the shared insurance is

subject to shared per-occurrence or aggregate limits such that any claim against a

co-insured Local Council or Chartered Organization could deplete the estate's

insurance.  Op. at 10-16, 122 (A.17-23, A.129).

The only other Third Circuit case cited by the D & V Claimants,
*Continental*, did not even address subject-matter jurisdiction, but rather addressed
the validity of a non-debtor injunction solely on the merits. *In re Continental
Airlines*, 203 F.3d 203, 216-217 (3d Cir. 2000) (shared insurance not, alone, a basis
to grant injunction absent findings of necessity and fairness).[12]

As if this were not enough, Judge Silverstein made detailed findings of fact
about numerous additional ways, in addition to shared insurance, in which claims
against the Local Councils and Chartered Organizations could have a
"conceivable" impact on the estate. For example, Judge Silverstein found, based
on the testimony of BSA's officers, advisors, and national defense counsel, that
plaintiffs consistently alleged that BSA was jointly responsible with the Local
Councils and Chartered Organizations for abuse claims, and that BSA defended,

---

[12]      Also without merit is the D&V Claimants' contention (at 37) that no "related
to" jurisdiction existed to enjoin pre-1976 claims against Chartered Organizations
covered by policies issued by the Settling Insurers to such Chartered
Organizations. As Judge Silverstein found, the Settling Insurers would not have
settled BSA's (and the Local Councils') coverage claims against them unless they
had obtained "finality" ensuring they do not "pay more than once for Abuse
Claims by a given claimant." Op. at 151-160 (A.158-167). Continued exposure to
abuse claims against Chartered Organizations covered by Settling Insurer policies
thus would have precluded "the global settlement of insurance coverage disputes
with BSA's two primary carriers (Hartford and Century)," without which "these
cases would devolve into a morass of coverage litigation, and recoveries to holders
of Abuse Claims would be delayed for countless years." *Id.* at 154-155 (A.161-
162). That would certainly have a "conceivable effect" on BSA's estate.

indemnified, and settled cases on behalf of its Local Councils and Chartered
Organizations.  Op. at 1-10, 19-20, 120-124, 133-140, 155-156 (A.8-17, A.26-27,
A.127-131, A.140-147, A.162-163).

The Dissenting Claimants quibble with these findings, citing a few instances
in which BSA was not held liable for a claim against a Local Council or Chartered
Organization, and claiming that there was insufficient documentary evidence of
BSA's (and the Local Councils') contractual obligations to indemnify the Local
Councils and Chartered Organizations.  Lujan Br. at 8-9, 12-15; D&V Br. at 28-35,
39-44.  But none of these trivial objections shows that Judge Silverstein's findings
were clearly erroneous or legally flawed.  *See e.g.*, *Stoe*, 436 F.3d at 211-212, 218-
219 ("related to" jurisdiction existed over claims against non-debtors who were
entitled to indemnification from debtor).  And the Dissenting Claimants all but
ignore Judge Silverstein's undisputed findings that BSA cannot accomplish its
Scouting mission without its Local Council and Chartered Organization partners.
Op. at 1-7, 120-124, 133-140, 153-156, 163-164 (A.8-14, A.127-131, A.140-147,
A.160-163, A.170-171).  As the court found, continued abuse litigation against
those entities would threaten their ability to remain in Scouting, leading to a drop
in membership and revenues and jeopardizing BSA's ability to continue the
Scouting mission.  *Id.*[13]

---

[13]   The Lujan Claimants are mistaken in contending (at 9-10) that the

In short, the bankruptcy court correctly held, in accordance with Third Circuit law and the court's well-supported findings of fact, that it had subject-matter jurisdiction to confirm the Plan with its non-debtor injunctions and releases.

**B.      Under Controlling Third Circuit Law, The Bankruptcy Code Provides Substantive Authority For The Bankruptcy Court To Approve The Plan's Non-Debtor Injunctions And Releases**

Just as the law of this Circuit makes clear that the bankruptcy court had subject-matter jurisdiction to confirm the Plan, Third Circuit precedent also establishes that the Bankruptcy Code authorizes non-debtor injunctions and releases where they are necessary to the reorganization and fair. The Dissenting Claimants' contrary arguments again conflict with the controlling law of this Circuit.

