## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* Boy Scouts of America and Delaware BSA, LLC, <br><br>         Debtors. | Chapter 11 <br><br> Bankruptcy Case No. 20-10343 (LSS) |
| National Union Fire Insurance Co. of Pittsburgh, PA, et al., <br><br>         Appellants. <br>         v. <br> Boy Scouts of America, et al., <br>         Appellees. | (Jointly Administered) <br><br> Case No. 22-cv-01237-RGA |

## BRIEF BY APPELLEES THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, COALITION OF ABUSED SCOUTS FOR JUSTICE, AND PFAU/ZALKIN CLAIMANTS IN RESPONSE TO OPENING BRIEF OF INSURERS AND JOINDER IN THE BRIEFS FILED BY FUTURE CLAIMANTS' REPRESENTATIVE <u>AND BOY SCOUTS OF AMERICA</u>

Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld (admitted *pro hac vice*
Debra I. Grassgreen (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (No. 4042)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Tel./Fax:  (302) 652-4100 / (302) 652-4400
rpachulski@pszjlaw.com
akornfeld@pszjlaw.com
dgrassgreen@pszjlaw.com
inasatir@pszjlaw.com
joneill@pszjlaw.com

*Counsel for the Official Committee of Tort Claimants*


Rachel B. Mersky (No. 2049)
MONZACK MERSKY AND BROWDER, P.A.
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Tel/Fax: (302) 656-8162 / (302) 656-2769
rmersky@monlaw.com

-and-

David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel/Fax: (212) 209-4800 / (212) 209-4801
dmolton@brownrudnick.com
egoodman@brownrudnick.com

-and-

Sunni P. Beville, Esq. (admitted *pro hac vice*)

Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
BROWN RUDNICK LLP
One Financial Center
Boston, Massachusetts 02111
Tel/Fax: (617) 856-8200 / (617) 856-8201
sbeville@brownrudnick.com
taxelrod@brownrudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

David M. Klauder, Esq. (No. 5769)
BIELLI & KLAUDER, LLC
1204 N. King Street
Wilmington, Delaware 19801
Tel/Fax: (302) 803-4600 / (302) 397-2557
dklauder@bk-legal.com

-and-

Thomas E. Patterson (admitted pro hac vice)
Daniel J. Bussel (admitted pro hac vice)
Robert J. Pfister (admitted pro hac vice)
Sasha M. Gurvitz (admitted pro hac vice)
KTBS LAW LLP
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Tel/Fax: (310) 407-4000 / (310) 407-9090
tpatterson@ktbslaw.com
dbussel@ktbslaw.com
rpfister@ktbslaw.com
sgurvitz@ktbslaw.com

*Counsel to each of The Zalkin Law Firm, P.C. and*
*Pfau Cochran Vertetis Amala PLLC*

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned Appellees make the following disclosures:

## The Official Committee of Tort Claimants

The Official Committee of Tort Claimants (the "TCC") was appointed by the Office of the United States Trustee for Region 3, pursuant to section 1102 of the Bankruptcy Code, on March 5, 2020 [Bankr. D.I. 142],[1] to represent the interests of all Survivor claimants.

## Coalition of Abused Scouts for Justice

The Coalition of Abused Scouts for Justice (the "Coalition") is an ad hoc group of Survivor claimants consisting of approximately 18,000 holders of Abuse Claims.

## Pfau/Zalkin Claimants

The Pfau/Zalkin Claimants is an ad hoc group of two law firms consisting of Pfau Cochran Vertetis Amala PLLC and The Zalkin Law Firm, P.C.

---

[1] "D.I. ___" refers to documents filed in this consolidated appeal docket (Case No. 22-cv-01237 (RGA)). "Bankr. D.I. ___" refers to documents filed in the main bankruptcy case that is the subject of this appeal (Case No. 20-10343 (LSS)). "A__" refers to documents included in the *Notice of Lodging of Multimedia Filing* filed by the Certain Insurers [D.I. 47]. "ADV__" refers to documents in the *Appendix to the D&V Claimants' Opening Brief* [D.I. 46] and "ALW" refers to documents in the *Appendix to the Lujan Claimants' Opening Brief* [D.I. 44]. "SA__" refers to documents included in the Debtors' supplemental appendix to its brief.

("<u>Pfau/Zalkin</u>"), that collectively represent approximately 1,300 Survivor claimants.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................1

II.     JURISDICTIONAL STATEMENT .................................................5

III.    STANDARD OF REVIEW ..............................................................5

IV.     JOINDER IN APPELLEE BRIEFS ..................................................6

V.      STATEMENT OF THE CASE ........................................................7

      A.      The Debtors' Bankruptcy Cases ............................................7

           1.      Notifying Creditors of the Claims Bar Date ...............7

           2.      Negotiating a Confirmable Plan ..................................8

           3.      The Plan Maximizes the Debtors' Assets for the Benefit
                 of Creditors .................................................................10

      B.      The TDP ..............................................................................12

           1.      Expedited Distribution ...............................................13

           2.      Trust Claim Submission .............................................14

           3.      Tort System Alternative .............................................15

           4.      Independent Review Option .......................................16

           5.      Additional Protections for Non-Settling Insurance
                 Companies ...................................................................18

VI.     ARGUMENT ..................................................................................19

      A.      Summary of Good-Faith Argument .....................................19

      B.      Good-Faith Under Section 1129(a)(3) ................................19

      C.      The Bankruptcy Court Properly Employed a  "Totality of
          Circumstances" Approach in  Considering the Good Faith of
          the Plan ...............................................................................21

      D.      Denial of Confirmation Based on a Lack of Good Faith Is an
          Extraordinary Remedy That Is Only Applied in the Most
          Egregious of Circumstances ................................................26

           1.      The Cases Cited by the Insurers Are  Inapposite and
                 Have No Bearing  on the Bankruptcy Court's Finding
                 That the Plan Was Proposed in "Good Faith" .........26

           2.      The Negotiation of the Plan Was Consistent  With the
                 Debtors' Obligations to Its Creditors ......................39

i

E.      Resolution of Claims Through Trust Distribution  Procedures Is a Hallmark of Mass Tort Cases ........................................................... 47

F.      The Plan and TDP Contain Numerous  Provisions That Specifically Preserve the  Rights of Non-Settling Insurance Companies ................................................................. 50

G.      Modifications to the Plan Prior to Confirmation Do Not Evidence a Lack of Good Faith .......................................................... 51

VII.    CONCLUSION............................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amadeo v. Zant*,
  486 U.S. 214 (1988) ......................................................................................6

*Anderson v. Bessemer City*,
  470 U.S. 573 (1985) ......................................................................................6

*Arch Ins. Co. v. Murdock*,
  2019 Del. Super LEXIS 227 (May 7, 2019) ...............................................44

*Armstrong World Indus., v. Aetna Cas. & Sur.*,
  45 Cal. App. 4th 1 (1996)............................................................................45

*ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*,
  2011 U.S. Dist. LEXIS 118884 (N.D. Ill. Sept. 30, 2011)..........................47

*Berger v. TWA*
  *(In re TWA)*,
  96 F.3d 687 (3d Cir. 1996) ..........................................................................38

*Cal. Dep't of Toxic Sub. Control v. Exide Holdings*
  *(In re Exide Holdings)*,
  2021 U.S. Dist. LEXIS 138478 (D. Del. July 26, 2021).................................5

*Certain Underwriters v. Federal-Mogul Glob.*
  *(In re Federal-Mogul Glob.)*,
  402 B.R. 625 (D. Del. 2009) ..........................................................................6

*Chapman v. Bituminous Ins. Co.*
  *(In re Coho Res.)*,
  345 F.3d 338 (5th Cir. 2003)........................................................................47

*Chemetron Corp v. Jones*,
  72 F.3d 341 (3d Cir. 1995) ..........................................................................37

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) .....................................................................................39

*Flintkote Co. v. Aviva PLC*,
  177 F. Supp. 3d 1165 (N.D. Cal. 2016) .......................................................42

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
   135 Cal. App. 4th 958 (2006) ................................................................42

*Houston v. Edgeworth*
   (*In re Edgeworth*),
   993 F.2d 51 (5th Cir. 1993) ...................................................................47

*In re 1250 Oceanside Partners*,
   519 B.R. 802 (Bankr. D. Haw. 2014) .....................................................40

*In re 203 N. LaSalle St. P'ship*,
   126 F.3d 955 (7th Cir.1997) .....................................................................6

*In re Abbotts Dairies*,
   788 F.2d 143 (3d Cir. 1986) ...................................................................20

*In re ACandS, Inc.*,
   311 B.R. 36 (Bankr. D. Del. 2004) ................................................... 28, 29

*In re American Capital Equip.*,
   688 F.3d 145 (3d Cir. 2012) ............................................................ 26, 28

*In re Andreuccetti*,
   975 F.2d 413 (7th Cir. 1992) ....................................................................6

*In re Combustion Engineering*,
   391 F.3d 190 (3d Cir. 2004) ............................................................ 50, 52

*In re Coram Healthcare Corp.*,
   271 B.R. 228 (Bankr. D. Del. 2001) .......................................................28

*In re Emerge Energy Servs.*,
   2019 Bankr. LEXIS 3717 (D. Del. Dec. 5, 2019) .....................................32

*In re Energy Future Holdings*,
   619 B.R. 99 (Bankr. D. Del. 2020) .........................................................37

*In re Federal-Mogul Glob.*,
   684 F.3d 355 (3d Cir. 2012) ..................................................... 11, 48, 51

*In re FF Holdings Corp.*,
   343 B.R. 84 (D. Del. 2006) ....................................................................40

*In re Genco Shipping & Trading*,
   509 B.R. 455 (Bankr. S.D.N.Y. 2014) ....................................................39

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) .................................................. 53, 54

*In re Global Indus. Techs.*,
    2013 Bankr. LEXIS 594 (Bankr. W.D. Pa. Feb. 13, 2013)...................................32

*In re Global Industrial Technologies*,
    645 F.3d 201 (3d Cir. 2011) .................................................................. 30, 31

*In re Grasso*,
    490 B.R. 500 (Bankr. E.D. Pa. 2013)...................................................52

*In re Hovensa LLC*,
    No. 15-10003 (Bankr. D.V.I Sept. 15, 2015) ......................................48

*In re Integrated Telecom Express*,
    384 F.3d 108 (3d Cir. 2004) .......................................................... 32, 33

*In re Ionosphere Clubs*,
    113 B.R. 64 (Bankr. S.D.N.Y. 1990) ...................................................41

*In re Johnson*,
    546 B.R. 83 (Bankr. S.D. Ohio 2016) .................................................39

*In re Kaiser Gypsum Co.*,
    2021 U.S. Dist. LEXIS 146354 (W.D.N.C. July 28, 2021) .......................... 48, 49

*In re M&G*,
    599 B.R. 256 (Bankr. D. Del. 2019)....................................................40

*In re Mallinckrodt plc*,
    No. 20-12522 (Bankr. D. Del. Oct. 12, 2020)......................................48

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019)........................................................20

*In re Marvel Ent. Grp.*,
    140 F.3d 463 (3d Cir. 1998) ..............................................................41

*In re Metex Mfg. Corp.*,
    No. 12-14554 (Bankr. S.D.N.Y. Nov. 9, 2012) ...................................48

*In re Paddock Ent. LLC*,
    No. 20-10028 (Bankr. D. Del. Jan 6, 2020) ........................................48

*In re Paddock Enter.*,
    2022 Bankr. LEXIS 1521 (Bankr. D. Del. May 31, 2022) .......................... 48, 52

*In re PG&E Corp.*,
    No. 19-30088 (Bankr. N.D. Cal. Jan 29, 2019).....................................48

