## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:  BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC<br><br>Debtors. | Chapter 11<br><br>Bankruptcy Case No. 20-10343-LSS<br><br>(Jointly Administered) |
| NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, *et al.*,<br><br>Appellants<br><br>-v.-<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Appellees | Case No. 22-cv-01237-RGA |

## REPLY BRIEF OF CERTAIN INSURERS

Theodore J. Boutrous Jr. (*pro hac vice*)
Richard J. Doren (*pro hac vice*)
Blaine H. Evanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
tboutrous@gibsondunn.com
rdoren@gibsondunn.com
bevanson@gibsondunn.com

Deirdre M. Richards
(DE Bar No. 4191)
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
Telephone: (302) 538-8331
drichards@finemanlawfirm.com

Susan Gummow (*pro hac vice*)
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
sgummow@fgppr.com

(Additional Parties and Counsel on Inside Cover)

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Michael A. Rosenthal (*pro hac vice*)
Mitchell A. Karlan (*pro hac vice*)
James Hallowell (*pro hac vice*)
Keith R. Martorana (*pro hac vice*)
Seth M. Rokosky (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com

*Additional Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks US Insurance Company*

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety Corporation and Interstate Fire & Casualty Company*

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

*Counsel for Arch Insurance Company*

Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite
1380
Wilmington, DE 19801
Telephone: (302) 251-8856
Email: plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy
Boulevard
Philadelphia, PA 19103
Telephone: (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

George R. Calhoun (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue,
N.W. Suite 650
Washington, DC 20006
Telephone: (202) 840-8758
george@ifrahlaw.com

*Counsel for Argonaut Insurance Company and Colony Insurance Company*

iv

Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

-and-

Kevin Coughlin (*pro hac vice*)
Lorraine Armenti (*pro hac vice*)
Michael Hrinewski (*pro hac vice*)
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
Facsimile:  973-267-6442
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
Facsimile:  (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

Maria Aprile Sawczuk (DE
#3320)
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally (*pro hac vice*)
Emily Stone (*pro hac vice*)
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone:  312-282-5282
dchristian@dca.law

*Counsel for The Continental
Insurance Company and
Columbia Casualty Company*

Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400
Fax: 504-561-1011
Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

*Counsel for Gemini Insurance*
*Company*

Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star*
*Indemnity*
*Company*

Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP
340 Mt. Kemble Avenue | Suite 300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor
Insurance Company, on behalf of
itself and as successor in interest
to Catlin Specialty Insurance
Company*

*Counsel for Great American
Assurance
Company, f/k/a Agricultural
Insurance Company; Great
American E&S Insurance
Company, f/k/a Agricultural
Excess and Surplus Insurance
Company; and Great American
E&S Insurance Company*

R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
khill@svglaw.com

-and-

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac
vice*)
Jonathan D. Marshall (*pro hac
vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

Thaddeus J. Weaver (DE Bar. No.
2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

-and-

William E. McGrath, Jr. (*pro hac
vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance
America, Inc., formerly known as
American Re-Insurance Company*

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC
Kim V. Marrkand (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com
lbstephens@mintz.com

*Counsel for Liberty Mutual
Insurance Company, The Ohio
Casualty Insurance Company,
Liberty Insurance Underwriters,
Inc. and Liberty Surplus
Insurance Corporation*

Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
MORRIS JAMES LLP
500 Delaware Avenue, Suite
1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
smiller@morrisjames.com
ckunz@morrisjames.com

-and-

Margaret M. Anderson
(*pro hac vice*)
Ryan T. Schultz
(*pro hac vice*)
Adam A. Hachikian
(*pro hac vice*)
Kenneth M. Thomas

Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
Facsimile:  (302) 250-4498
mbenedek@cozen.com

*Counsel for Traders and Pacific
Insurance Company, Endurance
American Specialty Insurance
Company, and Endurance
American Insurance Company*

(*pro hac vice*)
FOX SWIBEL LEVIN &
CARROLL LLP
200 W. Madison Street, Suite
3000
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile:  (312) 224-1201
panderson@foxswibel.com
rschultz@foxswibel.com
ahachikian@foxswibel.com
kthomas@foxswibel.com

*Counsel for Old Republic*
*Insurance Company*

Louis J. Rizzo, Jr. (DE Bar No.
3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty*
*and Surety Company, Inc. (f/k/a*
*Aetna Casualty & Surety*
*Company), St. Paul Surplus*
*Lines Insurance Company and*
*Gulf Insurance Company*

x

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ................................................................................................ 8

I.   THE BANKRUPTCY COURT ERRED IN CONFIRMING A
     BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH........... 8

    A.   The Standard of Review Is De Novo Because the Bankruptcy
     Court Committed Legal Error. ................................................. 8

    B.   BSA Cannot Dispute that the Bankruptcy Court Failed to
     Consider the Totality of the Plan Circumstances and Apply
     Them to the Correct Legal Precepts. ..................................... 10

    C.   BSA Cannot Dispute that It Proposed a Plan that Inflates
     Its Alleged Liability and Rewrites Insurance Contracts. .... 13

        1.   BSA Cannot Dispute that Claimants' Attorneys
     Solicited Thousands of Claims that Inflate BSA's
     Liability for Sexual Abuse. .......................................... 14

        2.   BSA Cannot Dispute that It Abandoned its Insurers
     and Aligned Itself with the Claimants. ....................... 15

        3.   BSA Cannot Dispute that It Improperly Sought to Bind
     Insurers to the Settlement Trustee's Claim
     Determinations. ............................................................ 17

        4.   BSA Cannot Dispute that It Embraced Efforts to
     Abrogate Its Insurance Contracts. .............................. 22

        5.   BSA Cannot Dispute that It Proposed TDPs That
     Inflate Its Own Liability for Abuse Claims. ................ 26

        6.   BSA Cannot Dispute that It Agreed to Claimants'
     Attorneys' Control Over the Settlement Trustee. ....... 32

# TABLE OF CONTENTS

Page(s)

      7.     BSA Cannot Dispute that It Repeatedly Agreed to Prejudice Insurers Leading up to the Confirmation Hearing............................................................................... 33

      8.     BSA Cannot Dispute that It Proposed Additional Prejudicial Findings After the Bankruptcy Court's Opinion. ........................................................................ 37

    D.    BSA's Attempts to Justify the Plan's Lack of Good Faith Are Unavailing............................................................... 38

      1.     The Plan Was Not Proposed Fairly and for Legitimate Bankruptcy Purposes.................................................... 38

      2.     The Plan Would Encourage Further Abuse of the Bankruptcy Process. ................................................... 44

      3.     BSA's Other Attempts to Justify the Plan's Lack of Good Faith Are Meritless.......................................... 51

II.    THE PLAN ABROGATES THE CERTAIN INSURERS' CONTRACTUAL RIGHTS..................................................... 53

    A.    The Plan Cannot Be Confirmed Because It Impermissibly Alters the Certain Insurers' Contracts................................ 54

      1.     The Plan Proponents Incorrectly Contend that the Plan Language Sufficiently Preserves Insurers' Contractual Rights. ....................................................................... 58

      2.     The Plan Proponents Incorrectly Contend that the Plan Preserves BSA's Contractual Obligations. .................. 61

    B.    The Plan Proponents' Argument that this Contractual Impairment Should Be Overlooked Because Insurers Can "Assert" Defenses in Coverage Litigation Is Unavailing. .... 68

CONCLUSION ................................................................. 76

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*American United Mut. Life Ins. Co. v. City of Avon Park, Fla.,*
311 U.S. 138 (1940).............................................................................21

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 559 (2007).................................................................47

*Burns v. United States,*
501 U.S. 129 (1991).........................................................................66

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994).........................................................................47

*Furness v. Lilienfield,*
35 B.R. 1006 (D. Md. 1983).............................................................50

*In re 47 Hops LLC,*
2020 WL 2485808 (Bankr. E.D. Wash. May 13, 2020) .....................65

*In re 641 Assocs., Ltd.,*
1993 WL 332646 (Bankr. E.D. Pa. Aug. 26, 1983)............................55

*In re ACandS,*
311 B.R. 36 (Bankr. D. Del. 2004) ......................................... 43, 46, 50

*In re Am. Cap. Equip.,*
688 F.3d 145 (3d Cir. 2012) ...................................................... passim

*In re Am. Home Mortg. Holdings,*
402 B.R. 87 (Bankr. D. Del. 2009) ......................................... 65, 67, 68

*In re Blitz U.S.A Inc.,*
2013 WL 6825607 (Bankr. D. Del. Nov. 12, 2013) ............................56

*In re Combustion Eng'g*,
    391 F.3d 190 (3d Cir. 2004) .......................................................... 55, 57

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ............................................. 22, 43

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ......................................................... 55, 66

*In re Emerge Energy Servs. L.P.*,
    2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ......................... 21, 40

*In re Exide Holdings, Inc.*,
    2021 WL 3145612 (D. Del. July 26, 2021) ................. 12, 26, 34, 39, 46

*In re Federal-Mogul Global Inc.*,
    684 F.3d 355 (3d Cir. 2012) ............................................. 41, 69, 71, 74

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ..................................................... 39

*In re Global Indus. Techs.*,
    645 F.3d 201, 214 (3d Cir. 2011) ..................................... 42, 48, 72, 74

*In re HomeBanc Mortg. Corp.*,
    945 F.3d 801 (3d Cir. 2019) ................................................................... 9

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004) ................................................................. 43

*In re Lernout & Hauspie Speech Prods. N.V.*,
    308 B.R. 672 (D. Del. 2005) ................................................................... 9

*In re Mitchell*,
    2012 WL 5988841 (Bankr. D. Md. Nov. 29, 2012) .............................. 55

*In re Purdue Pharma L.P.*,
    633 B.R. 63 (Bankr. S.D.N.Y. 2021) .................................................... 57

*In re Reliant Energy Channelview LP*,
    594 F.3d 200 (3d Cir. 2010) ................................................................. 64

*In re RTI Holding Co., LLC*,
2021 WL 4994414 (Bankr. D. Del. Oct. 27, 2021) .......................... 21, 38

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) .......... 25, 40, 41, 44

*In re Stewart Foods, Inc.*,
64 F.3d 141 (4th Cir. 1995) ................................................ 65

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) .............................................. 57

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ..................................... 57

*In re Weinstein Co. Holdings*,
No. 18-50924, (Bankr. D. Del. 2020) ................................... 65

*In re Weinstein Co. Holdings*,
997 F.3d 497 (3d Cir. 2021) ................................... 40, 44, 65

*In re WR Grace & Co.*,
729 F.3d 332 (3d Cir. 2013) ................................................ 9

*Lindsey v. Normet*, 405 U.S. 56, 66 (1972) .............................. 71

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) ................................................... 57, 72

*Luo v. Melinta Therapeutics, Inc.*,
2021 WL 965614 (D. Del. Mar. 15, 2021) ............................. 9

*Mission Prod. Holdings v. Tempnology, LLC*,
139 S. Ct. 1652 (2019) ....................... 39, 54, 56, 66, 69, 71

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984) ........................................... 54

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ............................. 46, 47, 49, 72

**Statutes**

11 U.S.C. § 1128 ........................................................................... 20

11 U.S.C. § 1129(a)(1) .................................................................. 53

11 U.S.C. § 1129(a)(3) ....................................................... 8, 12, 20, 53

**Treatises**

Restatement (Second) of Contracts § 317(2) (Westlaw 2022) ............... 67

29 Williston on Contracts § 74:10 (Westlaw 4th ed. 2022) .................... 66

29 Williston on Contracts § 74:28 (Westlaw 4th ed. 2022) .................... 66

## PRELIMINARY STATEMENT

BSA's bankruptcy plan was the result of an egregiously flawed process that neither BSA nor the claimants (the "plan proponents") in the hundreds of pages of response briefs is able to successfully defend. They *cannot* defend it because seeking to maximize a debtor's leverage to increase settlement pressure and compel non-settling insurers to make inflated payments to the estate, in abrogation of contractual rights and obligations, is *not* a permissible use of the bankruptcy system.

The 82,000 claims to be paid under BSA's plan bear no relationship to the liability BSA faced before the bankruptcy and, try as they might, BSA and the claimants do not show otherwise. This unprecedented explosion in the number of claims was not merely a consequence of the bankruptcy. As claimants' counsel anticipated, it culminated in the trampling of the Certain Insurers' rights. When the undisputed facts are viewed in their totality—as they must be—BSA's plan, even with attempts to fix it imposed by the bankruptcy court, was not proposed in good faith and abrogates core contractual rights and obligations in BSA's insurance policies, fundamentally altering the bargain central to those contracts. This Court should vacate confirmation of the plan.

The Bankruptcy Code does not guarantee BSA an exit from bankruptcy at all costs. Nor does the Code permit BSA to achieve its aims by rewriting its prepetition contracts at insurers' expense. The limited purpose of Chapter 11 is to fairly reorganize the debtor's property so that creditors can be compensated with the debtor's estate as it may exist, including the debtor's contracts. It is *not* to enlarge the estate's liabilities so debtors and claimants' attorneys gain leverage to pressure insurers into increasing their contributions in spite of their contracts.

