**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re:* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC, | Case No. 20-10343 (LLS) |
| Debtors. | (Jointly Administered) |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, Appellants. v. | Case No. 22-cv-01237-RGA (Jointly Consolidated)[1] |
| Boy Scouts of America and Delaware BSA, LLC, | |
| Appellees. | |

<u>**APPELLANT D & V CLAIMANTS' REPLY BRIEF**</u>

GELLERT SCALI BUSENKELL & BROWN LLC
Charles J. Brown, III, Esquire (No. 3368)
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

- and -

DUMAS & VAUGHN, LLC
Dumas & Vaughn, LLC, *pro hac vice*
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com
*Counsel to D & V Claimants*

December 21, 2022

---

[1] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243, 22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252, 22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237.  The D & V Claimants' appeal is docketed at 22-cv-01249.

# TABLE OF CONTENTS

I.    INTRODUCTION                                                              1

II.   ARGUMENT                                                                  3

   A.   **The Bankruptcy Court Lacked Subject Matter Jurisdiction
        Over Direct Third-Party Claims Against Non-Debtors**                    3

   B.   **There is No Statutory Authority for Releases and Injunctions
        of Direct Third-Party Claims Against Non Debtors**                      10

   C.   **Even Assuming Jurisdiction and Statutory Authority for the
        Sake of Argument, the Releases and Injunctions at Issue do
        Not Meet Factors Used in the Third Circuit**                            15

        1. *Hallmarks*                                                          16
        2. *Master Mortgage Factors*                                           19

   D.   **Current Abuse Claimants are Treated Unfairly Compared
        to Future Claimants**                                                   26

III.  CONCLUSION                                                                28

# TABLE OF AUTHORITIES

**Cases**

*Block v. Potter*,
  631 F.2d 233, 241 (3d Cir. 1980) ...................................................................15

*Czyzewski v. Jevic Holdings Corp.*,
  137 S. Ct. 973 (2017).............................................................................. 12, 13

*In re Combustion Engineering, Inc.*,
  391 F.3d 190, 228 (3d Cir. 2005) ......................................................... 4, 7, 9, 14

*In re Continental Airlines*,
  203 F.3d 203, 217 (3d. Cir 2000) ......................................................... 9, 14, 16

*In re Fed.-Mogul Glob. Inc.*,
  402 B.R. 625, 630 (D. Del. 2009).................................................................5, 7

*In re HomeBanc Mortg. Corp.*,
  945 F.3d 801, 810–11 (3d Cir. 2019) ..........................................................15

*In re Nortel Networks, Inc.*,
  669 F.3d 128, 137 (3d Cir. 2011) .................................................................16

*In re Purdue Pharma, L.P.*,
  635 B.R. 26 (S.D.N.Y. 2021) ...................................................................4, 11

*In re W.R. Grace & Co.*,
  591 F.3d 164, 173 (3d Cir. 2009) .................................................................7, 8

*In re Woodbridge Grp. of Cos., LLC*,
  617 B.R. 796, 801 (D. Del. 2020)..................................................................16

*Law v. Siegel*,
  571 U.S. 415, 421 (2014)................................................................. 10, 11, 13

*Master Mortgage Investment Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................................. 16, 19, 21

*Millennium Lab Holdings II, LLC.*,
  945 F.3d 126, 137 (3d Cir. 2019) ......................................................... 3, 13, 14

*Stern v. Marshall*,
  564 U.S. 462, 490 (2011)...........................................................................11

**Statutes**

11 U.S.C. § 105(a) ...................................................................... 10, 11, 14
11 U.S.C. § 1123(a)(5)...................................................................................10
11 U.S.C. § 1123(b)(6)...................................................................................10
28 U.S.C. § 1334...........................................................................................3
28 U.S.C. § 1334(b)(2)(L) ..............................................................................3

28 U.S.C. § 157 ...............................................................................................3
28 U.S.C. §§ 157(b)(2)(L) .........................................................................3, 13
28 U.S.C. § 157(b)(2)(O) ................................................................................3

## Constitutional Provisions

U.S. Const., Art. I ..........................................................................................10
U.S. Const., Art. III, § 1 ................................................................................10

## I.   INTRODUCTION

The Answering Briefs of the Boy Scouts, the Settling Insurers, and other Plan supporters show, once again, that the many supporters of this Plan really want it confirmed.  But the desires of the parties, no matter how fervent, do not create jurisdiction or statutory authority.

D & V Claimants submit this Reply brief in further support of their appeal of the Confirmation Opinion and Confirmation Order approving the Boy Scout's bankruptcy Plan.  Nothing in the Answering Briefs refutes the conclusion that the bankruptcy court lacked jurisdiction over direct claims against non-debtors or that there is no statutory authority for the third-party releases and injunctions in this case.  Likewise, the Answering Briefs do not demonstrate that the third-party releases and injunctions are necessary or fair or otherwise meet the standards discussed in Third Circuit cases.

