# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| | Bankruptcy Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC, | |
| Debtors. | (Jointly Administered) |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, | |
| Appellants, | |
| v. | Case No. 22-cv-01237-RGA |
| Boy Scouts of America and Delaware BSA, LLC, | |
| Appellees. | |

## REPLY BRIEF OF THE LIBERTY INSURERS AND THE ALLIANZ INSURERS

*(Counsel Listed on Following Pages)*

11150959

SEITZ, VAN OGTROP & GREEN, P.A
R. Karl Hill (DE Bar No. 2747)
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

CHOATE, HALL & STEWART LLP
Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO PC
Kim V. Marrkand (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

*Counsel to Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc. and Liberty Surplus Insurance Corporation*

TROUTMAN PEPPER HAMILTON SANDERS LLP
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184) Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

PARKER, HUDSON, RAINER & DOBBS
Harris B. Winsberg (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA 30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

McDERMOTT WILL & EMERY LLP
Margaret H. Warner (admitted *pro hac vice*)
Ryan S. Smethurst (admitted *pro hac vice*)
Alex M. Spisak (admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com
rsmethurst@mwe.com
aspisak@mwe.com

*Attorneys for Allianz Global Risks US Insurance Company*

- ii -

TROUTMAN PEPPER HAMILTON
SANDERS LLP
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No.
6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

PARKER, HUDSON, RAINER &
DOBBS
Harris B. Winsberg (admitted *pro hac
vice*)
Matthew G. Roberts (admitted *pro hac
vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

BRADLEY RILEY JACOBS PC
Todd C. Jacobs (admitted *pro hac
vice*)
John E. Bucheit (admitted *pro hac
vice*)
Paul J. Esker (admitted *pro hac vice*)
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com
pesker@bradleyriley.com

*Attorneys for National Surety
Corporation and Interstate Fire &
Casualty Company*

- iii -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

REPLY ...........................................................................................................4

I.   THE FACT THAT THE PLAN IS COMPRISED OF A "TAPESTRY" OF
     SETTLEMENTS DOES NOT JUSTIFY MODIFICATION OF INSURER
     RIGHTS UNDER THEIR CONTRACTS OR APPLICABLE LAW. ...........4

II.  THE APPELLEE BRIEFS MISSTATE THE INSURERS' POSITION AND
     THE GOVERNING LAW CONCERNING CLAIM ALLOWANCE AND
     BLUR THE LINES BETWEEN "TREATMENT" AND
     "ALLOWANCE". ..........................................................................10

III. THE APPELLEE BRIEFS MISSTATE THE INSURERS' POSITION AND
     THE GOVERNING LAW CONCERNING JUDGMENT REDUCTION. ..16

     A.   The Injuries from the Inappropriate Finality-of-Judgment Provision
          Are Not Speculative .....................................................................16

     B.   The Judgment Reduction Clause Does Not Adequately Protect the
          Insurers' Recovery Claims .............................................................21

          i.    The FCR's Probability-Based Argument Is Logically and
                Factually Flawed .................................................................21

          ii.   The FCR's Precedential Arguments Are Incorrect.................23

                1.   *Plant Insulation* Is Inapposite..........................................23

                2.   *Fraser's Boiler Service* Applies ....................................27

CONCLUSION ..............................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014) ..........................................................................7, 8

*In re Biolitec, Inc.*,
  528 B.R. 261 (Bankr. D.N.J. 2014) .................................................................7

*City of San Antonio v. Hotels.com, L.P.*,
  141 S. Ct. 1628 (2021)....................................................................................18

*Fireman's Fund Ins. Co. v. Plant Insulation Co. (In re Plant Insulation Co.)*,
  734 F.3d 900 (9th Cir. 2013) .....................................................................25, 26

*In re Fraser's Boiler Serv.*,
  No. 3:18-CV-05637-RBL, 2019 U.S. Dist. LEXIS 37840 (W.D. Wash. Mar. 8, 2019) ..................................................................................21, 28

*In re Masters Mates & Pilots Pension Plan*,
  957 F.2d 1020 (2d Cir. 1992) ...........................................................................6

*In re Miami Metals I, Inc.*,
  603 B.R. 531 (Bankr. S.D.N.Y. 2019)..............................................................6

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008)...............................................................6, 7

*Olin Corp. v. Lamorak Ins. Co.*,
  No. 84-CV-1968 (JSR), 2018 U.S. Dist. LEXIS 65446 (S.D.N.Y. Apr. 17, 2018) .................................................................................................20

*In re Plant Insulation Co.*,
  469 B.R. 843 (Bankr. N.D. Cal. 2012) ................................................23, 25, 26

*In re W.R. Grace Co.*,
  446 B.R. 96 (Bankr. D. Del. 2011)..................................................................14

**Statutes**

11 U.S.C. § 524(g) .............................................................................................25, 26

11 U.S.C. § 502 ...................................................................................................*passim*

**Other Authorities**

Federal Rule of Bankruptcy Procedure 3001 ............................................................1

The Liberty Insurers[1] and the Allianz Insurers (collectively, the "Insurers")
hereby file this reply brief (the "Reply Brief")[2] in further support of the *Opening
Brief on Appeal of the Liberty Insurers and the Allianz Insurers Regarding
Treatment of Class 9 Claims and Related Matters* (Dkt. No. 43) (the "Opening
Brief").

