**22-cv-01237-RGA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors | Jointly Administered |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, Appellants. | Case No. 22-cv-01237-RGA |
| v. Boy Scouts of America and Delaware BSA, LLC, | Jointly Consolidated[2] |
| Appellees | On appeal from confirmation of Debtors' Plan of Reorganization |

### <u>REPLY BRIEF OF APPELLANTS LUJAN CLAIMANTS</u>

| | |
|---|---|
| LOIZIDES, P.A. | LUJAN & WOLFF LLP |
| Christopher D. Loizides (No. 3968) | Delia Lujan Wolff (admitted Pro Hac Vice) |
| 1225 North King Street, Suite 800 | Suite 300, DNA Bldg. |
| Wilmington, DE 19801 | 238 Archbishop Flores St. |
| Phone: 302.654.0248 | Hagatna, Guam 96910 |
| Email: loizides@loizides.com | Phone: (671) 477-8064/5 |
| | Facsimile: (671) 477-5297 |
| | Email:  dslwolff@lawguam.com |

*Attorneys for Appellants the Lujan Claimants*

Dated: December 21, 2022

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243,22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252,22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237.  The Lujan Claimants' appeal is docketed at 22-cv-01258.

## TABLE OF CONTENTS

I.      INTRODUCTION                                                        1

II.     ARGUMENT                                                            1

  A.    The Plan should not have been confirmed with nonconsensual
        Third party releases and injunctions.                              1

  B.    The insurance Settlements fail the Martin test.                     7

  C.    Proceeds of the Abuse Insurance Policies are not property of
        the Estates.                                                       10

  D.    The Nondebtor Insurance Policies are not property of
        Debtors' estates.                                                  16

  E.    The Insurance Settlements impermissibly modify Lujan
        Claimants' rights.                                                 19

  F.    The insurance policies could not be sold free and clear of
        Lujan Claimants' interests, and without adequate protection
        and compensation.                                                  21

  G.    The Plan and Confirmation Order unquestionably violates
        the automatic stay in the bankruptcy case of the
        Archbishop of Agana.                                               22

  H.    Guam's Direct Action Statute reverse preempts conflicting
        Bankruptcy Code provisions under the McCarran-Ferguson
        Act.                                                               29

  I.    The best interest of creditors test was not met.                   32

  J.    The Plan improperly classifies Lujan Claimants and treats
        them unequally.                                                    35

  K.    The Motion to Amend and Supplement should not have been
        Granted to confirm a materially modified plan of
        reorganization.                                                    37

  L.    Joinder in D&V Claimants' Reply Brief                              41

III.    CONCLUSION                                                         41

## TABLE OF AUTHORITIES

**Cases**

*Evans v. TIN, Inc.*,
   Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-
   2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18,
   11-3050, 2012 WL 2343162 (E.D. La. June 20, 2012) .................................. 30,31
*First Fidelity Bank v. McAteer*,
*Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*,
   997 F. 2d 581 (9th Cir. 1993) ......................................................... 23, 26
*In re Allied Digital Techs., Corp.*,
   306 B.R. 505 (Bankr. D. Del. 2004) ....................................................... 14
*In re Barrett*,
   833 F. Appx. 668 (9th Cir. 2020) .......................................................... 25
*In re CyberMedica, Inc.*,
   280 B.R. 12 (Bankr. D. Mass. 2002) ....................................................... 14
*In re Edgeworth*,
   993 F.2d 55 (5th Cir. 1993) ................................................................ 12
*In re Goodman*,
   991 F. 2d 613 (9th Cir. 1993) ......................................................... 23, 24
*In re Int'l Forex of Cal., Inc.*,
   247 B.R. 284 (Bankr. S.D. Cal. 2000) ..................................................... 24
*In re La. World Exposition, Inc.*,
   832 F.2d 1391 (5th Cir. 1987) ............................................................. 11
*In re Neidorf*,
   534 B.R. 369 (9th Cir. BAP 2015) .................................................... 17, 18
*In re Nutraquest, Inc.*,
   434 F.3d 639 (3d Cir. 2006) ........................................................... 10,11
*In re Patterson*,
   Nos. 08-3025, 07-31735, 2008 WL 2276961, at *6 (Bankr. N.D.
   Ohio June 3, 2008) ......................................................................... 17
*In re Pecan Groves of Ariz.*,
   951 F. 2d 242 (9th Cir. 1991) ......................................................... 24, 25
*In re Pettit Oil Co.*,
   No. 13-47285, 2016 WL 4132473 (Bankr. W.D. Wash. July 29, 2016) ............. 17
*In re Porrrett*,
   564 B.R. 57 (Bankr. D. Idaho 2016) ....................................................... 17
*In re Purdue Pharma, L.P.*,
   21 cv 7532 (CM), 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) ..................... 30
*In re Schwartz*,
   954 F. 2d 569 (9th Cir. 1992) ............................................................. 26
*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ................................................................ 20
*Reis v. OOIDA Risk Retention Group, Inc.*,
   303 Ga. 659 (2018) .................................................................... 31,32
*Wadsworth v. Allied Professionals Ins. Co.*,
   748 F.3d 100 (2d Cir. 2014) ............................................................... 31

**Statutes**

11 U.S.C. § 363(f) ........................................................................... 19

11 U.S.C. § 362(h) ............................................................... 23, 24
11 U.S.C. § 1109(b) .............................................................. 23, 25
11 U.S.C. § 1123(a)(5) .......................................................... 29, 30
11 U.S.C. § 1129(a)(7) ........................................................... 33,34
11 U.S.C. § 541 ......................................................................17
11 U.S.C. § 541(a) .................................................................11
11 U.S.C. § 541(a)(1)..............................................................17
11 U.S.C. § 541(a)(7) ....................................................... 16, 17, 18
28 U.S.C. § 157(b)(2)(B) .........................................................1,2
28 U.S.C. § 157(b)(2)(L) ............................................................2
28 U.S.C. § 157(b)(2)(O) .........................................................1,2

**Rules**

Ninth Circuit Rule 36-3..........................................................25

# I. INTRODUCTION

Appellees' response briefs fail to disprove or rebut Lujan Claimants' arguments that the Plan should have been denied confirmation. The Confirmation Order must be reversed.

# II. ARGUMENT

## A. The Plan should not have been confirmed with nonconsensual third party releases and injunctions.

Debtors failed to meet their burden of proving the existence of subject matter jurisdiction over Survivors' claims against nondebtors. As argued in Lujan Claimants' opening brief, there is no "arising under" or "arising in" jurisdiction over Survivors' claims against nondebtors because these claims do not arise under title 11 and do not arise in a case or proceeding under title 11. These claims exist even if Debtors had never filed for bankruptcy. It is illogical to argue that child sexual abuse claims for abuse that occurred decades ago arose under title 11 or in a case under title 11. Appellees argue, however, that because the third party releases are part of a plan that the Court had jurisdiction to consider at a confirmation hearing, the Court has arising under and arising in jurisdiction over the third party releases. This is a gross exaggeration of arising under and arising in jurisdiction, especially since Title 28 explicitly excludes from the list of core proceedings the liquidation or estimation of contingent or unliquidated personal injury tort claims for purposes of distribution in a case under title 11, and personal injury torts. 28 U.S.C. §

1

157(b)(2)(B) and (O).  Appellees' interpretation cannot be accepted because it would render meaningless the inclusion of "confirmation of plans" as a core proceeding, 28 U.S.C. 157(b)(2)(L), and the exclusion of personal injury torts.  Congress did not intend that the inclusion of confirmation of plans as a core proceeding would swallow up the express exclusions.  If this were the case, then the bankruptcy court would have subject matter jurisdiction over anything the parties agreed to include in a plan proposed for confirmation.  However, the parties cannot on their own create subject matter jurisdiction by their agreement of what to include in a plan.

