## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | Lead Case No. 22-cv-01237-RGA |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, | Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; 22-cv-01240-RGA; 22-cv-01241-RGA; 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |
| Appellants. | |
| v. | |
| Boy Scouts of America and Delaware BSA, LLC, *et al.*, | |
| Appellees. | |

## APPELLEES' OMNIBUS JOINT OPPOSITION TO
## MOTIONS FOR STAY PENDING APPEAL

Appellees Boy Scouts of America and Delaware BSA LLC (together, the "BSA") and the undersigned Appellees respectfully submit this brief, the declaration of Brian Whittman (the "Whittman Declaration"), and the declarations of certain survivors and their representatives (the "Survivor-Related

---

[1] The last four digits of each Debtor's federal tax identification number, are: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Declarations")[2] in opposition to the emergency motions for stay pending appeal filed by Appellants [D.I.[3] 152, 154 and 156] (collectively, the "Stay Motions").

## PRELIMINARY STATEMENT

The BSA and numerous other parties in interest negotiated a plan that "ensure[s] the survival of an American institution, not only so that it may continue carrying out its charitable mission, but as a means to arguably more important ends: providing long-awaited compensation to abuse Survivors."  D.I. 150 (the "Affirmation Opinion") at 6-7.  Following a "lengthy, contentious, and emotionally charged proceeding," the Bankruptcy Court confirmed the Plan supported by every estate fiduciary and the overwhelming majority of abuse survivors in a 269-page opinion and confirmation order.  *Id.* at 6.  Upon entry of the Affirmation Opinion, all conditions precedent to the effective date of the Plan[4] can now be satisfied, and

---

[2]   Survivor-Related Declarations are submitted by Stephen Ehmann, David Stern (ASK LLP), Evan Smola (Hurley McKenna & Mertz), Irwin Zalkin (Zalkin Law Firm), Jordan Merson (Merson Law, PLLC), Peter Janci (Crew Janci LLP), Patrick Stoneking (Jeff Anderson & Associates, P.A.), and Paul Mones (Paul Mones P.C.).

[3]   "D.I. ___" refers to documents filed in this consolidated appeal docket (Case No. 22-cv-01237 (RGA)). "Bankr. D.I. ___" refers to documents filed in the main bankruptcy case that is the subject of this appeal (Case No. 20-10343 (LSS)).

[4]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC* [D.I. 1-4] (the "Plan"), or in the Affirmation Opinion, as applicable.

2

no further delay is warranted.  A stay would jeopardize the BSA's ability to continue its mission and compensate survivors.

Certain non-settling insurance companies and two claimant groups comprised of less than 0.2% of survivors seek to stay implementation of the Plan pending resolution of their contemplated appeals to the Third Circuit, which could take up to two years.  Appellants raise the same issues that two courts have already determined are meritless in lengthy, detailed opinions applying established law to largely uncontroverted facts.  Appellants cannot make a "strong showing" that their appeals have any chance of success, much less that they are likely to succeed. Indeed, this Court, in a thorough 155-page opinion, recently rejected Appellants' arguments, stating 83 times that their positions are wrong.  Moreover, the alleged harm to Appellants is not irreparable, but illusory.  The balancing of equities also favors the BSA, as does the public interest.

## BACKGROUND

A detailed factual background is included in the Appellees' brief [D.I. 66] and the Affirmation Opinion.  This Court's affirmation of the Confirmation Order [D.I. 150, 151] (the "Affirmation Order") was a condition precedent to the Effective Date of the Plan.  *See* D.I. 1-4, Art. IX.B.1a. Absent a stay, these conditions precedent may now be satisfied.

## ARGUMENT

A stay pending appeal is an "extraordinary remedy." *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018). "[T]he moving party bears the burden of showing that the circumstances justify the imposition of the stay." *In re. W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012).  In deciding a stay pending appeal, courts consider: (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury absent a stay; (3) whether issuance of the stay will substantially harm other parties; and (4) whether a stay is in the public interest.  *In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015).

The first two factors are the "most critical" and although "both are necessary" for imposition of a stay, "the former is arguably the more important piece of the stay analysis." *Revel,* 802 F.3d at 568 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  Appellants fail to satisfy any of the four factors required for a stay pending appeal.

