## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Boy Scouts of America and Delaware BSA, LLC,[1] <br><br>         Debtors. | Chapter 11 <br><br> Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered) <br><br> Lead Case No. 22-cv-01237-RGA |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, <br><br>         Appellants. <br><br>  v. <br><br> Boy Scouts of America and Delaware BSA, LLC, *et al.*, <br><br>         Appellees. | Consolidated Case Nos. 22-cv-01238-RGA; 22-cv-01239-RGA; 22-cv-01240-RGA; 22-cv-01241-RGA; 22-cv-01242-RGA; 22-cv-01243-RGA; 22-cv-01244-RGA; 22-cv-01245-RGA; 22-cv-01246-RGA; 22-cv-01247-RGA; 22-cv-01249-RGA; 22-cv-01250-RGA; 22-cv-01251-RGA; 22-cv-01252-RGA; 22-cv-01258-RGA; 22-cv-01263-RGA |

### DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF THE APPELLEES' OMNIBUS JOINT OPPOSITION TO MOTIONS FOR STAY PENDING APPEAL

I, Brian Whittman, pursuant to 28 U.S.C. § 1746 and under penalty of perjury,

hereby declare as follows:

---

[1]  The Debtors, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

1.      I am a Managing Director in the Commercial Restructuring practice of Alvarez & Marsal North America, LLC ("A&M"), which serves as restructuring advisor to Boy Scouts of America (the "BSA") and Delaware BSA, LLC (together, the "Debtors"), the non-profit corporations that are debtors and debtors in possession in the jointly administered chapter 11 cases (the "Chapter 11 Cases") pending before the Hon. Laurie Selber Silverstein of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  I submit this declaration (this "Declaration") in support of the Appellees' omnibus joint opposition to the motions for stay pending appeal.[2]  I am over twenty-one (21) years of age and fully competent to make this Declaration.

2.      A&M was engaged by the BSA through BSA's then-counsel Sidley Austin LLP in October 2018 to assist with financial matters related to the exploration of strategic alternatives. I joined the A&M team working on the BSA matter in August 2019 and shortly thereafter assumed the leadership of the restructuring team. In this capacity, I have familiarized myself with a range of matters concerning the BSA's finances, the BSA's projected financial performance, and obligations under the Plan, including the matters described herein.

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Appellees' Omnibus Joint Opposition to Motions for Stay Pending Appeal*, filed concurrently herewith, or in the Plan, as applicable.

3.      In connection with my work on this matter, I prepared a liquidation analysis of (a) the Debtors and Related Non-Debtor Entities, (b) the Local Councils, and (c) a consolidated liquidation analysis of the Debtors, the Related Non-Debtor Entities, and the Local Councils and compared each to recoveries under the Plan (the "Liquidation Analysis"). *See* Bankr. D.I. 9280 (Whittman Decl.) ¶¶ 9, 240.  In each of these analyses, I concluded that each class of creditors receives equal or better treatment under the Plan than under the Liquidation Analysis. *Id.*  My testimony was uncontroverted. *Id.*  In addition to my expert report on the Liquidation Analysis, I submitted an expert report on the feasibility of the Plan in connection with confirmation. *See* Bankr. D.I. 9280 ¶ 9.  As this Court pointed out in the Affirmation Opinion, no party, including any of the Appellants, offered evidence to rebut my expert reports on the Liquidation Analysis and feasibility of the Plan. *See* D.I. 150 at 97.

4.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the BSA's executive and management team or information obtained from my personal review of relevant documents.  Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the BSA's nonprofit operations, financial condition, and liquidity.  If called upon to testify, I could and would testify to each of the facts set forth herein based on my personal

knowledge, discussions and review of documents.  I am not being compensated specifically for this testimony other than through payments received by A&M as a professional retained by the BSA in the Chapter 11 Cases.

5.      The Stay Motions are premised, in part, on Appellants' arguments that issuing a stay would not cause irreparable harm to the BSA, creditors, and other stakeholders under the Plan.  I strongly disagree with that premise, and moreover, to the extent a stay is imposed, a bond is necessary to indemnify the BSA and other parties benefiting from consummation of the Plan for the losses caused by what will be Appellants' unsuccessful attempt to reverse both the Bankruptcy and District Court decisions confirming and affirming confirmation of the Plan.

