# Exhibit "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, | : : : | Chapter 11 Case No. 20-10343-LSS (Jointly Administered) |
| Debtors. | : : | |
| | | |
| NATIONAL UNION FIRE INSURANCE, COMPANY OF PITTSBURGH, PA, *et al*, | : : : | Civ. No. 22-1237-RGA (Lead Case) |
| Appellants, v. | : : : | Civ. Nos. 22-1238-RGA, 22-1239-RGA, 22-1240-RGA, 22-1241-RGA, 22-1242-RGA, |
| BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, *et al.,* | : : : : | 22-1243-RGA, 22-1244-RGA, 22-1245-RGA, 22-1246-RGA, 22-1247-RGA, 22-1249-RGA, 22-1250-RGA, 22-1251-RGA, |
| Appellees. | : : | 22-1252-RGA, 22-1258-RGA, & 22-1263-RGA (Consolidated) |

## **OPINION**

Theodore J. Boutrous, Jr. (argued), Richard J. Doren, Blaine H. Evanson, Gibson, Dunn & Crutcher, LLP, Los Angeles, California; Dierdre M. Richards (argued), Fineman Krekstein & Harris P.C., Wilmington, Delaware; Susan Gummow, Foran Glennon Palandech Ponzi & Rudloff P.C.; Michael A. Rosenthal, Mitchell A. Karlan, James Hallowell, Keith R. Martorana, Seth M. Rokosky, Gibson Dunn & Crutcher LLP, New York, New York, attorneys for appellants National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania.

Kathleen M. Miller, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware; Ronald P. Schiller, Matthew A. Hamermesh, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, attorneys for appellant Arch Insurance.

Paul Logan, Post & Schell, P.C., Wilmington, Delaware; John C. Sullivan, Kathleen K. Kerns, Post & Schell, P.C., Philadelphia, Pennsylvania; George R. Calhoun, Ifrah PLLC, Washington, D.C., counsel for appellants Argonaut Insurance Company and Colony Insurance Company.

Michael J. Joyce, Joyce LLC, Wilmington, Delaware; Kevin Coughlin, Lorraine Armenti, Michael Hrinewski, Coughlin Midlige & Garland, LLP, Morristown, New Jersey; Britton C. Lewis, John M. Flynn, Carruthers & Roth, P.A., Greensboro, North Carolina, attorneys for appellant Arrowood Indemnity Company.

Maria Aprile Sawczuk, Goldstein & McClintock LLP, Wilmington, Delaware; Laura McNally, Emily Stone, Loeb & Loeb LLP, Chicago, Illinois; David Christian, David Christian Attorneys LLC, Chicago, Illinois, attorneys for appellants The Continental Insurance Company and Columbia Casualty Company.

Brian A. Sullivan, Werb & Sullivan, Wilmington, Delaware; John E.W. Baay II, Gieger Loborde & Laperouose, LLC, New Orleans, Louisiana; William H. White, Jr., Kiernan Trebach LLP, Washington, D.C., attorneys for appellant Gemini Insurance Company.

Kathleen M. Miller, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware; Mary E. Borja, Gary P. Seligman, Ashley L. Criss, Wiley Rein LLP, Washington, D.C., attorneys for appellant General Star Indemnity Company.

Bruce W. McCullough, Bodell Bove, LLC, Wilmington, Delaware; Bruce D. Celebrezze, Clyde & Co US LLP, San Francisco, California; Konrad R. Krebs, Clyde & Co US LLP, Morristown, New Jersey; David Christian, David Christian Attorneys LLC, Chicago, Illinois, attorneys for appellants Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company; and Great American E&S Insurance Company.

Kathleen M. Miller, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware; Lloyd A. Gura, Pamela J. Minetto, Mound Cotton Wollan & Greengrass LLP, New York, New York, attorneys for appellant Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company.

R. Karl Hill, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Douglas R. Gooding (argued), Jonathan D. Marshall, Choate, Hall & Stewart LLP, Boston, Massachusetts; Kim V. Marrkand, Laura Bange Stephens, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC, Boston, Massachusetts, attorneys for appellants Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc. and Liberty Surplus Insurance Corporation.

Thaddeus J. Weaver, Dilworth Paxson LLP, Wilmington, Delaware; William E. McGrath, Jr. Dilworth Paxon LLP, Princeton, New Jersey, attorneys for appellant Munich Reinsurance America, Inc. f/k/a American Re-Insurance Company.

Stephen M. Miller, Carl N. Kunz, III, Sarah M. Ennis, Morris James LLP, Wilmington, Delaware; Margaret M. Anderson, Ryan T. Schultz, Adam A. Hachikian, Kenneth M. Thomas, Fox Swibel Levin & Carroll LLP, Chicago, Illinois, attorneys for appellant Old Republic Insurance Company.

Marla S. Benedeck, Cozen O'Connor, Wilmington, Delaware, attorneys for appellants Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company.

Louis J. Rizzo, Reger Rizzo & Darnall LLP, Wilmington, Delaware, attorney for appellants Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company.

2

David M. Fournier, Marcy J. McLaughlin Smith, Troutman Sanders Hamilton Sanders LLP, Wilmington, Delaware; Harris B. Winsberg (argued), Matthew G. Roberts, Parker Hudson, Rainer & Dobbs LLP, Atlanta, Georgia; Margaret H. Warner, Ryan S. Smethurst, Alex M. Spisak, McDermott Will & Emery, Washington, D.C., attorneys for appellant Allianz Global Risks U.S. Insurance Company.

David M. Fournier, Marcy J. McLaughlin Smith, Troutman Sanders Hamilton Sanders LLP, Wilmington, Delaware; Harris B. Winsberg, Matthew G. Roberts, Parker Hudson, Rainer & Dobbs LLP, Atlanta, Georgia; Todd J. Jacobs, John E. Bucheit, Paul J. Esker, Bradley Riley Jacobs, P.C., Chicago, Illinois, attorneys for appellants National Surety Corporation and Interstate Fire & Casualty Company.

Gilion Dumas (argued), Dumas & Vaughn, LL, Portland, Oregon; Charles J. Brown, III, Gellert Scali Busenkell & Brown LLC, Wilmington, Delaware, attorneys for appellants the D&V Claimants.

Delia Lujan Wolff (argued), Lujan & Wolff LLP, Hagatna, Guam; Christopher D. Loizides, Loizides, P.A., Wilmington, Delaware, attorneys for appellants the Lujan Claimants.

Jessica Lauria (argued), Glenn M. Kurtz (argued), White & Case LLP, New York, New York; Michael C. Andolina, Matthew E. Linder, Laura E. Baccash, Blair M. Warner, White & Case LLP, Chicago, Illinois; Ronald K. Gorsich, White & Case LLP, Los Angeles, California; Michael Stoner (argued), Haynes & Boone, Dallas, Texas; Derek C. Abbott, Andrew R. Remming, Paige N. Topper, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, attorneys for debtor-appellees Boy Scouts of America and Delaware BSA, LLC.

R. Craig Martin, DLA Piper, LLP (US), Wilmington, Delaware; Richard G. Mason (argued), Douglas K. Mayer, Joseph C. Celentina, Mitchell S. Levy, Wachtell, Lipton, Rosen & Katz, New York, New York, attorneys for appellee Ad Hoc Committee of Local Councils of the Boy Scouts of America.

Kami E. Quinn (argued), Rachel H. Jennings, Kyle Y. Dechant, December L. Huddleston, Gilbert LLP, Washington, D.C.; Robert S. Brady (argued), Edwin J. Harron, Kenneth J. Enos, Ashley E. Jacobs, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, attorneys for appellee the Future Claimants' Representative.

Philip D. Anker (argued), Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; James P. Ruggeri, Joshua D. Weinberg, Ruggeri Parks Weinberg LLP, Washington, D.C.; Joel Millar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Erin R. Fay, Gregory J. Flasser, Bayard, P.A., Wilmington, Delaware,  attorneys for appellees Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company.

Robert D. Cecil, Tybout, Redfearn & Pell, Wilmington, Delaware; Mark D. Plevin, Kevin D. Cacabelos, Crowell & Morning LLP, San Francisco, California; Tacie H. Yoon, Rachel A. Jankowski, Crowell & Morning LLP, Washington, D.C., attorneys for appellees American Zurich Insurance Company, American Guarantee Insurance Company, and Steadfast Insurance.

Matthew G. Summers, Chantelle D. McClamb, Ballard Spahr LLP, Wilmington, Delaware; Harry Lee, John O'Connor, Steptoe & Johnson, LLP, Washington, D.C.; Stephen Warren, attorneys for appellees Clarendon National Insurance Company, as successor in interest by merger to Clarendon America Insurance Company; River Thames Insurance Company Limited; and Zurich American Insurance Company, as successor to Maryland Casualty Company, Zurich Insurance Company, and Maryland American General Insurance Company.

Stamatios Stamoulis, Stamoulis & Weinblatt LLC, Wilmington, Delaware; Tancred Schiavoni, O'Melveny & Meyers LLP, New York, New York; Stephen Warren, O'Melveny & Meyers LLP, Los Angeles, California; Jonathan D. Hacker, O'Melveny & Meyers LLP, Washington, D.C., attorneys for appellees Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America.

Stamatios Stamoulis, Stamoulis & Weinblatt LLC, Wilmington, Delaware; Simpson Thacher & Bartlett LLP, New York, New York, attorneys for Federal Insurance Company and Westchester Fire Insurance Company.

Richard M. Pachulski, Alan J. Kornfeld, Debra I. Grassgreen, Iain A.W. Nasatir, Pachulski Stang Ziehl & Jones LLP, Wilmington, Delaware, attorneys for the Official Committee of Tort Claimants.

Rachel B. Mersky, Monzack Mersky and Browder, P.A., Wilmington, Delaware; David J. Molton, Eric R. Goodman, Brown Rudnick LLP, New York, New York; Sunni P. Beville, Tristan G. Axelrod, Brown Rudnick LLP, Boston, Massachusetts, attorneys for the Coalition of Abused Scouts for Justice.

David M. Klauder, Bielli & Klauder, LLC, Wilmington, Delaware; Thomas E. Patterson, Daniel J. Bussel, Robert J. Pfister, Sasha M. Gurvitz, KTBS Law LLP, Los Angeles, California, attorneys for each of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC.

March 27, 2023

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

The above-captioned consolidated appeals, arising in the chapter 11 cases of debtors Boy Scouts of America and Delaware BSA, LLC (together, "BSA" or "Debtors"), were taken from the Bankruptcy Court's Order, dated September 8, 2022 (D.I. 1-1) ("Confirmation Order"), making certain findings of fact and conclusions of law and confirming BSA's plan of reorganization (Bankr. D.I. 10296) ("Plan"),[1] together with the Bankruptcy Court's related Opinion, dated July 29, 2022 (Bankr. D.I. 10136), *In re Boy Scouts of Am.*, 642 B.R. 504 (Bankr. D. Del. 2022) ("Confirmation Opinion"), which approved key elements of the Plan.

The Plan embodies a global resolution of Scouting[2]-related sexual abuse ("Abuse") claims. The cornerstone of the Plan is a series of settlements, resolving a complex array of overlapping liabilities and insurance rights, that will establish what is apparently the largest sexual abuse compensation fund in the history of the United States—the Settlement Trust. These settlements are the product of nearly two years of mediation and provide at least $2.46 billion in cash and property to the Settlement Trust benefiting Abuse Survivors, plus significant unliquidated assets, including valuable insurance rights worth up to another $4 billion plus. *In re Boy Scouts of Am.*, 642 B.R. at 616; (Bankr. D.I. 9280 ¶¶ 52, 55). The Plan "channels" to the Settlement Trust all Abuse Claims against BSA, the Related Non-Debtor Entities, the Local Councils, certain Chartered Organizations, and those covered by insurance policies issued by the Settling Insurance Companies and provides for coextensive nonconsensual releases of the

---

[1] The docket of the Chapter 11 cases, captioned *In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343-LSS (Bankr. D. Del.), is cited herein as "Bankr. D.I. __." The appendix (D.I. 95-100) filed contemporaneously with Appellees' consolidated answering brief (D.I. 66) is cited herein as "SA__." The appendix (D.I. 46) filed contemporaneously with D&V Claimants' opening brief (D.I. 41) is cited herein as "ADV__," and the appendix (D.I. 44) filed contemporaneously with Lujan Claimants' opening brief (D.I. 40) is cited herein as "ALW__". "A.__" refers to documents in the Notice of Lodging of Multimedia Filing filed by the Certain Insurers (D.I. 47).
[2] Capitalized terms not defined herein have the meaning ascribed to them in the Plan.

channeled Abuse Claims ("Releases").  The channeled Abuse Claims will be processed, liquidated, and paid by the Settlement Trustee in accordance with the Settlement Trust Agreement and Trust Distribution Procedures (D.I. 1-4 Ex. A) ("TDP" or "TDPs") which were the subject of intensive negotiations by BSA and various constituencies during the chapter 11 cases.  The Channeling Injunction and Releases are the "cornerstone of the Plan," and are necessary to ensure an equitable process by which abuse Survivors' claims will be administered and paid.  *In re Boy Scouts of Am.*, 642 B.R. at 610.  This Court's affirmance of the Confirmation Order is a condition precedent to the Plan going effective.  (D.I. 66 at 8-9).

The Bankruptcy Court characterized BSA's chapter 11 proceedings as "an extraordinary case by any measure"—and indeed every aspect of the record bears this out.  *In re Boy Scouts of Am.*, 642 B.R. at 517.  Unlike the typical chapter 11 debtor, BSA is a Congressionally created, non-profit organization, existing for over a hundred years, and operating through tens of thousands of non-debtor entities—Local Councils and Chartered Organizations.  The number and nature of claims faced by the Debtor is staggering and apparently unprecedented—82,209 unique and timely claims asserting the type of abuse for which, as the Bankruptcy Court observed, "no compensation will ever be enough."  *Id.* at 518.  Perhaps nowhere is the extraordinary nature of this case more apparent, however, than in the efforts of the many constituencies and their professionals over the past several years to negotiate and confirm a plan.  During three years of chapter 11 proceedings there were thousands of hours of mediated negotiations among more than a dozen stakeholder groups, fifty-nine hearings, a twenty-two day confirmation trial, and 300 pages of opinion and supplemental findings.  The Plan was supported by every estate fiduciary and nearly every organized creditor group—a commendable result for such a lengthy, contentious, and "emotionally charged" proceeding.  The Plan, if upheld, will ensure the survival of an American institution, not only so that it may continue carrying out its charitable mission,

6

but as a means to arguably more important ends: providing long-awaited compensation to abuse Survivors and implementing youth protection measures to ensure that the crimes and mistakes of the past are not repeated.

The case is extraordinary. More prosaically, though, the Plan must meet the requirements of the Bankruptcy Code for confirmation, and several parties argue strenuously that it did not. Fifteen sets of Appellants, all non-settling insurance companies, called "Certain Insurers" or "Insurers" in this opinion, filed one set of arguments. (D.I. 45). Two of the fifteen sets of insurance companies, Liberty and Allianz, separately raised additional issues. (D.I. 43). Two sets of abuse claimants raised issues. (D.I. 41: D.I. 40). One set is represented by the law firm of Dumas & Vaughn, and they are referred to as "D&V Claimants." The other set is represented by the law firm of Lujan & Wolff, and they are referred to as "Lujan Claimants." On the appellee side, BSA, the Ad Hoc Committee of Local Councils, the Future Claimants' Representative, the Coalition of Abused Scouts for Justice ("Coalition"), and Settling Insurance Companies ("Appellees") have each filed briefs in support of the Confirmation Order.

Appellants argue on many fronts that the Plan did not meet requirements for confirmation, and I have carefully considered each of these arguments. Based on the record, Appellants have failed to put forth evidence that would demonstrate clear error in the Bankruptcy Court's careful findings of facts. Finding no error in the Bankruptcy Court's legal conclusions either, I will affirm the Confirmation Order.

## I.    BACKGROUND

The Confirmation Opinion sets forth detailed background facts that are not repeated here, including: the delivery of Scouting and the relationship between and among BSA, Local Councils, Chartered Organizations, and related non-Debtor entities, *see In re Boy Scouts of Am.*, 642 B.R. at 521-24; the sexual abuse lawsuits, *see id.* at 525-26; BSA's complex insurance

program, including coverage for BSA as the Insured, Coverage for Local Councils as Additional Insureds, and Coverage for Chartered Organizations as Additional Insureds, *see id.* at 526-30; prepetition coverage litigation, including resolutions and attempts to resolve abuse claims, *see id.* at 530-32; post-petition events, including the bar date order, mediations, the Plan process and voting, continued mediation and additional settlements, and the development of the Settlement Trust Agreements, the TDPs, and the Youth Protection terms, *see id.* at 533-49; and finally, the plan modifications, supplemental disclosure, and confirmation, *see id.* at 550-52.

As the Bankruptcy Court observed, and as was confirmed at oral argument, the facts supporting Plan confirmation are largely uncontroverted, whereas the import of the facts is very much in dispute. *In re Boy Scouts of Am.*, 642 B.R. at 521 n.1.  This Opinion includes only a general overview of the Debtors' business, the sexual abuse claims, the insurance policies, and the core components of the settlements embodying the Plan.  Otherwise, I do not repeat the thorough background and detailed findings made by the Bankruptcy Court, except as necessary to discuss the legal issues raised on appeal and to address the one disputed finding of fact: whether it was clear error for the Bankruptcy Court to find that the Plan likely pays Direct Abuse claimants in full.

## A.    Overview of BSA, Local Councils and Chartered Organizations

BSA has existed since 1916.  BSA's charitable mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful.  BSA trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and career-oriented programs in partnership with community organizations.  Congress recognized the "importance and magnitude" of BSA's work

and observed that BSA "tends to conserve the moral, intellectual, and physical life of the coming generation." *See* H.R. Rep. No. 64-130, at 245 (1916).

Scouting operates through a network of organizations that share a common charitable mission. BSA, in accordance with its congressional charter, develops and disseminates the structure and content of the Scouting program, owns and licenses intellectual property, and establishes merit badge requirements and membership qualifications. BSA also purchases general liability insurance that is shared among BSA, Local Councils, and Chartered Organizations (since the 1970s) and provides shared technical support, accounting, human resources and other corporate services to the Local Councils. Each of these Local Councils and Chartered Organizations, along with BSA, form part of an interconnected organizational structure that is crucial to carrying out BSA's mission.

Most Scouts never interact with the national BSA organization directly. Instead, the tens of thousands of Scouting units nationwide—*e.g.*, "troops," "packs," and "dens"—are organized locally, through "Chartered Organizations," including churches, schools, and civic associations, which are often referred to as Scouting's partners. These Scouting units and their Chartered Organization partners are, in turn, supported by the Local Councils. The Bankruptcy Court found that it takes:

> all three levels of organization to deliver Scouting—national, which sets policy and provides administrative services, Local Councils, which charter Organizations, recruit Scouts and volunteer leaders and enforce BSA rules and regulations, and Chartered Organizations, which provide facilities and use Scouting to further one of their goals of youth character development, career skill development, community service, patriotism, military and veteran recognition or faith-based youth ministry.

*In re Boy Scouts of Am.*, 642 B.R. at 597. Approximately 250 Local Councils in the United States cover geographic areas of varying size, population, and demographics. Each Local Council is a non-profit organization incorporated under applicable state law. The Local Councils

are chartered by BSA on an annual basis to facilitate the delivery of the Scouting program. Local Councils are led by paid professional adult leaders with assistance from volunteers and their own boards of directors and senior management. Pursuant to BSA bylaws, BSA may revoke or refuse to renew a Local Council charter at any time in its sole discretion and in the best interest of Scouting. In such circumstances, the articles of incorporation for the Local Council provide that such council will take the actions necessary to dissolve the entity.

BSA relies on Local Councils for services essential to Scouting, including funding local Scouting programs and initiatives, recruiting Scouts and volunteer leaders, Scout and volunteer training, opportunities for rank advancement, local enforcement of BSA's policies, rules, and regulations, and registration of members and leaders. In addition, Local Councils own and operate hundreds of unique camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in BSA's Scouting programs.

Through Local Councils, BSA maintains relationships with local donors and Chartered Organizations, which currently sponsor more than 44,000 local Scouting units throughout the country. These relationships, vital to the success of Scouting, drive membership and provide essential funding. Without a Local Council operating in a particular region, BSA would lose access to the resources necessary to operate Scouting units in such region. Thus, if a Local Council were to dissolve or file for bankruptcy, it would be difficult for BSA to reestablish the community ties necessary for a successful Scouting program.

BSA receives services and support from certain Related Non-Debtor Entities. These entities include (a) BSA Asset Management, LLC, a Delaware limited liability company that provides BSA with investment management and advisory services; (b) BSA Commingled Endowment Fund, LP, a Delaware limited partnership through which BSA's and certain Local Councils' investments are managed by BSA Asset Management, LLC; (c) BSA Endowment

10

Master Trust, a non-profit trust established for investing funds contributed to the BSA

Commingled Endowment Fund, LP; (d) National Boy Scouts of America Foundation, a non-

profit corporation that partners with Local Councils and other donors by providing support for

major-gift fundraising efforts and managing donor-advised funds; (e) Learning for Life, a non-

profit corporation that provides important education programs and mentoring to young people for

future career opportunities; (f) Arrow WV, Inc., a non-profit corporation that owns, develops,

and leases the Summit Bechtel Family National Scout Reserve high adventure base in West

Virginia to BSA; and (g) Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc., non-

share capital corporations formed under the laws of Canada that own and operate the BSA

portions of the Northern Tier High Adventure Base located in Canada.  There is "no record that

any of the Non-Related Debtor Entities is involved in anything other than Scouting." *In re Boy*

*Scouts of Am.*, 642 B.R. at 598.

    **B.**    **Overview of Abuse Claims**

    Prior to the Petition Date, BSA was a defendant in a significant number of Abuse-related

lawsuits and claims asserted by Abuse Survivors.  Most of these lawsuits also named non-debtor

entities as co-defendants, including Local Councils, Chartered Organizations, and certain Related

Non-Debtor Entities.  The Abuse allegations in these claims and complaints ranged in severity,

and plaintiffs generally sought economic and noneconomic damages, punitive damages, and non-

monetary relief.  The vast majority of the Abuse Claims settled before the Petition Date involved

allegations of Abuse that occurred more than thirty years ago.  As a result of a growing trend of

changes in state statutes of limitations for claims related to childhood sexual abuse, the number

of Abuse claims against BSA sharply increased during the time period immediately preceding

BSA's chapter 11 Cases.  Since 2002, approximately seventeen states have enacted legislation

allowing victims of sexual abuse to assert claims that previously would have been barred by statutes of limitation. More than a dozen of those states did so in 2019.

Beginning in 2016, BSA, with the assistance of its national coordinating counsel handling Abuse claims litigation, Ogletree Deakins Nash, Smoak & Stewart, worked to resolve Abuse Claims that were either the subject of pre-litigation demands or pending lawsuits. BSA sought to implement a coordinated, uniform approach for investigating, defending, and resolving Abuse Claims and ensuring consistent defense and claim resolution strategies across the country. With certain exceptions, BSA generally administered and defended Abuse Claims on behalf of Local Councils, Related Non-Debtor Entities, and Chartered Organizations, as well as authorizing and paying settlement amounts related to Abuse Claims, such that these entities did not bear the costs of litigation or settlement of Abuse Claims. BSA was able to resolve approximately 250 prepetition Abuse Claims and spent approximately $150 million on these efforts between 2017 and 2019, including Abuse Claims asserted against BSA, Local Councils, and/or Related Non-Debtor Entities. During 2018-2019, BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable and global out-of-court resolution of Abuse Claims. In late 2019, BSA participated in a mediation with counsel to certain Abuse Survivors and some of BSA's insurers. The mediation was unsuccessful.

On February 18, 2020 (the "Petition Date"), BSA filed for relief under chapter 11 the Bankruptcy Code. On May 26, 2020, the Bankruptcy Court entered an order establishing November 16, 2020 as the deadline for holders of claims, including Abuse Claims, to file them (Bankr. D.I. 695) ("Bar Date Order"). The Bar Date Order also approved procedures for the provision of notice to known and unknown survivors of Scouting-related abuse, and procedures for the confidential submission of Abuse Claims. As of the bar date, approximately 82,200

unique and timely Direct Abuse Claims, 14,000 largely, if not entirely, contingent and unliquidated Indirect Abuse Claims, and 950 non-abuse claims were filed in the chapter 11 cases.

### C.    Overview of Insurance Program

BSA's insurance program has evolved over the last eighty years, with variations in insurance carriers, covered entities, type and amount of limits, and the use of deductibles. Nearly all years have some available coverage for Abuse Claims, whether through a per-occurrence limit, an aggregate limit, or both.

Between at least 1935 and 1982, BSA purchased primary insurance policies providing coverage for Abuse Claims, with the limits of liability subject to a per-person or per-occurrence limit, but no aggregate limit.  A per-occurrence limit represents how much an insurance policy will pay for any one occurrence whereas an aggregate limit represents the overall amount a policy will pay for all occurrences that take place during the policy period; once the applicable payments made by these policies reach the aggregate limit, the policy will no longer respond to claims.  Certain of the older policies during this period are missing or are disputed.  From 1969 to 1982, BSA purchased excess insurance policies, which are triggered once the primary insurance coverage is exhausted.  Again, most of these excess policies provide per-occurrence coverage with no aggregate limit, meaning that once the primary policy's per-occurrence limit is exhausted, the excess policy attaches to cover any remaining value of the claim.  As a result, the policies can repeatedly pay out the per-occurrence limits.  Beginning in 1983, BSA insurance policies generally incorporated aggregate limits for Abuse Claims.  Because of these aggregate limits, BSA purchased significantly more layers of excess coverage.  In the post-1982 period alone, approximately $3.6 billion of coverage is potentially available within the policies' aggregate limits (after accounting for prior settlements and exhaustion of coverage).

13

Starting in 1986 and continuing through 2018, BSA purchased primary and first-layer excess policies that have deductibles that match the policies' limits of liability, dollar for dollar. (Bankr. D.I. 9398, Gutzler Decl. ¶¶ 12-13). The "matching deductible" policies required BSA to pay or reimburse the deductibles before excess coverage attached to cover the remaining value of a claim to the extent it exceeded the limits of the underlying policies. (*Id.*) During these years, BSA procured significant excess insurance coverage above the "matching deductible" primary and first-layer excess policies. In most years, the BSA had over $140 million in excess insurance coverage available for a single coverage year. (*Id.*).

Beginning in 2019 and continuing to the present, BSA discontinued its practice of procuring policies with matching deductibles. In addition to providing insurance coverage to BSA, the BSA insurance program also provided insurance coverage to Local Councils beginning in 1971. Prior to 1971, Local Councils were not insureds under BSA's insurance program; instead, they independently purchased insurance policies. For a brief period in the 1970s, BSA offered each Local Council the opportunity to pay a premium to be added as an additional insured (i.e., a party with rights to the insurance coverage) on BSA's insurance policies. Many Local Councils elected this option; others continued to purchase coverage independently. Starting in 1975, all Local Councils became insureds under BSA's insurance program, whether as an additional insured (between 1975 and 1977) or as a named insured (between 1978 and the present). Beginning in 1976, BSA also amended its policies to provide coverage for Chartered Organizations. Starting in 1978, BSA specifically included Chartered Organizations as insureds on its insurance policies, albeit with some variation in coverage. Some, but not all, Chartered Organizations are also listed as additional insureds on their Local Council's independent insurance policies.

### D.     Overview of Mediation and Plan Process

By filing the chapter 11 cases, BSA sought a global resolution that would achieve their dual objectives of (i) providing an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse while preserving trust assets such as insurance policies and (ii) ensuring that BSA has the ability to continue its vital charitable mission.

On June 9, 2020, the Bankruptcy Court appointed three mediators in the chapter 11 cases to aid BSA in achieving consensus.  For nearly two years, BSA engaged in near-continuous mediation with every major creditor constituency in the chapter 11 cases, including the Certain Insurers.  Mediation ultimately led to overwhelming support for the Plan by key constituencies, including (i) the representatives of almost all abuse survivors, including the official committee appointed by the United States Trustee ("UST") to represent Abuse Survivors ("Tort Claimants' Committee"), the Future Claimants' Representative, the Coalition (an ad hoc committee representing more than 70,000 Abuse Survivors), and the Pfau/Zalkin claimants (certain survivors represented by two law firms), (ii) the Settling Insurance Companies, (iii) the Debtors' prepetition secured lender, JPMorgan Chase Bank, (iv) the official committee for general unsecured creditors ("Creditors' Committee"), (v) the Ad Hoc Committee for Local Councils, (vi) and various Chartered Organizations, including The Church of Jesus Christ of Latter-day Saints (TCJC), a long-time Chartered Organization that ended its relationship with BSA in 2019, the United Methodist ad hoc committee, representing the United Methodist Entities involved in Scouting, and the Roman Catholic ad hoc committee ("RCAHC") representing Roman Catholic Entities involving in Scouting.  The Archbishop of Agaña (the "Archbishop") and the official creditors' committee in the AOA's bankruptcy case ("AOA Committee"), which opposed the Plan, have since settled with the Debtors and no longer dispute the Confirmation Opinion and Confirmation Order.  The final voting results following solicitation of votes on the Plan

15

demonstrate overwhelming creditor support for the Plan, with all voting classes voting to accept. With respect to Debtor BSA, 85.72% of holders of Class 8 Direct Abuse Claims and 82.41% of Class 9 Indirect Abuse Claims voted to accept the Plan. *See In re Boy Scouts of Am.*, 642 B.R. at 617 (finding that 85% acceptance by Class 8 constituted overwhelming creditor support for the Plan); Bankr. D.I. 9275.

### E.    The Core Components of the Plan

The settlements achieved through mediation and embodied in the Plan resulted in substantial monetary and other valuable contributions to the Settlement Trust and non-monetary contributions to the Scouting mission (including an enhanced Youth Protection Program). The Plan and Confirmation Order create the Settlement Trust. It is funded with more than $2.46 billion in cash and property and is assigned insurance and other rights under policies of the Debtors, Local Councils, and certain Chartered Organizations. The Settlement Trust will also be entitled to pursue additional recoveries for the benefit of Abuse Survivors against non-settling parties, including many Chartered Organizations and insurance companies. (D.I. 1-4 Art. IV.O).

### 1.    Contributions and Settlements

BSA's contributions[3] to the Settlement Trust include the following: (i) the BSA Settlement Trust Note in the principal amount of $80 million, (ii) the Insurance Assignment, (iii) BSA's right, title, and interest in and to the Artwork, which is deemed to be valued at approximately $59 million, (iv) the BSA Cash Sharing Amount, (v) the Oil and Gas Interests, valued at approximately $7.6 million, (vi) BSA's Settlement Trust Causes of Action, and (vii)

---

[3] Contributions also include BSA's Net Unrestricted Cash and Investments as of the Plan's effective date, which includes net proceeds of the sale of certain assets, after Reorganized BSA has received proceeds of a loan by the National Boy Scout Foundation in the amount of $42.8 million, less certain amounts, including certain exit fees and interest to be paid to JPMorgan Chase Bank, allowed administrative expenses, and allowed tax claims. (D.I. 1-4 at Art. I A.185).

the assignment of any Perpetrator Indemnification Claims held by BSA. (D.I. 1-4 Art I.A.45). The Local Councils are also providing valuable contributions to the Settlement Trust, including, in the aggregate: (i) $500 million in cash or real property, (ii) the DST Note, a non-recourse interest-bearing promissory note in the principal amount of $100 million, (iii) the Local Council Insurance Rights, and (iv) material insurance rights in the BSA Insurance Policies. (D.I. 1-4 Art. V.S.1.a). The Local Councils will also make the Chartered Organization Contribution of approximately $40 million to obtain certain protections for Participating Chartered Organizations. (D.I. 1-4 Art. I.A.181).

The Plan also includes valuable Insurance Settlements with Hartford, Century and Chubb, Zurich, and Clarendon ("Settling Insurance Companies"). In exchange for the benefits of the Channeling Injunction and Releases, the Settling Insurance Companies will make cash contributions of more than $1.6 billion to the Settlement Trust as consideration for the purchase of their respective policies. The Insurance Settlements also resolve certain other disputes between the parties to the benefit of BSA's estates and other parties in interest. (Bankr. D.I. 6210; Bankr. D.I. 7745; Bankr. D.I. 7929; Bankr. D.I. 8102). Finally, the Plan includes other settlements with critical constituencies to BSA, including (a) a settlement with the United Methodist Entities providing, among other things, a $30 million contribution to the Settlement Trust and a partnership to strengthen Youth Protection efforts and Methodist partnerships with Scouting (Bankr. D.I. 7884, 7929, 8907); (b) the JPMorgan Chase Bank/Creditors' Committee Settlement (Bankr. D.I. 2292; D.I. 1-4 Art. V.S.2); and (c) the Tort Claimants' Committee/Abuse Survivor Settlement, under which BSA agreed to certain governance changes to the Settlement Trust, the addition of an optional Independent Review Option in the TDP, the Youth Protection Program, and clarifications to certain Plan terms (Bankr. D.I. 8772).

## 2.      Youth Protection Program

BSA is committed to becoming the gold standard in Abuse prevention.  BSA's Youth

Protection Program will be strengthened by Plan provisions, which ensure that Abuse Survivors

play a key role in shaping BSA's future youth protection efforts.  The provisions were the result

of months of cooperative discussions and mediation sessions including a group of Survivors

affiliated with the Coalition, who formed what became known as the Survivors Working Group,

affiliated with the Coalition, Survivors from the Tort Claimants' Committee, representatives

from BSA and Local Councils, and a number of youth protection experts.  As a result of the

Youth Protection Program, BSA will engage in a number of initiatives, including (a) hiring a

Youth Protection executive with extensive experience in prevention of childhood abuse, (b)

forming a Youth Protection Committee, and (c) conducting an extensive review and update of

existing policies.  (D.I. 1-4, Ex. L).  BSA will also appoint a qualified survivor of abuse in

Scouting to the organization's national executive board.  (Bankr. D.I. 8647).

## 3.      Chartered Organizations

There are three categories of Chartered Organization participation in the Plan that enable

the global resolution of Scouting-related Abuse Claims.  First, Contributing Chartered

Organizations, which includes the United Methodist Entities, are those that make a substantial

contribution to the Settlement Trust in an amount deemed sufficiently substantial by BSA or,

after the Plan goes effective, the Settlement Trust, and become a Protected Party with respect to

the Channeling Injunction and Releases.  (D.I. 1-4 Art. I.A.86).  Second, Participating Chartered

Organizations, the default under the Plan, receive Limited Protected Party status and more

limited protection of the Channeling Injunction and Releases.  (D.I. 1-4 Art. I.A.199; Bankr. D.I.

9280 ¶ 191).  Third, Opt-Out Chartered Organizations may opt out of participation in the Plan

and will remain liable for all Scouting-related Abuse Claims regardless of whether such Abuse

18

Claims arose before or after January 1, 1976, with a limited exception for Abuse Claims covered under an insurance policy issued by a Settling Insurance Company. (D.I. 1-4 Art. I.A.196; Bankr. D.I. 9280 ¶ 197; Bankr. D.I. 9395 ¶ 32).

### 4. Channeling Injunction and Releases

To facilitate a global resolution of Abuse Claims, the Plan channels to the Settlement Trust all Scouting-related Abuse Claims against BSA, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives—collectively defined under the Plan as "Protected Parties"—and provides for corresponding Releases in favor of such parties. The Plan also channels to the Settlement Trust and provides for corresponding releases of (a) all Post-1975 Chartered Organization Abuse Claims against Participating Chartered Organizations and their Representatives—collectively defined under the Plan as "Limited Protected Parties,"—and (b) all Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations and their Representatives. (D.I. 1-4 Arts. X.F, X.J.3). All the monetary contributions provided to the Settlement Trust by resolving Abuse Claims against the Protected Parties and Limited Protected Parties under the Plan are only possible because of the Channeling Injunction, Insurance Entity Injunction, and Releases. *In re Boy Scouts of Am.*, 642 B.R. at 586. The structure is critical to securing the contributions from the Local Councils, Chartered Organizations, and Settling Insurance Companies, and unlocking BSA's insurance for the benefit of the Settlement Trust. *Id.* at 605.

