# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, <br><br> Debtors. | : Chapter 11 <br> : Case No. 20-10343-LSS <br> : (Jointly Administered) <br> : <br> : |
| NATIONAL UNION FIRE INSURANCE, COMPANY OF PITTSBURGH, PA, *et al*, <br><br> Appellants, <br> v. <br><br> BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, *et al.*, <br><br> Appellees. | : Civ. No. 22-1237-RGA <br> : (Lead Case) <br> : <br> : Civ. Nos. 22-1238-RGA, <br> : 22-1239-RGA, 22-1240-RGA, <br> : 22-1241-RGA, 22-1242-RGA, <br> : 22-1243-RGA, 22-1244-RGA, <br> : 22-1245-RGA, 22-1246-RGA, <br> : 22-1247-RGA, 22-1249-RGA, <br> : 22-1250-RGA, 22-1251-RGA, <br> : 22-1252-RGA, 22-1258-RGA, <br> : & 22-1263-RGA (Consolidated) |

## MEMORANDUM ORDER

Before the Court is the Emergency Motion (D.I. 152) of the Certain Insurers seeking a stay of the effectiveness of the Bankruptcy Court's Plan Confirmation Order, this Court's March 28, 2023 Order (D.I. 151) and accompanying opinion, *In re Boy Scouts of Am.*, 2023 WL 2662992 (D. Del. Mar. 28, 2023), affirming same ("Affirmance Order"), and the occurrence of the Plan's Effective Date, pending final disposition of Certain Insurers' appeal to the Third Circuit. The D&V Claimants (D.I. 154) and Lujan Claimants (D.I. 156) have filed their own Emergency Motions seeking a stay pending appeal. There is currently a temporary stay in place that will expire on April 11, 2023 ("Temporary Stay"). Fed. R. Bankr. P. 8025 ("Unless the district court or BAP orders otherwise, its judgment is stayed for 14 days after entry.") Absent a stay, Certain Insurers argue that the Temporary Stay will "expire after Tuesday, April 11" (D.I. 174 at 5), and the Plan will go effective, at which point Certain Insurers risk the chance that BSA will argue that the Plan has been

substantially consummated and that any appeals are equitably moot, "raising a substantial risk of irreparable harm." (D.I. 152 at 1).

On April 6, 2023, BSA and other appellees filed their Joint Opposition to these Emergency Motions (D.I. 164), together with the declaration of Brian Whittman ("Whittman Decl.") and the declarations of certain survivors and their representatives in support (D.I. 165-173). BSA argues, among other things, "Appellants raise the same issues that two courts have already determined are meritless in lengthy, detailed opinions applying established law to largely uncontroverted facts." (D.I. 164 at 3). BSA further argues that if a stay pending appeal is granted, the Plan may never be consummated, and BSA may be forced to liquidate. (*Id.* at 15; Whittman Decl. ¶¶ 11–12). "The imposition of any stay will (i) substantially harm the BSA's operations, including, the ability to recruit new members and secure donations, and jeopardize the BSA's ability to continue as a national organization and (ii) cost tens of thousands of survivors and other stakeholders, many of whom are elderly, billions of dollars." (*Id.* at 15; Whittman Decl. at ¶¶ 5–20). "Further, if the BSA is forced to liquidate, the Insurance Settlement Agreements would terminate, and it may prove impossible for survivors to ever collect the $1.65 billion those agreements contemplate." (*Id.* at 15; D.I. 1-3 at 140; Whittman Decl. ¶ 18). Finally, BSA argues that the Emergency Motions, filed by "Certain non-settling insurance companies and two claimant groups comprised of less than 0.2% of survivors," fail to demonstrate the irreparable harm required for the extraordinary relief of a stay.

