## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC, | Case No. 20-10343 (LLS) |
| Debtors. | (Jointly Administered) |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, Appellants. v. | Case No. 22-cv-01237-RGA |
| | (Jointly Consolidated)[1] |
| Boy Scouts of America and Delaware BSA, LLC, | |
| Appellees. | |

## EMERGENCY RENEWED MOTION OF DUMAS & VAUGHN CLAIMANTS FOR STAY OF BANKRUPTCY PLAN AND MOTION TO STAY APPEAL

## INTRODUCTION

Dumas & Vaughn Claimants' ("D&V Claimants") are 69 sexual

abuse survivors who oppose confirmation of Boy Scouts of America's

---

[1] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243, 22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252, 22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237. The D & V Claimants' appeal is docketed at 22-cv-01249.

("BSA") Chapter 11 bankruptcy plan.  On April 19, 2023, the Third

Circuit denied D&V Claimants' emergency Motion for Stay.  Since then,

circumstances have changed in two critical respects.  First, the

Supreme Court granted writ of certiorari in the Purdue bankruptcy case

on August 10, 2023.  *Harrington, U.S. Trustee v. Purdue Pharma, L.P.*,

S.Ct. Case No. 23-124 (2023).  The Supreme Court will review the exact

issue presented by D&V Claimants: "Whether the Bankruptcy Code

authorizes a court to approve, as part of a plan of reorganization under

Chapter 11 of the Bankruptcy Code, a release that extinguishes claims

held by nondebtors against nondebtor third parties, without the

claimants' consent."  *Id.*  The Supreme Court asked for briefing in time

for oral argument this December.  *Id.*  The Supreme Court's ruling in

that case is crucial to the Third Circuit's consideration of the issues in

this appeal.

Second, the potential that BSA and plan proponents will argue

that equitable mootness precludes the Third Circuit's review, which was

previously a hypothetical possibility, is now a certainty given that the

plan has gone effective.  The Settlement Trustee is accepting "expedited

claims" for processing (due on October 3) and just opened the "portal"

for regular claims on August 16.  Dumas Decl., Exhibit 2, pp. 1-3, emails from Settlement Trustee's office.  The deadline for filing "Independent Review Option" claims is October 19, but discovery documents supposed to be available to abuse claimants on or before, and as a condition to, the April 19 effective date are not yet available. The registration process for access to the documents only opened on August 16 and as of this filing, access has not been granted to counsel for D&V Claimants.  Dumas Decl. at ¶ 6 and Ex. 2, p. 4-5.

On August 16, 2023, D&V Claimants filed this motion with the Third Circuit.  On August 18, 2023, the Third Circuit denied the motion *without prejudice* and directed D&V Claimants to file it first with this Court.  Dumas Decl. at Exhibit 7, Order.  D&V Claimants request emergency consideration because of the October 3 deadline for expedited claims.  If this Court denies the stay, the Third Circuit will need time to consider it before October 3.

A stay of the plan until after the Supreme Court rules in *Purdue* will prevent the needless filing and processing of claims in the event the plan is overturned, allow claimants time to access discovery documents, and also guarantee that no claims distributions are made.  A stay of

this appeal will allow the Third Circuit to consider the third-party releases with the benefit of the Supreme Court's ruling in *Purdue*.

## MOTION

D&V Claimants renew their motion to stay the BSA's reorganization plan pending ruling from the Supreme Court in *Purdue* on the exact issue raised by D&V Claimants.  D&V Claimants also move the Court to stay all appeals in this case until the Supreme Court rules in *Purdue*.

D&V Claimants request emergency consideration of this motion, because "expedited claims" are due on October 3 and the portal is now open for regular claims.  Appellee briefs are now due October 10. Judicial efficiency calls for holding off on further appeals briefing until the Supreme Court rules in *Purdue*.

This Motion is supported by FRAP Rule 8(a); the points and authorities discussed below; the arguments and authorities in D&V Claimants' original Motion for Stay (D.I. 154), incorporated by reference as if set forth in full; arguments and authorities in D&V Claimants' Third Circuit Opening Brief, attached as Exhibit 8 to Dumas Decl.,

incorporated by reference as if set forth in full; and the supporting Dumas Declaration, filed herewith.

