IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC, | Case No. 20-10343 (LLS) |
| Debtors. | (Jointly Administered) |
| National Union Fire Insurance Co. of Pittsburgh, PA, *et al.*, Appellants. v. | Case No. 22-cv-01237-RGA |
| Boy Scouts of America and Delaware BSA, LLC, | (Jointly Consolidated)[1] |
| Appellees. | |

## DECLARATION OF GILION C. DUMAS IN SUPPORT OF THE RENEWED MOTION OF DUMAS & VAUGHN CLAIMANTS FOR STAY OF BANKRUPTCY PLAN AND MOTION TO STAY APPEAL

I, Gilion C. Dumas, declare under penalty of perjury as follows:

1.     I am a partner in the law firm of Dumas & Vaughn, LLC and

represent the Dumas & Vaughn Claimants ("D&V Claimants") in this

_____

[1] Case numbers 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243, 22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252, 22-cv-01258, and 22-cv-01263 have been jointly consolidated under 22-cv-01237.

1

appeal and the underlying Boy Scouts of America ("BSA") bankruptcy. I submit this Declaration in support of the Renewed Motion of Dumas & Vaughn Claimants for Stay of Bankruptcy Plan and Motion to Stay Appeal.  I am over 18 years old.  This Declaration is based on my personal knowledge and review of relevant documents.  I would be competent to testify to the facts set forth in this Declaration if called as a witness.

2.     D&V Claimants appeal from the March 28, 2023 Order of the district court affirming the bankruptcy court's confirmation of Debtors' plan of reorganization; the related Opinion of the district court, also dated March 28, 2023 (*In Re BSA*, 650 B.R. 87 (2023)); the bankruptcy court's confirmation Order, dated September 8, 2022; and the bankruptcy court's related Opinion, dated July 29, 2022 (*In Re Boy Scouts of America*, 642 B.R. 504 (2022) ("*BSA*")).

3.     My law firm has been actively involved in the BSA bankruptcy since the February 18, 2020 petition date.  D&V Claimants are all sexual abuse survivors who filed sexual abuse proofs of claim in the bankruptcy case.  They all voted against confirmation of the Plan. All of the D&V Claimants have direct liability claims against non-

debtor Local Councils (regional Scouting entities); most have claims against a Chartered Organization (entities that sponsored their Scout troops or Cub Scout packs). Almost all of the 69 have filed or are in the process of filing lawsuits in state court to preserve those claims. These lawsuits allege claims for, among other things, negligence, fraud, constructive fraud, vicarious liability for intentional torts, and punitive damages for willful and malicious conduct. These lawsuits have been stayed since March 30, 2020, when the bankruptcy court entered its nationwide preliminary injunction. Because the D&V Claimants have not been able to pursue discovery in these lawsuits, the full extent of the liability of released non-debtors remains unknown.

4. D&V Claimants objected to the plan because the bankruptcy court did not have jurisdiction to grant nonconsensual third-party releases and channeling injunctions to non-debtors; the releases and injunctions are not authorized by the Bankruptcy Code; and, even assuming they are authorized, they do not meet the standards of Third Circuit caselaw.

5.     Attached as Exhibit 1 are true and accurate copies of excerpts from Bankr. D.I. 11123-1, the *Amended Notice of Entry of Confirmation Order and Occurrence of Effective Date*.

6.     Attached as Exhibit 2 are true and accurate copies of emails from the Settlement Trustee's office.  The August 4 email explains that the questionnaire for and portal to submit sexual abuse claims ("Trust Claims" and "Independent Review Option" ("IRO") claims) was not available.  Only those approximately 7,300 (out of 82,000) holders of "Expedited Distribution" claims had access to a questionnaire and portal since August 4.  The August 16 email explains registering for access to discovery documents, which requires registering with the claim portal.  Only in the August 17 email did the Trustee's office announce that attorneys could register for the portal to submit regular claims.  As of the filing of this motion, counsel for D&V Claimants had not received confirmation allowing them access to the discovery documents.

7.     Attached as Exhibit 3 are true and accurate copies of excerpts from BSA's final Chapter 11 plan of reorganization.

8.      Attached as Exhibit 4 are true and accurate copies of excerpts from the solicitation version of the *Disclosure Statement.*

9.      Attached as Exhibit 5 are true and accurate copies of excerpts from the Final Vote Tabulation.

10.     Attached as Exhibit 6 are true and accurate copies of excerpts from the Documents Appendix.  The "Document Appendix" is available on the Scouting Settlement Trust website at:

> https://scoutingsettlementtrust.my.salesforce.com/sfc/p/#Dp0
> 000016pkB/a/Dp000000sbbs/.Yktt4ekPInxGkrvv7fm4ne05W
> JzMquaeHHc9tbigFw.

However, the Document Appendix itself does not include any discover documents.  The Appendix is only "an informational protocol that governs the production of, access to, and the scope of information held by BSA, Local Councils (and their predecessors), and Chartered Organizations relevant to help support the validation, evaluation, approval, and enforcement of insurance that covers Abuse Claims." https://www.scoutingsettlementtrust.com/s/faq.  No documents are available.  D&V Claimants are unfairly prejudiced by their lack of access to required discovery.  This prejudice is particularly onerous for those D&V Claimants considering or preparing IRO claims because the

plan requires these documents before or on, and as a condition to, the effective date, which was April 19, and IRO claims are due October 19.

11.    Attached as Exhibit 7 is a true and accurate copy of the Third Circuit August 18, 2023 Order dismissing D&V Claimants' Renewed Motion for Stay without prejudice, directing D&V Claimants to file the motion in this Court.

12.    Attached as Exhibit 8 is a true and accurate copy of the Opening Brief filed by D&V Claimants in the Third Circuit.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Dated:     Portland, Oregon
           August 18, 2023

_____
Gilion C. Dumas

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**AMENDED NOTICE OF ENTRY OF CONFIRMATION ORDER AND OCCURRENCE OF EFFECTIVE DATE OF THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION (WITH TECHNICAL MODIFICATIONS) FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      **Confirmation Order.** On September 8, 2022, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [D.I. 10316] (the "Confirmation Order") confirming the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10296] (as may be further amended, supplemented, or modified in accordance with the terms thereof, and together with the Plan Supplement and the Plan Documents, the "Plan")[2] in the chapter 11 cases of Boy Scouts of America and Delaware BSA, LLC, the above-captioned non-profit corporations that are debtors and debtors in possession (together, the "Debtors").

      **Affirmation Order.** On March 28, 2023, the United States District Court for the District of Delaware entered an Opinion [D.I. 150] and Order [D.I. 151] in Civ. No. 22-1237-RGA (D. Del.) affirming the Confirmation Order on appeal (the "Affirmation Order").[3]

      **Effective Date.** On **April 19, 2023**, the Effective Date of the Plan occurred, and as a result the Plan has been substantially consummated. All conditions precedent to the Effective Date of the Plan set forth in Article IX.B of the Plan have either been satisfied or waived in accordance with the Plan and Confirmation Order.

      **Binding Effect.** As of the Effective Date, the terms of the Plan (including, without limitation, all discharge, injunction, exculpation, and release provisions contained in the Plan and the Confirmation Order) and Plan Documents are immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized BSA, and any and all holders of Claims against and Interests in the Debtors (irrespective of whether holders of such Claims or Interests voted to accept the Plan or are impaired under the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and notwithstanding whether such Person or Entity (a) will receive or retain any property, or interest in property, under this Plan, (b) has filed a Proof of Claim in the Chapter 11 Cases or (c) failed to vote to accept or reject the Plan, affirmatively voted to reject the Plan, or is conclusively presumed to reject the Plan.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Confirmation Order or Plan, as applicable.

[3]    This notice is intended to provide notice of the Effective Date, among other things, and it does not, and shall not be construed to, limit, modify, or interpret any of the provisions of the Plan, Insurance Settlement Agreements, Confirmation Order, or Affirmation Order. Some of the provisions of the Plan, Insurance Settlement Agreements, and Confirmation Order are included herein for the convenience of creditors; *however*, creditors should refer to the full text of these documents and should not rely upon the summary provided herein.

# EXHIBIT 2

| | |
|---|---|
| **From:** | Scouting Settlement Trust Info |
| **Subject:** | Scouting Settlement Trust \| Expedited Claims Questionnaire |
| **Date:** | Friday, August 4, 2023 5:41:14 AM |

Counsel for Scouting Settlement Trust Survivors,

We are pleased to announce that the Scouting Settlement Trust (the "Trust") is ready to process Expedited Distribution Abuse Claims.  To enable the Trust to process the Expedited Distribution Abuse Claims, your clients will need to complete a short Expedited Claims Questionnaire and submit it to the Trust by **October 3rd, 2023.**

A claims processing portal has been established at www.scoutingsettlementtrust.com to facilitate the processing of the Expedited Distribution Abuse claims.  You will need to register for a user account to access the claims processing portal.  Only the attorney associated with the Claimant's Proof of Claim will be able to register via the Claims Processing Portal.  If additional individuals, including paralegals from your law firm, need access to the Claims Processing Portal, please contact us at info@scoutingsettlementtrust.com.

The Claims Processing Portal has been pre-populated with the list of Expedited Distribution Abuse Claims for your law firm based on the information made available to the Trust. Please review your list of claim(s) and advise us if it is incorrect. In addition, your client will need your assistance in submitting a completed Expedited Claims Questionnaire to the Trust.  Please note that both your client and you will need to sign the Expedited Claims Questionnaire prior to its submission to the Trust.

The Claims Processing Portal is currently available only to law firms representing Claimants who have Expedited Distribution Abuse Claims and to pro se Claimants who have Expedited Distribution Abuse Claims.  An announcement will be made when the Claims Questionnaire for non-expedited Claimants (Trust Claim submissions and Independent Review Option submissions) becomes available.

If you have any questions or need help accessing the Claims Processing Portal, please contact us at info@scoutingsettlementtrust.com.

Regards,

Scouting Settlement Trust Team

--------------------------------------------------------------------------------------------------

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete

**EXHIBIT 2**                                                      **Page 1 of 6**

the material from any computer.

EXHIBIT 2                                                    Page 2 of 6

| | |
|---|---|
| **From:** | Emily Chung |
| **To:** | Gilion Dumas |
| **Subject:** | FW: Scouting Settlement Trust – Acknowledgement re: Document Appendix |
| **Date:** | Friday, August 18, 2023 11:51:01 AM |
| **Attachments:** | FIRM EMPLOYEE ACKNOWLEDGEMENT AND AGREEMENT TO BE BOUND.pdf |
| | ATTORNEY ACKNOWLEDGEMENT AND AGREEMENT TO BE BOUND.pdf |

**From:** Document Appendix <documentappendix@scoutingsettlementtrust.com>
**Sent:** Wednesday, August 16, 2023 1:52 PM
**To:** Document Appendix <documentappendix@scoutingsettlementtrust.com>
**Subject:** Scouting Settlement Trust – Acknowledgement re: Document Appendix

The Plan Appendix Re: Document Sharing ("the Document Appendix") [live link] calls for the creation of a document repository (the "Document Repository") to give Claimants, through their attorneys, access to certain documents they may find helpful in obtaining compensation under the Plan.

The Scouting Settlement Trust (the "Trust") is required to protect the information in the Document Repository because it contains information that is protected from disclosure by court protective orders and various privilege rules.

For this reason, up to five attorneys and law firm employees will be given access to the Document Repository only after completing two steps: (1) electronically signing an Attorney Acknowledgement and Agreement to be Bound (the "Attorney Acknowledgement") or a Firm Employee & Attorney Acknowledgement and Agreement to Be Bound (the "Firm Employee & Attorney Acknowledgement"), and (2) becoming registered on the Claims Processing Portal. For your review, we have attached copies of the Attorney Acknowledgement and Firm Employee & Attorney Acknowledgement.

If you or other attorneys and employees at your law firm wish to have access to the Document Repository, you must first complete this online form: https://forms.office.com/r/UAg7NfhWBA. Each person listed on the form will receive an email from Adobe Sign on behalf of the Trust allowing that person to electronically sign one of the two Acknowledgements. The Trust will only accept Acknowledgements signed through Adobe Sign.

Please note that the Firm Employee & Attorney Acknowledgement requires signatures by both the law firm employee and the supervising attorney, who must also be an authorized user of the Document Repository. **For this reason, initially Attorney Acknowledgments will be sent only to attorneys.** Shortly thereafter, firm employees listed on the online form will receive emails from Adobe Sign on behalf of the Trust that will allow those persons to electronically sign the Firm Employee and Attorney Acknowledgements.

**EXHIBIT 2**                                        **Page 3 of 6**

After each Acknowledgment is executed, each attorney or firm employee will receive an email from documentappendix@scoutingsettlementtrust.com for the next step of the Document Repository registration process.


Regards,

Scouting Settlement Trust Team

----------------------------------------------------------------------------------------------------

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

**EXHIBIT 2**                                                                                                    **Page 4 of 6**

**From:** Scouting Settlement Trust Info
**Subject:** Scouting Settlement Trust | Trust Distribution Claims Questionnaire
**Date:** Thursday, August 17, 2023 5:53:57 AM

Counsel for Scouting Settlement Trust Survivors,

We are pleased to announce that the Scouting Settlement Trust (the "Trust") is now accepting Trust Distribution Abuse Claims.  To enable the Trust to process the claims, your clients will need to complete a Claims Questionnaire and submit it to the Trust.

A claims processing portal has been established at www.scoutingsettlementtrust.com to facilitate the processing of the claims.  If you have not done so already, you will need to register for a user account to access the Claims Processing Portal.  Only the attorney associated with the Claimant's Proof of Claim will be able to register via the Claims Processing Portal.  If additional individuals, including paralegals from your law firm, need access to the Claims Processing Portal, please contact us at info@scoutingsettlementtrust.com.

The Claims Processing Portal has been pre-populated with the list of Trust Distribution Abuse Claims for your law firm based on the information made available to the Trust. Please review your list of claim(s) and advise us if it is incorrect. We will do our best to identify and make available the proof of claim form(s) your clients previously filed. In certain cases, we may not be able to make this information available in full due to a lack of identifying information on the proof of claim filing. Please note that both your client and you will need to sign the Claims Questionnaire prior to its submission to the Trust. Please do not submit the claims questionnaire until all information is reviewed and confirmed for accuracy.

Please note that Article VII (A) of the Trust Distribution Procedures (TDP) requires that the Claimant "**produce all records and documents in his or her possession, custody, or control related to the Abuse Claim**, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources . . . " (emphasis added).  In addition, please note that Section A of the Claims Questionnaire requires that "**[y]ou must agree to produce for the Trustee all the documents and records in your possession relating to this Abuse claim.**"  The Trust expects full compliance with these production requirements and has provided instructions on how to upload all required documents and records to the claims processing portal.

We are offering a "bulk upload" option for firms that have more than 50 Claimants.  The bulk upload option allows information to be efficiently pre-populated into the Claims Questionnaire in bulk.  An announcement will be made soon about this option.

