## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC,<br><br>Debtors. | : : : : : : | Chapter 11<br>Case No. 20-10343-LSS<br>(Jointly Administered) |
| NATIONAL UNION FIRE INSURANCE, COMPANY OF PITTSBURGH, PA, *et al*,<br><br>Appellants,<br>v.<br><br>BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC, *et al.*,<br><br>Appellees. | : : : : : : : : : : : : : | Civ. No. 22-1237-RGA<br><br>Jointly Consolidated[1] |

### MEMORANDUM

Before the Court are three emergency motions (D.I. 222, 223, 235) ("Renewed Stay Motions") filed by the Lujan Claimants and the D&V Claimants (together, "Claimants") and certain non-settling insurers ("Certain Insurers," and together with the Claimants, "Appellants") by which Appellants seek to stay "further implementation" of BSA's plan of reorganization—which was confirmed by the Bankruptcy Court on September 8, 2022, affirmed by this Court on March 28, 2023, and which became effective on April 19, 2023—until after the Supreme Court issues its ruling in *Harrington v. Purdue Pharma L.P.,* S. Ct. Case No. 23-124 (2023) ("*Purdue*"). *Purdue*, Appellants argue, "presents a critical question of bankruptcy law also implicated in this case—the permissibility of non-consensual releases to non-debtors." (D.I. 235 at 1). Appellants further seek a stay of their appeals in the Third Circuit, pending the outcome in *Purdue*. The relief sought in the

---

[1] Case Numbers 22-1237, 22-1238, 22-1239, 22-1240, 22-1241, 22-1242, 22-1243, 22-1244, 22-1245, 22-1246, 22-1247, 22-1249, 22-1250, 22-1251, 22-1252, 22-1258, and 22-1263 have been jointly consolidated under Civ. No. 22-1237.

Renewed Stay Motions was denied by the Third Circuit without prejudice to Appellants filing "renewed" motions in this Court. For the reasons set forth below, the Renewed Stay Motions are denied.

I.   **BACKGROUND**

   A.   **Plan Confirmation Order and Affirmance Order**

Following a lengthy and complex proceeding, the Bankruptcy Court confirmed the plan of reorganization, which was supported by every estate fiduciary and the overwhelming majority of abuse survivors. The Plan embodies a global resolution of scouting-related sexual abuse claims. The cornerstone of the Plan is a series of settlements, resolving a complex array of overlapping liabilities and insurance rights, which will establish a compensation fund for abuse survivors—the Settlement Trust. The settlements provide at least $2.46 billion in cash and property to the Settlement Trust benefiting abuse survivors, plus significant unliquidated assets, including valuable insurance rights worth up to another $4 billion plus.

The Plan channels to the Settlement Trust all abuse claims against BSA, related non-Debtor entities, and those covered by insurance policies issued by certain settling insurance companies. It also provides for coextensive nonconsensual releases of the channeled abuse claims. The channeled abuse claims will be processed, liquidated, and paid by a Settlement Trustee in accordance with the Settlement Trust Agreement and Trust Distribution Procedures. (D.I. 1-4, Ex. A). The Trust Distribution Procedures were the subject of intensive negotiations by BSA and various constituencies during the chapter 11 cases. The Bankruptcy Court found that the channeling injunction and releases are the "cornerstone of the Plan," and are necessary to ensure an equitable process by which abuse survivors' claims will be administered and paid. *In re Boy Scouts of Am.*, 642 B.R. 504, 610 (Bankr. D. Del. 2022). Based on BSA's expert's estimate of the aggregate value

of abuse claims, the Bankruptcy Court found that BSA had shown, by a preponderance of the evidence, that the holders of abuse claims will be paid in full. *Id.* at 562.

The Plan allowed BSA to declare that the Effective Date of the Plan had occurred so long as, among other things, this Court had affirmed the Confirmation Order, no court had entered a stay of the Effective Date pending an appeal, and there was no request for a stay of the Effective Date. (*See* D.I. 1-4, Plan, Art. IX.B).