---

bankruptcy court lacked jurisdiction to approve the Plan's injunctions and releases of their claims against the Archbishop of Agaña because the Guam District Court overseeing the Archbishop's bankruptcy purportedly had "exclusive" jurisdiction over those claims. It did not. The Guam District Court had exclusive jurisdiction only over the Archbishop's bankruptcy case itself. *See* 28 U.S.C. §1334(a); *Stoe*, 436 F.3d at 216. Judge Silverstein did not assume jurisdiction over the Archbishop's bankruptcy case, but simply exercised jurisdiction to approve the injunctions in the BSA Plan, which impacted the claims of the Archbishop and its creditors. The Judicial Code specifies that the Guam District Court had "original *but not exclusive* jurisdiction" over such proceedings. 28 U.S.C. §1334(b) (emphasis added). The Lujan Claimants' reliance on *Pepper v. Litton* is misplaced; the predecessor bankruptcy statute discussed there has been replaced with the current jurisdictional statute in §1334. 60 S. Ct. 238, 244 (1939).

In *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit struck down a non-debtor release, but only because it lacked what the court termed the "hallmarks" for such a release—"fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Id.* at 214-217.  Addressing the validity of non-debtor releases as a question of first impression in this Circuit, the *Continental* court analyzed the relevant decisions from other circuits and concluded that the non-debtor release at issue "d[id] not pass muster under even the most flexible tests for the validity of non-debtor releases." *Id.* at 214.  The court accordingly determined that it "need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible." *Id.* at 214 & n.11.  But it made clear that such provisions may be authorized under circumstances like those involved in the *Manville*, *Robins,* and *Drexel* cases, where the "hallmarks of permissible non-consensual releases" are present.  *Id.* at 214.

As *Continental* explained, the Second Circuit in *Manville* and *Drexel* "upheld plans of reorganization containing releases and permanent injunctions of widespread claims against co-liable parties" in part because the plans "provided consideration to parties who would be enjoined from suing non-debtors."  203 F.3d at 212 (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), and *In re Johns-Manville Corp.*, 843 F.2d 636, 640, 649 (2d Cir. 1988)).  In

*Robins*, "the Fourth Circuit likewise upheld non-debtor releases that were necessary to reorganization and were accompanied by consideration for mass tort claimants, provided in part by the non-debtors." *Id.* (citing *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989)). "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties," where those "co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible." *Id.* at 212-213. Indeed, *Continental* distinguished a handful of lower-court decisions in the Third Circuit that had suggested that non-consensual non-debtor releases were impermissible on the facts presented in those cases on the ground that "[n]one of these cases … involved the mass litigation found in *Robins*, *Manville*, or *Drexel*." 203 F.3d at 214 n.11; *see also In re Mallinckrodt plc*, 639 B.R. 837, 873 (Bankr. D. Del. 2022) (approving non-debtor release and noting that "[h]ere, like in the *Manville*, *Robins*, and *Drexel* cases referred to in *Continental*, the 'central focus … has been the global settlement of massive liabilities against the debtors and co-liable parties'" (quoting *Continental*, 203 F.3d at 212-213)).

To be sure, the Third Circuit acknowledged that the Ninth and Tenth Circuits have held that Bankruptcy Code §524(e) bars non-consensual non-debtor releases. *Continental*, 203 F.3d at 212. But it did not join those other circuits and hold the Continental non-debtor release invalid on that basis. *Id.* at 214-217.

Instead, it merely held that the non-debtor release in the Continental plan was invalid "based on the [factual] record before us." *Id.* at 215.

The Third Circuit explained that the district court had not considered "whether the release and permanent injunction were fair to Plaintiffs and were given in exchange for reasonable consideration." 203 F.3d at 215. Rather, the Continental plan sought to release and permanently enjoin a securities class action against the debtors' directors and officers even though "Plaintiffs received no consideration in exchange for having their lawsuit[] permanently enjoined." *Id.* "On this basis alone, *Manville*, *Drexel*, and *Robins* are inapplicable." *Id.* As for "the necessity of the release and permanent injunction," the Third Circuit "[found] nothing in the record to even imply that the success of the Continental Debtors' reorganization bore any relationship to the release and permanent injunction of Plaintiffs' class actions." *Id.* "Unlike in cases such as *Manville*, *Drexel*, and *Robins*," there was "no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability for Plaintiffs' claims." *Id.*

Thus, fairly read, *Continental* holds that bankruptcy courts have authority to enter third-party releases and related channeling injunctions where, unlike in that case, such relief is both necessary for the reorganization and fair. Of critical

37

importance, the Third Circuit has itself read *Continental* as so "hold[ing]."  In *In re Global Industrial Technologies, Inc.*, 645 F.3d 201 (3d Cir. 2011) (en banc), the court of appeals, sitting en banc, explained that *Continental* "hold[s]" that a third-party injunction is "proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair." *Id.* at 206.