*In re Purdue Pharma LP*,
    No. 19-23649 (Bankr. S.D.N.Y. Sept. 15, 2019) ..................................48

v

*In re PWS Holding*,
    228 F.3d 224 (3d Cir. 2000) ........................................................................ 20, 26

*In re RTI Holding Co.*,
    2021 Bankr. LEXIS 2952 (Bankr. D. Del. Oct. 27, 2021) ...................................53

*In re TCI Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................................26

*In re USA Gymnastics*,
    No. 18-09108 (Bankr. S.D. Ind. Dec. 5, 2018) ...................................................48

*In re W.R. Grace & Co.*,
    446 B.R. 96 (Bankr. D. Del. 2011) ......................................................................44

*In re W.R. Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013) .............................................................. 4, 5, 19, 20

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ...................................................................... passim

*In re Yarway Corp.*,
    No. 13-11025 (Bankr. D. Del. April 22, 2013) ...................................................48

*Nat'l Union Fire Ins. Co. v. Porter Hayden Co.*,
    2012 U.S. Dist. LEXIS 29568 (D. Md. Mar. 6, 2012) ........................................47

*Official Comm. v. Nucor Corp.*
    *(In re SGL Carbon Corp.)*,
    200 F.3d 154 (3d Cir. 1999) ...............................................................................33

*Opt-Out Lenders v. Millennium Lab Holdings*
    *(In re Millennium Lab Holdings)*,
    591 B.R. 559 (D. Del. 2018) .................................................................................5

*Owasaki v. Jet Fla. Sys.*
    *(In re Jet Fla. Sys.)*,
    883 F.2d 970 (11th Cir. 1989) ..................................................................... 47, 48

*Search Mkt. Direct v. Jubber*
    *(In re Paige)*,
    685 F.3d 1160 (10th Cir. 2012) ............................................................................6

*Tucker v. Am. Int'l Grp.*,
    745 F. Supp. 2d 53 (D. Conn. 2010) ...................................................................48

*UNR Indus. v. Continental Cas. Co.*,
    942 F.2d 1101 (7th Cir. 1991) .............................................................................47

*Western Real Estate Equit., v. Village at Camp Bowie*
  *(In re Village at Camp Bowie)*,
  710 F.3d 239 (5th Cir. 2013) ...................................................................5

## STATUTES

11 U.S.C. § 1127 ......................................................................................52
11 U.S.C. § 1129 ......................................................................................19

## OTHER AUTHORITIES

14A *Couch on Ins.* § 204:120 ......................................................... 44, 45
44 Am. Jur. 2d *Insurance* § 1391 ................................................... 44, 45
Francis E. McGovern, *The Evolution of Asbestos Bankruptcy Trust Distribution
  Plans*, 62 NYU Annual Survey of Am. Law 163, 175 (2006) ...........................48

The TCC, Coalition, and Pfau/Zalkin, each an appellee herein (collectively, the "Survivor Claimant Appellees") and, together with the Future Claimants' Representative (the "FCR"), the "Survivor Representatives"), hereby submit this brief in response to the *Opening Brief of Certain Insurers* [D.I. 43], and state as follows:

## I.    INTRODUCTION

The Boy Scouts of America (and its affiliate, BSA Delaware, LLC, collectively, the "Debtors" or "BSA") commenced their bankruptcy cases with the stated goal of confirming a plan that would provide "equitable compensation to victims of abuse in its Scouting programs."  [Bankr. D.I. 4 at 5].[2]  The Debtors achieved that goal after nearly three years of hard-fought settlement negotiations with the Survivor Representatives, the Ad Hoc Committee of Local Councils, some of BSA's largest Chartered Organizations, and numerous settling insurance companies.  The Plan, negotiated and ultimately supported by all major constituencies and confirmed by the Bankruptcy Court, preserves and maximizes the value of assets available to survivors of childhood sexual abuse (the "Survivors")—many of whom have been waiting decades for resolution—and

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 1-4] (the "Plan") and *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 1-1] (the "Confirmation Order").

ensures that the Debtors' assets will be distributed fairly and efficiently through a settlement trust (the "Trust").  To date, the committed funding of the Trust totals approximately $2.5 billion.

Nonetheless, to obtain the full payment to which they are entitled, Survivors must rely upon the efforts of the Trust to be reimbursed under the insurance policies issued by Non-Settling Insurance Companies.  Non-Settling Insurance Companies, however, have a financial interest in delaying or preventing payout on their policies.  Certain of these insurers (the "Insurers") have claimed that the implementation of the Trust is impermissible.  The Insurers' challenges in these appeals include misguided objections to the appropriate judgment-reduction provisions and structured claims process under the Plan.  These issues are addressed in the Debtors' and FCR's responsive briefs, in which the Survivor Claimant Appellees join.

This brief specifically addresses the Insurers' contention that the Bankruptcy Court erred in finding that the Plan was proposed in "good faith and not by any means forbidden by law," as required by Bankruptcy Code section 1129(a)(3). The Insurers contend the Plan is not in good faith because it does not sufficiently protect the Insurers' interests in minimizing their obligations under the applicable insurance policies.  The Insurers' assertions are based, presumably, on typical contractual provisions found in insurance policies that require the Debtors'

prepetition cooperation with insurers in their defense of claims.  However, the Debtors have a postpetition fiduciary obligation to all their creditors to preserve and maximize the value of their assets—including their nonsettled insurance assets. The Insurers' position, that the Debtors were duty-bound postpetition to defer to the interests of their insurer-obligors to the detriment of their creditors, if adopted, would upend the legal requirements for confirming a plan and the basic principles of the Bankruptcy Code that have guided mass-tort and other bankruptcies for decades.

The Insurers argue that the following actions by the Debtors, collectively, reflect their "bad faith": (a) negotiating a Plan with the Debtors' primary creditor groups (which is encouraged and expected in all chapter 11 cases), (b) incorporating a trust-based claims resolution procedure in the Plan (as is done in virtually all mass-tort bankruptcy cases), and (c) revising the Plan at the Bankruptcy Court's urging prior to reaching the confirmed version of the Plan (which regularly occurs in connection with plan confirmation hearings).  The Insurers also argue that the fact that more than 82,000 Direct Abuse Claims were asserted prior to the claims bar date supports a finding that the Debtors' conduct in proposing the Plan was in bad faith.

None of these actions, individually or collectively, support a finding that the Debtors did not act in good faith in proposing the Plan.  Indeed, the Insurers appear

to concede that none of these individual issues of which they complain gives rise to bad faith on its own and are reduced to the illogical proposition that the whole of the Debtors' good faith actions, taken together, somehow constitute bad faith.

In assessing good faith, the United States Court of Appeals for the Third Circuit directs courts to look broadly at whether a plan (a) fosters a result consistent with the Bankruptcy Code's objectives, (b) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and (c) exhibits a fundamental fairness in dealing with creditors.  *In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013) (quoting lower court, 475 B.R. 34, 88 (D. Del. 2012)).[3]  This is the "holistic" review that the law requires, and the review that the Bankruptcy Court undertook in finding that the Plan "fosters a result consistent with the [Bankruptcy] Code, is proposed for the purpose of reorganizing and delivers value to creditors."[4]

Thus, this Court should determine that the Bankruptcy Court did not commit clear error in making its factual finding that the Plan was proposed in good faith and not by any means forbidden by law and, for the reasons set forth herein and in the responsive briefs filed by the Debtors and FCR, affirm the Confirmation Order.

---

[3] D.I. 1-3 at 212 n.621.

[4] D.I. 1-3 at 239.

4

## II.    JURISDICTIONAL STATEMENT

The Bankruptcy Court had subject matter jurisdiction to enter a final order confirming the Plan pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334.  This Court has jurisdiction to hear these appeals under 28 U.S.C. § 158(a)(1), which confers jurisdiction to district courts to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.

## III.    STANDARD OF REVIEW

The Bankruptcy Court's factual findings are reviewed for clear error.  *See Opt-Out Lenders v. Millennium Lab Holdings* (*In re Millennium Lab Holdings*), 591 B.R. 559, 570 (D. Del. 2018), *aff'd*, 954 F.3d 126 (3d Cir. 2019).  Whether a plan has been proposed in good faith as required by Bankruptcy Code section 1129(a)(3) is a factual question, also subject to the clearly erroneous standard.  *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("[D]eterminations of fact pertaining to good faith are reviewed for clear error."); *Cal. Dep't of Toxic Sub. Control v. Exide Holdings (In re Exide Holdings)*, 2021 U.S. Dist. LEXIS 138478, *39 (D. Del. July 26, 2021) ("The good-faith determination is 'a factual inquiry into a totality of the circumstances surrounding the plan's proposal,' and 'bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals.'")(quoting *W.R. Grace*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013)); *see also Western Real Estate Equit., v. Village at Camp*

*Bowie (In re Village at Camp Bowie)*, 710 F.3d 239, 247 (5th Cir. 2013); *Search Mkt. Direct v. Jubber (In re Paige)*, 685 F.3d 1160, 1178 (10th Cir. 2012) (citing *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 969 (7th Cir.1997)); *In re Andreuccetti*, 975 F.2d 413, 420 (7th Cir. 1992).

The "clearly erroneous" standard of review is highly deferential; where a bankruptcy court's "'account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (quoting *Anderson v. Bessemer City*, 470 U.S. 573-74 (1985)).

A bankruptcy court's legal conclusions, including a determination that it has subject-matter jurisdiction, are reviewed de novo. *Certain Underwriters v. Federal-Mogul Glob. (In re Federal-Mogul Glob.)*, 402 B.R. 625, 630 (D. Del. 2009).

## IV.    JOINDER IN APPELLEE BRIEFS

The Survivor Claimant Appellees hereby join in the *Future Claimants' Representative's Answering Brief* and *Debtors-Appellees' Consolidated Answering Brief*, both being filed contemporaneously herewith.

## V.    STATEMENT OF THE CASE

The Survivor Claimant Appellees hereby incorporate the Statement of the

Case set forth in the *Debtors-Appellees' Consolidated Answering Brief* and *Future*

*Claimants' Representative's Answering Brief*, and provide the following additional

background information.

### A.    The Debtors' Bankruptcy Cases

To confirm a chapter 11 plan, the Debtors had to accomplish three tasks:

(1) notifying substantially all of their creditors of their bankruptcy cases, (2)

negotiating a plan that claimants would overwhelmingly support, and (3) securing

and maximizing the assets of the bankruptcy estates, including insurance assets.

#### 1.    Notifying Creditors of the Claims Bar Date

Immediately prior to and after the commencement of the Debtors'

bankruptcy cases, numerous states opened "statutory windows" that revived Abuse

claims that would otherwise be out-of-statute.[5]

On May 26, 2020, the Bankruptcy Court issued an order (the "Bar Date

Order") requiring that holders of Abuse claims file proofs of claim by November

16, 2020, or forfeit their rights to bring any claims against the BSA.[6]

---

[5] D.I. 1-3 at 20; Bankr. D.I. 9280 ¶ 42.

[6] Bankr. D.I. 695; D.I. 1-3 at 21-22.

In addition, the Bar Date Order expressly provided that:

> **For the avoidance of doubt, even if the Sexual Abuse Claim is time-barred under an applicable statute of limitations, each Sexual Abuse Survivor is required to file a Sexual Abuse Survivor Proof of Claim in order to preserve the right to pursue a Sexual Abuse Claim**.[7]

The Bar Date Order also approved an extensive noticing campaign that included multiple media campaigns directed at both broad and targeted audiences and special procedures for providing actual and constructive notice to known and unknown survivors of Scouting-related abuse.[8]

The Debtors' efforts in notifying all potential creditors were successful: approximately 82,200 unique Direct Abuse Claims were filed before the Bar Date.[9]

## 2.    Negotiating a Confirmable Plan

Beginning in June 2021, the Debtors engaged in discussions with the Survivor Representatives regarding plan terms that would be acceptable to their largest creditor constituency.[10]  During these negotiations, in addition to increased cash contributions from the Debtors and other settling parties, the Survivor Representatives made clear to the Debtors that preservation and maximization of the insurance assets required ensuring that the Trust Distribution Procedures

---

[7] Bankr. D.I. 695 at 7 (emphasis in original).