Despite the plan proponents' attempts to explain away the bankruptcy court record, it is clear that the court below committed legal error when it confirmed the plan, for two independent reasons.

***First***, the plan was not proposed in good faith. In attempting to show otherwise, the plan proponents make the same fundamental error as the bankruptcy court—focusing on isolated aspects of their conduct but ignoring the *overall* reality that BSA and the claimants' lawyers teamed up in an effort to dramatically increase BSA's potential liability while at the same time restricting non-settling insurers' ability to protect the interests the insurers bargained for. That is the opposite of what the Bankruptcy Code requires.

2

The plan proponents offer isolated responses to many of the individual points in the Certain Insurers' opening brief, attempting to bury this Court in a morass and frame the central issue as a mere "factual" dispute.  But nothing they point to—endless "mediation" efforts among the plan proponents themselves, failed efforts to negotiate protections of non-settling insurers' rights, plan improvements made only when mandated by the bankruptcy court—changes the analysis. The totality of the circumstances demonstrates that the plan was not proposed in good faith.

BSA repeatedly acceded to proposals by claimants' attorneys to inflate BSA's supposed liability for abuse claims because it would be BSA's insurers, not BSA, that would be called upon to pay.  In doing so, BSA embraced efforts to increase the pressure on insurers that refused to support this plan so they would ultimately help fund this trust.  Like coercive class certification, confirming this plan creates hydraulic pressure to settle irrespective of insurers' contracts, regardless of any ability to assert coverage defenses down the road.  That is why, even after the bankruptcy court rejected the prejudicial insurance findings, claimants' counsel continue to support this unfair plan.

Even on appeal, BSA proclaims its insurers' contractual rights are preserved while, at the same time, suggesting they may not be because BSA relented to the demands of claimants' attorneys. The claimants' attorneys, for their part, now advance entirely new arguments on appeal about how the plan in fact can assign BSA's contractual rights without any of the corresponding burdens. All of this is inconsistent with the purposes of the Bankruptcy Code and tolerating it would only encourage further misconduct in mass tort bankruptcies, require bankruptcy courts to address thousands of illegitimate claims, and prejudice those claimants with valid claims. It cannot be squared with a debtor's good faith obligations.

***Second***, the bankruptcy court committed legal error when it concluded that BSA's plan does not impermissibly abrogate the insurers' contracts. As explained by Wharton Professor Scott Harrington in unrebutted expert testimony, the operative insurance contracts contain fundamental rights and obligations, including but not limited to the rights of the insurer to defend the insured, associate in any defense, investigate applicable legal liability, and consent to any settlements, and the obligation of the insured to cooperate in defense.

These and other protections are paramount for insurers because they guard against exactly the sort of misalignment between claimants and the insured that gave rise to this plan.  BSA and the plan proponents barely grapple with this issue in their mountain of paper, and when they do, they contradict themselves about what the plan is designed to do, and provide no legal justification for failing to preserve insurers' contractual rights.  They also advance an erroneous legal theory that they do not have to assign BSA's contractual obligations under Bankruptcy Code § 363— an argument so wrong that they did not advance it below.   The Bankruptcy Code does not permit the plan's assignment of insurance contract *rights* without BSA's insurance contract *obligations*.

 The plan proponents' principal argument is that this Court and the bankruptcy court should ignore this obvious violation of the Bankruptcy Code now because the insurers can simply try their luck later, by raising the issue in coverage litigation.  But the fact that insurers can raise arguments in separate litigation does not mean that the plan here leaves their contractual rights and obligations intact.  If the plan urged by BSA impermissibly attempts to abrogate those rights and obligations, as this

one does, it is not confirmable under *bankruptcy law*, regardless of what might happen in coverage litigation.

This of course makes sense.  If the plan is confirmed, insurers will be called upon to pay thousands of questionable claims that BSA chose not to contest without ever permitting its insurers to effect a proper resolution or defense as required in their contracts.  Just as in the class action context, the resulting potential liability would create a hydraulic settlement pressure on terms wholly unrelated to insurers' contracts, regardless of the scope of insurers' rights to litigate coverage issues.  BSA claims these concerns are "absurd," but courts routinely recognize them in many different litigation contexts, including the mass tort bankruptcy plan confirmation context.  The fact that the Certain Insurers, to BSA's dismay, have remained steadfast in refusing to support this plan confirms only the extent to which they will be prejudiced by it.

*  *  *

As the Chapter 11 debtor, BSA has the burden to put forth a plan that complies with the Bankruptcy Code.  It did not, and cannot, meet that burden.  BSA partnered with the claimants' lawyers, excluded the Certain Insurers from its plan negotiations, and went to great lengths to

6

restrict its own insurers from defending themselves. After decades of responding to allegations of sexual abuse, BSA wants to exit bankruptcy without even an obligation to cooperate with its insurers, either in the bankruptcy or after it.

BSA cannot exit bankruptcy through an overreaching plan that denies insurers' rights and ignores its obligations under prepetition contracts. BSA should instead propose a plan that is consistent with the Bankruptcy Code. This Court should reverse.

# ARGUMENT

## I. THE BANKRUPTCY COURT ERRED IN CONFIRMING A BANKRUPTCY PLAN THAT WAS NOT PROPOSED IN GOOD FAITH.

The plan proponents devote page after page dissecting individual pieces of evidence in an attempt to demonstrate that their plan was proposed in good faith. But their effort to conjure up a factual dispute cannot excuse the *legal error* committed by the bankruptcy court. When viewed in its totality—as it must be—the record shows a plan not proposed in good faith.

### A. The Standard of Review Is De Novo Because the Bankruptcy Court Committed Legal Error.

The bankruptcy court committed legal error because it incorrectly concluded, based upon the undisputed evidence, that the plan was proposed in "good faith." 11 U.S.C. § 1129(a)(3). In coming to that conclusion, the court failed to consider the totality of the circumstances giving rise to the plan's proposal (*see* Ins. Br. at 59-67), erroneously concluded that certain mandated improvements to the plan (such as removal of the prejudicial insurance findings) were sufficient to remedy a lack of good faith (*see* Ins. Br. at 68-74), and inappropriately emphasized the testimony of a single BSA lawyer who claimed that he subjectively intended to protect insurers' rights (*see* Ins. Br. at 75-76).

8

Those are legal errors, and this Court reviews them "de novo." *Luo v. Melinta Therapeutics, Inc.*, 2021 WL 965614, at \*7 (D. Del. Mar. 15, 2021). "Good faith presents mixed questions of law and fact" (*In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013)), and "[m]ixed questions of law and fact are reviewed under a mixed standard, affording a clearly erroneous standard to factual findings, but exercising *plenary review* of the bankruptcy court's *interpretation* and *application* of those facts to legal precepts." BSA Br. at 7 (emphasis added); *see, e.g.*, *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2005).

Thus, "[w]hether a plan was proposed in good faith is a *legal* question subject to de novo review by the district court, but factual findings supporting the bankruptcy court's determination that a plan was proposed in good faith should be reviewed for clear error." *Luo*, 2021 WL 965614, at \*7 (emphasis added); *see, e.g.*, *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 811 (3d Cir. 2019) ("A bankruptcy court's basic factual findings are examined for clear-error while the ultimate fact of good faith receives plenary review.").

BSA points out that factual findings are reviewed for "clear error." BSA Br. at 37-40. But the Certain Insurers do not challenge "factual

9

findings" made by the bankruptcy court; nor are there material "factual" disputes over the record in this appeal. The question that must be considered in this appeal is whether the relevant facts, when viewed in their totality and applied to the relevant legal precepts, demonstrate that BSA has carried its burden to prove the plan was proposed in "good faith" as Congress intended the meaning of that term in the Bankruptcy Code.

**B.     BSA Cannot Dispute that the Bankruptcy Court Failed to Consider the Totality of the Plan Circumstances and Apply Them to the Correct Legal Precepts.**

As set forth in the Certain Insurers' opening brief, the bankruptcy court never properly considered whether the plan was proposed in "good faith." It analyzed the conduct of the plan proponents piecemeal and concluded that certain individual circumstances, in isolation, did not *themselves* indicate "bad faith." (A. 223 (negotiations over plan).)

BSA argues that the bankruptcy court conducted an appropriate analysis because it "analyzed and cited to the record evidence hundreds of times." BSA Br. at 52; *see* BSA Br. at 52-54. But the issue is not whether the bankruptcy court cited *evidence* (of course it did); it is that the court failed to appropriately consider the *totality of the circumstances* surrounding each of the "steps" in its analysis (Claimant Br. At 21-22),

10

let alone determine whether the plan, as a whole, was proposed fairly and facilitates the objectives of the Bankruptcy Code, as was required.[1]

BSA simply ignores the Certain Insurers' core argument regarding BSA's lack of good faith—namely, that the bankruptcy court repeatedly analyzed circumstances in isolation, and then held that each of those circumstances, although concerning, was not so egregious as to deny confirmation.  For example, the court "reject[ed] out-of-hand the notion that *this explosion of claims, alone*, could be grounds for denial of confirmation." (A. 230.)  The court similarly held, in isolation, that the *conduct of claimants' attorneys in signing claim forms and ginning up*

---

[1] All of this is why BSA (and the bankruptcy court below) repeatedly attempt to knock down strawman arguments that the Certain Insurers have never advanced in this case.  (*Compare*, *e.g.*, A. 231 ("A debtor's ability to obtain a good faith finding necessary for confirmation cannot turn on the *number of claims filed*, whether *plaintiff lawyers advertised for clients*, *or* whether *plaintiff lawyers filed claims in derogation of applicable rules*." (emphasis added)), *with*, *e.g.*, BSA Br. at 88 ("[B]ankruptcy law provides no ground for defeating confirmation based on the volume of claims brought against the BSA … the logical extension of [such an] argument is that no entity with mass tort liabilities can file a bankruptcy case because claims might increase exponentially."); *see also*, *e.g.*, A. 238 ("Accepting Professor Harrington's opinions leads to . . . conclusions, all of which I reject.  <u>One</u>, a company facing mass tort liability *cannot file bankruptcy because an insurer's quantum of liability will, of necessity, increase*…." (emphasis added)).)

*claims* was not "proportional" to denying confirmation.  (A. 231.)  And after terminating BSA's nearly year-long effort to propose court findings that would prejudice insurers in coverage disputes, the court concluded, again in isolation, that "an *agreement to request a finding* from the court is not so egregious as to deny confirmation."  (A. 228; *see, e.g.*, A. 238 ("potential increase in the quantum of liability"), A. 229 (agreement to propose a Claims Matrix that was "deceptive" and "all optics"), A. 240-241 (agreement to pay time-barred and meritless claims).)

Addressing these issues piecemeal, without stepping back and asking the broader "good faith" question, was error.  The Bankruptcy Code requires that "*the plan*" be proposed in "good faith."  11 U.S.C. § 1129(a)(3)) (emphasis added).  Thus, the "important point of inquiry" for the good-faith requirement "is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Am. Cap. Equip.*, 688 F.3d 145, 156 (3d Cir. 2012) (quotation marks omitted).  Courts considering that must consider the "totality" of the circumstances surrounding the *plan's* proposal.  *In re Exide Holdings, Inc.*, 2021 WL 3145612, at *11 (D. Del. July 26, 2021). The bankruptcy court never performed the required holistic analysis.

## C.   BSA Cannot Dispute that It Proposed a Plan that Inflates Its Alleged Liability and Rewrites Insurance Contracts.

As the Certain Insurers explained (Ins. Br. at 59-68), and BSA does not dispute, BSA aligned itself with claimants' contingency attorneys who ginned up tens of thousands of claims that inflate BSA's liability, then joined their effort to bind insurers to claim awards under the TDPs.

The plan proponents attempt to infuse these disturbing facts with an aura of "good faith" by offering up a labyrinth of minutiae from the record that they hope will reflect positively on their plan nonetheless, such as their efforts to mediate with plan supporters, drafting of plan language that may have protected insurers' rights before it was abandoned, and parts of their plan that the bankruptcy court directed to be improved.

But none of these facts make any difference.  However the plan proponents wish to frame it, the plan they negotiated seeks to inflate BSA's liability for sexual abuse in order to give the plan proponents leverage over insurers while rewriting their contracts.  That is not a proposal made in good faith.

13

### 1. BSA Cannot Dispute that Claimants' Attorneys Solicited Thousands of Claims that Inflate BSA's Liability for Sexual Abuse.

BSA does not dispute that claimants' attorneys sought to profit by aggressively and misleadingly drumming up tens of thousands of claims on a contingency-fee basis. *See* Ins. Br. at 17-22; BSA Br. at 80, 82-83, 89-90. Nor does it dispute that at least 85% of these claims face such profound legal hurdles that they would never even have been filed but-for the bankruptcy. (*See, e.g.*, A. 2285-2287, 2425 (Bates); *see also, e.g.*, A. 3900-3901 (Rothweiler) (bankruptcy was only opportunity for 58,000 to be compensated).