First, allow some perspective on this case.  While the Settlement Trust proposed by this plan may be "the largest in United States history" in a sexual abuse bankruptcy, there are also more abuse claimants than in any other sexual abuse bankruptcy.  With over 82,000 direct abuse claimants and a settlement trust of approximately $2.46 billion, simple math makes the average per claimant payment only $30,000 (without accounting for any administrative expenses), which is nowhere near what abuse claimants have received in other bankruptcies.

1

In contrast, the simple average of settlement payments the BSA made to abuse survivors in the years before filing for bankruptcy was $649,521.  (ADV 723-725, JTX 1003, historic settlement spreadsheet.[2])

Also, while D & V Claimant and the Lujan Claimants may be the only abuse survivors who actively opposed the plan at trial and on appeal, they are by no means the only abuse survivors who oppose the plan.  Over 8,000 direct abuse claimants voted to reject the plan and opposed confirmation, including claimants represented by plan-supporting attorneys.  (ADV 204, D.I. 9275, Final [Vote] Tabulation Summary.)  That not all 8,000 plus of these plan opponents were able to participate in the trial or on appeal – either because they have no attorneys, their attorneys did not participate, or, in the case of those represented by Coalition attorneys, their attorneys participated in support of the plan – does not mean they support the plan.  On the contrary, these abuse survivors who voted to reject the plan total over 14% of the 56,536 direct abuse claimants who voted and roughly ten percent of all the direct abuse claimants.

/ / /

/ / /

---

[2]  All "ADV" citations are to documents and excerpts of documents identified in D & V Claimants' Designation of Record and listed on their Appendix.  "JTX" refers to the Joint Trial Exhibit number used at the confirmation hearing.

## II.   ARGUMENT

Without rearguing every point in their opening brief, D & V Claimants address the following points and issues:

### A.   The Bankruptcy Court Lacked Subject Matter Jurisdiction Over Direct Third-Party Claims Against Non-Debtors

Bankruptcy courts have "arising under," "arising in, and "related to" jurisdiction under 28 U.S.C. §§ 157 and 1334.  Confirmation of a plan is a "core proceeding" that gives a bankruptcy court "arising under" and "arising in" jurisdiction.  28 U.S.C. §§ 157(b)(2)(L) and 1334(b)(2)(L); see also, *Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) (bankruptcy court "indisputably" had statutory authority to confirm the plan because "core proceedings" include confirmation of plans; citing § 157(b)(2)(L)).  The jurisdiction and statutory authority to confirm a plan involving a debtor's liabilities is not in dispute.  But the direct claims of non-debtor third parties against other non-debtor third parties do not "arise under" or "arise in" a debtor's bankruptcy.  Third party claims are not listed in the Bankruptcy Code's list of core proceedings in section 157(b)(2)(L).  Subsection 157(b)(2)(O) specifically excludes "personal injury tort" claims from the list of core proceedings.  Non-parties simply do not bring claims against each other in other parties' bankruptcy cases in the normal course of things.  The only reason such claims were considered in this confirmation proceeding was because the parties

3

inserted them into the proceeding.  Doing so did not give the bankruptcy court

"arising under" or "arising in" jurisdiction because parties cannot create subject

matter jurisdiction by agreement.  *In re Combustion Engineering, Inc.*, 391 F.3d

190, 228 (3d Cir. 2005).

Instead, when it comes to third-party direct claims against non-debtors, the

court analyzes whether it has "related to" jurisdiction.  The bankruptcy court

recognized this when it stated that "courts and counsel are accustomed to analyzing

third-party releases in the context of related-to jurisdiction and I will do so here."

(A.125-126, D.I. 10136, *Confirmation Opinion*.[3])  In *Combustion Engineering*, the

Third Circuit analyzed, and ultimately rejected, third-party releases in the context

of "related to" jurisdiction.  391 F.3d at 223-24.  The court did not even consider

"arising under" or "arising in" jurisdiction because those concepts do not apply to

non-debtor third-party direct claims that would not be part of the bankruptcy at all

were it not for the agreement of the parties.  *See also*, *In re Purdue Pharma, L.P.*,

635 B.R. 26 (S.D.N.Y. 2021) (district court reversed confirmation of bankruptcy

plan that included nonconsensual third-party releases, rejecting bankruptcy court's

conclusion that it had "related to" jurisdiction over third-party direct claims against

non-debtors.)

---

[3] "A.___" references are to documents identified on the Certain Insurers'
Appendix.

Whether the bankruptcy court had jurisdiction is a question of law reviewed *de novo*. *In re Fed.-Mogul Glob. Inc.*, 402 B.R. 625, 630 (D. Del. 2009). The bankruptcy court did not have "related to" jurisdiction in this case, as D & V Claimants explained in detail in their opening brief. Without rehashing all of these details, D & V Claimants reply to points raised by the BSA and to the plan supporters.