## PRELIMINARY STATEMENT

In their Opening Brief, the Insurers addressed two errors by the Bankruptcy
Court:  First, the Bankruptcy Court approved an improper allowance process for
Class 9 claims that deprives Class 9 claimants, including the Insurers, of
fundamental protections the Bankruptcy Code provides by shifting the burden of
proof under Section 502 of the Bankruptcy Code from the debtor/objector to the
claimant/insurer.  Section 502 of the Bankruptcy Code (read in conjunction with
Bankruptcy Rule 3001 which governs the filing of a proof of claim) provides that by
merely filing a proof of claim, a claimant (in this case, an insurer) has provided
*prima facie* evidence in support of its claim and places the burden of objecting to
allowance of the claim on the debtor.  Here, the Plan reverses these express

---

[1] Capitalized terms used but not otherwise defined herein have the meanings
given to them in the Opening Brief.

[2] The Insurers are signatories to the Reply Brief of Certain Insurers (the
"Principal Reply Brief"), filed contemporaneously herewith.

provisions by requiring the claimant/insurer to, among other things, demonstrate that its claim *is not subject to disallowance*.

Second, the Bankruptcy Court at the urging of the FCR and BSA adopted an improper and prejudicial Judgment Reduction Clause. This Judgment Reduction Clause, among other things, inappropriately limits a non-settling insurer's Recovery Claim (for, *e.g.*, contribution) to amounts which may be off-set against such non-settling insurer's liability to the Settlement Trust. As such, the Judgment Reduction Clause fails to compensate for any portion of a Recovery Claim exceeding a non-settling insurer's liability—if any—to the Settlement Trust. And even this minimal reduction is hampered by asymmetrical finality-of-judgment language that essentially prevents application of an offsetting Recovery Claim until expiration or exhaustion of appeal.

The FCR and BSA are the only parties that responded to the Opening Brief.[3] And even these limited responses are deficient insofar as they do not address a number of the arguments raised in the Opening Brief. They ask this Court to affirm the Confirmation Order because the challenged provisions of the Plan and TDPs are the product of interconnected settlements that purportedly provide "fair" treatment for the Insurers, and are otherwise commonplace in mass tort bankruptcies. But

---

[3] *See* Dkt No. 81 (the "FCR Brief"); Dkt. No. 66 (the "BSA Brief" and, together with the FCR Brief, the "Appellee Briefs") at 260-68.

neither explains how the terms of a purported patchwork of settlements can be imposed upon non-settling parties (like the Insurers) who do not consent to being bound by the terms of those settlements.

Nor do BSA or the FCR cite any authority to justify how allegedly commonplace provisions in uncontested mass tort bankruptcies justify the abrogation of the Insurers' rights under the Bankruptcy Code and applicable law where the Insurers *are* objecting.  There is simply no basis to abrogate the non-settling Insurers' rights, or to bind them to a set of procedures that arose from purported settlements to which they were not party and did not consent.  Both BSA and the FCR assert that the Insurers' fears are unfounded, pointing to Judge Houser's role as Settlement Trustee to allay any fears as to the administration of the Settlement Trust.  There is no doubt about Judge Houser's reputation—but that is not the issue. The issue instead is that the TDPs conflict with applicable law.  And that is a problem Judge Houser cannot fix.  The FCR seems to recognize this, as he briefed at length how applicable law supposedly allows the Settlement Trust to have the benefits of the Insurance Policies (*e.g.*, indemnity rights) without being bound by concurrent contractual obligations (*e.g.*, reimbursement of deductibles or the duty to cooperate in the defense of claims).

The architects of the Settlement Trust have now said the quiet part out loud— the system is designed to prejudice the Insurers in favor of the claimants.  It provides

little comfort that a person of integrity has been nominated to oversee administration of that system.  The infirmities identified in the Opening Brief and discussed herein must be remedied.  Accordingly, the Insurers respectfully request that the Court reverse the Confirmation Order and remand with instructions to remedy these problematic provisions to comply with the Bankruptcy Code and applicable law.

## **REPLY**

### I.     THE FACT THAT THE PLAN IS COMPRISED OF A "TAPESTRY" OF SETTLEMENTS DOES NOT JUSTIFY MODIFICATION OF INSURER RIGHTS UNDER THEIR CONTRACTS OR APPLICABLE LAW.

BSA and the FCR repeat arguments below that the Plan is a series of settlements reached among BSA's disparate stakeholders, with each necessary to ensure BSA's reorganization.  BSA contends that "[t]he global resolution embodied in the confirmed plan of reorganization is a carefully calibrated compromise among the often competing interests of" the *Settling Parties* (as defined herein) and that the "Plan is a tapestry of interconnected and interdependent settlements."[4]  BSA warns that "[i]f any one of the settlements is eliminated, the totality of the global resolution embodied in the Plan would fall apart, an outcome which would, in turn, threaten the full payment to abuse survivors and the survival of Scouting."[5]

---

[4] BSA Brief at 3, 8.

[5] *Id.* at 8.

The "global resolution" that BSA champions through its Plan involved "the BSA, Local Councils and Chartered Organizations . . .; [certain] insurance companies that issued policies to the BSA, Local Councils and Chartered Organizations covering claims for Scouting-related abuse; and abuse survivors" (collectively, the "Settling Parties").[6]  Furthermore, the FCR characterizes the Plan not only as a "global settlement," but also a "proposed settlement framework" that the FCR argues "constitutes a reasonable, equitable, good-faith compromise" of Abuse Claim liability.[7]  Whether BSA and the FCR assert that the Plan itself is "a carefully calibrated compromise" or simply provides a "framework" for settlement in the form of the TDPs, the result is the same.  Both positions fail to support the Bankruptcy Court's decision.

The Bankruptcy Court itself rejected these arguments, taking issue with whether the compromises forming the scaffolding of the Plan are "truly settlement agreements" "for purposes of Bankruptcy Rule 9019" or are, instead, "consensual resolutions of Plan terms or resolutions of confirmation objections."[8]  Notwithstanding this ruling, the Appellee Briefs continue to frame the Plan as an

---

[6] *Id.* at 3.
[7] FCR Brief at 6, 26-27.
[8] A. 79.

intricate web of settlements that cannot be disrupted or disturbed without collapsing the Plan in its entirety.