Debtors failed to prove "related to" jurisdiction over Survivors' claims against third parties.  Appellees merely rehash the Court's conclusions in the Opinion.  They fail to meaningfully rebut Lujan Claimants' arguments.  As for a clear identity of interest, Appellees failed to show a clear identity of interest between Debtors and the Protected Parties.  Debtors' prepetition litigation history proves that a judgment against a local council or chartered organization will not in effect be a judgment or finding against the debtors.  Debtors' own witness, Bruce Griggs, testified that, for BSA's liability, they would look to whether BSA owed a duty of care to the Survivor.  The many cases cited in Lujan Claimants' opening brief, where BSA is a party, show that BSA's fate was not tied to the liability of a co-defendant local council or chartered organization.  There is also no evidence, and the Court made no finding, that non-chartered organization Roman Catholic Entities have an identity of interest

2

with Debtors.  They are not a part of the so-called tripartite—BSA, local council, chartered organization—allegedly required to carry out the scouting program.  The evidence also showed that the current model is not necessary to carry out the scouting program.  Debtors' witness, Devang Desai, testified that BSA is looking to potentially streamline the model of carrying out the scouting program by preemptively consolidating local councils and by altering BSA's relationship with chartered organizations.  Bankr. D.I. 9341 at 83-86, 102-03.  Desai testified that a problem with the current model is "[t]oo much collaboration, slow decision making." Id. at 86.  Thus, as the current tripartite model is proving cumbersome and in need of streamlining to include altered relationships, the evidence does not support a finding of interconnectedness or clear identity of interest. Neither did the evidence show that Debtors are the real parties in interest in claims against a local council or chartered organization since the latters' liability depends on Debtors' liability.  The undisputed prepetition history disproves this.

Debtors also misstate their prepetition history when they claim that they handle Scouting-related Abuse Claims on behalf of the entire tripartite group.  As stated in Lujan Claimants' opening brief, AOA had its own separate legal counsel. Further, Bruce Griggs testified that Guam was an exception to the typical practice of BSA settling on behalf of BSA, local councils, and chartered organizations. Griggs also admitted in a declaration filed in the AOA bankruptcy on September 18,

3

2022, that BSA's prepetition settlements of Guam claims involving the AOA sometimes specifically excluded chartered organizations/sponsors from the settlements. In re Archbishop of Agana, Case No. 19-00010, D.I. 1000 at 2 (Bankr. D. Guam 2022).

Further, the cases cited by Lujan Claimants, in which members of the alleged tripartite faced different outcomes as to liability for child sexual abuse, show that each case hinges on the particular facts of the case, as well as the law of the jurisdiction.  It is disingenuous for Debtors to continue to proclaim that the liability of a chartered organization or of a local council depends on whether BSA is liable. They have failed to prove a clear identity of interest between BSA, Delaware BSA, and as to the other Protected Parties, especially those that are not a part of the tripartite.

Regarding shared insurance, as discussed in Lujan Claimants' opening brief, shared insurance is not enough to confer "related to" jurisdiction over third party claims.  There must also be automatic liability through contractual indemnification. Debtors look past that and focus on the dollar-for-dollar reduction that might occur if an insurer pays out on behalf of another insured.  That payout is irrelevant, though, where the combined policy limit is in the millions as to one occurrence or one person, and the Survivor is fully paid through the policies.  Appellees offered no evidence or argument that insurance policy limits would be insufficient to cover BSA's

liabilities. Appellees also failed to prove that insurance proceeds would be depleted from hypothetical indemnification or defense costs. This factor also does not support related to jurisdiction over Survivors' claims against non-chartered organization Roman Catholic Entities or any other Protected Party that is not insured under BSA policies. It also does not support related to jurisdiction over nondebtors' insurance policies or interests in BSA policies.

Appellees also cannot prove contractual indemnification when no evidence shows such indemnification and the testimony affirmatively disclaims the existence of indemnification contracts, as discussed in Lujan Claimants' opening brief. The board resolutions adopted by BSA in which it agreed to defend and indemnify chartered organizations are not contracts because they are not agreements (where an offer is made and accepted) entered with anyone in exchange for consideration. Debtors have failed to prove that these board resolutions contain these critical elements of a contract so that BSA would be contractually bound to indemnify chartered organizations. Debtors also do not argue that these board resolutions constitute contracts to indemnify local councils. The Annual Charter Agreements, beginning in 2014, also are not contracts requiring BSA to indemnify, as these agreements are between local councils and chartered organizations; BSA is a stranger to these agreements. Debtors also failed to prove that these agreements bind BSA in any way. As there is no contractual indemnification requiring either Debtor

5

to indemnify a local council or chartered organization for Survivors' abuse claims, related to jurisdiction is not established by this factor.

BSA's contingent interest in local council property is only as to property that remains after payment of local council debts.  Also, local council property cannot automatically "revert" to BSA upon revocation of a local council's charter or the local council's dissolution if BSA never owned the local council property in the first place.  Debtors presented no evidence that they originally owned any local council property so that it would "automatically revert" to BSA ownership in the future.  To the extent that BSA claims that the Court has jurisdiction over local council property, due to BSA's claimed residual interest, no one has ever argued or acted like local council property is protected by the automatic stay.  Instead, in recognition that the automatic stay does not apply, BSA commenced an adversary proceeding to enjoin prosecution of claims against local councils and chartered organizations.  BSA's alleged residual interest does not convert the property itself into property of BSA's estate.

Lujan Claimants join in the Reply Brief of D&V Claimants in addressing the statutory authority of the Court to grant nonconsensual releases and injunctions and whether the releases and injunctions meet the hallmarks of sister circuits and Master Mortgage.

6

**B. The Insurance Settlements fail the Martin test.**

Lujan Claimants did not waive their objection, as they clearly raised this issue before the Bankruptcy Court.  In their briefs, Lujan Claimants objected to the insurance policy buybacks, including for the reason that the insurance dollars were too low.  During the Confirmation hearing, Lujan Claimants continued to object to the buybacks as providing too little compensation and specifically addressed the Martin factors.  At no time did Debtors ever raise an objection to Lujan Claimants' oral argument, and they could not because it is their burden to prove at the Confirmation hearing that the Martin factors were met.  When they failed to meet their burden at the Confirmation hearing, Lujan Claimants rightly argued this.  Even if Lujan Claimants somehow failed to raise the objection in their briefs, the Court acknowledged that the Martin objection was raised at the Confirmation hearing and the Court considered this objection in its Opinion.  Thus, Lujan Claimants raised the objection, no one argued or treated the objection as waived, and the Court ruled on the objection.  The cases cited by Debtors do not support a waiver argument before an appellate court.  In those cases, the Court considering the argument noted that the arguments were not raised in briefs and therefore chose to deem those arguments waived.  Here, the Court did not consider any Martin objection waived and addressed the objection.  Therefore, this objection is not waived and is properly before the District Court on appeal.