### A.    The Appellants Are Not Entitled To A Stay

#### 1.    Appellants Cannot Demonstrate Success On The Merits

In the Third Circuit, "a sufficient degree of success for a strong showing exists if there is a 'reasonable chance, or probability, of winning.'"  *Revel*, 802 F.3d at 568–69 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)).  "It is not enough that the chance of success on the

merits be 'better than negligible.'"  *Nken*, 556 U.S. at 434.  Appellants must show

that they have a "*significantly* better than negligible" chance of success.  *In re S.S.*

*Body Armor I., Inc.*, 927 F.3d 763, 773 (3d Cir. 2019) (quoting *Revel*, 802 F.3d at

571) (emphasis added).  In other words, "[l]ikelihood of success on the merits

means that a movant has a 'substantial case,' or a strong case on appeal.'"  *In re*

*Polaroid Corp.*, No. 02-1353, 2004 U.S. Dist. LEXIS 1917, at *4 (D. Del. Feb. 9,

2004) (quoting *In re Columbia Gas Sys.*, No. 92-127, 1992 U.S. Dist. LEXIS 3253,

at *4 (D. Del. Mar. 10, 1992)).  Moreover, "where, as here, 'two courts, not one,

have concluded that the [Appellants] are unlikely to succeed in winning a reversal'

the threshold showing of likelihood of success on the merits is raised 'one notch

higher.'"  *In re Finova Grp. Inc.*, No. 07-480, 2008 U.S. Dist. LEXIS 71555, at *2

(D. Del. Sept. 22, 2008) (quoting *In re Forty-Eight Insulations*, 115 F.3d 1294,

1301 (7th Cir. 1997)).

Appellants' arguments do not come close to the "strong showing" required.

Both Courts issued thorough, well-reasoned opinions rejecting Appellants'

arguments based on the law and the extensive and largely undisputed evidentiary

record.  Appellants advance the same failed arguments, citing the same

distinguishable or otherwise inapplicable legal authority.  *Compare* D.I. 156 at 6–7

*with* D.I. 40 (Lujan Claimants' opening brief) at 4-48 and D.I. 113 (Lujan

Claimants' reply brief) at 30–32 (making the same arguments and citing the same

cases); *compare* D.I. 154 at 7–8 *with* D.I. 41 (D&V Claimants' opening brief) at 45–58 and D.I. 110 (D&V Claimants' reply brief) at 10–14 (citing the same Bankruptcy Code provisions and cases); *compare* D.I. 152 at 6–7 *with* D.I. 45 (Certain Insurers' opening brief) at 5–6 and D.I. 109 at 41–43 (Certain Insurers' reply brief) (relying on the same cases and quotes).  Appellants cannot meet their burden of a "strong showing" of likelihood of success by "rehash[ing]" arguments that were twice rejected.  *See W.R. Grace,* 475 B.R. at 206.

The Certain Insurers argue they are likely to prevail because courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."  D.I. 152 at 4.  But this Court found that the Plan does not rewrite the insurance policies or allow the BSA to perform on more favorable terms.   D.I. 150 at 76.   The Plan language is clear, and the testimony and statements by the Court confirm that fact.  *Id.* at 74–75.  The Certain Insurers' argument that the Plan does not explicitly identify their alleged rights to defend claims or to cooperate in the defense is irrelevant because there is no obligation that a plan do so.  The Certain Insurers never had a right to prevent the BSA from settling claims, using a trust or otherwise, or to require the BSA to cooperate with them.  Rather, the Certain Insurers' rights are to raise coverage defenses for any alleged failure to comply with terms of their policies.  *Id.* at 77 (the *bargain* "is for the Certain Insurers to pay covered claims…there was never a bargain to allow[]

6

the Certain Insurers to prevent the BSA from compensating survivors of childhood abuse or otherwise resolving claims").