6.      I understand that an appeal to the Third Circuit typically takes between one and two years to resolve.  As set forth further below, if the BSA is forced to remain in bankruptcy and cannot achieve the Effective Date for another one to two years pending resolution of the appeal, the detriment to the BSA and other creditors, including abuse survivors, whose claims are being satisfied under the Plan and with contributions contributed pursuant to the settlements incorporated therein, would be enormous.

7.      The Stay Motions wholly ignore the various constraints and negative effects created by remaining in bankruptcy on the BSA's operations, which jeopardize the BSA's ability to continue its charitable mission, including the related

impact on the Local Councils and Chartered Organizations.   Indeed, the harms

caused by a delay in emergence are many, as set forth below.

8.      Importantly, in the event that there is a stay, there is a reasonable risk

that the BSA will run out of the liquidity necessary to operate, and the Plan will

never be consummated.  In that event, the BSA, a Congressionally-chartered 100-

year old institution, and its creditors, survivors, and other stakeholders would suffer

substantial harm, including, among other things, the liquidation of the BSA.

Contributions under the Plan would be lost, including valuable settlement

contributions from insurers, and survivors would not be able to timely or equitably

recover on account of their abuse claims.

9.      Along with other A&M professionals reporting to me, I prepared an

analysis of the costs of delaying the BSA's emergence from bankruptcy (the "Cost

of Stay Analysis"), which is attached hereto as **Exhibit A**.  As an initial matter, based

on the information provided by the BSA's legal counsel, for purposes of this

analysis, I assume a one-to-two-year stay period (the "Stay Period").  The Cost of

Stay Analysis summarizes the additional costs that would be incurred by the BSA

and the losses incurred by the BSA's creditors, including the abuse survivors, if a

stay pending appeal were imposed and the BSA could not go effective during the

Stay Period.  The Cost of Stay Analysis is based on my training and experience as a

restructuring advisor, including my experience with the costs and financial aspects of the Chapter 11 Cases as well as information obtained from the BSA.

10.    As demonstrated in **Exhibit A**, if a stay were granted for the Stay Period, then a reasonable quantification of the potential harm that the BSA, its creditors, and other stakeholders would likely suffer as a result of or during the stay would be no less than approximately $323.3 million to $1.38 billion given the likely one to two year delay and could potentially be $6.9 billion or higher in the event the BSA is forced to liquidate due to the delay in emergence.  The estimated bond amount is primarily comprised of the following components of harm.

### A.    Additional Chapter 11 Administrative Costs

11.    First, the BSA and its estates will continue to bear substantial additional administrative costs, professional fees and expenses, and other similar costs during any delay in emerging from bankruptcy.  Based on an analysis of the BSA's records, during the past three years since the Petition Date, the BSA has incurred in excess of approximately $301 million total in professional fees and costs.  Since the Petition Date, the average monthly fees and expenses has been approximately $8.2 million.

12.    Even assuming that there will be less professional fees expended on case matters during any Stay Period as compared to prior periods, in the last six months since the confirmation of the Plan, professional fees have averaged approximately $3.4 million per month, and thus, it is reasonable to assume that if

there is one year in delay in achieving the Effective Date, this one year delay would cause the BSA to incur at least approximately $40.8 million in incremental costs for professional fees.  If professional fees returned to the case average, the cost of a one year delay would be approximately $97.8 million.  In addition, the BSA would incur $1.4 million of additional interest due to higher interest rates on the current debt versus the post-emergence debt.  Furthermore, the BSA would likely lose out on substantial donations.  The BSA's business plan reflects an increase in annual unrestricted donations of $5.4 million post-emergence but is targeting a higher amount.  The BSA would be able to avoid incurring expenses and the loss of donations if the BSA could achieve the Effective Date as planned and the Stay Motions were denied.