### F. The Confirmation Hearing, Opinion, and Order

BSA's contested confirmation hearing commenced on March 14, 2022, and continued for twenty-two trial days. *In re Boy Scouts of Am.*, 642 B.R. at 552. Fifteen days were devoted to the submission of testimony and evidence, and seven days were devoted to oral argument. *Id.*

The trial record is extensive. Twenty-six witnesses, eleven of whom were qualified as experts, provided written or live testimony and were subject to cross-examination. *Id.* The hearing transcripts for the confirmation hearing total more than 5,000 pages.[4] More than one thousand exhibits, totaling tens of thousands of pages, and portions of six recorded depositions were admitted into evidence. *Id.* At the close of the confirmation hearing, the Bankruptcy Court took the matter under advisement. *Id.* The opinions of many of BSA's expert witnesses were not challenged by competing expert opinions or testimony. For example, no party produced a witness to contradict the opinions of Dr. Charles Bates (who testified as to the range of aggregate values of Direct Abuse Claims for the purposes of confirmation) or Nancy Gutzler (who testified as to the reasonableness of the insurance settlements, as well as the amount of insurance available from Non-Settling Insurance Companies).

On July 29, 2022, the Bankruptcy Court issued the Confirmation Opinion. The Confirmation Opinion did not confirm or deny confirmation of the Plan, as there were still certain issues to be addressed. But the Confirmation Opinion approved the key elements of the Plan. Following issuance of the Confirmation Opinion, BSA, in consultation with the other Plan supporters, modified the Plan and prepared a revised proposed Confirmation Order that conformed to and supplemented the Confirmation Opinion. To this end, on August 12, 2022, BSA filed the Debtors' Motion to Amend and Supplement the Findings of Fact and Conclusions of Law in the Confirmation Opinion (Bankr. D.I. 10188) ("Rule 7052 Motion"), which requested the Bankruptcy Court's authorization to amend and supplement the Confirmation Opinion and entry of the proposed Confirmation Order confirming the modified Plan. During a status conference held on August 18, 2022, the Bankruptcy Court acknowledged the need for certain

---

[4] Bankr. D.I. 9341, 9354, 9389, 9406, 9407, 9408, 9409, 9454, 9455, 9482, 9490, 9497, 9517, 9530, 9544, 9562, 9563, 9564, 9578, 9616, 9638, 9639, 9646, 9648, 9656.

findings not discussed in the Confirmation Opinion to be included in the revised Confirmation Order, and it encouraged the parties to work together to accomplish this goal. (*See* Bankr. D.I. 10215 at 11:4–12:14).

The Bankruptcy Court held hearings on September 1 and September 7, 2022. (Bankr. D.I. 10288; Bankr. D.I. 10317). Before each hearing, BSA mediated with Appellants about potential Plan modifications and revisions to the proposed Confirmation Order. (*See* Bankr. D.I. 10288 at 8:2-9:9; Bankr. D.I. 10317 at 4:23- 8:20). At each of the hearings, the Bankruptcy Court afforded all parties an opportunity to raise issues that they believed were not addressed in the Confirmation Opinion. (Bankr. D.I. 10288 at 11:7–23, 14:21–23; Bankr. D.I. 10317 at 8:21– 23). The Certain Insurers proposed twelve categories of revisions to the proposed Confirmation Order and modified Plan, and the Lujan Claimants objected to modifications related to the Insurance Settlement Agreements. (Bankr. D.I. 10246, 10247).

At the September 1, 2022 hearing, the Bankruptcy Court reviewed the changes made to the proposed Confirmation Order and the modified Plan that were in dispute, ruled on certain of these issues, and made its own modifications to the proposed Confirmation Order. (Bankr. D.I. 10288). The Bankruptcy Court ultimately directed parties to negotiate certain remaining disputed provisions. (*Id.* at 112:1–113:10). The parties were unable to resolve all issues. (Bankr. D.I. 10317 at 4:23–8:20).

At the September 7, 2022 hearing, the Bankruptcy Court ruled on all outstanding issues other than a dispute about the judgment reduction provision contained in the Plan. (*See id.* 70:11–16). The Bankruptcy Court requested that the parties submit competing proposed judgment reduction provisions. (*Id.* 69:24-70:2). Thereafter, the Bankruptcy Court issued a letter ruling largely accepting the provision proposed by BSA and certain other Plan supporters. (Bankr. D.I. 10304). BSA then submitted a revised form of Confirmation Order incorporating

such language. (Bankr. D.I. 10310). The Bankruptcy Court entered the Confirmation Order on September 8, 2022 (Bankr. D.I. 10316) and the Pre-Petition Century/Chubb Companies Claims Order on September 12, 2022 (Bankr. D.I. 10327). As the latter order recognizes, "[n]o objection was filed to this component of the Century and Chubb Companies Insurance Settlement Agreement and the entry of this Order." (Bankr. D.I. 10327 at 2).

These appeals followed.

### G. The Appeals

On October 17, 2022, I entered an Order approving a stipulation among the parties which provides for the consolidation and expedited briefing and review of the appeals. (D.I. 22). The parties filed more than 900 pages of mostly non-duplicative merits briefing. (D.I. 40, 41, 43, 45, 66, 67, 81, 86, 89, 109, 110, 111, 113, 130, 131).[5] On January 13, 2022, Certain Insurers filed a Motion to Supplement the Record. (D.I. 123). The Motion to Supplement the Record is fully briefed. (D.I. 128, 129, 132). On February 9 & 10, 2023, I held about five hours of oral argument. (*See* D.I. 144, 145). The appeals are ripe for decision.

## II. JURISDICTION

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Confirmation Order is a final order. *See In re Energy Future Holding Corp.*, 596 B.R. 473, 476 (D. Del. 2019).

## III. STANDARD OF REVIEW

The bankruptcy court's factual findings are reviewed for clear error. *See In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 570 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d

---

[5] I received several letters from holders of Direct Abuse Claims urging me to affirm the Confirmation Order. (D.I. 140-142, 146).

Cir. 2019); *In re W.R. Grace & Co.*, 475 B.R. 34, 75 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013). A bankruptcy court's factual findings "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'" *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors*, 323 F.3d 228, 232 (3d Cir. 2003)). A bankruptcy court's legal conclusions, including a determination that it has subject matter jurisdiction, are reviewed *de novo. See In re Fed.-Mogul Glob. Inc.*, 402 B.R. 625, 630 (D. Del. 2009). Mixed questions of law and fact are reviewed under a mixed standard, affording a clearly erroneous standard to factual findings but exercising plenary review of the court's interpretation and application of those facts to legal precepts. *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810–11 (3d Cir. 2019).

## IV.    PARTIES' CONTENTIONS

The Plan and Confirmation Order are challenged by both the Non-Settling Insurance Companies and by two sets of claimants. I summarize the main arguments.

Certain Insurers, arguing for the Non-Settling Insurance Companies, principally challenge the Bankruptcy Court's determination that the Plan was proposed in good faith, asserting that the Plan and the TDP are the result of a collusive bargain between BSA and the Abuse Survivors' representatives (the Coalition, the Tort Claimants' Committee, and/or the Future Claimants' Representative) to inflate Debtors' claim exposure at the Certain Insurers' expense. According to BSA, the Certain Insurers did not discharge their burden of proving that the Bankruptcy Court's factual findings underlying the good faith determination were "completely devoid" of evidence and failed to demonstrate collusion or evidence to support other allegations of bad faith. Certain Insurers' second challenge is that Plan abrogates their contractual rights. According to BSA, this contention is demonstrably wrong, as the Plan and

23

TDP preserve the insurance policy obligations as they existed prepetition, and the Bankruptcy Court further confirmed that any defenses of the Certain Insurers are preserved. Two Non-Settling Insurance Companies—Allianz and Liberty—raise specific issues with respect to their Indirect Abuse Claims and further argue that the Bankruptcy Court erred in approving judgment reduction provisions in the Plan.

Lujan Claimants raise a number of issues in these appeals. Lujan Claimants assert claims against both BSA and the Archbishop, an opt-out Chartered Organization, which filed its own bankruptcy case under chapter 11 in December 2019 in the United States District Court of Guam. Those claims stem from Abuse perpetrated by Father Louis Brouillard and allege that he abused them not only as a Scoutmaster, but also in his capacity as a Catholic priest in settings unrelated to Scouting. Lujan Claimants further argue that the Plan violates the automatic stay issued in the Archbishop's bankruptcy. According to BSA, Lujan Claimants lack standing to make this argument, and the confirmation of the Archbishop's plan of reorganization has rendered their arguments moot. Lujan Claimants challenge the Insurance Settlements on the basis that they did not meet the Third Circuit standard for approval. Lujan Claimants further assert that the Plan, which channels their claims against insurers to the Settlement Trust, impermissibly conflicts with a Guam statute which provides plaintiffs with a right of direct action against the insurers of persons or entities liable for personal injury. Lujan Claimants contend that the Guam direct action statute governs the "business of insurance." If it does, then any provision of the Bankruptcy Code that could support the channeling of the Lujan Claimants' direct action claims against insurance companies to the Settlement Trust violates the McCarran-Ferguson Act. According to Appellees, the Bankruptcy Court correctly determined that the Guam direct action statute does not govern the "business of insurance," as that term has been construed by the Supreme Court, for purposes of the Act.

D&V Claimants and Lujan Claimants challenge the Bankruptcy Court's exercise of subject matter jurisdiction over third-party claims against the non-debtor Local Councils and Chartered Organizations including determinations that (i) approval of the Channeling Injunction and Releases, to the extent they release third-party claims, fall under "arising in" jurisdiction in the context of plan confirmation, and (ii) the Bankruptcy Court had "related to" jurisdiction over the third-party claims.  Even if the jurisdictional requirements were met, D&V and Lujan Claimants argue, the third-party releases do not exhibit the hallmarks of permissible non-consensual releases set forth by the Third Circuit—necessity to the reorganization and fairness—and the Bankruptcy Court failed to set forth specific factual findings to support these conclusions.  According to Appellees, the Bankruptcy Court's jurisdictional analysis was sound, and it committed no clear error in finding that the third-party releases satisfied the Third Circuit standard.

D&V Claimants further assert that the Plan is not fair and equitable to current and future holders of Direct Abuse Claims.  According to Appellees, the Settlement Trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate future claims going forward.

There are also arguments (i) that the Bankruptcy Court erred in determining that the Plan satisfies the best interest of creditors test of § 1129(a)(7) of the Bankruptcy Code and (ii) that it further erred in determining that the Plan properly classifies the Lujan Claimants in accordance with § 1122 of the Bankruptcy Code, and (iii) that BSA violated certain notice requirements in confirming the Plan.

## V.    DISCUSSION

I will first address the one challenged finding of fact in these appeals—whether the Bankruptcy Court's finding that holders of Direct Abuse Claims are likely to be paid in full

25

under the Plan is clearly erroneous.  Next, I will turn to the most critical components of the

Plan—(i) approval of the Channeling Injunction and Releases, (ii) assignment of the Insurance

Policies, and (iii) approval of the Insurer Settlements—without which compensation of Survivors

would not be possible.  I will then address arguments challenging BSA's satisfaction of certain

plan confirmation requirements under the Bankruptcy Code, along with those challenges to the

Plan's treatment of Indirect Abuse Claims and its judgment reduction provision.  Finally, I will

address the challenges to the Bankruptcy Court's good faith determination, which requires

consideration of the totality of the circumstances and implicates several of the foregoing issues.

### A.   Holders of Direct Abuse Claims Are Likely to Be Paid in Full Under the Plan

This finding is relevant to—although not required by—the Bankruptcy Court's legal

conclusions that (1) substantial consideration is being given in exchange for the third-party

releases, and (2) that the Plan, by definition, meets the best interest of creditors test as to

claimants in Class 8 (Direct Abuse Claims).

### 1.  Aggregate Value of Direct Abuse Claims

Only one valuation expert testified at trial as to the aggregate value of Direct Abuse

Claims.  That was BSA's expert, Dr. Charles Bates.  Dr. Bates spent approximately eight hours

on the stand.  Among other things, Dr. Bates estimated the total value of Direct Abuse Claims

and Future Claims as of the filing of the petition, assuming the claims would be resolved at

values consistent with prepetition settlements.  Within the scope of this work, Dr. Bates

evaluated trends in the proofs of claim submitted in the BSA case.  Based on his estimate of the

aggregate value, the Bankruptcy Court found that BSA had shown, by a preponderance of the

evidence, that the Direct Abuse Claims will more likely than not be paid in full.  *In re Boy Scouts

of Am.*, 642 B.R. at 560.

Lujan and D&V Claimants challenge this finding and also challenge the credibility of Dr.

Bates's testimony on the range of aggregate values of the Direct Abuse Claims. (*See* D.I. 40 at

33; D.I. 41 at 75–78).  These are quintessential factual issues that the Bankruptcy Court resolved

in favor of confirmation.  A bankruptcy court's factual findings "may only be overturned if they

are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the

supporting data.'"  *Fruehauf Trailer*, 444 F.3d at 210 (quoting *Citicorp Venture Capital*, 323

F.3d at 232).  The record here supports the Bankruptcy Court's finding.

The Bankruptcy Court found that Dr. Bates "was qualified without objection as an expert

in claim valuation, mass tort matrixes and trust distribution structures."  *In re Boy Scouts of Am.*

642 B.R. at 553.  To arrive at the range of aggregate values, Dr. Bates employed a frequency

severity model:

> The frequency severity model takes guidance from historical claims about their
> values and characteristics to come up with averages for groups of claims within
> the historical data pool.  It then applies those averages to groups of claims in
> the subject pool that share similar characteristics to come up with an aggregate
> valuation of the subject pool.  This methodology necessarily includes testing
> [through] scenario analysis which requires an evaluation of the assumptions used
> to value and group the claims to see the impact on the analysis if factors are
> changed.

*Id.* at 554 (citing Bankr. D.I. 9454 at 116:11-19).  The Bankruptcy Court found the frequency

severity model "is an accepted valuation methodology within the valuation community" and is

the methodology that Dr. Bates employs in each of the many "mass tort case[s] in which he has

provided expert testimony."  *Id.*  (Bankr. D.I. 9454 at 115:4-116:2).

The Bankruptcy Court found, and the record reflects that, consistent with the severity

frequency methodology, Dr. Bates first analyzed historical data about BSA's prepetition

settlements with Abuse claimants.  (Bankr. D.I. 9454 at 56:18-21, 100:13-18).  Dr. Bates

grouped the Historical Abuse Claims by size of payment to claimants and observed a wide

variation in settlement amounts—including that a significant amount of the aggregate value of the settlements was concentrated in a small number of high value claims. (*Id.* 104:20-105:15, 106:5-10). Dr. Bates further isolated the most severe claims—penetration claims—and observed a distinct bimodal distribution pattern: fifty-five percent of the claims were resolved for less than $300,000 and about thirty-three percent of the claims settled for over $900,000, with relatively few claims settling for values in between. Dr. Bates looked at the facts underlying the Historical Abuse Claims and identified repeat abusers as the primary driver of highest settlement values. (*Id.* at 112:5-114:20). Dr. Bates equated repeat abuser to institutional responsibility and/or knowledge. (*Id.*) Dr. Bates also observed that the settlement average was higher for penetration claims than for claims involving sex acts without penetration, which in turn were higher than for claims involving groping/touching. Using this data, Dr. Bates established a benchmark value for penetration claims of $212,500 for once-identified abusers and $975,000 for repeat abusers. He then discounted those values by 54% for claims of other sex acts ($114,750/$526,500) and by one-half again for claims of groping/touching ($57,375/$263,250).

Having established these benchmarks based on Historical Abuse Claims, Dr. Bates segmented the proofs of claim filed in the bankruptcy case into categories that overlap the data in the Historical Abuse Claims based on severity (penetration, lesser sex acts, and groping/touching) and whether the abuser was a repeat abuser or once-identified abuser. He then discounted the Historical Abuse Claims benchmarks by 20% to account for the age difference between the claimants asserting Historical Abuse Claims and claimants who filed the proofs of claim, as the Historical Abuse Claims reflect that settlement values decrease significantly based on the delay in asserting the allegations. (*Id.* at 139:9-140:14). Dr. Bates also applied assumptions for "other relationships"—*i.e.*, non-BSA relationship between a victim and an abuser—another proxy for institutional responsibility. Applying the Historical Abuse Claim

28

benchmarks to this set of data and assumptions, Dr. Bates established an aggregate Initial

Benchmark Valuation of $2.5 billion.

As the Bankruptcy Court explained, "The Initial Benchmark Valuation changed over

time." *In re Boy Scouts of Am.*, 642 B.R. at 555 n.241.   In Spring 2021, when using data from

Proofs of Claim in Tranche IV, Dr. Bates arrived at a valuation of $4.75 billion, which was used

in connection with Debtors' estimates in the Disclosure Statement.  In Fall, 2021, when using

data from the Proofs of Claim in Tranche VI, Dr. Bates arrived at a valuation of $5.84 billion,

which accounted for (i) the passage of revival statutes in four states and (ii) amendments to

several thousand proofs of claim adding the names of abusers and the Abuse suffered.  Upon

further review the Tranche VI data, Dr. Bates observed that there were anomalous single-Abuse

claims that resulted in relatively high-value settlements.  (B.D.I. 9454 at 183:5-184:5).  In

researching ineligible volunteer files and/or contemporaneous news reports of Abuse, Dr. Bates

learned that claims classified as single abuser claims were, in actuality, repeat abuser claims.

(*Id.* at 185:9-20).  Updating that information in the Tranche VI data set ultimately resulted in the

$2.5 billion Initial Benchmark Valuation.  As the Bankruptcy Court noted, "These changes in the

Initial Benchmark Valuation were the result of updated information and not any change in the

methodology."  *In re Boy Scouts of Am.*, 642 B.R. at 555 n.241 (citing B.D.I. 9454 at 186:5-

11)).

The record reflects that Dr. Bates next tested his assumptions developing a list of "plus"

and "minus" factors that would move the Initial Benchmark Valuation up or down, as applicable.

(*Id.* 165:8-12; 175:21-176:2).  These factors account for unknowable future possibilities such as

(i) a change in the legal landscape (*e.g.,* passing of revival statutes), (ii) one or more claimants

supplying information not currently contained in the Proofs of Claim, or (iii) more future

claimants coming forward.  (*Id.* 174:8-180:17).  To account for these, Dr. Bates determined a

relative likelihood and the relative impact of each factor.  (*Id.* 180:18-25).  Dr. Bates landed on a

50% variance around his first benchmark valuation of $4.75 billion to create an appropriate

valuation range of $2.4 to $7.1 billion for the Direct Abuse Claims.  (*Id.* 181:18-25).  The

valuation range is inclusive of future claims. *In re Boy Scouts of Am.*, 642 B.R. at 556.  "The

range was admittedly large[,] reflective of the inherent uncertainties in the Direct Abuse

Claims." *Id.* (citing Bankr. D.I. 9454 at 97:8-23).  Based on the record and its assessment of Dr.

Bates's credibility, the Bankruptcy Court found that the best estimate of the aggregate value of

the Abuse Claims fell within the lower quartile of Dr. Bates's range of $2.4 billion to $7.1

billion—"between $2.4 billion and $3.6 billion." *Id.* at 558 (citing Bankr. D.I. 9454 at 97:10-23;

190:17-191:6).

     The Bankruptcy Court noted that "none of the objectors challenged his use of the

frequency severity model, suggested another analysis or undercut his conclusions." *In re Boy

Scouts of Am.*, 642 B.R. at 558.  As the only valuation expert, "Dr. Bates's analysis was

thorough and credible based on the data available," and "also undisputed." *Id.*

     Lujan Claimants and D&V Claimants argue that Dr. Bates contradicted his own prior

testimony because he adjusted his aggregate valuation range during the course of the chapter 11

cases.  Specifically, they assert Dr. Bates applied arbitrary criteria for the purpose of reducing the

aggregate value of claims to $2.5 billion, including (i) "greatly reducing the value of the 77% of

claims involving "single abuser" claims—those claims that identify an abuser not identified in

any other claim, and (ii) assigning "zero value" for any claim with an expected value below

$200,000.  (D.I. 40 at 32-33; D.I. 41 at 75).  These arguments are not supported by the record.

     The record reflects that Dr. Bates's aggregate valuation range did not change from his

initial stated range of $2.4 billion to $7.1 billion.  Following "the creation of the [$2.4 to $7.1

billion valuation] range, however, Dr. Bates reviewed the expert reports filed by others in this

case, received additional information regarding repeat abusers . . . and performed additional analysis." *In re Boy Scouts of Am.*, 642 B.R. at 556.  As the Bankruptcy Court explained, Dr. Bates's ultimate opinion that the range was most likely in the lower quartile of this initial range was informed by updated information regarding the historical data he relied on to perform his analysis, which led him to conclude that values in the lower quartile of the valuation range were much more likely than the upper quartile. *Id.* at 555 n.241; Bankr. D.I. 9454 at 186:12–19 ("I still believe that the overall range of 2.4 to 7.1 is a range that is a feasible range . . . [b]ut the most likely portion of that range is in the lower quartile.")).  Specifically, Dr. Bates testified that he found more of the historical high-value resolutions involved repeat abuser claims, which lowered the average for single abuser claims.  (Bankr. D.I. 9454 at 183:5-184:5; 15:9–186:11). Dr. Bates further determined that the majority of pending claims are single abuse claims.  (*Id.* at 48:1-9).  Thus, Dr. Bates's belief that the aggregate range was most likely in the lower quartile was "the result of updated information and not any change in the methodology." *In re Boy Scouts of Am.*, 642 B.R. at 555 n.241.

D&V Claimants further challenge the Bankruptcy Court's acceptance of Dr. Bates's valuation range because his analysis arbitrarily assigned "zero value" for any claim with an expected value below $200,000, based solely on his opinion that "plaintiffs' attorneys would not take cases in the tort system with settlement values under $200,000." (D.I. 41 at 76).  As BSA points out, this argument confuses a point that Dr. Bates made during his testimony about why low value claims were not historically pursued in the tort system.  (*See* Bankr. D.I. 9454 at 146:15-152:20, 156:1-23).  The record reflects that Dr. Bates did assign an estimate of what such claims would be worth if pursued in the tort system, even though in the tort system many of such claims would not be pursued, as the expected recovery on such claims were below the threshold of economic viability to plaintiffs' firms working on a contingency fee basis.  (*See id.*)  Dr. Bates

31

testified that, in the bankruptcy context, such claims have value associated with them due to lower economic barriers, and, thus, claims with an expected value below $200,000 were indeed included in Dr. Bates's estimation. (*See id.* at 158:20-159:2). Thus, while a claim valued below $200,000 may not have had sufficient value to be prosecuted by a contingency fee counsel in the tort system, Dr. Bates's analysis not only included those claims but also concluded that they likely constitute the majority of claims filed in the chapter 11 cases. (*See id.*)

D&V Claimants further challenge the Bankruptcy Court's acceptance of Dr. Bates's valuation range based on its low estimation of the number of expected Future Abuse Claims. *In re Boy Scouts of Am.*, 642 B.R. at 556 (citing Bankr. D.I. 9454 at 198:20–199:19). As the Bankruptcy Court explained, and as the record supports, in order to determine the impact of Future Abuse Claims (a "plus" factor) on his aggregate Benchmark Valuation, Dr. Bates performed a regression analysis and estimated that 400 future claims would be asserted. (Bankr. D.I. 9454 at 198:20-25-199:1-19). Dr. Bates testified that his analysis followed the downward trend in the trajectory of claims since the 1960s. (*See id.*) D&V Claimants cite the Future Claimants' Representative's estimation that there would be approximately 11,000 Future Abuse Claims with an aggregate value of $5 billion. (D.I. 41 at 78; *see* ADV 173). The Bankruptcy Court did not, however, assign any weight to the Future Claimants' Representative's testimony regarding the number or value of Future Abuse Claims. *In re Boy Scouts of Am.*, 642 B.R. at 556 n.246. It reasoned that the Future Claimants' Representative was not offered for the purpose of valuing Direct Abuse Claims; that he is not an expert; and that "there was no support offered for this position." *Id.* I agree this uncredited testimony does not negate the Bankruptcy Court's finding that the Plan likely provides for payment in full. D&V Claimants also point to Tort Claimants' Committee's estimate that aggregate value range of Abuse Claims is $13.5 billion to $73.2 billion. (*See* D.I. 41 at 78 (citing Bankr. D.I. 6445)). The Tort Claimants' Committee did

not offer any expert witness testimony, however, and the Bankruptcy Court did not give any evidentiary weight to the Tort Claimants' Committee's estimate.

The Bankruptcy Court's reliance upon Dr. Bates's uncontroverted and well-reasoned expert opinion, as opposed to unsubstantiated statements by non-experts, is not clearly erroneous. The arguments of Lujan Claimants and D&V Claimants fail.

## 2.  Value of the Settlement Trust Assets

The Bankruptcy Court found that the "fully noncontingent funding is $2,484,200,000, which is already within the [$2.4 billion to $3.6 billion] range of Direct Abuse Claims." *In re Boy Scouts of Am.*, 642 B.R. at 561. It noted that, "The committed, but contingent funding could bring another $200 million into the Settlement Trust. These funds, together with the available allocated insurance against Non-Settling Insurance Companies brings the total to $3,005,519,886 to $3,084,746,854, well over the Initial Benchmark Valuation and quite comfortably within the aggregate range." *Id.* "Finally, the Settlement Trust assets include an additional $4 billion in currently unallocated insurance against Non-Settling Insurance Companies." *Id.*

Lujan Claimants challenge the Bankruptcy Court's finding that "Direct Abuse Claims will more likely than not be paid in full" by arguing that "recovery up to 100%" depends on hypothetical future insurance settlements." (*See* D.I. 40 at 34). But the Bankruptcy Court determined that that the fully noncontingent funding is $2,484,200,000, which is just within the $2.4 billion to $3.6 billion range. *In re Boy Scouts of Am.*, 642 B.R. at 561. The Bankruptcy Court also took into account the committed, but contingent, funding in the amount of $200 million. The Bankruptcy Court also took into account an additional estimated $4.2 to $4.4 billion in currently unallocated insurance against Non-Settling Insurance Companies, and unliquidated additional contributions from Chartered Organizations, which provide a total potential recovery of more than $7 billion. (*See* Bankr. D.I. 9398 ¶ 121; Bankr. D.I. 9490 at

33

40:13-41:11.61). Taking all of these funding sources into account, the Bankruptcy Court found that funding for the Settlement Trust is "well over" the initial Benchmark Valuation and "comfortably" within the aggregate range. *Id.* Neither Lujan Claimants nor D&V Claimants provided any expert or evidence at trial to prove otherwise.

D&V Claimants argue that no expert testimony or other evidence is needed to show that the Bankruptcy Court clearly erred on this point; rather, it is evident from the record, as the Bankruptcy Court's Settlement Trust Asset Valuation fails to take into account the estimated cost to administer the Settlement Trust. (*See* D.I. 145, 2/10/2023 Hr'g Tr. at 22:8-23:7). According to D&V Claimants, these expenses, estimated at around $200 million, are funds which will not be available for distribution on account of Direct Abuse Claims, and thus fully noncontingent funding of the Settlement Trust is short of $2.4 billion. (*See id.*) Given the value of the substantial contributions to the Settlement Trust, including noncontingent and contingent sources of funding which could amount to $7 billion, any discrepancy attributable to the expenses of administering the Settlement Trust fails to establish that the Bankruptcy Court's finding, that "Direct Abuse Claims will more likely than not be paid in full," is "completely devoid of a credible evidentiary basis." *In re Fruehauf Trailer*, 444 F.3d at 210.

D&V Claimants' remaining arguments are unavailing. They cite an out-of-circuit decision involving a non-mass tort debtor, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768 (Bankr. N.D. Tex. 2007), in support of their argument that the Plan should not have been confirmed because it does not pay claimants in full. (*See* D.I. 41 at 79). Unlike this case, the bankruptcy court in *Wool Growers* determined that the plan did not provide for payment in full because the evidence established that creditors would recover only 60%-70% of their claims. 371 B.R. at 771, 778. Here, the Bankruptcy Court found payment in full based on the uncontroverted evidence. Finally, D&V Claimants argue that the Bankruptcy Court failed to

34

address their payment-in-full objections to the Plan but rather only focused on the Certain

Insurers' objection.  (*See* D.I. 41 at 79).  The record reflects that the Bankruptcy Court addressed

all of the objectors' arguments—indeed, it specifically mentioned the D&V Claimants' cross-

examination of Dr. Bates in the Confirmation Opinion.  *See In re Boy Scouts of Am.*, 642 B.R. at

556 n.246, 558.

      I see no clear error in the Bankruptcy Court finding that the Plan would likely provide for

payment in full of Direct Abuse Claims.  The evidence marshalled in support of this conclusion

was more than sufficient to sustain the finding.  Despite the opportunity, D&V and Lujan

Claimants did not offer any evidence or expert testimony of their own to convince the

Bankruptcy Court otherwise.

**B.**     **Channeling Injunction and Releases**

      At issue in these appeals is a set of releases specific to the Abuse Claims ("Scouting-

Related Releases").  These are found in the Channeling Injunction (Article X.F and X.G), the

Insurance Entity Injunction (Article X.H), Releases by Holders of Abuse Claims (Article X.J.3)

and Releases among Contributing Chartered Organizations and Settlement Parties (Article X.

J.5).  Except for the latter, which is a consensual release among certain parties, the Scouting-

Related Releases are nonconsensual third-party releases.  These releases run in favor of the

Settling Insurance Companies, Local Councils, Chartered Organizations, and their

Representatives.  Holders of Abuse Claims object to these releases on jurisdictional and other

grounds.  Specifically, D&V and Lujan Claimants argue that the Bankruptcy Court lacked

subject matter jurisdiction to confirm the Plan and to approve the Channeling Injunction and

Releases therein, challenging both the legal and factual bases for the Confirmation Opinion.

Appellees assert that the Bankruptcy Court correctly determined jurisdiction to grant the

Scouting-Related Releases, which were demanded by parties making contributions to the Settlement Trust and otherwise satisfy the Third Circuit's standard for approval.

### 1. Subject Matter Jurisdiction

#### a. "Arising In" Jurisdiction

The Bankruptcy Court determined it had subject matter jurisdiction to confirm the Plan both because (i) the Channeling Injunction and Releases were "arising in" title 11 in the context of plan confirmation, and (ii) it had "related to" jurisdiction over the Abuse Claims that are the subject of the Channeling Injunction and Releases.[6] The Bankruptcy Court noted that "this is a confirmation hearing" which is "a proceeding that 'by its nature, and not the particular factual circumstance, could arise only in the context of a bankruptcy case.'" *In re Boys Scouts of Am.*, 642 B.R. at 588-89 (quoting *In re New Century TRS Holding, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014)). Lujan Claimants argue that releases of claims against non-debtor third parties are not permissible merely because they are contained in a plan of reorganization. (*See* D.I. 40 at 7-8). Debtors and Settling Insurance Companies argue that the Bankruptcy Court was correct in approving the Plan containing the Channeling Injunction and Releases based on "arising in" jurisdiction. Settling Insurance Companies further contend that the permissibility of the Channeling Injunction and Releases is not a jurisdictional issue. (*See* D.I. 86 at 26).

Federal bankruptcy jurisdiction is defined by 28 U.S.C. § 1334. Section 1334(b) confers upon the district courts "original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in

---

[6] BSA contends that the Bankruptcy Court determined subject matter jurisdiction existed because Channeling Injunction and Releases were "arising under" title 11 in the context of plan confirmation. (D.I. 66 at 122-23). The Confirmation Opinion does not contain this determination. *See In re Boy Scouts of Am.*, 642 B.R. at 589 (finding "arising in," but not ruling on "arising under").

or related to cases under title 11." 28 U.S.C. § 1334(b).  The Bankruptcy Code permits district

courts to refer most matters to a bankruptcy court.  *See* 28 U.S.C. §§ 157(a) This broad

jurisdictional grant allows bankruptcy courts to "deal efficiently and expeditiously with all

matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards,* 514 U.S. 300, 308

(1995) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)).

As the Third Circuit has explained, bankruptcy court jurisdiction potentially extends to

four types of title 11 matters: (1) cases under title 11, (2) proceedings "arising under" title 11, (3)

proceedings "arising in" a case under title 11, and (4) proceedings "related to" a case under title

11.  *See Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.),* 372 F.3d 154, 162 (3d Cir.

2004).  The first three categories, "[c]ases under title 11, proceedings arising under title 11, and

proceedings arising in a case under title 11 are referred to as 'core' proceedings"—which the

Bankruptcy Court may hear and determine—while "proceedings 'related to' a case under title 11

are referred to as 'non-core' proceedings," as to which the Bankruptcy Court may only hear and

make proposed findings of fact and conclusions of law unless all parties consent.  *In re*

*Combustion Eng'g*, 391 F.3d at 225; *In re Essar Steel Minnesota LLC*, 47 F.4ᵗʰ 193, 198 (3d Cir.

2022).

The first category, "cases" under title 11, as used in 28 U.S.C. § 1334(a), "refers merely

to the bankruptcy petition itself," and is not applicable here.  *In re Marcus Hook Dev. Park, Inc.,*

943 F.2d 261, 264 (3d Cir. 1991).  The term "proceeding," on the other hand, as used in 28

U.S.C. § 1334(b) to describe the remaining three types of title 11 matters, refers "to the steps

within the 'case' and to any subaction within the case that may raise a disputed or litigated

matter." *In re Combustion Eng'g*, 391 F.3d at 226 n. 38 (quoting *In re Wolverine Radio Co*., 930

F.2d 1132, 1141 n.14 (6th Cir. 1991)).  "Put differently, 'anything that occurs within a case is a

proceeding,' *see* 1 Collier on Bankruptcy ¶ 3.01[4][b] at 3–19 (15th ed. rev. 2003) (quoting H.R.

Rep. No. 595, 95th Cong., 1st Sess. 445 (1977)), including all 'controversies, adversary

proceedings, contested matters, suits, actions or disputes.' *Id.* ¶ 3.01[3] at 3–13." *Id.*

As the Third Circuit recently explained, a proceeding "arises under" the Bankruptcy

Code "when the cause of action is based on a right or remedy expressly provided by the

Bankruptcy Code." *In re Essar Steel*, 47 F.4th at 197 (*quoting In re Weiand Auto. Indus.*, 612

B.R. 824, 854 (Bankr. D. Del. 2020) (internal quotation marks omitted)). BSA and Settling

Insurance Companies argue, "Confirmation of a plan arises under the Bankruptcy Code because

it is the Code that grants the bankruptcy court authority to confirm a plan that meets the

requirements set forth in section 1129 of the Code." (*See* D.I. 86 at 26-27). *See also* 1 Collier on

Bankruptcy ¶ 3.01[3][e][i] ("confirmation of a plan" is a proceeding "aris[ing] under title 11").

"Proceedings 'arising in' a case under [the Bankruptcy Code] include matters that, though not

explicitly mentioned in the Code, would not exist outside of bankruptcy. Related matters are

generally causes of action under state law that are imported into the bankruptcy because of their

impact on the size of the debtor's estate, and hence the distribution to the debtor's creditors." *In*

*re Essar Steel,* 47 F.4th at 197 (quoting *Weiand Auto. Indus.*, 612 B.R. at 854).