The Emergency Motions were fully briefed on April 7, 2023. (D.I. 174-176). On April 10, 2023, Lujan Claimants (D.I. 177), D&V Claimants (D.I. 179), and the various insurance companies that make up the Certain Insurers filed their appeals to the Court of Appeals for the Third Circuit.[1]

---

[1] Notices of appeal were filed by Liberty Insurance Underwriters, *et al.* (D.I. 178), Columbia Casualty Co., *et al.* (D.I. 180); Landmark Insurance Company, *et al.* (D.I. 181); Indian Harbor Insurance Company (D.I. 182); Old Republic General Insurance Group (D.I. 183); Travelers Casualty and Surety Company, Inc. (D.I. 184); Great American Assurance Company, *et al.* (D.I. 185); Allianz Global Risks US Insurance Company, *et al.* (D.I. 186); Argonaut Insurance Company,

Certain Insurers indicated that they were going to file on April 10 "an expedited stay relief request ... in the Third Circuit." (D.I. 174 at 5).

For the reasons set forth below, the Emergency Motions are denied. The request for a temporary stay while I decide the motions before me is dismissed as moot. The request that I grant a stay to April 27, 2023, for the benefit of the Court of Appeals, is denied. I note that the Court of Appeals has the authority to grant any appropriate orders, including an "order appropriate to preserve the status quo." Fed. Bankr. R. P. 8025(d)(4). The appeals and emergency motions are now before the Court of Appeals. I do not think it is my place to suggest how much time the Court needs to consider requests directed to it for emergency relief.

1. **Background.** Following a lengthy, contentious, and emotionally charged proceeding, the Bankruptcy Court confirmed the Plan supported by every estate fiduciary and the overwhelming majority of abuse survivors. This Court's affirmation of the Confirmation Order was a condition precedent to the Effective Date of the Plan. (*See* D.I. 1-4, Art. IX.B.1a). Absent a stay, these conditions precedent may now be satisfied.

2. The Plan embodies a global resolution of scouting-related sexual abuse claims. The cornerstone of the Plan is a series of settlements, resolving a complex array of overlapping liabilities and insurance rights, which will establish a compensation fund for abuse survivors—the Settlement Trust. The settlements provide at least $2.46 billion in cash and property to the Settlement Trust benefiting abuse survivors, plus significant unliquidated assets, including valuable insurance rights worth up to another $4 billion plus. The Plan channels to the Settlement Trust all abuse claims against BSA, related non-Debtor entities, and those covered by insurance policies issued by certain Settling Insurance Companies. It also provides for coextensive nonconsensual

---

*et al.* (D.I. 187); Gemini Insurance Company (D.I. 188); General Star Indemnity Company (D.I. 189); and Arrowood Indemnity Company (D.I. 190); and Endurance American Insurance Company (D.I. 191).

3

releases of the channeled abuse claims. The channeled abuse claims will be processed, liquidated, and paid by a Settlement Trustee in accordance with the Settlement Trust Agreement and Trust Distribution Procedures ("TDP"). (D.I. 1-4, Ex. A). The TDP were the subject of intensive negotiations by BSA and various constituencies during the chapter 11 cases. The Bankruptcy Court found that the channeling injunction and releases are the "cornerstone of the Plan," and are necessary to ensure an equitable process by which abuse survivors' claims will be administered and paid. *In re Boy Scouts of Am.*, 642 B.R. at 610. Based on BSA's expert's estimate of the aggregate value of abuse claims, the Bankruptcy Court found that BSA had shown, by a preponderance of the evidence, that the holders of abuse claims will be paid in full. *Id.* at 560.

3. The Plan provides that BSA may declare that the Effective Date of the Plan has occurred so long as, among other things, the Affirmance Order has been entered, no court has entered a stay of the Effective Date pending an appeal, and there is no request for a stay of the Effective Date, although this condition can be waived. (*See* Plan, Art. IX.B). Upon the Effective Date, the Settlement Trust Assets—including cash consideration from various appellees and the assignment of rights under various insurance policies ("Insurance Assignment")—will automatically be transferred to the Settlement Trust, and certain claims will be paid.

4. **Jurisdiction.** Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Plan Confirmation Order is a final order.

5. **Discussion.** The granting of a motion for stay pending appeal is discretionary. *See In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). The movant bears the burden of proving that a stay of the Confirmation Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay

4

will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

6. The most critical factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citations omitted)). The Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a 'sliding scale' approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Revel AC*, 802 F.3d at 571 (emphasis in text) (internal quotations and citations omitted).