## POINTS AND AUTHORITIES

1.     This case concerns the reorganization in bankruptcy of BSA, filed to resolve thousands of sexual abuse claims made and anticipated by BSA.  In approving BSA's chapter 11 reorganization plan, the bankruptcy and this court validated sweeping nonconsensual releases of nondebtors' direct claims against nondebtor third parties.  *In Re Boy Scouts of America*, 642 B.R. 504 (2022) ("*BSA*") (bankruptcy court opinion); *In Re BSA*, 650 B.R. 87 (2023) (district court opinion).  These releases and related channeling injunctions permanently "release and discharge" abuse claimants' direct claims against more than 250 Local Councils and over 300,000 Chartered.[2]  Dumas Decl., Exhibit 3, p. 1-2, excerpts from plan Art. X.J.3 ("...all holders of Abuse Claims shall ... forever *discharge* and release [released parties]"; emphasis added).

2.     Third party Local Councils and Chartered Organizations are not bankruptcy debtors in this case.  In exchange for discharge and

---

[2] Omni docket www.cases.omniagentsolutions.com/?clientId=3552 (a 4,808-page list of released parties, including Local Councils and Chartered Organizations).

release of all abuse claims, Chartered Organizations (except for the Methodist Church) paid not one cent of their own money.[3]  Chartered Organizations – including the Baptist Church, Church of Jesus Christ of the Latter-Day Saints, Elks, and Kiwanis – no doubt have substantial assets of their own.  Dumas Decl., Exhibit 4, p. 1, excerpt from *Disclosure Statement* (list of Most Common Chartered Organizations).  Local Councils, as a group, paid roughly 20% of their net assets, far less than they would have to pay if they filed for their own bankruptcies.  *Id.*, p. 2 (Local Councils have an aggregate $3.3 billion in total net assets, making their $665 million payment to the Settlement Trust only 20 percent.)  They had to relinquish rights under insurance policies that BSA paid for, but they did so regardless of their liability for direct (non-derivative) claims of sexual abuse survivors or their own assets, including their own insurance.

3.     In contrast, the Sackler family in *Purdue* agreed to pay approximately $6 billion to that settlement fund.  Despite this enormous contribution, the Supreme Court agreed to consider the

---

[3] The United Methodist Entities are the only "Contributing Charter Organizations" and are paying $30 million to the Settlement Trust.  *BSA*, 642 B.R. at 539.

legality of third-party releases.  *See*, *Purdue*, S.Ct. Case No. 23-124 (August 7, 2023, *Reply in Support of [Trustee's] Application for a Stay*, p. 25, discussing Sackler contribution).

4.     The releases concerning abuse claims in the BSA plan extinguish direct claims by abuse survivors.  They apply to the 8,073 abuse claimants who voted against confirmation, as well as the 41% of abuse claimants who did not vote on the plan and, therefore, did not specifically consent to the releases.  Dumas Decl., Exhibit 5, Final Vote Tabulation excerpts).  The releases extinguish these claimants' private property rights without providing an opportunity for the claimants to opt in or out of the releases, which raises due process concerns.

5.     These third-party releases are not authorized by the bankruptcy code, are an abuse of the bankruptcy system, and raise serious constitutional questions by extinguishing without consent the property rights of nondebtors against entities (and individual representatives) who are not debtors in this bankruptcy.  Allowing nondebtors that have not shown financial distress to avoid tort liability through discharge in another entity's bankruptcy is not what Congress intended the Bankruptcy Code to accomplish.  *See*, *LTL Mgmt., LLC*, 64

F.4th 84, 93, 111 (3d Cir. 2023) (holding that only debtors in financial distress are entitled to access the bankruptcy system).

6.    Since the Third Circuit denied Appellants' motions for stay on April 19, 2023, the BSA plan has gone effective as of that date.  But the administrative mechanism to process abuse claims only just opened to expedited claims on August 4 and regular claims yesterday, on August 17.  The deadline for expedited claims is October 3.  Dumas Decl., Ex. 2 (email).