There currently is no deadline to complete the Trust Claims Questionnaire, but we will notify all Claimants or their counsel when we do establish a deadline. Once we make that notification, Claimants will have 120 days to submit their completed claims questionnaires to the Trust.  **However, if you would like to participate in the Independent Review Option ("IRO"), you must elect to participate and complete and submit the Trust Claims Questionnaire to the Trust by October 19, 2023 (six months after the Effective Date).**

**EXHIBIT 2**                                    **Page 5 of 6**

As part of the Trust's commitment to transparency and open dialogue, it will host an hourlong Town Hall for claimants on Tuesday, Aug. 29 at 8 p.m. EDT / 5 p.m. PDT. Trustee Barbara Houser and claims administrator Randi Ilyse Roth will present an overview of the process and answer questions. Please watch your email in the coming days for more information about how to register. This will be first of what is planned to be regular meetings to keep claimants informed and up to date.

If you have any questions or need help accessing the Claims Processing Portal, please contact us at info@scoutingsettlementtrust.com.

Regards,

Scouting Settlement Trust Team

--------------------------------------------------------------------------------------------------

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

**EXHIBIT 2**                                                                                                     **Page 6 of 6**

# EXHIBIT 3

respect to any coverage for Abuse Claims and all other claims and causes of action specified in the applicable Insurance Settlement Agreements (collectively, the "Scouting Released Claims"). For the avoidance of doubt, the rights of Settling Insurance Companies that are assigned to the Settlement Trust are not released. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article X.J.2 shall not, and shall not be construed to release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, in the event of any conflict or inconsistency between this Article X.J.2 and the preceding Article X.J.1, this Article X.J.2 shall control.

3.  **Releases by Holders of Abuse Claims.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Protected Parties and the Limited Protected Parties to facilitate and implement the reorganization of the Debtors, including the settlements embodied in the Plan, including the Abuse Claims Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims; (b) each and all of the Limited Protected Parties and their respective property and successors and assigns of and from all Post-1975 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Post-1975 Chartered Organization Abuse Claims; (c) each of the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims and their respective property and successors and assigns of and from all Pre-1976 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Pre-1976 Chartered Organization Abuse Claims; and (d) each and all of the Opt-Out Chartered Organizations and their respective property and successors and assigns of and from all Opt-Out Chartered Organization Abuse

Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Opt-Out Chartered Organization Abuse Claims; provided, however, that the releases set forth in this Article X.J.3 shall not, and shall not be construed to: (i) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (ii) modify, reduce, impair or otherwise affect the ability of any holder of an Abuse Claim to recover on account of such Claim in accordance with  Article III.B.10 or Article III.B.11, as applicable.  For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims.  The releases in Article X.J.4 shall not, and shall not be deemed to, limit the releases in Article X.J.3.

4.      Releases by Holders of Claims.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the actions of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the JPM / Creditors' Committee Settlement, the Insurance Settlements, and the United Methodist Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim Holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Insurance Settlements, the United Methodist Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of

EXHIBIT 3                                                              Page 2 of 5

the holder being served notice of the Recommendation Rejection, the holder of such Direct Abuse Claim may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of the Direct Abuse Claim. Such Direct Abuse Claimant shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Direct Abuse Claimant. Notwithstanding the foregoing, any amount of an Accepted Settlement Recommendation or Allowed Claim Amount for an Abuse Claim that proceeds under this Independent Review Option in excess of a multiple of five (5) times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP (excluding Claims liquidated under this provision or under Article XII (regarding Tort Election Claims).

B. **Time to Select Independent Review Option**. Direct Abuse Claimants, other than Future Abuse Claimants, shall initially have until six (6) months after the Effective Date, to elect to participate in the Independent Review Option. In addition, in order to participate in the Independent Review Option, the Direct Abuse Claimant must complete and submit the Trust Claim Submission by six (6) months after the Effective Date to enable the Settlement Trust to establish reserves. If a Direct Abuse Claimant pursues a non-channeled Chartered Organization and the Settlement Trust settles with the Chartered Organization in question such that claims against it become channeled (a) the Settlement Trust shall provide notice of such settlement to any Direct Abuse Claimants that are pursuing any non-channeled Chartered Organizations and (b) such Direct Abuse Claimants shall have thirty (30) days from notice of the effectiveness of the Settlement Trust's settlement to select the Independent Review Option at that time.

C. **Excess Award Fund**. The Settlement Trust shall maintain a fund for the sole purpose of funding the portion of Accepted Settlement Recommendations that are in excess of $1 million (the "**Excess Award Fund**"). The Excess Award Fund shall be funded with certain proceeds from the Trust's collection of insurance policy proceeds from non-settling insurers as set forth below.[2]

D. **Accepted Settlement Recommendation of Less Than $1 Million**. If the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim. The Accepted Settlement Recommendation shall supersede the determination of the amount of the claim under the TDP, whether higher or lower, subject to limitations set forth in Article XIII.E below. If the Neutral makes an Accepted Settlement Recommendation of $1 million or less but greater than zero, then the Settlement Recommendation shall be paid by the Settlement Trust in accordance with Article IX, including any applicable payment percentage, and the Direct Abuse Claimant shall receive nothing from the Excess Award Fund.

---

[2] The sources of recovery for the fund or Direct Abuse Claimants are (i) the Debtors' or Local Counsels' non-settled shared insurance policies excess of the primary layer of coverage, and (ii) in the absence of a global settlement making a Chartered Organization a Protected Party, certain Chartered Organizations' separate non-settled insurance rights, collectively referred as Responsible Insurers, as defined below.

would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. No Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Abuse Claimant or to the Settlement Trust in respect of such claim for which the Settlement Trust would have liability, and in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim, *provided that* an Indirect Abuse Claimant may assert against the Settlement Trust an Indirect Abuse Claim for the recovery of defense costs solely to the extent permitted under applicable law.

      **C.**    <u>**Future Abuse Claims**</u>. To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

      (1)    have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date;

      (2)    as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

      (3)    submit the Future Abuse Claim to the Settlement Trust in accordance with these TDP, (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii), if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.E(iii) below; and

      (4)    have not filed a Chapter 11 POC.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

**ARTICLE V**
<u>**GENERAL TRUST PROCEDURES**</u>

      **A.**    <u>**Document Appendix**</u>. As more fully described in the Document Appendix, the Settlement Trustee may require other parties to the Document Appendix and third parties to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Document Obligations**").

      **B.**    <u>**Document Access**</u>. The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged information and documents obtained by the Settlement Trust pursuant to the Document Appendix to facilitate their submissions with respect to their Direct Abuse Claims. Such access shall include IV files (the Volunteer Screening Database), Troop Rosters, and non-privileged information and documents provided to the Settlement Trust by Direct Abuse Claimants that are not confidential and are relevant to the Allowed Amount of other Direct Abuse Claimants' Claims. A court of competent jurisdiction

7

**EXHIBIT 3**                          **Page 4 of 5**

shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these TDP.

C.    **Assignment of Insurance Rights**.    The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code. Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.    Notwithstanding the foregoing, the Settlement Trust, rather than any Protected Party, shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums, deductibles, and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim. Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law.

D.    **Deceased Abuse Survivor**.    The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

E.    **Statute of Limitations or Repose**.    The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the jurisdiction where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

**ARTICLE VI**
**EXPEDITED DISTRIBUTIONS**

A.    **Minimum Payment Criteria**.    A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the "**Expedited Distribution**"): (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order

**EXHIBIT 3**                    **Page 5 of 5**

# EXHIBIT 4

## Unique and Timely Abuse Claim Count* by Top-20 Most Common Chartered Organizations

| Chartering Organization Group | Count** |
|---|---|
| METHODIST CHURCH | 3,886 |
| BAPTIST CHURCH | 3,274 |
| CATHOLIC CHURCH | 3,213 |
| CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS | 2,481 |
| PRESBYTERIAN CHURCH | 1,687 |
| LUTHERAN CHURCH | 1,474 |
| ARMED FORCES*** | 704 |
| EPISCOPAL CHURCH | 597 |
| AMERICAN LEGION | 496 |
| YMCA | 488 |
| VFW | 410 |
| SALVATION ARMY | 252 |
| ELKS LODGE | 240 |
| LIONS CLUB | 224 |
| BOYS AND GIRLS CLUBS | 205 |
| KNIGHTS OF COLUMBUS | 181 |
| BOYS CLUB | 139 |
| KIWANIS CLUB | 121 |
| ROTARY CLUB | 95 |
| MOOSE LODGE | 88 |
| OTHER | 20,996 |
| UNKNOWN | 36,378 |
| MISSING | 4,928 |
| Total | 82,557 |

* The total Abuse Claim count in this table is slightly higher than the total count of unique and timely Abuse Claims to account for claimants that named multiple organizations.

** The abuse claim count listed in this column is based on the claimants' responses to Part 4.H. on the Sexual Abuse Proof of Claim Form and does not account for references to the Chartered Organization that may be located elsewhere in the proof of claim.  The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Chartered Organization.

*** Abuse Claims flagged as "Armed Forces" named one of the following groups: Army, Navy, Marines, Air Force, Coast Guard, National Guard, or the generic US Military or US Armed Forces.

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** (1), (2), (3)
**As of February 28, 2021**

| Council # | 733 | 741 | 748 | 763 | 773 | 775 | 777 | 780 | 802 | 803 | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Sioux | Texas Southwest | Yocona Area | Stonewall Jackson Area | Gulf Coast | Rio Grande | Washington Crossing | Michigan Crossroads | Transatlantic | Far East | |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,330,790 | $ 124,067 | $ 217,749 | $ 229,421 | $ 402,068 | $ 364,477 | $ 628,447 | $ 8,238,359 | $ 567,842 | $ 670,682 | $ 310,794,081 |
| Land, Buildings, and Equipment | 2,104,654 | 723,088 | 992,495 | 1,072,888 | | 6,029,080 | 2,013,185 | 21,428,581 | | | 1,294,849,955 |
| Long-Term Investments | 835,041 | 655,538 | 814,461 | 1,394,178 | | 1,798,169 | 3,423,224 | 31,637,398 | 662,887 | 2,200,977 | 1,650,837,634 |
| Other Assets | 932,377 | 96,120 | 91,413 | 2,490,208 | 7,693 | 1,550,593 | 389,536 | 5,796,383 | 399,052 | 188,738 | 280,852,608 |
| **Total Assets** | **5,192,862** | **1,598,832** | **2,116,118** | **5,185,695** | **409,791** | **9,742,319** | **6,455,392** | **67,087,721** | **1,629,782** | **3,060,397** | **3,537,334,278** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 201,463 | 88,060 | 70,583 | 612,700 | 395,300 | 618,600 | 263,300 | 7,415,844 | - | - | 118,313,912 |
| Other Liabilities | 713,191 | 37,265 | 93,756 | 353,484 | 99,011 | 105,973 | 358,690 | 11,358,441 | 208,902 | 73,474 | 115,884,679 |
| **Total Liabilities** | **914,653** | **125,325** | **164,339** | **966,184** | **494,311** | **724,573** | **621,990** | **18,774,285** | **208,902** | **73,474** | **234,198,591** |
| Unrestricted Net Assets | 1,496,185 | 916,498 | 863,638 | 217,980 | (292,475) | 1,906,030 | 3,906,611 | 25,109,723 | 966,036 | 2,886,174 | 1,870,754,935 |
| Restricted Net Assets | 2,782,024 | 557,010 | 1,088,141 | 4,001,531 | 207,677 | 7,111,716 | 1,924,791 | 23,203,713 | 454,843 | 100,750 | 1,432,473,515 |
| **Total Net Assets** | **$ 4,278,209** | **$ 1,473,507** | **$ 1,951,779** | **$ 4,219,511** | **$ (84,798)** | **$ 9,017,746** | **$ 5,831,402** | **$ 48,313,436** | **$ 1,420,880** | **$ 2,986,924** | **$3,303,228,450** |

Footnote:
(1) Figures presented are unaudited and preliminary and are as reported by each individual local council in the financial accounting system maintained by BSA. Some local council balance sheets may be incomplete. All figures are subject to material change
(2) Restricted and unrestricted classifications are reflected according to GAAP and generally does not include restrictions related to real property. Classification may not reflect all legal restrictions.
(3) The local councils are independent legal entities not controlled by BSA. The information reflected herein is aggregated for presentation purposes only.
(4) Greater Hudson Valley (#386) reflects Greater Hudson Valley 2/28/2021 and Hudson Valley (#374) 12/31/2020 balance sheets as the merger between Hudson Valley Council and Westchester-Putnam Council effective 1/1/2021 is not yet reflected on Greater Hudson Valley's system-generated balance sheet

**EXHIBIT 4**                    **Page 2 of 3**

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex-1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 261 | Transatlantic | ZZ | 139 | 1,569,070 | 28,081,700 | 447,138 | 966,036 | 28.50% | 61.57% | 1.59% | 3.44% |
| 262 | Far East | ZZ | 50 | 803,570 | 12,004,200 | 778,355 | 2,856,174 | 96.26% | 355.93% | 6.44% | 23.83% |
| | | | 41,750 | $ 7,646,294,995 | $ 41,069,210,100 | $ 519,568,545 | $ 1,870,754,935 | 6.80% | 24.47% | 1.27% | 4.56% |

**EXHIBIT 4**                                                                 **Page 3 of 3**

# EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 8345** |

**SUPPLEMENTAL DECLARATION OF CATHERINE NOWNES-WHITAKER OF OMNI AGENT SOLUTIONS REGARDING THE SUBMISSION OF VOTES AND FINAL TABULATION OF BALLOTS CAST IN CONNECTION WITH THE LIMITED EXTENDED VOTING DEADLINE FOR HOLDERS OF CLAIMS IN CLASS 8 AND CLASS 9 ON THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

I, Catherine Nownes-Whitaker, being duly sworn, hereby declare as follows:

1.      I am the Chief Operating Officer of Omni Agent Solutions ("Omni"), located at 5955 DeSoto Avenue, Suite 100, Woodland Hills, California 91367. I am over the age of eighteen years and not a party to the above-captioned action. Unless otherwise noted, I have personal knowledge of the facts set forth herein.

2.      On April 8, 2020, Omni was retained as administrative agent to the Debtors, *nunc pro tunc* to February 18, 2020. *See* D.I. 372. As administrative agent, Omni's services include solicitation, balloting, and tabulation of votes on the Plan. Omni and its employees have considerable experience in soliciting and tabulating votes to accept or reject chapter 11 plans.