On September 8, 2022, the Bankruptcy Court entered the Plan Confirmation Order. (B.D.I. 10316). Appellants appealed the Confirmation Order to this Court. On March 28, 2023, following two days of oral argument, this Court issued its Order (D.I. 151) ("Affirmance Order") and accompanying opinion, *In re Boy Scouts of Am.*, 2023 WL 2662992 (D. Del. Mar. 28, 2023), affirming the Confirmation Order. On April 10, 2023, Lujan Claimants (D.I. 177), D&V Claimants (D.I. 179), and the various insurance companies that make up the Certain Insurers filed their appeals to the Court of Appeals for the Third Circuit.[2]

### B.  Prior Stay Motions

On March 31 and April 1, 2023, respectively, Certain Insurers and Claimants filed emergency motions for stay pending appeal. (D.I. 152, 154, 156) ("Prior Stay Motions"). They sought a stay of the effectiveness of the Confirmation Order, the Affirmance Order, and the occurrence of the Plan's Effective Date, pending final disposition of their appeals to the Third Circuit. At that time, the temporary stay was set to expire on April 11, 2023. Fed. R. Bankr. P.

---

[2] Notices of appeal were filed by Liberty Insurance Underwriters, *et al.* (D.I. 178), Columbia Casualty Co., *et al.* (D.I. 180); Landmark Insurance Company, *et al.* (D.I. 181); Indian Harbor Insurance Company (D.I. 182); Old Republic General Insurance Group (D.I. 183); Travelers Casualty and Surety Company, Inc. (D.I. 184); Great American Assurance Company, *et al.* (D.I. 185); Allianz Global Risks US Insurance Company, *et al.* (D.I. 186); Argonaut Insurance Company, *et al.* (D.I. 187); Gemini Insurance Company (D.I. 188); General Star Indemnity Company (D.I. 189); and Arrowood Indemnity Company (D.I. 190); and Endurance American Insurance Company (D.I. 191).

8025 ("Unless the district court or BAP orders otherwise, its judgment is stayed for 14 days after entry.") Absent a further stay, Certain Insurers argued that the temporary stay would "expire after Tuesday, April 11" (D.I. 174 at 5), and that the Plan would go effective, at which point the Certain Insurers risked the chance that BSA would argue that the Plan had been substantially consummated and that any appeals were equitably moot, "raising a substantial risk of irreparable harm." (D.I. 152 at 1). On April 11, 2023, this Court denied the Prior Stay Motions, finding that Appellants had failed to carry their burden as to the likelihood of success and irreparable harm. (D.I. 193).

Appellants later moved the Third Circuit for a stay on substantially identical grounds. *Lujan Claimants v. Boy Scouts of Am.*, Case No. 23-1664, D.I. 3 (3d Cir. Apr. 10, 2023); *D&V Claimants v. Boy Scouts of Am.*, Case No. 23-1666, D.I. 2 (3d Cir. Apr. 11, 2023); *Nat'l Union Fire Ins. Co. of Pittsburgh PA., v. Boy Scouts of Am.*, Case No. 23-1668, D.I. 3 (3d Cir. Apr. 11, 2023). The Third Circuit denied Appellants' stay requests. (Case No. 23-1664, D.I. 27; Case No. 23-1666, D.I. 28; Case No. 23-1668, D.I. 24).

On April 19, 2023 ("Effective Date"), the Plan became effective and BSA emerged from bankruptcy. (B.D.I. 11119).

On July 24, 2023, Appellants filed opening briefs in the Third Circuit. BSA's and other appellees' response briefs are due on October 10, 2023.

### C. Renewed Stay Motions

On August 10, 2023, the Supreme Court granted certiorari to consider the *Purdue* appeal.

On August 16, 2023, four months after the Effective Date, D&V Claimants filed a motion in the Third Circuit "to stay the BSA's reorganization plan" and "to stay all appeals" until the Supreme Court rules in *Purdue*. (Case No. 23-1666, D.I. 81). Lujan Claimants filed a motion the next day seeking identical relief. (Case No. 23-1664, D.I. 87). On August 18, 2023, the Third

Circuit issued an order denying Claimants' motions "without prejudice to filing renewed stay motions in the district court." (*See* Case No. 23-1664, D.I. 88; Case No. 23-1666, D.I. 85).