Likewise, in *Millennium*, the Third Circuit affirmed an order confirming a plan that released and enjoined an objecting creditor's fraud claims against non-debtor shareholders.  Both the bankruptcy court and the district court upheld the non-debtor release and injunction because they satisfied *Continental*'s "hallmarks of permissible non-consensual releases."  *See* Dec. 11, 2015 Tr. of Court Decision re: Plan Confirmation at 16-26, *In re Millennium Lab Holdings, II, LLC*, No. 15-12284 (Bankr. D. Del. Dec. 15, 2015) [D.I. 206] (hereinafter "Millennium Bench Ruling"); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017); *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 573, 584-586 (D. Del. 2018).  On appeal, the Third Circuit upheld plan confirmation on other grounds, but it reiterated that non-debtor injunctions and releases are permissible if they are "'both necessary to the reorganization and fair'" and supported by "specific factual findings."  *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (citing *Global Industrial Technologies* and *Continental*).  It

added that, in approving such a non-debtor release in *Millennium*, "both the

Bankruptcy Court and District Court exercised appropriate—indeed, exemplary—

caution and diligence." *Id.*

Other Third Circuit decisions are in accord. *See United Artists Theatre Co.*

*v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (explaining that under *Continental*, the

"hallmarks of permissible non-consensual releases" are "fairness, necessity to the

reorganization, and specific factual findings," plus the "requirement[] that the

releases were given in exchange for fair consideration" (internal quotation marks

omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (explaining

that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a

reorganization plan limiting the liability of third parties," but rather "concluded …

the releases at issue were impermissible because the hallmarks of permissible non-

consensual releases … [were] absent" (internal quotation marks omitted)).

The Dissenting Claimants dismiss this controlling Third Circuit law with

barely any discussion.  Instead, they rely on *Purdue*, in which an out-of-Circuit

district court vacated confirmation of a plan containing non-consensual releases

and injunctions, asserting that the Bankruptcy Code provides no statutory authority

for that relief.  *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), *appeal*

*filed*, No. 22-90 (2d Cir. Jan. 18, 2022).  To the extent *Purdue* holds that a non-

consensual third-party release is never permissible, it is contrary to the controlling

law of this Circuit.  Indeed, another bankruptcy judge in this district recently so
held.  *Mallinckrodt*, 639 B.R. at 865-875 & n.70 (confirming plan containing non-
consensual releases and injunctions because "the Opioid Releases satisfy the
requirements set forth by the Third Circuit in *Continental*" and declining to follow
*Purdue* because "the law of the Third Circuit … has recognized that bankruptcy
courts do have statutory and constitutional authority to approve a plan of
reorganization that contains non-consensual third-party releases").

      The Dissenting Claimants also ignore controlling Third Circuit law in
contending that §524(g)'s explicit authorization of non-debtor injunctions in
asbestos cases creates a negative inference that the Code otherwise categorically
bars such injunctions.  *Continental* specifically recognized §524(g), but it
nonetheless refused to draw that negative inference.  203 F.3d at 211 & n.6.  As
Judge Silverstein explained (Op. at 128-129 (A.135-136)), Congress made clear
that no such inference should be drawn.  The legislative history explains that
Congress enacted §524(g) to address a specific concern, namely, a "lingering
uncertainty in the financial community as to whether the [*Johns-Manville*]
injunction can withstand all challenge."  H.R. Rep. No. 103-835, at 40 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 3340, 3349; Op. at 129 (A.136).  Congress
accordingly adopted a rule of construction for §524(g) expressly admonishing that
"[n]othing in [§524(g)] sh[ould] be construed to modify, impair, or supersede any

other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, §111(b), 108 Stat. 4106, 4117.

In short, under controlling Third Circuit law, the bankruptcy court had the statutory authority to confirm the Plan's non-debtor injunctions and releases if they are both necessary to the reorganization and fair.

### C.   The Bankruptcy Court Correctly Found That, On The Extraordinary Facts And Circumstances of This Case, The Plan's Non-Debtor Injunctions And Releases Meet The Standard For Approval

Judge Silverstein found that, under the particular and extraordinary facts and circumstances of this case, the Plan's non-debtor injunctions and releases meet the standard for approval under *Continental* and its progeny.  Based on a thorough examination of the evidentiary record, the court found that the *Continental* "hallmarks of permissible non-consensual releases" were satisfied because the Plan's non-debtor injunctions and releases were (i) necessary to BSA's reorganization and (ii) fair to the abuse claimants.  203 F.3d at 214.  The court also found that the "*Master Mortgage* factors" further demonstrated that the *Continental* hallmarks were met.  Although the Dissenting Claimants disagree with these findings, they do not (and cannot) show that Judge Silverstein made any error, much less clear error, in finding that the injunctions were necessary and fair on the facts of this case.