[8] Bankr. D.I. 695; D.I. 1-3 at 21-22.

[9] Bankr. D.I. 6445 § V.M.4; SA__ (JTX 14); Bankr. D.I. 9317.

[10] Bankr. D.I. 9309 ¶¶ 24-25.

("TDP") were reasonable and supported by evidence.[11] Although the plan then proposed by the Debtors did not have the support of the TCC and Pfau/Zalkin, the Debtors circulated that plan to creditors for voting.[12]

Subsequently, the Debtors, the Coalition, and the FCR engaged in negotiations with the TCC and Pfau/Zalkin to garner their support.  On February 9, 2022, the TCC and Pfau/Zalkin signed a Term Sheet that reflected a global settlement of their objections to the Plan (the "TCC Term Sheet").[13]

On February 15, 2022, Debtors filed the Plan incorporating the terms of the TCC Term Sheet and other post-solicitation revisions, settlements, and resolutions.[14]  After a hearing, the Debtors submitted supplemental disclosures targeted to holders of claims in Plan Class 8 (Direct Abuse Claims) and Class 9 (Indirect Abuse Claims) explaining the modifications to the Plan and providing an opportunity to change their vote.[15]

The Bankruptcy Court conducted a three-week trial regarding confirmation of the Plan.  In a 269-page Confirmation Opinion,[16] the Bankruptcy Court overruled the Plan objections, except as specifically noted.  In consultation with

---

[11] Bankr. D.I. 9395 ¶¶ 36-40, 67-69.

[12] Bankr. D.I. 6445 at 6 n. 12.

[13] Bankr. D.I. 8772.

[14] Bankr. D.I. 8817.

[15] Bankr. D.I. 8905.

[16] *See* D.I. 1-3.

the parties supporting the Plan, the Debtors amended the Plan to conform to the Confirmation Opinion and to ensure the Confirmation Order was accurate and unambiguous.  The Bankruptcy Court then issued the Confirmation Order approving the Plan, as revised.

### 3. The Plan Maximizes the Debtors' Assets for the Benefit of Creditors

The Plan channels Abuse claims against the Debtors, Local Councils, Settling Insurance Companies, and certain Chartered Organizations to the Trust for determination and payment.  The Trust will evaluate claims pursuant to the criteria, processes, and values set forth in the TDP, which were based on the Debtors' prepetition claims settlement practices.[17]  The Trust will be funded by contributions from BSA, the Local Councils, settlements reached with four insurance companies, and Chartered Organizations that will provide approximately $2.5 billion in committed funding for Abuse Claimants.[18]  Crucially, the Trust will also receive the rights to proceeds under unsettled insurance policies issued to the Debtors and Local Councils by the Non-Settling Insurance Companies and valued at over $4 billion, and perhaps far more, depending upon the ultimate liquidated amount of the Abuse claims.[19]

---

[17] D.I. 1-3 at 211-212; D.I. 1-1 at 25-26, ¶ 19.

[18] D.I. 1-3 at 163.

[19] *Id.*; Bankr. D.I. 9398 ¶ 121.

The Plan and the Confirmation Order need not be "insurance neutral." In an insurance-neutral plan, insurers are exempted from the otherwise applicable effects of the Bankruptcy Code and, on that basis, are denied standing to object to a plan.[20] Here, insurers were not carved out of the otherwise applicable effects of the Plan and Confirmation Order and, consequently, were provided a robust opportunity to object to any provision that they believed impermissibly impacted their rights.

The Plan and Confirmation Order contain numerous provisions that preserve such insurers' rights and defenses. For example, the Plan states that the transfer of the bankruptcy estates' causes of action to the Trust "shall not impair, affect, alter, or modify the right of any . . . insurer or alleged insurer . . . sued on account of an Abuse Claim or on account of any asserted right relating to any Abuse Insurance Policy, to assert each and every defense or basis for claim reduction."[21] Additionally, the Plan explicitly provides that, subject to the effects of the Confirmation Order and the approval of the Plan itself, the Trust's assumption of and power to resolve Abuse Claims may not affect any Non-Settling Insurance Company's obligations under or ability to assert defenses relating to insurance policies to the extent such rights exist and are available under applicable law.[22]

---

[20] For example, insurance policies regularly include anti-assignment clauses; however, the Bankruptcy Code preempts such state law limitations with respect to the debtors' policies. *In re Federal-Mogul Glob.*, 684 F.3d 355, 365-82 (3d Cir. 2012).

[21] D.I. 1-4 at 71 (Plan § IV.D.4).

[22] D.I. 1-4 at 67 (Plan § IV.C.1), 79 (Plan § V.N).

Further, the Plan preserves the Non-Settling Insurance Companies' rights with respect to their obligation to pay the amount of a Direct Abuse Claim as determined by the Trust as well as their right to assert contribution claims.[23]  The Trust's rights on the one hand, and the Non-Settling Insurance Companies' rights on the other, are to be determined in subsequent litigation.[24]

### B.    The TDP

The TDP provide for the implementation of Bankruptcy Court-approved, anti-fraud measures and a robust and neutral process pursuant to which the Settlement Trustee will weed out illegitimate claims.[25]

The TDP are designed to emulate the Debtors' prepetition claims handling practices and historical claim resolutions.[26]  Prior to the commencement of their bankruptcy cases, in resolving claims, the Debtors and their defense counsel weighed many factors, including the severity of the alleged Abuse, the negative publicity from the claim, BSA's negligence, the likelihood of prevailing on a defense (including a defense based on statute of limitations), the likelihood of success on the overall claim under the applicable law, and the potential cost in

---

[23] D.I. 1-1 at 9 (Confirmation Order § II.I.4), modifying D.I. 1-4 (Plan § IX.A.3.y); D.I. 1-4 at 123 (Plan § X.G.6).

[24] D.I. 1-1 at 8 (Confirmation Order § II.I.2), modifying D.I. 1-4 (Plan § IX.A.3.j); *see also* D.I. 1-1 at 55 (Confirmation Order ¶ III.48(a), modifying D.I. 1-4 (Plan § X.M.1).

[25] D.I. 1-3 at 211-212; D.I. 1-1 at 25-26, ¶ 19.

[26] Bankr. D.I. 9309, ¶ 9; Bankr. D.I. 9273, ¶¶ 52-65.

litigating the claim, among other factors.[27]  The Debtors often settled claims, albeit for reduced compensation, even where they believed they had strong defenses or were otherwise likely to succeed in litigation.[28]

The TDP also seek to balance the dual considerations of rigorous review and evidentiary process with the efficient administration of those claims that satisfy the TDP's requirements.[29]  The TDP are designed to achieve a fair evaluation of claims by one of four paths by which Direct Abuse Claims are liquidated and ultimately allowed or denied.[30]

### 1.    Expedited Distribution

Approximately 8,000 Direct Abuse Claims elected the Expedited Distribution, which provides a payment of $3,500 on account of such claim if a claimant timely submitted a substantially complete and non-duplicative proof of claim personally signed or verified by the claimant under penalty of perjury.[31] The Expedited Distribution serves the same function as an "early out" option that is common practice for defendants—including the Debtors and their insurers.[32]

---

[27] Griggs Decl., Bankr. D.I. 9273 ¶¶ 36-48; Bankr. D.I. 9354 at 98-105.

[28] Griggs Decl., Bankr. D.I. 9273 ¶ 39.

[29] D.I. 1-4 (TDP § I.B).  No party has provided evidence that the TDP are inconsistent with BSA's prepetition practices.

[30] D.I. 1-4 Ex. A at 8-21 and 25-34 (TDP §§ VI-VIII, XII, XIII); D.I. 1-3 at 36-37.

[31] D.I. 1-4 at 62-64 (Plan § III.B.10); D.I. 1-4 Ex. A at 8-9 (TDP § VI.A); D.I. 1-3 at 37; Bankr. D.I. 9273 ¶ 62.

[32] D.I. 1-4 Ex. A at 8-9 (TDP § VI.A); Bankr. D.I. 9273 ¶ 62.

The TDP prohibits the Settlement Trustee from seeking reimbursement from the Non-Settling Insurance Companies for any portion of the $3,500 Expedited Distribution.[33]

### 2.    Trust Claim Submission

Holders of Direct Abuse Claims may submit a Trust Claim Submission, which includes (a) submitting a completed questionnaire signed under oath, (b) producing all documents related to the Abuse Claim and a signed agreement to produce further documents or information upon request of the Settlement Trustee, and (c) consenting to a Trustee Interview and a written or oral examination, if needed.[34]  The Settlement Trustee considers all information received and evaluates, pursuant to the factors set forth in the TDP, the credibility and validity of the claim to make the approval or allowance decision.[35]

For each Allowed Abuse Claim, the Settlement Trustee assigns a value based upon the Claims Matrix and Scaling Factors.[36]  The Claims Matrix has six tiers of abuse types based on the nature of abuse and provides a Base Matrix Value and Maximum Matrix Value to each tier.[37]  The TDP then provide for

---

[33] D.I. 1-4 at 9 (TDP § VI.B).

[34] D.I. 1-4 Ex. A at 9-10 (TDP § VII.A); D.I. 1-3 at 37.

[35] D.I. 1-4 Ex. A at 10 (TDP § VII.B); D.I. 1-3 at 38.

[36] D.I. 1-4 Ex. A at 12 (TDP § VII.E); D.I. 1-3 at 40.

[37] D.I. 1-4 Ex. A at 14-16 (TDP § VIII.A); D.I. 1-3 at 38-40.

individualized damages assessments based upon applicable aggravating factors (that increase the value of the claim) or mitigating factors (that decrease the value of the claim), which process is consistent with BSA's pre-petition settlement practices.[38]

### 3.    Tort System Alternative

If the holder of an Allowed Direct Abuse Claim is not satisfied with the Allowed Claim Amount, the holder may request reconsideration.[39]  If unsatisfied with the reconsideration result, the holder may elect the Tort System Alternative, under which a court of competent jurisdiction determines the value of the Direct Abuse Claim.[40]  If the judgment amount exceeds the Maximum Matrix Value for the applicable tier, the excess amount is subordinated.[41]  In the Tort System Alternative, the Settlement Trustee must provide notice to any applicable Non-

---

[38] D.I. 1-4 Ex. A at 16-20 (TDP § VIII.C-D); Bankr. D.I. 9273 ¶ 60.

[39] D.I. 1-4 Ex. A at 13 (TDP § VII.G); D.I. 1-3 at 40-41.

[40] D.I. 1-4 Ex. A at 25 (TDP § XII.A); D.I. 1-3 at 40.

[41] D.I. 1-4 Ex. A at 27 (TDP § XII.G); D.I. 1-3 at 41.

Settling Insurance Company to defend the lawsuit in accordance with the terms of any applicable Abuse Insurance Policies.[42]

### 4.    Independent Review Option

Holders of Direct Abuse Claims may elect to participate in the Independent Review Option ("IRO") within six months of the Effective Date.[43]  The IRO provides an opportunity for the holders of egregious Direct Abuse Claims to be reviewed to determine whether they should be awarded an amount in excess of the Matrix Values.[44]  Under the IRO, an independent, neutral third party selected from a panel of retired judges with tort experience assesses the claim and makes a settlement recommendation to the Settlement Trustee.[45]  The neutral party must apply the same standard of proof that would apply under applicable law and also afford any applicable Non-Settling Insurance Company notice and the ability to participate in the process.[46]

The IRO explicitly allows for insurer participation throughout the process. Specifically, the IRO requires that the applicable insurers:  (a) receive prompt notice of any claim where the Direct Abuse Claimant has elected the IRO, (b) be

---

[42] D.I. 1-4 Ex. A at 12 (TDP § VII.D); D.I. 1-3 at 41.