Instead, BSA speculates that only an insignificant number of the claims are questionable. *See* BSA Br. at 79-82. But psychologists on both sides explained in unrebutted testimony that a *significant* number of the claims are likely fraudulent. (A. 3435-3436 (Conte), 3651 (Treacey).)[2] Even the bankruptcy court found, based on the record, that the likelihood

---

[2] Claimants' counsel speculate that other factors amplified this explosion (*see* Claimant Br. at 36-39) but ignore their undisputed (and misleading) advertising and media efforts (*see, e.g.*, A. 10796, 11376, 11526-11527), and their own testimony that they engaged clients whom they never would have accepted, signed claim forms by the thousands, and "unleashed [a] Pandora's box" of claimants coming forward (A. 3908 (Rothweiler)). *See* Ins. Br. at 18-21.

of fraudulent claims is enough to expressly require the Settlement Trustee to design robust anti-fraud measures to disallow fraudulent claims before any payment is made by the trust. *See* BSA Br. at 83-84.

As intended by the claimants' attorneys, this nationwide campaign permitted them to control BSA's bankruptcy. *See* Ins. Br. at 18-19. The explosion in claims created a constituency of more than 80,000 creditors, led by mass tort claimants' counsel seeking the "Holy Grail," from whom BSA required "overwhelming" support to exit bankruptcy. These claimants' counsel sought to secure proposal of a plan that would improperly expand BSA's liability, to the prejudice of BSA's insurers. *See* Ins. Br. at 23-51. And that is what they did.

### 2. BSA Cannot Dispute that It Abandoned its Insurers and Aligned Itself with the Claimants.

The Certain Insurers have demonstrated that, as claimants' counsel anticipated, rather than insisting on compensating only bona fide sexual abuse claimants, BSA proposed a plan that ensured that *all* 82,000 claims, no matter how meritless or questionable, would be paid under its plan, while requiring BSA to provide little or no cooperation with insurers in asserting appropriate defenses to the claims. *See* Ins. Br. at 22, 25-28, 32-34, 74.

15

BSA contends that it always sought to design TDPs that would merely emulate its prepetition practices.  *See* BSA Br. at 70-71, 75-76. But BSA cannot dispute that after capping its own liability for the explosion of claims, BSA *joined with the claimants*, contrary to its contracts, to obtain the overwhelming support it thought it needed to obtain releases for local councils and chartered organizations.  *See* Ins. Br. at 39-40, 45-46; *see also* BSA Br. at 41-42 (seeking to "maximize recoveries for creditors"); Ins. Br. at 45-46 (reneging on Hartford settlement, causing Hartford to object to lack of good faith).  BSA then embraced claimants' proposed "changes to the Plan," including the proposed findings to bind insurers and removal of language protecting insurers it had previously insisted be in the plan.  (A. 12926-12929; *see* Ins. Br. at 37-45.)

BSA repeatedly notes as a cure-all for its conduct that it engaged in numerous mediation sessions, including with insurers who ultimately settled.  *See* BSA Br. at 23 n.13, 43-47.  But BSA omits that when the Certain Insurers learned that BSA had already finished negotiating with claimants, the Certain Insurers offered to discuss TDPs that were "insurance neutral and consistent with [their] insurance policies," but

16

BSA responded that to do so would "scuttle the deal" with claimants. (A. 12901-12904; *see* Ins. Br. at 44.)  It was thus BSA who refused to "engage" with insurers in negotiating a fair plan that would account for the insurers' contracts.  BSA Br. at 73; *see* BSA Br. at 66 (claiming the Certain Insurers are "immune" to settlement).

### 3.   BSA Cannot Dispute that It Improperly Sought to Bind Insurers to the Settlement Trustee's Claim Determinations.

As the Certain Insurers have detailed, after abandoning its insurers, BSA joined claimants' attorneys' years-long quest for the "Holy Grail"—insurance findings intended to bind non-settling insurers to pay claims based on claimant-friendly TDPs.  *See* Ins. Br. at 23-24, 37-45, 63.  BSA's plan proponent allies repeatedly referred to these below as the "insurance" findings (*see, e.g.*, A. 4494, 4551), emphasizing their importance as plan components (*see, e.g.*, A. 6318-6319 (Patton) (findings were "essential" because they would "limit the insurers' ability" to "escape their coverage obligations" due to arguments about the TDPs)).

Now, however, BSA seeks to downplay these prejudicial findings as just "certain insurance related terms" of a prior plan that was never confirmed.  BSA Br. at 97-98.  BSA even concedes that the court

"correctly" rejected the findings because there is no "right[] to resolve coverage disputes" in a bankruptcy proceeding. BSA Br. at 119-120. And BSA's sole rationale for its lengthy effort to include the findings is that they were "part of a compromise" with claimants' attorneys to prevent insurers from raising "future legal challenges to the Settlement Trust and the TDP." BSA Br. at 101.

But that is exactly the point. BSA *knew* the court findings it pleaded for in concert with the claimants' attorneys were designed to hobble non-settling insurers by endorsing TDP awards as "binding" on them through res judicata, as determining claimants' right to payment, and as giving rise to determinations that are purportedly *de facto* "fair and equitable." *See* Ins. Br. at 42-44. BSA's belated admission in its brief that the bankruptcy court "correctly" refused to prejudge insurance coverage issues in this way is a concession *that BSA* proposed a plan that it knew was contrary to bankruptcy law.

As even the claimants now concede, the TDPs create insurance coverage defenses insofar as they "result in unreasonable, unsupportable, or inflated claim values." Claimant Br. at 44. The claimants' attorneys, again leveraging insurers, hoped to argue in coverage disputes that non-

18

settling insurers must "accept" the Settlement Trustee's awards for coverage purposes, regardless of any coverage defenses or violation of insurer rights and BSA's obligations under its contracts.  Claimant Br. at 45 n.87 (quotation marks omitted)); *see* Claimant Br. at 43-45 (insurers should not be "exempt from … a court order" they "had the opportunity to contest")).

BSA knew the claimants' lawyers intended to use these provisions to prejudice insurers.  Indeed, those lawyers argued in open court that the insurance findings proposed by BSA were appropriate *because* they were designed to prevent the insurers from "relitigating" issues relating to the TDPs and the Trustee's awards (A. 12969-12970), acknowledging that the "Trustee may seek to use the Findings in post-confirmation coverage litigation" *because* the insurers "had adequate notice of the bankruptcy proceedings and an opportunity" to contest the reasonableness of the Settlement Trustee's claim awards in the bankruptcy court.  (12970-12971; *see, e.g.,* A. 6318-6320 (Patton) (FCR testifying that the findings "are essential" because they limit insurers' ability "to escape their coverage obligations"); A. 4202-4203 (Amala) ("Generally true" that claimants' lawyers' strategy was to seek binding

19

TDPs "to create a precedent in this case that they could use in coverage litigation.").)

Having failed to persuade the bankruptcy court to adopt these insurance findings, BSA and the plan proponents now argue that all of their conduct leading up to the plan's confirmation is "irrelevant" because the Bankruptcy Code permits debtors to modify their plan, and the Certain Insurers cannot challenge a "Plan based on terms that are not in it." BSA Br. at 97-102; Claimant Br. at 51-52; *see also, e.g.*, BSA Br. at 98, 102-03 (making a similar argument about the proposal of Professor Green as Settlement Trustee); BSA Br. at 83-84, 89-90 (same for plan's lack of anti-fraud measures).

But as BSA concedes (*see* BSA Br. at 43), the bankruptcy laws require that a debtor *propose* a plan in good faith. 11 U.S.C. § 1129(a)(3). The relevant plan includes what BSA proposed and supported at the confirmation hearing, which was built on the prejudicial findings. *See* 11 U.S.C. § 1128. Indeed, BSA repeatedly cites to the court's confirmation opinion, which rejected its proposed findings, because that opinion "approv[ed] the key elements of the Plan." BSA Br. at 32.

Despite BSA's protestations, and while the plan as confirmed has been periodically modified, the good faith requirement "speaks more to the process of plan development than to the content of the plan." *In re RTI Holding Co., LLC*, 2021 WL 4994414, at *9 (Bankr. D. Del. Oct. 27, 2021) (citation omitted); *see, e.g.*, *In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *16 (D. Del. Dec. 5, 2019) (same).  Courts accordingly "scrutin[ize] … the circumstances surrounding" the plan's proposal, including plan negotiations.  *American United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940).  And where—as here— the circumstances surrounding the plan's proposal, including the proposal of *additional* insurance findings at claimants' insistence *after* the confirmation opinion (see *infra* Pt. I.C.8), demonstrate unfairness and lack of adherence to the objectives of the Bankruptcy Code, the proposal was not made in good faith.

To be sure, the bankruptcy court *improved* the plan by directing BSA to strike these findings and permitting non-settling insurers to attempt to defend themselves in coverage litigation.  *See* BSA Br. at 61-62, 64-65, 97-98.  But the fact that *the bankruptcy court*, not BSA, mandated that improvement—which BSA now admits was correct—

21

simply confirms that BSA's plan was not proposed in good faith. *American Capital Equip.*, 688 F.3d at 156, 158; see *infra* Pt. II.

The Certain Insurers have never advanced the "absurd" argument posited by BSA that proposal of an inappropriate plan "permanently tainted the debtors" and prevents them from ever modifying their plan "to comply with the bankruptcy court decisions." BSA Br. at 100-101; *see* Claimant Br. at 52. But a court must consider the circumstances surrounding the plan's proposal in determining whether the plan was proposed fairly. And simply modifying the plan to remove a few of these provisions does not erase the lack of good faith surrounding the plan's proposal. *See*, *e.g.*, *In re Coram Healthcare Corp.*, 271 B.R. 228, 234-35, 237, 240 (Bankr. D. Del. 2001) (attempts to "sprinkle holy water" on debtors' plan, which embraced a concerning conflict of interest, did not "evidence good faith").

### 4.   BSA Cannot Dispute that It Embraced Efforts to Abrogate Its Insurance Contracts.

As the Certain Insurers explain, because BSA proposed a plan that was anticipated to bind insurers in coverage litigation, BSA was necessarily seeking to disregard BSA's insurance contracts, which were intended to align BSA *with its insurers* in settling claims *before* such

22

litigation.   BSA nevertheless proposed a plan that assigned all of its insurance rights to the settlement trust without any of its own obligations, making no provision for insurer rights that BSA agreed would be exercised before any settlements.  *See* Ins. Br. at 25, 32-34.

As explained more fully below and in the Certain Insurers' opening brief, the operative insurance contracts contain numerous fundamental rights for insurers, including but not limited to insurers' right to defend the insured, associate in defense, consent to any settlements, and have their insured cooperate in defense.  (A. 233.)  See *infra* Pt. II.

BSA and the claimants now argue there has been no harm because BSA's outside insurance counsel supposedly ensured, at least, that the plan "explicitly preserves any [coverage] defenses that the Certain Insurers may have."  BSA Br. at 62-63, 69, 72; Claimant Br. at 34-35. But BSA does not dispute that the very same lawyer removed, at *claimants' insistence*, numerous protections for insurer rights that he had previously believed were necessary.   BSA Br. at 72 ("Mr. Azer painstakingly walked the bankruptcy court through multiple versions of negotiated TDPs, demonstrating how and where the BSA protected any existing rights of the Insurers," and how they were "modified or

eliminated after negotiations with counsel for the Coalition." (quotation marks omitted)).  And preserving the ability to assert coverage defenses is not equivalent to preserving rights to cooperate with the insured in defense or settlement of claims in the first instance.  See *infra* Pt. II.B.

Claimants' intentions were clear in these negotiations because that same lawyer rendered any remaining protections of insurers' rights in the plan linguistically circular and facially illusory by accepting claimants' demand to make those protections subject to the "Insurance Assignment"—which assigns BSA's rights only, and not its obligations— as well as to the remainder of the plan (including the insurance findings), and to "applicable law" (which claimants continue to argue abrogates BSA's contracts).  *See* Ins. Br. at 25, 37-51; BSA Br. at 62-63; Claimant Br. at 35-36; see *infra* Pt. II.  These changes were necessary for claimants' proposed findings to have any effect in a coverage court.

To be sure, BSA's insurance lawyer contended below that he now personally "believes [the language in Article V.C of the TDP] encompasses all of the language that was deleted in the numerous provisions in the TDP and achieves his goal of preserving the Insurers' rights under their contracts."  BSA Br. at 72 (quotation marks omitted);

24

*see* BSA Br. at 63-64, 75-76.  BSA thus argues that it never "colluded with the [claimants] to *intentionally* deprive insurers of their rights."  BSA Br. at 77-78 (emphasis added) (quotation marks omitted).

But neither "collusion" nor "intent" are required to reverse confirmation of this plan (*American Capital Equip.*, 688 F.3d at 157-58; *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999)), and as the Certain Insurers detail, the totality of the circumstances demonstrate that BSA was complicit in the claimants' plan to bind insurers in coverage litigation and deprive them of their rights.  BSA *knew* the claimants who were proposing its plan language did not believe its contracts were fully preserved because BSA simultaneously proposed findings the claimants had concocted to abrogate such protections, along with numerous other steps to prejudice the insurers, sometimes unbeknownst to the same insurance lawyer.  *See* Ins. Br. at 37-51, 54-55.