Contrary to the BSA's persistent argument, the "identity of interest" sufficient to create "related to" jurisdiction requires much more than an overlapping operation of the Scouting program. The Third Circuit requires an identity of interest sufficient to create derivative or otherwise automatic liability for the debtor. For example, the liability of the BSA's insurers for covered claims creates an "identity of interest" sufficient to give the court "related to" jurisdiction over such ordinary *derivative* claims against Settling Insurers. There is no such liability for *direct* claims against non-debtors for their own misconduct; when it would require a "another lawsuit" to establish the right to indemnity against the debtor; or when there is no contractual right to indemnity. None of those requirements for automatic liability exist here, or exist sufficiently, to create "related to" jurisdiction.

First, the "identity of interest" the BSA, Local Councils, and Chartered Organizations have because they work together to deliver the "Scouting program"

is not enough to create "related to" jurisdiction.  Unlike a defective product, the

Scouting program itself does not cause harm, so BSA delivering the Scouting

program through the Local Councils and Chartered Organization does not make

them all jointly liable for each other's conduct.  The Scouting program does not

cause sexual abuse.  The negligence of people at each level of the Scouting

organization may cause sexual abuse and each organization may be separately

liable for any particular incident of abuse, depending on the facts of each case.[4]

As a hypothetical example, a Chartered Organization may be liable because

they had notice that a leader was a risk to children and allowed him to remain a

Scoutmaster.  That negligence may lead to abuse in Scouting (which is "Scouting

Abuse" and not a mixed claim as the BSA argues), but does not implicate either a

Local Council or the BSA.  Likewise, a Local Council may get a report that a

leader is a risk to children and fail to remove him from Scouting.  That negligence

---

[4] For examples of separate liability rulings, see cases discussed in D & V
Claimants' opening brief at 33-25 and cases cited by Lujan Claimants in their
opening brief at 14-15.  Contrary to the BSA's arguments, D & V Claimants did
not cite these cases as factual examples but for what the BSA used to argue and
how courts ruled in the BSA's favor.  Every case involving child abuse is factually
different, and the fact record of the cases cited is not clear, so it is impossible to
know, as the BSA argues, whether they involve "Mixed Abuse" or not.  D & V
Claimants cited these cases because they are examples of courts holding that the
BSA had no control over Chartered Organizations and/or Local Councils in the
operation of the Scouting Program.  That was the successfully litigated position of
the BSA prior to this bankruptcy and is contrary to the BSA's arguments now and
the bankruptcy court's findings.

may lead to abuse in Scouting (there is no such thing as a mixed claim against Local Councils, by definition), but does not implicate the BSA or a Chartered Organization.  Even if the Local Council fails to follow BSA policies in dealing with reports of an abusive leader, the Local Council's failure to follow policies does not make the BSA negligent.

To say, as the BSA argues in its brief, that the BSA is "implicated" in every claim made against a Chartered Organization or Local Council makes no sense. That is like saying Toyota is "implicated" every time a driver negligently crashes a Toyota.  Even if the driver negligently failed to follow Toyota's "program" or "policies" in the owner's manual, Toyota is still not implicated.  Nor is the BSA implicated when a Chartered Organization or Local Council is negligent.

Second, the BSA is not automatically required to indemnify Local Councils or Chartered Organizations for sexual abuse claims.  As explained in D & V Claimants' opening brief and conceded by the BSA in their brief, claims against non-debtors are only "related to" a bankruptcy case where an action against the non-debtor would "affect the bankruptcy [] without the intervention of yet another lawsuit."  *In re W.R. Grace & Co.*, 591 F.3d 164, 173 (3d Cir. 2009), *cert. denied*, 562 U.S. 839 (2010) (citing *Fed.-Mogul*, 300 F.3d at 382; *Combustion Engineering*, 391 F.3d at 232); both cited by the BSA at 127.  The BSA did not

7

even argue at trial that Chartered Organizations and Local Councils had an automatic right to indemnity for historic claims.

Which leads to the third point, about contractual indemnification. The only evidence of an automatic right to indemnity in this case applies, if at all, to claims arising after October 2013 (which none of the claims of the D & V Claimants do). That is when the BSA passed a resolution to provide insurance for Scouting activities and indemnity for claims based on following "membership standards." (ADV 721-22, 2013 Resolution.) There is evidence that the annual Chartering Agreements included indemnification language starting in 2014, although the only Chartering Agreements entered into evidence are dated 2020 and 2021, after the bankruptcy petition date. Even if the contractual indemnity rights existed since 2014 – and there is no documentation of them in the record – they would only give the court "related to" jurisdiction over the relatively few claims that arose after those contracts existed. And they may not be sufficient even then to give the court "related to" jurisdiction, as the Third Circuit noted in *W.R. Grace & Co. v. Chakarian* ("we do not mean to imply that contractual indemnity rights are in themselves sufficient to bring a dispute over that indemnity within the ambit of related-to jurisdiction".) 591 F. 3d at 174, n. 9.