Presumably, BSA and the FCR would tell this Court that reversing the Bankruptcy Court's rulings on the claims allowance and judgment reduction issues the Insurers appealed will "threaten the full payment to abuse survivors and the survival of Scouting."[9] Even if that threat were credible, unsubstantiated predictions of catastrophe cannot justify the Court affirming the rulings below.[10]  If the Bankruptcy Court is right and the Plan is not the product of numerous settlements, then, for the reasons stated in the Opening Brief, the Insurers' rights cannot be abrogated by their class of creditors voting to confirm the Plan.  If, however, BSA and the FCR are right and the Plan is a web of settlements, the terms of those settlements cannot extinguish the Insurers' rights without their consent.

The Settling Parties could not (and cannot) unilaterally impose an alleged "tapestry of settlements" on the Insurers.  Courts uniformly "look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle."[11]  In *Nutritional*

---

[9] BSA Brief at 8.

[10] Both issues raised by the Insurers can be resolved by simple amendments to the Plan that would not prejudice the rights of any party or delay payment to Direct Abuse Claimants.

[11] *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832-33 (Bankr. D. Del. 2008) (citation omitted); s*ee In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019); *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1025-26 (2d Cir. 1992).

*Sourcing*, the bankruptcy court ruled that the proposed settlement embodied in the plan was not "fair and equitable" where "those parties whose rights were severely adversely impacted were not afforded meaningful participation in negotiations" of the terms of that settlement.[12]  That the class of claims affected by the settlement voted in favor of the plan was *not* sufficient for the bankruptcy court to conclude the settlement was fair and equitable to creditors that had no opportunity to participate in the settlement.[13]

A settlement is not fair and equitable to non-settling parties where such settlement "seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards."[14]  Because a settlement cannot impair the rights of non-parties, non-settling parties typically lack standing to object to such settlements.[15]  That changes, however, where the non-settling party sustains "some formal legal prejudice as a result of the settlement."[16]  Legal prejudice occurs where a settlement "*formally* strips a non-settling party of a legal claim or a cause of action,

---

[12] *Nutritional Sourcing*, 398 B.R. at 836-37.

[13] *Id.* at 838.

[14] *In re Biolitec, Inc.*, 528 B.R. 261, 269 (Bankr. D.N.J. 2014).

[15] *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014).

[16] *Id.*

such as a crossclaim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial."[17]

The purported settlement(s) in the Plan and TDPs clearly seek to strip the Insurers "of a legal claim or a cause of action . . . [and] invalidate[] [their] contract rights[.]"[18]  By way of example, the TDPs seemingly will impair Liberty's rights under its fronting policies.  Liberty issued a number of "matching deductible" "fronting policies" to BSA and other "named insureds" (which include the Local Councils).[19]  In essence, Liberty provided a financial accommodation that is achieved by having each policy's deductible, which erodes the policy's limit of liability, match the policy's limit.  Pursuant to these arrangements, Liberty *could* advance BSA's deductible up to $1 million, in return for which BSA or the Local Councils were contractually obligated to reimburse Liberty.[20]  At all times prior to

---

[17] *Id.* (emphasis in original).

[18] *Cf. id.*

[19] Liberty also wrote certain high-level excess policies for BSA.  Although this discussion focuses primarily on the rewriting of the fronting policies, the Insurers incorporate by reference those arguments raised both herein and in the Principal Reply Brief as they relate to the impermissible rewriting of contract terms through the TDPs.

[20] A. 13644 ("Pursuant to the terms of the Insurance Policies, Liberty Mutual may advance any part or all of the deductible amount on behalf of Policyholder for claims which are the sole and exclusive liability of Policyholder. Policyholder agrees to reimburse Liberty Mutual for such payments, and any allocated loss adjustment expenses and costs applicable to such claims.").

the bankruptcy case, BSA reimbursed Liberty for any amounts advanced.[21]  Simply put, there never was an instance prepetition where Liberty would pay a dollar that would not be directly reimbursed by BSA.

But the TDPs invert this arrangement, requiring Liberty to pay in full any deductible that, prepetition, it could elect to advance.  In exchange, Liberty must run the gauntlet of claim allowance provisions discussed in the Opening Brief that the FCR now admits were designed to maximize recoveries under the Insurance Policies at the expense of the Insurers.  This fundamentally alters the contractual bargain that Liberty struck with BSA prepetition, and this Court should reject it.[22]

The same is true for any alteration the Plan and/or TDPs purport to impose upon any other non-consenting Insurer.  The Insurers played no role in drafting the Plan or TDPs.[23]  Despite being parties to the global mediation, BSA excluded the Insurers from the Plan and TDP negotiations.  Therefore, absent their consent (which

---

[21] A. 7260 ¶ 2 ("Historically, the deductibles for these 'fronting' policies have been paid by the BSA.").

[22] The impairment of Insurers' rights under their policies and applicable law is no accident.  The FCR discusses at length how he believes that the Settlement Trust is entitled to take the benefits of the Insurance Policies without being saddled by the burdens.  That position is fundamentally at odds with governing case law, common sense, and even the claimants' prior statements. *See* A. 5925.  As discussed at length in the Principal Reply Brief, there is no authority, under the Bankruptcy Code or case law, to dismember a contract in order to transfer its benefits but *extinguish* the burdens, regardless of whether that contract is executory.  Principal Reply Brief, Part II.A.2.

[23] A. 6175; A. 6304.

they do not give), there is no basis for imposing purported settlement terms on the Insurers, and it was error to do so.