Regarding the first and third Martin factors, Debtors cite to testimony presented via declaration and live witness which basically says that the litigation is complex and would drain estate resources, but which does not provide any analysis of the merits of Debtors' contentions or of the insurers' arguments. It was Debtors' burden to provide this evidence, and not Lujan Claimants' burden to provide counter-evidence, including counter-evidence to no evidence. The sole piece of analysis regarding the merits of a position by either Debtors or insurers was Debtors' own admission that insurers' defenses are without merit.

As for the second Martin factor, Debtors prove Lujan Claimants' point that they failed to demonstrate difficulties in collection against any insurer other than Century. In their response brief, Appellees merely cite evidence concerning Century's ability to pay. They completely ignore the ability to pay of Chubb and other Chubb Companies, Hartford, Clarendon, and Zurich. Debtors admit that they failed to prove any difficulties in collection as to these insurers. Even as to Century's inability to pay, they fail to provide evidence that Century's run-off status has led to any insured tortfeasor's or injured party's difficulty to collect against it.

Debtors also failed to prove the fourth factor—paramount interest of creditors. They focus on the support of the buybacks by the TCC, Coalition, and FCR. But not a single one of those groups actually represents a creditor. The TCC and FCR are fiduciaries to unsecured creditors, but they do not actually speak on behalf of any

creditor and they cannot.  While the Coalition consists of creditors, it speaks and acts only on behalf of the Coalition as a group and cannot commit any Coalition member to take a particular position or vote.  Lujan Claimants are 75 actual creditors who would be affected by the buybacks, not just as injured parties whose claims against insureds are covered by the policies, but also because they have direct action claims and interests as to these policies.  Nothing in the Bankruptcy Code provides that the appointment of a creditors committee or of a future claimants representative, or the formation of an ad hoc group of creditors such as the Coalition, moots, supersedes, or diminishes the standing or interests of individual creditors.  Thus, the support of the TCC, FCR, and Coalition cannot and should not override the concerns and interests of actual creditors.

Debtors cite to the Court's conclusion that "the money coming into the Settlement Trust does not disadvantage the Lujan Claimants more than other creditors," and that "[g]iven the nature of mass tort litigation, it is impossible to focus on specific creditors when reviewing a resolution of obligations under insurance policies against which coverage can be sought on 82,209 claims."  D.I. 66 at 200. These conclusions by the Court are contradictory.  How can the Court conclude that Lujan Claimants are not comparatively disadvantaged by the buybacks and then also conclude that the Court cannot possibly focus on Lujan Claimants when reviewing

the buybacks?  The Court admittedly did not review the effect of the insurance buybacks on Lujan Claimants.  Therefore, this factor was not proven at trial.

As Debtors failed to prove that the Martin test was met, the insurance settlements should not have been approved.

**C. Proceeds of the Abuse Insurance Policies are not property of the Estate.**

The Court undisputedly did not make specific findings of fact as to whether the proceeds of each of the known and unknown bought-back insurance polices are property of the estate.  The Court merely concluded that the proceeds of all the policies are property of the Estate, without citing any evidence.  At the same time, the Court acknowledged that the proceeds of settling insurers policies will be used to pay Survivors, and that Lujan Claimants can pursue direct action claims against Non-Settling Insurers.   As Debtors are the parties claiming subject matter jurisdiction over the insurance policies proceeds, it was their burden to prove that the Court has subject matter jurisdiction over the proceeds.  Debtors utterly failed to meet their burden as they failed to point out and analyze language in each of the bought-back insurance policies which would support the existence of subject matter jurisdiction, leading to the Court's lack of specific findings on the issue.

Even if there were specific findings on the issue, Debtors have failed to present authority that supports subject matter jurisdiction.  They cite Nutraquest, but that case supports the lack of subject matter jurisdiction here.  In re Nutraquest,

the Third Circuit held that the exception to the general rule that the debtor's right to its insurance-policy proceeds is property of the estate under 11 U.S.C. § 541(a), is where "the debtor does not own the insurance proceeds, but just owns the policy." 434 F. 3d 6, 647 n.4 (3d Cir. 2006). The Third Circuit provided an example of this exception—"when the debtor was a corporation, but the liability policy insured only the corporation's directors and officers (and would pay only to them), the liability proceeds were not property of the bankruptcy estate." Id. (citing In re La. World Exposition, Inc., 832 F. 2d 1391, 1399-401 (5th Cir. 1987)). The Third Circuit found that that exception did not fit the facts of the case, since the insurance policy and any proceeds from it both belong to Nutraquest. Id. Here, there is no evidence that the bought-back insurance policies and proceeds of those policies are both owned by Debtors. Instead, Lujan Claimants concede that at least BSA owns the policies that BSA bought, but BSA does not own the proceeds. This fits the exception to the general rule. Debtors are incorrect insofar as they interpret Nutraquest's exception to be a situation only where the policy would insure and pay out to nondebtors. This scenario was only an example cited by the Third Circuit and not the totality of the exception it described therein, being the circumstance where the debtor owns the policy but does not own the proceeds to the policy.

For Debtors to own the proceeds of BSA insurance policies, ownership of the policy is not enough as the proceeds of the policies had to be payable to them and

not to creditors such as Lujan Claimants.   "The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim.  When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate.  In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate." In re Edgeworth, 993 F. 2d 51, 55-56 (5th Cir. 1993).  Casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary are examples of policies whose proceeds are property of the estate.  Id. at 56.  "But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy.  Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract." Id.  In Edgeworth, the Fifth Circuit held that the proceeds of the debtor's medical malpractice liability policy were part of the bankruptcy estate but that the proceeds of the policy were not a part of the estate. Id. The Fifth Circuit also stated, in dicta, that "no secondary impact has been alleged upon Edgeworth's estate, which might have occurred if, for instance, the policy limit was insufficient to cover appellants' claims or competing to claims to proceeds."  Id.

Here, Debtors have failed to show that the BSA abuse insurance policies differ from the typical liability policies where the debtor will not have a cognizable interest

in the proceeds of the policies.  They have failed to show, and the Court did not find, that Debtors are entitled to the proceeds of the policies.  At most, the Court found, without citing language from each of the bought-back policies, that "[t]he Abuse Insurance Policies provide direct coverage—indemnity, and in many cases, defense—to BSA or the Local Council" and that "[t]his indemnification is not hypothetical or speculative."  D.I. 1-3 at 91.  That some unidentified policy or policies may provide indemnification or defense is irrelevant as these do not constitute proceeds that are payable to Debtors; the liability policy proceeds are still payable to injured persons such as Survivors including Lujan Claimants and Debtors failed to prove, and the Court failed to make specific findings from policy language, otherwise.  Debtors also failed to argue or prove that the proceeds must be considered property of the estates because this is a mass tort bankruptcy.  They have failed to argue or prove that the policy limits are insufficient to pay creditors' claims.  In fact, prior to the mid-1980s, the insurance policies were generally non-aggregate, meaning that the policy limits were per-occurrence or per person.  Also, combined primary and excess policy limits often resulted in millions of dollars per-occurrence or per person.  Debtors never made this argument because they could never prove that the insurance coverage was insufficient to pay Survivors on their claims.  Even if they did, the so-called mass tort exception should not be followed since it is not based on any statute or rule.  There are no magic numbers for determining when a

bankruptcy case qualifies for this mass tort exception.  There is no authority to support the position that a high number of creditors converts non-estate property into estate property.