The Certain Insurers also continue to challenge the Bankruptcy Court's conclusion that the Plan was proposed in good faith.  Certain Insurers' argument that this Court did not apply the correct standard under *LTL* only highlights that this appeal has no merit.  This Court not only followed *LTL*, but block-quoted it. D.I. 150 at 124–25.  This Court's observation that Certain Insurers were, in fact, challenging findings of fact was accurate, as was its holding that the Bankruptcy Court's findings of fact, which the Certain Insurers state they are not challenging, all support the legal conclusion of good faith: (i) the Plan was designed to achieve the objectives and purposes of the Bankruptcy Code to reorganize and to provide compensation to survivors (*id.* at 128), (ii) the BSA did not collude with survivors (*id.* at 140), (iii) the TDP is not designed to inflate awards, but rather is designed to result in awards consistent with prepetition practices (*id.* at 131), (iv) the BSA protected the rights of the Certain Insurers (*id.* at 138), (v) the Plan resulted from thousands of hours of mediated negotiations among more than a dozen stakeholder groups (*id.* at 6), and (vi) the Plan enjoyed overwhelming support from every major stakeholder in the case (*id.* at 129).  The Bankruptcy Court relied on the unrebutted testimony of every percipient witness testifying to the matters, the contemporaneous written record corroborating such testimony (and demonstrating

that the Certain Insurers' arguments were wrong), and the testimony of multiple preeminent expert witnesses.   And as this Court found, the Certain Insurers' allegations of bad faith were not only correctly rejected by the Bankruptcy Court, they are unsupported by any evidence. *Id.* at 131.

Certain Insurers continue to rely on irrelevant legal authority or no authority at all.   *In re Extraction Oil & Gas, Inc.*, No. 20-1532, 2020 U.S. Dist. LEXIS 228697, at *7 (D. Del. Dec. 7, 2020) (determining that appellants' failure to "cite a single….case [to] support" their contentions "falls short of a 'strong showing' of likely success on the merits").   For example, Certain Insurers continue to rely on *Global Industrial Technologies* to claim that the Third Circuit reversed confirmation on good faith grounds.   *See* D.I. 152 at 6–7.   However, as this Court noted, that was about "standing to object to a plan," whereas here, "[i]nsurers were full participants at trial, but they introduced no evidence of collusion or that any claims were fraudulent—the opposite of what happened in *Global Industrial*."   D.I. 150 at 151.   The Certain Insurers' appeal is frivolous.

Likewise, the D&V and Lujan Claimants' arguments fail because the Courts' opinions comport with Third Circuit law regarding authorizing non-consensual third-party releases. *See, e.g.*, D.I. 150 at 58; D.I. 1-3 at 128.   Yet, the D&V and Lujan Claimants argue they are likely to prevail on their appeals related to the Channeling Injunction and Releases because of a lack of (i) jurisdiction, (ii)

statutory authority outside of section 524(g), and (iii) ability to meet the standards employed in the Third Circuit to authorize non-consensual releases.  *See* D.I. 156 at 3–6; *see also* D.I. 154 at 5–10.

Initially, this Court found "no error in the Bankruptcy Court's exercise of 'related to' jurisdiction," which was "based on identity of interest, shared insurance, contractual indemnity, and residual property interests, each of which is supported by careful findings."  D.I. 150 at 57.  Specifically, the BSA is the "real party defendant" and the interconnected nature of the delivery of Scouting within the tripartite structure further support the identity of interest.  *Id.* at 48 ("… BSA was the 'real party defendant' in defending Abuse Claims."); *see also id.* at 50 ("There can therefore be no concern that there is only an "incidental" relationship connecting the Channeling Injunction and Releases to BSA.).

This Court found that the record contains "ample evidence of complex and competing claims against BSA's insurance which supports subject matter jurisdiction over claims against the Releasees."  *Id.* at 53. This Court found that there was automatic indemnification of all Abuse Claims based on the annual charter agreements and board resolutions.  *Id.* at 54-55.  Additionally, the BSA's residual interest in Local Council property also supports "related to" jurisdiction. *Id.* at 56.

Next, this Court found that the D&V and Lujan Claimants "are wrong" that there is no statutory authority as "[t]he Third Circuit, courts within the Third Circuit, and other courts have repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances." *Id.* at 58 (citations omitted). In addition to this Court finding that the Bankruptcy Court correctly held that the Channeling Injunction and Releases are not prohibited under sections 524(e) and 524(g) of the Bankruptcy Code, courts in the Third Circuit, in appropriate circumstances, rely on their "inherent equitable power consistent with §§ 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code" to grant nonconsensual third-party releases. *Id.* at 59-62. Moreover this Court agreed that the Bankruptcy Court had constitutional authority to confirm a plan with non-consensual third-party releases. *Id*. at 58-59.