### B.     Risks To BSA's Operations

11.     The longer the BSA stays in bankruptcy, the continuation of the BSA's charitable mission is threatened.  If the Stay Motions are granted, the BSA will face further erosion to the brand of Scouting due to negative publicity and because staying in bankruptcy hampers the BSA's ability to fundraise donations and recruit members.  Further, given the ongoing costs of the Chapter 11 Cases, which have already cost the BSA over $300 million, there is a reasonable risk that the BSA would be forced to liquidate and never be able to consummate its reorganization due to the delay.

12.     The BSA has limited options available to generate additional liquidity and as a result, ensuring that the Effective Date occurs as quickly as possible and minimizing estate expenses is essential to ensuring a successful reorganization.  The BSA is highly leveraged and can successfully reorganize only if it receives access to the exit financing that becomes available at emergence.  The BSA does not have access to other financing options.  The BSA is already going to emerge from the Chapter 11 Cases with over $400 million in debt.  Thus, there is a risk that if the BSA runs out of liquidity before the Third Circuit appeal is finished, the BSA will have no alternative but to liquidate.

13.     Additionally, the publicity surrounding the bankruptcy has created a public relations overhang on the BSA's operations, which has impacted the BSA's ability to recruit new members, raise donations, and continue to make the BSA organization more attractive to modern scouts.  The BSA and Local Councils rely upon donations, among other things, to fund their operations and to fulfill the mission of Scouting.  Although difficult to quantify in a concrete number, uncertainty about future prospects lowers donors' confidence, which, in turn, decreases the funds necessary for delivery of a successful Scouting program.  Moreover, to the extent donors believe that their donations are going to pay professionals in connection with the Chapter 11 Cases rather than fund Scouting-

related activities, the BSA's and the Local Councils' ability to raise funds will remain substantially depressed.

14.     Moreover, member fees provide a substantial portion of the BSA's annual revenue. Although following years of decline, the BSA was finally able to stabilize membership numbers in 2022 after the Bankruptcy Court confirmed the Plan. Granting the Stay Motions may reverse the positive momentum that the BSA has gained since then. It is critical that the BSA emerges as soon as possible to bolster positive visibility, which will generate new interest in Scouting, spur increased donations, and move the organization past bankruptcy and onto a successful new chapter.

### C.     Harm To Survivors

15.     Any delay in the ability of the Plan to go effective will delay distributions to abuse survivors, who overwhelmingly voted to accept the Plan. Many of the survivors have waited decades to receive such distributions, and fear that they will not live to see those distributions if they are forced to wait any longer. I am aware that the Bankruptcy Court has received letters from hundreds of survivors during the Chapter 11 Cases, indicating that they are elderly and seek closure before they die. As more time passes before the Effective Date, the likelihood increases that survivors may be denied the compensation and closure that they have waited decades to receive.

16.     Moreover, as demonstrated in the Liquidation Analysis, if the BSA is

forced to liquidate (and the Local Councils thereby also ultimately liquidate), the

total amount of compensation available for survivors would plummet.  Based on my

analysis of the assets available following the liquidation of the BSA, the Related

Non-Debtor Entities, and the Local Councils, excluding insurance assets and

recoveries from Chartered Organizations, the value available to survivors in a

liquidation is estimated to be only $158 million.  *See* Bankr. D.I. 9280 ¶ 279, Chart

23.  Under a liquidation scenario, the existing $1.656 billion in insurance settlements

would be eliminated as would the well-funded centralized vehicle (*i.e.*, the

Settlement Trust) to pursue and secure insurance recoveries from non-settling

insurers on account of survivors under the BSA and Local Council insurance

policies, which potential recoveries the Bankruptcy Court collectively valued at up

to $7 billion.  *See* D.I. 1-3 at 70; Bankr. D.I. 9280 ¶ 275, Chart 22 (detailing

insurance litigation and costs absent the Plan).

17.     Specifically, in the event that the BSA is forced to liquidate, survivors

would be forced to individually pursue Local Councils and Chartered Organizations.

If numerous lawsuits were brought against Local Councils and Chartered

Organizations, such Local Councils and Chartered Organizations would likely be

forced to file their own bankruptcies, further decreasing funds available to

compensate abuse survivors and prolonging their decades-long wait for both compensation and closure.