Here, the Bankruptcy Court held that, in the context of the plan confirmation hearing,

"arising in" jurisdiction existed to confirm the Plan containing the Channeling Injunction and

Releases, because a confirmation hearing is a proceeding that "by its very nature, and not the

particular factual circumstance, could only arise in the context of a bankruptcy case." *In re Boy*

*Scouts of Am.*, 642 B.R. at 588-89 (quoting *In re New Century TRS Holdings, Inc.*, 505 B.R. 431,

441 (Bankr. D. Del. 2014); 1 Collier on Bankruptcy ¶ 3.01[4][c][iv] at 3-31 (15th ed. rev. 2005)).

That the Bankruptcy Court had either "arising in" or "arising under" subject matter

jurisdiction over the proceeding to confirm the Plan is not controversial. Whether the

Bankruptcy Court had subject matter jurisdiction over the third-party claims that are to be

enjoined and released under the Plan seems to be a separate analysis under Third Circuit law.

Appellees agree, at least in part. Settling Insurance Companies argue that whether the Plan could

be confirmed with the Channeling Injunction and Releases "is a separate question of substantive

authority under the Bankruptcy Code, not of subject-matter jurisdiction":

> Section 1334 gave the bankruptcy court the jurisdiction to determine whether the
> Plan is lawful and should be confirmed. To determine whether the Plan is lawful,
> the court had to determine whether the Bankruptcy Code authorizes a plan to
> include a non-debtor injunction or release and, if so, whether the requirements for
> approving such a provision were met on the facts of this case. But those are not
> jurisdictional questions; they are merits questions, which the bankruptcy court had
> the power to determine in the exercise of its jurisdiction over the plan-
> confirmation proceeding.

(D.I. 86 at 26-27). This argument echoes points raised by the Bankruptcy Court in *In re*

*Millennium Lab Holdings II, LLC*, 575 B.R. 252, 287 n.160 (Bankr. D. Del. 2017), *aff'd*, 591

B.R. 559 (D. Del. 2018), *aff'd on other grounds*, 945 F.3d 126 (3d Cir. 2019). Among many

points raised in the insightful analysis of jurisdictional issues was whether the traditional "related

to" analysis is the proper analytical framework with respect to plans containing releases. *See id.*

at 287 n.160 (citing *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99

(Bankr. D. Mass. 2013) ("It may or may not be appropriate for a court exercising bankruptcy

jurisdiction to confirm a plan containing a third-party release—and, if it is appropriate, the

manner and degree of relation of the released claim to the case are certainly factors in the

analysis—but the court undoubtedly has jurisdiction to adjudicate the plan, even without

recourse to its related-to jurisdiction.")).

Whether the analysis is characterized as jurisdictional or as a determination of the merits,

it is clear to me that the permissibility of third-party releases does not end with whether the

Bankruptcy Court had "arising in" or "arising under" jurisdiction to confirm the Plan containing

them. Rather, a separate analysis is required with respect to a Plan's release of claims and/or

suits between third parties. As Third Circuit law currently stands, that separate analysis is described as jurisdictional: "Bankruptcy court jurisdiction potentially extends to four types of title 11 matters: . . . Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate." *In re Combustion Eng'g*, 391 F.3d at 225-26 (quoting *Celotex*, 514 U.S. at 308 n.5, and applying "the seminal test for determining 'related to' jurisdiction over third-party claims").

In *Combustion Engineering,* the Third Circuit also considered whether the Bankruptcy Court had jurisdiction to approve non-consensual third-party releases in the context of a plan of reorganization. There, a prepackaged Chapter 11 reorganization plan provided that all asbestos claims against Combustion Engineering and two of its non-debtor affiliates were to be channeled through a post-confirmation trust created under § 524(g), to which all three entities were to contribute. *Id.* at 201. The plan also provided for a § 105(a) injunction barring any asbestos-related claims against the three entities. *Id.* One of the issues on appeal was whether the bankruptcy court should have approved the plan injunction as to the non-debtor affiliates. There, the Third Circuit did not address the bankruptcy court's "arising in" jurisdiction, despite the injunction having been approved in the plan confirmation context. Rather, the Third Circuit undertook a detailed "related to" claim analysis, applying the test articulated in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), and later clarified by *In re Federal-Mogul, Inc.*, 300 F.3d 368 (3d Cir. 2002), to the released claims. *See In re Combustion Eng'g*, 391 F.3d at 226-33.

The Third Circuit did not address "arising in" jurisdiction in *Combustion Engineering,* which the Bankruptcy Court noted. *In re Boy Scouts of Am.*, 642 B.R. at 589. When the Court of Appeals does not address an issue, one should not jump to conclusions. *See, e.g., In re Essar Steel Minnesota, LLC,* 47 F.4th at 199-200 (distinguishing prior Third Circuit precedent applying

"related to" analysis because "[w]e never addressed whether these proceedings could also qualify as "core" matters under "arising under" or "arising in" jurisdiction). While it seems unlikely that the *Combustion Engineering* court would have engaged in such a lengthy "related to" claim analysis if "arising in" jurisdiction to release those same claims was otherwise readily apparent in the plan confirmation context, I need not weigh in on this issue; based on the Confirmation Opinion's thorough analysis, I conclude that the Bankruptcy Court had, at a minimum, "related to" jurisdiction over the claims at issue. *In re Boy Scouts of Am.*, 642 B.R. at 589-91 ("courts and counsel are accustomed to analyzing third-party releases in the context of related-to jurisdiction and I will do so here.").

### b. "Related to" Jurisdiction

In *Pacor, Inc. v. Higgins,* the Third Circuit established that a proceeding is "related to" a chapter 11 proceeding if the "outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984), *overruled in part by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 124-25 (1995). The Third Circuit has noted, "the key inquiry no doubt is conceivability." *Nuveen Mun. Truste ex rel. Nuveen High Yield Bond Fund v. WithumSmith Brown PC,* 693 F.3d 283 (3d Cir. 2012). "Certainty, or even likelihood of effect on the estate being administered in bankruptcy, is not a requirement." *Copelin v. Spirco, Inc.,* 182 F.3d 174, 179 (3d Cir. 1999) (cleaned up). An action thus generally is "related to" a bankruptcy proceeding "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor,* 743 F.2d at 994. As the Third Circuit has noted, the Supreme Court endorsed *Pacor*'s conceivability standard with the caveats that "related to" jurisdiction "cannot be limitless," and that the critical component of the *Pacor* test is that "bankruptcy courts have no jurisdiction over proceedings that

41

have no effect on the estate of the debtor." *See Nuveen Mun.*, 692 F.3d at 294 (quoting *Celotex*, 514 U.S. at 308 & n.6).

Whether a claim is sufficiently "related to" a bankruptcy case to warrant the exercise of subject matter jurisdiction depends on the facts and circumstances of the particular case. *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n.9 (3d Cir. 2009). The Third Circuit has further instructed that third-party claims against non-debtors are "related to" a bankruptcy case where the action against the non-debtor "affect[s] the bankruptcy [] without the intervention of yet another lawsuit." *Id.* at 173 (citing *In re Fed.-Mogul Glob. Inc.*, 300 F.3d 368, 382 (3d Cir. 2002); *In re Combustion Eng'g*, 391 F.3d at 232). Courts may therefore exercise "related to" jurisdiction over third-party claims where the debtor is the real party defendant or where the claims implicate indemnification obligations owed by, or insurance policies shared with, the debtor. *See, e.g., A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1002 (4th Cir. 1986) (finding "related to" jurisdiction based on findings of identity of interest, express indemnification rights, and shared insurance); *see also In re Combustion Eng'g*, 391 F.3d at 228, 230-31 (noting that corporate affiliation may be sufficient for "related to" jurisdiction "if supported by factual findings demonstrating that a suit against [non-debtors] would deplete the estate or effect its administration" and finding that shared insurance may be sufficient if supported by evidence of automatic liability); *In re W.R. Grace*, 591 F.3d at 171 (indicating that for a finding of "related to" jurisdiction indemnification rights must accrue upon the filing of the claim without the intervention of another lawsuit).

The Bankruptcy Court found that the third-party claims subject to the Channeling Injunction and Releases have a "conceivable effect" on BSA's estates. *In re Boy Scouts of Am.*, 642 B.R. at 592. It found that "related to" jurisdiction exists with respect to the Abuse Claims "for any or all" of several reasons, *id.* at 589-91, including: (a) a clear identity of interest based

on interconnectedness among BSA and the other Protected Parties, Limited Protected Parties,

and Opt-Out Chartered Organizations (collectively, "Releasees"), which each benefit from the

protections afforded by the Channeling Injunction and Releases, *id.* at 589-90 (Bankr. D.I. 9341

at 263:14–264:1); (b) shared insurance coverage among BSA, the Local Councils, and the

Chartered Organizations, which, if depleted, would reduce the property of BSA's estate that

would otherwise be available for distribution to creditors, *id.* at 590 (Bankr. D.I. 9341 at 263:14–

264:1); (c) contractual indemnification obligations among BSA, Local Councils, and certain of

the other Releasees, including Chartered Organizations and BSA's Representatives, which

obligations, when triggered, would deplete property of the estates, *id.*; and (d) BSA's residual

interest in all Local Council property in the event of any such entity's dissolution or revocation

of its charter, *id.* at 590; *see also id.* at 523 n.25.[7]  BSA argues that each of these reasons are

independently sufficient to provide jurisdiction, and that when considered together, the

Bankruptcy Court's exercise of subject matter jurisdiction was well founded.  (D.I. 66 at 128-

29).

i.      **Corporate Affiliation or Identity of Interest**

The Bankruptcy Court found that an identity of interests between BSA and the Releasees

supported its exercise of "related to" jurisdiction. *In re Boy Scouts of Am.*, 642 B.R. at 589-90.

"Related to" jurisdiction is appropriately exercised where there is an identity of interest between

a non-debtor codefendant and the debtor, such that the debtor is the real party in interest. *See*

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997) (extending the

automatic stay to nonbankrupt codefendants where "there is such identity between the debtor and

---

[7] For similar reasons, the Bankruptcy Court determined (and such determination was uncontested) that it also had "related to" jurisdiction over Abuse Claims asserted against Related Non-Debtor Entities and the Debtors' officers, directors, and other Representatives. *In re Boy Scouts of America*, 642 B.R. at 592-93.

the third-party defendant that the debtor may be said to be the real party defendant and that a

judgment against the third-party defendant will in effect be a judgment or finding against the

debtor.") (citing *A.H. Robins*, 788 F.2d at 999); *In re Dow Corning Corp.*, 86 F.3d 482, 493 (6th

Cir. 1996) (noting that "[t]he degree of identity between a debtor and nondebtor codefendants" is

an important factor and holding that there was "related to" subject matter jurisdiction over claims

pending against nondebtor defendants).

      Courts have found an identity of interest between a debtor and a non-debtor where third-

party claims center on the debtor's product or operations and allege joint responsibility among

the debtor and non-debtor defendants. *See, e.g., In re Dow Corning*, 86 F.3d at 492–94 & n.11

(finding identity of interest where litigation centered on debtor's role as manufacturer and/or

supplier and claims demonstrated a relatedness between the parties); *A.H. Robins*, 788 F.2d at

996, 1014 (finding identity of interest with respect to claims arising out of use of a single device

manufactured by the debtor); *In re W.R. Grace*, 386 B.R. at 30–32 (finding identity of interest

where debtor's conduct and operations were "at the core" of third-party claims against non-

debtors); *cf. In re Combustion Eng'g*, 391 F.3d at 230-31 (distinguishing "single product" case

law and declining to exercise "related to" jurisdiction over claims arising out of non-debtors'

product line, which products were not manufactured or distributed by the debtor or subject to

contractual indemnification obligations of the debtor). In other words, "the existence of strong

interconnections between the third party and the bankruptcy" commonly serves as the basis for

the exercise of "related to" jurisdiction. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321

(S.D.N.Y. 2003) (collecting cases).

      The Bankruptcy Court made several findings related to the interconnectedness of BSA

with the Local Councils and Chartered Organizations. First, the Bankruptcy Court found that it

takes all three constituencies to deliver the Scouting program: "BSA sets the structure and

content of the Scouting program.  BSA charters Local Councils on an annual basis to ensure that

Scouting is available in their geographic locations. Local Councils annually charter Chartered

Organizations and the two work together to form troops, pacs, dens and other units and to

provide Scouting experiences to boys and girls." *In re Boy Scouts of Am.*, 642 B.R. at 589-90.

This finding is supported by the testimony of Devang Desai, a volunteer member of the BSA's

National Executive Board, the National Executive Committee, and the Bankruptcy Task Force,

who testified, "Because of the interconnectedness of a local council with the national

organization and our local chartering partners, we can't continue to deliver the mission of

Scouting without them." *Id.* (Bankr. D.I. 9341 at 263:14-264:1).  The Bankruptcy Court further

found:

> [P]repetition, plaintiffs often treated BSA, Local Councils and Chartered Organizations
> as jointly responsible for Direct Abuse Claims, pleading that each was responsible for the
> conduct not only of themselves, but of others. A lawsuit against a Local Council or a
> Chartered Organization, therefore, could have an immediate impact on BSA. Plaintiffs
> allege one harm—a singular Direct Abuse Claim—and they seek a single recovery from
> BSA, a Local Council and a Chartered Organization (as well as a perpetrator and perhaps
> others).

*Id.*

D&V Claimants argue on appeal that these findings "do not establish that direct claims

against these non-debtors are derivative of [*i.e.*, depend on] Debtors' liability." (D.I. 41 at 28).

"Any common law claims against Local Councils and Chartered Organizations are direct claims,

not derivative.  Such claims would only result in a potential indemnity claim against BSA, and

there would have to be 'another lawsuit' (theoretically) before any third-party claim had an

impact on the bankruptcy estate." (*Id.* at 34-35).  The Bankruptcy Court rejected this argument,

and so do I.  "The proper inquiry," according to the Third Circuit,

> is to review the law applicable to the claims being raised against the third party
> (and when necessary to interpret state law) to determine whether the third-party's
> liability is wholly separate from the debtor's liability or instead depends on it . . . .

45

> [T]his approach does not require the reviewing court to decide state-law claims on
> the merits.  It does, however, require it to ascertain what liability under the
> relevant law demands.

*In re W.R. Grace & Co.*, 13 F.4th 279, 286 (3d Cir. 2021).  A claim against a third party may be

derivative even if the claim is based on the third party's own misconduct.  *See id.*  The mere fact

that "a third party is alleged to have engaged in some wrongdoing is not enough to render a claim

against it independent if its liability depends on the debtor's liability."  *Id.*

The Bankruptcy Court found that claims against Local Councils and Chartered

Organizations are not wholly separate from claims against BSA.  This finding is not clearly

erroneous.  As BSA points out, the main theories of liability against Local Councils and

Chartered Organizations are (i) negligence, and (ii) respondeat superior.  *In re Boy Scouts of

Am.*, 642 B.R. at 600; *see* SA 1602, SA 2291, SA 1614, SA 618.  As to the negligence-based

Scouting-related Abuse Claims asserted against the Releasees, I agree those claims are not and

could never be "wholly separate from the debtor's liability."  (D.I. 66 at 132-34) (quoting *In re

W.R. Grace & Co.*, 900 F.3d 126, 137 (3d Cir. 2018)).  Similar to the plaintiffs' claims against

the insurer in *W.R. Grace*, though not to the same extent, the liabilities of the Local Councils and

the Chartered Organizations in this case "depend[] on the debtor's liability."  *In re W.R. Grace*,

900 F.3d at 136.

Abuse Survivors often assert such dependence.  (*See, e.g.,* SA 529 (Complaint against

BSA and Chartered Organizations) ¶ 141 (asserting, "At all relevant times . . ., Defendant BSA

invited and encouraged Plaintiffs to participate in the Scouting program it administered and

controlled.  Its invitation created a special, fiduciary relationship, wherein Plaintiffs and their

parents relied upon Defendant BSA's years of experience and judgment in selecting morally

upright and trustworthy men to lead Scout troops . . . Parents gave Defendant BSA authority to

act *in loco parentis* over Plaintiffs at BSA meetings, camping trips, hiking trips, and in private

social situations during Scouting activities. Defendant BSA also invited Plaintiffs into a commercial relationship by requiring him to pay yearly dues and other fees and required purchases, in exchange for participating in Scouting"); *id.* ¶ 142 ("Defendant BSA represented that the Scout leaders it selected, controlled, and/or approved were appropriate and trustworthy mentors and leaders for young boys. It also promoted Scouting as being safe and beneficial for boys—physically, emotionally, and spiritually. Defendant BSA . . . emphasized the friendly and paternalistic role a Scout leader should play in a young boy's life" including "specific statements in various editions of the *Boy Scout Handbook*); *id.* ¶ 147 ("Despite the special relationship that Defendant BSA maintained with Plaintiffs prior to and during their time in Scouting, BSA never made any warnings . . . that significant numbers of Scout leaders had abused boys in the past . . . Despite its knowledge of the use of Scouting by child molesters, Defendant BSA knowingly failed to change the Scouting program in any meaningful way to attempt to reduce the number of Scouts abused by Scout leaders until after Plaintiffs' time in Scouting, and nonetheless concealed this fact"); *see also* SA 2360-61 ¶ 11 (complaint asserting similar allegations against BSA and Chartered Organizations).

The evidence at trial demonstrated that such claims are based upon the Scouting system that BSA designed and has implemented at a local level by granting charters to Local Councils and Chartered Organizations in accordance with BSA's Rules and Regulations. *In re Boy Scouts of Am.*, 642 B.R. at 600-01. The Local Councils and Chartered Organizations follow BSA's protocol with respect to volunteers. *See id.* at 525. A part of that protocol involves BSA maintaining an ineligible volunteer file. (*See id.*; SA 1614, SA 2381, SA 618 ¶ 150).

BSA's youth protection standards and Scouting programming are also key to the plaintiffs' various negligence-based theories of liability. (*See id.* at 601 nn.451–53 (citing SA 3697 ¶¶ 6, 14, 39-40, 49; SA 529 ¶¶ 141–42, 147; SA 2357 ¶ 11; SA 1602 ¶ 28; SA 2291 ¶¶ 44–

45; SA 1614 ¶¶ 21–23, 27–28, 87–88; SA 618 ¶ 124)).  Indeed, the evidence demonstrated that it

is these policies and procedures that guide factfinders to determine whether there was

negligence.  (SA 1614 (referencing BSA's policies and procedures in a complaint against BSA);

SA 2381 (same); SA 618 (same)).  Like the programs themselves, the liability in these

negligence cases is rooted in a system that was created by, and necessarily implicates at every

level, BSA.  *In re Boy Scouts of Am.*, 642 B.R. at 525, 600-01; Bankr. D.I. 9273 ¶¶ 6, 18–19; *see,*

*e.g.*, SA 2357 ¶ 11.  This is reflected in BSA's historic practice of jointly defending and settling

abuse claims on behalf of Local Councils and Chartered Organizations.[8]  (*See* Bankr. D.I. 9273

¶¶ 4–9, 17–18, 20, 48).  Because BSA's conduct was always at issue in Abuse Claims, BSA was

the "real party defendant" in defending Abuse Claims.  *See A.H. Robins*, 788 F.2d at 999; *see*

*also In re Boy Scouts of Am.*, 642 B.R. at 599 (acknowledging BSA's historical prepetition

practices).

     As the Bankruptcy Court recognized, Lujan and D&V Claimants' own prepetition

complaints rely upon the interconnected relationship that they now attempt to downplay, as the

_____

[8] D&V Claimants and Lujan Claimants cite several cases in which BSA did not universally settle
or defend cases on behalf of BSA, the Local Councils, and the Chartered Organizations—what
the parties refer to as the "tripartite group." (*See* D.I. 40 at 14–15; D.I. 41 at 33–34).  In support,
Claimants cite nine lawsuits in which plaintiffs alleged abuse for which defendants were liable
but that were unrelated to Scouting.  The record supports that BSA handled Scouting-related
Abuse Claims (and only Scouting-related Abuse Claims) on behalf of the entire tripartite group.
(Bankr. D.I. 9273 ¶¶ 4–6, 9–19, 29).  The record reflects that claims that alleged abuse outside of
the Scouting context, such as claims asserted against the AOA and TCJC (unrelated to their roles
as Chartered Organizations), were handled differently.  (Bankr. D.I. 9273 ¶ 20; *see also* Bankr.
D.I. 9354 at 191:11-192:6 (Griggs describing that Guam was an exception because the
perpetrator of abuse, Father Brouillard, encountered claimants first within the church and then
brought such claimants into Scouting); Bankr. D.I. 9273 ¶ 4).  BSA asserts that where claims
against BSA were dismissed but claims against other members of the tripartite group were not,
the cases were distinguished by unique circumstances.  The record supports BSA's argument,
and I agree these instances are not a departure from the Debtors' overall historical practice of
jointly defending and settling Abuse Claims on behalf of Local Councils and Chartered
Organizations.

complaints "repeatedly implicate BSA's wrongdoing in their claims against Local Councils and Chartered Organizations." *In re Boy Scouts of Am.*, 642 B.R. at 600. Examples from the prepetition complaints filed by Mr. Aguon and the D&V Claimants include assertions that: (i) BSA and Local Councils controlled the selection of Scout leaders and exercised ultimate authority over who could be a Scout leader (*see, e.g.*, ALW 255 ¶¶ 11, 14; SA 0529 ¶¶ 141-42); (ii) BSA conspired with the Local Council and Chartered Organization in carrying out the tortious and unlawful conduct described in the complaint (*see, e.g.,* ALW 255 ¶¶ 11, 14; SA 2357 ¶ 11); and (iii) BSA was aware of the Abuse perpetrated against scouts since shortly after it started, kept that information secret, and did nothing to change the Boy Scouts program (*see, e.g.*, ALW 255 ¶ 39; SA 0529 ¶ 147).

Lujan Claimants argue that "survivors have direct claims against nondebtors based on the independent liability of these nondebtors and which do not depend on a finding of either Debtor's liability." (D.I. 40 at 15).

First, evidence of Abuse claims fitting that description claims is absent from the record. As the Bankruptcy Court observed, "Mr. Griggs testified that prepetition, plaintiffs often sued BSA, Local Councils and Chartered Organizations together. Conversely, he was not aware of any claims made against a Chartered Organization that did not include a claim against either BSA or a Local Council." *In re Boy Scouts of Am.*, 642 B.R. at 597. "Complaints filed prepetition by the Lujan Claimants and the D&V Claimants are no exception." *Id.* For example:

> [P]repetition, Mr. Aguon (who testified at trial) sued BSA, the Aloha Council and the Archbishop of Agana (as well as others) asserting that all defendants were negligent in hiring and retaining Brouillard, breached a fiduciary duty and confidential relationship with the plaintiff and are all vicariously liable for the abuser under a theory of [respondeat] superior. Mr. Aguon also alleges that each defendant is the agent, servant and/or employee of the other defendant, is the alter ego and partner of the other defendants, and each defendant ratified the acts of the others. So, too, complaints filed by the D&V Claimants naming BSA and TCJC assert that BSA was a "vertically-integrated organization" with BSA at the top of

49

the structure and sponsoring organizations and local councils at the "lower levels." The D&V Claimants allege that BSA and TCJC "jointly agreed to control and operate Scout troops." Further, they allege that "Defendants fraudulently misrepresented, failed to disclose and/or actively concealed the dangers and prevalence of child abuse in Scouting."

*Id.* at 597-98 (footnotes omitted) (citing ALW 255 ¶ 14; SA 0529 ¶ 27; SA 2357 ¶ 11; SA 0529 ¶ 121). Lujan Claimants filed proofs of claims asserting BSA bears responsibility for Scouting-related Abuse and identifying both Local Councils and Chartered Organizations for the same liabilities attributable to BSA. *Id.* at 597-98; SA 3697 ¶ 14.

Second, to the extent such direct claims are non-Abuse claims, those claims are not released under the Plan. The Plan clearly provides that liability that is not connected to BSA is not released. For example, with respect to Mixed Claims (which are claims that include both Scouting and non-Scouting-related Abuse), only those portions of Mixed Claims arising from Scouting will be channeled and released. (*See* D.I. 1-4 Arts. I.A.18, I.A.184, I.A.258, I.A.259). There can therefore be no concern that there is only an "incidental" relationship connecting the Channeling Injunction and Releases to BSA. *In re W.R. Grace*, 900 F.3d at 137.

In sum, I find no error in the Bankruptcy Court's determination that there is a clear identity of interest based on interconnectedness among BSA and the Releasees, each of which will benefit from the protections afforded by the Channeling Injunction and Releases.

### ii.    Shared Insurance Coverage

The Bankruptcy Court further found that shared insurance among BSA and the Releasees supported its exercise of "related to" jurisdiction. *In re Boy Scouts of Am.*, 642 B.R. at 590. Courts have found "related to jurisdiction over claims against non-debtors based in part on shared insurance policies." *In re Combustion Eng'g*, 391 F.3d at 226. The record supports the Bankruptcy Court's finding that, for more than 45 years, BSA's insurance program has provided coverage for Abuse Claims to all Local Councils and, by 1978, all Local Councils were added as

named insureds under BSA's insurance policies.  (Bankr. D.I. 9316 ¶ 11; Bankr. D.I. 9398 ¶¶ 15, 17; Bankr. D.I. 9398 ¶ 18; Bankr. D.I. 9490 19:6-7).  Chartered Organizations have been named as additional insureds under both BSA's policies and the Local Councils' policies for certain periods of time.  (SA 3824; Bankr. D.I. 9398 ¶ 25; Bankr. D.I. 9490 at 22:12-19; Bankr. D.I. 9398 ¶ 19).  In addition, certain independent policies issued to Local Councils also insured Chartered Organizations.  *In re Boy Scouts of Am.*, 642 B.R. at 528; Bankr. D.I. 9490 at 103:22-104:2; ADV 717.

A dollar-for-dollar reduction of the Debtor's available insurance coverage—property of the estate under § 541 of the Bankruptcy Code—without the need for an intervening action is precisely the type of effect on the estate that can adversely affect the Debtor's reorganization and provide the basis for "related to" jurisdiction over a third-party claim.  *See, e.g., SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.),* 388 B.R. 579, 584 (Bankr. D. Del. 2008) ("Depletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate."); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92–93 (2d Cir. 1988) (noting that where "third parties [sought] to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct . . . plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets."); *In re Quigley Co.*, 676 F.3d 45, 47 (2d Cir. 2012) ("[W]here litigation of [the suits] against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").

The Bankruptcy Court made detailed findings of fact in this regard.  *In re Boy Scouts of Am.*, 642 B.R. at 590.  It found that "from at least 1976 forward, Debtors provided insurance to both Local Councils and Chartered Organizations."  *Id.*  Moreover, BSA's primary policies

contain per-occurrence limits of liability that restrict potential recoveries for injuries arising from a single occurrence, regardless of the number of insureds. *Id.* As a result, "if an insurer paid out its per occurrence limits to plaintiff A to either a Chartered Organization or Local Council, there would be no insurance remaining to respond to a claim on the policy by BSA for Abuse alleged against it by plaintiff A." *Id.* Later policies contained "aggregate limits applicable to all claims," such that, again, "[p]ayment of any claims against any insured counts against the aggregate limits, thereby depleting the insurance policies." *Id.* Thus, "any call by Local Councils and Chartered Organizations on BSA's insurance has the potential to diminish property of the estate." *Id.* As the Bankruptcy Court further found, "No second suit is necessary to establish the existence of this liability." *Id.* These findings are supported by the record and are not clearly erroneous. It is settled law that bankruptcy courts have "related to" jurisdiction over such claims against insurance assets.

D&V Claimants' main argument is that the Third Circuit has held that shared insurance, by itself, is insufficient to give rise to "related to" jurisdiction. (D.I. 41 at 24, 36-37). But the Third Circuit recognized in *Combustion Engineering* that shared insurance can provide a basis for exercising "related to" jurisdiction over claims against non-debtors, citing the Fourth Circuit's decision in *A.H. Robins* and other decisions "finding 'related to' jurisdiction over claims against non-debtors based in part on shared insurance policies." *In re Combustion Eng'g*, 391 F.3d at 232-33. As Settling Insurance Companies correctly point out, although *Combustion Engineering* held that the shared insurance did not support "related to" jurisdiction in that case, it did so only because the bankruptcy court failed to make findings of fact that "[t]he shared insurance has one cap and that all insureds are under the same cap," such that claims against the co-insured non-debtors would deplete the debtor's insurance. *Id.* at 233 (noting "we would ordinarily remand on the shared insurance issue" for further fact finding, but the challenged

52

injunction was legally invalid anyway). Here, the Bankruptcy Court made precisely such findings. The shared insurance is subject to shared per-occurrence or aggregate limits such that any claim against a co-insured Local Council or Chartered Organization could deplete the estate's insurance. *In re Boy Scouts of Am.*, 642 B.R. at 526-31. The only other Third Circuit case D&V Claimants cite, *Continental*, did not address subject matter jurisdiction, but rather addressed the validity of a non-debtor injunction solely on the merits. *In re Cont'l Airlines*, 203 F.3d at 216-17 (shared insurance alone not a basis to grant injunction absent findings of necessity and fairness).

As the Bankruptcy Court based its "related to" jurisdiction on several other grounds, this Court need not decide whether shared insurance, standing alone, is sufficient to confer jurisdiction. The record here contains ample evidence of complex and competing claims against BSA's insurance which supports subject matter jurisdiction over claims against the Releasees.

### iii.     Contractual Indemnification Obligations

The Bankruptcy Court further found that BSA's and Local Councils' indemnification obligations supported its exercise of "related to" jurisdiction over the third-party claims. *In re Boy Scouts of Am.*, 642 B.R. at 590-91 (citing SA 3823, Proofs of Claim 14-1 through 14-15). "The contractual obligations of BSA and Local Councils to indemnify Chartered Organizations is immediate. No second lawsuit is necessary to establish the existence of this liability." *Id.* at 591. Lujan and D&V Claimants argue there was insufficient documentary evidence of BSA's (and the Local Councils') contractual obligations to indemnify the Local Councils and Chartered Organizations. (D.I. 40 at 8-9, 12-15; D.I. 41 at 28-35, 39-44).

Indemnification rights of non-debtors against a debtor support "related to" jurisdiction over third-party claims against the non-debtors where "the right to indemnification is clearly established and has accrued upon a filing of a civil action." *In re Lower Bucks Hosp.*, 488 B.R.

303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).  To give rise to subject matter

jurisdiction, such indemnification rights cannot be contingent on the factual findings of

subsequent litigation.  *Id.* at 314; *see also In re Combustion Eng'g*, 391 F.3d at 231

(indemnification rights are not clearly established or accrued where the lawsuit "would not,

itself, result in the indemnification against the debtor"); *In re Fed.-Mogul*, 300 F.3d 368 (same).

Here, Chartered Organizations have asserted contractual claims (as well as common law claims)

against both BSA and Local Councils for indemnification for losses related to Abuse Claims,

including in thousands of proofs of claim filed in the chapter 11 cases.  *In re Boy Scouts of Am.*,

642 B.R. at 590 (citing SA 3823, Proofs of Claim 14-1 through 14-15); SA 406–SA 472.

According to Lujan Claimants, the Bankruptcy Court's finding of indemnity obligations

was erroneous as "no evidence showed that Survivors' claims against nondebtors result in

automatic liability against BSA." (D.I. 40 at 12).  "Debtors produced no evidence of prepetition

written indemnification agreements." *Id.*  Lujan Claimants cite testimony of BSA National

Coordinating Counsel Bruce Griggs that he was aware of no written indemnification agreements

between BSA and Chartered Organizations (*see* A.1307, A.1336-37) and that of William

Sugden, counsel to the Atlanta Area Council and the designated Rule 30(b)(6) witness of the Ad

Hoc Committee of Local Councils, who testified that he was aware of no written indemnification

agreement between BSA and Local Councils (*see* A.2106, A.6197-98).

The record reflects that, in recognition of the critical roles that Chartered Organizations

and Local Councils play in the delivery of Scouting, BSA adopted board resolutions on October

30, 2013, in which it agreed to defend and indemnify Chartered Organizations, in addition to

maintaining and providing general liability insurance for Chartered Organizations in connection

with the delivery of Scouting. *In re Boy Scouts of Am.*, 642 B.R. at 590; ADV 721.  Further,

every year since 2014 each Local Council signs an Annual Charter Agreement with each

Chartered Organization that provides the Chartered Organization with a contractual right of indemnification against the Local Council with respect to any Scouting-related Abuse Claim. (ADV 717). Since 2014, the Annual Charter Agreements have provided, "The Local Council agrees to: . . . [i]ndemnify the Charter Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America." (Bankr. D.I. 9316 ¶ 69). Finally, the record establishes that Local Councils' indemnification obligations to Chartered Organizations may diminish BSA's residual interest in Local Council property. *See In re Boy Scouts of Am.*, 642 B.R. at 591. I agree with the Bankruptcy Court that BSA's and Local Councils' indemnification obligations support the Bankruptcy Court's exercise of "related to" jurisdiction.

D&V Claimants assert that Annual Charter Agreements do not create indemnity obligations because they did not exist at the time that most Abuse Claims arose. (*See* D.I. 41 at 40, 44). The Bankruptcy Court rejected the argument that the Annual Charter Agreements cannot support "related to" jurisdiction because they did not exist at the time at the time most of the underlying Direct Abuse Claims occurred. I agree. The promises in these agreements are broad enough to relate to claims whenever they actually occurred. D&V Claimants cite no law for the proposition that subject matter jurisdiction looks backward to the time of the underlying harm. *See In re Boy Scouts of Am.*, 642 B.R. at 591 n.422.

Appellants further argue that such indemnity obligations do not confer subject matter jurisdiction because another action would need to be filed before the current action could affect a bankruptcy proceeding. (*See* D.I. 41 at 39-40). *See In re W.R. Grace,* 591 F.3d at 172; *In re Fed.-Mogul*, 300 F.3d at 382. But the record demonstrates that BSA's and Local Councils' contractual indemnification obligations, including the duty to defend, are immediate and clearly established, that they accrued by the filing of Abuse Claims, and that they are in no way

55

dependent on potential third-party claims. I find no error in the Bankruptcy Court's determination that no second lawsuit is necessary to establish the existence of this liability. *In re Boy Scouts of Am.*, 642 B.R. at 591 ("A ruling in a lawsuit against a Chartered Organization or Local Council has an immediate impact on Debtors' estates.").

Appellants' argument that there is insufficient documentary evidence of BSA's (and the Local Councils') contractual obligations to indemnify the Local Councils and Chartered Organizations fails to show that the exercise of "related to" jurisdiction over third-party claims was legally flawed.

### iv.     Residual Interest in Local Councils' Property

As a further basis for its exercise of "related to" jurisdiction, the Bankruptcy Court found that BSA's residual interest in Local Council property constitutes property of the estate. *In re Boy Scouts of Am.,* 642 B.R. at 523, n.25 & 590. "While that interest is, of course, subject to all superior interests, including the payment of valid claims against the Local Council, that interest is nonetheless property of the estate. Any diminishment of that interest impacts the Debtors and property of the estate." *Id.* at 590.

Lujan Claimants argue that BSA's "residual interest in Local Council property" is insufficient to confer subject matter jurisdiction, as BSA's interest is only in what remains after payment of valid claims against a Local Council, and therefore it has no interest in Local Council property used to pay claims. (D.I. 40 at 13-14). D&V Claimants assert that, because the residual interest is subject to all superior interests, including valid claims against a Local Council, it is "impossible" that payment of claims against a Local Council would diminish BSA's interest. (D.I. 41 at 38). But BSA has a residual interest in all Local Council property, and the payment of debts by a Local Council, including on account of Abuse Claims, reduces the value of that residual interest to the detriment of the estate.