7. **Likelihood of success on the merits.** Certain Insurers have failed to make a "better than negligible" showing that they are likely to prevail on the merits of their appeal. First, Certain Insurers argue that they are likely to succeed on their argument that the Plan's assignment of insurance rights to the Settlement Trust was impermissible as a matter of law and must be reversed. The Plan requires "the assignment and transfer to the Settlement Trust" of all "rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves)." (Plan Art. 1.A.157). The Plan does not assign the entire insurance "policies," Certain Insurers complained on appeal. (D.I. 45 at 25). "Nor does it purport to assign any of BSA's contractual obligations to its insurers or say anything at all about whether BSA or anyone else remains obligated to comply with those contractual duties" (*Id.*).

5

8. I agreed with the Bankruptcy Court that rights under the insurance policies may be assigned consistent with applicable state law. "Under the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied." *In re Boy Scouts of Am.*, 642 B.R. at 668 (quoting *In re Am. Home Mortg.*, 402 B.R. 87, 92-93 (Bankr. D. Del. 2009) (emphasis in original)). The Insurance Policies are not executory contracts, *id.* at 668 n. 729, and no insurer argued otherwise. "Assuming § 363 is the operative section, . . . Debtors can transfer their property rights consistent with applicable state law." *Id.* The Bankruptcy Court found that § 363 was satisfied: "The Plan's transfer of rights under BSA Insurance Policies (the "Debtor Policy Assignment") is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights." (D.I. 1-1 ¶ II.I.2).

9. Certain Insurers have identified no authority that stands for the proposition that interests under their policies could not be assigned. The Bankruptcy Court cited cases noting that debtors routinely assign their insurance policy interests to a settlement trust. *See, e.g., In re Combustion Eng'g,* 391 F.3d 190, 218 n.27 (3d Cir. 2004) ("The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006); *In re Fed.-Mogul, Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *see also In re Congoleum Corp.*, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) ("[A] plan of reorganization may assign insurance policies to a personal injury trust."). Certain Insurers fail to distinguish these cases.

10. Certain Insurers merely rehash their arguments that Courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms, and that the Plan

6

fails to "preserve and affirmatively recognize insurer rights, including the rights to investigate legal liability, to defend claims, to require the insured to cooperate with its insurers in the defense of claims, and to consent to any settlements." According to Certain Insurers, this Court invited confusion by "agree[ing] that the plan could not re-write insurance policies" but also "failing to specifically find that the "*cum onere* principle" applies to the Insurance Assignment." (D.I. 152 at 4). Certain Insurers are unlikely to succeed on this argument. I found that the Plan does not rewrite the insurance policies or allow BSA to perform on more favorable terms. (D.I. 150 at 76). Rather, the Plan's clear language preserves all of the Insurers' rights and defenses under their policies, as confirmed by trial testimony and the Bankruptcy Court's rulings. (*Id.* at 74–75). The TDP is explicit in not modifying the insurance policies and preserving the policy obligations as they existed prepetition:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending, or supplementing the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of the Non-Settling Insurance Companies relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

(D.I. 1-4, Ex. A, Art. V.C). The Plan again references preserving those obligations in the assignment provision:

> The Settlement Trust's rights under any insurance policies issued by the Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions precedent or obligations under such policies (other than, in case of the BSA Insurance Policies, the terms of any policies or provision of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each policy in subsequent litigation.

(D.I. 1-1 ¶ II.I.2(e)). Certain Insurers do not cite any language in the Plan or the TDP abrogating the BSA's obligations under the insurance policies.

11. Certain Insurers' argument that the Plan does not explicitly identify their alleged rights to defend claims or to cooperate in the defense is irrelevant because there is no obligation that a plan do so. Certain Insurers never had a right to prevent BSA from settling claims or using a trust or otherwise, or a right to require BSA to cooperate with them. The Certain Insurers' rights are to raise coverage defenses for any alleged failure to comply with the terms of their policies. *In re Boy Scouts of Am.*, 2023 WL 2662992, at *36 (the *bargain* "is for the Certain Insurers to pay covered claims ... there was never a bargain to allow[] the Certain Insurers to prevent the BSA from compensating survivors of childhood abuse or otherwise resolving claims").