7.    The plan imposes an October 19 (six-month) deadline for abuse claimants to submit claims to the "Independent Review Option" ("IRO"), even though the portal only now became available.  Dumas Decl., Ex. 3, p. 3 (plan excerpts).  Even worse, the plan promised discovery through a "Document Appendix" that was supposed to be available to claimants on or before the effective date and those documents are still not available.  Dumas Decl., ¶6; Exhibit 6, ¶¶ 1-2, Document Appendix excerpts (BSA and third parties required to provide discovery documents "on or before the Effective Date" and "as a condition to the Effective Date"); Ex. 3, p. 4-5, plan excerpts from Art. V of the Trust Distribution Procedures ("The Settlement Trust shall afford

access for Direct Abuse Claimants to ... documents obtained by the Settlement Trust pursuant to the Document Appendix"). Claimants must pay a total of $20,000 to go through IRO and it is "like a trial." www.scoutingsettlementtrust.com/s/faq. IRO claimants must pay their first $10,000 by the October 19 deadline. *Id.* Trials involve discovery, which is why IRO claimants were promised six months' access to discovery documents to analyze their claims before they are due. IRO claims are now due in nine weeks and these claimants (including D&V Claimants) still have no access to discovery. Claimanst do not have the discovery needed to make that election and would be prejudiced if they either miss the opportunity because of the lack of discovery or pay $10,000 and learn from later discovery that they are unable to pursue an IRO claim. Even if they get access next week, that is not enough time to evaluate if a claim qualifies for the IRO. D&V Claimants are unfairly prejudiced by this substantial delayed discovery.

8.      With October deadlines approaching, this is an opportune time stay the plan. Plan proponents have consistently argued that the nonconsensual third-party releases are a key component to this plan. If so, there should be certainty about the legality of such releases before

the plan is permitted to be fully implemented.  The Supreme Court will supply that certainty, one way or the other, in the upcoming session.  A stay would, at a minimum, avoid potentially wasteful additional work by the Settlement Trustee in the event the Third Circuit ultimately overturns the plan.

9.      A stay of the plan would also diminish equitable mootness arguments of plan proponents.  The Third Circuit should review the third-party release issues on the merits.  While the Supreme Court has never endorsed the equitable mootness doctrine and D&V Claimants dispute its viability and applicability, a stay would prevent further implementation of the plan, allow required discovery, and avoid distribution to pay abuse claims.  A stay could therefore prevent the validity of the third-party releases from evading appellate review.

10.     In addition to staying the plan, D&V Claimants ask that this Court stay appeals in this case until the Supreme Court rules in *Purdue* on the legality of third-party releases.  D&V claimants ask that this Court stay the appeals only if it stays the plan.  A stay of the appeals without staying the plan would only strengthen equitable mootness arguments.

## I.   Background

11.    D&V Claimants are sexual abuse survivors who filed sexual abuse proofs of claim in BSA's bankruptcy.  They all voted against confirmation of the Plan.  Their lawsuits have been stayed by BSA's bankruptcy.  Dumas Decl. at ¶ 3.

12.    BSA's plan goes far beyond reorganizing the rights of BSA and its creditors by releasing claims against Chartered Organizations, Local Councils and channeling those claims into the post-bankruptcy Settlement Trust.  *BSA*, 642 B.R. at 586 (the "nonconsensual third-party releases" run "in favor of the Settling Insurance Companies, Local Councils, Chartered Organizations and their Representatives.").  In exchange, the released non-debtors will provide shockingly little to the abuse claimants forced to give up their direct claims.  With the exception of the United Methodist Entities, none of over 300,000 Chartered Organizations released will contribute any money at all.  *Id.* at 539.  Likewise, the aggregate contribution from Local Councils of only 20 percent of their net assets is unreasonable given their liability exposure and substantial assets.

11

13.    What these third parties give up is their rights in "shared insurance."  From 1976 on, BSA included Local Councils and Chartered Organizations as named or additional insureds on insurance policies paid for by BSA.  *BSA*, 642 B.R. at 89-90.  However, the third-party releases are so broad they include claims not involving BSA insurance policies but are direct claims covered by insurance policies third-party Chartered Organizations bought themselves, not naming BSA, but happened to be issued by Settling Insurers.  642 B.R. at 646-48 (discussing Chartered Organizations giving up their own insurance if issued by Settling Insurers).