3.      Except as otherwise noted, all facts set forth herein are based on my personal knowledge, knowledge that I acquired from individuals under my supervision, and my review of

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**EXHIBIT 5**                    **Page 1 of 3**

## Exhibit A

**Final Tabulation Summary – Class 8 and Class 9**

**EXHIBIT 5**        **Page 2 of 3**

**Exhibit A**
**Final Tabulation Summary – Class 8 and Class 9**

Debtor: Boy Scouts of America
Case No. 20-10343
Ballot Summary Results

| Class 8 Summary: Direct Abuse Claims | Voting Outcome: | Accepted | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **All** | | | **Master Ballots** | | **Direct Ballots** | |
| | | Total Valid | Accepted | Rejected | Accepted | Rejected | Accepted | Rejected |
| # Votes: | | 56,536 | 48,463 | 8,073 | 6,262 | 3,823 | 42,201 | 4,250 |
| Vote %: | | | 85.72% | 14.28% | 62.09% | 37.91% | 90.85% | 9.15% |
| Amount: | | $56,536.00 | $48,463.00 | $8,073.00 | $6,262.00 | $3,823.00 | $42,201.00 | $4,250.00 |
| Amount %: | | | 85.72% | 15.82% | 62.09% | 37.91% | 90.85% | 9.15% |
| Elect Expedited Distribution: | | 7381[1] | 6,729 | 585 | | | | |
| Elect Expedited Distribution %: | | 13.06% | 13.88% | 7.25% | | | | |
| # Opt Out Elections: | | 22,004 | | | | | | |

| Class 9 Summary: Indirect Abuse Claims | Voting Outcome: | Accepted | | |
|---|---|---|---|---|
| | | Total Valid | Accepted | Rejected |
| # Votes: | | 7,239 | 5,966 | 1,273 |
| Vote %: | | | 82.41% | 17.59% |
| Amount: | | $7,239.00 | $5,966.00 | $1,273.00 |
| Amount %: | | | 82.41% | 17.59% |
| # Opt Out Elections: | | 5505 | | |

Debtor: Delaware BSA, LLC
Case No. 20-10342
Ballot Summary Results

| Class 9 Summary: Indirect Abuse Claims | Voting Outcome: | Accepted | | |
|---|---|---|---|---|
| | | Total Valid | Accepted | Rejected |
| # Votes: | | 775 | 628 | 147 |
| Vote %: | | | 81.03% | 18.97% |
| Amount: | | $775.00 | $628.00 | $147.00 |
| Amount %: | | | 81.03% | 18.97% |
| # Opt Out Elections: | | 609 | | |

[1] Omni received 70 Class 8 Ballots in which the holder made the Expedited Distribution Election but did not vote to accept or reject the Plan, which are included in this total.

**EXHIBIT 5**                                    **Page 3 of 3**

# EXHIBIT 6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## PLAN APPENDIX RE: DOCUMENT SHARING

1.  **Production of Documents from Reorganized BSA.** On or before the Effective Date of the Plan, and as a condition to the Effective Date of the Plan, Debtors shall provide the following Documents to the Settlement Trustee, except to the extent a different production date is indicated below:

> (a) Documents produced in connection with the Chapter 11 Cases that relate to the Abuse Claims, including Documents produced by Local Councils in connection with the Preliminary Injunction; for the avoidance of doubt, this shall include all Rosters[2] produced by Local Councils in connection with the Preliminary Injunction;

> (b) Documents pertaining to the Abuse Claims that were open and unresolved as of the Petition Date that are in the possession of Debtors' National Coordinating Counsel, Ogletree Deakins;

> (c) The Volunteer Screening Database to the extent it relates to sexual abuse in Scouting. The Settlement Trustee or the holder of an Abuse Claim may request that Reorganized BSA search any other categories contained within the Volunteer Screening Database with respect to an alleged perpetrator. Reorganized BSA agrees that it will promptly conduct such a search and provide any records to the Settlement Trustee or the holder of an Abuse Claim it may find with respect to the particular request;

>> (i) The foregoing production includes any of the Reorganized BSA's "Perversion" files, "Confidential" files and "Red Flag" files or files stored under any other name comprising records of individuals accused of sexual impropriety or abuse of minors in the Scouting Program ("Perversion Files"), in both redacted (redacting the names

---

[1] The Debtors on these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] "Rosters" shall mean "historical troop and camp rosters that describe by name the Scouting youth, adult volunteers, or Scouting volunteers."

**EXHIBIT 6**        **Page 1 of 2**

of all victims and their family members, as well as all minors named in said files and their family members) and unredacted form;

(e)     All Documents necessary to secure the benefit of any insurance rights;

(f)     All of the following categories of Documents to the extent they are in possession of Ogletree Deakins and maintained in electronic form:

(i)     Documents regarding the registration of all identified alleged perpetrators in identified in a Proof of Claim;

(ii)    Each yearly version of the Youth Protection Guidelines and the equivalent;

(iii)   Each version of the Procedures for Maintaining Standards of Leadership and the equivalent;

(iv)    Each version of the Scoutmaster Handbook, Boy Scout Handbook Cub Scout Handbook, and similar Handbooks;

(v)     Each version of "How to Protect Your Children from Child Abuse" and the equivalent;

(vi)    Each version of the Procedures for Ineligible Volunteer File Deskbook and the equivalent;

(vii)   Each version of Standard Local Articles of Incorporation and the equivalent;

(viii)  Each version of the Standard Charter Agreement between a Local Council and a Charter Organization and the equivalent;

(ix)    Each version of BSA Rules and Regulations and the equivalent;

(x)     All Rosters,

*Provided, however,* that to the extent Ogletree Deakins does not have any of the categories of Documents referenced in Section 1(f), the Settlement Trustee may request such Documents from Reorganized BSA on an as-needed basis.

2.     **Production of Documents by Local Councils.**

On or before the Effective Date of the Plan, and as a condition to the Effective Date of the Plan, all Local Councils shall provide the following Documents to the Settlement Trustee (to the extent that such Documents are not produced by Debtors or Reorganized BSA, including pursuant to the Paragraph 1(a) above):

# EXHIBIT 7

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CCO-112

**Nos. <u>23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, & 23-1780</u>**

In re: Boy Scouts of America and Delaware BSA LLC

Lujan Claimants,
Appellants is No. 23-1664

Liberty Mutual Insurance Company, The Ohio Casualty
Insurance Company, Liberty Insurance Underwriters, Inc., and
Liberty Surplus Insurance Corporation,
Appellants in No. 23-1665

D&V Claimants,
Appellants in No. 23-1666

The Continental Insurance Company and Columbia Casualty
Company,
Appellants in No. 23-1667

National Union Fire Insurance Co. of Pittsburgh Pennsylvania,
Lexington Insurance Company, Landmark Insurance Company,
and The Insurance Company of the State of Pennsylvania,
Appellants in No. 23-1668

Indian Harbor Insurance Company,
Appellant in No. 23-1669

Old Republic General Insurance Group,
Appellant in No. 23-1670

Travelers Casualty and Surety Company, Inc., St. Paul Surplus
Lines Insurance Company, and Gulf Insurance Company,
Appellants in No. 23-1671

Great American Assurance Company and Great American E&S
Insurance Company
Appellants in No. 23-1672

Allianz Global Risks US Insurance Company, National Surety
Corporation, and Interstate Fire & Casualty Company,
Appellants in No. 23-1673

**EXHIBIT 7** Page 1 of 2

Argonaut Insurance Company and Colony Insurance Company
Appellants in No. 23-1674

Gemini Insurance Company,
Appellant in No. 23-1675

General Star Indemnity Company,
Appellant in No. 23-1676

Arrowood Indemnity Company,
Appellant in No. 23-1677

Traders and Pacific Insurance Company, Endurance American
Specialty Insurance Company, and Endurance American
Insurance Company
Appellants in No. 23-1678

Arch Insurance Company,
Appellant in No. 23-1780

(D. Del. No. 1-22-cv-01237)

Present:  SHWARTZ and MATEY, <u>Circuit Judges</u>

1. Renewed Motion by D&V Claimants (Appellants in No. 23-1666) to Stay Confirmation Order and Motion to Stay Appeals

2. Renewed Motion by Lujan Claimants (Appellants in No. 23-1664) to Stay Confirmation Order and Motion to Stay Appeals

Respectfully,
Clerk

_____ORDER_____

The foregoing motions are denied without prejudice to filing renewed stay motions in the district court.  <u>Cf.</u> Fed. R. App. P. 8(a).

By the Court,

<u>s/ Patty Shwartz</u>
Circuit Judge

Dated: August 18, 2023
kr/sb cc: All Counsel of Record

**EXHIBIT 7**                    **Page 2 of 2**

# EXHIBIT 8

# United States Court of Appeals

### for the

# Third Circuit

### Case No. 23-1666

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Debtors.*

_____

DUMAS & VAUGHN CLAIMANTS,

*Appellants,*

– v. –

BOY SCOUTS OF AMERICA, *et al.*,

*Appellees.*

_____

ON APPEAL FROM ORDER DATED MARCH 28, 2023,
ENTERED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE,
CASE 22 CV-01237 (RGA)[1]

## OPENING BRIEF OF THE DUMAS & VAUGHN CLAIMANTS

---

[1] Case number 22-cv-01237 (RGA) is a consolidated case including District Court cases 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243, 22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252, 22-cv-01258, and 22-cv-01263. The Dumas & Vaughn Claimants' appeal is docketed in the District Court at 22-cv-01249.

EXHIBIT 8                    Page 1 of 81

Gilion C. Dumas
DUMAS & VAUGHN, LLC
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com

Charles J. Brown, III, Esquire
GELLERT SCALI BUSENKELL & BROWN LLC
1201 N. Orange Street, 3rd Floor
Wilmington, DE 19801
Telephone: (302) 425-5813
Email: cbrown@gsbblaw.com

**EXHIBIT 8**                                                                 **Page 2 of 81**

# TABLE OF CONTENTS

I.   INTRODUCTION                                                        1

II.  STATEMENT OF JURISDICTION                                          5

III. STATEMENT OF THE ISSUES                                           6

IV.  STATEMENT OF RELATED CASES AND PROCEEDINGS                         7

V.   STATEMENT OF THE CASE                                              7

   A.   Relevant Facts                                          7

   B.   Procedural History                                       9

   C.   Rulings Presented for Review                            10

VI.  ARGUMENT                                                          10

   A.   Summary of Argument                                     10

      1. Third Circuit Cases Preclude Nondebtor Releases and
Injunctions                                                           10

      2. The Bankruptcy Court Lacked Jurisdiction Over Direct
Third-Party Claims Against Nondebtors                                  11

      3. There is no Statutory Authority for the Releases and
Injunctions                                                           12

      4. The Nondebtor Releases and Injunctions are Improper in
this Case                                                             13

      5. The Plan Treats Abuse Claimants Unfairly Compared to
Future Claimants                                                      14

B.  Standard of Review                                              14

C.  Argument                                                       15

  1. Third Circuit Law Precludes Nondebtor Releases               15

  2. The Bankruptcy Court did Not Have Jurisdiction Over
     Direct Third-Party Claims Against Nondebtors                 21

     a. No "Arising Under" or "Arising In" Jurisdiction           21

     b. No "Related to" Jurisdiction                              23

        i.   The Claims at Issue are Direct, Not Derivative       24

        ii.  No Automatic Right to Indemnity Exists               26

        iii. The Operation of Scouting Does Not Create
             Automatic Liability for BSA                          27

        iv.  Impact on Property, Primarily Shared
             Insurance, Did Not Confer Jurisdiction               31

  3. There is No Statutory Authority for Nonconsensual
     Nondebtor Releases and Injunctions                           33

     a. Nonconsensual Releases are Contrary to the
        Bankruptcy Code                                           34

        i.   Section 105(a)                                       34

        ii.  Section 1123(a)(5)                                   36

        iii. Section 1123(b)(6)                                   37

     b. Statutory Silence is Not Authority                        38

     c. Releases are Contrary to Third Circuit Cases
        Interpreting the Code                                     40

ii

**EXHIBIT 8**                                    **Page 4 of 81**

d. U.S. Supreme Court Cases Limit the Equitable
Power of Bankruptcy Courts ........................ 42

e. Bankruptcy Courts Have No General "Legal"
Authority and Releases are a Legal Remedy ...... 44

f. Conclusion Regarding Statutory Authority ........ 48

4. The Bankruptcy Court Erred in Applying "Guidelines"
to Grant Nondebtor Releases ............................ 49

a. It was Error to Apply Federal Common Law to
State Law Tort Claims ............................ 49

b. It was Legal Error to Conclude the Releases Meet
Federal Law Guidelines ............................ 53

i. Hallmarks .................................. 54

ii. *Master Mortgage* Factors .................... 58

5. The Plan Treats Current Claimants Unfairly Compared
to Future Claimants .................................. 68

VII. CONCLUSION ........................................ 69

iii

**EXHIBIT 8** **Page 5 of 81**

# TABLE OF AUTHORITIES

## Cases

*Archer v. Warner*,
  538 U.S. 314 (2003) ................................................................. 38

*Block v. Potter*,
  631 F.2d 233 (3d Cir. 1980) ............................................. 14, 53

*Czyzewski v. Jevic Holdings Corp.*,
  137 S. Ct. 973 (2017) ............................................... 39, 43, 44

*Erie v. Tompkins*,
  304 U.S. 64 (1938) ............................. 13, 49, 50, 51, 52, 53

*In re A.H Robins Co.*,
  880 F.2d 694 (4th Cir. 1989) ......................................... 40, 60

*In re American Family Enters.*,
  256 B.R. 377 (D. N.J. 2000) ................................................. 60

*In re AOV Indus., Inc.*,
  792 F.2d 1140 (D.C. Cir. 1986) ......................................... 60

*In re Boy Scouts of America and Delaware BSA, LLC.*,
  642 B.R. 504 (Bankr. D. Del. 2022) .. 1, 2, 3, 6, 8, 12, 19, 20, 21, 28, 30,
  31, 33, 34, 38, 44, 46, 55, 60, 61, 62, 63, 64, 65

*In re BSA*,
  650 B.R. 87 (Del. D. 2023) ............................................ 10, 34

*In re Combustion Engineering*,
  391 F.3d 190 (3d Cir. 2004).... ..10, 12, 15, 23, 24, 26, 28, 30, 32, 35, 37,
  40, 44, 46

/ / /

EXHIBIT 8      Page 6 of 81

*In re Continental Airlines*,
  203 F.3d 203 (3d. Cir 2000) ..................................... 16, 17, 32, 41, 53, 54

*In re Essar Steel Minnesota LLC*,
  47 F.4th 193 (3d Cir. 2022) ................................................................ 22

*In re Fed.-Mogul Glob. Inc.*,
  402 B.R. 625 (D. Del. 2009) ............................................................... 15

*In re Fed.-Mogul Glob. Inc.*,
  300 F.3d 382 (3d Cir. 2002)) ............................................................. 26

*In re Heron, Burchette, Ruckert & Rothwell*,
  148 B.R. 660 (Bankr. D.D.C. 1992) .................................................... 60

*In re Highland Capital Mgmt., L.P.*,
  48 F.4th 419 (5th Cir. 2022) ............................................................. 35

*In re Lowenschuss*,
  67 F.3d 1394 (9th Cir. 1995) ............................................................. 35

*In re LTL Mgmt., LLC*,
  64 F.4th 84 (3d Cir. 2023) .. 11, 14, 17, 18, 20, 21, 28, 39, 41, 53, 56, 57,
  65

*In re Pacific Lumber Co.*,
  584 F.3d 229 (5th Cir. 2009) ............................................................. 35

*In re USA Gymnastics*,
  Case No. 18-09108 [D.I. 1776] (Bankr. S.D. Ind. Dec. 16, 2021) ......... 60

*In re USN Communications, Inc.*,
  280 B.R. 573 (Bankr. D. Del. 2002) .................................................... 46

*In re W. Real Estate Fund*,
  922 F.2d 592 (10th Cir. 1990) ........................................................... 35

/ / /

v

**EXHIBIT 8**                                                    **Page 7 of 81**

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009)................................................................. 26, 27

*In re W.R. Grace & Co.*,
   900 F.3d 126 (3d Cir. 2018)................................................................. 23, 24

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007) ................................................. 59

*Law v. Siegel*,
   571 U.S. 415 (2014) ............................................................... 42, 43, 44