Claimants filed the Renewed Stay Motions in this Court on the same day. (D.I. 222, 223). On August 25, 2023, Certain Insurers filed their motion in this Court seeking the same relief. (D.I. 235). Consolidated responses to the Renewed Stay Motions were filed by appellees including BSA and certain settling insurers. (D.I. 240, 241, 244). On September 12, 2023, the Court granted leave to the Trustee of the Settlement Trust established by the Plan to file a consolidated response. (D.I. 238, 246). The Renewed Stay Motions are fully briefed. (D.I. 222, 223, 235, 238, 240, 241, 244, 247, 248, 249). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.   JURISDICTION

Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). While the Court had jurisdiction over the appeals from the final Confirmation Order, the Court's Affirmance Order has since been appealed to the Third Circuit. As a general rule, the filing of a notice of appeal is an event of jurisdictional significance, which immediately confers jurisdiction on the court of appeals and divests the district court of jurisdiction over the subject matter of the appeal in order to avoid confusion and maintain the integrity of the appeal process. *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *Venen v. Sweet*, 758 F. 2d 117, 120 (3d Cir. 1985). Rule 8(a) of the Federal Rules of Appellate Procedure recognizes a limited exception to this general rule by affording a party the

opportunity to "move first in the district court for ... a stay of the judgment or order of a district court pending appeal." Fed. R. App. P. 8(a)(1)(A). In denying Claimants' motions for stay pending appeal "without prejudice to filing renewed stay motions in the district court," the Third Circuit cited Rule 8(a). (Case No. 23-1664, D.I. 88; Case No. 23-1666, D.I. 85). The Federal Rules of Bankruptcy Procedure provide the same authority. *See* Fed. R. Bankr. P. 8025(b) ("the district court ... may stay its judgment pending an appeal to the court of appeals").[3]

The Prior Stay Motions clearly sought a stay of the Court's Affirmance Order—the entry of which was a precondition to the effectiveness of the Plan (*see* D.I. 152 at 16)—which was relief this Court had jurisdiction to grant. The Renewed Stay Motions seek to stay any "further implementation of the Plan" which became effective five months ago. (*See* D.I. 235 at 1). Thus, notwithstanding Appellants' description of their motions as "renewed" requests for relief, the Renewed Stay Motions seek entirely different relief than previously sought.

To the extent that the Renewed Motions seek a separate order staying "further implementation" of the Plan, the Court of Appeals has authority to "issue any order appropriate to preserve the status quo." Fed. R. Bankr. P. 8025(d)(4). This Court, on the other hand, has authority to stay its own order and proceedings. Fed. R. Bankr. P. 8025(b). To the extent that the Renewed Stay Motions seek a stay of the Affirmance Order—under an apparent theory that staying the Affirmance Order will also stay the Confirmation Order[4] and accordingly stay "further

---

[3] *See also In re W.R. Grace & Co.*, 2008 WL 5978951, at *3 (D. Del. Oct. 28, 2008) (collecting cases and "sid[ing] with the majority in concluding that jurisdiction is retained to hear" a motion for a stay while an appeal is pending); *In re Lambert Oil Co., Inc.*, 375 B.R. 197, 199 (W.D. Va. 2007) ("In light of the recognized inherent power of inferior courts to preserve the status quo pending appeals, the fact that Rule [8025] [formerly Rule 8017] appears to anticipate a stay prior to the filing of a notice of appeal, does not preclude the opposite.")

[4] Fed. R. Bankr. P. 8025(c) ("If the district court ... enters a judgment affirming an order, judgment, or decree of the bankruptcy court, a stay of the district court's ... judgment automatically stays the bankruptcy court's order, judgment, or decree for the duration of the appellate stay.")

implementation" of the Plan[5]—the Court may consider such relief. To the extent that the Renewed Stay Motions seek a stay of the Third Circuit appeals themselves, including whatever briefing has been ordered therein, such a request falls outside of the Court's authority to stay its own orders.