41

1.     The *Continental* hallmarks of necessity and fairness were met

*Necessity*.  Judge Silverstein found that the Plan's non-debtor injunctions and releases were the "cornerstone of the Plan."  Op. at 154-155 (A.161-162). Without them, the Settling Insurers, Local Councils and other contributing parties would not have agreed to settle and fund the $2.5 billion in contributions to the Settlement Trust that are expected (with other Trust assets) to pay the abuse claims in full.  *Id.* at 151-160, 163-164 (A.158-167, A.170-171).  And without them, BSA's essential partners—its Local Councils and Chartered Organizations—would be forced to limit or end their involvement in Scouting, jeopardizing the membership and revenues on which BSA's survival and the future of Scouting depend.  *Id.*  The alternative was a path to nowhere:  "Without the global settlement of insurance coverage disputes with BSA's two primary carriers (Hartford and Century) these cases would devolve into a morass of coverage litigation, and recoveries to holders of Abuse Claims would be delayed for countless years."  Op. at 155 (A.162).

These specific factual findings establish that the *Continental* hallmark of necessity was satisfied under the extraordinary circumstances of this case.  *See Continental*, 203 F.3d at 215 (standard met where "non-debtor [parties] provided a critical financial contribution to the … Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability for Plaintiffs'

42

claims"); *Mallinckrodt*, 639 B.R. at 870, 873-874 (standard met where channeling injunction of tort claims against debtor's directors and officers was necessary to obtain their continued participation in management of debtor, which was essential to the success of debtor's reorganized business).

The Dissenting Claimants' objections to these findings are meritless.  They contend that the injunctions and releases were unnecessary because BSA previously proposed a different plan, a year earlier, which did not include non-debtor injunctions and releases.  Lujan Br. at 25-26; D&V Br. at 65-67.  But Judge Silverstein found that this so-called "toggle" plan would have left "BSA in shambles" and "spiral[ing] into a 'death trap' of litigation with minimal recoveries in sight" for abuse claimants.  Op. at 156-158 (A.163-165).  The Dissenting Claimants have not shown that this finding was clearly erroneous.

The Lujan Claimants invoke the same flawed logic by pointing (at 26-28) to another, earlier plan (the so-called "solicitation plan"), which included some, but not all, of the non-debtor injunctions and releases contained in the final Plan.  As Judge Silverstein explained, that earlier plan also was not viable.  BSA had not yet entered into the settlements with Century, Zurich, Clarendon and others, which required additional injunctions and releases to induce those settlements and thereby increase the Settlement Trust's committed funding to $2.5 billion—a level that garnered the support of the TCC and 85% of abuse claimants and made

43

confirmation of the Plan possible.  Op. at 158-160 (A.165-167).  As Judge

Silverstein found, "[t]he Settling Insurers [were] seeking to buy complete relief";

"[t]he undisputed evidence is that without the Scouting-Related Releases, the

Settling Insurers would not settle their liability."  *Id.* at 160, 163 (A.167, A.170).

*Fairness*.  Judge Silverstein found that the Plan's non-debtor injunctions and

releases were fair.  In particular, the court found—based on uncontroverted

evidence—that the Plan will likely pay abuse claims in full.  Op. at 65-72, 149-

150, 164 (A.72-79, A.156-157, A.171).  Based on the "thorough," "credible" and

"undisputed" evidence presented by Dr. Bates and Ms. Gutzler, Judge Silverstein

found that (i) the aggregate value of the abuse claims is most likely between $2.4

billion and $3.6 billion, and (ii) the Settlement Trust will be funded with assets

sufficient to pay those claims in full, including $2.5 billion from the existing

settlements with the Settling Insurers, Local Councils and others, $200 million in

additional contingent funding, and more than $4 billion in additional insurance

coverage available from insurers that have not settled.  *Id.* at 65-72 (A.72-79).

The fairness of the Plan to abuse claimants was further demonstrated by the

overwhelming acceptance of the Plan.  More than 85% of the abuse claimants who

voted accepted the Plan.  Op. at 52-53, 149, 164 (A.59-60, A.156, A.171).  All

three of the principal claimant representatives in the case—the TCC, the FCR, and

the Coalition—ultimately supported the Plan, following extensive negotiations and

mediation.  *Id.* at 24-38, 48-56, 168 (A.31-45, A.55-63, A.175).  And the Plan

offered timely compensation and resolution for many abuse claimants who would

otherwise likely recover little or nothing following years of litigation in the tort

system, if they were able to bring their claims at all.  *Id.* at 7, 19-20, 62-64, 164-

167 (A.14, A.26-27, A.69-71, A.171-174) (finding that BSA faced only 275 abuse

lawsuits when it filed bankruptcy; many of the 82,000 claimants in the bankruptcy

had not come forward due to privacy concerns and economic barriers in the tort

system; many lawyers agreed to represent those claimants only in the bankruptcy

case; statutes of limitations and problems of proof could pose additional hurdles to

recovery; collecting a judgment from many non-profit Local Council and

Chartered Organization with restricted assets could pose further hurdles; and a

significant number of claimants were in their 70s or 80s).