[43] D.I. 1-4 Ex. A at 4 (TDP § III.B); D.I. 1-3 at 42.

[44] Bankr. D.I. 9398 ¶¶ 132-134); D.I. 1-3 at 41.

[45] D.I. 1-4 Ex. A at 4 (TDP § III.A); D.I. 1-3 at 41-42.

[46] D.I. 1-4 Ex. A at 4 (TDP § III.A); D.I. 1-3 at 42-43.

given a reasonable opportunity to participate in the IRO, and (c) receive notice of and request for consent to the settlement recommendation.[47]

Under the IRO, claimants must advance administrative fees, provide detailed evidence, and establish that the claim is not barred by the statute of limitations.[48] Specifically, claimants must: (a) elect to participate in the IRO and complete and submit the Trust Claim Submission within six months after the Effective Date; (b) submit a Sexual Abuse Survivor Proof of Claim; (c) pay administrative fees between $10,000-$20,000; (d) confirm that the Direct Abuse Claimant was in Scouting or attended a Scouting-related event where the Abuse occurred; (e) provide evidence that the alleged perpetrator was in a Scouting unit or worked or volunteered at a Scouting-related event; (f) provide evidence that the claim is timely under the applicable statute of limitations; (g) provide evidence of negligence (or other liability) by either the Debtors, Local Council, or Chartered Organization; (h) provide evidence of damages sustained (such as medical and counseling records) supported by an expert report, at claimant's own expense; and (i) submit to discovery, including an up to six-hour interview, mental health examination, or supplemental interrogatory responses at the discretion of the

---

[47] D.I. 1-4 Ex. A at 31-32 (TDP § XIII.K).
[48] D.I. 1-4 Ex. A at 30-31 (TDP § XIII.G); D.I. 1-3 at 42.

neutral or upon request of an applicable insurer, in which such insurer may then attend and participate.[49]

Only after a Direct Abuse claimant satisfies these requirements and the applicable insurer has an opportunity to participate and be heard does the neutral issue a settlement recommendation, which may range from zero to a value no more than five times greater than applicable Maximum Matrix Value.[50]  The fact that the neutral party is only issuing a settlement recommendation provides additional procedural guardrails to the process.

### 5.  Additional Protections for Non-Settling Insurance Companies

In addition to the provisions noted above, the TDP contain other provisions that safeguard the rights of the Non-Settling Insurance Companies.  For example, (a) the insurers' rights of setoff and recoupment (to the extent permitted under applicable law) are preserved to allow the insurers to assert any deductible obligation or self-insured retention against the Trust, subject to defenses[51] and (b) the insurers' defenses are preserved in any court review of the allowed amount of an Indirect Abuse Claim.[52]

---

[49] TDP § XIII.G.

[50] D.I. 1-4 Ex. A at 28-29 (TDP § XIII.A).

[51] D.I. 1.4 at Ex. A at 6 (TDP § IV.B, n.1), 8 (TDP § V.C).

[52] D.I. 1-4 at 24-25 (TDP § XI.C); *see also* at 27 (TDP § XII.F).

## VI.   ARGUMENT

### A.    Summary of Good-Faith Argument

Over the course of the lengthy trial,[53] the Bankruptcy Court determined that

the Plan was proposed in good faith under section 1129(a)(3) of the Bankruptcy

Code.[54]  The good-faith determination is a factual inquiry that is assessed on a

case-by-case basis in light of the totality of the circumstances surrounding the

establishment of the plan.  The Insurers' brief cites to more than three dozen cases,

few of which actually involve the denial of confirmation for a lack of good faith

and none of which presents facts remotely similar to these cases.  The facts in the

record do not demonstrate that the Plan resulted from collusion, conflict of

interests, or a breach of fiduciary duty, and do not evince the egregious

circumstances required to demonstrate a lack of good faith.  Accordingly, the

Court should affirm the Bankruptcy Court's finding that the Plan was proposed in

good faith.

### B.    Good-Faith Under Section 1129(a)(3)

Under the good-faith requirement,[55] "'the important point of inquiry is the

plan itself and whether such a plan will fairly achieve a result consistent with

---

[53] D.I. 1-3 at 1 n.1

[54] D.I. 1-1 at 6, ¶ II.D.

[55] *See* 11 U.S.C. § 1129(a)(3); *W.R. Grace*, 729 F.3d at 348; Confirmation Opinion, D.I. 1-3 at 212 n.621.

the objectives and purposes of the Bankruptcy Code.'"  *PWS Holding*, 228 F.3d

at 242 (quoting *In re Abbotts Dairies*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re

Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) (finding good faith where a

plan provides a "fair and equitable" resolution of personal-injury claims that results

from extensive arms' length negotiations with the major stakeholders).

Whether a plan has been proposed in good faith is a factual inquiry, assessed

on a case-by-case basis in light of the totality of the circumstances surrounding the

establishment of the chapter 11 plan.  *W.R. Grace*, 475 B.R. at 87.   Bankruptcy

courts have "considerable discretion in finding good faith," "are in the best

position to ascertain the good faith of the parties' proposals," and thus, "district

and circuit courts should carefully consider any recommendations from the

bankruptcy court on appeal."  *Id.*

The "good faith" standard used by the Bankruptcy Court is consistent with

the standard applied by courts throughout the Third Circuit.[56]  The Insurers also

fundamentally agree that the foregoing describes—in broad terms—the appropriate

legal standard of "good faith" under section 1129(a)(3) of the Bankruptcy Code.[57]

However, the Insurers, through unsupported argument and citation to irrelevant,

---

[56] D.I. 1-3 at 212-213.

[57] D.I. 43 at 59-60

factually distinguishable case law, misconstrue the undisputed facts in an attempt to fit within the narrow "egregious" circumstance exception.

The Bankruptcy Court specifically considered and overruled the Insurers' objections to the Plan on this basis,[58] finding the Plan "fosters a result consistent with the [Bankruptcy] Code, is proposed for the purpose of reorganizing and delivers value to creditors."[59]

### C. The Bankruptcy Court Properly Employed a "Totality of Circumstances" Approach in Considering the Good Faith of the Plan

The Insurers insist that the Bankruptcy Court erroneously took a "piecemeal approach" in its good-faith analysis, allegedly viewing the evidence in isolation, as opposed to employing a "totality of the circumstances" approach.  To the contrary, the Bankruptcy Court engaged in a totality of the circumstances analysis in these cases—considering and determining that each good-faith challenge to the Plan was unsupported.  A good-faith determination based on the Bankruptcy Court's step-by-step consideration necessarily means that these steps, when considered together, also demonstrate good faith.  *See W.R. Grace*, 475 B.R. at 87-91 (whether a plan has been proposed in good faith is a factual inquiry, assessed on a case-by-case basis in light of the totality of the circumstances surrounding the establishment of

---

[58] D.I. 1-1 at 6, ¶ II.D; D.I. 1-3 at 212-235.

[59] D.I. 1-3 at 239.

the chapter 11 plan; court looked "piecemeal" at each of the factors of good-faith
and at each of the elements of the objectors good faith arguments).

The Insurers, however, then make an unsupportable and illogical leap:
Although each circumstance analyzed in detail by the Bankruptcy Court supports a
finding of good faith, somehow, when taken together, the Debtors' conduct in
proposing the Plan represents bad faith.  However, the Insurers fail to produce any
evidence of improper acts or purposes not considered, addressed, and rejected by
the Bankruptcy Court.  It strains credulity that the Bankruptcy Court cannot take
each issue, argument, and/or objection and address each separately—and then
consider them all as part of its overall analysis and determinations.

The Bankruptcy Court's seriatim consideration (and dismantling) of each of
the arguments raised by the Insurers is not tantamount to a failure to consider the
totality of the evidence in making its overall good-faith finding.  The Bankruptcy
Court properly considered each argument of "bad faith" and collusion raised by the
Insurers and found that the evidence did not support their assertions, as follows:

| Issue Raised by Insurers | Bankruptcy Court's Determinations Based on a Consideration of the Record |
| --- | --- |
| Drafting of the TDP – Whether the Debtors "ceded the pen" to the claimant groups | "Based on this record, I cannot find that Debtors colluded with the Coalition or other plaintiff representatives to intentionally deprive insurers of their rights.  I cannot find that Debtors abdicated their |

| Issue Raised by Insurers | Bankruptcy Court's Determinations Based on a Consideration of the Record |
|---|---|
| (Confirmation Opinion, D.I. 1-3 at 213-217 (§ IV.B.1.a)) | responsibility to negotiate a plan or proceeded in bad faith." (p. 216)<br><br>"The Insurers' arguments that Debtors colluded with the Coalition, rather than negotiated with the Coalition, is wholly unsupported by the record." (p. 217) |
| The TCC Term Sheet – Bates testimony and requested findings<br><br>(Confirmation Opinion, D.I. 1-3 at 217-222 (§ IV.B.1.b)) | "Based on the timeline of Dr. Bates's reports and the record at the hearing, I find no collusion." (p. 219) |
| Quantum of Liability – Explosion of Claims<br><br>(Confirmation Opinion, D.I. 1-3 at 222-224 (§ IV.B.1.c)) | "I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation." (p. 223)<br><br>"A debtor's ability to obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules. The remedy for inappropriate behavior, if any, rests with state supreme courts and/or disciplinary counsel around the country, any appropriate remedy in this court for personal who failed to perform appropriate diligence before signing proofs of claim and appropriate procedures in the TDP to ferret out any fraudulent claims. Denying confirmation, however, is not an appropriate or proportional remedy." (p. 224) |

| Issue Raised by Insurers | Bankruptcy Court's Determinations Based on a Consideration of the Record |
|---|---|
| The Trust Distribution Procedures (Harrington testimony)<br><br>(Confirmation Opinion, D.I. 1-3 at 224-231 (§ IV.B.1.d)) | "I am also not convinced that the TDP will necessarily result in increased cost or liability to Non-Settling Insurance Companies.  While, of course, there is the potential, it is really not possible to know until claims are assessed."  (p. 224)<br><br>"I do not accept [Professor Harrington's] opinions regarding the impact of the TDP (or his reading of them), the Findings, or his conclusions about the 'difficulty' an insurance company may face in future coverage litigation."  (p. 230)<br><br>"Accepting Professor Harrington's opinions leads to one of three conclusions, all of which I reject.  <u>One</u>, a company facing mass tort liability cannot file bankruptcy because an insurer's quantum of liability will, of necessity, increase.  <u>Two</u>, an insurer must be given the right to develop or approve trust distribution procedures designed to liquidate personal injury claims or the insurer's contract rights will, necessarily be compromised or it will be 'more difficult' to raise positions in subsequent insurance coverage litigation.  This position gives too much leverage to insurance companies.  <u>Three</u>, a plan and trust distribution procedures must be 'insurance neutral.'  As I have already found, this is a standing concept.  While it is a tool debtors may choose to use and may offer significant benefits to a bankruptcy case, 'insurance neutrality' is not required."  (p. 231)<br><br>"In any event, on the record presented, I do not conclude that any potential increase in the quantum of liability precludes a finding of good faith under § 1129(a)(3)."  (p. 231) |

| Issue Raised by Insurers | Bankruptcy Court's Determinations Based on a Consideration of the Record |
|---|---|
| Statutes of Limitation / Negligence<br><br>(Confirmation Opinion, D.I. 1-3 at 232-235 (§ IV.B.1.e)) | "I conclude that these objections do not prevent a good faith finding because the objections are not grounded in 'law.'  There is no 'law' that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant whose claim is time barred."  (p. 233)<br><br>"Further, the TDP take into account a potential statute of limitations defense through the mitigating Scaling Factors.  . . . In the abstract, I cannot find based on the record before this court that this result means the Plan was not proposed in good faith.  Nor can I conclude based on the record before the court, that the payment, or even existence of this claim, increases the quantum of liability for any primary insurer much less any excess insurer."  (p. 234)<br><br>"Similarly, there is no 'law' that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimants who has not proven negligence.  . . . [Other than wordsmithing TDP Article VII.C.2(c) to reflect the Debtors' intent and include the term negligence], the Insurers' objection are overruled."  (pp. 234-235) |

There is simply no support for the Insurers' assertions that the Bankruptcy

Court failed to apply the correct approach to determine good faith.