BSA's willful blindness is ongoing.  BSA's insurance lawyer has made clear that the plan protects the rights of non-settling insurers *only* "to the extent any such rights exist," while claimants have continued to press the argument that in fact, as a result of the plan they helped draft, such rights *no longer exist*.  (*See, e.g.*, A. 6171, 6176, 6183.)   And while

BSA continues to claim that "none of the Insurers' rights or obligations were being modified" by the plan (BSA Br. at 74-75), and that insurers "will be able to defend against coverage *to the same extent* they would have" absent the plan (BSA Br. at 64 (emphasis added)), the plan proponents' own briefs here call that claim into doubt.  See *infra* Pt. II.

Claiming that insurers maintain contractual rights while *also* claiming those rights may no longer exist is the opposite of "honesty and good intentions," and confirming a plan where the debtor and its plan supporters continue to contradict each other about what they believe the plan to do would hardly discourage "debtor misconduct."  *Exide*, 2021 WL 3145612, at *11; *see American Capital Equip., LLC,* 688 F.3d at 156-58.

### 5. BSA Cannot Dispute that It Proposed TDPs That Inflate Its Own Liability for Abuse Claims.

Bankruptcy participants have a right to expect a good faith plan to include TDPs that compensate claimants only for BSA's *actual* abuse-claim liability, and nothing more.  But the claimants' attorneys, supported by BSA, were seeking to impair insurers' rights by drafting TDPs that were likely to result in awards that were far more favorable to claimants than judgments or settlements were in the tort system.

26

As the Certain Insurers explained, BSA collaborated with claimants' counsel to insert numerous plan provisions that would leverage insurers and provide a windfall to the claimants' attorneys by creating a mechanism to pay thousands of time-barred and meritless claims that BSA never would have faced, let alone paid, in the tort system, at amounts exceeding its prepetition settlements. *See* Ins. Br. at 25-31.

In response, BSA concedes, as it must, that the TDPs are "different from the tort system." BSA Br. at 104. Indeed, absent the inflationary TDPs, *at least 70,000* of the 82,000 claims never even would have been brought in the tort system (*see* Ins. Br. at 20); the rest would have been resolved in an "adversarial system" with BSA seeking to position cases "towards a more favorable settlement." (A. 5948 (Griggs); *compare* A. 1182-1183, 1208-1236 (Griggs), *with* A. 3976, 3978, 4016-4017 (Bitar).) *See* Ins. Br. at 13-15.

BSA contends that there is "no evidence" to dispute the testimony of BSA's lawyers that the TDPs are consistent with BSA's prepetition practices. *See* BSA Br. at 55-61, 119. Not so. BSA's national coordinating counsel testified that BSA *defended itself* prepetition to the

27

fullest extent "provided by the law," a far cry from agreeing in advance to settle 82,000 claims under the current TDPs.  (A. 1237-1238 (Griggs).) BSA's insurance lawyer similarly acknowledged that the plan may have the effect of modifying insurers' contractual rights—something that BSA never attempted to do prepetition—to the extent the court approved the plan "as part of a mass tort bankruptcy."  (A. 1770-1771 (Azer).)

Further, BSA's own abuse claims expert, Michael Burnett (*see* BSA Br. at 58), conceded that the TDPs (which place a "heavy emphasis" on the Settlement Trustee's ability to resolve abuse claims) differ from BSA's prepetition practices in the tort system in many ways, such as by eliminating defense counsel, BSA's pursuit of an appropriate defense, and even a neutral factfinder.  (A. 1391, 1402-1404, 1406-1407 (Burnett).)

As for the TDPs' awards to claimants, BSA does not dispute that they result in lucrative awards upon a mere showing of a *probability of a possibility*—a standard with no analog in the tort system.  *See* Ins. Br. at 26-27.  And while the TDPs provide for claims payments upon a mere showing of "legal responsibility," BSA never explains how settlement upon such a vague showing is possibly analogous to BSA's pre-petition

practices.  *See* BSA Br. at 95-97.  Indeed, the TDPs do not require the Settlement Trustee to detail the basis for that settlement.

BSA likewise attempts to justify its proposal of negligence as a TDP *aggravating factor*, rather than as a *prerequisite* for recovery, because negligence is supposedly "subsumed" within the prerequisites for recovery.  BSA Br. at 95-96.  But that is simply not what the TDPs say, and BSA points to nothing in the plan that would require the Settlement Trustee to diverge from its terms.

Nor has there been any showing that the TDP claim awards will bear any relationship to BSA's prepetition litigation outcomes.  BSA concedes that the purpose of the TDP Claims Matrix was originally to be "based on and consistent with" BSA's historical settlements and litigation outcomes.  BSA Br. at 55-56, 71; *see* Ins. Br. at 28-30.  (*See* A. 12927-12928, 12934.)  But that is not what BSA actually proposed, and it ultimately conceded that the Claims Matrix in *this* plan bears no relationship to prepetition values.  *See* Ins. Br. at 30-31.  (*See, e.g.*, A. 2435 (Bates) (base matrix values for single-abuser penetration claims must be reduced by 90 percent), A. 2439 (Bates) (otherwise the numbers do not "make sense").)  Indeed, BSA now claims that the Claims Matrix

was "designed to *be used by the Settlement Trustee to* ... replicate" prepetition values by somehow reverse-engineering claim awards to mirror prepetition litigation outcomes.  BSA Br. at 56.

While BSA says that the deceptive TDPs and Claims Matrix "replicate prepetition practices" and will not "result in inflated claim values" (BSA Br. at 59-60), what this actually means is that the Settlement Trustee will hopefully, somehow, apply them in the manner contemplated by Dr. Bates so that they replicate prepetition claim values. But requiring the Settlement Trustee to exercise this level of discretion in valuing such claims, with enormous discounts required to bring the vast majority in line with what claimants would have received in the tort system, and hoping that such discounts will be applied properly and accurately, is simply further pressure on insurers and the opposite of reasonably cabining the trustee's discretion through an objective Claims Matrix that mandates mathematically calculated discounts. *See* Ins. Br. at 30-31.

This is why the bankruptcy court refused to enter a finding that the base matrix values are based on BSA's historical settlements and litigation outcomes. (A. 191-192.)  After hearing the testimony of *BSA's*

*own expert*, the court rightly found that the base matrix values "are not 'magic number[s];' rather, any number could be used"; and that "perhaps in many ways" the "use of the term 'Base Matrix Value' is deceptive" and "optics." (A. 228-229.)

Finally, the plan contemplates that statutes of limitations and repose will be a mitigating scaling factor rather than a bar to recovery. *See* Ins. Br. at 13-14, 19-20, 28-30. BSA's expert, however, testified that the scaling factor for statutes of limitations was "simply the product of lawyers" negotiating the TDPs. (A. 2453-2454 (Bates).)

BSA argues that "[c]laims subject to statute of limitation defenses were paid by the BSA and sometimes its insurers" in the tort system before the bankruptcy, often in egregious cases. *See* BSA Br. at 90-95. But BSA's own expert explained that there are reasons not to consider extreme outlier cases and conceded that this factor was not based on historical data. (*See, e.g.*, A. 2416-2417, 2421-2422, 2453-2454) (Bates).)

And as BSA's national coordinating counsel testified, few time-barred claims were asserted prepetition because statutes of limitations and repose were a "significant hurdle" that had a "substantial chilling effect on the filing of claims." (A. 1187-1189, 5945 (Griggs).) BSA did not

even have to hire defense counsel in the majority of states because not a single claim was asserted there due to statutes of limitations. (A. 1185-1187 (Griggs).) By contrast, *65%* of the claims to be paid by this plan are untimely under applicable statutes of limitations. *See* Ins. Br. at 19.

### 6. BSA Cannot Dispute that It Agreed to Claimants' Attorneys' Control Over the Settlement Trustee.

As the Certain Insurers explained, having proposed a plan that entrusted the Settlement Trustee with enormous discretion to value claim awards in ways diverging from its prepetition experience, BSA compounded the problem by repeatedly proposing a plan that endorsed control over the Settlement Trustee by the same claimants' counsel who had negotiated the TDPs in the first place. *See* Ins. Br. at 34-37.

BSA does not dispute that it first acceded to the appointment of Professor Eric Green, who had extensive personal and professional relationships with claimants' counsel. (A. 8834-8835.) BSA sees nothing wrong with this. *See* BSA Br. at 102-103. But the bankruptcy court had determined that Green was inappropriate even as a *mediator*. (A. 8835.) BSA nevertheless proceeded to propose Green as the *Settlement Trustee* and withdrew its proposal only at the last minute.

32

BSA also touts its subsequent proposal of the respected Judge Houser as trustee. *See* BSA Br. at 49, 60. But regardless of her qualifications, BSA does not dispute that Judge Houser would, under this plan, owe fiduciary duties to the trust for claimants' benefit, and BSA, to the prejudice of its insurers, repeatedly embraced demands to allow claimants' lawyers to dominate her affairs through rights given to the FCR and the STAC, including consent rights over her choice of staff and legal counsel. *See* Ins. Br. at 35-37.

As Professor Jack Williams explained in unrebutted expert testimony, the plan creates a "mismatch in scope of fiduciary duties" that raises significant governance concerns because "the responsibility of the settlement trustee to act independently and to act in the best interest of all beneficiaries" means that Judge Houser has duties to all claimants, whereas the STAC members who have control over her actions have duties to their own clients and will act in their interests. (A. 3781.)

### 7. BSA Cannot Dispute that It Repeatedly Agreed to Prejudice Insurers Leading up to the Confirmation Hearing.

The Certain Insurers explained that in the lead up to voting on its plan, BSA learned through its own expert Dr. Bates that estimates of

aggregate sex abuse liability were far too high, and that an appropriate range was in the *bottom quartile* of prior estimates. But claimants' underwhelming support threatened to derail the broad releases and channeling injunction in favor of BSA and hundreds of other entities that BSA deemed essential. *See* Ins. Br. at 46-48. BSA thus capitulated to an array of additional demands made by the claimants. BSA Br. at 48-51.

BSA does not dispute that as a result, it sponsored a court finding, contradicted by its own expert analysis, that the TDP *Base Matrix Values* (prior to adjustments) were "based on and consistent with the Debtors' historical abuse settlements and litigation outcomes." (A. 13179 (Third Modified Fifth Amended Plan, Art. IX.aa).) *See* Ins. Br. at 48-49. (*See also*, *e.g.*, A. 12935-12936.) Because its Base Matrix Values were all "optics" (see *supra* at 30-31), BSA knew this finding was incorrect well before the confirmation hearing. If BSA was truly proceeding in good faith, it would have insisted that this finding be removed from the plan, but it did not do so. *See, e.g., Exide*, 2021 WL 3145612, at *11 (plan must be proposed "with honesty and good intentions").[3]

---

[3] BSA not only agreed to pursue a finding that it knew was not supported, but also agreed to limit how its own expert would testify about

[Footnote continued on next page]

Nor does BSA dispute the litigation advantages it gave to claimants at this point to attempt to further increase insurers' exposure for its liability.  For example, BSA agreed to provide the claimants' attorneys with extraordinary discovery authority to paper over defects in thousands of claims they had signed and filed.  *See* Ins. Br. at 50-51.  With this vast discovery, a claimant's attorney could use this information to amend their client's claim to make it more valuable under the TDPs.  This prospect did not bother BSA.  Instead, BSA agreed to turn over extensive information such as troop rosters, lists of perpetrators, and handbooks that it ordinarily would not in the tort system.  (A. 3984-3987 (Bitar), 5966 (Burnett), 6190-6191 (Azer).)

Nor does BSA dispute that it acquiesced to proposing a so-called "independent" review option ("IRO"), which would allow claimants to target excess insurers with potentially limitless recoveries.  *See* Ins. Br. at 49-50; BSA Br. at 17 ("excess insurance policies … are triggered once the primary insurance coverage is exhausted.").  BSA characterizes this process as removing a "windfall" because, in the tort system, "BSA paid

---

these values and to provide "consultation rights" to the claimants' counsel so they could put a thumb on the scale in an effort to convince the court to adopt this finding.  *See* Ins. Br. at 48; BSA Br. at 114.

claims substantially in excess of $2.7 million for egregious cases."  BSA Br. at 112-113.  But there was no such "windfall" because, prepetition, BSA rarely drew upon excess policies for such payments except in unusual cases—involving serial abusers of multiple victims with particularly egregious circumstances—that bear no resemblance to the overwhelmingly single-victim abuser claims at issue here.  *See* Ins. Br. at 14-15, 21-22, 49-50, 63.  (*See* A. 1203-1205 (Griggs) ("[T]here weren't" many cases that "potentially implicated the excess" insurers).)

This aspect of the plan, like the prejudicial findings, was specifically targeted at the Certain Insurers, most of whom were excess insurers who (unlike the settling insurers) had little to no liability for abuse claims against BSA prepetition and therefore no reason to agree to this lopsided plan.  (A. 10511 (explaining that settling insurers such as Century and Hartford account for the lion's share (approximately 90%) of all insurer liability); *see*, *e.g.*, A. 6385 (potential allocation among insurers).)  BSA knew the IRO was designed to leverage the Certain Insurers to settle and turn a small potential for liability into the hope of a windfall for the trust.  Indeed, the claimant attorneys did not hide that the IRO was anticipated to have this effect.  (A. 2922 (Gutzler).)