Finally, the only documents in the record showing pre-bankruptcy "contracts" for indemnity and possible shared assets are the BSA insurance

8

policies that name Chartered Organizations and Local Councils as additional or named insureds.  In the Third Circuit, rights under shared insurance policies are not enough to create "related to" jurisdiction over direct claims against non-debtors.  *In re Continental Airlines*, 203 F.3d 203, 217 (3d. Cir 2000) ("[E]ven assuming that the [shared insurance] proceeds are property of the estate, this by itself does not justify a permanent injunction of Plaintiff's actions against the insured non-debtor . . . as necessary for the reorganization."); *See also*, *Combustion Engineering*, 391 F3d at 233 (court concluded it was "doubtful whether shared insurance would be sufficient grounds upon which to find related-to jurisdiction over independent claims against [nondebtors]."). Local Councils (with few exceptions) and Chartered Organizations did not pay anything to be included on BSA insurance policies.  They paid nothing to be additional or named insures and are now reaping an enormous benefit in the way of releases for their own culpability, including releases for claims of negligence, fraud, and punitive damages.

There is certainly no "related to" jurisdiction over third-party claims against non-debtors that do not involve shared insurance, yet the releases and injunction in this plan include those claims too.  The releases and injunctions specifically apply to claims involving insurance policies that Chartered Organizations bought for themselves and are their own, separate assets, if a Settling Insurer issued those policies.  The Settling Insurers argue that there is "related to" jurisdiction over

these policies because they wanted "finality" and they would not have agreed to settle without them.  (Settling Ins. Br. at 32.)  Again, really wanting something is not a basis for jurisdiction.  There is no justification for extending the releases and injunctions to property over which Debtors have no ownership interest.

For these reasons and the reasons discussed in more detail in the D & V Claimants' opening brief, the bankruptcy court did not have subject matter jurisdiction over third-party claims against non-debtors.

## B.   There is No Statutory Authority for Releases and Injunctions of Direct Third-Party Claims Against Non-Debtors

The BSA concedes there is no express authority in the Bankruptcy Code for nonconsensual third-party releases for non-debtors and channeling injunctions of claims against non-debtors.  Instead, the BSA argues that the bankruptcy court had "residual authority," as the court found in sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code.  But unlike Article III judges, Article I bankruptcy judges do not have general equitable powers.  *See*, *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code.)  Only Article III judges hold "[t]he judicial Power of the United States."  U.S. Const., Art. III, § 1.  Bankruptcy judges and other "legislative" courts hold their authority by grant from Congress under Article I of the Constitution.  Article I judges' authority is limited to "cases in which the claim at issue derives from a

10

federal regulatory scheme, or in which resolution of the claim by an expert

Government agency is deemed essential to a limited regulatory objective within the

agency's authority." *Stern v. Marshall*, 564 U.S. 462, 490 (2011).

In the case of bankruptcy judges, that authority is tethered to the "federal

regulatory scheme" of the Bankruptcy Code.  The only "residual authority"

available to bankruptcy judges is to exercise some discretion in how they

implement the express authority granted to them under the Code.  They cannot do

something the code does not otherwise authorize in the name of "residual

authority." *See Purdue*, 635 B.R. at 89-96 (after exhaustive analysis of

Bankruptcy Code and relevant case law, court concluded there is no statutory

authority for nonconsensual releases of direct third-party claims against non-

debtors).

Two recent Supreme Court cases illustrate this point.  In *Law v. Siegel*, the

Court unanimously held that a bankruptcy court does not have "a general, equitable

power" or "inherent power" under section 105(a) of the Bankruptcy Code to order

a debtor's statutorily exempt assets be made available to cover attorney's fees

incurred by an estate's trustee a chapter 7 bankruptcy case.  571 U.S. 415.  The

trustee had argued that, because of the debtor's "abusive litigation practices," he

had incurred extraordinarily high attorney fees and exempt assets should be made

available to cover them.  571 U.S. at 415-16.  The Court disagreed, stating, "A

11

bankruptcy court may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its other provisions.  *Id*. at 425.  It announced that there is "no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code," because the Bankruptcy Code was intended to be a *comprehensive* statement of the rights and procedures applicable in bankruptcy.  *Id*. at 416.

More recently, in *Czyzewski v. Jevic Holdings Corp*., 137 S. Ct. 973 (2017), the Court held that a bankruptcy court cannot override the protections afforded by the Bankruptcy Code in a "rare" case, even to carry out certain bankruptcy objectives.  The bankruptcy court had approved a structured dismissal in a chapter 11 bankruptcy that did not follow normal priority rules, putting unsecured creditors before non-consenting judgment creditors.  Plan proponents argued – as do the proponents in this case – that the bankruptcy court had inherent authority to deviate from the rules because the Bankruptcy Code was "silent" on the subject and there was "sufficient reason" in this rare instance.  The Supreme Court disagreed that any such power existed.  It held that the "importance of the priority system leads us to expect more than simply statutory silence if, and when, Congress were to intend a major departure."  137 S. Ct. at 984.