## II. THE APPELLEE BRIEFS MISSTATE THE INSURERS' POSITION AND THE GOVERNING LAW CONCERNING CLAIM ALLOWANCE AND BLUR THE LINES BETWEEN "TREATMENT" AND "ALLOWANCE".

Both BSA and the FCR make a number of assertions to justify their position that the claims allowance procedures are valid.  As set forth herein and the Opening Brief, their assertions lack merit.[24]  However, there are four issues worth clarifying for the Court that the Insurers believe BSA and the FCR purposefully muddied in the Appellee Briefs.

First, BSA and the FCR inaccurately argue that the Bankruptcy Court duly considered whether the disputed provisions of the TDPs relate to allowance or treatment.[25]  Despite recognizing in the Opinion a difference between allowance and treatment,[26] the Bankruptcy Court did not determine whether Article IV.B of the

---

[24] For example, while the FCR asserts that the Insurers lack standing to challenge the claims allowance procedures because their Indirect Abuse Claims are not yet liquidated and do not identify a corresponding Direct Abuse Claim, he simultaneously seeks to bind the Insurers to the claim allowance procedures set forth in the TDPs.  The Bankruptcy Court and this appeal is the correct forum for the Insurers to challenge the impairment of their rights as Indirect Abuse Claimants.  Having chosen to impair the Insurers' rights, well-settled law is clear that the Insurers have standing to challenge those efforts.

[25] BSA Brief at 261-62; FCR Brief at 33-34.

[26] A. 265.

TDPs constituted *allowance* or treatment of Class 9 Indirect Abuse Claims until several weeks after it issued the Opinion in real-time at oral argument.[27]  The Court then incorrectly determined that Article IV.B constituted treatment, which the Insurers lacked any ability to challenge because Class 9 voted to accept the Plan. The disputed provisions supplant the Insurers' rights under Bankruptcy Code Section 502 with claims *allowance* procedures arising from a settlement to which the Insurers were not party.  Since Article IV.B does not address treatment of claims, it does not matter that Class 9 voted to accept its *treatment*.  The proper question before the Court is whether the Settling Parties can exclude the Insurers from a settlement but nevertheless force the terms of that settlement upon them and, in doing so, abrogate the Insurers' rights.  And the Insurers respectfully submit that the answer to this question is "no."

Second, a theme running throughout the Appellee Briefs is that the Insurers' objections were rightfully overruled because the contested provisions allegedly are commonplace in mass tort bankruptcies.  But neither BSA nor the FCR cites any case law suggesting that parties such as the Insurers cannot object to plan provisions that abrogate their rights simply because such provisions have made their way into the terms of an uncontested plan.  They likewise fail to cite any authority to support the proposition that these procedures that abrogate the Insurers' rights should be

---

[27] A. 9347 ("I think it's treatment, it was voted on.").

approved in the name of judicial and procedural efficiency.  Indeed, none of the cases upon which either BSA or the FCR relies involved a dispute over claims *allowance* provisions or the other provisions that BSA and the FCR contend promote efficiency.  Each of the cases they cite involved either "closed trusts"—that is, a trust where all parties, including any insurers, had settled and agreed to pay their settlement contributions when the applicable plan went effective—and/or included robust language guaranteeing that the plan would not impair any non-settling insurers' contractual or legal rights.[28]  In such cases, there simply was no opportunity (or reason) to test whether the claims allowance provisions were consistent with the Bankruptcy Code.

Had the Insurers been involved in any part of the "tapestry" of purported settlements that paved the way for the Plan and TDPs, or were the Plan to include language that actually preserves the Insurers' rights under applicable law and their policies, there would be no need for this appeal.  Unlike the litany of cases cited by BSA and the FCR where all parties had settled, the Insurers remain on the outside

---

[28]  BSA points to what it incorrectly refers to as "insurance neutrality language" in the Plan and TDPs to support its argument that the Insurers' rights are unimpaired.  As discussed more fully in the Principal Reply Brief, this so-called neutrality language is circular and fails to accomplish what BSA claims is its intended goal: to preserve all insurance matters for decision by a coverage court.  The fact that this language is circular—and therefore ineffective at actually protecting the Insurers' rights—is evidenced starkly by the FCR trumpeting the ability for the Plan to dismember the Insurance Policies into their attendant rights and obligations and assign only those rights that will benefit the Settlement Trust.

looking in. These entirely inapposite cases therefore provide no basis to overrule the Insurers' objection to the flawed claims allowance process under the TDPs. Nor is there a need for the Court to burden itself with reviewing every claims allowance provision in the cases cited by BSA and the FCR to determine how closely the terms of those provisions are mirrored in the TDPs here. There is instead a very simple solution to the disagreement among the parties—the TDPs should provide that any Indirect Abuse Claim that has been or will be filed is subject to allowance or disallowance pursuant to Section 502 of the Bankruptcy Code.

Third, both BSA and the FCR mischaracterize the Insurers' argument as one of disparate treatment.[29] The Insurers understand that Class 9 voted to accept the *treatment* of its claims. As such, the Insurers are not contesting disparate treatment between Class 9 (Indirect Abuse Claims) and Class 8 (Direct Abuse Claims), nor are they challenging the fact that there are different allowance provisions for Class 8. And the Insurers do not even object to the treatment of Class 9 Indirect Abuse Claims given that BSA has represented that such claims will be paid in full along with Class 8 Direct Abuse Claims.[30] The issue, instead, is whether any Class 9 Indirect Abuse Claims will ever be allowed under the allowance provisions for Class 9, since according to the FCR the Settlement Trust need not accept the obligations that arise

---

[29] BSA Brief at 262-63; FCR Brief at 33-34.