Debtors rely, as the Court did, on In re Allied Digital Techs., Corp., 306 B.R. 505 (Bankr. D. Del. 2004), to support their argument for subject matter jurisdiction over the policies' proceeds.  But that case again does the opposite.  In Allied Digital, the court stated that "the cases [addressing whether proceeds of a liability insurance policy are property of the estate] are controlled by the language and scope of the policy at issue not by broad, general statements."   Id. at 509 (citing In re CyberMedica, Inc., 280 B.R. 12, 16 (Bankr. D. Mass 2002) (a determination whether the proceeds of a directors and officers' liability insurance policy is a fact-based analysis)).   In this case, neither Debtors nor the Court engaged in a fact-based analysis of the specific language and scope of each of the bought-back policies.

Furthermore, Debtors and the Court seem to believe that the unidentified policy(ies) which provide(s) indemnification coverage where indemnification is non-hypothetical and non-speculative justifies a conclusion that the proceeds of all of the numerous policies are property of the estate.  However, the fact that 82,209 Survivors filed proofs of claim in the bankruptcy case does not prove that indemnification is hypothetical or non-speculative.  If that were the case, then indemnification would never be considered hypothetical or speculative in a

14

bankruptcy case where a creditor with a covered personal injury claim files a proof of claim in the bankruptcy case. There is simply no authority to support this position, and the Court cited none in the Opinion. The truth is that the Settling Insurers' buyback payments are not meant to pay Debtors for indemnification coverage owed to them; these buyback amounts are going to a Settlement Trust to pay injured persons who may or may not be covered by these specific settling insurers policies. There was no proof that the buyback amounts are payments to either Debtor for defense costs or indemnification; again, Debtors will not walk away with these amounts as they go to injured persons through the Settlement Trust. In fact, the Chubb Order provides that Debtors' "Claims and Causes of Action against Century and the Chubb Companies for payment of defense and indemnity costs allegedly owed as of the Petition Date" are settled and released in exchange for the $50,000,000 Initial Payment provided under the Century and Chubb Companies Insurance Settlement Agreement. ALW142-144. Thus, Debtors, Century, and the Chubb Companies admit that the rest of the $800 million (i.e., $750 million) has nothing to do with coverage for indemnification and defense but is to be payable to injured persons. Clearly, at the very minimum, Debtors cannot claim that they have a cognizable legal claim to the $750 million that is not part of the settlement of defense cost and indemnification claims identified in the Chubb Order. The Court

clearly lacks jurisdiction over the $750 million proceeds from Century and the Chubb Companies settling insurers policies.

Additionally, Appellees failed to prove that the estate includes proceeds of the 1976 and 1977 Hartford insurance for coverage of sexual abuse claims.  No one disputes that BSA released its right to be covered under those policies for sexual abuse claims.  The fact that BSA has coverage under these policies for non-sexual abuse claims is irrelevant because Lujan Claimants are not arguing that the proceeds of the policies to cover non-sexual abuse claims are excluded from the estate.  This is misdirection by Appellees to escape the obvious—that, since BSA released its right to coverage for sexual abuse claims, then it has no right to proceeds covering those claims.  Appellees argue that the local councils retained coverage under those policies for sexual abuse claims.  However, as argued below, the Bankruptcy Code does not permit this non-estate property to be converted to estate property.

**D. The Nondebtor Insurance Policies are not property of Debtors' estates.**

The Court erroneously found that nondebtors' insurance policies become property of Debtors' estates once they are assigned.  The Court and Debtors rely upon 11 U.S.C. § 541(a)(7) as the sole statutory authority endowing the estates with such largesse.  D.I. 207; D.I. 1-3 at 87.  Section 541(a)(7) provides that the debtor's bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. § 541(a)(7).  Debtors contend that, since

16

nondebtors will be assigning their insurance policies to BSA in connection with the Plan, Debtors will then have an interest in these policies as they acquire this interest after commencement of the bankruptcy case. However, it's not as easy as Debtors think.

Section 541(a)(7) was enacted by Congress "'to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate.'" In re Porrett, 564 B.R. 57, 68 (Bankr. D. Idaho 2016) (quoting In re Neidorf, 534 B.R. 369, 371 (9th Cir. BAP 2015)). Section 541(a)(7) "'presupposes … that the estate has an interest in the property. This section does not expand the debtor's interest in the property merely because it was delivered postpetition. [T]his section is not intended to expand the property rights that a debtor would possess under 541(a)(1).'" In re Porrett, 564 B.R. 57, 68-69 (Bankr. D. Idaho 2016) (quoting In re Pettit Oil Co., No. 13-47285, 2016 WL 4132473, at *4 (Bankr. W.D. Wash. July 29, 2016) (internal citation omitted)); see also In re Patterson, 2008 WL 2276961, at *6 (Bankr. N.D. Ohio June 3, 2008) (stating that section 541(a)(7) does not provide an independent basis for the creation of estate property and "only operates when property is encompassed within the estate in the first instance"). "Thus, some 'property' of the bankruptcy estate within the meaning of § 541(a)(1) must be used to acquire the 'interest in property' post-petition for § 541(a)(7) to bring that after-acquired

17

'interest' into the bankruptcy estate." Id. at 69.   In Neidorf, the Bankruptcy Appellate Panel of the Ninth Circuit explained that, for the after-acquired interest to be property of the estate under section 541(a)(7), "the interest (1) must be created with or by property of the estate; (2) acquired in the estate's normal course of business; or (3) otherwise be traceable to or arise out of any prepetition interest included in the bankruptcy estate."   534 B.R. at 371-72.

Debtors failed to meet their burden in proving that nondebtor insurance policies are after-acquired property of the estates.   First of all, there is no evidence that these policies were ever assigned or transferred to Debtors and so they clearly are not currently property of the estates.   Second, unless the Confirmation Order is reversed or vacated on appeal, these policies are anticipated to be assigned or transferred upon Debtors' reorganization, so at that point there is no bankruptcy estate.   Third, even if these policies were assigned to Debtors and there was a bankruptcy estate, Debtors have failed to prove that estate property was used to bring nondebtor insurance policies into the estates.   Instead, Debtors have the audacity to use nondebtor property to acquire nondebtor insurance policies.   In other words, Debtors plan to acquire Local Councils' and Chartered Organizations' separate insurance policies and interests in BSA insurance policies in exchange for the nonconsensual release of Survivors' claims against these insureds.   It should not have to be said that Debtors have no ownership of Survivors' claims for child sexual

abuse against tortfeasors, such as BSA, local councils, and chartered organizations, and their insurers.  Debtors never owned Survivors' most intimate personal injury claims prior to bankruptcy and the filing of bankruptcy does not give them power to take ownership or control of Survivors' claims.  As Debtors are not giving any of their property to acquire, post-petition, nondebtors' insurance policies and interests in insurance policies, any interest that Debtors may acquire in these nondebtor insurance policies and interests in BSA insurance policies is not property of the estate under section 541(a)(7).  They are not a part of the bankruptcy estates and the Court lacks subject matter jurisdiction over them.