In addition to pointing out that the Claimants "misconstrue[d] the legal standard articulated in *Continental*," this Court concluded the D&V and Lujan Claimants "failed to demonstrate clear error in any of the Bankruptcy Court's factual findings supporting the necessity and fairness of the Channeling Injunction and Releases." *Id.* at 63, 72. Importantly, the Releases were narrowly-tailored to address *only* claims related to Abuse in Scouting. *Id.* at 50.

This Court found that the Confirmation Opinion "includes countless specific findings of fact that support each aspect of the necessity and fairness" under

*Continental* and the D&V and Lujan Claimants' "argument is contrary to the record." D.I. 150 at 71. Indeed, the third-party releases are necessary and essential to the settlements embodied in the Plan and without the releases, the BSA's reorganization fails. *Id.* at 63-68. Moreover, this Court affirmed the Bankruptcy Court's determination that the Releases were fair "[b]ecause D&V and Lujan Claimants will receive under the Plan all the compensation to which they would be entitled in the tort system" and this is "adequate consideration." *Id.* at 69.

The D&V and Lujan Claimants refute the Bankruptcy Court's finding that the Direct Abuse Claims will likely be paid in full and the credibility of Dr. Bates's testimony. D.I. 154 at 9–10; D.I. 156 at 6. This Court, however, found that these arguments "fail," as the "Bankruptcy Court's reliance upon Dr. Bates's uncontroverted and well-reasoned expert opinion, as opposed to unsubstantiated statements by non-experts, is not clearly erroneous." D.I. 150 at 26–33.

Lujan Claimants separately argue that the McCarran-Ferguson Act reverse preempts the Bankruptcy Code. *See* D.I. 156 at 6–7. Both Courts rejected this, finding that the Guam statute only provides a procedural right to bring claims against insurers, but "is not for the protection of policyholders" and does not regulate the business of insurance. D.I. 150 at 86–96. This Court also thoroughly distinguished each decision relied upon by Lujan Claimants, including for their

failure to address the "business of insurance" exception of the McCarran-Ferguson Act. *See* D.I. 150 at 92–95.

Lujan Claimants further argue that Bankruptcy Court lacked jurisdiction to authorize the sale of insurance policies free and clear "over Lujan Claimants' interests" and "over the [Archbishop of Agaña's] interests in BSA insurance policies and non-debtors' separate insurance policies in which Debtors lack any interest." D.I. 156 at 7. But this Court agreed with the Bankruptcy Court that the Insurance Settlements do "not disadvantage the Lujan Claimants more than other creditors." *Id.* at 83. And this Court found that Lujan Claimants lack standing "to raise the rights of the Archbishop," which settled with the BSA and stipulated to resolve its objection to the Plan. D.I. 150 at 84–85. Further, this Court found that the Insurance Settlements satisfy the *Martin* standard. *Id.*

Because Appellants have failed to satisfy this essential factor, the Court need not consider the Appellants' arguments as to the remaining three factors. *Revel,* 802 F.3d at 571 (if movant fails on "either" of the first two factors, "the stay should be denied without further analysis"); *see also In re MD Helicopters, Inc.,* 641 B.R. 96, 109 (D. Del. 2022).

### 2.   Appellants Will Not Suffer Irreparable Harm

"To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Revel,* 802 F.3d at

571; *W.R. Grace,* 475 B.R. at 206.  Where movants have little to no chance of success on the merits, they must make an even more substantial showing of irreparable injury.  *See Revel,* 802 F.3d at 570 (internal citation omitted).