18.     In such a scenario where the BSA is forced to liquidate and the Plan is not consummated, the insurance settlements would terminate.  The settlements that are incorporated into the Plan embody the hard-fought global resolution that was reached during the Chapter 11 Cases.   D.I. 1-3 at 163; *see* D.I. 1-4 Ex. I-1 § III.A.1.c (Hartford); D.I. 1-4 Ex. I-2 § 31 (Century and Chubb Companies); D.I. 1-4 Ex. I-3 § 28 (Zurich); D.I. 1-4 Ex. I-4 § 28 (Clarendon).  Without the releases and global resolution embodied in the Plan, the Settling Insurance Companies would not be motivated to settle their liability.  Absent the Plan, in a hypothetical liquidation of the BSA and Local Councils, separate chapter 7 trustees would need to pursue litigation with settling and non-settling insurers to resolve coverage issues.  *See* Bankr. D.I. 9280 ¶ 275.  I estimated that, absent the Plan, the additional insurance litigation costs that would directly reduce net insurance proceeds for Abuse Claims range from $464 million to $825 million, with a mid-point range of $643 million. *See* Bankr. D.I. 9280 ¶ 275 n.61.[3]  Further, Century is in run-off with a statutory

---

[3]   These estimated costs are based on the assumption that in a liquidation, the Local Councils would incur substantial additional litigation and other costs, as well as the estimated impact of the time value of receipt of insurance proceeds in the Plan versus estimates absent a Plan.  *Id.* ¶ 275.

surplus of only $25 million and absent the Century and Chubb Companies Insurance Settlement Agreement, there may be difficulties in collecting from Century.

19.     During the Stay Period, the unsecured creditors (*e.g.*, thousands of survivors) would be unable to access, among other things, the roughly $2.46 billion in value (with the ability to commence the pursuit of unsettled insurance and Participating and Opt-Out Chartered Organizations to access over $7 billion total in value) that is contemplated under the Plan to be distributed to abuse survivors on or after the Effective Date.  *See* D.I. 1-3 at 70.  Upon emergence, creditors would be free to reinvest their cash distributions under the Plan in securities or other opportunities generating a more favorable rate of return.  I believe that a conservative and reasonable estimate of the BSA's unsecured creditors' potential investment rate of return is approximately 4.3% based on the average two-year U.S. Treasury Note rate over the last month and could be as high as 8.6% with a more balanced investment strategy.  Based on these assumptions, unsecured creditors, together with holders of Administrative Expense, Other Priority and Convenience Claims would likely be able to earn $275 to $586 million in additional investment income per year or $551 million to $1.2 billion over two years (*i.e.*, the high end of the Stay Period), as compared to the $0 that the unsecured creditors would be able to earn during the

Stay Period.[4]   Thus, there is financial harm related to the delay in reinvesting anticipated cash distributions under the Plan during the Stay Period.

### D.   Estimated Potential Harm

20.   Based on the foregoing, the amount of potential harm that may arise from the various risks during an extended stay period would be extensive.  Based upon an analysis of the harm caused by the delay alone, without including any risk of liquidation or other unquantified factors, the harm would likely be no less than approximately $323.3 million and up to $1.38 billion given the likely one to two year delay.  If the delay caused a liquidity crisis for any reason and the BSA were forced to liquidate, the difference between the funds available under the Plan and liquidation value for the Abuse Survivors alone, without considering the harm to the BSA and other creditors, is a minimum of $2.2 billion and could potentially be $6.9 billion or higher.  I believe it is important for the BSA to emerge from bankruptcy as soon as possible.  In the event the Stay Motions are granted, I believe the BSA, survivors, and other stakeholders will incur substantial harm and a condition to any such stay, must be the requirement for a bond.

---

[4]   Of note, the contribution provided under the Century and Chubb Companies Insurance Settlement Agreement is in escrow and the Settlement Trust will benefit from earnings over the time of a Third Circuit appeal, and therefore, I have excluded such contribution from this analysis.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  April 6, 2023          ALVAREZ & MARSAL NORTH AMERICA,
        Chicago, Illinois          LLC

                        */s/ Brian Whittman*
                        Brian Whittman
                        Managing Director