Bankruptcy courts indisputably have jurisdiction over property of the debtor. *See* 28 U.S.C. § 1334(e) (granting "exclusive jurisdiction . . . of property of the estate"). Claims against property of the estate fall within a bankruptcy court's "related to" jurisdiction. *See Pacor*, 743 F.2d at 996 n.15 (actions that "sought to affect property of the estate" are within "related to" jurisdiction). As the Bankruptcy Court found, BSA holds a contingent interest in Local Council property that would be triggered by BSA's termination of a Local Council charter or by the dissolution of a Local Council. This interest is set forth in BSA's Bylaws and Rules and Regulations, as well as in the form of Local Council bylaws. *In re Boy Scouts of Am.*, 642 B.R. at 523, n.25. (BSA Bylaws Art. VI § 1, cl.2). Although Local Councils are legally separate entities that hold title to property in their own name, such property automatically reverts to BSA upon the revocation of the Local Council's charter or the Local Council's dissolution. BSA's residual interest is indisputably "property of the estate." *See* 11 U.S.C. § 541 (broadly defining property of the estate as including "all legal or equitable interests of the debtor in property"). Accordingly, the Bankruptcy Court correctly recognized that any Abuse Claim that diminishes the assets of a Local Council or triggers the Local Councils' indemnification obligations to Chartered Organizations would also necessarily diminish the assets of BSA's estates. *In re Boy Scouts of Am.*, 642 B.R. at 590.

I need not determine whether such a residual interest, alone, is sufficient to confer subject matter jurisdiction over these claims. It contributes.

I find no error in the Bankruptcy Court's exercise of "related to" jurisdiction to confirm the Plan containing the Channeling Injunctions and Releases, based on identity of interest, shared insurance, contractual indemnity, and residual property interests, each of which is supported by careful findings.

## 2.    **Statutory Authority**

D&V and Lujan Claimants argue that there is no statutory authority for the Bankruptcy Court to grant non-consensual third-party releases.  They are wrong.  The Third Circuit, courts within the Third Circuit, and other courts have repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances. *See, e.g., In re Cont'l Airlines*, 203 F.3d at 214-15 (holding that a third-party injunction would be proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *Glob. Indus.*, 645 F.3d at 206 (explaining that a third-party injunction under § 105(a) requires showing with specificity that an injunction is both necessary to the reorganization and fair) (citing *Cont'l Airlines*, 203 F.3d at 214).

The Bankruptcy Court began with the Third Circuit's decision in *Continental*, which states that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here"—*i.e.*, section 524(g).  "Notwithstanding," the Bankruptcy Court explained, "the Third Circuit [in *Continental*] did not adopt the logic of those courts precluding third-party releases in all instances.  Rather, for the next twenty years, the Third Circuit (and courts within this circuit) has permitted nonconsensual third-party releases in narrow circumstances where the releases are fair and necessary to the reorganization." *In re Boy Scouts of Am.*, 642 B.R. at 594 (citing *Global Indus.*, 645 F.3d at 206; *In re United Artists*, 315 F.3d at 227).

The Third Circuit reiterated this conclusion in *In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126, 135 (3d Cir. 2019).  "While [the Third Circuit] did not reach the merits of the third-party releases granted in that instance," the Bankruptcy Court explained, "it did conclude that a bankruptcy court is constitutionally authorized to confirm a plan containing nonconsensual

58

third-party releases if it concludes that the releases are integral to the debtor-creditor relationship." *In re Boy Scouts of Am.*, 642 B.R. at 594. I agree with the Bankruptcy Court's observation that the recent *Millennium* ruling "suggests an implicit recognition that the granting of third-party releases is still permissible as part of the confirmation process." *Id.* As the Bankruptcy Court further explained, "The granting of such releases, therefore, must be found in the bankruptcy court's ability, in appropriate circumstances, to exercise its inherent equitable power consistent with §§ 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code." *Id.*

Congress enacted several provisions that provide bankruptcy courts the flexibility to accommodate unique, case-specific circumstances, and the Bankruptcy Court correctly relied upon them as the statutory basis for the nonconsensual third-party releases in the Plan. *See id.* at 594-95. Section 105(a) empowers the court to adopt flexible remedies, consistent with its powers as a court of equity, as "necessary or appropriate to carry out the provisions of" the Bankruptcy Code; § 1123(a)(5) requires a plan to provide "adequate means" of implementation "[n]otwithstanding any otherwise applicable nonbankruptcy law" and provides a non-exhaustive list of potential mechanisms; and § 1123(b)(6) allows a plan to include "any other appropriate provision not inconsistent with applicable provisions of [the Bankruptcy Code]."

Viewed together, these provisions confer what the Supreme Court has described as a bankruptcy court's "residual authority" to formulate plans that enable successful and value-maximizing reorganizations, including relief not specifically authorized elsewhere in the Bankruptcy Code. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). In *Energy Resources*, the Supreme Court held that the bankruptcy court had the authority under §§ 105(a) and 1123(b)(6), even though the Bankruptcy Code did not explicitly so provide, to reallocate the debtor's tax liabilities "if the bankruptcy court determines that this [reallocation] is necessary to the success of a reorganization plan." *Id.* at 549; *see id.* at 551. *Energy Resources* demonstrates

59

that §§ 105(a) and 1123(b)(6) are sufficiently broad to authorize plan provisions that are both fair and necessary to the reorganization, including third-party releases, so long as such provisions are not inconsistent with the Bankruptcy Code.

Based on these provisions, the Third Circuit, courts within the Third Circuit, and other courts have recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances. *See In re Cont'l Airlines*, 203 F.3d at 214-15; *Glob. Indus.*, 645 F.3d at 206; *In re Airadigm Commc'ns*, 519 F.3d 640, 657 (7th Cir. 2008) ("residual authority" derived from sections 105(a) and 1123(b)(6) "permits the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the Bankruptcy Code."); *In re Seaside Eng'g & Surveying*, 780 F.3d 1070, 1076–79 (11th Cir. 2015) (citing § 105 in approving third party releases); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (citing § 105(a) in affirming order enjoining suits against third parties); *In re A.H. Robins Co.*, 88 B.R. 742, 754 (E.D. Va. 1988) (citing § 105 in approving third party releases).

The Court must also reject D&V and Lujan Claimants' reliance on *In re Purdue Pharma*, 635 B.R. 26 (S.D.N.Y. 2021) for the proposition that the Bankruptcy Court lacked statutory authority to approve the Channeling Injunction and Releases. The district court's decision in *Purdue* is currently on appeal before the Second Circuit, and that decision departs from existing Second Circuit precedent, which, like the Third Circuit, holds that bankruptcy courts are authorized to enjoin and release third-party claims against non-debtors where such releases are integral to the debtor's reorganization. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–42 (2d Cir. 2005); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Johns-Manville Corp.*, 843 F.2d 636, 640, 649 (2d Cir. 1988).

Finally, Lujan Claimants and D&V Claimants argue that the Channeling Injunction and Releases are prohibited under §§ 524(e) and 524(g) of the Bankruptcy Code. The Bankruptcy correctly rejected both arguments.

Section 524(e) of the Bankruptcy Code only allows "discharge of a debt of the debtor" and "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Claimants argue that the Plan goes further by affecting the liability of non-debtors, not for the liability of the Debtors' debts, but for their own debts. But the Third Circuit has rejected the argument that § 524(e) bars non-consensual third-party releases. *See In re PWS Holding*, 228 F.3d at 247 (determining that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties," but rather "concluded . . . the releases at issue were impermissible because the hallmarks of permissible non-consensual releases . . . [were] absent"); *In re Mallinckrodt PLC*, 639 B.R. 837, 868 n.70 (Bankr. D. Del. 2022) (noting releases are not the equivalent of a discharge) *aff'd sub. nom., Sanofi-Aventis U.S. LLC v. Mallinckrodt plc*, 2022 WL 17839904 (D. Del. Dec. 22, 2022), *appeal docketed*, No. 23-1111 (3d Cir. Jan. 23, 2023).

The Bankruptcy Court rejected the argument, based on the inclusion of § 524(g) in the Bankruptcy Code, that nonconsensual third-party releases are not appropriate in any other setting. I agree that § 524(g), which expressly authorizes third-party releases in asbestos cases, does not render such releases impermissible in non-asbestos cases. *See In re Boy Scouts of Am.*, 642 B.R. at 594-95. As the Bankruptcy Court pointed out, Congress enacted a rule of construction in § 524(g) that contradicts the inference that Lujan and D&V Claimants ask this Court to make, legislating that "[n]othing in . . . the amendments made by [§ 524(g)-(h)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Bankruptcy Reform Act, Pub. L.

103-394 § 111(b) (1994); *see also* 140 Cong. Rec. 27,692 (Oct. 4, 1994). Section 524(g) thus

cannot be used as a basis to prohibit relief otherwise allowed by the Bankruptcy Code.

### 3. *Continental* Hallmarks of Permissible Nonconsensual Releases

Having determined that the Bankruptcy Court correctly determined that it had

jurisdictional and statutory authority to approve the Channeling Injunction and Releases, D&V

and Lujan Claimants must show that the Bankruptcy Court committed clear error in its

underlying factual findings. (D.I. 40 at 23-34; D.I. 41 at 58-79). Under Third Circuit law, the

*Continental* "hallmarks" of permissible nonconsensual releases—fairness and necessity to the

reorganization—guide the Bankruptcy Court's review of third-party releases. *See In re Boy*

*Scouts of Am.*, 642 B.R. at 595 (citing *In re Cont'l Airlines*, 203 F.3d at 212). Following a

detailed and thorough review of the relevant facts, the Bankruptcy Court concluded that the

Channeling Injunction and Releases satisfy the *Continental* hallmarks. *See id.* at 616-19. The

applicable legal standard—the *Continental* hallmarks—is uncontroverted.[9] Whether approval of

the Channeling Injunction and Releases was appropriate depends on the Bankruptcy Court's

analysis of the particular facts of the case, and the Court reviews the Bankruptcy Court's findings

of fact for clear error. *See Glob. Indus.*, 645 F.3d at 206 (conducting detailed case-specific

factual inquiry); *Cont'l Airlines*, 203 F.3d at 217 (same); *In re Wash. Mut., Inc.*, 442 B.R. 314,

345 (Bankr. D. Del. 2011) ("Determining the fairness of a plan which includes the release of

---

[9] The parties briefed whether the factors considered in *In re Master Mortgage*, 168 B.R. 930, 937
(Bankr. W.D. Mo. 1994) were met, and the Bankruptcy Court, in its thorough analysis,
considered those factors as well, ultimately returning to the *Continental* "hallmarks." *See In re*
*Boy Scouts of Am.*, 642 B.R. at 596-616. As the Bankruptcy Court noted, "While *Master*
*Mortgage* is not the law of the Third Circuit for approval of nonconsensual third-party releases,
those factors, as well as others, can inform the analysis of whether the *Continental* hallmarks
have been met." *Id.* at 596. Thus, I do not separately review using a *Master Mortgage* analysis.

non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.").

D&V and Lujan Claimants argue that the Channeling Injunction and Releases are not necessary because, according to them, BSA could have confirmed a "BSA-only" plan of reorganization that does not contain releases in favor of third parties. (*See* D.I. 40 at 26; D.I. 41 at 64). D&V and Lujan Claimants also contend that the Channeling Injunction and Releases are not fair because they were approved without what the D&V and Lujan Claimants believe to be sufficient consideration from the Local Councils and Chartered Organizations. These arguments misconstrue the legal standard articulated in *Continental*.

### a. The Channeling Injunction and Releases Are Necessary to the Reorganization

Under the Third Circuit standard, to approve a nonconsensual third-party release, the Bankruptcy Court must find that the release is necessary to the debtor's reorganization. *In re Cont'l Airlines*, 203 F.3d at 214. In *Continental*, the Third Circuit held that the particular third-party releases before it on appeal were not necessary to the reorganization, as there was "nothing in the record to even imply that the success of the . . . reorganization bore any relationship to the release and . . . injunction." *Id.* at 215. The Third Circuit subsequently clarified in *Global Industrial* that necessity and fairness mean showing that the liability of the third party is "sufficiently onerous to jeopardize the debtors' reorganization" if not channeled to a trust under the debtor's plan of reorganization. *In re Global Indus.*, 645 F.3d at 206. As courts in the Third Circuit have held, the necessity prong requires demonstration that "the success of the . . . reorganization [bears] a relationship to the release" of the nonconsensual parties, and that the releases have provided "a critical financial contribution" to the plan "in exchange for receiving a release of liability." *In re Cont'l Airlines*, 203 F.3d at 215.

63

D&V and Lujan Claimants argue that the Channeling Injunction and Releases are unnecessary because the BSA proposed—more than two years prior to the confirmation hearing—the "BSA Toggle Plan," which contained an option for a potential BSA-only plan. (*See* D.I. 40 at 26; D.I. 41 at 65–67). This argument misconstrues the necessity prong of the *Continental* standard. The record reflects that the BSA Toggle Plan was never solicited; indeed it was structured as a "cramdown" plan on Survivors. (Bankr. D.I. 6445). There is no evidence that a BSA-only plan would have been feasible—either for the future of the BSA or as a means of providing compensation to Survivors.

Among other things, the success of a plan of reorganization for the BSA depends upon the BSA's future membership revenue, which, in turn, depends on Local Councils and Chartered Organizations resolving their abuse liabilities and continuing to deliver the Scouting program. The Bankruptcy Court found that "[m]embership drives BSA's finances," which "depends on Local Councils and Chartered Organizations to both maintain and recruit Scouts." *In re Boy Scouts of Am.,* 642 B.R. at 610. According to the Bankruptcy Court, the "evidence is unrefuted" that, without the Channeling Injunction and Releases for Local Councils and Chartered Organizations, the "BSA is likely to suffer a drop in membership, significantly affecting revenue and putting into serious question BSA's ability to continue as a national organization." *Id.* at 617. Mr. Whittman of Alvarez & Marsal, BSA's financial advisor, who participated in mediation discussions and confirmed the arms-length nature of the negotiations, testified that (i) absent the Channeling Injunction and Releases for Local Councils, there would be "significant" Local Council bankruptcy filings (which the Ad Hoc Committee for Local Councils' witness, Mr. Sugden, agreed with), and (ii) absent the Channeling Injunction and Releases for Chartered Organizations, there would be a significant impact on membership and operation. *Id..* (Bankr. D.I. 9316 ¶¶ 11, 68; Bankr. D.I. 9407 at 35:15–36:9, 188:6–13; SA 2141). The record reflects

that the Local Councils' contribution to the Settlement Trust, as well as the contribution of their

insurance rights, would not have been possible without the Channeling Injunction and Releases.

(Bankr. D.I. 9316 ¶ 68 ("[I]f Abuse Claims against Local Councils are not channeled to the

Settlement Trust, Local Councils will not make the Local Council Settlement Contribution.")).

For these reasons, the Bankruptcy Court found that the BSA-only plan was "not a true

resolution and would leave claimants racing to the courthouse, filing suits across the country, and

BSA in shambles." *In re Boy Scouts of Am.*, 642 B.R. at 611. A BSA-only plan would spiral the

organization into a "death trap of litigation with minimal recoveries in sight," and Survivors—

many of whom have been waiting decades to receive a meaningful recovery—would miss out on

the recoveries made possible by this Plan. *See id.* at 613. The record further reflects that a BSA-

only plan would fail to unlock the value from the Abuse Insurance Policies and provide virtually

no recovery to holders of Abuse Claims. (Bankr. D.I. 2594 Art. II.A (disclosing that under the

BSA-only plan the recovery for holders of Direct Abuse Claims would be as little as 1% of their

claims); Bankr. D.I. 4108 (same); Bankr. D.I. 4716 at 73:9–14, 80:21–81:16 (counsel for the

Tort Claimants' Committee characterizing the BSA Toggle Plan as a "death trap plan")).

The Bankruptcy Court found that the Channeling Injunction and Releases were necessary

to maximize the value of the estates for the benefit of holders of Abuse Claims and made specific

findings in support. *In re Boy Scouts of Am.*, 642 B.R. at 616-17. The foundation of the Plan

consists of contributions to the Settlement Trust by the Releasees of approximately $2.5 billion

in cash and property, as well as other assets the Bankruptcy Court determined have a value of

more than $4 billion. *Id.* Without the Channeling Injunction and Releases, the Bankruptcy

Court found that these contributions would not have been made. The "Settling Insurers and

Local Councils would not make their monetary contributions to the Settlement Trust," and the

"Participating Chartered Organizations, Related Non-Debtor Entities and their respective

Representatives who are additional insureds would not contribute their insurance rights to the Settlement Trust [without the Channeling Injunction and Releases] . . . . [It] is illogical to believe these settlements could be achieved without releases and this conclusion is supported by the record." *Id.* at 610-11; *see also* Bankr. D.I. 9517 at 79:11–21 (Whittman) ("I believe [the Channeling Injunction and Releases] were necessary in order to maximize the value of the [insurance] policies, I believe they were necessary in order to secure this deal that is a set of interlocking, interrelated deals").

Moreover, the amounts payable under the Insurance Settlement Agreements, together with the contributions from Local Councils, Related Non-Debtor Entities, and Chartered Organizations, are each essential to the success of the Plan insofar as they provide the overwhelming majority of funding to the Settlement Trust for the benefit of holders of Abuse Claims. The Bankruptcy Court found that, absent the "global settlements of insurance coverage disputes" with BSA's two primary insurance carriers, Hartford and Century/Chubb Companies, "these cases would devolve into a morass of coverage litigation," and recoveries "would be delayed for countless years." *In re Boy Scouts of Am.*, 642 B.R. at 610; *see also* Bankr. D.I. 9517 at 66:23–67:2 (Whittman)] ("[A]bsent these insurance settlements . . . I'm not sure that the BSA would have been able to reorganize."). The Hartford and Century/Chubb Companies settlements also "provided a template" for settlements with Zurich and Clarendon and may serve as the template for future settlements with Non-Settling Insurance Companies after BSA's emergence from bankruptcy. " *In re Boy Scouts of Am.*, 642 B.R. at 610-11. The Bankruptcy Court also cited "undisputed evidence" showed that "without the Scouting-Related Releases, the Settling Insurance Companies would not settle their liability." *Id.* at 616. (*See also* Bankr. D.I. 9395 ¶ 31). As the Bankruptcy Court found, in a world without the Channeling Injunction and

Releases, "the insurance proceeds may or may not be available." *In re Boy Scouts of Am.*, 642 B.R. at 616.

Lujan Claimants further contend that the Channeling Injunction and Releases are not necessary because earlier versions of the Plan did not provide releases for the Archbishop, Century and Chubb Companies, Clarendon, Zurich, or Roman Catholic Entities, which are now receiving releases under the confirmed Plan. (*See* D.I. 40 at 26). Again, there is no evidence that such earlier versions of the Plan would have been feasible—either for the future of the BSA or as a means of providing compensation to Survivors. Lujan Claimants further argue that there was no determination by the Bankruptcy Court that BSA's successful reorganization requires the release of Roman Catholic Entities and other religious entities. (*See* D.I. 40 at 28). But under the Plan, the Roman Catholic Entities fall under the umbrella of Participating Chartered Organizations; therefore, all of the Bankruptcy Court's findings relating to the necessity of releases for Participating Chartered Organizations include Roman Catholic Entities (and any other religious Chartered Organizations that did not become Opt-Out Chartered Organizations with respect to Scouting-related Abuse Claims). (*See* D.I. 1-4 Art. V.S.8 ("[A]ll Roman Catholic Entities, other than those that have specifically opted out of such treatment . . . shall be treated as Participating Chartered Organizations.")). Consequently, Lujan Claimants' argument ignores the evidence establishing that the Channeling Injunction and Releases for Participating Chartered Organizations (which includes Roman Catholic Entities and religious Chartered Organizations) are necessary. (Bankr. D.I. 9395 ¶¶ 30–31; Bankr. D.I. 9316 ¶¶ 67–70; Bankr. D.I. 9280 ¶¶ 191– 93, 199).

The Bankruptcy Court determined that "BSA needs to resolve the Abuse litigation in order to move forward," and that the Plan, supported by the Channeling Injunction and Releases, accomplishes just that. *In re Boy Scouts of Am.*, 642 B.R. at 617. D&V and Lujan Claimants

have failed to demonstrate that the Bankruptcy Court erred in determining that the Channeling Injunction and Releases were necessary to the BSA's reorganization, as required by *Continental*.

### b.      The Channeling Injunction and Releases Are Fair

Under Third Circuit law, the Bankruptcy Court must also find that the Channeling Injunction and Releases are fair. *In re Cont'l Airlines*, 203 F.3d 214.  Courts in the Third Circuit have interpreted *Continental*'s fairness prong to require that the parties whose claims are being released receive adequate consideration in exchange for such releases. *See, e.g., Mallinckrodt*, 639 B.R. at 867 (noting that "[t]he [Third Circuit's] review of cases [in *Continental*] indicated that . . . fairness dictates that 'it is necessary to provide adequate consideration to a claimholder being forced to release claims against non-debtors'") (quoting *In re Cont'l Airlines*, 203 F.3d at 212-13); *David v. Weinstein Co. Holdings*, 2021 WL 979603, at *6 (D. Del. Mar. 16, 2021) ("Part of the inquiry into the fairness of non-consensual third-party releases is determining whether reasonable consideration is given in exchange for the releases.").  Indeed, the Third Circuit in *Continental* framed the legal question as "whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *In re Cont'l Airlines*, 203 F.3d at 214 n.11.  I have held that the adequacy of consideration given in exchange for releases of claims is reviewed for clear error. *See Exide Holdings*, 2021 WL 3145612, at *13.

The Bankruptcy Court determined that the Channeling Injunction and Releases are fair to holders of Abuse Claims because "the Plan provides a mechanism for payment of all or substantially all Direct Abuse Claims" and therefore holders of Direct Abuse Claims "are being treated fairly for the releases they are granting." *In re Boy Scouts of Am.*, 642 B.R. at 617.  As previously addressed herein, no party presented evidence at trial to challenge this critical finding. D&V and Lujan Claimants claim that they are being forced to release claims against Local

Councils, Chartered Organizations, and Settling Insurance Companies "while receiving little to nothing in exchange." (D.I. 40 at 24; *see also* D.I. 41 at 59–64). The Bankruptcy Court rejected this assertion based on unrefuted evidence, finding that D&V and Lujan Claimants, like other holders of Abuse Claims, can expect to be paid in full. Because D&V and Lujan Claimants will receive under the Plan all the compensation to which they would be entitled in the tort system, D&V and Lujan Claimants are receiving "adequate consideration" as required by *Continental*. Appellants provide no basis to disturb the Bankruptcy Court's fairness determination.

The fairness of the Channeling Injunction and Releases is also evidenced by the fact that holders of Direct Abuse Claims "voted overwhelmingly in favor of the Plan." *In re Boy Scouts of Am.*, 642 B.R. at 617, 660; *see also* Bankr. D.I. 9280 ¶ 56. The Bankruptcy Court found that more than 85% of holders of Direct Abuse Claims voted to accept the Plan, which constitutes "overwhelming acceptance." *Id.* at 617. The Plan also has the support of JPMorgan Chase Bank, the Creditors' Committee, the Tort Claimants' Committee, the Future Claimants' Representative, the Coalition, and the Settling Insurance Companies. *Id*. The Bankruptcy Court concluded that the settlements are preferable to the alternative after conducting an exhaustive review of, among other things, the fairness of the settlements and the impediments to collection. The vast majority of claimants similarly situated to the D&V and Lujan Claimants agreed.

Finally, the Bankruptcy Court's findings regarding the transparency and rigor of the process by which Local Councils' contributions to the Settlement Trust were calculated supports the fairness of the releases given in exchange. *See In re Boy Scouts of Am.*, 642 B.R. at 602-03. Each Local Council is contributing a fixed amount of cash and property based on a formula that fairly and equitably allocates the Local Council Settlement Contribution. (*See generally* Bankr. D.I. 9316; Bankr. D.I. 9280 ¶¶ 234–35). The formula was developed over many months and accounts for disparities between Local Councils' claims exposure, applicable statutes of

limitation, and financial capacity. (*See* Bankr. D.I. 9316 ¶¶ 24–43; Bankr. D.I. 9280 ¶¶ 232–35; D.I. 1-3 at 141–44).

The Bankruptcy Court cited several other aspects of the contributions and resulting Settlement Trust that supported the fairness of the releases given in exchange, including: (a) "more timely assessment and payment" of claims, and "more equal treatment across claimants," in comparison with resolution in the tort system, *In re Boy Scouts of Am.*, 642 B.R. at 617; (b) consistency with the manner in which claimants sued and settled claims with BSA (i.e., as a group), *id.*; (c) the "multiple options" provided under the TDP to holders of Direct Abuse Claims to pursue litigation in the tort system, *id.*; and (d) Survivors' need for global resolution after waiting decades, *id.* (*See also* Bankr D.I. 9280 ¶¶ 43–51, 53–56). All these findings are well supported by the record.

D&V and Lujan Claimants' additional arguments misapprehend the fairness standard. For instance, the D&V Claimants argue that the Local Councils' aggregate contribution is unfair by comparing the BSA's versus Local Councils' percentages of "liquid assets" being contributed to the Settlement Trust. (*See* D.I. 41 at 62 ("BSA is paying 67% of its liquid assets to the Settlement Trust . . . Local Councils are getting releases of all abuse claims in exchange for [contributing] only 30% of their liquid assets."). I agree with BSA that this argument is a red herring. The standard articulated in *Continental* is the adequacy of the consideration given to the party whose claims are released, not the cost imposed on the released party. *See, e.g., Mallinckrodt*, 639 B.R. at 874 (assessing fairness in terms of value provided to claimants in exchange for nonconsensual third party releases).

D&V Claimants further argue that, without knowing the assets and potential liabilities of each organization receiving a release, it is "impossible" to know if the claimants giving the releases are getting fair consideration in return. (*See* D.I. 41 at 61). Lujan Claimants likewise

complain that "no analysis was done" of Chartered Organizations' or, excluding Century/Chubb, the Settling Insurance Companies' assets or liability exposure. (*See* D.I. 40 at 24–25, 31). But these arguments fail to account for the significant value of the insurance rights that the Local Councils and Chartered Organizations are contributing to the Settlement Trust and the nonmonetary aspects of the Plan that the Bankruptcy Court determined to be fair to holders of Abuse Claims.

D&V Claimants also assert that the Bankruptcy Court failed to make certain specific findings of fact that support the Channeling Injunction and Releases. (*See* D.I. 41 at 67–68). Indeed, in *Continental*, the Third Circuit determined that the bankruptcy court "never specifically addressed the release and permanent injunction" of the released claims and found the confirmation order lacked "any findings" that the release was fair and necessary to the reorganization. *See In re Cont'l Airlines*, 203 F.3d at 214. But the Confirmation Opinion includes countless specific findings of fact that support each aspect of the necessity and fairness of Channeling Injunction and Releases under *Continental*. This argument is contrary to the record.

Finally, D&V Claimants argue that they did not have sufficient notice of released Representatives: "while there is a list attached to the Plan of more than 100,000 Chartered Organizations released, the Plan does not identify all the Chartered Organizations" nor the "Representatives" of Local Councils or Chartered Organizations who will be released. (*See* D.I. 41 at 67). The Bankruptcy Court, however, found that a "complete list of Chartered Organizations can be found at Boy Scouts of America Restructuring Website, http://omniagentsolutions.com/bsa/." *In re Boy Scouts of Am.*, 642 B.R. at 524 n.26; Bankr. D.I. 9275 ¶ 7. The website is repeatedly referenced throughout the solicitation packages served on all holders of Direct Abuse Claims. (Bankr. D.I. 7999; Bankr. D.I. 8378). "Representatives" is a

defined term in the Plan, and the definition provides sufficient details to put claimants on notice of the Representatives receiving a release. (D.I. 1-4 Art. I.A.249). And no party disputes that Representatives must be included in the Channeling Injunction and Releases as part of the global resolution under the Plan; certain Representatives are insureds under the BSA Insurance Policies, and claims against such Representatives would therefore impact the proceeds of the BSA Insurance Policies absent a release. (Bankr. D.I. 9316 ¶ 68 ("[W]ithout coverage for Representatives, a Local Council will likely face indemnity/contribution claims from such Representatives, rendering a "global resolution" illusory."); *id.* ¶ 70 ("I am confident that without the releases and channeling injunctions contained in the Plan of (a) Local Councils, (b) Local Councils' Representatives, (3) Chartered Organizations, and (4) Chartered Organizations' Representatives, Local Councils will not make the Local Council Settlement Contribution or the Supplemental LC Contribution."); SA 92 (providing requirement to indemnify Representatives)).

D&V and Lujan Claimants have failed to demonstrate clear error in any of the Bankruptcy Court's factual findings supporting the necessity and fairness of the Channeling Injunction and Releases, nor have they shown any error in the Bankruptcy Court's analysis under the Third Circuit standard.

## C.    Assignment of Insurance Rights

Certain Insurers urge me to reverse the Confirmation Order on the basis that the Insurance Assignment contemplated by the Plan impermissibly abrogates their contracts. (*See* D.I. 45 at 77-90). The Insurance Assignment includes "the assignment and transfer to the Settlement Trust" of all "rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves)." (Plan Art. 1.A.157). The Plan does not assign the entire insurance "policies," Certain Insurers complain. (D.I. 45 at

25 (citing Plan Art. 1.A.157; TDPs, Art. V.C)).  "Nor does it purport to assign any of BSA's contractual obligations to its insurers or say anything at all about whether BSA or anyone else remains obligated to comply with those contractual obligations."  (*Id.*)  According to Certain Insurers, the Plan's provisions effecting such a transfer are impermissible and render it unconfirmable.

Certain Insurers cite cases for the proposition that bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."  *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989).  The contracts at issue contain very important rights and obligations that are fundamental to the bargain, Certain Insurers assert, and assigning the contracts without assigning the corresponding obligations "rewrites" those contracts.  The obligations integral to the bargain cited by Certain Insurers include: (1) defense rights, which provide insurers with the right to associate in the defense and investigation of claims, as well as the right to defend lawsuits and make any settlements they deem expedient; (2) cooperation obligations, which require the insured to assist and cooperate in the insurer's investigation, defense, and settlement of claims, including by providing relevant materials and testimony; (3) consent obligations and "no action conditions," which obligate the insured to obtain its insurer's consent to a settlement and to further provide that no action lies against the insurer for breach unless a trial results in a judgment against the insured (or the claimant, insured, and insurer have agreed in writing to settle the claim); and (4) assignment obligations, which require the insured to obtain its insurers' consent to an assignment of the contract.  (*See* D.I. 45 at 16).  Certain Insurers argue that the Plan does not specifically provide for BSA or the Settlement Trustee to cooperate in the defense of claims or to obtain consent to settlements or other resolutions, and such "a plan that impermissibly modifies insurance contracts is not confirmable as a matter of law." (*Id.* at 80).

"Under the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied." *In re Boy Scout of Am.*, 642 B.R. at 668 (quoting *In re Am. Home Mortg.*, 402 B.R. 87, 92-93 (Bankr. D. Del. 2009) (emphasis in original)). The Insurance Policies are not executory contracts, *id.* at 668 n. 729, and no insurer argues otherwise. "Assuming § 363 is the operative section, . . . Debtors can transfer their property rights consistent with applicable state law." *Id.* The Bankruptcy Court found that § 363 was satisfied: "The Plan's transfer of rights under BSA Insurance Policies (the "Debtor Policy Assignment") is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights." (D.I. 1-1 ¶ II.I.2).

Certain Insurers identify no authority that stands for the proposition that interests under their policies could not be assigned. Debtors routinely assign their insurance policy interests to a settlement trust. *See, e.g., In re Combustion Eng'g,* 391 F.3d at 218 n.27 ("The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006); *In re Fed.-Mogul, Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *see also In re Congoleum Corp.*, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) ("[A] plan of reorganization may assign insurance policies to a personal injury trust.").

Certain Insurers do not cite any language in the Plan or the TDP abrogating the BSA's obligations under the insurance policies. To the contrary, the TDP is explicit in not modifying the insurance policies and preserving the policy obligations as they existed prepetition:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending, or supplementing the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of the Non-Settling Insurance Companies relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

(D.I. 1-4, Ex. A, Art. V.C). The Plan again references preserving those obligations in the

assignment provision:

> The Settlement Trust's rights under any insurance policies issued by the Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions precedent or obligations under such policies (other than, in case of the BSA Insurance Policies, the terms of any policies or provision of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each policy in subsequent litigation.

(D.I. 1-1 ¶ II.I.2(e)). Moreover, the TDP provide:

> The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code.

(D.I. 1-4, Ex. A, Art. V.C). The Bankruptcy Court repeatedly referred to the obligations as part

of the policies, not as having been abrogated: "If the obligations form the basis for claims, they

will be treated accordingly. If the obligations are conditions precedent, then the Non-Settling

Insurance Companies may be able to assert those conditions as a defense to performance." *In re

Boy Scouts of Am.*, 642 B.R. at 669. An "obligation" cannot form the basis of the claim or be a

condition precedent if it has been abrogated. Thus, obligations under the insurance policies are

not abrogated by the Plan. It appears Certain Insurers' real concern is that, in the future, the

Settlement Trustee will breach the policies by not complying with their conditions. (*See* D.I. 45

at 84-85). I agree with BSA that speculation about a potential alleged future breach of the insurance policies does not constitute abrogation or provide a basis for overturning the Plan.

Certain Insurers argue that the protective language contained in the Plan is not sufficient to safeguard their rights because any such protections are expressly "subject to the Plan and Confirmation Order"—the very documents containing/authorizing the "Insurance Assignment," which assigns the benefits but not the burdens of the contracts. (*See* D.I. 45 at 84). The language at issue provides, "Nothing in these TDP shall modify, amend, or supplement . . . the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order." (D.I. 1-4, Ex. A, Art. V.C). Certain Insurers complain that these provisos, which were not contained in earlier drafts of the TDPs, render the protective language, "at best, circular and, at worst, illusory" as this language "purported to abrogate such protections to the extent they were in conflict with other prejudicial provisions in the plan." (*Id.* at 41, 84-85). I don't agree with this reading. The plain meaning of this provision is clear that Insurers' rights and obligations under an Insurance Policy are preserved "to the extent such rights and obligations are otherwise available under applicable law." Thus, Insurers keep the whole gamut of permissible contractual rights under state law except, for example, anti-assignment provisions that are not "otherwise available" under the Bankruptcy Code. Similarly, Insurers' rights and obligations under an Insurance Policy are preserved "subject to the Plan and Confirmation Order," which, for example, assign rights under Policies to the Litigation Trust—an assignment not otherwise contemplate or authorized by the Policies.

Certain Insurers further argue that the Plan prejudices their rights because they have lost the ability to minimize liability by participating in defense. (*See* D.I. 45 at 84-85). While the

claims process "does not contain provisions requiring the Settlement Trustee to . . . permit insurer participation, nothing prohibits her from doing so." *In re Boy Scouts of Am.*, 642 B.R. at 656. This argument is unsupported by the evidence. First, they have not lost that right. Second, while Certain Insurers' expert, Professor Harrington, provided helpful testimony within his expertise as to the key clauses in commercial general liability policies that help reduce "moral hazard" and permit insurers to offer coverage at lower premiums, as the Bankruptcy Court found, his other conclusions "about the actual impact of the loss of contractual rights is all in the hypothetical." *Id.* at 655. Professor Harrington conceded that he did not know how insurance companies participate in the underlying Abuse litigation, so the Bankruptcy Court did "not accept his opinions regarding the impact of the TDP (or his reading of them) . . . or his conclusions about the 'difficulty' an insurance company may face in future coverage litigation." *Id.* at 656.

Certain Insurers assert that future failure to involve them in the defense will result in inflated awards that "would fundamentally alter the economic bargain between the parties." (D.I. 45 at 62). But Certain Insurers introduced no evidence that future awards would be inflated, and the record evidence contradicts this argument. Moreover, the bargain between the parties is set forth in the terms of the insurance policies, and it is for the Certain Insurers to pay covered claims, and not to pay claims that are not covered or are otherwise subject to a coverage defense. If there is future award that reaches an Insurer, and it disputes its obligation to pay that award, then it will raise its coverage defense, and that defense will be adjudicated on the then-existing facts. But the policies do not allow, and there never was a bargain to allow, the Certain Insurers to prevent BSA from compensating survivors of childhood abuse or otherwise resolving claims.