12. Certain Insurers rehash their challenge to the Bankruptcy Court's conclusion that the Plan was proposed in good faith, arguing that this Court failed to apply the correct standard under *In re LTL Management*, 58 F.4th 738, 753 (3d Cir. 2023). (D.I. 152 at 5). But this Court's opinion both quoted and applied the *In re LTL* standard. *In re Boy Scouts of Am.*, 2023 WL 2662992, at *59-60; *see also id.* at *75. The Bankruptcy Court's findings of fact, which the Certain Insurers state they are not challenging, all support the legal conclusion of good faith: (i) the Plan was designed to achieve the objectives and purposes of the Bankruptcy Code to reorganize and to provide compensation to survivors, (ii) the BSA did not collude with survivors, (iii) the TDP is not designed to inflate awards, but rather is designed to result in awards consistent with prepetition practices, (iv) the BSA protected the rights of the Certain Insurers, (v) the Plan resulted from thousands of hours of mediated negotiations among more than a dozen stakeholder groups, and (vi) the Plan enjoyed overwhelming support from every major stakeholder in the case. Certain Insurers' lack of good faith argument is unsupported by any evidence.

13. Certain Insurers argue they are likely to succeed on appeal because this Court's "analysis did not give appropriate consideration to critical, undisputed facts adduced at trial, such as the fact that BSA proposed to make the preservation of insurers' contractual rights subject not only

8

to applicable law, but also to the provisions of the plan and confirmation order (an attempt to abrogate insurers' rights and bind them in coverage litigation without insurer input)." (D.I. 152 at 6). This merely rehashes their prior argument, which fails because the Plan expressly preserves their rights and defenses. Certain Insurers' general arguments that the Plan is inconsistent with other "overarching principles" or that the objectives and purposes of the Code were not "fairly achieved," does not demonstrate a strong showing of likelihood of success on appeal where no specific evidence has been proffered in support. Certain Insurers cite *In re Global Industrial Technologies,* 645 F.3d 201, 213-15 (3d Cir. 2011) in support of their argument that the Third Circuit can reverse plan confirmation on good faith grounds. (*See* D.I. 152 at 6-7). However, as previously noted, that case addressed "standing to object to a plan," whereas here, "[i]nsurers were full participants at trial, but they introduced no evidence of collusion or that any claims were fraudulent—the opposite of what happened in *Global Industrial*." *In re Boy Scouts of Am.*, 2023 WL 2662992, at *73. I think Appellants' good faith arguments are frivolous.

14.     D&V and Lujan Claimants have failed to demonstrate likelihood of success on the merits of their many arguments. First, D&V and Lujan Claimants argue they are likely to prevail on their appeals related to the Plan's channeling injunction and releases based on a lack of (i) jurisdiction, (ii) statutory authority outside of § 524(g) of the Bankruptcy Code, and (iii) ability to meet the Third Circuit's hallmarks of permissible nonconsensual releases. (*See* D.I. 156 at 3–6; *see also* D.I. 154 at 5–10). But the Bankruptcy Court's confirmation of the Plan's channeling injunction and releases comports with Third Circuit law.

15.     D&V and Lujan Claimants argue they are likely to succeed on the jurisdiction issue because a finding of "shared insurance was not enough to give the Bankruptcy Court 'related to' jurisdiction over abuse claimants' independent third-party claims against [] nondebtor third parties." (D.I. 154 at 6-7). But the Bankruptcy Court's exercise of 'related to' jurisdiction" was based not on

9

that finding alone, but on many specific findings including "identity of interest, shared insurance, contractual indemnity, and residual property interests, each of which is supported by careful findings." *In re Boy Scouts of Am.*, 2023 WL 2662992 at *26 (summarizing same). Indeed, the record supports findings that BSA is the "real party defendant" in the abuse actions, and the interconnected nature of the delivery of scouting within the tripartite structure further supports the identity of interest between debtors and non-debtor third parties. *Id.* at *21 ("BSA was the 'real party defendant' in defending Abuse Claims."); *see also id.* at *22 ("There can therefore be no concern that there is only an 'incidental' relationship connecting the Channeling Injunction and Releases to BSA"). The record also contains "ample evidence of complex and competing claims against BSA's insurance which supports subject matter jurisdiction over claims against the Releasees." *Id.* at *24. There is also automatic indemnification of all abuse claims based on the annual charter agreements and board resolutions. *Id.* Additionally, the BSA's residual interest in Local Council property supports "related to" jurisdiction. *Id.* at *25.