14.    The released Chartered Organizations and Local Councils get the benefits of bankruptcy debtors without satisfying the obligations the Bankruptcy Code imposes, including the basic requirement of showing they are in financial distress.  *LTL Management*, 64 F.4th 84. The plan allows these non-debtors to ignore the Code's financial disclosure requirements; provide far less of their assets than debtors in a bankruptcy must; and releases individual representatives from nondischargeable claims for fraud or other willful and malicious conduct, including claims for punitive damages.  The releases do real

harm to abuse claimants who cannot pursue direct claims against these non-debtors in the tort system but must release and channel their claims.

15.   D&V Claimants objected to the plan because the bankruptcy court did not have jurisdiction to grant nonconsensual third-party releases and channeling injunctions to non-debtors; the releases and injunctions are not authorized by the Bankruptcy Code; and, even assuming they are authorized, they do not meet the standards of Third Circuit caselaw.  Dumas Decl. at ¶ 4.

16.   Appellants must ordinarily seek a stay pending appeal. Otherwise, if the "settlement proceeds are distributed before resolution of" the appeal, "that appeal is 'all but assured' to become moot." *In re Body Armor I*, 927 F.3d 763, 770 (3d Cir. 2019) (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 567 (3d Cir. 2015)).  Courts have dismissed appeals as equitably moot when the appellants failed to seek a stay. *See*, *e.g.*, *In re Allied Nev. Gold Corp.*, 725 F. App'x 144, 148 (3d Cir. 2018) (appeal from confirmation order dismissed as "equitably moot" when appellants "did not timely seek or obtain a stay."); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143-45 (2d Cir. 2005) (same).

17.    As discussed below, D&V Claimants have a "reasonable" chance of succeeding on appeal.  *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019).  Their appeal seeks answers to unsettled legal questions about third-party releases that, as the writ in *Purdue* makes clear, are of widespread public importance.

## I.    Joinder

18.    D&V Claimants join in the Renewed Motion for Stay of the Lujan Claimants.  D&V Claimants incorporate their arguments and supporting materials in their entirety as if set forth herein.

## II.    Argument

19.    FRAP Rule 8(a) gives power to district courts to stay underlying rulings pending appeal.  The Third Circuit discussed the applicable standard in *S.S. Body Armor I*, 927 F.3d at 771-72.  In ruling on a motion to stay, courts assess four factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (citation omitted).  "Before issuing a stay, it is ultimately necessary to balance the equities — to explore the relative harms to applicant and respondent, as well as the interests of the public at large."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal notations omitted).  The balance of equities favors granting a stay now.

## A.   D&V Claimants Have a Likelihood of Success on the Merits

20.    D&V Claimants have filed their opening brief arguing the illegality of third-party releases for nondebtor Local Councils and Chartered Organizations.  23-1666, D.I. 61.  Without repeating those arguments, D&V Claimants incorporate them by reference as if set forth in full.

21.    Courts need not find that the appellant will definitely be successful.  "Likelihood of success exists if there is 'a reasonable chance, or probability, of winning.'"  *S.S. Body Armor I*, 927 F.3d at 772 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)).  The appellant does not have to show that it is "more likely than not" to win the appeal, it is enough to show a "significantly better than negligible" chance of success.  *Id.* (quoting *In re Revel AC,*

*Inc.*, 802 F.3d 558, 569 and 571 (3d Cir. 2015)).  Now that the Supreme Court agreed to hear the appeal in *Purdue* on the exact issue raised by D&V Claimants, the chance that D&V Claimants will succeed on the merits is better than when they first asked for a stay, and significantly better than negligible.

- **The Releases are Contrary to Third Circuit Caselaw**

22.    D&V Claimants are likely to succeed on the merits because the third-party releases in BSA's plan are contrary to Third Circuit cases.  Third Circuit caselaw persuasively suggests that such releases are prohibited.  In *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004), the Third Circuit refused to extend the scope of nondebtor releases in an asbestos case beyond the express limits of Code § 524(g).  The Court held that the bankruptcy court's equitable powers under § 105(a) did not permit third-party releases broader than as specified in § 524(g).  *Id.* at 202.