*Marshall v. Marshall*,
   547 U.S. 293 (2006) ............................................................................ 49

*Master Mortgage Investment Fund, Inc.*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) ...................... 54, 58, 59, 60, 62

*Millennium Lab Holdings II, LLC.*,
   945 F.3d 126 (3d Cir. 2019)....................................................... 22, 41, 60

*Northwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988) ............................................................................ 44

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984)................................................................. 24

*Purdue Pharma, L.P. v. City of Grande Prairie*,
   69 F.4th 45 (2d Cir. 2023) ............................................................... 7, 47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................................ 39

*Raleigh v. Ill. Dep't of Revenue*,
   530 U.S. 15 (2000) .............................................................................. 49

*Stern v. Marshall*,
   564 U.S. 462 (2011) ...................................................................... 42, 44

vi

**Statutes**

11 U.S.C. § 105(a) .......................... 11, 15, 34, 35, 37, 40, 42, 44, 45, 47, 48

11 U.S.C. § 524(e) ...................................................................... 12, 35

11 U.S.C. § 1123(a)(5) ............................................................ 34, 36, 37, 48

11 U.S.C. § 1123(b)(6) ........................................................ 34, 36, 37, 38, 48

11 U.S.C. § 1334(a) .......................................................................... 5

11 U.S.C. § 1334(b)(2)(L) ................................................................. 22

28 U.S.C. § 157(b)(2)(L) .................................................................. 21

28 U.S.C. § 158(a)(1) ....................................................................... 5

28 U.S.C. § 158(d)(1) ....................................................................... 5

28 U.S.C. § 2072 ........................................................................ 49, 51

**Other Authorities**

8 Collier on Bankruptcy, 1141.02 (16th ed. 2021) ................................... 46

Amici Curiae *Brief of Bankruptcy Law Professors Ralph Brubaker, George W. Kuney, and Bruce Markell in Support of Appellees*, filed March 18, 2022, *In re Purdue Pharma*, Second Cir. Case No. 22-110, ECF No. 603 at 8 ..................................................................... 51

Brubaker, Ralph, *Mandatory Aggregation of Mass Tort Liability in Bankruptcy*, 131 Yale L.J.F. 960, 973 (2022) ........................................ 52

Hill, Alfred, *The Erie Doctrine in Bankruptcy*, 66 Harv. L. Rev. 1013 (1953) ..................................................................................... 49

vii

**EXHIBIT 8**      **Page 9 of 81**

Levitin, Adam J., *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 Fordham L. Rev. 429, 440 (2022) .............................. 45

Tabb, Charles Jordan, *The Historical Evolution of the Bankruptcy Discharge*, 65 Am. Bankr. L.J. 325 (1991) ........................................... 52

## STATEMENTS & SUMMARIES

## I.    INTRODUCTION

This is an appeal from confirmation of a Chapter 11 bankruptcy plan for the Boy Scouts of America ("BSA").  D&V Claimants are 69 victims of Scouting-related sexual abuse who filed bankruptcy Proofs of Claim and voted against confirmation.  The bankruptcy court issued an Opinion confirming the plan on July 29, 2022, and final Order on September 8, 2022.  The district court affirmed confirmation on March 28, 2023.  This appeal followed.  D&V Claimants ask this Court to reverse the decision of the district court and hold that a bankruptcy court does not have authority to impose nonconsensual third-party releases of direct claims against nondebtors.

BSA filed for bankruptcy because it faced hundreds of sexual abuse claims by people sexually abused in Scouting.  These claims "detail horrific allegations ranging from harassment to inappropriate touching to penetration."  *In re Boy Scouts of America and Delaware BSA, LLC.*, 642 B.R. 504, 525 (Bankr. D. Del. 2022) ("*BSA*").  BSA had documented the problem of sexual abuse in Scouting since at least the 1920s in its own "Ineligible Volunteer" files on adult volunteers kicked

EXHIBIT 8                    Page 11 of 81

out of Scouting for molesting children.  A26410-15, A26429-45 (sample I.V. File and Complaint describing same).

This plan creates a comprehensive framework for resolving and paying claims of BSA's creditors.  But the plan also releases claims against over 300,000 Chartered Organizations[2] (sponsors of Scout troops and other Scout units), Local Councils (separate entities that administer the Scouting program), their representatives, insurers, and other nondebtors from all civil Scouting-related sexual abuse lawsuits, and channel those claims into the post-bankruptcy Settlement Trust. *BSA*, 642 B.R. at 586 (the "nonconsensual third-party releases" run "in favor of the Settling Insurance Companies, Local Councils, Chartered Organizations and their Representatives.").  The releases expressly cover claims for fraud and malicious conduct (the basis for punitive damages), which would not be discharged in individuals' own bankruptcies.  A00867-68 (Plan definition of "Abuse Claim"); A00980-82 (Channeling Injunction provision).  The releases expressly "discharge" nondebtor Local Councils and Chartered Organizations, precluding

---

[2]  A 4,808-page list of over 310,000 Chartered Organizations is found in the listed "Documents" on the Omni docket at https://cases.omniagentsolutions.com/?clientId=3552.

D&V Claimants from seeking state law remedies against these nondebtors.  A00991-92 (Plan at Art. X.J.3 (" ...all holders of Abuse Claims shall ... forever *discharge* and release [released parties]." Emphasis added.)).

The D&V Claimants all have direct liability claims against nondebtor Local Councils and most have direct claims against a Chartered Organization.  Almost all of the 69 have filed or are in the process of filing lawsuits in state court to preserve those claims.[3]  These lawsuits allege claims for negligence, fraud, constructive fraud, vicarious liability for intentional torts, and punitive damages for willful and malicious conduct.  These lawsuits have been stayed because of BSA's bankruptcy.  The plan makes that injunction permanent.

In exchange for these releases, the released nondebtors will provide shockingly little to the abuse claimants forced to give up their direct claims.  Over 300,000 Chartered Organizations released under the plan are paying *no* money, regardless of their own assets.[4]  Many

---

[3] *See*, *e.g.* A26327-449, A26508-850 (sample Proofs of Claim, JTX 14-47925, 14-44934, 14-44159, 14-17941, 14-14993.)

[4] The United Methodist Entities are the only "Contributing Charter Organizations" and are paying $30 million to the Settlement Trust.  *BSA*, 642 B.R. at 539.

Chartered Organizations – including the Baptist Church, Church of Jesus Christ of the Latter-Day Saints, Elks, and Kiwanis – no doubt have substantial assets of their own.  *See*, A20917 (*Disclosure Statement*, list of Most Common Chartered Organizations).  But there was no evidence about their assets.

Likewise, the aggregate contribution of $665 million from Local Councils is unreasonable given their liability exposure and the substantial assets of these nondebtors.  Local Councils have, in the aggregate, $3.3 billion in total net assets and $1,870,754,935 in unrestricted net assets.  A20845, A20924 (*Disclosure Statement*).  Their payment to the Settlement Trust of $665 is only 19.8 percent of their net assets.

The released Chartered Organizations and Local Councils will get benefits available only to bankruptcy debtors without requiring them to satisfy the obligations the Bankruptcy Code imposes.  These nondebtors can ignore the Code's financial disclosure requirements, not turn over their assets to the court, and pay their own creditors far less than debtors in a bankruptcy would have to pay.  Individuals covered by the releases are released from nondischargeable liability for fraud and

other willful and malicious conduct, including claims for punitive damages.  These nondebtors made no showing that they are in financial distress to meet the good faith requirement to file their own bankruptcies.  Allowing them the benefits of bankruptcy releases without such a showing abuses Chapter 11 protections.

D&V Claimants objected to the plan, appealed to the district court, and filed this appeal because the nonconsensual third-party releases and channeling injunctions run afoul of Third Circuit precedent; the bankruptcy court did not have jurisdiction to grant these releases; the Bankruptcy Code does not authorize them; and, even assuming the releases and injunctions are authorized, they do not meet the standards of Third Circuit caselaw.  Confirmation should be reversed.

## II.    STATEMENT OF JURISDICTION

The bankruptcy court had subject matter jurisdiction over the bankruptcy under 11 U.S.C. § 1334(a).  The district court had jurisdiction under 28 U.S.C. § 158(a)(1).  This Court has jurisdiction under 28 U.S.C. § 158(d)(1).

/ / /

## III.   STATEMENT OF THE ISSUES

D&V Claimants objected on these issues.  A07985-8017, A09028-44 (Objections to the Disclosure Statement); A10769-83 (Objections to Confirmation); A05994-6039 (confirmation hearing).

A.   Did the bankruptcy court have jurisdiction over third-party claims against nondebtor Local Councils and Chartered Organizations such that the court could order those claims released and channeled to the Settlement Trust? *BSA*, 642 B.R. at 588-94.

B.   Does the Bankruptcy Code authorize the release and injunction of third-party claims against nondebtors outside of asbestos cases? *Id.* at 594-95.

C.   Even assuming the bankruptcy court had jurisdiction and statutory authority, do the third-party releases and injunctions meet the standards courts in this Circuit have used? *Id.* at 595-619.

D.   Does the plan treat current sex abuse claimants fairly and equitably compared to Future Claimants? *Id.* at 629.

/ / /

## IV.     STATEMENT OF RELATED CASES AND PROCEEDINGS

This case is consolidated with appeals of Lujan Claimants and "Certain Insurers" that objected to confirmation: Cases 23-1664, 23-1665, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, and 23-1678.  *Purdue Pharma, L.P. v. City of Grande Prairie* (*In re Pharma L.P.*), 69 F.4th 45 (2d Cir. 2023), raises similar issues.  The US Trustee filed a Motion to Stay in anticipation of a Petition for Writ of Certiorari in that case.  Second Circuit No. 22-220 (D.I. 1012).

## V.     STATEMENT OF THE CASE

### A.     Relevant Facts

BSA filed for Chapter 11 bankruptcy on February 19, 2020.  After a contested trial, the bankruptcy court confirmed a reorganization plan in an Opinion (July 29, 2022) and Order (September 8, 2022).  The plan requires victims of Scouting-related sexual abuse to release all claims against over 300,000 nondebtor third-party Local Councils and Chartered Organizations and related individuals.  These third-party claims are channeled into the Settlement Trust, where they are consolidated with claims against BSA.  As the bankruptcy court noted,

the "Scouting-Related Releases are nonconsensual" because there is no

right to opt out of the abuse releases and channeling injunctions in

Articles X.J.3 and X.F. *BSA*, 642 B.R. at 586. D&V Claimants, who

objected to and voted against the plan, did not consent and could not opt

out. Forcing objectors to release state law tort claims and give up rights

associated with litigating such claims, over their objection and based on

the consent of plan supporters, raises serious due process concerns.

D&V Claimants opposed confirmation because the third-party

releases are at odds with Third Circuit precedent; the bankruptcy court

lacked jurisdiction over third-party claims against nondebtors; there is

no statutory authority for the releases; and they are grossly unfair to

objecting abuse claimants. Chartered Organizations are paying no

money to the Settlement Trust and only gave up rights as additional or

named insurers on BSA policies. Local Councils likewise did not give

reasonable consideration in exchange for the releases, given their

assets. Further, an abuse claimant will not be compensated through

the Settlement Trust for the released claims because each "Abuse

Claim" is treated as a single claim against BSA, a Local Council, and a

Chartered Organization, with no assessment of liability among the

three entities.  Claimants with separate, direct claims against Local Councils and/or Chartered Organizations receive the same as claimants with claims only against BSA.

The plan is funded by payments to a Settlement Trust from BSA, Local Councils as a group, Settling Insurers, and the United Methodist Entities.  Over time, there will be approximately $2.4 billion in the Settlement Trust and estimated administrative costs of ten percent, leaving approximately $2.2 billion to pay abuse claimants.  With over 82,000 Direct Abuse Claimants, simple math makes the average payment less than $27,000.  In contrast, the simple average of settlement payments BSA made to abuse survivors in the years before filing for bankruptcy was $649,521.  A26216-18 (historic settlement spreadsheet).

## B.    Procedural History

BSA filed for bankruptcy on February 19, 2020.  No Local Council has filed for bankruptcy.  No Chartered Organization is a debtor in this bankruptcy, although some (several Catholic entities for example) have filed their own bankruptcies.  After a contested trial, the bankruptcy court confirmed a reorganization plan in an Opinion (July 29, 2022) and

Order (September 8, 2022). D&V Claimants seek reversal of confirmation because the plan includes broad releases and channeling injunctions for nondebtor, third-party Local Councils and Chartered Organizations. On March 28, 2023, the district court issued an Order and Opinion affirming confirmation of the plan. *In re BSA*, 650 B.R. 87 (Del. D. 2023) ("*BSA II*").

### C. Rulings Presented for Review

D&V Claimants appeal from the district court's March 28, 2023, Order and Opinion affirming bankruptcy court's confirmation Order and the bankruptcy court' September 8, 2022, Confirmation Order and July 29, 2022, Opinion regarding confirmation.

## VI. ARGUMENT

### A. Summary of Argument

#### 1. *Third Circuit Cases Preclude Nondebtor Releases and Injunctions*

While this Circuit has never squarely addressed the legality of nonconsensual third-party releases, Third Circuit caselaw persuasively suggests that such releases are prohibited. In *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004), this Court refused to extend the scope of nondebtor releases in an asbestos case beyond the express

limits of Bankruptcy Code § 524(g).  This Court held that the

bankruptcy court's equitable powers under § 105(a) did not permit

third-party releases broader than as specified in § 524(g).  *Id.* at 202.

This Court's recent opinion in *LTL Management* also provides

guidance, although the case came to the Court on appeal from denial of

a motion to dismiss.  *In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023).

That case, most broadly, asked, "who is entitled to use the bankruptcy

system?" and imposed a good faith requirement that looks to financial

distress.  This Court held that only debtors in financial distress are

entitled to bankruptcy.  *Id.* at 93, 111.  Here, Local Councils and

Chartered Organizations are not even debtors, and there was no

showing that any of them are in financial distress.  If lack of financial

distress is grounds to dismiss a putative debtor's own bankruptcy, then

lack of financial distress should also preclude the release and discharge

of nondebtors.

> ## 2. *The Bankruptcy Court Lacked Jurisdiction Over Direct Third-Party Claims Against Nondebtors*

The bankruptcy court did not have jurisdiction over direct (non-

derivative) third-party claims against nondebtors.  Subject matter

jurisdiction must exist before, and independent of, plan provisions

seeking to involve nondebtors. *Combustion*, 391 F.3d at 225. Here, the bankruptcy court purported to exercise "arising in" and "related to" jurisdiction. *BSA*, 642 B.R. at 589.

Third-party claims against nondebtors did not "arise in" this bankruptcy. There was also no basis for "related to" jurisdiction over direct, independent claims against nondebtor Local Councils and Chartered Organizations. Finally, even if the bankruptcy court may have had "related to" jurisdiction over certain third-party claims, the court did not have jurisdiction over all the claims, making the third-party releases impermissibly broad.

### 3. *There is no Statutory Authority for the Releases and Injunctions*

The nondebtor, third-party releases and injunctions are not proper because there is no authority for nondebtor releases except in asbestos bankruptcies. Section 524(e) of the Bankruptcy Code only allows "discharge of a debt of the debtor." 11 U.S.C. § 524(e). This plan goes too far in releasing and discharging liability of nondebtors *for their own debts*.