## III. DISCUSSION

### A. A Stay of the Affirmance Order Will Not Return the Parties to the Status Quo

Having determined jurisdiction to consider the limited relief of staying the Affirmance Order—the only action within the Court's jurisdiction at this point—it is unclear what such a stay could accomplish. Generally speaking, a stay pending appeal returns the parties to the status quo—the state of affairs that existed before the order to be reviewed was entered. *Nken v. Holder*, 556 U.S. 418, 429 (2009); *In re Zohar III, Corp.*, 2019 WL 6910285, at *8 (D. Del. Dec. 19, 2019) ("The fundamental purpose of a stay pending appeal is the preservation of the status quo") (citing *In re W.R. Grace*, 2008 WL 5978951, at *6 ("Generally, motions to stay do not impinge upon appellate court review but rather assist 'in maintaining the true status quo pending appeal.' ") (quoting *Sansom Cmte. v. Tr. of the Univ. Pa.*, 735 F.2d 1552, 1554 (3d Cir. 1984)); *In re Campbell*, 2011 WL 4501147, at *5 (Bankr. S.D. Fla. Apr. 13, 2011) ("A stay temporarily negates the impact of an order, to preserve the *status quo* during an appeal. The effect of such a stay, if granted, is as if the order appealed from was not entered."). The relevant status quo for purposes of the Renewed Stay Motions—the state of affairs which existed prior to entry of the Affirmance Order—is the confirmed Plan which had not yet become effective (as entry of the Affirmance Order was a condition precedent to the Plan's effectiveness). But the Plan became effective months ago, and the status quo cannot be preserved or even restored for a whole host of reasons outlined by the Appellees in their consolidated responses and supported by declarations. That an order staying the

---

[5] *See* D.I. 248 at 6 ("The relief sought by the Certain Insurers is to pause the implementation of the Plan, which is only effective as a result of this Court's affirmance of the Confirmation Order.")

Affirmance Order will not return the parties the status quo that existed before its entry—i.e., before the Plan became effective—demonstrates from the outset the problematic nature of the relief requested.

      **B.    Appellants Cite No Precedent Supporting the Extraordinary Relief of Staying "Further Implementation" of an Effective Plan**

It is also unclear how staying the Affirmance Order would "stay further implementation of the Plan," as Appellants request. According to Appellees, a stay is not possible because the Plan has been consummated, and a stay of the Plan, if granted, would "have far reaching and disastrous consequences for the BSA, co-liable third parties, abuse and non-abuse claimants, and other parties." (*See* D.I. 240 at 7). Importantly, Appellees argue, Appellants do not explain how it would be mechanically possible to leave the Reorganized Debtor without the mandates and protections of the Plan for an undetermined length of time.[6] In Certain Insurers' view, the Plan has yet to be consummated, and even if it has, the requested stay will not unwind any part of the Plan, but rather will simply "pause further implementation of the Plan until the Supreme Court clarifies the law of non-debtor releases in *Purdue*." (D.I. 235 at 3, D.I. 248 at 3-4). That the Plan might simply be "paused" at this point is a vast oversimplification of the Reorganized Debtors' circumstances.

As just one example, the Settlement Trust and the DST (a Delaware statutory trust) established on the Effective Date are fully operational and engaged in investing and managing hundreds of millions of dollars of cash and other assets to which it gained title on the Effective Date. (D.I. 242 ("Whittman Decl.") ¶ 7; D.I. 238-2 ("Houser Decl.") ¶¶ 5, 12). A substantial majority of the assets dealt with by the Plan have already been transferred. (Whittman Decl. ¶ 8; Houser Decl. ¶¶ 12-13). These transfers include Local Councils' total contribution of $439 million and the settling insurance companies' contributions of $189.9 million, plus $716 million held in

---

[6] Argument seems likely in December. (S.Ct. No. 23-124 (order of August 10, 2023)).