Moreover, for the few objectors who prefer to pursue their individual

lawsuits, the Plan offers multiple options to do so in the tort system.  Op. at 35-44,

160-165 (A.42-51, A.167-172).  If unsatisfied with the Settlement Trust's claims

process, in which claimants may seek allowed claims of up to $2.7 million,

claimants may elect to pursue a higher award through the Independent Review

Option or in the tort system.  *Id.*  Claimants may also pursue recovery in the tort

system against Opt-Out Chartered Organizations (including the Archbishop of

Agaña, which the Lujan Claimants wish to pursue), or against Participating

Chartered Organizations for abuse arising prior to 1976, to the extent those claims are not covered by a policy issued by a Settling Insurance Company. *Id.* Judge Silverstein found that all these options in combination, together with the $2.5 billion to be paid to the Trust, are sufficient to pay all abuse claims in full.

These detailed factual findings establish that the *Continental* hallmark of fairness was met here. *See Continental*, 203 F.3d at 215 (standard met where the release or injunction is "given in exchange for reasonable consideration"); *id.* at 213 (affected claimants should receive "adequate consideration"); *id.* at 214 n.11 (non-consensual releases may be valid if "given in exchange for fair consideration"); *United Artists Theatre*, 315 F.3d at 227 (standard under *Continental* is whether "the releases [are] given in exchange for fair consideration").[14]

The Dissenting Claimants' objections to these findings fail. The Dissenting Claimants contend that the Plan's injunctions and releases are unfair because each protected party is supposedly paying too little. Lujan Br. at 23-25, 30-31; D&V Br. at 59-63, 67-68, 71-72. Those complaints focus on the wrong question. The question is not whether the protected party is paying every cent it might be

---

[14]      *Accord In re Exide Holdings, Inc.*, 2021 WL 3145612, at *13 (D. Del. July 26, 2021); *In re Tribune Co.*, 464 B.R. 126, 178, 203 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020).

obligated to pay if complex, time-consuming, and costly litigation over hotly

contested issues were resolved against it.  The question is whether the injunctions

and releases are "fair":  Are they "given in exchange for reasonable consideration"

in light of the non-bankruptcy value of the released claims?  *Continental*, 203 F.3d

at 215.[15]  That standard is met here.  Given the bankruptcy court's finding that the

claims will be paid in full, the claimants will necessarily receive reasonable

consideration.  There is thus no need to conduct a granular entity-by-entity analysis

of each Local Council and Chartered Organization, as the Dissenting Claimants

urge.  As Judge Silverstein observed, "[n]othing in the *Continental* hallmarks

precludes collective consideration or prevents one party, in appropriate

circumstances, from contributing funds for the benefit of another."  Op. at 145

(A.152).

    To be sure, the Dissenting Claimants now attempt to challenge the

bankruptcy court's finding that the Plan will likely pay the abuse claims in full.

They criticize Dr. Bates' testimony, urging that his testimony was "not credible"

---

[15]    *See also, e.g.*, *In re Purdue Pharma L.P.*, 633 B.R. 53, 107 (Bankr.
S.D.N.Y.) (evaluating non-debtor release in accordance with "the Third Circuit's
focus on the fairness of the settlement," in which "neither a [non-debtor]
defendant's wealth nor the amount of claims asserted against it should dictate the
fairness of a settlement without considering the claims' merits, the costs and delay
of continued litigation, and risks relating to the collectability of any eventual
judgments"), *vacated on other grounds*, 635 B.R. 26 (S.D.N.Y. 2021).

and was contrary to the FCR's and TCC's purported valuations of the abuse claims in higher amounts.  Lujan Br. at 32-34; D&V Br. at 75-79.  But as Judge Silverstein explained, Dr. Bates was the only valuation expert who testified on the aggregate value of the abuse claims.  Op. at 57-58, 65 (A.64-65, A.72).  The purported valuations by the FCR and TCC were not presented as evidence at the trial and were not tested by cross-examination.  And the Dissenting Claimants did not present their own valuation expert.  Nor did their cross-examination of Dr. Bates "undercut his conclusions," which Judge Silverstein accepted based on her "assessment of Dr. Bates's credibility."  Op. at 65 (A.72).  The Dissenting Claimants have made no showing that Judge Silverstein's findings of payment in full are clearly erroneous or that the *Continental* hallmark of fairness was not met.