**D.    Denial of Confirmation Based on a Lack of**
**Good Faith Is an Extraordinary Remedy That Is**
**Only Applied in the Most Egregious of Circumstances**

Denial of a plan based on a lack of good faith is confined to the most

egregious cases where there is clear evidence of collusion, conflict of interests,

or a breach of fiduciary duty.  *See In re American Capital Equip.*, 688 F.3d

145, 158 (3d Cir. 2012); *In re TCI Holdings, LLC*, 428 B.R. 117, 142-45 (Bankr.

D.N.J. 2010).  "[S]cant evidence" and "innuendo" are insufficient to establish a

lack of good faith.  *PWS Holding*, 228 F.3d at 242.

**1.    The Cases Cited by the Insurers Are**
**Inapposite and Have No Bearing**
**on the Bankruptcy Court's Finding**
**That the Plan Was Proposed in "Good Faith"**

The cases cited by the Insurers involve circumstances that bear little

resemblance to those presented in the Plan.

*American Capital*[60] involved an appeal from an order converting a

bankruptcy case to chapter 7 because the debtor's plan was determined to be

unconfirmable at the disclosure statement stage—a situation inapplicable to the

Plan here.  The court's discussion regarding "good faith" focused on the debtor's

financial condition and the unusual structure proposed in its plan, specifically:  (a)

unlike BSA, which is putting up substantial funding for the Plan, the debtor had no

---

[60] Cited in Insurers' Brief, D.I. 43 at 3, 6, 59, 66, 71 and 72.

assets to distribute to creditors or attorneys; (b) the underpinning of the plan was a surcharge imposed on asbestos claimants, who would have to pay 20% of any recoveries to a "Plan Payment Fund" to pay the debtor's other creditors and attorneys; (c) the Plan Payment Fund in that case existed solely to pay off other creditors and insurers rather than to pay future asbestos litigants or generate profits to do so (whereas the funding of the Trust established under BSA's Plan benefits all holders of Abuse Claims, including Future Abuse Claims); (d) the debtor admitted that the only way that creditors and attorneys could be paid was if asbestos litigants secured settlements from it, creating a conflict of interest not present in the Debtors' cases where, instead, the Trust already is funded with $2.5 billion in cash and other assets; (e) the plan did not create, as the Plan does here, a trust to address claims after confirmation; (f) there was no channeling injunction, as there is here, to protect the debtor or insurers from future claimants; and (g) unlike BSA, the debtor there made no contribution to the trust, but rather planned to pull money from it. *Id.* at 151-52, 159, 160. The Debtors' Plan shares none of the characteristics with the plan in *American Capital*.

Moreover, although the Insurers cite to *American Capital* to support their unfounded accusations of collusion,[61] in that case, the Third Circuit was "not convinced the [plan was] collusive because insurers have not pointed to any

---

[61] D.I. 43 at 6.

evidence of an agreement to defraud insurers," even where the plan was intended to maximize the availability of insurance. *Id.* at 158. Similarly here, despite the Insurers' unfounded allegations of supposed "collusion," they adduced no evidence whatsoever of anything that even approaches an agreement to defraud.

The Insurers also cite *In re Coram Healthcare Corp.,* 271 B.R. 228 (Bankr. D. Del. 2001),[62] where the bankruptcy court found a lack of good faith because the debtors' CEO failed to disclose an employment contract with a significant creditor through which the CEO was paid approximately $1 million per year and was required to obey the creditor's instructions. *Id.* at 233-40. In denying confirmation, the court found that this conflict of interest was "a violation of his fiduciary duty to the Debtors and the estate and is so pervasive as to taint the 'Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations.'" *Id.* at 232, 240 (quoting record). Again, the Insurers fail to cite any facts in the record that the Debtors' management breached their fiduciary duties or were subject to a conflict of any kind.

In *In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004),[63] the bankruptcy court found that the debtor's plan had not been proposed in good faith because the debtor was defunct and the plan had been drafted primarily by and for the benefit

---

[62] D.I. 43 at 66.
[63] D.I. 43 at 66.

of certain prepetition asbestos plaintiffs or their professionals, and memorialized a prepetition settlement to the detriment of other similarly situated claimants. *Id.* at 42-43. The plan created a trust that would hold a security interest in certain of the debtor's insurance proceeds for the benefit of settling asbestos plaintiffs, which were divided into five categories of secured claims, certain of which were assured of payment in full while others were unlikely to receive anything. *Id.* at 39. The bankruptcy court remarked that, other than "vague assertions, no cogent explanation or rationale [was] ever . . . given for these categories or how claims held in certain law firms' 'inventories' were categorized," noting that "members of the prepetition committee appear prominently in all of the *secured* categories." *Id.* at 40 (emphasis added). The court found the proposed arbitrary treatment of similar claims violated Bankruptcy Code section 524(g)(2)(B)(ii)(V), which requires a trust to "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands *that involve similar claims in substantially the same manner.*" *Id.* at 42.

In stark contrast to the defunct debtor in *ACandS*, the Debtors are a century-old operating nonprofit entity with ongoing national operations. The Debtors' restructuring has been guided by robust governance at multiple levels: The record in these cases is replete with references to the involvement, control, and decision-making processes of the Debtors' National Executive Board (NEB), National

Executive Committee (NEC) and Bankruptcy Task Force (BTF).[64]  The Insurers

have produced no evidence that the TCC or any other survivor group was in a

position to exercise control—let alone unbridled dominance—over the Debtors in a

manner that resulted in preferential treatment to certain claimants, as the

committee was found to have done in *ACandS*.  Here, the Plan treats all current and

future claims similarly, and there is no allegation otherwise by the Insurers.

Further, the Insurers cite *In re Global Industrial Technologies*, 645 F.3d

201, 209, 214 (3d Cir. 2011),[65] in which insurance companies appealed an order

denying them standing to challenge confirmation of the debtor's plan of

reorganization.  *Id.* at 203-204.  In remanding the case to the bankruptcy court for

further proceedings, including a determination of whether there was collusion

between debtor's counsel and counsel for plaintiffs' claimants regarding the

creation of class of silica claims (that were not the impetus for the filing of the

bankruptcy case) in exchange for support of the plan's treatment of asbestos

claims, the Third Circuit emphasized the extremely limited nature of its holding:

> The decision we announce is no more far-reaching than
> this:  when a federal court gives its approval to a plan
> that allows a party to put its hands into other people's

---

[64] *See, e.g.*, D.I. 1-3 at 2 and n.10 (describing the operations of the NEB and NEC, including record citations); Bankr. D.I. 9341 at 21:6-21 (describing BTF operations); Bankr D.I. 9280 ¶¶ 13, 59, 74-78, 84, 94, 111, 116, 129-31, 145, 159, 165, 187, 208 (advising NEC and BTF on various aspects of the bankruptcy and Plan); Bankr. D.I. 9482 at 23:10-17 (NEC meeting with the Survivor Working Group); Bankr. D.I. 9279at ¶¶ 31-35, 38-45, 49-51, 55-57 (discussing insurer settlement agreements).

[65] D.I. 43 at 5, 73 and 77.

> pockets, the ones with the pockets are entitled to be fully
> heard and to have their legitimate objections addressed.
> In short, they at least have bankruptcy standing.

*Id.* at 204.

In that case, the court may have had good reason for concern:  The debtors contacted asbestos claimants' attorneys representing clients with silica-related claims against other companies to dramatically increase the number of silica-based claims and obtain sufficient votes to confirm their plan.  *Id.* at 205.  At the confirmation hearing it was revealed that certain physicians generated a suspiciously "high volume" of diagnoses that, at a high rate, proved to be inaccurate, and an unusual number of claimants were diagnosed with both silica- and asbestos-related diseases.  *Id.* at 207.

Neither "good faith" nor section 1129(a)(3) (nor any other provision of section 1129 for that matter) are mentioned in the decision.  Unlike *Global Industrial*, in these cases, the Insurers—who were heavily involved in litigating the Plan and—do not contend that they were denied standing to challenge any matters before the Bankruptcy Court.  Moreover, on that case's remand, the bankruptcy court determined that there was no evidence of collusion and that confirmation of the plan, creation of asbestos and silica trusts, and issuance of channeling injunctions were in the best interests of the debtors and their creditors.  *In re*

*Global Indus. Techs.,* 2013 Bankr. LEXIS 594, *1, *6-7, *92-93, *170-171 (Bankr. W.D. Pa. Feb. 13, 2013).

The Insurers reference *In re Emerge Energy Servs.*, 2019 Bankr. LEXIS 3717 (D. Del. Dec. 5, 2019),[66] for the proposition that if a plan is proposed with ulterior motives it should not be confirmed.  But the court in *Emerge Energy* found that the plan was the "result of good faith, arms-length, and meaningful negotiations among the Debtors' key stakeholders[,] . . . rooted in the Debtors' sound business judgment" and was "intended to preserve the Debtors' operations and deliver as much value as possible to those creditors entitled to it."  *Id.* at *47-49.

The court noted that any "power imbalance" between the debtors and their secured lenders did not "taint the negotiations or suggest bad faith on the part of the Debtors for pursuing the Plan and its proposed restructuring."  *Id.* at *48-49. The court further noted that the plan was "intended to preserve the Debtors' operations and deliver as much value as possible to those creditors entitled to it." *Id.* at *49.

*In re Integrated Telecom Express*, 384 F.3d 108, 120 (3d Cir. 2004), also cited by the Insurers,[67] does not discuss section 1129(a)(3)'s requirement that a

---

[66] D.I. 43 at 60, 69.

[67] D.I. 43 at 67.

plan be proposed in good faith; instead, the case focuses on the requirement implied by Bankruptcy Code section 1112(b) that a bankruptcy case be filed in good faith or be subject to dismissal.  *See id.* at 118.  The court found that the debtor, unlike BSA, was financially healthy and cash rich with no real intention of reorganizing or liquidating as a going concern and had filed for bankruptcy to reduce the debtor's landlord's claim under Bankruptcy Code section 502(b)(6).  *Id.* at 129.  *Integrated Telecom* has no application here, both because the Insurers are not arguing the Debtors' cases should be dismissed as bad faith filings and because the facts are highly distinguishable.

   *Official Comm. v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154 (3d Cir. 1999), is another bad-faith bankruptcy filing case cited by the Insurers.[68]  In *SGL*, the court found that the debtor had prematurely filed for chapter 11 to gain an unfair tactical advantage over certain prepetition civil antitrust plaintiffs where the proposed plan filed with the bankruptcy petition provided payment in full for all creditors other than the antitrust judgment creditors.  *Id.* at 167.  *SGL*'s holding and facts are also irrelevant here.