The IRO itself—just like the proposed insurance findings (see *supra* Pt. I.C.3.)—belies any suggestion by BSA and its claimant allies that BSA was unaware its plan would create "pressure to settle."  BSA Br. at 65-67.  Clearly they were.  That the Certain Insurers, much to BSA's dismay, have remained steadfast and refused to support such a coercive plan confirms only the extent to which they will be prejudiced by it, and underscores the fundamental *un*fairness the plan promotes.

### 8. BSA Cannot Dispute that It Proposed Additional Prejudicial Findings After the Bankruptcy Court's Opinion.

Even after the bankruptcy court issued its confirmation opinion (which approved certain aspects of the plan but rejected others, such as the plan proponents' desired insurance findings), BSA needed to retain claimant support until its plan was confirmed.  As the Certain Insurers pointed out, BSA therefore proposed still more insurance findings at the claimants' insistence to prejudice the insurers.  *See* Ins. Br. at 54-55. (*See*, *e.g.*, A. 9054.)   These findings, again, were rejected by the bankruptcy court.  (*See*, *e.g.*, A. 9289, 9296-9297.)   But BSA never disputes or even addresses these additional prejudicial findings.

37

**D.    BSA's Attempts to Justify the Plan's Lack of Good
        Faith Are Unavailing.**

The totality of the circumstances makes clear that BSA has failed
to meet its burden to demonstrate its plan was proposed in good faith.
The plan was not proposed fairly and in a manner that will achieve
results consistent with the purposes of the Bankruptcy Code.  Nor will it
have the effect of discouraging misconduct in future bankruptcy
proceedings.  BSA's arguments to the contrary are meritless.

**1.    The Plan Was Not Proposed Fairly and for
        Legitimate Bankruptcy Purposes.**

BSA argues that the confirmed plan is an extraordinary
achievement because it will pay for abuse claims and permit BSA to carry
on its mission.  But bankruptcy courts do not evaluate a Chapter 11 plan
in search of a pathway to confirmation.  They hold the debtor to its
burden to demonstrate by a preponderance of the evidence that the plan
is confirmable.  *See*, *e.g.*, *RTI Holding*, 2021 WL 4994414, at *9.  And they
scrutinize the circumstances surrounding the plan to determine whether
the debtor has shown its plan was proposed in "*good faith*"—that is, "with
honesty and good intentions," in "fundamental fairness," and in a manner
that will "fairly achieve a result consistent with the objectives and

38

purposes of the Bankruptcy Code." *See, e.g., Am. Cap. Equip., LLC,* 688 F.3d at 156-58 (emphasis added); *Exide*, 2021 WL 3145612, at *11.

BSA has failed to demonstrate how its plan does not seek a windfall from BSA's assets for claimants' attorneys, at the expense of its insurers. The plan is neither fair nor consistent with the Bankruptcy Code. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) ("[G]ood faith looks to the purposes that would be achieved by the plan.").

Critically, the "estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019). "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy [] appl[y] inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand either." *Id.* (quotation marks omitted); *see id.* (discussing the "core tenet[] of bankruptcy law" that "the estate can take only what the debtor possessed before filing"). Thus, the filing of a Chapter 11 petition creates a fixed estate of debtor's assets, and Chapter 11 provides a means of equitably dividing up and distributing parts to its creditors.

As for the debtor, the Chapter 11 process provides a "fresh start in life" (*American Capital Equip.*, 688 F.3d at 157 (quotation marks omitted)), and a "means to rehabilitate its business, including several to manage contractual obligations." *In re Weinstein Co. Holdings*, 997 F.3d 497, 501 (3d Cir. 2021). Chapter 11 thus presents an "inviting safe harbor" for the debtor to escape its debts, minimize its losses, and continue as a going concern. *SGL Carbon*, 200 F.3d at 169.

But "[w]ith great power comes great responsibility." *Weinstein Co.*, 997 F.3d at 501. The same benefits that make Chapter 11 attractive to debtors and creditors alike create "the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *SGL Carbon*, 200 F.3d at 169. Debtors and creditors understandably may seek to benefit their own interests by "preserving the value of the bankruptcy estate" to the extent they can and "delivering that value to creditors," but may not propose a plan with "ulterior motives" such as seeking to *expand* the size of the estate and pocket the windfall at others' expense. *Emerge Energy Servs.*, 2019 WL 7634308, at *16 (quotation marks omitted).

Contrary to BSA's claims, the plan does not seek merely to "*preserve* going concerns," "maximize property *available*," "*reorganize*" that property, "*divide*" its value, and use it to "*equitably* compensat[e] abuse survivors." *See* BSA Br. at 40-42; Claimant Br. at 39 (emphases added). Instead, it seeks to increase BSA's liabilities through an explosion of abuse claims and provide a *windfall* to claimants' attorneys by assigning BSA's insurance rights to cover the inflated liability it has agreed to, all while abrogating insurers' contractual rights and attempting to leverage insurers in plan confirmation and in coverage litigation.

The Third Circuit has recognized that creating a settlement trust like this can "distort ordinary incentives between insurer and insured, encouraging the debtor to collude with claimants and impose costs on the insurer." *In re Federal-Mogul Inc.*, 684 F.3d 355, 380 (3d Cir. 2012). "[T]here may be circumstances where the creation of a trust [alters] an insurer's exposure—for instance, when its mere existence attracts dramatically more claimants," and the debtor is tempted to collude with the claimants. *Id.* The good faith requirement provides an equitable backstop that combats such temptation to abuse the bankruptcy process. *See SGL Carbon Corp.*, 200 F.3d at 161 (good faith doctrine stems in part

41

from "equitable concept of 'clean hands'" because "bankruptcy relief is equitable").

Courts have not hesitated to find a lack of good faith where the facts demonstrate that a plan was inappropriate. *See* Ins. Br. at 65-67.  In *American Capital*, for example, the Third Circuit held that a plan was "patently unconfirmable" for lack of good faith. *See* 688 F.3d at 159-61, 164.  The Court noted, among other things, that even if the plan preserved the debtor's contractual duty to "cooperate in its defense," the debtor was, as here, "incentivized to sabotage its own defense"; the plan "severely limit[ed] or eliminat[ed] [i]nsurers' ability to take discovery, submit evidence, contest causation, or appeal a decision"; and the trust would not be funded by ongoing debtor contributions. *Id.* at 149, 158-61.

Moreover, the Third Circuit has expressed serious concerns regarding conduct that is disturbingly similar to the issue in this case. *See In re Global Indus. Techs.*, 645 F.3d 201, 214 (3d Cir. 2011) ("[T]he integrity of the bankruptcy proceeding is called into question by nonfrivolous allegations of collusion between [the debtor] and the asbestos claimants' counsel in negotiating [the plan]."); *see also id.* ("Not to put too fine a point on it, the assertion is that [the debtor] sold out

42

[insurers] by setting up a system in which they would pay for newly ginned-up … claims in exchange for [claimants] casting their votes in favor of the [plan].  It is a profoundly serious charge and not without record support.").  BSA simply ignores these concerns.  *See* BSA Br. at 108-109.

The plan proponents' argument in response is that each of these cases presented different facts.  *See*, *e.g.*, BSA Br. at 99 n.26, 108-112; Claimant Br. at 26-30, 32-33, 52-54.  That is of course true, but the underlying principles remain:  a debtor does not act in good faith where, for example, it chooses its plan because of the dominance and self-dealing by certain of its creditors (*ACandS*, 311 B.R. at 43), where there is a concerning conflict of interest (*Coram*, 271 B.R. at 232-40), or where the plan will be used for a tactical litigation advantage (*Integrated Telecom Express*, 384 F.3d at 120; *see*, *e.g.*, *American Capital Equip.*, 688 F.3d at 158, 160 n.8 (citing *ACandS* and *Coram*)).  The plan proponents cite *no case* in which a court has ever confirmed a plan that is analogous to the one at issue here.

### 2. The Plan Would Encourage Further Abuse of the Bankruptcy Process.

The plan is particularly inappropriate because it will neither achieve "fundamental fairness and justice" nor "discourag[e] debtor misconduct." *American Capital Equip.*, 688 F.3d at 157; *see SGL Carbon*, 200 F.3d at 161 (explaining that the "borderline between fulfillment and perversion" of bankruptcy objectives is "patrolled by courts of equity, armed with the doctrine of good faith").

The lack of good faith in this case began with misconduct by plaintiffs' attorneys not simply to resolve BSA's prepetition liability, but to gin up tens of thousands of meritless claims to *increase* BSA's liability, because doing so would increase fees and create leverage for the claimants' attorneys and BSA to exact inflated settlements out of the insurers. This leverage permitted them to control the bankruptcy and unfairly threaten to strongarm plan objectors into settling before they could press their objections at trial. BSA's decision to compensate these efforts to increase its own alleged liability, rather than put a stop to it, because BSA would exit bankruptcy and continue its mission, does not exhibit fundamental fairness in dealing with creditors and is not consistent with how the Bankruptcy Code ought to operate. *See*, *e.g.*,

44

*Weinstein Co.*, 997 F.3d at 505 (Bankruptcy Code contemplates "fairness to the nonbankrupt counterparty").

The plan proponents do not—because they cannot—dispute that such circumstances follow a playbook that plaintiffs' lawyers (with tacit approval by debtors) have been seeking to implement for years, and will continue to attempt in other mass tort bankruptcies unless halted by the courts. *See* Ins. Br. at 23-24. (*See, e.g.*, A. 12297 ("This idea of 'binding TDPs' or 'litigated TDPs' is a holy grail that the mass tort lawyers have been chasing for years"), A. 4202-4203 (Amala) (strategy was to get binding TDPs and then leverage precedent in other bankruptcies).)

Instead, they argue that "[m]ass tort settlements establishing an adjudication procedure, or trust distribution procedures, instead of litigation, are commonplace" (BSA Br. at 104) and resolution of claims through TDPs is a "hallmark of mass tort cases" (Claimant Br. at 47-48). But they do not and cannot cite any case in which a debtor has worked in collaboration with claimants' counsel to dramatically increase the debtor's liability and then abrogate contractual protections of the insurers as the plan proponents have sought to do here.

45

Although their quest for the "Holy Grail" was derailed when the bankruptcy court struck their proposed insurance findings, making it clear that insurers will not be *expressly* "bound by future awards" (BSA Br. at 66), the plan proponents persist.  They have never squarely stated that the plan preserves all of the insurers' contractual rights and BSA's obligations.  *See*, *e.g.*, *In re ACandS*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (lack of good faith where plan was proposed due to the dominance and self-dealing of certain creditors).  If the plan actually leaves the Certain Insurers' contractual rights and BSA's obligations intact, they (and this Court) should say so and put it clearly and expressly in their plan.  *See*, *e.g.*, *Exide*, 2021 WL 3145612, at *11 (plan must be proposed with "honesty and good intentions").  Instead, they hope that by remaining silent on this issue they will gain a tactical advantage in coverage litigation that the bankruptcy court refused to provide them.

As anticipated, the plan creates a "hydraulic pressure" to force insurers to fund payment for abuse claims irrespective of the insurers' actual coverage liability.  *Newton*, 259 F.3d at 164; see also *infra* Pt. II.B.  BSA's principal response is that the real-world harms discussed in cases

like *Newton* are "irrelevant" because "*Newton* is not a bankruptcy case or a mass tort case." *See* BSA Br. at 65-67.

But confirmation of this plan creates exactly the sort of tangible harms that coercive class certification does. It creates unfair pressure on insurers to settle notwithstanding any ability to assert coverage defenses later. Courts consistently caution that such a "risk, however small, of potentially ruinous liability" can create inordinate settlement pressure, irrespective of actual liability. *Newton*, 259 F.3d at 164, 167 n.8; *see*, *e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) ("Because of the uncertainty of the governing rules, entities ... may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (explaining that "the threat of discovery expense" can "push cost-conscious defendants to settle even anemic cases").

In any event, the Third Circuit has in fact recognized in a bankruptcy mass tort case that an explosion in claims, like the ones at issue here, creates a "tangible disadvantage to [insurers] which, *despite*

*having their coverage defenses available*, will be faced with coverage obligations … in a world that recognizes the existence" of thousands more claims. *Global Indus. Techs.*, 645 F.3d at 213-14 (emphasis added).   The Court recognized that the costs and uncertainty borne by insurers can be "enormous, even if [insurers] never pay a single dollar of indemnity." *Id.*

The tens of thousands of new claims worked up in this bankruptcy—*all* of which BSA seeks to compensate in stark departure from its prepetition practices—are the bludgeon wielded by BSA to cow its insurers on others' behalf.

That leverage has been wielded again and again: the claimants' attorneys used it to force BSA to abandon its insurers and align with them in their preferred plan.  *See* Ins. Br. at 22, 60, 64-65.  BSA then proposed insurance findings that would bind *non-settling insurers* (but not settling insurers) to inflated TDP claim awards in coverage litigation. *See* Ins. Br. at 37-45.  And after some insurer settlements, it proposed an independent review process that targeted excess insurers to leverage still more funds into the trust.  *See* Ins. Br. at 49-50.  This is precisely the sort of case in which piling thousands upon thousands of claims can "place

48

acute and unwarranted pressure on defendants to settle" rather than address them on their merits. *Newton*, 259 F.3d at 167 n.8.