The Bankruptcy Code is silent on the issue of granting releases to non-debtor third parties in exchange for their paying into the bankruptcy estate and

channeling claims against them into a post-bankruptcy trust.  *Law v. Siegel* and *Jevic Holding Corp*. strongly suggest the bankruptcy court has no residual or inherent authority to create a right in the face of Congressional silence on the point.

As discussed in more detail in D & V Claimants' opening brief, the Third Circuit has never analyzed or identified any statutory authority for nonconsensual third-party releases of direct claims against non-debtors.  Contrary to the arguments of the BSA and the passing comment of the bankruptcy court, the court in *Millennium Holdings* did not consider or rule on whether a bankruptcy judge has statutory authority to order such releases.  The Third Circuit stated, as a threshold observation, that bankruptcy courts have statutory authority to confirm plans as a core proceeding under 28 U.S.C. § 157(b)(2)(L).  945 F.3d at 137.  But the issue of statutory authority for nonconsensual third-party releases and channeling injunctions was not before the court.  The court did not address the issue, nor did it reach the merits of the third-party releases in that case.  The court went on to hold that entering a final confirmation order that contained such releases did not violate Article III of the Constitution.  945 F.3d at 139.  All that means is that the Third Circuit found that the bankruptcy court could enter a final order and did not have to issue proposed findings and recommendations, leaving final confirmation to an Article III district judge.  The bankruptcy court here recognized the limited nature

of the *Millennium* decision, stating, "I hesitate to read further into the Court's conclusion." (ADV 18, *Opinion*.)

In *Continental*, the Third Circuit recognized that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here" (asbestos cases). 203 F.3d at 238. The court recognized that circuits are split on allowing such releases and looked at the "hallmarks" applied in other circuits that allow them. The court then rejected the plan before it that released third-party claims against non-debtors and permanently enjoined direct actions against them. The court did not analyze the statutory authority for third-party releases.

More to the point, in *Combustion Engineering*, the Third Circuit held that §105(a) does not give a court the power to create substantive rights that are not otherwise available under the Bankruptcy Code. 391 F.3d 190 (3d Cir. 2005). The Third Circuit vacated the channeling injunctions in that case. *Id*. at 238.

Because the Bankruptcy Code does not authorize nonconsensual releases of direct third-party claims against non-debtors and related channeling injunctions, silence in the statute should not be read as consent by Congress for such releases and injunctions, and the bankruptcy court's equitable powers do not extend to creating such rights that are outside the Code, there was no statutory authority for the releases and injunctions at issue in this plan.

**C.    Even Assuming Jurisdiction and Statutory Authority for the Sake of Argument, the Releases and Injunctions at Issue do Not Meet Factors Used in the Third Circuit**

Even assuming the bankruptcy court had jurisdiction and statutory authority, the nonconsensual releases and injunctions in this case are unprecedented and do not meet Third Circuit guidelines, as discussed in detail in D & V Claimants' opening brief.

Contrary to the BSA's and Settling Insurers' argument, whether the releases and injunction meet Third Circuit guidelines are not pure findings of fact to be reviewed for clear error. Whether characterized as ultimate legal conclusions drawn from a factual record, or at most mixed questions of law and fact, if the releases meet Third Circuit guidelines are not findings of fact. When "conclusions [] are but legal inferences from facts" this court is not bound by them. *Block v. Potter*, 631 F.2d 233, 241 (3d Cir. 1980) (internal citation omitted). Therefore, whether the facts support the legal conclusions the bankruptcy court drew from them – that is, whether the releases and injunctions met Third Circuit guidelines – are subject to "plenary" (i.e.: *de novo*) review by this court. Even the BSA recognizes that this court exercises "plenary review of the bankruptcy court's interpretation and application of those facts to legal precepts." (BSA Br. at 7 (citing *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810–11 (3d Cir. 2019); *In re*

*Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011); and *In re Woodbridge Grp. of Cos., LLC*, 617 B.R. 796, 801 (D. Del. 2020).))

Here, the bankruptcy court drew erroneous legal conclusions from the facts it considered. This court may review those legal conclusions *de novo* and reject them. When viewed in their entire scope, the releases and injunctions here do not meet the hallmarks of fairness, necessity, and specific findings of fact. *Continental*, 203 F.3d at 214. Nor do they meet the five factors in *Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), which courts in this circuit have considered.

1.    *Hallmarks*

First, as discussed more thoroughly in D & V Claimants' opening brief, the releases and injunctions are not fair to direct abuse claimants because, as required for fairness, they will not receive any additional compensation for giving up their third-party claims. Certainly, with regards to claims against Chartered Organizations (other than the Methodists), abuse claimants will not get any additional monetary compensation at all. No Chartered Organization besides the Methodists are paying any money into the Settlement Trust.