[30] A. 12496 ¶ 294 n.445 ("Indeed, Class 8 and Class 9 will receive payment in full.").

- 13 -

under the Insurance Policies.   If all obligations under the Insurance Policies magically disappear on the Effective Date, the Settlement Trustee will never be in a position to *allow* Class 9 Indirect Abuse Claims so that they can be put in line for payment in full alongside Class 8 claims.

*In re W.R. Grace Co.*, upon which BSA relies, is inapposite on this point.  The objecting parties there asserted disparate treatment and classification arguments, which are positions that the Insurers have never taken here.[31]   Moreover, the allowance provisions in the *W.R. Grace* trust distribution procedures largely track the formulation that the Insurers asked the Bankruptcy Court to adopt in this case.[32] Under those procedures, an indirect abuse claim filed against the trust was deemed "*presumptively valid*" and was to be paid by the trust where the claimant could establish that (i) the claimant paid the amounts for which it was seeking reimbursement, (ii) the trust had received a release from both the direct and indirect abuse claimants, and (iii) the claim was not otherwise barred by a statute of limitations or repose or applicable law.[33]

*W.R. Grace* did not require indirect abuse claimants to prove a negative, as is the case here, such as *proving* that a claim is not subject to disallowance or

---

[31] 446 B.R. 96, 115-16 (Bankr. D. Del. 2011).
[32] *Id.* at 116.
[33] *Id.*

subordination or *proving* that there is no defense to an Indirect Abuse Claim.  That is because such attempts to disallow, subordinate, or assert a defense against an Indirect Abuse Claim are burdens that the Settlement Trust would bear under Section 502.  Here, the Insurers are asking this Court to preserve their rights under Section 502 and recognize that their claims are presumptively valid as a consequence of the Bankruptcy Code and the Insurers' compliance with the Bar Date Order.  The simplest formulation for allowance provisions regarding Indirect Abuse Claims is to provide that they will be allowed or disallowed in accordance with Section 502 of the Bankruptcy Code.

Finally, both BSA and the FCR argue that the Insurers should have no cause for concern because they are entitled to *de novo* review after the fact if they are not satisfied with the Settlement Trustee's allowance and/or valuation of the Insurers' claims.  But neither addresses the underlying concern raised by the Insurers in the Opening Brief:  What exactly is a court reviewing *de novo*?  Is it whether the Insurers' claims comply with the requirements of Section 502 of the Bankruptcy Code?  Or must the Insurers show that they satisfied the extraneous requirements for claim allowance imposed by the TDPs?  To the extent the Court is inclined to affirm the Confirmation Order as it relates to the TDP claim allowance procedures, the Insurers respectfully request that the Court rule that any *de novo* review must be to determine compliance with Section 502, not the TDPs.

## III.   THE APPELLEE BRIEFS MISSTATE THE INSURERS' POSITION AND THE GOVERNING LAW CONCERNING JUDGMENT UNDERLINE REDUCTION.

Despite a lengthy submission, the FCR offers virtually no response to the Insurers' claims regarding the Judgment Reduction Clause.  The FCR does not, for example, refute the Insurers' showing that the Judgment Reduction Clause fails to fully compensate excess Recovery Claims.[34]  Nor does the FCR explain why the asymmetrical finality-of-judgment requirement is appropriate—or even necessary.[35]

Instead, the FCR primarily attempts to conceal the prejudice to the Insurers by dismissing it as unlikely.[36]  The FCR then devotes the remainder of his brief (as it relates to the Judgment Reduction Clause) to a discussion of inapposite case law.[37]  This perfunctory approach falls far short of a valid opposition.  The Confirmation Order should be reversed.

### A.   The Injuries from the Inappropriate Finality-of-Judgment Provision Are Not Speculative.

The FCR dismisses as speculative the Insurers' concerns with the finality-of-judgment requirement, claiming that the harms inherent in its asymmetry "simply

---

[34] *See generally* FCR Brief at 36-42.

[35] *See generally id.* at 42-44.

[36] *See, e.g.*, *id.* at 37 ("[I]t is unlikely that an Insurer will ever be required by judgment to pay 'more than their fair share' in the first instance."); *id.* at 43 ("The harms that Allianz and Liberty speculate may befall them if the Trust seeks to enforce its judgment before final judgment . . . simply will not occur.").

[37] *See id.* at 39-41.

will not occur."[38]   Thus, according to the FCR, the fact that the Settlement Trustee may attempt to execute on a full (unreduced) judgment pending appeal is unobjectionable because the Settlement Trustee would never "ignore the governing Plan Documents."[39]   And even if she did, the FCR contends that the Insurers are adequately protected by their ability to seek "injunctive protection or damages."[40] These arguments are unavailing.

As a threshold matter, the FCR's arguments are not fully responsive to the Opening Brief.   The Opening Brief raised "at least two problems"[41] with the Judgment Reduction Clause's lopsided finality requirement: first, it is unnecessary and serves no articulable, legitimate purpose; and second, it will lead to prejudicial results.[42]   Yet, the FCR ignores the first argument entirely, offering nothing in defense of the purpose, structure, or necessity of the language.[43]

The FCR Brief likewise fails to meaningfully rebut the prejudice to the Insurers.   The FCR instead merely offers his assurances that the Settlement Trustee

---

[38] *Id.* at 43.

[39] *Id.* at 43-44.

[40] *Id.* at 44.

[41] Opening Brief at 38-39.

[42] *Id.* at 38-40.

[43] *See generally* FCR Brief at 36-44.

would never "ignore the governing Plan Documents."[44]  But this is conjecture—not proper argument—and is not probative of the likelihood of injury.