If Debtors are allowed the inclusion of nondebtor policies and policy interests in their estates, then it would set a poor precedent for creditors, including direct action claimants who have interests in the policies.  Nondebtor property would effectively be laundered through another's bankruptcy to enjoy the awesome protections of the Bankruptcy Code, including free and clear sales under 11 U.S.C. § 363(f), to the clear detriment of creditors of the nondebtor and creditors of the nondebtor's insurers.  If nondebtors want the protections of the Code, then they need to file their own bankruptcy case, which has not been done by any local council and most chartered organizations.

### E. The Insurance Settlements impermissibly modify Lujan Claimants' rights.

Appellees have failed to show that Lujan Claimants' interests in insurance settlements were not impermissibly modified by the insurance settlements. Debtors' reliance upon In re W.R. Grace & Co., 475 B.R. 34 (D. Del. 2012), is unavailing because they misinterpret the Court's ruling. No one can seriously contest that Guam has a direct action statute that provides that persons injured in Guam can file direct actions against insurers of tortfeasors. Thus, as argued in their opening brief, Lujan Claimants, who were all injured in Guam, have direct action rights against tortfeasors' insurers, including BSA's insurers, Aloha Council's insurers, the relevant chartered organizations' insurers, and other tortfeasors' insurers. Debtors' citation to language in the W.R. Grace decision is misleading because the court in that case was discussing the Libby Claimants who do not have direct action rights against insurers. Thus, they would have to obtain a judgment first against the insured tortfeasor in order to pursue insurance proceeds. Under Guam's Direct Action Statute, Lujan Claimants do not need to obtain a judgment in order to pursue insurance proceeds; the law grants them a right to sue an insurer without ever having to sue the insured tortfeasor. Since Lujan Claimants can directly sue insurers without first obtaining a settlement or judgment against the insured tortfeasor, they do not have a mere expectation of recovery. As Lujan Claimants have an interest in the insurance policies, and not just an expectation of recovery, the insurance settlements impermissibly modified their rights.

20

**F. The insurance policies could not be sold fee and clear of Lujan Claimants' interests, and without adequately protection and compensation.**

In their response briefs, Appellees failed to show that Lujan Claimants lack interests in the insurance policies.  They cite mass tort cases, but they are based on an exception that Appellees have failed to prove, as discussed above.

Appellees place great weight on Guam's Direct Action Statute as supposedly being procedural as opposed to substantive in nature, yet they cite no statute, case, rule, or other authority which states that direct action claimants lack interests in insurance policies where the direct action statute is procedural and not substantive. It is much ado about nothing

They argue that Lujan Claimants are adequately protected and compensated because they will "likely be paid in full for their claims."  D.I. 66 at 214.  However, nowhere in the Plan does it guarantee that Lujan Claimants will receive full payment on their claims, including at least full payment at least up to sold policy limits.  A priority right to insurance proceeds would guarantee payment in full, but the only Survivors receiving a priority right are those who elect the Independent Review Option.  But even those IRO Survivors are not guaranteed full payment.  Their priority right is as to unsettled insurance policies which may never settle, and which may never enjoy any benefits of free and clear sales or become part of Debtors' estates since these hypothetical settlements would occur post-reorganization.  If there are no settlements with the non-settling insurers then IRO Survivors would be

unable to receive payment beyond the $1 million to be paid from the general fund, and which may never be fully paid from the general fund. Even if these highly speculative and conjectural settlements with currently non-settling insurers come to pass, the IRO only funds amounts over the first $1 million of the IRO Survivor's award. The IRO Survivor may never be paid entirely on its first $1 million through the general fund of the Settlement Trust. Also, Debtors failed to prove and the Court failed to explain how directly suing non-settling insurers would lead to full payment of Lujan Claimants' claims. Regardless of whether there is full payment, no form of relief through the Plan constitutes a replacement of Lujan Claimants' lost interests in the sold insurance policies. The value of the direct action claims are also diminished by the insurance settlements because the proceeds of policies Lujan Claimants could have directly sued on will be distributed among more than 80,000 creditors. The Code requires that Lujan Claimants be provided adequate protection and compensation, but none was given.

### G. The Plan and Confirmation Order unquestionably violate the automatic stay in the bankruptcy case of the Archbishop of Agana.

As a preliminary matter, seventy Lujan Claimants are creditors of both this bankruptcy case and the AOA bankruptcy case for abuse related to scouting.[1]

---

[1] See Jtx. 14 (Proof of Claim Nos. 17480, 2010, 87715, 2991, 15139, 6434, 103378, 79403, 96419, 3120, 22872, 15104, 2394, 4858, 40889, 23388, 10548, 22874, 6825, 14187, 7977, 4859, 58370, 2597, 35352, 103377, 4857, 5655, 3616, 3051, 80982, 18860, 48168, 87757, 7976, 248, 25069, 2840, 18873, 45702, 4860, 35354, 2403,

Appellees do not dispute their status as creditors in the AOA bankruptcy.  The automatic stay is meant to protect the debtor and its creditors.  Appellees' main argument against standing is that the Ninth Circuit, which has appellate jurisdiction over the District Court of Guam, does not recognize a creditor's standing to assert automatic stay violations.  However, in Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F. 2d 581, 585-86 (9th Cir. 1993), the Ninth Circuit held that "[t]he [automatic] stay protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others."  Also, in In re Goodman, the Ninth Circuit stated that prepetition creditors normally shall recover damages under 11 U.S.C. §§ 362(h) and 1109(b) for willful violations of the automatic stay.  991 F. 2d 613, 618 (9th Cir. 1993).  The Ninth Circuit further stated that corporate creditors who do not qualify as an "individual" for section 362(h) relief may recover damages caused by a violation of the automatic stay under the theory of ordinary civil contempt.  Id. at 620.  In accordance with this precedent, courts within the Ninth Circuit have held that the automatic stay is intended to benefit creditors, as well as debtors, and that creditors have standing under section 362(h) to seek damages for alleged stay

---

25063, 1746, 6824, 1670, 3614, 79769, 22873, 8037, 2433, 1677, 11251, 5646, 8038, 6432, 2885, 2011, 3385, 40890, 80655, 3610, 11250, 1913, 2003, 1953, 1757).

violations.  See, e.g., In re Int'l Forex of Cal., Inc., 247 B.R. 284, (Bankr. S.D. Cal. 2000).

For their argument that Lujan Claimants lack standing to raise automatic stay violations, Appellees chiefly rely on two cases which are readily distinguishable.  In In re Pecan Groves of Ariz., 951 F. 2d 242, 245 (9th Cir. 1991), the Ninth Circuit held that where a chapter 7 trustee does not appeal an adverse ruling on an alleged stay violation, intervening creditors lack independent standing to do so.  "In re Pecan Groves is distinguishable [from a chapter 11 case] on several grounds, including: (1) its holding appears limited to an instance where a trustee in control of the debtor opts not to pursue an appeal; (2) it was a chapter 7 case where § 1109(b) was not applicable; and (3) the intervening creditors in Pecan Groves were also guilty of laches." Int'l Forex, 247 B.R. at 290-91.  Unlike in Pecan Groves, there is no trustee in control of AOA's estate (or, if relevant, of Debtors' estate), AOA's bankruptcy case is under chapter 11 (as is Debtors' case) and not chapter 7 and so section 1109(b) applies, and there is no evidence or argument by anyone that Lujan Claimants are guilty of laches.  Accordingly, Pecan Groves is inapposite.