Appellants claim irreparable harm from the risk that the appeals may be mooted by consummation of the Plan.  D.I. 152 ¶¶ 11-21; D.I. 154 ¶¶ 14-17; D.I. 156 ¶¶ 10-11.  An inability to prejudice the BSA and survivors by staying the Plan based on meritless arguments does not constitute any harm, much less irreparable harm.   Moreover,   it   is   well-established   that   "[t]he   mere   possibility   that [Appellants'] objections may become moot after the confirmation order becomes effective by itself is insufficient to demonstrate irreparable injury for purposes of the stay." *In re Exide Holding, Inc.*, No. 20-1402 (D. Del. 2020) [D.I. 32] Oct. 22, 2020 Hr'g Tr. at 78:8-12; *W.R. Grace*, 475 B.R. at 206; *In re Color Spot Holdings, Inc.*, No. 18-1246, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018); *In re Nuverra Envt'l Sols., Inc.,* 2017 WL 3326453, at *4 (D. Del. Aug. 3, 2017); *In re Swift Energy Co.,* 2016 WL 3566962, at *7 (D. Del. June 29, 2016).  Indeed, if mootness alone were sufficient to show irreparable injury, "a stay would be issued in every case of this nature pending appeal."  *W.R. Grace,* 475 B.R. at 207.

Additionally, "[t]o establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *See e.g.*, *Revel,* 802 F.3d at 571.  Appellants characterize the alleged

13

harms as speculative, stating that they "do not concede that equitable mootness is doctrinally correct or would apply here," and that supposedly "strong arguments exist that it would, among other things, still retain the ability to fashion relief with respect to the Plan." D.I. 152 ¶ 15; D.I. 154 ¶ 16; 156 ¶ 10.

Certain Insurers' reliance on *L.A. Dodgers* is misplaced.   In *In re L.A. Dodgers*, the "central reality" of the irreparable harm analysis focused on the appellant's potential loss of a "unique and extremely valuable asset." 465 B.R. 18, 35–36 (D. Del. 2011). No such unique asset is implicated here.

Lujan and D&V Claimants assert they will suffer irreparable harm because their claims against non-debtors will be released under the Plan. D.I. 156 ¶ 11; D.I. 154 ¶ 17. These arguments fail because they are premised on the erroneous notion, unsupported by evidence, that they will receive more compensation for their claims outside of the Plan. To the contrary, the Bankruptcy Court made a finding of fact, supported by the only record evidence on the matter, and affirmed by this Court, that survivor claims will likely be paid in full under the Plan. D.I. 150 at 32, 34, 69.

### 3.   The BSA And Other Stakeholders Will Be Irreparably Harmed By A Stay

Appellants' unsubstantiated arguments that issuing a stay will not cause material harm to Appellees and other parties are wrong. *See* D.I. 152 at 12-13; D.I. 154 at 12-13; D.I. 156 at 10. As proven by the Whittman Declaration, a stay will

have a substantial, detrimental effect on the BSA, survivors, other creditors, and stakeholders. *See* Whittman Decl. ¶¶ 8–10, 20.

If stayed pending appeal, the Plan may never be consummated, and the BSA may be forced to liquidate. *See* Whittman Decl. ¶¶ 11–12. The imposition of any stay will (i) substantially harm the BSA's operations, including, the ability to recruit new members and secure donations, and jeopardize the BSA's ability to continue as a national organization and (ii) cost tens of thousands of survivors and other stakeholders, many of whom are elderly, billions of dollars. *Id.* ¶¶ 5–20. Further, if the BSA is forced to liquidate, the Insurance Settlement Agreements would terminate, and it may prove impossible for survivors to ever collect the $1.65 billion those agreements contemplate. *See* D.I. 1-3 at 140; Whittman Decl. ¶ 18. Making matters worse, Century is in run-off, and absent the Century and Chubb Companies Insurance Settlement, collecting from Century may be difficult. *See* D.I. 1-3 at 79; Bankr. D.I. 9398 ¶ 86; Bankr D.I. 9280 ¶¶ 129–33. Additionally, the Hartford Insurance Settlement Agreement provides that if the Plan does not become effective, Hartford may seek administrative expenses of $23.61 million. *See* D.I. 1-4 Ex. I-1, § VI.N.3.a.iii (Hartford Insurance Settlement Agreement). This too will diminish survivor recoveries.