Certain Insurers further contend that the Plan does not specifically provide for BSA or the Settlement Trustee to cooperate in the defense of claims or consent to settlements or other resolutions, but there is no requirement for a plan of reorganization to provide those rights to insurers. Moreover, BSA could always settle claims without the Insurer's consent, and it has done so numerous times in the past, subject to the risk of coverage defense. (*See* Bankr. D.I. 9354 at 91:2-8). The Settlement Trust is no different. If the Insurers believe that there is some future breach of their insurance contracts, they retain the right to raise that defense to coverage.

Certain Insurers cite their expert's testimony that the contracts at issue anticipated that claims would be "settled within the context of the court system." (*See* Bankr. D.I. 9530 at 23:23-25 (Harrington)). But Certain Insurers cite no language in the contracts limiting settlements to those actions tried in court, and the record supports that such claims are routinely settled without the need for litigation. Even assuming there were such language, I would agree with BSA that Certain Insurers' rights under the contracts, including its right to assert a breach, are preserved.

Certain Insurers' final argument, that the Bankruptcy Court was required to decide all insurance coverage issues prior to approving the assignment of rights, is unavailing. (*See* D.I. 45 at 87). The requirements for confirmation do not include any right to coverage dispute resolution, much less with respect to future alleged claims. The Bankruptcy Court correctly determined not to adjudicate future breaches that had not occurred, and might not occur. *In re Boy Scouts of Am.*, 642 B.R. at 656 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered"). As Professor Harrington acknowledged, he does not know "'how anything will come out.'" *Id.* As the Bankruptcy Court held, "This issue will be resolved by a coverage court in the event of any disputes." *Id.* at 670. "[W]hile there may be some issues that are global in nature, insurance coverage litigation is often before the coverage court on whether an insurer must pay a specific

settlement entered into by the insured without the insurer's consent. This would appear to be a fact intensive inquiry." *Id.* at 653.

I find no error in the Bankruptcy Court's conclusion that the Insurance Assignment does not impermissibly abrogate Certain Insurers' contracts.

### D.    Approval of the Insurance Settlements Is Supported by the Record

Following mediation, Debtors entered into settlements with Settling Insurance Companies, Hartford, Chubb, Zurich, and Clarendon. The Insurer Settlements bring an aggregate of $1,656,000,000 to the Settlement Trust. The settlements are similar in structure and provide for: (i) the payment by the insurer of an agreed amount on an agreed schedule to the Settlement Trust to be used to pay Abuse Claims; (ii) the assignment of the Local Council Insurance Policies to the estate and the sale of the Local Council Insurance Policies and the BSA Insurance Policies (collectively, "Abuse Insurance Policies") to the insurer under § 363 free and clear of all claims and interests of all parties; and (iii) a complete release from all parties (*i.e.,* other Protected Parties, the Limited Protected Parties/Participating Chartered Organizations, the Future Claimants' Representative, the Coalition, and the Settlement Trust) of all causes of action arising out of their respective insurance policies and any liability for Abuse Claims. The settlement also requires the channeling to the Settlement Trust of the Abuse Claims for various periods of time, which differ based on whether the claim relates to a Contributing Chartered Organization, a Participating Chartered Organization, or an Opt-Out Chartered Organization. Through this combination of affirmative relief and protections, the Settling Insurance Companies will obtain a complete release of liability for Abuse Claims on behalf of themselves, the named insured(s) under their policies, and any additional insureds (whether specifically named or categorically identified). The Bankruptcy Court approved the Insurance Settlements, which it

determined were essential to the reorganization.  "Without these settlements, there is no Plan."
*Id.* at 562.

Lujan Claimants challenge certain of those Insurance Settlements, arguing, among other

things, that the policy proceeds are not property of the estate and that the Bankruptcy Court erred

in approving the releases of claims against the Settling Insurance Companies.  (D.I. 40 at 34-62).

### 1.  The Insurance Settlements Meet the *Martin* Standard

Lujan Claimants challenge the Bankruptcy Court's finding that the Insurance Settlements

satisfy the settlement approval standard.  (D.I. 40 at 62–64).  Bankruptcy courts consider the

following factors (the "*Martin* factors") when determining whether to approve a settlement under

Bankruptcy Rule 9019: "(1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin*

*(In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996).  I review the Bankruptcy Court's approval of a

settlement "for an abuse of discretion," which is "a deferential standard of review."  *In re*

*Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006).  A reviewing court will "not disturb an

exercise of discretion unless there is a definite and firm conviction that the court . . . committed a

clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  *Id.*

(quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001)).

Accordingly, to reverse the Bankruptcy Court's approvals of the Insurance Settlements, I must

determine that such approvals "rest on a clearly erroneous finding of fact, an errant conclusion of

law or an improper application of law to fact."  *Id.* (internal quotes and citations omitted).

Lujan Claimants fail to show an abuse of discretion.  The Bankruptcy Court approved the

Insurance Settlements based on an extensive evidentiary record that formed the basis for its

determination that BSA had satisfied the *Martin* standard.  *In re Boy Scouts of Am.*, 642 B.R. at

563-68.  Based on specific findings as to each Settling Insurance Company, including the amount

of its contribution, existing or potential coverage litigation issues, and the complexity and risk

associated with litigating those issues, the Bankruptcy Court concluded that the Insurance

Settlements "resolv[e] complex insurance coverage issues, saving years of litigation and expense

and yielding more timely recoveries for holders of Direct Abuse Claims." *Id.* at 564.  Although

Lujan Claimants quibble with the Bankruptcy Court's assessment of the *Martin* factors, they fail

to demonstrate that the Bankruptcy Court abused its discretion in approving the Insurance

Settlements.  As the Bankruptcy Court recognized, a settlement "need not be the best that can be

achieved," and a court "need only conclude that the settlement falls within the reasonable range

of litigation possibilities somewhere above the lowest point in the range of reasonableness." *Id.*

at 568 (quoting *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008)).

Lujan Claimants do not dispute the evidentiary standard, and they do not show that any of the

Insurance Settlements fell below "the lowest point in the range of reasonableness."

    As to the individual *Martin* factors, the Bankruptcy Court analyzed the first and third

*Martin* factors—the probability of success and the complexity of the litigation—together and

found that they support the approval of the Insurance Settlements.  Specifically, the Bankruptcy

Court determined that insurance coverage litigation (including the Illinois Action, Century Texas

Action, and Hartford Texas Action)—with potentially billions of dollars at stake—would have

been complex, costly, risky, and lengthy, with no guarantee of success. *See Id.* at 564.  "In

analyzing the compromise or settlement agreement under the *Martin* factors, courts should not

have a 'mini-trial' on the merits." *In re W.R. Grace*, 475 B.R. at 77-78.  BSA presented an

extensive evidentiary record reflecting the complexity, cost, risk, and delay that would attend the

coverage litigation. (*See, e.g.*, Bankr. D.I. 9398 ¶¶ 68–72, 76–77, 83, 87, 91, 95, 100, 104

(Gutzler Declaration addressing the significant risk that future rulings in favor of Settling

Insurance Companies' coverage defenses could substantially reduce available coverage for
Abuse Claims and that coverage litigation would be complex and a drain on the Debtors'
resources); Bankr. D.I. 9490 at 162:1-169:2 (Gutzler testimony regarding same); Bankr. D.I.
9280 ¶¶ 104, 132-33, 166-67, 180 (Whittman Declaration stating that the settlements "avoid the
costs, risks, uncertainty and delay associated with protracted litigation")). Lujan Claimants
assert that the Settling Insurance Companies' coverage defenses are "without merit" and
therefore that the Bankruptcy Court erred in approving the Insurance Settlements. (D.I. 40 at 62-
64). But a court's evaluation of the first and third *Martin* factors is not influenced by one party's
confidence in its litigation position. *See Mallinckrodt*, 639 B.R. at 864. The uncontroverted
evidence establishes that, notwithstanding the parties' views on the merits, litigation would have
been complex, costly, risky, and time-intensive.

The second *Martin* factor—difficulties in collection—is also satisfied (for
Century/Chubb) or was not at issue (other insurers). The Bankruptcy Court found that BSA (and
the Future Claimants' Representative) "had significant concerns regarding Century's ability to
honor its agreements going forward" based on evidence that "Century is in runoff paying
claims." *In re Boy Scouts of Am.*, 642 B.R. at 565. This conclusion is supported in the record.
As Ms. Gutzler, BSA's insurance expert, testified, "Century is not an income-generating insurer
through the continued receipt of premiums and there is significant uncertainty regarding the
assets available to satisfy Century Indemnity Company's obligations to the Debtors and to
Century's other policyholders"; *see also* Bankr. D.I. 9398 ¶ 86; Bankr D.I. 9280 ¶¶ 129–33
(expressing concern regarding Century's ability to pay any future judgment, "including the fact
that Century is in run-off and has a statutory surplus of only $25 million.")).

Finally, the Bankruptcy Court found that the fourth *Martin* factor—the paramount
interest of the creditors—was satisfied. It recognized that, without the Insurance Settlements,

"there is no Plan," and the Plan, including the approximately $1.656 billion being contributed to the Settlement Trust by the Settling Insurance Companies under the Insurance Settlements, provides for the likely payment in full of all Abuse Claims, including those of the Lujan Claimants. Despite Lujan Claimants' assertions otherwise, the Bankruptcy Court found that:

> [A]ll three groups representing holders of Direct Abuse Claims (i.e., the Tort Claimants' Committee, the Coalition and the Future Claimants' Representative) now support the Settling Insurer Settlements . . . . Their support satisfies me that Debtors have met their burden to show that the Settling Insurer Settlements are in the paramount interest of creditors.

*In re Boy Scouts of Am.*, 642 B.R. at 568. The Bankruptcy Court did not err in allowing overwhelming creditor support to speak for itself. *See Police & Fire Ret. Sys. of the City v. Ambac Fin. Grp., Inc. (In re Ambac Fin. Grp., Inc.)*, 2011 WL 6844533, at *6 (S.D.N.Y. Dec. 29, 2011) (holding that, because "the unsecured creditors . . . are the parties who stand to benefit from any recovery" under the settlement, "[t]he Bankruptcy Court was therefore justified in placing significant weight on the Creditors Committee's support for the 9019 Order").

The Bankruptcy Court rejected Lujan Claimants' argument that BSA should have considered the effect of the Insurance Settlements on the particular claims of the Lujan Claimants, noting that "the money coming into the Settlement Trust does not disadvantage the Lujan Claimants more than other creditors." *In re Boy Scouts of Am.*, 642 B.R. at 568. The Bankruptcy Court further found, "Given the nature of mass tort litigation, it is impossible to focus on specific creditors when reviewing a resolution of obligations under insurance policies against which coverage can be sought on 82,209 claims." *Id.* Thus, Lujan Claimants have failed to prove that the Bankruptcy Court erred in determining that the Insurance Settlements were in the paramount interest of the creditors—even if they were opposed by a small minority of creditors. For the foregoing reasons, Lujan Claimants have failed to prove that the Bankruptcy Court abused its discretion in approving the Insurance Settlements.

## 2. Policies Can Be Sold Free and Clear of Lujan Claimants' Rights

Lujan Claimants assert that the Plan violates the automatic stay issued in the Archbishop's bankruptcy case. (*See* D.I. 40 at 64-66). According to BSA, Lujan Claimants lack standing to make this argument, and, in any event, the confirmation of the Archbishop's plan of reorganization has rendered their arguments moot.

Prior to the filing of BSA's bankruptcy, the Archbishop filed its own petition for chapter 11 relief in the United States District Court of Guam – Bankruptcy Division (the "Guam Court").[10] On November 13, 2020, the Archbishop filed a proof of claim in BSA's bankruptcy proceeding. (SA 473). In September 2021, after resolution of a dispute between the Archbishop and the Guam Court's AOA Committee over the AOA Committee's derivative standing to enforce the automatic stay in connection with the Archbishop's purported rights under BSA Insurance Policies in the Archbishop's bankruptcy, the Archbishop took additional actions, including objecting to BSA's Plan. (Bankr. D.I. 8687, 9555). BSA also filed an objection to confirmation of the reorganization solicited in the Archbishop's Bankruptcy ("AOA Plan") as well as a proposed settlement in the Archbishop's case in order to defend against the impairment of BSA's interests with respect to certain of the BSA Insurance Policies. (SA 1682, SA 1819, SA 1837).

Thereafter, the parties mediated the disputes between the BSA Plan and the AOA Plan (SA 867), reached an agreement that resolved their respective objections ("AOA Stipulation"), and obtained approval of the settlement from both the Bankruptcy Court and the Guam Court. (SA 2117). The AOA Plan (AOA D.I. 1044; SA 1925) was revised to be in accord with BSA's Plan, and the two plans of reorganization allow for holders of Abuse Claims, including the Lujan

---

[10] *See In re Archbishop of Agaña*, Case No. 19-00010 (Bankr. D. Guam – Bankr. Div.). The docket of this chapter 11 case is cited herein as "AOA D.I. __."

Claimants, to receive distributions from the settlement trusts established in each of the chapter 11 cases simultaneously to the extent applicable. (*See, e.g.*, SA 1869 at 33:10-34:4; SA 2000 § 13.7; SA 2001 § 13.9 ("Nothing in this Plan . . . affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant to act in violation of applicable law or affirmatively authorizes such persons to violate . . . any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder"). On October 20, 2022, the Guam Court confirmed the AOA Plan, and the Archbishop withdrew its appeal of the Confirmation Order. (AOA D.I. 1093; Bankr. D.I. 10540).

Despite the settlement and release of all issues with respect to the AOA Bankruptcy and neutrality of the BSA's and AOA's Plans with respect to insurance interests, Lujan Claimants contend that the Plan violates the automatic stay in the AOA Bankruptcy. (*See* D.I. 40 at 64-66). According to BSA, this argument fails as a preliminary matter, and I agree. Lujan Claimants lack standing, as the AOA—the only party with standing to assert a stay violation—has voluntarily dismissed its appeal of the Confirmation Opinion and the Confirmation Order with prejudice. (*See Archbishop of Agaña v. Boy Scouts of America*, No. 22-1254-RGA, D.I. 7). Therefore, neither the Archbishop, nor any party purportedly acting on behalf of the Archbishop, may now appeal the Confirmation Order. *See* Fed. Rule. Bankr. P. 8002.

Moreover, Lujan Claimants lack independent standing to enforce the Archbishop's automatic stay. In rejecting similar arguments at confirmation, the Bankruptcy Court held, "Lujan Claimants have no standing to raise the rights of the Archbishop." *In re Boy Scouts of Am.*, 642 B.R. at 569 n.329; Bankr. D.I. 9638 at 39:8-13. The Ninth Circuit, which has jurisdiction over the District Court of Guam where the Archbishop's bankruptcy was filed, has held that "a creditor has no independent standing to appeal an adverse decision regarding a

violation of the automatic stay." *In re Pecan Groves of Ariz.*, 951 F.2d 242, 245 (9th Cir. 1991) (rejecting argument that the purpose of the automatic stay is to protect both the debtor and creditors). The Ninth Circuit has further held that creditors do not have an independent right to enforce alleged stay violations. *See In re Barrett*, 833 F. App'x 668, 670 (9th Cir. 2020) ("[I]f the trustee does not seek to enforce the protections of the automatic stay, then no other party may challenge acts purportedly in violation of the automatic stay, because 11 U.S.C. § 362 is intended solely to benefit the debtor estate").

Here, the Archbishop has dismissed its appeal, has not sought to enforce its automatic stay against BSA in any forum, and is barred under the AOA Stipulation from joining in the Lujan Claimants' appeal. Under clear Ninth Circuit precedent, Lujan Claimants have no independent standing to enforce the Archbishop's automatic stay. Because Lujan Claimants do not have standing to enforce the automatic stay on behalf of the Archbishop or in their own right, I will not permit Lujan Claimants to pursue their stay-related arguments.

### 3. The McCarran-Ferguson Act Does Not Reverse Preempt Bankruptcy Code Provisions Supporting the Channeling Injunction

Lujan Claimants objected to confirmation on the basis that the Plan, which channels their claims against insurers to the Settlement Trust, impermissibly conflicts with a Guam statute which provides plaintiffs with a right of direct action against the insurers of persons or entities liable for personal injury—here, BSA, Local Councils, and Chartered Organizations. (*See* D.I. 40 at 34-35 (citing 22 Guam Code Ann.§ 18305)). Lujan Claimants argue that the Guam direct action statute governs the "business of insurance." If so, any provision of the Bankruptcy Code that could support the channeling of its direct action claims against insurance companies to the Settlement Trust violates their rights under the McCarran-Ferguson Act. *See* 15 U.S.C. § 1012(b).

The McCarran-Ferguson Act provides in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). "The Act was enacted in response to a Supreme Court decision concluding that insurance transactions are subject to federal regulation under the Commerce Clause." *In re Boy Scouts of Am.*, 642 B.R. at 579 (citing *Securities & Exch. Com'n v. National Securities,* 393 U.S. 453, 458-59 (1969)). "The McCarran-Ferguson Act is intended to confirm that states, not the federal government, can regulate the business of insurance." *Id.* "The McCarran-Ferguson Act [is] an exception to the standard preemption rules in certain instances involving state statutes regulating the insurance industry [and] is said to 'reverse preempt' federal law." *In re Patriot National, Inc.,* 623 B.R. 696, 709 (D. Del. 2020).

In enacting the McCarran-Ferguson Act, Congress was concerned with the "core of the 'business of insurance.'" *National Securities,* 393 U.S. at 460. As the Bankruptcy Court explained, these are concerns with the type of state regulations that center around the "contract of insurance"—"the type of policy which could be issued, its reliability, interpretation and enforcement." *In re Boy Scouts of Am.*, 642 B.R. at 580; *see National Securities,* 393 U.S. at 460. "The focus of pre-emptive state regulation is the relationship between the insurance company and its policyholder." *In re Boy Scouts of Am.*, 642 B.R. at 380 (citing *National Securities,* 393 U.S. at 460). "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance.'" *Id.* (quoting *National Securities,* 393 U.S. at 460). The Bankruptcy Court concluded that the "Guam direct action statute does not regulate the business of insurance as that term is used in the [McCarran-Ferguson Act, and] . . . does not prohibit the channeling of the

Lujan Claimants' claims to the Settlement Trust thereby effectively extinguishing their procedural right to sue an insurance company." *Id.* at 584. I agree.

I must first assess a threshold question: whether the conduct regulated by Guam constitutes the "business of insurance." *U.S. v. Del. Dep't of Insur.*, 2021 WL 3012728, at *10-*16 (D. Del. July 16, 2021), *report adopted,* 2021 WL 4453606, at *10 (D. Del. Sept. 29, 2021), *appeal docketed*, No. 21-3008 (3d Cir. Nov. 1, 2021) (argued Nov. 8, 2022). If it does not, the inquiry ends, and the McCarran-Ferguson Act does not apply. *See id.* at *10. If the threshold question is answered in the affirmative, then reverse preemption will apply if three requirements are met: (i) the federal law at issue does not specifically relate to the business of insurance; (ii) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (iii) applying federal law would invalidate, impair or supersede the state law. *Id.* at *9.

In framing the challenged conduct, the Bankruptcy Court cited the channeling of Lujan Claimants' direct action claims against insurance companies to the Settlement Trust. Channeling those claims, they assert, runs counter to the Guam direct action statute which provides that Lujan Claimants may sue insurers directly. The Guam direct action statute provides:

> Liability Policy: Direct Action. On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct action, provided that the cause of action arose in Guam. Such action may be brought against the insurer alone, or against both the insured and insurer.

22 G.C.A. § 18305. As the Bankruptcy Court observed, the Guam statute does focus on who can sue an insurance company. But that observation does not resolve whether this conduct amounts to the "business of insurance." *In re Boy Scouts of Am.*, 624 B.R. at 581. The Bankruptcy Court noted the three criteria set forth by the Supreme Court for determining whether a particular

practice is part of the business of insurance: "(1) whether the practice has the effect of

transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the

policy relationship between the insurer and the insured; and (3) whether the practice is limited to

entities within the insurance industry." *Del. Dep't of Insur.*, 2021 WL 3012728, at *13 (citing

*Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 191 (3d Cir. 1998)). As the Bankruptcy Court noted,

"None of these criteria is necessarily determinative in itself." *In re Boy Scouts of Am.*, 624 B.R.

at 581 (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)).

Applying these factors, the Bankruptcy Court explained that, "permitting an injured party

to sue his offender's insurer" (1) "does not transfer or spread the risk between the insurer and the

insured"; (2) "is not an integral part of the policy relationship between the insurer and the

insured"; and (3) "is not directed at parties in the insurance industry, or even a purchaser of

insurance." *In re Boy Scouts of Am.*, 624 B.R. at 581. The Bankruptcy Court thus concluded

that the Guam direct action statute does not regulate the "business of insurance":

> The Guam direct action statute is not directed at the relationship between the
> insured and the insurer and it does not dictate the terms of the insurance policy.
> Instead, it is aimed at a non-party to the insurance contract and a party adverse to
> both the insured, if liability is disputed as it is here, and the insurer. It is not
> aimed at policyholder protection, but rather at the protection of a stranger to the
> contract.

*Id.* Noting these factors are "the starting point of the inquiry," the Bankruptcy Court turned to

the Supreme Court's guidance as to the "business of insurance" in *National Securities*:

> Certainly the fixing of rates is part of [the "business of insurance"] . . . [t]he
> selling and advertising of policies . . . and the licensing of companies and their
> agents . . . are also within the scope of the statute. Congress was concerned with
> the type of state regulation that centers around the contract of insurance . . . . The
> relationship between insurer and insured, the type of policy which could be
> issued, its reliability, interpretation, and enforcement—these were the core of the
> "business of insurance." Undoubtedly, other activities of insurance companies
> relate so closely to their status as reliable insurers that they to[o] must be placed
> in the same class. But whatever the exact scope of the statutory term, it is clear
> where the focus was—it was on the relationship between the insurance company

and the policyholder.  Statutes aimed at protecting or regulating this relationship, directly or indirectly[,] are laws regulating the "business of insurance."

*Id.* at 581-82 (quoting *National Securities*, 393 U.S. at 460).  Notwithstanding that the Guam direct action statute arguably could fall into the "enforcement" language used by the Supreme Court, the Bankruptcy Court observed that the statute "in no way protects or regulates the relationship between the insurance company and the policyholder.  In other words, it is not for the protection of policyholders." *Id.* at 582.

Finally, the Bankruptcy Court cited the District of Guam's own construction of such statutes, including its explanation that "[d]irect action statutes serve the general purpose of permitting an injured person to sue the liability insurance carrier directly; thereby, protecting the public at large by providing remuneration from the financially responsible entity." *Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd.*, 1997 WL 995625, at *4 (D. Guam Aug. 29, 1997).  Indeed, as the Bankruptcy Court noted, the Guam District Court has described the direct action as procedural in nature, not substantive: the statute is "not a cause of action, but merely a citation of a procedural statute that enables a [p]laintiff to name [a defendant's] insurer(s) in any substantive claim (s)he may have against [defendant]." *In re Boy Scouts of Am.*, 642 B.R. at 583 (quoting *Cruz Reyes v. United States*, 2010 WL 5207583, at *7 (D. Guam Dec. 15, 2010)).  "The goal of this statute," the Bankruptcy Court explained, is therefore "not policyholder protection nor does it change the payment provisions of the policy or the spread of risk between the insurer and insured.  Instead, it is a procedural law granting standing to sue or, at best, some collection remedy for a creditor of the policyholder in the event the creditor can prove the policyholder's liability and the policy covers the loss." *Id.*

I agree with the Bankruptcy Court's analysis.  As the Bankruptcy Court explained, "the Supreme Court has steadily focused on who the state statute is aimed at and what it is meant to

protect," *id.* at 582, holding that even where a state statute expressly addresses insurance companies, the statute nonetheless falls outside of the McCarran-Ferguson Act if—like the Guam direct action statute—the relevant provision is aimed not at protecting policyholders but instead at benefitting third parties.

The cases cited in the Confirmation Opinion further support the Bankruptcy Court's conclusion. For example, in *National Securities*, the Supreme Court held that a state statute protecting the stockholders of insurance companies in insurance-company mergers did not involve the "business of insurance." 393 U.S. at 460. "It is true that the state statute applies only to insurance companies." *Id.* But it "regulate[s] . . . the relationship between a stockholder and the company," whereas "the statutory term" "business of insurance" focuses "on the relationship between the insurance company and the policyholder." *Id.* Likewise, in *Fabe*, the Court held that a state statute governing the priority of payment in insurance-company liquidations regulated the "business of insurance" only to the extent the statute protected policyholders, but not to the extent it protected employees and general creditors. *Fabe*, 508 U.S. at 505-06, 508-10. The same is true here. As the District Court of Guam has emphasized, it is merely "a procedural law granting standing to sue," *Cruz Reyes*, 2010 WL 5207583, at *7, in order to "protect[] ... a stranger to the contract." *In re Boy Scouts of Am.*, 642 B.R. at 581. Because that stranger's rights remain entirely dependent on the insured's rights, which in turn are unaffected by the statute, the statute does not regulate the "business of insurance" and hence does not preempt the Bankruptcy Code's free-and-clear sale provisions or other provisions that support the channeling of claims to the Litigation Trust.

Arguing that the Bankruptcy Court erred in reaching this conclusion, Lujan Claimants cite several decisions construing direct action statutes under Louisiana, Georgia, and New York law. According to Lujan Claimants, each of these cases concluded that the direct action statute

at issue was a law governing the business of insurance. None of these decisions requires a different outcome.

In *Evans,* the district court held that Louisiana's direct action statute was enacted for the purpose of regulating the business of insurance. *Evans v. TIN, Inc.*, 2012 WL 2343162, at *10 & n.20 (E.D. La. June 20, 2012). As Settling Insurance Companies point out, this case did not involve the Bankruptcy Code or the Guam direct-action statute, but instead held that a Louisiana direct-action statute involved the business of insurance and reverse-preempted the Federal Arbitration Act. As The Bankruptcy Court noted, *Evans* is distinguishable for several reasons. That court downplayed the fact that the Louisiana statute regulates the insured-injured person relationship, not the insurer-insured relationship, addressing it in a footnote. *In re Boy Scouts of Am.*, 642 B.R. at 583; *Evans*, 2012 WL 2343162, at *10 & n.20. The *Evans* court found this distinction immaterial because the Louisiana statute, unlike the Guam statute, had a broader purpose of requiring that all insurance policies be executed for the benefit of injured persons as well as policyholders. *Id.* at 583-84; *Evans*, 2012 WL 2343162, at *10 & n.20. Finally, the Guam District Court has stated that the Louisiana direct action statute has "no binding, and little persuasive, effect" on Guam's direct action statute. *Heikkila*, 1997 WL 995625, at *4 n.4. I agree with Settling Insurance Companies that, to the extent *Evans*'s brief discussion can be read to mean that a direct-action statute like Guam's necessarily regulates the "business of insurance," it conflicts with the Supreme Court's narrow reading of reverse-preemption under the McCarran-Ferguson Act.

The *Wadsworth* decision cited by Lujan Claimants is also distinguishable because it does not address whether a direct action statute regulates the "business of insurance." At issue in that case was the federal Liability Risk Retention Act ("LRRA"). The LRRA permits risk retention groups—liability insurance companies, owned and operated by members, offering commercial

92

liability insurance for the mutual benefit of those owner-insureds, who must be exposed to similar risks and be members of the same industry. *See* 15 U.S.C. § 3901(a)(4). The LRRA also contains sweeping preemption language that sharply limits the authority of states to regulate, directly or indirectly, the operation of risk retention groups chartered in another state. *See id.* § 3902(a)(1) (preempting "any State law . . . to the extent that such law [] would . . . make unlawful, or regulate, directly or indirectly, the operation of a risk retention group"). In *Wadsworth*, a risk retention group domiciled in Arizona was sued under the New York direct action statute and argued that New York statute was preempted by the federal LRRA.

Thus, unlike the case at bar, reverse preemption under the McCarran-Ferguson Act was not at issue in *Wadsworth*.[11] In the case at bar, the Bankruptcy Court considered the threshold question of whether the conduct regulated by the state law (the Guam direct action statute) constitutes the "business of insurance"—*i.e.,* "the relationship between insurer and insured"— such that the McCarran-Ferguson Act may apply to "reverse preempt" the applicable federal law—Bankruptcy Code provisions supporting the Channeling Injunction. *Wadsworth,* on the other hand, considered not whether the conduct regulated by the state law (New York's direct action statute) regulated the "business of insurance" for purposes of application of the McCarran-Ferguson Act, but rather, whether the New York direct action statute "regulate[d], directly or indirectly, the operation of [the] risk retention groups" chartered in another state, such that the direct action statute was preempted by LRRA. *See Wadsworth*, 748 F.3d at 105-08. As the Second Circuit observed, despite "the general presumption, specifically reinforced by the

---

[11] The McCarran-Ferguson Act precludes the application of a federal statute in the face of state law "enacted ... for the purpose of regulating the business of insurance," if the federal statute does not "specifically relat[e] to the business of insurance," and would "invalidate, impair, or supersede" the state's law. *See Fabe*, 508 U.S. at 500–01. As the *Wadsworth* court noted, the federal statute at issue, the LRRA, "is, without question, a federal statute that specifically relates to the business of insurance." *Wadsworth*, 748 F.3d at 109.

McCarran–Ferguson Act, that insurance regulation is generally left to the states, the language and purpose of the LRRA clearly announce Congress's explicit intention to preempt state laws regulating risk retention groups." *Id.* at 105-06.  Whether the New York direct action statute regulated risk retention groups in violation of the LRRA—not the business of insurance—was the primary inquiry in *Wadsworth,* and therefore it is not instructive here.

Notwithstanding that *Wadsworth* is not analogous, Lujan Claimants rely on *dicta* in which the court notes that the New York direct action statute "was undoubtedly enacted to regulate the business of insurance." *Wadsworth*, 748 F.3d at 109.  As discussed, this determination was not necessary to the ultimate holding in the case, and the only support for its conclusion that the New York direct action statute was enacted to regulate the business of insurance is that the statute "requires insurance policies issued in that state to contain a provision permitting a direct action against a tortfeasor's insurer." *See id.*  While it is possible that a direct action statute requiring policy language aimed at protecting policyholders—as opposed to benefitting third parties—may be read as regulating the "business of insurance," such language is not present in the New York direct action statute (or the Guam direct action statute), and *Wadsworth* undertook no relevant analysis.

Like *Wadsworth*, the *Reis* decision involved a Georgia direct action suit against a risk retention group that was governed by the LRRA and not chartered or domiciled in Georgia. *Reis v. OOIDA Risk Retention Group, Inc.*, 303 Ga. 659, 665-66 (2018).  At issue was whether the LRRA preempted Georgia's motor carrier and insurance carrier direct action statutes with respect to risk retention groups, thus precluding the direct action against the risk retention group. *Reis,* 303 Ga. at 659.  Like *Wadsworth*, the *Reis* court looked to LRRA's provision § 3902(a)(1), which provides in relevant part that "a risk retention group is exempt from any State law . . . to the extent that such law . . . would make unlawful, or regulate, directly or indirectly, the

94

operation of a risk retention group." *Reis*, 303 Ga. at 661 (quoting 15 U.S.C. § 3902(a)(1)). The trial court concluded that LRRA preempted Georgia's direct action statutes after finding that the statutes would "'regulate, directly or indirectly the operation of the risk retention group as prohibited by 15 [USC] § 3902 (a)(1)." *Id.* at 662-63. Plaintiffs argued on appeal that Georgia's direct action statutes did not "regulate the operation of risk retention groups" but rather were "financial responsibility laws," as set forth in 15 U.S.C. § 3905(d). Because nondomiciliary states have the authority to specify acceptable means for risk retention groups to demonstrate "financial responsibility," as a condition for granting the risk retention group a license or permitting it to undertake specified activities within the state's borders, plaintiffs argued that Georgia's direct action statutes were not preempted by the LRRA. The Georgia Supreme Court disagreed. *See id.* at 666.

Like *Wadsworth*, *Reis* focused on whether direct action statutes at issue "regulate[d] the operation of risk retention groups"[12]—not the "business of insurance"—such that they would be preempted by the LRRA. *Reis* did not address the McCarran-Ferguson Act or consider whether the Georgia direct action statutes regulated the "business of insurance" for purposes of a reverse preemption analysis. None of *Evans*, *Wadsworth*, and *Reis* require a different outcome.

---

[12] In determining whether Georgia's direct action statutes would "regulate the operation of risk retention groups," the *Reis* court looked to LRRA's § 3902 exemptions, which specifically apply to "laws governing the insurance business." 15 U.S.C. 3902(b). Construing the term "insurance business," the *Reis* court referenced the "business of insurance" analysis applied in *Pireno*. The Supreme Court in *Pireno* had to determine whether an insurer's use of a peer review committee constituted the "business of insurance" exempted from antitrust laws by the McCarran-Ferguson Act, so *Pireno* looked to the recognized factors: whether the practice effectively transfers or spreads a policyholder's risk; whether it is an integral part of the contractual relationship between the insurer and the insured; and whether the practice is limited to entities within the insurance industry. *See Reis*, 303 Ga. at 665 (citing *Pireno*, 458 U.S. at 129). Lujan Claimants make much of the *Reis* court's conclusion that "[t]he direct action statutes would impact operation of the business of insurance of a risk retention group," but, as discussed, this is not the relevant inquiry. *Id.* at 665-66.

I find no error in the Bankruptcy Court's careful application of the Third Circuit standard of *Sabo* or its conclusion that the Guam direct action statute does not regulate the "business of insurance" as that term is used in the McCarran-Ferguson Act.

**D.      BSA Demonstrated By Preponderance of Evidence that the Plan Meets the Requirements of the Bankruptcy Code**

A debtor must prove by a preponderance of the evidence that its proposed plan satisfies all requirements of § 1129 of the Bankruptcy Code. *See, e.g., In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018).  I review *de novo* the Bankruptcy Court's conclusions under § 1129.  *In re Tribune*, 587 B.R. 606, 612 (D. Del. 2018) ("reviewing *de novo* the Bankruptcy Court's construction of Section 1129 and relevant provisions of the Bankruptcy Code.")

**1.      The Plan Satisfies the Best Interest of Creditors Test under § 1129(a)(7)**

The Bankruptcy Court held that BSA had established by a preponderance of the evidence that the Plan satisfies the requirements of § 1129(a)(7) of the Bankruptcy Code.  *In re Boy Scouts of Am.*, 642 B.R. at 665-66 (having determined "that holders of Direct [Abuse] Claims will [be] paid in full under the Plan.  [Thus,] the Plan, by definition, meets the best interest test as to claimants in Class 8 [Direct Abuse Claims]").  Determination of liquidation value is a factual inquiry, and this Court reviews that finding for clear error.  *In re Akorn, Inc.*, 2021 WL 4306222, at *13 (D. Del. Sept. 21, 2021) (citing *In re PWS Holdings*, 228 F.3d at 250).

Lujan Claimants assert that the Plan fails § 1129(a)(7)'s "best interest of creditors" test because Lujan Claimants would be able to pursue various claims and direct action rights against non-debtor Local Councils, Chartered Organizations, and Insurers in a chapter 7 liquidation, which claims and rights are enjoined under the Plan.  (*See* D.I. 40 at 66-71).  This argument fails on multiple grounds.

96

Section 1129(a)(7), known as the "best interest of creditors test," is a protection for individual creditors whose claims are impaired. *In re Boy Scouts of Am.*, 642 B.R. at 661 (citing *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle II*, 526 U.S. 434, 441 n.13 (1999)). It provides that, even if voting results in an accepting class, a plan may not be confirmed unless each holder of a claim has accepted the plan or "will receive or retain under the plan on account of such claim . . . value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." *Id.* (quoting 11 U.S.C. § 1129(a)(7)).