16. D&V and Lujan Claimants are not likely to succeed on the statutory authority argument either, because the Third Circuit, courts within the Third Circuit, and other courts have repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances. *See, e.g., In re Cont'l Airlines*, 203 F.3d 203, 214-15 (3d Cir. 2000) (holding that a third-party injunction would be proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *In re Glob. Indus.*, 645 F.3d at 206 (explaining that a third-party injunction under § 105(a) requires showing with specificity that an injunction is both necessary to the reorganization and fair) (citing *In re Cont'l Airlines*, 203 F.3d at 214).

17. The Third Circuit has recently held that a bankruptcy court is constitutionally authorized to confirm a plan containing nonconsensual third-party releases if it concludes that the

releases are integral to the debtor-creditor relationship. *In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126, 135 (3d Cir. 2019). As the Bankruptcy Court explained, this ruling "suggests an implicit recognition that the granting of third-party releases is still permissible as part of the confirmation process." *In re Boy Scouts of Am.*, 62 B.R. at 594. "The granting of such releases, therefore, must be found in the bankruptcy court's ability, in appropriate circumstances, to exercise its inherent equitable power consistent with §§ 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code." *Id.*

18. D&V and Lujan Claimants point to no error in this reasoning and cite no binding cases to the contrary. D&V and Lujan Claimants argue that the Plan's channeling injunction and releases are expressly prohibited under §§ 524(e) and 524(g) but cite no authority supporting their interpretation or showing they are likely to succeed on this argument. Indeed, the Third Circuit has rejected the argument that § 524(e) bars non-consensual third-party releases. *See In re PWS Holding*, 228 F.3d 224, 247 (3d Cir. 2000) (determining that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties," but rather "concluded ... the releases at issue were impermissible because the hallmarks of permissible non-consensual releases ... [were] absent"). And § 524(g), which expressly authorizes third-party releases in asbestos cases, does not render such releases impermissible in non-asbestos cases. Rather, as the Bankruptcy Court observed, Congress enacted a rule of construction in § 524(g) that contradicts the inference that Lujan Claimants and D&V Claimants ask this Court to make. *In re Boy Scouts of Am.*, 642 B.R. at 595.

19. D&V and Lujan Claimants argue that they are likely to succeed in arguing that the Plan's injunction and releases, even if permissible, did not meet the *Continental* hallmarks of permissible non-consensual third-party releases. These Appellants point to no error in the Bankruptcy Court's specific findings supporting the fairness and necessity of the Plan's injunction

11

and releases, however, including that the releases are narrowly tailored to address *only* claims related to abuse in scouting. Indeed, the Confirmation Opinion "includes countless specific findings of fact that support each aspect of the necessity and fairness" under *Continental,* including that the third-party releases are necessary and essential to the settlements embodied in the Plan and without the releases, the BSA's reorganization fails. *In re Boy Scouts of Am.*, 2023 WL 2662992, at *33.

20.  D&V and Lujan Claimants rehash their argument that the Bankruptcy Court erred in finding that abuse claims will likely be paid in full under the plan and dispute the credibility the expert testimony BSA proffered in support. (*See* D.I. 154 at 9-10; D.I. 156 at 6). D&V and Lujan Claimants are not likely to succeed in challenging this factual finding as they offered no evidence to contradict the expert's opinion. The Bankruptcy Court's reliance on BSA's expert's uncontroverted and well-reasoned expert opinion is not likely to be overturned on appeal based on the unsubstantiated statements by non-experts that Appellants cited throughout the appeal.