23.    The Third Circuit's recent opinion in *LTL Management* also provides guidance, although the case was on appeal from denial of a motion to dismiss.  That case, most broadly, asked, "who is entitled to use the bankruptcy system?" and imposed a good faith requirement that

looks to financial distress. The Third Circuit held that only debtors in financial distress are entitled to bankruptcy. *Id.* at 93, 111. Here, Local Councils and Chartered Organizations are not even debtors, and there was no showing that any of them are in financial distress. If lack of financial distress is grounds to dismiss a putative debtor's own bankruptcy, then lack of financial distress should also preclude the release and discharge of nondebtors.

- **The Bankruptcy Court Did Not Have Jurisdiction to Grant These Third-Party Releases**

24.    The bankruptcy court did not have jurisdiction to issue these third-party releases and injunctions. Subject matter jurisdiction must exist before, and independent of, plan provisions seeking to involve nondebtors. *Combustion*, 391 F.3d at 225. The liability of one third-party nondebtor to another third-party nondebtor is not an issue that "arises under" or "arises in" a debtor's bankruptcy and is not part of a core proceeding. "Related to" jurisdiction was the only possibility. "Related to" jurisdiction did not exist in this case because the only reasonable basis for such jurisdiction was shared assets and the only shared asset was the shared insurance described above. This shared insurance was not enough to give the bankruptcy court "related to"

jurisdiction over abuse claimants' independent third-party claims against these nondebtor third parties because shared insurance is not enough in the Third Circuit to create "related to" jurisdiction. *In re Continental Airlines*, 203 F.3d 203, 217 (3d. Cir 2000) ("[E]ven assuming that the [shared insurance] proceeds are property of the estate, this by itself does not justify a permanent injunction of Plaintiff's actions against the insured non-debtor ... as necessary for the reorganization."); *See also*, *Combustion*, 391 F3d 190, 233 (3d Cir. 2005) (concluding it was "doubtful whether shared insurance would be sufficient grounds upon which to find related-to jurisdiction over independent claims against [non-debtors].").

25.    At a minimum, the bankruptcy court did not have "related to" jurisdiction over claims *not* covered by shared insurance.  Despite this, the court included in the releases claims covered by a Chartered Organization's own insurance policy – policies in which BSA had no interest – if a Settling Insurer issued the policy.  The releases go too far in including such claims.

/ / /

/ / /

- **The Bankruptcy Code Does Not Authorize Third-Party Releases Except in Narrow Circumstances in Asbestos Cases**

26.    More important to the likelihood of success is that the Bankruptcy Code does not authorize nonconsensual releases and injunctions of independent, direct claims against nondebtor third parties.  This is the issue now before the Supreme Court in *Purdue*.  This issue is not settled in the Third Circuit because the Third Circuit has never directly addressed the issue of statutory authority for third-party releases outside the context of asbestos litigation expressly covered by section 524(g).  11 U.S.C. § 524(g) (allowing narrow third-party releases of derivative claims in asbestos cases).  11 U.S.C. § 524(e)only allows "discharge of a debt of the debtor."  This plan goes too far in releasing and discharging liability of nondebtors *for their own debts.*

27.    Nothing in the Code authorizes such releases.  Congressional silence is not authority.  General provisions regarding a bankruptcy court's equitable powers are not authority for these releases because the court's equitable powers must be tethered to actual authority in the Code.  Further, because the releases extinguish abuse claimants' state

law claims, they give a *legal* remedy to the released nondebtors, not an equitable remedy.  Therefore, they are outside any conceivable scope of § 105's *equitable* powers.  Recent U.S. Supreme Court cases, the Constitutional framework for the bankruptcy court system, and the *Erie* doctrine support the conclusion that there is no statutory authority for nondebtor releases.

28.   The general provisions in §§ 105(a), 1123(a)(5), and 1123(b)(6), relied on by the bankruptcy court, do not create broad equitable powers that extend to granting nonconsensual third-party releases.  *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Code.); *Combustion*, 391 F.3d at 202 (§ 105(a) does not give the bankruptcy court equitable power to enter other types of third-party injunctions not specifically authorized).  The lower courts erred in using general provisions preserving bankruptcy courts' residual equitable authority to exercise vast power over disputes between nondebtor third parties – power much greater than the powers the Code specifically gives bankruptcy courts.