Nothing in the Bankruptcy Code authorizes such releases. Congressional silence on the issue is not authority. General provisions

12

EXHIBIT 8                                    Page 22 of 81

regarding a bankruptcy court's equitable powers are not authority for these releases because the court's equitable powers must be tethered to actual authority in the Code. Further, because the releases extinguish abuse claimants' state law claims, they give a legal remedy to the released nondebtors, not an equitable remedy. Therefore, they are outside any conceivable scope of § 105's *equitable* powers. Recent U.S. Supreme Court cases, the Constitutional framework for the bankruptcy court system, and the *Erie* doctrine support the conclusion that there is no statutory authority for nondebtor releases.

### 4. *The Nondebtor Releases and Injunctions are Improper in this Case*

These broad releases and injunctions are unconstitutional because they are based on federal caselaw standards and federal courts cannot make common law. Further, they do not meet the guidelines of Third Circuit cases. The releases are profoundly unfair to abuse claimants who are forever barred from suing third-party Local Councils, Chartered Organizations, and their representatives for their own, independent wrongful conduct, including barring claims for fraud and punitive damages. In exchange, abuse claimants will receive no additional compensation and will not be paid in full. The bankruptcy

court's legal conclusions to the contrary are contradicted by the record and inconsistencies in the court's own findings.

        5.   *The Plan Treats Abuse Claimants Unfairly Compared to Future Claimants*

The plan has no deadline for "Future Claimants" (abuse victims who were minors or had repressed memories as of the petition date). Current claimants, who had to file by the Claims Bar Date, are unfairly burdened by having to wait until all future claims are paid, which could be many decades, to receive all their compensation under the plan.

## B.    Standard of Review

This Court gives "fresh (i.e., plenary or *de novo*) review to a conclusion of law and review for clear error findings of fact leading to the decision." *LTL Management*, 64 F.4th at 99. Basic facts are distinguished from an "ultimate fact," which is a "legal concept with a factual component." *Id.* at 100 (citations omitted). In reviewing ultimate facts, the Court separates "distinct factual and legal elements … and appl[ies] the appropriate standard to each component." *Id.* When "conclusions [] are but legal inferences from facts" this Court is not bound by them. *Block v. Potter*, 631 F.2d 233, 241 (3d Cir. 1980)

(internal citation omitted).  Jurisdiction is a question of law reviewed *de novo*.  *In re Fed.-Mogul Glob. Inc.*, 402 B.R. 625, 630 (D. Del. 2009).

### C.   Argument

#### 1.   *Third Circuit Law Precludes Nondebtor Releases*

While no Third Circuit case is directly on point, caselaw in this circuit persuasively suggests that, except in asbestos cases, nonconsensual third-party releases of direct claims are prohibited.

Third-party releases and injunctions outside asbestos cases conflict with *Combustion*.  391 F.3d 190.   In *Combustion*, this Court concluded that § 524(g) provides for third-party injunctions in asbestos cases in limited circumstances and § 105(a) does not give the bankruptcy court equitable power to enter other types of third-party injunctions not specifically authorized.  391 F.3d at 236.  The Court held that § 105(a) does not give a court the power to create "substantive rights" (in that case, third-party releases) not otherwise available under the Bankruptcy Code.  *Id.* at 202, 236.  The Court vacated the channeling injunctions.  *Id.* at 238.

The releases and injunctions here are intended to do the same as those in *Combustion* – enjoin non-derivative claims of third parties on

the grounds that they were necessary to a successful reorganization plan.  If a bankruptcy court lacks equitable power to enjoin third-party claims in asbestos cases beyond those specified in § 524(g), then the same reasoning prohibits third-party releases and injunctions in non-asbestos cases where there is no applicable Code provision.

This circuit's earlier decision in *Continental* is consistent with this conclusion.  *In re Continental Airlines*, 203 F.3d 203 (3d. Cir 2000).  In *Continental*, this Court rejected a reorganization plan that released third-party claims against nondebtors and permanently enjoined direct actions against them.  The Court concluded that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against nondebtors, except in one instance not applicable here" (asbestos cases).  203 F.3 at 211.  This Court did not analyze jurisdiction or the statutory authority for non-asbestos third-party releases and declined to "establish [its] own rule" regarding such releases.  *Id.* at 213-14.  This Court noted, "Several of the Bankruptcy Courts in our Circuit have stated that non-debtor releases are permissible *only if consensual*, at least with respect to direct (as opposed to derivative) claims."  *Id.* at 214, n. 11 (emphasis added).

*Continental* leans strongly against nonconsensual releases for

nondebtors.

This Court's recent ruling in *LTL Management*, while not

procedurally on point, is instructive.  In that case, this Court began its

analysis of the "good faith" necessary to file for bankruptcy by stating:

> We start, and stay, with good faith....  What counts to access
> the Bankruptcy Code's safe harbor is to meet its intended
> purposes.  Only a putative debtor in financial distress can do
> so.

64 F.4th at 93 (noting, "Good intentions ... do not suffice alone.").  The

Court went on to dismiss a Chapter 11 bankruptcy because the debtor

LTL Management was not in financial distress.  In doing so, the Court

reviewed the lower courts' conclusion of financial distress as a mixed

question of fact and legal conclusion:

> Whether financial distress exists depends on the underlying
> basic facts, such as the debtor's ability to pay its current
> debts, and inferred facts, such as projections of how much
> pending and future liabilities (like litigation) could cost it in
> the future.  But the ultimate determination, like with good
> faith, is essentially a conclusion of law that gets a fresh look.

*Id.*  The Court discussed the necessity of financial distress as a

requirement for bankruptcy protection.  "[A] valid bankruptcy purpose

'assumes a debtor in financial distress.'"  *Id.* at 101 (internal citation

omitted).  "[A] debtor who does not suffer from financial distress cannot

demonstrate its chapter 11 petition serves a valid bankruptcy purpose

supporting good faith."  *Id.*  "The theme is clear: absent financial

distress, there is no reason for chapter 11 and no valid bankruptcy

purpose."  *Id.*  Finally:

> Congress designed Chapter 11 to give those businesses
> teetering on the verge of a fatal financial plummet an
> opportunity to reorganize on solid ground and try again, not
> to give profitable enterprises an opportunity to evade
> contractual or other liability.

*Id.* at 103.

In analyzing LTL Management's financial condition, this Court

considered the company's current finances and the immediacy of any

distress.  "[A] debtor's balance sheet insolvency or insufficient cash

flows to pay liabilities (or the future likelihood of these issues occurring)

are likely always relevant."  *Id.* at 102.  Financial distress must be

immediate enough to justify bankruptcy filing.  "[A]n attenuated

possibility standing alone" that a debtor "may have to file for

bankruptcy in the future" does not establish good faith.  *Id.* (internal

citations omitted).

Local Councils and Chartered Organizations are not even debtors in this case, yet they are receiving the benefits of bankruptcy. There was no evidence of their balance sheets or cash flows. They made no showing that they are in financial distress or that discharge of their liability serves a valid bankruptcy purpose. There was no evidence or findings about the scope of liabilities each of the released entities face or their capacity to meet them, both required to prove financial distress. *Id.* at 104 ("[M]ass tort liability can push a debtor to the brink but to measure the debtor's distance to it, *courts must always* weigh not just the scope of liabilities the debtor faces, but also the capacity it has to meet them." Emphasis added.).

There was no financial evidence about any of the released Chartered Organization (beyond minimal testimony about the contributing Methodist group). For example, there was no evidence about the balance sheets or cash flow of the LDS Church, even though at the time of the confirmation hearing (later withdrawn), the LDS Church had agreed to pay $250,000,000 to the Settlement Trust. *BSA*, 642 B.R. 537.

The evidence concerning Local Councils' finances was sparse and did not include balance sheets or cash flows. It consisted only of (1) each Local Council's total net assets and "the raw number of claims filed" against it; (2) a "liquidation analysis" purporting to show that the Local Council contribution is more than the "aggregated liquidation value" of all Local Councils, and (3) testimony that, without Local Council releases, "'significant' Local Council bankruptcy filings" were expected. 642 B.R. at 603-04, 610. The "raw number of claims" provides no information about the "scope of liability" of each Local Council. Liquidation value in the aggregate was not at issue. The point is whether each Local Council was in financial distress so as to justify bankruptcy. Liquidation value of each Local Counsil might be relevant to separate findings of financial distress, but there was no such evidence. Finally, that some unidentified Local Councils could be expected to file their own bankruptcies is only an "attenuated possibility," not evidence that any particular Local Council seeking a release was "teetering on the verge of a fatal financial plummet." 64 F.4th at 102-03. In total, the evidence was no more than the "back-of-

the-envelope forecasts of hypothetical worst-case scenarios" this Court rejected in *LTL Management.  Id.* at 108.

*LTL Management* stands for the basic rule that any entity seeking the benefits of bankruptcy, include discharge of liabilities, must show it is in imminent financial distress that would justify bankruptcy protection.  None of the Local Councils or Chartered Organizations made this showing.  Nothing in the record supports the legal conclusion that any of these nondebtors were in financial distress or entitled to rights afforded bankruptcy debtors.  Even plan supporters' belief that this plan "creates the best of all possible worlds" for the abuse claimants is not enough to displace "the rule that resort to chapter 11 is appropriate only for entities facing financial distress." *Id.* at 111.

2. *The Bankruptcy Court did Not Have Jurisdiction Over Direct Third-Party Claims Against Nondebtors*

This Court reviews the exercise of jurisdiction *de novo*.

a. No "Arising Under" or "Arising In" Jurisdiction

Bankruptcy courts have "arising under," "arising in," and "related to" jurisdiction under 28 U.S.C. § 157 and 11 U.S.C. § 1334. Confirmation of a plan is a "core proceeding" that gives a bankruptcy court "arising under" and "arising in" jurisdiction.  § 157(b)(2)(L),

§ 1334(b)(2)(L); see also, *Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) ("core proceedings" include confirmation). The court found "arising in" jurisdiction over the third-party claims because "this is a confirmation hearing" which only arises in bankruptcy. 642 B.R. at 589. That circular logic misses the point. Confirmation is a core proceeding that gave the court jurisdiction over Debtors' obligations and assets. But the court needed a basis for jurisdiction over third-party claims against nondebtors *before* the court considered them.

Third parties simply do not bring claims *against each other* in other parties' bankruptcies in the normal course. *See*, *In re Essar Steel Minnesota LLC*, 47 F.4th 193, 197 (3d Cir. 2022) ("A case 'arises under' [the Code] when the cause of action is based on a right or remedy expressly provided by the Bankruptcy Code. Proceedings 'arising in' a case under [the Code] include matters that, though not explicitly mentioned in the Code, would not exist outside of bankruptcy." Internal citations omitted.) The Bankruptcy Code does not provide for litigation and adjudication of abuse victims' direct claims against nondebtors, and such claims would exist outside BSA's bankruptcy, so there is no

"arising under" or "in" jurisdiction.  That plan supporters inserted third-party claims into the "core proceeding" of confirming BSA's plan did not give the bankruptcy court jurisdiction.  Parties cannot create subject matter jurisdiction by agreement.  *Combustion*, 391 F.3d at 228.

Instead, when it comes to third-party direct claims against nondebtors, bankruptcy courts analyze whether they have "related to" jurisdiction.  *See*, *Combustion*, 391 F.3d at 226-33.  In *Combustion*, the Third Circuit analyzed and rejected third-party releases in the context of "related to" jurisdiction.  391 F.3d at 223-24.  This Court did not even consider "arising under" or "arising in" jurisdiction.

> b.    No "Related to" Jurisdiction

The bankruptcy court did not have "related to" jurisdiction over direct claims against nondebtors.  The "identity of interest" sufficient to create "related to" jurisdiction does not exist.  This Circuit requires an identity of interest sufficient to create derivative or otherwise automatic liability for the debtor.  *See*, *e.g.*, *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018) ("*Grace II*") (explaining, in the context of a § 524(g) asbestos case, how narrow derivative liability is).  Automatic liability for non-derivative claims depends on an established right to indemnity,

as with a judgment in an indemnity action or a contract for indemnity. *Combustion*, 391 F.3d at 226 (there is no "related to" jurisdiction over civil actions between nondebtors if such a lawsuit would be a "mere precursor" to a potential claim against a debtor; quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984)).

There is no automatic liability for direct claims against nondebtor Local Councils and Chartered Organizations for their own misconduct.

i. *The Claims at Issue are Direct, Not Derivative*

Third-Party abuse claims against nondebtors are not "derivative." In derivative claims, the claimant steps into the shoes of the debtor in suing a third party. Such claims potentially divert assets from the bankruptcy estate because any recovery would go to the claimant. At the very least, derivative claims "depend on" the liability of the debtor. *See*, *Grace II*, 900 F.3d at 135-38 ("The proper inquiry is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it.").

In contrast, *direct* abuse claims against Local Councils and Chartered Organizations for their own wrongdoing are "wholly separate" from, and do not "depend on," BSA's liability. These claims target nondebtors' own assets, not assets of the bankruptcy estate. Abuse claims against nondebtors can involve "Scout-related abuse" in the absence of the liability of BSA. For example, if a Local Council or Chartered Organization like the local Elks Lodge had notice that a man had molested children, still allowed him to serve as a Scout leader, never shared its knowledge with BSA, and the man molested more kids on Scout campouts, those claims would be "Scout-related," direct claims against the Local Council or Elks Lodge.

The releases specifically cover direct claims. *See, e.g.*, A00991-92 (Art. X.J.3 Abuse Claim release covers all claims "derivative ***or direct***"); A00980-82 (Channeling Injunction enjoins abuse claimants "from taking any action for the purpose of ***directly***, indirectly, ***or derivatively***" pursuing claims against releasees); A00867-68 (defining "Abuse Claim" as any claim that "***directly***, indirectly, ***or derivatively***, alleged Scouting-related Abuse"). The releases are impermissibly broad because the

court erroneously exercised "related to" jurisdiction over direct claims involving third parties' independent, direct liability.

ii.     *No Automatic Right to Indemnity Exists*

Second, BSA is not automatically required to indemnify Local Councils or Chartered Organizations for pre-petition sexual abuse claims.  While certain organizations filed indemnity claims in the bankruptcy, no pre-petition indemnity judgments exist.  Claims against nondebtors are only "related to" a bankruptcy case where an action against the nondebtor would "affect the bankruptcy [] without the intervention of yet another lawsuit." *In re W.R. Grace & Co.*, 591 F.3d 164, 173 (3d Cir. 2009), *cert. denied*, 562 U.S. 839 (2010) ("*Grace I*") (citing *Fed.-Mogul*, 300 F.3d at 382; *Combustion*, 391 F.3d at 232).

The only indemnity contracts in evidence post-date BSA's bankruptcy filing.  These are the 2020 and 2021 annual Chartering Agreements between Chartered Organizations and Local Councils. A23284-85, A23310-11 (the Local Council agrees to "[i]ndemnify the Chartered Organization").  By their terms, these agreements do not create an indemnity right against BSA.  Even if they did, BSA cannot benefit certain creditors over others by creating post-petition contract

rights to estate assets.  To do so would be a prohibited preferential or fraudulent transfer under § 547.