escrow. (*Id.*) BSA transferred to the Settlement Trust the BSA Settlement Trust Note, the Artwork, the Oil and Gas Interests, and millions of pages of privileged and confidential documents. In addition to cash contributions, Local Councils are selling ninety-six separate parcels of real property for the benefit the Settlement Trust. (*Id.* ¶ 10). To date, eleven such properties have been sold with the consent of the Settlement Trustee, generating approximately $4 million of proceeds that have been paid to the Settlement Trust. (Houser Decl. ¶ 36). The DST has also collected approximately $4.1 million from Local Councils to fund the Pension Plan and payments on the DST Note, with additional payments forthcoming. (Whittman Decl. ¶ 10). The Settlement Trust has collected $2 million in royalty payments from the Oil and Gas Interests and will continue to collect such royalties. (*Id.* ¶ 9).

The Settlement Trust is also vested with exclusive responsibility for all Scouting-related abuse claims against BSA and other protected parties and exclusive rights to pursue contributed causes of action. To this end, the Trustee has been engaged in all aspects of the claims process, including opening the claims processing portal, collecting responses to questionnaires, developing and seeking approval of a proposed audit program, processing expedited distribution claims, publicizing the claims review process and impending distributions, dealing with the hundreds of state court cases referred to the Settlement Trust since the Effective Date, and enforcing the insurance rights assigned to it by BSA and Local Councils.[7]

The substantial and ongoing responsibilities of the Settlement Trust are no bar to staying the Plan, Certain Insurers assert, because, "Trustee derives her authority and the Trust derives its existence from the Plan and Confirmation Order," which can simply be stayed. (D.I. 248 at 6). But if the Plan were stayed and the Settlement Trust were essentially enjoined from fulfilling its duties,

---

[7] *See Houser v. Allianz Global Risks US Ins. Co., et al.*, No. 3:23-cv-01592 (N.D. Tex.) (the "Coverage Action") (seeking coverage under more than 3,000 policies issued to BSA and/or Local Councils from 1942 to 2020).

9

it is unclear who would assume this role or whether the Settlement Trust would even remain authorized to receive ongoing distributions, such as the proceeds of ongoing real property sales and oil and gas royalties. No Appellant attempts to describe what would happen to these assets, distributions, and ongoing expenses if the Plan were stayed. Appellants' reassurance that they ultimately "are not seeking to unwind the Plan" is of no moment in the face of these ongoing concerns.

Setting aside the question of whether the Plan can be paused in any practical sense, Appellants have cited no precedent for the extraordinary relief of staying "further implementation" of a plan that has become effective, for an undetermined length of time, pending appeal. Certain Insurers maintain that such relief is not unprecedented: "When circumstances arise that require judicial intervention after bankruptcy plans have gone into effect, courts analyze requests for a stay by applying the same four familiar factors." (*Id.* at 5). In support, Certain Insurers cite two cases: *In re Player Wire Wheels, Ltd.*, 428 B.R. 767 (Bankr. N.D. Ohio 2010) and *In re CIT Group, Inc.*, 2012 WL 831095 (Bankr. S.D.N.Y. March 9, 2012). While each case applied the traditional four-factor stay analysis in the post-plan confirmation context, neither case supports the extraordinary relief sought here.

The bankruptcy court in *Player Wire Wheels* considered a motion to stay "confirmation of the Chapter 11 Plan of Liquidation" pending appeal, which was filed more than a month after confirmation. 428 B.R. at 768. Noting that it was "not clear what specific relief [movant] seeks," or "what actions this Court is able to stay at this juncture," the bankruptcy court considered and rejected the proposition that it could stay "implementation of the confirmed Plan." *See id.* at 770 (reasoning that even if the court deemed movant's request as one for "a stay of 'implementation of the confirmed plan,' the request was problematic because the primary objective of the Plan—*i.e.*, liquidation of Debtor's assets—has already occurred"). In *CIT Group*, the bankruptcy court

10

considered a creditor's motion to compel arbitration of a "rejection damages claim" and a debtor's competing motion to enjoin that arbitration pending the debtor's appeal of a decision denying subordination of the creditor's claim. The bankruptcy court's analysis focused on interpreting two seemingly contradictory plan provisions: one authorizing liquidation of disputed claims in a non-bankruptcy court (*i.e.*, arbitration) and another giving the bankruptcy court exclusive jurisdiction over such claims. *In re CIT Group, Inc.*, 2012 WL 831095, at *2. The case therefore involved a request for stay pending appeal of a subordination issue as it related to one creditor's claim under the plan's overall claims reconciliation process. It involved no request to stay implementation of the entire plan pending the appeal.