2.      The *Master Mortgage* factors further demonstrate that the *Continental* hallmarks were met

Judge Silverstein also correctly found that the *Master Mortgage* factors, derived from an out-of-circuit case, "[w]hile … not the law of the Third Circuit," further demonstrated that "the *Continental* hallmarks have been met."  Op. at 132 (A.139).

*Identity of interest*.  The bankruptcy court found that there was an "identity of interest" between BSA and the non-debtor protected parties, "such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate."  Op. at 132 (A.139).  There was an identity of interest between BSA

48

and the Settling Insurers "because they are the Debtors' insurers." *Id.* at 135 (A.142) ("[n]o holder" alleges "a separate claim against any Settling Insurer on account of its own conduct").  And there was an identity of interest among BSA and the Local Councils and Chartered Organizations by virtue of their shared insurance, indemnity relationships, interdependence in delivering the Scouting program, and alleged joint responsibility for Scouting-related abuse claims.  *Id.* at 133-140 (A140-147).  As discussed above, the Dissenting Claimants failed to show that these findings were erroneous.  *See supra* pp.28-33.

*Substantial contribution by non-debtors*.  The bankruptcy court found that each of the protected parties is making a substantial contribution in exchange for the Plan's injunctions and releases—including more than $1.6 billion by the Settling Insurers—and that those contributions are essential to funding a 100% plan.  Op. at 140-148 (A.147-155).  The Claimants' objections to these contributions fail as discussed above.  *See supra* pp.4-10, 44-48.

*Support of substantial majority of affected claimants*.  The bankruptcy court found that a substantial majority of the affected abuse claimants agreed to the Plan's injunctions and releases, with more than 85% of the claimants who voted accepting the Plan.  Op. at 149 (A.156).  As Judge Silverstein observed, the Dissenting Claimants' arguments (D&V Br. at 73-74) that a 90% vote is required is contrary to cases finding the requirement was met with smaller majorities than

was obtained here.  *Id.* (citing cases approved with 74% and 82.98% votes).  And

the vote exceeded the majority required in asbestos cases under §524(g), which

permits non-debtor injunctions with a 75% vote.  *Id.*

Finally, the court also properly rejected the Lujan Claimants' argument (at

31-32) that the vote must be analyzed on a protected-party-by-protected-party

basis.  Op. at 149 (A.156).  The Lujan Claimants cite no authority for that

proposition.  Indeed, even in asbestos cases, §524(g) permits a single, class-wide

vote to bind claimants to a plan that enjoins suits against numerous different third

parties, including directors, officers, shareholders, advisors, lenders, and insurers.

*See* 11 U.S.C. §524(g)(2)(B)(ii)(IV).  And as Judge Silverstein explained, such an

individualized voting rule would be unworkable in a case like this one, precluding

the ability to achieve a global resolution of mass-tort litigation necessary to

achieve a successful reorganization like the Plan here.  Op. at 149 (A.156).

*Payment of all, or substantially all, channeled claims*.  To meet the

*Continental* hallmarks, a plan does not always need to provide for payment in full

of all claims, so long as it provides "reasonable" or "fair" consideration in

exchange for the injunction.  *See* 203 F.3d at 215; *Millennium Bench Ruling* at 8,

24 (approving non-debtor injunction without payment in full because released

parties provided "reasonable compensation for [the] release" that exceeded

liquidation recoveries), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd on other grounds*,

945 F.3d 126 (3d Cir. 2019); *Mallinckrodt*, 639 B.R. at 868-875 (approving non-debtor injunction in mass-tort case without payment in full because release allowed claimants to "receive recoveries far in excess of what they could obtain through continued litigation").

But, in any event, Judge Silverstein found that this Plan will likely pay the channeled abuse claims in full.  Op. at 149-150 (A.156-157).  The Dissenting Claimants' objections to this finding fail as discussed above.  *See supra* pp.44-48.

*Necessity to the reorganization*.  Finally, Judge Silverstein found that the Plan's non-debtor injunctions and releases are "essential to reorganization such that without [them], there is little likelihood of success."  Op. at 132, 151-163 (A.139, A.158-170).  The Dissenting Claimants' objections to the necessity of the injunctions and releases likewise fail as already discussed.  *See supra* pp.42-44.

Accordingly, the *Master Mortgage* factors reinforce the correctness of Judge Silverstein's findings that the *Continental* hallmarks are met here.