---

[68] D.I. 43 at 6, 60, 67, 70 and 72.

a.     **The Debtors Negotiated With and**
       **Did Not Cede the Drafting of the**
       **Plan or TDP to the Survivor Representatives**

The Insurers assert that the Bankruptcy Court erred because the Debtors

allegedly ceded the drafting of the Plan and TDP to the Survivor Representatives

and relied exclusively on the subjective testimony of Debtors' insurance counsel,

Adrian Azer, as to his intent regarding the impact of the Plan on insurers' rights.[69]

The Insurers' argument is, at best, disingenuous, and is belied by the record that

the Bankruptcy Court considered in connection with the Insurers' argument.

The Bankruptcy Court carefully considered the testimony of Mr. Azer

regarding the development of the TDP as *well as* Mr. Azer's testimony that it was

his intent to protect the rights of the insurers in the development of the TDP and

the Plan; but the Bankruptcy Court did not rely solely on Mr. Azer's testimony that

he intended to protect the insurers' rights.  As set forth in the Confirmation

Opinion, the Bankruptcy Court considered the following additional facts:

> Mr. Azer, Debtors' insurance counsel, penned the initial
> draft of the TDP.  . . . To do so, he reviewed draft trust
> distribution procedures sent to him by Hartford's counsel
> in February as well as trust distribution procedures from
> other mass tort cases. . . . The first filed version of the
> TDP did not contain any of the Coalition's proposals.
>
> Thereafter, Mr. Azer never gave up the pen.  Mr. Azer
> testified that Debtors had an interest in the TDP because
> they needed a confirmable plan and that they spent

---

[69] D.I. 43 at 4, 44, 56, 75-76.

34

significant time negotiating protections for insurers'
contractual rights. . . . After much negotiation with the
Coalition, the multiple occurrences of this language
ended up in one paragraph:

> Nothing in these TDP shall modify, amend
> or supplement, or be interpreted as
> modifying, amending or supplementing, the
> terms of any Insurance Policy or rights and
> obligations under an Insurance Policy
> assigned to the Settlement Trust to the
> extent such rights and obligations are
> otherwise available under applicable law
> and subject to the Plan and Confirmation
> Order. The rights and obligations, if any, of
> any Non-Settling Insurance Company
> relating to these TDP, or any provision
> hereof, shall be determined pursuant to the
> terms and provisions of the Insurance
> Policies and applicable law.[70]

The undisputed evidence showed that the TDPs were drafted by the Debtors'

insurance counsel from a form provided to the Debtors by one of their primary

insurers—Hartford.  It is hardly surprising that the Bankruptcy Court was

"underwhelmed" by the Insurers' TDP-based objections to confirmation.[71]

Further, the TDP contain numerous protective provisions that preserve the

Insurers' rights under their insurance contracts to the extent such rights are not

inconsistent with the Plan, Confirmation Order, or the Bankruptcy Code, and

---

[70] D.I. 1-3 at 213-217 (footnotes, including the Bankruptcy Court's citations to supporting
testimony and exhibits, omitted).

[71] Bankr. D.I. 9616 at 44:45.

nothing in the Plan or TDP compels the Insurers to fund any Trust settlement.

Instead, absent a consensual resolution, the Trust and Insurers will have their rights

and obligations determined in subsequent coverage litigation based on applicable

law and the terms of the insurance policies.

> **b.      The Increase of Claims Was the
> Result of the Deadline Set and
> Approved by the Bankruptcy Court**

As to the alleged "explosion" of filed claims against the Debtors, the

Insurers point *exclusively* to the actions of certain plaintiffs' attorneys in allegedly

bringing this about—failing to provide any evidence whatsoever showing their

actions were in bad faith or linking their actions *to the Debtors*.  The Bankruptcy

Court "reject[ed] out-of-hand" the Insurers' objection to the Plan in this regard,

determining that "[t]here is no doubt that plaintiff lawyers aggressively advertised

for clients which, apparently, is nothing new.  But there is no evidence from which

I can conclude that plaintiff firm advertising alone increased the groundswell of

Direct Abuse Claims."[72]

In fact, the Bankruptcy Court correctly considered a variety of *other* factors

that it found may have contributed to the increase in claims in bankruptcy,

including: (i) the Debtors' advertising campaign in the bankruptcy cases, which

---

[72] *Id*. at 223; *see also id.* at 223-224 (stating that the Debtors' good faith "certainly cannot turn on the number of claims filed," or on the actions of plaintiff lawyers).

was designed to reach approximately 95.9% of men age 50 and over in the United States an average of 6.5 times; (ii) lower barriers to entry in bankruptcy; (iii) a more welcoming environment for the assertion of abuse claims (i.e., less stigmatization of abuse victims; the "me too" movement); (iv) the opening of statute-of-limitations windows that permitted otherwise out-of-statute claims in numerous states; (v) solace in numbers (i.e., the knowledge that a claimant was not the only abuse victim); and (vi) the bar date (which both invited abuse survivors to file claims even if they were out-of-statute and established a deadline by which claims had to be filed or be potentially barred forever).[73]

Robust noticing programs through the bar date process are encouraged in bankruptcy, and such a process was undertaken in these cases. *See, e.g., Chemetron Corp v. Jones,* 72 F.3d 341, 345-46 (3d Cir. 1995) (due process requires notice reasonably calculated to reach all interested parties that conveys all the required information, and permits a reasonable time for a response, and inadequate notice threatens the debtor's goal of successful reorganization); *In re Energy Future Holdings,* 619 B.R. 99, 108 (Bankr. D. Del. 2020).

The Debtors served notice of the Bar Date Order on all known creditors and implemented an expansive publication and noticing procedure to afford notice to unknown creditors and to reach the Debtors' primary target audience of men 50

---

[73] *Id*. at 223.

years of age or older.[74]  The Debtors' email efforts alone were anticipated to reach over 10 million potential claimants.[75]  The Debtors' noticing expert provided testimony that the noticing plan reached an estimated 95.8% of the target audience through a combination of media and that, on average, each member of the targeted audience viewed the notice an estimated 6.5 times.[76]

Notably, the Bar Date Order provided that claims "***time-barred under an applicable statute of limitations***" should still file a claim prior to the deadline or "***shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution***."[77]  Courts recognize that "[t]he bar date means just that; it is a 'drop-dead date' that bars all prepetition claimants who received the required notice.  Because the [claimants] failed to assert their prepetition claims by the bar date and failed to show excusable neglect, **those claims are legally dead**."  *Berger v. TWA (In re TWA)*, 96 F.3d 687, 690 (3d Cir. 1996) (emphasis added).

Absent BSA's bankruptcy and the imposition of the claims bar date, Survivors not certain they were ready to come forward could have waited, regardless of any then-applicable statute of limitations, in the hopes of passage of "statute of limitations revival windows" or laws eliminating limitations periods

---

[74] *Wheatman Declaration* [Bankr. D.I. 556] ¶¶ 32, 34.A.iii.

[75] Bankr. D.I. 557 at 4.

[76] D.I. 1-3 at 223.

[77] Bankr. D.I. 695 at 7.

completely.[78]  With the imposition of the bar date, however, all Survivors of

majority age and capable to do so were advised that they were required to file a

proof of claim by the Bar Date or have their claim barred forever.

Certainly, as the Bankruptcy Court recognized, to the extent that the so-

called "explosion" of claims resulted from the Bankruptcy Court-approved

noticing and publication process, the Insurers could hardly argue that this forms

any part of a basis of the Debtors' alleged bad faith.

### 2.   The Negotiation of the Plan Was Consistent With the Debtors' Obligations to Its Creditors

One purpose of the Bankruptcy Code, and chapter 11 in particular, is to

encourage a consensual restructuring of claims against the debtor through the plan

negotiation process.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017)

("Bankruptcy Code Chapter 11 allows debtors and their creditors to negotiate a

plan for dividing an estate's value."); *In re Johnson*, 546 B.R. 83, 129-30 (Bankr.

S.D. Ohio 2016) (commencement of chapter 11 case is an invitation to

negotiation); *In re Genco Shipping & Trading*, 509 B.R. 455, 468 (Bankr.

S.D.N.Y. 2014) (key goal of "mega" chapter 11 cases is for creditors to negotiate

to reach consensus).  Debtors are encouraged to seek resolution with key creditors

to ensure the consensual confirmation of its plan, even where the creditors

---

[78] *See* D.I. 1-4 Ex. A at 13-14 (TDP § VII.H).

"vigorously engage[] with the Debtors." *In re M&G*, 599 B.R. 256, 260 (Bankr. D.

Del. 2019) (expected or routine activities in a chapter 11 case include encouraging

negotiation among parties, commenting and participating in successful plan

negotiations, and reviewing documents).

Creating a plan "at the behest" of a debtor's primary creditor group— *i.e.*,

one that garners the support of the major stakeholders—is not inconsistent with

acting in good faith.  In fact, it is precisely what a debtor in bankruptcy should do.

Ensuring that key parties are content with their plan treatment "may

'obviate[ ] further litigation and, perhaps, [avoid] a denial of plan confirmation.'"

*Id.* (quoting *In re FF Holdings Corp.*, 343 B.R. 84, 87 (D. Del. 2006) and *In re*

*1250 Oceanside Partners*, 519 B.R. 802, 808 (Bankr. D. Haw. 2014)) (debtors

reached settlement with ad-hoc creditor group the day of but prior to confirmation

in exchange for switching their votes to accepting ballots to garner class

acceptance).

In these cases, the Debtors, consistent with the spirit and letter of the

Bankruptcy Code, negotiated with their major stakeholders the terms of the Plan—

and its critical components, like the TDP—winning the support of Survivors and

other parties in interest.

### a. The TDP Maximize the Value of the Debtors' Assets and Do Not Increase the Risks of the Insurers

The Insurers' complaint that the Debtors proposed a plan "at the Non-Settling Insurance Companies' expense"[79] ignores that the rights of BSA under their policies are estate assets that the Debtors are obligated to maximize for the benefit of their creditor constituencies. *See In re Marvel Ent. Grp.*, 140 F.3d 463, 474 (3d Cir. 1998) (stating that "among the fiduciary obligations of a debtor-in-possession is the 'duty to protect and conserve property in its possession for the benefit of creditors'") (quoting *In re Ionosphere Clubs*, 113 B.R. 64, 169 (Bankr. S.D.N.Y. 1990)); *W.R. Grace*, 475 B.R. at 87. Both the Debtors and the Survivor Representatives in these cases thus were legitimately focused on their obligation to maximize the value of the Debtors' estates and assets, including particularly the unsettled insurance policies, to the extent permitted by the Bankruptcy Code.[80] Nonetheless, in part to protect their insurance assets, the Debtors, with the support of the other parties in favor of the Plan, simultaneously provided insurers with considerable protections in the Plan that are consistent with the policies of and limitations under the Bankruptcy Code.

---

[79] D.I. 43 at 60.

[80] D.I. 1-3 at 216 ("Mr. Azer did, in fact, negotiate to maximize the value of Debtors' insurance assets for the benefit of the Settlement Trust and, ultimately, Abuse Claimants.").

The Debtors' and Survivor Representatives' efforts to protect the insurance assets took three forms.

*First*, the Non-Settling Insurance Companies could not be permitted a windfall (at the Survivors' expense) solely based on the Debtors' bankruptcy—requiring the parties to prevent the possibility that the Non-Settling Insurance Companies could later obtain a *Fuller-Austin* result (i.e., a cap on the amount insurers pay without regard to the limits under the applicable insurance policies or the actual liability incurred).  *See Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 997-98, 1000 (2006); *see also Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1168 (N.D. Cal. 2016) (following *Fuller-Austin* and finding insurers' obligation to pay was the amount the trust paid to tort victims based on the trust payment percentage rather than the tort victims' actual damages).