The plan proponents provide no evidence to the contrary. Instead, they contend that these concerns are "facially absurd" (BSA Br. at 66-67), but omit that they have embraced such real-world effects as a reason for plan confirmation. (*See* A. 12955 ("[W]hile the Debtors may believe that they have meritorious defenses to the Abuse Claims, the sheer volume of them is more than they can handle simultaneously, and the loss of even a few high-profile cases would negatively impact the Debtors' operations and programming. Defending against thousands of lawsuits simultaneously would be inherently complicated and prohibitively expensive.").) Even if the plan proponents persuaded a handful of BSA's insurers to settle (and, in one instance, *resettle*, see *supra* at 16), and are dismayed that the Certain Insurers "have proven themselves to be utterly immune" to settlement (BSA Br. at 66-67) this simply proves the point: the plan is premised on using the prospect of massive potential liability to prejudice the Certain Insurers.

Such a plan is unfair not only to the Certain Insurers, but also to the courts. Good faith "has long been the policing mechanism of

49

bankruptcy courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy philosophy and policy and for no other purpose." *Furness v. Lilienfield*, 35 B.R. 1006, 1011 (D. Md. 1983) (quotation marks omitted). And it "protects the jurisdictional integrity of the bankruptcy courts which sit in equity and therefore demand that a party seeking relief enter with clean hands." *Id.*

Furthermore, as experts on both sides testified, misuse of the bankruptcy process harms individuals who have valid claims in the bankruptcy—here, the bona fide claimants—by potentially diluting the claim pool and detracting from the Settlement Trustee's prompt resolution of legitimate claims of sexual abuse. *See* Ins. Br. at 22, 74; *see also In re ACandS*, 311 B.R. at 43 (no "fundamental fairness" in dealing with creditors when the "influence and cunning of lawyers" benefited some creditors at the expense of others). The fact that thousands of claimants voted for a plan (*see* BSA Br. at 86-87) that protects invalid or inflated claims hardly mitigates the harm to those filing bona fide abuse claims and, indeed, will only encourage further misuse of the bankruptcy process in future mass-tort bankruptcies.

50

### 3. BSA's Other Attempts to Justify the Plan's Lack of Good Faith Are Meritless.

BSA suggests that the plan nonetheless should be confirmed because it was proposed to "compensate survivors" and to continue its "charitable" mission. *See* BSA Br. at 41-43, 66-67. But the plan cannot be confirmed because it *also* embraces the demands of claimant representatives who seek to misuse the bankruptcy as a means of inflating claims against BSA and gaining an advantage in coverage litigation. *See American Capital Equip.*, 688 F.3d at 160 n.8 (rejecting the "*non sequitur*" that the plan "maximiz[es] value to creditors" because "the Plan could fulfill one specific purpose of the Code and yet be inconsistent with other overarching principles, or with the requirement that objectives and purposes of the Code must be fairly achieved.").

BSA also emphasizes that it "carefully reviewed and approved" the plan, that it engaged in "tireless" efforts in numerous "meetings" (BSA Br. at 44-49), and that the case is "complicated" (BSA Br. at 44). But the Certain Insurers, too, have carefully reviewed the plan and undertaken repeated efforts to ensure its fundamental fairness. Their fundamental contractual rights are at stake, and this case will set an important precedent in mass tort bankruptcies for years to come. BSA's efforts to

51

obtain a plan with the support of numerous stakeholders, but not the Certain Insurers, does not mean it was proposed in good faith.

Finally, a court should not confirm a plan merely because it is concerned the debtor would not otherwise be able to emerge from bankruptcy "as it currently exists." BSA Br. at 50. The Bankruptcy Code does not guarantee chapter 11 relief—especially not in the debtor's most preferred form. (*See, e.g.*, A. 12923 ("Without such protections, Survivors may very well be better off in a Chapter 7 liquidation.").) Because Chapter 11 is a powerful tool for restructuring assets, it imposes strict requirements for confirmation and, as the claimants concede, "the ends do not justify the means." Claimant Br. at 52.

BSA could have sought to disallow fraudulent or meritless claims before proposing its plan, or proposed an insurance neutral plan. It did neither, and instead seeks to persuade this Court that its plan can rewrite its insurance contracts to leave payment for 82,000 claims at the insurers' doorstep. *See* BSA Br. at 87. BSA did not have to follow this path. Nevertheless, if this Court reverses, the Certain Insurers are

willing—as they have been all along—to work with BSA to formulate a

plan that complies with the good faith requirement.[4]

## II.   THE PLAN ABROGATES THE CERTAIN INSURERS' CONTRACTUAL RIGHTS.

The Court also should reverse because the plan impermissibly

abrogates the Certain Insurers' contracts, and nothing in the hundreds

of pages of briefing by plan proponents shows otherwise.  *See* 11 U.S.C.

§§ 1129(a)(1), (3).  Rather, the plan proponents barely address the issue,

make inconsistent and vague statements about what their plan actually

does, and premise their arguments solely on an erroneous legal theory

that they never pressed below.  Even setting aside the plan's lack of good

faith, this is an independent basis for reversal.

As explained by Wharton Professor Scott Harrington, an expert in

insurance and economics (A. 3471-3474, 3482), in unrebutted expert

testimony, the operative insurance contracts contain fundamental rights

far more than simply no action clauses that state "no action lies against

the insurer for breach unless … the claimant, insured and insurer have

---

[4] In addition to the arguments made herein, the Certain Insurers hereby join in the Reply Brief of the Liberty Insurers and the Allianz Insurers, which is being filed concurrently herewith.

agreed in writing to settle a claim" (BSA Br. at 105; *see* Ins. Br. at 16), but including insurers' "right and/or duty to defend the insured," "the right to associate in the defense of the insured," "the right to investigate applicable legal liability," the "right to consent to settlements," and "the anti-assignment clause." (A. 233.)   Moreover, the policies provide that BSA as the insured has the obligation to "assist and cooperate with the insurer … in its defense." (A. 3485 (Harrington).)

## A.   The Plan Cannot Be Confirmed Because It Impermissibly Alters the Certain Insurers' Contracts.

As the Certain Insurers have explained (*see* Ins. Br. at 78-79), it is a bedrock principle of bankruptcy law that the Bankruptcy Code is "not intended to expand the debtor's rights against others." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (quoting H.R. Rep. No. 595 (1978)).  "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy," i.e., under state contract or property law, "appl[y] inside of bankruptcy." *Mission Prod.*, 139 S. Ct. at 1663 (quotation marks omitted); *see id.* ("The estate cannot possess anything more than the debtor itself did outside bankruptcy.").

Thus, courts applying the Bankruptcy Code "do not have the power to rewrite contracts to allow debtors to continue to perform on more

54

favorable terms." *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989). Following bankruptcy, the debtor must have "the same rights and defenses" under a contract as it did before. *In re Combustion Eng'g Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004); *see, e.g.*, *In re Mitchell*, 2012 WL 5988841, at *6 (Bankr. D. Md. Nov. 29, 2012) ("insurance contracts cannot be rewritten by this Court"); *In re 641 Assocs., Ltd.*, 1993 WL 332646, at *8 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contract rights.").

BSA recognized the ramifications of proposing a plan that violates these principles.  (A. 7311; *see* A. 7307 (acknowledging that the plan's "treatment of insurance" gets "to the [heart] of what is happening" here).) That is why, before it reversed course after capping its own liability and aligned itself with the claimants' lawyers, BSA repeatedly insisted upon a plan that accounted for all of the provisions in its insurance contracts and preserved the rights of its insurers and the obligations of BSA.  *See* Ins. Br. at 37-38.  Chapter 11 debtors often include provisions that seek to protect the rights of non-settling insurers to avoid impermissibly

modifying their insurance contracts. *See*, *e.g.*, *In re Blitz U.S.A. Inc.*, 2013 WL 6825607, at § 6.7 (Bankr. D. Del. Nov. 12, 2013).

After teaming up with the claimants, however, BSA gambled that the plan proponents could convince the courts to accept their novel legal argument that any abrogation of contracts was consistent with "applicable law." *See*, *e.g.*, BSA Br. at 75-76; *see also, e.g.*, FCR Br. at 54 ("The Plan provides that potential Insurer defenses predicated upon a failure to satisfy conditions precedent or obligations under such Abuse Insurance Policies shall be preserved and determined *under applicable law*." (emphasis added)).

The plan proponents pay lip service to the bankruptcy court's erroneous holding that "insurance neutrality" is merely a standing concept, but make no actual attempt to renew here their argument from the bankruptcy court that they can abrogate the Certain Insurers' contracts on that ground. *See* BSA Br. at 105-07; FCR Br. at 50; Claimant Br. at 50-51. (*See* A. 256-257.) That is because, as they now recognize, it is fundamental that Chapter 11 bankruptcies are not an opportunity to rewrite a debtor's contracts, even insurance contracts. *See*, *e.g.*, FCR Br. at 56-57; *see also Mission Prod.*, 139 S. Ct. at 1663 (debtor's contracts do

not expand or shrink by "happenstance of bankruptcy").[5]   Indeed, construing the Bankruptcy Code to permit the unilateral impairment of contracts without consent would raise serious constitutional concerns. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 602 (1935) (bankruptcy statute subject to takings protections).

As a result, they are left with nothing but the defective plan language they negotiated and a legally erroneous argument that they never pressed in the bankruptcy court under Bankruptcy Code § 363. Unsurprisingly, these are not sufficient for BSA to meet its burden to demonstrate that the plan does not impermissibly abrogate the Certain Insurers' contracts.  *See, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018).

---

[5] Cases the plan proponents cite recognize that a plan cannot impermissibly modify contracts.  *See*, *e.g.*, *Combustion Eng'g*, 391 F.3d at 209 ("[R]ecognizing the Plan should not modify the contractual rights of insurers, the court added a provision to make clear the Plan did not alter the contractual rights of insurers under any insurance policy …."); *In re Thorpe Insulation Co.*, 677 F.3d 869, 886 (9th Cir. 2012) ("care must be taken to ensure that, in fact, the insurer's rights are completely unaffected." (quotation marks omitted)).  The now-vacated decision in *In re Purdue Pharma L.P.*, 633 B.R. 63 (Bankr. S.D.N.Y. 2021), never held that bankruptcy courts have freewheeling authority to rewrite contracts.

1.    **The Plan Proponents Incorrectly Contend that the Plan Language Sufficiently Preserves Insurers' Contractual Rights.**

The plan proponents suggest that the Certain Insurers' "rights under the contracts" are "fully preserved."  BSA Br. at 118 n.28; *see*, *e.g.*, FCR Br. at 49; Claimant Br. at 51.  But the plan says nothing about these fundamental rights, such as the right to control or participate in defense, the right to investigate legal liability, and the right to consent to settlements.  *See* Ins. Br. at 15-17 (insurers' rights).  Instead, because BSA relented to the claimants' attorneys, the plan now states that preservation of contractual insurance rights and obligations is "subject to the Plan and Confirmation Order" and "applicable law,"[6] thus rendering any such preservation circular and facially illusory.  *See* Ins. Br. at 40-43.  Put simply, BSA never actually says—because it cannot—that the plan it accepted preserves these fundamental rights.

Instead, BSA argues that such rights are not important because the Certain Insurers were supposedly "largely uninvolved" with respect to

---

[6] These provisions also expressly exempted findings made by the bankruptcy court because BSA proposed prejudicial insurance findings that were intended to bind insurers to the Settlement Trustee's claim determinations in coverage litigation.  See *supra* Pt. I.

58

BSA's defense and settlement of abuse claims prior to the bankruptcy. *See* BSA Br. at 117-18 & n.28.  But whether or to what extent that was true, BSA never disputes that insurers *have* such rights under its contracts, and that some insurers did in fact exercise them in appropriate circumstances prior to the bankruptcy filing.  (*See, e.g.*, A. 1201-1207, 1276-1277, 5941, 5943, 5948-5949 (Griggs).)  Further, the degree to which insurers' rights were previously exercised—when BSA was mounting a zealous defense—is not probative, because BSA has now aligned itself with claimants' attorneys and attempted to inflate its own liability by proposing a plan that targets the Certain Insurers as a means of obtaining releases for all 82,000 channeled abuse claims.  Indeed, it is because BSA abandoned those insurers that these rights are particularly critical now.

Professor Harrington explained that these critical contractual rights reduce the "moral hazard" of an insured compromising its own defense by aligning its interests with the insurer and controlling the cost of such claims.  (A. 3484.)  These provisions make it possible for insurers to "offer coverage" for judgments or settlements in the tort system

because they permit insurers to work with their insured to effect a proper defense and settlement of claims.  (A. 233; *see* A. 3484-3485.)

BSA adhered to this contractual arrangement prepetition by aligning itself with its insurers and mounting a zealous defense to approximately 350 abuse claims, raising all applicable defenses and appropriate procedural safeguards in the tort system, communicating with insurers, providing information, permitting them to select counsel, and obtaining consent to settle.  *See* Ins. Br. at 14-15, 17 ("The purpose was 'to evaluate the credibility and value of a claim' and position the case 'towards a *more favorable settlement, if possible.*'" (emphasis added).)