The only thing Chartered Organizations are providing are their rights in insurance policies they did not pay for, but abuse claimants will not receive any compensation as a result of those "contributions." Because the policies paid for by

16

the BSA are limited to one payment per incident under their "one harm" provisions, direct abuse claimants will not receive any additional compensation related to Chartered Organizations' or Local Councils' rights in BSA policies. The same is true for policies the Chartered Organizations bought themselves from Settling Insurers – policies that are not even a shared asset with Debtors. Because the Settling Insurers are paying a lump sum into the Settlement Trust, direct abuse claimants will not receive any additional compensation as a result of Chartered Organizations turning over these policy rights, even though abuse claimants must release their claims under these policies and have them channeled into the Settlement Trust.

Nor are the releases and injunctions fair as related to the Local Council settlement, for all the reasons argued in D & V Claimants' opening brief. Local Councils are getting all the benefits of their own bankruptcies and more – a discharge of all sexual abuse liability (including for fraud and punitive damages) and channeling of claims to the Settlement Trust – without undertaking any of the burdens of bankruptcy. Local Councils did not have to fully disclose their assets or analyze whether their contribution was fair and reasonable in light of potential liabilities, as they would have in their own bankruptcies. Instead, they created their own complicated procedure for a settlement and now want to be rewarded with releases for getting internal, Local Council agreement to the complicated

procedure and settlement they created.  The issue is not whether the Local

Councils agreed to the settlement they came up with but whether that settlement is

fair to claimants.  For all the reasons argued earlier, it is not.

     Second, the releases and injunctions are not necessary for reorganization.

They may be necessary for ***this*** plan of reorganization, but they are not necessary

for ***a*** plan of reorganization.  Contrary to the BSA's argument, there was testimony

from BSA witnesses at the confirmation hearing that the alternate Toggle Plan was

feasible at the time of confirmation.  (ADV 64-67, Hr. Tr. Day 5 at 72:9-75:13.)

At the confirmation hearing, counsel for BSA acknowledged this, but argued that

the Toggle Plan was "not optimal."  (ADV 90, Hr. Tr. Day 20 at 63:14-17.)  As

long as the Toggle Plan or a version of it was possible – even if not "optimal" – the

releases in this particular plan were not "necessary."  Debtors did not meet their

burden to prove otherwise.

     Finally, there are no findings of fact specific to each party being released.

The BSA misses the point of D & V Claimants on this issue.  The point is not how

many Chartered Organizations are named or not.  D & V Claimants acknowledged

in their opening brief that the plan names more than 100,000 Chartered

Organizations (although not all of them).

     The problem is that there was no attempt to analyze, no evidence, and no

findings of fact about the potential liability and available assets of these Chartered

Organizations.  Without any evidence about their assets – including their own insurance – and what liability they face, it is impossible to determine whether direct abuse claimants have received reasonable consideration in exchange for the releases these claimants are forced to give.  To decide that the releases were reasonable without these findings is only to speculate.  While there was some evidence (not sufficient) about the assets and number of claims related to each Local Council, there was no analysis of the assets or the liabilities and no findings of fact as to each Local Council sufficient to justify their releases.

        *2.*    Master Mortgage *Factors*

As for the *Master Mortgage* factors, they also weigh against third-party releases and injunctions in this case.  While many of the bankruptcy court's findings of fact concerning these factors may not be in dispute, the legal conclusions the court drew from the factual findings are.  This court reviews those legal conclusions de novo.

Three of the five factors overlap with either jurisdictional issues or the hallmark of fairness.  Those are the factors concerning the "identity of interest" between the debtor and the third party; whether the non-debtor has contributed substantial assets; and whether the injunctions are "essential" to the reorganization. For the reasons discussed above and in D & V Claimants' opening brief, those

factors are not met in this case and weigh against approving the releases and injunctions.

The fourth factor is whether the "impacted class" has "overwhelmingly" voted to accept the proposed plan treatment. Of the 82,000 direct abuse claimants, only 48,463 voted in favor of this plan. Yes, those 48,463 were 85.72% of the total number who voted, but the fact that only 48,463 out of 82,000 voted in favor shows that abuse claimants were not excited to support this plan. Over 14% of direct abuse claimants who voted (8,073) voted to reject the plan.

The bankruptcy court took these facts and reached the legal conclusion that these numbers show "overwhelming" support for the plan. In light of the many cases discussing this factor and similar votes and concluding that votes of over 90% are required in non-asbestos cases, that conclusion was incorrect. See cases discussed in D & V Claimants' opening brief at 74.

The fifth factor is whether claimants will be paid in full. They will not be. The evidence and the BSA's arguments on this issue are confusing, to say the least. The BSA's expert witness, Dr. Charles Bates, testified that he believes direct abuse claimants will be paid in full because he believes that the direct abuse claims have an aggregate value between $2.4 and $7.1 billion, most likely between $2.4 and $3.6 billion. (ADV 11-12, *Opinion*.) Therefore, the bankruptcy court found that the approximately $2.5 billion committed to the Settlement Trust was sufficient to

pay the claims in full. (*Id.* at 13.) The court reiterated its payment in full conclusion after adding $200 million in "committed, but contingent funding" and another yet unavailable, speculative, approximately $300 million in general liability and $4 billion in excess insurance coverage from non-settling insurers to bring the total to approximately a possible $7 billion. (*Id.* at ADV 13-14.)