More importantly, the FCR fundamentally misapprehends the nature of the risk and the scope of the problem.  The asymmetrical finality language is not problematic because it prohibits a claim following the Settlement Trustee's breach, but because it inequitably and unnecessarily burdens the Insurers with the ***risk*** of such a breach (and collateral consequences).[45]  This is a simple function of the judgment amount entered at trial.  If the judgment entered at trial first has been reduced by the applicable offsetting Recovery Claim, then the Settlement Trustee cannot execute on the full (unreduced) amount of such judgment.  But if the trial court in any Insurance Action enters against an Insurer a full (unreduced) judgment—because the lopsided finality language prevented the contemporaneous application of an offsetting Recovery Claim—then it becomes ***possible*** for the Settlement Trustee to attempt to execute on that unreduced judgment amount once the 30-day stay expires.[46]

While the FCR insists that the Insurers simply can "enforce [the Plan Documents] . . . by seeking injunctive protection or damages"[47] after a breach (*viz.*,

---

[44] *Id.* at 43.

[45] *See* Opening Brief at 37-41.

[46] *See City of San Antonio v. Hotels.com, L.P.*, 141 S. Ct. 1628, 1632 (2021).

[47] FCR Brief at 44.

after the Settlement Trustee initiates collection on an unreduced, underlying judgment pending appeal), no amount of *post-hoc* enforcement can prevent a breach from occurring.  It is at best an inadequate remedy after the fact.  Rather than discrediting the harm from the asymmetrical finality language, the FCR's response thus underscores one of the problems the asymmetry creates.

The FCR also misperceives the other harmful consequence of the lopsided language: a possible miscalculation of prejudgment interest.[48]  The FCR contends that the Insurers "overlook the fact that pre-judgment interest stops accruing once a judgment is entered"[49] and, therefore, any accrual of prejudgment interest on an unreduced judgment "would not occur between any initial judgment and final judgment."[50]  But this answers an argument the Insurers did not make.  The prejudice is that prejudgment interest may be assessed on the wrong amount – not that it may continue to accrue between entry of an initial and final judgment.[51]  This arises because the Judgment Reduction Clause permits (or does not prohibit) prejudgment interest on a full judgment that later may be reduced by a final Recovery Claim.[52]

---

[48] *Cf.* Opening Brief at 39-40.

[49] FCR Brief at 44 n.50.

[50] *Id.* (internal citations and quotations omitted).

[51] *See generally* Opening Brief at 39-40.

[52] *See id.*

An Insurer who at trial both (i) suffers entry of an adverse judgment (*e.g.*, $100) and (ii) succeeds on a Recovery Claim (for, *e.g.*, $50) should not face an award of prejudgment interest on the ***entire*** underlying judgment ($100).[53]  Prejudgment interest, if any, instead should be limited to the reduced judgment ($50).[54]  Yet the requirement that a Recovery Claim be "final and non-appealable"[55] before reducing a judgment creates the potential for an assessment of prejudgment interest on the unreduced judgment amount.  This is inconsistent with the purpose of prejudgment interest.[56]  It is also demonstrably prejudicial to the Insurers.

More to the point, it is unnecessary – as is the risk of collection on an unreduced judgment.  Application of Recovery Claims to reduce judgments, if any, contemporaneously with their entry at trial would eliminate the dangers and prejudice inherent in the asymmetrical finality language.  The FCR provides nothing to refute this fact.[57]  Nor does the FCR explain whether, and if so why, the lopsided language is necessary.[58]  As such, the Judgment Reduction Clause could, and should,

---

[53] *Cf. Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968 (JSR), 2018 U.S. Dist. LEXIS 65446, at *46 (S.D.N.Y. Apr. 17, 2018) ("[P]re-judgment interest is properly calculated on the damages amount that [defendant] is ordered to pay after application of a set-off or judgment reduction.").

[54] *Cf. id.*

[55] A. 338-39 ¶ 51(b).

[56] *See Olin*, 2018 U.S. Dist. LEXIS 65446, at *45-46.

[57] *See generally* FCR Brief at 36-44.

[58] *See generally id.*

have been revised to eliminate its asymmetrical finality requirement.  The failure to do so was error, and the Confirmation Order should be reversed.

**B.      The Judgment Reduction Clause Does Not Adequately Protect the Insurers' Recovery Claims.**

The FCR offers two reasons why the Judgment Reduction Clause is adequate: (1) Recovery Claims are "adequately protected" because they are unlikely to arise in the first instance;[59] and (2) *Plant Insulation*[60] supports the Judgment Reduction Clause, while *Fraser's Boiler Service*[61] is inapposite.[62]  Each of these arguments is unavailing.

**i.      The FCR's Probability-Based Argument Is Logically and Factually Flawed.**

According to the FCR, the Judgment Reduction Clause provides "at least 'adequate'"[63] protection for Recovery Claims because "the likelihood that any Insurer is saddled with significant costs of defending . . . Abuse Claims in the tort system is small."[64]  In support, the FCR contends that the Insurers' "net expenditures

---

[59] *Id.* at 37.

[60] *In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012).

[61] *In re Fraser's Boiler Serv.*, No. 3:18-CV-05637-RBL, 2019 U.S. Dist. LEXIS 37840 (W.D. Wash. Mar. 8, 2019).

[62] *See* FCR Brief at 39-42.

[63] *Id.* at 41.

[64] *Id.* at 36.

for the defense of Abuse Claims are likely to be substantially *reduced*"[65] because "the TDPs were designed to resolve virtually all claims through out-of-court processes."[66]  This assertion is unsupported by any citation to record evidence and, in any event, is logically deficient.