Regarding the other case primarily relied upon by Appellees—In re Barrett, 833 F. Appx. 668 (9th Cir. 2020), that case is unpublished and, under Ninth Circuit Rule 36-3, is not precedent for this case since it is not relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion, and it may not be

24

cited to a court outside of the Ninth Circuit except for factual purposes, such as to show double jeopardy, sanctionable conduct, notice, entitlement to attorneys' fees, or the existence of a related case.  Based on Ninth Circuit Rule 36-3, Debtors should not be citing Barrett because the Rule does not allow its citation here under these circumstances.  Even if it were citable, it is clearly not Ninth Circuit precedent.  It should be disregarded.  Even if not disregarded, Barrett is a chapter 7 case like Pecan Groves, and therefore is distinguishable in the same way that Pecan Groves is distinguishable from AOA's chapter 11 bankruptcy and even Debtors' chapter 11 bankruptcy.

As Lujan Claimants have a pecuniary interest that is directly and adversely affected by the violation of the automatic stay, which results in them being enjoined from pursuing sold insurance policies through AOA's interest in those policies, they have standing to raise automatic stay violations in this case, including on appeal.

Appellees incorrectly argue that confirmation of the AOA Plan renders the automatic stay issue moot.  The AOA Plan does not endorse or defer to Debtors' Plan.  Instead, it neither affirmatively authorizes no one to violate or prohibits anyone from violating any relevant and operative provision of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order.  D.I. 66 at 221.  In the Ninth Circuit, "violations of the automatic stay [are] void, not voidable." In re Schwartz, 954 F. 2d 569, 571 (9th Cir. 1992); see also Hillis Motors, 997 F. 2d

25

at 586 ("In this circuit, actions taken in violation of the automatic stay are void rather than voidable.").  Thus, if the Plan or Confirmation Order provision violates the AOA bankruptcy's automatic stay, then such provision is void.  As a void provision, it is neither a relevant nor operative provision.  Even if such provision is still somehow relevant and operative (despite the stay violation, and legally impossible to be operative, but let us still consider this very hypothetical scenario), the AOA Plan does not prohibit anyone from violating this relevant and operative provision. Thus, while "neutral," the AOA Plan does not "abide by" Debtors' Plan in any way, shape, or form.

Appellees look forward to the AOA Plan becoming effective as soon as possible, for the reason that the automatic stay will terminate upon AOA's emergence from bankruptcy.  However, the Effective Date of the AOA Plan has not yet come and neither Appellees nor Lujan Claimants can predict when it will come. Appellees also conveniently omit that the AOA Plan is on appeal before the Ninth Circuit, and no briefing has yet occurred.  Their speculation as to the Effective Date should be disregarded.  Even if the Effective Date occurs tomorrow, Lujan Claimants will still have a live case or controversy because the Plan's injunctions purportedly preclude creditors of AOA from pursuing settling insurers policies through AOA's interests in those policies.  Under the AOA Plan, all of the settling insurers in this

case qualify as non-settling insurers in the AOA bankruptcy, against whom AOA creditors may pursue direct actions.

Richly, Appellees argue that Lujan Claimants' claims against AOA and its insurers were never protected by the AOA's automatic stay. D.I. 66 at 225. Debtors contend, without the slightest hint of irony or self-awareness, that "Lujan Claimants' claims and procedural rights are not property of the AOA's estate." Id. Lujan Claimants agree with Debtors that their child sexual abuse claims against AOA are not a part of AOA's estate. Yet, that does not mean that Debtors then have free rein to pillage AOA's interest in settling insurers policies. That Lujan Claimants' personal injury claims do not belong to AOA's estate has no relevance to the issue of the automatic stay violation. If it were relevant, there would be no point in arguing whether Lujan Claimants have standing to raise violations of the automatic stay. The automatic stay is violated at least through the injunctions prohibiting AOA and its creditors including Lujan Claimants from pursuant settling insurers and settling insurers policies. Even the Court acknowledged that AOA is affected by the injunction. The fact that Lujan Claimants may pursue AOA, but not the settling insurers policies, does not somehow validate the void injunctions.

The Settling Insurers' newfound waiver ability does not negate the automatic stay violation. The Settling Insurers settlements contemplated the scenario where a bankrupt chartered organization might refuse to consent to the terms of the insurance

27

settlement agreements.  <u>See, e.g.</u> D.I. 8816-1 ¶ 12 ("To the extent that a Bankrupt Chartered Organization does not agree to provide written consent to the terms of this Agreement, such Bankrupt Chartered Organization shall automatically be deemed an Opt-Out Chartered Organization for all purposes hereunder.  The Parties will use reasonable efforts to jointly resolve such non-consent, which may, upon the consent of the Parties, include excluding such Bankrupt Chartered Organization from the protections and benefits otherwise provided herein, provided that the failure to obtain such consent as it applies to the applicable Bankrupt Chartered Organization shall not be deemed a breach of this Agreement by any Party or a failure to satisfy a condition to the effectiveness of the Plan.  The Parties consent to the foregoing provisions covering the Settling Insurers to apply to any other Settling Insurance Company.  The Settling Insurers reserve all rights and defenses they have under policies issued to Bankrupt Chartered Organizations that do not consent to the terms of this Agreement.").  Despite their express agreement that the failure to obtain a bankrupt chartered organization's consent to the settlement terms shall not be deemed a breach of the agreement or a failure to satisfy a condition to the effectiveness of the Plan, Appellees claim that the settling insurers could waive a condition precedent.  It is unclear, though, what condition precedent may be waived, since the failure to obtain a bankrupt chartered organization's consent shall not be deemed a failure to satisfy a condition to the effectiveness of the Plan.  Appellees

28

are grasping at straws in attempting to argue that no violation of the automatic stay occurred, when it is clear, even from the Court's own admission, that the injunctions affect the AOA and its interest in the insurance policies subject to buybacks by exercising control over AOA's interest in the policies.  Any actions in furtherance of the injunctions as to AOA's interest in the policies, including but not limited to Settling Insurance Companies' so-called voluntary waivers, are automatic stay violations and therefore void *ab initio.*

## H. Guam's Direct Action Statute reverse preempts conflicting Bankruptcy Code provisions under the McCarran-Ferguson Act.