The monetary harm caused by the delay of a lengthy stay alone, apart from any risk of liquidation or other unquantified factors, would likely be between

$323.3 million and $1.38 billion.  Whittman Decl. ¶ 20.  And if such delay caused a liquidity crisis for any reason and the BSA were forced to liquidate, the difference between the funds available under the Plan and liquidation value for abuse survivors, without considering harm to the BSA and other creditors, would range from $2.2 billion to $6.9 billion or higher.  *Id.*

Certain Insurers claim this risk is mitigated because the parties can agree to an expedited schedule before the Third Circuit as was agreed to in this Court.  *See* D.I. 152 at 13.  First, no such expedited schedule can be guaranteed and the average appeal lasts more than a year.  Second, the Certain Insurers omit that the reason for the expedited schedule in this Court was that the Affirmation Order is a condition precedent to the effectiveness of the Plan.  So, the expedition was necessary to protect the BSA and survivors.  Without a stay, the Plan can go effective immediately.

Granting a stay would delay the distribution of billions of dollars to survivors.[5]  *See* Whittman Decl. ¶ 19.  Courts recognize that a delay in distributions is a tangible and substantial harm.  *See, e.g.*, *Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, No. 01-11220, 2002 WL 1058196, at *3 (D. Del. May 22, 2002) (parties would be substantially harmed by a one year delay

---

[5]  Certain Insurers argue that, regardless of a stay, survivors may not receive payments for some time.  See D.I. 152 ¶ 24.  This argument makes no sense.  A delay in the Effective Date will cause a commensurate or greater delay in the liquidation of claims and payments to survivors.

in implementing plan); *see also W.R. Grace*, 475 B.R. at 208 (denying stay due to the "detrimental effects for both Grace and its thousands of creditors, who at this point are more than entitled to take steps forward towards emergence from bankruptcy and obtaining payment of their long-awaited claims"). Moreover, many survivors are elderly and any delay could mean no closure or recovery in their lifetimes. *See* Survivor-Related Decls.; *see also* Whittman Decl. ¶¶ 15, 17.

### 4.   The Public Interest Favors Denial Of The Stay

The public interest in allowing the Plan to go effective for the benefit of the Debtors' creditors, including over 82,000 survivors, weighs heavily in favor of denying the stay. In considering a stay of a confirmation order, courts must "consider the good of the case as a whole," because the "public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value for all." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007).

Moreover the "timely resolution of the bankruptcy estate is . . . in the public interest," while "[a]ctions that needlessly delay a fair settlement agreement deprive claimants of their proceeds while preventing the debtor from completing its reorganization." *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009). "In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgements." *Caliber N.D., LLC v. Nine Point*

*Energy Holdings, Inc. (In re Nine Point Energy Holdings, Inc.)*, No. 21-972 (RGA), 2021 WL 3410242, at *7 (D. Del. Aug. 4, 2021) (quoting *W.R. Grace*, 475 B.R. at 208).

The Bankruptcy Court acknowledged the importance of providing long-overdue compensation to abuse survivors. *See* D.I. 1-3 at 158 ("[M]any survivors have been waiting for thirty, forty, or even fifty years to tell their stories and receive a meaningful recovery."). Confirmation testimony and the hundreds of survivors' letters to the Courts illustrate the need to begin distributions as soon as possible. *See, e.g.*, Bankr. D.I. 5635, 10275.

A stay would serve only to "thwart the will of such an overwhelming majority [of voting creditors] to accommodate the desires of such a small minority, who are simply dissatisfied with the Settlement under the Plan." *Adelphia*, 368 B.R. at 284. This delay is precisely the type of harm that this factor was designed to avoid.

Likewise, a stay threatens the BSA's ability to continue to "serve[] over one million boys and girls across the country, providing them with opportunities to learn self-sufficiency and leadership skills that can contribute to the betterment of society." D.I. 1-3 at Introduction. The loss of the non-profit Scouting mission would be unjust to American society at large. *See In re Gen. Motors*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009) ("[W]ith the death of [the debtor] on the line, the

damage to the public interest would be irreparable . . . the public interest does not favor a stay; it compels the denial of one . . . this is a monumental factor."). Thus, the public interest weighs against a stay.