To satisfy that requirement, BSA prepared a liquidation analysis for BSA and Related Non-Debtor Entities. (*See* Bankr. D.I. 9280 ¶ 240). This analysis demonstrates that the Plan satisfies § 1129(a)(7). Although not required to do so, BSA also prepared a consolidated liquidation analysis of the Local Councils. *Id.* BSA further adjusted its analysis to account for the impact of a hypothetical liquidation on insurance recoveries. (*See id.* ¶ 241). Based on these liquidation analyses, as supported by the uncontroverted expert testimony of Mr. Whittman, BSA confirmed—and the Bankruptcy Court agreed—that each class of creditors receives equal or better treatment under the Plan than under a hypothetical liquidation. *See In re Boy Scouts of Am.*, 642 B.R. at 666 ("each Class of claims is receiving more than it would in a chapter 7 case."); Bankr. D.I. 9280 ¶ 242. It further "determined based on the record presented that Class 8 holders of Direct [Abuse] Claims will be paid in full under the Plan" and thus "the Plan, by definition, meets the best interest test as to claimants in Class 8." *Id.* No party, including Lujan Claimants, offered any evidence to rebut BSA's liquidation analysis. *See id.* at 664 (noting that "[n]o party cross-examined Mr. Whittman on his liquidation analysis or, [except for certain other objections not raised on appeal], in any way challenged Mr. Whittman's specific calculations,

97

assumptions or conclusions"). There is, therefore, no support for Lujan Claimants' challenges to

the Bankruptcy Court's best interest of creditors determination.

As to Lujan Claimants' argument that the Plan fails the best interest test of § 1129(a)(7)

because they would be able to pursue various claims and direct action rights against non-debtor

Local Councils, Chartered Organizations, and insurers in a chapter 7 liquidation, this argument

assumes without evidence that such actions would result in greater recoveries.  (D.I. 40 at 66-

70).  Lujan Claimants argue that in a chapter 7 scenario, certain maximum insurance coverage

limits would be available to satisfy their disputed claims.  BSA counters that Lujan Claimants

submitted no evidence to support this contention or to demonstrate that it would hold true in a

chapter 7 liquidation.  (D.I. 66 at 230-31).  Lujan Claimants' arguments also fail, BSA argues,

because (a) the Plan satisfies the plain language of § 1129(a)(7), (b) the Lujan Claimants' claims

against Chartered Organizations are too speculative to be included in any liquidation analysis,

and (c) the Plan provides for payment in full of Abuse Claims.  I agree with BSA.

### a.      The Plan Satisfies the Plain Language of § 1129(a)(7)

Lujan Claimants assert that BSA was required to include the value of claims released

against third parties under the Plan in their liquidation analysis.  (D.I. 40 at 70-71).  Section

1129(a)(7) requires only that an impaired creditor "receive or retain under the plan on account of

such claim or interest property of a value, as of the effective date of the plan, that is not less than

the amount that such holder would so receive or retain if the debtor were liquidated under

chapter 7." 11 U.S.C. § 1129(a)(7).  The "plain language" of § 1129(a)(7) does not support the

Lujan Claimants' argument because the text focuses only on claims against the debtor.  *In re Boy

Scouts of Am.*, 642 B.R. at 665.  "[A]s a matter of grammar," the required comparison under §

1129(a)(7) "is between the amount that the objecting creditor would receive under the plan on

account of its claim and what it would 'so' receive—that is, on account of its claim—if the

debtor were liquidated under chapter 7." *Id.* at 663 (quoting *Purdue Pharma*, 633 B.R. at 110). The amount that a creditor may receive or retain on account of claims against third parties in a liquidation is therefore irrelevant. I agree with the Bankruptcy Court that this plain-text interpretation correctly "leaves an analysis of third-party releases to the relevant third-party standard (in the Third Circuit, *Continental*)." *Id.* Finally, the Bankruptcy Court's interpretation of the best interest of creditors test is grounded in established precedent.[13]

Lujan Claimants rely on an out-of-circuit bankruptcy court decision, *In re Conseco*, for the proposition, "A plan of reorganization is unconfirmable for violating the best interests of creditors test where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan." (*See* D.I. 40 at 67 (citing *In re Conseco, Inc.*, 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003))). However, the statement Lujan Claimants rely upon was made in *dicta* describing a prior version of the plan at issue in the decision. The plan at issue in *Conseco* included a settlement whereby certain creditors who accepted additional consideration under a plan also agreed to third-party

---

[13] *See, e.g., Purdue Pharma*, 633 B.R. at 110 (holding that the plain language of section 1129(a)(7) does not require that a liquidation analysis include an analysis of a claimant's rights against third parties in a liquidation); *W.R. Grace*, 475 B.R. at 149-50 (concluding that the best interest test considers only the amount that claimants would obtain from the estates in a hypothetical chapter 7 liquidation, not the amount claimants would allegedly recover from the estates' insurers); *In re Plant Insulation Co.*, 469 B.R. 843, 887 (Bankr. N.D. Cal. 2012) (explaining that the "most natural interpretation of section 1129(a)(7) is that it addresses only the amount the dissenting creditor would receive or retain on its claim against the debtor" in a hypothetical chapter 7 scenario); *see In re Dow Corning*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (holding that the best interest test examines only the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan" and observing that courts applying the nearly identical test under chapter 13 "uniformly hold that amounts obtainable from other sources, such as guarantors, are irrelevant" to the inquiry). *But see In re Ditech Holding*, 606 B.R. 544, 610-14 (Bankr. S.D.N.Y. 2019) (holding that, in the context of a § 363 sale under a plan, certain estimable third party interests must be included in the liquidation analysis) and *In re Quigley Co.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010) (finding that the value of third party derivative claims could be estimated and therefore must be included in the liquidation analysis).

releases. *Conseco,* 301 B.R. at 528.  A group of creditors challenged the releases, but the court found that because the releases were voluntary, they were not "compulsory releases that would require justification by special circumstances." *Id.* at 527.  *Conseco*'s holding therefore did not call into doubt the cases in this circuit finding that "the condition requiring a release in order to receive a distribution does not violate the best interest of creditors test." *In re Wash. Mut., Inc.,* 461 B.R. 200, 251 (Bankr. D. Del. 2011), *unrelated parts vacated,* 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

      **b.**      **Lujan Claimants' Claims Against Chartered Organizations Are Too Speculative to be Included in a Liquidation Analysis**

Even assuming that, in some circumstances, claims against non-debtors should be considered under § 1129(a)(7), Lujan Claimants' claims against certain non-Debtor entities are speculative.  They have offered no evidence to estimate their claims nor any expert or other testimony to suggest the insurance coverage that they claim exists is valid or collectible.  As the Bankruptcy Court recognized, in the few cases where a court has included claims against third parties in the best interest test, they have done so when such claims "are neither speculative nor incapable of estimation and exist as of the date of the hypothetical chapter 7 case." *In re Boy Scouts of Am.,* 642 B.R. at 663; *see also Ditech Holding,* 606 B.R. at 610-14 (holding that "when weighing [third-party] claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation"); *Quigley,* 437 B.R. at 145 (same).  The Bankruptcy Court distinguished the chapter 11 cases from *Ditech* and *Quigley,* noting that there are "82,209 different claims against tens of thousands of different third-parties such that it would be impossible to value any particular claims." *In re Boy Scouts of Am.,* 642 B.R. at 664.  In response to Lujan Claimants' speculation that their claims are worth substantial amounts, the Bankruptcy Court noted that, on average, "[each of] the prepetition settlement of claims against BSA for Abuse committed by the

same perpetrator, Brouillard . . . settled for $57,000." *Id.*  If Lujan Claimants' claims and potential recoveries in a chapter 7 liquidation were not highly speculative and unliquidated, but instead could be reliably calculated, they should have produced evidence to that effect to rebut BSA's liquidation analysis.

### c.  The Plan Provides for Payment in Full of Abuse Claims

Finally, the Plan satisfies the best interest of creditors test because the Lujan Claimants are likely to be paid in full.  Regardless of whether claims against third parties are included in the best interest test, the Bankruptcy Court's determination that the holders of Abuse Claims will likely be paid in full necessarily shows that "the Plan, by definition, meets the best interest test as to claimants in Class 8." *Id.* at 666 (citing *Quigley*, 437 B.R. at 145).

For these reasons, I find no error in the Bankruptcy Court's conclusion that BSA demonstrated by a preponderance of the evidence that the Plan satisfies § 1129(a)(7).

### 2.  The Plan Properly Classifies the Claims of Lujan Claimants Pursuant to § 1122(a)

Lujan Claimants complain that the Plan violates § 1122 of the Bankruptcy Code because their claims are not "substantially similar" to other Direct Abuse Claims in Class 8; unlike other creditors in Class 8, Lujan Claimants argue, they hold direct action rights against Insurers.  (D.I. 40 at 71-72).  Additionally, they are subject to "an open civil statute of limitations to bring suit for child sexual abuse," and therefore "should have been separately classified." (*Id.* at 72).  The Bankruptcy Court rejected these arguments. *See In re Boy Scouts of Am.*, 642 B.R. at 633-34.[14]

---

[14] As BSA notes, the issue raised by Lujan Claimants is a purely academic one, as the Bankruptcy Court has found that Direct Abuse Claims will likely be paid in full, and Lujan Claimants have offered no grounds for error.  The class in which the Lujan Claimants are placed does not matter if they are paid all they could be due.  Thus, they are not "parties aggrieved" with appellate standing on this issue.

Section 1122(a) provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). As the Third Circuit has recognized, a plan proponent has significant flexibility in creating multiple classes under a plan of reorganization so long as a reasonable basis exists and all claims in a particular class are substantially similar. *See, e.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that classification is proper in a cram-down case where each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006) (explaining that § 1122 is satisfied "when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar"). The Bankruptcy Court concluded that the Plan comported with § 1122(a), as there was a rational basis for classifying all Direct Abuse Claims together in Class 8. *In re Boy Scouts of Am.*, 642 B.R. at 634-35. "As to the Lujan Claimants, . . . I find that their claims against BSA are substantially similar to other claimants in the class as they are similar in legal character vis-à-vis BSA." *Id.* at 634.

As to the direct action rights and open civil statute of limitations characteristics that purportedly distinguish Lujan Claimants from other claims in Class 8, the Bankruptcy Court stressed, "It is the nature of the claims being classified that is significant not the nature of other claims or interests a creditor might have." *Id.* (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150-51 (D.C. Cir. 1986) (ruling that the existence of a third party guarantor is irrelevant for classification purposes) (internal citations omitted)). Lujan Claimants challenge this ruling, arguing that the Bankruptcy Code requires their different treatment. (D.I. 40 at 71-72).

Lujan Claimants' argument is premised on their interpretation that "substantially similar" requires that all claims within a class be identical in all respects. That is not the law. In evaluating whether claims in the same class are substantially similar for purposes of § 1122(a), the question is "whether the claims in a class have the same or similar legal status in relation to the debtor." *In re Piece Goods Shops Co.,* 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) (recognizing that a debtor could appropriately classify all unsecured claims, including "trade, tort, unsecured notes, or deficiency claims of secured debtors," in a single class); *see also In re AOV Indus.,* 792 F.2d at 1150-51 (noting that "the focus of the classification is the legal character of the claim as it relates to the assets of the debtor"). Lujan Claimants' claims share the same legal status in relation to BSA as all other Direct Abuse Claims under the Plan. All holders of Class 8 claims have unliquidated and unsecured personal injury claims against BSA and, accordingly, "exhibit a similar effect" on BSA's estates. *In re W.R. Grace*, 475 B.R. at 37. The asserted differences—direct action rights and open statutes of limitations—do not change the character of those claims against BSA. As the Bankruptcy Court correctly observed, a direct action right is simply a procedural right that does not change the character of the claims. *See In re Boy Scouts of Am.,* 642 B.R. at 634. Similarly, a statute of limitations is a defense, which does not change the character of a personal injury claim. *Id.* "Indeed, it would be impracticable to attempt to determine the relative strengths and weaknesses of 82,209 disputed, unliquidated personal injury claims," *id.,* and attempt to place such substantially similar claims into multiple classes. Nor is such an exercise required. *See In re Resorts Int'l, Inc.,* 145 B.R. 412, 448 (Bankr. D.N.J. 1990) ("even though some class members may have stronger claims, or stronger defenses than others, they may be classified together so long as their claims are substantially similar and their treatment is approximately equal").

I find no error in the Bankruptcy Court's determination that Debtors carried their burden of demonstrating by a preponderance of the evidence that classification of claims was proper.

### 3. The Plan Provides Equal Treatment for Holders of Direct Abuse Claims in Accordance with § 1123(a)(4)

Lujan Claimants assert that the Plan violates the equal treatment requirement of § 1123(a)(4) of the Bankruptcy Code because certain claimants are providing greater consideration than other claimants while not being commensurately compensated in return. (*See* D.I. 40 at 72-74). Specifically, they assert that (a) claimants that hold direct action rights are entitled to greater consideration in exchange for giving up these rights, and (b) the Plan violates § 1123(a)(4) because some Survivors are enjoined from pursuing their claims directly against a Chartered Organization while other Survivors retain this right. *See id.* According to BSA, both arguments fail, and Lujan Claimants should not be permitted preferential treatment for themselves to the detriment of other claimants. (D.I. 66 at 242-45).

Section 1123(a)(4) requires that a plan shall "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment" for such claim. This provision means that "all claimants in a class must have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). On this basis, the Bankruptcy Court concluded that (a) the Lujan Claimants' direct action rights did not warrant separate classification because such rights are procedural in nature, and (b) "equal treatment" does not mean "equality of consideration." *In re Boy Scouts of Am.*, 642 B.R. at 638. Moreover, Class 8 Direct Abuse Claims "are all disputed and unliquidated," and "[t]he treatment for each claimant in Class 8 is specified in the TDP, which provide each claimant multiple avenues to liquidate his claim, at the election of the claimant." *Id.* Accordingly, Lujan

Claimants are receiving the same opportunity to recover on their claims, consistent with §
1123(a)(4).

Lujan Claimants do not contend that their opportunity to recover on their claims against
BSA differs in any way from other holders of Direct Abuse Claims; rather, they contend that
they are providing more consideration than other Survivors, in the form of the loss of their direct
action rights, without being appropriately compensated in exchange.  As the Bankruptcy Court
correctly observed, Lujan Claimants' unequal treatment argument is "really just the flip side of
the Lujan Claimants' § 1122(a) argument," in which they seek separate classification and
enhanced treatment under the Plan on account of their direct action rights.  *In re Boy Scouts of
Am.*, 642 B.R. at 637.  As discussed, the Bankruptcy Court correctly concluded that Lujan
Claimants' direct action rights do not warrant separate classification because those rights are
procedural in nature and do not give the Lujan Claimants extra substantive rights.

Lujan Claimants further contend that the Plan treats Survivors unequally as some
Survivors must release claims against Chartered Organizations and related religious entities,
while other Survivors retain their claims against such nondebtors.  (*See* D.I. 40 at 73).  "In other
words, Survivors who lose their claims against chartered organizations and related religious
entities are giving up more rights, and therefore paying more consideration, in exchange for their
distribution and while not being compensated for the loss of their claims.  The Survivors who are
being compelled to surrender their claims include those who were first abused after 1975 and
those whose claims are released and enjoined under settling insurer injunctions." (*Id.*)  In their
plan confirmation objection, Lujan Claimants relied on their direct action rights to support their
unequal treatment argument (*see* Bankr. D.I. 8708 at 39-40), and BSA contends that this
additional argument—that only some holders of Direct Abuse Claims are deemed under the Plan
to release Chartered Organizations that are co-liable for their claims—was raised for the first

105

time on appeal, and therefore has been waived.  (D.I. 66 at 244-45).  According to Lujan

Claimants, this issue was presented to the Bankruptcy Court, but Lujan Claimants cite only oral

argument and an objection, filed following the close of briefing and the trial in response to

BSA's 7052 Motion to amend the proposed findings of fact and conclusions of law.  (*See* D.I.

113 at 35-36 (citing Bankr. D.I. 9639 at 294-95; Bankr. D.I. 10246 at 3)).

Even assuming that Lujan Claimants have preserved this argument for appeal, they fail to

specify whether they are among the group of creditors that is supposedly being treated unequally

in being enjoined from pursuing the Chartered Organizations that are co-liable for their claims.

It is unclear how Lujan Claimants could be part of this group, however, as their claims against

the Archbishop, which is an Opt-Out Chartered Organization, are uniquely preserved.  *See In re*

*Boy Scouts of Am.*, 642 B.R. at 615.  Regardless, as BSA points out (D.I. 66 at 245 n.88), the

judgment reduction provision set forth in Article X.N of the Plan moots any argument with

respect to unequal treatment of Survivors that may have claims against a Chartered Organization

that are not channeled, as that provision expressly contemplates this situation and instructs a

court to set off or credit a judgment in this circumstance.  (D.I. 1-4 § X.N).  Based on the

foregoing provisions, Lujan Claimants do not have standing to make this argument.

### 4.    Treatment of Future Claimants

D&V Claimants argue that the treatment of current Direct Abuse Claims is not fair and

equitable as compared to Future Abuse Claims, because a holder of a Future Abuse Claim—

i.e., a minor or a person whose Abuse Claim arose prior to the Petition Date, but who was at the

time unaware of such claim as a result of "repressed memory" to the extent such concept is

recognized by the relevant state or territory—was not required to file a proof of claim by the Bar

Date.  (*See* D.I. 41 at 80-81).  According to BSA, D&V Claimants did not raise this issue in their

objections to confirmation of the Plan and have thus not preserved it for appeal.  (*See* Bankr. D.I.

8744; Bankr. D.I. 9017).  D&V Claimants state the argument was presented to the Bankruptcy

Court, but they cite only cross-examination of the Future Claimants' Representative (Bankr. D.I.

9482 at 112:11-124:19) and oral argument (Bankr. D.I. 9646 at 309:10-312:13) together with

their purported reservation of the right "to make additional arguments at the Confirmation

Hearing" contained in their plan objection (Bankr. D.I. 8744).[15]

Assuming this issue is properly before me, however, D&V Claimants have cited no

authority supporting their contention, and the Court is aware of none.  Rather, the reverse is true,

as incorporating the fair and equitable treatment of Future Abuse Claims into the Plan was

necessitated by due process concerns.  The creation of a trust to compensate these claimants and

the appointment of a legal representative to act as a fiduciary for their interests in the bankruptcy

case have been endorsed by numerous courts in mass tort chapter 11 cases as appropriate

mechanisms for a debtor to comply with the requirements of due process and to obtain a

discharge from this type of claim.  *See, e.g., Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.),*

239 B.R. 564, 568-69 (N.D. Cal. 1999) ("[T]he claimants' interests had already been represented

in the bankruptcy proceedings through the creation of the trust funds and the appointment of

class representatives.  Had this not been the case, it is doubtful that plaintiffs' claims could

properly be deemed to have been discharged in bankruptcy.") (citing *In re A.H. Robins*, 88 B.R.

742, 743 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *In re Johns-Manville Corp.*, 36

B.R. 743, 745–46 (Bankr. S.D.N.Y. 1984)).

The channeling of Future Abuse Claims to the Settlement Trust preserves the due process

rights of these claimants, following the mechanisms approved by courts in other mass tort

---

[15] As with other arguments raised by D&V Claimants, this argument is academic in light of the
Bankruptcy Court's finding that Abuse Claims (which includes current Direct Abuse and Future
Abuse Claims) will be paid in full.  D&V Claimants, therefore, are not "parties aggrieved" with
appellate standing on this issue.

bankruptcy cases, while also permitting BSA to obtain the channeling and discharge injunction and fresh start. Moreover, it is common practice in mass tort bankruptcies to classify current and future claimants in the same class and to provide future claimants with additional time to file their as-yet unmanifested claims. Providing holders of Future Abuse Claims with additional time to assert their claims because, by definition, as "futures" they were unable to assert their claims by the Bar Date, comports with principles of fairness, due process, and common sense. In any event, all such claimants receive the same treatment, as required by § 1123(a)(4).

Finally, I reject as hyperbole D&V Claimants' speculation that holders of Direct Abuse Claims will have to wait "80 to 90 years" for Future Abuse Claims to be filed, during which holders of Direct Abuse Claims will be awaiting their compensation from the Settlement Trust. (*See* D.I. 41 at 80-82). First, the only competent testimony on this subject is that there are likely only 400 Future Abuse Claims. *In re Boy Scouts of Am.*, 642 B.R. at 556 n.246; Bankr. D.I. 9454 at 198:20-199:19). The addition of 400 Future Abuse Claims to the already over 82,200 current Direct Abuse Claims (0.5%) is not material, nor will it lead to the catastrophic inequity that D&V Claimants predict. Second, as evidenced by the TDP, the Settlement Trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate remaining current, as well as future, claims going forward. Distributions from the Settlement Trust to current Direct Abuse Claims will not be delayed because of Future Abuse Claims; rather, the Settlement Trustee may make distributions to holders of current or future Direct Abuse Claims when those claims are allowed under the procedures set forth in the TDP. (*See, e.g.,* D.I. 1-4, Ex. A, Art. IX (providing process for payment upon final determination of an Allowed Abuse Claim); D.I. 1-4, Ex. B Art. 4 (same)).

Accordingly, D&V Claimants' argument that the Plan is not fair and equitable to holders of current Direct Abuse Claims lacks support.

### 5.    The Bankruptcy Court Properly Authorized Plan Modifications

Lujan Claimants make several Plan modification-related arguments, asserting that (a) BSA did not satisfy the correct standard required for a Rule 7052 Motion, (b) BSA's Rule 7052 Motion impermissibly bypassed Plan-related notice requirements, and (c) the Plan was materially and adversely modified without proper notice following confirmation.  (*See* D.I. 40 at 74-78).

Lujan Claimants argue that the modifications were not permitted under Bankruptcy Rule 7052 as a "vehicle" to confirm an "alternative plan of reorganization."  (D.I. 40 at 74; *see also id.* at 78).  The record reflects that BSA timely submitted the Rule 7052 Motion, which sought to supplement, or, in certain instances, amend, particular findings of fact and conclusions of law in the Confirmation Opinion.  Lujan Claimants posit that the BSA was required but failed to "show manifest injustice without amendment or supplement of the Opinion or any newly discovered evidence justifying amendment or supplement."  (*See* D.I. 40 at 78).  As an initial matter, the Bankruptcy Court contemplated a supplemental order that would work in tandem with the Confirmation Opinion.  (*See* Bankr. D.I. 10215 at 11:13-22 (Bankruptcy Court noting, "I actually wasn't focused on Rule 7052 which maybe applies or maybe doesn't . . . I appreciate the timing concern and the need to file a motion. . . .  All this order is supposed to do is memorialize the opinion to the extent that there are additional findings that needed to be made.").  In any event, limited corrections to findings of fact were required in order to avoid future confusion or mistakes which could result in manifest injustice for the BSA and plan supporters.  (*See* Bankr. D.I. 10188 at 11-16).  The Bankruptcy Court clearly had authority to supplement or amend its own Confirmation Opinion under any number of rules and provisions, including § 105(a) of the Code.

The record further reflects that notice of the Rule 7052 Motion was extensive, and BSA did not "bypass requirements for plan confirmation" in violation of the twenty-eight-day notice requirement of Bankruptcy Rule 2002(b). (*See* D.I. 40 at 74). As detailed above, the plan confirmation hearing began on March 14, 2022 and lasted twenty-two trial days over a six-week period, during which the Bankruptcy Court addressed objections from numerous parties including the Lujan Claimants. *In re Boy Scouts of Am.*, 642 B.R. at 550. BSA provided extensive notice of the confirmation hearing, which was adequate and complied with the Bankruptcy Code and Bankruptcy Rules, as set forth in a specific finding contained in the Confirmation Order:

> All necessary service and notice with respect to confirmation of the Plan, including all releases and injunctions thereunder, on all known and unknown creditors and other parties in interest was adequate and sufficient under the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is necessary or shall be required.

(D.I. 1-1 ¶ II.B). Thereafter, the record reflects that Lujan Claimants had ample time to consider the discrete modifications requested by BSA, file objections, and participate in the hearing on the Rule 7052 Motion. The Confirmation Opinion was issued on July 29, 2022. Any Rule 7052 Motion was required to be filed within fourteen days of the Bankruptcy Court's issuance of the Confirmation Opinion. The motion was timely filed on August 12, 2022. (Bankr. D.I. 10188). On August 15, 2022, the Bankruptcy Court established an appropriate objection deadline of August 24, 2022, and a hearing date of September 1, 2022 with respect to the Rule 7052 Motion. (*See* Bankr. D.I. 10195). Lujan Claimants thus had nearly one month following entry of the Confirmation Opinion and two weeks from the filing of the Rule 7052 Motion to object and had at least seventeen days prior to the hearing on the Rule 7052 Motion to consider BSA's proposed Confirmation Order. Moreover, Lujan Claimants did in fact object to the Rule 7052 Motion and

actually participate at the September 1, 2022 hearing.  (*See* Bankr. D.I. 10246; Bankr. D.I. 10288 at 52:25–56:11, 79:11–80:8, 100:7–110:6).

Pursuant to the Rule 7052 Motion, BSA requested amendment of findings related to: (1) the United Methodist ad hoc committee's contributions, (2) a settlement with the law firm of Pachulski Stang Ziehl & Jones, and (3) exculpation provisions in the Plan.  (*See* Bankr. D.I. 10188 at 11-16).  Lujan Claimants did not object to the amendment of any of these specific findings, only the process by which BSA proposed the amendments.  Because Lujan Claimants did not include written objections to the specific findings in their Rule 7052 objection, they have not preserved these arguments on appeal.  *Watkins v. Int'l Union Sec. Police and Fire Professionals of Am.*, 2016 WL 1166323, at *4 n.4 (D. Del. Mar. 23, 2016) (argument not included in written objections need not to be considered); *Thompson v. TCT Mobile*, 2020 WL 1531333, *7 n.3 (D. Del. Mar. 31, 2020) (same); *In re Mallinckrodt*, 639 B.R. at 892 n.178 (same).  Even assuming that Lujan Claimants have preserved these arguments, however, they are unavailing.

Lujan Claimants assert that BSA materially and adversely modified the Plan without proper notice after confirmation to incorporate modifications that (a) resolved the RCAHC's objections to the Plan, and (b) implemented a fraud-prevention provision in the Confirmation Order as required by the Confirmation Opinion.  (*See* D.I. 40 at 74-78).  At the outset, Lujan Claimants misstate the facts and timing of the settlement that resolved the RCAHC's Plan objections.  Lujan Claimants assert that "the Plan now includes third-party releases and injunctions of Survivors' claims which were not in the earlier plan, namely, the releases and injunctions in favor of Roman Catholic Entities," citing the definition of Roman Catholic Entities set forth in the Confirmation Order and arguing that the Plan "now treats those undisclosed entities as Participating Chartered Organizations."  (D.I. 40 at 74–75).  But the resolution of the

RCAHC's Plan objections was disclosed in a term sheet filed with a mediator's report on March 17, 2022 and announced at the beginning of the confirmation hearing with the exact language that the Lujan Claimants argue was added after confirmation.  (Bankr. D.I. 9387; Bankr. D.I. 9406 at 8:1–10:21).  The mediator's report and term sheet were also served on parties in interest, including Lujan Claimants.  (Bankr. D.I. 9442; Bankr. D.I. 9498).  That notice clearly stated that the terms of the settlement would be included in the Plan in exchange for resolution of the RCAHC's Plan objections, and the terms were subsequently incorporated into the modified version of the Plan.  (Bankr. D.I. 9696; Bankr. D.I. 9697).  Lujan Claimants had twenty-eight days from the disclosure of the resolution of the RCAHC Plan objection to the end of the confirmation hearing to raise this issue, but they did not.

The settlement with the RCAHC provided for certain clarifications, which were incorporated directly into the Plan, and the record reflects that no party objected to the RCAHC resolution at any time prior to the issuance of the Confirmation Opinion.  The RCAHC settlement was served on, among others, the Bankruptcy Rule 2002 list parties, parties that had filed a notice of appearance or requested notice, *pro se* parties, all parties entitled to vote on the Plan or their counsel, and Chartered Organizations.  (*See* Bankr. D.I. 9498).  Lujan Claimants' purported objection was first raised well past any conceivable deadline to do so and they never filed any pleading challenging the RCAHC settlement.  After issuing the Confirmation Opinion, the Bankruptcy Court held multiple hearings on the form of Confirmation Order and the BSA's Rule 7052 Motion.  Lujan Claimants' objection to the Rule 7052 Motion, filed on August 24, 2022, does not mention the RCAHC settlement either.  (*See* Bankr. D.I 10246)  It was not until the September 1 hearing on the Rule 7052 Motion that Lujan Claimants orally challenged the RCAHC settlement and related clarifications to the Plan.  The Bankruptcy Court ruled that the objection was untimely:

112

> I am not going to change anything with respect to the Roman Catholic resolution.
> It was filed . . during confirmation, but which extended way beyond the filing of
> this particular resolution and any objections should have been raised at that point
> in time. There was plenty of time to do it . . . . I think it was fairly covered . . . by
> the [Confirmation] [O]pinion and, again, if there was a specific issue, it should
> have been raised specifically.

(Bankr. D.I. 10288 at 111:1-17). Lujan Claimants have provided no evidence to support that the

waiver finding is clearly erroneous.

Finally, Lujan Claimants' argument that the modifications are material and adverse are

unavailing. The Bankruptcy Code permits modifications of a plan "at any time" prior to

confirmation. 11 U.S.C. § 1127(a). The Bankruptcy Code further provides that all voting

creditors who previously accepted a plan will be deemed to have accepted the modified plan. *Id.*

Bankruptcy Rule 3019(a) specifies that post-solicitation plan modifications do not require re-

solicitation if the modifications do not adversely change the treatment of parties who previously

voted for the plan. As such, courts have found that only "material" and "adverse" modifications

require re-solicitation. *See In re Fed.-Mogul Glob. Inc.*, 2007 WL 4180545, at *39 (Bankr. D.

Del. Nov. 16, 2007); *In re Century Glove, Inc.*, 1993 WL 239489, at *3 (D. Del. Feb. 10, 1993).

A plan modification is immaterial unless it will "so affect a creditor or interest holder

who accepted the plan that such entity, if it knew of the modification, would be likely to

reconsider its acceptance." *In re Am. Solar King*, 90 B.R. at 824; *see also In re New Power Co.*,

438 F.3d 1113, 1117–18 (11th Cir. 2006) (explaining that a party's "vote for or against a plan"

may be applied "to a modified plan unless the modification materially and adversely changes"

the party's treatment).

Applying this standard, it is unclear how any change could be deemed material and

adverse to Lujan Claimants, when holders of Direct Abuse Claims are likely to be paid in full

under the Plan—both before and after Plan modifications were made. Notwithstanding, Lujan

Claimants take specific issue with the definition of "Roman Catholic Entities" in the resolution with the RCAHC, asserting that the modified definition "expands" the number of parties being released under the Plan and captures entities that may not share insurance with BSA and may not be Chartered Organizations. (D.I. 40 at 75-76). Lujan Claimants contend that these entities were not adequately disclosed in connection with soliciting votes on the Plan. (*Id.* at 76). The record reflects the RCAHC resolution simply clarifies that the listed entities were recognized by BSA. (Bankr. D.I. 9386 (Twelfth Mediator's Report attaching terms of the RCAHC Term Sheet to "be appended to and incorporated by reference in the Plan or the Confirmation Order," defining "Roman Catholic Entities," and providing that the "Plan and/or the Confirmation Order shall be amended to provide that Roman Catholic Entities other than those that have specifically opted out of such treatment . . . shall be treated as Participating Chartered Organizations, provided that the RCAHC withdraws its [plan] Objections . . .); Bankr. D.I. 9387 (notice of settlement attaching RCAHC Term Sheet)).

Moreover, only "Abuse Claims" are being released under the Plan. Abuse Claims, by definition, are claims against, among others, Limited Protected Parties such as the Roman Catholic Entities that "alleged Scouting-related Abuse that occurred prior to the Petition Date." (*See* D.I. 1-4 Art. I.A.18). If Lujan Claimants have claims against religious orders that are not related to Scouting, those are not released under the Plan. If such claims are Scouting-related, then they relate to claims against BSA and its insurance and are properly treated under the Plan. The Bankruptcy Court noted this point in the Confirmation Opinion: "Of course, the Archbishop will have to defend non-Abuse Claims (i.e., abuse claims unrelated to Scouting) but those claims are not covered by the BSA Insurance Policies." *In re Boy Scouts of Am.*, 642 B.R. at 577. Thus, the RCAHC settlement creates no risk that the injunctions will spill past their intended effect and the Bankruptcy Court's jurisdiction.

114

Lujan Claimants assert that a fraud-prevention provision added to the Plan to conform with the Confirmation Opinion materially and adversely affects the Lujan Claimants such that re-solicitation is required. (*See* D.I. 40 at 76-78). This argument, which implies that Lujan Claimants' claims would be negatively impacted by a process designed to identify and address fraudulent claims, also must be rejected. As BSA points out, the TDP is not designed to pay fraudulent claims; rather, the detection of fraudulent claims is also part of the review process. As the Bankruptcy Court noted, a provision that would aid in eliminating fraudulent claims from the claim pool is not materially adverse to Lujan Claimants; rather such a procedure can only benefit those claimants who believe they have valid claims. (*See* Bankr. D.I. 10288 at 104:10–13).

The Bankruptcy Court appropriately overruled Lujan Claimants' objections related to the Plan modifications.

### E.    Indirect Abuse Claims and Judgment Reduction Provision

Non-Settling Insurance Companies Allianz and Liberty challenge the Bankruptcy Court's rulings on the treatment of Indirect Abuse Claims and the judgment reduction provisions set forth in the TDP and Confirmation Order. (*See* D.I. 43 at 14-41).

### 1.    The Plan's Treatment of Indirect Abuse Claims Is Proper

Indirect Abuse Claims are claims for contribution, indemnity, reimbursement, or subrogation with respect to Abuse Claims asserted by Local Councils, Chartered Organizations, and Insurance Companies that are being channeled to the Settlement Trust for liquidation in accordance with the TDP. (*See* D.I. 1-4, Art. III.B.11). Article IV.B of the TDP sets forth specific requirements for Indirect Abuse Claims to be eligible for compensation from the Settlement Trust. (D.I. 1-4, Ex. A, Art. IV.B). Among other things, an indirect abuse claimant (1) must have a valid Indirect Abuse Claim, (2) "that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof, (subject to the right of the

holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under

section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination

under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law," and

(3) must establish that (a) such claimant has paid in full the underlying liability for a Direct

Abuse Claim for which the claimant seeks payment, (b) such claimant has released the

Settlement Trust and Protected Parties from liability for the Direct Abuse Claim, and (c) the

Indirect Abuse Claim is not subject to a valid defense. (D.I. 1-4, Ex. A Art. IV. B).

Liberty and Allianz argue that the Bankruptcy Court erred in confirming the Plan because

the TDPs impermissibly shift the burden of the claims allowance process onto the holders of

Indirect Abuse Claims. (*See* D.I. 43 at 13). "In overruling the Insurers' objection to the Plan as

to this issue, the Bankruptcy Court erroneously conflated claim treatment with claim allowance."

(*Id.*) These arguments are not persuasive.