21.  Lujan Claimants separately argue that the McCarran-Ferguson Act reverse preempts the Bankruptcy Code. (*See* D.I. 156 at 6–7). I rejected this argument, agreeing with the Bankruptcy Court that the Guam statute only provides a procedural right to bring claims against insurers, but "is not for the protection of policyholders" and does not regulate the business of insurance. *In re Boy Scouts of Am.*, 2023 WL 2662992, at *42. I further distinguished each decision relied upon by Lujan Claimants, including for their failure to address the "business of insurance" exception of the McCarran-Ferguson Act. *See id.* at *43-45. Lujan Claimants' Emergency Motion does not point to any error in my reading of those cases or application of the statute. I nevertheless recognize that my decision on this issue is not free from doubt, and I think Lujan Claimants have a better than negligible chance of being right on this issue.

22.  Lujan Claimants argue that they are likely to succeed on the merits of their argument that the Bankruptcy Court lacked jurisdiction to authorize the sale of insurance policies free and

clear "over Lujan Claimants' interests" and "over the [Archbishop of Agaña's] interests in BSA insurance policies and non-debtors' separate insurance policies in which Debtors lack any interest." (D.I. 156 at 7). I agreed with the Bankruptcy Court that the Insurance Settlements do "not disadvantage the Lujan Claimants more than other creditors," and Lujan Claimants have cited no authority that requires a different outcome. *In re Boy Scouts of Am.,* 2023 WL 2662992, at *39. Lujan Claimants further point to no error in my conclusion that they lacked standing "to raise the rights of the Archbishop," as the Archbishop settled with the BSA and further stipulated to resolve its objection to the Plan. *Id.* Again, this conclusion is consistent with law in the Ninth Circuit law, which has jurisdiction over the District Court of Guam where the Archbishop's bankruptcy was filed, and which has held that "a creditor has no independent standing to appeal an adverse decision regarding a violation of the automatic stay." *In re Pecan Groves of Ariz.*, 951 F.2d 242, 245 (9th Cir. 1991) (rejecting argument that the purpose of the automatic stay is to protect both the debtor and creditors). The Ninth Circuit has further held that creditors do not have an independent right to enforce alleged stay violations. *See In re Barrett*, 833 F. App'x 668, 670 (9th Cir. 2020) ("[I]f the trustee does not seek to enforce the protections of the automatic stay, then no other party may challenge acts purportedly in violation of the automatic stay, because 11 U.S.C. § 362 is intended solely to benefit the debtor estate"). Lujan Claimants have cited no authority to the contrary.

23. Lujan Claimants have further failed to show a likelihood of success on the merits of their argument that the Bankruptcy Court abused its discretion in approving the insurance settlements under Bankruptcy Rule 9019 based on the *Martin* factors : "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The Bankruptcy Court's determination was based on an extensive evidentiary record and included

specific findings as to each Settling Insurance Company, including the amount of its contribution, existing or potential coverage litigation issues, and the complexity and risk associated with litigating those issues. Based on the foregoing, the Bankruptcy Court concluded that the Insurance Settlements "resolv[e] complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims." *In re Boy Scouts of Am.*, 642 B.R. at 564. Lujan Claimants point to no clear error and have demonstrated no basis to find that the Bankruptcy Court abused its discretion in approving the insurance settlements.

24. ***Irreparable harm absent a stay.*** Appellants have failed to demonstrate irreparable harm absent a stay pending appeal. To do so, a movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Revel AC*, 802 F.3d at 571; *In re W.R. Grace*, 475 B.R. 34, 206 (D. Del. 2012). The movant must establish a resulting injury "that cannot be redressed by a legal or equitable remedy." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Finally, a purely economic injury generally does not meet the burden. *See Revel AC*, 802 F.3d at 572 ("[A purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement" unless "the potential economic loss is so great as to threaten the existence of the movant's business.")