29.    In recent years, the Supreme Court has clarified the narrow nature of bankruptcy courts' equitable or inherent power, finding that bankruptcy courts may not rely on general grants of residual equitable authority to reach outcomes incompatible with the structure and purpose of the Code.  In *Law*, the Court unanimously held that a bankruptcy court does not have "a general, equitable power" or "inherent power" under § 105(a) to make orders inconsistent with other Code provisions.  571 U.S. at 425 ("A bankruptcy court may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its other provisions.)  The Court reversed the bankruptcy court's order denying a homestead exemption.  The Court explained that there is "no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code" because the Code was intended to be a comprehensive statement of the applicable rights and procedures.  *Id.* at 416.

30.    More recently, in *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 984 (2017), the Court held that a bankruptcy court cannot override the protections afforded by the Bankruptcy Code in a "rare" case, even to carry out bankruptcy objectives.  That bankruptcy court

did not follow priority rules, putting unsecured creditors before

nonconsenting judgment creditors.  As here, plan proponents argued the

bankruptcy court had inherent authority to deviate from the rules

because the Code was "silent" on the subject and there was "sufficient

reason" in that rare instance.  The Supreme Court disagreed and held

the "importance of the priority system leads us to expect more than

simply statutory silence if, and when, Congress were to intend a major

departure."  137 S. Ct. at 984.

31.    The fact that the bankruptcy court used judge-made criteria

to decide third-party releases were justified in this case further shows

that the Bankruptcy Code itself does not provide for such releases.  In

applying these judge-made criteria for third-party releases, the

bankruptcy and district courts violated the *Erie* doctrine's prohibition

against making federal common law.  *Erie v. Tompkins*, 304 U.S. 64, 78

(1938) ("there is no general federal common law").

- **These Releases Do Not Meet the Standards Used by the Bankruptcy and District Courts**

32.    Even assuming the bankruptcy court had jurisdiction and

statutory authority, and federal common law were allowed, the third-

party releases and injunctions in this case did not meet the standards

used by the bankruptcy and district courts.  (*See*, 23-1666, D.I. 61, D&V Claimants' Opening Brief at 63-78.)

**B.   D&V Claimants Will be Irreparably Harmed in the Absence of a Stay**

33.    The interests of D&V Claimants, other abuse claimants that did not consent to the releases, and the public will be irrevocably harmed if the Third Circuit does not review the third-party release issues on the merits.  Nonconsensual third-party releases enable wealthy and powerful organizations to obtain legal immunity from tort victims without having to subject themselves to the procedures and scrutiny required from debtors under the Bankruptcy Code.  These releases deprive tort victims of their day in court without their consent.  They erode public trust in the bankruptcy system.  Such releases deserve Third Circuit scrutiny.

34.    Because Document Appendix documents were "a condition to" the effective date, the plan should not have "gone effective" (and arguably did not) before these documents were available to abuse claimants.  This Court could nullify the effective date and stay the plan on this basis alone.

35.     The risk that the Third Circuit might dismiss the appeals on the grounds of equitable mootness is enough to find irreparable harm. *In re MTE Holdings, LLC*, 2021 WL 4203339, at *4 (D. Del. Sept. 15, 2021); *In re MD Helicopters, Inc.*, 641 B.R. 96, 109 (D. Del. 2022) (irreparable harm exists where "there is a substantial risk of mootness, in addition to potential economic harm"); *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011) ("[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied."). Here, D&V Claimants risk mootness and potential economic harm. Dismissal on equitable mootness grounds would be a particularly harsh result if the Supreme Court rules in *Purdue* that nonconsensual releases of direct third-party claims are illegal under the Bankruptcy Code or the Constitution. Further, dismissal on equitable mootness grounds would deprive this Circuit of the opportunity to address third-party nondebtor releases after the Supreme Court rules on their legality.

36.     In the absence of a stay, the plan will continue to move forward. Specific to the D&V Claimants and their economic hardship, they will be in the difficult, if not impossible, position of pursuing this

24

appeal while at the same time having to submit their claims to the Settlement Trustee, so far without promised discovery.  Participating in the claims process will strengthen Appellees' argument that D&V Claimants' appeal is moot.  Any finding of equitable mootness would be irreparably harmful to D&V Claimants.