The bankruptcy court also relied on an October 2013 BSA resolution to provide insurance for Scouting activities and indemnity for claims "based upon the Corporation's *membership standards*."  A23592-93 (2013 Resolution, emphasis added).  Even if the October 2013 resolution provided relevant indemnity rights, it would not support "related to" jurisdiction over the vast majority of claims that arose before those contracts existed, including the claims of D&V Claimants.

Even these few documents related to indemnity from October 2013 forward should not be sufficient to give the court "related to" jurisdiction, as this Court noted in *Grace I*.  591 F.3d at 174, n. 9 ("[W]e do not mean to imply that contractual indemnity rights are in themselves sufficient to bring a dispute over that indemnity within the ambit of related-to jurisdiction".).

> iii.   *The Operation of Scouting Does Not Create Automatic Liability for BSA*

Likewise, the joint operation of Scouting is not an "identity of interests" sufficient to confer jurisdiction.  Local Councils are separate corporate entities incorporated under the laws of their own states.  They

are "legally independent from the BSA, each with its own officers, board of trustees or directors, and management." A07021 (*Debtors' Informational Brief*). Chartered Organizations are completely separate entities, such as churches, civic clubs, educational groups, and businesses. *See*, *BSA*, 642 B.R. at 523-24. Bankruptcy courts must "respect the separateness of legal entities (and their respective assets and liabilities)." *LTL Management*, 64 F.4th at 105. In *Combustion*, this circuit rejected nondebtor releases even though the district court had found a "unity of interest" based on "corporate affiliates, shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue" and " extensive financial inter-dependence between the entities." 391 F.3d at 213.

Prior to bankruptcy, BSA relied on the "separateness of legal entities" to avoid liability for sexual abuse. *See*, A08220-24 (*Declaration of Nathaniel Marshall*). Marshall was the Assistant Director of Registration for BSA at the time he testified:

- The three levels of Scouting are "entirely separate legal entities" with a "common goal of youth character development," but "none has control over the other."

- "Local community organizations ... actually 'own' and operate their Boy Scout troops and supervise and control their scouting activities."

- "[BSA] and the Local Councils do not administer the Scouting Program directly but rather offer the program to community organizations..."

- Scout units "are created, organized, supervised and run by approximately 1.3 million community volunteers who have absolutely no employment or agency relationship with [BSA]."

- "The sponsoring organization's troop committee selects the troop leaders.... BSA does not supervise or control the manner in which the troop committee governs its troop."

The Scouting program itself does not cause sexual abuse. That BSA delivered the Scouting program through Local Councils and Chartered Organization does not make them jointly liable for each other's conduct. The negligence of people at each level of the Scouting organization might cause sexual abuse and each organization may be separately liable for any particular incident of abuse, depending on the facts and applicable state law.

Having a common interest in the Scouting program and mission is not enough to create jurisdiction. There must be factual findings that a suit against a nondebtor would deplete the bankruptcy estate or affect its administration. *Combustion*, 391 F.3d at 228. The only findings the bankruptcy court made on this issue are:

- "I conclude that it takes all three constituencies – BSA, Local Councils and Chartered Organizations – to deliver the Scouting program." 642 B.R. 589.

- "As Mr. Desai credibly testified, 'because of the interconnectedness of a local council with the national organization and our local chartering partners, we can't continue to deliver the mission of Scouting without them.'" *Id.* at 590.

These statements may be accurate, but both are irrelevant to whether the released direct claims against nondebtors deplete the estate or threaten its administration. There are no dots connecting these statements and a conclusion that the claims affect the estate.[5]

_____

[5] The bankruptcy court apparently recognized that "identity of interest" did not give it "related to" jurisdiction over every third-party claim. The court excluded pre-1976 claims against Chartered Organizations unless covered by policies issued by Settling Insurers. That exclusion shows, at a minimum, that the court recognized it did

30

**EXHIBIT 8**                    **Page 40 of 81**

iv. *Impact on Property, Primarily Shared Insurance, Did Not Confer Jurisdiction*

The bankruptcy court also based "related to" jurisdiction on an "impact on property" of the estate, primarily shared insurance. Since the 1970s, Local Councils and Chartered Organizations have been additional or named insureds on BSA insurance policies. *BSA*, 642 B.R. 89-90. In exchange for nondebtor releases, Chartered Organizations and Local Councils give up all rights under policies purchased by BSA since 1976.

However, the releases also cover claims against Local Councils that pre-date 1976 and shared insurance. Likewise, the releases require Chartered Organizations to give up rights to policies they purchased for themselves at any time from Settling Insurers. Debtors have no ownership interest in these policies and they are not shared assets. The court had no jurisdiction over these policies or claims covered by them. By excluding pre-1976 claims against Chartered Organizations, the bankruptcy court recognized it did not have jurisdiction in the absence of shared insurance (although the court

---

not have jurisdiction based on "identity of interest" over third-party claims against Chartered Organizations.

made an erroneous exception for claims covered by policies issued by

Settling Insurers).  The court had no jurisdiction over claims covered by

nondebtors' own insurance.

Even the "shared asset" of insurance rights since 1976 is

insufficient to create "related to" jurisdiction.  Shared insurance may

affect the insurance available to cover third-party claims once BSA has

its bankruptcy discharge.  But shared insurance does not affect the

liability of nondebtors or their other available assets.  *Continental*, 203

F.3d at 217 ("[E]ven assuming that the [shared insurance] proceeds are

property of the estate, this by itself does not justify a permanent

injunction of Plaintiff's actions against the insured nondebtor ... as

necessary for the reorganization."); *See also*, *Combustion*, 391 F.3d at

233 (it was  "doubtful whether shared insurance would be sufficient

grounds upon which to find related-to jurisdiction over independent

claims against [nondebtors].").

Local Councils (with few exceptions) and Chartered Organizations

did not pay anything to be included on BSA insurance policies.  Now

they are reaping the enormous benefit of releases for their own

culpability, including releases for non-dischargeable claims against

their representatives for willful conduct, fraud, and punitive damages.
It is "doubtful" that such insurance rights support jurisdiction or
"justify a permanent injunction" of third-party claims.

Finally, the bankruptcy court considered BSA's residual interest
in Local Councils' real property as a basis of jurisdiction. 642 B.R. at
592. The court acknowledged that this residual interest is "subject to
all superior interests, including the payment of valid claims against the
Local Council." *Id.* Because BSA's interest in Local Council property is
only a "residual" interest, only whatever is left *after paying claims* is
the total of BSA's interest. Also, BSA's residual interest in Local
Council property cannot be a basis jurisdiction over claims against
Chartered Organizations, which have nothing to do with Local Council
property.

For all these reasons, the bankruptcy court erred in asserting
jurisdiction over direct claims against nondebtors.

### 3. *There is No Statutory Authority for Nonconsensual Nondebtor Releases and Injunctions*

There is no express authority in the Bankruptcy Code for
nonconsensual third-party releases and channeling injunctions except
in asbestos cases. § 524(g). Congress passed § 524(g) in 1994 and it is

expressly limited to asbestos cases.  The bankruptcy court erred in finding it had "inherent equitable power consistent with §§105(a), 1123(a) (5) and 1123(b) (6) of the Bankruptcy Code to grant nonconsensual third-party releases."  *BSA*, 642 B.R. at 594; *BSA II*, 650 B.R. at 136.  This conclusion was erroneous for at least the following reasons.

> a.   Nonconsensual Releases are Contrary to the Bankruptcy Code

First, as a matter of statutory interpretation, §§ 105(a), 1123(a)(5), and (b)(6) of the Code, separately or together, do not give a bankruptcy court authority to grant nonconsensual third-party releases and injunctions.

> i.   *Section 105(a)*

Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

In *Combustion*, this Circuit held that § 105(a) did not give a court the power to expand the scope of the available releases and injunctions because § 105(a) could not create "substantive rights" that are not otherwise available under the Code. 391 F.3d at 238 (treating nondebtor releases as "substantive rights"). This Court concluded that § 105(a) does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id.* at 236.

The Fifth, Ninth, and Tenth Circuits rely on § 524(e) to outright reject the idea of statutory authority for nondebtor releases in non-asbestos cases. *See*, *e.g.*, *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022) ("Our court along with the Tenth Circuit hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code." Citing *In re Pacific Lumber Co.*, 584 F.3d 229, 252-3 (5th Cir. 2009)); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund*, 922 F.2d 592, 600 (10th Cir. 1990). These circuits rely on § 524(e)'s basic notion that bankruptcy is a system for resolving claims between the bankrupt debtor and its creditors.

ii.    *Section 1123(a)(5)*

Subsections (a) and (b) of 11 U.S.C. § 1123, "Contents of plan," lay out in detail what a reorganization plan must and may contain in order to be confirmed. Section 1123(a)(5) provides that a plan must "provide adequate means for [its] implementation" and lists possible means.

Nonconsensual releases for nondebtors and channeling injunctions of third-party claims are not on the § 1123(a)(5) list. The bankruptcy court concluded that the broad releases were necessary to secure settlement money from Local Councils, the United Methodist Entities (the only Chartered Organizations to pay money to the Settlement Trust), and the Settling Insurers. The other Chartered Organizations are getting the same release without paying any money.

But the fact that Debtors need money from these settling parties to fund the plan they want does not mean that § 1123(a)(5) confers on Debtors or the released parties the right to force claimants to accept these nonconsensual releases. Section 1123(a)(5) cannot create a substantive right to discharge and nonconsensual release just because the released parties agree, no matter how much they want the releases.

Section 1123(a)(5) does not authorize a court to confirm a plan not otherwise authorized, simply because doing so would ensure funding for the plan.  There must be independent statutory authority for the court to issue the nondebtor releases and injunctions, such that a bankruptcy court can enter a "necessary and appropriate" order to secure the funding debtors want.  There is no such independent authority.

iii.    *Section 1123(b)(6)*

Section 1123(b)(6) provides that a plan *may* "include any other appropriate provision not inconsistent with the applicable provisions of this title."  This is substantively analogous to § 105(a)'s authorization of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Just as § 105(a) does not confer any substantive authority on a bankruptcy court – *Combustion*, 391 F.3d at 238 – neither does § 1123(b).

Further, § 1123(b) does not authorize the nonconsensual releases of Local Councils and Chartered Organizations because they are inconsistent with the Code.  They are inconsistent with § 523(a), which prohibits discharge of claims against individuals for fraud and willful and malicious conduct.  Congress intended that the Code "ensure that

all debts arising out of fraud are excepted from discharge no matter what their form." *Archer v. Warner*, 538 U.S. 314, 321 (2003) (internal citation omitted).  Here, "Abuse Claim" includes any claim "that seeks monetary damages or other relief, under any theory of law or equity whatsoever," specifically including fraud, willful misconduct, and "any theory based on or related to public policy" which includes claims for punitive damages.  A00867-68.  The releases expressly include fraud claims against individual representatives of released nondebtors. A00980-82.

D&V Claimants filed lawsuits against Local Councils and Chartered Organizations asserting direct claims for their own fraud, as well as punitive damages claims for willful and malicious conduct. Because release of these claims would be prohibited if representatives of Local Councils or Chartered Organizations filed their own bankruptcies, it would be inconsistent to use § 1123(b) to accomplish such a prohibited release when they are not bankrupt.

### b.    Statutory Silence is Not Authority

The bankruptcy court stated, "While the Code does not explicitly authorize releases, neither does it prohibit them."  *BSA*, 642 B.R. at

594. This logic runs counter to the purpose of the Bankruptcy Code, which Congress intended to be a "comprehensive scheme" to target "specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). If the Code does not address certain problems or contain certain solutions, the court cannot read a solution into the code through "equitable powers." Silence is not consent. *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 984 (2017).

Further, discharging nondebtors is not the purpose of the Code. The Code imposes obligations as well as provides benefits for *debtors* who file for bankruptcy protection. *LTL Management*, 64 F.4th at 100 ("A debtor who attempts to garner shelter under the Bankruptcy Code ... must act in conformity with the code's underlying principles." Internal citation omitted). It is illogical to expect Congress to spell out that nondebtors, that have not filed for bankruptcy and are not saddled with the same obligations, are not entitled to the same benefits. Congress has not included in the Code every single thing the Code does not do.

Finally, when Congress did want to address the issue of nonconsensual releases for nondebtors, it enacted § 524(g) for asbestos cases in 1994. At that time, other mass tort cases had gone through bankruptcy. *See*, *e.g.*, *In re A.H Robins Co.*, 880 F.2d 694 (4th Cir. 1989). Congress could have broadened the scope of § 524(g) but chose to apply it only to asbestos cases. Significantly, in 1997, the National Bankruptcy Review Commission issued its final report and recommended changing 524(g) to include other mass torts.[6] That Congress has not changed the narrow statutory authority for nondebtor releases in 29 years, in the face of Commission recommendations to do so, indicates Congress does not want to.

        c.     Releases are Contrary to Third Circuit Cases
               Interpreting the Code

Second, as discussed above, the releases are contrary to Third Circuit cases. Specifically, *Combustion* held that § 105(a) does not give a bankruptcy court power to create substantive rights not authorized by the Bankruptcy Code. In that asbestos case, this Court rejected nondebtor releases broader than those authorized in § 254(g). 391 F.3d

---

[6]     https://govinfo.library.unt.edu/nbrc/report/09bmass.html.

40

**EXHIBIT 8**       **Page 50 of 81**

at 236.  If bankruptcy courts lacks statutory authority to broaden releases authorized by § 254(g), then they lacks authority to grant even broader releases in a non-asbestos case.

Other Third Circuit cases are in accord or at least not contrary to this conclusion.  In *Continental Airlines*, this Court rejected the nondebtor releases proposed, but did not discuss statutory authority.  Nor did this Court rule on *statutory* authority in *Millennium Labs*.  In that case, this Court held that "under the particular facts of this case ... the bankruptcy court was constitutionally authorized to confirm the plan in which [nondebtor releases] appeared."  945 F.3d at 140.  This Court did not consider the statutory basis for such releases and ultimately dismissed the appeal as equitably moot.

Most recently, this Court in *LTL Management* held that the Bankruptcy Code only allows debtors demonstrating financial hardship to file for bankruptcy protection.  64 F.4th 84.  Following this reasoning, the Code cannot be interpreted as allowing nondebtors that have not filed for bankruptcy and do not demonstrate financial hardship to get bankruptcy protection.

/ / /

d.  U.S. Supreme Court Cases Limit the Equitable
Power of Bankruptcy Courts

Third, using "inherent equitable powers" to grant nondebtor

releases in non-asbestos cases is contrary to Supreme Court cases and

the structure of legislative courts.

Article I of the Constitution allows Congress to create legislative

courts to implement a "federal regulatory scheme." *See*, *Stern v.

Marshall*, 564 U.S. 462, 490 (2011).  Article I bankruptcy judges do not

have general equitable powers; their authority is tethered to the

"federal regulatory scheme" of the Bankruptcy Code.  *See*, *Law v.

Siegel*, 571 U.S. 415, 421 (2014) ("whatever equitable powers remain in

the bankruptcy courts must and can only be exercised within the

confines of" the Bankruptcy Code.)  Their equitable power does not

allow them to do something the code does not otherwise authorize in the

name of "residual authority."