Finally, the Supreme Court's order granting certiorari and staying further proceedings in *Purdue* does not support Appellants' request to stay implementation of a plan either. Certain Insurers assert, "The Plan in this action and the plan in *Purdue* are virtually identical in their architecture." (D.I. 235 at ¶ 2). Maybe so, but the Supreme Court's stay of the *Purdue* cases was granted under different circumstances. Among other things, BSA's Plan became effective five months ago, while the plan in *Purdue* has not yet become effective. So while BSA, tens of thousands of claimants, and numerous third parties have relied on the Plan's effectiveness, there has been no similar reliance on the plan in *Purdue*.

          **C.**    **Appellants Fail to Demonstrate that a Stay Pending Appeal Is Warranted**

Even assuming that that implementation of the Plan could be stayed in any practical sense, or that precedent existed to support such extraordinary relief, Appellants have not carried the burden of demonstrating that a stay is warranted under the four-factor stay analysis.

Appellants bear the burden of establishing that a stay of the Affirmance Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3)

whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

The most critical factors are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citations omitted)). The Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a sliding scale approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Revel AC*, 802 F.3d at 571 (emphasis in text) (cleaned up).

### 1.     Likelihood of Success on the Merits

As to the first factor, a strong showing of the likelihood of success exists if there is "a reasonable chance, or probability, of winning." *In re S.S. Body Armor I., Inc.*, 927 F.3d 763, 772 (3d Cir. 2019) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)).

The court has already considered whether Certain Insurers were likely to succeed on appeal with respect to their arguments, including that (i) the Plan's assignment of insurance rights to the Settlement Trust was impermissible as a matter of law; (ii) the Plan failed to explicitly identify their rights to defend claims or to have input into the defense; and (iii) the Bankruptcy Court erred in its conclusion that the Plan was proposed in good faith. (D.I. 193). Certain Insurers' appeals did not

challenge the Plan on the basis of its third-party releases, and they fail to demonstrate how the *certiorari* grant in *Purdue* improves their likelihood of success on appeal.[8]

Claimants, on the other hand, have challenged the Plan's third-party releases and argued in their Prior Stay Motion that they were likely to succeed on the merits of their challenge based on a (i) lack of jurisdiction to grant the releases, (ii) the absence of statutory authority outside of § 524(g) of the Bankruptcy Code, and (iii) the inability to meet the Third Circuit's hallmarks of permissible nonconsensual releases. (*See* D.I. 156 at 3–6; *see also* D.I. 154 at 5–10). The Court previously determined that the Claimants had failed to satisfy the first element of the stay analysis because the Plan's channeling injunction and releases, and the Bankruptcy Court's detailed analysis and findings in support, comported with Third Circuit law. Neither Third Circuit nor Supreme Court precedent has changed since the Court denied Claimants' prior stay motions. Claimants, who collectively total 140 out of 82,000 survivors, speculate that *Purdue* will find nonconsensual third-party releases to be impermissible under the Bankruptcy Code.