3.    The Lujan Claimants' arguments based on the Archbishop of Agaña's bankruptcy stay are baseless

Finally, the Lujan Claimants cannot salvage their appeal by claiming (at 64-66) that the Plan's non-debtor injunctions and releases violated the automatic stay in the Archbishop of Agaña's bankruptcy case.

As Judge Silverstein correctly held, the Lujan Claimants lack standing to assert the Archbishop's rights.  Op. at 85 n.329 (A.92); Sept. 7, 2022 Hr'g Tr. [D.I.

51

10317] at 12:1-40:14 (A.9956-9984).  Only the Archbishop itself—the debtor in

the Guam bankruptcy—has standing to enforce the automatic stay in its bankruptcy

case.  *See, e.g.*, *In re 69 N. Franklin Tpk., LLC*, 2018 WL 4773115, at *4 (D.N.J.

Oct. 2, 2018) ("[I]f the debtor or the trustee chooses not to invoke the protections

of [the automatic stay under] § 362, no other party may attack any acts in violation

of the automatic stay." (quoting *In re Brooks*, 79 B.R. 479, 481 (B.A.P. 9th Cir.

1987), *aff'd*, 871 F.2d 89 (9th Cir. 1989))); *id.* at *3 ("The automatic stay is for the

benefit of the debtor and if it chooses to ignore stay violations other parties cannot

use such violations to their advantage." (quoting *In re Fuel Oil Supply &*

*Terminaling, Inc.*, 30 B.R. 360, 362 (Bankr. N.D. Tex. 1983))); *Marin v. Leslie*,

2008 WL 4238961, at *4 (W.D. Pa. Sept. 10, 2008) ("Plaintiff was not the debtor

in bankruptcy"; "[t]hus, he lacks standing to prosecute a claim for violation of the

automatic stay"), *aff'd*, 337 F. App'x 217 (3d Cir. 2009).  The sole authority the

Lujan Claimants cite likewise involved stay violations asserted by the debtor, not a

third party.  *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 257 (3d Cir.

2006).

Moreover, any arguable impact of the Guam automatic stay on the BSA Plan

has been mooted by developments in the Guam case.  The Archbishop of Agaña

*has withdrawn its appeal* from confirmation of the BSA Plan and dropped all of its

challenges to the Plan, including any contention that the Plan's non-debtor releases

and injunctions violated the Guam automatic stay.[16]  Indeed, the Archbishop

settled its disputes with BSA over their competing plans of reorganization.  Both

the Delaware and the Guam Bankruptcy Courts approved the settlement, which

expressly provides that nothing in the Guam plan authorizes any violation of the

BSA Plan's injunctions and releases.[17]  The Guam plan further states that any

liability of the BSA Settling Insurers must be determined in accordance *with the*

*BSA Plan*, including any injunctions and releases thereunder.[18]

       In other words, the Archbishop's bankruptcy plan voluntarily *abides* by the

BSA Plan—including the very injunctions and releases that the Lujan Claimants

contend supposedly violated the Archbishop's automatic stay.  Those injunctions

---

[16]       *See* Stipulation and Order of Voluntary Dismissal, *Archbishop of Agaña v. Boy Scouts of Am.*, No. 22-cv-01254-RGA (D. Del. Oct. 5, 2022) [D.I. 7].

[17]       *See* Fifth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña, *In re Archbishop of Agaña*, No. 19-00010 (D. Guam Sept. 28, 2022) [D.I. 1044] ("Guam Plan") at §13.9 ("Nothing in this Plan … affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant … to violate … any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder"); Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña, *In re Archbishop of Agaña*, Case No. 19-00010 (D. Guam Oct. 20, 2022) [D.I. 1093].

[18]       *See* Guam Plan §6.14(n) (providing that obligations of Settling Insurers in the BSA case—classified as "Non-Settling Insurers" in the Guam case—"shall be determined by and in accordance with … any relevant and operative provision(s), if any, of the BSA Plan, BSA Confirmation Opinion, or the BSA Confirmation Order, including any injunctions and releases granted or approved thereunder").

and releases, which bar the Archbishop from suing the Settling Insurers for coverage for claims of abuse, take nothing away from the Archbishop, since the BSA Plan also enjoins the Lujan Claimants (or anyone else) from suing the Archbishop on any abuse claims covered by the Settling Insurers' policies, thereby mooting the Archbishop's need for any coverage.  Op. at 97-99 & n.355 (A.104-106).  The BSA Plan accordingly does not run afoul of any of the Archbishop's rights.  And while the Plan does enjoin the Lujan Claimants from bringing their own direct-action claims against the Settling Insurers, the Lujan Claimants' claims are not property of the Archbishop's bankruptcy estate and are not protected by any automatic stay.  Moreover, as discussed above, those claims are being channeled to a Settlement Trust funded with the insurance settlements and other assets in amounts sufficient to pay all abuse claims, including those of the Lujan Claimants, in full.  The Dissenting Claimants' objections to the Plan are without merit.[19]

## **CONCLUSION**

The bankruptcy court's order confirming the Plan should be affirmed.