*Second*, the Debtors and the Survivor Representatives sought to ensure that nothing in the Plan itself breached the insurance policies in a manner that would prevent the Trust from obtaining the insurance benefits.  To that end, they were careful to avoid creating new rights or protections for the Non-Settling Insurance Companies under the Plan or TDP, to avoid providing Non-Settling Insurance Companies with a "free pass" from the otherwise applicable impacts of the Debtors' bankruptcy cases on the functioning of the insurance contracts, and to

avoid inserting redundant or ambiguous statements of insurer rights.  They also balanced this interest with the need to protect the rights and defenses of the insurers.[81]

As Mr. Azer testified:  "We needed to make sure that we were taking into consideration the interests of claimants, but also making sure that we preserved the rights of our insurers, right?  That is a significant asset to the estate, and we needed to make sure that we were protecting our insurers' contractual rights."[82]  The Bankruptcy Court correctly found that the resulting Plan and TDP did just that.  In doing so, it considered Azer's testimony regarding his intent, but appropriately relied on the actual language of the Plan and TDP.[83]  While the Insurers complain that the protections are not sufficient to safeguard their rights,[84] they cite no case or principle—*other than their own desire for a windfall*—that they alone should be

---

[81] *See, e.g.*, D.I. 1-3 at 214.

[82] Bankr. D.I. 9406 at 40:4-17.

[83] D.I. 1-3 at 215-216.  The Bankruptcy Court cited the language from TDP Article V.C (D.I. 1-4 at 8) that preserves the insurers' rights:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

[84] D.I. 43 at 85.

exempt from any effects of bankruptcy law, or from a court order, which they had the opportunity to contest.

*Third*, the Survivor Representatives have a particular interest in creating TDP that fairly value claims and are supported by evidence because insurers otherwise may use the TDP as an excuse for refusing to pay settlements under their policies, claiming they are unreasonable.[85]  Thus, contrary to the Insurers' assertions, TDP that result in unreasonable, unsupportable, or inflated claims values do not serve the interests of claimants.[86]

If, notwithstanding the Supporting Parties' best efforts, the TDP produce results that are unreasonable in any particular case, the applicable insurer can decline to pay the claim and assert its position in subsequent coverage litigation. Numerous courts have found that this adequately protects an insurer's rights.  *See W.R. Grace*, 446 B.R. at 132 ("[T]he mere fact that the Trust pays a claim does not bind the non-settling insurer to reimburse the Trust.  The insurer retains its rights to

---

[85] *See, e.g.*, *In re W.R. Grace & Co.*, 446 B.R. 96, 132 (Bankr. D. Del. 2011); *Arch Ins. Co. v. Murdock*, 2019 Del. Super LEXIS 227, at *10-12 (May 7, 2019); Reasonableness standard, generally, 14A *Couch on Ins.* § 204:120; 44 Am. Jur. 2d *Insurance* § 1391.

[86] The claims value ranges for specific abuse types were initially provided by the Debtors, in consultation with their national counsel, based on historical evidence, and were not modified by the Survivor Representatives.  *See* D.I. 1-3 at 220 (detailing the Debtors' consistent position that the TDP claims values have always reflected their historical abuse settlements and litigation outcomes, as supported by confirmation testimony of Mr. Griggs and Dr. Bates); *id.* at 19–20 (describing the testimony of BSA's prepetition resolutions of abuse claims); *id.* at 58-65 (describing Dr. Bates's expert review of the BSA Historical Abuse Claims in constructing his expert opinion on the likely aggregate values of Direct Abuse Claims).

object to the claim against it if and when the Trust seeks to recover from the insurer.").

The Insurers' position that they are entitled to prevent confirmation of a Plan that enables settlements to which they may not consent but that preserves their defenses is inconsistent with their rights outside of bankruptcy.  Outside of bankruptcy, insureds may settle without their insurers' consent.  The consequence, depending on the particular policy and law, is that the insureds may or may not be able to compel reimbursement from the insurer for their settlement payment.[87]

### b.    The TDP Provide an Appropriate Mechanism for Determining the Validity of Claims

Addressing the allowance of all of the over 90,000 Direct and Indirect Abuse Claims through court proceedings was never feasible for any party in terms of time or money. The Plan provides for addressing these claims through the Trust Documents, including the TDP, to be operated under the supervision of the independent Settlement Trustee.[88]  No evidence has been adduced that the approval of Direct Abuse Claims under the TDP will result in unreasonable, unsupported, or

---

[87] *Armstrong World Indus., v. Aetna Cas. & Sur.*, 45 Cal. App. 4th 1, 85 (1996) ("[E]ven if the insurer has not denied coverage or refused to defend, the insurer has a duty to accept a reasonable settlement . . . ."); Prohibit settlement by insured, 14A *Couch on Ins.* § 202:7-8 (insured is permitted to enter into reasonable settlements without losing recovery rights where the insured unjustifiably refuses to defend); 44 Am. Jur. 2d *Insurance* § 1391 (examples of when the insured is permitted to enter into reasonable and good faith settlements without insurer consent without forfeiting coverage).

[88] D.I. 1-1 at 9, § J.2. ("The allowed amount of Direct Abuse Claims, either individually or in the aggregate, will be determined pursuant to the Trust Distribution Procedures.")

inflated claim values that the Insurers would be compelled to pay. The Bankruptcy Court was not convinced that the TDP will necessarily result in increased cost or liability to Non-Settling Insurance Companies, noting that, "[w]hile, of course, there is the potential, it is really not possible to know until claims are assessed."[89] Further, the Bankruptcy Court did "not accept [Professor Harrington's] opinions regarding the impact of the TDP (or his reading of them), the Findings, or his conclusions about the 'difficulty' an insurance company may face in future coverage litigation." [90]

Importantly, the insurer is not compelled by the Plan or TDP to pay a claim just because it is tendered by the Settlement Trustee. If the Responsible Insurer declines to pay, the Settlement Trustee is placed in the same position as a policyholder prepetition and may pursue remedies under the insurance policies and applicable law against such insurer.[91] When an insurer litigates such a dispute, it retains all its rights under the insurance policies, including any coverage defenses other than as set forth in the Plan or Confirmation Order or that are not otherwise available under applicable law.

---

[89] D.I. 1-3 at 224.

[90] *Id.* at 230.

[91] D.I. 1-4 Ex. A at 31-32 (TDP § XIII.K).

### E.    Resolution of Claims Through Trust Distribution Procedures Is a Hallmark of Mass Tort Cases

The Insurers assert that the Plan "seeks to rewrite insurance policies by eviscerating contractual rights and obligations that would apply in the tort system . . . and replaces that system with dispute resolution that aligns BSA with the claimants."[92]  The Insurers erroneously presuppose that their policies contain an unassailable right to require their policyholder to resolve claims exclusively in the tort system.  However, the Insurers' own standard-form policies recognize that the insurers remain obligated to pay, even if their policyholder is in bankruptcy—which necessarily includes resolving claims through a bankruptcy-based process rather than the state tort system.[93]  In mass tort cases since 1985, the "bankruptcy

---

[92] D.I. 43 at 57.

[93] *See Houston v. Edgeworth* (*In re Edgeworth*), 993 F.2d 51, 54 (5th Cir. 1993) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge."); *UNR Indus. v. Continental Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (reversing district court's finding that the insured's covered loss was the amount the settlement trust actually pays to tort victims on the ground that it conferred a "windfall" on the debtor's insurers and was contrary to applicable law); *Owasaki v. Jet Fla. Sys.* (*In re Jet Fla. Sys.*), 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured."); *Nat'l Union Fire Ins. Co. v. Porter Hayden Co.*, 2012 U.S. Dist. LEXIS 29568, *15 (D. Md. Mar. 6, 2012) ("The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations.  The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established."); *ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, 2011 U.S. Dist. LEXIS 118884, *5 (N.D. Ill. Sept. 30, 2011) ("The court finds no support for Transport's assertion that the provisions prevent the trust from asserting that the policy language and Illinois law require Transport to indemnify it for any covered claims at the full amount of the claim rather than at the bankruptcy discount rate."); *Chapman v. Bituminous Ins. Co.* (*In re Coho Res.*), 345 F.3d 338, 343 (5th Cir. 2003) ("fundamentally wrong" to allow an insurer to escape coverage merely because the insured receives bankruptcy discharge); *Tucker v. Am. Int'l Grp.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) ("[C]ourts have 'reasoned that the insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy.'") (quoting *Jet Fla. Syst.*, 883 F.2d at 975.).

court-approved process" has included resolution of claims through a trust, with standardized and streamlined processes to allow equitable and timely payment of claims.[94]  This typical trust structure provides a fair and equitable mechanism for pro rata distribution to claimants from debtors with limited assets.[95]  Indeed, no mass-tort bankruptcy case, or resulting coverage case, has ever held that insurers are entitled to insist that their policyholders be forced to resolve claims against them in the tort system.  To do so would frustrate the Bankruptcy Code's requirement of equitable treatment for similarly situated claims by requiring a "race to the courthouse" for access to limited insurance assets.

---

[94] *See Federal-Mogul Glob.*, 684 F.3d at 361 (stating that all 56 asbestos personal-injury trusts as of May 2011 had trust distribution procedures to govern how claims are processed and compensated, many of which were funded in part by insurance settlements); *In re Mallinckrodt plc, No. 20-12522* (Bankr. D. Del. Oct. 12, 2020) (misleading marketing of opioids); *In re Paddock Ent. LLC*, No. 20-10028 (Bankr. D. Del. Jan 6, 2020)(asbestos liability); *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 15, 2019)(opioids); *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Jan 29, 2019)(wildfire-related liabilities); *In re USA Gymnastics*, No. 18-09108 (Bankr. S.D. Ind. Dec. 5, 2018) (sexual abuse); *In re TK Holdings, Inc.*, No. 17-11375 (Bankr. D. Del. June 25, 2017) (liability for airbag malfunctions); In *re Kaiser Gypsum Co.*, No. 16-31602 (Bankr. W.D. N.C. Sept. 30, 2016) (asbestos); *In re Hovensa LLC*, No. 15-10003 (Bankr. D.V.I Sept. 15, 2015)(environmental liability); *In re Yarway Corp.*, No. 13-11025 (Bankr. D. Del. April 22, 2013) (asbestos); *In re Metex Mfg. Corp.*, No. 12-14554 (Bankr. S.D.N.Y. Nov. 9, 2012)(asbestos).

[95] *See In re Kaiser Gypsum Co.*, 2021 U.S. Dist. LEXIS 146354, at *57-58, 61 (W.D.N.C. July 28, 2021)  upholding bankruptcy plan despite insurer objections that the plan was not proposed in good faith and the trust distribution procedures were improper, due to alleged collusion to keep insured claims in the tort system)(*appeal filed*, No. 21-1858 (4th Cir. Aug. 9, 2021); *In re Paddock Enter.*, 2022 Bankr. LEXIS 1521, *94 (Bankr. D. Del. May 31, 2022); Francis E. McGovern, *The Evolution of Asbestos Bankruptcy Trust Distribution Plans*, 62 NYU Annual Survey of Am. Law 163, 175 (2006) (generally describing the history of trust distribution procedures in mass tort bankruptcies since the *Manville* trust was established in 1985, and stating that TDPs "became necessary to allocate scarce resources equitably among qualified claimants").

For these reasons, the Bankruptcy Court properly recognized that providing insurers with veto rights on the TDP would give insurers too much power.[96]  It would be inappropriate for a nonfiduciary party like the Insurers that (in contrast to the Debtors and creditors) has no economic interest in the Debtors' speedy reorganization or the maximization of the estate assets to have the final say over a fundamental, necessary aspect of the Plan.  To the contrary, the Insurers benefit from extending the Debtors' reorganization proceedings: as long as the Debtors' automatic stay is in place, they benefit from delaying resolution of claims that would trigger their payment obligations and expenditure of defense costs.  Stated simply, the Insurers' interests are in direct conflict with the Debtors' duties to its creditors.  *See In re Kaiser Gypsum*, 2021 U.S. Dist. LEXIS 146354, at *43-44 (stating that "there is no requirement that a plan satisfy the desires of an insurer" and finding it unsurprising that the insurer did not reach settlement with the parties 'to reduce its unlimited obligations under [its] Policies to a fixed or other limited amount," and that failure to reach settlement was "certainly no basis for an objection").