Now, however, the plan aligns BSA with *the claimants' lawyers*, assigning its insurance rights under the contracts to the trust but providing for an alternative dispute resolution system in which neither the Settlement Trustee nor the insurers can mount a zealous defense, and there is no provision in the plan for insurers to consent to a settlement.  This creates an "inherent potential" to benefit claimants' attorneys and certain claimants through inflated settlements at the insurers' expense.  (A. 3483-3487, 3507, 3518-3519 (Harrington).)

The plan thus upends the economic bargain and creates massive risks for insurers that was never contemplated by BSA's insurance policies.  (*See*, *e.g.*, A. 3529 (Harrington) (the proposed plan will have already "eviscerate[d]" these rights), A. 3477, 3488-3489 (Harrington) (insurers' contracts anticipate claims resolved in "the tort system").) While the bankruptcy court did not accept Professor Harrington's opinions regarding the "'difficulty' an insurance company may face in future coverage litigation" as a result of the prejudicial findings proposed by BSA, the court "accept[ed]" his *unrebutted* testimony that insurance policies contain multiple provisions "that factor into the economic pricing of policies" yet are not accounted for in the current plan.  (A. 237.)  That testimony about these rights and their value to insurers is undisputed, and BSA's speculation that its abrogation of rights is not important is simply contrary to the record and its own practices.

### 2. The Plan Proponents Incorrectly Contend that the Plan Preserves BSA's Contractual Obligations.

In any event, the plan *further* impermissibly abrogates the Certain Insurers' contracts because it purports to assign BSA rights under its policies without concomitant obligations, such as BSA's obligation to

61

"cooperate with the insurer in the investigation and defense of the claim." (A. 233; *see* A. 3485 (Harrington) (This is "an important clause.").)  *See* Ins. Br. at 16-17, 32-33, 62, 84-85 (The plan "assigns insurance rights without any corresponding obligations, such as BSA's obligation to allow insurers to work with BSA to minimize its liability for abuse claims, whether on statute of limitations grounds or any other ground arising from the many defects in the plan.").  While BSA asserts that insurance policy interests are routinely assigned by debtors, it has not and cannot identify a single case in which policy rights have ever been assigned without their concomitant obligations.  BSA Br. at 115-121.

BSA now claims that the plan does in fact "preserve the policy obligations as they existed prepetition," but does so silently.  BSA Br. at 35; *see* BSA Br. at 115-16, 118 (there is "no requirement" for a bankruptcy plan to "specifically provide" for contractual obligations set forth in the debtor's insurance policies).  But neither BSA nor the claimants actually state that BSA and the successor Settlement Trust continue to be *bound* by such obligations, such as the duty to cooperate with insurers in defending against abuse claims.  And nothing in the plan that they negotiated provides for such obligations to be delegated to the trust.

To the contrary, the plan expressly assigns only BSA's *rights* under BSA's insurance policies, without mentioning its obligations, stating that it does not assign the complete terms of BSA's insurance policies.  (A. 384 (assignment includes all "rights, claims, benefits, or Causes of Action of the Debtors … under or with respect to the Abuse Insurance Policies *(but not the policies themselves)*") (emphasis added).)[7]

It is therefore irrelevant whether, as BSA claims, the TDPs do not "modify" the "terms of any insurance policy," or the "obligations under an Insurance Policy assigned to" the trust—BSA's plan assigns insurance rights, but it does not actually assign the policies or the obligations to the trust.  BSA Br. at 115 (quoting TDPs, Art. V.C).  And even if it did, the plan provides only that the TDPs shall not modify terms "to the extent such rights and obligations are otherwise *available under applicable law* and *subject to the Plan and Confirmation Order*," negating any such protections in the plan.  (A. 511 (emphasis added).)

---

[7] *See, e.g.*, BSA Br. at 116 (quoting TDPs, Art. V.C ("The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received … all … rights *or* obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code." (emphasis added))).

Prior to confirmation, the claimants told the bankruptcy court that BSA was trying to "assign the rights *and* assign the duties or the burdens" under the insurance policies. (A. 5925.) Now, however, they make the extraordinary argument for the first time on appeal that they are not required "to transfer obligations" under the insurance policies because they are transferring insurance rights in contracts pursuant to Bankruptcy Code § 363, which governs non-executory contracts, rather than pursuant to Bankruptcy Code § 365, which governs executory contracts. *See* FCR Br. at 50, 55-59; *see also* BSA Br. at 115.

In the bankruptcy court, the plan proponents never contended that they can transfer rights without obligations because they are transferring rights under non-settling insurers' policies pursuant to § 363.[8] (A. 259.) Nor did the plan proponents argue below that the insurance policy rights can somehow be severed from the obligations under those policies. These arguments have accordingly been waived, and they may not assert them in this appeal. *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 209 (3d Cir. 2010) (appellant "did

---

[8] *See, e.g.*, Bankr. D.I. 9690 at 2 ("The Debtors and the Local Councils are purporting to transfer certain rights under their policies consistent with section 1123(a) of the Bankruptcy Code ….").

not raise this claim in the Bankruptcy Court, and we will not consider new claims for the first time on appeal.").

In any event, as the Certain Insurers have explained (*see* Ins. Br. 79-81), the "*cum onere* principle"—requiring contracts to be taken in full, rather than accepting benefits but not the burdens (*see*, *e.g.*, Bankr. D.I. 9690 at 2)—applies "to the transfer of rights and obligations … pursuant to § 363 of the Bankruptcy Code" just as it does to transfers of rights and obligations pursuant to § 365.  *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009); *see In re Weinstein Co. Holdings, LLC*, No. 18-50924, Dkt. 44 at 137:4-11 (Bankr. D. Del. 2020) ("[T]he concept of a sale free and clear of all liens, claims and interests [under § 363] does not mean that you can sell the benefits of a contract, but not its obligations."), *aff'd*, 997 F.3d 497, 505 ("Under the terms of the sale, the buyer must typically fulfill obligations under the contract it bought after the sale closes, just as it would with any other asset or liability.").[9]

---

[9] *See also*, *e.g.*, *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) ("Because § 365 applies only to executory contracts, a debtor-in-possession does not have the option of rejecting or assuming non-executory contracts and remains bound by the debtor's obligations under those contracts after the bankruptcy's filing."); *In re 47 Hops LLC*, 2020 WL 2485808, at *4 (Bankr. E.D. Wash. May 13, 2020) ("Although the

[Footnote continued on next page]

The *cum onere* principle is yet another reflection of the principle that "[w]hatever limitation[s] on the debtor's property [apply] outside of bankruptcy appl[y] inside of bankruptcy" (*Mission Prod.*, 139 S. Ct. at 1663), and that bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms" (*Crippin*, 877 F.2d at 598).   (A. 259 (property rights can be transferred "consistent with applicable state law").)  *See, e.g.*, *Burns v. United States*, 501 U.S. 129, 136 (1991), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005) ("An inference drawn from Congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.").

In the context of assignments, Congress rightly understood that contract rights of a debtor under state law can generally be assigned, and duties generally can be delegated.  *See, e.g.*, 29 Williston on Contracts §§ 74:10, 74:28 (Westlaw 4th ed. 2022).  But there are limitations: an assignment, for example, cannot "materially impair [an insurer's] chance

---

bankruptcy law regarding executory contracts is broad, the law does not rewrite contracts wholesale.  For example, the estate representative must address any given contract in its entirety and may not forage among favorable or unfavorable components.").

of obtaining return performance, or materially reduce its value to [the insurer]" (Restatement (Second) of Contracts § 317(2) (Westlaw 2022)), as transferring insurance rights without obligations would do.

The plan proponents' sole purported authority for their erroneous construction is *American Home Mortgage*, a case the Certain Insurers raised below and the plan proponents ignored.  (A. 249-250.)  This case expressly recognized that "the *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365."  402 B.R. at 98.

As the court explained, "[u]nder the common law of contracts, there is a distinction between the assignment of rights under a contract, the delegation of duties under a contract, and the transfer of rights and obligations under a contract."  *Id.* at 92-93.  Thus, "a debtor may assign, delegate, or transfer rights and/or obligations under Section 363 of the Bankruptcy Code" depending on which applies (*id.*), but regardless, any such "rights and obligations under a non-executory contract" must "be sold *cum onere*" (*id.* at 98).  After holding that parts of a contract were severable into two agreements, the court held that the debtors' "rights

67

*and* obligations under [one] agreement may be transferred, *cum onere*." *Id.* at 100.  BSA's plan does the opposite of what the case law requires.

### B. The Plan Proponents' Argument that this Contractual Impairment Should Be Overlooked Because Insurers Can "Assert" Defenses in Coverage Litigation Is Unavailing.

Like the bankruptcy court, the plan proponents suggest that the "real question" is not whether the assignment of BSA's insurance rights abrogates contractual rights and obligations, but the extent to which, as a consequence, the insurers will actually be harmed because they can "assert a defense or claim" in coverage litigation.[10]   FCR Br. at 49-50. (A. 258-260.)  That argument continues to be meritless.

Questions such as whether the bankruptcy plan modifies contractual rights (see *supra* Pt. II.A.1) or impermissibly abrogates contractual obligations (see *supra* Pt. II.A.2) are not esoteric "insurance coverage issue[s]" (BSA Br. at 119)—they are fundamental questions of

---

[10] *See*, *e.g.*, BSA Br. at 119 ("If there is future award [sic] that reaches an Insurer, and they dispute their obligation to pay that award, then they will raise their coverage defense, and that defense will be adjudicated on the then-existing facts."); BSA Br. at 118-19 ("If the Insurers believe that there is some future breach of their insurance contracts, then they retain the right to raise that defense to coverage."); *see also* BSA Br. at 62-65.

68

bankruptcy law that determine whether a bankruptcy plan is confirmable or, instead, impermissibly modifies contracts "by happenstance of bankruptcy." *Mission Prod.*, 139 S. Ct. at 1663.

Resolving such issues, like confirming or rejecting the plan, may *impact* the amount of insurance coverage available to a trust, but that does not make them "coverage" issues to be adjudicated later. *See*, *e.g.*, BSA Br. at 119-21 (explaining that coverage courts consider "whether an insurer must pay a specific settlement entered into by the insured" (quotation marks omitted)). Whether or not insurers must indemnify the trust for certain claims pursuant to their policies is an entirely separate question from what the plan purports to do and whether it accordingly satisfies the requirements of applicable law. The bankruptcy court was required to resolve these questions but instead deferred them to an insurance coverage dispute. The plan proponents ask this Court to do the same, but that is contrary to bankruptcy law. *See*, *e.g.*, *Federal-Mogul*, 684 F.3d at 382 (holding in a *bankruptcy* appeal that the Bankruptcy Code preempted anti-assignment rights in certain cases).

It is particularly off the mark for the plan proponents to argue that these issues can simply be deferred to a later court for resolution (BSA

69

Br. at 119), because it was the *plan proponents* that proposed the prejudicial "insurance" findings in the first place, urging *the bankruptcy court* to find that the insurers are bound by claim awards notwithstanding their contractual rights.

While it would clearly have been improper for the bankruptcy court to prejudge how much insurers are obligated to pay (BSA Br. at 107; A. 237-238), and it correctly has not done so, it is absolutely essential for the bankruptcy court to determine at the confirmation stage whether the debtor has met its burden to show that its proposed plan does not impermissibly abrogate contractual rights and duties—an issue that is ripe for review in this appeal.[11]  By failing to do so, the bankruptcy court committed reversible error.

Contrary to BSA's claims, preserving insurers' ability to "assert" coverage defenses is not remotely equivalent to what the Bankruptcy Code requires: actually preserving all of their rights and BSA's

---

[11]  *See also*, *e.g.*, A. 12350 ("A chapter 11 plan can be confirmed if it satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence."  (citations omitted)); A. 12350 ("The Debtors have satisfied their burden under section 1129."); A. 12946 ("For the Court to confirm the Plan, the Debtors must establish by a preponderance of the evidence that the Plan satisfies each of the requirements of § 1129(a) of the Bankruptcy Code.").

obligations in the contracts.  *See Mission Prod.*, 139 S. Ct. at 1663; *see also*, *e.g.*, *Federal-Mogul*, 684 F.3d at 379; FCR Br. at 49-50, 53-54; Claimant Br. at 51; FCR Br. at 48-52 (erroneously claiming that "the risk undertaken by the Insurers in policies remains the same following the assignment of BSA's insurance rights to the Trust").

The mere ability to *raise* coverage defenses would prove cold comfort if the plan already impermissibly rendered rights and defenses effectively meaningless.  Deferring the preservation of insurer rights for coverage litigation raises serious due process concerns (*Lindsey v. Normet*, 405 U.S. 56, 66 (1972)), because it would open the door for improper contentions (as made in the bankruptcy court) that the Certain Insurers should be bound by the plan nonetheless given their "robust opportunity to object" and contest confirmation.  Claimant Br. at 11, 44.

In any event, the plan would impermissibly impair the Certain Insurers' contracts because it would abrogate critical contractual rights, such as the rights to defend against claims and the right to consent to settlements.  See *supra* Pt. II.A.  By the time of coverage litigation, the proposed plan will have already "eviscerate[d]" such rights (A. 3546), resulting in settlements of 82,000 claims through a system that is worlds

71

apart from the adversarial system contemplated in the parties' contracts.[12]   The trampling of those rights, and resulting inflated potential exposure from thousands of questionable abuse claims, would upend the economic bargain without just compensation.  *See Louisville Joint Stock Land Bank*, 295 U.S. at 589-90, 602.

The bankruptcy court overlooked the most immediate impact of denying these fundamental rights, which is that such a plan would create a "hydraulic pressure … to settle" existing independent of any outcome in coverage litigation.  *See Newton*, 259 F.3d at 164.  As explained above, the Third Circuit has recognized that an explosion in claims creates a "tangible disadvantage to [insurers] which, *despite having their coverage defenses available*, will be faced with coverage obligations … in a world that recognizes the existence" of thousands more claims.  *Global Indus. Techs.*, 645 F.3d at 213-14 (emphasis added).   The Court recognized that

---

[12] *Compare*, *e.g.*, A. 3488-3489 (Harrington) (insurers' contracts "anticipate that these claims will be brought within the court system and that they will be settled within the context of the tort system …."), *with*, *e.g.*, A. 12432-12433  ("If this Plan fails and survivors return to the tort system, the vast majority will not recover anywhere close to the recoveries made available to them under the Plan—if anything at all.").

the costs and uncertainty borne by insurers in such a case can be "enormous, even if [insurers] never pay a single dollar of indemnity." *Id.*

BSA tries to flip the script, claiming that the Certain Insurers somehow have "no right" to prevent it from compensating claimants, so long as insurers can assert coverage defenses. BSA Br. at 66-67. But even if insurers can eventually "assert" coverage defenses, this plan, as confirmed, runs counter to the very premise of their contracts (*see*, *e.g.*, Ins. Br. at 16-17 ("Insurers underwrite a particular entity .... The assignee may not have the same incentives to align with the insurer in defense of tort claims.")) and is therefore not confirmable (*see*, *e.g.*, Ins. Br. at 80-81 (explaining that an assignment may not "materially increase the obligor's [e.g., the insurer's] burden or risk under the contract" or "materially reduce its value to [the insurer]" (quotation marks omitted)).

To be sure, there is no "*unassailable* right to require [a] policyholder to resolve claims exclusively in the tort system." Claimant Br. at 47-48 (emphasis added); *see*, *e.g.*, FCR Br. at 48-49 & n.52; Claimant Br. at 11 n.20. That is because the Third Circuit has held in asbestos cases that Congress intended for section 524(g) of the Bankruptcy Code to permit the channeling of claims to a personal injury trust notwithstanding state

law governing anti-assignment clauses in insurance policies. *Federal-Mogul*, 684 F.3d at 357; *see*, *e.g.*, BSA Br. at 25 n.16; FCR Br. at 58.

But as the plan proponents recognize, the holding in that case was narrow.  It did not examine whether rights under insurance policies assigned to such a trust could be transferred without the concomitant burdens, which no law permits. *See*, *e.g.*, A. 257-258 (Third Circuit did not even "have before it the argument made here: whether the rights can be transferred without the correlative obligations.").  And the Court in *Federal-Mogul* made clear that it was distinguishing the scenario that is now presented here: where a broad assignment of insurance rights without obligations or protections for insurers materially increases the risk that insurers bargained for in their contracts. *See Federal-Mogul*, 684 F.3d at 379 & n.37; *see also Global Indus.*, 645 F.3d at 213-14 (explosion in claims materially altered insurers' risk).

Despite BSA's claims, the Certain Insurers have never contended that their contracts require "scorched earth litigation" (BSA Br. at 104), prevent BSA from "settl[ing]" (BSA Br. at 67, 104, 119), or make coverage turn on "bankruptcy" (FCR Br. at 49).  But, as explained above, the Certain Insurers' rights extend far beyond the right to "refuse to pay

74

under their policies to the extent they could establish a coverage defense."
BSA Br. at 105.  The plan cannot abrogate those rights and alter the
parties' economic and contractual bargain.

The Court should reverse and remand for BSA to propose a good-
faith plan that preserves all rights and obligations under BSA's
prepetition insurance contracts.  Such a result would not prevent BSA
from exiting bankruptcy, continuing its mission, and compensating bona
fide survivors of sexual abuse—it would simply ensure that BSA's
Chapter 11 reorganization is consistent with the Bankruptcy Code and
its commitments to insurers under prepetition contracts.

## CONCLUSION

The Court should reverse.

Dated:     Wilmington, Delaware
           December 21, 2022

                                            Respectfully Submitted,

                                   By:  /s/ Deirdre M. Richards
Theodore J. Boutrous Jr. (*pro hac vice*)    Deirdre M. Richards
Richard J. Doren (*pro hac vice*)            (DE Bar No. 4191)
Blaine H. Evanson (*pro hac vice*)           FINEMAN KREKSTEIN
GIBSON, DUNN & CRUTCHER LLP                  & HARRIS PC
333 South Grand Avenue                       1300 N. King Street
Los Angeles, California 90071                Wilmington, DE 19801
tboutrous@gibsondunn.com                     Telephone: (302) 538-8331
rdoren@gibsondunn.com                        Facsimile: (302) 394-9228
bevanson@gibsondunn.com                      drichards@finemanlawfirm.com


Michael A. Rosenthal (*pro hac vice*)        Susan N.K. Gummow
Mitchell A. Karlan (*pro hac vice*)          (*pro hac vice*)
James Hallowell (*pro hac vice*)             FORAN GLENNON
Keith R. Martorana (*pro hac vice*)          PALANDECH PONZI &
Seth M. Rokosky (*pro hac vice*)             RUDLOFF P.C.
GIBSON, DUNN & CRUTCHER LLP                  222 N. LaSalle St., Suite 1400
200 Park Avenue                              Chicago, Illinois 60601
New York, New York 10166                     sgummow@fgppr.com
mrosenthal@gibsondunn.com
mkarlan@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondun.com
srokosky@gibsondunn.com


*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa.,*
*Lexington Insurance Company, Landmark Insurance Company, and the*
*Insurance Company of the State of Pennsylvania*

76

<u>/s/ David M. Fournier</u>
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Margaret H. Warner (*pro hac vice*)
Ryan S. Smethurst (*pro hac vice*)
Alex M. Spisak (*pro hac vice*)

<u>/s/ David M. Fournier</u>
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

Harris B. Winsberg (*pro hac vice*)
Matthew G. Roberts (*pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

Todd C. Jacobs (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
Paul J. Esker (*pro hac vice*)
BRADLEY RILEY JACOBS PC
500 West Madison Street

77

McDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Counsel for Allianz Global Risks US Insurance Company*

Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Counsel for National Surety Corporation and Interstate Fire & Casualty Company*

/s/ Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

Ronald P. Schiller (*pro hac vice*)
Matthew A. Hamermesh (*pro hac vice*)
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
T: (215) 568-6200
F: (215) 568-0300
E: rschiller@hangley.com
mhamermesh@hangley.com

/s/ Paul Logan
Paul Logan (No. 3339)
POST & SCHELL, P.C.
300 Delaware Avenue, Suite 1380
Wilmington, DE 19801
Telephone:  (302) 251-8856
Email:  plogan@postschell.com

John C. Sullivan (*pro hac vice*)
Kathleen K. Kerns (*pro hac vice*)
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Telephone:  (215) 587-1000
jsullivan@postschell.com
kkerns@postschell.com

-and-

78

*Counsel for Arch Insurance Company*

George R. Calhoun (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue,
N.W. Suite 650
Washington, DC  20006
Telephone:  (202) 840-8758
george@ifrahlaw.com

*Counsel for Argonaut Insurance Company and Colony Insurance Company*

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

-and-

Kevin Coughlin (*pro hac vice*)
Lorraine Armenti (*pro hac vice*)
Michael Hrinewski (*pro hac vice*)
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
Facsimile:  973-267-6442
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

/s/ Maria Aprile Sawczuk
Maria Aprile Sawczuk (DE #3320)
GOLDSTEIN & MCCLINTOCK LLLP
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally (*pro hac vice*)
Emily Stone (*pro hac vice*)
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

-and-

Britton C. Lewis
John M. Flynn
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
Facsimile:  (336) 478-1145
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

/s/ Brian A. Sullivan
Brian A. Sullivan (No. 2098)
WERB & SULLIVAN
LEGAL ARTS BUILDING
1225 N. King Street
Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-1100
Cell: (302) 757-9932
Facsimile: (302) 652-1111
Email:
bsullivan@werbsullivan.com

John E.W. Baay II (*pro hac vice*)
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139
Tel.: 504-561-0400
Fax: 504-561-1011

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone:  312-282-5282
dchristian@dca.law

*Counsel for The Continental
Insurance Company and
Columbia Casualty Company*

/s/ Kathleen M. Miller
Kathleen M. Miller (DE Bar No.
2898)
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

-and-

Mary E. Borja (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
Ashley L. Criss (*pro hac vice*)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law

Email: jbaay@glllaw.com

-and-

William H. White Jr (*pro hac vice*)
KIERNAN TREBACH LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
Tel.: 202-712-7000
Fax: 202-712-7100
Email:
wwhite@kiernantrebach.com

*Counsel for Gemini Insurance Company*

/s/ Bruce W. McCullough
Bruce W. McCullough (No. 3112)
BODELL BOVÉ, LLC
1225 N. King Street, Suite 1000
Wilmington, Delaware 19801-3250
Telephone: (302) 655-6749
bmccullough@bodellbove.com

-and-

Bruce D. Celebrezze (*pro hac vice*)
CLYDE & CO US LLP
150 California Street | 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
bruce.celebrezze@clydeco.us

gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star Indemnity Company*

/s/ Kathleen M. Miller
Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN
& JENKINS LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
kmiller@skjlaw.com

and

Lloyd A. Gura (*pro hac vice*)
Pamela J. Minetto (*pro hac vice*)
MOUND COTTON WOLLAN & GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282

81

Konrad R. Krebs (*pro hac vice*)
CLYDE & CO US LLP
340 Mt. Kemble Avenue | Suite 300
Morristown, NJ 07960
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
konrad.krebs@clydeco.us

-and-

David Christian (*pro hac vice*)
DAVID CHRISTIAN
ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Great American Assurance*
*Company, f/k/a Agricultural*
*Insurance Company; Great*
*American E&S Insurance*
*Company, f/k/a Agricultural*
*Excess and Surplus Insurance*
*Company; and Great American*
*E&S Insurance Company*

lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor*
*Insurance Company, on behalf of*
*itself and as successor in interest*
*to Catlin Specialty Insurance*
*Company*

/s/ R. Karl Hill
R. Karl Hill (DE Bar No. 2747)
SEITZ, VAN OGTROP &
GREEN, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600

/s/ Thaddeus J. Weaver
Thaddeus J. Weaver (DE Bar. No. 2790)
DILWORTH PAXSON LLP
704 N. King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)

khill@svglaw.com

-and-

CHOATE, HALL & STEWART
LLP
Douglas R. Gooding (*pro hac
vice*)
Jonathan D. Marshall (*pro hac
vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO PC
Kim V. Marrkand (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

*Counsel for Liberty Mutual
Insurance Company, The Ohio
Casualty Insurance Company,
Liberty Insurance Underwriters,
Inc. and Liberty Surplus
Insurance Corporation*

(302) 351-8735 (facsimile)
tweaver@dilworthlaw.com

-and-

William E. McGrath, Jr. (*pro hac
vice*)
Dilworth Paxson LLP
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Counsel for Munich Reinsurance
America, Inc., formerly known as
American Re-Insurance Company*

/s/ Stephen M. Miller
Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
MORRIS JAMES LLP
500 Delaware Avenue, Suite
1500
Wilmington, Delaware 19801
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
smiller@morrisjames.com
ckunz@morrisjames.com

-and-

Margaret M. Anderson
(*pro hac vice*)
Ryan T. Schultz
(*pro hac vice*)
Adam A. Hachikian
(*pro hac vice*)
Kenneth M. Thomas
(*pro hac vice*)
FOX SWIBEL LEVIN &
CARROLL LLP
200 W. Madison Street, Suite
3000
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile:  (312) 224-1201
panderson@foxswibel.com
rschultz@foxswibel.com
ahachikian@foxswibel.com
kthomas@foxswibel.com

*Counsel for Old Republic*
*Insurance Company*

/s/ Marla S. Benedek
Marla S. Benedek (No. 6638)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024
Facsimile:  (302) 250-4498
mbenedek@cozen.com

*Counsel for Traders and Pacific*
*Insurance Company, Endurance*
*American Specialty Insurance*
*Company, and Endurance*
*American Insurance Company*

84

/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr. (DE Bar No. 3374)
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE  19803
Telephone: (302) 477-7100
Facsimile: (302) 652-3620
lrizzo@regerlaw.com

*Counsel for Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the word limit set by the Court.  A proportionally spaced typeface was used, as follows:

> Name of typeface:  Century Schoolbook
> Point size:  14
> Line spacing:  Double

The total number of words in the brief, excluding the items set forth in Federal Rule of Bankruptcy Procedure 8015(g), is 15,255.

<u>/s/ Deirdre M. Richards</u>
(DE Bar No. 4191)