There are several problems with Dr. Bates's testimony and the bankruptcy court's reliance on it to conclude that direct abuse claimants will be paid in full.

First, even Dr. Bates's range of $2.4 to $7.1 billion would pay direct abuse claimants a range of anywhere between 31.5% to 93%, which even in the best case is not payment in full. His likely range of $2.4 to $3.6 billion will pay direct abuse claimants only a range of 62% to 93% of their claims, which is not payment in full. The plan calls for $2,484,200,000 in "noncontingent funding." (ADV 13, *Opinion*.) All other funding is contingent at best and absolutely speculative at worst. There are no findings of fact related to the certainty that the contingent funding or the unsettled insurance coverage will ever be paid into the Settlement Trust. It would be impossible to make such findings because, by definition, this funding is contingent on future events or dependent on coverage litigation and defenses. No one knows how much, if any, of this money will ever go into the Settlement Fund. The *Master Mortgage* finding requires that a plan "provides" a mechanism for payment, not that it "might provide" for payment. The only

findings about actual, existing funds provided for payment is the finding that the plan calls for $2,484,200,000 in "noncontingent funding."

Debtors estimate that administrative expenses of the Settlement Trust will be ten percent.  (ADV 171, D.I. 6445, *Disclosure Statement*.)  That will leave $2,235,780,000 for abuse claimants.  Even at Dr. Bates's lowest estimate, they would only receive approximately 93% payment, which is not payment in full.  At the higher end of his own expected range, $3.6 billion, abuse claimants would only receive approximately 62% payment, which is nowhere near payment in full.  At the upper end of Dr. Bates's possible range, $7.1 billion, abuse claimants would only receive approximately 31.5%.

Second, Dr. Bates's $2.4 to $3.6 billion valuation range is contrary to the TDP Matrix itself.  The primary reason he reduced his benchmark value from his original amount of $5.84 billion and reached his opinion that the likely aggregate range was $2.4 to $3.6 billion involved single victim abusers.  After his initial analysis of the direct abuse claimants' Proofs of Claim (POCs), Dr. Bates reevaluated the POCs and greatly reduced the value of the 77% of claims involving "single abuser" claims – those claims that identify an abuser not identified in any other claim.  (ADV 74, Hr. Tr. Day 6, 130:3-135:15.)  Based on the larger number of single victim abusers, Dr. Bates revised his opinion.  While he continued to opine that the aggregate value of direct abuse claims ranged from $2.4 to $7.1

billion, he concluded that the likely value was in the "lower quartile" of $2.4 to $3.6 billion.  (A. 2311, Hr. Tr. Day 6, 186:12-19.)

Because of the lower-value claims involving single victim abusers, Dr. Bates further opined, and the BSA argues in its Answering Brief, that "most of the claims will, to emulate the tort values, be scaled downward from the base matrix values…by design."  (BSA Br. at 57, citing Bankr. D.I. 9454 at 209:8-10.)  The glaring problem with this is that there is no mechanism in the TDP to scale down the claims' values for single victim abusers.  As the BSA acknowledges, Dr. Bates and his team designed the TDP base matrix values and the scaling factors "based on and consistent with the BSA's historical abuse settlements and litigation outcomes."  (BSA Br. at 56, citing Bankr. D.I. 9455 at 31:22-32:7.)  The base matrix values Dr. Bates and his team came up with ***are*** the values for a single victim abuser.  This is clear from the fact that the scaling and mitigating factors Dr. Bates designed in the TDP do not include a mitigating factor to decrease the base matrix value for single victim abusers.  The scaling factors, on the other hand, specifically increase the base matrix value by different increments if an abuser has multiple victims.  (ADV 49-55, Plan Matrix.)  The TDP only allows the value to be ratcheted up, not down, for the number of victims.

Dr. Bates used "the BSA's historical abuse settlements and litigation outcomes" to assign his base matrix values.  These values are based on abuse by a

single victim abuser.  Under the TDP, the Settlement Trustee has no authority or

discretion to reduce the value of the claim because of a single victim abuser

because there is no mitigating factor that allows that.  Dr. Bates's testimony – and

the BSA's argument – that claims in the TDP will be scaled downwards from the

base matrix values because they involve single victim abusers is simply, flat out

wrong.  It did not require a competing expert witness to testify to this point.  It only

requires reading the language of the TDP Matrix.

Third, it is wildly speculative to think there will ever be $7 billion in the

Settlement Trust and there are no findings to support such a conclusion.  There

could not be without a crystal ball and full litigation of all coverage issues.

Reaching that amount would require obtaining, through litigation or settlement,

100% of the maximum amount of potentially available insurance assets from the

Non-Settling Insurers.  The BSA spent much of its Answering Brief arguing that

the fears of the Non-Settling Insurers that they will have to pay this $4 billion are

overblown because these assets are subject to further coverage litigation and

coverage defenses.  It is one or the other.  Either the Non-Settling Insurers' fears

are justified, or these assets are not really available for abuse claimants.  For now,

their availability is speculative and – without evidence or findings concerning the

merits of the coverage litigation, defenses, or claims – there is no evidence that the

assets are available to pay claimants "in full" or at all.  It was error to conclude otherwise.

There is no reason to believe that, if the Non-Settling Insurers are to settle, they will settle for 100% of the value of these assets.  The Settling Insurers faced billions of dollars in coverage exposure, given the years of policies with no aggregate limits, but Hartford settled for $787 million, Century for $800 million, Zurich for $52.5 million, and Clarendon for $16.5 million.  (A. 83-87, *Opinion*.) Likewise, the Local Councils combined hold $3.3 billion in net assets, including $1.87 billion in unrestricted funds, and settled for $665 million.  (ADV 177, *Disclosure Statement*.)

Fourth, and finally, the bankruptcy court wrongly disregarded the evidence contradicting Dr. Bates's $2.4 to $7.1 billion valuation.  The Future Claims Representative determined that there would be approximately 11,000 future claims with an aggregate value of $5 billion, which shows the inadequacy of even $7.1 billion for 82,000 claimants.  (ADV 173, *Disclosure Statement*.)

More compelling is the evidence of the TCC's calculation, based on running the POCs through the Matrix, that the actual aggregate value of direct abuse claims ranges from $13.5 billion to $73.2 billion.  (ADV 171, *Disclosure Statement*.)  The TCC did no analysis of the claims.  The TCC merely looked at the number of each type of claim (Penetration, Oral Sex, Masturbation, etc.) and then calculated the

range, hypothetically applying the median of the statutes of limitations discounts to reach the low end and all scaling factors to reach the high end.  (*Id*.)  If the TCC's low estimate of $13.5 billion is even close, direct abuse claimants would receive only approximately 16.5% of the value of their claims under this plan, which obviously is not payment in full.

Again, this is not a point on which expert testimony was required.  The TCC's calculation was rudimentary and the evidence of the TCC's calculation is a fact sent out in the Disclosure Statement approved by the bankruptcy court.

Based on these problems with Dr. Bate's testimony, it was clear error to fail to see the flaws in Dr. Bate's analysis, especially concerning single victim abusers; to include speculative amounts in the money available for the Settlement Trust; and to disregard compelling contradictory valuation evidence.  The bankruptcy court wrongly concluded that the plan provides payment in full to direct abuse claimants.

### D.    Current Abuse Claimants are Treated Unfairly Compared to Future Claimants

D & V Claimants' arguments regarding the unfair treatment of current abuse claimants compared to Future Claimants is a small point, but one that both the

BSA and the Future Claimants' Representative responded to.  Neither addressed the substance of the arguments.[5]

Without belaboring the issue, the point is not that current abuse claimants had a Claims Bar Deadline, it is that Future Claimants do not have any deadline.  It is not speculative to argue that a victim of abuse who was a minor at the date of filing will have decades in many states to bring a claim.  While the Settlement Trust can begin to pay the claims of current claimants, the Trust cannot pay these claims in full until all Future Claimants have come forward.  James Patton, the Future Claimants' Representative, testified at trial that he estimates there will be 11,000 future claimants.  (A.2517, Hr. Tr. Day 7, 119:12-18.)  He acknowledged that future claimants will have decades to come forward and the Trust will have to remain open until the last one does.  (A.2743-44, Hr. Tr. Day 8, 121:19-25, 122:15-123:2.)  Yes, the Trust will make initial payments to current claimants.  But with no deadline other than those imposed by state statutes of limitations, the Trust will have to hold back final payments from existing claimants for decades.

---

[5]  Contrary to the BSA's initial point, D & V Claimants did preserve this issue below.  They raised their objections at trial when they cross examined the Future Claims Representative and made their objections in closing arguments. (A.2734-46, Hr. Tr. Day 8, 112:11-124:19, cross examination; A.5529-32, Hr. Tr. Day 20, 309:10-312:13, closing argument).  In their written objections filed before trial, D & V Claimants specifically reserved the right to raise argument at the hearing, "D & V Claimants reserve their right . . . to make additional arguments at the Confirmation Hearing."  (ADV 186, DI 8744, *Objection*.)

III.   **CONCLUSION**

For these reasons and those argued in D & V Claimants' opening brief, this court should reverse the Confirmation Order.

Dated:  December 21, 2022

GELLERT SCALI BUSENKELL & BROWN LLC

/s/ *Charles J. Brown, III*
Charles J. Brown, III, Esquire (No. 3368)
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

- and -

DUMAS & VAUGHN, LLC

/s/ *Gilion C. Dumas*
Dumas & Vaughn, LLC, *pro hac vice*
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com

*Counsel to D & V Claimants*