The FCR's contention rests on an assumption that a decrease in the number of Abuse Claims brought in the tort system translates into a reduction in net defense expenditures.[67]  But one does not necessarily follow the other.  A net reduction could occur only if the TDPs' "out-of-court processes" removed from the tort system Abuse Claims that would have been brought there originally.  And there is no evidence to suggest that this is, or will be, the case.  On the contrary, the 6,000% increase in the number of Abuse Claims following the Petition Date[68] supports the *opposite* inference, as does the unrefuted testimony—from BSA's own expert—that many of the Abuse Claims would never have been brought in the tort system.[69]  The FCR's reasoning should be rejected.

---

[65] *Id.* (emphasis in original).

[66] *Id.*

[67] *Cf. id.*

[68] *See* Dkt. No. 45 at 18.

[69] *See* A. 2285-87; A. 2425.

### ii.   The FCR's Precedential Arguments Are Incorrect.

The FCR advances two precedent-based arguments in the FCR Brief: (1) *Plant Insulation* demonstrates that the Judgment Reduction Clause is appropriate; and (2) *Fraser's Boiler Service* is inapplicable.  Neither argument has merit.

### 1.   *Plant Insulation* Is Inapposite.

The FCR relies on *Plant Insulation* throughout the FCR Brief, citing to it as support for the following: (1) Recovery Claims do not "rise to the level of a property right";[70] (2) a reduction in "the number of claims an insurer must defend" protects the Insurers;[71] and (3) more robust protections for Recovery Claims would prejudice the Abuse Claimants.[72]  But *Plant Insulation* is inapposite, and the FCR's reliance on it is misplaced.

*Plant Insulation* arose out of an asbestos bankruptcy and related Chapter 11 plan.[73]   This plan (the "Plant Plan") provided for, among other things, the establishment of a Section 524(g) trust (the "Plant Trust").[74]   The Plant Trust was funded primarily by settlement payments from certain of Plant Insulation's insurers, who were protected from further liability by an injunction.[75]   Among other things,

---

[70] FCR Brief at 40.

[71] *Id.* at 41.

[72] *Id.*

[73] 469 B.R. at 848.

[74] *Id.*

[75] *Id.*; *see also id.* at 854.

this injunction barred the non-settling insurers ("NSI") from asserting equitable contribution claims against the settling insurers.[76]  The Plant Plan therefore provided the NSI with a judgment reduction that reduced any judgment by (i) any amount previously paid to the applicable claimant by the Plant Trust and (ii) the value of any equitable contribution claim that the NSI would have had against any settling insurer.[77]   However, the judgment reduction provision excluded equitable contribution claims that did not arise from an adverse judgment.[78]

The NSI therefore objected to confirmation of the Plant Plan.[79]  They argued, among other things, that the Plant Plan was not fair and equitable because it denied them the majority of the value "of their lost equitable contribution rights"[80] – and that the Plant Plan could be fair and equitable only if (i) it permitted them to assert against the Plant Trust the equitable contribution rights the Plant Plan enjoined *and* (ii) "all such claims were paid a 100-percent dividend."[81]

---

[76] *Id.* at 848.

[77] *Id.* at 873.

[78] *Id.* at 876-77.

[79] *Id.* at 857-58.

[80] *Id.* at 874.

[81] *Id.*

The bankruptcy court overruled the NSIs' objections and confirmed the Plant Plan.[82]  The primacy of Section 524(g) over practically all other considerations is an animating principle that appears throughout the decision.[83]  The bankruptcy court, for example, relied on Section 524(g) to enjoin the NSI equitable contribution claims without compensation in return.[84]  The bankruptcy court also expressed a concern that the trust backstop "would interfere with the operation of [S]ection 524(g),"[85] including by causing delays in payments to claimants if the Plant Trust were required to create reserves, and by elevating the NSI claims against the Plant Trust over those of the claimants.[86]

That animating principle is absent here because this case does not involve an asbestos trust.  Section 524(g), therefore, does not apply.[87]  The Ninth Circuit in *Plant Insulation* recognized this distinction, noting that "[a] common theme in the cases on which both the Non-Settling Insurers and *Dow Corning* itself relied is that they do not involve asbestos or injunctions under § 524(g). . . . In contrast, the plain language of § 524(g) explicitly permits injunctions of the Non-Settling Insurers

---

[82] *Cf. Fireman's Fund Ins. Co. v. Plant Insulation Co. (In re Plant Insulation Co.)*, 734 F.3d 900, 907-08 (9th Cir. 2013).

[83] *See generally Plant Insulation*, 469 B.R. 843.

[84] *Id.* at 875.

[85] *Id.* at 879.

[86] *Id.*

[87] *See* 11 U.S.C. § 524(g).

claims and nowhere provides for any compensation of their lost rights."[88]   For this reason alone, the FCR's reliance on *Plant Insulation* is misplaced.

Further, the facts of *Plant Insulation* are distinguishable.  First, the bankruptcy court in *Plant Insulation* held the injunction against equitable contribution claims posed a threat to the non-settling insurers only when the settling insurers represent a significant portion of the total risk, which had not occurred.[89]   But, the record here shows that up to 90% of the aggregate liability for Abuse Claims can be allocated to the Settling Insurance Companies' policies.[90]   The risk articulated in *Plant Insulation* therefore is present here.  Second, the bankruptcy court in *Plant Insulation* held that the trust backstop would overcompensate the non-settling insurers because the asbestos claimants were not being paid in full.[91]   Here, however, the Bankruptcy Court held that Abuse Claims will likely be paid in full.[92]   Third, the court in *Plant Insulation* relied at least in part on the policy objectives under Section 524(g) to determine that the delay associated with the creation of trust reserves was unacceptable.[93]   Those policy concerns are not present here.[94]   Moreover, the FCR's

---

[88] 734 F.3d at 912.

[89] 469 B.R. at 878-79.

[90] Opening Brief at 34.  The FCR failed to contest this point in the FCR Brief.

[91] 469 B.R. at 879.

[92] *Cf.* A. 12496 ¶ 294 n.445.

[93] *See* 469 B.R. at 879.

[94] *See* 11 U.S.C. § 524(g).

professed concerns with the creation of Trust reserves are inconsistent with his repeated assertions that Recovery Claims are unlikely to arise.[95]  Recovery Claims cannot both be unlikely and so prevalent that the creation of reserves will have a materially negative effect on the Abuse Claimants.  But in either event, *Plant Insulation* is wholly distinguishable and should not be followed here.

### 2.   *Fraser's Boiler Service* Applies.

The FCR asserts that *Fraser's Boiler Service* is inapplicable.[96]  According to the FCR, that decision rested on "(i) the Ninth Circuit's blanket prohibition against non-debtor releases . . ., (ii) the existence of a separate prepetition contract among insurers as the basis for contribution claims, and (iii) a plan structure that contemplated non-settling insurers would continue regularly defending claims in the tort system."[97]  These arguments miss the mark.  First, the District Court's opinion on the sufficiency of the FBS Reduction[98] was not premised on the Ninth Circuit's prohibition against non-debtor releases.  Rather, the District Court determined that even if the FBS Settlement[99] were reasonable, it did not adequately protect the

---

[95] *Cf.* FCR Brief at 37, 41.

[96] *Id.* at 42.

[97] *Id.*

[98] Opening Brief at 32.

[99] *Id.* at 31.

- 27 -

Remaining FBS Insurers[100] through the FBS Reduction.[101]  The analysis, therefore, did not turn on whether non-debtor releases are permissible.[102]

Second, while the Remaining FBS Insurers had claims against the Settling FBS Insurers under a prepetition contract, the Remaining FBS Insurers also had claims under an equitable contribution theory.[103]  Thus, the decision did not depend solely on the existence of a separate prepetition contract.

Finally, *Fraser's Boiler Service* did not appear to rest on the non-settling insurers' regular, continued defense of claims in the tort system.  To the contrary, the District Court noted that "all asbestos claims against FBS so far have resulted in settlements."[104]  And even if the opinion relied on the regular defense of claims in the tort system, the FCR's assertion that defense costs will be reduced is entirely speculative, particularly considering the explosion of Abuse Claims.  As a result, the FCR fails to distinguish *Fraser's Boiler Service*, and it should inform the outcome here for the reasons set forth in the Opening Brief.

---

[100] *Id.* at 32.

[101] 2019 U.S. Dist. LEXIS 37840, at *29.

[102] The FCR's argument on this point is curious since he heavily relies on the Ninth Circuit decision in *Plant Insulation*.

[103] *Compare* 2019 U.S. Dist. LEXIS 37840, at *6 ("Those claims . . . include equitable contribution and breach of contract claims based on the Cost Sharing Agreement . . . between FBS's various insurers."), *with id.* at *18 ("Here, in contrast, the Non-Settling Insurers' rights derive from equity and the CSA, an entirely separate contract between the insurers.").

[104] *Id.* at *30.

## <u>CONCLUSION</u>

For the reasons set forth herein and in the Opening Brief, the Confirmation Order should be reversed and remanded with instructions to remedy these problematic provisions to comply with the Bankruptcy Code and applicable law.

Dated: December 21, 2022

Respectfully Submitted,

SEITZ, VAN OGTROP & GREEN, P.A

*/s/ R. Karl Hill*
R. Karl Hill (DE Bar No. 2747)
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

CHOATE, HALL & STEWART LLP
Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO PC
Kim V. Marrkand (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

*Counsel to Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc. and Liberty Surplus Insurance Corporation*

TROUTMAN PEPPER HAMILTON SANDERS LLP

*/s/ David M. Fournier*
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184) Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 404.885.3000
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

PARKER, HUDSON, RAINER & DOBBS
Harris B. Winsberg (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

McDERMOTT WILL & EMERY LLP
Margaret H. Warner
(admitted *pro hac vice*)
Ryan S. Smethurst
(admitted *pro hac vice*)
Alex M. Spisak
(admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: 202.756.8228
Facsimile: 202.756.8087
mwarner@mwe.com

- 30 -

rsmethurst@mwe.com
aspisak@mwe.com

*Attorneys for Allianz Global Risks US Insurance Company*

TROUTMAN PEPPER HAMILTON SANDERS LLP

*/s/ David M. Fournier*
David M. Fournier (DE Bar No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
david.fournier@troutman.com
marcy.smith@troutman.com

-and-

PARKER, HUDSON, RAINER & DOBBS
Harris B. Winsberg (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
303 Peachtree Street NE
Suite 3600
Atlanta, GA  30308
Telephone: 404.420.4313
Facsimile: 404.522.8409
hwinsberg@phrd.com
mroberts@phrd.com

-and-

BRADLEY RILEY JACOBS PC
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
Paul J. Esker (admitted *pro hac vice*)
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone: 312.281.0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com

pesker@bradleyriley.com

*Attorneys for National Surety Corporation and Interstate Fire & Casualty Company*

## <u>CERTIFICATION OF COMPLIANCE</u>

The foregoing brief was prepared on a computer using Microsoft Word.   A proportionally spaced typeface was used, as follows:

> Name of typeface:  Times New Roman
> Point size:  14
> Line spacing:  Double

The total number of words in the brief, excluding the items set forth in Federal Rule of Bankruptcy Procedure 8015(g), is 6416.


*/s/ R. Karl Hill*
R. Karl Hill (DE Bar No. 2747)
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

Date: December 21, 2022