Appellees' arguments against the application of the MFA here are meritless. As for the first requirement, Appellees dwell on 11 U.S.C. § 1123(a)(5)'s language granting the bankruptcy court authority to provide adequate means for, implementation of a plan "[n]otwithstanding any otherwise applicable bankruptcy law."  D.I. 81 at 62.  But nothing in section 1123(a)(5) specifically relates to the business of insurance; "insurance" is not even mentioned.  Appellees have cited no case law which actually holds that section 1123(a)(5) makes the MFA inapplicable to an entire reorganization plan.  If that were the case, then a reorganization plan would be a hotbed for provisions not authorized under the Code (other than nonconsensual third party releases) or nonbankruptcy law.  This is inconsistent with the case law cited by Lujan Claimants that provide that the Bankruptcy Code does not specifically relate to the business of insurance.  D.I. 40 at 37.  If the Bankruptcy

Code does not regulate the business of insurance, then section 1123(a)(5) cannot sanction the invalidation, impairment, or superseding of direct action rights.  In re Purdue Pharma, L.P., 21 cv 7532 (CM), 2021 WL 5979108, at *64 (S.D.N.Y. Dec. 16, 2021) ("Section 1123(a)(5) does not authorize a court to give its imprimatur to something the Bankruptcy Code does not otherwise authorize, simply because doing so would secure funding for a plan.").  Also, no Appellee has argued that adequate means for implementation of a plan requires stripping Lujan Claimants of their Guam-given direct action rights against insurers.  As no Bankruptcy Code section cited by Appellees specifically relates to the business of insurance, this first requirement of the MFA is met.

The second requirement is also met because Guam's Direct Action Statute was enacted for the purpose of regulating the business of insurance.  Except to reiterate what the Court had previously said about Evans v. TIN, Inc., Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162 (E.D. La. June 20, 2012). Appellees do not meaningfully address the other cases cited by Lujan Claimants that looked specifically at direct action statutes.  In Wadsworth v. Allied Professionals Ins. Co., 748 F. 3d 100 (2d Cir. 2014), the Second Circuit looked at the very issue under the MFA of whether a direct action statute was enacted to regulate the business of insurance.  The Second Circuit found that

application of New York's direct action statute would "undoubtedly" regulate insurers by subjecting them to lawsuits filed in New York by claimants who are not parties to the policies, by increasing the cost of litigation including higher attorney fees, costs, and potential recoveries, and by requiring insurers to place in their New York contracts a provision that is not required in other states. Id. at 108. Likewise, Guam's Direct Action Statute undoubtedly regulates insurers by subjecting them to lawsuits filed in Guam by claimants who are not named parties to the policies, by increasing the costs of litigation such higher attorney fees, costs, and potential recoveries, and by inserting direct actions into their contracts. Similarly, in Reis v. OOIDA Risk Retention Group, Inc., 303 Ga. 659 (2018), the Georgia Supreme Court analyzed whether Georgia's motor carrier and insurance carrier direct action statutes regulate the operation of the risk retention group. In answering the question, the court looked to the same factors to be considered under the MFA on whether a practice is part of the business of insurance—whether the practice effectively transfers or spreads a policyholder's risk; whether it is an integral part of the contractual relationship between the insurer and insured; and whether the practice is limited to entities within the insurance industry. Id. at 662-63. The court found that Georgia's direct action statutes would impact operation of the business of insurance inasmuch as application of the statutes would result in the spreading of risk and associated increases in costs due to the financial burden of defending unanticipated

31

lawsuits in which insurers are directly named as parties, in affecting the relationship between an insurer and insured by creating possible conflicts of interests between the insurer and the policyholder, and in limiting their application to insurers of motor carriers.  Id. at 665-666.  Likewise, Guam's Direct Action Statute regulates the business of insurance as application of the Guam statute would result in the spreading of risk and associated increases in costs due to the financial burden of defending lawsuits in which insurers are directly named as parties by persons injured in Guam, in affecting the relationship between and insurer and the policyholder by creating the conflicts of interest between the insurer and policyholder which would require among other things that each have its own separate counsel if sued in the same lawsuit, and in limiting their application to insurers of tortfeasors responsible for personal injury in Guam.  Appellees failed to refute any of this, and they failed to refute the application of Evans except to repeat the Court's irrelevant citation to one Guam case.  Guam's Direct Action Statute undoubtedly regulates the business of insurance, including the relationship between the insured and policyholder and, therefore, the second requirement is met.

The third requirement is also met because the Plan and Confirmation Order clearly enjoin Lujan Claimants from exercising their direct action rights against settling insurers including but not limited to Century and Hartford.  Appellees failed to prove otherwise.

As all three requirements are met, the MFA requires that Guam's Direct Action reverse preempt conflicting Bankruptcy Code provisions. The Confirmation Order must be reversed because the Plan invalidates, impairs, and supersede Lujan Claimants' direct action rights.

## I. The best interest of creditors test was not met.

Contrary to Appellees' contention, the plain language of 11 U.S.C. § 1129(a)(7) does not exclude from the best interest of creditors analysis the value of claims released against third parties. Section 1129(a)(7) requires that each dissenting creditor "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7). The best interest of creditors test is meant to protect creditors by ensuring that each dissenting creditor receives at least what he would have received under a chapter 7 liquidation; the test is meant to ensure appropriate compensation for the resolved claim.

Thus, in line with this purpose, each dissenting creditor must receive on account of each resolved claim (including claims against third parties) at least the same value he would receive under chapter 7.

If section 1129(a)(7) is to be interpreted in the way put forth by Appellees, then it supports Lujan Claimants' argument that the Bankruptcy Code only has

33

statutory authority to resolve claims against the debtor and not to grant nonconsensual third party releases of creditors' claims. If the claim or interest at issue under the plan must only be the creditor's claim against the debtor, then the plan cannot include nonconsensual resolution of creditors' claims against nondebtors. Appellees cannot have it both ways.

Appellees argue that, even if creditors' claims against nondebtors must be considered in the best interests of creditors test, Lujan Claimants' claims against nondebtors are unliquidated and too speculative to be included in a liquidated analysis. However, they ignore the lost direct action claims against settling insurers, which are up to the policy limits. Notably, the Court stated that it would be impossible to value any particular claims since there are 82,209 different claims against tens of thousands of nondebtors. D.I. 1-3 at 244. The high number of creditors and high number of released third party claims do not provide an exception to the requirement that Debtors prove that the best interests of creditors test is met. Debtors failed to provide a liquidation analysis as to these third party claims, which was their burden to do. They failed to prove that this Bankruptcy Code requirement was satisfied.

Debtors argue that the best interest of creditors of test is met because Lujan Claimants will likely be paid in full. However, as discussed earlier, this was not supported by the record. Now, Lujan Claimants will lose claims against religious

orders who are not chartered organizations but who have liability for their scouting-related abuse.  These are the Roman Catholic Entities who will now receive the benefit of nonconsensual third party releases.  There was no testimony by anyone, including Dr. Bates and Ms. Gutzler, of the value of Survivors' claims against Roman Catholic Entities and their insurers.  These claims were not part of any analysis relating to whether Survivors will be paid in full.  This provides an additional basis for rejecting Appellees' repeated cry of "likely payment in full."

## J. The Plan improperly classifies Lujan Claimants and treats them unequally.

Appellees' argument that Lujan Claimants are properly classified is based on the mistaken premise that Lujan Claimants have no interest in the insurance policies. As Lujan Claimants do have an interest in such policies, including policies that are a property of the estates, the Code requires their different classification from unsecured creditors who lack interests in the policies.

As Lujan Claimants are required to give up their interests in the policies, while others have no interests in the policies to give up, Lujan Claimants are paying more consideration in exchange for the same treatment as creditors who lack interests in the policies. This is unequal treatment in violation of the Code.

Regarding the other unequal treatment—Survivors being required to relinquish their claims against chartered organizations for abuse that first occurred post-1975, while Survivors who were first abused before 1976 are allowed to keep

their claims against chartered organizations—Lujan Claimants did not waive this argument.  They raised it before the Bankruptcy Court including during the trial, Bankr. D.I. 9639 at 294-95, and they raised it in their objection to the motion to amend and supplement the Opinion, Bankr. D.I. 10246 at 3.  At no time prior to Debtors' December 7, 2022, response brief, did anyone object to Lujan Claimants' raising this issue.  Thus, they themselves waived their objection by filing to object before the Bankruptcy Court.  The Court itself never found the objection to have been waived.  Also, there is standing to make this objection.  One Lujan Claimant, SA Claimant No. 73585, was first abused in 1981 and there is no evidence that his troop was sponsored by the Archbishop of Agana.  Jtx. 14 (Proof of Claim No. 73585).  In fact, he has never made a claim against AOA for his scouting abuse, as he believes a non-religious organization was the chartered organization for his troop.  Accordingly, since he must give up his claim against a chartered organization that is not AOA, while other Survivors retain their claims against chartered organizations, he is paying more consideration in order to receive the same treatment.  He has standing to raise the issue of his unequal treatment.

Appellees fail to address this objection on its merits, and therefore they concede this point. See, e.g., D.I. 66 at 244-45.

### K. The Motion to Amend and Supplement should not have been granted to confirm a materially modified plan of reorganization.

36

Appellees again begin with a meritless attack on standing to divert attention away from their clear failures.  As Lujan Claimants have said before more than once, not all Lujan Claimants voted to reject the Plan.  Of the 75 Lujan Claimants, 72 voted to reject, 2 did not vote, and 1 voted to accept.  Jtx. 2664 (showing Claimant No. 58317 as voting to Accept).  Thus, three Lujan Claimants did not vote to reject the Plan.  Since one Lujan Claimant voted to accept the Plan, at least he has standing to raise this objection.  And he is directly affected by both undisclosed and materially adverse modifications to the Plan.

Debtors never provided adequate disclosure of the new Plan amendments including the Roman Catholic Entities as Participating Chartered Organizations and requiring undisclosed strong fraud prevention measures.  The Court never approved a disclosure statement which adequately disclosed these Plan provisions, which they were required to do because they are material and adverse changes to the solicited Plan.  At the time of the Opinion, the Court never addressed any Plan or disclosure statement which includes either Roman Catholic Entities as Participating Chartered Organizations or the strong fraud prevention measures.  It was not until trial that Debtors even amended a plan to include the Roman Catholic Entities, as that term was never in any plans that existed before the close of trial.

As a result of Debtors' settlement with the Ad Hoc Roman Catholic Committee, reached during the Confirmation hearing, never before disclosed or

37

defined "Roman Catholic Entities" were to receive the benefits of nonconsensual third party releases and injunctions as Participating Chartered Organizations. However, Debtors, up to now, have never disclosed who exactly these Roman Catholic Entities are.  There is no list of individuals or entities that fall under the definition of that term that was sent out by Debtors to creditors including Lujan Claimants.  "Roman Catholic Entities" means:

> each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, **regardless of whether any of the foregoing entities is or was a Chartered Organization at any time** or whether such facilities were owned or leased by any of such entities or third party, (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, and (iii) all Representatives of the foregoing, including their attorneys, any affiliates and the RCAHC.

D.I. 1-3 at 15 (bold added).  These entities are now being treated as Participating Chartered Organizations, even if they were never a chartered organization.  They include three different categories, none of which has been disclosed adequately by Debtors.  As to the first group, Debtors have never disclosed to creditors each and every Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting in any way.  As to the second group, Debtors have never disclosed who are the entities listed or

eligible to be listed in the Official Catholic Directory since January 1910—112 years ago.   Regarding the third group, Debtors have never identified who the Representatives of the foregoing are, including their attorneys and their affiliates. Debtors have never even disclosed how many Roman Catholic Entities there are who will now enjoy the benefits and protections of nonconsensual third party releases and injunctions, but Lujan Claimants believe that they can easily number in the tens of thousands.   That Debtors now consider these undisclosed entities to be Participating Chartered Organizations does not make it less material or adverse of a change to the Plan.   Prior to this modification, Survivors could argue that an individual or entity was not protected from suit because it was not a chartered organization that had a charter to sponsor a troop.   Now, it does not matter if the individual or entity had a charter to sponsor a troop; their connection to scouting and to a church earns it a get-out-of-jail-free card, which is so easily given in the Plan. There is no compensation at all given by a non-chartered organization Roman Catholic Entity for its release, as it is not insured under BSA or local council insurance policies.   Debtors have never even tried to articulate the compensation they are supposedly paying for their release.   The one Lujan Claimant who voted to accept the Plan also has a post-1975 (specifically, 1976 and 1977) claim against religious orders which are not chartered organizations, as the chartered organization was the Archbishop of Agana.   Jtx. 14 (Proof of Claim No. 58317).   This

modification materially and adversely changes the Plan's treatment of his claim by now depriving him of his claim against the Capuchin Franciscans, Capuchin Franciscans Province of St. Mary, and Capuchin Franciscans Custody of Star of the Sea, even though none were the chartered organization for his troop.

The other modification to the Plan—the strong fraud prevention measures— also is a material and adverse change to the Plan.  It is not an absurd objection because Survivors have a right to know how their claims will be evaluated under the Plan, just as they have a right to know how their claims will be evaluated under the Trust Distribution Procedures.  That a Survivor's claim is ultimately allowed under the TDPs and unknown strong fraud prevention measures does not mean that he lacks standing to object to the adequacy of the disclosure of the strong fraud prevention measures, and to the loss of opportunity to vote on the materially and adversely modified Plan.  The accepting Lujan Claimant may change his vote to reject if he discovers that fraud prevention measure to be unfair.  He may also change his election of the Expedited Distribution to a non-election, if he believes that the strong fraud prevention measures are too onerous and invasive to justify a total settlement (including against Protected third parties) of $3,500.  He has standing to raise this issue because he not only voted to accept, but he also elected the Expedited Distribution on the ballot.  Jtx. 2664 (Claim No. 58317).

**L. Joinder in D&V Claimants' Reply Brief.**

40

Lujan Claimants hereby join in and incorporate as if fully set forth herein D&V Claimants' Reply Brief.

## III. CONCLUSION

The Confirmation Order must be reversed.

Dated:  December 21, 2022.            Respectfully submitted,

 /s/ *Christopher D. Loizides*
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: loizides@loizides.com

and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com
*Attorneys for Lujan Claimants*

# CERTIFICATE OF COMPLIANCE

The foregoing Reply Brief of Appellants Lujan Claimants complies with D. Del. L.R. 7.1.3(f) and Fed. R. Bankr. P. 8015(a) (7) (B) and (h) as modified by this Court's Order.  This Brief has been prepared using Times New Roman 14-point typeface in Microsoft Word. This Brief contains 10,129 words, as calculated by Microsoft Word.

Dated:  December 21, 2022.                    Respectfully submitted,

 /s/ *Christopher D. Loizides*
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: loizides@loizides.com


and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com


*Attorneys for Lujan Claimants*