In contrast, Appellants' public interest arguments fail. Certain Insurers argue that the Plan would "dilute[e] payments to holders of valid abuse claims," D.I. 152 at ¶ 30 (emphasis omitted), but they are not even challenging the Bankruptcy Court's finding of fact rejecting this specious argument, which this Court has affirmed. D.I. 150 at 144; D.I. 1-3 at 211. And the insurers lack standing to argue on behalf of survivors, who voted overwhelmingly to accept the Plan. Moreover, the argument that "BSA is advancing arguments never before accepted in a mass tort bankruptcy case," D.I. 152 ¶ 28, is incorrect, contrary to this Courts' conclusions that confirming the Plan is consistent with the law in the Third Circuit, and irrelevant. If ensuring correct application of the law was grounds for a valid public interest argument, then the public interest factor would duplicate the likelihood-of-success factor. *Nine Point*, 2021 WL 3410242, at *7.

### 5.   The Alternative Relief Should Be Denied

Appellants' alternative request for a stay through April 27, 2023, should be denied for the same reasons that Appellants have not proven a strong likelihood of success on the merits or irreparable harm. Moreover, Appellants cannot evade a decision by this Court denying a stay pending appeal—which would have to have

19

occurred if the Court was moving to the alternative request for relief—by asking for a short stay. Bankruptcy Rule 8025(b)(3) provides for a continuation of an issued stay if the movant files a notice of appeal, "until final disposition by the court of appeals." Appellants have not filed notices of appeal and should not be allowed to evade the standards for a stay and any decision by this Court's denying a stay pending appeal by trying to turn a short stay into a stay until "disposition by the court of appeals" through the mechanical exercise of filing boilerplate notices of appeal. *See Nine Point*, 2021 WL 3410242, at \*3, 6.

### B.    If A Stay Is Granted, Appellants Must Post A Substantial Bond

A bond "secure[s] the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." *In re Tribune Co.,* 477 B.R. 465, 478 (Bankr. D. Del. 2012) (quoting *In re Adelphia,* 361 B.R. 337, 350 (S.D.N.Y. 2007)). To obtain such a stay, it is a "standard requirement" that an appellant post bond "at or near the full amount of the potential harm to the non-moving parties. *Adelphia,* 361 B.R at 350-52; *see also In re Purdue Pharma*, No. 21-08271 (Bankr. S.D.N.Y. Nov. 9, 2021) D.I. 4158 at 276:20-22 ("[P]osting of a bond to protect the appellees from the adverse effects of a stay is the norm rather than the exception."); Fed. R. Bankr. P. 8025(b)(4).

Appellants boldly assert there is no need for a bond with no attempt to demonstrate "why the court should deviate from the ordinary full security

requirement."[6] *In re ASHINC Corp.*, No. 21-994 (CFC), 2021 WL 3288078, at *2 (D. Del. Aug. 2, 2021); *W.R. Grace*, 475 B.R. at 209; *see also Adelphia*, 361 B.R. at 350 (finding that "the party seeking a stay without bond *has the burden of providing specific reasons* why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond") (emphasis added).   Appellants also ignore that waiver of the bond requirement occurs "only in extraordinary circumstances, and only where alternative means of securing [Appellees'] interest are available." *Bank of Nova Scotia v. Pemberton*, 964 F. Supp. 189, 192 (D.V.I. 1997); *see also Tribune*, 477 B.R. at 478 (addressing requirement to post bond "absent exceptional circumstances").   Appellants' waiver request is so deficient that the Court should consider it as weighing against imposition of the stay. *See W.R. Grace*, 475 B.R. at 209 ("[T]he Court declines to do Appellant's work for it.   Therefore, the Court will merely consider this as another factor weighing against the imposition of a stay.").

Given the substantial, irreparable harm that will befall the Appellees if a stay is granted, including the real risk of liquidation, the bond required should be $6.9 billion.   Whittman Decl. ¶¶ 10, 20.   In reality, the actual cost of the stay is much

---

[6]   Appellants rely solely on *L.A. Dodgers*, but neglect to inform the Court that parties in that case had contractually agreed to waive the bond requirement and the court determined that it would "hold[s] the parties to the contractual agreement not to require [appellant], in the circumstances of this appeal, to post a bond." *L.A. Dodgers*, 465 B.R. at 38.

greater and unquantifiable—the loss of a century-old, non-profit American institution, which "unlike the typical chapter 11 debtor," provides responsible citizenship, character development, and self-reliance training to millions of boys and girls in partnership with community organizations across the nation, is priceless.  *See* D.I. 150 at 6-8.  The "importance and magnitude" of the BSA's mission—to prepare young people to make ethical and moral choices over their lifetimes—has been recognized by Congress and cannot be overstated.  *See e.g.*, D.I. 150 at 8-9; Bankr. D.I. 16 ¶ 12.

For all of the reasons explained in the Whittman Declaration, if this Court granted the Stay Motions, the BSA, survivors and other stakeholders "will incur substantial harm and a condition to any such stay, must be the requirement for a bond."  Whittman Decl. ¶ 20.

## **CONCLUSION**

The Appellees respectfully request that the Court deny the Stay Motions.  If a stay were to be issued, a bond should be set in an amount commensurate with the harm as set forth above.

Dated:  April 6, 2023
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Tori L. Remington (No. 6901)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:      dabbott@morrisnichols.com
            aremming@morrisnichols.com
            ptopper@morrisnichols.com
            tremington@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
Glenn Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:      jessica.lauria@whitecase.com
            gkurtz@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:      mandolina@whitecase.com
            mlinder@whitecase.com
            laura.baccash@whitecase.com
            blair.warner@whitecase.com

*Attorneys for the Debtors-Appellees and Debtors in Possession, Boy Scouts of America and Delaware BSA LLC*

23

**DLA PIPER, LLP (US)**

*/s/  R. Craig Martin*

R. Craig Martin (No. 5032)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5655
craig.martin@dlapiper.com

– and –

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason (admitted *pro hac vice*)
Douglas K. Mayer (admitted *pro hac vice*)
Mitchell S. Levy (admitted *pro hac vice*)
51 West 52nd Street
New York, New York
10019 Telephone: (212)
403-1000
RGMason@wlrk.com
DKMayer@wlrk.com
JCCelentino@wlrk.com
MSLevy@wlrk.com

*Attorneys for Appellee Ad Hoc Committee
of Local Councils of the Boy Scouts of
America*

**MONZACK MERSKY AND BROWDER, PA**

*/s/  Rachel B. Mersky*
Rachel B. Mersky (No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:   (302) 656-8162
Facsimile:   (302) 656-2769
Email:          RMersky@Monlaw.com

– and –

**BROWN RUDNICK LLP**

David J. Molton, Esq.
Eric Goodman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: DMolton@BrownRudnick.com

– and –

Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: SBeville@BrownRudnick.com
         TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/  James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Alan J. Kornfeld (CA Bar No. 130063)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email:   rpachulski@pszjlaw.com
            akornfeld@pszjlaw.com
            dgrassgreen@pszjlaw.com
            joneill@pszjlaw.com


*Counsel for the Official Tort Claimants' Committee*


**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimilie: (302) 571-1253
Email:   rbrady@ycst.com
            eharron@ycst.com
            jkochenash@ycst.com


*Counsel to the Future Claimants' Representative*

26

**BIELLI & KLAUDER, LLC**

*/s/ David M. Klauder*
David M. Klauder, Esq. (No. 5769)
1204 N. King Street
Wilmington, Delaware 19801
Tel/Fax: (302) 803-4600 / (302) 397-2557
dklauder@bk-legal.com

-and-

**KTBS LAW LLP**
Thomas E. Patterson
Daniel J. Bussel
Robert J. Pfister
Sasha M. Gurvitz
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, CA 90067
Telephone: (310) 407-4000
Email: tpatterson@ktbslaw.com
           dbussel@ktbslaw.com
           rpfister@ktbslaw.com
           sgurvitz@ktbslaw.com

*Counsel to each of The Zalkin Law Firm, P.C. and*
*Pfau Cochran Vertetis Amala PLLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this response complies with the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A).  Exclusive of the exempted portions specified in Fed. R. Bankr. P. 8015(g), the response contains 5,188 words.  The response has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

Dated: April 6, 2023          */s/ Tori L. Remington*
                                   Tori L. Remington