As noted in the Confirmation Opinion, this is an extraordinary case. *In re Boy Scouts of

Am.,* 642 B.R. at 517, 619. The difficulty in adjudicating tens of thousands of tort claims in

bankruptcy cases has led to the creation of streamlined procedures, like the TDPs, to resolve tort

claims under a trust in numerous cases. The TDPs establish an orderly, alternative mechanism to

verify, evaluate, and resolve Abuse Claims, which predominantly involve state law issues,

without overwhelming the Bankruptcy Court. To litigate tens of thousands of claims before the

Bankruptcy Court would take decades and would result in uncertainty and delay. Moreover,

considerable resources would be expended litigating claims, diminishing the assets available for

distribution to Survivors. The TDPs avoid this outcome by permitting Abuse Claims to be

resolved in an effective, fair, and cost-efficient manner, maximizing overall distributions to

Survivors. Providing procedures to facilitate this process and to encourage settlement and

compromise promote important policies of the Bankruptcy Code and should be encouraged. *See,*

116

*e.g., In re Martin*, 91 F.3d at 393 ("[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy'"); *In re Elder*, 325 B.R. 292, 298-300 (N.D. Cal. 2005) (finding "the Plan merely attempts to reduce the number of time-consuming objection hearings by offering parties a chance to settle claims objections through the Plan Administrator prior to requesting a hearing before the court," and "[s]uch compromises should be encouraged in the bankruptcy context.").

If a holder of an Indirect Abuse Claim disagrees with the Trustee's decision regarding its Indirect Abuse Claim, the claimant may seek *de novo* review. (*See* D.I. 1-4, Ex. A, Art. XI.C). As the Bankruptcy Court observed, "the indirect abuse claimants are entitled to a review in front of me and they can argue whatever they want to argue with respect to burden shifting at that point in time and who has the burden when they're in front of me, if that's where they want to be." (Bankr. D.I. 10288 at 89:16-20). Thus, the rights of holders of Indirect Abuse Claims under § 502 of the Bankruptcy Code are protected.

As other courts have noted, so long as claims may receive judicial review, "there is nothing inherently inappropriate" about a plan administrator (or the trustee) "being given the ability to compromise and settle claims objections." *In re Elder*, 325 B.R. at 298-300.

According to Liberty and Allianz, the Bankruptcy Court failed to recognize the distinction between claim allowance and claim treatment, foreclosing them from arguing that the Plan's claims allowance provisions for Indirect Abuse Claims are improper. (*See* D.I. 43 at 21-25). The central premise underlying Liberty and Allianz's plan objection (and argument on appeal) is that the TDPs treated Indirect Abuse Claims unfairly and inequitably compared to Direct Abuse Claims. (*See, e.g.*, Bankr. D.I. 8778 ¶¶ 5, 19, 29 & 33; Bankr. D.I. 8698 ¶ 1). The Bankruptcy Court considered and overruled these objections in that context. "To the extent that Liberty and/or Allianz object to the process of resolving Indirect Abuse Claims because it is

different than the process for resolving Direct Abuse Claims, this objection is overruled.  It is evident that the claims are different in nature and the factors and analysis that go into resolving these claims are, of necessity, different."  *In re Boy Scouts of Am.,* 642 B.R. at 672.

The goal of the TDPs is to avoid litigating tens of thousands of claims.  To achieve this goal—as countless other mass-tort trusts have done—the TDPs request that claimants, both for Direct and Indirect Claims, provide relevant information.   This requirement is not, as Liberty and Allianz contend, an "unjustified burden" or "a gauntlet of requirements."  To the contrary, "the requested information is simply a necessary means of procedural efficiency."  *See In re Heath*, 331 B.R. 424, 436-37 (B.A.P. 9th  Cir. 2005) (agreeing with the "majority" of courts that in the context of claim objections, "creditors have an obligation to respond to formal or informal requests for information"); *In re Hopkins Fabrication, LLC*, 2022 WL 1237794, *20-21 (D. Conn. Apr. 26, 2022) (following *Heath* and noting *Heath* requires creditors to provide requested information "whether or not the proof of claim constitutes prima facie evidence of the claim's validity and amount").  Requesting sufficient documentation from sophisticated parties to aid this process, while also affording judicial review, is not a remarkable procedure.  It does not violate the Bankruptcy Code or the Bankruptcy Rules.

## 2.    The Plan's Treatment of Intra-Insurer Contribution Claims Is Appropriate

Allianz and Liberty assert that the Plan fails in regard to their potential "Recovery Claims."  By "Recovery Claims," they mean contribution or similar claims against the Settling Insurance Companies (which are enjoined by the Plan).  Such claims would arise if a coverage court[16] enters a judgment requiring a non-settling insurance company (such as Allianz and Liberty) to pay more than their share of liability for a particular Abuse Claim or Claims, and

---

[16] A coverage court is simply any court handling coverage litigation.

some of that liability is otherwise allocable to Settling Insurance Companies. Allianz and Liberty contend that the Plan's judgment reduction provisions do not provide an adequate remedy for such Recovery Claims. (*See* D.I. 43 at 25-41). First, Allianz and Liberty complain that "the judgment reduction clause does not fairly compensate [them] for the loss of [Recovery] claims," including their contribution claims. (*Id.* at 27-37). Second, Allianz and Liberty take issue with the judgment reduction provision, which provides that any reduction to which an Insurer is entitled may not be offset from the underlying judgment until the reduction is "final and nonappealable," whereas the full (unreduced) underlying judgment is not so restricted." (*See id.* at 37-41). Accordingly, Allianz and Liberty assert that the Trust may require payment of the underlying judgment before they have the opportunity to offset via a Recovery Claim.

### a. Judgment Reduction Is an Adequate Remedy for the Recovery Claims

Allianz and Liberty argue that the Plan does not fully compensate their contingent future Recovery Claims against Settling Insurers in all circumstances, and, thus, the Plan should not have been confirmed. As BSA and the Future Claimants' Representative point out (D.I. 66 at 267-68; D.I. 81 at 36-37), the Recovery Claims are not constitutionally protected property rights, and they are adequately protected by the Plan's judgment reduction provisions.

Recovery Claims arise only where one insurer has paid "more than its fair share" for claims against its insured. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 209, 215 (1994). Here, as BSA and the Future Claimants' Representative argue, it is unlikely that Insurers will ever be required by judgment to pay "more than their fair share" in the first instance. (D.I. 81 at 81; D.I. 66 at 266-67). Under the TDPs, only the Trust may assert claims for coverage against Insurers. (*See* D.I. 1-4,t Ex. A, Art. X). In other words, the Insurers will never be the subject of a judgment directly for an Abuse Claim. Thus, any judgment against an Insurer will be rendered

119

by a coverage court—which will apply the terms and conditions of their policies that provide, for example, that the policy only provides coverage excess of the Settling Insurance Companies— and which will enter a judgment consistent with those policies.

Allianz and Liberty concede that usually (*i.e.*, to the extent their contribution claim against a Settling Insurer does not exceed the underlying judgment from which it arises), an insurer's rights are protected by the existing judgment reduction clause. (*See* D.I. 43 at 4-5). The issue Allianz and Liberty complain of only occurs if the claim against a Settling Insurance Company exceeds the judgment against it, which they posit may occur with respect to "defense costs associated with [an] Insurance Action and/or Abuse Claim," that it has successfully defended. (D.I. 43 at 35). In such circumstances, Allianz or Liberty would obtain a judgment against the Trust (since suits against the Settling Insurance Companies have to be brought against the Trust) that exceeds whatever it owes the Trust. First, Allianz and Liberty provide no support for the proposition that they would ever have a Recovery Claim against Settling Insurance Companies for the costs of defending a coverage action. Second, despite their complaints, the TDPs streamline and reduce defense costs by resolving claims consensually through an out-of-court process. Thus, the likelihood that an Insurer is saddled with significant costs of defending Abuse Claims in the tort system is small.

Adequate protection need not provide "full" protection; rather, as the name suggests, adequate protection includes that which suffices under the circumstances. *In re Plant Insulation Co.*, 469 B.R. 843, 876 (Bankr. N.D. Cal.) ("The Non-Settling Insurers need not be compensated in full," but conditions should "mitigate the greatest hardships of the injunction" and "should not impose conditions that would undermine the purposes of section 524(g)"), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), *and aff'd on other grounds*, 544 F. App'x 669 (9th Cir. 2013); *see In re O'Connor*, 808 F.2d 1393, 1396-97 (10th

120

Cir. 1987) ("courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis," and is fact finding subject to clearly erroneous review). Many courts have agreed that a judgment reduction clause, like the one in this case, protects this right appropriately. *See In re Duro-Dyne Nat'l Corp.*, 2020 WL 6270691, at *65 (D.N.J. Oct. 23, 2020) (confirming Plan over insurer objection to judgment reduction provision); *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 438, 452-53 (W.D. Pa. 2006) (approving partial settlement of claims where non-settling defendants would "enjoy the benefit of a corresponding judgment reduction for the elimination of its contribution claims against any released party"); *In re Tribune Co.*, 464 B.R. at 179 (proposed plan's bar order was substantively fair to the non-settling defendants because they were protected by the proportionate judgment reduction provision).

In each case where courts have addressed this issue in the mass-tort context, the structures of those plans provided for the continued assertion of claims directly against non-settling insurers in the tort system. *See In re Plant Insulation*, 469 B.R. at 855; *In re Duro-Dyne Nat'l Corp.*, 2020 WL 6270691, at *38. The Insurers' alleged rights here are more speculative and less specific than in those cases. Finally, even the courts in those cases have found that an entitlement to contribution is not sufficiently specific and well-protected to rise to the level of a property right. *See In re Plant Insulation*, 469 B.R. at 881.

Even where a substantial number of injury claims continue to be asserted against non-settling insurers in the tort system, courts have found that insurers are appropriately protected from defense overpayment recovery claims by judgment reduction because the number of claims an insurer must defend is reduced, reducing their defense costs overall. *Id.* at 878. Here, where the TDPs were designed to resolve virtually all claims through out-of-court processes, protection for the Insurers is greatly increased. Their net expenditures for the defense of Abuse Claims are

likely to be substantially reduced by the Plan, rendering the protection provided at least "adequate." In contrast, further protection of this contingent, theoretical right could require the Trust to create reserves and delay payments to claimants, or to expend its resources forecasting these hypotheticals. The *Plant* court recognized the deleterious impact of such a scheme on a trust for personal injury victims. *Id.* at 879.

In support of the proposition that they are entitled to further protection, Allianz and Liberty cite a case decided under Ninth Circuit law, *In re Fraser's Boiler Service, Inc.*, 2019 WL 1099713 (W.D. Wash. Mar. 8, 2019). That decision, as the Future Claimants' Representative points out (D.I. 81 at 41-42), rested on (i) the Ninth Circuit's blanket prohibition against non-debtor releases, a prohibition that the Third Circuit has rejected, (ii) the existence of a separate prepetition contract among insurers as the basis for contribution claims, which does not exist here, and (iii) a plan structure that contemplated non-settling insurers would continue regularly defending claims in the tort system. The *Fraser's Boiler* decision is not compelling here.

### b.   The Judgment Reduction Clause's Mutually Applicable Finality Requirement Does Not Render the Plan Unconfirmable

Allianz and Liberty object to the "finality requirement" in the judgment reduction provision, which they say requires that their entitlement to a contribution claim must be reduced to a final judgment before the Trust must reduce its judgment against the Insurers if their judgment is to offset the Trust's judgment. (D.I. 43 at 37-41). Allianz and Liberty acknowledge only in passing that the Plan's judgment reduction provision was modified to provide that the Trust "shall not seek to enforce" its own judgment until the Insurers' claim becomes final and non-appealable—an issue which they won. (*Id.* at 40). Thus, the harms that Allianz and Liberty speculate may befall them if the Trust seeks to enforce its judgment before final judgment on any contribution claim is foreclosed by the Plan. Notwithstanding, Allianz and Liberty complain this

additional language is "cold comfort" because it lacks a specific enforcement mechanism.  (*Id.*)
However, they cite no evidence for the proposition that the Trustee is likely to ignore the
governing Plan Documents, and they can enforce this provision as any party would enforce
restrictions or limitations on the Trustee's powers—by seeking injunctive protection or damages
from a court of competent jurisdiction.  That Allianz and Liberty do not receive their preferred
judgment reduction mechanisms did not render the Plan unconfirmable.

For these reasons, I find no error in the Bankruptcy Court's rulings with respect to the
Plan's provisions addressing Indirect Abuse Claims and the judgment reduction provisions.

### F.   The Bankruptcy Court Correctly Determined that the Plan Was Proposed in Good Faith Pursuant to § 1129(a)(3)

Certain Insurers argue the Plan was not proposed "in good faith."  This argument is not to
be confused with whether the bankruptcy petition was filed in good faith.   Certain Insurers do
not challenge a single factual finding underlying the Bankruptcy Court's good faith
determination.  (*See* D.I. 144, 2/9/2023 Hr'g Tr. at 14:17-14:24).  The main thrust of their
argument on appeal is that the Bankruptcy Court erroneously "took a piecemeal approach"—that
it considered, in isolation, each of the issues raised by Certain Insurers with respect to the Plan
and determined that no single aspect of the Plan alone demonstrated a lack of good faith.  (*See*
D.I. 45 at 3; *id.* at 67 (arguing that the Bankruptcy Court "erroneously analyzed the record
evidence piecemeal, concluding that certain elements such as the explosion of claims or BSA's
proposed findings, did not in isolation demonstrate a lack of good faith.")  Had the Bankruptcy
Court properly considered the issues raised by Certain Insurers together as a whole, under the
applicable totality of the circumstances approach, Certain Insurers argue, the Bankruptcy Court
would have drawn a different conclusion.  Instead, the Bankruptcy Court "missed the forest for
the trees and confirmed a plan that was likely to inflate the number and value of claims

regardless of merit and seeks to hamstring insurers' ability to defend themselves. This is not good faith, and the bankruptcy court committed reversible error in holding otherwise." *Id.* at 67-68.

I agree with BSA that Certain Insurers are not really arguing for a different conclusion based on a totality of the circumstances approach. Rather, what Certain Insurers seek are "different underlying factual findings to support a different conclusion." (D.I. 131). Indeed, Certain Insurers assert that the Bankruptcy Court should have found that BSA colluded with survivors (D.I. 45 at 45–51), that the Plan inflated claim values (*id.* at 25–31), that the Plan abrogated insurance rights (*id.* at 32–34), that the Plan bound insurers to pay awards (*id.* at 37), and that the Plan eliminated insurer coverage defenses (*id.*). The Bankruptcy Court's findings on each of these matters is subject to a clear error standard of review. None of these findings support a legal conclusion that the Plan was not proposed in good faith.

### 1.      Applicable Standards

#### a.      Standard of Review

In the context of determining whether a bankruptcy petition (as opposed to a plan) was filed in good faith, the Third Circuit recently explained that such a conclusion is an "ultimate fact." *In re LTL Management,* 58 F.4th 738, 753 (3d Cir. 2023). As the Third Circuit explained:

> Facts subject to clear-error review include those that are basic, the historical and narrative events elicited from the evidence presented at trial, and those that are inferred, which are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the basic facts. These are distinguished from an "ultimate fact," which is a legal concept with a factual component. Examples include negligence or reasonableness. Reviewing an ultimate fact, we separate its distinct factual and legal elements and apply the appropriate standard to each component.
>
> Concluding a bankruptcy petition is filed in good faith is an "ultimate fact." While the underlying basic and inferred facts require clear-error review, the

culminating determination of whether those facts support a conclusion of good faith gets plenary review as essentially a conclusion of law.

*Id.* (internal citations and quotations omitted).

Following briefing, Certain Insurers filed a letter brief explaining that the *In re LTL Management* decision should be considered in my determination of the standard of review applicable to the Bankruptcy Court's good faith determination under § 1129(a)(3). According to Certain Insurers, "*LTL* confirms that whether a debtor has demonstrated good faith is a legal question subject to *de novo* review." (D.I. 130 at 1). Thus, Certain Insurers assert, this Court "takes a fresh look at the bankruptcy court's analysis." *See id.* (quoting *In re LTL*, 58 F.4th at 753) (internal quotations omitted). Assuming that a good faith determination is an "ultimate fact" for purposes of § 1129(a)(3) as well,[17] basic and inferred facts underlying the good faith determination are still reviewed for clear error. *In re LTL*, 58 F.4th at 753. Plenary review is applied only to the "culminating determination of whether those facts support a conclusion of good faith." *Id.*

**b.    Good Faith Determination**

---

[17] This is not an obvious conclusion. *See In re Plant Insulation Co.*, 544 F. App'x 669, 671 (9th Cir. 2013) ("The bankruptcy court's finding of good faith is evaluated for clear error."). The Third Circuit has explained:

> The question of whether a Chapter 11 bankruptcy petition is filed in good faith is a judicial doctrine, distinct from the statutory good faith requirement for confirmation pursuant to § 1129(a)(3). The judicial doctrine inquires into the motivation for proceeding in bankruptcy, and requires an examination of all of the facts and circumstances and depends upon an amalgam of factors, none of which is dispositive. In contrast, the good-faith confirmation requirement is narrower and focuses primarily on the plan itself, and on whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

*In re Am. Capital Equipment, LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (internal quotations and citations omitted).

Section 1129(a)(3) provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C § 1129(a)(3). "For purposes of determining good faith under section 1129(a)(3), the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Abbotts Dairies*, 788 F.2d at 150 n.5 (cleaned up) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).

"In its assessment, the court should keep in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re W.R. Grace*, 475 B.R. at 87 (cleaned up). "The factors which a court should consider in determining a debtor's good faith include if the plan: (1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [reflects] a fundamental fairness in dealing with the creditors." *Id.* at 87-88 (citation omitted). Courts examine the "totality of the circumstances" when analyzing these factors, none of which is dispositive. *Id.* at 88. As the Bankruptcy Court correctly observed, "[T]hat there might be another plan, or even a better one, is not grounds to find a lack of good faith." *In re Boy Scouts of Am.*, 642 B.R. at 660; *see also In re Tonopah Solar Energy, LLC*, 2022 WL 982558, at *8 (D. Del. Mar. 31, 2022) (affirming finding of good faith under § 1129(a)(3) "[e]ven assuming a better settlement could be reached"); *In re Spansion, Inc.*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) ("Even assuming the Alternative Rights Offering provides 'a better deal' for some creditors, the Debtors' refusal to accept the proposal does not, on its own, demonstrate 'bad faith.'") (citing *In re Celotex Corp.*, 204 B.R. 586, 611-12 (Bankr. M.D. Fla. 1996)).

Bankruptcy Courts have "considerable discretion" in making the "factually specific," "case-by-case" determinations involved in analyzing good faith. *In re W.R. Grace*, 475 B.R. at

87.   A bankruptcy court's factual findings "may only be overturned if they are 'completely

devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'"

*Fruehauf Trailer*, 444 F.3d at 210 (quoting *Citicorp Venture Capital*, 323 F.3d at 232).

### 2.      The Good Faith Determination Is Well Supported by the Record

Certain Insurers assert that the Bankruptcy Court "never answered the fundamental

question whether the plan as proposed was in good faith." (D.I. 45 at 67).  I disagree.  The

Bankruptcy Court literally found that the "Plan has been proposed in good faith."  (D.I. 1-1 ¶

II.D).  The record reflects that the Bankruptcy Court's determination was based on its

consideration of the totality of the circumstances and an overwhelming volume of evidence that

was largely uncontroverted.

"The Supreme Court of the United States has specifically identified two purposes of

Chapter 11 as: (1) preserving going concerns; and (2) maximizing property available to satisfy

creditors." *In re W.R. Grace*, 475 B.R. at 88 (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203*

*N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)); *see also In re Thgh Liquidating LLC*, 2020 WL

5409002, at *7 (D. Del. Sept. 9, 2020) (One "honest" purpose in developing a plan of

reorganization is to "maximiz[e] value for the Debtors, their estates, and their creditors.").  Here,

the Bankruptcy Court correctly concluded that the Plan was proposed in good faith because it is

consistent with the purposes and objectives of the Bankruptcy Code: "The Plan fosters a result

consistent with the Code, is proposed for the purpose of reorganizing and delivers value to

creditors." *In re Boy Scouts of Am.*, 642 B.R. at 645; D.I. 1-1 ¶ II.D.

The record establishes that, after filing the chapter 11 cases due to the "tremendous

financial pressure" imposed by the sharp increase in the number of Abuse Claims, BSA

maintained two consistent objectives: (1) to timely and equitably compensate abuse survivors

and (2) to emerge from bankruptcy with the capability to continue to carry out its charitable

mission. "[T]he Plan contains a series of compromises that represent a good faith effort to achieve consensual resolution, maximize recoveries for creditors, resolve Scouting-related Abuse Claims as a whole, and provide recoveries for abuse survivors through the Settlement Trust." (Bankr. D.I. 9280 ¶ 43; ¶ 55). "[T]he organization, through the efforts of many of the insurers and chartered partners, and our local council partners have been able to forge a pathway . . . to emerge from this process while achieving the twofold objectives that the Boy Scouts of America set out to do, which were, one, to equitably compensate our victims, two, to allow the mission of Scouting to continue." (Bankr. D.I. 9341 at 41:20-25 (Desai)).). Certain Insurers did not introduce any evidence refuting BSA's intent to compensate creditors and to reorganize. The Bankruptcy Court therefore credited unrefuted evidence of BSA's intention to reorganize through "a global resolution that balanced the competing interests of Chartered Organizations, Insurance Companies, and abuse survivors" and "provided the BSA with the opportunity to survive the Bankruptcy and fulfill its mission of Scouting." (Bankr. D.I. 9279 ¶ 23).

Certain Insurers did not dispute that BSA's plan to compensate survivors and reorganize BSA is consistent with the purposes and objectives of the Bankruptcy Code. Consequently, the Bankruptcy Court did not err in finding that "the Plan fosters a result consistent with the [Bankruptcy] Code, [and] is proposed for the purpose of reorganizing and delivers value to creditors." *In re Boy Scouts of Am.*, 642 B.R. at 645; (D.I. 1-1 § II.D). "Overall, I find that the claims being compromised bring significant value to the estate, enabling Debtors to fund the Settlement Trust with substantial insurance proceeds in a timely fashion." *Id.* at 568. "Many survivors have been waiting for thirty, forty or even fifty years to tell their stories and receive a meaningful recovery. This Plan makes that happen." *Id.* at 613.

### 3.   The Bankruptcy Court Properly Considered the Totality of the Circumstances

Certain Insurers assert that the Bankruptcy Court "analyzed the record evidence piecemeal, concluding that [the evidence] . . . did not in isolation demonstrate a lack of good faith." (D.I. 45 at 67).   I find no support for this contention.   The Bankruptcy Court stated at the outset of the Confirmation Opinion, "These findings of fact draw on the trial testimony and the admitted exhibits." *In re Boy Scouts of Am.*, 642 B.R. at 521 n.1.   The Bankruptcy Court considered the testimony of twenty-six witnesses, including "portions of six video depositions," "over one thousand exhibits," "designated and counter-designated portions of eight depositions," and "six days of oral argument." *Id.* at 552-53.   In resolving countless confirmation-related issues and objections, the Bankruptcy Court analyzed and cited to the record evidence hundreds of times.   The Confirmation Opinion contains 765 footnotes, a sizeable portion of which cite evidence from the trial record.   The section of the Confirmation Opinion addressing the Debtors' satisfaction of the good faith requirement alone contains approximately fifty citations to the evidentiary record (i.e., references to declarations, submitted evidence, and trial testimony)—the aggregation of all of the evidence admitted at trial.   *See id.* at 521 n.1; *id.* at 633 n.558.   The Bankruptcy Court's analysis demonstrates that the totality of evidence included Plan negotiations, mediation efforts, the terms of the Plan, the TDP, including the Claims Matrix, the professionals that structured and documented the arrangement, the careful consideration of BSA's board and committees, the views of representative survivors, and the support of every major constituency in the case.

In support of their argument that the Bankruptcy Court considered each piece of evidence in isolation, Certain Insurers quote the Bankruptcy Court's finding, "I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation." (D.I.

45 at 67 (quoting *In re Boy Scouts of Am.*, 642 B.R. at 652)). But the use of the word "alone"

here does not indicate that the issue was viewed in isolation. Rather, the Bankruptcy Court used

the word "alone" in responding to the Certain Insurers' "argument that this 'explosion' of claims

alone is grounds to deny confirmation of the Plan." *Id.* (citing witness testimony and

summarizing Certain Insurers' argument). Other excerpts of the Confirmation Opinion cited by

Certain Insurers also do not reflect or support their contention that the Bankruptcy Court viewed

each argument or piece of evidence in isolation. (*See* D.I. 45 at 67).

That the Bankruptcy Court added or removed some provisions of the Plan was also

"legally erroneous," Certain Insurers argue: "A bankruptcy judge determining whether a plan is

proposed in good faith is not tasked with simply removing portions of the plan that it finds

problematic. If the plan as a whole is proposed with ulterior motives, it should not be

confirmed." (*Id.* at 69). In support of this argument, Certain Insurers cite cases holding that the

good faith inquiry should be focused "more to the process of plan development than the content

of the plan." (D.I. 45 at 69 (quoting *In re Emerge Energy Servs. L.P.*, 2019 WL 7634308, at *16

(D. Del. Dec. 5, 2019) and citing *In re RTI Holding Co.*, 2021 WL 4994414, at *9 (Bankr. D.

Del. 2021) ("The requirement of § 1129(a)(3) 'speaks more to the process of plan development

than to the content of the plan.'")).[18] Certain Insurers do not dispute that "the [bankruptcy] court

in this case improved the plan by directing BSA to strike the prejudicial findings and permitting

insurers to defend themselves in coverage litigation, just as it did when it required the proposal

of ani-fraud measures" (*Id.*) But in Certain Insurers' view, "The very fact that BSA was forced

to improve these and other individual aspects of the plan merely shows that BSA has yet to come

---

[18] I am not sure that I agree with "the process" being more important than "the content." The
Third Circuit cases seem to be more concerned with the content. In any event, I assume the
importance of the process for the sake of this opinion.

to the court with clean hands with respect to the plan as a whole; BSA proposed a plan for illegitimate purposes, and the bankruptcy court was forced to solve (part of) the problem." (*Id.* at 72). Certain Insurers cite no authority for their argument that a plan modified to come into compliance with the confirmation opinion is then not proposed in good faith (because it was the bankruptcy court that guided the modification).

As discussed below, I find no support in the record for Certain Insurers' argument that the Plan was proposed with ulterior motives, that the Plan's development process suffered from BSA's unclean hands, or that the Plan process otherwise indicates a lack of good faith.

### 4.     Allegations of Bad Faith Are Not Supported by the Evidence

Certain Insurers' primary challenge to the Plan is based on their assertion that the Trust (through its Trustee) will award "inflated claim values" that are "worlds apart from BSA's prepetition claims history[,]" which the Certain Insurers will be required to pay. (D.I. 45 at 2, 5, 60-68, 72-74). Certain Insurers introduced no evidence to support those arguments or to show that the Bankruptcy Court committed clear error in rejecting their position.

### a.     There Is No Support for the Allegation that the Plan Inflates Claims

The record supports the Bankruptcy Court's finding that the Settlement Trust is intended to replicate the BSA's prepetition claim history—not inflate the value of the claims. (Bankr. D.I. 9309 ¶¶ 9-10; Bankr. D.I. 9273 ¶¶ 49-63). The lead developers and drafters of the TDP and related documents were law firms and an economics firm. (*See generally* Bankr. D.I. 9309; *see also id.* ¶ 12). Mr. Azer was a lead attorney, and the economist team was led by Dr. Bates. The record reflects that Mr. Azer and Dr. Bates met repeatedly with Mr. Griggs (BSA's national coordinating counsel) to understand and document BSA's prepetition practices and experiences. (Bankr. D.I. 9309 ¶ 4-10; Bankr. D.I. 9273 ¶¶ 49-50). Mr. Azer testified that he and teams of

lawyers drafted the TDP, including criteria for claims and mitigating and aggravating factors, based on BSA's prepetition practices and experiences. (Bankr. D.I. 9309 ¶¶ 4-10). Mr. Griggs testified that the TDP is consistent with BSA's prepetition practices and experiences, which he in fact determined and supervised. (Bankr. D.I. 9273 ¶¶ 9, 52-63). Certain Insurers introduced no evidence to refute Mr. Griggs's testimony about prepetition practices and experience, or Mr. Azer's and Mr. Griggs's testimony that the TDP is consistent with those prepetition practices.

The Claims Matrix—the section of the TDP that provides guidance as to valuing claims—was formulated by the economist team, led by Dr. Bates, and the record reflects that he and his team have vast experience in structuring trust distribution procedures in mass tort cases. (Bankr. D.I. 9454 at 95:6-22). Dr. Bates testified that his assignment was to design the TDP base matrix values and scalars that were consistent with BSA's historical abuse settlements and litigation outcomes. (Bankr. D.I. 9455 at 31:22-32:7). Dr. Bates further testified that the TDP base matrix values and scalars were designed to be used by the Settlement Trustee to emulate the tort system and to replicate the values that Abuse Claims would have received had they been litigated outside of the chapter 11 cases. (Bankr. D.I. 9454 at 96:14-20). Dr. Bates further testified that, in his expert opinion, the combination of base values and scalars set forth in the TDP was consistent with the BSA's historical abuse claim settlement values. (Bankr. D.I. 9454 at 226:1-4).

> The base matrix values and scal[a]rs that are at hand for the trustee to be able to valuate the individual claims and assign to them appropriate values that would be consistent with those claims as if they were filed in the tort system, but perhaps even better than that in that they would be able to be consistently applied and equitably applied across all of the claimants by having the same procedures used for all of them.

(Bankr. D.I. 9454 at 98:2-9).

Certain Insurers challenge good faith in developing the TDP, arguing that the prepetition claim pool differs from the post-petition claim pool. (*See* D.I. 45 at 3, 21-22). The TDP specifically accounts for those differences, however, through mitigating and aggravating factors and scalars to ensure that new claims are treated consistently with prior practices. (Bankr. D.I. 9454 at 207:15-209:12, 223:11-224:12; Bankr. D.I. 9455 at 33:2-5; *see also* Bankr. D.I. 9406 at 294:10-295:11 (Azer); D.I. 1-4, Ex. A., Art. VIII.C-D). Dr. Bates testified that because of the differences between the claims pools, the value of the average post-petition claim is estimated to be lower than the average prepetition claim. (Bankr. D.I. 9454 at 164:11-14; *id.* at 135:13-15; *id.* at 209:8-10 ("[M]ost of the claims will, to emulate the tort values, be scaled downward from the base matrix values…by design."). The Bankruptcy Court credited Dr. Bates's unrebutted opinion that the TDP will result in awards at lower average values, not inflated values:

> The result of [Dr. Bates's] thought experiment confirmed his view that the value of a Direct Abuse Claim, on average, will be less than the average value of Historical Abuse Claims although the aggregate of such claims could be significant…Dr. Bates' analysis was thorough and credible based on the data available. It was also undisputed….Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims.

*In re Boy Scouts of Am.*, 642 B.R. at 557.

The argument that the TDP inflates claim values was also refuted by Michael Burnett of Burnett Risk Control International, LLC, an expert who opined on the reasonableness of the TDP based on his experience evaluating and assessing sexual abuse claims in litigation for over 26 years. (Bankr. D.I. 9274 ¶ 5). Mr. Burnett has evaluated and valued thousands of abuse claims, including over 500 abuse claims in the last year alone, and testified that the TDP is reasonable. (Bankr. D.I. 9274 ¶ 6; Bankr. D.I. 9389 at 42:1-3 ("[M]y opinion is that the TDP mimic what you might get in the tort system and I believe that the TDPs are reasonable.")).

Certain Insurers introduced no evidence contradicting the testimony of these expert witnesses or to otherwise support their argument that future claim values will be inflated. While Certain Insurers retained an economist to rebut Dr. Bates, ultimately they "chose not to use their expert during the confirmation hearing to support their argument that the TDP produce over-inflated values." *In re Boy Scouts of Am.*, 642 B..R at 651. Accordingly, the Bankruptcy Court found the Insurers' position unsupported:

> The Certain Insurers could have chosen to put on their expert to challenge the Base Matrix Value or otherwise clear up any confusion, but they did not. This appears to be all optics. Any misperception, especially when the Certain Insurers chose not to challenge the Base Matrix value through their own expert, is not so egregious as to deny confirmation.

*Id.*; (Bankr. D.I. 9616 at 44:18-45:1).

### b. The Plan Does Not Require Insurers to Pay Future Inflated Awards

Certain Insurers argue that, "at the request of the Coalition [of Abused Scouts for Justice], BSA inserted a number of proposed plan provisions that, combined with the Claims Matrix, were intended to bind non-settling insurers in coverage litigation to inflated claim payments and deprive insurers of any means to challenge the Trustee's determinations." (D.I. 45 at 77). I find no support for the contention that the Plan requires Insurers to pay future inflated awards. Indeed, the Bankruptcy Court held that Certain Insurers would not necessarily be bound by the awards issued by the Settlement Trust: "the allowed amount of a claim does not necessarily correlate to what an insurer is 'obligated to pay' or what 'a loss' is under its insurance policy and 'a finding in the plan' does not equate the two." *In re Boy Scouts of Am.*, 642 B.R. at 632. Rather, a coverage court will determine whether awards are covered by any particular insurance policy to the extent that there is a dispute in the future about that matter:

> The Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions

precedent or obligations under such policies (other than, in the case of the BSA
Insurance Policies, the terms of any policies or provisions of applicable law that
are argued to prohibit the assignment or transfer of such rights), shall be
determined under the law applicable to each such policy in subsequent litigation.

(D.I. 1-1 ¶ II.I.2(e)); *see also In re Boy Scouts of Am.*, 642 B.R. at 632 ("What insurers are

obligated to pay under their policies is an insurance coverage issue that is not before the court.");

*id.* at 656 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP

or any confirmation order that may be entered."). Moreover, as discussed, I find no error in the

Bankruptcy Court's determination that the Plan explicitly preserves any defenses that the Certain

Insurers may have. Consequently, if Certain Insurers are correct in predicting that awards will

be inflated, they will be able to defend against coverage to the same extent they would have been

able to defend against coverage for a settlement made without a trust. Courts have recognized

that this is enough to protect insurers. *See In re W.R. Grace*, 446 B.R. at 132 ("[T]he mere fact

that the Trust pays a claim does not bind the non-settling insurer to reimburse the Trust. The

insurer retains its right to object to the claim against it if and when the Trust seeks to recover

from the insurer.").

### c.  No Evidence that the Plan Is Designed to Leverage Insurers

Certain Insurers repeatedly argue that the Plan is designed to create "hydraulic pressure

to settle," colorfully asserting that the Plan was designed to point "an 82,000 claim bazooka at

Insurers [to] create[] 'hydraulic pressure' to settle that serves no legitimate purpose." (*See* D.I.

45 at 6). As BSA points out (D.I. 66 at 66), this argument is based on the faulty premise that

Certain Insurers are bound by future awards.

There is no evidence that the Plan was intended to leverage the Certain Insurers to settle.

The record reflects that the Plan was designed to serve the legitimate purpose of compensating

survivors of childhood abuse in a cost-effective and expedited way, and to allow the Reorganized

135

BSA to continue its charitable mission of delivering Scouting. As BSA points out, it does not stand to reason that the settling parties formulated a record-breaking Settlement Trust, funded primarily by insurance companies, not for the purpose of fairly compensating Survivors, but rather to somehow leverage the remaining Insurers. Rather, the unrefuted evidence is that the TDP were designed to emulate, to the greatest extent practicable, the prepetition practices of the BSA and its insurance companies for investigating, evaluating, valuing, and resolving Direct Abuse Claims, while simultaneously preserving all of the rights of the Non-Settling Insurance Companies to dispute and litigate coverage issues with the Settlement Trust. (Bankr. D.I. 9309 ¶ 5; *see also* Bankr. D.I. 9406 at 292:17-293:11, 293:20).

### d. No Support for Allegation that Debtors Failed to Negotiate

Certain Insurers allege that BSA "ceded the pen" on the TDP to Survivors, and never negotiated at all with Certain Insurers.[19] Indeed, the Certain Insurers were successful in invading mediation privilege based on those allegations. *In re Boy Scouts of Am.*, 642 B.R. at 646 ("Because of their allegations of bad faith, I permitted insurers to take discovery into the mediation process with respect to the development of the TDP."). Certain Insurers further argue that the protections for the Insurers "were nearly always gutted or removed by the claimants'

---

[19] Following completion of appellate briefing, Certain Insurers filed the Motion to Supplement the Record (D.I. 123) which seeks to add to the record certain recent applications, filed by counsel to the Coalition, the Pfau/Zalkin claimants, and RCAHC, which seek Bankruptcy Court allowance of their professional fees on the basis that they have made "substantial contributions" to BSA's chapter 11 cases. These applications contain time entries and assertions of work undertaken by counsel which, Certain Insurers argue, support Certain Insurers' contentions that the Plan was not proposed in good faith—*e.g.*, that the Plan is a result of a "claimant-driven process," and that, as a result of the attorneys' work, "Survivors will receive enhanced compensation." BSA argues that Certain Insurers should not be permitted to reopen the record on appeal to introduce more than three thousand pages of hearsay material that is not part of the trial record. (*See* D.I. 128 at 6). I agree with BSA that admitting untested statements, that are not part of the trial record, after briefing has been completed, would be unfair to Appellees and not helpful to the Court. Accordingly, the Motion to Supplement the Record is denied.

attorneys . . . [a]nd BSA allowed it to happen." (D.I. 45 at 40).  I find no support for these
contentions.

The record reflects that BSA's attorney, Mr. Azer, was a lead drafter of the TDP, and he
testified that BSA had the pen, not the Survivors, and that he never gave up control of the
documents to the Survivors or to anyone else.  (Bankr. D.I. 9309 ¶ 7).  "Q: And had the debtors
ceded control of the plan process to the coalition, Tort Claimants' Committee, and FCR? Azer:
No, absolutely not . . . Like I said throughout my testimony, we were playing it straight down the
fairway, trying to protect everyone's rights, including insurers' contractual rights."  (Bankr. D.I.
9406 at 298:11-21 (Azer)).   Indeed, Mr. Azer testified that the Survivors had no input into the
initial draft, that BSA rejected the survivor model, and that he and other counsel drafted the
initial TDP based on a model provided by an insurer.  Mr. Azer's testimony was supported by
the contemporaneous records.  (Bankr. D.I. 9406 at 37:20-48:14; Bankr. D.I. 9309 ¶¶ 14-23;
A11673; A11696; see also SA 2146, SA 2176, SA 2196, SA 2197, SA 2246, SA 2267; Bankr.
D.I. 9406 at 37:20-38:1; D.I. 1-3 at 214).  The record reflects that BSA also relied on other mass
tort bankruptcy trust distribution procedures.  (Bankr. D.I. 9406 at 39:13-24).

With those templates as a starting point, BSA created TDPs with the goal of emulating, to
the greatest extent practical, BSA's prepetition practices for resolving sexual abuse claims.
(Bankr. D.I. 9309 ¶¶ 5, 9, 42-44; Bankr. D.I. 9406 at 73:5-9).  To that end, Mr. Azer consulted
with Mr. Griggs who provided the extensive, real-world background that informed (a) the criteria
for determining claim validity, and (b) the types of aggravating and mitigating factors considered
by the BSA in resolving abuse claims on a prepetition basis.  (Bankr. D.I. 9309 ¶¶ 9, 10; Bankr.
D.I. 9273 ¶¶ 49-50).  "The Debtors exercised good faith throughout the whole process, taking
into consideration both the interests of the Direct Abuse Claimants and the Non-Settling
Insurance Companies.  The BSA never ceded control of the TDP . . . to any other party (be it a

claimant constituency or an insurance company) or colluded with any third party to prejudice the rights of another." (Bankr. D.I. 9309 ¶ 7). Mr. Azer's testimony was not refuted. Indeed, the record reflects that the Certain Insurers did not cross-examine him at trial on this issue.

BSA also relied on its expert consultant, Bates White, economists with expertise on TDPs and claim valuation, to identify base claim values, as well as the amount of the aggravating scaling factors and mitigating scaling factors, that would produce results consistent with the BSA's prepetition practices. (Bankr. D.I. 9309 ¶ 12). The record supports that the Bates White team developed the Claims Matrix based on the BSA's data for prepetition claims resolutions and comprehensive statistical modeling and analyses. (Bankr. D.I. 9454 at 201:10- 230:5). "Dr. Charles Bates, chairman of Bates White LLC and Debtors' retained expert was qualified without objection as an expert in claim valuation, mass tort matrixes and trust distribution procedures. He spent eight hours on the stand." *In re Boy Scouts of Am.*, 642 B.R. at 553. "Dr. Bates's analysis was thorough and credible based on data available. It was also undisputed. No other expert testified on the aggregate valuation of the Direct Abuse Claims." *Id.* at 558. The Bankruptcy Court found:

> Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for the purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims. Accordingly, I conclude based on the record of evidence presented and the information known to date regarding the Direct Abuse Claims, that the aggregate valuation of the Direct Abuse Claims is most likely between $2.4 billion and $3.6 billion.

*Id.* at 65-66.

The evidence demonstrates that BSA protected the interests of Certain Insurers, even though they were not settling. (Bankr. D.I. 9309 ¶ 26; Bankr. D.I. 9406 at 40:18-42:19). The written contemporaneous record demonstrates that Mr. Azer negotiated against the Coalition, persistently including protections for the Insurers after they had been stricken by the Coalition.

138

Mr. Azer "in minute detail" walked the Bankruptcy Court through multiple versions of negotiated TDP drafts, demonstrating how and where the BSA protected any existing rights of the Insurers. *In re Boy Scouts of Am.*, 642 B.R. at 646-47. After numerous exchanges of drafts over several months, the parties agreed the Plan should provide that none of the Insurers' rights or obligations were being modified, and preserving any coverage defenses they had. (Bankr. D.I. 9309 ¶¶ 27-41). The Plan proves that those protections demanded by BSA, and repeatedly rejected by the Coalition, are included. Although there were drafts that repeated the same Insurer protection language in multiple provisions, the record supports a finding that those protections were ultimately consolidated because repetition added nothing and "the broad general protections in Article V.C would be clearer, less ambiguous, and protected the interests of Non-Settling Insurance Companies." (Bankr. D.I. 9406 at 149:14-25). The Bankruptcy Court correctly found that consolidating the protections into one provision, rather than including them in several provisions, was a matter of "drafting conventions". *In re Boy Scouts of Am.*, 642 B.R. at 648.

Finally, Certain Insurers' argument that BSA was incentivized to buy votes from Survivors by settling on certain issues is unsupported by evidence. (D.I. 45 at 2, 88-89). The fact that BSA negotiated a settlement with Survivors, however, demonstrates good faith, not bad faith. Negotiations for plan support do not prove, or remotely support, bad faith. Debtors negotiate with creditors in every case and need creditors' support for a consensual plan of reorganization. As the Bankruptcy Court noted, "Debtors are supposed to negotiate plans, as are official committees (i.e., the [Tort Claimants' Committee]). Other constituencies are often involved." *In re Boy Scouts of Am.*, 642 B.R. at 626. BSA could not dictate the terms of an agreement with Survivors, so BSA negotiated in mediation with stakeholders who were willing to engage. (Bankr. D.I. 9309 ¶ 20). Mr. Azer testified, "The insurers were not willing to engage

constructively to seek a mutually agreeable resolution with any sort of creditor support." (*Id.* ¶

47). "They did not provide input into the [TDP] . . . . [I]nsurers basically refused to provide

comments. They threatened us with kind of multi-year litigation if we proceeded." (Bankr. D.I.

9406 at 47:11-15).

### e. Allegations of Collusion Are Unsupported

Certain Insurers introduced no evidence to support their allegations of collusion.

The Bankruptcy Court noted:

> Because of their allegations of bad faith, I permitted insurers to take discovery
> into the mediation process with respect to the development of the TDP. In their
> confirmation objection, the Certain Insurers represent that "the results of that
> discovery were damning." I disagree. The record developed at trial shows that
> Mr. Azer, Debtors' insurance counsel, penned the initial draft of the TDP . . . .
> Thereafter Mr. Azer never gave up the pen. Mr. Azer testified that Debtors had
> an interest in the TDP because they needed a confirmable plan and that they spent
> significant time negotiating protections for the insurers' contractual rights.

*In re Boy Scouts of Am.*, 642 B.R. at 646. And,

> Based on this record, I cannot find that Debtors colluded with the Coalition or
> other plaintiff representatives to intentionally deprive insurers of their rights. I
> cannot find that Debtors abdicated their responsibility to negotiate a plan or
> proceeded in bad faith. . . . The Certain Insurers' arguments that Debtors colluded
> with the Coalition, rather than negotiated with the Coalition, is wholly
> unsupported by the record.

*Id.* at 648. These findings are not clearly erroneous.

### f. Remaining Allegations Do Not Demonstrate Lack of Good Faith

***Explosion of claims.*** Certain Insurers argue that the Bankruptcy Court committed clear

error in finding that the Plan was proposed in good faith where there has been "an explosion of

claims" and the "tens of thousands of meritless or questionable claims was never addressed in

this plan." (D.I. 45 at 72). "Rather than seek disallowance of such claims, or propose a plan

that fairly accounted for its actual liability, BSA baked that lack of good faith *into its plan*." (*Id.* at 61).

The proofs of claim were filed by November 16, 2020, long before the Plan was proposed, so it is unclear how the filing of claims factors into an analysis of whether the Plan was proposed in good faith. Certain Insurers cannot impute to BSA the conduct of the plaintiffs' attorneys in soliciting clients. And BSA took certain steps to mitigate the potential for fraud. The record reflects that BSA sought to supplement the Bar Date Order to prevent "what Debtors deemed to be false and misleading statements." *In re Boy Scouts of Am.,* 642 B.R. at 534; (Bankr. D.I. 1145 ¶ 42). As a result of these efforts, the Bankruptcy Court entered the Supplemental Bar Date Order prohibiting the plaintiffs' bar from "continuing to make statements (i) suggesting that abuse claimants may remain anonymous, (ii) indicating a specific value of any potential compensation trust, and (iii) suggesting that abuse claimants will never have to be deposed, appear in court or otherwise prove their claims." *In re Boy Scouts of Am.,* 642 B.R. at 534; (Bankr. D.I. 1331 ¶ 10.A).

Certain Insurers introduced no evidence that any of the claims were invalid. Certain Insurers cite the fact that there were 1,700 abuse claims filed prepetition, and then 82,209 filed post-petition (D.I. 45 at 72-73), but the fact that a bankruptcy proceeding—which will result in a discharge of BSA's liability—attracted the attention of the plaintiffs' bar and Survivors does not prove that the claims are invalid (or provide any ground to not account for them in a plan of reorganization). Certain Insurers had access to all 82,209 proofs of claims and did not challenge a single one. Certain Insurers did introduce evidence about certain group filings at the deadline, but an attorney's effort to preserve claims before they expire does not prove fraud. (*See* Bankr. D.I. 9517 at 221:15-224:21 (explaining that proof of claim forms were submitted, and sometimes

141

signed on behalf of claimants, at or near the bar date "to protect them from a Draconian bar date in a pandemic" and "avoid the Draconian consequences of missing the bar date")).

Certain Insurers further assert that the "claimants' own expert recognized [that] a significant portion [of claims] are likely fraudulent." (D.I. 45 at 2). They cite to a statement made by a witness who was not retained or qualified as an expert to evaluate the prevalence of fraud in the claim pool, and who did not evaluate the claim pool. (*See* Bankr. D.I. 9517 at 197:17-24 (proffering Dr. Conte as an expert witness to opine on the characteristics of the allegations, survivor profiles, and legal issues presented by the proofs of claim, but not to evaluate the claim pool for instances of fraud)). Dr. Conte said during a deposition that his reaction was that, given the number of claims, "a significant portion of that 80,000 . . . are probably not real claims," without defining what would constitute a significant portion or providing any data or analysis to support his belief, much less a report. (Bankr. D.I. 9517 at 202:20-22). *See Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at *7 (D. Del. Sept. 4, 2019) (excluding opinion that contains "no actual analysis"). But the number of claims alone does not indicate fraud, as BSA has served more than 130 million Americans since its inception (Bankr. D.I. 16 ¶ 6), and Dr. Conte's testimony indicates no awareness of that total or whether the number of claims—representing 0.06% of the population—was unreasonably large given the total population. In contrast, Dr. Bates comprehensively analyzed the difference between pre-petition and post-petition claim numbers and concluded that the increase of claims post-petition was a result of Survivors' privacy concerns and economic considerations of Survivors and their attorneys. (*See* Bankr. D.I. 9454 at 142:9-146:8). That is, Survivors who were unwilling to engage in costly and public litigation in the tort system came forward in the bankruptcy proceeding to file claims when presented the opportunity to do so through the confidential proof of claim process. (*Id.*) Certain Insurers also cite an analysis by BSA's data

management expert that 90% of claimants never reported abuse to Scouting or law enforcement. (D.I. 45 at 22). The fact that children that were abused decades ago did not report, or frequently even understand, abuse does not remotely support the Insurers' argument that "tens of thousands" of the claims are fraudulent. This testimony does not call into question any of the Bankruptcy Court's findings or demonstrate a lack of good faith.

Certain Insurers further argue that the possibility of invalid claims "was never addressed in this Plan." (D.I. 45 at 72). First, the Plan includes numerous provisions for assessing the validity of claims and one of the founding principles of the TDP is the "prevention and detection of any fraud." (D.I. 1-4, Ex. A, Art. I.B.5). For example, the signature page on the proof of claim form requires a signature under penalty of perjury, and contains warnings of substantial consequences for submitting false claims:

> **"Penalty for presenting fraudulent claim has a fine of up to $500,000 or imprisonment of up to five years or both. 18 U.S.C. §§ 152, 157, 2571."**
>
> **"I have examined the information in the sexual abuse survivor proof of claim and have a reasonable belief that the information is true and correct."**
>
> **"I declare under penalty of perjury that the foregoing statements are true and correct."**

(A 11596). Moreover, the Bankruptcy Court directed that the Confirmation Order require the Settlement Trustee to "propose procedures to suss out fraudulent claims taking into account factors she deems appropriate, which can include a cost/benefit analysis. Those procedures will be presented to the court. . . . In addition to disallowance of a claim, penalties may include seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 and seeking sanctions from the court." *In re Boy Scouts of Am.*, 642 B.R. at 645.

No settlement trust (or litigation) is immune from efforts by unscrupulous people to commit fraud. The Plan includes procedures for denying such claims. That an unscrupulous person might pursue a fraudulent claim does not support an argument that BSA lacked good faith in proposing the plan. Mass tort settlements administered by trusts like the one at issue here are commonplace. *See In re Maremont Corp.*, 601 B.R. 1, 20-21 (Bankr. D. Del. 2019); *In re W.R. Grace & Co.*, 446 B.R. 96, 132 (Bankr. D. Del. 2011) ("The Trustees have a fiduciary duty to ensure that only valid claims are paid. No evidence was proffered to suggest, let alone prove, that Trustee will violate that duty."), *aff'd*, 729 F.3d 311 (3d Cir. 2013).

Certain Insurers' argument that the recovery for bona fide claimants will be reduced by invalid claims is again based on their faulty premise that significant numbers of invalid claims will be provided awards.[20] (D.I. 45 at 74). Certain Insurers further criticize BSA for not seeking to disallow claims, but they cite no authority for the proposition that a debtor should seek to disallow claims, rather than having claims assessed through the TDP, much less that a decision to do so could constitute bad faith. I agree it would have made no sense for BSA to attempt to investigate 82,209 claims in a disallowance proceeding, only to transfer the remaining claims to a Trust for adjudication. This would defeat the purpose and the efficiencies of the TDP.

Finally, Certain Insurers argue that, but for the BSA's bankruptcy proceedings, the "explosion of claims" would not have occurred. (D.I. 45 at 20). Common sense applied to the record in this case suggests that is true, but it does not follow at all that the "explosion" is of invalid claims. The reasons for the "explosion" are unexplained. There is no accounting for the Bar Date, which required all claimants to assert their claims or forever lose them. As the Bankruptcy Court found, the "explosion" of claims "could be a consequence of a bankruptcy

---

[20] No fraud-detection system is foolproof. The reasonable possibility that some fraudulent claimants will escape detection and be paid does not begin to establish lack of good faith.

filing and a bar date and an open statute of limitations and the advertising that went on." (*See* Bankr. D.I. 9638 at 191:10-17).

> A debtor's ability to obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules. The remedy for inappropriate behavior, if any, rests with state supreme courts and/or disciplinary counsel around the country, any appropriate remedy in this court for persons who failed to perform appropriate diligence before signing proofs of claim and appropriate procedures in the TDP to ferret out any fraudulent claims. Denying confirmation, however, is not an appropriate or proportional remedy.

*In re Boy Scouts of Am.*, 642 B.R. at 652.

> **Payment of claims subject to statutes of limitations.** Certain Insurers argue that the

Bankruptcy Court should have found that the Plan was not proposed in good faith because the

Settlement Trust will pay claims that are subject to a statute of limitations defense, inconsistent

with prepetition practices. (D.I. 45 at 28, 38). They rely on the testimony of Ms. Bitar who

opined that a Survivor in the tort system "would get nothing" on a time-barred claim, but under

the TDP "would get $300,000." (D.I. 45 at 33). First, Ms. Bitar's statement that a Survivor

"would get $300,000" in the Settlement Trust is not supported by the terms of the TDP. (Bankr.

D.I. 9563 at 52:6-8). In reaching this conclusion, Ms. Bitar took a Base Value and applied a

statute of limitations discount. (Bankr. D.I. 9563 at 50:18- 52:8, 122:4-15). But under the TDP,

the Settlement Trustee must apply numerous mitigating and aggravating factors to ascertain the

value of a claim, so the TDP is not formulated to result in awards equal to the Base Matrix Value

number. *In re Boy Scouts of Am.*, 642 B.R. at 651 ("Dr. Bates's testimony was clear: the Base

Matrix Values in the TDP are a starting point, not an ending point. In his words, the Base Matrix

Values are not 'magic number[s]'; rather, any number could be used . . . one would simply have

to modify the Scaling Factors appropriately.")

Second, Ms. Bitar's statement that a Survivor in the tort system "would get nothing" on a time-barred claim is not supported by her experience, as she has never represented BSA or settled an abuse claim. (B.D.I. 9563 at 72:4-73:2). More importantly, her statement is contradicted by evidence demonstrating that claims subject to statute of limitations defenses were sometimes paid prepetition by BSA and its insurers. The testimony at trial established that States consistently revive abuse claims, and that "courts are reluctant to grant dispositive motions on a statute of limitations basis, particularly for something like childhood sexual abuse. Indeed, many of the states that had potentially applicable statutes of limitations also included exceptions (such as discovery exceptions) that would effectively negate a dispositive motion on a statute of limitations defense." (Bankr. D.I. 9273 ¶ 24). Mr. Griggs testified that BSA often settled claims with a statute of limitations defense, even if it was likely to prevail on the defense, and insurers often approved those settlements. (*Id.* ¶¶ 22-26). BSA also paid claims after prevailing on its defense "rather than face the cost and risk of an appeal." (*Id.* ¶ 26). Large settlements paid by BSA and its insurers also arose out of claims where BSA believed it had a viable statute of limitations defense. (*Id.* ¶ 24). Nonetheless, Dr. Bates and his team formulated a Claims Matrix that includes different discounts for statute of limitations defenses based on the strength of the relevant State's statute.

Certain Insurers complain that the statute of limitations defense is a mitigating factor, rather than part of the General Criteria for allowance, but Mr. Griggs testified that the availability of a potential statute of limitations defense was considered a mitigating factor prepetition also, and not a requirement for payment. (D.I. 9273 ¶ 24). The Bankruptcy Court credited Mr. Griggs' unrefuted evidence: "During the trial there was much discussion about the statute of limitations defense. As Mr. Griggs testified, his experience is that even in states with

closed statutes of limitations, courts are hesitant to dismiss on statute of limitations grounds." *In re Boy Scouts of Am.*, 642 B.R. at 634 n.566 (citation omitted). It further noted:

> There is no 'law' that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant whose claim may be time-barred. Indeed, the uncontroverted testimony of Mr. Griggs is that prepetition BSA was not often successful in asserting statute of limitations defenses even in states where the defense was viable, and that even when BSA prevailed on a statute of limitations defense it still might subsequently settle the claim.

*Id.* at 658. Consequently, the Bankruptcy Court did not find "that this result means the Plan was not proposed in good faith." *Id.* at 658.

I find no support for Certain Insurers' assertion that claims subject to statute of limitations defenses would receive nothing outside the Settlement Trust or that the potential availability of the defense should be part of the General Criteria, not a mitigating factor.

***TDP criteria for legal responsibility.*** Certain Insurers argue that "BSA's negligence is not a prerequisite for liability as it would be in the tort system. . . ." and that this supports a lack of good faith. (D.I. 45 at 28). But the record reflects that, under the TDP, the Settlement Trustee will consider evidence of "legal responsibility," rather than negligence, because claims other than negligence had been brought on a prepetition basis. Consequently, the TDP needed to address the potential liability of a Protected Party for all claims, not merely for negligence claims. (Bankr. D.I. 9309 ¶¶ 50-51; Bankr. D.I. 9406 at 217:20-23 (Azer) ("I think we wanted to encompass all the causes of action, right, so we wanted to make sure we were encompassing everything that could be out there, and this is the reason we used that language.")).

Certain Insurers further contend that the TDP are unfair because they treat negligence only as an aggravating factor that is multiplied against the Base Matrix Value to increase the claim's value. (D.I. 45 at 28). Testimony established, however, that "the showing of negligence was subsumed by the General Criteria." (Bankr. D.I. 9309 ¶ 50; *see also* Bankr. D.I. 9273 ¶ 59

147

("Based on my work as [National Coordinating Counsel], if an underlying plaintiff could establish, by a preponderance of the evidence, each of the General Criteria, I would have considered that a claim that should be settled because the claimant likely would be able to show negligence by the BSA, Local Council, and/or Chartered Organization.")). Moreover, the evidence supports a finding that the General Criteria is consistent with BSA's prepetition practices. Specifically, if all the General Criteria was met prepetition, then BSA viewed that as a sufficient basis to establish negligence and to pay the claim. (Bankr. D.I. 9273 ¶ 59). While there is a reference to negligence in the "aggravating factors" of the TDP, the unrebutted testimony is that BSA meant for this to address the issue of notice, rather than legal liability, which is subsumed by the General Criteria of the TDP. (Bankr. D.I. 9406 at 41:15-22 (Azer) ("[W]e actually had a reference to negligence . . . [I]f the BSA had notice, then it was meant to allow for an increased dollar value, and I guess the insurers were confused by that. And so, again, we modified that language to try to make clear our intent in the aggravating factors."). The testimony further established that treating the degree of notice as an aggravating factor was consistent with BSA's prepetition practices. (Bankr. D.I. 9273 ¶ 41). In any case, BSA subsequently revised the TDP after the confirmation hearing to expressly require that "a Protected Party may be negligent or may otherwise bear legal responsibility" in the final version of the TDP. (D.I. 1-4, Ex. A, Art. VII.C.2(c).

 ***Prior versions of the Plan.*** Certain Insurers next argue that the Plan was not proposed in good faith based on certain insurance-related terms that were included in a prior plan. BSA proposed a plan in February 2022 that included certain insurance-related terms opposed by the Insurers. (*See* Bankr. D.I. 8813 Art. IX.A.3.w-aa). The Bankruptcy Court declined to approve certain of those terms. Section 1127(a) provides a debtor with the right to modify its plan, and then it is that modified plan that needs to satisfy the confirmation requirements, not a prior plan:

"The proponent of a plan may modify such plan at any time before confirmation . . . . After the proponent of the plan files a modification of such plan with the court, the plan that is modified becomes the plan." 11 U.S.C. § 1127(a). Altering plan provisions before and after confirmation is consistent with bankruptcy precedent and procedure. In August 2022, BSA modified the prior plan to comply with the Confirmation Opinion, listed those changes in a plan addendum, and filed a corresponding proposed order confirming the Plan. (*See* Bankr. D.I. 10188, Exs. A, B, Bankr. D.I. 10190). The Bankruptcy Court ultimately confirmed the Plan over the Certain Insurers' objection in September 2022. Certain Insurers cannot challenge the Plan based on terms that are not in it, much less demonstrate that the Bankruptcy Court committed clear error by not making certain factual findings based on terms that BSA did not propose in the confirmed Plan.

Certain Insurers argue that an earlier proposal to retain Professor Eric Green as the trustee supports their argument that the Plan was not proposed in good faith. (D.I. 45 at 34-35, 71-72). The Plan did not propose Professor Green, nor did the prior version, but rather proposed Judge Houser, someone everyone agrees is an "eminently qualified, retired, neutral Federal Judge[]." (Bankr. D.I. 9389 at 50:13-15; D.I. 1-3 at 211 ("[N]o one questions the integrity of the proposed Settlement Trustee."). As addressed above, a challenge directed to a proposal that was not included in the Plan presented for confirmation, and that is not included in the confirmed Plan, is irrelevant. Arguing that BSA engaged in bad faith by initially proposing the appointment of a well-regarded mediator, and then changing the proposal in response to objections by the Insurers, demonstrates the weakness of the "good faith" aspect of the appeals.

***Claim resolution process differs from the tort system***. Certain Insurers repeatedly assert that the Settlement Trust resolution process is different from the tort system. That is correct and does not evidence any lack of good faith. The record supports that the TDP is designed to

149

replicate tort system resolutions in an expedited and cost-effective fashion, as opposed to years-long litigation, which BSA cannot survive. Mass tort settlements establishing an adjudication procedure, or trust distribution procedures, instead of litigation, are commonplace. *See, e.g., In re W.R. Grace*, 446 B.R. 96. As addressed above, the TDP here was fashioned in part on other mass tort resolutions in bankruptcy.

*Insurance neutrality in not required by the Bankruptcy Code.* Certain Insurers assert that the Bankruptcy Court "erroneously declined to engage with the [P]lan's real-world impact because the court believed 'insurance neutrality' is merely a 'standing concept.'" (D.I. 45 at 77). There is no confirmation requirement that a chapter 11 plan be "insurance neutral." *In re Boy Scouts of Am.*, 642 B.R. at 648 (citing *Purdue Pharma*, 633 B.R. at 63 ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect.")).

Certain Insurers cite *In re Global Industrial Technologies*, 645 F.3d 201, 207-08 (3d Cir. 2011), and *Combustion Engineering*, 391 F.3d at 218, but the Bankruptcy Court correctly found that neither case held that a plan had to be insurance neutral. *In re Boy Scouts of Am.*, 642 B.R. at 667. These cases held that the insurers there had standing to raise challenges to the plan. *Id.* ("[I]f a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard."). Finally, the Bankruptcy Court did address the real-life impact of the Plan by preserving the Insurers' defenses and ruling that, to the extent a dispute arises in the future, a court with jurisdiction over the matter will determine the dispute based on the then-existing facts. *See id.* at 656.

*Case law does not support lack of good faith here.* The cases cited by Certain Insurers in support of their argument that the Plan was not proposed in good faith do not advance their cause. The appellate cases either do not address good faith or affirm a bankruptcy court's finding of bad faith, the exact opposite of what occurred here. For example, Certain Insurers cite

*In re SGL Carbon*, 200 F.3d 154 (3d Cir. 1999), which did not address confirmation issues. That case dismissed the bankruptcy petition because the debtor was "a financially healthy company" and the "Chapter 11 lacks a valid reorganization purpose . . . " *Id.* at 156, 166 (finding courts have "consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."). No one claims BSA was financially healthy when it filed its Petition.

Certain Insurers cite *Global Industrial Technologies*, but that court did not rule on good faith. It merely found that the bankruptcy court erred in holding that the insurers had no standing to object to a plan where their policies were being transferred to a trust, and where the insurers had submitted substantial evidence that 91.5% of the claims were not legitimate. *In re Glob. Indus. Techs.*, 645 F.3d at 207-08. The bankruptcy court in that case found that there was record evidence that "[the debtors] had sold out [the insurers] by setting up a system in which they would pay for newly ginned-up silica claims in exchange for asbestos claimants casting their votes in favor of the [plan]." *Id.* at 214. Indeed, the debtors obtained a list of silica claimants from another company's bankruptcy and then solicited those claims to gain confirmation votes, causing the "explosion of silica claims." *Id.* Although the bankruptcy court had considered some of the insurers' contentions, the Third Circuit remanded to ensure that the insurers had the opportunity to make a full record: "We accept the logical position that a party, granted standing and a full opportunity to participate, may add something meaningful to the record on which the bankruptcy court is called to make a decision." *Id.* at 215 n.33.

Here, Insurers were full participants at trial, but they introduced no evidence of collusion or that any claims were fraudulent—the opposite of what happened in *Global Industrial*. Moreover, the Bankruptcy Court found that the BSA did not collude with the Survivors' counsel based on a careful review of the record. Certain Insurers introduced no evidence to the contrary,

151

relying primarily on an argument that the BSA was incentivized to collude.  (D.I. 45 at 66-67).

The argument was specifically rejected by the Third Circuit in *Federal-Mogul*:

> Insurers also allege the trust mechanism might distort ordinary incentives between
> insurer and insured, encouraging the Debtor to collude with claimants and impose
> costs on the insurer.  But as Federal-Mogul points out, this shift in incentives is
> not unique to the asbestos context and occurs in bankruptcy where there is a
> discharge of the liability of the debtor but not that of the insurer.... Nor did the
> Insurers provide any evidence of such collusion in this case. Such bare
> speculation does not establish an increase in risk.

*In re Fed.-Mogul*, 684 F.3d at 380.

The bankruptcy cases relied upon by Certain Insurers present egregious facts not present

here.

The bankruptcy court *In re ACandS* determined that the plan was not proposed in good

faith because the trust structure was unfair to claimants and dictated by plaintiffs' attorneys that

favored their clients over other claimants.  *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del.

2004).  Specifically, the conflicted controllers provided a different treatment for the exact same

claims, so that their clients would be paid in full even if they were merely exposed to asbestos

and were not sick, while someone they did not represent, with the most serious disease,

mesothelioma, could get nothing: "[I]t is fundamentally unfair that one claimant with non-

symptomatic plural plaques would be paid in full, but while someone with mesothelioma runs a

substantial risk of receiving nothing.  Both should be compensated based on the nature of their

injuries, not based on the influence and cunning of their lawyers." *Id.* at 40, 43.

The bankruptcy court *In re Coram Healthcare* made a factual finding that the plan was

not proposed in good faith because the debtors' CEO and president had an actual conflict of

interest when entering into an agreement with the debtors' largest creditor, requiring that he take

the creditors' instructions.  *In re Coram Healthcare*, 271 B.R. 228, 234-35 (Bankr. D. Del.

2001).  His annual fee of $1 million was substantially more than the executive's salary from the

debtor, the executive breached his fiduciary duties, and the conflict caused "insidious effects," including the debtors' decision to provide the creditor with $6.3 million interest payment, "with no legal obligation" to do so, harming the debtors' liquidity at a time that they needed cash to achieve "operational advantages, as well as an enhanced negotiating position vis-à-vis its creditors." *Id.* at 236. Neither the executive nor the creditor disclosed the arrangement, until it was uncovered in discovery, and the bankruptcy court found the executive's testimony "unconvincing." *Id.* at 239.

Last, the bankruptcy court in *American Capital Equipment* considered a plan structure materially different from BSA's Plan and determined it was not proposed in good faith. The bankruptcy in that case did not involve tort liability, the debtors did not contribute to the fund, (and would take from the fund), tort claimants were the sole source of funding, funds were designated to pay off only creditors and insurers (rather than tort claimants), and there was an "inherent conflict of interest" as the plan stripped insurers of "procedural and substantive rights without the protections of Section 524(g)." *In re Am. Capital Equipment*, 688 F.3d at 159-60. The Third Circuit held that the "inherent conflict of interest" was "especially concerning" because the debtors were financially incentivized to sabotage their own defense due to a kickback mechanism. *Id.* at 158-60 ("[Debtor] is required to cooperate in its defense, but will be incentivized to do otherwise."). Unlike the debtor in that case, BSA has no conflict of interest, has meaningfully contributed to the Settlement Trust, and has not established a surcharge mechanism at the claimants' expense for the BSA's own gain.

***The Tort Claimants' Committee/Abuse Survivor Settlement.*** Finally, Certain Insurers argue that the Tort Claimants' Committee/Abuse Survivor Settlement, which provides an Independent Review Option and uncapped recoveries against Non-Settling Insurance Companies, supports its argument that the Plan was not proposed in good faith. A goal of the

TDP was to reflect the BSA's prepetition settlement practices, and the record reflects that BSA and its insurers sometimes paid sexual abuse claims in excess of the $2.7 million maximum cap applicable to a Trust Claim Submission.  (Bankr. D.I. 9309 ¶¶ 55-56; Bankr. D.I. 9454 at 237:12-18 (Bates)).  The Independent Review Option was intended to address the fact that an earlier version of the TDP that did not provide a pathway for recoveries in excess of $2.7 million for particularly egregious cases.  Therefore, the addition of the Independent Review Option is consistent with BSA's prepetition practices.  (Bankr. D.I. 9454 237:12-18 (Bates); Bankr. D.I. 9454 at 98:14-99:1 (Bates) ("[The Independent Review Option] [b]asically remov[es] . . . a windfall that the excess insurers had obtained in the original draft of the [TDP]."); *id.* at 235:16-23 (Bates) ("The excess insurers ... pay more, but ... only to the extent that they got a windfall from the original [TDP], which capped itself at [$]2.7 [million].  So, they aren't actually made worse off, relative to what the policies are worth.")).  The inclusion of this provision does not demonstrate a lack of good faith.  Certain Insurers are not entitled to capped recoveries.  Outside of the Settlement Trust, Survivors are able to, and did, pursue claims with uncapped recoveries.  (Bankr. D.I. 9273 ¶ 63).  Prepetition, BSA paid claims substantially in excess of $2.7 million for egregious cases.  (Bankr. D.I. 9273 ¶ 63).  If awards under the Independent Review Option are unreasonable, Certain Insurers retain their coverage defenses.

 *Other*.  I previously rejected Certain Insurers' argument that the Plan's transfer of rights under insurance policies abrogates their contractual rights, which constituted an independent ground for Certain Insurers' challenge to the Bankruptcy Court's good faith determination.

 *Summation*.  Having considered "the objective factors" highlighted by Certain Insurers—"the plan itself and the process," including whether it resulted from "fundamental fairness in dealing with the creditors," achieved "fundamental fairness and justice," "discouraged debtor misconduct," and "whether the debtor has sought to step outside the equitable limitations

of Chapter 11" (*see* D.I. 144, 2/9/2023 Hr'g Tr. at 15:1-17; *Exide*, 2021 WL 3145612, at *11), I

find no support for Certain Insurers' allegations of BSA's collusion, failure to negotiate, or the

Plan's inflation of claims at the expense of Certain Insurers' rights and defenses. I further find

no evidence demonstrating clear error in the factual findings underlying the Bankruptcy Court's

good faith determination. To the extent the Bankruptcy Court's good faith determination is not

merely a finding of fact but an "ultimate fact," *In re LTL Management,* 58 F.4th at 753, upon *de*

*novo* review of "the culminating determination of whether th[e underlying] facts support[ed] a

conclusion of good faith," I find no error in the Bankruptcy Court's determination based on its

detailed analysis of objections and ample support in the record.

## VII.    CONCLUSION

I have endeavored to address all developed arguments raised in these appeals. To the

extent not addressed herein, any remaining arguments are rejected. I will therefore affirm the

Confirmation Order.

A separate order will be entered.