25. Appellants argue that absent a stay they are likely to suffer "irreparable" harm because of the substantial risk that the Plan will be promptly consummated and their appeals will be dismissed as equitably moot. The possibility that an appeal may become moot does not alone constitute irreparable harm for purposes of obtaining a stay. *In re Tribune Co.*, 477 B.R. 465, 477, n.12 (Bankr. D. Del. 2012) ("[t]he possibility of equitable mootness, while a factor here for irreparable harm, is not dispositive of the ultimate question of whether to grant a stay pending appeal.") If the possibility of mootness alone were sufficient to show irreparable injury, "a stay

would be issued in every case of this nature pending appeal." *In re W.R. Grace,* 475 B.R. at 207. Appellants must show something more.

26. Certain Insurers themselves characterize the additional harms they face as speculative. They argue that, absent a stay and reversal of the Plan Confirmation Order, they may not receive the benefit of their bargain with respect to their rights under the policies. (D.I. 152 at 11 ("Certain Insurers would be independently harmed absent a stay because they would be subject to risks that run counter to the economic bargain in their contracts.") Such a hypothetical falls far short of posing an injury that is "actual and imminent." *Revel AC,* 802 F.3d at 571. As there was no requirement that the Plan prejudge all possible litigation possibilities and outcomes under all policies, Certain Insurers cannot be harmed by its failure to do so. Moreover, Certain Insurers' defenses are preserved, the usual enforcement actions exist, and so, unlike "irreparable harm," any harms that Certain Insurers may face can "be redressed by a legal or equitable remedy." *Instant Air Freight,* 882 F.2d at 801.

27. Notably, Certain Insurers "do not concede that equitable mootness is doctrinally correct" or that it necessarily "would apply here," but "to the extent that the Third Circuit continues to recognize the equitable mootness doctrine," Certain Insurers assert that "strong arguments exist that [the Third Circuit] would, among other things, still retain the ability to fashion relief with respect to the Plan." (D.I. 152 at 10). The doctrine of equitable mootness remains recognized by the Third Circuit. *See, e.g., In re Nuverra Environmental Solutions Inc.,* 834 Fed. App'x 729 (3d Cir. 2021). That said, I agree that, upon a successful appeal, it is conceivable that relief might be fashioned—such as requiring the transfer of the entire policies—that would not unravel the entire Plan. In sum, Certain Insurers have failed to establish irreparable harm warranting a stay pending appeal.

28. D&V and Lujan Claimants assert they will suffer irreparable harm because their claims against non-debtors will be released under the Plan. (D.I. 156 ¶ 11; D.I. 154 ¶ 17). These arguments fail because they are premised on the erroneous notion, unsupported by evidence, that they will receive more compensation for their claims outside of the Plan. To the contrary, the Bankruptcy Court made a finding of fact, supported by the only record evidence on the matter, and affirmed by this Court, that survivor claims will likely be paid in full under the Plan. That D&V and Lujan Claimants may give up more than other claimants fares no better—such a harm is "purely economic," may be redressed by a legal or equitable remedy, and is likely illusory, as their claims will be paid in full and there is no "additional" payment to which they are entitled.

29. Having evaluated Appellants' likelihood of success on the merits and irreparable harm absent a stay, and having determined that Appellants have failed to carry their burden as to either element, the Court is satisfied no further analysis is required. *See Revel AC*, 802 F.3d at 571.[2]

30. **Conclusion.** The Bankruptcy Court's ruling is consistent with existing precedent, and Appellants have failed to establish that they will suffer irreparable harm in the absence of a stay.

NOW, THEREFORE, it is HEREBY ORDERED that the Emergency Motions (D.I. 152, 154, 156) are DENIED. The request for a temporary stay while I decide the motions before me is DISMISSED as moot. The request that I grant a temporary stay to April 27, 2023, is DENIED.

Entered this 11th day of April, 2023.

_____
United States District Judge

---

[2] I do note BSA's out-of-pocket expenses of about $3,400,000 per month related to being in bankruptcy. (D.I. 165, Whittman Decl., at 6-7). I also note the other 99.8% of abuse claimants whose claims remain in limbo as long as the Plan does not go effective. When evaluating the motions for stay of D&V Claimants and Lujan Claimants, who are likely to be made financially whole by the Settlement Trust, any injury to them seems to be outweighed by the injury to others.