### C.   On Balance, a Stay Will Not Harm the Other Parties

37.   Courts compare this third factor with the second factor and look at how the equities balance.  *S.S. Body Armor I.*, 927 F.3d at 772.  A *lack* of stay before an adequate discovery period and before the Settlement Trustee starts disbursing funds will cause D&V Claimants irreparable harm.  D&V Claimants – abuse victims themselves – are sensitive to the fact that a stay may delay full implementation of the plan and payment to abuse survivors.  But that delay is of BSA's and other plan proponents' own making.  If plan proponents had not insisted on nonconsensual third-party releases that violate this circuit's caselaw, Supreme Court authority, and the Code, this appeal would not be necessary and there would be no delay.  The plan only (purportedly) went effective on April 19, 2023.  The administrative process for handling abuse claims is not fully up and running and required

discovery is not available.  Any additional delay until the Supreme

Court rules in *Purdue* will not cause substantial harm and will make

this appeal more efficient.

### D.   The Public Interest Weighs Heavily in Favor of a Stay

38.   This fourth factor weighs very much in favor of a stay.  In

granting a writ of review in *Purdue*, the Supreme Court recognized the

public's great concern in nonconsensual third-party releases and the

need to resolve the circuit split on this issue.  Third Circuit litigants

deserve the Third Circuit's fulsome analysis of such releases, an

analysis that incorporates the Supreme Court's ultimate ruling in

*Purdue*.

39.   The Third Circuit has never squarely addressed the issues of

third-party releases raised in these appeals.  While the Third Circuit

has reviewed non-debtor releases in non-asbestos cases, it did so

without addressing the statutory authority or the jurisdictional basis

for such releases.  These are issues that merit the Third Circuit's full

and robust review *after* the Supreme Court rules on this exact issue.

The need for this review is of particular concern to the public given how

many mass tort type bankruptcy cases are filed in the Third Circuit.

The Court should have the opportunity to conduct this full review after the Supreme Court decides *Purdue*, without being sidetracked by equitable mootness arguments that will be strengthened in the absence of a stay.

### E.    No Bond Required

40.    As D&V Claimants argued before, this is not a case that requires an appellate bond.  Bonds are typically required on appeal to secure the payment of a judgment.  D&V Claimants are not judgment debtors.  They owe no money to BSA.  There is no judgement to secure.  Because the plan does not require D&V Claimants to pay money to Debtors or anyone else, and BSA will not suffer material harm from a stay, there is nothing for a bond to secure and there is "no need for a bond."  *L.A. Dodgers*, 465 B.R. at 38.  D&V Claimants also ask that the Court not require a bond for costs.  D&V Claimants are all individual people and sexual abuse survivors.  Imposing any additional costs on them, even the cost of a bond, would be a hardship for them.

/ / /

/ / /

/ / /

## CONCLUSION

41.     D&V Claimants ask that this Court grant their motion and issue a stay of the plan and appeals in this case until after the Supreme Court rules in *Purdue*.


Dated:  August 18, 2023

**DUMAS & VAUGHN, LLC**
*/s/ Gilion C. Dumas*
Dumas & Vaughn, LLC
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com

**GELLERT SCALI BUSENKELL & BROWN LLC**
*/s/ Charles J. Brown, III*
Charles J. Brown, III, Esquire
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

*Counsel to D&V Claimants*

## CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8013(f).  A proportionally spaced typeface was used, as follows:

> Name of typeface:  Century
> Point size:  14
> Line spacing:  Double

The total number of words in the motion, excluding the items set forth in Federal Rule of Bankruptcy Procedure 8015(g), is 4,998.

Counsel for D&V Claimants sent reasonable notice of their intent to file this motion, as required by FRAP Rule 8(C), by email to all parties.

## CERTIFICATE OF SERVICE

I, Charles J. Brown, III, hereby certify that on August 18, 2023, I caused a copy of the forgoing **EMERGENCY RENEWED MOTION OF DUMAS & VAUGHN CLAIMANTS FOR STAY OF BANKRUPTCY PLAN AND MOTION TO STAY APPEAL**, to be served on all registered users of the Court's Case Management/Electronic Case File ("CM/ECF") in this case via CM/ECF.

DATED: August 18, 2023          GELLERT SCALI BUSENKELL & BROWN LLC

/s/ *Charles J. Brown, III*
Charles J. Brown, III, Esquire (No. 3368)
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

*Counsel for D&V Claimants*