In recent years, the Supreme Court has clarified the narrow

nature of bankruptcy courts' equitable or inherent power.  In *Law*, the

Court unanimously held that a bankruptcy court does not have "a

general, equitable power" or "inherent power" under § 105(a) to make

orders inconsistent with other Code provisions.  571 U.S. at 425 ("A

bankruptcy court  may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its other provisions.)  The Court reversed the bankruptcy court's order denying a homestead exemption.  The Court explained that there is "no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code" because the Code was intended to be a comprehensive statement of the applicable rights and procedures.  *Id*. at 416.

More recently, in *Czyzewski*, the Court held that a bankruptcy court cannot override the protections afforded by the Bankruptcy Code in a "rare" case, even to carry out bankruptcy objectives.  The bankruptcy court did not follow priority rules, putting unsecured creditors before nonconsenting judgment creditors.  As here, plan proponents argued the bankruptcy court had inherent authority to deviate from the rules because the Code was "silent" on the subject and there was "sufficient reason" in that rare instance.  The Supreme Court disagreed and held the "importance of the priority system leads us to expect more than simply statutory silence if, and when, Congress were to intend a major departure."  137 S. Ct. at 984.

*Law* and *Czyzewski* demonstrate the Supreme Court's trend in limiting the authority of bankruptcy courts. *See also*, *Stern v. Marshall*, 564 U.S. 462 (absent consent, bankruptcy courts lack constitutional authority to enter final judgments on state law counterclaims not resolved entirely through the claims process, despite Congress purportedly granting such authority in § 157(b)(2)(C)); *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). This line of cases strongly suggests the bankruptcy court had no residual or inherent authority to create substantive rights to nondebtor releases in the face of Congressional silence on the point.

      e.     Bankruptcy Courts Have No General "Legal" Authority and Releases are a Legal Remedy

Third, because § 105(a) only gives a bankruptcy court *equitable* power, § 105(a) does not authorize *legal* remedies. Section 105(a) applies only to the bankruptcy court's "inherent equitable power." *BSA*, 642 B.R. at 594. *See*, *Law*, 571 U.S. at 421 (2014) (the Supreme Court examined § 105 when ruling to limit the "equitable powers" of the bankruptcy court.); *Combustion*, 391 F.3d at 236 (discussing "[t]he

44

**EXHIBIT 8**      **Page 54 of 81**

general grant of equitable power contained in § 105(a)").  A court's "equitable power" is not blanket authority to "do equity" or to do whatever a court thinks is fair.  391 F.3d at 236.  Rules and principles of equity jurisprudence, as well as the Bankruptcy Code, limit the scope of a court's equitable power.

In exercising equitable power, courts are, by definition, limited to equitable remedies.  These include injunctions, accountings, interpleader, rescission and reformation of contracts, clearing of title to property, imposition of constructive or resulting trusts, or disposition of proceeds of funds to class claimants.  In contrast, third-party state law claims seek the legal remedy of money judgements and give rise to the right to jury trial.  A direct legal claim is a property interest and to extinguish, or substantially alter, that property interest is a substantive due process violation.  *See*, Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 Fordham L. Rev. 429, 440 (2022) ("Creditors who have a direct claims against nondebtors have property interests; their direct claims are 'choses in action.'  Like other types of property interests, choses in action are protected under

the Due Process Clause."); *Combustion*, 391 F.3d at 202, 238 (treating

nondebtor releases as "substantive rights").

Direct, independent claims by nondebtor abuse claimants against

nondebtor Local Councils and Chartered Organizations are state law

tort claims (almost always common law claims) that seek legal

remedies. The third-party releases in BSA's plan provide the third

parties with a substantive legal remedy – dismissal of claims with

prejudice through release and discharge – not an equitable remedy.

The releases are a legal remedy because they completely extinguish

abuse claimants' substantive rights to their state law tort claims. They

are, as the bankruptcy court recognized, a final judgment that

dismisses all third-party claims against nondebtors with *res judicata*

effect. *BSA*, 642 B.R. at 630 ("[T]there is abundant common law on the

doctrine of *res judicata* and collateral estoppel as it applies to orders

confirming plans.") (citing *In re USN Communications, Inc.*, 280 B.R.

573, 592 (Bankr. D. Del. 2002) ("[A] confirmed plan acts as a binding

contract on all the parties thereto"); 8 Collier on Bankruptcy, 1141.02

(16th ed. 2021) ("A confirmation order operates as a final judgment.")).

The releases expressly "discharge" nondebtors' obligations as would

their own bankruptcy or a judgment of dismissal.  A00991-92.  Congress
gave bankruptcy courts power to discharge the obligations of a debtor.
Congress did not give bankruptcy courts, directly or through § 105(a),
power to give nondebtors the legal remedies of release and discharge for
state law claims of third parties.

The fact that abuse claims against third parties are channeled to
the Settlement Trust does not change the nature of the releases as a
final adjudication and legal remedy.  The third-party claims in *Purdue*
were also channeled, but the Second Circuit still found that the releases
were a final resolution of the claims.  69 F.4th at 68.  The releases here
completely extinguish the bundle of rights abuse claimants had in their
third-party state law claims.  That the channeling injunctions
substitute a different, lesser bundle of rights to bring those claims in a
limited administrative process does not undo the fact that the original
bundle of rights is gone.  This is particularly clear where the channeled
claims against third-party Local Councils and Chartered Organizations
will not result in any additional compensation to abuse victims.  The
Proof of Claim form provides only for one "Abuse Claim" for abuse in
Scouting, with no consideration of liability and certainly no distinction

of liability among BSA, a Local Council, and a Chartered Organization. *See*, *e.g.*, A26372-83 (sample POC).   There is no mechanism in the plan's Tort Distribution Procedures to award any more to a claimant with independent, direct claims against a Local Council or Chartered Organization.  A1009-55 (Tort Distribution Procedures).

Because the releases are a legal remedy, no grant of equitable power to the bankruptcy court can be the basis for them, whether that equitable power comes from §§ 105(a), 1123(a)(5), 1123(b)(6), or the court's "residual authority."

   f.  Conclusion Regarding Statutory Authority

Because equitable power of bankruptcy courts must be exercised within the confines of the Bankruptcy Code, and the code does not authorize the releases and injunctions, there was no statutory authority for the court to grant them.  This conclusion comports with statutory interpretation, Third Circuit case law, Supreme Court cases, and the premise that no equitable power gives the bankruptcy court authority to grant legal relief.

/ / /

/ / /

4. *The Bankruptcy Court Erred in Applying "Guidelines" to Grant Nondebtor Releases*

The bankruptcy court erred in applying judge-created "guidelines" and "factors" to reach the legal conclusions that the releases and injunctions were proper under federal caselaw.

a. It was Error to Apply Federal Common Law to State Law Tort Claims

Non-bankruptcy state law governs the substance of direct claims against nondebtors. Federal courts, including bankruptcy courts, cannot make common law to govern state law claims. This rule is grounded in the Rules Enabling Act, 28 U.S.C. § 2072, as interpreted in *Erie v. Tompkins*, 304 U.S. 64 (1938).[7] The Rules Enabling Act provides (with emphasis added):

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts ... *and courts of appeals.*

---

[7] The *Erie* Doctrine applies to bankruptcy courts exercising "related to" jurisdiction. *Marshall v. Marshall*, 547 U.S. 293, 313 (2006) (if a state law claims is subject to "related to" jurisdiction, "[i]t is clear, under *Erie*, that [state] law governs the substantive elements of [the] claim."); *see also*, *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (non-bankruptcy "state law governs the substance of claims" asserted in federal court under bankruptcy jurisdiction); *see generally* Alfred Hill, *The Erie Doctrine in Bankruptcy*, 66 Harv. L. Rev. 1013 (1953).

49

**EXHIBIT 8**                    **Page 59 of 81**

    (b)    ***Such rules shall not abridge, enlarge or modify any substantive right.***  All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

In *Erie*, the Supreme Court expanded its interpretation of the Rules Enabling Act and held that federal courts must apply state common law (as well as state statutes) when adjudicating state law claims.  304 U.S. at 78.  "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State....  There is no general federal common law." *Id*. The Supreme Court analyzed constitutional problems with courts applying federal common law.  First, doing so offends federalism because the judiciary does not have the power to create substantive law in substantive areas governed by state law.  Second, it offends principles of separation of power because Congress, as the legislative branch, is charged with making laws, not judges.

The releases and channeling injunctions extinguish the substantive state law rights of D&V Claimants and discharge Local Councils and Chartered Organization from all liability.  While the claims are channeled to the Settlement Trust, the rights of abuse

claimants in the Settlement Process are different and greatly

diminished compared to their original state law rights.

The nonconsensual settlement and discharge of state law claims

"abridge" and "modify" the substantive rights of claimants, and

"enlarge" the rights of the putative defendants, by extinguishing

claimants' causes of action without adjudication on the merits.

Bankruptcy courts cannot use federal law to alter these substantive

rights. 28 U.S.C. § 2072(b). Bankruptcy courts must use state law –

not create federal common law – to govern these rights. *Erie*, 304 U.S.

at 78. They cannot apply "guidelines" and "factors" created by federal

judges.

Because this alteration of their state law rights is substantive, the

constitutional limits proscribed by *Erie v. Tompkins* govern:

> That which must govern the parties' rights and obligations
> in federal court under *Erie's* constitutional holding are the
> "*substantive rules* ... applicable in a State" for the state law
> claim. And there can be no question but that *extinguishing*
> those state-law rights and obligations via nonconsensual
> nondebtor release is an alteration that is "substantive" in
> every traditional sense.[8]

---

[8] Amici Curiae *Brief of Bankruptcy Law Professors Ralph Brubaker, George W. Kuney, and Bruce Markell in Support of Appellees*, filed March 18, 2022, *In re Purdue Pharma*, Second Cir. Case No. 22-110, ECF No. 603 at 8.

51

**EXHIBIT 8** **Page 61 of 81**

Here, the bankruptcy court used rules made by federal judges to decide that nonconsensual releases were permissible. Doing so was "an illegitimate and unconstitutional exercise of substantive lawmaking powers" by the bankruptcy court that "contravenes the separation-of-powers limitations embedded in both the Bankruptcy Clause and *Erie*'s constitutional holding." Ralph Brubaker, *Mandatory Aggregation of Mass Tort Liability in Bankruptcy*, 131 Yale L.J.F. 960, 973 (2022). The judge-made guidelines and factors used by the bankruptcy court violate principles of federalism, separation of powers, and the holdings in *Erie*. There is no common law discharge power. The right of a debtor to get a bankruptcy discharge is authorized only by the Bankruptcy Code. *See*, Brubaker at 5 (citing Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge*, 65 Am. Bankr. L.J. 325 (1991)). Without an express grant of authority by Congress, no federal court may create common law rules about when to discharge the debts of a non-bankrupt party.

/ / /

/ / /

b.   It was Legal Error to Conclude the Releases Meet
Federal Law Guidelines

The guidelines are invalid because they violate the *Erie* Doctrine.

Additionally, the bankruptcy court erred in concluding they support

these releases.  The bankruptcy court drew erroneous legal conclusions

from the facts it considered.  Further, the district court erred in

affirming those findings under the "clear error" standard applicable to

findings of fact, not conclusions of law.  Whether the releases and

injunction meet Third Circuit guidelines are not pure findings of fact to

be reviewed for clear error.  These determinations are legal conclusions

or, at most, mixed questions of law and fact.  When "conclusions [] are

but legal inferences from facts" this Court is not bound by them.  *Block

v. Potter*, 631 F.2d 233, 241 (3d Cir. 1980) (internal citation omitted).

Whether the facts support the legal conclusions that the releases and

injunctions met Third Circuit guidelines is subject to *de novo* review by

this Court.  *LTL Management*, 64 F.4th at 99

This Court should reject the bankruptcy court's conclusions.  The

releases and injunctions here do not meet the hallmarks of fairness,

necessity, and specific findings of fact.  *Continental*, 203 F.3d at 214.

Nor do they meet the five factors in *Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).

       i.     *Hallmarks*

First, the releases and injunctions are not fair to Direct Abuse Claimants because, as required for fairness, they will not receive any ***additional*** compensation for their third-party claims. *See*, Continental, 203 F.3d at 213 (discussing need for "additional" compensation). As for claims against Chartered Organizations (other than the Methodists), abuse claimants will not get any additional monetary compensation at all. As discussed above, no Chartered Organization besides the Methodist group is paying any money into the Settlement Trust. The only thing Chartered Organizations are providing is their rights in BSA insurance policies they did not pay for. Abuse claimants will not receive any compensation as a result of those "contributions."

Because the plan has no provision for assessing the separate liability of each potential defendant, a claimant with separate claims against a Chartered Organization or Local Council will receive the same compensation as one with a claim only against BSA. What is more, because the policies paid for by BSA are limited to one payment per

54

**EXHIBIT 8**      **Page 64 of 81**

incident under their "Combined Single Limits" provisions, direct abuse claimants will not receive any additional compensation related to Chartered Organizations' (or Local Councils') rights in BSA policies. *BSA*, 642 B.R. at 528-29. Nor will claimants receive any additional compensation for policies Chartered Organizations bought themselves from Settling Insurers – policies that are not even a shared asset with Debtors. Because the Settling Insurers are paying a lump sum into the Settlement Trust, direct abuse claimants will not receive any additional compensation as a result of Chartered Organizations turning over their own insurance. Nonetheless, abuse claimants must release and channel claims covered by these policies.

Nor are the releases and injunctions fair as to the Local Council settlement. Local Councils and their representatives are getting all the benefits of their own bankruptcies and more – a discharge of all sexual abuse liability (including for fraud and punitive damages) and channeling of claims to the Settlement Trust – without undertaking the burdens of bankruptcy. Local Councils as a group created their own complicated procedure for settlement and now want to be rewarded with releases for getting internal agreement among themselves for the

complicated procedure and settlement they created. The issue is not whether Local Councils agreed to the settlement they came up with but whether that settlement is fair to claimants. *LTL Management*, 64 F.4th at 111 (a sincerely held belief that a plan "creates the best of all possible worlds" is not enough). It is not fair to nonconsenting claimants. Local Councils did not have to fully disclose their assets, analyze whether their contribution was fair and reasonable in light of potential liabilities, or give up most of their assets to creditors, as they would have in their own bankruptcies. Local Councils hold net assets with an estimated aggregate value of $3.3 billion. A20845 (*Disclosure Statement*). They are contributing $665 million to the Settlement Trust.[9] This monetary payment is only 19.8 percent of Local Councils' aggregate net assets, far less than they would have to pay to satisfy creditors in their own bankruptcies.

Second, the releases and injunctions are not necessary for reorganization. Even if necessary for *this* plan of reorganization, they

---

[9] Local Councils are also contributing insurance rights. But those rights are not part of the $33.3 billion in assets, so are beside the point on the issue of whether they contributed substantially all of their assets to satisfy claims of *their* creditors.

56

EXHIBIT 8          Page 66 of 81

are not necessary for *a* plan of reorganization. There was testimony from BSA witnesses at confirmation that the alternate Toggle plan was feasible at the time of confirmation. A02506-09 (Hr. Tr. Day 5 at 72:9-75:13). Counsel for BSA acknowledged this, but argued that the Toggle plan was "not optimal." A05789 (Hr. Tr. Day 20 at 63:14-17). As long as the Toggle plan – or a version of it – was possible, even if not "optimal," the releases in this particular plan were not "necessary." It was error for the lower courts to draw a contrary legal conclusion.

Finally, there are no findings of fact specific to each party being released. There is a 4,808-page list of over 310,000 Chartered Organizations posted on the Omni docket. This list is beside the point. The problem is there was no attempt to analyze the potential liability and available assets of these Chartered Organizations. There were no findings of fact regarding such an analysis and no evidence in the record. Without evidence about their assets – including their own insurance – and what liability they face, it is impossible to determine whether the nondebtors are entitled to bankruptcy protection (see discussion of *LTL Management*, above) or if direct abuse claimants have received reasonable consideration in exchange for the releases they are

forced to give.  To decide that the releases were reasonable without these findings was complete speculation on the part of the bankruptcy court.

Likewise, the findings regarding Local Councils were insufficient to conclude that their contribution was reasonable or fair to abuse claimants or that Local Councils were entitled to bankruptcy protection. While there was some evidence (not sufficient) about the assets and *number* of claims related to each Local Council, there was no analysis of the assets or the liabilities, and no findings of fact, as to each Local Council sufficient to justify their release.  A20822-45, A20882-916 (*Disclosure Statement* spreadsheets of Local Council assets and claims).

ii.     Master Mortgage *Factors*

The *Master Mortgage* factors also weigh against third-party releases and injunctions.  While many of the bankruptcy court's findings of fact concerning these factors may not be in dispute, the legal conclusions the court drew from the factual findings are.  This Court reviews those legal conclusions *de novo*.

Three of the five factors overlap with either jurisdictional issues or the hallmark of fairness.  Those are the factors concerning the "identity

of interest" between the debtor and the third party; whether the nondebtor has contributed substantial assets; and whether the injunctions are "essential" to the reorganization. For the reasons discussed above, those factors are not met and the bankruptcy court erred in drawing the legal conclusion that they were.

The fourth factor is whether the "impacted class" has "overwhelmingly" voted to accept the proposed plan treatment. Only 59 percent of all Direct Abuse Claimants voted in favor of this plan. Those 48,463 were 85.72 percent of the total number who voted, but it does not show "overwhelming" support that the plan could not get more claimants to vote. Over 14 percent (8,073) of Direct Abuse Claimants who voted, voted to reject the plan. A12168-70 (Final Vote Tabulation).

In light of the many cases discussing this factor and concluding that votes of over 90 percent are required in non-asbestos cases, it was error for the bankruptcy court to reach the legal conclusion that the plan had overwhelming support. *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) ("Most courts have held that factor four [of the *Master Mortgage* factors] is satisfied when over ninety percent of the impacted creditors approve the plan.");

*Millennium Labs*, 945 F.3d at 132 (93% agreement); *In re American Family Enters.*, 256 B.R. 377, 392 (D. N.J. 2000) (100% and 99.99% of the affected classes); *Master Mortgage*, 168 B.R. at 938 (94.8% and 96.2%); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 674 (Bankr. D.D.C. 1992) (97%); *A.H. Robins Co.*, 880 F.2d at 700 (94% of tort claimants); *In re AOV Indus.*, 792 F.2d 1140, 1143 (D.C. Cir. 1986) (roughly 90% of in each class); *See also In re USA Gymnastics*, Case No. 18-09108 [D.I. 1776] ¶¶ Q., II. (Bankr. S.D. Ind. Dec. 16, 2021) (100%).

The fifth factor is whether claimants will be paid in full. They will not be. The evidence and BSA's arguments on this issue were confusing, to say the least. BSA's expert witness, Dr. Charles Bates, testified that direct abuse claimants will be paid in full because he believes the direct abuse claims have an aggregate value (in the tort system) between $2.4 and $7.1 billion, most likely between $2.4 and $3.6 billion. *BSA*, 642 B.R. at 556-57. Therefore, the bankruptcy court found that the $2.5 billion committed to the Settlement Trust was sufficient to pay the claims in full. *Id.* at 607. The court reiterated its "payment in full" conclusion after calculating the addition of $200 million in "committed, but contingent funding" and another yet

unavailable, speculative, approximately $400 million in general liability and $4 billion in "unallocated" excess insurance coverage from Non-Settling Insurers, to bring the total to approximately $7 billion. *Id.* at 560-61. "Unallocated" insurance means policies not triggered by the filed abuse claims. *Id.* at 561, n. 277.

There are several problems with the court's findings, Bates's testimony, and the bankruptcy court's conclusion that direct abuse claimants will be paid in full.

First, it is wildly speculative to think there will ever be $7 billion in the Settlement Trust and there are no findings to support such a conclusion. There could not be without a crystal ball and full litigation of all coverage issues. There are no findings of fact related to the certainty that $200 million in contingent funding or $4.4 billion in unsettled insurance coverage will ever be paid into the Settlement Trust. It would be impossible to make such findings because, by definition, this funding is contingent on future events or dependent on coverage litigation and defenses. No one knows how much, if any, of this money will ever go into the Settlement Fund.

The *Master Mortgage* finding requires that a plan "provides" a mechanism for payment, not that it "might provide" for payment. 168 B.R. at 935. The only findings about actual, existing funds provided for payment is the finding that the plan calls for $2,484,200,000 in "noncontingent funding." But the bankruptcy court never directly said it considered this amount sufficient for full payment.

The bankruptcy court made conflicting findings on this point. On the one hand, the court found that the total $7 billion would be in the Settlement Trust:

> The committed, but contingent funding could bring another $200 million into the Settlement Trust. These funds, together with the available allocated insurance against Non-Settling Insurance Companies brings the total to [just over $3 billion].... Finally, *the Settlement Trust assets include* an additional $4 billion in currently unallocated insurance against Non-Settling Insurance Companies [for a total of $7 billion].

642 B.R. at 561, emphasis added. On the other hand, the court correctly found that the plan only gives the Settlement Trustee the ability to negotiate with Non-Settling Insurers to contribute funds equaling the amount of unsettled insurance coverage. *Id.* at 606 ("It also provides the Settlement Trustee a chance ... to negotiate with Non-Settling Insurance Companies with respect to the $400 million in

62

**EXHIBIT 8**                                    **Page 72 of 81**

allocated insurance and $4 billion in unallocated insurance.").  These two findings directly conflict.  It was error to find the Settlement Trust assets include $4.4 billion in unsettled insurance.

The plan itself does not include this $4.4 billion as an asset of the Settlement Trust.  The plan only provides a mechanism for the Settlement Trustee to attempt to negotiate for the unsettled insurance funds.  Any conclusion that $4.4 billion in unsettled insurance definitely will bring the trust assets to $7 billion was erroneous.  Reaching $7 billion would require obtaining, through litigation or settlement, 100 percent of the maximum amount of potentially available insurance from Non-Settling Insurers, including $4 billion in unallocated insurance not triggered by abuse claims.  642 at 561, n. 277.

BSA argued throughout this case that the fears of Non-Settling Insurers that they will have to pay this $4.4 billion are overblown because these assets are subject to further coverage litigation and coverage defenses.  The bankruptcy court made multiple findings about Non-Settling Insurers' right to contest coverage.  *See*, *e.g.*, 642 B.R. at 648.  It is one or the other.  Either Non-Settling Insurers' fears are justified, or these assets are not really available for abuse claimants.

For now, these funds do not exist.  Their availability is speculative and – without evidence or findings concerning the merits of the coverage litigation, defenses, or claims – there is no evidence that the unsettled assets will ever be available to pay claimants "in full" or at all.  It was error to conclude otherwise.

What is more, there is no reason to believe that, if Non-Settling Insurers are to settle, they will settle for 100 percent of these assets. Settling Insurers faced billions of dollars in coverage exposure, given the years of policies with no aggregate limits, but Hartford settled for $787 million, Century for $800 million, Zurich for $52.5 million, and Clarendon for $16.5 million.  642 B.R. at 564-67.  Likewise, Local Councils combined hold $3.3 billion in net assets, including $1.87 billion in unrestricted assets, and settled for only $665 million.  The bankruptcy court erred in finding that any amount of the unsettled insurance is going to the Settlement Trust, let alone that 100 percent of this unsettled insurance will be available to pay claimants.

Second, Bates's testimony does not show payment in full.  With $2,484,200,000 in "noncontingent funding" and estimated administrative expenses of ten percent, there will be $2,235,780,000 in

the Settlement Trust. 642 B.R. at 561; A20534 (*Disclosure Statement*).

Even at Bates's lowest estimate of aggregate tort value, $2.4 billion,

claimants would receive approximately 93 percent payment, not

payment in full. At the higher end of his expected range, $3.6 billion,

abuse claimants would only receive approximately 62 percent payment,

nowhere near payment in full. At the upper end of Bates's possible

range, $7.1 billion, abuse claimants would only receive approximately

31.5 percent.

Further, Bates did not testify that one end of his $2.4 to $3.6

billion range – or any point in the middle – was more or less likely.

Based on his testimony, a 62 percent payment is just as likely as a 93

percent payment, as is any number in between. Even if, for argument's

sake, 93 percent is payment in full, 62 percent is nowhere close. The

bankruptcy court made no findings regarding this potential range of

results and merely concluded that "the Plan provides for payment in

full." 642 B.R. at 607. This Court should reject those findings, as it did

with the "back-of-the-envelope" calculations in *LTL Management*. 64

F.4th at 108 ("[W]e cannot help noting that the casualness of the

calculations supporting the Court's projections engenders doubt as to

whether they were factual findings at all, but instead back-of-the-envelope forecasts....  Still, to the extent they were findings of fact, we cannot say these were inferences permissibly drawn and entitled to deference. [Citation omitted.] Hence, they were clearly erroneous.")

Third, Bates's $2.4 to $3.6 billion valuation range is contrary to the TDP "Matrix" in the plan.  The primary reason he opined that the likely aggregate range was $2.4 to $3.6 billion was his conclusion that the Settlement Trustee would greatly reduce the Base Matrix Value of claims involving single victim abusers.  He, therefore, greatly reduced the value of the 77 percent of claims involving "single abuser[s]" – those claims identifying an abuser not identified in any other claim.  A02765-66 (Hr. Tr. Day 6, 134:1-135:15).  He opined that claims involving single victim abusers have a lower value, therefore "most of the claims will, to emulate the tort values, be scaled downward from the base matrix values…by design."  A02839-40 (*Id.* at 208:13-209:12).

The glaring problem with this opinion is there is no mechanism in the TDP for the Settlement Trustee to scale down the claim values for single victim abusers.  Bates designed the TDP Base Matrix Values and the scaling factors "based on and consistent with BSA's historical abuse

settlements and litigation outcomes." *Id.* at 31:22-32:7. The Base Matrix Values Bates came up with *are* the values for a single victim abuser, as the TDPs clearly state. A01026. The scaling and mitigating factors do not include a factor to decrease the Base Matrix Value for single victim abusers. The scaling factors, on the other hand, specifically increase the Base Matrix Value by different increments if an abuser has multiple victims, depending on the number of victims. *Id.* The TDP only allows the value to be ratcheted up, not down, for the number of victims.

The Settlement Trustee has no authority or discretion to reduce the value of the claim based on a single victim abuser because there is no mitigating factor to allow that. Bates's testimony that claims in the TDP will be scaled downwards from the Base Matrix Values because they involve single victim abusers is simply, flat out wrong. It did not require a competing expert witness to testify to this point. It only requires reading the language of the TDPs.

Fourth, the bankruptcy court disregarded evidence contradicting Bates's $2.4 to $7.1 billion valuation. For example, the Tort Claimants Committee concluded that the aggregate value of direct abuse claims

ranges from $13.5 billion to $73.2 billion. A20534-35 (*Disclosure Statement*). The TCC merely ran basic data through the Matrix about the number of each type of claim (Penetration, Oral Sex, Masturbation, etc.), statutes of limitations, and scaling factors to calculate the range under the Matrix. *Id.* If the TCC's *low* estimate of $13.5 billion is even close, direct abuse claimants will receive only approximately 16.5 percent of the value of their claims, which is obviously not payment in full. Sadly, if the TCC's high estimate of $73.2 billion is correct, claimants will receive only roughly three percent of the value of their claims.

Again, this is not a point on which expert testimony was required. The TCC's calculation and method were simple enough for the bankruptcy court to approve sending it to abuse claimants in the Disclosure Statement.

The bankruptcy court wrongly concluded that the plan provides payment in full to direct abuse claimants.

5. *The Plan Treats Current Claimants Unfairly Compared to Future Claimants*

The Future Claims Representative testified that future claimants will have decades to come forward and the Settlement Trust will have

to remain open until the last one does.  A03249-51 (Hr. Tr. Day 8, 121:19-25, 122:15-123:2).  The Trust can make initial payments but must hold back enough money to cover future claims.  There is no plan deadline for future claimants and they have until the statutes of limitations expire in their states to bring claims.  For example, a minor abused in Cub Scouts (ages six to ten) in Vermont, a state with no statute of limitations, will have until he dies to file a claim, which could be 70 or more years from now.  It is not fair to current claimants to make them wait decades for their compensation.

## VII.   CONCLUSION

The nonconsensual third-party releases and injunctions are contrary to Third Circuit and Supreme Court cases and violate claimants' substantive due process rights.  There is no statutory authority for the releases and injunctions and they are an unconstitutional use of federal common law.  Also, the plan is unfair to current claimants compared to future claimants.  For these reasons and as further discussed above, this Court should reverse the district and bankruptcy court orders and deny confirmation.

/ / /

Dated: July 24, 2023    DUMAS & VAUGHN, LLC

        By:  /s/ Gilion C. Dumas 
        3835 NE Hancock St., Suite GLB
        Portland, OR 97212
        Telephone: (503) 616-5007
        gilion@dumasandvaughn.com

        Charles J. Brown, III, Esquire
        GELLERT SCALI BUSENKELL
        & BROWN LLC
        1201 N. Orange St., 3rd Floor
        Wilmington, DE 19801
        Phone: (302) 425-5813
        Email: cbrown@gsbblaw.com

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit in Federal Rules of Appellate Procedure 32. This brief contains 12,989 words, as calculated by Microsoft Word, excluding the portions of the brief exempted by FRAP 32(f). Further, this brief is prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century.

As required by Local Appellate Rules 28.3(d), I further certify that both attorneys whose names appear on this brief have been admitted to the bar of this court.

I further certify that on July 24, 2023, I served this OPENING BRIEF OF D&V CLAIMANTS on all parties to this appeal through the court's electronic-filing service and as required by FRAP 25(c).

Dated: July 24, 2023                    */s/ Gilion C. Dumas*
                                        Gilion C. Dumas

<u>CERTIFICATE OF SERVICE</u>

I, Charles J. Brown, III, hereby certify that on August 18, 2023, I caused a copy of the forgoing **DECLARATION OF GILION C. DUMAS IN SUPPORT OF THE EMERGENCY RENEWED MOTION OF THE DUMAS & VAUGHN CLAIMANTS FOR STAY**, to be served on all registered users of the Court's Case Management/Electronic Case File ("CM/ECF") in this case via CM/ECF.

DATED: August 18, 2023       GELLERT SCALI BUSENKELL & BROWN LLC

/s/ *Charles J. Brown, III*
Charles J. Brown, III, Esquire (No. 3368)
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

*Counsel for D&V Claimants*