A broad prohibition of nonconsensual third party releases is but one of many potential outcomes in *Purdue*, given the circumstances of that case and the nature of the releases granted. That said, the Supreme Court will consider a question fundamental to Claimants' appeals in *Purdue*: "Whether the Bankruptcy Code authorizes a court to approve ... a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimants' consent." *See Harrington*, S. Ct. No. 23-124 (entry of Aug. 10, 2023). "To obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show," among other things, "a fair prospect that a majority of the Court will vote to reverse the judgment below." *Hollingsworth v.*

---

[8] Indeed, "Certain Insurers take no position on the merits of the issue presented by *Purdue*"—the permissibility of nonconsensual third-party releases. (D.I. 248 at 8). But Claimants have challenged such releases on appeal, Certain Insurers argue, and if the decision in *Purdue* results in modifications to the Plan, "Certain Insurers will be affected." (*Id.*)

13

*Perry,* 558 U.S. 183, 190 (2010). A "fair prospect" that the *Purdue* appeal will succeed equates to a "reasonable chance" of success here. *See In re S.S. Body Armor I,* 927 F.3d at 772 (movant need only demonstrate "a reasonable chance, or probability, of winning") (quotation omitted). The Court agrees that the Supreme Court's grant of stay to consider the issue of nonconsensual third-party releases in *Purdue* signals at least a reasonable chance that Claimants may succeed on their challenge to that aspect of BSA's Plan with respect to their own claims. Claimants have therefore satisfied the first element of the stay analysis.

### 2. Irreparable Harm to Appellants Absent a Stay

To demonstrate irreparable harm absent a stay pending appeal, a movant "must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Revel AC,* 802 F.3d at 571. The movant must establish a resulting injury "that cannot be redressed by a legal or equitable remedy." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir. 1989). Finally, a purely economic injury generally does not meet the burden. *See Revel AC,* 802 F.3d at 572 ("[A] purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement" unless "the potential economic loss is so great as to threaten the existence of the movant's business.") (internal citations omitted).

The Court previously rejected Claimants' arguments that they will suffer irreparable harm because their claims against non-debtors will be released under the Plan:

> These arguments fail because they are premised on the erroneous notion, unsupported by evidence, that [Claimants] will receive more compensation for their claims outside of the Plan. To the contrary, the Bankruptcy Court made a finding of fact, supported by the only record evidence on the matter, and affirmed by this Court, that survivor claims will likely be paid in full under the Plan.

(D.I. 193 at ¶ 28). The Court also found that "Certain Insurers' defenses are preserved, the usual enforcement actions exist, and so, unlike irreparable harm, any harms that Certain Insurers may face

14

can be redressed by a legal or equitable remedy." (*Id.* ¶ 26) (internal quotations omitted). Appellants offer nothing that would lead the Court to revisit these conclusions.

Certain Insurers assert that absent a stay, the Settlement Trustee will continue the Coverage Action, which according to Certain Insurers, seeks to abrogate their contractual rights and coverage defenses based on the Plan. Certain Insurers further assert that claims distributions in a post-*Purdue* plan may be significantly different than what the current Plan provides. (*See* D.I. 235 at 10-11). Such a hypothetical falls far short of posing an injury that is "actual and imminent." *Revel AC,* 802 F.3d at 571. Certain Insurers merely identify potential judicial inefficiency and increased costs stemming from the Settlement Trust's continued prosecution of the Coverage Action if the Supreme Court's future ruling in *Purdue*—the nature and scope of which is unknown—ultimately unwinds the Plan and, by extension, affects the Settlement Trust's pursuit of the Coverage Action or distribution on claims.

Certain Insurers also rehash their assertions of irreparable harm based on the risk of equitable mootness, which this Court previously rejected. "The mere possibility that [an] objection[] may become moot after the confirmation order becomes effective by itself is insufficient to demonstrate irreparable injury for purposes of the stay." *In re Exide Holding, Inc.*, No. 20-1402, D.I. 32 (Oct. 22, 2020 Hr'g Tr. at 78:8–12) (D. Del. 2020). If the risk of equitable mootness alone were sufficient to show irreparable harm, "a stay would be issued in every case of this nature pending appeal." *In re W.R. Grace,* 475 B.R. 34, 207 (D. Del. 2012). With respect to the Claimants—who, like Certain Insurers, simultaneously argue that "there is no statutory or constitutional basis for equitable mootness" (D.I. 222 at 9; D.I. 247 at 9) and that "the risk ... of equitable mootness is enough to find irreparable harm," (D.I. 222 at 3; D.I. 223 at 24)—the potential harm that would result from an equitable mootness determination is remote and

15

speculative because abuse claims are paid in full under the Plan. This factor weighs against granting a stay.

### 3. Balance of Harms

Upon satisfaction of the first two factors,[9] courts assess the harm to the opposing parties and weigh the public interest. *Nken*, 556 U.S. at 435. In particular, courts balance the harms by weighing the likely harm to the movant absent a stay, the second factor, against the likely harm to stay opponents if the stay is granted, the third factor. *Revel*, 802 F.3d at 569. According to Certain Insurers, a stay of further implementation of the Plan would not cause substantial harm to other parties. "The Trustee has already made progress in setting up the Trust. If a stay is granted but ultimately dissolved, the Trustee can resume her work. Any delay would be relatively short because the Supreme Court has indicated that it will hear argument in *Purdue* in the December argument session." (D.I. 235 at 12-13). Claimants advance similar arguments. (D.I. 222 at 10-11; D.I. 223 at 25-26). They argue that while there will be additional delay, abuse survivors would not be irreparably harmed because (i) a stay would ensure that their claims against nondebtors are treated lawfully, and (ii) the current Plan does not fairly compensate survivors anyway. (*See* D.I. 222 at 10).

As set forth in Appellees' consolidated responses and supporting declarations, BSA, Local Councils, Chartered Organizations, the settling insurance companies, abuse claimants, charitable donors, and numerous other third parties have relied on the Plan's effectiveness. (*See* D.I. 240 at 7-14). If a stay of the Plan is granted, the ability of the Settlement Trust to operate will be thrown into question, and the claims of the 99.8% of abuse claimants who did not object to the Plan will be put back into in limbo. With respect to such abuse claimants, Courts recognize that a delay in

---

[9] Although Appellants have not demonstrated irreparable harm, the Court considers the remaining factors.

distributions is a tangible and substantial harm. *See In re ANC Rental Corp.*, 2002 WL 1058196, at *3 (D. Del. May 22, 2002); *In re W.R. Grace & Co.*, 475 B.R. 34, 208 (D. Del. 2012). Any injury to D&V Claimants and Lujan Claimants, on the other hand, who are likely to be made financially whole by the Settlement Trust, is outweighed by the injury to abuse claimants. This factor also weighs against granting a stay.

### 4. Where the Public Interest Lies

In weighing a request for a stay pending appeal, courts "consider the good of the case as a whole," because the "public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value for all." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007). The "timely resolution of the bankruptcy estate is … in the public interest," while "[a]ctions that needlessly delay a fair settlement agreement deprive claimants of their proceeds while preventing the debtor from completing its reorganization." *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009). The Renewed Stay Motions would, if granted, further the private agendas of less than 0.2% of abuse claimants to the detriment of the 99.8% who will likewise receive full compensation under the Plan. Given the consummation of the Plan and the Settlement Trust's progress in processing abuse claims since this Court's entry of the prior Stay Denial Order, the weight of the public interest has shifted even further in favor of BSA. Abuse survivors with claims against BSA are a largely aged group who should not continue to wait for compensation or closure. *In re Boy Scouts of Am.*, 642 B.R. at 618 (noting testimony that approximately 12,400 of abuse claimants are over the age of 70, and 2,200 of those claimants are over the age of 80). This factor also weighs against granting a stay.

## IV. CONCLUSION

The Court has jurisdiction to stay its Affirmance Order, but as the confirmed Plan became effective months ago, staying that order will not return the parties to the status quo that existed

before its entry. The Renewed Stay Motions seek a stay of "further implementation" of the Plan, for which Appellants cite no precedent. While the Supreme Court's grant of certiorari to consider the issue of nonconsensual third-party releases in *Purdue* signals at least a reasonable chance that Claimants may succeed on their challenge to that aspect of BSA's Plan with respect to their own claims, Appellants have failed to demonstrate that the remaining factors warrant an indefinite stay of "further implementation" of the Plan pending the Supreme Court's decision. For these reasons, the Renewed Stay Motions are denied. A separate order will be entered.

_____
United States District Judge