---

[19]     Even apart from these problems of standing and mootness, the BSA Plan injunctions and releases would not have implicated the Guam automatic stay because they constitute "defensive" protections for the BSA estate; defensive orders are not governed by an automatic stay in another bankruptcy case, as Judge Silverstein recognized.  Op. at 99-101 (A.106-108).

Date: December 7, 2022                    Respectfully submitted,

                                          BAYARD, P.A.

                                          */s/ Erin R. Fay*
                                          Erin R. Fay (No. 5268)
                                          Gregory J. Flasser (No. 6154)
                                          600 North King Street, Suite 400
                                          Wilmington, Delaware 19801
                                          Telephone:  (302) 655-5000
                                          Facsimile:  (302) 658-6395
                                          Email: efay@bayardlaw.com
                                                  gflasser@bayardlaw.com

                                          - and -

                                          James P. Ruggeri (admitted *pro hac vice*)
                                          Joshua D. Weinberg (admitted *pro hac vice*)
                                          RUGGERI PARKS WEINBERG LLP
                                          1875 K Street, NW, Suite 600
                                          Washington, D.C. 20003
                                          Tel:  (202) 469-7750
                                          Fax:  (202) 469-7751

                                          - and -

                                          Philip D. Anker (admitted *pro hac vice*)
                                          WILMER CUTLER PICKERING HALE AND
                                          DORR LLP
                                          7 World Trade Center
                                          250 Greenwich Street
                                          New York, N.Y. 10007
                                          Tel:  (212) 230-8890
                                          Fax:  (212) 230-8888

                                          Joel Millar (admitted *pro hac vice*)
                                          WILMER CUTLER PICKERING HALE AND
                                          DORR LLP
                                          1875 Pennsylvania Avenue N.W.
                                          Washington, D.C.  20006

Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and Indemnity
Company, First State Insurance Company,
Twin City Fire Insurance Company, and
Navigators Specialty Insurance Company*


*/s/ Robert D. Cecil, Jr.*
Robert D. Cecil, Jr. (No. 5317)
TYBOUT, REDFEARN & PELL
501 Carr Road, Suite 300
Wilmington, Delaware 19899
Phone: (302) 658-6901
Email: rcecil@trplaw.com


Mark D. Plevin (admitted *pro hac vice*)
Kevin D. Cacabelos (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone: (415) 986-2800
Email: mplevin@crowell.com,
        kcacabelos@crowell.com


Tacie H. Yoon (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Email: tyoon@crowell.com,
        rjankowski@crowell.com

*Attorneys for American Zurich Insurance
Company, American Guarantee Insurance
Company, and Steadfast Insurance Company*

56

/s/ Matthew G. Summers
Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail:    summersm@ballardspahr.com
           mcclambc@ballardspahr.com

-and-

Harry Lee*
John O'Connor*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail:    hlee@steptoe.com
           joconnor@steptoe.com
(*Admitted pro hac vice)


*Attorneys for Clarendon National Insurance Company, as successor in interest by merger to Clarendon America Insurance Company; River Thames Insurance Company Limited (as successor in interest to Unionamerica Insurance Company Limited, on its own behalf and in turn as successor to St. Katherine Insurance Company Limited); and Zurich American Insurance Company, as successor to Maryland Casualty Company, Zurich Insurance Company, and Maryland American General Insurance Company*

57

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540

Tancred Schiavoni (*pro hac vice*)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone: (212) 326-2000

Stephen Warren (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone:  (213) 430-6000

Jonathan D. Hacker (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

/s/ Stamatios Stamoulis
Stamatios Stamoulis
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540

David Elbaum (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000

*Counsel for Federal Insurance Company*
*and Westchester Fire Insurance Company*

## <u>CERTIFICATION OF COMPLIANCE</u>

The foregoing brief was prepared on a computer using Microsoft Word.   A proportionally spaced typeface was used, as follows:

Name of typeface:      Times New Roman
Point size:                 14
Line spacing:             Double

The total number of words in the brief, excluding the items set forth in Federal Rule of Bankruptcy Procedure 8015(g), is 12,985.

*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email: efay@bayardlaw.com
        gflasser@bayardlaw.com

Dated:  December 7, 2022