---

[96] D.I. 1-3 at 231.

**F.    The Plan and TDP Contain Numerous
        Provisions That Specifically Preserve the
        Rights of Non-Settling Insurance Companies**

The Insurers cite *In re Combustion Engineering*, 391 F.3d 190 (3d Cir.

2004), to suggest some categorical, judicial mandate to specially preserve any and

all contractual rights of insurers in a chapter 11 case (which is not the case as

discussed herein), and that any purported efforts by the debtors to negotiate or

litigate such matters constitute bad faith.[97]

*Combustion Engineering* centered on jurisdictional and statutory issues

regarding the nondebtor release of asbestos claims by way of section 105 of the

Bankruptcy Code instead of section 524(g), which governs the release of asbestos

claims.[98]  Notably, there was no claim of bad faith made by the insurers.  The

bankruptcy court's approval of the plan was vacated because the injunction issued

under section 105(a) was not authorized.[99]  Nothing in the Third Circuit's opinion

suggests any collusion or fraud or allegations thereof with respect to the debtors'

posture and actions toward the insurers.  Nor did the court in *Combustion

Engineering* suggest that insurers were entitled to plan neutrality language or

protections *except* in the circumstance where, as in that case, they were denied

standing to object to the plan.

---

[97] D.I. 43 at 65.

[98] 391 F.3d at 233, 244.

[99] *Id*. at 236-38.

Contrary to the Certain Insurers' assertions, the Plan and TDP are designed to preserve the rights of the Certain Insurers consistent with the Bankruptcy Code. The Plan and TDP do not compel the Certain Insurers to pay any individual awards under the TDPs.  Instead, the Plan and TDP contain numerous provisions that preserve the Non-Settling Insurance Companies' rights under the policies, as well as the ability of the Non-Settling Insurance Companies to assert those rights in future coverage litigation.

Moreover, to the extent the Insurers' rights may be affected by the Plan (such as through the assignment of the Debtors' policies), such impact is authorized by way of federal preemption of the Bankruptcy Code over insurers' prepetition state law rights.  *In re Fed.-Mogul Global Inc.*, 684 F.3d 355, 365-82 (3d Cir. 2012).  In this regard, the Third Circuit in *Federal-Mogul* properly recognized that in certain cases, the Bankruptcy Code's goal of successful reorganizations trumps the contractual rights of insurers, finding that debtors can, for example, as part of a chapter 11 plan under section 1123(a), properly transfer "rights under [debtors'] insurance policies to a post-confirmation trust notwithstanding policies" anti-assignment clauses.  684 F.3d at 365-82.

### G.  Modifications to the Plan Prior to Confirmation Do Not Evidence a Lack of Good Faith

Courts regularly consider and allow modifications to a plan prior to and in connection with confirmation, as expressly provided for in the Bankruptcy Code.

*See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation," provided certain requirements are satisfied, by filing modification of such plan with the court.).[100]  Nevertheless, the Insurers argue that the Bankruptcy Court should not have considered modifications to the Plan when it determined the Plan was proposed in good faith.[101]

The Insurers cite *In re Grasso*, 490 B.R. 500 (Bankr. E.D. Pa. 2013),[102] arguing that the Bankruptcy Court should have in some manner penalized the Debtors for proposing certain plan and/or confirmation order provisions and not permitted the Debtors to remove such provisions from the Plan.  In *Grasso,* a debtor lied to the court and other parties regarding actions that required court approval and, against that backdrop, the court rejected a "no harm, no foul" judicial approach (i.e., the ends do not justify the means).  *See id.* at 509-11. There is no parallel between the situation in *Grasso* and the case here.

---

[100] *Paddock Enters.,* 2022 Bankr. LEXIS 1521, at *96 (approving post-solicitation plan modifications under § 1127(a) after finding that Bankruptcy Rule 3019 was satisfied because the modifications did not adversely change treatment of any claim or interest without written consent); *Combustion Eng'g*, 391 F.3d at 202 (describing plan modifications made by the debtors, creditors, bankruptcy court, and district court, none of which were ultimately rejected on the basis that modifications were per se inappropriate).

[101] While the Bankruptcy Court declined to make certain findings in the Plan, it did so because they were unnecessary for purposes of confirmation and not because they were proposed in bad faith or for ulterior purposes.  D.I. 1-3 at 176-184 (§ III.A), 184-185 (§ II.B), 185-187 (§ III.C), and 188-189 (§ III.E).

[102] D.I. 43 at 69.

The Insurers also cite to *In re RTI Holding Co.*, 2021 Bankr. LEXIS 2952 (Bankr. D. Del. Oct. 27, 2021),[103] which addressed whether a postconfirmation state-court action was an improper collateral attack on the confirmation order.  The court held the state action was not a collateral attack because the action did not affect the handling of the bankruptcy estate.  While the *RTI* court did state that "[t]he requirement of § 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan,'" it further explained that the good-faith requirement relates strictly to the proposed plan, its contents, and, depending on the circumstances, its negotiation (to the extent it could shed light on the plan's contents and parties' intentions), and not purported good or bad faith in other chapter 11 matters. *Id.* at *25.

Similarly, the Insurers refer, without any discussion or analysis, to *Emerge Energy* (discussed *infra*) and *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001).[104]  In *Genesis*, the objecting parties contended that the plan was not in good faith because the confirmation process moved too quickly and certain junior creditors were not provided for in the plan.[105] In the end, the bankruptcy court rejected such objections and lauded the debtor for moving promptly through the confirmation process and noted that the treatment for junior

---

[103] D.I. 43 at 70.

[104] D.I. 43 at 69-70.

[105] 266 B.R. at 609-10.

creditors was appropriate because the senior lender was undersecured.[106]

Importantly, the bankruptcy court, like here, required the debtor in *Genesis* to

modify its plan before it would confirm it.[107]

Thus, these cases provide no support for an argument that the Bankruptcy

Court in the Debtors' cases should not have considered modifications to the Plan in

its consideration of whether the Plan was proposed in good faith.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny all pending appeals and

affirm confirmation of the Debtors' Plan, allowing all parties to move forward

toward global resolution of the Abuse Claims.

---

[106] *Id.*

[107] *Id.* at 608-09.

Dated:      Wilmington, Delaware
            December 7, 2022

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: rpachulski@pszjlaw.com
akornfeld@pszjlaw.com
dgrassgreen@pszjlaw.com
inasatir@pszjlaw.com
joneill@pszjlaw.com

*Counsel for the Official Tort Claimants' Committee*

*/s/ Rachel B. Mersky*
Rachel B. Mersky (No. 2049)
MONZACK MERSKY AND BROWDER, P.A.
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Tel./Fax:    (302) 656-8162 / (302) 656-2769
RMersky@Monlaw.com

-and-

David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036

Tel./Fax: (212) 209-4800 / (212) 209-4801
DMolton@BrownRudnick.com
EGoodman@BrownRudnick.com

-and-

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
BROWN RUDNICK LLP
One Financial Center
Boston, Massachusetts 02111
Tel./Fax:  (617) 856-8200 / (617) 856-8201
SBeville@BrownRudnick.com
TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

*/s/ David M. Klauder*
David M. Klauder, Esq. (No. 5769)
BIELLI & KLAUDER, LLC
1204 N. King Street
Wilmington, Delaware 19801
Tel./Fax: (302) 803-4600 / (302) 397-2557
dklauder@bk-legal.com

-and-

Thomas E. Patterson (admitted pro hac vice)
Daniel J. Bussel (admitted pro hac vice)
Robert J. Pfister (admitted pro hac vice)
Sasha M. Gurvitz (admitted pro hac vice)
KTBS LAW LLP
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Tel./Fax: (310) 407-4000 / (310) 407-9090

*Counsel to each of The Zalkin Law Firm, P.C. and*
*Pfau Cochran Vertetis Amala PLLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* Boy Scouts of America and Delaware BSA, LLC,<br><br>                    Debtors. | Chapter 11<br><br>Bankruptcy Case<br>No. 20-10343 (LSS) |
| National Union Fire Insurance Co. of Pittsburgh, PA, et al.,<br><br>                    Appellants.<br><br>                    v.<br><br>Boy Scouts of America, et al.,<br>                    Appellees. | (Jointly Administered)<br><br>Case No. 22-cv-01237-RGA |

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the word limit set by the Court.  A

proportionally spaced typeface was used, as follows:

        Name of typeface:  Times New Roman
        Point size:  14
        Line spacing:  Double

        The total number of words in the brief, excluding the items set forth in

Federal Rule of Bankruptcy Procedure 8015(g), is 12,790.

        /s/ James E. O'Neill
        (Bar No. 4042)


 Date:  December 7, 2022        By:   */s/ James E. O'Neill*
                                      James E. O'Neill (admitted pro hac vice)
                                      Alan J. Kornfeld (admitted pro hac vice)
                                      Debra I. Grassgreen (admitted pro hac vice)
                                      Iain A.W. Nasatir (admitted pro hac vice)
                                      James E. O'Neill (No. 4042)
                                      PACHULSKI STANG ZIEHL & JONES LLP

919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel./Fax:  (302) 652-4100 / (302) 652-4400
rpachulski@pszjlaw.com
akornfeld@pszjlaw.com
dgrassgreen@pszjlaw.com
inasatir@pszjlaw.com
joneill@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

Date: December 7, 2022        By        */s/ Rachel B. Mersky*
                                         Rachel B. Mersky (No. 2049)
                                         MONZACK MERSKY AND BROWDER, P.A.
                                         1201 North Orange Street, Suite 400
                                         Wilmington, Delaware 19801
                                         Tel./Fax:     (302) 656-8162 / (302) 656-2769
                                         RMersky@Monlaw.com

                                         -and-

                                         David J. Molton, Esq. (admitted *pro hac vice*)
                                         Eric R. Goodman, Esq. (admitted *pro hac vice*)
                                         BROWN RUDNICK LLP
                                         Seven Times Square
                                         New York, New York 10036
                                         Tel./Fax: (212) 209-4800 / (212) 209-4801
                                         DMolton@BrownRudnick.com
                                         EGoodman@BrownRudnick.com

                                         -and-

                                         Sunni P. Beville, Esq. (admitted *pro hac vice*)
                                         Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
                                         BROWN RUDNICK LLP
                                         One Financial Center
                                         Boston, Massachusetts 02111

Tel./Fax:  (617) 856-8200 / (617) 856-8201
SBeville@BrownRudnick.com
TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

Date: December 7, 2022      By    */s/ David M. Klauder*
                                           David M. Klauder, Esq. (No. 5769)
                                           BIELLI & KLAUDER, LLC
                                           1204 N. King Street
                                           Wilmington, Delaware 19801
                                           Tel./Fax: (302) 803-4600 / (302) 397-2557
                                           dklauder@bk-legal.com

                                           -and-

                                           Thomas E. Patterson (admitted pro hac vice)
                                           Daniel J. Bussel (admitted pro hac vice)
                                           Robert J. Pfister (admitted pro hac vice)
                                           Sasha M. Gurvitz (admitted pro hac vice)
                                           KTBS LAW LLP
                                           1801 Century Park East, Twenty-Sixth Floor
                                           Los Angeles, California 90067
                                           Tel./Fax: (310) 407-4000 / (310) 407-9090

                                           *Counsel to each of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC*